**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | allowing for activities that would benefit biological values; 2) provide the necessary recreation facilities (e.g., trails, trailheads, staging areas, and camping) to facilitate activity participation; 3) provide basic on-site visitor services (e.g., signs and maps), and 4) clearly post conditions of use throughout the area. | |
| 444. | *Jumbo Mountain ERMA* | | | |
| 445. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>No similar objective (see Jumbo Mountain SRMA). | **Objective:** Focus recreation and visitor services on protecting and facilitating visitor opportunities to provide a variety of established recreation activities (e.g., OHV riding, mountain biking, hiking, and hunting). | **Objective:**<br>Same as Alternative B. |
| 446. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>No similar action (see Jumbo Mountain SRMA). | **Action:**<br>Provide a recreation setting commensurate with other uses that 1) retain a natural-appearing landscape while allowing for activities that would benefit biological values; 2) provide the necessary recreation facilities (e.g., trails, trailheads, staging areas, and | **Action:**<br>Same as Alternative B. |

BLM_0114635

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | camping) to facilitate activity participation; 3) provide basic on-site visitor services (e.g., signs and maps), and 4) clearly post conditions of use throughout the area. | |
| 447. | *Kinikin Hills ERMA* | | | |
| 448. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>No similar objective (see Kinikin Hills SRMA). | **Objective:**<br>Focus recreation and visitor services on protecting and facilitating visitor opportunities to provide a variety of motorized and nonmotorized trail activities (e.g., OHV riding, mountain biking, and hiking). | |
| 449. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>No similar action (see Kinikin Hills SRMA). | **Action:**<br>Provide a recreation setting commensurate with other uses that 1) retain a natural-appearing landscape while allowing for activities that would benefit biological values; 2) provide the necessary recreation facilities (e.g., trails, trailheads, staging areas, and camping) to facilitate activity participation; 3) provide basic, on-site visitor services (e.g., signs and maps), and 4) clearly post conditions of use throughout the area. | |
| 450. | *North Delta ERMA* | | | |
| 451. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>No similar objective (see North Delta SRMA). | **Objective:**<br>Focus recreation and visitor services on protecting and facilitating visitor opportunities to provide a variety of established motorized and nonmotorized recreation activities (e.g., OHV riding, mountain biking, and hiking). | |

BLM_0114636

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 452. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>No similar action (see North Delta SRMA). | **Action:**<br>Provide a recreation setting commensurate with other uses that 1) retain a natural-appearing landscape while allowing for activities that would benefit biological values; 2) provide the necessary recreation facilities (e.g., trails, trailheads, staging areas, and camping) to facilitate activity participation; 3) provide basic, on-site visitor services (e.g., signs and maps), and 4) clearly post conditions of use throughout the area. | |
| 453. | *Paradox Valley ERMA* | | | |
| 454. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>No similar objective (see Paradox Valley SRMA). | **Objective:**<br>Focus recreation and visitor services on protecting and facilitating visitor opportunities to provide a variety of established recreation activities (e.g., OHV riding, mountain biking, hiking, rock climbing and bouldering, rafting, scenic touring, and hunting). | |
| 455. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>No similar action (see Paradox Valley SRMA). | **Action:**<br>Provide a recreation setting commensurate with other uses that 1) retain a natural-appearing landscape while allowing for activities that would benefit biological values; 2) provide the necessary recreation facilities (e.g., trails, trailheads, staging areas, and camping) to facilitate activity participation; 3) provide basic, on-site visitor services (e.g., signs and maps), and 4) clearly post conditions of use throughout the area. | |
| 456. | *Ridgway Trails ERMA* | | | |
| 457. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>No similar objective (see Ridgway Trails SRMA). | **Objective:**<br>Focus recreation and visitor services on protecting and facilitating visitor opportunities to provide a variety of established recreation | **Objective:**<br>Same as Alternative B. |

BLM_0114637

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | activities (e.g., OHV riding, mountain biking, hiking, and hunting). | |
| 458. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>No similar action (see Ridgway Trails SRMA). | **Action:**<br>Provide a recreation setting commensurate with other uses that 1) retain a natural-appearing landscape while allowing for activities that would benefit biological values; 2) provide the necessary recreation facilities (e.g., trails, trailheads, staging areas, and camping) to facilitate activity participation; 3) provide basic, on-site visitor services (e.g., signs and maps), and 4) clearly post conditions of use throughout the area. | **Action:**<br>Same as Alternative B. |
| 459. | *Roubideau ERMA* | | | |
| 460. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>No similar objective (see Roubideau SRMA). | **Objective:**<br>Focus recreation and visitor services on protecting and facilitating visitor opportunities to participate in a variety of backcountry recreation activities (e.g., hiking, horseback riding, hunting, and camping). | **Objective:**<br>Same as Alternative B. |

BLM_0114638

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 461. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>No similar action (See Roubideau SRMA). | **Action:**<br>Provide a recreation setting commensurate with other uses that 1) retain a low level of contrast between developments and the natural surrounding while allowing for activities that would benefit biological values; 2) provide the necessary recreation facilities (e.g., trails and trailheads) to facilitate activity participation; 3) provide basic, on-site visitor services (e.g., signs and maps), and 4) clearly post conditions of use throughout the area. | **Action:**<br>Same as Alternative B. |
| 462. | *San Miguel River ERMA* | | | |
| 463. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>No similar objective (see San Miguel River SRMA). | **Objective:**<br>Focus recreation and visitor services on protecting and facilitating visitor opportunities to provide a variety of established recreation activities (e.g., mountain biking, hiking, rafting, and scenic touring). | **Objective:**<br>Same as Alternative B. |
| 464. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>No similar action (See San Miguel River SRMA). | **Action:**<br>Provide a recreation setting commensurate with other uses | **Action:**<br>Same as Alternative B. |

BLM_0114639

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | that 1) retain a natural-appearing landscape while allowing for activities that would benefit biological values; 2) provide the necessary recreation facilities (e.g., trails, trailheads, staging areas, and camping) to facilitate activity participation; 3) provide basic, on-site visitor services (e.g., signs and maps), and 4) clearly post conditions of use throughout the area. | |
| 465. | *Spring Creek ERMA* | | | |
| 466. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>No similar objective (see Spring Creek SRMA). | **Objective:**<br>Focus recreation and visitor services on protecting and facilitating visitor opportunities to provide a variety of established recreation activities (e.g., OHV riding, mountain biking, hiking, hunting, and camping). | **Objective:**<br>Same as Alternative B. |
| 467. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>No similar action (See Spring Creek SRMA). | **Action:**<br>Provide a recreation setting commensurate with other uses that 1) retain a natural-appearing landscape while allowing for activities that would benefit biological values; | **Action:**<br>Same as Alternative B. |

BLM_0114640

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | 2) provide the necessary recreation facilities (e.g., trails, trailheads, staging areas, and camping) to facilitate activity participation; 3) provide basic, on-site visitor services (e.g., signs and maps), and 4) clearly post conditions of use throughout the area. | |
| 468. | Allowable Use:<br>No similar allowable use in current RMPs. | Allowable Use:<br>No similar allowable use. (ERMAs would not be designated under Alternative B; a CSU would not apply to ERMAs under Alternative C.) | | Allowable Use:<br>**STIPULATION** CSU-51: *Recreation ERMAs.* Apply CSU restrictions in ERMAs. (Refer to Appendix B; Figure 2-23, Appendix A.) |
| 469. | *PUBLIC LANDS NOT DESIGNATED AS RECREATION MANAGEMENT AREAS* | | | |
| 470. | Objective:<br>No similar objective in current RMPs | Objective:<br>Provide for a diversity of quality, sustainable recreational opportunities consistent with other resources and uses, and contribute to local economies. | | |
| 471. | Action:<br>Manage 626,480 acres as public lands not designated as recreation management areas to provide a wide range of diverse recreational opportunities to meet public demands for dispersed recreation. Emphasize providing access, visitor information, and facilities | Action:<br>Manage 432,880 acres as public lands not designated as recreation management areas (i.e., ERMAs or SRMAs; Figure 2-45, Appendix A). | Action:<br>Manage 459,920 acres as public lands not designated as recreation management areas (i.e., ERMAs or SRMAs; Figure 2-46, Appendix A). | Action:<br>Manage 479,220 acres as public lands not designated as recreation management areas (i.e., ERMAs or SRMAs; Figure 2-47, Appendix A). |

BLM_0114641

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A _Current Management (No Action)_ | Alternative B | Alternative C | Alternative D _Agency Preferred_ |
|---|---|---|---|---|
| | needed to address public health and safety standards (BLM 1985, 1989a; Figure 2-44, Appendix A). _Note: Planning guidance in place when the San Juan/San Miguel and Uncompahgre Basin RMPs were written directed that all BLM-administered land not designated as an SRMA should be designated as an ERMA. Under today's recreation guidance, what was formerly the Uncompahgre ERMA would be considered "undesignated" (i.e., neither an ERMA nor an SRMA). As such, the terminology has been updated to reflect more closely the recreation guidance under which this RMP was written to avoid unequal comparisons._ | | | |
| 472. | **COMPREHENSIVE TRAVEL AND TRANSPORTATION MANAGEMENT** | | | |
| 473. | **GOAL:** Manage travel to support the BLM's mission, achieve resource management objectives and provide appropriate, sustainable public and administrative access. | | | |
| 474. | **Objective:** Maintain and improve land health while promoting | **Objective:** Maintain and improve land health while promoting responsible use through active travel management. Within in each Travel Management Area, designate a comprehensive travel management system that | | |

BLM_0114642

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | responsible use through active travel management (BLM 2009a).<br><br>Prioritize travel planning, including the designation of areas open, limited to existing roads and trails, limited to designated roads and trails, and closed to motorized vehicle access (BLM 1985). | achieves resource management objectives, provides appropriate, sustainable public and administrative access, communicates with the public about opportunities, and monitors the effects of use. (Refer to Appendix M, Travel Management, for further information.) | | |
| 475. | **Action:**<br>Identify off-road vehicle designations as follows (Figure 2-48, Appendix A):<br>• Open: 8,560 acres<br>• Closed to motorized travel: 11,950 acres<br>• Closed to motorized and mechanized travel: 44,200 acres<br>• Limited yearlong to existing routes for motorized and mechanized travel: 465,790 acres<br>• Limited yearlong to designated routes for motorized and mechanized travel: 145,300 acres | **Action:**<br>Designate travel areas as follows (Figure 2-49, Appendix A):<br>• Open: 0 acres<br>• Closed to motorized travel: 12,180 acres<br>• Closed to motorized and mechanized travel: 102,790 acres<br>• Limited yearlong to designated routes for motorized and mechanized travel: 560,830 acres<br>• Seasonal limitations: 218,230 acres | **Action:**<br>Designate travel areas as follows (Figure 2-50, Appendix A):<br>• Open: 16,070 acres<br>• Closed to motorized travel: 0 acres<br>• Closed to motorized and mechanized travel: 45,170 acres<br>• Limited yearlong to designated routes for motorized and mechanized travel: 614,560 acres<br>• Seasonal limitations: 19,580 acres | **Action:**<br>Designate travel areas as follows (Figure 2-51, Appendix A):<br>• Open: 0 acres<br>• Closed to motorized travel: 1,160 acres<br>• Closed to motorized and mechanized travel: 57,400 acres<br>• Limited yearlong to designated routes for motorized and mechanized travel: 617,240 acres<br>• Seasonal limitations: 104,940 acres |

BLM_0114643

**Table 2-2
Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | • Seasonal limitations: 59,070 acres | | | |
| 476. | **Action:**<br>Identify the North Delta OHV Area (8,560 acres) as open to OHV use. | **Action:**<br>Manage 0 acres as open to OHV use. (The North Delta OHV area would be limited to designated routes; until a future route-designation process is completed, the preliminary route network would include all existing routes.) | **Action:**<br>Manage 16,070 acres as Open to OHV use:<br>• Portion of North Delta ERMA (5,250 acres)<br>• Kinikin Hills ERMA (10,810 acres) | **Action:**<br>Same as Alternative B. |
| 477. | **Action:**<br>Identify 11,950 acres as closed to motorized travel (except for administrative and permitted use).<br>• Dolores River Canyon SRMA<br>• ACECs<br>  ○ Adobe Badlands<br>  ○ Fairview South<br>  ○ Portions of San Miguel River<br>    – Beaver Canyon<br>    – Norwood Canyon (Clay Creek to Horsefly Creek)<br>• Potter Creek<br>• Saltado Creek | **Action:**<br>Manage 12,180 acres as closed to motorized travel, except for administrative and permitted vehicular access (which would be limited to authorized routes), and with mechanized travel limited to designated routes:<br>• SRMAs<br>  ○ Jumbo Mountain RMZ 1<br>  ○ Kinikin Hills RMZ 2<br>  ○ North Delta RMZ 1<br>  ○ Ridgway Trails<br>  ○ Spring Creek RMZs 1 and 2 | **Action:**<br>No similar action. | **Action:**<br>Manage 1,160 acres as closed to motorized travel, except for with administrative and permitted vehicular access (which would be limited to authorized routes), and with mechanized travel limited to designated routes:<br>• SRMAs<br>  ○ Jumbo Mountain RMZ 1<br>  ○ Ridgway Trails RMZ 1<br>  ○ Spring Creek RMZ 1 |

BLM_0114644

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 478. | **Action:**<br>Manage 44,200 acres as closed to motorized and mechanized travel, except for administrative and permitted vehicular access:<br>• Tabeguache Area<br>• WSAs | **Action:**<br>Manage 102,080 acres as closed to motorized and mechanized travel, except for administrative and permitted vehicular access, which would be limited to authorized routes:<br>• Lands managed to protect wilderness characteristics<br>• SRMAs<br>  ○ Burn Canyon RMZ 1<br>  ○ Dolores River Canyon<br>  ○ Kinikin Hills RMZ 1<br>  ○ Paradox Valley RMZ 4<br>  ○ Roubideau RMZs 1 and 2 (no exceptions for administrative and permitted vehicular access in RMZ 2)<br>  ○ San Miguel River RMZs 2 and 3<br>• Portion of Dolores Slickrock Canyon ACEC (9,790 acres)<br>• Tabeguache Area<br>• WSAs | **Action:**<br>Manage 45,170 acres as closed to motorized and mechanized travel, except for administrative and permitted vehicular access, which would be limited to authorized routes:<br>• Portion of Paradox Rock Art Complex National Register District above Paradox Valley bottom (920 acres)<br>• ERMAs<br>  ○ Adobe Badlands<br>  ○ Dolores River Canyon<br>• Adobe Badlands ACEC<br>• Tabeguache Area<br>• WSAs | **Action:**<br>Manage 57,400 acres as closed to motorized and mechanized travel, except for administrative and permitted vehicular access, which would be limited to authorized routes:<br>• SRMAs<br>  ○ Dolores River Canyon<br>  ○ Roubideau RMZs 1 and 2 (no exceptions for administrative and permitted vehicular access in RMZ 2)<br>  ○ Portion of San Miguel River RMZ 2 (Saltado Canyon; 2,570 acres)<br>  ○ San Miguel River RMZ 3<br>• ACECs<br>  ○ Adobe Badlands<br>  ○ Fairview South (BLM Expansion)<br>  ○ Dolores River Slickrock Canyon<br>• Tabeguache Area<br>• WSAs |
| 479. | **Action:**<br>Identify 145,300 acres as limited to designated routes for motorized and | **Action:**<br>Manage the remaining portion of the planning area (561,540 acres; including landing strips) as limited to designated | **Action:**<br>Manage the remaining portion of the planning area (614,560 acres; including landing strips) | **Action:**<br>Manage the remaining portion of the planning area (617,240 acres and including landing |

BLM_0114645

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | mechanized travel. Manage areas without designated routes (465,790 acres) as limited to existing routes, according to the OHV Area Designations (BLM 2010b; Figure 2-48, Appendix A). | routes for motorized and mechanized travel. Until travel management plans to designate routes are completed, limit areas to existing routes and existing route widths, as shown on Figure 2-49, Appendix A. | as limited to designated routes for motorized and mechanized travel. Until travel management plans to designate routes are completed, limit areas to existing routes and existing route widths, as shown on Figure 2-50, Appendix A. | strips) as limited to designated routes for motorized and mechanized travel. Until travel management plans to designate routes are completed, limit areas to existing routes and existing route widths, as shown on Figure 2-51, Appendix A. |
| 480. | **Action:**<br>Prohibit motorized and mechanized travel seasonally, except for administrative and permitted vehicular access, on 59,070 acres, as follows (Figure 2-48, Appendix A):<br>• The Storm King area (May 15 to June 15)<br>• Closure areas identified in the Dry Creek Travel Management Plan and EA (May 15 to June 15; BLM 2009a)<br>• Closure areas identified in the Uncompahgre Basin RMP (BLM 1989a) | **Action:**<br>Prohibit motorized and/or mechanized travel seasonally, except for administrative and permitted vehicular access, on 218,230 acres, as follows (Figure 2-49, Appendix A):<br>ACECs (motorized and mechanized)<br>○ San Miguel Gunnison Sage-Grouse (April 1 to July 15)<br>○ Sims-Cerro Gunnison Sage-Grouse (April 15 to July 15)<br>• Ecological emphasis areas (motorized) totaling 207,310 acres from December 1 to April 30 (dates may vary depending on data when area travel management plans are completed)<br>○ A portion of Adobe (Zone 1, 11,520 acres)<br>○ A portion of Dry Creek (Zones 1-4, 14,340 acres) | **Action:**<br>Prohibit motorized and/or mechanized travel seasonally, except for administrative and permitted vehicular access, on 19,580 acres, as follows (Figure 2-50, Appendix A):<br>• La Sal ecological emphasis area from January 1 to March 31 (dates may vary depending on data when area travel management plans are completed)<br>• Elk production/ calving areas (motorized and mechanized; May 15 to June 15)<br>• Add other areas as appropriate through future site-specific travel management analyses. | **Action:**<br>Prohibit motorized and/or mechanized travel seasonally, except for administrative and permitted vehicular access, on 103,840 acres, as follows (Figure 2-51, Appendix A):<br>• Ecological emphasis areas totaling 82,120 acres from December 1 to April 30 (dates may vary depending on data when area travel management plans are completed)<br>○ A portion of Adobe (Zone 1, 11,480 acres)<br>○ A portion of Dry Creek (Zone 1, 8,940 acres)<br>○ A portion of Jumbo Mountain/ McDonald Creek (Zones 2 and 3, |

BLM_0114646

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A _Current Management (No Action)_ | Alternative B | Alternative C | Alternative D _Agency Preferred_ |
|---|---|---|---|---|
| | | ○ Jumbo Mountain/McDonald Creek<br>○ La Sal<br>○ Monitor-Potter-Roubideau<br>○ Naturita Canyon<br>○ Ridgway<br>○ San Miguel<br>○ Sims Mesa<br>○ Spring Canyon<br>○ Tabeguache<br>○ Terror Creek<br>• Elk production/ calving areas (motorized and mechanized; April 15 to June 30)<br>• Add other areas as appropriate through future site-specific travel management analyses<br><br>The Field Manager may modify the size and time frames upon consultation with CPW:<br>• if monitoring information indicates that plant seasonal cycles or animal use patterns are inconsistent with dates established, or<br>• under mild winter conditions for the last 60 days of the closure (severity of the winter will be determined on the basis of snow depth, snow crusting, daily mean temperature, and whether the animals were | The Field Manager may modify the size and time frames:<br>• if monitoring information indicates that plant seasonal cycles or animal use patterns are inconsistent with dates established, or<br>• under mild winter conditions for the last 60 days of the closure (severity of the winter will be determined on the basis of snow depth, snow crusting, daily mean temperature, and whether the animals were concentrated on the crucial winter range during winter months).<br>• where necessary, extend seasonal closures to include pedestrian or equestrian traffic. | 4,670 acres)<br>○ A portion of La Sal (Zone 1, 9,860 acres);<br>○ A portion of Monitor-Potter-Roubideau (Zones 1, 2, and 10, 14,260 acres)<br>○ A portion of San Miguel (Zones 1-3, 9,880 acres)<br>○ Sims Mesa (19,650 acres<br>○ Spring Canyon (3,380 acres)<br>• Area closures identified in Dry Creek Travel Management Plan and EA (BLM 2009a)<br>○ December 1 to April 15 (11,010 acres)<br>○ December 1 to March 31 (11,810 acres)<br>• Add other areas as appropriate through future site-specific travel management analyses.<br><br>Prohibit all travel (including motorized, mechanized, foot, and equestrian) seasonally in the Ridgway Trails SRMA, RMZ 2, from December 1 to April 30, except for |

BLM_0114647

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | concentrated on the crucial winter range during winter months).<br>• where necessary, extend seasonal closures to include pedestrian or equestrian traffic. | | administrative and permitted access (1,100 acres).<br><br>The Field Manager may modify the size and time frames upon consultation with CPW:<br>• if monitoring information indicates that plant seasonal cycles or animal use patterns are inconsistent with dates established, or<br>• under mild winter conditions for the last 60 days of the closure (severity of the winter will be determined on the basis of snow depth, snow crusting, daily mean temperature, and whether the animals were concentrated on the crucial winter range during winter months).<br>• where necessary, extend seasonal closures to include pedestrian or equestrian traffic. |
| 481. | **Action:**<br>Use the following guidance for areas that are limited to existing routes until travel management plans to designate routes are completed:<br>• Unless otherwise restricted, limit recreational motorized and mechanized travel to existing routes, | | | **Action:**<br>Use the following guidance for areas that are limited to existing routes until travel |

BLM_0114648

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | and aircraft to existing routes and backcountry air strips, as displayed on Figure 2-48 (Appendix A) and the BLM's 2009 aerial photography (on file at the UFO) until route-by-route analysis is complete.<br>• Permit pedestrian or equestrian travel year-round on existing routes and cross-country travel on public lands throughout the planning area where available for public use.<br>• Prohibit motorized or mechanized modes of travel on existing routes if the following would result:<br>○ Convert or upgrade a single-track route (maximum of 36 inches wide) to a two-track route, such as driving an ATV or full-size passenger vehicle on a route consisting of a single track used by hikers, horseback riders, motorcycles, mountain bikes, game, or livestock.<br>○ Convert or upgrade a route (maximum of 50 inches wide) used by and established for use by an ATV to a wider two-track route, such as would occur if a full-size passenger vehicle were used to travel along a route narrower than its wheelbase.<br>• Require that anyone operating an emergency or administrative motorized vehicle or equipment off existing routes provide the BLM with prior notification and approval. Should prior notification not be possible, require contact with a BLM Authorized Officer within 72 hours following emergency entry.<br>• Address any BLM administrative functions related to resource management objectives that require cross-country travel using motorized vehicles or equipment at the project level on a case-by-case basis and potentially require additional environmental documentation and analysis for certain administrative functions.<br>• Subject the use of motorized or mechanized modes of travel (including snowmobiles) during the execution of BLM-issued authorizations or permits to the terms and conditions or stipulations of each individual authorization on a case-by-case basis.<br>• Avoid impacts on known eligible cultural properties, or minimize or mitigate such impacts in consultation with the State Historical Preservation Office. Where NRHP-eligible sites are known to be in danger or are currently being impacted by travel activities, close routes to travel as necessary until the appropriate mitigation has been implemented.<br>• To mitigate impacts on Colorado hookless cactus (*Sclerocactus glaucus*) and clay-loving wild buckwheat (*Eriogonum pelinophilum*) or other special status species listed in the future, systematically install roadside signs to indicate especially sensitive areas where travel-related impacts on these species would be greater.<br>• Further restrict travel and use by vehicle type or season on any route in order to protect natural or | | | management plans to designate routes are completed:<br>Same as Alternative A, plus<br>• Require that travel modes adhere to the following width restrictions on existing routes:<br>○ Single track: 36 inches or less<br>○ ATV/utility-terrain vehicle: 50 inches or less and weighing no more than 1,200 pounds<br>○ Roads: wider than 50 inches<br>• Prohibit cross-country motorized/mechanized travel for big game retrieval. Allow hand-held, wheeled, game retrieval carts off routes only during CPW-authorized big game and mountain lion hunting seasons.<br>• Unless otherwise restricted, allow users to park motorized or mechanized vehicles next to and parallel to available existing routes. |

BLM_0114649

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | other resources or infrastructure from being impacted by vehicle use in the event of extreme winters and wet conditions to reduce safety hazards, or in other unforeseeable situations, or to better manage or protect other values, such as wetlands, riparian areas, rare plant communities and species, big game, nesting raptors, or other important resources. These actions could include permanent or seasonal route closures or relocations. Take these actions following appropriate emergency closure or other procedures and/or after appropriate site-specific NEPA analysis.<br>• Over time, changes to the route network may be necessary, including adding, designating, relocating, closing, maintaining, and/or changing seasonal or other use restrictions on routes, as well as adding necessary travel management support facilities. Document such changes using appropriate BLM land use planning regulations and NEPA procedures. | | | |
| 482. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Where off-highway vehicles or aircraft are causing or will cause considerable adverse effects on soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, immediately close the affected areas to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence. | | |
| 483. | **Action:**<br>Bring forward the decisions from the Dry Creek Travel Management Plan (BLM 2009a) in the Dry Creek Travel Management Area and the Ridgway Travel Management Plan (BLM 2013a) (Figure 2-80, Appendix A). | | | |
| 484. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Establish Travel Management Areas and, within five years of the Approved RMP/Record of Decision, initiate comprehensive travel management plans within each the following Travel Management Areas and in the following order unless a change is deemed necessary by the BLM Authorized Officer (Figure 2-81, Appendix A):<br>1. North Fork (71,020 acres)<br>2. South Montrose (66,180 acres)<br>3. North Delta (61,270 acres)<br>4. San Miguel (74,960 acres)<br>5. West End (289,960 acres) | | |

BLM_0114650

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | Refer to Appendix M, Travel Management, for information and guidance on comprehensive travel management planning. Travel Management Areas are a planning and management tool and may be altered. At the time of comprehensive travel management planning, the Travel Management Area may be broken down into subareas to address different resource management objectives.<br><br>A travel management plan is not intended to provide evidence bearing on or addressing the validity of any RS 2477 assertions. RS 2477 rights are determined through a process that is entirely independent of the BLM's planning process. Consequently, travel management planning should not take into consideration RS 2477 assertions or evidence. Travel management planning should be founded on an independently determined purpose and need that is based on resource uses and associated access to public lands and waters. At such time as a decision is made on RS 2477 assertions, the BLM will adjust its travel routes accordingly. | | |
| 485. | **Action:**<br>Develop facilities to support the travel management plan, including staging areas, hardened camping areas, trailheads, and portal signs. Allow up to a maximum of three acres of disturbed surface for these facilities. Facilities could include restrooms, loading and unloading ramps, kiosks, hardened graveled parking areas and camping spurs, fencing, hitching rails, picnic tables and cabanas, vehicular control devices, native landscape islands, erosion | **Action:**<br>Develop facilities as needed to support the travel management plan goals and objectives, including staging areas, hardened camping areas, trailheads, and portal signs. Facilities could include restrooms, loading and unloading ramps, kiosks, hardened graveled parking areas and camping spurs, fencing, hitching rails, picnic tables and cabanas, vehicular control devices, native landscape islands, erosion and drainage control devices, hardened access trails, and limited hardened egress, ingress, and winch points where needed for all technical four-wheel drive routes. | | |

BLM_0114651

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | and drainage control devices, hardened access trails, and limited hardened egress and ingress points for all technical four-wheel drive routes. | | | |
| 486. | **Action:** No similar action in current RMPs. | **Action:** Prohibit mechanized and motorized off-route travel in areas with riparian or wetland vegetation. | **Action:** Prohibit mechanized and motorized off-route travel in areas with riparian or wetland vegetation, with the exception of camping, collecting rock, wood products, and other plant products, and retrieving large game during hunting seasons. | **Action:** Prohibit motorized off-route travel in riparian and wetland areas, including for camping and collecting rock, wood products, and other plant products. |
| 487. | **Action:** No similar action in current RMPs. | **Action:** Limit BLM rerouting or relocating needed for mitigation to a corridor 250 feet wide on either side of the centerline of the existing or designated route. | | |
| 488. | **Action:** No similar action in current RMPs. | **Action:** Any emergency or administrative motorized vehicle or equipment use off designated routes on BLM-administered lands would require prior notification and approval. Should prior notification not be possible, contact would be made with the authorized BLM official within 72 hours following emergency entry. | | |
| 489. | **Action:** No similar action in current RMPs. | **Action:** In cooperation with the local communities, counties, and other partners, secure access to and manage a network of roads and trails that ensure management objectives are met and provide connectivity to the surrounding communities. | | |

BLM_0114652

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 490. | **LANDS AND REALTY** | | | |
| 491. | **GOAL:**<br>Meet public needs for land use authorizations (i.e., ROWs, communication sites, utility corridors, leases, permits, and renewable energy resources), land tenure adjustments, withdrawals, and easements in an environmentally responsible manner. | | | |
| 492. | **Objective:**<br>Ensure compatibility of the various multiple uses with environmental protection of natural resources (BLM 1985).<br><br>Generally make public land available for utility corridor development (BLM 1985).<br><br>Open the majority of public lands to development of major utility facilities (BLM 1989a). | **Objective:**<br>Make lands available for land use authorizations, and apply stipulations to ensure the compatibility of multiple use with resource protection. | | |
| 493. | Allowable Use:<br>ROW Exclusion Areas (including renewable energy sites): Manage 85,080 acres as ROW exclusion areas that are not available for locating ROWs or other land use authorizations under any conditions, to include the following (Figure 2-52, Appendix A):<br>• On 3,890 acres (emphasis | Allowable Use:<br>ROW Exclusion Areas (including renewable energy sites): Manage 431,040 acres as ROW exclusion areas that are closed to land use authorizations (Figure 2-53, Appendix A):<br>• Saline/selenium soils<br>• Slopes of 30 percent or greater<br>• Lands within 325 feet of perennial streams | Allowable Use:<br>ROW Exclusion Areas (including renewable energy sites): Manage 44,550 acres as ROW exclusion areas that are closed to land use authorizations (Figure 2-54, Appendix A):<br>• Rare biological soil crust (*Lecanora gypsicola* and *Gypsoplaca macrophylla*) in East Paradox (360 acres) | Allowable Use:<br>ROW Exclusion Areas (including renewable energy sites): Manage 53,700 acres as ROW exclusion areas that are closed to land use authorizations (Figure 2-55, Appendix A):<br>• Roubideau SRMA, RMZ 1<br>• ACECs<br>  ○ Fairview South (BLM Expansion) |

BLM_0114653

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | area F) to protect cultural resources, generally disallow major utility corridors (BLM 1985) <br> • A portion of the federal coal estate (17,350 acres; a portion of emphasis area 7, except for those needed for coal development (BLM 1989a) <br> • Tabeguache Area <br> • WSAs <br> • ACECs <br> ○ Adobe Badlands <br> ○ Needle Rock <br> ○ San Miguel River Corridor; close to the development of major utilities, with the exception of those already established with San Miguel Power Association. In addition, do not authorize ROWs in the relic riparian communities (BLM 1993a) <br> ○ Fairview South (exclusion area for new pipelines) | • Lands within 100 feet of naturally occurring riparian and wetland areas, seeps, and springs <br> • Lands within 2,640 feet (0.50-mile) of either side of a classified surface water-supply stream segment (as measured from the average high-water mark) for a distance of 5 miles upstream of a public water supply intake <br> • Exemplary, ancient, and rare vegetation communities <br> • Ecological emphasis areas (see *Wildlife – Terrestrial* section); <br> • Occupied habitat of known populations of federally threatened and endangered species (see *Special Status Species – General* section) <br> • Gunnison sage-grouse critical habitat <br> • Tabeguache Caves/Tabeguache Pueblos Area and Tabeguache Canyon <br> • Lands managed to protect wilderness characteristics <br> • SRMAs <br> ○ Dolores River Canyon <br> ○ Paradox Valley RMZ 4 <br> ○ Roubideau RMZs 1 and 2 <br> • ACECs | • Tabeguache Area <br> • WSAs <br><br> The following exceptions would apply to ROW exclusions: <br> • Designated West-wide Energy Corridors (section 368 corridors) <br> • 100-foot buffer from the center line of county roads and highways (these areas would be managed as ROW avoidance) <br> • Allow ROWs for private in-holdings or edge-holdings for reasonable access and utilities (these areas would be managed as ROW avoidance) | ○ Biological Soil Crust <br> • Tabeguache Area <br> • WSAs <br> • Suitable WSR segments classified as "wild" (see Table 2-5 [Summary of Wild and Scenic River Study Segments (Alternative D)]) <br><br> The following exceptions would apply to ROW exclusions: <br> • Designated West-wide Energy Corridors (section 368 corridors) <br> • Designated utility corridors <br> • 100-foot buffer from the center line of county roads and highways (these areas would be managed as ROW avoidance) <br> • Allow ROWs for private in-holdings or edge-holdings for reasonable access and utilities (these areas would be managed as ROW avoidance) |

BLM_0114654

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | • Tabeguache Area<br>• WSAs<br>• Suitable WSR segments classified as wild (see Table 2-4 [Summary of Wild and Scenic River Study Segments (Alternatives A and B)])<br><br>The following exceptions would apply to ROW exclusions (these areas would be managed as ROW avoidance):<br>• Designated West-wide Energy Corridors (section 368 corridors)<br>• Designated utility corridors<br>• 100-foot buffer from the center line of county roads and highways<br>• Allow ROWs for private in-holdings or edge-holdings for reasonable access and utilities | | |
| 494. | Allowable Use:<br>In the San Miguel River ACEC outside of relic riparian communities, restrict ROW authorizations to only those with an overriding public need that will not create long-term visual impacts or damage the riparian system (BLM 1993a). | Allowable Use:<br>ROW Avoidance Areas (including renewable energy sites): Manage 195,460 acres as ROW avoidance areas (Figure 2-53, Appendix A):<br>• Lands, streams, and wetlands *not meeting* or *meeting with problems* the BLM Colorado Public Land Health Standards (BLM 1997; Appendix C)<br>• Within 0.25-mile along major river corridors (i.e., Gunnison, North | Allowable Use:<br>ROW Avoidance Areas (including renewable energy sites): Manage 210,390 acres as ROW avoidance areas (Figure 2-54, Appendix A):<br>• Saline/selenium soils<br>• Slopes of or greater than 40 percent<br>• Lands within 1,000 feet of either side of a classified | Allowable Use:<br>ROW Avoidance Areas (including renewable energy sites): Manage 276,500 acres as ROW avoidance areas (Figure 2-55, Appendix A):<br>• Slopes of 30 percent or greater<br>• Within 325 feet of perennial streams<br>• Within 325 feet of naturally |

BLM_0114655

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | Fork Gunnison, San Miguel, Uncompahgre, and Dolores)<br>• Ecological emphasis areas (see *Wildlife – Terrestrial* section)<br>• Sites listed or eligible for listing on the NRHP<br>• SRMAs:<br>  ○ Burn Canyon<br>  ○ Dry Creek<br>  ○ Jumbo Mountain<br>  ○ Kinikin Hills<br>  ○ North Delta<br>  ○ Paradox Valley RMZs 1-3<br>  ○ Ridgway Trails<br>  ○ Roubideau RMZ 3<br>  ○ San Miguel River<br>  ○ Spring Creek<br>• Suitable WSR segments classified as scenic and recreational (see Table 2-4 [Summary of Wild and Scenic River Study Segments (Alternatives A and B)])<br>• Lands within 0.5-mile of either side of centerline of National Trails, except for the Old Spanish National Historic Trail<br>• Lands within 100 meters (328 feet) of either side of centerline of the Old Spanish National Historic Trail | surface water-supply stream segment (as measured from the average high-water mark of a water body) for a distance of 5 miles upstream of a public water supply intake<br>• Exemplary, ancient, and rare vegetation communities<br>• Ecological emphasis areas (see *Wildlife – Terrestrial* section)<br>• Occupied habitat of known populations of federally threatened and endangered species<br>• Sites listed or eligible for listing on the NRHP<br>• ACECs:<br>  ○ Needle Rock<br>  ○ Adobe Badlands<br>  ○ Fairview South<br>• Lands within 100 meters (328 feet) of either side of centerline of National Trails. | occurring riparian and wetland areas, seeps, and springs<br>• Lands within 1,000 feet of either side of a classified surface water-supply stream segment (as measured from the average high-water mark) for a distance of 5 miles upstream of a public water supply intake<br>• Exemplary, ancient, and rare vegetation communities<br>• Ecological emphasis areas (see *Wildlife – Terrestrial* section);<br>• Occupied habitat of known populations of federally threatened and endangered species<br>• Gunnison sage-grouse lek habitat (lek area plus 0.6-mile radius)<br>• Tabeguache Caves/Tabeguache Pueblos Area and Tabeguache Canyon<br>• Sites listed on or eligible for listing on the NRHP<br>• Lands managed to protect |

BLM_0114656

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | | wilderness characteristics<br>• SRMAs<br>  o Dolores River Canyon<br>  o Roubideau RMZs 2 and 3<br>  o San Miguel River RMZs 2 and 3<br>  o Spring Creek RMZ 2<br>• ACECs<br>  o Adobe Badlands<br>  o Needle Rock<br>  o Roubideau Corridors<br>  o Dolores River Slickrock Canyon<br>  o Paradox Rock Art<br>• Suitable WSR segments classified as scenic (see Table 2-5 [Summary of Wild and Scenic River Study Segments (Alternative D)])<br>• Lands within 100 meters (328 feet) of either side of centerline of National Trails |
| 495. | **Action:**<br>Make every reasonable effort to authorize primary access to private landowners via ROWs, when such access will not cause significant adverse impacts on other resources. While county | **Action:**<br>Provide reasonable access and utilities to private landowners in an environmentally responsible manner. New ROWs would not be permitted if there is other reasonable access. | | |

BLM_0114657

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | road standards may be required when environmental impacts can in no other way be mitigated, do not grant additional ROWs when reasonable access already exists, unless there is a compelling public need (BLM 1985). | | | |
| 496. | **Action:**<br>The ROD for the Solar Energy Development PEIS was signed on October 12, 2012 and excluded all lands within the UFO for solar development for projects 20 megawatts or greater. | **Action:**<br>Allow renewable energy projects (such as wind, solar under 20 megawatts, and hydropower) development and operation, except in ROW exclusion areas and areas identified in Table 2-3 (Renewable Energy Exclusion and Avoidance Areas[1]). The ROD for the Solar Energy Development PEIS was signed on October 12, 2012 and excluded all lands within the UFO for solar development for projects 20 megawatts or greater. | | |

BLM_0114658

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 497. | *COMMUNICATION SITES (LAND USE AUTHORIZATIONS)* | | | |
| 498. | **Action:**<br>Manage existing communication sites. | **Action:**<br>Same as Alternative A, plus:<br>• Designate all existing sites for low-power uses (i.e., 1,000 watts effective radiated power or less), except for high-power uses that currently exist.<br>• Evaluate and allow new low- or high-power communication site locations on a case-by-case basis. | **Action:**<br>Same as Alternative A, plus:<br>• Evaluate and allow new low- or high-power communication site locations on a case-by-case basis. | **Action:**<br>Same as Alternative B. |
| 499. | *UTILITY CORRIDORS (LAND USE AUTHORIZATIONS)* | | | |
| 500. | **Action:**<br>Manage the designated West-wide Energy Corridor (26,880 acres) according to existing policy (Appendix B of the West-wide Energy Corridor Programmatic EIS) (Figure 2-56, Appendix A). | **Action:**<br>Same as Alternative A, plus: Designate and manage an additional 14 corridors (37,420 acres) for public utilities and facilities (Figure 2-57, Appendix A):<br>• Dry Creek: 2,500 feet wide<br>• Highway 90: 2,500 feet wide (the highway is generally the centerline but located south of the highway near Biological Soil Crust ACEC in Paradox Valley)<br>• Highway 92: 1,320 feet wide (from the northern edge of highway)<br>• Highway 141: 2,500 feet wide<br>• Highway 145/62: 2,500 feet wide<br>• Hotchkiss-Crawford: 2,500 feet wide | **Action:**<br>Same as Alternative A (Figure 2-58, Appendix A). | **Action:**<br>Same as Alternative B. |

BLM_0114659

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | • Hotchkiss-North Fork: 2,500 feet wide<br>• North Delta: generally 2,500 feet wide, except 1,320 feet wide on small parcels next to the WSA<br>• Oxbow-Hubbard Creek: 1,300 feet wide<br>• South Canal: 200 feet wide (from western edge of canal)<br>• Spring Creek Mesa: 2,500 feet wide<br>• Stevens Gulch Road: 600 feet wide<br>• Western Area Power Association Curecanti-Hayden: 2,500 feet wide<br>• Western Area Power Association Curecanti-Shiprock: 2,500 feet wide | | |
| 501. | **Action:**<br>Identify 297,930 acres (management units 1, 2, 3, 5, portion of 7, 8, 9, 10, 11, 16) as open to development of major utility corridors, including the following:<br>• On 2,510 acres (management unit 7), corridors 0.25-mile wide and located on each side of Colorado Highway 133 (BLM 1989a)<br>• Fairview South ACEC (210 acres), except pipelines | **Action:**<br>Allow ROW development and operation except in ROW exclusion areas. ROWs must follow existing facilities and routes. | **Action:**<br>Allow ROW development and operation except in ROW exclusion areas. Preferred locations are next to existing facilities and routes. | |

BLM_0114660

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A
*Current Management (No Action)* | Alternative B | Alternative C | Alternative D
*Agency Preferred* |
|---|---|---|---|---|
| | and any surface disturbance that would affect threatened or endangered plant species or their potential habitat (BLM 1989a)
• San Miguel River SRMA, subject to visual impact mitigation. Open to major utilities the area downstream of Horsefly Creek until construction and maintenance impacts on the riparian zone reach five percent of the total riparian acreage (BLM 1993a)
• West-wide Energy corridors (3,500 feet wide, 27,460 acres) for oil, gas, and hydrogen pipelines, and electricity transmission and distribution facilities (DOE and BLM 2009) | | | |
| 502. | *LAND TENURE ADJUSTMENTS – DISPOSAL* | | | |
| 503. | **Objective:**
No similar objective in current RMPs. | **Objective:**
Consider disposal of lands that would consolidate public ownership for greater management efficiency while serving the public interest, including communities and their expanding needs. | | |

BLM_0114661

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| 504. | **Action:** No similar action in current RMPs. | **Action:** Desert Land Entry Act/Carey Act Applications: Do not accept new Desert Land Entry or Carey Act applications. | | |
| 505. | **Action:** Identify 9,850 acres as available for disposal (Figure 2-59, Appendix A) (refer to Appendix N, Legal Descriptions of Lands Available for Disposal):<br>• Allow disposal through exchange, boundary adjustment, and the Recreation and Public Purposes Act (BLM 1993a)<br>• Dispose of approximately 2,645 acres through sales, exchanges, or any other title transfer means (BLM 1985)<br>• Identify 84 tracts totaling 7,200 acres for consideration for disposal through sale or exchange (BLM 1994a) | **Action:** Identify 2,650 acres as available for disposal by any method (Figure 2-60, Appendix A) (refer to Appendix N, Legal Descriptions of Lands Available for Disposal). | **Action:** Identify 9,850 acres as available for disposal by any method (Figure 2-61, Appendix A) (refer to Appendix N, Legal Descriptions of Lands Available for Disposal). | **Action:** Identify 1,930 acres as available for disposal by any method (Figure 2-62, Appendix A) (refer to Appendix N, Legal Descriptions of Lands Available for Disposal). |
| 506. | **Action:** Land would be considered for disposal on a case-by-case basis. Intend to retain lands in public ownership, | **Action:** Consider additional lands suitable for disposal by any method if they meet one or more of the following criteria:<br>• Enhance management goals. | **Action:** Consider additional lands suitable for disposal by any method if they meet one or more of the following criteria: | **Action:** Consider additional lands suitable for disposal by any method if they enhance management goals, meet one |

BLM_0114662

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | but consider disposal that would enhance management goals and serve public interest. Allow disposal through exchange, boundary adjustment, and the Recreation and Public Purposes Act (BLM 1993a).<br><br>Allow for disposal of parcels that are not significant or not needed for cultural values, mineral development, water and soil, livestock, wildlife, wild horses, forestry, natural resources, or recreation management (BLM 1985). | • Consolidate BLM ownership.<br>• Serve local community or other government agency needs when in the public interest. | • Same as Alternative B plus:<br>  ○ Resolve unintentional trespass where disposal is the best tool to meet management objectives.<br>  ○ Do not provide public or administrative access. | or more of the following criteria, and do not meet the criteria for retention:<br>• Consolidate BLM ownership.<br>• Serve local community or other government agency needs when in the public interest.<br>• Resolve unintentional trespass where disposal is the best tool to meet management objectives. |
| 507. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Do not dispose of lands within existing withdrawals, powersite classifications, or powersite reserves (19,710 acres) (Figure 2-82, Appendix A) without concurrence from the managing agency (e.g., BOR and DOE). | | |
| 508. | *LAND TENURE ADJUSTMENTS – RETENTION* | | | |
| 509. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>Retain lands in public ownership when it will serve the public interest, protect valuable resources, or achieve management goals. | | |
| 510. | **Action:**<br>Retain in federal ownership a total of 665,950 acres (BLM 1994, 1985; Figure 2-59, | **Action:**<br>Retain public lands not identified for disposal (673,150 acres), except for those lands that meet the criteria for | **Action:**<br>Retain public lands not identified for disposal (665,950 acres), except for those lands | **Action:**<br>Retain public lands not identified for disposal (673,870 acres), except for |

BLM_0114663

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | Appendix A); consider these lands for disposal on a case-by-case basis (BLM 1994a). | disposal, for long-term management (Figure 2-60, Appendix A). | that meet the criteria for disposal, for long-term management (Figure 2-61, Appendix A). | those lands that meet the criteria for disposal, for long-term management (Figure 2-62, Appendix A). |
| 511. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Retain lands that meet one or more of the following criteria:<br>• Lands containing valuable resources<br>• Lands within key/priority habitats<br>• Lands within or next to areas with special designation (i.e., Tabeguache Area, WSAs, lands managed to protect wilderness characteristics, NCAs, ACECs, WSRs, SRMAs)<br>• Lands near communities that would better serve the public interest as open space<br>• Lands that provide public or administrative access<br>• Lands that consolidate BLM ownership<br>• Lands suitable for trail construction to link communities<br>• Lands containing National Historic Trail segments | **Action:**<br>Retain lands that meet one or more of the following criteria:<br>• Lands containing valuable resources<br>• Lands within or next to special designation areas (i.e., Tabeguache Area, WSAs, NCAs, ACECs)<br>• Lands suitable for trail construction to link communities<br>• Lands containing National Historic Trail segments | **Action:**<br>Retain lands that meet one or more of the following criteria:<br>• Lands containing valuable resources<br>• Lands within or next to special designation areas (i.e., Tabeguache Area, WSAs, lands managed to protect wilderness characteristics, NCAs, ACECs, WSRs, SRMAs)<br>• Lands near communities that would better serve the public interest as open space<br>• Lands that provide public or administrative access<br>• Lands that consolidate BLM ownership<br>• Lands suitable for trail construction to link communities<br>• Lands containing National Historic Trail segments |

*Uncompahgre Draft Resource Management Plan Revision and Environmental Impact Statement*

BLM_0114664

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 512. | *LAND TENURE ADJUSTMENTS – ACQUISITION* | | | |
| 513. | **Objective:**<br>Acquire private lands, if available, to facilitate resource goals and objectives (BLM 1989a).<br><br>Acquire easements needed to facilitate management (BLM 1993a). | | | **Objective:**<br>Allow acquisition of nonfederal lands and easements to facilitate resource goals and objectives. |
| 514. | **Action:**<br>Acquire lands that contain sensitive, critical, crucial, and rare habitats to improve and benefit public lands and resources (BLM 1994a).<br><br>Acquire or exchange land and subsurface mineral estate when mineral development, cultural resources, water and soil, livestock, wildlife, forestry, natural resources, ACECs, wilderness values or manageability, or recreation management opportunities will be enhanced (BLM 1985).<br>• Acquire fishing easements associated with priority streams (emphasis area B; BLM 1985)<br>• Acquire easements | **Action:**<br>As opportunities arise, acquire lands or easements as follows:<br>• Access to Jumbo Mountain near Paonia<br>• Access to Ridgway SRMA<br>• Private inholding in Camel Back WSA (Section 3 of Township 49 North, Range 12 West; 160 acres)<br>• Easement to Paradox Rock Art ACEC<br>• Between Bedrock and the Dolores River Canyon WSA | **Action:**<br>No similar action. (Specific lands or easements have not been identified under this alternative.) | **Action:**<br>Same as Alternative B. |

BLM_0114665

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | between Bedrock and the northern boundary of the Dolores River Canyon WSA (BLM 1985) | | | |
| 515. | **Action:**<br>Acquire private lands, if available, if they would meet any of the following criteria:<br>• Improve livestock management.<br>• Increase crucial (now termed severe and winter concentration areas) deer and elk winter range.<br>• Improve riparian management (BLM 1989a).<br><br>In land exchanges, acquire sensitive or critical habitats, where possible (BLM 1994a). | **Action:**<br>Consider acquiring lands or easements that meet the following criteria:<br>• Lands within or next to areas with special designations (e.g., WSAs, lands managed to protect wilderness characteristics, NCAs, ACECs, WSRs, and SRMAs)<br>• Lands within key/priority habitats<br>• Lands containing valuable resources (e.g., recreational, cultural, special status species, riparian, fragile soils, and rare biological soil crusts)<br>• Lands that provide public or administrative access<br>• Lands that consolidate BLM ownership and/or enhance management goals<br>• Riverside parcels and/or associated water rights along the Gunnison, San Miguel, and Dolores Rivers with important riparian values or that provide watershed or water quality protection values (e.g., salinity/selenium and sedimentation)<br>• Lands suitable for trail construction | **Action:**<br>Consider acquiring lands or easements that meet the following criteria:<br>• Lands containing valuable resources (e.g., recreational, cultural, special status species, riparian, fragile soils, and rare biological soil crusts);<br>• Lands suitable for trail construction to link communities<br>• Lands that enhance recreation opportunities | **Action:**<br>Consider acquiring lands or easements that meet the following criteria:<br>• Same as Alternative C, plus:<br>  ○ Lands within or next to areas with special designations (e.g., WSAs, lands managed to protect wilderness characteristics, NCAs, ACECs, and WSRs)<br>  ○ Lands that provide public or administrative access<br>  ○ Lands that consolidate BLM ownership and/or enhance management goals |

*Uncompahgre Draft Resource Management Plan Revision and Environmental Impact Statement*

BLM_0114666

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | • to link communities<br>• Lands that enhance recreation opportunities | | |
| 516. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Reserve public access easements on lands transferred from public ownership (patents) when it would benefit management goals or the public. | | |
| 517. | *WITHDRAWALS* | | | |
| 518. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>Meet resource and other agency needs by withdrawing lands from the public land laws and/or mining laws. | | |
| 519. | Refer to the *Locatable Minerals* section for withdrawals. | | | |
| 520. | **Action:**<br>Where applicable, replace existing withdrawals with ROWs, leases, permits or cooperative agreements (BLM 1985). | **Action:**<br>Where applicable, issue ROWs, leases, other authorizations, or agreements in lieu of withdrawals. | | |
| 521. | **Action:**<br>Upon withdrawal modification or revocation, revert part or all of the withdrawn land to the BLM (BLM 1985). | **Action:**<br>Upon revocation of existing withdrawals, manage the lands consistent with the objectives of adjacent or comparable public lands. | | |
| 522. | **Action:**<br>Maintain existing power site withdrawals pending determination of potential. Do not consider these lands for disposal (BLM 1989a). | **Action:**<br>Maintain existing power site classifications and power site reserves pending determination of potential for power or reservoir-related projects. | | |

BLM_0114667

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 523. | Special Designations | | | |
| 524. | **AREAS OF CRITICAL ENVIRONMENTAL CONCERN** | | | |
| 525. | **GOAL:**<br>Manage ACECs to protect significant resource values and prevent damage to important natural, biological, cultural, recreational, or scenic resources and values, or to protect life and safety from natural hazards. Refer to Appendix O, Summary of Areas of Critical Environmental Concern Report. | | | |
| 526. | **Objective:**<br>Manage the following areas (30,000 acres) as ACECs and RNAs or outstanding natural areas (Figure 2-63, Appendix A):<br>• Adobe Badlands ACEC/ Outstanding Natural Area (6,370 acres)<br>• Fairview South ACEC/ Research Natural Area (210 acres)<br>• Needle Rock ACEC/ Outstanding Natural Area (80 acres)<br>• San Miguel River ACEC (22,780 acres)<br>• Tabeguache Creek ACEC/ Outstanding Natural Area (560 acres) | **Objective:**<br>Manage the following areas (215,840 acres) as ACECs (Figure 2-64, Appendix A):<br>• Coyote Wash ACEC (2,100 acres)<br>• Dolores Slickrock Canyon ACEC (10,670 acres)<br>• East Paradox ACEC (7,360 acres)<br>• Fairview South (CNHP Expansion) ACEC (4,250 acres)<br>• La Sal Creek ACEC (10,490 acres)<br>• Lower Uncompahgre Plateau ACEC (31,810 acres)<br>• Needle Rock ACEC (80 acres)<br>• Paradox Rock Art ACEC (1,080 acres)<br>• Roubideau-Potter-Monitor ACEC (20,430 acres)<br>• Salt Desert Shrub Ecosystem ACEC (34,510 acres; includes the existing Adobe Badlands ACEC)<br>• San Miguel Gunnison Sage-Grouse ACEC (470 acres)<br>• San Miguel River Expansion ACEC | **Objective:**<br>Manage the following areas (29,440 acres) as ACECs (Figure 2-65, Appendix A):<br>• Adobe Badlands ACEC (6,370 acres)<br>• Fairview South ACEC (210 acres)<br>• Needle Rock ACEC (80 acres)<br>• San Miguel River (22,780 acres) | **Objective:**<br>Manage the following areas (51,320 acres) as ACECs (Figure 2-66, Appendix A):<br>• Adobe Badlands ACEC (6,370 acres)<br>• Biological Soil Crust ACEC (1,900 acres)<br>• Dolores River Slickrock Canyon ACEC (9,780 acres)<br>• Fairview South (BLM Expansion) ACEC (610 acres)<br>• Needle Rock ACEC (80 acres)<br>• Paradox Rock Art ACEC (1,080 acres)<br>• Roubideau Corridors ACEC (8,720 acres)<br>• San Miguel River (22,780 acres) |

BLM_0114668

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | (35,480 acres)<br>• Sims-Cerro Gunnison Sage-Grouse ACEC (25,620 acres)<br>• Tabeguache Pueblo and Tabeguache Caves ACEC (26,400 acres)<br>• West Paradox ACEC (5,190 acres) | | |
| 527. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Apply the following management prescriptions to all ACECs:<br>• Manage as ROW exclusion<br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry<br>• Allowable Use: Close to mineral materials disposal<br>• Allowable Use: Close to nonenergy solid mineral leasing | **Action:**<br>No similar action; all management prescriptions are identified below within each ACEC. | |
| 528. | *ADOBE BADLANDS ACEC/OUTSTANDING NATURAL AREA* | | | |
| 529. | **Action:**<br>Manage 6,370 acres of the Adobe Badlands WSA as an ACEC/Outstanding Natural Area to protect unique scenic qualities; threatened and endangered species' habitats (Colorado hookless cactus [formerly Uinta Basin hookless cactus], clay-loving wild buckwheat, and Adobe Hills beardtongue (*Penstemon* | **Action:**<br>No similar action (see Salt Desert Shrub ACEC). | **Action:**<br>Manage 6,370 acres as the Adobe Badlands ACEC to protect federally threatened and BLM-sensitive species and habitats, scenic values, and highly erodible soils; provide for semiprimitive, nonmotorized, recreation opportunities and use, and reduce active erosion. Management actions are as | **Action:**<br>Manage 6,370 acres as the Adobe Badlands ACEC to protect federally threatened and BLM-sensitive species and habitats, scenic values, and highly erodible soils; provide for semiprimitive, nonmotorized, recreation opportunities and use, and reduce active erosion. Management actions are as follows: |

BLM_0114669

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | *retrorsus*)); provide for semiprimitive, nonmotorized, recreation opportunities and use, and reduce active erosion. Management actions are as follows:<br>• Close to off-highway vehicles.<br>• Manage as VRM Class I.<br>• Allowable Use: Close to major utility development.<br>• Prohibit erosion and salinity control measures from using structures or land treatments that would alter scenic values.<br>• Conduct a complete inventory for threatened and endangered species and establish research and monitoring studies.<br>• Allowable Use: Close to coal leasing.<br>• Allowable Use: Recommend for withdrawal from locatable mineral entry.<br>• Allowable Use: Close to mineral materials disposal. | | follows:<br>• Manage for primitive nonmotorized and nonmechanized recreational uses.<br>• Close to motorized and mechanized travel.<br>• Manage as VRM Class II.<br>• Provide such facilities as informational and interpretive signs, designated trail systems for nonmotorized and nonmechanized travel, restrooms, barricades, and fences as needed to protect resources.<br>• Manage for day use only; prohibit camping.<br>• Prohibit campfires.<br>• Manage as ROW avoidance.<br>• Allowable Use: **STIPULATION** CSU-52/SSR-57: *Special Designation ACEC: Surface occupancy or use may be restricted and SSR restrictions applied in the ACEC. (Refer to Appendix B.)* | • Close to motorized and mechanized travel.<br>• Manage as VRM Class II.<br>• Provide such facilities as informational and interpretive signs, designated trail systems for nonmotorized and nonmechanized travel, restrooms, barricades, and fences as needed to protect resources.<br>• Manage for day use only; prohibit camping.<br>• Prohibit campfires.<br>• Manage as ROW avoidance.<br>• Allowable Use: Close to coal leasing.<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing.<br>• Allowable Use: **STIPULATION** NSO-58/SSR-57: *Special Designation ACEC. Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.)* |

BLM_0114670

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | • Allowable Use: **STIPULATION** NSO-UB-7 (BLM 1989a): *Areas of Critical Environmental Concern/Outstanding Natural Areas.* Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.) | | | |
| 530. | *FAIRVIEW SOUTH ACEC/RESEARCH NATURAL AREA* | | | |
| 531. | **Action:** Manage 210 acres as the Fairview South ACEC/Research Natural Area to protect clay-loving wild buckwheat and Adobe Hills beardtongue (*penstemon retrorsus*). Management actions are as follows: • Develop plant monitoring studies in cooperation with the Colorado Natural Areas Program. • Close to OHV use. • Close to development of new pipelines. • Restrict surface-disturbing activities to protect the threatened and | **Action:** Manage 4,250 acres as the Fairview South (CNHP Expansion) ACEC to protect clay-loving wild buckwheat, Colorado desert parsley, Adobe Hills beardtongue, and good-neighbor bladderpod. Management actions are as follows: • Continue monitoring studies in cooperation with Colorado Natural Areas Program. • Close to sheep grazing unless research shows sheep grazing is beneficial or has no impact on clay-loving wild buckwheat. • Allow research on impacts from sheep to clay-loving wild buckwheat. • Close to cattle grazing. • Provide such facilities as informational and interpretive signs, | **Action:** Manage 210 acres as the Fairview South ACEC to protect clay-loving wild buckwheat. Management actions are as follows: • Continue monitoring studies in cooperation with Colorado Natural Areas Program. • Provide facilities such as informational and interpretive signs, designated trail systems for nonmotorized and nonmechanized travel, restrooms, barricades, fences, etc. as needed for resource protection. • Limit motorized and | **Action:** Manage 610 acres as the Fairview South (BLM Expansion) ACEC to protect clay-loving wild buckwheat. Management actions are as follows: • Continue monitoring studies in cooperation with Colorado Natural Areas Program. • Close to sheep grazing except for research. • Allow research on sheep impacts on clay-loving wild buckwheat. • Allow sheep grazing if approved research clearly demonstrates that effects of sheep grazing are beneficial |

BLM_0114671

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | endangered species and their potential habitat.<br>• Continue to allow livestock to graze at current levels unless studies determine threatened and endangered plant species or their potential habitats are being degraded.<br>• Allowable Use: **STIPULATION** NSO-UB-7 (BLM 1989a): *Areas of Critical Environmental Concern/Outstanding Natural Areas.* Prohibit surface occupancy and use in the ACEC (Refer to Appendix B.)<br>• Allowable Use: Recommend for withdrawal from locatable mineral entry and location.<br>• Allowable Use: Close to mineral materials disposal. | designated trail systems for nonmotorized and nonmechanized travel, restrooms, barricades, and fences as needed for resource protection.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage for day use only; prohibit camping.<br>• Prohibit campfires.<br>• Prohibit wood collecting.<br>• Close to wood product sales and/or harvest.<br>• Manage as VRM Class III<br>• Manage as ROW exclusion with additional exceptions; manage these exceptions as ROW avoidance:<br>○ 200 feet of the edge of South Canal, Kinikin Road, and Pahgre Road<br>○ 600-foot buffer on private lands in the Kinikin/Cedar portion (south unit of the ACEC)<br>• Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special Designation ACEC:* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | mechanized travel to designated routes.<br>• Manage as day use only; prohibit camping.<br>• Prohibit campfires.<br>• Prohibit wood collecting.<br>• Close to wood product sales and/or harvest.<br>• Manage as VRM Class IV.<br>• Manage as ROW avoidance.<br>• Allowable Use: **STIPULATION** CSU-52/ SSR-57: *Special Designation ACEC:* Surface occupancy or use may be restricted and SSR restrictions applied in the ACEC. (Refer to Appendix B.) | or have no impact on clay-loving wild buckwheat, through consultation with USFWS.<br>• Close to cattle grazing.<br>• Provide facilities such as informational and interpretive signs, designated trail systems for nonmotorized and nonmechanized travel, restrooms, barricades, fences, etc. as needed for resource protection.<br>• Close to motorized and mechanized travel.<br>• Manage as day use only; prohibit camping.<br>• Prohibit campfires.<br>• Prohibit wood collecting.<br>• Close to wood product sales and/or harvest.<br>• Manage as VRM Class III.<br>• Allowable Use: **STIPULATION** NSO-58/ SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix |

BLM_0114672

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | | B.)<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing.<br>• Manage as ROW exclusion. |
| 532. | *NEEDLE ROCK ACEC/OUTSTANDING NATURAL AREA* | | | |
| 533. | **Action:**<br>Manage 80 acres as the Needle Rock ACEC/Outstanding Natural Area ISA to protect the scientific, interpretive, and scenic qualities of this site. Management actions are as follows:<br>• Manage as unallotted for livestock grazing use.<br>• Limit travel to designated road and trails.<br>• Manage as VRM Class I.<br>• Close to development of major utility facilities.<br>• Manage as a roaded natural area for recreation opportunities, including sightseeing, picnicking, and geologic study.<br>• Allowable Use: | **Action:**<br>Manage 80 acres as the Needle Rock ACEC ISA to protect the scientific, interpretive, and scenic qualities of this site. Management actions are as follows:<br>• Close to livestock grazing.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage as VRM Class II.<br>• Provide such facilities as informational and interpretive signs and maintain existing trails as needed to provide enhanced visitor use, enjoyment, and safety. Maintain existing trail systems and interpretive signs.<br>• Provide adequate protection (e.g., signing, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>• Manage for day use only: prohibit | **Action:**<br>Manage 80 acres as the Needle Rock ACEC ISA to protect the scientific, interpretive, and scenic qualities of this site. Management actions are as follows:<br>• Close to livestock grazing.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage as VRM Class II.<br>• Manage for day use only: prohibit camping.<br>• Prohibit open campfires; require use of stoves or grills.<br>• Prohibit wood collecting.<br>• Manage as ROW avoidance.<br>• Allowable Use:<br>**STIPULATION** NSO-58: | **Action:**<br>Manage 80 acres as the Needle Rock ACEC ISA to protect the scientific, interpretive, and scenic qualities of this site. Management actions are as follows:<br>• Close to livestock grazing.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage as VRM Class II.<br>• Provide such facilities as informational and interpretive signs and maintain existing trails as needed to provide enhanced visitor use, enjoyment, and safety. Maintain existing trail systems and interpretive signs. |

BLM_0114673

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|---|
| | **STIPULATION** NSO-UB-7 (BLM 1989a): *Areas of Critical Environmental Concern/ Outstanding Natural Areas.* Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.)<br>• Allowable Use: Recommend for withdrawal from locatable mineral entry.<br>• Allowable Use: Close to mineral materials disposal. | camping.<br>• Prohibit open campfires: require use of stoves or grills.<br>• Prohibit wood collecting.<br>• Close to wood product sales and/or harvest.<br>• Prohibit rock climbing. | | *Special Designation ACEC.* No surface occupancy or use is allowed in the ACEC. (Refer to Appendix B.) | • Provide adequate protection (signing, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>• Manage for day use only; prohibit camping.<br>• Prohibit open campfires; require use of stoves or grills.<br>• Prohibit wood collecting.<br>• Close to wood product sales and/or harvest.<br>• Prohibit rock climbing.<br>• Manage as ROW avoidance.<br>• Allowable Use: **STIPULATION** NSO-58/SSR-57: *Special Designation ACEC.* No surface occupancy or use is allowed, and SSR restrictions are applied, in the ACEC. (Refer to Appendix B.)<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing.<br>• Recommend to the Secretary of the Interior for |
| | | **Alternative B:**<br>Allowable Use: **STIPULATION** NSO-58/SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the Needle Rock ACEC. (Refer to Appendix B.) | **Alternative B.1** (North Fork area only):<br>Allowable Use: **NO LEASING** NL-11: *Prominent Landmarks.* Close to oil and gas leasing and geophysical exploration the Needle Rock ACEC. (Refer to Appendix B.) | | |

BLM_0114674

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|---|
| | | | | | withdrawal from locatable mineral entry. |
| 534. | *SAN MIGUEL RIVER ACEC* | | | | |
| 535. | **Action:**<br>Manage 22,780 acres as the San Miguel River ACEC to protect unique riparian resources, bird habitat, and scenic values. Management actions are as follows (BLM 1993a):<br>• Continue cooperating with The Nature Conservancy and CPW to study suitability of the San Miguel River for river otter reintroduction. Support reintroduction into suitable habitat.<br>• Manage as VRM Class II, except for the forest management areas from the original RMP (BLM 1985), which is VRM Class IV.<br>• With exception of three forest management areas designated in the original RMP (BLM 1985), close the ACEC to forest | **Action:**<br>Manage 35,480 acres as the San Miguel River Expansion ACEC to protect unique riparian resources, bird habitat, and scenic values. Management actions are as follows:<br>• Manage as VRM Class III.<br>• Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change.<br>• Close to wood product sales and/or harvest.<br>• Close to livestock grazing.<br>• Limit camping to designated sites and areas.<br>• Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit campers from returning to that location for 30 days and/or require them to move out of the ACEC.<br>• Prohibit open campfires; require use of fire pans, stoves, or grills.<br>• Prohibit target shooting (see | | **Action:**<br>Manage 22,780 acres as the San Miguel River ACEC to protect unique riparian resources, bird habitat, and scenic values. Management actions are as follows:<br>• Manage as VRM Class III.<br>• Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change.<br>• Prohibit vegetation projects to improve livestock forage production.<br>• Limit camping to designated sites and areas.<br>• Prohibit open campfires: require use of fire pans, stoves, or grills.<br>• Limit motorized and mechanized travel to designated routes.<br>• Where possible, locate facility development outside | **Action:**<br>Manage 22,780 acres as the San Miguel River ACEC to protect unique riparian resources, bird habitat, and scenic values. Management actions are as follows:<br>• Manage as VRM Class III.<br>• Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change.<br>• Close to wood product sales and/or harvest.<br>• Limit camping to designated sites and areas.<br>• Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit campers from returning to that location for 30 days and/or require them to move out of the ACEC. |

BLM_0114675

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | product disposal unless criteria of improving riparian values and maintaining forest health are met.<br>• Do not attempt to improve forage production through vegetation projects.<br>• Limit camping along the river between Placerville and Sanborn Park Road to two designated sites only.<br>• Limit maximum length of stay to 14 days.<br>• Limit travel to designated routes.<br>• Require that all facility construction protects riparian and scenic values. Where possible, locate facility development outside the 100-year floodplain.<br>• Authorize upgrades to existing electric transmission lines in San Miguel Canyon (BLM 1993a).<br>• Close to development of | *Recreation section for more information).*<br>• Close to recreational mining.<br>• Limit motorized and mechanized travel to designated routes.<br>• Where possible, locate facility development outside the 100-year floodplain.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and restrooms, barricades, and fences, as needed for enhanced visitor use, enjoyment, and safety and to protect sensitive species and their habitats.<br>• Allowable Use: Close to coal leasing.<br>• Allowable Use: **NO LEASING/STIPULATION** NL-16/SSR-57: Special Designation *ACEC.* Close to fluid mineral leasing and geophysical exploration and apply SSR restrictions in the ACEC. (Refer to Appendix B.) | the 100-year floodplain.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and restrooms, barricades, and fences, as needed for enhanced visitor use, enjoyment, and safety and to protect sensitive species and their habitats.<br>Allowable Use:<br>**STIPULATION** CSU-52: *Special Designation ACEC:* Surface occupancy or use may be restricted in the ACEC. (Refer to Appendix B.)<br>• Recreational mining must adhere to the following practices:<br>o All recreational mining activities must take place within the stream channel, no closer than two feet from any stream bank (and/or inter-river island) with established vegetation, and shall be conducted to prevent undercutting of banks; | • Prohibit open campfires; require use of fire pans, stoves, or grills.<br>• Prohibit target shooting (*see Recreation section for more information).*<br>• Limit motorized and mechanized travel to designated routes.<br>• Where possible, locate facility development outside the 100-year floodplain.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and restrooms, barricades, and fences, as needed for enhanced visitor use, enjoyment, and safety and to protect sensitive species and their habitats.<br>• Allowable Use: Close to coal leasing.<br>• Allowable Use: Close to nonenergy solid mineral leasing.<br>• Allowable Use: **STIPULATION** NSO-58: *Special Designation ACEC.* |

BLM_0114676

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | major utilities, with the exception of those already established by the San Miguel Power Association.<br>• Prohibit BLM-permitted actions, such as ROWs, bike trails, and camping areas, in relic riparian communities within the ACEC.<br>• Allowable Use: Close to mineral materials disposal unless disposal is needed to meet management goals for the river or riparian area.<br>• Allowable Use: Close to mineral materials disposal.<br>• Manage mineral development to minimize impacts on riparian and recreation values. | | Material too large to be moved by hand shall remain undisturbed;<br>○ All excavations shall have materials replaced upon completion of operations, and no sites shall be left open in excess of 14 days;<br>○ Operations shall not disturb in excess of two cubic yards of material per day; and<br>○ Anchorage systems (if used) shall not span the stream if it will restrict the free passage of water craft. | Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.)<br>• Allowable Use: Close to mineral materials disposal.<br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.<br>• Ensure that recreational mining adheres to the following practices:<br>○ Prohibit motorized recreational mining (e.g., motorized dredging);<br>○ All activities shall be conducted below existing water surface;<br>○ Material too large to be moved by hand shall remain undisturbed.<br>○ All excavations shall have materials replaced on completion of operations, and no sites shall be left open in excess of 14 days.<br>○ Operations shall not disturb in excess of two cubic yards of material per day. |

BLM_0114677

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 536. | *TABEGUACHE CREEK ACEC/OUTSTANDING NATURAL AREA* | | | |
| 537. | **Action:**<br>Manage 560 acres as the Tabeguache Creek ACEC/ONA to protect cultural resources and aquatic/riparian values. Management actions are as follows (BLM 1985):<br>• Closed to OHV use<br>• VRM Class II<br>• Allowable Use:<br>**STIPULATION** NSO-UB-7 (BLM 1989a): *Areas of Critical Environmental Concern/ Outstanding Natural Areas.* Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.) | **Action:**<br>No similar action (Tabeguache Creek is not proposed as an ACEC under Alternatives B, C, and D; see the proposed Tabeguache Pueblo and Tabeguache Caves ACEC). | | |
| 538. | *COYOTE WASH ACEC* | | | |
| 539. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 2,100 acres as the Coyote Wash ACEC to protect BLM sensitive species. Management actions are as follows:<br>• Manage as VRM Class II.<br>• Provide such facilities as informational and interpretive signs, designated trail systems, camping | **Action:**<br>No similar action (Coyote Wash is not proposed as an ACEC under this alternative). | **Action:**<br>No similar action (this area is within the Dolores River Slickrock Canyon ACEC). |

BLM_0114678

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | areas, restrooms, barricades, and fences, as needed for resource protection.<br>• Allowable Use: **STIPULATION** NSO-58: *Special Designation ACECs.* Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.) | | |
| 540. | *DOLORES (RIVER) SLICKROCK CANYON ACEC* | | | |
| 541. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 10,670 acres as the Dolores Slickrock Canyon ACEC to protect scenic values, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub, and plant communities, and the BLM sensitive species Kachina daisy and Naturita milkvetch. Management actions are as follows:<br>• Close 9,800 acres (overlapping Dolores Canyon WSA) to motorized and mechanized travel.<br>• In the remaining portion of the ACEC (870 acres), limit motorized and mechanized travel to designated routes.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, restrooms, barricades, and fences as needed for resource | **Action:**<br>No similar action (Dolores [River] Slickrock Canyon is not proposed as an ACEC under this alternative). | **Action:**<br>Manage 9,780 acres as the Dolores River Slickrock Canyon ACEC to protect scenic values, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub, and plant communities and the BLM sensitive species Kachina daisy and Naturita milkvetch. Management actions are as follows:<br>• Close to motorized and mechanized travel.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, restrooms, barricades, and fences, as needed for resource |

BLM_0114679

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A Current Management (No Action) | Alternative B | Alternative C | Alternative D Agency Preferred |
|---|---|---|---|---|
| | | protection. <br>• Allow camping only in designated sites and areas. <br>• Prohibit open campfires: require use of fire pans, stoves, or grills. <br>• Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change. <br>• Close to wood product sales and/or harvest. <br>• Require firepans and porta-potties for overnight use if restroom is not available. <br>• Manage as VRM Class II. <br>• Close to recreational mining. <br>• Allowable Use: **NO LEASING/STIPULATION** NL-16/NGD-26: *Special Designation ACEC:* Close to fluid mineral leasing and geophysical exploration and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | protection. <br>• Allow dispersed camping unless otherwise posted. <br>• Prohibit open campfires: require use of fire pans, stoves, or grills. <br>• Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change. <br>• Close to wood product sales and/or harvest. <br>• Require porta-potties for overnight use if restroom is not available. <br>• Manage as VRM Class II. <br>• Allowable Use: **STIPULATION** NSO-58/SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.) <br>• Manage as ROW avoidance. <br>• Recommend to the Secretary of the Interior for withdrawal from locatable |

BLM_0114680

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | | mineral entry.<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing. |
| 542. | *EAST PARADOX/BIOLOGICAL SOIL CRUST ACEC* | | | |
| 543. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 7,360 acres as the East Paradox ACEC to protect potential and known rare biological soil crusts, unique vegetation communities, and BLM sensitive plant, aquatic, and terrestrial wildlife species, including Paradox Valley lupine, Paradox breadroot, roundtail chub, flannelmouth sucker, and peregrine falcon. Management actions are as follows:<br>• Manage as VRM Class III.<br>• Limit motorized and mechanized travel to designated routes.<br>• On 1,810 acres of biological soil crust and gypsipherous plant communities, limit all travel (motorized, mechanized, pedestrian, and equestrian) to designated routes.<br>• Close to camping.<br>• Allowable Use: **STIPULATION** | **Action:**<br>No similar action (East Paradox/Biological Soil Crust is not proposed as an ACEC under this alternative). | **Action:**<br>Manage 1,900 acres as the Biological Soil Crust ACEC to protect biological soil crusts. Management actions are as follows:<br>• Manage as VRM Class II.<br>• Emphasize management and long-term preservation of the biological soil crust community.<br>• Allow surface-disturbing activities associated with research for biological soil crust and gypsipherous plant communities. Conduct a complete inventory for biological soil crust and gypsipherous plant communities.<br>• Locate livestock salt/mineral supplement sites and water sites farther than 0.25-mile |

BLM_0114681

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>Current Management (No Action) | Alternative B | Alternative C | Alternative D<br>Agency Preferred |
|---|---|---|---|---|
| | | NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.)<br>• Allowable Use: **STIPULATION** TL-28: *East Paradox ACEC.* Close the East Paradox ACEC to rock climbing during peregrine falcon breeding season (March 1 to August 15) if peregrine falcons are present. (Refer to Appendix B.)<br>• Allowable Use: Close to coal leasing.<br>• Allow surface-disturbing activities associated with research for biological soil crust and gypsiferous plant communities.<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats. | | from the boundary of the gypsiferous soils (gypsum land and gypsiothorids).<br>• Allow existing livestock watering reservoirs closer than 0.25-mile from the gypsiferous soils to remain; prohibit new reservoirs within 0.25-mile of the gypsiferous soils.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage for day use only; prohibit camping.<br>• Manage as ROW exclusion with the following additional exception:<br>  ○ Allow private edge-holding ROWs for reasonable access and utilities, only if other access is not possible (these areas would be managed as ROW avoidance).<br>• Allowable Use: **STIPULATION** NSO-58/ SSR-57: *Special Designation ACEC.* Prohibit surface |

BLM_0114682

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | | occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)<br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing. |
| 544. | *LA SAL CREEK ACEC* | | | |
| 545. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 10,490 acres as the La Sal Creek ACEC to protect unique vegetation communities and BLM sensitive plant, fish, and wildlife species, including Paradox breadroot, Paradox Valley lupine, desert bighorn sheep, and peregrine falcon. Management actions are as follows:<br>• Limit motorized and mechanized travel to designated routes.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, restrooms, barricades, and fences, as needed for resource | **Action:**<br>No similar action (La Sal Creek is not proposed as an ACEC under Alternatives C and D; it is partially within the Dolores River Slickrock Canyon ACEC under Alternative D). | |

BLM_0114683

2. Alternatives (Management Guidance for Alternatives A, B/B.1, C, and D)

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | protection.<br>• Allow camping only in designated sites and areas.<br>• Manage as VRM Class II.<br>• Manage with additional exceptions for ROW exclusion, including:<br>  ○ 0.25-mile buffer along private lands on the north side of the ACEC<br>• Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special Designation ACEC*: Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | |
| 546. | *LOWER UNCOMPAHGRE PLATEAU ACEC* | | | |
| 547. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 31,810 acres in the area of the Lower Uncompahgre Plateau between the Dry Creek Basin and Roubideau Creek as an ACEC to protect unique cultural resource values. Management actions are as follows:<br>• Manage as VRM Class III.<br>• Limit motorized and mechanized travel to designated routes.<br>• Provide such facilities as informational and interpretive signs, designated trail systems, camping areas, restrooms, barricades, and | **Action:**<br>No similar action (Lower Uncompahgre Plateau is not proposed as an ACEC under Alternatives C and D). | |

BLM_0114684

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | fences, as needed to provide resource protection.<br>• Manage for the protection of the Formative Era and protohistoric Ute occupations in Coalbank Canyon.<br>• Manage for the protection of historic Ute occupations and sacred sites.<br>• Manage for the protection of numerous rock art panels in the region including Dry Creek Overlook, Roatcap Gulch, Big Sandy, and Cushman Creek.<br>• Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | |
| 548. | *PARADOX ROCK ART ACEC* | | | |
| 549. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 1,080 acres in the area of Paradox Rock Art Complex as an ACEC to protect unique cultural resource values, including numerous prehistoric petroglyphs and pictographs. Management actions are as follows:<br>• Manage as VRM Class II.<br>• Limit motorized and mechanized | **Action:**<br>No similar action (Paradox Rock Art is not proposed as an ACEC under this alternative). | **Action:**<br>Manage 1,080 acres in the area of Paradox Rock Art Complex as an ACEC to protect unique cultural resource values, including numerous prehistoric petroglyphs and pictographs in the area. Management actions are as follows: |

BLM_0114685

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A Current Management (No Action) | Alternative B | Alternative C | Alternative D Agency Preferred |
|---|---|---|---|---|
| | | travel to designated routes. <br>• Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, and restrooms, as needed for resource protection. <br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sites. <br>• Allow camping only in designated sites and areas. <br>• Prohibit target shooting (see Recreation section for more information). <br>• Close to rock climbing. <br>• Issue no SRPs. <br>• Allowable Use: **STIPULATION** NSO-58/NGD-26: Special Designation ACEC. Prohibit surface occupancy and use and apply NGD restrictions are applied, in the ACEC. (Refer to Appendix B.) | | • Manage as VRM Class II. <br>• Limit motorized and mechanized travel to designated routes. <br>• Manage as ROW avoidance. <br>• Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, and restrooms, as needed for resource protection. <br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive sites. <br>• Allow camping only in designated sites and areas. <br>• Prohibit target shooting (see Recreation section for more information). <br>• Prohibit rock climbing, except for in designated areas. <br>• Issue no SRPs for competitive events. <br>• Allow organized SRPs for groups up to 25 people. <br>• If resource damage occurs, |

BLM_0114686

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | | close to the action that is causing the damage.<br>• Allowable Use: **STIPULATION** NSO-58/SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)<br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing. |
| 550. | *ROUBIDEAU CORRIDORS AND ROUBIDEAU-POTTER-MONITOR ACEC* | | | |
| 551. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 20,430 acres as the Roubideau-Potter-Monitor ACEC to protect narrowleaf cottonwood/skunkbrush riparian forests, montane and lower montane riparian forests, BLM-sensitive species (peregrine falcon, Grand Junction milkvetch, desert bighorn sheep, and northern leopard frog), and historic | **Action:**<br>No similar action (Roubideau Corridors and Roubideau-Potter-Monitor are not proposed as an ACEC under this alternative). | **Action:**<br>Manage 8,720 acres as the Roubideau Corridors ACEC to protect narrowleaf cottonwood/skunkbrush riparian forests, montane and lower montane riparian forests, BLM-sensitive species (Grand Junction milkvetch, desert bighorn sheep, and |

BLM_0114687

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | | resources. Management actions are as follows:<br>• Manage as VRM Class II.<br>• Limit motorized and mechanized travel to designated routes, in accordance with the Dry Creek Travel Management Plan (BLM 2009a).<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>• Issue no SRPs for competitive events.<br>• Prohibit target shooting *(see Recreation section for more information)*.<br>• Close to wood product sales and/or harvest and Christmas tree cutting.<br>• Allowable use: Close to recreational mining.<br>• Allowable Use: **NO LEASING/STIPULATION** NL-16/NGD-26: *Special Designation ACEC.* Close to fluid mineral leasing and geophysical exploration and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | northern leopard frog), and historic resources. Management actions are as follows:<br>• Manage as VRM Class III.<br>• Limit motorized and mechanized travel to designated routes, In accordance with the Dry Creek Travel Management Plan (BLM 2009a).<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>• Close to wood product sales and/or harvest and Christmas tree cutting.<br>• Manage as ROW avoidance.<br>• Allowable Use: **STIPULATION** NSO-58/SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)<br>• Recommend to the Secretary of the Interior for |

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | | | | withdrawal from locatable mineral entry.<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing. |
| 552. | *SALT DESERT SHRUB ECOSYSTEM ACEC/RESEARCH NATURAL AREA* | | | |
| 553. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 34,510 acres as the Salt Desert Shrub Ecosystem ACEC to protect federally threatened plant species: Colorado hookless cactus; the globally vulnerable and locally imperiled salt desert shrubland; and BLM-sensitive wildlife species, white-tailed prairie dog, burrowing owl, kit fox, ferruginous hawk, and pronghorn antelope. Management actions are as follows:<br>• Manage as VRM Class III.<br>• Limit motorized and mechanized travel to designated routes.<br>• Provide such facilities as informational and interpretive signs, barricades, and fences, as needed to protect resources.<br>• Manage for day use only: prohibit camping.<br>• Prohibit open campfires; require use | **Action:**<br>No similar action (Salt Desert Shrub Ecosystem is not proposed as an ACEC under Alternatives C and D; see Adobe Badlands ACEC). | |

BLM_0114689

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | of stoves or grills.<br>• Prohibit wood collecting.<br>• Allowable Use: Close to coal leasing.<br>• Manage with additional exceptions for ROW exclusion:<br>  ○ 0.25-mile ROW buffer zone along Highway 50 and 200 feet along existing roads<br>  ○ 0.25-mile ROW buffer zone along the south, southeast, and southwest eastern boundaries with private lands.<br>• Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special Designation ACEC*. Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | |
| 554. | *SAN MIGUEL GUNNISON SAGE-GROUSE ACEC* | | | |
| 555. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 470 acres as the San Miguel Gunnison Sage-Grouse ACEC for greater protection and enhancement of Gunnison sage-grouse habitat and to reduce wildlife harassment by other users.<br>• Manage as VRM Class III.<br>• Limit motorized and mechanized travel to designated routes. | **Action:**<br>No similar action (San Miguel Gunnison Sage-Grouse is not proposed as an ACEC under Alternatives C and D). | |

BLM_0114690

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | • Close to motorized and mechanized travel during strutting, nesting, and brood-rearing season (April 1 to July 15) to prevent disturbance to breeding sage-grouse.<br>• Follow recommendations in San Miguel Basin Gunnison Sage-grouse Conservation Plan (San Miguel Basin Gunnison Sage-grouse Working Group 2009). Manage vegetation for optimal Gunnison sage-grouse habitat.<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>• Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special Designation ACEC*. Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | |
| 556. | *SIMS-CERRO GUNNISON SAGE-GROUSE ACEC* | | | |
| 557. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 25,620 acres as the Sims-Cerro Gunnison Sage-Grouse ACEC for greater protection and enhancement of Gunnison sage-grouse habitat and to reduce wildlife harassment by other users. Management includes the following: | **Action:**<br>No similar action (Sims-Cerro Gunnison Sage-Grouse is not proposed as an ACEC under Alternatives C and D). | |

BLM_0114691

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | | • Manage as VRM Class III. <br> • Manage vegetation for optimal Gunnison sage-grouse habitat. <br> • Limit motorized and mechanized travel to designated routes. <br> • Close to motorized and mechanized travel during strutting, nesting, and brood-rearing season (April 1 to July 15) to prevent disturbance to breeding sage-grouse. <br> • Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats. <br> • In cooperation with CPW, develop a Sims-Cerro Gunnison Sage-grouse Conservation Plan. <br> • Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | |
| 558. | *TABEGUACHE PUEBLO AND TABEGUACHE CAVES ACEC* | | | |
| 559. | **Action:** <br> No similar action in current RMPs. | **Action:** <br> Manage 26,400 acres in the area of Tabeguache Pueblos and Tabeguache Caves as an ACEC to protect unique cultural resource values and to protect the Tabeguache Caves. Management actions are as follows: | **Action:** <br> No similar action (Tabeguache Pueblo and Tabeguache Caves is not proposed as an ACEC under Alternatives C and D). | |

BLM_0114692

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | • Manage 5,260 acres within the Tabeguache Area as VRM Class II.<br>• Manage the remaining 21,140 acres as VRM Class III.<br>• Limit motorized and mechanized travel to designated routes.<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive sites.<br>• Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | |
| 560. | *WEST PARADOX ACEC* | | | |
| 561. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 5,190 acres as the West Paradox ACEC to protect unique vegetation communities and BLM sensitive plant and terrestrial wildlife species, including Paradox Valley lupine, Paradox breadroot, and peregrine falcon. Management actions are as follows:<br>• Manage as VRM Class III.<br>• Limit motorized and mechanized travel to designated routes.<br>• Allowable Use: Close to rock climbing during peregrine falcon | **Action:**<br>No similar action (West Paradox is not proposed as an ACEC under Alternatives C and D). | |

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | breeding season (March 1 to August 15) if they are present.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, and restrooms, as needed for resource protection.<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>• Allow camping only in designated sites and areas.<br>• Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | |
| 562. | **WILDERNESS AND WILDERNESS STUDY AREAS** | | | |
| 563. | **GOAL:**<br>Preserve the wilderness character of the Tabeguache Area. | | | |
| 564. | **Objective:**<br>Provide protection and management of the Tabeguache Area (8,060 acres) to maintain wilderness character and potential for inclusion in the National Wilderness Preservation System as directed by Congress in the Colorado Wilderness Act of 1993 (PL 103-77, August 13, 1993). | | | |
| 565. | **Action:**<br>Apply the following management actions to the Tabeguache Area (8,060 | **Action:**<br>Apply the following management actions to the Tabeguache Area (8,060 acres) (Figure 2-67, Appendix A): | **Action:**<br>Apply the following management actions to the Tabeguache Area (8,060 acres) (Figure 2-67, Appendix A):<br>• Same as Alternative A, plus: | |

BLM_0114694

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | acres) (Figure 2-67, Appendix A):<br>• Manage as VRM Class I.<br>• Close to motorized and mechanized travel.<br>• Manage as ROW exclusion.<br>• Closed to wood cutting and wood product sales and harvest<br>• Allowable Use: Withdrawn from locatable mineral entry.<br>• Allowable Use: Close to coal leasing.<br>• Allowable Use: **NO LEASING** NL-17: *Tabeguache Area.* Close to fluid mineral leasing and geophysical exploration. (Refer to Appendix B; Figure 2-19, Appendix A.)<br>• Allowable Use: Close to nonenergy solid mineral leasing.<br>• Allowable Use: Close to mineral materials disposal. | • Same as Alternative A, plus:<br>○ Prohibit target shooting *(see Recreation section for more information)*<br>○ Allowable Use: **STIPULATION** SSR-58: *Tabeguache Area.* Apply SSR restrictions. (Refer to Appendix B; Figure 2-20, Appendix A.) | ○ Allowable Use: **STIPULATION** SSR-58: *Tabeguache Area.* Apply SSR restrictions. (Refer to Appendix B; Figures 2-30 [Alternative C] and 2-31 [Alternative D], Appendix A.) | |
| 566. | **GOAL:**<br>Preserve the wilderness characteristics of WSAs. | | | |

BLM_0114695

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 567. | **Objective:**<br>Preserve wilderness characteristics in WSAs in accordance with nonimpairment standards, as defined in BLM Manual 6330, Management of Wilderness Study Areas until Congress either designates these lands as wilderness or releases them for other purposes. | | | |
| 568. | **Action:**<br>Manage the following WSAs according to BLM Manual 6330, Management of Wilderness Study Areas until Congress either designates them as wilderness or releases them for other uses (Figure 2-67, Appendix A):<br>• Adobe Badlands (10,320 acres)<br>• Camel Back (10,680 acres)<br>• Dolores River Canyon (13,340 acres)<br>• Needle Rock ISA (80 acres)<br>• Sewemup Mesa (1,740 acres) | | | |
| 569. | **Action:**<br>Recommend 13,350 acres of the Dolores River Canyon WSA as suitable for wilderness designation under Section 603 of FLPMA (BLM 1985). | **Action:**<br>No similar action; this action has been completed.<br>*Note: The recommendation action in Alternative A was made over 20 years ago, and societal attitudes, relative rarity of wilderness resources, and conditions on the ground in the WSA may have changed since the original recommendation. The BLM has managed these lands for protection of wilderness characteristics for nearly 30 years.* | | |
| 570. | **Action:**<br>Recommend 22,740 acres as unsuitable for wilderness designation under Section 603 of FLPMA:<br>• Adobe Badlands WSA (10,320 acres; BLM 1989a)<br>• Camel Back WSA (10,680 acres; BLM 1989a)<br>• Sewemup Mesa WSA (1,740 acres; BLM 1991b) | **Action:**<br>No similar action; this action has been completed.<br>*Note: The recommendation action in Alternative A was made over 20 years ago, and societal attitudes, relative rarity of wilderness resources, and conditions on the ground in the WSAs may have changed since the original recommendation. The BLM has managed these lands for protection of wilderness characteristics for nearly 30 years.* | | |

BLM_0114696

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 571. | **Action:**<br>Apply the following management prescriptions to all WSAs:<br>• Manage as VRM Class I.<br>• Manage as ROW exclusion.<br>• Closed to wood cutting and wood product sales and harvest.<br>• Allowable Use: Close to coal leasing.<br>• Allowable Use: Close to nonenergy solid mineral leasing.<br>• Allowable Use: **NO LEASING/STIPULATION** NL-18/NGD-27: *WSAs:* Close to fluid mineral leasing and geophysical exploration and prohibit surface-disturbing activities. (Refer to Appendix B; Figures 2-19 [Alternative A], 2-20 and 2-29 [Alternative B], 2-22 and 2-30 [Alternative C], and 2-23 and 2-31 [Alternative D].) | | | |
| 572. | **Action:**<br>In addition to the above, no similar action. | **Action:**<br>In addition to the above, apply the following management prescriptions to all WSAs:<br>• Prohibit competitive events.<br>• Prohibit target shooting *(see Recreation section for more information)*.<br>• Allowable Use: Close to mineral materials disposal. | **Action:**<br>In addition to the above, apply the following management prescription to all WSAs:<br>• Allowable Use: Close to mineral materials disposal. | **Action:**<br>In addition to the above, apply the following management prescriptions to all WSAs:<br>• Prohibit competitive events.<br>• Allowable Use: Close to mineral materials disposal. |
| 573. | Allowable Use:<br>Close Needle Rock ISA and a portion of Adobe Badlands WSA (6,380 acres [Adobe Badlands ACEC/Outstanding Natural Area and Needle Rock ACEC/Outstanding Natural Area]) to mineral materials disposal. | Allowable Use:<br>No similar allowable use; see management prescriptions for all WSAs. | | |

BLM_0114697

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 574. | **Action:**<br>Close WSAs to motorized and mechanized travel:<br>• Adobe Badlands<br>• Camel Back<br>• Dolores River Canyon<br>• Sewemup Mesa<br><br>(BLM 2009a, 2010b)<br><br>In the Dolores River Canyon WSA:<br>• Prohibit motorized river activities.<br>• Close ways (BLM 1985).<br><br>Limit motorized and mechanized travel in Needle Rock ISA to the one existing county road (BLM 2010b).<br><br>Issue special permits for vehicle use for administration of livestock grazing allotments in Sewemup Mesa WSA. | **Action:**<br>Close WSAs to motorized and mechanized travel:<br>• Adobe Badlands<br>• Camel Back<br>• Dolores River Canyon<br>• Sewemup Mesa<br><br>Limit motorized and mechanized travel in Needle Rock ISA to designated routes. | | |
| 575. | **GOAL:**<br>No similar goal in current RMPs. | **GOAL:**<br>Implement management strategies for lands within WSAs, should Congress release one or more of these areas from wilderness consideration. | | |

BLM_0114698

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 576. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>If Congress releases one or more WSAs from wilderness consideration, manage those lands consistent with underlying land use designations. | | |
| 577. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>If Congress releases one or more WSAs from wilderness consideration, update the wilderness characteristics inventory for lands that were formerly WSAs (FLPMA Section 201). | | |
| 578. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>If Congress releases Sewemup Mesa WSA from wilderness consideration:<br>• Manage as VRM Class II.<br>• Close to motorized travel, including over-the-snow travel.<br>• Limit mechanized travel to designated routes.<br>• Allowable Use: **NO LEASING/STIPULATION** NL-19/NGD-28: *Sewemup Mesa WSA if Released from Wilderness Consideration.* Close to fluid mineral leasing and geophysical exploration and apply NGD restrictions. (Refer to Appendix B.)<br>• Allowable use: Close to nonenergy solid mineral leasing.<br>• Allowable use: Close to mineral materials disposal.<br>• Issue no SRPs for competitive events.<br>• Prohibit wood cutting.<br>• Open to livestock grazing.<br>• Manage as ROW exclusion. | **Action:**<br>If Congress releases Sewemup Mesa WSA from wilderness consideration, manage the lands consistent with the goals and objectives in the RMP for adjacent areas. | **Action:**<br>If Congress releases Sewemup Mesa WSA from wilderness consideration:<br>• Manage as VRM Class II.<br>• Close to motorized travel, including over-the-snow travel.<br>• Limit mechanized travel to designated routes.<br>• Allowable Use: **NO LEASING/ STIPULATION** NL-19/ SSR-59: *Sewemup Mesa WSA if Released from Wilderness Consideration.* Close to fluid mineral leasing and geophysical exploration and apply SSR restrictions. (Refer to Appendix B.)<br>• Allowable use: Close to nonenergy solid mineral leasing.<br>• Allowable use: Close to |

BLM_0114699

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | | • mineral materials.<br>• Issue no SRPs for competitive events.<br>• Prohibit wood cutting.<br>• Open to livestock grazing.<br>• Manage as ROW avoidance. |
| 579. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>If Congress releases Dolores River Canyon WSA from wilderness consideration, manage the lands consistent with the Dolores River SRMA and Dolores Slickrock Canyon ACEC. | **Action:**<br>If Congress releases Dolores River Canyon WSA from wilderness consideration, manage the lands for multiple uses consistent with the goals and objectives in the RMP. | **Action:**<br>If Congress releases Dolores River Canyon WSA from wilderness consideration, manage the lands consistent with the Dolores River SRMA and Dolores River Slickrock Canyon ACEC. |
| 580. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>If Congress releases Camel Back WSA from wilderness consideration, manage those lands consistent with Roubideau SRMA and Roubideau-Potter-Monitor ACEC. | **Action:**<br>If Congress releases Camel Back WSA from wilderness consideration, manage those lands consistent with management prescriptions of adjacent public lands. | **Action:**<br>If Congress releases Camel Back WSA from wilderness consideration, manage those lands consistent with Roubideau SRMA and Roubideau Corridors ACEC. |
| 581. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>If Congress releases Adobe Badlands WSA from wilderness consideration, manage those lands consistent with Salt Desert Shrub ACEC. | **Action:**<br>If Congress releases Adobe Badlands WSA from wilderness consideration, manage those lands consistent with Adobe Badlands ACEC. | **Action:**<br>If Congress releases Adobe Badlands WSA from wilderness consideration, manage those lands consistent with Adobe Badlands ACEC. |
| 582. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>If Congress releases Needle Rock ISA from wilderness consideration, manage those lands consistent with Needle Rock ACEC. | | |

BLM_0114700

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 583. | **WILD AND SCENIC RIVERS** | | | |
| 584. | **GOAL:**<br>Protect National Wild and Scenic Rivers System (NWSRS)-eligible segments in accordance with the Wild and Scenic Rivers Act and BLM guidance (BLM Manual 6400). | **GOAL:**<br>Evaluate eligible river segments to determine suitability for inclusion in the NWSRS, protecting them in accordance with the Wild and Scenic Rivers Act and BLM guidance (BLM Manual 6400). | | |
| 585. | **Objective:**<br>Preserve the preliminary classification of each eligible segment by protecting its free-flowing nature, water quality, and ORVs, pending congressional action. | **Objective:**<br>Preserve the recommended classification of each suitable segment by maintaining the level of development allowed under the recommended classification. In addition, maintain the free-flowing condition, water quality, and ORVs associated with suitable segments. | | |
| 586. | **Action:**<br>The following 29 stream segments are **eligible** for inclusion in the NWSRS (Figure 2-68, Appendix A). See Table 2-4 (Summary of Wild and Scenic River Study Segments (Alternatives A and B)) (a description of each segment is provided in Appendix P, Summary of Draft Wild and Scenic River Suitability Report):<br>• Segments classified as wild: | **Action:**<br>Determine that the following 29 stream segments are **suitable** for inclusion in the NWSRS (Figure 2-68, Appendix A). See Table 2-4 (Summary of Wild and Scenic River Study Segments (Alternatives A and B)) (a description of each segment is provided in Appendix P, Summary of Draft Wild and Scenic River Suitability Report):<br>• Same as Alternative A. | **Action:**<br>Determine that all 29 eligible stream segments are **not suitable** for inclusion in the NWSRS and release them from interim management protections afforded eligible segments. | **Action:**<br>Determine that the following 16 stream segments are **suitable** for inclusion in the NWSRS (Figure 2-69, Appendix A). See Table 2-5 (Summary of Wild and Scenic River Study Segments (Alternative D)) (a description of each segment is provided in Appendix P, Summary of Draft Wild and Scenic River Suitability Report):<br>• Segments classified as wild: |

BLM_0114701

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | ○ Monitor Creek<br>○ Potter Creek<br>○ Roubideau Creek Segment 1<br>○ Dry Creek<br>○ Saltado Creek<br>○ San Miguel River Segment 2<br>○ Tabeguache Creek Segment 1<br>○ Dolores River Segment 1a<br>○ La Sal Creek Segment 3<br>• Segments classified as scenic:<br>○ Roubideau Creek Segment 2<br>○ Deep Creek<br>○ West Fork Terror Creek<br>○ Beaver Creek<br>○ Naturita Creek<br>○ San Miguel River Segment 3<br>○ Lower Dolores River<br>○ Ice Lake Creek Segment 2<br>○ North Fork Mesa Creek<br>○ La Sal Creek Segment 2<br>○ Lion Creek Segment 2 | | | ○ Monitor Creek<br>○ Potter Creek<br>○ Roubideau Creek Segment 1<br>○ Saltado Creek<br>○ San Miguel River Segment 2<br>○ Tabeguache Creek Segment 1<br>○ Dolores River Segment 1a<br>○ La Sal Creek Segment 3<br>• Segments classified as scenic:<br>○ Lower Dolores River<br>• Segments classified as recreational:<br>○ Beaver Creek<br>○ San Miguel River Segments 1, 3, 5, and 6<br>○ Dolores River Segment 2<br>○ La Sal Creek Segment 2<br><br>Determine that the following 13 stream segments are **not suitable** for inclusion in the NWSRS:<br>• Dry Creek<br>• Roubideau Creek Segment 2<br>• Deep Creek<br>• West Fork Terror Creek |

BLM_0114702

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | • Segments classified as recreational:<br>  ○ Gunnison River Segment 2<br>  ○ San Miguel River Segments 1, 5, and 6<br>  ○ Tabeguache Creek Segment 2<br>  ○ Dolores River Segments 1b and 2<br>  ○ La Sal Creek Segment 1<br>  ○ Spring Creek | | | • Naturita Creek<br>• Ice Lake Creek Segment 2<br>• Lion Creek Segment 2<br>• Gunnison River Segment 2<br>• Tabeguache Creek Segment 2<br>• Dolores River Segment 1b<br>• North Fork Mesa Creek<br>• La Sal Creek Segment 1<br>• Spring Creek<br><br>For eligible streams in which only a portion was determined to be suitable, stream miles and acreage that are not within the mapped boundary of the suitable stream segment are determined to be **not suitable**.<br><br>All stream miles and acreage determined to be **not suitable** are released from further protection under the provisions of the Wild and Scenic Rivers Act. |
| 587. | **Action:**<br>Establish the following interim protective | **Action:**<br>Establish the following interim protective management guidelines for | **Action:**<br>No similar action (there are not any suitable segments | **Action:**<br>Establish the following interim protective management |

BLM_0114703

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | management guidelines for all eligible segments pending congressional action (all interim protective management is subject to valid existing rights):<br>• Approve no actions altering the free-flowing nature of eligible segments through impoundments, diversions that have the effect of impounding water, channeling, or riprapping.<br>• Approve no action that would have an adverse effect on an eligible segment's identified ORV(s). Enhance identified ORV(s) to the extent practicable.<br>• Approve no action that would modify an eligible segment or its corridor to the degree that its eligibility or tentative classification would be affected.<br>• Approve no action that would diminish water | all suitable segments pending congressional action (all interim protective management is subject to valid existing rights):<br>• The same management of eligible segments as described under Alternative A would be carried forward for suitable segments under Alternative B, plus:<br>○ Manage wild segments as VRM Class I.<br>○ Manage scenic segments as VRM Class II.<br>○ Manage recreational segments as VRM Class III.<br>○ Manage wild segments as ROW exclusion areas.<br>○ Manage scenic and recreational segments as ROW avoidance areas.<br>○ Allowable Use: **STIPULATION** NSO-59/NGD-29: *Special Designation WSR ("Wild")*. No surface occupancy or use is allowed, and NGD restrictions are applied, within the WSR study corridor, as defined in Appendix B of the Uncompahgre Wild and Scenic River Suitability Report of segments determined have the | under this alternative). | guidelines for all suitable segments pending congressional action (all interim protective management is subject to valid existing rights):<br>• The same management of eligible segments as described under Alternative A would be carried forward for suitable segments under Alternative D, plus:<br>○ Manage wild segments with scenic ORV or within a WSA or the Tabeguache Area as VRM Class I.<br>○ Manage wild segments without a scenic ORV and not within a WSA or the Tabeguache Area as VRM Class II.<br>○ Manage scenic segments as VRM Class II.<br>○ Manage recreational segments with a scenic ORV as VRM Class II.<br>○ Manage recreational segments without a scenic ORV according to the background VRM class in |

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | quality to the point that the water quality would no longer support the ORV(s). | classification of "Wild" (Figures 2-20 and 2-29, Appendix A).<br>○ Allowable Use: **STIPULATION** CSU-53/SSR-60: *Special Designation WSR ("Scenic" or "Recreational")*. Surface occupancy or use may be restricted and SSR restrictions applied within the WSR study corridor, as defined in Appendix B of the Uncompahgre Wild and Scenic River Suitability Report, of segments determined to have the classification of "Scenic" or "Recreational." (Refer to Appendix B; Figures 2-20 and 2-29, Appendix A).<br>○ Allowable use: Close wild segments to mineral material disposal.<br>○ Allowable use: Close wild segments to nonenergy solid mineral leasing.<br>○ Allowable use: Close wild segments to coal leasing.<br>○ Recommend to the Secretary of the Interior to withdraw wild segments from locatable mineral entry. | | that area.<br>○ Manage wild segments as ROW exclusion areas.<br>○ Manage scenic segments as ROW avoidance areas.<br>○ Allowable Use: **STIPULATION** NSO-60: *Special Designation WSR ("Wild" or "Scenic")*. Prohibit surface occupancy and use within the WSR study corridor, as defined in Appendix B of the Uncompahgre Wild and Scenic River Suitability Report, of segments determined to be suitable for inclusion in the National Wild and Scenic Rivers System with the classification of "Wild" or "Scenic." (Refer to Appendix B; Figure 2-23, Appendix A.)<br>○ Allowable Use: **STIPULATION** CSU-54: *Special Designation WSR ("Recreational")*. Surface occupancy or use may be restricted within |

BLM_0114705

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | | the WSR study corridor, as defined in Appendix B of the Uncompahgre Wild and Scenic River Suitability Report, of segments determined to have the classification of "Recreational." (Refer to Appendix B; Figure 2-23, Appendix A.)<br>○ Allowable Use: **STIPULATION** SSR-61: *Special Designation WSR.* Apply SSR restrictions within the WSR study corridor, as defined in Appendix B of the Uncompahgre Wild and Scenic River Suitability Report. (Refer to Appendix B; Figure 2-31, Appendix A.)<br>○ Allowable use: Close to nonenergy solid mineral leasing<br>○ Allowable use: Close all segments to mineral materials disposal.<br>○ Allowable use: Close all segments to coal leasing. |

BLM_0114706

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | | ○ Recommend to the Secretary of the Interior to withdraw wild segments from locatable mineral entry. |
| 588. | **NATIONAL TRAILS AND BYWAYS** | | | |
| 589. | *NATIONAL TRAILS* | | | |
| 590. | **GOAL:**<br>Enhance, promote, and protect the scenic, natural, and cultural resource values associated with current and future designated National Scenic, Historic, and Recreation Trails. | | | |
| 591. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>Identify and manage National Historic Trails. Identify the nature and purposes of National Historic Trails; and, to the greatest extent possible, manage the trails in a manner so as to safeguard the nature and purpose of the trail and in a manner that protects the values for which the trail was designated. Manage congressionally designated National Historic Trails in consideration of the developed trail-wide comprehensive administrative strategy. | | |
| 592. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Evaluate known historic trails and/or trail segments  (e.g., Old Spanish Trail-northern branch, Ute Trail, Rivera Expedition trail, Dominguez/Escalante Trail, Loring Military Expedition Trail, and Gunnison Expedition Trail; (Figures 2-84 [Alternative B], 2-85 [Alternative C], and 2-86 [Alternative D], Appendix A)). | | |
| 593. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Establish the National Trail Management Corridor for the Old Spanish Trail. Class III inventory has identified the Old Spanish Trail corridor in the UFO as roughly centered along US Highway 50. The congressionally designated Old Spanish Trail route is based on completed field inventories; however, additional Class III inventory may be required to locate and document existing traces located outside the corridor on all BLM-administered parcels. Pursue partners for grant funding where practical to conduct surveys on adjacent lands with landowner permission. The National Historic Trail designation allows for small location changes without congressional authorization. If the location of the trail changes as a result of Class III inventory, then the management actions in this RMP would apply to the newly mapped | | |

BLM_0114707

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | location(s) and may be modified to better address the inventory findings. That land no longer identified as trail location, as proven through the archaeological survey, would be managed for similar purposes and with similar VRM class to the adjacent public land. | | |
| 594. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage all National Trails, except for the Old Spanish National Historic Trail, as ROW avoidance areas (0.5-mile management corridor on either side of centerline). Manage the Old Spanish National Historic Trail as ROW avoidance (100-meter [328 feet] management corridor on either side of centerline of US Highway 50). | **Action:**<br>Manage all National Trails as ROW avoidance areas (100-meter [328 feet] corridor). Class III cultural resource inventory will be required for all ROW applications within these corridors, with avoidance of existing traces being the preferred mitigation. | |
| 595. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage all National Historic Trails as VRM Class II within 0.5-mile of either side of centerline. | **Action:**<br>Manage all National Historic Trails as VRM Class III within 0.5-mile of either side of centerline. | **Action:**<br>Manage all National Historic Trails (except the Old Spanish Trail) as VRM Class II within 0.5-mile of either side of centerline.<br><br>Manage the Old Spanish Trail as VRM Class III within 0.5-mile of either side of the centerline of US Highway 50 |
| 596. | **Allowable Use:**<br>Close all congressionally designated National Trails to coal leasing (43 CFR 3400.2[a][4]). | **Allowable Use:**<br>Same as Alternative A, plus close all congressionally designated National Trails to mineral materials disposal and nonenergy solid mineral leasing (0.5-mile buffer). | **Allowable Use:**<br>Same as Alternative A, plus close all National Trails to mineral materials disposal and nonenergy solid mineral leasing (50-meter [164 feet] buffer). | |

BLM_0114708

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| 597. | Allowable Use: No similar allowable use in current RMPs. | Allowable Use: **STIPULATION** NSO-61: *Special Designation Trail (Old Spanish National Historic Trail).* Prohibit surface occupancy and use within 805 meters (0.50-mile) of the centerline of the following: Old Spanish National Historic Trail. (Refer to Appendix B; Figure 2-20, Appendix A.) | Allowable Use: **STIPULATION** NSO-62: *Special Designation Trail (Old Spanish National Historic Trail).* Prohibit surface occupancy and use within 50 meters (164 feet) of the centerline of the following: Old Spanish National Historic Trail. (Refer to Appendix B; Figure 2-22, Appendix A.) | Allowable Use: Same as Alternative B. (Refer to Appendix B; Figure 2-23, Appendix A.) |
| 598. | Allowable Use: No similar allowable use in current RMPs. | Allowable Use: **STIPULATION** CSU-55: *Special Designation Trail (Old Spanish National Historic Trail).* Surface occupancy or use may be restricted from 805 to 8,047 meters (0.5 to 5.0 miles) of the centerline of the following: Old Spanish National Historic Trail. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. (Refer to Appendix B; Figure 2-20, Appendix A.) | Allowable Use: **STIPULATION** CSU-56: *Special Designation Trail (Old Spanish National Historic Trail).* Surface occupancy or use may be restricted from 50 to 8,047 meters (164 feet to 5.0 miles) of the centerline of the following: Old Spanish National Historic Trail. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. (Refer to Appendix B; Figure 2-22, Appendix A.) | Allowable Use: Same as Alternative B. (Refer to Appendix B; Figure 2-23, Appendix A.) |

BLM_0114709

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 599. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>Manage the Tabeguache and Paradox Trails to provide for the ever-increasing outdoor recreation needs of an expanding urban population and to promote the preservation of public access to, travel within, and enjoyment and appreciation of the scenic, natural, and cultural resources. | | |
| 600. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Proposed to the Secretary of Interior to designate the Tabeguache and Paradox Trails as National Recreation Trails, as described in the National Trails System Act of 1968 (Public Law 90-543; Figures 2-84 [Alternative B], 2-85 [Alternative C], and 2-86 [Alternative D], Appendix A). | | |
| 601. | Allowable Use:<br>No similar allowable use in current RMPs. | Allowable Use:<br>**STIPULATION** NSO-63: *Special Designation Trail (National Recreation Trails)*. Prohibit surface occupancy and use within 805 meters (0.50-mile) of the centerline of designated National Recreation Trails. (Refer to Appendix B; Figure 2-20, Appendix A.) | Allowable Use:<br>**STIPULATION** NSO-64: *Special Designation Trail (National Recreation Trails)*. Prohibit surface occupancy and use within 200 meters (656 feet) of the centerline of designated National Recreation Trails. (Refer to Appendix B; Figures 2-22 [Alternative C] and 2-23 [Alternative D], Appendix A.) | |
| 602. | *NATIONAL AND BLM BYWAYS* | | | |
| 603. | **GOAL:**<br>Enhance, promote, and protect the scenic, natural, and cultural resource values associated with current and future designated byways. | | | |
| 604. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>Support efforts of designated byway corridor management plans and provide assistance in the development of byway facilities:<br>• Grand Mesa Scenic and Historic Byway<br>• San Juan Skyway (National Scenic Byway and All-American Road)<br>• Unaweep-Tabeguache Scenic and Historic Byway (Colorado Scenic and Historic Byway)<br>• West Elk Scenic and Historic Byway (Colorado Scenic and Historic Byway)<br>(Refer to Figures 2-84 [Alternative B], 2-85 [Alternative C], and 2-86 [Alternative D], Appendix A.) | | |

BLM_0114710

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| 605. | **Action:** No similar action in current RMPs. | **Action:** Designate all National and BLM Byways as VRM Class II within 0.5-mile of either side of centerline. | **Action:** Designate all National and BLM Byways as VRM Class III within 0.25-mile of either side of centerline. | **Action:** Within 0.5-mile of either side of centerline, designate: <br>• Grand Mesa Scenic Byway as VRM Class II <br>• West Elk Scenic Byway, from Northeast UFO boundary to Gunnison County Road 12, as VRM Class II <br>• Remaining portion of West Elk Scenic Byway as VRM Class III <br>• San Juan Skyway as VRM Class III <br>• Unaweep/Tabeguache Byway as VRM Class III |
| 606. | Allowable Use: No similar allowable use in current RMPs. | Allowable Use: **STIPULATION** NSO-65: *Special Designation Byway (Scenic Byways)*. Prohibit surface occupancy and use within the viewshed of designated scenic byways up to a distance of 805 meters (0.50-mile). (Refer to Appendix B; Figure 2-20, Appendix A.) | Allowable Use: **STIPULATION** CSU-57: *Scenic Byways*). Surface occupancy or use may be restricted within 402 meters (0.25-mile) of designated scenic byways. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required to protect the scenic | Allowable Use: **STIPULATION** CSU-58: *Special Designation Byway (Scenic Byways)*. Surface occupancy or use may be restricted within 805 meters (0.50-mile) of designated scenic byways. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be |

BLM_0114711

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | (visual) values. (Refer to Appendix B; Figure 2-22, Appendix A.) | required to protect the scenic (visual) values. (Refer to Appendix B; Figure 2-23, Appendix A.) |
| 607. | **WATCHABLE WILDLIFE VIEWING SITES** | | | |
| 608. | **GOAL:**<br>Provide opportunities for publics to see and enjoy native wildlife. | | | |
| 609. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>Designate and provide information to the public on Watchable Wildlife Viewing Sites. | **Objective:**<br>No similar objective. (Watchable Wildlife Viewing Sites are not considered under this alternative.) | **Objective:**<br>Evaluate areas for possible designation as Watchable Wildlife Viewing Sites. |
| 610. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Designate the following as Watchable Wildlife Viewing Sites; focus management on enhancing wildlife habitat in these areas and providing opportunities for the public to view and learn about the wildlife of these areas:<br>• Uncompahgre Riverway<br>• Billy Creek<br>• San Miguel River ACEC (IBA)<br><br>(Figure 2-70, Appendix A) | **Action:**<br>No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | |
| 611. | **Action:**<br>Where feasible, complete wildlife habitat improvements to enhance wildlife viewing in association with cultural values | **Action:**<br>Where feasible, complete wildlife habitat improvements to enhance fish/wildlife viewing opportunities, while maintaining protection of fish/wildlife. | **Action:**<br>No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | |

BLM_0114712

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | (emphasis area F; BLM 1985) | | | |
| 612. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 20 acres of Uncompahgre Riverway Watchable Wildlife Viewing Site to protect and enhance migratory and breeding bird and native fish habitat. | **Action:**<br>No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | |
| 613. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 2,990 acres of Billy Creek Watchable Wildlife Viewing Site, in coordination with CPW, to protect and enhance migratory and breeding bird and big game habitat. | **Action:**<br>No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | |
| 614. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 22,780 acres of San Miguel Watchable Wildlife Viewing Site to protect and enhance migratory and breeding bird and native fish habitat. | **Action:**<br>No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | |
| 615. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>In coordination with CPW and local wildlife-related organizations (e.g., Black Canyon Audubon, Colorado Breeding Bird Atlas, Colorado Natural Areas Program, and hunting groups), evaluate known wildlife concentration areas or areas with special wildlife interest for possible additional designation as Watchable Wildlife Viewing Sites. | **Action:**<br>No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | **Action:**<br>Same as Alternative B. |

BLM_0114713

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 616. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Provide such facilities as informational and interpretive signs, designated trail systems, and restrooms, as needed for enhanced visitor use, enjoyment, and safety. Provide adequate protection (e.g., signs, use stipulations, barricades, and fences), as needed to protect sensitive species and their habitats. | **Action:**<br>No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | **Action:**<br>If watchable wildlife viewing sites are designated, same as Alternative B. |
| 617. | **Social and Economic** | | | |
| 618. | **NATIVE AMERICAN TRIBAL USES** | | | |
| 619. | **GOAL:**<br>Manage public lands in a manner that accommodates American Indian religious traditions, practices, and beliefs. | | | |
| 620. | **Objective:**<br>Consult on a government-to-government basis with all appropriate federally recognized tribes regarding developments or projects on public lands that may affect historic properties, sacred sites, traditional cultural properties, or traditional use areas of interest or concern to them. | | | |
| 621. | **Action:**<br>Follow current management practices, as guided by directives contained in BLM 8120, American Indian Religious Freedom Act (42 USC, 1996), Native American Graves Protection and Repatriation Act (25 USC, 3001), Executive Order 13007 (Indian Sacred Sites), and Executive Order 13084 (Tribal Consultation). | | | |
| 622. | **Action:**<br>During project planning, consult with tribes regarding visual resources in connection with Native American religious values and practices. If the visual resources in the project area are important to traditional and religious tribal values, consider modifying or mitigating the project. Consultations with tribes would include proposed programs of avoidance and mitigation, including off-site mitigation. If the project modification, mitigation, or treatment measures cannot be accomplished to the satisfaction of the concerned parties, consider canceling the project at the discretion of the BLM Authorized Officer. | | | |
| 623. | **Action:**<br>Continue and expand consulting and educational program partnerships with the Northern Ute Tribe, Southern Ute Tribe, and Ute Mountain Ute tribes. | | | |

BLM_0114714

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| 624. | **Action:** Continue government-to-government consultation with Indian tribes to identify traditional cultural properties, sacred/religious sites, or traditional use areas through face-to-face meetings, letters, phone calls, emails, and on-site visits. If any areas are identified or become known through the Native American notification or consultation process, address their concerns through site- and project-specific modification and/or mitigation. | | | |
| 625. | **Action:** Protect and preserve Native American cultural and sacred sites and Native American access to these sites whenever possible. Take no action that would adversely affect these areas or locations without consultation with the appropriate Native American tribes (Executive Orders 13007 and 13084). | | | |
| 626. | **Action:** In cooperation with tribal entities, allow qualified Native Americans appropriate access to public lands in order to practice spiritual traditions and beliefs and to gather resources needed for these practices. | | | |
| 627. | **PUBLIC HEALTH AND SAFETY** | | | |
| 628. | **GOAL:** Manage public lands to reduce hazardous risks to protect lives, resources, and property. Enhance public health in cooperation with local communities. | | | |
| 629. | **Objective:** No similar objective in current RMPs. | **Objective:** Reduce risks from potential hazard sites and pursue the reduction of hazards. | | |
| 630. | **Action:** Post caution signs for the public in the North Delta unexploded ordnance area. | | | |
| 631. | Allowable Use: No similar allowable use in current RMPs. | Allowable Use: Continue to work with the Army National Guard to remedy unexploded ordnance in support of land use and management specified in this RMP. | | |
| 632. | **Action:** Require project proponents in the North Delta unexploded ordnance area to clear the affected project area on a project-specific basis. Clear and dispose of identified unexploded ordnance in accordance with applicable US Army policies and procedures. | | | |
| 633. | Allowable Use: **LEASE NOTICE** LN-UFO-8/LN-1: *Unexploded Ordnance.* The lease area is known to contain unexploded ordnance. The Colorado National Guard and Army Reserve used the lease area as a practice area for military training in the past. Periodic surface searches for | | | |

BLM_0114715

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A _Current Management (No Action)_ | Alternative B | | Alternative C | Alternative D _Agency Preferred_ |
|---|---|---|---|---|---|
| | ordnance may not have located and removed all of the ordnance. Prior to any new activity on the lease area, a survey for surface and subsurface unexploded ordnance is required to avoid impacts on health and safety. Lessees must contact the UFO prior to any surface activities associated with this lease. The lessee will be required to coordinate with the Colorado National Guard, Army Reserve, and the Colorado Department of Public Health and Environment to conduct additional surveys to ensure that there is no unexploded ordnance present on the proposed disturbance sites and appropriate actions are taken to be sure the sites are safe for use. The BLM may recommend modifications to exploration and development proposals to avoid impacts on health and safety. The lease holder agrees to indemnify the United States against any liability arising from the lease holder's and its agents' activities on the lease area. | | | | |
| 634. | **Action:** To the extent possible, conduct hazardous material response and reclaim sites in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan (40 CFR, 300) and the Comprehensive Environmental Response, Compensation, and Liability Act. | | | | |
| 635. | Allowable Use: No similar allowable use in current RMPs. | Allowable Use: Close the DOE Uranium Mill Tailings Remedial Action Area to mineral materials disposal. | | | |
| 636. | Allowable Use: No similar allowable use in current RMPs. | Allowable Use: **STIPULATION** NSO-66/NGD-30: _DOE Uranium Mill Tailings Remedial Action Area._ Prohibit surface occupancy and use and surface-disturbing activities in the supplemental standard area around Uravan associated with the US DOE Uranium Mill Tailings Remedial Action Area. (Refer to Appendix B; Figures 2-20 and 2-29 [Alternative B], 2-22 and 2-30 [Alternative C], and 2-23 and 2-31 [Alternative D], Appendix A.) | | | |
| 637. | Allowable Use: No similar allowable use in current RMPs. | **Alternative B:** Allowable Use: **STIPULATION** NSO-67: _Dwellings and High Occupancy Buildings._ Prohibit surface occupancy and use within 152 meters (500 feet) of occupied | **Alternative B.1** (North Fork area only): **STIPULATION** NSO-68: _Community Facilities._ Prohibit surface occupancy and use within: • 402 meters (0.25-mile) of | Allowable Use: No similar allowable use. (There would be no similar stipulations.) | Allowable Use: Same as Alternative B (Figure 2-23, Appendix A). |

_Uncompahgre Draft Resource Management Plan Revision and Environmental Impact Statement_

BLM_0114716

**Table 2-2**
**Description of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|---|
| | | dwellings and building units (as defined by the State of Colorado), or within 305 meters (1,000 feet) from high-occupancy buildings (as defined by the State of Colorado). (Refer to Appendix B; Figure 2-20, Appendix A.) | schools and community facilities: <br> • North Fork Swimming Pool <br> • Crawford School <br> • Hotchkiss High School <br> • North Fork Community Montessori School <br> • North Fork Recycling Center <br> (Refer to Appendix B; Figure 2-21, Appendix A.) | | |
| 638. | **Action:** No similar action. | **Action:** Manage new and abandoned mine lands projects to include road closures and rehabilitation to reduce active erosion. | | **Action:** Manage abandoned mine lands projects to include rehabilitation to reduce active erosion. | **Action:** Manage new and abandoned mine lands projects to include rehabilitation to reduce active erosion. Consider closing routes as part of comprehensive travel management planning. |
| 639. | **Action:** No similar action. | **Action:** Provide for public safety in the event of a burning or smoldering coal seam. | | | |

BLM_0114717

**Table 2-3**
**Renewable Energy Exclusion and Avoidance Areas[1]**

| Resource/Concern | Alternative A (Current Management/ No Action) | Alternative B | Alternative C | Alternative D (Agency Preferred) |
|---|---|---|---|---|
| ACECs | Follow the ROW management for the ACEC. | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative B |
| Within 0.25-mile of bank-full stage or within 100 meters (328 feet) of the 100-year floodplain (whichever is greatest) on the Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores Rivers | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative B |
| Within 325 feet of all perennial and intermittent waters and naturally occurring wetlands, springs, and seeps to protect riparian areas; if riparian area extends beyond 325 feet, extend restriction to include the entire riparian area. | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Avoid Solar: Exclude Hydropower: Avoid |
| Suitable Wild and Scenic River Segments (Eligible segments in alternative A) | Wind: Avoid Solar: Avoid Hydropower: Avoid | Wind: Exclude Solar: Exclude Hydropower: Exclude | No suitable segments in this alternative. | Same as Alternative B |
| Wilderness Study Areas and Tabeguache Area | Wind: Exclude Solar: Exclude Hydropower: Exclude | Same as Alternative A | Same as Alternative A | Same as Alternative A |
| Ecological emphasis areas | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Wind: Avoid Solar: Avoid Hydropower: Avoid |
| Within 200 meters (656 feet) of occupied habitat of federally listed, candidate, and proposed plant species | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Same as Alternative B |
| Within areas designated as critical habitat for federally listed, candidate, and proposed plant species | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Avoid Solar: Exclude Hydropower: Avoid |

BLM_0114718

**Table 2-3**
**Renewable Energy Exclusion and Avoidance Areas[1]**

| Resource/Concern | Alternative A (Current Management/ No Action) | Alternative B | Alternative C | Alternative D (Agency Preferred) |
|---|---|---|---|---|
| Within 1.0 mile of occupied federally listed fish habitat | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Avoid Solar: Exclude Hydropower: Exclude |
| Within known occupied habitat for federally listed wildlife and bird species | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Avoid |
| In all Gunnison sage-grouse breeding habitat (lek and non-lek) plus a 0.6-mile radius | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative B |
| Within 4.0 miles of an active lek or within mapped Gunnison sage-grouse nesting and early brood rearing habitat | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative C |
| Within Gunnison sage-grouse designated critical habitat | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Same as Alternative C |
| Within 0.25-mile of special status raptor nest sites and associated alternate nests | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Exclude Solar: Avoid Hydropower: Avoid |
| Within 0.25- to 1.0 mile of special status raptor nest sites | No specific management decisions | Wind: Exclude Solar: Avoid Hydropower: Avoid | No specific management decisions | Wind: Avoid Solar: Avoid Hydropower: Avoid |
| Within 0.25-mile of non-special status Raptors (except kestrel) active nest sites and associated alternate nests | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Exclude Solar: Avoid Hydropower: Avoid |
| Within 0.5-mile of bald eagle winter roost sites | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Exclude Solar: Avoid Hydropower: Avoid |

BLM_0114719

**Table 2-3**
**Renewable Energy Exclusion and Avoidance Areas[1]**

| Resource/Concern | Alternative A (Current Management/ No Action) | Alternative B | Alternative C | Alternative D (Agency Preferred) |
|---|---|---|---|---|
| Within bald eagle winter concentration areas | No specific management decisions | Wind: Exclude Solar: Avoid Hydropower: Avoid | No specific management decisions | Wind: Avoid Solar: Avoid Hydropower: Avoid |
| Within 0.25-mile of federally listed, BLM sensitive, and Colorado State Species of Concern bat species' maternity roost sites and winter hibernacula | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Wind: Exclude Solar: Avoid Hydropower: Avoid |
| Habitat for BLM Sensitive plant and animal species | No specific management decisions | Wind: Avoid Solar: Avoid Hydropower: Avoid | No specific management decisions | Same as Alternative B |
| Areas mapped as having soils with elevated levels of salinity/selenium | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative C |
| Slopes of 30 percent or greater | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Avoid Solar: Avoid Hydropower: Avoid |
| Lands with Wilderness Characteristics | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Same as Alternative A | Same as Alternative B |
| National Historic Trails, within 0.5-mile buffer (Alternative B) or within 100 meter buffer (Alternatives C and D) on either side of centerline | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative C |
| National and State Scenic Byways, within 0.50-mile (Alternatives B and D) or within 0.25-mile (Alternative C) of the byway | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Wind: Avoid Solar: Avoid Hydropower: Avoid |
| VRM Class I | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Same as Alternative B | Same as Alternative B |

BLM_0114720

**Table 2-3**
**Renewable Energy Exclusion and Avoidance Areas[1]**

| Resource/Concern | Alternative A (Current Management/ No Action) | Alternative B | Alternative C | Alternative D (Agency Preferred) |
|---|---|---|---|---|
| VRM Class II | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative C |
| Total Acres – Open | Wind: 561,200 Solar: 561,200 Hydropower: 561,200 | Wind: 34,040 Solar: 34,040 Hydropower: 34,040 | Wind: 369,970 Solar: 369,970 Hydropower: 369,970 | Wind: 229,290 Solar: 229,290 Hydropower: 229,290 |
| Total Acres – Avoid (Includes other ROW Avoidance) | Wind: 29,460 Solar: 29,460 Hydropower: 29,460 | Wind: 123,610 Solar: 128,400 Hydropower: 128,400 | Wind: 261,280 Solar: 261,280 Hydropower: 261,280 | Wind: 320,350 Solar: 279,890 Hydropower: 298,790 |
| Total Acres – Exclude (Includes other ROW Exclusion) | Wind: 85,140 Solar: 85,140 Hydropower: 85,140 | Wind: 518,150 Solar: 513,360 Hydropower: 513,360 | Wind: 44,550 Solar: 44,550 Hydropower: 44,550 | Wind: 126,160 Solar: 166,620 Hydropower: 147,720 |

[1]An area restricted by "Exclusion" is closed to the type of renewable energy project.

An area restricted by "Avoidance" allows some use and occupancy of BLM-administered lands while protecting identified resources or values. These areas are potentially open to renewable energy projects, but the restriction allows the BLM to require special constraints, or the activity can be shifted to protect the specified resource or value.

Notes: Geothermal development would follow stipulations shown under Fluid Minerals. Solar energy projects are allowed for fewer than 20 megawatts only.

**Table 2-4**
**Summary of Wild and Scenic River Study Segments (Alternatives A and B)**

| River or Creek | Total Segment Length (miles) | Length on BLM Land (miles) | Total Wild and Scenic River Study Corridor (acres) | Area on BLM Land (acres) | Preliminary Classification | Outstandingly Remarkable Values |
|---|---|---|---|---|---|---|
| Gunnison River Segment 2 | 0.4 | 0.4 | 130 | 90 | Recreational | Fish |
| Monitor Creek | 9.4 | 9.4 | 2,730 | 2,610 | Wild | Fish, Vegetation |
| Potter Creek | 9.8 | 9.8 | 2,880 | 2,830 | Wild | Fish, Vegetation |
| Roubideau Creek Segment 1 | 10.7 | 10.0 | 2,850 | 2,700 | Wild | Recreational, Wildlife, Cultural, Vegetation |
| Roubideau Creek Segment 2 | 7.6 | 3.5 | 2,200 | 1,330 | Scenic | Wildlife, Vegetation |
| Deep Creek | 2.6 | 0.6 | 810 | 130 | Scenic | Fish |
| West Fork Terror Creek | 1.2 | 0.5 | 390 | 150 | Scenic | Fish |
| Beaver Creek | 14.3 | 14.2 | 4,290 | 3,710 | Scenic | Vegetation |
| Dry Creek | 10.5 | 10.4 | 2,730 | 2,640 | Wild | Scenic, Geologic |
| Naturita Creek | 25.0 | 10.0 | 6,420 | 3,240 | Scenic | Fish |
| Saltado Creek | 5.6 | 4.1 | 1,760 | 1,450 | Wild | Vegetation |
| San Miguel River Segment 1 | 27.2 | 17.3 | 8,440 | 6,680 | Recreational | Scenic, Recreational, Wildlife, Historic, Vegetation, Paleontology |
| San Miguel River Segment 2 | 4.0 | 3.6 | 1,260 | 1,110 | Wild | Scenic, Recreational, Wildlife, Vegetation |
| San Miguel River Segment 3 | 7.3 | 5.3 | 2,290 | 1,880 | Scenic | Recreational, Fish, Wildlife, Vegetation |
| San Miguel River Segment 5 | 14.0 | 2.6 | 4,270 | 2,660 | Recreational | Recreational, Fish, Historic, Vegetation |

BLM_0114722

**Table 2-4**
**Summary of Wild and Scenic River Study Segments (Alternatives A and B)**

| River or Creek | Total Segment Length (miles) | Length on BLM Land (miles) | Total Wild and Scenic River Study Corridor (acres) | Area on BLM Land (acres) | Preliminary Classification | Outstandingly Remarkable Values |
|---|---|---|---|---|---|---|
| San Miguel River Segment 6 | 3.2 | 2.3 | 990 | 810 | Recreational | Recreational, Fish, Historic, Vegetation |
| Tabeguache Creek Segment 1 | 3.6 | 3.6 | 1,080 | 1,080 | Wild | Vegetation |
| Tabeguache Creek Segment 2 | 11.6 | 7.9 | 2,970 | 2,480 | Recreational | Cultural, Vegetation |
| Lower Dolores River | 10.5 | 6.9 | 2,910 | 1,990 | Scenic | Scenic, Recreational, Geologic, Fish, Wildlife |
| North Fork Mesa Creek | 8.5 | 5.8 | 2,170 | 1,740 | Scenic | Vegetation |
| Dolores River Segment 1a *(portion within the Dolores River Canyon WSA)* | 8.7 | 8.7 | 1,880 | 1,880 | Wild | Recreational, Scenic, Fish, Wildlife, Geology, Ecologic, Archaeology |
| Dolores River Segment 1b *(portion from the Dolores River Canyon WSA to Bedrock)* | 3.2 | 0.9 | 950 | 460 | Recreational | Recreational, Scenic, Fish, Wildlife, Geology, Ecologic, Archaeology |
| Dolores River Segment 2 | 11.5 | 5.4 | 3,240 | 1,820 | Recreational | Scenic, Recreational, Geologic, Fish, Wildlife, Vegetation |
| Ice Lake Creek Segment 2 | 0.6 | 0.3 | 180 | 100 | Scenic | Scenic |
| La Sal Creek Segment 1 | 4.8 | 0.6 | 1,350 | 720 | Recreational | Fish, Vegetation |
| La Sal Creek Segment 2 | 4.5 | 3.8 | 1,170 | 1,030 | Scenic | Fish, Vegetation |

BLM_0114723

**Table 2-4**
**Summary of Wild and Scenic River Study Segments (Alternatives A and B)**

| River or Creek | Total Segment Length (miles) | Length on BLM Land (miles) | Total Wild and Scenic River Study Corridor (acres) | Area on BLM Land (acres) | Preliminary Classification | Outstandingly Remarkable Values |
|---|---|---|---|---|---|---|
| La Sal Creek Segment 3 | 3.4 | 3.4 | 910 | 900 | Wild | Scenic, Recreational, Fish, Cultural, Vegetation |
| Lion Creek Segment 2 | 1.6 | 1.3 | 490 | 400 | Scenic | Vegetation |
| Spring Creek | 2.7 | 1.5 | 830 | 630 | Recreational | Vegetation |

Sources: BLM 2010d; BLM and Forest Service 2007

**Table 2-5**
**Summary of Wild and Scenic River Study Segments (Alternative D)**

| River or Creek | Total Segment Length (miles) | Length on BLM Land (miles) | Total Wild and Scenic River Study Corridor (acres) | Area on BLM Land (acres) | Preliminary Classification | Outstandingly Remarkable Values |
|---|---|---|---|---|---|---|
| Monitor Creek | 9.4 | 9.4 | 2,540 | 2,540 | Wild | Fish, Vegetation |
| Potter Creek | 9.8 | 9.8 | 2,810 | 2,810 | Wild | Fish, Vegetation |
| Roubideau Creek Segment 1 | 10.0 | 10.0 | 2,680 | 2,680 | Wild | Recreational, Wildlife, Cultural, Vegetation |
| Beaver Creek | 14.3 | 14.2 | 4,170 | 3,640 | Recreational | Vegetation |
| Saltado Creek | 5.6 | 4.1 | 1,640 | 1,340 | Wild | Vegetation |
| San Miguel River Segment 1 | 27.2 | 17.3 | 8,360 | 6,680 | Recreational | Scenic, Recreational, Wildlife, Historic, Vegetation, Paleontology |
| San Miguel River Segment 2 | 4.0 | 3.6 | 1,260 | 1,100 | Wild | Scenic, Recreational, Wildlife, Vegetation |
| San Miguel River Segment 3 | 4.5 | 4.5 | 1,350 | 1,350 | Recreational | Recreational, Fish, Wildlife, Vegetation |
| San Miguel River Segment 5 | 7.5 | 1.3 | 2,340 | 1,740 | Recreational | Recreational, Fish, Historic, Vegetation |
| San Miguel River Segment 6 | 2.1 | 2.1 | 390 | 390 | Recreational | Recreational, Fish, Historic, Vegetation |
| Tabeguache Creek Segment 1 | 3.4 | 3.4 | 1,010 | 1,010 | Wild | Vegetation |
| Lower Dolores River | 4.2 | 4.2 | 630 | 630 | Scenic | Scenic, Recreational, Geologic, Fish, Wildlife |

BLM_0114725

**Table 2-5**
**Summary of Wild and Scenic River Study Segments (Alternative D)**

| River or Creek | Total Segment Length (miles) | Length on BLM Land (miles) | Total Wild and Scenic River Study Corridor (acres) | Area on BLM Land (acres) | Preliminary Classification | Outstandingly Remarkable Values |
|---|---|---|---|---|---|---|
| Dolores River Segment 1a | 8.7 | 8.7 | 1,950 | 1,950 | Wild | Recreational, Scenic, Fish, Wildlife, Geology, Ecologic, Archaeology |
| Dolores River Segment 2 | 5.3 | 5.3 | 1,230 | 1,230 | Recreational | Scenic, Recreational, Geologic, Fish, Wildlife, Vegetation |
| La Sal Creek Segment 2 | 3.3 | 3.3 | 790 | 790 | Recreational | Fish, Vegetation |
| La Sal Creek Segment 3 | 3.4 | 3.4 | 800 | 800 | Wild | Scenic, Recreational, Fish, Cultural, Vegetation |

Sources: BLM 2010d; BLM and Forest Service 2007

BLM_0114726

## 2.7 SUMMARY COMPARISON OF ENVIRONMENTAL CONSEQUENCES

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)*<br>Resources | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 1. | **AIR QUALITY AND CLIMATE** | | | |
| 2. | Potential impacts on air quality due to increased oil and gas and solid mineral development as well as predicted increases in OHV use may occur. Impacts on air quality include potential increases in concentrations of ozone forming pollutants, visibility degradation, fugitive dust, and greenhouse gases. | Potential impacts on air quality are likely to be the lowest for this alternative due to the combination of implementation of the Colorado BLM Comprehensive Air Resource Protection Protocol (Appendix H), restrictions and stipulations on solid and fluid mineral leasing and development, and emission control strategies. | This alternative assumes the maximum level of reasonably foreseeable development for oil and gas predicted over the life of the plan. Potential impacts on air quality are likely to be greatest for this alternative due to the potential for increased oil and gas and solid mineral development. However, Alternative C also includes implementation of the Colorado BLM Comprehensive Air Resource Protection Protocol (Appendix H) and emission control strategies, which would be effective at minimizing emissions. | Potential impacts on air quality would be managed more effectively compared to Alternative A due to the implementation of the Colorado BLM Comprehensive Air Resource Protection Protocol (Appendix H) and associated strategies.<br><br>Restrictions and stipulations related to solid mineral leasing and development would result in reduced impacts on air quality from these sources. |
| 3. | **SOILS AND GEOLOGY** | | | |
| 4. | Adhering to BLM Colorado Public Land Health Standards would ensure a baseline level of soil health and provide protection against soil erosion, compaction, contamination, and vegetation removal.<br><br>There would continue to be | Compared with Alternative A, the BLM would implement more actions to protect and monitor soils and geology.<br><br>More areas would be closed to livestock grazing (10 times more acres than under Alternative A), reducing the impacts noted in | Compared with Alternative A, 62 percent more acres would be closed to livestock grazing, reducing impacts from livestock grazing in those areas.<br><br>NGD restrictions would be applied on 42,660 acres, and SSR restrictions would be | Alternative D provides greater protection to soils by protecting riparian and perennial streams, imposing management measures to control saline and selenium levels in soils, and directing the BLM to manage lands to |

BLM_0114727

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | 17,260 acres closed and 658,540 acres open to livestock grazing. Improper grazing management could result in accelerated erosion rates, localized compaction, and disturbance to biological soil crusts.<br><br>NSO stipulations would continue to be applied on 24,890acres of BLM surface/federal mineral estate to protect soils and geology resources either directly or indirectly. There would be no SSR restrictions and, thus, no protections from these measures.<br><br>Continuing to allow dispersed camping, overnight use, and recreational mining in all areas would subject soils to erosion, compaction, degradation of biological soil crust, and vegetation removal. | Alternative A.<br><br>NGD restrictions would be applied on 445,720 acres, the most under any alternative, providing the greatest protection from surface-disturbing activities. SSR restrictions would be applied on 230,020 acres, the least under any alternative, to protect soil resources.<br><br>Motorize use would be reduced from Alternative A, resulting in fewer impacts on soil resources.<br><br>Alternative B would not manage any areas as open to cross-country travel within the North Delta OHV Area, protecting soils in that area.<br><br>Closing several areas surrounding water bodies to dispersed camping, overnight use, and recreational mining would protect soils in these sensitive areas. | applied on 241,400 acres, providing less protection for soil resources than Alternatives B or D.<br><br>Cross-country travel within the North Delta OHV Area would be allowed on 39 percent fewer acres than under Alternative A, protecting fragile soils in a portion of the area. | improve water quality and to promote the delisting of state-impaired water bodies in areas where BLM management actions are contributing to impaired water quality.<br><br>Under Alternative D, the BLM would close 4 times more acres to livestock grazing than under Alternative A, reducing impacts from livestock grazing in those areas.<br><br>NGD restrictions would be applied on 36,180 acres, fewer than Alternatives B and C. SSR restrictions would be applied on 512,570 acres, the most of any alternative, providing the greatest protection for soil resources.<br><br>Impacts from dispersed camping, overnight use, and recreational mining would be similar to Alternative B.<br><br>No acres would be open to cross-country travel within the North Delta OHV Area, protecting the fragile soils from motorized use. |

BLM_0114728

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 5. | **WATER RESOURCES** | | | |
| 6. | The BLM would continue to apply NSO stipulations on 24,890acres to protect water resources either directly or indirectly. There would be no SSR restrictions and, thus, no protections from these measures.<br><br>The BLM would continue general activities to maintain or improve water quality, natural stream morphologic conditions, water resources sustainability (water quantity), groundwater aquifer properties, and natural stream hydrographs.<br><br>The North Delta OHV Area would continue to be open to cross-country travel, which could continue to degrade and contaminate downslope waterways during and after precipitation.<br><br>Alternative A outlines the fewest restrictions on fluid mineral leasing, forest harvest, recreation, and livestock grazing, but would still continue to reduce impacts on water | The BLM would restrict surface-disturbing activities by applying NGD restrictions on 445,720 acres and SSR restrictions on 230,020 acres, providing protection for water resources. Alternative B also includes specific protections for perennial streams.<br><br>Specific actions would maintain or improve water quality, natural stream morphologic conditions, sustainability of water resources (water quantity), groundwater aquifer properties, and natural stream hydrographs.<br><br>The North Delta OHV Area would be closed to cross-country motorized travel, protecting downslope waters from saline and selenium runoff.<br><br>Fewer areas would be open to fluid mineral leasing, forest harvest, recreation, and livestock grazing, reducing impacts on water quality, channel stability, and watershed health.<br><br>Lands designated as ACECs and managed to protect wilderness | Under Alternative C, NGD restrictions would be applied on 42,660 acres, and SSR restrictions would be applied on 241,400 acres, providing the least protection for water resources.<br><br>Impacts from fluid minerals would be similar to Alternative A.<br><br>More lands would be open to forest harvest, fewer lands would be open to grazing, and more restrictions on recreation would be applied than under Alternative A, result would be varying levels of protection for water resources. | The BLM would restrict surface-disturbing activities by applying NGD restrictions on 36,180 acres and SSR restrictions on 512,570 acres, providing protection for water resources.<br><br>Specific protections for surface water supply stream segments and domestic water wells would protect water resources.<br><br>Alternative D provides greater protections to water quality than Alternative A, including protecting riparian and perennial streams, implementing management measures to control saline and selenium levels in soils, and managing lands to improve water quality and to promote the delisting of state-impaired water bodies in areas where BLM management actions are contributing to impaired water quality.<br><br>Fewer areas would be open to fluid mineral leasing, forest harvest, recreation, and livestock grazing, reducing |

BLM_0114729

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | quality, channel stability, and watershed health. | characteristics would provide additional protection for water resources. | | impacts on water quality, channel stability, and watershed health. |
| 7. | **VEGETATION** | | | |
| 8. | *VEGETATION – UPLANDS* | | | |
| 9. | ROW activities, mineral and energy development, forest harvest, recreation (especially motorized use), and livestock grazing are primary land uses that could impact vegetation.<br><br>Land use restrictions designed to protect vegetation and plant communities would be relatively limited and generally handled with design features and mitigation measures at the project level. | Management under Alternative B would have an ecological focus, with existing uses geared toward ensuring the protection of natural values. This focus would improve and protect vegetation communities. Alternative B would emphasize use of fire over mechanical treatments, which could limit vegetation improvement and restoration.<br><br>Alternative B provides the most restrictions on land use (i.e., the most acres covered by NSO, NGD, and CSU) and the fewest areas open to mineral and energy development, forest harvest, recreation (especially motorized use), and livestock grazing, providing the greatest protections of vegetation. These restrictions would limit or modify uses in special vegetation or habitat types. Such use restrictions would reduce | Impacts from Alternative C would be similar to Alternative B, but emphasis would be on managing vegetation for commodities and resource uses, as well as maintaining vegetation conditions. As a result, there would be fewer opportunities for resource protection, vegetation improvement, and restoration. Fewer restrictions (e.g., NSO, NGD, and CSU) and ROW exclusion areas, which reduce surface-disturbing activities, would result in less protection for vegetation and could limit improvements to native vegetation communities and individual native plant species in areas that are important for regional vegetation diversity and quality.<br><br>Fewer ACECs and ecological emphasis areas would be | Management would emphasize balancing resources and resource uses while sustaining and enhancing ecological integrity across the landscape. The BLM would implement protective management measures for vegetation and stipulations and restrictions to reduce impacts from resource uses.<br><br>The BLM would apply more restrictions on surface-disturbing activities (e.g., NSO, NGD, and CSU) and fewer areas would be open to mineral and energy development, forest harvest, recreation (especially motorized use), and livestock grazing compared with Alternative A, reducing impacts related to vegetation disturbance, changes in condition, and fragmentation.<br><br>Lands designated as ACECs, |

BLM_0114730

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | damage to the condition of native vegetation communities and individual native plant species in areas that are important for regional vegetation diversity and quality. Likewise, use restrictions would minimize connectivity loss and would be more likely to retain existing age class distribution within these specific areas. | designated. No lands would be managed to protect wilderness characteristics. | ecological emphasis areas, and managed to protect wilderness characteristics would increase protection of vegetation resources. |
| 10. | *VEGETATION – RIPARIAN* | | | |
| 11. | Riparian and aquatic zones would be protected on 15,350 acres. There would be some riparian vegetation management to restore and enhance riparian vegetation, which would maintain or improve riparian vegetation conditions and hydrologic functionality.<br><br>Increased visitation could result in impacts within the San Miguel SRMA.<br><br>The San Miguel River ACEC and along 29 river segments managed as eligible for inclusion in the NWSRS provide additional protections for riparian vegetation. | Under Alternative B, the BLM would close the major river corridors in the planning area to fluid mineral leasing (26,990 acres of BLM surface/ federal mineral estate and 1,060 acres of split-estate) and would also apply NGD restrictions and manage the areas as ROW avoidance. NSO and NGD restrictions would be applied within 660 feet (63,540 acres of BLM surface/federal mineral estate and 2,530 acres of split-estate) of perennial and intermittent waters and naturally occurring wetlands, springs, and seeps. The following restrictions would also be applied: ROW exclusion within | The BLM would require some restrictions within riparian areas, though fewer than Alternative B. The BLM would apply CSU and SSR to the major river corridors in the planning area (26,990 acres of BLM surface/ federal mineral estate and 1,060 acres of split-estate) and within 325 feet of perennial streams (26,050 acres of BLM surface/ federal mineral estate and 12,730 acres of split-estate). CSU and SSR restrictions would also be applied within 100 feet of perennial and intermittent waters and naturally occurring wetlands, springs, and seeps | Protections from restrictions would be similar to, but slightly less than, those described for Alternative B. The BLM would apply NSO and SSR to major river corridors (26,990 acres of BLM surface/ federal mineral estate and 1,060 acres of split-estate) and within 325 feet of perennial and intermittent waters and naturally occurring wetlands, springs, and seeps (26,050 acres of BLM surface/ federal mineral estate and 12,730 acres of split-estate). The following restrictions would also be applied: ROW avoidance around major river corridors, within 325 feet of |

BLM_0114731

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | 325 feet of perennial streams; ROW exclusion within 100 feet of riparian and wetland areas, seeps, and springs; mineral materials disposal closures within 500 feet of riparian areas; wood products collection and harvest and other plant products collection closures within 100 feet of riparian areas;. This would protect riparian vegetation condition and hydrologic functionality, as well as reducing impacts from surface-disturbing activities.<br><br>Vegetation treatments in riparian areas would be limited, reducing the potential for achieving vegetation objectives and desired conditions in certain areas.<br><br>Increased visitation could result in impacts on riparian areas within the Dolores River Canyon and San Miguel SRMAs.<br><br>ACECs on 55,910 acres of riparian areas and along 29 river segments determined suitable for inclusion in the NWSRS would provide additional protections for riparian vegetation. | (10,280 acres of BLM surface/ federal mineral estate and 70 acres of split-estate). The BLM would also limit mineral materials disposal, wood products collection and harvest, and other plant products collection within riparian areas.<br><br>Riparian areas within the Dolores River Canyon and San Miguel River Corridor ERMA could be impacted by increased visitation in the same was as under Alternative B. However, because ERMAs would be managed commensurate with other resource needs, it may be easier for the BLM to modify recreation activities to protect riparian vegetation under this alternative than under alternatives where these areas are managed as SRMAs.<br><br>ACEC management would be similar to Alternative A, though there would be fewer protections in certain areas. No river segments would be managed as eligible or suitable for inclusion in the NWSRS. | perennial streams, and within 100 feet of riparian and wetland areas, seeps, and springs; closure to mineral materials disposal, wood products collection and harvest, and other plant products collection within 100 feet of riparian areas.<br><br>Impacts from SRMA management would be the same as those described for Alternative B.<br><br>ACECs on 31,500 acres of riparian areas and along 16 river segments determined suitable for inclusion in the NWSRS would provide additional protections for riparian vegetation. |

BLM_0114732

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| 12. | *VEGETATION – WEEDS* | | | |
| 13. | Management for weeds would continue per BLM regulations. Over time, recreation would have increasing impacts on the spread of weeds. | Soil and water protections would decrease the potential for the spread of weeds. All quarry pits would be managed as weed free for A, B, and C state-listed noxious weeds and BLM weed species of concern. Recreation management within SRMAs could concentrate weed populations and make them easier to manage. | The increased disturbance associated with Alternative C would result in the greatest potential for the introduction and spread of weeds. All quarry pits would be managed as weed free for A and B state-listed noxious weed species. | Impacts from weed management would be similar to those described for Alternative B. All quarry pits would be managed as weed free for A, B, and C state-listed noxious weed species. |
| 14. | **FISH & WILDLIFE** | | | |
| 15. | Alternative A management direction for fish and wildlife focuses more on single-species management and provides less direction on protecting species and habitat diversity, intact ecosystems, and ecosystem processes. Continuing current management would result in potential for direct and indirect impacts on fish and wildlife species and their habitats. Land use restrictions designed to protect fish and wildlife and their habitat would be limited and would generally be handled with design features and | Alternative B would create the most ecological emphasis areas (12), covering the most area (242,580 acres), and would provide the greatest protections from use impacts, with 186,070 acres of ROW exclusion and 207,320 acres with NSO stipulations. As a consequence, compared with Alternative A, this alternative would have reduced impacts on most fish and wildlife species. Within these special areas, it would provide the greatest protections for wildlife and reduced habitat fragmentation. | In general, Alternative C provides the least protection of the action alternatives for aquatic and terrestrial wildlife by emphasizing resource uses. Alternative C would create 2 ecological emphasis areas, covering 24,150 acres, with no ROW exclusion areas, and with ROW avoidance areas and CSU/SSR stipulations throughout the ecological emphasis areas. Alternative C would have reduced impacts on most fish and wildlife species, compared with Alternative A, but is the least protective of | Alternative D would provide substantial protection and enhancement of fish and wildlife populations and their habitats. Alternative D would create 12 ecological emphasis areas, covering 177,700 acres, with no ROW exclusion areas, and with ROW avoidance areas and CSU/SSR stipulations throughout the ecological emphasis areas. ROW avoidance areas provide less protection for ecological emphasis areas than ROW exclusion areas, because ROWs would be allowed in |

BLM_0114733

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | mitigation measures at the project level.<br><br>No ecological emphasis areas would be proposed, making it more difficult to effectively and efficiently manage for wildlife. | Healthier vegetation for fish and wildlife would be more resistant to invasive weeds and drought conditions.<br><br>Alternative B provides the most restrictions on minerals, ROW, trails and travel management, and other surface-disturbing activities. Alternative B would also create the most SRMAs, which would generally provide more protection for fish and wildlife from impacts of recreational use. As a consequence, impacts on fish and wildlife from these uses would be least for this alternative. | the action alternatives.<br><br>Among the action alternatives, Alternative C provides the least restrictions on minerals, ROWs, trails and travel management, and other surface-disturbing activities. This alternative provides the most ERMAs for recreation management, which would result in increased impacts on most fish and wildlife species and their habitats from recreation because activities would be less controlled in key or sensitive habitats or seasons. Overall, this alternative provides restrictions similar to Alternative A. As a consequence, impacts on fish and wildlife from these uses would be greatest among the action alternatives and similar to Alternative A. | ecological emphasis areas with siting restrictions to reduce impacts on fish and wildlife. Despite this, Alternative D would reduce detrimental impacts on most fish and wildlife species as compared with Alternative A.<br><br>Overall, Alternative D provides more restrictions than Alternative A on minerals, ROWs, trails and travel management, and other surface-disturbing activities. As a consequence, Alternative D would generally cause fewer impacts on fish and wildlife than Alternative A. |
| 16. | **SPECIAL STATUS SPECIES** | | | |
| 17. | *SPECIAL STATUS SPECIES – GENERAL* | | | |
| 18. | Alternative A provides overall direction to maintain or improve habitat for special status species, but it relies on | Under Alternative B, the BLM would implement protective management measures for fish, wildlife, and plants, and | Impacts from Alternative C would be similar to Alternative B. However, Alternative C would emphasize managing | Alternative D's overall management direction is similar to Alternative B, with additional direction to promote |

BLM_0114734

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | outdated conservation priorities and practices. Alternative A lacks recognition of the importance of landscape-scale conservation to protect and enhance habitat quality and patterns that preserve ecosystem functions and allow for climate change. As a result, Alternative A would generally result in greater habitat fragmentation and loss of population connectivity for special status species, compared with other alternatives.

Land use restrictions designed to protect special status species and their habitat would be relatively limited, and would generally be handled with design features and mitigation measures at project level. | stipulations and restrictions to reduce impacts from resource uses, which would protect special status species populations and habitats.

There would be 12 ecological emphasis areas covering 242,580 acres, including 186,070 acres of ROW exclusion areas and 56,490 acres of ROW avoidance areas. NSO stipulations would be applied on 207,320acres, and CSU stipulations would be applied on 35,250 acres of ecological emphasis areas. Ecological emphasis areas and ACECs with ROW exclusion and NSO restrictions would result in the greatest protection among any alternatives for special status fish and wildlife in these more-sensitive areas. These protections would provide the most intact natural landscapes, the greatest amount of corridor conservation for species movements, and the greatest resiliency against climate change or other long-term changes.

Overall, there would be more restrictions (e.g., NSO, NGD, | vegetation for commodities and resource uses, as well as maintaining vegetation conditions. As a result, there would be less opportunity for resource protection.

Under Alternative C, two ecological emphasis areas (24,150 acres) would be ROW avoidance areas, with CSU and SSR restrictions applied. Occupied habitat of known populations of federally listed species would be ROW avoidance areas. These protections would cover a smaller area than under Alternative B.

Overall, there would be fewer restrictions (e.g., NSO, NGD, CSU, and TL; ROW avoidance and exclusion areas) to reduce or limit surface-disturbing activities would reduce protections for special status species. | ecosystem integrity and protect and restore ecosystem processes. As a result, Alternative D would reduce adverse impacts on special status species, compared with Alternative A, and would provide beneficial impacts through active management to restore and enhance habitats.

Under Alternative D, the BLM would manage 12 ecological emphasis areas (177,700 acres), with ROW avoidance and CSU and SSR restrictions applied. Impacts are similar to those described for Alternative B, although across fewer acres and with less-protective stipulations (i.e., CSU versus NSO).

Overall, there would be more restrictions (e.g., NSO, NGD, and CSU), and fewer areas would be open to mineral and energy development, forest harvest, recreation (especially motorized use), and livestock grazing than Alternatives A and C, providing protection to special status species over a greater area. |

BLM_0114735

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.I, C, and D**

| Line # | Alternative A  Current Management (No Action) | Alternative B | Alternative C | Alternative D  Agency Preferred |
|---|---|---|---|---|
| | | and CSU), and fewer areas would be open to mineral and energy development, forest harvest, recreation (especially motorized use), and livestock grazing than Alternative A, reducing impacts related to disturbance from casual use, disturbance from permitted activities, and changes to habitat condition. | | |
| 19. | *SPECIAL STATUS PLANTS* | | | |
| 20. | Two ACECs (6,580 acres), Adobe Badlands and Fairview South, would continue to be managed to protect significant resource values, including special status plants (Colorado hookless cactus, clay-loving wild buckwheat, and Adobe Hills beardtongue. ). | Alternative B would require an NSO in federally listed and candidate plant species' occupied and historic habitat and closure of all federally threatened, endangered, proposed, and candidate plant species' occupied habitat to mineral materials disposal and nonenergy solid mineral leasing.  Seven ACECs (92,900 acres) would be designated to protect special status and rare plants (Colorado hookless cactus, clay-loving wild buckwheat, Adobe Hills beardtongue, Colorado desert parsley, good-neighbor bladderpod, kachina daisy, Naturita milkvetch, Paradox | Alternative C would close all federally threatened, endangered, and proposed plant species' occupied habitat to mineral materials disposal and nonenergy solid mineral leasing. Up to 10 percent of sensitive plant populations could be damaged, injured, or removed. There would be no stipulations to protect federally listed or candidate species.  Impacts from ACEC management would be the same as described for Alternative A.  Impacts on clay-loving wild buckwheat in the Kinikin Hills ERMA would be similar to, but | Impacts from closure on mineral materials disposal and nonenergy solid mineral leasing would be the same as those described for Alternative C.  Four ACECs (25,480) would be designated to protect special status and rare plant species (Colorado hookless cactus, clay-loving wild buckwheat, Adobe Hills beardtongue, kachina daisy, Naturita milkvetch, and Grand Junction milkvetch).  Impacts on clay-loving wild buckwheat from recreation in the Kinikin Hills ERMA would be similar to those described for Alternative B. However, |

*Uncompahgre Draft Resource Management Plan Revision and Environmental Impact Statement*

BLM_0114736

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | Valley lupine, Paradox breadroot, and Grand Junction milkvetch), the most of any alternative.<br><br>OHVs would be limited to designated trails on portions of the Kinikin Hills SRMA, where there are clay-loving wild buckwheat populations. | greater than, those described for Alternative B due to the proximity of the Kinikin Hills ERMA. | because ERMAs would be managed commensurate with other resource needs, it may be easier for the BLM to modify recreation activities to protect riparian vegetation under this alternative than under Alternative B. |
| 21. | *SPECIAL STATUS FISH AND WILDLIFE* | | | |
| 22. | Alternative A does not provide direction to remove nonnative trout to protect native cutthroat trout populations.<br><br>For Gunnison sage-grouse, some restrictions would apply in sage-grouse winter habitats and within 0.25-mile of leks. Some special status nesting raptors would be protected by NSO and TL stipulations.<br><br>For other special status species, Alternative A does not provide adequate management guidance or protective stipulations. | Alternative B provides direction to remove nonnative trout to protect native cutthroat trout populations.<br><br>For Gunnison sage-grouse, a range of stipulations would increase protection for all seasonal habitats compared with Alternative A.<br><br>Alternative B would have the lowest likelihood of disease transmission between domestic sheep and desert bighorn sheep.<br><br>Stipulations would also be applied to protect Canada lynx, special status raptors, prairie dogs, kit foxes, sensitive bats, and waterfowl and shorebirds to the greatest extent of any of the alternatives. | Alternative C, like Alternative A, does not provide direction to remove nonnative trout to protect native cutthroat trout populations.<br><br>For Gunnison sage-grouse, stipulations would provide some protection for key habitats but none in winter habitat.<br><br>Alternative C would manage to reduce the likelihood of disease transmission between domestic sheep and desert bighorn sheep, although to a lesser extent than Alternative B.<br><br>Stipulations would also be applied to protect special status raptors, prairie dogs, kit foxes, sensitive bats, and waterfowl | For all special status species, management and impacts would be similar to, though less protective than, Alternative B.<br><br>Removal of nonnative trout would be the same as Alternative B.<br><br>For Gunnison sage-grouse, stipulations would provide protection from surface occupancy and site disturbance in all seasonal habitats.<br><br>Alternative D would reduce the likelihood of disease transmission between domestic sheep and desert bighorn sheep to a greater extent than Alternative C but to a lesser extent than Alternative B. |

BLM_0114737

Table 2-6
Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | and shorebirds, though to a lesser extent than Alternative B. | Stipulations would also be applied to protect Canada lynx, special status raptors, prairie dogs, kit foxes, sensitive bats, and waterfowl and shorebirds. |
| 23. | **WILD HORSES** | | | |
| 24. | Under all alternatives, the BLM would continue to maintain Naturita Ridge as a herd area and would not reintroduce wild horses to the area. The area would be available for other uses. | | | |
| 25. | **WILDLAND FIRE ECOLOGY AND MANAGEMENT** | | | |
| 26. | Vegetation management and weed treatments would result in a long-term decrease in standing vegetation and modify the composition and structure of vegetation communities across the planning area, which would decrease the intensity of wildland fires. However, over the short term, vegetation treatments can increase the amount of downed vegetation in treated areas, thereby raising the risk of high-intensity wildfires until the downed vegetation decays.<br><br>The extent of planned ignitions and mechanical treatments would be altered in design and potentially limited in the 66,250 acres of VRM Class I and II | Increased fuel loading and potential for more costly fires could occur as a result of a reduction in mechanical treatments under this alternative. Specific restrictions include less use of mechanical hazardous fuels treatments in special status species habitat and when restoring terrestrial wildlife habitat. Emphasizing prescribed fire over mechanical treatments would likely increase the number of acres mitigated against fire, but it could also increase the chance of invasive species. Actions to fully meet or exceed BLM Colorado Public Land Health Standards would lower the risk of impacts from large wildfires and move more areas to fire | Alternative C would emphasize forage-producing vegetation treatments, which could reduce the potential for high intensity wildfires. In addition, this alternative would be the most permissive in regard to fuels treatments in riparian areas and upland vegetation communities and wildlife habitat restoration. Emphasizing mechanical treatments (as opposed to prescribed fire) would likely result in slightly fewer acres mitigated against fire, but this could also decrease the chance of invasive species outcompeting native vegetation post-treatment<br><br>Impacts from ACEC management would be similar | Compared with Alternative A, the increased use of planned and unplanned fires as well as mechanical treatments to meet resource objectives under Alternative D would, in the long term, further decrease fire intensity and fuel loading. Alternative D would emphasize a balanced approach to modifying fuels complexes with slightly fewer acres mitigated against fire and a decreased chance of invasive species outcompeting native vegetation, post-treatment as compared with Alternative B.<br><br>The types of impacts from VRM actions would be the same as those described under Alternative A, but VRM Class I |

BLM_0114738

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | lands, and 30,000 acres as ACECs, although lack of development in these areas may reduce the risk of human-caused ignition.<br><br>Areas are not closed to dispersed camping or overnight use, which results in potential for human-caused ignition. Alternative A would have the greatest potential for human-caused fire from recreational vehicles because it includes the fewest travel restrictions. | regime condition class 1.<br><br>The extent of planned ignitions and mechanical treatments would be altered in design and potentially limited in the 229,800 acres of VRM Class I and II lands (3 times more acres than under Alternative A), 42,150 acres managed for wilderness characteristics, and 215,840 acres of ACECs (7 times more than under Alternative A and the largest area of any alternative). Under Alternative B.1, VRM Class I and II lands would be managed on 235,520 acres (3 times more acres than under Alternative A, and slightly more than Alternative B).<br><br>Alternative B would have the most restrictions on dispersed camping and close the most areas to overnight camping, reducing the risk for human-caused ignitions. Impacts from comprehensive motorized and mechanized travel management would be similar to those described under Alternative A; however lack of areas open to cross-country motorized and | to those described under Alternative A. The types of impacts from visual resources management actions would be the same as those described under Alternative A, but VRM Class I and II lands would be managed on 75,480 acres (14 percent more acres than under Alternative A).<br><br>The restrictions on camping (dispersed and overnight use) would reduce the risk for human-caused ignitions from Alternative A, although not as much as the other action alternatives. The types of impacts from comprehensive motorized and mechanized travel management would be as described under Alternative A, but increased in intensity (16,070 acres open to cross-country motorized and mechanized travel). Lack of prohibition on surface-disturbing activities during times of high winds would result in an increased risk of human-caused ignitions in those areas. | and II lands would be managed on 158,980 acres (2 times more acres than under Alternative A). The types of impacts from ACEC management would be the same as those described under Alternative A, but they would occur over 51,320 acres (71 percent more than under Alternative A).<br><br>The restrictions on camping (dispersed and overnight use) would reduce the risk for human-caused ignitions from Alternative A, although not as much as Alternative B. Travel management restrictions on OHVs and open areas would reduce the risk of human-caused ignitions as described in Alternative B. |

BLM_0114739

Table 2-6
Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | | mechanized travel would result in fewer opportunities for unplanned ignition. Designated routes and prohibiting surface-disturbing activities as needed during times of high winds would reduce the risk of human-caused ignitions in those areas. | | |
| 27. | **CULTURAL RESOURCES** | | | |
| 28. | Impacts on resources could occur from authorized surface-disturbing events, unregulated events, and natural events, all of which could impact the integrity of cultural resources.

Natural and unregulated events (such as wildfires, illegal artifact collection, and unregulated OHV usage) would create unmitigated impacts. Authorized events (such as oil and gas development and vegetation management) could result in the discovery of additional resources. | Impacts would be similar to Alternative A.

Alternative B emphasizes the retention of relatively unmodified landscapes by decreasing areas of authorized surface-disturbing activities, such as increased areas of NSOs and greater use of travel management plans.

This alternative provides the most protection from special designations. The BLM would manage four ACECs specifically for the protection of cultural resources and eight stream segments with cultural or historical ORVs would be determined suitable for inclusion in the NWSRS. | Impacts would be similar to Alternative A.

Alternative C emphasizes the management of cultural resources on a site-by-site basis as needed for authorized surface-disturbing events. | Impacts would be similar to Alternative A.

Alternative D would emphasize a balance of economic and environmental outcomes.

Some areas would emphasize the retention of relatively unmodified landscapes by decreasing areas of surface-disturbing activities. Other areas would focus on the management of cultural resources on a site-by-site basis.

This alternative provides less protection from special designations that Alternative B, but more than Alternatives A and C. The BLM would manage two ACECs specifically for the |

BLM_0114740

Table 2-6
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | | protection of cultural resources and six stream segments with cultural or historical ORVs would be determined suitable for inclusion in the NWSRS. |
| 29. | **PALEONTOLOGICAL RESOURCES** | | | |
| 30. | Continued management of VRM Class I and II areas, ROW exclusion areas, areas closed to fluid mineral leasing and saleable minerals, areas withdrawn from locatable mineral entry, the Tabeguache Area, WSAs, and ACECs would directly protect paleontological resources by prohibiting or severely restricting surface-disturbing activities.<br><br>Paleontological resources would continue to be directly protected via the paleontological resources lease notification, which requires an inventory be performed by an accredited paleontologist approved by the BLM Authorized Officer before surface-disturbing activities are authorized in Class I and II | The same programs noted under Alternative A would likely directly protect paleontological resources by prohibiting or severely restricting surface-disturbing activities that could damage or destroy paleontological resources. Additionally, NGD and SSR restrictions would protect paleontological resources in a similar manner to NSO and CSU stipulations.<br><br>Stipulations would provide greater protection for paleontological resources by covering a larger area than under Alternative A. There are approximately 386,230 more acres of PFYC 4 and 5 areas covered by NSO stipulations (402,010 acres under Alternative B.1) and 471,580 more acres covered by CSU stipulations (the | The same programs noted under Alternative A would likely directly protect paleontological resources by prohibiting or severely restricting surface-disturbing activities that could damage or destroy paleontological resources. Additionally, NGD and SSR restrictions would protect paleontological resources in a similar manner to NSO and CSU stipulations.<br><br>Unlike Alternative A, there are no stipulations that directly protect fossil resources, resulting in a loss of direct protection for these resources.<br><br>NSO stipulations would provide less protection for paleontological resources than under Alternative A. There are approximately 12,060 acres of PFYC 4 and 5 areas covered by | The same programs noted under Alternative A would likely directly protect paleontological resources by prohibiting or severely restricting surface-disturbing activities that could damage or destroy paleontological resources. Additionally, NGD and SSR restrictions would protect paleontological resources in a similar manner to NSO and CSU stipulations.<br><br>Unlike Alternative A, there are no stipulations that directly protect fossil resources, resulting in a loss of direct protection for these resources.<br><br>Stipulations would provide greater protection for paleontological resources by covering a larger area than under Alternative A. There are approximately 141,870 more |

BLM_0114741

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | Paleontological Areas.<br><br>Stipulations would continue to provide indirect protection to paleontological resources by restricting or prohibiting surface-disturbing activities. For example, NSO stipulations would protect approximately 23,360 acres of PFYC 4 and 5 areas, and CSU stipulations would protect 111,960 acres of PFYC 4 and 5 areas.<br><br>The 41,670 acres of SRMAs that overlap PFYC 4 and 5 areas would continue to generally have a protective effect on paleontological resources due to restrictions on surface-disturbing activities. | same under Alternative B.1) than under Alternative A.<br><br>The 197,890 acres of SRMAs that overlap PFYC 4 and 5 areas would continue to generally have a protective effect on paleontological resources due to restrictions on surface-disturbing activities. | NSO stipulations. However, protections from CSU stipulations would increase as compared to Alternative A: there would be 134,050 more acres covered by CSU stipulations than under Alternative A.<br><br>Alternative C has 166,410 acres of PFYC 4 and 5 within ERMAs; the type of impacts would be the same as under Alternative B. | acres of PFYC 4 and 5 areas covered by NSO stipulations and 263,460 more acres covered by CSU stipulations than under Alternative A.<br><br>The 173,940 acres of SRMAs that overlap PFYC 4 and 5 areas would continue to generally have a protective effect on paleontological resources due to restrictions on surface-disturbing activities. |
| 31. | **VISUAL RESOURCES** | | | |
| 32. | Approximately 7,860 acres lack a visual resource inventory (VRI) class (these lands are part of the Curecanti National Recreation Area and are managed by the National Park Service). They are almost entirely managed as VRM Class III. Without a visual resource inventory, it is difficult to | As described under Alternative A, approximately 7,860 acres lack a VRI class and would be managed as VRM Class III.<br><br>There would be no lands in the planning area that lack a VRM class. Most (132,610 acres) of the VRI Class II lands are managed as VRM Class II or III. Virtually the | As described under Alternative A, approximately 7,860 acres lack a VRI class and would be managed as VRM Class III.<br><br>As described under Alternative B, there would be no lands in the planning area that lack a VRM class. Alternative C assigns VRM Class II | Similar to Alternative A, approximately 7,860 acres lack a VRI class and would be managed as VRM Class III.<br><br>As described under Alternative B, there would be no lands in the planning area that lack a VRM class. Alternative D assigns VRM Class I and II |

*Uncompahgre Draft Resource Management Plan Revision and Environmental Impact Statement*

BLM_0114742

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | identify if VRM Class III management objectives would be appropriate for these lands.<br><br>Approximately 47 percent of the planning area lacks a VRM class, making it possible for activities to degrade visual resources. Most (117,810 acres) of the VRI Class II lands are VRM Class III or undesignated. Most (303,670 acres) of the VRI Class III lands are VRM Class III or undesignated. Most (171,010 acres) of the VRI Class IV lands are VRM Class III or undesignated. In those areas managed for a VRM of a lower class than the VRI, it is expected that scenic resources would be degraded.<br><br>Activities that involve surface disturbance, such as motorized travel, vegetation treatments, utility corridors, and mineral development, would affect visual resources. For utility corridors, Alternative A is the only alternative with lands lacking a VRM class. | same number of acres of VRI Class II lands are managed as VRM Class II or III under Alternative B.1. Most (253,460 acres) of the VRI Class III lands are VRM Class III. Under Alternative B.1, 247,380 acres of VRI Class III lands would be managed as VRM Class III. Most (161,470 acres) of the VRI Class IV lands are VRM Class II or III (the same under Alternative B.1). Alternative B is more protective than Alternative A, though slightly less protective than Alternative B.1.<br><br>Activities that involve surface disturbance, such motorized travel, vegetation treatments, utility corridors, and mineral development, would affect visual resources. For utility corridors, Alternative B allows for the most VRI Class II, III, and IV lands to be protected due to management with more protective VRM class management objectives.<br><br>For lands open to fluid mineral leasing, subject to standard terms and conditions, Alternative B is the only alternative that allows | management to more VRI Class II lands than Alternative A. Alternative C assigns VRM Class I or III management to all of the VRI Class III lands. Alternative C is more protective than Alternative A.<br><br>Activities that involve surface disturbance, such motorized travel, vegetation treatments, utility corridors, and mineral development, would affect visual resources. For utility corridors, Alternative C allows for the most VRI Class II lands to be degraded due to management with less protective VRM class management objectives.<br><br>For lands open to fluid mineral leasing, subject to standard terms and conditions, Alternative C is the only alternative that allows for no VRI classes to be managed with more protective VRM class management objectives.<br><br>For lands open to fluid mineral leasing, subject to CSU, Alternative C allows for the | management to more VRI Class II lands than Alternative A. Alternative D assigns VRM Class I, II, or III management to almost all of the VRI Class III lands. Alternative D is more protective than Alternative A.<br><br>Activities that involve surface disturbance, such motorized travel, vegetation treatments, utility corridors, and mineral development, would affect visual resources. For utility corridors, Alternative D allows for the fewest VRI Class II lands to be degraded due to management with less protective VRM class management objectives.<br><br>For lands open to fluid mineral leasing, subject to standard terms and conditions, Alternative D is slightly more protective of visual resource conditions than Alternative B and C.<br><br>For lands open to fluid mineral leasing, subject to CSU, Alternative D allows for the most VRI Class II lands to be |

BLM_0114743

2. Alternatives (Summary Comparison of Environmental Consequences)

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | For lands open to fluid mineral leasing, subject to standard terms and conditions, Alternative A allows for the most VRI Class II and IV lands to be protected due to management with more protective VRM class management objectives. It also allows for the most VRI Class II and III lands to be degraded due to management with less protective VRM class management objectives. It is also the only alternative with lands lacking a VRM class. | for no VRI classes to be managed with less protective VRM class management objectives. This would keep visual resources on inventoried lands from degrading. | most VRI Class II lands to be degraded due to management with less protective VRM class management objectives. | protected due to management with more protective VRM class management objectives. |
| | For lands open to fluid mineral leasing, subject to CSU, Alternative A allows for the fewest VRI Class II lands to be degraded due to management with less protective VRM class management objectives. It is also the only alternative with lands lacking a VRM class. | For lands open to fluid mineral leasing, subject to CSU, Alternative B protects the most VRI Class III and IV lands due to management with more protective VRM class objectives. | | |
| 33. | **LANDS WITH WILDERNESS CHARACTERISTICS** | | | |
| 34. | Under Alternative A, the BLM would not manage any lands to protect wilderness characteristics and current | Under Alternative B, the BLM would manage all lands found to have wilderness characteristics to protect wilderness | Under Alternative C, the BLM would not manage any lands to protect wilderness characteristics. Impacts would | Under Alternative D, the BLM would manage 44 percent of lands found to have wilderness characteristics to protect |

*Uncompahgre Draft Resource Management Plan Revision and Environmental Impact Statement*

BLM_0114744

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | management provides the least amount of incidental protection to lands with wilderness characteristics. Current management led to current conditions that include wilderness characteristics existing in seven areas within the decision area, and conditions would likely persist in many of these areas under Alternative A. Wilderness characteristics in at least some areas that currently possess wilderness characteristics could degrade under this alternative.<br><br>Some lands with wilderness characteristics are protected from fluid mineral leasing by CSU (4 percent) or TL (68 percent) stipulations, although these stipulations provide less protection than NSO stipulations, which overlap 35 percent of lands with wilderness characteristics.<br><br>47 percent of lands with wilderness characteristics are managed according to VRM Class III objectives, which would allow landscape | characteristics. This alternative would offer the most protection to those areas via restrictions on land uses. | be similar to Alternative A, but this alternative would offer slightly more incidental protection from the management of other resources.<br><br>More lands with wilderness characteristics would be protected from fluid mineral leasing than Alternative A by CSU (56 percent) or TL (81 percent) stipulations, although these stipulations provide less protection than NSO stipulations, which overlap only 3 percent of lands with wilderness characteristics More lands with wilderness characteristics would be protected from land use authorizations as ROW avoidance areas (33 percent), and from other surface-disturbing activities by SSR restrictions (21 percent). In addition, 97 percent of lands with wilderness characteristics would be managed according to VRM Class III or IV objectives, which would allow landscape modifications that | wilderness characteristics. These lands would be protected in a similar manner as under Alternative B except that NSO stipulations would apply instead of closure to fluid mineral leasing, SSR restrictions would apply instead of NGD restrictions, and some lands would be managed as ROW avoidance areas instead of ROW exclusion areas.<br><br>Of the lands not managed to protect their wilderness characteristics, most lands would be protected from fluid mineral leasing by CSU stipulations (72 percent) and from such land use restrictions as ROW avoidance areas (74 percent). In addition, 71 percent of lands with wilderness characteristics not managed for their protection would be managed according to VRM Class III or IV objectives, which would allow landscape modifications that could impair the naturalness of the area. |

BLM_0114745

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | modifications that could impair the naturalness of the area. The remaining lands would not have a VRM classification, which would allow landscape modifications that could impair the naturalness of the area. | | could impair the naturalness of the area. The remaining lands would be managed according to VRM Class II objectives, providing some insurance that the naturalness will be protected in those areas. | |
| 35. | **Resource Uses** | | | |
| 36. | **FORESTRY AND WOODLAND PRODUCTS** | | | |
| 37. | No significant commercial harvest is anticipated over the life of the RMP.<br><br>Under Alternative A, 168,910 acres are open to forest product harvest and 110,160 acres are closed to harvest to protect special designation areas (including the Tabeguache Area, WSAs, and some ACECs) to protect water quality as well as provide the desired visitor experience in the San Miguel SRMA.<br><br>Forest product harvest could be impacted on the 372,240 acres open to forest use that overlap TLs, particularly if overlapping TLs provide a narrow window during which harvest would be allowed. | No significant commercial harvest is anticipated over the life of the RMP.<br><br>Under Alternative B, 397,160 acres would be closed to wood product sales and harvest to protect special designation areas, specific SRMAs and water quality (more than three times the acres closed under Alternative A). In addition to the closures discussed under Alternative A, there would be closures in areas to protect sensitive resources such as ecological emphasis areas, fragile soils or steep slopes, ancient woodlands, riparian areas, federally threatened or endangered species habitat, and rare vegetation. As a result, additional acres would be | No significant commercial harvest is anticipated over the life of the RMP.<br><br>Under Alternative C, 44,530 acres would be closed to wood product sales and harvest (40 percent fewer acres than Alternative A). Closures include the Tabeguache Area, WSAs, and Fairview South ACEC.<br><br>In total, 631,270 acres would be managed to provide minor wood products (noncommercial saw timber), some of which would be closed due to overlap with special resource areas. Though more acres are managed for wood product harvest under this alternative than under | No significant commercial harvest is anticipated over the life of the RMP.<br><br>Under Alternative D, 281,390 acres would be closed to wood product sales and harvest (2.5 times more than under Alternative A). Closures include special designation areas (i.e., specific ACECs, lands with wilderness characteristics, Tabeguache Area, WSAs) and sensitive resource areas (e.g., steep slopes, ecological emphasis areas, riparian areas, ancient woodlands, rare vegetation). Closures under Alternative D would limit forest product harvest but would likely improve forest and woodland |

BLM_0114746

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | unavailable for harvest. Woodland health is likely to improve in the long term due to protection of soils and sensitive habitat.<br><br>Approximately 278,640 acres would be managed to provide minor wood products (noncommercial saw timber). Though more acres are managed for wood product harvest under this alternative than under Alternative A, Alternative B allows the harvest of minor wood products only. Impacts from closure of commercial saw timber harvest are likely minimal due to the lack of current and projected commercial harvest demand, as well as limited acres occupied by such resources.<br><br>Forest product harvest could be impacted on the 278,640 acres open to forest use that overlap TLs, particularly if overlapping TLs provide a narrow window during which harvest would be allowed. | Alternative A, Alternative C allows the harvest of minor wood products only.<br><br>Under this alternative, due to few closures, woodland product harvest would be least restricted for personal use, but forest health is less likely to improve or remain stable in the long term.<br><br>Forest product harvest could be impacted on the 474,930 acres open to forest use that overlap TLs, particularly if overlapping TLs provide a narrow window during which harvest would be allowed. | health in the long term, as described under Alternative B.<br><br>Approximately 394,530 acres would be managed to provide minor wood products (noncommercial saw timber) under Alternative D.<br><br>Forest product harvest could be impacted on the 394,340 acres open to forest use that overlap TLs, particularly if overlapping TLs provide a narrow window during which harvest would be allowed. |

BLM_0114747

Table 2-6
Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 38. | **LIVESTOCK GRAZING** | | | |
| 39. | This alternative includes the largest area open to livestock grazing (658,540 acres) and the highest level of permitted AUMs (38,364). In general, Alternative A also has the fewest surface use restrictions that would limit range improvements and livestock management. As a result permittees would have the greatest flexibility for management<br><br>Under Alternative A, special vegetation treatments are authorized on a case-by-case basis. No ecological emphasis areas would be established under this alternative. Current management actions to maintain or improve land health for allotments would remain in place.<br><br>Trends described for forage and water conditions in Chapter 3 would continue. Limitations on grazing for soil and water protection would affect few acres and have | This alternative would provide the fewest acres open to grazing, 510,070 acres (approximately 23 percent fewer acres than under Alternative A). In addition, permitted AUMs would be reduced to 29,862 (approximately 22 percent fewer than Alternative A). In general, restrictions on grazing and adjustments to management practices would be the most extensive under this alternative, leading to the greatest limitations on livestock management options of all the alternatives.<br><br>Any additional forage would not be allocated for livestock, eliminating the potential for adjustments to increase AUMs. Furthermore, managing vegetation structure for maximum naturalness would preclude vegetation treatments solely for forage improvement, which could reduce AUMs or limit livestock dispersal options.<br><br>Approximately 394,540 acres would be closed to sheep and | Alternative C would slightly reduce areas open to grazing compared with Alternative A. Approximately 647,900 acres of allotments would be open to grazing (approximately 2 percent fewer acres than under Alternative A). Similarly, permitted AUMs would be slightly reduced to 37,926 (a 1 percent reduction in AUMs). A total of 27,900 acres would be closed to all classes of livestock grazing (nearly twice as many acres as under Alternative A).<br><br>Management strategies would emphasize increasing available forage and stocking rates where appropriate, while maintaining land health standards. Additional forage under this alternative would be allocated to domestic livestock, and AUMs could be increased. This alternative is more likely to increase flexibility for livestock management in the long term. In addition, construction, modification, or removal of range | Alternative D would reduce areas open to grazing compared to Alternative A. Approximately 611,560 acres would be open to grazing (approximately 7 percent fewer acres than under Alternative A). Similarly, permitted AUMs would be slightly reduced to 36,424 (approximately 5 percent fewer than under Alternative A). A total of 32,560 acres would be closed to all classes of livestock grazing to protect steep slopes.<br><br>Under Alternative D, management strategies would emphasize improving rangeland health and forage quality. As a result, short-term impacts on permittees could increase if additional management actions are needed to implement an improved grazing strategy. In the long term, however, land heath and forage base is likely to improve, benefitting permittees. |

*Uncompahgre Draft Resource Management Plan Revision and Environmental Impact Statement*

BLM_0114748

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | minimal impacts.<br><br>Management for special status species habitat would continue to result in potential restrictions on known, mapped habitat. Timing limitations for wildlife protection would restrict surface disturbing and could impact ability to construct range improvements management.<br><br>No specific RMP management actions are in place to prohibit domestic sheep grazing in adjacent or occupied bighorn sheep habitat.<br><br>Livestock would continue to be impacted by recreation, particularly in SRMAs on 22,570 acres, where changes in grazing management could be required to reduce user conflicts. | goat grazing. The cost to permittees associated with conversion of permits to cattle could be prohibitive and could result in a major change to the operation or the hardship of finding grazing lands (private or public) to replace the area lost.<br><br>Impacts from recreation are possible on 171,580 acres open to grazing within SRMAs (8 times more than under Alternative A). | improvements would be allowed if compatible with other resource uses.<br><br>Management for vegetation would emphasize resource production needs and fuels reduction; there would be less focus on resource protection and improvement or restoration of vegetation under Alternative C. As a result, this alternative would have the fewest limitations on manipulation of forage for livestock purposes.<br><br>Management for special status species habitat would continue to result in potential restrictions on known, mapped habitat. Timing limitations to protect wildlife would restrict surface-disturbing activities and could impact the ability to construct range improvements.<br><br>Minimal restrictions on range improvements could result from restriction on surface use for soil protection, but to a lesser degree than under any other alternative. | Additional forage under this alternative would be allocated to domestic livestock, wildlife, land health, or a combination of these, allowing for flexibility in livestock management while improving land health conditions. In addition, construction, modification, or removal of range improvements would be allowed if compatible with other resource uses. This would allow permittees additional flexibility while increasing management options.<br><br>Activities next to public water supplies would be restricted, however, grazing would not be expressly prohibited and impacts on grazing would be reduced compared to other action alternatives.<br><br>Special status species protection would result in 1,050 acres closed to grazing as well as 10,580 acres of mapped special status species habitat open to grazing with potential for limitations. Timing limitations for wildlife protection would restrict |

BLM_0114749

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | Prohibiting grazing adjacent to public water supplies would affect approximately 3,990 acres.<br><br>As in Alternative B, domestic goat and sheep grazing would be restricted to minimize disease transmission, but Alternative C would not specifically close existing domestic sheep allotments and would allow for greater flexibility in management.<br><br>Under Alternative C, no SRMAs would be established. ERMAs would be established on 199,250 acres open to livestock grazing. In contrast to SRMAs, ERMA management emphasizes multiple use and impacts on livestock from recreation are likely to be reduced compared with a SRMA, due to the management focus on interdisciplinary objectives rather than specifically on recreation. | surface-disturbing activities and could impact the ability to construct range improvements.<br><br>Stipulations to protect soil resources could limit range improvements on steep slopes and management options on soils high in salinity and selenium, with potential costs to permittees.<br><br>Restrictions on domestic sheep grazing would be based on the probability of interaction assessment; decisions would be made based on site-specific needs. Additional costs or management requirements would be limited to those allotments where an adverse impact on bighorn sheep is likely.<br><br>Under Alternative D, SRMAs would be established, with impacts similar to those described under Alternative A but occurring over a larger area (four times more than under Alternative A). |

BLM_0114750

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 40. | **COAL** | | | |
| 41. | Under Alternative A, there would be fewer restrictions on coal development than the action alternatives. However, a smaller coal development potential area would continue to constrain the amount of acreage suitable for coal development.<br><br>There would continue to be 980 acres within the Nucla-Naturita coal field with a TL stipulation that precludes surface-disturbing activities (e.g., surface mining) during certain times of the year, reducing the area available for surface mining operations.<br><br>Coal production is expected to remain the same across all alternatives. | The coal development potential area would to 421,500 acres, resulting in a larger area available to coal development.<br><br>Closures would also increase, prohibiting development in portions of areas such as WSAs, and the Grand Mesa, Somerset, and Tongue Mesa coal fields.<br><br>A TL stipulation would preclude surface mining operations in the Nucla-Naturita coal field during certain times of the year.<br><br>Coal production is expected to remain the same across all alternatives. | Increased coal development potential area would be the same size as Alternative B.<br><br>Compared with Alternative B, a smaller portion of the Grand Mesa, Somerset, and Tongue Mesa coal fields would be closed to development.<br><br>A TL stipulation would preclude surface mining operations on 17,480 of 19,500 acres in the Nucla-Naturita coal field during certain times of the year.<br><br>Coal production is expected to remain the same across all alternatives. | Increased coal development potential area would be the same size as Alternative B.<br><br>Compared with Alternatives B and C, a smaller portion of the Grand Mesa, Somerset, and Tongue Mesa coal fields would be closed to development.<br><br>A TL stipulation would preclude surface mining operations in the Nucla-Naturita coal field during certain times of the year.<br><br>Coal production is expected to remain the same across all alternatives. |
| 42. | **FLUID MINERALS** *(Oil and Gas and Geothermal Resources)* | | | |
| 43. | 871,810 acres (95 percent) of federal fluid mineral estate would remain open to oil and gas and geothermal leasing, and 44,220 acres (5 percent) would remain closed. | **Alternative B:**<br><br>Increased restrictions on development when compared with Alternative A.<br><br>696,450 acres (76 percent) of the federal fluid mineral estate would | Increased restrictions on development when compared with Alternative A.<br><br>871,810 acres (95 percent) of federal fluid mineral estate would be open to future oil | Increased restrictions on development when compared with Alternative A.<br><br>865,970 acres (95 percent) of federal fluid mineral estate would be open to future oil and |

BLM_0114751

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A _Current Management (No Action)_ | Alternative B | Alternative C | Alternative D _Agency Preferred_ |
|---|---|---|---|---|
| | NSO, CSU, and TL stipulations restrict future exploration and development activities by identifying where surface-disturbing activities may not occur, the manner in which they may be implemented, and when they may occur.<br><br>459,650 acres have higher development potential for conventional oil and gas and would remain open to leasing, 25,390 acres (6 percent) of which have NSO stipulations, 126,650 acres (28 percent) are open with a CSU stipulation, and 319,050 acres (69 percent) have higher development potential and no NSO or CSU stipulations. 282,650 acres (61 percent) are open with a TL.<br><br>456,190 acres have development potential for coalbed natural gas and would remain open to leasing, 5,460 acres (1 percent) of which has NSO stipulations, 15,010 acres (3 percent) are open with a CSU stipulation, and 437,750 acres (96 percent) have development potential and no | be open to future oil and gas and geothermal leasing, a 20 percent decrease from Alternative A. Approximately 186,700 acres (20 percent) would be closed (5 times more acres than under Alternative A).<br><br>NSO, CSU, and TL stipulations restrict future exploration and development activities by identifying where surface-disturbing activities may not occur, the manner in which they may be implemented, and when they may occur.<br><br>Approximately 24 percent of the area with geothermal resource potential would be closed to geothermal leasing. Approximately 65 percent of the geothermal potential area open to leasing would be subject to NSO stipulations.<br><br>369,600 acres have higher development potential for conventional oil and gas and would remain open to leasing, 219,610 acres (59 percent) of which would have an NSO stipulation, 372,860 acres (99 | and gas and geothermal leasing (the same as Alternative A), and 44,220 acres (5 percent) would be closed (the same as Alternative A).<br><br>NSO, CSU, and TL stipulations restrict future exploration and development activities by identifying where surface-disturbing activities may not occur, the manner in which they may be implemented, and when they may occur.<br><br>Approximately four percent of the area with geothermal resource potential would be closed to geothermal leasing. Approximately 3 percent of the geothermal potential area open to leasing would be subject to NSO stipulations.<br><br>459,650 acres have higher development potential for conventional oil and gas and would remain open to leasing, 11,210 acres (2 percent) of which would have an NSO stipulation, 182,140 acres (40 percent) would be open with a CSU stipulation, and 257,420 | gas and geothermal leasing (1 percent fewer acres than under Alternative A), and 50,060 acres (5 percent) would be closed (13 percent more acres than under Alternative A).<br><br>NSO, CSU, and TL stipulations restrict future exploration and development activities by identifying where surface-disturbing activities may not occur, the manner in which they may be implemented, and when they may occur.<br><br>Approximately four percent of the area with geothermal resource potential would be closed to geothermal leasing. Approximately 28 percent of the geothermal potential area open to leasing would be subject to NSO stipulations.<br><br>455,370 acres have higher development potential for conventional oil and gas and would remain open to leasing, 110,830 acres (24 percent) of which would have an NSO stipulation, 202,180 acres (44 percent) would be open with a |

BLM_0114752

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | NSO or CSU stipulations. 232,570 acres (51 percent) are open with a TL. | percent) would be open with a CSU stipulation, and 480 acres (less than one percent) of which would have neither NSO nor CSU stipulations. 369,420 acres (nearly 100 percent) would be open with a TL.<br><br>392,080 acres have development potential for coalbed natural gas and would remain open to leasing, 250,060 acres (64 percent) of which would have an NSO stipulation and 412,490 acres (98 percent) would be open with a CSU stipulation. There would be 4,420 acres (1 percent) with development potential open to leasing without NSO or CSU stipulations. 391,880 acres (nearly 100 percent) would be open with a TL.<br><br>**Alternative B.1** (North Fork area):<br><br>Increased restrictions on development when compared with Alternative A.<br><br>635,190 acres (69 percent) of federal fluid mineral estate would be open to future oil and gas leasing, a 27 percent decrease | acres (56 percent) have higher development potential and no NSO or CSU stipulations. 340,010 acres (74 percent) would be open with a TL.<br><br>456,220 acres have development potential for coalbed natural gas and would remain open to leasing, 12,810 acres (3 percent) of which would have an NSO stipulation, 253,470 acres (56 percent) would be open with a CSU stipulation, and 81,880 acres (18 percent) has development potential and no NSO or CSU stipulations. 246,010 acres (54 percent) would be open with a TL. | CSU stipulation, and 198,360 acres (44 percent) have higher development potential and no NSO or CSU stipulations. 455,370 acres (100 percent) would be open with a TL.<br><br>452,330 acres have development potential for coalbed natural gas and would remain open to leasing, 87,420 acres (19 percent) of which would have an NSO stipulation, 271,820 acres (60 percent) would be open with a CSU stipulation. There would be no acres with development potential open to leasing without NSO or CSU stipulations. 452,330 acres (100 percent) would be open with a TL. |

BLM_0114753

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | from Alternative A. Approximately 280,840 acres (31 percent) would be closed (6 times more acres than under Alternative A).<br><br>NSO, CSU, and TL stipulations restrict future oil and gas exploration and development activities by identifying where surface-disturbing activities may not occur, the manner in which they may be implemented, and when they may occur.<br><br>Analysis of leasing decisions for geothermal resources is the same as Alternative B.<br><br>344,020 acres have higher development potential for conventional oil and gas and would remain open to leasing, 214,850 acres (62 percent) of which would have an NSO stipulation, 343,480 acres (nearly 100 percent) would be open with a CSU stipulation, and 480 acres (less than 1 percent) have higher development potential and no NSO or CSU stipulations. 346,340 acres (100 percent) would be open with a TL. | | |

BLM_0114754

Table 2-6
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | 329,280 acres have development potential for coalbed natural gas and would remain open to leasing, 222,880 acres (68 percent) of which would have an NSO stipulation, 322,320 acres (98 percent) would be open with a CSU stipulation, and 4,430 acres (1 percent) have higher development potential and no NSO or CSU stipulations. 329,200 acres (nearly 100 percent) would be open with a TL. | | |
| 44. | **LOCATABLE MINERALS, MINERAL MATERIALS, & NONENERGY LEASABLE MINERALS** | | | |
| 45. | *LOCATABLE MINERALS* | | | |
| 46. | Impacts of withdrawals and areas petitioned for withdrawal with gypsum and gold potential would continue to be negligible.<br><br>If 12,350 acres petitioned for withdrawal in the uranium/vanadium potential area are withdrawn, the uranium/vanadium potential area would be reduced by six percent, pending resolution of the required mining claim validity exams. | Limiting the availability of locatable minerals on 399,770 acres (7 times more acres than under Alternative A), including recommending to withdraw 37,010 acres of open and active mining claims, would result in the most restrictive alternative for gypsum, uranium/vanadium, and placer gold mining. | Under Alternative C, there are fewer limitations on availability of locatable minerals (39,310 acres; 29 percent fewer acres than under Alternative A) than any of the alternatives. About 460 acres of open and active mining claims are within the area to be recommended for withdrawal.<br><br>Restrictions for gypsum, uranium/vanadium, and placer gold mining would apply to a smaller area than under Alternatives B and D. | Under Alternative D, there are fewer limitations on availability of locatable minerals (83,940 acres; 1.5 times more acres than under Alternative A) than Alternative B.<br><br>Restrictions for gypsum, uranium/vanadium, and placer gold mining would apply to a smaller area than under Alternative B. Of these minerals, gypsum would be the most-impacted: 73 percent of the potential area would be recommended for withdrawal. |

BLM_0114755

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 47. | **MINERAL MATERIALS** | | | |
| 48. | Constraints and closures would cover the smallest area of any alternative, resulting in the fewest restrictions on the disposition of mineral materials. | The largest area would be closed to the disposition of mineral materials (568,270 acres) with SSR and TL stipulations on the 327,920 acres open to the disposition of mineral materials where development would be constrained. | TL stipulation constraints (558,320 acres) and closures (58,610 acres) would, combined, cover a smaller area than under Alternatives B and D. | Under Alternative D, there would be fewer closures than Alternatives B and C, but up to 756,760 acres where development would be seasonally constrained by a TL stipulation (the greatest constraints of any alternative). |
| 49. | *NONENERGY SOLID LEASABLE MINERALS (e.g., sodium and potassium)* | | | |
| 50. | The Tabeguache Area and WSAs could continue to be closed to the leasing of nonenergy solid minerals, precluding future mining in these areas. | Alternative B would have the largest area closed to the leasing of nonenergy solid minerals (396,400 acres). There would be 499,790 acres open to the leasing of nonenergy solid minerals, with SSR restrictions on 487,610 acres. TL stipulations on an additional 289,400 acres open to leasing where development would be seasonally constrained. | Closures (57,390 acres) and TL stipulation constraints (560,540 acres) would, combined, cover a smaller area than under Alternatives B and D. | Under Alternative D, there would be fewer closures (170,490 acres) than Alternatives B and C, but up to 725,700 acres where development would be seasonally constrained by a TL stipulation (the greatest constraints of any alternative). |
| 51. | **RECREATION AND VISITOR SERVICES** | | | |
| 52. | Certain parts of the planning area, such as Spring Creek and the Jumbo Mountain receive heavy recreation use that currently falls under undesignated recreation management area management. Not providing special recreation management for | Alternative B attempts to identify the areas that will continue to require or will be most likely to require management actions to support recreation and the attainment of outcome-focused objectives. Eleven SRMAs would be managed to protect and enhance a targeted set of | Twelve ERMAs would be managed to support principal recreation activities. There would be no SRMA management, so recreation outcomes would not be protected under this alternative. Over time, outcomes desired by current | Seven SRMAs would provide long-term protection of targeted recreation outcomes in those areas. In general, desired future recreation setting characteristics would largely be realized through less-restrictive management actions. Four ERMAs would support |

BLM_0114756

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | these areas would likely inhibit desired opportunities, outcomes, and experiences and would result in user conflict and displacement. Similar impacts would be expected where outdated management plans for popular areas, such as Dry Creek, North Delta, Burn Canyon, and the Paradox Valley, fail to provide adequate management direction for emerging recreation trends and increased visitation. These impacts would likely become significant in certain areas over the life of the plan.<br><br>Allowing recreational shooting (except in developed recreation sites) and recreational mining without restrictions would provide recreation opportunities but could increase surface disturbance and visitor conflicts in specific areas with frequent use. | activities, experiences, benefits, and desired recreation setting characteristics. Management actions from other resource programs generally facilitate SRMA objectives.<br><br>Managing zero acres as open for cross-country motorized travel would have a long-term direct effect by eliminating this type of recreation in the North Delta OHV area.<br><br>Prohibiting target shooting in certain areas (see Table 2-2) would reduce opportunities for this activity but would increase public safety in many parts of the decision area by focusing target shooting in appropriate locations. | visitors, service providers, and affected communities may become unavailable. However, ERMA management would protect a variety of recreation opportunities. Recreation management actions to protect and provide recreation (e.g., trail design, construction, maintenance, and access points) would help mitigate conflict among user groups and with important biological resources.<br><br>Compared to Alternative A, more recreation opportunities would be lost in the long term by prohibiting target shooting within or toward developed recreation sites, and by prohibiting recreational mining in developed recreation sites. However, this could maintain naturalness in specific areas where these activities would no longer occur and would increase the quality of other recreation opportunities. | principal recreation activities. Managing zero acres as open for cross-country motorized travel would result in impacts similar to those under Alternative B.<br><br>There would be more long-term loss of recreation opportunities than under Alternative A by prohibiting recreational mining and target shooting within and near developed recreation sites and roads, near residences, in the North Delta OHV area, and in specific ACECs and SRMAs. However, this could also result in the potential for maintaining naturalness in localized areas where these activities would no longer occur and could increase the quality of other recreation opportunities. |

BLM_0114757

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 53. | **COMPREHENSIVE TRAVEL AND TRANSPORTATION MANAGEMENT** | | | |
| 54. | The degree of impact on travel would be lowest under Alternative A because of fewer land use restrictions for the protection of sensitive resources. Except for Alternative D, Alternative A would limit the most acreage to existing or designated routes (611,090 acres, 90 percent of the decision area). | Alternative B includes the most limitations on and closures to motorized and mechanized vehicle use for resource protection. Therefore, this alternative would cause the greatest adverse impacts on access opportunities for motorized vehicle use. Alternative B closes the most areas to motorized travel (114,970 acres). Alternative B would have no areas open to cross-country motorized travel. | Alternatives C would have the least amount of restrictions on travel, and, therefore, slightly less impact than Alternative B. Alternative C would have the most acres open to cross-country motorized travel (16,070 acres) and the fewest acres closed to motorized travel (45,170 acres). | Alternative D would have slightly less restriction, and therefore slightly greater impact, than Alternative B. Alternative D limits the most acreage to designated routes (617,240 acres, 91 percent of the decision area). Alternative D would have no areas open to cross-country motorized travel. |
| 55. | **LANDS AND REALTY** | | | |
| 56. | Continuing to manage 85,080 acres as ROW exclusion areas would prohibit ROW development in these areas. There would continue to be no ROW avoidance areas.<br><br>Alternative A would continue to manage 56,150 acres as closed to motorized travel. This creates areas that cannot be accessed readily, thereby creating areas that are off limits to some types of land uses, such as ROWs. | ROW exclusion and avoidance areas would have impacts similar to those under Alternative A, except that there would be 431,040 acres of ROW exclusion areas (5 times more than under Alternative A) and 195,460 acres of ROW avoidance areas.<br><br>Alternative B would manage 114,970 acres as closed to motorized travel. Impacts are similar to those identified under Alternative A, but there would be twice as many acres closed to motorized travel. | ROW exclusion and avoidance areas would have impacts similar to Alternative A, except that the BLM would manage 44,550 acres as ROW exclusion areas (48 percent fewer acres than under Alternative A) and 210,390 acres as ROW avoidance areas.<br><br>Alternative C would manage 45,170 acres as closed to motorized travel. Impacts are similar to those identified under Alternative A, but there would be a 20 percent | ROW exclusion and avoidance areas would have impacts similar to Alternative A, except that there would be 53,700 acres of ROW exclusion areas (37 percent fewer than Alternative A) and 276,500 acres of ROW avoidance areas (the greatest acreage under all of the alternatives).<br><br>Alternative D would manage 58,560 acres as closed to motorized travel. Impacts are similar to those identified under Alternative A, but there would |

BLM_0114758

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | | decrease in the areas closed to motorized or mechanized travel. | be a 4 percent increase in the areas closed to motorized travel. |
| 57. | *UTILITY CORRIDORS* | | | |
| 58. | Utility corridors would continue to occupy 297,930 acres in area. Collocating utilities within designated corridors would reduce land use conflicts in other locations by grouping similar facilities and activities in specific areas and away from conflicting developments and activities. It would also clarify the preferred locations for utilities and simplify processing on BLM-administered lands. However, designation of corridors could limit options for ROW design plans and selection of more-preferable locations. | Corridors totaling 64,300 acres for utilities would be managed for under Alternative B. Impacts would be the same as identified under Alternative A, but within a smaller area. | Impacts from utility corridors would be the same as those identified under Alternative B, except that only the West-wide Energy Corridor would be designated, a smaller area than Alternative B. | Impacts from utility corridors would be the same as those identified under Alternative B. |
| 59. | *LAND TENURE ADJUSTMENTS* | | | |
| 60. | Under Alternative A, 9,850 acres would remain available for land disposal. This would result in more contiguous public lands within the planning area and accommodate resource management. Land | Alternative B identifies 2,650 acres for land disposal (7,200 acres fewer than under Alternative A). Impacts would be similar to those identified under Alternative A, but less consolidation of BLM- | Impacts would be the same as Alternative A, except no lands are identified for acquisition and there would be no benefit to access for manageability through acquisition. | Alternative D identifies 1,930 acres for land disposals (7,920 fewer acres than under Alternative A). Impacts would be the same as those described under Alternative A, but less consolidation of BLM- |

BLM_0114759

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | disposals near cities or towns could accommodate community expansion needs by enabling lands to be used for public purposes. Disposal would also reduce isolated tracts, thus increasing land management efficiency. Most lands identified for disposal are south and west of Paonia, south of Montrose, and northwest and southeast of Norwood. Land acquisitions would improve access and manageability. | administered land would occur. Most lands identified for disposal are south of Montrose and northwest of Norwood. Land acquisitions would improve access and manageability. | | administered land would occur. Most lands identified for disposal are south of Montrose and northwest of Norwood. Land acquisitions would improve access and manageability. |
| 61. | **RENEWABLE ENERGY** | | | |
| 62. | Managing 85,140 acres as exclusion areas for wind, solar, and hydropower would continue to prohibit renewable energy development in this area. A significant area containing no VRM class objectives, as well as VRM Class III and IV management (totaling 609,550 acres), would continue to allow for renewable energy ROW authorizations. | Alternative B would implement the most restrictions of any alternative. Managing 518,150 acres (518,490 acres under Alternative B.1) as exclusion areas for wind and 513,360 acres (513,700 acres under Alternative B.1) as exclusion areas for solar and hydropower would result in the largest area off-limits to renewable energy development. Likewise, aside from Alternative B.1, the fewest acres would be managed as VRM Class III or IV (445,920 acres) where | Alternative C would implement the fewest restrictions of any alternative. Managing 44,550 acres as exclusion areas for wind, solar, and hydropower would result in the smallest area off-limits to renewable energy development. There would be few restrictions on the 600,320 acres managed as VRM Class III or IV.

Alternative C would be more supportive of biomass production than Alternative A. | Alternative D would be slightly less restrictive than Alternative A. There would be 126,160 acres of exclusion areas for wind, 166,620 acres of exclusion areas for solar, and 147,720 acres of exclusion areas for hydropower off-limits to ROW applications. There would be 516,820 acres managed as VRM Class III and IV, where restrictions would be less likely.

Alternative D would be the |

BLM_0114760

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | restrictions would be less likely. Under Alternative B.1, 439,630 acres would be managed as VRM Class III or IV.<br><br>Alternative B would be more supportive of biomass production than Alternative A. | | most supportive of biomass production. |
| 63. | Special Designations | | | |
| 64. | **AREAS OF CRITICAL ENVIRONMENTAL CONCERN** | | | |
| 65. | Impacts on values of existing ACECs would continue from authorized land uses, including grazing, recreation, and motorized use. Restrictions on authorized land uses within these ACECs would protect their relevant and important values.<br><br>Values in areas identified as potential ACECs that are not existing ACECs would continue to be impacted by authorized land uses including grazing, recreation, motorized use, utility development, and energy, and mineral development. | Fewer impacts on relevant and important values would occur compared with Alternative A because more areas would be designated as ACECs (7 times the acres under Alternative A). Increased restrictions on authorized land uses within these ACECs would protect their relevant and important values.<br><br>Impacts on values on the 770 acres identified as potential ACECs not proposed for designation would be similar to those under Alternative A, but would occur over a smaller area. Restrictions on authorized land uses in these areas would increase compared with Alternative A. | The BLM would designate the same ACECs as under Alternative A, except for Tabeguache Creek. More impacts on relevant and important values would occur because the BLM would reduce restrictions on authorized land uses.<br><br>Impacts on values in areas identified as potential ACECs not proposed for designation would be similar to those under Alternative A, but restrictions on authorized land uses would increase. | Fewer impacts on relevant and important values would occur compared with Alternative A because more areas would be designated as ACECs (71 percent more acres than under Alternative A). Restrictions on authorized land uses within these ACECs would protect their relevant and important values in a manner similar to Alternative A.<br><br>Impacts on values in areas identified as potential ACECs not proposed for designation would be similar to those under Alternative A but would occur over a smaller area. Restrictions on authorized land uses in these areas would increase compared with Alternative A. |

BLM_0114761

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 66. | **WILDERNESS AND WILDERNESS STUDY AREAS** | | | |
| 67. | *TABEGUACHE AREA* | | | |
| 68. | The BLM would not permit any actions that would impair the wilderness character of the Tabeguache Area. Such impacts would only occur from activities associated with valid existing rights or special provisions (e.g., livestock grazing). | Alternative B would provide the maximum level of protection for wilderness character for the Tabeguache Area. In addition to impacts experienced under Alternative A, management of lands with wilderness characteristics, ACECs, SRMAs, and ecological emphasis areas and WSR protection would provide management complementary to the protection of wilderness character both adjacent to and overlapping the Tabeguache Area. Such management could heighten protection within the Tabeguache Area and further ensure the integrity of wilderness character.<br><br>Recreational impacts on wilderness character under Alternative B would be reduced by the prohibition of competitive events and target shooting in the Tabeguache Area, preserving opportunities for solitude and naturalness and undeveloped character. | Impacts would be similar to Alternative A. | Impacts would be similar to Alternative A. |

BLM_0114762

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| 69. | *WILDERNESS STUDY AREAS* | | | |
| 70. | Alternative A would allow resource uses in the WSAs that maintain each area's suitability for preservation as wilderness and protects the viability of current wilderness characteristics. Additional protection for naturalness would be provided by closing Needle Rock ISA and a portion of the Adobe Badlands WSA to mineral materials disposal.<br><br>If Congress were to release WSAs from wilderness consideration, some protection would be afforded for wilderness characteristics due to overlapping special designations. Specifically, a portion of the Abode Badlands WSA (6,380 acres) would be encompassed in the Adobe Badlands ACEC, and segments eligible for inclusion in the National Wild and Scenic River System overlap with portions of the Dolores River Canyon WSA (La Sal Creek Segment 3 and Dolores River Canyon Segment 1a) and Camelback | Alternative B would provide the maximum level of protection for wilderness characteristics of all WSAs. Management of ACECs, SRMAs, ecological emphasis areas, WSRs, and lands with wilderness characteristics would provide management complementary to the protection of wilderness characteristics both adjacent to and overlapping WSAs.<br><br>All WSAs under Alternative B would be closed to mineral material disposal, providing protection for all wilderness characteristics. If any WSAs were released from wilderness consideration and managed as open to leasing, mineral entry and development, or mineral material sales, there could be impacts on wilderness characteristics from surface disturbance caused by mineral exploration and development.<br><br>Recreational impacts on wilderness characteristics under | Alternative C would provide the fewest adjacent or overlapping special designation areas, so incidental impacts from special designation areas on WSAs would be minimized and surface disturbance could be more likely to occur in areas released from wilderness consideration.<br><br>All WSAs would be closed to mineral materials disposal, as described under Alternative B. | Under Alternative D solitude and primitive and unconfined recreation would be enhanced by the prohibition of competitive events.<br><br>As described under Alternative B, management for areas with wilderness characteristics would provide protection of wilderness characteristics in areas next to current WSAs. This is only applicable for the Camel Back WSA Adjacent (6,950 acres) under Alternative D.<br><br>Impacts from rivers suitable for inclusion in the NWSRS would be as described under Alternative B.<br><br>All WSAs under Alternative D would be closed to mineral material disposal, with impacts as described under Alternative B. |

BLM_0114763

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | WSA (Roubideau Creek Segment 1). | Alternative B would be reduced by prohibiting competitive events and target shooting in all WSAs, preserving opportunities for solitude and preserving naturalness. | | |
| 71. | **WILD AND SCENIC RIVERS** | | | |
| 72. | There are 29 stream segments identified as eligible for inclusion in NWSRS. The BLM would not authorize any action that would adversely affect the free-flowing condition, water quality, ORVs, or tentative classifications of the segments. Potential impacts on WSR values would be minimized where other special management designations overlap a stream segment. | All stream segments would be determined suitable for inclusion in NWSRS. In addition to protections afforded the eligible segments under Alternative A, the BLM would apply land use restrictions to protect the suitable segments under Alternative B. This alternative provides the most protection of any alternative to the free-flowing condition, water quality, tentative classification, and ORVs of the segments. | Alternative C offers the least amount of protection for the 29 eligible segments. All eligible segments would be determined not suitable for inclusion in the NWSRS and would not be managed to protect their free-flowing condition, water quality, tentative classification, and ORVs. This could result in a potential long-term impact to the free-flowing condition, water quality, tentative classification, and ORVs. While the BLM would not be obligated to protect the ORVs, free-flowing condition, or tentative classification of the segments, the river segments could still receive indirect protection from other resource management actions. | Alternative D offers more protection to eligible segments than Alternative C but less than Alternatives A and B. Under Alternative D, 16 segments would be determined suitable for inclusion in the NWSRS. In addition to protections afforded the eligible segments under Alternative A, the BLM would apply land use restrictions to protect the suitable segments under Alternative D.

The remaining 13 segments would be determined not suitable for inclusion in the NWSRS. Impacts would be similar to Alternative C, although more incidental protection would be afforded under this alternative. |

BLM_0114764

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A
Current Management (No Action) | Alternative B | Alternative C | Alternative D
Agency Preferred |
|---|---|---|---|---|
| 73. | **NATIONAL TRAILS AND BLM BYWAYS** | | | |
| 74. | *NATIONAL TRAILS* | | | |
| 75. | No impacts on the Old Spanish Trail from mining coal. Portions of the Paradox Trail near Nucla could be directly impacted by activities related to mining (such as surface disturbance) over the long term. Indirect impacts are visual resource impacts from mining that could alter the scenic values of the trail.

No special restrictions for surface occupancy or fluid mineral leasing surrounding the Old Spanish, Tabeguache, and Paradox trails, which could result in impacts on visual resources or setting for the trail.

Visual resource management could impact natural scenic qualities of trails. Development may be permitted that could impact scenic qualities of the trail.

The Old Spanish, Tabeguache, and Paradox trails are all within areas not managed as | No impacts on the Old Spanish Trail from mining coal. The Tabeguache Trail is also in an area unacceptable to coal leasing. Portions of the Paradox Trail near Nucla are within areas acceptable to coal leasing; some trail sections could be directly impacted in the short and long term by activities related to mining (such as surface disturbance). Indirect impacts would include visual resource impacts that could alter the scenic values of the trail in the long term.

Applying NSO stipulation (0.5-mile buffer) and CSU stipulation (0.5- to 5-mile buffer) on either side of the Old Spanish Trail would provide more protection from surface-disturbing activities than under Alternative A. If the Tabeguache and Paradox trails were designated as National Recreation Trails, applying NSO stipulation (0.5-mile buffer) on either side of these trails would provide more protection from | No impacts on the Old Spanish Trail from mining coal. The Tabeguache and Paradox Trails are in areas acceptable to coal leasing; some trail sections could be directly impacted in the short and long term by activities related to mining (such as surface disturbance). Indirect impacts include visual resource impacts that could alter the scenic values of the trail in the long term.

Applying NSO and CSU stipulations (50-meter buffer) on either side of the Old Spanish Trail would provide more protection from surface-disturbing activities than under Alternative A, but less than Alternative B. If the Tabeguache and Paradox trails were designated, applying NSO stipulation (200-meters [656-foot] buffer) on either side of these trails would provide more protection from surface-disturbing activities | No impacts on the Old Spanish Trail from mining coal. The Tabeguache Trail is also in an area unacceptable to coal leasing. Portions of the Paradox Trail are within areas acceptable to coal leasing; some trail sections could be directly impacted in the short and long term by activities related to mining (such as surface disturbance). Indirect impacts would include visual resource impacts that could alter the scenic values of the trail in the long term.

The same NSO and CSU stipulations as Alternative B would be applied to the Old Spanish Trail and would result in the same impacts. If the Tabeguache and Paradox trails were designated as National Recreation Trails, the same NSO stipulation as Alternative C would be applied and would result in the same impacts. |

BLM_0114765

Table 2-6
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | recreation management areas. Recreation settings and opportunities would be impacted by other uses, and current opportunities and recreation settings could change over the long term. | surface-disturbing activities than under Alternative A.<br><br>In areas of NGD and SSR, national trails would also be less impacted in the short and long term by controlling surface-disturbing activities.<br><br>Visual impacts would be the same as Alternative A.<br><br>Increased recreation management in SRMAs could provide additional opportunities for activities and experiences for national trail users.<br><br>Potential listing of the Tabeguache and Paradox trails as a National Recreation Trail could increase recreational use of these trails, thus providing the potential for greater opportunities for interpretation and education, while also increasing pressure on trail resources. | than under Alternative A, but less than Alternative B.<br><br>Alternative C would have would have fewer areas of NGD and SSR, resulting in less protection from surface disturbance and development impacts then Alternative B.<br><br>Less restrictive visual resource management would result in increased impacts from development.<br><br>Recreation management in ERMAs would result in similar impacts as Alternative A.<br><br>Like Alternative B, potential listing of the Tabeguache and Paradox trails as a National Recreation Trail would result in the same impacts. | Most of the Old Spanish, Tabeguache, and Paradox Trails would be in areas of SSR, resulting in more opportunities for protection from surface disturbance and development impacts.<br><br>Similar to Alternative C, less restrictive visual resource management would result in increased impacts from development.<br><br>Recreation management in SRMAs and ERMAs would result in impacts similar to Alternatives B and C.<br><br>Like Alternative B, potential listing of the Tabeguache and Paradox trails as a National Recreation Trail would result in the same impacts. |
| 76. | *NATIONAL AND BLM BYWAYS* | | | |
| 77. | By not establishing additional BLM byways, resources along those roads would not receive public recognition and traffic would not increase at levels | No new BLM byways would be established. Impacts would be the same as those under Alternative A. | No new BLM byways would be established. Impacts would be the same as those under Alternative A. | No new BLM byways would be established. Impacts would be the same as those under Alternative A. |

BLM_0114766

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | commensurate with an official byway.<br><br>Areas of less restrictive visual resource management would result in development that could attract attention.<br><br>Portions of the Unaweep-Tabeguache Byway and San Juan Skyway would run through the San Miguel SRMA, and driving for pleasure combined with SRMA visitation could lead to an increase in use.<br><br>Portions of the Unaweep-Tabeguache Byway and West Elk Loop are in areas managed as ROW exclusion areas, eliminating impacts from development in these areas.<br><br>Efforts to protect scenic ORVs along eligible WSR segments would benefit scenic values of the byways by prohibiting or limiting most surface-disturbing activities. | All national and BLM byways would be managed as VRM Class II within 0.5-mile of either side of the centerline. By designating the area around byways as VRM Class II, opportunities to protect viewsheds would be greater than under Alternative A.<br><br>An NSO stipulation would apply to fluid mineral leasing within a half-mile of scenic byways. Potential impacts from these uses would be less than under Alternative A.<br><br>Potential impacts from SRMAs would be the same as Alternative A. Scenic touring would be a targeted activity in these SRMAs.<br><br>More ROW avoidance and exclusion areas would provide more protections from development then Alternative A.<br><br>Overall, additional stipulations (NSO and CSU for fluid minerals, and NGD and SSR for other surface-disturbing activities) under Alternative B would provide greater protection of ORVs along byways than under Alternative A. | All national and BLM byways would be managed as VRM Class III within a 0.25-mile of either side of centerline. This would result in less protection of scenic values than Alternative B.<br><br>A CSU stipulation would apply to fluid minerals within a 0.25-mile of scenic byways. The less restrictive stipulation and smaller buffer area would not provide as much protection to viewsheds than Alternative B.<br><br>Potential impacts from ERMAs would be the same as impacts on SRMAs under Alternative A.<br><br>Most areas would be managed as ROW avoidance areas and would provide more protections from development then Alternative A.<br><br>All eligible stream segments would be found not suitable. Therefore, opportunities to protect scenic values associated with the eligible segments along this byway would be less than under Alternative A. | Byways would be managed as VRM Class II or III. Impacts would vary depending on classification and would be similar to Alternatives B and C. A CSU stipulation would apply to fluid minerals within a 0.5-mile of scenic byways. The less restrictive stipulation and smaller buffer area would not provide as much protection to viewsheds as Alternative B.<br><br>Potential impacts from ERMAs would be the same as impacts on SRMAs under Alternative A.<br><br>Potential impacts on byways related to ROW activities are similar to Alternative C. However, expanded areas of avoidance could provide more opportunities to preserve values.<br><br>Protection ORVs along the Unaweep-Tabeguache Byway are similar to those under Alternative B. However, the Naturita Creek segment would be determined to be not suitable, so ORV protective measures would not apply. Like |

BLM_0114767

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | | | | Alternative B, additional stipulations would provide greater protection of ORVs than under Alternative A. |
| 78. | **WATCHABLE WILDLIFE VIEWING SITES** | | | |
| 79. | There are no watchable wildlife viewing sites under Alternative A. Visitors have to create their own opportunities to view wildlife, but the associated interpretation and education is lacking. Visitors are not directed to these areas for the purpose of viewing wildlife, so visitors may not know that they are good locations. Wildlife viewing takes place across the decision area as opportunities arise, but is lower quality that provided for under Alternative B. | Under Alternative B, three watchable wildlife viewing sites would provide targeted opportunities for wildlife interpretation and education, enhancing public wildlife viewing experiences as a result. The watchable wildlife areas would also direct resources for watching wildlife to areas most suitable for this activity, thereby improving the chances of viewing wildlife. In addition, wildlife habitat improvements in the watchable wildlife areas would encourage more wildlife to frequent the area. | Impacts would be similar to Alternative A except that there would be fewer restrictions on recreation within potential watchable wildlife viewing sites than the other alternatives which may decrease opportunities for wildlife viewing by disturbing wildlife or their habitat. | Impacts would be similar to Alternative A. |
| 80. | **Support** | | | |
| 81. | **NATIVE AMERICAN TRIBAL USES** | | | |
| 82. | There would be no immediate impacts from the goals, objectives, and allocations noted in the alternatives, though there may be direct impacts associated with some future management actions. Impacts are difficult to quantify because the locations of sacred sites in the planning area are unknown and planning-level alternatives typically do not identify specific areas for surface-disturbing activities. | | | |

BLM_0114768

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| 83. | **PUBLIC HEALTH AND SAFETY** | | | |
| 84. | Hazardous materials threaten public health and safety directly through potential exposure to a hazardous substance and indirectly through potential contamination of water, soil, and air. Risks described in existing conditions from the unexploded mines, abandoned mines, recreation on public lands, and hazardous fuels treatments, would continue to be present.<br><br>Target shooting would continue to be prohibited on developed recreational sites (2,070 acres), providing a minimal level of protection for the public from injury gunfire.<br><br>Specific protection measures for municipal water supplies are limited to the water supply for the town of Norwood, so there is some potential for contamination of water supplies by development related to mining and oil, gas, and geothermal exploration. | Impacts would be similar to A with the following exceptions:<br><br>Target shooting would be prohibited on 248,130 acres, providing the maximum level of protection from injury and damage to facilities from gunfire across all alternatives.<br><br>All municipal water supplies classified by the State of Colorado, as well as groundwater wells and springs used for public water supply, would be protected from contamination with a no leasing (fluid minerals) restriction, as well as an NGD restrictions for other activities providing enhanced protection in comparison with Alternative A.<br><br>Under Alternative B.1, all municipal water supplies classified by the State of Colorado, as well as domestic water wells and private water systems, would be protected from contamination with a no leasing (oil and gas) restriction. The area closed to leasing surrounding these sites is smaller than under Alternative B | Impacts would be similar to A with the following exceptions:<br><br>Target shooting would be prohibited within and towards developed recreational sites, providing a similar level of protection from injury by gunfire to Alternative A, but less than under Alternative B.<br><br>All municipal water supplies classified by the State of Colorado, as well as groundwater wells and springs used for public water supply would be similar to Alternative B, but would have an additional CSU stipulation and additional protective measures between 1,000 and 2,640 feet from the water would be maintained, providing enhanced protection. | Impacts would be similar to A with the following exceptions:<br><br>Target shooting would be prohibited on 67,740 acres, providing more protection from injury and damage to facilities by gunfire than Alternative A or C, but less than Alternative B.<br><br>Municipal water supplies classified by the State of Colorado, as well as groundwater wells and springs used for public water supply, would be protected from contamination with a no leasing restriction for the first 1,000 feet from the water supply, with a CSU stipulation and additional protective measures between 1,000 and 2,640 feet.<br><br>Management of active and abandoned mine lands to reduce active soil erosion through rehabilitation would be similar to Alternative B, but additionally provides for the possible closure of routes as a part of a comprehensive travel management plan |

BLM_0114769

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | but would still provide enhanced protection compared with Alternative A.<br><br>The surface occupancy and surface-disturbing activities on a 20-acre site near Uravan would be prohibited resulting in the reduction of risk from exposure to uranium and vanadium caused by earth-disturbing activities.<br><br>Management of new and abandoned mine lands to include road closure and soil stabilization reduce risk by reducing exposure to these areas through inhibiting access. | | |
| 85. | **SOCIOECONOMICS** | | | |
| 86. | *Note: Dollar amounts and employment numbers provided below represent the quantifiable economic impacts based on the level of activity predicted by alternative in the year 2032. These numbers are estimates based on best available data and should be utilized only for comparison of impacts by alternative. Refer to Section 4.6.3 for detailed assumptions and methodology utilized in economic modeling.* | | |
| 87. | Under Alternative A, livestock grazing is estimated to generate between $55.2 million and $91.3 million in total spending, between $7.5 million and $12.8 million in labor income, and would create between 889 and 1,579 full-time equivalent jobs over the 20-year lifespan of the plan, depending on the level of | Under Alternative B, livestock grazing would generate between $42.5 million and $68.6 million in total spending, between $5.3 million and $8.7 million in labor income, and would create between 529 and 869 full-time equivalent jobs over the 20-year lifespan of the plan, depending on | Under Alternative C, livestock grazing would generate between $56.6 million and $88 million in total spending, between $7.3 million and $11.5 million in labor income, and would create between 759 and 1,232 full-time equivalent jobs over the 20-year lifespan of the plan, depending on the level of | Under Alternative D, livestock grazing would generate between $52.3 million and $86.9 million in total spending, between $7.2 million and $12.3 million in labor income, and would create between 854 and 1,527 full-time equivalent jobs over the 20-year lifespan of the plan, depending on the level of |

BLM_0114770

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| | permitted AUMs. | the level of permitted AUMs. | permitted AUMs. | permitted AUMs. |
| | Under Alternative A, recreation spending would generate $5.7 million dollars in total spending, $1.8 million in labor income, and 69 full-time equivalent jobs over the 20-year lifespan of the plan. | Economic effects from recreation spending would be similar but slightly less than Alternative A. Motorized use is anticipated to be slightly less under this alternative, while non-mechanized use may increase. | Economic effects from recreation spending would be similar but slightly greater than Alternative A. Motorized use is anticipated to increase slightly under this alternative, while non-mechanized use may decrease. | Economic effects from recreation spending would be similar to, but slightly greater than, Alternative A. Both motorized and non-motorized used may increase slightly over the long-term due to increased resource available and protection for both user types. |
| | Due to minimal restrictions within high-potential areas under this alternative, fluid mineral development is more likely to meet levels predicted in the RFD (BLM 2012d), and economic impacts would be increased. | Additional stipulations could increase the costs for fluid mineral development, leading to additional contributions to the local economy per well, but overall economic contributions are likely to be reduced as compared to Alternative A. | Fewer stipulations and closures for fluid mineral development, as compared with other action alternatives, could decrease costs for developers and encourage development. | Alternative D would be more restrictive to fluid mineral development than Alternative A because a larger percentage of the planning area would be unavailable for leasing, and fewer acres would be open to leasing without stipulations. Associated costs for development would be increased above that in Alternative A. |
| | Under Alternative A, the economic effects from coal production would generate $11.1 billion in total spending, $7.8 billion in labor income, and would create 50,350 full-time equivalent jobs over the 20-year lifespan of the plan. | The economic effects from coal production would be similar as Alternative A.

Under Alternative B.1, impacts would be similar to those discussed under Alternative B; however, additional oil and gas closures (NL) in the North Fork area (104,750 acres, 75 percent of the North Fork area) and stipulations (NSO on 27,280 acres, 20 percent of the North Fork area) on oil and gas development under Alternative | The economic effects from coal production would be the same as Alternative A. | The economic effects from coal production would be the same as Alternative A. |

BLM_0114771

**Table 2-6**
**Summary of Environmental Consequences of Alternatives A, B/B.1, C, and D**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred* |
|---|---|---|---|---|
| | | B.1 would increase restrictions on development and costs to developers, further reducing economic contributions from the oil and gas industry in the planning area and in the North Fork area in particular.<br><br>These additional stipulations on oil and gas development are intended to increase protection of local water sources for North Fork Valley residents and to maintain water quality for local agricultural operations. Protecting these resources would likely maintain and enhance quality of life for area residents (North Fork Heart and Soul 2014). Additionally, as discussed in **Chapter 4, Section 4.6.3**, Socioeconomics, *Nature and Type of Effects*, agriculture is of local economic importance for farms and agritourism; therefore, maintaining water quality would protect these economic sectors from potential development impacts. | | |

BLM_0114772

# Chapter 3
# Affected Environment

BLM_0114773

BLM_0114774

# TABLE OF CONTENTS

Chapter                                                                                                        Page

**3.    AFFECTED ENVIRONMENT** ........................................................................................ 3-1

    3.1    Resources ....................................................................................................... 3-2
        3.1.1    Air Quality.............................................................................................3-2
                    Current Conditions..............................................................................3-2
                    Trends ................................................................................................3-7
        3.1.2    Climate .................................................................................................3-12
                    Current Conditions............................................................................3-12
        3.1.3    Soils and Geology ................................................................................3-16
                    Current Conditions............................................................................3-17
                    Trends ..............................................................................................3-25
        3.1.4    Water Resources..................................................................................3-27
                    Current Conditions............................................................................3-27
                    Trends ..............................................................................................3-41
        3.1.5    Vegetation............................................................................................3-41
                    Vegetation Types within the Planning Area.........................................3-43
                    Current Conditions............................................................................3-46
                    Trends ..............................................................................................3-52
        3.1.6    Fish and Wildlife...................................................................................3-57
                    Current Condition .............................................................................3-57
                    Trends ..............................................................................................3-64
        3.1.7    Special Status Species...........................................................................3-68
                    Federal Endangered, Threatened, Proposed, and Candidate Species ............3-68
                    Current Conditions............................................................................3-69
                    Trends ..............................................................................................3-84
        3.1.8    Wild Horses.........................................................................................3-86
                    Current Conditions............................................................................3-86
                    Trends ..............................................................................................3-86
        3.1.9    Wildland Fire Ecology and Management ................................................3-86
                    The National Fire Plan.......................................................................3-87
                    Unit Fire Management Plans...............................................................3-87
                    Fire Regime Condition Class ..............................................................3-87
                    Current Condition .............................................................................3-89
                    Trends ..............................................................................................3-91
        3.1.10   Cultural Resources................................................................................3-93
                    Current Conditions............................................................................3-94
                    Trends ..............................................................................................3-99
        3.1.11   Paleontological Resources..................................................................... 3-100
                    Potential Fossil Yield Classification System .......................................... 3-100
                    Current Condition ............................................................................. 3-101
                    Trends .............................................................................................. 3-103
        3.1.12   Visual Resources .................................................................................. 3-103
                    Current Conditions............................................................................ 3-104
                    Trends .............................................................................................. 3-106
        3.1.13   Lands with Wilderness Characteristics.................................................. 3-107
                    Current Conditions............................................................................ 3-108
                    Trends .............................................................................................. 3-111

BLM_0114775

## TABLE OF CONTENTS (Continued)

Chapter                                                         Page

3.2    Resource Uses ............................................................................................ 3-111
      3.2.1    Forestry and Woodland Products ........................................................ 3-111
                Current Conditions .................................................................................. 3-111
                Trends ......................................................................................................... 3-114
      3.2.2    Livestock Grazing .................................................................................. 3-115
                Current Conditions .................................................................................. 3-116
                Trends ......................................................................................................... 3-118
      3.2.3    Energy and Minerals .............................................................................. 3-118
                Fluid Leasable Minerals – Oil and Gas ............................................... 3-118
                Fluid Leasable Minerals – Geothermal Resources ........................... 3-121
                Solid Leasable Minerals – Coal ............................................................ 3-123
                Solid Leasable Minerals – Sodium and Potassium ........................... 3-127
                Locatable Minerals – Uranium-Vanadium ......................................... 3-127
                Locatable Minerals – Gypsum ............................................................. 3-128
                Locatable Minerals – Placer Gold ...................................................... 3-128
                Mineral Materials ..................................................................................... 3-129
      3.2.4    Recreation and Visitor Services ......................................................... 3-130
                Current Conditions .................................................................................. 3-130
                Trends ......................................................................................................... 3-137
      3.2.5    Comprehensive Travel and Transportation Management ............. 3-137
                Modes of Travel ...................................................................................... 3-138
                Travel Designations ................................................................................ 3-139
                Emergency Closures ............................................................................... 3-139
                Federal Regulations ................................................................................ 3-140
                National Guidance .................................................................................... 3-140
                Current Conditions .................................................................................. 3-140
                Trends ......................................................................................................... 3-144
      3.2.6    Lands and Realty ..................................................................................... 3-144
                Current Conditions .................................................................................. 3-145
                Trends ......................................................................................................... 3-148
      3.2.7    Renewable Energy .................................................................................. 3-150
                Current Conditions .................................................................................. 3-151
                Trends ......................................................................................................... 3-152
3.3    Special Designations ................................................................................. 3-152
      3.3.1    Areas of Critical Environmental Concern ........................................ 3-152
                Current Conditions .................................................................................. 3-153
      3.3.2    Wilderness and Wilderness Study Areas ......................................... 3-157
                Wilderness Study Areas ......................................................................... 3-157
                Tabeguache Area ...................................................................................... 3-159
      3.3.3    Wild and Scenic Rivers ......................................................................... 3-164
                Determination of Wild and Scenic River Eligibility ......................... 3-164
                Determination of Wild and Scenic River Suitability ....................... 3-165
                Current Conditions .................................................................................. 3-165
                Trends ......................................................................................................... 3-167
      3.3.4    National Trails and Byways ................................................................... 3-167
                Current Condition ................................................................................... 3-167
                Trends ......................................................................................................... 3-170

BLM_0114776

# TABLE OF CONTENTS (Continued)

Chapter | Page
---|---
3.3.5 Watchable Wildlife Viewing Areas | 3-170
Current Condition | 3-170
3.4 Social and Economic Conditions | 3-171
3.4.1 Native American Tribal Interests | 3-171
Current Conditions | 3-172
Trends | 3-174
3.4.2 Public Health and Safety | 3-175
Current Conditions | 3-175
Trends | 3-178
3.4.3 Socioeconomics | 3-178
Current Conditions and Trends | 3-180
3.4.4 Environmental Justice | 3-198
Current Conditions and Trends | 3-199
3.5 Support | 3-201
3.5.1 Cadastral | 3-201
Current Conditions | 3-202
Trends | 3-202
3.5.2 Interpretation and Environmental Education | 3-202
Current Conditions | 3-202
Trends | 3-203
3.5.3 Transportation Facilities | 3-203
Current Conditions | 3-203
Trends | 3-207

# TABLES

| | | Page |
|---|---|---|
| 3-1 | Average Annual Air Pollutant Emissions (2008) | 3-3 |
| 3-2 | Applicable Ambient Air Quality Standards and Existing Representative Pollutant Concentrations for the Planning Area | 3-5 |
| 3-3 | Climate Summary from Stations within the Planning Area | 3-12 |
| 3-4 | Land Health Assessment Soil Summary Ratings | 3-18 |
| 3-5 | Acreage of Fragile Soils | 3-20 |
| 3-6 | Major Hydrologic Units | 3-27 |
| 3-7 | Hydrologic Soil Group Ratings | 3-28 |
| 3-8 | Land Health Standard 5 Summary Ratings | 3-30 |
| 3-9 | Colorado 303(d) List of Impaired Waters | 3-32 |
| 3-10 | State Monitoring of UFO Waters with Suspected Quality Impairments | 3-33 |
| 3-11 | Aquatic Macroinvertebrate in Planning Area Streams | 3-35 |
| 3-12 | BLM Consumptive Water Rights by Source | 3-36 |
| 3-13 | Stream Reaches Protected by Instream Flow Water Rights | 3-37 |
| 3-14 | Public Water Sources with Zones of Potential Influence | 3-39 |
| 3-15 | Vegetation Communities | 3-42 |
| 3-16 | Major Vegetation Issues in the Decision Area | 3-47 |
| 3-17 | Land Health Assessment Results Since 1999 | 3-47 |
| 3-18 | Noxious Weeds | 3-50 |
| 3-19 | Key Fish and Wildlife Species | 3-59 |

BLM_0114777

## TABLES (Continued)

| | | Page |
|---|---|---|
| 3-20 | Birds of Conservation Concern | 3-60 |
| 3-21 | Federally Listed Plant Species | 3-69 |
| 3-22 | Sensitive Plant Species Known to Inhabit and Potentially Inhabit the Planning Area | 3-73 |
| 3-23 | Federally Listed Fish and Wildlife Species | 3-76 |
| 3-24 | Sensitive Animal Species Known to Inhabit and Potentially Inhabiting the Planning Area | 3-79 |
| 3-25 | Fire Management Units and Dominant Vegetation Types | 3-90 |
| 3-26 | Cultural Periods | 3-94 |
| 3-27 | Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources | 3-102 |
| 3-28 | Visual Resource Inventory Component Distribution | 3-105 |
| 3-29 | Visual Resource Management Classes | 3-106 |
| 3-30 | Visual Resource Inventory – Cultural Modifications (acres) | 3-107 |
| 3-31 | Units Inventoried for Wilderness Characteristics | 3-109 |
| 3-32 | Forest and Woodland Products Sold (1998-2008) | 3-112 |
| 3-33 | Status of Allotments in Relation to Public Land Health Standards | 3-117 |
| 3-34 | Federal Oil and Gas Acreage Leased By Year | 3-120 |
| 3-35 | Coal Fields | 3-124 |
| 3-36 | Visitor Use on BLM-administered Lands | 3-133 |
| 3-37 | OHV Designations | 3-141 |
| 3-38 | Current Withdrawals by Type | 3-149 |
| 3-39 | Existing Areas of Critical Environmental Concern | 3-153 |
| 3-40 | Wilderness Recommendations | 3-159 |
| 3-41 | Wilderness Study Areas | 3-159 |
| 3-42 | Tabeguache Area | 3-163 |
| 3-43 | Eligible Stream Segments | 3-166 |
| 3-44 | Study Area Population Totals (1980–2010) | 3-186 |
| 3-45 | Study Area Population Projections (2015–2030) | 3-186 |
| 3-46 | Study Area Household Characteristics 2000–2010 Comparison | 3-187 |
| 3-47 | Study Area Employment Characteristics (2001-2011) | 3-187 |
| 3-48 | Study Area Average Annual Wages by Industry (2001-2011) | 3-191 |
| 3-49 | Study Area Unemployment Levels by County | 3-192 |
| 3-50 | Study Area Income Distribution | 3-192 |
| 3-51 | UFO Receipts (Fiscal Year 2008) | 3-192 |
| 3-52 | Study Area Severance Tax Distribution (2010) | 3-195 |
| 3-53 | Study Area Federal Mineral Lease Revenues (Fiscal Year 2009) | 3-196 |
| 3-54 | Study Area Property Assessed Value and Revenue (2010) | 3-196 |
| 3-55 | Study Area PILT (Fiscal Year 2010) | 3-198 |
| 3-56 | Study Area Poverty Estimates by County (all people in poverty) | 3-199 |
| 3-57 | Study Area Key Community Poverty Information (all people in poverty) | 3-199 |
| 3-58 | Study Area County Population by Race/Ethnicity | 3-200 |
| 3-59 | Study Area Key Community Minority Information | 3-201 |
| 3-60 | BLM Road Maintenance Intensity Levels | 3-204 |

# DIAGRAMS <span style="float:right">Page</span>

3-1    Standard Visual Range for 20th% Cleanest Days, Weminuche Wilderness Area IMPROVE Site..................................................................................................................3-7

3-2    Standard Visual Range for 20th% Middle Days, Weminuche Wilderness Area IMPROVE Site..................................................................................................................3-8

3-3    Standard Visual Range for 20th% Worst Days, Weminuche Wilderness Area IMPROVE Site..................................................................................................................3-8

3-4    Standard Visual Range for 20th% Cleanest Days, White River National Forest IMPROVE Site..................................................................................................................3-9

3-5    Standard Visual Range for 20th% Middle Days, White River National Forest IMPROVE Site................................................................................................................3-10

3-6    Standard Visual Range for 20th% Worst Days, White River National Forest IMPROVE Site................................................................................................................3-10

3-7    Total Annual Wet and Dry S Deposition (kilograms per hectare per year) at the Gothic Clean Air Status and Trends Network Program Site ............................................3-11

3-8    Total Annual Wet and Dry N Deposition (kilograms per hectare per year) at the Gothic Clean Air Status and Trends Network Program Site ............................................3-11

3-9    Wind Rose. Montrose, Colorado, 2005 – 2009 .........................................................3-15

3-10   Stratigraphic Relationship of Coal-bearing Formations in the Planning Area ..........................3-123

# FIGURES (see Appendix A)

3-1    Major Soil Units
3-2    Potential Biotic Soil Crust Locations
3-3    Saline and Selenium Enriched Soils
3-4    Wind Erosion Areas
3-5    Soil Erosion Capacity
3-6    Droughty Soil Areas
3-7    Flood Hazard Areas
3-8    Geology of the Uncompahgre RMP Planning Area
3-9    Major Geologic Structural Features
3-10   Major Hydrologic Units
3-11   Distribution of Hydrologic Soil Groups
3-12   Naturita Ridge Herd Area
3-13   Fire Management Units
3-14   Wildland Urban Interface
3-15   Cultural Resource Units
3-16   Potential Fossil Yield Classification Distribution
3-17   Visual Resource Inventory
3-18   Vegetation Types
3-19   Grazing Allotments
3-20   Oil and Gas Well Locations
3-21   Coal Fields
3-22   Active Uranium Exploration Sites in the Morrison Formation
3-23   SRMAs and Developed Recreation Sites
3-24   Right-of-Way Locations and Corridors
3-25   Unexploded Ordnance
3-26   Socioeconomic Units

BLM_0114779

This page intentionally left blank.

BLM_0114780

## ACRONYMS AND ABBREVIATIONS                                        Full Phrase

| | |
|---|---|
| ACEC | area of critical environmental concern |
| ATV | all-terrain vehicle |
| AUM | animal unit month |
| | |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BMP | best management practice |
| BOR | United States Department of the Interior, Bureau of Reclamation |
| | |
| CARMMS | Colorado Air Resources Management Modeling Study |
| CFR | Code of Federal Regulations |
| CNHP | Colorado Natural Heritage Program |
| CPW | Colorado Parks and Wildlife |
| CSU | controlled surface use |
| | |
| decision area | public lands and federal mineral estate managed by the United States Department of the Interior, Bureau of Land Management |
| DOE | United States Department of Energy |
| DOI | United States Department of the Interior |
| | |
| EIS | environmental impact statement |
| EPA | United States Environmental Protection Agency |
| ERMA | extensive recreation management area |
| ESA | Endangered Species Act of 1973 |
| | |
| federal mineral estate | subsurface mineral estate administered by the United States Department of the Interior, Bureau of Land Management |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FMP | fire management plan |
| Forest Service | United States Department of Agriculture, Forest Service |
| FWFMP | Federal Wildland Fire Management Policy |
| | |
| GIS | Geographic Information Systems |
| | |
| IMPLAN | impact analysis for planning (model) |
| IMPROVE | Interagency Monitoring of Protected Visual Environments |
| ISA | instant study area |
| | |
| NCA | National Conservation Area |
| NEPA | National Environmental Policy Act of 1969 |
| NGD | no ground disturbance |
| NHPA | National Historic Preservation Act of 1966 |
| NL | no leasing |
| North Fork area | North Fork Alternative Plan area (63,390 acres of BLM-administered surface estate and 159,820 acres of federal mineral estate) (Figure 2-1) |
| NPS | United States Department of the Interior, National Park Service |
| NRHP | National Register of Historic Places |
| NSO | no surface occupancy |
| NWSRS | National Wild and Scenic Rivers System |

BLM_0114781

## ACRONYMS AND ABBREVIATIONS *(continued)*                                   Full Phrase

| | |
|---|---|
| OHV | off-highway vehicle |
| ORV | outstandingly remarkable value |
| | |
| PFC | proper functioning condition |
| PFYC | Potential Fossil Yield Classification |
| PILT | payment in lieu of taxes |
| planning area | Uncompahgre Field Office boundary, including all lands, regardless of land ownership, except the Gunnison Gorge NCA Planning Area and the Dominguez-Escalante NCA |
| $PM_{2.5}$ | particulate matter smaller than 2.5 microns in effective diameter |
| $PM_{10}$ | particulate matter smaller than 10 microns in effective diameter |
| | |
| RMA | recreation management area |
| RMP | resource management plan |
| ROD | record of decision |
| ROW | right-of-way |
| | |
| SRMA | special recreation management area |
| SRP | special recreation permit |
| SSR | site-specific relocation |
| | |
| TL | timing limitation |
| | |
| UFO | Uncompahgre Field Office |
| US | United States |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| USFWS | United States Department of the Interior, Fish and Wildlife Service |
| | |
| VRI | visual resource inventory |
| VRM | visual resource management |
| | |
| WSA | wilderness study area |
| WSR | wild and scenic river |
| WUI | wildland urban interface |

BLM_0114782

# CHAPTER 3
# AFFECTED ENVIRONMENT

The purpose of this chapter is to describe the existing biological, physical, and socioeconomic characteristics of the Uncompahgre resource management plan (RMP) planning area (planning area), including human uses that could be affected by implementing the alternatives described in **Chapter 2** (Alternatives). This chapter includes a discussion of resources, resource uses, special designations, support functions, and social and economic conditions. Each topic area includes an introduction, followed by a description of current conditions and characterization. Characterization includes the indicators, which assess the resource condition, and trends, which express the direction of change between the present and some point in the past.

Certain types of resources that may be present in the RMP planning area, such as cave and karst resources, are not addressed in this RMP because issues relating to the management of these resources were not identified during scoping by the public or by the United States (US) Department of the Interior (DOI), Bureau of Land Management (BLM). These resources do not require specific management direction at this time. Information from broad-scale assessments was used to help set the context for the planning area. The information and direction for BLM resources and resource uses has been further broken down into fine-scale assessments and information. The level of information presented in this chapter is commensurate with and sufficient to assess potential effects discussed in Chapter 4, based on the alternatives presented in **Chapter 2**.

Acreage figures and other numbers used are approximate projections; readers should not infer that they reflect exact measurements or precise calculations. Acreages were calculated using Geographic Information Systems (GIS) technology, and there may be slight variations in total acres between resources.

The planning area includes all lands, regardless of jurisdiction, within the planning area boundaries. However, the BLM makes decisions on only those lands and federal mineral estate that it administers (the decision area). The Gunnison Gorge National Conservation Area (NCA) is covered under a separate RMP/environmental impact statement (EIS), and the Dominguez-

BLM_0114783

Escalante NCA will also be covered under a separate RMP/EIS, rather than under this Uncompahgre RMP/EIS.

## 3.1 RESOURCES

This section contains a description of the biological and physical resources of the planning area and follows the order of topics addressed in Chapter 2, as follows:

- Air quality
- Climate
- Geology and soils
- Water resources
- Vegetation
- Fish and wildlife
- Special status species
- Wild horses
- Wildland fire ecology and management
- Cultural resources
- Paleontological resources
- Visual resources
- Lands with wilderness characteristics

### 3.1.1 Air Quality

Meteorological and topographical characteristics within the planning area and the surrounding lands affect the transport, deposition, and dispersion of emissions within the planning area and region. The effects of both emissions and management decisions within the area influence air quality throughout the area, not just within the planning area boundaries. This section describes the existing air quality within the planning area.

#### Current Conditions

The federal and state governments have established ambient air quality standards for six criteria pollutants: carbon monoxide, lead, nitrogen dioxide, ozone, particulate matter smaller than 10 microns in effective diameter ($PM_{10}$), particulate matter smaller than 2.5 microns in effective diameter ($PM_{2.5}$), and sulfur dioxide. The US Environmental Protection Agency (EPA) also regulates emissions of oxides of nitrogen, and volatile organic compounds. These compounds are precursors for producing photochemical smog (ozone) and secondary particulate matter. Ozone, including its oxides of nitrogen and volatile organic compound precursors, $PM_{2.5}$, and sulfur dioxide, are considered regional air pollutants, typically affecting air quality on a regional scale.

Pollutants such as carbon monoxide and lead are considered local, typically accumulating close to their emission sources. $PM_{10}$ can be considered both a regional and local air pollutant, depending on the particular circumstance. In addition, long-range transport of nitrogen dioxide,

BLM_0114784

$PM_{10}$, $PM_{2.5}$, and sulfur dioxide can contribute to regional visibility degradation, as well as atmospheric deposition at sensitive areas many miles downwind of individual emission sources, such as national parks and wilderness areas.

*Existing Air Pollutant Emissions*

Air quality in the planning area is affected primarily by emissions from agricultural, biogenic, mobile, and industrial sources, which are quantified on a countywide basis. **Table 3-1** (Average Annual Air Pollutant Emissions (2008)) shows the average annual regional air pollutant emissions for five counties in and around the planning area.

**Table 3-1**
**Average Annual Air Pollutant Emissions (2008)**

| County | Emissions (tons per year) | | | | | |
|---|---|---|---|---|---|---|
| | CO[1] | NOx[2] | $PM_{10}$ | $PM_{2.5}$ | SO$_2$[3] | VOCs[4] |
| Delta | 10,342 | 1,490 | 2,156 | 813 | 52 | 13,131 |
| Gunnison | 18,553 | 1,308 | 2,739 | 1,202 | 79 | 24,466 |
| Montrose | 12,985 | 3,297 | 3,716 | 1,011 | 1,327 | 24,733 |
| Ouray | 3,434 | 403 | 1,107 | 263 | 12 | 6886 |
| San Miguel | 6,016 | 1003 | 1,425 | 352 | 15 | 12721 |

Source: EPA 2012a
[1] carbon monoxide
[2] oxides of nitrogen
[3] sulfur dioxide
[4] volitile organic compounds

*Existing Air Quality Concentrations*

Existing air quality conditions in the planning area can be characterized through use of monitoring data collected in the region. Carbon monoxide, $PM_{10}$, and $PM_{2.5}$ are the only air pollutants within the planning area monitored by the Colorado Department of Public Health and the Environment Air Pollution Control Division, at sampling locations in Delta and Telluride, Colorado. $PM_{10}$, $PM_{2.5}$, and carbon monoxide are monitored north of the planning area in Grand Junction, Colorado. Carbon monoxide, nitrogen dioxide, $PM_{10}$, and ozone are measured south of the planning area on the Southern Ute Reservation, one mile northeast of Ignacio, and $PM_{2.5}$ is measured north of the planning area at the Greasewood Pipeline Hub in Rio Blanco County; both of these sites are representative of regional rural concentrations. Lead has been measured in the Denver metropolitan area for several years by the Colorado Department of Public Health and the Environment. In addition, the Colorado Department of Public Health and the Environment began monitoring ozone in Cortez, Palisade, and Rifle, Colorado, during 2008. Ozone is also monitored in the Weminuche Wilderness located south of the planning area. As part of the Clean Air Status and Trends Network program[1], the EPA measures gaseous ozone and sulfur dioxide at the Rocky Mountain Biological Laboratory in Gothic, Colorado (approximately 20 miles east of the northeastern portion of the planning area). Over the course

---

[1] Found online at http://www.epa.gov/castnet/

BLM_0114785

of the week, air is drawn at a controlled flow rate through a three-stage filter pack mounted atop a ten-meter (33-foot) tower to collect particulate and gaseous air pollutants.

$PM_{2.5}$, including speciated chemicals such as lead and sulfur dioxide, are also sampled at the Aspen Mountain Ski Area in Pitkin County in the White River National Forest by the Interagency Monitoring of Protected Visual Environments (IMPROVE) Program.

Because most of the planning area is rural, actual air quality is likely to be cleaner than that measured in towns and cities, especially the Denver metropolitan area. The entire planning area is classified as attainment or unclassified, with the exception of the Telluride $PM_{10}$ Attainment/Maintenance Area, indicating current compliance with all applicable National Ambient Air Quality Standards. The Telluride Attainment/Maintenance Area includes the Town of Telluride, the Town of Mountain Village, and portions of San Miguel County within three miles of Telluride, which are within the Telluride airshed. At one time Telluride was in violation of $PM_{10}$ air quality standards, primarily due to smoke emissions from local wood stoves. Those emissions have been reduced so that the town is now in compliance. The Telluride area was redesignated to attainment status by the EPA in 2001, and the area continues to demonstrate compliance with the $PM_{10}$ National Ambient Air Quality Standards. Proposed direct- or authorized-use BLM activities within the Telluride $PM_{10}$ maintenance area must be structured to comply with EPA General Conformity Regulations. None of the site-specific air quality monitoring stations in the planning area has measured an exceedance of National Ambient Air Quality Standards in the past five years.

**Table 3-2** (Applicable Ambient Air Quality Standards and Existing Representative Pollutant Concentrations for the Planning Area) provides a summary of recent representative pollutant concentrations measured in the planning area and at nearby sites.

*Air Quality-Related Values*

<u>Visibility</u>
Visibility can be expressed in terms of deciviews, a measure of perceived changes in visibility. A deciview is a change in visibility just perceptible to an average person, which is approximately a 10-percent change in light extinction. To estimate potential visibility impairment, monitored aerosol concentrations are used to reconstruct visibility conditions for each day monitored. These daily values are then ranked from clearest to haziest and divided into three categories to indicate the mean visibility for all days (average), the 20 percent of days with the clearest visibility (20 percent clearest), and the 20 percent of days with the worst visibility (20 percent haziest). Visibility can also be defined by standard visual range measured in miles, and is the farthest distance at which an observer can see a black object viewed against the sky above the horizon; the larger the standard visual range, the cleaner the air.

Since 1980, the IMPROVE program has measured visibility in national parks and wilderness areas. IMPROVE helps federal land managers from the BLM, US DOI National Park Service (NPS), US Department of Agriculture (USDA), Forest Service (Forest Service), US DOI Fish and Wildlife Service (USFWS), and EPA, as well as regional-state organizations, protect visibility at 156 Class I airsheds (national parks and wilderness areas), as required by the Clean Air Act of 1977. These areas are accorded strict levels of air quality protection, including limits on visibility impacts.

BLM_0114786

**Table 3-2**
**Applicable Ambient Air Quality Standards and Existing Representative Pollutant Concentrations for the Planning Area**

| Pollutant | Background Levels[1] | Averaging Time | National Ambient Air Quality Standards | | Colorado Ambient Air Quality Standards |
|---|---|---|---|---|---|
| | | | Standard | Primary or Secondary | |
| Carbon Monoxide [3] | 1 - 3 ppm | 1-hour[1] | 35 ppm | P | -- |
| Carbon Monoxide [3] | 1 - 2 ppm | 8-hour[1] | 9 ppm | P | -- |
| Lead | 0.006 µg/m³ | Rolling 3-month average | 0.15 µg/m³ | P,S | -- |
| Nitrogen Dioxide [4] | 0.025 - 0.05 ppm | 1-hour[12] | 0.1 ppm | P | -- |
| Nitrogen Dioxide [4] | 0.002 - 0.007 ppm | Annual | 0.053 ppm | P,S | -- |
| PM$_{10}$ [5] | 28 - 83 µg/m³ | 24-hour[2] | 150 µg/m³ | P,S | -- |
| PM$_{10}$ [5] | 12 - 37 µg/m³ | Annual | -- | -- | -- |
| PM$_{2.5}$ [6] | 11 - 19 µg/m³ | 24-hour[8] | 35 µg/m³ | P,S | -- |
| PM$_{2.5}$ [6] | 4 - 8 µg/m³ | Annual[9] | 12/15 µg/m³ | P,S | -- |
| Ozone [7] | 0.076 - 0.081 ppm | 1-hour | -- | -- | -- |
| Ozone [7] | 0.066 - 0.074 ppm | 8-hour[10] | 0.070 ppm | P,S | -- |
| Sulfur Dioxide | 0.009 ppm | 1-hour[11] | 0.075 ppm | P | -- |
| Sulfur Dioxide | 0.009 ppm | 3-hour[1] | 0.5 ppm | S | 700[1] |
| Sulfur Dioxide | 0.002 ppm | 24-hour[1] | 0.14 ppm | P12 | -- |
| Sulfur Dioxide | 0.001 ppm | Annual | 0.03 ppm | P12 | -- |

Sources: Background pollutant data from Colorado Department of Public Health and Environment 2012a, National Ambient Air Quality Standards (EPA 2015a), and Colorado Ambient Air Quality Standards (Colorado Department of Public Health and Environment 2013)
(1) Not to be exceeded more than once per year
(2) Not to be exceeded more than once per year on average over 3 years
(3) Carbon monoxide data reflects the range of maximum ambient air pollutant concentrations monitored in urban and rural areas
(4) Nitrogen dioxide data reflects range of maximum ambient air pollutant concentrations monitored in urban and low- and high-altitude rural areas
(5) PM$_{10}$ data reflects the range of maximum ambient air pollutant concentrations monitored in the following areas: Montrose, Delta, Telluride, outside Telluride, Hotchkiss, Olathe, Paonia, and rural Ute County
(6) PM$_{2.5}$ data reflects the range of maximum air pollutant concentrations monitored in Delta, Telluride, and in a rural area
(7) Ozone data reflects the range of maximum air pollutant concentrations monitored in urban and low- and high-altitude rural areas
(8) 98th percentile averaged over 3 years
(9) Annual mean averaged over 3 years
(10) On October 1, 2015, the EPA revised the National Ambient Air Quality Standards for 8-hour ozone concentrations from 75 parts per billion to 70 parts per billion. The effective date of the revised National Ambient Air Quality Standards is December 28, 2015 (EPA 2015b).
(11) 99th percentile of 1-hour daily maximum concentrations, averaged over 3 years
(12) The 24-hour and annual National Ambient Air Quality Standards remain in effect in Colorado until 1 year after the area is designated for the June 22, 2010 (1-hour) standard. Designations for the 1-hour sulfur dioxide National Ambient Air Quality Standard in Colorado have not occurred.
Primary standards set limits to protect public health, including the health of sensitive populations such as asthmatics, children, and the elderly. Secondary standards set limits to protect public welfare, including protection against decreased visibility and damage to animals, crops, vegetation, and buildings.

BLM_0114787

There are six IMPROVE stations in Colorado, but none within the Uncompahgre Field Office (UFO). The Forest Service operates a IMPROVE monitors at the Weminuche Wilderness Area in the San Juan National Forest, located south of the planning area, and at the White River National Forest in Pitkin County, northeast of the planning area. The Black Canyon of the Gunnison National Park, Maroon Bells-Snowmass Wilderness Area, and West Elk Wilderness Area are Class I airsheds located partially (but not entirely) inside the UFO planning area. Other nearby Class I airsheds include Arches National Park (45 kilometers [28 miles] from the UFO), La Garita Wilderness (40 kilometers [25 miles] from the UFO), and Weminuche Wilderness Area (20 kilometers [12 miles] from the UFO). The Colorado National Monument, a Class II airshed located 35 kilometers (22 miles) from the planning area near Grand Junction, is also afforded special air quality protection.

Atmospheric Deposition

Atmospheric deposition refers to processes in which air pollutants are removed from the atmosphere and deposited into terrestrial and aquatic ecosystems. Air pollutants can be deposited by either wet precipitation (via rain or snow) or dry (gravitational) settling of particles and adherence of gaseous pollutants to soil, water, and vegetation. Much of the concern about deposition surrounds the secondary formation of acids and other compounds from emitted nitrogen and sulfur species such as nitrogen oxides and sulfur dioxide, which can contribute to acidification of lakes, streams, and soils and affect other ecosystem characteristics, including nutrient cycling and biological diversity.

Substances deposited include:

- Acids such as sulfuric and nitric, sometimes referred to as acid rain

- Air toxics, such as pesticides, herbicides, and volatile organic compounds

- Heavy metals, such as mercury

- Nutrients, such as nitrates and ammonium

Rain, snow, cloud water, particle settling, and gaseous pollutants complicate the accurate measurement of atmospheric deposition. Deposition varies with precipitation and other meteorological variables such as temperature, humidity, winds, and atmospheric stability, which, in turn, vary with elevation and time.

Atmospheric deposition is primarily monitored through the National Atmospheric Deposition Network/National Trends Network and the Mercury Deposition Network. The closest regional National Atmospheric Deposition Network/National Trends Network site monitoring atmospheric deposition is the Gothic site located in Gunnison County at the Rocky Mountain Biological Laboratory. Other regional sites include those at Mesa Verde National Park in the southwest corner of Colorado and Molas Pass in the San Juan National Forest.

*Uncompahgre Draft Resource Management Plan Revision and Environmental Impact Statement*

BLM_0114788

### Trends

#### Visibility Trends

An environmental concern in the United States is the improvement and maintenance of visibility conditions, especially in national parks, recreation areas, wilderness areas, and national forests. The Black Canyon of the Gunnison Wilderness Area is located within the planning area; however, there is no IMPROVE monitor at that location. The IMPROVE monitor located within the Weminuche Wilderness Area to the south is the closest to and considered to be the most representative of the Black Canyon Wilderness Area. Another IMPROVE monitor is located at the White River National Forest in Pitkin County, northeast of the planning area. Visibility data from both sites are given to provide a comprehensive representation of visibility conditions in the planning area.

**Diagram 3-1** (Standard Visual Range for 20th% Cleanest Days, Weminuche Wilderness Area IMPROVE Site), **Diagram 3-2** (Standard Visual Range for 20th% Middle Days, Weminuche Wilderness Area IMPROVE Site), and **Diagram 3-3** (Standard Visual Range for 20th% Worst Days, Weminuche Wilderness Area IMPROVE Site) show visibility estimates for the 20th percent cleanest days, 20th percent median days, and 20th percent worst visibility days at the Weminuche Wilderness area IMPROVE site for the period 1990-2010. These data indicate excellent visibility conditions with a trend toward improved visual range during this period.

**Diagram 3-1**
**Standard Visual Range for 20th% Cleanest Days, Weminuche Wilderness Area IMPROVE Site**



Source: Visibility Information Exchange Web System 2012

BLM_0114789



**Diagram 3-2**
**Standard Visual Range for 20th% Middle Days, Weminuche Wilderness Area IMPROVE Site**

Source: Visibility Information Exchange Web System 2012



**Diagram 3-3**
**Standard Visual Range for 20th% Worst Days, Weminuche Wilderness Area IMPROVE Site**

Source: Visibility Information Exchange Web System 2012

BLM_0114790

**Diagram 3-4** (Standard Visual Range for 20th% Cleanest Days, White River National Forest IMPROVE Site), **Diagram 3-5** (Standard Visual Range for 20th% Middle Days, White River National Forest IMPROVE Site), and **Diagram 3-6** (Standard Visual Range for 20th% Worst Days, White River National Forest IMPROVE Site) show visibility estimates for the 20% percent cleanest days, 20th percent median days, and 20th percent worst visibility days, respectively, at the White River National Forest IMPROVE site, for the period 2000-2010. These data also indicate excellent visibility in the region with a trend toward improved visual range during this period.

*Atmospheric Deposition Trends*

The Clean Air Status and Trends Network/National Atmospheric Deposition Network/National Trends Network monitoring site located nearest the planning area is the Gothic site (GTH161) located in northern Gunnison County within the Gunnison Field Office. **Diagram 3-7** (Total Annual Wet and Dry S Deposition (kilograms per hectare per year) at the Gothic Clean Air Status and Trends Network Program Site) provides the total annual (wet and dry) sulfur deposition (kilograms per hectare per year). **Diagram 3-8** (Total Annual Wet and Dry N Deposition (kilograms per hectare per year) at the Gothic Clean Air Status and Trends Network Program Site) shows the total annual (dry and wet) nitrogen deposition for 1990 through 2010 for the Gothic site. Over this period, sulfur deposition trended downward, and there were no discernible trends in nitrogen deposition.

**Diagram 3-4**
**Standard Visual Range for 20th% Cleanest Days, White River National Forest IMPROVE Site**



Source: Visibility Information Exchange Web System 2012

BLM_0114791

**Diagram 3-5**
**Standard Visual Range for 20th% Middle Days, White River National Forest IMPROVE Site**



Source: Visibility Information Exchange Web System 2012

**Diagram 3-6**
**Standard Visual Range for 20th% Worst Days, White River National Forest IMPROVE Site**



Source: Visibility Information Exchange Web System 2012

BLM_0114792

**Diagram 3-7**
**Total Annual Wet and Dry S Deposition (kilograms per hectare per year) at the Gothic Clean Air Status and Trends Network Program Site**



Source: EPA 2012b

**Diagram 3-8**
**Total Annual Wet and Dry N Deposition (kilograms per hectare per year) at the Gothic Clean Air Status and Trends Network Program Site**



Source: EPA 2012b

BLM_0114793

### 3.1.2   Climate

*Current Conditions*

The planning area is located in a high plateau continental region of mesas, mountains, and high desert. The climate is characterized by dry, sunny days and clear nights with extreme daily temperature changes. **Table 3-3** (Climate Summary from Stations within the Planning Area) provides a summary of weather records from seven National Cooperative Observer Network weather stations in the planning area compiled by the Western Regional Climatic Center.

**Table 3-3**
**Climate Summary from Stations within the Planning Area**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cimarron, Colorado (Elevation: 6,900 Feet) | | | | | | | Period of Record: 9/1951–5/2012 | | | | | | |
| Average Maximum Temperature (°F) | 33.9 | 38.3 | 47.9 | 58.7 | 69.2 | 80.2 | 85.3 | 82.9 | 75.3 | 64.1 | 47.6 | 35.1 | 59.9 |
| Average Minimum Temperature (°F) | 0.5 | 6.0 | 16.7 | 24.2 | 30.8 | 36.7 | 43.8 | 43.0 | 34.2 | 24.4 | 15.2 | 3.8 | 23.3 |
| Average Total Precipitation (Inches) | 1.13 | 0.89 | 1.00 | 1.01 | 1.04 | 0.83 | 1.24 | 1.48 | 1.53 | 1.33 | 0.99 | 0.98 | 13.45 |
| Average Total Snow Fall (Inches) | 14.2 | 12.4 | 11.0 | 4.5 | 0.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.8 | 7.7 | 13.7 | 64.9 |
| Average Snow Depth (Inches) | 4 | 6 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 |
| Montrose 2, Colorado (Elevation: 5,690 Feet) | | | | | | | Period of Record: 10/1895–9/2012 | | | | | | |
| Average Maximum Temperature (°F) | 37.9 | 43.9 | 53.1 | 62.5 | 72.4 | 83.2 | 88.6 | 85.7 | 78.0 | 65.7 | 50.4 | 39.2 | 63.4 |
| Average Minimum Temperature (°F) | 13.6 | 19.7 | 26.6 | 34.0 | 42.2 | 49.8 | 55.7 | 54.0 | 45.7 | 35.1 | 24.0 | 15.3 | 34.6 |
| Average Total Precipitation (Inches) | 0.57 | 0.53 | 0.72 | 0.85 | 0.87 | 0.52 | 0.87 | 1.23 | 1.10 | 1.03 | 0.65 | 0.65 | 9.60 |
| Average Total Snow Fall (Inches) | 6.5 | 4.5 | 3.9 | 1.9 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.7 | 2.7 | 6.9 | 27.2 |
| Average Snow Depth (Inches) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Norwood, Colorado (Elevation: 7,020 Feet) | | | | | | | Period of Record: 4/1924–8/2008 | | | | | | |
| Average Maximum Temperature (°F) | 37.4 | 41.5 | 48.6 | 58.0 | 68.1 | 78.7 | 83.9 | 80.7 | 73.4 | 62.1 | 48.0 | 38.7 | 59.9 |
| Average Minimum Temperature(°F) | 9.6 | 14.6 | 21.8 | 28.3 | 35.9 | 43.7 | 50.0 | 48.9 | 41.8 | 31.9 | 20.5 | 11.9 | 29.9 |
| Average Total Precipitation (Inches) | 0.95 | 0.93 | 1.14 | 1.22 | 1.12 | 0.78 | 1.86 | 1.96 | 1.77 | 1.59 | 1.11 | 0.97 | 15.41 |

BLM_0114794

**Table 3-3**
**Climate Summary from Stations within the Planning Area**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Total Snow Fall (Inches) | 12.7 | 10.5 | 9.8 | 5.3 | 0.8 | 0.0 | 0.0 | 0.0 | 0.1 | 2.3 | 7.7 | 10.9 | 60.2 |
| Average Snow Depth (Inches) | 4 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 1 |
| **Paonia 1 SW, Colorado (Elevation: 5,580 Feet)** | | | | | | | **Period of Record: 1/1893–9/2012** | | | | | | |
| Average Maximum Temperature (°F) | 38.6 | 44.9 | 53.9 | 63.0 | 73.0 | 83.6 | 89.2 | 86.5 | 78.1 | 66.6 | 52.4 | 40.2 | 64.2 |
| Average Minimum Temperature (°F) | 13.8 | 20.4 | 27.5 | 33.9 | 41.6 | 49.3 | 56.1 | 54.7 | 46.8 | 36.5 | 26.1 | 16.2 | 35.2 |
| Average Total Precipitation (Inches) | 1.20 | 1.19 | 1.46 | 1.34 | 1.37 | 0.75 | 1.07 | 1.33 | 1.48 | 1.60 | 1.26 | 1.33 | 15.39 |
| Average Total Snow Fall (Inches) | 11.9 | 9.0 | 6.3 | 2.4 | 0.2 | 0.0 | 0.0 | 0.0 | 0.1 | 0.8 | 4.7 | 11.9 | 47.1 |
| Average Snow Depth (Inches) | 4 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 |
| **Ridgway Colorado (Elevation: 7,000 feet)** | | | | | | | **Period of Record: 5/1982–5/2012** | | | | | | |
| Average Maximum Temperature (°F) | 39.6 | 42.8 | 50.5 | 57.5 | 67.8 | 78.2 | 82.9 | 80.6 | 73.6 | 62.0 | 48.6 | 38.9 | 60.3 |
| Average Minimum Temperature (°F) | 5.2 | 11.2 | 19.4 | 26.2 | 33.0 | 38.5 | 45.2 | 44.2 | 35.6 | 25.2 | 16.3 | 6.6 | 25.5 |
| Average Total Precipitation (Inches) | 0.86 | 0.88 | 1.48 | 1.52 | 1.53 | 1.02 | 2.02 | 2.18 | 1.79 | 1.56 | 1.36 | 0.94 | 17.13 |
| Average Total Snow Fall (Inches) | 12.6 | 13.2 | 17.1 | 8.1 | 1.6 | 0.0 | 0.0 | 0.0 | 0.2 | 3.8 | 13.0 | 15.2 | 84.9 |
| Average Snow Depth (Inches) | 4 | 4 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 1 |
| **Telluride, Colorado (Elevation: 8,800 feet)** | | | | | | | **Period of Record: 12/1900–11/2008** | | | | | | |
| Average Maximum Temperature (°F) | 37.2 | 39.5 | 43.3 | 52.0 | 61.8 | 72.3 | 76.9 | 74.2 | 68.8 | 59.1 | 46.5 | 38.1 | 55.8 |
| Average Minimum Temperature (°F) | 5.2 | 8.4 | 14.2 | 22.7 | 29.9 | 35.5 | 41.5 | 40.9 | 34.3 | 25.5 | 14.9 | 6.8 | 23.3 |
| Average Total Precipitation (Inches) | 1.63 | 1.69 | 2.16 | 2.20 | 1.76 | 1.16 | 2.44 | 2.91 | 2.13 | 1.92 | 1.55 | 1.54 | 23.09 |
| Average Total Snow Fall (Inches) | 27.6 | 25.4 | 30.9 | 21.1 | 6.5 | 0.7 | 0.0 | 0.0 | 1.0 | 9.0 | 20.6 | 24.2 | 167.0 |
| Average Snow Depth (Inches) | 13 | 16 | 12 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 8 | 5 |

BLM_0114795

**Table 3-3**
**Climate Summary from Stations within the Planning Area**

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Uravan, Colorado (Elevation: 5,010 feet) | | | | | | Period of Record: 11/1960–5/2012 | | | | | | | |
| Average Maximum Temperature (°F) | 42.7 | 49.8 | 58.9 | 67.7 | 78.5 | 89.4 | 95.6 | 92.4 | 83.8 | 71.4 | 55.2 | 43.3 | 69.1 |
| Average Minimum Temperature (°F) | 15.5 | 22.3 | 29.2 | 35.7 | 44.6 | 52.4 | 59.6 | 58.3 | 48.5 | 37.0 | 26.6 | 17.9 | 37.3 |
| Average Total Precipitation (Inches) | 0.86 | 0.78 | 1.01 | 0.98 | 0.92 | 0.49 | 1.18 | 1.36 | 1.47 | 1.47 | 1.00 | 0.99 | 12.54 |
| Average Total Snow Fall (Inches) | 3.8 | 1.3 | 0.5 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 0.8 | 4.2 | 11.1 |
| Average Snow Depth (Inches) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |

Source: Western Regional Climatic Center 2012

Throughout much of the planning area, average daily winter temperatures range from a low of around 10°F to a high of nearly 40°F. During summer, average daily temperatures range from around 50°F up to 90°F. Higher-elevation locations are cooler, with extreme minimum temperatures approaching negative 40°F. Lower-elevation locations are warmer, with extreme maximum temperatures near 110°F.

Monthly precipitation is relatively uniform, with minimum precipitation typically occurring during June, followed by a period of maximum precipitation caused by summer convective thunderstorms. Higher-elevation monthly precipitation is more uniform but contains less moisture in mid-winter snow. Snowfall typically occurs from November through April (October through May at higher elevations), with light accumulation. However, mountain snowpack can become quite deep and remain well into spring. In general, total accumulated precipitation throughout the planning area was low in 2000, 2002, and 2003, which were among the ten driest years on record, with 2006 and 2007 among the ten wettest years on record.

Winds are influenced by the complex terrain and valleys and vary at locations throughout the planning area. A wind rose illustrating wind distributions at Montrose, Colorado, which is located in a valley near the center of the planning area, is provided in **Diagram 3-9** (Wind Rose. Montrose, Colorado, 2005 – 2009). As indicated by **Diagram 3-9**, the prevailing wind direction originates from the southeast approximately 41 percent of the time. Wind speed averages 7.6 miles per hour annually.

*Climate Change*
The temperature of Earth's atmosphere is determined by the amount of radiation from the sun absorbed by greenhouse gases in the Earth's atmosphere. The absorbed radiation raises the surface temperature, allowing the planet to sustain life. While these gases and particles have occurred naturally for millennia, the atmospheric concentration has increased since the start of the industrial age.

BLM_0114796

**Diagram 3-9**
**Wind Rose. Montrose, Colorado, 2005 – 2009**



Source: Colorado Department of Public Health and Environment 2012b

A 2007 EPA report indicates that increased atmospheric concentrations of greenhouse gases and land use changes are contributing to an increase in average global temperature or global warming (EPA 2007). This warming is associated with climatic variability, commonly known as climate change, and exceeds the historic norm. Temperature changes and climactic variability are not evenly distributed across the globe. Models and observations indicate that average temperature increases in northern latitudes are greater than in other areas, and seasonal low temperatures are generally increasing faster than high temperatures.

BLM_0114797

According to the Colorado Water Conservation Board, temperatures in Colorado increased by approximately 2°F between 1977 and 2006 (Colorado Water Conservation Board 2008). As reported in the 2007 Colorado Climate Action Plan developed by the state of Colorado (State of Colorado 2007), climate change effects within Colorado have included:

- shorter and warmer winters, with a thinner snowpack and earlier spring runoff
- less precipitation overall, with more precipitation falling as rain
- longer periods of drought
- more and larger wildfires
- widespread beetle infestations
- rapid spread of West Nile virus due to higher summer temperatures

In relation to a 1950 to 1999 baseline, climate models project that Colorado will warm 2.5°F by 2025, and 4°F by 2050. The 2050 projection indicates that summers will warm by 5°F, and winters by 3°F (Colorado Water Conservation Board 2008). Predicted climate change impacts on Colorado include:

- more frequent and longer lasting heat extremes that stress electrical utility demands
- longer and more intense wildfire seasons
- midwinter thawing and earlier melting of snowpack
- lower river flows in summer months
- water shortages for irrigated agriculture
- slower recharge of groundwater aquifers
- migration of plant and animal species to higher elevations
- more insect infestation in forests

### 3.1.3   Soils and Geology

Soils within the planning area are largely a product of the local geologic parent material, climatic conditions, and topographic position on the landscape. Living organisms and time also play a role in soil development. Sedimentary sandstone and shale formations occupy much of the area's bedrock geology, which therefore dominates the parent (source) material from which soils are formed. Igneous and metamorphic rocks along the mountainous eastern margin of the planning area provide additional variety in the parent material. Most of the mountainous areas have been glaciated, thus stripping the soils and depositing them in the valley floors or washing them away, so those soils at higher elevations are relatively young compared with the canyon country (Colorado Plateau) sandstone and shale that occupies roughly 80 percent of the planning area.

The geology of the planning area is complex, consisting of thick layers of sedimentary rocks from the Colorado Plateau, which meet the crystalline basement and volcanic rocks of the Rocky Mountains. The region contains major landforms such as the Uncompahgre Plateau, Paradox Basin, San Juan Mountains, Grand Mesa, West Elk Mountains, and the Black Canyon of

BLM_0114798

the Gunnison River gorge. Major river valleys were also carved by the Uncompahgre, Gunnison, North Fork of the Gunnison, San Miguel, and Dolores Rivers. These mountains and valleys create a dramatic landscape that offers a spectacular view into the Earth's history.

### Current Conditions

#### Soils

<u>Colorado Standards for Public Land Health</u>. BLM Colorado finalized Standards for Public Land Health and Guidelines for Livestock Grazing in Colorado in March 1997 (BLM 1997). The BLM applies these standards to public lands on a landscape scale to help describe a landscape's potential, various uses, and the conditions needed to sustain land health. The five Colorado Standards (shown in **Appendix C** [BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado]) are described in two parts: 1) A statement that describes conditions relating to the potential of a landscape, followed by 2) a series of indicators that help define the standard and are observable on the land. BLM Colorado Public Land Health Standard 1 identifies the characteristics and standards for healthy soil resources.

Beginning in 1998, the BLM directed its field offices to assess all BLM-administered lands against these standards over a ten-year period. The findings are documented in annual reports known as land health assessments. BLM staff completed the ten-year cycle of land health assessments for the UFO during the winter of 2008-2009. Soil results for the planning area are summarized in **Table 3-4** (Land Health Assessment Soil Summary Ratings). Site-specific soil evaluations for each land health assessment are on file at the UFO.

<u>Land Health Assessments</u>. Soil resources on lands within the planning area were rated in one of three categories based upon BLM Colorado Public Land Health Standard 1: 1) Meeting the standard, 2) meeting the standard with problems, or 3) not meeting the standard. The soil rating for each land health assessment unit is shown in **Table 3-4**.

The "meeting the standard with problems" category implies that less than half of the assessment sites within a soil polygon had a soil indicator rating of less than satisfactory, but overall, the soil condition in the polygon was meeting the standard.

The most common soil indicators resulting in rankings of meeting the standard (but) with problems or not meeting the standard were:

- high levels of bare -exposed soil surface
- low densities of live- perennial plant basal cover
- low amounts of plant litter cover
- high levels of annual -invasive weed species
- presence of gullied (incised) stream channels

BLM_0114799

**Table 3-4**
**Land Health Assessment Soil Summary Ratings**

| Land Health Assessment[1] | Year | Area Soils (Acres) | | |
|---|---|---|---|---|
| | | Meeting | Meeting but with Problems | Not Meeting |
| East Paradox | 1999 | 70,354 | 6,115 | 1,559 |
| North Delta | 2002 | 39,896 | 30,132 | 1,554 |
| Mesa Creek | 2004 | 59,931 | 50,507 | 1,005 |
| Roubideau | 2005 | 45,905 | 45,186 | 9,616 |
| Norwood | 2006 | 82,971 | 15,768 | 730 |
| North Fork | 2007 | 31,833 | 28,399 | 1,472 |
| Colona | 2008 | 39,754 | 8,864 | 2,394 |
| West Paradox | 2009 | 53,281 | 15,240 | 0 |
| *Total* | | *423,925* | *200,211* | *18,330* |

[1]Gunnison Gorge NCA was surveyed in 2001 but is not part of the planning area.

The causal factors for not meeting the soil standard were also numerous, but often were determined to be caused by:

- poor follow-up management of vegetation treatments
- historic livestock grazing
- historic wildfire suppression
- proximity to private lands

Soil Composition. Based on the Web Soil Survey (Natural Resources Conservation Service 2010), there are 30 major soil units in the planning area (**Figure 3-1** [Major Soil Units]). The primary parent material from which these soils are derived are shale and sandstone bedrock, but there other contributing parent material, including mixed alluvium on mesas and in valley bottoms, mountain residuum and colluvium derived from igneous and sedimentary rocks, and eolian (windblown silt and sand) deposits. The interbedded sandstone and shale units of the Cretaceous Dakota Sandstone and Mancos Shale formations dominate the surface over much of the planning area. Weathering of parent material produces sandy and fine sandy loam to silty clay and clay loam textured soils. The Dakota Sandstone, which was formed in a coastal environment, contains massive, well-cemented sandstone interbedded with weaker shale, carbonaceous shale, and coal. The sandstone beds in this formation resist weathering and form cliffs, ledges, and mesa tops. The soils derived from Dakota Sandstone are typically sandy to fine sandy loam with some clay loam where more shale is present in the unit. The overlying Mancos Shale is the primary shale formation, which characteristically weathers to produce fine-textured silty clay to clay loam soils. The Mancos Shale is a marine-deposited formation and, as a result, often contains high levels of selenium (a non-metallic chemical element) and a variety of soluble salts, both of which can degrade water quality in receiving streams when mobilized by natural processes (i.e., wind or water) and human-caused soil disturbances.

BLM_0114800

Additional shale- and sandstone-bearing formations in the planning area are the Jurassic Morrison Formation, which underlies the Dakota Sandstone found in the deeper canyons of the western half of the planning area, and the Cretaceous Mesaverde Formation, which overlies the Mancos Shale. The Mesaverde formation has been stripped off of most of the Mancos Shale and is not present in the western half of the planning area. The Mesaverde remains where it is protected by overlying Tertiary sedimentary and volcanic rocks along the southern flank of Grand Mesa and south along the West Elk Mountains and Cimarron Ridge (south of the Black Canyon of the Gunnison National Park).

<u>Soil Surveys</u>. A soil survey describes the characteristics of the soils in a given area, usually as a survey unit within a county within neighboring counties. Soils are classified according to a standardized system, and soil boundaries are plotted on a map using aerial photographs as a base. Soil surveys help to make predictions about how a particular soil might behave, as well as its potential uses. The information collected in a soil survey aids in evaluating and predicting the effects of various land uses on the environment when developing land use plans. Order 3 soil surveys have been completed for the planning area, which describe and assess soil resources down to the phases of a soil series and delineations on the ground ranging from 6 to 640 acres.

Five surveys conducted by the USDA, Natural Resources Conservation Service describe soil resources in the planning area:

1. Soil Survey of Paonia Area, Colorado (Natural Resources Conservation Service 1981), including parts of Delta, Gunnison, and Montrose Counties

2. Soil Survey of Ridgway Area, Colorado (Natural Resources Conservation Service undated), including parts of Delta, Montrose, Gunnison and Ouray Counties

3. Soil Survey of Uncompahgre National Forest Area, Colorado (Natural Resources Conservation Service 1995), including parts of Mesa, Montrose, Ouray, and San Miguel Counties

4. Soil Survey of Grand Mesa-West Elk Area, Colorado (Natural Resources Conservation Service 1997), including parts of Delta, Montrose, Mesa, and Gunnison Counties

5. Soil Survey of San Miguel Area, Colorado (Natural Resources Conservation Service 2003), including parts of Dolores, Montrose, and San Miguel Counties

In addition, the online Web Soil Survey (Natural Resources Conservation Service 2010) provides soil survey data in map and tabular formats and is the source for "Ridgway Area Soil Survey" data that is compiled but yet unpublished in a report.

Two BLM-administered lands parcels within the planning area have not been surveyed. Soils in a 12,000-acre parcel adjoining National Forest System lands along the northern planning area boundary on the west side of the Uncompahgre Plateau in Mesa County have been field surveyed but not yet compiled and finalized into a soil survey report. The second parcel is 1,000 to 1,500 acres, and is located in the vicinity of High Park Lake in the Big Cimarron drainage. Limited access to this area has prevented the field work necessary to complete the survey.

BLM_0114801

<u>Fragile Soils</u>. For the purposes of this RMP, fragile soils include soils with a high potential for supporting biological soil crust, soils with elevated levels of salinity (dissolvable salts) and/or selenium, soils prone to erosion by wind or water, and soils prone to impacts from drought conditions.

The local climate, landscape position, land uses, and soil properties largely dictate the density and composition of vegetation cover over most of the planning area. Vegetation cover and plant litter are important components for maintaining a healthy soil surface. At higher elevations in the planning area, mountain shrub and spruce (*Picea* spp.), fir, aspen *(Populus tremuloides)*, and ponderosa pine *(Pinus ponderosa)* tree communities provide soil surface cover and help bind the soil with their roots. At lower elevations, pinyon *(Pinus edulis) and* juniper *(Juniperus* spp.*)* and sagebrush *(Artemisia* spp.*)* communities dominate coarser-textured, non-saline soils, while salt desert shrub communities occur on saline, shale-derived soils.

*Biological Soil Crust.* In lower-elevation areas with sparse plant cover, biological soil crust provides another important soil cover component. Biological soil crust is comprised of a complex mosaic of green algae, lichens, mosses, cyanobacteria, and other bacteria (BLM 2001). It serves many beneficial functions to protect and enhance soil productivity, including acting as a stabilizer to inhibit erosion of surface soils. Biological soil crust is most prevalent in portions of the planning area that receive less than 14 inches of annual precipitation, and on terrain with less than a 25-percent slope. In areas receiving more than 14 inches of annual precipitation, competition from vascular plants reduces the occurrence of biological soil crust. On terrain with greater than 25-percent slope, erosional forces act to minimize the establishment of biological soil crust. While soil texture and chemistry can also be factors in determining the density and composition of biological soil crust communities, field inventories to define these differences have not been completed, and were not used to identify soils having a high potential for biological soil crust. Based on these precipitation and slope parameters, approximately 254,900 acres of planning area soils have been identified as having a high potential for supporting biological soil crust. Refer to **Table 3-5** (Acreage of Fragile Soils) and **Figure 3-2** (Potential Biotic Soil Crust Locations).

**Table 3-5**
**Acreage of Fragile Soils**

| Soil Attribute[1] | Low Potential | Moderate Potential | High Potential |
|---|---|---|---|
| Wind Erosion | 249,750 | 375,940 | 1,130 |
| Water Erosion | 285,900 | 140,390 | 120,410 |
| Drought Affected | 207,120 | 319,280 | 100,430 |
| Saline | 0 | 0 | 107,180 |
| Biological Soil Crust | 0 | 0 | 254,850 |

[1]Total acreage within and between each soil attribute and under BLM management varies as a result of the specific set of soil units rated by the Natural Resources Conservation Service.

*Saline Soils.* The Colorado River Basin Salinity Control Act (Colorado River Water Quality Office, Bureau of Reclamation) directs the BLM to minimize salt contributions to the Colorado

BLM_0114802

River system from BLM-administered lands. The Mancos Shale is the primary source of both salinity and selenium in the region. Since the early 1980s, the UFO has been managing some areas dominated by Mancos Shale to minimize salinity yields. The Elephant Skin Wash Salinity Control Pilot Project was implemented by the BLM in 1984 in what was then part of the UFO. The project site is now managed as part of the Gunnison Gorge NCA, which is excluded from but adjacent to the planning area. The purpose of the project was to test the effectiveness of off-channel storage structures in capturing and retaining salinity and preventing it from entering larger receiving streams. Two of four sites targeted for structures were completed and maintained into the early 1990s, at which time monitoring data was compiled and evaluated. Conclusions from this effort were that although the structures were effective at capturing and retaining salinity, the initial project cost and required frequent maintenance exceeded the salinity reduction benefits. Additionally, sites suitable for structural projects are limited, and without routine monitoring and treatment, invasive weeds become a problem.

The most recent salinity management efforts in the UFO have concentrated on non-structural controls, such as managing soil surface-disturbing activities such as livestock grazing and off-highway vehicle (OHV) use to minimize salinity yields. Additionally, potential salinity yields from realty actions such as land exchanges are assessed and minimized. Recently completed land health assessments identify areas where soils are meeting, meeting with problems, or not meeting BLM Colorado Public Land Health Standard I (**Appendix C**). The land health assessments also identify causal factors for less than satisfactory soil ratings, and specify actions needed to correct problem areas. Adding terms and conditions to grazing permit renewals has been the most commonly used tool aimed at improving surface conditions on saline soils.

The Gunnison Basin Selenium Task Force is a group of private, local, state, and federal interests committed to finding ways to reduce selenium in affected waterways in the Gunnison Basin, while maintaining the economic viability and lifestyle of the Lower Gunnison River basin of western Colorado. **Section 3.1.4** (Water Resources) explains the water quality implications of excessive selenium levels in the Gunnison Basin. Because high concentrations of selenium occur in Mancos Shale and soils derived from this formation, land management practices and actions that reduce soil surface disturbance and deep water percolation minimize the yield of selenium offsite, much like salinity management. The UFO has been coordinating with the Selenium Task Force to develop best management practices (BMPs) to minimize selenium yields from management activities on BLM-administered lands.

**Figure 3-3** (Saline and Selenium Enriched Soils) shows the occurrence of 107,180 acres of saline geologic units (primarily of Mancos Shale and the Paradox Formation) in the planning area. Saline soils are commonly coincident with these strata. However, salinity concentrations in the surface soils vary according to site-specific topography, local climate, and the geologic member that weathered to produce the soil. Shale in steep badland areas generally exhibits higher surface salinity concentrations than valley fill or outwash, shale-derived soils. Within badland areas, southerly and westerly hill slope aspects have higher surface salinity levels than more northerly aspects. Salinity concentrations also tend to be higher in more arid portions of the planning area.

*Wind and Water-eroded Soils.* As shown in **Table 3-5**, the potential for soil erosion from wind or water action varies across the planning area. While less than 1 percent of soils in the planning

BLM_0114803

area have a high potential to be eroded through wind action, about 18 percent have high potential for erosion by water, due to steep topography and the physical characteristics of the soil. The erodibility of a soil, known as the "K" factor presented in soil surveys, represents both the susceptibility of soil to erosion and the rate of runoff. **Figure 3-4** (Wind Erosion Areas) shows areas susceptible to wind erosion, while **Figure 3-5** (Soil Erosion Capacity) shows areas susceptible to water erosion. As shown in **Table 3-5**, 1,130 acres of the planning area are soil with a high potential for wind erosion, and 120,410 acres have a high potential for water erosion.

*Drought-affected Soils.* Drought-affected soils have a low capacity to retain water in the root zone of the soil profile (calculated as a soil depth of 40 inches or a limiting layer). Within the planning area, approximately 15 percent of soils have a high potential to be affected by drought conditions as shown in **Table 3-5** and **Figure 3-6** (Droughty Soil Areas). Through a National Cooperative Soil Survey interpretation, criterion was developed to determine fragile soils (Bryce et al. 2012).

*Prime or Unique Farmlands and Residential Development.* Four categories of farmlands are federally regulated by the USDA under the Farmland Protection Policy Act: (1) Prime farmlands, (2) Unique farmlands, (3) Farmlands of statewide importance, and (4) Farmlands of local importance. Impacts from federal actions on BLM-administered lands to farmlands identified as prime or unique are required to be analyzed and disclosed to the public during development of an RMP/EIS. In addition, the USDA delineates important farmlands as those having soils that support the crops necessary for the preservation of the nation's domestic food and other supplies, specifically the capacity to preserve high yields of food, seed, forage, fiber, and oilseed with minimal agricultural amendment of the soil, adequate water, and a sufficient growing season.

There are no farmlands of national or statewide importance on BLM-administered lands within the planning area. However, according to a report by the Soil Conservation Service, irrigated and prime irrigated lands of statewide importance, most of which are situated at low elevations on valley floors, occur in the Uncompahgre, North Fork, Surface Creek, and Smith Fork drainage basins (Soil Conservation Service 1980). Several private and federal (e.g., US DOI Bureau of Reclamation [BOR]) ditch and canal systems provide irrigation water to these farmlands and some of the associated facilities cross or are located on BLM-administered lands. In several locations, tributaries that drain onto these farmlands have their headwaters on public lands within the planning area. Historically, flood events originating on public lands within the planning area have resulted in damage to farmland and associated canals and laterals operated by the Uncompahgre Valley Water Users Association.

*Flood Hazard Areas and Control Measures.* Within the planning area, two flood-control retention structures are located in the Shavano Valley and in the Roatcap drainage west of Olathe. These structures function to help mitigate flood damage to valley bottom farmland. Although these two facilities provide flood protection for their respective drainages, other drainages in the planning area remain free flowing. The soil surface and hydrologic condition of these watersheds influences the amount of runoff and sediment produced during flood events. A recent effort by Montrose County and the Colorado Geological Survey to identify flood/debris flow hazard areas

BLM_0114804

on private lands in eastern Montrose County was conducted in part to help assess future land use proposals (White et al. 2008). **Figure 3-7** (Flood Hazard Areas) shows flood hazard areas within the planning area that were determined by the hazard study.

*Geology*

Geologic resources are defined through descriptions of the surficial and bedrock geology and stratigraphy of the planning area. Geologic information is used to evaluate the potential development of mineral resources, as well as to regulate land uses based upon slope stability, geologic hazards, and accessibility issues. Several geologic type localities and areas of paleontological significance occur within the planning area.

Surficial and Bedrock Geology. Much of the planning area lies within the Colorado Plateau physiographic province, which is characterized by deeply dissected plateaus composed mostly of sedimentary rocks with some younger intrusions and volcanic lava flows. The southeastern to northeastern edge of the planning area contains the Rocky Mountain physiographic province, composed of uplifted Precambrian crystalline basement rocks and Tertiary volcanic rocks. Surface and bedrock geology for much of the area consists of sedimentary rocks ranging in age from Paleozoic (230 to 600 million years) to Cenozoic (63 million years to present). **Figure 3-8** (Geology of the Uncompahgre RMP Planning Area) depicts the generalized geology, which shows that Paleozoic and Mesozoic Era (i.e., Triassic, Jurassic, and Cretaceous Periods) sedimentary rocks are most common in the western half of the planning area, while Mesozoic and Cenozoic sedimentary rocks dominate the northern and central portions. Volcanic rocks and related intrusions are located along the southeastern and northeastern edges in the San Juan and West Mountains, respectively. Dominant sedimentary formations include the Cretaceous Mancos shale that occupies the Uncompahgre and North Fork Valleys, forming the Adobe Badlands, and the Cretaceous Dakota Sandstone that caps the Uncompahgre Plateau and canyon rims to the east and west.

The structural geology of the planning area (**Figure 3-9** [Major Geologic Structural Features]) consists of the following main features presented from southwest to northeast: Paradox Basin (salt dome anticlines and synclines), Uncompahgre Plateau, Montrose Syncline, Piceance Basin, San Juan Volcanic Field, and the Gunnison Uplift, including the Gunnison Gorge and West Elk Volcanic Field.

The northern portion of the planning area lies within the southern Piceance Basin in western Colorado. The Piceance Basin is a broad, southeast-northwest trending structural and topographic basin bordered by the White River Uplift to the east, the West Elk Mountains to the southeast and south, the Uncompahgre Uplift to the southwest, the Douglas Creek Arch to the west-northwest, the Yampa Plateau to the north, and the Axial Basin Uplift to the northeast. The Piceance Basin encompasses 3,900 square miles of exposed Tertiary rocks. The Tertiary-Cretaceous contact forms a nearly continuous outcrop along the basin margins. The basin is asymmetric, with gently dipping beds along the southwest flank and steeply dipping beds along the northeast flank, which form the Grand Hogback (Dunn 1972). Deposition of sediments into this region began with downwarping of the Piceance Basin floor during the Cretaceous, and continued through the Eocene. This resulted in the deposition of the Wasatch, Green River, and Uinta formations in and around a series of landlocked lakes (Bradley 1964). The Tertiary

BLM_0114805

Wasatch Formation is one of the main surface formations along the northern planning area boundary.

The planning area contains stratified rock units ranging in age from Precambrian through late Tertiary, with Quaternary deposits such as alluvium, colluvium, glacial moraines, and landslide deposits placed on top of some of the bedrock units. As a result of the large geographic size of the planning area, lateral changes in the presence, thickness, and composition of these units occurs.

<u>Geologic Hazards</u>. Geologic hazards are geologic conditions or materials that pose risks to life and property. Geologic hazards include landslides, unstable slopes, rockfall, debris flows, flooding, avalanches, subsidence, and earthquakes (Shelton and Prouty 1979). Other hazards such as swelling soils, collapsible soils, shallow groundwater, erosion, and radon are more related to construction problems, damage to property, and expensive mitigation, but do not generally pose a risk for loss of life due to a catastrophic event. However, all of these geologic hazards are potentially present in the planning area. Those of primary concern for use and management of public land are those that cause damage to infrastructure and facilities, injury or death, degradation of resources, and disrupted access. Some small areas in the planning area have geologic hazard maps available, primarily in the most populated areas where development is occurring, but most of the area is largely unmapped for geologic hazards. The significant geologic hazards relevant to the planning area are discussed below.

*Unstable Slopes*. Unstable slopes occur on hillsides and cliffs and in areas that are susceptible to landslides, mudflows, rockfalls, or accelerated creep of slope-forming materials. Unstable slopes occur naturally and are widespread in the planning area due to over-steepened slopes, dipping bedrock, an abundance of unconsolidated surficial material, and inherently weak bedrock units such as shale. Most unstable slopes consist of weathered sedimentary strata and/or recent colluvium deposits that move downhill due to gravity. Unstable slopes can be active or inactive. Slope failure can be initiated by natural events or human actions. Natural factors contributing to slope instability include weathering and erosion, changes in the hydrologic characteristics of a hillside, loss of vegetation cover, earthquakes, and the slow natural deterioration of slope strength. Artificial factors that can undermine slope strength include cut and fill operations, blasting, vehicular traffic, excessive irrigation, the alteration of surface drainages, and the removal of vegetation cover.

<u>Mass Movement</u>. Mass wasting includes any activity that involves the downhill movement of rock and soil under the influence of gravity. It includes landslides, earthflows, debris flows, rockfall, and creep. Mass movement is a dynamic process that can be triggered by earthquakes, rapid snowmelt, intense rainstorms, or gravity. While mass movement plays a major role in the evolution of a hillslope by modifying slope morphology and transporting material from the slope to the valley, it also poses a potential natural hazard. The ability to predict the location and volume of transported mass on potentially unstable slopes is critical in assessing mass movement hazards and hillslope evolution. A promising approach is to examine the relationship of area, volume, length, height, and width of existing movements through ratio quantification. For example, the Paonia-McClure Pass area, in the northeast corner of the planning area, has a well-known zone of mass movement. A technical study using aerial photographs and field surveys

BLM_0114806

mapped 683 movement features covering approximately 600 square kilometers. The area of movement is classified as 29 percent debris flows, 26 percent rockslides, 23 percent debris slides, 15 percent soil slides, and 7 percent highway and forest road-influenced landslides (Regmi et al. 2008). Future hazard analysis will produce landslide hazard zone maps that the BLM can use in planning efforts.

*Rockfall*. Rockfall can originate from bedrock outcrops or loose rocky debris on a hillside left behind by glaciers, landslides, or other forms of mass movement. Roadways are particularly susceptible to rockfall due to the over-steepened hillsides caused by roadcuts. Rockfall in undeveloped areas is not a significant hazard due to the low population density, but high risk areas can be avoided with careful placement of trails, roads, and structures.

*Debris Flows*. Debris flows are a slurry of rocks, trees, and other debris entrained in a flood event carried down a channel and then deposited in a fan-shaped deposit in the valley floor where the gradient becomes less steep. The towns of Telluride and Ouray within the planning area are located on active debris flow fans. Avoiding the mouth of steep canyon streams can avoid this type of hazard.

Mineral Resources. The planning area has a number of active and inactive mining districts and a variety of mineral resources resulting from the unique and widely varying geologic setting of the region. Mineral resources include industrial minerals, metals, coal, natural gas, and radioactive elements. Separate studies have been performed for these topics and are summarized in other sections of Chapter 3.

**Trends**

*Soils*
Effectiveness monitoring of soil problems will be an important part of the adaptive management approach, ensuring that land management actions are appropriate for a particular site. At present, guidelines for both recreation and livestock grazing are used to develop appropriate site management activities. The land health assessments identify causal factors (including activities in addition to grazing and recreation) responsible for soils not meeting BLM Colorado Public Land Health Standard 1.

While BMPs for mineral and energy development activities help to minimize soil surface disturbance, projected increases in both uranium (concentrated in the western portions of the planning area) and natural gas extraction (concentrated in the northeastern and western portions of the planning area) indicate that there is potential for additional soil disturbance and accelerated rates of erosion. Coal mining activities in the planning area will also contribute to soil disturbance in the planning area. Surface strip mining in the Nucla area will expose new areas to be stripped and reclaimed, while underground mining in the North Fork Valley will have associated roads, stock piles, processing plants, and other infrastructure on the surface associated with the mining activities.

Population growth and the subdividing and development of historic farmland and rangeland along the lower elevations of the planning area have created an additional and progressively increasing problem regarding flood potential, especially in the Uncompahgre Valley. Occasionally,

BLM_0114807

residential developments occur in alluvial plains or on alluvial fans, and may experience rare flood and debris events of high magnitude from intermittent drainages with headwaters on public land. Because most of these flood hazard areas have not been identified as floodplains, the county land use department has allowed such development to occur. The recent identification of these areas should aid Montrose County in making land use decisions with this flood potential in mind, and provide the BLM with locations of high priority watersheds that should be managed in the future to meet BLM Colorado Public Land Health Standards.

Black Shale Terrains. A five-year scientific research effort conducted in the Gunnison Gorge NCA by the US Geological Survey in partnership with the BLM and BOR (Grauch et al. 2005) resulted in a broad array of scientific findings about Mancos Shale. The primary focus was to assess how soil surface-disturbing activities affect physical, chemical, and biological processes on the diverse terrain. The research examined and described the stratigraphy and chemistry of individual members of the Mancos Shale, soil chemistry (including salinity and selenium), hillslope erosion processes, and area botany, as well as completing a rainfall/runoff analysis in a variety of landscape positions. Although the research was conducted in the Gunnison Gorge NCA, the intent of the effort was to identify attributes of Mancos Shale that were applicable to similar black shale landscapes outside of the Gunnison Gorge NCA. These areas could include all or portions of public land in the planning area dominated by Mancos shale (as shown in **Figure 3-8**). Soil resources are not depicted herein for the Gunnison Gorge NCA, which operates under its own RMP.

Ongoing and future land management actions aimed at reducing salinity, selenium, and erosion emanating from areas dominated by Mancos Shale include:

- Developing and implementing BMPs from the BLM/US Geological Survey Mancos Shale research findings applicable to livestock management, recreation management (e.g., location and limitations of OHV use areas), rights-of-way (ROWs), and other surface-disturbing activities

- Continuing efforts to locate, assess, and remove hundreds of non-functional, eroding earthen check dams in Mancos Shale areas north of Delta

- Continuing to identify and minimize potential salinity and selenium yield increases from future land uses that could occur on exchanged or disposed of parcels of BLM-administered land

- Continuing to collaborate and coordinate salinity and selenium management activities with both the Colorado River Basin Salinity Control Forum and the Gunnison Basin Selenium Task Force

Predicted Changes in Climate. Many prominent climatologists are predicting some change to the near term future climate of Colorado. A recent report, Climate Change in Colorado 2008, analyzes past and present climate data, and makes a forecast that southwestern Colorado will experience warmer temperatures in the coming decades (Ray et al. 2008). The report summarizes potential issues for land and water managers in response to the forecast, concluding that increasing temperatures would raise evapotranspiration by plants, lower soil moisture, alter

BLM_0114808

growing seasons, alter disturbances such as wildland fire and insect outbreaks, and shift existing plant communities to higher elevations.

Although difficult to predict, impacts on the health of the soil surfaces could occur from a changing climate, and could include reduced vigor of native plant communities that provide needed soil surface protection; higher levels of bare, exposed surface soil; and higher densities of annual invasive weed species (which are unreliable for providing a protective soil cover). These changes could affect most, if not all, of the soil resources in the planning area, but would likely be most pronounced for the drought-affected soils shown in **Figure 3-6**.

*Geology*
An increased understanding of area geology can be expected as more knowledge is gained through mineral exploration and development, as well as from geologic mapping.

### 3.1.4   Water Resources

#### Current Conditions

*Surface Water*
The planning area includes portions of seven major hydrologic units, as shown in **Table 3-6** (Major Hydrologic Units) and **Figure 3-10** (Major Hydrologic Units). Over 66 percent of the planning area is within the Lower Gunnison, San Miguel, and Uncompahgre River basins.

### Table 3-6
### Major Hydrologic Units

| Hydrologic Unit | 4th Level HUC[1] | BLM Acres | Percent of Planning Area |
|---|---|---|---|
| Lower Dolores River | 14030004 | 55,680 | 8 |
| Upper Dolores River | 14030002 | 96,000 | 14 |
| San Miguel River | 14030003 | 211,790 | 31 |
| North Fork Gunnison River | 14020004 | 59,080 | 9 |
| Uncompahgre River | 14020006 | 127,920 | 19 |
| Lower Gunnison River | 14020005 | 108,210 | 16 |
| Upper Gunnison River | 14020002 | 15,840 | 2 |

Source: Natural Resources Conservation Service 2009[1]
HUC – Hydrologic Unit Code developed by the US Water Resources Council to delineate and catalog the drainage basins of the US.

Large drainages with headwaters at higher elevations experience high flows from spring snowmelt, which can last for several weeks. Baseflow in these drainages occurs from late summer through February or March. In all area drainages, high-magnitude, short-duration floods can occur in summer months due to high-intensity, short-duration precipitation events associated with southwest monsoonal airflow. The frequency and magnitude of these events is highly variable from year to year. Localized flooding from these events can be significant in ephemeral channels, as floodwaters commonly contain large amounts of accumulated vegetation debris and sediment. Additionally, watershed characteristics such as size, shape, slope,

BLM_0114809

orientation, watershed cover condition, and soils can affect the magnitude of flood peaks produced by localized summer storms.

Planning area soils have been evaluated by the Natural Resources Conservation Service for their capacity to infiltrate water and categorized into one of four Hydrologic Soil Groups, as shown in **Figure 3-11** (Distribution of Hydrologic Soil Groups) and **Table 3-7** (Hydrologic Soil Group Ratings). Category A and B soil groups have higher infiltration capacities and produce low amounts of runoff during storm events, while the inverse occurs with categories C and D. Over 73 percent of planning area soils falls into Categories C and D, meaning the majority of area soils have high runoff potential.

**Table 3-7**
**Hydrologic Soil Group Ratings**

| Hydrologic Soil Group | Description | BLM Acres |
|---|---|---|
| A | Soils having a high infiltration rate even when thoroughly wetted (estimated range of water infiltration 1.00 – 8.30 inches/hour) | 1,560 |
| B | Soils have a moderate infiltration rate when thoroughly wetted (estimated range of water infiltration 0.50 – 1.00 inches/hour) | 169,770 |
| C | Soils have a slow infiltration rate when thoroughly wetted (estimated range of water infiltration 0.17 – 0.50 inches/hour) | 115,840 |
| D | Soils have a very slow infiltration rate when thoroughly wetted (estimated range of water infiltration 0.02 – 0.17 inches/hour) | 339,650 |

Source: Soil Survey Division Staff 1993

High-magnitude flood events commonly originate from public lands on the eastern side of the Uncompahgre Plateau due to the northeast drainage orientation, direction of storm travel, and soils with high runoff potential, as well as small watershed size and linear shape, which allow for rapid runoff concentration. Figure 3-7 (Flood Hazard Areas) shows areas of private land along the boundary with public land in eastern Montrose County that experience flooding, some of which originates on public lands. This flooding situation and related issues are further addressed in **Section 3.1.3** (Soils and Geology).

Floodplains along some reaches of higher-order rivers, such as the San Miguel, Dolores, Uncompahgre, North Fork of the Gunnison, and Lower Gunnison, are mapped by the Federal Emergency Management Agency. In reaches that are not incised, lower-order streams without a delineated floodplain are commonly considered to include the extent of the riparian zone bordering the channel. The floodplain width on these streams is partially determined by the degree of valley confinement, but even at downstream locations within the planning area, floodplains typically extend less than 50 feet from active channel banks.

Over 2,700 total stream miles (perennial, intermittent, and ephemeral stream channels) are managed in the planning area. Perennial streams make up approximately 350 stream miles and drain from 30 major watersheds across the UFO. The majority of perennial streams are highly dissected by private property, which makes it challenging to implement management actions to fully protect water resource values.

BLM_0114810

*Groundwater*

Groundwater in the planning area ranges from local, unconsolidated aquifers to extensive, bedrock (consolidated) aquifers, and is most common in coarse sedimentary rock formations. The unconsolidated aquifers are most common in alluvial deposits along perennial watercourses and on higher-elevation mesa tops. Water yields in these aquifers can vary seasonally and in response to long-term climatic variations. The extensive bedrock aquifers are often interrupted by deeply incised topography over much of the planning area. The bedrock aquifers typically have lower water yields and are higher in dissolved salts compared with water contained in unconsolidated aquifers. Groundwater recharge typically originates from higher elevations and is limited by a semi-arid climate over much of the planning area.

Groundwater resources have been developed extensively throughout the planning area. An inventory of springs and seeps across the UFO is incomplete, but the majority of sources that are known to flow on a regular basis have been developed for livestock watering, recreational developments, and other beneficial uses. Since the early 1970s, approximately 222 groundwater wells have been permitted on BLM-administered lands within the UFO. The majority of these wells were drilled into shallow (less than 100 feet deep) unnamed aquifers, while other aquifers were identified as being part of the Dakota, Burro Canyon, and Mesa Verde formations, which vary in depth but can be upwards of 800 feet deep. Many wells on BLM-administered lands have been abandoned over time, while other sources are being relied on more heavily as overall demand has increased (see *Source Water Protection of Public Water Supplies*, below). The majority of the permitted wells are for domestic and household use only. Other beneficial uses are for commercial, stock, industrial, irrigation, municipal, and monitoring purposes. The total volume of groundwater withdrawal from the UFO is unknown at this time.

*Water Quality*

Achieving high-quality water is an important component to an effective water resource management program to ensure both on and offsite water uses are satisfied. Water quality of UFO surface waters is assessed and monitored by several means. The land health assessments conducted over the most recent ten-year period assessed water quality against BLM Colorado Public Land Health Standard 5. Data assessed for land health assessments include water chemistry, bacteriological analyses, density, and composition of aquatic macroinvertebrates, and the potential for accelerated levels of sediment, salinity, and selenium. UFO land management actions also consider potential affects to water quality-impaired rivers and streams on the Colorado's 303(d) and Monitoring and Evaluations lists. While water temperature and dissolved oxygen levels are important factors in the ability of water to support aquatic life at the local habitat level, these factors are not human health concerns nor have they been identified as major water quality concerns in the planning area. As such, temperature and dissolved oxygen levels are not discussed further.

As part of the BLM Colorado Public Land Health Standards passed in 1997 (BLM 1997), water quality is one of the five standards for land health that must be assessed:

> Standard 5. The water quality of all water bodies, including groundwater where applicable, located on or influenced by BLM lands will achieve or exceed the water quality standards established by the State of Colorado. Water quality standards for

BLM_0114811

surface and groundwater include the designated beneficial uses, numeric criteria, narrative criteria, and anti-degradation requirements set forth under state law (5 CCR 1002-8), as required by Section 303(c) of the Clean Water Act.

Indicators:
- Appropriate populations of macroinvertebrates, vertebrates, and algae are present.

- Surface and groundwater only contain substances (e.g., sediment, scum, floating debris, odor, and heavy metal precipitates on channel substrate) attributable to humans within the amounts, concentrations, or combinations as directed by the Water Quality Standards established by the State of Colorado (5 CCR 1002-8).

**Table 3-8** (Land Health Standard 5 Summary Ratings) shows the ratings for stream miles within each land health assessment unit. The potential for streams to experience accelerated levels of sediment was the most common cause for not meeting the standard. The sediment yield entering streams from any given watershed in the planning area is difficult to quantify, as much of the sediment is derived from uplands and is detached and transported during intense, short-duration rainfall events during summer months. In order to assess the potential for an area to introduce accelerated levels of sediment into receiving streams, surrogate indicators (such as upland soil surface conditions) were used in place of water quality analyses. The specific surrogate indicators used for assessing water quality include the amount of bare soil surface, live plant basal coverage, and the degree of soil pedestal formation. In areas where no more than two of these three indicators showed problems, the "meeting but with problems" rating applied.

**Table 3-8**
**Land Health Standard 5 Summary Ratings**

| Land Health Assessment Unit | Meeting Standard[1] | Meeting with Problems[1] | Not Meeting[1] |
|---|---|---|---|
| Colona | 22.2 | 16.4 | 5.6 |
| East Paradox | 11.8 | 36.9 | 0 |
| Roubideau | 91.7 | 24.2 | 8.2 |
| Norwood | 92.0 | 22.3 | 15.5 |
| North Fork | 43.2 | 13.8 | 1.9 |
| North Delta | 50.2 | 19.7 | 0 |
| Mesa Creek | 95.1 | 50.8 | 0 |
| West Paradox | 16.1 | 9.7 | 7.0 |
| *Total* | *422.3* | *193.8* | *38.2* |

[1]Miles of streams

Because soil surface indicators were used for the water quality assessment, the causal factors for not meeting the water quality standard would be the same as those described in the soils: poor follow-up management on vegetation treatments, historic livestock grazing, historic wildfire suppression, and proximity to private lands.

BLM_0114812

The primary water quality issues for the waters in the planning area include elevated levels of sediment, salinity, and selenium.

Sediment. There are many sources for excessive sediment loading of surface waters on public lands. Soil surface-disturbing activities have the potential to accelerate the rate of soil erosion, which is strongly correlated with sediment production. Excess sediment has both on- and off-site impacts, lowering soil productivity at its source and affecting downstream uses of water, including instream riverine values.

Salinity and Selenium. Salinity and selenium are yielded from areas dominated by Mancos Shale and can be accelerated by the same processes that increase sediment, but additionally can be mobilized and transported by deep water percolation from activities such as irrigation and land development, especially in more arid portions of the planning area. Selenium is a particularly important issue in the Gunnison River Basin, as elevated levels are the suspected cause of reproductive failure of select species of warm water fishes in the Lower Gunnison River. Salinity is a Colorado River Basin issue and affects many water uses, especially in the Lower Basin and Mexico. In 2009, USFWS issued a Programmatic Biological Opinion under the Endangered Species Act (ESA), requiring a selenium management program for which the UFO is a participatory agent. The UFO will sign a Memorandum of Understanding with the BOR to assist with developing a long-range plan for the program.

*Selenium.* The most widespread impairment to area water quality is excessive selenium. Elevated levels of selenium have been shown to cause reproductive failure and deformities in fish and aquatic birds and are suspected to be the cause of reproductive failures in select species in the Lower Gunnison River. The stream segments in **Table 3-9** (Colorado 303(d) List of Impaired Waters) are on the 2008 Colorado 303(d) list of impaired waters and include reaches of, or receive drainage from, public lands within the planning area. In June 2011, the Colorado Department of Public Health and Environment, Water Quality Control Commission amended the Classifications and Numeric Standards for the Gunnison and Lower Dolores River Basins (Colorado Department of Public Health and Environment 2011c). These amendments included the adoption of new standards for selenium and the adoption of temporary modifications for selenium standards in four segments of the basin. These segments are now included in the Colorado 303(d) list.

The Colorado Water Quality Control Division has prepared a draft Total Maximum Daily Load, which identifies both point and non-point sources of selenium loading and establishes safe levels of selenium for the Gunnison River Basin. Developed under Section 303(d) of the Clean Water Act, the Total Maximum Daily Loads are pollutant-specific, identify pollution sources and a water body's capacity to assimilate pollutants, and allocate assimilative capacity among those sources.

Selenium loading of waters on planning area lands primarily originates from diffuse, non-point sources associated with natural runoff and erosion process. Assessments made by the local National Resources Conservation Service office determined that areas dominated by Mancos Shale in its natural state contains up to 34 times the concentration of selenium in comparison to similar irrigated lands. On public lands, accelerated yields of selenium can occur from activities

BLM_0114813

**Table 3-9**
**Colorado 303(d) List of Impaired Waters**

| Water Source | Impairment | Priority |
| --- | --- | --- |
| Gunnison River, Uncompahgre River to Colorado River | Selenium | High |
| North Fork of Gunnison from Black Bridge above Paonia to confluence with Gunnison River | Selenium | High |
| Leroux Creek, Jay Creek | Selenium | High |
| Big Creek, Short Draw | Selenium | High |
| Cottonwood Creek, Big Gulch | Selenium | High |
| Uncompahgre River, Red Mountain Creek to Montrose | Cadmium, Copper, and Iron | High |
| Uncompahgre River, La Salle Road to Confluence Park | Selenium | High |
| Uncompahgre River, Confluence Park to Gunnison River | Selenium | High |
| Tributaries to Uncompahgre River, South Canal to Gunnison River | Selenium | High |
| Dolores River from Little Gypsum Valley bridge to Colorado/Utah border | Iron | High |
| Sweitzer Lake | Selenium and Dissolved Oxygen | High |

Source: Colorado Department of Public Health and Environment 2008a

that result in soil surface disturbance and increased runoff and erosion. Management of surface-disturbing land uses such as livestock and OHV use on Mancos Shale-dominated areas has been to apply stipulations or terms and conditions that reduce accelerated selenium yields.

Another process resulting in excessive yields of selenium is the application of added amounts of water from activities such as agricultural irrigation and land developments (including golf courses and septic systems). Adding water to unaltered Mancos Shale commonly results in deep water percolation through the shale, and the dissolving and transporting of selenium to receiving streams. Management actions in the planning area that could result in accelerated selenium yields from deep water percolation include ROWs involving open water sources (such as irrigation ditches and canals), and land sales or exchanges that involve lands dominated by Mancos Shale. Once land is transferred from public to private ownership, future land uses allowed by local governments could result in accelerated selenium yields. These land actions are assessed through the National Environmental Policy Act of 1969 (NEPA) process, during which potential impacts are identified and mitigated where possible.

_Salinity._ Accelerated levels of salinity in surface waters are also an issue in the planning area. The processes that cause salinity loading of waters are similar to those discussed above for selenium. As with selenium, areas dominated by Mancos Shale have the highest potential to yield dissolvable salts to surface waters. The State of Colorado develops and adopts water quality standards for salinity as part of a seven-state Colorado River Basin Salinity Control Forum. The Forum gathers and reviews information relevant to the complex problem of salinity standards and implementation of controls by the basin states. Through this basin-wide effort, Colorado works with the other basin states and the federal government to manage salinity and its effects.

The BLM is mandated by the Colorado River Basin Salinity Control Act (Colorado River Water Quality Office) to manage lands to minimize salinity yields to surface waters. Because of the

BLM_0114814

semi-arid climate throughout much of the planning area, most of the salinity yielded from public lands is episodic and only occurs during rainfall events that produce runoff. Maintaining adequate watershed cover and healthy soil surface conditions are important for minimizing runoff, sediment, and salinity from areas dominated by Mancos Shale. Through the land health assessment process, the BLM has identified areas where watershed conditions are less than adequate and has developed corrective actions.

The stream segments in **Table 3-10** (State Monitoring of UFO Waters with Suspected Quality Impairments) are on the 2008 Colorado Monitoring and Evaluation List of waters suspected of being water quality impaired and either include reaches of, or receive drainage from, public lands within the planning area. As sufficient water quality data are collected and analyzed for these stream reaches, they will ultimately be either removed from the Monitoring and Evaluation List or transferred to the 303(d) list of impaired waters. While on the Monitoring and Evaluation List, the BLM recognizes the potential water quality impairment and manages lands draining into these streams to minimize further water quality degradation.

**Table 3-10**
**State Monitoring of UFO Waters with Suspected Quality Impairments**

| Water Source | Suspected Impairment |
| --- | --- |
| Gunnison River from confluence with Uncompahgre River to Colorado River | Sediment |
| Tongue Creek and Ward Creek | Selenium |
| Surface Creek, Coal Gulch, Hawksnest Creek, Gribble Gulch, and Cottonwood Creek (tributary to North Fork of Gunnison) | Iron |
| Ridgway Reservoir | Temperature/Dissolved Oxygen |
| Uncompahgre River Highway 90 to confluence with Gunnison River | Sediment |
| Billy Creek, Onion Creek, and Alkali Creek (tributary to Uncompahgre River) | Selenium |
| Dry Creek Watershed (from East and West Forks to Coalbank Canyon Creek) | Sediment |

Source: Colorado Department of Public Health and Environment 2008b

Other less-widespread water quality issues include excessive heavy metal loading, radium isotopes Ra-226 and Ra-228, and biological pathogens. Little of the planning area is directly affected by metal pollutants. Heavy or toxic metal issues affecting water quality are primarily associated with high-elevation hard rock mining areas in the San Juan Mountains. Ra-226 and Ra-228 are occasionally elevated in waters associated with the Uravan Mineral Belt, especially water discharges from uranium mine and waste rock areas.

Biologic pathogens, including several types of bacteria and protozoan, potentially occur in water bodies in the planning area and can increase in relation to the density and activities of warm-blooded animals, including humans. As part of the land health assessment process, several UFO streams with primary-contact recreation activities were monitored for fecal and *Escherichia coliform* bacteria concentrations. There is a strong correlation between these bacteria and the occurrence of other pathogens. Based on a limited number of samples per site (usually one or two samples collected in spring or summer months), none of the sampled streams exceeded state criteria for bacteria as defined in the Basic Standards and Methodologies for Surface Water

BLM_0114815

(Colorado Department of Public Health and Environment2007). However, because of the temporal and spatial variability of bacteria in surface waters, a more-intensive sampling regime would be required to determine conclusively whether planning area streams comply with state criteria for bacteria. Overall, the data show that bacterial concentrations are highest in planning area waters during warm months and following rainfall events that produce runoff.

Macroinvertebrates and Stream Health. The population density and composition of macroinvertebrates are used as another tool to assess stream health in the planning area. Macroinvertebrates are good indicators of water quality and overall stream health, as there are many relatively immobile species in the stream environment. Many aquatic invertebrates are sensitive to pollutants and, because of their year-round presence in a stream, are susceptible to intermittent flow changes and discharges of pollutants.

Instream factors controlling the composition and abundance of stream invertebrates include:

- water flow rate and velocity

- water chemistry

- channel substrate size

- concentration of suspended solids

- winter processes such as river icing

- composition and density of aquatic and riparian vegetation

Twenty-six sites along perennial watercourses throughout the UFO were inventoried for aquatic macroinvertebrate composition and density during a ten-year period between 1998 and 2007. **Table 3-11** (Aquatic Macroinvertebrate in Planning Area Streams) provides a summary of invertebrate metrics for planning area streams in relation to average values within the Colorado Plateau Ecoregion. Some of the monitoring sites were sampled during water years 2000 and 2002, which experienced extremely warm and dry climatic conditions. These extreme conditions could have significantly altered both the abundance and species composition of aquatic macroinvertebrates as a result of reduced water flow, increased water temperature, and higher levels of total dissolved solids. Many higher-order streams in the planning area are significantly dewatered during the irrigation season, which can restrict the invertebrate population of a watercourse. All aquatic macroinvertebrate data for waters in the planning area are on file at the UFO.

*Water Rights*
The process of allocating water through the water rights system has a significant impact on the availability of water for meeting public land management purposes. Exercise of surface water rights located within and upstream from public lands can significantly change the rate, timing, location and quality of streamflows through public lands. In addition, exercise of groundwater rights can significantly affect aquifer levels, discharge of groundwater systems to surface streams, and groundwater quality. Reduced water flows or aquifer levels can have adverse impacts on the ecology of streams, springs, and wetlands, on recreational potential, on the availability of water

**Table 3-11**
**Aquatic Macroinvertebrate in Planning Area Streams[1]**

| Stream | Latitude | Longitude | Sample Number | Total[2] Abundance | EPT[3] Taxa | EPT[4] Abundance | Intolerant[5] Abundance | Tolerant[6] Abundance |
|---|---|---|---|---|---|---|---|---|
| Cow Creek | 38.1491 | 107.6444 | 1 | 789 | 13 | 645 | 39 | 0 |
| Dry Creek | 38.5353 | 108.0644 | 2 | 3,135 | 6 | 1,830 | 0 | 0 |
| Hubbard Creek | 38.9333 | 107.5186 | 1 | 63 | 6 | 23 | 7 | 0 |
| La Sal Creek Lower | 38.2785 | 108.9328 | 1 | 293 | 8 | 258 | 11 | 0 |
| La Sal Creek Upper | 38.3234 | 108.9856 | 1 | 858 | 12 | 380 | 39 | 3 |
| Leroux Creek | 38.8789 | 107.7850 | 1 | 2,004 | 17 | 772 | 23 | 0 |
| Lion Canyon | 38.3334 | 109.0553 | 1 | 430 | 10 | 261 | 32 | 1 |
| Maverick Draw | 38.2256 | 108.5061 | 1 | 3,522 | 2 | 397 | 0 | 0 |
| Mesa Creek | 38.4508 | 108.8225 | 1 | 1,297 | 2 | 20 | 1 | 0 |
| Minnesota Creek | 38.8625 | 107.5411 | 1 | 394 | 11 | 81 | 16 | 0 |
| Monitor Creek | 38.6217 | 108.2089 | 2 | 5,112 | 4 | 1,916 | 0 | 8 |
| Naturita Creek | 38.1475 | 108.3353 | 1 | 61,279 | 3 | 21,798 | 0 | 88 |
| Naturita Creek | 38.1594 | 108.4033 | 2 | 2,436 | 4 | 542 | 0 | 1 |
| Naturita Creek | 38.2244 | 108.5047 | 2 | 7,197 | 4 | 665 | 3 | 0 |
| North Fork Mesa Creek | 38.5036 | 108.7903 | 1 | 3,358 | 7 | 178 | 0 | 0 |
| Potter Creek | 38.6339 | 108.1944 | 3 | 2,270 | 5 | 1,001 | 1 | 5 |
| Roatcap Creek | 38.8833 | 107.6436 | 1 | 3 | 0 | 0 | 0 | 0 |
| Roubideau Creek above Potter Creek | 38.6378 | 108.1936 | 3 | 1,475 | 5 | 827 | 0 | 1 |
| San Miguel River at Tabeguache Creek | 38.3578 | 108.7083 | 1 | 23 | 3 | 4 | 3 | 0 |
| San Miguel River below Beaver Creek | 38.1060 | 108.1866 | 2 | 8,201 | 22 | 6,480 | 2,758 | 0 |
| San Miguel River near mouth | 38.3881 | 108.7872 | 2 | 884 | 8 | 397 | 46 | 0 |
| San Miguel River above Pinon | 38.2496 | 108.3867 | 2 | 1,308 | 13 | 392 | 46 | 0 |
| San Miguel River above Placerville | 38.0060 | 108.0459 | 2 | 11,753 | 19 | 7,574 | 3,683 | 0 |
| San Miguel River above Tabeguache | 38.3392 | 108.7015 | 4 | 2,520 | 5 | 848 | 48 | 0 |
| South Fork Mesa Creek | 38.4500 | 108.8028 | 1 | 355 | 5 | 27 | 1 | 0 |
| Spring Creek | 38.3808 | 107.9539 | 3 | 2,306 | 10 | 431 | 35 | 0 |
| Williams Creek | 38.9733 | 107.3350 | 1 | 4,169 | 9 | 2,208 | 257 | 5 |

Source: BLM 2007c
[1]Values *italicized* rate higher than the average of 524 samples at 245 sites across the Colorado Plateaus Ecoregion. Tolerant Abundance rates with lower values are higher.
[2]Number of invertebrates per 0.74 square meters of stream bottom.
[3]Number of invertebrate families within orders Ephemeroptera (mayflies), Plecoptera (stoneflies), and Trichoptera (caddisflies)
[4]Total number of invertebrates within orders Ephemeroptera (mayflies), Plecoptera (stoneflies), and Trichoptera (caddisflies)
[5]Total number of invertebrates rated as intolerant to pollution.
[6]Total number of invertebrates rated as tolerant to pollution.

BLM_0114817

for consumptive on public lands, such as livestock watering and mineral development. Collectively, the exercise of water rights places limits on the management alternatives and actions that can be considered during the planning process. While describing water availability limitations for each stream and aquifer on BLM-administered lands is beyond the scope of this document, it is important to note that the hydrology of a majority of the stream miles managed by the BLM have been significantly altered by the exercise of water rights.

The BLM holds two types of water rights – those established pursuant the provisions of Colorado water law (state-based water rights), and those established pursuant to federal law (federal reserved water rights).

The BLM is able to claim state-based water rights for federal land management purposes pursuant to the provisions of the McCarran Amendment, signed into federal law in 1952. The McCarran Amendment allows the United States to be joined as a participant in state-run water rights adjudication and allocation processes, even though the United States generally has sovereign immunity from state laws. In Colorado, the BLM applies to the Colorado water court system for water rights and to the Colorado Division of Water Resources for administrative water use authorizations, such as well permits. Through this process, the State of Colorado has granted thousands of water rights to the BLM for water uses that occur on public lands, including domestic, livestock, wildlife, recreation, and fire suppression use. The Colorado Supreme Court has confirmed United States water uses on public lands that date back to the 1800's. **Table 3-12** (BLM Consumptive Water Rights by Source) summarizes water rights granted to the BLM by the State Colorado within the planning area.

**Table 3-12**
**BLM Consumptive Water Rights by Source**

| Water Source Type | Number[1] |
|---|---|
| Ditches | 2 |
| Wells | 1 |
| Adjudicated Federal Reserved Water Rights | 64 |
| Springs | 67 |
| Reservoirs | 15 |

[1]Water source data comes from a UFO water source inventory database.

Federal reserved water rights are created when lands owned by the United States are reserved for a specific purpose by Congressional action or executive order. In general, most BLM lands are not reserved lands. This is contrast to Forest Service lands, which were reserved through Congressional action to place them into National Forests. However, some BLM lands are were reserved as Public Water Reserves, which be create by a 1926 Executive Order that reserved natural springs and water holes to prevent monopolization of scarce water resources on public lands. The order states that the 40-acre tract surrounding any spring or water hole not already claimed by a private party under the Homestead Act was reserved for public use. Of the 161 springs in the planning area, 64 possess adjudicated federal reserved water rights claimed under Public Water Reserve 107.

BLM_0114818

<u>Livestock Tanks</u>. In addition to water rights, the BLM applies to the State of Colorado for permits to construct livestock water tanks (ponds). Livestock tanks are permitted through the Colorado Division of Water Resources and typically have storage capacities of less than one acre-foot. They are required to be located on intermittent or ephemerally flowing channels, and typically contain water only after snowmelt or large precipitation events. The BLM's records show between 375 and 600 existing livestock tanks in the UFO. However, because many livestock tanks were constructed prior to state permit filings or being cataloged in BLM databases, the actual number is considered to be much higher. Many of the tanks are poorly maintained or non-functional and cause accelerated levels of erosion and sedimentation. Invasive weed species commonly become established on areas disturbed by livestock tanks, which can degrade watershed conditions.

<u>Instream Flow</u>. Instream flow water rights to protect aquatic resources are secured for a number of streams in the planning area, as shown in **Table 3-13** (Stream Reaches Protected by Instream Flow Water Rights). While only the Colorado Water Conservation Board can hold an instream flow water right in Colorado, BLM staff makes recommendations to the state for candidate streams and provides the channel surveys and assessments necessary for quantifying the flow. Instream flow water rights are secured to protect habitat for both warm and cold water fish species, and can vary in amount throughout the year.

**Table 3-13**
**Stream Reaches Protected by Instream Flow Water Rights**

| HUC[1] | Stream[2] | Case Number | Reach Length (miles) | Recommending Party |
|--------|-----------|-------------|----------------------|--------------------|
| 14020004 | Anthracite Creek | 06CW230 | 8.0 | Colorado Parks and Wildlife |
| 14030003 | Upper Beaver Creek | 84CW439 | 4.6 | BLM |
| 14030003 | Lower Beaver Creek | 93CW268 | 10.6 | BLM |
| 14020002 | Cimarron River | 84CW398 | 3.7 | Colorado Parks and Wildlife |
| 14030003 | Cottonwood Creek | 05CW149 | 3.2 | BLM |
| 14020006 | East Fork Dry Creek | 05CW151 | 10.0 | BLM |
| 14020002 | Gunnison River | 92CW107 | 28.9 | Colorado Parks and Wildlife |
| 14020002 | Gunnison River | 03CW265 | 28.9 | Colorado Parks and Wildlife |
| 14030003 | Horsefly Creek | 05CW215 | 5.2 | BLM |
| 14030002 | La Sal Creek | 02CW271 | 6.0 | BLM |
| 14030004 | Mesa Creek | 06CW168 | 2.0 | BLM |
| 14020004 | North Fork Gunnison River | 84CW400 | 6.2 | Colorado Parks and Wildlife |
| 14030004 | North Fork Mesa Creek | 02CW274 | 5.9 | BLM |
| 14020002 | North Fork Smith Fork | 05CW203 | 9.4 | Colorado Parks and Wildlife |
| 14020005 | Potter Creek | 04CW161 | 9.0 | BLM |
| 14030004 | Roc Creek | 02CW275 | 10.0 | BLM |
| 14020005 | Roubideau Creek | 04CW162 | 14.4 | BLM |
| 14030003 | Saltado Creek | 93CW267 | 8.3 | BLM |
| 14030003 | San Miguel River (Upper) | 84CW429 | 8.4 | Colorado Parks and Wildlife |
| 14030003 | San Miguel River (Mid) | 02CW277 | 24.1 | BLM |
| 14030003 | Specie Creek | 02CW279 | 3.2 | BLM |
| 14020006 | Spring Creek | 04CW163 | 5.5 | BLM |
| 14020006 | West Fork Dry Creek | 05CW155 | 5.9 | BLM |

Source: BLM 2010e
[1] 4th level Hydrologic Unit Code; refer to Table 3-5 for the corresponding drainage basin.
[2] Some stream reaches include segments of land not managed by the BLM.

BLM_0114819

*Source Water Protection of Public Water Supplies*
While the BLM has no statewide policy for managing public water supplies or source water areas, the BLM is required to comply with the Safe Drinking Water Act. In 1996, the Safe Drinking Water Act was amended to include requirements that each state develop a Source Water Assessment and Protection Program to ensure safe public drinking water supplies. Spearheaded by the Colorado Water Quality Control Division, the BLM, along with other agencies and citizen groups, is involved in developing the program. The first phase of the plan is to assess all public water supplies to identify existing and potential pollution sources. Following the assessment phase, a Protection Phase plan is developed in a collaborative effort involving state and local governments, water providers, and citizens to identify actions to address the problems and risks identified in the assessments. As Protection Plans are completed for public water supply areas on public lands in the planning area, it is anticipated that agreements will be prepared between the BLM and water providers to ensure that BLM management activities provide adequate protection of public water supplies.

Source Water Area – Assessment Phase. The Water Quality Control Division has completed initial source water assessments for over 1,700 public water systems in Colorado. **Table 3-14** (Public Water Sources with Zones of Potential Influence) lists public water supplies, including assessment reports for counties with lands in the planning area. The Assessment Phase involves understanding where each public water system's source water comes from, the potential contaminant sources that threaten the water sources, and how susceptible each water source is to potential contamination. A high, medium, or low ranking of risk is identified for each potential source of contamination. Assessment results are provided as a starting point for public water suppliers to evaluate a system's potential contaminant risks and to develop protection plans to minimize these risks.

The State has established buffer zones to categorize the distance from a potential source of contamination to the drainage network and water supply intake. The drainage network includes all perennial, intermittent, and ephemeral tributaries to the stream segment on which the intake is located. The State distinguishes between three zones of distance from the source to the drainage network on the premise that the further away a source is from the intake, the lower the contamination risks (Colorado Department of Public Health and Environment 2000c). Near-field and far-field areas are used to identify potential risks of contamination from activities within a watershed. Similar zone concepts were applied to groundwater and reservoir sources as described in the Source Water Assessment Methodologies for both surface water and groundwater (Colorado Department of Public Health and Environment 2004b).

- **Zone 1** is defined as either a 1,000-foot-wide band on each side of a stream, lake, or shallow alluvial aquifer (where groundwater is under the influence of surface water) or the 100-year floodplain. Land use activities in Zone 1 occur closest to the drainage network and are of greatest concern to the quality of public water supplies.

- **Zone 2** *extends* one-quarter mile (1,320 feet) beyond each side of the boundaries for Zone 1; moreover, Zones 1 and 2 constitute a 2,320-foot buffer on each side of the stream, lake, or alluvial aquifer.

- **Zone 3** *encompasses* the remainder of the source water area up to the watershed boundary and has the lowest contamination risk of the three zones.

BLM_0114820

**Table 3-14**
**Public Water Sources with Zones of Potential Influence**

| Name | Public Water System ID Number | Water Source[1] | County |
|------|------|------|------|
| Bowie Mine #2 | 215202 | Surface | Delta |
| Camp Cedaredge | 215166 | Ground | Delta |
| Crawford Mesa Water Authority | 115189 | Ground | Delta |
| Gunnison River Pleasure Park | 215325 | Ground | Delta |
| Hotchkiss, Town of | 115352 | Surface | Delta |
| Lazear Domestic Water Commission | 115467 | Ground | Delta |
| Paonia, Town of | 115601 | Ground | Delta |
| Sunshine Mesa Domestic Water Commission | 115725 | Ground | Delta |
| Beaver Lake Campground | 326140 | Ground | Gunnison |
| Crystal Meadows Resort Inc. | 226189 | Ground | Gunnison |
| Curecanti NRA Ponderosa RA | 326009 | Ground | Gunnison |
| Erickson Springs Campground | 326502 | Ground | Gunnison |
| Mountain Coal Company, LLC | 226838 | Surface | Gunnison |
| Silver Jack Campground | 326710 | Ground | Gunnison |
| Fruitland Domestic Water Commission | 115288 | Surface | Montrose |
| Cimarron Inn | 243176 | Ground | Montrose |
| Curecanti – East Portal | 326011 | Ground | Montrose |
| Earls Subdivision Water Commission | 143233 | Ground | Montrose |
| Elk Ridge Restaurant | 257505 | Ground | Montrose |
| Millard's Mobile Home Park | 143510 | Ground | Montrose |
| Naturita, Town of | 143533 | Surface | Montrose |
| Nucla, Town of | 143559 | Surface | Montrose |
| Project 7 Water Authority | 143621 | Surface | Montrose |
| Riverwood Subdivision Water Commission | 143676 | Ground | Montrose |
| Spring View Trailer Park | 143719 | Ground | Montrose |
| Sunrise Trailer Park | 143725 | Ground | Montrose |
| The River Meadows | 143505 | Ground | Montrose |
| Tri State G and T Nucla Station | 243185 | Surface | Montrose |
| Ouray - Switzerland KOA | 246452 | Ground | Ouray |
| Ouray, City of | 146588 | Ground | Ouray |
| Ilium Valley Water System | 157250 | Ground | San Miguel |
| Norwood Water Commission | 157500 | Surface | San Miguel |
| Sawpit, Town of | 157700 | Ground | San Miguel |
| Telluride Regional Airport | 257050 | Ground | San Miguel |

Source: Colorado Department of Public Health and Environment 2004a
[1]Indicates whether a water source is ground (typically from a well or spring source) or surface (typically from the diversion of a stream or reservoir).

Near-fields and far-fields define the source water or watershed area near (within) or far (outside of) a 15-mile radius of a water supply, with activities in near areas presenting a higher risk to a water supply than far areas.

Within the planning area, the Source Water Assessment area for surface water totals 480,104 acres of public land, while the Source Water Assessment area for groundwater totals 22,101 acres. These figures may change when public water suppliers complete a source water protection

BLM_0114821

plan. A confidentiality agreement to withhold the spatial information of public water systems from public disclosure exists between the BLM and Colorado Department of Public Health and the Environment, Water Quality Control Division, due to homeland security concerns.

<u>Source Water Areas – Protection Plan Phase</u>. The second phase of a SWAP is the protection plan phase. Protection plans are collaboratively developed by cities, towns, and municipalities to further identify drinking water protection measures, and involve stakeholders in the process. This phase is voluntary, but the State strongly encourages municipalities to develop plans.

Currently, there are no known completed protection plans that affect BLM-administered lands in the planning area, although the Town of Norwood has formulated a draft plan. However, as protection plans are completed, land use activities on affected public lands would be managed to provide adequate protection to public water supplies in coordination with public water supply managers.

*UFO Coordination and Collaboration with Partners*
The UFO continues to coordinate and collaborate with several external groups in managing soil and water resources within the planning area. The UFO has been active in the San Miguel Watershed Coalition since its inception in the early 1990s, and assisted in preparing and implementing the coalition's watershed plan. The coalition's accomplishments include:

- Securing an instream flow water right on a 24-mile reach of the San Miguel River

- Collecting survey data to allow instream flow recommendations on other river reaches

- Preparing a draft San Miguel Instream Flow Water Needs Assessment

- Implementing two in-channel river stabilization projects in the San Miguel near Placerville, Colorado, requiring close coordination with the Colorado Department of Transportation

- Planning to improve fish migration and boater safety for the Highline Canal Diversion and represented the coalition on the Ames Hydroelectric Power Plant, Federal Energy Regulatory Commissions relicensing process

Other outreach efforts include:

- Participating in the local Water Roundtable for the Gunnison Basin, a state-based effort to identify, coordinate, and collaborate on water issues throughout the state

- Providing water resources education to local public schools, including 15 years of presentations to over 6,000 students at the Children's Water Festival

- Collaborating with the US Geological Survey during the Mancos Shale research effort, which will benefit future management of Mancos Shale areas in the planning area

- Participating in a watershed coalition group formed in the Uncompahgre Valley

- Participating in the development of a watershed action plan for the Uncompahgre River through the Uncompahgre Watershed Planning Partnership

BLM_0114822

**Trends**

Competing uses for water in an ever drier climate may result in decreases in water quantity and quality in the planning area over the long term. Lead climatologists forecast warmer temperatures in southwestern Colorado over the upcoming decades. Changes in precipitation and soil moisture will likely affect groundwater recharge rates, causing diminished spring and well discharge rates on public lands. Earlier spring runoff and decreased snowpack could complicate prior appropriation systems and interstate water compacts, affecting which rights holders and irrigation operations receive water. Focused efforts by the BLM have secured many instream flow water rights, although most rights have recent adjudication dates, making them junior to many other water users.

There has been a trend towards more domestic and industrial uses for water, as the population grows and energy demands increase throughout Colorado. Oil and gas production, coal mining and other energy related activities such as uranium processing are becoming more active once again and energy and mineral resources are expected to increase in price over time, likely resulting in increasing demand for extraction. Consumptive uses of freshwater resources have also been increasing. As a result, many public stakeholders groups have formed to address water quantity and quality issues and the potential to balance competing uses for water in the future.

### 3.1.5   Vegetation

Along with landform, defines the appearance and function of the landscape. It also serves a variety of beneficial functions, such as providing food for animals, stabilizing soils, and providing plant products for human uses. Over 1,100 plant species occur in and near the planning area. Of these, more than 1,000 species are native. Some of these species are generalists, tolerant of a wide variety of soil chemistry, soil depth and texture, aspect, elevation, and precipitation timing and amount. Other species may be more limited in the physical conditions they tolerate, such as those associated with riparian and wetland areas or those associated with saline soils. The presence of plant species within the planning area can range from extremely common to scarce. Based on land health assessment data, over 40 percent of planning area plant species could be considered uncommon, while less than 10 percent could be considered extremely common. Those that are particularly scarce or rare may be classified as BLM Sensitive Species, threatened, or endangered species. In contrast, some of the most common species are highly adaptable, non-native weeds and are very competitive with native species. Whether they are species considered noxious by the State of Colorado or are considered exotic species, they can have a marked negative effect on native plant vegetation.

On a national scale, similar geographic areas are divided into ecoregions by a variety of factors, including elevation, climate, and geology. As shown in **Table 3-15** (Vegetation Communities) the planning area falls primarily in the Colorado Plateau ecoregion, and secondarily in the Southern Rockies ecoregion (Chapman et al. 2006). These ecoregions are subdivided based on physical characteristics of the landscapes, and further divided into vegetation communities, which are named according to the types of plant species of which they are composed. As shown in **Table 3-15**, plant communities with the same name can occur in more than one ecoregion or subdivision; however, these communities often have subtle differences in their makeup. A description of each of the major vegetation communities in the planning area follows.

BLM_0114823

**Table 3-15**
**Vegetation Communities**

| Ecoregion | Ecoregion Subdivision | Total Acres | Vegetation Community | Percent of Subdivision |
|---|---|---|---|---|
| Colorado Plateau | Sedimentary Mid-Elevation Forests and Shrublands | 507,456 | Grass-Forb | 5 |
| | | | Montane Forest | 2 |
| | | | Mountain Shrub | 2 |
| | | | Pinyon-Juniper | 71 |
| | | | Riparian | 2 |
| | | | Sagebrush | 18 |
| | Shale and Sedimentary Basins | 102,200 | Grass-Forb | 49 |
| | | | Pinyon-Juniper | 16 |
| | | | Riparian | 1 |
| | | | Sagebrush | 20 |
| | | | Salt-Desert Shrub | 12 |
| | | | Unvegetated/other | 2 |
| Southern Rockies | Sedimentary Mid-Elevation Forests and Shrublands | 56,433 | Montane Forest | 23 |
| | | | Mountain Shrub | 43 |
| | | | Pinyon-Juniper | 27 |
| | | | Subalpine Forest | 2 |
| | | | Unvegetated/other | 5 |
| | Sedimentary Subalpine Forests | 7,998 | Montane Forest | 43 |
| | | | Mountain Shrub | 20 |
| | | | Pinyon-Juniper | 3 |
| | | | Subalpine Forest | 27 |
| | | | Unvegetated/other | 7 |
| | Volcanic Subalpine Forests | 1,510 | Alpine | 5 |
| | | | Grass-Forb | 3 |
| | | | Montane Forest | 4 |
| | | | Mountain Shrub | 2 |
| | | | Subalpine Forest | 78 |
| | | | Unvegetated/other | 8 |
| | Volcanic Mid-Elevation Forests and Shrublands | 90 | Montane Forest | 44 |
| | | | Mountain Shrub | 36 |
| | | | Subalpine Forest | 19 |
| | | | Unvegetated/other | 1 |
| | Alpine Zone | 13 | Alpine | 59 |
| | | | Unvegetated/other | 41 |

Source: BLM 2012a

### *Vegetation Types within the Planning Area*

<u>Alpine</u>
Alpine vegetation is typically found above 11,000 feet in elevation. It is defined as vegetation that occurs above the elevation at which forests can grow and is heavily influenced by the harsh growing conditions of long cold winters, heavy snows, and intensive solar radiation found in high mountains. Alpine vegetation occurs in only a tiny fraction of the decision area. It is characterized by low-growing shrubs such as arctic willow (*Salix arctica*), numerous sedge (*Carex* spp.) species, grasses such as alpine bluegrass (*Poa alpina*), and a variety of highly specialized forb species.

<u>Grass-Forb</u>
The grass-forb vegetation type is a significant component of the planning area and occurs across a wide range of elevations. In some cases, its presence is related to perennial soil characteristics, while it is a result of disturbances such as fire, avalanche, rangeland projects, or drought in others. In disturbed areas, it is considered an early successional stage to other vegetation types. The dominant grasses and forbs are dependent primarily upon elevation and secondarily upon soil type. Typical grass species include bottlebrush squirreltail (*Elymus elymoides*), western wheatgrass (*Pascopyrum smithii*), saline wildrye (*Leymus salinus*), galleta grass (*Pleuraphis jamesii*), needle-and-thread grass (*Hesperostipa comata*), Indian ricegrass (*Achnatherum hymenoides*), blue grama *(Bouteloua gracilis)* and bluegrasses *(Poa* spp.*)*. Common forbs include scarlet globemallow (*Sphaeralcea coccinea*), longleaf phlox *(Phlox longifolia)*, wild onion (*Allium* spp.), and biscuitroots (*Lomatium* and *Cymopterus* spp.) These species can also be found in each of the different vegetation types described below.

<u>Montane Forest</u>
The montane forest vegetation type generally occurs between 7,500 and 9,500 feet in elevation and comprises a small component of the planning area. This vegetation type typically includes ponderosa pine (*Pinus ponderosa*), Douglas-fir, (*Pseudotsuga menziesii*), and aspen (*Populus tremuloides*), singularly and in combination with one another. Soils and fire history influence where and in what combinations these species occur. They also influence the understory vegetation. Many of the mountain shrub species are found in montane forest. The more common species include birchleaf mountain mahogany (*Cercocarpus montanus*), Utah serviceberry (*Amelanchier utahensis*), Gambel oak (*Quercus gambelii*), Rocky Mountain juniper (*Juniperus scopulorum*), black chokecherry (*Prunus virginiana*), and roundleaf snowberry (*Symphoricarpos rotundifolius*). The herbaceous component is generally sparse but contains many of the same grasses and forbs found in the mountain shrub vegetation type described above.

<u>Mountain Shrub</u>
The mountain shrub vegetation type occurs at elevations ranging from 7,000 to 9,000 feet and makes up a significant proportion of the planning area. Birchleaf mountain mahogany, Utah serviceberry, and Gambel oak are prominent overstory components. Soils, slope, aspect, and fire history influence the character and distribution of this vegetation type, resulting in several diverse communities. These communities are distinguished by one or a combination of the prominent shrub species, along with one or more of the following species: black chokecherry, mountain big sagebrush (*Artemisia tridentata* ssp. *vaseyana*), wild crabapple (*Peraphyllum*

BLM_0114825

*ramosissimum*), fendlerbush (*Fendlera rupicola*), roundleaf snowberry, Utah juniper (*Juniperus osteosperma*), Rocky Mountain juniper, and Colorado pinyon pine (*Pinus edulis*). Common herbaceous species include elk sedge (*Carex geyeri*), Letterman's needlegrass (*Achnatherum lettermanii*), Kentucky bluegrass (*Poa pratensis*), muttongrass (*Poa fendleriana*), Sandberg bluegrass (*Poa secunda*), bottlebrush squirreltail, western wheatgrass, slender wheatgrass (*Elymus trachycaulus*), and nodding brome (*Bromus anomalus*). Forbs are abundant, with many species. Among the most widespread and dominant are western yarrow (*Achillea millefolium*), lupine (*Lupinus* spp.), biscuitroot (*Lomatium* spp.), and aspen peavine (*Lathyrus lanzwertii*).

<u>Pinyon-Juniper</u>
The pinyon-juniper vegetation type occurs between 5,800 and 7,500 feet and occupies more of the planning area than any other vegetation type. Pinyon-juniper woodland is dominated by Utah juniper and Colorado pinyon in varying proportions depending on soil, slope, aspect, and elevation. The understory is typically a sparse and variable and may contain remnant shrubs such as Wyoming big sagebrush (*Artemisia tridentata* ssp. *wyomingensis*), birchleaf mountain mahogany, Utah serviceberry, snakeweed (*Gutierrezia sarothrae*), yucca (*Yucca harrimaniae*), potato cactus (*Opuntia fragilis*), muttongrass, Indian ricegrass, and bottlebrush squirreltail. Primary forbs in this type are western tansy mustard (*Descurainia pinnata*), scarlet globemallow, rock goldenrod (*Petradoria pumila*), lobeleaf groundsel (*Packera multilobata*), and numerous species of *Penstemon*, *Arabis*, *Astragalus*, *Lomatium*, *Erigeron*, and *Machaeranthera*.

*Riparian and Wetlands*

<u>Riparian</u>. The riparian vegetation type is always associated with water and extends from the lowest to highest elevations within the planning area. Approximately one to two percent of Colorado is covered with riparian or wetland vegetation (Lyon and Sovell 2000). Although small in area, it is a significant vegetation type because of its productive and diverse plant communities. Within the broad category of riparian vegetation are many distinct, interwoven plant communities. Among the most widespread are communities dominated by narrowleaf cottonwood (*Populus angustifolia*) above 5,800 feet in elevation, and Fremont cottonwood (*Populous fremontii*) generally below this elevation. These areas are distinguished by various associated shrubs and trees, including thinleaf alder (*Alnus tenuifolia*), blue spruce (*Picea pungens*), Douglas-fir, sandbar willow (*Salix exigua*), skunkbush sumac (*Rhus trilobata*), Wood's rose (*Rosa woodsii*), and red osier dogwood (*Cornus sericea*). Some willow-dominated communities are also present, with sandbar willow occurring alone or in combination with strapleaf willow (*Salix ligulifolia*) or other willow species. Thinleaf alder forms a common community along the edge of many streams. Shrub-dominated communities are found along some higher stream terraces, including skunkbush sumac, seep willow (*Baccharis salicina*), New Mexico privet (*Forestiera pubescens*), and silver buffaloberry (*Shepherdia argentea*). Small pockets of scouringrush horsetail (*Equisetum hyemale*) can be found at lower elevations. Ephemeral and lower-elevation drainages are often dominated by black greasewood (*Sarcobatus vermiculatus*) and alien tamarisk (*Tamarix chinensis*). Detailed descriptions of these communities can be found in the Field Guide to the Wetland and Riparian Plant Associations of Colorado (Carsey et al. 2003).

<u>Wetlands</u>. Wetland communities in the planning area are very infrequent and typically much smaller than riparian areas. Though they often share some species with riparian communities,

BLM_0114826

wetland communities are characterized by vegetation that is inundated with water during some time of the year or soils that are saturated with water during all or part of the year (Carsey et al. 2003). Wetlands are most often associated with standing water such as lakes, reservoirs, and ponds, but many of the remaining wetlands in the planning area are associated with stock ponds and are not natural in origin. They may be located within any of the other vegetation types in the planning area, and mainly exist naturally as hanging gardens, springs, and seeps. Plant species that may commonly be found in wetland communities include Geyer willow (*Salix geyeriana*), water sedge (*Carex aquatilis*), cattail (*Typha angustifolia-Typha latifolia*), Mancos columbine (*Aquilegia micrantha*), Eastwood monkeyflower (*Mimulus eastwoodiae*), scouringrush horsetail, thinleaf alder, hardstem bulrush (*Schoenoplectus acutus*), and, in some degraded areas, salt cedar (*Tamarix ramosissima*) (Carsey et al. 2003). The UFO has limited data on wetland communities within the planning area.

*Sagebrush*

The sagebrush rangeland vegetation type is widespread and occupies a significant portion of the planning area. This vegetation type typically occurs on deeper soils at elevations ranging from 5,000 to 7,500 feet. The sagebrush community is dominated by Basin big sagebrush (*Artemisia tridentata* ssp. *tridentata*) at the lowest elevations, Wyoming big sagebrush at mid-elevations, and mountain big sagebrush at the highest elevations. Black sagebrush (Arte*misia nova*) also occurs as a dominant shrub on some soils across this elevation range. The sagebrush type can also occur on steeper rockier sites, where it is usually successional to woodland types and has resulted from removal of the tree canopy by fire or other natural disturbances. Snakeweed, Utah serviceberry, rabbitbrush (genus *Ericameria* or *Chrysothamnus*), and four-wing saltbush (*Atriplex canescens*) can be secondary shrubs in the sagebrush vegetation type. The sagebrush vegetation type contains a variable understory that can include western wheatgrass, galleta grass, bottlebrush squirreltail, Indian ricegrass, blue grama, Sandberg bluegrass, muttongrass, needle-and-thread grass, prairie junegrass (*Koeleria macrantha*), and many forbs. Among the most prominent are scarlet globemallow and longleaf phlox.

*Salt-Desert Shrub*

The salt-desert shrub vegetation type is commonly found on saline and other droughty soils in the driest portions of the planning area below 6,000 feet. Plant densities in some salt desert communities, such as those found on Mancos Shale-derived soils, can be extremely low, and those sites are sometimes classified as barren. The following shrubs characterize this drought-tolerant vegetation type: shadscale (*Atriplex confertifolia*), Gardner saltbush (*Atriplex gardneri*), mat saltbush (*Atriplex corrugata*), black greasewood, four-wing saltbush, black sagebrush, winterfat (*Krascheninnikovia lanata*), snakeweed, and prickly pear cactus (*Opuntia polyacantha*). The numbers of individuals for each species vary, and species can be found various combinations depending on the soil type and disturbance history of the area. Native grasses in this vegetation type include western wheatgrass, galleta grass, bottlebrush squirreltail, Salina wildrye (*Leymus salinus*), and Indian ricegrass on better-condition sites. Many different forbs are present, with some of the most common including wild buckwheats (*Eriogonum* spp.), wild onion, and biscuitroots.

A number of BLM Sensitive Species and threatened or endangered plant species (see **Section 3.1.7** [Special Status Species]) are primarily or exclusively found within this plant community. The endangered clay-loving wild buckwheat (*Eriogonum pelinophilum*) and threatened Colorado

BLM_0114827

hookless cactus (*Sclerocactus glaucus*) are both found in the salt desert shrub community (Spackman et al. 1997).

<u>Subalpine Forest</u>

The subalpine forest vegetation type occupies only a minor portion of the planning area above 9,500 feet elevation. Engelmann spruce (*Picea engelmannii*) and subalpine fir (*Abies lasiocarpa*) characterize the overstory of this vegetation type. Aspen may be present in some areas as well, but is typically successional to the spruce and fir. The understory in this vegetation type is generally sparse and dominated by sedges, whortleberry (*Vaccinium myrtillus*), and arnica (*Arnica cordifolia*). Mountain brome (*Bromus marginatus*), Thurber fescue (*Festuca thurberi*), slender wheatgrass, wild strawberry (*Fragaria* spp.), and an abundance of other forbs may occur where the tree canopy lets sunlight through.

**Current Conditions**

In 1997, the Colorado BLM adopted standards for the health of public land (BLM 1997). The standards that are applicable to the vegetation communities discussed in this section are Standard 2 and Standard 3 (**Appendix C**). As part of implementing the BLM Colorado Standards for Public Land Health and to establish a baseline of current conditions, the UFO conducted land health assessments assessing the current condition of vegetation and overall land health in ten landscape units across the decision area between 1999 and 2008.

Vegetation problems identified during the land health assessments relate to the indicators for the BLM Colorado Public Land Health Standards. Problems were noted throughout the decision area but were not clearly associated with a particular region. **Table 3-16** (Major Vegetation Issues in the Decision Area) lists the major vegetation problems in order of prevalence. The column indicating the percentage of the planning area affected represents a high estimate. Problem areas could be widespread or serious, or they could be isolated, localized, or minor.

*Upland Vegetation*

The current condition of vegetation in the decision area has been assessed over the last ten years as part of implementing BLM Colorado Public Land Health Standards (**Table 3-17** [Land Health Assessment Results Since 1999]). Of the 675,700 acres assessed for upland vegetation health, 304,622 acres (45 percent) were considered to fully meet BLM Colorado Public Land Health Standard 3 for healthy upland plant communities, 260,905 acres (39 percent) met the standard but showed some vegetation problems, and 79,042 acres in the planning area (12 percent) failed to meet BLM Colorado Public Land Health Standard 3. The remaining acreage (4 percent) was not assessed or was not upland. Over 50 percent of the North Delta, Roubideau, North Fork, and Colona land health assessment areas are meeting with problems or not meeting standards.

Across all ten land health assessment units, cool season grasses were underrepresented in the plant communities. This is probably the result of livestock grazing in the spring and fall periods when these grasses are most vulnerable. Often perennial forbs are also underrepresented in the same areas. The reduced cool season grass and forb cover may make it easier for exotic species such as cheatgrass to move in. On many crucial big game winter ranges throughout the planning area, moderate to severe hedging of palatable shrubs is common. Usually reduced vigor of these shrubs is also evident.

BLM_0114828

**Table 3-16**
**Major Vegetation Issues in the Decision Area**

| Identified Problem or Issue | Percentage Affected |
|---|---|
| **Upland Vegetation** | |
| Not enough cool season perennial grass | 39 |
| Exotic plants in community | 37 |
| Not enough perennial forbs | 37 |
| Low plant diversity in community | 26 |
| Shrubs in low vigor | 19 |
| Not enough warm season perennial grass | 15 |
| Browse shrubs heavily hedged | 13 |
| Noxious weeds within or nearby community | 10 |
| Plant spacing too great | 5 |
| **Riparian and Wetland Vegetation** | |
| Not enough riparian vegetation to protect banks | 14 |
| Riparian plant root structure will not withstand flooding | 14 |
| Streamside plants are not wetland species | 13 |
| Riparian vegetation in poor vigor | 11 |
| Riparian vegetation does not have diverse age classes | 10 |
| Riparian vegetation does not have diverse composition | 9 |
| Riparian vegetation not establishing on point bars | 6 |

Source: BLM 2012a

**Table 3-17**
**Land Health Assessment Results Since 1999**

| Land Health Assessment I | Year | Area Vegetation (acres) | | |
|---|---|---|---|---|
| | | Meeting | Meeting but with Problems | Not Meeting |
| East Paradox | 1999 | 61,743 | 8,087 | 8,199 |
| North Delta | 2002 | 9,677 | 52,420 | 9,484 |
| Mesa Creek | 2004 | 60,004 | 40,849 | 10,591 |
| Roubideau | 2005 | 17,403 | 66,437 | 16,867 |
| Norwood | 2006 | 66,695 | 24,881 | 7,894 |
| North Fork | 2007 | 18,905 | 27,200 | 15,598 |
| Colona | 2008 | 17,334 | 29,220 | 4,459 |
| West Paradox | 2009 | 49,552 | 16,907 | 2,069 |

On five percent of public lands in the planning area, past vegetation treatments resulted in the loss of native plant communities. This was primarily caused by the use of exotic grass and forb species that prevented native species from occupying the sites. Exotic weed infestations, resulting from poorly reclaimed fires and disturbances such as heavy OHV use and grazing, have been found on an estimated additional two percent of this area. These infestations on public land are shrinking over time, as natural processes return native vegetation to the sites. In addition, many historic treatment locations are being retreated and seeded with native species in

BLM_0114829

small patches. Large disturbances, such as wildfires, are also being treated with native species. It is the policy of the UFO to utilize native plant species to reclaim disturbed sites.

Within plant communities, there is indication that the diversity, composition, and frequency of occurrence of native species across the landscape are degraded and may pose a threat to the sustainability of these species in some areas. The land health assessment data show that 25 percent of 2,170 upland sites evaluated had low native plant diversity, while 31 percent had plants spaced too far apart. These affected communities may not be resistant to changing conditions, disturbances, or weed invasions. Over time, this lack of resilience equates to decreased sustainability.

*Riparian and Wetland Vegetation*

Riparian Vegetation. Riparian vegetation along nearly all of the 418 miles of perennial and intermittent streams in the decision area has been evaluated for BLM Colorado Public Land Health Standard 2. This standard is based on BLM's Proper Functioning Condition concept (BLM 1998). Riparian areas along 291 miles of streams and rivers (70 percent) fully met Standard 2 for riparian health. Another 98 miles (24 percent) of riparian area met Standard 2 but had some problems, while 25 miles (6 percent) were rated as not meeting Standard 2.

Of the riparian systems that are not meeting the standard, or met the standard with problems, the reasons are summarized in **Table 3-16**. Past management practices, such as livestock grazing, vehicle use, road construction, and water diversions, have contributed to the failure of riparian systems to fully meet BLM Colorado Public Land Health Standards. Because state water law often precludes BLM management actions that could address water use issues, some riparian vegetation communities have a very low potential to recover to the point where they would fully meet Standard 2.

Wetland Vegetation. Very little information is available on the condition of planning area wetlands, and their health has not been evaluated.

*Weeds*

Weeds are plants considered nonnative in origin with invasive and highly competitive characteristics. Weeds can disrupt the function of an ecosystem, conflict with the management objectives of an area, and compete with native vegetation for space, light, and limited nutrients. Invasive species can also reduce the cover and species richness of biological soil crusts (DOI 2001). Serious infestations can create a monoculture, effectively locking the area into a long-term dysfunctional situation. When an individual species is identified as a substantial economic threat, it is designated by the State of Colorado as a noxious species or by the BLM as a species of concern. Noxious weeds or invasive species of concern can be found in every plant community present in the planning area.

Weed Control Guidance and Programs. The June 2007 programmatic EIS, Vegetation Treatments using Herbicides on Bureau of Land Management Lands in 17 Western States (BLM 2007a), discusses how herbicides will be applied to BLM-administered lands, including mitigation measures, standard operating procedures, and analysis of active and inactive ingredients by herbicide. The UFO subsequently created an Integrated Weed Management program for control

BLM_0114830

of weeds on the Colorado Noxious Weed List and on the BLM Colorado List of Invasive Weed Species of Concern (BLM 2010f).

The UFO coordinates with counties and other entities in and around the planning area in implementing the Integrated Weed Management program. This cooperation promotes the success of methods such as early detection/rapid response and the treatment and re-treatment of small and large patches of noxious weeds. The coordinated strategy means that there are more people looking for and treating noxious weeds in a strategic manner on public lands. Support for Integrated Weed Management comes from executive orders, legislation, and strategic documents, including:

- Colorado Noxious Weed Act 8 CCR 1203-15 (2003)
- President's Executive Order 13112 (1999)
- Federal Noxious Weed Act of 1974, Public Law 93-692
- BLM Partners Against Weed Plan (BLM's strategic plan)
- Colorado Governor's Executive Order D 00699
- UFO Weed Management Strategy (BLM 2010c)
- Record of Decision (ROD) on Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States (September 2007) (BLM 2007a)

<u>Systematic Weed Surveys</u>. Since 2001, the UFO has completed a systematic weed survey on about 70 percent, or 473,000 acres, of the decision area. Thus far, 6,600 associated noxious weed infestations affecting 8,600 acres have been identified. The estimate is conservative and not comprehensive, as the entire decision area has not been surveyed, much of the survey is linear, and part of the survey was completed over ten years ago.

The average size of an infestation patch is 1.3 acres, making it relatively small and easy to treat using a hand-held spray gun. This patch size supports the land health assessment finding that noxious weeds have not become a prominent feature in most of the decision area, and presents an opportunity to continue this trend. Large patches of weeds will need to be treated for years to come, and linear infestations always pose a threat due to ease of seed transportation by trail, road, irrigation ditch, stream, or river. The UFO will continue to survey for about 40 weed species, including all weeds on the Colorado Noxious Weed list and the BLM species of concern (BLM 2010f). The UFO has noxious weed species from all categories of the Colorado list and several from the BLM list. **Table 3-18** (Noxious Weeds) lists some of the most troublesome weeds in the decision area, along with associated data.

The land health assessment data reveal the current scope of the weed establishment on uplands as follows: 92 percent of the 2,170 upland sites evaluated had no noxious weeds, 6 percent had small infestations, and only 1.5 percent had noxious weeds as a dominant part of the vegetation. The land health assessment data also show that 37 percent of upland sites had no exotics, 21 percent had isolated occurrences, 29 percent had exotics growing within native vegetation, and 12 percent had exotics dominating a plant community.

BLM_0114831

**Table 3-18**
**Noxious Weeds**

| Weed Species | Listing | Number of Infestations | Acres Infested | Average Infestation (by acre) | Potential Average Rate of Spread (percent) |
|---|---|---|---|---|---|
| Russian knapweed<br>*Acroptilon repens* | State Noxious<br>BLM Concern | 1,920 | 2,280.0 | 1.2 | 8-14 |
| Spotted knapweed<br>*Centaurea maculosa* | State Noxious<br>BLM Concern | 85 | 725.0 | 8.5 | 10-24 |
| Diffuse knapweed<br>*Centaurea diffusa* | State Noxious<br>BLM Concern | 26 | 31.0 | 1.2 | 16 |
| Oxeye daisy[1]<br>*Chrysanthemum leucanthemum* | State Noxious<br>BLM Concern | 35 | 115.0 | 3.3 | |
| Yellow toadflax<br>*Linaria vulgaris* | State Noxious<br>BLM Concern | 2 | 5.0 | 5.0 | 8-29 |
| Dalmatian toadflax<br>*Linaria dalmatica* | State Noxious<br>BLM Concern | 1 | 1.0 | 1.0 | 8-29 |
| Purple loosestrife<br>*Lythrum salicaria* | State Noxious<br>BLM Concern | 8 | 4.0 | 0.5 | 15 |
| Hoary cress (Whitetop)<br>*Cardaria draba* | State Noxious<br>BLM Concern | 340 | 288.0 | 1.0 | 11-18 |
| Absinth wormwood<br>*Artemisia absinthium* | State Noxious | 4 | 2.0 | 0.5 | |
| Yellow starthistle<br>*Centaurea solstitialis* | State Noxious<br>BLM Concern | 4 | 20.0 | 10.0 | 13-17 |
| Sulfur cinquefoil<br>*Potentilla recta* | State Noxious<br>BLM Concern | 2 | 2.0 | 1.0 | |
| Canada thistle<br>*Cirsium arvense* | State Noxious<br>BLM Concern | 1,253 | 1,264.0 | 1.0 | 10-12 |
| Bull thistle<br>*Cirsium vulgare* | State Noxious<br>BLM Concern | 399 | 296.0 | 1.0 | |
| Musk thistle<br>*Carduus nutans* | State Noxious<br>BLM Concern | 659 | 1,104.0 | 1.5 | 12-22 |
| Russian olive<br>*Elaeagnum angustifolia* | State Noxious<br>BLM Concern | 24 | 7.5 | 0.5 | |
| Tamarisk<br>*Tamarix* spp. | State Noxious<br>BLM Concern | 907 | 1,508.0 | 1.7 | 12 |
| Chinese clematis<br>*Clematis orientalis* | State Noxious<br>BLM Concern | 2 | 2.0 | 0.3 | |
| Jointed goatgrass<br>*Aegilops cylindrica* | State Noxious<br>BLM Concern | 6 | 11.0 | 1.8 | 14<br>(traits similar to cheatgrass) |
| Burdock<br>*Arctium minus* | State Noxious<br>BLM Concern | 113 | 222.0 | 2.0 | |
| Plumeless thistle<br>*Carduus acanthoides* | State Noxious<br>BLM Concern | 5 | 5.3 | 1.0 | |

BLM_0114832

**Table 3-18**
**Noxious Weeds**

| Weed Species | Listing | Number of Infestations | Acres Infested | Average Infestation (by acre) | Potential Average Rate of Spread (percent) |
|---|---|---|---|---|---|
| Chicory *Cichorium intybus* | State Noxious BLM Concern | 18 | 7.3 | 0.4 | |
| Field bindweed *Convolvulus arvensis* | State Noxious BLM Concern | 73 | 133.0 | 1.8 | |
| Hounds tongue *Hieracium cynoglossoides* | State Noxious BLM Concern | 63 | 83.5 | 1.3 | |
| Leafy spurge *Euphorbia esula* | State Noxious BLM Concern | 1 | 89.0 | 89.0 | 12-16 |
| Halogeton *Halogeton glomeratus* | State Noxious BLM Concern | 47 | 90.0 | 1.9 | |
| Scotch thistle *Onopordum acanthium* | State Noxious BLM Concern | 2 | 0.4 | 0.2 | |
| Siberian elm *Ulmus pumila* | State Noxious BLM Concern | 4 | 5.6 | 1.4 | |
| Common mullein *Verbascum thapsus* | State Noxious BLM Concern | 263 | 58.0 | 0.3 | |

Source: BLM 2012a
[1] Does not include San Miguel River watershed
Note: Data are not comprehensive.

Treating Problem Weeds. Not counting weed treatments completed by the counties, approximately 970 UFO weed treatments have been conducted in the decision area. Of these, about 75 percent were carried out with herbicide or a combination of herbicide, mechanical, and manual treatments. The majority of the most troublesome weeds in the planning area are perennial, and the most effective option for long-term success and eradication is continued implementation of early detection/rapid response, as well as the application of herbicides on small infestations.

*Herbicides*: The appropriate use of approved herbicides in moderation reduces the cost of treatment, insures a reduction in infestation size, potentially eradicates weeds in a location, reduces herbicide use in native systems by reducing the need to treat large patches over several years, and promotes land health.

*Biological Controls*: There are several biological controls in development that, using living organisms, may help with some of the more troublesome weed species. For instance, biological agents to control Russian knapweed were tested and released in 2011. As biological controls become more available, they could be used in conjunction with chemical and mechanical treatments. Some biological agents currently approved for release are effective against certain weed species in the planning area, including Canada, musk, bull and scotch thistles; field bindweed; Dalmatian toadflax; spotted knapweed; puncture vine; and tamarisk.

BLM_0114833

The size of infestation and type of noxious weed determines whether or not to use a biological control agent. Noxious weed patches need to be of a large enough size to support the biological agent, the noxious weed cannot be on a state directive not to let the plant flower and reproduce, and there must be state and federal consensus that there will always be a small to medium amount of the weed present in the ecosystem. The Tamarisk leaf beetle (*Diorhabda elongata*) is a prime example of a biological control agent being used in riparian areas; the beetle enables a small amount of tamarisk to remain but not enough to compromise the function of the riparian ecosystem.

Other Common Exotic Species. Other common weedy exotic species in the planning area include cheatgrass (*Bromus tectorum*), annual wheatgrass (*Eremopyrum triticeum*), clasping pepperweed (*Lepidium perfoliatum*), Russian thistle (*Salsola tragus*), filaree (*Erodium cicutarium*), burr buttercup (*Ceratocephala testiculata*), spreading wallflower (*Erysimum repandum*), blue mustard (*Chorispora tenella*), and European madwort (*Alyssum simplex*).

### Trends

*Upland Vegetation*

Undesirable Species in Native Communities. Undesirable, exotic species are generally increasing within native vegetation in the planning area. An analysis of 190 trend studies read over the past 20 years showed a slim majority had no exotic plants (46 percent), but 40 percent had increasing levels of exotic species, and only 14 percent showed declines in exotics. These findings are consistent with patterns observed across the western US. There is the concern that some of the winter annuals like cheatgrass have the potential to overtake native vegetation, alter the fuels and fire regime, and ultimately displace entire native communities, as has happened in other ecoregions. There is little evidence that this is happening at a large scale, as the planning area has not experienced dramatic increases in fire frequency or fires fueled by invasive annuals. Several cheatgrass-fueled burns indicate this is happening in localized areas. Many of the undesirable species are tied to disturbances on the landscape. Fifty-eight percent of sampled travel routes in the planning area have weed infestations nearby, as do 70 percent of sampled ponds. In addition, many past vegetation treatments were seeded with nonnative species, such as crested wheatgrass, which produce abundant forage but compete with native species.

Native Community Distribution. Plant community distribution is on a slight downward trend across the region. This trend is less pronounced on decision area lands. Whether or not a given plant community can grow on a site is largely determined by the soils and climate (or site potential), and data from land health assessments indicate the appropriate plant communities were found on the appropriate sites. The amount of land supporting native plant communities in the region has declined, reducing their spatial distribution and frequency in the planning area. The great majority of this is due to land use changes and development on private lands. On public lands, loss of native plant communities has been caused by past vegetation treatments that replaced native species with introduced (exotic) grasses and forbs on 5 percent of the planning area. Exotic weed infestations, resulting from poorly reclaimed fires and disturbances such as heavy OHV use and grazing, have been found on an estimated additional two percent of this area. Other losses of native communities from appropriate sites, including die-off of aspen from

BLM_0114834

lower-elevation stands and invasion of trees into adjacent shrub and grass communities in some areas, appear to be associated with a changing climate.

<u>Native Species Diversity and Density</u>. A modest upward trend is apparent for native species diversity on decision area lands. While there are some issues with diversity, composition, and density in some areas, trends generally appear to be improving. Evidence from 190 trend studies read over the past 20 years shows 47 percent of communities increased in native species richness, compared with 30 percent that showed declines (16 percent showed no changes). Total native species canopy cover also showed generally upward trends with 62 percent of communities improving, while only 33 percent declined. There is some evidence that tree density is increasing. Many land use activities can degrade native communities. Excessive grazing by livestock, big game, and even rabbits can reduce palatable plants and trample others. Physical disturbance can damage plants and is associated with off-road travel or concentrated activities like woodcuts or rock collecting. Alteration of normal drainage patterns such as those associated with road development or range or watershed improvement projects can also degrade native plant communities.

<u>Age Classes and Recruitment</u>. For the most part, upland age class distribution seems adequate to maintain the major species on the landscape, and no strong trends are evident. The land health assessment data confirm field observations that the majority (74 percent) of dominant species are present in a range of age classes at evaluated sites. Only 5 percent of species were found limited to old-age individuals at some sites, indicating problems with recruitment for those species at those sites, but there are no data regarding trend. The dominance of old age classes on some sites is probably due to plant community successional processes, and is normal at some level on the landscape. Large-scale trends, which are occurring regionally and beyond, include drought-triggered tree and shrub die-offs and large beetle, borer, and bud worm infestations. Qualitative observations indicate that populations of trees and shrubs have sustained themselves despite the increased mortality, suggesting that age class distribution is adequate to sustain populations.

<u>Habitat Connectivity</u>. The general trend is one of increasing fragmentation, both at the regional and local levels. Regionally, the topography and varied geology of the planning area cause a substantial background level of habitat fragmentation and habitat isolation, particularly in the lowest- and highest-elevation areas. The pattern of land ownership and private land development has further fragmented this landscape, with native habitat converted into agricultural and residential development in the Uncompahgre and North Fork Valleys, and, to a lesser extent, the Norwood area and Paradox Valleys. This has isolated the large areas of intact public land habitat into three distinct, separate blocks: 1) the area from Grand Mesa down to Dry Creek on the east side of the Uncompahgre Plateau; 2) the area northeast of Paradox Valley down to Third Park on the west side of the Uncompahgre Plateau; and 3) the area on the southwest of Paradox Valley to the UFO boundary. A more subtle fragmentation of habitat has occurred within decision area lands, with development of roads, pipelines, canals, and other disturbed areas. This kind of fragmentation has brought in weeds and degraded habitat along these corridors so that areas of intact or suitable habitat for some plant species become separated from one another. As growth and development continue, the lower-level fragmentation is expected to continue.

BLM_0114835

<u>Photosynthetic Activity</u>. Overall, large areas of BLM-administered land do not have plant communities that take full advantage of sunlight, but there have been improvements over time in some areas. While inadequate cool season grass was identified as the biggest problem in land health assessment data, trend data show substantial improvements over the past decades. Data from the set of 190 trend studies show that perennial cool season grasses increased over the past 20 to 30 years in 54 percent of areas and declined in 34 percent, while 12 percent had no perennial cool season grasses. Warm season grass was a lesser problem in the land health assessment data, but trend data indicate it is continuing to diminish on the landscape, with 15 percent of studies showing an increase in warm season cover, 25 percent declining, and 61 percent with none. Physical disturbances, the spread of invasive cool season annuals and seeded species, and heavy grazing (especially through the duration of the growing season for a particular type of plant) have been primary causes for reduced photosynthetic activity. Climate change may disrupt the moderate improving trends that BLM-administered lands have shown over the past 30 years. If monsoonal patterns are changed to reduce moisture during the summer months, it is likely that warm season grasses will continue to decline. If spring and fall moisture dries out, reductions in cool season plants are expected.

<u>Litter Accumulation</u>. Trends in plant litter accumulation and contributions to the soil indicate a general lack of problems and that plant litter has increased over the past 30 years. The land health assessment data showed that only 5 percent of sites appeared to have too little litter. An increase in plant litter was shown in 67 percent of long-term trend studies. Litter accumulation is affected by grazing, wind and water erosion, and ground-disturbing activities. To date, these activities generally appear to be consistent with increasing litter accumulation. Invasions of annual invasive species have increased litter in some areas and may disrupt natural litter and carbon cycles, as well as soil organic matter. The forecast for plant litter is a likely continued increase as the existing trends continue and as invasive annual plants continue to increase.

<u>Landscape Patterns</u>. There is some evidence that vegetation is gradually becoming more uniform, although the planning area does not appear to be substantially affected yet. Within that overall trend, lower-level trends are occurring that have moved parts of the landscape in the opposite direction. Wildfire is burning an average of 0.16 percent of the decision area each year, and vegetation management practices, such as rollerchops and prescribed burns that result in younger age classes, affect another 0.18 percent of the decision area per year on average. Because some studies (Eisenhart 2004; Baker and Shinneman 2004) suggest a 250-year fire return interval for woodland, approximately 0.4 percent of the vegetation would need treatment or fire annually. This suggests that the vegetation is gradually aging, and the pattern is generally becoming more uniform across the landscape. Counteracting trends include the large woodland conversion projects of the 1960s and the recent fuels control work around wildland-urban interface areas. The land health assessments have determined that, in general, early seral (or grass- and forb-dominated) vegetation is most lacking, with most of the landscape units needing more of this stage on the landscape. Early mid-seral stage (shrub- and grass-dominated) vegetation is also lacking in the majority of units. While late-stage vegetation (mature tree or shrub) is too abundant in just over half of units, it is lacking in other units.

BLM_0114836

*Riparian and Wetland Vegetation*

Vegetation Indicators. No measured trends are available for riparian plants, but, overall, these indicators have been stable to improving. Riparian vegetation appears generally healthy, with stable conditions to date for streams but problems along the planning area rivers. Riparian Proper Functioning Condition data from 162 reaches indicates that between 70 and 85 percent of studied reaches have wetland species, high vigor vegetation, appropriate age class structure and species composition, and adequate riparian vegetation cover. Inappropriate grazing can lead to the loss of desirable plants, but there are very few streams with this problem in the planning area. Channel dewatering from upstream diversions associated with private water rights appears to be the biggest factor behind low-vigor riparian vegetation. The BLM has acquired some minimal instream flows for many of the larger streams to protect them from further dewatering. The rivers, with the exception of the San Miguel, are mostly impacted by altered flow regimes tied to upstream reservoir management. This has resulted in changes in species composition and loss of young age classes of cottonwood and willow. These trends are expected to continue unless reservoir management changes to simulate spring flooding. The forecast for climate change may cause widespread reductions in riparian plant vigor that will ultimately affect riparian composition, reproduction, age class distribution, and streambank cover.

Weeds, particularly tamarisk, are a significant problem in these riparian areas and, in a few cases, dominate the vegetation. Forty-six percent of sampled riparian areas in the planning area had exotic or noxious species at some level within the native vegetation. While tamarisk control work has been done with herbicide on a number of planning area streams, the tamarisk beetle, which has already become established in the planning area, shows great promise for ultimately providing long-term tamarisk control. This will result in improvements to riparian vegetation vigor and composition in the future, although other weeds are present, which may diminish this gain. The forecast for climate change and the projected earlier snowmelt, reduced precipitation, and warmer temperatures may cause widespread reductions in riparian plant vigor that negates the improvements from tamarisk control.

Hydrologic Indicators. These indicators also show little change. There are very few instances of channel downcutting, widening, sinuosity, or increasing width-to-depth ratios. Hydrologic impacts on stream channels are most evident along the Dolores River and sections of the San Miguel River, which have been dewatered for many years; these changes are minor. While there are no measured trends for hydrologic changes, Riparian Proper Functioning Condition data indicate that 75 to 88 percent of reaches studied have point bar colonization and adequate streambank vegetation to protect streambanks during floods (BLM 2009b). Activities such as heavy grazing, mining, and uncontrolled recreation use, which remove streambank vegetation, can be drivers of channel widening or downcutting and dewatering of the riparian area. These have been very limited in the planning area and have been reduced in scope over the past 20 years. Stream dewatering from upstream diversions is one of the largest influences on channel morphology and hydrologic indicators in the planning area.

BLM_0114837

*Weeds*

<u>Spread of New and Existing Weed Species</u>. Noxious weeds continue to spread rapidly across the western US. The planning area is no exception, with creeping perennials like hoary cress, oxeye daisy, Russian knapweed, and spotted knapweed spreading at rates of 8 to 24 percent per year (Duncan and Clark 2005). Evidence of this spread includes the recent appearance of the following noxious weed species that were previously absent from this area:

- yellow star thistle near Colona and Paonia, and along P12 Road in Montrose County
- spotted knapweed along Highway 90
- diffuse knapweed in an old woodcut
- jointed goatgrass along county roads
- absinth wormwood in and around Ouray
- meadow knapweed in the Owl Creek Pass area
- oxeye daisy throughout riparian areas in the San Miguel River and upper North Fork watersheds

The BLM also has anecdotal evidence that existing populations of noxious weeds have spread and increased in size. However, land health assessment data indicate that noxious weeds have not yet become a dominant feature of vegetation within the decision area. Systematic weed surveys support the idea that weeds spread at alarming rates if not controlled. This spread will continue to threaten native systems, slowly compromising native vegetation and altering these systems until they can no longer support native plant, aquatic, or wildlife populations.

<u>Competition with Native Vegetation</u>. Other exotic species are increasing within native vegetation. Estimates from a sampling of 190 20- to 30-year-old trend studies on decision area lands indicate that 46 percent had no exotic species either at the time the study was initiated or at the last reading of the study, while 40 percent had increasing levels of exotics, and 14 percent had declines in exotics. This has generally been substantiated and further clarified by land health assessment data. There is concern that some winter annuals like cheatgrass have the potential to overtake native vegetation, alter fuel and fire regimes, and ultimately displace entire native communities as has happened in other ecoregions. There is little evidence that this is happening on a large scale yet, as there has not been a dramatic increase in fire frequency or fires fueled by invasive annuals. Some cheatgrass-fueled burns have occurred, indicating that it is happening in localized areas.

<u>Landscape Disturbances</u>. Many weed invasions are tied to disturbances on the landscape. Based on partially completed road and weed inventories, about 58 percent of travel routes in the decision area have noxious weed infestations within 15 feet, while an estimated 70 percent of ponds have noxious weeds associated with them. Weeds are also commonly found in riparian areas and drainages, with 46 percent of riparian areas sampled having exotic or noxious species at some level within native vegetation. Past vegetation treatments have included seeding of nonnative species, contributing to high levels of undesirable plants such as crested wheatgrass.

BLM_0114838

Based on staff observation, the scale of disturbances infested with exotic annuals is probably even greater.

It is likely that noxious weeds and exotic plants will continue to stay at high levels and increase in some locations in the planning area. Increasing population densities and development trends on private lands, increasing recreation use, increasing mineral and oil and gas development, irrigation ditches, wildlife corridors, and sustained livestock grazing are all factors that will promote weeds and exotic species to the detriment of native plant communities.

The phenomenon of climate change is also likely to favor weeds over natives, as mountain climates move upward in elevation and desert southwest climates move into western valleys, causing disruptions in native plant communities (Ray et al. 2008). However, the risk that exotics and noxious weeds will overtake native vegetation across substantial amounts of the decision area seems unlikely over the next 20 years due to active an integrated weed management program.

### 3.1.6   Fish and Wildlife

This section describes the existing conditions of fish and wildlife resources within the planning area, including aquatic and terrestrial animal species and their habitats. Fish and wildlife resources include big game, upland game, waterfowl, raptors, migratory birds, small mammals, reptiles, amphibians, and fish. Colorado Parks and Wildlife (CPW) and USFWS have primary responsibilities for management of fish and wildlife species in the planning area. The BLM is responsible for land management. Therefore, on BLM-administered lands in the decision area, the BLM is directly responsible for the management of habitat for fish and wildlife species and indirectly responsible for the health of fish and wildlife populations that are supported by these habitats.

***Current Condition***

*Habitat Types*

An overview of fish and wildlife habitats in the planning area is provided in the existing conditions discussion in **Sections 3.1.4** (Water Resources) and **3.1.5** (Vegetation). Additional details particularly important to fish and wildlife management are presented here. Habitats are the specific spaces that fish and wildlife species occupy. Some species are generalists that may be found in a broad range of habitat types, while other species are specialists that may require specific habitat types and a limited range of site characteristics.

Dominant habitat types in the planning area correspond with the principal vegetation communities and include tall and low shrublands, desert shrub, grassland, woodland, forest, and riparian. Other localized habitats include rocks and cliffs, caves and mines, barren slopes, and water bodies. Vegetation communities vary based on precipitation, elevation, topography, slope, aspect, geology, soils, and other environmental variables. Habitat type and quality are further characterized by site-specific attributes such as vegetation cover, composition, and structure.

<u>Dominant Habitats in the Planning Area</u>

Sagebrush provides important habitat for sagebrush-dependent bird species, including sage sparrow (*Artemisiospiza belli*), Brewer's sparrow (*Spizella breweri*), and Gunnison sage-grouse

BLM_0114839

(*Centrocercus minimus*). Sagebrush also provides important winter range for mule deer (*Odocoileus hemionus*) and foraging habitat for open-country raptors. Salt desert shrub provides habitat for pronghorn (*Antilocapra americana*), winter range for mule deer and elk (*Cervus canadensis*), and birds such as horned lark (*Eremophila alpestris*) and Swainson's hawk (*Buteo swainsoni*). Grasslands provide habitat for northern harrier (*Circus cyaneus*), lark sparrow (*Chondestes grammacus*), prairie dog (*genus Cynomys*), and numerous other species. Pinyon-juniper woodlands and mixed mountain shrub communities provide habitat for bats, big game, ravens, and a variety of songbirds. Forests of cottonwood, aspen, ponderosa pine, and Douglas-fir provide habitat for big game such as elk, mule deer, and black bear (*Ursus americanus*), and habitat for a host of forest and woodland species, notably raptors, squirrels, bats, and songbirds, including cavity-nesting species. Riparian and aquatic habitats such as streams, rivers, and springs support warblers, raccoons, frogs, toads, and other species (aquatic species are discussed below).

Rock complexes provide unique habitats that are used by many species of wildlife. Cliff-nesting birds include golden eagle (*Aquila chrysaetos*), prairie falcon (*Falco mexicanus*), peregrine falcon (*Falco peregrinus anatum*), swallows, and swifts. Rocky canyons and slopes provide essential habitat for bighorn sheep (*Ovis canadensis nelsoni*) and preferred hunting areas for mountain lion, bobcat, and ringtail. Boulder piles may be occupied by American pika, marmot, and various species of woodrats and other rodents. Several bat species roost, hibernate, and breed in rock crevices, caves, and mines.

Water bodies, including rivers, perennial and intermittent streams, ponds, springs, and water diversions, provide habitat for fish, amphibians, and aquatic mammals such as beaver, river otter, and mink. Rivers and streams in the planning area include middle-elevation reaches characterized by higher gradients, fast water velocity, and normally clear, cool water. These reaches tend to support native and introduced trout species, mink, and relatively low diversity of amphibian species. At lower elevations in the planning area, rivers and streams are typically lower gradient with slower velocity; water may be sediment laden and warm during summer. These reaches typically support a mix of native and introduced warm water fish species, beaver and muskrat, and a higher diversity of amphibian species.

*Key Fish and Wildlife Species*
**Table 3-19** (Key Fish and Wildlife Species) lists species of high priority for BLM management efforts due to their economic value, regulatory status, high public interest, or other qualities. Special status species are discussed in **Section 3.1.7** (Special Status Species).

The following discussion of fish and wildlife in the planning area includes some assessments of species distribution and population trends. This information is based on data files in the UFO, personal experience of UFO biologists, CPW Species Activity Maps (CPW 2009), and several general references on the zoology of the region. These include Colorado Birds (Andrews and Righter 1992), Colorado Breeding Bird Atlas (Kingery 1998), Birds of Western Colorado Plateau and Mesa Country (Righter et al. 2004), Amphibians and Reptiles of Colorado (Hammerson 1999), and Mammals of Colorado (Fitzgerald et al. 1994).

BLM_0114840

**Table 3-19**
**Key Fish and Wildlife Species**

| Species or Group | Rationale for Key Designation |
|---|---|
| **Birds** | |
| Waterfowl and shorebirds | Economic and recreational value |
| Upland game birds | Economic and recreational value |
| Migratory birds | High interest and protected by law |
| Golden eagle | High interest and protected by law |
| Other Raptors | High interest, protected by law, top of food chain |
| **Mammals** | |
| Bighorn sheep, Rocky Mountain and desert | High economic and recreational value |
| Black bear | High interest, economic and recreational value |
| Elk | High interest, economic and recreational value |
| Moose | High interest, economic and recreational value |
| Mountain lion | High interest, economic and recreational value |
| Mule deer | High economic and recreational value |
| Pronghorn | High economic and recreational value |
| Gunnison and white-tailed prairie dogs | High interest, species declines, and listing petitions |
| River otter | High interest, economic value |
| Bats | High interest |
| **Fish** | |
| Rainbow, brown, and cutthroat trout | High interest, economic and recreational value |

_Birds_

_Waterfowl_. Streams, rivers, reservoirs, ponds, canals, and associated riparian vegetation provide habitat for waterfowl and shorebirds. Canada goose, mallard, green-winged teal, common merganser, and American widgeon are a few of the more common game waterfowl species found in the area. Great blue heron, great egret, sandhill crane, and other wading birds and shorebirds can be found along major rivers, valleys, and irrigated fields, many as spring and fall migrants.

_Upland Game Birds_. The quality of upland game bird habitat depends on the availability of mixed shrubby and herbaceous vegetation for nesting, brood rearing, foraging, and thermal cover. Riparian habitat plays an important role as a source of food, water, and cover for many upland birds. Dusky grouse are widely distributed throughout the higher-elevation woodlands and into adjacent shrublands. Wild turkeys occupy ponderosa pine and Gambel oak woodlands, mixed mountain shrub, pinyon-juniper woodlands, and riparian areas. Chukar and Gambel's quail, both introduced in the planning area by CPW for sprit hunting, occur in rocky foothills, canyons, and valleys, primarily in the north and central portions of the planning area along the Uncompahgre-Gunnison River watershed. Mourning doves occupy a variety of habitats across the planning area. Ring-necked pheasants are common in agricultural lands and adjacent riparian areas.

_Raptors_. Raptors in the planning area include eagles, falcons, hawks, and owls. Golden eagles, red-tailed, sharp-shinned, ferruginous, Swainson's, and Cooper's hawks, peregrine and prairie

BLM_0114841

falcons, northern harrier, and American kestrel are the most common diurnal species. Great-horned owl and several other owl species occupy mostly wooded habitats in the planning area, while the burrowing owl occurs in open landscapes usually associated with prairie dogs. Cliffs, rocky outcrops, and large trees provide nesting habitat for most of these species, while a few nest in tree cavities or on the ground.

<u>Migratory Birds</u>. The planning area supports a variety of migratory bird species, including neotropical migrants. A migratory bird literature review by the UFO (Lambeth and Reeder 2009) complied a database of all migratory birds that occupy the planning area, mapped migratory bird species diversity in all four seasons, reviewed conservation plans from various agencies and conservation groups, and developed management recommendations and conservation opportunities for migratory birds in the planning area. At least 240 bird species are considered residents or annual visitors in the planning area. Species richness is highest in spring and fall due to the presence of migrants, with water and riparian land cover types showing the highest diversity of species. For upland habitats during spring through fall, species richness is generally higher in mid- to high-elevation shrublands and forests, but, in winter, pinyon-juniper woodlands and lower-elevation shrublands support the most species.

Recent studies and monitoring suggest that some of these populations are declining, due in part to land use and management practices and habitat loss and degradation (USFWS 2008). Some of the bird species in the planning area have been identified by USFWS as Birds of Conservation Concern (USFWS 2008). These bird species, and their habitats and conservation status, are listed in **Table 3-20** (Birds of Conservation Concern). Several species of concern listed here are also addressed in **Section 3.1.7** (Special Status Species).

**Table 3-20**
**Birds of Conservation Concern**

| Species | Habitat Description | UFO Range and Status[1] |
|---|---|---|
| Gunnison sage-grouse *Centrocercus minimus* | Sagebrush communities for hiding and thermal cover, food, and nesting; open areas within sagebrush stands for leks; sagebrush-grass-forbs mix for nesting; wet meadows for brood rearing | Year-round resident Breeding |
| American bittern *Botaurus lentiginosus* | Marshes and wetlands; ground nester | Spring/ summer resident Breeding confirmed in region but not within planning area |
| Bald eagle[2] *Haliaeetus leucocephalus* | Nests along forested rivers and lakes; winters in upland areas, often with rivers or lakes nearby | Fall/winter resident Rarely nesting in river valleys |
| Ferruginous hawk *Buteo regalis* | Open, rolling and/or rugged terrain in grasslands and shrub-steppe communities; also grasslands and cultivated fields; nests on cliffs and rocky outcrops | Fall/ winter resident Non-breeding |
| Golden eagle *Aquila chrysaetos* | Open country, grasslands, woodlands, and barren areas in hilly or mountainous terrain; nests on rocky outcrops or large trees | Year-round resident Breeding |

BLM_0114842

**Table 3-20**
**Birds of Conservation Concern**

| Species | Habitat Description | UFO Range and Status[1] |
|---|---|---|
| Peregrine falcon[2] *Falco peregrinus* | Open country near cliff habitat, often near water such as rivers, lakes, and marshes; nests on ledges or holes on cliff faces and crags | Spring/summer resident Breeding |
| Prairie falcon *Falco mexicanus* | Open country in mountains, steppe, or prairie; winters in cultivated fields; nests in holes or on ledges on rocky cliffs or embankments | Year-round resident Breeding |
| Snowy plover[3] *Charadrius alexandrines* | Sparsely vegetated sand flats associated with pickleweed, greasewood, and saltgrass | Rare spring migrant Non-breeding |
| Mountain plover *Charadrius montanus* | High plain, cultivated fields, desert scrublands, and sagebrush habitats, often in association with heavy grazing, sometimes in association with prairie dog colonies; short vegetation | Rare spring/fall migrant Non-breeding |
| Long-billed curlew *Numenius americanus* | Lakes and wetlands, and adjacent grassland and shrub communities | Spring/fall migrant Non-breeding |
| Yellow-billed cuckoo[4] *Coccyzus americanus* | Riparian, deciduous woodlands with dense undergrowth; nests in tall cottonwood and mature willow riparian, moist thickets, orchards, abandoned pastures | Summer resident Breeding |
| Flammulated owl *Otus flammeolus* | Montane forest, usually open and mature conifer forests including ponderosa pine, Douglas-fir, aspen, and aspen-conifer mix | Summer resident Breeding |
| Burrowing owl *Athene cunicularia* | Open grasslands and low shrublands often in association with prairie dog colonies; nests in abandoned burrows created by mammals; short vegetation | Spring/summer/fall resident Breeding, very few records in recent years |
| Lewis's woodpecker *Melanerpes lewis* | Open forest and woodland, often logged or burned, including oak, coniferous forest (often ponderosa pine), aspen, riparian woodland, and orchards, less often in pinyon-juniper | Year-round resident Breeding |
| Willow flycatcher[3] *Empidonax traillii* | Riparian and moist shrubby areas; winters in shrubby openings with short vegetation | Summer resident Breeding |
| Gray vireo *Vireo vicinior* | Pinyon-juniper and open juniper-grassland | Summer resident Breeding |
| Pinyon jay *Gymnorhinus cyanocephalus* | Pinyon-juniper woodlands | Year-round resident Breeding |
| Juniper titmouse *Baeolophus griseus* | Pinyon-juniper woodlands, especially juniper; nests in tree cavities | Year-round resident Breeding |
| Veery *Catharus fuscescens* | Deciduous forests, riparian, shrubs | Possible summer resident observed in Gunnison County Possible breeding |
| Grace's warbler *Dendroica graciae* | Mature ponderosa pine forests | Summer resident Breeding |
| Brewer's sparrow *Spizella breweri* | Sagebrush-grass stands; less often in pinyon-juniper woodlands | Summer resident Breeding |

BLM_0114843

**Table 3-20**
**Birds of Conservation Concern**

| Species | Habitat Description | UFO Range and Status[1] |
|---|---|---|
| Chestnut-collared longspur *Calcarius ornatus* | Open grasslands and cultivated fields | Spring migrant Non-breeding |
| Black rosy-finch *Leucosticte atrata* | Open country including mountain meadows, high deserts, valleys, and plains; breeds/nests in alpine areas near rock piles and cliffs | Winter resident Non-breeding |
| Brown-capped rosy-finch *Leucosticte australis* | Alpine meadows, cliffs, and talus and high-elevation parks and valleys | Summer resident Breeding |
| Cassin's finch *Carpodacus cassinii* | Open montane coniferous forests; breeds/nests in coniferous forests | Year-round resident Breeding |

Source: USFWS 2008
[1] Assessment based on UFO files and GIS data, partner data, and local knowledge
[2] ESA delisted species
[3] Non-listed subspecies/population
[4] ESA candidate species

<u>Reptiles</u>. Reptile species in the planning area are most diverse in lower elevations and drier habitats, such as shrublands, pinyon-juniper woodlands, and associated riparian areas. Reptile species diversity is consequently higher in the drier western portion of the planning area where these habitats are more common. Common species in the planning area include gopher snake, western rattlesnake, western terrestrial garter snake, sagebrush lizard, fence lizard, plateau striped whiptail, and collared lizard.

<u>Mammals</u>

<u>Big Game</u>. CPW has mapped some of the important seasonal habitats for big game, particularly hooved mammals. Elk and mule deer are the most abundant and widespread big game species in the planning area. During summer, elk occupy higher, often forested elevations and the planning area includes a few of the mapped calving areas and summer concentration areas. Mule deer also typically move to higher, forested elevations in summer, although some remain resident year round in lower valleys along riparian areas or agricultural and urban areas. Elk and mule deer mostly migrate to lower elevations in winter and utilize pinyon-juniper woodland, mountain shrub, sagebrush, and agricultural areas. BLM-administered lands provide the majority of deer and elk winter range in the planning area. Crucial winter ranges, consisting of CPW-defined severe winter range and winter concentration areas, are considered critical to maintaining mule deer and elk herds at desired levels in the planning area. The UFO has participated with agency and private landowner partners on many recent programs and projects to protect and improve big game winter range, including the Uncompahgre Project collaborate landscape-scale planning and brush treatment projects, brush and woodland treatments on Fruitland Mesa, and projects with CPW in the region of the Billy Creek State Wildlife Area.

BLM_0114844

Pronghorn occur in limited numbers in the northeast portion of the planning area near Delta, Colorado. BLM-administered lands provide the majority of the salt desert shrub habitat used by these open-country animals in the planning area.

CPW introduced moose into the San Juan Mountains southeast of the planning area, and more recently onto Grand Mesa north of the planning area. While no moose are permanently established within the planning area, emigrants from the established populations occasionally move into adjacent forested areas and move through the river valleys and foothills. Primary habitat for moose in Colorado is montane willow stands and similar wetland areas, along with adjacent forest stands and meadows.

Three populations of bighorn sheep occur in the planning area. Portions of the Ouray-Mt. Sneffels herd of Rocky Mountain bighorn sheep range into the planning area from the upper Uncompahgre River watershed west to near Placerville, Colorado. The sheep mostly occupy alpine tundra and subalpine meadows and cliff areas, especially in summer, but range lower into open woodlands, shrublands, and meadows in winter, particularly in the City of Ouray and adjacent oak woodlands to the northeast, and in the Placerville area where they sometimes range onto BLM-administered lands. In the 1980s, CPW reintroduced desert bighorn sheep, a more desert-adapted subspecies, to the Dolores River canyon in western Dolores and San Miguel Counties and to Dominguez and Escalante canyons on the east side of the Uncompahgre Plateau. Both of these populations range partly into the planning area, occupying arid sandstone canyons with sparse shrublands and pinyon-juniper woodlands.

Black bear are common in more mesic habitats and riparian areas throughout much of the planning area. BLM-administered lands that support aspen forest, Gambel oak shrublands, and pinyon-juniper woodlands provide key habitat for black bears, particularly in fall when bears seek rich foods, including oak acorns and pinyon nuts, as they prepare for hibernation.

Mountain lion are uncommon but widely distributed in the planning area, mainly in drier forest types and shrublands above the valleys. Mountain lions tend to favor rough terrain such as canyon edges and, in the planning area, are highly dependent on migratory herds of mule deer and elk, their primary prey.

<u>Small Mammals</u>. Small mammal species include mountain and desert cottontail rabbits, white-tailed jackrabbit, striped and spotted skunks, raccoon, several species of ground squirrels, chipmunks, mice, and woodrats, white-tailed prairie dog in the Uncompahgre and Gunnison River watersheds, and Gunnison's prairie dog in the western part of the panning area.

Seventeen bat species are known to occur in the planning area. Species such as the big brown bat are common in urban areas and around human settlement. Species such as the little brown bat, hoary bat, long-legged myotis, fringed myotis, and silver-haired bat are most common in forested areas. Other species are more common in desert shrublands and pinyon-juniper woodlands at lower elevations, including the California myotis, western pipistrelle, and pallid bat. Some species, such as the big free-tailed bat, Allen's lappet-browed bat, and Yuma myotis, are rare since the planning area is located at the northern or eastern edges of their breeding ranges which primarily in the desert southwest. The spotted bat, uncommon throughout its range, occupies rocky canyons in the planning area. Townsend's big-eared bat, also uncommon

BLM_0114845

throughout its range, utilizes abandoned mines as hibernacula and maternity roosts, with most of Colorado's five known roosts in abandoned mines in western Colorado. Many bat species are closely associated with streams and riparian areas. In winter, bats in the region either hibernate or migrate south. Bats roost in trees, caves, mines, rock crevices, rock piles, buildings, bridges, and other protected situations, and roost preference differs by species. Bats are especially vulnerable to human disturbance at maternity roosts where young are raised and winter hibernation sites; protection of these roosts is an important conservation concern.

Furbearers. Coyotes, bobcats, raccoons, red foxes, and muskrats occur in all habitat types throughout the planning area, with coyotes being the most abundant. In the planning area, river otters are found in the San Miguel, Dolores, and Gunnison Rivers, and in major tributaries with abundant fish.

Aquatic Species. Game fish include rainbow, brown, brook, and cutthroat trout. Non-game fish include carp, sculpin, dace, minnows, suckers, cottids, shiners, and sunfish. Amphibians occur exclusively or seasonally in most aquatic systems throughout the planning area. The most common amphibians include the western chorus frog, tiger salamander, and Woodhouse's toad.

## Trends

### Wildlife Populations

A Data Analysis Unit is a geographic area that represents the year-round range of a big game herd, and includes all of the seasonal ranges of a specific herd. In the planning area, elk numbers typically exceed and mule deer numbers typically fall short of CPW population targets for Data Analysis Units in the planning area. The BLM seeks to cooperate with CPW management aimed at reducing populations that exceed objectives and increasing populations that fall below objectives.

Current trends for fish, amphibians, and other aquatic species are largely unknown. With the limited data available, it appears that most raptor populations are stable. However, a number of migratory bird and neotropical passerine populations are declining across the planning area. Although data are lacking, other non-game populations, including furbearers, small mammals, and reptiles, are expected to be stable. Those wildlife species or populations thought to be at risk or declining are monitored and tracked as special status species (as described in **Section 3.1.7** [Special Status Species]).

### Declining Habitat

Wildlife diversity and abundance typically reflect the diversity, quality, and quantity of habitat. In general, habitats have declined over time. Possible causes include conversion of native vegetation to agricultural uses, noxious weed infestations, and increased recreational use of public lands. The effects of habitat decline vary for each species. While problems such as poor browse conditions for wintering big game are present in some areas, most of the planning area appears to be meeting land health objectives. Still, sagebrush and salt desert habitats, in particular, have been reduced in area and quality in the planning area and other regions across the US. These sites are at risk due to overgrazing, cheatgrass and other weed invasions, pinyon-juniper succession, and other factors. Wildlife that depend on these habitat types have declined in abundance and range (see **Section 3.1.7** [Special Status Species]).

BLM_0114846

*Monitoring Results*

Long-term, systematic monitoring of wildlife habitat conditions, such as with permanent transects, has not been conducted in most of the planning area. Currently, the best available information is derived from annual land health assessments, including a limited number of vegetation transects in select areas. The entire decision area has been assessed using the land health methodology. Portions of each landscape were found to be meeting, meeting with problems, or failing to meet BLM Colorado Public Land Health Standards. The following is a summary of the most common conditions observed in problem areas, along with the significance to wildlife and fish.

Low cover by perennial cool season and warm season grasses and forbs. Cover by desirable native species is lower than expected for a particular site's ecological potential. This problem is most evident at drier low-elevation sites in the decision area. Low-elevation sites also sustain heavier concentrations of grazing wildlife and livestock, which may further reduce palatable native grasses. Among other benefits, healthy stands of native perennial grasses and forbs provide essential hiding and breeding cover and forage for many wildlife species.

Low plant community diversity. Plant community diversity is lower than expected for a particular site's ecological potential. This problem is often observed in connection with other symptoms, such as weeds and overbrowsing. Typically, diverse plant communities or heterogeneous habitats are more resilient to disturbances, more productive, and provide habitat for a greater number of wildlife species and individuals than uniform or homogenous plant communities. Vegetation patches that vary in type, size, shapes, and juxtaposition across a landscape are typically desired so that multiple species benefit.

Low seral stage diversity. Seral stage refers to a specific period in the development or succession of the plant community. Seral stage influences structural and spatial diversity of plant assemblages. Typically, low seral stage diversity across a landscape, such as closed-canopy pinyon-juniper, provides relatively poor habitat from a multi-species standpoint. Where late seral stages of forest communities are reduced, habitat quality for some wildlife species such as cavity-nesting birds may be reduced.

Low vegetation age-class diversity. Areas are dominated by an even-aged stand of vegetation, such as sagebrush, and some sites may be closed canopy or stagnant (e.g., lacking cover with understory grasses). Like plant community and seral stage diversity, a diverse age-class community or population is typically more resilient to environmental disturbances and provides habitat for a greater number of species than even-aged stands of vegetation. Age-class diversity also indicates that vegetation reproduction and recruitment are occurring, another indicator of land health.

Excessive weeds and/or threat of invasion. Weeds, including cheat grass, other annuals, and noxious species, are at moderate to high levels in some areas and have invaded some undisturbed sites. In some cases, weed cover occurs at a level that poses an invasion risk, should a major disturbance such as fire or drought occur. Exotic and noxious weeds often displace native vegetation, typically resulting in degraded or unsuitable habitat for wildlife.

BLM_0114847

Pinyon-juniper encroachment. Pinyon juniper communities are expanding beyond their perceived or known historical range or are increasing in canopy cover. Pinyon-juniper encroachment can render habitat unsuitable or poor for some species, such as Gunnison sage-grouse, and may alter plant community productivity, particularly in the understory community.

Habitat fragmentation, degradation, and loss. Road expansion, recreation, agriculture, and residential developments are increasing habitat fragmentation and degrading some habitats through the introduction of weeds. Disturbances may negatively impact some species and benefit others.

Degraded or unsuitable habitat due to past vegetation treatments. Some vegetation treatments have resulted in poor or unsuitable habitat for wildlife. In the planning area, the most common example is the conversion of sagebrush communities to crested wheatgrass stands. Crested wheatgrass plantings create a monoculture that typically results in poor habitat structure and diversity for wildlife, with exceptions such as big game, and contributes to declines in sagebrush obligate populations. In addition, cheatgrass, annuals, and noxious weeds have invaded a number of treatment areas. However, when done properly, sagebrush thinning can promote herbaceous production and forbs cover. Thus, some treatment areas in the UFO are recovering well and have resulted in improved conditions for wildlife.

Over-browsed shrubs and trees. Abnormal growth form, hedging, poor leader growth, high or conspicuous browse-line heights, and similar problems indicate overuse by wildlife and livestock. This problem is most evident where big game and livestock use overlap. Intensive browsing of shrubs can cause shifts in vegetation, which can impact birds, small mammals, and other wildlife. This may indicate an imbalance between big game numbers, livestock stocking rates, and animal distribution, and the capacity of a habitat to support these population levels.

Poor vigor of shrubs. Decadent plants, dead plants, poor leader growth, and marginal seed production are observed in some areas. These problems are often observed in association with heavy browsing and foraging damage by grazing animals. The health and persistence of native shrubs is critical to provide essential cover, food, and structural diversity for many wildlife species.

Loss and/or degradation of crucial habitats. Impacts from developments, weeds, recreation, and similar activities may result in short or long-term loss or degradation of crucial habitats, such as big game severe winter range and production areas.

Landscape and habitat connectivity problems. Roads, fences, trails, rangeland conversions, power lines, energy corridors, and other human developments may impede or prevent animal movement and migration.

Declining wildlife populations. Wildlife populations, such as neotropical migratory birds, may be declining.

Overabundance or unwanted growth of wildlife populations. Some wildlife species are exceeding habitat carrying capacity and may be contributing to site degradation. Overpopulation may be

BLM_0114848

inferred from both habitat condition and utilization indices, such as overbrowsing or hedging of shrubs, scat, and weed proliferation, and harvest/population data collected by CPW.

<u>Poor water quality, channelized streams, and poor or weedy riparian vegetation.</u> Riparian habitat is crucial to the survival of species in arid environments. In addition, the condition of fish habitat is intrinsically linked to the condition of adjacent riparian habitat and stream channel characteristics. Among other benefits, riparian vegetation moderates water temperatures, reduces stream bank erosion, and provides cover for fish. Amphibian and aquatic invertebrate species richness and diversity are strongly correlated with water quality and hydrologic conditions.

The primary causes identified for failure to meet Standard 3 include:

- Residual impacts from historic uses
- Old vegetation treatments or woodcuts
- Roads and road maintenance
- Fire suppression
- Livestock overgrazing
- Wildlife use, including excessive browsing by deer, elk, rabbits, and prairie dogs
- Wildland/urban/agricultural interface and associated activities on isolated BLM parcels
- OHV activity
- Recreation
- Recent fire
- Pipelines, canals, and other ROWs
- Livestock ponds
- Mining
- Water diversions, flow regulations, and augmented flows
- Dumping, such as trash and carcasses

The primary causes identified for failure to meet Standard 2 on riparian systems include:

- Water diversions, flow regulations, and augmented flows
- Channelized streams
- Upstream water quality problems
- Residual impacts from historic use
- Old vegetation treatments or woodcuts
- Roads and road maintenance

BLM_0114849

- Livestock overgrazing

- Wildlife use, including excessive browsing by deer, elk, rabbits, and prairie dogs

- Wildland/urban/agricultural interface and associated activities on isolated BLM parcels

- Mining

Other potential causes for land health problems include:

- Drought or climate change

- Disease

- Oil and gas development

- Lack of keystone predators to control prey populations, such elk and deer

- Sociopolitical challenges

Further discussion of land health trends and causal factors can be found in **Section 3.1.5** (Vegetation).

### 3.1.7   Special Status Species

Special status species are those that:

- have been proposed for listing or officially listed as threatened or endangered

- are candidates for listing as threatened or endangered under the provisions of the ESA

- have been listed by a state in a category such as threatened or endangered, implying potential endangerment or extinction

- have been designated by each BLM State Director as sensitive

Federal threatened and endangered species and designated critical habitat are managed by USFWS in cooperation with other federal agencies, with the ultimate goal of species recovery and viability. The BLM cooperates with USFWS to identify and manage critical habitat for listed species in addition to habitat previously designated. Candidate species are managed to maintain viable populations in order to avoid listing. State of Colorado and BLM sensitive species are treated similarly. The BLM, USFWS, and State of Colorado have developed formal and informal agreements to provide guidance on species management. Consultation is required on any action proposed by the BLM or another federal agency that "may affect" a listed species or critical habitat.

***Federal Endangered, Threatened, Proposed, and Candidate Species***
The ESA, as amended (in 16 United States Code [USC] 1531-1534), mandates the protection of species listed as threatened or endangered of extinction and the habitats on which they depend. Section 7 of the ESA clarifies the responsibility of federal agencies to utilize their authority to carry out programs for the conservation of listed species. In addition, federal agencies must consult with USFWS to insure that any action authorized, funded, or carried out by the agency

BLM_0114850

is "…not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species…"

The UFO refers to the most current list of threatened, endangered, and candidate species Colorado by county provided on the USFWS Web site[1] to analyze the effects of proposed actions on threatened, endangered, and candidate species and designated critical habitat for these species.

***Current Conditions***

*Special Status Plants*

Federally Listed Species. Two federally protected plant species are known to exist in the planning area, as shown in **Table 3-21** (Federally Listed Plant Species). Federally designated critical habitat for one of these plant species, the clay-loving wild buckwheat, also exists in the planning area. Some species are not known to inhabit in the planning area yet are included in this analysis due to historic populations in the area, adjacent known populations, the presence of suitable habitat, insufficient survey coverage, potential expansions or shifts in species ranges, and other factors. In accordance with BLM Manual 6840, Special Status Species Management, federal candidate species are managed as BLM sensitive species in order to prevent the need for future listing of species. Candidate species are discussed in the following section, BLM Sensitive Species.

**Table 3-21**
**Federally Listed Plant Species**

| Common Name<br>*Scientific name* | Federal Status | Designated Critical<br>Habitat in Planning Area |
|---|---|---|
| Clay-loving wild buckwheat<br>*Eriogonum pelinophilum* | Endangered | Yes |
| Colorado hookless cactus<br>*Sclerocactus glaucus* | Threatened | No |

Source: USFWS 2010

*Clay-loving wild buckwheat (*Eriogonum pelinophilum*).* Clay-loving wild buckwheat is confined to whitish alkaline, clay soils and soils of the Mancos shale adobe badlands. This species is endemic to Montrose and Delta Counties. The following is known about the species:

- Over 22 known occurrences of clay-loving wild buckwheat have been recorded by the Colorado Natural Heritage Program (CNHP) and the BLM:
  - 9 of these occurrences are found entirely or partially on BLM-administered land. 7 of these occurrences have not been relocated in over 20 years, and 1 occurrence could not be relocated upon revisit; however, all of these occurrences are on private land.

---

[1] Found at http://www.fws.gov/mountain-prairie/endspp/CountyLists/Colorado.pdf

BLM_0114851

- – The 22 known occurrences are found on less than 600 acres of occupied habitat. Sites range in size from 1 acre to over 200 acres and contain anywhere from 100 to more than 10,000 individuals. Based on recent surveys, the total estimated population is likely more than 278,000 individuals on approximately 582 acres (USFWS 2009a).

- The clay-loving wild buckwheat is found on BLM-administered land on the Fairview North and Fairview South ACECs, and on BLM-administered land immediately adjacent to Fairview South ACEC (Colorado Natural Areas Program 2010; USFWS 2009a).

   - – The Fairview North ACEC is within the Gunnison Gorge NCA, which is outside the planning area.

   - – The Fairview South occurrence is adjacent to another protected site, the Wacker Ranch Natural Area. The Wacker Ranch was purchased through a cooperative USFWS Recovery Land Acquisition grant to Colorado State Parks/Colorado Natural Areas Program and The Nature Conservancy specifically for protection of the clay-loving wild buckwheat.

- The remaining 50 percent of known occurrences are on scattered BLM-administered land and private land. Other BLM locations include Sunshine Road, Dry Cedar Creek, Garret Ditch, and several other locations within the Gunnison Gorge NCA planning area (USFWS 2009a).

- The BLM occurrences and the Wacker Ranch occurrence together comprise about 50 percent of the total known occurrences (USFWS 2009a) and 50 percent of the known geographic area (312 of 582 acres).

- Two of the occurrences on private land are protected by conservation easements through the Black Canyon Land Trust, but the remaining occurrences on private land are vulnerable to extirpation from land development. Therefore, the occurrences on BLM-administered land, especially the Fairview South occurrence, are critical to this species' persistence and recovery.

Clay-loving wild buckwheat was listed as endangered in 1984 (USFWS 1984), a Recovery Plan was finalized in 1988 (USFWS 1988a), and a ruling on a petition to list the species was issued in 2009 (USFWS 2009a). At the time of listing, there was only 1 known population on private land with less than 10,000 individuals. The entire geographic area of the then-only population (120 acres) was designated as critical habitat. The original critical habitat remains the only critical habitat, protecting approximately 200 plants.

The clay-loving wild buckwheat is threatened primarily by habitat loss from agricultural and residential development (USFWS 1988a). Trespass OHV use and overgrazing are also threats. The small population size and small geographic extent makes the clay-loving wild buckwheat vulnerable to catastrophic events such as wildfire.

The BLM has conducted monitoring of the clay-loving wild buckwheat at four plots on Fairview South. The BLM has also collaborated with USFWS to conduct inventories for clay-loving wild

BLM_0114852

buckwheat. The following additional monitoring and protective/recovery actions for clay-loving wild buckwheat have been conducted since 2011:

- 2011–2012: UFO worked with US FWS, Montrose Model Airplane Club, and Colorado Natural Heritage Program to establish three exclosures to protect clay-loving wild buckwheat occurrences from recreation and to study the effects of livestock grazing on clay-loving wild buckwheat with a no-grazing control

- 2013: UFO established a 14-acre exclosure to protect clay-loving wild buckwheat from recreation impacts in the Elephant Skin area in the Gunnison Gorge NCA adjacent to but outside the planning area.

- 2008–2013: UFO established a long-term monitoring program for clay-loving wild buckwheat with five study plots: two in the planning area in the South Fairview ACEC, and three adjacent to but outside the planning area (in the Gunnison Gorge NCA)

Protections for the clay-loving wild buckwheat in the Fairview South ACEC include the following (BLM 1989a):

- Open to fluid minerals leasing with no surface occupancy stipulation

- Closed to disposal of mineral materials

- Open to livestock grazing unless studies determine threatened and endangered plants or habitats are being degraded

- Closed to OHV use

- Open to major utility development, except pipelines, provided there are no effects on threatened and endangered plants or habitats

The USFWS has ruled that revisions to critical habitat were warranted but precluded by other priorities. If additions to critical habitat for clay-loving wild buckwheat become a priority, USFWS may choose BLM-administered land as critical habitat.

*Colorado Hookless Cactus (*Sclerocactus glaucus*).* Habitat for the Colorado hookless cactus, formerly the Uinta Basin hookless cactus, includes rocky hills, mesa slopes, and alluvial benches in desert shrub communities at elevations from 4,500 to 6,000 feet. The Uinta Basin Hookless Cactus Recovery Plan estimated that 15,000 individual plants exist in the Gunnison River population. Recent surveys near Delta, Colorado, suggest total population size and distribution may be much larger than originally thought. Within the planning area, this species is found primarily north of Montrose, Colorado, in the lower Uncompahgre River and Gunnison River valleys, with most subpopulations found near the city of Delta, Colorado. The Colorado hookless cactus was listed as threatened in 1979 (USFWS 1979).

The taxonomy of the Colorado hookless cactus (*Sclerocactus glaucus* complex) has changed since its listing in 1979 (USFWS 2009b). The USFWS now recognizes the *Sclerocactus glaucus* complex as three separate species: the Colorado hookless cactus (*S. glaucus*), the Uinta Basin cactus (*S.*

BLM_0114853

*wetlandicus*), and the Pariette cactus (*S. brevispinus*). The Uinta Basin and Pariette cacti are only found in Utah, outside the planning area.

There are 314 distinct Colorado hookless cactus occurrences occupying greater than 0.25-acre that are documented, and 950 occurrences occupying less than 0.25-acre within the planning area. This does not include the Dominguez-Escalante or Gunnison Gorge NCAs, both of which also contain significant occurrences adjacent to the planning area. Currently identified Colorado hookless cactus occurrences occupy more than 3,000 acres within the planning area. Numerous point-in-time counts conducted between 2012 and 2013 suggest that historic Element Occurrence Records drastically underestimate the size of the occurrences. Since the publication of the 2010 USFWS Recovery Outline, 94 new distinct occurrences have been documented within the planning area, totaling well over 2,000 individuals. Within the last 10 years, two newly designated wilderness areas have effectively protected a substantial portion of the species' range from development-related impacts, and the Dominguez-Escalante and Gunnison Gorge NCAs have added or are likely to add new protections specific to the conservation of the Colorado hookless cactus. Continued survey is likely to add significantly more new occurrences within the planning area.

<u>BLM Sensitive Species</u>. Species designated as BLM sensitive are native species found on BLM-administered lands for which the BLM has the capability to significantly affect the conservation status of the species through management and either:

1.   There is information that a species has recently undergone, is undergoing, or is predicted to undergo a downward trend such that the viability of the species or a distinct population segment of the species is at risk across all or a significant portion of the species range, or

2.   The species depends on ecological refugia or specialized or unique habitats on BLM-administered lands, and there is evidence that such areas are threatened with alteration such that the continued viability of the species in that area would be at risk.

All federal candidate species, proposed species, and delisted species in the five years following delisting are considered BLM sensitive species. BLM sensitive species may also include Colorado State endangered, threatened, and species of conservation concern; or plant species ranked as critically imperiled (G1 or S1) or imperiled (G2 or S2) by the CNHP. Sensitive species known to inhabit and potentially inhabiting in the planning area are listed in **Table 3-22** (Sensitive Plant Species Known to Inhabit and Potentially Inhabit the Planning Area).

All BLM sensitive species are managed in accordance with BLM Manual 6840, Special Status Species Management (BLM 2008j).

*Grand Junction Milkvetch (*Astragalus linifolius*).* Habitat for this milkvetch includes sparsely vegetated sites, often within the Chinle and Morrison formations and selenium-bearing soils, in pinyon-juniper and sagebrush communities at 4,800 to 6,200 feet in elevation. Plants often grow on rocky slopes and in canyons. Based on current knowledge, the species is confined to the east side of the Uncompahgre Plateau. There has been one report of the plant along the west side of the plateau has been reported, but this is believed to be a misidentification of the species.

BLM_0114854

**Table 3-22**
**Sensitive Plant Species Known to Inhabit and Potentially**
**Inhabit the Planning Area**

| Common Name | Scientific Name |
| --- | --- |
| Grand Junction milkvetch | *Astragalus linifolius* |
| Naturita milkvetch | *Astragalus naturitensis* |
| San Rafael milkvetch | *Astragalus rafaelensis* |
| Sandstone milkvetch | *Astragalus sesquiflorus* |
| Gypsum Valley cateye | *Cryptantha gypsophila* |
| Fragile (slender) rockbrake | *Cryptogramma stelleri* |
| Kachina daisy (fleabane) | *Erigeron kachinensis* |
| Montrose (Uncompahgre) bladderpod | *Lesquerella vicina* |
| Colorado (adobe) desert parsley | *Lomatium concinnum* |
| Paradox Valley lupine | *Lupinus crassus* |
| Dolores skeleton plant | *Lygodesmia doloresensis* |
| Eastwood monkey-flower | *Mimulus eastwoodiae* |
| Paradox (aromatic Indian) breadroot | *Pediomelum aromaticum* |

Source: BLM 2009c

*Naturita Milkvetch (*Astragalus naturitensis*).* Habitat for the Naturita milkvetch includes the cracks and ledges of sandstone cliffs and flat bedrock areas with shallow soil development within pinyon-juniper woodlands at elevations of 5,000 to 7,000 feet. This species is found on mesas adjacent to the Dolores River and its tributaries in Montrose and San Miguel Counties, including portions of the BLM Dolores Field Office. Recent surveys have found additional populations in region, including a population in the Dominguez-Escalante NCA area in the Grand Junction Field Office, and the species appears to be more abundant than originally thought.

*San Rafael Milkvetch (*Astragalus rafaelensis*).* San Rafael Milkvetch habitat includes sandy clay gulches at the foot of sandstone outcrops, boulders along dry watercourses, and gullied hills and washes in seleniferous soils at 4,500 to 5,300 feet in elevation. The species is found in the Dolores River canyon, on side slopes, and tributary drainages near Uravan, Nucla, and Roc Creek.

*Sandstone Milkvetch (*Astragalus sesquiflorus*).* Habitat for this milkvetch includes sandstone rock ledges, slickrock fissures, cliff talus, and sometimes, sandy washes at 5,000 to 5,500 feet in elevation. This species is found in the Dolores River canyon near Uravan and in the Paradox Valley area.

*Gypsum Valley Cateye (*Cryptantha gypsophila*).* This cateye species is confined to scattered gypsum outcrops and grayish-white, often lichen-covered, soils of the Paradox Member of the Hermosa Formation at elevations from 5,200 to 6,500 feet. It is often the dominant plant at these sites. Although suitable habitats are present, particularly in the Paradox Valley region, no populations have been found in the planning area. Several known populations exist in neighboring BLM field offices.

BLM_0114855

*Fragile (slender) Rockbrake (*Cryptogramma stelleri*).* Habitat for the fragile rockbrake includes cool, moist, sheltered calcareous cliff crevices and rock ledges, typically in coniferous forest or other boreal habitats. Known populations exist within the planning area but are restricted to higher elevation lands administered by the Forest Service.

*Kachina Daisy (*Erigeron kachinensis*).* This species of daisy is found in wet, seasonally flooded sites and in the shallow caves or hanging gardens of red sandstone cliffs at 4,800 to 8,400 feet in elevation. One population exists within the planning area in Coyote Wash near the Dolores River. Populations are also found along the Dolores River south and north of the UFO in the Grand Junction and Dolores Field Offices. Suitable habitat is present in the Dolores River vicinity and other similar areas in the UFO, and future surveys will likely discover additional populations.

*Montrose Bladderpod (*Lesquerella vicina*).* This bladderpod species inhabits sandy-gravel soil comprised mostly of sandstone fragments over Mancos shale adobe soils, primarily in pinyon-juniper woodlands or pinyon-juniper and salt desert scrub mixed communities at 5,800 to 7,500 feet in elevation. The species is found less often in sandy soils in sagebrush steppe communities. Distribution centers on the Uncompahgre River Valley in south Montrose County and north Ouray County, with most populations near the town of Montrose. However, outlying subpopulations persist near Escalante Canyon just south of the Delta County line, and north to the Peach Valley area in the Gunnison Gorge NCA in Montrose County.

*Colorado Desert Parsley (*Lomatium concinnum*).* This species of parsley prefers barren adobe soils derived from Mancos Shale in shrub-dominated communities, including sagebrush, shadscale, or scrub oak at 4,300 to 7,300 feet in elevation. The species is found along the lower Uncompahgre and Gunnison River valleys in Montrose, Delta, and Ouray Counties.

*Paradox Valley Lupine (*Lupinus crassus*).* Paradox Valley lupine is typically found in or near pinyon-juniper or juniper woodland at 5,000 to 5,800 feet in elevation, on shales, quaternary alluvium, and other sparsely vegetated soils. The species is often found in drainages in the Paradox Valley near Nucla and Naturita.

*Dolores Skeleton Plant (*Lygodesmia doloresensis*).* Habitat for the Dolores skeleton plant includes juniper-shrub or juniper-grassland communities in reddish-purple alluvial soils derived from sandstone outcrops at 4,000 to 5,500 feet in elevation. Most of these plants are found along benches between canyon walls and the river in juniper, shadscale, or sagebrush communities. Distribution includes the Dolores River Valley near Gateway, Colorado, in the Grand Junction Field Office, and Grand County, Utah. Although not confirmed, this species potentially inhabits the Dolores River corridor within the planning area.

*Eastwood Monkey-flower (*Mimulus eastwoodiae*).* The Eastwood monkey-flower is found exclusively in hanging gardens in the shallow alcoves or horizontal cracks of sandstone canyon walls at 4,700 to 5,800 feet in elevation. Several subpopulations inhabit a series of seep alcoves along Escalante Canyon in Delta County (Dominguez-Escalante NCA). Several other locations are found just outside the UFO along the Dolores River.

BLM_0114856

*Paradox Breadroot (*Pediomelum aromaticum*).* This breadroot species prefers open pinyon-juniper, sagebrush, and shadscale communities in sandy or clay soils on adobe hills or in dry washes at 4,800 to 5,700 feet in elevation. This plant is often found alongside the Paradox Valley lupine (see description above.) The distribution of this breadroot is concentrated in the Paradox Valley of western Montrose County, although additional occurrences have been found along the Dolores River and its tributaries.

In general, threats to all BLM sensitive plants include water development, livestock grazing, weeds, OHVs, mining, oil and gas, and climate change. To date, permitted actions that affect special status plants are routinely moved, modified, or mitigated to reduce impacts to individuals or populations.

*Special Status Fish and Wildlife*

<u>Federally Listed Species</u>. Ten federally protected animal species potentially exist in the planning area, as shown in **Table 3-23** (Federally Listed Fish and Wildlife Species). Federally designated critical habitat for two of these species also exists in the planning area. Some species are not known to exist in the planning area yet are included in this analysis and all other project planning efforts due to historic populations in the area, adjacent known populations, a presence of suitable habitat, insufficient survey coverage, potential expansions or shifts in species ranges, and other factors. In accordance with BLM Manual 6840, Special Status Species Management, federal candidate species are managed as BLM sensitive species in order to prevent the need for future listing of species. Candidate species are discussed in the following section, BLM Sensitive Species.

Colorado River endangered fishes include the following four species, all of which inhabit the larger rivers of the Colorado River Watershed in lower-elevation warm water reaches. The Gunnison, Uncompahgre, Dolores, and San Miguel Rivers all flow through the planning area into the Upper Colorado River system, which supports populations of these species. Critical habitat was designated in 1994 for all four species (USFWS 1994), and recovery plans for each species were amended in 2002 with the addition of recovery goals for each species (USFWS 2002).

*Colorado Pikeminnow (*Ptychocheilus lucius*).* In the planning area, critical habitat includes the Gunnison River and its 100-year floodplain from the mouth of the Uncompahgre River near Delta north to the planning area boundary. In the planning area, the Colorado pikeminnow are found in the Gunnison River below the Uncompahgre River, and the lower reaches of the Uncompahgre River (USFWS 2002). Recent data also suggests this species may exist in portions of the Dolores River (BLM 2010p).

*Razorback Sucker (*Xyrauchen texanus*).* In the planning area, critical habitat includes the Gunnison River and its 100-year floodplain from the mouth of the Uncompahgre River near Delta north to the planning area boundary. Historically, razorback suckers inhabited as far upstream as the Gunnison and Uncompahgre River confluence. Today only small populations are found in the Colorado River and in the Gunnison River below the planning area.

*Bonytail Chub (*Gila elegans*).* Critical habitat includes parts of the Colorado River downstream of the planning area. Bonytails historically were found in the Gunnison River up to about Delta, Colorado. Presently, no known populations exist in Colorado (USFWS 2002).

BLM_0114857

**Table 3-23**
**Federally Listed Fish and Wildlife Species**

| Species | Federal Status | Designated Critical Habitat in Planning Area |
|---|---|---|
| Bonytail chub *Gila elegans* | Endangered | No |
| Humpback chub *Gila cypha* | Endangered | No |
| Razorback sucker *Xyrauchen texanus* | Endangered | Yes |
| Colorado pikeminnow *Ptychocheilus lucius* | Endangered | Yes |
| Greenback cutthroat trout *Oncorhynchus clarki stomias* | Threatened | No |
| Gunnison sage-grouse *Centrocercus minimus* | Proposed (endangered) | No[1] |
| Black-footed ferret *Mustela nigripes* | Endangered | No |
| Canada lynx *Lynx canadensis* | Threatened | No |
| Mexican spotted owl *Strix occidentalis* | Threatened | No |
| Southwestern willow flycatcher *Empidonax traillii extimus* | Endangered | No |
| Uncompahgre fritillary butterfly *Boloria acrocnema* | Endangered | No |

Source: USFWS 2010, 78 *Federal Register* 2486-2538, January 11, 2013
[1] Critical habitat for the Gunnison sage-grouse has been proposed by the USFWS. The proposal includes habitat in the planning area (78 *Federal Register* 2540-2570, January 11, 2013).

*Humpback Chub (*Gila cypha*).* Critical habitat includes parts of the Colorado River downstream of the planning area. The historic range of the humpback chub is similar to that of the Colorado pikeminnow. While this species may still exist in the lower Gunnison River near the mouth, most are found in the Colorado River downstream of Grand Junction. This species likely does not exist in the planning area.

*Greenback Cutthroat Trout (*Oncorhynchus clarki stomias*).* A recovery plan for this subspecies was completed in 1998 (USFWS 1998). No critical habitat has been designated. Habitat for the greenback includes cold-water streams and lakes with adequate spawning habitat in gravelly riffles, often with shading cover. Young typically shelter in shallow backwaters. Greenbacks are closely related to the Colorado River cutthroat trout, a BLM sensitive species found in similar habitats in the region, and the two subspecies are difficult or impossible to distinguish from appearance alone. Greenbacks were originally native to the Arkansas and South Platte River systems in Colorado and Wyoming, east of the continental divide. Recent genetic studies have indicated that some native cutthroat populations in western Colorado are best characterized genetically as greenback cutthroat trout, possibly due to human transport of fish across the continental divide. Known greenback populations in the planning area are restricted to a few relatively short stream segments in Delta County, south of Grand Mesa. Ongoing studies may

BLM_0114858

further resolve the current uncertainty over taxonomy and distribution of greenback cutthroat trout on the western slope.

*Black-footed Ferret (*Mustela nigripes)*.* A recovery plan has been completed (USFWS 1988b) and no critical habitat has been designated. Black-footed ferrets are found exclusively in association with prairie dogs and require colonies greater than 200 acres with a density of greater than eight burrows per acre (USFWS 1988b). Black-footed ferrets are carnivores, preying almost entirely on prairie dogs and living within their burrow systems. Historically black-footed ferrets occupied the Gunnison and Uncompahgre River valleys, but the species has been extirpated from this area of Colorado for more than 30 years. Gunnison and white-tailed prairie dogs exist in the planning area, but no colonies are large and dense enough to support black-footed ferrets.

*Canada Lynx (*Lynx canadensis)*.* A recovery plan was completed (USFWS 2005) and critical habitat has been designated and revised (USFWS 2009c), with no critical habitat in Colorado. Lynx historically existed in Colorado but were extirpated by the 1970s. CPW began a reintroduction program in 1999, and lynx are now established in the San Juan Mountains of southwestern Colorado and are found at least occasionally in other mountainous areas of the state. Lynx in Colorado use primary habitat of spruce-fir forest and secondary habitat of aspen and drier conifer forest types (Ruediger et al. 2000). Lynx sometimes move large distances, and maintenance of movement corridors between habitat areas is an important conservation concern. Primary habitat for lynx is very limited in the planning area. Lynx may occasionally be present in the higher elevations of the planning area.

*Gunnison Sage-grouse (*Centrocercus minimus)*:* The Gunnison sage-grouse is found in sagebrush communities, adjacent riparian meadows, and mixed mountain shrub communities with a diversity of understory grasses and forbs. Sagebrush provides essential cover throughout the year and winter food. Three Gunnison sage-grouse populations inhabit the planning area: Crawford (west of Crawford, Colorado), Cerro Summit-Cimarron-Sims Mesa (east and south of Montrose, Colorado), and San Miguel (mainly near Miramonte Reservoir, Colorado, mostly in the Dolores Field Office planning area). The species is proposed for listing under the ESA. The UFO has conducted several habitat improvement projects to benefit Gunnison sage-grouse, primarily in the Crawford Area, in the Gunnison Gorge NCA (outside but adjacent to the planning area), and is active in collaborative working groups and other cooperative efforts to conserve this species and its habitats.

*Mexican Spotted Owl (*Strix occidentalis)*:* Although widely variable by region and population, typical habitat for this species includes deep canyons with dense old growth conifers with high canopy cover and stand density. Mexican spotted owls are not known to exist within the planning area, although small isolated areas of suitable habitat may be present in the west and north portions of the planning area. Numerous spotted owl surveys over the past 20 years have been conducted in the major drainages of the Dolores and San Miguel watersheds and the Uncompahgre Plateau, all with negative results. The nearest known populations are to the west around Moab, Utah, to the south near Mesa Verde National Park, and to the east around Canon City, Colorado. USFWS considers all suitable terrain in western Colorado to be potential habitat for Mexican spotted owls.

BLM_0114859

*Southwestern Willow Flycatcher (*Empidonax traillii extimus*):* Breeding habitats include riparian tree and shrub communities along rivers, wetlands, and lakes. In Colorado, historic and current breeding range includes the extreme southwest portion of the state. Although suitable habitat is found in the region, the planning area is outside the current known range for the southwestern willow flycatcher.

*Uncompahgre Fritillary Butterfly (*Boloria acrocnema*).* The Uncompahgre fritillary butterfly is found in the San Juan Mountains above 12,000 feet elevation on moist alpine slopes with extensive stands of snow willow, a very short mat-forming willow species. In the planning area, habitat is very limited and no known populations of the butterfly exist. The known colonies in the San Juan Mountains are on lands managed by the Forest Service and the BLM Gunnison Field Office. The greatest known controllable threat is collecting by butterfly enthusiasts. Climatological patterns, disease, parasitism, predation, and trampling of larvae by humans and livestock are other possible threats.

<u>BLM Sensitive Species</u>. Sensitive species known to inhabit and potentially inhabiting the planning area are listed in **Table 3-24** (Sensitive Animal Species Known to Inhabit and Potentially Inhabiting the Planning Area).

*Roundtail Chub (*Gila robusta*):* Roundtail chub habitats include warm to cool waters with rocky runs and rapids, and pools in creeks, streams, and rivers. Roundtail chubs also inhabit some reservoirs. Important habitat features include cobble-rubble, sand-cobble, or sand-gravel substrate. The chub exists in warm-water watersheds at lower elevations across the UFO, including the Lower Gunnison River downstream of the North Fork, Dolores River, and San Miguel River.

*Bluehead Sucker (*Catostomus discobolus*):* While blueheads typically inhabit cool rivers and mountain streams, they are occasionally found in lakes and warm, turbid streams. Most occupied sites have moderate to fast flowing water above rubble-rock substrate. In the UFO, the species are found in the lower Dolores River, lower San Miguel River, and lower Gunnison River watersheds.

*Flannelmouth Sucker (*Catostomas latipinnis*):* Habitats for the flannelmouth sucker include rivers and creeks free of major impoundments and barriers. In the planning area, the species is known to exist in the lower Dolores, lower Gunnison, and lower San Miguel river watersheds.

*Colorado River Cutthroat Trout (*Oncorhynchus clarki pleuriticus*):* This is the native trout of western Colorado. It requires cool, clear water and well-vegetated streambanks for cover and bank stability, as well as instream features including deep pools, boulders, and logs. Populations are found in higher-elevation streams and lakes. The planning area has a number of more or less isolated populations in mid- to high-elevation stretches and major tributaries of the Gunnison, North Fork of the Gunnison, Uncompahgre, San Miguel, and Dolores rivers.

*Desert Bighorn Sheep (*Ovis canadensis nelsoni*):* Important habitat requirements for the desert bighorn include escape terrain and areas with high visibility, with good forage sources and reliable water sources nearby. Terrain is typically rough, rocky, and broken by canyons and

BLM_0114860

**Table 3-24**
**Sensitive Animal Species Known to Inhabit and Potentially Inhabiting the Planning Area**

| Common Name | Scientific Name |
| --- | --- |
| **FISH** | |
| Roundtail chub | *Gila robusta* |
| Bluehead sucker | *Catostomus discobolus* |
| Flannelmouth sucker | *Catostamus latipinnis* |
| Colorado River cutthroat trout | *Oncorhynchus clarki pleuriticus* |
| **MAMMALS** | |
| Desert bighorn sheep | *Ovis canadensis nelsoni* |
| Gunnison's prairie dog | *Cynomys gunnisoni* |
| White-tailed prairie dog | *Cynomys leucurus* |
| Kit fox | *Vulpes macrotis* |
| Allen's (Mexican) big-eared bat | *Idionycteris phyllotis* |
| Big free-tailed bat | *Nyctinomops macrotis* |
| Spotted bat | *Euderma maculatum* |
| Townsend's big-eared bat | *Corynorhinus townsendii* |
| Fringed myotis | *Myotis thysanodes* |
| **BIRDS** | |
| Bald eagle | *Haliaeetus leucocephalus* |
| American peregrine falcon | *Falco peregrinus anatum* |
| Western yellow-billed cuckoo | *Coccyzus americanus* |
| Northern goshawk | *Accipter gentilis* |
| Ferruginous hawk | *Buteo regalis* |
| Burrowing owl | *Athene cunicularia* |
| Columbian sharp-tailed grouse | *Tympanuchus phasianellus columbianus* |
| Long-billed curlew | *Numenius americanus* |
| White-faced ibis | *Plegadis chihi* |
| American white pelican | *Pelecanus erythrorhynchos* |
| Brewer's sparrow | *Spizella breweri* |
| Black swift | *Cypseloides niger* |
| **REPTILES and AMPHIBIANS** | |
| Longnose leopard lizard | *Gambelia wislizenii* |
| Midget faded rattlesnake | *Crotalus viridis concolor* |
| Milk snake | *Lampropeltis triangulum taylori* |
| Northern leopard frog | *Rana pipiens* |
| Canyon treefrog | *Hyla arenicolor* |
| Boreal toad | *Anaxyrus boreas boreas* |
| **INVERTEBRATES** | |
| Great Basin silverspot butterfly | *Speyeria nokomis Nokomis* |

Source: BLM 2009c

washes, with steep slopes used for lambing and predator avoidance and cliff overhangs for shade in hot weather. Desert bighorn utilize grass and shrub communities, generally avoiding areas of dense vegetation and poor visibility. Water availability can influence distribution patterns for some herds. In the UFO, desert bighorn sheep are found along the Lower Dolores River corridor and in the area around Roubideau Creek-Camel Back Wilderness Study Area (WSA), including portions of the Dominguez-Escalante NCA. The Dominguez-Escalante-Roubideau herd is currently the largest in the state of Colorado. Both populations in the UFO are the result of reintroductions by CPW in the 1980s, and the populations are closely managed.

*Gunnison's Prairie Dog (*Cynomys gunnisoni*):* Gunnison's prairie dog habitats include level to gently sloping grasslands and semi-desert and montane shrublands at elevations from 6,000 to 12,000 feet. Although historically present in the Uncompahgre River Valley and surrounding areas, this species now exists primarily in the south and west portions of the planning area (Seglund et al. 2005). A 12-month finding by USFWS on a petition to list the Gunnison's prairie dog under the ESA determined that the "montane population segment, in south-central Colorado and north-central New Mexico, has experienced significant declines and is warranted for listing, but precluded by higher priority actions." The primary threat is sylvatic plague, which appears to be more prevalent at montane elevations. Other threats are habitat loss and direct take, which can include recreational shooting. While Gunnison's prairie dogs are found in the planning area, there are no known populations on BLM-administered lands that meet the USFWS definition of the "montane" population segment. However, one small colony inhabits private lands within the montane range near Ridgway, Colorado. CPW is conducting genetic studies to examine the differences, if any, between prairie and montane subpopulations.

*White-tailed Prairie Dog (*Cynomys leucurus*):* Habitats include level to gently sloping grasslands and semi-desert grasslands typically from 5,000 to 10,000 feet elevation. Within the planning area, colonies are concentrated along the lower valleys of the Uncompahgre, Gunnison, and North Fork of the Gunnison Rivers and adjacent lowlands. White-tailed prairie dog range partially overlaps with Gunnison's prairie dog in the upper Uncompahgre River valley in Ouray County. Generally, most colonies east of the Uncompahgre Plateau are white-tailed, while colonies west of the plateau are Gunnison's prairie dogs (Seglund et al. 2005). Genetic testing is underway to determine whether there is evidence of hybridization between these two species. Threats include plague, habitat loss, and direct take, which can include recreational shooting.

*Kit Fox (*Vulpes macrotis*):* Kit foxes occupy sparsely vegetated semi-desert shrublands, primarily dominated by saltbush, shadscale, and greasewood. Kit foxes spend most daylight hours in dens, important for raising young and avoiding predators such as coyotes, and hunt small mammals and other small prey at night. Probably never abundant in western Colorado in recent times, by the 1990s the species was known from only a few scattered locations in adobe hills around Montrose, Delta, and Grand Junction (Fitzgerald 1996) and recent intensive surveys suggest that kit fox are now extirpated, or nearly so, from Colorado (Reed-Eckert 2009). Kit fox are listed as endangered in Colorado by CPW but remain relatively common in suitable habitat of adjacent eastern Utah.

*Allen's (Mexican) Big-eared Bat (*Idionycteris phyllotis*):* Habitats for Allen's big-eared bat include mountainous, wooded areas dominated by ponderosa pine, pinyon-juniper, and oak brush,

BLM_0114862

riparian woodlands, and low-elevation deserts. This bat is typically found near rock and cliff features, and is frequently observed along streams or over ponds. The species was first recorded (acoustically) in Colorado in western Montrose County in the planning area (Hayes et al. 2009). The species has not yet been confirmed through capture techniques. Suitable habitat for this species exists across the planning area, and the species may be more widespread than currently documented.

*Big Free-tailed Bat (*Nyctinomops macrotis*):* Habitats for the big free-tailed bat include rocky areas in rugged country, shrubland deserts, and woodlands. The species roosts in cliff and cave crevices, and occasionally in tree cavities. Big free-tailed bats have been documented along the Dolores River in Montrose County, and 2008 surveys in Paradox Valley suggested the presence of big free-tailed bats based on recorded echolocation calls (Hayes 2008). The species may exist across the planning area wherever suitable habitat is present.

*Townsend's Big-eared Bat (*Corynorhinus townsendii*):* Townsend's big-eared bats commonly utilize mesic habitats characterized by coniferous and deciduous forests but occupy a broad range of other habitats, including sagebrush steppes, juniper woodlands, and mountain shrub communities. Maternity and hibernation typically occur in caves and mine shafts. Maternity roosts for Townsend's big-eared bats were documented at Hieroglyphic Canyon west of Uravan and at Joe Davis Hill Project along the Dolores River. Roosting sites are found in several mines in the Dolores and San Miguel Canyons. Surveys in the Paradox Valley recorded echolocation call sequences consistent with that of Townsend's big-eared bats. The species is likely to be found across the planning area wherever suitable habitat is present.

*Spotted Bat (*Euderma maculatum*):* Spotted bats inhabit desert to montane coniferous stands, including open ponderosa pine, pinyon-juniper woodland, and canyon bottoms, open pastures, and hayfields. Although roosting behavior is poorly known, spotted bats appear to roost singly in crevices of rocky cliffs near surface water. The species, including lactating females, are known to forage long distances (20 to 30 miles) from roost sites (Rabe et al. 1998; Siders et. al 1999). Spotted bats were recently documented through call identification in the Gunnison Gorge and Black Canyon of the Gunnison National Park (Hayes 2009). This bat is expected to exist in other major canyon systems in western Montrose County.

*Fringed Myotis (*Myotis thysanodes*):* Habitats for the fringed myotis include desert, grasslands, and woodlands. Common vegetation associations may include ponderosa pine, pinyon-juniper, greasewood, saltbush, and scrub oak. Roost sites include caves, mines, rock crevices, buildings, and other protected sites. The species has been documented in inactive mines in Montrose and San Miguel Counties (Navo et al. 2003; Navo et al. 2005) and identified by echolocation call surveys in Paradox Valley (Hayes 2008). Suitable habitat is found throughout the planning area.

*Bald Eagle (*Haliaeetus leucocephalus*):* Bald eagles concentrate near rivers, lakes, and adjacent uplands. In the planning area, most birds are observed along the Uncompahgre, San Miguel, and Gunnison Rivers. Nesting is rare in the planning area, with just one active nest known in 2010 near Delta. Bald eagles are common in the lower valleys and western mesas in winter. CPW has identified winter forage, winter concentration, and roosts in the planning area. The bald eagle was removed from ESA federal listing in July 2007. Management of eagles and their habitat is

BLM_0114863

guided by the delisting monitoring plan for five years, and the species is protected by the Bald and Golden Eagle Protection Act and Migratory Bird Treaty Act.

*Peregrine Falcon (*Falco peregrinus anatum): Peregrine falcons occupy open, rugged terrain, typically on cliffs or similar features near water. Nests are often on cliff faces and rarely in trees. Peregrines and their habitat are found throughout the planning area, with the greatest concentration along the Dolores River. Peregrine falcons were removed from ESA federal listing in 1999, and are currently managed under the delisting monitoring plan.

*Western Yellow-billed Cuckoo (*Coccyzus americanus): Habitats for the cuckoo include extensive cottonwood galleries and riparian willow thickets with dense undergrowth. Suitable habitat is found across the planning area, primarily at lower elevations. This species had not been reported in the region since the late 1980s until surveys in 2008 and 2009 documented nesting pairs on private land near the North Fork of the Gunnison River in Delta County. Summer observations of the species have been recently reported near the San Miguel River and south of Montrose, Colorado, but no breeding has been documented in those areas.

*Northern Goshawk (*Accipiter gentilis): In the western US, goshawk habitats include coniferous forest and mature aspen woodlands, often on north-facing slopes. Northern goshawks typically nest in large blocks of forested habitats above 7,000 feet elevation. Nesting has been confirmed on adjoining National Forest System lands and is possible on higher elevation BLM-administered lands in the planning area.

*Ferruginous Hawk (*Buteo regalis): Habitats for the ferruginous hawk include open landscapes in grassland, shrubland, and juniper-pinyon woodland types. This species is often observed near prairie dog colonies and other rodent populations, in proximity to their primary prey. The species apparently is only found as an uncommon winter resident and migrant in the planning area. However, suitable nesting habitat is common, particularly along the lower Uncompahgre and Gunnison River Valleys.

*Burrowing Owl (*Athene cunicularia): Burrowing owls are primarily found in grasslands and mountain parks, usually in or near prairie dog towns. The burrowing owl also uses well-drained steppes, deserts, prairies, and agricultural lands. Burrowing owls require rodent burrows, typically prairie dog, for shelter and nesting. Abandoned prairie dog colonies eventually become unsuitable for burrowing owls due to burrow collapse. Although very uncommon in the planning area, the species has been observed during breeding season in Delta County between 2007 and 2009 and in western Montrose County in 2005.

*Columbian Sharp-tailed Grouse (*Tympanuchus phasianellus columbianus): Sharp-tailed grouse prefer deciduous shrub or woodland communities with native grasses and perennial forbs. In Colorado, serviceberry provides critical winter food and cover. Grasses and forbs provide nesting cover and brood-rearing habitat. Other habitat types include sagebrush, Gambel oak, and aspen. Columbian sharp-tailed grouse historically occupied parts of the planning area, especially the Uncompahgre Plateau; the species has not been reported in the area since the 1990s and is presumed extirpated.

BLM_0114864

*Long-billed Curlew (*Numenius americanus*):* Curlew habitats include lakes, ponds, wetlands, and adjacent grassland and shrub communities. This species has been documented as a migrant, but is not known to nest in the planning area.

*White-faced Ibis (*Plegadis chihi*):* The white-faced ibis inhabits shallow ponds and lake margins, irrigated hayfields, and wet meadows. The species is a fairly common spring and fall migrant in the planning area, primarily along the lower Uncompahgre and Gunnison river valleys. Breeding is rare in western Colorado, but possible in the planning area.

*American White Pelican (*Pelecanus erythrorhynchos*):* Habitats for the pelican include rivers, lakes, reservoirs, estuaries, bays, and open marshes, as well as inshore marine habitats. Pelicans typically rest, roost, and locate their nests on islands or peninsulas (natural or dredge spoils) in brackish or freshwater lakes, or on ephemeral islands in shallower wetlands. White pelicans are uncommon spring and fall migrants in the planning area, and sometimes rest on larger surface waters such as rivers and reservoirs. In some years a few have remained during summer at Fruitgrower's Reservoir in Delta County and other locations, but there are no breeding records for the planning area.

*Brewer's Sparrow (*Spizella breweri*):* Brewer's sparrow primarily breeds in sagebrush communities, and occasionally in other shrublands such as mountain mahogany and rabbitbrush. Migrants are found in wooded, brushy, and weedy riparian, agricultural, and urban areas. The species occasionally utilizes pinyon-juniper woodlands for habitat. Brewer's sparrows are summer breeding residents in suitable habitats throughout the planning area.

*Black Swift (*Cypseloides niger*):* Black swifts nest in small colonies, in Colorado exclusively near or behind waterfalls along mountain streams. All known nesting colonies in the vicinity of the planning area are at least 8,000 feet in elevation, typically over 9,000 feet. Known colonies near the planning area are in the vicinity of Ouray and Telluride, Colorado, Black Canyon of the Gunnison National Park, West Elk Wilderness, and Raggeds Wilderness. Black swifts forage widely and are likely to forage over BLM-administered lands. The species has been observed in the Dominguez-Escalante NCA planning area, although breeding has not been confirmed.

*Longnose Leopard Lizard (*Gambelia wislizenii*):* Habitats for this lizard include lowland desert and semidesert areas with scattered shrubs or other low plants, such as sagebrush, especially in areas with abundant rodent burrows. No populations have been documented in the planning area, and the nearest known populations are in western Montezuma and Mesa Counties. However, the distribution in Colorado is not well known, and the species could exist in lower elevations in the western part of the planning area.

*Midget Faded Rattlesnake (*Crotalus viridis concolor*):* The distribution of this snake appears to be limited by the availability of rocky outcrops, which support many of their survival needs, including cover and winter hibernation sites. In the planning area, the midget faded rattlesnake has been documented along the lower Gunnison, Dolores, and San Miguel rivers and tributaries.

*Milk Snake (*Lampropeltis triangulum taylori*):* Habitats for the milk snake vary from desert scrub to grassland to scrub oak to pinyon-juniper, at elevations from 4,000 to 7,500 feet. Throughout most of their range, milk snakes are most often found in gravelly or sandy soils, and they

BLM_0114865

typically do not inhabit areas with thick clay or hardpan. Known populations in the planning area
include areas along the Uncompahgre and Gunnison river valleys. The species is also likely to be
found in western portions of the planning area.

*Northern Leopard Frog (*Rana pipiens*):* The northern leopard frog inhabits springs, slow streams,
marshes, bogs, ponds, canals, flood plains, reservoirs, and lakes. Sites usually contain perennial
water and aquatic vegetation. In the summer, the species sometimes inhabits wet meadows and
fields. Within the planning area, the species has been reported along the San Miguel,
Uncompahgre, and Dolores rivers, as well as the major tributaries.

*Canyon Treefrog (*Hyla arenicolor*):* The canyon treefrog requires temporary or permanent pools
along streams for breeding, typically in rocky canyons. Because the species is primarily
terrestrial, it is also found in arroyos and streambeds in pinyon-juniper communities. Several
populations are known in the planning area, primarily in the lower San Miguel and Dolores river
watersheds.

*Boreal Toad (*Anaxyrus boreas boreas*):* The boreal toad is a state endangered species not known
to exist in the planning area. However, the species has been documented in Ouray County,
south of the planning area. Limited habitat may be present at higher elevation BLM-administered
lands (above 7,500 feet) within the planning area, near lakes, ponds, meadows, and wetlands.
Formerly widespread and common, boreal toads are now rare except in localized areas.

*Great Basin Silverspot Butterfly (*Speyeria nokomis nokomis*):* The Great Basin silverspot butterfly is
found in arid, streamside meadows and open seepage areas, typically with an abundance of the
northern bog violet (*Viola nephrophylla*), upon which this species depends. The colonies of the
silverspot are often isolated. There are historic records of this species in Paradox Valley,
although the exact location is uncertain and habitats do not appear suitable in that area. There
are no current populations known in the planning area, with the closest known population in
Unaweep Canyon in the Grand Junction Field Office.

**Trends**

*Special Status Plants*
Reasons for plant species to be proposed for listing or listed by USFWS, or designated as a BLM
sensitive species, may include known or suspected downward population trends, relative
rareness in all or a portion of its range, or threats that without such designations may not be
effectively mitigated. The CNHP and Colorado Natural Areas Program, in conjunction with the
BLM, track populations of rare plants through Element Occurrence Records. An Element
Occurrence Record is a record of an individual plant or plant population present at a specific
geographic location at a specific time. However, Element Occurrence Records are not
consistently revisited, so using them to predict population trends has limitations. The UFO
coordinates with CNHP or Colorado Natural Areas Program to periodically check element
occurrences for BLM sensitive species, and requires surveys in suspected or suitable habitat for
proposed projects to aid in expanding the distribution, abundance, and population condition.
Based on the spot checks of historic Element Occurrence Records and results of surveys
conducted for projects, the trend for BLM sensitive species within the UFO appear to be stable

BLM_0114866

based on no documented loss of a specific occurrence and the addition of new occurrences through survey.

A monitoring program is in place for the clay-loving wild buckwheat with three long-term trend plots established in the Gunnison Gorge NCA outside the planning area and two long-term trend plots established at South Fairview within the planning area; all plots are on BLM-administered lands. The plots at South Fairview were established in 2008 and are designed to monitor grazing on the species. The plots in the Gunnison Gorge NCA were established in 2012 to monitor similar impacts. Based on the data to date, trends in clay-loving wild buckwheat appear to be stable, with climactic variability largely driving population density.

A Colorado hookless cactus monitoring program, which is a collaborative effort between the Denver Botanic Gardens and the BLM, is also in place. Within and adjacent to the planning area there are a total of seven long-term monitoring plots designed to determine population trends and monitor impacts from BLM-permitted actions. Six of the seven sites show stable to slightly upward trends in population density with very minimal to no impacts documented from BLM-permitted actions. The one site with documented declines is just north of the town of Delta, Colorado, which was considerably drier than the surrounding areas of the planning area during the significant drought in 2012. Declines at this site have been attributed to the drought with documented mortality caused by rodent herbivory, cactus borers, and drought-induced mortality.

It has been the UFO's policy since inception of the Public Land Health Standards (BLM 1997) to manage for healthy rangelands; thus, if the rangelands including special status species habitat were deemed to meet Public Land Health Standards, then it has been assumed that all indicators for standard 4, special status species, were also being met unless otherwise specifically addressed, which would include all three indicators.

*Special Status Fish and Wildlife*
By definition, the populations, and often habitats, of all special status wildlife species have historically suffered downward trends. However, due to protection and recovery efforts, some populations, such as peregrine falcon and bald eagle, are stabilizing. Management efforts by USFWS, CPW, BLM, and others have reversed the downward trend for a number of these populations. Nevertheless, none of the populations are thought to be near their historic levels, and most remain biologically insecure, regardless of their legal status.

Current and future threats include habitat loss and fragmentation, poaching, predation, disease, invasive species, and others. Habitat degradation and loss are caused by, or exacerbated by, historic overgrazing, oil and gas development, mining, water diversions, recreation, agriculture, residential development, and other human activities. Natural processes such as fire, drought, vegetation type conversions, and climate change may also contribute to landscape changes over time. It is not known which species will be able to adapt to these changes and persist. Pinyon-juniper, riparian, sagebrush, and salt-desert shrub, which provide habitat for many special status and rare species, have been determined to be at-risk.

BLM_0114867

### 3.1.8   Wild Horses

The BLM protects, manages, and controls wild horses and burros under the authority of the Wild Free-Roaming Horses and Burros Act of 1971 (as amended) to ensure that healthy herds thrive on healthy rangelands. The BLM manages these living symbols of the Western spirit as part of its multiple-use mission under the Federal Land Policy and Management Act (FLPMA) of 1976.

#### Current Conditions

There is one herd management area located in the Naturita Ridge area, south of the town of Naturita (**Figure 3-12**, Naturita Ridge Herd Area). Through analysis and decision of the 1985 San Juan/San Miguel RMP, all wild horses in this area were removed. The Herd Area has not had wild horses since 1985.

#### Trends

Following the passage of the Wild Horse and Burro Act of 1971, it was estimated that the Naturita Ridge wild horse herd roamed an area of 63,000 acres. Nearly 10,000 acres of their estimated range at that time was private and state land. The analysis for the 1985 San Juan/San Miguel RMP and EIS estimated the roaming area for the herd had diminished to 9,300 acres of public land and 330 acres of private land. In 1971, the population was estimated at eight wild horses.

Factors supporting the decision to close out the population on Naturita Ridge included the segmentation of the area by private land and pasture fences, lack of dependable water, conflicts with private land uses, elk herds, and livestock. In addition, the population was not large enough to sustain a viable genetic base.

### 3.1.9   Wildland Fire Ecology and Management

The Federal Wildland Fire Management Policy (FWFMP) was developed by the secretaries of the Departments of Interior and Agriculture in 1995 in response to dramatic increases in the frequency, size, and catastrophic nature of wildland fires in the US. The 2001 review and update of the 1995 FWFMP consists of findings, guiding principles, policy statements, and implementation actions, and replaces the 1995 FWFMP (DOI et al., 2001). Known as the 2001 FWFMP, this update directs federal agencies to achieve a balance between fire suppression to protect life, property, and resources, and fire use to regulate fuels and maintain healthy ecosystems. The FWFMP provides nine guiding principles fundamental to the success of the federal wildland fire management program and the implementation of review recommendations. These umbrella principles compel each agency to review its policies to ensure compatibility. The BLM's policies are reflected in the fire management planning process and this plan.

The FWFMP identifies the following guiding principles:

- Firefighter and public safety is the first priority in every fire management activity.

- The role of wildland fire as an essential ecological process and natural change agent will be incorporated into the planning process.

- Fire management plans (FMPs), programs, and activities support RMPs and their implementation.

BLM_0114868

- Sound risk management is a foundation for all fire management activities.

- FMPs and activities are economically viable, based on values to be protected, costs, and land and resource management objectives.

- FMPs and activities are based on the best available science.

- FMPs and activities incorporate public health and environmental quality considerations.

- Federal, state, tribal, local, interagency, and international coordination and cooperation are essential.

- Standardization of policies and procedures among federal agencies is an ongoing objective.

### The National Fire Plan

The Secretaries of Interior and Agriculture initiated a National Fire Plan in 2000 to address the principles outlined in the FWFMP. The National Fire Plan is a nationally coordinated effort to protect communities and natural resources from the harmful effects of increasing wildland fire occurrence and severity in the US. The National Fire Plan establishes the overarching purpose and goals, which are articulated and carried forward through the 10-Year Comprehensive Strategy (US Department of Agriculture and DOI 2002), the Cohesive Strategy for Protecting People and Sustaining Natural Resources (Forest Service 2000a), and other supporting documents.

### Unit Fire Management Plans

Under the FWFMP, every unit within a federal land management agency, such as a BLM field office, that has vegetation capable of sustaining wildland fire is required to prepare an FMP. The FMP is a strategic plan that outlines a program for managing wildland and prescriptive vegetation treatments. A Field Office's FMP is tiered to its RMP. The FMPs are dynamic documents that are reviewed annually and updated whenever better information is available. The plan is supplemented by operational plans, such as preparedness plans, dispatch plans, prescribed fire plans, and prevention plans. Development of this collaborative FMP is an essential implementation task and performance measure for accomplishing the goals of the National Fire Plan and the 10-Year Comprehensive Strategy. The FMP is the on-the-ground operational framework by which the Montrose Interagency Fire Management Unit implements national direction for wildland fire (wildfires and prescribed fires), fuels treatment, emergency stabilization and rehabilitation, and community assistance and protection programs.

### Fire Regime Condition Class

National and State BLM fire policy requires that current and desired resource conditions related to fire management be described in terms of three condition classes and five fire regimes. The Fire Regime Condition Classification System measures the extent to which vegetation departs from reference conditions, or how the current vegetation differs from a particular reference condition. Departures from reference condition could be a result of changes to key ecosystem components such as vegetation characteristics, fuel composition, fire frequency, fire severity, and pattern, as well as other associated disturbances, such as insects and disease mortality. The

BLM_0114869

classification system is used to categorize existing ecosystem conditions and to determine priority areas for treatment as mandated by national direction.

Fire Regime Condition Class 1. Fire regimes in this condition class are within historical ranges. Thus, the risk of losing key ecosystem components from the occurrence of fire remains relatively low. Maintenance management, such as prescribed fire, mechanical treatments, or preventing the invasion of non-native weeds, is required to prevent these lands from becoming degraded.

Fire Regime Condition Class 2. Fire regimes on these lands have been moderately altered from their historical range by either increased or decreased fire frequency. A moderate risk of losing key ecosystem components has been identified for these lands. To restore their historical fire regimes, these lands may require some level of restoration as through prescribed fire, mechanical or chemical treatments, and the subsequent reintroduction of native plants.

Fire Regime Condition Class 3. These lands have been significantly altered from their historical range. Because fire regimes have been extensively altered, risk of losing key ecosystem components from fire is high. Consequently, these lands are on the verge of the greatest risk of ecological collapse. To restore their historical fire regimes before prescribed fire can be utilized to manage fuel or obtain other desired benefits, these lands may require multiple mechanical or chemical restoration treatments, or reseeding.

Based on the analysis conducted by the BLM fire ecologist and fuels specialists, most of the vegetation types within the planning area were identified as belonging to Condition Class 2. The analysis completed in the San Miguel County Community Wildfire Protection Plan indicates that many of the pinyon-juniper forests in the study area fall into Condition Classes 2 and 3. This classification is supported by the volatile fire behavior that is seen in these stands. There is a high percentage of decadent wood in the trees that contribute to high intensity fires (San Miguel County 2009).

*Fire History*
Another indicator of possible changes to fire regimes, including changes in vegetation, is the number of large fires that have occurred in the past 15 years. Beginning in 1993, numerous large fires ignited on southern and southwestern aspects, primarily in pinyon-juniper vegetation, and moved upward into ponderosa pine. These fires ranged from hundreds of acres to 5,000 acres in size, with the largest burning over 31,000 acres. Although historically rare, this type of fire may have been part of the prehistoric fire regime. While there were no large fires within the planning area during 2006, 2007, or 2008, the 800-acre Grammar Fire occurred in 2009, and the Beaver Fire burned 3,000 acres in May 2010.

Lightning is a significant cause of historic fire starts. Additionally, campfires and human caused fires will continue to pose a threat as more development occurs in the surrounding private lands (San Miguel County 2009).

BLM_0114870

### Current Condition

*UFO Fire Management Plan*

The UFO FMP was originally written and approved in 1998, and has undergone three revisions in order to incorporate national policy changes, as well as minor changes gained through experience. The plan addresses wildland fire (natural and managed fires) to protect, maintain, and enhance resources consistent with management objectives because these events sometimes burn a large part of the planning area. In addition, the plan outlines constraints on fire management activities as needed to protect natural and cultural resources. Numerous management polygons were developed for the plan, with emphases on wildland urban interface, winter range for deer and elk, and sage-grouse habitat. In addition, polygons were designated for fire exclusion, as well as the use of fire as a natural process.

Vegetation mosaics were identified that best characterize a desired future condition in terms of a range of variability in seral stage (early, early mid, mid, and late) and patch size (in acres). Mosaics have been helpful in designing and planning mechanical fuels reduction treatments and, to some extent, prescribed burns, but have been of limited value for analyzing and managing wildland fire used to protect, maintain, and enhance resources consistent with management objectives events which sometimes burn larger and hotter than is ideal (such as deer winter range).

The FMP is a primary document supporting the development of vegetation treatment projects for fuels management, to enhance ecosystem processes, and for wildlife, range, or watershed enhancement. FMPs for Black Canyon of the Gunnison National Park, the Forest Service, and the BLM Gunnison Field Office are similar in direction to the UFO FMP, allowing for seamless management of fire and fuels across jurisdictional boundaries.

*Fire Management Units*

In the next few years, an effort will be made to integrate each local agency's FMP into a single Montrose Interagency Fire Management Unit FMP. The Montrose Interagency Fire Management Unit contains 17 smaller fire management units delineated by similar vegetation type and natural processes. The fire management units are designed to help describe fire history, fire ecology, and suppression needs and constraints on a landscape scale. The fire management units describe the vegetation and fuels situation, as well as some of the more significant land management issues within each area, making them extremely useful in managing wildland fire across the landscape, and as part of the Fire Planning Analysis budget process. These fire management units, as utilized in the UFO FMP, are not decision polygons but rather provide information to help make decisions regarding ignition specific fires and prescribed fire and fuels treatments. Thirteen of the 17 fire management units include lands managed by the UFO. The current UFO FMP (2008 revision) includes a description of these fire management units (BLM 2008d) which are summarized in **Table 3-25** (Fire Management Units and Dominant Vegetation Types) and depicted in **Figure 3-13** (Fire Management Units).

BLM_0114871

**Table 3-25**
**Fire Management Units and Dominant Vegetation Types**

| Fire Management Unit | UFO Acres (Percent BLM) | Dominant Vegetation Types (Percent BLM) |
|---|---|---|
| Black Canyon | 95,102 (27%) | Oak/Brush (40%) Grass/Sage (30%) Pinyon/Juniper (20%) Aspen (10%) |
| Carpenter | 58,549 (92%) | Grass/Sage (68%) Pinyon-Juniper (32%) |
| East Uncompahgre | 4,351 (3%) | Oak/Brush (50%) Pinyon/Juniper (50%) |
| LaGarita | 3,466 (0.4%) | Spruce/Fir (100%) |
| Naturita Division | 10,043 (15%) | Grass (66%) Pinyon/Juniper/Oak (34%) |
| Roubideau | 193,437 (67%) | Aspen (40%) Grass (30%) Shrub (30%) |
| Sneffles | 15,483 (4%) | Spruce/Fir (63%) Aspen (19%) Shrub (18%) |
| South Grand Mesa | 67,148 (26%) | Oak/Brush (61%) Pinyon/Juniper (27%) Aspen (12%) |
| Tabeguache | 137,501 (66%) | Pinyon/Juniper (77%) Grass (23%) |
| Uncompahgre Valley | 117,925 (24%) | Grass (66%) Shrub (34%) |
| West Uncompahgre | 27,557 (11%) | Pinyon/Juniper/Oak/Sage (58%) Ponderosa pine (32%) Spruce/Fir/Aspen (10%) |
| West Muddy | 2,739 (1%) | Pinyon/Juniper/Oak (100%) |
| Wray Mesa | 116,849 (75%) | Pinyon/Juniper/Sage/Grass (79%) Grass (21%) |

Source: BLM 2012a

*Wildland Urban Interface*
The wildland urban interface is defined as those areas in which undeveloped wildlands meet or intermix with human development, ranging from communities and subdivisions to isolated structures and infrastructure, such as communication sites and powerlines. Wildland urban interface is an issue throughout much of the planning area. The location of the wildland urban interface in the planning area is represented in **Figure 3-14** (Wildland Urban Interface). These areas present a management challenge, not just from a fire perspective, but also with regard to wildlife habitat, travel management, recreation, watersheds, and exotic species. Continuing collaboration with the Colorado State Forest Service, county and community leaders, industry representatives, and homeowners associations is essential in order to mitigate some of these issues, particularly regarding fuels management and fire suppression. Over the past eight years, numerous fuel management projects involving extensive acreage within the planning area have

BLM_0114872

been designed and implemented in wildland urban interface areas. The UFO supports local volunteer and rural fire departments with funding for training and equipment as programs and budgets are available. These programs complement and enhance local fire protection capabilities within the wildland urban interface.

*Fire Suppression*

The UFO has a moderate fire suppression load, which can range from as few as 30 to 40 fires per year with a few hundred acres burned, to 70 to 90 fires per year, with several thousand acres burned. As part of the larger Montrose Interagency Fire Management Unit, fires are managed across jurisdictional boundaries as needed, sometimes including prioritization of suppression needs. The majority of fires and acres burned occur in the pinyon-juniper vegetation community, where fuels are typically more available than in lower grassland communities that may be grazed or impacted by drought. Fires also occur in grassland, desert shrub, oakbrush, ponderosa pine, and occasionally in spruce/fir/aspen vegetation, although the acres burned tends to be lower in these vegetation communities. Wildland fire used to protect, maintain, and enhance resources consistent with management objectives are designated five to ten times each season within the UFO, depending on the forecasted ability of the fire to meet desired resource objectives through a naturally occurring fire. Wildland fire use acres burned range from as few as 10 acres per year to 3,000 acres per year.

*Fuel Management Objectives*

Prescribed Fire. Prescribed fires are implemented regularly with 4 to 5 burns each year, totaling approximately 600 to 1,000 acres burned. The majority of burns are located in previous mechanical treatments with the objective of reducing dead and down fuels and maintaining a mosaic of earlier seral stages across the landscape. The majority of burns in recent years have been implemented in wildland urban interface areas in order to keep fuel loadings and continuity low so that subsequent wildfires would burn with less intensity and reduced resistance to control.

Mechanical Fuel Reduction. Mechanical fuel reduction treatments are aimed primarily at reducing fuel loadings and subsequent fire behavior with secondary objectives of improving wildlife habitat, range, and watershed conditions. Tools used for mechanical treatment include roller choppers, hydro-axes, brush beaters, hand crews, and small timber sales. Between 1,500 and 4,900 acres of mechanical treatment are implemented each year within the UFO.

**Trends**

The trend is somewhat uncertain, given the continuity of vegetation types in the absence of significant disturbance over the past 120 years, coupled with changes in climate, as well as other unknown factors. The increasing incidence of larger fires should be considered when planning fire and fuels management activities, as well as resource management actions.

*Challenges for the Fire Program*

Wildland Urban Interface. Wildland urban interface areas have been increasing dramatically throughout the planning area over the past two decades. Many large pieces of private land adjacent to BLM-administered lands have been subdivided, while smaller acreages within larger

BLM_0114873

pieces of contiguous BLM-administered land are also being developed. Many of these subdivisions contain 35- to 40-acre parcels, while others contain 3- to 10-acre parcels. Development has slowed due to the current large-scale economic downturn, but this slowdown is expected to be temporary, and subdividing of large blocks of private land is expected to continue into the near future. Additional wildland urban interface infrastructure includes powerlines, pipelines, and communications sites, as well as some recreation and energy sites. Much of the UFO fuel management budget is being used to plan and implement fuel treatments within the wildland urban interface, with the objective of reducing risk to these values. Many of the more-intensive and costly fire suppression actions occur within and adjacent to the expanding wildland urban interface.

<u>Invasive Plants</u>. Exotic species are a growing concern in fire management (see the subsection on Weeds in **Section 3.1.5** [Vegetation]). Most fire management activities are either surface or vegetation disturbing and subsequently the impacts from these activities include increased susceptibility to exotic species. The most significant, widespread, and persistent threat is the invasion of cheatgrass into disturbed areas. The potential impact of exotic species invasions, as well as mitigation measures that must be followed in order to reduce or, if possible, eliminate the risk, are carefully considered in planning for mechanical and prescribed burn treatments, as well as wildland fire used to protect, maintain, and enhance resources consistent with management objectives. Rehabilitation of lands after large wildfires is primarily aimed at quickly reestablishing native vegetation that can compete with invasive species. Regular monitoring of treatments, as well as treating exotic species in and near treatments, is the key to maintaining healthy landscapes.

<u>Smoke Impacts</u>. Smoke management, primarily from prescribed burning, is always an issue. With increasing population and the changing demographics of the communities, the aesthetic impacts of smoke cannot be ignored. Although no known violations of National Ambient Air Quality Standards from prescribed burning have occurred within the planning area, fire managers and burn bosses typically manage smoke based on aesthetic issues and public perception, which can be more restrictive than air quality standards. Tourism and, consequently, Visual Resource Management (VRM) is important to communities within and adjacent to the planning area. The fire program continues to work with the State's Air Pollution Control Division to find ways to increase the BLM's ability to burn more acres each year. These relationships are critical for maintaining and improving our ability to utilize fire as a management tool.

<u>Benefits of Prescribed Fire</u>. Given the trends outlined above, the continued and increased use of prescribed fire as a management tool will take extraordinary effort on the part of fire managers, education specialists, resource specialists, and line management. Each of the trends alone presents a challenge and, when combined, the demand on fire and resource personnel becomes significant. Although this increased difficulty can make replacing prescribed burns with solely mechanical treatments an attractive alternative, the ecological impacts of mechanical treatment are more significant than those of prescribed fire, and require more frequent treatments. The use of prescribed fire in the planning area is worth supporting and pursuing as a fuels and resource management tool, as well as for on-site ecological processes and as a landscape scale disturbance mechanism.

BLM_0114874

A Changing Climate. Climate change is difficult to quantify. Research indicates that changes are occurring (Karl et al. 2009), and fire management is readily impacted by minor changes in climate, which affect frequency, intensity, and size of fires, and also the vegetative recovery of burned areas. As wildland fires are managed and prescribed burns and mechanical treatments are planned and implemented, it will continue to be important to maintain resiliency and redundancy across the landscape so that the ecological system can adjust to changes in climate.

A Shrinking Fire Budget. Because future budgets cannot be forecast, it is important to maintain flexibility within the fire program so that resources can be shifted to those emphasis areas that are being funded, while maintaining the long-term capability to perform all aspects of the fire management job.

### 3.1.10  Cultural Resources

The term cultural resource refers to historic or architectural objects, sites, structures, or places with potential public and scientific value, including locations of traditional cultural, ethnic, or religious significance to a specific social or cultural group. Cultural resources are located, classified, ranked, and managed in order to identify, protect, and utilize them for public benefit. Fragile and irreplaceable, cultural resources represent an integral part of American heritage. Cultural resources represent physical locations of human activity, occupation, or use identified through field inventories, historical documentation, or oral evidence (BLM Manual 8110, Identifying and Evaluating Cultural Resources [BLM 2004b]). Archaeological resources are a subset of cultural resources that include any material remains of human life or activities that are at least 50 years old for historic properties under the National Historic Preservation Act, or at least 100 years old under the provisions of the Archaeological Resources Protection Act, and are of archaeological interest (as defined in 43 Code of Federal Regulations [CFR] 7.3). Native American religious concerns, a critical element noted in Appendix 5 of the BLM NEPA Handbook, H-1790-1 (BLM 2008a), are addressed in **Section 3.4.1** (Native American Tribal Interests).

Prehistoric or historic cultural resource sites, structures, or objects listed in or eligible for listing in the National Register of Historic Places (NRHP) are managed as directed by 36 CFR 800, Protection of Historic and Cultural Properties. These regulations stipulate that cultural resources must be assessed for integrity of location, design, setting, materials, workmanship, feeling, and association. A property may be considered eligible for listing on the NRHP if it retains sufficient integrity of these elements and meets certain criteria outlined in National Register Bulletin 15 (NPS 1997a). As listed in 36 CFR Part 60, Historic Properties (including prehistoric and historic archaeological sites and places considered important to Native Americans) must meet a specific set of criteria, described below:

- The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association

- Association with events that have made a significant contribution to the broad patterns of our history

- Association with the lives of persons significant in our past

BLM_0114875

- Embodiment of the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction

- Yielding, or may be likely to yield, information important in prehistory or history (NPS 1997a)

*Current Conditions*

Cultural resources include prehistoric and historic archaeological and architectural structures, features, and objects, as well as Native American traditional cultural and religious properties and properties important to other cultural groups. Prehistoric properties include lithic scatters, quarries, temporary camps, extended camps, wickiups, hunting/kill/butchering sites, processing areas, tree scaffolds, rock shelters, formative era stone structures, caves, rock art panels, trails, and isolated finds. Historic properties include homesteads, trails and roads, irrigation ditches, reservoirs, mining sites, corrals, line camps, cabins, trash scatters, and isolated finds. Together these properties represent human use of the area by Native American and Euroamerican cultures, covering a timeframe from the Paleoindian period (11,500 BC) through the present. **Table 3-26** (Cultural Periods) provides a description of these cultural periods.

During consultation, the Ute Tribes have indicated that the UFO encompasses part of their ancestral homeland, thereby increasing the potential of traditional cultural properties and sacred sites. At present, the Ute Tribes have identified several sacred/religious sites and special use areas.

**Table 3-26**
**Cultural Periods**

| Era | Time Period | Cultural Adaptation |
| --- | --- | --- |
| Paleoindian | Before 7000 BC | • Big game subsistence patterns<br>• No dated sites from this period, although projectile points have been recovered<br>• Sites are significant due to their scarcity |
| Archaic | 7000 BC – AD 1 | • Hunting and gathering lifestyle likely, with well-established seasonal rounds for resource procurement<br>• Projectile points and camps have been found and further discoveries are likely |
| Formative | AD 1 – AD 1250 | • Introduction of bow and arrow, ceramics, and farming with associated sedentary lifestyle and population growth<br>• Permanent settlements associated with cultural resources remain from these cultures<br>• Scientific uncertainty remains concerning their origin and disappearance<br>• Identification of additional sites would be scientifically beneficial<br>• Formative Era sites in the planning area are associated with both Anasazi and Gateway cultures in the West End and possibly with the Fremont complex |

BLM_0114876

**Table 3-26**
**Cultural Periods**

| Era | Time Period | Cultural Adaptation |
|---|---|---|
| Post-Formative | AD 1250 – AD 1600 | • Return to hunting-gathering traditions with limited use of ceramics and horticulture<br>• Expansion of the historically known Numic (Ute, Paiute, Shoshone and Comanche) and Athabaskan (Navajo and Apache) peoples<br>• Diagnostic artifacts include small unnotched or side-notched projectile points and Ute Intermountain Brownware ceramics<br>• Later traits include equestrian rock art motifs, European trade goods, wickiups, and a possible increase in the use of obsidian<br>• Identification of additional sites would benefit further research |
| Historic | Post AD 1600 | • Euroamerican settlement patterns associated with agriculture, homesteading, limited ranching, farming, minerals development, and transportation |
| Multiple | Any | • Multi-component sites occupied over at least two identifiable time periods within the same geographical boundaries (e.g., Anasazi site with Historic campsite) |
| Unknown Prehistoric | Unknown | • Unknown prehistoric sites with general utility artifacts<br>• Lack diagnostic materials making assignment to a specific prehistoric time period impossible |

*Assessing Resource Conditions*

The condition of a cultural resource is assessed through field observation, inventory, and project review. The primary indicator is whether the characteristics that would qualify a resource for National Register of Historic Place listing, or the cultural values of an area important to Native American or other traditional communities, have been lost or diminished. These characteristics can be affected by physical destruction, damage, neglect, alteration, isolation, transfer, sale, or lease of a resource, or alteration of the resource setting. Specific indicators include the extent or intensity of natural weathering, erosion, wildfire, ground disturbance, grazing, recreation use, and unauthorized collection, intrusion, and vandalism. This kind of loss affects the completeness and accuracy of the scientific information that can be derived from a resource, the aesthetic, historic, or interpretive value of a resource, and the importance of a resource in maintaining social and cultural traditions.

Over the past five decades, various large and small cultural projects have been conducted in the planning area (Alpine Archaeological Consultants 2010). Range improvement projects, wildland fire rehabilitation, recreation projects, realty actions, oil and gas development, and minerals extraction, including uranium and coal, continue to expand the number of inventories completed and cultural resources identified.

Alpine Archaeological Consultants, Inc., under contract to the UFO, prepared a synthetic compilation of recorded cultural resources, cultural resource surveys, and excavations in the planning area (Alpine Archaeological Consultants 2010). The prehistoric site types and thematic

BLM_0114877

historic categories used by Alpine Archaeological Consultants (2010) are condensed into ten different cultural resource management categories:

<u>Open artifact sites</u>. Open artifact sites are either prehistoric or historic cultural resources that are dominated by artifacts (e.g., flaked stone debris, tin cans, and glass) and lack visible architectural features, though other features (e.g., hearths) can be present. These sites are generally considered eligible to the NRHP based on their scientific value (e.g., intactness and depth of surface sediments as well as the quantity and diversity of artifacts), though historic open artifact sites may be eligible because of a connection to people or events of historical importance. Open artifact sites are frequently recorded in all cultural resource units, are found throughout the varied topography encompassed by the planning area, and are the most common type of site, equaling 89 percent of the total prehistoric sites and 17 percent of the historic sites (Alpine Archaeological Consultants 2010). These sites are impacted by energy development, grazing, vegetation treatments, and recreational activities that disturb surface sediments.

<u>Sheltered artifact sites</u>. Sheltered artifact sites contain the same attributes as an open artifact site, with the exception of being located in a rockshelter or protected by a rock overhang. These sites are usually considered eligible to the NRHP because of their scientific value. Scientific value is often ascertained as a product of their uniqueness on the landscape, the intactness and depth of surface sediments as well as the quantity and diversity of artifacts. These resources are less common (five percent of total prehistoric sites) than open artifact sites (Alpine Archaeological Consultants 2010). Sheltered artifact sites are frequently located in the Uncompahgre unit, though they have also been recorded in the West End unit. Any activity that disturbs surface sediments or the shelter, such as vandalism, energy development, and grazing has the potential to disturb this type of site.

<u>Open architectural sites</u>. Open architectural sites are prehistoric and historic cultural resources that contain structural features (e.g., stone circles or alignments, granaries, storage cists, masonry, hunting blinds, sweat lodges, wickiups, homesteads, and corrals), though other artifacts and features may be present. Prehistoric open architectural sites are usually considered eligible to the NRHP because of their scientific value, though connections to important persons, events, or styles of construction are also used. Conversely, historic open architectural sites may be eligible to the NRHP based on their scientific value, though it is more frequently determined based on historical connections to persons, events, or construction styles of importance. Open architectural sites are found in all four cultural resource units. This site type is a small portion (three percent) of the total prehistoric cultural resources recorded, though they constitute a larger portion of the historic resources (45 percent) (Alpine Archaeological Consultants 2010). Activities that disturb the integrity of the structural components or associated sediments, such as vandalism, wildfires, energy development, vegetation treatments, and grazing negatively impact this type of site.

<u>Sheltered architectural sites</u>. Sheltered architectural sites are cultural resources that contain the same attributes as open architectural sites, with the exception of being located in a rockshelter or protected by a rock overhang. Common elements in sheltered architectural sites include masonry walls, rock alignments, storage cists, and fences. Prehistoric sheltered architectural sites are usually considered eligible to the NRHP because of their scientific value. Historic

BLM_0114878

sheltered architectural sites may be eligible to the NRHP based on their scientific value, though it is more frequently determined based on the site's integrity and its connection to activities, individuals or construction styles of historical importance. Prehistoric sheltered architectural sites have only been recorded in the West End and Uncompahgre cultural units and are a rare (less than one percent of total prehistoric sites) cultural resource. Because of geological constraints historic sheltered architectural sites are also expected to be more frequent in the West End and Uncompahgre units. Vandalism, recreational, and grazing activities negatively impact this type of site, though they can be disturbed by any activity that alter the structural components, local sediments, or associated shelter.

Open quarry sites. Open quarry sites are prehistoric and historic cultural resources that are defined by open pit lithic procurement and processing (e.g., prehistoric lithic procurement sites, prospecting pits, and gravel quarries), though artifacts and features may be present. These sites can be considered eligible because of scientific value, though connections to people, events, or construction techniques of historical importance are also valid. In the planning area, prehistoric open quarry sites are generally associated with outcrops of Cretaceous and Jurassic sediments, being absent in the North Fork unit, and most frequently recorded in the West End unit (Alpine Archaeological Consultants 2010). Historic open quarry sites can be located in any cultural unit, though they are uncommon in the planning area. Energy development, erosion, wildfires, and recreational activities that disturb associated sediments, artifacts, or features have the potential to disturb this type of site.

Mining sites. Mining sites are prehistoric and historic cultural resources that are defined by extraction processes that occur in subsurface contexts (e.g., adits and mine shafts), though external structures, features, and artifacts may be present. These types of sites are generally considered eligible to the NRHP based on their historical connection to people, events, or construction styles of historical significance. While these types of sites occur across the planning area (20 percent of total historic sites), they most frequently occur in the West End and Ouray cultural units. Mining sites are often impacted by vandalism and recreational activities, though wildfires, which can damage external structures, and energy development also impact these sites.

Rock art sites. Rock art sites are prehistoric and historic cultural resources that include petroglyphs or pictographs, though other artifacts and features may also be present. These sites are generally considered eligible to the NRHP due to their artistic value and the potential to recover scientific information. Rock art sites are found in association with rock outcrops and are relatively uncommon in the planning area, accounting for two percent of the total prehistoric site count (Alpine Archaeological Consultants 2010). Rock art sites have been recorded in the Uncompahgre, Ouray, and West End cultural units and are unlikely to be found in the Ouray unit. Vandalism is the most common impact on rock art sites, though any activity (e.g., erosion, energy development, and grazing) that modifies the rock face can degrade this type of site.

Cambium trees. Cambium trees are pine trees that were culturally modified by removal of the bark to access the cambium as a food source. Cambium trees are generally eligible for the NRHP based on their scientific value, though a connection to persons or events of historical

BLM_0114879

significance is also important. Cambium trees are rarely recorded in the planning area, being less than one percent of the total prehistoric site count (Alpine Archaeological Consultants 2010). Because cambium tree sites are tied to vegetation boundaries, they have only been recorded in the Ouray and West End cultural units. The integrity of cambium tree sites is dependent on the nature and location of logging operations and forest fires that damage and remove the trees.

Human burials. Human burial sites are uncommon in the planning area, consisting of less than one percent of the total prehistoric site count (Alpine Archaeological Consultants 2010). Human burials are frequently considered Traditional Cultural Properties. They are generally considered eligible to the NRHP because of a connection to persons and events of historical importance as well as the potential to provide scientific information. Human burials can be found in above ground (e.g., rock crevices) as well as in subsurface contexts and need not be associated with structural elements. Although rarely encountered, human burials have been located in all cultural units except for the North Fork unit. Any activity, be it vandalism, erosion, energy development, or recreational, that disturbs the burial is considered to have a negative impact.

Linears. Linear sites are cultural resources that are functionally associated with transportation (e.g., roads, trails, and railroads) and infrastructure development (e.g., water control, communication, and energy transfer), though artifacts and other features can be present. These sites are generally considered eligible to the NRHP based on the sites association with activities, individuals or styles of construction that are of historical importance. Linear sites are relatively common (18 percent of total historic sites) and have been recorded throughout the planning area. Any activity that disturbs the structural integrity, associated deposits, or related features (e.g., energy development, wildfires, and recreational activities) has the potential to impact this type of site.

*Cultural Resource Units*

For ease of discussion, the cultural resources staff has divided the planning area into four cultural resource units (**Figure 3-15** [Cultural Resource Units]), which are described below.

Uncompahgre Unit. The Uncompahgre unit encompasses lands along the northeastern flank of the Uncompahgre Plateau in Ouray, Montrose, Delta, and Mesa Counties, including the Dry Creek Basin, Roubideau Canyon, Escalante Canyon, Little Dominguez and the adobe badland flanks of Grand Mesa north of Delta. Existing data indicates that the unit covers some 498,952 acres, of which 19,859 acres (4.0 percent) have been surveyed for cultural resources. There are 314 survey reports and 2,473 recorded cultural resources, including 880 prehistoric sites, 284 historic sites, 1,226 prehistoric isolated finds, and 83 historic isolated finds in the Uncompahgre Plateau unit.

North Fork Unit. The North Fork unit includes all BLM-administered lands situated north and east of the Gunnison Gorge NCA. The unit encompasses some 433,810 acres, of which 15,240 acres (3.5 percent) have been surveyed for cultural resources. There are 253 survey reports and 371 recorded cultural resources in the North Fork unit. Of these resources, 51 are prehistoric sites, 188 are historic sites, 116 are prehistoric isolated finds, and 16 are historic isolated finds.

BLM_0114880

Ouray Unit. The Ouray unit is generally characterized by higher elevations and less intensive use. The unit extends along the eastern margin of the UFO from Ouray on the south to the Black Canyon on the north, and includes some 520,270 acres, of which 12,530 acres (2.4 percent) have been inventoried for cultural resources. There are 153 survey reports and 793 cultural resources in the Ouray unit, including 283 prehistoric sites, 311 historic sites, 157 prehistoric isolated finds, and 42 historic isolated finds.

West End Unit. The West End encompasses all BLM-administered lands in the western half of the UFO, including lands on the southern flank of the Uncompahgre Plateau, the San Miguel River drainage, Paradox Valley, and the Dolores River canyons south of Gateway. The unit covers some 631,290 acres, of which 51,090 acres (8.1 percent) have been inventoried for cultural resources. There are 410 survey reports and 4,050 recorded cultural resource sites in the West End. Of these resources, 2,153 are prehistoric sites, 457 are historic sites, 1,359 are prehistoric isolated finds, and 81 are historic isolated finds.

*Trends*

Factors influencing cultural resource trends include the presence and condition of cultural sites, landscapes, or places of traditional use. The current condition of cultural resources in the planning area is highly variable due to the diversity of terrain, geomorphology, access, visibility, and past and current land use patterns. Adherence to Section 106 of the National Historic Preservation Act and the BLM policy of avoiding impacts on cultural resources provides for the continued identification and preservation of cultural resource sites. Few research-based surveys or Class II inventories have been conducted, and much of the information used to help identify the characteristics of the planning area is generally based only on where disturbance has previously occurred, rather than where sites are likely to occur. Most surveys conducted in the planning area comply with Section 106, meaning that the surveys are conducted as needed to identify cultural resources in a project-specific context and generally are not statistically valid samples of a region.

*Decline in Site Conditions*

In general, site conditions are considered to be declining, mainly due to natural erosional processes, increased casual use of public lands, and limited site monitoring and protection. Exposed sites and associated artifacts, features, and structures are easily disturbed by natural elements such as wind and water erosion, deterioration, decay, animal and human intrusion, and development and maintenance activities. Vandalism to sites and cultural artifacts, such as illicit surface collecting, unauthorized digging, and pot hunting, has been documented, and is illegal under the Archaeological Resources Protection Act. Archaeological and historic sites are also known to be deteriorating from a variety of causes. Collectively, these agents have adversely affected many known cultural resources.

Conditions have remained stable for cultural resources identified through compliance activities associated with Section 106 and the State Protocol Agreement between the Colorado BLM and the Colorado State Historic Preservation Office. Although realty actions and energy and mineral activities continue to be conducted in proximity to cultural resources, potential impacts are avoided or mitigated under current NEPA guidelines and management measures. In these cases, the trend is toward a desired condition of conservation and protection. Qualitative observations

BLM_0114881

indicate a downward trend in condition for recorded and unrecorded cultural resources not associated with formal surface disturbing management proposals. Illegal removal of artifacts, ground disturbance associated with recreational activity, limited law enforcement, livestock operations, and a trend toward more intensive use of public lands all contribute to this trend.

### 3.1.11  Paleontological Resources

Paleontology is the study of prehistoric life, its evolution, and its interaction with the environment (paleoecology). The term "paleontological resources," as used by the BLM, includes any fossilized remains or traces of organisms that are preserved in or on Earth's crust, are of scientific interest, and provide information about the history of life. Paleontological resources, whether invertebrate, plant, trace, or vertebrate fossils, constitute a fragile and nonrenewable record of the history of life on our planet. The BLM's policy is to manage paleontological resources for scientific, educational, and recreational values (e.g., hobby collecting of invertebrate fossils and petrified wood) and to protect these resources from adverse impacts. To accomplish this goal, paleontological resources must be professionally identified and evaluated, and paleontological data should be considered as early as possible any decision-making process.

Paleontological resources are integrally associated with the geologic rock units (formations, members, or beds) in which they are preserved, and the probability for finding paleontological resources can be broadly predicted from the geologic units present at or near the surface. Therefore, geologic mapping paired with the BLM's Potential Fossil Yield Classification (PFYC) system can be used for assessing the occurrence potential of paleontological resources.

Paleontological resources are managed according to the BLM Manual Section 8270, Paleontological Resource Management, BLM Handbook H-8270-1, General Procedural Guidance for Paleontological Resource Management, and applicable BLM instructional memoranda and bulletins. It should be noted that additional protection measures have now been enacted under the Omnibus Public Lands Act of 2009 (123 Stat. 1174 Public Law 111–11, Subtitle D), giving paleontological resources protection under law. The BLM is currently developing regulations to implement the requirements of this law.

Recent BLM guidance (Instruction Memorandum 2008-009, PFYC system for Paleontological Resources on Public Lands [BLM 2007b]) defines a new classification system for the classification of paleontological resources, the PFYC system. This system is intended to provide a uniform tool to assess potential occurrences of paleontological resources and to allow evaluation of potential impacts on these resources. It is intended to be applied in broad approach for planning efforts and as an intermediate step in evaluating specific projects.

### *Potential Fossil Yield Classification System*

The potential for paleontological resources is currently identified using two indicators: The BLM Fossil Class Condition system, and the newer PFYC system. While the older BLM Fossil Class Condition system has been used extensively in the past, recent BLM guidelines encourage use of the more precise PFYC system.

In the PFYC system, geologic units are classified from 1 (no potential for significant fossils) to 5 (high potential for significant fossils) based on the relative abundance of vertebrate fossils or

significant invertebrate or plant fossils and their sensitivity to adverse impacts. This classification is applied to the geologic formation, member, or other distinguishable unit, preferably at the most detailed mappable level. It is not applicable to specific paleontological localities or small areas within units. While widely scattered fossils or localities may occur within a geologic unit, the relative abundance of significant localities determines the class assignment. The BLM in Colorado has classified rock units both statewide and by BLM region (Trujillo 2010).

The PFYC system is meant to provide baseline guidance for predicting, assessing, and mitigating paleontological resources. The classification should be considered at an intermediate point in the analysis, and should be used to assist in determining the need for further assessment and/or mitigation actions. Descriptions of the PFYC classes can be found in BLM Instruction Memorandum 2008-009 (BLM 2007b).

### Current Condition

Surface exposures of potentially fossil-bearing rock within the planning area consist of a large number of lithologic types and ages, and they range in age from Pennsylvanian (318-299 Ma) to Quaternary (2.6 Ma to present) (Green 1992). The majority of this rock was deposited during the Mesozoic Era, though older (e.g., Pennsylvanian) and younger (e.g., Tertiary) rocks are exposed. For detailed descriptions of the potentially fossil-bearing rock units in the planning area, see **Section 3.1.3**.

Because a wide variety of terrestrial and marine sedimentary deposits are found within the planning area (**Figure 3-8**), many types of vertebrate, invertebrate, plant, and trace fossils are known. **Table 3-27** (Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources) lists the potentially fossil-bearing rock units in the planning area in stratigraphic order (from oldest at bottom to youngest at top), their PFYC category, and the known fossil resources from each unit both in general and specifically in the planning area. The distribution of PFYC categories across the planning area is displayed in **Figure 3-16**, Potential Fossil Yield Classification Distribution. Because specific geographic information for vertebrate fossil localities is considered confidential by the BLM in order to protect the resource, this information is not included here. Specific geographic information for fossil localities can be obtained through the BLM by qualified personnel.

The Upper Jurassic Morrison Formation rock unit deserves special mention. This formation crops out across a large part of the planning area, and it is one of the most prolific fossil-bearing rock units in the world. Many fossil localities are known from the Morrison Formation in the planning area, several of which are scientifically important. Among these are dinosaur quarries excavated by Brigham Young University (Foster 2005; Turner and Peterson 1999).

### Classification for the Planning Area

As seen in **Table 3-27**, several formations with high potential for yielding fossil vertebrates crop out in the planning area, and the probability for impacting fossils during construction in these areas is high. Pedestrian surveys will typically be necessary prior to authorizing any surface-disturbing activities in these units, especially the Morrison Formation, and on-site monitoring may be necessary during construction activities.

BLM_0114883

**Table 3-27**
**Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources**

| Geologic Age | Group | Formation | Member | PFYC Rating | Known Fossil Resources | Known Fossil Resources in Planning Area[1] |
|---|---|---|---|---|---|---|
| Quaternary | | unconsolidated sediments | | 3 | Pleistocene mammals[7] | Mammoth teeth, camel, horse, rodents |
| Eocene | | Uinta Formation | | 3 | mammals[13] | none known |
| Eocene | | Green River Formation | Parachute Creek Member | 3 | fish, bats, birds, mammals[12] | none known |
| Paleocene-Eocene | | Wasatch Formation | | 3 | mammals, reptiles, invertebrates[12] | none known |
| Upper Cretaceous | Mesa Verde | Hunter Canyon Formation Mt. Garfield Formation Sego Sandstone | | 3 | dinosaurs, mammals, reptiles, fish[3, 8] | none known |
| Upper Cretaceous | | Mancos Shelf | | 3 | marine reptiles, invertebrates, shark teeth, wood[6] | mosasaur, invertebrates, wood |
| Lower Cretaceous | | Dakota Formation | | 3 | invertebrates, plants, tracks, mammals[10, 18] | none known |
| Lower Cretaceous | | Burro Canyon Formation | | 3 | dinosaurs, tracks, plants[9, 13] | theropod dinosaur, fish scales, plants, invertebrates |
| Upper Jurassic | | Morrison Formation | Brushy Basin Member | 4-5 | dinosaurs, mammals, pterosaurs, lizards, amphibians, sphenodonts, crocodiles, turtles, fish, invertebrates[4, 15] | dinosaurs, mammals, pterosaurs, lizards, amphibians, crocodiles, turtles, fish, invertebrates |
| Middle Jurassic | San Rafael | Wanakah Formation | | 4-5 | fish, plants, trace fossils, invertebrates[7, 11] | Hadrodon (bivalve) |
| | | | Salt Wash Member | 4-5 | dinosaurs, crocodiles, turtles, invertebrates[2, 11] | dinosaurs, crocodiles, turtles, invertebrates |
| | | Entrada Sandstone | | 3 | dinosaur tracks[9] | none known |

BLM_0114884

**Table 3-27**
**Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources**

| Geologic Age | Group | Formation | Member | PFYC Rating | Known Fossil Resources | Known Fossil Resources in Planning Area[1] |
|---|---|---|---|---|---|---|
| Lower Jurassic | Glen Canyon | Navajo Sandstone | | 3 | dinosaur tracks, rare dinosaur skeleton[9, 14] | none known |
| | | Kayenta Formation | | 3 | dinosaurs, dinosaur tracks[13] | none known |
| | | Wingate Sandstone | | 3 | dinosaur tracks[9] | theropod tracks |
| Lower Triassic | | Chinle Formation | | 5 | Phytosaurs, aetosaurs, dinosaurs, lizards, lungfish, invertebrates[5] | none known |
| Lower Triassic | | Moenkopi Formation | | 3 | tracks[16], invertebrates[2] | plants |
| Pennsylvanian-Permian | | Cutler Formation | | 3-4-5 | amphibians, synapsids, reptiles, invertebrates[17] | Fish, large amphibians, microsaurian amphibians, various reptiles, plants |
| Pennsylvanian | | Hermosa Formation | | | none known | none known |

Sources: [1]Trujillo 2010; [2]Batten and Stokes 1986; [3]Breithaupt 1985; [4]Foster 2007; [5]Irmis 2005; [6]Kass 1999; [7]Kurten and Anderson 1980; [8]Lillegraven and McKenna 1986; [9]Lockley and Hunt 1995; [10]Merewether et al. 2006; [11]O'Sullivan et al. 2006; [12]Roehler 1992; [13]Schoch 1986; [14]Sertich and Loewen 2010; [15]Turner and Peterson 1999; [16]Untermann and Untermann 1964; [17]Vaughn 1962, 1964; [18]Weiscampel 1990

### Trends

Qualitative observation indicates that the condition has remained stable for paleontological resources protected or mitigated through the permitting process and other standard operating procedures, such as pre-disturbance clearance, associated with federal management actions. In these cases, the trend has been toward conservation. For resources not associated with direct management actions, the trend has been slightly downward. The primary contributors to this trend include unauthorized collection of fossils, limited law enforcement resources, and ground disturbance associated with recreational activities.

### 3.1.12 Visual Resources

Visual resources refer to the visible features on a landscape (e.g., land, water, vegetation, animals, and structures). These features contribute to the scenic or visual quality and appeal of the landscape. Visual impact is the creation of an intrusion or perceptible contrast that affects the scenic quality of a landscape. A visual impact can be perceived by an individual or group as

BLM_0114885

either positive or negative, depending on a variety of factors or conditions (e.g., personal experience, time of day, and weather or seasonal conditions) (BLM 1984).

### Current Conditions

Cumulative impacts on the landscape have resulted from increases in recreation and tourism by sightseers attracted to the area for its extraordinary scenic qualities, vehicular travel, and the number of roads and trails. Additional impacts have resulted from an expanding urban interface due to population increase, the development of utility corridors, oil and gas exploration and development, seismic exploration, surface mining, vegetation management, and other land use disturbances.

The increasing number of roads and travel networks in use within the planning area is having an indirect effect on visual resources. Area networks include highways; paved and gravel county roads; dirt roads (two-tracks); foot, equestrian, mountain bike, and OHV trails; railroads; and river corridors. As a result, seldom-seen zones no longer exist, most areas are within three to five miles of a travel route, foreground and middle-ground views are increasing, and changes in visual sensitivity have occurred (Otak 2009). The increased use of two-track roads and routes is creating conditions that allow users to expand surface disturbances and impact visual resources.

The scenic quality of the planning area is of national significance and an important part of the local and state economy. Many people live and recreate in the planning area because of its remoteness and visual qualities. The visual setting is an important part of local lifestyles, and for most travelers, the scenery or visual resource is an important part of their visit. Both tourists and local residents drive across this landscape expecting to see open mountain vistas, rushing water, forested slopes, and vast rolling sagebrush-covered lands.

### Visual Resource Management System

The BLM VRM system is a way to identify and evaluate these scenic values in order to determine appropriate levels of management. VRM is a tool to identify and map essential landscape settings to meet public preferences and recreational experiences today and into the future. The VRM system helps to ensure that actions taken on BLM-administered lands today will benefit the visual qualities associated with the landscapes, while protecting these visual resources for years to come.

### Visual Resource Inventory

Visual resource inventory involves identifying the visual resources of an area and assigning them to inventory classes using the BLM's resource inventory process. The process involves rating the visual appeal of a tract of land, measuring public concern for scenic quality, and determining whether the tract of land is visible from travel routes or observation points. This process is described in detail in BLM Handbook H-8410-1, Visual Resource Inventory (BLM 1986a).

The results of the visual resource inventory become an important component of the RMP for the area. The RMP establishes how BLM-managed lands will be used and allocated for different purposes, and it is developed through public participation and collaboration. Visual values are considered throughout the RMP process, and the area's visual resources are then assigned to the management classes with established objectives.

BLM_0114886

A visual resource inventory of the planning area was completed in September 2009 according to guidelines in BLM Manual Handbook H-8410-1, Visual Resource Inventory (BLM 1986a). The inventory consisted of three components: Scenic Quality Evaluation, Sensitivity Level Analysis, and Delineation of Distance Zones.

Based on the three inventory components, lands in the planning area were placed into one of four Visual Resource Inventory (VRI) classes (as shown in **Figure 3-17** [Visual Resource Inventory]). These class assignments are informational and provide the basis for considering visual values during the RMP process. They do not establish management direction and are not used as a basis for constraining or limiting surface-disturbing activities but are considered a baseline for existing conditions. The Scenic Quality, Sensitivity, and resulting VRI Class distribution for the UFO is presented in **Table 3-28** (Visual Resource Inventory Component Distribution). The entire field office was found to be within the foreground/middle ground distance zone.

**Table 3-28**
**Visual Resource Inventory Component Distribution**

| Visual Resource Inventory Component | Acres | Percent of Decision Area |
|---|---|---|
| Scenic Quality | | |
| A | 75,530 | 11% |
| B | 384,370 | 57% |
| C | 208,000 | 31% |
| Not inventoried | 7,860 | 1% |
| Sensitivity | | |
| High | 187,580 | 28% |
| Medium | 298,230 | 44% |
| Low | 182,100 | 27% |
| Not inventoried | 7,860 | 1% |
| VRI Class | | |
| Class I | 8,080 | 1% |
| Class II | 165,380 | 25% |
| Class III | 313,960 | 46% |
| Class IV | 180,520 | 27% |
| Not inventoried | 7,860 | 1% |

Source: BLM 2012a
Non-inventoried lands are the Curecanti National Recreation Area and are managed by the National Park Service.

*Visual Resource Management*
The designation of VRM classes is ultimately based on management decisions made during the RMP process, which must take into consideration the value of visual resources. During the process, inventory class boundaries can be adjusted as necessary to reflect these resource allocation decisions. The goal of VRM is to minimize the visual impacts of all surface-disturbing

BLM_0114887

activities, regardless of the class to which an area is assigned. Current VRM classes are summarized in **Table 3-29** (Visual Resource Management Classes) and displayed in **Figure 2-5** (Alternative A: Visual Resource Management).

**Table 3-29**
**Visual Resource Management Classes**

| VRM Class | Acres |
|-----------|-------|
| Class I | 44,220 |
| Class II | 21,930 |
| Class III | 280,520 |
| Class IV | 9,260 |
| No data | 319,770 |

Source: BLM 2012a

Objectives for each of the four VRM classes are as follows:

Class I. The objective of this class is to preserve the existing character of the landscape. This class provides for natural ecological changes; however, it does not preclude very limited management activity. The level of change to the characteristic landscape should be very low and must not attract attention.

Class II. The objective of this class is to retain the existing character of the landscape. The level of change to the characteristic landscape should be low. Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape.

Class III. The objective of this class is to partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate. Management activities may attract attention but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape.

Class IV. The objective of this class is to provide for management activities that require major modification of the existing character of the landscape. The level of change to the characteristic landscape can be high. These management activities may dominate the view and be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating the basic elements.

The analysis of a visual contrast rating process is used to resolve visual impacts. The process of a visual contrast rating, which involves comparing the project features with the existing landscape features using basic elements of form, line, color, and texture, is described in detail in BLM Handbook H-8431-1, Visual Resource Contrast Rating (BLM 1986b).

***Trends***
Public lands in the planning area are highly fragmented. The landscape is experiencing a high degree of human modification due to urban development and its associated infrastructure and uses, as well as energy development. Management of multiple resources on public lands can alter

BLM_0114888

scenic resources. With an increased amount of urban development throughout the resource area on adjacent private lands, increased management activities are also occurring on public lands. Growing pressure is being placed on visual resources due to activities such as oil and gas extraction, fire management, utility corridors, roads and trails, recreation activities, communication sites, pipelines, livestock grazing, and water tanks. Public concern is also on the rise regarding preservation of the visual and scenic qualities associated with open space and scenic backgrounds for recreation and in residential areas.

Cultural modification may be considered a detraction from the scenery in the form of a negative intrusion or may be considered a compliment or improvement to the scenery. As part of the visual resource inventory process, cultural modifications were analyzed. **Table 3-30**, Visual Resource Inventory – Cultural Modifications (acres)[1], shows the degree of modification by the number of acres (the lower the number, the more negative the modification is perceived).

**Table 3-30**
**Visual Resource Inventory – Cultural Modifications (acres)[1]**

| Degree of Modification | BLM | Local (City, State, etc.) | Private | State (School Board) |
|---|---|---|---|---|
| -2 | 19,780 | 20 | 13,560 | 0 |
| -1 | 58,230 | 0 | 380 | 0 |
| -0.5 | 202,560 | 2,110 | 43,260 | 0 |
| 0 | 371,830 | 3,930 | 217,140 | 1,470 |
| 1 | 9,640 | 40 | 4,980 | 0 |
| Not Rated | 7,340 | 0 | 8,530 | 0 |

Source: BLM 2012a
[1]Includes mineral estate

In response to growing concern from local communities, the current condition of visual resources is being assessed for major transportation corridors, population centers, and other scenic viewsheds to assess how the BLM can best manage these sensitive viewsheds and corridors.

Tourism also plays a major role in the economy of western Colorado, and much of the planning area is viewed en route to or from major tourist destination areas, such as Telluride. As the population of Colorado grows, more visitors will be attracted to the natural landscapes of public lands. In addition, a high demand is being placed on scenic resources near population centers.

### 3.1.13  Lands with Wilderness Characteristics

The BLM's authority to conduct wilderness reviews, including the establishment of new WSAs, expired on October 21, 1993, pursuant to Section 603 of the FLPMA. However, the BLM has retained authority under Section 201 of the FLPMA to inventory BLM-administered lands for wilderness characteristics and to consider such information during land use planning. Policy guidance is provided by BLM Manual 6310, Conducting Wilderness Characteristics Inventory on BLM Lands (BLM 2012e) and Manual 6320, Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process (BLM 2012f). Through this planning process, the BLM has discretion to determine which portions of BLM-administered lands with wilderness characteristics would be protected by special management. While the BLM is in the land use

BLM_0114889

planning process, the BLM will manage lands so as not to forgo management options in the event that new information is presented, evaluated, and incorporated into the planning process as part of one or more RMP alternatives.

The inventory process entails the identification of wilderness inventory units, an inventory of roads and wilderness characteristics, and a determination of whether the unit as a whole possesses wilderness characteristics. Units found to possess wilderness characteristics are evaluated during the land use planning process to address future management for wilderness characteristics. Wilderness characteristics considered in this analysis include naturalness, outstanding opportunities for solitude or a primitive and unconfined type of recreation, and supplemental values.

- Size: An area must be a roadless area of 5,000 acres of contiguous BLM-administered lands or, if less than 5,000 acres, must be contiguous with lands which have been formally determined to have wilderness or potential wilderness values (e.g., designated Wilderness and BLM WSAs).

- Naturalness: Lands and resources exhibit a high degree of naturalness when affected primarily by the forces of nature and where the imprint of human activity is substantially unnoticeable. An area's naturalness may be influenced by the presence or absence of roads and trails, fences, or other developments; the nature and extent of landscape modifications; the presence of native vegetation communities; and the connectivity of habitats. Wildlife populations and habitat are recognized as important aspects of naturalness and would be actively managed.

- Outstanding Opportunities for Solitude or Primitive and Unconfined Types of Recreation: Visitors may have outstanding opportunities for solitude when the sights, sounds, and evidence of other people are rare or infrequent, or where visitors can feel isolated, alone or secluded from others. Visitors may have outstanding opportunities for primitive and unconfined types of recreation where the use of the area is through nonmotorized, nonmechanical means, and where no or minimal developed recreation facilities are encountered.

- Supplemental Values: The area may contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

### Current Conditions

The 1989 RMP did not provide special management for areas outside of WSAs with wilderness characteristics. During this current RMP revision process, the BLM completed a review of BLM-administered lands within the UFO to determine whether they possess wilderness characteristics.

Numerous external groups have advocated wilderness designations through legislation and participation in the land use planning processes. The most recent proposal for consideration of protection of wilderness characteristics was submitted to the BLM in May 2007 by the Colorado Wilderness Network, a coalition of citizen groups. The BLM's current review of lands for wilderness characteristics included these external nominations, internal nominations, areas identified through inventory and monitoring, and adjacent designations of other federal and state

BLM_0114890

agencies. This review includes only BLM-administered lands and does not include portions of wilderness proposals on National Forest lands, within the Gunnison Gorge or Dominguez-Escalante NCAs, or within existing WSAs.

**Table 3-31** (Units Inventoried for Wilderness Characteristics) identifies the areas that were assessed for wilderness characteristics outside of WSAs and the Tabeguache Area as part of the RMP revision process. Summaries are included following the table for inventory units that will be evaluated for management in at least one alternative in the RMP/EIS (see Chapter 2, Alternatives, and Chapter 4, Environmental Consequences). Areas found to have wilderness characteristics are depicted on **Figure 2-10** (Alternatives B and D: Lands Managed to Protect Wilderness Characteristics).

**Table 3-31**
**Units Inventoried for Wilderness Characteristics**

| Inventory Unit | Acres Inventoried[1] | Acreage with Wilderness Characteristics | Acres not Having Wilderness Characteristics |
|---|---|---|---|
| Camel Back WSA  Adjacent | 8,700 | 6,950 | 1,750 |
| Dolores River Canyon WSA  Adjacent | 3,750 | 550 | 3,200 |
| Dry Creek Basin | 7,030 | 7,030 | 0 |
| Roc Creek | 7,650 | 5,480 | 2,170 |
| Shavano Creek | 6,100 | 4,900 | 1,200 |
| Norwood Canyon Unit 1 | 2,350 | 0 | 2,345 |
| Norwood Canyon Unit 2 | 3,250 | 0 | 3,250 |
| **Total** | **38,830** | **24,910** | **13,920** |

[1]Reflects total BLM-administered acreage within the planning area submitted by the Colorado Wilderness Network, including acreage within existing WSAs. Acreages generated through GIS mapping may vary due to rounding inconsistencies and different mapping techniques.

More information on the evaluation of proposed wilderness units, including methodology for analysis, as well as detailed information on and location of all inventoried units, is in **Appendix F** (Summary of the Uncompahgre Planning Area Wilderness Characteristics Inventory: 2011 Update).

*Camel Back Wilderness Study Area Addition*
This unit is contiguous with the Camel Back WSA and includes 8,700 acres proposed by the Colorado Wilderness Network. A total of 1,750 acres have been excluded from the unit due to substantial evidence of human modification. The remainder of the area retains its natural appearance and provides outstanding opportunities for solitude and primitive and unconfined recreation. Supplemental values include areas of Fremont cottonwood/skunkbush sumac riparian woodland (*Populus deltoides ssp. wislizeni/Rhus trilobata*), which is classified as globally imperiled by the CNHP, as well as important habitat connectivity between the higher-elevation forested lands on the Uncompahgre Plateau to the lower-elevation desert scrub lands at the lower end of the unit.

BLM_0114891

*Dolores Canyon Wilderness Study Area Addition*

This unit contains 3,750 acres adjacent to the Dolores River Canyon WSA as identified in the Colorado Wilderness Network proposal. Portions of the unit on Davis Mesa between the WSA boundary on the northeast side of Wild Steer Canyon and Montrose County Road DD16 (approximately 550 acres) are natural in appearance; however, the unit does not contain outstanding opportunities for solitude due to an adjacent county road. Opportunities for primitive and unconfined recreation are available on the previously described 550-acre portion of the unit.

*Dry Creek Basin*

This unit was identified by the BLM through internal review and update of the UFO wilderness characteristics inventory as required by the FLPMA Section 201. The single-track motorized trails and all-terrain vehicle (ATV) trail within the unit are currently at a low level of use that is consistent with the findings of naturalness and outstanding opportunities for solitude and primitive and unconfined recreation. The Dry Creek Transportation Plan (BLM 2009a) designated both routes. In the southwest portion of the unit, a constructed and maintained road extends into the unit for about two miles and terminates. The route is cherry-stemmed out of the unit. This unit also provides important wildlife habitat connectivity between the higher-elevation forested lands on the Uncompahgre Plateau at the south end of the unit and the lower-elevation lands to the north.

*Roc Creek*

The original proposal from the Colorado Wilderness Network included Sewemup Mesa WSA and BLM-administered lands in both the BLM Grand Junction Field Office and UFO, as well as National Forest System lands in the Roc Creek vicinity. This inventory focuses on BLM-administered lands outside of existing WSAs and designated wilderness within the RMP planning area. The portion of the proposed unit within the planning area is comprised of 7,650 acres near, but not contiguous with, the Sewemup Mesa WSA. A total of 250 acres on the west side of the remaining proposal were eliminated because they were non-contiguous with the remainder of the unit. Of the remaining acres inventoried, 5,480 acres are natural in appearance. Much of the unit contains steep terrain draining toward the north into Roc Creek. Vegetation is predominantly pinyon-juniper forest. The southeast part of the inventory unit (2,170 acres) is not natural in appearance and contains many vehicle routes and linear disturbances remaining from mineral exploration. Several road spurs have been cherry-stemmed out of the unit. Opportunities for solitude and primitive and unconfined recreation are present, and the area is notable for highly scenic views from the bluffs overlooking the deep drainages within the unit.

*Shavano Creek*

This unit is just north of but not adjacent to the congressionally designated Tabeguache Area. A total of 1,190 acres were excluded from the initial inventory area when it was found that Road U475 is a constructed and maintained road and, therefore, formed a new boundary for the unit. The remaining 4,900 acres contain wilderness characteristics and are of sufficient size to make practicable its management in an unimpaired condition. There are abundant opportunities for primitive and unconfined recreation. Opportunities for solitude are also outstanding throughout the unit. In addition, this area provides important habitat connectivity between the higher-

BLM_0114892

elevation forested lands on the Uncompahgre Plateau at the northeast end of the unit and the lower-elevation lands to the southwest.

*Trends*

Lands within the decision area were not inventoried as part of the previous land use planning processes (BLM 1985; BLM 1989a) and have not been inventoried since the original wilderness characteristics inventory conducted in 1980. It is likely that these areas, found to possess wilderness characteristics during the inventory conducted for this RMP, would have possessed wilderness characteristics in 1980 had the inventory been conducted using current methods and technologies. Additionally, over the intervening decades as more of the natural landscapes in the US have been developed, peoples' sensibilities of what constitutes naturalness, solitude, and primitive and unconfined recreation have changed.

## 3.2   RESOURCE USES

This section contains a description of the human uses of resources in the planning area and follows the order of topics addressed in Chapter 2:

- Forestry and woodland products

- Livestock grazing

- Recreation and visitor services

- Comprehensive trails and travel management

- Lands and realty

- Energy and minerals

- Renewable energy

### 3.2.1   Forestry and Woodland Products

The BLM forests and woodlands are managed under the principles of multiple use, sustained yield, and environmental quality protection in accordance with FLPMA and the Colorado Standards for Public Land Health. Values and uses associated with forests, such as timber production, recreation, aesthetics, water quality, wildlife habitat, and wilderness, are managed through an ecologically based program that emphasizes biological diversity, sustainability, and long-term forest health.

*Current Conditions*

*Forest Resources*

The BLM manages approximately 5,300 acres of forested land within the planning area (as shown in **Figure 3-18** [Vegetation Types]). Commercial species include ponderosa pine, Douglas fir, Engelmann spruce, subalpine fir, and aspen. Historically, the primary commercial species were ponderosa pine, Engelmann spruce, and aspen. The annual allowable harvest from suitable commercial forested lands established for the San Juan/San Miguel decision area is 14.5 thousand cubic feet. Annual allowable harvests for the Uncompahgre Basin decision area were to be developed as needed, but due to funding constraints and low demand, were never established. Harvest levels over the past decade have averaged less than 36 hundred cubic feet

BLM_0114893

of forest products per year. This figure is significantly less than annual sustainable harvest limits within the resource area. In Colorado, the low harvest levels have coincided with a reduction in national forest timber harvests and consequent closures and/or very low levels of capacity at the few remaining sawmills since the late 1970s through the early 1990s. **Table 3-32** (Forest and Woodland Products Sold (1998-2008)) shows the number of forest products sold in the UFO from 1998 to 2008.

**Table 3-32**
**Forest and Woodland Products Sold (1998-2008)**

| Fiscal Year | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Fuelwood Cords # | 285 | 167 | 309 | 126 | 262 | 199 | 224 | 192 | 291 | 214 | 254 |
| Fuelwood Volume | 232 | 136 | 252 | 103 | 214 | 162 | 183 | 157 | 237 | 174 | 207 |
| Revenue | $2,850 | $1,400 | $2,440 | $976 | $1,966 | $1,592 | $1,680 | $1,562 | $2,220 | $1,752 | $1,270 |
| Round-wood[1] | 33 | 11 | 16 | 20 | 22 | 25 | 16 | 19 | 79 | 150 | 3 |
| Revenue | $1,501 | $395 | $1,452 | $759 | $1,082 | $1,140 | $601 | $776 | $494 | $182 | $863 |
| Christmas Trees # | 607 | 625 | 603 | 438 | 463 | 289 | 673 | 636 | 580 | 374 | 370 |
| Revenue | $3,269 | $3,362 | $2,412 | $2,728 | $2,963 | $1,788 | $3,438 | $2,601 | $2,008 | $1,827 | $3,700 |
| Boughs (pounds) | | | | | | | 1,000 | | | 4,000 | |
| Revenue | | | | | | | $16 | | | $16 | |
| Transplant # | | 6 | 62 | 14 | 55 | 242 | 32 | 32 | 20 | 15 | |
| Revenue | | $24 | $252 | $56 | $260 | $512 | $144 | $128 | $80 | $68 | |
| *Total Yearly Revenue* | *$7,620* | *$5,181* | *$6,556* | *$4,519* | *$6,271* | *$5,032* | *$5,878* | *$5,066* | *$4,802* | *$3,845* | *$5,833* |

[1]Roundwood includes both saw timber and all non-saw timber and fuelwood products sold which are convertible to cubic feet such as posts, poles, and house logs.

*Woodland Resources*
In addition to commercial forestlands, approximately 107,000 acres of woodland within the planning area are suitable for harvest, consisting mainly of pinyon pine, juniper, and Gambel oak (as shown in **Figure 3-18**). The annual allowable harvest established for woodlands in the San Juan/San Miguel decision area is 10.2 thousand cubic feet; annual allowable woodland harvests for the Uncompahgre Basin decision area were not established. The average annual firewood harvest for the past decade has been 230 cords per year across the entire field office, which is well below sustainable harvest limits. The present demand for fuelwood has been steady and limited almost exclusively to pinyon and juniper. Currently, the collecting of other woodland species, including Gambel oak, is not permitted within the planning area, except on a case-by-

BLM_0114894

case basis when other management objectives are desired. There are known cases of fuelwood and post and pole removal by the public without permits; however, the level of use has been difficult to document and quantify. Realistically this level of use is likely to comprise an additional 10 to 15 percent of known use (approximately 23-35 cords per year) which, combined with known harvest levels, remains well below sustainable harvest limits.

*Christmas Trees and Transplants*
Special forest products, including posts, poles, Christmas trees, and transplants, are sold commercially or by the individual item. Seasonal Christmas tree harvesting by local residents is also a common use of woodland resources, with an average of 514 trees sold per year. Pinyon pine and juniper are the only species currently permitted for Christmas tree harvest within the planning area. The annual harvest of Christmas trees has fluctuated over the past ten years, with the greatest demand occurring in 2004 and the lowest demand in 2008. The harvest of transplants has been minimal, reflecting public and commercial demand. Fewer than 60 transplant permits are sold annually, with a preference for pinyon used in the emerging trend of xeriscaping.

*Forest Inventories*
Given the minimal demand for pinyon-juniper products and relatively small volume contained within stands of commercially viable saw timber in the planning unit, labor-intensive stand inventories have not been utilized. Straight area calculations have traditionally been used to calculate allowable harvest limits under sustained yield principles. Harvest limits are calculated using the following equation:

$$\frac{Stand\ Acres}{Return\ Interval/Regeneration\ Time\ +\ Reestablishment\ Lag}\ x\ Productive\ Capability = Sustainable\ Harvest$$

An extensive inventory of the planning area known as the Timber Production Capability Classification was conducted in the late 1970s through 1980s in order to identify the various species present within a given stand and calculate the stand's production capabilities, as well as to map the stand on a 1:24,000 scale (commonly known as 7.5-minute quadrangle maps). Given current BLM funding and the decrease in demand for forest products from 1970-1989 levels, these inventories, and the straight area calculations used to determine sustainable allowable cuts, remain valid and useful.

*Management Objectives and Practices*
The primary focus of forest management practices in the UFO from the early 1950s through the early 1980s was to provide forage for livestock and big game species. These objectives were achieved through the practice of chaining and roller chopping, primarily in pinyon-juniper woodlands, and then seeding with non-native forage species. This practice was applied to approximately 35,000 acres of pinyon-juniper woodland within the planning area. Although the woodlands are lightly stocked, these treated acres are still considered part of the woodland base. These management objectives and practices have continued through the 1990s to the present.

BLM_0114895

While the emphasis had been on moving towards or maintaining pinyon-juniper woodlands in an early seral state for forage production, there has been a shift in the last decade toward a landscape approach for managing these treatment areas. For example, a percentage of the early seral woodlands within the Spring Creek and Dry Creek watersheds will be allowed to mature, while the remaining pinyon-juniper sites will be managed as early seral, with restoration of the native herbaceous and woody shrub component. Similar approaches could be utilized across the resource area to restore greater ecological integrity to forest and woodland communities.

With implementation of the National Fire Plan, the BLM has conducted numerous fuel treatments in the planning area to manage previously untreated stands through mechanical thinning or prescribed burning. Such efforts represent an attempt to restore areas of woodland and forest that have experienced an increase in numbers of trees per acre or crown closure due to past management practices, such as fire exclusion and grazing. The objective of the treatments has been to minimize fire danger by reducing stocking rates and the continuity of forest canopy.

### Trends

*Forest Health*
Forest and woodlands in Colorado have been affected by drought, insects, and disease. Pinyon ips, mountain pine, spruce bark, and balsam fir beetles have all been increasing in population (Colorado State Forest Service 2009). Within the planning area, aspens are in varying stages of growth, although overall stands are declining. Many stands are on marginal sites exhibiting signs of a relatively unknown phenomenon called Sudden Aspen Decline Syndrome (Colorado State Forest Service 2005).

Fluctuations in Tree Density. Concerns about tree invasion causing major land health problems are lessening in light of recent drought. In addition, recent research on pinyon dendrochronology and stand structure on the Uncompahgre Plateau indicates that many woodland stands have experienced density increases followed by density declines over the past several centuries, apparently linked to climate fluctuations (Romme et al. 2008).

Two prolonged wet periods over the past century have likely contributed to increases in tree density, both within woodlands and through invasion into new communities. Land management practices such as livestock grazing may enhance tree establishment as well, with young trees sprouting in woodland chainings from the mid-20th century. However, the drought has recently killed many of these young regenerating pinyon trees in parts of the landscape, with tree death in some areas as high as 90 percent. Because there is no evidence that frequent fire in shrub communities has repelled tree invasions, the effects of fire repression cannot be implicated thus far.

*Demand for Forest Products*

Saw Timber. Recent government initiatives, including the National Fire Plan, Healthy Forest Restoration Act, and Healthy Forest Initiative, have called for the treatment of forests and woodlands to reduce fire and insect threats and improve overall forest health, while also providing incentives for local community-based business development of forest products.

BLM_0114896

Despite these initiatives, the demand for saw timber within Colorado and eastern Utah remains low. With the sawmill in Montrose, Colorado, reopening, and with the development of biomass plants in the region, demand may increase over the life of the RMP.

Fuelwood. The demand for fuelwood has remained steady over the last decade, and this trend is expected to continue, along with fluctuations in response to oil and natural gas price fluctuations. This is due, in part, to strict air quality regulations that deter wood burning within major population centers in the region, and the fact that fuelwood is more readily obtained on adjoining National Forest System lands. Posts and poles account for approximately 75 to 90 percent of all roundwood sales within the planning area over the past decade. This trend can be expected to remain constant, as modestly priced manufactured posts and poles enter the region, due in part to landscape-scale pest epidemics damaging forests throughout the intermountain west.

As communities along the Western Slope continue to grow, and water resources become more stretched, it is reasonable to expect that xeriscaping and xerogardening trends will accelerate, increasing the demand for native transplant trees from public lands. While difficult to project, as community planners impose water restrictions and promote green community development, the demand for water-conserving transplants can be expected to parallel community growth.

### 3.2.2   Livestock Grazing

The primary laws that govern grazing on public lands are the Taylor Grazing Act of 1934, FLPMA, and the Public Rangelands Improvement Act of 1978. A grazing district is the specific area within which public lands are administered under Taylor Grazing Act Section 3. All Taylor Grazing Act Section 3 permits are contained in grazing districts. A grazing permit is a document that authorizes grazing use of public lands under Taylor Grazing Act Section 3; it specifies grazing preference and the terms and conditions under which permittees make grazing use during the term of the permit. Public lands outside grazing district boundaries are administered under Taylor Grazing Act Section 15. A grazing lease is a document that authorizes grazing use of public lands under Taylor Grazing Act Section 15; it specifies grazing preference and the terms and conditions under which lessees make grazing use during the lease term.

The BLM manages grazing lands under 43 CFR Part 4100 and BLM Handbooks 4100-4180, and it conducts grazing management practices through BLM Manual H-4120-1: Grazing Management (BLM 1987). In addition, the BLM must meet or ensure progress is being made toward meeting the BLM Colorado Public Land Health Standards and Guidelines for Livestock Grazing Management (BLM 1997; **Appendix C**) for each allotment. An allotment is a designated area or management unit that allows grazing and can be made up of multiple pastures. The allowed use of grazing on each allotment is determined based on allocated Animal Unit Months (AUMs). An AUM is equal to the approximate amount of forage needed to sustain one cow, five sheep, or five goats for a month.

Standards and guidelines establish conditions needed to sustain public land health for soils, riparian systems, upland vegetation, wildlife habitat, threatened and endangered species, and water quality (BLM 1997). Guidelines are livestock grazing management tools, methods, strategies, and techniques designed to maintain or achieve healthy public lands as defined by the standards. The standards and guidelines have been implemented through land health

BLM_0114897

assessments, determination documents, environmental assessments, permit renewals, and other permit changes. These standards not only pertain to impacts associated with livestock grazing, but also to other rangeland impacts from such activities as recreation, development activities, wildlife grazing, and wild horse management. Sustainable livestock grazing and desired rangeland condition requires the collective management of forage, water, soil, and livestock by the BLM and the livestock owners and operators. An interdisciplinary approach ensures effective management of the multiple resource values and uses in the Uncompahgre RMP. Management strategies for livestock grazing are focused on achieving BLM Colorado Public Land Health Standards and meeting objectives for other resources, such as vegetation and soils.

*Current Conditions*

Currently 658,540 acres (97 percent) of BLM-administered land within the planning area are allocated for livestock grazing. The public range is permitted at a level of 38,364 AUMs of forage. The permitted level includes 36,554 active AUMs and 5,153 suspended use AUMs. Permittees paid to use 29,219 AUMs of forage in 2008. **Appendix E** (Livestock Grazing Allotments and Allotment Levels) details grazing allotments, acreages, permitted AUMs, and grazing periods within the planning area.

Approximately 17,260 acres (3 percent) of BLM-administered land within the planning area are not managed under an active grazing permit. Some of this area may be unsuitable for grazing and some may be vacant grazing areas due to no permittee in place.

Within the planning area, there are 203 allotments and 135 permittees (see **Figure 3-19** [Grazing Allotments]). The allotments vary in size from 40 to 92,198 acres, with grazing allocations ranging from 1 to 4,800 AUMs in each allotment. In 2009, 85 percent of the allotment permits were for cattle, with sheep and horse grazing accounting for the remaining 15 percent. Individual operators graze animals on 188 allotments, while the remaining fifteen are common allotments grazed by two or more operators.

Grazing within the planning area occurs throughout the year, with much of the use concentrated during spring and fall months. Spring and fall allotments are typically located adjacent to National Forest System land, and are utilized for short periods prior to "on" dates and after "off" dates for higher elevation summer allotments on National Forest System land. Summer use allotments are commonly found at higher elevations in the North Fork of the Gunnison River area. The Forest Service and BLM coordinate grazing management when a permittee uses lands managed by both agencies. Winter use allotments are primarily located in the west end of Montrose and San Miguel Counties, at lower elevations associated with a semi-arid climate.

All grazing permits include terms and conditions regarding management of the allotment. In some cases, allotment management plans have been developed, which provide details about the location, amount, and timing of permitted grazing use, and incorporate allotment-specific planned grazing systems.

Some allotments in the planning area contain portions that are only slightly used or not used at all by livestock due to topography, distance from water, limitations caused by natural barriers, or other reasons. Rangeland improvement projects, water developments in particular, have been implemented within the UFO to better distribute livestock grazing.

BLM_0114898

land health assessments conducted in the planning area between 1998 and 2009 identified causal factors in instances where BLM Colorado Public Land Health Standards were not met or were met with problems. **Table 3-33** (Status of Allotments in Relation to Public Land Health Standards) summarizes the status of grazing allotments in relation to BLM Colorado Public Land Health Standards.

**Table 3-33**
**Status of Allotments in Relation to Public Land Health Standards**

| Description | Number of Allotments | Acres |
|---|---|---|
| Upland Soils, Healthy Plant and Animal Communities, and Threatened and Endangered Species Standards | | |
| Total number of allotments assessed | 181 | 607,760 |
| Allotments meeting standards with problems and/or NOT meeting standards, with current livestock grazing identified as the cause | 30 | 32,744 |
| Allotments meeting standards with problems and/or NOT meeting standards, with causes other than current livestock grazing identified | 128 | 350,923 |
| Riparian and Water Quality Standards | | |
| Allotments meeting standards with problems and/or NOT meeting standards, with current livestock grazing identified as the cause | 11 | 32 |
| Allotments meeting standards with problems and/or NOT meeting standards, with causes other than current livestock grazing identified | 84 | 222 |

The results of the land health assessments assist the BLM in prioritizing allotment management. Three selective management categories for allotments have been developed: Custodial, Maintain, and Improve. Custodial allotments are those where investment in time or money would not be justified due to size or condition of the allotment. In Maintain category allotments, no serious resource use conflicts or controversy exist or current management is generally achieving desired results. Although some investment in time or money would be justified in these allotments, they are not as high a priority as Improve category allotments. Improve category allotments have resource use conflicts or controversies, opportunities exist to achieve the allotment's potential through management changes, or the allotment contains significant unique resources that would justify investments of time and money. These allotments are the highest priority for monitoring and increased range management.

**Appendix E** identifies 30 allotments (275,970 acres) in the improve category, 22 allotments (47,970 acres) in the maintain category, and 178 allotments (334,380 acres) in the custodial category. Changes in management may be due to conflicts with other uses, conflicts with other resources, adjustment in authorized active AUMs based on Ecological Site Inventory, or results of a land health assessment where livestock grazing has been determined to be a causal factor. Improve category allotments have priority in completing Allotment Management Plans, but due to new resource issues and increased focus in some areas, some Allotment Management Plans have been established for lower-priority allotments.

BLM_0114899

### Trends

Over the past five years, billed use has averaged 65 percent of total permitted use. This difference can be attributed to a number of variables. Seasonal variations in precipitation and temperature result in more or less available forage from one year to the next. Drought conditions have required a temporary reduction in grazing use in order to maintain good range conditions. Permittees may also opt for voluntary non-use for a variety of reasons, resulting in AUMs that are available but not used. In addition, grazing is typically deferred in an area for two years following land treatments and fire rehabilitation projects, accounting for lower use levels.

As grazing permits within the planning area become available for whatever reason, there is considerable interest among area livestock producers to acquire them. There is also interest in acquiring grazing authorization for lands not currently allocated for grazing. The anticipated demand for grazing on BLM-administered lands within the planning area is expected to continue into the near future.

### 3.2.3   Energy and Minerals

Energy and minerals are discussed in four separate subsections describing fluid leasable minerals, solid leasable minerals, locatable minerals, and mineral materials.

- **Fluid leasable minerals** are oil (including oil shale) and gas (including shale gas). Leasable minerals are governed by the Mineral Leasing Act of 1920, as amended, which authorized specific minerals to be disposed of through a leasing system. Geothermal heat is also considered a leasable mineral and is governed by the Geothermal Steam Act of 1970.

- **Solid leasable minerals** are coal, sodium, potash, and phosphate. Leasable minerals are governed by the Mineral Leasing Act of 1920, as amended, which authorized specific minerals to be disposed of through a leasing system.

- **Locatable minerals** are gold, silver, platinum, copper, lead, zinc, magnesium, nickel, tungsten, bentonite, uranium, vanadium, and uncommon varieties of sand, gravel, and dimension stone. Locatable minerals can be located and claimed under the Mining Law of 1872.

- **Mineral materials** are common varieties of construction materials and aggregates, such as, sand, gravel, cinders, roadbed, and ballast material. Mineral materials are sold or permitted under the Mineral Materials Sale Act of 1947.

### Fluid Leasable Minerals – Oil and Gas

Oil and gas leasing in the UFO is guided by three RMPs or RMP amendments; none are inclusive of the entire Uncompahgre RMP decision area.

- Uncompahgre RMP (BLM 1989a). Applies to oil and gas leasing and development activities proposed on lands from the North Fork area to the eastern edge of the Uncompahgre National Forest boundary in the UFO.

- Colorado Oil and Gas Leasing and Development EIS and RMP Amendment for the San Juan/San Miguel Planning Area (BLM 1991a). Applies to oil and gas leasing and

BLM_0114900

development activities proposed on lands southwest of the Uncompahgre National
Forest in the UFO.

- San Miguel River Special Recreation Management Area (SRMA) and ACEC
  Amendment (BLM 1993a). Applies to lands within the San Miguel River SRMA and
  ACEC.

Most of the hydrocarbon production in the Uncompahgre RMP planning area is natural gas, with
very little associated oil, natural gas liquids, or water. As of 2010, approximately 15,000 barrels
of oil had been produced in the planning area indication that oil production is not a significant
activity within the planning area (BLM 2012d). As such, only natural gas production will be
discussed in the remainder of this section.

*Current Conditions*
There are currently three types of natural gas occurrences within the planning area:
conventional gas often found in sandstone formations, coal bed methane found in coal seam
deposits, and shale gas produced from shale formations using horizontal drilling technologies.
Natural gas resources are located generally in two areas within the planning area: the North
Fork of the Gunnison River area (North Fork area) and the west end of Montrose and San
Miguel Counties area (West End area) (**Figure 3-20** [Oil and Gas Well Locations]). The North
Fork area lies in the northeast corner of Delta County and the northwest corner of Gunnison
County. In this area, the Mesa Verde Group in the Piceance Basin has gas potential for
conventional gas in sandstone units, coal bed methane gas within its coal seams, and shale gas
resources in sedimentary strata associated with the Mancos Shale. In the West End area, the
Dakota Sandstone Formation has potential for conventional and coal bed methane gas, while the
deeper Cutler Formation and Hermosa Formation Group have potential for conventional gas
and a deep shale gas play, respectively (BLM 2011b) (**Figure 3-8**). These formations all lie within
the Paradox Basin (**Figure 3-9**).

In the last ten years (January 1, 2000, to December 31, 2009), drilling operations have resulted
in 57 new exploratory and development natural gas wells. Of these, thirteen were in the
Paradox Basin part of the planning area, while 44 were located in the Piceance Basin part of the
planning area (BLM 2012d).

Leasing of oil and gas since 2000 has varied from zero acres in 2010 to 54,710 acres in 2005
(**Table 3-34** [Federal Oil and Gas Acreage Leased By Year]). As of August 2012, the planning
area had 348 active leases containing 224,950 acres. Because most leases expire after ten years,
some of these lands may now be available for leasing. As a result, it is estimated that there are
approximately 646,860 acres open to leasing (471,070 acres of BLM surface and 175,790 acres
of split-estate lands (private, state, and local surface with federal fluid mineral subsurface) within
the planning area.

BLM_0114901

**Table 3-34**
**Federal Oil and Gas Acreage Leased By Year**

| Year | Average Lease Acres | Total Leased Acres | Number of Leases |
|------|--------------------|--------------------|------------------|
| 2000 | 745 | 16,130 | 21 |
| 2001 | 545 | 40,070 | 71 |
| 2002 | 490 | 2,240 | 5 |
| 2003 | 460 | 14,070 | 32 |
| 2004 | 635 | 4,250 | 7 |
| 2005 | 900 | 54,710 | 52 |
| 2006 | 510 | 15,850 | 29 |
| 2007 | 500 | 31,560 | 48 |
| 2008 | 490 | 23,540 | 37 |
| 2009 | 80 | 390 | 5 |
| 2010 | n/a | 0 | 0 |
| 2011 | 40 | 40 | 1 |
| 2012 | 800 | 800 | 1 |

<u>North Fork Area</u>. The North Fork area hosts the largest natural gas development activity in the planning area. As of 2010, wells in this area had produced over three billion cubic feet of gas. The bulk of the gas production in this area is from upper Cretaceous sandstone reservoirs in the Mesa Verde Group within the greater Piceance Basin. Primary targets for drilling in the Mesa Verde group include the Cozzette and Corcoran Sandstone members found within the Mount Garfield (or Iles) Formation.

In addition, a high potential exists for the occurrence of coalbed natural gas in the Mesa Verde Group. The South Canyon Coal and Cameo Coal units within the Williams Fork Formation are targets within this group. Producers are also exploring potential sources of shale gas within the Mancos shale (BLM 2012d).

Additional formations within the Cenozoic zone contain natural gas production potential but have not yet been productive (BLM 2012d). According to Colorado State historic records, 116 gas wells have been drilled in the North Fork area on federally managed oil and gas leases, including split-estate lands. Of these wells, 15 are currently producing, 29 are shut-in but capable of production, and 72 have been drilled, abandoned, and plugged (BLM 2011b).

<u>West End Area</u>. Gas exploration in the West End area is occurring in the Mailbox Park, Hamilton Creek, and Wray Mesa areas in portions of Montrose and San Miguel counties west of Telluride. The West End area has a high potential for the occurrence of oil and natural gas; however, the amount of historic oil and gas production to date in this area is very small. According to Colorado Oil and Gas Conservation Commission records, there have been 53 wells drilled on federally managed oil and gas leases (including split-estate lands). Of these wells, two are currently producing, two are shut-in; and 49 have been drilled, abandoned, and plugged (Colorado Oil and Gas Conservation Commission 2012).

The West End area formations lie in the Paradox Basin and are much older than those in the North Fork area. The Dakota Sandstone formation dates to the early Cretaceous period.

BLM_0114902

Various members of the Permian Cutler Formation and the Pennsylvanian Hermosa Group are also targets for gas production. These formations are generally much deeper than the younger North Fork area formations, with total well depths averaging around 10,000 feet in the West End area as opposed to 5,000 feet in the North Fork area.

*Trends*

The Energy Information Administration estimates that over the next twenty years United States energy consumption will grow at an average annual rate of 0.5 percent, with natural gas growing at 0.2 percent. Future natural gas supply is projected to grow at an annual rate of 0.9 percent, and the price of natural gas is projected to increase at an annual rate of 1.2 percent. These projections indicate continued industry emphasis on increasing natural gas supplies and searching for additional natural gas supplies in the Uncompahgre RMP planning area. Much of the planning area gas supply growth is expected to come from development of the coalbed natural gas resource and new reservoir discoveries potentially coming from exploration for nonconventional plays. An estimated 1,271 wells could be drilled in the planning area by 2030, with 418 of those wells falling under BLM management. Of those 1,271 wells, approximately 62 percent (up to 782) could be coalbed natural gas wells, and the remaining 38 percent (up to 489) could be conventional wells (including shale wells). As many as ten of the conventional wells could be deep wells located in the Paradox basin (BLM 2012d).

Although the number of wells drilled, both nationally and in the Uncompahgre RMP planning area, is projected to increase, the production per well has been decreasing and is expected to continue this trend. In response, producers are drilling more and more wells in an attempt to maintain current levels of total production (BLM 2012d).

Carbonaceous shale is expected to become an important future source of natural gas in the United States. Some exploration of the shale resources in the UFO planning area has occurred, but it is still in early phases. When and if the Mancos, Gothic, or Hovenweep shale gas plays are fully characterized for the planning area and technology and well completion methods are optimized, these shale gas resources could become an important energy source (BLM 2012d).

### Fluid Leasable Minerals – Geothermal Resources

A geothermal lease is for the heat resource of the earth where there is federal mineral estate. Unless specifically owned in fee, the federal government does not own the hot water commonly associated with the heat; this falls under state water laws. Geothermal developers must obtain the appropriate water rights and state permits in addition to the federal lease for the resource.

The BLM has the delegated authority to issue geothermal leases on federal lands. It is the policy of the federal government, consistent with Section 2 of the Mining and Mineral Policy Act of 1970 and Sections 102(a)(7), (8), and (12) of the Federal Lands Policy and Management Act of 1976 (43 USC 1701 et seq.), to encourage the development of mineral resources, including geothermal resources, on federal lands. The Geothermal Steam Act of 1970 (30 USC 1001, et seq.), which was amended and supplemented by the Energy Policy Act of 2005, provides statutory guidance for geothermal leasing by the BLM. New federal geothermal development regulations (43 CFR Parts 3000, 3200, and 3280: Geothermal Resource Leasing and Geothermal Resources Unit Agreements) were made effective June 1, 2007 (72 *Federal Register* 24358, May

BLM_0114903

2, 2007), as a result of a directive provided in the Energy Policy Act of 2005. These statutes and regulations delineate lands that are available and unavailable for leasing.

All geothermal project applications are subject to environmental review in accordance with the requirements of NEPA. Applications triggering environmental review are typically received at each of the following three phases of a geothermal development project: (1) exploration (e.g., seismic surveys and temperature gradient hole drilling); (2) drilling operations (e.g., full bore exploration well drilling and well testing); and (3) utilization (i.e., construction and utilization of power plants and transmission lines and ancillary facilities).

As of 2010, the BLM's geothermal energy policy is directed by the following regulations and executive orders:

- The Geothermal Steam Act of 1970, as amended, designates the BLM as being responsible for leasing Federal lands and reviewing permit applications for geothermal development. This authority encompasses about 570 million acres of BLM-administered land, National Forest System lands, with concurrence of the Forest Service, and other federal lands, as well as private lands where the mineral rights have been retained by the Federal Government;

- The Energy Policy Act of 2005 (Title II, Sec. 211), which requires the DOI to approve at least 10,000 megawatts of renewable energy on public lands by 2015;

- The Energy Policy Act of 2005 (Title II, Sec. 222(d)), which requires that all future RMPs in areas of geothermal resource potential consider geothermal leasing and development;

- The Energy Policy Act of 2005 (Title II, Sec. 223), which gives the Secretary of Interior authority to identify areas that could be leased exclusively for direct use of geothermal resources;

- Executive Order 13212, Actions to Expedite Energy-Related Projects, which requires federal agencies to expedite review of energy project applications;

- Secretarial Order 3285, which requires the DOI to identify and prioritize specific locations best suited for large-scale renewable energy production; and

- Instruction Memorandum 2009-022, Geothermal Leasing under the Energy Policy Act of 2005 (BLM 2008g), provides guidance for geothermal leasing.

*Current Conditions*
Of the 909,580 acres of federal mineral estate in the decision area, 44,220 are designated as closed to geothermal leasing.. There are no geothermal facilities, pending applications for geothermal facilities, leases or lease nominations in the planning area.

According to the Programmatic EIS for Geothermal Leasing in the Western US (BLM 2008b) and the Renewable Energy Potential Report prepared in support of this RMP, the planning area has 593,600 acres with geothermal potential. Aside from the westernmost portion, the entire planning area is considered to have geothermal potential. This is shown in Figure 2-2 of the Renewable Energy Potential Report (BLM 2010g). Specific geothermal surface features within

BLM_0114904

the planning area are limited to Orvis Hot Spring (126 degrees Fahrenheit) and Ouray Hot Spring (156 degrees Fahrenheit), which have the potential for expansion of both direct use and indirect (electrical) use applications for the communities near those resources. While neither of these hot springs are located on BLM-administered lands, such lands are nearby and could potentially be involved in future development of these geothermal resources.

*Trends*

The main long-term trend that is expected to influence geothermal energy development within the planning area is the ongoing national rapid expansion of renewable energy development and the possible future trend toward locally produced renewable energy.

### Solid Leasable Minerals – Coal

Coal in the Uncompahgre RMP planning area is found in three Upper Cretaceous formations. From oldest to youngest, they are the Dakota Sandstone Formation, the Mesaverde Formation and Mesaverde Group (Mesaverde), and the Fruitland Formation. The Mancos Shale Formation lies between the Dakota Sandstone and the Mesaverde/Fruitland Formations. These Upper Cretaceous formations are found within two coal regions in the planning area: the Uinta coal region that is associated with the Piceance Basin, and the San Juan River coal region associated

*Diagram 3-10, Stratigraphic Relationship of Coal-bearing Formations in the Planning Area*

with the Colorado Plateau physiographic province. The generalized stratigraphic column illustrated in **Diagram 3-10** (Stratigraphic Relationship of Coal-bearing Formations in the Planning Area), shows the relationship of the three formations and the coal regions (BLM 2010h).

The Uinta and San Juan River coal regions are comprised of seven coal fields, four of which are within the planning area and three adjacent to the planning area (**Figure 3-21** [Coal Fields]). The four fields within the planning area are the Tongue Mesa and Nucla-Naturita coal fields (San Juan River coal region), and the Grand Mesa and Somerset coal fields (Uinta coal region). The three coal fields adjacent to the planning area are the Book Cliffs, Carbondale, and Crested Butte. The Carbondale coal field extends into the northeast corner of the planning area; however, the coal resource in this area has been mostly mined out or is inaccessible due to wilderness status. As such, the coal resource potential for Carbondale is not further discussed in this section (BLM 2010h).



Source: BLM 2010h

*Current Conditions*

The coal development potential area identified in the 1985 San Juan/San Miguel RMP (BLM 1985) and 1989 Uncompahgre Basin RMP (BLM 1989a) was carried forward to Alternative A (which reflects current management) in the Draft RMP/EIS. As part of development of the revised RMP,

BLM_0114905

the BLM developed the *Coal Resource and Development Potential Report* (BLM 2010h) to assess the geographic areas where potential coal resource development may occur in the next 20 years. This report was developed with the assistance of a contractor and included input from geologists and coal mining specialists from the BLM, the Colorado Geological Survey, the Forest Service, and the US Geological Survey, who provided input on coal resource data and activity forecasts. Much of the information came from reports developed by the Forest Service in 2006 and the US Geological Survey in 2004, which identified coal potential for the associated National Forests and surrounding areas. The coal potential area in Alternatives B, C, and D was expanded because of new technology that allows mining of deeper coal and because of the addition of Dakota coal west of Montrose and an expanded Nucla-Naturita Coal Field, neither of which were recognized in the 1985 and 1989 RMPs (as shown in **Figure 3-21**). **Table 3-35** (Coal Fields) illustrates the coal potential area for each coal field, by alternative.

**Table 3-35**
**Coal Fields**

| Coal Field or Coal Resource Area | Federal Mineral Estate Acres[1] | |
|---|---|---|
| | 1989 Data Alternative A | 2009 Data Alternatives B, C, and D |
| Coal Fields | | |
| Grand Mesa | 25,580 | 27,740 |
| Nucla-Naturita | 2,080 | 148,440 |
| Tongue Mesa | 15,920 | 16,570 |
| Somerset | 44,920 | 46,220 |
| Coal Resource Areas[2] | | |
| Piceance deep | 57,350 | 57,360 |
| Uncompahgre Plateau | No data | 117,260 |
| Other areas | No data | 7,910 |
| **TOTAL** | **145,850** | **421,500** |

[1]Acreages shown are those within the decision area and, as such, do not include federal minerals underlying National Forest System lands.
[2]The coal resource areas of Piceance Deep and Uncompahgre Plateau, and other unnamed areas where the coal resource is present, contribute to the coal development potential area, but are not further discussed in this chapter because they have low coal potential and no interest from industry.

The coals in the Grand Mesa coal field are in the Mount Garfield Formation of the Mesaverde Group. The coal is found in the Paonia Shale and Bowie Shale Members. The Rollins Sandstone Member is a whitish, massive sandstone unit that underlies the Paonia Shale and Bowie Shale coal-bearing members and overlies the Mancos Shale Formation that is comprised of marine shale and mudstone and forms the adobe badlands on the lowest slopes of Grand Mesa (BLM 2010h).

The apparent rank of coal in the Grand Mesa coal field is high-volatile C bituminous to subbituminous A. Lee (1912) indicated that the Grand Mesa coal field (known at that time as the Rollins District of the Grand Mesa coal field) produced coal that was typically subbituminous and had lower energy than the bituminous coal in the "Somerset District" to the east. As with most Cretaceous coal in western Colorado, the coal is of high quality, with typically low ash and sulfur content and moderately high energy value. However, because of the lower energy (than coal in

BLM_0114906

the Somerset field), deep overburden, and inaccessibility to coal-handling and transportation facilities, coal mining activity in this field has limited potential during the next 20 years (BLM 2010h).

Nucla-Naturita Coal Field. The Nucla-Naturita coal field is near the southwest corner of the planning area in the vicinity of the towns of Nucla and Naturita (**Figure 3-21**). Although there are 24 historic surface and underground coal mines in the Nucla-Naturita coal field, the only active coal mine is at the New Horizon Mine, operated by Western Fuels Association and currently located on private land with private mineral estate. The New Horizon Mine is a strip mining operation that supplies coal by truck (because no rail line is available in this area) to the Nucla Power Station, a 100-megawatt power plant owned by Tri-State Generation and Transmission Association. In addition to not having a rail line to haul coal, the coal is not in high demand outside of the area because of its low quality.

The coals in the Nucla-Naturita coal field are in the Middle Carbonaceous Shale Member of the Dakota Sandstone Formation. The Upper and Lower Sandstone Members contain massive sandstone, while the Middle Carbonaceous Shale Member contains coal, carbonaceous shale, and siltstone. Coal beds within the Middle Carbonaceous Shale Member are lenticular, discontinuous, and difficult to correlate across the field. In the Nucla-Naturita area, however, there are three beds of mineable thickness ranging from one to five feet. Due to the fragile nature of Mancos Shale, most of it has been eroded from above the Dakota Sandstone. The Burro Canyon Formation, which underlies the Dakota Sandstone, is a massive sandstone and conglomerate that is often mapped as part of the lower member of the Dakota Sandstone (BLM 2010h).

The apparent rank of the coal in the Nucla-Naturita coal field is high-volatile A to C bituminous to low-volatile B bituminous. The lenticular and discontinuous nature of the coal, as well as the presence of partings (thin interbeds of impurities) and clastic dikes, has limited the quality and economic viability of this coal (BLM 2010h).

Somerset Coal Field. The Somerset coal field is located on the lower, southeastern flank of Grand Mesa, extending from the east side of the Leroux Creek drainage (where it abuts the Somerset coal field to the west), past Paonia and Somerset, and east to drainages near Paonia Reservoir in the North Fork of the Gunnison Valley (**Figure 3-21**). The UFO currently manages several active federal coal leases related to two coal mines in the North Fork Valley near Paonia. The Bowie #2 (operated by Bowie Resources) and West Elk (operated by Mountain Coal Company) mines are actively producing underground (longwall, continuous) coal mines. The Elk Creek (operated by Oxbow Mining, LLC) coal mine is idle and the resumption date of production is unknown. Many inactive historic mines are also distributed throughout this field. Highway 133 passes through the eastern end of this field. The field is roughly 38 miles long and two to ten miles wide. Most of this coal field is in Delta County, with the eastern portion extending into Gunnison County (BLM 2010h).

The coals in the Somerset coal field are in the Paonia Shale and Bowie Shale Members of the Mesaverde Formation. The alluvial plain deposits of the Barren and Ohio Creek Members overlie the coal-bearing members. The Rollins Sandstone Member, a tan, massive sandstone unit, underlies the coal-bearing members and overlies the Mancos Shale Formation (BLM 2010h).

BLM_0114907

The apparent rank of the coal in the Somerset coal field is high-volatile B and C bituminous. In the eastern portion of the field where the coal has been exposed to laccoliths and other intrusions, the rank of coal is marginal to premium high-volatile A and B bituminous, and some are of good coking quality. As with most Cretaceous coal in western Colorado, the coal is of high quality, with typically low ash and sulfur content and moderately high to high energy value (BLM 2010h). The Somerset coal field is the most active coal field in the planning area with production totals averaging approximately 11.2 million tons per year for the 5 years ending in June 2014. Production for the year ending in June 2015 was 8.009 million tons.

<u>Tongue Mesa Coal Field (San Juan River Region)</u>. The Tongue Mesa coal field is along Cimarron Ridge, a prominent ridge southeast of Montrose between the Uncompahgre River and Cimarron Creek (**Figure 3-21**). It extends from south of Cerro Summit (Highway 50) in the vicinity of Coal Hill, south along the Cimarron Ridge to Owl Creek Pass east of Ridgway. Most of the historic mining in this field was on the west side of Cimarron Ridge from Buckhorn Lakes south to the Lou Creek drainage, but no active mining has occurred since 1950. The coal field is roughly 18 miles long from north to south and generally 2 to 3 miles wide. The coal field spans Montrose, Ouray, and Gunnison Counties.

The Fruitland Formation is the primary coal-bearing formation in the Tongue Mesa coal field. It is poorly consolidated, typically forming side slopes, and is exposed mostly in landslide scarps. Coal-bearing strata are located in the lower 200 feet of the Fruitland Formation and correlate with the Fruitland-Kirtland Formation of the San Juan Basin section (south of Durango, Colorado) and with the Paonia Shale section in the Grand Mesa area. Early US Geological Survey geologic quadrangle mapping by Dickinson (1965) identified the coal-bearing units as belonging to the Fruitland Formation, which was carried into the more recent mapping. However, others include the Tongue Mesa coal field as being in the Uinta Coal Region and consider the units to be the Mesaverde Formation. The Cimarron Ridge area is an outlier of Upper Cretaceous age coal-bearing rocks capped and protected by Upper Cretaceous and early Tertiary volcanic and volcaniclastic rocks. Due to the proximity of the Tongue Mesa coal field to the Somerset and Grand Mesa coal fields, it has been determined that it is more closely associated with the stratigraphy and local variations of the Uinta Coal Region. However, for the purposes of this planning effort, it is included in the San Juan River Coal Region (BLM 2010h).

The apparent rank of the coal in the Tongue Mesa coal field is high-volatile B subbituminous and subbituminous C. Some of the coal is reported to be considerably oxidized and bony (impure). As with most Cretaceous coal in western Colorado, the coal in this is field is of high quality, with typically low ash and sulfur content and moderately high to high energy value. An exploration license exercised in the 1970s provided data that revealed the coal resource included one very thick seam but indicated faulting that would hamper longwall mining. There are no existing mines in this coal field and historic production has been minimal (BLM 2011b).

*Trends*
For the last decade (2000-2010), the number of coal mines in the US has held steady at approximately 1,400 mines, with a total industry value in 2010 of nearly $37 million dollars (National Mining Association 2011). Within the planning area, the Somerset coal field has the greatest potential for continuing to produce the largest amount of coal. Projections by the US

BLM_0114908

Department of Energy's Energy Information Administration indicate that demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal (BLM 2010h).

**Solid Leasable Minerals – Sodium and Potassium**
Potash is the common name given to potassium carbonate and variously mined and manufactured salts containing potassium in a water-soluble form. Potash is used for the manufacture of glass, soap, and soil fertilizer; and it is important for agriculture. Soda ash, or trona, is a mixture of sodium salt and carbonate minerals. Soda ash is used in the manufacturing of various glass products, powdered detergents, and medicine. It is also used in photography, cleaning, and boiler compounds; in the control of pH in water; and as a food additive (BLM 2011c).

*Current Conditions*
Abundant evidence indicates high potential in the Paradox Valley area for the occurrence of sodium and potassium deposits within the Paradox Member of the Hermosa Group. The Hermosa Group is found above the Paradox Basin in the western portion of the planning area. Although this high potential exists, as of 2011, there had been no reported mineral exploration, development, or production on BLM-administered lands within the planning area. However, in the Paradox Basin portion of the Tres Rios Field Office area, located immediately south of the Uncompahgre RMP planning area, a potash mining company has filed 21 prospecting permit applications. Another company has shown interest in submitting prospecting permit applications for potash in the Paradox Basin (BLM 2011c).

*Trends*
Along with other natural resources, potash and soda ash have experienced a rise in commodity prices to historic levels. With high demand for sodium and potassium deposits expected to continue, soda ash and potash exploration activity in the planning area is projected to increase over the next fifteen to twenty years (BLM 2011c).

**Locatable Minerals – Uranium-Vanadium**
Uranium and placer gold (discussed below) are the primary mineral resources found in the planning area, and are therefore the focus of discussion for this section. Vanadium is also present primarily as a byproduct of uranium mining.

*Current Conditions*
Uranium and vanadium resources are located within the historic uranium mining area designated as the Uravan Mineral Belt in western Montrose County. The host rock for this resource is the Salt Wash Member of the Jurassic-age Morrison Formation. This uranium-rich member outcrops in several locations associated with the Uravan Mineral Belt (BLM 2010i).

Numerous companies are conducting exploratory drilling for uranium-vanadium in the planning area portion of the Uravan Mineral Belt, while a few operations have begun underground bulk sampling excavations. Currently there are 29 active plans of operations or mining notices within the planning area, but there are no active mining operations.

BLM_0114909

The uranium-vanadium mineral resource potential of the planning area is classified according to the system outlined in BLM Manual 3031. Under this system, occurrence potential ratings are based on the geologic likelihood of a mineral's presence in a particular area. The ratings do not reflect the economic feasibility of developing a resource. The potential for development of uranium-vanadium mineral resources from the Morrison Formation in the Uravan Mineral Belt part of the planning area as projected over the life of the RMP, for twenty years, is rated as high occurrence potential with a high level of certainty (BLM 2011c). **Figure 3-22** (Active Uranium Exploration Sites in the Morrison Formation) depicts active uranium exploration sites in the Morrison Formation within the planning area.

*Trends*
The last uranium and vanadium mines in the region closed in 1990 due to declining commodity prices. However, because past mining operations did not completely remove all potential uranium and vanadium resources in the area, the potential for new economically profitable mines in the region remains strong. It is reasonable to expect that new exploration, coupled with modern mining and milling methods, will extract additional uranium and vanadium from Uravan Mineral Belt mines (BLM 2011c).

**Locatable Minerals – Gypsum**
Gypsum is a very soft mineral composed of calcium sulfate dihydrate that is used widely by the construction industry as a major component of wallboard. Paradox Valley, located in the western portion of the planning area, is known for the potential and occurrence of gypsum deposits. However, there are no known commercial deposits of gypsum in the planning area (BLM 2011c).

*Current Conditions*
Gypsum is an evaporate mineral present at the surface of Paradox Valley, in the Paradox Formation of the Hermosa Group, located in the western portion of the planning area. The planning area does not have a history of exploration, development, or production of any kind for gypsum deposits from this formation. In 2010, an inquiry over the submittal of a mining plan of operations for a gypsum mine was submitted to the UFO, but thus far no plans have been made (BLM 2011c).

*Trends*
The demand for gypsum is entirely dependent on the status of the construction industry, which has seen a decline in the US due to the recession. Recently there has been an increase in the demand for the export of gypsum to Asia, whose construction industry is booming. The demand for exports is expected to remain high, and the demand for gypsum within the US is expected to increase with recovery from the recession (BLM 2011c).

**Locatable Minerals – Placer Gold**
Other than uranium and vanadium, placer gold is the other primary mineral resource found in the planning area.

*Current Conditions*
The other primary locatable mineral is placer gold that is mined along the San Miguel River in western Montrose County. The activity is centered on Pinon, Colorado, and east of Nucla, with

BLM_0114910

placer mining claims located upstream from this location. Placer gold deposits in the planning area consist of random occurrences of gold particles that have eroded out of gold vein deposits, washed down to the Dolores, San Miguel, and Uncompahgre rivers, and become entrapped in riverbed sand, gravel, and cobble. Seasonal snowmelt and precipitation serve as an intermittent transport system to replenish the deposits annually. Independent operators and mining clubs both use up to a four-inch suction dredge to extract gold from the river bed. This activity is considered casual use and does not require BLM authorization. The UFO tracks this activity by requiring the operators to submit a notification of use. In 2008, the UFO received over 50 notices.

*Trends*
Placer mining activity largely depends upon the price of gold. In 2011, the price of gold fluctuated between a low of $1,316 per troy ounce and a historic high of $1,854 per troy ounce (Gold Price History 2012). It is anticipated that as the price of gold fluctuates, so will the activity level. In the short term, robust placer mining activity can be expected in the planning area. The historic nature of the mineral ensures a high degree of certainty that placer gold resources are present within the San Miguel River system into the Dolores River, giving the area a high potential rating (BLM 2011c).

**Mineral Materials**
Mineral materials include sand and gravel, and construction materials that are sold or permitted under the Mineral Materials Sale Act of 1947. Mineral materials are sold at a fair market value or through free use permits to governmental agencies. Local government agencies and non-profit organizations may obtain these materials free of cost for community purposes. County and state road construction divisions are significant users of gravel and sand resources.

Sand and gravel, as construction aggregate, is an extremely important resource. The extraction of the resource varies directly with the amount of development nearby – road building and maintenance, and urban development – as sand and gravel is necessary for that infrastructure development. Even more so than other resources, however, the proximity of both transportation and markets are key elements in the development of a deposit.

*Current Conditions*
The mineral materials program on BLM-administered lands within the UFO planning area centers mainly around the use of sand and gravel for construction and paving activities. Sand and gravel deposits are found along the San Miguel, Uncompahgre, and Gunnison Rivers and their major tributary valleys. Other sources include widespread glacial outwash, colluvium, and alluvial fans.

There are six county free-use permitted gravel pits and one private, non-competitive gravel pit, two riprap sites, two fill locations, and one clay area scattered across the planning area. In addition, there is currently a sales area for moss rock.

Production is reported annually. The free-use sites consist of erratic use as conditions demand, with a few thousand tons extracted one year followed by no use for many years thereafter. The noncompetitive site is currently in use for the last phase of a road improvement project, during which up to 50,000 tons have been extracted over the past year. Once completed, the project

BLM_0114911

site is expected to be reclaimed and the surface used to construct a residential housing development. Decorative moss rock is sold on a personal, small quantity basis, with over a hundred permits typically sold per year (BLM 2011c).

*Trends*
Future demand for mineral materials will vary depending upon market conditions, which differ according to economic conditions and construction activity. It is expected that as the current recession ends, construction activity will increase and economic conditions will improve, resulting in an increased demand for construction materials including gravel from areas within the UFO's planning area. There is a high degree of certainty that high potential for sand and gravel deposits exist in a wide variety of locations within the planning area (BLM 2011c).

### 3.2.4   Recreation and Visitor Services
Management of recreation is guided by BLM regulations and policies, federal and state laws, current and emerging trends in public demand for recreational activities and opportunities, and an area's physical and natural surroundings. Current management direction is based on objectives in RMPs and RMP amendments, activity level plans, and recreation management guidance, including 43 CFR 8300. The intent of the BLM's recreation-focused laws, policy, and guidelines is to meet public demand for outdoor land- and water-based recreation opportunities, while preventing or minimizing adverse impacts on the natural and cultural resources on BLM-administered lands in Colorado.

**Current Conditions**
Popular recreation opportunities in the planning area include hunting, fishing, whitewater rafting, OHV use, canoeing, kayaking, camping, hiking, backpacking, mountain biking, horseback riding, rock climbing, photography, and scenery and wildlife viewing. Recreation activities have increased in most areas since the 1985 and 1989 RMPs were adopted, with the greatest increase in OHV use, mountain biking, river recreation use, and rock climbing. In accordance with BLM's multiple-use mandate, per FLPMA, the agency seeks to provide recreational opportunities that include dispersed, organized, competitive, and commercial uses. Recreation in the planning area is managed primarily through licensing, permit fees, and enforcement of federal regulations.

*Recreation Tourism Elements*
Western Colorado is a world-renowned destination for outdoor recreation enthusiasts, and recreation has emerged as the predominant activity on local BLM-administered lands and national forests. The planning area receives around 320,000 visits per year (BLM 2009d). Visitors utilizing the planning area for recreation come from not only the local area (including cities such as Montrose and Delta and smaller communities such as Ridgway and Paonia) and other regions of Colorado, but also from other national and international locations.

<u>Outdoor Recreation Service Providers</u>. The UFO has a well-defined and diverse group of outdoor recreation service providers including informational and marketing providers such as the Montrose Visitors and Convention Bureau and active chambers of commerce in towns including Telluride, Nucla and Naturita, Delta, and Paonia. The planning area is home to dozens of outdoor gear providers, including bicycle shops, motorcycle and OHV shops, backpacking and sporting goods stores, and rafting and boating stores.

BLM_0114912

The UFO also supports a wide variety of permitted outfitters providing recreation services from big-game hunting and float trips to rock climbing excursions and mountain biking trips. Recreation and tourism opportunities are also supported by a number of large hotel chains in addition to locally owned lodging and full-service campgrounds that are privately owned or managed by Colorado State Parks.

Tourism. Recreation-based tourism, driven by a diverse set of year-round recreational opportunities, is critical to the local economies within the planning area. Outdoor recreation provides significant positive economic contributions to the local communities because recreationists tend to locally purchase meals, food, fuel, sporting goods, gifts, and lodging.

Regional public land marketing has historically focused on the BLM, NPS units, and Colorado State Parks. The UFO staff routinely attend regional tourism and marketing meetings to assist in the development of outreach campaigns that highlight BLM-administered land.

*Recreation Management Areas*
Recreation planning guidance and the definitions for recreation management areas (i.e., SRMAs and extensive recreation management areas [ERMAs]) have changed since the San Juan/San Miguel Planning Area RMP (BLM 1985) and the Uncompahgre Basin RMP (BLM 1989a).

Special Recreation Management Areas. Current BLM guidance identifies SRMAs as administrative units where the existing or proposed recreation opportunities and recreation setting characteristics are recognized for their unique value, importance and/or distinctiveness, especially as compared to other areas used for recreation. SRMAs are managed to protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics. SRMAs may be subdivided into recreation management zones (RMZs) to further delineate specific recreation opportunities. Within SRMAs, recreation and visitor service management is recognized as the predominant land use planning focus, where specific recreation opportunities and recreation setting characteristics are managed and protected on a long-term basis. SRMAs/RMZs must have measurable outcome-focused objectives. Supporting management actions and allowable use decisions are required to: 1) sustain or enhance recreation objectives, 2) protect the desired recreation setting characteristics, and 3) constrain uses, including non-compatible recreation activities that are detrimental to meeting recreation or other critical resource objectives (e.g., cultural or threatened and endangered species).

The BLM issues special recreation permits (SRPs) for commercial outfitters to operate and hold events in SRMAs. The planning area contains two SRMAs (**Figure 3-23** [SRMAs and Developed Recreation Sites]):

- San Miguel River SRMA: A 1993 amendment to the San Juan/San Miguel RMP designated 35,940 acres as the San Miguel River SRMA. The predominant recreation uses in the San Miguel River SRMA include whitewater rafting, kayaking, fishing, camping, picnicking, hiking, mountain biking, and sightseeing. BLM visitor patrols recorded 28,387 visitor days from October 1, 2008 through September 30, 2009. These visits were associated with rafting, fishing, camping, and hunting trips within the San Miguel River corridor. During the summer, the majority of campers are first-time visitors who spend at least two to four days in the area (BLM 2009d).

BLM_0114913

Camping use peaks during the fall hunting and spring river seasons, and many of these visitors return every year for an average stay of seven days. Camping use occurs on developed and dispersed designated sites along the river corridor. Thirteen river rafting outfitters currently operate under provisional SRPs.

- Dolores River SRMA: The Dolores River SRMA, co-managed with the BLM Dolores Field Office, was designated in 1985 and encompasses the Dolores River corridor from McPhee Dam in Montezuma County to Bedrock, Colorado. The 13,380-acre portion within the Uncompahgre decision area extends from the Dolores Field Office boundary to Bedrock. The Dolores River SRMA provides recreation activities and settings that are unique for BLM-administered lands. BLM visitor patrols recorded 875 visitor use days at the Bedrock boat launch from October 1, 2008 through September 30, 2009 (BLM 2009d). In most years, the Dolores River provides boatable flows from the end of April through mid-June.

<u>Extensive Recreation Management Areas</u>. Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. Management of ERMA areas is commensurate with the management of other resources and resource uses. Supporting management actions and allowable use decisions must facilitate the visitors' ability to participate in outdoor recreation activities and protect the associated qualities and conditions. Non-compatible uses, including some recreation activities, may be restricted or constrained to achieve interdisciplinary objectives. There are no ERMAs in the decision area.

<u>BLM-administered Lands</u> <u>Not Designated as Recreation Management Areas</u>. Planning guidance in place when the San Juan/San Miguel and Uncompahgre Basin RMPs were written directed that all BLM-administered land not designated as an SRMA should be designated as an ERMA. However, under current recreation guidance (Instruction Memorandum 2011-004, Revised Recreation and Visitor Services Land Use Planning Guidance, Updated Checklist, and Three Land Use Planning Templates), what was formerly the Uncompahgre ERMA would now be considered "undesignated" (i.e., neither an ERMA nor an SRMA). As such, 626,480 acres (93 percent of the decision area) is "undesignated." These BLM-administered lands that are not designated as Recreation Management Areas are managed to meet basic recreation and visitor services and resource stewardship needs. Recreation is not emphasized, however recreation activities may occur. The recreation and visitor services are managed to allow recreation uses that are not in conflict with the primary uses of these lands. Management actions and allowable use decisions may still be necessary to address basic recreation and visitor services and resource stewardship needs.

*Recreation Visits*

Most public land use and activity participation estimates depend on a mix of computerized trail counter data, field observations, and professional judgment of the recreation staff and hence are not scientifically based. Recreation data are recorded in the BLM's Recreation Management Information System, which is a web-based application used to track, store, and retrieve data. The system enables the BLM to estimate recreation participation based on visitor registrations,

BLM_0114914

permit records, observations, and professional judgment. A visitor day is a recreation unit of measure commonly used by federal agencies, and represents an aggregate of twelve visitor hours at a site or area. **Table 3-36** (Visitor Use on BLM-administered Lands) displays the Recreation Management Information System figures for BLM-administered lands within the planning area for fiscal years 2006 through 2009.

**Table 3-36**
**Visitor Use on BLM-administered Lands**

| Activity | Visitor Days ( October 1 – September 30) | | | |
|---|---|---|---|---|
| | 2005/2006 | 2006/2007 | 2007/2008 | 2008/2009 |
| Boating (Motorized) | 416 | 592 | 325 | 636 |
| Boating (Nonmotorized) | 12,145 | 11,443 | 14,047 | 16.821 |
| Camping and Picnicking | 53,310 | 53,141 | 56,255 | 57,699 |
| Driving for Pleasure | 16,971 | 17,538 | 18,939 | 19,772 |
| Fishing | 7,340 | 6,814 | 7,709 | 7,718 |
| Hunting | 50,417 | 52,210 | 55,318 | 56,486 |
| Interpretation, Education, and Nature Study | 13,583 | 13,568 | 2,445 | 2,455 |
| Nonmotorized Travel | 21,886 | 23,065 | 24,614 | 25,380 |
| OHV Travel | 78,894 | 81,601 | 87,699 | 90,405 |
| Snowmobile and Other Motorized Travel | 4,656 | 4,807 | 5,186 | 5,350 |
| Specialized Motor Sports, Events and Activities | 6,014 | 6,214 | 6,714 | 6,929 |
| Specialized Nonmotor Sports, Events and Activities | 21,369 | 21,093 | 22,262 | 22,870 |
| Swimming and Other Water Based Activities | 4,749 | 4,630 | 4,769 | 4,865 |
| Winter/Nonmotorized Activities | 3,021 | 3,122 | 3,372 | 3,480 |
| *Total* | *294,771* | *299,838* | *309,654* | *320,866* |

Source: BLM 2009d

Visitation figures provided in **Table 3-36** are estimates as many areas lack direct visitation monitoring facilities, such as traffic counters or visitor registers. In addition, many popular trails and trail networks are not designated for a particular type of recreational use, making it difficult to assess the activity in which each visitor is engaging.

<u>Growth in Recreation Activities</u>. During the past four years, participation in some recreational activities has substantially increased. These activities include OHV travel, camping and picnicking, hunting, nonmotorized travel, pleasure driving, and nonmotorized winter activities. Increased recreation use is attributed to population growth, local marketing efforts, and a desire by local residents and visitors to enjoy a healthy, outdoors-oriented lifestyle.

BLM_0114915

OHV travel, the most popular recreation activity in the planning area, increased from 78,894 visitor days in 2006 to 90,405 visitor days in 2009, and has become one of the fastest growing activities. Consequently, management actions based on OHV use levels when the 1985 and 1989 RMPs were adopted are often inadequate. Due to its significance, OHV use is more thoroughly addressed in the Comprehensive Trails and Travel Management section of this chapter.

<u>Seasonal Popularity</u>. Recreation activities are common year-round, but the fall hunting and spring fishing seasons are the busiest times of year in the planning area. The CPW manages hunting, primarily through licensing and law enforcement. The CPW issues state rules and regulations, which Colorado State Park Rangers help to enforce. Elk, mule deer, small game, bears, and mountain lions are hunted throughout the planning area and fishing is popular on the Lower Gunnison, Uncompahgre, San Miguel, and Dolores Rivers.

*Developed Recreation Facilities*
Developed recreation facilities range from designated campgrounds equipped with restrooms and picnic tables, to trailheads with simple bulletin boards. They have been constructed to enhance recreation opportunities, protect resources, manage activities, or reduce recreation use conflicts.

The decision area includes 29 developed recreation facilities, which incorporate amenities such as roads, parking areas, and restroom facilities. Among these sites are 10 boat launches (some are associated with camping areas), 8 restrooms, 9 picnic areas, and 10 parking areas (**Figure 3-23**).

Developed recreation sites occur mainly in the San Miguel River and Dolores River SRMAs. There are several campsites along the San Miguel River corridor which have boat ramps, changing rooms for boaters, cabanas and picnic tables, grills, kiosks, parking areas, and toilets. The Dolores River SRMA has picnic tables, cabanas, a parking area, a boat ramp, and an informational kiosk.

The Dry Creek area, North Fork area, and North Delta OHV Area all contain dispersed staging areas and trailheads with kiosks, picnic tables, and parking areas. There is one developed site along the Uncompahgre River near Ridgway with cabanas and picnic tables, informational signs, benches, toilets, and a nonmotorized paved trail.

BLM upgrades recreation facilities as demand for such upgrades increases. These upgrades will be managed in accordance with the prescribed setting character for each particular area. The need for any upgrades or development of additional facilities is overshadowed by a shortfall in maintenance and rehabilitation funds for existing facilities and the high cost of construction for new facilities. Developed recreation sites are maintained by BLM park rangers, seasonal staff, and volunteers.

<u>Developed Campgrounds</u>. The UFO manages four developed campgrounds in the decision area containing 40 to 50 individual campsites. Both of the developed campgrounds are along the San Miguel River and have basic facilities, including toilets and picnic tables.

BLM_0114916

*Recreation Administration*

Cooperative Management. Most developed local trail systems are cooperatively administered with communities and community groups. Each partner shares responsibility for the development, administration, and maintenance of local trail systems. Through these numerous partnerships, the UFO has been able to better meet the local demand for trail-based recreation.

For the past several years OHV trails have been managed in cooperation with the Colorado State Parks State Trails Program. Grant funding has helped a seasonal work crew maintain trails, plan and build new trails, and provide information to OHV users. Without this cooperation very little trail improvement or maintenance would occur on OHV trails.

Special Recreation Permits. As authorized by 43 CFR 2932, the following four types of uses require SRPs: commercial use, competitive events, organized groups, and recreation use in special areas. The BLM also issues SRPs for noncommercial use in certain special areas, including wilderness, rivers, the backcountry, and other areas where it is determined that resources require special protective management and control measures or a permit system for individual use would achieve management objectives.

Commercial SRPs are issued to outfitters, guides, vendors, recreation clubs, and commercial competitive event organizers that provide recreational opportunities or services not requiring permanent facilities. SRPs for competitive and organized group events are also included in this category. SRPs may be issued for ten years or less, with annual renewal. The permits are issued to manage visitor use, protect natural and cultural resources, and accommodate commercial recreational uses. In a typical year, the UFO issues approximately 50 SRPs for use within the planning area, most of which are authorized for river activities and upland hunting outfitting. Other SRPs include those for guided fishing, vehicle shuttles, horseback trail rides, jeep and motorcycle tours, camping, archery tournaments, mountain bike rides, rock climbing, and backpacking. Fifteen percent of SRP fees are expended on program administration, with the remainder going toward visitor services, monitoring, and maintenance.

The BLM also requires noncommercial recreation use permits for individual use of fee-site campgrounds and other uses such as large noncommercial group activities, although none have been issued for the Uncompahgre decision area thus far.

*Accessibility*
Participation in outdoor recreation can be restricted by age, disabilities, poor health, lack of appropriate facilities within an accessible distance, undesirable recreation settings, lack of information about recreation opportunities, poor transportation, or lack of convenience.

The BLM continually improves facilities to make them more accessible to people with disabilities, and to provide easier access to public lands and better information about recreation opportunities. All construction is reviewed for compliance with Uniform Federal Accessibility Standards and the Americans with Disabilities Act Guidelines. As newer Accessibility Guidelines for Outdoor Developed Areas become final, those standards will also be followed.

BLM_0114917

*Recreation Monitoring and Evaluation*

The UFO recreation staff and law enforcement officers monitor all forms of recreation activities and public use for user conflicts, recreation effects on natural and cultural resources, visitor health and safety issues, and conflicts with adjacent private landowners. In addition, recreation staff monitors implementation of recreation management actions and the attainment of management objectives.

*Outcomes Focused Management*

Landscape attributes affect recreational activities and the outcomes for people, communities, economies, and the environment. For example, an area's remoteness, naturalness, or facilities may facilitate different opportunities for hiking, wildlife viewing, or camping. The outcome of engaging in one of those opportunities in a particular setting may have an impact on the individual, the community, the economy, and the environment. The BLM focuses on providing specific, positive outcomes while at the same time attempting to minimize negative outcomes by engaging recreation-tourism participants, non-participating but affected community residents, and national and international visitors. This holistic approach attempts to satisfy the ever increasing and competing demands which are difficult to manage utilizing a traditional activity-based recreation management model (Driver et al. 2008).

*Recreation Setting Character Conditions*

Recreation Setting Character Conditions complement Outcomes Focused Management by allowing recreation planners to combine various setting components to produce a variety of recreation opportunities. These settings components are defined as physical, social, and operational.

*Physical Setting Character Conditions*

The fundamental physical setting character trends for the planning area are clear and predictable, realizing the physical changes in the region. The planning area has experienced rapid growth in the 21 to 25 years since the 1985 and 1989 RMPs. During this time, the natural resource recreation settings have generally become physically less remote due to many factors, including energy development, urban growth, and mechanized/motorized use on public lands.

This change in the physical setting has accelerated change in the social setting character of BLM-administered lands in the planning area.

*Social Setting Character Conditions*

Socially, BLM-administered lands in the planning area are generally busier than they were 20 years ago. This is especially true near communities and around popular destinations like the Dolores River, San Miguel River, Paradox Valley, Roubideau Canyon, Dry Creek, Tabeguache Trail, and Spring Creek. On weekends and in the evenings, interactions with other people are very common in the more popular recreation areas.

Many upland areas (e.g., Tabeguache Area and Cottonwood Creek) receive low levels of visitation (especially weekdays) and offer uncrowded social settings. However, many residents and nonresident hunters utilize BLM-administered lands in the planning area during big game hunting seasons, and the number of contacts with other visitors dramatically increases throughout the planning area. In addition, more people are seeking out these less-visited areas

BLM_0114918

as relief from some of the crowded areas, modifying the social setting of the less crowded areas. With use levels growing, the evidence of visitation is also increasing. Evidence of alteration, including vehicle use, litter, manmade structures, tree damage, surface vegetation impacts, hardened campsites, and compacted soils, can be found in more and more places. In addition to these impacts, increases in recreational shooting and human-caused wildfire are occurring in the planning area.

*Operational Setting Character Conditions*
The UFO has rules and regulations in place to assist in achieving the following goals: maintain natural resource settings; direct recreation use; and protect resources. To achieve these goals, the UFO has also implemented administrative tools such as limiting motorized use in specific areas and by season, increasing signage, increasing field staff, and improving visitor services by creating new brochures and maps. Many of these actions were precipitated by increased accessibility and crowding. Within some recreation areas and in urban-interface areas, new issues such as domestic animals, noise, and visual aesthetics are necessitating BLM to consider additional administrative remedies for recreation use. Currently, no individual user fees for recreational activities are charged on BLM-administered lands in the planning area.

**Trends**
Five key issues are causing the setting character of the planning area to change:

1.  Population growth and changing demographics;

2.  Changing public expectations and demand for outdoor recreation opportunities, especially for dispersed recreation;

3.  Increased energy development;

4.  Close proximity of BLM-administered lands to private property and the growing use of public lands as a backyard recreation destination; and

5.  Technological advances in OHVs as well as better outdoor equipment and clothing.

*Increased Use and Demand for Recreational Opportunities*
Concentrated camping use is increasing across the planning area, particularly during the fall hunting season, as well as in spring and summer. The impacts include rock fire rings, user-created routes, littering, soil compaction and vegetation loss at campsites, and vandalism of signs. As use continues to increase, user conflicts and possible effects on wildlife, cultural resources, soil, and vegetation may increase. Effective management is necessary to mitigate impacts from recreation on other resources in the planning area. Overall recreation use, especially motorized-based, may increase. Additional SRMAs may be prescribed to minimize possible resource impacts. These SRMAs would also address recreational demands in gateway communities. It would be beneficial for the BLM to coordinate with counties and communities to assist in identifying recreational opportunities that local users would enjoy.

## 3.2.5   Comprehensive Travel and Transportation Management
Travel and transportation are integral parts of virtually every activity that occurs on BLM-administered lands. Comprehensive Travel and Transportation Management is the proactive management of public access, natural resources, and regulatory needs to ensure that all aspects

BLM_0114919

of road and trail system planning and management are considered. This includes resource management, road and trail design, maintenance, and recreational and non-recreational use of the roads and trails.

The Comprehensive Travel and Transportation Management framework replaces a travel management program focused primarily on motorized vehicle use. The introduction of Comprehensive Travel and Transportation Management significantly expands the planning scope to include all forms of travel, including foot, horseback and other livestock, bicycle, motorized vehicle (e.g., motorcycles, cars, and trucks), and travel by motorized and nonmotorized boats.

Comprehensive Travel and Transportation Management planning means providing clear and specific direction on the proper levels of land and water access for all modes of travel. The Comprehensive Travel and Transportation Management process must address variability among landscapes, users' interests, equipment options, and cultural and biological resource constraints. The primary goal of Comprehensive Travel and Transportation Management is to develop a systematic network of routes with appropriately designated uses that provides opportunities for a diverse set of activities to occur on public lands, such as recreation, energy development, grazing, and wildlife management. Travel management objectives serve as the foundation for appropriate travel and access prescriptions.

There is considerable overlap between travel management and all other uses on BLM-administered lands. For example, many people visit BLM-administered lands for recreation purposes. For these visitors, a route system may serve as either a means to reach a destination where the activity occurs (e.g., a road to a trailhead or parking area) or as the focus of the recreation activity itself (e.g., a four-wheel driving, hiking, or horseback riding trail).

To reduce the duplication of narrative between travel management and the other sections of this document, this section addresses only public travel and access (i.e., OHV management area designations, route designations, types of travel, and seasonal area limitations). The interrelated recreation component narrative is addressed under **Section 3.2.4** (Recreation and Visitor Services). The transportation component of Comprehensive Travel and Transportation Management addressing administrative access, agricultural use, commercial use, commodity use, and road maintenance is addressed in **Section 3.5.3** (Transportation Facilities).

### Modes of Travel

Visitors to public lands use roads and trails for a variety of activities involving various modes of travel. Motorized travel in the planning area ranges from standard passenger vehicles driving on maintained roads to OHVs operating on primitive roads and trails. OHV is synonymous with off-road vehicle, as defined in 43 CFR 8340.0-5(a):

> *Off-road vehicle means any motorized/battery-powered vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain, excluding: 1) Any nonamphibious registered motorboat; 2) Any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; 3) Any vehicle whose use is expressly authorized by the authorized officer or otherwise officially approved; 4) Vehicles in official use; and 5) Any combat or combat-support vehicle when used in times of national defense emergencies.*

BLM_0114920

OHVs commonly used in the planning area include off-road motorcycles, all-terrain vehicles, utility terrain vehicles, jeeps, specialized 4-by-4 trucks, and snowmobiles. Other modes of travel include mountain biking, cross-country skiing, snowshoeing, horseback riding, pack animal driving, hiking, boating, hang-gliding, paragliding, ballooning, and wheelchairs. The type and amount of use and the location of roads and trails influence physical, social, and administrative recreation setting and the overall quality of the recreation experience.

### Travel Designations

Executive Order 11644 and CFR (43 CFR Part 8340) both require the BLM to designate all BLM-administered lands nationally as open, closed, or limited for OHV use. Per BLM Colorado policy, all OHV use must now be restricted to designated routes within limited areas, rather than designating areas as limited to existing routes (Instruction Memorandum CO-IM-2007-20 [BLM 2007d]). The BLM will not be designating routes as part of this planning effort. However, this RMP will set criteria for future route designation. Travel management planning will commence after the ROD for this RMP is signed. Per the BLM's regulations for OHV management, all BLM-administered lands within the planning area have been designated in one of three OHV designation categories, as follows:

#### Open

Used in areas of intensive OHV or other transportation use where there are no special restrictions and analysis determines that there are no compelling resource protection needs, user conflicts, or public safety issues to warrant limiting cross-country travel.

#### Limited

For areas where OHV travel is limited to designated or existing roads and trails in order to meet specific resource/resource use objectives. Restrictions may include the number or types of vehicles, time, season of use, use of existing roads and trails only, use of designated roads or trails, or licensed use only. The BLM may also impose other restrictions to protect resource/resource use objectives. In addition, the BLM must provide specific guidance about the process for managing motorized vehicle access for authorized, permitted, or otherwise approved vehicles for those specific categories of motorized vehicle uses that are exempt from a limited designation.

#### Closed

Motorized travel and transportation is not allowed in areas designated as closed. Areas are closed in order to protect resources, ensure visitor safety, or reduce user conflicts. Nonmotorized uses are permitted in these areas.

Approximately 1 percent of the decision area is designated as open to OHV use, 91 percent is limited to designated or existing roads and trails, and 9 percent is closed to motorized and/or mechanized use (**Figure 2-48** [Alternative A: Comprehensive Travel and Transportation Management]).

### Emergency Closures

Emergency closures are sometimes necessary to protect public health and safety or prevent unnecessary or undue resource degradation due to unforeseen circumstances. Where off-road vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife,

wildlife habitat, cultural and historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, the affected areas shall be immediately closed to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.

Instruction Memorandum 2013-035 (Requirements for Processing and Approving Temporary Public Land Closure and Restriction Orders) (BLM 2012m) dictates that temporary closures or restrictions orders on BLM-administered lands must be 24 months or less in duration. If the justification for a closure or restriction order has not been addressed within the 24-month period, a new temporary closure or restriction order must be established in accordance with the Instruction Memorandum. Temporary closures and restrictions should be implemented for the shortest time and in the smallest area necessary to protect resources, public health, and safety.

### Federal Regulations
Route designation criteria is described in 43 CFR 8342.1 and states, "The authorized officer shall designate all public lands as either open, limited, or closed to off-road vehicles. All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands."

### National Guidance
On a national level and in response to increasing demand for recreation trails on public lands, the BLM first developed an OHV strategy and then a mountain bike strategy. These strategies emphasize that the BLM should be proactive in seeking travel management solutions that conserve natural resources while providing for ample recreation opportunities (BLM 2007e).

The BLM released the current version of the Land Use Planning Handbook (H-1601-1) in March 2005. Guidance on determining OHV designations during the planning process was incorporated into the Recreation Section (Appendix C, Section II C). As field offices implemented the guidance for RMP development, revision, or amendment, they identified a need to clarify how to implement the guidance in the Recreation section and introduce refinements to the existing process. Instruction Memorandum 2004-005, Clarification of OHV Designations and Travel Management in the BLM Land Use Planning Process, emphasized policy and provided clarification and additional guidance for travel management decisions that will be part of RMP planning (BLM 2003).

### Current Conditions
Primary factors influencing the current state of travel management within the planning area include:

- Lack of comprehensive travel management planning that considers the relationships between various resources, authorized access, and recreation uses

- Historic routes that predate planning for recreational opportunities

- Unauthorized uses (including user-created routes) emanating from existing routes and impacting other resources

BLM_0114922

- Subdivision of private property resulting in the creation of new access points to public lands

- Routes/areas open to motorized use, but accessible only to adjacent landowners

- Increasing conflicts between recreational users over route use

*Emphasis on Minimizing Impacts*

In the current RMPs, OHV designations were made solely to limit impacts by protecting resources, preventing recreation conflicts, and protecting public safety. Recent travel management plans for specific areas have been intended to manage routes and route systems to provide specific recreation opportunities and experiences. However, this planning has focused on a relatively limited area.

Furthermore, even designated routes were not built with recreation experiences in mind. Most follow historic non-recreational routes (such as grazing, mining, or administrative) or were created by repeated cross-country OHV travel. Such trails typically do not provide a desirable recreation experience. The user-created routes in particular are often unsustainable and cause resource impacts.

*Increased OHV Use*

OHV use has increased dramatically in the planning area since the existing RMPs were written in the 1980s. Lands with little previous history of recreational use now commonly experience impacts on natural and cultural resources, as well as significant impacts on recreation. Areas like Dry Creek, the San Miguel River Basin, and Spring Creek, once considered remote and seldom-visited, are now becoming popular recreation destinations. **Table 3-37** (OHV Designations) shows how OHV use is managed throughout the decision area.

**Table 3-37**
**OHV Designations**

| OHV Designation | Acres | Percent of Decision Area |
|---|---|---|
| Closed to Motorized and Mechanized Travel | 44,200 | 7% |
| Closed to Motorized Travel *(mechanized travel limited to designated routes)* | 11,950 | 2% |
| Open to Cross-Country Travel | 8,560 | 1% |
| Limited to Designated Routes | 145,300 | 22% |
| Limited to Existing Routes | 465,790 | 69% |
| *Limited to Existing Routes with Seasonal Closures* | *59,070* | 9% |
| **Total** | **675,800** | **100** |

Source: BLM 2012a

OHV use occurs nearly year-round in lower elevation areas, and for many users OHV riding is the primary reason for their visit to BLM-administered lands. Most of these visitors live within an hour's drive of their destination and enjoy practicing their technical skills, using their

BLM_0114923

equipment, and spending time with family and friends. During autumn, most parts of the planning area experience heavy OHV use by hunters.

*High Use Areas and Trails*
The following information provides a basic profile of high use areas in the planning area.

<u>Dry Creek Area</u>. This area, encompassing 110,500 acres of BLM-administered land within a few miles of Montrose, Olathe, and Delta, is easily accessed nearly year round for a variety of purposes. Uses of the area include sightseeing, photography, hunting, hiking, cross-country skiing, camping, horseback riding, mountain bike riding, ATV riding, technical four-wheel driving, motorcycle riding, snowmobiling, livestock grazing management, decorative rock gathering, Christmas tree cutting, firewood gathering, rights-of-way management/operation/maintenance, BLM and Forest Service administrative purposes, and other uses. Much of the travel is heavily influenced by the regional population growth and nearby private land development. A travel management plan for this area was completed in 2009 and created a designated network of trails for motorized and nonmotorized uses (BLM 2009a).

<u>North Delta OHV Open Area</u>. This Open Area covers 8,560 acres of mostly Mancos shale approximately six miles northeast of the town of Delta and receives heavy use in spring, summer, and fall by local and regional OHV enthusiasts. Facilities are limited but include a concrete unloading ramp and kiosk. Use is expected to continue to increase due to the area's close proximity to Delta.

<u>San Miguel River SRMA</u>. The 35,940-acre San Miguel River SRMA encompasses a stretch of the San Miguel River corridor, beginning between Telluride and Saw Pit and terminating where the river intersects Highway 90 northeast of Naturita. The SRMA also encompasses portions of the Unaweep-Tabeguache Scenic Byway and San Juan Skyway. The SRMA sees heavy use in the spring, summer, and fall for hiking, biking, horseback riding, scenic touring, camping, and river recreation (including recreational mining, rafting, kayaking, and fishing). Hunting is also popular in the fall. There are a number of developed facilities, including campgrounds, picnic tables, kiosks, boat ramps, parking areas, cabins, and restrooms. Land ownership patterns within the SRMA provide management challenges in the form of providing education about public as opposed to private land and where those boundaries are located as well as designating trail systems to avoid trespassing on private property or causing safety concerns along the highway.

<u>Spring Creek</u>. This 4,980-acre area is located on the southern portion of the Uncompahgre Plateau approximately 15 miles southwest of Montrose. The area encompasses a beautiful long and deep canyon with narrow ridges and mesa tops. There is a designated nonmotorized trail system on approximately 800 acres and the larger area is popular in spring, summer, and fall for motorcycle and mountain bike riding, hiking, and horseback riding.

<u>Tabeguache Trail</u>. This trail crosses public land for 142 miles and connects Montrose and Grand Junction, Colorado. OHVs and mountain biking are the dominant uses and the trail includes several designated camping areas. It is difficult, but not impossible, for high-clearance 4-wheel drive vehicles to travel all but the single-track sections of the trail.

BLM_0114924

*Effects of Urbanization and Increased Access*

In addition to increased OHV use, urbanization of adjacent private lands has created additional nonmotorized and motorized use and new expectations for recreation experiences. Many users recreate on BLM-administered lands because the lands are close to home and provide a convenient place to exercise, relieve stress, and spend time with family and friends. New and evolving BLM land uses include "backyard" hiking, mountain biking, dog walking, rock climbing, fly-fishing, and OHV riding. Recreational boating (fly-fishing, whitewater kayaking, and rafting) occurs heavily on the San Miguel, Dolores, and Lower Gunnison rivers.

At times, uses and expectations conflict with one another. Until recently, there has been very little demand, and consequently very few resources allocated, for nonmotorized recreation travel. This type of use has increased in all of the public lands that border municipalities. The counties of Montrose, Delta, Ouray, San Miguel, Mesa, and Gunnison have all experienced rapid population growth, and the subdivision of private lands adjacent to BLM parcels has accompanied the growth. BLM-administered lands are often isolated and provide limited public access. In these instances, enforcement of travel restrictions can be difficult, and motorized trespass from adjacent private land frequently occurs. Increasing high-density subdivision of private land is changing this scenario. Subdivisions are often designed to provide public access to BLM-administered lands. A new community can offer welcome stewardship to adjacent public lands, while the resulting increased access can make BLM monitoring and management more efficient.

*Competing Non-recreational Uses*

Increased transportation demands for non-recreational uses, such as oil and gas exploration and development and livestock grazing, have greatly affected recreation travel in some areas. Recreation experiences can suffer when transportation systems for other uses are increased or created.

When the above factors are considered, it is apparent that there is a need for comprehensive travel management for all recreation uses, as well as close coordination with transportation planning for non-recreational uses.

*Types of Routes*

The majority of the existing route system in the decision area was not built with consideration for sustainability, resource concerns or conditions, or recreation experiences. Most routes either follow historic routes, such as those for grazing, mining, timber, or administrative access, or were user created. Many routes were not necessarily intended to be left open for recreational use. As a result, these trails do not always provide desirable recreation experiences and can have unmitigated impacts on natural or cultural resources.

The Dry Creek area is the only part of the decision area to have undergone a travel management planning process, whereby motorized travel is limited to a system of designated routes. The Dry Creek Travel Management Plan designated a total of 419 miles available to the public seasonally or year-round. This network includes 317 miles of routes open to motorized travel, 44 miles open to nonmotorized and nonmechanized travel, and 23 miles open to nonmotorized and mechanized travel. The plan also closed 258 miles of routes to motorized and mechanized travel, proposed 16 miles of route construction, reserved some routes for

BLM_0114925

administrative motorized use, and implemented seasonal restrictions to protect resource values (BLM 2009a).

*Nonmotorized Travel*
Hiking, bicycling, and horseback riding have generally been increasing throughout the planning area, with pockets of growth concentrated along the urban interface (BLM 2009d).

Foot and horse travel is not limited to existing or designated routes and areas closed to motorized use and seasonal closures currently do not apply to foot, horse, or bicycle travel.

### Trends
Local population growth is expected to drive a continued increase in OHV use, especially around Montrose, Delta, and Telluride and along the urban interface surrounding the towns of Paonia, Ridgway, Norwood, Naturita, and Placerville. Expanding oil and gas and mining operations in the western and northeastern portions of the planning area are expected to attract new residents and with them an increase in OHV use and requests for improved access. These new routes may also infringe upon current motorized and nonmotorized routes by fragmenting existing trails. Use may also become more concentrated in remote areas as suburbanization drives motorized users to look for areas with fewer recreation conflicts.

Current OHV use exceeds historic levels and new, more-powerful vehicles are capable of accessing steeper and rougher terrain. In the past, visitors drove principally Jeeps, trucks, and motorcycles. Today the BLM has seen an increase in use of OHVs of all types and sizes. Increased visitation and the use of more-powerful vehicles have contributed to the widening, deepening, braiding, and eroding of some existing vehicle routes, and an increasing number of hill-climb, play, and camping areas.

Nonmotorized uses close to urbanizing areas will likely increase as the population grows. It is expected that demand for new hiking and mountain biking trails adjacent to municipalities in the planning area will increase, as well as in areas close to major subdivisions outside of incorporated towns. In addition, the demand for floating and fishing access on the San Miguel River and Lower Dolores River is expected to increase. Continued and expanded collaboration between the BLM and local governments will help provide appropriate access to and stewardship of BLM-administered lands along the urban interface.

The existing travel network, especially those routes lacking professional design, is expected to cause increasing impacts on natural and cultural resources. Research from the past 20 years on the impacts of roads to resources, wildlife, and other users, and actual experience by the BLM on these impacts, is increasing the need for well-designed and integrated transportation planning.

### 3.2.6   Lands and Realty
BLM-administered lands are used for a variety of purposes. Major focus areas for the lands and realty program include land tenure adjustments, ROWs, utility corridors, communication sites, and management and adjustment of withdrawals. Wind and solar renewable energy projects are also permitted by ROWs through the lands and realty program.

BLM_0114926

The goals of the lands and realty program are to manage public lands, support the goals and objectives of other resource programs, provide for uses of public lands in accordance with regulations and compatibility with other resources, and improve management of public lands through land tenure adjustments. The lands and realty program is a support program to all other resources to help ensure that BLM-administered lands are managed to benefit the public.

The following section describes the current conditions and characterization of lands and realty within the planning area.

### Current Conditions

Lands and realty actions can be divided between land tenure adjustments and land use authorizations. Land tenure adjustments focus primarily on land exchange, acquisition (including purchase and easement acquisition), and disposal, while land use authorizations consist of ROWs, utility corridors, communication sites, and other leases or permits. Management and adjustment of withdrawals focuses on the establishment, management, modification, and revocation of withdrawals. Lands and realty actions help ensure that BLM-administered lands are managed to benefit the public.

Twenty-five distinct and diverse communities exist within the UFO. Numerous communities and subdivisions are also in the wildland urban interface. The population in many of the counties is expected to grow faster than the statewide average over the next 25 years, which will contribute to an expanding urban interface zone. In addition, the planning area is crossed by several major power transmission lines that are critical for maintaining service to the western US. Mineral development is also expected to continue at a rapid pace over the next decade, adding to the complexity of managing public lands and increasing the realty workload.

### Land Tenure Adjustments

While BLM-administered lands are typically retained in federal ownership, occasionally there are jurisdictional transfers. Land tenure adjustments are typically accomplished through acquisitions, exchanges, or sales.

Land may be acquired when it is in the public interest, provides resource protection, improves land management through consolidation, provides recreational opportunities, enhances wildlife habitat, provides access to public lands or waters, or preserves archaeological and historical resources.

Lands identified for disposal are typically parcels that are difficult or uneconomical to manage, or will serve important public objectives such as community expansion and economic development. Land exchanges are preferred over sales for disposal of BLM-administered lands.

The Recreation and Public Purposes Act of 1926 was established as a means for state and local government or non-profit organizations to acquire BLM-administered lands at reduced or no cost. The transferred land must be used for an established or proposed public project, need, historic monument, or recreational purpose.

BLM_0114927

When in the public interest, it is the goal in land tenure adjustments to keep the surface and mineral estates together on both lands disposed of and acquired to avoid the creation of split estate.

Acquisitions. Lands may be acquired through purchase, exchange, and donation. Acquisitions must be consistent with the BLM mission, regulations, and applicable land use plans.

Exchanges. An exchange must be determined to be in the public interest and enhance federal land management objectives. It must be determined that the values and objectives of the lands being acquired are greater than the values of the federal lands being conveyed.

Sales. The criteria to be used for disposal of BLM-administered lands must be identified for disposal in a land use plan, or an amendment to the plan, before being offered for sale. Sales are typically conducted through the competitive bid process and cannot be sold at less than fair market value. Public lands that are classified, withdrawn, reserved or have special designations are generally not available for sale.

Lands identified for disposal or exchange in the decision area are shown on **Figure 2-59** (Alternative A: Lands Identified for Disposal).

In the Uncompahgre Basin RMP (as amended), 10,350 acres of BLM-administered lands were considered suitable for disposal. Nonfederal lands are considered for acquisition through exchange opportunities if such lands met established criteria and enhanced resource management.

In the San Juan/San Miguel RMP, approximately 21,700 acres of BLM-administered lands were considered suitable for disposal. These tracts included parcels of land with limited public value scattered throughout the area. Disposal would be accomplished through sales, exchanges, or any other title transfer means.

*Land Use Authorizations*

BLM-administered lands throughout the planning area are generally made available for land use authorizations, which are analyzed and issued on a case-by-case basis. Certain lands within the planning area are designated as areas to be avoided or excluded. Examples of designated areas include ACECs, WSRs, SRMAs, and WSAs. Land use authorizations within designated areas generally are not allowed, or if allowed, are subject to stringent stipulations.

Typical land use authorizations within the planning area currently include:

- Roads, including county roads or highways, as well as roads authorized for commercial use or access to private lands. Material storage sites and stock piles may also be included

- Off-lease oil and gas pipelines including transmission and distribution lines and other related facilities, such as compressor stations

- Water facilities including pipelines, irrigation ditches, and canals

BLM_0114928

- Power lines, including transmission and distribution lines, and other related facilities, such as substations

- Telephone and fiber optic cables

- Communication sites

- Railroads

- ROWs to other federal agencies

- Film permits

- Temporary use or short term permits (less than 3 years) such as temporary construction areas or storage sites

It is the BLM's responsibility to protect the public lands from trespass and encroachment through means of prevention, detection, and resolution. Locations in the planning area where trespass is more likely to occur include areas where residential and commercial development interface with public lands. Trespass does exist and is continually being discovered within the planning area. Instances of trespass are pursued as time, personnel and priorities allow.

Rights-of-Way. A ROW is an authorization to use a specific parcel of BLM-administered land for a certain project, such as roads, pipelines, power lines, and communication sites. A ROW authorizes nonexclusive rights and privileges for a specific use of the land for a designated time. A ROW is granted for a term appropriate to the life of a project. A ROW authorizes the holder to construct, operate, maintain, and terminate a facility over, under, upon, or through BLM-administered lands. Such authorizations are issued for commercial and non-commercial purposes such as roads and utilities and may be for energy or nonenergy-related uses. Land use authorizations are also issued to other federal, state, and local agencies and governments.

Permits are generally short-term authorizations (not to exceed three years) that have a minimal impact on the land, such as film permits and temporary storage areas. Leases are usually long-term authorizations requiring a significant capital investment, such as occupancy leases.

Impacts on resources are analyzed when the BLM evaluates an application for the routing or siting of a proposed ROW. Land use authorizations contain special stipulations for surface reclamation, weed control, and other resource protections. Additional mitigation stipulations to protect resources such as cultural, plant, wildlife, riparian, and soils are applied on a case-by-case basis. Existing ROW locations and corridors in the planning area are shown on **Figure 3-24** (Right-of-Way Locations and Corridors).

*Utility Corridors and Communication Sites*

Utility Corridors. Utility corridors are preferred routes that co-locate multiple linear ROWs and are generally located adjacent to existing highways or county roads. Facilities within these corridors may include gas and water pipelines, power lines, and communication lines such as telephone or cable. The BLM encourages the placement of new ROWs within existing corridors to the extent possible. However, factors such as origin, destination, purpose, compatibility, and

BLM_0114929

saturation of an existing corridor may prevent or limit the routing of a new facility within an existing corridor.

Section 368 of the Energy Policy Act of 2005, Public Law 109-58 (HR 6), enacted August 8, 2005, directed the Secretaries of Agriculture, Commerce, Defense, Energy, and the Interior to designate, under their respective authorities, corridors on federal land in eleven western states for oil, gas, hydrogen pipelines, and power lines. As a result of the Act, the West-wide Energy Corridor Programmatic EIS designated corridors, and the ROD was signed on January 14, 2009. Procedures for processing ROW applications within these corridors are in Appendix B, Interagency Agency Operating Procedures, of that EIS. The designated corridors are shown in **Figure 2-56** (Alternative A: Designated Utility Corridors).

<u>Communication Sites</u>. The BLM issues ROW Communications Use Leases for communications facilities on BLM-administered lands. The planning area currently has 11 existing communications sites with 28 authorized uses.

*Withdrawals*
Withdrawals are formal actions that segregate or reserve federal land by statute or administrative order for specific purposes. Withdrawals are often used to preserve sensitive environmental values, protect federal investments in facilities or improvements, support national security, and provide for public health and safety. The majority of withdrawals issued prior to FLPMA remain in effect until they are specifically revoked. Since FLPMA was enacted, withdrawals typically have a term not to exceed 20 years, unless a term is specifically determined by the Secretary of the Interior based upon resource use. See **Figure 2-32** (Alternative A: Lands Withdrawn and to be Recommended for Withdrawal from Locatable Mineral Entry) for a map of withdrawn lands in the planning area.

Withdrawals typically accomplish one or more of the following:

- Transfer total or partial jurisdiction of federal land between federal agencies, without the land leaving federal ownership;

- Close, segregate, or suspend federal land to operation of all or some of the public land or mineral laws (withdraw land from settlement, disposal, location, or entry); or

- Dedicate federal land to a specific purpose.

Current withdrawn areas within the planning area are outlined in **Table 3-38** (Current Withdrawals by Type) which shows the type, holder and purpose of the withdrawal. These areas are also shown in **Figure 2-82** (Land Withdrawals and Power Site Classifications).

*Trends*

*Land Tenure Adjustments*
The BLM will process land exchanges, acquisitions, easements, and potential sales within the decision area on a case-by-case basis as staff and priority workload allow. As opportunities

BLM_0114930

**Table 3-38**
**Current Withdrawals by Type**

| Type of Withdrawal | Holder of Withdrawal | Purpose |
|---|---|---|
| Public Water Reserve | BLM | Water Resource Protection |
| Power Site Reserve | BLM | Power |
| BLM Special Designation | BLM | Tabeguache Special Management Area |
| BLM Miscellaneous | BLM | Administrative |
| Reclamation | BOR | Reclamation Projects |
| Department of Energy | Department of Energy | Energy |
| FERC | Grand Mesa Hydroelectric | Hydroelectric |

Source: BLM 2012a

present themselves, each proposal will be reviewed giving careful consideration to management goals and public benefit.

*Land Use Authorizations*
Demand for land use authorizations in the planning area is anticipated to increase in correlation with future residential and commercial development, increasing population, and energy demand. There is potential for land use authorizations for renewable energy projects (wind, solar, and geothermal).

*Utility Corridors and Communication Sites*

Utility Corridors. Use of utility corridors or the co-location of ROWs has become a more common practice within the BLM. As development in the planning area continues for both energy and increased population related needs, the demand for and use of utility or energy corridors will increase accordingly. As existing corridors become saturated, new corridors will need to be identified.

Communication Sites. Demand for communication sites is anticipated to increase in the future, given the fast pace of technological advances and the boom in wireless networking. Whenever possible, new applicants will be encouraged to co-locate their facilities in existing buildings and towers. Ultimately, new communication sites for new facilities will need to be identified as the existing sites become filled to capacity.

*Withdrawals*
The majority of withdrawals in the planning area were issued between 1915 and 1966, when the withdrawal orders were passed. Withdrawals since 2000 have primarily been designated for creation of special management areas, developed recreation areas, NCAs, and protection of threatened and endangered species or cultural sites. The lands program will continue to administer both new and existing withdrawals in accordance with FLPMA on a case-by-case, site-specific basis. If any existing withdrawals were revoked, the lands would be managed in accordance with the objectives of surrounding or similar lands.

BLM_0114931

### 3.2.7 Renewable Energy

Renewable energy includes solar, wind, and biomass resources. As demand has increased for clean and viable energy to power the nation, consideration of renewable energy sources available on public lands has come to the forefront of land management planning.

In cooperation with the National Renewable Energy Laboratory, the BLM assessed renewable energy resources on public lands in the western US (BLM and DOE 2003). The BLM reviewed the potential for concentrated solar power, photovoltaics, wind, and biomass energy on BLM, Bureau of Indian Affairs, and National Forest System lands in the western US, except Alaska. In December 2005, the BLM signed a ROD for the Wind Programmatic EIS (BLM 2005b). In October 2012, the BLM signed a ROD for the Solar Energy Development Programmatic EIS (BLM 2012c). As part of this RMP effort, a Renewable Energy Potential Report containing information from various sources helped determine the potential for development of renewable energy resources within the planning area (BLM 2010g). These documents will serve as the baseline for the assessment of renewable energy resources in the UFO decision area.

Renewable energy potential within the planning area, excluding ROW exclusion areas, the Tabeguache Area, and WSAs, are discussed below under Current Management. Renewable energy potential for all lands within the planning area, including lands excluded under the Current Management discussion, is discussed below under Resource Potential.

While geothermal is a renewable energy source, it is considered a leasable mineral and, therefore, is covered in **Section 3.2.3** (Energy and Minerals).

As of 2010, the BLM's renewable energy policy is directed by the following regulations and executive orders:

- The Energy Policy Act of 2005 (Title II, Sec. 211), which requires the DOI to approve at least 10,000 megawatts of non-hydropower renewable energy on public lands by 2015. The President has requested that BLM produce an additional 10,000 megawatts beyond that mandated in the Energy Policy Act of 2005.

- Executive Order 13212, Actions to Expedite Energy-Related Projects, which requires federal agencies to expedite review of energy project applications.

- Secretarial Order 3285, which requires the DOI to identify and prioritize specific locations best suited for large-scale renewable energy production.

Additionally, the BLM has specific guidance for certain types of renewable energy. The main Instruction Memoranda are summarized here:

- Instruction Memorandum 2007-097, Solar Energy Development Policy (BLM 2007f), establishes policy for the processing of ROW applications for solar energy development projects on BLM-administered lands and evaluating the feasibility of installing solar energy systems on BLM administrative facilities and projects.

- Instruction Memorandum 2006-216, Wind Energy Development Policy (BLM 2006a), provides guidance on implementing the ROD for the Programmatic EIS on

BLM_0114932

Wind Energy Development (BLM 2005b) and processing ROW applications for wind energy projects on BLM-administered lands.

- Instruction Memorandum 2009-043, Wind Energy Development Policy (BLM 2008h), provides updated guidance on processing ROW applications for wind energy projects on BLM-administered lands.

- Instruction Memorandum 2004-227, Biomass Utilization Strategy (BLM 2004c), updated in July 2005, provides sets of goals to help focus and increase utilization of biomass from BLM-administered lands. In June 2005, the final rule in the *Federal Register* revised the authority of 48 CFR Part 1452 by adding 1452.237-71, which is a new contract clause for removal and utilization of woody biomass generated as a result of land management service contracts whenever ecologically and lawfully appropriate. The BLM issued Instruction Memorandum 2009-120 in May 2009, which updated the contract clause for utilization for woody biomass.

### Current Conditions

Potential solar, biomass, wind, and geothermal resources occur in various locations and forms within the planning area.

There are no permit applications or current leases for concentrated solar, wind generation, biomass, or geothermal energy production within the planning area.

The planning area has been assessed for renewable energy potential (BLM and DOE 2003). Although state of Colorado policies and financial incentives are classified as favorable for renewable energy development, the UFO does not rank nationally among the top 25 BLM field offices with potential.

For solar energy, 557,000 acres of BLM-administered lands within the planning area have good concentrating solar power resource potential (6 to 7 kWh/m²/day), and 118,400 acres have moderate (5 to 6 kWh/m²/day) concentrating solar power resource potential. Photovoltaic solar potential is very good on all 675,700 acres of BLM-administered lands within the planning area. The identified high-potential areas for both concentrating solar power and photovoltaic solar resources are predominantly found in the western and central regions of the planning area. Figure 3-1 of the Renewable Energy Potential Study Report prepared in support of this RMP shows the solar potential areas within the planning area (BLM 2010g).

For wind energy, wind potential is generally marginal to poor within the planning area. Outstanding wind potential areas (class 6) have been identified on 40 acres, while 50 acres have excellent (class 5) wind potential, and an additional 60 acres have good (class 4) wind potential. The identified high-potential areas are located on the eastern side of the planning area and are shown with these potential classes in Figure 4-1 within the Renewable Energy Potential Study Report prepared in support of this RMP (BLM 2010g).

Biomass potential has not been quantified for this report but vegetation types across the planning area are shown in Figure 5-1 of the Renewable Energy Potential Study Report prepared in support of this RMP (BLM 2010g). Biomass productivity from the lands supporting these vegetation types depends on how the BLM is managing the vegetation (i.e., how much of the

BLM_0114933

vegetation is removed and how often), vegetation productivity and growth rate, how accessible those lands are to roads, the slopes of the lands (i.e., the technical feasibility of harvesting biomass), and the private-sector demand for biomass feedstock in the region. The UFO has not been involved in any biomass harvesting activities.

*Trends*

As part of the RMP effort, the Renewable Energy Potential Report (BLM 2010g) containing information from the various sources helped to determine the potential for development of renewable energy resources within the planning area.

The demand for renewable energy-related ROWs should increase nationally, although within the planning area, the potential for wind, solar, and biomass energy is considered to be low relative to other field offices in BLM.

## 3.3   SPECIAL DESIGNATIONS

This section is a description of the special designation areas in the planning area and follows the order of topics addressed in Chapter 2:

- Areas of critical environmental concern
- Wilderness and wilderness study areas
- Wild and scenic rivers
- National trails and byways
- Watchable wildlife viewing sites

There are no designated watchable wildlife viewing sites managed by the BLM in the planning area. However, management alternatives may include the identification, designation or management of such areas.

### 3.3.1   Areas of Critical Environmental Concern

An ACEC is defined in FLPMA, Section 103(a), as an area on BLM-administered lands where special management attention is required to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or to protect life and ensure safety from natural hazards. BLM regulations for implementing the ACEC provisions of FLPMA are found in 43 CFR 1610.7-2(b).

Special management attention refers to management prescriptions developed expressly to protect the important and relevant values of an area from the potential effects of actions permitted by an RMP or RMP amendment, including proposed actions deemed to be in conformance with the terms, conditions, and decisions of the RMP (BLM Manual 1613, Areas of Critical Environmental Concern [BLM 1988]). Such management measures would not be necessary or prescribed if the critical and important features were not present.

To be designated as an ACEC, the area must meet both the criteria of relevance and importance found in 43 CFR 1610-7-2(a)(b) and as defined in BLM Manual 1613, Areas of Critical Environmental Concern (BLM 1988). An ACEC possesses significant historic, cultural, or

BLM_0114934

scenic values; fish or wildlife resources including habitat, communities, or species; natural processes or systems; or natural hazards. In addition, the significance of these values and resources must be substantial in order to satisfy the importance criteria.

ACECs differ from some other special management designations in that designation by itself does not automatically prohibit or restrict other uses in the area. The special management attention is designed specifically for the relevant and important values and, therefore, varies from area to area. Restrictions that arise from an ACEC designation are determined at the time the designation is made and are designed to protect the values or serve the purposes for which the designation was made. The BLM identifies goals, standards, and objectives for each proposed ACEC as well as general management practices and uses, including necessary constraints and mitigation measures. The RMP will identify a reasonable range of alternatives that will include current management for existing ACECs, as well as management for proposed ACECs. In addition, ACECs are protected by the provisions of 43 CFR 3809.1-4(b)(3), which requires an approved plan of operations for activities resulting in more than five acres of disturbance under the mining laws.

### Current Conditions

The decision area has five ACECs totaling 30,000acres: Fairview South Research Natural Area/ACEC, Needle Rock Outstanding Natural Area/ACEC, Adobe Badlands Outstanding Natural Area/ACEC, San Miguel River ACEC/SRMA, and Tabeguache Creek Outstanding Natural Area/ACEC (see **Figure 2-63** [Alternative A: Areas of Critical Environmental Concern]).These ACECs were designated in the two existing RMPs, as amended. The size of each area and the values it is designed to protect are listed in **Table 3-39** (Existing Areas of Critical Environmental Concern). Current ACECs were reevaluated as part of the RMP revision process to determine whether the relevance and importance of each ACEC were still present and required continued management attention; whether threats of irreparable damage to the values had been identified; and whether current management is sufficient to protect the values.

**Table 3-39**
**Existing Areas of Critical Environmental Concern**

| Fairview South Research Natural Area/ACEC | |
|---|---|
| Acres in planning area | The south tract located within the planning area includes 210 acres. The north tract is in the Gunnison Gorge NCA planning area. |
| Natural Values | The ACEC contains a significant portion of one of the largest populations of the federally endangered clay-loving wild buckwheat (*Eriogonum pelinophilum*). This species is endemic to the adobe badlands of Montrose and Delta Counties, with the known range restricted to less than 35 square miles. Fairview South Research Natural Area/ACEC also contains native plant communities representative of the sparsely vegetated adobe badlands. |
| Current Uses/ Management | • Managed to protect endangered and rare plant species.<br>• Open to fluid mineral leasing with no surface occupancy stipulations.<br>• Sheep grazing permits reauthorized in 2008. Recent grazing management changes include minimizing overall use, restricting sheep bedding activities in clay-loving wild buckwheat habitats, and |

BLM_0114935

**Table 3-39**
**Existing Areas of Critical Environmental Concern**

| | |
|---|---|
| | incorporating longer rest periods for the affected allotments. |
| | • Mechanical vehicular travel is limited to a single designated route used for maintenance of an irrigation canal and associated facilities. |
| | • Closed to development of new pipelines. |
| | • Closed to mineral materials disposal. |
| Valid Existing Rights | A BOR irrigation canal and operation and maintenance road runs through the far northern portion of the ACEC. |
| Management Issues/ Trends | • Lack of patrol and enforcement of regulations. |
| | • Potential impacts on clay-loving wild buckwheat from authorized and trespass grazing. Monitoring plots for clay-loving wild buckwheat have been established to examine trend and potential impacts of sheep grazing. |
| | • ROW development increases the risk of noxious weeds; weeds dominate several roads and ROWs in the area, including the South Canal. However, these appear to pose minimal risk to clay-loving wild buckwheat populations at this time. |
| | • Recreation impacts, namely OHV activity, are an issue in the area. |

**Needle Rock Outstanding Natural Area/ACEC**

| | |
|---|---|
| Acres in planning area | 80 |
| Natural Values | This site consists mainly of a volcanic geological structure with high-value scientific, interpretive, and scenic characteristics. The spectacular volcanic formation rises almost 1,000 feet above the Smith Fork River valley. |
| Current Uses/ Management | • Managed to protect the scientific, interpretive, and scenic qualities of the site. |
| | • Open to fluid mineral leasing with no surface occupancy stipulations. |
| | • Managed as unallotted for livestock grazing use. |
| | • Travel is limited to designated roads and trails. |
| | • Managed as VRM Class I |
| | • Closed to development of major utility facilities. |
| | • Closed to mineral materials disposal. |
| | • Recreation opportunities include sightseeing, picnicking, and geological study in a roaded but natural environment. BLM has constructed a small parking lot, interpretive sign, shelter, and walking trail. |
| Valid Existing Rights | A county road and utilities cross the southeast corner of the ACEC. |
| Management Issues/ Trends | • Lack of public information regarding recreation opportunities. |
| | • Lack of on-the-ground monitoring, patrol, and enforcement of regulations. |
| | • Lack of an effective information and education campaign promoting a sound land-use ethic. |

**Adobe Badlands Outstanding Natural Area/ACEC**

| | |
|---|---|
| Acres in planning area | 6,370 |
| Natural Values | This area consists of Mancos shale hills and flats which, through wind and water erosion, have formed unique scenic formations. The area's soils are |

BLM_0114936

**Table 3-39**
**Existing Areas of Critical Environmental Concern**

|  |  |
|---|---|
|  | highly erodible and saline, resulting in high sediment loads and high salinity runoff. The ACEC contains occupied habitat for the threatened Colorado hookless cactus (*Sclerocactus glaucus*) and other native plants. The area supports small populations of the BLM sensitive species white-tailed prairie dog and provides potential habitat for other sensitive species, such as burrowing owls, ferruginous hawk, and kit fox. |
| Current Uses/Management | • Managed to protect its unique scenic qualities, improve threatened and endangered species habitat, provide for semi-primitive nonmotorized recreation opportunities and use, and reduce active erosion.<br>• There are a total of three sheep grazing allotments in the ACEC.<br>• Open to fluid mineral leasing with no surface occupancy stipulations.<br>• Closed to coal leasing.<br>• Closed to mineral materials disposal.<br>• Closed to off-road-vehicle use, managed for nonmotorized recreation opportunities.<br>• Managed as VRM Class I.<br>• Closed to major utility development.<br>• Erosion and salinity control measures are prohibited from using structures or land treatments that would alter scenic values. |
| Valid Existing Rights | There are no valid existing rights in the ACEC. |
| Management Issues/Trends | • Lack of on-the-ground monitoring, patrol, and enforcement of regulations, particularly for recreational use.<br>• Lack of an effective information and education campaign promoting a sound land-use ethic.<br>• OHV incursions from adjacent North Delta OHV open travel area. OHV use may be impacting threatened species including Colorado hookless cactus, which has known populations in the ACEC boundary with the OHV open area. |
| **San Miguel River ACEC/SRMA** (BLM 1993a) | |
| Acres in planning area | 22,780 |
| Natural Values | The ACEC preserves the high quality riparian vegetation resources, relic riparian communities, habitat for many bird species, and the scenic value of the corridor. It protects high quality native riparian communities that are mainly due to the undammed San Miguel River and its intact hydrology. Such communities are becoming increasingly rare in Colorado. The ACEC has been designated as an Important Bird Area by Audubon Society. This site represents one of the finest protected southwest canyon riparian habitats in the US, and it provides breeding sites for a wide variety of species and primary migratory routes for nearly all of the West's songbirds. More than 300 bird species have been observed at the site. The expanding black phoebe (*Sayornis nigricans*) population, which has been moving up the San Miguel River, reached the lower end of the original ACEC in 1999. The river also has yellow-billed cuckoo habitat. |
| Current Uses/ Management | • Managed to protect the high quality riparian habitat, including important bird habitat. |

BLM_0114937

**Table 3-39**
**Existing Areas of Critical Environmental Concern**

| | |
|---|---|
| | • Managed to preserve scenic values. The majority of the ACEC is managed under VRM Class II guidelines, except for the forest management areas from the original RMP, which are managed under Class IV. |
| | • Recreational uses in the area include rafting and kayaking on the San Miguel River and dispersed recreational use such as hiking, cross country skiing, snowshoeing, camping, mountain biking, hunting, and off-highway-vehicle use. |
| | • Camping is limited along the river between Placerville and Sanborn Park Road to two designated sites only. |
| | • Maximum camping stay is 14 days. |
| | • Beaver Creek Canyon, Saltado Creek, and the San Miguel River Canyon from the Sanborn Park road to Horsefly Creek are closed to OHVs. Within the remainder of the ACEC, vehicle use is limited to designated roads or trails. |
| | • Contains 10 active grazing allotments for cattle. Riparian areas not currently allotted, including acquired lands, are closed to livestock use. |
| | • Open to oil and gas leasing subject to standard stipulations and timing limitations. |
| | • Mineral development is managed to minimize impacts on riparian and recreation values. |
| | • Closed to major utility corridors, with the exception of overhead electric transmission lines at Beaver and Saltado creeks. |
| | • All facility construction is required to protect riparian and scenic values. Where possible, facility development is located outside the 100-year floodplain. |
| | • BLM-permitted actions, such as ROWs, bike trails, camping areas, etc., are prohibited in relic riparian communities. |
| Valid Existing Rights | • Existing oil and gas leases are found throughout the ACEC, occurring on a total of 10,410 acres. |
| | • State Highway 145 runs the length of the ACEC adjacent to the river. |
| | • Two transmission lines run through portions of the ACEC. |
| Management Issues/ Trends | • Recreational demand is increasing. |
| | • Livestock grazing, existing oil and gas leases, and ROWs provide potential conflicts with protection of the area's natural values. |
| **Tabeguache Creek ACEC/Outstanding Natural Area** | |
| Acres in planning area | 560 |
| Natural Values | The Outstanding Natural Area and is confined topographically. The ACEC/Outstanding Natural Area is within the Tabeguache Area, which was designated by congress in 1993. Historically there was not vehicle access into much of the canyon and, as a result, many cultural sites remain in pristine condition. The scientific value of the sites within the canyon, their association, and their setting are values that qualify this district for National Register listing. |

BLM_0114938

**Table 3-39
Existing Areas of Critical Environmental Concern**

| Current Uses/ Management | • Managed to protect Cultural resources and aquatic/riparian values.<br>• Has a no surface occupancy stipulation, but is in a No Leasing area (Tabeguache Area).<br>• Closed to off-road vehicle use.<br>• Assigned as VRM Class II, but managed as Class I because it is within the Tabeguache Area, which is managed as Class I. |
|---|---|
| Valid Existing Rights | • There are no valid existing rights in the ACEC. |
| Management Issues/ Trends | • The ACEC/Outstanding Natural Area is within the congressionally designated Tabeguache Area (1993), and, as such, is managed to protect its wilderness values (see **Table 3-41** [Wilderness Study Areas]). There is no motorized or mechanized access. |

In accordance with BLM Manual 1613, Areas of Critical Environmental Concern (BLM 1988), the UFO Interdisciplinary Team reviewed all BLM-administered lands in the planning area to determine whether any areas should be considered for designation as ACECs. The BLM review included both internal and external nominations, areas identified through inventory and monitoring, and adjacent designations of other federal and state agencies. Areas determined to meet the relevance and importance criteria, as defined by 43 CFR 1610.7-2(a)(1) and 43 CFR 1610.7-2(a)(2), and guidance in BLM Manual 1613 (BLM 1988), are provided temporary management to protect human life and safety or significant resource values from degradation until the area is fully evaluated through the RMP process.

### 3.3.2   Wilderness and Wilderness Study Areas

In 1964, Congress passed the Wilderness Act, thereby establishing a national system of lands for the purpose of preserving a representative sample of ecosystems in a natural condition for the benefit of future generations. Until 1976, most land considered for, and designated as, wilderness was managed by the NPS and the Forest Service. With the passage of FLPMA in 1976, Congress directed the BLM to inventory, study, and recommend which public lands under its administration should be designated wilderness. Within the decision area there are wilderness study areas (WSAs) and a congressionally designated area, the Tabeguache Area, which is not designated wilderness, but receives similar protections.

### Wilderness Study Areas

Section 603 of FLPMA specifically required the BLM to provide Congress with recommendations as to the suitability or nonsuitability of roadless areas greater than 5,000 acres and roadless islands for wilderness designation. Congress gave the BLM 15 years to complete the wilderness inventory, which was done on a state-by-state basis. Only Congress can decide which areas, if any, will be designated as wilderness and added to the National Wilderness Preservation System. In 1991, the Colorado BLM issued its final wilderness study reports that included discussion and recommendations for 54 WSAs throughout Colorado (BLM 1991b). The recommendations were based on the findings of the 15-year wilderness study process that included each area's resource values, present and projected future uses, and manageability as wilderness; the environmental consequences of designating or not designating

BLM_0114939

the areas as wilderness; mineral surveys; and public input. Until Congress acts on the recommendations and either designates them as wilderness or releases them for other uses, these areas are managed according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b) to preserve their wilderness values. Activities that would impair wilderness suitability are prohibited in WSAs. There are six primary provisions of FLPMA with regard to interim management of WSAs:

- WSAs must be managed so as not to impair their suitability for preservation as wilderness

- Activities that are permitted in WSAs must be temporary uses that create no new surface disturbance nor involve permanent placement of structures

- Grazing, mining, and mineral leasing uses that existed on October 21, 1976, may continue in the same manner and degree as on that date, even if this would impair wilderness suitability of the WSAs

- WSAs may not be closed to appropriation under the mining laws to preserve their wilderness character

- Valid existing rights must be recognized

- WSAs must be managed to prevent unnecessary or undue degradation

In summary, WSAs must be managed in a manner that would not impair the suitability of the area for preservation as wilderness and to prevent unnecessary or undue degradation. Except for grandfathered uses and valid existing rights, permitted activities in WSAs are temporary uses that create no new surface disturbance and don't involve placement of permanent structures. The BLM's authority to conduct wilderness reviews, including establishing new WSAs, expired in 1991. However, the BLM has authority under Section 201 and 202 of FLPMA to maintain an inventory of all BLM-administered lands and their resources, including wilderness characteristics, and to consider such information during land use planning. Through the land use planning process, BLM will consider all available information to determine the mix of resource use and protection that best serves the FLPMA multiple-use mandate. Wilderness characteristics findings are discussed in **Section 3.1.13** (Lands with Wilderness Characteristics).

*Current Conditions*

Five WSAs lie completely or partially within the decision area: Camel Back (10,400 acres), Adobe Badlands (10,430 acres), Dolores River Canyon (13,350 acres within the decision area), and Sewemup Mesa (1,800 acres within the decision area), and Needle Rock (80 acres within the decision area). The findings of the 1991 wilderness study report for areas within the planning area are shown in **Table 3-40** (Wilderness Recommendations). In this ROD, the BLM recommended as nonsuitable for wilderness designation all of Camel Back and Adobe Badlands WSAs and the Needle Rock Instant Study Area (ISA). The Dolores River Canyon WSA was recommended as suitable for wilderness designation and Sewemup Mesa WSA was also recommended as suitable for wilderness designation with the exception of approximately 130 acres (BLM 1991b). It should be noted that the Sewemup Mesa WSA extends into the Grand Junction Field Office to the north. The acreages discussed here are only for the portion of the WSA in the decision area. As such, acreage figures differ slightly from the 1991 study report and recommendation.

BLM_0114940

**Table 3-40**
**Wilderness Recommendations**

| WSA/ISA | Acres Recommended for Wilderness |
|---|---|
| Camel Back | 0 |
| Adobe Badlands | 0 |
| Needle Rock ISA | 0 |
| Dolores River Canyon | 13,350 |
| Sewemup Mesa | 1,800 |

Source: BLM 1991b, BLM 2012a

The WSAs are designated and protected under the authority of Section 603 of FLPMA, are managed according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b) to preserve their wilderness values until Congress either designates them wilderness or releases them for other uses. The interim management policy recognizes valid existing rights and grandfathered uses. Grandfathered uses include grazing, mining, and mineral leasing conducted in the manner and degree in which these uses were being conducted on October 21, 1976, as long as they do not cause unnecessary or undue degradation of the lands under wilderness review. Only Congress can designate a WSA as wilderness or release it from the protective mandate of Section 603 of FLPMA. The status of these WSAs will not change as a result of the Uncompahgre RMP revision.

***Tabeguache Area***

*Current Conditions*
The Colorado Wilderness Act (HR 631) passed by Congress in 1993, designated the Tabeguache Area (7,750 acres within the decision area) as a special area, the management for which is similar to that of a wilderness area (**Figure 2-67** [Alternatives A, B, C, and D: Tabeguache Area and Wilderness Study Areas]).

A description of each WSAs and the Tabeguache Area are provided in **Table 3-41** (Wilderness Study Areas) and **Table 3-42** (Tabeguache Area).

**Table 3-41**
**Wilderness Study Areas**

| Camel Back Wilderness Study Area | |
|---|---|
| Description | The Camel Back WSA is located nine miles southwest of Delta and 20 miles northwest of Montrose, adjacent to the Uncompahgre National Forest. The WSA's northern boundary follows the cliff line of the east rim of Roubideau Canyon and private land boundaries. Its southern boundary is contiguous with the Uncompahgre National Forest. Private property also makes up a small part of the southern boundary. |
| Acres in planning area | 10,680 |
| Natural Values | • The geomorphic features of the · Camel Back WSA are canyons, mesas, and the · Camel Back ridge |

BLM_0114941

**Table 3-41**
**Wilderness Study Areas**

| | |
|---|---|
| Current Uses/Management | • Opportunities for solitude in the Camel Back WSA are extensive due to a variety of factors including difficulty of access.<br>• Opportunities for primitive · and unconfined recreation including cross county hiking and horseback riding, rock climbing, camping, hunting, photography, and sightseeing.<br>• Approximately 19 miles of aquatic and riparian habitat are provided by perennial creeks within or immediately adjacent to the WSA.<br>• The entire area is closed to motorized and mechanized travel.<br>• Approximately 73 percent of the WSA is crucial deer and elk winter range.<br>• Improvements for livestock include three stock ponds, one water catchment facility, and 1.25 miles of fence. |
| Valid Existing Rights | • There are no unpatented or patented mining claims located in the WSA.<br>• The Winter Mesa allotment has a total of 514 AUMs of spring and fall cattle use and comprises approximately 7,700 acres, or 76 percent, of the WSA. |
| Management Issues/Trends | • The WSA is popular with local area residents for unauthorized off-road vehicle use and fuelwood cutting. There has been an increase in off-road vehicle use in and along the numerous roads and ways which border the WSA. This use highlights the lack of on-the-ground monitoring, patrol, and enforcement of activities as well as a conflict between management for wilderness qualities and recreational use.<br>• Potential conflicts exist between management for wilderness qualities and livestock grazing. |

**Adobe Badlands Wilderness Study Area**

| | |
|---|---|
| Description | Located three miles northwest of Delta, the area is surrounded by both public and non-public lands, and the northern boundary is contiguous with the Grand Mesa National Forest. |
| Acres | 10,320 |
| Natural Values | • Approximately 82 percent, of the Adobe Badlands WSA is composed of the Badlands type Mancos shale formations. Topography of the area is characterized by abrupt sloping hills dissected by rugged serpentine canyons. The northern 18 percent of the WSA is characterized by the foothills of Grand Mesa, vegetated in pinyon-juniper.<br>• Approximately 6,780 acres in the southern two-thirds of the area is managed as an Outstanding Natural Area and ACEC to protect scenic values, threatened and endangered plants, and reduce active erosion.<br>• The WSA provides many opportunities for solitude in the maze-like badlands and upper elevation pinyon-juniper vegetation.<br>• The WSA offers yearlong opportunities for hiking, backpacking, horseback riding, photography, and sightseeing.<br>• Contains occupied habitat for the threatened Colorado hookless cactus, sensitive Adobe Hills beardtongue (*Penstemon retrorsus*), and other native plants. The white tail prairie dog and kit fox, which are sensitive animal species, inhabit the area. |

BLM_0114942

**Table 3-41**
**Wilderness Study Areas**

| | |
|---|---|
| Current Uses/Management | • The Adobe Badlands WSA is closed to motorized and mechanized travel.<br>• Approximately 1,930 acres in the northern portion is managed for deer and elk winter range. |
| Valid Existing Rights | • There are approximately 75 placer mining claims scattered throughout the WSA. These claims were located in 1982 and 1984, and no activity has occurred on them to date.<br>• Three livestock grazing allotments are located within WSA. A total of approximately 878 AUMs of winter sheep use is authorized on these allotments. There are no range facilities. |
| Management Issues/Trends | Lack of on-the-ground monitoring, patrol, and enforcement of recreational activities, particularly off-road vehicle use, which is environmentally damaging to the area's highly erodible, saline soils. |

**Dolores River Canyon Wilderness Study Area**

| | |
|---|---|
| Description | The Dolores River Canyon WSA is located 18 miles west of Naturita and is surrounded by BLM-administered land. |
| Acres | The area contains 28,670 acres of BLM-administered land with the northernmost 13,340 acres in the decision area. Approximately 29,420 acres, including an additional 950 acres from outside the WSA boundary, were recommended for wilderness designation by the BLM. |
| Natural Values | • The WSA is predominantly natural with negligible human imprints. The focal point of the area is the Dolores River Canyon characterized by massive, sheer canyon walls interspersed with several individually unique side canyons such as Bull, Leach, Spring, Coyote Wash, La Sal, and Wild Steer. The rugged canyon system is cut through a series of sedimentary strata which results in many colorful ledges and massive cliffs interspersed with talus slope.<br>• Outstanding natural scenery, opportunities for solitude and primitive, unconfined recreation, and for its ecological diversity. The area is relatively low in elevation and can be reached by maintained roads on both the north and south boundaries making it accessible for year-round wilderness recreation opportunities such as hiking, backpacking, photography, geologic study, hunting, and rock climbing and scenic whitewater river opportunities for float boating, kayakers, and canoeists.<br>• Contains pinyon-juniper woodland and Great Basin sagebrush vegetation zones. The WSA provides potential habitat for a number of threatened, endangered, and candidate plant and wildlife species. |
| Current Uses/Management | • This WSA is closed to motorized and mechanized travel.<br>• Current use focus on wilderness recreational activities. |
| Valid Existing Rights | • No pre-FLPMA oil and gas leases.<br>• Several mining claims are located primarily in La Sal Creek, Wild Steer Canyon, Coyote Wash, and near Buck Mesa, which are peripheral areas and not in the main river canyon. |

BLM_0114943

**Table 3-41**
**Wilderness Study Areas**

| | |
|---|---|
| Management Issues/Trends | • Contains all or portions of five grazing allotments totaling approximately 580 AUMs.<br>• Lack of on-the-ground monitoring, patrol, and enforcement of recreational activities.<br>• Lack of an effective information and education campaign promoting a sound land-use ethic.<br>• Inadequate signing, posting, and maintenance, especially in spring and fall, of access routes. |

**Sewemup Mesa Wilderness Study Area**

| | |
|---|---|
| Description | The Sewemup Mesa WSA is located south of Gateway, west of Highway 141, approximately 15 miles northwest of Uravan. The southwest portion is adjacent to Manti-La Sal National Forest. |
| Acres | The WSA contains 19,140 acres of BLM-administered land, with the southernmost 1,740 acres in the decision area. Of the entire WSA, approximately 18,840 acres were recommended by the BLM as suitable for wilderness designation and 310 acres were recommended as non-wilderness. |
| Natural Values | • Sewemup Mesa is an isolated mesa top with sheer cliff faces that are 500 to 700 feet high. The mesa top is highly dissected by numerous shallow canyon systems. Pinyon-juniper woodlands are the predominate vegetation of the mesa top.<br>• The upland area of Sewemup Mesa contains no imprints of man and is considered to be a pristine natural environment.<br>• Outstanding opportunities for solitude.<br>• Outstanding opportunities for day hiking, backpacking, scenic viewing, nature study, and technical rock climbing.<br>• Uncommon and sensitive plants occur in the WSA. Sensitive plants found in the WSA include Eastwood monkeyflower (*Mimulus eastwoodiae*), spike pappusgrass (*Enneapogon desvauxii*), purple lovegrass (*Eragrostis spectabilis*), and wolftail (*Lycurus phleoides*).<br>• The geology of the WSA is of scientific, educational and scenic value.<br>• Sewemup Mesa WSA provides important wildlife habitat for deer, elk, peregrine falcon and golden eagles. |
| Current Uses/Management | • Suitable area is closed to motorized travel.<br>• Contains critical deer winter range.<br>• Managed to provide for nonmotorized recreation use such as hiking and backpacking in a natural or predominantly natural setting. |
| Valid Existing Rights | • One unpatented mining claim within the UFO portion of the WSA. The surface has not been noticeably disturbed.<br>• There are no oil and gas leases within the UFO portion of the WSA. Conventional oil and gas potential is high, with moderate potential for development (BLM 2012d).<br>• Contains all or portions of three grazing Allotments. The existing level of livestock use is 212 AUMs. |

BLM_0114944

**Table 3-41**
**Wilderness Study Areas**

| | |
|---|---|
| Management Issues/Trends | • Nonmotorized recreation use in the area is increasing. This use highlights the need for signing and maintenance, of access routes as well as the need for additional access routes.<br>• Lack of on-the-ground monitoring, patrol, and enforcement of recreational use.<br>• Lack of an effective information and education campaign promoting a sound land-use ethic. |
| **Needle Rock Instant Study Area** | |
| Description | Needle Rock towers 800 feet above the floor of the Smith Fork of the Gunnison River valley. It originated as the throat of a large volcano about 28 million years ago (Miocene epoch) when molten rock intruded between existing sedimentary formations. As the surrounding country rocks eroded over millions of years, the resistant igneous core was exposed. |
| Acres | The ISA contains 80 acres of BLM-administered land. Of the entire WSA, zero acres were recommended by the BLM as suitable for wilderness designation and 80 acres recommended as non-wilderness. |
| Current Uses/Management | • Needle Rock is an Instant Study Area (ISA), defined as an area formally identified as natural or primitive areas prior to November 1, 1975.<br>• The WSA is closed to motorized and mechanized travel, except for on the county road. |
| Valid Existing Rights | None |
| Management Issues/Trends | None |

**Table 3-42**
**Tabeguache Area**

| | |
|---|---|
| **Tabeguache Area** | |
| Description | The Tabeguache Area is located on the west-central side of the Uncompahgre Plateau, approximately seven miles north of Nucla and adjacent to the Uncompahgre National Forest. The Colorado Wilderness Act (HR 631) passed by Congress in 1993 designated the Tabeguache Area. |
| Acres | A total of 8,060 acres of the area lies within the decision area. The Congressionally designated area contains an additional 9,492 adjacent acres of land in the Uncompahgre National Forest. |
| Natural Values | • One of the last pristine canyons along the Uncompahgre Plateau. Tabeguache Creek Canyon contains a perennial stream and characterized by steep talus slopes and rocky ledges of Wingate and Entrada sandstone.<br>• Rugged terrain has excluded most human use of the area while enhancing opportunities for solitude.<br>• Opportunities for hiking, backpacking, hunting, and fishing.<br>• High potential for the existence of important archeological sites due to |

BLM_0114945

**Table 3-42**
**Tabeguache Area**

| | |
|---|---|
| | the topography, year-round water supply, and proximity to known archeological sites. |
| Current Uses/Management | The Tabeguache Area must be managed by the BLM and Forest Service in order to maintain the area's "presently existing wilderness character and potential for inclusion in the National Wilderness Preservation System." The entire Tabeguache Area is closed to motorized and mechanized travel, mineral entry, and leasing. |
| Valid Existing Rights | There are no pre-FLPMA oil and gas leases and no patented mining claims. Contains all or portions of four grazing allotments totaling 286 AUMs. |
| Management Issues/Trends | • Lack of on-the-ground monitoring, patrol, and enforcement of recreational use. <br> • Lack of an effective information and education campaign promoting a sound land-use ethic. <br> • Lack of public access, inadequate signing, posting, and maintenance, especially in spring and fall, of access routes. |

### 3.3.3   Wild and Scenic Rivers

Wild and scenic rivers are streams or segments of streams designated by Congress under the authority of the Wild and Scenic Rivers Act of 1968 (Public Law 90-542, as amended; 16 USC 1271-1287) for the purpose of preserving the stream or stream section in its free-flowing condition, preserving water quality, and protecting its outstandingly remarkable values (ORVs). ORVs are identified on a segment-specific basis and may include scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values.

Section 5(d)(1) of the Wild and Scenic Rivers Act directs federal agencies to consider potential wild and scenic rivers in their land and water planning process. To fulfill this requirement, the BLM evaluates streams when developing or revising its RMPs. In order to fulfill its obligations under Section 5(d)(1) of the Wild and Scenic Rivers Act, the UFO is considering the eligibility and suitability of streams in the planning area for inclusion in the National Wild and Scenic Rivers System (NWSRS).

***Determination of Wild and Scenic River Eligibility***

The initial step in the eligibility phase of the wild and scenic river analysis is to generate an inventory of all streams within the evaluation area. Every known stream with a perennial or intermittent flow regime within the planning area was identified using a variety of BLM and other data sources. Some waterways were further segmented based on differences in level of development, physiographic character, land status, or the existence of in-channel diversions or dams.

The stream segments were then evaluated to determine whether they meet the dual criteria of being free-flowing and possessing one or more outstandingly remarkable value, as defined in the Wild and Scenic Rivers Act. Eligible segments were preliminarily classified as wild, scenic, or recreational based on water quality and level of human development along the river corridor.

BLM_0114946

The Final Wild and Scenic River Eligibility Report for the Uncompahgre Planning Area (BLM 2010d) details stream segments determined to be eligible for inclusion in the NWSRS, as defined by the Wild and Scenic Rivers Act of 1968. The final eligibility report also lists all streams within the planning area that were evaluated and found to be not eligible, along with supporting rationale. The report, including detailed maps of eligible stream segments, is available at the UFO in Montrose, Colorado, and on the Uncompahgre RMP Planning Web site (http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html).

**Determination of Wild and Scenic River Suitability**
Stream segments found to be eligible for inclusion in the NWSRS are carried forward to the suitability phase of the wild and scenic river analysis. The suitability phase considers tradeoffs between corridor development and stream protection by applying eight criterion to each eligible segment. The Draft Wild and Scenic Rivers Suitability Report details the suitability study process and the draft suitability determinations for each segment (see **Appendix P** [Summary of Draft Wild and Scenic Rivers Suitability Report]). A final determination of suitability will be issued in the RMP ROD.

**Current Conditions**
There are no streams in the planning area designated as a Wild and Scenic River. In 1975, the Wild and Scenic Rivers Act was amended and identified 105 miles of the Dolores River, from McPhee to Bedrock, as a Study River (Public Law 93-621). In 1976, a joint study by the Colorado Department of Natural Resources, Forest Service, and DOI, Bureau of Outdoor Recreation identified the entire length as suitable for inclusion in the NWSRS and such a recommendation was made to Congress (Colorado Department of Natural Resources et al. 1976), but Congress did not act on the recommendation. The river was again studied in a joint effort between the BLM and the Forest Service as part of the San Juan Public Lands Draft Land Management Plan, and the river was again preliminarily determined to be eligible and suitable for inclusion in the NWSRS (BLM and Forest Service 2007). The draft plan acknowledges that the lowest 11.9 miles of the river is within the UFO and that the UFO has decision-making and on-the-ground management responsibility in this area. As such, the UFO reviewed the eligibility analysis of the San Juan Public Lands Center and concurred with the findings. As part of this plan, the UFO will review the segment for suitability.

After evaluating all streams identified during the inventory phase, 18 streams separated into 28 segments, were determined to be free-flowing and possessing one or more ORV necessary for Wild and Scenic Rivers eligibility. While a portion of the Gunnison River Segment 3 (0.5 mile) is within the decision area for this RMP, the entire segment will be considered for suitability during the preparation of the RMP for the Dominguez-Escalante NCA. The 18 streams (28 segments) are carried forward for suitability analysis (**Appendix P**) (**Figure 2-68** [Alternatives A and B: Segments Eligible (Alternative A) or Suitable (Alternative B) for Inclusion in the NWSRS]). **Table 3-43** (Eligible Stream Segments) shows those eligible segments in the planning area being studied for suitability analysis, the identified ORVs associated with each segment, and the preliminary classification assigned to each segment.

BLM_0114947

**Table 3-43**
**Eligible Stream Segments**

| River or Creek | Length on BLM Land (miles) | Area on BLM Land (acres) | Preliminary Classification | Outstandingly Remarkable Values |
|---|---|---|---|---|
| Gunnison River Segment 2 | 0.4 | 90 | Recreational | Fish |
| Monitor Creek | 9.4 | 2,610 | Wild | Vegetation |
| Potter Creek | 9.8 | 2,830 | Wild | Vegetation |
| Roubideau Creek Segment 1 | 10.0 | 2,700 | Wild | Recreational, Wildlife, Cultural, Vegetation |
| Roubideau Creek Segment 2 | 3.5 | 1,330 | Scenic | Wildlife, Vegetation |
| Deep Creek | 0.6 | 130 | Scenic | Fish |
| West Fork Terror Creek | 0.5 | 150 | Scenic | Fish |
| Beaver Creek | 14.2 | 3,710 | Scenic | Vegetation |
| Dry Creek | 10.4 | 2,640 | Wild | Scenic, Geologic |
| Naturita Creek | 10.0 | 3,240 | Scenic | Fish |
| Saltado Creek | 4.1 | 1,450 | Wild | Vegetation |
| San Miguel River Segment 1 | 17.3 | 6,680 | Recreational | Scenic, Recreational, Wildlife, Historic, Vegetation, Paleontology |
| San Miguel River Segment 2 | 3.6 | 1,110 | Wild | Scenic, Recreational, Wildlife, Vegetation |
| San Miguel River Segment 3 | 5.3 | 1,880 | Scenic | Recreational, Fish, Wildlife, Vegetation |
| San Miguel River Segment 5 | 2.6 | 2,660 | Recreational | Recreational, Fish, Historic, Vegetation |
| San Miguel River Segment 6 | 2.3 | 810 | Recreational | Recreational, Fish, Historic, Vegetation |
| Tabeguache Creek Segment 1 | 3.6 | 1,080 | Wild | Vegetation |
| Tabeguache Creek Segment 2 | 7.9 | 2,480 | Recreational | Cultural, Vegetation |
| Lower Dolores River | 6.9 | 1,990 | Scenic | Scenic, Recreational, Geologic, Fish, Wildlife |
| North Fork Mesa Creek | 5.8 | 1,740 | Scenic | Vegetation |
| Dolores River Segment 1a (portion within the Dolores River Canyon WSA) | 8.7 | 1,880 | Wild | Recreational, Scenic, Fish, Wildlife, Geology, Ecologic, Archaeology |
| Dolores River Segment 1b (portion from the Dolores River Canyon WSA to Bedrock) | 0.9 | 460 | Recreational | Recreational, Scenic, Fish, Wildlife, Geology, Ecologic, Archaeology |
| Dolores River Segment 2 | 5.4 | 1,820 | Recreational | Scenic, Recreational, Geologic, Fish, Wildlife, Vegetation |
| Ice Lake Creek Segment 2 | 0.3 | 100 | Scenic | Scenic |
| La Sal Creek Segment 1 | 0.6 | 720 | Recreational | Fish, Vegetation |
| La Sal Creek Segment 2 | 3.8 | 1,030 | Scenic | Fish, Vegetation |

**Table 3-43**
**Eligible Stream Segments**

| River or Creek | Length on BLM Land (miles) | Area on BLM Land (acres) | Preliminary Classification | Outstandingly Remarkable Values |
|---|---|---|---|---|
| La Sal Creek Segment 3 | 3.4 | 900 | Wild | Scenic, Recreational, Fish, Cultural, Vegetation |
| Lion Creek Segment 2 | 1.3 | 400 | Scenic | Vegetation |
| Spring Creek | 1.5 | 630 | Recreational | Vegetation |

Sources: BLM 2010d; BLM and Forest Service 2007

*Trends*
A discussion of trends specific to each eligible segment can be found within the Draft Wild and Scenic River Suitability Report (**Appendix P**).

### 3.3.4   National Trails and Byways

*Current Condition*

*National Trails System*
The National Trails System includes National Historic Trails, National Scenic Trails, and National Recreation Trails, which are congressionally designated by the Secretary of Interior per the National Trails System Act of 1968 (Public Law 90-543).

*National Historic Trails*
A National Historic Trail is a congressionally designated trail that is an extended, long-distance trail, not necessarily managed as continuous, that follows as closely as possible and practicable the original trails or routes of travel of national historic significance. The purpose of a National Historic Trail is the identification and protection of the historic route and the historic remnants and artifacts for public use and enjoyment. A National Historic Trail is managed in a manner to protect the nationally significant resources, qualities, values, and associated settings of the areas through which such trails may pass, including the primary use or uses of the trail. The BLM manages 13 National Historic Trails.

The Old Spanish National Historic Trail was designated on December 4, 2002, by the Old Spanish Trail Recognition Act of 2002 (Public Law 107-325). The Old Spanish National Historic Trail passes through a portion of the planning area. Fifty-one miles of the Old Spanish National Historic Trail are within the planning area. However, only nine miles of the trail are under BLM jurisdiction, as the remaining portions are on land with other surface ownership (**Figure 2-83** [Alternative A: National Historic Trails and State and BLM Byways]).

The Old Spanish National Historic Trail was a 2,700-mile trade route linking Santa Fe, New Mexico, and Los Angeles, California, passing through New Mexico, Colorado, Utah, Arizona, Nevada, and California. The trail had brief but heavy use between 1829 and 1848. During that period, Mexican and American traders took woolen goods west over the trail by mule train and returned eastward with California mules and horses for the eastern US and Mexican markets (Old Spanish Trail Association 2010).

BLM_0114949

Spanish traffic was fairly constant between 1765 and 1821 to trade with the Ute. Some trail users chose to trade with the Utes as far north as Salt Lake, and followed a path now labeled the "North Branch," which led to Grand Junction, Colorado before heading south to rejoin the other major route from Santa Fe via Green River, Utah. Mexican trader Antonio Armijo made the first commercial, round-trip journey along a southern variant of the route in 1829 to 1830. William Wolfskill and George Yount's commercial pack train of 1830 to 1831 inaugurated consistent use of the entire route from 1830 to 1848. Use lapsed after the end of the Spanish American War in 1848, and by 1853, the Old Spanish National Historic Trail had been abandoned as a principal trade route (NPS 2001). The various historical routes together make up what is today known as the Old Spanish National Historic Trail.

BLM and NPS jointly administer the Old Spanish National Historic Trail in collaboration with the Old Spanish Trail Association, which serves as the primary nonfederal partner. A Draft Comprehensive Management Plan and EIS are being prepared for the entire trail. The Comprehensive Management Plan will provide strategic direction and guidance for the future administration and management of the Old Spanish Trail. The plan includes identification of the nature and purposes, goals and objectives, high-potential sites and high-potential segments (historic trails), and the selection of the National Trail ROW.

*National Trails*
The Tabeguache Trail crosses public land for 142 miles, connecting Montrose and Grand Junction, Colorado. The trail begins in Shavano Valley and weaves through the canyons, mesas, and highlands of the Uncompahgre Plateau before ending in No Thoroughfare Canyon, a few miles west of Grand Junction. Most of the trail is on remote lands administered by the Forest Service and BLM (Colorado Plateau Mountain Bike Trail Association 2012).

The Paradox Trail was established in 1995 by the Colorado Plateau Mountain Bike Trail Association in collaboration with Montrose West Recreation, the Forest Service, and the BLM. The 110 mile long Paradox Trail traverses the unique landscape of western Montrose County, utilizing some of the hundreds of miles of backcountry jeep roads and trails that exist here. The route links two other long distant trails in the region, the Tabeguache Trail to the east on the Uncompahgre Plateau and the Kokopelli Trail to the west in the La Sal Mountains of Utah. Together, the three trails form the "Grand Loop," a grueling 360 mile backcountry system.

The Paradox Trail forms the southern leg of the Grand Loop and even though no singletrack was created (as of 2011) for the trail, the area offers trail users some of the most rugged and remote backcountry terrain in the lower 48 states. There are six large tracks of public lands being administered as wilderness or wilderness study areas in the region, and the trail is predominantly on two-track. While there are trail sections that utilize some seasonally graded county roads, much of the Paradox Trail is inaccessible to motorized vehicles, although vehicle access points exist at many places (Colorado Plateau Mountain Bike Trail Association 2012).

*Byways*
The RMP planning area includes portions of four byways. The UFO works cooperatively with each byway committee and considers each corridor management plan when making management decisions on BLM-administered lands that may affect a byway.

BLM_0114950