**Table K-6**
**RoC Model Results for Desert Bighorn Risk of Contact with Allotments (Probability that a Bighorn Sheep Will Intersect an Allotment)[1]**

| Allotment Name | Allotment Number | Type of Livestock | Probability of Contact | | Rate of Contact/10 Years | | |
|---|---|---|---|---|---|---|---|
| | | | Ram | Ewe | Ram | Ewe | Herd |
| N Wickson Draw | 17023 | Cattle | 0.001006 | 0.000338 | 0.006243 | 0.000457 | 0.006700 |
| Naturita Canyon-A | 07203 | Cattle | 0.001055 | 0.000230 | 0.006547 | 0.000311 | 0.006857 |
| Naturita Canyon-B | 07203 | Cattle | 0.000059 | 0.000015 | 0.000368 | 0.000020 | 0.000388 |
| Naturita Canyon-C | 07203 | Cattle | 0.000049 | 0.000015 | 0.000302 | 0.000020 | 0.000322 |
| Naturita Canyon-D | 07203 | Cattle | 0.000061 | 0.000019 | 0.000381 | 0.000025 | 0.000406 |
| Naturita Canyon-E | 07203 | Cattle | 0.000609 | 0.000184 | 0.003778 | 0.000248 | 0.004026 |
| Naturita Canyon-F | 07203 | Cattle | 0.000269 | 0.000081 | 0.001668 | 0.000110 | 0.001778 |
| Naturita Ridge | 17035 | Cattle | 0.062360 | 0.013224 | 0.386878 | 0.017852 | 0.404730 |
| Needle Rock | 14542 | Horse | 0.000569 | 0.000178 | 0.000972 | 0.000077 | 0.001049 |
| Norwood Hill | 07218 | Cattle | 0.001836 | 0.000100 | 0.032617 | 0.000266 | 0.032883 |
| Nyswanger | 17082 | Cattle | | | * | | |
| Oak Hill | 07225 | Cattle | 0.001005 | 0.000311 | 0.017862 | 0.000830 | 0.018692 |
| Oak Hill 40 | 03644 | Cattle | | | ^ | | |
| Oak Mesa | 14506 | Cattle | 0.007195 | 0.001880 | 0.008115 | 0.000620 | 0.008736 |
| Oak Ridge Com | 14528 | Cattle | 0.005351 | 0.001375 | 0.014046 | 0.000967 | 0.015013 |
| Onion Lakes | 05533 | Cattle or Sheep | 0.011575 | 0.001282 | 0.154453 | 0.001158 | 0.155611 |
| Overland | 14511 | Cattle | 0.000210 | 0.000049 | 0.000237 | 0.000016 | 0.000253 |
| Park | 17030 | Cattle | 0.004831 | 0.001070 | 0.029973 | 0.001445 | 0.031417 |
| Parkway | 17062 | Cattle | 0.000853 | 0.000211 | 0.005545 | 0.000309 | 0.005854 |
| Petrie Mesa | 14022 | Sheep | 0.036802 | 0.009590 | 0.339704 | 0.017094 | 0.356798 |
| Piney | 05516 | Cattle | 0.020442 | 0.009790 | 0.266032 | 0.025710 | 0.291741 |
| Pinion | 03641 | Cattle | | | ^ | | |
| Pipeline | 05507 | Cattle or Sheep | 0.025079 | 0.006472 | 0.288450 | 0.014289 | 0.302739 |
| Pocket Ind | 17085 | Cattle | | | * | | |
| Point Creek | 14021 | Sheep | 0.027646 | 0.006135 | 0.327320 | 0.014210 | 0.341530 |
| Popp Ranch | 14531 | Cattle | 0.001263 | 0.000436 | 0.001588 | 0.000184 | 0.001773 |
| Radio Tower | 02660 | Cattle | 0.003787 | 0.001273 | 0.023495 | 0.001718 | 0.025213 |
| Ragsdale | 03708 | Cattle | | | ^ | | |
| Rawhide/Coffee Pot-A | 05034 | Sheep | 0.009168 | 0.004268 | 0.016004 | 0.001509 | 0.017513 |
| Rawhide/Coffee Pot-B | 05034 | Sheep | 0.018411 | 0.014541 | 0.022776 | 0.005171 | 0.027947 |
| Rawhide/Coffee Pot-C | 05034 | Sheep | | | * | | |
| Rawlings Ind | 17021 | Cattle | | | * | | |
| Ray (Wray) Mesa | 03298 | Cattle | | | * | | |
| Redvale | 07227 | Cattle | 0.002511 | 0.000934 | 0.016378 | 0.001304 | 0.017681 |
| Reynolds/McDonald-A | 14530 | Cattle | 0.000422 | 0.000136 | 0.000604 | 0.000061 | 0.000664 |
| Reynolds/McDonald-B | 14530 | Cattle | 0.033291 | 0.008301 | 0.038364 | 0.002952 | 0.041316 |
| Ridgway Reservoir | 00001 | Cattle | | | ^ | | |
| Rim Rock | 05051 | Cattle | | | * | | |
| Smith Fork Rim | 03526 | Cattle | | | * | | |
| River | 17079 | Cattle | | | * | | |

BLM_0116120

**Table K-6**
**RoC Model Results for Desert Bighorn Risk of Contact with Allotments (Probability that a Bighorn Sheep Will Intersect an Allotment)[1]**

| Allotment Name | Allotment Number | Type of Livestock | Probability of Contact | | Rate of Contact/10 Years | | |
|---|---|---|---|---|---|---|---|
| | | | Ram | Ewe | Ram | Ewe | Herd |
| River Allotment | 07200 | Cattle | 0.002920 | 0.001252 | 0.042982 | 0.003131 | 0.046113 |
| Roatcap | 05504 | Cattle | 0.009721 | 0.006274 | 0.120063 | 0.016222 | 0.136285 |
| Roatcap/Jay Creek | 14507 | Cattle | 0.018193 | 0.005564 | 0.020521 | 0.001836 | 0.022357 |
| Roc Creek | 17020 | Cattle | 0.033260 | 0.019194 | 0.206345 | 0.025911 | 0.232256 |
| Rock Ditch | 05538 | Cattle | 0.000126 | 0.000037 | 0.000629 | 0.000023 | 0.000652 |
| Round Top | 00002 | Cattle | | | ^ | | |
| Rowher Canyon | 17080 | Cattle | | | * | | |
| S Dry Creek | 14548 | Cattle | 0.010282 | 0.003144 | 0.011608 | 0.001038 | 0.012646 |
| S Piney-A (Olathe Reservoir East) | 05515 | Cattle or Sheep | 0.003132 | 0.000722 | 0.040075 | 0.001687 | 0.041762 |
| S Piney-B | 05515 | Cattle or Sheep | 0.018089 | 0.007097 | 0.231140 | 0.017475 | 0.248616 |
| San Miguel Rim | 03639 | Cattle | | | ^ | | |
| San Miguel River | 03640 | Cattle | | | ^ | | |
| Sandy Wash | 05502 | Sheep | 0.020198 | 0.009368 | 0.246753 | 0.023812 | 0.270566 |
| Saw Pit | 03636 | Cattle | | | ^ | | |
| Sawtooth | 17032 | Cattle | | | * | | |
| Second Park | 17105 | Cattle | 0.012555 | 0.003023 | 0.077894 | 0.004082 | 0.081975 |
| Section 35 | 14547 | Cattle | 0.000855 | 0.000256 | 0.002395 | 0.000158 | 0.002553 |
| Sewemup | 03646 | Cattle | | | ^ | | |
| Shavano Mesa | 05511 | Sheep | 0.005201 | 0.001197 | 0.063177 | 0.002857 | 0.066035 |
| Shinn Park | 05534 | Sheep | 0.073631 | 0.015434 | 0.083669 | 0.006023 | 0.089692 |
| Simms Mesa-A | 05519 | Sheep | 0.000480 | 0.000130 | 0.001457 | 0.000128 | 0.001585 |
| Simms Mesa-B | 05519 | Sheep | 0.001221 | 0.000920 | 0.011483 | 0.001776 | 0.013259 |
| Slagle Pass | 05547 | Cattle | 0.005813 | 0.000558 | 0.086024 | 0.000686 | 0.086710 |
| Slaugher Grade | 03651 | Cattle | | | ^ | | |
| Smith Fork Ind | 05049 | Cattle | 0.025896 | 0.012459 | 0.029619 | 0.004218 | 0.033838 |
| South Branch | 14004 | Cattle | 0.002206 | 0.000899 | 0.013448 | 0.001005 | 0.014453 |
| South of Town | 14534 | Sheep | 0.010049 | 0.004487 | 0.011368 | 0.001489 | 0.012856 |
| Spring Creek | 05517 | Cattle | | | ^ | | |
| Spring Creek Canyon | 03659 | Cattle | | | ^ | | |
| Spring Creek and Highway 90 | 03638 | Cattle | | | * | | |
| Spring Gulch | 05029 | Cattle | | | * | | |
| Stevens Gulch Com | 14513 | Cattle | 0.005086 | 0.001108 | 0.006439 | 0.000411 | 0.006849 |
| Stingley Gulch | 14503 | Cattle | 0.006308 | 0.001929 | 0.007115 | 0.000637 | 0.007752 |
| Stock Driveway | 14521 | Cattle | 0.002184 | 0.000692 | 0.005123 | 0.000397 | 0.005520 |
| Sundown | 03633 | Cattle | | | * | | |
| Sunrise Gulch Com | 17102 | Cattle | | | * | | |
| Sunshine Mesa | 14541 | Cattle | 0.006437 | 0.001426 | 0.007260 | 0.000470 | 0.007731 |
| Swain Bench | 17081 | Cattle | | | * | | |
| Tabeguache Creek | 17031 | Cattle | 0.025582 | 0.006866 | 0.164013 | 0.010500 | 0.174513 |
| Tappan Creek-A | 05575 | Sheep | 0.000244 | 0.000026 | 0.003489 | 0.000040 | 0.003529 |

BLM_0116121

**Table K-6**
**RoC Model Results for Desert Bighorn Risk of Contact with Allotments (Probability that a Bighorn Sheep Will Intersect an Allotment)[1]**

| Allotment Name | Allotment Number | Type of Livestock | Probability of Contact | | Rate of Contact/10 Years | | |
|---|---|---|---|---|---|---|---|
| | | | Ram | Ewe | Ram | Ewe | Herd |
| Tappan Creek-B | 05575 | Sheep | 0.000044 | 0.000007 | 0.000636 | 0.000012 | 0.000648 |
| Taylor Draw | 05555 | Cattle | 0.005691 | 0.001685 | 0.090401 | 0.003627 | 0.094028 |
| Third Park Com | 17103 | Cattle | 0.010779 | 0.002286 | 0.066870 | 0.003086 | 0.069956 |
| Tinkler Ind | 05530 | Cattle | 0.001981 | 0.001309 | 0.007034 | 0.002543 | 0.009577 |
| Transfer Road | 05505 | Cattle | 0.021507 | 0.008115 | 0.260493 | 0.020283 | 0.280776 |
| Tuttle Draw | 17106 | Cattle | 0.020981 | 0.004287 | 0.130167 | 0.005787 | 0.135954 |
| Twenty Five Mesa N | 14008 | Cattle | | | * | | |
| Twenty Five Mesa N Proposed | 14008 | Cattle | | | ^ | | |
| Twenty Five Mesa S-A | 07008 | Cattle | 0.001188 | 0.000506 | 0.008257 | 0.000878 | 0.009135 |
| Twenty Five Mesa S-B | 07008 | Cattle | 0.000663 | 0.000370 | 0.005360 | 0.000616 | 0.005977 |
| Uncompahgre Bench | 07007 | Cattle | 0.009129 | 0.003201 | 0.057178 | 0.004422 | 0.061599 |
| Uncompahgre Com-A | 07302 | Cattle | 0.000982 | 0.000102 | 0.017442 | 0.000272 | 0.017714 |
| Uncompahgre Com-B | 07302 | Cattle | 0.001052 | 0.000308 | 0.018696 | 0.000823 | 0.019518 |
| Uncompahgre Com-C | 07302 | Cattle | 0.004680 | 0.000098 | 0.083149 | 0.000262 | 0.083411 |
| Uncompahgre Com-D | 07302 | Cattle | 0.004344 | 0.000029 | 0.077177 | 0.000078 | 0.077254 |
| Uncompahgre Com-E | 07302 | Cattle | 0.002434 | 0.000002 | 0.043246 | 0.000005 | 0.043251 |
| Upper Mail Box | 07208 | Cattle | 0.000216 | 0.000081 | 0.003479 | 0.000191 | 0.003670 |
| Upper Maverick Draw | 07202 | Cattle | 0.000855 | 0.000529 | 0.005889 | 0.000821 | 0.006710 |
| Upper Terror Creek | 14514 | Cattle | 0.000463 | 0.000343 | 0.000823 | 0.000152 | 0.000975 |
| W Roatcap | 14510 | Cattle | 0.000144 | 0.000049 | 0.000163 | 0.000016 | 0.000179 |
| W Stevens Gulch | 14515 | Cattle | 0.008353 | 0.001959 | 0.009422 | 0.000647 | 0.010069 |
| W Youngs Peak | 14536 | Cattle | 0.016611 | 0.003329 | 0.019074 | 0.001166 | 0.020240 |
| Wakefield | 03628 | Cattle | | | ^ | | |
| Ward Creek/Doughspoon | 14025 | Cattle | 0.051155 | 0.014199 | 0.257059 | 0.015760 | 0.272819 |
| Washboard Rock-A | 05548 | Cattle | 0.015798 | 0.004511 | 0.076412 | 0.003146 | 0.079557 |
| Waterdog Basin | 05546 | Cattle | 0.001399 | 0.000222 | 0.009594 | 0.000111 | 0.009705 |
| Weimer Hill Place | 03660 | Cattle | | | ^ | | |
| Wells Gulch | 14016 | Sheep | 0.014522 | 0.007551 | 0.179680 | 0.017748 | 0.197427 |
| White Ranch | 14015 | Cattle | 0.011673 | 0.004484 | 0.153065 | 0.011906 | 0.164971 |
| Wickson Draw | 17010 | Cattle | 0.006772 | 0.001916 | 0.042010 | 0.002586 | 0.044597 |
| Wilbanks-A | 14502 | Cattle | 0.010570 | 0.003542 | 0.012681 | 0.001254 | 0.013936 |
| Washboard Rock-B | 14502 | Cattle | 0.000130 | 0.000044 | 0.000150 | 0.000015 | 0.000165 |
| Williams Creek | 14523 | Cattle | 0.003363 | 0.001105 | 0.009386 | 0.000693 | 0.010080 |
| Willims Ditch | 07220 | Cattle | 0.000219 | 0.000064 | 0.001358 | 0.000086 | 0.001443 |
| Winter/Monitor Mesa | 14010 | Cattle | | | * | | |
| Youngs Peak | 14537 | Cattle | 0.015303[a] | 0.003260 | 0.018164[b] | 0.001195 | 0.019359[c] |

*This allotment intersects the home range polygon and is therefore not included in the RoC analysis.
^This is a proposed allotment in the RMP that was not included in the RoC model run.
Sample Interpretation for Youngs Peak:
[a]Given that a ram is on foray, there is a 1.5% probability that it will come in contact with this allotment.
[b]Given the probability of ram on foray, predicts a rate of 0.2 ram contacts with allotment in 10 years.
[c]Given the probability of foray of bighorn in the population, a rate of 0.2 contact with allotment in 10 years is predicted.

**Table K-7**
**Predicted Years Between Potential Disease Events for Allotments That Did Not Intersect with CHHR, Based on RoC Model Results**

| Allotment Name | Allotment Number | Type of Livestock | Herd Rate of Contact[a] | Years Between Contact[b] | Years Between Potential Disease Events[c] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1:1 (1.0) | 1:1.1111 (0.9) | 1:1.3333 (0.75) | 1:2 (0.50) | 1:4 (0.25) | 1:10 (0.10) | 1:20 (0.05) |
| Adobe | 05027 | Cattle | 0.010244 | 98 | 98 | 108 | 130 | 195 | 390 | 976 | 1952 |
| Alder Creek-A | 17253 | Cattle | 0.011734 | 85 | 85 | 95 | 114 | 170 | 341 | 852 | 1704 |
| Alder Creek-B | 17253 | Cattle | 0.013835 | 82 | 72 | 80 | 96 | 145 | 289 | 723 | 1446 |
| Alkali Flats | 14017 | Sheep | 0.122772 | 8 | 8 | 9 | 11 | 16 | 33 | 81 | 163 |
| Allen Reservoir | 05050 | Cattle | 0.038187 | 26 | 26 | 29 | 35 | 52 | 105 | 262 | 524 |
| Anthracite Creek | 14525 | Cattle | 0.060587 | 17 | 17 | 18 | 22 | 33 | 66 | 165 | 330 |
| Aspen Ditch-A | 14551 | Sheep | 0.001499 | 667 | 667 | 741 | 889 | 1334 | 2668 | 6671 | 13342 |
| Aspen Ditch-B | 14551 | Sheep | 0.001556 | 643 | 643 | 714 | 857 | 1285 | 2570 | 6426 | 12851 |
| Bald Hills | 05510 | Cattle | 0.107397 | 9 | 9 | 10 | 12 | 19 | 37 | 93 | 186 |
| Barkelew Draw Com | 07303 | Cattle | 0.030266 | 33 | 33 | 37 | 44 | 66 | 132 | 330 | 661 |
| Beaver Canyon | 17060 | Cattle | 0.091003 | 11 | 11 | 12 | 15 | 22 | 44 | 110 | 220 |
| Beaver Hill | 05522 | Sheep | 0.089969 | 11 | 11 | 12 | 15 | 22 | 44 | 111 | 222 |
| Beaver Rim | 07204 | Horse | 0.056113 | 18 | 18 | 20 | 24 | 36 | 71 | 178 | 356 |
| Big Bear Creek-A | 07207 | Cattle | 0.096351 | 10 | 10 | 12 | 14 | 21 | 42 | 104 | 208 |
| Big Bear Creek-B | 07207 | Cattle | 0.050183 | 20 | 20 | 22 | 27 | 40 | 80 | 199 | 399 |
| Big Bucktail | 17061 | Cattle | 0.023782 | 42 | 42 | 47 | 56 | 84 | 168 | 420 | 841 |
| Big Gulch-40 | 05036 | Sheep | 0.003706 | 270 | 270 | 300 | 360 | 540 | 1079 | 2698 | 5397 |
| Big Gulch-A | 03630 | | 0.000990 | 1010 | 1010 | 1122 | 1346 | 2020 | 4039 | 10098 | 20196 |
| Big Gulch-B | 03630 | | 0.000249 | 4013 | 4013 | 4459 | 5351 | 8026 | 16052 | 40130 | 80259 |
| Big Pasture | 05044 | Cattle | 0.046327 | 22 | 22 | 24 | 29 | 43 | 86 | 216 | 432 |
| Black Bullet | 05045 | Cattle | 0.026229 | 38 | 38 | 42 | 51 | 76 | 153 | 381 | 763 |
| Blue Cimarron | 16036 | Cattle or Sheep | 0.045151 | 22 | 22 | 25 | 30 | 44 | 89 | 221 | 443 |
| Bolinger Ditch | 07219 | Cattle | 0.006915 | 145 | 145 | 161 | 193 | 289 | 578 | 1446 | 2892 |
| Bramier Draw | 07235 | Cattle | 0.005161 | 194 | 194 | 215 | 258 | 388 | 775 | 1938 | 3875 |
| Broad Canyon | 17199 | Cattle | 0.013611 | 73 | 73 | 82 | 98 | 147 | 294 | 735 | 1469 |
| Buck | 07232 | Cattle or Horse | 0.000260 | 3844 | 3844 | 4271 | 5125 | 7688 | 15376 | 38440 | 76879 |

BLM_0116123

**Table K-7**
**Predicted Years Between Potential Disease Events for Allotments That Did Not Intersect with CHHR, Based on RoC Model Results**

| Allotment Name | Allotment Number | Type of Livestock | Herd Rate of Contact[a] | Years Between Contact[b] | Years Between Potential Disease Events[c] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1:1 (1.0) | 1:1.1111 (0.9) | 1:1.3333 (0.75) | 1:2 (0.50) | 1:4 (0.25) | 1:10 (0.10) | 1:20 (0.05) |
| Burn Canyon | 17022 | Cattle | 0.004282 | 234 | 234 | 259 | 311 | 467 | 934 | 2335 | 4671 |
| Burro Creek | 05556 | Cattle | | | | | | ^ | | | |
| Burro Ridge | 05532 | Cattle | 0.177058 | 6 | 6 | 6 | 8 | 11 | 23 | 56 | 113 |
| Busted Boiler | 03648 | Cattle | | | | | | ^ | | | |
| Cedar | 05570 | Cattle | 0.017274 | 58 | 58 | 64 | 77 | 116 | 232 | 579 | 1158 |
| Cedar Creek-A | 05535 | Cattle | 0.045059 | 22 | 22 | 25 | 30 | 44 | 89 | 222 | 444 |
| Cedar Creek-B | 05535 | Cattle | 0.001625 | 616 | 616 | 684 | 821 | 1231 | 2462 | 6155 | 12311 |
| Chaffee | 00019 | Cattle | 0.048221 | 21 | 21 | 23 | 28 | 41 | 83 | 207 | 415 |
| Chaffee Gulch | 05528 | Cattle | 0.020871 | 48 | 48 | 53 | 64 | 96 | 192 | 479 | 958 |
| Cimarron 40 | 03658 | Cattle | 0.082927 | 0 | 12 | 13 | 16 | 24 | 48 | 121 | 241 |
| Coal Canyon | 17107 | Cattle | 0.013697 | 73 | 73 | 81 | 97 | 146 | 292 | 730 | 1460 |
| Coal Creek | 05509 | Cattle | 0.002911 | 344 | 344 | 382 | 458 | 687 | 1374 | 3435 | 6870 |
| Coal Gulch-A | 14517 | Sheep | 0.026488 | 38 | 38 | 42 | 50 | 76 | 151 | 378 | 755 |
| Coal Gulch-B | 14517 | Sheep | 0.004713 | 212 | 212 | 236 | 283 | 424 | 849 | 2122 | 4243 |
| Coke Ovens | 17027 | Cattle | 0.089106 | 11 | 11 | 12 | 15 | 22 | 45 | 112 | 224 |
| Collins | 05043 | Cattle | 0.002620 | 382 | 382 | 424 | 509 | 763 | 1526 | 3816 | 7632 |
| Cone | 03635 | Cattle | | | | | | ^ | | | |
| Cookie Tree | 05560 | Cattle | | | | | | ^ | | | |
| Coventry | 07222 | Cattle | 0.051189 | 20 | 20 | 22 | 26 | 39 | 78 | 195 | 391 |
| Crawford Reservoir | 05018 | Cattle | 0.010749 | 93 | 93 | 103 | 124 | 186 | 372 | 930 | 1861 |
| Creek Bottom | 03632 | Cattle | | | | | | ^ | | | |
| Cushman | 05506 | Sheep | 0.562856 | 2 | 2 | 2 | 2 | 4 | 7 | 18 | 36 |
| Cut Off | 05052 | Cattle | 0.000488 | 2048 | 2048 | 2275 | 2730 | 4095 | 8191 | 20477 | 40954 |
| Dave Wood Road | 05518 | Sheep | 0.052288 | 19 | 19 | 21 | 25 | 38 | 76 | 191 | 382 |
| Deep Creek | 14524 | Cattle | 0.024961 | 40 | 40 | 45 | 53 | 80 | 160 | 401 | 801 |
| Deer Basin/Midway-A | 14019 | Sheep | 0.100908 | 10 | 10 | 11 | 13 | 20 | 40 | 99 | 198 |
| Deer Basin/Midway-B | 14019 | Sheep | 0.141392 | 7 | 7 | 8 | 9 | 14 | 28 | 71 | 141 |

BLM_0116124

**Table K-7**
**Predicted Years Between Potential Disease Events for Allotments That Did Not Intersect with CHHR, Based on RoC Model Results**

| Allotment Name | Allotment Number | Type of Livestock | Herd Rate of Contact[a] | Years Between Contact[b] | Years Between Potential Disease Events[c] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1:1 (1.0) | 1:1.1111 (0.9) | 1:1.3333 (0.75) | 1:2 (0.50) | 1:4 (0.25) | 1:10 (0.10) | 1:20 (0.05) |
| Deer Basin/Midway-C | 14019 | Sheep | 0.000651 | 1536 | 1536 | 1707 | 2048 | 3073 | 6145 | 15363 | 30726 |
| Delta Pipeline | 03277 | Sheep | 0.287454 | 3 | 3 | 4 | 5 | 7 | 14 | 35 | 70 |
| Dirty George | 14023 | Cattle | 0.006951 | 144 | 176 | 196 | 235 | 353 | 706 | 1765 | 3529 |
| Doby Canyon | 17042 | Cattle | 0.017893 | 56 | 56 | 62 | 75 | 112 | 224 | 559 | 1118 |
| Doug Creek | 05028 | Cattle | 0.027426 | 36 | 36 | 41 | 49 | 73 | 146 | 365 | 729 |
| Downing | 05541 | Cattle | 0.000555 | 1803 | 1803 | 2003 | 2404 | 3606 | 7212 | 18031 | 36062 |
| Dry Cedar-A | 05537 | Sheep | 0.048400 | 21 | 21 | 23 | 28 | 41 | 83 | 207 | 413 |
| Dry Cedar-B | 05537 | Sheep | 0.002805 | 357 | 357 | 396 | 475 | 713 | 1426 | 3565 | 7130 |
| Dry Cedar-C | 05537 | Sheep | 0.004475 | 223 | 223 | 248 | 298 | 447 | 894 | 2235 | 4469 |
| Dry Creek | 14549 | Cattle | 0.013278 | 75 | 76 | 84 | 101 | 152 | 303 | 758 | 1516 |
| Dry Creek Basin | 05513 | Cattle or Sheep | 0.318237 | 3 | 3 | 3 | 4 | 6 | 13 | 31 | 63 |
| Dry Creek Place | 05525 | Cattle or Horse | 0.009244 | 108 | 108 | 120 | 144 | 216 | 433 | 1082 | 2164 |
| Dry Gulch | 05540 | Cattle | 0.023233 | 43 | 43 | 48 | 57 | 86 | 172 | 430 | 861 |
| Dry Park | 07300 | Cattle | 0.013451 | 74 | 74 | 83 | 99 | 149 | 297 | 743 | 1487 |
| Duroy | 03637 | Cattle | | | | | | ^ | | | |
| E Fork Dry Creek | 05514 | Cattle | 0.044798 | 22 | 22 | 25 | 30 | 45 | 89 | 223 | 446 |
| E Gould Reservoir | 05041 | Cattle | 0.030814 | 32 | 32 | 36 | 43 | 65 | 130 | 325 | 649 |
| E Paradox Com-B | 17101 | Cattle | 0.131816 | 8 | 8 | 8 | 10 | 15 | 30 | 76 | 152 |
| E Roatcap Ind | 14512 | Cattle | 0.000067 | 14903 | 14903 | 16559 | 19871 | 29806 | 59613 | 149031 | 298063 |
| Far Away | 17213 | Cattle | 0.009667 | 103 | 103 | 115 | 138 | 207 | 414 | 1034 | 2069 |
| Fire Mountain Canal | 14508 | Cattle | 0.000924 | 1082 | 1082 | 1202 | 1442 | 2164 | 4327 | 10818 | 21636 |
| Flatiron | 05501 | Cattle | 0.293396 | 3 | 3 | 4 | 5 | 7 | 14 | 34 | 68 |
| Franklin Mesa | 05512 | Cattle or Sheep | 0.141301 | 7 | 7 | 8 | 9 | 14 | 28 | 71 | 142 |
| Gravel Pit | 07063 | Cattle | 0.005997 | 167 | 167 | 185 | 222 | 333 | 667 | 1667 | 3335 |
| Green | 05503 | Cattle | 0.084209 | 12 | 12 | 13 | 16 | 24 | 48 | 119 | 238 |

BLM_0116125

**Table K-7**
**Predicted Years Between Potential Disease Events for Allotments That Did Not Intersect with CHHR, Based on RoC Model Results**

| Allotment Name | Allotment Number | Type of Livestock | Herd Rate of Contact[a] | Years Between Contact[b] | Years Between Potential Disease Events[c] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1:1 (1.0) | 1:1.1111 (0.9) | 1:1.3333 (0.75) | 1:2 (0.50) | 1:4 (0.25) | 1:10 (0.10) | 1:20 (0.05) |
| Hairpin | 05569 | Cattle | 0.030241 | 33 | 33 | 37 | 44 | 66 | 132 | 331 | 661 |
| Hamilton Mesa | 07209 | Cattle | 0.018242 | 55 | 55 | 61 | 73 | 110 | 219 | 548 | 1096 |
| High Park | 05549 | Cattle | 0.015306 | 65 | 65 | 73 | 87 | 131 | 261 | 653 | 1307 |
| Highway 90 | 05521 | Sheep | 0.121058 | 8 | 8 | 9 | 11 | 17 | 33 | 83 | 165 |
| Home Ranch | 07201 | Cattle | 0.015477 | 65 | 65 | 72 | 86 | 129 | 258 | 646 | 1292 |
| Horsefly | 05523 | Cattle | 0.014391 | 69 | 69 | 77 | 93 | 139 | 278 | 695 | 1390 |
| Horsefly Com | 07301 | Cattle | 0.019125 | 52 | 52 | 58 | 70 | 105 | 209 | 523 | 1046 |
| Houser | 07076 | Cattle | 0.200931 | 5 | 5 | 6 | 7 | 10 | 20 | 50 | 100 |
| Hubbard Creek | 14516 | Sheep | 0.005349 | 187 | 187 | 208 | 249 | 374 | 748 | 1869 | 3739 |
| Jumbo Mountain | 14527 | Cattle | 0.015991 | 63 | 63 | 69 | 83 | 125 | 250 | 625 | 1251 |
| Juniper Knob | 14505 | Cattle | 0.002582 | 387 | 387 | 430 | 516 | 775 | 1549 | 3873 | 7746 |
| Kinnikin | 03643 | Cattle | | | | | | ^ | | | |
| Lavender | 07075 | Cattle | 0.277113 | 4 | 4 | 4 | 5 | 7 | 14 | 36 | 72 |
| Lee Bench | 14011 | Cattle | 0.075891 | 13 | 13 | 15 | 18 | 26 | 53 | 132 | 264 |
| Lee Lands-B | 17003 | Sheep | 0.155262 | 6 | 6 | 7 | 9 | 13 | 26 | 64 | 129 |
| Leroux | 14550 | Cattle | 0.011468 | 87 | 87 | 97 | 116 | 174 | 349 | 872 | 1744 |
| Leroux Creek | 14504 | Cattle | 0.001640 | 610 | 610 | 678 | 813 | 1220 | 2439 | 6098 | 12196 |
| Lillylands/West | 17024 | Cattle | 0.044251 | 23 | 23 | 25 | 30 | 45 | 90 | 226 | 452 |
| Little Baldy | 07223 | Cattle | 0.034548 | 29 | 29 | 32 | 39 | 58 | 116 | 289 | 579 |
| Little Maverick Draw | 07210 | Cattle | 0.003161 | 316 | 316 | 351 | 422 | 633 | 1265 | 3163 | 6326 |
| Log Hill | 05529 | Cattle or Sheep | 0.018139 | 55 | 55 | 61 | 74 | 110 | 221 | 551 | 1103 |
| Lower Beaver Canyon | 07211 | Cattle | 0.003462 | 289 | 289 | 321 | 385 | 578 | 1155 | 2888 | 5776 |
| Lower Hamilton | 07234 | Cattle | 0.010938 | 91 | 91 | 102 | 122 | 183 | 366 | 914 | 1829 |
| Lower Horsefly-A | 05520 | Sheep | 0.007352 | 136 | 136 | 151 | 181 | 272 | 544 | 1360 | 2720 |
| Lower Horsefly-B | 05520 | Sheep | 0.041860 | 24 | 24 | 27 | 32 | 48 | 96 | 239 | 478 |
| Lower Horsefly-C | 05520 | Sheep | 0.006608 | 151 | 151 | 168 | 202 | 306 | 605 | 1513 | 3026 |

BLM_0116126

**Table K-7**
**Predicted Years Between Potential Disease Events for Allotments That Did Not Intersect with CHHR, Based on RoC Model Results**

| Allotment Name | Allotment Number | Type of Livestock | Herd Rate of Contact[a] | Years Between Contact[b] | Years Between Potential Disease Events[c] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1:1 (1.0) | 1:1.1111 (0.9) | 1:1.3333 (0.75) | 1:2 (0.50) | 1:4 (0.25) | 1:10 (0.10) | 1:20 (0.05) |
| Simms Mesa-A | 05519 | Sheep | 0.001585 | 631 | 631 | 701 | 841 | 1262 | 2524 | 6311 | 12622 |
| Simms Mesa-B | 05519 | Sheep | 0.013259 | 75 | 75 | 84 | 101 | 151 | 302 | 754 | 1508 |
| Lower Pinion | 07213 | Cattle | 0.005939 | 168 | 168 | 187 | 225 | 337 | 674 | 1684 | 3368 |
| Lower Roc Creek | 07216 | Cattle | 0.050947 | 20 | 20 | 22 | 26 | 39 | 79 | 196 | 393 |
| Mailbox Park-A | 17001 | Cattle | 0.000215 | 4659 | 4659 | 5176 | 6211 | 9317 | 18634 | 46586 | 93172 |
| Mailbox Park-B | 17001 | Cattle | 0.016523 | 61 | 61 | 67 | 81 | 121 | 242 | 605 | 1210 |
| Maverick Draw | 17018 | Cattle | 0.005997 | 167 | 167 | 185 | 222 | 334 | 667 | 1668 | 3335 |
| McDonald Creek | 14532 | Sheep | 0.021018 | 48 | 48 | 53 | 63 | 95 | 190 | 476 | 952 |
| McKee Draw | 07206 | Cattle | 0.008938 | 112 | 112 | 124 | 149 | 224 | 448 | 1119 | 2238 |
| McKee Draw | 07206 | Cattle | 0.008938 | 112 | 112 | 124 | 149 | 224 | 448 | 1119 | 2238 |
| Mesa Creek-B | 17014 | Cattle | 0.060323 | 17 | 17 | 18 | 22 | 33 | 66 | 166 | 332 |
| Middle Hamilton Lse | 07233 | Cattle | 0.007678 | 130 | 130 | 145 | 174 | 260 | 521 | 1302 | 2605 |
| Milk Creek | 14544 | Cattle | 0.000065 | 15477 | 19173 | 21304 | 25564 | 38347 | 76693 | 191733 | 383467 |
| Mud Springs | 07230 | Cattle | 0.012724 | 79 | 79 | 87 | 105 | 157 | 314 | 786 | 1572 |
| Muddy Creek | 14519 | Sheep | 0.017981 | 56 | 56 | 62 | 74 | 111 | 222 | 556 | 1112 |
| N Saddle Peak | 14540 | Cattle | 0.002920 | 342 | 342 | 381 | 457 | 685 | 1370 | 3425 | 6849 |
| N Wickson Draw | 17023 | Cattle | 0.006700 | 149 | 149 | 166 | 199 | 299 | 597 | 1493 | 2985 |
| Naturita Canyon-A | 07203 | Cattle | 0.006857 | 146 | 146 | 162 | 194 | 292 | 583 | 1458 | 2917 |
| Naturita Canyon-B | 07203 | Cattle | 0.000388 | 2574 | 2574 | 2860 | 3432 | 5148 | 10296 | 25741 | 51482 |
| Naturita Canyon-C | 07203 | Cattle | 0.000322 | 3104 | 3104 | 3449 | 4139 | 6209 | 12417 | 31043 | 62087 |
| Naturita Canyon-D | 07203 | Cattle | 0.000406 | 2466 | 2466 | 2740 | 3288 | 4931 | 9863 | 24656 | 49313 |
| Naturita Canyon-E | 07203 | Cattle | 0.004026 | 248 | 248 | 276 | 331 | 497 | 994 | 2484 | 4968 |
| Naturita Canyon-F | 07203 | Cattle | 0.001778 | 563 | 563 | 625 | 750 | 1125 | 2250 | 5626 | 11252 |
| Naturita Ridge | 17035 | Cattle | 0.404730 | 2 | 2 | 3 | 3 | 5 | 10 | 25 | 49 |
| Needle Rock | 14542 | Horse | 0.001049 | 954 | 954 | 1060 | 1272 | 1907 | 3815 | 9537 | 19074 |
| Norwood Hill | 07218 | Cattle | 0.032883 | 30 | 30 | 34 | 41 | 61 | 122 | 304 | 608 |
| Oak Hill | 07225 | Cattle | 0.018692 | 53 | 53 | 59 | 71 | 107 | 214 | 535 | 1070 |

BLM_0116127

**Table K-7**
**Predicted Years Between Potential Disease Events for Allotments That Did Not Intersect with CHHR, Based on RoC Model Results**

| Allotment Name | Allotment Number | Type of Livestock | Herd Rate of Contact[a] | Years Between Contact[b] | Years Between Potential Disease Events[c] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1:1 (1.0) | 1:1.1111 (0.9) | 1:1.3333 (0.75) | 1:2 (0.50) | 1:4 (0.25) | 1:10 (0.10) | 1:20 (0.05) |
| Oak Hill 40 | 03644 | Cattle | | | | | | ^ | | | |
| Oak Mesa | 14506 | Cattle | 0.008736 | 114 | 114 | 127 | 153 | 229 | 458 | 1145 | 2289 |
| Oak Ridge Com | 14528 | Cattle | 0.015013 | 67 | 67 | 74 | 89 | 133 | 266 | 666 | 1332 |
| Onion Lakes | 05533 | Cattle or Sheep | 0.155611 | 6 | 6 | 7 | 9 | 13 | 26 | 64 | 129 |
| Overland | 14511 | Cattle | 0.000253 | 3947 | 3947 | 4386 | 5263 | 7895 | 15790 | 39474 | 78949 |
| Park | 17030 | Cattle | 0.031417 | 32 | 32 | 35 | 42 | 64 | 127 | 318 | 637 |
| Parkway | 17062 | Cattle | 0.005854 | 171 | 171 | 190 | 228 | 342 | 683 | 1708 | 3416 |
| Petrie Mesa | 14022 | Sheep | 0.356798 | 3 | 3 | 3 | 4 | 6 | 11 | 28 | 56 |
| Piney | 05516 | Cattle | 0.291741 | 3 | 3 | 4 | 5 | 7 | 14 | 34 | 69 |
| Pinion | 03641 | Cattle | | | | | | ^ | | | |
| Pipeline | 05507 | Cattle or Sheep | 0.302739 | 3 | 3 | 4 | 4 | 7 | 13 | 33 | 66 |
| Point Creek | 14021 | Sheep | 0.341530 | 3 | 3 | 3 | 4 | 6 | 12 | 29 | 59 |
| Popp Ranch | 14531 | Cattle | 0.001773 | 564 | 564 | 627 | 752 | 1128 | 2257 | 5641 | 11283 |
| Radio Tower | 02660 | Cattle | 0.025213 | 40 | 40 | 44 | 53 | 79 | 159 | 397 | 793 |
| Ragsdale | 03708 | Cattle | | | | | | ^ | | | |
| Rawhide/Coffee Pot-A | 05034 | Sheep | 0.017513 | 57 | 57 | 63 | 76 | 114 | 228 | 571 | 1142 |
| Rawhide/Coffee Pot-B | 05034 | Sheep | 0.027947 | 36 | 36 | 40 | 48 | 72 | 143 | 358 | 716 |
| Redvale | 07227 | Cattle | 0.017681 | 57 | 57 | 63 | 75 | 113 | 226 | 566 | 1131 |
| Reynolds/McDonald-A | 14530 | Cattle | 0.000664 | 1506 | 1506 | 1673 | 2007 | 3011 | 6022 | 15055 | 30110 |
| Reynolds/McDonald-B | 14530 | Cattle | 0.041316 | 24 | 24 | 27 | 32 | 48 | 97 | 242 | 484 |
| Ridgway Reservoir | 00001 | Cattle | | | | | | ^ | | | |
| River Allotment | 07200 | Cattle | 0.046113 | 22 | 22 | 24 | 29 | 43 | 87 | 217 | 434 |
| Roatcap | 05504 | Cattle | 0.136285 | 7 | 7 | 8 | 10 | 15 | 29 | 73 | 147 |
| Roatcap/Jay Creek | 14507 | Cattle | 0.022357 | 45 | 45 | 50 | 60 | 89 | 179 | 447 | 895 |

BLM_0116128

**Table K-7**
**Predicted Years Between Potential Disease Events for Allotments That Did Not Intersect with CHHR, Based on RoC Model Results**

| Allotment Name | Allotment Number | Type of Livestock | Herd Rate of Contact[a] | Years Between Contact[b] | Years Between Potential Disease Events[c] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1:1 (1.0) | 1:1.1111 (0.9) | 1:1.3333 (0.75) | 1:2 (0.50) | 1:4 (0.25) | 1:10 (0.10) | 1:20 (0.05) |
| Roc Creek | 17020 | Cattle | 0.232256 | 4 | 4 | 5 | 6 | 9 | 17 | 43 | 86 |
| Rock Ditch | 05538 | Cattle | 0.000652 | 1534 | 1534 | 1705 | 2046 | 3069 | 6137 | 15344 | 30687 |
| Round Top | 00002 | Cattle | | | | | | ^ | | | |
| S Dry Creek | 14548 | Cattle | 0.012646 | 79 | 79 | 88 | 105 | 158 | 316 | 791 | 1582 |
| S Piney-A | 05515 | Cattle or Sheep | 0.041762 | 24 | 24 | 27 | 32 | 48 | 96 | 239 | 479 |
| S Piney-B | 05515 | Cattle or Sheep | 0.248616 | 4 | 4 | 4 | 5 | 8 | 16 | 40 | 80 |
| San Miguel Rim | 03639 | Cattle | | | | | | ^ | | | |
| San Miguel River | 03640 | Cattle | | | | | | ^ | | | |
| Sandy Wash | 05502 | Sheep | 0.270566 | 4 | 4 | 4 | 5 | 7 | 15 | 37 | 74 |
| Saw Pit | 03636 | Cattle | | | | | | ^ | | | |
| Second Park | 17105 | Cattle | 0.081975 | 12 | 12 | 14 | 16 | 24 | 49 | 122 | 244 |
| Section 35 | 14547 | Cattle | 0.002553 | 392 | 392 | 435 | 522 | 783 | 1567 | 3917 | 7833 |
| Sewemup | 03646 | Cattle | | | | | | ^ | | | |
| Shavano Mesa | 05511 | Sheep | 0.066035 | 15 | 15 | 17 | 20 | 30 | 61 | 151 | 303 |
| Shin Park/South Canal | 05534 | Cattle | 0.066035 | 15 | 15 | 17 | 20 | 30 | 61 | 151 | 303 |
| Shinn Park | 05534 | Sheep | 0.089692 | 11 | 11 | 12 | 15 | 22 | 45 | 111 | 223 |
| Slagle Pass | 05547 | Cattle | 0.086710 | 12 | 12 | 13 | 15 | 23 | 46 | 115 | 231 |
| Slaughter Grade | 03651 | Cattle | | | | | | ^ | | | |
| Smith Fork Ind | 05049 | Cattle | 0.033838 | 30 | 30 | 33 | 39 | 59 | 118 | 296 | 591 |
| South Branch | 14004 | Cattle | 0.015474 | 65 | 69 | 77 | 92 | 138 | 277 | 692 | 1384 |
| South of Town | 14534 | Sheep | 0.012856 | 78 | 78 | 86 | 104 | 156 | 311 | 778 | 1556 |
| Spring Creek | 05517 | Cattle | | | | | | ^ | | | |
| Spring Creek Canyon | 03659 | Cattle | | | | | | ^ | | | |
| Stevens Gulch Com | 14513 | Cattle | 0.006849 | 146 | 146 | 162 | 195 | 292 | 584 | 1460 | 2920 |
| Stingley Gulch | 14503 | Cattle | 0.007752 | 129 | 129 | 143 | 172 | 258 | 516 | 1290 | 2580 |
| Stock Driveway | 14521 | Cattle | 0.005520 | 181 | 181 | 201 | 242 | 362 | 725 | 1812 | 3623 |

BLM_0116129

**Table K-7**
**Predicted Years Between Potential Disease Events for Allotments That Did Not Intersect with CHHR, Based on RoC Model Results**

| Allotment Name | Allotment Number | Type of Livestock | Herd Rate of Contact[a] | Years Between Contact[b] | Years Between Potential Disease Events[c] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1:1 (1.0) | 1:1.1111 (0.9) | 1:1.3333 (0.75) | 1:2 (0.50) | 1:4 (0.25) | 1:10 (0.10) | 1:20 (0.05) |
| Sunshine Mesa | 14541 | Cattle | 0.007731 | 129 | 129 | 144 | 172 | 259 | 517 | 1294 | 2587 |
| Tabeguache Creek | 17031 | Cattle | 0.174513 | 6 | 6 | 6 | 8 | 11 | 23 | 57 | 115 |
| Tappan Creek-A | 05575 | Sheep | 0.003529 | 283 | 283 | 315 | 378 | 567 | 1134 | 2834 | 5668 |
| Tappan Creek-B | 05575 | Sheep | 0.000648 | 1543 | 1543 | 1715 | 2057 | 3086 | 6172 | 15431 | 30862 |
| Taylor Draw | 05555 | Cattle | 0.094028 | 11 | 11 | 12 | 14 | 21 | 43 | 106 | 213 |
| Third Park Com | 17103 | Cattle | 0.069956 | 14 | 14 | 16 | 19 | 29 | 57 | 143 | 286 |
| Tinkler Ind | 05530 | Cattle | 0.009577 | 104 | 104 | 116 | 139 | 209 | 418 | 1044 | 2088 |
| Transfer Road | 05505 | Cattle | 0.280776 | 4 | 4 | 4 | 5 | 7 | 14 | 36 | 71 |
| Tuttle Draw | 17106 | Cattle | 0.135954 | 7 | 7 | 8 | 10 | 15 | 29 | 74 | 147 |
| Twenty Five Mesa S-A | 07008 | Cattle | 0.009135 | 109 | 109 | 122 | 146 | 219 | 438 | 1095 | 2189 |
| Twenty Five Mesa S-B | 07008 | Cattle | 0.005977 | 167 | 167 | 186 | 223 | 335 | 669 | 1673 | 3346 |
| Uncompahgre Bench | 07007 | Cattle | 0.061599 | 16 | 16 | 18 | 22 | 32 | 65 | 162 | 325 |
| Uncompahgre Com-A | 07302 | Cattle | 0.017714 | 56 | 56 | 63 | 75 | 113 | 226 | 565 | 1129 |
| Uncompahgre Com-B | 07302 | Cattle | 0.019518 | 51 | 56 | 63 | 75 | 113 | 226 | 565 | 1129 |
| Uncompahgre Com-C | 07302 | Cattle | 0.083411 | 12 | 51 | 57 | 68 | 102 | 205 | 512 | 1025 |
| Uncompahgre Com-D | 07302 | Cattle | 0.077254 | 13 | 12 | 13 | 16 | 24 | 48 | 120 | 240 |
| Uncompahgre Com-E | 07302 | Cattle | 0.043251 | 23 | 13 | 14 | 17 | 26 | 52 | 129 | 259 |
| Upper Mail Box | 07208 | Cattle | 0.003670 | 273 | 23 | 26 | 31 | 46 | 92 | 231 | 462 |
| Upper Maverick Draw | 07202 | Cattle | 0.006710 | 149 | 149 | 166 | 199 | 298 | 596 | 1490 | 2981 |
| Upper Terror Creek | 14514 | Cattle | 0.000975 | 1025 | 1025 | 1139 | 1367 | 2051 | 4102 | 10255 | 20510 |
| W Roatcap | 14510 | Cattle | 0.000179 | 5599 | 5599 | 6221 | 7465 | 11197 | 22394 | 55986 | 111972 |
| W Stevens Gulch | 14515 | Cattle | 0.010069 | 99 | 99 | 110 | 132 | 199 | 397 | 993 | 1986 |
| W Youngs Peak | 14536 | Cattle | 0.020240 | 49 | 49 | 55 | 66 | 99 | 198 | 494 | 988 |
| Wakefield | 03628 | Cattle | | | | | | ^ | | | |
| Ward Creek/Doughspoon | 14025 | Cattle | 0.274489 | 4 | 4 | 4 | 5 | 7 | 15 | 37 | 73 |
| Ward Creek/Doughspoon | 14025 | Cattle | 0.274489 | 4 | 4 | 4 | 5 | 7 | 15 | 37 | 73 |

*Uncompahgre Draft Resource Management Plan Revision and Environmental Impact Statement*

BLM_0116130

**Table K-7**
**Predicted Years Between Potential Disease Events for Allotments That Did Not Intersect with CHHR, Based on RoC Model Results**

| Allotment Name | Allotment Number | Type of Livestock | Herd Rate of Contact[a] | Years Between Contact[b] | Years Between Potential Disease Events[c] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1:1 (1.0) | 1:1.1111 (0.9) | 1:1.3333 (0.75) | 1:2 (0.50) | 1:4 (0.25) | 1:10 (0.10) | 1:20 (0.05) |
| Washboard Rock-A | 05548 | Cattle | 0.079557 | 13 | 13 | 14 | 17 | 25 | 50 | 126 | 251 |
| Waterdog Basin | 05546 | Cattle | 0.009705 | 103 | 103 | 114 | 137 | 206 | 412 | 1030 | 2061 |
| Weimer Hill Place | 03660 | Cattle | | | | | | ^ | | | |
| Wells Gulch | 14016 | Sheep | 0.197428 | 5 | 5 | 6 | 7 | 10 | 20 | 51 | 101 |
| White Ranch | 14015 | Cattle | 0.164971 | 6 | 6 | 7 | 8 | 12 | 24 | 61 | 121 |
| White Ranch | 14015 | Cattle | 0.164971 | 6 | 6 | 7 | 8 | 12 | 24 | 61 | 121 |
| Wickson Draw | 17010 | Cattle | 0.044597 | 22 | 22 | 25 | 30 | 45 | 90 | 224 | 448 |
| Wilbanks-A | 14502 | Cattle | 0.014274 | 70 | 72 | 80 | 96 | 144 | 287 | 718 | 1435 |
| Wilbanks-B | 14502 | Cattle | 0.000173 | 5787 | 6069 | 6743 | 8091 | 12137 | 24274 | 60686 | 121372 |
| Williams Creek | 14523 | Cattle | 0.010080 | 99 | 99 | 110 | 132 | 198 | 397 | 992 | 1984 |
| Willims Ditch | 07220 | Cattle | 0.001443 | 693 | 693 | 770 | 924 | 1386 | 2771 | 6928 | 13856 |
| Youngs Peak | 14537 | Cattle | 0.019359 | 52 | 52 | 57 | 69 | 103 | 207 | 517 | 1033 |

[a] From last column.
[b] 1/Herd rate of contact
[c] Gray-shaded cells for allotments show potential disease event rates more frequently than 25 years.
^ This is a proposed allotment in the RMP that was not included in the RoC model run.

BLM_0116131

K. Bighorn/Domestic Sheep Risk of Association Modeling

**Table K-8**
**Summary of RoC Model Results for the UFO RMP Area**

| Type of Livestock | Number (Percent) of Areas Assessed | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | High* | High | Moderate | Some | Low | Very Low | ^ | Grand Total |
| Cattle | 37 (14.3%) | 19 (7.3%) | 14 (5.4%) | 7 (2.7%) | 13 (5.0%) | 102 (39.4%) | 22 (8.5%) | 214 (82.6%) |
| Cattle or Horse | | | | | | 2 (0.8%) | | 2 (0.8%) |
| Cattle or Sheep | | | 1 (0.4%) | | | 1 (0.4%) | | 2 (0.8%) |
| Horse | | | | 1 (0.4%) | | 1 (0.4%) | | 2 (0.8%) |
| Sheep | 4 (1.5%) | 6 (2.3%) | 6 (2.3%) | 1 (0.4%) | 3 (1.2%) | 19 (7.3%) | | 39 (15.1%) |
| **Grand Total** | 41 (15.8%) | 25 (9.7%) | 21 (8.1%) | 9 (3.5%) | 16 (6.2%) | 125 (48.3%) | 22 (8.5%) | 259 |

**Table K-9**
**Comparison of PoI Model and RoC Model Results for Bighorn Risk of Contact with Domestic Sheep Allotments**

| PoI Model Allotment Name | Allotment Number | Type of Livestock | POIM Results# | Allotment Number | RoC Allotment Name | RoC Results@ |
|---|---|---|---|---|---|---|
| Alkali Flats | 14017 | Sheep | Moderate | 14017 | Alkali Flats | Moderate |
| Aspen Ditch | 14551 | Sheep | Some | 14551 | Aspen Ditch-A | Very Low |
| | | | | | Aspen Ditch-B | Very Low |
| Beaver Hill | 05522 | Sheep | Low | 05522 | Beaver Hill | Moderate |
| Big Gulch-40 | 05036 | Sheep | Moderate | 05036 | Big Gulch-40 | Very Low |
| Canal | 14012 | Sheep | High | 14012 | Canal | High* |
| Coal Gulch | 14517 | Sheep | Low | 14517 | Coal Gulch-A | Very Low |
| | | | | | Coal Gulch-B | Very Low |
| Cushman | 05506 | Sheep | Some | 05506 | Cushman | High |
| Dave Wood Road | 05518 | Sheep | Low | 05518 | Dave Wood Road | Low |
| Deer Basin/Midway | 14019 | Sheep | Some | 14019 | Deer Basin/Midway-A | Moderate |
| | | | | | Deer Basin/Midway-B | Moderate |
| | | | | | Deer Basin/Midway-C | Very Low |
| Delta Pipeline | 03277 | Sheep | Some | 03277 | Delta Pipeline | High |
| Dry Cedar | 05537 | Sheep | Some | 05537 | Dry Cedar-A | Low |
| | | | | | Dry Cedar-B | Very Low |
| | | | | | Dry Cedar-C | Very Low |
| Highway 90 | 05521 | Sheep | Some | 05521 | Highway 90 | Moderate |
| Hubbard Creek | 14516 | Sheep | Low | 14516 | Hubbard Creek | Very Low |
| Lee Lands | 17003 | Sheep | High | 17003 | Lee Lands-A | High* |
| | | | | | Lee Lands-B | Moderate |
| Leopard Creek | 07205 | Sheep | High | 07205 | Leopard Creek | High* |

BLM_0116132

**Table K-9**
**Comparison of PoI Model and RoC Model Results for Bighorn Risk of Contact with Domestic Sheep Allotments**

| PoI Model Allotment Name | Allotment Number | Type of Livestock | POIM Results[#] | Allotment Number | RoC Allotment Name | RoC Results[@] |
|---|---|---|---|---|---|---|
| Log Hill | 05529 | Cattle or Sheep | Some | 05529 | Log Hill | Very Low |
| Lower Horsefly Combined | 05520 | Sheep | Low | 05520 | Lower Horsefly-A | Very Low |
| | | | | | Lower Horsefly-B | Low |
| | | | | | Lower Horsefly-C | Very Low |
| | | | | 05519 | Simms Mesa-A | Very Low |
| | | | | | Simms Mesa-B | Very Low |
| McDonald Creek | 14532 | Sheep | Some | 14532 | McDonald Creek | Very Low |
| Muddy Creek | 14519 | Sheep | Low | 14519 | Muddy Creek | Very Low |
| Onion Lakes | 05533 | Cattle or Sheep | Some | 05533 | Onion Lakes | Moderate |
| Petrie Mesa | 14022 | Sheep | Some | 14022 | Petrie Mesa | High |
| Point Creek | 14021 | Sheep | Some | 14021 | Point Creek | High |
| Rawhide/Coffee Pot | 05034 | Sheep | Moderate | 05034 | Rawhide/Coffee Pot-A | Very Low |
| | | | | | Rawhide/Coffee Pot-B | Very Low |
| | | | | | Rawhide/Coffee Pot-C | High* |
| Sandy Wash | 05502 | Sheep | Some | 05502 | Sandy Wash | High |
| Shavano Mesa | 05511 | Sheep | Some | 05511 | Shavano Mesa | Some |
| Shinn Park/South Canal | 05534 | Cattle | Some | 05534 | Shin Park | Moderate |
| Shinn Park | 05534 | Sheep | Moderate | | | |
| South of Town | 14534 | Sheep | Moderate | 14534 | South of Town | Very Low |
| Tappan Creek | 05575 | Sheep | Low | 05575 | Tappan Creek-A | Very Low |
| | | | | | Tappan Creek-B | Very Low |
| Wells Gulch | 14016 | Sheep | Moderate | 14016 | Wells Gulch | High |

[#]Using ArcGIS , natural breaks in the data were determined using the Natural Breaks option for displaying graduated color groups (Jenks 1967; Esri 2012), with four categories for those allotments falling within 9 miles of bighorn sheep habitat in the UFO: High, Moderate, Some, and Low.
[@]High—Intersects with bighorn sheep range or disease contact less than 25 years (assume 1:4 contacts results in disease event); Moderate—disease contact 25-50 years; Some—disease contact 50-75 years; Low—disease contact 75-100 years; Very Low—disease contact greater than 100 years.
*Allotments intersect the CHHR for RoC model.
^This is a proposed allotment in the RMP that was not included in the RoC model effort.

BLM_0116133

**Table K-10**
**Comparison of PoI Model and RoC Model Results for Bighorn Risk of Contact with Non-Domestic Sheep Allotments**

| PoI Model Allotment Name | Allotment Number | Type of Livestock | PoI Model Results# | Allotment Number | RoC Model Allotment Name | RoC Model Results@ |
|---|---|---|---|---|---|---|
| Adobe | 05027 | Cattle | Moderate | 05027 | Adobe | Very Low |
| Alder Creek | 17253 | Cattle | High | 17253 | Alder Creek-A | Very Low |
|  |  |  |  |  | Alder Creek-B | Very Low |
| Allen Reservoir | 05050 | Cattle | Moderate | 05050 | Allen Reservoir | Very Low |
| Anthracite Creek | 14525 | Cattle | Some | 14525 | Anthracite Creek | Some |
| Bald Hills | 05510 | Cattle | Some | 05510 | Bald Hills | Moderate |
| Baldy | 05568 | Cattle | High | 05568 | Baldy | High* |
| Barkelew Draw Com | 07303 | Cattle | Low | 07303 | Barkelew Draw Com | Very Low |
| Beaver Canyon | 17060 | Cattle | Some | 17060 | Beaver Canyon | Moderate |
| Beaver Rim | 07204 | Horse | Low | 07204 | Beaver Rim | Some |
| Ben Lowe | 14013 | Cattle | Moderate | 14013 | Ben Lowe | High* |
| Big Bear Creek | 07207 | Cattle | Moderate | 07207 | Big Bear Creek-A | Moderate |
|  |  |  |  |  | Big Bear Creek-B | Low |
| Big Bucktail | 17061 | Cattle | Low | 17061 | Big Bucktail | Very Low |
| Big Gulch | 03630 | Cattle | Some | 03630 | Big Gulch-A | Very Low |
|  |  |  |  |  | Big Gulch-B | Very Low |
| Big Pasture | 05044 | Cattle | Moderate | 05044 | Big Pasture | Low |
| Black Bullet | 05045 | Cattle | Moderate | 05045 | Black Bullet | Very Low |
| Blue Cimarron | 03642 | Cattle | Moderate | 03642 | Blue Cimarron | Low |
| Bolinger Ditch | 07219 | Cattle | Low | 07219 | Bolinger Ditch | Very Low |
| Bramier Draw | 07235 | Cattle | Low | 07235 | Bramier Draw | Very Low |
| Broad Canyon | 17199 | Cattle | Low | 17199 | Broad Canyon | Very Low |
| Buck | 07232 | Cattle or Horse | Low | 07232 | Buck | Very Low |
| Buckeye | 17033 | Cattle | Some | 17033 | Buckeye | High* |
| Burn Canyon | 17022 | Cattle | Low | 17022 | Burn Canyon | Very Low |
| Burro Creek | 05556 | Cattle | Some |  | Burro Creek | ^ |
| Burro Ridge | 05532 | Cattle | Some | 05532 | Burro Ridge | High |
| Busted Boiler | 03648 | Cattle | Low |  | Busted Boiler | ^ |
| Carpenter Ridge Com | 17100 | Cattle | Moderate | 17100 | Carpenter Ridge Com | High* |
| Horse Bench | 03634 | Cattle | Moderate | 03634 | Carpenter Ridge Com/Horse Bench | High* |
| Cedar | 05570 | Cattle | Some | 05570 | Cedar | Very Low |
| Cedar Creek | 05535 | Cattle | Moderate | 05535 | Cedar Creek-A | Low |
|  |  |  |  |  | Cedar Creek-B | Very Low |
| Chaffee | 00019 | Cattle | Some | 00019 | Chaffee | Low |
| Chaffee Gulch | 05528 | Cattle | Some | 05528 | Chaffee Gulch | Very Low |
| Cimarron 40 | 03658 | Cattle | Moderate | 03658 | Cimarron 40 | Moderate |
| Cimarron Stock Driveway | 03650 | Cattle | High | 03650 | Cimarron Stock Driveway | High* |
| Coal Canyon | 17107 | Cattle | Low | 17107 | Coal Canyon | Very Low |

BLM_0116134

**Table K-10**

**Comparison of PoI Model and RoC Model Results for Bighorn Risk of Contact with Non-Domestic Sheep Allotments**

| PoI Model Allotment Name | Allotment Number | Type of Livestock | PoI Model Results[#] | Allotment Number | RoC Model Allotment Name | RoC Model Results[@] |
|---|---|---|---|---|---|---|
| Coal Creek | 05509 | Cattle | Some | 05509 | Coal Creek | Very Low |
| Coke Ovens | 17027 | Cattle | Some | 17027 | Coke Ovens | Moderate |
| Collins | 05043 | Cattle | Moderate | 05043 | Collins | Very Low |
| Cone | 03635 | Cattle | Some | | Cone | ^ |
| Cookie Tree | 05560 | Cattle | Moderate | | Cookie Tree | ^ |
| Coventry | 07222 | Cattle | Low | 07222 | Coventry | Low |
| Cow Creek | 05566 | Cattle | High | 05566 | Cow Cr | High* |
| Crawford Reservoir | 05018 | Cattle | Some | 05018 | Crawford Reservoir | Very Low |
| Creek Bottom | 03632 | Cattle | Low | | Creek Bottom | ^ |
| Cut Off | 05052 | Cattle | Some | 05052 | Cut Off | Very Low |
| Davis Mesa | 17037 | Cattle | Moderate | 17037 | Davis Mesa | High* |
| Deep Creek | 14524 | Cattle | Low | 14524 | Deep Creek | Very Low |
| Dexter Creek | 05551 | Cattle | High | 05551 | Dexter Creek | High* |
| Dirty George | 14023 | Cattle | Low | 14023 | Dirty George | Very Low |
| Doby Canyon | 17042 | Cattle | Low | 17042 | Doby Canyon | Very Low |
| Dolores Canyon | 17004 | Cattle | High | 17004 | Dolores Canyon | High* |
| Doug Creek | 05028 | Cattle | Some | 05028 | Doug Creek | Very Low |
| Downing | 05541 | Cattle | Some | 05541 | Downing | Very Low |
| Dry Creek | 14549 | Cattle | Low | 14549 | Dry Creek | Very Low |
| Dry Creek Basin | 05513 | Cattle | Some | 05513 | Dry Creek Basin | High |
| Dry Creek Place | 05525 | Cattle or Horse | Some | 05525 | Dry Creek Place | Very Low |
| Dry Gulch | 05540 | Cattle | Some | 05540 | Dry Gulch | Very Low |
| Dry Park | 07300 | Cattle | Low | 07300 | Dry Park | Very Low |
| Duroy | 03637 | Cattle | Moderate | | Duroy | ^ |
| E Fork Dry Creek | 05514 | Cattle | Some | 05514 | E Fork Dry Creek | Low |
| E Gould Reservoir | 05041 | Cattle | Moderate | 05041 | E Gould Reservoir | Very Low |
| E Paradox Com | 17101 | Cattle | Moderate | 17101 | E Paradox Com-A | High* |
| | | | | 17101 | E Paradox Com-B | Moderate |
| E Roatcap Ind | 14512 | Cattle | Low | 14512 | E Roatcap Ind | Very Low |
| Far Away | 17213 | Cattle | Low | 17213 | Far Away | Very Low |
| Feedlot | 17078 | Cattle | Moderate | 17078 | Feedlot | High* |
| Fire Mountain Canal | 14508 | Cattle | Moderate | 14508 | Fire Mountain Canal | Very Low |
| Flatiron | 05501 | Cattle | Moderate | 05501 | Flatiron | High |
| Franklin Mesa | 05512 | Cattle | Some | 05512 | Franklin Mesa | Moderate |
| Gravel Pit | 07063 | Cattle | Low | 07063 | Gravel Pit | Very Low |
| Green | 05503 | Cattle | Some | 05503 | Green | Moderate |
| Hairpin | 05569 | Cattle | Moderate | 05569 | Hairpin | Very Low |
| Hamilton Mesa | 07209 | Cattle | Low | 07209 | Hamilton Mesa | Very Low |
| High Park | 05549 | Cattle | Moderate | 05549 | High Park | Very Low |
| Hillside | 05562 | Cattle | High | 05562 | Hillside | Very Low* |

BLM_0116135

**Table K-10**
**Comparison of PoI Model and RoC Model Results for Bighorn Risk of Contact with Non-Domestic Sheep Allotments**

| PoI Model Allotment Name | Allotment Number | Type of Livestock | PoI Model Results# | Allotment Number | RoC Model Allotment Name | RoC Model Results@ |
|---|---|---|---|---|---|---|
| Home Ranch | 07201 | Cattle | Low | 07201 | Home Ranch | Very Low |
| Horsefly | 05523 | Cattle | Some | 05523 | Horsefly* | Very Low |
| Horsefly (W) | 05523 | Cattle | Some | | | |
| Horsefly Com | 07301 | Cattle | Low | 07301 | Horsefly Com | Very Low |
| Houser | 07076 | Cattle | Some | 07076 | Houser | High |
| Jumbo Mountain | 14527 | Cattle | Low | 14527 | Jumbo Mountain | Very Low |
| Juniper Knob | 14505 | Cattle | Some | 14505 | Juniper Knob | Very Low |
| Kinnikin | 03643 | Cattle | Some | | Kinnikin | ^ |
| La Sal Creek | 17011 | Cattle | High | 17011 | La Sal Creek | High* |
| Lavender | 07075 | Cattle | Moderate | 07075 | Lavender | High |
| Lee Bench | 14011 | Cattle | Moderate | 14011 | Lee Bench | Some |
| Leroux | 14550 | Cattle | Some | 14550 | Leroux | Very Low |
| Leroux Creek | 14504 | Cattle | Some | 14504 | Leroux Creek | Very Low |
| Lillylands/West | 17024 | Cattle | Low | 17024 | Lillylands/West | Low |
| Lion Canyon | 17012 | Cattle | Moderate | 17012 | Lion Canyon | High* |
| Lion Creek Basin | 17044 | Cattle | Some | 17044 | Lion Creek Basin | High* |
| Little Baldy | 07223 | Cattle | Some | 07223 | Little Baldy | Very Low |
| Little Maverick Draw | 07210 | Cattle | Low | 07210 | Little Maverick Draw | Very Low |
| Log Hill | 05529 | Cattle or Sheep | Some | 05529 | Log Hill | Very Low |
| Lower Beaver Canyon | 07211 | Cattle | Low | 07211 | Lower Beaver Canyon | Very Low |
| Lower Hamilton | 07234 | Cattle | Low | 07234 | Lower Hamilton | Very Low |
| Lower Pinion | 07213 | Cattle | Low | 07213 | Lower Pinion | Very Low |
| Lower Roc Creek | 07216 | Cattle | High | 07216 | Lower Roc Creek | Low |
| Lower Roubideau Canyon | 05000 | Cattle | High | 05000 | Lower Roubideau Canyon | High* |
| Mailbox Park | 17001 | Cattle | Low | 17001 | Mailbox Park-A | Very Low |
| | | | | | Mailbox Park-B | Very Low |
| Maverick Draw | 17018 | Cattle | Low | 17018 | Maverick Draw | Very Low |
| McKee Draw | 07206 | Cattle | Some | 07206 | McKee Draw | Very Low |
| McKee Draw (E) | 07206 | Cattle | Some | 07206 | McKee Draw | Very Low |
| Mesa Creek | 17014 | Cattle | Moderate | 17014 | Mesa Creek-A | High* |
| | | | | | Mesa Creek-C | High* |
| Mesa Cr/First Park | 03645 | Cattle | Low | | Mesa Creek-B | Some |
| Middle Hamilton Lse | 07233 | Cattle | Low | 07233 | Middle Hamilton Lse | Very Low |
| Milk Creek | 14544 | Cattle | Low | 14544 | Milk Creek | Very Low |
| Moonshine Park | 05563 | Cattle | High | 05563 | Moonshine Park | High* |
| Moonshine Park (N) | 05563 | Cattle | High | 05563 | Moonshine Park | High* |
| Morrow Point | 03631 | Cattle | High | | Morrow Point | High* |
| Mud Springs | 07230 | Cattle | Low | 07230 | Mud Springs | Very Low |

BLM_0116136

**Table K-10**
**Comparison of PoI Model and RoC Model Results for Bighorn Risk of Contact with Non-Domestic Sheep Allotments**

| PoI Model Allotment Name | Allotment Number | Type of Livestock | PoI Model Results[#] | Allotment Number | RoC Model Allotment Name | RoC Model Results[@] |
|---|---|---|---|---|---|---|
| North Saddle Peak | 14540 | Cattle | Low | 14540 | N Saddle Peak | Very Low |
| North Wickson Draw | 17023 | Cattle | Low | 17023 | N Wickson Draw | Very Low |
| Naturita Canyon | 07203 | Cattle | Low | 07203 | Naturita Canyon-A | Very Low |
| | | | | | Naturita Canyon-B | Very Low |
| | | | | | Naturita Canyon-C | Very Low |
| | | | | | Naturita Canyon-D | Very Low |
| | | | | | Naturita Canyon-E | Very Low |
| | | | | | Naturita Canyon-F | Very Low |
| Naturita Ridge | 17035 | Cattle | Some | 17035 | Naturita Ridge | High |
| Needle Rock Allotment-not ACEC | 14542 | Horse | Low | 14542 | Needle Rock | Very Low |
| Norwood Hill | 07218 | Cattle | Low | 07218 | Norwood Hill | Very Low |
| Nyswanger | 17082 | Cattle | High | 17082 | Nyswanger | High* |
| Oak Hill | 07225 | Cattle | Low | 07225 | Oak Hill | Very Low |
| Oak Hill 40 | 03644 | Cattle | Some | | Oak Hill 40 | ^ |
| Oak Mesa | 14506 | Cattle | Some | 14506 | Oak Mesa | Very Low |
| Oak Ridge Com | 14528 | Cattle | Low | 14528 | Oak Ridge Com | Very Low |
| Onion Lakes | 05533 | Cattle or Sheep | Some | 05533 | Onion Lakes | Moderate |
| Overland | 14511 | Cattle | Low | 14511 | Overland | Very Low |
| Park | 17030 | Cattle | Some | 17030 | Park | Very Low |
| Parkway | 17062 | Cattle | Some | 17062 | Parkway | Very Low |
| Piney | 05516 | Cattle | Some | 05516 | Piney | High |
| Pinion | 03641 | Cattle | Low | | Pinion | ^ |
| Pipeline | 05507 | Cattle | Some | 05507 | Pipeline | High |
| Pocket Ind | 17085 | Cattle | Moderate | 17085 | Pocket Ind | High* |
| Popp Ranch | 14531 | Cattle | Some | 14531 | Popp Ranch | Very Low |
| Radio Tower | 02660 | Cattle | Low | 02660 | Radio Tower | Very Low |
| Ragsdale | 03708 | Cattle | Low | | Ragsdale | ^ |
| Rawlings Ind | 17021 | Cattle | Moderate | 17021 | Rawlings Ind | High* |
| Ray (Wray) Mesa | 03298 | Cattle | Moderate | 03298 | Ray (Wray) Mesa | High* |
| Redvale | 07227 | Cattle | Low | 07227 | Redvale | Very Low |
| Reynolds/McDonald | 14530 | Cattle | Some | 14530 | Reynolds/McDonald-A | Very Low |
| | | | | | Reynolds/McDonald-B | Low |
| Ridgway Reservoir | 00001 | Cattle | Moderate | | Ridgway Reservoir | ^ |
| Rim Rock | 05051 | Cattle | High | 05051 | Rim Rock | High* |
| Smith Fork Rim | 03526 | Cattle | High | 03526 | Smith Fork Rim | High* |
| River | 17079 | Cattle | High | 17079 | River | High* |
| River Allotment | 07200 | Cattle | Low | 07200 | River Allotment | Low |

BLM_0116137

**Table K-10**
**Comparison of PoI Model and RoC Model Results for Bighorn Risk of Contact with Non-Domestic Sheep Allotments**

| PoI Model Allotment Name | Allotment Number | Type of Livestock | PoI Model Results[#] | Allotment Number | RoC Model Allotment Name | RoC Model Results[@] |
|---|---|---|---|---|---|---|
| Roatcap | 05504 | Cattle | Moderate | 05504 | Roatcap | Moderate |
| Roatcap/Jay Creek | 14507 | Cattle | Some | 14507 | Roatcap/Jay Creek | Very Low |
| Roc Creek | 17020 | Cattle | High | 17020 | Roc Creek | High |
| Rock Ditch | 05538 | Cattle | Low | 05538 | Rock Ditch | Very Low |
| Round Top | 00002 | Cattle | Moderate | | Round Top | ^ |
| Rowher Canyon | 17080 | Cattle | Moderate | 17080 | Rowher Canyon | High* |
| S Dry Creek | 14548 | Cattle | Some | 14548 | S Dry Creek | Very Low |
| South Piney | 05515 | Cattle | Some | 05515 | S Piney-A | |
| | | | | | S Piney-B | High |
| San Miguel Rim | 03639 | Cattle | Low | | San Miguel Rim | ^ |
| San Miguel River | 03640 | Cattle | Low | | San Miguel River | ^ |
| Saw Pit | 03636 | Cattle | Moderate | | Saw Pit | ^ |
| Sawtooth | 17032 | Cattle | Some | 17032 | Sawtooth | High* |
| Second Park | 17105 | Cattle | Some | 17105 | Second Park | |
| Section 35 | 14547 | Cattle | Some | 14547 | Section 35 | Very Low |
| Sewemup | 03646 | Cattle | High | | Sewemup | ^ |
| Shinn Park/South Canal | 05534 | Cattle | Some | 05534 | Shin Park | Moderate |
| Shinn Park | 05534 | Sheep | Moderate | | | |
| Slagle Pass | 05547 | Cattle | Moderate | 05547 | Slagle Pass | Moderate |
| Slaugher Grade | 03651 | Cattle | Low | | Slaugher Grade | ^ |
| Smith Fork Ind | 05049 | Cattle | Moderate | 05049 | Smith Fork Ind | Very Low |
| South Branch | 14004 | Cattle | Low | 14004 | South Branch | Very Low |
| Spring Creek | 05517 | Cattle | Low | | Spring Creek | ^ |
| Spring Creek Canyon | 03659 | Cattle | Low | | Spring Creek Canyon | ^ |
| Spring Creek and Highway 90 | 03638 | Cattle | Moderate | 03638 | Spring Creek and Highway 90 | High* |
| Spring Gulch | 05029 | Cattle | High | 05029 | Spring Gulch | High |
| Stevens Gulch Com | 14513 | Cattle | Low | 14513 | Stevens Gulch Com | Very Low |
| Stingley Gulch | 14503 | Cattle | Some | 14503 | Stingley Gulch | Very Low |
| Stock Driveway | 14521 | Cattle | Some | 14521 | Stock Driveway | Very Low |
| Sundown | 03633 | Cattle | High | 03633 | Sundown | High* |
| Sunrise Gulch Com | 17102 | Cattle | High | 17102 | Sunrise Gulch Com | High* |
| Sunshine Mesa | 14541 | Cattle | Some | 14541 | Sunshine Mesa | Very Low |
| Swain Bench | 17081 | Cattle | Moderate | 17081 | Swain Bench | High* |
| Tabeguache Creek | 17031 | Cattle | Some | 17031 | Tabeguache Creek | High |
| Taylor Draw | 05555 | Cattle | Moderate | 05555 | Taylor Draw | Moderate |
| Third Park Com | 17103 | Cattle | Some | 17103 | Third Park Com | Some |
| Tinkler Ind | 05530 | Cattle | Low | 05530 | Tinkler Ind | Very Low |
| Transfer Road | 05505 | Cattle | Some | 05505 | Transfer Road | High |
| Tuttle Draw | 17106 | Cattle | Some | 17106 | Tuttle Draw | Moderate |
| Twenty Five Mesa N | 14008 | Cattle | High | 14008 | Twenty Five Mesa N | High* |

BLM_0116138

**Table K-10**

**Comparison of PoI Model and RoC Model Results for Bighorn Risk of Contact with Non-Domestic Sheep Allotments**

| PoI Model Allotment Name | Allotment Number | Type of Livestock | PoI Model Results# | Allotment Number | RoC Model Allotment Name | RoC Model Results@ |
|---|---|---|---|---|---|---|
| Twenty Five Mesa N (proposed) | 14008 | Cattle | Moderate | 14008 | Twenty Five Mesa N | ^ |
| Twenty Five Mesa S | 07008 | Cattle | Low | 07008 | Twenty Five Mesa S-A | Very Low |
| | | | | | Twenty Five Mesa S-B | Very Low |
| Uncompahgre Bench | 07007 | Cattle | Some | 07007 | Uncompahgre Bench | Some |
| Uncompahgre Com | 07302 | Cattle | Some | 07302 | Uncompahgre Com-A | Very Low |
| | | | | | Uncompahgre Com-B | Very Low |
| | | | | | Uncompahgre Com-C | Very Low |
| | | | | | Uncompahgre Com-D | Moderate |
| | | | | | Uncompahgre Com-E | Some |
| Upper Mail Box | 07208 | Cattle | Low | 07208 | Upper Mail Box | Low |
| Upper Maverick Draw | 07202 | Cattle | Low | 07202 | Upper Maverick Draw | Very Low |
| Upper Terror Creek | 14514 | Cattle | Low | 14514 | Upper Terror Creek | Very Low |
| W Roatcap | 14510 | Cattle | Low | 14510 | W Roatcap | Very Low |
| W Stevens Gulch | 14515 | Cattle | Low | 14515 | W Stevens Gulch | Very Low |
| W Youngs Peak | 14536 | Cattle | Some | 14536 | W Youngs Peak | Very Low |
| Wakefield | 03628 | Cattle | Low | | Wakefield | ^ |
| Ward Creek-Doughspoon | 14025 | Cattle | Some | 14025 | Ward Cr/Doughspoon | High |
| Ward Creek-Doughspoon (south) | 14025 | Cattle | Some | 14025 | Ward Creek/Doughspoon | High |
| Washboard Rock | 05548 | Cattle | Moderate | 05548 | Washboard Rock-A | Some |
| Waterdog Basin | 05546 | Cattle | Some | 05546 | Waterdog Basin | Very Low |
| Weimer Hill Place | 03660 | Cattle | Low | | Weimer Hill Place | ^ |
| White Ranch | 14015 | Cattle | Moderate | 14015 | White Ranch | High |
| White Ranch (proposed) | 14015 | Cattle | Moderate | 14015 | White Ranch | High |
| Wickson Draw | 17010 | Cattle | Low | 17010 | Wickson Draw | Low |
| Wilbanks | 14502 | Cattle | Low | 14502 | Wilbanks-A | Very Low |
| | | | | | Wilbanks-B | Very Low |
| Williams Creek | 14523 | Cattle | Low | 14523 | Williams Creek | Very Low |
| Williams Ditch | 07220 | Cattle | Low | 07220 | Willims Ditch | Very Low |
| Camel Back Pasture | 14010 | Cattle | High | 14010 | Winter/Monitor Mesa | High |

BLM_0116139

**Table K-10**

**Comparison of PoI Model and RoC Model Results for Bighorn Risk of Contact with Non-Domestic Sheep Allotments**

| PoI Model Allotment Name | Allotment Number | Type of Livestock | PoI Model Results[#] | Allotment Number | RoC Model Allotment Name | RoC Model Results[@] |
|---|---|---|---|---|---|---|
| Winter-Monitor Mesa | 14010 | Cattle | High | 14010 | Winter/Monitor Mesa | High* |
| Winter-Monitor Mesa (proposed) | 14010 | Cattle | High | 14010 | Winter/Monitor Mesa | High |
| Youngs Peak | 14537 | Cattle | Some | 14537 | Youngs Peak | Very Low |

[#]Using ArcGIS , natural breaks in the data were determined using the Natural Breaks option for displaying graduated color groups (Jenks 1967; Esri 2012) with four categories for those allotments falling within 9 miles of bighorn sheep habitat in the UFO: High, Moderate, Some, and Low.

[@]High—Intersects with bighorn sheep range or disease contact less than 25 years (assume 1:4 contacts results in disease event); Moderate—disease contact 25-50 years; Some—disease contact 50-75 years; Low—disease contact 75-100 years; Very Low—disease contact greater than 100 years.

*Allotments intersect the CHHR for RoC model.

^This is a proposed allotment in the RMP that was not included in the RoC model run.

%Same as Horsefly and Horsefly (W) combined

BLM_0116140

**Figure K-4.    CPW Rocky Mountain Bighorn Sheep Suitable Habitat Model for RoC Analysis Area**



BLM_0116141

**Figure K-5.    CPW Desert Bighorn Sheep Suitable Habitat Model for RoC Analysis Area**



BLM_0116142

**Figure K-6.   Analysis Area and Bighorn Sheep Populations Used in the RoC Model**



BLM_0116143

K. Bighorn/Domestic Sheep Risk of Association Modeling

**Figure K-7.    Comparison of PoI Model and RoC Model Results for UFO RMP Area**



BLM_0116144

## K.5   REFERENCES

Besser, T. E., N. J. Anderson, K. Baker, D. L. Bruning, E. F. Cassirer, M. A. Highland, J. A. Jenks, et al. 2012a. "Causes of pneumonia epizootics among bighorn sheep, western United States, 2008-2010." *Emerging Infectious Diseases* 18(3):406-414.

Besser, T. E., E. F. Cassirer, W. J. Foreyt, C. Herndon, D. P. Knowles, K. A. Potter, S. Srikumaran, and C. Yamada. 2012b. "Short communications: Survival of bighorn sheep (*Ovis canadensis*) commingled with domestic sheep in the absences of *Mycoplasma ovipneumoniae*." *Journal of Wildlife Diseases* 48(1):168-172.

Besser, T. E., E. F. Cassirer, M. A. Highland, P. Wolf, A. Justice-Allen, K. Mansfield, M. A. Davis, and W. Foreyt. 2013. "Bighorn sheep pneumonia: Sorting out the cause of a polymicrobial disease." *Preventive Veterinary Medicine* 108:83-93.

BLM (US Department of the Interior, Bureau of Land Management) and CPW (Colorado Parks and Wildlife). 2015. Bighorn/Domestic Sheep Risk of Contact Modeling Webinar Series, December 12, 2014 to February 20, 2015, Montrose, Colorado.

Cahn, M. L., M. M. Conner, O. J. Schmitz, T. R. Stephenson, J. D. Wehausen, and H. E. Johnson. 2011. "Disease, population viability, and recovery of endangered Sierra Nevada bighorn sheep." *Journal of Wildlife Management* 75(8):1753-1766.

Carpenter, T. E., V. L. Coggins, C. McCarthy, C. S. O'Brien, J. M. O'Brien, and T. Schommer. 2014. "A spatial risk assessment of bighorn sheep extirpation by grazing domestic sheep on public lands." *Preventative Veterinary Medicine* 114:3-10.

Coggins, V. L., and P. E. Matthews. 1992. "Lamb survival and herd status on the Lostine bighorn herd following a Pasteurella die-off." *Biennial Symposium of the Northern Wild Sheep and Goat Council* 8:147-154

CPW (Colorado Department of Natural Resources, Parks and Wildlife). 2012. Bighorn Sheep Suitable Habitat Modeling in Colorado. Colorado Parks and Wildlife, Denver.

_____. 2013. CPW bighorn sheep shapefiles. Internet website: http://www.arcgis.com/home/item.html?id=d1359dc6cf6e44979cacbfdbc34691e4.

Desert Bighorn Council. 1990. "Guidelines for management of domestic sheep in the vicinity of desert bighorn habitat." *Desert Bighorn Council Transactions* 34:33-35.

Esri. 2012. *FAQ: What is the Jenks Optimization method?* Internet website: http://support.esri.com/en/knowledgebase/techarticles/detail/26442.

Forest Service (US Department of Agriculture, National Forest Service). 2009. Memorandum of Understanding for Management of Domestic Sheep and Bighorn Sheep. Forest Service Agreement No. 09-Mu-11020000-006; Bureau of Land Management Agreement No. BLM-MOU-CO-482.

BLM_0116145

_____. 2010. Final Supplemental Environmental Impact Statement for the Southwest Idaho Ecogroup Land and Resource Management Plans. USDA Forest Service, Intermountain Region.

_____. 2013a. Bighorn Sheep Risk of Contact Tool User's Guide. Internal document. United States Department of Agriculture, Forest Service, Intermountain Region. January 2013.

_____. 2013b. Risk of Contact Analysis between Bighorn and Domestic Sheep on the Fisher-Ivy/Goose Lake Domestic Sheep Grazing Allotment. Rio Grande National Forest, Divide Ranger District, Colorado.

Foreyt, W. J. 1989. "Fatal *Pasteurella haemolytica* pneumonia in bighorn sheep after direct contact with clinically normal domestic sheep." *American Journal of Veterinary Research* 50:341-344.

_____. 1990. "Pneumonia in bighorn sheep: Effects of *Pasteurella haemolytica* from domestic sheep and effects on survival and long-term reproduction." In: *Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council* 7:92-101.

Gaillard, J. M., M. Festa-Bianchet, N. G. Yoccoz, A. Loison, and C. Toïgo. 2000. "Temporal variation in fitness components and population dynamics of large herbivores." *Annual Review of Ecology and Systematics* 31:367-393.

Garde, E., S. Kutz, H. Schwantje, and A. Veitch. 2005. "Examining the risk of disease transmission between wild Dall's sheep and mountain goats, and introduced domestic sheep, goats and llamas in the Northwest Territories." The Northwest Territories Agricultural Policy Framework and Environment and Natural Resources, Government of the Northwest Territories, Canada.

Gross, J. E., F. J. Singer, and M. E. Moses. 2000. "Effects of disease, dispersal, and area on bighorn sheep restoration." *Restoration Ecology* 8:25-37.

Holecheck, J. L., R. D. Pieper, and C. H. Herbel. 1989. *Range Management: Principles and Practices.* Regents/Prentice Hall, Englewood Cliffs, New Jersey.

Jenks, G. F. 1967. "The data model concept in statistical mapping." *International Yearbook of Cartography* 7:186-190.

Johnson, T. L. 1995. *A test of a habitat evaluation procedure for Rocky Mountain bighorn sheep.* Master's thesis, Colorado State University, Fort Collins.

Johnson, T. L., and D. M. Swift. 2000. "A test of a habitat evaluation procedure for Rocky Mountain bighorn sheep." *Restoration Ecology* 8(4S):47-56.

Lawrence, P. K., S. Shanthalingam, R. P. Dassanayake, R. Subramaniam, C. N. Herndon, D. P. Knowles, R. R. Rurangirwa, et al. 2010. "Transmission of *Mannheimia haemolytica* from domestic sheep (*Ovis aries*) to bighorn sheep (*O. canadensis*): Unequivocal demonstration with green fluorescent protein-tagged organisms." *Journal of Wildlife Diseases* 46(3):706-717.

Levins, R., T. Awerbuch, U. Brinkman, I. Eckardt, P. Epstein, N. Makhoul, C. A. de Possas, et al. 1994. "The emergence of new diseases." *American Scientist* 82:52-60.

BLM_0116146

McDaniel, K. C., and J. Tiedeman. 1981. "Sheep use on mountain winter range in New Mexico." *Journal of Range Management* 34:102-105.

McKinney, T., T. W. Smith, and J. C. deVos, Jr. 2006. "Evaluation of factors potentially influencing a desert bighorn sheep population." *Wildlife Monographs* 154:1-36.

Miller, M.W., and L. W. Wolf. 2011. "*Pasteurellaceae* from Colorado bighorn sheep herds." *Journal of Wildlife Diseases* 47(3):800-804.

O'Brien, J. M., C. S. O'Brien, C. McCarthy, and T. W. Carpenter. 2014. "Incorporating foray behavior into models estimating contact risk between bighorn sheep and areas occupied by domestic sheep." *Wildlife Society Bulletin* 38: 321-331.

Schommer, T. J., and M. M. Woolever. 2008. A Review of Disease Related Conflicts Between Domestic Sheep and Goats and Bighorn Sheep. General Technical Report RMRS-GTR-209. US Department of Agriculture, Forest Service, Rocky Mountain Research Station, Fort Collins, Colorado. May 2008.

Scott, M. E. 1988. "The impact of infection and disease on animal populations: Implications for conservation biology." *Conservation Biology* 2:40-56.

Singer, F. J., L. Spicer, and L. C. Zeigenfuss. 2001. "Role of patch size, disease, and movement in rapid extinction of bighorn sheep." *Conservation Biology* 15:1347-1354.

Singer, F. J., S. Bellew, M. E. Moses, and W. Sloan. 2000. "Correlates to colonizations of new patches by translocated populations of bighorn sheep." *Restoration Ecology* 8:66-74.

The Wildlife Society. 2014. Impacts of Disease on Bighorn Sheep Management – Fact Sheet. Bethesda, Maryland.

WAFWA (Western Association of Fish and Wildlife Agencies). 2012. Recommendations for Domestic Sheep and Goat in Wild Sheep Habitat. Wild Sheep Working Group, Western Association of Fish and Wildlife Agencies.

BLM_0116147

This page intentionally left blank.

BLM_0116148

# Appendix L
## Coal Screening for the Uncompahgre Planning Area

BLM_0116150

# APPENDIX L
# COAL SCREENING FOR THE UNCOMPAHGRE PLANNING AREA

## INTRODUCTION

The federal government provides for coal leasing under the Mineral Leasing Act of 1920, as amended by the Federal Coal Leasing Amendments Act of 1976. The Mineral Leasing Act outlines procedures for considering development of coal deposits through a leasing system that involves land use planning and environmental analysis. This document summarizes land management decisions regarding federal coal resources in the Uncompahgre Planning Area (planning area) within the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO), Colorado.

The identification of areas acceptable for coal leasing consideration is a major land use planning decision, providing direction for coal leasing decisions made by the Secretary of the Interior and guiding the future development of federal coal resources throughout the planning area.

Lands in the planning area were evaluated for coal leasing suitability using the screening process set forth in the Competitive Leasing section of the Code of Federal Regulations (43 CFR 3420.1-4) and summarized as follows:

1)  Identify lands that have coal development potential, using internal estimates and nonconfidential coal geology information and economic data provided by public and private sources

2)  Evaluate lands identified as having coal development potential in relation to the unsuitability criteria set forth in 43 CFR 3461 to determine areas that are unsuitable for all or stipulated methods of surface mining

3)  Identify multiple land use decisions that could eliminate from leasing lands that contain resource values and land uses that are locally, regionally, or nationally important or unique and that are not included in the unsuitability criteria.

BLM_0116151

The Department of the Interior offers federal coal resources through two application processes:

- Lease-by-application
- Application to modify an existing lease

Applications are typically initiated by coal companies, qualified individuals, or existing coal lessees. When a federal coal tract is proposed for leasing, the BLM reviews the application to ensure that it conforms to existing land use plans and contains sufficient geologic data to assess the fair market value of the coal.

Both leasing processes require compliance with the National Environmental Policy Act (NEPA) of 1969, in which the direct, indirect, and cumulative impacts associated with a proposed action are evaluated. After considering environmental analysis and public comments solicited during the NEPA process, the BLM determines whether to accept a proposed action, take no action, or develop an alternative action.

The submission of a coal lease application for lands within the planning area would initiate a fourth screening procedure:

4)  Consult with the surface owner regarding private surface lands overlying federal coal.

## RESULTS OF THE COAL SCREENING PROCESS

The following details the results of screening procedures used to identify lands in the planning area as suitable for coal leasing consideration.

### Screen 1: Identification of Coal Development Potential

Somerset, Grand Mesa, Tongue Mesa, and Nucla-Naturita coal fields constitute the leased and unleased federal coal resources within the planning area where development could occur over the estimated twenty-year duration of the RMP.

Located along the northeastern boundary of the planning area in Delta and Gunnison counties, **Somerset Coal Field** contains three active mines on federal leases operating in coal seams of the Mesaverde Formation and has the highest development potential of the four areas. Adjacent to Somerset along the northern boundary of the planning area, **Grand Mesa Coal Field** straddles the Delta-Mesa County Line and is also comprised of Mesaverde coals.

**Tongue Mesa Coal Field** traverses the Ouray-Gunnison County Line in the southeastern portion of the planning area and contains relatively inaccessible coal seams of the Fruitland Formation. Somerset, Grand Mesa, and Tongue Mesa are considered deep coal fields, with overburden depths too great to allow for surface mining potential. **Nucla-Naturita Coal Field** is located in western Montrose County and has overburden depths sufficiently shallow to allow for surface mining of Dakota Formation coals.

At the time of this report, only private portions of the Nucla-Naturita Coal Field were being developed, and there was no active mining of federal mineral estate within either the Grand Mesa or Tongue Mesa coal fields.

BLM_0116152

***Coal Development Potential in the RMP***

The coal development potential area identified in the 1985 San Juan/San Miguel RMP and 1989 Uncompahgre Basin RMP was carried forward to Alternative A (which reflects current management) in the Draft RMP/EIS. Under Alternative A, coal potential was based on a maximum development depth of about 2,000 feet. The coal potential area in Alternatives B, C, and D was expanded because of newer technology that allows for mining of deeper coal to a maximum development depth of 3,000 feet, and the addition of Dakota coal west of Montrose and an expanded Nucla-Naturita Coal Field, both of which were not recognized in the 1985 and 1989 RMPs.

**Screen 2: Unsuitability Criteria Review**

As required by 43 CFR 3461, the BLM assessed the coal development potential areas (identified in Screen 1) in relation to twenty unsuitability criteria to determine suitability for surface mining. In accordance with 43 CFR 3461.3-2, lands already leased for coal mining were not assessed. The criteria focus on significant resource values that could be impacted by surface operations. ***Surface coal mining operations*** are defined in 43 CFR 3400.0-5 as "activities conducted on the surface of lands in connection with a surface coal mine or surface operations and surface impacts incident to an underground mine" (such as vent holes, portals, load out facilities, roads, and other surface disturbances).

Federal regulation 43 CFR 3461.1 [a] outlines exemptions and exceptions from the criteria, stating that "federal lands with coal deposits that would be mined by underground mining methods shall not be assessed as unsuitable where there would be no surface coal mining operations." The unsuitability criteria were not applied to the three coal fields in the planning area that have deep coal deposits and no clearly defined areas where surface operations would occur. The criteria will be applied to surface facilities and operations during the exploration and leasing stages, as allowed by 43 CFR 3461.2-1(b) (1) and 3461.3-1.

A summary of the findings is as follows. Note that acres are subject to change as the BLM would evaluate proposed surface mining and surface operations in relation to the criteria at the time of exploration and leasing.

| Criteria | Nucla-Naturita Coal Field (acres) | Other Shallow Coal Fields (acres) |
|---|---|---|
| 2: Rights-of-Way and Easements | 2,190 | 30 |
| 3: Public Roads, Buildings, Cemeteries, and Parks and Occupied Dwellings | 20 | 0 |
| 12: Bald and Golden Eagle Roosts and Winter Concentrations | 340 | 10 |
| 17: Municipal Watersheds | 70 | 0 |
| **Total** | **2,460[1]** | **40** |

[1]The total acreage is less than the sum total of the individual acres because some areas overlap. The total does not include overlapping acreage.

BLM_0116153

### Criterion 1 - Special Systems of Federal Lands

Federal surface lands included in the following land systems or categories shall be considered unsuitable for surface mining and surface operations:

- National Park System
- National Wildlife Refuge System
- National System of Trails
- National Wilderness Preservation System
- National Recreation Areas
- land acquired with money derived from the Land and Water Conservation Fund
- National Forests (not applicable to underground mining)
- federal lands in incorporated cities, towns, and villages

_Analysis:_ Designated as a National Historic Trail by Congress in 2002, the northern branch of The Old Spanish Trail passes through the planning area. The trail and associated corridor are unsuitable for surface mining and surface operations associated with underground mining. Prior to coal exploration and leasing within any coal development potential area in the planning area, the BLM will examine proposed federal lands and identify additional areas listed under Criterion 1 as unsuitable for surface mining and surface operations.

### Criterion 2 - Rights-of-Way and Easements

Federal lands within rights-of-way or easements or within surface leases for residential, commercial, industrial, or other public purposes shall be considered unsuitable for surface mining and surface operations.

_Analysis:_ The West-Wide Energy Corridor, the Kinder-Morgan pipeline, Western Area Power Administration and Tri-state powerline corridors, utility corridors, and county road rights-of-way within the Nucla-Naturita Coal Field are unsuitable for surface mining and surface operations.

Numerous additional rights-of-way occur within coal development potential areas in the planning area. Prior to coal exploration and leasing, the BLM will examine proposed federal lands and identify additional rights-of-way and easements listed under Criterion 2 as unsuitable for surface mining and surface operations.

### Criterion 3 - Public Roads, Buildings, Cemeteries, and Parks and Occupied Dwellings

Federal lands affected by sections 522(e) (4) and (5) of the Surface Mining Control and Reclamation Act shall be considered unsuitable for surface mining and surface operations, including:

- within 100 feet of a cemetery or the outside line of a public highway right-of-way
- within 300 feet of an occupied building

BLM_0116154

- within 350 feet of an occupied public building, school, church, community, or institutional building or public park

*Analysis:* Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM will examine proposed federal lands and identify areas and structures listed under Criterion 3 as unsuitable for surface mining and surface operations. Coal fields in the planning area include the following public roads:

- State Highway 133 runs through the Somerset Coal Field.
- State Highway 65 runs through the Grand Mesa coal Field.
- P77 Road and Owl Creek Pass run through the Tongue Mesa Coal Field.
- State Highway 145 runs through the Nucla-Naturita Coal Field.

### Criterion 4 - Wilderness Study Areas
Federal lands designated as Wilderness Study Areas (WSA) shall be considered unsuitable for surface mining and surface operations while under review by the federal administration and Congress for possible wilderness designation.

*Analysis:* At the time of this report, no WSAs have been designated within the Nucla-Naturita Coal Field. Because Screen 3 eliminates all WSAs from coal leasing, Criterion 4 is not applicable to surface operations for underground mines.

### Criterion 5 - Class I Visual Resources
Federal lands designated as Visual Resource Management (VRM) Class I (signifying an area of outstanding scenic quality or high visual sensitivity) and not currently on the National Register of Natural Landmarks shall be considered unsuitable for surface mining and surface operations.

*Analysis:* At the time of this report, no VRM Class I areas have been designated within the Nucla-Naturita Coal Field. Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM will examine proposed federal lands and identify VRM Class I areas as unsuitable for surface mining and surface operations.

### Criterion 6 - Scientific Studies, Demonstrations, and Experiments
Federal lands under permit by the BLM for scientific studies involving food or fiber production, or natural resources or technology demonstrations and experiments shall be considered unsuitable for the duration of the study, demonstration, or experiment, except where mining could be conducted in such a way as to enhance or not jeopardize the purposes of the study, as determined by the BLM, or where the principal scientific user or agency gives written concurrence to all or certain methods of mining.

*Analysis:* At the time of this report, no scientific studies listed under Criterion 6 are being conducted within coal development potential areas in the planning area. Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM will examine proposed federal lands and identify areas with scientific studies, demonstrations, and experiments listed under Criterion 6 as unsuitable for surface mining and surface operations.

BLM_0116155

### Criterion 7 - National Register of Historic Place Sites

Federal lands containing publicly owned sites listed on the National Register of Historic Places shall be considered unsuitable for surface mining and surface operations. The BLM shall consult with the Advisory Council on Historic Preservation and the State Historic Preservation Office and apply Criterion 7 to properties within coal development potential areas determined to be necessary in order to protect the inherent values that made the property eligible for National Register listing.

_Analysis:_ At the time of this report, no publicly owned sites within coal development potential areas in the planning area have been identified as eligible for listing on the National Register of Historic Places. Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM will examine proposed federal lands, consult with the Advisory Council on Historic Preservation and the State Historic Preservation Office, and identify National Register of Historic Place sites as unsuitable for surface mining and surface operations.

### Criterion 8 - National Natural Landmarks

Federal lands designated as natural areas or National Natural Landmark sites (containing outstanding biological and geological resources regardless of land ownership) shall be considered unsuitable for surface mining and surface operations.

_Analysis:_ At the time of this report, no natural areas or National Natural Landmarks have been identified within coal development potential areas in the planning area. Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM will examine proposed federal lands and identify natural areas and National Natural Landmarks listed under Criterion 8 as unsuitable for surface mining and surface operations.

### Criterion 9 - Federally Designated Critical Habitat for Threatened & Endangered Species

Federally designated critical habitat for listed threatened or endangered plant and animal species, and habitat proposed to be designated as critical habitat, which is determined by the US Fish and Wildlife Service (FWS) and the surface management agency to be of essential value, and where the presence of threatened or endangered species has been scientifically documented, shall be considered unsuitable for surface mining and surface operations.

_Analysis:_ At the time of this report, no federally proposed or designated habitat for listed threatened and endangered plant and animal species have been identified within the Nucla-Naturita Coal Field. Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM will examine proposed surface coal operations and facilities in relation to Criterion 9.

Prior to mine plan approval, the BLM will survey for critical habitat that could be directly or indirectly impacted by surface operations or structures. Mine plans will identify known federally designated and proposed critical habitat for threatened and endangered plant and animal species as unsuitable, and outline avoidance and mitigation measures for habitat discovered during mining operations.

BLM_0116156

***Criterion 10 – Critical Habitat for State-listed Threatened & Endangered Species***
Federal lands containing habitat determined to be critical or essential for plant or animal species listed as threatened or endangered by the State of Colorado pursuant to state law shall be considered unsuitable for surface mining and surface operations.

<u>Analysis:</u> At the time of this report, no critical or essential habitat for state-listed threatened or endangered plant and animal species has been identified within coal development potential areas in the planning area. Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM will examine proposed surface coal operations and facilities in relation to Criterion 10.

Prior to mine plan approval, the BLM will survey for critical and essential habitat for state-listed threatened and endangered plant and animal species that could be directly or indirectly impacted by surface mining or surface operations. Mine plans will identify known critical and essential habitat for state-listed threatened and endangered plant and animal species as unsuitable, and outline avoidance and mitigation measures for critical or essential habitat discovered during mining operations.

***Criterion 11 – Bald and Golden Eagle Active Nest Sites***
Federal lands containing an active bald or golden eagle nest site, along with an appropriate buffer zone around the nest site, shall be considered unsuitable for surface mining and surface operations. The BLM will consult with the FWS and will consider terrain and availability of habitat for prey species when defining buffer zones.

<u>Terminology Used:</u> According to 2007 National Bald Eagle Management Guidelines issued by the FWS, a nest is defined as a structure built, maintained, or used by eagles for the purpose of reproduction. An active nest is attended (built, maintained, or used) by a pair of eagles during a given breeding season, whether or not eggs are laid.

<u>Analysis:</u> Federal lands within an appropriate buffer zone of known active bald or golden eagle nesting sites (established through consultation with the FWS) will be identified as unsuitable for surface mining and surface operations. At the time of this report, no known bald or golden eagle nest sites have been identified within the Nucla-Naturita Coal Field.

Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM will evaluate proposed surface operations and facilities in relation to Criterion 11. Prior to mine plan approval, the BLM will survey for bald and golden eagle nests and nesting activity that could be directly or indirectly impacted by surface operations or facilities. Mine plans will identify known golden and bald eagle active nest sites and associated buffer zones as unsuitable and will outline measures to comply with current FWS Bald Eagle Management Guidelines & Conservation for active nest sites discovered during mining operations.

***Criterion 12 – Bald and Golden Eagle Roosts***
Federal lands containing bald and golden eagle roosts and concentration areas used during migration and wintering shall be considered unsuitable for surface mining and surface operations.

BLM_0116157

_Terminology Used:_ According to 2007 National Bald Eagle Management Guidelines issued by the FWS, roosts are areas where eagles gather and perch overnight (and sometimes during the day in the event of inclement weather). Communal roost sites are usually in large trees (live or dead) that are relatively sheltered from wind and are generally in close proximity to foraging areas. Roosts may also serve a social purpose for pair bond formation and communication among eagles. Many roost sites are used year after year.

_Analysis:_ Federal lands within one-quarter mile of known bald or golden eagle roosts and concentration areas will be identified as unsuitable for surface mining and surface operations. At the time of this report, no known bald or golden eagle roosts and concentration areas have been identified within the Nucla-Naturita Coal Field.

Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM will examine surface operations and facilities in relation to Criterion 12. Prior to mine plan approval, the BLM will survey for bald and golden eagle roosts and concentration areas that could be directly or indirectly impacted by surface operations or facilities. Mine plans will identify known bald and golden eagle roosts and concentration areas as unsuitable, and will outline measures to comply with current FWS Bald Eagle Management Guidelines & Conservation for roosts and concentration areas discovered during mining operations.

### Criterion 13 – Falcon Cliff Nest Sites

Federal lands containing falcon cliff nest sites with active nests (excluding kestrel), along with a buffer zone of federal land around the nest site, shall be considered unsuitable for surface mining and surface operations. The BLM will consult with the FWS and will consider terrain and availability of habitat for prey species when defining buffer zones.

_Analysis:_ At the time of this report, no falcon cliff nest sites have been identified within the Nucla-Naturita Coal Field. Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM will evaluate proposed surface mining and surface operations in relation to Criterion 13.

Prior to mine plan approval, the BLM will survey for falcon cliff nest sites that could be directly or indirectly impacted by surface operations or structures. Mine plans will identify federal lands within an appropriate buffer zone of known active falcon cliff nest sites (established in consultation with the FWS) as unsuitable for surface mining and surface operations, and outline avoidance and mitigation measures for nest sites discovered during mining operations.

### Criterion 14 – Migratory Bird Habitat

Federal lands considered high-priority habitat for migratory bird species of high federal interest on a regional or national basis, as determined jointly by the surface management agency and FWS, shall be considered unsuitable for surface mining and surface operations.

_Analysis:_ At the time of this report, no high-priority habitat for migratory bird species of high federal interest has been identified within the Nucla-Naturita Coal Field. Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM (in consultation with the FWS) will evaluate proposed surface mining and surface operations in relation to Criterion 14.

BLM_0116158

Prior to mine plan approval, the BLM will survey for high-priority migratory bird habitat that could be directly or indirectly impacted by surface operations or facilities. Mine plans will identify known high-priority migratory bird habitat as unsuitable, and outline avoidance and mitigation measures for habitat discovered during mining operations. During periods when a high-priority habitat is in use by a migratory bird species, underground coal mining may occur in areas where the BLM (in consultation with the FWS) determines that all or certain stipulated mining methods will not adversely affect the habitat.

### Criterion 15 – Habitat for State High-Interest Wildlife and Plants

Federal lands that the BLM and State of Colorado jointly identify as essential habitat for maintaining resident fish, wildlife, and plant species of high interest to the State shall be considered unsuitable for surface mining and surface operations.

Examples of lands that serve a critical function for a particular species include:

- active dancing and strutting grounds for sage-grouse
- crucial winter range for deer and elk
- migration corridors for elk
- extremes of range for plant species

_Analysis:_ Much of the planning area consists of crucial winter range for deer and elk. Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM will evaluate proposed surface mining and surface operations in relation to Criterion 15.

Prior to mine plan approval, the BLM will survey for crucial deer and elk winter range that could be directly or indirectly impacted by surface operations or facilities. Mine plans will identify known crucial winter range for deer and elk as unsuitable, and outline avoidance and mitigation measures.

### Criterion 16 – Riverine, Coastal, and 100-Year Recurrence Interval Floodplains

Federal lands in riverine, coastal, and 100-year recurrence interval flood plains, on which the BLM determines that mining could not be undertaken without substantial threat of loss of life or property, shall be considered unsuitable for all or certain stipulated methods of mining.

_Analysis:_ Coastal and riverine flood plains do not occur within the planning area and, at the time of this report, 100-year recurrence interval floodplains have not been identified within any coal development potential areas in the planning area. One hundred-year floodplains may exist along drainages in some areas.

Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM will evaluate proposed surface mining and surface operations in relation to Criterion 16. Mine plans will identify potential effects of mine operations on adjacent flood plains and outline mitigation measures.

BLM_0116159

### Criterion 17 – Municipal Watersheds

Federal lands that have been classified by the BLM as municipal watersheds shall be considered unsuitable for surface mining and surface operations.

<u>Analysis:</u> The Nucla, Naturita, Norwood, and Tri-state G&T Station are municipal watersheds within the Nucla-Naturita Coal Field identified as unsuitable for surface mining.

Grand Mesa and Somerset coal fields both contain numerous municipal watersheds within which surface operations will be considered unsuitable. Because designation of municipal watersheds is likely to increase over time, the BLM will evaluate proposed surface mining and surface operations in relation to Criterion 17 at the time of exploration and leasing.

### Criterion 18 – Natural Resource Waters

Federal lands with national resource waters identified in state water quality management plans, and a buffer zone of federal lands one-quarter mile from the outer edge of the far banks of the water, shall be considered unsuitable for surface mining and surface operations.

<u>Analysis:</u> At the time of this report, no national resource waters have been identified by the State of Colorado within coal development potential areas in the planning area. Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM will evaluate proposed surface mining and surface operations in relation to Criterion 18.

### Criterion 19 – Alluvial Valley Floors

Federal lands identified by the surface management agency, in consultation with the state in which they are located, as alluvial valley floors according to the definition in 43 CFR 3400.0-5 (a), standards in 30 CFR Part 822, the final alluvial valley floor guidelines of the Office of Surface Mining Reclamation and Enforcement when published, and approved state programs under the Surface Mining Control and Reclamation Act of 1977, where mining would interrupt, discontinue, or preclude farming, shall be considered unsuitable. Additionally, when mining federal land outside an alluvial valley floor would materially damage the quantity or quality of water in surface or underground water systems that would supply alluvial valley floors, the land shall be considered unsuitable for surface mining and surface operations.

<u>Analysis:</u> Alluvial valley floors will be identified at the time of coal exploration and leasing. Office of Surface Mining Reclamation and Enforcement guidelines will be followed. Surface coal mining operations may occur along alluvial valley floors if no reasonable alternative sites exist outside these areas. Lease stipulations and conditions of approval would be required in order to minimize disturbance and impacts to water supplies within these areas.

### Criterion 20 – State and Indian Tribe Proposed Criteria

Within the State of Colorado, federal lands in the planning area to which an applicable criterion (i) proposed by the State or an Indian tribe located in the planning area, and (ii) adopted by rulemaking by the Secretary, shall be considered unsuitable for surface mining and surface operations.

<u>Analysis:</u> At the time of this report, no federal lands within coal development potential areas in the planning area have been proposed by the State of Colorado or an Indian tribe as unsuitable.

BLM_0116160

Prior to coal exploration or leasing within any coal development potential area in the planning area, the BLM will evaluate proposed surface mining and surface operations in relation to Criterion 20.

**Screen 3: Identification of Multiple Land Use Conflicts**

Screen 3 requires evaluating multiple land use decisions that could eliminate from surface or underground coal exploration and leasing consideration, federal lands containing resource values and uses that are considered locally, regionally, or nationally unique or more important than coal. Such values and uses include, but are not limited to, those identified in Section 522(a)(3) of the Surface Mining Reclamation and Control Act of 1977 and the Criteria for Designating Areas as Unsuitable for Surface Coal Mining Operations (30 CFR 762).

The following areas within coal development potential areas have been identified as containing resource values or uses deemed of greater value than coal, for which potential impacts could not be mitigated. The conflict areas differ within each draft RMP alternative and have been identified as unacceptable for further coal exploration and leasing consideration.

*Common to All Alternatives*

Section 308 of the Fiscal Year 1984 Interior Appropriations Act prohibits leasing within wilderness study areas (WSAs). The WSAs in the planning area are managed according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b) until such time as Congress either designates them as wilderness or releases them for other purposes. These WSAs have been identified in all of the proposed RMP alternatives as unacceptable for further coal exploration and leasing consideration.

*Alternative A*

Under Alternative A, no WSAs are within the coal development potential area, as identified in the San Juan/San Miguel and Uncompahgre Basin RMPs (BLM 1985, 1989a). No other areas were identified as unacceptable for further coal exploration and leasing consideration under Alternative A.

*Alternative B*

Under Alternative B, the Adobe Badlands (10,320 acres) and Camel Back (10,680 acres) WSAs are within the revised coal development potential area and will be managed as unacceptable for further consideration for coal leasing as described under Common to All Alternatives. In addition, the following areas have been identified as unacceptable for further coal exploration and leasing consideration under Alternative B:

- Lands within 2,640 horizontal feet of either side of a classified surface water supply stream segment (as measured from the average high water mark of a water body) for a distance of five (5) miles upstream of a public water supply intake with the classification "Water Supply" by the State of Colorado

- Public water supplies using a groundwater well or spring, a 2,640 horizontal foot buffer

- State parks

BLM_0116161

- State wildlife areas
- Municipal parks
- Lands identified for wilderness characteristics protection
- SRMAs
- ACECs:
    – Salt Desert Shrub
    – San Miguel River Expansion
    – East Paradox
- Suitable WSR segments classified as "wild:"
    – Monitor Creek
    – Potter Creek
    – Roubideau Creek, Segment 1
    – Dry Creek
    – Saltado Creek
    – San Miguel River, Segment 2
    – Tabeguache Creek, Segment 1
    – Dolores River, Segment 1a
    – La Sal Creek, Segment 3

**Alternative C**

Under Alternative C, the Adobe Badlands (10,320 acres) and Camel Back (10,680 acres) WSAs are within the revised coal development potential area and will be managed as unacceptable for further consideration for coal leasing as described under Common to All Alternatives. In addition, the following areas have been identified as unacceptable for further coal exploration and leasing consideration under Alternative C:

- Lands within 1,000 horizontal feet of either side of a classified surface water supply stream segment (as measured from the average high water mark of a water body) for a distance of five (5) miles upstream of a public water supply intake with the classification "Water Supply" by the State of Colorado
- Public water supplies using a groundwater well or spring, a 1,000 horizontal foot buffer
- State parks
- State wildlife areas
- Municipal parks

BLM_0116162

*Alternative D*

Under Alternative D, the Adobe Badlands (10,320 acres) and Camel Back (10,680 acres) WSAs are within the revised coal development potential area and will be managed as unacceptable for further consideration for coal leasing as described under Common to All Alternatives. In addition, the following areas have been identified as unacceptable for further coal exploration and leasing consideration under Alternative D:

- State parks

- State wildlife areas

- Municipal parks

- Lands identified for wilderness characteristics protection

- SRMAs

- ACECs:

    – Adobe Badlands

    – San Miguel River

- Suitable WSR segments

**Screen 4: Consultation with Private Surface Owners**

Both Section 714 of the Surface Mining Control and Reclamation Act and 43 CFR 3420(e)(4) require the BLM to consult with qualified owners whose lands overlie federal coal deposits proposed for development by surface mining methods. The BLM will consult with qualified surface owners prior to coal exploration or leasing within any coal development potential area in the planning area.

BLM_0116163

This page intentionally left blank.

# Appendix M
## Travel Management

BLM_0116165

BLM_0116166

# APPENDIX M
# TRAVEL MANAGEMENT

## INTRODUCTION

Travel management is the process of planning for and managing access and travel systems on public lands. This includes route planning, inventory and evaluation, innovative partnerships, user education, mapping, monitoring, signing, field presence and law enforcement (IM CO-2007-020). Comprehensive travel management planning should address all resource use aspects, such as recreational, traditional, casual, agricultural, commercial, and educational, and all modes and conditions of travel on public lands, not just motorized or off-highway vehicle activities (Appendix C of the BLM Land Use Planning Handbook 1601-1).

Travel management implementation decisions for the Uncompahgre Resource Management Plan (RMP) are being deferred to an implementation plan due to the complexity of the area, controversy, and incomplete data (e.g., complete inventory of routes) within a majority of the resource plan area. To conform with Appendix C of the BLM Land Use Planning Handbook, comprehensive travel management planning efforts will consider all modes of travel, motorized and nonmotorized.

The Uncompahgre RMP and Record of Decision (ROD) offers a mix of recreational opportunities that attempt to meet a wide variety of recreation demands while reducing conflict among users. The RMP/ROD also provides for livestock grazing, the continued operation of public land rights-of-way, forest product collection, traditional uses, and access to private property. Each of these uses, including recreation, requires a supporting travel management system within the UFO.

The ultimate goal of the travel management process is to propose a management framework that supports BLM's mission, achieves resource management objectives and provides appropriate, sustainable public and administrative access.

Travel management decisions are considered sequentially at two levels of analysis:

- Land Use Planning – Uncompahgre RMP, Travel area decisions (i.e., areas that are open, closed or limited for all modes of travel)

BLM_0116167

- Activity or Implementation Level Plans – Route-by-route decisions (i.e., which routes are open or closed for different modes of travel in limited areas)

*Note: Land Use Plan level decisions differ from activity or implementation level decisions. To change a travel area decision, the RMP must be amended. Route-by-route decisions do not require a RMP amendment. As implementation decisions, they are designed to be more adaptable. Based on monitoring, the designated route system can be changed to meet resource and resource use objectives. Additionally, area designations may be protested and route-by-route designations may be appealed.*

## BACKGROUND

### Description of Route System

Travel management historically focused specifically on motor vehicle use. The BLM now thinks more comprehensively about travel management to include all forms of transportation, including travel by foot, horseback, and mechanized vehicles such as bicycles, as well as the numerous forms of motorized vehicles from two-wheeled (motorcycles) and four-wheeled all-terrain vehicles (ATVs) to full-size vehicles (cars and trucks), and aircraft (landing strips).

The vast majority of existing routes within the UFO were not constructed by the BLM for recreational use. Instead, the majority of existing routes are two-track routes that were created to provide access for timber cutting, mineral and paleontological exploration, range and vegetation management projects, and various rights-of-way. Of these routes, many were not necessarily intended to be left behind or open for recreational use but have become popular routes for visitors engaged in nonmotorized and motorized recreation activities.

Over time, the UFO's route system has been expanded by users themselves, particularly in areas that were previously designated as open for cross-country travel. These routes are not typically maintained by the BLM; rather, it is the repeated passage of vehicles that maintains these routes.

### Description of Process

Travel management planning for the UFO will be based upon extensive public participation and internal, structured interdisciplinary team route by route analysis.

#### Inventory and Public Comment

BLM staff in the UFO will inventory and digitize spatial information regarding the existing route systems within each Travel Management Area prior to travel planning. The majority of this information will be collected in the field, while some may have to be digitized remotely using satellite imagery and verified in the field at a later date.

During the scoping comment period, the BLM will seek feedback from the public on the following questions:

- Is the BLM's route inventory accurate and complete?
- Which routes do you value for what uses, and why?
- Where would you like to see additional routes, and why?
- What routes would you like to see closed and why?

BLM_0116168

*Interdisciplinary Meetings*

Once public comments have been reviewed, the BLM will use an interdisciplinary team to draft travel management route-by-route implementation-level decisions for a range of alternatives. During this step of the process, comments from the public, resource information, and management objectives will drive the decision-making process. The purpose of the BLM interdisciplinary team meetings will be to:

- Gather information from the interdisciplinary team on conflicts identified and mitigation proposed. Identify the purpose and need for each route. Where conflicts with resources exist, these conflicts will be discussed and resolved during the meeting, and final proposals for the various alternatives will be established.

- Formulate a range of alternatives that will support the goals and objectives established under each alternative.

The product of the process will be a range of alternative travel management systems. Development of a preferred alternative would likely include components of the other alternatives.

**Laws, Regulations, Policies, and Program Guidance**

Currently, the Code of Federal Regulations (CFR) establishes the criteria for designating public lands with respect to OHVs and for establishing controls governing the use and operation of OHVs. Nonmotorized and nonmechanized uses will also be addressed in travel planning, and decisions made will be incorporated into supplemental rules for enforcement purposes. Various laws and regulations apply to the process, including:

- National Environmental Policy Act (NEPA)
- Endangered Species Act (ESA)
- Wilderness Act
- Omnibus Public Lands Management Act of 2009
- National Historic Preservation Act
- Antiquities Act of 1906
- Wild and Scenic Rivers Act
- Clean Air Act
- Clean Water Act
- Taylor Grazing Act
- Mining Act of 1872 (and subsequent mining acts)
- Federal Land Policy and Management Act (FLPMA) for the BLM
- Executive Orders 11644 (1972) and 11989 (1977)
- BLM's Travel and Transportation Manual (1626)
- Travel and Transportation Management Handbook (H-8342-1)

- Addendum 1 to the Colorado Protocol: Section 106 Requirements for Comprehensive Travel and Transportation Management Planning
- Code of Federal Regulations (CFR)

Addendum 1 to the Colorado Protocol: Section 106 Requirements for Comprehensive Travel and Transportation Management Planning allows the BLM to complete consultation per Section 106 of the National Historic Preservation Act after route designation.

The Federal Regulations 43 CFR Part 8342.1 and Executive Order 12608 require BLM to designate all public lands as Open, Limited, or Closed for OHV use within the following parameters.

The BLM Authorized Officer shall designate all public lands as open, limited, or closed to off-highway vehicles. All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, recreational opportunities, and the minimization of conflicts among various uses of the public lands; and in accordance with the following criteria:

a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.

c) Areas and trails shall be located to minimize conflicts between existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

d) Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the BLM Authorized Officer determines that off-highway vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

## AREA ALLOCATION TRAVEL DECISIONS

Area allocation travel management decisions, or land use planning travel management decisions, define the areas within the UFO that are designated Open, Limited, or Closed to OHV, mechanized travel, and possibly cross-country foot and horse. Limited can mean the following:

- Limited to designated routes
- Limited to existing routes
- Limited to a specific season of use (generally done for wildlife or soil protection)
- Limited to a specific class or type of use

BLM_0116170

Area decisions reflected the goals and objectives of resources and resource uses throughout Chapter 2 of the Uncompahgre RMP/EIS. Goals and objectives for all UFO uses and resources (e.g., recreation, lands with wilderness characteristics, livestock grazing and vegetative health, wildlife, and soils and water quality) played a role in influencing the land allocation travel decision process.

## IMPLEMENTATION-LEVEL TRAVEL DECISIONS

Implementation level decisions include the process of assigning route designations to each route in accordance with alternative objectives, while balancing access and resource concerns. Route designation is an implementation level decision intended to support the UFO's goals and objectives.

The BLM's interdisciplinary team will convene for each travel management plan. The group will examine each route within the planning area to determine its designation under the range of alternatives. Access needs, resource concerns, recreation objectives and public comment all factored into this process. The criterion that will be used is described below.

Please note that only routes on BLM land within the UFO travel planning area that are not county roads will be considered during this process. In addition, routes within Wilderness Study Areas can be designated for horse and/or foot travel.

### Identification of Use Needs and Concerns for Each Route

As the BLM analyzes each route (existing and proposed) within the travel management planning area, the following baseline criteria will be used to determine the use needs and resources concerns associated with each route. This process will be done with all alternatives in mind. For example if a route helps meet trail-based recreation objectives under any of the alternatives it will be noted at this stage of the process.

Some of the criteria for identifying environmental concerns and other factors for consideration may be treated with more urgency than others when route-by-route designations are being determined. For example, routes that are in big game calving or production areas would be considered to be a far more pressing concern than routes that fall within big game summer range.

### *Use of the Route*

*Recreation*
1.  The route helps meet objectives for recreation

2.  The route provides access to recreational opportunities

3.  The route provides access to a destination point (e.g., dispersed camping site or scenic overlook)

*Livestock Grazing*
1.  The route provides access to existing range developments

2.  The route facilitates livestock management

BLM_0116171

*Lands and Realty*

1. The route provides access to nonfederal lands

2. There is an existing right-of-way associated with the route, or the route provides access to an existing right-of-way

3. The route provides access for authorized mineral activities, valid mineral rights, or other valid existing rights

*Other*

1. The route is necessary for wildland fire suppression activities

2. The route could provide access for forest resource permits (e.g., wood collection and Christmas trees)

3. The route is needed for public health and safety

4. The route provides administrative access for BLM administrative functions (e.g., research or vegetation treatments)

5. The route provides administrative access for traditional use by Native Americans

### Environmental Concerns

*Soil Stability*

1. The route is within a highly erosive soils area (i.e., fragile soils, as defined by NRCS)

2. The route crosses slopes of 40 percent or greater

3. Increases erosion potential with use

*Wildlife Habitat*

1. The route is within big game winter range (1a. severe winter range, etc.)

2. The route is within big game calving or production areas

3. The route is within big game summer range

4. The route leads to significant wildlife habitat fragmentation

5. The route is a potential issue for nesting birds

*Special Status Species Habitat*

1. The route is a known issue within special status wildlife habitat

2. The route is a known issue for special status plants

3. No known issue for special status species, but within suitable habitat

4. Route has potential to impact special status wildlife species

*Riparian, Water Quality, and Fisheries*

1. The route causes known impacts to water quality

2. The route could cause impacts to water quality

BLM_0116172

3. The route impacts riparian areas, or seeps and springs

4. The route could lead to cumulative impacts to water quality

*Vegetation*
1. The route creates concerns for rare, exemplary, or ancient vegetation

2. The route is a known contributor to land health problems

*Visual Resources*
1. The route conflicts with potential Visual Resource Management class objectives

*Cultural Resources*
1. The route creates an issue for known historic or prehistoric properties

2. The route creates an issue for areas of Native American concern

3. The route falls within an area that lacks cultural survey information

*Geological/Paleontological Resources*
1. The route crosses significant paleontological or geological areas

2. The route creates an issue for active or future paleontological research sites

*Wilderness/Wilderness Study Area*
1. The route is within an area determined to contain wilderness characteristics

2. The route is within a Wilderness Study Area/Congressionally Designated Area

*Special Management Areas*
1. The route conflicts with recreation management area objectives

2. The route conflicts with ecological emphasis area objectives

3. The route falls within a ACEC or heritage area

4. The route is within a Wild and Scenic River suitable corridor

5. The route is within a Wild and Scenic River eligible corridor

6. The route conflicts with National Trail or Byway objectives

**Other Factors for Consideration**

*General*
1. The route is a BLM-maintained route

2. The route condition is poor and/or unsustainable

3. The route is unsafe (e.g., steep or no turn-around)

4. The route is an existing aircraft landing strip

*Route Redundancy/Dead-end*
1. The route runs parallel to a preferable, existing route

BLM_0116173

2.   The route is a dead-end route (0.5-mile or less and not leading to a facility, campground or scenic overlook)

*Private Land Issues*
1.   The route could lead to private land trespass issues

**Route-by-route Designation**

Once the uses, concerns and other factors for each route have been determined, the interdisciplinary team will give each route a designation under each alternative.

Route designations under each alternative will be made to conform to the management objectives and actions described in Chapter 2 of the UFORMP/DEIS.

Route designations will fall into the following categories (letters within parentheses are symbols used for each category:

- Open to all modes of travel

- Closed

- Limited to administrative use only

- Limited to foot and horse travel

- Limited to bicycle, foot and horse travel

- Limited to motorcycle, bicycle, foot and horse travel

- Limited to ATVs, motorcycles, bicycle, foot and horse travel

Administrative routes are routes that would be closed to the public, but open for use by individuals (e.g., grazing permittees, BLM employees, and Colorado Parks and Wildlife) who receive authorization to travel on such routes. These administrative routes could include routes to stock ponds and other range improvements, guzzlers, and BLM facilities. Some routes could receive both an administrative use designation as well as another designation for public use. This could mean that a route could be open to full-size vehicles for administrative use, but limited for the public to bicycle, foot and horse travel.

There may be routes where the BLM identifies an environmental concern that could be addressed or mitigated. This allows the BLM to address environmental concerns, while continuing to provide access or recreational opportunities. Depending on the alternative and the nature of the concern, the routes could fall into one of the following categories:

- Open, seek re-route or mitigate resource concern

- Closed until re-route or resource concern is mitigated

***Route-by-route Designation Guidelines***

Through the process of route-by-route designation, the interdisciplinary team will follow the baseline guidelines for route designation that will apply across all alternatives except for the No Action Alternative. These are described in more detail below.

BLM_0116174

1. Routes will be designated to provide consistency with adjacent route designations on adjacent Federal and State lands.

2. Motorized and mechanized travel onto public lands from adjacent private lands will be limited to public access points only.

3. Route density for designated public routes will be used as an analysis tool. Due to the low level of use, administrative route mileage would not be considered within the route density analysis.

4. Prohibit cross-country motorized/mechanized travel for big game retrieval. Where appropriate, allow hand-held wheeled game retrieval carts off route in limited areas only during Colorado Parks and Wildlife authorized hunting seasons.

5. Where needed to protect resource values, provide for public safety, and/or maintain an identified opportunity, limit nonmechanized/nonmotorized travel to designated roads and trails.

6. Width restrictions for:

    a. Single track = 36" or less

    b. ATV = 50" or less and weighing no more than 1200 lbs.

    c. Roads = Wider than 50"

7. Motorized and mechanized modes of travel employing advanced technology must adhere to specified route width and weight restrictions.

8. Identify and consider aircraft landing strips.

9. Parking will be restricted to immediately adjacent and parallel to available designated routes unless otherwise restricted.

10. Designate spur routes leading to destination sites that meet objectives (e.g., campsites and overlooks).

11. Impacts to currently known eligible cultural properties will be avoided, minimized or mitigated in consultation. Where National Register eligible sites are known to be in danger or are currently being impacted by travel activities, routes will be closed to travel if necessary until the appropriate mitigation has been implemented.

12. Route density will be considered during the environmental analysis

13. BLM administrative functions related to resource management objectives requiring cross-country travel using motorized vehicles or equipment will be addressed at the project level on a case-by-case basis.

14. Monitoring plans will be developed sufficient to detect and evaluate motorized OHV, mechanized and nonmotorized/nonmechanized related impacts so that management changes can occur, if needed.

BLM_0116175

This page intentionally left blank.

# Appendix N
## Legal Descriptions for Lands Identified for Disposal

BLM_0116177

BLM_0116178

# APPENDIX N
# LEGAL DESCRIPTIONS FOR LANDS IDENTIFIED FOR DISPOSAL

Legal descriptions of lands available for disposal under each alternative, as described in Chapter 2, are as follows.

| Acres | Alternative A | Alternative B | Alternative C | Alternative D | Township / Range | Section |
|---|---|---|---|---|---|---|
| 35 | Yes | No | Yes | No | T42N / R11W | 02 |
| 35 | Yes | No | Yes | No | T42N / R11W | 02 |
| 63 | Yes | No | Yes | No | T43N / R10W | 33 |
| 151 | Yes | No | Yes | No | T42N / R10W | 04 |
| 49 | Yes | No | Yes | No | T43N / R12W | 10 |
| 39 | Yes | No | Yes | No | T43N / R12W | 09 |
| 47 | Yes | No | Yes | No | T43N / R12W | 02 |
| 6 | Yes | No | Yes | No | T44N / R12W | 35 |
| 30 | Yes | No | Yes | No | T43N / R12W | 01 |
| 38 | Yes | Yes | Yes | Yes | T44N / R13W | 35 |
| 40 | Yes | Yes | Yes | No | T44N / R10W | 29 |
| 41 | Yes | Yes | Yes | Yes | T44N / R13W | 24 |
| 22 | Yes | No | Yes | No | T44N / R08W | 13 |
| 129 | Yes | Yes | Yes | Yes | T44N / R08W | 11 |
| 46 | Yes | Yes | Yes | Yes | T45N / R15W | 03 |
| 78 | Yes | No | Yes | No | T45N / R13W | 06 |
| 40 | Yes | No | Yes | No | T45N / R14W | 01 |
| 161 | Yes | Yes | Yes | Yes | T45N / R15W | 02 |
| 80 | Yes | No | Yes | No | T46N / R14W | 36 |
| 40 | Yes | Yes | Yes | Yes | T46N / R14W | 35 |
| 39 | Yes | No | Yes | No | T46N / R08W | 24 |
| 115 | Yes | No | Yes | No | T46N / R08W | 15 |
| 40 | Yes | Yes | Yes | Yes | T46N / R09W | 15 |

BLM_0116179

| Acres | Alternative A | Alternative B | Alternative C | Alternative D | Township / Range | Section |
|---|---|---|---|---|---|---|
| 80 | Yes | No | Yes | No | T46N / R17W | 14 |
| 81 | Yes | No | Yes | No | T46N / R17W | 11 |
| 39 | Yes | Yes | Yes | Yes | T47N / R09W | 36 |
| 40 | Yes | Yes | Yes | Yes | T46N / R17W | 03 |
| 39 | Yes | Yes | Yes | Yes | T47N / R09W | 24 |
| 41 | Yes | Yes | Yes | Yes | T47N / R09W | 22 |
| 40 | Yes | Yes | Yes | Yes | T47N / R18W | 16 |
| 40 | Yes | Yes | Yes | Yes | T47N / R18W | 21 |
| 80 | Yes | Yes | Yes | Yes | T47N / R16W | 09 |
| 39 | Yes | Yes | Yes | No | T47N / R09W | 02 |
| 85 | Yes | Yes | Yes | No | T47N / R10W | 01 |
| 41 | Yes | Yes | Yes | Yes | T47N / R10W | 02 |
| 40 | Yes | Yes | Yes | No | T48N / R09W | 35 |
| 40 | Yes | Yes | Yes | Yes | T47N / R18W | 08 |
| 41 | Yes | No | Yes | No | T48N / R11W | 34 |
| 77 | Yes | Yes | Yes | Yes | T48N / R08W | 26 |
| 41 | Yes | No | Yes | No | T48N / R06W | 29 |
| 41 | Yes | Yes | Yes | Yes | T47N / R18W | 06 |
| 243 | Yes | Yes | Yes | No | T48N / R10W | 36 |
| 82 | Yes | Yes | Yes | No | T48N / R10W | 25 |
| 121 | Yes | No | Yes | No | T48N / R11W | 34 |
| 40 | Yes | No | Yes | No | T48N / R11W | 27 |
| 79 | Yes | No | Yes | No | T48N / R11W | 28 |
| 78 | Yes | No | Yes | No | T48N / R11W | 29 |
| 81 | Yes | No | Yes | No | T48N / R11W | 20 |
| 394 | Yes | No | Yes | No | T48N / R08W | 15 |
| 161 | Yes | No | Yes | No | T48N / R09W | 14 |
| 41 | Yes | No | Yes | No | T48N / R09W | 11 |
| 41 | Yes | No | Yes | No | T48N / R09W | 14 |
| 39 | Yes | No | Yes | No | T48N / R08W | 09 |
| 38 | Yes | No | Yes | No | T48N / R06W | 08 |
| 41 | Yes | Yes | Yes | Yes | T48N / R12W | 14 |
| 39 | Yes | Yes | Yes | Yes | T48N / R08W | 11 |
| 120 | Yes | Yes | Yes | Yes | T48N / R08W | 02 |
| 40 | Yes | No | Yes | Yes | T48N / R10W | 11 |
| 3 | Yes | No | Yes | Yes | T49N / R08W | 32 |
| 3 | Yes | No | Yes | Yes | T49N / R08W | 32 |
| 7 | Yes | No | Yes | Yes | T49N / R08W | 29 |
| 39 | Yes | No | Yes | No | T49N / R08W | 26 |
| 40 | Yes | No | Yes | No | T49N / R11W | 29 |
| 44 | Yes | No | Yes | No | T49N / R08W | 23 |
| 21 | Yes | No | Yes | Yes | T49N / R10W | 21 |
| 52 | Yes | No | Yes | No | T49N / R06W | 07 |

BLM_0116180

| Acres | Alternative A | Alternative B | Alternative C | Alternative D | Township / Range | Section |
|---|---|---|---|---|---|---|
| 23 | Yes | No | Yes | No | T50N / R05W | 35 |
| 68 | Yes | No | Yes | No | T50N / R05W | 36 |
| 20 | Yes | No | Yes | Yes | T50N / R11W | 36 |
| 81 | Yes | No | Yes | No | T50N / R06W | 09 |
| 202 | Yes | No | Yes | No | T50N / R06W | 16 |
| 41 | Yes | No | Yes | No | T50N / R06W | 09 |
| 81 | Yes | No | Yes | No | T50N / R06W | 03 |
| 81 | Yes | No | Yes | No | T50N / R06W | 08 |
| 120 | Yes | No | Yes | No | T50N / R06W | 05 |
| 408 | Yes | No | Yes | No | T51N / R06W | 27 |
| 80 | Yes | No | Yes | No | T51N / R07W | 16 |
| 40 | Yes | No | Yes | No | T51N / R08W | 14 |
| 42 | Yes | No | Yes | No | T15S / R92W | 31 |
| 42 | Yes | No | Yes | No | T15S / R93W | 36 |
| 165 | Yes | No | Yes | No | T15S / R93W | 25 |
| 82 | Yes | No | Yes | No | T15S / R91W | 26 |
| 76 | Yes | No | Yes | No | T15S / R92W | 04 |
| 40 | Yes | No | Yes | No | T14S / R92W | 33 |
| 152 | Yes | No | Yes | No | T15S / R92W | 05 |
| 40 | Yes | No | Yes | No | T14S / R92W | 32 |
| 40 | Yes | No | Yes | Yes | T14S / R92W | 32 |
| 39 | Yes | No | Yes | No | T14S / R94W | 20 |
| 81 | Yes | No | Yes | No | T14S / R94W | 21 |
| 123 | Yes | No | Yes | No | T14S / R93W | 22 |
| 40 | Yes | No | Yes | No | T14S / R93W | 17 |
| 161 | Yes | No | Yes | No | T14S / R93W | 20 |
| 39 | Yes | No | Yes | No | T14S / R93W | 19 |
| 44 | Yes | No | Yes | No | T14S / R92W | 17 |
| 42 | Yes | No | Yes | No | T14S / R92W | 03 |
| 39 | Yes | No | Yes | No | T14S / R95W | 04 |
| 40 | Yes | No | Yes | No | T14S / R96W | 02 |
| 43 | Yes | No | Yes | No | T13S / R95W | 26 |
| 41 | Yes | No | Yes | No | T13S / R95W | 28 |
| 84 | Yes | No | Yes | No | T13S / R91W | 22 |
| 42 | Yes | No | Yes | No | T13S / R95W | 24 |
| 136 | Yes | No | Yes | No | T13S / R89W | 10 |
| 20 | Yes | No | Yes | No | T13S / R89W | 09 |
| 76 | Yes | Yes | Yes | No | T13S / R89W | 07 |
| 23 | Yes | No | Yes | No | T13S / R89W | 11 |
| 151 | Yes | No | Yes | No | T13S / R93W | 06 |
| 90 | Yes | No | Yes | No | T13S / R94W | 12 |
| 94 | Yes | No | Yes | No | T13S / R94W | 01 |
| 40 | Yes | Yes | Yes | Yes | T13S / R95W | 01 |

BLM_0116181

| Acres | Alternative A | Alternative B | Alternative C | Alternative D | Township / Range | Section |
|---|---|---|---|---|---|---|
| 38 | Yes | Yes | Yes | Yes | T12S / R95W | 36 |
| 11 | Yes | Yes | Yes | Yes | T12S / R94W | 32 |
| 14 | Yes | Yes | Yes | Yes | T12S / R94W | 34 |
| 11 | Yes | Yes | Yes | Yes | T12S / R94W | 35 |
| 2 | Yes | Yes | Yes | Yes | T12S / R94W | 34 |
| 40 | Yes | Yes | Yes | Yes | T12S / R95W | 36 |
| 80 | Yes | Yes | Yes | Yes | T12S / R95W | 25 |
| 40 | Yes | No | Yes | No | T12S / R90W | 12 |
| 40 | Yes | Yes | Yes | No | T12S / R90W | 11 |
| 79 | Yes | No | Yes | No | T15S / R96W | 01 |
| 133 | Yes | No | Yes | No | T43N / R14W | 02 |
| 83 | Yes | Yes | Yes | No | T44N / R08W | 14 |
| 27 | Yes | No | Yes | No | T44N / R08W | 13 |
| 23 | No | Yes | No | No | T45N / R08W | 09 |
| 80 | Yes | No | Yes | No | T49N / R06W | 07 |
| 40 | Yes | No | Yes | No | T44N / R08W | 13 |
| 40 | Yes | No | Yes | Yes | T46N / R15W | 17 |
| 40 | Yes | No | Yes | Yes | T46N / R15W | 16 |
| 168 | Yes | No | Yes | No | T15S / R91W | 26 |
| 44 | Yes | Yes | Yes | Yes | T45N / R08W | 08 |
| 240 | Yes | No | Yes | No | T46N / R16W | 13 |
| 40 | Yes | No | Yes | No | T46N / R16W | 12 |
| 40 | Yes | No | Yes | Yes | T46N / R15W | 17 |
| 334 | Yes | No | Yes | No | T46N / R15W | 19 |
| 22 | Yes | No | Yes | No | T46N / R15W | 21 |
| 75 | Yes | No | Yes | No | T46N / R15W | 20 |
| 52 | Yes | No | Yes | No | T46N / R15W | 21 |
| 121 | Yes | No | Yes | No | T46N / R15W | 21 |
| 55 | Yes | No | Yes | Yes | T46N / R15W | 18 |
| 80 | Yes | Yes | Yes | No | T15S / R96W | 30 |
| 83 | Yes | No | Yes | No | T13S / R92W | 34 |
| 42 | Yes | No | Yes | No | T14S / R92W | 03 |
| 37 | Yes | Yes | Yes | No | T14S / R93W | 31 |
| 40 | Yes | Yes | Yes | No | T14S / R96W | 31 |
| 85 | No | Yes | No | Yes | T45N / R15W | 04 |
| 40 | No | Yes | No | Yes | T43N / R13W | 12 |
| 80 | No | Yes | No | No | T12S / R89W | 08 |
| 41 | No | Yes | No | No | T15S / R96W | 30 |

BLM_0116182

# Appendix O
## Summary of Areas of Critical Environmental Concern Report

BLM_0116183

BLM_0116184

# APPENDIX O
# SUMMARY OF AREAS OF CRITICAL
# ENVIRONMENTAL CONCERN REPORT

This appendix provides summary information about the ACECs evaluation process for the Uncompahgre RMP planning area. The *Evaluation of Existing and Proposed Areas of Critical Environmental Concern for the Uncompahgre Planning Area* report (BLM 2011f) provides more detail on the process, as well as maps of each proposed and existing ACEC.

An ACEC is an area of BLM-administered land where special management attention is needed to protect its relevant and important values from irreparable damage. ACECs are an administrative designation made by the BLM during the land use planning process.

Special management attention refers to management prescriptions developed during RMP preparation expressly to protect the important and relevant values of an area from the potential effects of actions permitted by the RMP, including proposed actions deemed to be in conformance with the terms, conditions, and decisions of the RMP (BLM Manual 1613.12; BLM 1988). These are management measures that would not be necessary or prescribed if the critical and important features were not present.

As part of the land use planning process for the Uncompahgre RMP, a BLM interdisciplinary team reviewed 25 proposals for ACECs. The team analyzed the areas to determine if they are within the planning area and if they contain values that meet the relevance and importance criteria for consideration as potential ACECs. External sources (including other agencies and the public) submitted 11 nominations, BLM specialists submitted 9 nominations, and 5 are existing ACECs.

The *Evaluation of Existing and Proposed Areas of Critical Environmental Concern for the Uncompahgre Planning Area* report (BLM 2011f) presents the evaluations of all existing and proposed ACECs. The BLM found 23 areas meet the relevance and importance criteria (**Table O-1**, Existing and Proposed ACECs Meeting the Relevance and Importance Criteria). Areas found to meet the relevance and importance criteria are identified as <u>potential</u> ACECs and have been fully

BLM_0116185

**Table O-1**
**Existing and Proposed ACECs Meeting the**
**Relevance and Importance Criteria**

| ACEC | Acres |
|---|---|
| Needle Rock ACEC/ONA | 80 |
| Adobe Badlands ACEC/ONA | 6,370 |
| Salt Desert Shrub Ecosystem ACEC | 34,510 |
| Fairview South ACEC/RNA | 210 |
| Fairview South ACEC (with BLM expansion) | 610 |
| Fairview South ACEC (with CNHP Expansion) | 4,250 |
| Roubideau Corridors ACEC | 8,720 |
| Roubideau-Potter-Monitor ACEC | 20,430 |
| Lower Uncompahgre Plateau Cultural ACEC | 31,810 |
| San Miguel River ACEC | 22,780 |
| San Miguel River ACEC Expansion | 35,480 |
| San Miguel Gunnison Sage-grouse ACEC | 470 |
| Sims Cerro Gunnison Sage-grouse ACEC | 25,620 |
| Dolores River Slickrock Canyon ACEC | 9,780 |
| Dolores Slickrock Canyon ACEC | 10,670 |
| La Sal Creek ACEC | 10,490 |
| Coyote Wash ACEC | 2,100 |
| East Paradox ACEC | 7,360 |
| Biological Soil Crust ACEC | 1,900 |
| West Paradox ACEC | 5,190 |
| Paradox Rock Art ACEC | 1,080 |
| Tabeguache Pueblo/Tabeguache Caves ACEC | 26,300 |
| Tabeguache Creek ACEC/ONA | 560 |

considered for designation and management. The BLM dropped two areas from further ACEC consideration. One area was found not to meet the relevance and importance criteria and one area is outside of the Uncompahgre RMP planning area.

***Nomination***

BLM staff, other agencies, or members of the public may nominate ACECs at any time, but ACECs are only designated during the BLM's land use planning process. Existing ACECs are also reconsidered at this time.

During the scoping period for the Uncompahgre RMP revision, the UFO solicited ACEC nominations from the public. At public scoping meetings, the UFO displayed a panel describing special management areas and distributed a fact sheet on ACECs, along with a map showing current ACECs in the planning area. The fact sheet and map were also made available on the RMP planning Web site: (http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html). The fact sheet and display panel are shown in Appendices A and B of the *Evaluation of Existing and Proposed Areas of Critical Environmental Concern for the Uncompahgre Planning Area* report (BLM 2011f).

### Relevance

Areas meeting the relevance criterion possess "significant historic, cultural, or scenic value; a fish or wildlife resource or other natural system or process; or natural hazard."

An area meets the relevance criterion if it contains *one or more* of the following:

1.  A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans).

2.  A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity).

3.  A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features).  For the purposes of the UFO's evaluation, an area also meets the criteria for relevance if it contains a plant species or community ranked G1 through G3 or S1 through S3 by the CNHP.

4.  Natural hazards (including but not limited to areas of avalanche, dangerous flooding, landslides, unstable soils, seismic activity, or dangerous cliffs).  A hazard caused by human action may meet the relevance criteria if it is determined through the resource management planning process that it has become part of a natural process.

### Importance

To meet the importance criterion, the value, resource, system, process or hazard resource must "have substantial significance and value."  This generally requires qualities of more than local significance and special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource, or qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.  A natural hazard can be important if it is a significant threat to human life or property.

An area meets the importance criterion if *one or more* of the following characteristics are present:

1.  Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.

2.  Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.

3.  Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of the FLPMA.

4.  Has qualities that warrant highlighting to satisfy public or management concerns about safety and public welfare.

5.  Poses a significant threat to human life and safety or to property.

BLM_0116187

Maps of ACECs proposed for analysis, as well as additional information about the relevance and importance criteria, are included in the *Evaluation of Existing and Proposed Areas of Critical Environmental Concern for the Uncompahgre Planning Area* report (BLM 2011f). The size and management prescriptions for each ACEC may vary by alternative to reflect a balance between the goals and objectives or the alternatives and the values being protected (BLM Manual 1613; BLM 1988). **Table O-2** (Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area) summarizes the proposed ACECs evaluated, the values assessed, and whether the criteria were met.

BLM_0116188

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| Needle Rock ACEC/ONA<br><br>Existing: 80 acres | Existing | Yes | Natural System: *Rare Geological Feature*<br><br>Scenic | 1, 3 | 1, 2, 3 | The existing Needle Rock ACEC/ONA protects a geologic landform with high-value scientific, scenic, and interpretive characteristics. The isolated structure is the igneous core or plug of a tertiary volcano formed when magma hardened within the vent.<br><br>The spectacular volcanic formation rises almost 1,000 feet above the Smith Fork River Valley. The structure formed in the Miocene when intruding magma hardened to form a plug (also known as a neck) and is an iconic symbol for the North Fork of the Gunnison region. The 80-acre site is managed to protect scientific and scenic qualities that are vulnerable to damage from human use. |
| Adobe Badlands ACEC/ONA<br><br>Existing: 6,370 acres | Existing | Yes | Botanical: *Federally Threatened Species*<br><br>Wildlife: *BLM Sensitive Species*<br><br>Scenic<br><br>Natural Process: *Highly Erodible Soils* | 2, 3 | 1, 2, 3 | The existing Adobe Badlands ACEC/ONA is managed to protect its unique scenic qualities, improve threatened and endangered species habitat, and reduce active erosion. The area has been managed as an ACEC since 1989, and is within the Adobe Badlands WSA, which was designated in 1992.<br><br>The area consists of Mancos shale hills and flats |

BLM_0116189

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | which, through wind and water erosion, have formed unique scenic formations. This area is listed in state and regional hiking books because of these formations. |
| | | | | | | The area also contains occupied and potential habitat for threatened Colorado hookless cactus (*Sclerocactus glaucus*). The BLM sensitive species white-tailed prairie dog (*Cynomys leucurus*) inhabits the area, and the BLM Sensitive species kit fox (*Vulpes macrotis*) may be in the area. |
| | | | | | | The area's soils are highly erodible and saline, resulting in high sediment loads and very saline runoff. The area is also within an adobe roadless area, which is vulnerable to adverse change (highly susceptible to erosion) without special management. |
| Salt Desert Shrub Ecosystem ACEC<br><br>Proposed: 34,510 acres | BLM and External<br><br>Proposal | Yes | Botanical: *Federally Endangered and Threatened Species*<br><br>Fish and Wildlife: *BLM Sensitive Species* | 2, 3 | 1, 2, 3 | The existing Adobe Badlands ACEC/ONA is within the proposed Salt Desert Shrub Ecosystem ACEC. The proposed Salt Desert Shrub Ecosystem ACEC contains a core population of the threatened Colorado hookless cactus, cold desert shrubland |

BLM_0116190

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | communities (locally imperiled), and two BLM sensitive species: white-tailed prairie dog and burrowing owl (*Athene cunicularia*). The ecosystem within the proposed ACEC is easily disturbed and difficult to restore. This area also suitable habitat for and may have populations of BLM sensitive species: kit fox, ferruginous hawk (*Buteo regalis*), and pronghorn antelope (*Antilocapra americana*). Much of the known populations of the endemic and federally listed Colorado hookless cactus are located in this area. CNHP considers salt desert shrubland in the area to be globally vulnerable and locally imperiled (G3/S2). The area has adobe soils and is within a selenium program management area. The area has potential as a demonstration area for cactus and species recovery. |
| Fairview South ACEC/RNA Existing: 210 acres | Existing | Yes | Botanical: *Endangered and BLM Sensitive Species* | 3 | 1, 2, 3 | The 1989 Uncompahgre Basin RMP designated the Fairview South ACEC/RNA. This area contains a large population of clay-loving wild buckwheat (*Eriogonum pelinophilum*), which is endemic to the adobe badlands of Montrose |

BLM_0116191

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | and Delta Counties. The known range of the clay-loving wild buckwheat is restricted to less than 35 square miles, and this species is vulnerable to adverse change. The area also contains native plant communities representative of the sparsely vegetated adobe badlands, and a population of the globally vulnerable Adobe Hills beardtongue (*Penstemon retrorsus*). |
| Fairview South ACEC (with BLM proposed expansion)<br><br>Existing: 210 acres<br><br>Proposed expansion: 610 acres | BLM Proposal | Yes | Botanical: *Federally Endangered and BLM Sensitive Species*<br><br>Fish and Wildlife: *Federal Candidate Species* | 2, 3 | 1, 2, 3 | The proposed Fairview South ACEC is the existing Fairview South ACEC/RNA, with additional acreage. This expanded area contains a significant portion of one of the largest populations of the federally endangered clay-loving wild buckwheat (*Eriogonum pelinophilum*), and a good occurrence (B-ranked) of Adobe Hills beardtongue (*Penstemon retrorsus*), identified as globally vulnerable (G3/S3). The area also has populations of white-tailed prairie dog, listed as a BLM sensitive species.<br><br>Since designation of the existing Fairview South ACEC/RNA, additional dense populations of clay-loving wild buckwheat have been |

BLM_0116192

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | discovered to the south and east. Populations of this species have been receiving increasing pressures from development both on and off BLM-administered lands. Much of the potentially suitable habitat for clay-loving wild buckwheat is located on private lands and has either been developed or may be developed in the future. CNHP has given this area a Biodiversity Significance Rank of B2: Very High Biodiversity Significance. |
| Fairview South ACEC (with CNHP Expansion) Existing: 210 acres Proposed expansion: 4,250 acres | External Proposal | Yes | Botanical: *Federally Endangered and Candidate, and BLM Sensitive Species* Fish and Wildlife: *Federal Candidate Species* | 2, 3 | 1, 2, 3 | The proposed Fairview South ACEC is the existing Fairview South ACEC/RNA, with additional acreage proposed by external groups to include CNHP mapped habitat. The Dry Cedar Creek area contains an occurrence of the federally endangered clay-loving wild buckwheat (*Eriogonum pelinophilum*); Colorado desert parsley (*Lomatium concinnum*), a BLM sensitive and globally imperiled species; and Adobe Hills beardtongue (*Penstemon retrorsus*) and good-neighbor bladderpod (*Lesquerella vicina*), both of which are globally vulnerable. The South Canal area contains an excellent occurrence of the federally endangered clay- |

BLM_0116193

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | loving wild buckwheat and the globally vulnerable Adobe Hills beardtongue. CNHP has given this area a Biodiversity Significance Rank of B2: Very High Biodiversity Significance. |
| Roubideau Corridors ACEC Proposed: 8,720 acres | BLM Proposal | Yes | Botanical: *Riparian Vegetation and BLM Sensitive Species* Fish and Wildlife: *Aquatic and BLM Sensitive species* Historical: *Early settlement* | I, 2, 3 | I, 2, 3 | The proposed Roubideau Corridors ACEC is based on the Roubideau Creek Potential Conservation Area, recommended by the CNHP. The canyons and streams have very high biodiversity significance, supporting good to excellent examples of narrowleaf cottonwood (*Populus angustifolia*)/skunkbrush riparian forests, montane and lower montane riparian forests with blue spruce (*Picea pungens*), Douglas fir (*Pseudotsuga menziesii*), narrowleaf cottonwood, and red-osier dogwood (*Cornus sericea*). The riparian areas also have foothills riparian shrublands characterized by river birch (*Betula nigra*) and coyote willow (*Salix exigua*). BLM sensitive species including Grand Junction milkvetch (*Astragalus linifolius*), Peregrine falcon (*Falco peregrinus*), desert bighorn sheep (*Ovis canadensis nelsoni*), and northern leopard frog |

BLM_0116194

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | (*Rana pipiens*) are found there. Golden eagle nests also occur in the area. A recent fish survey conducted by the BLM indicates that Potter Creek supports, and Monitor Creek is likely to support, viable populations of BLM sensitive species bluehead sucker (*Catostomus discobolus*) and flannelmouth sucker (*Catostomus latipinnis*). The canyons contain three perennial streams that provide available water sources for the desert bighorn sheep and other wildlife, and also provide important movement corridors from the desert and Gunnison River up to the forest on the Uncompahgre Plateau. These corridors are important for wildlife, and were important for early settlers as well. Several historic structures are found along Roubideau Creek. The area is rated as a VRI Class II. |
| Roubideau-Potter-Monitor ACEC  Proposed: 20,430 acres | External Proposal | Yes | Botanical: *Riparian Vegetation and BLM Sensitive Species*  Fish and Wildlife: *Aquatic and BLM Sensitive Species* | I, 2, 3 | I, 2, 3 | The proposed Roubideau-Potter-Monitor ACEC overlays the proposed Roubideau Corridors ACEC, and would include all of the Camel Back WSA, as well as the Roubideau Creek Potential Conservation Area recommended by the CNHP. The canyons and streams have very high biodiversity significance, |

BLM_0116195

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | Historical: *Early Settlement* | | | supporting good to excellent examples of narrowleaf cottonwood/skunkbrush riparian forests, montane and lower montane riparian forests with blue spruce, Douglas fir, narrowleaf cottonwood, and red osier dogwood. Foothills riparian shrublands are characterized by river birch and coyote willow. |
| | | | | | | BLM sensitive species, including Grand Junction milkvetch, peregrine falcon, desert bighorn sheep and northern leopard frog, are found there. Golden eagle nests also occur in the area. A recent fish survey conducted by the BLM indicates that Potter Creek supports, and Monitor Creek is likely to support, viable populations of BLM sensitive species bluehead sucker *(Catostomus discobolus)* and flannelmouth sucker *(Catostomus latipinnis)*. |
| | | | | | | The canyons contain three perennial streams that provide an available water source for the desert bighorn sheep and other wildlife, and form important movement corridors from the desert and Gunnison River up to the forest on the Uncompahgre Plateau. These corridors are important for wildlife, and were important for |

BLM_0116196

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | early settlers as well. Several historic structures are found along Roubideau Creek. |
| | | | | | | The uplands afford protection to the integrity of the canyons below, as well as offer spectacular views down into the canyons and to mountains and mesas in the distance. With a depth of 750 to 1,000 feet from the rim to the creeks, the area is geographically configured to offer a sense of isolation for wildlife and human visitors. |
| | | | | | | Archeological and historical sites abound in this area, including a rare collection of thirteen Ute wickiups, petroglyphs perhaps 6,000 years old, an historic inscription in Roubideau Canyon that may date back to the time of the American Revolution, and sheep herder cabins and structures more than 100 years old. The area is rated as a VRI Class II. |
| Lower Uncompahgre Plateau Cultural ACEC<br><br>Proposed: 31,810 acres | External Proposal | Yes | Cultural | 1 | 1, 2 | The proposed Lower Uncompahgre Plateau Cultural ACEC contains important rock art and archaeological sites from three different transitional time periods of occupation that are not represented elsewhere. The area was a |

BLM_0116197

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | central part of the early homeland of the Ute Indians, and has many localities of traditional cultural and sacred site interest to modern Utes. The area has many scattered important archaeological sites that include archaic to historic Ute occupation in the 1880s (including the Harris site, rock art sites, and wickiups). The archaeological sites are nationally significant. |
| San Miguel River ACEC<br><br>Existing: 22,780 acres | Existing | Yes | Botanical: *Riparian Vegetation*<br><br>Wildlife: *Important Bird Area*<br><br>Scenic | 1, 2, 3 | 1, 2, 3 | The San Miguel River ACEC was designated through an amendment of the San Juan/San Miguel RMP in 1993. The ACEC protects high quality native riparian communities that are mainly due to the undammed San Miguel River and its intact hydrology. Such communities are becoming increasingly rare in Colorado. The ACEC preserves the high quality riparian vegetation resources, habitat for many bird species, and the scenic value of the corridor.<br><br>The ACEC has been designated as an Important Bird Area by the Audubon Society, and represents one of the finest protected southwest canyon riparian habitat in the United States (US). This area provides breeding sites |

BLM_0116198

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | for a wide variety of species and primary migratory routes for nearly all of the West's songbirds. More than 300 bird species have been observed in this area. The expanding black phoebe (*Sayornis nigricans*) population, which has been moving up the San Miguel River, reached the lower end of the ACEC in 1999. The San Miguel River also provides habitat for the yellow-billed cuckoo (*Coccyzus americanus*). The ACEC's scenic values include the Unaweep Tabeguache Scenic and Historic Byway, which runs along the San Miguel River. This area inventoried at VRI Class II. |
| San Miguel River ACEC, Expanded<br><br>Existing: 22,780 acres<br><br>Proposed expansion: 35,480 acres | BLM and External Proposal | Yes | Botanical: *Riparian Vegetation*<br><br>Wildlife: *Important Bird Area*<br><br> Scenic | I, 2, 3 | I, 2, 3 | The proposed San Miguel River ACEC is the existing San Miguel River ACEC, with additional acreage. The proposed ACEC would protect high quality native riparian communities that are mainly due to the undammed San Miguel River and its intact hydrology. Such communities are becoming increasingly rare in Colorado. The ACEC preserves the high quality riparian vegetation resources, habitat for many bird species, and the scenic value of the corridor. |

BLM_0116199

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | The proposed ACEC expansion would extend protection to additional areas that have been recognized by the BLM and the CNHP as having high biodiversity significance. The CNHP has proposed the San Miguel River at Cottonwood Creek as a Potential Conservation Area, which hosts skunkbrush/coyote willow riparian shrubland, narrowleaf cottonwood/skunkbrush riparian woodland, and coyote willow/mesic graminoid riparian shrubland; all are good to excellent examples of these community types. The existing ACEC has been designated as an Important Bird Area by the Audubon Society, and represents one of the finest protected southwest canyon riparian habitats in the US. The area provides breeding sites for a wide variety of species and primary migratory routes for nearly all of the West's songbirds. More than 300 bird species have been observed in this area. The expanding black phoebe population, which has been moving up the San Miguel River, reached the lower end of the existing ACEC in 1999. |

BLM_0116200

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | The ACEC's scenic values include the Unaweep Tabeguache Scenic and Historic Byway, which follows the San Miguel River downstream from Placerville, and the San Juan Skyway, which follows the San Miguel River upstream from Placerville. These areas inventoried at VRI Class II. |
| San Miguel Gunnison Sage-grouse ACEC Proposed: 470 acres | External Proposal | Yes | Wildlife Resource: *Habitat for BLM Sensitive Species* | 2 | 2, 3 | The proposed San Miguel Gunnison Sage-grouse ACEC is located on several small parcels of BLM-administered land in San Miguel County. This area contains potential, historic, and occupied Gunnison sage-grouse (*Centrocercus minimus*) habitat, as defined by CPW.  This area also contains proposed critical habitat (460 acres) for Gunnison sage-grouse, as designated by USFWS. Gunnison sage-grouse currently occur in what have previously been considered eight widely scattered and isolated populations in Colorado and Utah. The San Miguel Basin population exhibits a patchy distribution of Gunnison sage-grouse. As a result, there are six separate subpopulations identified within San Miguel Basin. This proposed ACEC is the northern end of what is considered part of the San Miguel |

BLM_0116201

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | (Miramonte Reservoir) population of Gunnison sage-grouse. The core of this population is found in the BLM Dolores Field Office to the south, but small portions of occupied habitat exist in this proposed ACEC.<br><br>Historically, Dove Creek – Monticello, San Miguel, Crawford, and Piñon Mesa all had much more sagebrush habitat and probably larger Gunnison sage-grouse populations that were somewhat connected through more contiguous areas of sagebrush habitat. An estimated 20 percent loss of sagebrush habitat between the late 1950's and the early 1990's and fragmentation of sagebrush habitat in southwestern Colorado is thought to have led to the current isolation of these populations. The protection of the small BLM portions of occupied habitat adjacent to private, state, and Forest Service lands being managed for Gunnison sage-grouse, provide additional protection for the species. |

BLM_0116202

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| West Montrose County Gunnison Sage-Grouse Sites ACEC<br><br>Proposed: 22,930 acres | External Proposal | No | Wildlife Resource: *Habitat for BLM Sensitive Species* | None | 3 | The proposed West Montrose County Gunnison Sage-grouse Sites ACEC does not meet the relevance criterion. The proposed ACEC contains areas of potential habitat which have not been occupied for more than 50 years.<br><br>The proposed ACEC contains historic and potential Gunnison sage-grouse habitat in western Montrose County, and also contains a small portion of proposed critical habitat (approx. 290 acres) for Gunnison sage-grouse, as designated by USFWS.  It is located on several small parcels of BLM-administered land containing historic Gunnison sage-grouse habitat, as defined by CPW.<br><br>Gunnison sage-grouse currently occur in what have previously been considered eight widely scattered and isolated populations in Colorado and Utah. The San Miguel Basin population exhibits a patchy distribution of Gunnison sage-grouse. As a result, there are six separate subpopulations identified within San Miguel Basin. This proposed ACEC area is at the northern end of what is considered part of the San Miguel population of Gunnison sage-grouse. |

BLM_0116203

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | The core of this population is found in the Dolores Field Office to the south, but small portions of occupied habitat exist in this proposed ACEC. Historically, Dove Creek – Monticello, San Miguel, Crawford, and Piñon Mesa all had much more sagebrush habitat and probably larger Gunnison sage-grouse populations that were somewhat connected through more contiguous areas of sagebrush habitat. An estimated 20 percent loss of sagebrush habitat between the late 1950's and the early 1990's and fragmentation of sagebrush habitat in southwestern Colorado is thought to have led to the current isolation of these populations. |
| Sims Cerro Gunnison Sage-grouse ACEC Proposed: 25,620 acres | External Proposal | Yes | Wildlife Resource: *Habitat for BLM Sensitive Species* | 2 | 2, 3 | The proposed Sims Cerro Gunnison Sage-grouse Sites ACEC is located on a large parcel of BLM-administered land southeast of Montrose, and on smaller BLM parcels about 10 miles east of Montrose near Cerro Summit. The ACEC contains historic, potential, and occupied Gunnison sage-grouse habitat, as defined by CPW. This area also contains proposed critical |

BLM_0116204

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | habitat (6,970 acres) for Gunnison sage-grouse, as designated by USFWS.<br><br>Gunnison sage-grouse currently occur in what have previously been considered eight widely scattered and isolated populations in Colorado and Utah. The Cerro Summit-Cimarron-Sims Mesa population exhibits a patchy distribution of Gunnison sage-grouse. As a result, there are two subpopulations identified within Cerro Summit-Cimarron-Sims Mesa: Cerro Summit-Cimarron; and Sims Mesa. This area includes the BLM-administered lands within the Sims Mesa subpopulation, and a very small portion of the Cerro Summit-Cimarron subpopulation that is within the planning area.<br><br>The Sims Mesa lek locations have been periodically occupied by a few grouse as recently as 2002. While no Gunnison sage-grouse have been seen on the Sims Mesa leks in many years, Gunnison sage-grouse have been seen in the area in 2011 and 2012. Other lek sites in the area include Coal Hill (6 birds seen in 2004), Hairpin (1 bird seen in 2010), Cimarron (5 birds seen 2009), Cerro (last seen |

BLM_0116205

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | 2000) (CPW 2010). While no Gunnison sage-grouse have been seen on the Cerro lek in recent years, a Gunnison sage-grouse was seen in the Cerro Summit area in 2009 (CPW 2010).<br><br>An estimated 20 percent loss of sagebrush habitat between the late 1950's and the early 1990's and fragmentation of sagebrush habitat in southwestern Colorado is thought to have led to the current isolation of these populations. The protection of the small BLM portions of occupied/historic habitat provides additional protection for the species. |
| Dolores River Slickrock Canyon ACEC<br><br>Proposed: 9,780 acres | BLM Proposal | Yes | Botanical: *Riparian Communities and BLM Sensitive Species*<br><br>Fish and Wildlife: *BLM Sensitive Species*<br><br>Scenic | 1, 2, 3 | 1, 2, 3 | The proposed Dolores River Slickrock Canyon ACEC includes the Dolores River, La Sal Creek, and Coyote Wash, which have carved a spectacular, deep canyon through Jurassic and Triassic sandstones. Steep vertical cliffs dominate the canyon sides, broken only where tributaries enter the canyon. Most of this area is roadless and accessible only by raft, canoe or kayak.<br><br>This area includes the riparian zone and adjacent uplands along the Dolores River, from |

BLM_0116206

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | Slick Rock Canyon north almost to Bedrock. There are good to excellent occurrences of the globally common coyote willow/mesic graminoids. Typical vegetation along the river and creeks includes a band of coyote willow, mixed with giant reed at the water's edge between the low and high water marks. La Sal Creek has a critically imperiled plant association consisting of box elder and river birch. Colorado's largest population of Kachina daisy (*Erigeron kachinensis*), a G2/S1 BLM sensitive species, occurs along drainages feeding into Coyote Wash and Slick Rock Canyon._<br><br>The canyon bottoms support a nearly continuous occurrence of the riparian plant association known as New Mexico privet foothills riparian shrubland. The area supports two excellent (A-ranked) occurrences of a globally imperiled (G2/S1) New Mexico privet riparian shrub community (*Forestiera pubescens*) along the Dolores River. The New Mexico privet plant community is known only from the major rivers in the Four Corners area. |

BLM_0116207

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | There are a few hanging garden communities (*Aquilegia micrantha – Mimulus eastwoodiae*), imperiled to vulnerable on a global scale (G2G3/S2S3), containing small populations of the globally vulnerable (G3/S1) Eastwood monkeyflower (*Mimulus eastwoodiae*).

The proposed ACEC also has a good (B-ranked) occurrence of the Naturita milkvetch (*Astragalus naturitensis*), a BLM sensitive species and considered to be imperiled to vulnerable both globally and in Colorado (G2G3/S2S3).

The Dolores River throughout the length of the site supports populations of roundtail chub (*Gila robusta*), which is a BLM sensitive species and globally vulnerable (G3/S2). Populations of the chub are at the upstream margin of the species' range and comprise the majority of occurrences for this species. The La Sal Creek tributary harbors exemplary populations of three BLM and Colorado sensitive species: flannelmouth suckers (*Catostomus latipinnis*), bluehead suckers (*Catostomus discobolus*), and roundtail chubs (*Gila robusta*); this is one of a very few spawning tributaries for these species within the Dolores |

BLM_0116208

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | River Basin. . Other animal species with conservation significance are desert bighorn sheep and peregrine falcon. Cultural sites (rock art panels and historic structures) are in the area, as is a paleontological study area. |
| Dolores Slickrock Canyon ACEC Proposed: 10,670 acres | BLM Proposal | Yes | Botanical: *Riparian Communities and BLM Sensitive Species* Fish and Wildlife: *BLM Sensitive Species* Scenic | 1, 2, 3 | 1, 2, 3 | The proposed Dolores River Slickrock Canyon ACEC includes the Dolores River, La Sal Creek, and Coyote Wash, which have carved a spectacular, deep canyon through Jurassic and Triassic sandstones. Steep vertical cliffs dominate the canyon sides, broken only where tributaries enter the canyon. Most of this area is roadless and accessible only by raft, canoe or kayak. This area includes the riparian zone and adjacent uplands along the Dolores River, from Slick Rock Canyon north almost to Bedrock. There are good to excellent occurrences of the globally common coyote willow/mesic graminoids. Typical vegetation along the river and creeks includes a band of coyote willow, mixed with giant reed at the water's edge |

BLM_0116209

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | between the low and high water marks. La Sal Creek has a critically imperiled plant association consisting of box elder and river birch. Colorado's largest population of Kachina daisy (*Erigeron kachinensis*), a G2/S1 BLM sensitive species, occur along drainages feeding into Coyote Wash and Slick Rock Canyon. |
| | | | | | | The canyon bottoms support a nearly continuous occurrence of the riparian plant association known as New Mexico privet foothills riparian shrubland. The area supports two excellent (A-ranked) occurrences of a globally imperiled (G2/S1) New Mexico privet riparian shrub community (*Forestiera pubescens*) along the Dolores River. The New Mexico privet plant community is known only from the major rivers in the Four Corners area. |
| | | | | | | There are a few hanging garden communities (*Aquilegia micrantha – Mimulus eastwoodiae*), imperiled to vulnerable on a global scale (G2G3/S2S3), containing small populations of the globally vulnerable (G3/S1) Eastwood monkeyflower (*Mimulus eastwoodiae*). |

BLM_0116210

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | The proposed ACEC also has a good (B-ranked) occurrence of the Naturita milkvetch (*Astragalus naturitensis*), a BLM sensitive species and considered to be imperiled to vulnerable both globally and in Colorado (G2G3/S2S3). The Dolores River throughout the length of the site supports populations of roundtail chub (*Gila robusta*), which is a BLM sensitive species and globally vulnerable (G3/S2). Populations of the chub are at the upstream margin of the species' range and comprise the majority of occurrences for this species. The La Sal Creek tributary harbors exemplary populations of three BLM and Colorado sensitive species: flannelmouth suckers *(Catostomus latipinnis)*, bluehead suckers *(Catostomus discobolus)*, and roundtail chubs *(Gila robusta;* this is one of a very few spawning tributaries for these species within the Dolores River Basin. Other animal species with conservation significance are desert bighorn sheep and peregrine falcon. Cultural sites (rock art panels and historic structures) are in the area, as is a paleontological study area. |

BLM_0116211

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| La Sal Creek ACEC<br><br>Proposed: 10,490 acres | External Proposal | Yes | Botanical: *Unique Vegetation Communities and BLM Sensitive Species*<br><br>Fish and Wildlife: *BLM Sensitive Species* | 2, 3 | 1, 2, 3 | The proposed La Sal Creek ACEC includes La Sal Creek, as well as uplands. La Sal Creek cuts a spectacular canyon of entrenched meanders through red Triassic and Jurassic sandstones and siltstones. The narrow floodplain supports a critically imperiled plant association consisting of box elder and river birch. In the narrow band of riparian vegetation, box elder accounts for as much as 70 percent cover, with river birch providing 25 to 60 percent cover. Only a few other small occurrences of this community are known to exist.<br><br>New Mexico privet, coyote willow, red-osier dogwood, giant reed, and wild rose are also common. Although there are some introduced pasture grasses, including Kentucky bluegrass, there is no tamarisk along the upper part of the creek.<br><br>Eroding shale slopes support populations of rare plants: Paradox breadroot (*Pediomelum aromaticum*), a G3/S2 BLM sensitive species; and Paradox Valley lupine (*Lupinus crassus*), a G2/S2, BLM sensitive species. |

BLM_0116212

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | Upland vegetation consists of pinyon-juniper woodland with both true and dwarf mountain mahogany, cliffrose, Gambel's oak, yucca, cacti, and rabbitbrush. A good-sized population of Paradox breadroot, with several hundred plants, was found on a dry bench overlooking La Sal Creek. |
| | | | | | | La Sal Creek harbors exemplary populations of three BLM and Colorado sensitive species: flannelmouth suckers (*Catostomus latipinnis*), bluehead suckers (*Catostomus discobolus*), and roundtail chubs (*Gila robusta*). This is one of a very few spawning tributaries for these species within the Dolores River Basin. |
| Coyote Wash ACEC Proposed: 2,100 acres | External Proposal | Yes | Botanical: BLM Sensitive Species | 3 | 1, 2, 3 | The proposed Coyote Wash ACEC is a steep-sided tributary canyon that joins the Dolores Canyon. Its flat sandy bottom has a small meandering stream that occasionally floods. Colorado's largest population of Kachina daisy, a G2/S1 BLM sensitive species, occurs along drainages feeding into the wash and canyon; hanging gardens in the canyon walls support Eastwood monkeyflower (*Mimulus eastwoodiae*) a BLM sensitive species. The banks of the |

BLM_0116213

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | Dolores River also have box-elder, river birch, and red-osier dogwood communities. Isolated benches in the canyon support Great Basin grassland communities that are in excellent condition.<br><br>The south boundary of the ACEC is the UFO boundary. Because of this, the proposed ACEC does not include the bottom of the drainage. |
| East Paradox ACEC<br>Proposed: 7,360 acres | BLM Proposal | Yes | Botanical: *Unique Vegetation Communities, rare species of* biological soil crusts, *and BLM Sensitive Species*<br><br>Fish and Wildlife: *BLM Sensitive Species* | 2, 3 | 1, 2, 3 | The proposed East Paradox ACEC has the best known occurrence of the BLM sensitive species Paradox Valley lupine. This species is known only to occur in Colorado and is globally imperiled (G2/S2). There are two excellent occurrences (A-ranked) of the Paradox breadroot, a BLM sensitive and globally vulnerable (G3/S2) plant.<br><br>There are well developed cryptogamic crusts found between plants. During the spring of 2009, an inventory of biological soil crusts was conducted by Jessie Salix (BLM Vernal Field Office Botanist) in the Paradox Valley, at the request of the UFO. The survey discovered that the soils in the inventory area are derived from |

BLM_0116214

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | the Paradox Formation, and are highly gypsiferous. These soils tend to support a higher than normal density and species diversity of biological soil crusts. The inventory also resulted in the documentation of the occurrence of two species of biological soil crusts that are somewhat rare and typically found only on gypsiferous soils. The two species are: *Lecanora gypsicola* and *Gypsoplaca macrophylla.* The identification of these species was verified by Dr. Larry St. Clair, Lichenologist at Brigham Young University. Dr. St. Clair conveyed via e-mail to Jessie Salix that he felt the lichens were in need of protection for two reasons: 1) they occur exclusively on gypsiferous soils, a limited habitat that is commonly mined, 2) Dr. St. Clair has only observed these two species on less than half of the gypsiferous sites he has inventoried. The location is also the type locality for the Paradox cateye (*C. paradoxa*). This area has a number of occurrences of wildlife species with conservation significance. The two rarest are the roundtail chub and |

BLM_0116215

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | flannelmouth sucker, both BLM sensitive fish species. Nesting peregrine falcons also occur at this site. |
| Biological Soil Crust ACEC<br><br>Proposed: 1,900 acres | BLM Proposal | Yes | Botanical: *Rare species of biological soil crusts* | 2, 3 | 1, 2, 3 | There are well developed cryptogamic crusts found between plants. During the spring of 2009, an inventory of biological soil crusts was conducted by Jessie Salix (BLM Vernal Field Office Botanist) in the Paradox Valley, at the request of the UFO. The survey discovered that the soils in the inventory area are derived from the Paradox Formation, and are highly gypsiferous. These soils tend to support a higher than normal density and species diversity of biological soil crusts.<br><br>The inventory also resulted in the documentation of the occurrence of two species of biological soil crusts that are somewhat rare and typically found only on gypsiferous soils. The two species are: *Lecanora gypsicola* and *Gypsoplaca macrophylla*. The identification of these species was verified by Dr. Larry St. Clair, Lichenologist at Brigham Young University. Dr. St. Clair conveyed via e-mail to Jessie Salix that he felt the lichens were |

BLM_0116216

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | in need of protection for two reasons: 1) they occur exclusively on gypsiferous soils, a limited habitat that is commonly mined, 2) Dr. St. Clair has only observed these two species on less than half of the gypsiferous sites he has inventoried. |
| West Paradox ACEC<br><br>Proposed: 5,190 acres | BLM Proposal | Yes | Botanical: *Unique Vegetation Communities and BLM Sensitive Species*<br><br>Fish and Wildlife: *BLM Sensitive Species* | 2, 3 | 1, 2, 3 | The proposed West Paradox ACEC is located on the north side of Paradox Valley and west of the Dolores River, on dark red soils derived from the Chinle Formation. This site contains an excellent (A-ranked) and historical occurrences of the BLM sensitive species Paradox Valley lupine, a globally imperiled (G2/S2) species. It also contains Paradox breadroot, a BLM sensitive and globally vulnerable (G3/S2) plant.<br><br>The Paradox Valley lupine and Paradox breadroot are both locally common in the bottoms and on the sides of draws at the base of the south-facing slopes. There are many thousands of individuals of each species, with a variety of ages represented. |

BLM_0116217

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | Other vegetation consists of Utah juniper woodland, with galleta and snakeweed. The plant community is in good condition with few exotic species present. |
| Paradox Rock Art ACEC Proposed: 1,080 acres | External Proposal | Yes | Cultural | 1 | 1, 2 | The proposed Paradox Rock Art ACEC is located in the eastern part of Paradox Valley. It contains important rock art and archaeological sites, including several outstanding examples of Ancestral Puebloan style petroglyphs, Formative period and earlier occupations, features and isolates, and settled village sites dating more than five hundred to a thousand years old. The site is rare for its northern extent of Anasazi rock art and occupation. |
| Tabeguache Pueblo/ Tabeguache Caves ACEC Proposed: 26,300 acres | External Proposal | Yes | Cultural | 1 | 1, 2 | The proposed Tabeguache Pueblo/Tabeguache Caves ACEC contains important archaeological sites that show a relationship between the Fremont and Anasazi cultures. The Tabeguache Pueblos and Tabeguache Caves are important both to the prehistory of the region and to the history of archaeology in Colorado, being some of the earliest explored and described archaeological sites in the state. In addition to |

BLM_0116218

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| | | | | | | their historic interest, both Tabeguache caves and the pueblos still contain intact archaeological deposits dating to the Formative period Anasazi, or Ancestral Puebloan people. There is some evidence of farming (corn production). |
| Tabeguache Creek ACEC/ONA<br><br>Existing: 560 acres | Existing | Yes | Cultural | 1 | 1, 2 | The Tabeguache Creek ACEC and ONA is designated to protect cultural resources and aquatic/riparian values.  The ACEC/ONA is completely within the Tabeguache Special Management Area. It contains important archaeological sites that show a relationship between the Fremont and Anasazi cultures. The Tabeguache Creek ACEC/ONA is important both to the prehistory of the region and to the history of archaeology in Colorado.  It has some of the earliest explored and described archaeological sites in the state.  The ACEC contains intact archaeological deposits dating to the Formative period Anasazi, or Ancestral Puebloan people. |

BLM_0116219

**Table O-2**
**Summary of the Evaluation of Existing and Proposed ACECs in the Decision Area**

| Name of ACEC | Status | Relevant and Important (carried forward)? | Values Assessed | Relevance Criteria Supported (see text above for relevance criterion) | Importance Criteria Supported (see text above for importance criterion) | Comments |
|---|---|---|---|---|---|---|
| Young Egg Locality ACEC<br><br>Proposed: 120 acres | External Proposal | No | | | | The proposed ACEC is within the Dominguez-Escalante National Conservation Area, which is not within the Uncompahgre RMP planning area. Because the proposed ACEC is outside of the planning area, it will not be considered in the Uncompahgre RMP. |

BLM_0116220

# Appendix P
## Summary of Draft Wild and Scenic River Suitability Report

BLM_0116221

BLM_0116222

# TABLE OF CONTENTS

Section                                                                                                          Page

**P.    SUMMARY OF DRAFT WILD AND SCENIC RIVER SUITABILITY REPORT ......................P-1**

P.1     Introduction ..........................................................................................................P-1
        P.1.1   The Study Area ..........................................................................................P-1
P.2     Wild and Scenic River Study Process .................................................................P-2
        P.2.1   Eligibility Analysis .......................................................................................P-2
        P.2.2   Suitability Analysis......................................................................................P-7
        P.2.3   Actions in Response to Recommendations...........................................P-10
P.3     Suitable Segments: Assessment and Suitability Determination........................P-12
        P.3.1   7:  Monitor Creek – Suitable Segment ...................................................P-12
        P.3.2   8: Potter Creek – Suitable Segment........................................................P-14
        P.3.3   10: Roubideau Creek, Segment 1 – Suitable Segment .........................P-16
        P.3.4   14:  Beaver Creek – Suitable Segment ....................................................P-18
        P.3.5   17: Saltado Creek  – Suitable Segment....................................................P-21
        P.3.6   18: San Miguel River, Segment 1 – Suitable Segment..........................P-23
        P.3.7   19: San Miguel River, Segment 2 – Suitable Segment..........................P-29
        P.3.8   20: San Miguel River, Segment 3 – Suitable Segment..........................P-32
        P.3.9   21: San Miguel River, Segment 5 – Suitable Segment..........................P-36
        P.3.10  22: San Miguel River, Segment 6 – Suitable Segment..........................P-39
        P.3.11  23: Tabeguache Creek, Segment 1 – Suitable Segment.........................P-42
        P.3.12  25: Lower Dolores River – Suitable Segment........................................P-45
        P.3.13  27: Dolores River, Segment 2 – Suitable Segment ...............................P-49
        P.3.14  30: La Sal Creek, Segment 2 – Suitable Segment .................................P-52
        P.3.15  31: La Sal Creek, Segment 3 – Suitable Segment .................................P-54
        P.3.16  34: Dolores River, Segment 1 – Suitable Segment ...............................P-57
P.4     Not Suitable Segments:  Assessment and Suitability Determination................P-61
        P.4.1   5: Gunnison River, Segment 2 – Not Suitable.......................................P-61
        P.4.2   11: Roubideau Creek, Segment 2 – Not Suitable .................................P-63
        P.4.3   12: Deep Creek – Not Suitable...............................................................P-64
        P.4.4   13: West Fork Terror Creek – Not Suitable ........................................P-65
        P.4.5   15: Dry Creek – Not Suitable .................................................................P-67
        P.4.6   16: Naturita Creek – Not Suitable..........................................................P-68
        P.4.7   24: Tabeguache Creek, Segment 2 – Not Suitable ................................P-71
        P.4.8   26: North Fork Mesa Creek – Not Suitable ..........................................P-73
        P.4.9   28: Ice Lake Creek, Segment 2 – Not Suitable......................................P-75
        P.4.10  29: La Sal Creek, Segment 1 – Not Suitable ..........................................P-77
        P.4.11  32: Lion Creek, Segment 2 – Not Suitable.............................................P-79
        P.4.12  33: Spring Creek – Not Suitable .............................................................P-80
P.5     Dolores-San Miguel Stakeholder Analysis and Recommendations.................P-82
        P.5.1   Southwest Resource Advisory Council...................................................P-82
P.6     Gunnison Basin Stakeholder Analysis and Recommendations........................P-83

BLM_0116223

# TABLES

Page

P-1   Eligible Segments by Hydrologic Unit ................................................................................P-3
P-2   National Register of Historic Places Evaluation Criteria ...................................................P-5
P-3   Colorado Natural Heritage Program Element Imperilment Ranks .................................P-6
P-4   Interim Protection for Suitable Segments..........................................................................P-11

BLM_0116224

# APPENDIX P
# SUMMARY OF DRAFT WILD AND SCENIC RIVER SUITABILITY REPORT

## P.1 INTRODUCTION

This appendix provides summary information about Wild and Scenic River (WSR) suitability for the Bureau of Land Management (BLM) Uncompahgre Resource Management Plan (RMP) Planning Area (planning area). The Wild and Scenic River Suitability Report (February 2013) provides more detail as well as maps of each segment found to be suitable or unsuitable. The Wild and Scenic River Suitability Report is available on the Uncompahgre Field Office (UFO) Wild and Scenic River Studies web page (http://www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html).

The Wild and Scenic River Suitability report presents an analysis of and recommendations regarding the suitability of 28 eligible river segments within the planning area for inclusion in the National Wild and Scenic River System (NWSRS). An 11.88-mile segment of the Dolores River within the planning area was identified as eligible in the San Juan Public Lands Draft Land Management Plan and is among the 28 segments evaluated for this report.

After considering information, comments, and recommendations from BLM resource staff, the BLM Southwest Resource Advisory Council (SWRAC), cooperating agencies, stakeholder groups, landowners, and other interested parties, the BLM identified 16 of the 28 segments as suitable for NWSRS consideration. The findings are used to develop the preferred alternative for the Uncompahgre RMP and to make NWSRS recommendations to Congress.

### P.1.1 The Study Area

The UFO manages public land in Delta, Mesa, Montrose, Gunnison, Ouray, and San Miguel counties in southwestern Colorado. The planning area for the RMP consists of over 675,000 acres of BLM-administered land within the UFO, excluding the Gunnison Gorge National Conservation Areas (NCA) and the Dominguez-Escalante NCA, which operate under separate RMPs.

BLM_0116225

The BLM completed an evaluation of 174 river segments in the planning area and released the *Final Wild and Scenic River Eligibility Report for the BLM Uncompahgre Planning Area* in July 2010. The report identifies 28 segments within the Uncompahgre Planning Area as eligible for inclusion in the NWSRS.

## P.2   WILD AND SCENIC RIVER STUDY PROCESS

Section 5(d)(1) of the 1968 Wild and Scenic Rivers Act (WSR Act) requires federal agencies to evaluate potential wild and scenic rivers when preparing resource management plans: "In all planning for the use and development of water and related land resources, consideration shall be given by all federal agencies involved to potential national wild, scenic, and recreational river areas."

The Wild and Scenic River (WSR) study process consists of evaluating segments for **eligibility** and **suitability**. Both studies are conducted in accordance with the WSR Act, BLM Manual 8351 and the recently revised BLM Manual 6400: *Wild and Scenic Rivers—Policy and Program Direction for Identification, Evaluation, and Management* (1992 and 2012), and *The Wild and Scenic River Study Process Technical Report* (1999) issued by the Interagency Wild and Scenic Rivers Coordinating Council.

### P.2.1   Eligibility Analysis

#### Field Surveys
Extensive field inventories were conducted throughout the planning area between 2006 and 2009. An interdisciplinary team of BLM employees identified 174 river and stream segments from within seven hydrologic units.

#### Analysis
The team evaluated each segment to determine whether it meets the two criteria required for NWSRS eligibility: the stream (1) is free-flowing and (2) possesses any of several outstandingly remarkable values (ORVs) adopted and specifically tailored for application within the planning area prior to the assessment. As shown in **Table P-1** (Eligible Segments by Hydrologic Unit), below, 28 segments within five hydrologic units were found to possess the eligibility criteria. In addition, one Upper Dolores segment within the planning area was identified as eligible in the San Juan Public Lands Draft Land Management Plan. No eligible segments were identified within either the Upper Gunnison or Uncompahgre hydrologic units.

#### Outstandingly Remarkable Values
While values must be river-related, eligible ORVs may be scenic, recreational, geologic, fish, wildlife, cultural, historic, vegetation, or other similar value (such as paleontological). In addition, in order to be considered outstandingly remarkable, a value must be unique, rare, or exemplary, as well as significant within a defined region of comparison.

#### Regions of Comparison
A region of comparison is used to compare the special values for which a river is being considered against comparable elements within a defined geographic area. The area, region, or scale used for comparison is not fixed, and should be that which best serves as a basis for

**Table P-1**
**Eligible Segments by Hydrologic Unit**

| Hydrologic Unit | Eligible Segments |
|---|---:|
| Upper Gunnison | 0 |
| Lower Gunnison | 5 |
| Uncompahgre | 0 |
| North Fork of the Gunnison | 2 |
| San Miguel | 11 |
| Lower Dolores | 2 |
| Upper Dolores[1] | 8 |
| **Total Segments** | **28** |

[1]Includes one reach of the Dolores River determined eligible in the San Juan Public Lands Draft Land Management Plan.

meaningful analysis—it might vary, depending on the value being considered. The scale of a region could consist of a portion of a state or other appropriately scaled geographic area or hydrologic unit (Interagency WSR Coordinating Council 1999).

The following standards and regions of comparison for each ORV category were developed by UFO resource specialists, and used to evaluate the WSR eligibility of UFO rivers:

<u>1. Scenic</u>

***Standard*** - The landscape elements of landform, vegetation, water, color, and related factors must result in notable or exemplary visual features and/or attractions within the geographic region. The BLM Visual Resource Inventory Handbook (H8410-1) may be used to assess visual quality and evaluate the extent to which development impacts an area's scenic values. The area must have a Scenic Quality Classification of A, as defined in H8410-1. When analyzing scenic values, additional factors such as seasonal variations in vegetation, scale of cultural modifications, and length of time negative intrusions are viewed may be considered. Scenery and visual attractions may be highly diverse over the majority of the river segment length and not common to other rivers in the geographic region.

***Region of Comparison*** - The landscape has a Scenic Quality Classification of A within either the Southern Rockies or Colorado Plateau ecologic region.

<u>2. Recreational</u>

***Standard*** - Recreational opportunities are or have the potential to be unusual enough to attract visitors to the geographic region. Visitors are willing to travel long distances to use the river resources for recreational purposes. Recreation-related opportunities could include, but are not be limited to, sightseeing, wildlife observation, camping, photography, hiking, fishing, hunting, and boating. Interpretive opportunities may be exceptional and attract or have the potential to attract visitors from outside the geographic area. The river may provide or have the potential to

BLM_0116227

provide settings for national or regional commercial usage or competitive events. In addition, the river may be eligible if it is determined to provide a critically important regional recreation opportunity, or be a significant component of a regional recreation opportunity spectrum setting.

***Region of Comparison*** - The area possesses recreational opportunities popular enough to attract visitors from throughout or beyond the state of Colorado, and/or that are unique or rare within either the Southern Rockies or Colorado Plateau ecologic region. Opportunities could include Gold Medal fisheries, rafting, and others.

3. Geologic

***Standard*** - The river or the area within the river corridor contains one or more examples of a geologic feature, process, or phenomenon that is rare, unusual, or unique to the geographic region. The feature or features may be in an unusually active stage of development, represent a textbook example and/or represent a unique or rare combination of geologic features (erosional, volcanic, glacial, and other geologic structures).

***Region of Comparison*** - The feature is unique or rare within either the Southern Rockies or Colorado Plateau ecologic region.

4. Fish

***Standard*** - Fish values may be judged on the relative merits of either fish populations or habitat, or a combination of these river-related conditions.

    a)  Populations:  The river is nationally or regionally one of the top producers of resident, indigenous, and/or anadromous fish species. Of particular significance may be the presence of wild or unique stocks, or populations of Colorado State and/or federally listed or candidate threatened and endangered species.

    b)  Habitat:  The river provides exceptionally high quality habitat for fish species indigenous to the region. Of particular significance is habitat for Colorado State and/or federally listed or candidate threatened and endangered species.

***Region of Comparison*** - Distribution of native species across their entire range, within either the Southern Rockies or Colorado Plateau ecologic region.

5. Wildlife

***Standard*** - Wildlife values may be judged on the relative merits of either wildlife populations or habitat, or a combination of these conditions.

    a)  Populations:  The river or area within the river corridor contains nationally or regionally important populations of resident or indigenous wildlife species dependent on the river environment. Of particular significance may be species considered to be unique or populations of Colorado State and/or federally listed or candidate threatened and endangered species.

BLM_0116228

b) Habitat:  The river or area within the river corridor provides exceptionally high quality, occupied habitat for wildlife of national or regional significance, or may provide a unique or critical habitat link for special status species known to occur in the area. Contiguous habitat conditions are such that the biological needs of the species are met.

***Region of Comparison*** - Distribution of native species across their entire range, within either the Southern Rockies or Colorado Plateau ecologic region.

<u>6. Cultural</u>

***Standard*** - The river or area within the river corridor contains one or more sites where there is evidence of occupation or use by Native Americans. Sites must be rare, have unusual characteristics, or exceptional human interest values. Sites may have national or regional importance for interpreting prehistory, may be rare, may represent an area where culture or cultural period was first identified and described, may have been used concurrently by two or more cultural groups, or may have been used by cultural groups for rare, sacred, tribal, or spiritual purposes.

***Region of Comparison*** - A site that is on, or could be eligible for, the National Register of Historic Places (NRHP).

<u>7. Historic</u>

***Standard*** - The river or area within the corridor contains one or more sites or features associated with a significant event, person, or cultural activity of the past that was rare or unusual in the region. Historic and/or Native American sites or features in most cases are 50 years old or older. Sites or features listed in, or eligible for inclusion in, the NRHP may be of particular significance.

***Region of Comparison*** - A site that is unique or rare within the state of Colorado, and is on or could be eligible for the NRHP (as shown in **Table P-2** [National Register of Historic Places Evaluation Criteria]).

**Table P-2**
**National Register of Historic Places Evaluation Criteria**

| The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association, and: | |
|---|---|
| Criterion | Description |
| A | Are associated with events that have made a significant contribution to the broad patterns of our history |
| B | Are associated with the lives of persons significant in our past |
| C | Embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction |
| D | Have yielded, or may be likely to yield, information important in history or prehistory |

BLM_0116229

<u>8. Vegetation</u>

***Standard*** - The river or stream segment supports a riparian vegetation community that is a superior occurrence or is rare on a global basis:

a) Superior occurrence:  For this standard, a superior community is defined as having received an Element Occurrence Ranking of A by the Colorado Natural Heritage Program (CNHP). An A ranking denotes that a community has excellent estimated ecological integrity based on size, condition, and landscape context.

b) Rare on a global basis:  For this standard, rareness is defined as a ranking of G1 or G2 (as determined by CNHP and described in **Table P-3**, Colorado Natural Heritage Program Element Imperilment Ranks).

Riparian vegetation that is located in a Potential Conservation Area (as determined by CNHP) has enhanced value because it has been identified as highly important for conserving regional and global biodiversity.

**Table P-3**
**Colorado Natural Heritage Program Element Imperilment Ranks**

| Rank | Description |
|------|-------------|
| G1 | Critically imperiled globally because of rarity (5 or fewer occurrences in the world or 1,000 or fewer individuals), or because some factor of its biology makes it especially vulnerable to extinction. |
| G2 | Imperiled globally because of rarity (6 to 20 occurrences or 1,000 to 3,000 individuals), or because other factors demonstrably make it very vulnerable to extinction throughout its range. |
| G3 | Vulnerable through its range or found locally in a restricted range (21 to 100 occurrences or 3,000 to 10,000 individuals). |
| G4 | Apparently secure globally, though it may be quite rare in parts of its range, especially at the periphery. Usually more than 100 occurrences and 10,000 individuals. |
| G5 | Demonstrably secure globally, though it may be quite rare in parts of its range, especially at the periphery. |

***Region of Comparison*** - The river or area within the river corridor provides exceptional vegetative species or communities of significance within either the Southern Rockies or Colorado Plateau ecologic region. Consideration should be given to habitats and rare plants identified by CNHP as being of global importance (such as exceptional riparian areas and hanging gardens).

The element imperilment ranks shown in the table above are assigned in terms of an element's imperilment over its entire range (its Global-rank or G-rank).

BLM_0116230

9. Other Similar Values

**Standard** - While no specific evaluation guidelines have been established for the "other similar values" category, additional values deemed relevant to the eligibility of the river segment should be considered in a manner consistent with the foregoing guidance including, but not limited to, paleontologic, and scientific study opportunities.

**Region of Comparison** - Unique or rare within the Southern Rockies or Colorado Plateau ecologic region. For paleontological resources, these regions would be defined based on geological associations.

**Preliminary Classification**
The eligible segments were then assigned a preliminary classification of **wild**, **scenic,** or **recreational** based upon the amount of access to, and level of shoreline and water resource development within, the corridor, as defined in the WSR Act.

For a complete description of the segments analyzed and methods used, the eligibility report is available for review at the Montrose Public Lands Center in Montrose, Colorado and on the UFO Wild and Scenic River Studies webpage (http://www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html).

**P.2.2   Suitability Analysis**
During the suitability process, the BLM weighed protective measures for eligible river segments and the corresponding corridor in relation to current and potential identified uses. Possible environmental and economic consequences of, management issues resulting from, and reasonable alternatives to WSR designation were considered. Preliminary segment boundaries and classifications were reevaluated in response to public input. Geographic information systems data was recalculated, at times resulting in modified segment lengths and land ownership measures.

The portions of the eligible stream segment that are not included within the suitable stream segment boundaries, both in terms of stream miles and acreage within the eligible stream corridor, are found to be not suitable.

According to the Interagency WSR Coordinating Council (1999), a suitability evaluation should address three primary considerations:

- Should the river's free-flowing character, water quality, and ORVs be protected, or are one or more other uses important enough to warrant doing otherwise?

- Will the river's free-flowing character, water quality, and ORVs be protected through designation?  Is designation the best method for protecting the river corridor?  In answering these questions, the benefits and impacts of WSR designation must be evaluated and alternative protection methods considered.

- Is there a demonstrated commitment to protect the river by any nonfederal entities partially responsible for implementing protective management?

BLM_0116231

***UFO Suitability Criteria***

Criteria used to evaluate eligible planning area segments for suitability were derived from BLM Manual 8351, *Wild and Scenic Rivers - Policy and Program Direction for Identification, Evaluation, and Management* (1992), as well as from guidelines issued by the Interagency Wild and Scenic Rivers Coordinating Council (1999). Suitability criteria in the recently revised 8351 manual (now BLM Manual 6400 [2012]) were also considered. The following suitability criteria were formulated to elicit focused responses from BLM staff and the public useful in analyzing individual segments:

1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.

2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.

3. ORVs that could be affected by designation or non-designation.

4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.

5. Compatibility or incompatibility of designation with current land and water uses and development.

6. Reasonably foreseeable potential land and water development and uses that could be affected by designation.

7. Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.

8. Consistency of designation with other BLM plans, programs, and policies and regional objectives.

9. Issues that might make administering this segment difficult.

10. Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.

***BLM Interdisciplinary Team***

For each eligible segment, an interdisciplinary team of BLM resource specialists ((listed in the WSR Suitability Report) compiled information from within their particular area(s) of expertise. The specialists met as a group to evaluate the segments in relation to the suitability criteria. Following their preliminary review, the team collected additional data to fill information gaps.

***Information Sources***

BLM staff utilized a variety of resources to analyze and make recommendations for each segment, including:

- Geographic Information Systems data
- U.S. Geological Survey stream gauge data and minerals maps
- Land status maps

BLM_0116232

- State and federal agency agreements and management plans
- Local and county government land use plans and zoning documents
- Colorado Water Conservation Board (CWCB) project data
- Published books and reports
- River guides
- Water rights tabulations

### Public Participation

The suitability comment period was announced through a press release issued July 15, 2010. Letters inviting participation and requesting input regarding eligible segments were mailed to potential interested parties. Response forms were disseminated at public meetings and via mail and email, and available through the UFO Wild and Scenic River Studies webpage.

### Public Comments

The UFO received hundreds of forms and letters containing unique comments, as well as numerous form letters. Substantive comments received during the formal suitability comment period (ending August 20, 2010) were summarized by segment and suitability criteria and considered in the suitability analysis. Comments received during the stakeholder process ending January 24, 2011 were also considered when they provided new information. In addition, comments received during the eligibility period that pertained more closely to suitability were included. Eligibility-related comments were not considered during the suitability analysis. Original comments are on file at the UFO administrative headquarters in Montrose, Colorado.

### Stakeholder Groups

Input from public stakeholder groups was critical in evaluating the suitability of each segment. Separate stakeholder processes were initiated for segments in the Gunnison River Basin and those in the Dolores and San Miguel river basins. Stakeholder groups held public meetings during late 2010 and early 2011. BLM staff participated in the meetings to provide information and data and answer questions pertaining to the WSR process and specific segments, but did not offer recommendations. Results of both stakeholder processes were forwarded to the BLM for consideration.

Gunnison Basin Stakeholder Process

The Gunnison Basin stakeholder process was initiated by the Colorado River Water Conservation District. The stakeholder group contracted with a team of co-facilitators and held nine public meetings pertaining to Gunnison Basin segments outside of the Dominguez-Escalante NCA. The stakeholder group was unable to reach a consensus and two sets of recommendations were forwarded to the BLM for consideration.

Dolores and San Miguel Basin Stakeholder Process

The Dolores-San Miguel process was coordinated by the RMP Subgroup for the SWRAC. The subgroup contracted with a facilitator early in the process and held ten public meetings. In addition, the subgroup opened a second public comment period to gather additional suitability input.

---

BLM_0116233

The subgroup considered BLM analysis and public input and developed recommendations for each of the Dolores-San Miguel segments. The full BLM Colorado SWRAC reviewed and adopted the subgroup recommendations at the Colorado Statewide RAC meeting held on February 25, 2011.

*Cooperating and Other Public Agency Input*
State and federal agencies were invited to participate as cooperating agencies in the RMP process, providing information and reviewing preliminary findings during and between monthly meetings. Agencies opting not to serve as cooperating agencies provided input through correspondence and during public meetings.

### P.2.3   Actions in Response to Recommendations

Results of the suitability analysis were used to formulate a range of alternatives for the Draft RMP/Environmental Impact Statement (EIS). The range of alternatives consists of a no action alternative that would maintain all rivers at the eligible stage, an alternative that would find all eligible rivers suitable, an alternative that would find all segments not suitable, and an alternative that would find some or portions of some eligible rivers suitable. Following publication of the Draft RMP/EIS, the public has 90 days to comment on the draft suitability determinations. The final suitability determinations will be documented in the Approved RMP/Record of Decision. Segments found not suitable will be dropped from further consideration and revert to management according to objectives and prescriptions in the RMP.

**NWSRS Congressional Consideration**
Neither the suitability evaluation nor the RMP planning process result in designation of a river segment as part of the NWSRS. Following completion of the Uncompahgre RMP, the findings are forwarded to Congress for consideration. Congress (or the Secretary of the Interior upon application by a state governor) has the final authority to designate waterways. Members of Congress craft the legislative language for designated segments and develop water protection strategies and measures in support of the WSR Act.

**Interim Management of Suitable Segments**
The WSR Act and BLM guidelines require the BLM to develop and implement interim management to protect the free-flowing nature, water quality, ORVs, and recommended classification of suitable segments until Congress takes formal action regarding NWSRS designation. Table 4 provides interim guidelines for managing suitable rivers, as adapted by the Interagency Wild and Scenic Rivers Coordinating Council from the WSR Act. Once final determinations have been made, the BLM will draft protective management measures for each suitable segment.

While congressionally authorized study rivers are protected under the WSR Act, agency-identified rivers receive protection through other authorities, including the National Environmental Policy Act, the Federal Lands Policy and Management Act, the Clean Water Act, and the Endangered Species Act. For example, potential effects on the free-flowing condition, water quality, and ORVs of eligible river segments would be considered when proposing federal or federally permitted actions subject to the National Environmental Policy Act.

BLM_0116234

Following release of the Approved RMP/Record of Decision, suitable segments will be managed to maintain their free-flowing character and ORVs in support of the selected alternative until designated or released from consideration by Congress.

**Table P-4**
**Interim Protection for Suitable Segments**

| Issue | Protection Under Suitable Designation |
|---|---|
| Study Boundary | • Corridor width is generally one-quarter mile from ordinary high water mark on both sides of active channel<br>• Boundary may include adjacent areas needed to protect identified values |
| Preliminary Classification WSR Act Section (2b) | • Wild, Scenic, and Recreational classes as defined by statute (classification criteria described in Interagency Guidelines)<br>• Manage segment at recommended classification |
| Study Report Review Procedures | • Notice of study report/Draft EIS published in *Federal Register*<br>• Comments/responses from federal, state, and local agencies, and public included in study report/Final EIS transmitted to President and Congress |
| Private Land:<br>• Administration<br>• Acquisition | • Affects private land uses only through voluntary partnerships with state/local governments and landowners<br>• No regulatory authority over private land<br>• Evaluation of local zoning and land use control adequacy is typically a component of suitability determination[1]<br>• BLM has no authority to acquire interest in land under WSR Act prior to designation |
| Water Resources Project | • River's free-flowing condition protected to the extent of other BLM authorities and not under the WSR Act |
| Land Disposition | • Agency discretion to retain lands within river corridor in federal ownership |
| Mining and Mineral Leasing | • Protect free flow, water quality, and ORVs through other BLM authorities |
| Actions of Other Agencies | • Affect actions of other agencies through voluntary partnerships |
| Protect Outstandingly Remarkable Values (ORVs) | • No regulatory authority conferred by WSR Act; agency protects through other authorities<br>• Section 11(b)(1)[2]: Limited financial or other assistance to encourage participation in acquisition, protection, and management of river resources |

[1] Agency-identified study rivers that include private land typically require an evaluation of existing state and local land use controls and the willingness of state and local governments to protect river values.

[2] Section 11(b)1 authorizes the Secretary of the Interior and Secretary of Agriculture, or the head of any other federal agency to provide for "limited financial or other assistance to encourage participation in the acquisition, protection, and management of river resources." This authority "applies within or outside a federally administered area and applies to rivers which are components of the NWSRS and to other rivers." Recipients of federal assistance include states or their political subdivisions, landowners, private organizations, or individuals. Examples of assistance under this section include riparian restorations, riparian fencing to protect water quality and riparian vegetation, and vegetative screening to enhance scenery and/or the recreation experience.

Source: Interagency Wild and Scenic Rivers Coordinating Council (1999)

BLM_0116235

## P.3    SUITABLE SEGMENTS: ASSESSMENT AND SUITABILITY DETERMINATION

### P.3.1    7:  Monitor Creek – Suitable Segment

*Classification:* **Wild**

*ORVs:* **Fish, Vegetation**

*Suitable Length:* **9.4 miles**

*BLM-administered:* **9.4 miles**

**Key Considerations:**
- Protecting a stream flow regime that mimics natural seasonal changes needed to sustain a healthy riparian vegetation community within the segment might only be achieved through federal WSR designation.
- Water yield through the segment contributes significantly to the proper hydrologic function of Potter and Roubideau creeks.
- The small percentage of private land is primarily consolidated near the upper terminus and predominantly outside of areas containing the Vegetation ORV.

Monitor Creek was found to be suitable for WSR consideration, with a classification of *Wild*. The stream corridor is natural and rugged, with no substantial evidence of human alteration. The suitability finding will protect the continued health of fish and plant communities identified within the segment.

**Public Input**
Public support for suitability focused on providing a reliable and enduring form of protection for the continued health of rare plant communities and the riparian ecosystem extending from USFS lands upstream, as well as citing values not considered for suitability (such as wilderness character and recreation opportunities).

Public comments opposing suitability cited existing protections, including a proposed conservation easement for adjacent land and a citizen-proposed wilderness area designation.

**Segment Assessment**

*Outstandingly Remarkable Values*

Fish
A recent fish survey conducted by the BLM indicates that Monitor Creek is likely to support viable populations of both bluehead sucker *(Catostomus discobolus)* and flannelmouth sucker *(Catostomus latipinnis)*, warranting the addition of a Fish ORV.

BLM_0116236

Vegetation
This segment supports a superior (A-ranked) occurrence of the common coyote willow riparian shrubland *(Salix exigua/mesic graminoids)*. Monitor Creek is within the Roubideau Creek Potential Conservation Area designated by the CNHP.

*Water Rights and Uses*
Monitor Creek is a small, intermittent headwater drainage managed primarily by the BLM and USFS, making the potential for future water development low. The segment has no existing instream flow water right protection.

Flow from Monitor Creek contributes heavily to Potter and Roubideau creeks downstream, providing spring spawning habitat for native warm water fishes. Protecting a streamflow regime that mimics the natural seasonal changes needed to sustain a healthy riparian vegetation community within this segment might only be secured through federal WSR designation.

There are no absolute or conditional water rights or impoundments in this segment, and absolute water rights upstream would not be affected by designation. A couple of small reservoirs (totaling 184 acre-feet of storage) occur above the upper terminus and have a slight potential to influence the flow regime through the segment.

*Land Ownership and Uses*
The BLM manages all of the land within the corridor, with private land primarily consolidated adjacent to the upper terminus. Because of the limited amount of adjacent private land and remote location, non-restrictive zoning in the area is not expected to have much of an impact on the segment. Travel along Monitor Creek is restricted to non-motorized vehicles on designated roads and trails.

Special Designations
The segment is within a proposed Special Recreation Management Area, as well as two potential Areas of Critical Environmental Concern (ACEC) being considered within separate alternatives for the Uncompahgre RMP.

Energy and Mineral Leasing
No existing oil and gas leases or mining claims occur within the segment.

*Administration*
WSR designation would be consistent with actions pertaining to the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)* and would complement the BLM Colorado Public Land Health Standard for riparian vegetation.

Because of the predominance of public land, few additional resources and facilities would be needed to effectively manage and support the ORV.

Potential Costs Associated with WSR Designation
As a result of the suitability finding, the stream and corridor will be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional

BLM_0116237

funding for signage, public education, ranger patrols, and maintenance, the amount of which
would vary depending upon projected increases in visitor use, as well as the segment's size,
location, and other attributes.

<u>Alternative Protective Measures Considered</u>
ACEC designation would provide some protection for the segment, but would not confer the
flow needed to support the Vegetation ORV. BLM staff determined that a state-based instream
flow water right would likely be sufficient to protect the Fish ORV, but would likely not be able
to protect the peak flows necessary to sustain the Vegetation ORV.

### P.3.2   8: Potter Creek – Suitable Segment

*Classification:* **Wild**

*ORV:* **Fish, Vegetation**

*Eligible Length:* **9.8 miles**

*BLM-Administered:* **9.8 miles**

*Key Considerations:*

- Most private land is relatively consolidated in one parcel near the lower terminus
and predominantly outside of areas containing the Vegetation ORV. The segment
would require few additional resources and facilities to manage effectively and
support the ORV.

- Protecting a stream flow regime that mimics natural seasonal changes needed to
sustain a healthy riparian vegetation community might only be secured through
federal WSR designation.

- Water yield through the segment contributes significantly to the proper hydrologic
function of Roubideau Creek and the Gunnison River downstream.

Potter Creek was found to be *suitable* for WSR consideration, with a classification of *Wild*. The
stream corridor is natural and rugged, with no substantial evidence of human alteration. The
suitability finding will protect the continued health of the fish and plant communities identified
within the segment.

*Public Input*
Public support for suitability focused on providing a reliable and enduring form of protection for
the continued health of the riparian ecosystem extending from USFS lands upstream, as well as
outstanding opportunities for solitude and a primitive and unconfined form of recreation.

Public comments opposing suitability cited existing protections, including a proposed
conservation easement for adjacent lands and a citizen-proposed wilderness area designation.

BLM_0116238

**Segment Assessment**

*Outstandingly Remarkable Values*

Fish
A recent fish survey conducted by the BLM indicates that Potter Creek supports viable populations of both bluehead sucker *(Catostomus discobolus)* and flannelmouth sucker *(Catostomus latipinnis)*, warranting the addition of a Fish ORV.

Vegetation
This segment supports areas of narrowleaf cottonwood/ strapleaf willow/silver buffaloberry riparian forest (*Populus angustifolia/Salix ligulifolia/Shepherdia argentea*). While the CNHP lowered the rarity ranking to G3, the BLM determined that the quality and extensiveness of the plant community warrants retaining the Vegetation ORV until a review determines whether or not the occurrence is superior (A-ranked). This segment is included in the Roubideau Creek Potential Conservation Area designated by the CNHP.

*Water Rights and Uses*
There are no absolute or conditional water rights or impoundments on or upstream of this segment. The CWCB holds an instream flow water right structured to protect the natural environment to a reasonable extent. The water right is decreed for 1.8 cfs (from March 1 to March 31), 4 cfs (from April 1 to June 15), 1.8 cfs (from June 16 to July 31), and 1.4 cfs (from August 1 to February 28), helping to sustain the Vegetation ORV.

Flow from Potter Creek contributes to the proper hydrologic function of Roubideau Creek and the Gunnison River downstream. Protecting a streamflow regime that mimics the natural seasonal changes needed to sustain a healthy riparian vegetation community might only be secured through federal WSR designation.

*Land Ownership and Uses*
All land within the corridor is managed by the federal government. One parcel of private land is adjacent to the lower terminus.

Energy and Mineral Leasing
There are no existing oil and gas leases or mining claims within the segment.

*Administration*
WSR designation would be consistent with actions pertaining to the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)* and would complement the BLM Colorado Public Land Health Standard for riparian vegetation.

Potential Costs Associated with WSR Designation
As a result of the suitable finding, the stream and corridor will be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary

BLM_0116239

depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

<u>Alternative Protective Measures Considered</u>
The segment is within a proposed Special Recreation Management Area and two versions of a potential Area of Critical Environmental Concern being considered during development of the Uncompahgre RMP.

### P.3.3   10: Roubideau Creek, Segment 1 – Suitable Segment

*Classification:* **Wild**

*ORVs:* **Recreational, Wildlife, Cultural, Vegetation**

*Suitable Length:* **9.9 miles**

*BLM-Administered:* **9.9 miles**

*Key Considerations:*
- The segment contains a wide array of ORVs.
- The segment is within the Camel Back Wilderness Study Area.
- Private land is consolidated into one parcel near the upper terminus.
- Protection of a streamflow regime that mimics the natural seasonal changes needed to sustain a healthy riparian vegetation community for this segment might only be protected through WSR designation.
- Roubideau Creek contributes significant flow to the proper hydrologic function of Lower Roubideau Creek and the Gunnison River downstream.

Roubideau Creek, Segment 1 was found to be *suitable* for WSR designation, with a classification of *Wild.* The segment lies almost entirely within the Camel Back Wilderness Study Area and possesses a wild and primitive character and range of ORVs.

**Segment Assessment**

*Outstandingly Remarkable Values*

<u>Recreational</u>
The perennial creek flows within a highly scenic, wilderness-quality canyon, offering superior opportunities for non-mechanized recreation in a primitive setting. Activities include hiking, backpacking, horseback riding, photography, nature study, and other non-mechanized uses, with vehicle access at the lower terminus.

<u>Wildlife</u>
The area has been designated as a potential conservation area for the northern leopard frog *(Rana pipiens),* a species currently under review by the Fish and Wildlife Service. This segment

BLM_0116240

also provides regionally important habitat for desert bighorn sheep *(Ovis Canadensis)*, which use the lower end of the creek extensively as a water source and the cliffs above for lambing.

<u>Cultural</u>
The stream flows past an inscription panel of extreme historic significance. The site has been nominated to the National Register of Historic Places under *Criteria A, B,* and *D*. In 1769, Juan Maria Rivera visited the site at the behest of the king of Spain and carved his name and a date into a rock face. The panel also contains a prehistoric mountain sheep figure.

<u>Vegetation</u>
The segment lies within the CNHP-designated Roubideau Creek Potential Conservation Area, supporting areas of globally imperiled (G2) skunkbush sumac/sandbar willow riparian shrubland *(Rhus trilobata/Salix exigua)*.

*Water Rights and Uses*
The entire stream channel is federally managed. There are no absolute or conditional water rights or impoundments within the segment. In the headwaters, a water diversion known as Spruce Spring Ditch (decreed for up to 9.3 cfs) transfers water from Roubideau Creek to the Dry Creek drainage (typically limited to the snowmelt period). The diversion diminishes spring and early summer flow through the segment.

The CWCB holds an instream flow water right decreed for 5 cfs (from March 1 to March 31), 21 cfs (from April 1 to June 15), 5 cfs (from June 16 to July 31), and 1.9 cfs (from August 1 to February 28) and structured to protect the natural environment to a reasonable extent. The instream flow provides some protection to sustain the ORVs. Protecting a streamflow regime that mimics the natural seasonal changes needed to sustain a healthy riparian vegetation community for this segment might only be accomplished through WSR designation.

This section of Roubideau Creek in turn contributes flow to the proper hydrologic function of Lower Roubideau Creek and the Gunnison River downstream, providing habitat for native warm water fishes consistent with actions in the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*.

*Land Ownership and Uses*
The entire corridor is managed by the BLM. One parcel of private agricultural land is adjacent to the corridor's upper terminus.

<u>Special Designations</u>
The segment lies almost entirely within the Camel Back Wilderness Study Area.

<u>Energy and Mineral Leasing</u>
There are no existing oil and gas leases or mining claims within the segment.

BLM_0116241

*Administration*
WSR designation would complement the BLM Colorado Public Land Health standard for riparian vegetation. The segment would require few additional resources and facilities to effectively manage in support of the ORV.

Potential Costs Associated with WSR Designation
As a result of the suitability finding, the stream and corridor will be managed to protect the ORVs, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Alternative Protective Measures Considered
Although the segment is within a WSA, the designation is provisional and may not offer the long-term flow protection necessary for sustaining the Vegetation ORV. In addition, the segment is within two versions of a potential Area of Critical Environmental Concern being considered within separate alternatives for the Uncompahgre RMP.

### P.3.4   14:  Beaver Creek – Suitable Segment

*Classification:* **Recreational**

*ORV:* **Vegetation**

*Suitable Length:* **14.3 miles**

*BLM-Administered:* **14.2 miles**

*Key Considerations:*

- Beaver Creek provides value-added flow for the proper hydrologic function of the San Miguel River system and river-dependent resource values (including aquatic and riparian plant and animal species).

- A stream flow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community for this segment might only be achieved through WSR designation.

- The principal private landowner within the corridor has expressed support for WSR designation.

Beaver Creek was found to be suitable for WSR designation, with a classification of Recreational. It was thought that the classification would allow for protection of the Vegetation ORV, while providing reasonable certainty that future water development projects would receive consideration and could move forward with minimal difficulty. There was strong public support for the finding.

BLM_0116242

***Public Interest in Designation***
There was strong public support for suitability, including from the primary private landowner and San Miguel County, with protection of riparian vegetation and predominance of federal ownership most commonly cited as the bases.

***Segment Assessment***

*Outstandingly Remarkable Value*

Vegetation
This segment supports an occurrence of narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest *(Populus angustifolia/ Picea pungens/Alnus tenuifolia)* along several miles of the corridor ranked as superior (A) by the CNHP. The BLM has designated an area that includes this segment as part of the San Miguel ACEC, primarily in order to protect this outstanding riparian community.

*Water Rights and Uses*
Beaver Creek provides flow for the proper hydrologic function of the San Miguel River system and river-dependent resource values (including aquatic and riparian plant and animal species). While there are no absolute or conditional water rights or impoundments within the segment, ditch diversions totaling 28 cfs and decreed storage rights totaling 203 acre-feet upstream of the segment and on tributaries diminish flow through the segment, primarily during irrigation season.

Conditional water rights for direct flow totaling 10 cfs and 6,043 acre-feet of storage rights occur upstream of the segment and on tributaries. If developed, these water rights would be senior to the instream flow water right. The Norwood Water Commission has a conditional water right on the San Miguel River.

The Naturita Canal presently diverts water from Beaver Creek upstream of the segment. The diversion is presently limited to a portion (approximately 60%) of the full decree due to water conveyance limitations of the canal system. As the infrastructure is improved to increase the water carrying capacity of the canal, more of the decree will be diverted, further depleting flows through the segment (based upon personal communication with Colorado Division of Water Resources Water Commissioner Aaron Todd). This water right is senior to both the existing state instream flow and any federal water right associated with WSR designation. In the 2004 Statewide Water Supply Initiative, the CWCB identified upper Beaver Creek as a potential dam site to help supply future water needs in the San Miguel River Basin.

A streamflow regime that mimics the natural seasonal changes necessary for sustaining a healthy riparian vegetation community within the segment might only be achieved through WSR designation. The CWCB holds an instream flow water right along a portion of the segment decreed for 5 cfs (from May 1 to June 30) and 2.5 cfs (from July 1 to April 30), which is structured to protect the natural environment to a reasonable extent. The instream flow provides some protection to sustain the Vegetation ORV. A 2.7-mile portion of the segment from the upper terminus to the confluence with Goat Creek has no water right.

BLM_0116243

*Land Ownership and Uses*

Land ownership is primarily federal within an approximately one quarter-mile buffer of the creek. Approximately 13% of land in the San Miguel County portion of the corridor is private. Private lands on the east side of Beaver Creek are in the Forestry, Agriculture, and Open Zone District, which is intended to preserve large, relatively remote areas of the county for resource, agricultural, open space, and recreational proposes. These areas currently have minimal public facilities and services and are considered inappropriate for substantial development. Development and/or special uses are encouraged to be located away from environmentally sensitive land.

Private lands on the west side of the corridor are within the Wright's Mesa Zone District. The district is intended to preserve the rural and agricultural character of Wright's Mesa while encouraging compatible, diverse economic opportunities that complement the rural landscape. Wright's Mesa has a history of coexisting agricultural, ranching, residential, and small business uses that comprise its rural character. The district discourages sprawl patterns typically created by 35-acre lots by offering reasonable alternatives and incentives to cluster buildings, retain open lands, and keep large parcels intact.

The Beaver Creek corridor is closed to OHV use. If developed, a conditional water right on the San Miguel River could require an ROW along portions of Beaver Creek.

ROWs

Numerous BLM ROW authorizations cross or run adjacent to the creek, including distribution and Western Area Power Administration (WAPA)/Tri-State transmission powerlines, a gas pipeline, a Colorado Department of Transportation (CDOT) highway, and a county road. These ROWs are primarily concentrated near the confluence of Beaver Creek with the San Miguel River.

Energy and Mineral Resources

There are existing oil and gas leases within the segment. Active mining claims occur within the segment corridor and have a prior existing right to mineral deposits.

*Administration*

Although compatible with WSR designation, neither the existing ACEC and Special Recreation Management Area designations, nor the state instream flow water right secure sufficient instream flow to sustain the Vegetation ORV.

Segment access is somewhat restricted by limited existing roads and trails. WSR designation would complement the BLM Colorado Public Land Health standard for riparian vegetation.

*Potential Costs Associated with WSR Designation*

As a result of the suitability finding, the stream and corridor will be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

BLM_0116244

Costs for administering and managing this segment for the Vegetation ORV are not likely to increase much above current funding levels. Factors that assist in protecting the ORV include: remoteness of the segment, limited trail access, and the predominance of federal land managed as an ACEC for riparian protection. It is unlikely that additional facilities would be needed to enhance management.

Alternative Protective Measures Considered
WSR designation would provide the highest level of protection for the Vegetation ORV by necessitating acquisition of a federal water right that produces a flow rate mimicking natural, seasonal variation. Several existing authorities and segment features provide a lesser level of ORV protection, including an ACEC designation that protects riparian values, an existing state-based instream flow water right, environmentally supportive San Miguel County land use codes, and a high percentage of federally managed land within the corridor.

### P.3.5   17: Saltado Creek  – Suitable Segment

*Classification:* **Wild**

*ORV:* **Vegetation**

*Suitable Length:* **5.6 miles**

*BLM-Administered:* **4.1 miles**

*Key Considerations:*
- A stream flow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian community might only be achieved through designation.

- Saltado Creek provides value-added flow for the proper hydrologic function of the San Miguel River system and river-dependent resource values (including aquatic and riparian plant and animal species).

- San Miguel County and a local homeowners association have expressed support for WSR designation.

- The majority of the segment is comprised of contiguous BLM-administered land, allowing for efficient management if designated.

- There are no roads or water right diversions within the segment.

Saltado Creek was found to be *suitable* for WSR designation, with a classification of *Wild*. The finding will help to protect the area's primitive character and vulnerable plant community.

*Public Interest in Designation*
There was strong public support for suitability, including from a local homeowners association and San Miguel County, with the protection of riparian vegetation and stream-related values most commonly cited as the bases for designation.

BLM_0116245

**Segment Assessment**

*Outstandingly Remarkable Value*

<u>Vegetation</u>
This segment supports an occurrence of narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest *(Populus angustifolia/ Picea pungens/Alnus incana ssp. tenuifolia)* along several miles of its length ranked as superior (A) by the CNHP. The BLM has designated an area that includes this segment as part of the San Miguel ACEC, primarily in order to protect this outstanding riparian community.

*Water Rights and Uses*
A streamflow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community might only be achieved through federal designation. The CWCB holds an instream flow water right along the entire segment decreed for 2 cfs (from May 1 to June 30) and 1 cfs (from July 1 to April 30) and structured to protect the natural environment (including the Vegetation ORV) to a reasonable extent. Water yield through the segment contributes to the proper hydrologic function of the San Miguel River.

There are no water diversions or impoundments within the segment. Absolute water rights upstream of the segment include ditch diversions totaling 39 cfs and storage rights totaling 11.4 acre-feet. These water rights cause some depletion of streamflow through the segment, especially during the irrigation season.

Conditional water rights above the upper terminus include flow diversions totaling 5 cfs and storage rights totaling 15 acre-feet. If developed, these water rights would have seniority over the existing instream flow and any water right established as part of WSR designation, and could further diminish flow through the segment.

*Land Ownership and Uses*
Approximately 18% of the corridor consists of private land within the Forestry, Agriculture, and Open Zone District of San Miguel County. The district is intended to preserve large, relatively remote areas of the county for resource, agricultural, open space, and recreational proposes. These areas currently have minimal public facilities and services and are considered inappropriate for substantial development. Development and special uses are encouraged to be located outside of environmentally sensitive areas.

<u>Special Designations</u>
The segment is within the San Miguel Special Recreation Management Area and ACEC. The area is closed to OHV use.

<u>ROWs and Withdrawals</u>
Numerous BLM ROW authorizations cross or briefly run adjacent to the creek, including distribution and telephone lines, a CDOT highway, two WAPA transmission lines, and the Tri-State Nucla-Sunshine 115 kV transmission project.

BLM_0116246

While portions of the segment are within an area identified as a Powersite Classification, the classification does not preclude WSR designation. The federal government acquired public access easement across private lands adjacent to the creek in the southern upper reach of the segment.

Energy and Mineral Leasing

There are existing oil and gas leases within the segment. Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

*Administration*

The northern lower reach of the segment has contiguous public land and lack of development, while along the southern upper reach, land ownership is split. WSR designation would be consistent with the BLM Colorado Public Land Health standard for riparian vegetation.

Potential Costs Associated with WSR Designation

As a result of the suitability finding, the stream and corridor will be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Administering and managing this segment for the Vegetation ORV would require a moderate increase in funding over current levels. The segment is remote, has no developed access, and 82% of the corridor is federal land managed as an ACEC for riparian protection, factors that assist in protecting the ORV.

It is unlikely that additional facilities would be necessary as a result of WSR designation. If available for purchase from willing sellers, private land parcels within the corridor would have added value for ORV protection.

Alternative Protective Measures Considered

WSR designation would provide the highest level of protection for the Vegetation ORV by necessitating acquisition of a federal water right that produces flow rates mimicking natural, seasonal variation. However, several existing authorities and segment features provide a lesser level of ORV protection, including: an ACEC designation intended to protect riparian values, an existing state-based instream flow water right, environmentally supportive San Miguel County land use codes, and a high percentage of federally managed land within the corridor.

### P.3.6   18: San Miguel River, Segment 1 – Suitable Segment

*Classification:* **Recreational**

*ORV:* **Scenic, Recreational, Wildlife, Historic, Vegetation, Paleontology**

*Suitable Length:* **27.2 miles**

*BLM-Administered:* **17.3 miles**

BLM_0116247

**Key Considerations:**
- The segment contains a wide array of ORVs.
- A stream flow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community for this segment might only be achieved through WSR designation.
- Over 80% of land within the segment is public. Most of the segment is within San Miguel County, which has expressed support for WSR designation. A small portion of the segment is within Montrose County, which opposes designation.

San Miguel River, Segment 1 was found to be *suitable* for WSR designation, with a classification of *Recreational*. Suitability would allow for protection of the multitude of ORVs within the corridor. While concerns were raised regarding uranium and recreational placer mining within the segment, the RAC Subgroup believed that a *Recreational* classification would allow for the continuation of these activities.

**Public Interest in Designation**
The segment received much support for and opposition to suitability, with supporters (including San Miguel County) citing the unparalleled scenery and natural and cultural features within the corridor and opponents (including the Montrose County Board of Commissioners) expressing concern over potential restrictions on historic uses.

**Segment Assessment**

*Outstandingly Remarkable Values*

Scenic
An interdisciplinary BLM field inventory team evaluated and assigned this section of the San Miguel a *Scenic Quality Classification* of *A*. The river here is boulder-strewn, with a strong and constant gradient. The energetic, splashy flow is the keystone to the scenic quality of the reach. The color and contrast provided by steep canyon walls and interesting erosional patterns add to the visual appeal. Thick, diverse riparian vegetation provides additional scenic interest, changing in color and density throughout the growing season. From Deep Creek to Leopard Creek, stunning views of the San Juan mountain range enhance the landscape. A few modifications, including power lines and roads, are a minor detraction from the scenery.

Recreational
This entire segment of the San Miguel is within the San Miguel River Special Recreation Management Area and provides superior opportunities for river-related recreation. The river is easily accessed via paved highway and contains a number of high-quality BLM recreation sites, including six developed boat launches, six picnic areas, a campground, and an interpretive center. During snowmelt, whitewater rafters and kayakers are challenged by the swift currents and complex hydraulics of this boulder-strewn river. Outside of the snowmelt season, the river provides excellent opportunities for trout fishing on complex pocket water. Fishing enthusiasts may access the river via foot or raft.

BLM_0116248

The river's reputation for outstanding recreation, combined with the availability of commercial guide services, consistently draws visitors from around the world. This section also offers exceptional opportunities for sightseeing and photography along the Unaweep-Tabeguache Byway. The byway is marketed to visitors both within and outside of Colorado by the Unaweep-Tabeguache Byway Committee and the Colorado Office of Tourism.

Wildlife
Portions of the river corridor in this segment represent one of the finest protected Southwest Canyon Riparian Habitat sites in the United States. The Southwest Canyon Riparian Habitat is recognized as the richest terrestrial bird habitat type in North America, providing breeding sites for a wide variety of species, and primary migratory routes for nearly all songbirds throughout the western United States. According to the National Audubon Society, more than 300 bird species have been observed in the San Miguel River corridor.

Historic
Remnants of an old railroad grade follow along much of this section. The Rio Grande Southern Railroad operated a fleet of seven unusual railcars along a narrow gauge track from the 1930s until service ended in 1952, at which point the line was decommissioned. The rail line was known as the Galloping Goose. Built from car, truck, and bus parts, the lightweight "motors" proved to be an economical method for transporting mail and passengers between Durango and Ridgway.

The remains of historic uranium ore processing loadout areas are also present along this stretch. The site qualifies for nomination to the National Register of Historic Places under *Criterion A*.

Vegetation
This reach supports occurrences of four riparian communities, river birch/mesic graminoid riparian shrubland *(Betula occidentalis/mesic graminoids)*, narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest *(Populus angustifolia/Picea pungens/Alnus incana ssp. tenuifolia)*, narrowleaf cottonwood/ thinleaf alder riparian woodland *(Populus angustifolia/Alnus incana ssp. tenuifolia)*, and thinleaf alder/mesic graminoid riparian shrubland *(Alnus incana ssp. tenuifolia/mesic graminoids)*, ranked as Superior (A) by the CNHP. The reach falls within the Middle San Miguel Potential Conservation Area and the BLM has designated an area which includes this segment as part of the San Miguel ACEC, primarily to protect these outstanding riparian communities.

Paleontology
For many miles, the canyon formed by the San Miguel River exposes chunks of the Morrison Formation, remnants of a one hundred million-year old river bed. This Jurassic-age river meandered eastward from the ancestral Rocky Mountains into immense inland seas. Many fossils, including rare fish, plants, and fragmentary dinosaur bones, can be found along this stretch.

*Water Rights and Uses*
Water yield through the segment contributes to the proper hydrologic function of the lower San Miguel River and Dolores River downstream. The CWCB holds two instream flow water rights structured to protect the natural environment and sustain the ORVs to a reasonable

BLM_0116249

extent. Instream flow from Deep Creek to Fall Creek provides for a year-round flow of 20 cfs, while the flow from Fall Creek to the lower terminus calls for 93 cfs from May 1 to October 14 and 61 cfs for the remainder of the year. Flow needed to support some recreational boating activities and riparian protection might only be secured through water rights associated with WSR designation.

Approximately six water diversions scattered along the segment are not prominent features in the corridor and do not detract from the natural character of the river. Impoundments upstream of the segment include Trout Lake and Hope Lake on the Lake Fork tributary. There are a few off-channel impoundments within the segment associated with Cascabel Ranch near the lower terminus.

According to a draft BLM San Miguel instream flow assessment, senior water rights on the mainstem of the San Miguel River between Horsefly Creek and Naturita Creek divert water downstream of the segment. Much of this water demand is conveyed through the segment, but is limited primarily to the irrigation season.

Estimates from the Colorado HydroBase Decision Support System indicate that there are more than 160,000 acre-feet of conditional storage water rights on either the mainstem or tributaries within and upstream of the segment. If developed, these rights could influence flow through the segment.

Much of the water needed to meet future demands would come from conservation practices and development of existing water rights, including some conditional water rights in the San Miguel Basin. Most of these rights are senior to existing instream flow water rights or any instream flow created through WSR designation. Dam sites identified on the mainstem may be very difficult to develop, given current construction costs and concerns over environmental impacts.

Any new water right or change to existing rights is limited by the instream flow water right. Authorization for any new structures on BLM lands would contain conditions to ensure compliance with WSR Act.

*Land Ownership and Uses*

Zoning
A portion of the segment within Montrose County is zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of these uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

Portions of the corridor downstream of Beaver Creek and on the southwest side of the San Miguel River are within the Wright's Mesa Zone District in San Miguel County. The district is intended to preserve the rural and agricultural character of Wright's Mesa while encouraging diverse economic opportunities compatible with the rural landscape. Wright's Mesa has a history of coexisting agriculture, ranching, residential, and small business uses that comprise its

BLM_0116250

rural character. The district discourages large-lot patterns of sprawl (typically created through 35-acre developments) by offering alternatives and incentives to cluster buildings, retain open lands, and keep large parcels intact.

The remaining portions of the corridor within San Miguel County are primarily in the Forestry, Agriculture, and Open Zone District. The district is intended to preserve large, relatively remote areas of the county for resource, agricultural, open space, and recreational purposes. These areas currently have minimal public facilities and services and are considered inappropriate for substantial development. Development and/or special uses are encouraged to be located away from environmentally sensitive land.

The incorporated town of Placerville is zoned into two districts: The Placerville Residential Zone District provides areas and design standards for single-family residences surrounding the Placerville Commercial Zone District. The Placerville Commercial Zone District provides standards for commercial establishments located on Front Street in Placerville and at the southwest corner of the intersection of State Highways 62 and 145 west of Placerville. The size of the district cannot be increased.

There are a few planned unit developments along the San Miguel River in the vicinity of the incorporated town of Sawpit. The allowed uses within the planned unit developments are primarily single family housing on large lots (with a minimum of 35 acres). Other uses, such as multi-family housing and neighborhood commercial development, are allowed upon approval from the Board of County Commissioners.

ROWs and Withdrawals
ROWs within the segment include four power and nine telephone lines, gas pipelines, private access roads, county roads, a highway, an historic ditch, two WAPA 345-kilovolt power lines, the McKeever drift fence to the USFS boundary, and C-64335 river diversion weirs.

While portions of the segment are within an area identified by the Federal Energy Regulatory Commission as having potential for hydropower development, classification as a Power Site does not preclude WSR designation.

Energy and Mineral Leasing
There are existing oil and gas leases within the segment. According to the State of Colorado Oil and Gas Commission electronic well records database, there is an abandoned oil and gas well within the corridor.

Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

Administration
Several private land parcels are scattered throughout the corridor. A small portion of the segment is within Montrose County, which has adopted a resolution opposing WSR designation.

WSR designation would complement BLM Colorado Public Land Health standards for riparian vegetation and wildlife.

BLM_0116251

Special Designations

Most of the segment is within a Special Recreation Management Area and an ACEC.

Potential Costs Associated with WSR Designation

As a result of the suitability finding, the stream and corridor will be managed to protect the ORVs, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

The costs for managing this segment for the Scenic, Recreational, Wildlife, Historic, Vegetation, and Paleontologic ORVs would be moderately higher than current funding levels. The segment is within an existing Special Recreation Management Area and an ACEC from Placerville downstream, both of which have resulted in additional funding and resource protection actions along the river corridor.

A state highway parallels most of this reach, providing for easy access and use of the river and riparian area.

The segment includes several scattered parcels of private land. The BLM would pursue land acquisition from willing sellers as funding and opportunities arose, which would add value toward management and protection of the ORVs.

Alternative Protective Measures Considered

While WSR designation would provide the most comprehensive protection for the ORVs, several existing authorities and segment features provide some lesser level of ORV protection:

- ACEC and Special Recreation Management Area designations emphasize management for riparian and recreation values.

- An existing state-based instream flow water right in the San Miguel River helps to sustain the water-dependent ORVs.

- Development objectives on private lands in most of the segment are within the San Miguel County Land Use Code, which promotes preserving large remote areas for resource, agricultural, open space, and recreational purposes.

- A large portion of private land within the corridor is managed by The Nature Conservancy, which supports a finding of suitability.

In addition, conservation easements could be pursued on select private portions of the corridor, which would be value added in providing protection for the ORVs.

BLM_0116252

### P.3.7   19: San Miguel River, Segment 2 – Suitable Segment

*Classification:* **Wild**

*ORVs:* **Scenic, Recreational, Wildlife, Vegetation**

*Suitable Length:* **4.0 miles**

*BLM-Administered:* **4.0 miles**

*Key Considerations:*
- The segment contains a wide array of ORVs.
- The segment is comprised entirely of public lands.
- A stream flow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community for this segment might only be achieved through WSR designation.

San Miguel River, Segment 2 was found to be *suitable* for WSR designation, with a classification of *Wild*. The segment length was shortened to end at the Bennett property in order to protect landowner interests at Horsefly Creek, and the natural topography of the canyon rims will be used to delineate the corridor.

The RAC Subgroup considered overall land health within the segment to be of primary concern. While the impact of grazing on the Vegetation ORV is addressed to some extent through the current ACEC and Special Recreation Management Area designations, it was determined that WSR designation would provide longer-lasting protections.

*Public Interest in Designation*
The segment received much support for and opposition to suitability, with supporters identifying the outstanding canyon setting and stream-related values within the corridor and opponents expressing concern over potential restrictions on historic and future uses of water and the corridor.

*Segment Assessment*

*Outstandingly Remarkable Values*

Scenic
An interdisciplinary BLM field inventory team evaluated the area and assigned a *Scenic Quality Classification of A*. The San Miguel River flows clear and is a dominant element in this section. Complex erosional patterns combine with a diverse riparian plant community to form a varied landscape in contrasting hues of green, red, yellow, orange, gray, tan, and blue. This section of river is boulder-strewn and has a consistent gradient. The constant, energetic, splashy flow creates visually pleasing hydraulic features that are rare in the region of comparison. Adjacent scenery contributes to the setting.

BLM_0116253

Recreational

This section of the San Miguel River offers a rare and extraordinary opportunity for primitive river recreation, as the riparian surroundings transition from the Rocky Mountain physiographic region of the upper San Miguel to the Colorado Plateau physiographic region of the lower San Miguel. With no roads or developments, this section appears primitive and natural. River recreation in this section includes rafting, kayaking and trout fishing, as part of long day or multi-day trips. This and the adjacent downstream segment support the best population of self-sustaining trout in the San Miguel. There are several primitive BLM campsites along the reach. The entire reach lies within the San Miguel Special Recreation Management Area, used by private and commercial river runners and trout fishers.

Wildlife

Portions of the river corridor in this segment represent one of the finest examples of protected Southwest Canyon Riparian Habitat in the United States. The Southwest Canyon Riparian Habitat is recognized as the richest terrestrial bird habitat type in North America, providing breeding sites for a wide variety of bird species and primary migratory routes for nearly all songbirds throughout the western United States. According to the National Audubon Society, more than 300 bird species have been observed in the San Miguel River corridor.

Vegetation

This segment supports five distinct and outstanding riparian communities. These include four superior (A-ranked) occurrences of communities classified as globally vulnerable (G3) thinleaf alder/mesic graminoid riparian shrubland (*Alnus incana ssp. tenuifolia/mesic graminoids*), narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest *(Populus angustifolia/Picea pungens/Alnus incana ssp. tenuifolia)*, narrowleaf cottonwood/thinleaf alder riparian woodland *(Populus angustifolia/Alnus incana ssp. tenuifolia)*, and river birch/mesic graminoid riparian shrubland *(Betula occidentalis/mesic graminoids)*. In addition, a superior (A-ranked) occurrence of blue spruce/red osier dogwood riparian forest *(Picea pungens/Cornus sericea)*, ranked as apparently secure (G4), occurs here as well. The site is included within the CNHP-designated San Miguel River, Clay Creek to Horsefly Creek Potential Conservation Area. The BLM has also designated an area that includes this segment as part of the San Miguel ACEC, primarily in order to protect these outstanding riparian communities.

*Water Rights and Uses*

Water yield through the segment contributes to the proper hydrologic function of the lower San Miguel River and Dolores River downstream.

The CWCB holds an instream flow water right along the entire segment decreed for 93 cfs from May 1 to October 14 and 61 cfs the remainder of the year structured to protect the natural environment to a reasonable extent. The instream flow provides some protection to sustain the ORVs.

There are no absolute or conditional water rights or impoundments within the segment.

If developed, conditional water rights upstream of the segment could influence flow through the segment. Colorado Decision Support System HydroBase estimates indicate that there are more

BLM_0116254

than 160,000 acre-feet of conditional storage water rights upstream of the segment, on either the mainstem or tributaries.

There are a few impoundments upstream of the segment, including Trout Lake and Hope Lake (on the Lake Fork tributary), and a few off-channel impoundments associated with Cascabel Ranch immediately upstream of the segment.

Any new water right or change to existing rights is limited by the instream flow water right. Authorization for any new structures on BLM lands would contain conditions to ensure compliance with WSR Act.

Senior rights on the mainstem of the San Miguel River divert water in the reach between Horsefly Creek and Naturita Creek downstream of this segment (based upon San Miguel legal and institutional analysis). Much of the water demanded by these diversions is conveyed through the segment, primarily limited to the irrigation season.

Much of the water needed to meet future demand in the San Miguel River Basin would come from conservation practices and development of existing water rights, including some of the existing conditional water rights in the San Miguel Basin. Most of these rights are senior to both the existing instream flow water rights and any instream flow created through WSR designation.

According to San Miguel legal and institutional analysis, potential dam sites on the San Miguel River (downstream of Leopard Creek near the confluence with Beaver Creek and above Horsefly Creek) and major tributaries (including Horsefly Creek and Maverick Draw) identified in the 2004 Statewide Water Supply Initiative are unlikely to be developed, given current costs and concern over environmental impacts. Saltado Reservoir (with a conditional fill and refill right totaling over 140,000 acre-feet on the San Miguel River downstream of Specie Creek) is included in this assessment.

*Land Ownership and Uses*
Approximately 1.7% of the corridor consists of private land zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a fee or special use permit. Many of the uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

Special Designations
The segment is within an ACEC, as well as a Special Recreation Management Area. WSR designation is compatible with these existing designations.

Withdrawals
While portions of the segment are within an area classified as having potential for Waterpower and

Energy and Mineral Resources
There are existing oil and gas leases within the segment. Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

BLM_0116255

*Administration*

River flow needed to support some recreational boating activities and provide adequate protection for the riparian vegetation might only be secured through water rights associated with WSR designation. Designation would complement BLM Colorado Public Land Health standards for riparian vegetation and wildlife. There is no road access within the segment.

Potential Costs Associated with WSR Designation

As a result of the suitability finding, the stream and corridor will be managed to protect the ORVs, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Estimated costs for administering and managing this segment for the Scenic, Recreational, Wildlife, and riparian Vegetation ORVs would be slightly higher than current funding levels. The river corridor is remote, has limited trail access, and is entirely comprised of federal land, most of which is managed as both an ACEC (for riparian protection) and a Special Recreation Management Area. These designations provide some additional funding necessary for managing and protecting the ORVs.

Alternative Protective Measures Considered

The segment is within an ACEC, as well as a Special Recreation Management Area.

Current instream flow water rights held by the CWCB provide some protection for flows necessary to support the ORVs.

The area is identified in the Colorado Citizens Wilderness Proposal and the Colorado *Wilderness Act* of 2009 (H.R. 4289) introduced by Congresswoman Diana DeGette. WSR designation would be compatible with wilderness designation and wilderness characteristics.

**P.3.8   20: San Miguel River, Segment 3 – Suitable Segment**

*Classification:* **Recreational**

*ORVs:* **Recreational, Fish, Wildlife, Vegetation**

*Suitable Length:* **4.5 miles**

*BLM-Administered:* **4.5 miles**

*Key Considerations:*

- The segment contains a wide array of ORVs.

- A stream flow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community within the segment might only be achieved through WSR designation.

BLM_0116256

- Sufficient flow for certain recreational boating activities might only be secured with water rights acquired through WSR designation.

San Miguel River, Segment 3 was found to be *suitable* for WSR designation, with a classification of *Recreational*. Based on a recommendation by the RAC Subgroup, the eligibility classification was changed (from *Scenic*) due to the presence of the CC Ditch, two BLM campgrounds, and many mining claims along this stretch, as well as a dirt road running parallel to the river. In addition, the segment is popular for recreational gold mining. The Bennett property, as well as private land at the lower end of the segment, was excluded from the suitability recommendation.

### Public Interest in Designation
The segment received much support for and opposition to suitability, with supporters identifying the outstanding setting and stream-related values within the corridor and opponents expressing concern over potential restrictions on historic and future uses of water and the corridor.

### Segment Assessment

*Outstandingly Remarkable Values*

Recreational
This San Miguel River segment offers a rare and extraordinary opportunity for primitive river recreation, as the riparian surroundings transition from the Rocky Mountain physiographic region of the upper San Miguel to the Colorado Plateau physiographic region of the lower San Miguel. River recreation in this section includes rafting, kayaking and trout fishing, as part of long day or multi-day trips.

With few developments and one minor dirt road not visible from the river, this section appears mostly primitive and natural. Several primitive BLM campsites dot the shoreline, and two developed campgrounds with boat ramps, toilets and picnic facilities are located along the lower third of the reach. Exceptionally good "play waves" form in the Ledges area during spring runoff and are sought by kayakers, who consider them to be some of the best natural features of their kind in the state.

This and the adjacent upstream segment support the San Miguel's best population of self-sustaining trout. The entire reach lies within the San Miguel Special Recreation Management Area, used by private and commercial river runners and trout fishers.

Fish
This segment harbors exemplary populations of three BLM and Colorado sensitive species: flannelmouth suckers *(Catostomus latipinnis)*, bluehead suckers *(Catostomus discobolus)*, and roundtail chubs *(Gila robusta)*.

Wildlife
Portions of the river corridor in this segment represent one of the finest areas of protected Southwest Canyon Riparian Habitat in the United States. The Southwest Canyon Riparian Habitat is recognized as the richest terrestrial bird habitat type in North America, providing

BLM_0116257

breeding sites for a wide variety of bird species and primary migratory routes for nearly all songbirds throughout the western United States. More than 300 bird species have been observed in the San Miguel River corridor. The expanding Black Phoebe *(Sayornis nigricans)* population has been moving up the San Miguel River, as evidenced by a nest found at the Highway 90 Bridge at Piñon (National Audubon Society 2010).

Vegetation
This reach supports a superior (A-ranked) occurrence of sandbar willow *(Salix exigua/mesic graminoids)* riparian shrubland, ranked as secure globally (G5). The segment is included in the San Miguel River at Cottonwood Creek Potential Conservation Area.

*Water Rights and Uses*
Water yield through the segment contributes to the proper hydrologic function of the lower San Miguel River and Dolores River downstream. There is no instream flow water right on the segment, so changes or enlargements to existing water rights or new water rights on private property could further diminish flow.

Four absolute water rights within the segment divert up to 153 cfs for irrigation and municipal use. An instream flow right associated with WSR designation could limit the ability to change points of diversion on existing water rights.

The Highline Canal diversion (decreed for 145 cfs) is located downstream of the upper terminus and parallels the San Miguel River for most of the segment. The canal is senior to most other water rights and is primarily used for crop irrigation downstream in late summer, when irrigation demand is high and snowmelt has diminished.

While there are no existing impoundments within the segment, Trout Lake and Hope Lake impound water upstream on the Lake Fork tributary. In addition, there are a few off-channel impoundments associated with Cascabel Ranch.

Colorado Decision Support System HydroBase estimates indicate that there are more than 204,000 acre-feet of conditional water storage rights upstream of the segment, on both the mainstem and tributaries. Much of the water needed to meet future demand is likely to come from conservation practices and development of existing water rights, including conditional rights in the San Miguel Basin. Most of these rights would be senior to any instream flow created through WSR designation.

Given current construction costs and concerns over environmental impacts, dam sites identified on the mainstem may be difficult to develop. One such site is the Saltado Reservoir on the San Miguel River downstream of Specie Creek, with a conditional water right for fill and refill totaling over 140,000 acre-feet.

*Land Ownership and Uses*
This 4.5-mile stretch of the San Miguel River consists entirely of BLM-administered land.

Special Designations
WSR designation would be consistent with the existing Special Recreation Management Area designation.

ROWs and Withdrawals
Transco and Rocky Mountain Natural Gas pipelines, two Tri-State transmission lines, and one distribution powerline cross the segment. The Highline Canal, telephone lines, and a county road parallel the segment. There is a private access road one-quarter to one-half mile to the west and a water pipeline within one-quarter mile to the north.

While portions of the segment are within an area classified as having Waterpower and Reservoir Resources the Powersite Classification does not preclude WSR designations.

Energy and Mineral Leasing
According to a State of Colorado Oil and Gas Commission electronic well records database, there are existing oil and gas leases within the segment, as well as two abandoned oil and gas wells. Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

*Administration*
A streamflow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community for this segment might only be achieved through WSR designation. Designation would complement BLM Colorado Public Land Health Standards for riparian vegetation, special status species, and wildlife.

River flow needed to support certain recreational boating activities might only be secured through water rights associated with WSR designation.

This segment of the San Miguel supports habitat for native warm water fish, making WSR designation consistent with actions in the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*. Depletion of flow by the Highline Canal might inhibit the ability to sustain the Fish ORV, as well as the Vegetation ORV.

Potential Costs Associated with WSR Designation
As a result of the suitability finding, the stream and corridor will be managed to protect the ORVs, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs associated with administering and managing this segment for the Recreational, Fish, Wildlife, and Vegetation ORVs are estimated to be moderately higher than current funding levels. The segment is managed as a Special Recreation Management Area, which has provided some funding for facilities and maintenance to protect the ORVs.

BLM_0116259

With easy access to the river corridor provided by a county road running parallel to the river, visitor use could increase if designated and additional funding for facilities would likely be needed. If purchased from willing sellers, private land parcels within the corridor would have added value for ORV protection.

Alternative Protective Measures Considered

While WSR designation would provide the most comprehensive protection for the ORVs, existing authorities provide some level of protection, including the Special Recreation Management Area designation, which emphasizes management for riparian and recreation values. Conservation easements for select private portions of the corridor could be pursued, potentially increasing protection for ORVs. Appropriation of a state-based instream flow water right through the segment would also help to sustain the ORVs.

### P.3.9   21: San Miguel River, Segment 5 – Suitable Segment

*Classification:* **Recreational**

*ORVs:* **Recreational, Fish, Historic, Vegetation**

*Suitable Length:* **7.5 miles**

*BLM-Administered:* **1.3 miles**

*Key Considerations:*
- Water yield contributes significantly to the proper hydrologic function of the Lower Dolores River downstream.

- A stream flow regime that mimics the natural seasonal changes necessary for sustaining a healthy riparian vegetation community might only be attainable through WSR designation.

- The Nature Conservancy is the principal landowner and has expressed strong support for WSR designation of the segment.

- The CWCB has declared its intent to appropriate a state instream flow for the lower San Miguel River.

San Miguel River, Segment 5 was found to be *suitable* for WSR designation, with a classification of *Recreational*. Based on recommendations by the RAC Subgroup, the segment was reduced from its eligible length to begin downstream from the Richards property, run the length of The Nature Conservancy property, and terminate at the confluence with Tabeguache Creek. In addition, the boundaries of the protective corridor were delineated to extend rim to rim, using existing developments and natural barriers.

*Public Interest in Designation*

The segment received much support for and opposition to suitability, with supporters highlighting the important river-related values within the corridor and opponents expressing concern over potential restrictions on access and historic and future uses of water and the corridor.

BLM_0116260

### Segment Assessment

*Outstandingly Remarkable Values*

<u>Recreational</u>
This section of the San Miguel River provides exceptional opportunities for sightseeing and photography along the Unaweep-Tabeguache Byway. The byway is marketed to visitors from within Colorado, out of state, and internationally by the Unaweep-Tabeguache Byway Committee and by the Colorado Office of Tourism. This section of the byway focuses on the San Miguel River and its associated historic sites and surrounding landscape.

<u>Fish</u>
This segment supports exemplary populations of three BLM and Colorado sensitive species: flannelmouth sucker *(Catostomus latipinnis)*, bluehead sucker *(Catostomus discobolus)*, and roundtail chub *(Gila robusta)*. This segment contains an intact native fishery and is regionally one of the best examples of a remnant native fishery. In addition, this segment was historically occupied by Colorado pikeminnow *(Ptychocheilus lucius)*, a federally endangered species.

<u>Historic</u>
This stretch of river marks the beginning of the historic Hanging Flume, one of the premier 19th century engineering accomplishments in the west. The thirteen-mile flume was constructed above the Dolores and San Miguel rivers over a three-year period in the late 1800s to supply water to a hydraulic placer gold mining operation. The structure was added to the National Register of Historic Places in 1980, and was listed as one of Colorado's Most Endangered Places in 1999. In addition, the flume is listed on the Colorado State Register of Historic Properties, the World Heritage Fund list of most endangered places and the 2006 World Monument Fund Watch List of 100 Most Endangered Sites.

<u>Vegetation</u>
The segment lies within the San Miguel River at Tabeguache Creek Potential Conservation Area and supports New Mexico privet riparian shrubland *(Forestiera pubescens)*, Fremont cottonwood/skunkbush sumac riparian woodland *(Populus deltoides ssp. wislizenii/Rhus trilobata)*, and skunkbush sumac riparian shrubland *(Rhus trilobata)*, all ranked as globally imperiled (G2).

*Water Rights and Uses*
Water yield through San Miguel River, Segment 5 contributes to the proper hydrologic function of the Lower Dolores River. In January 2011, the CWCB announced its intention to appropriate an instream flow for the lower San Miguel River (from the confluence of Calamity Draw to the confluence with the Dolores River) of 325 cfs (from April 15 to June 14), 170 cfs (from June 15 to July 31), 115 cfs (from August 1 to August 31), 80 cfs (from September 1 to February 28), and 115 cfs (from March 1 to April 14) structured to benefit the propagation of three native warm water fish species. The appropriation was upheld at a hearing on September 13, 2011.

While no existing impoundments occur within the segment, there are a few small impoundments upstream (including Trout Lake and Hope Lake on the Lake Fork tributary), and a few off-channel impoundments associated with Cascabel Ranch.

BLM_0116261

The segment contains approximately six water diversions, at least two (San Miguel Power Company Canal and Johnson Ditch) of which were owned by Umetco Minerals Corporation and donated to the CWCB for other than decreed uses. Decision on the fate of these water rights is pending, but potential future uses include conveying a portion to Montrose County or local governments within the San Miguel Basin, and donating a portion to an instream flow right in the lower San Miguel River. Future use of these rights could result in changes to existing points of diversion.

According to Colorado Decision Support System HydroBase estimates, there are over 349,000 acre-feet of conditional storage water rights upstream of the segment, on either the mainstem or tributaries of the San Miguel River. If developed, these water rights would be senior to any instream flow or federal water right and could further diminish flow.

Much of the water needed to meet future regional demand would be derived through conservation practices and development of existing water rights, including conditional water rights in the San Miguel Basin. Most of these conditional water rights are senior to both existing instream flow water rights and any instream flow created through WSR designation.

The 2004 Statewide Water Supply Initiative identified future potential dam sites on the San Miguel River (downstream of Leopard Creek near the confluence with Beaver Creek and above Horsefly Creek) and major tributaries, including Horsefly Creek and Maverick Draw. According to a draft BLM San Miguel Instream Flow Assessment, dam sites identified on the mainstem are unlikely to be developed, given current costs and concerns with environmental impacts. The assessment included Saltado Reservoir on the San Miguel River downstream of Specie Creek, with a fill and refill right totaling over 140,000 acre-feet.

An instream flow or federal water right associated with WSR designation could restrict new water rights or changes to existing water rights.

*Land Ownership and Uses*

ROWs and Withdrawals
ROWs within the corridor include Colorado State Highway 141, several county roads, telephone and power lines, an historic irrigation ditch, and a water pipeline.

A bat maternity roost withdrawal is located in an abandoned uranium mine along the river.

While portions of this segment are within an area classified as having Waterpower and Reservoir Resources the Powersite Classification does not preclude WSR designation.

Energy and Mineral Resources
There are existing oil and gas leases within the segment. Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

*Administration*
WSR designation would complement the public land health standard for riparian vegetation and special status species. This segment supports habitat for native warm water fishes, and

designation would be consistent with actions in the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*.

The Nature Conservancy is the principal landowner within the corridor and supports WSR designation and working with the BLM to manage the segment ORVs.

<u>Potential Costs Associated with WSR Designation</u>
As a result of the suitability finding, the stream and corridor will be managed to protect the ORVs, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

The segment is paralleled by State Highway 141, part of the Unaweep-Tabeguache Scenic and Historic Byway. The highway provides easy access to the river corridor, and if designated, visitor use along the byway could be expected to increase somewhat.

<u>Alternative Protective Measures Considered</u>
While WSR designation would provide the most comprehensive protection for the ORVs, The Nature Conservancy ownership affords protections. If confirmed by the water court, an instream flow water right appropriated by the CWCB in September 2011 would help sustain the Fish and Vegetation ORVs.

### P.3.10 22: San Miguel River, Segment 6 – Suitable Segment

*Classification:* **Recreational**

*ORVs:* **Recreational, Fish, Historic, Vegetation**

*Suitable Length:* **2.1 miles**

*BLM-Administered:* **2.1 miles**

*Key Considerations:*
- A stream flow regime that mimics the natural seasonal changes necessary for sustaining a healthy riparian vegetation community might only be attainable through WSR designation.

- Water yield contributes significantly to the proper hydrologic function of the Lower Dolores River downstream.

- The CWCB has declared its intent to appropriate a state instream flow for the lower San Miguel River.

San Miguel River, Segment 6 was found to be *suitable* for WSR designation, with a classification of *Recreational*. Based on a recommendation from the RAC Subgroup, the segment was

BLM_0116263

redelineated to begin downstream of Umetco Minerals Corporation property and terminate at the confluence with the Dolores River.

***Public Interest in Designation***
The segment received substantial support for and opposition to suitability, with supporters highlighting protection of the riparian ecosystem and river-related values within the corridor and opponents expressing concern over potential restrictions on historic and future uses of water and the corridor.

***Segment Assessment***

*Outstandingly Remarkable Values*

<u>Recreational</u>
This section of the San Miguel River provides exceptional opportunities for sightseeing and photography along the Unaweep-Tabeguache Byway. The byway is marketed to visitors from within Colorado, as well as out of state and internationally by the Unaweep-Tabeguache Byway Committee and by the Colorado Office of Tourism. This section of the byway focuses on the river and surrounding landscape, as well as associated historic sites.

<u>Fish</u>
This river segment contains exemplary populations of Bluehead sucker *(Catostomus discobolus)*, flannelmouth sucker *(Catostomus latipinnis)*, and roundtail chub *(Gila robusta)*, all BLM and Colorado sensitive warm water fish species. The species are regionally important within the reach due to population numbers and the lack of non-native fish. In addition, the reach was historically occupied by the Colorado pikeminnow *(Ptychocheilus lucius)*, a federally endangered species.

<u>Historic</u>
One of the premier engineering accomplishments of the 19th century in the west, remnants of the historic Hanging Flume dot the canyon walls along this stretch of the San Miguel. The thirteen-mile flume was built in the late 1800s to supply water to a hydraulic placer gold mining operation on the Dolores River near Roc Creek. The structure was added to the National Register of Historic Places in 1980, and was listed as one of Colorado's Most Endangered Places in 1999. In addition, the flume is listed on the Colorado State Register of Historic Properties, the World Heritage Fund's list of most endangered places and the 2006 World Monument Fund Watch List of 100 Most Endangered Sites.

Historic uranium mining buildings and shafts can also be found along this stretch, many of which have been evaluated and found to be eligible for nomination to the National Register of Historic Places under *Criterion A*.

<u>Vegetation</u>
This riparian zone contains New Mexico privet riparian shrubland *(Forestiera pubescens)*, which is currently ranked as globally imperiled (G2). The reach is included within the Uravan West Potential Conservation Area and is considered by CNHP to have outstanding significance.

BLM_0116264

*Water Rights and Uses*
Water yield through San Miguel, Segment 6 contributes to the proper hydrologic function of the Lower Dolores River.

In January 2011, the CWCB announced its intention to appropriate an instream flow for the lower San Miguel River (from the confluence of Calamity Draw to the confluence with the Dolores River) of 325 cfs (from April 15 to June 14), 170 cfs (from June 15 to July 31), 115 cfs (from August 1 to August 31), 80 cfs (from September 1 to February 28), and 115 cfs (from March 1 to April 14) structured to benefit the propagation of three native warm water fish species. The appropriation was upheld at a hearing on September 13, 2011.

While there are no existing impoundments within the segment, there are a few small impoundments upstream (including Trout Lake and Hope Lake on the Lake Fork tributary) and a few off-channel impoundments associated with Cascabel Ranch.

There are a few small impoundments upstream of the segment (including Trout Lake and Hope Lake) located on the Lake Fork tributary.

According to Colorado Decision Support System HydroBase estimates, there are more than 349,000 acre-feet of conditional storage water rights upstream of the segment, on either the mainstem or tributaries of the San Miguel River. If developed, these water rights would be senior to any instream flow or federal water right on this segment and could further diminish flow through this reach.

Much of the water needed to meet future demand would come from conservation practices and development of existing water rights, including some of the existing conditional water rights in the San Miguel Basin. Most of these conditional water rights are senior to both existing instream flow water rights and any instream flow created through WSR designation.

2004 Statewide Water Supply Initiative identified future potential dam sites on the San Miguel River (downstream of Leopard Creek near the confluence with Beaver Creek, and above Horsefly Creek) and major tributaries, including Horsefly Creek and Maverick Draw. Given current construction costs and concerns over environmental impacts, dam sites identified on the mainstem may be difficult to develop. This assessment includes Saltado Reservoir on the San Miguel River downstream of Specie Creek, with a conditional water right totaling over 140,000 acre-feet.

An instream flow or federal water right associated with WSR designation could restrict new water rights or changes to existing water rights.

*Land Ownership and Uses*

<u>ROW and Withdrawals</u>
ROWs within the corridor include Colorado State Highway 141, several county roads, telephone and powerlines, and an historic irrigation ditch and water pipeline.

BLM_0116265

While portions of the segment are within an area classified as having Waterpower and Reservoir Resources, the Powersite Classification does not preclude WSR designation.

<u>Energy and Mineral Resources</u>
There are existing oil and gas leases within the segment. Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

*Administration*
WSR designation for this segment complements BLM Colorado Public Land Health standards for riparian vegetation and, by supporting habitat for native warm water fishes, is consistent with the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*.

<u>Potential Costs Associated with WSR Designation</u>
As a result of the suitability finding, the stream and corridor will be managed to protect the ORVs, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs associated with administering and managing this segment for the Recreational, Fish, Historic, and Vegetation ORVs would be moderately to much higher than current funding levels. With easy access to the river corridor provided by the paralleling county road, visitor use would be expected to increase if designated. As a result, additional funding for facilities would likely be needed.

A county road currently infringes on the stream channel and riparian zone along portions of this reach. With future county plans to possibly widen the road, costly measures would be necessary to avoid additional impacts to the river corridor. If purchased from willing sellers, private lands in the upper reaches of the segment would add value for ORV protection.

<u>Alternative Protective Measures Considered</u>
While WSR designation would provide the most comprehensive protection for the ORVs, conservation easements on select private portions of the corridor would offer added value toward protecting the ORVs. If confirmed by the water court, an instream flow water right appropriated by the CWCB in September 2011 would help sustain the Recreation, Fish, and Vegetation ORVs.

### P.3.11  23: Tabeguache Creek, Segment 1 – Suitable Segment

*Classification:*  **Wild**

*ORV:*  **Vegetation**

*Suitable Length:*  **3.4 miles**

*BLM-Administered:*  **3.4 miles**

BLM_0116266

**Key Considerations:**
- Existing designation as a Special Management Area offers significant protection to sustain the Vegetation ORV.

- Limited water development in the upper Tabeguache Basin results in a flow regime that mimics natural conditions.

- A contiguous 3.7-mile upstream portion of Tabeguache Creek managed by the USFS is identified as eligible in the Proposed Land Management Plan for the Grand Mesa, Uncompahgre, and Gunnison National Forests (2007), based upon Scenic and Cultural ORVs.

Tabeguache Creek, Segment 1 was found to be suitable for WSR designation, with a classification of *Wild.* Based on the recommendation of the RAC Subgroup, the segment was redelineated to begin at the USFS boundary and end one-quarter mile from private property. The classification complements existing protections in the area, including designation as a specially managed "area," and provides the BLM with an effective tool for managing the segment in support of the Vegetation ORV.

**Public Interest in Designation**
The segment received balanced support for and opposition to suitability, with supporters highlighting protection of the wild and natural values within the corridor and opponents expressing concern over impacts to private property and potential restrictions to use.

**Segment Assessment**

*Outstandingly Remarkable Value*

<u>Vegetation</u>
This segment contains a superior (A-ranked) occurrence of narrowleaf cottonwood/skunkbush sumac riparian woodland *(Populus angustifolia/Rhus trilobata)*, classified as vulnerable globally (G3). There is also a superior (A-ranked) occurrence of common sandbar willow/barren riparian shrubland *(Salix exigua/barren)*. The entire segment lies within the CNHP-designated San Miguel River at Tabeguache Creek Potential Conservation Area.

*Water Rights and Uses*
Water yield through the segment contributes to the proper hydrologic function of lower Tabeguache Creek and the lower San Miguel River downstream. An instream flow water right appropriation has been finalized for the segment. The instream flow would provide some protection to sustain the Vegetation ORV.

An irrigation diversion known as Skees Ditch was decreed for 1.92 cfs in 1939 by the State of Colorado, but no records are available indicating if and when it was constructed. A field assessment conducted by BLM personnel in May 2009 found no physical sign of a diversion or ditch. Although the Skees Ditch has not been developed, it is considered an absolute water right by Colorado and would be senior to both the pending state instream flow and any federal instream flow resulting from WSR designation.

BLM_0116267

Glencoe Ditch in the Tabeguache headwaters is presently decreed to divert up to 17 cfs, and would have seniority over any instream or federal water right established as part of WSR designation. Changing the diversion point on an existing water right within the segment could be limited in the future by any instream flow right associated with WSR designation.

There are no impoundments or conditional water rights within the segment. Diversions totaling 22.18 cfs are decreed upstream of this segment. Conditional water rights upstream of the segment include 2.0 cfs for diversion and 30 acre-feet for storage.

*Land Ownership and Uses*
A contiguous 3.7-mile upstream portion of Tabeguache Creek managed by the USFS is identified as eligible in the Proposed Land Management Plan for the Grand Mesa, Uncompahgre, and Gunnison National Forests (2007), based upon Scenic and Cultural ORVs.

Special Designations
This segment and the contiguous USFS segment are within the Tabeguache Area, an area withdrawn by Congress and managed to protect wilderness values. Due to the designation, the only foreseeable actions within the segment are likely to be BLM-proposed projects. Access is limited to non-mechanized and non-motorized use.

*Administration*
The source water area upstream of this segment is primarily managed by the USFS. Existing authorities provide adequate management capability to protect the streamflow and sustain the ORV.

WSR designation would be consistent with policies and authorities afforded by designation as a Special Management Area and would complement the BLM Colorado Public Land Health standard for riparian vegetation.

Tabeguache Creek contributes flow to the Lower San Miguel and Dolores Rivers, supporting habitat for native warm water fish. WSR designation would be consistent with actions in the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*.

Potential Costs Associated with WSR Designation
As a result of the suitability finding, the stream and corridor will be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Administrative costs associated with managing this segment for the Vegetation ORV would not likely increase much above current levels. The segment is remote, has limited access along undeveloped trails, and the riparian zone is completely under federal management, factors that assist in protecting the ORV. Additional facilities would not be needed if designated. A small amount of additional funding would be needed for signage, public education, ranger patrolling, and maintenance.

BLM_0116268

<u>Alternative Protective Measures Considered</u>
The existing Tabeguache Area congressional designation and a state-based instream flow water right provide  protection to sustain the Vegetation ORV. In addition, the watershed upstream of this segment is dominated by USFS lands also within the congressionally designated Area and having a state-based instream flow water right, both of which would aid in future management, administration, and preservation of the area.

### P.3.12  25: Lower Dolores River – Suitable Segment

*Classification:*  **Scenic**

*ORVs:*  **Scenic, Recreational, Geologic, Fish, Wildlife**

*Suitable Length:*  **4.2 miles**

*BLM-Administered:*  **4.2 miles**

*Key Considerations:*
- Flow through the segment is significantly diminished by the operation of McPhee Dam upstream.

- The segment contains a wide array of ORVs.

- The remaining suitable portion of the segment consists of BLM- administered public land with exceptional redrock canyon scenery.

The Lower Dolores River segment was found to be *suitable* for WSR designation, with a classification of *Scenic.* Based on recommendations of the RAC Subgroup, the segment was shortened from its eligible length to end at and exclude the private Weimer property. In addition, the corridor boundary was modified to protect mining claims and delineated on the east side by the highway and on the west side by natural topographic features such as the canyon rim.

### Public Interest in Designation
The segment received support for and moderate opposition to suitability, with supporters identifying the outstanding scenery and wild and natural setting and opponents (including the Montrose County Board of Commissioners) expressing concern over potential restrictions on historic and future uses of water and the corridor.

### Segment Assessment

*Outstandingly Remarkable Values*

<u>Scenic</u>
An interdisciplinary BLM field inventory team evaluated the area and assigned a *Scenic Quality Classification of A.* The following observations were derived from their field notes: A highly varied landscape marked by prominent cliffs, strong vertical relief and interesting erosional patterns, make the Dolores River a visually remarkable area. Exceptional views of adjacent scenery

BLM_0116269

complete the stunning scene. The colors in the area, consisting of greens, yellows, oranges, tans, reds, browns and grays, are rich and varied. Cultural modifications consist of power lines, a recreation site, and Colorado Highway 141 that do not detract greatly from the scenery.

From the mouth of the San Miguel River downstream to the confluence with Red Canyon, the river meanders through a narrow canyon bounded by sheer red rock walls. The scenic value created by the river flowing within the canyon is rare in the region of comparison. The section downstream from the confluence with Red Canyon opens to broken ledges and slopes, and does not merit the same outstandingly remarkable scenic quality.

Recreational
This section of the Dolores River provides exceptional opportunities for sightseeing and photography along the Unaweep-Tabeguache Byway. The byway is marketed to visitors from within Colorado, out of state, and internationally by the Unaweep-Tabeguache Byway Committee and by the Colorado Office of Tourism. This section of the byway focuses on the Dolores River and its associated historic sites and surrounding landscape. The river provides extraordinary opportunities for rafting, kayaking and canoeing in a spectacular redrock canyon. With only a handful of comparable opportunities spread across the entire Colorado Plateau, this is an outstanding section of water.

Geologic
The Dolores River has a well-defined entrenched meander channel pattern through this area, with exposures of Triassic-age Chinle, Wingate, and Kayenta formations. The river has been superimposed upon the Colorado Plateau geology as the region has undergone uplifting. Initially the river established a meandering pattern and as the area rose, the river cut down in this channel until the pattern became well entrenched. Now the river cannot easily cut across the meander bends to create oxbow lakes, as many unentrenched rivers do. Over time, as the river downcuts, it exposes underlying rock formations, usually in the form of resistant redrock sandstone cliffs. The Chinle, Wingate, and Kayenta formations all exhibit this cliff-forming erosional characteristic.

Fish
This segment harbors exemplary populations of three BLM and Colorado sensitive species: flannelmouth suckers (*Catostomus latipinnis*), bluehead suckers (*Catostomus discobolus*), and roundtail chubs (*Gila robusta*). In addition, this segment was historically occupied by Colorado pikeminnow (*Ptychocheilus lucius*), a federally endangered species.

Wildlife
This river segment provides exceptionally high quality habitat for peregrine falcons (Falco peregrinus), and is considered a regionally important area for this rare BLM sensitive species. In 1999, the peregrine was delisted from threatened status under the Endangered Species Act. The BLM monitors the status of peregrine populations to ensure their continued recovery. Peregrine falcons are closely associated with steep-walled canyons and often nest near perennial water sources that support prey populations such as waterfowl, songbirds, and shorebirds. Peregrine pairs were observed along this segment as recently as 2008 and 2009, and breeding/nesting activity has been confirmed along this segment. Several established peregrine territories also occur in the vicinity.

BLM_0116270

*Water Rights and Uses*

Water yield through the segment contributes to the proper hydrologic function of the Lower Dolores River downstream (within the Grand Junction Field Office). There is no instream flow water right protection on the segment. An instream flow right associated with WSR designation could restrict the ability to change points of diversion on existing water rights within the segment.

There are no conditional water rights or impoundments within the segment. Two small diversions along the lower reaches of the segment do not detract from the natural character of the river.

Flow through the segment is greatly diminished by the operation of the McPhee Dam upstream. A large portion of natural water yield entering the reservoir is transferred out of the basin, primarily for agricultural uses. Water rights associated with the McPhee Reservoir are senior to the instream flow water right on the downstream reach.

Most future water demand will be met through conservation practices and development of existing water rights. According to the 2004 Statewide Water Supply Initiative, between 400,000 and 500,000 acre-feet of conditional storage water rights upstream throughout the San Miguel and Upper Dolores basins predate any future state or federal instream flow right. As rights are perfected to meet future water demand, flows through the segment could be diminished. Additional water developments for uses such as irrigation are likely to increase along with the growing population.

The 2004 Statewide Water Supply Initiative identified reservoir sites on Beaver Creek and Plateau Creek flowing into the McPhee Reservoir that could be operated to increase flows in the Dolores River below the McPhee Reservoir. Beaver Creek and Plateau Creek reservoir sites are a high priority for the Southwest Basins Roundtable of Colorado Interbasin Compact Committee.

*Land Ownership and Uses*

<u>ROWs and Withdrawals</u>

ROWs within the segment include telephone lines, powerlines, a highway, county roads, private access roads, and a gravel pit.

While public lands adjacent to the river are withdrawn to the Department of Energy as a potential Power Site, the Powersite classification does not preclude WSR designation.

<u>Energy and Mineral Leasing</u>

There are existing oil and gas leases within the segment. Active mining claims occur within the corridor and have prior existing right to mineral deposits.

*Administration*

Because of limited unappropriated water, it is unlikely that the high flows needed to sustain recreational activities could be secured through WSR designation.

BLM_0116271

Managing this segment to sustain native warm water fish is consistent with actions in the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*.

WSR designation would complement BLM Colorado Public Land Health standards for special status species and wildlife.

The BLM Grand Junction Field Office has identified the Dolores River segments within its jurisdiction as eligible, but will not make any decisions regarding suitability until its draft resource management plan is published.

Potential Costs Associated with WSR Designation

As a result of the suitability finding, the stream and corridor will be managed to protect the ORVs, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

The costs for administering and managing this segment for the Scenic, Recreational, Geologic, Fish, and Wildlife ORVs would be substantially higher than current funding levels. The lower portion of this segment is paralleled by State Highway 141, providing diffuse access points to this portion of the river corridor. If designated, the potential increase in visitor use, especially in the lower portion of the corridor, would require additional funding for facilities, public education, signage, additional weed control, and ranger patrolling. Visitor use in the upper portion of the segment would be limited to mostly river-based recreation activities which would require a small amount of additional funding for maintenance and primitive camp and day use site development.

If purchased from willing sellers, private land parcels within the corridor would have added value for ORV protection.

Alternative Protective Measures Considered

Warm water fish would receive protection by acquiring a state-based instream flow water right for this segment.

The Visual Resource Management classification of the segment could be upgraded to protect the Scenic ORV.

The Hanging Flume receives protection through listing on the National Register of Historic Places.

BLM_0116272

### P.3.13  27: Dolores River, Segment 2 – Suitable Segment

*Classification:*  **Recreational**

*ORVs:*  **Scenic, Recreational, Geologic, Fish, Wildlife, Vegetation**

*Suitable Length:*  **5.3 miles**

*BLM-Administered:*  **5.3 miles**

*Key Considerations:*
- A series of alluvial water wells adjacent to the river are managed by the BOR as part of the Paradox Valley Unit, Salinity Control Project.

- The segment contains a wide array of ORVs.

- The upstream portion of the segment is dominated by private land, while the downstream portion is comprised primarily of public land with little development.

- A stream flow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community for this segment might only be achieved through WSR designation.

Based upon providing protection for the numerous and varied ORVs, the 5.3-mile downstream public land portion of Dolores River, Segment 2 was found to be *suitable* for WSR consideration, with a classification of *Recreational*. Suitability was not supported for the 6.2-mile private land portion upstream. In addition, the protective corridor was modified to exclude the Buck Shot Mine and associated ROW and to follow the cliff line if less than one-quarter mile from the river center.

*Public Interest in Designation*
The segment received much support for and moderate opposition to suitability, with supporters identifying the segment as the core of a regionally important river and opponents (including the Montrose County Board of Commissioners) expressing concern over potential restriction of water rights.

*Segment Assessment*

*Outstandingly Remarkable Values*

Scenic
An interdisciplinary BLM field inventory team evaluated the area and assigned the lower portion of this segment from where the river leaves the Paradox Valley downstream to the mouth of the San Miguel River a *Scenic Quality Classification of A*. The following observations were derived from field notes:  A highly varied landscape marked by prominent cliffs, strong vertical relief, and interesting erosional patterns, make the Dolores River a visually remarkable area. Exceptional views of adjacent scenery complete the stunning scene. Spectacular landforms, water, and vegetation of rich and varied color combine to create one of the most dramatic canyons in

BLM_0116273

Western Colorado. A small, dirt road paralleling the river in the lower section detracts only minimally from the scenic quality.

Recreational

When releases from McPhee Dam allow, the lower five miles of this reach offer rare and outstanding opportunities for rafting, kayaking, and canoeing in a deep, meandering redrock canyon. With only a handful of rivers on the Colorado Plateau possessing such qualities, the Dolores River attracts boaters from across the western United States.

Geologic

The Paradox Basin is a northwest, southeast trending geologic structural anticline that has at its core the Pennsylvanian-age Paradox Formation, a halitic evaporite. Over time, water has partially dissolved the salt core, causing the axis of the anticline to collapse and creating a valley with walls that dip away in either direction. The Dolores River has carved a channel across and perpendicular to this collapsed valley, forming the geological paradox for which the valley is named.

After traversing the Paradox Valley and exiting toward the north, the Dolores River follows a well-defined and exemplary entrenched meander channel. Initially the slow-moving river established its meandering pattern. As the Colorado Plateau uplifted, the accelerated flow continued to downcut within this same channel until the pattern became entrenched. Now the river cannot easily cut across these meander bends to form oxbow lakes, as many unentrenched rivers do. As the river carves slowly downward through Triassic-age strata of the Chinle Group, Wingate Sandstone, and Kayenta Formation, it exposes resistant red sandstone cliffs.

Fish

This river segment supports populations of three BLM and Colorado sensitive species: flannelmouth suckers *(Catostomus latipinnis)*, bluehead suckers *(Catostomus discobolus)*, and roundtail chubs *(Gila robusta)*. In addition, this segment was historically occupied by Colorado pikeminnow *(Ptychocheilus lucius)*, a federally endangered species.

Wildlife

This river segment provides exceptionally high quality habitat for peregrine falcons *(Falco peregrinus)*, and is considered a regionally important area for this rare BLM sensitive species. In 1999, the peregrine was delisted from threatened status under the Endangered Species Act. The BLM monitors the status of peregrine populations to ensure their continued recovery. Peregrine falcons are closely associated with steep-walled canyons and often nest near perennial water sources that support prey populations such as waterfowl, songbirds, and shorebirds. Peregrine breeding/nesting activity has been confirmed along this segment. Active territories and nests occur within this reach. In addition, the BLM sensitive canyon treefrog *(Hyla arenicolor)* occupies portions of this stretch.

Vegetation

This segment contains areas of New Mexico privet riparian shrubland *(Forestiera pubescens)*, which is classified as globally imperiled (G2).

BLM_0116274

*Water Rights and Uses*
Water yield through the segment contributes greatly to the proper hydrologic function of the Lower Dolores River downstream. The CWCB holds a year-round 78 cfs instream flow water right along the entire segment, structured to protect the natural environment to a reasonable degree, which also provides some protection to sustain the ORVs.

There are no conditional water rights within the segment. The only withdrawals are a series of alluvial wells along the corridor that are operated as part of Paradox Valley Unity, Deep Well Injection Salinity Control Project.

Flow is greatly diminished by the operation of the McPhee Dam upstream. A large portion of natural water yield entering the reservoir is transferred out of the basin, primarily for agricultural uses. Water rights associated with McPhee are senior to the instream flow water right.

The 2004 Statewide Water Supply Initiative identifies potential dam sites on Beaver Creek and Plateau Creek that flow into McPhee Reservoir and could be operated to increase flows below McPhee Reservoir. The Beaver Creek and Plateau Creek sites are a high priority for the Southwest Basins Roundtable of the Colorado Interbasin Compact Committee.

According to the initiative, most future water demand would come from conservation practices and development of existing water rights, including some 141,000 acre feet of conditional water rights in the basin. Many conditional rights are senior to both existing instream flow water rights and any instream flow resulting from WSR designation.

*Land Ownership and Uses*

ROWs and Withdrawals
BLM ROWs within the corridor include a Montrose County road, telephone and powerlines, and the Bureau of Reclamation Paradox Valley Salinity Control Project, including an evaporative salt disposal pond.

While portions of the segment are within an area classified as having Waterpower and Reservoir Resources, the Powersite Classification does not preclude WSR designation.

Energy and Mineral Resources
There are existing oil and gas leases within the segment. Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

*Administration*
A streamflow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community for this segment might only be achieved through WSR designation.

A Montrose County road located within the corridor may need to be upgraded and enlarged in the future.

BLM_0116275

Potential Costs Associated with WSR Designation

As a result of the suitability finding, the stream and corridor will be managed to protect the ORVs, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs associated with administering and managing this segment for the Scenic, Recreation, Geologic, Fish, Wildlife, and riparian Vegetation ORVs would be moderately to much higher than current funding levels. With easy access to the river corridor provided by the paralleling county road, visitor use would be expected to increase if designated. Additional funding would likely be needed for facilities and increased weed control.

A county road currently infringes on the stream channel and riparian zone along portions of this reach. With future county plans to possibly widen the road, costly measures would need to be employed to avoid additional impacts to the river corridor.

Alternative Protective Measures Considered

The current state-based instream flow water right for 78 cfs provides limited protection for the ORVs.

The Dolores River Working Group is proposing that the area be designated as a National Conservation Area.

The area is being proposed as a Special Recreation Management Area in one RMP alternative and as an Extensive Recreation Management Area in the preferred alternative. In addition, portions of the corridor are being proposed as an ACEC in one alternative.

### P.3.14  30: La Sal Creek, Segment 2 – Suitable Segment

*Classification:* **Recreational**

*ORVs:* **Fish, Vegetation**

*Suitable Length:* **3.3 miles**

*BLM-Administered:* **3.3 miles**

*Key Considerations:*
- A stream flow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community might only be achieved through WSR designation.
- Both the river segment and corridor consist primarily of public lands.

La Sal Creek, Segment 2 was found to be *suitable* for WSR consideration, with a classification of *Recreational*. Based on recommendations from the RAC Subgroup, the eligibility classification was changed from *Scenic* to *Recreational* in order to accommodate potential future mining

BLM_0116276

activities and road improvements and the segment length was reduced to end at and exclude the Cashin Mine.

**Public Input**
The segment received much support for and limited opposition to suitability, with supporters highlighting the healthy riparian ecosystem and opponents (including the Montrose County Board of Commissioners) expressing concern over potential restriction of water and mining uses.

**Segment Assessment**

*Outstandingly Remarkable Values*

Fish
This segment harbors exemplary populations of three BLM and Colorado sensitive species: flannelmouth suckers *(Catostomus latipinnis)*, bluehead suckers *(Catostomus discobolus)*, and roundtail chubs *(Gila robusta)*. This is one of a very few spawning tributaries for these species within the Dolores River Basin. The segment is largely intact, with native fish predominant over introduced species, and includes populations of native speckled dace *(Rhinichthys osculus)* and mottled sculpin *(Cottus bairdii)*.

Vegetation
The entire length of this segment supports boxelder/river birch riparian woodland *(Acer negundo/Betula occidentalis)*, which is currently ranked as globally imperiled (G2). The segment is included within the CNHP-designated La Sal Creek Potential Conservation Area.

*Water Rights and Uses*
Water yield through the segment contributes to the proper hydrologic function of Lower La Sal Creek downstream.

The CWCB holds an instream flow water right along the entire segment decreed for 3 cfs (from December 15 to March 14), 5.1 cfs (from March 15 to June 14), and 1.2 cfs (from June 15 to December 14) and structured to protect the natural environment to a reasonable degree. The flow would also provide some protection to sustain ORVs by limiting future water right actions within and upstream of the segment.

No absolute or conditional water rights occur within the segment. No impoundments occur within or upstream of the segment to the Colorado-Utah state line. Four ditch diversions are located upstream of the segment within La Sal Creek, Segment 1.

*Land Ownership and Uses*
The suitable portion of the corridor consists of BLM-administered public land.

ROWs
Numerous BLM ROW authorizations cross or run adjacent to the creek, including transmission powerlines, telephone lines, a CDOT highway, and a Montrose County road.

BLM_0116277

Energy and Mineral Resource

There are existing oil and gas leases within the segment. Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

*Administration*

WSR designation would complement BLM Colorado Public Land Health standards for riparian vegetation and special status species.

A streamflow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community might only be achieved through WSR designation.

Potential Costs Associated with WSR Designation

As a result of the suitability finding, the stream and corridor will be managed to protect the ORVs, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs for administering and managing this segment for the Recreation, Fish, and riparian Vegetation ORVs would be moderately higher than current funding levels. With easy access to the river corridor provided by a parallel-running county road, visitor use would be expected to increase if designated. Thus, additional funding would be needed for facilities, public education, signage, ranger patrolling, and maintenance.

Alternative Protective Measures Considered

The current state-based instream flow water right provides for some protection of the Fish and Vegetation ORVs.

An area encompassing the segment is being considered for ACEC designation in one RMP alternative.

**P.3.15   31: La Sal Creek, Segment 3 – Suitable Segment**

***Classification:*** **Wild**

***ORVs:*** **Scenic, Recreational, Fish, Cultural, Vegetation**

***Suitable Length:*** **3.4 miles**

***BLM-Administered:*** **3.4 miles**

***Key Considerations:***

- The entire segment is comprised of public land within the Dolores River Canyon Wilderness Study Area, facilitating effective management.

- The segment contains a wide array of ORVs.

BLM_0116278

- A stream flow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community within the segment might only be accomplished through WSR designation.

La Sal Creek, Segment 3 was found to be *suitable* for WSR designation, with a classification of *Wild*. The segment was reclassified due to the pristine, wild, and remote character of the area and the critical habitat the creek provides for warm water fish.

**Public Input**
The segment received considerable support for and limited opposition to suitability, with supporters highlighting protection of healthy riparian and aquatic ecosystems and opponents (including the Montrose County Board of Commissioners) expressing concern over potential restriction of water and mining uses.

**Segment Assessment**

*Outstandingly Remarkable Values*

Scenic
An interdisciplinary BLM field inventory team evaluated the area and assigned a *Scenic Quality Classification of A*. The following observations were derived from their field notes: Massive rock outcrops and prominent cliffs are the stunning qualities of the La Sal Creek area. The creek flows constant and swift. The rocks and box elder-river birch vegetation create an area of strong contrasts in color and relief consisting of greens, reds, yellows, oranges, grays, and browns. This area is visually exceptional and was determined to be rare within the region.

Recreational
This narrow, deeply incised, and tightly meandering canyon provides superior opportunities for hiking, wildlife observation, nature study, and photography in a high quality, primitive, densely vegetated riparian setting. BLM specialists have observed abundant signs of game species and large predators. The upper end of the segment can be reached by rough four-wheel drive road, while the lower end is accessible by boaters hiking up from the Dolores River.

Fish
This segment harbors exemplary populations of three BLM and Colorado sensitive species: flannelmouth suckers *(Catostomus latipinnis)*, bluehead suckers *(Catostomus discobolus)*, and roundtail chubs *(Gila robusta)*. The segment is one of only a very few spawning tributaries for these three species in the Dolores River Basin. In addition, this river segment supports two other native fishes: speckled dace *(Rhinichthys osculus)* and mottled sculpin *(Cottus bairdii)*.

Cultural
Several large and significant petroglyph panels are located at the junction of La Sal Creek and the Dolores River. These panels represent cultural expressions ranging from Archaic hunting motifs dating from as early as 4,000 years ago to late period Anasazi figures from around AD 1000. These petroglyph panels have been recorded and evaluated as being eligible for nomination to the National Register of Historic Places under *Criteria C* and *D*.

BLM_0116279

Vegetation
This segment contains boxelder/river birch riparian woodland *(Acer negundo/Betula occidentalis)* along its entire length, which is currently ranked as globally imperiled (G2). The segment is included within the CNHP-designated La Sal Creek Potential Conservation Area.

*Water Rights and Uses*
Water yield through the segment contributes greatly to the proper hydrologic function of the Dolores River downstream.

The CWCB holds an instream flow water right along the entire segment, structured to protect the natural environment to a reasonable extent. The water right is decreed for 3 cfs (from December 15 to March 14), 5.1 cfs (from March 15 to June 14), and 1.2 cfs (from June 15 to December 14), providing some protection to sustain the ORVs by limiting future water right actions within and upstream of the segment.

No absolute or conditional water rights occur in the segment. No impoundments occur within or upstream of the segment to the Colorado-Utah state line. Four ditch diversions occur upstream of the segment within La Sal Creek, Segment 1.

*Land Ownership and Uses*
All surrounding federal lands are within the Dolores River Canyon WSA.

Approximately 0.9% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the General Agriculture Zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

WSR designation would complement BLM Colorado Public Land Health standards for riparian vegetation and special status species.

Special Designations
The entire segment is located within the Dolores River Canyon WSA. While the WSA affords interim protection for the ORVs, the designation is transitory and should not be relied upon for enduring protection.

ROWs and Withdrawals
There are no known ROWs within the segment.

While portions of the segment are within an area classified as having Waterpower and Reservoir Resources the Powersite Classification does not preclude WSR designation.

Energy and Mineral Resources
Because of the WSA designation, BLM-proposed projects are likely to constitute the only foreseeable development within the segment. Although lands under wilderness review continue to be subject to location under federal mining laws, location methods and subsequent

BLM_0116280

assessment work are restricted to operations determined as meeting BLM non-impairment criteria.

*Administration*
A streamflow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community might only be accomplished through WSR designation.

<u>Alternative Protective Measures Considered</u>
The existing state-based instream flow water right is sufficient to sustain the warm water fishery, but may not be adequate for long-term sustainability of the Vegetation ORV.

The entire segment is located within the Dolores River Canyon WSA. The WSA designation affords some protection for the ORVs in accordance with the Interim Management Policy for Lands under Wilderness Review (H-8550-1).

<u>Potential Costs Associated with WSR Designation</u>
As a result of the suitability finding, the stream and corridor will be managed to protect the ORVs, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs for administering and managing this segment for the Scenic, Recreational, Fish, Cultural, and riparian Vegetation ORVs would be similar to slightly higher than current funding levels. The stream corridor is totally within the Dolores River Canyon WSA, is very remote and accessible only by an unmaintained non-motorized, non-mechanized trail, factors that assist in protection of the ORVs. The BLM presently incurs some costs in this area associated with implementing the Interim Management Policy for Lands under Wilderness Review. However, additional visitor use associated with WSR designation could generate the need for funding to develop staging facilities to support primitive recreation opportunities, signage, public education, ranger patrolling, and maintenance.

### P.3.16  34: Dolores River, Segment 1 – Suitable Segment

**NOTE:**  The identification of ORVs and eligibility determination for this segment were made by the BLM Dolores Field Office.

*Classification:*  **Wild**

*ORVs:*  **Recreation, Scenery, Fish, Wildlife, Geology, Ecology, Archaeology**

*Suitable Length:*  **8.7 miles**

*BLM-Administered:*  **8.7 miles**

*Key Considerations:*
- A wide array of ORVs occurs within the segment.

BLM_0116281

- A stream flow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community for the segment might only be secured through WSR designation.

- The segment is within the Dolores River Canyon Wilderness Study Area (WSA).

The portion of Dolores River, Segment 1 classified as *Wild* by the BLM Dolores Field Office was found to be *suitable* for WSR designation, while the northernmost downstream portion classified as *Recreational* was excluded from the segment in order to circumvent mining operations. The segment was shortened to begin at the UFO boundary and terminate at the private land boundary south of Bedrock, and the corridor was redelineated to extend from rim to rim or one-quarter mile from the high water mark (whichever measure is less). The suitability finding complements the Wilderness Study Area designation and is consistent with WSR findings for portions of the Dolores River outside of the UFO.

### Public Input
The segment received balanced support for and opposition to suitability, with supporters highlighting the segment's significance in relation to both upstream and downstream portions of the Dolores, and opponents siting potential future access and development issues associated with designation.

### Segment Assessment

*Outstandingly Remarkable Values*
The following ORV descriptions are derived from page D-16 of the *San Juan Public Lands Draft Land Management Plan, Appendix D.*

Recreation and Scenery
This section of the Dolores contains Class II, III, and IV rapids and is listed as one of the most popular and beautiful rafting areas in Southwest Colorado. The river flows through a wild and deep canyon that combines red sandstone cliffs with coniferous forests.

Based on observations of actual use and interviews with regional recreation providers, the segment is regionally important for boating recreation, and is listed in the Nationwide Whitewater Inventory, American Whitewater, 2006 (although it is more of a scenic float trip than a whitewater experience).

Fish and Wildlife
This section of the Dolores contains occupied habitat for roundtail chub *(Gila robusta)*, considered a sensitive species by the BLM and State of Colorado.

The segment also contains a population of canyon treefrog *(Hyla arenicolor)*, considered rare or imperiled within the state and listed by the state as a species of special concern. Canyon treefrogs occur along streams in deep rocky canyons and breed in canyon bottom pools, often bounded by solid rock. Although most active at night, they can be found resting in small depressions in solid rock near pools of water during the day.

BLM_0116282

Geology
Dramatic Cretaceous sandstone cliffs throughout the canyon, and in some areas the geology has confined the canyon to a uniquely persistent linear and angular form. The northerly flow of this river is rare within the region of comparison, and documents the uplift of the Colorado Plateau and the subsidence of the adjacent Paradox Basin. These two geological events also determine the unusual gradient of the river. The penetration of the river through the hard caprock of the present-day cliffs and the linear flow pattern of the canyon demonstrate the unusual rapidity of tectonic processes in the area and the speed of the corresponding downward cutting of the river, which in turn documents the geologic-timescale history of water supply in Southwest Colorado.

Ecology
The segment contains New Mexico privet *(Forestiera pubescens)*, which is currently ranked as extremely rare or imperiled globally, and the BLM-sensitive Eastwood's monkeyflower *(Mimulus eastwoodiae)*, ranked S1 (critically imperiled within Colorado).

Archaeology
Several rare and exemplary prehistoric archaeological sites are preserved immediately adjacent to the Dolores River between McPhee Reservoir and the small town of Bedrock. The sites range from Anasazi pueblos such as Mountain Sheep Point Village and the Kayenta House cliff dwelling to sacred sites such as the rock art panel at the mouth of Bull Canyon. These archaeological sites evince at least 11,000 years of inextricable connection between the Dolores River and the area's human inhabitants.

*Water Rights and Uses*
Water yield through the segment contributes greatly to the proper hydrologic function of the Lower Dolores River downstream. The CWCB holds a year-round 78 cfs instream flow water right along the entire segment, structured to protect the natural environment to a reasonable extent. The instream flow would also provide some protection to sustain the ORVs.

One pump diversion within the segment is located near the lower terminus. There are no conditional water rights within the segment.

The 2004 Statewide Water Supply Initiative identifies reservoir sites on Beaver Creek and Plateau Creek with flows into McPhee Reservoir that could be operated to increase flow in the Dolores River below McPhee Reservoir. The reservoir sites are a high priority for the Southwest Basins Roundtable of Colorado Interbasin Compact Committee. The report also identifies potential dam sites on the Dolores River in Paradox Valley and Slickrock, Colorado.

Flow through the segment is greatly diminished by the operation of McPhee Reservoir upstream. A large portion of natural water yield entering the reservoir is transferred out of the basin, primarily for agricultural use. Water rights associated with the reservoir are senior to an instream flow water right downstream.

According to the 2004 Statewide Water Supply Initiative, most future water demand will come from conservation practices and development of existing water rights, including some existing

141,000 acre-feet of conditional water rights in the basin. Many of these are senior to both the existing instream flow water right and any instream flow associated with WSR designation.

*Land Ownership and Uses*

Special Designations
The segment is located within the Dolores River Canyon WSA, as well as a Special Recreation Management Area. While the WSA affords some interim protection for the ORVs, neither designation provides the authority to acquire flows necessary for sustaining the Ecology ORV.

Rights-of-Way and Withdrawals
While portions of the segment are within an area classified as having Waterpower and Reservoir Resources the Powersite, classification does not preclude WSR designation.

Energy and Mineral Resources
Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

*Administration*
WSA designation limits access to the segment. WSR designation would complement BLM Colorado Public Land Health standards for special status species and wildlife.

Managing the segment to sustain native warm water fish is consistent with actions in the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*.

Potential Costs Associated with WSR Designation
As a result of the suitability finding, the stream and corridor will be managed to protect the ORVs, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs for administering and managing this segment for the Recreation, Scenery, Wildlife, Geology, Ecology, and Archeology ORVs would be similar to or slightly higher than current funding levels. The segment is within the Dolores River Canyon WSA, with access limited to a single track non-motorized, non-mechanized trail, factors that assist in protection of the ORVs.

The BLM presently incurs some costs on this area to implement the Interim Management Policy for Lands under Wilderness Review. However, additional visitor use resulting from WSR designation could generate the need for funding to develop staging facilities to support primitive recreation opportunities.

Alternative Protective Measures Considered
The segment is within the proposed Dolores River Slickrock Canyon ACEC, being considered during development of the Uncompahgre RMP.

BLM_0116284

The segment is located within the Dolores River Canyon WSA, as well as a Special Recreation Management Area. The WSA designation affords some protection for the ORVs in accordance with the Interim Management Policy for Lands Under Wilderness Review (H-8550-1).

If the stream is designated into the NWSRS, future ROW applications on BLM lands for would include terms and conditions to protect the ORVs.

## P.4    NOT SUITABLE SEGMENTS: ASSESSMENT AND SUITABILITY DETERMINATION

### P.4.1    5: Gunnison River, Segment 2 – Not Suitable

*Classification:* **Recreational**

*ORV:* **Fish**

*Eligible Length:* **0.41 miles**

*BLM-Administered:* **0.41 miles**

*Key Considerations:*
- The southern bank of the river corridor is largely private land, and includes a dominant flood flow channel, which could eventually pirate the existing channel.
- Existing BLM authorities and agreements, along with the Endangered Species Act (ESA), provide effective management and river flow to protect and sustain the ORV.

Gunnison River, Segment 2 was found to be *not suitable* for WSR designation due to the short length of the segment, as well as the lack of exemplary habitat and spawning ground for the endangered fish species for which the Fish ORV was assigned.

### Segment Assessment

*Water Rights and Uses*
No absolute or conditional water rights or impoundments occur in this segment. The segment has no instream flow water right protection. Flows derive primarily from:

- Required deliveries to downstream senior water rights.
- Upstream water releases from three in-channel reservoirs of the Bureau of Reclamation (BOR) Colorado River Storage Project Aspinall Unit.

An instream flow water right upstream through the Black Canyon of the Gunnison National Park and the Gunnison Gorge National Conservation Area helps ensure flow through the segment. A portion of water conveyed through this segment is made as part of the Upper Colorado River Endangered Fish Recovery Program (according to personal communication with Patty Gelatt of the U.S. Fish and Wildlife Service, Grand Junction, CO dated 9/20/2010).

Delta Water Works Department has an alternate point of diversion for 2.40 cfs just downstream from the lower terminus.

BLM_0116285

According to the Statewide Water Supply Initiative (2004), future water demand and development in the Gunnison Basin and within the Lower Colorado River Basin has the potential to affect the flow regime of the Gunnison River. Additionally, the initiative identified several future potential dam sites upstream of the segment which could influence the river's flow regime (including Union Park, Gateview, Gates, Almont, and Lamm reservoirs).

The south bank of the river is largely private land and includes a dominant flood flow channel, which in the future could pirate the existing channel.

*Land Ownership and Uses*
Delta County zoning for private lands in the corridor does not ensure land uses compatible with designation. Delta County has no land use zoning to ensure development compatible with designation on private portions of the river corridor (according to personal communication with David Rice, Delta County Planner, 9/29/2010). However, change of use approval is needed by the county to convert existing agricultural lands to commercial or industrial development.

Special Designations
The proposed segment is within the North Delta OHV area.

Rights-of-Way (ROWs)
ROWs include a Delta County road. All future private water right and ROW applications should include BLM terms and conditions to protect the Fish ORV.

Energy and Mineral Leasing
There are no existing oil and gas leases or mining claims within the segment.

*Administration*
Both the instream flow water right through the Black Canyon of the Gunnison National Park and Gunnison Gorge National Conservation Area and releases from the Aspinall Unit in support of the Colorado River Endangered Fish Recovery Program provide flows to sustain native fish populations.

Potential Costs Associated with WSR Designation
The costs for administering and managing this segment for the fish ORV would not increase much above current funding levels. Federal protections exist for the target fish species under the Endangered Species Act which would continue with or without designation. Private land acquisition would not be needed since the entire fish habitat (river channel) is under federal management. There would be no additional facilities needed to provide protection for the ORV. A small amount of additional funding would be needed for signage, public education, ranger patrolling, and maintenance.

Alternative Protective Measures Considered
Potential management mechanisms considered by the BLM include:

- Intensive travel management.

- Designation as a Special Recreation Management Area.

BLM_0116286

- Tributary watershed management activities to reduce sediment, salinity, and selenium loading to the Gunnison River.

### P.4.2   11: Roubideau Creek, Segment 2 – Not Suitable

*Classification:* **Scenic**

*ORVs:* **Wildlife, Vegetation** (not supported following review)

*Eligible Length:* **7.6 miles**

*BLM-Administered:* **3.5 miles**

*Key Considerations:*
- Private land is consolidated into two parcels at the upper terminus and approximately one half mile upstream of the lower terminus.

- A stream flow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community might only be achieved through WSR designation.

Roubideau Creek, Segment 2 was found to be *not suitable* for WSR designation. Following a review by the CNHP that lowered the rarity ranking of the Fremont cottonwood/skunkbush sumac plant community to G3, the segment no longer possesses a Vegetation ORV and the remaining Wildlife ORV could not be adequately substantiated. In addition, the BLM manages less than 50% of the land within the corridor.

**Segment Assessment**

*Water Rights and Uses*
There are no absolute or conditional water rights or impoundments within this segment. The CWCB holds an instream flow water right structured to protect the natural environment to a reasonable extent. The water right is decreed for 1.8 cfs (from March 1 to March 31), 4 cfs (from April 1 to June 15), 1.8 cfs (from June 16 to July 31), and 1.4 cfs (from August 1 to February 28). The instream flow provides some protection to sustain the ORVs. A streamflow regime that mimics natural seasonal flow changes necessary for sustaining a healthy riparian vegetation community in this segment might only be achieved through federal designation.

In the headwaters, a water diversion known as Spruce Spring Ditch decreed for up to 9.3 cfs transfers water from Roubideau Creek to the Dry Creek drainage (typically limited to the snowmelt period). The diversion diminishes spring and early summer flow through the segment.

*Land Ownership and Uses*
Approximately 19.4% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the General Agriculture Zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

BLM_0116287

ROWs
ROWs crossing the segment include a county road, Tri-State transmission lines, and a Transco gas pipeline.

Energy and Mineral Leasing
There are no existing oil and gas leases or mining claims within the segment.

*Administration*
Reducing the segment length to omit private land would reduce potential manageability issues.

WSR designation would complement BLM Colorado Public Land Health standards for riparian and wildlife.

Alternative Protective Measures Considered
The segment is within two potential Areas of Critical Environmental Concern being considered during development of the Uncompahgre RMP.

The current state-based instream flow water right provides some support for general vegetation and wildlife values.

### P.4.3   12: Deep Creek – Not Suitable

*Classification:* **Scenic**

*ORV:* **Fish**

*Eligible Length:* **2.6 miles**

*BLM-Administered:* **0.6 miles**

*Key Considerations:*
- Senior upstream water diversions greatly deplete the stream flow.
- The Fish ORV could be protected through a state instream flow water right.
- Approximately 0.58 mile of the stream channel is managed by the BLM, while the remaining 1.97 miles are private.

Deep Creek was found to be *not suitable* for WSR designation due to the short portion of the segment managed by the BLM, as well as the intermittent flow of the creek.

**Segment Assessment**

*Water Rights and Uses*
There are no absolute or conditional water rights or impoundments within the segment. Four diversions above the upper terminus are used for irrigation, livestock, and domestic purposes. The diversions greatly deplete the streamflow, especially during irrigation season. Much of the natural flow, as well as water from an adjoining drainage, is used for irrigation upstream of the upper terminus, greatly diminishing flow through the segment.

BLM_0116288

The Fish ORV could be protected without WSR designation through a state instream flow water right. This segment currently has no water right protection.

*Land Ownership and Uses*
Approximately 84% of the corridor is private land within Gunnison County. While there is no land use zoning, the county does have an administrative review and approval process for land use changes. While proposed residential and agricultural related facilities typically do not require a permit, more substantive changes require a permit as well as administrative review. Gunnison County *Standards for Approval of Administrative Review Projects* states that:  The proposed land use change shall be compatible with, or an enhancement of, the character of existing land uses in the area, and shall not adversely impact the future development of the surrounding area.

ROWs
BLM ROW authorizations crossing or briefly running adjacent to the creek include telephone and distribution power lines, private access roads, and an historic ditch.

Energy and Mineral Resources
Lands within the segment have known high potential for oil, gas, and coal development. There are no existing oil and gas leases or mining claims.

*Administration*
WSR designation would have limited potential to adequately protect the segment, as any federal water right associated with designation would be junior to existing water rights. While a state instream flow water right would protect the Fish ORV, it could require the purchase, lease, or donation of water to achieve adequate flow rates.

Any new water right application on public lands within the segment should contain BLM conditions to ensure compliance with the intent of the WSR Act and Endangered Species Act.

Alternative Protective Measures Considered
If not designated, the BLM recommends that protective language be included in the Uncompahgre RMP to ensure that no additional impacts to streamflow quantity and quality occur on public lands within the segment.

### P.4.4   13: West Fork Terror Creek – Not Suitable

*Classification:* **Scenic**

*ORV:* **Fish**

*Eligible Length:* **1.2 miles**

*BLM-Administered:* **0.5 miles**

*Key Considerations:*
- The Fish ORV could be protected through a state instream flow water right.
- The segment is within an area with high potential for coal development.

BLM_0116289

- Because the public land portion of the segment is comprised of two short reaches, one of which is bracketed by private lands, the land configuration could be difficult to manage.

- There is significant public opposition to WSR designation of this segment.

West Fork Terror Creek was found to be n*ot suitable* for WSR designation due to the predominance of private land within the segment and uncertainty regarding whether the threatened Greenback Cutthroat Trout occurs within the segment.

### Segment Assessment

*Water Rights and Uses*
There are no absolute or conditional water rights or impoundments within the segment. The Overland Ditch upstream of the segment diverts 75 cfs for irrigation, and three diversions downstream of the lower terminus create water demand through the segment during the irrigation season.

There is no instream flow water right protection on the segment. There is a conditional water right upstream of the upper terminus for 50 cfs, which could greatly deplete flow during the irrigation season if perfected. This water right has a low probability of being developed (based upon personal communication with Colorado Division of Water Resources, Division 4 Water Commissioner Stephen Tuck).

*Land Ownership and Uses*
Over 52% of the corridor consists of private land in Delta County. While Delta County has no land use zoning to ensure development compatible with WSR designation on private portions of the corridor, change of use approval by the county is necessary for converting existing agricultural lands to commercial or industrial development (based upon personal communication with Delta County Planner David Rice on September 29, 2010).

ROWs
BLM ROW authorizations crossing or briefly running adjacent to the segment include a WAPA transmission powerline, coal development access roads, and a stream gauge site to monitor coal development and water quality. There is a pending access road ROW application for the Bowie Spruce Stomp Coal Exploration License and current coal mining activities.

Energy and Mineral Leasing
Federal coal leases currently held by Bowie Resources, LLC span or are adjacent to Terror Creek. A federal coal lease spans about one mile of the upper portion and another is within one quarter mile along the west side of the segment. In a final environmental assessment, a proposed coal exploration drill pad within the corridor would not be visible from the creek and would have no detectable effect on the Fish ORV.

*Administration*
Land distribution alternates between private and public at three locations along the segment length. Providing and managing for special protection of the greenback cutthroat trout

BLM_0116290

population in the West Fork of Terror Creek complies with the Endangered Species Act and BLM Colorado Public Land Health standards.

<u>Alternative Protective Measures Considered</u>
The Fish ORV could be protected through a state instream flow water right. If the segment is not designated, the BLM recommends that protective language be included in the Uncompahgre RMP to ensure that no additional impacts to streamflow quantity and quality occur within public portions of the segment.

### P.4.5   15: Dry Creek – Not Suitable

*Classification:*  **Wild**

*ORVs:*  **Scenic, Geologic**

*Eligible Length:*  **10.5 miles**

*BLM-Administered:*  **10.4 miles**

*Key Considerations:*
- Private land and water rights could make the segment difficult to manage.

Dry Creek was found to be *not suitable* for WSR designation primarily due to a variety of protective factors (including low visitation and natural terrain) that serve to protect the canyon to some extent. In addition, current travel management implementation, as well as ACEC designation and No Surface Occupancy (NSO) stipulations (potential management strategies being considered during RMP development) would provide considerable protection for the segment.

While oil and gas development is thought to be the greatest potential threat to the Dry Creek corridor, little exploration has occurred to date. Five miles of private land at the upper end of the segment and three miles of private land between the segment and the San Miguel River, as well as accompanying senior private water rights, could make WSR management difficult.

*Segment Assessment*

*Water Rights and Uses*
There is no instream flow water right protection for the segment. An absolute water right diversion of 5 cfs for irrigation near the lower terminus has seniority over any future instream flow water right associated with designation. Upstream of the segment, absolute water rights include ditch diversions totaling 97 cfs and reservoir storage totaling 170 acre-feet. These rights are also senior to any instream flow associated with WSR designation.

In addition, conditional water rights upstream of the segment include ditch diversions totaling 135 cfs and reservoir storage totaling 136,400 acre-feet. If developed, these water rights would be senior to any instream flow water right associated with WSR designation.

BLM_0116291

*Land Ownership and Uses*

ROWs and Withdrawals
Hecla Mining has ROWs for earthen berm water diversion structures and a tank site within the corridor.

Energy and Mineral Leasing
There are existing oil and gas leases within the segment. According to the State of Colorado Oil and Gas Commission electronic well records database, an abandoned oil and gas well remains within the corridor. Current lode mining claims have a prior existing right to lode mineral deposits. No BLM authorizations exist for these claims.

*Administration*

Potential Costs Associated with WSR Designation
The costs for administering and managing this segment for the Scenic and Geologic ORVs would not likely increase much above current funding levels. The segment is remote, has limited trail access, and the stream corridor is nearly all (greater than 99%) federal or state managed lands, factors that assist in protection of the ORVs and support the Wild classification. It is therefore unlikely that additional facilities would be needed if the segment was designated. While just under 0.1% of the stream corridor contains private land, there is no known benefit in acquiring this land to support the ORVs.

Alternative Protective Measures Considered
The segment is within a potential ACEC being considered during development of the Uncompahgre RMP and an area undergoing travel management planning. Implementing travel restrictions would help to protect the area from surface-disturbing activities.

**P.4.6   16: Naturita Creek – Not Suitable**

*Classification:* **Scenic**

*ORV:* **Fish**

*Eligible Length:* **25 miles**

*BLM-Administered:* **10 miles**

*Key Considerations:*
- Numerous conditional water rights in the Naturita Creek drainage are senior to any federal water right associated with WSR designation.
- The Fish ORV is concentrated in the lower reaches of the segment.
- During suitability analysis, BLM staff determined that CWCB appropriation of a state instream flow water right would provide much protection for the Fish ORV.
- A substantial amount of private land is distributed in a diffuse pattern throughout the corridor.

BLM_0116292

Naturita Creek was found to be n*ot suitable* for WSR designation because the fish species for which the Fish ORV was assigned is found primarily within private property at the lower end of the segment and landowners in that portion do not support WSR suitability. While a private landowner with property at the upper end of the segment expressed strong support for suitability, an on-site review conducted by BLM staff concluded that a Vegetation ORV could not be substantiated in the stretch. Another landowner within the segment has a conservation easement on their property.

### Segment Assessment

*Water Rights and Uses*
Naturita Creek provides value-added flow for the proper hydrologic function of the San Miguel River system and river-dependent resource values (including aquatic and riparian plant and animal species).

Five diversion ditches decreed for 2.73 cfs are scattered between the lower and upper terminus and would be senior to any instream flow water right associated with WSR designation. Absolute water right decrees upstream of the segment on the mainstem and tributaries (including Maverick Draw) consist of ditch diversions totaling 1,623 cfs and storage rights totaling 43,000 acre-feet. These water rights cause much depletion of streamflow through the segment. Changing points of diversion on existing water rights within the segment could be limited by any instream flow right associated with WSR designation.

Development of conditional water rights would be senior to any instream flow water right established as part of WSR designation and would further diminish flow through the segment. Conditional water rights on the mainstem and tributaries upstream of the segment include ditch diversions totaling 8.4 cfs and storage rights totaling 19,434 acre-feet.

The CWCB holds an instream flow water right decreed for 3 cfs year-round from above the upper terminus (at the Uncompahgre National Forest boundary) to a county road crossing just upstream of the confluence with McKee Draw (4.81 miles) structured to protect the natural environment to a reasonable extent, including the Fish ORV. Due to the many surface water diversions in the creek, this instream flow progressively loses value downstream of the confluence with McKee Draw.

*Land Ownership and Uses*
Almost 50% of the corridor consists of private land encompassing parts of San Miguel and Montrose counties. Portions of the corridor within Montrose County are zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

Portions of the corridor within San Miguel County and to the east and north of Naturita Creek are within the Wright's Mesa Zone District. The district is intended to preserve the rural and agricultural character of Wright's Mesa, while encouraging diverse economic opportunities compatible with the rural landscape. A history of co-existing agriculture, ranching, residential,

BLM_0116293

and small business uses comprise the rural character of the area. The district discourages the sprawl pattern typically created by 35-acre lots by offering alternatives and incentives to cluster buildings, retain open lands, and keep large parcels intact.

Portions of the corridor within San Miguel County and to the south and west of Naturita Creek are within the West End Zoning District. The district is intended to preserve large, relatively remote areas of western San Miguel County for resource, agricultural, open space, and recreational purposes, while protecting private property rights. These areas currently have minimal public facilities and services and are considered premature for substantial development. Development in these areas preserves historical, archeological, and natural resources and landmarks, while allowing individuals to farm, ranch, and use necessary resources with limited intrusion on property rights.

ROWs
Numerous ROWs exist within the corridor, including Highways 145 and 141, county roads, powerlines, telephone lines, a water pipeline, and an access road to private property.

Energy and Mineral Resources
There are existing oil and gas leases within the segment. While portions of the segment are within an area identified by the USGS as having coal potential, the classification does not preclude WSR designation. There are no mining claims within the corridor.

*Administration*
The diffuse and scattered pattern of private land within the corridor could make this segment difficult to administer. Given the current level of water depletion in Naturita Creek, sufficient flow needed to protect the fish population might need to be acquired from existing decree owners. WSR designation would be consistent with the BLM Colorado Public Land Health standard for special status species.

Proposed management actions include designating the area as a Special Recreation Management Area, as well as conducting travel management planning for Burn Canyon (part of the Norwood Recreation District in Montrose and San Miguel counties).

Potential Costs Associated with WSR Designation
The costs for administering and managing this segment for the Fish ORV would be substantially higher than current funding levels. Approximately half (3,177 acres) of the stream corridor is composed of private land with a fragmented pattern throughout most of the reach that could restrict access and limit available management options within the stream corridor. Land acquisition from willing sellers would be necessary in order to effectively and proactively manage for the ORV. Some stream channel modification projects might be needed to facilitate fish propagation.

Alternative Protective Measures Considered
Apart from WSR designation, options for protecting the Fish ORV include actions implemented in accordance with the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*.

BLM_0116294

BLM staff determined that appropriation of an instream flow water right below McKee Draw by the CWCB would provide much protection for the Fish ORV.

### P.4.7   24: Tabeguache Creek, Segment 2 – Not Suitable

*Classification:* **Recreational**

*ORVs:* **Cultural, Vegetation**

*Eligible Length:* **11.6 miles**

*BLM-Administered:* **7.9 miles**

*Key Considerations:*
- Congressional designation to protect wilderness values upstream ensures reliable flow through the segment, while a recently authorized state-based instream flow will help sustain the Vegetation ORV.
- The upper Tabeguache Basin has experienced limited water development and has few conditional water rights, resulting in a flow regime that mimics natural conditions, except during irrigation.
- The source water area upstream is managed primarily by the BLM and USFS, facilitating protect flow and sustain the ORV.
- Private property within the corridor consists of three distinct parcels separated by public land.

Tabeguache Creek, Segment 2 was found to be *not suitable* for WSR designation based on a consensus that much private land would make the segment difficult to manage. In addition, there was a lack of support from private landowners for finding the segment suitable.

**Segment Assessment**

*Water Rights and Uses*
Water yield through the segment contributes to the proper hydrologic function of the Lower San Miguel River downstream. One small impoundment occurs within the segment. An instream flow water right appropriation has been finalized for this segment.

While the water right provides additional protection to sustain the Vegetation ORV, the Templeton Ditch can dewater the channel downstream of the diversion during the summer months. The ditch is decreed for 5.5 cfs and is senior to the instream flow water right.

Although it has not been in use for several years, the Uravan pipeline diversion and ROW located near the lower terminus of the segment remains an active water right. Several small stock reservoirs and ditch diversions on tributaries draining into the segment are decreed for a total of 62.3 cfs and 46 acre-feet of storage rights. Changing points of diversion on existing water rights within the segment could be restricted by any instream flow right associated with WSR designation.

BLM_0116295

If developed, a conditional water right ditch diversion of 3.5 cfs upstream of the segment could result in additional diminution of flow through the segment. Conditional water rights are senior to a pending state instream flow and any future instream flow associated with WSR designation.

The majority of the source water area upstream of this segment is managed by the BLM or USFS. Existing authorities allow for management actions to ensure adequate river flow needed to sustain the ORV.

*Land Ownership and Uses*
Private property within the corridor consists of three distinct parcels separated by public land. The scattered land configuration provides opportunities for land uses that could negatively impact public land within the corridor. Approximately 17.2% of the corridor consists of private land zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the allowable and special uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

Special Designations
Cultural resources within the segment are on the National Register of Historic Places.

Rights-of-Way and Withdrawals
ROWs within the corridor include county roads V19 and U19, telephone and power lines adjacent to and crossing the creek, and an historic ditch adjacent to the creek in the upper part of the segment. Umetco owns a water pipeline and road adjacent to and crossing the creek.

While portions are within an area classified as having Waterpower and Reservoir Resources, classification preclude WSR designation.

Energy and Mineral Leasing
There are existing oil and gas leases within the segment. Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

*Administration*
WSR designation would complement the BLM Colorado Public Land Health standard for riparian vegetation.

Management actions in support of the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)* promote preserving the streamflow in Tabeguache Creek, which in turn benefits the Vegetation ORV.

Potential Costs Associated with WSR Designation
Costs for administering and managing this segment for the Cultural and Vegetation ORVs would be moderately higher than current funding levels. Portions of the segment can be accessed by county roads which would facilitate increased visitor use if designated.

BLM_0116296

The corridor does include parcels of private land containing riparian vegetation. As funding and opportunities arise, the BLM would pursue land acquisition from willing sellers, which would add value for ORV management and protection.

Alternative Protective Measures Considered
Congressional designation of an area upstream of the segment (that includes Tabeguache Creek, Segment 1 and a contiguous USFS segment) to protect its wilderness values ensures reliable flow through the segment, while a recently finalized state-based instream flow water right would contribute additional flow to help sustain the Vegetation ORV. Future water right applications on public land within the segment should contain BLM terms and conditions ensuring that the ORVs are sustained.

## P.4.8   26: North Fork Mesa Creek – Not Suitable

*Classification:* **Scenic**

*ORV:* **Vegetation** (not supported following review)

*Eligible Length:* **8.5 miles**

*BLM-Administered:* **5.8 miles**

*Key Considerations:*
- There is little water development in the headwaters of the North Fork Mesa Creek, which produces a flow regime mimicking natural conditions.
- The majority of the source water area upstream of the segment is managed by the BLM or USFS and existing authorities provide for ample management actions to protect stream flow needed to sustain the Vegetation ORV.
- Several ROWs occur within the corridor.
- There is a significant amount of private land in the lower reach of the segment.

Following a review by the CNHP that lowered the rarity ranking of the Narrowleaf cottonwood/strapleaf willow/silver buffaloberry plant community to G3, the segment no longer possesses a Vegetation ORV to support WSR eligibility.

*Segment Assessment*

*Water Rights and Uses*
The North Fork of Mesa Creek contributes flow to Mesa Creek and the Lower Dolores River, providing habitat for native warm water fish. WSR designation would be consistent with actions in the Range-wide Conservation Agreement and Strategy for the Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*.

The CWCB holds instream flow water rights along the entire segment structured to protect the natural environment to a reasonable extent. The instream flow provides some protection to sustain the Vegetation ORV. From the lower terminus and 3.90 miles upstream to Cedar Tree

BLM_0116297

Ditch Diversion, seasonal instream flow is 2.1 cfs for the period from April 1 to May 31. From Cedar Tree Ditch to the upper terminus, instream flow appropriation varies throughout the year. Between April 1 and May 31, appropriated instream flow is 2.75 cfs. It drops to 0.5 cfs between June 1 and February 29, and rises to 1.9 cfs between March 1 and March 31.

There are three water diversions in the lower reach, but only the Patterson Ditch has a decreed flow (of 14.12 cfs). The Patterson ditch diversion is located on public land. This water right is senior to the existing instream flow water right and any federal water right associated with WSR designation. An instream flow right associated with WSR designation could restrict the ability to change points of diversion for existing water rights within the segment.

A number of stock watering facilities in headwater tributaries constitute the only water use above the upper terminus.

There are no conditional water rights within or upstream of the segment.

Any additional water right filings or changes to existing diversions would be junior to the instream flow water right.

*Land Ownership and Uses*
Approximately 17.2% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the allowable and special uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

ROWs and Withdrawals
ROWs include telephone and power lines. A county road runs along the creek, dominating the setting for much of the segment. Unsurfaced roads cross the stream in a couple of locations.

There is a bat maternity roost withdrawal along the creek.

While portions of the segment are within an area classified as having Waterpower and Reservoir Resources, the Powersite Classification does not preclude WSR designation.

Energy and Mineral Leasing
There are existing oil and gas leases within the segment. Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

*Administration*
WSR designation would complement the BLM Colorado Public Land Health standard for riparian vegetation, while private land at the lower portion of the corridor could create challenges for managing the area.

Potential Costs Associated with WSR Designation
Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional

BLM_0116298

funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

<u>Alternative Protective Measures Considered</u>
Because the BLM and USFS manage the headwaters of the North Fork of Mesa Creek, authorities exist to preserve a flow regime that mimics the natural variability needed to sustain the Vegetation ORV.

### P.4.9    28: Ice Lake Creek, Segment 2 – Not Suitable

*Classification:* **Scenic**

*ORV:* **Scenic**

*Eligible Length:* **0.58 miles**

*BLM-Administered:* **0.31 miles**

*Key Considerations:*
- Landowners in the lower reach of the segment oppose WSR designation.

- The segment length is short and there are access issues involving private land within the segment.

- The BLM manages the source water areas that produce baseflow for the creek, providing protection for flow-dependent values.

- The segment was found to be n*ot suitable* for WSR designation due to mining along the mesa at the northern end of the segment, as well as the short segment length. In addition, the segment terminates on private land, which could make the area more difficult to manage.

*Segment Assessment*

*Water Rights and Uses*
Water yield through the segment contributes to the proper hydrologic function of La Sal Creek downstream. There is no instream flow water right protection on the segment. A federal water right associated with WSR designation could restrict changing the points of diversion for existing water rights within the segment.

One absolute water right near the lower terminus would be senior to any water right associated with WSR designation. There are no conditional water rights or impoundments within or upstream of the segment. In the lower reaches, La Sal Creek is protected by an instream flow water right that could restrict future diversions from Ice Lake Creek.

Flow through the segment could be further reduced if diversion amounts are enlarged or diversion points are changed prior to securing an instream flow water right.

BLM_0116299

*Land Ownership and Uses*
Approximately 42% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act. The private property in question is a contiguous parcel located just upstream of the lower terminus. The potential for impacts to the ORV due to lack of zoning controls would be limited on public land.

ROWs
A BLM road traverses the canyon just east of the creek.

Energy and Mineral Resources
There are existing oil and gas leases within the segment. Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

*Administration*
Ice lake Creek contributes flow to La Sal Creek, providing spring spawning habitat for native warm water fish consistent with the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*.

A large amount of private land hinders access to public land within the segment and a number of private landowners have expressed opposition to WSR designation.

Potential Costs Associated with WSR Designation
Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Administering and managing this segment for the Scenic ORV would increase costs moderately above current levels. The public land portion of this segment is remote and has no developed access, both factors that would assist in the protection of the ORV. The lower reach of this segment is private land within which the Ice Lake Creek Corridor is bisected by Colorado State Highway 90.

Private land currently limits access to the public land portion of the corridor from the highway. Acquiring portions of private land from willing sellers would add value for managing and providing public access to this segment if designated. If designated, additional facilities would not likely be needed.

Alternative Protective Measures Considered
The following potential actions were identified as alternatives to WSR designation:

BLM_0116300

- Upgrade the Visual Resource Management classification in order to protect scenic values.
- Apply a No Surface Occupancy (NSO) stipulation to protect the corridor.
- Include conditions in the Uncompahgre RMP to protect the baseflow source water area at the upper terminus.

The Scenic ORV could be protected through existing authorities by requiring BLM conditions on all future applications and actions to ensure compatibility with the scenic classification.

### P.4.10  29: La Sal Creek, Segment 1 – Not Suitable

*Classification:* **Recreational**

*ORV:* **Fish, Vegetation**

*Eligible Length:* **4.82 miles**

*BLM-Administered:* **0.62 miles**

**Key Considerations:**
- There is a significant amount of private land within the segment, along with significant opposition to WSR designation from private landowners.
- Land use zoning for private land within the segment is relatively non-restrictive.

The segment was found to be *not suitable* for WSR designation due to extensive private land that could make the segment difficult to manage. In addition, a large number of private landowners do not support finding the segment suitable.

*Segment Assessment*

*Water Rights and Uses*
A streamflow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community in this segment might only be achieved through WSR designation. The upstream terminus is along the Colorado-Utah state line and much of the headwaters are in Utah.

There is no instream flow water right protection on the segment. Water yield through the segment contributes greatly to the proper hydrologic function of the lower reaches of La Sal Creek, which is protected by an instream flow water right, possibly restricting additional water development within the segment.

Four absolute water right diversions totaling 8.9 cfs within private portions of the reach are senior to any instream flow water right. A water right associated with WSR designation could restrict changing the points of diversion on existing water rights within the segment.

No conditional water rights or impoundments occur within the segment.

BLM_0116301

*Land Ownership and Uses*

Approximately 47% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the allowable and special uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

ROWs and Withdrawals

ROWs within the segment include a CDOT highway and county roads. Telephone and power lines cross and run adjacent to La Sal Creek.

Energy and Mineral Leasing

There are existing oil and gas leases within the segment. Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

*Administration*

The headwaters of La Sal Creek are in the State of Utah. A state-based instream flow water right would provide sufficient flow to sustain the Fish ORV, but would be inadequate for sustaining the Vegetation ORV. WSR designation would complement BLM Colorado Public Land Health standards for riparian vegetation and special status species.

A large amount and configuration of private land with non-restrictive zoning occurs within the segment. Large portions of private land have been converted to agricultural crops, making it difficult to manage for native riparian vegetation.

Potential Costs Associated with WSR Designation

Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs for administering and managing this segment for the Fish and Vegetation ORVs would be substantially higher than current funding levels. Some management actions to sustain the target fish species would continue with or without designation per the Range-Wide Conservation Agreement and strategy for Roundtail Chub, Bluehead Sucker, and Flannelmouth Sucker.

Private land acquisition would not be pursued, as more than 87% of the stream segment is privately owned, making it difficult for the BLM to acquire enough land to benefit management of the ORV. Some stream channel modification projects may be needed to facilitate fish propagation.

Alternative Protective Measures Considered

Any future private water right or ROW application on public land within the segment should include BLM terms and conditions to protect the ORVs.

BLM_0116302

### P.4.11  32: Lion Creek, Segment 2 – Not Suitable

*Classification:* **Scenic**

*ORV:* **Vegetation**

*Eligible Length:* **1.57 miles**

*BLM-Administered:* **1.26 miles**

*Key Considerations:*
- There is a much private land and landowner opposition to WSR designation in the lower reaches of the segment.

- Because the BLM manages the source water areas that produce baseflow for the creek, flow-dependent values could be protected through existing authorities.

- Existing authorities could provide much protection for the Vegetation ORV by requiring that future BLM applications and actions be compatible with sustaining the riparian vegetation.

Lion Creek, Segment 2 was found to be *not suitable* for WSR designation due to the short length of the segment, as well as a measure of self-protection afforded by the steep slopes of the corridor. In addition, private land restricts access and landowners do not support finding the segment suitable.

### Segment Assessment

*Water Rights and Uses*
Water yield through the segment contributes to the proper hydrologic function of La Sal Creek downstream, which is protected by an instream flow water right in the lower reaches that might also limit additional water development in Lion Creek. There is no instream flow water right protection for Lion Creek.

The Manning Ditch is an absolute water right (of 0.6 cfs) near the lower terminus that would be senior to any instream flow associated with WSR designation. There are no conditional water rights or impoundments within or upstream of the segment.

Changing points of diversion on existing water rights within the segment could be limited in the future by water rights associated with WSR designation. Enlarging the diversion amount or changing the diversion point of an existing water right within the segment would further reduce flow within the longer reach of the segment if the changes are decreed prior to securing water rights associated with WSR designation.

*Land Ownership and Uses*
Approximately 17.4% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses

BLM_0116303

requiring a special use permit. The property is a contiguous parcel located just upstream of the lower terminus, limiting the potential for impacts to the ORV.

Energy and Mineral Resources
There are existing oil and gas leases within the segment. Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

*Administration*
WSR designation would complement the BLM Colorado Public Land Health Standard for riparian vegetation.

There is a much private land and landowner opposition to WSR designation in the lower reaches.

Potential Costs Associated with WSR Designation
Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs for administering and managing this segment for the Vegetation ORV would increase moderately above current funding levels. The public land portion of this segment is remote and has no developed access, both factors that would assist in the protection of the ORV. The lower reach of this segment is private land within which the Lion Creek Corridor is bisected by Colorado State Highway 90.

The private land presently limits access to the public land portion of the corridor from the highway. Thus, acquiring portions of the private land from willing sellers would be value added for managing and providing public access to this segment if designated. A small amount of additional funding would be needed for signage, public education, ranger patrolling, and maintenance. Additional facilities would not be needed if designated. No detailed cost analysis or estimate was prepared as part of this study.

Alternative Protective Measures Considered
The Vegetation ORV could be protected through existing authorities by requiring BLM terms and conditions on all future water right and ROW applications and actions to ensure compatibility with sustaining the riparian vegetation.

**P.4.12 33: Spring Creek – Not Suitable**

*Classification:* **Recreational**

*ORV:* **Vegetation**

*Eligible Length:* **2.65 miles**

*BLM-Administered:* **1.49 miles**

BLM_0116304

**Key Considerations:**

- The segment is short and non-contiguous, with private land parcels near the lower terminus and along much of the middle portion.

- The BLM manages the source water areas that produce baseflow for Spring Creek, allowing for protection of flow-dependent values through existing authorities.

- The Vegetation ORV in the segment could be protected through existing authorities by ensuring that all future applications and actions contain BLM terms and conditions.

Spring Creek was found to be *not suitable* for WSR designation due to the short length of the segment and an extensive amount of interspersed private land that could make the segment difficult to manage. In addition, the segment is afforded a measure of self-protection by the steep slopes that define the corridor.

**Segment Assessment**

*Water Rights and Uses*
Although Spring Creek has no instream flow water right protection, water yield from the creek contributes flow to La Sal Creek, which is protected by an instream flow in the lower reaches that could restrict additional water development within the segment.

An absolute ditch diversion water right within the segment is senior to any water right associated with WSR designation. There are no conditional water rights or impoundments within or upstream of the segment.

Enlarging or changing diversion points on existing water rights within the segment prior to obtaining a federal reserved water right associated with WSR designation could further reduce flow within the reach. If the points of diversion are on public land, the water right could contain BLM terms and conditions limiting impacts to the Vegetation ORV.

*Land Ownership and Uses*
Approximately 24.1% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the uses are not related to agriculture. Private parcels cover much of the middle portion and lower terminus of the segment.

ROWs
ROWs within the segment include Highway 90, a county road, a powerline, and a telephone line that parallels a portion of the creek.

Energy and Mineral Resources
There are existing oil and gas leases within the segment. Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

BLM_0116305

*Administration*
WSR designation would complement the BLM Colorado Public Land Health standard for riparian vegetation.

Potential Costs Associated with WSR Designation
Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs for administering and managing this segment for the Vegetation ORV would increase slightly above current funding levels. The headwater, public land portion of this segment is remote and has no developed access, both factors that would assist in the protection of the ORV.

The middle and lower portions of this segment contain private land within which the Spring Creek corridor is bisected by Colorado State Highway 90. The private land currently limits highway access to public land portions of the segment. Thus, acquiring portions of private land from willing sellers would add value to managing and providing public access to this segment if designated. A small amount of additional funding would be necessary for signage, public education, ranger patrolling, and maintenance. Additional facilities would not be needed if designated.

Alternative Protective Measures Considered
The Vegetation ORV would receive much protection by placing BLM terms and conditions on all future actions and activities within the segment.

## P.5   DOLORES-SAN MIGUEL STAKEHOLDER ANALYSIS AND RECOMMENDATIONS

### P.5.1   Southwest Resource Advisory Council
The SWRAC is appointed by the Secretary of the Interior to represent a variety of interests across the Southwest District. The SWRAC meets two to four times annually to develop recommendations for the BLM regarding the preparation, amendment, and implementation of land use plans for public lands and resources and to provide representative citizen counsel and advice to the Secretary of the Interior concerning the planning and management of public land resources within the BLM Southwest District.

Between November 2010 and January 2011, a subgroup of the SWRAC conducted a series of public meetings in various towns throughout the western portion of the planning area to inform and solicit comment regarding segments within the Dolores and San Miguel river basins. The SWRAC Subgroup presented their suitability recommendations to the full SWRAC at the Statewide RAC Meeting on February 25. The SWRAC adopted the recommendations and forwarded them to the UFO for consideration.

BLM_0116306

## P.6 GUNNISON BASIN STAKEHOLDER ANALYSIS AND RECOMMENDATIONS

The Gunnison Basin stakeholder process was initiated by the Colorado River Water Conservation District. The stakeholder group contracted with a team of co-facilitators and held a series of public meetings to formulate recommendations regarding WSR suitability for eligible river segments in the Gunnison River Basin, including within the Dominguez-Escalante NCA. Nine meetings pertained to segments within the planning area outside of the NCA.

The stakeholder group was unable to reach a consensus and two sets of recommendations were forwarded to the BLM for consideration. Following are the meeting notes submitted by each group.

BLM_0116307

This page intentionally left blank.

BLM_0116308

# Appendix Q
## Summary of Air Emission Inventory Technical Support Document

BLM_0116309

BLM_0116310

# TABLE OF CONTENTS

Section                                                                                                         Page

**Q.  SUMMARY OF AIR EMISSION INVENTORY TECHNICAL SUPPORT DOCUMENT ........... Q-1**
   Q.1     Introduction ................................................................................................. Q-1
           Q.1.1   Scope and Goals ............................................................................... Q-1
           Q.1.2   Study Area ........................................................................................ Q-1
           Q.1.3   Relationships to Existing Plans and Documents ................................ Q-3
           Q.1.4   Emission Inventory Overview ............................................................ Q-3
   Q.2     Emission Inventory Development ................................................................. Q-4
           Q.2.1   Alternatives ...................................................................................... Q-5
           Q.2.2   Emission Calculations ....................................................................... Q-9
   Q.3     Emission Inventory Results ......................................................................... Q-44
           Q.3.1   BLM Action Emissions ..................................................................... Q-44
           Q.3.2   Cumulative Emission Calculations and Emission Summary ............... Q-46
   Q.4     References ................................................................................................... Q-49

# APPENDICES

*Appendices are available in the complete Air Emission Inventory Technical Support Document (November 2015), which is available on Uncompahgre RMP revision Web site (http://www.blm.gov/co/st/en/fo/ufo/ uncompahgre_rmp.html) and at the BLM Uncompahgre Field Office in Montrose, Colorado.*

A       Conventional Oil and Gas Emission Inventory
B       Coalbed Methane Oil and Gas Emission Inventory
C       Midstream Sector Oil and Gas Emission Inventory
D       Non-Oil and Gas Sources Emission Inventory
E       Air Emission Inventory Tables and Figures

# TABLES
Page

Q-2-1.   Oil and gas well counts by alternative. ................................................................. Q-6
Q-2-2.   Activity by alternative for non-oil and gas sources (year 10). ..................................... Q-7
Q-2-3.   Emission controls summary table for non-oil and gas source categories (note all
         controls listed in this table apply to each management alternative). ......................... Q-8
Q-2-4.   Oil and gas emission controls description and percent changes.................................. Q-9
Q-2-5.   Construction source categories and scaling surrogates.............................................. Q-10
Q-2-6.   Vehicle fleets used during drilling and completion. ................................................. Q-14
Q-2-7.   Empirical constants by pollutant to estimate road dust emissions factor............................. Q-16
Q-2-8.   Vehicles groups related to fugitive road dust emissions in well construction and
         development. ..................................................................................................... Q-17
Q-2-9.   Vehicle fleets comprising production traffic. ........................................................... Q-21
Q-2-10.  Empirical constants by pollutant to estimate road dust emissions factor............................. Q-22
Q-2-11.  Schedule of uranium  mines in production. ............................................................ Q-37
Q-3-1.   Estimated annual emissions summary BLM actions within the UFO planning area. ............. Q-44
Q-3-2.   Estimated annual emissions summary cumulative actions within the UFO planning area... Q-46

BLM_0116311

This page intentionally left blank.

BLM_0116312

# APPENDIX Q
# SUMMARY OF AIR EMISSION INVENTORY TECHNICAL SUPPORT DOCUMENT

## Q.1 INTRODUCTION

This appendix summarizes the Air Emission Inventory Technical Support Document (November 2015), which is available on the Uncompahgre RMP revision Web site (http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html) and at the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) in Montrose, Colorado.

### Q.1.1 Scope and Goals

The Emission Inventory Technical Support Document explains the data and methodologies used to estimate emissions associated with future development in the UFO planning area. For this effort, an emission inventory was developed for emission sources affected by BLM management decisions for the UFO planning area.

### Q.1.2 Study Area

The emission inventory was developed for the UFO planning area. The UFO planning area is located in western Colorado sharing a small section of the border with Utah (**Figure Q-1**) and incorporates all or part of Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties.

The UFO manages more than 900,000 surface acres in southwestern Colorado, including the Gunnison Gorge National Conservation Area and Wilderness, as well as portions of the Dominguez-Escalante National Conservation Area, Dominguez Canyon Wilderness Area, and four river systems (the Gunnison, San Miguel, Dolores, and Uncompahgre Rivers). The varied topography within the UFO ranges from lowland riparian along the Dolores River (4,706 feet) to red rock desert to pinion-juniper woodland to subalpine forest up on Storm King Mountain (11,449 feet). These lands offer a wealth of resources and opportunities for public use and enjoyment. The UFO is revising the UFO Resource Management Plan (RMP). The UFO RMP planning area encompasses approximately 675,677 surface acres within the UFO boundary. It does not include the Gunnison Gorge National Conservation Area or the Dominguez-Escalante National Conservation Area, which are managed under separate RMPs. Major activities

---

BLM_0116313



Figure Q-1.    Uncompahgre Field Office Planning Area.

occurring in the UFO planning area that have the potential to affect air quality include oil and gas development, off-highway vehicle (OHV) activity, solid minerals mining, locatable minerals mining, and prescribed fires and vegetation management.

### Q.1.3   Relationships to Existing Plans and Documents

The most recent documents describing activities in the UFO planning area are the Reasonably Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office (BLM 2012a), the Mineral Potential Report for the Uncompahgre Planning Area (BLM 2011), and the Coal Resource and Development Potential Report (BLM 2010). The Mineral and Coal Potential Reports indicates relatively stable coal production and potential significant increases in uranium and vanadium mining in the UFO planning area. The Reasonably Foreseeable Development Scenario for oil and gas also indicates potential significant increases in oil and gas activity in the UFO planning area.

### Q.1.4   Emission Inventory Overview

#### Q.1.4.1   Emission Generating Activities

The following list of emission generating activities were identified as those management actions and activities authorized, permitted, allowed or performed under this RMP that could potentially emit regulated air pollutants and could potentially cause impacts to air quality within the planning area and Class I and sensitive Class II areas within 100 kilometers of the planning area:

- Fluid Leasable Minerals – Conventional Oil and Gas
- Fluid Leasable Minerals – Coal Bed Natural Gas
- Solid Leasable Minerals – Coal
- Locatable Minerals – Uranium and Vanadium
- Salable Minerals – Sand and Gravel
- Lands and Realty – Rights-of-Way
- Livestock Grazing
- Comprehensive Travel and Transportation Management
- Vegetation – Prescribed Fire and Mechanical Treatment

#### Q.1.4.2   Pollutants

The emission inventory includes estimation of emissions of criteria air pollutants (CAPs), greenhouse gases (GHGs), and hazardous air pollutants (HAPs) as follows:

- Criteria Pollutants
    - Carbon monoxide (CO)
    - Nitrogen oxides (NOX)
    - Particulate matter less than or equal to 10 microns in diameter ($PM_{10}$)
    - Particulate matter less than or equal to 2.5 microns in diameter ($PM_{2.5}$)

BLM_0116315

    – Sulfur dioxide ($SO_2$)

    – Volatile Organic Compounds (VOCs)

    – Greenhouse Gases

    – Carbon dioxide ($CO_2$)

    – Methane ($CH_4$)

    – Nitrous oxide ($N_2O$)

- Hazardous Air Pollutants (HAPs)

While lead (pb) is a criteria pollutant, emissions of lead in the UFO planning area are expected to be extremely low and are therefore not included in this analysis.

HAP emissions were estimated for each emissions source. For oil and gas emissions sources, HAP emissions from venting and combustion source categories were estimated for formaldehyde, n-hexane, benzene, toluene, ethylbenzene, and xylenes (BTEX).

Anthropogenic greenhouse gas emission inventories typically include carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), and fluorinated gases. Fluorinated gases are not expected to be emitted in appreciable quantities by any category considered in this emission inventory and were therefore not included in this analysis.

### Q.1.4.3  Temporal

The analysis focused on estimating annual emissions associated with peak construction, production, and operation activities associated with the identified emission generating management actions. The base year 2011 was chosen as the base year for estimating actual emissions as this was the most recent year that reliable production and emissions data was available for existing sources within the planning area and this base year is consistent with the base year emission inventory developed for the Colorado Air Resource Management Modeling Study (CARMMS). Future year estimated emissions were calculated for 2012 to 2021. Potential peak construction and operation years for projected oil and gas development occur in Year 10 (i.e., 2021); therefore, Year 10 was selected to evaluate future air quality impacts.

## Q.2  EMISSION INVENTORY DEVELOPMENT

The UFO emission inventory was developed based on activity data for emission generating activities obtained from UFO staff, the *Reasonably Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office* (BLM 2012a), the *Mineral Potential Report* (BLM 2011), the *Coal Resource and Development Potential Report* (BLM 2010), and from NEPA analyses currently being conducted for BLM actions within the planning area. There is one oil and gas development which is currently under NEPA review, SG Interests Bull Mountain Unit (BLM 2012b). *The Decision Record, Finding of No Significant Impact, and Final Environmental Assessment for the Whirlwind Mine Uranium Mining Project* (BLM 2008) was used as a reference to identify the level of emissions associated with uranium mining. *The Bowie Coal Lease Modification Application, Preliminary Environmental Assessment* (BLM 2012c), *Environmental Assessment for the West Elk Coal Lease Modifications Application* (BLM 2012d), *Environmental Assessment for the Elk Creek Mine* (BLM

*Uncompahgre Draft Resource Management Plan Revision and Environmental Impact Statement*

2012f) and the *Oak Mesa Coal Environmental Assessment* (BLM 2012e) describe environmental impacts associated with each project.

## Q.2.1   Alternatives

For the UFO RMP, the BLM developed four alternatives to prepare different combinations of resource uses to address the identified major planning issues, enhance or expand resources or resource uses, and resolve conflicts among resources and resource uses.

- Alternative A is the No Action alternative; a continuance of current management practices.

- Alternative B emphasizes non-consumptive use and management of resources through protective, restorative, and enhancement measures, while also providing for multiple uses, such as livestock grazing, recreational opportunities and settings, and mineral development.

- Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in portions of Delta and Gunnison Counties. While future oil and gas planning differs from Alternative B for Alternative B.1, future planning for non-oil and gas resources is equivalent to Alternative B for Alternative B.1.

- Alternative C emphasizes intensive management of natural resources, commodity production, and public use opportunities.

- Alternative D is the Preferred Alternative, which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat.

Estimates of future activity for each emissions source category were made specific to each alternative for activities expected to be affected by the chosen management alternative.

### Q.2.1.1   *Activity by Alternative*

#### Q.2.1.1.1 *Oil and Gas Sources*
Future oil and gas activity estimates were provided by BLM staff (BLM 2014). **Table Q-2-1** shows estimates of well, rig, and compressor station counts for each alternative Year 10 development. Included in **Table Q-2-1** is oil and gas activity on BLM-administered lands and cumulative development on BLM- and non BLM-administered lands in the UFO area.

For the emission inventory analysis, conventional well emissions were developed separately from coalbed natural gas (CBNG, also called coalbed methane) emissions based on the assumption that they differ significantly due to differences in drilling, completion, and production practices used in the development and operation. Additionally, midstream emissions were developed separately from well site emissions based on Colorado Department of Public Health and Environment Air Pollutant Emission Notices (APENs) emission data for the base year 2011 and forecasts to future years based on total annual UFO area-wide gas production.

BLM_0116317

## Table Q-2-1.  Oil and gas well counts by alternative.

| Description | BLM | | Cumulative | |
|---|---|---|---|---|
| | Historical Years 1-3[1] | Projected Years 4-10[2] | Historical Years 1-3[1] | Projected Years 4-10[2] |
| **Alternative A** | | | | |
| Annual Number of Wells Drilled (Conventional) | 1 | 16.2 | 1.3 | 17.0 |
| Annual Number of Wells Drilled (CBNG) | 0 | 25.8 | 0 | 27.0 |
| Number of Drill Rigs Operating | 1 | 2 | 1 | 2 |
| Number of Operating Compressor Stations | 4 | 13 | 4 | 14 |
| **Alternative B** | | | | |
| Annual Number of Wells Drilled (Conventional) | 1 | 17.4 | 1.3 | 22.5 |
| Annual Number of Wells Drilled (CBNG) | 0 | 25.4 | 0 | 33.3 |
| Number of Drill Rigs Operating | 1 | 2 | 1 | 3 |
| Number of Operating Compressor Stations | 4 | 13 | 4 | 17 |
| Alternative B.1 | | | | |
| Annual Number of Wells Drilled (Conventional) | 1 | 16.0 | 1.3 | 21.1 |
| Annual Number of Wells Drilled (CBNG) | 0 | 22.9 | 0 | 30.8 |
| Number of Drill Rigs Operating | 1 | 2 | 1 | 3 |
| Number of Operating Compressor Stations | 4 | 12 | 4 | 16 |
| **Alternative C** | | | | |
| Annual Number of Wells Drilled (Conventional) | 1 | 18.8 | 1.3 | 24.0 |
| Annual Number of Wells Drilled (CBNG) | 0 | 30.9 | 0 | 39.0 |
| Number of Drill Rigs Operating | 1 | 2 | 1 | 3 |
| Number of Operating Compressor Stations | 4 | 16 | 4 | 20 |
| **Alternative D** | | | | |
| Annual Number of Wells Drilled (Conventional) | 1 | 18.8 | 1.3 | 24.0 |
| Annual Number of Wells Drilled (CBNG) | 0 | 27.9 | 0 | 36.0 |
| Number of Drill Rigs Operating | 1 | 2 | 1 | 3 |
| Number of Operating Compressor Stations | 4 | 15 | 4 | 19 |

[1] For years 2012 to 2014 for which historical drilling data were available
[2] For years 2015 to 2021 for which alternative specific oil and gas development estimates of drilling activity were used

For each year, the suite of existing and newly spudded wells along with individual well production estimates are used to estimate total annual gas production; total annual gas production is used to make future projections of certain oil and gas emissions sources including midstream sector gathering and treating facilities. For conventional and CBNG wells, CARMMS estimates of annual gas production per well and each alternative's well development scenario were used to estimate future year gas production for each alternative.  Midstream emissions were forecasted to future years based on the assumption that total UFO planning area-wide midstream emissions would scale linearly with increases in total gas production. As necessary, for accounting purposes, total midstream sector emissions are allocated to each well type (CBNG or conventional) and/or mineral designation (BLM or cumulative) based on the

corresponding percentage of annual gas production by well type and/or annual gas production by mineral designation.

### Q.2.1.1.2 Non-Oil and Gas Sources

Comparisons of activities by source category for non-oil and gas sources are presented in **Table Q-2-2** below.

**Table Q-2-2.  Activity by alternative for non-oil and gas sources (year 10).**

| Key Assumption | Base Year | A | B | B.1 | C | D |
|---|---|---|---|---|---|---|
| **Coal Mining** | | | | | | |
| **tons produced (MMt/yr)** | 14 (21)[1] | 14 (21)[1] | 14 (21)[1] | 14 (21)[1] | 14 (21)[1] | 14 (21)[1] |
| Coal mining activity was estimated for the Somerset Coal Field which includes the Bowie Mine, Elk Creek Mine, and West Elk Mine as well as the Oak Mesa area which may be developed in the future. Emissions were not estimated for the New Horizon Mine which is not subject to BLM review. The Coal Resource and Development Potential Report (BLM 2010) indicated that Somerset Field coal production is likely to remain stable at recent levels into the future. While demand for the bituminous coal produced by the Somerset Coal Field is likely to increase, production is limited by the capacity of the rail line spur that transports coal away from the Somerset Coal Field. It was assumed that Somerset Coal Field production would remain at 2008 levels. | | | | | | |
| **Uranium Mining** | | | | | | |
| **tons produced (MMt/yr)** | 0 | 0.73 | 0.73 | 0.73 | 0.73 | 0.73 |
| The Mineral Potential Report (BLM 2011) stated that the development potential of the Morrison Formation in the Uravan Mineral Belt is high. Based on input from UFO BLM personnel, it was assumed that 20 mines would be developed under each alternative, each assumed to have construction and operational characteristics similar to the estimates for the Whirlwind Mine, presented in Whirlwind Mine Environmental Assessment (BLM 2008). | | | | | | |
| **Sand and Gravel** | | | | | | |
| **Production (tons processed)** | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Sand and gravel mining activities were assumed to remain unchanged from base year levels for all alternatives based on input from BLM UFO Personnel. | | | | | | |
| **Fire** | | | | | | |
| **Acres Burned** | 800 | 800 | 1,120 | 1,120 | 640 | 1,000 |
| BLM UFO Personnel estimated that prescribed burning activities would remain similar to the base year for Alternative A, increase by 40% from the base year for Alternatives B and B.1, decrease by 20% from the base year for Alternative C, and increase from the base year by 25% for Alternative D. Estimates of changes in prescribed burning activity are based on stated objectives by alternative in the draft RMP for wildlife species management, vegetation mosaic objectives, and Wildland Urban Interface. | | | | | | |
| **Travel and Transportation Management** | | | | | | |
| **1000 vehicle miles traveled per year** | 1,910 | 2,433 | 1,831 | 1,831 | 2,433 | 2,032 |
| For Alternatives A and C, growth rate estimates similar to those estimated for the BLM Grand Junction Field Office (ENVIRON, 2012) were used to estimate 27% increase in off-road recreational vehicle activity in Year 10. For Alternatives B and B.1, off-road recreational vehicle activity was assumed to decrease by 4% from the base year for Year 10. For Alternative D, off-road recreational vehicle activity was assumed to remain at 2012 levels. | | | | | | |
| **Livestock Grazing** | | | | | | |
| **AUMs** | 38,364 | 38,364 | 34,184 | 34,184 | 36,833 | 36,424 |
| BLM UFO Personnel indicated the 38,364 animal unit months (AUMs), 34,184 AUMs, 34,184 AUMs, 36,833 AUMs, and 36,424 AUMs for Alternatives A, B, B.1, C, and D respectively. | | | | | | |
| **Lands-ROWs and Realty** | | | | | | |
| **# of sites** | 28 | 28 | 28 | 28 | 28 | 28 |
| BLM UFO Personnel indicated no change in activity for this emissions source from the base year for any alternative. | | | | | | |

BLM_0116319

### Q.2.1.2  Emission Controls

The UFO emission inventory accounted for all applicable emissions controls such as New Source Performance Standards (NSPS). **Table Q-2-3** shows the emissions control measures for each emissions source category (except oil and gas) that were modeled in this analysis. **Table Q-2-4** presents the emission controls applied to oil and gas sources along with the associated numerical estimates of the level of control.

**Table Q-2-3.  Emission controls summary table for non-oil and gas source categories (note all controls listed in this table apply to each management alternative).**

| Applicable Pollutants | Control Description |
|---|---|
| **Coal Mining** ||
| $PM_{10}$, $PM_{2.5}$ | Emissions from coal mining and assumed emission controls were based on available NEPA documents for Somerset Coal Field development. Fugitive Dust Control: Mitigation measures would be implemented to reduce particulate matter/fugitive dust emissions during construction and production activities. Unpaved roads would be treated with water to control fugitive road dust emissions. Storage piles would be watered to limit wind erosion potential and reduce fugitive emissions. It is assumed that most coal transfer points and processing activities would be enclosed and would therefore reduce fugitive particulate emissions. |
| **Uranium Mining** ||
| $NO_X$, $PM_{10}$, $PM_{2.5}$ | Emissions from uranium mining and assumed emission controls were based on the Whirlwind Mine Environmental Assessment (BLM 2008) **Generators:** Generators would meet NSPS standards and incorporate best available control technology. **Particulate:** $PM_{10}$ emissions would be limited to Colorado Department of Public Health and Environment APEN permitted levels. The ore loading area would be treated with magnesium chloride and water would be used for dust suppression at the waste rock storage and other disturbed areas. |
| **Sand and Gravel** ||
| $PM_{10}$, $PM_{2.5}$ | **Fugitive Dust Control:** Fugitive road dust emissions would be controlled by watering and/or application of magnesium chloride. |
| **Fire** ||
| - No specific emission controls identified - ||
| **Travel and Transportation Management** ||
| - No specific emission controls identified - ||
| **Livestock Grazing** ||
| $PM_{10}$, $PM_{2.5}$ | **Fugitive Dust Control:** Fugitive road dust emissions would be controlled by watering. |
| **Land and Realty ROW** ||
| $PM_{10}$, $PM_{2.5}$ | **Fugitive Dust Control:** Fugitive road dust emissions would be controlled during land and realty right-or-way projects by watering and/or application of magnesium chloride. |

BLM_0116320

**Table Q-2-4.   Oil and gas emission controls description and percent changes.**

| Applicable Pollutant(s) | Description | Percent Change |
|---|---|---|
| **Dust Control** | | |
| $PM_{10}$, $PM_{2.5}$ | watering | 50% |
| **Drill Rig Engines** | | |
| $NO_X$, PM | Tier II engines | 0% |
| **Completion Engines** | | |
| $NO_X$, PM | Tier II engines | 0% |
| **Green Completions** | | |
| VOC, HAPs | closed loop system and flaring control | 88% |
| **Liquids Removal System** | | |
| All | none | 0% |
| **Production Site Dehydrators** | | |
| VOC, HAPs | none | 0% |
| **Production Site Condensate Tanks** | | |
| VOC, HAPs | none | 0% |
| **Production Site Pneumatic Devices** | | |
| VOC, HAPs | usage of low-bleed pneumatic devices per Colorado requirements | 100% |
| **Production Site Pneumatic Pumps** | | |
| VOC, HAPs | none | 0% |
| **Wellhead and Lateral Compressor Engines Electrification** | | |
| All | none | 0% |
| **Wellhead, Lateral, Centralized Compressor Engines** | | |
| VOC, CO, $NO_X$ | All engines required to meet Colorado RICE and Federal NSPS Standards | |

## Q.2.2   Emission Calculations

Emission calculations for all emission-generating activities were derived from Operator-supplied data whenever possible. The detailed calculations shown in Appendices A, B, C, and D (of the Air Emission Inventory Technical Support Document) indicate the origin of the input data and how these data were used in the emissions estimates.

Methods used to estimate emissions from each source category are explained in Sections 2.2.1 and 2.2.2. For oil and gas sources, the estimation methods used for the conventional wells were the same as those used for CBNG wells unless noted otherwise. For each source category, emissions for the base year were estimated. Emissions were then forecasted to future years, accounting for activity growth and for applicable sources, emissions controls. More detailed assumptions, emission factors and calculations by source category are included in Appendices A, B, C, and D (of the Air Emission Inventory Technical Support Document).

BLM_0116321

### Q.2.2.1   Oil and Gas Sources

The methodologies implemented to estimate base year and future year emissions by alternative from oil and gas sources are explained in this section. Methodologies apply to conventional and CBNG oil and gas developments, unless noted otherwise. More detailed assumptions, emission factors, and emission estimates by source category are included in Appendix A (of the Air Emission Inventory Technical Support Document) for conventional activities, Appendix B for CBNG activities, and Appendix C for the midstream sector.

Emissions are generated in three main phases of oil and gas systems:

- Emissions from Well Construction and Development

- Emissions from the Production Phase (occurring at-or-nearby the wellpad)

- Emissions from Midstream Sources (Central Gas Compression and Processing)

#### Q.2.2.1.1  Emissions from Well pad Construction and Development

Emissions from Well pad Construction and Development include those generated by equipment, vehicles and activities related to well pad construction, access roads construction, pipeline construction, wellbore drilling and well completions. **Table Q-2-5** includes the emission sources identified for the well pad construction and development phase. Pollutant emissions are initially estimated on a per surrogate basis and later scaled with the projected surrogate estimate to obtain area-wide annual emissions from each source.

**Table Q-2-5.  Construction source categories and scaling surrogates.**

| Equipment Source Category | Emissions Units per Event | Scaling Surrogate |
|---|---|---|
| Well Pad, Access Road, and Pipeline Construction Equipment | tons/new pad | New pads per year |
| Well Pad, Access Road and Pipeline Construction Traffic | tons/new pad | New pads per year |
| Drilling Equipment and Completion Equipment | tons/spud | Spuds per year |
| Fracing Equipment | tons/spud | Spuds per year |
| Refracing Equipment | tons/well | Active wells per year |
| Drilling and Well Completion Traffic | tons/spud | Spuds per year |
| Rig Hauling and Rig Moving Traffic | tons/pad | New pads per year |
| Well Pad, Access Road and Pipeline Construction Wind Erosion | tons/new pad | New pads per year |
| Well Completion Venting | tons/spud | Spuds per year |

Q.2.2.1.1.1  Well Pad, Access Road, and Pipeline Construction Equipment

This category refers to emissions associated with off-road engines used during construction of well pads, access roads and pipelines and is also inclusive of well pad reclamation activity. Detailed data for each engine type such as horsepower rating, hours of operation, fuel type,

BLM_0116322

engine technology and load factors were derived from the literature. The EPA NONROAD2008a model (EPA 2009b) was used to compile emission factors for each equipment type. The $N_2O$ emissions factor was obtained from the 2009 American Petroleum Institute O&G GHG Methodologies Compendium, Tables 4-13 and 4-17 (American Petroleum Institute 2009). Engines were classified in three types as activity data and emissions factors vary by utility: well pad construction equipment, access road construction equipment and pipeline construction equipment.

Emissions on a per event (new well pads) basis for an engine type for which data was provided were estimated according to Equation 1:

$$E_{engine\,k,i} = \frac{EF_i \times HP \times LF \times t_{event} \times n}{907,185}$$

Equation (1)

where:
$E_{engine}$ are emissions of pollutant $i$ from an engine type $k$ [ton/pad]
$EF_i$ is the emissions factor of pollutant $i$ [g/hp-hr]
$HP$ is the horsepower of the engine $k$ [hp]
$LF$ is the load factor of the engine $k$
$t_{event}$ is the number of hours the engine is used [hr/pad]
$907,185$ is the mass unit conversion [g/ton]
$n$ is the number of type-k engines

### Q.2.2.1.1.1.1 Area-Wide Annual Emissions from Source Category

Annual emissions from well pad construction equipment by pollutant were estimated from the sum of engine emissions from each of the construction engine types ($E_{engineTOTAL,i} = \sum E_{engine\,k,i}$) according to Equation 2:

$$E_{well\,pad\,equip,i} = E_{engineTOTAL,i} \times S_{well\,pad}$$

Equation (2)

where:

$E_{well\,pad\,equip}$ are annual emissions of pollutant i from well pad construction and development equipment [ton/yr]
$E_{engineTOTAL,i}$ is sum of all engine emissions per event [ton/pad]
$S_{well\,pad}$ is the scaling surrogate for well pad construction [new pads/yr]

### Q.2.2.1.1.2 Well Pad, Access Road and Pipeline Construction Traffic

This category refers to the exhaust emissions from light-duty and heavy-duty vehicle traffic during well pad, access road and pipeline construction. Emission factors were developed using the MOVES2010a model (EPA 2010). For each field office, by project year representative county emissions factors were developed. The emission factors were prepared for two vehicle classes, heavy duty trucks (source type combination short-haul truck) and pick-up trucks (source type light commercial truck). MOVES2010a emissions factors were modeled to include exhaust running, idle and start, brake wear, tire wear, and evaporative processes. The $N_2O$ emission factor was obtained from 2012 Climate Registry Default Emission Factors (The Climate Registry 2012).

BLM_0116323

Emissions from two distinct fleet types were estimated in this source category dependent on the vehicle destination/use: (1) well pad and access road construction vehicles and (2) pipeline construction vehicles. Annual vehicle miles traveled (VMT) to well site were available for each vehicle class (light duty and heavy duty) within each fleet type (well pad and access road, and pipeline construction), thus exhaust emissions for each of four vehicle groups were calculated using the MOVES2010a emission factors on a grams per mile basis, as shown in Equation 3.

$$E_{traffic,i} = \frac{EF_i \times N_{trips} \times D}{907185}$$   Equation (3)

where:

$E_{traffic,i}$ is traffic exhaust emissions for pollutant i per well pad [ton/pad]
$EF_i$ is the average emission factor of pollutant i [g/mile]
$N_{trips}$ is the annual number of round trips per activity [trips/pad]
$D$ is the round trip distance [miles/trip]
$907185$ is the mass conversion [g/ton]

### Q.2.2.1.1.2.1 Area-Wide Annual Emissions from Source Category

Annual emissions for well pad, pipeline and access road construction traffic by pollutant were propagated with the appropriate scaling surrogate according to Equation 4:

$$E_{well\ pad\ traffic,i} = E_{traffic,i} \times S_{well\ pad}$$   Equation (4)

where:

$E_{well\ pad\ traffic,\ i}$ is the annual exhaust emissions of pollutant i from well pad, pipeline and access road construction traffic [ton/yr]

$E_{traffic,i}$ are the emissions of pollutant i per new well pad [ton/wellpad]
$S_{well\ pad}$ is the scaling surrogate for well pad and access road construction traffic [new pads/yr]

### Q.2.2.1.1.3 Drilling, Completion and Hydraulic Fracturing Equipment

This section refers to emissions associated with off-road engines used during drilling and completion activities. Detailed data for each engine type per source category such as horsepower rating, hours of operation, fuel type, engine technology and load factors was derived from the literature. Emissions for four distinct engine groups were estimated: (1) drilling equipment, (2) completion equipment, (3) fracing equipment, and (4) refracing equipment. Emissions were estimated separately by engine type as inputs and surrogates (see **Table Q-2-5**) varied by type; however the same methodology delineated by Equations 5 and 6 was used in all calculations.

For drilling, completion and hydraulic fracturing equipment, the EPA Tier 2 Federal Diesel Engine Standard emission rates were applied for $NO_X$, VOC, CO, $PM_{10}$ and $PM_{2.5}$ emissions. The $N_2O$ emissions factor was obtained from the 2009 American Petroleum Institute O&G GHG Methodologies Compendium, Tables 4-13 and 4-17 (American Petroleum Institute 2009).

BLM_0116324

Emissions on a per event (spuds or active wells) basis for an engine type were estimated according to Equation 5:

$$E_{engine\,k,i} = \frac{EF_i \times HP \times LF \times t_{event} \times n}{907,185}$$   **Equation (5)**

where:

$E_{engine}$ are exhaust emissions of pollutant $i$ from an engine type $k$ [ton/event]
$EF_i$ is the emissions factor of pollutant $i$ [g/hp-hr]
$HP$ is the horsepower of the engine $k$ [hp]
$LF$ is the load factor of the engine $k$
$t_{event}$ is the number of hours engine $k$ is used [hr/event]
$907,185$ is the mass unit conversion [g/ton]
$n$ is the number of type-k engines

### Q.2.2.1.1.3.1 Area-Wide Annual Emissions from Source Category

Annual equipment emissions by pollutant were estimated separately for each of the four engine groups and scaled with the appropriate scaling surrogate according to Equation 6:

$$E_{D\&C\,equipment,i} = E_{engineTOTAL,i} \times S_{event}$$   **Equation (6)**

where:

$E_{D\&C\,equipment,i}$ is annual emissions of pollutant i from completion/drilling equipment [ton/yr]
$E_{engineTOTAL,i}$ is sum of all engine emissions per event [ton/event]
$S_{event}$ is the scaling surrogate for completion/drilling operations [event/yr] according to **Table Q-2-5**.

### Q.2.2.1.2 Drilling and Well Completion Traffic

This section refers to on-road emissions from light-duty and heavy-duty vehicle traffic during drilling and completion operations. Methodology to estimate traffic emissions from these source categories was similar to that of source category *Well Pad, Access Road and Pipeline Construction Traffic*. However, emissions for *Drilling Traffic* and *Completion Traffic* were calculated separately since activity inputs and surrogates varied by source category. Input data to estimate the annual vehicle miles traveled (VMT) per activity was derived from the literature for each vehicle class (light duty and heavy duty) within each fleet. Fleets were defined by the vehicle destination or utility. These are shown in **Table Q-2-6** below. Annual average emission factors from EPA's MOVES2010a model as described in Section 2.2.1.2 were applied.

BLM_0116325

**Table Q-2-6.  Vehicle fleets used during drilling and completion.**

| Vehicle Use/Destination | Vehicle Class | | Fleet group ID |
|---|---|---|---|
| | Type | Class | |
| Drilling Traffic | Semi Trucks | Heavy Duty Truck | 1 |
| | Pickup Trucks | Light Duty Truck | 2 |
| Rig Move Drilling Traffic | Semi Trucks | Heavy Duty Truck | 3 |
| Rig Hauling | Semi Trucks | Heavy Duty Truck | 4 |
| Well Completion & Testing | Semi Trucks | Heavy Duty Truck | 5 |
| | Pickup Trucks | Light Duty Truck | 6 |

Exhaust emissions for each of the fleet groups were calculated using the appropriate MOVES2010a emission factors on a grams per mile basis, as shown in Equation 7:

$$E_{traffic,i} = \frac{EF_i \times N_{trips} \times D}{907185} \qquad \text{Equation (7)}$$

where:

$E_{traffic,i}$ is the traffic emissions for pollutant i per spud [tons/spud]
$EF_i$ is the average emission factor of pollutant i [g/mile]
$N_{trips}$ is the annual number of round trips per activity [trips/spud]
$D$ is the round trip distance [miles/trip]
$907185$ is the mass unit conversion [g/ton]

Given that emissions from the vehicle fleets are based on the same surrogate (spuds), total emissions from drilling and completion traffic will be the sum of emissions per spud from each fleet (calculated with Equation 7), as shown in Equation 8:

$$E_{traffic,D\&C,i} = \sum_{fleet=1}^{7} (E_{traffic,i})_{fleet} \qquad \text{Equation (8)}$$

where:

$E_{traffic,D\&C,i}$ is the total drilling and completions emissions of pollutant i per spud [ton/spud]
$E_{traffic,i}$ is the traffic emissions for pollutant i per spud for a vehicle fleet [tons/spud]

Q.2.2.1.2.1  Area-Wide Annual Emissions from Source Category
Annual emissions for drilling/completion traffic by pollutant were propagated with the appropriate scaling surrogate (spuds per year) according to Equation 9:

$$E_{traffic,i} = E_{traffic,D\&C,i} \times S_{spud} \qquad \text{Equation (9)}$$

where:

$E_{category\ traffic,\ i}$ are annual emissions of pollutant i from drilling/completion traffic [ton/yr]
$E_{traffic,D\&C,i}$ is the total drilling and completions emissions of pollutant i per spud [ton/spud]

BLM_0116326

$S_{spud}$ is the scaling surrogate for drilling/completion traffic [spuds/yr]

### Q.2.2.1.3 Construction Equipment Fugitive Dust

Fugitive dust emissions from disturbed land by well pad construction and reclamation equipment were estimated based on AP-42 Chapter 13 Section 13.2.3 guidance for estimating emissions from Heavy Construction Operations (EPA 1995a). A construction fugitive dust emission factor for total suspended particles (TSP) is available in the AP-42 guidance (1.2 tons-TSP/acre/month of activity).

Total suspended particle emissions from wellpad construction equipment on a per wellpad basis are estimated based on Equation 10:

$$E_{equip.dust,TSP} = EF \times A \times t \times \frac{(1-C)}{30} \qquad \text{Equation (10)}$$

where:

$E_{equip,dust,TSP}$ is the TSP emissions from construction equipment fugitive dust [tons/wellpad]
$A$ is the average number of acres disturbed per wellpad [acres/wellpad]
$t$ is the number of construction days per wellpad [days]
$C$ is the control efficiency
$30$ is the conversion factor for days/month

Conversion factors for TSP to particulate matter $PM_{10}$ (EPA 2006b) and from $PM_{10}$ to $PM_{2.5}$ (Midwest Research Institute, 2006) were used to estimate other fugitive dust pollutant emissions ($PM_{10}$ and $PM_{2.5}$). A control efficiency of 50% was assumed for well pad construction watering control.

#### Q.2.2.1.3.1  Area-Wide Annual Emissions from Source Category

Annual emissions for construction equipment fugitive dust, by pollutant i, were propagated with the appropriate scaling surrogate (wellpads per year) according to Equation 11:

$$E_{equip,dust,i_{TOTAL}} = E_{equip.dust,i} \times S_{new\ pads} \qquad \text{Equation (11)}$$

where:

$E_{equip,dust,i_{TOTAL}}$ is the annual dust emissions of pollutant i from construction equipment [ton/yr]
$E_{equip,dust,i}$ is the fugitive dust emissions of pollutant i from construction equipment per pad [tons/wellpad]
$S_{new\ pads}$ is the scaling surrogate for construction equipment fugitive dust [new pads/yr]

### Q.2.2.1.4 Fugitive Dust Emissions from Construction, Drilling and Completion Support Vehicles

Fugitive dust emissions from vehicle travel on unpaved roads were estimated based on the AP-42 technical guidance in Section 13.2.2.1 Unpaved Roads (EPA 2006a). Road dust emission factors for vehicles traveling on unpaved surfaces at industrial sites can be estimated with Equation 12.

BLM_0116327

$$EF_i = k \left(\frac{s}{12}\right)^a \left(\frac{W}{3}\right)^b$$ 

Equation (12)

where:

$EF$ is the size-specific particulate emissions factor for pollutant i (lb/mile)
$s$ is the surface material silt content (%)
$W$ is the mean vehicle weight (tons)
$k, a, b$ are empirical constants according to **Table Q-2-7**.

**Table Q-2-7.  Empirical constants by pollutant to estimate road dust emissions factor.**

| Parameter | PM$_{10}$ | PM$_{2.5}$ |
|---|---|---|
| k | 1.5 | 0.15 |
| a | 0.9 | 0.9 |
| b | 0.45 | 0.45 |

Because the emissions factor is a function of vehicle weight, individual emissions factor for heavy duty vehicles and light duty vehicles were derived with Equation 12. To account for natural mitigation of road dust emissions due to annual precipitation and from watering control, Equation 13 was applied:

$$EF_{mitigated} = EF_i \times \frac{365-P}{365} \times \frac{100-CE}{100}$$ 

Equation (13)

where:

$EF_{mitigated}$ is the annual average emission factor for uncontrolled conditions including natural mitigation [lb/mile]

$EF_i$ is the size-specific emission factor [lb/mile]
$P$ is number of precipitation days (>0.01" rainfall) at the site
$CE$ is the control efficiency for watering in unpaved roads; CE =50%

Emissions were estimated for all types of vehicles involved in construction, drilling and completion activities. The vehicle groups were classified according to their vehicle class and utility, and literature data was collected to estimate annual vehicle miles traveled per activity (or event), which varied by vehicle groups and by the type of oil and gas development (conventional gas and CBNG). The vehicle fleets used in each type of development are shown in **Table Q-2-8**.

BLM_0116328

**Table Q-2-8. Vehicles groups related to fugitive road dust emissions in well construction and development.**

| Vehicle Group ID | Utility/Destination | Vehicle Class | Event (Surrogate) |
|---|---|---|---|
| 1 | Well Pad Access Road Construction | Heavy Duty Truck | New pads |
| 2 | | Light Duty Truck | |
| 3 | Pipeline Construction | Heavy Duty Truck | |
| 4 | | Light Duty Truck | |
| 5 | Drilling Traffic | Heavy Duty Truck | Spuds |
| 6 | | Light Duty Truck | |
| 7 | Rig Move Drilling Traffic | Heavy Duty Truck | New pads |
| 8 | | Light Duty Truck | |
| 9 | Rig Hauling | Heavy Duty Truck | |
| 10 | Well Completion & Testing | Heavy Duty Truck | Spuds |
| 11 | | Light Duty Truck | |
| 12 | Fuel Haul Truck | Heavy Duty Truck | Spuds |

Fugitive dust road emissions were calculated using the mitigated emissions factor ($EF_{mitigated}$) from Equation 13, along with the vehicle miles traveled for each vehicle group as shown in Equation 14.

$$E_{traffic,i} = \frac{EF_{mitigated} \times N_{trips} \times D}{2000} \qquad \text{Equation (14)}$$

where:

$E_{traffic,i}$ is the traffic fugitive dust emissions for pollutant i per event [ton/event]

$EF_{mitigated}$ is the average emission factor of pollutant i for fugitive dust emissions [lb/mile]

$N_{trips}$ is the annual number of round trips per activity [trips/event]

$D$ is the round trip distance [miles/trip]

$2000$ is the mass conversion [lb/ton]

Q.2.2.1.4.1  Area-Wide Annual Emissions from Source Category

Annual emissions for road fugitive dust from construction/drilling/completion traffic were propagated with the appropriate scaling surrogate according to Equation 15:

$$E_{dust,traffic,i} = E_{traffic,i} \times S_{event} \qquad \text{Equation (15)}$$

where:

$E_{dust,traffic,i}$ are annual emissions of pollutant i for road fugitive dust from construction/drilling/completion traffic [ton/yr]

$E_{traffic,i}$ are the emissions of pollutant i per event (spuds or new pads) [ton/event]

$S_{event}$ is the scaling surrogate for the vehicle group [event/yr]

BLM_0116329

*Q.2.2.1.5 Construction Wind Erosion*

Wind erosion dust emissions associated with well pad construction, and road, pipeline construction operations, and well pad reclamation activity were estimated based on AP-42 guidance for the estimation of emissions from industrial wind erosion (EPA 2006b). Wind erosion emissions per well pad were estimated based on Equation 16:

$$E_{dust,i} = \frac{P \times A \times r}{907,185}$$

Equation (16)

where:

$E_{dust,\ i}$ are dust emissions for pollutant i from construction wind erosion [ton/pad]
$P$ is the erosion potential [g/m$^2$]
$A$ is the well pad construction area [m$^2$/pad]
$r$ is the particle size multiplier for PM$_{10}$ or PM$_{2.5}$
$907,185$ is a mass unit conversion [g/ton]

The erosions potential is a function of the wind friction velocity, as shown in equation 17 and 18:

$$P = 58 \times (u* - u_t)^2 + 25(u* - u_t)$$

Equation (17)

where:

$u*$ is the friction velocity (m/s)
$u_t$ is the threshold friction velocity (m/s)

$$P = 0 \qquad for \qquad (u* \leq u_t)$$

Equation (18)

Friction velocity estimates (u*) were made by multiplying the average annual fastest wind speed by 0.053 per AP-42 guidance (EPA 2006b). Particle size multipliers of 0.5 and 0.075 were assumed for PM$_{10}$ and PM$_{2.5}$ respectively per AP-42 guidance.

<u>Q.2.2.1.5.1   Area-Wide Annual Emissions from Source Category</u>

The annual construction dust wind erosion emissions were scaled by multiplying per well pad emissions by the scaling surrogate (new pads) according to Equation 19:

$$E_{wind\ erosion\ total,i} = E_{dust,i} \times S_{well\ pad}$$

Equation (19)

where:

$E_{dust\ erosion\ total,i}$ are the annual emissions of pollutant *i* from construction dust wind erosion [ton/yr]
$E_{dust,\ i}$ are the dust emissions of pollutant i per well pad [ton/pad]
$S_{well\ pad}$ is the scaling surrogate for construction dust wind erosion [pad/yr]

*Q.2.2.1.6 Well Completion Venting*

This section describes emissions from well completion venting. The calculation methodology for estimating venting emissions from a single completion event is shown below in Equation 20:

BLM_0116330

$$E_{completion,i} = \left[ \frac{P \times Q_{completion}}{\frac{R}{MW_{gas}} \times T \times 3.5 \times 10^{-5}} \right] \times \frac{f_i}{907185} \times (1 - 0.95 F_{flare} - F_{green})$$   **Equation (20)**

where:

$E_{completion,i}$ is the uncontrolled emissions of pollutant $i$ from a single completion event [ton/event]
$P$ is atmospheric pressure [1 atm]
$Q_{completion}$ is the volume of gas generated per completion [MCF/event]
$R$ is the universal gas constant [0.082 L-atm/mol-K]
$MW_{gas}$ is the molecular weight of the gas [g/mol]
$T$ is the atmospheric temperature [298 K]
$f_i$ is the mass fraction of pollutant $i$ in the completion venting gas
$F_{green}$ is the fraction of completions that were controlled by green completion techniques
$F_{flare}$ is the fraction of completions controlled by flare
$0.95$ is the control efficiency of the flare

### Q.2.2.1.6.1  Extrapolation to Area-Wide Annual Emissions

Annual emissions are obtained by scaling-up emissions per event by the number of spuds for a particular year. The total emissions from completion venting are estimated following Equation 21:

$$E_{completion,TOTAL,i} = E_{completion,i} \times S_{spuds}$$   **Equation (21)**

where:

$E_{completion,TOTAL}$ are the annual emissions for pollutant i from completion venting [tons/year]
$E_{completion,i}$ are the completion emissions from a single completion event [tons/event], event=spuds
$S_{spuds}$ is the scaling surrogate for completion venting in a particular year [spuds/year]

### Q.2.2.1.7  Well Completion Flaring

This section describes the methodology for estimating flaring emissions from completion venting as described in Equation 22. It was assumed the efficiency of the flare was 95 percent.

$$E_{flare,completion} = \left( \frac{EF_i \times Q_{completion} \times F_{flared} \times HV}{1000} \right) \Big/ 2000$$   **Equation (22)**

where:

$E_{flare,completion}$ is the area-wide flaring emissions of pollutant i for well completions [ton/event]
$EF_i$ is the flaring emissions factor for pollutant $i$ [lb/MMBtu]
$Q_{completion}$ is the volume of gas generated per completion [MCF/event]
$HV$ is the local heating value of the gas [BTU/SCF]
$F_{flared}$ is the fraction of well completions with flares

### Q.2.2.1.7.1  Extrapolation to Area-Wide Annual Emissions

Annual area-wide flaring emissions for well completions are scaled-up using the total number of spuds per year as shown in Equation 23:

BLM_0116331

$$E_{heater,TOTAL,i} = E_{heater,i} \times S_{TOTAL}$$

**Equation (23)**

where:

$E_{heater,TOTAL}$ is the annual emissions from well completion flaring for pollutant i [ [ton/yr]
$E_{heater}$ is the emissions from well completion flaring for pollutant i per event [ton/event]
$S_{TOTAL}$ is the total number of spuds for a particular year [spuds]. The number of well completions is
assumed equal to the spuds count for the year.

### Q.2.2.1.8 Emissions from the Production Phase

Emissions from the Production phase include those generated by equipment, vehicles and
activities related to oil and gas production at well sites after a well has been completed.
Pollutant emissions are initially estimated on a per event basis and later scaled with the
projected number of events per year (scaling surrogate) to obtain UFO planning area-wide
annual emissions from each source.

### Q.2.2.1.8.1   Well Workovers Equipment

This category refers to emissions associated with off-road engines used during well workovers.
Detailed data for a typical workover engine such as horsepower rating, hours of operation, fuel
type, engine technology and load factor was derived from the literature. The EPA
NONROAD2008a model (EPA 2009b) was used to compile emission factors for 'other oil field
equipment' representative of workover engines. The $N_2O$ emissions factor was obtained from
the 2009 American Petroleum Institute O&G GHG Methodologies Compendium, Tables 4-13
and 4-17 (American Petroleum Institute 2009).

Emissions on a per well basis for a workover engine were estimated according to Equation 24:

$$E_{engine,i} = f \times \frac{EF_i \times HP \times LF \times t \times n}{907,185}$$

**Equation (24)**

where:

$E_{engine}$ are emissions of pollutant i from a workover engine [ton/well]
$EF_i$ is the emissions factor of pollutant i [g/hp-hr]
$HP$ is the horsepower of the engine [hp]
$LF$ is the load factor of the engine
$t$ is the number of hours of use per day [hr/day]
$907,185$ is the mass unit conversion [g/ton]
$n$ is the number of operating days per well [days/well]
$f$ is the well workover frequency per year

### Q.2.2.1.8.2   Extrapolation to Area-Wide Annual Emissions

Annual emissions from well workover equipment by pollutant were estimated according to
Equation 25:

$$E_{WO-equip,i} = E_{engine\ i} \times S_{wells}$$

**Equation (25)**

where:

$E_{WO\text{-}equip,i}$ are annual emissions of pollutant i from workover equipment [ton/yr]
$E_{engine,i}$ is emissions of pollutant i from workover equipment per well [ton/well]
$S_{well\,pad}$ is the scaling surrogate for workovers [active wells/yr]

### Q.2.2.1.9 Production Traffic (Well workovers, Road Maintenance, Well Pad Reclamation and Production)

This section describes the estimation of exhaust emissions from light-duty and heavy-duty vehicle traffic used for Well Workovers, Maintenance, Well Pad Reclamation and Production. This excludes traffic from tank loading and compressor stations maintenance. Vehicle classes within the four source categories are shown in **Table Q-2-9**. Emissions from these vehicle fleets were first estimated on a per well basis and later on scaled to annual Area-wide emissions with the scaling surrogate, active wells per year.

**Table Q-2-9.  Vehicle fleets comprising production traffic.**

| Vehicle Fleets ID | Utility (Source Category) | Vehicle Class | Event (Surrogate) |
|---|---|---|---|
| 1 | Well Workover Commuting Vehicles | Light Duty Truck | Active Wells |
| 2 | | Heavy Duty Truck | |
| 3 | Road Maintenance | Light Duty Truck | |
| 4 | Road and Well Pad Reclamation | Light Duty Truck | |

Emission factors were developed using the MOVES2010a model as described in Section 2.2.1.2 above.

Exhaust emissions for the five vehicle groups were estimated as shown in Equation 26.

$$E_{fleet,traffic,i} = \frac{EF_i \times N_{trips} \times D}{907185}$$
  **Equation (26)**

where:

$E_{fleet,traffic,i}$ is the fleet's traffic emissions for pollutant i per well [tons/well]
$EF_i$ is the average emission factor of pollutant i [g/mile]
$N_{trips}$ is the annual number of round trips per activity [trips/well]
$D$ is the round trip distance [miles/trip]
907185 is the mass unit conversion [g/ton]

#### Q.2.2.1.9.1  Extrapolation to Area-Wide Annual Emissions

Annual emissions for each category (fleet) of production traffic were propagated with the appropriate scaling surrogate (active wells per year) according to Equation 27:

$$E_{fleet,TOTAL,i} = E_{fleet,traffic,i} \times S_{wells}$$
  **Equation (27)**

BLM_0116333

where:

$E_{fleet,TOTAL,i}$ are annual emissions of pollutant i from a production fleet [ton/yr]

$E_{fleet,traffic,i}$ is the emissions of pollutant i per well for a production traffic fleet [ton/well]

$S_{wells}$ is the scaling surrogate for the source category [active wells/yr]

### Q.2.2.1.10 Fugitive Dust Emissions from Production Traffic (Well Workovers, Road Maintenance, Well Pad Reclamation and Other Production)

Fugitive dust emissions from vehicle travel on unpaved roads were estimated based on the AP-42 technical guidance Section 13.2.2.1 Unpaved Roads (EPA 2006a). Road dust emission factors for vehicles traveling on unpaved surfaces at industrial sites can be estimated with Equation 28.

$$EF_i = k \left(\frac{s}{12}\right)^a \left(\frac{W}{3}\right)^b \qquad \text{Equation (28)}$$

where:

$EF$ is the size-specific particulate emissions factor for pollutant i (lb/mile)
$s$ is the surface material silt content (%)
$W$ is the mean vehicle weight (tons)
$k, a, b$ are empirical constants according to **Table Q-2-10**.

**Table Q-2-10. Empirical constants by pollutant to estimate road dust emissions factor.**

| Parameter | PM$_{10}$ | PM$_{2.5}$ |
|---|---|---|
| k | 1.5 | 0.15 |
| a | 0.9 | 0.9 |
| b | 0.45 | 0.45 |

Because the emissions factor is a function of vehicle weight, individual emissions factor for heavy duty vehicles and light duty vehicles were calculated with Equation 28. To account for natural mitigation of road dust emissions due to annual precipitation and from watering control, Equation 29 was applied:

$$EF_{mitigated} = EF_i \times \frac{365-P}{365} \times \frac{100-CE}{100} \qquad \text{Equation (29)}$$

where:

$EF_{mitigated}$ is the annual average emission factor for uncontrolled conditions including natural mitigation [lb/mile]
$EF_i$ is the size-specific emission factor [lb/mile]
$P$ is number of precipitation days (>0.01" rainfall) at the site
$CE$ is the control efficiency for watering in unpaved roads

Vehicle fleets comprising production traffic are shown in **Table Q-2-9**. Fugitive dust emissions from these vehicle fleets were first estimated on a per well basis and later scaled to annual Area-wide emissions with the scaling surrogate, active wells per year.

BLM_0116334

Fugitive dust road emissions per well were calculated using the mitigated emissions factor ($EF_{mitigated}$) from Equation 29, along with the vehicle miles traveled for each vehicle group. This is shown in Equation 30

$$E_{fleet,traffic,i} = \frac{EF_{mitigated} \times N_{trips} \times D}{2000}$$

**Equation (30)**

where:

$E_{fleet,traffic,i}$ is the traffic fugitive dust emissions for pollutant i per well [ton/well]
$EF_{mitigated}$ is the average emission factor of pollutant i for fugitive dust emissions [lb/mile]
$N_{trips}$ is the annual number of round trips per activity [trips/well]
$D$ is the round trip distance [miles/trip]
$2000$ is the mass conversion [lb/ton]

Q.2.2.1.10.1   Extrapolation to Area-Wide Annual Emissions
Annual fugitive dust emissions for each category (fleet) of Production traffic were propagated with the appropriate scaling surrogate (active wells per year) according to Equation 31:

$$E_{fleet,TOTAL,i} = E_{fleet,traffic,,i} \times S_{wells}$$

**Equation (31)**

where:

$E_{fleet,TOTAL,i}$ are annual fugitive dust emissions of pollutant i from a production fleet [ton/yr]
$E_{fleet,traffic,i}$ is the fugitive dust emissions of pollutant i per well for a production traffic fleet [ton/well]
$S_{wells}$ is the scaling surrogate for the source category [active wells/yr]

Q.2.2.1.11  Blowdown Venting
This section refers to the estimation of emissions from venting during well blowdowns. The calculation methodology for estimating emissions from a single blowdown event is shown below in Equation 32:

$$E_{blowdown,i} = \left( \frac{P \times (V_{vented})}{\left( R / MW_{gas} \right) \times T \times 3.5 \times 10^{-5}} \right) \times \frac{f_i}{907185}$$

**Equation (32)**

where:

$E_{blowdown,i}$ is the emissions of pollutant *i* from a single blowdown event [ton/event]
$P$ is atmospheric pressure [1 atm]
$V_{vented}$ is the volume of vented gas per blowdown (uncontrolled) [MCF/event]
$R$ is the universal gas constant [0.082 L-atm/mol-K]
$MW_{gas}$ is the molecular weight of the gas [g/mol]
$T$ is the atmospheric temperature [298 K]
$f_i$ is the mass fraction of pollutant *i* in the vented gas

BLM_0116335

Q.2.2.1.11.1   Extrapolation to Area-Wide Annual Emissions

The total emissions from all annual blowdowns events occurring are estimated with Equation 33:

$$E_{blowdown,TOTAL} = E_{blowdown,i} \times N_{blowdown} \times S_{wells}$$   **Equation (33)**

where:

$E_{blowdown,TOTAL}$ are the total annual emissions from blowdowns [tons/yr]
$E_{blowdown,i}$ are the blowdown emissions from a single blowdown event [tons/event]
$N_{blowdown}$ is the frequency of blowdowns per well per year [events/yr-well]
$S_{wells}$ is the total number of active wells for a particular year [wells]

### Q.2.2.1.12  Well Recompletion Venting

This section describes emissions from well recompletion venting. The calculation methodology for estimating venting emissions from a single recompletion event is shown below in Equation 34:

$$E_{recompletion,i} = \left[ \frac{P \times Q_{recompletion}}{\frac{R}{MW_{gas}} \times T \times 3.5 \times 10^{-5}} \right] \times \frac{f_i}{907185}$$   **Equation (34)**

where:

$E_{recompletion,i}$ is the uncontrolled emissions of pollutant $i$ from a single recompletion event [ton/event]
$P$ is atmospheric pressure [1 atm]
$Q_{recompletion}$ is the volume of gas generated per recompletion [MCF/event]
$R$ is the universal gas constant [0.082 L-atm/mol-K]
$MW_{gas}$ is the molecular weight of the gas [g/mol]
$T$ is the atmospheric temperature [298 K]
$f_i$ is the mass fraction of pollutant $i$ in the recompletion venting gas

Q.2.2.1.12.1   Extrapolation to Area-Wide Annual Emissions

Annual emissions are obtained by scaling-up emissions per event with the total number of recompletion events in a particular year. The total emissions from recompletion venting are estimated following Equation 35:

$$E_{recompletion,TOTAL,i} = E_{recompletion,i} \times f \times S_{well\ count}$$   **Equation (35)**

where:

$E_{completion,TOTAL}$ are the annual emissions for pollutant i from recompletion venting [tons/year]
$E_{completion,i}$ are the venting emissions from a single recompletion event [tons/event]
$f$ is the frequency of recompletion events per well per year [events/yr-well]
$S_{well\ count}$ is the scaling surrogate for recompletion venting in a particular year [active wells]

### Q.2.2.1.13  Wellhead Fugitives

This source category refers to fugitive emissions or *leaks* from well equipment such as pump seals, valves, connectors, flanges, etc. Fugitive emissions were estimated for three main streams identified: gas service stream, liquids service stream and high oil stream. VOC, $CO_2$ and $CH_4$ emissions per stream were estimated using device-specific TOC emission factors for oil and gas production (EPA 1995b) and equipment counts. Input data was obtained from the literature on total device counts per well by type of equipment and by the type of service to which the equipment applies – gas, liquids and high oil.

Fugitive VOC emissions for an individual device in a given stream (gas, liquids, and high oil) were estimated according to Equation 36:

$$E_{fugitiveVOC,k} = EF_{TOC} \times N \times t_{annual} \times Y$$

Equation (36)

where:

$E_{fugitive\ VOC,\ k}$ is the fugitive VOC emissions for a given device k [ton/yr-well]
$EF_{TOC}$ is the emission factor of TOC [kg/hr/device]
$N$ is the total number of devices type-k for a given stream per well [devices/well]
$Y$ is the ratio of VOC to TOC in the vented gas

Total VOC fugitive emissions for a given stream are equal to the sum of all fugitive emissions from devices in that stream per Equation 37:

$$E_{fugitiveVOC,stream} = \sum E_{fugitiveVOC,k}$$

Equation (37)

where:

$E_{fugitive\ VOC,stream}$ is the total fugitive VOC emissions in a given stream per well [ton/yr-well]

$CO_2$ and $CH_4$ fugitive emissions per stream were estimated according to Equations 38 and 39:

$$E_{fugitiveCH4,stream} = E_{fugitiveVOC,stream} \times \frac{weight\ fraction_{CH4}}{weight\ fraction_{VOC}}$$

Equation (38)

$$E_{fugitiveCO2,stream} = E_{fugitiveVOC,stream} \times \frac{weight\ fraction_{CO2}}{weight\ fraction_{VOC}}$$

Equation (39)

where:

$E_{fugitive\ CO2,stream}$ is the total fugitive $CO_2$ emissions in a given stream per well [ton/yr-well]
$E_{fugitive\ CH4,stream}$ is the total fugitive $CH_4$ emissions in a given stream per well [ton/yr-well]
*Weight fractions* per pollutant were based on gas compositions. For gas and well streams, sales gas composition was used. For condensate stream, fugitive-post flash compositions were used.

### Q.2.2.1.13.1   Extrapolation to Area-Wide Annual Emissions

Fugitive emissions were propagated annually according to Equation 40 using the scaling surrogate, active well counts:

$$E_{fugitive,i} = E_{fugitive\ i,stream} \times S_{well\ count} \qquad \textbf{Equation (40)}$$

where:

$E_{fugitive,\ i}$ are the annual fugitive emissions for pollutant i in a given stream [ton/yr]
$E_{fugitive\ i,\ stream}$ are fugitive emissions of pollutant i in a stream per well [ton/yr-well]
$S_{well\ count}$ is the number of active wells for a particular year [active wells]

### Q.2.2.1.14  Pneumatic Devices

Emissions for pneumatic devices will vary by the bleed rate of the device. The methodology for estimating the emissions from a mix of pneumatic devices i (liquid level controllers, pressure controllers, etc.) for a single typical well is shown in Equation 41:

$$E_{pneumatic,j} = \frac{f_j}{907185}\left(\sum_i \dot{V_i} \times N_i \times t_{annual}\right) \times \frac{P}{\left(\left(R / MW_{gas}\right) \times T \times 3.5 \times 10^{-5}\right)} \qquad \textbf{Equation (41)}$$

where:

$E_{pneumatic,j}$ is the total emissions of pollutant j from all pneumatic devices for a typical well [ton/year/well]

$\dot{V_i}$ is the volumetric bleed rate from device i [MCF/hr/device]

$N_i$ is the average number of devices found in a well [devices/well]

$t_{annual}$ is the number of hours per year that devices were operating [8760 hr/yr]

$P$ is the atmospheric pressure [1 atm]

$R$ is the universal gas constant [0.082 L-atm/mol-K]

$MW_{gas}$ is the molecular weight of the gas [g/mol]

$T$ is the atmospheric temperature [298 K]

$f_j$ is the mass fraction of pollutant j in the vented gas

#### Q.2.2.1.14.1   Extrapolation to Area-Wide Annual Emissions

Annual emissions from pneumatic devices were estimated according to Equation 42:

$$E_{pneumaticTOTAL,j} = E_{pneumatic,j} \times N_{well} \qquad \textbf{Equation (42)}$$

where:

$E_{pneumatic,TOTAL,j}$ is the total annual emissions of pollutant j from pneumatic devices [ton/yr]
$E_{pneumatic,j}$ is the pneumatic device emissions of pollutant j for a single typical well [ton/yr/well]
$N_{well}$ is the total number of active wells in the basin [wells]

### Q.2.2.1.15  Pneumatic Pumps

To estimate emissions from pneumatic pumps, literature data indicating the average rate of gas consumption per gallon of chemical injected and the annual chemical throughput for a single

BLM_0116338

pump was applied. Emissions per well from pneumatic pumps were estimated as shown in Equation 43:

$$E_{pump,i} = \frac{N_{CIP} \times V_{vented,gas} \times t_{pump} \times MW_i \times R \times Y_i}{2000}$$

**Equation (43)**

where:

$E_{pump,\,i}$ is the pneumatic pump emissions for pollutant i per well [ton/yr-well]
$V_{vented,TOTAL}$ is the average gas venting rate per pump [SCF/pump/hr]
$N_{CIP}$ is the number of gas-actuated pneumatic pumps per well [pump/well]
$t_{pump}$ is the annual hours of operation of a pump [hrs/yr]
$MW_i$ is the molecular weight of pollutant i [lb/lb-mol]
$R$ is the universal gas constant [lb-mol/391.9scf]
$Y_i$ is the molar fraction of pollutant i in pneumatic pump vented gas
$2000$ is the mass unit conversion [lb/ton]

### Q.2.2.1.15.1   Extrapolation to Area-Wide Annual Emissions

To estimate area-wide annual emissions from pneumatic pumps the scaling surrogate, active wells, was used according to Equation 44

$$E_{pneumaticpumps,i} = E_{pump,i} \times S_{well\ count}$$

**Equation (44)**

where:

$E_{pneumaticpumps,\,i}$ are the annual emissions for pollutant i from pneumatic pumps [ton/yr]
$E_{pump,\,i}$ is the emissions from all pneumatic pumps per well [ton/yr-well]
$S_{well\ count}$ is the number of active wells for a particular year [wells]

### Q.2.2.1.16 Water Injection Pumps

This category refers to exhaust emissions associated with diesel combustion in water injection pump engines. Detailed data for each engine type such as horsepower rating, hours of operation, fuel type, engine technology and load factors was derived from the literature. The EPA NONROAD2008a model (EPA 2009b) was used to compile emission factors. The $N_2O$ emissions factor was obtained from the 2009 American Petroleum Institute O&G GHG Methodologies Compendium, Tables 4-13 and 4-17 (American Petroleum Institute 2009).

Emissions on a per well basis for a water injection pump were estimated according to Equation 45:

$$E_{engine,i} = \frac{EF_i \times HP \times LF \times t_{event} \times n}{907,185}$$

**Equation (45)**

where:

$E_{engine}$ are per-well emissions of pollutant *i* from water injection pumps [ton/well]
$EF_i$ is the emissions factor of pollutant *i* [g/hp-hr]
$HP$ is the horsepower of the pump [hp]

BLM_0116339

*LF* is the load factor of the pump
$t_{event}$ is the number of hours the engine is used annually [hrs/unit]
*907,185* is the mass unit conversion [g/ton]
*n* is the number of water injection pumps per well [units/well]

### Q.2.2.1.16.1   Extrapolation to Area-Wide Annual Emissions
Annual emissions from water injection pumps for pollutant i were estimated according to Equation 46:

$$E_{water\,pumps,i} = E_{engine,i} \times S_{well} \qquad \textbf{Equation (46)}$$

where:

$E_{well\,pad\,equip}$ are annual emissions of pollutant i from water injection pumps [ton/yr]
$E_{engine,i}$ is engine emissions per well [ton/well]
$S_{well}$ is the scaling surrogate for water injection pumps [active wells/yr]

### Q.2.2.1.17 Miscellaneous Engines
This category refers to exhaust emissions associated with miscellaneous engines at well sites. Detailed data for miscellaneous engines such as horsepower rating, hours of operation, fuel type, engine technology and load factors was derived from the literature. The EPA NONROAD2008a model (EPA 2009b) was used to compile emission factors. The $N_2O$ emissions factor was obtained from the 2009 American Petroleum Institute O&G GHG Methodologies Compendium, Tables 4-13 and 4-17 (American Petroleum Institute 2009).

Emissions on a per well basis for miscellaneous engines were estimated according to Equation 47:

$$E_{engine,i} = \frac{EF_i \times HP \times LF \times t_{event} \times n}{907,185} \times f \qquad \textbf{Equation (47)}$$

where:

$E_{engine}$ are per-well emissions of pollutant *i* from miscellaneous engines [ton/well]
$EF_i$ is the emissions factor of pollutant *i* [g/hp-hr]
*HP* is the horsepower of the pump [hp]
*LF* is the load factor of the pump
$t_{event}$ is the number of hours the engine is used [hrs/unit]
*f* is the fraction of wells served by a miscellaneous engine
*907,185* is the mass unit conversion [g/ton]
*n* is the number of engines per well [units/well]

### Q.2.2.1.17.1   Extrapolation to Area-Wide Annual Emissions
Annual emissions from miscellaneous engines for pollutant i were estimated according to Equation 48:

$$E_{water\,pumps,i} = E_{engine,i} \times S_{well} \qquad \textbf{Equation (48)}$$

where:

BLM_0116340

$E_{well\,pad\,equip}$ are annual emissions of pollutant i from miscellaneous engines [ton/yr]
$E_{engine,i}$ is engine emissions per well [ton/well]
$S_{well}$ is the scaling surrogate for miscellaneous engines [active wells/yr]

### Q.2.2.1.18  Compressor Station Maintenance Traffic Exhaust

This section describes the estimation of exhaust emissions from light-duty vehicles (pickup trucks) used for compressor maintenance at compressor stations. Emission factors were developed using the MOVES2010a model (EPA 2010) as described in Section 2.2.1.2. The total vehicle miles travelled annually from maintenance visits to a single compressor station were obtained from the literature.

Exhaust emissions for this fleet were estimated as shown in Equation 49.

$$E_{fleet,traffic,i} = \frac{EF_i \times VMT_{CS}}{907185}$$
  **Equation (49)**

where:

$E_{fleet,traffic,i}$ is the fleet's traffic emissions for pollutant i per well [tons/station]
$EF_i$ is the average emission factor for light duty vehicles of pollutant i [g/mile]
$VMT_{CS}$ is the annual miles travelled for maintenance compressor station [miles/station]
$907185$ is the mass unit conversion [g/ton]

#### Q.2.2.1.18.1   Extrapolation to Area-Wide Annual Emissions

Annual emissions for the compressor maintenance fleet were propagated with the scaling surrogate "total count of active compressor stations" according to Equation 50:

$$E_{fleet,TOTAL,i} = E_{fleet,traffic,i} \times S_{CS}$$
  **Equation (50)**

where:

$E_{fleet,TOTAL,i}$ are annual emissions of pollutant i from compressor station maintenance traffic [ton/yr]
$E_{fleet,traffic,i}$ is the emissions of pollutant i per station for the fleet [ton/station]
$S_{CS}$ is the scaling surrogate for the source category [number of active compressor stations per year]

### Q.2.2.1.19  Fugitive Dust Emissions from Compressor Station Maintenance Traffic

Road dust emission factors for light duty vehicles traveling on unpaved surfaces to and from compressor stations were estimated with the same methodology as Section 2.2.1.2.6 using Equations 28 and 29. Fugitive dust road emissions per station (visited) were calculated using the mitigated emissions factor ($EF_{mitigated}$) from Equation 29, along with the annual vehicle miles traveled per compressor station. This is shown in Equation 51.

$$E_{fleet,traffic,i} = \frac{EF_{mitigated} \times VMT}{2000}$$
  **Equation (51)**

where:

BLM_0116341

$E_{fleet,traffic,i}$ is the traffic fugitive dust emissions for pollutant i per station [ton/station]
$EF_{mitigated}$ is the average emission factor of pollutant i for fugitive dust emissions [lb/mile]
*VMT* is the annual miles travelled for maintenance compressor station [miles/station]
*2000* is the mass conversion [lb/ton]

Q.2.2.1.19.1   Extrapolation to Area-Wide Annual Emissions

Annual fugitive dust emissions for compressor station maintenance traffic were propagated with the "total number of compressor stations" according to Equation 52:

$$E_{fleet,TOTAL,i} = E_{fleet,traffic,i} \times S_{CS}$$   Equation (52)

where:

$E_{fleet,TOTAL,i}$ are annual fugitive dust emissions of pollutant i from compressor station maintenance traffic [ton/yr]
$E_{fleet,traffic,i}$ is the emissions of pollutant i per station for the fleet [ton/station]
$S_{CS}$ is the scaling surrogate for the source category [number of active compressor stations per year]

*Q.2.2.1.20 Condensate Tanks Flashing*

An uncontrolled VOC emissions factor applicable to Garfield, Mesa, Rio Blanco, and Moffat Counties (Colorado Department of Public Health and Environment 2006) was used to estimate emissions for condensate tanks in conventional gas and coalbed natural gas developments on a per barrel basis. The published emissions factor was 10 lbs VOC/bbl [0.005 tons/bbl]; for planning areas outside of those counties the emission factor of 11.8 lbs VOC/bbl [0.0059 tons/bbl] was used (Colorado Department of Public Health and Environment 2006). The VOC emissions factor was multiplied by the annual condensate production from each type of well to propagate VOC emissions to the planning area level for each year. $CO_2$ and $CH_4$ total emissions were then calculated using the weight fraction ratios from local flash gas composition analyses using Equations 53 and 54.

$$E_{tanks,CH4} = E_{tanks,VOC} \times \frac{weight\ fraction_{CH4}}{weight\ fraction_{VOC}}$$   Equation (53)

$$E_{tanks,CO2} = E_{tanks,VOC} \times \frac{weight\ fraction_{CO2}}{weight\ fraction_{VOC}}$$   Equation (54)

where:

$E_{tanks,VOC}$ is the total annual condensate tanks emissions from APENS database [tons/yr]
$E_{tanks,CO2}$ is the total condensate tank $CO_2$ emissions [tons/yr]
$E_{tanks,CH4}$ is the total condensate $CH_4$ emissions [tons/yr]
*Weight fractions* of each pollutant in flash gas

*Q.2.2.1.21 Loading Emissions from Condensate or Oil Tanks*

This section describes emissions from truck loading of condensate tanks. The loading loss rate is estimated following Equation 55:

BLM_0116342

$$L = 12.46 \times \left( \frac{S \times V \times M}{T} \right)$$

**Equation (55)**

where:

$L$ is the loading loss rate [lb/1000gal]
$S$ is the saturation factor taken from AP-42 default values based on operating mode. The operating mode for loading assumed was submerged loading: dedicated normal service.
$V$ is the true vapor pressure of the liquid loaded [psia]
$M$ is the molecular weight of the vapor [lb/lb-mole]
$T$ is the temperature of the bulk liquid [°R], T=540 R

VOC tank loading emissions are then estimated by Equation 56:

$$E_{loading,VOC} = L \times Y_{voc} \times \frac{42}{2000}$$

**Equation (56)**

where:

$E_{loading}$ are the VOC tank loading emissions [ton/bbl]
$L$ is the loading loss rate [lb/1000gal]
$Y_{VOC}$ is the weight fraction of VOC in the vapor in the liquid loaded
$42$ is a unit conversion [gal/bbl]
$2000$ is a unit conversion [lbs/ton]

$CO_2$ and $CH_4$ emissions are calculated based on Equations 57-58:

$$E_{loading,CH4} = E_{loading,VOC} \times \frac{weight\ fraction_{CH4}}{weight\ fraction_{VOC}}$$

**Equation (57)**

$$E_{loading,CO2} = E_{loading,VOC} \times \frac{weight\ fraction_{CO2}}{weight\ fraction_{VOC}}$$

**Equation (58)**

where:

$E_{loading,CO2}$ is the total loading $CO_2$ emissions per barrel of liquid [ton/bbl]
$E_{loadingCH4}$ is the total loading $CH_4$ emissions per barrel of liquid [ton/bbl]
*Weight fractions* of each pollutant in the vapor losses from the liquid loaded

### Q.2.2.1.21.1   Area-Wide Annual Emissions from Source Category

Annual emissions per pollutant i from condensate loading were scaled by annual condensate production per Equation 59:

$$E_{tank\ loadout,i} = E_{loading,i} \times S_{bbl\ condensate}$$

**Equation (59)**

where:

$E_{tank\ loadout\ i}$ is the total condensate loading emissions for pollutant i from tank load-out [ton/yr]
$E_{loading,i}$ is the condensate loading emissions for pollutant i from per barrel [ton/bbl]

BLM_0116343

$S_{bbl\ condensate}$ is the total annual of barrels condensate [bbl/yr]

### Q.2.2.1.22  Condensate, and Produced Water Hauling Traffic Exhaust

This section describes the estimation of exhaust emissions from heavy-duty vehicles (haul trucks) used for produced condensate hauling from the well site. Emission factors were developed using the MOVES2010a model (EPA 2010) as described in Section 2.2.1.2. The total round trip distance for each hauling trip was derived from the literature. A hauling volume of per truck of 200 barrels of condensate, hence the number of round trips per barrel was estimated (1/200).

Exhaust emissions for condensate hauling fleet were estimated as shown in Equation 60a.

$$E_{fleet,traffic,i} = \frac{EF_i \times N_{trips} \times D}{907185}$$    **Equation (60a)**

where:

$E_{fleet,traffic,i}$ is the hauling traffic exhaust emissions for pollutant i per barrel [ton/bbl]
$EF_i$ is the average emission factor of pollutant i for heavy duty vehicles [g/mile]
$N_{trips}$ is the annual number of round trips per barrel [trips/bbl]. N=1/200
$D$ is the round trip distance [miles/trip]
907185 is the mass conversion [g/ton]

#### Q.2.2.1.22.1   Area-Wide Annual Emissions from Condensate Hauling

Annual emissions for the condensate hauling fleet were propagated with the annual condensate production according to Equation 61a:

$$E_{fleet,TOTAL,i} = E_{fleet,traffic,,i} \times S_{bbl,condensate}$$    **Equation (61a)**

where:

$E_{fleet,TOTAL,\ i}$ are annual emissions of pollutant i from condensate hauling traffic [ton/yr]
$E_{fleet,traffic,i}$ is the emissions of pollutant i per barrel for the hauling fleet [ton/bbl]
$S_{bbl,condensate}$ is the scaling surrogate for the source category [barrels of condensate produced per year]

#### Q.2.2.1.22.2   Produced Water Hauling Exhaust Emissions

Produced water refers to the water produced with the gas once the well has been completed and is under operation. This water is typically hauled from the well site storage tanks with water trucks or sent via pipeline to injection wells. Annual produced water rates will vary by the type of well. It was assumed that the annual rate of water production for conventional gas and CBNG wells was 33,632 and 1,671 barrels per year, respectively based on IHS Enerdeq Datbase estimates of 2011 water production by well type. It was assumed that produced water truck capacity is 130 bbl and that 50 percent of the water is hauled out.

Exhaust emissions for produced water hauling fleet were estimated as shown in Equation 60b:

*Uncompahgre Draft Resource Management Plan Revision and Environmental Impact Statement*

BLM_0116344

$$E_{fleet,traffic,i} = \frac{EF_i \times N_{trips} \times D}{907185}$$   **Equation (60b)**

where:

$E_{fleet,traffic,i}$ is the produced water hauling exhaust emissions for pollutant i per well [ton/well]
$EF_i$ is the average emission factor of pollutant i for heavy duty vehicles [g/mile]
$N_{trips}$ is the annual number of round trips per well [trips/well]
$D$ is the round trip distance [miles/trip]
$907185$ is the mass conversion [g/ton]

### Q.2.2.1.22.2.1   *Area-Wide Annual Emissions from Produced Water Hauling*

Annual emissions for the produced water hauling fleet were propagated to the planning area according to Equation 61b:

$$E_{fleet,TOTAL,i} = E_{fleet,traffic,i} \times S_{active\ wells}$$   **Equation (61b)**

where:

$E_{fleet,TOTAL,i}$ are annual emissions of pollutant i from produced water hauling traffic [ton/yr]
$E_{fleet,traffic,i}$ is the emissions of pollutant i per well for the hauling fleet [ton/well]
$S_{active\ wells}$ is the scaling surrogate for the source category, active wells per year [wells/yr]

### Q.2.2.1.22.3   Fugitive Dust Emissions from Condensate and Produced Water Hauling Traffic

Road dust emission factors for heavy duty vehicles traveling on unpaved surfaces for condensate hauling and produced water hauling were estimated with the same methodology as in Section 2.2.1.2.6 using Equations 28 and 29. Because the number of trips for both of these activities is based on different surrogates - per barrel for condensate hauling and per well for produced water hauling - as shown in Section 2.2.1.2.15, fugitive dust road emissions of each fleet were calculated using the mitigated emissions factor ($EF_{mitigated}$) from Equation 29. This is shown in Equation 62.

$$E_{fleet,traffic,i} = \frac{EF_{mitigated} \times D \times N_{trips}}{2000}$$   **Equation (62)**

where:

$E_{fleet,traffic,i}$ is the traffic fugitive dust emissions for pollutant i per (1) barrel of condensate [ton/bbl] for condensate hauling or (2) well [ton/well] for produced water hauling
$EF_{mitigated}$ is the average emission factor of pollutant i for fugitive dust emissions [lb/mile]
$N_{trips}$ is the annual number of round trips per (1) barrel of condensate hauled [trips/bbl] for condensate hauling or (2) well [trips/well] for produced water hauling
$D$ is the round trip distance per hauling trip [miles/trip]
$2000$ is the mass conversion [lb/ton]

BLM_0116345

<u>Q.2.2.1.22.3.1   Area-Wide Annual Emissions from Condensate and Produced Water Hauling Traffic</u>

Annual fugitive dust emissions for condensate hauling were propagated with the annual condensate production according to Equation 63:

$$E_{fleet,TOTAL,i} = E_{fleet,traffic,i} \times S_{bbl,condensate\ or\ active\ wells} \qquad \text{Equation (63)}$$

where:

$E_{fleet,TOTAL,i}$ are annual fugitive dust emissions of pollutant i from condensate hauling traffic [ton/yr]

$E_{fleet,traffic,i}$ is the dust emissions of pollutant i per barrel for the hauling fleet [ton/surrogate]

$S_{bbl,condensate\ or\ active\ wells}$ is the scaling surrogate for the source category: (1) [barrels of condensate produced per year] for condensate hauling or (2) [active wells per year] for produced water hauling

### Q.2.2.1.23  Heaters

This section describes the methodology for estimating emissions from heaters and reboilers. Heater emissions are a function of the properties of the local produced gas used as a fuel. Emissions factors for external combustion of natural gas were obtained from AP-42 Section 1.4 Natural Gas Combustion (EPA 1995a). Emissions per well from heaters and reboilers can be estimated individually using Equation 64.

$$E_{heater,i} = N_{heaters} \times \frac{EF_i \times Q_{heater} \times t_{annual}}{(HV_{local} \times 2000)} \qquad \text{Equation (64)}$$

where:

$E_{heater,i}$ is the per well emissions for pollutant from a given heater [ton/well-yr]
$EF_i$ is the heater emission factor for a given pollutant i [lb/MM SCF]
$Q_{heater}$ is the heater MMBTU/hr rating [MMBTU$_{rated}$/hr]
$HV_{local}$ is the local natural gas heating value [BTU$_{local}$/SCF]
$t_{annual}$ is the annual hours of operation [hr/yr]
$N_{heaters}$ is the number of heaters per well

<u>Q.2.2.1.23.1   Area-Wide Annual Emissions from heaters</u>

Annual emissions for heaters and reboilers are estimated with Equation 65 using the scaling surrogate active wells.

$$E_{heater,TOTAL,i} = E_{heater,i} \times W_{TOTAL} \qquad \text{Equation (65)}$$

where:

$E_{heater,TOTAL,i}$ is the total emissions of pollutant i for a given heater type in the Project [ton/yr]
$E_{heater,i}$ is the per well annual emissions from a given heater type for pollutant i [ton/well-yr]
$W_{TOTAL}$ is the total number of wells for a particular year [wells]

BLM_0116346

### Q.2.2.1.24 Dehydrator Emissions

This section describes the methodology to estimate emissions from dehydrator still vents. Uncontrolled emission factors per unit of gas production for emissions of VOC, $CH_4$ and $CO_2$ were derived from the literature for the various well types. Total emissions were propagated using the gas production by well type, assuming 100 percent of the gas undergoes well site dehydration. This was done applying Equation 66.

$$E_{dehyTOTAL,i,j} = EF_{dehy,i} \times S_{gas\ production,j} \qquad \textbf{Equation (66)}$$

where:

$E_{dehy,TOTAL,,l,j}$ are the total area-wide emissions from dehydrators still vents for pollutant i in year j [tons/yr]

$EF_{dehy,i}$ is the dehydrator still vent emissions rate [tons/MCF]

$S_{gas\ production}$ is the annual gas production in year j [MCF/yr]

### Q.2.2.2  Midstream Sources

Midstream sources include gathering and treating emissions associated with facilities such as compressor stations and gas plants. Base year midstream emissions are taken from the 2011 APEN (Air Pollutant Emission Notice) emissions database provided by Colorado Department of Public Health and Environment (2013). Colorado Department of Public Health and Environment provided APEN emissions for all oil and gas related emission sources covered by the following SCC and SIC codes:

- All of the SCCs 202002*, 310*, 404003* (where * indicates all sub-SCCs for the SCC)

- And only those with the following SICs: 13*, 492*, 4612

UFO planning area sources were identified based on whether the latitude and longitude of each source was within the UFO planning area. The APEN oil and gas emissions database includes both well site and midstream sources. Midstream sources were identified for inclusion in the calculator based on the facility name and the suite of equipment included at a given facility. Appendix C (of the Air Emission Inventory Technical Support Document) includes a table of emissions by facility for the UFO planning area.

Emissions were available in the APEN emissions database for the pollutants VOCs, CO, $NO_X$, $PM_{10}$ and $SO_2$ in tons per year. Emissions for $CH_4$ and $CO_2$ were calculated using the vented gas speciation according to Equations 67 and 68 for the following sources.

- Glycol Dehydrator

- Natural Gas Processing Facilities, Gas Sweeting: Amine Process

- Condensate Tanks

- Natural Gas Processing Facilities, Flanges and Connections

$$E_{source,CH4} = E_{tanks,VOC} \times \frac{weight\ fraction_{CH4}}{weight\ fraction_{VOC}} \qquad \textbf{Equation (67)}$$

BLM_0116347

$$E_{source CO2} = E_{tanks,VOC} \times \frac{weight\ fraction_{CO2}}{weight\ fraction_{VOC}}$$   **Equation (68)**

where:

$E_{source,VOC}$ is the total annual emissions from APENS database *a source* [tons/yr]
$E_{source,CO2}$ is the total $CO_2$ emissions from *a source* [tons/yr]
$E_{source,CH4}$ is the total $CH_4$ emissions from *a source* [tons/yr]
*Weight fractions* of each pollutant in the vented gas

For combustion sources such as compressor engines, process heaters and flares, emissions for $CH_4$, $N_2O$ and $CO_2$ were estimated using the ratios of each greenhouse gas to NOx of emissions factors from AP-42.

Emissions in future years were estimated by multiplying 2011 emissions by the ratio of gas production in a given future year to gas production in 2011. As necessary, for accounting purposes, total midstream sector emissions are allocated to each well type (CBNG or conventional) and/or mineral designation (BLM or cumulative) based on the corresponding percentage of annual gas production by well type and/or annual gas production by mineral designation.

### Q.2.2.3  Non-Oil and Gas Sources
The methodologies implemented to estimate base year and future year emissions by alternative from non-oil and gas sources are explained in this section. More detailed assumptions, emission factors, and emission estimates by source category are described in Appendix D (of the Air Emission Inventory Technical Support Document).

#### Q.2.2.3.1  Coal Mining
Annual base year emissions from coal mining were estimated for the Somerset Coal Fields based on existing emission estimates for the operation of producing mines, Bowie #2 (BLM 2012c), West Elk (BLM 2012d), and Elk Creek (BLM 2012f), as well as exploration and construction emissions from the Oak Mesa Project (BLM 2012e). Emissions were not estimated for the New Horizon Mine which is not subject to BLM review. Based on the *Coal Resource and Development Potential Report* (BLM 2010), which indicated that Somerset Coal Field production is likely to remain stable at recent levels into the future, emissions for all future years for all scenarios were set equal to base year emissions.

#### Q.2.2.3.2  Uranium Mining
Annual emissions from uranium mining were estimated according to the number of mines constructed and/or producing in a given year combined with estimates of emissions per mine from discrete emission producing activities: wind erosion, fugitive dust, heavy equipment, and on-road vehicles. Activity inputs such as the equipment and vehicle operations, tons of material processed, and disturbed area were taken primarily from the Whirlwind Mine EA (BLM 2008). The estimated number of uranium mines in operation is shown in **Table Q-2-11**.

*Uncompahgre Draft Resource Management Plan Revision and Environmental Impact Statement*

BLM_0116348

**Table Q-2-11. Schedule of uranium mines in production.**

| Year | Uranium Mining Facilities, All Alternatives |
|------|------|
| 2008-2012 | 0 |
| 2013 | 1 |
| 2014 | 3 |
| 2015 | 5 |
| 2016 | 7 |
| 2017 | 9 |
| 2018 | 10 |
| 2019 | 11 |
| 2020 | 12 |
| 2021 | 13 |
| 2022 | 14 |
| 2023 | 15 |
| 2024 | 16 |
| 2025 | 17 |
| 2026 | 18 |
| 2027 | 19 |
| 2028 | 20 |
| 2029 | 20 |
| 2030 | 20 |

Q.2.2.3.2.1  Wind Erosion

Wind erosion dust emissions were estimated based on AP-42 guidance for the estimation of emissions from industrial wind erosion (EPA 2006b) based on Equation 71:

$$E_{dust,i} = \frac{k \times P \times M \times N}{907,185}$$

Equation (71)

where:

$E_{dust,\ i}$ are dust emissions for pollutant i from construction wind erosion [ton/mine]
$k$ is the particle size multiplies [0.5 for $PM_{10}$ and 0.075 from $PM_{2.5}$]
$P$ is the erosion potential [g/m²]
$M$ is the number of disturbed acres [m²/pad]
$N$ is the number of disturbances
$907,185$ is a mass unit conversion [g/ton]

The erosions potential is a function of the wind friction velocity, as shown in Equation 72 and 73:

$$P = 58 \times (u* - u_t)^2 + 25(u* - u_t)$$

Equation (72)

where:

$u*$ is the friction velocity (m/s)
$u_t$ is the threshold friction velocity (m/s)

$$P = 0 \qquad for \qquad (u* \leq u_t) \qquad\qquad \text{Equation (73)}$$

Friction velocity estimates ($u*$) were made by multiplying the average annual fastest wind speed from Uncompahgre, Colorado from 1947 to 1979 by 0.053 per AP-42 guidance (EPA 2006b).

### Q.2.2.3.2.2   Fugitive Dust
Fugitive dust emissions from ventilation and surface facilities were taken from Whirlwind Mine Environmental Assessment (BLM 2008) permit not-to-exceed values.

### Q.2.2.3.2.3   Heavy Equipment
This category refers to emissions associated with off-road equipment used in uranium mining. The EPA NONROAD2008a model (EPA 2009b) was used to compile emission factors for each equipment type included in surveys. The $N_2O$ emissions factor was obtained from the 2009 American Petroleum Institute O&G GHG Methodologies Compendium, Tables 4-13 and 4-17 (American Petroleum Institute 2009).

Emissions on per piece of equipment were estimated according to Equation 74:

$$E_{engine,i} = \frac{EF_i \times HP \times LF \times t_{event} \times n}{907,185} \qquad\qquad \text{Equation (74)}$$

where:

$E_{engine}$ are emissions of pollutant $i$ [ton/equipment]
$EF_i$ is the emissions factor of pollutant $i$ [g/hp-hr]
$HP$ is the horsepower [hp]
$LF$ is the load factor
$t_{event}$ is the number of hours the engine is used [hr/pad]
$907,185$ is the mass unit conversion [g/ton]

### Q.2.2.3.2.4   On-road Vehicles – Exhaust
This category refers to the exhaust and road dust emissions from light-duty and heavy-duty vehicle traffic used in uranium mining.

Emission factors were developed using the MOVES2010a model (EPA 2010). The emission factors were prepared for two vehicle classes, Semi-Trucks (Heavy Duty) and Pick-up Trucks (Light Duty), and represent annual average per-mile emissions in 2008 for Mesa County, Colorado. MOVES2010a emissions factors were modeled to include exhaust running, idle and start, brake wear, and tire wear, and evaporative processes. The $N_2O$ emission factor was obtained from 2012 Climate Registry Default Emission Factors (The Climate Registry 2012). Emissions were calculated using the MOVES2010a emission factors on a grams per mile basis, as shown in Equation 75.

BLM_0116350

$$E_{traffic,i} = \frac{EF_i \times N_{trips} \times D}{907185}$$   **Equation (75)**

where:

$E_{traffic,i}$ is traffic exhaust emissions for pollutant i per well pad [ton/pad]
$EF_i$ is the average emission factor of pollutant i [g/mile]. For exhaust emissions, $EF_i$ = MOVES emission factors.
$N_{trips}$ is the annual number of round trips per activity [trips/pad]
$D$ is the round trip distance [miles/trip]
$907185$ is the mass conversion [g/ton]

### Q.2.2.3.2.5   On-road Vehicles – Road Dust

Fugitive dust emissions from vehicle travel on unpaved roads were estimated based on the AP-42 technical guidance Section 13.2.2.1 Unpaved Roads (EPA 2006a). Road dust emission factors for vehicles traveling on unpaved surfaces at industrial sites can be estimated with Equation 76.

$$EF_i = k \left(\frac{s}{12}\right)^a \left(\frac{W}{3}\right)^b$$   **Equation (76)**

where:

$EF$ is the size-specific particulate emissions factor for pollutant i (lb/mile)
$s$ is the surface material silt content (%)
$W$ is the mean vehicle weight (tons)
$k, a, b$ are empirical constants according to Table Q-2-10.

Because the emissions factor is a function of vehicle weight, individual emissions factors for heavy duty vehicles and light duty vehicles were derived with Equation 76. To account for natural mitigation of road dust emissions due to annual precipitation and from watering control, Equation 77 was applied:

$$EF_{mitigated} = EF_i \times \frac{365-P}{365} \times \frac{100-CE}{100}$$   **Equation (77)**

where:

$EF_{mitigated}$ is the annual average emission factor for uncontrolled conditions including natural mitigation [lb/mile]
$EF_i$ is the size-specific emission factor [lb/mile]
$P$ is number of precipitation days (>0.01" rainfall) at the site (Precipitation days at Uncompahgre Walker, CO; from Western Regional Climate Center. Mean data 1990-2010)
$CE$ is the control efficiency for watering in unpaved roads

Fugitive dust road emissions were calculated using the mitigated emissions factor ($EF_{mitigated}$) from Equation 77, along with the vehicle miles traveled for each vehicle group as shown in Equation 78.

$$E_{traffic,i} = \frac{EF_{mitigated} \times N_{trips} \times D}{2000}$$   **Equation (78)**

where:

$E_{traffic,i}$ is the traffic fugitive dust emissions for pollutant i per event [ton]
$EF_{mitigated}$ is the average emission factor of pollutant i for fugitive dust emissions [lb/mile]
$N_{trips}$ is the annual number of round trips per activity [trips]
$D$ is the round trip distance [miles/trip]
*2000* is the mass conversion [lb/ton]

### Q.2.2.3.3  Sand and Gravel

Annual emissions from sand and gravel extraction were estimated based on the data provided by BLM UFO personnel on the quantity of sand and gravel material extracted, equipment operation, and vehicle use for sand and gravel extraction.

Wind erosion, heavy equipment, and on-road vehicle exhaust and road dust emissions were estimated with sand and gravel source category activity inputs using the similar methodology to uranium mining as described above.

Q.2.2.3.3.1  <u>Extraction and Processing Fugitive Dust</u>
Fugitive dust emissions associated with sand and gravel extraction were estimated based on AP-42 methodology. Extraction emissions were estimated using AP-42, Chapter 11.9 methodology and include estimates of emissions from the following processes: scraping, removal of overburden, grading, scraper unloading, batch drop, and truck loading. AP-42 methodology for estimating emissions from rock crushing (Chapter 11.19) and concrete batching (11.12) were used to estimate processing emissions for the following processes: tertiary crushing, fines crushing, screening, fines screening, conveyor transfer point, truck drop unloading, and batch plant crushed rock transfer. For all processes except removal of overburden, grading, and batch drop, AP-42 particulate matter emission rates were applied directly to UFO sand and gravel activity. For removal of overburden, grading, and batch drop standard AP-42 equations were used to estimate particulate matter emissions.

### Q.2.2.3.4  Vegetation – Prescribed Fire and Mechanical Treatment

Annual emissions from prescribed fires and mechanical treatments were estimated based on the data provided by BLM UFO personnel on the heavy equipment operation and vehicle use during prescribed fires and mechanical treatments as well as recent estimates of prescribed fire acreage burned. BLM UFO Personnel estimated that prescribed burning activities would remain similar to the base year for Alternative A, increase by 40% from the base year for Alternatives B and B.I, decrease by 20% from the base year for Alternative C, and increase from the base year by 25% for Alternative D. BLM UFO Personnel estimated that mechanical treatment activities would remain similar to the base year for Alternative A, decrease by 20% from the base year for Alternatives B and B.I, increase by 50% from the base year for Alternative C, and increase from the base year by 20% for Alternative D. Estimates of changes in prescribed burning and mechanical treatment activity are based on stated objectives by alternative in the draft RMP for wildlife species management, vegetation mosaic objectives, and Wildland Urban Interface.

Heavy equipment and on-road vehicle exhaust emissions were estimated with prescribed fire and mechanical treatment source category activity inputs using the similar methodology to uranium mining as described above.

### Q.2.2.3.4.1   Smoke

Smoke emissions from prescribed fires were estimated by applying the annual estimate of acreage burned to a tons/acre burned emission factor. The tons/acre burned emission factor was derived estimated based on average emission rates from prescribed fires in the Western Governor's Association, Western Regional Air Partnership 2002 Fire Emission Inventory (Western Governors' Association, Western Regional Air Partnership 2005).

### Q.2.2.3.4.2   Fugitive Dust from Heavy Equipment

Fugitive dust emissions from heavy equipment were estimated based on AP-42 Chapter 13 Section 13.2.3 guidance for estimating emissions from Heavy Construction Operations (EPA 1995a). A construction fugitive dust emission factor for total suspended particles (TSP) is available in the AP-42 guidance (1.2 tons-TSP/acre/month of activity).

Total suspended particle emissions from wellpad construction equipment on a per wellpad basis are estimated based on Equation 79:

$$E_{equip.dust,TSP} = EF \times A \times t \times \frac{(1-C)}{30} \qquad \textbf{Equation (79)}$$

where:

$E_{equip,dust,TSP}$ is the TSP emissions from construction equipment fugitive dust [tons]
$EF$ is the construction fugitive dust emission factor [tons/acre/month]
$A$ is the average number of acres disturbed annually [acres]
$t$ is the number of days to completion [days]
$C$ is the control efficiency for watering
$30$ is the conversion factor for days/month

Conversion factors for TSP to particulate matter $PM_{10}$ (EPA, 2006b) and from $PM_{10}$ to $PM_{2.5}$ (Midwest Research Institute, 2006) were used to estimate other fugitive dust pollutant emissions ($PM_{10}$ and $PM_{2.5}$).

### Q.2.2.3.4.3   On-road Vehicle Road Dust

Fugitive dust emissions from vehicle travel on unpaved roads were estimated based on the AP-42 technical guidance Section 13.2.2.1 Unpaved Roads (EPA 2006a). Road dust emission factors for vehicles traveling on unpaved surfaces at industrial sites can be estimated with Equation 80.

$$EF_i = \frac{k\left(\frac{s}{12}\right)^a \left(\frac{S}{30}\right)^b}{\left(\frac{M}{0.5}\right)^c} - C \qquad \textbf{Equation (80)}$$

where:

$EF$ is the size-specific particulate emissions factor for pollutant i (lb/mile)
$s$ is the surface material silt content (%)

---

BLM_0116353

*S* is the mean vehicle speed (mi/hr)
*M* is the surface material moisture content (%)
*k, a, b* are empirical constants
*C* is the emission factor for 1980's vehicle fleet exhaust, brake wear, and tire wear (lb/VMT)

To account for natural mitigation of road dust emissions due to annual precipitation and from watering control, Equation 81 was applied:

$$EF_{mitigated} = EF_i \times \frac{365-P}{365} \times \frac{100-CE}{100}$$

Equation (81)

where:

$EF_{mitigated}$ is the annual average emission factor for uncontrolled conditions including natural mitigation [lb/mile]
$EF_i$ is the size-specific emission factor [lb/mile]
*P* is number of precipitation days (>0.01" rainfall) at the site (Precipitation days at Uncompahgre Walker, CO; from Western Regional Climate Center. Mean data 1990-2010)
*CE* is the control efficiency for watering in unpaved roads

Fugitive dust road emissions were calculated using the mitigated emissions factor ($EF_{mitigated}$) from Equation 81, along with the vehicle miles traveled for each vehicle group as shown in Equation 82:

$$E_{traffic,i} = \frac{EF_{mitigated,i} \times N_{trips} \times D}{2000}$$

Equation (82)

where:

$E_{traffic,i}$ is the traffic fugitive dust emissions for pollutant i per event [ton]
$EF_{mitigated,i}$ is the average emission factor of pollutant i for fugitive dust emissions [lb/mile]
$N_{trips}$ is the annual number of round trips per activity [trips]
*D* is the round trip distance [miles/trip]
*2000* is the mass conversion [lb/ton]

### Q.2.2.3.5 Comprehensive Travel and Transportation Management

Annual emissions from Travel and Transportation Management were estimated for off-road recreational vehicles based on annual estimates of activity by recreational equipment type (ATV, motorcycle, or snowmobile). Annual activity estimates were calculated based on the number of annual visitors per year using each recreational equipment type combined with estimates of activity per visit (14 miles per visit for ATVs and motorcycles and 4 hours per visit for snowmobiles). BLM UFO personnel also provided estimates of activity for heavy equipment used in road maintenance operations.

Heavy equipment emissions were estimated with Travel and Transportation Management activity using the similar methodology to uranium mining as described above. Recreational vehicle road dust emissions were estimated using methodology similar to road dust from Prescribed Fire and Mechanical Treatment activities.

BLM_0116354

Q.2.2.3.5.1  Recreational Vehicles

This category refers to emissions associated with off-road motorcycles and all-terrain vehicles (ATVs). The EPA NONROAD2008a model (EPA 2009b) was used to estimate emission rates on a grams per mile basis for motorcycle and ATV use and on a grams per hour basis for snowmobile use within the UFO planning area. The $N_2O$ emissions factor was obtained from the 2009 American Petroleum Institute O&G GHG Methodologies Compendium, Tables 4-13 and 4-17 (American Petroleum Institute 2009).

Emissions were estimated according to Equation 83:

$$E_{vehicle\ type,i} = \frac{EF_i \times A}{907,185}$$
Equation (83)

where:

$E_{vehicle\ type}$ are emissions of pollutant $i$ for motorcycles or ATVs [ton]
$EF_i$ is the emissions factor of pollutant $i$ [g/mi or g/hr]
$A$ is the number of miles travelled annually by motorcycles or ATVs [mi] or the number of hours of annual use for snowmobiles [hr]
907,185 is the mass unit conversion [g/ton]

Q.2.2.3.6  Livestock Grazing

Annual emissions from livestock grazing and associated activities were estimated based on the data provided by BLM UFO personnel on the number of animals in the UFO planning area for the base year and for the future year for each alternative as well as information about the annual frequency, type, and duration of livestock associated construction projects.

Wind erosion, heavy equipment, and on-road vehicle exhaust emissions were estimated with livestock grazing associated activity using the similar methodology to uranium mining as described above. Road dust emissions were estimated using methodology similar to road dust from Prescribed Fire and Mechanical Treatment described above.

Q.2.2.3.6.1  Enteric Fermentation

Enteric fermentation emissions were estimated by applying the Intergovernmental Panel on Climate Change (2006) $CH_4$ emission rate per animal to the number of animals in the UFO planning area.

Q.2.2.3.7  Lands and Realty – Rights-of-Way

Annual emissions from land and realty – right-of-way activities were estimated based on the data provided by BLM UFO personnel on the annual frequency and type of projects.

Wind erosion, heavy equipment, and on-road vehicle exhaust emissions were estimated with land and realty – right-of-way source category activity inputs using the similar methodology to uranium mining as described above. Road dust emissions were estimated using methodology similar to road dust from Prescribed Fire and Mechanical Treatment described above.

BLM_0116355

## Q.3    EMISSION INVENTORY RESULTS

This section presents emissions plots and tables summarizing the UFO planning area emissions. For more detailed emissions results, see Appendices A, B, C, and D (of the Air Emission Inventory Technical Support Document), which show detailed emission estimates. Appendix E (of the Air Emission Inventory Technical Support Document) includes a number of tables and figures summarizing the emission inventory results.

### Q.3.1   BLM Action Emissions

**Table Q-3-1** shows BLM action total emissions across all source categories for the base year and for each alternative. Notably, Alternative B.I has the lowest emissions except for $SO_2$, while Alternative C has the highest emissions across all pollutants. A comparison of emissions from Alternative A and D indicates that Year 10 $PM_{10}$ emissions are lower for Alternative D relative to Alternative A, but for all other pollutants are higher for Alternative D relative to Alternative A for the future year. Note that **Table Q-3-1** uses the standard convention of reporting criteria pollutant emissions using short tones (tons), but GHG emissions are reported using long (metric) tonnes.

**Table Q-3-1.   Estimated annual emissions summary BLM actions within the UFO planning area.**

| Scenario | Emissions (tons per year) | | | | | | | Emissions (metric tonnes per year) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | VOC | CO | NOX | $PM_{10}$ | $PM_{2.5}$ | $SO_2$ | HAPs | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ (million metric tonnes) |
| Base Year | 243 | 894 | 438 | 771 | 283 | 9 | 25 | 81,978 | 128,840 | 6 | 2.79 |
| Year 10 | | | | | | | | | | | |
| Alternative A | 742 | 1,896 | 1,430 | 1,444 | 533 | 19 | 70 | 256,212 | 134,569 | 9 | 3.08 |
| Alternative B | 727 | 1,870 | 1,430 | 1,339 | 527 | 19 | 68 | 258,174 | 134,475 | 11 | 3.09 |
| Alternative B.I | 686 | 1,801 | 1,381 | 1,330 | 524 | 19 | 64 | 247,280 | 133,955 | 11 | 3.06 |
| Alternative C | 863 | 2,176 | 1,575 | 1,487 | 544 | 19 | 82 | 283,901 | 135,609 | 8 | 3.13 |
| Alternative D | 800 | 2,054 | 1,511 | 1,400 | 538 | 20 | 75 | 273,027 | 135,082 | 10 | 3.11 |

**Figure Q-2**, **Figure Q-3**, and **Figure Q-4** show BLM action emissions by aggregate source for the base year and for each alternative in Year 10. 79% of base year $NO_X$ emissions are from oil and gas and non-oil and gas minerals while 78% of base year VOC emissions are from oil and gas minerals and other activities. Non-oil and gas minerals are the dominant source of base year $CO_2e$ emissions, accounting for 98% of base year $CO_2e$ emissions. For Year 10, across all alternatives, oil and gas emissions are the dominant source of VOC emissions. Oil and gas mineral emissions account for 39% to 44% of $NO_X$ emissions for Year 10 across all alternatives with greater contribution from non-oil and gas minerals of 48% to 55%, and minor contributions of 8% or less from other sources.

BLM_0116356



**Figure Q-2.  BLM action NO$_X$ emissions by alternative and source.**



**Figure Q-3.  BLM action VOC emissions by alternative and source.**

BLM_0116357



**Figure Q-4. BLM action CO$_2$e emissions by alternative and source.**

### Q.3.2 Cumulative Emission Calculations and Emission Summary

Cumulative emissions incorporate all BLM action emissions as well as additional oil and gas development not subject to direct BLM control. **Table Q-3-2** shows cumulative action emissions for the base year and for each alternative for Year 10. Alternative A shows the lowest emission for VOC, CO, NO$_X$, HAPs, and CO$_2$e while Alternative B.I shows the lowest emissions for PM$_{10}$ and PM$_{2.5}$. Alternative C has the highest emissions across all pollutants.

**Table Q-3-2. Estimated annual emissions summary cumulative actions within the UFO planning area.**

| Scenario | Emissions (tons per year) | | | | | | | Emissions (metric tonnes per year) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | VOC | CO | NOX | PM$_{10}$ | PM$_{2.5}$ | SO$_2$ | HAPs | CO$_2$ | CH$_4$ | N$_2$O | CO$_2$e (million metric tonnes) |
| Base Year | 308 | 1,009 | 514 | 782 | 285 | 9 | 32 | 90,985 | 129,128 | 6 | 2.80 |
| Year 10 | | | | | | | | | | | |
| Alternative A | 806 | 2,010 | 1,501 | 1,454 | 537 | 19 | 76 | 270,416 | 135,087 | 9 | 3.11 |
| Alternative B | 913 | 2,183 | 1,646 | 1,378 | 538 | 20 | 85 | 305,138 | 136,497 | 11 | 3.18 |
| Alternative B.I | 871 | 2,111 | 1,595 | 1,368 | 535 | 19 | 81 | 294,060 | 135,978 | 11 | 3.15 |
| Alternative C | 1,055 | 2,500 | 1,797 | 1,527 | 555 | 20 | 99 | 332,080 | 137,674 | 9 | 3.23 |
| Alternative D | 991 | 2,375 | 1,732 | 1,440 | 549 | 20 | 92 | 321,058 | 137,147 | 11 | 3.20 |

BLM_0116358

**Figure Q-5**, **Figure Q-6**, and **Figure Q-7** show cumulative action emissions by aggregate source for the base year and each alternative in Year 10. Similar to BLM action emissions, the majority of $NO_X$ emissions in the base year (82%) are from oil and gas and non-oil and gas minerals while a majority of base year VOC emissions (83%) are from oil and gas minerals and other activities. Non-oil and gas minerals are the dominant source of base year $CO_2e$ emissions, accounting for 98% of base year $CO_2e$ emissions. In Year 10, VOC emissions are dominated by oil and gas minerals across all alternatives. Non-oil and gas minerals is the primary and oil and gas minerals the secondary contributor to $NO_X$ emissions in Year 10 for Alternatives A and B.I. For Alternatives B, C, and D in Year 10, oil and gas minerals is the primary contributor to $NO_X$ emissions, with non-oil and gas minerals the secondary contributor. For $CO_2e$, non-oil and gas minerals is the primary and oil and gas minerals is the secondary contributor in Year 10.



**Figure Q-5. Cumulative action $NO_X$ emissions by alternative and source.**

BLM_0116359



**Figure Q-6. Cumulative action VOC emissions by alternative and source.**



**Figure Q-7. Cumulative action CO₂e emissions by alternative and source.**

BLM_0116360

## Q.4    REFERENCES

American Petroleum Institute. 2009. American Petroleum Institute Compendium of Greenhouse Gas Emissions Methodologies for the Oil and Natural Gas Industry. Prepared for American Petroleum Institute by URS Corporation: Austin, TX. August 2009.

BLM (United States Department of the Interior, Bureau of Land Management). 2008.  Decision Record, Finding of No Significant Impact, and Final Environmental Assessment for the Whirlwind Mine Uranium Mining Project. BLM, Grand Junction Field Office, Grand Junction, CO, and Moab Field Office, Moab, UT. September 2008.

_____. 2010. Coal Resource and Development Potential Report. Prepared by Buckhorn Geotech for BLM, Uncompahgre Field Office, Montrose, CO. April 2010.

_____. 2011. Mineral Potential Report for the Uncompahgre Planning Area, Uncompahgre Field Office. Prepared by Rob Ernst, Geologist. BLM, Uncompahgre Field Office, Montrose, CO. March 2011. 61 p.

_____. 2012a. Reasonable Foreseeable Development Scenario for Oil and Gas, Uncompahgre Field Office, Colorado. Prepared by BLM Wyoming State Office, Reservoir Management Group for BLM, Uncompahgre Field Office, Montrose, CO. February 2012.

_____. 2012b. Bull Mountain Unit Master Development Plan Preliminary Environmental Assessment, Gunnison County, CO. DOI-CO-150-2009-0005-EA. BLM, Uncompahgre Office, Montrose, CO. March 2012.

_____. 2012c. Final Environmental Assessment: Bowie Coal Lease Modification Application. DOI-BLM-CO-S050-2012-0001 EA. BLM, Uncompahgre Office, Montrose, CO. August 2012.

_____. 2012d. Environmental Assessment for the West Elk Coal Lease Modifications Application. DOI-BLM-CO-150-2012-13-EA. BLM, Uncompahgre Office, Montrose, CO. June 2012.

_____. 2012e. Environmental Assessment Oak Mesa Coal Exploration License. DOI-BLM-CO-S050-2011-0036-EA. BLM, Uncompahgre Office, Montrose, CO. September 2012.

_____. 2012f. Environmental Assessment for the Elk Creek Mine, North East Lease Modification, Tract 5, D-Seam. DOI-BLM-CO-150-2012-18-EA. BLM, Uncompahgre Office, Montrose, CO. March 2012.

_____. 2014. Uncompahgre oil and gas well development scenarios by alternative. Personal communication between Chad Meister, BLM, Colorado State Office, and John Grant, Manager, ENVIRON International Corporation. September  8, 2014.

BLM_0116361

Colorado Department of Public Health and Environment. 2006. Oil and Gas Exploration and Production Condensate Tanks: An Overview of Air Quality Regulations. Colorado Department of Public Health and Environment, Air Pollution Control Division, Denver, CO. March 2006.

_____. 2013. 2011 APEN Emissions for Select Sources. Personal communication between David Thayer, Public Health Engineer, Colorado Department of Public Health and Environment, Air Pollution Control Division / Stationary Sources Program, and John Grant, Manager, ENVIRON International Corporation. March 22, 2013.

ENVIRON International Corporation. 2009. Final Report: Development of 2012 Oil and Gas Emissions Projections for the Piceance Basin. ENVIRON International Corporation, Novato, CA; Buys & Associates, Littleton, CO; and Independent Petroleum Association of Mountain States, Denver, CO. January 2009.

_____. 2012. Air Resources Technical Support Document: Grand Junction Field Office. Prepared by ENVIRON International Corporation for BLM, Grand Junction Field Office, Grant Junction, CO. December 2012.

EPA (US Environmental Protection Agency). 1995a. AP-42, Compilation of Air Pollutant Emission Factors, Fifth Edition, Volume I: Stationary Point and Area Sources. EPA Office of Air Quality Planning and Standards, Office of Air and Radiation, Research Triangle Park, NC. January 1995 with supplements. Internet Web site: http://www.epa.gov/ttn/chief/ap42/. Accessed on November 22, 2013.

_____. 1995b. Protocol for Emission Leak Emission Estimates. EPA Office of Air Quality Planning and Standards, Research Triangle Park, NC. November 1995.

_____. 2006a. AP-42, Compilation of Air Pollutant Emission Factors, Fifth Edition, Volume I: Stationary Point and Area Sources. Chapter 13.2.2 Unpaved Roads. EPA Office of Air Quality Planning and Standards, Office of Air and Radiation, Research Triangle Park, NC. November 2006.

_____. 2006b.  AP-42, Compilation of Air Pollutant Emission Factors, Fifth Edition, Volume I: Stationary Point and Area Sources. Chapter 13.2.5 Industrial Wind Erosion. EPA Office of Air Quality Planning and Standards, Office of Air and Radiation, Research Triangle Park, NC. November 2006.

_____. 2009. Office of Transportation and Air Quality, Modeling and Inventories, NONROAD Model (nonroad engines, equipment, and vehicles). Internet Web site: http://www.epa.gov/otaq/nonrdmdl.htm. Accessed on November 22, 2013.

_____. 2010. Office of Transportation and Air Quality, Modeling and Inventories, MOVES (Motor Vehicle Emission Simulator). Internet Web site: http://www.epa.gov/otaq/models/moves/index.htm. Accessed on August 2, 2010.

BLM_0116362

Intergovernmental Panel on Climate Change. 2006. 2006 Intergovernmental Panel on Climate
        Change Guidelines for National Greenhouse Gas Inventories. Prepared by the National
        Greenhouse Gas Inventories Programme, H. S. Eggleston, L. Buendia, K. Miwa, T. Ngara,
        and K. Tanabe (eds.). Institute for Global Environmental Strategies, Hayama, Kanagawa,
        Japan.

Midwest Research Institute. 2006. Background Document for Revisions to Fine Fraction Ratios
        Used for AP-42 Fugitive Dust Emission Factors. Prepared by Midwest Research Institute
        for Western Governors' Association, Western Regional Air Partnership, Denver, CO.
        November 2006.

The Climate Registry. 2012. 2012 Climate Registry Default Emission Factors. January 2012.

URS. 2012a. Final Colorado River Valley Field Office Resource Management Plan Revision Air
        Resources Technical Support Document. Prepared by URS Group, Inc. for BLM,
        Colorado River Valley Field Office, Silt, CO, and BLM, Colorado State Office,
        Lakewood, CO. Revised August 2011.

Western Governors' Association, Western Regional Air Partnership. 2005. 2002 Fire Emission
        Inventory for the Western Regional Air Partnership Region – Phase II. July 2005.
        Internet Web site: http://www.wrapair.org/forums/fejf/documents/task7/PhaseIIEI/
        Wild_RX_20050701.zip. Accessed on November 22, 2013.

BLM_0116363

This page intentionally left blank.

BLM_0116364



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fw:public comment on federal register
1 message

**Jean Public** <jeanpublic1@yahoo.com>                                   Sat, Jun 4, 2016 at 2:40 PM
Reply-To: Jean Public <jeanpublic1@yahoo.com>
To: uformp@blm.gov, information@sierraclub.org
Cc: info@pewtrusts.org, foe@foe.org, info@defenders.org

the plan should include the following statements which the pubilc wants:
ban all development. we want the following bans
1. no grazing
2. no hunting or trapping
3. no drilling for oil gas mining
4. no new roads
5. no chemical use to kill and murder life on this earth
6. no burning which releaese fine particulate matter which gets into bodies and causes lung cancer, heart attacks, strokes, allergies, pneumonia, and asthma and other ailments
7. no grazing to robber baron cattle ranchers with their cheap cheap use of our national land and then leaving it desroyed. this welfare leaching by robber baron cattle ranchers paying so little to use national land. let them go to private land and pay the rates they should be paying.
8.sae ouf natural wildlife and land for our children to have a place to live. they will need it.
9. stop taxing the citizens of this country into bankruptcy so you employees can have all you wnat at the tadpayers expense. we are tired of treating you like dictators. this comment is for the pbulic record. please receipt. jean publiee
jeanpublic1@yahoo.com


> [Federal Register Volume 81,
> Number 107 (Friday, June 3, 2016)]
> [Notices]
> [Pages 35793-35796]
> From the Federal Register Online via the Government
> Publishing Office [www.gpo.gov]
> [FR Doc No: 2016-13131]
>
>
> -----------------------------------------------------------------
>
> DEPARTMENT OF THE INTERIOR
>
> Bureau of Land Management
>
> [LLCOS05000 L16100000.DP0000]
>
>
> Notice of Availability of the Draft Resource Management Plan
> and
> Draft Environmental Impact Statement for the Uncompahgre
> Field Office,
> Colorado
>
> AGENCY: Bureau of Land Management, Interior.
>
> ACTION: Notice.
>
> -----------------------------------------------------------------
>
> [[Page 35794]]
>
> SUMMARY: In accordance with the National Environmental

BLM_0116365

> Policy Act of
> 1969, as amended, and the Federal Land Policy and Management
> Act of
> 1976, as amended, the Bureau of Land Management (BLM) has
> prepared a
> Draft Resource Management Plan (RMP) and Draft Environmental
> Impact
> Statement (EIS) for the Uncompahgre Planning Area and by
> this notice is
> announcing the opening of the public comment period.
>
> DATES: To ensure that comments will be considered, the BLM
> must receive
> written comments on the Draft RMP/EIS within 90 days
> following the date
> the Environmental Protection Agency publishes this notice of
> the Draft
> RMP/EIS in the Federal Register. The BLM will announce
> future meetings
> or hearings and any other public participation activities at
> least 15
> days in advance through public notices, media releases,
> and/or
> mailings.
>
> ADDRESSES: You may submit comments related to the
> Uncompahgre Draft
> RMP/EIS by any of the following methods:
>     Email: uformp@blm.gov.
>     Mail: Uncompahgre RMP, 2465 South Townsend Avenue,
> Montrose, CO 81401.
>     Fax: 970-240-5368.
>     Copies of the Uncompahgre Draft RMP/EIS are available in
> the
> Uncompahgre Field Office at the above address or on the RMP
> Web site
> at: http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.htm;
> or at:
> www.uformp.com.
>
> FOR FURTHER INFORMATION CONTACT: Gina Jones, Southwest
> District NEPA
> Coordinator; telephone 970-240-5300; see above for address
> and email.
> Persons who use a telecommunications device for the deaf
> (TDD) may call
> the Federal Information Relay Service (FIRS) at
> 1-800-877-8339 to
> contact the above individual during normal business hours.
> The FIRS is
> available 24 hours a day, seven days a week, to leave a
> message or
> question with the above individual. You will receive a reply
> during
> normal business hours.
>
> SUPPLEMENTARY INFORMATION: The BLM prepared the Uncompahgre
> Draft RMP/
> EIS to evaluate and revise the management strategy for
> resources,
> resource uses, and special designations within the
> Uncompahgre planning
> area. Existing management decisions for public lands and
> resources in
> the Uncompahgre planning area are described in two

BLM_0116366

9/9/2016                              DEPARTMENT OF THE INTERIOR Mail - Fw:public comment on federal register

> documents: the 1985
> San Juan/San Miguel RMP, as amended; and the 1989
> Uncompahgre Basin
> RMP, as amended.
>     The Uncompahgre planning area includes approximately 3.1
> million
> acres of land managed by the BLM, U.S. Forest Service
> (portions of the
> Grand Mesa, Uncompahgre and Gunnison National Forest),
> National Park
> Service (Black Canyon of the Gunnison National Park, and
> portions of
> Curecanti National Recreation Area), U.S. Bureau of
> Reclamation, State
> of Colorado (including Ridgway, Crawford, and Paonia State
> Parks), and
> local and private lands all of which are located in
> southwestern
> Colorado, in Montrose, Delta, Gunnison, Ouray, San Miguel
> and Mesa
> counties. The Gunnison Gorge National Conservation Area
> (NCA) and the
> Dominguez-Escalante NCA are not within the planning area for
> this Draft
> RMP/EIS. The Uncompahgre RMP will determine management for
> approximately 675,800 acres of BLM-administered surface
> lands and for
> approximately 971,220 acres of Federal mineral estate.
>     The formal public scoping process for the Uncompahgre
> RMP began
> February 25, 2010, with the publication of a Notice of
> Intent in the
> Federal Register (75 FR 8739). The BLM held seven scoping
> open houses
> in January and February 2010. The BLM used public scoping
> comments to
> help identify planning issues that led to the formulation of
>
> alternatives and framed the scope of analysis in the Draft
> RMP/EIS. The
> BLM also used the scoping process to introduce the public to
> the
> preliminary planning criteria, which set limits on the scope
> of the
> Draft RMP/EIS.
>     Major issues considered in the Draft RMP/EIS include
> management of
> biological resources including special status species,
> renewable and
> non-renewable energy, minerals, human activities and uses
> including
> livestock and recreation, utility/energy corridors and
> rights-of-way
> (ROW), and cultural resources. The RMP also addresses
> decisions
> regarding Wild and Scenic Rivers, the Old Spanish National
> Historic
> Trail, and lands with wilderness characteristics. The Draft
> RMP/EIS
> evaluates in detail the No Action Alternative (Alternative
> A), three
> action alternatives (Alternatives B, C and D), and
> sub-alternative
> (B.1). The BLM identified Alternative D as the Preferred
> Alternative.

BLM_0116367

> This alternative, however, does not represent the final
> agency
> direction, and the Proposed RMP may reflect changes or
> adjustments
> based on information received during public comment on the
> Draft RMP/
> EIS, new information, or changes in the BLM policies or
> priorities. The
> Proposed RMP may include objectives and actions described in
> any of the
> alternatives analyzed in the Draft.
>    Alternative A retains the current management goals,
> objectives, and
> direction specified in the 1985 San Juan/San Miguel RMP and
> the 1989
> Uncompahgre Basin RMP. Alternative B emphasizes improving,
> rehabilitating and restoring resources; sustaining the
> ecological
> integrity of habitats for all priority plant, wildlife and
> fish
> species; and allowing appropriate development scenarios for
> allowable
> uses (such as mineral leasing, locatable mineral
> development,
> recreation, communication sites and livestock grazing).
> Alternative B.1
> is a subset of Alternative B, and specifically addresses oil
> and gas
> leasing and development in the North Fork and Smith Fork
> drainages of
> the Gunnison River. Certain areas would be closed to oil and
> gas
> leasing and this alternative would impose development
> setbacks with
> strict surface use restrictions in places where leasing
> might be
> allowed to occur. Alternative C emphasizes the appropriate
> mix of uses
> that maximize utilization of resources while protecting land
> health.
> The appropriate development scenarios for allowable uses
> emphasize
> maximizing resource production in an environmentally
> responsible
> manner, while maintaining the basic protection needed to
> sustain
> resources, including mitigating impacts on land health.
> Alternative D
> emphasizes balancing resources and resource use among
> competing human
> interests, land uses, and the conservation of natural and
> cultural
> resource values, while sustaining and enhancing ecological
> integrity
> across the landscape, including plant, wildlife, and fish
> habitat. This
> alternative incorporates a balanced level of protection,
> restoration,
> enhancement and use of resources and services to meet
> ongoing programs
> and land uses.
>    Pursuant to 43 CFR 3461.2-1(a)(2), this notice announces
> a
> concurrent public comment period on the application of
> unsuitability

BLM_0116368

9/9/2016                        DEPARTMENT OF THE INTERIOR Mail - Fw:public comment on federal register

> criteria to lands with coal development potential. Maps and
> other
> information describing the results of the application of
> unsuitability
> criteria are available at the BLM Uncompahgre Field Office.
>     The Uncompahgre planning area has all or portions of
> five
> Wilderness Study Areas (Needle Rock, Adobe Badlands, Camel
> Back,
> Sewemup Mesa, Dolores River Canyons), as well as the
> congressionally
> designated Tabeguache Area. This RMP analyses seven areas
> identified as
> lands with wilderness characteristics. Also, this RMP
> analyzes eligible
> water segments for recommendation for inclusion in the
> National Wild
> and Scenic River System.
>
> [[Page 35795]]
>
>     Pursuant to 43 CFR 1610.7-2(b), this notice announces a
> concurrent
> public comment period on the proposed Areas of Critical
> Environmental
> Concern (ACEC). The BLM analyzed 19 potential ACECs meeting
> the
> relevance and importance criteria within the range of
> alternatives. The
> alternative where each ACEC is considered, as well as the
> largest size
> and most restrictive limitations under consideration for
> each potential
> ACEC within the range of alternatives are as follows:
>     Adobe Badlands ACEC, 6,370 acres, Alternatives A, C, D:
>
> ROW avoidance; close to coal leasing; recommend for
> withdrawal from
> locatable mineral entry; close to mineral materials
> disposal; close to
> non-energy solid mineral leasing; close to motorized and
> mechanized
> travel; Visual Resource Management (VRM) Class I; close to
> major
> utility development; manage for day use only; prohibit
> camping and
> campfires; No Surface Occupancy (NSO) for fluid minerals;
> Site Specific
> Relocation (SSR) for non-fluid mineral activities.
>     Fairview South ACEC, up to 4,250 acres, Alternatives A,
> B,
> C, D: ROW exclusion; recommend for withdrawal from locatable
> mineral
> entry; close to mineral materials disposal; close to
> non-energy solid
> mineral leasing; close to motorized and mechanized travel;
> designated
> trail systems for non-motorized and non-mechanized travel;
> VRM Class
> III; close to sheep and cattle grazing; day use only;
> prohibit camping
> and campfires; prohibit wood collecting; close to wood
> product sales
> and/or harvest; NSO for fluid minerals; No Ground
> Disturbance (NGD) for

BLM_0116369

9/9/2016                              DEPARTMENT OF THE INTERIOR Mail - Fw:public comment on federal register

> non-fluid mineral activities.
>       Needle Rock ACEC, 80 acres, Alternatives A, B, C, D:
> ROW
> exclusion; recommend for withdrawal from locatable mineral
> entry; close
> to mineral materials disposal; close to non-energy solid
> mineral
> leasing; close to livestock grazing; limit motorized and
> mechanized
> travel to designated routes; VRM Class I; day use only;
> prohibit
> camping, prohibit open campfires (require use of stoves or
> grills);
> prohibit wood collecting; close to wood product sales and/or
> harvest;
> prohibit rock climbing; provide adequate protection
> (signing,
> stipulations, barricades and fences) to protect sensitive
> species and
> their habitats; NSO for fluid minerals; SSR for non-fluid
> mineral
> activities.
>       San Miguel River ACEC, up to 35,480 acres, Alternatives
> A,
> B, C, D: ROW exclusion; recommend for withdrawal from
> locatable mineral
> entry; close to mineral materials disposal; close to
> non-energy solid
> mineral leasing; close to coal leasing; VRM Class II and
> III; close to
> wood product sales and/or harvest; allow on-site collection
> of dead and
> downed wood for campfires (fire pans required); close to
> livestock
> grazing; limit camping to designated sites and areas; limit
> camping to
> no longer than 7 consecutive days at any one location and
> prohibit
> return to that location for 30 days; prohibit target
> shooting; close to
> recreational mining; limit motorized and mechanized travel
> to
> designated routes; locate facility development outside the
> 100-year
> floodplain; prohibit BLM-permitted actions (such as ROWs,
> bike trails
> and camping areas) in relic riparian communities; close to
> fluid
> mineral leasing and geophysical exploration; provide
> informational and
> interpretive signs; designated trail systems, restrooms,
> barricades and
> fences, as needed for enhanced visitor use, enjoyment, and
> safety and
> to protect sensitive species and their habitats.
>       Coyote Wash ACEC, 2,100 acres, Alternative B: ROW
> exclusion; recommend for withdrawal from locatable mineral
> entry; close
> to mineral materials disposal; close to non-energy solid
> mineral
> leasing; VRM Class II; NSO for fluid minerals; NGD for
> non-fluid
> mineral activities; provide facilities (e.g., informational
> and
> interpretive signs, designated trail systems, camping areas,

BLM_0116370

9/9/2016                          DEPARTMENT OF THE INTERIOR Mail - Fw:public comment on federal register

> restrooms,
> barricades and fences) for resource protection.
>       Dolores River Slickrock Canyon ACEC, up to 10,670
> acres,
> Alternatives B, D: ROW exclusion; recommend for withdrawal
> from
> locatable mineral entry; close to mineral materials
> disposal; close to
> non-energy solid mineral leasing; VRM Class II; close to
> recreational
> mining; close to motorized and mechanized travel; provide
> facilities
> (informational/interpretive signs, designated trail systems,
> camping
> areas, restrooms, barricades, fences) as needed for resource
>
> protection; camping only in designated sites and areas,
> prohibit open
> campfires (fire pans, stoves, or grills required); close to
> wood
> product sales and/or harvest; require porta-potties for
> overnight use
> if restroom is not available; no leasing of fluid minerals;
> NGD for
> non-fluid mineral activities.
>       East Paradox ACEC, 7,360 acres, Alternative B: ROW
> exclusion; recommend for withdrawal from locatable mineral
> entry; close
> to mineral materials disposal; close to non-energy solid
> mineral
> leasing; VRM Class III; limit motorized and mechanized
> travel to
> designated routes; close to camping; close to coal leasing;
> NSO for
> fluid minerals; NGD for non-fluid mineral activities;
> provide adequate
> protection (signs, use stipulations, barricades and fences,
> as needed)
> to protect sensitive species and their habitats; on 1,810
> acres limit
> all travel (motorized, mechanized, pedestrian and
> equestrian) to
> designated routes.
>       Biological Soil Crust ACEC, 1,900 acres, Alternative D:
>
> ROW exclusion; close to mineral materials disposal; close to
> non-energy
> solid mineral leasing; recommend for withdrawal from
> locatable mineral
> entry; VRM Class II; locate livestock salt/mineral
> supplement sites and
> water sites farther than 0.25 mile from the boundary of the
> gypsipherous soils (allow existing livestock watering
> reservoirs closer
> than 0.25 mile from the gypsipherous soils to remain); limit
> motorized
> and mechanized travel to designated routes; manage for day
> use only;
> prohibit camping; NSO for fluid minerals; SSR for non-fluid
> mineral
> activities.
>       La Sal Creek ACEC, 10,490 acres, Alternative B: ROW
> exclusion; recommend for withdrawal from locatable mineral
> entry; close
> to mineral materials disposal; close to non-energy solid

BLM_0116371

> mineral
> leasing; VRM Class II; limit motorized and mechanized travel
> to
> designated routes; allow camping only in designated sites
> and areas;
> provide facilities (e.g., informational and interpretive
> signs,
> designated trail systems, camping areas, restrooms,
> barricades and
> fences, as needed) for resource protection; NSO for fluid
> minerals; NGD
> for non-fluid mineral activities.
>      Lower Uncompahgre Plateau ACEC, 31,810 acres,
> Alternative
> B: ROW exclusion; recommend for withdrawal from locatable
> mineral
> entry; close to mineral materials disposal; close to
> non-energy solid
> mineral leasing; VRM Class III; limit motorized and
> mechanized travel
> to designated routes; provide facilities (e.g.,
> informational and
> interpretive signs, designated trail systems, camping areas,
> restrooms,
> barricades and fences, as needed) to provide resource
> protection; NSO
> for fluid minerals; NGD for non-fluid mineral activities.
>      Paradox Rock Art ACEC, 1,080 acres, Alternatives B, D:
> ROW
> exclusion; recommend for withdrawal from locatable mineral
> entry; close
> to mineral materials disposal; close to non-energy solid
> mineral
> leasing; VRM Class II; limit motorized and mechanized travel
> to
> designated routes; provide facilities (e.g., informational
> and
> interpretive signs, designated trail systems and camping
> areas, and
> restrooms, as needed) for resource protection; provide
> adequate
> protection (signs, use stipulations, barricades and
>
> [[Page 35796]]
>
> fences, as needed) to protect sites; allow camping only in
> designated
> sites and areas; prohibit target shooting; close to rock
> climbing;
> issue no Special Recreation Permits (SRP); NSO for fluid
> minerals; NGD
> for non-fluid mineral activities.
>      Roubideau-Potter-Monitor ACEC, 20,430 acres,
> Alternative
> B: ROW exclusion; recommend for withdrawal from locatable
> mineral
> entry; close to mineral materials disposal; close to
> non-energy solid
> mineral leasing; VRM Class II; limit motorized and
> mechanized travel to
> designated routes; provide adequate protection (signs, use
> stipulations, barricades and fences, as needed) to protect
> sensitive
> species and their habitats; issue no SRP for competitive
> events;

BLM_0116372

9/9/2016                    DEPARTMENT OF THE INTERIOR Mail - Fw:public comment on federal register

> prohibit target shooting; close to wood product sales and/or
> harvest
> and Christmas tree cutting; close to recreational mining;
> close to
> fluid mineral leasing; NGD for non-fluid mineral activities.
>        Roubideau Corridors ACEC, 8,720 acres, Alternative D:
> ROW
> avoidance; recommend for withdrawal from locatable mineral
> entry; close
> to mineral materials disposal; close to non-energy solid
> mineral
> leasing; VRM Class III; limit motorized and mechanized
> travel to
> designated routes; provide adequate protection (signs, use
> stipulations, barricades and fences, as needed) to protect
> sensitive
> species and their habitats; close to wood product sales
> and/or harvest
> and Christmas tree cutting; NSO for fluid minerals; SSR for
> non-fluid
> mineral activities.
>        Salt Desert Shrub Ecosystem ACEC, 34,510 acres,
> Alternative B: ROW exclusion; recommend for withdrawal from
> locatable
> mineral entry; close to mineral materials disposal; close to
> non-energy
> solid mineral leasing; VRM Class III; limit motorized and
> mechanized
> travel to designated routes; provide such facilities as
> informational
> and interpretive signs, barricades and fences, as needed to
> protect
> resources; manage for day use only: Prohibit camping and
> open campfires
> (require use of stoves or grills); prohibit wood collecting;
> close to
> coal leasing; NSO for fluid minerals; NGD for non-fluid
> mineral
> activities.
>        San Miguel Gunnison Sage-Grouse ACEC, 470 acres,
> Alternative B: ROW exclusion; recommend for withdrawal from
> locatable
> mineral entry; close to mineral materials disposal; close to
> non-energy
> solid mineral leasing; manage as VRM Class III; limit
> motorized and
> mechanized travel to designated routes; close to motorized
> and
> mechanized travel April 1 to July 15 (during sage-grouse
> strutting,
> nesting and brood-rearing season) to prevent disturbance to
> breeding
> sage-grouse; follow recommendations in San Miguel Basin
> Gunnison Sage-
> Grouse Conservation Plan (San Miguel Basin Gunnison
> Sage-Grouse Working
> Group 2009); manage vegetation for optimal Gunnison
> Sage-Grouse
> habitat; provide adequate protection (signs, use
> stipulations,
> barricades and fences, as needed) to protect sensitive
> species and
> their habitats; close to leasing for fluid minerals; NGD for
> non-fluid
> mineral activities.

BLM_0116373

9/9/2016                              DEPARTMENT OF THE INTERIOR Mail - Fw:public comment on federal register

>     Sims-Cerro Gunnison Sage-Grouse ACEC, 25,620 acres,
> Alternative B: ROW exclusion; recommend for withdrawal from
> locatable
> mineral entry; close to mineral materials disposal; close to
> non-energy
> solid mineral leasing; VRM Class III; manage vegetation for
> optimal
> Gunnison Sage-Grouse habitat; limit motorized and mechanized
> travel to
> designated routes; close to motorized and mechanized travel
> April 1 to
> July 15 (during sage-grouse strutting, nesting and
> brood-rearing
> season); provide adequate protection (signs, use
> stipulations,
> barricades and fences, as needed) to protect sensitive
> species and
> their habitats; develop a Sims-Cerro Gunnison Sage-Grouse
> Conservation
> Plan; close to leasing for fluid minerals; NGD for non-fluid
> mineral
> activities.
>     Tabeguache Pueblos and Tabeguache Caves ACEC, 26,400
> acres, Alternative B: ROW exclusion; recommend for
> withdrawal from
> locatable mineral entry; close to mineral materials
> disposal; close to
> non-energy solid mineral leasing; VRM Class I (5,260
> acres),VRM Class
> II (21,140 acres); limit motorized and mechanized travel to
> designated
> routes; provide adequate protection (signs, use
> stipulations,
> barricades and fences, as needed) to protect sensitive
> sites; NSO for
> fluid minerals; NGD for non-fluid mineral activities.
>     Tabeguache Creek ACEC, 560 acres, Alternative A: VRM
> Class
> II; close to Off-Road Vehicle use; NSO for fluid minerals.
>     West Paradox ACEC, 5,190 acres, Alternative B: ROW
> exclusion; recommend for withdrawal from locatable mineral
> entry; close
> to mineral materials disposal; close to non-energy solid
> mineral
> leasing; VRM Class III; limit motorized and mechanized
> travel to
> designated routes; close to rock climbing during peregrine
> falcon
> breeding season (March 1 to August 15) if birds are present;
> provide
> facilities (e.g., informational and interpretive signs,
> designated
> trail systems, camping areas and restrooms, as needed) for
> resource
> protection; provide adequate protection (signs, use
> stipulations,
> barricades and fences, as needed) to protect sensitive
> species and
> their habitats; allow camping only in designated sites and
> areas; NSO
> for fluid minerals; NGD for non-fluid mineral activities.
>     Please note that public comments and information
> submitted
> including names, street addresses, and email addresses of
> persons who

BLM_0116374

> submit comments will be available for public review and
> disclosure at
> the above address during regular business hours (8 a.m. to 4
> p.m.),
> Monday through Friday, except holidays.
>     Before including your address, phone number, email
> address, or
> other personal identifying information in your comment, you
> should be
> aware that your entire comment--including your personal
> identifying
> information--may be made publicly available at any time.
> While you can
> ask us in your comment to withhold your personal identifying
>
> information from public review, we cannot guarantee that we
> will be
> able to do so.
>
>     Authority:  40 CFR 1506.6, 40 CFR 1506.10, 43 CFR
> 1610.2, 43 CFR
> 1610.5.
>
> Ruth Welch,
> BLM Colorado State Director.
> [FR Doc. 2016-13131 Filed 6-2-16; 8:45 am]
>  BILLING CODE 4310-JB-P
>
>
>

BLM_0116375

9/9/2016                                    DEPARTMENT OF THE INTERIOR Mail - Question



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Question
1 message

**CarlsonFamily** <rwccacgjco@gmail.com>                    Sat, Jun 4, 2016 at 12:56 PM
To: uformp@blm.gov

Will these new BLM plans interfere with Elk hunting in SW Colorado?



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## RE:Management of BLM for target shooting!
1 message

---

**Jim Eng** <jim.deb.eng@gmail.com>                                    Mon, Jun 6, 2016 at 10:27 AM
To: uformp@blm.gov

To whom this may concern,
I want to thank you for your work and concern for the public use of public lands. I use many of the acres of public lands for recreational activities, hunting, camping and target shooting. I know that there are some areas that may be of concern for the safety of others. I am always concerned and careful when discharging a firearm anywhere. I think that most gun owners are the same as I am. But like in everything there are the few that are careless whether driving a car or shooting a gun. Please do not close down all areas because of a careless few. So I would like to see  Alternative A, the no-action or status-quo management strategy take place for public land.
Thanks so much for your work and concern for our public lands.
Sincerely,
James Eng
2401 Fairplay Dr.
Loveland,  CO 80538
970-310-8696

9/9/2016                                      DEPARTMENT OF THE INTERIOR Mail - RE:Management of BLM for target shooting!



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## RE:Management of BLM for target shooting!
1 message

---

**Jim Eng** <jim.deb.eng@gmail.com>                                                Mon, Jun 6, 2016 at 10:27 AM
To: uformp@blm.gov

To whom this may concern,
I want to thank you for your work and concern for the public use of public lands. I use many of the acres of public lands for recreational activities, hunting, camping and target shooting. I know that there are some areas that may be of concern for the safety of others. I am always concerned and careful when discharging a firearm anywhere. I think that most gun owners are the same as I am. But like in everything there are the few that are careless whether driving a car or shooting a gun. Please do not close down all areas because of a careless few. So I would like to see  Alternative A, the no-action or status-quo management strategy take place for public land.
Thanks so much for your work and concern for our public lands.
Sincerely,
James Eng
2401 Fairplay Dr.
Loveland,  CO 80538
970-310-8696

---

BLM_0116378



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

# Draft Management Plan for Public Lands in Southwest Colorado
1 message

**Darin Locke** <bigdlocke@comcast.net>                                    Mon, Jun 6, 2016 at 1:18 PM
To: uformp@blm.gov

Dear Sirs:

It is my understanding that you are currently taking comments for a Draft management Plan for Public Lands in Southwest Colorado.

I am opposed to any forest service plan that further limits recreational or target shooting on public land.

Thank you,

Darin Locke


Darin Locke
Attorney at Law
10901 Oxford Rd
Longmont, CO  80504
303-437-4435
303-713-6227 (fax)
bigdlocke@comcast.net

BLM_0116379



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## BLM redesignation
1 message

**John Rybon** <john.rybon@gmail.com>                    Mon, Jun 6, 2016 at 2:31 PM
To: uformp@blm.gov

The loss of land to target shooters is terrible.  There are more target shooters than hunters.  This is a tragic change to tradition, culture, and rights.

BLM_0116380

9/9/2016 DEPARTMENT OF THE INTERIOR Mail - UFORMP Proposal



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## UFORMP Proposal
1 message

---

**George Taylor** <georgeandlaurie2016@gmail.com>                    Mon, Jun 6, 2016 at 3:02 PM
To: uformp@blm.gov

I would like to provide the following comments:

My interest in this management proposal pertains to recreational shooting, namely target shooting. I reviewed the report and specifically the Recreation Focus Group Report. My interest is in the four proposals/alternatives and access to recreational shooting.

**I favor Alternative A, the status quo.**

I am responsible shooter and when I am traveling Colorado; I appreciate being able to shoot on public lands. I am a responsible recreational shootist and follow the principle of leave no trace. If and when I shoot; I make a point to clean-up after shooting and do not shoot or attempt to damage the landscape with inappropriate shooting behavior. I would like the ability to shoot throughout public lands when the area is appropriate for shooting and where a restriction or prohibition does not exist.

George Taylor
183 Raven Way
Como, CO 80432
719-836-4868
georgeandlaurie2016@gmail.com

BLM_0116381

9/9/2016                    DEPARTMENT OF THE INTERIOR Mail - Colorado BLM land Recreation Shooting



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Colorado BLM land Recreation Shooting

1 message

**stillmancw@yahoo.com** <stillmancw@yahoo.com>                    Mon, Jun 6, 2016 at 3:40 PM
To: uformp@blm.gov

To whom this may concern at BLM:

Please keep portions of Colorado's BLM Public Land open to Recreational/Target shooting for responsible and safe
shooters.
These lands are precious to me and other Colorado shooters and hunters I know.
Public lands are the only places available to people like me in a lower economic status, can afford to sight in our
firearms before hunting season. I can not afford membership to belong to expensive shooting clubs or ranges.
Public lands give me and my friends an opportunity to enjoy Colorado's beautiful outdoor spaces.

Thank you.

Chris Stillman
stillmancw@yahoo.com

BLM_0116382



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## BLM Uncompahgre Resource Management Plan
1 message

**Vince and Lisa Dougan** <lvdougan@gmail.com>                          Mon, Jun 6, 2016 at 5:10 PM
To: uformrmp@blm.gov

### Barbara Sharrow,

I will not be able to attend any of the public meetings on the BLM Uncompahgre
Resource Management Plan but I want to voice my opposition to any changes to our
current public land use in Colorado.  Through Federal Government actions we continue
to lose access/usage to/of our Public lands in this state and I want to go on record as
opposed to any changes to our current land use and access in Colorado.

Vince Dougan

BLM_0116383

9/9/2016                                 DEPARTMENT OF THE INTERIOR Mail - (no subject)



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

# (no subject)
1 message

---

**Frank Smith** <coloradoairbear@aol.com>                          Mon, Jun 6, 2016 at 7:43 PM
To: "uformp@blm.gov" <uformp@blm.gov>

This whole thing is redicoulous.  Is this an Obama command?  I worked with folks from the BML for years and there was no guns.  What is going on?  Have to question all of this!


Frank Smith


Sent from Mail for Windows 10

---

 Virus-free. www.avast.com

BLM_0116384

9/9/2016                    DEPARTMENT OF THE INTERIOR Mail - Shooting areas



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Shooting areas
1 message

---

**F T <milehighmountain6697@hotmail.com>**                    Mon, Jun 6, 2016 at 7:46 PM
To: "uformp@blm.gov" <uformp@blm.gov>

Regarding the proposed changes of the Colorado shooting areas over the next 10-15 years, I fully understand the
increase in people coming to Colorado but please don't reduce the area size that people have to target shoot.
I know that we now live in a time that everyone wants to sue for any little thing and BLM does not want negative exposure
either legal or media in the event someone is injured but we are Colorado not California !
Please do not change any of the areas reserved for target shooting !

Respectfully,
Fred Thompson
11480 West Brandt Pl.
Littleton, Co. 80127

Sent from my iPad

---

BLM_0116385



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Draft Mgmt Plan for SW Colorado

1 message

**Greg Harper** <gnhllw@gmail.com>                                    Mon, Jun 6, 2016 at 9:24 PM
To: uformp@blm.gov

I am opposed to Alternative B and D as it unduly restricts target shooting.  I am in favor of Alternative A the no-action or status quo plan.  Thank you for your consideration.

BLM_0116386

11/8/2016                          DEPARTMENT OF THE INTERIOR Mail - RMP comment



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## RMP comment

1 message

**Nel Hig** <crazyhorse1430@gmail.com>                              Wed, Jul 6, 2016 at 4:28 PM
To: uformp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org

Please find attached.

Thank you.

Nelly Higginbotham
Paonia, CO

**lettertoBLMJune2016.jpeg**
122K

BLM_0116387



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Public Lands
1 message

---

**Daniel Reuter <danielreuter58@yahoo.com>**                    Tue, Jun 7, 2016 at 4:40 AM
To: uformp@blm.gov

Dear BLM Uncompahgre Field Office,

I learned of the following situation:

The Bureau of Land Management's Uncompahgre Field Office has released a plan to manage over 675,000 acres of public land for the next 15 to 20 years. In the draft plan are four management strategies (alternatives) that will affect the future use of the land for hunting, target shooting, and a host of other recreation activities. The plan does not affect hunting; however, each of the alternatives would close acreage to target shooting.

Alternative A, the no-action or status-quo management strategy, would continue to prohibit target shooting at developed recreational sites. Slightly over 2,000 acres are affected. Alternative B would close nearly 250,000 acres, or well over half of the planning area, to target shooting. Alternative C is the same as Alternative A with respect to target shooting. Alternative D, which is the BLM's preferred management strategy, would close nearly 70,000 acres to target shooting.

**PLEASE LEAVE THESE AREAS, MENTIONED ABOVE, OPEN TO TARGET SHOOTING. THANK YOU.**

DAN REUTER
BROOMFIELD, COLORADO

BLM_0116388



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## ClosingTarget shooting on BLM land
1 message

**marce jessop** <framerton@gmail.com>                                    Tue, Jun 7, 2016 at 6:48 AM
To: uformp@blm.gov

As a law abiding citizen, I am again concerned with the motives of a federal controlled BLM! These tactics always benefit the government and never the tax payer and always lead to the never ending attack on the second amendment, the costitutional rights of American citizens are your first responsibility! Do your job! An elected official or government hired worker IS a public servant, not a dictator! What is your motive?
     Yours respectfully,  Marce Jessop

BLM_0116389



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## (no subject)
1 message

**Matt Cooper** <coop9351@gmail.com>            Tue, Jun 7, 2016 at 6:57 AM
To: uformp@blm.gov

We need less government employees sitting around on the dead ass scheming as to how they can limit the public access, use, or benefit from the lands that were set aside "FOR THE PEOPLE OF THE UNITED STATES OF AMERICA",  and NOT for the government benifits. You people are simply hired by us to manage this land, and it's looking like to me it's high time we reassess wether or not you employees are serving our interest.

BLM_0116390

9/9/2016                                        DEPARTMENT OF THE INTERIOR Mail - Uncompagre plan



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Uncompagre plan
1 message

---

**Jeff Davis** <jdeere4500@gmail.com>                              Tue, Jun 7, 2016 at 7:25 AM
To: uformp@blm.gov

I noticed every option for the new plan for Uncompagre district reduces the target shooting areas, yet no hunting areas are restricted. Is there any value or reason for this?


Jeff Davis
Walsenburg,  Co

---

BLM_0116391

9/9/2016                                    DEPARTMENT OF THE INTERIOR Mail - Shooting



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

# Shooting
1 message

**Jamie sorensen** <jsorensen888@gmail.com>                    Tue, Jun 7, 2016 at 7:27 AM
To: uformp@blm.gov

Please keep as many acres possible open for shooting. To many places are being closed to shooting.
Thank you,

BLM_0116392

9/9/2016                                    DEPARTMENT OF THE INTERIOR Mail - Public land use



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Public land use
1 message

---

**annemarie maynard** <amintransit@yahoo.com>                    Tue, Jun 7, 2016 at 7:47 AM
Reply-To: annemarie maynard <amintransit@yahoo.com>
To: "uformp@blm.gov" <uformp@blm.gov>

The Bureau of Land Management's Uncompahgre Field Office has released a fifteen to twenty year plan for over 675,000 acres of public land use. Included in this plan are four separate options to limit target shooting within that acreage. It is no wonder so many of the West's citizens are opposed to public ownership of our lands since that ownership seeks to change the nature of our lives by limiting or curtailing target shooting. **All of those lands that are being proposed for closure should remain open to target shooting!**

Annemarie Maynard

---

BLM_0116393

9/9/2016                          DEPARTMENT OF THE INTERIOR Mail - Management Plans Under Consideration



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Management Plans Under Consideration
1 message

---

**Ron Bruce** <st8cop@centurytel.net>                                   Tue, Jun 7, 2016 at 9:48 AM
To: uformp@blm.gov

To Whom It Should Concern:

Based on my reading of the 4 plans under consideration, I would strongly urge the BLM to adopt Plan A.  The other plans, as I understand them, are far too restrictive when it comes to recreational shooting.  My Sheriff's Office hears a steady barrage of anger directed at BLM's perceived over-stepping regarding what was originally intended for BLM's authority. Whether true or not, certainly that perception exists.

So, in conclusion, I would very much favor Plan A.  Thank you for your considerations.

Respectfully,

Ronald B. Bruce, Hinsdale County, Colorado Sheriff

BLM_0116394

9/9/2016                                    DEPARTMENT OF THE INTERIOR Mail - (no subject)



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## (no subject)
1 message

**Jesse Seelhoff** <jesseseelhoff@gmail.com>                      Tue, Jun 7, 2016 at 10:15 AM
To: uformp@blm.gov

   Blm and national forests shouldn't have any target shooting.  I've been hunting in areas without any LEO patrolling.  It
   was like a machine gun party.  All game became nocturnal and my hunt was over before it started.  Wasted a tag and
   never hunted there again.  Archery is in August so ban shooting from August through March.

BLM_0116395



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Proposed plans for public lands SW Colorado

1 message

---

**Thomas Reyburn <sjmtnman@gmail.com>**                   Tue, Jun 7, 2016 at 10:18 AM
To: uformp@blm.gov

I strongly support Plan A due to its approach to shooting recreation. Since an estimated 100 million Americans own firearms, it would seem that if BLM lands are for "many uses" that firearms practicing should be high on the list of "many uses."

Thank you for your consideration.

BTW: I  moved to Oklahoma from Lake City, CO last month. My 13 years in SW Colorado included service in Search and Rescue, Deputy Sheriff Hinsdale County and Alpine Ranger (Hinsdale and San Juan Counties).

--
Tom Reyburn
SJMtnMan@gmail.com

918-907-0036 (Office)
970-209-4695 (Cell)
1122 Swan Drive
Bartlesville, OK   74006

BLM_0116396

9/9/2016                                    DEPARTMENT OF THE INTERIOR Mail - Management Plans Under Consideration



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Management Plans Under Consideration
1 message

**Don Croasdale** <don_croasdale@cox.net>                                      Tue, Jun 7, 2016 at 8:01 PM
To: uformp@blm.gov

Reading the 4 plans under consideration, I would strongly urge the BLM to adopt Plan A.
The other plans, as I understand them, are far too restrictive when it comes to recreational shooting.

Don Croasdale

BLM_0116397



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Target shooting on Public Lands
1 message

---

**Marilyn Colyer** <marilyncolyer.1@gmail.com>                                    Wed, Jun 8, 2016 at 1:18 PM
To: uformp@blm.gov

I am in favor of Alternative B. Or in truth I would suggest maybe three safely boundered areas where hill prevent straying bullets and where there is visibility and these would be signed as Target Shooting areas.

The way things are now with people shooting willy nilly into woods just about any where has made much of the public lands very unsafe for all other people apart from shooter, for livestock and for wildlife. It surely is time to bring about a change and stop target shooters using land at random. Until new areas are established and well known and also signing at many roads and also information in newspapers random target shooters should be warned one time and there after fined.

With the increase in  people numbers and many using the public lands we must bring about some changes. Imagine having somebody killed this way? It makes no sense that so many of us are held at bay this way.

Designated target shooting areas are a good solution. Maps of those areas should be posted and also rules of safely on public lands.

BLM_0116398

DEPARTMENT OF THE INTERIOR Mall - (no subject)



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## (no subject)
1 message

---

**James Pasterz** <jamespasterz@gmail.com>    Wed, Jun 8, 2016 at 3:26 PM
To: uformp@blm.gov

I am writing in favor of Alternative A.   Restricting the public lands to a minimum for target shooting is my vote .

Dr. James R. Pasterz, D.O.    Grand Junction, Co.

BLM_0116399



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## (no subject)
1 message

**James Pasterz** <jamespasterz@gmail.com>                    Thu, Sep 29, 2016 at 7:33 PM
To: uformp@blm.gov

As a sportsman, and avid hunter and outdoor enthusiast, I do not want to see any more restrictions on our use of public lands.  Government intervention is expensive.  Lets not burden the taxpayers w more regulations.    Dr. James R. Pasterz,  D.O. Grand Junction ,Co.

BLM_0116400



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## SW Colorado FS/BLM Proposed Management Plan
1 message

**Gary C Douglass** <elkpilot2001@yahoo.com>                    Thu, Jun 9, 2016 at 1:57 PM
To: uformp@blm.gov

I STRONGLY support "Alternative A, the no-action or status-quo management strategy, which would continue to prohibit target shooting at developed recreational sites. "  I STRONGLY recommend the adoption of "Alternative A".

"Alternative A" does NOT add to the plethora of does/don't s; we the general public are already OVERWHELMED by PC regulations!  Additionally, to adequately enforce any other Alternative would be cost prohibitive...currently insufficient personnel to enforce other regulations other than by complaint.

Gary C Douglass
430 Golden Drive
Montrose, CO 81401

BLM_0116401



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## BLM planning for the Montrose area
1 message

**Jim Frank** <jimandrofrank@gmail.com>                          Tue, Jun 14, 2016 at 11:47 AM
To: uformp@blm.gov

Ladies and gentlemen, I am an avid target shooter and I want to formally oppose ANY plan that reduces the areas that are open to target shooting, hunting, sports shooting, and any other firearm related activity on BLM managed lands.

Thank you.

Jim Frank

--
Using Opera's mail client: http://www.opera.com/mail/

BLM_0116402

| 1.1 | **BLM UNCOMPAHGRE FIELD OFFICE**<br>*Providing Comments*<br>*for Draft RMP/EIS* | Uncompahgre Field Office<br>2465 S. Townsend Ave, Montrose, CO 81401<br>Office hours are 8:00 am to 4:30 pm<br>Phone: (970) 240-5300 | TDD (970) 240-5366<br>FAX (970) 240-5367 |
| --- | --- | --- |

The BLM Uncompahgre Field Office (UFO) is revising the Resource Management Plan (RMP) for the Uncompahgre planning area. The Uncompahgre RMP will set forth a plan of action for managing resources and uses for the next twenty years under the BLM's dual mandate of *multiple use* and *sustained yield*. The Draft RMP/EIS is now available for your review and comment.

## PROVIDING EFFECTIVE COMMENTS

During this comment period, many public land users, organizations, and businesses will want to provide comments to help in the Uncompahgre RMP planning effort. The best and most useful comments are substantive comments; that is, those that have substance. Try not to provide comments that offer opinion only.

**Substantive comments at this stage of the RMP do one or more of the following:**

- Question, with reasonable basis, the accuracy of information in the EIS;
- Question, with reasonable basis, the adequacy of, methodology for, or assumptions used for the environmental analysis;
- Present new information relevant to the analysis;
- Present reasonable alternatives other than those analyzed in the EIS;
- Cause changes or revisions in one or more of the alternatives;
- Recommend specific changes to the landscape or management actions.

## TYPES OF COMMENTS TO AVOID

**Comments that are not substantive include:**

- Comments in favor of or against an action without any reasoning (such as "I don't like" without providing any rationale);
- Comments that only agree or disagree with BLM policy;
- Comments without justification or supporting data (such as "allow more grazing");
- Comments that don't pertain to the planning area (such as "the government should eliminate all dams throughout the west");
- Comments that take the form of vague, open-ended questions.

Please make an effort to provide substantive comments, which will be of greatest benefit to this planning effort. Thank you for your interest in the Uncompahgre RMP.



| **UFO Planning Webpage:**<br>**www.UFORMP.com** | **Mail comments to:**<br>**RMP Project Manager**<br>**2465 S. Townsend Ave**<br>**Montrose, CO 81401** | **Email comments to:**<br>**UFORMP@blm.gov**<br><br>**Email is the preferred method** |
| --- | --- | --- |

BLM
1.1—Providing Comments

**UFO 1/2016**

BLM_0116403

BLM_0116404