Clearly, if the designated route system that was being adopted by these Forests was insufficient for the protection of Sage Grouse habitat, such a position would have been clearly stated in this discussion given the large body of research that exists for the management of the Sage Grouse.

Research indicates that seasonal closures of a designated trail system for the protection of leks is a highly effective tool, which the status decision specifically notes as follows:

> "The BLM and Gunnison County have 38 closure points to minimize impacts to Gunnison sage-grouse within the Basin from March 15 to May 15 each year (BLM 2009, p. 40). While road   closures may be violated in a small number of situations, road closures are having a beneficial effect on Gunnison sage-grouse through avoidance or minimization of impacts during the breeding season."[58]

The Organizations believe that seasonal closures of routes will also only be effective if the nesting areas are seasonally closed to other uses as well.   Clearly closing a route to address concerns regarding its proximity to leks and nesting areas will not be effective if grazing, lek viewing  and other activities identified as similar or higher risk activities for the habitat areas are continued.

The Organizations again believe Grouse management is an issue that a range of alternatives for recreational trails usage could be provided for and simply has not been.  As the FWS has specifically addressed the effectiveness of designated routes and seasonal closures on a significantly smaller scale than those proposed in the DRMP, the Organizations believe this is a viable option for the management of these areas.  The Organizations are vigorously opposed to any more restrictive standards in the DRMP as these standards would not be based on best available science and would directly contradict the ongoing and extensive efforts of partner groups and committees to determine appropriate management standards for the Grouse that preserve economic contributions of public lands. Given the  lack  of analysis provided for particular routes or areas to be closed in the DRMP, the Organizations are simply  unable to provide more site specific comments on this issue.

## 16.  Gunnison Sage Grouse habitats established by the USFWS are not accurately reflected in the creation of ACEC.

The Organizations are very concerned with the impact that the potential listing of the Gunnison Sage Grouse had on development of ACEC proposal in 2013.  As the Gunnison Sage Grouse has

---

[58] *See*, Grouse  Status proposal at pg 2532 .

BLM_0123732

been listed and was provided designated habitat areas in 2014, the Organizations believe this overly cautious planning process for ACEC for grouse habitat can be significantly tightened to avoid unintended consequences in subsequent planning.  The Organizations submit that the ACEC designations in the RMP bear little to no relationship to the critical habitat that was subsequently designated. These are the types of conflicts that can result when there are concurrent planning efforts being conducted with multiple agencies that are not reconciled.

An example of the overly broad designation of proposed ACEC areas to protect the Gunnison Sage Grouse in comparison to the designated critical habitat found in the recent USFWS listing would be the West Montrose County ACEC. This ACEC would designate 22, 930 acres of ACEC to protect 290 acres of critical habitat. [59]  Sims Cerro Gunnison Sage Grouse ACEC proposal would create an ACEC of 25,620 acres to protect 6,970 acres of critical habitat identified by the USFWS.   As these ACEC areas more than 10x the size of the designated habitat, the Organizations must question the basis for this designation. The basis for these designations is brought into further concern as these ACEC encompass areas that were specifically found **_NOT_** to be habitat areas by the UWFWS.   Designation of modeled but unoccupied habitat has become an issue of huge controversy in both the Gunnison and Greater sage grouse listing efforts.   No more acceptable here than in designation of critical habitat as SERIOUSLY undermines partnership efforts.

ACEC designations would Significantly larger geographic areas would be protected as ACEC than were ever analyzed under related Gunnison Sage Grouse planning efforts. Gunnison Sage Grouse listing decisions provide the following outline of identified habitat as follows:

---

[59] *See*, UFO ACEC Report at pg 51.

BLM_0123733



60

Clearly the proposed boundaries for these ACEC to protect gunnison sage grouse habitat simply do not relate in any manner to the analysis area for habitat or decisions that have been made in associated USFWS planning efforts since the ACEC report was published. This simply is improper and must be updated to avoid a myriad of issues including unintended management consequences.

### 17.  Prairie Dog management standards must be balanced with multiple use impacts from lack of clarity in standards.

Organizations are deeply concerned with proposed management of white Tailed Prairie dog habitat in the DRMP and related ACEC areas proposed for the protection of these species, such as the Salt Desert Shrublands, Roubideau and Fairview South ACEC covering almost 50k acres. The Organizations are aware the prairie dog remains a sensitive species for BLM management purposes, but submit that the DRMP management simply cannot be reconciled with relevant management decisions from other managers.   The DRMP proposes to manage the species as follows:

"Allowable Use:  **STIPULATION** TL-25:  *Gunnison and White-Tailed Prairie Dog.* Prohibit surface use and surface-disturbing and disruptive activities within 300

---

[60] See, DEPARTMENT OF THE INTERIOR Fish and Wildlife Service 50 CFR Part 17 Threatened Wildlife and Plants; *Designation of Critical Habitat for Gunnison Sage-Grouse*; Federal Register /Vol. 79, No. 224 /Thursday, November 20, 2014 /Rules and Regulations  at pg 69357

BLM_0123734

feet of active prairie dog colonies from April 1 to July 15 to protect reproduction."[61]

Again recreational usage is frequently a factor important in development and related implementation of ACEC and now clearly identified in the RMP. Such management would result in major closures for minimal risks that have been identified by relevant experts who have concluded:

"Indirect effects of energy development on prairie dogs and their ecosystem may include (1) increased exposure to shooters and OHV users because of improved road access into remote areas - Gordon et al. (2003) found that shooting pressure was greatest at colonies with easy road access, as compared to more remote colonies; and (2) invasion of habitats by invasive and noxious weeds."[62]

Additionally, this management fails to address the primary threat to the species identified when USFWS determined listing was not necessary in 2010. In this document recreational concerns for the species were entirely centered on recreational shooting, as the USFWS clearly states:

"We conclude that the best scientific and commercial information available indicates that the white-tailed prairie dog is not now, or in the foreseeable future, significantly threatened by the overutilization for commercial, recreational, scientific, or educational purposes."[63]

The Organizations vigorously assert that any management actions that are proposed or ACEC management standards that are proposed MUST be narrowly tailored to avoid impacts to recreational usage of roads and trails in these areas as these have been consistently and vigorously determined to NOT be a priority threat to the species.

---

[61] *See,* UFO DRMP at pg 2-114.

[62] See, Seglund, A.E. and P.M Schnurr. 2010. Colorado Gunnison's and white-tailed prairie dog conservation strategy. Colorado Division of Wildlife, Denver, Colorado, USA. at pg 126.

[63] See, Dept of Interior; **Endangered and Threatened Wildlife and Plants; 12–month Finding on a Petition to List the White-tailed Prairie Dog as Endangered or Threatened Federal Register** / Vol. 75, No. 104 / Tuesday, June 1, 2010 / at 30354

BLM_0123735

## 18.  Kit fox threats are often outside land manager ability to address as many threats are on private lands or under state management.

The Organizations are aware that the kit fox is a BLM sensitive species, but the Organizations vigorously opposed to any assertion that the protection of possible habitat areas will contribute to any recovery of the species.  The Organizations will note that the kit fox is not a major species in Colorado and has often been managed with the swift fox in Colorado, which has a much larger range and historical presence in the state and is also able to breed with the kit fox and generate a swift fox offspring. Given the large scale designations proposed in the ACEC/RMP  the Organizations are forced to assume that the term kit fox and swift fox have been used interchangeably. The Organizations are vigorously opposed to any management that would be based on the San Joaquin Kit Fox, a species in southern California, as this species is geographically unrelated to the kit fox in Colorado.

The Organizations are aware that at one point OHV recreation was the basis for a highly theoretical concern for kit fox habitat and was specifically identified as an area where research was needed in 2006 Conservation Assessment and Strategy for the kit fox.   This research was conducted and the  2011 Conservation assessment and strategy for the kit fox  clearly found:

> "While swift foxes continue to be used for commercial, recreational, scientific, or
> educational purposes, populations appear to be stable throughout the range. It
> is the SFCT's view this factor has not risen to the level of a threat."[64]

In the 2011 Conservation Assessment and Strategy high speed arterial type roadways were specifically and extensively reviewed  and found to not to be a threat to the species.[65]  Given these conclusions the Organizations must question the relevance of an ACEC that addresses kit fox habitat as these ACEC areas and management standards are addressing issues that clearly pose far less of a threat than a high speed arterial road.  In the 2011 Conservation Assessment and Strategy there is simply no mention of OHV recreation as a possible threat, which clearly relates to the fact this activity most commonly occurs on low speed low volume forest roads where risks are greatly reduced. .

---

[64] See, Dowd Stukel, E., ed. 2011. Conservation assessment and conservation strategy for swift fox in the United States – 2011 Update. South Dakota Department of Game, Fish and Parks, Pierre, South Dakota. Conservation assessment and strategy at pg 52 (Hereinafter referred to as the Swift fox Conservation assessment and Strategy")
[65] See, Swift Fox Conservation assessment and strategy at pg 58.

BLM_0123736

North Dakota Fish and Wildlife provides a very neat summary of the primary threats to the kit fox, which are outlined as follows:

> **"Reasons for Decline:** The swift fox has declined as a consequence of the increase in agriculture and the disappearance of the native prairies. Widespread shooting, trapping, and poisoning campaigns aimed at wolves, coyote, and red fox also reduced swift fox populations. Swift fox are very easy to trap and very susceptible to poisoned bait. They also get hit by cars when foraging along the sides of roads."[66]

The Organizations vigorously assert that protecting habitat areas in a resource management plan simply bears no relationship to reducing these threats to the species as hunting and baiting of the fox are not habitat issues and are clearly within the management authority of state wildlife managers. Again the presence of kit fox habitat does not create importance in the area to warrant the designation as an ACEC.

### 19a. The Organizations are vigorously opposed to Wilderness type designations as these significantly impair forest health.

As previously noted the Organizations have significant concerns regarding the lack of NEPA analysis of many issues surrounding management changes proposed for ACEC areas and these concerns would extend to areas proposed to be Wilderness characteristics areas as well.  The Organizations are also aware of a significant amount of research that is clearly best available science on Wilderness issues that  weighs heavily against designation of additional areas as WCA as the restrictive management impacts a variety of resources. The Organizations can simply find no reference to any of these works on the DRMP but believe them to be highly relevant management issues to be reviewed if designations are expanded.

The  scope of these threats and of the impact to public access is outlined in the Forest Service Report, prepared at the request of Senator Udall and discussed in other sections of these comments.  A copy of the Udall report is submitted in conjunction with these comments. The Organizations would note that many of the Forest health issues raised in the report mirror factors to be balanced in WCA management in BLM guidance.  Management of forest health and fires are issues that are specifically addressed in the new BLM WSA manual as follows:

---

[66] https://www.fws.gov/northdakotafieldoffice/endspecies/species/swift_fox.htm

"2. **Fire** a. General. This section of the manual cannot be used without incorporating standard agency fire management policies and techniques found in other BLM documents, such as the Guidance for Implementation of Federal Wildland Fire Management Policy, but not repeated here.

i. *Managing fire.* The overall goal of managing fire in WSAs is to allow the frequency and intensity of the natural fire regime to play its inherent role in the ecosystem. This means both allowing fire where ecosystems evolved in the presence of fire, and preventing unnatural spread of fire in ecosystems that evolved without broad-scale fires.

ii. *Biological constraints.* The overall goal may be affected by past human actions. These may include fire suppression leading to fuel buildup creating the possibility of unnaturally severe fires, or the invasion of non-native annual grasses leading to the unnatural spread of fire in ecosystems that evolved without broad-scale fires.

iii. *Management constraints.* The overall goal may be affected by budgets, national fire management demands, suppression of fire on adjacent land before it moves into the WSA, or undesired consequences of wildfire moving out of the WSA (such as wildfires that may pose a danger to human life and/or property)." [67]

The Organizations vigorously assert that these factors weigh heavily against the expansion of any WCA areas in management.   Colorado needs to learn from the negative forest health impacts that have resulted from existing Wilderness areas and not allow additionally management restrictions to be brought into place that can limit land manager responses in the future.

**19b. Udall Forest Health Report.**

The Organizations believe there is significant research prepared at the request of Senator Udall that must be addressed as part of any Wilderness or similar designation process as best available science.  The Organizations are aware that Senator Udall's request was directed toward pine beetle impacts, but believe these findings are exceptionally relevant to the management of public lands in general. General management of public lands was also within the scope of the Senator's request. [68]  The Organizations are aware that the UFO planning area has been spared much of the pine beetle impact  but many of these same issues are present on

---

[67] See, BLM manual 6330 at pg 1-13.

[68] *Id* at pg 25.

44

BLM_0123738

the UFO but involve juniper incursions and other invasive species that need to be actively managed.

The conclusions of this report specifically identify that designated Wilderness and improperly managed Roadless areas were a contributing factor to the pine beetle outbreak[69] and a limiting factor in the FS response[70]. Given the stark nature of these conclusions and the large scope of the request from Senator Udall, the Organizations vigorously assert these concerns must be addressed in the designation of any further WSA/WCA or similar designations.

### 19c. State Forest Service reports identify Wilderness as a significant impairment to Forest Health.

The state of Colorado has also developed planning documents addressing forest health that must be addressed in the DRMP. The Colorado State Forest Service conducted its annual forest health analysis in 2010, which outlined the numerous insect and disease threats that face Colorado's forests.   This is an annually published report which consistently finds that active forest management was critical in addressing these threats to Colorado forests.  This plan specifically outlined the significant areas that are impacted by the mountain pine beetle epidemic and addressed the significant impacts to safety and enjoyment of recreational usage in these areas as a result of the beetle epidemic.

The 2010 report also provided specific insect impacts maps for the State[71].  A comparison of the high impact areas for beetles to designated  Wilderness areas reveals an exceptionally high correlation between designated Wilderness and areas that are hardest hit by the beetle epidemic.  These maps were exceptionally similar to the forest health and fire risk maps that were provided in the Colorado SCORP.  The Organizations concerns regarding the failure to address the SCORP are addressed in other portions of these comments.

The 2011 State Forest Service Forest Health report addressed the concerns between forest health and the spruce beetle outbreak in and around the Wolf Creek pass area, which the State Forest Service directly attributes to the inability of land managers to address blow down areas in the

---

[69] USFS; *A review of the Forest Service Response: The Bark Beetle outbreak in Northern Colorado and Southern Wyoming; A report by the USFS at the request of Senator Mark Udall; September 2011*; Executive Summary at pg i.
[70] *Id* at pg 12.

[71] Colorado State Forest Service; *2010 Report on the health of Colorado Forests; January 2011*: maps included as unpagenated introduction to the report.

45

Weminuche Wilderness area.[72] The 2011 report provides a historical analysis of many other blow down areas that could have been managed but were not due to land management restrictions. The inability to mitigate these blow down specifically resulted in massive spruce beetle outbreaks in the area. [73] The Organizations will note at the time of preparation of these comments the West Fork Complex fire is currently burning completely out of control in this area and has forced the complete evacuation of the town of South Fork, providing concrete proof of many of the negative impacts of failing to actively manage these areas. Clearly the massive superheated burn area will not improve wildlife habitat or any recreational usage of these areas for a significant period of time going forward.

Again the Organizations believe these reports are clearly best available science that has clearly found there is a critical need for the active management of public lands in order to maintain basic health and sustainable. The Organizations believe cost effective and easy access is a key component of the active management of these areas. The Organizations believe these analysis and conclusions must be addressed in any WSA/WCA review and balanced in any expansion of such management in the UFO DRMP.

### 19d.  Watershed health managements standards identify the critical need for active management of these areas.

The Organizations must note that the designations and management of WCA/WSA areas fails to analyze the need for active management in protecting watershed health in these areas. The need for management to address priority watershed management issues is specifically identified in regional management documents prepared under FSM 2520. The Organizations must again note the USFS is a science partner with the BLM and the Organizations believe these issues and management standards are clearly based on best available science. The regional priorities identify forest thinning as the priority management issue in watershed areas to protect against wildfire risks and this need is are simply never addressed in the designation of WSA/WCA in the DRMP. Forest Service research identifies a wide variety of adverse impacts to watershed health from a lack of ability to actively manage a watershed. The Organizations believe these management priorities are accurately addressed in USFS regional watershed guidelines and the reasoning for the variance between the DRMP and regional guidelines must be addressed.

---

[72] *Id* at pg 9.

[73] *Id* at pg 10.

46

Region 2 mangers have completed this requirement under FSM 2520 in partnership with the Colorado Forest Service and the Denver Water Department.  These guidelines have been adopted by all 11 front range counties for management of Watershed areas. The regional guidelines for protection and management of watersheds outlines significantly different management objectives and requirements for watersheds as these guidelines identify the need for thinning and removal of trees as the management priority, of which motorized access and routes is a key tool.        Issues such as stream bank stabilization and fisheries habitat enhancement are simply never addressed in regional watershed management guidelines.  The project appears to directly contradicts the concerns and direction for management provided in the management guidelines. Clearly this issue must be resolved prior to moving forward with any expansion of WCA type management.

<h2 style="text-align:center">20.  Conclusion</h2>

The Organizations are cautiously  supporting Uncompahgre Field Office("UFO") Draft Resource Management Plan("the Proposal") Alternative "C".  While we are supportive of Alternative C of the Proposal, there are many factors that must be addressed to insure that the planning process is relying on the most accurate information possible in balancing resources.  We are vigorously opposed to Alternative B of the Proposal for reasons that are more specifically addressed in these comments, the Organizations believe Alternative D could be easily adapted to become the most favorable alternative for the Organizations.    Our main concern with Alternative D in its current form is the loss of the North Delta OHV area and associated open riding opportunities.  The Organizations submit that the North Delta area is truly suitable for an open riding designation and these open riding areas are diminishing rapidly throughout the State, which will make any of these opportunities highly valued in the future.

After review of the Proposal, the valuation of recreational activity on the UFO is badly undervalued, in terms of total spending, total jobs that result from recreation and the per day average spending  amounts from the recreational activity. The variation of the UFO per day spending estimate of $10.01 and the public's experience on these issues is simply shocking.

The Organizations are also very concerned that with the large number of Areas of Critical Environmental Concern that are proposed in the RMP, that the impacts to multiple use access are not accurately reflected in the summary of Alternative C, or any other alternative of the Proposal.    It has been the Organizations experience that when ACEC are designated, this designation lays the foundation for closure of these areas to multiple use recreation, even when the management issues to be addressed are simply unrelated to multiple use recreation.

BLM_0123741

Our concerns about imbalance in these areas is compounded by the fact that the economic contribution of recreational activity is badly underestimated, which will result in an erroneous balance between resource protections and the benefits of resource utilization being struck.

Please feel free to contact Scott Jones at 518-281-5810 or via email at scott.jones46@yahoo.com or via USPS at 508 Ashford Drive, Longmont CO 80504 if you should wish to discuss these matters further or if you should wish to have further information regarding these concerns.

Sincerely,

Don Riggle

Scott Jones, Esq.
COHVCO/TPA authorized Representative
CSA President

D.E. Riggle
Director of Operations
Trails Preservation Alliance

Enclosures

48





**Review of the Forest Service Response:**

**The Bark Beetle Outbreak in Northern Colorado and Southern Wyoming**



A report by
USDA Forest Service
Rocky Mountain Region and Rocky Mountain Research Station
at the request of Senator Mark Udall

September 2011

BLM_0123743



BLM_0123744

# Executive Summary

A mountain pine beetle outbreak in three national forests in the Rocky Mountain Region (Region 2) of the U.S. Forest Service—the Arapaho-Roosevelt, Medicine Bow-Routt and White River—was initially detected in 1996. By 2010 it had spread to about four million acres. This report examines the ecological conditions and historical land use that contributed to the outbreak, management response to the outbreak, suggested new and extended authorities for addressing the outbreak, and what we might expect as we look forward to the "new forest."

## Looking Back: Conditions that Led to the Outbreak

Bark beetles are a natural part of forest ecosystems throughout the world. However, bark beetles are killing trees in larger numbers, at faster rates, over longer time periods, and over larger areas compared to outbreaks recorded over the past century. Moreover, outbreaks are occurring in multiple forest types. Reasons for these changes are unclear, but they include a changing climate affecting both insect and host; previous management practices such as selective timber harvesting and wildfire suppression in some forest types; a maturing forest due in part to changing disturbance patterns; and prolonged drought, which can stress trees and make them more vulnerable to insect attacks.

During the last part of the 20th century, widespread treatments in lodgepole pine stands that would have created age class diversity, enhanced the vigor of remaining trees, and improved stand resiliency to drought or insect attack—such as timber harvest and thinning—lacked public acceptance. Proposals for such practices were routinely appealed and litigated, constraining the ability of the Forest Service to manage what had become large expanses of even-aged stands susceptible to a bark beetle outbreak.

There were other factors that helped set the stage for a large-scale outbreak:

- Consecutive years of severe drought in the late 1990s and through the middle of the first decade of the 2000s, putting already densely populated stands under severe stress.
- Funding for pre-commercial and commercial thinning to reduce stand density during the decade leading up to and including the outbreak did not keep pace with the rate of bark beetle outbreak spread.
- Limited accessibility of terrain (only 25% of the outbreak area was accessible due to steep slopes, lack of existing roads, and land use designations such as Wilderness that precluded treatments needed to reduce susceptibility to insects and disease).
- Decline in public acceptance of large-scale timber management practices in the last part of the 20th century. This lack of public acceptance, compounded by national and international market forces and the relatively low commercial value of lodgepole pine, contributed to a corresponding decline in the timber industry. (The timber industry in the Rocky Mountain Region has declined by 63 percent since 1986).

## Management Response in the Aftermath of the Outbreak and Factors that Influenced Response

Region 2 has made mitigation in the aftermath of the outbreak a top priority in its allocation of limited resources. However, funding levels at the outset of the outbreak (mid- to late 1990's) were inadequate to conduct any appreciable level of mitigation work in response to both its scale and rate of spread. Beginning in FY 2008, federal and state lawmakers have responded to the outbreak through increased funding, and legislation to expand authorities.

i

BLM_0123745

Collaboration with communities of interest has been a key component of the Forest Service response to the outbreak. These partnerships have helped to increase public awareness of the threat posed by dead and dying trees, and have been instrumental in identifying priority areas in which to conduct mitigation work. The response strategy focuses on protecting human life, public infrastructure and critical water supplies; and on strengthening the ability of communities to adapt to changed conditions on the landscape. What has emerged from collaborative efforts with communities is widespread social acceptance of the treatments needed to mitigate these threats of dead and dying trees.

Authorities such as timber sale contracts and stewardship contracts have proven to be of limited use because of the low value of beetle-killed timber and the declining capacity of the traditional timber industry. Although some new markets have been developed for beetle-killed trees, utilization of large quantities of biomass is still years away. Grants have been made to private wood products companies to stimulate new technologies and increase current efficiencies. The research community and private companies are studying the economics of biomass utilization, as well as the environmental consequences of adding biomass and biological charcoal (biochar) to forest soils.

Significant increases in appropriated funds have been used to accelerate mitigation activities. Sustaining those increased levels of funding will be essential for the Forest Service to continue to prepare for and implement mitigation activities at the level and pace needed to effectively protect life and property from the threat of dead and dying trees.

### New or Extended Authorities that Could Help

Two tools that hasten response to emerging outbreaks and improve effectiveness are the Good Neighbor Authority and the Stewardship Contracting Authority. Both are set to expire on 30 September 2013. It would be helpful if they were extended or made permanent.

### Looking Forward: the "New Forest"

Developing appropriate management responses to bark beetle outbreaks requires understanding the complexities of interactions between the beetles and host trees. In establishing the new forest, long-term management objectives will include creation of more diversity in terms of both species composition and age classes across the landscape; implementing restoration strategies for high-elevation pine forests; thinning to reduce stand density in forest ecosystems that have highly susceptible conditions; and incorporating climate change considerations when formulating forest management strategies.

However, opportunities to apply a strategy to achieve those objectives will continue to be limited to a small fraction of the infested land base, due to terrain (accessibility), appropriated budgets, economics, and land use designations. Simulations suggest that lodgepole pine will remain the dominant species in harvested stands that have lost their overstory to bark beetles. In untreated stands, simulations suggest that subalpine fir will become the most dominant species.

The complexity of watershed and hydrologic processes make it difficult to predict the effect of the bark beetle outbreak on runoff quantity and quality. Any variation due to the outbreak would be difficult to detect due to other sources of variation that affect water quality and quantity, such as precipitation and climate factors.

ii

Bark beetle outbreaks result in significant changes to forest stand structure, and thus to fire risk and fire behavior.[1] Fire risk and behavior in these stands are complicated by differences in the degree (percentage) of tree mortality, rate of tree mortality, and time since mortality. The specifics of how beetle outbreaks affect the likelihood that a fire will start are a topic of current research.

