**ROB MLLER**
**PICKIN' PRODUCTIONS**
PO Box 1690, Paonia, CO 81428
970.260.6493
pickinproductions@gmail.com
www.pickinproductions.com





October 27, 2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

I'm pleased to have the opportunity to comment on the draft Uncompahgre plan. I strongly encourage the BLM to get behind including the Alt B1 plan. I have read thru the options, and it seems to be the one that balances our community's well-being and the fact that there has to be drilling somewhere. Even tho my livelihood isn't in the energy sector, I still get that drilling is a reality. However, it seems like striving for a balance is what we should be going for.

I live in downtown Paonia and am a dad to two teenage girls. They were born here and consider The North Fork Valley home, and at least one of the two is determined to stay here "all her life". She rides horses, and plays outside all the time. Protecting this community and it's water supply is a paramount concern to us. I've seen a lot of changes since I moved here 17 years ago. We do not want to see this town, this valley, turn into the likes of Rifle or one of the heavily drilled communities in our neighborhood. The mines have closed, and this community is on the verge of picking itself up by the bootstraps and making it work - with wineries, tourism, agriculture, the arts - and MOUNTAIN BIKING!

I have brought my bike up Jumbo Mountain 117 times since this past April. The open space that Mt. Jumbo provides could be the most crucial part of this discussion. To me, personally, it is. I've watched towns like Ridgway and Gunnison thrive in part because of the draw their trail provide. Bringing people to Paonia is crucial for it's future success. And the trail on Jumbo are the key part to that success. Please **DO NOT INCLUDE** Mt Jumbo in any future drilling speculation. Thank you.

And I am glad the BLM is considering ways to protect important natural resources like wildlife habitat and wild and scenic rivers. In particular, I support the BLM designating "ecological emphasis areas" to preserve habitat connectivity and wildlife corridors.

I would like the BLM to include all proposed actions in the North Fork Alternative, B1, in the final RMP. The North Fork Alternative boundaries include the communities of Hotchkiss, Paonia and Crawford and include areas that supply municipal water, irrigation, and domestic water companies, impact the scenic features of the Valley, and are high quality wildlife lands. It ensure the strongest level of long-term protection for resources of particular concern included in Alternative B1, such as water supplies and riparian areas; scenic qualities of the valley and our wonderful views; undeveloped wildlife lands including winter range and migration corridors.

The conservation protections in Alternative B1 should be included in the final plan. Thank you again for accepting my comments for the RMP process. The outcome is important to me because it will affect my home and community for years to come.

Sincerely,

Rob Miller
Pickin' Productions

**ufo- ar**

| | |
|---|---|
| **From:** | Magee, Deborah (Maggie) <dmagee@blm.gov> |
| **Sent:** | Friday, October 28, 2016 1:10 PM |
| **To:** | Angie Adams; Kate Krebs; ufo- ar |
| **Subject:** | Fwd: Notes from UFO RMP Cooperating Agency meeting held 10/14/2016 |
| **Attachments:** | 2016-1014 RMP CA Meeting Notes FINAL DRAFT.docx |

---------- Forwarded message ----------
From: **Marah, Dawn** <dmarah@blm.gov>
Date: Fri, Oct 28, 2016 at 12:04 PM
Subject: Notes from UFO RMP Cooperating Agency meeting held 10/14/2016
To: ASchroeder@usbr.gov, gbaker@ci.montrose.co.us, renzo.delpiccolo@state.co.us, brian.magee@state.co.us, brad.banulis@state.co.us, rlevalley@deltacounty.com, mpelletier@gunnisoncounty.org, Jon Waschbusch <jwaschbusch@montrosecounty.net>, lynnp@sanmiguelcountyco.gov, joanm@sanmiguelcountyco.gov, manager@cedaredgecolorado.com, grafmyer@norwoodtown.com, dandean@townofpaonia.com

# Please see attached

--
Dawn Marah, Administrative Assistant
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO  81401
Phone:  970-240-5326
Fax:  970-240-5368

dmarah@blm.gov

1

# COOPERATING AGENCY MEETING #11
## Friday, October 14, 2016 (1:00–4:00PM) Meeting Location:
### Holiday Inn Express
### 1391 South Townsend Avenue, Montrose, CO

# MEETING NOTES

**Attendees:** Renzo DelPiccolo (Colorado Department of Natural Resources, Southwest Region), Brad Banulis (Colorado Department of Natural Resources, Southwest Region), Brian Magee (Colorado Department of Natural Resources, Southwest Region), Robbie Baird-LeValley (Delta County BOCC), Bruce Krickbaum (BLM Colorado State Office), Mike Pelletier (Gunnison County), David Sinton (BLM Uncompahgre Field Office), Dan Dean (Town of Paonia), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Joseph Meyer (BLM South West District), Jon Waschbusch (Montrose County), Patti Grafmyer (Town of Norwood), Joan May (San Miguel County BOCC), Garry Baker (City of Montrose), Dean Whitt (BLM Uncompahgre Field Office), Kathleen Sickles (Town of Cedaredge), Lynn Padgett (Ouray County), Maggie Magee (BLM Colorado Southwest District), Dawn Marah (BLM Uncompahgre Field Office)

---

1. Welcome (Bruce Krickbaum)

2. Introductions (All Present)

3. Explain the issues that contributed to an extended delay in releasing the Uncompahgre Draft Resource Management Plan (RMP)/Draft Environmental Impact Statement (EIS) (Bruce Krickbaum)
   o The BLM had to determine how best to respond to and incorporate into the RMP a partial alternative pertaining to oil and gas leasing in the North Fork Valley (Alternative B1 - Citizen's Alternative for the North Fork area).
   o The BLM explored no leasing within Gunnison Sage-Grouse habitat for Alternative B.
   o Due to a focus on protest resolution for the Greater Sage Grouse plan amendments, the BLM Washington Office was not able to review the Uncompahgre Draft RMP within the anticipated timeframe.
   o Several of the BLM Uncompahgre Field Office (UFO) resource specialists were redirected to work on the high-priority Gunnison Sage-Grouse (GUSG) RMP Amendment.
      ▪ Brian Magee: How many previous cooperating agency meetings have been held and when was the last one?
        Bruce Krickbaum: There have been ten meetings, with the last one taking place in 2012.
      ▪ Brian Magee: Were chapters 3 and 4 sent out for review?
        Bruce Krickbaum: Yes.

4. Review the roles and responsibilities of cooperating agencies in the planning and review process. (Bruce Krickbaum and PowerPoint)
   o Images of the PowerPoint slides for this topic were attached to the agenda.

5. Highlight key planning decisions and modifications in the Draft RMP/Draft EIS.
   o Ecological emphasis areas address landscape level wildlife and native plant habitat and migration corridors.
      ▪ Lynn Padgett: Is the BLM considering replacing Areas of Critical Environmental Concern (ACECs) with ecological emphasis areas? Is there a philosophical difference?
        Bruce Krickbaum: When there is overlapping management within an area (such as ACECs and ecological emphasis areas), then the more restrictive management (ACECs) would prevail.
      ▪ Lynn Padgett: Is there increased administration with ACECs? Is there still an ACEC for the San

BLM_0126422

**Cooperating Agency Meeting #11**
**October 14, 2016**

Miguel River corridor?

NOTE:  The San Miguel River ACEC still exists and has been proposed for expansion through the Uncompahgre RMP.  Designated in 1993 through amendment of the San Juan/San Miguel RMP, the current ACEC protects high quality native riparian communities, important bird habitat, and the scenic values of the corridor.  The proposed expansion would extend protection to additional areas recognized by the BLM and the Colorado Natural Heritage Program as having high biodiversity significance.

Bruce Krickbaum:  ACEC is a formal designation.  If you believe that there needs to be a change, please submit a comment and provide reasons to support your assertion.

Joe Meyer provided a brief explanation of ACECs and noted that there may be alternate ways to protect the areas other than through ACEC designation.

- Robbie Baird-LeValley:  Are ecological emphasis areas a legal authority?
- Jon Waschbusch:  Ecological emphasis areas look and sound like a legal authority.

  Bruce Krickbaum:  No, an ecological emphasis area is a management approach (similar to the polygons in the current RMPs) rather than a legal authority or designation.  There is no BLM policy establishing these areas or prohibiting their establishment.  These areas consist of discreet landscapes with a common management concern that would be managed to achieve a specific objective.  The proposed Planning 2.0 regulation refers to landscape management, which is similar to this concept.

- Jon Waschbusch:  Has the BLM's approach to inventorying lands for wilderness characteristics changed?  Some areas in the 2015 inventory update (such as the Camel Back WSA Adjacent) were not identified in the original 2010 inventory.  How did 18,000 acres get added in Montrose County?

  Bruce Krickbaum:  The BLM followed procedures in *BLM Manual 6310 – Conducting Wilderness Characteristics Inventory on BLM Lands* when completing the Uncompahgre Field Office inventory.  The BLM resource specialist who led the inventory received training on the process and had prior related experience.  If an agency believes that the inventory is incorrect, then they should submit a comment so that the BLM can look into it.

- Brian Magee:  Several of the ecological emphasis areas overlap with special recreation management areas (SRMAs).  How would management of an area be balanced if there are competing purposes within the area?

  Bruce Krickbaum:  Overlap between an SRMA and an ecological emphasis area should not create a conflict.  For instance, the zone of a particular SRMA might be managed for non-motorized recreation.  If the zone could conflict with management of an ecological emphasis area, let us know via a comment.  We want to reduce conflicting management in the Proposed RMP.  Travel management planning is to begin within five years of the ROD being signed.

- Brian Magee:  The RMP lists issues considered but dismissed (i.e. no livestock grazing throughout the planning area, no fluid mineral leasing, and others).  Why include a description of so many issues not being considered?

  Bruce Krickbaum:  We include a discussion about livestock grazing because that is the direction from the Washington Office.  Other issues dismissed from detailed analysis are included because they were brought up by the public during scoping.

- Brian Magee:  At times, it seems as though the range of alternatives is too broad, and the ends are beyond any reasonable alternative that would ever be considered.

  Bruce Krickbaum:  Although the range is broad, we believe that all of the alternatives are reasonable and should be considered.  If you believe they are too broad, let us know which ones and why.

- Robbie Baird-LeValley:  Would you compare the acres of No Leasing and No Surface Occupancy in Alternative B1 with the other alternatives, and describe this within the North Fork area?  Could I get a map displaying this information?

**ACTION:**  David Sinton will send the requested map to Robbie.

**ACTION:**  Following the meeting, Maggie sent the PowerPoint out to all attendees who provided an email address.

BLM_0126423

- Lynn Padgett:  What are the odds that the Uncompahgre RMP ROD will come out before the ROD for the GUSG RMP Amendment?
  Bruce Krickbaum:  Although we don't know which will be approved first, the decision for the GUSG RMP Amendment will determine the way the BLM manages for Gunnison Sage-Grouse.  If the Uncompahgre RMP is approved first, then the GUSG RMP Amendment would amend the RMP.  If the GUSG RMP Amendment is issued first, then the Proposed RMP would be updated to match language in the GUSG RMP Amendment.
- Lynn Padgett:  The Preferred Alternative for the Uncompahgre RMP is quite a bit different from the GUSG RMP Amendment.  I'm trying to figure out the best use of my time when commenting on Gunnison Sage-Grouse.
  Bruce Krickbaum:  The Uncompahgre RMP Preferred Alternative was drafted based on BLM Washington Office Information Memorandum 2014-100, which came out before we knew the content of the GUSG RMP Amendment.  The Proposed RMP will be in line with the most current version of the GUSG RMP Amendment.  It would be better to concentrate your comments pertaining to Gunnison Sage-Grouse on the GUSG RMP Amendment.
  Renzo Del Piccolo:  The UFO RMP must mimic the GUSG RMP Amendment.
- Brian Magee:  How will the BLM manage Gunnison Sage-Grouse in the interim?
  Bruce Krickbaum:  The BLM will manage according to current guidance and all RMP language will need to be updated.  Ideally the UFO RMP will come out first, followed by the GUSG RMP Amendment.
- Brad Banulis:  Some of the language in the RMP is outdated.  Will the species list be updated in the Proposed RMP?
  Bruce Krickbaum:  Outdated language in the RMP will be updated to reflect current information and policies.  Let us know if there is something specific, so that we don't overlook it.

6. Discuss BLM transition to Drupal/ePlanning and potential impact to the public. (PowerPoint and Bruce Krickbaum)
   - Images of the PowerPoint slides for this topic were attached to the agenda.
   - The BLM will transition to a new content management system beginning October 21.  Some sites might be unavailable or difficult to access during the transition.
   - Field offices will no longer post individual NEPA registers.  A single register is now being used to host all BLM environmental actions (EIS, EAs, CXs, and DNAs).  Enter "BLM ePlanning" in your internet search engine:  https://eplanning.blm.gov/epl-front-office/eplanning/lup/lup_register.do
   - Southwest District RMPs have been moved over to ePlanning.
   - A 16-minute video provides information on using ePlanning:
     Introduction to ePlanning for the Public
   - Contact Maggie Magee (at dmagee@blm.gov or (970) 240-5323) for ePlanning assistance and for older Southwest District actions no longer available online.

7. Respond to questions and concerns not related to the Draft RMP/Draft EIS.  (All)
   - Jon Waschbusch:  The BLM and Colorado Water Conservation Board (CWCB) appear to be in partnership regarding water rights.  Is that the case?
     Joe Meyer:  Only the state can grant water rights.
   - Jon Waschbusch:  Can the BLM hold a prior appropriation?
     Brian Magee:  For Wild and Scenic Rivers designation, the state holds the water rights.  The BLM can file but does not hold a prior appropriation.
     Lynn Padgett:  Asked the question of and was told by CWCB that they prefer that there not be a federal water right.  They would support designation of suitable segments as Wild and Scenic Rivers provided that the BLM does not file for water rights.  Additionally, tables in the eligibility report show that a number of the segments have adequate stream flow with no additional water right necessary.
   - Alan Schroeder:  The RMP might result in restrictions that could impact the Paradox Valley Unit Colorado River Basin Salinity Control Project and evaporative ponds off of Highway 90, as well as other Bureau of Reclamation (BOR) projects.  How would BOR lands be handled?  Draft RMP

maps appear to omit some BOR project lands in the planning area.  Areas within the Black Canyon are managed like Park Service lands.

Bruce Krickbaum:  Alan should submit a comment (including maps) that outlines BOR concerns regarding omissions and potential restrictions.

**ACTION:**  The BLM will ensure that BOR lands are correctly identified in the Proposed RMP.

- What happens next after the comment period closes?  Cooperating agencies will have an opportunity to review and comment on the Proposed RMP before it is released to the general public.
  - Lynn Padgett:  Can more alternatives be added?  The comment form is not conducive to general comments—can something else be used?

    Bruce Krickbaum:  The BLM can propose any alternative or mix of objectives and actions with changes from several alternatives.  Tell us in your comments what you think we've missed.
  - Robbie Baird-LeValley:  Why are the requirements so specific for recreation and not for other resources?

    Bruce Krickbaum:  Recreation requirements are based on the planning handbook.  The planning handbook requires some implementation-level decisions for recreation.  Other resources do not require implementation decisions.
  - Brian Magee:  How can SRMAs be designated without travel management?

    Bruce Krickbaum:  The RMP identifies the targeted experiences and types of travel management for the SRMA zones.  The actual designation of route-by-route travel management decisions will occur after the RMP is completed.
  - Garry Baker:  For lands identified as having wilderness characteristics, what happens to existing trails like Coyote Ridge, which is not on the map?

    Bruce Krickbaum:  (David projected map showing trail and wilderness characteristics data layers) Areas containing lands with wilderness characteristics can have trails, but not maintained trails.  Is it an existing maintained trail?

    Garry Baker:  Yes, it has a BLM sign.

    Bruce Krickbaum:  Garry should submit a comment.
  - Lynn Padgett:  What is the difference between ROW avoidance and exclusion?  Can the proposed ROW exclusion have an exception to allow for new non-motorized routes (such as bike paths and a broadband corridor in the San Miguel Canyon)?

    Bruce Krickbaum:  The potential trail would likely not require a right-of-way and could occur in a ROW exclusion area.  A partnership with the BLM might be possible, and a trail authorized without a right-of-way after an environmental assessment.  Are there power poles in the broadband corridor?
  - Lynn Padgett:  There are existing power poles but more area would likely be needed.

    Bruce Krickbaum:  In the Preferred Alternative, the San Miguel Canyon is identified as ROW avoidance, not ROW exclusion.

    Joe Meyer:  Can we follow it on the ground?

    Lynn Padgett:  Can a ROW exclusion area become a ROW avoidance area in some instances?
  - Brian Magee:  An exception waiver might be appropriate.

    Bruce Krickbaum:  A ROW exclusion area can have an exception built into it, so that it becomes ROW avoidance area in specific instances.  For example, in Alternative B, the Fairview ACEC has ROW exclusion with an exception for private land access where it would be managed as ROW avoidance.  Lynn Padgett should submit comments.
  - Renzo Del Piccolo:  There is an odd ACEC overlap by ecological emphasis areas, there seems to be a conflict.
  - Jon Waschbusch:  A section in Chapter 2 addresses this.

    Bruce Krickbaum:  The more restrictive action applies in an overlap.
  - Joan May:  More uniform restrictions across ACECs would be helpful.
  - Lynn Padgett:  Section 2–5 states that the GUSG EIS is "likely" to trump the UFO RMP; not "shall."

    Bruce Krickbaum:  The language change was recommended by the solicitor to allow for greater flexibility.

BLM_0126425

**Cooperating Agency Meeting #11**
**October 14, 2016**

- Joan May:  The final ROD should be consistent with the GUSG RMP Amendment.
  Bruce Krickbaum:  The RMP states that the Proposed RMP/Final EIS will likely incorporate by reference the analysis in the GUSG EIS and include decisions from the sage grouse EIS. Management will be consistent with the RMP Amendment.
- Renzo Del Piccolo:  Why is a Gunnison Sage-Grouse section included in the UFO RMP?
  David Sinton:  The UFO RMP has buffers that extend beyond and in most situations cover Gunnison Sage-Grouse better.
- Lynn Padgett:  Does the RMP buffer by lek?
  David Sinton:  Yes.
- Lynn Padgett:  There is critical habitat beyond the buffers.
- Renzo Del Piccolo:  If the RMP Amendment says 4.0 (miles), can the RMP say 6.0?
  Bruce Krickbaum:  The RMP can be broader, but the UFO would go by what the GUSG RMP Amendment states.  It would be hard to explain and defend something that is broader than what is in the GUSG RMP Amendment.
- Lynn Padgett:  Would you summarize the preferred grazing allotments on the mesas west of Telluride?
  Bruce Krickbaum:  Not a lot of change, there could be some reduced acres and AUMs, some management terms and conditions have changed.  A table in the appendix identifies allotment changes.

8. Discuss next steps for cooperating agencies in the RMP process:
   - Submit your substantive written comments on the Draft RMP/Draft EIS by November 1, 2016
   - BLM IDT will develop Proposed RMP/Final EIS.
   - BLM will hold a cooperating agency meeting to introduce Proposed RMP/Final EIS.
   - Proposed RMP/Final EIS will be available for cooperating agency review and comment in approximately 6-7 months

9. Next Meeting
   ***Projected Uncompahgre RMP Schedule (as of October 14, 2016)***

| | |
|---|---|
| Draft RMP/Draft EIS released for public review and comment | June 3 – November 1, *2016* |
| Prepare Proposed RMP/Final EIS | November 2016 – Summer 2017 |
| Release Proposed RMP/Final EIS for 30-day protest period and Governor's Consistency Review | Summer 2017 |
| Resolve Protests | Fall 2017 – Winter 2018 |
| Issue Approved RMP and signed Record of Decision | Spring 2018 |

BLM_0126426



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

---

**David Kuntz** <kuntz@wic.net>                                      Fri, Oct 28, 2016 at 7:10 AM
Reply-To: kuntz@wic.net
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miies that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

David Kuntz
106 Lake Fork Jct.
Ophir, CO 81426

BLM_0126427

8/7/2018                    DEPARTMENT OF THE INTERIOR Mail - Fully protect all free flowing rivers and streams in the RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP
1 message

**Anthony Gegauff** <agegauff@earthlink.net>                              Sat, Oct 8, 2016 at 9:10 AM
Reply-To: agegauff@earthlink.net
To: UFORMP@blm.gov

Dear

Dear Uncompahgre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Anthony Gegauff
615 Terrace Drq
RIdgway, CO 81432

BLM_0126428



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Fully protect all free flowing rivers and streams in the RMP

1 message

---

**Anne Ewing** <aniclark@mountainmax.net>                              Sat, Oct 8, 2016 at 6:01 AM
Reply-To: aniclark@mountainmax.net
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Anne Ewing
PO box 187
3 McCoy Rd.
McCoy, CO 80463

BLM_0126429



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP
1 message

**Arlan Moore** <arlan5@centurytel.net>                                          Sat, Oct 8, 2016 at 6:00 AM
Reply-To: arlan5@centurytel.net
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompaghre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Arlan Moore
3 McCoy Rd. x192
McCoy, CO 80463

BLM_0126430



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP
1 message

**Susan Pernot** <pernotcortez@gmail.com>                          Fri, Oct 7, 2016 at 2:30 PM
Reply-To: pernotcortez@gmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Susan Pernot
5098 Road 24.5
3
Cortez, CO 81321

BLM_0126431



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Fully protect all free flowing rivers and streams in the RMP

1 message

---

**Betty Walters** <bjwalters93@charter.net>                    Fri, Oct 7, 2016 at 11:59 AM
Reply-To: bjwalters93@charter.net
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Betty Walters
13 Rex Circle
Salida, CO 81201

BLM_0126432



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Celia Roberts** <celia@paonia.com>                                      Fri, Oct 7, 2016 at 10:32 AM
Reply-To: celia@paonia.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Celia Roberts
PO Box 5
Paonia, CO 81428

BLM_0126433

DEPARTMENT OF THE INTERIOR Mail - Fully protect all free flowing rivers and streams in the RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Evelyn Merritt <lamerritt@hotmail.com>**          Fri, Oct 7, 2016 at 9:57 AM
Reply-To: lamerritt@hotmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Evelyn Merritt
15 Green Mesa Pl
Parachute, CO 81635

BLM_0126434

8/7/2018                    DEPARTMENT OF THE INTERIOR Mail - Fully protect all free flowing rivers and streams in the RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Lee Kirsch** <snag44@charter.net>                                        Fri, Oct 7, 2016 at 9:47 AM
Reply-To: snag44@charter.net
To: UFORMP@blm.gov

Dear

Dear Uncompahgre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompahgre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Lee Kirsch
1880 Prospector Dr.
Leadville, CO 80461

BLM_0126435

8/7/2018                    DEPARTMENT OF THE INTERIOR Mail - Fully protect all free flowing rivers and streams in the RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Deanna Jenne** <djbutterfly5@gmail.com>                                                  Fri, Oct 7, 2016 at 6:35 AM
Reply-To: djbutterfly5@gmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Deanna Jenne
51477 KE Road
Mesa, CO 81643

BLM_0126436



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

---

**Kenneth Scissors** <scissorsgj@gmail.com>                                        Fri, Oct 7, 2016 at 6:25 AM
Reply-To: scissorsgj@gmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Kenneth Scissors
1225 Chipeta Ave
Grand Junction, CO 81501

BLM_0126437



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Sandra Cremers** <SandyBeaches715@gmail.com>                    Thu, Oct 27, 2016 at 8:59 PM
Reply-To: SandyBeaches715@gmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Sandra Cremers
129 Drumlin Circle
Fruita, CO 81521

BLM_0126438



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP
1 message

**Kathleen Mcintosh** <Kathypmc@hotmail.com>                    Thu, Oct 6, 2016 at 8:25 PM
Reply-To: Kathypmc@hotmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Kathleen Mcintosh
20065 Spring Creek Rd
Buffalo Creek, CO 80425

BLM_0126439



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

---

**Anne Dal Vera** <dalveran@hotmail.com>                    Thu, Oct 6, 2016 at 8:04 PM
Reply-To: dalveran@hotmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Anne Dal Vera
54 E. Pine Top Dr.
Bayfield, CO 81122

BLM_0126440



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP
1 message

**Susan Peirce** <speirce@prodigy.net>                                Thu, Oct 6, 2016 at 6:03 PM
Reply-To: speirce@prodigy.net
To: UFORMP@blm.gov

Dear

Dear Uncompahgre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Susan Peirce
143 Eagle Feather Way
Lyons, CO 80540

BLM_0126441



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP
1 message

**Paul janzen** <paul@intermountainfunding.com>                    Thu, Oct 6, 2016 at 5:32 PM
Reply-To: paul@intermountainfunding.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Paul janzen
62213 Charolais Dr.
Montrose, CO 81403

BLM_0126442

DEPARTMENT OF THE INTERIOR Mail - Fully protect all free flowing rivers and streams in the RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP
1 message

**Anthony Buxton** <anthonymbuxton@hotmail.com>                     Thu, Oct 6, 2016 at 5:04 PM
Reply-To: anthonymbuxton@hotmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Anthony Buxton
251 Dogwood Ave.
Crawford, CO 81415

BLM_0126443



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Joe Joyner** <gregcalif@hotmail.com>                                    Thu, Oct 6, 2016 at 4:43 PM
Reply-To: gregcalif@hotmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Joe Joyner
2212 27th Avenue Court
Greeley, CO 80634

BLM_0126444



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Aron Ralston** <captainfunhog@hotmail.com>                                    Thu, Oct 6, 2016 at 4:41 PM
Reply-To: captainfunhog@hotmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Aron Ralston
928 Mapleton Ave.
Boulder, CO 80304

BLM_0126445

8/7/2018                          DEPARTMENT OF THE INTERIOR Mail - Fully protect all free flowing rivers and streams in the RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Fully protect all free flowing rivers and streams in the RMP

1 message

---

**Charla Brown** <robert.burnett8@gmail.com>                              Thu, Oct 6, 2016 at 4:41 PM
Reply-To: robert.burnett8@gmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompaghre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

•Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

• Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Charla Brown
PO Box 170
Crested Butte, CO 81224

---

BLM_0126446



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Steve Allerton** <sballerton@gmail.com>                    Thu, Oct 6, 2016 at 4:10 PM
Reply-To: sballerton@gmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Steve Allerton
1945 N 9TH ST
GRAND JUNCTION, CO 81501

BLM_0126447



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Suze Gingery** <suze6@q.com>                                      Thu, Oct 6, 2016 at 3:12 PM
Reply-To: suze6@q.com
To: UFORMP@blm.gov

Dear

Dear Uncompahgre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompahgre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Suze Gingery
502 Sabeta Dr. #C
502 Sabeta Dr.#C
Ridgway, CO 81432

BLM_0126448

8/7/2018     DEPARTMENT OF THE INTERIOR Mail - Fully protect all free flowing rivers and streams in the RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Cynthia Appel** <cindyappel19@gmail.com>                     Thu, Oct 27, 2016 at 9:19 AM
Reply-To: cindyappel19@gmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Cynthia Appel
452 W Scenic Dr
Grand Junction, CO 81507

BLM_0126449



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Kathryn Christian** <krelayer@gmail.com>                        Thu, Oct 6, 2016 at 2:09 PM
Reply-To: krelayer@gmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Kathryn Christian
960 White Avenue
Grand Junction, CO 81501

BLM_0126450



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Susan Beug** <ssbeug@gmail.com>                   Mon, Oct 10, 2016 at 8:10 PM
Reply-To: ssbeug@gmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompahgre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompahgre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Susan Beug
178 HIGHWAY 78
RED LODGE, MT 59068

BLM_0126451



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP
1 message

**Joseph Hayes** <jth815@earthlink.net>                                                                    Sun, Oct 9, 2016 at 1:12 PM
Reply-To: jth815@earthlink.net
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Joseph Hayes
185 Rainbow Dr
Grand Junction, CO 81503

BLM_0126452



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Fully protect all free flowing rivers and streams in the RMP
1 message

---

**Robert and Donna Green** <greendb12@gmail.com>                    Sun, Oct 9, 2016 at 6:52 AM
Reply-To: greendb12@gmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompaghre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompaghre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompaghre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompaghre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Robert and Donna Green
PO box 2040
Ridgway, CO 81432

---

BLM_0126453



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP
1 message

**Barbara Bernhardt** <solituderd@sanjuanlive.net>                    Sat, Oct 8, 2016 at 12:15 PM
Reply-To: solituderd@sanjuanlive.net
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Barbara Bernhardt
20409 Solitude Road
Montrose, CO 81403

BLM_0126454



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Dick Gray** <dgray3265@gmail.com>                                Thu, Oct 6, 2016 at 2:41 PM
Reply-To: dgray3265@gmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Dick Gray
62880 Jeremy Rd
Montrose, CO 81401

BLM_0126455



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Susan Pernot** <pernotcortez@gmail.com>                                    Sat, Oct 8, 2016 at 5:30 PM
Reply-To: pernotcortez@gmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompaghre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Susan Pernot
5098 Road 24.5
3
Cortez, CO 81321

BLM_0126456



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP
1 message

Eleanor Nelson <snowflower2@comcast.net>                              Sat, Oct 8, 2016 at 11:26 AM
Reply-To: snowflower2@comcast.net
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Eleanor Nelson
35 Locust Way
Battlement Mesa
Parachute, CO 81635

BLM_0126457



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fully protect all free flowing rivers and streams in the RMP

1 message

**Robert and Donna Green** <greendb12@gmail.com>                    Sun, Oct 9, 2016 at 7:52 AM
Reply-To: greendb12@gmail.com
To: UFORMP@blm.gov

Dear

Dear Uncompaghre Field Office Manager,

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompaghre Field Office RMP has made a great first step in identifying and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.

