October 28, 2016

BLM
Uncompahgre Field Office
2465 S. Townsend Ave
Montrose CO  81401
uformp@blm.gov

RE: Comments on Draft Resource Management Plan

Dear UFO BLM,

I am writing to urge you to select Alternative B as the agency's preferred alternative, **with the stipulation that it be revised to incorporate language prohibiting fossil fuel leasing on 95% of the lands within the decision area throughout the life of the Resource Management Plan.**

Outlined below are my comments on the Draft RMP.


FAILURE TO CONSIDER ALL REASONABLE ALTERNATIVES
BLM has failed to consider all reasonable alternatives in the Draft RMP. Paragraph (a) of §1502.14 of the Council on Environmental Quality regulations direct federal agencies undergoing the NEPA process to:

> Rigorously explore and objectively evaluate **all reasonable alternatives**, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated. (Emphasis added.)

Section 2.4.1 of the Draft RMP provides the following additional information on how BLM formulates its alternatives:

> …the purpose of this RMP is to ensure that public lands are managed in accordance with the intent of Congress, as stated in the FLPMA, under the principles of multiple use and sustained yield. Alternatives that promote **exclusive use or maximum development, production, or protection of one resource at the expense of other resources or resource uses were eliminated from further consideration.** (Emphasis added.)

Consistent with these guidelines, Section 2.4.3 of the draft RMP dismisses a no oil and gas leasing alternative by stating:

> An alternative that prohibits fluid mineral leasing throughout the decision area would not meet the purpose of and need for the RMP.

Further, Section 2.4.4 states:

An alternative that prohibits coal leasing throughout the decision area would not meet the purpose of and need for the RMP.

However, an analysis of Alternative D, the Agency's Preferred Alternative, reveals BLM is proposing to make approximately 870,000 acres, or 95%, of the 916,000 acres in the planning area available for oil and gas leasing. Apparently, BLM considers making 95% of the acreage available for oil and gas leasing a reasonable alternative and not an exclusive use or maximum development alternative.

To remain consistent with BLM's proposed Preferred Alternative, I propose inserting language in Alternative B, the Conservation Alternative, prohibiting fossil fuel (coal, oil and gas) leasing on 95% of the lands within the planning area throughout the life of the RMP.

When deciding where to locate the 5% of lands, or approximately 46,000 acres, that will be open to fossil fuel leasing in Alternative B, BLM must take into account where there is opposition to oil and gas development and where there is support. Due to the overwhelming opposition to leasing anywhere near the North Fork Valley, this area should be included in the 870,000 acres that will remain closed to leasing. Similarly, the 46,000 acres available for fossil fuel leasing should be located in those communities within the UFO that support oil and gas development.

FAILURE TO CONSIDER IMPACTS OF CLIMATE CHANGE

Scientists say that 2016 is turning out to be the warmest year on record, breaking the second warmest year that occurred in 2015. As a result of warmer temperatures, severe climate events are becoming more commonplace. For example, southern Louisiana recently received 30 inches of rain in three days! Let's put that in perspective—since we don't receive much rain within the UFO, let's translate this into snow. Thirty inches of rain is equivalent to approximately 300 inches (25 feet) of snow. In three days! This extreme weather would result in the loss of many lives.

According to a recent article in CommonDreams.org, three of the world's biggest insurance companies are warning that climate change amounts to the "mother of all risks" and are demanding the industrialized countries of the world stop bankrolling the fossil fuels industry. This article states:

> Multi-national insurance giants Aviva, Aegon, and Amlin, which together manage $1.2 trillion in assets, released a statement in August of this year calling on the leaders of the world's biggest economies to commit to ending coal, oil, and gas subsidies within four years.

> "Climate change in particular represents the mother of all risks—to business and to society as a whole. And that risk is magnified by the way in which fossil fuel subsidies distort the energy market," said Aviva CEO Mark Wilson.

> One of the subsidies our local oil and gas companies receive is the leasing of publicly-owned lands for a pittance—often for as little as $2 per acre. Meanwhile,

the "real costs" associated with damage to the environment and human health are foisted on others and are not paid by polluters.

Indeed, insurance companies are increasingly shouldering many of the costs associated with a warming planet, whether it be from extreme weather damage or reimbursing farmers for lost crops.

In the first half of 2016 alone, natural catastrophes worldwide have caused $70 billion in losses, of which $27 billion was insured, according to an assessment by insurance and reinsurance company Munich RE—with events of particular note being climate-related "storms in the U.S. and Europe, massive forest fires in Canada, and the complete absence of typhoons in the northwestern Pacific."

And housing data firm Zillow recently published an analysis which found that as many as 1.9 million homes across the country could be underwater by 2100 if the seas rise as much as climate scientists predict, amounting to property losses in the hundreds of billions of dollars.

"These subsidies fuel dangerous climate change," said Whitley. "**If we are to have any chance of meeting the 2°C target set at the Paris climate summit then governments need to start a program of rapid decarbonization**. The finance sector recognizes the importance of moving away from fossil fuels, **governments need to realize they may be the only ones left not moving**." (Emphasis added.)

It is absolutely unconscionable for BLM to propose fossil fuel leasing on approximately 870,000 of available acreage in the Preferred Alternative. BLM must instead adopt Alternative B with the inclusion of a provision prohibiting fossil fuel leasing on 95% of the acreage in the planning area because the climate crisis we are currently facing demands action. Approximately 73% of fossil fuel extraction in the U.S. takes place on private lands while the remaining 27% occurs on publicly-owned land. Preventing fossil fuel extraction on private lands is difficult, if not impossible, for citizens and government agencies to stop. **Therefore, to protect our families and all life forms on Earth from this impending crisis, it is imperative that we keep those fossil fuels we have direct control over—the federal mineral estate—in the ground.**

FAILURE TO CONSIDER DIRECT AND INDIRECT IMPACTS TO NON-DECISION AREA LANDS
The fifth bullet point found in Section 4.1.1 of the Draft RMP states that "Direct and indirect impacts of implementing the RMP primarily occur on the decision area lands:"

Nothing could be further from the truth. BLM's decisions are about to destroy many people's lives—including that of my family.

When it came time to retire, my wife and I choose to move from Ohio to a 45-acre property three miles south of Paonia. We put much of our savings into building our dream home where we intended to live the remainder of our days. Now, thanks to BLM, our future is at risk.

BLM_0126831

The Agency's Preferred Alternative makes available for a leasing a parcel of land that is directly adjacent to our property at 40849 M Road, Paonia. Consequently, we have the potential of having oil and gas drilling occurring right next door to our property. We also have water well and a pond that is located 488 yards from the parcel BLM is proposing to make available for oil and gas leasing. If my well and pond become contaminated with chemicals from the oil and gas industry, will BLM provide my family with drinking water in perpetuity? We grow much of our own food on our property—herbs and vegetables in the garden, as well as apples, peaches, plums, pears, nectarines, cherries, grapes, blackberries, and raspberries in our orchard. Will BLM provide us with food when we can no longer grow our own organic produce due to contaminated irrigation water?

It is a bold-faced lie for BLM to state that oil and gas development occurring on the federal mineral estate property adjacent to ours will not have any direct or indirect impacts on our non-decision lands—our private property. The negative impacts of oil and gas drilling next to our property will result in us being forced to:

- Breathe contaminated air;

- Risk drinking contaminated water;

- Risk irrigating our organically cultivated garden and orchard with contaminated water;

- Listen to constant fracking noise;

- Feel the ground vibrate from fracking;

- Endure endless truck traffic breaking the peace and tranquility of our rural property;

- Lose our dark skies due to light pollution;

- Have our beautiful mountain views obscured by oil and gas wells; and

- No longer see dozens of migrating deer, elk, and other wildlife on our property.

Because we do not want to live next to an oil and gas patch, the direct and indirect negative impact of oil and gas drilling next to our property will result in us having to sell our property and move out of the area. That assumes, of course, that we will be able to find someone to buy our property—after-all, who would buy his dream home next to an oil and gas well? Additionally, our reduced property values will cause financial hardship on our family. And, by the way, will BLM pay our moving costs? Or will this be another indirect financial impact that we must bear because of BLM's poor decision making?

Lastly, if BLM is so sure there will not be any direct or indirect impacts to our property, then they should be willing to pay us the difference between an appraisal of our property value done before leasing and another one done while fracking is taking place on the adjacent property.

IGNORING PUBLIC INPUT
The Draft RMP continues BLMS past history of ignoring public comments from residents of the North Fork community.

It is absolutely mind boggling that BLM continues to ignore the requests of thousands of people in the North Fork Valley and around the country to stop oil and gas development in our area. Over the past six years our community has spent considerable time, money, and effort developing the North Fork Alternative. And how does BLM respond to our considerable effort to provide input? Not one iota of the North Fork Community Alternative was incorporated into the Preferred Alternative! Talk about a slap in the face!

Perhaps the UFO of the BLM needs a refresher course in high school civics. BLM needs to go back to school to learn that Republican President Abraham Lincoln, in dedicating a Civil War military cemetery at Gettysburg, said: "that we here highly resolve that these dead shall not have died in vain—that this nation, under God, shall have a new birth of freedom—and that government of the people, by the people, for the people, shall not perish from the earth."

With the recent release of the UFO Draft RMP calling for 95% of our publicly-owned lands to be made available for oil and gas leasing, it appears BLM misunderstood President Lincoln to say that our government of the *fossil fuel corporations*, by the *fossil fuel corporations*, and for the *fossil fuel corporations* shall not perish from the earth.

Somewhere along the way, BLM has lost its way and forgotten they are responsible to the **people** of this country. **It is time for BLM to regain the trust of the public by listening to our voices and developing an RMP that responds to our concerns**.


CONCLUSION
BLM's Draft RMP fails to consider: all reasonable alternatives; impacts resulting from climate change; and direct and indirect impacts to non-decision area lands (private property). Additionally, the Draft continues BLM's saga of ignoring public input from residents of the North Fork community.

The Draft RMP provides BLM an opportunity to correct these deficiencies by selecting Alternative B as the Preferred Alternative with the inclusion of language that incorporates a prohibition on fossil fuel leasing on 95% of the lands within the decision area throughout the life of the Resource Management Plan.

Sincerely,
Robin Smith
40849 M Road
Paonia Colorado  81428

BLM_0126833



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## UFO RMP comments
1 message

**Renata Raziano** <renata.raziano@gmail.com>                    Fri, Oct 28, 2016 at 10:53 PM
To: ufomp@blm.gov

Attached are my comments on the UFO RMP.

Thank you-
Renata Raziano



**Unc RMP Comment.pdf**
185K

BLM_0126834

Renata Raziano
62062 Highway 90
Montrose, CO 81403
October 28, 2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

My family and I enjoy mountain biking, hiking and trail running. We live on the Uncompahgre
Plateau and use the trails at Buzzard Gulch on a weekly basis. While we enjoy this trail system,
the mileage at Buzzard Gulch is limited, and we often travel to other towns in the Western
Slope to bike and hike. I feel the BLM needs to designate more nonmotorized SRMAs in
Montrose so there are more opportunities for quiet recreation. Montrose has hundreds of
miles of motorized trails, but Buzzard Gulch stands as the only nonmotorized trail system and
has less than 10 miles of trail.

I support the designation of nonmotorized SRMAs in Dry Creek and Spring Creek, but also
would like to see the Kinikin Hills ERMA be designated an SRMA. This area is easily accessed
from town and has terrain that is very promising for mountain biking.

In addition, I am concerned that the Lands with Wilderness Characteristics designation in Dry
Creek includes the Coyote Ridge and Coyote Cutoff trails. These trails are two of the most
suitable trails for mountain biking in that Dry Creek area and should not be closed to
mechanized use.

Beyond the enjoyment my family and I would derive from these trails, quality nonmotorized
singletrack will bring visitors to Montrose and provide an economic benefit to businesses in
town. Gas stations, restaurants, hotels and other stores all benefit when visitors come to
recreate on the trails. Several other towns on the Western Slope, such as Fruita, Grand Junction
and Cortez, have proven that quality nonmotorized trails provide a very tangible economic
benefit, and Montrose is currently missing out on this opportunity.

Thanks you again for accepting my comments for the RMP process.

Sincerely,

Renata Raziano

11/2/2016                                    DEPARTMENT OF THE INTERIOR Mail - Uncompahgre Draft RMP Comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Uncompahgre Draft RMP Comments
1 message

**Toni O'Hara** <tohara@rmef.org>                                    Fri, Oct 28, 2016 at 2:41 PM
To: "uformp@blm.gov" <uformp@blm.gov>

Dear BLM Uncompahgre Field Office,

Attached please find the Rocky Mountain Elk Foundation's (RMEF) comments on the Uncompahgre Draft Resource Management Plan and Environmental Impact Statement.  RMEF appreciates the opportunity to comment.

Sincerely,



**Toni O'Hara | Lands & Conservation Office Administrator**
Rocky Mountain Elk Foundation
406-523-0264 phone | 406-523-4550 fax
**tohara@rmef.org | www.rmef.org**

This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any errant transmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any copies of it and notify the sender by reply e-mail. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message or any attachments if you are not the intended recipient. The Rocky Mountain Elk Foundation reserves the right to monitor all e-mail communications through its network.

📄 **RMEF Comments_Uncompahgre RMP_10-28-2016.pdf**
   480K

BLM_0126836

ROCKY  MOUNTAIN  ELK  FOUNDATION

October 28, 2016

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO  81401
Email: uformp@blm.gov

Re:    Uncompahgre Draft Resource Management Plan and Environmental Impact Statement

The Rocky Mountain Elk Foundation (RMEF) appreciates the opportunity to comment on the
Uncompahgre Draft Resource Management Plan and Environmental Impact Statement.  The
RMEF has gone on record in favor of more active management on our public lands.  We believe
that early successional stages of habitat are largely under-represented across the west and we
favor plans that address that shortfall.

The RMEF supports Alternative D, which emphasizes balancing resources and resource use
among competing human interests, land uses, and the conservation of natural and cultural
resource values, while sustaining and enhancing ecological integrity across the landscape,
including plant, wildlife, and fish habitat.  Table 3-16 of your analysis indicates some of the
major vegetation issues in the decision area:  1) Not enough cool season perennial grass; 2)
Exotic plants in community; 3) Not enough perennial forbs; 4) Low plant diversity in
community; 5) Shrubs in low vigor; 6) Not enough warm season perennial grass; 7) Browse
shrubs heavily hedged; 8) Noxious weeds within or nearby community; and 9) Plant spacing too
great.  The land health assessments determined that, in general, early seral (or grass- and forb-
dominated) vegetation is most lacking, with the majority of the landscape units needing more
of this stage.  Early mid-seral stage (shrub- and grass-dominated) vegetation is also lacking in
the majority of units.  While late-stage vegetation (mature tree or shrub) is too abundant in just
over half of the units, it is lacking in other units.  We agree with that assessment, and are
pleased that the plan calls for remedying that situation.

The only part of Alternative D that we do not support is the recommendation for Wilderness
designation of 13, 350 acres of the Dolores River Canyon and 1,800 acres of the Sewemup
Mesa.  We are pleased that the Camel Back (10,400 acres), Adobe Badlands (10,430 acres), and
Needle Rock (80 acres) Wilderness Study Areas were not recommended for Wilderness
designation by Congress.  With the identified shortage of early succession habitat within the
planning area, active management is needed on a large scale and classification as Wilderness
would prohibit active management for wildlife habitat.  In the Colorado Plateau ecoregion's
mid-elevation forest type the analysis points out that only 5% is in grass-forb type, while more

1

BLM_0126837

ROCKY MOUNTAIN ELK FOUNDATION

than 71% is in Pinyon-Juniper type. While in the Southern Rockies ecoregion there is nothing identified in the grass-forb type, we suspect that it may be contained in the mountain shrub type.

We do not promote management for grasses, forbs, and browse in early seral condition for the benefit of only elk or big game, but for a wide variety of wildlife that is dependent on "early seral" for all or part of their habitat needs during their life cycle. It is estimated that more than 1/3 of all birds in North America are in population decline, and most have a close tie to early seral habitat. Recent elk nutrition research points out the importance of summer forage to ensure that a cow elk has sufficiently good body condition to become pregnant, provide for good calf development through the winter, and successfully nurse the calf in the spring. While wilderness and back country do provide hiding cover for elk and other wildlife, the closed canopy condition in many of these areas precludes early seral conditions on the forest floor. Active management through prescribed burning, forest thinning (fuel treatments), timber harvest, noxious weed control, and natural unplanned ignitions can open the canopy and provide sunlight to the forest floor. This provides good biodiversity in the understory and benefits a wide variety of wildlife species.

Alternative D would provide substantial protection and enhancement of fish and wildlife populations and their habitats. It also would provide for significantly fewer impacts on fish and wildlife than would Alternative A (No action). Alternative D's overall objectives for fish and wildlife are similar to those of Alternative C: To restore, enhance, conserve, and promote aquatic and terrestrial species conservation and ecosystem integrity with the use of vegetation mosaic objectives. Alternative D's overall emphasis is on native species management, with objectives for ensuring habitat diversity, productivity, and viability, and on promoting ecosystem processes.

Compared with Alternative A, Alternatives B and D would reduce cumulative effects on fish and wildlife, due to fish and wildlife management emphasis based on current science and greater emphasis on landscape scale management of habitats and populations.

Compared with Alternative A, Alternative D's increased use of planned and unplanned fires to meet resource objectives would, in the long term, further decrease fire intensity and fuel loading. Mechanical treatments in all vegetation types, but especially in forest communities, could also help reduce the potential for crown fires and make fires easier to manage and control.

Alternative D's vegetation management objectives focused on reducing fuel loads and flexibility in the use of planned and unplanned fires are likely to result in the lowest long-term fire suppression costs of any alternative.

2

BLM_0126838



ROCKY MOUNTAIN ELK FOUNDATION

Compared to Alternative A, Alternative D has more acres that could cause impacts on forestry due to timing limits. Under Alternative D there are 394,340 acres open to forest product harvest that overlap with timing limits, which is 22,100 more acres than under Alternative A.

RMEF supports Alternative D as the one that provides for the most active management while also providing wildlife habitat needs for elk and other wildlife. Thank you for the opportunity to comment.

Sincerely,

Blake L. Henning
Chief Conservation Officer

3

BLM_0126839

11/1/2016                                    DEPARTMENT OF THE INTERIOR Mail - No Leasing Alternative



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## No Leasing Alternative
1 message

---

**Leah Morris** <wanderwomanleah@gmail.com>                            Mon, Oct 31, 2016 at 12:24 PM
To: uformp@blm.gov, rmpcomments@citizensforahealthycommunity.org

   Good afternoon,
   I am attaching a letter regarding my views on the BLM draft Resource Management Plan.  Please consider my
   statements and include a no-leasing alternative.  I would be happy to provide more information as needed.
   Thank you,
   Leah Morris
   Paonia, Colorado

---

 **RMP-comment-letter-Leah Morris.doc**
   29K

BLM_0126840

Leah Morris
201 Oak Avenue
Paonia, CO 81428
10/28/2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft Resource Management Plan. As presented, none of the alternatives offer the level of protection these lands warrant, that communities and the public in your planning area have specifically asked for and favored, and which federal law requires.

I moved to Paonia, Colorado over 10 years ago because I was captivated by the surrounding wilderness, BLM recreation potential, organic farming, and family-friendly community. My son was born in 2010, and I am pleased to be able to provide him a home with clean air, clean water, healthy food, and a good number of outdoor activities. However, I was devastated to learn that actions by the BLM are jeopardizing this lifestyle for my family and my community.

This is a small town, and any leases which allow oil and gas companies to develop roads, pollute water sources, and increase traffic to sites will have a direct impact on every person who lives in this area. For instance, increased truck traffic through town on 2nd Avenue to oil and gas developments will pass within feet of my house where my son plays outside. The cost to the Town of Paonia to maintain those roads is one consideration, and the safety of my child is another. Any increase in traffic on roads not equipped to handle such traffic means a higher likelihood of accidents, road damage, congestion, noise pollution, impact on local wildlife, and more. I do not accept this for my neighborhood.

Additionally, this valley is finally beginning to collaborate on high quality agriculture projects that focus on organic farming. If we can no longer guarantee the quality of our water, we will lose farmers, tourism, food production, and other businesses that provide the tax dollars that maintain our schools, libraries, and other vital organizations. Many families, possibly including our own, will not choose to live in such a place and will move away. The community will then lose our tax dollars, our professional skills, our school participation, and our values.

Finally, I cannot bear to imagine the impact that roads and development will have in the wild areas surrounding our town. Hunting, hiking, fishing, biking, camping, and other recreation will be threatened as wildlife corridors, trails, scenic beauty, and water sources are ruined by roads and pollution. The livelihood of many citizens depends on wildlife and open spaces. The impacts of these BLM decisions are far reaching and overwhelming.

I have said all this and now I offer a very specific answer. The final Resource Management Plan should:
- Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.
- Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.
- Focus on quality of life and the recreation potential of such areas without leasing.

Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities.

I appreciate the opportunity to voice my opinions. Please make a decision that the residents of the North Fork Valley can accept. Do not make irreversible mistakes due to lack of proper consideration.

Sincerely,
Leah Morris

12/20/2016                    DEPARTMENT OF THE INTERIOR Mail - RMP Comment Letter Form submitted on Citizens for a Healthy Community



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## RMP Comment Letter Form submitted on Citizens for a Healthy Community
1 message

**Citizens for a Healthy Community** <wordpress@citizensforahealthycommunity.org>      Fri, Oct 28, 2016 at 7:02 PM
Reply-To: tamaralawhorn@yahoo.com
To: uformp@blm.gov

The following comment letter was submitted by the named citizen through the website of the organization, Citizens for a Healthy Community. It was submitted from the following page: http://www.citizensforahealthycommunity.org/submit-rmp-comment-letter

| | |
|---|---|
| **Please check the box below if you agree to the following letter. A check in the box is required in order to submit the form to the BLM.** | I am opposed to oil and gas leasing on public lands in the North Fork Valley, which is one of the most beautiful and fertile places in the world. I am opposed to oil and gas leasing here because it has the potential to 1) lead to loss of the clean air and abundant clean fresh water that have made this area Colorado's largest concentration of organic farms, prime hunting grounds, and home to gold medal fishing, and 2) cause significant harm to human health and a local economy based on recreation, hunting, tourism, and agriculture. I oppose the BLM's Preferred Alternative, as it relates to oil and gas development, in the Draft Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado. The BLM's preferred alternative would open almost every acre of public lands in the region to oil and gas leasing (865,970 acres or 94.5% of total oil, gas, and mineral acreage), and specifically in sensitive air, water and foodsheds. **The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.** The potential for human, animal and environmental damage is too high. |
| | Development would contaminate soils, water, and air, and impair human health, including increases in respiratory, endocrine, immune, and cardiovascular disease. |
| | Development of the leases would destroy local investments and resources required in transitioning the economy to one based on agro-tourism, recreation, renewable energy, agriculture, and organic/clean food. In addition, development would contribute to increased greenhouse gas emissions and climate change impacts on community resources, including agriculture and wildlife. |
| | A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil and gas operations including fracking technologies, and large-scale industrialization. Because BLM did not consider new information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed. BLM should adopt a no-leasing alternative, which is the only option to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. In addition, unregulated gas gathering pipelines on public lands present an unacceptable risk to human life and the environment. BLM should impose a moratorium on oil and gas leasing until rural gas gathering pipelines are properly regulated under the Pipeline Hazardous Materials and Safety Administration. |

| | |
|---|---|
| **Date** | October 28, 2016 |
| **Name** | Tamara Lawhorn |
| **Email Address** | tamaralawhorn@yahoo.com |
| **Phone Number** | 7202321861 |

BLM_0126842

12/20/2016                    DEPARTMENT OF THE INTERIOR Mail - RMP Comment Letter Form submitted on Citizens for a Healthy Community

| City | Paonia |
|---|---|
| **State** | CO |
| **Zip** | 81428 |
| **I am:** | A resident, A consumer of NFV/Delta County produce and meat and poultry, An Independent, A homeowner |
| **Additional Comments** | Please review these references:<br><br>Characteristics of landslides in western Colorado, USA:Regmi, N.R., Giardino, J.R. & Vitek, J.D. Landslides (2014) 11: 589. doi:10.1007/s10346-013-0412-6<br><br>GROUNDWATER SYSTEMS IN DELTA COUNTY, COLORADO: NORTH FORK VALLEY AND TERRACES AREA<br>GIS-Based Hydrological and Environmental Systems Analysis and Formulation of Conceptual Site Models<br><br>Full article located at: http://www.heath-hydrology.com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf<br>Quote from conclusion:<br>"The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail. " |
| **Signature. Please sign using the cursor below to write your name. This digital signature is legally binding and confirms your agreement with the comment letter above. Thank you.** | |

BLM_0126843

Scanned
00 37 4/6

Bureau of Land Management
2505 S Townsend
Montrose CO 81401

October 28, 3016

Re:  Draft Resource Management Plan

To Whom it May Concern:

I moved here two years ago from Garfield County where I had resided for
ten years.  I know what it's like to have gas and oil drilling close by.  I was
so happy after I moved here to not have that concern in my close proximity.

It is very important to NOT allow more gas and oil drilling in our beautiful
state.  It is detrimental to our health, air, water and tourist trade.  Our focus
should be on sustainable, renewable energy.  There has been ample
evidence of what drilling, fracking and injection wells can cause:  water, air,
light and noise pollution and earthquakes.

There is always talk about the jobs that are offered by oil and gas drilling.
However, there are very few high paying jobs offered to the local citizens.
There are O&G industry personnel who are brought in from other states to
do a lot of the work.  The jobs are very dangerous.  A former neighbor of
mine was killed during an O&G operation.

I urge you to not allow any additional oil and gas drilling on government
lands under your control.  I don't want to have to move again.