---

[1] Fire Risk: the probability of an ignition occurring as determined from historical fire record data. Fire behavior: the magnitude, direction, and intensity of fire spread.

iii

BLM_0123747



iv

BLM_0123748

# Table of Contents

Executive Summary ............................................................................... i

Introduction......................................................................................... 1

Part I – Looking Back: Conditions that Led to the Outbreak .................................... 3
  Ecological Conditions ....................................................................... 3
  Historical Use ............................................................................... 4
  Social, Economic and Policy Issues ....................................................... 5

Part II – The Outbreak: Management Response and Factors that Affected Response ...... 7
  Management Response....................................................................... 7
  Factors Affecting Response ................................................................ 9

Part III – Suggested New or Extended Authorities .............................................. 15

Part IV – Looking Forward: The "New Forest" .................................................. 17
  Creating a Resilient Forest ................................................................. 17
  The Role of Natural Regeneration ....................................................... 18
  Impacts to Watersheds .................................................................... 19
  Fire Risk and Behavior .................................................................... 20

Appendices .......................................................................................... 23
  Appendix One – Senator Udall's Request ................................................ 25
  Appendix Two – Funding History of the Rocky Mountain Region .................. 27
  Appendix Three – Accomplishments and Remaining Work ......................... 29
  Appendix Four – Forest Service Biomass Grants in the Rocky Mountain Region... 31
  Appendix Five – Impacts to Watersheds ................................................ 33
  Appendix Six – Fire Risk and Behavior................................................... 37

Bibliography ....................................................................................... 41

BLM_0123749



vi

BLM_0123750

# Introduction

Since 1996, when it was first detected, the mountain pine beetle outbreak in the lodgepole pine forests of northern Colorado and southern Wyoming has grown exponentially. By 2010, aerial detection surveys had estimated that four million acres were affected by mountain pine beetles in the Arapaho-Roosevelt, White River and Medicine Bow-Routt National Forests. A bark beetle outbreak of this scope is historically unprecedented in this area.

The three national forests took early steps to respond to the outbreak. Treatments to thin stands to reduce susceptibility to infestation; salvage infested trees; and reduce the number of susceptible of trees around rural subdivisions were among the actions taken. By the middle of the first decade of the 2000s, it was clear that management actions such as thinning had not stopped the spread of the outbreak, but only slowed its spread into high-value areas. It was not feasible even to remove dead trees to the degree desired by many local residents to reduce wildfire risk.

In November of 2010, Senator Mark Udall wrote to USDA Secretary Tom Vilsack to request that the U.S. Forest Service conduct a review of this mountain pine beetle outbreak (see Appendix One). He asked that the Forest Service document "lessons learned and obstacles encountered" to help determine what more can be done, and what additional tools may be needed to respond to this outbreak and others in the future. This report was produced collaboratively by the Rocky Mountain Research Station (RMRS) and the Rocky Mountain Region (Region 2). It is a compilation of current research information and management experience, using readily available information on administrative and management issues. No additional research or development of administrative data was undertaken for this report.

Part I (Looking Back: Conditions that Led to the Outbreak) addresses the ecological conditions of the lodgepole pine forests that contributed to an outbreak. It also describes uses of the forests in the 19th century that contributed to a forest structure that was highly vulnerable to an outbreak. Finally, this section addresses social, economic and policy issues that constrained vegetation treatments that would have increased resiliency to drought or insect attack.

Part II (The Outbreak: Management Response, and Factors that Affected It) details the response to the outbreak by the Forest Service and its partners. It also examines the social, economic and policy issues that affected the ability of the Forest Service to respond quickly and at the necessary scale.

Part III (Suggested Extended Authorities) suggests extension of authorities, set to expire, that would be useful in responding to an outbreak.

In Part IV (Looking Forward: The "New Forest") touches on post-outbreak conditions, including development of the future forest, how to promote resiliency, impacts to watersheds, and how fire hazard[1] and fire risk will change over time.

---

[1] Fire Hazard: A fuel complex, defined by volume, type, condition, arrangement and location, which determines the ease of ignition and the resistance to control. A physical situation (fuels, weather, and topography) with potential for causing harm or damage as a result of wildland fire.

1



## Part I – Looking Back: Conditions that Led to the Outbreak

### Ecological Conditions

Native bark beetles are a natural part of forest ecosystems throughout the world. We know that bark beetles have been associated with western forests in the United States since at least the Holocene geologic epoch, which began approximately 12,000 years ago. They have probably been a part of the forest ecosystem for much longer.

About 500 species of bark beetles occur in North America, but only a few kill all or a portion of the host trees they infest. These few species are primarily responsible for the large areas of tree mortality seen across the major forest ecosystems in the West. These tree-killers reside in a single family of insects (*Curculionidae*, subfamily *Scolytinae*) and each species has evolved to feed and reproduce in a single conifer group. The mountain pine beetle, the species of primary interest in this report, attacks and reproduces in at least 12 different species of pine, including lodgepole, ponderosa, bristlecone, whitebark, western white, sugar, and limber pine.

Historically in North America, bark beetle populations are cyclical and periodically erupt into outbreaks. Although outbreaks can kill many trees over large areas, they have not "destroyed" forests but have served as positive forces of transformation that redistribute nutrients and growing space. In this role, beetles generally attack larger trees, thus helping to renew the forest by killing older and declining trees while allowing younger, more productive trees to compete successfully for resources. The current bark beetle outbreaks, however, are unprecedented in their intensity, their extent, and their synchroneity (that is, their occurrence at the same time). Bark beetles are killing trees in larger numbers, at a faster rate, over longer time periods, and over larger areas compared to outbreaks recorded over the past century. Furthermore, the outbreaks are occurring concurrently across western North America in multiple forest types. The reason or reasons for these changes are unclear, but the best available science provides some insights. They include:

- A changing climate affecting both insect and host.
- Previous management practices such as timber harvesting, historical use patterns, and wildfire suppression in some forest types; and a maturing forest due in part to management practices that changed the size and frequency of regeneration events. The result was hundreds of thousands of contiguous acres of lodgepole pine in densely stocked, mature stand conditions that were highly susceptible to bark beetle attack.
- Prolonged drought, which can stress trees and make them more vulnerable to insect attacks.

3

BLM_0123752

**Climate:**  Bark beetles, like all insects, are ectotherms (an organism whose body temperature varies with the temperature of its environment).  Every aspect of the beetle's life is affected by temperature—from the number of eggs it lays, to its ability to disperse, to the rate at which the beetle moves from one life stage to the next (for example, from pupa to adult), to the survival of the beetle during cold periods.  Mountain pine beetles, for instance, move from one life stage to another only when temperatures are warm enough—a threshold which varies depending on geographic location.

During the past decade, most years ranked among the warmest since record keeping began in the mid-1800s.  Naturally this is also the case in forest ecosystems where bark beetles make their home.  Cold winter temperature is a major mortality agent of bark beetles.  Warmer winter temperatures foster increased insect survival during the winter, leading to larger populations.  Warmer, drier conditions can result in a stressed environment for trees—making them more susceptible to insect attack—and higher temperatures can increase the speed of insect development.  However, this will be a factor only if the insect is still able to enter the winter in its cold-hardy stage; this may be occurring in high-elevation forest types such as whitebark and limber pine.

In addition to the direct effects of warming temperatures, there are indirect effects of climate change.  A prolonged drought in portions of the western U.S. during the late 1990's and early 2000's, combined with the warming temperatures, weakened trees and made them more susceptible to bark beetle attacks.  Forests full of drought-stressed trees, combined with rapidly expanding populations of bark beetles, fueled dramatic increases in the duration, intensity, and extent of tree mortality in these western forests.

**Wildfire Suppression:**  Since the early 20th century, when the United States implemented a policy of suppressing fire on public land, many fire-prone ecosystems such as ponderosa and lodgepole pine have experienced long fire-free intervals.  Often the species composition and structure of those forests changed, resulting in dense forests full of the mature trees that bark beetles favor.

The role of fire suppression in bark beetle outbreak dynamics is a topic of much discussion among scientists, reflecting the need for additional research.  Although the effect of fire suppression on bark beetle outbreaks varies by forest type, region, and the level of forest management (such as timber harvest), it is fair to conclude that fire suppression policies have helped create a landscape that is more homogeneous over vast tracts of forest, and therefore more susceptible to large-scale bark beetle attacks.

### Historical Use

The tie hacking industry in the area of Wyoming and Colorado that is now the Medicine Bow National Forest began in 1868 with the construction of the Transcontinental Railroad.  During the peak construction years, 1868 to 1870, timber for 3 million railroad ties was removed.  Between 1869 and 1902 (the year the Medicine Bow National Forest was established), timber for another 10 million railroad ties was taken, representing 90-95% of the total volume of forest products.

In Colorado, construction of railroads was more localized, supporting the mining industry that sprang up along the mineral belt after the discovery of gold in 1858.  The boom years for railroad construction began in 1880 and ran until 1892, supporting the silver boom.  The mining industry was the most significant industry in Colorado in the nineteenth century.  It used vast amounts of forest resources.  All materials for local railroads, mining supports, and construction in mining towns and camps came from local forests.  Placer mines and mill waste came to dominate many landscapes.  Often entire mountainsides were completely denuded to provide milled lumber for construction, supports for mines and cribbing, and fuel.  Industrial mining on a landscape scale peaked around 1900 and then retreated to only the most profitable mines.

4

This scale of tree removal, and the clearing of large areas to expose the geology for mining exploration and extraction, resulted in a "regeneration event" in thousands of acres of pine forests—in other words, whole forests started over with seedlings. This contributed to the current stand structure where a mature overstory is the prevalent condition.

## Social, Economic, and Policy Issues

### Public Acceptance of Treatments

Forest conditions susceptible to mountain pine beetle infestation in pine forests were recognized by Forest Service personnel as early as the mid-1990s. These conditions were noted as the rationale for vegetation treatments in Purpose and Need statements for disclosure documents required under the National Environmental Policy Act (NEPA). In the 1990's, vegetation treatments in lodgepole pine stands that would have increased resiliency to drought or insect attack (timber sales and stand improvement projects such as thinning) lacked public acceptance. These practices, which increase growth rates and vigor of individual trees by reducing competition, were routinely appealed and litigated. This hampered the ability of the Forest Service to address stand conditions susceptible to outbreak.

Moreover, people were skeptical about the potential spread of the insects. Many did not believe, looking at green trees that had been attacked by bark beetles, that they had actually been killed. That realization came a year later, when the trees turned red. Public acceptance of active forest management (also called social license) increased as people witnessed the scope of the outbreak and its rapid rate of spread, but by then it was too late to implement active preventive forest management measures. Rather, the social license allowed the Forest Service (and other partners) to implement large mitigation projects in the aftermath of the outbreak to address threats to public safety from wildfires and falling dead trees.

### Funding

Funding for pre-commercial and commercial thinning to reduce green tree stocking was extremely low for the decade leading up to and including the outbreak. As the infestation progressed, appropriated funds did not keep pace with the outbreak sufficiently for Region 2 to take early measures to effectively detect and remove infested trees (brood trees) or to thin stands of lodgepole pines ahead of the predicted beetle infestation expansion (see Appendix 2).

### Scale of Possible Treatments

Funding levels were not the only limiting factor in maintaining forest stands. The Forest Service was able to access less than 25 percent of the suitable timber base. Limited access is attributed to several factors:

- Forested slopes that exceed 35% to 40% are too steep for conventional forest management practices.

- Many wildland urban interface (WUI) areas, particularly in Colorado, are adjacent to inventoried roadless areas. Since the Roadless Rule was promulgated in 2001, it has been repeatedly litigated, and judicial decisions have differed. Court decisions have changed the legal landscape for project planning. Fuel treatment projects in the WUI require additional analysis and in some cases have been controversial. In some areas fuel loadings are so great that effective fuel treatment cannot occur without removing some of the fuel using a temporary road. Commercial access on a large scale that would support a long-term supply of wood to industry and allow increased management of watersheds is difficult outside of the WUI and at-risk communities.

- In general, mechanized treatments are prohibited in designated wilderness areas. The Arapaho,

5

Roosevelt, White River, and Routt National Forests in Colorado have a combined total of over one million acres of wilderness; the Medicine Bow National Forest in Wyoming has more than 78 thousand acres. A large portion of these wilderness acres have been impacted by the current bark beetle outbreak.

### Capacity of the Traditional Timber Industry

The timber industry in the United States has been in decline for at least the last two decades. One factor in this decline has been public pressure to reduce the supply of green live timber from National Forest System (NFS) lands (public opposition to tree cutting); another has been national/international market forces. In Region 2, the timber industry has declined by 63% since 1986. (In 1989, the Region sold 190 million board feet; in 2005, the Region sold 58 million board feet.) Consequently, few industrial resources were or are available to help the Forest Service in applying management practices in response to the bark beetle outbreak.

### Use of Federal Authorities

As the outbreak emerged, Region 2 was limited in its ability to reduce stocking of low-value lodgepole pine because it cost more to remove it than it was worth. The Forest Service does not have authority to assign no-value or salvage rates to the healthy, green standing trees.

### Stewardship Contracting

Stewardship contracts[1] can be a valuable tool for thinning stands where the value of the extraction activity (timber harvest) is equal to or greater than the cost of thinning. In R2, there often is not enough value in the material being removed to offset the cost of removal of the material or to offset the cost for other restoration activities within the contract area. Short-term contracts were frequently used in Region 2, but they were generally used on areas of less than 2,000 acres, and only a fraction of the area in those contracts involved thinning stands. Previous contracts didn't affect enough acres in the three national forests to measurably improve resiliency of lodgepole pine stands on large landscapes.

---

[1] Stewardship contracting combines restoration and extraction activities on NFS lands into contract or agreement packages. It provides for trading goods for services, and allows a national forest to retain receipts from forest products that need to be removed to meet restoration objectives, and apply the receipts to needed service work in the stewardship project area. Stewardship contracts may be short-term contracts that last for 1 to 5 years or they may be long-term contracts, often referred to as Long-Term Stewardship Contracts or LTSCs, which can have 10-year duration.

6



## Part II – The Outbreak: Management Response and Factors that Affected Response

### Management Response

#### *Collaboration*

As the outbreak expanded to affect millions of acres, the Forest Service recognized that neither it nor any other entity could respond effectively on its own—so the agency convened partners in 2006 to suggest a collaborative approach. The partners agreed, and created the Colorado Bark Beetle Cooperative (CBBC), an organization that takes concerted and strategic action to address the outbreak. The CBBC, composed of federal, state and local governments, non-governmental organizations and private businesses, has cooperated on projects and public education efforts ever since. These partners have been involved in general awareness and public education, identification and prioritization of areas for mitigation work, and watershed assessments.

In 2007, Region 2 established a Regional Incident Management Team to coordinate hazardous tree removal among the three forests and promote cooperation with partners. Soon afterward, the Northern Front Range Mountain Pine Beetle Working Group was formed to coordinate efforts along the Front Range of Colorado. In the research community, the Western Bark Beetle Research Group (WBBRG)[1] was formed to serve as an ad hoc umbrella organization aimed at fostering communication, and enriching scientific interactions among Forest Service bark beetle researchers in the western United States. WBBRG's goal is to enhance the responsiveness, delivery, and impact of bark beetle research. It has provided Forest Insect and Disease Tally (FIDT) software for analyzing insect and disease population information taken during stand surveys; a research bibliography, extending back into the 1960's and including current research; and databases of historical mountain pine beetle outbreaks.

#### *Mitigation*

The response strategy developed by the Forest Service and its partners focuses on public and employee health and safety; protection of public infrastructure and critical water supplies; and community resilience to adapt to changed conditions on the landscape. (There was not the funding, capacity, nor public support to address backcountry areas.) The strategy identifies values at risk:

---

[1] The web site address for the WBBRG is (http://www.usu.edu/beetle/wbbrg_bark_beetle.htm.

BLM_0123756

- 215,000 acres of wildland urban interface (WUI) ;
- 3,700 miles of forest system roads;
- 1,300 miles of trails;
- 460 developed recreation sites;
- 16 ski areas; and
- 550 miles of powerlines.

In addition, essential water supplies are at risk from falling trees because of the damage wildfires can cause to watersheds, and because falling dead trees can obstruct water infrastructure (such as ditches, gates, pipelines, and storage facilities). Within the heart of the outbreak in Colorado and Wyoming are the headwaters for rivers that supply water to 13 western states.

In 2009, Regional Forester Rick Cables, recognizing that the outbreak had become a safety emergency that exceeded regional capability, signed a Delegation of Authority that transferred management of public health and safety actions to the Boise National Incident Management Organization (NIMO) for a duration of two years. The NIMO developed a "theatre-level" management strategy for the area comprising the three "bark beetle forests."[2] The NIMO also developed an Incident Action Plan and an incident management organization. Management has since transitioned back to a Regional-level team that continues to focus mitigation efforts.  Projects are directed in four major activity areas:

- Hazardous tree removal from roads, trails and campgrounds.
- Hazardous tree removal from administrative sites and the WUI.
- Work with permittees who are removing hazardous trees from infrastructure such as powerlines, ski areas, and recreational residences.
- Public information about the hazards of falling trees.

The need for mitigation grows as risk grows.  Necessary accelerated activities include environmental analysis, contract preparation and administration, layout of contract units, and hazard tree removal and hazardous fuels reduction work.   Region 2 has made mitigation of the outbreak its top priority, shifting allocated funding to this effort to the fullest extent possible. The "bark beetle forests" are using innovative approaches to perform critical work.  For example, interagency hot shot crews, youth crews, and prison crews augment the capacity of the forests' workforce.  Forest Service Enterprise Teams and employees from other national forests also help to temporarily increase capacity.  Contracts are used to implement work projects, providing jobs in the private sector.

Through these efforts, the following have been accomplished to date:

- 12% of roads mitigated for hazard trees
- 12% of trails mitigated for hazard trees
- 61% of recreation sites mitigated for hazard trees
- 18% of wildland urban interface (WUI) acres mitigated for hazardous fuels reduction

See Appendix Three for further details.

---

[2] Medicine Bow-Routt, Arapaho-Roosevelt and White River National Forests.

8

At the national level, the Forest Service has developed a multi-region bark beetle strategy to identify and accomplish work needed across NFS lands in the West. This will aid in establishing a consistent and sustainable budget plan for bark beetle mitigation efforts in the longer term.

### *Forest Service State and Private Forestry Assistance*
The State and Private Forestry branch of the U.S. Forest Service has provided funding to the Colorado State Forest Service (CSFS) to help address the outbreak. CSFS provides technical assistance to landowners, and treats thousands of acres for hazardous fuel reduction. For example, Cooperative Fire Protection program funding supported planned fuel reduction treatments on more than 4,000 acres in 2009, and more than 5,550 acres in 2010.

### *Public Information/Education*
The Forest Service and its partners in Colorado have conducted a coordinated bark beetle education and information campaign. The campaign has evolved from explaining why trees are dying (the changing forest, the biology of the bark beetle) to raising awareness of safety threats, especially falling dead trees and wildfire (practices for safe camping and hiking, creating defensible space around private properties, etc.) The campaign is directed at the general public, specific categories of stakeholders such as homeowners in the wildland urban interface (WUI), and state and federal legislators.

Products that have been created to share information include brochures, flyers, media releases and editorials, interpretive signs, newspaper inserts, DVDs, door hangers, table tents, and lapel buttons. (These products were shared with partners in Wyoming as they began to experience effects of the outbreak.) Signs warn forest visitors of the danger of falling trees, and Forest Service employees also make personal contacts in the woods to share information with visitors.

To raise awareness among lawmakers at the federal and state levels, partners provide briefings locally and in Washington, D.C., and host several field tours each summer.

### *Federal and State Legislative Action*
Federal lawmakers, in responding to the threat to public safety, critical infrastructure, recreation activities, and water supplies, have introduced legislation to help the Forest Service address the outbreak. Senator Mark Udall's National Forest Insect and Disease Emergency Act of 2009 is an example. None of these bills have passed to date.

Federal lawmakers have also secured additional funding, either directly, as Senator Wayne Allard did when he provided $13 million through the Senate Appropriations Committee in FY 2008, or through reprogramming. At the request of concerned western lawmakers in FY 2010, USDA Secretary Tom Vilsack directed Region 2 to prioritize $40 million to address bark beetle mitigation.

Colorado lawmakers have passed 25 forestry-related bills in the past three years, ranging from loan programs to state income tax breaks for homeowners working to create defensible space (notably HB 1199, the Colorado Healthy Forests and Vibrant Communities Act of 2009). In addition, Governor Bill Ritter established the Colorado Forest Health Advisory Council in 2008 to advise state and federal government on actions to promote forest health.

## Factors Affecting Response

### *Authorities to Remove Trees*
Authorities available to the Forest Service to manage forests were developed in the post-war period (1960s

BLM_0123758

and 1970s) for "normal" environmental conditions and "business as usual."[3] They are based on the assumption that the wood products available for removal have enough value to cover the cost of removal, pay for reforestation, and still return money to the U.S. Treasury.

Current conditions are far from the "normal" conditions under which these authorities and regulations were promulgated. Today stand mortality far exceeds stand growth; current estimates are that over six million acres of forests in Region 2 have some level of insect-caused tree mortality. Dead standing trees and most green standing trees in the Colorado and Wyoming outbreak area have little or no commercial value due to size, condition, accessibility or marketability. In fact, they have negative value because they must be removed at a cost.

Region 2 has done as much as possible to accelerate the removal and disposal of dead and dying trees. In 2004, Region 2 was allowed to increase the delegated authority for Personal Free Use[4] and Administrative Free Use[5] to remove trees that were "killed, infested, or anticipated to be infested with insects or disease...." This authority was delegated to Forest Supervisors in October 2007. The Region has maximized delegation of administrative use and timber settlement authorities, enabling forest supervisors and district rangers to dispose of larger quantities of dead and dying material. Timber designation and appraisal procedures have been streamlined to respond more expediently to requests for removing material.

*Stewardship Contracting*

Although stewardship contracting authority has been available for many years, Region 2 was unable to take advantage of large Long-Term Stewardship Contracts (LSTCs) during the early years of the mountain pine beetle outbreak for two reasons:

1. *The cancellation ceiling for multiyear contracts (part of the Federal Acquisition Regulations):* The cancellation ceiling is essentially a bond funded by the Forest Service to cover the maximum amount of a contractor's investment in the event the agency cancels a long–term stewardship contract. The appropriated funds needed to fulfill the cancellation ceiling requirement are encumbered. In most cases, the cancellation ceiling is more than $500,000 (held in reserve annually). This requirement has been clarified and should not be a barrier to using stewardship contracts in the future.

2. *Goods for services:* Under a stewardship contract, the contractor doesn't pay for the value of merchantable material harvested; instead, the contractor provides services of comparable value to the Forest Service. This is not useful for areas where the value of the removed material is much less than the cost of the removal—such as lodgepole pine stands killed by bark beetles. Most treatments in the outbreak area require appropriated funds to implement.

Region 2 currently has an LTSC that covers parts of the Arapaho-Roosevelt and Pike National Forests. Approximately 4,000 acres per year are treated.[6]

---

[3] Normal environmental conditions include predictable mortality from endemic beetle populations in green stands and predictable growth and mortality of forested stands based on accepted models of forest development. "Business as usual" means that there is adequate milling capacity and funding to remove wood products on a schedule that reflects a compromise between growth rates and mortality rates (an allowable sale quantity assessment would balance natural tree mortality and growth with a complementary harvest quantity).

[4] Personal Free Use: Small quantities of wood cut for firewood or fence posts for private individuals when removal of the material is in the government's interest.

[5] Administrative Free Use: Special-use permittees are allowed to cut wood products to support the purposes of their permit. For example, a range permittee would be allowed to cut wood for fence posts used on the permitted range allotment.

[6] Region 2 is exploring opportunities for another LTSC in western Colorado, and evaluating responses to a Request for Information.

10

*Emergency Planning Authorities*

Region 2 has found the expanded authorities in the Healthy Forest Restoration Act (HFRA) very helpful in addressing the outbreak because they streamline the environmental analysis process. These authorities provide that:

- Only the proposed action and no-action alternative be identified for projects within 1 ½ miles of an at-risk community, or in the WUI as defined in a community wildfire protection plan (CWPP).

- Only the Proposed Action, No-Action and Action Alternative be identified for projects farther than 1 ½ miles outside an at-risk community or CWPP-defined boundary.

Two other emergency authorities have been analyzed for use in mitigating the outbreak: a Governor's emergency or disaster declaration and a USDA Secretarial disaster designation. These authorities are used to respond to natural disasters that have overwhelmed the capabilities of local and state governments, or caused the loss of at least 30% of one crop. The relief provided is in the form of assistance to private land-owners; therefore, these types of emergency measures do not affect federal agency responses.

*Evolving Public Acceptance of Treatments*

Experience has shown that some forest management practices that involve cutting trees are more accepted by the public than others. For example, practices that reduce hazardous fuels or encourage the restoration of pre-settlement ponderosa pine stands are more acceptable than practices that are undertaken as commercial forest products management. Project proposals that are viewed as "cutting trees for the sake of cutting trees" or "feeding the timber industry" are routinely appealed; consequently, the projects are negotiated down to reduced levels of harvest or affected acres.