 •Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.

 • Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

Robert and Donna Green
PO box 2040
Ridgway, CO 81432

BLM_0126458



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Alternative B1 in the Final RMP
1 message

**Dennis Olmstead** <dwotrans@bresnan.net>                    Fri, Oct 28, 2016 at 8:19 AM
Reply-To: dwotrans@bresnan.net
To: UFORMP@blm.gov

Dear

Hello BLM / Staff and others.

This is a short comment on the Final RMP

From time to time I drive between Montrose and Denver along the I-70 route.  It is clear that oil and gas "development" has essentially destroyed a significant part of that territory.

I have had occasion to fly over the Dakota States at night.  Flaring from from energy development are widespread making much of the territory resemble a major forest fire.  Again it's planned and allowed devastation.

As you put the final touches on the RMP I ask you to spare the North Fork / Paonia area from similar fate.

I implore BLM to plan about our long term future instead of short term development money.


Dennis Olmstead
1124 South 11th st
Montrose, CO 81401

BLM_0126459



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## BLM UFO RMP Comments
1 message

---

**Lucy Hunter <lucy@odiseanet.com>**                              Fri, Oct 28, 2016 at 3:37 PM
To: uformp@blm.gov

Please find attached my comments on the current draft of the Resource Management Plan.

Thank you,

Lucy Hunter, P.E.
Principal

ODISEA  |  Civil and Structural Engineering
Designing Your Vision

P.O. Box 1809
Paonia, CO  81428
(970) 270-7353
www.odiseanet.com



📄 **BLM Draft RMP Review Letter_Lucy_Signed.pdf**
   151K

BLM_0126460

# Lucille Hunter



337 Main Street, P.O. Box 1809• Paonia, CO 81428• Phone: (970) 270-7353
E-Mail: lucy@odiseanet.com Web: www.odiseanet.com

Date: October 15, 2016
UFO Draft RMP
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401

To Whom It May Concern:

I am a small business owner and resident of Paonia and the North Fork Valley. My residence and home office are 570 feet from the North Fork of the Gunnison River. I choose to live, work, and raise my family here because of the quality of life: small, rural town with excellent views, pristine water and air quality, abundance of local and organic food, and outdoor recreation.

Specifically, my family enjoys mountain biking, backcountry skiing, and hiking on Grand Mesa, McClure Pass, the Raggeds, and Jumbo Mountain. We often fly-fish the North Fork, Smith Fork, and main Gunnison Rivers, Anthracite Creek, Muddy Creek, Hubbard Creek, and Leroux Creek and hunt in Game Management Units 521 and 53. We raft the Gunnison River many times each year. The final RMP must include protections for these recreation resources and lands.

As a local professional engineer, I have many new clients that have recently moved to the area. Without exception, each one of these families has moved here to enjoy the same amenities mentioned above. They are young families that are contributing to the economic viability of the area and to the future generations of this valley.

I want to begin by saying THANK YOU to the BLM UFO for including the North Fork Alternative B1 in the draft of the RMP. I understand that the BLM must try to balance a multitude of uses for our limited natural resources and public lands. I also feel very strongly that the way in which we choose to manage these lands and resources over the next few decades is critical in sustaining them and preserving the quality of life and economic health of North Fork residents and visitors. In the following paragraphs, I will outline my concerns with utilizing any management strategy for this area other than Alternative B1.

The Preferred Alternative (Alternative D) would open 90% of the Uncompahgre area to oil and gas leasing. Oil and gas leasing is a threat to our quality of life and the economic livelihood of the North Fork Valley. Specifically, this type of development endangers our surface waters and our groundwater, which in turn affects the quality of our drinking water and of the foods grown here. This also has the potential to affect the organic certification of many of our local farms and ranches. Additionally, drill pads are unsightly. I enjoy scenic drives and hikes on the Grand Mesa and often take out-of-town guests there to show off the natural beauty of this area. This use would be drastically / negatively impacted by oil and gas development. Oil and gas development in this watershed / viewshed is too risky. Land use in this area should instead be focused on more sustainable uses such as: quality open space, recreation, hunting, fishing, and mitigation of wildlife fragmentation. From an economic standpoint, rather than relying on the limited and temporary income and tax revenue from oil and gas

BLM_0126461



development, we should focus on more diverse and sustainable practices such as agriculture and tourism (as well as attracting young professionals that telecommute and contribute to the economic health of the area).

The final RMP must protect the health of the watershed for the greatest number of users. Our communities have invested countless dollars developing both domestic and agricultural water systems for their homes, farms and ranches. The final plan must exclude all oil and gas activities within a half-mile of all surface and ground domestic water sources, including municipal waters supplies, that risk being impacted by surface spills and well failure. Most of the domestic water sources in the North Fork Valley are surface springs and streams that are either on or near BLM lands affected by this plan.

The final RMP must protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, or canals. This is a minimum distance required to safeguard direct and rapid impacts from surface spills and other contamination from oil and gas activity.

The final RMP must protect streams and surface water quality, protecting ecological resources, aquatic habitat, recreational attractions, water storage, and flood control by closing areas within a half mile of lakes, ponds, wetlands, and reservoirs to oil and gas activities including leasing. The final plan should also recognize that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters are priority habitats with adequate protections from all surface activities.

The final RMP must protect the idyllic character and scenic beauty of the North Fork Valley, which is home to the West Elk Wine region and has been called Colorado's Farm-to-Table Capital. That character would be jeopardized by oil and gas activity. Alternative B1 requires development setbacks from agricultural lands, prevents damage to visual qualities, and best preserves the current rural character of the valley.

The North Fork Valley sits at the very heart of the West Elk Loop Scenic Byway, world renowned for its scenery and rural character. Oil and gas development could jeopardize the scenic qualities of the area. The final RMP should include Alternative B1, which provides the adequate protections for the Valley's scenic features.

River and trail recreation are a growing economic opportunity in the North Fork, with these industries bringing millions of dollars to communities in Colorado. The North Fork Alternative provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area. These protections must be included in the final RMP.

Real estate sales in the North Fork Valley continue to be driven by those seeking a rural, non-industrial, and agricultural lifestyle. The final RMP must protect the investments locals have made in the value of their home and land, and should not allow for speculative oil and gas leasing which discourages homebuyers from purchasing in our communities, producing real and direct negative economic impacts on our communities.

Specifically with regard to recreation: The BLM lands on and surrounding Jumbo Mountain are a well-used and well-loved recreation asset for North Fork residents. The final RMP should include the entire Jumbo Mountain unit as a Special Recreation Management Area to protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism, and the businesses that rely on those tourists. The final plan

2

BLM_0126462



should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat. Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat, are critical components that help sustain the multi-million-dollar hunting industry in the area. The final RMP should include ecological emphasis areas for all critical winter habitats within the North Fork Valley. The final plan should also include the protections of the B1 alternative, which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies. Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land- and water-based recreation. The final RMP should include Special Recreation Management Areas and Extensive Recreation Management Areas for all lands identified as of high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking, among others. These areas include Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte, and Robideau Canyon.

With respect to wilderness and wildlife protection: Wildlife habitat fragmentation should be mitigated by assuring connectivity between Grand Mesa and West Elk Wilderness through the designation of Ecological Emphasis Areas and Special Recreation Management Areas. Wild and scenic rivers should be protected. The final RMP must protect all lands with wilderness characteristics, including the areas up Stevens Gulch. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest. Hunting in this area is an important part of both our culture and our economy.

With respect to agricultural water rights: I would like to see further education for our farmers and ranchers to alleviate the 'use it or lose it' mentality; ranchers/farmers should be able to maintain their water rights regardless of use in order to encourage conservation and to keep the water in the river as much as possible.

Thank you again for your efforts in this regard. I strongly support and respectfully request the inclusion of the North Fork Alternative B1 and all other conservation protections in Alternative B in the final UFO RMP. The locally driven proposal that is Alternative B1 is the right way to protect the entire Gunnison Watershed - supporting farmers, protecting public health, sustaining ecological well being, and building a sustainable rural economy on Colorado's Western Slope.


Sincerely,

BLM_0126463

10/31/2016                    DEPARTMENT OF THE INTERIOR Mail - comment of resource management plan draft



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## comment of resource management plan draft

1 message

**bill crompton** <billcrompton@hotmail.com>                    Fri, Oct 28, 2016 at 8:12 AM
To: "uformp@blm.gov" <uformp@blm.gov>
Cc: "info@theconservationcenter.org" <info@theconservationcenter.org>, "info@citizensforahealthycommunity.org"
<info@citizensforahealthycommunity.org>, Margaret Stochosky <mstochosky@msn.com>

Hello,

I am writing in support of North Fork Alternative, B1.

My wife and I purchased a home in Paonia in June of this year. We were attracted to the area by
its combination of beauty, cleanliness, access to pristine wilderness and the amiability of the
community of ranchers, farmers and artists. We are both healthcare professionals and we are
happy to bring our skills and financial resources to the local community. We have already spend
thousands of dollars locally in supplying and remodeling our new home. It is my understanding that
the heightened action of the real estate market in the area indicates we are not alone in this.

We oppose the introduction of further mineral extraction, and, specifically, natural gas mining via
fracking, to the area. The risk of damage to the water resources, as well as sub-surface stability of
the land is well-documented in other areas of the country and the benefit of further production of
carbon-based fuels is certainly questionable in terms of environmental effects and financial
benefits for local populations.

I lived for a number of years in Southeast Alaska in Juneau. A mining company applied for
permission to re-open old gold mines there in hopes of extracting minerals previously left behind
by less modern mining techniques. While the company was awaiting for approval from the EPA it
was allowed to do some exploratory drilling. In the course of that exploration an old holding pond
was violated and cyanide was released into the local creek (Gold Creek) which runs through the
middle of Juneau and a large fish kill resulted. Needless to say, the approval was denied. I believe
this story is pertinent to the North Fork in a couple of ways. First of all, water contamination would
effect the health of the people, the plants and the animals of not only the immediate area but,
potentially, the entire southwest of the U.S. that depends on this drainage to contribute to the
Colorado River drainage. Secondly, like Juneau, the North Fork Valley is, and will become,
increasingly valuable for its environmental beauty and cleanliness and is far more likely to benefit
financially as a destination point for tourism and/or living space for people such as my wife and I.
My experience with mineral extraction is that the companies in that business often take the product
and the earnings away with them and leave only the devastation to the land behind.

There is little long term benefit to the local communities in this kind of compromise.

BLM_0126464

Again, WE SUPPORT NORTH FORK ALTERNATIVE, B1, IN THE REVISION OF THE
RESOURCE MANAGEMENT PLAN!!!!!


Thank you,

Bill Crompton

Margaret Stochosky

40839 Stewart Mesa Road

Paonia, Colorado, 81428

BLM_0126465

10/31/2016                    DEPARTMENT OF THE INTERIOR Mail - Comments from R. Cascade



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comments from R. Cascade
1 message

**Robyn Cascade** <casbyn813@gmail.com>                    Fri, Oct 28, 2016 at 1:58 AM
To: uformp@blm.gov

Dear UFO staff,

Please see my comments in the attached document.

Robyn Cascade

 **UFO RMP comments.Cascade.docx**
144K

BLM_0126466

575 Sabeta Drive
Ridgway, CO 81432

October 24, 2016

Dear BLM staff,

Thank you for the opportunity to comment on the Uncompahgre Field Office
(UFO) draft Resource Management Plan (RMP).

## Wild and Scenic Rivers

I applaud your inclusion of 104.6 miles of suitable Wild and Scenic River (WSR)
segments in the preferred alternative D and request you retain all these
segments in your final draft.  I also urge you to include the other 50 (actually
49.5) miles of river that you found eligible in your survey in your final RMP. All
these segments are free flowing and have values worthy of protection. There are
so few free-flowing rivers in the UFO jurisdiction that it is incumbent on the UFO
to conserve these stretches of river in the most natural condition possible.
Including them in your final RMP will do just that.  Just as examples, I support
including Tabaguache Creek segment 2 in addition to Tabaguache Creek
segment 1 to further protect the length of this waterway.  Although segment 2 is
not within the already protected Tabequache Area, segment 2 is very close to
and adjacent to this area managed as wilderness. Similarly, including Roubideau
Creek segment 2 in addition to the already suitable Monitor, Potter and
Roubideau segment 1 enhances the protection of the riparian habitats in this
area. I have hiked this area and can attest to the scenic value of this segment.
Even the shorter isolated segments included in Alternative B such as the Deep
Creek and West Fork Terror Creek warrant protection as this region has so few
remaining free flowing rivers. All segments should be managed with protection
equal to or stronger than adjacent federal land planning areas surrounding these
UFO segments.  Finally, please add Roc Creek to the UFO eligibility report and
deem it suitable for protection as well.

You are no doubt aware that Colorado has only one congressionally designated
WSR – the Poudre – and currently two being considered by Congress – the
Crystal near Marble and Deep Creek in the southern Flat Tops.  BLM's inclusion
of all 154.1 miles of suitable WSR affords the opportunity that we might one day
have a WSR designation in the UFO region.  More importantly their inclusion in
the final RMP protects these rivers' pristine qualities into the future for wildlife,
habitat preservation, biological diversity, and future human generations.

## Lands with Wilderness Characteristics

The draft RMP determined seven areas totaling 42,150 acres qualify as suitable
Lands with Wilderness Characteristics (LWC), however the preferred alternative

BLM_0126467

proposes to designate only three of those seven units as LWC encompassing 18,320 acres to be managed as wilderness. I have visited the majority of these LWCs and consider them most worthy of protection. Please include all seven units in your final RMP. 42,150 acres is such a small proportion of the UFO planning area such that inclusion of all these units is an extremely reasonable ask.

I applaud your inclusion of the Camelback addition in your preferred alternative. When I hiked in the Camelback WSA and the proposed Camelback addition, I enjoyed quintessential solitude, delightful riparian habitat, mesas with extraordinary views and the tranquility of a non-motorized landscape. The occurrence of Fremont cottonwood and skunkbush sumac add ecological value to the unit. These adjacent units also provide habitat connectivity from the high elevation forests of the Uncompahgre Plateau to the lower elevation desert environment. Given that the addition is contiguous with the already designated WSA, this proposed addition affords enhanced protection for both units. As the draft RMP states on page 4-217, "A wider expanse of contiguous land containing the special management area and lands with wilderness characteristics could therefore heighten protection within the lands with wilderness characteristics and further ensure the integrity of wilderness characteristics." I couldn't agree more, and therefore want to urge the BLM to include the Adobe Badlands addition for the same reasons.

I realize the Adobe Badland WSA sees regular violations to its non-motorized status. I personally have witnessed these infractions during my visits to this WSA, but I have also experienced the solitude, vastness, beauty, naturalness, recreational opportunities and sightings of *Eriogonum inflatum*, the federally endangered *Eriogonum pelinophilum* and the rare/threatened Hookless cactus (*Schlerocactus glaucus.)* The presence of cryptobiotic soil/biological crust is noteworthy as well. Combined with the proposed Adobe area of critical environmental concern (ACEC) and the ecological emphasis area included in the preferred alternative, the inclusion of the adjacent Adobe Badlands addition in the final RMP will augment the significance of protecting this larger unique and fragile ecosystem which is home to Ferruginous hawks, Burrowing owls, White-tailed prairie dogs, pronghorn and possibly kit fox. I urge you to include all acreage in this region suitable for ACEC and ecological emphasis in the final RMP – not the reduced area currently proposed in the preferred alternative. This lower elevation environment coupled with spectacular geology makes this area worthy of protection. As a large contiguous unit, it will also provide an expanded landscape for wildlife, a span of ecological zones across elevation, and opportunities for recreation.

During a meeting, (now retired) Barb Sharrow's response to the question of why Adobe Badlands addition was not included in the preferred alternative was primarily due to management challenges. I see this challenge as an opportunity - not a reason to omit this unit from LWC status in the final RMP. I often hear from

federal agency personnel that motorized users monitor themselves and each other, and are, in fact, some of the best resources for ensuring compliance because, as a group, they want to continue to enjoy access to public lands.  If this is in fact true, then I urge the UFO to enlist the help of motorized users to advocate for compliance in the current Adobe Badlands WSA and the proposed Adobe Badlands addition.  I also know that the motorized community regularly contributes resources to manage and improve motorized trails across UFO lands.  I would suggest that some of these contributions be designated to install more adequate signage along the border of the Adobe Badland unit(s) so motorized users will stay on the adjacent BLM lands containing designated motorized routes.  When I last visited the Adobe Badlands WSA in May of 2016, I saw only one carsonite sign on West Pipeline Rd.  The sign indicated the boundary was a WSA but there was no mention of prohibition of motorized use - only a no dumping notice.

I had the great fortune recently to visit the Lower Tabeguache/Campbell Creek and Shavano Creek units.  Given their remote location, untrammeled qualities and your findings of suitability for LWC, I strongly recommend that these two units be included in your final RMP as LWCs and that they be managed as wilderness.  Lower Tabeguache/Campbell Creek includes many cultural sites that warrant protection and preservation and the unit's sheer size of 11,060 roadless acres is cause for protection.  Together with the Shavano Creek unit (which contains valuable riparian habitat, naturalness, and opportunities for solitude) and the nearby (already protected) Tabeguache SMA, these combined units provide a large track of landscape that affords a critical wildlife corridor from lower elevations up to the forested Uncompahgre Plateau.

Though I have not visited the Roc Creek LWC, I have witnessed the landscape from a distance at high elevation.  The scenic beauty is awe-inspiring and I commend the UFO for including this unit in the preferred alternative.  Please do include it in your final RMP along with the Dry Creek Basin as currently proposed.

I also strongly recommend that, if Congress releases any WSAs from wilderness consideration, the UFO continue to manage these units as wilderness to protect their wilderness characteristics into the future.

**<u>Areas of Critical Environmental Concern/Ecological Emphasis Areas</u>**
I strongly urge the UFO to include many more acres of ACEC units and ecological emphasis areas in the final RMP than are currently proposed in the preferred alternative. Of the 215,840 acres (within 15 units) identified as eligible for ACEC less than one-fourth of that acreage is proposed in Alternative D and only 8 of the 15 units. Many of these units overlap or are adjacent to currently designated or proposed areas for protection.  The draft RMP states on page 4-217 that this overlap and proximity is advantageous: "Where lands managed to protect wilderness characteristics overlap or are next to eligible or suitable WSR

segments or ACECs, management of these other areas could also indirectly protect wilderness characteristics due to protective measures proposed for other areas." Of course the protective advantage works in both directions, so it makes logical sense to protect so many of the ACEC units omitted from Alternative D (and included in Alternative B) such as Salt Desert Shrub Ecosystem; Roubideau-Potter-Monitor; Lower Uncompahgre Plateau; San Miguel River Extension; Tabeguache Pueblo and Tabeguache Caves - to name a few – due to their proximity or overlap with already or proposed protected areas and of course based upon their identified values – geological, cultural, scenic, riparian habitat, rare or endangered species, etc.

I applaud your proposal to protect the Paradox Rock Art ACEC which I visited recently. Numerous significant cultural sites exist within this ACEC. One in particular is extraordinary – a large panel covered in diverse pictographs that indicate use over an extended period of time. Protection of this panel alone is justification for including the Paradox Rock Art ACEC in your final RMP. We also visited other petroglyph sites which warrant protection. Some show signs of vandalism. To prevent further degradation of this critical resource, I urge you to protect this region through designation as an ACEC and plan for the monitoring of these cultural sites (utilizing volunteer stewards if needed.)

Though I commend your inclusion of every identified ecological emphasis area in the preferred alternative, I urge you to restore each unit to its full acreage (as identified in Alternative B) in the final RMP. Every acre that is eliminated from a unit diminishes the integrity of the ecosystem and negatively impacts the efforts to protect the values found there. I support inclusion of all 242,580 acres and request that these units receive the significant protection warranted including but not limited to: no surface occupancy for oil and gas, closure to motorized travel, exclusion of right of way development, prohibition of target shooting, etc.

## Travel and Recreation

I celebrate the UFO's preferred alternative proposal to close the entire planning/management area to open motorized travel. This decision is a critical component of protecting natural resources while still allowing motorized travel on designated routes. As a quiet user who values wildlife viewing, tranquility and the sounds and smells of nature, I ask (or more accurately implore) you to close the 114,970 acres to motorized travel as defined in Alternative B. This acreage constitutes a mere 17% of the UFO jurisdiction. This component of Alternative B does not yet balance motorized and human powered use in my opinion, but it is a move in the right direction – not just for quiet users but also for wildlife, botanical species, soils, water, and air quality. I also support the inclusion of all 11 Special Recreation Management Areas totaling 244,050 acres in your final RMP.

## Oil and Gas/Coal

It is disturbing that the draft RMP's preferred alternative makes nearly 90% of the UFO's planning area available to oil and gas leasing and 95% of the area rated

as low potential for gas development open to gas leasing.  I recognize that every lease must go through NEPA and is site specific, however I ask that the final RMP reflect the realistic potential for oil and gas development in the region and that further consideration be given to effects of development on water and air quality, wildlife, soils, climate change, agriculture, recreation, and human health.  I also urge you to consider the economic and health benefits of keeping fossil fuels in the ground particularly in our region where agriculture, ranching, recreation and tourism are significant economic drivers.  I ask that you consider a no-leasing alternative on all public lands in the UFO as it seems all 4 alternatives have significant/excessive potential for lease sales.  I grow much of my own food and purchase local foods for my family's consumption I consider extractive industries incompatible with sustainable agriculture.  If your final RMP does not include a no-leasing on public lands management plan, at a minimum please adopt the B1 Alternative to at least limit oil and gas leasing in the North Fork Valley.  B1 is a small step, but better than the proposed preferred alternative.

When it comes to coal, the best alternative seems to be keeping it in the ground.  The US government's commitment to the Paris agreement on climate change and the negative impact of emissions on green house gases coupled with the collapse of the coal industry and corporate bankruptcies indicate that our country must move away from coal toward renewable sources of energy.  The UFO would be setting a monumental example if the final RMP closed its planning area to coal leasing/extraction.

Again, I appreciate your consideration of my comments and look forward to a final RMP that gives more value and protection to the natural qualities of these 675,800 acres.

Respectfully,
Robyn Cascade

BLM_0126471



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## comment on BLM UFO Draft RMP
1 message

**Brian Inouye** <binouye@bio.fsu.edu>                    Fri, Oct 28, 2016 at 11:36 AM
To: uformp@blm.gov

Dear Uncompahgre Field Office BLM,

I grew up in Gunnison county and now live there seasonally, and my parents have retired to Delta county.  The Upper North Fork Valley has been part of my life for decades, and my family has enjoyed hiking, camping, hunting, fishing, and backpacking in that area.

I strongly support the "North Fork Alternative", and feel that that the UFO BLM should be considering an even more restrictive option that does not allow for any new coal leasing.  The nation's and region's economy is rapidly moving away from coal, and recent Tri-State Utilities court cases and economic developments are likely to accelerate our region's shift away from coal.  New coal leases are short-sighted.  The Upper North Fork Valley should not be damaged as a resource for hiking, biking, and hunting, and we should not allow coal and gas developments that threaten clean water supplies, in pursuit of a short-term boost to a fading industry.

Sincerely,
Dr. Brian Inouye
7500 County Rd 317 (PO Box 2510)
Crested Butte CO 81224

BLM_0126472



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comments on the BLM Uncompahgre Field Office Draft Resource Management Plan
1 message

**John Hess** <johnthehess@crestedbutte.net>                              Fri, Oct 28, 2016 at 12:30 PM
To: uformp@blm.gov

To whom this many Concern:

I would like to comment on the BLM Uncompahgre Field Office (UFO) Draft Resource Management Plan (RMP).

I am concerned that the RMP is not doing enough to minimize climate impacts. Therefore, in my opinion, the Final RMP must include up-to-date data concerning coal markets, coal production and coal employment in the area. The Draft RMP's data, much of it dating back to 2010 or older, is stale in light of shrinking coal production and employment. I support the "North Fork Alternative."

I will be personally affected by increased and long-term coal and natural gas development in the North Fork Valley. I purchase fresh produce, and I am concerned about decreasing snowpack from climate change.

John Hess

P.O. Box 925

Crested Butte, CO 81224

  Virus-free. www.avast.com

BLM_0126473

10/31/2016           DEPARTMENT OF THE INTERIOR Mail - draft resource management plan - public comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## draft resource management plan - public comments

1 message

---

**Jon Hickam** <jon.hickam@gmail.com>           Fri, Oct 28, 2016 at 11:03 AM
To: uformp@blm.gov

Attn: BLM Uncompahgre Field Office,

I am a resident of Hotchkiss Colorado.  I do software work for a variety of local, national, and international companies from our small organic farm outside of town.  I hunt and fish in the mountains surrounding Paonia and Hotchkiss.  I am well educated and politically moderate.

I am writing this letter in response to the draft resource management plan that was released this year.  While I appreciate that the BLM is trying to find a middle ground between extraction economy and preservation I feel that it did not adequately address the unique environmental and economic situation of the north fork valley.

Right now the economy of the north fork is changing.  The coal mines are shutting down but the real estate market and economic activity of the region is actually growing.  The new economy that is developing in the North Fork is based on a combination of organic farming, outdoor recreation, hunting and fishing, and folks like me that are moving to the area and bring their jobs with them.  I overheard the postmaster in Paonia say that he had processed 5 change of address forms in one week for people coming from Boulder alone. We are drawn to the safe small town feel, the fantastic local agricultural products and the relatively pristine natural environment.  This is what the basis of a long-term, stable North Fork economy will be in the 21st century.

This developing economy is fundamentally not compatible with today's hydraulic fracking technologies.  The implications of fracking technology here would be a couple of outside companies making some money, a short term boom of temporary labor, followed by long-term degradation of our watershed and view shed and by extension or local economic sustainability.  Having this area become known as a fracking area will decrease the appeal of our agricultural products, the appeal our outdoor recreation, and appeal as a home community for people that are coming into the area with new economic opportunities.

I am a realist; I know that the propane that cooks my food and gas that drives my car has to come from somewhere.  However it is not the right fit for the North Fork, and future attempts for fracking development here are sure to be met with an onslaught of public outcry, protest, and lawsuits that are ultimately divisive and expensive for all parties involved.

I urge the BLM to approve a resource management plan that does not open up the North Fork to further oil and gas development, and instead embrace a conservation-oriented alternative that takes into consideration the long-term economic sustainability of our unique environment.

Thanks for listening,

Jonathan Hickam

Hotchkiss, CO

---

BLM_0126474

10/31/2016                     DEPARTMENT OF THE INTERIOR Mail - North Fork Valley



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## North Fork Valley
1 message

**George Reinhardt** <georeinhardt46@gmail.com>                     Fri, Oct 28, 2016 at 10:09 AM
To: uformp@blm.gov

To Whom It May Concern:
I am in favor of developing green energy and reducing our dependence on coal. I also fish and hunt in the valley and coal
sites will significantly impact game in a negative manor. I am in support, however, with the North Fork Alternative option. It
strikes a commonsense balance between reduced coal development and preservation of the North Fork Valley.

Thank you

George Reinhardt

--
*Please note this is my new email address, thank you for updating your contact information.*

BLM_0126475



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Re Draft Resource Management Plan
1 message

**Patricia Del Tredici <pdel_tredici@hotmail.com>**                        Fri, Oct 28, 2016 at 7:57 PM
To: "uformp@blm.gov" <uformp@blm.gov>

To Whom it Concerns,

This letter is in regards to the consideration of increasing mineral extraction in the North Fork Valley.

The North Fork Valley is currently valuable for Recreation, Farming, Hunting, Hiking, and Fishing. These are valuable resources in themselves, and provide a quality of life that is increasingly at risk of being diminished.  Coal is no longer a viable fuel, and should not be given priority over Organic Farming and / or clean air and water.   Natural gas extraction requires huge amounts of water, destroys wildlife habitat and wilderness, and may be instrumental in degrading air quality.