Sincerely,

Nina Hiatt

Nina Hiatt
1106 Park Ridge Ct
Delta CO 81416

BLM_0126844

From: Thomas Pitterle - Owner, Country Excavating
Paonia CO

Dear B.L.M.                    10-28-16

Please withdraw the lands around
watersheds that lead into the North Fork
Valley from oil and gas leasing. The long
history of Delta County being a poor county
has preserved a quality of life that many
people seek. I own Country Excavating
in Paonia. All of my new customers are
moving in from various industrialized areas
and really appreciate the quality of life here.
Clean air, clean water, organic foods in
abundance. It all goes away, along with
property values, if these operations are
allowed here. The new economy in this
valley centers around the many newcomers
moving here, services for them, agri-tourism,
organic everything, entertainment, arts, recreation,
and excellent hunting. Property values are up.
The economy is robust. We don't need
money or jobs. You could do us a
solid by respecting the wishes of the
majority of residents in the North Fork Valley.
You probably love where you live. Imagine
a meth lab set up wind from your home and
the meth heads have government immunity.
They're making money, but you don't benefit
at all and can't do anything about it. Please
help us to preserve the North Fork! Thomas Pitterle

T. Pitterle
41924 Lamborn Mesa Rd.
Paonia, CO 81428

GRAND JUNCTION CO 815

29 OCT 2016 PM 1 L



RECEIVED
NOV 0 1 2016
UNCOMPAHGRE FIELD OFFICE

BLM
2465 S. Townsend Ave.
Montrose, CO 81401

8141680008

BLM_0126846

**Please consider this a public comment on**
**BLM's Uncompahgre Field Office Draft Resource Management Plan.**

Reference page number or section in RMP (optional): _____

Title of comment (area or trail name): _East Paradox Rock Art and Lower Tabegauche unit_

Name: _April Kennedy_

Address: _PO Box 669_

Email (optional): _____     Phone (optional): _____

Consider answering one or more of these questions:

**(1) Describe the area and your historical use/activities there** (Time of year and hiking, camping, photography, etc):
**(2) What do you like about this area/trail?** (Close to home, wildlife, historic sites, scenic views, etc. include experiential data and resource knowledge when possible):
**(3) With what aspects of BLM's findings do you agree and/or disagree and why?** (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):
**(4) Additional Comments** (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

The east paradox rock art area and lower tabegauche unit are within an hour drive of my home and I enjoy accessing these areas for hiking, mountain biking, and observation of nature. These areas are unique in that there are desert plants and native american petroglyphs not found in other landscapes. This offers residents and visitors of these areas an experience in nature that they can not find anywhere else.

These areas should be Areas of Critical Environmental Concern and I would ask the BLM to restore them to their full acreage in the final RMP. Additionally, I would ask the BLM to create more meaningful protections for the rock art and plants by disallowing occupancy by oil and gas, keeping areas closed to motorized travel, excluding right of way development, and prohibiting target shooting.

**Please turn in comments to the BLM by November 1, 2016**

**Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP**

**Or email:** uformp@blm.gov

BLM_0126847

Kennedy
PO Box 669
NORWOOD, CO 81423

GRAND JUNCTION CO 815

27 OCT 2016 PM 2 T



RECEIVED
OCT 28 2016
UNCOMPAHGRE FIELD OFFICE

ATT: UFO RMP
2465 S. Townsend Ave.
Montrose, CO 81401

81401$5436

Jennifer Chavez
Paonia, CO 81428
October 28, 2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

I am a resident of Paonia, CO and I live in town. I teach at North Fork Community Montessori School in Hotchkiss, CO. I am a mother of a 5 and 6 year old. I have lived in the valley for over 10 years and worked one summer for the US Forest Service in the Raggeds Wilderness Area.

I am writing to express my support for the inclusion of Alt B1 into the final Resource Management Plan. It balances the development of our natural resources without threatening our way of life.

Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The final plan should include ecological emphasis areas for all critical winter habitat within the North Fork Valley. The final plan should also include the protections of B1 which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.

I agree with Appendix D when it talks about the importance of connectivity between the wilderness areas.

The BLM should listen to the local community in Crawford, Hotchkiss and Paonia and adopt the North Fork Citizens' Alternative for the area in and around the North Fork Valley. This locally-driven proposal is the right way to protect the Gunnison Watershed--supporting farmers and building a sustainable rural economy on Colorado's Western Slope. Please help us protect where we live.

Sincerely,
Jennifer Chavez

Jennifer Susan Chavez
413 Vista Dr
Paonia CO 81428-8466



GRAND JUNCTION CO 815

29 OCT 2016 PM 1 L



FOREVER

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO
81401

UNCOMPAHGRE FIELD OFFICE
RECEIVED
OCT 31 2016

8140135435

BLM_0126850

Trudy Welty
Paonia, Colorado
81428

October 28, 2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft Resource Management Plan. As presented, none of the alternatives offer the level of protection these lands warrant, that communities and the public in your planning area have specifically asked for and favored, and which federal law requires.

As a resident, with family lineage that has been orchard farmers in the North Fork Valley since the 1920s. I live here for the clean water, the organic foods grown, and clearn air for my health and well being.

I have attended the meetings presented both by the BLM and by other professionals who have presented the facts inpaticular about the affects of fracking on water resources and contamination.

I support a no leasing policy. I would hope that Delta County would be courageous enough to adopt this policy. My reasons:

There is no investigation as to the affects elsewhere in Colo. and the results that the land, people and animals have suffered since fracking was allowed many years ago Rifle Col. New Raymer Colo. to name a few.

There are not enough regulations of hydraulic fracking to prevent ground water contaminations. The records show how many spills in 2015 , 615 spills. That affected and resulted in contamination of waters and livestock.

There is no good analysis to the radioactive material that comes up with wastewater.

Paonia secured its source water plans which was not taken into consideration and which the BLM is required to honor this protection plan.

Water is scarce and drought conditions would leave many farms and towns without water.

There is a lot of information that the BLM gathered. Still not enough to cover the important aspects for protection of these lands. And not enough say no the fracking for the health and well-being of land, animals and humans. The result of fracking on the Eastern slope has been documented as having tremendous health affects on children and adults. The land is a waste land and will contribute to a dust bowl. As an example that had not been considered.

In attending the BLM presentation in Hotchkiss, one employee said"we have only issued 38 leases in so many years" My response is: " that is 38 too many. " To jeopardize the future of the land which will affect the future of this country and leave no food or water for the young ones of which to survive is not being protectors of land.
Please do not let this precious land which houses organic farms for the US be destroyed by Big Money.
Again, I implore you to adopt NO FRACKING. in the North Fork Valley as the alternative.

Sincerely,
Trudy Welty Very concerned Citezen

*Trudy Welty Oct. 28, 2016*

P.O. Box 812
Paonia, CO
81428

GRAND JUNCTION CO 815

29 OCT 2016 PM 1 L



USA FOREVER

RECEIVED
OCT 3 1 2016
UNCOMPAHGRE FIELD OFFICE

BLM Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO
81401

81401$5436

BLM_0126852

GRAND JUNCTION CO 815

22 OCT 2016 PM 2 L



OCT 2 4 2016

UNCOMPAHGRE FIELD OFFICE

RMP Comments
Bureau of Land Management
2465 S. Townsend Ave.
Montrose, CO 81401

TO: BLM

I Love where I Live and Live here for 26 years. developing and fracking here not only will infringe on my way of life but also threaten my heath and The heath of my loved ones and our farm. A leasing band should be put on all potential leasing propeties. please respect This land and The people who live near it and Their need for clean water and air.

Sincerely,

Anateya cranson
15495 black bridge rd.
Paonia CO. 81428

BLM_0126854

500

**Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.**

Reference page number or section in RMP (optional): _____

Title of comment (area or trail name): _____ See attached _____

Name: Pauline Heuscher _____

Address: 24601 Sorrento Ln, Cedaredge _____

Email (optional): pheuscher @ gmail. com ____ Phone (optional): 970-856-4226

Consider answering one or more of these questions:

(1) **Describe the area and your historical use/activities there** (Time of year and hiking, camping, photography, etc):
(2) **What do you like about this area/trail?** (Close to home, wildlife, historic sites, scenic views, etc. include experiential data and resource knowledge when possible):
(3) **With what aspects of BLM's findings do you agree and/or disagree and why?** (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):
(4) **Additional Comments** (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

See Attached
Total of 3 Pages
faxed 10/28/16
to 970-240-5367

**Please turn in comments to the BLM by November 1, 2016**

**Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP**

**Or email: uformp@blm.gov**

BLM_0126855

Pauline Heuscher
24601 Sorrento Ln.
Cedaredge, CO 81413
pheuscher@gmail.com

10-28-2016

BLM Uncompahgre Field Office Draft Resource Management Plan

**I Appendix D&F ACECs**

My letter requests inclusion of several areas in the Paradox Valley along HWY 90 as
Areas of Critical Environment Concern and an area along HWY 141 for inclusion as an
ACEC.

**A.** The most impressive petroglyph panel that I have ever viewed in Colorado is in the
<u>W. Paradox Valley ACEC just north of HWY 90.</u> There are other petroglyphs in this
same area. The large petroglyph is as impressive as the famous petroglyphs and
pictographs of the "Great Gallery in Horseshoe Canyon" or the "Hunting Scene" both of
Utah. **They must be protected under ACECs for several reasons: they have**
<u>**outstanding cultural values and I noticed bullet holes above the large panel-**</u>
<u>**protection is vital.**</u>

**B.** As a photographer, I was not only delighted to capture the petroglyphs but also the
beauty of the views from atop the mesa (N. of HWY 90 looking toward Utah's La Sal
Mtns. and looking toward the <u>Roc Creek</u> area. I have visited Sewemup Mesa and noticed
that the <u>Roc Creek LWC is by</u> the <u>Roc Creek Roadless Area</u> that is next to Sewemup.
Inclusion of the Roc Creek LWC helps to provide contiguous protection of ecologically
important riparian habitat. <u>**BLM should leave the Roc Creek LWC in the Resource**</u>
<u>**Management Plan.**</u>

**C.** There are **native ruins** atop a mesa close to HWY 141 in the Tabeguache area. <u>**This**</u>
<u>**area deserves protection as an ACEC.**</u>

**II** Energy <u>**and Resource Management**</u>

The Hubbard Park and Muddy Creek area above Paonia has been targeted for oil and gas
drilling. The Preferred Option has too many acres allowed for drilling I am strongly
opposed to that option. **PLEASE SUPPORT B1.**

Reasons to support B1:

A. The Hubbard Park area is one of few prime habitat areas for the purple martin birds.
This species of birds is very sensitive to disruption of their habitat. There are few areas in
western Colorado that have the habitat that the purple martins need other than this area
proposed for drilling. BLM has an obligation to consider this issue and choose B1.

*p9  2*

B. Agriculture is this areas' main business-ranching and in particular organic farming.
This North Fork area is in the watershed of the proposed drilling and that will affect
water quality and water quantity which is of prime importance to growers and ranchers.
Paonia area is famous state wide as a great resource for organic food not only for the
West Slope but also for the entire state of Colorado.

Thank you for your attention to these matters.

Sincerely,
Pauline Heuscher

*Page 2 - Cont: Resource & Energy*
*Management*

*Comments to BLM*
*Pauline Heuscher*
*24601 Sorrento In*
*Cedaredge 81413*
*pheuscher @ gmail.com*

BLM_0126857

## Recipient Information

**To:  joe**
**Company: joes magic foods**
**Fax #: 19702405367**



## Sender Information

**From: Joe Bullock**
**Email address: bullockphoto@yahoo.com (from 67.176.170.246)**
**Phone #: 9999999999**
**Sent on: Monday, October 31 2016 at 4:00 PM EDT**

**Teresa, I understand you are in need of leasing our BLM lands for land usage and revenu but please look at their track record as there are other options. (Recreation, Hunting, Farming, Hemp etc...) Communities are being torn apart as in Battlement mesa. Farm lands are being contaminated from accidents and natural desasters as in the Boulder flood. Most importantly our food is in jepordy:** In the proposed region is Colorado's largest concentration of organic farms and orchards. If nearly 900,000 acres go to the oil and gas industry are food supply is in imminent danger to their **under-regulated industry\*.** In Colorado alone the track record is alarming; some are considering it a natural holocaust of daily accidental spills and larger disasters have occurred. Weather changes of mountain floods, landslides as well as **other natural disasters are imminent over time\*.** These critical farmlands would be irreparably harmed. The food safety of all farms located within an industrial oil and gas zone would be forever questioned.

Thank You for making a choice for the health of our nation and not the wealth of a few.

Joe Bullock
Cholaca Inc.
Joes Magic Foods
HempCures.Org
444 Stahl Rd.
Paonia, CO 81428
(970) 871-9240
Joesmagicfoods@gmai.com

This fax was sent using the FaxZero.com free fax service. FaxZero.com has a zero tolerance policy for abuse and junk faxes. If this fax is spam or abusive, please e-mail support@faxzero.com or send a fax to 855-330-1238, or phone 707-400-6360. Specify fax #17986715. We will add your fax number to the block list.

BLM_0126858



# Fracking Madness!! February 5, 2016|By Alicia Silverstone

- Tweet this article
- Share on Facebook
- Share on Google+
- Pin on Pinterest

Fracking (also called hydraulic fracturing) is an extreme and unsafe method of extracting fossil fuels from the ground that harms our drinking water, food, health, environment, and climate and has been even linked to earthquakes. Not to mention, it keeps us from shifting away from fossil fuels and into renewable energy! Fracking is carried out by drilling deep into the ground and injecting millions of gallons of toxic fluid – a mix of water, sand, and harsh chemicals – at a high enough pressure to fracture the rock and release oil or gas. Doesn't that sound nuts?? The scariest part is that fracking is exempt from major environmental laws such as the Safe Drinking Water Act!

BLM_0126859

I recently went to an event focused on this issue that was hosted by Mark Ruffalo. Man is he great! I love him as an actor and a person. He is a genuine, intelligent, and heartfelt man who cares so passionately about change. It was so great to talk to a like-minded activist about all things eco! Mark has been a key face behind the fracking movement since the beginning, so a huge thank you to him for all of his involvement in this, truly! Anyways, one of the most shocking parts of the evening was realizing this toxic process is impacting even organically grown fruits, nuts, and vegetables!!

*WaterDefense.org*



## Where Fracking Meets Organic Food

The Marcellus Shale formation holds vast supplies of natural gas. It also covers an area that is home to some of the country's highest concentrations of organic farms.

*The Nation*

*Bakken Shale*

*Marcellus Shale*

Three of the highest concentrations of organic farms are on the Marcellus Shale.

*The Nation*

You might be wondering how this yucky wastewater can even be re-used on plants…? This is because of a recycling program implemented to help deal with water shortages. It seems like a cool idea on the surface, but since this process requires heavy chemical use, it's no good! Take Chevron, they recycle 21 million gallons of their wastewater each day and sell it to farmers who use it on about 45,000 acres of crops, which equals about 10% of Kern County's farmland. Crazy right? It's almost hard to grasp what this means in plain terms… And in addition to recycling water, chemicals can migrate along fissures through abandoned wells, leaky well casings, or spill from holding ponds or pipelines. If your like me, your probably thinking there's no way a farm can be certified organic if the water it's using is filled with chemicals. Unfortunately, these standards strictly ban petroleum-derived fertilizers commonly used in convention agriculture, but the same rules do not prohibit farmers from irrigating their crops with petroleum-laced wastewater gained from oil and gas wells. Insane and scary right?? For this reason it's extremely important to know where your food is coming from, in comparison to where fracking wells can be found. You can find a map here of where drilling sites are located.

On top of this, the impacts fracking has on human health are frightening. Theo Colborn, an environmental health analyst, identified 632 chemicals used in natural-gas production. More than 75 percent of them could affect sensory organs and the respiratory and gastrointestinal systems; 40 to 50 percent have the potential impacts on the kidneys and on the nervous, immune and cardiovascular systems; 37 percent act on the hormone system; and 35 percent are linked with cancer of mutations… If you haven't seen the documentary Gasland, it gives an upclose look at how fracking is effecting individuals health all over the country. I encourage you to watch it and share it with your family and friends!

BLM_0126860

Case No. 1:20-cv-02484-MSK Document 65-3 filed 04/29/21 USDC Colorado pg 33 of 115

Join me in taking a stand. There is SO much to be done! Banning fracking is what needs to happen, and we're getting there! Fracking was banned in the state of New York, so I'm optimistic. Let's stop the contamination of irrigation, ban fracking on public lands, and stop this madness that's making many very sick.

*Take Action:*

Email, Tweet, sign this petition, and/or send a message on Facebook, and call Governor Jerry Brown's office at (916) 445-2841 and tell him he needs to stop relying on destructive fossil fuel extraction processes and start transitioning to renewable energy immediately! We simply can't say California is 'green' while we frack!!

*Ban Fracking on Public Lands*

Sign this petition for members of Congress, call your Congress person, and share news and action on social media!

**What's going on in your community in regards to fracking? Have you organized to achieve a ban? How can we alert each other of what farms are using this recycled wastewater??**

Photo Credit: Treehugger

BLM_0126861

## Appendix C:  Program/Resource-Specific Decision Guidance

This appendix provides three categories of planning information for BLM program areas:  (1) *Land Use Plan Decisions*, (2) *Implementation Decisions*, and (3) *Notices, Consultations, and Hearings*.  Each program/resource heading contains resource-specific guidance for each category.  The guidance presented for each resource should be addressed in conjunction with the guidance presented for other resources to maintain an integrated, interdisciplinary approach to planning.

   **1.  *Land Use Plan Decisions.***  These broad-scale decisions guide future land management actions and subsequent site-specific implementation decisions.  Land use plan decisions fall into two categories:  desired outcomes (goals and objectives), and allowable uses and actions to achieve outcomes.  Proposed land use plan decisions are protestable to the BLM Director but are not reviewable by the Office of Hearings and Appeals.

   The application of program-specific guidance for land use plan decisions will vary, depending on the decision category, and must be applied as follows:

      I.  *Natural, Biological, and Cultural Resources:*  Decisions identified must be made during the land use planning process if the resource exists in the planning area.

      II.  *Resource Uses:*  Decisions identified must be made during the land use planning process if the BLM anticipates it may authorize or allow a resource use.  If uses are allowed, decisions must also be made regarding intensity and limits or restrictions.

      III.  *Special Designations:*  Special designation decisions identified must be made during the land use planning process when the BLM anticipates it may authorize or allow uses which could disqualify inventoried resource values from designation.  Special designation decisions may be made during the land use planning process when there is no threat to the inventoried resource.

      IV.  *Support:*  Support needs and decisions may be determined through the land use planning process, based on individual planning situations.

   **2.  *Implementation Decisions.***  Implementation decisions generally constitute the BLM's final approval allowing on-the-ground actions to proceed.  These types of decisions require site-specific planning and NEPA analysis.  They may be incorporated into implementation plans (activity  or project plans) or may exist as stand-alone decisions.  Where implementation decisions are made as part of the land use planning process, they are still subject to the appeals process or other administrative review as prescribed by specific resource program regulations after the BLM resolves the protests to land use plan decisions and makes a decision to adopt or amend the RMP *(High Desert Multiple Use Coalition, Inc. et al. Keith Collins, 142 IBLA 285 (1998))*.

BLM_0126862

Appendix C, page 2

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

3. *Notices, Consultations, and Hearings.* This section identifies resource-specific requirements and suggestions for notices, consultations, and hearings when developing Land use plan decisions that are in addition to those identified in Section III of this Handbook. *Note:* Some laws or regulations, such as the Endangered Species Act, National Historic Preservation Act, and Clean Air Act, have notice, consultation, or hearing requirements that apply to most resource programs, resource uses, or activities. These requirements are identified in the primary program narrative but are not repeated for each resource program, resource use, or activity that may be affected.

## I. Natural, Biological, and Cultural Resources

## A. Air

*Land Use Plan Decisions.* Identify desired outcomes and areawide criteria or restrictions, in cooperation with the appropriate air quality regulatory agency, that apply to direct or authorized emission-generating activities, including the Clean Air Act's requirements for compliance with:

1. Applicable National Ambient Air Quality Standards (Section 109);
2. State Implementation Plans (Section 110);
3. Control of Pollution from Federal Facilities (Section 118);
4. Prevention of Significant Deterioration, including visibility impacts to mandatory Federal Class I Areas (Section 160 et seq.); and
5. Conformity Analyses and Determinations (Section 176(c)).

*Implementation Decisions.* Identify site-specific emission control strategies, processes, and actions to achieve desired air quality conditions from direct or authorized emission-generating activities.

*Notices, Consultations, and Hearings.* Consult, coordinate, and comply with applicable Tribal, Federal, state, and local air quality regulations, as required by the Clean Air Act, Executive Order 12088, and Tribal, Federal or state implementation plans. Each field office should work closely with counties or states on the development or amendment of state implementation plans.

## B. Soil and Water

*Land Use Plan Decisions.* Identify desired outcomes (including standards or goals under the Clean Water Act). Identify watersheds or specific soils that may need special protection from the standpoint of human health concerns, ecosystem health, or other public uses. For riparian areas, identify desired width/depth ratios, streambank conditions, channel substrate conditions, and large woody material characteristics. Identify areawide use restrictions or other protective measures to meet Tribal, state, and local water quality requirements. Identify measures, including filing for water rights under applicable state or Federal permit procedures, to ensure water availability for multiple use management and functioning, healthy riparian and upland systems.

BLM_0126863

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

*Implementation Decisions.* Identify site-specific management opportunities and priorities by using a watershed approach and watershed assessment information. Identify the site-specific or basin-specific soil, riparian, or nonpoint-source best management practices and rehabilitation techniques needed to meet Tribal, state, and local water quality requirements.

*Notices, Consultations, and Hearings.* Consult and coordinate with other Federal, state, and local agencies, as directed by the Watershed Protection and Flood Prevention Act (16 U.S.C. 1001-1009), and the Clean Water Act (33 U.S.C. 1251) (see BLM Manual 7000). Collaborate with local watershed groups when developing activity plans.

## C. Vegetation

*Land Use Plan Decisions.* Identify desired outcomes for vegetative resources, including the desired mix of vegetative types, structural stages, and landscape and riparian functions; and provide for native plant, fish, and wildlife habitats and livestock forage. Desired outcomes (goals and objectives) may be established at multiple scales. Identify areas of ecological importance and designate priority plant species and habitats, including special status species and populations of plant species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age. Identify the actions and areawide use restrictions needed to achieve desired vegetative conditions.

Reference materials for establishing desired outcomes for vegetative resources include:

1. National Range and Pasture Handbook (1997): Natural Resource Conservation Service (USDA- NRCS) Methodology of Vegetation Inventory, Monitoring, Analysis and Management of Grazing Lands.

2. Interpreting Indicators of Rangeland Health: BLM Technical Reference 1734-6.

3. Ecological Site Inventory: BLM Technical Reference 1734-7.

4. Rangeland Health Standards: H-4180-1.

5. Website examples of ecological site descriptions (use Internet Explorer):

   - http://esis.sc.egov.usda.gov
   - http://www.nm.nrcs.usda.gov/technical/fotg/section-2/ESD.html
   - http://www.mt.nrcs.usda.gov/technical/ecs/range/ecolsites/

In areas where Healthy Forests Restoration Act authorities are to be used, identify old growth forest stands or describe a process for identifying old growth forest stands in the land use plan based on the structure and composition characteristic of the forest type. Provide management direction to maintain, or contribute toward the restoration of, the structure and composition of old growth forest stands in areas where these authorities will be used. This management direction should consider the pre-fire exclusion old growth conditions characteristic of the forest

BLM_0126864

Appendix C, page 4

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

type, taking into account the contribution of the stand to landscape fire adaptation and watershed health, and retaining the large trees contributing to old growth structure.

***Implementation Decisions.*** Identify site-specific vegetation management practices such as allotment grazing systems, vegetation treatments, or manipulation methods (including fuels treatments) to achieve desired plant communities, as well as integrated vegetation management techniques to rehabilitate weed infestations or otherwise control noxious and invasive weeds.

Identify old-growth stands and management practices to achieve old-growth management direction where applicable.  Identify old-growth stands and management practices to achieve old-growth management direction where applicable.

***Notices, Consultations, and Hearings.***  Consult under Section 7 of the Endangered Species Act with the USFWS and/or NOAA-Fisheries for all actions that may affect listed species or designated critical habitat or confer if actions are likely to jeopardize the continued existence of a proposed species or result in the destruction of adverse modification of proposed critical habitat (see 50 CFR 402.14 and 402.10; and BLM Handbook H-6840).  Depending on state-specific laws, agreements, or policies, there may be additional requirements to confer with state wildlife agencies if Federal actions may affect state-listed species or their habitats.

**D.  Special Status Species**

***Land Use Plan Decisions.***  Identify desired outcomes, strategies, restoration opportunities, use restrictions, and management actions to conserve and recover special status species.  Desired outcomes may incorporate goals and objectives from recovery plans and conservation strategies or identify ecologically important areas or scarce, limited habitats.  Goals and objectives may be species or habitat specific and can be established at multiple scales (i.e., fine, mid, and broad) to fully understand the context of the larger landscape.

Given the legal mandate to conserve threatened or endangered species and BLM's policy to conserve all special status species, land use planning strategies, desired outcomes, and decisions should result in a reasonable conservation strategy for these species.  Land use plan decisions should be clear and sufficiently detailed to enhance habitat or prevent avoidable loss of habitat pending the development and implementation of implementation-level plans.  This may include identifying stipulations or criteria that would be applied to implementation actions.  Land use plan decisions should be consistent with BLM's mandate to recover listed species and should be consistent with objectives and recommended actions in approved recovery plans, conservation agreements and strategies, MOUs, and applicable biological opinions for threatened and endangered species.

***Implementation Decisions.***  Identify the programmatic and site-specific actions needed to implement planning decisions for conserving and recovering special status species.  These decisions may be identified in implementation plans for habitat management areas, ACECs, and grazing allotments, etc.