*Current Funding*

As noted in Part 1, low funding levels were a contributing factor to low levels of stand density management in the past. Sustained high-level funding allocations are necessary to accelerate activities for public and employee safety, and hazardous fuels reduction in the WUI. These activities include additional NEPA preparation, layout of contract units, and appropriate contract administration. Appropriated funds have been inadequate to "staff up" to the level needed for these accelerated activities.

In 2008 the Region identified a $10 million shortfall in the timber program to address impacts of the outbreak. That year, Regional Forester Cables formally requested emergency funding to implement a public safety strategy, largely due to falling trees. However, program priorities for Forest Health Protection, Forest Management, Hazardous Fuels, and Road Maintenance are aligned around issues other than hazard tree mitigation. Programs are designed to deal with a recurrent program of work, not a long-term, evolving incident like the bark beetle outbreak. Hazard tree mitigation, especially at a large scale, is not a focus of any Forest Service program area. Budget line items (BLIs) tend to be aligned around functional resource areas, and their relationship to the bark beetle epidemic is not straightforward.

Additionally, the constrained budget leads to only marginal changes in regional allocations, and the budget process and structure only address year-to-year rather than multi-year funding. The budget process favors a steady-state program of work and lacks a mechanism for Regions to ask for additional funding for emergencies. Generally speaking, there is no clear mechanism in the budget process to ask for special recognition or emergency considerations. The constrained budget approach coupled with high fixed costs effectively prevents any but the most marginal changes in Regional requests and therefore allocations. Thus, R2 did not have enough discretionary budget after fixed costs to show how much of a shift was needed to address the impacts of the bark beetle outbreak.

11

The budget amounts for bark beetle mitigation through FY 2010 are displayed in Appendix Two.  In FY 2011, a total of $33 million is being directed to mitigation efforts.

*Scale of Possible Treatments*
The factors that limited access to many areas for treatments to maintain forest stands—steep slopes, adjacency to inventoried roadless areas, prohibition of mechanical treatments in designated wilderness—are still applicable today.

*Capacity of the Traditional Timber Industry*
Intermountain Resources LCC (IMR), located in Montrose, CO, is in receivership.  The last large mill operating in Colorado, IMR processes material from both Colorado and Wyoming.  Like other forest product companies across the nation, it is facing an extended downturn in forest product markets.  The company is seeking relief from Forest Service contract requirements for emergency removal of green and dead trees.

There are 25 small operators in Colorado, each with 5 to 10 employees. These small operators do not have the financial or physical capacity to respond to the huge number of acres affected by the outbreak.  The material to be removed and processed is expensive to transport relative to the value of the product.  These small operators primarily produce items such as pellets, fence posts, rails, rough lumber, and specialty products.

In Wyoming, a now-closed mill in Saratoga, which has a 36-million board foot capacity, will cost $4 million to modernize.

**Biomass**
Some new avenues have been developed for utilization of dead standing material, but utilization of large quantities of biomass material is still years away.  The benefit/cost ratio for converting municipalities to biomass-fueled heat or power does not favor use of biomass when compared to natural gas because natural gas costs less at this time.  With the exception of a biomass heating unit in Boulder County, there are no large biomass utilization units in proximity to the outbreak.

Region 2 has been approached by 17 companies investigating their ability to utilize biomass.  This demonstrates the high level of interest in the private sector in utilizing this material.  The national forests in the Region cannot provide the volume of wood necessary to meet the capacity of all the new companies seeking certainty of supply.  Also, Region 2 has been contacted by many individuals and companies wanting a guarantee of long-term supply and exclusive rights to wood volume.  Federal contracting rules do not allow entering into sole source contracts when there is clear interest from multiple qualified potential contractors.  As an alternative, Region 2 has proposed a nontraditional "stewardship agreement" with the State of Colorado.  This agreement would give the State an opportunity to access much of the available beetle-killed material and dispose of it according to State procurement and acquisition rules.

There are three active pellet mills in Colorado: Rocky Mountain Pellets in Walden, Confluence Energy in Kremmling, and EE Pellets in Silverplume (mobile technology).  Rocky Mountain Pellets and Confluence Energy are each capable of producing about 100,000 tons per year.  EE Pellets produces about 20,000 tons per year.  It is working on building four or five portable mills (Colorado manufactured).

Small private wood products companies within Region 2 have benefitted from grants provided through the Forest Service's Forest Products Laboratory.  (See Appendix Four for details.)  Although some opera-

BLM_0123761

tors have received financial and technical assistance to upgrade or expand their businesses, business capacity is still insufficient to address the needs of forest management on a very large scale.

In the research community, the Rocky Mountain Research Station, university collaborators, and private partners are studying the economics of biomass utilization, as well as the environmental consequences of adding biomass and biological charcoal (biochar) to forest soils.

Studies of the economics of biomass utilization are investigating options for utilizing forest treatment residues for bioenergy production. This includes using either ground wood or processed wood to co-fire a coal-powered electricity generating facility, and quantifying net greenhouse gas emissions, carbon balance, and energy balance associated with various configurations. These alternative configurations help determine the conditions under which utilization of biomass from forest treatments delivers the greatest net economic and environmental value. Economic development impacts, as well as the social acceptability of biomass removal and utilization, are a part of these analyses. Studies to investigate alternatives for, and economic efficiencies of, transporting forest treatment residues from locations that are not accessible to standard chip vans (which are not designed for use on forest roads) are also informing results.

The potential for manufactured products using pyrolysis (the heating of organic matter to create biochar, synthetic gas, or bio-oil from forest residue) offers an additional value-added use for residual or waste material from forest thinning and wood processing. Biochar appears to be useful as a soil amendment; it can enhance the absorption of heavy metals and toxins, suggesting potential uses in mine reclamation; it's a precursor to activated carbon for water filtration; and it can potentially be used as a stable form of carbon in future carbon markets. Field, laboratory and greenhouse studies are examining the properties of biochar, as well as how it can be part of an integrated utilization strategy, or added to a wood processing facility as an additional product line.

Myriad conversion technologies are emerging, including new pyrolysis systems. State and federal land and resource managers, as well as county and municipal managers, need to understand the costs and benefits of biomass utilization at a variety of scales. Technology demonstrations can be an effective part of outreach programs to increase exposure to new knowledge and emerging results.

While many studies are ongoing, researchers are confident that, in some cases, collecting, processing, and hauling forest treatment residues off site for thermal energy production can substantially reduce greenhouse gas and particulate matter emissions. (This is in comparison to burning those residues on site, and using either natural gas or fuel oil to provide the same amount of usable thermal energy in a boiler.)

13

# Part III – Suggested Extended Authorities

### Extension of Temporary Authorities

Congress could extend, or make permanent, two authorities that have been very useful in responding to the outbreak. Both are set to expire on 30 September 2013:

- The Good Neighbor Authority allows Colorado Forest Service employees to act as agents for the federal government to mark and remove trees on NFS land when the work is performed in conjunction with similar treatments on adjacent non-NFS land.

- Stewardship Contracting Authority allows a "goods for services" arrangement with a contractor.

BLM_0123763



## Part IV – Looking Forward: The "New Forest"

### Creating a Resilient Forest

Developing appropriate management responses to bark beetle outbreaks requires understanding the complexities of species-specific, multi-scale interactions between beetle and host tree occurring within the targeted forested area. It also requires understanding the long-term influences of these management actions at the larger landscape and regional levels. The unprecedented nature of the current mountain pine beetle outbreak in Colorado and Wyoming makes management decisions more difficult because the appropriate management response cannot necessarily be formulated based on previous events. Using lessons learned from this outbreak can help forest managers in the future develop management strategies to ameliorate stand conditions which would be predisposed to large-scale insect outbreak.

There are some general guidelines, however, that can be used in developing management strategies for future forests:

- In areas severely affected by recent outbreaks, land managers may consider creating more diverse forests through modifying species composition and age classes across the landscape. Greater diversity of species and age structure may reduce susceptibility to massive outbreaks in the future. Treatments such as these must be initiated early during stand development and continued with relative frequency as stands mature; in other words, proactive stand regeneration is required to maintain age class diversity across large landscapes.

- Restoration strategies for high-elevation pine forests affected by mountain pine beetle and blister rust are needed to ensure perpetuation of these critical ecosystems.

- Forest ecosystems that have highly susceptible forest conditions, but are currently unaffected by bark beetles, may benefit from thinning to reduce stand density. This is particularly true in lodgepole and ponderosa pine stands where research has shown that thinning can reduce susceptibility. For example, in a diameter-limit thinning study in lodgepole pine on the Shoshone National Forest in Wyoming, the investigators found that 26% of trees were killed by mountain pine beetle in untreated control plots compared to less than 3% in the thinning treatments.

- Policy makers and forestry professionals can incorporate different climate change scenarios—as well

17

BLM_0123764

as the direct and indirect effects of this change on both potential hosts (the trees) and the pest (bark beetles)—when formulating future forest management strategies. A greater investment in research is critical to generating new knowledge and incorporating research results into managers' decision making.

It may make sense to practice intensive management, such as applying insecticides on high-value trees on a small scale in areas such as campgrounds or near homes, but such practices are not feasible on a landscape scale. At larger scales, lodgepole pine forests affected by mountain pine beetles will regenerate naturally and a new forest will emerge with time. While dead trees on a mountain slope may not be visually appealing, the forest has been reset—not destroyed.

## The Role of Natural Regeneration

In Colorado and Wyoming, land managers and the public are concerned about the extent of poor seedling establishment in beetle-killed lodgepole forests. Other concerns relate to potential changes in species composition after the outbreak, and to the length of time it will take these forests to recover.

These concerns are justified. Owing to the unprecedented nature of the outbreak, it is unknown if the forests that regenerate after this outbreak will differ from those that regenerated in the past. There are no systematic surveys of regeneration in beetle-killed forests, nor do we have comprehensive information about the number, size, and species of surviving trees where beetles have caused extensive mortality. Both types of information are critical to charting a course following the outbreak and assuring investments in regeneration are strategic.

Owing to terrain, and to budgetary, economic and regulatory limitations—such as prohibitions on entering roadless areas and designated wilderness—active management will be applied to a small fraction (probably less than 15%) of the forest area killed by mountain pine beetles. Research studies conducted on the Sulphur Ranger District of the Arapaho-Roosevelt National Forest help us understand the implications of this situation.

Recent studies conducted by the RMRS in forest stands near Fraser, CO suggest that lodgepole pine will remain the dominant species in harvested stands over the next century, but subalpine fir will become the most abundant species in untreated areas. The long-term consequences of the outbreak will be most dramatic in untreated areas, where the shift in tree species composition will influence timber and water production, wildfire behavior, wildlife habitat and other forest attributes. Another RMRS study suggests that the density of seedlings is at least as high in stands affected by extensive pine beetle-caused mortality as in stands having healthy pre-outbreak conditions. Care must be taken when drawing conclusions for the broader infestation area. Similar studies on-going at a network of sites will complement the need for additional work across the range of physical and biological conditions to provide a more robust data set from which we can begin to predict the future forest and begin to plan how to manage it.

Research gaps in understanding future forest composition and resilience include the impacts of mechanical fuel reduction treatments and post-harvest site preparation in beetle-killed forests on seedling establishment and growth, plant nutrient and moisture relations, and biogeochemical and hydrologic processes; and the influence of continuing climate change on forest regeneration and species composition in mountain pine beetle-impacted areas.

18

BLM_0123765

## Impacts to Watersheds

Water supply in western North America is controlled primarily by snow accumulation and melt in forested headwater basins. Watershed health and function in the subalpine zone are controlled by climate, physiography,[1] forest cover, and land use. Recent impacts from the widespread mountain pine beetle outbreak are exerting a profound effect on forest cover, structure, and species composition. These impacts, in turn, are driving changes in water quantity and quality—two important ecosystem services provided by federally managed forests.

The mountain pine bark beetle began to attack lodgepole pine at the long-term Forest Service watershed research site at the Fraser Experimental Forest (FEF) in 2002. By 2007, bark beetles had killed between 50% and 80% of the overstory pine in Fraser's research watersheds. The suite of scientific records at the FEF provides a unique opportunity to quantify the impacts of this widespread disturbance. Consequences of the mountain pine beetle outbreak result from a combination of short-term and longer-term changes in hydrologic and biogeochemical processes that control delivery of clean water from forested catchments. In general terms, canopy mortality from bark beetles influence watershed processes in ways similar to logging or stand-replacing fire. However, the impacts of beetle outbreaks to downstream users—associated with the magnitude, timing, and duration of watershed change—are likely to differ dramatically from logging or fires because of the lack of impacts to understory vegetation and soils.

Stream Water Quality: Higher stream water nitrate concentration and export were detected during six years following bark beetle mortality; this is likely the result of decreased nutrient demand following mortality of overstory pines (dead trees don't require nutrients). The increase in concentration and export in the years following the bark beetle outbreak was small and does not pose a risk to human or stream health.

Stream Water Quantity: Trees impact runoff by returning water to the atmosphere through two important mechanisms. First, trees use soil water during the growing season through transpiration,[2] which moves water from the soil back to the atmosphere. Second, tree canopies in snow-dominated regions intercept snowfall, a portion of which then sublimates directly back to the atmosphere before reaching the snowpack. The magnitude of beetle-related changes in transpiration, interception, and runoff will depend on three things: the amount of mortality in the stand, the species composition of the remaining overstory, and finally, basin physiography. Earlier empirical work on water yield effects of both harvest and lesser-scale beetle kills provides some basis for predictions.

The best empirical information we have for the region is from harvesting studies, although limited research on beetle kill has shown similar magnitudes of effect. Our hypothesis is that beetle kill will result in less yield increase than harvesting. Harvesting typically removes the mature timber and the understory over a short period of time, so impacts are immediate and profound—on the order of a 40% increase in yield averaged over 30 years post-harvest. Beetle-killed mature stands often leave a healthy understory behind. This understory still consumes water through summertime transpiration and still causes some interception losses of snowfall. It is important to note that the current bark beetle outbreak is unprecedented in magnitude and extent, and there may be significant departures in impacts from previous beetle infestations.

Future detection of changed streamflow may be difficult, as well. In the harvest studies, researchers were able to maintain control watersheds to isolate climate versus land cover changes. Because the beetle kill

---

[1] Physiography: physical features of the earth's surface
[2] Transpiration is the evaporation of water from plants. It occurs chiefly at the leaves.

19

has been so widespread, the traditional paired watershed approach cannot be used to separate the effects of climate variations from land cover variations as readily as where scientific control is retained.   In the future, with longer statistical records, and studies using semi-deterministic models, there is a greater probability of detecting and quantifying the effects of the beetle infestation on stream flow and water quality.

Improved knowledge and understanding of how canopy loss and tree death following mountain pine beetle infestation alters snow accumulation in winter, and snowmelt, transpiration, nutrient release, and runoff processes in spring and summer would improve the precision of water yield predictions and detection.

For more detailed information on watershed impacts, see Appendix Five.

### Fire Risk and Behavior

Bark beetle outbreaks can result in significant changes to forest stand structure, and thus to fire risks and fire behavior.   Regardless of beetle activity, fire risk and behavior are shaped by:

- The amount, type, and condition of vegetation or fuels on site.
- The fuels' dryness and exposure to sun and wind.
- Topography, elevation and weather.

The presence of beetle activity adds additional variables to the challenges of predicting and managing fire risks based on:

- Species of beetle.
- Intensity and rate of tree mortality.
- Time since mortality.

Bark beetle mortality modifies canopy fuels, surface fuels (such as grasses, forbs, shrubs, and downed-woody material), and ground fuels of dead litter and humus.  Localized weather conditions such as increased sun, wind, and rain or snow are also modified in proportion to the number of trees killed.  These changes are directly linked to changes in the forest water balance that are known to affect fuel moisture relationships, and therefore fire behavior.

The specifics of how beetle outbreaks affect the likelihood of a fire are poorly understood; this is a topic of current research.  The increased presence of fine, dry surface fuels implies a greater number of successful ignitions and can affect fire spread.  The degree to which mortality affects fire potential depends on the stand structure[3] prior to the bark beetle outbreak, and the level of stand mortality.  Owing to the complexity of the number of sites, beetle outbreak dynamics, and scientific limitations, it is possible to describe expected future fire potential in only a general way.   Real-time fire management decisions should be based on local expert knowledge informed by the context of the specific wildfire situation.

*Will the beetle outbreaks lead to more frequent fires in impacted watersheds?*
Basic fire science principles suggest that opening the forest should lead to dryer surface fuels, more sunshine, and more wind, which will favor increased ignitions and early fire spread resulting in more fires requiring management.

---

[3] Stand structure: The quantity, distribution, and horizontal and vertical arrangement of live and dead trees, understory vegetation, woody debris, litter, and humus within a given area.

20

BLM_0123767

*Will the bark beetle outbreaks lead to more or less extreme fire behavior?*
Past experience is largely anecdotal but decades of firefighter wisdom suggest fires will be more intense for an indeterminate amount of time following attack. Current operational fire behavior models were developed for "normal" healthy forests; they do not include variables that address the phases of beetle attacks: attacked green, attacked yellow, dead-red. (See Appendix Six.)

The physics and chemistry of fire and fire weather/climatology suggest all fire behavior measures should increase during the attack phase. Following attack, forest composition and structure are fundamentally altered. The "time-since-outbreak" is important in differentiating effects on fine fuels (and thus fire spread) and larger fuels (which relate to fireline construction and often safety).

Fire behavior can be expected to decline somewhat in the post-attack phase but not return to pre-fire conditions. Conditions for surface fire spread are exacerbated, whereas conditions for crown fire spread are reduced. However, snags (standing dead trees) present unique fire behavior problems, principally as a source for, and recipient of, embers which start new fires ahead of the main fire.

*Will the bark beetle outbreaks lead to larger or more severe fires?*
Past experience regarding whether fires are naturally larger or smaller, or more or less severe, is anecdotal and inconclusive. Snags constitute a major safety hazard for firefighters. Snag mitigation concerns may reduce firefighter effectiveness, leading to larger fires.

Heavy downed logs slow fireline construction. Moreover, they are associated with extended burning, greater soil heating, sustained smoke production and extended fire mop-up, particularly in warmer, dryer forests. Increased resistance to control implies that fires will either grow larger or require more suppression resources.

Intense scientific interest in bark beetle-fire interactions is relatively recent and ongoing. It is clear that beetle infestations have a direct effect on wildfire potential, and that the degree of influence can be categorized by phases of the infestation: Are the attacked trees still green? Are there standing dead trees with red needles? Are there fallen dead trees that have lost all their needles?

In addition, given that operational fire models are not able to account for low fuel moisture, newly developed physics-based models are exploring how attack intensity and patterns, along with variable winds, influence fire spread. Since many of the scientific studies are not yet complete, research can inform, but the expert local knowledge of a fire suppression practitioner is needed to guide management.

Gaps in knowledge and understanding of fire risk and behavior in beetle-killed stands include the observable changes in fire behavior in beetle-killed stands and how can these observations be efficiently and accurately obtained (can these observations be used to further develop predictive models?); how fuel dynamics ( i.e., spatial and temporal changes in fuels: mass, chemistry, moisture, and size distribution) change in beetle-killed stands; how flammability simulation models can be adequately parameterized using these observations; and , finally, the implications of insect and disease attacks on public and fire fighter safety.

For more detailed information on fire risk and behavior, see Appendix Six.

21

# Appendices



23

BLM_0123769

## Appendix One- Senator Udall's Request

MARK UDALL
COLORADO

# United States Senate

WASHINGTON, DC 20510

November 15, 2010

The Honorable Tom Vilsack
U.S. Department of Agriculture
1400 Independence Ave., SW
Washington, D.C. 20250-0003

Dear Secretary Vilsack:

As you know, we have been experiencing an unprecedented insect epidemic in the forests of Colorado and Wyoming. The vast scale of tree mortality brought on by the mountain pine beetle has affected over 3.5 million acres of National Forest Service land in Colorado and Wyoming over the past decade. When it finally runs its full course, it is estimated that the vast majority of mature lodgepole pine in these areas will have died.

We are now dealing with the aftereffects of dead trees that present a serious hazard to people and property when they eventually fall down, and can present decades of increased fire threats due to the accumulation of the dead, downed trees. We are also dealing with impacts to watersheds, power lines, ski areas, tourism, and many other facets of an epidemic of this scale.

As you also know, I have been working with my congressional colleagues to secure additional resources and legislative tools so that the Forest Service, the state and private property owners can reduce the hazards and threats posed by these dead trees.

I believe that much more can and should be done to address this epidemic and eventually help manage our forests so that they can be healthier and better able to withstand future stresses such as insect infestations. While I applaud the work of the Forest Service to address many of these concerns, I stand ready to do all that I can to help.

In that regard, I am writing to request that the U.S. Forest Service conducts a study or review of this epidemic—especially in the forests of Colorado and Wyoming—to highlight the lessons learned and the obstacles encountered in addressing and responding to it.

I understand that we are still experiencing and responding to this epidemic. However, I believe that now would be a good time to take stock and review what is working, what more needs to be done, and what additional tools may be needed. This seems especially timely, as it is my understanding that the mountain pine beetle, albeit a natural part of our forest ecosystems, is now spreading across our Western forests in similar epidemic proportions.

25

BLM_0123770

Specifically, I would suggest that this study examine the following issues (this is not intended to be an exhaustive list, but rather to identify the sorts of topics that I believe could be useful in responding to this and future epidemics):

- the preemptive actions taken—or that could have been taken---by the Forest Service to address this epidemic so as to reduce or mitigate its severity;

- the obstacles (such as fiscal, regulatory, legal, administrative, economic) that the Forest Service has encountered that may have hindered—and may continue to hinder—responses that could reduce wildfire and hazardous tree threats and promote healthier future forest conditions;

- the availability—or lack of availability—of any "emergency" authorities to allow the Forest Service to respond to this epidemic in an expeditious and responsible manner;

- the availability—or lack of availability—of resources and facilities (such as private timber extraction and milling capacity) external to the Forest Service that could help respond to the threats through tree removal and reuse;

- the administrative contracting mechanisms and whether these mechanisms are adequately flexible to respond to this epidemic given the low commercial value of the timber;

- any special issues related to the impacts to watersheds;

- any issues related to implementing policies and projects that will help improve natural forest regeneration; and

- the estimated costs associated with addressing the threats and impacts from this epidemic.

I believe an epidemic of this scale and scope can provide a useful learning experience to help address not only this incident in my region, but also help identify ways that we can better respond to future epidemics and in areas where the current one may eventually spread. In addition, it can help me in my continuing efforts to help the Forest Service better respond to this issue and promote healthy and safe forests for the enjoyment and benefit of the nation.

Thank you for your consideration of this request. Please feel free to contact my office if I can be of further help in initiating and conducting this study.

Sincerely,

Mark Udall
United States Senator

26

BLM_0123771

## Appendix Two – Funding History of the Rocky Mountain Region (Region 2)

SPFH – Forest Health Federal Lands
SPS4 – Forest Health Federal Lands, National Fire Plan

|  | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|
| SPFH % USFS Om- nibus | 5% | 3% | 5% | 4% | 3% | 5% | 5% | 4% |
| SPFH R2 $ | $2,481,000 | $1,693,000 | $2,883,000 | $2,109,000 | $1,876,000 | $2,656,000 | $260,500 | $2,327,000 |
| SPS4 % USFS Om- nibus | 22% | 31% | 12% | 10% | 12% | 10% | 14% | 15% |
| SPS4 R2 $ | $1,492,000 | $4,544,000 | $1,824,000 | $1,436,000 | $1,775,000 | $1,496,000 | $2,490,000 | $3,210,000 |
| SPS5 % USFS Om- nibus | 12% | 11% | 9% | 9% | 14% | 12% | 13% | 8% |
| SPS5 R2 $ | $1,201,000 | $1,111,000 | $850,000 | $850,000 | $1,418,000 | $1,176,000 | $1,271,000 | $ 897,000 |
| NFVW % USFS Omnibus | 6% | 6% | 6% | 8% | 7% | 6% | 7% | 6% |
| NFVW R2 $ | $11,079,00 | $12,165,000 | $11,799,000 | $14,313,000 | $12,116,000 | $10,761,000 | $11,928,000 | $12,071,000 |
| NFTM % USFS Omnibus | 5% | 6% | 7% | 8% | 5% | 5% | 6% | 6% |
| NFTM R2 $ | $14,452,000 | $16,388,000 | $18,269,000 | $21,447,000 | $16,868,000 | $17,351,000 | $18,760,000 | $19,974,000 |

SPS5 – Forest Health State Lands, National Fire Plan
NFVW – Vegetation and Watershed, Federal Land
NFTM – Timber Management, Federal Land
Omnibus – annual federal funding legislation

27

BLM_0123772

## Appendix Three – Accomplishments and Remaining Work



BLM_0123773

# Appendix Four—Forest Service Biomass Grants
# in the Rocky Mountain Region (Region 2)

**American Reinvestment and Recovery Act Wood-to-Energy grants:** Three grants were funded and awarded to upgrade and improve wood processing equipment.