I urge you to consider the values that are important to citizens, such as myself, who depend on Organic Produce, clean water and air, as well as wilderness for maintaining a healthy life style.

I support "North Fork Alternative" which provides for **no** oil or gas leasing across 75% of the North Fork Valley.

Respectfully,

Patricia F. Del Tredici

311G Cement Creek Rd.

Crested Butte,  CO  81224

BLM_0126476

10/31/2016                    DEPARTMENT OF THE INTERIOR Mail - Re the RMP of the North Fork Valley



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Re the RMP of the North Fork Valley
1 message

**Mary Harte** <melharte@yahoo.com>                    Fri, Oct 28, 2016 at 6:38 PM
Reply-To: Mary Harte <melharte@yahoo.com>
To: "uformp@blm.gov" <uformp@blm.gov>

I support the "North Fork Alternative," which provides for no oil and gas leasing across 75% of the North Fork Valley.  Such development permanently damages resources that I greatly value there, and that is an important source of revenue, that is, sustainable recreation. I urge you to adopt it!

Thanks!

Cheers,

**Mel (Mary Ellen) Harte, Ph. D.**

*"MEN ARGUE; NATURE ACTS." Voltaire, 1769.*

*Climate Change This Week  Huffingtonpost:  the News, the Solutions.*

*Tell Congress you'll VOTE for those
who promote clean energy.*

BLM_0126477

11/1/2016                                    DEPARTMENT OF THE INTERIOR Mail - Re: Resource Mangement Plan



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Re: Resource Mangement Plan
1 message

**Bob Gleason** <bootdr1@gmail.com>                                    Fri, Oct 28, 2016 at 3:23 PM
To: uformp@blm.gov

Thanks for noting this second input. In my earlier correspondence, I neglected to include a key point about Wild and Scenic status for the San Miguel/Dolores rivers.

Over the 35 years that I have been working as a river guide and outfitter, I have had the opportunity to run most of the nations Wild and Scenic rivers. In travelling through all the navigable sections of the San Miguel and Dolores rivers, I have found these rivers to have tremendous wild and scenic characteristics on par with the prime rivers currently protected by Wild and Scenic status. The San Miguel is a freestone river without artificial alteration of the natural flow variations through the seasons. This has preserved a rich display of plant and wildlife that is rare among our river systems. The seasonal ebb and flow of water levels provides unique recreational opportunities. The gush of high water in the spring is a delight to the river runner, and opens the entire river corridor to exploration by the whitewater enthusiast. The low water of the late summer and fall creates a fine experience for the walk and wade angler. This seasonal variation has supported native and rare plant life and animal habitat that has been lost on other rivers. These natural characteristics of this upper reach of the Colorado River system would greatly benefit from the protections assured by the Wild and Scenic Rivers Act.

With the likelihood of a change in mood in our nation's capitol in the near future, Wild and Scenic status for the San Miguel and Dolores should be an integral part of the Resource Management plan. Three summers ago, I went to Washington DC for Go America Week. There was a lot of interest in the congressional offices we visited when I brought up the subject of Wild and Scenic status for these rivers. Rep. Michael Bennett stated that he would like to sponsor the bill for Wild and Scenic status on the San Miguel when the timing is right.

As a river outfitter, I feel Wild and Scenic status would add to the cache and allure of the river and buoy up the perception of this beautiful river system. It would offer protections to maintain flows that we need for the future of recreation on this river. As water resources grow scarcer, water as a commodity threatens the life and vitality of this amazing river. Wild and Scenic status would be a tremendous support for long term protection of the San Miguel as a recreational resource and a vital river environment.

--
Bob Gleason- President
Boot Doctors dba Further Adventures
www.bootdoctors.com

On Fri, Oct 28, 2016 at 11:50 AM, Bob Gleason <bootdr1@gmail.com> wrote:
Thank you for hearing our concerns with the Resource Management Plan.

The highest value of the resource managed by the Uncompahgre Field Office is the inherent beauty and environmental health of the wild areas of the region and the tremendous value of the resource in it's natural state. Since the end of the mining era, this region has been largely spared the devastation and degradation that comes with modern mineral and gas extraction. When one gets an aerial view of the degradation that has occurred to the north of us in Colorado and through the wild areas of Utah it is obvious that those areas have suffered resource degradation that will take many years to recover if it does at all. The surface disturbance of exploration roads and the patchwork of drilling pads totally alters the natural beauty of an area, negatively affects wildlife, and degrades the recreational aspects of the area.

The subsurface disturbance of fracking has far reaching potential for resource degradation including tainting of subsurface water resources. With water being the resource which will become progressively more scarce in the future, any risk to the ground water must be prevented. Water is the resource that is the basis of life and can not be shrugged off for short term energy use!

As a permitted outfitter, my business provides recreational experiences to visitors and local citizens on the Resource Area. I believe mineral resource development would severely degrade the experience our clients have. Recreation is the key economic driver in our region and is a far more sustainable and environmentally much friendlier than extractive industries. Our business provides direct employment to 60 persons in San Miguel county and through our purchasing of supplies and services we provide economic benefit to many more. We feel mineral resource development in the area would be devastating to our enterprise.

On a more holistic perspective, Climate Change is the biggest challenge we as a race and the planet face. Recent studies have shown a concentration of greenhouse gasses in our region. Fracking produces dramatic amounts of greenhouse gas. The Resource Plan must acknowledge this fact and retard the development of fracking as a step towards climate health.

Thank you

BLM_0126478

--
Bob Gleason- President
Boot Doctors dba Further Adventures
www.bootdoctors.com

--
Bob Gleason- President
Boot Doctors, Inc
www.bootdoctors.com

BLM_0126479



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Re: UFO RMP
1 message

**D TEAL** <DORISTEAL@msn.com>                                    Fri, Oct 28, 2016 at 2:52 PM
To: "uformp@blm.gov" <uformp@blm.gov>

Dear BLM , I am referring to the  letter  I sent to you on October 18th.


After much thought and consideration of the mountain of new  information now available  regarding Fracking and the contamination of upstream water sources to the North Fork Valley, I have made the decision to change my position to a "NO LEASING ALTERNATIVE".

The plan is totally incompatible with our current sustainable economy and lifestyle.  ANY kind of leasing alternative could prove disastrous.

Thank you again for your consideration,


Doris T Wehrmacher


**From:** D TEAL
**Sent:** Tuesday, October 18, 2016 9:51:26 PM
**To:** uformp@blm.gov
**Subject:** UFO RMP

BLM_0126480



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Resource Mangement Plan
1 message

**Bob Gleason** <bootdr1@gmail.com>                                    Fri, Oct 28, 2016 at 11:50 AM
To: uformp@blm.gov

    Thank you for hearing our concerns with the Resource Management Plan.
    The highest value of the resource managed by the Uncompahgre Field Office is the inherent beauty and environmental health of the wild areas of the region and the tremendous value of the resource in it's natural state.  Since the end of the mining era, this region has been largely spared the devastation and degradation that comes with modern mineral and gas extraction.  When one gets an aerial view of the degradation that has occurred to the north of us in Colorado and through the wild areas of Utah it is obvious that those areas have suffered resource degradation that will take many years to recover if it does at all.  The surface disturbance of exploration roads and the patchwork of drilling pads totally alters the natural beauty of an area, negatively affects wildlife, and degrades the recreational aspects of the area.
    The subsurface disturbance of fracking has far reaching potential for resource degradation including tainting of subsurface water resources.  With water being the resource which will become progressively more scarce in the future, any risk to the ground water must be prevented.  Water is the resource that is the basis of life and can not be shrugged off for short term energy use!
    As a permitted outfitter, my business provides recreational experiences to visitors and local citizens on the Resource Area. I believe mineral resource development would severely degrade the experience our clients have.  Recreation is the key economic driver in our region and is a far more sustainable and environmentally much friendlier than extractive industries. Our business provides direct employment to 60 persons in San Miguel county and through our purchasing of supplies and services we provide economic benefit to many more.  We feel mineral resource development in the area would be devastating to our enterprise.
    On a more holistic perspective, Climate Change is the biggest challenge we as a race and the planet face.  Recent studies have shown a concentration of greenhouse gasses in our region.  Fracking produces dramatic amounts of greenhouse gas. The Resource Plan must acknowledge this fact and retard the development of fracking as a step towards climate health.

Thank you

--
Bob Gleason- President
Boot Doctors dba Further Adventures
www.bootdoctors.com

BLM_0126481



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Uncompahgre Plateau Resource Management Plan
1 message

**Marc Kenney** <mkenney@rccwest.com>                    Fri, Oct 28, 2016 at 11:57 AM
To: uformp@blm.gov

To whom it may concern:

I am writing in regards to the request for public comment on the Uncompahgre Plateau Resource Management Plan. I have spend a bit of time on the Uncompahgre Plateau doing various activities (camping, hiking, backpacking, hunting, rock climbing, mountain biking, and dirt biking). I think the Plateau facilitates all these activities quite well, except single track dirt biking. Many of the motorized trails on the north end are either discontinuous or shared with 4-wheelers, side x sides, and/or are roads. Roads and 4-wheeler trails are not compatible with dirt bikes and are not single track. What I would LOVE to see is a plan to provide long single track loops. Single track trails, with minimal width and disturbance to the natural terrain. There are some mountain bike trails that could be considered being opened to motos … but I'm sure that would be greatly opposed. There was a time when some of these mountain bike trails were open to motos and they were in much better shape then than they are currently. That is because the moto traffic kept things open and ridden in. Now they are a mess and hard to even bike. There are some nice one-way single track trails, but you have to ride on roads to connect them and you have to ride them backwards or ride roads to get back to your starting point. The south end of the Plateau is a little better in regards to single track moto loops, but it would be great to get some more trails down on that end too. But in my opinion the north end needs the most work and would get a lot of use from the Grand Junction users (because it is closer to GJ).

I would strongly encourage the BLM work with the Bookcliff Rattlers and MTRA to design and layout dirt bike single track trails using as much of existing as possible to create various loops options on the north end. Further these trails would make great mountain biking trails too. I'm thinking of Butterknife, Sarlacc, Sidewinder, West Bench, and other shared single track moto and dirt bike trails. I think most of these trails work really well for both user groups.

Thank you, good luck, and have a great day.

Marc Kenney

BLM_0126482



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## UFO RMP
1 message

**Mary Hockenbery** <ravensdreamscape@gmail.com>         Fri, Oct 28, 2016 at 2:40 PM
To: uformp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org

To the BLM employees concerned with the UFO RMP,

Attached please find a copy of my comment letter about the UFO RMP, I sent the hard copy of the letter via Priority Mail USPS and the local post office assures me that it will be delivered by November 1st. In case it does not get there in time I am sending it via email also.

Thank You,
Mary Hockenbery

📄 **blm letter.doc**
11K

BLM_0126483

Mary Hockenbery
PO BOX 624
Hotchkiss,CO 81419
October 28, 2016

To BLM Uncompahgre Field Office: RE Draft RMP

I am writing this letter to express my concerns about the Draft RMP for the BLM Uncompahgre Field Office.

I am an 8 year resident of the Town of Hotchkiss. This year I was elected to serve as a Hotchkiss Town Trustee. This letter is in NO WAY an official Town of Hotchkiss letter – I mention that I serve as a Trustee because I love my Town and the surrounding area enough to have put in 5 years of volunteer work as a Downtown Beautification Committee member (and chief flower waterer) and then decided to dedicate to a higher level of public service as an elected official.

Three years ago I bought an abandoned church in Hotchkiss and created a gallery and arts center – the Church of Art. I have recently closed the gallery but will continue to use the Church of Art to work with young people - creating public art to further beautify our town. I bought the Church to help move our North Fork Valley Creative District forward. As you may know, the Colorado State Office of Economic Development is home to Colorado Creative Industries – the Department responsible for administering the 18 Creative Districts around the State of Colorado. The Creative District program comes from the State of Colorado recognizing that Creative Industries are a major economic driver in the state. The NFV Creative District is unique in that it takes in the entire NFV and also recognizes Agricultural Creatives and Value Added Agriculture as part of our unique attraction and heritage. Value Added Agriculture is an important rural economic driver and is recognized as such by the USDA.

Shortly after we moved to Hotchkiss – August 2008 – Delta county was hit hard by the national economic collapse and is still struggling to recover. We are very slowly rebuilding our economy in a new way – recognizing our organic farms, creative industries and tourism are vital to our economic recovery.

Lastly, I am a grandmother to 7 beautiful young people ages 6 – 22 and I recognize that Climate Change is real, is accelerating, and is a very real threat to their health and well-being. As it is for all humans and other living beings on this planet Earth. Even if we were to stop any more development of fossil fuels at this point Climate Change will be wreaking havoc with food production, accelerating violent weather disasters, rising sea levels – all of which we can't afford – literally. Climate Change will be an economic disaster as well as a moral failing of humans to change behaviors that are harmful to the Earth – the only home we have.

I am writing this letter to question why this Draft RMP allows for gas leasing in the lower and central NFV - when many years of exploratory drilling have shown little in the way of commercially viable resources in these areas. Allowing leasing in these areas creates conflict with our economic recovery and will economically harm many residents in our valley while providing very little local economic benefit in the way of permanent jobs. The losses far outweigh the benefits. Having a lease sale go forward in the future would be devastating to our communities and our efforts to create a sustainable long term economy based on our diverse assets.

BLM_0126484

Also, this Draft RMP needs to assess in depth the impact of local gas leasing on Global Climate Change. We all have a responsibility to manage resources in a way that recognizes future impacts – long range impacts – not just the "here and now" demands of one industry – oil and gas. It is past time for "business as usual."

I take this quote from a Sepetember 3, 2016 article in The Guardian titled **Breakthrough as US and China agree to ratify Paris climate deal** "If the Paris agreement comes into force this year as hoped, it means the nearly 200 governments party to it will become obliged to meet emissions-cutting pledges made before the deal last December. For example, the EU has a "national determined contribution" of cutting emissions by 40% by 2030 on 1990 levels, and the US by up to 28% by 2025 compared with 2005." Our Federal Government recognizes that we must cut our dependence on fossil fuels. The UFO draft RMP needs to address this in depth and not work at cross purposes with other federal agencies and programs.

In closing I request that you continue to work on the UFO Draft RMP in a way that addresses the concerns brought up in this letter.

Thank you,


Mary Hockenbery

BLM_0126485



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## letter of comment about the BLM Uncompahgre Field Office Draft Resource Management Plan

1 message

**David Inouye** <inouye@umd.edu>                                    Fri, Oct 28, 2016 at 6:19 PM
To: uformp@blm.gov
Cc: director@blm.gov, rwelch@blm.gov, jmeyer@blm.gov, tpfifer@blm.gov, datchley@deltacounty.com,
bhovde@deltacounty.com, mroeber@deltacounty.com, rlevalley@deltacounty.com, kerry.donovan.sd5@gmail.com,
millie.hamner.house@state.co.us

Please see the attached letter of comment about the Uncompahgre Field Office Draft Resource Management Plan.

```
--
Dr. David W. Inouye
Professor Emeritus
Department of Biology
University of Maryland
College Park, MD 20742-4415
```
inouye@umd.edu

```
Principal Investigator
Rocky Mountain Biological Laboratory
PO Box 519
Crested Butte, CO 81224
```



**Letter to BLM about RMP.docx**
131K

BLM_0126486

28 October 2016

BLM
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 814101

Submitted via uformp@blm.gov

Cc: director@blm.gov, rwelch@blm.gov, jmeyer@blm.gov, tpfifer@blm.gov, datchley@deltacounty.com, bhovde@deltacounty.com, mroeber@deltacounty.com, rlevalley@deltacounty.com, kerry.donovan.sd5@gmail.com, millie.hamner.house@state.co.us,

I am providing this comment letter on the Uncompahgre Field Office Draft Resource Management Plan. **I will document in this letter why I believe strongly that you should adopt a no-leasing option in a revised RMP.**

I am a resident of the North Fork Valley, and am concerned about the potential for negative effects on my health, my quality of life, and the value of real estate I own if there is significant development of oil and gas resources in the planning area. In 2003 my wife and I purchased our 34-acre property, which is adjacent to a 25-acre BLM inholding (parcel 324303400011 in the Delta County Assessor's office records). We purchased our property because we were attracted by the isolation, views, solitude, and wildlife. We have watched eagles, bear, elk, deer, coyotes, bobcat, and wild turkeys on our property. We are concerned about the impacts that development of gas production facilities on BLM property in the study area would have on our property.

The oil and gas industries can have a significant negative effect on property values of nearby properties because of the negative effects they can have on noise, air pollution, light pollution, and water pollution. We are concerned that if BLM property is developed for oil or gas extraction in the study area that we will no longer find the quiet, clean air, and solitude that attracted us to that area, that there would be potential health impacts from air pollution, and that the stream on our property and Fire Mountain Canal water we rely on for irrigation could be contaminated. These impacts would reduce the value of our property when we try to sell it in the future.

**Human health effects of oil and gas extraction activities**

I don't think the Draft RMP pays sufficient attention to the adverse health effects that could result from large-scale oil and gas extraction activities, especially given the many recent research reports about such activities. I will highlight here some recent studies in Colorado. For example, a recent "study was designed to characterize and quantify emission rates and dispersion of air toxics, ozone precursors, and greenhouse gases from oil and gas operations in the Denver-Julesburg Basin on the northern Front Range of Colorado. Based on a review of critical knowledge gaps and input from a study Technical Advisory Panel, particular focus was placed on quantifying emissions of individual volatile organic compounds (VOCs), methane, and ethane

BLM_0126487

from oil and gas production sites and from hydraulic fracturing ("fracking") and flowback, important steps in the completion of new wells." (http://www.colorado.gov/airquality/tech_doc_repository.aspx?action=open&file=CSU_NFR_Report_Final_20160908.pdf).  Reported dated 15 September 2016, accessed 28 September 2016.

The chemicals released by fracking, flowback, and production included methane, ethane, propane, i-pentane, n-pentane, benzene, toluene, ethylbenzene, and m+p-xylene, at concentrations that can be predicted to have potential health impacts on humans for at least hundreds of meters from the release site. The consequences of the release of these chemicals for air quality and human health must be considered. They are likely to have impacts on local vegetation and wildlife as well. Such risks led the Governor of New York to ban fracking in that state in December 2014. The risks include both air and water pollution.

A recent study (McKenzie, L. M., et al. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environmental Perspectives 122:412-417) examined associations between maternal residential proximity to natural gas development and birth outcomes in a retrospective cohort study of 124,842 births between 1996 and 2009 in rural Colorado. They calculated inverse distance-weighted natural-gas well counts within a 10-mile radius of maternal residence to estimate maternal exposure, and found an association between density and proximity of natural gas wells and the prevalence of congenital heart defects and possibly neural tube defects. The chemicals responsible are probably the same cohort described in the study described above.

Additional information on the health consequences of gas drilling is available in these publications, which are not cited in the RMP, but should be considered in a revision:

**Bamberger, M., Oswald, R. (2012). Impacts of Gas Drilling on Animal and Human Health.** *New Solutions: A Journal of Environmental and Occupational Health*, 22(1): 51-77.

The researchers conducted interviews with animal owners in six states–Colorado, Louisiana, New York, Ohio, Pennsylvania, and Texas–affected by gas drilling. They also interviewed the owners' veterinarians, and examined the results of water, soil, and air testing as well as the results of laboratory tests on affected animals and their owners. The study highlights the possible links between gas drilling and negative health effects, along with the difficulties associated with conducting careful studies of such a link.

**Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2012.Natural Gas Operations from a Public Health Perspective,** *Human and Ecological Risk Assessment: an International Journal* 17(5):1039-1056.

The authors examined the chemicals known to be used in natural gas fracking procedures. Researchers were able to compile a list of 632 chemicals, though this list is incomplete due to trade secret exemptions given to the energy companies by Congressional allies. Many of the chemicals are toxic and represent the 'bad boys' of health concerns–causing everything from skin and eye irritation to cancer and mutations. They also highlight the "side effect" of air pollution

BLM_0126488

and the resulting irreversible damage to lung tissue, along with damage to vegetation in the surrounding area.

**McKenzie L, Witter RZ, Newman LS, Adgate JL, 2012, Human Health Risk Assessment of Air Emissions from Development of Unconventional Natural Gas Resources,** *Science of the Total Environment,* **424:79-87.**

Researchers from the Colorado School of Public Health used EPA guidance to estimate chronic and subchronic non-cancer hazard indices and cancer risks from exposure to hydrocarbons for two populations: (1) residents living > ½ mile from wells and (2) residents living ≤ ½ mile from wells. Risks were higher for those living less than a 1/2 mile from wells than those living further from drilling sites.

**Stephen G. Osborn, Avner Vengosh, Nathaniel R. Warner, and Robert B. Jackson Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing PNAS 2011 108: 8172-8176.**

Scientists found methane contamination of drinking water associated with shale-gas extraction. Average and maximum methane concentrations in drinking-water wells increased with proximity to the nearest gas well. Researchers also found a potential explosion hazard with the related concentrations of methane.

**Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology DOI: http://dx.doi.org/10.1210/en.2013-1697**

This study found that a selected subset of chemicals used in natural gas drilling operations and also surface and ground water samples collected in a drilling-dense region of Garfield County, Colorado, can exhibit estrogen and androgen receptor activities. Water samples were collected, solid-phase extracted, and measured for estrogen and androgen receptor activities using reporter gene assays in human cell lines. Of the 39 unique water samples, 89%, 41%, 12%, and 46% exhibited estrogenic, antiestrogenic, androgenic, and antiandrogenic activities, respectively. Testing of a subset of natural gas drilling chemicals revealed novel antiestrogenic, novel antiandrogenic, and limited estrogenic activities. The Colorado River, the drainage basin for this region, exhibited moderate levels of estrogenic, antiestrogenic, and antiandrogenic activitiessuggesting that higher localized activity at sites with known natural gas–related spills surrounding the river might be contributing to the multiple receptor activities observed in this water source. The majority of water samples collected from sites in a drilling-dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than reference sites with limited nearby drilling operations. Our data suggest that natural gas drilling operations may result in elevated endocrine-disrupting chemical activity in surface and ground water.

**Vidic, R. D., et al. 2013. Impact of shale gas development on regional water quality. Science 340 (6134): DOI: 10.1126/science.1235009**

BLM_0126489

Horizontal drilling and hydraulic fracturing make the extraction of tightly bound natural gas from shale formations economically feasible. These technologies are not free from environmental risks, however, especially those related to regional water quality, such as gas migration, contaminant transport through induced and natural fractures, wastewater discharge, and accidental spills. The focus of this Review is on the current understanding of these environmental issues.

**Jackson RB, B Rainey Pearson, SG Osborn, NR Warner, A Vengosh. 2011. Research and policy recommendations for hydraulic fracturing and shale-gas extraction. Center on Global Change, Duke University, Durham, NC.**

The potential for contamination from wastewaters associated with hydraulic fracturing depends on many factors, including the toxicity of the fracturing fluid and the produced waters, how close the gas well and fractured zone are to shallow ground water, and the transport and disposal of wastewaters. Despite precautions by industry, contamination may sometimes occur through corroded well casings, spilled fracturing fluid at a drilling site, leaked wastewater, or, more controversially, the direct movement of methane or water upwards from deep underground.

During the first month of drilling and production alone, a single well can produce a million or more gallons of waste water that can contain pollutants in concentrations far exceeding those considered safe for drinking water and for release into the environment. These pollutants sometimes include formaldehyde, boric acid, methanol, hydrochloric acid, and isopropanol, which can damage the brain, eyes, skin, and nervous system on direct contact. Another potential type of contamination comes from naturally occurring salts, metals, and radioactive chemicals found deep underground. After hydraulic fracturing, fracking fluids and deep waters flow through the well to the surface along with the shale gas.

Data from a recent study suggest that natural gas drilling operations may result in elevated endocrine-disrupting chemical activity in surface and ground water. The majority of water samples collected from sites in a drilling-dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than sites with limited nearby drilling operations. (Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology DOI: http://dx.doi.org/10.1210/en.2013-1697)

One of the consequences of oil and gas development is impacts on air quality. For 17 years, the American Lung Association has analyzed data from official air quality monitors to compile the State of the Air report. Although most residents and visitors probably think the air is clean in Montrose County, neighboring Mesa County gets an F for the number of high ozone days, and Gunnison County gets a C grade in the ALA report card (http://www.lung.org/our-initiatives/healthy-air/sota/city-rankings/states/colorado/). Some of that ozone likely comes from oil and gas production in those counties, and some from nearby parts of Utah. On the Front Range, where many counties get an F rating, a study found that oil and gas production accounts for about 17 percent of overall ozone contribution. These results suggest that air quality in the study area for the RMP is at risk from future oil and gas development, and the only way to avoid these consequences is to not drill new wells.

4

BLM_0126490



This is a graph from Web of Science (10/28/16), showing the number of scientific publications since 2012 that have the keywords "fracking" and "health". It documents how rapidly our knowledge of this intersection is growing. Would it be imprudent to make a decision now that would lock us into exposure to adverse health effects of oil and gas development for decades to come? With the kinds of adverse effects already documented in the studies listed above? I think it would be. We need to confirm the science before deciding to proceed with oil and gas development that can threaten human health.

As a group, these studies raise serious concerns about the health and environmental impacts of development of natural gas wells. These impacts would have serious consequences for the economy of the North Fork valley, which depends on clean air and water for agriculture, recreation, tourism, and domestic consumption. These impacts and consequences need to be addressed, as the only way to guarantee that there will be no such environmental and health consequences is a no-fracking option. If these health effects are engendered by permitting oil and gas development in the study area, how will they be mitigated? I'm not sure they can be. Who will pay for the consequences to individuals exposed to these effects?

**Climate change consequences of oil and gas development**

On p. 92 the draft RMP states: " It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP. It is important to note that projected changes are likely to occur over several decades to a century. Many of the projected changes associated with climate change may not be measurably discernible within the reasonably foreseeable future."

Note that this text is largely copied from a 2008 BLM report from Oregon that stated **"It may be difficult to discern whether global climate change is already affecting resources,** let alone the Planning or Decision Areas for the RMP. In most cases there is more information about potential or projected effects of global climate change on resources. **It is important to note that projected changes are likely to occur over several decades to a century.** Therefore **many of the projected changes associated with climate change** described below **may not be measurably discernible within the reasonably foreseeable future."** - Environmental Assessment OR-030-08-006 (Copying unattributed text like that would be considered plagiarism in the scientific literature.)

This statement was mostly incorrect in 2008, and the RMP statement is definitely incorrect now. Global climate change is already affecting the ecology of the analysis area. I have conducted research on this topic (at the Rocky Mountain Biological Laboratory) since 1971. The

5

BLM_0126491

growing season is significantly longer than it used to be a few decades ago, the timing of hibernation by marmots and other mammals has been changing, plants and animals are moving up in elevation and disappearing from some lower elevations, the timing of runoff in streams has changed, the timing of bird migration has changed, and the frequency of "false springs" has increased (a warm spell in early spring followed by a late frost), resulting in increased frost damage to both wildflowers and agriculture (for example, last year's disastrous frost that wiped out almost all fruit production in the North Fork Valley). Some of my publications about these changes in Gunnison County include:

Inouye, D. W., W. A. Calder and N. M. Waser. 1991. The effect of floral abundance on feeder censuses of hummingbird populations. Condor 93:279-285.

Inouye, D. W. and A. D. McGuire. 1991. Effects of snowpack on the timing and abundance of flowering in *Delphinium nelsonii*: implications for climate change. American Journal of Botany 78(7):997-1001.

Inouye, D. W., W. A. Barr, K. B. Armitage, and B. D. Inouye. 2000. Climate change is affecting altitudinal migrants and hibernating species. Proceedings of the National Academy of Sciences 97(4): 1630-1633.

Inouye, D. W. 2000. The ecological and evolutionary significance of frost in the context of climate change. Ecology Letters 3(5):457-463.

Inouye, D. W., M. A. Morales, and G. J. Dodge. 2002. Variation in timing and abundance of flowering by *Delphinium barbeyi* Huth (Ranunculaceae): the roles of snowpack, frost, and La Niña, in the context of climate change. Oecologia 130: 543-550.

Inouye, D. W., F. Saavedra, and W. Lee-Yang. 2003. Environmental influences on the phenology and abundance of flowering by *Androsace septentrionalis* L. (Primulaceae). American Journal of Botany 90(6):905-910.

Saavedra, F., D. W. Inouye, M. V. Price and J. Harte. 2003. Changes in flowering and abundance of *Delphinium nuttallianum* (Ranunculaceae) in response to a subalpine climate warming experiment. Global Change Biology 9: 885-894.