BLM_0126865

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

***Notices, Consultations, and Hearings.*** Consultation with the USFWS or NOAA-Fisheries is required by the Endangered Species Act for actions that may affect listed species and designated critical habitat, and conferencing is needed if actions are likely to jeopardize the continued existence of a proposed species, or result in the destruction or adverse modification of proposed critical habitat (see 50 CFR 402.14 and 402.10; and BLM Manual Section 6840). Depending on state-specific agreements or policies, there may be additional requirements to confer with state wildlife agencies if Federal actions may affect state-listed species or their habitats.

    1. *Interagency Agreements on Consultation.* The BLM has entered into a variety of Memoranda of Agreement and Memoranda of Understanding regarding consultation on agency actions to help streamline and bring greater efficiency to the consultation process. A key element of these includes utilizing early involvement of regulatory agency personnel in the planning process. Including representatives from these agencies on the planning team during development of alternatives could improve the BLM's ability to address and discuss the effects of management direction on listed and proposed species and their critical habitats. For additional direction and guidance, consult the most current versions of these Memoranda.

    2. *Initial Effects Determination.* During preparation of draft land use plan decisions and associated NEPA analysis, the BLM makes an initial determination of effects to listed or proposed species. If the BLM makes a determination of "no effect" on the preferred alternative, informal consultation is not required.

    3. *Informal Consultation.* Informal consultation should be initiated on the preferred alternative with the USFWS or the NOAA-Fisheries if the initial BLM determination is "not likely to adversely affect" listed species or designated critical habitat. "Not likely to adversely affect" determinations are reached when effects of the action are insignificant, discountable, or completely beneficial. **Beneficial effects** are contemporaneous positive effects without any long-term adverse effects to the species. **Insignificant effects** relate to the size of the impact and cannot be meaningfully measured. **Discountable effects** are those that have an extremely low probability of occurring.

Informal consultation is concluded if the Services concur with the BLM determination. This concurrence must be documented in the planning record by a written letter of concurrence from the USFWS or NOAA-Fisheries. If the Services do not concur with the BLM determination, formal consultation must be initiated.

    3. *Formal Consultation.* Formal consultation is required when proposed management direction and resource allocations in the preferred alternative are determined to be "likely to adversely affect" to listed species or designated critical habitat. The Endangered Species Act and 50 CFR 402.16 outline criteria for re-initiating consultation when there has been significant change since the original consultation was completed. Based on these criteria, consultation on land use plan and implementation decisions must be re-initiated for any of the following reasons:

BLM_0126866

Appendix C, page 6

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

a) New information shows that the plan decisions may affect listed or proposed species or critical habitat in a way or to an extent not previously considered;

b) land use plan and/or implementation decisions are modified in a way that may cause adverse effects to the listed or proposed species or critical habitat that were not considered in the biological opinion;

c) implementation of existing land use plan decisions could affect a newly listed species or newly designated critical habitat; or

d) the amount or extent of incidental take is exceeded.

4. *Conferencing.* The BLM will conference with the Services on any action which is likely to jeopardize the continued existence of any proposed species or result in the destruction or adverse modification of proposed critical habitat. The conference is designed to assist the Federal agency and any applicant in identifying and resolving potential conflicts at an early stage in the planning process. Conferencing includes informal discussions concerning an action that is likely to jeopardize the continued existence of the proposed species or results in the destruction or adverse modification of the proposed critical habitat at issue.

5. *Consultation under Endangered Species Act with Indian Tribes.* Department of the Interior's Secretarial Order 3206, American Indian Tribal Rights; Federal-Tribal Trust Responsibilities; and the Endangered Species Act; requires Interior agencies to consult with Indian Tribes when agency actions to protect a listed species, as a result of compliance with Endangered Species Act, affect or may affect Indian lands, Tribal trust resources, or the exercise of American Indian Tribal rights. Consultation under this Order should be closely coordinated with regional or field offices of the USFWS and/or NOAA-Fisheries for game and non-game species.

**E.  Fish and Wildlife**

***Land Use Plan Decisions.*** Designate priority species and habitats, in addition to special status species, for fish or wildlife species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age. Identify desired outcomes using BLM strategic plans, state agency strategic plans, and other similar sources.

Describe desired habitat conditions and/or population for major habitat types that support a wide variety of game, non-game, and migratory bird species; acknowledging the states' roles in managing fish and wildlife, working in close coordination with state wildlife agencies, and drawing on state comprehensive wildlife conservation strategies. Identify actions and areawide use restrictions needed to achieve desired population and habitat conditions while maintaining a thriving natural ecological balance and multiple-use relationships. (Also see previous Section D, Special Status Species.) Identify essential fish habitat (EFH) for federally managed fish species (Oregon, Washington, California and Idaho only).

BLM_0126867

Appendix C, page 7

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

***Implementation Decisions.*** In coordination with state wildlife agencies, identify site-specific actions, such as riparian fencing, guzzler placement, fuels management, etc., needed to manage ecosystems for all species and habitat for special status species. Identify specific measures to conserve and enhance EFH.

***Notices, Consultations, and Hearings.*** Consult under Section 7 of the Endangered Species Act with the USFWS and/or NOAA-Fisheries, for all actions that may affect listed species or designated critical habitat or confer if actions are likely to jeopardize the continued existence of a proposed species or result in the destruction or adverse modification of proposed critical habitat (see 50 CFR 402.14 and 402.10; and BLM Handbook H-6840). Depending on state-specific laws, agreements, or policies, there may be additional requirements to confer with state wildlife agencies if Federal actions may affect state-listed species or their habitats. Consult with the NOAA-Fisheries on any action authorized, funded, or undertaken that may impact EFH (through existing environmental review processes in accordance with NEPA). Comply with Executive Order 13186 for the conservation of migratory birds.

## F.  Wild Horses and Burros

***Land Use Plan Decisions.*** Identify the following (see 43 CFR 4700):

    1.  *Herd Areas.* Herd areas (HAs) are limited to areas of the public lands identified as being habitat used by wild horses and burros at the time of the passage of the Wild Horse and Burro Act, as amended (16 U.S.C. 1331-1340). HA boundaries may only be changed when it is determined that (1) areas once listed as HAs are later found to be used only by privately-owned horses or burros, or (2) the HA boundary does not correctly portray where wild horses and burros were found in 1971.

    2.  *Herd Management Area Designation.* Herd management areas (HMAs) are established only in HAs, within which wild horses and/or burros can be managed for the long term. For HMAs, identify the following:

        a)  Initial and estimated herd size that could be managed while still preserving and maintaining a thriving natural ecological balance and multiple-use relationships for that area.
        b)  Guidelines and criteria for adjusting herd size.

    3.  *Herd Areas Not Designated as Herd Management Areas.* Where appropriate, the land use plan may include decisions removing horses from all or part of a HA. Examples include intermingled and unfenced lands within HAs where private landowners do not want to make them available for wild horse or burro use; or essential habitat components are not available for wild horse or burro use within a HA.

    4.  *Wild Horse and Burro Ranges.* An HMA may be considered for designation as a wild horse or burro range when there is a significant public value present, such as unique characteristics in a herd or an outstanding opportunity for public viewing.

BLM_0126868

Appendix C, page 8

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

5. *Areawide Restrictions Needed to Achieve Objectives.*  For example, if domestic horses in HMAs are not compatible with wild horse management policies, then, domestic horse grazing must not be permitted in HMAs or adjacent to HMAs if domestic and wild horses are likely to intermingle.

***Implementation Decisions.***  Identify and set objectives for herd composition, animal characteristics, and habitat development needs.  Establish appropriate management levels (AMLs) based on monitoring and evaluations, including the population range within which the herd size will be allowed to fluctuate.  *(Commission for the Preservation of Wild Horses, et al., 139 IBLA 24 (1997).)*

***Notices, Consultations, and Hearings.***  The Wild and Free-Roaming Horses and Burros Act, as amended (16 U.S.C. 1331-1340) requires BLM to consult with Federal and state wildlife agencies and all other affected interests during land use and implementation planning for the management of wild horses and burros.

Public hearings are required when anticipated management activities involve the use of helicopters to capture, or the use of motor vehicles to transport, wild horses and burros. Hearings are held in the state where the activities are proposed and are normally conducted on an annual basis (see 43 CFR 4740).

## G.  Cultural Resources

***Land Use Plan Decisions.***  Identify special cultural resource restrictions that may affect the location, timing, or method of development or use of other resources in the planning area. Identify site-specific use restrictions from cultural resources currently being actively managed. Identify area wide criteria for recognizing potential cultural resource conflicts, such as geographic characteristics of sacred sites, historic properties, or cultural landscapes (springs, ridges, peaks, caves, and rock shelters, for example).  Consider these restrictions and criteria in all proposed land and resource use decisions.  Identify measures to pro-actively manage, protect, and use cultural resources, including traditional cultural properties.

The scope and scale of cultural resource identification are much more general and less intensive for land use planning than for processing site-specific use proposals.   Instead of new, on-the-ground inventory, the appropriate identification level for land use planning is a regional overview:  (1) a compilation and analysis of reasonably available cultural resource data and literature, (2) a management-oriented synthesis of the resulting information that includes priorities and a strategy for accomplishing needed inventory (see Manual Section 8110.)  If land use decisions, however, are more specific in terms of impacts, they may require a more detailed level of identification of the scope and nature of cultural resources during land use planning.

RMPs will include at least the following two goals:

1.  Identify, preserve, and protect significant cultural resources and ensure that they are available for appropriate uses by present and future generations (FLPMA, Section 103

BLM_0126869

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

(c), 201(a) and (c); National Historic Preservation Act, Section 110(a); Archaeological Resources Protection Act, Section 14(a)).

2.  Seek to reduce imminent threats and resolve potential conflicts from natural or human-caused deterioration, or potential conflict with other resource uses (FLPMA Sec. 103(c), NHPA 106, 110 (a) (2)) by ensuring that all authorizations for land use and resource use will comply with the NHPA Section 106.

All cultural properties in the RMP area, whether already recorded or projected to occur on the basis of existing-data synthesis, including cultural landscapes, will be allocated to the uses listed in Table C-1 according to their nature and relative preservation value.  These use allocations pertain to cultural resources, not to areas of land.

**Table C-1.—Cultural use allocations and desired outcomes**

| Use allocation [1] | Desired outcomes |
| --- | --- |
| a. Scientific use | Preserved until research potential is realized |
| b. Conservation for future use | Preserved until conditions for use are met |
| c. Traditional use | Long-term preservation |
| d. Public use | Long-term preservation, on-site interpretation |
| e. Experimental use | Protected until used |
| f. Discharged from management | No use after recordation; not preserved |

[1] The majority of the cultural properties in a given geographic area will fall into categories (a) and (f).  The less-common properties in categories (b)–(e) are likely to be associated with particular settings that can be delineated geographically in the planning process.  As the plan is developed, properties in categories b–d will require the most attention to balance their proactive uses with other land and resource uses.

*Implementation Decisions.*  Identify site-specific information needs, impacted resources, protection measures and opportunities to use cultural properties for scientific, educational, recreational, and traditional purposes.  Evaluate whether intended uses would result in changes to cultural properties' significance or preservation value, and if so, how resource condition should be monitored, measured, and maintained at an acceptable level.

1.  Cultural properties allocated to uses are subject to the management actions listed in Table C-2 to realize their use potential.

**Table C-2.—Cultural use allocations and management actions**

| Use allocation | Management |
| --- | --- |
| a. Scientific use | Permit appropriate research, including date recovery |
| b. Conservation for future use | Propose protective measures/designations [1] |
| c. Traditional use | Consult with Tribes; determine limitations [1] |
| d. Public use | Determine permitted use [1] |
| e. Experimental use | Determine nature of experiment |
| f. Discharged from management | Remove protective measures |

[1] Safeguards against incompatible land and resource uses may be imposed through withdrawals, stipulations on leases and permits, design requirements, and similar measures which are developed and recommended by an appropriately staffed interdisciplinary team.

BLM_0126870

Appendix C, page 10

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

2.  Categorize geographic area as high/medium/low priority for future inventory of cultural properties.

3.  All authorizations for land and resource use will comply with Section 106 of the National Historic Preservation Act, consistent with and subject to the objective established in the RMP for the proactive use of cultural properties in the public interest (NHPA Sec. 106, 101(d)(6), 110(a)(2)(E); national BLM-ACHP-NCSHPO Programmatic Agreement of March 1997).

***Notices, Consultations, and Hearings.***

1.  Consistent with the national Programmatic Agreement and individual state BLM-SHPO protocols, invite the State Historic Preservation Officer (SHPO) to participate from the outset of planning in order to reduce the potential for cultural resource conflicts with other resource uses as plans are implemented.

2.  For states not operating under a BLM-SHPO protocol, such as Eastern states, consult with the SHPO before plan approval concerning any actions that may be directly implemented upon plan approval and could affect a cultural property listed in or eligible for the National Register of Historic Places (see 36 CFR 800).

3.  Formal consultations under Section 106 of the National Historic Preservation Act usually take place during implementation planning; however, consult with the SHPO during land use planning regarding cultural resource evaluation recommendations (36 CFR 800.4(c)).

4.  Consult Tribal leaders and traditional religious practitioners under the American Indian Religious Freedom Act about any management objectives and actions that might affect Native American religious practices, including access to sacred sites.  Consult Tribal leaders under the National Historic Preservation Act about any management objectives or actions that might affect properties of traditional cultural importance.

## H.  Paleontology

***Land Use Plan Decisions.***  Identify criteria or use restrictions to ensure that (a) areas containing, or that are likely to contain, vertebrate or noteworthy occurrences of invertebrate or plant fossils are identified and evaluated prior to authorizing surface-disturbing activities; (b) management recommendations are developed to promote the scientific, educational, and recreational uses of fossils; and (c) threats to paleontological resources are identified and mitigated as appropriate.

***Implementation Decisions.***  Identify appropriate protection measures and scientific, educational, and recreational use opportunities for paleontological localities.

***Notices, Consultations, and Hearings.***  No additional specific requirements exist.

BLM_0126871

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## I.  Visual Resources

***Land Use Plan Decisions.***  Manage visual resource values in accordance with visual resource management (VRM) objectives (management classes).  Designate VRM management classes for all areas of BLM land, based on an inventory of visual resources and management considerations for other land uses.  VRM management classes may differ from VRM inventory classes, based on management priorities for land uses (see BLM Handbook H-8410-1 for a description of VRM classes).

***Implementation Decisions.***  Manage resource uses and management activities consistent with the VRM objectives established in the land use plan.  Design all BLM resource uses, management activities, and other implementation decisions to meet VRM objectives established in the land use plan.  Utilize visual resource design techniques and best management practices to mitigate the potential for short- and long-term impacts.  Contrast ratings are required for all major projects proposed on public lands that fall within VRM Class I, II, and III areas which have high sensitivity levels (see Handbook H-8341-1 for contrast-rating procedures).

***Notices, Consultations, and Hearings.***  No additional specific requirements exist.

## J.  Wildland Fire Management

***Land Use Plan Decisions.***  Fire management strategies must recognize the role of wildland fire as an essential ecological process and natural change agent.  Fire management strategies must result in minimum suppression costs, considering firefighter and public safety, benefits, and values to be protected; consistent with resource objectives.  Fire management decisions (goals and objectives, and allowable uses and management actions) must reflect that the protection of human life is the single, overriding priority.  Other priorities (protecting human communities and community infrastructure, other property and improvements, and natural and cultural resources) are based on the values to be protected, human health and safety, and the costs of protection.

Consistent with these principles, identify landscape-level fire management goals and objectives, which would be achieved through allowable uses and management actions.  Use fire regime/condition class methodology to identify desired wildland fire conditions.  Wildland fire management goals and objectives must be closely coordinated with vegetation management goals and objectives.

Identify allowable uses and management actions to achieve the fire management goals and objectives, and support the goals and objectives for vegetation, wildlife, and other resources.

As part of identifying allowable uses, identify the geographic areas that are suitable for wildland fire use, provided conditions are appropriate.  Also, identify the geographic areas where wildland fire use is not appropriate due to social, economic, political, or resource constraints (e.g., wildland urban interface areas); and where suppression action would be taken.

BLM_0126872

Appendix C, page 12

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

As part of identifying management actions to achieve goals and objectives, identify the types of fuels management or vegetation management treatments (e.g., mechanical, biological, and chemical treatments and prescribed fire) that would be implemented.

Allowable uses and management actions include the identification of restrictions on fire management practices (including both wildfire suppression and fuels management) needed to protect natural or cultural resource values. Restrictions may be structured to allow flexibility to apply restrictions on a seasonal or annual basis, based on resource conditions, weather factors, and operational capability.

Establish landscape-scale fire management priorities or provide criteria that will guide more site-specific priorities at the fire management plan level.

***Implementation Decisions.*** Identify site-specific fire management practices and fuels treatment actions needed to meet the broad-scale land use plan goals and objectives (such as wildland fire use, prescribed fire, mechanical thinning, biological, and chemical treatments) including their location, size, and specific layout and project design features, as well as any measures needed to protect sensitive resources.

For additional guidance, see the DOI and BLM Fire Management Manuals and Handbooks.

***Notices, Consultations, and Hearings.***

> 1. Consult, coordinate, and comply with Tribes, Federal agencies, and state and local governments regarding smoke management where required by the Clean Air Act, Executive Order 12088 (Federal Compliance with Pollution Control Standards), and State Implementation Plans.

> 2. Consult and coordinate with adjacent Tribes, Federal agencies, and state and local governments to establish protection and fuels management priorities.

## K. Wilderness Characteristics

***Land Use Plan Decisions.*** Identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation). Include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives. For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics.

***Implementation Decisions.*** Identify site-specific protection measures to insure protection of wilderness characteristics.

***Notices, Consultations, and Hearings.*** No additional specific requirements exist.

BLM_0126873

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## L.  Cave and Karst Resources

***Land Use Plan Decisions.***  Identify significant caves as mandated by the Federal Cave Resources Protection Act of 1988.  Criteria for identification of significant caves is set forth in 43 CFR 37.11(c).  If it is determined that a cave meets these criteria, it must be designated as significant as set forth in 43 CFR 37.11(f).

For each designated significant cave, consider whether or not an administrative designation (e.g., ACEC) is needed to provide adequate protection for significant cave resources (see III. Special Designations).  Regardless, it is vital that both management objectives and setting prescriptions be set for each designated significant cave.  Management objectives should be outcome-based (i.e., not facility- or project-based).  Setting prescriptions should specify conditions needed to facilitate achievement of the management objectives.

***Implementation Decisions.***  Address four basic but broad types of cave and karst resource management actions for all significant caves:

    1.  Management (resources, visitors and facilities);

    2.  marketing (outreach, information and education, promotion, interpretation, and environmental education);

    3.  monitoring (social, environmental and administrative indicators and standards); and

    4.  administration (regulatory, permit/fee/fiscal, data management, and customer liaison).

All BLM implementing actions must be conditioned by the specific management objectives and accompanying setting prescriptions incorporated within land use plan decisions for each significant cave.

***Notices, Consultations, and Hearings.***  Certain actions involving impacts to cave and karst resources may require consultation and coordination with other Federal, state and local government agencies, and nongovernmental organizations or individuals as mandated by Section 4 of the Federal Cave Resources Protection Act; Section 106 of the National Historic Preservation Act; Section 7 of the Endangered Species Act; and Section 8 of the Public Rangeland Improvement Act.

## II.  Resource Uses

## A.  Forestry

***Land Use Plan Decisions.***  Identify characteristics (indicators) to describe healthy forest conditions (i.e., desired outcomes) for forest/woodland types found within the planning area (also see I(C), Vegetation).  Identify the suite of possible management actions (including appropriate harvest, reforestation, and forest development methods), and associated best management practices, that can be applied to meet desired outcomes.

BLM_0126874

Appendix C, page 14

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Identify areas that are available and have the capacity for planned, sustained-yield timber harvest or special forest product harvest. A probable sale quantity (PSQ) should be determined, if possible, for those areas determined to be available for harvest. The PSQ is the allowable harvest level that can be maintained without decline over the long term if the schedule of harvests and regeneration are followed. PSQ recognizes a level of uncertainty in meeting the determined level; this uncertainty is typically based on other environmental factors that preclude harvesting at a particular time (for example, because of watershed or habitat concerns). A PSQ is not a commitment to offer for sale a specific level of timber volume every year.

***Implementation Decisions.*** Identify individual timber or special forest product sale locations and schedules; site-specific intensive management practices, locations, and schedules; and restrictions associated with forestry activities. Identify individual forest health treatment activities by location and schedule *(Headwaters, Inc., 116 IBLA 129 (1990)).*

***Notices, Consultations, and Hearings.*** There are no additional specific requirements.

## B. Livestock Grazing

***Land Use Plan Decisions.*** Identify lands available or not available for livestock grazing (see 43 CFR 4130.2(a)), considering the following factors:

1. Other uses for the land;
2. terrain characteristics;
3. soil, vegetation, and watershed characteristics;
4. the presence of undesirable vegetation, including significant invasive weed infestations; and
5. the presence of other resources that may require special management or protection, such as special status species, special recreation management areas (SRMAs), or ACECs.

Decisions identifying lands available, or not available, for livestock grazing may be revisited through the amendment or revision process if the grazing preference or permit on those lands has been voluntarily relinquished, or if there are outstanding requests to voluntarily relinquish the grazing preference or permit. If an evaluation of Land Health Standards identifies an allotment or group of allotments where Land Health Standards cannot be achieved under any level or management of livestock use, then decisions identifying those areas as available for livestock grazing need to be revisited.

For lands available for livestock grazing, identify on an areawide basis both the amount of existing forage available for livestock (expressed in animal unit months) and the future anticipated amount of forage available for livestock with full implementation of the land use plan while maintaining a thriving natural ecological balance and multiple-use relationships. The land use plan needs to describe how these public lands will be managed to become as productive as feasible for livestock grazing, including a description of possible grazing management practices such as grazing systems, range improvements (including land treatments), changes in seasons of use and/or stocking rates. In addition, identify guidelines and criteria for future allotment-

BLM_0126875

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

specific adjustments in the amount of forage available for livestock, season of use, or other grazing management practices *(Joel Stamatakis, Steve Stamatakis; 98 IBLA 4 (1987))*.

***Implementation Decisions.*** For areas available for grazing, identify allotment-specific (for one or several allotments) grazing management practices and livestock forage amounts based on monitoring and assessment information, as well as constraints and needs related to other resources. Grazing management practices and levels of livestock grazing use must achieve the desired outcomes outlined in the land use plan, including rangeland health standards (or comprehensive Land Health Standards), or must result in significant progress toward fulfilling rangeland health standards; they must also conform to the guidelines required under 43 CFR 4180.2(b).

***Notices, Consultations, and Hearings.*** Conduct appropriate consultation, cooperation, and coordination actions as required under 43 CFR 4130.2(b). Copies of proposed decisions on grazing use are sent to interested members of the public in accordance with 43 CFR 4160.1.

## C.  Recreation and Visitor Services

***Land Use Plan Decisions.***  Identify special recreation management areas (SRMAs).

Each SRMA has a distinct, primary recreation-tourism market as well as a corresponding and distinguishing recreation management strategy. For each SRMA selected, determine whether that primary market-based strategy will be to manage for a *destination* recreation-tourism market, a *community* recreation-tourism market, or an *undeveloped* recreation-tourism market, and state that determination in the land use plan. Then describe the market that corresponds to that specific recreation management strategy (who they are and where they are located). Divide recreation areas that have more than one distinct, primary recreation market into separate SRMAs.

For each SRMA identified, delineate discrete recreation management zone (RMZ) boundaries. Each RMZ has four defining characteristics - it:  (1) serves a different recreation niche within the primary recreation market; (2) produces a different set of recreation opportunities and facilitates the attainment of different experience and benefit outcomes (to individuals, households and communities, economies, and the environment); (3) has distinctive recreation setting character; and (4) requires a different set of recreation provider actions to meet the strategically-targeted primary recreation market demand. To address these four variables within each RMZ, make the following land-use allocation decisions:

1.  Identify the corresponding recreation niche to be served;

2.  write explicit recreation management objectives for the specific recreation opportunities to be produced and the outcomes to be attained (activities, experiences, and benefits);

3.  prescribe recreation setting character conditions required to produce recreation opportunities and facilitate the attainment of both recreation experiences and beneficial

BLM_0126876

Appendix C, page 16

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

outcomes, as targeted above (the recreation opportunity spectrum is one of the existing tools for both describing existing setting character and prescribing desired setting character); and

4.  briefly describe an activity planning framework that addresses recreation management, marketing, monitoring, and administrative support actions (e.g., visitor services, permits and fees, recreation concessions, and appropriate use restrictions) necessary to achieve explicitly-stated recreation management objectives and setting prescriptions (see Implementation Decisions subsection below).

Visual resource management classes need to be correlated with the recreation management objectives and setting prescriptions that have been set for each RMZ delineated.

Anything not delineated as an SRMA is an extensive recreation management area (ERMA). Management within all ERMAs is restricted to custodial actions only. Therefore, actions within ERMAs are generally implemented directly from land use plan decisions and do not require activity-level planning. Land use plan decisions must, therefore, include recreation management objectives for all ERMAs. Consider addressing visitor health and safety, user conflict and resource protection issues in particular through these recreation management objectives. However, land use plan decisions for ERMAs need to also identify implementing recreation management, marketing, monitoring, and administrative support actions of the kinds listed for SRMAs under Implementation Decisions below (because no follow-up implementation decisions at the activity plan level are required for ERMAs) *Note: If recreation demand (i.e., from an undeveloped recreation-tourism market) requires maintenance of setting character and/or production of associated activity, experience, and benefit opportunities/outcomes, the area should be identified and managed as an SRMA, rather than being custodially managed as an ERMA.*

Recognition of singularly dominant activity-based recreation demand of and by itself (e.g., heavy off-highway vehicle use, river rafting, etc.), however great, generally constitutes insufficient rationale for the identification of an SRMA and the subsequent expenditure of major recreation program investments in facilities and/or visitor assistance. This does not mean that the expenditure of substantial custodial funding is unwarranted when circumstances require it, but such expenditures should be geared to take care of the land and its associated recreation-tourism use and not to provide structured recreation opportunities which characterize SRMAs.