- Colorado Springs Utilities: $250,000 for equipment that will facilitate wood chip co-firing at rates up to 20 percent in the Drake Power Plant (coal-fire).
- Boulder County Parks and Open Space: $250,000 for installation and refurbishment of wood-fired steam heat system at a county facility, and for equipment that will facilitate better handling of wood waste streams coming from the forest.
- Confluence Energy: $250,000 for wood processing equipment to facilitate conversion of beetle-killed wood into pellets for commercial and home heating use.

**Forest Products Lab grants for 2009:** Three companies in Colorado received funding for wood utilization grants.

- Intermountain Resources LLC (Montrose) received $250,000 for a chipper/grinder to increase efficiency in biomass utilization.
- Independent Logging (Alamosa) received $250,000 to expand mill operations and equipment.
- Rouge Resources (Steamboat Springs) received $250,000 for in-woods operations and milling equipment.

**Forest Products Lab grant for 2010:**

- West Range Reclamation received $350,000 to purchase a log delimber/debarker and log loader for use in creating a product and market for residual biomass from the Front Range Long-Term Stewardship Contract.

BLM_0123774

# Appendix Five—Impacts to Watersheds

Water supply in western North America is controlled primarily by snow accumulation and melt in forested headwater basins. Watershed health and function in the subalpine zone are controlled by complex relationships between climate, physiography, forest cover and land use. Recent impacts from widespread mountain pine beetle infestation are exerting a profound impact on forest cover, structure, and species composition. These impacts are driving changes in water quantity and quality --two important ecosystem services provided by federally managed forests. The expectation is the infestation will result in quantifiable changes in streamflow and water quality, as well as forest composition and structure.

While there is a desire to predict the effect of the beetle infestation on runoff quantity and quality, the complexity of watershed and hydrologic processes suggests that such predictions are premature and subject to considerable uncertainty. In addition to complexity of processes, inter-annual variability in meteorology, especially precipitation, makes detection of changes due to the infestation problematic.   In the future, with longer statistical records, and studies using semi-deterministic models, there is a greater probability of detecting and quantifying the effects of the beetle infestation on streamflow and water quality.

The mountain pine bark beetle began to attack lodgepole pine at the long-term USFS watershed research site at the Fraser Experimental Forest in 2002. By 2007, bark beetles had killed 50% to > 80% of the overstory pine in Fraser's research watersheds. The hydrologic, climatic, biogeochemical and vegetation records available at the Fraser Experimental Forest provide a unique opportunity to quantify the impacts of this widespread and poorly-understood disturbance. The consequences of the current MPB outbreak will result from a combination of short and longer-term changes in hydrologic and biogeochemical processes that control the delivery of clean water from forested catchments. In general terms, canopy mortality from bark beetles will influence watershed processes in ways similar to logging or stand-replacing fire. However, the relevance of beetle outbreaks to downstream users, associated with the magnitude, timing and duration of watershed change are likely to differ dramatically from logging or fires

## Stream Water Quality

Water flowing from most undisturbed lodgepole pine ecosystems has a low nutrient content because of the combination of f of low soil nutrient supply and high nitrogen (N) demand and retention by vegetation and soil microbes (Fahey et al. 1985; Knight et al. 1985; Stottlemyer et al. 1997). Mortality of the forest overstory is sure to lessen N demand, but it is unclear to what extent this will result in measurable changes in nutrient transport to stream water. In fact, change in stream nutrients following bark beetles may signal ecosystem response to disturbance rather than a symptom of impaired water quality.

During the first six years following the onset of bark beetle activity and in basins where bark beetles killed more than 70% of the overstory, spring and late fall stream water nitrate were elevated compared to pre-outbreak concentrations Figure 1). Since few physical changes have altered forest structure at this point, the higher stream water nitrate concentration and export are the likely result of decreased nutrient demand following mortality of overstory pine. However, the increase in concentration and export in the years following the MPB outbreak were small and do not pose a risk to human or stream health. Indeed the changes from extensive MPB-related canopy mortality were less than the scale of natural seasonal fluctuations and they were < 2% the annual N input in precipitation.

BLM_0123775



Figure 1.  Stream nitrate concentrations at the USDA Forest Service, Fraser Experimental Forest prior to and during (shaded area) the current mountain pine beetle outbreak.

These findings from the long-term Fraser watershed record are substantiated by independent monitoring efforts led by the University of Colorado and the US Geological Survey that also find measureable but small changes in stream water nutrients following bark beetles (Clow et al. 2011; Lewis et al. 2011).

## Stream Water Quantity

Trees impact runoff by returning water to the atmosphere through two important mechanisms.  First, trees use soil water during the growing season through transpiration, which moves water from the soil matrix back to the atmosphere.  Transpiration may account for losses of up to 50% of the annual precipitation in subalpine basins (Leaf, 1975; Kaufman, 1985).  Second, tree canopies in snow-dominated regions intercept snowfall, a portion of which then sublimates directly back to the atmosphere before reaching the snowpack.  Canopies may intercept up to 60% of the annual snowfall (Hedstrom and Pomeroy, 1998; Storck and Lettenmaier, 1999), and 20% to 50% of the annual snowfall may sublimate directly back to the atmosphere without producing runoff (Troendle and Meiman, 1986; Pomeroy and Gray, 1995; Montesi et al., 2004) The magnitude of beetle related changes in transpiration,  interception, and runoff, will depend on three things – the e amount of mortality in the stand, a,  the species composition of the remaining overstory, and finally  basin physiography.

Research at FEF shows that transpiration declines rapidly following a successful beetle attack and that tree water use stops completely by the beginning of the following growing season.  As part of an experiment that implicated beetle induced blue stain fungi as the primary cause of tree mortality following beetle attack, researchers showed that transpiration is affected just seven to thirteen days after beetles first infect a tree (Figure 2).  By the end of the first growing season, "beetle- attacked" trees used 50% less water than trees unaffected by beetles and blue-stain fungi.  This rapid decrease in tree water use means that residual vegetation will have greater access to soil water and that more water will potentially be available for runoff.  The magnitude of these responses remains uncertain but ongoing studies at FEF are quantifying changes in tree and stand water use over a range of site conditions.



Figure 2. Change in tree water use for mountain pine beetle attacked trees (MPB Transpiration) versus trees not affected by beetles or blue-stain fungi (Control Transpiration). Dashed vertical lines indicate 95% confidence intervals around the date that a significant decrease in transpiration occurred.

34

BLM_0123776

Change in forest structure following forest disturbance has the potential to significantly alter snow interception during the winter months. Following mountain pine beetle infestations, lodgepole pine trees killed by beetles lose their needles within three to five years and fall to the ground five to ten years later (Mitchell and Preisler, 1998). Reduced leaf area and openings created by falling trees reduces snow interception and allows more snowfall to reach the ground where it accumulates until spring melt and subsequent runoff. Data from forest inventory plots at FEF show tree basal area declined by 50% in managed basins as a result of the current mountain pine beetle infestation. However, because Engelmann spruce and subalpine fir have more leaf area per unit stem diameter, leaf area losses from the same basins averaged only 24% (Figure 3).



Figure 3. Lodgepole pine Basal area and leaf area losses due to mountain pine beetle (MPB) in the East Saint Louis Creek watershed at Fraser Experimental Forest. ( LP = Lodgepole Pine, ES = Engelmann Spruce, SAF = subalpine fir).

A complex relationship exists between changes in interception and transpiration and streamflow. Other complicating factors include forest structure, species composition, local meteorology, and basin physiography (slope, aspect, elevation, etc.). Previous management studies provide general insights to potential changes in streamflow, because there are important similarities between harvest through management and tree mortality from beetle infestation. There are decades of research in the subalpine zone that show that tree removal results in increased runoff (e.g. Wilm and Dunford, 1948; Van Haveren, 1981; Bosch and Hewlett, 1982; Troendle and King, 1985; Troendle and Meiman, 1986; Troendle and King, 1987). In general, increased streamflow will result from harvesting and the magnitude of the increase will be proportional to the basal area removed. At the Fraser Experimental Forest, a 50% removal of the timber from the Fool Creek basin resulted in a 40% increase in flow over the first 30 years of post-treatment record (Troendle and King, 1985). A a 29% increase has been recorded over a 50 year post-treatment period (Elder, unpublished data).

There are, however, complicating factors that make simple prediction of increased flows subject to considerable uncertainty. In order to detect the change in flow, there must be a minimum mean annual snowfall of about 800 mm (water equivalent). Too much basal area removal may result in snowpack loss due to redistribution and sublimation. Differences between harvest methods and impacts versus beetle-related mortality further cloud our ability to accurately predict changes in streamflow resulting from the current infestation. Harvesting typically removes the mature timber and the understory over a short period of

35

time, so impacts are immediate and profound. Beetle-killed mature stands often leave a healthy under-story behind. This understory still consumes water through summertime transpiration and still suffers interception losses of snowfall. There is also a multi-year lag between tree infestation and eventual tree removal. The tree may maintain a green canopy for up to a year, followed by red needles, needle loss, branch loss and eventual tree fall. This progression may last several years and will produce a slow change in the tree's ability to intercept snow. At the stand or basin level, this progression will result in a slow change in sublimation loss and runoff generation. At the same time, the understory water consumption may be increasing through transpiration, thus offsetting water savings from reduced snowfall interception. There are few studies that have quantified streamflow changes following MPB infestation (Love, 1955; Bethlamy, 1975; Potts, 1984), and their results suggest variable, but similar results to some effects of forest harvesting. However, it is important to note that the current MPB outbreak is unprecedented in mag-nitude and extent, a there will likely be significant departures from both previous beetle infestations and harvests.

In addition to the complexity of processes described above, inter-annual variability in meteorology, especially precipitation, makes detection of changes due to the infestation problematic. Figure 4 shows a graph of a relationship between a heavily infested basin (East St Louis), and a control basin (Brush Creek) that had little beetle presence for the period graphed. The years following the infestation in East St. Louis Creek (2003) are shown with different symbols (2004-2007). Note that the values all fall well within the 95% confidence interval that indicates no significant change from the previous relationship.



Pre-TRT = data up through 2003

Figure 4. Predicted annual flow from East St. Louis creek from observed flow in Brush Creek. Mountain pine beetle infestation was first observed in 2003 in the East St. Louis Creek watershed. Brush Creek was not significantly affected through the period shown. The 95% confidence limits were calculated based on the pre-infestation record.

36

BLM_0123778

# Appendix Six—Fire Risk and Behavior

Bark beetle outbreaks can result in significant changes to forest stand structure and thus, to fire risks and fire behavior.

## Factors shaping fire risk and behavior

Regardless of beetle activity, fire risk and behavior are shaped by:
- The amount, type and condition of vegetation, or fuels, on site,
- The fuels' dryness and exposure to sun and wind, and
- Topography, elevation and weather.

The presence of beetle activity adds additional variables to the challenges of predicting and managing fire risks based on:
- Species of beetle,
- Intensity and rate of tree mortality, and
- Time since the mortality.

Bark beetle mortality modifies the canopy fuels, surface fuels such as grasses, forbs, shrubs, and downed-woody material, and ground fuels of dead litter and humus. Localized weather conditions such as increased sun, wind, and rain or snow are also modified in proportion to the number of trees killed. These changes are directly linked to changes in the forest water balance which are known to affect fuel moisture relationships, and therefore fire behavior.

Intense scientific interest in bark beetle-fire interactions is relatively recent and is ongoing. It is clear that beetle infestations have a direct effect on wildfire potential, and that the degree of influence can be categorized by the phase of the infestation: attacked green, attacked yellow, standing dead red, standing/fallen dead grey, and fallen gray/new green.

Since much of the scientific studies are not yet complete, research can inform, but expert local knowledge is needed to guide management.

## Summary of research and findings pertaining to the relationship between beetle outbreaks and fire risk and behavior

*Will the beetle outbreaks lead to more frequent fires in impacted watersheds?*
- Basic fire science principles suggest that opening the forest should lead to dryer surface fuels, more sunshine, and more wind which will favor increased ignitions and early fire spread resulting in more fires requiring management.

*Will the bark beetle outbreaks lead to more or less extreme fire behavior?*
- Past experience is largely anecdotal but decades of firefighter wisdom suggest fires will be more intense for an indeterminate amount of time following attack.
- Current operational fire behavior models were developed for "normal," healthy forests and do not include variables that address the phases of beetle attacks: attacked green, attacked yellow, dead-red.

37

BLM_0123779

- The physics and chemistry of fire and fire weather/climatology suggest all fire behavior measures should increase during the attack phase.
- Following attack forest composition and structure are fundamentally altered. Fire behavior can be expected to decline somewhat in the post attack phase but not return to pre-fire conditions. Conditions for surface fire spread are improved whereas conditions for crown fire spread are reduced. However, snags, standing dead trees, present unique fire behavior problems, principally as a source for, and recipient of, embers which start new fires ahead of the main fire.

*Will the bark beetle outbreaks lead to larger or more severe fires?*
- Past experience regarding whether fires are naturally larger/smaller or more/less severe is anecdotal and inconclusive.
- Snags constitute a major safety hazard for fire fighters. Safety concerns will reduce fire fighter effectiveness leading to larger fires.
- Heavy downed logs slow fireline construction. The increased resistance to control implies fires will either grow larger or require more suppression resources.
- Heavy downed logs are associated with extended burning, greater soil heating, sustained smoke production and extended fire mop-up, particularly in warmer-dryer forests.

## Additional Information

The specifics of how beetle outbreaks affect the likelihood that a fire will start is poorly understood and a topic of current research. The increased presence of fine, dry surface fuels implies greater number of successful ignitions. The degree to which mortality affects fire potential depends on the stand structure[1] prior to the bark beetle outbreak, and the level of stand mortality. Owing to the complexity of the number of sites, beetle outbreak dynamics, and scientific limitations it is only possible to describe expected future fire potential in a general way. Management decisions should be based on local expert knowledge cognizant of the context for the decision. Scientific limitations are less critical in vegetation management planning decisions than in real-time fire management actions.

## Phase I – Attacked **Green**

Prior to beetle attack foliage is green and moisture contents are 'normal,' around 100 to 110 percent by weight. Shortly after successful beetle attack, within one- or two-weeks, fungal associates of the beetles disrupt sap flow in the tree limiting the normal cycle of nighttime replenishment of canopy moisture. Once attacked foliar moisture drops slightly and needle chemistry changes (Jolly and Parsons, in progress and Gibson and Negron, 2009). At least by the start of the first full year following successful attack, trees lose the physiological capacity to limit moisture loss, needles die and rapidly dry. Evidence suggests ignition time, the amount of heat and time required to ignite a fuel, decreases even before symptoms are visible.

---

[1] Vegetation Structure: The quantity, distribution, and horizontal and vertical arrangement of live and dead trees, understory vegetation, woody debris, litter and humus within a given area.

BLM_0123780

| Condition | Color | Foliar Moisture Content (%) | Ignition Time (sec.) |
|---|---|---|---|
| Unattacked | Green | 100 - 110 | 30 - 42 |
| Attacked (Initial) | Green | 90 - 100 | 18 - 32 |
| Attacked (Dying) | Yellow to buff | 90 to 50 (rapid decline) | 15 - 28 |
| Dead | Red | 10 - 19 | 11 - 15 |
| Snag | Grey | n.a. (no foliage) | n.a. |

### Phases II and III – Attacked **Yellow** and Standing Dead **Red**

Initially ignition time drops by about one-third and crown fire potential increases somewhat. Once foliage transitions to visibly yellowed needle moisture content is half that of normal foliage, with a comparable reduction in ignition time. The decrease in foliar moisture content effectively reduces the crown base height of a tree (Keyes 2006). Thus, fires can more easily transition from a surface fire to a crown fire at lower flame lengths and fireline intensity (Keyes 2006, Gibson and Negron 2009). The corresponding increase in fire intensity and spotting implies that firefighter safety zones need to be larger and defensible space around infrastructure and homes (home ignition zone) (Cohen 2000) needs to be wider.

Changes in fire behavior depend on the severity and sequence of beetle attack. For reasons not fully understood some attacks are relatively uniform over large areas and most trees are attacked over a short time. In contrast in other areas beetles attack and kill trees to varying degrees over three to seven years. The severity and sequence determine how much live vs. dead fuel is in the forest canopy at any point during the outbreak, and thus the fire potential.

### Phase IV – Standing and Fallen **Grey**

Once the dead needles fall from trees fuel and fire dynamics change. Initially more soil moisture is available to keep ground fuels (humus and rotten logs) and surface vegetation/fuels moist. While more sunlight increases the drying rate of dead surface fuels the understory fuels beneath more open forests are also more exposed to rainfall and humidity events during the fire season. It is also reasonable to expect that live understory vegetation would experience less competition for water after large trees are killed, which could alter their growth, development, and susceptibility to drought, all of which affect their flammability. Thus, the combined effect on fire potential must be assessed on a site by site basis.

Snags, standing dead trees, have long been known to present special fire behavior problems. Snags are both the source of embers starting spot fires ahead of the main fire or across fire lines, and are themselves receptive to embers that land on them. Fire intensity can be expected to be less during the snag phase as compared to the red-dead phase. In addition, snags pose extreme fire fighter safety issues. Falling and rolling snags hamper day-time fire fighting and preclude many nighttime operations. Snags on both sides of the fireline pose hazards not only from falling but also spotting. Recent Canadian experience indicates fire lines may need to be twice as wide to protect firefighters on the lines.

### Phase V – Fallen **Grey** and New **Green**

Once the majority of snags have fallen, fire behavior will vary depending on the new forest structure, and should be assessed accordingly. The immature trees reforesting beetle-killed areas typically have foliage close to the ground and are thus susceptible to crowning and spotting. The downed logs present three problems. First, their contribution to fire intensity is not well understood nor represented in current fire behavior models. This is the subject of current research. Second, fireline construction rates are reduced to

39

as little as one-fourth depending on the density of downed logs. Third, as logs age they become increasing receptive to ignition by embers. The effect of heavy deadwood is to increase resistance to control which implies a trade-off between increasing suppression forces or accepting larger fires.

*Research Opportunities and Needs:*

- Current operational fire behavior models were developed for "normal," healthy forests. The models are not valid to address the beetle attack phases of attacked green, attacked yellow, dead-red.

- Current crown fire prediction models are not valid in recently beetle-killed forests.

40

# Bibliography

## Bark Beetles and Forests, Creating a Resilient Forest

Bentz B, Nordhaus H, Allen CD, Ayres M, Berg E, Carroll A, Hansen M, Hicke J, Joyce L, Logan J, MacFarlane W, MacMahon J, Munson S, Negrón J, Paine T, Powell J, Raffa K, Régnière J, Reid M, Romme W, Seybold S, Six D, Tomback D, Vandygriff J, Veblen T, White M, Witcosky J, Wood D (2009) Bark beetle outbreaks in western North America: Causes and consequences. University of Utah Press, ISBN 978-0-87480965-7, 42 p.

Fettig C, Klepzig KD, Billings RF, Munson AS, Nebeker TE, Negrón J, Nowak J (2007) Review: The effectiveness of vegetation management practices for prevention and control of bark beetle infestations in coniferous forests of the western and southern United States. Forest Ecology and Management 238: 24-53.

Negrón, JF, Bentz BJ, Fettig CJ, Gillette N, Hansen EM, Hayes JL., Kelsey RG, Lundquist JE, Lynch AM, Progar RA, Seybold SJ (2008) US Forest Service bark beetle research in the western United States: Looking toward the future. Journal of Forestry 106: 325-331.

Raffa, KF, Aukema B, Bentz B, Carroll A, Erbilgin N, Herms D, Hicke J, Hofstetter R, Katovich BS, Lindgren J, Logan J, Mattson W, Munson AS, Robison DJ, Six DL, Tobin P, Townsend P, Wallin K (2009) A literal use of "forest health" safeguards against misuse and misapplication. Journal of Forestry 5: 276-277.

Gibson K, Skor K, Kegley S, Jorgensen C, Smith S, Witcosky J (2008) Mountain pine beetle impacts in high-elevation and five-needle pines: current trends and challenges. USDA Forest Service, Forest Health Protection, R1-08-020

## Timber Harvest and Historical Use Patterns

Wroten, 1955

## Biomass

Price, JI, D.W. MCCollum and R.P Berrens (2010). Insect infestation and residential property values: A hedonic analysis of the mountain pine beetle epidemic. Forest Policy and Economics. 12. 415-422.

Jones, Greg; Loeffler, Dan; Calkin, David; Chung, Woodam. 2010. Forest treatment residues for thermal energy compared with disposal by onsite burning: Emissions and energy return. Biomass and Bioenergy 34(2010): 737-746.

Jones, Greg; Loeffler, Dan; Butler, Edward; Chung, Woodam; Hummel, Susan. 2009. Emissions, energy return and economics from utilizing forest residues for thermal energy compared to onsite pile burning. In Proceedings of the 2009 National Silvicultural Workshop, June 15-18, Boise, ID, USDA Forest Service Proceedings RMRS-P-61, pp. 145-158.

## The Role of Natural Regeneration

Collins BJ, Rhoades CC, Hubbard RM, Battaglia MA (under revision) Tree regeneration and future stand development after bark beetle infestation and harvesting in Colorado lodgepole pine stands. Forest Ecology and Management.

41

BLM_0123783

Collins BJ, Rhoades CC, Underhill J, Hubbard RM (2010) Post-harvest seedling recruitment following mountain pine beetle infestation of Colorado lodgepole pine stands: A comparison using historic survey records. Can. J. For. Res. 40: 2452-2456.

Rocca ME, Romme WH (2009) Beetle-infested forests are not "destroyed." Frontiers in Ecology and the Environment 7(2): 71-72.

### Impacts to Watersheds

Bethlamy, N. 1976. A Colorado episode: beetle outbreak, ghost forests, more streamflow. Northwest Science. 49: 95-105.

Bosch, J.M., and J.D. Hewlett. 1982. A review of catchment experiments to determine the effect of vegetation changes on water yield and evapotranspiration. Journal of Hydrology. 55: 3-23.

Clow, D.W., C.C. Rhoades, J. S. Briggs, and M. Caldwell. Responses of soil and water chemistry to Mountain Pine Beetle induced tree mortality in Grand County, Colorado (in preparation manuscript).

Elder, K. 2009. Fool Creek Watershed study: 50 Years later. Unpublished Report, USDA Forest Service, Rocky Mountain Research Station, Fort Collins, CO.

Fahey, T.J., J.B. Yavitt, J.A. Pearson, and D.H. Knight. 1985. The nitrogen cycle in lodgepole pine forests, southeastern Wyoming. Biogeochemistry. 1: 257-275.

Hedstrom, N. and J. Pomeroy, 1998. Measurements and modeling of snow interception in the boreal forest. Hydrological Processes. 12: 1611-1625.

Kaufman, M. 1985. Annual transpiration in subalpine forests: large differences among four tree species. Forest Ecology and Management. 13: 235-246.

Knight, D.H., T.J. Fahey, and S.W. Running. 1985. Water and nutrient outflow from contrasting lodgepole pine forests in Wyoming. Ecological Monographs. 55: 29-48.

Leaf, C. 1975. Watershed management in the Rocky Mountain subalpine zone: the status of our knowledge. USDA Rocky Mountain Forest and Range Experiment Station, Research Paper RM-137.

Lewis, Jr., W.M., J.H. McCutchan, Jr., L. A. Cooper, T.M. Detmer, C.C. Rhoades, D.W. Clow, J.S. Briggs, and J.D. Stednick. Biogeochemistry of beetle kill: Explaining a weak nitrate response (in preparation manuscript).

Love, L.D. 1955. The effect on streamflow of the killing of spruce and pine by the Engelmann spruce beetle. Transactions of the American Geophysical Union. 36: 113-118.

Mitchell, R. G. and H. K. Preisler. 1998. Fall rate of lodgepole pine killed by the mountain pine beetle in central Oregon. Western Journal of Applied Forestry. 13: 23-26.

Montesi, J., K. Elder, R.A. Schmidt, and R.E. Davis. 2004. Sublimation of intercepted snow within a subalpine forest canopy at two elevations. Journal of Hydrometeorology. 5: 763-773.

42

Pomeroy, J. and D.M. Gray, 1995. Snowcover accumulation, relocation and management. NHRI Science Report 7, National Hydrology Research Institute, Environment Canada. 134 pp.

Potts, D. 1984. Hydrological effects of a large-scale mountain pine beetle (Dendroctonus ponderosae Hopkins) outbreak. Water Resources Bulletin. 20: 373-377.

Storck, P and D. Lettenmaier. 1999. Predicting the effect of a forest canopy on ground snowpack accumulation and ablation in maritime climates. Proceedings of the 63rd Western Snow Conference. Lake Tahoe, CA. Western Snow Conference, 1-12.

Stottlemyer, R., C.A. Troendle, and D. Markowitz. 1997. Change in snowpack, soil water, and streamwater chemistry with elevation during 1990, Fraser Experimental Forest, Colorado. Journal of Hydrology. 195: 114-136.