Inouye, D. W. 2007. Impacts of global warming on pollinators. Wings 30(2): 24-27.

Inouye, D. W. 2008. Effects of climate change on phenology, frost damage, and floral abundance of montane wildflowers. Ecology 89(2): 353-362. [Rated "Recommended" by Faculty of 1000]

Miller-Rushing, A. J., D. W. Inouye, and R. B. Primack. 2008. How well do first flowering dates measure plant responses to climate change? The effects of population size and sampling frequency. Journal of Ecology 96: 1289-1296.

Miller-Rushing, A. J. and D. W. Inouye. 2009. Variation in the impact of climate change on flowering phenology and abundance: An examination of two pairs of closely related wildflower species. American Journal of Botany 96:1821-1829.

BLM_0126492

Forrest, J., D. W. Inouye, and J. D. Thomson. 2010. Flowering phenology in subalpine communities: Does climate variation reshuffle species assemblages?  Ecology 91(2):431-440.

Lambert, A., A. J. Miller-Rushing, and D. W. Inouye. 2010. Changes in snowmelt date and summer precipitation affect the flowering phenology of *Erythronium grandiflorum* Pursh (glacier lily, Liliaceae). American Journal of Botany 97(9): 1431–1437.

Aldridge, G., D. W. Inouye, J. R. K. Forrest, W. A. Barr, and A. J. Miller-Rushing. 2011. Emergence of a mid-season period of low floral resources in a montane meadow ecosystem associated with climate change. Journal of Ecology 99(4): 905-913.
Boggs, C. L., and D. W. Inouye.  2012. A single climate driver has direct and indirect effects on pollinator numbers**.** Ecology Letters 15(5):502-508. [Rated "must read" by Faculty of 1000]

Anderson, J. T., D. W. Inouye, A. McKinney, and T. Mitchell-Olds. 2012. Phenotypic plasticity and adaptive evolution contribute to advancing flowering phenology in response to climate change. Philosophical Transactions of the Royal Society 279(1743): 3843-3852. [Rated "must read" by Faculty of 1000]

McKinney, A. M., P. J. CaraDonna, D. W. Inouye, b. barr, D. Bertelson, and N. M. Waser. 2012. Asynchronous changes in phenology of migrating Broad-tailed Hummingbirds and their early-season nectar resources. Ecology 93(9):1987-1993.

Iler, A. M., and D. W. Inouye.  2013. Effects of climate change on mast-flowering cues in a clonal montane herb, *Veratrum tenuipetalum* (Melanthiaceae). Amer. J. Bot. 100:1-7.

Iler, A. M., T. T. Høye, D. W. Inouye, and N. M. Schmidt. 2013. Nonlinear flowering responses to climate: Are species approaching their limits of phenological change? Philosophical Transactions of the Royal Society, themed issue 368: 20120489

Iler, A. M., D. W. Inouye, T. T. Høye, A. J. Miller-Rushing, L. A. Burkle, and E. Johnston. 2013. Maintenance of temporal synchrony between syrphid flies and their floral resources despite differential phenological responses to climate. Global Change Biology 19(8):2348–2359.

CaraDonna, P. J., A. M. Iler, and D. W. Inouye. 2014. Shifts in flowering phenology reshape a subalpine plant community. Proc. Nat. Acad. Sci. (USA) 111(13): 4916-4921. [Recommended by Faculty of 1000]

Wright, Karen W., K. L. Vanderbilt, D. W. Inouye, C. D. Bertelsen, and T. M. Crimmins. 2015. Turnover and reliability of flower communities in extreme environments: Insights from long-term phenology data sets. Journal of Arid Environments 115:27-34.

Pyke, G. H., J. D. Thomson, D. W. Inouye and T. J. Miller. 2016. Effects of climate change on phenologies and distributions of bumble bees and the plants they visit. Ecosphere 7(3): DOI 10.1002/ecs2.1267

7

BLM_0126493

Petry, W. K., J. D. Soule, A. M. Iler, A. Chicas-Mosier, D. W. Inouye, T. E. X. Miller, K. A. Mooney. 2016. Sex-specific responses to climate change drive rapid shifts in population sex ratio. Science 353: 69-71.

Compagnoni, A., A. J. Bibian, B. M. Ochocki, H. S. Rogers, E. L. Schultz, M. E. Sneck, B. D. Elderd, A. M. Iler, D. W. Inouye, H. Jacquemyn, and T. E. X. Miller. The effect of demographic correlations on the stochastic population dynamics of perennial plants. Ecological Monographs, in press.

These changes, with potential negative consequences for the flora and fauna of the study area, are already well documented and would be exacerbated by the greenhouse gases that would be produced by oil and gas development. As would the effects of climate change on the orchards and vineyards of the North Fork Valley.

Less than a mile from my house there was a major forest fire about 15 years ago, and the vegetation has still not recovered. A paper out this fall reports: "Increased forest fire activity across the western United States in recent decades has contributed to widespread forest mortality, carbon emissions, periods of degraded air quality, and substantial fire suppression expenditures. Although numerous factors aided the recent rise in fire activity, observed warming and drying have significantly increased fire-season fuel aridity, fostering a more favorable fire environment across forested systems. We demonstrate that human-caused climate change caused over half of the documented increases in fuel aridity since the 1970s and doubled the cumulative forest fire area since 1984. This analysis suggests that anthropogenic climate change will continue to chronically enhance the potential for western US forest fire activity while fuels are not limiting." http://www.pnas.org/content/early/2016/10/05/1607171113.abstract

In summary, I don't think it is "difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP.". **We don't have to wait several decades to a century to see the effects of continued/increasing fossil fuel use.**

**Effects on outdoor recreation**

I am a hunter and fisherman, as well as a conservation biologist and ecologist. I have taken my kayak and white water raft on rivers in the study area. Last week, a Denver Post article about the declining deer population in Colorado reported that ".... state biologists have determined that oil and gas drilling in deer habitat is hurting the ability of deer to recover.". It seems likely that other big game populations are also in danger of declining if there is large-scale oil and gas development in the study area. Road-kills are a major source of mortality already (I see many on Highway 133) and any increase in the number of roads, or of traffic on existing roads, will undoubtedly result in more roadkills, and disrupt traditional migration routes. How would these negative effects be mitigated if additional development occurs? Or could they be mitigated?

Water quality is an important issue for fisheries, which support recreational fishing (a big economic driver in the study area). Will people who now kayak and raft on rivers in this area still

8

want to do that if they know that the water is contaminated with drilling/production waste? The experience from the 2015 Gold King Mine waste water accident in Colorado shows that there can be a significant economic and environmental cost from such accidents. Oil and gas development will threaten both water quality and the volume of in-stream flows that support this economic and recreational activity. There are already too many spills from oil and gas drilling and production in Colorado. 615 in 2015 alone (http://www.denverpost.com/2016/03/17/oil-and-gas-companies-in-colorado-reported-615-spills-in-2015/), of which 90 contaminated groundwater. There were 777 spills the previous year. An unavoidable conclusion is that increased oil and gas development in the study area will result in groundwater contamination.

If drilling/production waste water is stored in pounds, what efforts would be made to protect wildlife from coming into contact with contaminated water? Big and small game animals would potentially be attracted to storage ponds, and unless they are covered they pose a threat to waterfowl as well. Would there be any volatile chemicals released from waste storage ponds? How would that air pollution be monitored and mitigated?

**Economic losses from loss of methane from wells**

If any new wells are permitted, they should be required to capture methane released by drilling and development of oil and gas. Not only is methane a potent greenhouse gas that contributes to global climate change, but it is also a potentially valuable resource. If it is flared or simply vented, there is an economic loss to the federal government, as well as the state and local municipalities that could benefit from that income.

**Potential earthquake risk from underground disposal of fracking wastes**

Is enough known about the geology of the study area to provide certainty that injection of fracking wastes would not cause an increased potential for earthquakes? "Oklahoma's three largest earthquakes since 2011 have accounted for approximately two-thirds of the energy unleashed during the state's spate of induced seismicity. Potential remains for another magnitude 5.0 or greater temblor — and there still has not been a sizable aftershock from the state-record Pawnee quake last month — but indications are that man-made earthquakes have returned to a downward trend [following a reduction in underground disposal of fracking wastes].

Jeremy Boak, director of the Oklahoma Geological Survey, presented that information this month during an hourlong talk at the Oklahoma Corporation Commission's annual Oil and Gas Institute on OU-Tulsa's campus. Boak discussed his concern that an underground "pressure pulse" could trigger another large quake."http://www.tulsaworld.com/homepagelatest/three-quakes-since-make-up-two-thirds-of-oklahoma-s/article_ec758a9f-2944-5fc0-8150-1658da9c22fb.html

BLM_0126495

**Regulation of rural gathering lines**

The draft RMP does not address the fact that at present major gas pipelines in the study area are not regulated, by either the state or federal government. There have been some dramatic and fatal accidents in the past year from pipelines in other parts of the country, and I am concerned that there is already the potential for these kinds of accidents in the study area from existing transmission lines. I think there should be a moratorium on new drilling until rural gathering lines are regulated, to help minimize the potential for a major accident in the study area.

**In closing**

Given all of these potential hazards and negative impacts of oil and gas development, **I request that you adopt a no-leasing alternative as the logical conclusion for management in the study area.** The economics of fossil fuel extraction are changing rapidly; witness the decline of coal mining in the North Fork Valley in the past few years, and the rapid increase in renewable energy development. For example, last year I installed enough solar panels that I am now a net producer of electricity. Social attitudes toward fossil fuels are also changing rapidly, as the feasibility of replacing fossil fuels with renewable resources is demonstrated. At least five countries around the world have already or will soon be independent of fossil fuels for most or all energy demands (http://theantimedia.org/5-countries-that-prove-the-world-doesnt-need-fossil-fuels/). The USA is on track to follow their lead and we should not develop fossil fuel resources that will put areas like the North Fork Valley at risk.

Sincerely,

Dr. David W. Inouye
38213 Hwy 133
Hotchkiss, CO 81419-7315
inouye@umd.edu

Professor Emeritus                         Principal Investigator
Department of Biology                      Rocky Mountain Biological Laboratory
University of Maryland                      Crested Butte, CO 81224
College Park, MD 20742-4415

Past-President, Ecological Society of America

10



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

# Draft Resource Management Plan for the Uncompahgre Field Office comments
1 message

**Paonia Chamber** <naturally@paoniachamber.com>                    Fri, Oct 28, 2016 at 4:23 PM
To: uformp@blm.gov
Cc: Jon Schulz <jonrschulz@aol.com>, Doris Danielsen <jambi@tds.net>, Annette Pretorius
<annettepretorius@gmail.com>, Carri Gillenwater <cgillenwater@firstcoloradobank.com>, Betsy Marston
<betsym@hcn.org>, Frederick Zimmer <frederick@elementaldb.com>, Debbie Kimball <debsimkim@gmail.com>, Kathy
Swartz <kswartz@solarenergy.org>, "Alex Johnson, Executive Director" <info@theconservationcenter.org>

Dear BLM-UFO Staff and RMP Comment Team,

Attached please find the Paonia Chamber of Commerce comments and recommendations letter for the Draft Resource
Management Plan.  Thank you for the opportunity to comment on this plan.  Please consider the attached input from
The Paonia Chamber of Commerce on the Draft Resource Management Plan (RMP).

Sincerely,


**Susan Shoemaker, Office Manager**
**(970) 527-3886**

Paonia Chamber of Commerce
PO Box 366
136 Grand Avenue
Paonia, CO   81428




📄 **Paonia Chamber ltr to BLM, RMP 28oct2016 Letterhead.pdf**
448K

BLM_0126497

**PAONIA**
Chamber of
Commerce

PO Box 366 • Paonia, CO  81428-0366

naturally@paoniachamber.com • www.paoniachamber.com • Phone/Fax:  970-527-3886

October 26, 2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,


Thank you for the opportunity to comment on this plan. Please consider this input from The Paonia Chamber of Commerce on the DRAFT Resource Management Plan (RMP).

**Recommendations Concerning the Draft RMP**
**1.1    Please continue to include and consider the NFA (Alternative B-1) in the RMP.**
The role of the Paonia Chamber of Commerce is to support and promote existing businesses in the town and region and to encourage appropriate new businesses.

Of the proposed alternatives in the RMP, Alternative B-1 maintains the possibility of continuing to develop a diverse, robust, thriving economy for Paonia and Delta County not overly vulnerable to the booms and busts typical of energy extraction.

Significant effort has been expended to understand what is needed to develop economic prosperity in Paonia, North Fork communities, and Delta County: Paonia Vision and Planning, Vision 2020, Heart and Soul, Region 10 Economic Development Plan for Delta County and nearby areas.  Certain FACTS have emerged from these efforts.

- In every case, the critical need to reduce our vulnerability to the booms and busts associated with energy extraction have been identified and emphasized. This does mean that planning for oil and gas extraction as a significant part of an overall economic recovery plan would be very foolish.

Paonia Chamber of Commerce

- The one viable and best solution identified for Paonia and Delta county is development of a diverse and balanced economy based on food production and processing (especially organic and naturally grown), recreation, tourism, internet businesses, and the creative arts – businesses that are already successful, in sync with major national trends, and growing.

We, as citizens, community leaders, and Directors of the Paonia Chamber of Commerce, are focused on continuing efforts to support and develop this economy.
In case it is not blindly obvious, the economic survival and potential of this area depends on the reality (and, indeed, the perception) of this area as a region of clean air, clean water, productive agricultural land, beautiful landscapes, fantastic food and beverages, healthy wildlife, and awesome culture.

**1.2  Also, please seriously consider designating the BLM lands on and around Jumbo Mountain as a Special Recreation and Ecological Emphasis Management Area** because of their unique value, importance, and distinctiveness of the recreational area and criticality of the area as winter habitat for mule deer and other wildlife.

**2.0  Correct Significant Deficiencies in the Draft RMP and Planning Process**

Based on FACTS emerging from areas already fracked, it is likely that the scale and nature of proposed gas and oil development in the Uncompahgre planning area will create massive negative systemic impacts across the entire region – damaging every resource the people of Western Colorado value – except resource extraction.  Not only will these actions adversely impact current residents, agriculture and businesses of the present generation but future generations as well.

The BLM has an important legal mandate:
> *Sustain the health, diversity, and productivity of America's public lands and resources through balanced stewardship to enhance the quality of life for all citizens, meeting their needs today without compromising their ability to meet those needs in the future.*

Unfortunately the Draft RMP is fatally flawed as it is and cannot possibly accomplish this mandate. It takes a very reductionist and micro view of the situation, ignoring the "elephants" in the room, ignoring significant near term as well as long term cumulative and permanent impacts. A systems perspective is required and totally lacking.
For this RMP to meet the BLM mandate, it's deficiencies must be corrected to prevent the region from being turned permanently into a toxic, dangerous,

Paonia Chamber of Commerce

industrialized wasteland through its leasing and development plans.  Here are some of the issues and impacts that must be addressed to prevent this:

- The RMP must protect the resources that citizens of Western Colorado value by becoming far more balanced – by addressing significant impacts not covered by the Draft RMP.
- The RMP must address the question of whether or not this oil and gas development is really needed as well as the appropriate scale and timing of leasing and proposed development.  At best natural gas is a short-term transition fuel eventually to be replaced by other energy sources.
- The RMP must address the impact of massive losses of methane and flaring during drilling and operations and the use of that methane that is finally produced on climate change. Natural gas is extracted by fracking is not the clean transition fuel that has been advertised, it is worse than coal.
- The RMP must address the massive destructive use of water in the fracking process in a region where water supplies are already overdrawn and pervasive long term drought is the most likely reality for the foreseeable future. It must also address potential impacts to city and private water system watersheds, and irrigation systems including their watersheds.
- The RMP must address the adverse impacts of oil and gas development on human, agricultural animal, and wildlife health.
- The RMP must address the cumulative system impacts of oil and gas development on community health and function (things like physical infrastructure, health services, crime, community safety, and policing).
- The RMP must deal with the actual impacts of modern fracking technology and not imply that it is equivalent to older less damaging technologies.
- The RMP must not ignore the fact that current regulatory policy and processes have been totally inadequate to minimize the destructive impacts of modern oil and gas development.
- The RMP must address the massive impacts to wildlife, wildlife habitat, and hunting, along with related economic issues.
- The RMP must deal with the impacts to regional and state food security.
- The RMP must protect the current and long term productivity of public lands - emphasizing resource extraction to the detriment of all other resources is a violation of BLM's mandate.
- The RMP must enhance the quality of life for all citizens, not just the managers, owners and shareholders of oil and gas companies.
- The RMP must protect the ability of future generations to meet their needs. That means you must include and properly address the issues and impacts identified here.

Paonia Chamber of Commerce

BLM_0126500

- The assertion that this gas and oil development is about meeting our needs today may have some merit, but please spare yourselves some embarrassment by not asserting that this is about energy for Americans, it is about extracting the resource in the cheapest way possible to sell in international markets to the highest bidder.
- The RMP must address the very real risks that will be created by deep well wastewater injection in the area, one of the most geologically unstable areas of Colorado. Earthquakes and mudslides damage to infrastructure critical to the economic function of the region. Impacts to oil and gas infrastructure must be assessed as well.

We are hopeful that this input will help you to design a Resource Management Plan that will meet BLM's legal mandate, and protect our public lands and resources while allowing appropriate levels of resource development

Sincerely,



Paonia Chamber of Commerce.

Paonia Chamber of Commerce

11/1/2016        DEPARTMENT OF THE INTERIOR Mail - DEIS Comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## DEIS Comments
1 message

**Jonathan B Ratner** <jonathan@westernwatersheds.org>            Tue, Oct 25, 2016 at 2:16 AM
To: ufomp@blm.gov

Jonathan B Ratner

WWP – Wyoming Office

PO Box 1160

Pinedale, WY 82941

Tel: 877-746-3628

Fax: 208-4754702



**14 attachments**

Exerpt from Winnemucca RMP protest RE bighorn sheep .docx
154K

BLM - CO - Uncompahgre RMP Comments.pdf
393K

RMBS North Delta Final EA and FONSI Protest 071516 Final.pdf
1255K

2 - Exhibit A - Pages from BLM RMP Planning Handbook.pdf
259K

6 - Exhibit E - BLM Manual 7200 Water Resource Managment.pdf
223K

3 - Exhibit B - DOI Manual 520 DM 1 Wetlands and Floodplain.pdf
68K

4 - Exhibit C - BLM Manual 1737 Riparian - Wetland Management.pdf
1148K

5 - Exhibit D - BLM Manual 6720 Aquatic Resource Management.pdf
442K

45d - Prineville BLM - Grazing Matrix Table.pdf
305K

45a - Prineville BLM - Alternatives Grazing Comparison Chart.pdf
207K

45b - Prineville BLM - Grazing Guidelines - Allotment Evaluations.pdf
459K

45c - Prineville BLM - Grazing Matrix Memo.doc

BLM_0126502

 26K

 **82 - Carter WyomingBLMRangeRecommendations.pdf**
373K

 **92 - A Science-Based Tool for Assessing Grazing Capacity Catlin et al.pdf**
394K

BLM_0126503



**Wyoming Office**
**PO Box 1160**
**Pinedale, WY 82941**
**Email: Wyoming@WesternWatersheds.org**
**Web site: www.WesternWatersheds.org**

*Working to protect and restore Western Watersheds*

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401

BLM_0126504



**Wyoming Office**
**PO Box 1160**
**Pinedale, WY 82941**
**Tel: (877) 746-3628**
**Fax: (208) 475-4702**
**Email: Wyoming@WesternWatersheds.org**
**Web site: www.WesternWatersheds.org**          *Working to protect and restore Western Watersheds*

**Western
Watersheds
Project**

October 23, 2016

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401

Re: RMP Comments

*"A thing is right when it tends to preserve the integrity, stability, and beauty of the biotic community. It is wrong when it tends otherwise."*

*"We abuse land because we regard it as a commodity belonging to us. When we see land as a community to which we belong, we may begin to use it with love and respect. There is no other way for land to survive the impact of mechanized man, nor for us to reap from it the esthetic harvest it is capable, under science, of contributing to culture."*

- Aldo Leopold

*"What we do with the public lands of the United States tells a great deal about what we are, what we care for and what is to become of us as a nation."*

- Senator Henry M. Jackson

*"And [multiple use is] harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output."*

- Federal Land Policy and Management Act 43 U.S.C. § 1702(c)

*"In managing the public lands the Secretary [of the Department of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands."*

- Federal Land Policy and Management Act 43 U.S.C. § 1732(b)

Dear Field Office Manager,

The first and foremost consideration must be the legal and regulatory framework within which the BLM operates. The overarching law is FLPMA. FLPMA requires that the BLM:

*Section 102 (2) the national interest will be best realized if the public lands and their resources are periodically and systematically inventoried and their present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts*

*Section 102 (8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will pro-vide for outdoor recreation and human occupancy and use*

*Section 201 (a) The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern. This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values. The preparation and maintenance of such inventory or the identification of such areas shall not, of itself, change or prevent change of the management or use of public lands.(emphasis added)*

Compliance with this subsection is the prerequisite of all planning and must be completed prior to initiation of the RMP revision process. Note also that the next Section B mentions funding. This indicates Section B is discretionary, whereas Section A is mandatory.

*Section 202 (c) In the development and revision of land use plans, the Secretary shall–*
*(1) use and observe the principles of multiple use and sustained yield set forth in this and other applicable law;*
*(2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;*
*(3) give priority to the designation and protection of areas of critical environmental concern;*
*(4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other values;*
*(5) consider present and potential uses of the public lands;*
*(6) consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;*
*(7) weigh long-term benefits to the public against short-term benefits;*
*(8) provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans;* (emphasis added)

BLM_0126506

*Section 302 B In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.*

The regulations implementing the FLPMA planning requirements are at 43 CFR 1600.

43 CFR 1601.0-2 Objective.

The objective of resource management planning by the Bureau of Land Management is to maximize resource values for the public through a rational, consistently applied set of regulations and procedures which promote the concept of multiple use management and ensure participation by the public, state and local governments, Indian tribes and appropriate Federal agencies. Resource management plans are designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses. (emphasis added)

It is clear from the above that RMP's are required to provide specific requirements, standards and limitations that are overarching for the Field Office and that guide the site-specific decisions later. The DEIS RMP direction are little more than aspirational with no requirements. This violates FLPMA.

This is made even more clear under Definition N, which states:

(n) Resource management plan means a land use plan as described by the Federal Land Policy and Management Act. The resource management plan generally establishes in a written document:
> (1) Land areas for limited, restricted or exclusive use; designation, including ACEC designation; and transfer from Bureau of Land Management Administration;
> (2) Allowable resource uses (either singly or in combination) and related levels of production or use to be maintained;
> (3) Resource condition goals and objectives to be attained;
> (4) Program constraints and general management practices needed to achieve the above items;
> (5) Need for an area to be covered by more detailed and specific plans;
> (6) Support action, including such measures as resource protection, access development, realty action, cadastral survey, etc., as necessary to achieve the above;
> (7) General implementation sequences, where carrying out a planned action is dependent upon prior accomplishment of another planned action; and
> (8) Intervals and standards for monitoring and evaluating the plan to determine the effectiveness of the plan and the need for amendment or revision.

43 CFR 1610.4-4 requires that the BLM:

The Field Manager, in collaboration with any cooperating agencies, will analyze the inventory data and other information available to determine the ability of the resource area to respond to identified issues and opportunities. The analysis of the management situation shall provide, consistent with multiple use principles, the basis for formulating reasonable alternatives, including the types of resources for development or protection. Factors to be considered may include, but are not limited to:

BLM_0126507

(a) The types of resource use and protection authorized by the Federal Land Policy and Management Act and other relevant legislation;
(b) Opportunities to meet goals and objectives defined in national and State Director guidance;
(c) Resource demand forecasts and analyses relevant to the resource area;
(d) The estimated sustained levels of the various goods, services and uses that may be attained under existing biological and physical conditions and under differing management practices and degrees of management intensity which are economically viable under benefit cost or cost effectiveness standards prescribed in national or State Director guidance;
(e) Specific requirements and constraints to achieve consistency with policies, plans and programs of other Federal agencies, State and local government agencies and Indian tribes;
(f) Opportunities to resolve public issues and management concerns;
(g) Degree of local dependence on resources from public lands;
(h) The extent of coal lands which may be further considered under provisions of §3420.23(a) of this title;
and
(i) Critical threshold levels which should be considered in the formulation of planned alternatives.

43 CFR 1610.7-2 requires:

Areas having potential for Areas of Critical Environmental Concern (ACEC) designation and protection management shall be identified and considered throughout the resource management planning process (see §§1610.4–1 through 1610.4–9).
 (a) The inventory data shall be analyzed to determine whether there are areas containing resources, values, systems or processes or hazards eligible for further consideration for designation as an ACEC. In order to be a potential ACEC, both of the following criteria shall be met:
(1) Relevance. There shall be present a significant historic, cultural, or scenic value; a fish or wildlife resource or other natural system or process; or natural hazard.
(2) Importance. The above described value, resource, system, process, or hazard shall have substantial significance and values. This generally requires qualities of more than local significance and special worth, consequence, meaning, distinctiveness, or cause for concern. A natural hazard can be important if it is a significant threat to human life or property.

BLM Manual 1601 Land Use Planning further describes the requirements the BLM must comply with in the development of an RMP:

Section .1 B. The land use planning process is the key tool used by the BLM, in coordination with interested publics, to protect resources and designate uses on Federal lands managed by the BLM. Planning is critical to ensuring a coordinated, consistent approach to managing these lands. This Manual and Handbook provide guidance for preparing new Resource Management Plans (RMPs), plan revisions, plan amendments, other equivalent plans (e.g., plans adopted from other agencies), and subsequent implementation-level plans. Procedures and requirements are set forth to ensure that the BLM's plans meet regulatory and statutory requirements. (emphasis added)

Section .2 .02 Objectives. These plans help ensure that the public lands are managed in accordance with FLPMA (43 USC 1701 et seq.) and other applicable laws and regulations, under the principles of multiple use and sustained yield; in a manner that recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber; and in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water, and archaeological values. Where appropriate, lands will be managed to preserve and protect certain public lands in their natural condition to provide food and habitat for fish and wildlife and domestic animals, and to provide for outdoor recreation and human occupancy and use. The BLM will encourage collaboration and public participation throughout the planning process. To accomplish the above, the BLM will:

A. Provide on a continuing basis an inventory of all public lands and their resource and other values. This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values (FLPMA, Sec. 201 (a)).

B. Use an interdisciplinary process for evaluating resource information that considers physical, cultural, and biological resources in conjunction with social and economic factors to decide appropriate public land uses.

C. Ensure opportunities for participation by Indian tribes, State and local governments, other Federal agencies, and the public in a way that coordinates land use inventory, planning, and management activities with these other jurisdictional entities. Such participation will help ensure that land use plans for public lands are consistent with the plans and policies of these entities to the maximum extent consistent with Federal law (FLPMA, Sec. 202 (c) (9)), and that policies of approved Indian tribal land resource management programs are considered (FLPMA, Sec. 202 (b)).

D. Use collaborative and multijurisdictional approaches, to the extent possible, to encourage consistency in planning across different land ownerships and jurisdictions.

E. Provide to the public a documented record of land allocations and permissible resource uses and constraints.

F. Provide a framework to guide subsequent implementation decisions. (emphasis added)

Section .3 2. reiterates the requirements of FLPMA:

"Sec. 201 requires the Secretary of the Interior to prepare and maintain an inventory of the public lands and their resource and other values, **giving priority** to areas of critical environmental concern (ACECs), and, as funding and workforce are available, to determine the boundaries of the public lands, provide signs and maps to the public, and provide inventory data to State and local governments.

F. The Colorado River Basin Salinity Control Act, 43 U.S.C. 1593, requires a comprehensive program for minimizing salt contributions to the Colorado River from BLM lands.

Section .06 requires:

2. The BLM's mission is to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations. Land use plan decisions will further this mission by identifying desired outcomes and actions that restore and maintain the health of the land; preserve natural and cultural heritage; reduce threats to

BLM_0126509

public health, safety, and property; and provide opportunities for environmentally responsible recreational and commercial activities.

3. When making land use plan decisions, the BLM will consider information from all available sources, including scientific data gained from resource assessments, information regarding ecosystem protection and restoration needs, the reasonably foreseeable development of consumptive and nonconsumptive uses, and social and economic information.

The Manual provides specific definitions for the requirements that a RMP must contain:

Goal: a broad statement of a desired outcome. Goals are usually not quantifiable and may not have established time frames for achievement.

Guidelines: actions or management practices that may be used to achieve desired outcomes, sometimes expressed as best management practices. Guidelines may be identified during the land use planning process, but they are not considered a land use plan decision unless the plan specifies that they are mandatory. Guidelines for grazing administration must conform to 43 CFR 4180.2.