Identification, but not formal designation, of both SRMAs and ERMAs is required (see Manual Section 8300).

***Implementation Decisions.*** For all SRMAs, address four basic but broad types of recreation actions:

1.  Recreation management (of resources, visitors, and facilities [i.e., developed recreation sites, roads and trails, recreation concessions, etc.]);

BLM_0126877

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

2.  recreation marketing (including outreach, information and education, promotion, interpretation, environmental education; and other visitor services);

3.  recreation monitoring (including social, environmental, and administrative indicators and standards); and

4.  recreation administration (regulatory; permits and fees, including use restrictions where necessary and appropriate; recreation concessions; fiscal; data management; and customer liaison).

All BLM implementing actions for SRMAs must be conditioned by both the identified primary recreation market strategy and the specific RMZ land use allocation objectives and accompanying setting prescriptions incorporated within land use plan decisions.  Since the BLM is not the sole-source provider of public lands recreation, be sure to address any actions of other key recreation-tourism providers within local service communities (i.e., local governments and private recreation-tourism businesses).  The BLM cannot dictate to its local government and private business providers.  Yet, without their collaborative engagement as managing partners in plan design and implementation, recreation opportunities targeted by land use plan management objectives cannot be produced over the long run, nor can prescribed recreation settings be sustained.

To the greatest extent possible, and appropriate to the setting prescriptions for the area involved, all new construction and modifications to recreation facilities, outdoor developed areas, and any related programs and activities will be accessible to people with disabilities in accordance with the Architectural Barriers Act of 1968 and Section 504 of the Rehabilitation Act of 1973, as amended, and in conformance with relevant building standards, accessible outdoor program guidance, and program regulations.

***Notices, Consultations, and Hearings.***  No additional specific requirements exist.

## D.  Comprehensive Trails and Travel Management

***Land Use Plan Decisions.***  Delineate travel management areas and designate off-highway vehicle management areas.

1.  *Delineating Travel Management Areas.*  Comprehensive travel management planning should address all resource use aspects (such as recreational, traditional, casual, agricultural, commercial, and educational) and accompanying modes and conditions of travel on the public lands, not just motorized or off-highway vehicle activities.  In the RMP, travel management areas (polygons) should be delineated.  Identify acceptable modes of access and travel for each travel management area (including over-land, over-water, over-snow and fly-in access [remote airstrips and float planes]).   In developing these areas, consider the following:

  a.  Consistency with all resource program goals and objectives;
  b.  primary travelers;

Appendix C, page 18

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

    c.  objectives for allowing travel in the area;
    d.  setting characteristics that are to be maintained (including recreation opportunity system and VRM settings); and
    e.  primary means of travel allowed to accomplish the objectives and to maintain the setting characteristics.

    2.  *Designation of Off-Highway Vehicle Management Areas.*  All public lands are required to have off-highway vehicle area designations (see 43 CFR 8342.1).  Areas must be classified as *open*, *limited*, or *closed* to motorized travel activities.  Criteria for open, limited, and closed area designations are established in 43 CFR 8340.0-5(f), (g) and (h), respectively.

For areas classified as limited consider a full range of possibilities, including travel that will be limited to types or modes of travel, such as foot, equestrian, bicycle, motorized, etc.; limited to existing roads and trails; limited to time or season of use; limited to certain types of vehicles (OHVs, motorcycles, all-terrain vehicles, high clearance, etc.); limited to licensed or permitted vehicles or users; limited to BLM administrative use only; or other types of limitations.  In addition, provide specific guidance about the process for managing motorized vehicle access for authorized, permitted, or otherwise approved vehicles for those specific categories of motorized vehicle uses that are exempt from a limited designation (see 43 CFR 8340.0-5(a)(1-5).

At a minimum, the travel management area designation for wilderness study areas (WSAs) must be limited to ways and trails existing at the time the area became a WSA.  *Open* areas within WSAs are appropriate only for sand dune or snow areas designated as such prior to October 21, 1976.  Existing roads, ways and trails must be fully documented and mapped. This applies to both motorized and mechanized transport (see Interim Management Policy and Guidelines for Lands Under Wilderness Review H-8550-1(I.)(B.)(11) for mechanized transport).  In addition, future designations may be made for a WSA if it is released from study.

Except as otherwise provided by law (e.g., the Alaska National Interest Lands Conservation Act), congressionally designated wilderness areas are statutorily closed to motorized and mechanized use.  These areas should be shown in the land use plans along with the acreage affected.

Existing laws, proclamations, regulations or Executive orders may limit the use of the open area designation or impose additional requirements relating to travel management in specific circumstances.

For RMP provisions related to national scenic, historic and national recreation trails, national back country byways, or other byway designations (see Appendix C, III. Special Designations).

***Implementation Decisions.***  Complete a defined travel management network (system of areas, roads and/or trails) during the development of the land use plan, to the extent practical.  If it is

Case No. 1:20-cv-02484-MSK   Document 65-3   filed 04/29/21   USDC Colorado   pg 52 of 115

not practical to define or delineate the travel management network during the land use planning process, a preliminary network must be identified and a process established to select a final travel management network.  Possible reasons for not completing the final network might be size or complexity of the area, controversy, incomplete data, or other constraints.

If the final travel management network is to be deferred in the RMP, then the RMP should document the decision-making process used to develop the initial network, provide the basis for future management decisions, and help set guidelines for making road and trail network adjustments throughout the life of the plan. The identification of the uncompleted travel management networks should be delineated in the land use plan and the following tasks completed for each area:

1)  Produce a map of a preliminary road and trail network;

2)  define short-term management guidance for road and trail access and activities in areas or sub-areas not completed;

3)  outline additional data needs, and a strategy to collect needed information;

4)  provide a clear planning sequence, including public collaboration, criteria and constraints for subsequent road and trail selection and identification;

5)  provide a schedule to complete the area or sub-area road and trail selection process; and

6)  identify any easements and rights-of-ways (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.

If the decision on delineating travel management networks is deferred in the land use plan to the implementation phase, the work normally should be completed within 5 years of the signing of the ROD for the RMP.

At the implementation phase of the plan, establish a process to identify specific areas, roads and/or trails that will be available for public use, and specify limitations placed on use.  Products from this process will include:

1)  A map of roads and trails for all travel modes.

2)  Definitions and additional limitations for specific roads and trails (defined in 43 CFR 8340.0-5(g)).

3)  Criteria to select or reject specific roads and trails in the final travel management network, add new roads or trails and to specify limitations.

4)  Guidelines for management, monitoring, and maintenance of the system.

Appendix C, page 20

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

5)  Indicators to guide future plan maintenance, amendments, or revisions related to travel management network.

6)  Needed easements and rights-of-ways (to be issued to the BLM or others) to maintain the existing road and trail network providing public land access.

In addition, travel management networks should be reviewed periodically to ensure that current resource and travel management objectives are being met (see 43 CFR 8342.3).

***Notices, Consultations, and Hearings.***  No additional specific requirements exist.

## E.  Lands and Realty

***Land Use Plan Decisions.***  Identify the following consistent with the goals and objectives for natural resources within the planning area:

1.  Lands for retention (43 CFR 2400), proposed disposal, or acquisition (based on acquisition criteria identified in the land use plan; FLPMA Section 205(b)) *(Oregon Natural Resources Council, 78 IBLA 124 (1983)).*  Lands are to be retained in Federal ownership, unless it is determined that disposal of a particular parcel will serve the national interest (FLPMA Section 102(a)(1)).  Land use plans should avoid prescribing the method of disposal, acquisition, or property interest to be acquired.

2.  Lands or interest in lands that are available for disposal under a variety of disposal authorities, provided they meet the criteria outlined in FLPMA (Sales, Section 203, 43 U.S.C. 1713(a); Exchanges, Section 206, 43 U.S.C. 1716(a); and Reservation and Conveyance of Minerals, Section 209, 43 U.S.C. 1719(a)) or other statutes and regulations.  Lands available for disposal must be identified by parcel or by specific areas (on a map or by legal description).

3.  Lands available for disposal under the Federal Land Transaction Facilitation Act of 2000 (FLTFA).  The FLTFA amended FLPMA to allow retention by the BLM of receipts received from sale of land or interests in land under Section 203 of FLPMA or conveyance of mineral interest under Section 209(b) of FLPMA provided a land use plan was completed prior to July 25, 2000.  The FLTFA currently does not apply to lands identified for disposal after July 25, 2000.  In Nevada, the FLTFA does not apply to lands eligible for sale under the Southern Nevada Public Land Management Act, Santini-Burton Act, Mesquite Lands Act, or Lincoln County Land Act.

4.  Proposed withdrawal areas including existing withdrawals to be continued, modified, or revoked (including how the lands would be managed if the withdrawal were relinquished and an opening order issued) (see 43 CFR 2300).

5.  Land Classifications under Section 7 of the Taylor Grazing Act of 1934, as amended (43 U.S.C. 315f).  The procedures applicable to Section 7 outlined in 43 CFR 2400 must be followed.  The following actions require classification:  Recreation and Public

BLM_0126881

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Purposes Act sales (see 43 CFR 2740) and leases (see 43 CFR 2912); agricultural entries (see 43 CFR 2520, 2530, 2610); and state grants (see 43 CFR 2620). To the extent that the land use planning procedures pursuant to 43 CFR 1600 differ from applicable classification procedures under 43 CFR 2400, the latter procedures shall be followed and applied. The analysis that supports classification decisions is normally the same analysis utilized in the land use planning/NEPA process to make decisions concerning the disposal or retention of public lands. For any classification decision made through the land use plan, initiate the classification decision requirements (i.e., proposed and initial decisions required under 43 CFR 2400) at the time the decision document is issued for the land use plan.

6. Where and under what circumstances authorizations for use, occupancy, and development (such as major leases and land use permits) may be granted (see 43 CFR 2740, 2912, 2911, and 2920, respectively).

7. Existing and potential right-of-way corridors (potential corridors include existing right-of-way routes with the potential for at least one additional facility and thus can be considered a corridor if not already designated) to minimize adverse environmental impacts and the proliferation of separate right-of-ways (see 43 CFR 2806).

8. Existing and potential development areas for renewable energy projects (e.g., wind and solar), communication sites, and other uses.

9. Right-of-way avoidance or exclusion areas (areas to be avoided but may be available for location of right-of-ways with special stipulations and areas which are not available for location of right-of-ways under any conditions).

10. Terms and conditions that may apply to right-of-way corridors or development areas, including best management practices to minimize environmental impacts and limitations on other uses which would be necessary to maintain the corridor and right-of-way values.

***Implementation Decisions.*** Identify exchange agreements, land sale plans, approvals of leases and permits, and all subsequent phases of case processing. Identify issuance of site-specific right-of-way grants and authorizations. Identify authorization notices for those actions that require classification or other notices, including sales, exchanges, state selections, Recreation and Public Purposes Act sales and leases, agricultural entries, and other land disposal actions.

***Notices, Consultations, and Hearings.*** Consult with parties to Interagency Agreements or MOUs relating to corridor identification or use. The Western Utility Group must be consulted when developing decisions affecting utility use. Consult with Indian Tribes and state and local governments having an interest in or jurisdiction over lands proposed for disposal or acquisition.

## F. Coal

***Land Use Plan Decisions.*** The land use plan is the chief process by which public land is reviewed to assess whether there are areas suitable for leasing or unsuitable for all or certain

Appendix C, page 22

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

types of coal mining operations under Section 522(b) of the Surface Mining Control and Reclamation Act.  Identify the following consistent with the goals and objectives for natural resources within the planning area:

    1.  Unleased coal lands that are acceptable for further consideration for coal leasing and development and those that are not (see 43 CFR 3461).

    2.  Areas unsuitable for surface mining of coal (43 CFR 1610.7-1) under the criteria set forth in 43 CFR 3461.5.

    3.  For acceptable lands, areas suitable for development by all mining methods or by only certain stipulated mining methods, such as surface or underground mining (see 43 CFR 3461).

    4.  Any special conditions that must be met during more detailed planning, lease sale, or post-lease activities, including measures required to protect other resource values (see 43 CFR 3461).

    5.  An estimate of the amount of coal recoverable by either surface or underground mining operations or both (43 CFR 3420.1-4(d)).  Only those areas that have development potential may be identified as acceptable for further consideration for leasing.

    6.  Areas that have development potential for coal leasing according to the screening process outlined in 43 CFR 3420.1-4(e)(1–4).

    7.  Areas to be withdrawn from further consideration for leasing to protect other resource values and land uses that are locally, regionally or nationally important or unique and that are not included in the unsuitability criteria discussed in 43 CFR 3461.5.

**Implementation Decisions.**  Offer leases with appropriate conditions and stipulations, process lease exchanges, process preference right lease applications, and delineate coal tracts for disposal.

**Notices, Consultations, and Hearings.**

    1.  Prior to or as part of the initiation or update of a land use plan or land use analysis, a *call for coal and other resource information* shall be made to formally solicit indications of interest and information on coal resource development potential and on other resources which may be affected by coal development for land in the planning unit.  Industry, state, and local governments and the general public may submit information on lands that should be considered for coal leasing, including statements describing why the lands should be considered for leasing (43 CFR 3420.1-2).

BLM_0126883

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

The Call for Coal and other Resource Information may be combined with the notice of intent to conduct land use planning published in accordance with 43 CFR 1601.3(g) or with the issue identification process in accordance with 43 CFR 1600.

2.  Publish in the *Federal Register* a notice under 43 CFR 3461.2-1(a)(2), providing for a minimum 30-day comment period on the results of the application of unsuitability criteria, exemptions, and exceptions.

3.  Consult as required under 43 CFR 3461.5 for unsuitability criteria 7 through 11, criteria 13 through 15, and criterion 17.

4.  Consult qualified surface owners as required under 43 CFR 3420.1-4(e)(4) and 1610.2(j) to determine their preference for or against surface mining.  If a significant number of qualified surface owners in an area do not support surface mining, BLM can consider only underground mining unless one of the exceptions in 43 CFR 3420.1-4(e)(4)(ii) or (iii) applies.

5.  Consult Indian Tribes, other Federal agencies, and states as required under 43 CFR 3420.1-6 and 3420.1-7.

6.  Hold a public hearing as required under 43 CFR 1610.2(k) and 43 CFR 3420.1-5 if requested.

## G.  Oil Shale

Refer to the Fluid Minerals section (Appendix C, Section II.H below) for applicable decision guidance, making decisions that consider the unique development aspects of oil shale, from underground mining to in-situ production techniques.

## H.  Fluid Minerals:  Oil and Gas, Tar Sands, and Geothermal Resources

*Land Use Plan Decisions.*  Identify the following consistent with the goals and objectives for natural resources within the planning area (refer to H-1624-1):

1.  Areas open to leasing, subject to existing laws, regulations, and formal orders; and the terms and conditions of the standard lease form.

2.  Areas open to leasing, subject to moderate constraints such as seasonal and controlled surface use restrictions. (These are areas where it has been determined that moderately restrictive lease stipulations may be required to mitigate impacts to other land uses or resource values.)

3.  Areas open to leasing, subject to major constraints such as no-surface-occupancy stipulations on an area more than 40 acres in size or more than 0.25 mile in width. (These are areas where it has been determined that highly restrictive lease stipulations are required to mitigate impacts to other lands or resource values.  This category also

BLM_0126884

Appendix C, page 24

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

includes areas where overlapping moderate constraints would severely limit development of fluid mineral resources.)

4.  Areas closed to leasing.  (These are areas where it has been determined that other land uses or resource values cannot be adequately protected with even the most restrictive lease stipulations; appropriate protection can be ensured only by closing the lands to leasing.)  Identify whether such closures are discretionary or nondiscretionary; and if discretionary, the rationale.

5.  Resource condition objectives that have been established and specific lease stipulations and general/typical conditions of approval and best management practices that will be employed to accomplish these objectives in areas open to leasing.

6.  For each lease stipulation, the circumstances for granting an exception, waiver, or modification.  Identify the general documentation requirements and any public notification associated with granting exceptions, waivers, or modifications.

7.  Whether the leasing and development decisions also apply to geophysical exploration.

8.  Whether constraints identified in the land use plan for new leases also apply to areas currently under lease.

9.  Long-term resource condition objectives for areas currently under development to guide reclamation activities prior to abandonment.

A plan-level decision to open the lands to leasing represents BLM's determination, based on the information available at the time, that it is appropriate to allow development of the parcel consistent with the terms of the lease, laws, regulations, and orders, and subject to reasonable conditions of approval.  When applying leasing restrictions, the least restrictive constraint to meet the resource protection objective should be used.

***Implementation Decisions.***  Offer leases with appropriate stipulations.  Address site-specific actions such as geophysical exploration, approval or disapproval of applications for permit to drill (APDs) with attached restrictions or conditions of approval, well siting, tank battery placement, and pipeline routing.

***Notices, Consultations, and Hearings.***  Public notice shall be given 45 days before offering lands for lease and 30 days before approving APDs or substantially modifying the terms of any lease (43 CFR 3101.1-4).

## I.  Locatable Minerals

***Land Use Plan Decisions.***  For lands that are open to the location of lode, placer, and mill claims, the claimant has statutory authority under the mining laws to ingress, egress and development of those claims.  This authority means that those areas open to mineral entry for the purposes of exploration or development of locatable minerals cannot be unreasonably restricted.

BLM_0126885

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Identify the following consistent with the goals and objectives of locatable mineral exploration and development in concert with the protection of natural resources within the planning area.

> 1.  Areas recommended for closure to the mining laws for locatable exploration or development (that must be petitioned for withdrawal).

> 2.  Any terms, conditions, or other special considerations needed to protect other resource values while conducting activities under the operation of the mining laws.

***Implementation Decisions.***

> 1.  Process notices and plans of operations according to the 43 CFR 3809 regulations.

> 2.  Manage the use and occupancy on public lands for the development of locatable mineral deposits to that which is reasonably incident to prospecting, mining or processing operations under the mining laws (43 CFR 3715).

> 3.  After a resource management plan or plan amendment in which lands are designated unsuitable is approved, the authorized officer shall take all necessary steps to implement the results of the unsuitability review as it applies to locatable minerals.

***Notices, Consultations, and Hearings.***  Recommend proposed withdrawals to the Secretary of the Interior for appropriate action pursuant to Section 204(a) of FLPMA.  Comply with the congressional notice provisions of Section 204(c) of FLPMA (43 U.S.C. 1714(c)) for withdrawals of 5,000 acres or more.

Areas that are petitioned for designation as unsuitable for mineral development shall receive public review and hearings as appropriate.

## J.  <u>Mineral Materials</u>

***Land Use Plan Decisions.***  Identify the following consistent with the goals and objectives for the exploration, development, and disposal of mineral materials in concert with the protection of natural resources within the planning area.

> 1.  Areas open or closed to mineral material disposal.

> 2.  Any terms, conditions, or other special considerations needed to protect resource values while operating under the mineral materials regulations.

***Implementation Decisions.***

> 1.  Establish common use areas and community pits and process and approve disposal of mineral materials through prospecting permits, free use permits, and competitive and noncompetitive permits and sales.

BLM_0126886

Appendix C, page 26

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

2.  After a resource management plan or plan amendment in which lands are designated unsuitable is approved, the authorized officer shall take all necessary steps to implement the results of the unsuitability review as it applies to mineral materials.

***Notices, Consultations, and Hearings.***  Recommend proposed withdrawals to the Secretary of the Interior for appropriate action pursuant to Section 204(a) of FLPMA.  Comply with the congressional notice provisions of Section 204(c) of FLPMA (43 U.S.C. 1714(c)) for withdrawals of 5,000 acres or more.

Areas that are petitioned for designation as unsuitable for mineral development shall receive public review and hearings as appropriate.

## K.  Non-energy Leasables

***Land Use Plan Decisions.***  Applies to minerals leased under the mineral leasing acts and to hardrock minerals leasable under Reorganization Plan No. 3 of 1946.  Identify the following consistent with the goals and objectives for exploration, development, and disposal of non-energy leasables in concert with the protection of natural resources within the planning area.

1.  Areas open or closed to non-energy leasing and development.

2.  Any area wide terms, conditions, or other special considerations needed to protect other resource values while exploring or developing minerals under the non-energy leasable regulations.

***Implementation Decisions.***

1.  Issue mineral use authorizations for prospecting permits, exploration licenses, preference right lease, competitive leases, lease modifications, and use permits.

2.  After a resource management plan or plan amendment in which lands are designated unsuitable is approved, the authorized officer shall take all necessary steps to implement the results of the unsuitability review as it applies to non-energy leasables.

***Notices, Consultations, and Hearings.***  Recommend proposed withdrawals to the Secretary of the Interior for appropriate action pursuant to Section 204(a) of FLPMA.  Comply with the congressional notice provisions of Section 204(c) of FLPMA (43 U.S.C. 1714(c)) for withdrawals of 5,000 acres or more.

Areas that are petitioned for designation as unsuitable for mineral development shall receive public review and hearings as appropriate.

BLM_0126887

Case No. 1:20-cv-02484-MSK   Document 65-3   filed 04/29/21   USDC Colorado   pg 60 of 115

## III. Special Designations

### A.  Congressional Designations

***Land Use Plan Decisions.***  Develop stand-alone RMP/EIS-level plans for all national monuments and congressionally designated national conservation areas, national recreation areas, cooperative management and protection areas, outstanding natural areas, and forest reserves (in accordance with the establishing statute or Presidential proclamation).

For designated national scenic and historic trails:

> 1.  Identify goals, objectives and measures to achieve them, as well as allowable uses and surface restrictions to avoid potential adverse affects.  Land use plans must also reference, incorporate, or be amended with provisions from applicable comprehensive management plans required by the National Trails System Act.

> 2.  Establish VRM designations; identify SRMAs, recreation management zones, and off-highway vehicle designations; identify trail-related lands for retention, acquisition, withdrawals, avoidance, and exclusion areas; identify appropriate special leasing conditions, terms, constraints, or stipulations; designate trail segments as ACECs; and identify interpretive measures.

> 3.  Concentrate on high potential sites and segments along national historic trails, national register eligible segments, and the primitive character and connection of national scenic trail segments. Consider the historic context and/or current and future landscape condition along the trails.

***Implementation Decisions.***  Develop site-specific implementation actions and plans for congressionally designated areas.

***Notices, Consultations, and Hearings.***  No additional specific requirements.

### B.  Administrative Designations

***Land Use Plan Decisions.***  Consistent with the goals and objectives for the planning area, make the following determinations:

> 1.  Manage WSAs under the interim management policy (H-8550-1) until they are designated wilderness or released by Congress.  Identify management direction for WSAs should they be released from wilderness consideration by Congress.

> 2.  Assess all eligible river segments and determine which are suitable or non-suitable per Section 5(d)(1) of the Wild and Scenic Rivers Act of 1968, as amended (see BLM Manual 8351).

BLM_0126888

Appendix C, page 28

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

3.  Designate ACECs and identify goals, standards, and objectives for each area, as well as general management practices and uses, including necessary constraints and mitigation measures (also see BLM Manual 1613).  This direction should be specific enough to minimize the need for subsequent ACEC management plans.  ACECs must meet the relevance and importance criteria in 43 CFR 1610.7-2(a) and must require special management (43 CFR 1601.0-5(a)) to:

> a)  Protect the area and prevent irreparable damage to resources or natural systems.

> b)  Protect life and promote safety in areas where natural hazards exist.

4.  Designate research natural areas and outstanding natural areas as types of ACECs using the ACEC designation process.

5.  Designate BLM Scenic or Back Country Byways.  Detailed procedural guidance for nomination and designation of BLM byways, as well as other byway designations occurring on BLM lands (such as All American Roads, National Scenic Byways, State Scenic Byways, Forest Scenic Byways, and similar) can be found in Handbook 8357-1: Byways, 12/17/93.

6.  Designate national recreation trails, watchable wildlife viewing sites, wild horse and burro ranges, or other BLM administrative designations.

Subject to valid existing rights, avoid approval of proposed actions that could degrade the values of potential special designations.  Proposed actions will be reviewed on a case-by-case basis and impacts to an area's values will be assessed.  The standard for this review is the protection of the area's resources and values so that the area will not be disqualified from designation.  Subject to valid existing rights, proposed actions that can not meet this standard should be postponed, relocated, mitigated, or denied until the planning for the area is completed.

***Implementation Decisions.***  Develop site-specific management actions and constraints.  Evaluate and issue permits for scientific, educational, or recreational activities, and develop project plans for trails, interpretive exhibits, resource rehabilitation, and other site-specific activities.  Protective management provisions must be followed to enhance or protect identified resource values and/or characteristics.

***Notices, Consultations, and Hearings.***  Publish a *Federal Register* notice providing a 60-day comment period on proposed ACEC recommendations and resource use limitations (see 43 CFR 1610.7-2(b)).

## IV.  Support

The planning regulations at 43 CFR 1601.0-5(k)(6) provide that land use plans may identify support needs.  These are based on individual planning situations.

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## A. Cadastral

***Land Use Plan Decisions.*** Identify planning boundaries so the geographic extent of land use decisions is clearly understood. The plan may identify areas where additional cadastral survey work is needed to locate and mark boundaries on the ground, including those areas identified for disposal. The plan may also identify the need to complete more detailed boundary management plans.

***Implementation Decisions.*** If necessary, develop a boundary management plan for locating and marking priority areas. Identify areas needing immediate trespass resolution.

***Notices, Consultations, and Hearings.*** No additional specific requirements.

## B. Interpretation and Environmental Education

***Land Use Plan Decisions.*** Identify management goals and/or objectives for interpretation and environmental education, and describe the significant resources or areas that will be made available for interpretation/environmental education. For units of the NLCS, significant resource or area descriptions should be based on the designation or proclamation language establishing each area.