Troendle, C., and R. King. 1985. The effect of timber harvest on the Fool Creek Watershed, 30 years later. Water Resources Research, 21(12): 1915-1922.

Troendle, C., and R. King. 1987. The effect of partial and clearcutting on streamflow at Deadhorse Creek, Colorado. Journal of Hydrology, 90: 145-157.

Troendle, C. and J. Meiman. 1986. The effect of patch clear-cutting on the water balance of a subalpine forest slope. Proceedings of the 54th Western Snow Conference. Phoenix, AZ. Western Snow Conference, 93-100.

Van Haveren, B. 1981. Wagon Wheel Gap watershed experiment revisited. Proceedings of the 49th Western Snow Conference. St. George, UT. Western Snow Conference, 131-138.

Wilm, H.G., and E.G. Dunford. 1948. Effect of timber cutting on water available for streamflow from a lodgepole pine forest. USDA Technical Bulletin 968, Washington, DC, 43 pp.

**Fire Risk and Behavior**

Bentz B, Nordhaus H, Allen CD, Ayres M, Berg E, Carroll A, Hansen M, Hicke M, Hicke J, Joyce L, Logan j, Macfarlane W, MacMahon J, Munson S, Negrón J, Paine T, Powell J, Raffa K, Regniere J, Reid M, Romme W, Seybold S, Six D, Tomback D, Vandygriff J, Veblen T, White M, Witcosky J, Wood D (2009) Bark beetle outbreaks in western North America: Causes and consequences. University of Utah Press, ISBN 978-0-87480965-7, 42 p.

Cohen, J. D. (2000). Preventing disaster, home ignitability in the wildland-urban interface. Journal of Forestry 98(3): 15-21.

Cruz, M. G. and M. E. Alexander (2010). Assessing crown fire potential in coniferous forests of western North America: a critique of current approaches and recent simulation studies. International Journal of Wildland Fire 19(4): 377-398.

Deeming, J. E., R. E. Burgan, et al. (1977). The National Fire Danger Rating System – (1978). Ogden, Utah, US Forest Service Intermountain Forest and Range Experiment Station: INT-GTR-39 63p.

43

BLM_0123785

Fahnestock, G. R. (1970). Two Keys for Appraising Forest Fire Fuels. US Forest Service, Pacific Northwest Forest and Range Experiment Station: PNW-RP-99. 26p.

Fettig c, Klepzig KD, Billings RF, Munson AS, Nebeker TE, Negrón J, Nowak J (2007) Review: The effectiveness of vegetation management practices for prevention and control of bark beetle infestations in coniferous forests of western and southern United States. Forest Ecology and Management 238: 24-53.

Finney, M. A. (1998). FARSITE: Fire Area Simulator -- model development and evaluation. US Forest Service Rocky Mountain Research Station: RMRS-RP-4. 47p.

Finney, M.A. (2002). Fire growth using minimum travel time methods. Canadian Journal of Forest Research 32: 1420-1424.

Finney, M.A. (2006). An overview of FlamMap Modeling Capabilities. In: Andrews, Patricia L.; Butler, Bret W., comps. 2006. Fuels Management-How to Measure Success: Conference Proceedings. 28-30 March 2006; Portland, OR..U.S Forest Service, Rocky Mountain Research Station. Proceedings RMRS-P-41. p. 213-220.

Finney, M. A. (2007). A computational method for optimising fuel treatment locations. International Journal of Wildland Fire 16(6): 702-711.

Gibson, K. and Negron, J.F. (2009). Fire and bark beetle interactions. In: Hayes, J.L.;Lundquist, J.E., comps. The Western Bark Beetle Research Group: A Unique collaboration with Forest Health Protection: Proceedings of a symposium at the 2007 Society of American Foresters Conference. US Forest Service, Pacific Northwest Research Station: PNW-GTR-784. 51-70.

Heinsch, F. A.; Andrews, P.L. (2010). BehavePlus fire modeling system, version 5.0: Design and Features. US Forest Service, Rocky Mountain Research Station. RMRS-GTR-249. 111 p.

Keyes, C.R. (2006). Role of foliar moisture content in the silvicultural management of forest fuels. Western Journal of Applied Forestry 21: 228-231.

Klutsch, J.G., Negron, J.F., Costello, S.L., Rhoades, C.C., West, D.R., Popp, J., and Caissie, R. 2009. Stand characteristics and downed woody debris accumulations associated with a mountain pine beetle (Dendroctonus ponderosae Hopkins) outbreak in Colorado. For. Ecol. Manage. 258: 641–649.

Klutsch, J.G., M.A. Battaglia, D.R. West, S.L. Costello, and J.F. Negrón. Evaluating potential fire behavior in lodgepole pine-dominated forests after a mountain pine beetle outbreak in north-central Colorado. In Press, Western Journal of Applied Forestry.

Klutsch, J.G. 2008. Fuel and stand characteristics in ponderosa pine infested with mountain pine beetle, Ips spp., and southwestern dwarf mistletoe in Colorado's Northern Front Range. 2008. M.S. Thesis, Bioagricultural Sciences and Pest Management Department, Colorado State University and Rocky Mountain Research Station.

McArthur, A. G. (1966). Weather and grassland fire behaviour. Department of National Development, Forestry and timber, Bureau, Canberra, Australia, Commonwealth of Australia. Leaflet 100 23p.

44

BLM_0123786

Neary, D. G.; Ryan, K. C.; DeBano, L. F. (2005). Wildland fire in ecosystems: Effects of fire on soils and water. US Forest Service, Rocky Mountain Research Station, RMRS-GTR-42-vol.4. 250 p.

Negrón JF, Bentz BJ, Fettig CJ, Gillette N, Hansen EM, Hayes JL, Kelsey RG, Lundquist JE, Lynch AM, Progar RA, Seybold SJ (2008) US Forest Service bark beetle research in the western United States: Looking toward the future. Journal of Forestry 106: 325-331.

Raffa, KF, Aukema B, Bentz B, Carroll A, Erbligin N, Herms D, Hicke J, Hofsteter R, Katovich BS, Lindgren J, Logan J, Mattson W, Munson AS, Robinson DJ, Six DL, Tobin P, Townsend P, Wallin K (2009) A literal use of 'forest health' safeguards against misuse and misapplication. Journal of Forestry 5: 276-277.

Rothermel, R. C. (1972). A mathematical model for predicting fire spread in wildland fuels. USDA Forest Service, Intermountain Forest and Range Experiment Station: INT-RP-115 40p.

Ryan, K. C. (2002). Dynamic interactions between forest structure and fire behavior in boreal ecosystems. Silva Fennica 36(1): 13-39.

Sandberg, David V.; Ottmar, Roger D.; Peterson, Janice L.; Core, John. 2002. Wildland fire on ecosystems: effects of fire on air. USDA Forest Service, Rocky Mountain Research Station. RMRS-GTR-42-vol. 5. 79 p.

Scott, J. H.; Reinhardt, E. D. (2001). Assessing crown fire potential by linking models of surface and crown fire behavior. USDA Forest Service, Rocky Mountain Research Station: RMRS-RP-29 59 p.

Stocks, B. J.; Lawson, B. D.; Alexander, M. E.; Van Wagner, C .E.; McAlpine, R. S.; Lynham, T. J.; Dube, D. E. 1989. The Canadian forest fire danger rating system: an overview. The Forestry Chronicle. 65(4): 258-265.

van Wagner, C. E. (1977). Conditions for the start and spread of crown fire. Canadian Journal of Forest Research 7: 23-34.

West, D.R., 2010. Mountain pine beetle-caused lodgepole pine mortality from the 1980's and subsequent fire occurrence In Colorado. M.S. Thesis, Bioagricultural Sciences and Pest Management Department, Colorado State University and Rocky Mountain Research Station.

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination, write to USDA, Director, Office Of Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410, or call (800) 795-3272 (voice) or (202) 720-6382 (TDD). USDA is an equal opportunity provider and employer.

BLM_0123787

# ECONOMIC CONTRIBUTION OF OFF-HIGHWAY VEHICLE USE IN COLORADO

August 2013

BLM_0123788

# Canada Lynx Conservation Assessment and Strategy

3rd Edition — August 2013

http://www.fs.fed.us/biology/resources/pubs/wildlife/index.html

BLM_0123789

10/18/2016                         DEPARTMENT OF THE INTERIOR Mail - Protect mulitple use in the RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Protect mulitple use in the RMP
1 message

**Mike Foster** <mfoster@cbcworldwide.com>                    Mon, Sep 26, 2016 at 4:39 PM
Reply-To: mfoster@cbcworldwide.com
To: UFORMP@blm.gov

Dear

I am writing today to ask you to protect the economic integrity of public lands in western Colorado's Uncompahgre region.

The Draft RMP should not lock up public lands with important mineral potential.

 Specifically, I urge the BLM to:

•Reduce the area with wilderness characteristics in the final RMP, particularly excluding the Adobe Badlands unit, the Lower Tabeguache unit and the Shavano Creek unit.

I urge you to maximize multiple use and protect mineral assets in order to ensure wide access and economic vitality for future generations.

Thank you.

Mike Foster
639 Pineneedle Ct.
Grand Junction, CO 81506

BLM_0123790

10/18/2016                          DEPARTMENT OF THE INTERIOR Mail - Protect our wildlands In the RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Protect our wildlands in the RMP
1 message

---

**Paul janzen** <paul@intermountainfunding.com>                     Mon, Sep 26, 2016 at 5:44 PM
Reply-To: paul@intermountainfunding.com
To: UFORMP@blm.gov

Dear

Colorado,s economic future is greatly aided by protecting our public lands. These are the resources that will bring in
tourist and recreation dollars long after the mineral and gas resources have been plundered. I urge the utmost protection
is given to our irreplaceable natural lands.

Thank You,
Paul Janzen


Paul janzen
62213 Charolais Dr.
Montrose, CO 81403

BLM_0123791

10/20/2016                                          DEPARTMENT OF THE INTERIOR Mall - Land Management



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Land Management
1 message

**daniel blackwell** <danbwell@q.com>                                          Tue, Sep 27, 2016 at 11:09 PM
To: uformp@blm.gov

As an avid outdoorsman, hunter, shooter, hiker, I hate to see destruction of our public lands by any inconsiderate means
from mineral exploration (liquid or solid) and especially from careless public shooters. In the last three years alone,
Pikes Peak National Forest has seen an increase in destruction and littering by shooters & non outdoor individuals.
Places I used to access to hunt have been turned into parking lots of shot up targets and empty shotgun/rifle shells. It's
utterly disheartening!
I would like to see legislation to detour the use & destruction of public lands for personal financial gains or reckless
shooters. Example, permits to shoot on public lands with mandatory hunter education or forestry classes would create a
source of income to help manage our resources. Similar to the registration of OHV vehicles. Let those that use our lands
for responsible recreation pay to play. Those that do not comply can be ticketed, another source of income, or assigned
to work/cleanup detail.
The Pikes Peak Forest Service can provide further insight into the inappropriate use of lands surrounding Gold Camp
Road.  Let's keep our public lands, pack out what you pack in!

BLM_0123792

DEPARTMENT OF THE INTERIOR Mail - North Fork Valley



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## North Fork Valley
1 message

---

**Kayla Dodson** <kaylaafuera@gmail.com>                    Tue, Sep 27, 2016 at 11:53 AM
To: rmpcomments@citizensforahealthycommunity.org, uformp@blm.gov

I live in Grand Junction, CO and certainly enjoy driving my car and heating my house with petroleum products and still I am against some mining techniques especially near precious natural resources and near homes, schools and towns. I hope you will consider protecting land, animals and people who live and work in the North Fork Valley area by not allowing fracking. Thank you, Kayla Dodson, 2504 Mt Sopris Dr, Grand Junction, CO 81507. 970-615-0693.

++++++
"True discernment is the ability to step back from ourselves, a situation and the influence of others, see a clear picture and then choose how to act for the best." *A Quest for Well-being*
+++++++++

---

BLM_0123793

10/20/2016                          DEPARTMENT OF THE INTERIOR Mail - comment on RMZ 2



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## comment on RMZ 2

1 message

**Rossann Mosher** <rossann.mosher@gmail.com>                    Wed, Sep 28, 2016 at 11:12 AM
To: uformp@blm.gov

We would like to comment specifically on the Ridgway Trails Special
Recreation Management Area – RMZ 2.

We are private land owners in the area and are in favor of Alternative
B because it would prohibit competitive events in the area, as
Alternative D could allow. We feel this is the better alternative for
wildlife and near-by residents. The trail access areas are quite small
and a large competitive event would have a negative impact on the
local traffic flow, noise levels, particulate pollution levels (dust),
roadside trash levels and wildlife movement through the area.

We do however have one concern about Alternative B, under the item of
travel management. This item does not specify closing the trails from
November through April. This seems like an important omission in terms
of the health of local wildlife populations (deer and some birds) who
winter throughout this area and then birth their young in the spring
in this area.

Thank you for the opportunity to comment.
Local Residents

BLM_0123794

10/20/2016                    DEPARTMENT OF THE INTERIOR Mall - BLM management proposal



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## BLM management proposal
1 message

**Brian Hall** <brainh18@hotmail.com>                    Thu, Sep 29, 2016 at 10:39 PM
To: "uformp@blm.gov" <uformp@blm.gov>

Dear BLM folks.


This is concerning your proposal to add un-needed, and unnecessary rules and restrictions on land in SW Colorado.  I grew up in Pueblo, I'm familiar with  Colorado.  Leave our public lands unrestricted.


The land belongs to the people, not you.  Do not place anymore un-need restrictions concerning how folks recreate on it, whether it be shooting, camping, hiking, whatever. Alternate A is the only option...period.


We have enough laws, restrictions, you name it.  You have closed enough access roads and limited other activities.  If people are scared or afraid of guns and shooting sports, tell them to stay in town.  It's public land for public use.


Sincerely,


Brian Hall

Johnstown CO

970-646-1540




Sent from Outlook

BLM_0123795

10/20/2016                    DEPARTMENT OF THE INTERIOR Mail - BLM Managment Plan



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## BLM Managment Plan
1 message

---

**Luke Shipley <lkship86@gmail.com>**                    Thu, Sep 29, 2016 at 1:59 PM
To: uformp@blm.gov

To Whom it may concern,
   I recently have been informed of the Bureau of Land Management's plan(s) for public land management in the southwest Colorado region. As a hunter, recreational shooter and outdoor enthusiast I am concerned for the plans put forth by BLM. Much of which will greatly affect the public's ability to have safe recreational shooting opportunities on public land. I recently moved back to Colorado where I grew up and have rekindled a love for target shooting. Having made recent trips to do so on public land has proved very enjoyable and vastly superior to the expensive, stuffy and regulated indoor range offerings not mention the lack of extreme long range shooting options. As a safe responsible land owner myself I understand the value of taking care of the land that we use. Cleaning up after ourselves and others who may have left trash and otherwise been abusive to these valued places. That is why I am greatly concerned for what will become of these public lands that I use for hunting and recreation. Please take into consideration the thousands of others who enjoy these lands as I do. It is part of what makes Colorado such an enjoyable place for people like me who cherish the opportunity we have to do these things on some of the most beautiful lands in the nation. Thank you for hearing me out and I hope to hear good things about the decisions being made from this proposal.

Regards,
Luke

BLM_0123796

10/20/2016                    DEPARTMENT OF THE INTERIOR Mail - Keep SW Colorado open to hunting and target shooting



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

___

## Keep SW Colorado open to hunting and target shooting
1 message

___

**CarlsonFamily** <rwccacgjco@gmail.com>                    Thu, Sep 29, 2016 at 1:47 PM
To: uformp@blm.gov

Keep SW Colorado open to hunting and target shooting.

Thank you!

BLM_0123797

Case No. 1:20-cv-02484-MSK   Document 64-9   filed 04/29/21   USDC Colorado   pg 67 of 162

10/20/2016                    DEPARTMENT OF THE INTERIOR Mail - Management Plan Will Affect Target Shooting on Public Lands in Southwest Colorado



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Management Plan Will Affect Target Shooting on Public Lands in Southwest Colorado
1 message

---

**Jim Kilpatrick** <jimkilp@hotmail.com>                                    Thu, Sep 29, 2016 at 3:56 PM
To: "uformp@blm.gov" <uformp@blm.gov>

I STRONGLY OPPOSE any INFRINGEMENTS whatsoever to the exercise of our Constitutionally guaranteed right to keep and bear arms on public lands.  Target and recreational shooting are required activities in order to maintain a well-regulated (meant "well-trained/organized/calibrated" at time of founding) militia (all of the people).

Just like We the People have the RIGHT TO TRAVEL on PUBLIC RIGHTS OF WAY unencumbered without need of  ANY LICENSES in customary means of personal conveyances, WTP also have the right to use Public Lands for the exercise of our rights in conjunction with the pursuit of happiness.

The BLM has NO LEGITIMATE AUTHORITY to deny the use of public lands to the people for any lawful purposes.  FYI, any "laws" "rules' "regulations" etc. that are contrary to the guaranteed rights of the people are NOT "law" at all but are known in legal terminology as a "nullity" and unenforceable in any honorable court.

DO NOT PASS ANY BS THAT INFRINGES OUR RIGHTS because I will aggressively pursue both criminal and civil charges against your officers, department et. al. for KNOWING. OR SHOULD HAVE KNOWN, VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW!

References:  18 USC Sections 241, 242

42 USC Sections 1983, 1985, 1986

18 USC Section 4

2nd, 9th and 14th Amendments to the U.S Constitution

for starters.

Thank you.

BLM_0123798

10/20/2016                         DEPARTMENT OF THE INTERIOR Mail - No No on Closing land to target shooting



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

___

# No No on Closing land to target shooting
1 message

___

**John Klausner** <youthctk@gmail.com>                                Thu, Sep 29, 2016 at 1:44 PM
To: ufomp@blm.gov

Hello,
As a resident of Colorado and a frequenter to the Southwest I am very opposed to the closing of land currently open to shooting. It is becoming increasingly expensive to shoot in Colorado. Closing public land is not a good option.

John Klausner
Youthctk@gmail.com

BLM_0123799

10/20/2016                          DEPARTMENT OF THE INTERIOR Mail - Proposed Mngmnt Plan



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Proposed Mngmnt Plan
1 message

**Garth** <fullcurlram@yahoo.com>                    Thu, Sep 29, 2016 at 3:29 PM
To: "uformp@blm.gov" <uformp@blm.gov>

   I am firmly against ANY new legislation proposals by BLM re historic, existing dirt access roads to close or otherwise "micro-manage" our Federal lands!!
I am firmly against BLM issuing any new regulations that would affect discharge of firearms on OUR PIBLIC LANDS.
Increase in personnel hiring IS NOT JUSTIFIED IN ORDER TO NOT LOSE FEDERAL GRANTS!!
If anything you should be cutting back on personel hiring!

Sent from my iPhone

BLM_0123800

10/26/2016                                DEPARTMENT OF THE INTERIOR Mail - Comment on management plan



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Comment on management plan
1 message

---

**Recce, Susan** <SRecce@nrahq.org>                                        Thu, Sep 29, 2016 at 11:27 AM
To: "uformp@blm.gov" <uformp@blm.gov>

Please find attached a letter of comments on the draft management plan for lands in southwest Colorado managed by the Uncompahgre Field Office.  I would very much appreciate a reply to let me know that the letter has been received.


Thanks,


Susan Recce, Chair

Federal Lands Hunting and Shooting Sports Roundtable


Director

Conservation, Wildlife and Natural Resources

National Rifle Association

Fairfax, VA

---

📄 **Comments on BLM Uncompahgre Field Office public lands in southwest Colorado.docx**
   19K

---

BLM_0123801

COMMENTS ON MANAGEMENT PLAN FOR PUBLIC LANDS IN SOUTHWEST COLORADO

September 29, 2016

Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401

Dear Bureau of Land Management (BLM):

The undersigned organizations are signatories, along with the BLM, to the Federal Lands Hunting, Fishing, and Shooting Sports Roundtable Memorandum of Understanding (MOU).  We share a long-standing and vested interest in access and opportunities on federal public lands for people to enjoy hunting and recreational shooting. We appreciate the opportunity to comment on the draft resource management plan (DRMP) for 675,800 acres of public land in southwest Colorado.

Because the DRMP does not appear to affect hunting opportunities on or access to the planning area, our comments focus on the effects on recreational shooting of the DRMP's four management alternatives.  Alternatives A and C would maintain closure to recreational shooting of 340 acres around developed recreation sites.  We support the rationale for the continued closure of developed recreation sites to recreational shooting for the purposes in the DRMP of public safety and protection of facilities from potential damage.

Alterative B would close nearly 250,000 acres or 37% of the planning area to recreational shooting.  We oppose this alternative as being excessive in meeting the BLM's multiple use mandates under the Federal Land Policy and Management Act.  While this Alternative would close certain ACECs and SRMAs to recreational shooting, as does Alternative D (the BLM's preferred alternative), it would also close lands in Wilderness Study Areas and lands managed to protect wilderness characteristics.  Since the Wilderness Act does not prohibit recreational shooting or hunting, there is no basis for the BLM to preemptively close lands to recreational shooting that are designated as wilderness or are protected for the future possibility of being designated as wilderness, any more than there is a basis to close these lands to hunting.

**Recommendation:**  Remove any and all references to recreational shooting closure proposals that are inconsistent with existing BLM regulations (43 CFR Sec. 8365).

Alternative B would also close lands to recreational shooting where there are prairie dog colonies that have burrowing owls.  No supporting data is provided to justify such closures as necessary for the protection of burrowing owls.  Closing lands to public activities that have been a historic use requires supporting data to make the case for the loss of public access.  That case is not made in the DRMP for Alternative B.

**Recommendation:**  In areas where prairie dog colonies and burrowing owl populations are present as noted in Alternative B, provide analysis and or evidence of existing or predicted impacts to species populations as a result of the presence of recreational shooting prior to restricting the activity.

Alternative D proposes to close 49,370 acres to recreational shooting.  It would maintain closure of lands around recreational facilities and, like Alternative B, it would close certain ACECs and SRMAs to recreational shooting.   The DRMP explains that the ACEC and SRMA closures are designed to "increase the quality of other recreation opportunities", or provide for "quiet trail or water-based activities," or for those "users seeking opportunities for primitive and unconfined recreation."  We appreciate the need to provide well-balanced opportunities for a variety of recreation experiences; however, it is impossible to determine if the BLM will achieve the appropriate balance without data on the impacts, individual and cumulative, that these closures will have on shooters who are the only group of recreationists facing the entire loss of access under Alternative D and Alternative B that is currently open to them.  All the DRMP states is that "prohibiting target shooting in certain areas would reduce opportunities for this activity."  To understand the true impact, one needs to know how many shooters will likely be affected, where the alternative locations to recreate are that have similar or better access, and what the effect will be on crowding and safety of driving displaced recreationists to areas used by other shooters.

For example, a person who recreationally shoots in the North Delta SRMA contacted a member of the Roundtable to say that the area would be well suited for target shooting and does not understand why it is proposed for closure.   Under Alternative D on page 2-415 it is called the North Delta OHV area, implying that it will be closed to recreational shooting to accommodate off-highway vehicle (OHV) use.  He explains that the area is remote and virtually unused except for target shooting and some OHV use.  We share his concern because the DRMP does not lend understanding as to why both activities could not be accommodated if the recreational use is sparse and demand for places to shoot is expected to increase (as described below).

**Recommendation:**  Under Alternative D on page 2-415, the BLM should provide further analysis and explanation regarding the inability of the North Delta OHV area to accommodate recreational shooting.  Such analysis should provide the public with a description of how the area is currently used and an explanation as to the types of user conflicts that have been observed and what is predicted in the future.  The analysis should also include the number and types of recreational users who would be impacted by the restrictions proposed in Alternative D.

The DRMP notes on page 3-178 that requests for dispersed shooting areas are expected to increase and with that, concerns from adjacent landowners are also expected to increase.  However, nothing in the DRMP indicates how the BLM will address the expected increase in recreational shooting and resolve anticipated conflicts with landowners.  Neither does the DRMP address how the ability of the BLM to respond to the expected shooting demand will be affected by closing additional public lands as proposed in Alternatives B and D.

On page 3-176, the DRMP states that there are no designated target shooting areas within the planning area, and that the "planning area has several unofficial shooting areas in old borrow pits, gravel pits and other disturbed areas where there is a history of such use."  These popular shooting sites are not identified in the DRMP as being within or outside the areas being proposed for closure in Alternatives B and D.

**Recommendation:**  Identify existing "unofficial shooting areas in old borrow pits, gravel pits and other disturbed areas where there is a history of such use" in the DRMP and provide further explanation as to how these individual areas would be impacted by the various alternatives proposed in the DRMP.