Land Use Allocation: the identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions.

Land Use Plan Decision: establishes desired outcomes and actions needed to achieve them. Decisions are reached using the planning process in 43 CFR 1600. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to IBLA.

Objective: a description of a desired condition for a resource. Objectives can be quantified and measured and, where possible, have established time frames for achievement.

Planning Criteria: the standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning. Planning criteria streamline and simplify the resource management planning actions.

Resource Use Level: the level of use allowed within an area. It is based on the desired outcomes and land use allocations in the land use plan. Targets or goals for resource use levels are established on an area-wide or broad watershed level in the land use plan. Site-specific resource use levels are normally determined at the implementation level, based on site-specific resource conditions and needs as determined through resource monitoring and assessments.

Standard: a description of the physical and biological conditions or degree of function required for healthy, sustainable lands (e.g., land health standards).

With the exception of some specific oil and gas related requirements, most of the other resource extraction sections fail to implement Objectives and Resource Use Levels as

defined above. Livestock grazing is a perfect example of this problem. It fails to implement limitations or specific requirements.

BLM H-1601-1 Land Use Planning Handbook, likewise provides further specificity and reiteration of the requirements the BLM must follow in the development of RMP's:

Land use plans and planning decisions are the basis for every on-the-ground action the BLM undertakes.

Land use plans ensure that the public lands are managed in accordance with the intent of Congress as stated in FLPMA (43 U.S.C. 1701 et seq.), under the principles of multiple use and sustained yield. As required by FLPMA and BLM policy, the public lands must be managed in a manner that protects the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; that will provide for outdoor recreation and human occupancy and use;

Land use plans are one of the primary mechanisms for guiding BLM activities to achieve the mission and goals outlined in the Department of the Interior (DOI) Strategic Plan.

Handbook at 1A

Decisions in land use plans guide future land management actions and subsequent site-specific implementation decisions. These land use plan decisions establish goals and objectives for resource management (desired outcomes) and the measures needed to achieve these goals and objectives (management actions and allowable uses). Section 202(c) of FLPMA (43 U.S.C. 1712) requires that in developing land use plans, the BLM:

1. Use and observe the principles of multiple use and sustained yield;
2. use a systematic interdisciplinary approach to integrate physical, biological, economic, and other sciences;
3. give priority to designating and protecting areas of critical environmental concern (ACECs);
4. rely, to the extent available, on an inventory of public lands, their resources, and other values;
5. consider present and potential uses of public lands;
6. consider the relative scarcity of the values involved and the availability of alternative means and sites for realizing those values;
7. weigh long-term benefits to the public against short-term benefits;
8. provide for compliance with applicable Tribal, Federal, and state pollution control laws, standards, and implementation plans; and
9. to the extent consistent with the laws governing the administration of public lands, coordinate the land use inventory, planning, and management activities of public lands with land use planning and management programs of other Federal departments/agencies and state/local governments, as well as the policies of approved Tribal and state land resource management programs. The BLM must, to the extent practical, assure that consideration is given to those Tribal, state, and local plans that are germane in the development of land use plans for public lands. Land use plans must be consistent with

state and local plans to the maximum extent consistent with Federal law. Refer to
FLPMA for the full text of Federal responsibilities detailed under Section 202(c)(9).

Handbook at IIA

Further defining the required components of an RMP, the Handbook states in Section II B:
**B. Types of Land Use Plan Decisions**
<u>Land use plan decisions for public lands fall into two categories: desired outcomes (goals
and objectives) and allowable (including restricted or prohibited) uses and actions
anticipated to achieve desired outcomes</u>.

1. Desired outcomes
Land use plans must identify desired outcomes expressed in terms of <u>specific goals and
objectives. Goals and objectives direct the BLM's actions in most effectively meeting legal
mandates; numerous regulatory responsibilities; national policy, including the DOI
Strategic Plan goals; State Director guidance (see 43 CFR 1610.0-4(b)); and other resource
or social needs. Desired outcomes should be identified for and pertain to resources (such as
natural, biological, and cultural), resource uses, (such as energy and livestock grazing), and
other factors (such as social and economic conditions).</u> Definitions and examples of goals
and objectives are listed below:

*Goals* are broad statements of desired outcomes (e.g., maintain ecosystem health and
productivity, promote community stability, ensure sustainable development) that usually
are not quantifiable. Since the release of the original Handbook, the BLM has worked with
RACs to develop Land Health Standards applicable to all ecosystems and management
actions. These Land Health Standards must be expressed as goals in the land use plan.
Goals can also be drawn from the Departmental and/or the DOI Strategic Plan or other
sources. A sample goal for a Land Health Standard is: "Maintain healthy, productive plant
and animal communities of native and other desirable species at viable population levels
commensurate with the species and habitat's potential." A sample goal from the Strategic
Plan is: "Sustain desired biological communities on Department of the Interior-managed
and -influenced lands and waters in a manner consistent with obligations regarding the
allocation and use of water." These goals, or modifications thereof, could be used in a land
use plan.

<u>*Objectives* identify specific desired outcomes for resources. Objectives are usually
quantifiable and measurable and may have established timeframes for achievement (as
appropriate). A sample objective is: "Manage vegetative communities on the upland
portion of the Clear Creek Watershed to achieve, by 2020, an average 30 to 40 percent
canopy cover of sagebrush to sustain sagebrush-obligate species." When quantified, the
indicators associated with Land Health Standards are one possible source of objectives.</u>

While the DEIS has goals, the objectives as defined above are noticeably missing.

2. Allowable uses and management actions anticipated to achieve desired outcomes (goals
and objectives)

After establishing desired outcomes, the BLM identifies allowable uses (land use allocations) and management actions for different alternatives that are anticipated to achieve the goals and objectives.

a. Allowable uses. Land use plans must identify uses, or allocations, that are allowable, restricted, or prohibited on the public lands and mineral estate. These allocations identify surface lands and/or subsurface mineral interests where uses are allowed, including any restrictions that may be needed to meet goals and objectives. Land use plans also identify lands where specific uses are excluded to protect resource values. Certain lands may be open or closed to specific uses based on legislative, regulatory, or policy requirements or criteria to protect sensitive resource values. If land use plan decisions close areas of 100,000 acres or greater in size to a principal or major use for 2 years or more, Congress must be notified of the closure upon its implementation as prescribed in 43 CFR 1610.6.

The land use plan must set the stage for identifying site-specific resource use levels. Site-specific use levels are normally identified during subsequent implementation planning or the permit authorization process. At the land use plan level, it is important to identify reasonable development scenarios for allowable uses such as mineral leasing, locatable mineral development, recreation, timber harvest, utility corridors, and livestock grazing to enable the orderly implementation of future actions. These scenarios provide a context for the land use plan's decisions and an analytical base for the NEPA analysis. The BLM may also establish criteria in the land use plan to guide the identification of site-specific use levels for activities during plan implementation.

b. Management actions. Land use plans must identify the actions anticipated to achieve desired outcomes, including actions to maintain, restore, or improve land health. These actions include proactive measures (e.g., measures that will be taken to enhance watershed function and condition), as well as measures or criteria that will be applied to guide day-to-day activities occurring on public land. Land use plans also establish administrative designations such as ACECs, recommend proposed withdrawals, land tenure zones, and recommend or make findings of suitability for congressional designations (such as components of the National Wild and Scenic River System). While protection and restoration opportunities and priorities are often related to managing specific land uses (such as commodity extraction, recreation, or rights-of-way corridors), they can be independent of these types of uses as well. In certain instances, it is insufficient to simply remove or limit a certain use, because unsatisfactory resource conditions may have developed over long periods of time that will not correct themselves without management intervention. For example, where exotic invasive species are extensive, active restoration may be necessary to allow native plants to reestablish and prosper. In these cases, identifying restoration opportunities and setting restoration priorities are critical parts of the land use planning process.

Again, the 'direction' contained in the DEIS utterly fails to meet the above requirements.

Appendix C of the Handbook states:

The application of program-specific guidance for land use plan decisions will vary, depending on the decision category, and must be applied as follows:

BLM_0126513

I. *Natural, Biological, and Cultural Resources:* <u>Decisions identified must be made during the land use planning process if the resource exists in the planning area.</u>

II. *Resource Uses:* <u>Decisions identified must be made during the land use planning process if the BLM anticipates it may authorize or allow a resource use. If uses are allowed, decisions must also be made regarding intensity and limits or restrictions.</u>

Again, take livestock grazing as an example, the DEIS 'direction' fails to implement requirements and limitations needed to meet goals.

III. *Special Designations:* <u>Special designation decisions identified must be made during the land use planning process when the BLM anticipates it may authorize or allow uses which could disqualify inventoried resource values from designation. Special designation decisions may be made during the land use planning process when there is no threat to the inventoried resource.</u>

IV. *Support:* Support needs and decisions may be determined through the land use planning process, based on individual planning situations.

Appendix C of the Handbook provides the heart of the planning process. Given its importance to complying with FLPMA, we are providing it, with highlights, in its entirety as Exhibit A.

Please review the

The Department of the Interior Departmental Manual 516 DM1 provides important guidance for the development of DEIS:

1.2   **Policy**.  It is the policy of the Department:

     A.     To provide leadership in protecting and enhancing those aspects of the quality of the Nation's environment which relate to or may be affected by the Department's policies, goals, programs, plans, or functions in furtherance of national environmental policy;

Section D states, in part:

(4)     Shall monitor, evaluate, and control on a continuing basis their activities as needed to protect and enhance the quality of the environment.  Such activities will include both those directed to controlling pollution and enhancing the environment and those designed to accomplish other program objectives which may affect the quality of the environment. They will develop programs and measures to protect and enhance environmental quality. They will assess progress in meeting the specific objectives of such activities as they affect the quality of the environment.

Section E states, in part:

(2)      Shall use information obtained in the NEPA process, including pertinent information provided by those persons or organizations that may be interested or affected, to identify reasonable alternatives to proposed actions that will avoid or minimize adverse impacts to the human environment while improving overall environmental results.

(3)      Shall monitor, evaluate, and control their activities on a continuing basis to further protect and enhance the quality of the environment.

Subsection 1.19      **Methodology and Scientific Accuracy** (40 CFR 1502.24). Conclusions about environmental effects will be preceded by an analysis that supports that conclusion unless explicit reference by footnote is made to other supporting documentation that is readily available to the public.  Bureaus will also follow Departmental procedures for information quality as required under Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Pub. L.106-554, 114 Stat. 2763).

The DEIS failed to comply with this requirement.

The Department of the Interior Departmental Manual 520 DM1 provides important guidance for the development of RMP. We provide a highlighted version of this in full as Exhibit B.

We particularly draw your attention to the Policy statement, Section 1.7 C 4, 5 and 10 as well as 1.8.

These requirements were not implemented in the DEIS.

We also provide as highlighted version of BLM Manual 1737 Riparian-Wetland Area Management as Exhibit C. Of critical importance are:

.06 Department of the Interior and BLM Policy (p9)
.11C 1 through 6 (p12)  which define RMP minimum requirements
.41A (p19) grazing related RMP requirements for the protection of riparian areas
.41B (20) Wetland management requirements for RMP's
.42A 1, 2 and 3  RMP requirements for soil and water
.45A and D - RMP requirements for fish and wildlife habitat
Page 30 Salinity Control Act requirements

These requirements were not implemented in the DEIS.

We also provide as highlighted version of BLM Manual 6720 Aquatic Resource Management as Exhibit D. Of critical importance are:

.04J Manager responsibilities
.06 BLM Policy
.11 and .12 Inventory requirements
.13B (p9) RMP requirements
.16 (p11) RMP requirements

BLM_0126515

These requirements were not implemented in the DEIS.

We also provide as highlighted version of BLM Manual 7200 Water Resource Management as Exhibit E. Of critical importance are:

Objectives (p3)
.06C RMP requirements
.21 Planning and RMP requirements

These requirements were not implemented in the DEIS.

We also provide as highlighted version of BLM Manual 6840 Sensitive Species Management as Exhibit F. Of critical importance are:

.04E5 (p5) State director responsibilities
.06 (p7) ESA and Sensitive Species requirements
 Section D on p9
.12 (p14) Sensitive Species RMP requirements
.2 (p15)
.22 (p36 and on) Section A
.22D4C (p41) RMP requirements

These requirements were not implemented in the DEIS.

Without question, private livestock grazing is the most important RMP topic. Livestock grazing is permitted on 99% of the total Field Office acres. Livestock grazing has caused and is causing the most impacts over the entire Field Office. BLM permitted livestock grazing has caused a permanent ~50% loss in the productivity over most parts of the Field Office. BLM permitted livestock grazing has destroyed most of the riparian and hydrologic function throughout the Field Office. BLM permitted livestock grazing has degraded the water storage capacity of riparian areas throughout the Field Office which has lead to reduced flows, elimination of once productive fisheries and loss of riparian habitat. BLM permitted livestock grazing has not been properly managed. Trespassing livestock and excessive utilization are the rule not the exception. The BLM has known about these violations of permit terms and conditions for decade after decade, it has also known the ecosystem degradation caused by this lack of action for decade after decade, but has failed to take any effective actions to fulfill its public trust and legal responsibilities.

The RMP will not be morally or legally defensible if this most important of issues is not addressed properly. The RMP EIS must thoroughly and defensibly review the failures of the past RMP and what actions must be taken to correct these failures. The current DEIS fails to do this.

The BLM must include in each RMP alternative and in the final selected alternative a voluntary waiver and retirement provision for all grazing permits.

The RMP must include measurable (i.e. quantifiable) standards for livestock grazing including maximum upland and riparian utilization of 30% on any herbaceous graminoids; maximum bank or wetland trampling annually not to exceed 10% of hydric and mesic soils

BLM_0126516

areas; maximum use of woody browse by all sources not to exceed 15% of new leader growth annually.

In addressing range management in the revision the BLM should use and reference the quantitative data (including the methodologies used to collect them and the time they were collected) pertaining to the current and expected acreages which meet, or fail to meet, desired vegetative condition, and trends in vegetative condition. Using out-dated data or using methodologies which are no longer accepted, would be inappropriate. As we previously cited, the BLM's own planning handbook requires the use of the best available information. For example, the critical values of riparian areas were not well known even twenty years ago, so that most analyses at the time did not apply to riparian areas.

In many areas, winter use by wildlife follows the end of the livestock grazing period. It would be worthwhile to establish a standard and a monitoring plan for total use (by both wildlife and livestock) on an annual basis to determine if the standards for livestock use are achieving the desired objectives. In some areas, it is likely that combined use would be greater than expected for both riparian and upland total utilization and stricter standards may be necessary for livestock utilization.

It is widely recognized in the range management literature that monitoring is the key to successful range management program. The RMP revision should include standards/requirements for a range management monitoring protocol for both upland and riparian areas. Details of the stream stability monitoring protocol, including the frequency and intensity with which it will be utilized, and so forth, should be provided in the RMP revision.

The EIS must disclose the type, location, and number of the various "range improvements" (fencing, water developments, water pipelines, access roads, and so forth) that currently exist on the public lands that will be managed under the direction of the RMP revision. What cumulative impacts have these "improvements" had on vegetation, wildlife habitat, water quality, riparian areas, soils, and habitat fragmentation? What changes/impacts to upland vegetation, water quality, habitat values, and other resources near these developments have occurred as a result of these "improvements?" Have these management activities been successful at accomplishing the goals for which they were implemented? These questions must be answered.

Additionally, the EIS should document how domestic grazing activities on allotments has affected habitat for threatened, endangered, and sensitive species in the project area. How has vegetation changed as a result of a century of livestock grazing?

Claims based on the absence of streams from 303d lists or absence of monitoring data are not sufficient to document that water quality is not impaired. Research has shown that when livestock are present, fecal coliform bacteria increase, temperature increases due to removal of shading vegetation and streams become silt-laden, destroying their native aquatic life. Other factors such as eroding stream banks, cattle defecating in streams, etc. are violations of Narrative or Anti-degradation Standards. The altering of stream flows by degraded watershed conditions that allow greater runoff and siltation as well as late season dewatering of streams must all be considered.

The RMP must address how it will handle the buy-out of grazing permits by conservation and other organizations, and should identify how it will retire such permits through the planning process. BLM should work with permittees to identify those who are interested in retiring their permits or being relocated to prevent resource damage.

Grazing permits should require public access easements across private land. If permittees refuse to grant access to public lands, then all permits should be cancelled.

It is imperative that BLM, in its RMPs, recognize the value of ungrazed watersheds both from an economic and environmental point of view. Not all areas should be grazed by livestock. This should be based on a determination of suitability for livestock grazing considering alternative uses and their benefits as well as the current condition of the land. In addition, sensitive soils must be protected. This includes soils which occur on steep slopes, are susceptible to severe wind and water erosion or have been degraded from their potential by removal of ground covering vegetation and cryptogrammic crusts. It also means that in areas of weed infestations, generally caused as a result of livestock grazing, livestock should be eliminated to allow recovery. Unsuitable areas should be mapped and allotments in those areas phased out to provide necessary protections. Those areas that are to continue being grazed by livestock must be stocked and managed in accordance with the condition of the land and its vegetation.

In areas to be grazed by livestock, the amount of forage produced must be determined and allocations of forage to watershed protection (50%), wildlife (25%) and livestock (25%) be made as recommended by Holechek et al (1998)[1]. Field data collection will be necessary to accomplish this.

To summarize key components that the RMP must address:

> Drought – The RMP must lay out a clear and effective drought policy
> PFC – The BLM initiated in 1991, a program called Riparian-Wetland Initiative for the 1990's, Among other things, this initiative called for management improvements to insure that at least 75% of the BLM stream miles reached the minimum of PFC by 1997. The BLM has failed miserably in meeting this goal. The RMP must commit to and provide the direction necessary to maintain all streams in the FO at a minimum of PFC
> Fundamentals of Rangeland Health – Implementing the 4180 regulations within the FO has been spotty at best and in those areas that compliance with Standards and Guidelines have been reviewed, the actions proposed have either never been implemented or been proven to be ineffective. The RMP must correct this deficiency and implement a schedule and regular feedback loops to complete the processes required under 4180. It also must prioritize reviews based on the need for change, such as I Category allotments first
> The EIS and RMP must address the fact that livestock sizes, and thus forage consumption, have increased dramatically since the AUM was defined. Failure to address this critical issue will lead to legal vulnerability under NEPA, APA and the False Claims Act.

---

[1] Holechek, Jerry L., Rex D. Piper and Carlton H. Herbel. 1998. Range Management Principles and Practices. 542 pp. Prentice-Hall, New Jersey.

BLM_0126518

> ➢ To comply with FLMPA, TGA, PRIA, NEPA and the APA, the EIS and RMP must only approve livestock grazing within the limits of current productivity and suitability, not capacities determined many decades ago. Current data shows that productivity on BLM lands has declined significantly over the last 20-40 years.
> ➢ The EIS and RMP must analyze the successes and failures of the current RMP and analyze the validity of the assumptions and accuracy of the analysis of the EIS conducted to develop the current RMP. Such analyses are critical to learning from the mistakes of the past as well as to comply with NEPA
> ➢ The RMP must provide clear management direction for the protection of ESA listed and BLM Sensitive Species

PFC

In 1991 the BLM initiated a program called "Riparian-Wetland Initiative for the 1990's" (See BLM/WO/GI-91/001+4340). This initiative called for achievement of four overarching goals:

> ➢ Restore and maintain riparian-wetland areas so that 75% or more are in proper functioning condition by 1997
> ➢ Protect riparian-wetland areas and associated uplands through proper management and to avoid or mitigate negative impacts
> ➢ Ensure an aggressive riparian-wetland information and outreach program
> ➢ Improve partnerships and cooperative restoration

Strategies to implement these goals include:

> ➢ Inventory and Classification to determine current status and potential
> ➢ Land Use and Activity Planning revisions describing actions needed to meet these objectives
> ➢ Monitoring to determine if management actions are meeting goals and objectives
> ➢ Avoiding or mitigating impacts on riparian-wetland areas

Little progress has been made in the 20 years since.

The RMP must address this poor performance and lay out an action plan to achieve the goals laid out in the BLM's "Riparian-Wetland Initiative for the 1990's".

We would like the reader to note that attaining PFC is only the lowest acceptable level. PFC is not a goal but the basis on which other resource goals are met. We request the BLM review its own manual, TR 1737-15, for a more complete description of what PFC is and is not. We especially direct the BLM's attention to page 16 of this manual for a very clear description of the fact that PFC is only the lowest basis on which all other values are built upon. As such, the RMP must delineate management objects that go far beyond PCF to include watershed health values, fisheries values, water quality values and wildlife values.

FUNDAMENTALS OF RANGELAND HEALTH

The RMP must include timelines and priorities for the completion and review of progress of the Fundamentals of Rangeland Health Standards and Guidelines assessments and determinations as required under the 4180 regulations.

For further details on the implementation of the 4180 regulations, we request that the BLM review its 1/19/01 Manual Transmittal Sheet for H-4180-1 Rangeland Health Standards. We specifically bring the BLM's attention to its duties to make "significant progress" towards meeting Standards and Guidelines. The RMP must provide direction to achieve the Fundamentals of Rangeland Health and the Standards and Guidelines, and in those situations, of which there are many, where these are not being met, the RMP must provide sufficient direction that results in the required "significant progress".

The RMP must also provide feedback loops so that once Standards and Guidelines (S&G) evaluations are completed, that the BLM requires regular reviews to insure "significant progress" is being made.

LIVESTOCK SIZES, FORAGE CONSUMPTION AND THE AUM

The BLM can not just assume that an AUM is 800 lbs of forage consumption per month. The RMP/EIS must analyze the current and potentially available forage to satisfy the forage consumption by the number of livestock it currently permits or proposes to permit. It can not assume that the forage capacity determined 20-40 years ago is applicable today.

The Society for Range Management (SRM) in 1974 defined an Animal Unit *"to be one mature (1000 lb.) cow or the equivalent based upon average daily forage consumption of 26 lbs. dry matter per day."*[2].  SRM also defined an Animal Unit Month as *"The amount of feed or forage required by an animal-unit for one month."*  NRCS defined the forage demand for a 1,000 pound cow as 26 pounds of oven-dry weight or 30 pounds air-dry weight of forage per day[3].  It is important to ensure that forage consumption rates by livestock are based on the size of animals present on the allotment and a reasoned estimate of their daily consumption rates.   The following analysis provides some background and justifies a more current forage consumption rate for cow/calf pairs.  It is BLM's obligation to ensure this forage is accurately accounted for as this is its fiduciary duty to the American People.  Undercounting forage consumption by livestock results in undercharging for that forage.  This is potentially defrauding the American public under the False Claims Act[4]

The University of Nevada Agricultural Experiment Station published a report on cattle production in 1943[5] (Brennan and Harris, 1943).   That report analyzed 14 years of ranch operation for eleven ranches in northeastern Nevada.  At that time, a mature cow was considered one unit and a branded calf or weaner as ½ cow unit, for a combined total of 1.5 cow units per cow/calf pair.  Bulls were considered 1.5 cow units.  For the period 1938 – 1940, the average turnoff weight (when they left the range) of mature cows was 959 pounds, calves were 381 pounds and bulls were 1222 pounds. This means that in the

---

[2] Society for Range Management. 1974.  Glossary of terms used in range management.
[3] USDA.  1997.  National Range and Pasture Handbook.
[4] Title 18 USC Section 1001.
[5] Brennan, C.A. and Fred B. Harris.  1943.  Fourteen Years Cattle Production and Ranch Earning Power in Northeastern Nevada 1928 to 1941.  University of Nevada Agricultural Experiment Station, Reno, Nevada.

BLM_0126520

1930's, a cow/calf pair was 1340 pounds. With breeding, supplements and hormones, weights have increased over time, for example, Anderson et al (ca 2000) calculated a 35% increase in dressed weights per animal between 1975 and 1995[6].

USDA market statistics[7] give the average weights of slaughter cattle for the week ending August 14, 2004 as 1251 pounds. The estimate for the same week in 2005 for slaughter cattle average weight was 1260 pounds. The USDA National Agricultural Statistics Service data for average live weight of cattle slaughtered in 2004 was 1242 pounds compared to 1187 pounds in 1995, or an increase of nearly 8.5% in those 10 years[8]. The Livestock Monitor is a newsletter produced by the North Dakota State University Extension Service Livestock Marketing Information Center in cooperation with USDA State Extension Services[9]. The Livestock Monitor shows for the week ending August 6, 2005, live weights of slaughter cattle averaged 1258 pounds.

The potential weights of mature cows can be even larger than these numbers. For example, NRCS in its National Range and Pasture Handbook, referenced above, defines body condition scores. A body condition score of 6 which is described as *"Good, smooth appearance throughout. Some fat deposits in brisket and over the tailhead. Ribs covered and back appears rounded."* This body condition score relates to a pregnancy percentage of 88%, which is important as a goal for cow/calf operations as dry cows are usually culled and replaced and the weight gain of calves is important for income. According to Dr. Larry W. Olson, Extension Animal Scientist at Clemson University, a medium frame cow in body condition score 6 could easily weigh 1300 – 1400 pounds[10].

Holechek et al (2001) summarized the weaning weights of calves grazed on various types of rangelands at different stocking rates[11]. The data for the period since 1990 produced an average weaning weight of 430 pounds and a range of 382 – 475 pounds. Ray et al (2004) gave a weaning weight of 480 pounds for calves. Using the current market statistics for slaughter cattle at about 1250 pounds and assuming a calf weight of 300 pounds to allow for weight gain during the grazing season, an estimate for the average weight of a cow/calf pair during the grazing season of 1,500 pounds seems reasonable.

As pointed out above, the NRCS used 26 lbs/day of oven dry weight for a 1,000 pound cow and stated this was equivalent to 30 pounds per day air-dry weight. The NRCS Range and Pasture Handbook value of 30 pounds air-dry weight would be 3% of body weight for a 1,000 pound cow. Applying this to the estimate of a current weight of 1,500 pounds for a cow/calf pair, the daily forage consumption would be 45 lbs of air-dry forage per day, or for a month (30.4 days), 1368 pounds of forage per AUM.

The forage needs for domestic sheep must also be determined. Based on current USDA published weights for ewes and lambs, adult domestic sheep weigh from 165 to 440

---

[6] http://agecon.uwyo.edu/RiskMgt/marketrisk/TheCattleCycle.pdf
[7] http://www.ams.usda.gov/mnreports/SJ_LS712.txt
[8] http://www.usda.gov/nass/pubs/agr05/acro05.htm
[9] http://www.ag.ndsu.nodak.edu/aginfo/lsmkt/monitor.htm
[10] Email correspondence with Dr. Olson dated 8/18/05.
[11] Holechek, Jerry L., Rex D. Pieper and Carlton H. Herbel. 2001.Range Management: Principles and Practices, Fourth Edition. Prentice-Hall, New Jersey. 587p

pounds,[12] and lambs about 129 pounds.[13] A low-end estimate of the weights of a sheep and two lambs grazing on these allotments would be 400 pounds (200 pounds for the ewe and 100 pounds each for two lambs).  The forage consumption rate for sheep given in the 1964 R4 Range Analysis Handbook cited above was 3.3% of body weight per day consumed as air dry forage weight.  Using these estimated weights of mature sheep (ewes) and lambs with two lambs per ewe and a total weight of 400 pounds would result in forage consumption of 13.2 pounds per day for each mature sheep with two lambs, or 6.6 pounds per day for a mature ewe weighing 200 pounds.

Forage consumption rates must be calculated based on the current weights and consumption rates of livestock in order to provide the forage needed for wildlife, plant community sustainability and watershed protection and to ensure the public trust is not violated by undercharging for the actual weights of cattle and calves grazed.

The current RMP authorizes a certain number of AUM's.  However, that is based on an AUM equivalent to 800 lbs of forage per month.  The most current information, reviewed above shows that number to be 1368 lbs/month per AUM.  Therefore, if sufficient forage were available to satisfy all needs, the numbers of livestock grazed should be reduced to account for the increases in weight and correct the erroneous assumption that 800 lbs/month is an accurate consumption figure.  Using the ratio between the current RMP's forage amount per AUM divided by the correct figure above, gives a needed reduction in permitted numbers and/or seasons of use of 42% to account for the RMP's understated forage consumption, without accounting for wildlife, plant and watershed needs.

CAPABILITY AND SUITABILITY ANALYSIS

The EIS can not just move forward allotment condition and use information from the current RMP to satisfy its NEPA, FLPMA, PRIA and APA requirements.

BLM RMP Planning Handbook Appendix C requires that lands available or not available for livestock grazing be determined by considering:  other uses for the land; terrain characteristics; soil, vegetation and watershed characteristics; the presence of undesirable vegetation, including significant invasive weed infestations; and the presence of other resources that may require special management or protection, such as special status species, special recreation management areas (SRMAs), or ACECs.