***Implementation Decisions.*** Determine what management actions are necessary to achieve identified interpretive and environmental education goals and/or objectives. Address the techniques to be used, and the partners and volunteers needed, to implement these management actions. The following factors should be considered for relevant activity-level interpretive and environmental education plans:

1. Key stories unique to the area;
2. primary messages or themes;
3. educational goals which support management objectives;
4. primary recreation opportunities;
5. distinctive recreation setting character;
6. key resource as well as recreation-tourism attractions; and
7. administrative services and controls.

The key interpretive stories and educational themes are best identified by collaborating with: 1) community groups; 2) service providers and other interested partners; and 3) other federal, state, and local government agencies. These key stories and themes are often about unique historical, biological, geological, or other resource and human values found within the planning area. The interpretive and educational themes relate to the primary values of the areas and/or their

BLM MANUAL          Rel. 1-1693
Supersedes Rel. 1-1667      03/11/05

BLM_0126890

Appendix C, page 30

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

associated resources. LUP management goals should be incorporated into primary interpretive messages where appropriate.

***Notices, Consultations, and Hearings.*** No additional specific requirements.

## C. <u>Transportation Facilities</u>

***Land Use Plan Decisions.*** Identify land areas available or suitable for transportation facilities. Identify types of transportation facilities that are appropriate for the planning area. Identify limitations, if any, on the types or locations of facilities for specified areas.

Identify the area(s) having in-place transportation facilities that should be removed. Identify road repair, road rehabilitation, road construction, and maintenance standards appropriate to specific areas. Identify limitations, if any, on road repair, road rehabilitation, road construction, and maintenance actions. Identify limitations, if any, on road density (i.e., miles/section) for specific areas.

Also refer to Appendix C(II)(D), Comprehensive Trails and Travel Management.

***Implementation Decisions.*** Develop a map or other type of specification document that displays and describes the intended use of the individual geographic units within the planning area. In conjunction with the process of identifying a road network (see Appendix C, Section II.D, (Comprehensive Trails and Travel Management)), develop a transportation plan outlining specific road types and designations such as Federal, state, county, and Tribal roads, BLM administered/maintained roads, and BLM public roads. Identify roads in congressionally designated conservation units, Presidential conservation designations, and administrative conservation designations such as back country byways.

***Notices, Consultations, and Hearings.*** No additional specific requirements.

Download 

# Department of the Interior

# Departmental Manual

**Effective Date**: 6/28/00

**Series**: Environmental Quality Programs

**Part 520**: Protection of the Natural Environment

**Chapter 1**: Floodplain Management and Wetlands Protection Procedures

**Originating Office**: Office of Environmental Policy and Compliance

**520 DM 1**

1.1 **Purpose**. This Chapter sets forth the procedures to be followed in implementing Executive Order 11988, Floodplain Management (May 24, 1977) and Executive Order 11990, Protection of Wetlands (May 24, 1977), which are hereinafter referred to as the Orders. Whenever only one Order is referred to it will be identified by its Executive Order number (e.g., EO 11988).

1.2 **Policy**. The Department has a general mandate and broad responsibility for the management of the Nation's natural resources, including its streams, wetlands and floodplains. The Department's policy is to:

A. Exercise leadership and take action to avoid, to the extent possible, the long- and short-term adverse impacts associated with the occupancy and modification of wetlands and floodplains;

B. Avoid the direct or indirect support of wetland or floodplain development whenever there is a practicable alternative;

C. Reduce the risk of flood loss and minimize the impact of floods on human health, safety and welfare;

D. Restore and preserve the natural and beneficial values served by floodplains and wetlands;

E. Develop an integrated process to involve the public in the floodplain management decision making process;

F. Incorporate the Unified National Program for Floodplain Management into relevant Departmental programs.

1.3 **Authority**.

A. EO 11988, which revoked and replaced EO 11296 (August 10, 1966), was issued in furtherance of the National Flood Insurance Act of 1968, as amended, the Flood Disaster Protection Act of 1973, and the National Environmental Policy Act of 1969 (NEPA). Section 2(d) of EO 11988 requires issuance of new or amended agency procedures.

B. EO 11990 was issued in furtherance of the NEPA, and Section 6 of EO 11990 requires issuance of new or amended procedures.

1.4 **References**. The following references are made an integral part of this Chapter.

BLM_0126892

A. EO 11988, Floodplain Management;

B. EO 11990, Protection of Wetlands;

C. Unified National Program for Floodplain Management, Water Resources Council (WRC);

D. Floodplain Management Guidelines, WRC, February 10, 1978 (43 FR 6030);

E. EO 11514, as amended, Protection and Enhancement of Environmental Quality;

F. EO 12372, as amended, Intergovernmental Review of Federal Programs.

1.5 **Interrelationships**.

A. General. The Department recognizes that the requirements of the Executive Orders have basic interrelationships with and condition the implementation of existing Federal activities and guidance documents. Therefore, to the extent possible, the Department will integrate floodplain management and wetland protection requirements into its programs and will utilize existing consultation, planning and decision processes.

B. Water Resources Council (WRC) Guidelines. The WRC Guidelines for implementing EO 11988 are the basic guidance for interpreting that Executive Order and conducting the floodplain management planning and decision process. Where it is deemed appropriate for the Department to diverge from the WRC Guidelines, this Chapter will supersede that document. In general, the substantive requirements of EO 11988 as interpreted and explained in the Executive Summary of the WRC Guidelines are adopted by this Department. This Department will adhere to the methods, standards and definitions of terms as set forth in the WRC Guidelines for determining risks and hazards of flood loss; minimization of impact on health, safety and welfare; and evaluation of alternatives.

C. Protection of Wetlands. EO 11990 requires Federal agencies to avoid destruction or modification of wetlands whenever there is a practicable alternative. Since almost all wetlands are found in floodplains, the Department will, in general, conduct its activities regarding wetlands in accordance with this Chapter.

D. NEPA Compliance. For actions located in floodplains and wetlands, the requirements of the Executive Orders supplement those of NEPA. Since most Federal actions in floodplains and wetlands will impact these resources, an environmental document (environmental statement or assessment) will probably be required to comply with NEPA. For ease and economy of documentation, the Executive Orders' requirements will be included in the NEPA compliance documents for each such action.

E. Interagency Review. Because of its broad responsibility for the protection, maintenance and enhancement of the Nation's natural resources, the Department maintains an effective review function which monitors other agency activities in floodplains and wetlands. Under the auspices of various laws, regulations and interagency agreements, the Department suggests methods of study and solutions for many problems which impact floodplain and wetland resources.

1.6 **Responsibilities**.

A. Assistant Secretary-Policy, Management and Budget (PMB). The Assistant Secretary--PMB will:

(1) Have overall responsibility for ensuring that the Secretary's responsibilities under the Executive Orders are carried out. In performing this duty, the Assistant Secretary--PMB will prepare program directives and other necessary guidance as required.

BLM_0126893

(2) Approve bureau and office procedures for complying with the Executive Orders.

(3) In consultation with Program Assistant Secretaries, prepare any required reports to the Water Resources Council and/or the Council on Environmental Quality.

(4) Mediate conflicting interests between two or more Assistant Secretaries, and either resolve differences between the parties, or refer the conflicting views to the Secretary with a recommended course of action.

B. <u>Program Assistant Secretaries</u>. The Program Assistant Secretaries will:

(1) Maintain general supervision of bureaus and offices under their jurisdiction in order to ensure compliance with the Executive Orders and this Chapter.

(2) Review and concur with the floodplain and wetland procedures of their bureaus and offices prior to forwarding them to the Assistant Secretary--PMB for approval.

(3) Be responsible for resolving any conflicts among the bureaus and offices under their individual jurisdiction.

C. <u>Heads of Bureaus and Offices</u>. The heads of bureaus and offices will:

(1) Review their programs for compliance with the Executive Orders and, at a minimum, apply the Executive Orders to the following types of activities:

(a) Planning and designing new Federal facilities;

(b) Modifying existing Federal facilities or constructing new ones;

(c) Acquiring, managing and disposing of Federal lands and facilities;

(d) Carrying out and influencing programs involving land use and water planning and development, including regulating and licensing activities;

(e) Administering construction, improvement and land acquisition programs supported or assisted by Federal grants, loans or other forms of financial assistance.

(2) Develop procedures for determining, for the activities listed above and any other covered activities, the degree of risk present, and whether or not an alternative location or other course of action is practicable. If not practicable, the procedures will indicate what steps to take to minimize harm to facilities, to the floodplain and to wetland resources.

(3) Furnish with all requests for new authorizations or appropriations (for proposals to be located in floodplains and wetlands) a statement that the proposal complies with the Executive Orders.

(4) Be responsible for assuring compliance with the public information and other procedural requirements of the Executive Orders.

(5) Inform private parties and State and local governments participating in regulatory, financial and land transactions of the hazards and impacts of locating structures in floodplains and wetlands. Appropriate information should include the levels of expected flooding, location in a riverine or coastal high hazard area, existence of multiple flooding sources or combinations of hazards, and other important information for the safety of potential floodplain occupants and development.

(6) Be the responsible official for all statements of findings (WRC Guidelines, Part II, Step 7).

BLM_0126894

1.7 **Procedures for Bureau and Office Guidance.**

A. <u>General</u>.

(1) Bureaus and offices are required to prepare or update written procedures for complying with the Executive Orders. Initially, bureau and office procedures will be prepared or updated in consultation with the Assistant Secretary--PMB and the appropriate Program Assistant Secretary. Once approved by the Assistant Secretary--PMB, periodic minor revisions can be made without extensive reconsultation. Any major amendments, however, will require concurrence of the appropriate program Assistant Secretary and approval by the Assistant Secretary--PMB.

(2) Secretarial Offices do not have to prepare separate procedures, but will comply with the Executive Orders and these procedures. The Office of Environmental Policy and Compliance is available to provide guidance for any specific compliance activities.

B. <u>Specific</u>.

(l) Procedures will be prepared in accordance with this Chapter, its references and existing policies and will be published in the <u>Federal Register</u>.

(2) Procedures initially prepared in accordance with this Chapter will be circulated for review to the Council on Environmental Quality (CEQ), Water Resources Council (WRC), Federal Emergency Management Agency (FEMA), Environmental Protection Agency (EPA), U.S. Fish and Wildlife Service (FWS) and Corps of Engineers (CE).

(3) Minor procedural amendments to procedures do not require extensive reconsultation; however, substantive amendments will be circulated as required in 520 DM 1.7B(2).

(4) Procedures will be prepared in the most logical format. The following two formats are recommended:

(a) <u>Single Procedure Document</u>. This format would present bureau and office procedures in one document and explain its application to all affected programs.

(b) <u>Dispersed Procedures</u>. This format would present a summary of and reference the various separate procedures of the bureau and office programs. With this approach detailed procedures would be issued separately as additions or revisions to existing program guidance.

(5) Procedures, when published in the <u>Federal Register</u>, will also provide a listing of any handbooks, manuals or other guidelines which will be modified, the schedule for completion of the modification, and how and where copies can be obtained for review.

C. <u>Criteria for Evaluation</u>. The following criteria will be used by the Assistant Secretary--PMB and the Program Assistant Secretaries to evaluate all procedures prepared for compliance with this Chapter. The procedures must provide for:

(l) Leadership with respect to natural and beneficial values of floodplains and wetlands;

(2) Utilization of the principles of the "Unified National Program for Floodplain Management";

(3) A systematic review of existing procedures to involve protection and restoration of values and a sound policy to apply floodplain and wetlands principles in all stages of planning, implementation, monitoring and evaluation of bureau and office activities;

BLM_0126895

(4) Avoidance of long- and short-term adverse impacts associated with the occupancy and modification of floodplains and wetlands;

(5) Avoidance of direct or indirect support of floodplain development whenever there is a practical alternative;

(6) Reduction of flood losses;

(7) Minimization of flood impacts on human health, safety and welfare;

(8) Development of an integrated process to involve the public in the floodplain and wetlands decision making process.

(9) Technical consultation with WRC, CEQ, FEMA, FWS, and CE and other institutions with expertise in the natural and beneficial values of floodplains and wetlands;

(10) Assurance that planning programs and budget requests reflect consideration of natural and beneficial values of floodplains and wetlands;

(11) Documentation of specific analysis of actions and examples of responses to EO 11988 for reporting purposes under that Executive Order.

## 1.8 Procedures for Bureau and Office Activities.

A. General. Procedures to be followed in applying EO 11988 to all activities are set forth in Part II of the WRC Guidelines. The Department has adopted this process and will deviate from it only when Departmental missions and programs will be more adequately served by modified procedures. When the affected floodplain includes wetlands, the application of these procedures will also reflect the wetlands considerations and will demonstrate how the wetlands will be protected.

B. Procedures. When an action is proposed in wetlands or a floodplain, the following procedural steps (summarized from the WRC Guidelines) will be addressed and integrated into the planning process.

(l) Identification of whether a proposed action is located in the 100-year floodplain (500-year floodplain for "critical actions") and assessment of the type of hazard involved. This requirement is discussed in Step 1 of the WRC Guidelines.

(2) Identification of the overall audience to be reached for public notice and involvement, the vehicles for public participation and the purpose and timing of public notice actions. This requirement is discussed in Step 2 of the WRC Guidelines.

(3) Identification of practicable, alternative sites or actions and how such alternatives will be reviewed and evaluated. This requirement is discussed in Step 3 of the WRC Guidelines.

(4) Identification of direct or indirect impacts associated with the occupancy and modification of the floodplain; direct and indirect support of floodplain development; and how they will be reviewed and evaluated. This requirement is discussed in Step 4 of the WRC Guidelines.

(5) Identification of minimization of harm to lives and property, and to natural and beneficial floodplain values; how this will be achieved; and what restoration and preservation of the natural and beneficial values will be made. These requirements are discussed in Step 5 of the WRC Guidelines.

(6) Re-evaluation of proposed actions to determine if they are still practicable at a floodplain site in light of

BLM_0126896

the exposure to flood risk and ensuing disruption of floodplain values. This requirement is discussed in Step 6 of the WRC Guidelines.

(7) Identification of the contents of the written statement of findings and public explanation, and appropriate integration of this process into existing procedures and documents. This requirement is discussed in Step 7 of the WRC Guidelines.

(8) Assurance that the actions are implemented according to the requirements of EO 11988. This requirement is discussed in Step 8 of the WRC Guidelines.

C. Documentation and Circulation.

(1) Case-by-case documentation is required for all actions covered by the Executive Orders. Project files will be kept current and reflect compliance with the decision making process outlined in the WRC Guidelines.

(2) Circulation of information and data on casework is necessary to satisfy Sections 2(a)(2), (3) and (4) of EO 11988. Section 2(a)(2) is a general notice of actions to be taken. Section 2(a)(3) assures compliance with EO 12372 reporting procedures. Section 2(a)(4) calls for early public review whether or not the action will require preparation of an environmental impact statement.

(3) Steps 2 and 7, Part II of the WRC Guidelines give thorough information for compliance with the public notice requirements of EO 11988. A notice will be published in the Federal Register when the proposed action has national significance or impact. On actions of lesser geographic coverage, the Federal Register may be used, but bureaus and offices will also use other public information methods, such as news releases, newsletters, and public meetings to inform the interested public.

(4) To assure interagency coordination notices, NEPA documents and decision statements on proposals in floodplains and wetlands will be circulated to the following agencies:

(a) Environmental Protection Agency (EPA)

(b) Federal Emergency Management Agency (FEMA)

(c) U.S. Fish and Wildlife Service (FWS)

(d) Geological Survey (WGS)

(e) Bureau of Reclamation (WBR)

(f) Corps of Engineers (CE)

(g) Natural Resources Conservation Service (NRCS)

(h) Applicable State Water Resources Agencies (if not covered by the EO 12372 process)

1.9 **Statement of Findings**. The WRC Guidelines in Part II, Step 7, describe the post-decisional process for the statement of findings and explanation to the public in the event that re-evaluation results in locating the project in the floodplain. All procedures will include the process in its pre-decisional activities including the re-evaluation of alternatives (Step 6). Bureaus and offices should work the key parts of the WRC Guidelines into their NEPA process so that floodplain and wetlands considerations remain pre-decisional. A proposed statement of findings would then be attached to a finding of no significant impact. If the final decision differs significantly from the proposed action, then bureaus and offices are required to issue a separate statement of findings in accordance with Step 7.

BLM_0126897

1.10 **Intra-Departmental Conflict Resolutions**. When two or more bureaus and offices of the Department hold conflicting views on a particular project, the following steps will be taken to achieve a satisfactory solution:

A. A meeting will be held between field-level officials of the bureaus and offices involved to resolve the matter or to clarify their differences.

B. If there is no resolution, a meeting will be held with the Regional Environmental Officer (REO) of the Office of Environmental Policy and Compliance and regional officials of the involved bureaus and offices to find a solution or refer to higher authority.

C. If referred to a higher authority, each involved bureau and office and the REO will prepare and forward to headquarters a complete case report which provides background, analysis, acceptable alternative positions, conclusions and recommendations. Supporting material (maps, associated reports, position papers, etc.) will accompany the case report. If the supporting materials are too voluminous, they should be summarized in the case report and made available to higher authority upon request.

D. If the opposing views are upheld within a program area under one Assistant Secretary, that Assistant Secretary will review the issue, document the findings, and decide the issue.

E. If the opposing views are held between two or more Assistant Secretaries, each Assistant Secretary will review the case report(s) and forward them with their separate findings and recommendations to the Assistant Secretary--PMB.

F. The Assistant Secretary--PMB will decide any disputed issue forwarded, or refer it to the Secretary in those few instances where the Secretary's personal decision may be necessary.

6/28/00 #3308

Replaces 6/11/79 #2180

Click here to download in WordPerfect format

BLM_0126898

TC-1

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibility
.05  References
.06  Policy
.07  File and Records Maintenance
.08  Background
.09  Natural and Beneficial Floodplain Functions

.1  Coordination
   .11  Internal Coordination
      A.  Program Coordination
      B.  Riparian-Wetland Coordinator
      C.  BLM Resource Management Planning
   .12  External Coordination
      A.  Public Participation
      B.  Workshops and Tours
      C.  Demonstration Areas
      D.  Public Consultation
      E.  Working Committee(s)
      F.  National Wetlands Priority Conservation Plans
          (NWPCP's)
      G.  North American Waterfowl Management Plan
   .13  Section 404 Dredge or Fill Permits
      A.  Applications
      B.  Review
   .14  Funding
      A.  Sources
      B.  Range Betterment Funds (8100)
      C.  Private and Other Public Contributions
      D.  Investment Analysis Guidelines
   .15  Progress Reporting and Accountability
      A.  Statewide Riparian-Wetland Management Strategies
      B.  Rangeland Improvement Project System (RIPS)

.2  Inventory, Monitoring, and Evaluation
   .21  General Guidance
   .22  Inventory and Monitoring Relationships
      A.  Purpose
      B.  Scope
      C.  Priorities
   .23  Coordination
      A.  Priorities
      B.  External
   .24  Classifying and Describing Riparian-Wetland Ecosystems
   .25  Standards
      A.  Data Collection
      B.  Data Storage
      C.  Evaluation
.3  Key Riparian-Wetland Management Considerations
   .31  Objectives
   .32  Integrated Watershed Management

BLM_0126899

TC-2

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

.33  Natural Stream Functions
.34  Management vs. Structural Alternatives
.35  Priorities

.4  Program Specific Guidance Relative to Riparian-Wetland
    Management
    .41  Grazing Management
        A.  Riparian Areas
        B.  Wetland Areas
        C.  Terms and Conditions
    .42  Soil and Water Management
        A.  Objectives
        B.  Management Determinations
        C.  Watershed Management Plans (WMP's)
        D.  Chemical Pest Control
    .43  Minerals Management
        A.  Mining Claims
        B.  Reclamation Standards
        C.  Placer Mining
        D.  Coal Development
        E.  Solid Minerals
        F.  Fluid Minerals
    .44  Recreation Management
        A.  Off-Road Vehicle Use
        B.  Visitor Sites
        C.  Visitor Use
        D.  Wilderness Management
    .45  Fish and Wildlife Habitat Management
        A.  Priority Species
        B.  Seasonal Use Conflicts
        C.  Waterfowl
        D.  Habitat Management Plans
    .46  Construction Management
    .47  Lands and Realty
        A.  Public Interest
        B.  Restrictions
        C.  Authorizations
        D.  Acquisitions
    .48  Forest Management
        A.  Management Direction
        B.  Free-Use Disposal
        C.  Contracts
        D.  Buffer Zone
    .49  Fire Management
        A.  Retardant Application
        B.  Fireline Construction
        C.  Prescriptions
        D.  Emergency Fire Rehabilitation

Glossary of Terms

Bibliography

Appendix
    1.  Annotated Authorities

BLM_0126900

.01

## 1737 - RIPARIAN-WETLAND AREA MANAGEMENT

.01  Purpose.  This Manual Section describes the policies, responsibilities, and guidance for the identification, protection, restoration, and maintenance, of fresh, brackish, and saline water wetland areas.  It applies to all Bureau of Land Management (BLM) programs and actions.  Wetlands include both natural and intentionally created areas adjacent to, and influenced by, streams (whether waters are surface, subsurface, or intermittent), springs, lake shores, marshes, potholes, swamps, muskegs, lake bogs, wet meadows, and estuarine areas.  Riparian areas  are a form of wetland transitional between permanently saturated wetlands and upland areas.  The Riparian-Wetland Initiative for the 1990's provides a strategic plan for management and restoration of BLM riparian wetland areas.

.02  Objectives.  The goal of riparian-wetland area management is to maintain, restore, improve, protect, and expand these areas so they are in proper functioning condition for their productivity, biological diversity,and sustainability.  The overall objective is to achieve an advanced ecological status, except where resource management objectives, including proper functioning condition would require an earlier successional stage. The goal is also to ensure agressive riparian-wetland information, training and research programs as well as improve partnerships and cooperative management processes.

.03  Authority.

   A.  Major Legislation (see Appendix 1 for other laws, Executive Orders, and regulations related to riparian-wetland area management).

      1.  Taylor Grazing Act of 1934, as amended, 49 U.S.C. 315; 48 Stat. 1269 (1970).

         a.  Directs the Secretary to stop injury to the public lands by preventing overgrazing and soil deterioration, and to provide for their orderly use, improvement, and development.

         b.  Requires that the Secretary provide for the protection, administration, regulation, and improvement of grazing districts created in accordance with the act.

         c.  Requires the Secretary to ensure the objectives of such grazing districts, namely, to regulate their occupancy and use, to protect the land and its resources from destruction or unnecessary injury, and to provide for the orderly use, improvement, and development of the range.

         d.  Authorizes the Secretary to continue the study of erosion and flood control and to perform such work as may be necessary to amply protect and rehabilitate such areas.

      2.  Oregon and California Act, P.L.  75-405, August 28, 1937.

         a.  States that "portions of the revested Oregon and California Railroad and reconveyed Coos Bay Wagon road grant lands as are or may hereafter come under the jurisdiction of the Department of the Interior . . . shall be managed. . . for permanent forest production . . . in conformity with the principles of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating streamflow, . . . and providing recreational facilities . . . ."

BLM_0126901

.03A3

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

3.   National Environmental Policy Act of 1969 (42 U.S.C. 4321-47; 83 Stat. 852; P.L. 91-190).

a.   Encourages productive and harmonious relationships between man and his environment and an enriched understanding of ecological systems and natural processes important to the Nation.

b.   Requires preparation of detailed statements on environmental impacts of proposed major Federal actions that significantly impact the quality of the human environment.

c.   Directs Federal agencies to initiate and use ecological information in the planning and development of resources-oriented projects.

4.   Federal Land Policy and Management Act (FLPMA) of 1976 (43 U.S.C. 1701 et seq.; 90 Stat. 2743; P.L. 94-579).

a.   Requires the development and maintenance of land use plans based on an inventory of all public lands and their resources.

b.   Identifies fish and wildlife development and utilization, domestic livestock grazing, mineral exploration and production, rights-of-way, outdoor recreation, and timber production as principal or major land uses.

c.   Requires that part of grazing fees be spent for "range betterment," including aquatic and terrestrial wildlife habitat enhancement, protection, and maintenance; watershed protection; and livestock production where livestock use occurs.

d.   Requires that "the public lands be managed in a manner that will protect the quality of . . . ecological, environmental . . . water resource, and . . . that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and  habitat for fish and wildlife and domestic animals . . . ."

e.   Authorizes the designation of areas of critical environmental concern to protect and prevent irreparable damage to fish and wildlife, and other resources.

f.   Authorizes investigations, studies, and experiments involving the improvement, management, use, and protection of the public lands and their resources.

g.   Requires the compliance with State and Federal water pollution standards.

5.   Public Rangelands Improvement Act of 1978 (49 U.S.C. 1901 et seq.)

a.   Directs improvement of rangeland conditions in accordance with land use planning under FLPMA.

b.   Directs development and maintenance of an inventory of range conditions and trends as part of FLPMA's inventory process.

c.   Provides funding for rangeland improvements which includes stabilizing soil and water conditions and providing habitat for livestock and wildlife.

BLM_0126902

.03A6

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

6. Water Quality Act of 1987, as amended from the Federal Water Pollution Control Act (Clean Water Act) of 1977 (33 U.S.C. 1251 et seq.; 91 Stat. 1566-1611; P. L. 95-217).

a. The objective of this act is to restore and maintain ". . . the chemical, physical, and biological integrity of the Nation's water . . ." at a level of quality which provides protection for fish, shellfish, wildlife, and recreational use.

b. Requires permits for certain activities in navigable waters.

c. Requires States to assess their rivers, streams, and lakes and to develop nonpoint source management programs to control and reduce specific nonpoint sources of pollution. Requires Federal agency consistency with state management programs.

d. Authorizes funds to help States and local entities to manage into sources of pollution.

7. Emergency Wetlands Resource Act of 1986 (16 U.S.C. 3901).

a. This act promotes the conservation of wetlands in the United States by intensifying cooperative efforts between public and private sectors to protect the wetlands resources of the Nation through land acquisition, easements, and other methods.