BLM_0123803

On page 4-311, under Alternative C, the DRMP states that "Designated target shooting areas and ranges would be allowed, which could increase recreational opportunities by providing managed, accessible and designated areas for shooting."  A similar statement appears on page 4-316 under Alternative D. We question whether these are valid statements in light of BLM's established policy of not allowing ranges to be built on public lands, including the addition of small improvements such as berms and target holders, as well as a separate policy that terminated the leasing of public lands for range development.

With rare exception, the BLM has steadfastly refused to identify or designate areas for recreational shooting, even if such designations would reduce user conflicts and increase public safety.  The "disturbed areas" that the DRMP speaks of seem ideal sites to study for their potential to accommodate more concentrated recreational use as shooting participation increases, as well as their potential to mitigate the proposed closures, reduce user conflicts and positively respond to adjacent homeowner concerns.  But we question whether this is a realistic expectation that the DRMP offers the public, when it appears to be diametrically opposed to agency policy.

Needless to say, we would very much support a reversal of these policies which would allow field offices such as the Uncompahgre to pursue these options in a quest to enhance recreational opportunities for all visitors, and to be proactive in addressing the projected increase of those who are looking to these public lands for recreational shooting opportunities. The DRMP would have provided the ideal opportunity to address proactive management of recreational shooting especially if, as noted, pressure for more places to shoot is likely to increase.  At the very least, the closures proposed in both Alternatives B and D would exacerbate a set of condition that the BLM has described for the future, a future that the DRMP is supposed to address throughout the next 15 years.  Therefore, we strongly encourage the BLM to incorporate the following recommendation.

**Recommendation:**  Incorporate language in the final RMP that would allow the BLM to determine the feasibility of establishing "unofficial shooting areas" (noted above) as managed or unmanaged designated target shooting areas and/or ranges as an implementation level activity.  In addition, retain language in the final RMP stating that "designated target shooting areas and ranges would be allowed, which could increase recreational opportunities by providing managed, accessible and designated areas for shooting."

On page 5.2.7 of the DRMP, it states that

> *Staff from BLM UFO met with representatives of the local Rod and Gun Club and other interested firearm shooters on March 13 and April 10, 2013.  The purpose of the meeting was to discuss potential management alternatives in the RMP, including areas with limits on or closure to target shooting.  As a result of the meetings, the alternatives were further developed and refined.  The attendees of the meetings indicated that they are generally agreeable with the actions that are carried forward in the preferred alternative.*

Upon inquiring about those two meetings, we were provided with a list of the attendees.  The only participants representing recreational shooting interests appeared to be representatives of the local rod and gun club; the other participants were largely representing OHV interests.  For such important meetings, it is unfortunate that the private organizations that are signatory to the MOU were not contacted at the time and asked to assist in inviting recreational shooters to participate, especially those

BLM_0123804

shooters who are not affiliated with a gun club and may have no other place to shoot than in this planning area.  It would appear that recreational shooting interests were very much underrepresented at the meetings.  Further, we question whether those attending who represented recreational shooting interests agreed with BLM's preferred alternative, Alternative D.  We were advised by one of the participants that support was not given for Alternative D, but that it was believed the alteratnive was a fait accompli.

In summary, we appreciate the fact that additional public lands beyond the closures to recreational shooting as embodied in Alternatives A and C may need to be made in order to provide for a variety of recreational experiences and for the protection of particularly sensitive natural and cultural resources.  As noted above, we oppose Alterative B as being excessive in its closures to recreational shooting, as well as for other recreational users who also depend on motorized and mechanized access to these public lands.  We also believe that Alternative D does not present a solid case for the closures of the areas identified that would result in nearly 50,000 acres being closed to recreational shooting, particularly in light of the fact that recreational shooting demand is expected to increase.  And, importantly, the BLM's mitigation for the closures in light of increased demand is to designate shooting areas and allow ranges, both of which are against BLM's policies that exist today.

Thank you for the opportunity to comment on the DRMP.

Sincerely,

Boone and Crockett Club

Congressional Sportsmen's Foundation

National Rifle Association

National Shooting Sports Foundation

Safari Club International

10/20/2016                                    DEPARTMENT OF THE INTERIOR Mail - Target Shooting Changes



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Target Shooting Changes
1 message

**Jeff M. <scout@createclarity.com>**                                    Thu, Sep 29, 2016 at 3:13 PM
To: ufomp@blm.gov

Dear BLM,

As a resident of Southern Colorado and an avid target shooter, I object to further restrictions contemplated in the Uncompahgre planning area.

Please do not take away spaces where responsible recreational shooters practice this craft.

## Regards,
## Jeff
~~~~~~~~~~~~~~~~~~~~~~~~~~~
**Jeffrey S. Markewich**
United Capital
Financial Life Management
www.UnitedCP.com/CO3
Office: 719-228-3630
CO Cell: 719-233-1898
Vegas: 702-493-9678
~~~~~~~~~~~~~~~~~~~~~~~~~~~

To Opt-Out of future e-mails, please reply with the words "REMOVE ME" in the subject line. Thank you.

BLM_0123806



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Uncompahgre Draft Resource Plan
1 message

**Daniel Elsner** <elsner.dan@gmail.com>                          Thu, Sep 29, 2016 at 3:42 PM
Reply-To: elsner.dan@gmail.com
To: UFORMP@blm.gov

Dear

I wanted to comment on the BLM's Uncompahgre Field Office Draft Resource Management Plan.

I have hiked,camped,hunted,mountain biked and photographed this area for many years.  On a recent hike I was simayed by the damage donw by OHVs as the riders tried to high point on many of the adobe hills.  As an avid mountain biker I was saddened by the closure of one of my favorite rides - Pollock Bench - but I honored the wilderness designation and found other areas to ride of equal enjoyment. I request you consider in the RMP:

1. Include the lands with wilderness character in the final plan.  The geological features, rare plants and insects are amazing!

2. Include the greater salt brush area of critical environmental concern in the field plan. Isolated wildlife are a disaster for healthy populations.  Wildlife know no boundaries.  Healthy predator populations that can roam large areas enhance all the other communities - (plant, arthropod, prey).

3. While protecting these areas it is imperative to appropriately manage motorized and mechanized use.  Most OHV users are respectable but one track can leave a lasting depression for years and signal its okay to go there for others.

As our population grows and more and more pressure is put on our natural areas now is the time to save them for future generations
to enjoy.  I want my granddaughters to be able
to smell, view, and enjoy the solitude of these areas. These wilderness areas can be our
second best idea behind the National Parks.
Thanks for allowing me to comment.

Dan Elsner
513 N 17th Street
Grand Junction Colo 81501
970-361-6813

Daniel Elsner

BLM_0123807

513 N 17th Street
Grand Junction, CO 81501

BLM_0123808

10/20/2016                          DEPARTMENT OF THE INTERIOR Mail - Uncompahgre Mangement Plan



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Uncompahgre Mangement Plan
1 message

**Terry Quinn** <teejay@vail.net>                                Thu, Sep 29, 2016 at 7:36 PM
To: uformp@blm.gov

   About non-hunting firearms activity. I suggest that the BLM do a survey of places that are suitable for shooting at targets. Not near residences, good backup, like a steep tall hill, easily accessible by ordinary street vehicles if possible. I presume the NRA has a set of standards for rural shooting ranges. You might even be able to get the NRA and local shooting organizations to assist in this survey.

   There is a problem about trash at shooting sites on public land. It would be useful if trash containers were provided, as well as restrooms, like porta-potties. The BLM could solicit support from local shooting clubs for funding and periodic cleanups, the way highways are cleaned up.

Terry Quinn


**TERENCE J. QUINN**

**123 W. 4TH ST, 2D FLOOR APT**

**PO BOX 1110 ( for USPS mail)**
**EAGLE, COLORADO  81631**

**PHONE: 970-328-7116   Cell: 970-471-0818**
**E-MAIL: teejay@vail.net**

BLM_0123809



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Vote for Alternative A
1 message

**Brett Guthrie** <guthrie390@gmail.com>                                   Thu, Sep 29, 2016 at 1:24 PM
To: ufomrp@blm.gov

Hello,
I am in favor of draft plan Alternative A.
Keep target shooting open to the public.
Don't close acreage.

BLM_0123810



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## BLM out of Colorado
1 message

**Gun Man** <platform.308@aol.com>                              Fri, Sep 30, 2016 at 6:00 AM
To: uformp@blm.gov

**Jon Prince**
Cell: 719.217.5318
Live Well 🏹

BLM_0123811



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## BLM Uncompahgre Resource Management Plan (RMP) - shooting sports
1 message

**James Kentling Campbell** <j.kent.campbell@gmail.com>                    Fri, Sep 30, 2016 at 7:38 AM
To: ufomp@blm.gov

Hello,

As a Coloradan who hunts and has 3 kids who are becoming well rounded outdoorsmen and women, I encourage you to not limit any shooting related activities in the lands administered by the BLM in Colorado.

It's my understanding BLM's mandate is to promote "mixed use" of it's federal lands.  Target shooting is the required step in giving new hunters the confidence and skills required for hunting.

Shooting sports should have just as much access as any other recreational activity.

Regards,
Kent Campbell
5801 Jay Road
Boulder, CO 80301

BLM_0123812

10/20/2016 DEPARTMENT OF THE INTERIOR Mail - Fwd: And the misuse of our precious water continues for short term profits.



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fwd: And the misuse of our precious water continues for short term profits.
1 message

**alison gannett** <alisongannett@mac.com>                                              Fri, Sep 30, 2016 at 1:48 PM
To: uformp@blm.gov
Cc: Alex Johnson <director@theconservationcenter.org>, Pete Kolbenschlag <mountainweststrategies@tds.net>

Alison Gannett here from Holy Terror Farm, 42485 Highway 133, Paonia, Colorado. I am concerned with the storage of waste production from natural gas. Currently, there is no safe storage method. The use of pits and land application present high risk for shallow ground water aquifers and our streams, rivers, lakes, etc. ALL OF OUR WATER here at the farm comes from Terror Creek, and Fire Mountain Canal (via Paonia Reservoir). Since we are chemical free, even a small spill upstream of waste water (such as a wastewater transport vehicle or pit storage (leak or overflow from heavy rain), etc) would potentially contaminate the veggies/fruits/animals we eat and sell for our farm business. We could even unknowingly apply a carcinogenic chemical via our irrigation water to our food sale products (TEDx reports that 30% of fracking chemicals are potentially or known carcinogens). Those with weaker or sensitive immune systems (such as children, elderly, or even myself with brain cancer) will be sensitive to even small amounts of chemicals that are below EPA standards. There is no alert system in place to notify us farmers if there were to be a spill. Based upon the spill reports from the COGCC, we should have every reason to fear for this to happen, as there are spills reported everyday in Colorado.

Until there is mandatory baseline water testing of ALL our local streams, aquifers, wells, and irrigation canals AND a way to alert us if there were to be a spill, I do not believe it is safe to continue drilling for oil and gas. The coal mine right next to me must monitor my water, and I can log on to see all recent water tests to make sure they are in compliance. And without mandatory baseline testing of ALL our drinking water and irrigation water in the North Fork Valley, I do not see how you can issue any planning recommendations until the EPA loophole has been closed (1995 rider on the Energy Act, nicknamed the Dick Cheney Halliburton loophole).

If there were to be just one spill that would affect out water, our farm would be devalued forever. My husband and I do not have a retirement fund - all we have is our farm. As we have seen happen to our farm friends in Rifle and Silt, once contamination happens or is even perceived to potentially be close by, their farms become unsellable. They don't want to stay with the poor water, air and soil quality (not to mention traffic, crime, etc), and they can't leave since they can't sell.

In Oklahoma, they tried deep injection to solve this problem, and now have earthquakes instead. With the current exemptions for deep water aquifer contamination, this is no solution either.

Our farm is surrounded on all sides with PUBLIC BLM land. This land is to managed for ALL uses, not just energy extraction. If there is no way to manage waste from drilling (radioactive and toxic chemicals), why would you even consider any leasing at all? At least protect our food and water sources. without either, we will have no life, or quality of life. If you will not accept no leasing, at least pass the North Fork Alternative B1, so that we can not fear for our health and income.
Best, Alison Gannett

## Groundwater Threats in Colorado



September 20, 2016
by Kyle Ferrar, MPH
**FracTracker has been increasingly looking at oil and gas drilling in Colorado**, and we're finding some interesting and concerning issues to highlight. Firstly, **operators in Colorado are not required to report volumes of water use or freshwater sources.** Additionally, this analysis looked at how wastewater in

BLM_0123813

Colorado is injected, and found that the **majority is injected into Class II disposal wells (85%)** while recycling wastewater is not common. **Open-air pits for evaporation and percolation of wastewater is still a common practice.** Colorado has at least **340 zones granted aquifer exemptions from the Clean Water Act for injecting wastewater into groundwater.** The analysis also found that Weld County produces the most oil and gas in the state, while Rio Blanco and Las Animas counties produce more wastewater. And finally, Rio Blanco injects the most wastewater of all Colorado counties. Learn more about groundwater threats in Colorado below:

# Introduction

Working directly with communities in Weld County, Colorado the FracTracker Alliance has identified issues concerning oil and gas exploration and production in Colorado that are of particular concern to community stakeholder groups. The issues include air quality degradation, environmental justice concerns for communities most impacted by oil and gas extraction, and leasing of federal mineral estates. Analysis of data for Colorado's Front Range has **identified areas where setback regulations are not followed or are inadequate to provide sufficient protections for individuals and communities and our analysis of floodplains shows where oil and gas operations pose a significant risk to watersheds.** In this article we focus on the specific threat to groundwater resources as a result of particular waste disposal methods, namely underground injection and land application in disposal pits and sumps. We also focus on the sources of the immense amount of water necessary for fracking and other extraction processes.

# Groundwater Threats

Numerous threats to groundwater are associated with oil and gas drilling, including hydraulic fracturing. Research from other regions shows that the **majority of groundwater contamination events actually occur from on-site spills and poor management and disposal of wastes.** Disposal and storage sites and spill events can allow the liquid and solid wastes to leach and seep into groundwater sources. There have been many groundwater contamination events documented to have occurred in this manner. For example, in 2013, flooding in Colorado inundated a main center of the state's drilling industry causing over **37,380 gallons of oil to be spilled from ruptured pipelines and damaged storage tanks that were located in flood-prone areas.** There are serious concerns that the oil-laced floodwaters have permanently contaminated groundwater, soil, and rivers.

# Waste Management

In Colorado, wastes are managed <u>several ways</u>. If the wastewater is not recycled and used again in other production processes such as hydraulic fracturing, drilling fluids disposal must follow one of three rules:

1. Treated at <u>commercial facilities and discharged to surface water,</u>
2. Injected in Class II injection wells, or
3. Stored and applied to the land and disposal pits at <u>centralized exploration and production waste management facilities</u>.

Additionally the wastes can be dried and buried in additional drilling pits, with restrictions for crop land. For oily wastes, those containing crude oil, condensate or other "hydrocarbon-containing exploration and production waste," there are additional land application restrictions that mostly require prior removal of free oil. These various sites and facilities are mapped below, along with aquifer exemptions and other map layers related to water quality.

**Figure 1. Interactive map of groundwater threats in Colorado**

*<u>View Map Fullscreen</u>* | *<u>How Our Maps Work</u>*

# Injection Wells

In 2015, Colorado injected a total of **649,370,514 barrels of oil and gas wastewater back into the ground. That is 27,273,561,588 gallons, which would fill over 41,000 Olympic sized swimming pools.** Injected into the ground in deep formations, this water is forever removed from the water cycle.

Allowable injection fluids include a variety of things you do **not want to drink**:

- Produced Water
- Drilling Fluids
- Spent Well Treatment or Stimulation Fluids
- Pigging (Pipeline Cleaning) Wastes
- Rig Wash
- Gas Plant Wastes such as:
  - Amine
  - Cooling Tower Blowdown
  - Tank Bottoms

This means that federal exemptions to Underground Injection Control (UIC) regulations for oil and gas exploration and production have nothing to do with environmental chemistry and risk, and only consider fluid source.

## Why the concern?

Why are we concerned about these wastes? To quote the regulation, "it is possible for an exempt waste and a non-exempt hazardous waste to be chemically very similar" (RCRA). Since oil and gas development is considered part of the United State's strategic energy policy, the entire industry is exempt from many federal regulations, such as the Safe Drinking Water Act (SDWA), which protects underground sources of drinking water (USDW).

The Colorado Oil and Gas Conservation Commission has primacy over the UIC permits and the Colorado Department of Public Health and Environment (CDPHE) administers the environmental protection laws related to air quality, waste discharge to surface water, and commercial disposal facilities. **Under the UIC program, operators are legally allowed to inject wastewater containing heavy metals, hydrocarbons, radioactive elements, and other toxic and carcinogenic chemicals into groundwater aquifers.**

## The State of CO Injection Wells

According to the COGCC production reports for the year 2015, there are **9,591 active injection wells** with volumes reported to the regulatory agency. Additionally, there are of course distinctions within the UIC rules for different types of injection wells, although the COGCC does not provide comprehensive data to distinguish between these types.

Injecting into the same geological formation or "zone" as producing wells is typically considered EOR, although some of the injected water will ultimately remain in the ground. Injecting into a producing formation is an immediate qualification for receiving an aquifer exemption.

EOR operations require considerably more energy and resources than conventional wells, and therefore have a higher water carbon footprint. If the **wastewater is "recycled" as hydraulic fracturing fluid, the injections are exempt from all UIC regulations regardless.** These are two options for the elimination of produced wastewater, although much of it will return to the surface in the future along with other formation waters. When the produced waters reach a certain level of salinity the fluid can no longer be used in enhanced recovery or stimulation, so final disposal of wastewater is typically necessary. These liquid wastes may then go to UIC Class II Disposal Wells.

## Class II Injection Wells

The wells injecting into non-producing formations are therefore disposal wells, since they are not "enhancing production." **Of the almost 10,000 active injection wells in Colorado there are OVER 670 class II disposal well facilities; 402 facilities are listed as currently active.** These facilities may or may not host multiple wells. By filtering the COGCC production and injection well database by target formation, we find that there are over 1,070 wells injecting into non-producing formations. These **disposal wells injected at least <span style="color:red">66,193,874 barrels (2,780,142,708 gallons)</span> of wastewater in 2015 alone.**

## Where is the waste going?

A simple life-cycle assessment of wastewater in Colorado shows that the majority of produced water is injected back underground into class II disposal and EOR wells. The percentage of injected produced waters has been increasing since 2012, and in 2015 85% of the total volume of produced water in 2015 was injected.

If we assume that all the volume injected was produced wastewater, this still **leaves 60 million barrels of produced water unaccounted for.** Some of this volume may have been recycled and used for hydraulic fracturing, but this is rarely the case. Other options for disposal include commercial oilfield wastewater disposal facilities (COWDF) that use wastewater sumps (pits) for evaporation and percolation, as well as land application, to dilute the solid and liquid wastes by mixing them into soil.

## Centralized Exploration and Production Waste Management Facilities

BLM_0123815

10/20/2016                    DEPARTMENT OF THE INTERIOR Mail - Fwd: And the misuse of our precious water continues for short term profits.



Figure 2. Chevron Wastewater Land Application and Pit "Disposal" Facility. Photo by COGCC

According to the COGCC, there are 40 active and 71 total "centralized exploration and production waste management facilities" in Colorado. These facilities, mapped in Figure 1 above, are mostly open-air pits used for storage or disposal, or land-application sites.

As can be seen in the Figure 2 to the right, land application sites are little more than farms that don't grow anything, where wastewater is mixed with soil. Groundwater monitoring wells around these sites measure the levels of some contaminants. **Inspection reports show that sampling of the wastewater is not usually – if ever – conducted.** The only regulatory requirement is that oil is not visibly noticeable as a sheen on the wastewater fluids in impoundments, such as the one in Figure 3 below, operated by Linn Operating Inc., which is covered in an oily sheen.

In most other hydrocarbon producing states, open-air pits or sumps are not allowed for a variety of reasons. At FracTracker, we have covered this issue in other states, as well. In New Mexico, for example, the regulatory agency outlawed the use of pits after finding cased where 369 pits were documented to have contaminated groundwater. California is another state that still uses above ground pits for disposal. At sites in California, plumes of contaminants are being monitored as they spread from the facilities into surrounding regions of groundwater. Additionally, these wastewater pit disposal sites present hazards for birds and wildlife. There have been a number of papers documenting bird deaths in pits, and the risk for migratory bird species is of high concern. Other states like California are struggling with the issue of closing these types of open-air pit facilities. Closing these facilities means that more wastewater will be injected in Class II disposal wells.



Figure 3. Linn energy oily wastewater disposal pit

## Production and Injection Volumes

The data published by the COGCC for well production and injection volumes shows some unique trends. An analysis of injection and production well volumes shows Class II Injection is tightly connected to exploration and production activities. This finding is not surprising. Class II injection wells are considered a support operation for the production wells, and therefore should be expected to be similarly related. Wastewater

BLM_0123816

injection wells are needed where oil and gas extraction is occurring, particularly during the exploration and drilling phases.

Looking at the graphs in Figures 4-6 below, it is obvious that injection volumes have been consistently tied to production of wastewater. It is also clear that the trend since 2012 shows that an increasingly **larger percentage of wastewater is being injected each year. This trend follows the sharp increase in high volume hydraulic fracturing activity that occurred in 2012.** During this boom in exploration and drilling activity, recycling of flowback for additional hydraulic fracturing activities most likely accounts for some of the discrepancy in accounting for the fact that 200% more wastewater was produced than was injected in 2012. When Figure 4 (below) is compared to the graphs in Figures 5 and 6 (further below) it is also interesting to note that produced water volumes in 2015 are at a 5-year low as of 2015, while production volumes of both natural gas and oil are at a 5-year high. Wastewater volumes are linked to production volumes, but there are many other factors, including geological conditions and types of extraction technologies being used, that have a massive affect on wastewater volumes.



Figure 4. Colorado wastewater volumes by year (barrels)

The graphs in Figures 5 and 6 below show different trends. Gas production in Colorado has remained relatively constant over the last five years with a sharp increase in 2015, while oil production volumes have been continually increasing, with the largest increase of 49% from 2014 to 2015, and 46% the year prior.

**Figures 5-6**



**Colorado's Front Range, specifically Weld County, is increasing oil production at a fast rate. New multi-well well-pads are being permitted in neighborhoods and urban and suburban communities <u>without consideration for even elementary schools</u>. Weld County currently has 2,169 new wells permitted within the county.** The figure is higher than the next 9 counties combined. The other top three counties with the most well permits are 2. Garfield (1,130) and 3. Rio Blanco (189), for perspective. Additionally, 74% of pending permits for new wells are located in Weld County.

# How Counties Compare

The top 10 counties for oil production are very similar to the top 10 counties for both produced and injected volumes, although there are some inconsistencies (Table 1). For example, Las Animas County produces the second largest amount of produced wastewater, but is not in the top 10 of oil producing counties. This is because the majority of wells in Las Animas County produce natural gas. Natural gas wells do not typically produce as much wastewater as oil wells. The counties and areas with the most oil and gas production are also the regions with the most injection and surface waste disposal, and therefore surface waste water and groundwater degradation.

BLM_0123817

10/20/2016                    DEPARTMENT OF THE INTERIOR Mail - Fwd: And the misuse of our precious water continues for short term profits.

**Table 1. Top 10 CO counties for gas production, oil production, wastewater production, and injection volumes in 2015.**

| | **Gas Production** | | **Oil Production** | | **Wastewater Production** | | **Injection Volumes** | |
|---|---|---|---|---|---|---|---|---|
| *Rank* | *County* | *Gas[1]* | *County* | *Oil[2]* | *County* | *Water[2]* | *County* | *Water[2]* |
| 1 | Weld | 568,919,168 | Weld | 112,898,400 | Rio Blanco | 113,132,037 | Rio Blanco | 138,502,742 |
| 2 | Garfield | 556,855,359 | Rio Blanco | 4,412,578 | Las Animas | 45,868,907 | Weld | 50,360,796 |
| 3 | La Plata | 322,029,940 | Gardield | 1,744,900 | Weld | 37,665,571 | Garfield | 29,022,147 |
| 4 | Las Animas | 78,947,042 | Araahoe | 1,661,204 | Garfield | 34,704,673 | La Plata | 23,211,646 |
| 5 | Rio Blanco | 57,284,876 | Lincoln | 1,194,435 | Washington | 25,075,998 | Washington | 15,105,886 |
| 6 | Mesa | 32,200,936 | Cheyenne | 1,192,162 | La Plata | 23,352,861 | Las Animas | 13,706,555 |
| 7 | Yuma | 25,960,947 | Adams | 664,530 | Cheyenne | 9,326,944 | Cheyenne | 10,309,413 |
| 8 | Archuleta | 13,648,006 | Moffat | 419,893 | Moffat | 7,712,323 | Logan | 5,930,937 |
| 9 | Moffat | 13,610,219 | Washington | 413,603 | Logan | 5,606,828 | Mesa | 5,611,075 |
| 10 | Gunnison | 4,805,541 | Jackson | 407,537 | Morgan | 4,197,849 | La Plata | 4,992,391 |

*1. Units are in MCF = Thousand cubic feet of natural gas;*
*2. Units are in Barrels*

# Aquifer Exemptions

**Operators are given permission by the U.S. EPA to inject wastewater into groundwater aquifers in certain locations where groundwater formations are particularly degraded or when operators are granted aquifer exemptions.** Aquifer exemptions are not regions where the groundwater is not suitable for use as drinking water. Quite the contrary, as any aquifer with groundwaters above a 10,000 ppm total dissolved solids (TDS) threshold are fast-tracked for injection permits. When the TDS is below 10,000 ppm operators can apply for an exemption from SDWA (safe drinking water act) for USDWs (underground sources of drinking water), which otherwise protects these groundwater sources. An exemption can be granted for any of the following three reasons. The formation is:

- hydrocarbon producing,
- too deep to economically access, or
- too "contaminated" to economically treat.