Sec. 201. [43 U.S.C. 1711] states:

  (c) In the development and revision of land use plans, the Secretary shall–

    (1) use and observe the principles of multiple use and sustained yield set forth in this and other applicable law;

    (2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;

    (3) give priority to the designation and protection of areas of critical environmental concern;

---

[12] http://www.wildlifeprairiestatepark.org/animalpages/domestic_sheep.htm
[13] http://www.usda.gov/nass/pubs/agr04/04_ch7.pdf

BLM_0126522

(4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other values;

(5) consider present and potential uses of the public lands;

(6) consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;

(7) weigh long-term benefits to the public against short-term benefits;

(8) provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans; …

Therefore, BLM must give priority to ACECs and the inventory must be current and reflect changes in conditions and identify new and emerging resources and other values. The revised RMP and the DEIS must show that the BLM identified the emerging issues of the public's increasing desire for wilderness values, unspoiled wildlife habitat, protected resources, and the value of public lands.

BLM should define specifically what, if any, animal damage control or predator control activities will be allowed and in what manner. The WWP opposes all animal damage control, predator control and wildlife services proposals made to date. The majority, if not all, of these types of activities are not appropriate and should not be allowed on public lands.

The BLM should establish goals, objectives, standards and limitations to ensure the protection of and recovery of threatened, endangered, sensitive and special status species. BLM should designate critical habitat for every endangered, sensitive, threatened and special status species. These habitat areas should be managed with the species survival and recovery as the highest and most valuable use. The BLM should look at all options for protecting activity centers through special status land designations, including, but not limited to, Areas of Critical Environmental Concern, Research Natural Areas, Outstanding Natural Areas, Wilderness Study Areas, Suitable Wild, Scenic and Recreational River miles, or other administrative designations.

One of the thorniest issues that the BLM has to consider is water quality of streams flowing through the lands it manages. The revision should provide a comprehensive plan for watershed analysis, restoration, monitoring, and adaptive management; particularly where livestock impact water quality; and to inventory, monitor and develop site-specific plans for riparian management, tailored to watershed needs as identified through these processes.

The DEIS does not accomplish this.

No BLM action or plan would be complete without considering TMDL listing, status, and planning. Therefore state data and information are incorporated by reference with the specific request that the BLM insure that TMDL goals are met and water quality is not further degraded. Furthermore, the revision should include details of the actions the BLM intends to take relative to state listed Water Quality Limited Stream Segments. The EIS needs to include a thorough discussion of how the BLM intends to meet its legal obligations under the federal Clean Water Act, State Water Quality Standards and FLPMA requirements in managing water quality limited segments (WQLSs). The RMP must also require water quality monitoring to determine the impacts of its authorized activities.

BLM_0126523

The BLM should also develop an expanded monitoring plan. Many activities on BLM lands degrade water quality but the BLM may not have a clear grasp on its waters' quality. This RMP revision and EIS must expand on other agencies' and individuals' monitoring efforts, to insure that no data-gaps exist on BLM lands.

Overall, the BLM must comply with the Clean Water Act. To this end, the BLM should look to required CWA reporting, such as 305(b) reports, the 303(d) list, and triennial reviews, and consider how high quality waters can be protected and how degraded waters can be improved. Additionally, the BLM should specially insure that anti-degradation provisions are met, and that principles of anti-degradation are applied to all facets of the RMP.

The RMP/EIS can not present livestock grazing as a given with little difference in AUM's between alternatives. This would not be a reasonable range of alternatives.

With current GIS technology, availability of soil surveys, and vegetation type information, developing a capability analysis is a relatively simple task.

Without balancing the currently available livestock AUM's with the physical and biological limitation of the land, the BLM avoids the most basic scientific principles which are aimed at providing for sustainable use without impairment. As a result of having no capability determination, combined with a realistic forage capacity determination, BLM cannot assure that sufficient forage exists to support the proposed livestock numbers and ignores the forage and habitat needs of wildlife and the need for nutrient cycling and soil protection provided by retaining plant matter to hold the soil and add nutrients.

A review of range science studies which we include as Appendix A, shows that forage for livestock should be allocated at conservative levels of about 25 - 30% utilization. This is necessary so that overgrazing does not place palatable, or preferred native species at risk of decline, prevents over grazing in dry years and provides forage and habitat for wildlife and watershed protection. As can be seen throughout the FO, failure to adjust for topographic, soil and other limitation and apply conservative use principles has lead to severely degraded conditions including soil erosion, loss of native forage species and infestations of noxious weeds and invasives.

Grazing and rest requirements for key species of grass can be critical. Native cool-season perennial bunchgrasses can be very sensitive to defoliation and growing season use. For example, Anderson (1991)[14] stated in regards to bluebunch wheatgrass, *"Effects of growing season defoliation injury are well documented: basal area, stem numbers and both root and forage yields are reduced and mortality can be high. ... Defoliation to very short stubble heights during the boot stage has been reported to essentially eliminate plants within as few as three years. ... Vigor recovery has been found to require most of a decade, even with complete protection from grazing."* The author went on to describe experiments in which a single clipping of the grass during the growing season produced 43% less herbage and 95% fewer flower stalks the following year than unclipped plants. Under a deferred system in eastern Oregon, it was reported that bluebunch wheatgrass could not be

---

[14] Anderson, Loren D. 1991. Bluebunch wheatgrass defoliation, effects and recovery – A Review. BLM Technical Bulletin 91-2, Bureau of Land Management, Idaho State Office.

maintained at 30 – 40% use in the boot stage (early June). A one time removal of 50% of the shoot system during active growth may require six years' rest even in an area with 17" precipitation.[15] Anderson (1991) also makes the point regarding bluebunch wheatgrass that, *"The belief that range improvement will occur after one or two years of rest following a single season of more than 'light' use during the growing season is erroneous."* Mueggler (1975) also determined that Idaho fescue of moderately low vigor required 3 years of rest for recovery and that plants of bluebunch wheatgrass and Idaho fescue in very low vigor may require 8 years and 6 years of rest, respectively for recovery. BLM failed to consider the recovery, growth and maintenance requirements for these sensitive native grasses.

A failure by the BLM in its RMP to analyze utilization, stocking rates and precipitation is a failure to meet NEPA requirements for analysis. The failure to provide sustainable utilization rates for upland and riparian area herbaceous vegetation, aspen suckers and riparian shrubs and incorporate those into grazing permits as terms and conditions leaves management uncontrolled and subject to bias, violating FLPMA.

We provide in C_Grazing Capacity Info Proposed Outline, a scientifically and legally defensible methodology for determining capability and suitability of BLM lands for livestock grazing. We request the BLM incorporate this process into the RMP as well as the EIS alternatives.

SPECIAL STATUS SPECIES

The RMP must provide scientifically defensible and clear direction for the recovery and management ESA listed and BLM Sensitive Species. The DEIS fails to accomplish this.

BLM must ensure full compliance with BLM Manual MS-6840.06.E (Special Status Species Management). BLM Manual MS-6840.06.E requires that "protection provided by the policy for candidate species shall be used as the minimum level of protection for BLM sensitive species"—that is:

Consistent with existing laws, the BLM shall implement management plans that conserve candidate species and their habitats and shall ensure that actions authorized, funded, or carried out by the BLM do not contribute to the need for the species to become listed. BLM Manual MS-6840.06.C & .06.E. See BLM Manual MS-6840.06.C (1&3) (discussing BLM's responsibility to confer with U.S. Fish & Wildlife Service regarding individual species' needs).

BLM Manual MS-6840.06.C.2 imposes a series of additional substantive obligations on the BLM regarding candidate [and therefore sensitive] species management:

2.      For candidate species [and sensitive species] where lands administered by the BLM or BLM authorized actions have a significant effect on their status, [the BLM shall] manage the habitat to conserve the species by:

---

[15] Mueggler, W.F. 1975. Rate and pattern of vigor recovery in Idaho fescue and Bluebunch wheatgrass. Journal of Range Management 28(3):198-204.

> ➤ Ensuring candidate [and BLM sensitive species] are appropriately considered in land use plans (BLM 1610 Planning Manual and Handbook, Appendix C).
> ➤ Developing, cooperating with, and implementing range-wide or site-specific management plans, conservation strategies and assessments for candidate [and sensitive] species that include specific habitat and population management objectives designed for conservation, as well as management strategies necessary to meet those objectives.
> ➤ Ensuring that BLM activities affecting the habitat of candidate [and sensitive] species are carried out in a manner that is consistent with the objectives for managing those species.
> ➤ Monitoring populations and habitats of candidate [and sensitive] species to determine whether management objectives are being met.

Additionally, BLM must ensure compliance with BLM Manual MS¬6840.22. Provisions here require BLM to take a broad and proactive approach to special status species management, and in the context of planning require that, "Land use plans shall be sufficiently detailed to identify and resolve significant land use conflicts with special status species without deferring conflict resolution to implementation-level planning."  (emphasis added).

Take for instance, bighorn sheep, the DEIS fails to even mention let alone implement the BLM's bighorn sheep manual.

**Migratory Birds:**  Woodyard et al (2003) conducted bird censuses along an elevational gradient in east-central Nevada.  These censuses were conducted in study plots monitored in 1981 and 1982 by Dean E. Medin and found fewer species and total numbers of birds (62% less)[16].  Parrish et al (2002)[17] also describe the declines in these birds due to a variety of factors relating to habitat.  They provide descriptions of the birds in Utah most in need of conservation and describe their habitat requirements, threats and management considerations.  They discuss habitats most in need of conservation.  Habitats such as shrub-steppe occurring in the Pocatello Resource Area are described as in need of protection.  Medin et al (2000) provide a discussion of bird-habitat relationships for the Great Basin that provide insight into the habitats that occur in the Pocatello Resource Area and their relationships to these birds. Many of these birds are dependent on riparian areas[18].

Paige and Ritter (1999) cite population declines of 63% and 70% in shrub dependent and grassland bird species during the last 30 years across the U.S.  In the Intermountain West, more than 50% of shrub- and grassland species show downward trends with sagebrush steppe as the highest priority for conservation based on trends for habitat and bird populations[35].  They provide detailed descriptions of the history, characteristics and

---

[16] Woodyard, John, Melissa Renfro, Bruce L. Welch and Kristina Heister.  2003.  A 20-year recount of bird populations along a Great Basin elevational gradient.  USDA Forest Service Rocky Mountain Research Station Research Paper RMRS-RP-43.

[17] Parrish, Jimmie R., Frank Howe and Russell Norvell.  2002.  Utah Partners in Flight Avian Conservation Strategy Version 2.0.  Utah Division of Wildlife Publication No. 02-27. 305p.

[18] Medin, Dean E., Bruce L. Welch and Warren P. Clary.  2000.  Bird habitat relationships along a Great Basin elevational gradient.  USDA Forest Service Rocky Mountain Research Station Research Paper RMRS-RP-23.  22p.

management of these systems with management recommendations.  They note that cattle grazing in sagebrush steppe first select grasses and forbs and avoid browsing on sagebrush.  In addition, even light grazing can put pressure on the herbaceous plants favored by livestock and intensive spring grazing prevents bunchgrasses from reproducing, eventually eliminating the palatable native bunchgrasses.  They also discuss the response time for recovery of these systems and parasitism by cowbirds, a significant factor in decline of songbirds in some areas.

Taylor (1986) evaluated the effects of cattle grazing on birds nesting in riparian habitats[19].  He found that increased grazing resulted in decreases shrub volume and density and decreased bird abundance.  *"The longer the time since a transect was last grazed correlated significantly with increases in bird abundance, shrub volume and shrub height"*.  Bird species decreased with increased grazing, bird counts were 5 to 7 times higher on an area ungrazed since 1940 than on 2 areas grazed annually until 1980 and 11 to 13 times higher on a transect that was severely disturbed.

Krueper et al (2003) studied the changes in vegetation and breeding birds in the San Pedro River, Arizona following removal of cattle in 1987[20].  Birds were monitored for five years.  Mean numbers detected along riparian transects increased by 23% per year or from 103/km in 1986 to 221/km in 1992.  Earnst et al (2004) compared songbird abundance in 2000-2001 to that in 1991-1993, following cattle removal from the Sheldon National Wildlife Refuge in 1990[21].  Of 51 species for which abundances were sufficient to calculate changes, 71% exhibited a positive trend.  Detections of ground/low cup and high cup nesting species, ground/understory foraging species, aerial and overstory foraging species increased significantly.

Rich (2002) evaluated the ability of riparian PFC assessments as employed by BLM and noted that they lacked the ability to incorporate assessment of land breeding bird communities[22].  He constructed a list of riparian-obligate birds that should occur on the site during the breeding season and used that to score the site based on the percent of those occurring there.

The RMP/EIS must review the habitat requirements for migrant birds, the effects of livestock grazing at the permitted numbers in combination with all other habitat altering management proposed and provide prescriptions that will assure migrant birds and their habitat improve.

CURRENT RMP PERFORMANCE AND ACCOMPLISHMENTS

---

[19] Taylor, Daniel M.  1986.  Effects of cattle grazing on passerine birds nesting in riparian habitat.  Journal of Range Management 39(3):254-258.

[20] Krueper, David, Jonathan Bart and Terrell D. Rich.  2003.  Response of vegetation and breeding birds to the removal of cattle on the San Pedro River, Arizona (U.S.A.).  Conservation Biology 17(2):607-615.

[21] Earnst, Susan L., Jennifer A. Ballard, and David S. Dobkin.  2004.  Riparian songbird abundance a decade after cattle removal on Hart Mountain and Sheldon National Wildlife Refuges.  USDA Forest Service PSW-GTR-191.

[22] Rich, Terrell D.  2002.  Using breeding land birds in the assessment of western riparian systems.  Wildlife Society Bulletin 30(4):1128-1139.

BLM_0126527

In order to comply with NEPA and the APA, the BLM must conduct a thorough review of the performance and accomplishments of the current RMP as well as the validity and accuracy of the current RMP's NEPA documents. Further, the BLM must analyze how effectively the RMP and ROD have been implemented, what goals and objective have been met and why aspects of the RMP and ROD were not implemented or not implemented effectively.

Such analyses must form the foundation for any RMP revision. Such analyses are fundamental not only compliance with the law by basic management principles.

ECONOMIC ANALYSIS

The RMP/EIS must adequately and honestly analyze the economic impacts of livestock grazing on BLM lands. The BLM has pandered to "lifestyles" for ranchers while ignoring the actual contribution of the livestock grazed to the local and regional economy or the economic impacts of the land degradation that takes place from livestock grazing. The Fish and Wildlife Service publishes reports on the value of wildlife-associated recreation that shows values of hundreds of millions of dollars to billions of dollars of revenue related to hunting, fishing and wildlife watching in each western state[23]. In addition, the cost of polluted water, loss of watershed storage due to soil compaction and loss of herbaceous cover are not counted in the costs of livestock grazing. As the reference below shows, in actuality, rural communities as well as livestock permittees depend on other sources of income. Laws require that public lands be administered in the long-term interests of the American people and not a handful of stockmen, who are permittees, on the public lands.

Livestock permittees are a small minority of livestock producers in the eleven western states and are insignificant in their numbers or their economic contribution to the States, their local and regional economies. Their numbers and contribution pale in comparison to the natural values of our public lands. Dr. Thomas Power, Chairman of the University of Montana's Economics Department, in Wuerthner and Matteson (2002)[24] points out the minimal economic contribution of federal public lands livestock grazing to local, state and regional economies in the West. That reference can be found on-line at:

**http://www.publiclandsranching.org/htmlres/PDF/wr_TAKING_STOCK.pdf**

Dr. Power also points out that the majority of public lands livestock producers depend on non-agricultural sectors of these local, state and regional economies for employment, not livestock production. It is not in the public's interest to blindly continue livestock grazing at unsustainable stocking levels in order to provide a short-term benefit to this small minority, while ignoring the values displaced by livestock grazing.

Dr. Power shows that *"Livestock grazing on federal lands is generally unimportant to local economies and even less so to state and regional economies. In terms of income and*

---

[23] U.S. Department of Interior, U.S. Fish and Wildlife Service, U.S. Department of Commerce and U. S. Census Bureau. 2002. 2001 National Survey of Fishing, Hunting and Wildlife-Watching Associated Recreation. 170 p.

[24] Wuerthner, George and Mollie Matteson. 2002. Welfare ranching: the subsidized destruction of the west. Island Press.

BLM_0126528

*numbers of jobs provided, the contribution of federal lands grazing is less than 0.1% across the West. Farm and ranch operations are increasingly reliant on non-farm income sources to be financially feasible, while livestock grazing competes with other uses of public lands – such as clean water, recreation, wildlife habitat – that contribute to the ongoing vitality of western economies."*

In his analysis of the economies of individual rural counties, Dr. Power showed that federal lands grazing does not contribute significantly to those economies across the west. In fact, given the high percentage of ranching families that have jobs, either full or part time outside the ranch (60 – 70%), it is ranchers that depend on the other economic sectors for their ability to persist, not federal grazing. Dr. Power states, *"It is not that towns depend on agriculture, but that agriculture increasingly depends on the vitality of urban and nonagricultural rural economies to provide the nonfarm income that keeps farm operations alive."*

Dr. Power states that claims about the relative importance of federal grazing to the economies of western states can be analyzed by answering these questions:

1. "What portion of the value produced by cattle and sheep operations is associated with feed used?

2. What portion of the feed for those cattle and sheep operations comes from grazing on federal lands?

3. What portion of the total agricultural activity involves raising cattle and sheep?

4. What part of the total economy is represented by agriculture?"

The RMP Economic analyses should include consideration of this information and the following:

- ➢ costs of administration
- ➢ costs of installation and maintenance of range improvements borne by the BLM and/or funded by county range improvement funds
- ➢ grazing fees collected and their distribution to various entities
- ➢ grazing fees collected and net return to the Forest Service and the American people, and separate out the dollars returned to grazing permittees and local counties.
- ➢ value of livestock grazing gross revenue to the permittee at current market rates
- ➢ value of wildlife-associated recreation (DOI 2002)
- ➢ loss in value of wildlife associated recreation to livestock grazing by using equivalent AUMS consumed by livestock as applied to wildlife needs (AUMs) and economic benefits
- ➢ cost of soil erosion and loss of groundwater recharge and streamflow
- ➢ cost of water pollution
- ➢ the net contribution of the individual livestock operations under consideration to the county and regional economy
- ➢ compare the individual livestock operation in dollars and jobs to the local, state and regional economy and report what percentage this allotment comprises of this total
- ➢ compare these various economic values with other economic and employment sectors at those local, state and regional levels.

BLM_0126529

BEDROCK ISSUES

The RMP and EIS must consider the bedrock management principles that direct all activities on BLM lands. FLPMA is one of these key bedrock laws. FLMPA requires the BLM to manage public lands under the principle of multiple use and sustained yield.

The definition of multiple use in FLPMA is long, but key provisions include the following:

➢ Public lands and their resource values must be managed so that they "best meet the present and future needs of the American people;"
➢ It is appropriate that some land be used "for less than all of the resources;"
➢ There must be harmonious and coordinated resource management that is done "without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or greatest unit output."

43 U.S.C. § 1702(c)

Sustained yield as defined in FLPMA can be achieved either by "high-level annual" or "regular periodic" output of resources, so long as this is accomplished in a way that can be maintained in perpetuity and is consistent with the definition of multiple use. 43 U.S.C. §1702(h).

These definitions give substance to the requirement that land use plans and resulting management actions are to use and observe multiple use and sustained yield principles. The purpose of this planning process must be to produce a plan that "best" meets the present and future needs of the American people. The RMP cannot adequately meet these needs, or generally meet these needs, or largely meet these needs, it must "best" meet them. FLPMA explicitly requires that what is "best" must be viewed from the perspective of the present and the future and all alternatives, including the proposed action, must be designed to satisfy this requirement. What is best now may not meet future needs, and since future needs may be unknown in some respects, the only way to "best" insure that future needs are met is to develop and select alternatives that have a large built in margin of safety. To achieve a large built in margin of safety the plan should emphasize resource and ecosystem protection, which will best ensure that future options are retained.

Furthermore, what is "best" must be determined with reference to the needs of the American people as a whole, not a small subset of the American people. FLPMA explicitly provides that the plan that is developed need not accommodate all resource uses on all lands. This provision has special significance relative to grazing, oil and gas leasing, exploration, and development because too often essentially all lands are made available by the BLM for oil and gas extraction. By this legally required measure, rare, unique, and sensitive native species have a relative value far in excess of more common or easily replaced public land resources, or resources that can be provided from other lands. The same is true of many other resources, such as cultural and wilderness resources. Accordingly, the alternative plans that are developed, and particularly the preferred

BLM_0126530

alternative, must give special emphasis to protecting and providing for relatively rare resources.

The FLPMA Section 1702(c) permanent impairment and Section 1732(b) prevention of unnecessary or undue degradation provisions are extremely important. They must inform and be the basis of all RMP direction.

The BLM must base its management decisions upon inventories of the resources that occur on the public lands. The BLM must structure a comprehensive inventory program to inform the RMP process. This is a crucial and frequently overlooked aspect of the planning process.

The EIS and RMP must also address CWA compliance, including monitoring, anti-degradation and Class I waters issues. We are attaching a letter by Raymond Corning discussing some of these issues.

ECONOMICS

The Revised RMP should also contain a complete and unbiased economic analysis of livestock grazing, including the income to the federal government and counties of permitting grazing on allotments within the planning area and an accurate and thorough breakdown of costs of administering livestock grazing in the planning area.  Costs should include restoration of habitats, monitoring, fence maintenance, and administrative and planning expenses.  The costs of livestock grazing in terms of loss in ecological services should be analyzed.  Ecological services compromised by livestock grazing include watershed function as a result of reduced ground cover, soil compaction and loss of infiltration capacity and water storage, soil erosion, loss of forage and habitat for native species.  The forage consumed by livestock must be valued in terms of the value of deer and other wildlife species displaced, the loss of hunting and wildlife watching opportunities Further, in terms of the value of livestock grazing itself, Dr. Thomas Power (Power 2002) has developed questions that allow a determination of the significance of forage used on public lands to the economy as a whole.   These are:

5. "What portion of the value produced by cattle and sheep operations is associated with feed used?

6. What portion of the feed for those cattle and sheep operations comes from grazing on federal lands?

7. What portion of the total agricultural activity involves raising cattle and sheep?

8. What part of the total economy is represented by agriculture."

The following references provide insight into non-market or ecosystem service valuations of natural resources:  (1) Daily, Gretchen C and Katherine Ellison.  2002.  The New Economy of Nature; (2) Committee on Assessing and Valuing the Services of Aquatic and Related Terrestrial Ecosystems, National Research Council. 2004. *Valuing Ecosystem Services: Toward Better Environmental Decisionmaking*. Washington DC: National Academies Press; (3) Loomis, John., Paula Kent, Liz Strange, Kurt Fausch, and Alan Covich. Measuring the Total Economic Value of Restoring Ecosystem Services in an Impaired River Basin: Results from a Contingent Valuation Survey. *Ecological*

BLM_0126531

*Economics.* 33, pp. 103-117. 2000.  (4) Loomis, John. Environmental Valuation Techniques in Water Resource Decision Making. *Journal of Water Resources Planning and Management,* Vol. 126, No. 6, pp. 339-344. November/December 2000.

RESOURCES

Attached we provide a range of information we request the BLM to review and provide analysis of in the EIS and move into management direction in the RMP. If the BLM feels that any of the information supplied is not applicable to the RMP planning process, we request the BLM to supply rationale in the EIS to justify that decision. Without such justification the BLM will not be complying with NEPA and the APA.

We also request the BLM to review its own analyses, management and monitoring direction contained in:

BLM Application of Environmental Laws, September 1995

BLM TR 1734-6 Interpreting Indicators of Rangeland Health

BLM TR 1737-20 Grazing Management Processes and Strategies for Riparian-Wetland Areas

BLM TR 1737-17 A Guide to Managing, Restoring and Conserving Springs in the Western United States

USDA FS RMRS-GTR-160 Survey Responses From the Intermountain West: Are we Achieving the Public's Objectives for Forests and Rangelands

US EPA Managing Change – Livestock Grazing on Western Riparian Areas, 1993

USDA FS Research Paper INT-RP-492 Response of a Depleted Sagebrush Steppe Riparian System to Grazing Control and Woody Plantings, 1996

USDA FS Research Paper INT-425 Bird and Small Mammal Populations in a Grazed and Ungrazed Riparian Habitat in Idaho, 1990

Montana BLM Riparian Technical Bulletin #3 Effective Cattle Management in Riparian Zones – A Field Survey and Literature Review

Montana BLM Riparian Technical Bulletin #4 Successful Strategies for Grazing Cattle in Riparian Zones, 1998

BLM TR 1737-14 Grazing Management for Riparian Wetland Areas, 1997

BLM TR 1730-2 Biological Soil Crusts: Ecology and Management, 2001

BLM TR 1737-3 Inventory and Monitoring of Riparian Areas, 1989

BLM_0126532

USDA FS PNW-GTR-361 Role of Nonmarket Economic Values in Benefit-Cost Analysis of Public Forest Management, 1996

USDA FS RMRS-GTR-47 Monitoring the Vegetation Resources in Riparian Areas

USDA FS RMRS-GTR-121 Guide to Effective Monitoring of Aquatic and Riparian Resources

USDA FS RMRS-RP-40 Counter Misinformation Concerning Big Sagebrush, 2003

USDA FS RMRS-GTR-141 Big Sagebrush: A Sea Fragmented into Lakes, Ponds and Puddles, 2005

We incorporate by reference all of the above and request that the BLM analyze each of them and add these to the administrative record.

The DEIS stated that it was in compliance with WO IM 2012-169 but this is not the case. Clearly, just looking at the bighorn sheep issue, the IM was not implemented.

Let's look at Action #19 as an example of the failure to provide appropriate limitations and requirements. This "action" states:

> **Action:**
> Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values.

But this is a broad goal that lacks any specificity that would allow it to be implemented. As discussed in the earlier section on RMP requirements, this type of general,, 'apple pie' type statement does not drive or direct action. Appropriate actions would be such things as limitations on forage utilization, requirements for biological soil crust coverage by soil type with timeframes and repercussions if BSC recovery is not attained. This type of specificity, which the BLM's planning requirements mandate is totally absent from the DEIS.

In Action #25 we see that the BLM proposes to manage most of its lands to allow <50% of the areas to fail Rangeland Health Standards as long as the failing areas are "stable". This clearly does not comply with the 43 CFR 4180 mandate.

> Manage the remaining lands, streams, and wetlands to *fully meet* the BLM Colorado Public Land Health Standards or to *meet with problems* where needed to support resource uses, provided that lands meeting with problems are stable or trend toward achieving the BLM Colorado Public Land Health Standards.

Action #37 applies only to oil and gas, no other soil disturbing activity and that too only where BSC is in excellent condition. The vast majority of the FO has very low levels of BSC because of the impacts of livestock grazing but no recovery or protection actions are provided.

Goal #71 stunningly elevates resource extraction above other FLPMA requirements across nearly all the FO. Clearly, this does not comply with the wide range of requirements discussed above.

Frequently, we see such as in #74:

> **Objective:**
> Manage naturally occurring riparian and wetland areas <u>to maintain or improve</u> hydrologic and riparian vegetation conditions

But this is another typical way for the BLM to eliminate requirements. These kinds of statements must be changes to maintain areas exceeding objectives/standards and improve area not exceeding.

Another frequently abused weasely words rendering direction meaningless is the use of words such as "pursue" and "analyze" and "prioritize". All these modifiers render the subsequent direction utterly meaningless.

The primary impact to vegetation and the spread of weeds is livestock grazing yet the DEIS fails to address this primary issue.

#103 designates ecological emphasis areas but authorizes the same ecologically degrading activities, such as livestock grazing, in them. This renders the whole ecological emphasis area concept meaningless.

The elimination of #109 prioritized resource extraction of wildlife needs.

#116 fails to implement the recent WO IM regarding bighorn sheep management.

#126 is another example of meaningless direction that looks good on paper but does nothing:

> **Action:**
> Use adaptive management to conserve and avoid impacts on populations of Birds of Conservation Concern, Partners-in-Flight priority species, and other species of concern.

The action needs to properly define adaptive management triggers and response actions. As currently written it provides no management direction.

#128 is similar in its worthlessness:

> **Action:**
> Apply appropriate restrictions and mitigation to minimize impacts on migratory birds.

It is the RMP that is required to define what those "appropriate restrictions and mitigation" measures are and when they are to be applied.

#136 is the same rubbish:

> **Action:**
> Promote BLM-sensitive species conservation to reduce the likelihood and need for species to be listed

This is a general goal not an action.