8. Agricultural Credit Act of 1987 (7 U.S.C. 1989).

a. This act authorizes the Farmers Home Administration (FmHA) to take several actions to aid farmers and ranchers who are in danger of defaulting on FmHA loans.

b. One option is that FmHA may transfer a conservation/ recreation easement (at no cost) to another agency, including BLM. FmHA can also grant access and conservation easements across properties which have been foreclosed.

9. Land and Water Conservation Fund Act of 1964 (16 U.S.C. 460).

a. Enacted for the purpose of "preserving, developing and assuring accessibility to all citizens . . . of outdoor recreation resources."

b. Generates money from a wide variety of sources and applies it to a broad spectrum of Federal and State recreation programs, including land acquisitions.

BLM_0126903

.03B

                    1737 - RIPARIAN-WETLAND AREA MANAGEMENT


     B.  Executive Orders (EO).

     1.  EO 11988 of 1977 (Floodplain Management as amended by Executive
Order 12148).  Each Federal agency is to take action to avoid, to the extent
possible, the long- and short-term adverse impacts associated with the
occupancy and modification of floodplains.  Agencies are further required to
avoid direct or indirect support of floodplain development whenever there is
a practicable alternative.  Each agency shall provide leadership and shall
take action to restore and preserve the natural and beneficial values served
by floodplains in carrying out its responsibilities for acquiring, managing,
and disposing of Federal lands and facilities.

     2.  Executive Order 11990, May 24, 1977 (Protection of Wetlands).  This
EO directs Federal agencies to take action to minimize the destruction,
loss, or degradation of wetlands and to preserve and enhance the natural and
beneficial value of wetlands in carrying out programs affecting land use.
All federally initiated, financed, or permitted construction projects in
wetlands must include all practical measures to minimize adverse impacts.
This requires that all leases, rights-of-ways, easements, and disposals
involving Federal wetlands must contain restrictions to uses by the grantee
which are consistent with Federal, State, and local wetland regulations.

.04  Responsibility.  Responsibilities described below are commensurate with
those identified in approved functional statements (see BLM Manual Sections
1211, 1212, and 1216).

     A.  The Director and the Deputy Directors are responsible for all aspects
of riparian-wetland area protection, management, and improvement on public
lands administered by the BLM.

     B.  Assistant Director, Land and Renewable Resources is responsible for the
development, implementation, coordination, and integration of riparian-
wetland area policies, procedures, and technical guidance.  This Assistant
Director provides policy and program interpretations, direction, leadership,
and line management to assure consistency of field implementation of
policies and procedures to enhance, protect, maintain, or develop riparian-
wetland resources on public lands administered by the BLM and ensures that
these procedures are incorporated into all BLM programs.  The Assistant
Director is also responsible for:

     1.  Evaluating the effectiveness of riparian-wetland habitat protection
and management procedures and programs.

     2.  Developing guidance for the preparation of activity plans with
riparian-wetland management objectives to protect, maintain, and restore these
areas to the desired condition.

     3.  Systematically reviewing rules, regulations, procedures, and
proposed legislation to establish and update the BLM's efforts to protect and
manage riparian-wetland resources on public lands administered by the BLM.

BLM_0126904

.04C

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

C.  Chief, Division of Rangeland Resources and Branch Chief, Soil, and Air are responsible for interprogram coordination on policy, quality control, and riparian-wetland evaluations and reviews.

D.  Assistant Director, Energy and Mineral Resources; Assistant Director, Support Services; Chief, Division of Wildlife and Fisheries; Chief, Division of Forestry; Chief, Division of Lands and Realty, Chief, Division of Recreation, Cultural, and Wilderness Resources; Chief, Division of Rangeland Resources; and Chief, Division of Planning and Environmental Coordination are all responsible for ensuring the incorporation of riparian-wetland protection and improvement policies and procedures into their program areas.

E.  The Service Center Director is responsible for providing technical support for development and coordination of riparian-wetland inventory, classification, management techniques, and monitoring as well as other appropriate technical expertise, assistance, and/or support within the purview of Service Center operations and responsibilities.

F.  State Directors are responsible for formulating policy (within limits delegated by the Director) and for developing, directing, coordinating, and implementing a Statewide riparian area management strategy.  They must ensure compliance with official procedures and provide technical assistance and guidance needed to implement inventory, classification, management, and monitoring procedures.

G.  District Managers are responsible for formulating policy (within limits delegated by State Directors) and for developing, directing, and coordinating Districtwide riparian-wetland area management by implementing BLM and State policies, programs, and procedures.

H.  Resource Area Managers are responsible for implementing District, State, and BLM riparian-wetland area management policies within their designated areas of jurisdiction.

.05 References.

A.  Departmental Manual 520 - Floodplain and Wetlands Protection Procedure.

B.  BLM Manuals and Handbooks.

    1.  Manual Section 1613 (Areas of Critical Environmental Concern).

    2.  Manual Sections 1620-1625 (Supplemental Program Guidance).

    3.  Manual Section 1702 (Research Management and Liaison).

    4.  Manual Section 1734 (Inventory and Monitoring Coordination).

    5.  Manual Section 1740 (Renewable Resource Improvements and Treatments).

    6.  Manual Section 4100 (Grazing Administration - Exclusive of Alaska).

BLM_0126905

.05B7

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

    7.  Manual Section 6720 (Aquatic Resource Management).

    8.  Manual Section 6840 (Special Status Species Management).

    9.  Manual Section 7200 (Water Resources).

    10.  Manual Section 7221 (Floodplain Management).

    11.  Handbook H-4120-1 (Grazing Management).

    12.  Handbook H-4410-1 (National Range Handbook).

    13.  Manual Section 8550 (Interim Management Policy and Guidelines for Lands Under Wilderness Review).

    14.  Manual Section 8560 (Management of Designated Wilderness Areas).

    15.  Manual Section 8561 (Wilderness Management Plans).

    16.  Handbook H-8550-1 (Interim Management Policy and Guidelines for Lands Under Wilderness Review).

    17.  Handbook H-8560-1 Management of Designated Wilderness Areas).

  C.  Master Memorandum of Understanding with the U.S. Fish and Wildlife Service, dated December 1986.

  D.  Technical References on Riparian Area Management.

    1.  <u>Trend Studies</u>.  Technical Reference 4400-4, 1984.

    2.  <u>A Selected, Annotated Bibliography of Riparian Area Management</u>. Technical Reference 1737-1, 1987.

    3.  <u>The Use of Aerial Photography to Inventory and Monitor Riparian Areas.</u>  Technical Reference 1737-2, Aug. 1987.

    4.  <u>Inventory and Monitoring Riparian Areas</u>.  Technical Reference 1737-3, 1989.

    5.  <u>Grazing Management in Riparian Areas</u>.  Technical Reference 1737-4, 1989.

    6.  <u>Riparian and Wetland Classification Review</u>.  Technical Reference 1737-5, 1990.

    7.  <u>Management Techniques in Riparian Areas.</u>  Technical Reference 1737-6, 1992.

    8.  <u>Procedures for Ecological Site Inventory With Special Reference to Riparian-Wetland Sites</u>.  Technical Reference 1737-7, 1992.  Interior, Fish and Wildlife Service.

BLM_0126906

.05E

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

E.  Concepts in Stream Riparian Rehabilitation, 1986.  BLM, by Van Haveren and Jackson.

F.  North American Waterfowl Management Plan, 1986.  U.S. Department of

G.  Riparian Areas: Perspectives in Management.  Rangelands 9(6), December 1987.  By Elmore, and Beschta.

H.  Federal Manual for Identifying and Delineating Jurisdictional Wetlands, an Interagency Cooperative Publication, 1989.  Fish and Wildlife      Service, Environmental Protection Agency, Department of the Army, and Soil Conservation Service.

.06  Policy.

A.  Departmental Policy.  The Department of the Interior has a mandate for the management of the Nation's natural resources, including riparian-wetland areas.  The Department's policy is to:

1.  Exercise leadership and take action to avoid, to the extent possible, the long- and short-term adverse impacts associated with the occupancy and modification of wetlands and floodplains.

2.  Avoid the direct or indirect support of wetland or floodplain projects whenever there is a practical alternative.

B.  BLM's Policy.  In accordance with laws, EO's, and Departmental policy to maintain, restore, or improve riparian-wetland ecosystems to achieve a healthy and proper functioning condition that assures biological diversity, productivity, and sustainability, it is the BLM's policy to:

1.  Use an interdisciplinary team to conduct and maintain an inventory of all riparian-wetland areas, quantifying physical, biological, chemical condition and potential.

2.  Focus management on entire watersheds using an ecosystem approach and involving all interested landowners and affected parties whenever possible.

3.  Achieve riparian-wetland area improvement and maintenance objectives through the management of existing and future uses wherever feasible.

4.  Ensure that new resource management plans (RMP's) and activity plans, and existing plans when revised, recognize the importance of riparian-wetland values, and initiate management to maintain, restore, improve or expand them.

5.  Prescribe management for riparian-wetland values that is based upon site-specific characteristics and settings.

6.  Use an interdisciplinary team approach to monitor and evaluate management activities in riparian-wetland areas and revise management practices where objectives are not being met.

BLM_0126907

.06B7

### 1737 – RIPARIAN-WETLAND AREA MANAGEMENT

7.  Ensure public involvement in the planning and management of riparian-wetland ecosystems.  This includes Federal, State, local governments, and industry organizations sharing information, implementing management actions, coordinating activities, and providing education on the value, productivity, and management of riparian-wetland areas.

8.  Retain riparian-wetland areas in public ownership unless disposal would be in the public interest, and acquire riparian-wetlands as determined in the land use planning system.

9.  Identify, encourage, and support research and studies needed to ensure that riparian-wetland area management objectives can be properly defined and met.  Incorporate research findings into the planning and management of riparian-wetland ecosystems.

.07  <u>File and Records Maintenance</u>.  Record files for Riparian-Wetland Area Management should be established and maintained in accordance with BLM Manual Section 1272 and disposed of according to the BLM Records Schedule. Guidance on the organization and contents of riparian-wetland project files is contained in BLM Handbook H-1740-1.  See Sections .14 and .25 for documentation requirements.  Copies of records retention schedules and information pertaining to specific riparian-wetland area management may be obtained from the local records managers.  All records are for permanent retention, usually on paper or machine readable, and not of propriety or sensitive in character.

.08  <u>Background</u>.  Riparian-wetland areas are unique and among the most productive and important ecosystems, comprising approximately 1 percent of the Public lands in the contiguous United States and 24 percent in Alaska. Characteristically, these areas display a greater diversity of plant, fish, wildlife, and other animal life and vegetation structure than adjoining ecosystems.  Healthy riparian-wetland systems filter and purify water as it moves through the riparian zone, reduce sediment loads, enhance soil stability, provide micro-climate moderation when contrasted to extremes in adjacent areas, and contribute to ground water recharge and base flow.

.09  <u>Natural and Beneficial Floodplain Functions</u>.  Many of the natural and beneficial functions of a floodplain are directly related to riparian-wet-land vegetation.  Such functions include:

A.  Dissipating stream energies associated with high flows; thereby reducing erosion and improving water quality.

B.  Filtering sediment and other pollutants carried with overland flow and aiding alluvial valley floor and floodplain development.

C.  Improvement of floodplain storage potential, which can result in making water available for gradual release throughout the year.

D.  Development of root masses that stabilize stream banks against cutting action.

E.  Regulation of sunlight incident on the stream surface.  Adequate vegetative cover to shade the water is required to keep water temperatures low enough for survival and production of fish and aquatic life.

F.  Reduction of heat loss and icing during the colder winter months.

BLM_0126908

Case No. 1:20-cv-02484-MSK   Document 65-3   filed 04/29/21   USDC Colorado   pg 81 of 115

.09G

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

G.  Production of a food source for aquatic organisms and wildlife.

H.  Production of cover for fish and aquatic wildlife shelter or protection.

I.  Production of a food supply and habitat for terrestrial animals.

J.  Development of diverse stream morphology to provide habitat for aquatic organisms.

K.  Provision of critical wintering habitat for wildlife.

BLM_0126909

.1

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

.1  Coordination.

.11  Internal Coordination.

A.  Program Coordination.  Riparian-wetland area values and functions influence virtually every BLM program with either compatible or conflicting interests.  An interdisciplinary approach is, therefore, a necessity to achieve riparian-wetland management objectives.  Coordination between programs is required not only to analyze land use actions and allocations, but for other activities including inventory, monitoring, budget preparation, etc.

B.  Riparian-Wetland Coordinator.  Each BLM State, District, and Resource Area Office should designate a person responsible for riparian-wetland coordination.  This person shall coordinate riparian-wetland related actions and activities with all BLM programs that may be affected.

C.  BLM Resource Management Planning.  Impacts of various land uses and management proposals on riparian-wetland areas are initially considered in the resource management plan.  Management actions stemming from decisions developed in RMP's are translated, where necessary, into specific actions through more detailed, site specific planning and environmental analysis process.

1.  Managers are to ensure that riparian-wetland determinations, including management objectives, are made in accordance with the Supplemental Program Guidance (SPG) for resource management planning, Manual Sections 1622.1 and 1624.  Programs with SPG relating to riparian-wetland management include livestock grazing management; recreation management; wildlife habitat management; soil, water, and air management; forest management; and energy/mineral resources.

2.  Establish riparian-wetland management objectives using an interdisciplinary approach and incorporate these as appropriate in site-specific activity plans:  wildlife and fish habitat management plans (HMP's), allotment management plans, timber management plans, watershed management plans, coordinated activity plans, wild horse management plans, oil and gas development plans, mine operation plans, etc.

3.  Important riparian-wetland areas should be considered for designation as areas of critical environmental concern (ACEC) through the RMP when they meet the criteria of revelance and importance, as defined in 43 CFR 1610.7-2.

4.  The authorized officer shall incorporate the necessary stipulations in land use authorizations and contracts to ensure that riparian-wetland objectives in land use and activity plans are met.

5.  All actions and mitigating measures shall be monitored using an iterative process and records of results shall be maintained.

6.  Monitoring results should be evaluated by interdisciplinary teams to ensure that management prescriptions are achieving their intended purpose.  If they are not, management prescriptions, associated enforcement and treatments must be changed to ensure that riparian-wetland objectives are being met.

BLM_0126910

.12

### 1737 – RIPARIAN-WETLAND AREA MANAGEMENT

.12  Underlined: External Coordination.

A.  Public Participation.  The public participation required in 43 CFR 1610.2 must be followed in developing RMP alternatives and decisions related to riparian-wetlands area management.

B.  Workshops and Tours.  BLM sponsored workshops and tours should be conducted to increase and maintain riparian and wetland consciousness among BLM resource specialists and managers and the public.

C.  Demonstration Areas.  To assist in this education process, each District Office should develop and maintain at least one riparian showcase area to demonstrate that through proper management, conservation practices, and/or restoration project work, riparian-wetland areas are producing a variety of benefits.

D.  Public Consultation.  BLM should consult with the public, private organizations, other State and Federal agencies, and scientists from colleges and universities to exchange knowledge, experience, and technology in the maintenance, restoration, and improvement of riparian-wetland areas. Included is an awareness and compliance with State and local regulations and permits for work undertaken in streams.

E.  Working Committee(s).  The understanding and involvement of all interested parties generates commitment and accountability and are essential to successful riparian-wetland management.  To foster public involvement in implementing management goals and objectives, State Directors are encouraged to establish and/or participate in a working committee(s) to address riparian-wetland issues, consider options, and make recommendations for management on a general and site specific basis.

F.  National Wetlands Priority Conservation Plans (NWPCP's). Coordination with U.S. Fish and Wildlife Service is encouraged for the development of NWPCP's for identifying riparian-wetlands warranting priority attention for acquisition using Land and Water Conservation Funds appropriations.  In addition, the NWPCP should be used to identify priority riparian-wetlands warranting protection through measures not requiring land acquisition (see .47D).

G.  North American Waterfowl Management Plan.  This plan, developed jointly by Canada and the U.S., identifies strategies for the maintenance and recovery of populations of North American waterfowl.  The BLM, as a cooperator in implementation, has a key role to play in managing and restoring riparian-wetland habitats to support continental populations of waterfowl. Coordination of BLM riparian-wetland actions and programs with plan cooperators is essential particularly in Joint Venture areas and within Areas of Major Concern identified in the plan.  The BLM's role in implementation is outlined in "Waterfowl Habitat Management on Public Lands a Strategy for the Future", and State Fish and Wildlife 2000 Plans.

Rel. 1-1611
                                                           12/10/92

.13

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

.13  Section 404 Dredge and Fill Permits.

A.  Applications.  All activities affecting riparian-wetland area  which
result in the discharge of dredge or fill material requires a permit from the
Army Corps of Engineers (see Section 404 (f)(2), Water Quality Act of 1987).
Certain types of activities may be conducted under a general permit, and
therefore do not require an individual permit application.  Title 33 CFR 320
through 330 provides the regulations for applying for a 404 permit.  The
office shall apply to the Corps of Engineers on all proposed Bureau dredge or
fill activities.  For all land use applications, the applicant shall acquire a
404 permit prior to the initiation of dredge and fill activities in
riparian-wetland areas.  BLM shall work with other Federal agencies for the
identification of jurisdictional wetlands subject to Section 404 of the Clean
Water Act permitting process.  Refer to the "Federal Manual for Identifying
and Delineating Jurisdictional Wetlands, an Interagency Cooperative
Publication", Fish and Wildlife Service, Environmental Protection Agency,
Department of the Army, and Soil Conservation Service, 1989 for additional
guidance.

B.  Review.  Departmental Manual Section 503 requires that all  agencies
review 404 Permit applications for activities affecting lands under their
management authority.  The agency must assure that such activities are
consistent with agency policy, management practices, and plans.  Review
comments and proposed stipulations shall be provided to the Army Corps of
Engineers through the U.S. Fish and Wildlife Service.

.14  Funding.

A.  Sources.  Riparian-wetland management and protection benefits a
variety of BLM resources and programs.  Riparian-wetland related activities,
including planning, inventory, monitoring, project development and
maintenance are to be funded according to the Financial Management System
and based on the benefitting activity concept (see Handbook H-1684-1).  The
special interest project code "RPRN" must be used on all financial documents
to establish a baseline for tracking accomplishments and expenditures by the
benefitting subactivity code.                         .

B.  Range Betterment Funds (8100).  Use of 8100 funds for riparian-
wetland related projects is allowable and appropriate.  General guidelines
for expending these funds are described in Handbook H-1740-1.

C.  Private and Other Public Contributions.  Joint ventures with private
and governmental organizations should be considered as an approach to
financing high-priority management projects.  The use of Challenge Cost
Share funding for riparian-wetland workloads provides an excellent
opportunity to extend existing funding capability, encourage cooperative
partnerships and increase public awareness.

D.  Investment Analysis Guidelines.  (See Manual Section 1740 and
Handbook H-1740-1.)

BLM_0126912

.15

1737 – RIPARIAN–WETLAND AREA MANAGEMENT

.15  Progress Reporting and Accountability.

A.  Statewide Riparian–Wetland Management Strategies.

1.  BLM riparian–wetland management activities receive  considerable attention from Congress and the public.  To be responsive, the BLM will track and report funds allocated and expended as well as units of  accomplishment for work done in these areas.  The BLM intends to direct riparian– wetland management through development and implementation of statewide and district riparian–wetland area management strategies.  At a minimum, these strategies are to outline the effort needed, target dates, and projected costs by subactivity to describe:

a.  The number of miles and acreages of riparian areas in the State.

b.  Riparian goals, objectives and values.

c.  Present and future management efforts.

d.  Benefits of sound riparian practices.

e.  RMP and activity plan updates needed to incorporate riparian objectives.

f.  Coordination of monitoring and evaluation schedules in  all activities.

g.  Training needs and curriculum.

h.  Ways to improve management understanding and commitment.

i.  Relationship between allotment categorization and important riparian values.

j.  Implementation of a Riparian Outreach Plan which brings partners into the effort.

2.  Statewide strategies will allow quick and thorough response to public and congressional inquiries on riparian–wetland related activities and accomplishments.  Strategies will provide a means to ensure consistency between Districts and States.  The goals, timeframes, management actions, and priorities established in these strategies are to be used in allocating available funds and staffing at the State and national level.

B.  Rangeland Improvement Project System (RIPS). All improvement and treatment projects which primarily benefit riparian–wetland areas must be identified in the RIPS.  The RIPS provides a useful means of tracking work performed in riparian–wetland areas and accounting for funds spent on projects that benefit riparian areas.  It allows for identification of all contributors to such a project.  End–of–year funding summaries can be obtained quickly by requesting data relative to riparian codes.

BLM_0126913

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

.2  Inventory, Monitoring, and Evaluation.

.21  General Guidance.  Manual Section 1734 provides general guidance for a
coordinated approach among programs for inventory, monitoring, and
evaluation of BLM activities.  Also refer to "Inventory and Monitoring of
Wildlife Habitat", Cooperrider, Boyd, and Stuart, 1986.  Policy and guidance
in 1734 are especially relevant to the BLM's interdisciplinary approach to
riparian-wetland management.  In particular, it is BLM's policy to
"coordinate all phases of resource inventory, monitoring, and evaluation
among Bureau programs to avoid duplication of effort and provide a process
for jointly coordinating the collection, interpretation, and evaluation of
data necessary to fulfill management requirements, and document progress in
resolving resource conflicts and meeting resource objectives" (see Manual
Section 1734.06C).

.22  Inventory and Monitoring Relationships.

A.  Purpose.  The primary purpose of inventory is to gather  information
on the distribution, characteristics, condition, trend, potential, and
utilization of riparian-wetland resources.  Inventories are usually conducted
prior to preparation of an environmental impact statement, environmental
assessments, RMP's, activity plans, and certain land use authorizations.

B.  Scope.  The scope of an inventory will depend on the level of
planning and the issues.  An RMP will generally require broad inventory
while activity plans require site specific inventories.  At all levels,
existing data must be reviewed and the inventory designed to fill data gaps
and update existing information using an interdisciplinary approach.  Once
baseline data have been collected and used in decisionmaking,  inter-
disciplinary monitoring is conducted to determine the effects of these
decisions and to assist in determining the extent to which riparian-wetland
management objectives are being met and effective and appropriate practices
are being used.  Monitoring results may be used to identify needed changes
in management.

C.  Priorities.  Inventory and monitoring priorities are based on  legal
mandates, BLM priorities, annual work plan directives, and priorities in land
use and activity plans.

.23  Coordination.

A.  Priorities.  Priorities shall be set to organize and implement
effective monitoring programs, and to establish priorities among affected
programs for riparian-wetland resource monitoring.  This should be done at
the Resource Area level through development of interdisciplinary monitoring
plans which include standards and procedures, responsibilities, and
schedules.

B.  External.  Riparian-wetland resource inventories and monitoring
programs within BLM shall be coordinated, with State agencies, other Federal
agencies, Indian tribes, and private individuals and groups to increase
effectiveness, reduce costs, and avoid duplication of effort.

.24

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

.24  Classifying and Describing Riparian-Wetland Ecosystem.  To be most useful to resource managers, classification of riparian sites must include identification and description of existing resource condition as well as potential for improvement through various types of management.  Classification provides a systemmatic basis for extrapolating management applications over similar sites.  Technical guidance on various riparian-wetland classification and description procedures is provided in Technical Reference 1737-5.  The BLM has developed an approach to describing riparian area stream sites using the ecological site criteria.  This approach has been incorporated into the Standard Site Description Format and inventory procedures outlined in Handbook H-4410-1.

.25  Standards.

A.  Data Collection.  Flexibility to use various methods is allowed to meet inventory and monitoring needs in a wide variety of habitats and management situations.  However, within regions possessing similar habitats and species, managers should strive to use as many standard methods as possible to ensure long-term data consistency.  See .05 for guidance on acceptable methods for the inventory and monitoring of riparian-wetland resources.

B.  Data Storage.

1.  Data generated from inventory and monitoring must be documented and stored in permanent files that can be easily accessed. Computer files may be developed at the local level, but inventory data should be entered using the Data Elements from the Data Element Dictionary into Riparian Aquatic Information Data System (Handbook H-6601-1) or SITEFORM Microcomputer program, the BLM systems for storing riparian and ecological site data.  Major inventories must be automated using automated techniques best suited for individual situations.

2.  Written files are usually stored at the District or Resource Area.  Ensure that riparian-wetland files are cross-referenced to other pertinent program files.  All inventory and monitoring data shall be summarized and interpreted in a report that is part of the activity plan file.

C.  Evaluation.  Conduct periodic evaluations of inventory and monitoring activities to ensure conformance with policy, standards, and procedures.  Establish interdisciplinary teams to review monitoring data and identify the need for changes in management direction.  This will ensure that appropriate skills are represented to adequately analyze and review monitoring data.

BLM_0126915

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

.3  Key Riparian-Wetland Management Considerations.

.31  Objectives.  Achievable management objectives are one of the fundamental keys to successful riparian-wetland management. Riparian-wetland management objectives developed through the planning process using an interdisciplinary approach must be achievable, specific, and measurable whenever possible.  Riparian sites vary in physical, chemical, and biological characteristics, resource conditions, and local use impacts.  Therefore, the objectives and management designed for an area shall be tailored to the conditions, conflicts, capability and improvement potential, and land use considerations on a site-specific basis.

.32  Integrated Watershed Management.  Management of riparian-wetland areas should be integrated whenever possible with that of the uplands through a holistic watershed approach.  Restoration and enhancement of riparian areas should be approached through management of the entire watershed rather than just focusing on a narrow riparian zone.

.33  Natural Stream Functions.  Management actions should permit the natural functions of streams, including flood energy dissipation, bank building, stream channel maintenance, filtration of sediment and other contaminants, water-storage, and aquifer recharge to operate without significant alteration.  To accomplish these actions or functions, it is necessary to evaluate the interrelationships between riparian systems and the hydrologic and geomorphic processes.  Refer to "Riparian Areas:  Perspectives in Management," Elmore and Beschta, 1987 and "Concepts in Stream Riparian Rehabilitation," Van Haveren and Jackson, 1986 for additional guidance.