Since the **first requirement is enough to satisfy an exemption, most class II wells are located within oil and gas fields.** Other considerations include approval of mineral owners' permissions within ¼ mile of the well. On the map above, you can see the ¼ mile buffers around active injection wells. If you live in Colorado, and suspect you live within the ¼ mile buffer of an injection well, you can input an address into the search field in the top-right corner of the map to fly to that location.

# Sources of Water

The economic driver for increasing wastewater recycling is mostly influenced by two factors. First, **states with many class II disposal wells, like Colorado, have much lower costs for wastewater disposal than states like Pennsylvania,** for example. Additionally, the cost of water in drought-stricken states makes re-use more economically advantageous.

These two factors are not weighted evenly, though. On the Colorado front range, water scarcity should make recycling and reuse of treated wastewater a common practice. The stress of sourcing fresh water has not yet become a finanacialrestraint for exploration and production. Water scarcity is an issue, but not enough to motivate operators to recycle. According to an article by Small, Xochitl T (2015) "Geologic factors that impact cost, such as water quality and availability of disposal methods, have a greater impact on decisions to recycle wastewater from hydraulic fracturing than water scarcity." **As long as it is cheaper to permit new injection wells and contaminate potential USDW's than to treat the wastewater, recycling practices will be largely ignored.** Even in Colorado's arid Front Range where the demand for freshwater frequently outpaces supply, recycling is still not common.

# Fresh Water Use

The majority of water used for hydraulic fracturing is freshwater, and much of it is supplied by municipal water systems. There are several proposals for engineering projects in Colorado to redirect flows from rivers to the specific municipalities that are selling water to oil and gas operators. These projects will divert more water from the already stressed watersheds, and permanently remove it from the water cycle.

The Windy Gap Firming Project, for example, plans to dam the Upper Colorado River to divert almost 10 billion gallons to six Front Range cities including Loveland, Longmont, and Greeley. These three cities have

BLM_0123818

sold water to operators for fracking operations. **Greeley in particular began selling 1,500 acre-feet** (500 million gallons) to operators in 2011 and that has only increased . The same thing is happening in Fort Lupton, Frederick, Firestone, and in other communities. Additionally, the Northern Integrated Supply Project proposes to drain an additional 40,000 acre feet/year (13 billion gallons) out of the Cache la Poudre River northwest of Fort Collins. **The Seaman Reservoir Project by the City of Greeley on the North Fork of the Cache la Poudre River proposes to drain several thousand acre feet of water out of the North Fork and the main stem of the Cache la Poudre.** And finally, the Flaming Gorge Pipeline would take up to 250,000 acre feet/year (81 billion gallons) out of the Green and Colorado Rivers systems, among others.

## Other Water Sources

Unfortunately, not much more is known about sources and amounts of water for used for fracking or other oil and gas development operations. Such a data gap seems ridiculous considering the strain on freshwater sources in eastern Colorado and the Front Range, but **regulators do not require operators to obtain permits or even report the sources of water they use. Legislative efforts to require such reporting were unsuccessful in 2012.**

Now that development and fracking operations are continuously moving into urban and residential areas and neighborhoods, sourcing water will be as easy as going to the nearest fire hydrant. Allowing oil and gas operators to use municipal water sources raises concerns of conflicts of interest and governmental corruption considering public water systems are subsidized by local taxpayers, not well sites.

## Conclusions

In Colorado, exploration and drilling for oil and natural gas continues to increase at a fast pace, while the increase in oil production is quite staggering. As this trend continues, the waste stream will continue to grow with production. This means **more Class II injection wells and other treatment and disposal options will be necessary.**

<span style="color:red">While other states are working to end the practices that have a track record of surface water and groundwater contamination, Colorado is issuing new permits. Colorado has issued 7 permits for CEPWMF's in 2016 alone, some of them renewals.</span> While there aren't any eco-friendly methods of dealing with all the wastewater, the use of pits and land application presents high risk for shallow groundwater aquifers. In addition, sacrificing deep groundwater aquifers with aquifer exemptions is not a sustainable solution. These are important considerations beyond the obvious contribution of carbon dioxide and methane to the issue of climate change when considering the many reasons why hydrocarbon fuels need to be eliminated in favor of clean energy alternatives.

---

*By Kyle Ferrar, Western Program Coordinator & Kirk Jalbert, Manager of Community Based Research & Engagement, FracTracker Alliance*
*Cover photo by COGCC*

Cherish and preserve these important words –

"**All tyranny needs to gain strength is for people of good conscience to remain silent.**" *- Thomas Jefferson*

"**The only thing necessary for the triumph of evil is that good men do nothing.**" *- Edmond Burke*

"**That government of the people, by the people, for the people shall not perish from the earth.**" *- Abraham Lincoln*



10/20/2016                          DEPARTMENT OF THE INTERIOR Mail - Fwd: BLM land In SW Colorado



                                        **UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fwd: BLM land in SW Colorado

1 message

**Jones, Gina** <gmjones@blm.gov>                                  Fri, Sep 30, 2016 at 8:18 AM
To: BLM_CO UFO_RMP <blm_co_ufo_rmp@blm.gov>

———— Forwarded message ————
From: **Dan Keuning** <dankeuning@yahoo.com>
Date: Thu, Sep 29, 2016 at 7:32 PM
Subject: BLM land in SW Colorado
To: gmjones@blm.gov


Good evening,
Please allow us to continue to use our land for target and sport shooting. This is a way of life for my family and has
created excellent sportsmen and women in my family. Do not take away our rights to use our land in responsible ways.

Daniel Keuning
400 Rifle Place
Pagosa Springs, CO
81147

Dankeuning@yahoo.com

Sent from my iPad



--
*Gina Jones*
BLM - Southwest District NEPA Coordinator
2465 S. Townsend Ave.
Montrose, CO 81401
Office: 970-240-5381
Cell: 970-589-9852
gmjones@blm.gov

BLM_0123820

10/20/2016                          DEPARTMENT OF THE INTERIOR Mail - Fwd: Colorado public lands



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fwd: Colorado public lands
1 message

**Jones, Gina** <gmjones@blm.gov>                                    Fri, Sep 30, 2016 at 9:32 AM
To: BLM_CO UFO_RMP <blm_co_ufo_rmp@blm.gov>

———— Forwarded message ————
From: **Matt Livingston** <sigml01@gmail.com>
Date: Fri, Sep 30, 2016 at 8:58 AM
Subject: Colorado public lands
To: gmjones@blm.gov


This is in support of keeping Coloraodo's public lands available for target shooting.

Sent from my iPhone



--
*Gina Jones*
BLM - Southwest District NEPA Coordinator
2465 S. Townsend Ave.
Montrose, CO 81401
Office: 970-240-5381
Cell: 970-589-9852
gmjones@blm.gov

BLM_0123821



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Input on target shooting on public lands
1 message

**Mark Kirchhoefer** <k.10@aol.com>                                    Fri, Sep 30, 2016 at 6:44 AM
To: uformp@blm.gov

Thanks for your efforts on our behalf concerning our land resources and wildlife conservation. I just want to add my support to maintaining lands for public target shooting. I know you are considering options for land use at this time. I really enjoy going into the mountains with my boys and shooting. We do it safely and always take out more trash than we brought in.

Again, thanks for your efforts and for working to protect our open spaces.

Mark Kirchhoefer
Monument, CO
k.10@aol.com

BLM_0123822

Case No. 1:20-cv-02484-MSK   Document 64-9   filed 04/29/21   USDC Colorado   pg 92 of 162

10/20/2016          DEPARTMENT OF THE INTERIOR Mail - My Comments ON The Draft Resource Management Plan For The Uncompahgre Field Office Area



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## My Comments ON The Draft Resource Management Plan For The Uncompahgre Field Office Area
1 message

**Susan and Phil Johnson** <pjohnsn3@tds.net>                                    Fri, Sep 30, 2016 at 6:55 PM
To: uformp@blm.gov

After studying the proposed RMP, although too massive a document to fully absorb,  I prefer alternative B for the overall area and B-1 for the North Fork alternative.  I am resident of

Stucker Mesa near Paonia.  I retired from a career in law enforcement but returned to Colorado where I grew up to live in the North Fork valley because of the unique and spectacular mountains, canyons, and rivers.  I enjoy hiking, rafting, and visiting natural areas whether desert or mountains.  Stucker Mesa has a small regulated water company of about 25 residents that depend on four springs located mostly on the upper drainage of Roadcap Creek.  Our very limited water supply would certainly be vulnerable to oil and gas drilling in this area.  The economy in the North Valley depends very much on its water.  With the coal mines rapidly closing their operations because of economic and air quality issues, the valley has turned towards organic farming, orchards, the Solar International Institute, wineries, traditional farming and ranching to maintain a sustainable economy.   We do not need the boom and bust cycle of the oil and gas industry.  However, the RMP would make the majority of their public land eligible for oil and gas leasing.  The Master Development Plan on the land leased by SG Interests proposes 146 wells in the North Fork drainage area.  I cannot imagine a situation where drilling on a massive scale in the mountains is not damaging to our air and water quality.  The roads, pipelines and other infrastructure additions will create damage to the natural terrain which fragment wildlife habitats, cause sedimentation of our streams, and erosion is magnified in mountainous areas.  Tourism, hunting, and fishing are important to our economy and people choosing these activities will avoid drilling areas.  I also have safety and annoyance concerns of trucks carrying fracking fluids travelling on Highway 133 whether over McClure Pass or to Delta.  I can see many hazards along the way and no suitable alternative.


With regards to the overall land outside of the North Fork valley considered by this RMP, I favor alternative B since it is the most protective of our natural terrain.  I have hiked or rafted, or driven the back roads over most of the BLM's area considered in this RMP plan.  My grandparents had an upper and lower ranch on the Uncompahgre Plateau which they settled in 1914, where my mother was raised.  My exposure to visiting the old ranch as a kid and my last 19 years living near Paonia have made me more aware of the land issues in this area.  I hope the RMP will include more lands with special wilderness characteristics and other types of protection for lands of critical environmental concerns or unique qualities.  I have especially enjoyed hiking the canyons west of Delta, including Potter,Roubideaux,Escalante,Dry Fork, and Monitor.  I have floated the Dolores River between Slick Rock and Bedrock and have been amazed by the canyons winding continuously around cliffs overhanging the river.  This is one area that needs wilderness protection.  Dominguez Canyon of the Gunnison, and the Dolores should be recommended for Wild and Scenic River Status.  I also believe that more restrictions or blockages should be made on unauthorized roads created by off road vehicles.  I oppose additional trails created for quad tracs and dirt bikes, since there are thousands of miles of 4WD and back roads for them to use within the area.  I appreciate the work that the BLM does to balance the issues of conservation and resource usage,  and all the effort it must take to  research, write and gather our imput on  the Resource Management.

Philip A. Johnson

P.O. Box 683

Paonia,Colorado

BLM_0123823

BLM_0123824



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Comment Uncompahgre RMP/EIS 2016
1 message

---

**Kevin Anderson** <kevin@grandmesamoto.com>                        Fri, Sep 30, 2016 at 12:20 PM
To: "uformp@blm.gov" <uformp@blm.gov>

Hello BLM,

Please accept my comments for your Draft RMP/EIS 2016.

Thank you.  Kevin Anderson

2535 Iris Court

Montrose, CO 81401

---

📄 **BLM RMP EIS 2016 comment.pdf**
394K

BLM_0123825

09/29/2016

Hello BLM,

Appreciate the opportunity to comment on your Uncompahgre Draft RMP/EIS.

First, as you know your Draft is massive. Most likely took a few years to prepare. My opportunity to comment being extended is appreciated. The document is like three metropolitan phone books and deceive the reader. I was looking at the maps in the index portion, then referencing the map on the next page only to have Alternative B. Not A, C, and D. I'm not sure if this was on purpose, however deceiving. This document is more than most individuals could comprehend.

One of my largest concerns is the adverse effect of our local economy. Multiple use of public lands has long been Delta County's cornerstone. In the last three years Delta County has lost over 1000 coal mining jobs alone! That equates 31,000 lost jobs if this was in the Denver area. This forces me to believe the economic outcome portion of the Draft is flawed.

Delta County has been working with broadband initiatives, promoting recreation, and inviting other businesses to come to our area. I don't think the oppression of public lands is the answer to help create a better economy.

That said, Delta has the largest open OHV use area left in Colorado. "North Delta Adobes" This area has historical motorized use. The Draft notes. "In the past, visitors drove jeeps, trucks and motorcycles. Today the BLM has seen an increase in use of OHV's of all types and sizes." The Draft goes on to say these vehicles have contributed to the widening, deepening, braiding and eroding of some existing routes and increasing the number of hill climb, play and camping areas. The OHV increased use must be ATV and Side by Sides? These vehicles are limited by design. Four wheels do not climb steep adobes without rolling.

I would like to see the North Delta Adobes retain their historical use and be left as an open OHV area. This would be a good attribute for Delta's economy in the future. The OHV community has lost over 75 percent of their trails and riding opportunities over the past twenty years. Delta is the center of other commonly visited OHV areas. The passing of House Bill 16-1030 will give municipalities the jurisdiction to allow OHV's on their roads to access recreation areas. This could allow access from Delta to public lands without having to trailer. This should also help boost tourism dollars in town at gas stations, restaurants, motels and campgrounds.

Another concern, the Draft does not have route by route designations. I was told that would come after the gavel drops on the Draft RMP/EIS. I'm concerned the OHV community and public land access will lose again on the next round!

Thank you for considering my comment.

Sincerely, Kevin Anderson. 2535 Iris Court Montrose, CO 81401

Scanned
00 07 74

October 30, 2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

I am writing to express my support for the inclusion of Alternative B1 "the North Fork Alternative" into the final Resource Management Plan. It balances the development of our natural resources without threatening our local economy and culture.

Currently Alternative D, the "preferred plan" as proposed by the BLM would open **90 percent** of the Uncompahgre area to oil and gas leasing, endangering wilderness-quality lands, wildlife, recreation and cultural sites. *This cannot be defined as a "balanced" plan.* Much of the area doesn't even have oil and gas reserves that are feasible for development - why would the BLM consider putting our public lands at risk for speculative leasing?

My family chose to relocate to the North Fork Valley eight years ago due to the clean air and water, healthy environment and access to public lands for hunting, camping, fishing and travel. The potential for energy development as proposed in Alternative D would force us to leave the North Fork Valley taking not only our tax dollars but also the revenue contributions of dozens of our friends and family who visit annually.

I ask the BLM to adopt a final plan that makes wilderness-quality lands, important wildlife habitat and recreation areas off-limits to energy development and ensures sustainable, secure water supplies. I support the inclusion of Alternative B1 "the North Fork Alternative" which balances all the resources managed by the BLM.

Finally and specifically I urge the BLM to designate Jumbo Mountain as a Special Resource Management Area, assuring that local residents and visitors alike will continue to have access to outdoor recreation that enhances our community's health and well being, and scenic vistas that show off the unique beauty and agricultural heritage of the North Fork Valley.

Sincerely,

Callie West
PO Box 1532
Paonia CO 81428



 A Touchstone Energy® Cooperative

We energize and serve our communities

RECEIVED

SEP 3 0 2016

UNCOMPAHGRE FIELD OFFICE

September 30, 2016

BLM Uncompahgre Field Office
2465 S. Townsend Ave
Montrose, CO 81401

RE: Uncompahgre Draft Resource Management Plan Revision

Delta-Montrose Electric Association (DMEA) is a non-profit electric utility that serves electric consumers in all of Delta County (excluding the City of Delta) and in portions of Montrose, Gunnison, Mesa and Ouray Counties. We are a nonprofit electric utility owned by the customers we serve. Within our service territory DMEA currently operates and maintains over 3,280 miles of energized lines and provides electricity to more than 35,530 services.

DMEA's basic mission is to purchase and distribute dependable electric service to consumers within our service area. This generally includes an obligation not only to install and maintain distribution lines to serve our members/consumers, but to ensure a reliable source of energy supply and to support transmission sources into our area to supply local electrical needs. We also support the local development of renewable electric resources including those of hydroelectric, solar and coal bed methane.

DMEA's cooperative mission was recently expanded to also include the installation and offering of high speed fiber optic services to our membership through the Fiber to the Premise Program (FTTP). Fiber optic cables will be installed following the electric distribution system within existing public and private DMEA rights-of-way.

In our effort to provide reliable, affordable electric serve and high speed fiber to our members, both now and in the future, we ask BLM to consider the following as you finalize the revision and environmental impact statement for the Uncompahgre Resource Management Plan.

General Comments:

- Please refer to DMEA's letter dated March 29, 2010. All points made in that letter are still valid and without reiterating them, DMEA considers each one to be vital to our community's overall health, welfare and safety as they affect the outcome – safe, affordable and reliable power to public institutions such as hospitals, schools, police departments, emergency services, water supplies and sewer systems.

- DMEA also believes that the ability to provide safe, affordable and reliable power to homes and businesses directly affects the quality of life, health, wellbeing and safety of our communities. Many of DMEA's consumers have lower incomes. Increased costs create an undue burden on this segment of the population.

- The life of the BLM land use plan is estimated to be 20 years. Current land use plans have been in effect for much longer and it can be anticipated that this one will too. Flexibility will be needed. DMEA encourages BLM to use an adaptive management process to ensure that DMEA's concerns are incorporated into the decision making process.

- DMEA is adamantly opposed to any restrictions which may result in unnecessary and increased costs to DMEA's consumers for the access, maintenance and repair of existing transmission and distribution facilities. We are also opposed to unreasonable limitations of siting new facilities on public lands.

- Land use decisions must recognize the need for safe passage of equipment and personnel performing routine maintenance and repair. Especially the immediate passage of equipment and personnel responding to emergency situations such as electrical outages. It should also be noted that reasonable access may not always be down line within the line ROW due to restrains such as topography, other resource values and the need to access the main road system.

- BLM correctly acknowledges that the demand for energy ROW's and the Wildland Urban Interface (WUI) is expanding. Even though the demand and the expansion are identified as planning issues, only the Wildland Fire Management section addresses in any meaningful way the land use management implications and intentions. Although briefly addressed in the Recreation section, that section only addresses the public's demand for recreation. None of the other resource uses address the issue. DMEA's services provide a critically important need to the public. We request the BLM consider and address the issue in relation to ROW's especially in the WUI, resource uses such as utility ROW's need to be permitted without restrictions that would lead to unnecessary and increased costs to DMEA's consumers.

Chapter 2 Comments:

Table 2-2 Description of the Alternatives

- Line 196 – Wildland Fire and Ecology Management: The objective states that fire-protection and fuels-management activities would be utilized to prevent or reduce negative impacts on power transmission lines. Within the industry, there is a distinction between transmission and distribution lines. DMEA asks that this objective be clarified to include electric distribution lines as well as communication lines throughout the document.

- Line 374 – Target shooting limits: Proposed limits on target shooting ask people to not target facilities such as "recreation site, communication site, and power substations". Please note that

targeting power line insulators and fiber optic lines can also cause significant damage and should be included in the proposed limitations.

- Line 493 – ROW Exclusion Areas:   Exceptions that would apply to exclusion areas:
  . Designated West-wide Energy Corridors (section 368 corridors).
  . Designated utility corridors.  Figure 2-57, Alternative D Designated Utility Corridors, shows most of DMEA's service area as Designated Utility Corridor.  DMEA endorses this depiction, but is still concerned about how and what restrictions will be implemented.  (See other comments related to utility corridors.)
  . 100-foot buffer from the center line of county roads and highways (these areas would be managed as ROW avoidance).  This exception should be modified for linear ROW's such as overhead power and communication lines.  It is not always advantageous to overlap the line and road ROW. Placing the structures far enough from the road to ensure vehicle safety and meet design criteria is necessary.  Overlapping ROW's can result in less new surface disturbance during construction but increase traffic hazards to both the public and utility workers as they perform maintenance and repair activities.
  . Allow ROWs for private in-holdings or edge-holdings for reasonable access and utilities. DMEA endorses this objective.  Additional exceptions and allowances should be made for proposed ROW's in the WUI zone to meet public needs.

- Line 494 – ROW Avoidance Areas:  DMEA is very concerned over the nature, scope and application of restrictions.  Concerns are commented on under the appropriate sections.  It is noted that there are no exceptions listed for Avoidance Areas as there are for Exclusion Areas.  Additional exceptions and allowances should be made for proposed ROW's in the WUI zone to meet public needs.

- Line 495 - Provide reasonable access and utilities to private landowners in an environmentally responsible manner:  DMEA endorses this objective.

- Line 500- Utility Corridors:  Manage the designated West-wide Energy Corridor (26,880 acres) according to existing policy plus designate and manage an additional 14 corridors (37,420 acres) for public utilities and facilities (Figure 2-57, Appendix A):

  Figure 2-57 shows almost all of the public lands in the DMEA service area. From the description, it appears Figure 2-57 is suited to Line 501 and Figure 3-24 is suited to the described utility corridors. Please clarify. (See other comments associated with Figure 2-57.)

- Line 501 - Allow ROW development and operation except in ROW exclusion areas:  Preferred locations are next to existing facilities and routes. Is this what is meant to be depicted in Figure 2-57? (See other comments related to exceptions, modifications, waiver and how restrictions will be applied.)

- Table 2-3 Renewable Energy Exclusion and Avoidance Areas:  The objective states that future hydro projects proposed "within 325 feet of all perennial and intermittent waters and naturally occurring wetlands, springs, and seeps" would be in an avoidance area but would be considered.  If in an

avoidance area, project would involve extra time, design, process, restrictions and cost. It would be impossible to cost-effectively develop a small hydro project without being in this zone. The National Energy Policy is encouraging a shift from fossil fuels to renewable energy. This objective is contrary to that Policy and should be reconsidered. It is also contrary to the objective in Table 2-2, Line 496. (See DMEA's other comments related to restrictions.)

Chapter 3 Comments:

- DMEA and Tri-State provided digital mapping of their systems during Scoping. It is not readily apparent from the description in Chapter 3 or Figures 2-56 through 2-58, Designated Utility Corridors, that the information was used. It is noted that major ROW's are depicted on Figure 3-24, ROW Locations, but there is just a reference in Chapter 3 and analysis in Chapter 4 only addresses the 'Designated Utility Corridors' and not the existing infrastructure. Although the existing electric corridors does not appear to be 'Designated', the ROW's do exist. Existing ROW's have special relevance by virtue of their Valid Existing Rights to the description of the Existing Environment. Consequently, they will have an important bearing on future management decisions and the analysis of possible environmental consequences should reflect existing infrastructure.

- In addition, the problems associated with corridors designated in the West Wide Energy Corridor EIS were brought to BLM's attention in Tri-State's Scoping input. DMEA refers BLM to that letter. Basing the analysis and proposed land use decisions on dated, faulty and/or inaccurate information leads to poor management decisions. It appears that BLM failed to use its Adaptive Management process to update the baseline data with pertinent and available information to correct this problem.

- The DRMP correctly notes that demand for utility services and renewable energy will increase and that over time existing corridors will become saturated and new corridors will need to be identified. The document states that Adaptive Management will be used to update the plan. The comment above gives cause for concern. The pressure on corridors will increase quicker in the WUI. It is important for the document to start from a current and more accurate baseline and then analyze the management of ROW's, especially in the WUI.

- The Renewable Energy section does not address hydropower. (Hydropower is addressed in Chapter 4.) DMEA has been very proactive in developing this type of renewable energy source (e.g.; the South Canal hydropower facilities) and continues to receive numerous requests from its consumers about small scale hydropower projects. Opportunities for low head hydro should be addressed.

- It is also worth noting that developing a renewable energy facility also requires it to be connected to the grid via a ROW (e.g.; a connected action) for it to be feasible.

Chapter 4 Comments:

- In the Lands and Renewable Energy section Effects Common to All Alternatives, the effects are accurately described but DMEA has shown that the 'designated corridors' are inaccurate. This

leads to a flawed analysis and problematical management decisions. (See other comments related to designated corridors.)