#543 is just pure corruption. The BLM is so spineless that it allows the only significant impact to BSC to continue in the postage stamp sized ACEC to protect BSC.

It is quite similar to the bighorn sheep section that prohibits goat grazing that impacts bighorn sheep, because goat grazing does not exist, very much like prohibiting Martian landing sites, but leaves domestic sheep, which is very much a treat to bighorn sheep essentially unaddressed.

On p. 317 we see the statement: "The "meeting the standard with problems" category implies that less than half of the assessment sites within a soil polygon had a soil indicator rating of less than satisfactory, but overall, the soil condition in the polygon was meeting the standard."

We could find no support, either in the 4180 regulations or elsewhere to support the policy that 49% of a land area failing Rangeland Health Standards meets Rangeland Health Standards.

Please provide the regulatory basis for this approach in the revised EIS.

We see on 3-21 the statements:

> The most recent salinity management efforts in the UFO have concentrated on non-structural controls, such as managing soil surface-disturbing activities such as livestock grazing and off-highway vehicle (OHV) use to minimize salinity yields.

> Because high concentrations of selenium occur in Mancos Shale and soils derived from this formation, land management practices and actions that reduce soil surface disturbance and deep water percolation minimize the yield of selenium offsite, much like salinity management.

Yet the primary surface disturbing activity across the FO, livestock grazing, has no requirements or limitations put in place to reduce salinity or selenium.

3-29 states:

> Water quality of UFO surface waters is assessed and monitored by several means. The land health assessments conducted over the most recent ten-year period assessed water quality against BLM Colorado Public Land Health Standard 5. Data assessed for land health assessments include water chemistry, bacteriological analyses, density, and composition of aquatic macroinvertebrates, and the potential for accelerated levels of sediment, salinity, and selenium.

This statement implies that the BLM actually monitors the water quality impacts of its authorized actions. I deal with dozens of FO's in Wyoming Utah and Colorado and none of them do this. Is the UFO actually monitoring water quality impacts of its actions, such as e. coli, sediment from livestock grazing on each allotment it administers or is the above statement stretching the truth?

In the FEIS please clarify what data is being collected, where and how often and what percent of the FO the data collection efforts cover.

The DEIS lists a large number of water bodies on the 303d list, but the proposed RMP does not implement actions to bring these water bodies into compliance with the CWA.

3-32 states that the BLM is mandated to reduce salinity but the proposed RMP is entirely silent on requirements and limitations to reduce salinity from most of its action, including the most significant source of increased salinity, livestock grazing.

3-33 states:

> As part of the land health assessment process, several UFO streams with primary-contact recreation activities were monitored for fecal and *Escherichia coliform* bacteria concentrations. There is a strong correlation between these bacteria and the occurrence of other pathogens. Based on a limited number of samples per site (usually one or two samples collected in spring or summer months), none of the sampled streams exceeded state criteria for bacteria

Please provide information as to the dates when this sampling occurred and when livestock were present on the applicable allotment. WWP and the Forest Service have collected thousands of e. coli samples and exceedances of standards only occur when livestock are present. Natural background levels of e. coli are rarely above 25 CFU. So if your data was not collected when livestock were present on the allotment, the results are meaningless to conclude there are no exceedances.

3-37 states:

> However, because many livestock tanks were constructed prior to state permit filings or being cataloged in BLM databases, the actual number is considered to be much higher. Many of the tanks are poorly maintained or non-functional and cause accelerated levels of erosion and sedimentation. Invasive weed species commonly become established on areas disturbed by livestock tanks, which can degrade watershed conditions.

Certainly, if the BLM were serious about salinity, erosion and selenium control it would have inventoried these for the AMS and then put in specific actions in the RMP to deal with this problem.

3-46 states:

> Across all ten land health assessment units, cool season grasses were underrepresented in the plant communities. This is probably the result of livestock grazing in the spring and fall periods when these grasses are most vulnerable. Often perennial forbs are also underrepresented in the same areas. The reduced cool season grass and forb cover may make it easier for exotic species such as cheatgrass to move in. On many crucial big game winter ranges throughout the planning area, moderate to severe hedging of palatable shrubs is common. Usually reduced vigor of these shrubs is also evident.

Yet the RMP puts in place no requirements or limitations to recover cool season bunch grasses, eliminate growing season grazing or deal with the over-allocation of forage and winter range problems it fully knows about. The proposed RMP utterly fails to address these major FO-wide problems.

3-72 states:

> Within the last 10 years, two newly designated wilderness areas have effectively protected a substantial portion of the species' range from development-related impacts, and the Dominguez-Escalante and Gunnison Gorge NCAs have added or are likely to add new protections specific to the conservation of the Colorado hookless cactus.

But this inaccurately portrays the situation. None of these designations protect, and the RMP fails to implement protections, from the primary disturbance factor for this species, livestock grazing. The RMP fails to provide adequate protections in the BLM's rush to continue the status quo grazing.

Appendix C contains various BMP's but the RMP does not implement these. For instance in the livestock section we see rest and not doing repeated spring grazing yet the RMP fails to implement these BMP's despite the fact that repeated spring grazing is one of the major grazing problems on the FO.

So Appendix C looks good on paper but is worthless on the ground.

> 8. Colorado Best Management Practices and other scientifically developed practices that enhance land and water quality should be used in the development of activity plans prepared for land use.

But again these are not only undefined but not implemented.

Appendix G suffers from the same failure.

### GEOLOGY, SOILS, AND WATER

- Implement guidelines from BLM Technical Reference 1737-17 (Sada et al. 2001), to protect or restore the functions of springs.
- Measures designed to minimize erosion and water quality deterioration will be required in the site-specific plans for surface-disturbing land use activities.
- Implement BMPs from the BLM/USGS Mancos shale research findings (Murphy 2011) applicable to livestock management, recreation management (e.g. location and limitations of OHV use areas), rights-of-way, and other surface disturbing activities.
- Implement guidelines from BLM Technical Reference 1730-2 (BLM 2001), to protect or restore the functions of biological soil crusts.

Yet the RMP fails to implement any of these nor does the RMP require the implementation of these. So again it looks good on paper but is designed to to be worthless from a resource protection perspective.

> Maintaining healthy soil surface conditions on Mancos shale landscapes is more effective for the long term in limiting the yield of sediment, salinity and selenium than physical retention/detention structures

Again the RMP fails to put in place any requirements or limitations to achieve this. This is particularly obvious from the perspective of livestock which is the primary impact to soil surface conditions.

> ☐ Minimize livestock grazing and trailing impacts in riparian areas to protect vegetation, habitat values, streambank stability, and water quality.

Yet the RMP puts in place NO requirements or limitations to achieve this.

The livestock grazing section of Appendix G is another example of where the RMP fails to implement basic protections.

Appendix K fails to comply with the WO IM on bighorn sheep management. It also fails to utilize current science. We provide as an attachment a review of the use of this model in the North Delta process.

The analysis also fails to address disease transmission from cattle.

From a recent RMP revision:

https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=36859&dctmId=0b0003e88040d6d4

### 2.4.6 Alternative L – Allow Domestic Sheep and Goat Grazing on All Allotments with Leasing Terms and Conditions to Reduce Potential Interspecies Contact

The BLM considered an alternative that would make all four allotments available for domestic sheep and goat grazing with application of the leasing terms and conditions identified in Appendix C to reduce the potential for contact with bighorn sheep. These terms and conditions have previously been identified, recommended, or implemented by the USFS and the BLM as best management practices (BMPs). However, when bighorn sheep CHHR occur in or adjacent to a domestic sheep allotment, and especially when the allotment is within bighorn herd home range, development and implementation of effective separation measures is difficult; and contact between the species will most likely still occur. **In other words, special terms and conditions to avoid contact between bighorn and domestic sheep that are known to be in close proximity are generally ineffective to ensure separation of the species.** Furthermore, even with these extra measures, control of domestic sheep, or monitoring and locating bighorn sheep in forested/ dense vegetation or steep/rocky/rugged terrain is very difficult. Accordingly, without a large buffer between domestic and wild bighorn sheep, extra measures are not likely to result in a significant reduction in the risk of contact (Schommer 2009). No known studies, research, or peer reviewed literature has documented the effectiveness of BMPs preventing contact and disease transmission when domestic sheep or goats grazed within or adjacent to occupied bighorn sheep habitats. Appendix C contains a more detailed review of the effectiveness of BMPs.

The Partridge Creek allotment overlaps with bighorn sheep CHHR and the Marshall Mountain Allotment is in close proximity to CHHR. The Hard Creek allotment overlaps with the Little Salmon area of concern. The terrain on all three of these allotments is interspersed with dense vegetation and forested areas, with additional areas that are steep, rocky, and rugged. Therefore, application of the specified terms and conditions on these allotments would likely be ineffective at significantly reducing the potential for contact between bighorn sheep and domestic sheep. Hence, for the Partridge Creek, Hard Creek, and Marshall Mountain Allotments, this alternative would be effectively the same as Alternative A under which all four allotments would be available for domestic sheep grazing but without specified terms and conditions. Differing from the other three allotments, the Big Creek Allotment is not in or near bighorn sheep CHHR or the Little Salmon area of concern and has more open and moderately sloped rangeland. However, for this allotment, this alternative would be essentially the same as Alternatives B, which also makes Big Creek available for domestic sheep or goat grazing with application of the terms and conditions. Therefore this alternative was not analyzed in detail.

Appendix K relies on BMP's which have been shown to be ineffective and it ignores completely the WO IM for bighorn sheep which requires effective separation.

CONCLUSION:

The current RMP revision is BLM's traditional faith-based, politics-based management where no requirements or limitations are imposed. The BLM should review the Standards of Ethical Conduct for Federal Employees[25] that are based on Executive Order 12674, as amended by Executive Order 12731. In particular, three of the broad principles I believe apply here are:

   *"(1) Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private gain.*

   *(5) Employees shall put forth honest effort in the performance of their duties.*

   *(8) Employees shall act impartially and not give preferential treatment to any private organization or individual."*

Just because the BLM will be outsourcing much of this process does not mean it has any less legal or ethical responsibilities to the American people. I bring this up because, after years of working on livestock grazing and other issues on public lands and, with other WWP staff, having reviewed EAs and EISs on hundreds of grazing allotments and other projects, it is my belief that these documents are used to justify decisions that are already made and basically constitute a "shell game" in which evident degradation by livestock is explained away in every case due to some other cause even though livestock grazing is

---

[25] http://www.usdoj.gov/jmd/ethics/generalf.htm

widely recognized in the scientific literature as a cause of degradation to riparian areas, water quality, plant communities, soils and wildlife.  I cannot recall a single instance in all these cases, no matter how serious the environmental degradation, when the agency (Forest Service or BLM) performed an objective, science-based monitoring and analysis process directed at making an objective and logical decision concerning livestock grazing. Invariably, the decisions arrived at through these NEPA documents have amounted to a continuation of the status quo with at best, cosmetic changes that make little or no difference on the ground.  It is time for BLM to demonstrate to the public that it will engage in an honest, objective process in order to restore the public trust.

Sincerely yours,

Jonathan B Ratner
Director, WWP –Wyoming Office

11/1/2016                                DEPARTMENT OF THE INTERIOR Mail - comment on RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

___

## comment on RMP
1 message

___

**Peggy Baxter** <peggybax@gmail.com>                    Fri, Oct 28, 2016 at 5:45 PM
To: uformp@blm.gov

Ed and Peggy Baxter

18779 2375 Road

Cedaredge CO 81413

970-856-6225

BLM, Uncompahgre Field Office

2465 S. Townsend Ave.

Montrose, CO 81401

Sent VIA email to: uformp@blm.gov

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

We appreciate your consideration of the issues raised in this lettert on the Uncompahgre Field Office draft Resource Management Plan. As presented, none of the alternatives offer the level of protection these lands warrant, that communities and the public in your planning area have specifically asked for and favored, and which federal law requires.

The following are illustrations of how this plan negatively affects us.

* The watershed for both our domestic and our irrigation water lies in its entirety in the area made available for leasing increasing the risk of our water's contamination from the estimated 2300 truck trips necessary for each well.
* Our way of life will be altered significantly by the truck traffic our roads.  Our school buses use the same roads as these large trucks will use.  Our neighbors whose livelihoods have been saved by their country markets will not attract the tourist business that has kept them afloat.
* Just the truck traffic alone will significantly impact our air quality that has drawn people to this area.
* Water in our area is fully allotted.  With each well requiring over a million gallons of water to drill, our area's way of life will be significantly altered by the use of water for industrial development as opposed to agriculture.
*

Specifically, the final Resource Management Plan should include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.  Without having considered a no-leasing alternative the draft RMP fails to fulfill it's duty to consider the full range of reasonable management possibilities.

BLM_0126541

-

Our family has lived in this area for over 40 years.  As our parents did before us, we are watching our grandchildren being raised to respect the gifts of nature and our agricultural way of life.  As far as we are concerned, the industrialization of our county has no place here.


Sincerely,


Ed and Peggy Baxter

---

BLM_0126542



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Draft Resource Management Plan/DEIS Public Comment

1 message

**Max Eisele** <max@mesawindsfarm.com>                                                    Fri, Oct 28, 2016 at 4:00 PM
To: uformp@blm.gov, info@theconservationcenter.org, info@citizensforahealthycommunity.org

Dana Wilson, Uncompahgre Field Office Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401

**RE: BLM Draft Resource Management Plan/DEIS**

I wish to add my two cents as a long time resident of the North Fork community re: fracking in the North Fork Valley.
The following points very aptly list the reasons I am opposed to the BLM's Preferred Alternative:

- NASA predicts Impacts to climate, increasingly long periods of drought for the West
- Our farm and winery is dependent on irrigation water, especially clean water as we are certified organic and our water is monitored federally by the NOP
- Our business is dependent upon visitors and tourists to the valley because of the unique beauty, wildlife for hunting, support for organic and local products, and lack of congestion
- Oil and gas wells do and will leak, pollute ground water, despoil the natural beauty and disrupt wildlife, and damage outdoor recreation opportunities which in turn harms our personal and community economic stability.

In addition, recently fracking operations have taken on more debt and expansion than can be maintained. The bubble is bursting. Fracking companies are leaving communities and taxpayers holding the bag for their mess while they dissolve in Court. This scenario alone should give great pause in assessing risk versus gain. Strapped fracking businesses will no doubt cut their costs by ignoring safety procedures and protections required by government entities, which the BLM cannot watchdog due to the bureau's own lack of resources.

I support the North Fork Alternative Plan (NFAP) as the *only* way to insure our community's well being in the coming years. It is clearly the only correct option and well supported by the majority of people who live in the North Fork.

Max Eisele
Mesa Winds Farm
PO Box 327
31262 L Rd
Hotchkiss, CO 81419

**Links:**
A 'megadrought' will grip U.S. in the coming decades, NASA researchers say *https://www.washingtonpost.com/national/health-science/todays-drought-in-the-west-is-nothing-compared-to-what-may-be-coming/2015/02/12/0041646a-b2d9-11e4-854b-a38d13486ba1_story.html*
Oil and Gas Exploration Bankruptcies Could Sextuple This Year *http://fortune.com/2016/03/25/fracking-bankruptcies/*

_____
Max Eisele
max@mesawindsfarm.com
719.227.1396
PO Box 327
Hotchkiss, CO 81419

---

📄 **DEISpublicComment.pdf**
44K

BLM_0126543

BLM_0126544

October 29, 2016

Dana Wilson, Uncompahgre Field Office Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401

**RE: BLM Draft Resource Management Plan/DEIS**

I wish to add my two cents as a long time resident of the North Fork community re: fracking in the North Fork Valley. The following points very aptly list the reasons I am opposed to the BLM's Preferred Alternative:
- NASA predicts Impacts to climate, increasingly long periods of drought for the West
- Our farm and winery is dependent on irrigation water, especially clean water as we are certified organic and our water is monitored federally by the NOP
- Our business is dependent upon visitors and tourists to the valley because of the unique beauty, wildlife for hunting, support for organic and local products, and lack of congestion
- Oil and gas wells do and will leak, pollute ground water, despoil the natural beauty and disrupt wildlife, and damage outdoor recreation opportunities which in turn harms our personal and community economic stability.

In addition, recently fracking operations have taken on more debt and expansion than can be maintained. The bubble is bursting. Fracking companies are leaving communities and taxpayers holding the bag for their mess while they dissolve in Court. This scenario alone should give great pause in assessing risk versus gain. Strapped fracking businesses will no doubt cut their costs by ignoring safety procedures and protections required by government entities, which the BLM cannot watchdog due to the bureau's own lack of resources.

I support the North Fork Alternative Plan (NFAP) as the *only* way to insure our community's well being in the coming years. It is clearly the only correct option and well supported by the majority of people who live in the North Fork.

Max Eisele
Mesa Winds Farm
PO Box 327
31262 L Rd
Hotchkiss, CO 81419

**Links:**
A 'megadrought' will grip U.S. in the coming decades, NASA researchers say *https:// www.washingtonpost.com/national/health-science/todays-drought-in-the-west-is-nothing-compared-to-what-may-be-coming/2015/02/12/0041646a-b2d9-11e4-854b-a38d13486ba1_story.html*
Oil and Gas Exploration Bankruptcies Could Sextuple This Year *http://fortune.com/2016/03/25/ fracking-bankruptcies/*

BLM_0126545



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## DWCD Comment Letter and attachments on the UFO Draft RMP
1 message

**Michael Preston** <mpreston@frontier.net>                          Fri, Oct 28, 2016 at 3:35 PM
To: uformp@blm.gov
Cc: James.Eklund@state.co.us

To Whom It May Concern,

Attached is the comment letter dated October 28, 2015 from the Dolores Water Conservancy District concerning the Uncompahgre BLM Field Office Draft RMP and EIS.  The attachments to this email are very closely related to the Draft comment and should be considered very carefully in conjunction with the comment letter.

Other attachments to the letter will be sent in two supplemental emails:  Supplement #1 is the Southwest Basin Implementation Plan and "IPP" (Identified Projects and Processes) list; and Supplement 2: DWCD 2014 Water Management Plan.

—————————————

Michael Preston, General Manager

Dolores Water Conservancy District

Chair, Southwest Basin Roundtable

60 South Cactus, Cortez, CO 81321

(970) 565-7562

**4 attachments**

 **DWCD Comment UFO Draft RMP, EIS 10-28-16.pdf**
2613K

 **20111221 MOU BLM-CWCB.pdf**
2196K

**DoloresCWCBStipulation.pdf**
133K

 **Welch Letter to Mike King 1-6-15.pdf**
375K



**Dolores Water Conservancy District**

60 S. Cactus St. • P.O. Box 1150 • Cortez, CO 81321
Phone: 970-565-7562 • Fax: 970-565-0870 • Email: dwcd@frontier.net

October 28, 2016

Barbara Sharrow
Acting Southwest District Manager
Bureau of Land Management, Uncompahgre Field Office
2465 Townsend Avenue
Montrose, Colorado 81401

Re:  Dolores Water Conservancy District Comments on Uncompahgre Field Office Draft
Resource Management Plan and Environmental Impact Statement

Dear Ms. Sharrow:

The Dolores Water Conservancy District (DWCD) submits these comments to you
regarding  the Bureau of Land Management (BLM)'s preferred alternative
recommending five segments of the Dolores River as Suitable for inclusion in the
National Wild and Scenic Rivers System.  The alternative, Alternative D, is presented in
the Uncompahgre Field Office (UFO) Draft Resource Management Plan/ Environmental
Impact Statement.

This comment letter from DWCD is submitted in support of the comment letter
submitted by the Colorado Department of Natural Resources (DNR) and the Colorado
Water Conservation Board (CWCB) on the Uncompahgre Field Office Draft RMP and
EIS (CWCB/DNR Comment Letter).

## McPhee Reservoir is a Federal Project

The DWCD operates McPhee Reservoir, the facilities of which are owned by the United
States Bureau of Reclamation, located on the Dolores River upstream of the five
Dolores River segments proposed for Wild and Scenic Suitability determination.  The
DWCD began operation of the 381,160 acre-foot (229,182 AF active) McPhee
Reservoir in 1987.  Since 1987, irrigation water has been delivered to Full Service
Dolores Project Irrigators, the Montezuma Valley Irrigation Company and the Ute
Mountain Ute Tribal Farm and Community of Towaoc.  Domestic water has also been
provided to the City of Cortez, the Town of Dove Creek and the Montezuma Water
Company.  These federally-sanctioned Dolores Project operations are buttressed by
Colorado water rights held by the DWCD.

The CWCB/DNR Comment Letter points out that the BLM has noted several times that
flow through the proposed Dolores River sections is greatly diminished by the operation
of the Dolores Project upstream.  The DWCD strongly disagrees with this position of
the BLM.  The DWCD maintains that before McPhee Reservoir, the Dolores River was a
heavy spring run-off river which usually ran dry by the end of the summer.  McPhee
Reservoir has allowed for flows in the Dolores River to be more constant later in the
year than in previous history.

1

The relationship between Wild and Scenic Rivers Act (WSRA) suitability determinations and the operation of the Dolores Project was raised in the recent Tres Rios Resource Management Plan process and was addressed by the BLM in the January 6, 2015 letter from the BLM State Director to the Executive Director of the Colorado Department of Natural Resources and in the section of the Tres Rios Resource Management Plan addressing Government to Government consultation. The DWCD joins the CWCB in its request for similar clarity between the relationship of the UFO WSRA suitability determinations and the operation of the Dolores Project. The UFO RMP must state that any Dolores River suitability determinations and the BLM identification of flow-based ORVs on the Dolores River below the Dolores Project shall not affect the delivery of water allocations or water rights decrees for the Dolores Project.

## Use of State Programs to ensure ISF and ORV protections

A Memorandum of Understanding has been entered into among the BLM, the State of Colorado and the CWCB which is relevant to river segments on BLM lands which may be considered as Suitable under the WSRA. The MOU, which was last renewed in December of 2011 and is due for extension in 2016, sets forth a framework for interaction between the BLM and the CWCB relevant to joint Federal-State-Local efforts to protect the Dolores River segments.

The DWCD joins the CWCB in recommending that the BLM should work through the CWCB's Instream Flow (ISF) Program to provide protections adequate for flow-related values in the subject Dolores River segments. The DWCD notes that the BLM regularly initiates the CWCB process for ISF water rights to be held by the CWCB for many streams through lands managed by the BLM.

Currently, the CWCB holds ISF water rights on 145 miles of the 200-mile Dolores River and has a pending case in State water court for an ISF water right for an additional 35 miles of the lower Dolores River below the confluence with the San Miguel River. Therefore, more than 90 percent of the Dolores River is currently protected for fish and instream habitat by the Colorado ISF program. In addition, the Dolores River also currently has 118.9 miles of river designated as Suitable under the WSRA.

In regard to the most recent 35-mile segment of the lower Dolores River, the CWCB and the DWCD entered into a Stipulation regarding the application pending in Water Court. The Stipulation is referenced in the CWCB/DNR Comment Letter and quotes a section that states, "it is the Board's intent that this ISF water right is adequate to meet all requirements as a streamflow guideline in federal administrative or regulatory permitting contexts." The DWCD submits that the pending ISF water right is adequate to meet all requirements as a streamflow guideline for the UFO RMP and suitability guidelines for the ORVs on the Dolores River.

The CWCB also points out that the Stipulation provides a number of provisions intended to ensure the pending ISF water right does not reach up the Dolores River, into McPhee Reservoir and above McPhee, to protect State appropriated water rights above the confluence of the San Miguel and the Dolores Rivers. The DWCD joins the CWCB in requesting that the intent outlined in the Stipulations for

2

protection of upstream water rights be acknowledged by the BLM in the body of the final RMP.

## Collaborative Community Efforts to Protect ORVs

Many community efforts have been in place and continue to be in place to address the environmental concerns on the Dolores River, including Suitability concerns and related ORVs.   While seeking to ensure that operations of the Dolores Project will not be impacted, the DWCD has participated in many collaborative efforts including the Dolores River Dialogue; the Lower Dolores River Plan Working Group;  the "A Way Forward" Study: "Status and Trends of the Flannelmouth Sucker, Bluehead Sucker, and Roundtail Chub in the Dolores River Colorado and Opportunities for Improvement" by Kevin Bestgen, William Miller and Phaedra Budy (July 2011); "Lower Dolores River Implementation, Monitoring and Evaluation Plan for Native Fish" (June 2014); Dolores River Native Fish Monitoring and Recommendation Team; and the Lower Dolores River Working Group - Legislative Subcommittee.

Monitoring of native fish populations on the Dolores River from McPhee Dam to Bedrock framed within the "A Way Forward" Study and the Range-Wide Conservation Agreement ("Three Species Agreement") is being conducted by Colorado Parks and Wildlife and reviewed by the Dolores River Monitoring and Recommendation Team.  This monitoring has indicated that Roundtail Chub populations prefer pool habitats and are stable above the San Miguel confluence. By contrast the bluehead sucker and flannelmouth sucker monitor poorly within this reach because they require higher flows which are only available below the San Miguel River confluence.

DWCD requests that the UFO RMP commits to a holistic approach to monitoring populations of each of the three native fish species listed as ORVs which includes the entire Dolores River from McPhee Dam to the Confluence of the Colorado River.  This commitment should include all three Colorado BLM Field Offices along the Dolores River that now fall within the Southwest District Office of BLM, in cooperation with Colorado Parks and Wildlife native fish monitoring efforts and local collaboratives such as the Dolores River Native Fish Monitoring and Recommendation Team.

A focus of this coordination should involve the identification of areas along the Dolores River in which each of the three species is currently viable.  The intent of this coordination is to identify the habitats within which each species is viable and build on these strongholds, so if any of these three species is ever listed under the Endangered Species Act, there will be a solid set of relationships and strategies that involve BLM, CPW, CWCB, Water Management Entities, Conservation Advocates and local governments with the best possible capability to care for these native fish species within available hydrologic and habitat conditions.

Most recently the DWCD has worked with citizens of various community interests including four counties, two water boards, TNC, Wilderness Society and San

3

Juan Citizens Alliance to develop a legislative proposal for a congressionally-approved National Conservation Area (NCA) to address the various water supply and ecological interests on the Dolores River from McPhee Dam to Bedrock. Three of the four segments considered for suitability (Dolores River, Segment 1a and La Sal Creek, Segments 2 & 3) in the Upper Dolores River are in the area currently being considered for the NCA. The DWCD again joins the CWCB in anticipating that, if an NCA is established on these segments, Congress will release these and other segments within the NCA from designation as Suitable and from potential legislative designation under the Wild and Scenic Rivers Act.

## Specific Language requests for the UFO RMP

The DWCD joins the CWCB and DNR to request certain specific language be included in the body of the final RMP regarding the Dolores River segments. These include:

1. The Wild and Scenic Rivers Act suitability determinations found in Appendix P of the UFO RMP will not affect the delivery of water allocations in the Dolores Project. Rather, the suitability determinations are intended to guide BLM land use decisions that could affect the streams that are determined to be suitable. When the BLM determines that a river is suitable under the Wild and Scenic Rivers Act, the authority to protect ORVs is limited to existing BLM authorities under the Federal Land Policy and Management Act. A suitability determination by BLM does not obligate other agencies, such as Reclamation, to utilize their authorities to protect the ORVs identified by the BLM. Congress has not granted any authority to BLM that would allow the BLM to dictate how a Reclamation project is operated, nor could a BLM administrative decision supersede congressionally enacted legislative direction for the Dolores Project. Accordingly, the Dolores River suitability determinations and the BLM identification of flow-based ORVs on the Dolores River below the Dolores Project will not affect the delivery of water allocations or water rights decrees for the Dolores Project.

2. If the Colorado water court system decrees an ISF water right for the lower Dolores River in the locations, flow rates, and timing appropriated by the CWCB at its March 2014 Board meeting, and if the instream flow right is vigorously enforced by the CWCB, the BLM will determine it unnecessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

3. If alternative forms of flow protection are provided to support flow-related ORVs, the BLM will determine it unnecessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

4

**Supporting Documents**

Attached to this letter are documents the DWCD submits are important for this review and should be incorporated into the public record on this matter. These documents include:

- Memorandum of Understanding between DNR, the CWCB, and BLM, dated December 21, 2011
- Stipulation Between the CWCB Staff and the DWCD, In the Matter of the CWCB Staff's Recommendation for an Instream Flow Appropriation on the Dolores River, dated August 31, 2015 (Dolores ISF Stipulation)
- Letter from Ruth Welch, BLM Acting State Director, to Mike King, Executive Director, Colorado Department of Natural Resources, January 6, 2015 (Tres Rios RMP Letter)
- Southwest (SW) Basin Roundtable's Basin Implementation Plan (BIP), including an updated Identified Projects and Processes (IPP) list
- Dolores Water Conservancy District (DWCD) 2014 Water Management and Conservation Plan
- DWCD Drought Contingency Plan, anticipated April 2017

The DWCD recognizes the importance of ensuring that the Dolores River is protected for both the ecological values and the operations of the Dolores Project. The DWCD believes that the active community collaborative efforts are making great strides in establishing these protections, including but not limited to the NCA, and will continue to work with the BLM and other federal agencies to ensure establishment and enforcement of these protections. The DWCD will remain active in the process of developing the final RMP and hopes its suggested language will be incorporated into the final RMP.