.34  Management vs. Structural Alternatives.  Prior to initiating restoration measures, a determination must be made of riparian-wetland site potential and the primary causes of a degraded ecological condition.  The natural recovery processes operating in an area should be evaluated prior to considering structural measures.  While stream systems and wetland basins are undergoing major geomorphic or hydrological adjustments, structural measures should not be initiated.  Consider implementing structural measures only if (1) proper management prescriptions will not achieve management objectives within the desired timeframe, (2) costs incurred to achieve accelerated rehabilitation are justified by the benefits to be achieved, and (3) natural recovery has not progressed to a point that will stabilize stream banks and/or wetlands basins.

.35  Priorities.  In setting priorities on riparian-wetland areas, consider the extent to which the wetland may deteriorate if restoration or improvement action is not immediately implemented.  Riparian-wetland areas that may suffer further degradation and have potential for improvement should be given top priority.  Those that have been degraded but appear stable may be given lower priority for restoration and improvement.  Other factors, such as special status species, water quality, competing water uses, fisheries, and recreation values should also be considered when establishing priorities.

BLM_0126916

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

.4  Program Specific Guidance Relative to Riparian-Wetland Management.

  .41  Grazing Management.

    A.  Riparian Areas.

        1.  The RMP's shall include general management objectives for use of vegetative resources by livestock and wild horses and burros and other grazing animals considering vegetation requirements for stream functions, watershed protection, riparian dependent wildlife, and other uses. Management objectives shall be expressed in terms of the landscape description or the desired plant community (DPC) where site-specific data are available and the amount of vegetation required on the banks and overflow zones at the close of the grazing period to permit the natural stream functions to operate.  When acceptable data are not available to allow description of the DPC in the RMP, data shall be acquired to provide for its development at the activity planning stage.

        2.  The livestock operator is critical to the success of any grazing management program.  Many who experience the results of good riparian management become the best salespersons for proper management of these areas. BLM resource specialists shall consult with livestock operators and other affected interests to identify site-specific objectives and to design grazing prescriptions that will help achieve these objectives.  The entire watershed, including the uplands, shall be considered when designing grazing management for riparian areas.  Successes have been documented in several States where compliance with grazing prescriptions and practices have achieved riparian habitat recovery.  Riparian areas shall be considered as key for monitoring studies in allotments.  Technical guidance on grazing management in riparian areas is provided in Technical Reference 1737-4.

        3.  Livestock grazing prescriptions and practices needed to accomplish riparian area management objectives must be identified in allotment management plans.  These should include alternatives to passive continuous (free choice) grazing, as well as changes in season of use and duration of grazing, adjustments in numbers, minimum rest or deferment requirements, utilization guides, salting, and riding or herding practices.  Analysis of grazing management proposals must include the effects of the various practices and intensities of livestock grazing on the other resource values and uses.

        4.  Fencing is one of several tools useful in accomplishing riparian management objectives but is expensive to construct and maintain.  Exclusion fencing should be used only when other options will not meet management objectives in the desired timeframe.  If fencing is chosen as a tool for management, careful consideration shall be given to its design and location. Handbook H-1741-1 provides further guidance on fencing applications and standards.

        5.  Compliance with the management prescription is essential.  Use supervision must be frequent enough to ensure that range improvements are functional, that livestock are in the proper area at the proper time, and where utilization guides are used, that vegetation use does not exceed the level prescribed.  Timely use supervision will help ensure that the management prescription is given an opportunity to show its effectiveness and also facilitate accurate evaluation of progress toward meeting the riparian management objectives.

Rel. 1-1611
                                                12/10/92

BLM_0126917

.41A6

1737 — RIPARIAN-WETLAND AREA MANAGEMENT

6.   Grazing has been proven to be a compatible use in riparian areas when it is managed in harmony with multiple use objectives and when the functions of the riparian system, potential of the site, and needs of the vegetation guide the development of the grazing prescription.  However, when grazing cannot be managed in harmony with other uses to accomplish the site specific land use plan objectives, restrictions on grazing use may be necessary.  These areas shall be identified in the land use plan.

B.   Wetland Areas.  Grazing prescriptions and management practices shall be designed to give wetland sites the protection necessary to maintain   and restore habitat cover and diversity, stabilize shoreline, reduce sedimentation, and provide water temperature ranges suitable for desired aquatic life.  Refer to Technical Note 327, "Construction and Management of Stockponds for Waterfowl." As determined by the RMP, important waterfowl production habitat and water bodies inhabited by threatened, endangered, or sensitive species shall receive special management consideration, which may include special grazing prescriptions and livestock use adjustments to provide for the accomplishment of the management objectives for the area. Technical guidance on grazing management in wetland areas is provided in Technical Reference 1734-4.

C.   Terms and Conditions.  Grazing Administration Handbook H-4120-1 (Grazing Management) and 43 CFR 4130.6 and 4130.6-2 contain provisions appropriate for the management of grazing in riparian-wetland areas.  These documents provide that:

1.   Grazing permits and leases shall contain terms and conditions that are necessary to achieve the management objectives identified in land use and activity plans.  Livestock grazing use may be temporarily delayed, discontinued, or modified to allow for the reproduction, establishment, or restoration of vigor of vegetation or to prevent soil compaction.  Other terms and conditions which will provide for proper range management may be specified in permits and leases.  Title 43 CFR 4110.3-2(b) provides for adjustments in management practices where unacceptable levels or patterns of utilization are determined by monitoring.

2.   The authorized officer may specify that livestock be managed to provide the vegetation cover or structure at the end of the grazing period required to ensure that management objectives are met.  Key plant species shall include the vegetation required for protection and sustenance of riparian-wetland values.

.42   Soil and Water Management.

A.   Objectives.  SPG requires that RMP's include management objectives to restore or rehabilitate watersheds (including riparian areas) found to be in unsatisfactory condition and protect unique soil and water values. Management direction is provided to meet soil and water management objectives in the form of:

1.   Establishing land use restrictions or other protective measures based on soil and water related criteria (e.g., restrictions on off-road vehicle use, limitations in floodplains, and mitigation measures in areas vulnerable to contamination from various sources of pollution).

BLM MANUAL

Rel. 1-1611
12/10/92

BLM_0126918

.42A2

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

     2. Prescribing appropriate Best Management Practices and describing the circumstances under which they are to be applied.

     3. Designating soil and water related ACEC's.

  B. Management Determinations. Site-specific soil and water management/determinations (e.g., watershed or riparian rehabilitation techniques, monitoring techniques and schedule, and the design and placement of improvements) are deferred to the activity planning phase for lead resource programs.

  C. Watershed Management Plans (WMP's). The development and implementation of WMP's in areas with riparian-wetland values should include management actions and/or treatments to restore, maintain, and preserve the natural and beneficial floodplain functions. (See .08.)

  D. Chemical Pest Control. Establish definite boundaries for the treatment area and leave buffer strips in the riparian-wetland area and/or adjacent upland areas to prevent water pollution and damage to sensitive species or resource values as discussed in Manual Section 9011 and Handbook H-9011-1.

  .43 Minerals Management.

    A. Mining Claims. Title 43 CFR 3710 requires that no claimant of any mining claim shall, prior to issuance of patent thereof, sever, remove, or use any vegetative or other surface resources thereof which are subject to management or disposition. Any severance or removal of timber shall be in accordance with sound principles of forest management.

    B. Reclamation Standards. Title 43 CFR 3809 requires prevention of unnecessary or undue degradation. These regulations specifically require reclamation of fisheries and wildlife habitat including revegetation of disturbed areas. They require an approved plan of operations for any operation in designated ACEC's. They also require compliance with water quality standards and prevent an operator from adversely impacting threatened or endangered species and their habitat. In addition, an area may be withdrawn from mineral entry to protect unique characteristics.

    C. Placer Mining. To the extent possible, mineral removal must be away from the water's edge or outside the riparian-wetland vegetation zone and instream or shoreline lease developments should be discouraged. Placer mining activity should be monitored to prevent destruction of these habitats and enforce applicable regulations. Placer mine settling ponds should be designed to allow for high waterflows to prevent washouts from seasonal flooding.

    D. Coal Development. Title 43 CFR 3460 requires land use planning assessments that require a determination of the unsuitability of Federal lands for all or certain stipulated methods of coal mining. The criteria to be applied in the planning or environmental assessment process and prior to lease issuance in riparian-wetland areas are defined in 43 CFR 3461.5.

BLM_0126919

.43E

## 1737 - RIPARIAN-WETLAND AREA MANAGEMENT

E.  Solid Minerals.  Title 43 CFR 3590 requires prospecting, exploration, testing, development, mining, and processing operations and production practices which will avoid, minimize, or correct damage to the environment, land, water, and air, for solid minerals (other than coal).

F.  Fluid Minerals.

1.  Oil and Gas Order No. 1 and Geothermal Resource Operational Order No. 4 require protection for environmentally sensitive areas. Ordinarily, fluid mineral development should not be authorized that would adversely affect riparian-wetland areas.  However, if measures can be taken to either prevent or offset adverse affects, and the operator agrees to undertake such measures, then activities may be approved.  Measures to be considered should include those that would either improve the particular riparian-wetland area involved or another area in the vicinity.  Coordination with the appropriate State agency, the U.S. Fish and Wildlife Service, and local chapters of national conservation organizations is recommended.  For operations which result in dredge or fill activities in wetlands, a 404 permit is required prior to authorization.

2.  Measures to be taken to protect riparian-wetland areas in the event of fluid mineral development are to be presented in RMP's with at least a summary appearing within the fluid minerals narrative of the plan.  The plan should make a clear commitment to ensure that there will be no net loss of riparian-wetland areas as a consequence of the fluids program.  Negative impacts are to be avoided to the maximum extent practicable.  If potential impacts have been avoided to the maximum extent practicable, then the remaining unavoidable impacts will be mitigated to the extent appropriate and practicable.  When feasible, compensatory mitigation, such as creating wetlands, may be applied.

.44  Recreation Management.

A.  Off-Road Vehicle Use.  Title 43 CFR 8300 specifies that no person shall operate an off-road vehicle on public lands in a manner causing, or likely to cause, significant, undue, damage to or disturbance of the soil, wildlife, wildlife habitat, or vegetative resources.

B.  Visitor Sites.  Locate recreation visitor-use facilities, including campgrounds, picnic areas, interpretative sites, parking areas, roads, and trails, and sewage disposal facilities to cause minimal or no adverse impact upon the quality and quantity of riparian-wetland areas.

C.  Visitor Use.  Plan and control visitor use to avoid adverse impacts of concentrated visitor use upon the quality of riparian-wetland areas.

D.  Wilderness Management.  Title 43 CFR 8560 specifies that wilderness areas shall be managed to promote, perpetuate, and where necessary, restore wilderness character of the land and its specific values of solitude, watersheds and water yield, wildlife habitat, natural plant communities, and similar natural and recreational values.  Wilderness study areas must be managed so as not to impair their suitability for preservation as wilderness.  Wilderness area activities must be conducted in such a manner as to leave them unimpaired for future use and enjoyment as wilderness and to preserve their wilderness character or wilderness resources.  (See Manual Sections 8550 and 8560.)

BLM_0126920

.45

1737 – RIPARIAN–WETLAND AREA MANAGEMENT

.45  Fish and Wildlife Habitat Management.

A.  Priority Species.  Supplemental Program Guidance (Manual Section 1622.1) requires every RMP to identify priority species an habitats having special significance for management.  These include aquatic, wetland, and riparian habitats.  Priority habitat areas may be designated as ACEC's, and special management measures applicable to each area are to be specified. RMP's are to identify required management objectives and threshold levels for the restoration and maintenance of riparian-wetland habitats to achieve desired resource conditions.

B.  Seasonal Use Conflicts.  Fish and wildlife habitat data that may be required during resource management planning include maps of seasonal use areas with special emphasis on riparian-wetland areas.  Known or potential conflicts between fish and wildlife habitat management objectives and other resource use objectives may also be required along with recommended solutions to resolve those conflicts.

C.  Waterfowl.  Strategies for the management of waterfowl and other associated wetland migratory species and their habitats are identified in the Waterfowl Habitat Management Strategic Plan and State Fish and Wildlife 2000 Plans.  These strategic planning documents also identify the BLM's role in participating in implementation of the North American Waterfowl Management Plan (NAWFP).  Management actions shall be focused in Joint Venture areas and within Major Areas of Concern identified in the NAWMP.  Outside these areas, priority shall be given to waterfowl habitat management areas identified in strategic planning documents consistent with land use and activity plans. Management actions shall be at intensities necessary to achieve desired wetlands habitat and population objectives and to restore wetland communities to productive condition and to encourage optimum use of available habitat.

D.  Habitat Management Plans.  The management of riparian-wetland habitats must be based on site-specific and measurable objectives related to RMP planning document decisions.  HMP objectives and planned actions shall establish required management direction and monitoring to restore and maintain wetland and riparian habitats.  (See Manual Section 6780.)

.46  Construction Management.  New construction in riparian-wetland areas shall be avoided unless enhancement of riparian-wetland values will occur. Any new construction shall meet the requirements of Manual Section 7221 and the intent of Executive Orders 11988 and 11990.  It shall result in the least amount of disturbance possible.  Any adverse action shall incorporate reasonable and practical mitigative measures to maintain, minimize damage to, or restore natural beneficial functions of the riparian-wetland area.

.47  Lands and Realty.

A.  Public Interest.  Riparian-wetland areas shall be retained in public ownership unless disposal would be in the public interest, as determined in appropriate planning processes and environmental analyses.

BLM_0126921

.47B

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

     B.  Restrictions.  When property in riparian-wetland areas is proposed
for lease, easement, right-of-way, or disposal to non-Federal public or
private parties, the BLM shall (1) reference in the grant or conveyance those
uses that are restricted under identified Federal, State, or local
regulations; and (2) attach other appropriate restrictions to the uses of
properties by the grantee or purchaser and any successors, except where
prohibited by law; or (3) withhold such properties from conveyance.

     C.  Land Disposals.  To meet conveyance authorization requirements,
the BLM must engage in careful and extensive land use planning.  If any of
the four following requirements cannot be satisfied with respect to a
particular wetlands tract, the tract shall be retained in Federal ownership.
A Field Solicitor's Opinion dated April 7, 1983, expands on the Requirements
for wetlands (including those associated with floodplains) with the following
statement:  The BLM can "authorize the sale of wetlands when the following
conditions have been met:

     1.  The tract of public wetlands is either so small or remote that it
is uneconomical to manage.

     2.  The tract of public wetlands is not suitable for management by
another Federal agency.

     3.  The patent contains restrictions of uses as prohibited by
identified Federal, State, or local wetlands regulations.

     4.  The patent contains restrictions and conditions that ensure the
payee can maintain, restore, and protect the wetlands on a continuous basis .
. . ."

     D.  Acquisitions.  Improved management or protection of
riparian-wetland areas may require the acquisition of private inholdings
within wetland-riparian areas or of wetlands adjacent to public lands.  Such
acquisitions must be consistent with land use plans for the area and provided
by law (Land and Water Conservation Act of 1964; endangered Species Act of
1979; Food, Agriculture, Conservation, and Trade Act of 1990; Emergency
Wetlands Resource Act of 1986; Agricultural Credit Act of 1987; and Federal
Land Policy and Management Act of 1976). Lands may be acquired in fee or
conservation easements obtained by exchange, donation, or purchase under
these authorities.  Where major purchases are anticipated for a wetland or
riparian project, funding may be requested under the Land and Water
Conservation Fund (Subactivity 3110).  Opportunities may also be available to
obtain needed wetlands located on farm or ranch properties repossessed by the
Farmers Home Administration at reduced or no cost.

   .48  Forest Management.

     A.  Management Direction.  SPG requires management direction for
forest lands (commercial, noncommercial, woodlands, and the Alaska forest
land classifications).  Management direction for each timber management area
may include preferred or permitted silvicultural practices, restricted or
excluded silvicultural practices, and identification of other resource values
(riparian-wetland) requiring protection.

BLM_0126922

.483

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

B.  <u>Free-Use Disposal</u>.  Title 43 CFR 5511.9 specifies that all
free-use timber disposal under the Act of 1947 shall be removed in accordance
with sound forestry and conservation practices so as to preserve all scenic,
recreational, watershed, and other values of the land and resources.

C.  <u>Contracts</u>.  Removal of slash and stream blockages resulting from
harvest operations is required as part of timber sale contracts.  Skidding of
logs across or down streams or drainage-ways is discouraged, and heavy
equipment is allowed to cross streams only at designated crossing sites.
Directional felling of trees and yarding of logs away from riparian-wetland
areas or full suspension logging operations may be necessary to protect
riparian-wetland ecosystems.

D.  <u>Buffer Zone</u>.  An adequate buffer zone of vegetation along
riparian-wetland areas is required to ensure that resource values and natural
stream functions are maintained, restored, or improved.

.49  <u>Fire Management</u>.

A.  <u>Retardant Application</u>.  Exercise care in the application of fire
retardant chemicals in riparian-wetland areas.  As a general rule, do not
apply retardants closer than 100 yards to any wetland or riparian area.  Make
applications parallel to streams.

B.  <u>Fireline Construction</u>.  Construct firelines in a manner to
minimize erosion and sedimentation of riparian-wetland Areas.  Fire manages
should avoid creating chutes into natural drainages.  Firelines that are
angular or perpendicular to a drainage should be stopped within 300 feet of
drainages where terrace slope could create erosion entering the drainage
system.  Firelines along streambanks should be rehabilitated before leaving
an area by structure development and seeding if natural revegetation would be
insufficient to prevent erosion.

C.  <u>Prescriptions</u>.  The benefits of properly planned prescribed fire
shall be considered.  Precautions concerning siting and timing of the burn,
resource needs, and fire effects on the riparian-wetland ecosystem shall be
considered.

D.  <u>Emergency Fire Rehabilitation</u>.  Implement emergency rehabilitation
treatments in a timely and effective manner to ensure protection of resource
values and prevent further damage to the soil and water resources following
wildfire as discussed in Handbook H-1742-1.

BLM_0126923

Case No. 1:20-cv-02484-MSK   Document 65-3   filed 04/29/21   USDC Colorado   pg 96 of 115

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

## Glossary of Terms

-B-

best management practices (BMP's): methods, measures, or practices to prevent or reduce water pollution, including, but not limited to, structural and nonstructural controls and operation and maintenance procedures. Usually, BMP's are applied as a system of practices rather than a single practice. BMP's are selected on the basis of site-specific conditions that reflect natural background conditions and political, social, economic, and technical feasibility and are defined by the authorized agency of the State government.

-E-

ecological status: the present state of vegetation and soil protection of an ecological site in relation to the potential plant community for the site. Ecological status is the expression of the relative degree to which the kinds, proportions, and amounts of plants in a community resemble that of the potential plant community. The four ecological status classes correspond to 0-25, 26-50, 51-75, or 76-100 percent similarity to the potential plant community and are generally called early seral, mid-seral, late seral, and potential plant community, respectively.

ephemeral stream: a stream that flows in direct response to surface runoff and is not influenced by ground water sources.

-H-

habitat: the place where an animal or plant normally lives during its life cycle often characterized by dominant food, cover, water, and space (e.g., the stream habitat, the forest habitat).

-I-

intermittent stream: a stream that does not flow year round but has some association with ground water for surface or subsurface flows.

-M-

monitoring: the collection of qualitative and quantitative data relating to the physical, chemical, and biological status either at one point in time or on a continuous basis, of a total environmental system or portion thereof (e.g., water, air, aquatic life cycles), designed to detect change or record events. Monitoring is used to record movement away from or toward a specific quantifiable objective.

Rel. 1-1611
12/10/92

BLM_0126924

Glossary, Page 2

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

-N-

nonpoint source (NPS): a term used for pollutants discharged by natural
    processes (precipitation, seepage, percolation, and runoff) that are not
    traceable to any discrete, discernable, or confined conveyance facility
    and are usually related to runoff from rainfall or snowmelt.

-P-

perennial stream: surface water normally flows throughout the year except
    during infrequent years of drought.

proper functioning condition: the functioning condition of riparian-wetland
    areas is a result of interaction among geology, soil, water, and
    vegetation.  Riparian-wetland areas are functioning properly when adequate
    vegetation, land form or large woody debris is present to dissipate stream
    energy associated with high water flows, thereby reducing erosion and
    improving water quality; filter sediment, capture bedload, and aid
    floodplain development; improve floodwater retention and groundwater
    recharge; develop root masses that stabilize streambanks against cutting
    action; develop diverse pending and channel characteristics to provide the
    habitat and the water depth, duration, and temperature necessary for fish
    and production, waterfowl, and other such uses; and support greater
    biodiversity.

-R-

riparian areas: riparian areas are a form of wetland transition between
    permanently saturated wetlands and upland areas.  These areas exhibit
    vegetation or physical characteristics reflective of permanent surface or
    subsurface water influence.  Lands along, adjacent to, or contiguous with
    perennially and intermittently flowing rivers and streams, glacial
    potholes, and the shores of lakes and reservoirs with stable water levels
    are typical riparian areas.  Excluded are such sites as ephemeral streams
    or washes that do not exhibit the presence of vegetation dependent upon
    free water in the soil.

riparian area-dependent resources: resources such as water, vegetation, fish,
    and wildlife that owe their existence to the riparian area.

-W-

wetlands:areas that are inundated or saturated by surface or ground water
    at a frequency and duration sufficient to support and which, under normal
    circumstances, do support a prevalence of vegetation typically adapted for
    life in saturated soil conditions.  Wetlands include marshes, shallows,
    swamps, lakeshores, bogs, muskegs, wet meadows, estuaries, and riparian
    areas.

BLM_0126925

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

## Bibliography

Cooperrider, Boyd, Stuart.  Inventory and Monitoring of Wildlife Habitat.
  DOI-BLM. 1986. 858 pages.

U.S. Army Corps of Engineers, EPA, SCS, and U.S. Fish and Wildlife Service.
  Federal Manual For Identifying and Delineating Jurisdictional Wetlands -
  An Interagency Cooperative Publication.  1989.  Federal Interagency
  Committee for Wetland Delineation.  76 pages plus appendices.

Cowardin, Carter, Gobet and La Roe.  Classification of Wetlands and Deepwater
  Habitats of the United States.  DOI - U.S. Fish and Wildlife Service.
  1979.  FWS/OBS - 79/31.  107 pages.

Oakley et al. Management of Wildlife and Fish Habitats in Forests of Western
  Oregon and Washington - Riparian Zones and Freshwater Wetlands.  1985.
  Pacific Northwest Region, USDA, Forest Service.

Thomas, Maser, Rodiek.  Wildlife Habitats in Managed Rangelands - The Great
  Basin of Southeastern Oregon - Riparian Zones.  1979.  U.S. Department of
  Agriculture; Forest Service Gen. Tech. Rep. RNW - 80.  18 pages.

U.S. Fish and Wildlife Service.  National Wetlands Priority Conservation
  Plan.  1989.  58 pages plus appendices.

BLM_0126926

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

Annotated Authorities

Legislation

1.  Soil Conservation and Domestic Allotment Act of 1935, as amended.  (P.L. 74-46, 49 Stat. 163, 16. U.S.C. 590).

    a.  Authorizes the BLM to conduct demonstration projects in areas subject to wind and water erosion.

2.  PL 167, 1955.  An Act to amend the Act of July 91, 1947 (61 Stat.  681).

    a.  Provides for multiple use of the surface of mining tracts on the public lands.

    b.  States that the United States, prior to issuance of a patent, may "manage and dispose of the vegetative surface resources thereof" on mining claims, which provided a legal basis for managing riparian areas.

3.  Outer Continental Shelf Lands Act in 1953 (as amended, 43 U.S.C.  1331-43 (1970)).

    a.  Requires the Secretary of the Interior to use rules and regulations necessary to conserve natural resources.  (BLM must identify wildlife resources, assess the impacts of mineral leasing on them in environmental impact statements, and imposes stipulations to protect them during mineral leasing and development.)

4.  Watershed Protection and Flood Prevention Act of 1954, PL 566 (Act of August 4, 1954, as amended; 16 U.S.C. 1001-1009 (1964 and Suppl.  IV 1965-1968)).

    a.  Directs the Federal Government to prevent erosion or floodwater and sediment damage.

5.  Fish and Wildlife Coordination Act of 1958 (16 U.S.C. 661 et seq.; 72 Stat. 563).

    a.  Directs that wildlife conservation be given equal consideration and be coordinated with other features of water resource development programs.

    b.  Requires that possible damage to fish and wildlife resources from work planned in navigable waters and drainages be assessed and that measures be adopted for preventing such losses or damages.  Provides for development and improvement of wildlife and fisheries resources.

6.  Water Resources Research Act (Act of July 17, 1964, as amended; 42 U.S.C. 1961-1961c-7 (1964 and Supp.  IV 1965-1968)).

    a.  Permits the Secretary of the Interior to give grants to, and cooperate with, Federal, State, and local agencies to undertake research into any water problems related to the mission on the Department.

BLM_0126927

Appendix 1, Page 2

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

7. <u>Water Resources Planning Act of 1965</u>, as amended, 42 U.S.C. 1962 (Supp. IV 1965-1968).

a.  Directs the Water Resources Council to maintain studies of water supplies and water programs.

8.  <u>Coastal Zone Management Act of 1972</u> (16 U.S.C. 1451-64) as amended, P.L. 94-970, 90 Stat 1013 (1976).

a.  Encourages States, with cooperation of the Federal Government, to develop and implement management plans to preserve, develop, and where possible, enhance resources of the Nation's coastal zone.

b.  Prescribes that management plans include:

(1)  An inventory and designation of areas of particular concern (e.g., areas of "essential habitat for living resources", including fish and wildlife); and

(2)  Adequate consideration of national interests (e.g., wildlife refuges, areas of species and habitat preservation) during siting of facilities.