- Working with DMEA on both the Delta County Transmission Improvement Project and the East Montrose Project, BLM is aware that the public strongly desires public utilities serving the public good be constructed on public lands. The public has been strongly opposed to providing private property ROW for a public improvement project. This obviously puts increasing demand on public lands within the WUI. Exceptions, modifications, waivers and reasonable restrictions need to be incorporated for ROW and renewable energy developments. The analysis in Chapter 4 and proposed land use management decisions should reflect the need.

- Proposed restrictions related to NGD/NSO and SSR/CSU are presented for the other resource uses. Although Chapter 4 is unclear, it appears from Appendix B that NGD/NSO and SSR/CSU will not apply to ROW Exclusion and Avoidance Areas. The potential negative impact to DMEA's operations and maintenance under Alternative B is alarming. DMEA believes that the utility companies deserve to review and comment on the Exclusion and Avoidance restrictions in the same manner as other proponents. (Also see comments on Appendix B and Appendix G.)

- The DRMP should address the potential impact of overlapping restrictions, whether they are restrictions and/or timing limitations, since they can negate a project administratively or by making a project uneconomically feasible.

- Recreationists and others who are described as being negatively impacted by utility ROW's but are the same people requesting more electric and communication services for heat, A/C, power appliances, lights, broadband, etc. Modern society considers the benefit of affordable electricity and high speed broadband critical for the safety, health, and job growth of our rural communities. A great deal is said about the negative impacts to other resources, but the positive impacts these services bring to our communities should also be discussed in the DRMP.

- DMEA assumes that any reference to communications functions includes both utility and commercial use of broadband.

- Table 4.1 refers to three other plans where decisions were expected in 2013 or 2014. Were these decisions made and if so, were the decisions incorporated into the DRMP?

- DMEA notes that there is no table in the Lands section similar to Renewal Energy Table 4-62, page 4-338 (referenced as Table 4-61 in the Table of Contents). A similar table would be helpful.

- As noted in the Chapter 3 comments for the Renewable Energy section, any new renewable energy site development will need to be connected to the grid via a ROW. As a connected action, this needs to at least be acknowledged in Chapter 4.
- Any land tenure adjustments such as disposals need to be subject to existing ROW's and facilities as valid existing rights.

- DMEA requests that any area closed or restricted to motorized or mechanized travel allows the utility administrative access for the inspection, operation, maintenance, repair and upgrade of the electric infrastructure.

*Appendix A: Figures*

- Figures 2-52 – 55: ROW Exclusion and Avoidance.

Alternative D, the Preferred Alternative, would be very limiting. If restrictions similar to NGD's and SSR's are applied to ROW's, there would be significant direct adverse impacts to DMEA's operations and maintenance activities. Those restrictions would indirectly affect our rural communities through a decrease in available services and cost increases. The exceptions noted in Table 2-2 for ROW's is of little help. Please provide DMEA and other utilities with the proposed restrictions and how those restrictions would be applied in the Exclusion and Avoidance areas in order that we provide meaningful review and comment.

- Figures 2-56 – 58: Designated Utility Corridors

The muddy green color in Figure 2-56 (Alternative A) is defined in the legend as 'Utility Corridors' and in Figure 2-57 (Alternatives B and D) as 'Open to Development of Major Utility Corridors'. No explanatory information is provided for the distinction of 'Major'. DMEA notes that the titles of the figures only refer to 'Utility Corridors'. In addition to transmission lines, DMEA's distribution lines are critical to providing electric service to its customers. Land use decisions in the plan need to accommodate this need.

In comparing Alternative D Figure 2-55, ROW Exclusion and Avoidance Areas, and Figure 2-57, Designated Utility Corridors, it is incongruous that so much of DMEA's service area can at the same time be in Exclusion and Avoidance Areas and open to development. This again underscores the need for BLM to provide DMEA and other utilities clarification on what land use decisions are proposed and how and when any restrictions will be applied. As noted elsewhere, the exceptions described in Table 2-2 for ROW's is of little help.

Please see comments and issues associated with the identification of existing 'Designated' corridors. Factoring the existing transmission lines and distribution lines into the analysis would provide a better baseline for analyzing potential impacts and proposing practical future land use decisions.

- Figure 3-14, Wildland Urban Interface (WUI)

The Lands section acknowledges that the local population is expanding faster than state averages and that the WUI is expanding. It is DMEA's experience that since Scoping was completed many of the people moving to the area are building residences in more rural areas. Given that the life of the plan is estimated to be 20 years and that it will probably be longer, the mapped WUI should be expanded farther onto BLM administered lands in the Uncompahgre valley and north Delta areas particularly. Figure 3-24, Right-of-Way Locations and Corridors, depicts areas where current ROW locations already cross or are very near public lands. (Please see other comments related to the need to address ROW's in the WUI.)

*Appendix B: Restrictions*

- Section 2.2.1 states that NGD restrictions do not apply to ROW's, SSR restrictions may apply to ROW's and Timing Limitations (TL) do apply to ROW's. Section 2.2.2 states that NGD and SSR do not apply and TL's do apply. Based on other narrative in the document, DMEA assumes that NGD and SSR restrictions do not apply to ROW's.
- The application of unnecessary and overly onerous restrictions can create a situation where the BLM can give its 'approval' for a project and then negate the project by administrative fiat. We urge the BLM be judicious in the design and application of the various restrictions.

- In the event of an emergency, the standard exception needs to allow for immediate utility response without prior BLM approval to protect public safety and health, welfare and property.

- While there may be some flexibility to site a substation or communication site, transmission and distribution lines are linear. DMEA must be able to build a power line from Point A to Point B with limited angles and deviations, and have reasonable access to the power line corridor. Expansive areas of Exclusion or Avoidance in the middle of a proposed line will be extremely detrimental in the design and cost effectiveness of public projects.

- There are timing limitations that protect periods such as nesting, breading and calving periods. There are also SSR's that could force relocation or compliance with other unspecified constraints for the same purpose. This creates confusion and uncertainty as to what a proponent can expect. Many of the restrictions allow for exception, modification or waiver, but that does not alleviate the potential for significant time delay and cost impacts.

- Timing Limitations need to be the minimum timeframes biologically necessary. The constraints can add significantly to the overall duration and cost of the development. The impact of overlapping timing limitations can potentially make a project unbuildable due to the small open window available for development. DMEA requests that exceptions, modifications and waivers be reasonably available to reduce the negative impact on a project. This is especially necessary in the WUI where public health, safety and electrical/broadband service is critical.

- TL1 has a rutting threshold of 2" in Alternative B and TL2 has a rutting 3" threshold in Alternative D for the same reason. What is the justification for an even more restrictive requirement in the Preferred Alternative than what is proposed in Alternative B, the environmental emphasis alternative? DMEA requests that the 3" rut rule continue to be included in the Preferred Alternative as it currently exists.

- TL17 and TL18 prohibits surface use and surface disturbing and disruptive activities within 4.0 to 6.0 miles of Gunnison sage-grouse leks from March 1 to June 30. These distances are unreasonable compared to the 0.25 and 0.5 mile distances associated with other species such as nesting raptors. DMEA notes that Table 2-2 Line #494 refers to a 0.6 mile radius. DMEA requests that the avoidance distance match those of raptors of 0.5 mile of nesting raptors.

- TL24 and TL25 prohibit surface use and surface disturbing or disruptive activities within 300 feet of active prairie dog colonies from March 1/April 1 to July 15. CPW has seasons established for

prairie dogs that are June 15 through the end of February on public lands and year round on
private lands with unlimited bag and possession limits. It is incongruous to protect prairie dogs
from development that recreationists can shoot.

On private lands, landowners tend to view prairie dogs as vermin due to the property damage
they cause and the threat (real or perceived) to contract and transmit disease. Expansion of
prairie dog populations from public lands to private lands would be considered a negative off-
site impact. This timing limitation should be reconsidered for its practicality and should
especially not be applied in the Wildland Urban Interface zone.

<u>Appendix G: BMP's and SOP's</u>

- There are new provisions to defer vegetation disturbing activities during extreme drought.
These have the potential to be very limiting to DMEA's operation and maintenance activities.
Please see comments on Appendix I.

- There are noise reduction provisions proposed within 4 miles of active leks. DMEA notes that
Table 2-2 Line #494 and Table 2-3 refer to a 0.6 mile radius. DMEA suggests that this distance
match the 0.5 mile protection distance discussed previously.

- The provisions encourage underground electric transmission lines over overhead lines through
non-wooded and non-forested habitat. DMEA is very strongly opposed. Especially for the higher
voltage transmission lines, this would result in significantly greater surface disturbance during
construction, would increase the cost of construction by approximately 10 times, maintenance
costs would skyrocket, and DMEA's ability to quickly respond to emergency outages would be
affected. Also, the landowner's right of use of land within an underground right-of-way is
greatly diminished.

- DMEA notes that oil and gas operators have to try and obtain agreements from all existing ROW
holders before starting surface disturbing activities. DMEA recommends that BLM consider
adopting a BMP or SOP that any operator on public lands conducting surface disturbing actions
(i.e.; pipelines, access roads) should notify other ROW holders if they may be impacted.

<u>Appendix I: Drought Management</u>

- Under Extreme (D3) and Exceptional (D4) drought, new surface disturbing activities in areas with
sensitive soils would be prohibited. The description of how drought management would be
implemented is vague and raises numerous questions. For example, the appendix provides a
table of varying drought conditions and says management would be focused on "droughty
soils". Figure 3-6 depicts droughty soils with a rating of High to Low. DMEA didn't find any
description in the document as to how the drought provisions would be applied to soils of the
various ratings. Most of the soils in the planning area are rated High to Moderate. Drought
management could have a significantly negative impact on DMEA and its consumers. DMEA
requests that the concept of drought management be better defined, explained and considered
before moving forward.

- The public demand for electrical and broadband services is independent of drought conditions. Demand will continue to increase especially in the WUI. BLM management prescriptions need provide consider the public's health and safety, and efforts should be made to mitigate negative impacts the public.

Conclusion

DMEA sincerely appreciates the opportunity for our comments to be seriously considered and included in the revised Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office. As the process moves forward, we respectfully request that DMEA be contacted to discuss any potential issues that may directly impact our ability to cost-effectively construct, maintain, repair or upgrade the electric infrastructure and fiber network. This infrastructure currently provides, and with consideration to the future needs of how the utility serves the public, will continue to provide the safe, reliable and affordable electric service our community deserves.

We look forward to continue working with the BLM through the completion of the Uncompahgre Field Office Resources Management Plan.

Kindest regards,

Shelby R. Bear
DMEA System Design Supervisor

BLM_0123836

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

54 HOLLY HILL ROAD
AVERILL PARK, NY  12018

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

BLM_0123837

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management.  While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas.  Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

ERIN VOKOUN
214 PARK DR. GUNNISON CO 81230

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=Cj0KEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlx0oP8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

BLM_0123838

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas.  Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Michele Miller
15835 Black Bridge Rd.
Paonia, CO 81428

We have a small farm on the North Fork river and our home, land and water would be irrevocably ruined by the BLM's DRMP—We do NOT support it!

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlx08P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners     Michele Miller

BLM_0123839

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management.  While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas.  Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

James Lehman

PO BOX 1446
Paonia, CO 81428

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Elizabeth A. Steirer

2047 Ingalls St.
Edgewater, CO
80214

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management.  While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas.  Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Jaecey Adams
PO Box 351
Paonia, CO 81428

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlx08P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

BLM_0123842

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Betsy Lehman
Po Box 1446
Paonia, CO 81428

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

i like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Matthew Coates
94 Pearson Ave , Apt 2
Somerville, MA 02144

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Allison McGuigan
Po Box 1501
Paonia, CO 81428

10-06-16

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

BLM_0123845

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Carol S Hickam
Carol S. Hickam
PO Box 503
800 Short Rd   Hotchkiss, CO. 81419

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

R. Xerxes Steiver
2047 Ingalls St.
Edgewater CO  80214

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlx08P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

BLM_0123847

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,
Michele Champagne
17575 Johnson Road
Paonia, CO
Michele Champagne
http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=Cj0KEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7w Qf3gwGDFmgZYaAlx08P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

BLM_0123848

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Jennifer Stephens
1853 S. Leyden St.
Denver, CO  80224

We love visiting the beautiful countryside of Paonia. Please No fracking! Keep it beautiful!

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Jacob Gable

PO 1235
Paonia CO 81428

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

BLM_0123850

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Jacqueline Jeffreys
Jacqueline Jeffreys
13621 Ragged Mtn. Drive
Paonia, CO 81428

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7w Qf3gwGDFmgZYaAlxo8P8HAQ

*I know the dangers of fracking – no matter how much we are "assured" it is safe. I am willing to sacrifice a lot to not have fracking happen.*

*J. Jeffreys*

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

BLM_0123851

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas.  Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Stephen Lyons
P.O. Box 1291
Paonia, Co 81428

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

...

Anthony Bean Burger
PO Box 683        Hotchkiss CO  81419

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas.  Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Linda Froberg
16553 Cava Drive
Fishers CO 46037

*I visit Colorado to see family & do not want the beauty & water distroyed by fracking*

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas.  Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Katherine Mulcahy
2430 Depew St.
Edgewater, CO 80214

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

BLM_0123855

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,     Dominick DPasquale

...

2730 Depew St.
Edgewater, Co, 80214

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=Cj0KEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas.  Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Matthew Coates
94 Pearson Ave, Apt 2
Somerville, MA 02144

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=Cj0KEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlx08P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Carol S. Hickam
PO Box 503
800 Short Rd    Hotchkiss, CO. 81419

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas.  Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

...

AMY DELUrA
PO BX 304
PISONIA CO 81428

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife? These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

*[signature]* 54 HOLLY HILL ROAD
AVJILL PARK, NY 12018

http://www.ecowatch.com/fracking-earthquakes-2013542184.html

http://wilderness.org/blog/fracking-dangers-7-ugly-reasons-why-wilderness-lovers-should-be-worried?gclid=CjoKEQjwztG8BRCJgseTvZLctr8BEiQAA_kBD6MmVtp2BCXUDRFSU3OB8hL3payru7wQf3gwGDFmgZYaAlxo8P8HAQ

cc: R. Welch, N. Kornze, M. Bennet, S. Jewell, J. Hickenlooper, Delta County Commissioners

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Daniel Maul
7 Timber Ridge
Annandale, New Jersey 08801

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Wayne Martin
P. O. Box 2518
Ketchum, ID 83340

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with BLM, I looked up the BLM's description of who we are and what we do. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to bring in income, and I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this as addressed in the following:

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on people's health.

BLM did not take into consideration the following in regard to potential damage to respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems:

1. truck transportation of water, fluids and sand and the impact of VOCs and particulate matter
2. casing, drilling and hydraulic fracturing and the impact of methane, nitrogen oxide, hydrogen sulfide and particulate matter
3. flaring and condensate tank flaring and the impact of VOCs, methane, nitrogen oxide and particulate matter

I question the BLM considering additional oil and gas development, and fracking when you have not analyzed oil and gas operations and their impact on human health? Please see the, *Shalefield Stories vol. 2* published by Friends of the Harmed in 2015. www.shalefieldstories.org I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development? The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations?

The only reasonable alternative is one that allows NO Leasing.

Sincerely,

Terri Rose
1840 American Way
Address Montrose, CO
81401

Terri L Rose

en

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.


Sincerely,

Ryan Sylvester

337 BoxElder
Paonia, CO 81428

Cc: R. Welch, S. Jewell, N. Kornze

BLM_0123864

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Gloria O'Reily
119 Nihell
Nevada City, CA 95959

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

*Gabe Linehan*

*Gabe Linehan*
*180 Equestrian Way*
*Carbondale, CO 81623*

Cc: R. Welch, S. Jewell, N. Kornze

BLM_0123866

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Mark Kosinski
304 Williams Way
Aspen, CO 81611

Cc: R. Welch, S. Jewell, N. Kornze

BLM_0123867

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Cynthia Radeke
645 Stutwell
San Francisco, CA 94110

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Bryant Clearwater
P.O. Box 246
Paonia, CO 81428

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Thomas De Vine     Thomas Devine
111 Nihel Rd
Nevada City, CA 95959

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Ramona Payne
P.O. Box 1298
Ketchum, ID 83340

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Mark Stout
P.O. Box 6275
Snowmass Vlg, CO 81615

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Karlyn Stout    Kaley Stout
P.O. Box 6275
Snowmass Vlg., CO 81615

Cc: R. Welch, S. Jewell, N. Kornze

BLM_0123873

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

William Gerdes
30404 River Valley Dr
Anderson, CA 96007

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Jan Hill     Jana Hill
12 Millstone
Irvine, CA 92606

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Ronald Factor
c/o Jan Hill
12 Millstone.
Chrome, CA 92606

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,     *Sandra De Vine*     *Sandra Dune*
111 Nihel Rd
Nevada City, CA 95959

Cc: R. Welch, S. Jewell, N. Kornze

BLM_0123877

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

ARTHUR RADEKE
645 SHOTWELL
SAN FRANCISCO, CA 94110

Cc: R. Welch, S. Jewell, N. Kornze

BLM_0123878

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Kiki Martin
P.O. Box 2518
Ketchum, ID 83340

Cc: R. Welch, S. Jewell, N. Kornze

BLM_0123879

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Joseph Hill        Joann Hill
12 Millstone
Clune, CA 92606

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Lisa Maul   Lisa Maul
7 Timber Ridge
Annandale, New Jersey 08801

Cc: R. Welch, S. Jewell, N. Kornze

BLM_0123881

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Terrance Payne
4413 Tujuna Ave
Studio City CA 91602

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Gordon Payne
P.O. Box 1278
Ketchum, ID 83340

Cc: R. Welch, S. Jewell, N. Kornze

BLM_0123883

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Karlyn Stout    Kaley Stout
P.O. Box 6275
Snowmass Vlg, CO 81615

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Kate Linehan
Kate Linehan
P.O. Box 1813
Paonia, CO 81428

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Crystal Petitt
2512 6 3/7 Rd
GJ, CO 81505

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Mark Stout
P. O. Box 6275
Snowmass Vlg, CO 81615

Mark Stout

Cc: R. Welch, S. Jewell, N. Kornze

Dear Dana Wilson,

Not being very familiar with the BLM, I looked up the BLM's own description of what it is and what it does. It states that the "(BLM) may best be described as a small agency with a big mission: To sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I realize that the BLM needs to consider productivity, but I would like to believe that the choice would also focus on sustaining the health and diversity of the country's public lands. In my opinion the BLM has failed in this.

In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.

In particular, the BLM did not take into consideration the following:

1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

I question the BLM considering additional oil and gas development and fracking when it has not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development. The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Can you really trust those who keep allowing repeated spills and damage to the environment in fracking operations? I can only consider a NO Leasing alternative.

Sincerely,

Reynea Gerdes
20404 River Valley Dr.
Anderson, CA 96007

Cc: R. Welch, S. Jewell, N. Kornze

0243

Elaine M. Brett
PO Box 1682
Paonia, CO 81428

October 1, 2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office
Subject: Jumbo Mountain Recreation Area

I live at the base of Jumbo Mountain and I walk my dogs on the Jumbo Mountain trails. Every day I
see people from the town of Paonia and visitors to the area walking, hiking, running, biking and
overall enjoying the Jumbo Mountain area. It is an amazing space. The varied terrain and the views
of the North Fork of the Gunnison Valley, the West Elk mountains, the Raggeds and the Grand Mesa
are incredible. Jumbo is the home to wildlife including herds of deer, foxes, mountain lions, hawks
and eagles.

Industrial development is not compatible with recreational use. The Jumbo area must remain
undeveloped to support community health and wellness and the benefits of being able to use the trails
on a daily basis. Industrial development is not compatible with a trail-centered tourism economy.
These trails attract visitors from throughout Colorado and support local hospitality and retail
businesses.

I am educated and aware of my surroundings. I love living in the North Fork Valley in Western
Colorado. It provides good, clean food -- an amazing landscape -- fabulous access to recreation -
spiritual renewal - a healthy environment – an incredible small town community – traditions and
history --- and so much more.

I moved here from Washington DC following a 25 year career of dealing with bureaucrats in
government and private industry so I know what you are as public servants what you are up against.
You need to administer the laws and regulations that have been handed to you by your superiors and
your agency. You are doing your best to implement what has been given to you. If you do a good
job, you will get paid and will receive a good retirement plan. I know this because I am living this
reality now.

I want to trust that you have done a good job and you will use your skills and expertise to devise a
plan that is fair and equitable for the people of this region. I do not want to dispute, line by line the
facts and data that you have compiled. As an American taxpayer, I want to feel comfortable that you
know what you are doing and are implementing plans in the best interest of the "good of the all."

In my 63 years, I have never found a place or community that is like the North Fork Valley. This is a
special place with amazing energy and potential. This is a community that cherishes the land and

BLM_0123889

water and a community that takes care of itself.  I live in a county that is about 50% public lands.  What the BLM does will affect our lives and those who come behind us.  The maintenance of our public lands is a sacred duty. In that spirit, the continuance of the respect for the public land and the people who are adjacent to that land is of utmost importance.

The RMP is important in laying out the plan for this area for the next 20-30 years.  It is true that we are a low-density population yet, it is true that there is something very special about the community that resides in this North Fork Valley.

There are many here who depend on the organic and biodynamic farming practices in this place to feed us with nutritious food  - it does not matter whether they are conservative "old-timers" or idealistic "new-comers" - they produce amazing, healthy food that nourishes us.  There are creatives and artists who provide nurturing art that enriches our culture and makes us better human beings.  And there are those who practice and educate us on health alternatives.  There are the new entrepreneurs who are "inventing" new businesses using the internet and new technologies.  They are our resilient future – not the boom and bust cycle of industrial extraction companies.

I am optimistic and hopeful about this North Fork Valley.  And I am concerned …

If the BLM adopts any actions that will destroy – or have the potential of destroying – the beauty, the culture, the spirit or the community of this region, it will create a vacuum – a black hole – that decimates a piece of Americana that cannot be replaced.

Allowing oil and gas leases adjacent to communities like the North Fork Valley is the equivalent to genocide.  You would be killing those people, lifestyles and lands that make America great.

**I urge you to incorporate into the UFO RMP plans that prohibit or severely limit oil and gas development.  The BLM should include a "no leasing" alternative.**

**However, reality dictates that the market continues to demand fossil fuels, therefore, I urge you to accept Alternatives B and B1 which limit development and maintain special places for all of us to enjoy for years to come.**

**In addition, I urge you to designate the Jumbo Mountain area as a Special Recreation Management Area per Alternative B and to remove oil and gas leasing from the Jumbo area.**

Sincerely,

Elaine M. Brett

# Special Recreation Management Area (SRMA) - Alternative B

The North Fork Valley



Special Recreation Management Area

USFS

Jumbo Mountain

Paonia

Map: H. Stevens, Western Slope Conservation Center, 2016; Data: BLM, USFS
Service Layer Credits: Sources: Esri, DeLorme, USGS, NPS
Sources: Esri, USGS, NOAA

0   0.5   1 Miles

WESTERN SLOPE CONSERVATION CENTER

BLM_0123892

10/20/2016                          DEPARTMENT OF THE INTERIOR Mail - Oil and gas leases in the North Fork Valley



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Oil and gas leases in the North Fork Valley
1 message

**S. Anderson <samontrose@yahoo.com>**                          Sun, Oct 2, 2016 at 2:13 PM
Reply-To: "S. Anderson" <samontrose@yahoo.com>
To: "uformp@blm.gov" <uformp@blm.gov>

Dear stewards of our public lands,

  I am strongly opposed to allowing oil and gas leasing on public lands in the North Fork Valley of Delta County.  Because of the clean air, water, and soil in this valley, this is one of the largest concentrations of organic farms in Colorado.

  Oil and gas extraction is causing numerous serious long-term damaging effects on the environment.  A serious number of earthquakes attributed to fracking are occurring in many parts of our country, such as Oklahoma and the Dallas area of Texas, among others.  Water pollution, air pollution, and ground pollution are serious issues where these industries are operating.

  From what I understand, BLM did not analyze the impacts of hydraulic fracturing and multi-drilling technologies,  the impact of unregulated gas gathering pipelines, extreme weather effects on pipelines, removing water from the hydrologic cycle, injection wells and the potential for earthquakes and contamination of aquifers, ozone levels, community source water protection, the impact of the pollution on wildlife, the human health impact, the impact on local real estate or the organic agricultural economy, or many other crucial aspects.

  Let's quit looking at short-term financial interests of a few, and look the long term effects.  For so long, our public lands have been given or leased to under regulated industries, such as mines.  A few people made huge profits, many people working for them made small amounts of money, often at the cost of their health.  But our public lands were seriously harmed for the long term, and we tax payers are the ones who are living with the polluted land, water, and air, and are footing the bill for the cleanup.

  Please do thorough research on all of the areas of concern listed above.  The health of our citizens, our land, our air, our water above and below ground, our natural resources, including wildlife, and our future generations depend on your careful diligence!

Thank you,

Sandy Anderson

---

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=1578708e52c32953&siml=1578708...     1/1

BLM_0123893