Thank you for considering these ideas and please contact me with any questions you may have.

Sincerely,

Michael Preston, General Manager
Dolores Water Conservancy District

Cc.  James Eklund, Director, Colorado Water Conservation Board

5

BLM-MOU-CO-545

## MEMORANDUM OF UNDERSTANDING
## BETWEEN
## STATE OF COLORADO
## DEPARTMENT OF NATURAL RESOURCES
## AND
## COLORADO WATER CONSERVATION BOARD
## AND
## UNITED STATES DEPARTMENT OF INTERIOR
## BUREAU OF LAND MANAGEMENT

This MEMORANDUM OF UNDERSTANDING (MOU) is hereby made and entered into by and between the State of Colorado Department of Natural Resources, hereinafter referred to as the DNR, and the Water Conservation Board, hereinafter referred to as CWCB, and the United States Department of Interior, Bureau of Land Management, hereinafter referred to as the BLM.

## A. PURPOSE:

To formalize framework for the DNR, the CWCB and the BLM, to work together in a cooperative manner on issues regarding the management of water and water uses on BLM lands in Colorado.

## B. STATEMENT OF MUTUAL BENEFIT AND INTERESTS:

The allocation and management of water plays a crucial role in the vitality of Colorado's economy and way of life. Water dependent wildlife, fish, scenic, aesthetic, ecological, agricultural, municipal, industrial and recreational values of BLM lands in Colorado contribute substantially to the economy of the state, and the enjoyment of the public.

The prior appropriation system was developed in Colorado to govern the appropriation, use and distribution of water tailored to Colorado's unique physiologic, hydrologic and climatic conditions. The BLM provides land, access and rights-of-way for numerous water supply and transport facilities in Colorado that allow for the exercise of water rights under the prior appropriation system.

Federal and state interests, in the management of water resources on BLM lands require coordination and cooperation between the DNR, the CWCB and the BLM. There are numerous federal and state laws pertaining to the management of land and water resources, and collaborative efforts consistent with the state and federal law will lead to the most effective management of water resources for all uses.

It is in the public interest to find collaborative solutions to challenging natural resource issues under cooperative agreements. Cooperation will result in more benefits to the public, to water resources, and to federal land than interaction through other means.

1

The BLM recognizes and respects the authority of the state to allocate water available for appropriation and respects valid water rights that are granted, exercised and managed in accordance with state law. The state recognizes and respects the authority of the BLM to approve and manage rights-of-way for water infrastructure located on BLM lands and also recognizes water rights adjudicated to the BLM. The BLM will seek to administer rights-of-way for water infrastructure on BLM lands to prevent impacts to the exercise of water rights while still meeting the requirements of federal laws and regulations.

In cases where federal laws and regulations require the BLM to consider new management prescriptions for existing structures in a way that could impact the exercise of water rights, the DNR, the CWCB and the BLM agree to explore innovative ways to assure continued operation of the water use facilities and undiminished historic use of water. For new water facilities on BLM lands, the BLM will seek to engage water users early in the permitting process to jointly develop terms and conditions that will meet and protect the water user's water rights and objectives while still meeting the requirements of federal laws and regulations.

## C. THE DNR, THE CWCB AND THE BLM DO HEREBY AGREE:

1. To respect both federal and state laws and regulations. The DNR's responsibilities include developing and implementing state water policy. The CWCB is responsible for water policy and planning and the administration of the State's Instream Flow and Natural Lake Level Program, and has the exclusive authority to hold instream flow water rights under Colorado law. The BLM is responsible for managing water resources and water-dependent wildlife habitat on BLM lands, including habitat utilized by species protected under the Endangered Species Act. The DNR, the CWCB and the BLM will seek to integrate federal and state responsibilities into each agency's respective and mutual decision-making processes under this MOU.

2. To: (a) explore innovative ways to assure continued operation of water use facilities on BLM lands and undiminished historic use of water while protecting aquatic resources and water-dependent wildlife habitat; and (b) seek opportunities to further develop the collaborative relationship between the agencies. In this spirit, the parties will continue to commit staff and resources to this effort, with a focus on flexibility and opportunity.

3. That conflicts are best avoided by careful advance planning and a spirit of cooperation. The parties agree that when conflicts arise, they should, to the greatest extent possible, be resolved by federal and state authorities working together in cooperation with water right holders and where appropriate, tribal and local governments and other interested parties.

4. That BLM's Resource Management Plans (RMPs) are a critical tool for long term planning and decision-making. The parties agree to continue to work together during RMP revision and implementation to identify and address issues in advance that could be significant factors in the authorization and management of water supply facilities on BLM lands. The parties will recognize and plan for the continued exercise of non-federal water rights and non-federal water facilities as a valuable resource benefit of BLM lands, and will cooperate on analysis and planning for new water supply facilities that may be needed to

2

meet future municipal, industrial and agricultural water demands. In addition, the parties will cooperate on analysis and planning to maintain aquatic habitat conditions and improve degraded aquatic habitat conditions where they exist.

5. Many of the BLM's responsibilities under the Wild and Scenic Rivers Act are discharged during the RMP process, including identification of eligible and suitable stream segments. The parties agree to explore innovative ways to address the BLM's review of river segments under the Wild and Scenic Rivers Act and to protect Outstandingly Remarkable Values (ORVs) on those segments with the goal of achieving adequate protection of the ORVs without taking or diminishing existing water rights or historical water use.

6. That re-authorization of existing water facilities on BLM lands will be done in cooperation and collaboration with the holders of the permits and with other parties such as local governments, tribes, and state and federal agencies, as appropriate.

7. To work together to identify steps that can be taken to better integrate federal and state laws and activities concerning protection and management of riparian resources and instream flows on BLM lands:

    a.      The DNR, the CWCB and the BLM will continue to seek innovative ways to achieve instream flow protection instream reaches that support exceptional aquatic and riparian values and instream reaches significantly affected by existing water uses. These stream reaches include reaches that provide habitat for sensitive aquatic and riparian species, reaches located close to state boundaries, reaches that flow only seasonally, reaches flowing through a mix of public and private lands, and reaches located below significant diversions and significant return flow locations. These innovative measures will be consistent with state and federal laws.

    b.      Where the BLM has secured appropriated water rights appurtenant to land acquisitions, it may enter into agreements with the CWCB in regards to changing the use of such water rights to instream flows and protecting and enforcing those rights consistent with federal and state laws.

    c.      The CWCB will work with the BLM to identify monitoring and stream gaging needs on stream reaches deemed of special importance to the BLM, and the parties will jointly identify funding sources for additional stream monitoring and stream gages on such stream reaches as necessary or appropriate. Additionally, the DNR, the CWCB and the BLM will work together concerning the operation and maintenance of stream gages on stream reaches deemed of special importance to the BLM by providing funding or in-kind services where possible.

    d.      To the extent that funding and personnel allow, the BLM will work together with the CWCB and the DNR to determine if the flow amounts of instream flow water rights held by the CWCB are adequate to satisfy the instream flow needs for BLM purposes. If the parties determine the flows are inadequate for BLM purposes, the parties agree to explore mechanisms to assure adequate protection for such purposes consistent with state

3

and federal laws without taking or diminishing existing water rights or historical water use.

e.    The CWCB will aggressively monitor and enforce instream flow water rights and file Statements of Opposition in water court if a water right application is determined to injure the CWCB's instream flow water rights on streams that flow through BLM lands.

f.    The BLM and the CWCB will work together to identify high priority stream reaches for protection. These identified reaches will be used to facilitate discussions with water users to identify innovative protective measures that will protect water-dependent values while protecting the exercise of existing water rights.

g.    Where appropriate, the CWCB and the BLM will work together when water users on BLM lands wish to donate, sell or lease water to the CWCB as a means of providing for instream flow protection.

8. That when the BLM receives land use authorization applications for significant new stream diversions on BLM lands, the BLM will notify the CWCB as early as possible to create a coordinated approach on instream flow protection.

9. That when the CWCB is considering funding a water development project that would be located upon BLM lands or would significantly affect streams crossing BLM lands, the CWCB will notify the BLM as early as possible to coordinate land use, permitting and instream flow issues.

10. To share information and data to further the understanding of water needs and resources on BLM lands, and to protect these resources consistent with state and federal law.

11. To maintain, protect and restore watersheds as appropriate through cooperative adaptive management, which is a systematic process for continually improving management policies and practices by learning from the outcomes of previously employed policies and practices.

**D.  THE PARTIES MUTUALLY UNDERSTAND AND AGREE THAT:**

1. FREEDOM OF INFORMATION ACT (FOIA).  Any information furnished to the BLM under this instrument is subject to the Freedom of Information Act (5 U.S.C. 552).

2. PARTICIPATION IN SIMILAR ACTIVITIES.  This instrument in no way restricts the parties from participating in similar activities with other public or private agencies, organizations, and individuals.

3. COMMENCEMENT/EXPIRATION/TERMINATION.  This MOU takes effect upon the signature of the DNR, the CWCB and the BLM, and shall remain in effect for five years from the date of execution. This MOU may be extended or amended upon written request of either the DNR, the CWCB or the BLM and the subsequent written concurrence of the

BLM_0126555

other(s). Either the DNR, the CWCB or the BLM may terminate this MOU with a 60-day written notice to the other(s).

4.  RESPONSIBILITIES AND LEGAL AUTHORITIES OF PARTIES.  The BLM, the DNR and the CWCB and their respective agencies and offices handle their own activities and utilize their own resources, including the expenditure of their own funds in pursuing these objectives. Each party will carry out its separate activities in a coordinated and mutually beneficial manner, consistent with its legal obligations. Each party reserves the right to consult with its respective legal counsel at any time during the implementation of this MOU to assure that it has the legal authority to undertake any activity provided for in this MOU, including the provisions contained in Section C.

5.  PRINCIPAL CONTACTS:  The principal contacts for this instrument are:

**BLM Project Contact**
Mr. Roy Smith
Instream Flow Coordinator
Bureau of Land Management
2850 Youngfield St.
Lakewood, CO 80215
Phone: (303) 239-3940
FAX:  (303) 239-3808
E-Mail: r20smith@blm.gov

**Cooperator Project Contact**
Ms. Linda Bassi
Stream and Lake Protection Section
Colorado Water Conservation Board
1313 Sherman St., Suite 721
Denver, CO 80203
Phone: (303) 866-3441, ext. 3204
FAX:  (303) 866-4474
E-Mail: linda.bassi@state.co.us

**BLM Administrative Contact**
Ms. Tammy Strahan, Secretary
Bureau of Land Management
2850 Youngfield St.
Lake wood, CO 80215
Phone: (303) 239-3733
FAX:  (303) 239-3808
E-Mail: tstrahan@blm.gov

**Cooperative Administrative Contact**
Ms. Suzy Williams
Program Assistant
Executive Director's Office
DNR
1313 Sherman St., Suite 718
Denver, CO 80203
Phone: (303) 866-3311, ext. 8670
FAX:  (303) 866-2115
E-Mail: suzy.willams@state.co.us

6.  NON-FUND OBLIGATING DOCUMENT.  Nothing in this MOU shall obligate the parties to obligate or transfer any funds. Specific work projects or activities that involve the transfer of funds, services, or property among the parties will require execution of separate agreements and be contingent upon the availability of appropriated funds. Such activities must be independently authorized by appropriate statutory authority. This MOU does not provide such authority. Negotiation, execution, and administration of each such agreement must comply with all applicable statutes and regulations.

5

7. ESTABLISHMENT OF RESPONSIBILITY. This MOU is not intended to, and does not create, any right, benefit, or trust responsibility, substantive or procedural, enforceable law or equity by a party against the United States, the State of Colorado, or either of its agencies, its officers, or any person.

8. AUTHORIZATION REPRESENTATIVES. By signature below, the parties certify that the individuals listed in this document are representatives of the cooperator are authorized to act in their respective areas for matters related to this MOU.

THE PARTIES HERETO have executed this instrument.

COLORADO DEPARTMENT
OF NATURAL RESOURCES


Mike King, Executive Director                    12/21/11
                                                 DATE


Jennifer Gimbel, Division Director               12-21-11
                                                 DATE


U.S. DEPARTMENT OF INTERIOR
BUREAU OF LAND MANAGEMENT


Helen M. Hankins, State Director                 12-16-11
                                                 DATE

6

BEFORE THE COLORADO WATER CONSERVATION BOARD
STATE OF COLORADO

**STIPULATION BETWEEN THE COLORADO WATER CONSERVATION BOARD
STAFF AND THE DOLORES WATER CONSERVANCY DISTRICT**

IN THE MATTER OF THE CWCB STAFF'S RECOMMENDATION FOR AN INSTREAM
FLOW APPROPRIATION ON THE DOLORES RIVER, WATER DIVISION 4

The Dolores Water Conservancy District ("District") and the Colorado Water Conservation
Board Staff ("CWCB staff"), by and through their respective counsel, hereby stipulate and agree
as follows:

A. In January 2014, the Colorado Water Conservation Board ("CWCB" or "Board") declared its
intent to appropriate an instream flow ("ISF") water right on the Dolores River from the
confluence with the San Miguel River to the confluence with West Creek ("Dolores River
ISF"). Because a Notice to Contest was filed by the deadline of March 31, 2015, the Board
will hold a hearing on the Dolores River ISF in September 2015 pursuant to Rule 5j(1) of the
Rules Concerning the Colorado Instream Flow and Natural Lake Level Program ("ISF
Rules").

B. The District filed a Notice of Party Status in the Dolores River ISF proceeding on April 28,
2015 and a Prehearing Statement on June 29, 2015. The District and CWCB staff have
negotiated terms and conditions to be included in a stipulation in the CWCB's water court
application for the Dolores River ISF. On July 16, 2015, the Board approved the terms and
conditions for inclusion in a stipulation in its water court application for the Dolores River
ISF.

C. In the water court case adjudicating the Dolores River ISF, the District and the CWCB staff
shall enter into and file with the court a stipulation that includes the following terms and
conditions:

    1.      The CWCB shall not file Statements of Opposition based upon this ISF water
right in applications for water rights above McPhee Dam that would add augmented
structures to DWCD's augmentation and/or exchange plans in Case Nos. 95CW104,
96CW49, and 05CW44.

    2.      This ISF, if decreed, will be junior to all existing senior decrees on the Dolores
and San Miguel Rivers and will be administered within the priority system. Therefore, a
call by the CWCB for this junior right will not adversely affect the operation of the
existing senior augmentation plans as outlined in Case Nos. 95CW104, 96CW49, and
05CW44.

    3.      The ISF water right decreed herein is not intended to deprive the people of
the State of Colorado of the beneficial use of those waters available pursuant to interstate
compact. The CWCB agrees that this ISF water right will be administered by the
State Engineer in accordance with rules duly promulgated by the State Engineer in
accordance with applicable law related to the curtailment of Colorado River

BLM_0126558

basin water uses within Colorado in order to comply with the Colorado River Compact of 1922 and the Upper Colorado River Basin Compact of 1948, including any such rules intended to avoid, delay, or limit the severity of such a compact curtailment.

4.      As required by Colorado law, the CWCB staff will conduct reasonable reviews of water court applications made after the date of this ISF that may impact this ISF water right.

5.      It is the Board's intent that this ISF water right is adequate to meet all requirements as a stream flow standard or guideline in federal administrative or regulatory permitting contexts.

6.      In accordance with Rules 8e and 8f of the Rules Concerning the Instream Flow and Natural Lake Level Program (2009), for applications seeking new water rights, diligence for conditional water rights, or changes of water rights on the Dolores River, the CWCB will not file any Statements of Opposition to applications that will result in depletions that do not exceed a total of one percent (1%) depletive effect on the Dolores River ISF. This term and condition does not preclude the CWCB from enforcing this ISF appropriation in accordance with the priority system.

7.      Pursuant to CRS 37-92-102(3)(b), this ISF is subject to present uses or exchanges in existence on the date of the ISF appropriation, whether or not confirmed by court order at the time of the court filing.

8.      The CWCB shall not unreasonably deny injury with mitigation proposals for this ISF under Injury Accepted with Mitigation Rule 8i(3) of the Rules Concerning the Instream Flow and Natural Lake Level Program (2009).

9.      This Stipulation is entered into by way of compromise and settlement of this litigation. Any agreements or terms and conditions herein are due solely to the unique circumstances of this case. This Stipulation shall not establish any precedent and shall not be construed as a commitment to include any specific Findings of Fact, Conclusions of Law, or specific engineering methodologies or administrative practices in future stipulations or decrees.

D. Upon execution by both parties of this Stipulation, any and all of the District's objections to the Dolores ISF shall be settled and the District shall not participate in the hearing on the Dolores River ISF.
E. The District may file a Statement of Opposition to the Board's water court application for the Dolores River ISF for the sole purpose of entering into the above-described stipulation with the CWCB.

SIGNATURES ON NEXT PAGE

BLM_0126559

Stipulated and agreed to this _____ day of August, 2015.

DOLORES WATER CONSERVANCY DISTRICT

By _____    8/13/15
    Michael Preston, General Manager       Date

COLORADO WATER CONSERVATION BOARD

By _____    8.31.2015
    James Eklund, Director                 Date

BLM_0126560



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Colorado State Office
2850 Youngfield Street
Lakewood, Colorado 80215-7210
www.co.blm.gov



In Reply Refer To:
6400 (CO-932)

**JAN 0 6 2014**

Mr. Mike King
Executive Director
Colorado Department of Natural Resources
1313 Sherman St., Room 718
Denver, CO 80203

Dear Mr. King:

Thank you for meeting with me on December 22, 2014, to discuss the Tres Rios Resource Management Plan (RMP) and items of concern to the water districts in southwest Colorado.

As we discussed, the Tres Rios RMP has not been signed and protest responses have not been provided to the protestors. The Bureau of Land Management (BLM) has agreed to make changes to language in the RMP in accordance with the Governor's Consistency Review. Those changes will be reflected in the Record of Decision (ROD) and final plan. These changes include converting the aquatic habitat language from a standard to a guideline and a commitment to working with stakeholder groups who are addressing "outstandingly remarkable values" (ORV). The BLM is convinced that cooperation and collaboration is essential for addressing issues related to native fish management in the Dolores River. For that reason, the BLM has been and will continue to be committed to being involved in the Dolores River Dialogue.

Further, we discussed the Tres Rios Field Manager's letter to the Dolores Water Conservancy District dated October 6, 2014 (enclosed). My staff worked with the field manager on this response and we concur with the responses provided. As we discussed, the identification of an ORV creates commitments solely for the BLM on actions within the BLM's jurisdiction and not for any other federal agency or entity. The BLM's identification of ORVs cannot be used to modify binding water delivery contracts executed by the Bureau of Reclamation (BOR). The BLM and the BOR operate under completely separate authorities. The BLM is granted operational authority by the Federal Land Policy and Management Act of 1976, while Reclamation is granted operational authorities by the Reclamation Act of 1902. In addition, Reclamation authority is governed by the Colorado River Basin Act of September 30, 1968 (Public Law 90-537), which specifically authorized the Dolores Project.

We also discussed proposed language changes for the RMP, which the water districts provided earlier this month to the field manager. The BLM is considering these proposed changes and acknowledges that the delay of the ROD has prevented predictability for the water districts to

make a decision about how to participate in other decision making arenas, such as appropriation of in-stream flow water rights.

We appreciate the chance we had to discuss the concerns of the water districts. The BLM is committed to working with the State and the water districts as we manage resources in southwestern Colorado.

Sincerely,

_Acting_

Ruth Welch
State Director

Enclosure

cc: Mike Preston, Dolores Water Conservancy District
James Eklund, Colorado Water Conservation Board, 1313 Sherman St., Rm 721, Denver, CO 80203
Bruce Whitehead, Southwestern Colorado Water Conservation District, 841 E. 2nd Ave., Durango, CO 81301
Ed Warner, DOI, Bureau of Reclamation, Western Colorado Area, 2764 Compass Dr., Grand Junction, CO 81506
Lori Armstrong, Southwest District Manager
Connie Clementson, Tres Rios Field Manager



United States Department of the Interior

BUREAU OF LAND MANAGEMENT
TRES RIOS FIELD OFFICE
29211 Highway 184
Dolores, CO  81323
www.blm.gov/co/st/en/fo/sjplc.html



In Reply Refer To:
4750 (COS01000)

October 6, 2014

Mr. Mike Preston
Dolores Water Conservancy District
P.O. Box 1150 - 60 Cactus Street
Cortez, CO  81321

Dear Mr. Preston,

The purpose of this letter is to provide Dolores Water Conservancy District (DWCD) with additional information concerning the limits of Bureau of Land Management (BLM) authority when implementing various provisions of the Wild and Scenic Rivers Act.

The BLM hopes this information is useful as DWCD evaluates how to respond to the BLM's Record of Decision (ROD) for the Tres Rios Resource Management Plan (RMP).  The BLM would like to schedule a meeting with you immediately after the ROD is released to discuss any additional questions you might have concerning the BLM's implementation of the RMP.

There are several questions that have been posed by DWCD as the BLM has formulated the RMP.  The attachment to this letter attempts to provide BLM's perspective on those questions.  If you have any questions about the BLM responses, our proposed meeting would be an excellent time to discuss those.

Sincerely,

Connie Clementson
Field Manager

Cc:    Mike King, Colorado Department of Natural Resources
       James Eklund, Colorado Water Conservation Board
       Bruce Whitehead, Southwestern Colorado Water Conservation District

**Questions and Answers for Dolores Water Conservancy District**

**1. What effect will the identification of outstandingly remarkable values (ORVs) have on BLM's decision making processes?**

The Identification of an ORV is simply a label used to describe values that already exist in the river corridor. The identification of an ORV indicates that BLM considers the value of significant importance in a regional context, and that BLM will give the value special consideration during BLM decision-making processes.

Once an ORV is identified, BLM decision-making processes must be consistent with these values. It does not mean, however, that BLM must manage for that value to the exclusion of or minimization of other land uses for which BLM is legally obligated to manage. For example, identification of an ORV cannot be used as a rationale to cancel existing land use authorizations on BLM lands simply because exercise of the authorization may impact the ORV.

Finally, the identification of an ORV is also an official record of BLM s analysis of the river corridor and an official commitment to the Congress and the President that BLM will not make decisions that could degrade the ORVs.

**2. What sort of decisions could be influenced or impacted by the identification of an ORV?  How far do BLM's commitments extend when BLM identifies an ORV?**

BLM's identification of an ORV creates commitments only for the BLM. It influences decisions solely under BLM management authority.  No other federal agency, including the U.S. Bureau of Reclamation (Reclamation) has an obligation to change its management practices because BLM identifies an ORV.  Identifying ORVs is a BLM administrative action that ultimately appears in a land use plan.  An administrative action by BLM cannot be used to change existing legal and contractual obligations that are fulfilled by other agencies. For example, a BLM administrative decision cannot be used to modify obligations that Reclamation has under the laws that authorized the Dolores Project. In addition, a BLM administrative decision cannot be used to modify binding water delivery contracts executed by Reclamation.

When BLM identifies an ORV, the types of BLM decisions that could be modified to take ORVs into account include:

- applications for new land use authorizations along the river corridor, such as roads, utility corridors, etc.
- rehabilitation projects along the river corridor, such as removal of weeds and invasive species
- recreation management along the river corridor, such as projects to build new recreational facilities
- proposed surface disturbing projects in the Dolores River watershed that might change sediment loads to the river, such as vegetation treatments

The list above is not exhaustive, but it illustrates the type of land management decisions that are within the BLM's authority.

BLM_0126564

**3. What is the relationship between BLM authorities under the Wild and Scenic Rivers Act and Reclamation's authorities?**

BLM and Reclamation operate under completely separate authorities. BLM is granted operational authority by the Federal Land Policy and Management Act of 1976, while Reclamation is granted operational authorities by the Reclamation Act of 1902. In addition, Reclamation authority is governed by the Colorado River Basin Act of September 30, 1968 (Public Law 90-537), which specifically authorized the Dolores Project. Congress has not granted any authority to BLM that would allow the agency to dictate how a Reclamation project is operated, nor could a BLM administrative decision supersede congressionally enacted legislative direction for the Dolores Project.

When BLM identifies ORVs and determines that a river is suitable under the Wild and Scenic Rivers Act, the authority to protect the ORVs is limited to existing BLM authorities under the Federal Land Policy and Management Act. A suitability determination by BLM does not obligate other agencies to utilize their authorities to protect the ORVs identified by the BLM. The only situation in which other federal agencies are obligated to utilize their authorities to protect the ORVs identified by BLM is when Congress decides to officially designate a river segment into the National Wild and Scenic Rivers System. Congress has not done so for the Dolores River.

**4. Does the ongoing operation of any Reclamation facility depend upon BLM land use authorizations or other decisions?**

The BLM checked its records and could not identify any project facilities, such as pump stations, canals, and laterals that have been authorized under right of-way grants issued by BLM. Rather, all BLM lands that were needed for project construction and operation, such as BLM lands around the perimeter of McPhee Reservoir, were withdrawn to Reclamation. When a withdrawal occurs, the agency receiving the withdrawal receives administrative authority to manage the withdrawn lands. When Reclamation facilities operate on withdrawn lands, BLM no longer reviews and reauthorizes the land use, as it does with right-of-way grants.

**5. Does BLM plan to become involved in Reclamation's decision making, from the Wild and Scenic Rivers' perspective?**

BLM recognizes that Reclamation must balance multiple legal mandates and legal contractual obligations in the operations of the Dolores Project. Given Reclamation's obligations, BLM is convinced that cooperation and collaboration is essential for addressing issues related to native fish management in the Dolores River. For that reason, BLM has been and will continue to be committed to being involved in the Dolores River Dialogue, which is an independently formed group of stakeholders who are attempting to collaboratively address river management issues..

If Reclamation seeks public comments on one of its decision that requires National Environmental Policy Act analysis, the Wild and Scenic Rivers Act does not mandate that BLM provide comments regarding Dolores River ORVs. In those situations, the BLM will provide comments only if BLM believes that a Reclamation decision will have a significant impact on the portions of the river that BLM manages, and

BLM_0126565

if BLM believes that the issue of concern to BLM is not being fully addressed as part of the Dolores River Dialogue.

Even if BLM does provide comments on a Reclamation decision, the Wild and Scenic Rivers Act does not obligate Reclamation to change its decision to respond to BLM comments. Rather, BLM anticipates that Reclamation would respond within the constraints of its legal and contractual obligations.

Case No. 1:20-cv-02484-MSK   Document 65   filed 04/29/21   USDC Colorado   pg 148 of 149

11/1/2016   DEPARTMENT OF THE INTERIOR Mail - DWCD Attachments to Comment Letter - UFO Draft RMP (Supplement 1) - Southwest Basin Implementati...



UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

## DWCD Attachments to Comment Letter - UFO Draft RMP (Supplement 1) - Southwest Basin Implementation Plan and "IPP" List

1 message

**Michael Preston** <mpreston@frontier.net>                        Fri, Oct 28, 2016 at 3:37 PM
To: uformp@blm.gov
Cc: James.Eklund@state.co.us

To whom it may concern,

The attached Southwest Basin Implementation Plan and the attached Appendix 1 "IPP" list are submitted as attachments to the DWCD comment letter on the Draft UFO RMP and EIS dated October 28, 2016.

The attached Plan lays out goals and measurable outcomes, needs, and strategies for all 9 sub-basins that make up the Southwest Basin Roundtable.  The "IPP List" (Identified Projects and Processes) describes specific projects within each Basin planned to address water supply gaps including agricultural, domestic, recreational and environmental water needs.  Projects related to the Dolores River entitled "Dolores and McElmo River Basins Draft IPP List" appear on pages 13 and 14 of the IPP Appendix.  Please take these projects into account in finalizing the RMP.

_____

Michael Preston, General Manager

Dolores Water Conservancy District

Chair, Southwest Basin Roundtable

60 South Cactus, Cortez, CO 81321

(970) 565-7562

**2 attachments**

 **SW BIP 04017015 (1).pdf**
3799K

 **Appendix A_1.pdf**
213K

BLM_0126567

4/17/2015

# Basin Implementation Plan

Southwest Basin Roundtable

Ann Oliver and Carrie Lile
HARRIS WATER ENGINEERING, INC.

BLM_0126568