9.  <u>Endangered Species Act (ESA) of 1973</u> (87 Stat. 884; 16 U.S.C. 1531 et seq.) P.L. 93-205, as amended.

a.  Requires BLM to ensure that proposed actions neither jeopardize the continued existence of a threatened or endangered species nor cause its critical habitat to be adversely modified or destroyed.

b.  Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.

10. <u>Water Resources Development Act of 1974</u> (P.L. 93-251).

a.  Directs agencies to consider the full range of potentially useful measures in all projects involving reduction of flood losses.

11. <u>Colorado River Basin Salinity Control Act of 1974</u>, PL 99-320, as amended by PL 98-569.

a.  Directs the Department of the Interior to undertake projects to improve the water quality of the Colorado River.

b.  Requires specific BLM action to develop and implement a program to minimize salt contributions from public lands.

BLM_0126928

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

12. <u>Surface Mining Control and Reclamation Act of 1977</u> (91 Stat. 445).

a. Authorizes the surface mining of coal in environmentally compatible areas.

b. Provides a mechanism for State management of the Act. (Protection/or reestablishment of fish and wildlife habitat is one of the factors that would be considered during the design, assessment, and implementation of reclamation plans, and during designation of areas unsuitable for mining.)

c. Directs improvement of rangeland conditions in accordance with land use planning under the Federal Land Policy and Management Act.

d. Provides funding for rangeland improvements which include providing habitat for wildlife.

13. <u>Emergency Wetlands Resource Act of 1986 (100 Stat. 3582).</u>

a. Extends the Wetland Loan Act and delays its repayment. Authorizes the charging of admission fees to certain units within the National Wildlife Refuge System and provides for distribution of the subject fee.

b. Provides for the development of a national wetland priority conservation plan to prioritize, on a regional basis, wetland acquisitions to be pursued.

c. Modifies the Land and Water Conservation Act of 1965 to require the Statewide Comprehensive Outdoor Recreation Plans to specifically address wetlands.

d. Directs the Fish and Wildlife Service to continue the National Wetlands Inventory.

e. Directs the Fish and Wildlife Service to evaluate the effects of Federal programs on wetlands.

14. <u>Sikes Act of 1960</u> (16 U.S.C. 670a-f; 74 Stat. 1052, as amended, P.L. 93-452 and 88 Stat. 1369 (1974), P.L. 95-420, and 92 Stat. 921 (1978)). The basic intent of Title II was to extend the Sikes Act authority for wildlife program development from strictly military reservations to public lands administered by the Forest Service and BLM. In essence, it was a congressional mandate for BLM to" . . . plan, develop, maintain and coordinate programs for the conservation and rehabilitation of wildlife, fish and game."

15. <u>Food, Agriculture, Conservation, and Trade Act of 1990 (104 Stat. 3585).</u>

a. Encourages the restoration of wetland values and functions of converted wetland to its prior (1985) wetland state.

BLM_0126929

Appendix 1, Page 4

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

b. Provides for Federal Farm Home Loan debt relief in exchange for easements to protect and restore wetlands on wetlands held by the borrower. BLM can be authorized to administer such easements.

16. Mineral Leasing Act of 1920 as amended and supplemented (30 U.S.C. 181-287).

a. Directs the Secretary of the Interior, prior to granting a right-of-way or permit for pipelines through Federal lands, to require the applicant to submit a plan of construction, operation, and rehabilitation.

b. Requires the BLM to impose stipulations to a new project that include:

(1) requirements for restoration, revegetation, and curtailment of erosion of the surface of the land.

(2) requirements to ensure that activities in connection with the new project will not violate applicable water quality standards.

(3) requirements designed to control or prevent damage to the environment including damage to fish and wildlife habitat.

17. Mineral Leasing Act for Acquired Lands of 1947, as amended (30 U.S.C 351-359). Authorizes the Secretary of the Interior to prescribe that such rules and regulations shall be the same as those prescribed under the mineral leasing laws.

18. Wilderness Act (Act of September 3, 1964; 78 Stat. 890; 16 U.S.C. 1131). Directs the jurisdictional agency to manage the wilderness area to retain its primeval character and influence, without permanent improvements or human habitation, and to preserve its natural conditions.

Executive Orders.

1. Executive Order 11989, May 24, 1977, Off-Road Vehicle (ORV). Recognizes wildlife and their habitat as one of the values to be protected through closure of certain areas to ORV use or through the limitation of ORV use in those areas.

BLM_0126930

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

2.  <u>Executive Order 12088, October 24, 1978, Federal Compliance with Pollution Control Standards</u>.  Requires all Federal agencies to comply with local standards and limitations relating to water quality.

<u>Regulations</u>.

1.  <u>40 CFR 190, Water Quality Planning and Management</u>.  Provides for a consistent national approach for maintaining, improving, and protecting water quality while allowing States to implement the most effective individual programs.

2.  <u>43 CFR 3480, Coal Exploration and Mining Operations</u>.  Ensures orderly and efficient development, mining, preparation, and handling operations for Federal coal; ensures production practices that prevent wasting and loss of coal or other resources; and ensures efficient, environmentally sound exploration and mining operations.

3.  <u>43 CFR 3590, Solid Minerals (Other than Coal) Exploration and Mining Operations</u>.  Promotes orderly and efficient prospecting, exploration, testing, development, mining, and processing operations and production practices without waste or avoidable loss of minerals or damage to deposits; and promotes operating practices which will avoid, minimize, or correct damage to the environment--land, water, and air.

4.  <u>43 CFR 3809, Mining Claims under the General Mining Laws, Surface Management</u>.  Assures that operations include adequate and responsible measures to prevent unnecessary or undue degradation of the Federal lands and to provide for reasonable reclamation.  Reclamation shall include revegetation of disturbed areas and rehabilitation of fisheries and wildlife habitat.

5.  <u>43 CFR 4100, Grazing Administration</u>.  Includes improvement of fish and wildlife habitat as a basic part of range betterment, provides BLM grazing and trespass regulations, requires the reservation of sufficient habitat for wildlife, and recognizes wildlife habitat as one of the values that can be protected by closing certain areas to livestock use.

6.  <u>43 CFR 4700, Protection, Management, and Control of Wild Free-Roaming Horses and Burros</u>.  Provides for the management of wild horses and burros as an integral part of the natural system of the public lands under the principles of multiple use, including management of a self-sustaining population of healthy animals in balance with other uses and the productive capacity of their habitat.

7.  <u>43 CFR 8340, Recreation Management</u>.  Provides for limitation of ORV use to protect certain resource values, including wildlife and their habitat.

BLM_0126931

6720 – AQUATIC RESOURCE MANAGEMENT

Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibility
.05  References
.06  Policy
.07  File and Records Maintenance

.1  Aquatic Resource Management Guidelines
    .11  Program Priorities
        A.   Threatened or Endangered Species
        B.   Other Special Status Species
        C.   Anadromous Species
        D.   Resident Species
        E.   Exotic Species
    .12  Inventories
    .13  Aquatic Resources and the BLM Planning System
        A.   Policy Tier
        B.   RMP Tier
        C.   Activity Plan Tier
    .14  Protection for Special Status Species
        A.   Species Identification
        B.   Habitat Identification
        C.   Habitat Management Plans
        D.   Use of FWS and State Plans
    .15  Instream Flow Needs
        A.   Special Status Species
        B.   Anadromous Species
        C.   Resident Species
        D.   Riparian Areas
    .16  Water Quality Requirements
    .17  Aquatic Habitat Monitoring and Evaluation
    .18  Studies and Research Involving Habitat and Multiple-Use
         Relationships

.2  Support and Coordination with Other BLM Resource Programs
    .21  Energy and Minerals
    .22  Lands and Realty
    .23  Rangeland Resources
        A.   Rangeland EA's and EIS's
        B.   Grazing Systems
        C.   Rangeland Monitoring
        D.   Rangeland Practices Assessment
        E.   Rangeland Improvement Project Assessment
    .24  Forestry
        A.   Forest Management Plans
        B.   Forest Transportation Systems
        C.   Forest Management Activities

TC-2

## 6720 – AQUATIC RESOURCE MANAGEMENT

.25  Wildlife and Fisheries
.26  Soil, Water, and Air
   A.   Best Management Practices
   B.   Instream Flow Assessments
.27  Recreation, Cultural, and Wilderness Resources

.3  <u>Support and Coordination with Other Federal Agencies,
   States and Interested Parties</u>
.31  Other Federal Agencies
.32  State Fish and Wildlife Agencies
.33  Interested Parties
   A.   Trout Unlimited
   B.   The Nature Conservancy
   C.   Amerifish Corporation, Fishing Has No Boundaries
   D.   Other Parties

<u>Glossary of Terms</u>

BLM_0126933

.01

## 6720 - AQUATIC RESOURCE MANAGEMENT

.01  Purpose.  This Manual Section defines the Bureau of Land Management's (BLM's) objectives and policy for those species of invertebrates, fish, and wildlife dependent upon aquatic habitats.

.02  Objectives.  The BLM's overall objectives for aquatic resource management of public lands are to:

A.  Ensure that the natural integrity of aquatic ecosystems is restored and managed in an ecologically sound manner.

B.  Ensure that the natural diversity of aquatic biota is maintained or restored as appropriate.

C.  Manage habitat for anadromous and resident species that are of high economic, social, or scientific value.

D.  Expand recreational fisheries by developing and strengthening partnerships, considering needs and opportunities in the development and amendment of RMP's, and responding to changing attitudes and desires of the public.

E.  Ensure full compliance with applicable Federal laws, Executive Orders, and regulations.

.03  Authority.  See also Manual Sections 1737 and 6500.

A.  Legislation.

1.  Fish and Wildlife Coordination Act of 1958 (16 U.S.C. 661 et seq.).  Requires wildlife conservation be given equal consideration with other features of water resource developments.

2.  Sikes Act of 1960 (16 U.S.C. 670a-f).  Provides for conservation and habitat rehabilitation programs for certain public lands, and collection of fees for such purposes.

3.  National Environmental Policy Act of 1969 (42 U.S.C. 1701 et seq.).  Encourages harmonious relationships between man and his environment by requiring preparation of detailed statements of environmental impacts from Federal projects and directs Federal agencies to use ecological information in the development of resource programs.

4.  Endangered Species Act of 1973 (16 U.S.C. 153 et seq.).  Provides for conservation of ecosystems upon which endangered or threatened species depend and consultation between Federal agencies on actions that affect threatened, endangered, and proposed species.

BLM_0126934

.03A5

## 6720 - AQUATIC RESOURCE MANAGEMENT

5.  Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.). Requires that public lands be managed in a manner that will provide food and habitat for fish and wildlife, and protect the quality of water resources. Section 201(a) provides for the preparation and maintenance of an inventory of public land resources on a continuing basis.

6.  Oregon and California Act of 1937 (43 U.S.C. 1181). Provides for management of revested Oregon and California Railroad and reconveyed Coos Bay Wagon Road Grant Lands by BLM.

7.  Water Quality Act of 1987, as amended from the Federal Water Pollution Control Act (Clean Water Act) of 1977 (33 U.S.C. 1251 et seq.). Provides for restoration and maintenance of the chemical, physical, and biological integrity of the Nation's water at a level of quality which provides protection for fish, shellfish, wildlife, and recreational use.

8.  Public Rangelands Improvement Act of 1978 (43 U.S.C. 1901 et seq.). Directs and provides funds for rangeland improvements in accordance with land use planning.

9.  Wild and Scenic Rivers Act of 1968 (16 U.S.C. 1271 et seq.). Provides for recognition and protection of certain rivers through designation as wild, scenic, or recreational.

B.  Executive Orders.

1.  Executive Order 11987, Exotic Organisms (dated May 24, 1977). Restricts the introduction of exotic species into natural ecosystems of the United States.

2.  Executive Order 11988, Floodplain Management (dated May 24, 1977). Directs Federal agencies to avoid, to the extent possible, the long-term and short-term adverse impacts associated with the occupancy and modification of floodplains.

3.  Executive Order 11990, Protection of Wetlands (dated May 24, 1977). Directs Federal agencies to minimize the destruction, loss, or degradation of wetlands and to preserve and enhance the natural and beneficial values of wetlands in carrying out programs affecting land use.

.04  Responsibility.

A.  The Director and Deputy Director are responsible for overall aquatic resource management on public lands, and for the interactions between programs managing aquatic resources and all other BLM programs.

BLM MANUAL
Supersedes Rel. 6-92

Rel. 6-118
3/22/91

BLM_0126935

.04B

6720 – AQUATIC RESOURCE MANAGEMENT

B.  Assistant Director, Land and Renewable Resources is
responsible for the overall coordination and integration of
aquatic resource management, policies, and procedures.  The
Assistant Director provides policy and program interpretations,
direction, and leadership to ensure consistent field
implementation of policies and procedures to manage aquatic
resources.  The Assistant Director also reconciles aquatic
resource-related issues and conflicts among Land and Renewable
Resource programs.·

C.  Assistant Director, Energy and Mineral Resources is
responsible for providing program interpretations, direction,
and leadership to ensure consistent field implementation of
necessary procedures to manage energy and mineral resources.
This includes consideration of aquatic resources in development
programs.

D.  Chief, Division of Wildlife and Fisheries is responsible
for the following:

1.  Developing aquatic resource management policy,
strategic plans, and technical guidance.

2.  Developing guidance for the preparation of habitat
management plans to maintain aquatic habitats at desired levels
and in compliance with applicable Federal laws, executive
orders, and regulations.

3.  Ensuring that aquatic resource management procedures
are incorporated into the BLM programs.

4.  Evaluating the effectiveness of aquatic resource
management programs and procedures.

5.  Systematically reviewing rules, regulations,
procedures, and proposed legislation to establish and update
the BLM's efforts to maintain aquatic resources and habitats on
public lands.

E.  Chief, Division of Rangeland Resources is responsible
for developing and issuing guidelines for water quality,
riparian and floodplain management on public lands.  These
responsibilities also include ensuring compliance with Federal,
State, and local water quality standards and developing policy
and guidance for preparing allotment and watershed management
plans, and to manage beneficial and natural floodplain
functions in accordance with applicable executive orders.

BLM_0126936

.04F

## 6720 - AQUATIC RESOURCE MANAGEMENT

F.  Other Division and Office Chiefs are responsible for ensuring that policies and guidelines for their respective resources are coordinated with the aquatic resource management policies and guidance, to the extent applicable.

G.  Service Center Director is responsible for providing technical support to Field Offices in new and emerging natural resource technologies, assistance to Washington Office, and development and information transfer of aquatic resource-related inventories, data storage, and other appropriate technical expertise.

H.  State Directors are responsible for the following:

1.  Ensuring compliance with the BLM policies and procedures for aquatic resource management and protection.

2.  Ensuring coordination and cooperation with the States and other cooperators in aquatic resource management programs and issues.

3.  Monitoring aquatic resource management effectiveness on public lands within the State to ensure that every effort is made to meet management objectives in State Fish and Wildlife 2000 plans, resource management plans, and activity plans.

4.  Ensuring that when aquatic habitats on public lands, or portions thereof, are proposed for exchange, lease, easement, or right-of-way that the BLM retains ownership of aquatic habitats containing special status species, anadromous species, or other significant aquatic resources, and attaches appropriate stipulations to the uses of properties by the grantee or purchaser and any successor that are necessary to protect aquatic resources.

I.  District Managers are responsible for the following (those in Alaska, also are responsible for items listed under .04(J) below):

1.  Monitoring aquatic habitat, population and water quality characteristics to assure maintenance of aquatic communities in compliance with Federal laws, regulations, and resource management plans.

2.  Storing aquatic habitat, population and water quality information in approved data bases such as Riparian Aquatic Information Data Summary (RAIDS), Threatened and Endangered Species Data System (TEDS), Environmental Protection Agency water quality data management system, Storage Retrieval (STORET) (water quality), etc.

BLM MANUAL                                    Rel. 6-118
Supersedes Rel. 6-92                          3/22/91

BLM_0126937

.04J

6720 - AQUATIC RESOURCE MANAGEMENT

J.   Area Managers are responsible for the following:

     1.   Maintaining up-to-date inventories of aquatic habitats and populations, analyzing and identifying protection and enhancement opportunities, and formulating management recommendations concerning aquatic resource management.

     2.   Developing, implementing, and maintaining aquatic habitat management plans and projects that are consistent with legal and policy requirements.

.05   References.

     A.   Fish Habitat Inventory and Monitoring.  BLM Manual Handbook 6720-1.

     B.   Rapid Bioassessment Protocols for Use in Streams and Rivers: Benthic Macroinvertebrates and Fish.  U.S. Environmental Protection Agency Report No. EPA/444/4-89-001, dated May 1989.

     C.   Fish and Wildlife 2000: a plan for the future.

     D.   National Recreational Fisheries Policy, dated June 6, 1988.

     E.   Forest Service and Bureau of Land Management Recreational Fisheries Policy, dated March 19, 1990.

     F.   Riparian-Wetland Initiative for the 1990's.

.06   Policy.  See also Manual Sections 1737, 6500, and 6820. BLM policy with respect to aquatic resources is to:

     A.   Inventory, evaluate, and monitor aquatic habitats on public lands to determine existing conditions and those habitats supporting aquatic vertebrate and macroinvertebrate species.

     B.   Restore, enhance, and protect aquatic habitats by preventing their loss, and implementing and monitoring habitat management or restoration projects as identified during resource management planning process.

     C.   Recover threatened or endangered aquatic species, and protect, restore, and monitor other special status aquatic species so that listing as threatened or endangered is not necessary.

BLM_0126938

.05D

## 6720 - AQUATIC RESOURCE MANAGEMENT

D.  Maintain or restore natural ecosystem functions, such as water flow regimes and energy cycles, that are necessary for maintenance of aquatic biodiversity at population, species, and ecosystem levels.

E.  Enhance anadromous fisheries by increasing habitat integrity and productivity in coastal drainages of the states of Alaska, California, Idaho, Oregon, and Washington.

F.  Enhance the quality and quantity of recreational fishing opportunities by increasing habitat integrity and productivity.

G.  Promote the use of native fishes for recreational use, where possible.  Introductions of nonnative and exotic species should be prevented in habitats where they would be harmful to the native biota or where it is against the established policy of the State fish and wildlife agency.

H.  Manage aquatic habitats in a manner that facilitates restoration of riparian areas to proper functional condition.

I.  Determine fisheries-related allocations, objectives, and management directions through resource management planning.

J.  Coordinate and cooperate among field managers/offices, State agencies, Federal agencies, fisheries organizations, conservation organizations and universities to identify and implement cooperative projects and activities for aquatic habitats as consistent with other policy statements.

.07  File and Records Maintenance.  See BLM Manual Section 1272 for records maintenance and the BLM Records Schedule for the disposition of records.

BLM_0126939

.1

## 6720 - AQUATIC RESOURCE MANAGEMENT

.1  Aquatic Resource Management Guidelines.

.11  Program Priorities.  Within the framework of BLM's overall program priorities, give attention to aquatic habitats in the following order:

A.  Threatened or Endangered Species.  Aquatic habitats supporting federally listed threatened or endangered species, or those species proposed for such designation by the Secretary of the Interior.

B.  Other Special Status Species.  Aquatic habitats supporting Federal candidate species, BLM sensitive species, or species listed by State governments as endangered or threatened.

C.  Anadromous Species.  Aquatic habitats supporting anadromous species.

D.  Resident Species.  Aquatic habitats supporting resident game and nongame species.

E.  Exotic Species.  Aquatic habitats supporting exotic species.

.12  Inventories.  To provide the necessary information for management decisions, including the resolution of planning issues, maintain and update aquatic resource inventories.

.13  Aquatic Resources and the Bureau Planning System.

A.  Policy Tier.  Policy guidance for managing aquatic resources is set forth in this Manual Section, Manual Sections concerning riparian-wetland management (M.S. 1737), introductions and transplants (1745), and special status species (6840), and further relevant directives that may be issued periodically by the Director.  These policies may be supplemented by pertinent State Director guidance issued pursuant to 43 CFR 1610.1(a)(3).

B.  RMP Tier.  How specific aquatic habitats and resources are to be managed is determined through resource management planning.  Aquatic resource condition objectives, allowable uses on aquatic habitats, and management prescriptions for aquatic habitats are established in resource management plans.  Resource management planning is the principal means for accomplishing interdisciplinary coordination and establishing integrated resource management. Guidance is found in Manual Section 1622.1.

BLM_0126940

.13C

## 6720 - AQUATIC RESOURCE MANAGEMENT

C. __Activity Plan Tier__. Activity plans are prepared ==only when necessary== to show how particular uses provided for at the RMP tier are to be carried out (see Manual Section 1601.12). Activity plans involving aquatic habitats and resources should describe more fully capital improvements, investment schedules and/or priorities, and goals and objectives. Activity plans may be for single or multiple activities. Wherever appropriate, activity-level provisions for aquatic resources may be included in any Bureau activity plan.

.14 __Protection for Special Status Species__. See also Manual Section 6840. The aquatic resource management program must include the following components to protect threatened and endangered species, species proposed for such designation, Federal candidate species, BLM sensitive species, or species listed by States as endangered, threatened, or of special concern:

A. __Species Identification__. Identification of special status aquatic species on public lands in cooperation with the States and the U.S. Fish and Wildlife Service (FWS).

B. __Habitat Identification__. Identification and protection of critical or essential habitat necessary for the survival or recovery of such designated aquatic species.

C. __Habitat Management Plans__. Develop, implement, and maintain habitat management plans to aid the recovery and possible delisting of threatened or endangered species, and to prevent the need to list candidate species as threatened or endangered.

D. __Use of FWS and State Plans__. Where approved recovery plans have been developed by the Fish and Wildlife Service for aquatic species, such plans provide the specific directions and habitat requirements to be included in the Habitat Management Plan (HMP). For those species that are listed by the State but not by the Federal Government, HMP's conform, as appropriate, to the direction and habitat requirements identified by the official State publication or status report. Should no recovery plan or status report exist, an HMP should be developed at the earliest practical opportunity based on best available data.

.15

6720 - AQUATIC RESOURCE MANAGEMENT

.15 Instream Flow Needs. Water flow is a critical component of stream and spring habitats as well as for maintenance of many lakes and reservoirs. In all activities affecting these habitats, include estimates of flow requirements for maintenance of fisheries and aquatic habitats. Assessing streamflow requirements for maintaining aquatic habitats must be an integral part of all aquatic inventory and monitoring procedures. Instream flows necessary to protect aquatic resources should be secured in cooperation with State water management policies and regulations through guidance contained in Manual Section 7250 (Water Rights). Within this framework, the following habitats should receive priority for determination and appropriation of flow requirements.

    A.  Special Status Species. Habitats supporting special status aquatic species.

    B.  Anadromous Species. Habitats supporting species of salmon, steelhead, sea-run cutthroat, or other anadromous fish.

    C.  Resident Species. Habitats supporting resident game and nongame species.

    D.  Riparian Areas. Streams, rivers, or springs supporting significant riparian habitats.

.16 Water Quality Requirements. Resource management plans and activity plans should establish watershed management objectives where necessary to improve or protect downstream habitat quality for aquatic resources. Wherever possible, point and nonpoint water pollution sources detrimental to aquatic life should be identified. Measures to reduce sources of water pollution should be incorporated into landuse authorizations. BLM should work with States, the U.S. Environmental Protection Agency, and other appropriate agencies to ensure maintenance of water quality.

.17 Aquatic Habitat Monitoring and Evaluation. To maintain an effective aquatic habitat management program, regularly monitor aquatic habitats and/or populations, and evaluate impacts of management decisions and management practices on them to determine if management objectives are being met.

.18 Studies and Research Involving Habitat and Multiple-Use Relationships. Studies should be designed, when needed, to develop criteria for aquatic habitat management and overall management objectives. Cooperative studies should be encouraged when appropriate.

BLM MANUAL                                          Rel. 6-118
Supersedes Rel. 6-92                                   3/22/91

BLM_0126942

## 6720 - AQUATIC RESOURCE MANAGEMENT

.2  <u>Support and Coordination with Other BLM Resource Programs</u>.

It is essential that management of aquatic resources be coordinated with other resource uses and management activities. Many of BLM's aquatic resource responsibilities can best be met through incorporation of aquatic resource objectives and protective provisions in other BLM activities and programs.  It is incumbent upon each program to ensure that its actions and plans are responsive to aquatic resource management on the public lands involved.

.21  <u>Energy and Minerals</u>.  Energy and mineral development programs affect aquatic organisms and their habitat, primarily in terms of water quality and quantity, and physical habitat disturbance or alteration.  Such development also may cause human population increases and may create additional demands or pressures on the local aquatic resources and habitats on public lands.  For these reasons, activities associated with the energy and minerals program must be coordinated with management of aquatic resources.  Aquatic resource program responsibilities include developing criteria to assess the impacts of energy and mineral development on aquatic resources.

.22  <u>Lands and Realty</u>.  The aquatic resource management program shall be coordinated with the withdrawal review and land disposal programs to ensure adequate consideration of valuable aquatic resources.  It also shall be coordinated with the processing of energy related applications that involve water use, such as small hydropower or geothermal projects. Resource specialists in both programs are responsible for ensuring adequate coordination.  Disposal of public land or acquisition of private lands or easements for fishery values shall be considered as they affect habitat significant to the survival or recovery of endangered or threatened aquatic species, areas designated as areas of critical environmental concern, important anadromous fish habitats, and public access to the land for fishing.  The existence and protection of aquatic resources shall be considered in any proposed land exchanges.  Exchanges to benefit the aquatic resource management program shall demonstrate a particular need for land acquisition and adhere to public interest criteria such as public access to fishing sites or acquisition of important aquatic habitat within a given watershed.

.23  <u>Rangeland Resources</u>.  Use of the public lands by cattle, sheep, horses, or other livestock may seriously affect aquatic resources on rangelands.  The aquatic resource management program assists in actions to improve range (including aquatic) conditions, by taking the following actions.

BLM MANUAL
Supersedes Rel. 6-92

Rel. 6-118
3/22/91

BLM_0126943