Case No. 1:20-cv-02484-MSK   Document 65-4   filed 04/29/21   USDC Colorado   pg 1 of 160

.23A

A.  Rangeland EA's and EIS's.  Providing aquatic
    information and analyses for environmental
    assessments and environmental impact statements, as
    necessary.

B.  Grazing Systems.  Providing aquatic data, analyses
    and interpretations for grazing systems to ensure
    protection and enhancement of aquatic habitat and
    fishery values.

C.  Rangeland Monitoring.  Providing aquatic resource
    baseline data for monitoring and evaluating rangeland
    management decisions.

D.  Rangeland Practices Assessment.  Coordinating with
    Rangeland Resources personnel in developing and
    implementing monitoring programs, to assess impacts
    of alternative grazing practices on aquatic
    resources.

E.  Rangeland Improvement Project Assessment.  Providing
    analyses of rangeland improvement projects affecting
    aquatic habitats and recommending practices to
    provide optimum habitat protection or improvement.

.24  Forestry.  The aquatic resource management program
assists this program by taking the following actions.

A.  Forest Management Plans.  Providing aquatic data and
    environmental analysis for the development and
    implementation of forest management plans where
    aquatic resources are affected.  Makes
    recommendations on protection and enhancement of
    aquatic resources.

B.  Forest Transportation Systems.  Providing design and
    layout information for forest transportation systems
    to ensure consideration and protection of aquatic
    resources.

C.  Forest Management Activities.  Providing information
    for monitoring forest management activities to
    protect aquatic resources.

.25  Wildlife and Fisheries.  Coordination of the fish and
wildlife programs is needed if conflicting use demands occur.
Closing reservoirs to public use as part of waterfowl
management, thus precluding angling opportunities, is an
example.  Coordination of these programs also is needed to
quantify instream flow needs.  Flows identified as adequate for
fishery needs in certain streams may not suffice for
terrestrial wildlife needs.

BLM_0126944

## 6720 - AQUATIC RESOURCE MANAGEMENT

.26  <u>Soil, Water, and Air</u>.  Point and nonpoint sources of water pollution degrade aquatic habitats.  The soil and water management program provides support to improve aquatic conditions through the following:

A.  <u>Best Management Practices</u>.  Section 319 of the Clean Water Act of 1987 (P.L. 100-4) authorizes a program to restore waters impaired by nonpoint pollution sources.  A major emphasis is to restore fisheries impacted by sources such as silviculture, grazing, and mining.  Another goal is to prevent damage from future activities by implementation of best management practices.  Funds are available through this program to State agencies for public and private lands.  The aquatic resource management program should initiate projects to establish baseline water quality characteristics and to restore fisheries damaged by pollution sources.  Adequate program coordination also is necessary to ensure that soil erosion and sedimentation problems affecting aquatic resources are considered in developing Best Management Practices, and that aquatic resource needs are considered in constructing erosion control structures.

B.  <u>Instream Flow Assessments</u>.  The program also must coordinate instream flow assessments necessary to preserve, restore, or enhance aquatic resource habitats.  Methodologies may vary with the characteristics of the habitat in question, but should be compatible with methods utilized by other agencies, such as the Fish and Wildlife Service and·State fish and wildlife agencies.  Acceptable methodologies are discussed in Manual Handbook 6720-1.

.27  <u>Recreation, Cultural, and Wilderness Resources</u>.  Aquatic resources and habitats often are a significant part of a wilderness or recreation experience, and should be considered in the review of Wilderness Study Areas.  Aquatic resource data, analyses, and interpretation may be needed to complete some wilderness studies.  The Recreation program is responsible for completing river management plans and providing river recreation permit programs on major recreation rivers, some of which are included in the National Wild and Scenic Rivers System.  Aquatic resource data may be needed to develop management plans for recreation users and to monitor impacts from increased visitation on aquatic resources.

BLM_0126945

6720 - AQUATIC RESOURCE MANAGEMENT

.3  Support and Coordination with Other Federal Agencies, States and Interested Parties.

.31  Other Federal Agencies.  Close coordination with other Federal agencies is necessary for optimum management of public lands.  Special status species programs should be coordinated with U.S. Fish and Wildlife Service (for freshwater species) or National Marine Fisheries Service (for anadromous species). Close coordination with Federal agencies that manage lands upstream of public lands is critical.  The joint Forest Service/BLM Recreational Fisheries Policy should facilitate and guide cooperation between those two agencies on matters relating to recreational fisheries.

.32  State Fish and Wildlife Agencies.  The aquatic resource specialist must coordinate aquatic resource programs with State agencies.  State fish and wildlife agencies or commissions typically are responsible for fishing regulations and introductions of game and forage species into aquatic habitats. Introductions of sportfishes should be coordinated so that the most suitable habitats are stocked and that stocking does not conflict with special status species management.

.33  Interested Parties.  The BLM maintains national-level and State Memorandum of Understandings (MOU's) with various organizations for the purposes of promoting cooperation with interested parties, facilitating volunteer participation in projects, and cooperative management programs.  Involvement of these parties, plus other interested organizations and landowners will facilitate better management.

A.  Trout Unlimited.  The BLM maintains a master MOU and cooperative agreement with Trout Unlimited for maintaining and enhancing coldwater fish habitats on public lands.

B.  The Nature Conservancy.  The BLM maintains a master MOU and cooperative agreement with The Nature Conservancy for maintaining and enhancing important aquatic habitats, including those containing special status species, on public lands.

C.  Amerifish Corporation, Fishing Has No Boundaries. The BLM maintains a MOU with Amerifish Corporation for the purposes of promoting angling opportunities and increasing environmental awareness for disabled persons.

D.  Other Parties.  The aquatic resource specialist should coordinate activities with affected landowners and other interested parties as appropriate.

BLM_0126946

6720 - AQUATIC RESOURCE MANAGEMENT

Glossary of Terms

-A-

aquatic habitat:  habitat confined to streams, rivers, springs,
    lakes, ponds, or reservoirs; habitat confined to water.

aquatic resources:  fauna and flora that live within or are
    entirely dependent upon water to live; living resources of
    aquatic habitats (i.e., fishes, invertebrates, amphibians,
    etc.); aquatic species.

aquatic resource management program:  all BLM activities
    undertaken expressly to maintain, improve, and protect
    aquatic habitat for fisheries or other aquatic resources.

anadromous species:  species of fish that migrate upriver from
    the ocean to reproduce in freshwater.

-C-

candidate species:  those category 1 or 2 species considered by
    the Secretary of the Interior for listing as published in
    Notices of Review in the Federal Register.

critical habitat:  an area designated as such by the Secretary
    of the Interior on which are found those physical and
    biological features essential to the conservation of
    threatened or endangered species and which may require
    special management considerations or protection.  Critical
    habitat may include any portion of the range of a listed
    species.  Some listed species may not have any critical
    habitat designated.

-E-

essential habitat:  an area on which are found those physical
    and biological features essential to the conservation of
    threatened or endangered species and which may require
    special management considerations or protection.  Criteria
    for identifying essential habitat are the same as for
    critical habitat, although essential habitat has not been
    officially designated by the Secretary of the Interior.

exotic species:  any species not naturally occurring, either
    presently or historically, in any ecosystem of the United
    States.

BLM_0126947

## 6720 - AQUATIC RESOURCE MANAGEMENT

-F-

floodplain:  the lowland and relatively flat areas adjoining inland and coastal waters, including flood-prone areas of offshore islands, that at a minimum is subjected to a 1 percent or greater chance of flooding in any given year.

-N-

native:  any species that naturally occurred within a given body of water.

-P-

proper functioning condition:  when riparian-wetland areas (1) dissipate energy associated with high water flows, thereby reducing erosion and improving water quality; (2) filter sediments and nutrients and aid in floodplain development; (3) contribute to root mass development that stabilize banks against cutting action; (4) develop diverse channel and ponding characteristics to provide the habitat necessary for fish production, waterfowl breeding and other uses; and (5) support greater biodiversity.

-R-

resident species:  any species naturally occurring, either presently or historically, in any ecosystem of the United States.  This definition excludes special status and anadromous species.

riparian habitat:  a specialized form of wetland restricted to areas with characteristic vegetation along, adjacent to, or contiguous with perennially and intermittently flowing stream, lake, spring, and reservoir shore areas. Characteristic vegetation may range from hydrophilic plants such as pondweed through more terrestrial forms such as sycamores, cottonwoods, conifers, and willows.  This habitat is transitional between true bottomland wetlands and upland terrestrial habitats, and while associated with water courses, may extend inland for considerable distances.

-S-

special status species:  any species listed as threatened or endangered by the Federal government, officially proposed for such designation, Federal candidate species, BLM sensitive species, or species listed by State government as threatened or endangered.

species:  any species, subspecies, or variety of flora or fauna.

BLM_0126948

6720 – AQUATIC RESOURCE MANAGEMENT

-W-

water quality degradation:  any reduction in the biological, chemical, or physical values that describe the quality of water.

wetland or wetland habitat:  Areas that have a predominance of hydric soils and that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and under normal circumstances do support, a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions.  Marshes, shallows, swamps, muskegs, bogs, and wet meadows are examples of wetlands.

BLM_0126949

# 7200 – WATER RESOURCES

## Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibility
.05  References
.06  Policy

.1  Program Operation
   .11  Programming
   .12  Program Functions
   .13  Cooperative Relations
      A.  Federal Agencies
      B.  Federal Interagency Advisory Committee on
          Water Data Acquisition (IACWD)
      C.  State
      D.  Local
   .14  Training

.2  Planning
   .21  Resource Management Plans
   .22  Activity Plans
   .23  Project Plans

.3  Inventory
   .31  Water Use
   .32  Watershed Condition

.4  Watershed Monitoring

.5  Watershed Improvements

.6  Project Maintenance
   .61  Dam Safety
   .62  Abandonment

.7  Water Rights

.8  Ground Water

BLM_0126950

TC-2

7200 - WATER RESOURCES

.9  Support Activities
   .91  Water Use/Rights
      A.  Legal Availability
      B.  Physical Availability
   .92  Floodplain Delineation and Mapping
   .93  Hydrologic Design
   .94  Water Power and Water Storage Assessments
   .95  Impact Assessment
   .96  Mitigative Measures
   .97  Compliance Monitoring

Illustration
1. Activities of the Soil and Water Resources Programs

BLM_0126951

.01

7200 – WATER RESOURCES

.01  Purpose.  This Manual Section presents overall objectives, responsibilities, and policies for conducting the Water Resources Program.

.02  Objectives.

A.  Maintain or improve surface and ground water quality consistent with existing and anticipated uses and applicable State and Federal water quality standards.

B.  Minimize the harmful consequences of overland flow and surface runoff on, or arising from, Bureau-administered lands.

C.  Provide for the physical and legal availability of water to facilitate authorized uses of the public lands.

.03  Authority.  The Water Resources Program is conducted under the following authorities:

A.  Statues.

1.  Taylor Grazing Act of 1934, as amended, P.L. 73–482, 48 Stat. 1269, 43 U.S.C. 315, June 28, 1934.

2.  Revested Oregon and California Railroad and Reconveyed Coos Bay Wagon Road Grant Lands Act of 1937, as amended, P.L. 75–405, 50 Stat. 874, 43 U.S.C. 1181, August 28, 1937.

3.  Appropriations Act of 1952, McCarran Amendment, 66 Stat. 560, 43 U.S.C. 666, July 10, 1952.

4.  Watershed Protection and Flood Control Act of 1954, as amended, P.L. 83–566, 68 Stat. 666, 16 U.S.C. 1001 et seq., August 4, 1954.

5.  Water Resources Research Act of 1954, as amended, P.L. 88–379, 78 Stat. 329, 42 U.S.C. 1961, July 17, 1964.

6.  National Environmental Policy Act (NEPA) of 1969, as amended, P.L. 91–190, 83 Stat. 852, 42 U.S.C. 4321 et seq., January 1, 1970.

7.  Water Resources Development Act of 1974, P.L. 93–251, March 7, 1974.

8.  Federal Land Policy and Management Act of 1976, as amended, P.L. 94–579, 90 Stat. 2743, 43 U.S.C. 1701 et seq., October 21, 1976.

9.  Safe Drinking Water Amendments of 1977, amended Section 2 of the Safe Drinking Water Act, P.L. 95–190, 42 U.S.C. 201, November 16, 1977.

BLM_0126952

.0310

7200 – WATER RESOURCES

10. Public Rangelands Improvement Act of 1978, P.L. 95-514, 92 Stat. 1803, 43 U.S.C. 1901 et seq., October 25, 1978.

11. Classification and Multiple-Use Act (78 Stat. 986, 43 U.S.C. 1411-18), 43 CFR 1725.3-3(h) October 1, 1981.

12. Water Resources Planning Act of 1983, as amended, P.L. 97-449, 96 Stat. 2413, 49 U.S.C. 1962 et. seq., Jan. 12, 1983.

13. Colorado River Basin Salinity Control Act, as amended P.L. 98-569, 98 Stat. 2933, 43 U.S.C. 1593, Oct. 30, 1984.

14. Water Quality Act of 1987, P.L. 100-4, 101 Stat. 7, 33 U.S.C. 1251, Feb. 4, 1987.

15. Annual Appropriation Act of the Department of the Interior and Related Agencies.

B. Executive Orders.

1. Executive Order (Public Water Reserve No. 107) of April 17, 1926 (36 Stat. 847).

2. Executive Order 11514, March 5, 1970, as amended by Executive Order 11991, May 24, 1977. Executive order for the protection and enhancement of environmental quality.

3. Executive Order 11738, September 10, 1973. This Order directs each Federal agency to enforce the Clean Air Act and the Clean Water Act in the procurement of goods, materials, and services.

4. Executive Order 11752, December 17, 1973. This Order mandates that Federal agencies shall provide national leadership to protect and enhance the quality of air, water, and land resources through compliance with applicable Federal, State, interstate, and local pollution standards.

5. Executive Order 11988, May 24, 1977, Floodplain Management, as amended by Executive Order 12148.

6. Executive Order 11990, May 24, 1977, Protection of Wetlands.

7. Executive Order 12322, September 17, 1981. Under this Order, any report, proposal, or plan relating to a Federal or federally assisted water and related land resources project or program must be submitted to the Director, Office of Management and Budget, before submission to Congress.

BLM_0126953

.03C

7200 – WATER RESOURCES

C. Circulars.

1. OMB (Office of Management and Budget) Circular A-67 (August 28, 1964). This Circular provides guidelines for coordination of water data activities and states that the U.S. Geological Survey shall acquire basic water data on the water resources of the Nation. It further states that other agencies shall acquire special water data in support of their respective missions and that these activities be closely coordinated to assure effective and economical management of resources.

2. Circular A-81, Reporting Requirements in Connection with Prevention, Control, and Abatement of Water Pollution at Existing Federal Facilities.

   a. Requires Federal agencies to:

      (1) Meet water quality standards and related plans which States have developed under the Federal Water Pollution Control Act.

      (2) Consult with the Secretary of the Interior at the earliest feasible time to determine standards applicable to particular facilities and, otherwise, cooperate with him/her.

      (3) Cooperate with State and local pollution control agencies and with other Federal agencies in the evaluation of their pollution control needs.

3. Circular A-97, Specialized and Technical Services to State and Local Governments. Sets forth rules and regulations to effect Title III of the Intergovernmental Cooperation Act authorizing Federal agencies to provide reimbursable technical services to State and local governments.

.04 Responsibility.

A. The Director and Deputy Director are responsible for:

1. Establishing Bureauwide objectives, developing and analyzing national level policies, and setting national priorities for the conduct of the Water Resources Program.

2. Preparing, evaluating, and revising Bureau Manual Sections, Handbooks, and Technical References to maintain a current system of program policy and guidance.

3. Providing liaison at the national level with other Federal agencies and organizations.

4. Ensuring internal coordination between the Water Resources Program and other Bureau programs.

5. Providing direction and leadership to Bureauwide water resources training courses.

BLM_0126954

.04B

7200 - WATER RESOURCES

B.  The Service Center Director is responsible for providing technical support to the Headquarters Office and Field Offices by:

   1.  Responding to Field Office requests for technical assistance and/or training.

   2.  Developing, testing, evaluating, and making recommendations to the Headquarters Office on the applicability of new technologies for the collection, storage and retrieval, analysis and interpretation, and application of water resources data.

   3.  Preparing water resource Handbooks, technical notes, and references, and other Field-oriented guidance at the direction of the Headquarters Office or request of Field Offices.

   4.  Providing liaison with research agencies, educational institutions, and professional organizations to maintain a "state-of-the-art" knowledge in water resources.

C.  State Directors are responsible for achieving the Bureau's Water Resources Program objectives (.02) within their respective States by:

   1.  Implementing Bureauwide water resources policies, setting State water resources priorities, and preparing supplemental program directives for Statewide application.

   2.  Providing liaison with other Federal agencies, State agencies, user groups, and adjoining BLM State Offices to ensure a coordinated Water Resources Program.

   3.  Evaluating Statewide Water Resources Program effectiveness through periodic analyses of related decisions and products (e.g., Resource Management Plans (RMP), activity plans, data management).

   4.  Providing, or otherwise making available, training, workshops, and technical support to ensure that Water Resources Program personnel are professionally equipped to comply with established technical standards.

D.  District Managers are responsible for achieving Bureau and State Water Resources Program objectives within their respective District boundaries by:

   1.  Implementing Bureau and State water resources policies, setting District water resources priorities, and preparing supplemental program directives and guidelines for Districtwide application.

   2.  Cooperating with other Federal, State, and local agencies, user groups; and adjoining BLM District Offices to ensure a coordinated Water Resources Program.

**BLM MANUAL**

.04D3

7200 – WATER RESOURCES

3.  Evaluating Districtwide Water Resources Program effectiveness by periodically reviewing Resource Area work accomplishments for technical adequacy and compliance with Bureau, State, and District policies.

4.  Maintaining sufficient professional expertise, within applicable budgets, in the District and Resource Area organizations to ensure that water resources management is carried out in accordance with established policies and technical standards.

E.  Resource Area Managers are responsible for achieving Bureau, State, and District Water Resources Program objectives within their respective Resource Area boundaries by:

1.  Conducting water resources inventories of water sources/uses and watershed condition.

2.  Implementing water resources monitoring to document changes over time in water quality, water quantity, and sediment yield.

3.  Analyzing and interpreting water resources and related data to determine and maintain a record of resource conditions.

4.  Protecting, acquiring, and/or perfecting water rights to meet multiple-use management needs according to Bureau Policy and Manual Section 7250 procedures.

5.  Preparing and implementing plans to develop, protect, and/or rehabilitate water resources and watersheds.

6.  Identifying and resolving shortages or deficiencies in professional expertise needed to carry out the Water Resources Program.

.05  References.

A.  Manual Section 1601 – Bureau Planning System.

B.  Manual Section 1619 – Activity Plan Coordination.

C.  Manual Section 1621 – Supplemental Program Guidance for Environmental Resources.

D.  Handbook H-1684-1 – Fund Coding Handbook.

E.  Manual Section 1734 – Inventory and Monitoring Coordination.

F.  Handbook H-1734-2 – Rangeland Monitoring.

G.  Manual Section 1740 – Renewable Resource Improvements and Treatments.

BLM_0126956

.05H

7200 – WATER RESOURCES

H.  Handbook H-1740-1 – Renewable Resource Improvement and Treatment Guidelines and Procedures.

I.  Manual Section 1741 – Renewable Resource Improvement, Practices, and Standards.

J.  Manual Section 1743 – Renewable Resource Investment Analysis.

K.  Handbook H-1743-3 - 1 Resource Investment Analysis.

L.  Manual Section 1780 – Cooperative Relations.

M.  Manual Section 7000 – Soil, Water, and Air Management.

N.  Manual Section 7240 – Water Quality.

O.  Manual Section 7250 – Water Rights.

P.  Manual Section 910  – Facility Planning

Q.  Manual Section 9104 – Facility Maintenance.

R.  Manual Section 9171 – Water Development.

S.  Manual Section 9172 – Water Control Structures.

T.  Manual Section 9177 – Maintenance and Safety of Dams.

U.  Manual Section 9184 – Drinking Water Supply.

V.  Manual Section 9188 – Nonpoint Source Pollution Control.

.06  Policy.

A.  Water resources information will be collected and maintained consistent with land management needs and professionally accepted methodologies and standards.

B.  Water resources information will be used through analysis and interpretation to set and monitor resource management objectives, determine compliance with State and Federal authorities, and assess environmental impacts from land use activities.

C.  Water resources improvements and practices will be implemented through the resource management planning process, State water quality management programs, and budget directives.

BLM_0126957

7200 - WATER RESOURCES

.1 <u>Program Operation</u>.  The Water Resources Program is administered as part of the Soil, Water, and Air subactivity.

.11 <u>Programming</u>.  All water resources programming and cost accounting shall use the available program elements in the financial management system (see H-1684-1).  The mix of program elements should be assessed periodically to ensure that they adequately reflect program emphasis and workload.

.12 <u>Program Function</u>.  The Water Resources Program includes three distinguishable, though closely related, areas of activity:  Watershed management, water use/rights, and ground water.  In each of the three areas, there are direct and support functions (see Illustration 1).  The Water Resources Program and Soil Resources Program together provide the policy and technical direction for accomplishing watershed management.  The Water Resources Program provides the policy and technical direction for water use/rights and ground water activities.

.13 <u>Cooperative Relations</u>.  Water resources management activities require cooperation with other agencies and organizations to provide for efficient data collection, information exchange, and the coordinated development or improvement of procedures, practices, and standards.  Due to the States' primary roles in water rights and water quality, the Bureau must establish and/or maintain effective communications and negotiative processes with State water resources administrators.  Principal agencies and organizations are listed below (also see Manual Section 1780).

A.  <u>Federal Agencies</u>.

   1.  USDI Geological Survey, Water Resources Division.

   2.  USDI Bureau of Reclamation.

   3.  USDI Fish and Wildlife Service.

   4.  USDA Forest Service.

   5.  USDA Soil Conservation Service.

   6.  Environmental Protection Agency.

   7.  Army Corps of Engineers.

   8.  NOAA, National Weather Service.

.13B

7200 - WATER RESOURCES

B.  Federal Interagency Advisory Committee on Water Data Acquisition (IACWD).  The BLM is represented on the IACWD and on several of the permanent subcommittees listed below:

    1.  Hydrology.

    2.  Sedimentation.

    3.  Ground Water.

    4.  Water Data and Information Exchange.

    5.  Water Use.

    6.  Water Quality

C.  State.

    1.  Department of Water Resources.

    2.  Department of Forestry.

    3.  State Water Quality Boards and Agencies.

    4.  Universities.

    5.  Water Resources Research Center.

    6.  Water Right Administrators.

D.  Local.

    1.  Irrigation/Drainage Districts.

    2.  City/County Planning Agencies.

    3.  Conservation Districts.

.14  Training.  The Water Resources Program will provide training for BLM employees on principles and techniques of hydrology as applied to water resources management on public lands.  These activities will be based on management needs identified through a periodic training needs analysis, performed by program leaders and training coordinators.  Training and technical guidance will be provided through professional meetings, workshops, formal classroom sessions, packaged training modules, and technical reference publications.

BLM_0126959

.2

7200 – WATER RESOURCES

.2 <u>Planning</u>. Water Resources Program functions are carried out as part of the Bureau Planning System described in Manual Section 1601.12.

.21 <u>Resource Management Plans</u>. Resource management plans (RMP's) are multiple use plans that establish allowable uses, levels of production and protection, and provide management direction for all public land resources. Water resources are addressed and analyzed in the RMP and related EIS to identify objectives and associated actions. Examples of program specific factors of analysis, objectives, and actions, along with other guidance, are provided in Manual Section 1621. Exceptions to RMP-required determinations are outlined in Manual Section 1620.06.

.22 <u>Activity Plans</u>. Activity plans are more detailed, site-specific plans prepared as necessary to supplement and implement an RMP. Water resources activity planning is carried out whenever such need is established in an approved RMP (or Management Framework Plan not yet replaced by an RMP). Water resource activity planning is accomplished through specific Watershed Management Plans or by incorporating watershed management objectives and actions into other resource activity plans (e.g, Allotment Management Plans, Habitat Management Plans). In either case, cooperation among activities is essential to minimize duplication of effort and to ensure the coordinated design to specific features or actions that benefit several activities. Activity plan coordination requirements are described in Manual Section 1619.

23. <u>Project Plans</u>. Watershed management objectives and/or actions identified through the planning process may provide the basis for development of site-specific plans such as project or detailed facility plans (see Manual Section 9101).

BLM_0126960

7200 – WATER RESOURCES

.3  <u>Inventory</u>.  There are two water resources related inventories, one for collecting water use information and the other for characterizing watershed condition.

.31  <u>Water Use</u>.  <mark>All water uses on BLM–administered public land shall be inventoried.</mark>  Water uses on public lands will be located, quantified, and otherwise described to facilitate water rights processes and public inquiries.  Each State Office is responsible for automating and managing water-use inventory data and providing supplemental guidance addressing data collection standards and informational requirements necessitated by individual State water laws.

.32  <u>Watershed Condition</u>.  The watershed condition inventory provides a rating of satisfactory or unsatisfactory for public land watersheds based on soil, water, and related resource components.  The data used are primarily derived from other inventories (e.g., soil surveys, ecological site inventories, water-use inventories), ongoing monitoring efforts (e.g., water quality, streamflow, erosion, climate), and other available descriptive information (e.g., slope, landform).  The watershed condition inventory and associated analyses are used to identify areas in need of rehabilitation or protection and to aid in establishing priorities for improvements and management action.

.4

7200 - WATER RESOURCES

.4  <u>Watershed Monitoring</u>.  Watershed monitoring is the systematic collection and analysis of soil, water, and related resource data to evaluate progress toward meeting specific watershed management objectives and to develop or refine watershed protection practices routinely applied as mitigations or standard operating procedures.  General requirements for renewable resource monitoring are described in Manual Section 1734.  Additional direction for watershed monitoring is provided in Manual Section 7240.

BLM_0126962

7200 – WATER RESOURCES

.5  <u>Watershed Improvements</u>.  Watershed improvements consist of land treatments and structures whose primary function is to reduce soil loss, reduce sedimentation, stabilize streambanks and channels, improve water quality, augment water yields, and/or attenuate flood peaks.  General requirements for planning, coordination, and documentation of renewable resource improvements with specific exceptions and constraints are described in Manual Section 1740.

BLM_0126963

.6

7200 - WATER RESOURCES

.6  Project Maintenance.  Maintenance of existing watershed improvements is
essential to assure the health and safety of public land users and to provide
for continued benefits from previous Federal investments.  Facility
maintenance policies in Manual Section 9104 require that all Bureau physical
facilities be inventoried, have maintenance plans, and have condition surveys
performed at regularly scheduled intervals and following unusually severe
climatic events.

.61  Dam Safety.  In addition to the above requirements, BLM-administered
dams must be assigned a hazard classification based on the potential for loss
of life and property downstream from the structure.  Classification procedures
and special requirements for dams with high or significant hazard ratings are
described in Manual Section 9177.

.62  Abandonment.  Where it is determined that the benefits of an existing
watershed improvement no longer justify the costs of continued maintenance,
the project shall be abandoned or removed and the site stabilized or
rehabilitated as necessary.  Such determinations must be documented in
accordance with established environmental and investment analysis standards
(see Manual Section 1740.1).

BLM_0126964

.7

7200 – WATER RESOURCES

.7  <u>Water Rights</u>.  The BLM shall ensure water availability for, and legally
protect, existing and proposed water uses needed by its resource management
programs.  Manual Section 7250 (Water Rights) provides direction on acquiring
and perfecting water rights.  The Water Resources Program coordinates and
directs responses to State-ordered adjudications, expert testimonies for
water-use litigation, and applications for State appropriations or assertions
of Federal water rights.  Where instream flow needs are addressed through
planning, the Bureau will perform necessary instream flow assessments,
determinations, and reports prior to any water-right assertions or
acquisitions.

**BLM MANUAL**

BLM_0126965

.8

7200 – WATER RESOURCES

.8  <u>Ground Water</u>.  Regional or Areawide ground water studies provide resource information associated with supply and water quality determinations.  These studies are considered reconnaissance level or extensive in scope, and are conducted to satisfy multiresource data needs.  Examples of these studies would include Resource Areawide ground water data collection to supplement RMP's, or characterization of extensive subsurface water supplies potentially available to water users in general (not based on individual water project proposals).

BLM_0126966

7200 - WATER RESOURCES

.9  Support Activities.  The Water Resources Program provides input to other BLM programs by incorporating hydrologic considerations, both on and offsite, into proposed actions to protect water resources values.  Examples of appropriate input to the various Bureau programs are outlined below.

.91  Water Use/Rights.

A.  Legal Availability.  Provide direction and assistance to other programs for quantification, acquisition, transfer, and protection of water rights for specific uses such as recreation, wildlife, livestock, and mineral development and exploration.  The types and amounts of assistance are specifically based on individual water project proposals.  Activities in support of land sales, purchases, and exchanges would require legal status determinations of existing water uses(s) and proper transfer or acquisition of water rights.

B.  Physical Availability.  Provide hydrologic determinations of water supply during applicable project planning.  Determinations include predicting surface water yields available to proposed reservoirs and performing well-site investigations.  Due to the natural variability of ground water (e.g., depth occurrence) and cost of developing ground water resources, a well-site investigation is necessary and cost effective on all proposed well developments.

.92  Floodplain Delineation and Mapping.  Provide floodplain data for proposed activities affecting these areas.  Proposed activities such as locating recreational sites, using rivers and streams for water sports, managing wetlands, developing mineral resources, and lands exchanges must have information regarding floodplain locations, elevations, and risks.

.93  Hydrologic Design.  Provide hydrologic design assistance for proposed water projects.  Hydrologic design is the determination of flood volumes, peaks, frequencies, and analyses of associated risks to allow for proper operation and maintenance of facilities.  Facilities that often need hydrologic design input are roads, bridges, reservoirs, recreation sites, channel stabilization projects, and wildlife habitat improvements.  Provide review of water development project proposals affecting public lands for impacts to Bureau-managed resources, programs or activity plans.

.94  Water Power and Water Storage Assessments.  Provide assistance in assessing Federal lands for waterpower and water storage potential.  Such assessments shall be conducted to identify sites suitable for development for hydro-power, irrigation, flood control, water supply, recreation, and other uses.  Such sites are subject to withdrawal to assure availability, free of encumbrance, for future water project development.

BLM_0126967

.95

7200 – WATER RESOURCES

.95  Impact Assessments.  Provide analyses of water resources and watershed system impacts from planned land uses and resource development.  The analysis must be documented typically in an RMP environmental impact statement (EIS), specific activity EIS, or programmatic environmental assessments.  The following are specific examples of analyses for determining positive and negative effects on hydrologic systems:

   A.  Providing hydrologic input to prescribed burn plans.

   B.  Identifying impacts to water resource values from recreational uses such as off-road vehicles, camping, and boating.

   C.  Evaluating vegetation and surface treatments and the changes to water resource values caused by the treatments.

   D.  Analyzing impacts to water resources due to mineral exploration and development activities.

   E.  Determining potential hydrologic changes resulting from silvicultural practices.

   F.  Identifying hydrologic considerations where changes in land ownership are proposed.

   G.  Identifying water resource problems associated with developing habitat improvements.

   .96  Mitigative Measures.  Provide assistance in determining, recommending, and implementing mitigative measures for minimizing or avoiding water resource impacts from resource development.  Mitigative measures may include, but are not limited to, protective stipulations, reclamation standards and techniques, best management practices, land-use restrictions, and substitute resource provisions.  Grazing, timber harvesting, mineral exploration and development, and recreational activities are resource uses often encountered and typically requiring mitigative measures.

   .97  Compliance Monitoring.  Provide technical and procedural input to activities such as testing drinking water at recreational facilities, evaluating permit compliance (e.g., mining operation plans, National Pollutant Discharge Elimination System-(NPDES), and verifying best management practices implementation.

BLM_0126968

Illustration 1
(.1)

7200 – WATER RESOURCES



**ACTIVITIES OF THE
SOIL AND WATER RESOURCES PROGRAMS**

|◄——— WATER RESOURCES PROGRAM ———►|

| | SOILS | WATERSHED MANAGEMENT | WATER USE/RIGHTS | GROUND WATER |
|---|---|---|---|---|
| **D I R E C T** | Soil Survey<br><br>Soil Interpretations<br>• Development<br>• Application<br><br>Research and Development | Watershed Condition Determination<br>• Erosion/Sedimentation<br>• Water Quality<br>• Runoff<br><br>Watershed Rehabilitation<br>• Planning/Implementation<br>• Monitoring<br>• Maintenance<br><br>RESEARCH AND DEVELOPMENT | Water Source Inventory<br><br>Water Rights<br>• Respond to State Adjudications<br>• Assert Federal Reservations<br>• Expert Witness<br><br>Instream Flow Quantification | Regional or Determination<br>• Water Quality<br>• Supply<br><br>Data Compilation<br><br>Research and Development |
| **S U P P O R T** | Soil/Vegetation Correlation<br><br>Site-Specific Evaluations<br><br>Impact Assessment and Mitigation | Floodplain Delineation<br><br>Hydrologic Design<br><br>Impact Assessment and Mitigation<br><br>Compliance Monitoring | Availability Determination<br><br>Individual Project Filings | Well Site Investigation<br><br>Impact Assessment and Mitigation<br><br>Compliance Monitoring |

|◄——— SOIL RESOURCES PROGRAM ———►|

Rel. 7–107
10/5/89

BLM_0126969

BLM. 2004. Proposed Upper Deschutes Resource Management Plan/Final Environmental Impact Statement.
BLM, Prineville District, Deschutes Resource Area. (September 2004). Vol. I: xxxiii.

## Table ES-1. Comparison of Grazing Management in Alternatives[1]

Alternative 7 (Preferred Alternative) would reduce the areas available for livestock grazing over those identified in Alternative 1 (current management) by up to approximately 121,000 acres, reducing available AUMs by about 20% percent in the planning area, if all permittees willingly relinquished their permits. This would reduce conflicts between livestock grazing and other uses on and adjacent to public land. About half of these acres would still be available as Reserve Forage Allotments, but the AUMs would not be allocated to specific permittees.

| | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 | Alternative 6 | Alternative 7 |
|---|---|---|---|---|---|---|---|
| **Livestock Grazing** | | | | | | | |
| Acres available for livestock grazing[5] | 389,900 | 389,348 | 389,348 | 348,682 | 228,625 | 347,890 | 268,815 |
| AUMs / Number of Allotments[6] | | | | | | | |
| Available (Open) | 25,840 / 124 | 25,779 / 124 | 25,779 / 124 | 23,545 / 86 | 13,261 / 61 | 24,375 / 115 | 20,785 / 84 |
| Open or available as RFA[7] | 0 | 0 | 0 | 0 | 0 | 0 | 472[9] / 1 |
| Available as RFA | 0 | 0 | 0 | 0 | 0 | 0 | 1,967[10] / 10 |
| RFA or not available[8] | 0 | 0 | 0 | 0 | 0 | 0 | 1,834[11] / 23 |
| Not available (Closed) | 0 | 69 / 0 | 69 / 0 | 2,345 / 38 | 12,530 / 63 | 1,508 / 9 | 721[12] / 6 |

[1] All numbers in this table are approximate. All percentages are in relation to the approximately 404,000 acres of BLM-administered public land within the planning area, not in relation to all land in the planning area.

[5] The available acres are not 100% of the acres in the planning area; several thousand acres remain unavailable to grazing in all alternatives.
[6] Allotments were counted as Open if any portion of the allotment remains Open in the alternative. Number of allotments counts La Pine unallotted as one.
[7] RFA = reserve forage allotment (see text for description)
[8] The "RFA or not available" column is a management discretion category.
[9] This figure assumes the permittees voluntarily relinquish their permits. If they don't, the figures would drop to 0 and "open" would increase correspondingly.
[10] ibid
[11] ibid
[12] ibid

BLM_0126970

BLM. 2004. Proposed Upper Deschutes Resource Management Plan/Final Environmental Impact Statement. BLM, Prineville District, Deschutes Resource Area. (September 2004). Vol. III: 50-58.

## Land Uses

### Livestock Grazing

<u>Objective LG - 1</u>: Provide for continued livestock grazing, while reducing conflicts with and meeting needs of other uses and resources.

**Rationale:**

During the planning process, public comments urged the BLM to modify or discontinue grazing in sensitive areas, critical plant/animal habitats, and areas not grazed in many years. Livestock grazing permittees who rely on public lands also expressed continued concerns about the difficulty of managing allotments in areas adjacent to resorts and residential areas, and in areas of high recreation uses. BLM management direction is to reduce threats to public health, safety, and property as well as to provide guidance for grazing management.

FLPMA, the Public Rangeland Improvement Act (PRIA), the Taylor Grazing Act, and other acts direct public lands to be managed for multiple use and sustained yield; and, among other things, to provide for improved forage conditions to benefit wildlife, watershed protection and livestock production.

The Standards for Rangeland Health and Guidelines for Livestock Management (BLM 1997), provide standards by which the condition of watersheds currently under livestock management can be measured to evaluate upland and riparian function, ecological processes, water quality, and habitat for native, Threatened and Endangered, and locally important species. Based on the condition assessment, this direction also guides actions to be taken if livestock grazing is found to be affecting those factors. These Standards and Guidelines have been incorporated into this plan by reference, and form the basis for future evaluation of livestock use. However, these Standards and Guidelines to not include evaluation social and economic conditions that are prevalent throughout the planning area. The Grazing Matrix establishes classifications into which each allotment is placed depending upon a number of factors in addition to the Rangeland Health Standards. This approach is described under guidelines, and the classifications displayed in the Grazing Matrix.

### Allocations/Allowable Uses:

**General Uses**

1. Allow prescribed livestock grazing to control weeds, reduce fire danger, or accomplish other management objectives, regardless of parcel status (including active, vacant, RFA, or area of discontinued grazing).
   A. Prescribed grazing would only occur when BLM initiates such action.
   B. Vacant allotments and areas of discontinued grazing would not be available for temporary non-renewable grazing use.
2. Allotment classifications shown in appendix G may be adjusted by more site-specific information about allotments.
3. Livestock grazing would not be allowed in the fenced area around Mayfield Pond, after an alternate water source for livestock is established.
4. Additional direction for livestock grazing in Peck's Milkvetch ACEC is described in the Special Management Areas section.
5. After a disturbance event[1] which results in undesirable soil or plant conditions, livestock grazing would typically not be permitted the remainder of the calendar year, and through the growing season of the next year. Exceptions would be for cases where such grazing would either not impede site recovery, or where livestock are used as a tool to aid in achieving certain recovery objectives (such as cheatgrass control). Livestock grazing would resume after interdisciplinary review and determination that soil and vegetation have recovered sufficiently from the initial disturbance to support livestock grazing.
6. Livestock grazing would be allowed in pastures if the disturbance event does not result in undesirable soil or vegetative conditions. Livestock exclusion after disturbance events would also not be required if livestock would not be trailed through the affected area, and attractants (e.g., water, supplemental feed, salt) are not provided within one mile. Attractants could be closer than one mile if physical barriers (e.g., rimrock, fences) would prevent livestock access to the affected area.
7. Prescribed or permitted livestock grazing could occur any time after disturbances in pastures containing affected areas if an interdisciplinary team designs and monitors the grazing to accomplish resource objectives (e.g. to control noxious weeds, or assist in getting broadcast seeds worked into the soil).

[1] Natural and human-induced events including but not limited to wildland fire, prescribed burns, timber management treatments, juniper cuts, and rehabilitation seedings.

BLM_0126971

**Allotment Classification**

8. FEIS Map 5 and the "Alt 7" column in Appendix G show areas available for livestock grazing. Allotments are shown or listed in one of several categories: "Open," "If permit is relinquished (IPR), Open or create Reserve Forage Allotment (RFA)" (see explanation of RFA below under guidelines), "IPR, create RFA," "IPR, Close or create RFA," "IPR, Close" or "Close." Some of these categories allow manager discretion (ones with "or").

9. Livestock grazing would continue to be allowed for allotments in the "Open" category on the Grazing Matrix (Table PRMP-4). See section below on "Using the Grazing Matrix" for instructions on how to rate allotments, and see Table PRMP-5 for allotments' raw scores on each factor. Currently about 90 allotments (75 percent) of the allotments are in the "Open" category.

10. Livestock grazing would continue be allowed under permit or as an RFA for allotments falling in the "IPR, Open or Create RFA" category on the Grazing Matrix if the grazing permittee voluntarily relinquishes his or her grazing permit.

11. Allow livestock grazing as an RFA for allotments falling into the "IPR, Create RFA" category if the grazing permittee voluntarily relinquishes his or her grazing permit.

12. Livestock grazing would not be allowed under permit but could be allowed as an RFA for allotments falling into the "IPR, Close or Create RFA" category if the grazing permittee voluntarily relinquishes his or her grazing permit.

13. Livestock grazing would not be allowed for allotments falling in the "IPR, Close" category if the grazing permittee voluntarily relinquishes his or her grazing permit.

14. Livestock grazing would not be allowed for allotments falling in the "Close" category.

**Guidelines:**

1. Permits for Reserve Forage Allotments would not be held by specific grazing operators. In these allotments, temporary, non-renewable use could be granted to federal permit holders when there is a demonstrated need to rest a permittee's allotment. "Need" for rest would include but not be limited to the following reasons: Prior to prescribed fire or necessary fence construction, or during/after rehabilitation projects, wildland fire or prescribed fire, drought, flood, insect damage, or disease. Use would meet goals described for the area in the RMP and, if applicable, in an Allotment Management Plan.

2. Grazing operators in good standing can continue to hold or transfer permits to other qualified applicants in all but those allotments in the "Close" category on the Grazing Decision Matrix.

*Using the Grazing Matrix*

3. Estimate the potential demand for and social and ecological conflict in each allotment using the factors shown in Table PRMP-2. Note conflict/demand are interrelated, so there is some overlap of factors used in their estimates. The weighting of each factor in the conflict/demand rating is also shown in the Table PRMP-3.

BLM_0126972

## Table PRMP-2 Grazing Matrix Factors[1]

| Factor title | What factor measures | How factor is calculated[2] | Weight of factor | | |
|---|---|---|---|---|---|
| | | | Social | Demand | Ecological |
| SMA Social | Percent of acres within allotment designated as a Special Management Area (SMA) in part for social values (e.g.: WSA for scenery, solitude) | Acres SMA-social / total acres in allotment. | 33 | | |
| Zoning | Miles of high-density zoning (resort, residential) along allotment boundary relative to number of AUMs in allotment, and relative to other allotments. | Miles X 4000 / AUMs in allotment. [3] | 33 | 20 | |
| Recreation | Amount of recreational use in allotment | If C3 on Allotment Categorization Form (see App. G) is "M" then the score is 75; if it is "H" the score is 100. | 33 | 12 | |
| Wait List | Rancher interest in allotment | Relative interest shown in an allotment compared to other allotments, based on considerations including but not limited to applications, letters of interest and personal contacts. | | 12 | |
| Fencing | Cost to install new fence and maintain existing fence, relative to other allotments. | Miles of fence maintenance X 4 X $50 / mi / yr + miles of new fence X $4,000 / mi / decade.[4] | | 12 | |
| Water | Percent of allotment needing water hauled to troughs | Permittee and BLM estimate of number of acres served by hauling water to troughs, divided by the total number of acres in the allotment. | | 12 | |
| Seasonal | Amount of seasonal restrictions on livestock grazing. | Grazing restricted to one season = 100, two seasons = 50, three seasons = 25, year-round permit = 0 | | 10 | |
| Forage | Relative amount of forage in allotment, compared to other allotments in planning area | For each allotment, 2500 / AUMs.[5] | | 12 | |
| Wildlife | Percent of allotment containing important deer, grouse, and elk habitats. | For each allotment, 0.5 X (percent of acres deer winter range + percent of acres sage grouse habitat + percent elk winter range)[6] | | 10 | 30 |
| SMA Ecological | Percent of acres within allotment designated SMA at least in part for ecological values (e.g. Peck's Milkvetch ACEC). | Acres SMA-ecological / total acres in allotment. | | | 30 |
| Rangeland Health Assessment | Percent of Standards not met during Rangeland Health Assessment, where livestock have been determined to be part of that failure. | Number of Standards not met where livestock are a factor / total number of Standards (5) | | | 40 |

[1] Each allotment's score on the above factors at the time of this printing is listed in Table LG2-XX. These scores are not constant; they change as the amount of residentially zoned land around allotments changes, as the proportion of the allotment where water is hauled vs. piped changes, and as each of the other factors making up the scores changes.
[2] All calculations are estimates, and would require site visit, updated information, and permittee input to get more accurate estimate. Scores at time of this printing are shown in Appendix G.
[3] Score is multiplied (by number indicated) and scores over 100 are set at 100, to get a more even spread of scores and to make the indicators sensitive enough to register differences.
[4] Ibid
[5] Ibid
[6] Ibid

BLM_0126973

Table PRMP-3 Grazing Matrix Rating

| Factor | Rating | | |
|---|---|---|---|
| | Low | Moderate | High |
| Social | <34 | 34-66 | >66 |
| Demand | >66 | 34-66 | <34 |
| Ecological | <34 | 34-66 | >67 |

Table PRMP-4: Grazing Matrix

| | | SOCIAL & ECOLOGICAL RATING | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low Ecological | | | Moderate Ecological | | | High Ecological | | |
| | | Low Social | Moderate Social | High Social | Low Social | Moderate Social | High Social | Low Social | Moderate Social | High Social |
| DEMAND RATING | Low Demand | IPR[1], Close or create RFA[2] | IPR, Close or create RFA | IPR, Close or create RFA | IPR, Close or create RFA | IPR, Close | IPR, Close | IPR, Close | Close[3] | Close |
| | Moderate Demand | Open | Open | IPR, create RFA | Open | IPR, Close or create RFA | IPR, Close | IPR, Close or create RFA | IPR, Close | IPR, Close |
| | High Demand | Open | Open | IPR, Open or create RFA | Open | IPR, Open or Create RFA | IPR, create RFA | IPR, Open or create RFA | IPR, create RFA | IPR, Close or create RFA |

[1] IPR = if permit is relinquished
[2] RFA = Reserve Forage Allotment
[3] Close = Discontinue livestock grazing for the life of the plan. BLM would provide two years notice of cancellation unless waived by permittee.

BLM_0126974

Table PRMP-5: Indicators of and estimated levels of Conflict/Demand regarding Livestock Grazing (for use in Grazing Matrix).

| Allotment Number | Indicators (factors) | | | | | | | | | | | Estimated Levels Total score[1] in category, and rating (Low, Moderate, High) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SMA Soc | Zoning | Recreation | Waiting List | Fences | Water | Seasonal | Forage | Wildlife | SMA Eco | S&Gs | Social | | Demand | | Ecological | |
| 0072 | 0 | 12 | 75 | 75 | 57 | 100 | 100 | 30 | 3 | 0 | 0 | 43 | M | 58 | M | 1 | L |
| 5001 | 0 | 100 | 75 | 90 | 29 | 100 | 50 | 100 | 3 | 0 | 0 | 88 | H | 72 | L | 1 | L |
| 5002 | 0 | 100 | 75 | 95 | 100 | 0 | 100 | 100 | 0 | 0 | 0 | 88 | H | 74 | L | 0 | L |
| 5003 | 0 | 100 | 0 | 95 | 100 | 100 | 50 | 100 | 0 | 0 | 0 | 51 | M | 72 | L | 0 | L |
| 5004 | 0 | 0 | 0 | 90 | 25 | 0 | 100 | 100 | 0 | 0 | 0 | 0 | L | 43 | M | 0 | L |
| 5006 | 0 | 100 | 75 | 95 | 100 | 100 | 50 | 100 | 100 | 100 | 0 | 88 | H | 91 | L | 60 | M |
| 5007 | 0 | 0 | 75 | 85 | 68 | 50 | 100 | 100 | 100 | 100 | 0 | 37 | M | 72 | L | 60 | M |
| 5011 | 0 | 0 | 0 | 0 | 17 | 0 | 0 | 100 | 100 | 0 | 0 | 0 | L | 24 | H | 30 | L |
| 5012 | 0 | 72 | 75 | 75 | 77 | 100 | 0 | 30 | 100 | 0 | 0 | 74 | H | 68 | L | 30 | L |
| 5018 | 0 | 41 | 75 | 50 | 27 | 0 | 50 | 51 | 100 | 0 | 0 | 58 | M | 48 | M | 30 | L |
| 5019 | 0 | 0 | 100 | 10 | 5 | 40 | 25 | 13 | 10 | 0 | 0 | 50 | M | 24 | H | 3 | L |
| 5022 | 0 | 100 | 75 | 75 | 42 | 0 | 100 | 40 | 0 | 0 | 20 | 88 | H | 56 | M | 8 | L |
| 5023 | 0 | 0 | 0 | 0 | 40 | 0 | 0 | 100 | 80 | 0 | 0 | 0 | L | 25 | H | 24 | L |
| 5024 | 0 | 0 | 0 | 0 | 20 | 0 | 25 | 100 | 100 | 0 | 0 | 0 | L | 27 | H | 30 | L |
| 5026 | 0 | 67 | 0 | 95 | 100 | 0 | 50 | 83 | 100 | 2 | 0 | 34 | M | 64 | M | 31 | L |
| 5031 | 0 | 0 | 75 | 100 | 100 | 0 | 0 | 37 | 100 | 0 | 40 | 37 | M | 53 | M | 46 | M |
| 5032 | 0 | 0 | 0 | 90 | 25 | 100 | 100 | 100 | 53 | 0 | 0 | 0 | L | 60 | M | 16 | L |
| 5050 | 0 | 0 | 100 | 85 | 11 | 100 | 50 | 89 | 100 | 0 | 0 | 50 | M | 68 | L | 30 | L |
| 5051 | 0 | 0 | 100 | 85 | 20 | 100 | 0 | 49 | 100 | 0 | 0 | 50 | M | 59 | M | 30 | L |
| 5052 | 0 | 0 | 100 | 85 | 50 | 100 | 0 | 100 | 82 | 0 | 0 | 50 | M | 67 | L | 25 | L |
| 5061 | 0 | 100 | 100 | 95 | 100 | 100 | 50 | 7 | 100 | 0 | 0 | 101 | H | 83 | L | 30 | L |
| 5064 | 0 | 0 | 0 | 65 | 23 | 100 | 50 | 57 | 100 | 0 | 0 | 0 | L | 50 | M | 30 | L |
| 5065 | 0 | 52 | 75 | 50 | 34 | 100 | 100 | 8 | 100 | 0 | 0 | 63 | M | 62 | M | 30 | L |
| 5066 | 0 | 29 | 0 | 75 | 32 | 100 | 100 | 74 | 100 | 0 | 0 | 15 | L | 63 | M | 30 | L |
| 5067 | 0 | 0 | 75 | 95 | 100 | 0 | 50 | 100 | 100 | 0 | 0 | 37 | M | 67 | L | 30 | L |
| 5068 | 0 | 0 | 75 | 95 | 100 | 100 | 50 | 54 | 100 | 0 | 0 | 37 | M | 74 | L | 30 | L |
| 5069 | 0 | 100 | 75 | 95 | 100 | 50 | 50 | 100 | 100 | 0 | 0 | 88 | H | 85 | L | 30 | L |
| 5070 | 0 | 0 | 75 | 95 | 100 | 100 | 50 | 13 | 100 | 0 | 0 | 37 | M | 69 | L | 30 | L |
| 5071 | 0 | 56 | 75 | 95 | 100 | 100 | 50 | 10 | 100 | 0 | 0 | 65 | M | 75 | L | 30 | L |

BLM_012975

| Allotment Number | Indicators (factors) | | | | | | | | | | | Estimated Levels — Total score* in category, and rating (Low, Moderate, High) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SMA Soc | Zoning | Recreation | Waiting List | Fences | Water | Seasonal | Forage | Wildlife | SMA Eco | S&Gs | Social | | Demand | | Ecological | |
| 5072 | 0 | 42 | 100 | 90 | 90 | 100 | 50 | 17 | 100 | 0 | 0 | 71 | H | 75 | L | 30 | L |
| 5073 | 0 | 13 | 100 | 90 | 10 | 100 | 0 | 4 | 100 | 43 | 0 | 56 | M | 49 | M | 43 | M |
| 5075 | 0 | 71 | 100 | 60 | 50 | 100 | 0 | 22 | 100 | 65 | 0 | 86 | H | 63 | M | 50 | M |
| 5076 | 0 | 0 | 0 | 75 | 4 | 0 | 100 | 37 | 100 | 0 | 40 | 0 | L | 40 | M | 46 | M |
| 5078 | 0 | 100 | 100 | 75 | 12 | 100 | 50 | 13 | 100 | 100 | 40 | 101 | H | 69 | L | 76 | H |
| 5079 | 0 | 10 | 100 | 75 | 12 | 100 | 50 | 25 | 100 | 49 | 40 | 55 | M | 60 | M | 61 | M |
| 5080 | 0 | 24 | 75 | 50 | 37 | 100 | 0 | 12 | 100 | 0 | 0 | 49 | M | 50 | M | 30 | L |
| 5081 | 0 | 0 | 0 | 80 | 36 | 0 | 100 | 100 | 100 | 0 | 0 | 0 | L | 52 | M | 30 | L |
| 5082 | 0 | 0 | 0 | 95 | 100 | 0 | 50 | 100 | 100 | 0 | 0 | 0 | L | 58 | M | 30 | L |
| 5084 | 0 | 0 | 75 | 95 | 100 | 100 | 50 | 100 | 0 | 0 | 0 | 37 | M | 69 | L | 0 | L |
| 5086 | 0 | 0 | 0 | 90 | 100 | 0 | 100 | 100 | 20 | 0 | 0 | 0 | L | 54 | M | 6 | L |
| 5088 | 0 | 0 | 0 | 90 | 12 | 0 | 25 | 100 | 79 | 0 | 0 | 0 | L | 42 | M | 24 | L |
| 5089 | 0 | 0 | 75 | 90 | 100 | 25 | 100 | 100 | 0 | 0 | 0 | 37 | M | 64 | M | 0 | L |
| 5092 | 0 | 0 | 100 | 90 | 36 | 0 | 0 | 76 | 0 | 0 | 0 | 50 | M | 53 | M | 0 | L |
| 5093 | 0 | 0 | 0 | 90 | 84 | 0 | 50 | 100 | 0 | 0 | 0 | 0 | L | 45 | M | 0 | L |
| 5094 | 0 | 0 | 0 | 90 | 13 | 100 | 25 | 100 | 0 | 0 | 0 | 0 | L | 46 | M | 0 | L |
| 5096 | 0 | 83 | 0 | 90 | 25 | 0 | 0 | 100 | 100 | 0 | 0 | 43 | M | 53 | M | 30 | L |
| 5107 | 0 | 0 | 0 | 90 | 6 | 0 | 25 | 69 | 0 | 0 | 0 | 0 | L | 30 | H | 0 | L |
| 5108 | 15 | 0 | 100 | 80 | 17 | 0 | 25 | 33 | 100 | 0 | 0 | 57 | M | 47 | M | 30 | L |
| 5109 | 0 | 0 | 75 | 60 | 17 | 100 | 0 | 10 | 100 | 0 | 0 | 37 | M | 46 | M | 30 | L |
| 5110 | 0 | 0 | 0 | 90 | 11 | 0 | 25 | 71 | 0 | 0 | 0 | 0 | L | 30 | H | 0 | L |
| 5111 | 0 | 100 | 75 | 75 | 37 | 100 | 100 | 51 | 0 | 0 | 0 | 88 | H | 69 | L | 0 | L |
| 5112 | 0 | 4 | 75 | 60 | 15 | 50 | 50 | 10 | 0 | 0 | 0 | 39 | M | 36 | M | 0 | L |
| 5113 | 0 | 0 | 100 | 60 | 27 | 50 | 100 | 25 | 0 | 0 | 0 | 50 | M | 46 | M | 0 | L |
| 5114 | 0 | 0 | 100 | 60 | 11 | 50 | 25 | 14 | 0 | 0 | 0 | 50 | M | 36 | M | 0 | L |
| 5115 | 0 | 0 | 100 | 50 | 24 | 0 | 50 | 23 | 0 | 0 | 0 | 50 | M | 33 | M | 0 | L |
| 5116 | 2 | 60 | 100 | 50 | 11 | 0 | 100 | 4 | 0 | 0 | 0 | 81 | H | 41 | M | 0 | L |
| 5117 | 5 | 0 | 100 | 50 | 9 | 0 | 50 | 5 | 0 | 0 | 0 | 52 | M | 29 | H | 0 | L |
| 5119 | 0 | 0 | 0 | 50 | 4 | 0 | 100 | 50 | 0 | 0 | 0 | 0 | L | 26 | L | 0 | L |
| 5120 | 4 | 0 | 100 | 90 | 13 | 50 | 25 | 11 | 0 | 0 | 0 | 51 | M | 33 | M | 0 | L |
| 5121 | 0 | 0 | 75 | 25 | 13 | 100 | 0 | 21 | 0 | 0 | 0 | 37 | M | 30 | M | 0 | L |
| 5122 | 13 | 100 | 75 | 85 | 13 | 0 | 25 | 37 | 0 | 0 | 0 | 95 | H | 47 | M | 30 | H |
| 5123 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 49 | 100 | 0 | 0 | 0 | L | 17 | H | 30 | L |

| Allotment Number | Indicators (factors) | | | | | | | | | | Estimated Levels — Total score² in category, and rating (Low, Moderate, High) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SMA Soc | Zoning | Recreation | Waiting List | Fences | Water | Seasonal | Forage | Wildlife | SMA Eco | S&Gs | Social | | Demand | | Ecological | |
| 5125 | 0 | 0 | 100 | 50 | 14 | 50 | 25 | 8 | 0 | 0 | 0 | 50 | M | 33 | H | 0 | L |
| 5127 | 0 | 0 | 100 | 25 | 14 | 100 | 25 | 4 | 100 | 0 | 0 | 50 | M | 44 | M | 30 | L |
| 5130 | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 24 | 100 | 0 | 0 | 0 | L | 14 | H | 30 | L |
| 5132 | 0 | 25 | 100 | 25 | 21 | 75 | 0 | 6 | 100 | 0 | 0 | 62 | M | 42 | M | 30 | L |
| 5133 | 0 | 0 | 0 | 0 | 53 | 0 | 25 | 100 | 100 | 0 | 0 | 0 | L | 31 | H | 30 | L |
| 5134 | 0 | 0 | 100 | 0 | 14 | 5 | 0 | 4 | 100 | 0 | 60 | 50 | M | 25 | H | 54 | M |
| 5135 | 0 | 72 | 100 | 25 | 12 | 0 | 0 | 7 | 100 | 0 | 0 | 86 | H | 38 | M | 30 | L |
| 5136 | 0 | 57 | 100 | 10 | 13 | 0 | 75 | 7 | 100 | 0 | 0 | 78 | H | 41 | M | 30 | L |
| 5138 | 0 | 0 | 75 | 25 | 23 | 100 | 0 | 10 | 100 | 0 | 0 | 37 | M | 40 | M | 30 | L |
| 5140 | 0 | 0 | 75 | 0 | 6 | 0 | 50 | 2 | 100 | 0 | 0 | 37 | M | 25 | H | 30 | L |
| 5141 | 0 | 0 | 0 | 0 | 6 | 0 | 50 | 7 | 100 | 0 | 0 | 0 | L | 17 | H | 30 | L |
| 5142 | 0 | 100 | 75 | 0 | 23 | 0 | 0 | 54 | 100 | 0 | 0 | 88 | H | 40 | M | 30 | L |
| 5143 | 0 | 0 | 75 | 0 | 14 | 0 | 75 | 15 | 100 | 0 | 0 | 37 | M | 30 | H | 30 | L |
| 5145 | 0 | 0 | 100 | 0 | 16 | 0 | 50 | 15 | 100 | 0 | 0 | 50 | M | 31 | H | 30 | L |
| 5176 | 0 | 0 | 0 | 95 | 100 | 0 | 50 | 100 | 100 | 0 | 0 | 0 | L | 58 | M | 30 | L |
| 5177 | 0 | 0 | 0 | 90 | 16 | 0 | 50 | 25 | 100 | 0 | 0 | 0 | L | 38 | M | 30 | L |
| 5178 | 0 | 0 | 0 | 95 | 100 | 50 | 50 | 36 | 100 | 0 | 0 | 0 | L | 56 | M | 30 | L |
| 5179 | 0 | 0 | 0 | 90 | 100 | 0 | 50 | 100 | 60 | 0 | 0 | 0 | L | 53 | M | 18 | L |
| 5180 | 0 | 0 | 0 | 85 | 100 | 0 | 50 | 100 | 99 | 0 | 0 | 0 | L | 56 | M | 30 | L |
| 5182 | 0 | 0 | 0 | 95 | 100 | 0 | 50 | 32 | 100 | 0 | 0 | 0 | L | 50 | M | 30 | L |
| 5198 | 0 | 0 | 0 | 95 | 100 | 0 | 50 | 100 | 80 | 0 | 60 | 0 | L | 56 | M | 48 | M |
| 5201 | 0 | 43 | 100 | 75 | 13 | 100 | 50 | 18 | 0 | 0 | 0 | 71 | H | 53 | M | 0 | L |
| 5204 | 100 | 71 | 75 | 90 | 25 | 100 | 25 | 89 | 100 | 0 | 40 | 123 | H | 74 | L | 30 | L |
| 5205 | 56 | 0 | 75 | 85 | 48 | 0 | 0 | 33 | 100 | 0 | 0 | 65 | M | 46 | M | 46 | M |
| 5206 | 0 | 100 | 75 | 95 | 100 | 100 | 50 | 100 | 100 | 0 | 40 | 88 | H | 91 | L | 30 | L |
| 5207 | 100 | 0 | 75 | 85 | 39 | 100 | 25 | 66 | 100 | 0 | 40 | 87 | H | 63 | M | 46 | M |
| 5208 | 0 | 28 | 75 | 25 | 6 | 0 | 50 | 4 | 100 | 0 | 0 | 52 | M | 34 | M | 30 | L |
| 5209 | 93 | 0 | 75 | 25 | 11 | 100 | 25 | 5 | 100 | 0 | 20 | 83 | H | 40 | M | 38 | M |
| 5210 | 0 | 0 | 75 | 0 | 5 | 100 | 2 | 2 | 100 | 0 | 0 | 37 | M | 32 | H | 30 | L |
| 5211 | 0 | 0 | 100 | 10 | 7 | 85 | 0 | 8 | 100 | 0 | 0 | 50 | M | 36 | M | 30 | L |
| 5212 | 5 | 0 | 100 | 10 | 5 | 0 | 0 | 1 | 100 | 0 | 0 | 52 | M | 25 | H | 30 | L |
| 5213 | 44 | 0 | 100 | 10 | 8 | 100 | 0 | 4 | 100 | 0 | 0 | 71 | H | 37 | M | 30 | L |
| 5214 | 0 | 0 | 100 | 0 | 9 | 0 | 0 | 3 | 100 | 0 | 0 | 50 | M | 23 | H | 30 | L |

BLM_0126977

| Allotment Number | Indicators (factors) | | | | | | | | | | | Estimated Levels Total score[1] in category, and rating (Low, Moderate, High) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SMA Soc | Zoning | Recreation | Waiting List | Fences | Water | Seasonal | Forage | Wildlife | SMA Eco | S&Gs | Social | | Demand | | Ecological | |
| 5216 | 0 | 0 | 75 | 85 | 75 | 0 | 100 | 100 | 0 | 0 | 20 | 37 | M | 57 | M | 8 | L |
| 5224 | 0 | 0 | 0 | 0 | 47 | 0 | 0 | 100 | 100 | 0 | 0 | 0 | L | 28 | H | 30 | L |
| 5228 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 15 | 100 | 0 | 0 | 0 | L | 13 | H | 30 | L |
| 5231 | 0 | 0 | 75 | 0 | 4 | 0 | 50 | 1 | 100 | 0 | 0 | 37 | M | 25 | H | 30 | L |
| 5233 | 0 | 0 | 0 | 0 | 3 | 10 | 0 | 5 | 100 | 0 | 0 | 0 | L | 12 | H | 30 | L |
| 5234 | 0 | 0 | 0 | 0 | 6 | 0 | 25 | 13 | 100 | 0 | 0 | 0 | L | 15 | H | 30 | L |
| 5252 | 0 | 0 | 75 | 95 | 79 | 0 | 50 | 74 | 0 | 0 | 0 | 37 | M | 51 | M | 0 | L |
| 5257 | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 100 | 42 | 0 | 0 | 0 | L | 17 | H | 13 | L |
| 5261 | 0 | 91 | 0 | 0 | 14 | 0 | 25 | 57 | 100 | 0 | 0 | 46 | M | 32 | H | 30 | L |
| 7502 | 0 | 4 | 0 | 85 | 43 | 100 | 0 | 2 | 100 | 0 | 0 | 2 | L | 45 | M | 30 | L |
| 7504 | 0 | 11 | 0 | 75 | 9 | 0 | 25 | 27 | 100 | 0 | 0 | 5 | L | 33 | H | 30 | L |
| 7509 | 0 | 100 | 75 | 75 | 55 | 0 | 50 | 28 | 100 | 0 | 0 | 88 | H | 61 | M | 30 | L |
| 7514 | 0 | 100 | 0 | 90 | 61 | 0 | 100 | 93 | 100 | 0 | 0 | 51 | M | 68 | L | 30 | L |
| 7515 | 0 | 0 | 75 | 85 | 13 | 0 | 25 | 42 | 100 | 0 | 0 | 37 | M | 45 | M | 30 | L |
| 7530 | 0 | 0 | 0 | 90 | 3 | 0 | 100 | 78 | 0 | 0 | 0 | 0 | L | 38 | M | 0 | L |
| 7538 | 0 | 100 | 75 | 95 | 100 | 0 | 50 | 96 | 100 | 0 | 0 | 88 | H | 79 | L | 30 | L |
| 7552 | 0 | 2 | 0 | 60 | 7 | 50 | 50 | 4 | 100 | 0 | 0 | 1 | L | 34 | M | 30 | L |
| 7554 | 0 | 0 | 0 | 90 | 27 | 0 | 50 | 100 | 40 | 0 | 20 | 0 | L | 42 | M | 20 | L |
| 7559 | 0 | 28 | 75 | 60 | 8 | 50 | 25 | 14 | 100 | 0 | 0 | 51 | M | 46 | M | 30 | L |
| 7571 | 0 | 38 | 0 | 95 | 42 | 0 | 50 | 96 | 0 | 0 | 0 | 20 | L | 45 | M | 0 | L |
| 7572 | 0 | 100 | 0 | 90 | 29 | 0 | 25 | 100 | 0 | 0 | 0 | 51 | M | 48 | M | 0 | L |
| 7574 | 0 | 0 | 0 | 95 | 41 | 100 | 50 | 74 | 39 | 0 | 0 | 0 | L | 54 | M | 12 | L |
| 7575 | 0 | 82 | 0 | 80 | 55 | 0 | 75 | 34 | 0 | 0 | 0 | 42 | M | 44 | M | 0 | L |
| 7582 | 0 | 0 | 0 | 75 | 29 | 100 | 0 | 100 | 99 | 0 | 0 | 0 | L | 52 | M | 30 | L |
| 7586 | 0 | 61 | 75 | 80 | 21 | 100 | 75 | 76 | 0 | 0 | 0 | 68 | H | 63 | M | 0 | L |
| 7594 | 0 | 0 | 0 | 95 | 25 | 0 | 25 | 100 | 13 | 0 | 0 | 0 | L | 38 | M | 4 | L |
| 7595 | 0 | 100 | 0 | 80 | 22 | 50 | 25 | 35 | 100 | 0 | 0 | 51 | M | 53 | M | 30 | L |
| 7597 | 0 | 0 | 75 | 73 | 5 | 0 | 50 | 10 | 100 | 0 | 0 | 37 | M | 40 | M | 30 | L |
| 9999 | 0 | 6 | 75 | 75 | 26 | 50 | 50 | 0 | 100 | 0 | 0 | 40 | M | 49 | M | 30 | L |

[1] The raw scores for some factors were proportionally adjusted to achieve a fairly even spread between 0 and 100 (aiming for about 1/3 falling above 67, at the "high" end). This was necessary to make the indicators sensitive enough to register differences between allotments. These adjustments are noted above by the adjusted factors.

BLM_012697B

**The Grazing Decision "Matrix" in the BLM Upper Deschutes Resource Management Plan**

The preferred alternative in the Proposed Upper Deschutes Resource Management Plan and Final Environmental Impact Statement published by the Bureau of Land Management, Prineville District proposes a new, efficient and amelioratory method to manage livestock grazing on the Deschutes Resource Area in eastern Oregon. Rather than continue the current management scheme, whereby conflicts between livestock grazing and other uses on public (and adjacent private) land are resolved on a case-by-case basis (and often are never resolved to anyone's satisfaction), the plan proposes a new decision matrix to help managers decide where potential grazing conflicts are so high that livestock grazing might no longer be manageable under current conditions (and there is a need to change conditions or discontinue livestock grazing).

The proposed matrix compares the value of a grazing allotment for livestock grazing to its ecological and social value for other uses (recreation, wildlife habitat, etc.), and measures the potential conflict that exists between grazing and other uses (*see* **Grazing Matrix Table**). The value of an allotment for livestock grazing is assessed based on demand among potential grazing permittees to use the allotment for grazing. If an allotment scores high for grazing on the decision matrix, and low for ecological and social uses, then the BLM will seek to continue livestock grazing on that allotment, resolving grazing conflicts on a case-by-case basis as necessary. However, if an allotment scores low for grazing use (i.e., low demand among grazing permittees to graze the allotment), and high for ecological or social values (e.g., allotment within Wilderness Study Area, conflict due to presence of sensitive species, allotment borders urban area), then the BLM may seek to close the allotment to livestock grazing or reallocate the forage as a grassbank ("Reserve Forage Allotment"). However, the BLM will only close or reallocate an allotment as a grassbank if the current grazing permittee voluntarily relinquishes the grazing permit to the agency.

The BLM devised a formula to determine the value of each allotment for grazing, ecological and social uses to estimate which allotments have the highest potential for conflicts. The plan applies the formula to each of the 124 active grazing allotments in the planning area (*see* **Grazing Guidelines – Allotment Evaluations**). Each allotment was given a "Social," "Demand," and "Ecological" score, which may be plotted on the decision matrix to help decide future management for each allotment when conflict occurs, or when a permit comes due for renewal.

The formula first measures the potential for social conflict on each grazing allotment, considering three factors: (1) miles of residential or resort zoning along allotment boundary; (2) amount of recreational use; and (3) percent of allotment within a special management area (e.g., Wilderness Study Area) that was designated at least in part for "social" values (e.g., visual resources, solitude). The factors making up the total social conflict score are weighted equally (each represents 33 percent of the total score).

Second, each allotment was scored for its demand for grazing, using eight factors: (1) waiting list for permit for allotment; (2) miles of residential or resort zoning along allotment boundary (this factor and factor #3 are calculated the same here as they are under social conflict); (3) amount of recreational use; (4) costs to install required new and maintain existing fence (assuming $50/mi maintenance and $4,000/mi new); (5) percent of allotment needing water hauled to troughs; (6)

amount of seasonal restrictions on grazing; (7) relative amount of forage (AUMs) on allotment; and (8) percent of allotment containing important deer, grouse, and elk habitats. Factors are weighted as follows: #1 is 20 percent of the total demand score, #2, #3, #4, #5, #7 are each 12 percent, and #6 and #8 are each 10 percent. An allotment's waiting list is based on professional judgment of a BLM Rangeland Management Specialist (12 years at Prineville District BLM).

Finally, criterion for determining the ecological value of grazing allotment include: (1) percent of the allotment failing to meet Standards for Rangeland Health; (2) percent of allotment containing important deer, grouse, and elk habitats; (3) percent of allotment within a special management area (e.g., Wilderness Study Area) that was designated at least in part for "ecological" values (e.g., sensitive species). The factors are weighted as follows: #1 makes up 40 percent of the total ecological conflict score, #2 and #3 are each 30 percent.

Further details on the formula, including explication of how each social, grazing demand, and ecological value was scored, and application of the grazing decision matrix is available in the proposed Upper Deschutes plan. Using the decision matrix, the preferred alternative would reduce areas available for livestock grazing in the planning area over current management by up to approximately 121,000 acres, reducing available AUMs by about 20% percent, if all permittees willingly relinquished their permits. About half of these acres would still be available as Reserve Forage Allotments, but the AUMs would not be allocated to specific permittees (*see* **Alternatives Grazing Comparison Chart**). While grazing operators may participate in voluntary permit relinquishment for any allotment under any alternative in the proposed plan, the grazing matrix provides additional opportunities for BLM managers to designate active allotments as other than "open" to reduce conflicts between livestock grazing and other uses on and adjacent to public lands in the planning area.

BLM. 2004. Proposed Upper Deschutes Resource Management Plan/Final Environmental Impact Statement. BLM, Prineville District, Deschutes Resource Area. (September 2004). Vol. I: 170.

## Alternative 7 (Preferred Alternative)

### Livestock Grazing

In this alternative the BLM would use a formula to estimate potential for conflict and demand to help identify where problems are likely to occur (for additional details of how this formula works see Common to 2-7 section in this chapter, and Chapter 4 livestock grazing assumptions). This formula is changed somewhat from alternatives 2-6; most notably, an ecological conflict factor is added, and allotments would not be placed in "closed" or Reserve Forage Allotment (RFA) status in most cases, unless the grazing permittee voluntarily relinquishes his or her permit. In this alternative, livestock grazing would be modified as directed in Table 2-27 when thresholds of conflict and demand are exceeded. Appendix G shows which allotments would be affected. When conflicts are below the thresholds described above, they would be solved (in all alternatives) on a case-by-case basis by modifying livestock grazing, recreational use, fences, roads, and/or other uses, activities or developments as needed to reduce conflicts.

Some allotments would be placed in RFA status. These allotments would not be allocated to a specific grazing operator. The BLM would allow temporary, non-renewable use to federal permit holders when there is a demonstrated need to rest the permittee's allotment. "Need" for rest would include but not be limited to the following reasons: Prior to prescribed fire or necessary fence construction, or during/after rehabilitation projects, wildland fire or prescribed fire, drought, flood, insect damage, or disease. Use would meet goals described for area in RMP and, if applicable, in AMP.

Grazing operators who have permits for allotments that fall into "IPR close," "IPR RFA," "IPR close or RFA," or "IPR open or RFA" status are under no obligation to relinquish their permits, and they are still able to transfer their permits to other qualified applicants.

## Table 2-27 Grazing Matrix

| | | SOCIAL & ECOLOGICAL RATING | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low Ecological | | | Moderate Ecological | | | High Ecological | | |
| | | Low Social | Moderate Social | High Social | Low Social | Moderate Social | High Social | Low Social | Moderate Social | High Social |
| DEMAND RATING | Low Demand | IPR[1], Close or create RFA[2] | IPR, Close or create RFA | IPR, Close or create RFA | IPR, Close or create RFA | IPR, Close | IPR, Close | IPR, Close | Close[3] | Close |
| | Moderate Demand | Open | Open | IPR, create RFA | Open | IPR, Close or create RFA | IPR, Close | IPR, Close or create RFA | IPR, Close | IPR, Close |
| | High Demand | Open | Open | IPR, Open or create RFA | Open | IPR, Open or Create RFA | IPR, create RFA | IPR, Open or create RFA | IPR, create RFA | IPR, Close or create RFA |

[1] IPR = if permit is relinquished
[2] RFA = Reserve Forage Allotment
[3] Close = Discontinue livestock grazing for the life of the plan. BLM would provide two years notice of cancellation unless waived by permittee.



**Western Watersheds Project, Inc.**
P.O. Box 280
Mendon, Utah 84325
435-881-1232 • utah@westernwatersheds.org

**Western Watersheds Project**

June 4, 2004

Mr. Bob Bennett, Director
BLM Wyoming State Office
5353 Yellowstone
P.O. Box 1828
Cheyenne, Wyoming 82003

Western Watersheds Project (WWP) is a 501c3 non-profit membership conservation organization. WWP, on behalf of all its members, has been working for over a decade to beneficially influence the management of BLM administered lands in the western United States. WWP has a long history of close involvement as an interested public on numerous grazing allotments administered by the BLM in Idaho, Nevada, Utah, Wyoming, eastern Oregon and southwest Montana.

WWP is submitting these comments and analysis for incorporation into the BLM's analysis of Range (Livestock Grazing) issues in its current and future planning and for inclusion in grazing permit renewal, vegetation treatments and range improvement project analyses. Copies of these comments and analyses are being submitted simultaneously by email to the State Office and all Wyoming Field Offices for incorporation into these efforts. We support sustainable multiple use without loss of the potential productivity and diversity of these lands and also support the restoration of these lands to their full biological potential. In accordance with BLM's multiple use mandate, you must include consideration of the intrinsic values of the native biodiversity of these lands and protect those values for the long-term benefit of the American people as described in 43 CFR 1601.0-5(f).

WWP is knowledgeable of literally hundreds of grazing allotments which are failing the most minimal of environmental health criteria because of livestock grazing on BLM administered lands. The evidence we provide in these comments makes the case that these lands continue to be <u>severely overstocked with livestock</u>. BLM's own data and current management shows this to be the case. The best quantitative and peer-reviewed range science shows that continued emphasis on structural facilities erroneously called "range improvements" is a flawed strategy. BLM typically proposes these projects rather than making the difficult decision to adjust livestock numbers and seasons to be within the current capacity of the land. Without addressing this issue, the productivity and diversity of the land will continue to fall with the result that the land, the public interest and livestock producers will suffer over the long term. Many irreplaceable resources, for example, springs, their associated wetlands and wildlife have been lost and many more will be lost or irreversibly damaged if management continues to ignore the limitations of the land and the scientific knowledge regarding livestock grazing.

As part of these comments, we refer to voluminous scientific literature and reports that BLM must consider in its analyses. Your review and analysis of these documents and inclusion of them in planning and grazing-related projects is necessary to provide

1

BLM_0126982

a "balanced" approach to the issues.  Their inclusion is also essential for BLM to comply with NEPA's mandate to take a "hard look" at science and do a thorough and integrated analysis of all disciplines.  WWP can provide copies of most of these publications to you for our costs of reproduction and postage, should you request them.

Our comments are organized by sections including:

1. Introduction
2. What Does Range Science Tell Us?
3. Management Recommendations for Uplands
4. Management Recommendations for Riparian Areas
5. References

## 1.0 Introduction

WWP is concerned that, in the past, BLM has not included consideration of the best available science in its environmental analyses.  BLM does not follow the well known and science-based principles of range management in managing livestock grazing.  The three pertinent federal statutes (FLPMA, PRIA and the Taylor Grazing Act) require that BLM administer these lands in the long-term interests of the American people and not a handful of stockmen, who are permittees, on the public lands.

Livestock permittees are a small minority of livestock producers in the eleven western states and are insignificant in their numbers or their economic contribution to the States, their local and regional economies.  Their numbers and contribution pale in comparison to the natural values of our public lands.  Dr. Thomas Power, Chairman of the University of Montana's Economics Department, in Wuerthner and Matteson (2002) points out the minimal economic contribution of federal public lands livestock grazing to local, state and regional economies in the West, including Utah.  That reference can be found on-line at:

http://www.publiclandsranching.org/htmlres/PDF/wr_TAKING_STOCK.pdf

Dr. Power also points out that the majority of public lands livestock producers depend on non-agricultural sectors of these local, state and regional economies for employment, not livestock production.  It is not in the public's interest to blindly continue livestock grazing at unsustainable stocking levels in order to provide a short-term benefit to this small minority, while ignoring the values displaced by livestock grazing.

In its environmental analysis and subsequent land use plan, BLM must include detailed consideration of the information and data provided in several recent publications and the references cited herein before making its decision.  The following three books provide volumes of meaningful assessments of the unfortunate current condition of public lands and the failing economic and social realities of public lands ranching. These are:

2

BLM_0126983

- *Welfare Ranching, The Subsidized Destruction of the American West* (Wuerthner and Matteson 2002)
- *The Western Range Revisited: Removing Livestock from Public Lands to Conserve Native Biodiversity* (Donahue 1999)
- *Waste of the West* (Jacobs 1991)

In addition, BLM must consider in detail the publications referenced in these comments and also National Research Council (2002), *Riparian Areas: Functions and Strategies for Management.* All of these publications are clear in describing the flaws in current methods of livestock management on public lands and should form a core of its analysis.

In addition, the BLM's *Rangeland Reform '94 DEIS* and *Executive Summary* (RRDEIS, BLM 1995) reported that riparian areas *"have continued to decline and are considered to be in their worst condition in history"*; livestock grazing is identified as the chief cause. Indeed, some riparian areas have literally been destroyed; that is, they no longer exist or have any potential for restoration.

In its recent DEIS to revise its grazing regulations, BLM bypassed consideration of best available science. It pretended that current grazing management is fine if interested publics and environmental organizations would just quit holding up BLM and Permittee proposals by creating an administrative paperwork burden (BLM 2003). BLM asserted that greater cooperation with stockmen would somehow result in improvement by merely "tweaking" stocking rates, but then went on to state that this seldom happens, that changes in grazing really only amount to changes in season or location of use and that *"Changes in active grazing use in excess of 10% are infrequent."*

In its RRDEIS, BLM provided definitions describing the status of upland plant communities. These were:

- Potential Natural Community (PNC) = existing vegetation is between 75 – 100% of the sites potential natural plant community.
- Late Seral Community = existing vegetation is between 50 – 74% of the sites' potential natural plant community
- Mid Seral Community = existing vegetation is between 25 – 49% of the sites' potential natural community
- Early Seral Community = existing vegetation is between 0 – 24% of the sites' potential natural community.

Table 1 indicates that management of uplands since the passage of the last Rangeland Reform regulation in 1995 has not resulted in improvement of upland condition. In fact, by BLM's own definitions, condition has declined. It also shows that productivity of those lands is greatly below potential with 63% of its lands below 49% of potential. The data also show that BLM's management has failed in the intervening 10 years to take meaningful actions to improve conditions.

In spite of the evidence of widespread loss of plant productivity and ground cover, accelerated erosion and BLM's own documentation of rapid declines in species such as

3

sage grouse, BLM routinely chooses not to address livestock impacts in any scientific or sustainable fashion. Instead, BLM proposes more water developments and grazing systems. This ignores that in the 1960's, BLM began a massive program of developing water, putting streams and springs into pipelines, seeding with crested wheatgrass, building fences, engaging in rotation grazing, and spending millions of dollars to "even out livestock distribution".

**Table 1.  Comparison in BLM Upland Condition Between RRDEIS (1995) and Current Condition (BLM 2003)**

| Community Status | RRDEIS | Current DEIS | Change '94 to date |
|---|---|---|---|
| PNC | 4% | 6% | +2% |
| Late Seral | 34% | 31% | -3% |
| Mid Seral | 40% | 34% | -6% |
| Early Seral | 15% | 12% | -3% |
| Unclassified | 7% | 17% | +10% |

An early example of this, among others, was in BLM's Vale District, where millions of dollars were spent on crested wheatgrass seedings and structural range improvements. Today, across BLM lands in the west, many of these systems have fallen into disrepair, the land has failed to recover and we are faced with more and more proposals to install grazing systems, water developments, treat and seed – not reduce livestock numbers. This is in spite of the fact that long-term studies, including those from the Vale District have shown that <u>stocking rate</u> is the critical variable, not grazing systems. These are cited in a later section.

This is all in the context of BLM's failure to scientifically and accurately determine those lands which are capable and suitable for livestock grazing. We must add to this the further failure of BLM to accurately and quantitatively determine how much forage (i.e. forage capacity) is currently available. On top of this, there is the failure of BLM to properly allocate that forage to watershed and stream protection, wildlife habitat and food, then to livestock if available. Then there is the failure to provide for long-term rest to facilitate recovery. Finally, we must add the unwillingness of permittees to use peer-reviewed range science principles for management, instead they rely on "snake-oil" solutions such as time-controlled grazing <u>and</u> maintain strong opposition to the most minimal standards of performance. These failures by BLM and livestock permittees have prevented the recovery of damaged ecosystems in order that they might sustain use as envisioned in the Taylor Grazing Act and FLPMA.

Instead, BLM continues to use the take "half/leave half" principle for livestock use. In its planning, permits and analyses, BLM typically includes livestock use levels of 50% of forage as proper. They do this without providing any scientific foundation for this claim, nor do they adequately monitor this use and use it to manage livestock. The following paragraphs provide a summary of the relevant range science regarding utilization levels, plant growth and productivity, effects of precipitation regime, capability and suitability, capacity determinations, range improvements, stocking rates and range economics. These principles are well founded in the range science literature.

BLM_0126985

## 2.0  What Does Range Science Tell Us?

**2.1 Plant Growth and Precipitation.**   In order to understand the implications of grazing livestock at these heavy forage utilization levels in arid regions, it is important to understand the precipitation regime and its relationship to forage production. Holechek et al (2001) point out what we all understand at the most basic level.  That is, precipitation is the single most important factor determining the type and amount of vegetation in a particular area.  In the 11 Western States, 80% of the area receives less than 500 mm (19.6 inches) of annual average precipitation.  Further, this precipitation is subject to great year-to-year variation.

Four locations representative of precipitation patterns for Wyoming BLM lands are used for illustration.  Long-term precipitation records were analyzed for stations at Kemmerer, Rock Springs, LaBarge and Worland.  The effects of annual variations in precipitation on plant community production are important to understand in establishing livestock stocking rates and management.  Table 2 provides a summary of annual precipitation statistics for these locations.  Data was obtained from the Western Regional Climate Center database which can be found on line at http://www.wrcc.dri.edu/index.html .  Figure 1 provides plots of annual precipitation and occurrence of below average and drought years for these locations.

The analysis uses the Standard Precipitation Index (SPI) developed by McKee et al (1993) which considers drought, or extremely dry conditions, as years with 2" less than average precipitation.

**Table 2.  Summary of Precipitation Statistics for Four Wyoming Locations**

| Description | Kemmerer | LaBarge | Rock Springs | Worland |
|---|---|---|---|---|
| Period of Record | 1949 – 2003 | 1958 – 2003 | 1949 – 2003 | 1960 - 2003 |
| Years of Record | 43 | 28 | 50 | 43 |
| Average, inches | 10.26 | 7.94 | 8.7 | 7.63 |
| Range, inches | 5.06 – 23.72 | 3.44 – 17.82 | 4.53 – 14.54 | 3.75 – 11.27 |
| Year below average | 25 | 16 | 27 | 21 |
| Percent years below average | 58.1 | 57.1 | 54 | 48.8 |
| No drought years based on SPI | 14 | 5 | 13 | 6 |
| Percent drought years based on SPI | 30.2 | 17.8 | 26 | 13.9 |

Figure 2 shows the monthly distribution of precipitation at these locations. The differences in overall precipitation amounts are reflected in the relative magnitudes of monthly precipitation at each of the locations, with Worland being the driest.  All locations have increased precipitation during spring and late summer.  Winters are generally characterized by consistent, but lower precipitation from month to month.

5

BLM_0126986

These periods of precipitation vary in their effects on the plant communities. Increased precipitation during the spring-summer-fall months may not be effective due to the higher temperatures occurring then.  Typically, the fall-winter period is the period of greatest increase in soil moisture due to lower temperatures and lower evapo-transpiration.  Precipitation effectiveness during the warmer spring – fall periods varies with the storm intensity and soil condition.  Storms must be of high enough intensity to promote recharge of the soil profile into the root zone to be effective for plant growth.  Generally, this is greater than 0.6 inches in desert shrub types, although very high intensity storms may not be effective due to rainfall rates in excess of infiltration that result in overland runoff and flash events.

Spring plant growth in these arid areas depends on the amount of moisture received and retained during the fall-winter period.  Relatively dry summers may allow little regrowth and by the time fall comes, temperatures may be low and growth limited.  Trampled and compacted soils exacerbate this effect (Blaisdale and Holmgren 1984).  Some desert shrubs such as Artemisia sp. with both shallow and deep root systems can take advantage of both shallow and deep soil moisture (West 1983).

Annual production of available forage at the Desert Experimental Range in western Utah was highly correlated with total annual precipitation, showing an 800% variation in forage production between the driest and wettest years (Hutchings and Stewart, 1953).  Scientists developing quantitative ecosystem relationships for the Prototype Oil Shale Program managed by BLM in Utah's Uinta Basin found that annual sagebrush stem leader growth used as an index of production had a high correlation with winter precipitation (October – March) and that spring annual plant biomass was correlated with spring precipitation (ERI 1984; WRSOC 1984).  These studies were carried out under the supervision of BLM's Vernal Field Office.

Analysis of twenty years of data for perennial grass production and annual precipitation for a study area at the Chihuahuan Desert Rangeland Research Center in New Mexico showed a high correlation (Holechek et al, 2001).  A graph of this data is shown in Figure 3.   Annual perennial grass production varied between 6 and 750 lbs per acre, corresponding to the second-lowest and highest precipitation years.   The linear regression plot of the same data is provided in Figure 4.  Results of long term studies of crested wheatgrass production from experimental plots on BLM land at Malta, Idaho showed that crested wheatgrass production was most closely related to May-June precipitation (Sharp et al, 1992).  They found that annual production of crested wheatgrass during 35 years averaged about 500 pounds/acre and ranged between 130 and 1090 pounds/acre depending on precipitation (Figure 5).  These relationships demonstrate that this is a predictable phenomenon that should be taken into account in setting livestock grazing seasons, stocking rates and management on an annual basis as well as over the longer term.  A typical NRCS soil survey (USDA 1980) for these arid areas shows that total production of potential plant communities varies by about 300% between favorable and unfavorable years.  This wide range in production between dry and wet years is typical in the arid regions of the West and should be reflected in related levels of livestock use.

6

BLM_0126987









**Figure 1.  Annual precipitation patterns in Kemmerer, LaBarge, Rock Springs and Worland, Wyoming**

7

BLM_0126988









**Figure 2.  Monthly precipitation patterns in Kemmerer, LaBarge, Rock Springs and Worland, Wyoming.**

8



Figure 3.  Annual Precipitation vs Forage Production



Figure 4.  Forage Production vs Precipitation



Figure 5.  Crested Wheatgrass Production at Malta, Idaho

9

BLM_0126990

**2.2  Grazing Intensity and Effects on Productivity.**  Much of the current research and analysis of livestock grazing management, plant productivity and economics has come out of the Department of Animal and Range Sciences at New Mexico State University.  This work has been presented in a series of textbooks and papers in the range science literature.  These references provide analyses of the interactions of livestock stocking rates, plant productivity and economics based on a set of long term grazing management studies from native rangeland types.  They provide recommendations for determining livestock grazing intensity to maintain vegetative productivity and economic stability, while taking into account the effects of inherent variation in precipitation in desert ecosystems.

The effects of different livestock grazing intensities on forage plant production was studied in a ponderosa pine type in Colorado as early as the 1940's (Schwan et al, 1949).  This study showed that forage consumption at a rate of 57% produced an average of twice as much forage as a rate of 71%.  An area left ungrazed by livestock for 7 years produced three times as much forage as the 71% use area.  The authors concluded that, as grazing use increased, forage production decreased.  During that same period, Dyksterhuis (1949), in a classic paper on the use of quantitative ecology in range management, presented examples of how stocking rates must be adjusted based on precipitation and range condition, which included a rating based on departure from the potential plant community.  NRCS (USDA, 1982) considers proper grazing management as that management that sustains the potential plant community.

The effects of conservative (30 – 35%) use vs. heavy (60 – 65%) grazing use on grasses and forbs by cattle was determined in a New Mexico study (Galt et al, 1999).  Both of these pastures had experienced conservative use for over 10 years.  In 1997, one pasture was changed to heavy use.  Quantitative measurements at key locations in both pastures in the following year, while being rested, provided the results shown in Table 3.

**Table 3. Standing Crop of Grasses and Forbs from Galt et al (1999)**

| Location/Forage Component | Spur Pasture Heavy Stocking Rate Pounds/acre | Deep Lake Pasture Conservative Stocking Rate Pounds/acre |
|---|---|---|
| Perennial Grasses | 352 | 824 |
| Forbs | 256 | 436 |
| Total Forage | 608 | 1260 |

This study showed that heavy stocking rates, even for a single year, resulted in serious declines in productivity in the succeeding year.  Perennial grass production was reduced by 57% and forbs by 41% in the heavily grazed pasture compared to the conservatively grazed pasture.  The authors cited a number of other studies in arid environments that showed heavy stocking rates were accompanied by decreases in forage production when compared to conservative use.  After drought, the ability of forage plants to recover was directly related to the standing crop levels maintained during the dry period.  The studies cited showed that grazing during different seasons was less important than grazing intensity.

10

BLM_0126991

Five long-term stocking rate studies from three different locations in Arizona, New Mexico and Utah documented similar patterns (Holechek et al 1999a).  In the Desert Experimental Range in Utah, a 13-year study with moderate (35%) and heavy (60%) use by sheep resulted in annual forage production of 198 lbs/acre and 72 lbs/acre.  The authors recommended 25 – 30% use of all forage species.  A 10-year study at the Santa Rita Range in Arizona demonstrated that perennial grass cover and yield showed an inverse relationship to grazing intensity, while burroweed, an undesirable species, increased with increasing forage use.  The authors recommended a 40% use level.  A 37-year study in the Jornada Experimental range in New Mexico involving conservative (33%) and moderate (45%) use showed that the lower grazing intensity resulted in greater black grama (perennial grass) cover.  Lowland areas with high clay content and periodic flooding grazed at moderate intensity had higher cover of Tobosa, a perennial grass, than heavily grazed areas.  They recommended 30% be used as a stocking intensity with no more than 40% removed in any year.  A 10-year study at the Chihuihuan Desert Rangeland Research Center looked at four grazing intensities of 25%, 35%, 50% and 60%.  Light (25%) and moderate (35%) use produced 70% more forage than 50% use and more than double that achieved at 60% use.  Here, the author recommended conservative stocking at 30 – 35%.

Hutchings and Stewart (1953), suggested that 25 – 30 % use of all forage species by livestock was proper.  They recommended this level because routinely stocking at capacity will result in overgrazing in half the years and necessitate heavy use of supplemental feed.  Even with this system, they recognized that complete destocking would be needed in 2 or 3 out of ten years.  Holechek et al (1999a) concluded that the research is remarkably consistent in showing that conservative grazing at 30 – 35% use of forage will give higher livestock productivity and financial returns than stocking at grazing capacity.  They also recognized that consumption by rodents and other wildlife must be taken into account as part of this utilization.  Otherwise, rangeland productivity would suffer even at these levels of use.  Galt et al (2000) recommended levels of 25% utilization for livestock and 25% for wildlife with 50% remaining for watershed protection.  In none of these cases have the scientists recommended 50% utilization by livestock and they are clear that even at the lower use levels recommended, wildlife use is included.

BLM has never even looked into the issue of the relationship between its typical riparian greenline stubble height standard of 3 – 4", usually applied to Nebraska sedge and other sedge species, and the effects of applying this standard on adjacent riparian plant community productivity.  Carter (1998) showed that before greenline N. sedge had been reduced in height to the standard of 6", riparian grasses had been reduced to 2" stubble height and 89% of stream banks had been trampled, compacted or were actively eroding into the stream.  Monitoring data from the Wasatch-Cache National Forest (USDA 1993) included the observation that a Nebraska sedge stubble height of 7.6" corresponded to an estimated 70% use of riparian grasses.  Lile et al (2003), compared clipping of N. sedge to stubble heights of 2" and 4" during early season, late season and multiple clippings to both heights.  Late season use or 2" stubble height did not allow recovery.  Only the 4" early season use achieved the 4" criteria, but did not regrow to meet the 6" criteria by the end of the growing season.  This shows that season-long or late season use does not allow sufficient time for re-growth and that 3-4" stubble heights are not effective in protecting riparian vegetation.

11

BLM_0126992

Schulz and Leininger (1990) studied long-term riparian exclosures compared to areas that continued to be grazed. They found that, after 30 years, willow canopy cover was 8.5 times greater in livestock exclosures than in adjacent grazed riparian areas. Grasses were 4 to 6 times greater in cover within the exclosure than outside. Mean peak standing crop of grasses within the exclosure was 2,410 Kg/Ha, while outside in caged plots, mean peak standing crop was 1,217 Kg/Ha.

Often cited, Franklin Crider's study on root growth stoppage from plant top removal provided quantitative measurements of plant re-growth under different amounts of removal (Crider 1955). Three mid-west perennial grasses were grown from seed in pots under ideal conditions of watering and fertilization. After sixty days of growth, these potted grasses were clipped once at intervals from 10% to 90% of the above ground biomass. Repeat clippings of the potted grasses were made every two days to return the plants to the same height as the original clipped percent. The experiment lasted thirty three days at which time root growth of controls became inhibited by the size of the pot. Crider concluded that under these ideal growing conditions, if these species of grasses had 40% or less of their aboveground biomass clipped either once or many times, then the net root mass was the same or more at the end of the experiment. This was used to make the assumption that grazing during the entire growing season at 40% or less would sustain plants from one season to the next. This same study has been used to justify the 50% or "take half/leave half" proposition that range managers have used for decades. Clearly, the long-term range studies cited here show that under actual field conditions, these use levels are excessive and light grazing (25%) is most equitable to BLM's mandate for sustainable use.

**2.3 <u>Forage Needs Other Than Livestock</u>.** Let's assume for the moment that Crider's finding (40% removal in a growing season) applies to the very arid lands found on Wyoming BLM lands. If Crider's results apply, then the 40% removed needs to be shared with all the animals that require forage. Some is needed for wild grazers (insects, nematodes, mammals), some for the generation of litter and nutrient cycling. A certain amount of the plant needs to remain to ensure regeneration of the plant and to ensure plant community structure is sufficient for wildlife habitat needs and soil erosion protection. A certain proportion of plants must remain ungrazed to allow for seed and flower production to ensure propagation of the species and provide food for pollinators and granivores, an often overlooked requirement.

Existing research helps answer the question of how much of the annual plant growth is required for wild grazers. For a detailed review of this research we recommend that you download Catlin et al (2003) from:

<u>http://rangenet.org/directory/jonesa/sulrprec/index.html</u>

Based on a number of studies of mammal consumption of forage, some annual forage consumption needs for mammals where mammal populations are at or near their potential are provided in Table 4.

12

BLM_0126993

**Table 4.  Forage Needs of Mammals**

| Mammal | Forage Needs kg/hectare |
|--------|-------------------------|
| Deer | 12.7 |
| Rabbits | 72.7 |
| Rodents | 142.3 |
| Total | 227.6 |

Less is understood regarding the typical vegetation needs for insects.  What is known is that insects play a significant role.  For example, harvester ants are granivores with individual colony populations of tens of thousands of individuals.  Even in the driest and hottest parts of North America, the total biomass of one species of harvester ant, *Messor (Veromessor) pergandei* has approximately the same total biomass as the total rodent population in the same area.  One of many ecological roles harvester ants fulfill is dispersing plants as a result of accidental abandoning of seeds near the nest.  The analysis here focuses on the typical forage needs of insects.

A number of studies have reported the percent of plant growth consumed by insects.  In grassland and savannah, insect consumption of a single species varied from less than 1% to 19% with a mean of 3.5% (Wiegert and Peterson, 1983).  Rangeland grasshoppers consume between 1- 3% in typical years (Mispagel 1978) and up to 99% in periods of super abundance (Nerny and Hamilton 1969).  Hewitt and Onsager (1983) suggest that between 21-23% of available range forage is consumed by all grasshopper species in the western U.S. each year.  This production is transferred to birds and mammals such as sage grouse and rodents as a food source, to the soil for nutrient cycling and to higher trophic levels such as raptors and other carnivores.  It is important for ecosystem function and cannot be dismissed.

Nematodes provide critical soil nutrient cycling and structure functions.  This complex array of species normally has a higher diversity and biomass than other rangeland flora and fauna combined. Some nematodes consume plants and should be considered as a component in the consumption of rangeland plants.  Ingham and Detling (1984) estimated that nematodes consumed between 6 and 13 % of below ground net productivity in the mixed grass prairie.  Other studies by Scott et al (1979) and Anderson (1987) found that root feeding arthropods and nematodes consume between 7-26% of the net productivity in normal years.  For the full citations to these studies please visit the paper at the web site shown above.

Holechek et al (2001) provide equivalents in forage consumption between livestock and wildlife.  They are summarized in Table 5.  Studies in the Vernal resource area during the 1970's and 1980's generated many years of quantitative data describing the abundance of many species of animal, bird and insect in the different vegetation types occurring there.  This information is available in the Vernal Field Office for review and analysis.  Some of it is provided in the (ERI 1984; WRSOC 1984) reports referenced.  Final determinations of livestock stocking rates and utilization criteria for livestock must take this information into account, using the current vegetation production for the area under consideration.

13

BLM_0126994

**Table 4.  Animal Equivalents from Holechek et al (2001)**

| Animal | Animal Unit Equivalents |
|---|---|
| Mature cow | 1.0 |
| Yearling cow | 0.75 |
| Domestic sheep | 0.15 |
| Horse | 1.8 |
| Bison | 1.8 |
| Elk | 0.7 |
| Moose | 1.2 |
| Bighorn sheep | 0.18 |
| Mule deer | 0.15 |
| Pronghorn | 0.12 |

**2.4  What is an AUM?** Various estimates have been used in the past to define the amount of forage consumed by livestock (AUM).  BLM often uses the value of 800 lbs/AUM.  This section discusses some of that variability and proposes a standard forage amount for livestock consumption.  A check of USDA market statistics at:

http://www.ams.usda.gov/mnreports/lm_ct166.txt

shows that during 2003, auction weights of mature steers averaged 1268 lbs and mature heifers averaged 1157 pounds.  Recent auction weights for mature cows have seen ranges up to 1400 pounds. Ray et al (2004) give a weaning weight of 480 pounds for calves. Holechek et al (2001) state that daily dry matter consumption averages  2% of body weight per day.  They then calculate that a 1000 pound cow will consume 20.0 lbs dry forage/day and a 750 pound yearling will consume 15 lbs dry forage/day, for a total of 35 lbs/day.  The 1969 AMP for the North Rich Allotment in Rich County and Cache Counties (Wasatch-Cache NF) used 30 lbs/day for a cow calf pair.  In its FEIS for the Land and Resource Management Plan for the Curlew National Grassland (USDA 2002), the Caribou-Targhee National Forest used 34 pounds per day for a cow/calf pair. There is little doubt that cattle weights have increased over time and a value that is accurate under current conditions must be applied.  In fact, Anderson et al (ca 2000) calculated a 35% increase in dressed weights per animal between 1975 and 1995.  Their analysis can be found at:

http://agecon.uwyo.edu/RiskMgt/marketrisk/TheCattleCycle.pdf

Using the average auction weight for heifers (1157 lbs), the weaning weight for calves (480 lbs) and the 2% consumption rate from Holechek et al (2001) results in forage dry weight consumption of:

(1157 + 480) x 0.02 x 30 days    =    982 lbs/month, or 32.7 lb/day

Even this will likely be an underestimate since calves graze all summer and are probably closer to the yearling weight given in Holechek et al (2001) and mature cows can be a good deal larger than the heifer weight used here.  BLM must also count

14

BLM_0126995

calves in its AUM for permitting purposes.  FLPMA requires that an AUM be the forage consumed by a mature cow or its equivalent each month.  Therefore, calves must be counted in the AUM allocation for permitting purposes.  We propose that BLM establish a forage consumption allocation for a cow/calf pair of 1,000 lbs/month = 1 AUM.

**2.5 Grazing Systems.**  In a review paper that considered grazing systems, grazing intensity and season of use, Holechek et al (1998) determined that, *"financial returns from livestock production, trend in ecological condition, forage production, watershed status and soil stability are all closely associated with grazing intensity."*  They found that grazing systems such as rest-rotation had limited or no benefit in arid systems. Citing long-term studies in Arizona, they documented that after 12 years of rest-rotation management compared to continuous grazing, neither forage plant densities nor forage plant production differed between the treatments.  Grazing intensity employed was 30 – 35% use with occasional high use of 50% or more.  *"Rest and deferment were not sufficient to overcome the effects of periodic heavy use on primary forage plants when rest-rotation grazing was applied on big sagebrush range in northern Nevada."*  In an Arizona study comparing winter-spring grazing with summer-fall rest to continuous grazing, the rotation scheme was inferior to the year-long system from the standpoint of perennial grass density and production.  Perennial grass production was closely associated with the degree of use and was highest where grazing use was lowest.  In a Vale, Oregon study, lasting over 20 years at moderate grazing intensity, rotational grazing showed no advantage over season-long grazing in improving range condition or forage production.  *"The key factor in range improvement appeared to be the reductions in grazing intensities that were applied when the project was initiated..".*

A review of the "classic" range studies, which are the long-term stocking rate and grazing system studies that provide the scientific foundation for modern range management again showed that light use is closer to sustainable use, while heavy use is not (Holechek et al 1999a).  Definitions of "heavy", "moderate" and "light" grazing developed in 1961 were cited.  Heavy grazing was defined as the degree of forage utilization that does not allow desirable forage species to maintain themselves. Moderate grazing was defined as the level at which palatable species can maintain themselves. Light grazing was defined as the degree of utilization at which palatable species are able to maximize their herbage producing ability.  However, it is clear that using even "moderate" grazing in depleted areas will not allow them to recover.

When averaged across all the long-term studies for all regions, heavy grazing was 57% use of primary forage species, moderate use was 43% and light use was 32%.  In arid regions, the research showed that moderate grazing use was 35 – 45%.  When the average forage production change over time was compared with use, heavy stocking resulted in a 20% decline in production, moderate use experienced no change and light use resulted in an 8% increase.  During drought, moderately stocked pastures produced 20% more forage than heavily stocked pastures, light grazing produced 49% more forage than heavy and 24% more than moderate stocking levels.  Heavy stocking resulted in a downward trend and light stocking an upward trend in ecological condition.  Moderate stocking showed a slight, but not significant increase in condition, resulting in depleted ranges being maintained in depleted condition.

15

Table 6 provides summary statistics from that paper.  It must be remembered that these comparisons are to prior heavy use, not to ungrazed lands.  It is apparent from these studies that "moderate" use levels will not allow significant recovery of severely depleted range.  In fact, in studies of long-term rest at Idaho National Engineering Laboratory, the recovery rate of grasses in sagebrush communities was slow, progressing from 0.28% to 5.8% over 25 years (Anderson and Holte, 1981 and Anderson and Inouye, 2001).  It is clear from these examples that native plant communities in heavily depleted sites will require decades to recover in the absence of livestock, while their ability to recover in the presence of livestock at any level of use has not been demonstrated.

Relying on additional water developments, fences and grazing systems will not alleviate the problem.  The use of range improvements and rotation systems is not sufficient to correct over-stocking.  Results from 18 western grazing system studies by Van Poollen et al (1979) found that adjustment of livestock numbers, or stocking intensity was more important than implementing grazing systems to improve herbage production.  Holechek et al (1999a) recognized that *various rotation grazing systems cannot overcome the rangeland deterioration associated with chronic overstocking.*  Holechek et al (2000) also showed that the various claims made by advocates of short-duration or time-controlled grazing were false.

A comprehensive discussion of rest-rotation is found in Clary and Webster's General Technical Report titled *"Managing Grazing of Riparian Areas in the Intermountain Region."* (Clary and Webster 1989).  They summarized a dozen studies showing significant increases in forage production occurred with decreased intensities of grazing.  The article described the improvements found in reducing grazing from heavy, to moderate and then to light grazing. Grazing with utilization above 50% was described as heavy, moderate was 30 - 50% and <25-30% was called light grazing in most of these studies.

**Table 5.  Summary of Data from 25 Classic Grazing Studies (Holechek et al 1999a)**

| Description | Heavy | Moderate | Light |
|---|---|---|---|
| Average Forage Use % | 57 | 43 | 32 |
| Average Forage Production lb/acre | 1,175 | 1,473 | 1,597 |
| Drought Years Production lb/acre | 820 | 986 | 1,219 |
| Average Calf Crop % | 72 | 79 | 82 |
| Average Lamb Crop % | 78 | 82 | 87 |
| Calf Weaning Weight lbs | 381 | 415 | 431 |
| Lamb Weaning Weight lbs | 57 | 63 | -- |
| Gain per Steer lbs | 158 | 203 | 227 |
| Steer/calf Gain per Day lbs | 1.83 | 2.15 | 2.3 |
| Steer/calf Gain per Acre lbs | 40.0 | 33.8 | 22.4 |
| Lamb Gain per Acre lbs | 26.0 | 20.4 | 13.8 |
| Net Returns per Animal $ | 38.06 | 51.57 | 58.89 |
| Net Returns per Acre $ | 1.29 | 2.61 | 2.37 |

16

BLM_0126997

Clary and Webster's study concluded that *"managers should place more emphasis on proper stocking intensity and less on grazing system implementation. The concentrated use of grazing pastures is not compensated for during rest years if grazing use is heavy. In summary, although grazing systems have great intuitive appeal, they are apparently of less consequence than once thought. In fact as long as good management is practiced so that there is control of livestock distribution and grazing intensity, the specific grazing system employed may not be significant."*

Holechek et al (2001) have indicated that, depending on topography, areas of severe degradation, or *"sacrifice areas"* occur around water sources including water developments. These can extend from 1 mile to several miles from these sources and out further if stocking rates are too high. Based on this, a single water development can result in an area of soil compaction, erosion and severe loss of ground cover and vegetation for thousands of acres. They also indicate that installing water developments in locations that have had limited access to livestock in the past may increase ecological damage to areas that are important refuges for relict plant communities and wildlife that have not been displaced by livestock.

Catlin et al (2003) provides a review of grazing systems. It summarizes more than 40 studies concerning rest rotation and related issues. Short term rest (one year) as typically applied does not lead to significant improvements of deteriorated ranges. Clearly, the long-term range studies we have cited show that it is stocking rate, not water developments, or grazing systems that are most important in maintaining or improving rangeland productivity. It is critical that BLM take this information into account in determining livestock stocking intensities and evaluating the efficacy of added water developments or grazing systems.

**2.6 <u>Economic Considerations.</u>** The studies we have cited show that light stocking results in greater forage production and improvement in range condition when compared to both heavy and moderate use. Moderate and light use also provided greater financial returns than those obtained with heavy use. Because these financial figures included data from humid areas, a separate analysis taking into account the necessity for destocking during drought in arid regions showed that conservative stocking (35% use) would provide the highest long-term financial returns on semi-desert rangelands in Arizona.

Economic analyses in (Holechek et al, 1999b) show that conservative stocking rates yield better returns. For example, in the sheep experiment at the Desert Experimental Range in Utah, the lower stocking rate (35% use) yielded a financial return of $0.39/acre compared to $0.14/acre for the higher stocking rate (60% use). A modeling study that evaluated 29 years of financial returns for a cow-calf operation revealed that a relatively constant stocking rate of 35% use was considered the best approach.

Winder et al (2000) reported on comparisons of stocking rates and financial returns using 30 or 40% of current years perennial grass growth. The 30% use level provided greater vegetation productivity and financial returns. After drought in 1994 through 1996, forage production on the pastures with the lower stocking rate (30% use) increased 71% compared to 35% increase on those with the moderate stocking rate (40%). Economic returns were $0.52/acre for the conservative use level and

17

$0.31/acre for the moderate use level.  <u>A combination of stubble heights, clippings and ocular measures were used to set annual stocking rates, termination of the grazing season, sale of cattle to balance numbers with capacity and destocking during drought.</u>  Under these criteria, all pastures were destocked in the summer of 1994 and the moderately stocked pasture was destocked in May, 1999.  After livestock were removed due to drought, pastures were rested for two years, then afterwards stocked in late fall according to current year's forage production.

Results of seven years' research in New Mexico's Chihuahuan Desert to evaluate the relationship between range condition and financial returns showed similar relationships (Holechek et al 1996a).  Condition was evaluated using the Dyksterhuis (1949) definitions based on departure from climax.  This study showed a relationship between forage production and range condition.  Higher condition range, or that nearer climax community plant composition, had higher production of forage and more preferred forage species than lower condition range.  <u>Excellent range condition provided over four times the financial return of fair condition range and 65% greater return than good condition range.</u>

The reasons for this were the high costs of management and the energy lost by livestock in seeking forage in lower condition range. In a companion paper, livestock returns were compared to conventional investments such as bonds or stocks (Holechek et al, 1996b).  This analysis showed that over-capitalization in infrastructure, coupled with over-stocking lead ranchers into a boom and bust cycle as climatic conditions change.  In wet years, they added livestock, generally when prices were high then sold off their herds during dry, or bust periods when prices and productivity are low.  <u>The final analysis concluded that conservative stocking, minimal investment in range improvements and greater spacing of watering points reduced fixed costs and insulated the operation from the vagaries of precipitation and market forces.</u>

In addition to the economics of livestock production, BLM is required to analyze other economic values and determine the values foregone by its proposed action.  NEPA (40CFR1508.8) recognizes that the analysis of effects must include ecological, aesthetic, historic, cultural, economic, social, or health issues.  BLM typically has clouded the distinction between "cultural" as applied to historical features such as buildings, artifacts, or paleo-resources with societal lifestyle issues.  In particular, in its recent DEIS to revise the grazing regulations, BLM used the abstraction called "lifeways" .  <u>This distinction needs to be clearly drawn.</u>  It appears BLM is trying to draw in "lifestyle" or "lifeways" as some sort of cultural feature that is given protection by the cultural preservation laws and SHPOs.  This is not the intent of these laws or NEPA.  If it were, would not "lifestyles" or "lifeways" other than livestock production also deserve protection, consideration and analysis?

NEPA, at 40 CFR 1501.2 (b) states that federal agencies must *"Identify environmental effects and values in adequate detail so they can be compared to economic and technical analysis."*  43 CFR 1601.0-5(f) defines Multiple Use as:  *"Multiple use means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the lands for some or all of these*

BLM_0126999

*resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some lands for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the lands and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output."*

FLPMA requires BLM to manage the public lands for multiple use. This means that the agency must make *"the most judicious use of the land for some or all of [the various] resource values . . . [and to] use . . . some land for less than all of the resources . . . ."* 43 U.S.C. § 1702(c). This requires BLM to undertake a decision process *"to balance competing resource values to ensure that the public lands are managed in a manner 'that will best meet the present and future needs of the American people.'"* 43 U.S.C. § 1702(c); <u>Comb Wash</u> at 101. BLM's balancing of values must be reasoned and well-informed. Therefore, the agency must accumulate sufficient data and consider relevant rigorous science to determine what uses are appropriate in any given area.

Applied to the management of livestock grazing, the analysis must, on a site-specific level, weigh the benefits and harms of grazing to determine if BLM should allow this use in any given area. Moreover, should the agency conclude that livestock grazing is an appropriate use, BLM must consider multiple-use values in determining how that area should be grazed. <u>National Wildlife Fed'n v. BLM</u>, No. UT-06-91-1 (DOI, Office of Hearings and Appeals, Hearings Div.) (Dec. 20, 1993) at 25, *aff'd* <u>Comb Wash</u> (*citing* 43 U.S.C. §§ 1701(a)(8), 1702(c)). Therefore, in establishing grazing thresholds such as stocking rates and utilization levels, BLM is required to abide by *"FLPMA's mandate [that it] protect the full spectrum of environmental, ecological, cultural, and recreational values."* <u>Id</u>.

Other than asserting in various ways that continued livestock grazing at current levels provides for preservation of rural values and lifestyles, BLM generally does not provide any economic analysis of the costs and benefits of public lands livestock grazing and its contribution to local and regional economies. It does not analyze the values of uses foregone in favor of livestock grazing and its infrastructure. See the detailed and quantitative analysis by Dr. Power in (Wuerthner and Matteson 2002) that is referenced above.

Dr. Power shows that *"Livestock grazing on federal lands is generally unimportant to local economies and even less so to state and regional economies. In terms of income and numbers of jobs provided, the contribution of federal lands grazing is less than 0.1% across the West. Farm and ranch operations are increasingly reliant on nonfarm income sources to be financially feasible, while livestock grazing competes with other uses of public lands – such as clean water, recreation, wildlife habitat – that contribute to the ongoing vitality of western economies."*

In his analysis of the economies of individual rural counties, Dr. Power showed that federal lands grazing does not contribute significantly to those economies across the

19

west.  In fact, given the high percentage of ranching families that have jobs, either full or part time outside the ranch (60 – 70%), it is ranchers that depend on the other economic sectors for their ability to persist, not federal grazing.  Dr. Power states, *"It is not that towns depend on agriculture, but that agriculture increasingly depends on the vitality of urban and nonagricultural rural economies to provide the nonfarm income that keeps farm operations alive."*

Dr. Power states that claims about the relative importance of federal grazing to the economies of western states can be analyzed by answering these questions:

1. "What portion of the value produced by cattle and sheep operations is associated with feed used?

2. What portion of the feed for those cattle and sheep operations comes from grazing on federal lands?

3. What portion of the total agricultural activity involves raising cattle and sheep?

4. What part of the total economy is represented by agriculture."

Souder (1997) analyzed the economics of livestock grazing in the Central Winter Ecosystem Management Area on the Kaibab Plateau using readily available economic data.  His analysis showed the values of various activities in the study area generated values that are tabulated in Table 7.

**Table 7.  Summary of Values Received Annually in the Central Winter EMA**

| Resource | Local Benefits |
|---|---|
| Dispersed Recreation | $6,400,000 (Locally and Regionally) |
| Hunting Mule Deer and Turkey | $719,392 (Mule Deer = $470,528) |
| Livestock Grazing | $43,283 |
| Fuelwood Gathering | $45,492 |

BLM should include consideration and analysis of these sources in its planning and grazing-related project proposals and also provide more analysis of the economic benefits of wildlife through hunting, fishing and wildlife-watching associated recreation.  These benefits are summarized in the Fish and Wildlife Service *2001 National Survey of Fishing, Hunting and Wildlife-Watching Associated Recreation* (DOI 2002).  That survey showed that in Wyoming alone, expenditures for hunting, fishing and wildlife-associated recreation were $634,049,000.00 in 2001

**2.6 Grazing Capability and Suitability Determinations**.  Current range science recommendations include adjusting the stocking rate for livestock in order to account for distance from water and steepness of slope (Holechek et al, 2001).  The Natural Resources Conservation Service has adopted these guidelines for slope adjustments (Galt et al, 2000).  Their suggested reductions in grazing capacity for cattle with distance to water and increasing slope are provided in Table 8.

They note that on cold desert ranges of the U.S., snow reduces water availability problems in winter.  Also, sheep do not require water every day and can use areas further than 2 miles from water.  Sheep on New Mexico winter ranges used slopes of less than 45% with no adjustment necessary for slope, whereas slopes greater than 45% were hardly used.  Regional criteria for the Intermountain Region of the Forest

20

Service designate lands with greater than 30% slope as not capable for cattle and greater than 45% slope as not capable for sheep.  Other factors used by the Intermountain Region of the Forest Service for determining lands that are not capable include:  current vegetation production less than 200 lb/acre, forested areas and areas with highly erodible soils (Blackwell 2001; USDA 2001).

**Table 7.  Adjustments for Distance to Water and Slope for Cattle (Galt et al, 2000)**

| Distance from Water miles | Percent Reduction in Grazing Capacity |
|---|---|
| 0 – 1 | 0 |
| 1 – 2 | 50 |
| >2 | 100 |
| *Slope %* | |
| 0 – 10 | 0 |
| 11 – 30 | 30 |
| 31 – 60 | 60 |
| >60 | 100 |

Suitability determinations should be performed on those lands that are found capable for livestock to determine whether or not livestock grazing should be allowed.  For example, important or critical fish and wildlife habitat, recreation areas, locations of sensitive populations, natural research areas, watershed protection areas among others should not be considered suitable and should be closed to livestock.  These capability and suitability determinations are critical components in meeting the definitions and mandates of FLPMA, PRIA and NEPA regarding sustainability and multiple use.  See also the discussion in the previous section regarding balancing of resource uses and values.

## 3.0  Management Recommendations for Uplands

It is critical for BLM to incorporate the science we have cited in its analysis for planning and grazing-related project documents to ensure that best available science is applied on the ground.  In this way, it may be possible to sustain livestock grazing on those lands that are capable and suitable.  The following steps should be implemented in each of these efforts.

**3.1  Literature Review.**   Review the literature on the effects of grazing livestock in arid environments.  This review should address the effects of different levels of grazing intensity (stocking rate), grazing systems, range improvements and livestock exclusion on upland habitats.  It should include an evaluation of their effects on maintenance, productivity and recovery rates of native plants and soil communities.  It should also review the use of various standards, indicators and monitoring methods used to manage grazing and their ability to accurately and timely assess and be representative of plant and soil community characteristics.

21

BLM_0127002

**3.2 <u>Determine Soil and Plant Community Status</u>.** Using GIS, map all vegetation, range site types and soil types on BLM lands in the affected areas. Design and carry out a science-based review of existing information and a field survey to accurately assess current conditions in the plant and soil community. This survey should determine the distribution of plant species, their ground cover and production. It should do this by allotment, pasture and range site (soil) type. Survey locations should be selected to incorporate distance to the nearest source of water so effects due to proximity to water can be determined. The survey should also include considerations of slope in order to assess the interaction of susceptibility to erosion based on slope and proximity to water sources. Results should be analyzed in the context of past grazing management including type of livestock, seasons of use and grazing intensity. Summarize historical actual use records and grazing systems for each allotment to provide a basis for evaluating proposed actions.

**3.3 <u>Determine Capable and Suitable Acres for Livestock Grazing</u>.** Based on the science we have provided and criteria we have discussed (slope, distance to water, forage production, hazard of erosion, etc), establish a protocol for determining capable and suitable lands for livestock grazing. This protocol should include a recovery prescription for lands that are severely depleted of their native herbaceous plant communities or have bare ground exceeding thresholds that lead to accelerated erosion.

**3.3 <u>Determine a Sustainable Livestock Stocking Rate</u>.** Establish the percent of diets of domestic sheep, cattle, deer, elk, pronghorn and sage grouse that are grasses, forbs and shrubs and their seasonal variation in selection of these foods. We suggest information from Holechek et al (2001) as a starting point. Using this information and the population management goals for wildlife, calculate wildlife needs. This should include the stubble height and other criteria established in Braun et al (1977) and Connelly et al (2000). Based on the information we provided in section **2.0** above, and the limitations on use of perennial grasses established by the scientific review, calculate the available AUMs of palatable native forage grasses, forbs and shrubs that can be utilized by livestock without impairment of plant productivity. Use this analysis to determine livestock stocking rates for each allotment and pasture for normal and dry precipitation years. Livestock numbers should not be increased during above normal precipitation years to allow for improvement of plant and soil conditions.

**3.4 <u>Develop a Systematic Monitoring Protocol</u>.** Based on the science we have referenced here, develop a systematic monitoring protocol for assessing livestock use (forage amount) in a timely manner to avoid over use of any pasture. The timing of measurement must be established relative to the permitted grazing season of use. It is critical that during the early years of application, these must be assessed frequently in order to ascertain the length of time livestock may remain in each pasture before excessive use occurs. This information will lead to establishment of realistic grazing schedules that lower the risk of excessive livestock grazing and damage. If indicators such as stubble height are proposed, they must also have a demonstrated relationship to actual percent use on grasses, forbs and shrubs by field testing.

BLM_0127003

**3.5  Determine Recovery Prescriptions for Lands Below Potential.**  Analyze peer-reviewed science and government publications we have referenced as well as others that have specifically evaluated different grazing scenarios and their ability to recover native components of damaged arid lands to their potential.  Use this information to develop recovery prescriptions for allotments and pastures that are not at potential (based on their departure from potential species distribution, ground cover and productivity).  Prescriptions that should be evaluated should include options such as (a) long-term rest, (b) reduced stocking rates, (c) grazing systems, (d) reseeding with native species, (e) vegetation treatments and others.  The time required for recovery of potential should be evaluated for each method.

**3.6  Determine Impacts of Water Developments.**  Water developments have been used for decades on the promise that they would result in better livestock distribution and improvement in conditions on the ground.  BLM has never quantitatively assessed these claims.  It is critical that BLM provide this analysis based on evidence from the literature and its own survey of conditions in Wyoming.  The analysis described in sections **3.1** and **3.2** above should include an element that locates and maps all water developments in the area of interest.  Based on field surveys combined with historical range data and satellite imagery, determine the impacts and/or benefits of these past water developments on upland plant communities and soils.  The effects of these water developments on their source waters (spring, stream or seep) and associated wetland habitats should be assessed, documented and reported in each project analysis.

## 4.0  Management Recommendations for Riparian Areas

BLM must provide assured protection of springs, streams, riparian areas and wetlands as these areas are highest in wildlife values, yet occupy only a small land area.  While continuing to propose additional water developments and grazing systems as means of protecting riparian areas, BLM does not provide scientific evidence that the values of these areas are actually protected by these methods.  The evidence in the government and scientific literature is that excluding livestock from riparian areas is the only effective method of protection and recovery.  According to FLPMA, BLM is to "accelerate" recovery through its management options.

Don Duff (1977) published results of studies that showed greater fish and vegetation production and stream bank recovery occurred within exclosures on Big Creek, Utah than outside in grazed areas.  In fact, he stated that conditions outside the exclosures continued to decline.  He concluded that 6 to >8 years of rest were necessary to restore aquatic and riparian habitat.  Even after 30 years of excluding livestock, sediment from uplands and riparian areas outside the exclosures continues to impair salmonid spawning, rearing and feeding substrates.  The literature is consistent in showing that exclusion of livestock from riparian areas is the most effective method of restoring their ecological integrity.  There is little evidence that continued livestock grazing of degraded streams under various management schemes or at any level leads to recovery of habitat attributes required for native fish and wildlife.  BLM must objectively evaluate its alternatives to livestock exclosures in the literature review proposed in paragraphs (4.1) and (4.7) below and include those evaluations and the science upon which they are based in its project analysis.

BLM_0127004

We are concerned over the lack of quantitative monitoring of streams, springs and riparian areas. Some of the limitations of the current BLM PFC assessment technique are discussed in Stevens et al (2002). BLM has not provided any systematic protocol for this monitoring and in general does not assess spring or wetland conditions. We are concerned that reliance will be placed on stubble heights without providing any evidence that, in arid ecosystems, use of this standard promotes recovery of critical habitat elements in damaged stream or wetland systems, or for that matter, prevents degradation of those attributes.

If stubble height is used, it must be correlated with percent riparian vegetation use and a stubble height standard set so that livestock use is kept within constraints that do not lead to lowered production of riparian vegetation in future years. In addition, it must be shown to be protective of stream bank integrity through comparison to percent bank trampling, bank erosion and bank stability. The literature review we propose in section **4.1** should address these issues, establish and justify riparian utilization standards and bank trampling standards that are protective of stream banks and riparian vegetation. This analysis of this and other issues presented below must be incorporated into each project analysis.

**4.1 <u>Literature Review</u>.** Review the literature on the effects of livestock grazing, grazing systems, range improvements and livestock exclusion on stream, spring and riparian habitats, their maintenance and recovery as well as water quality. Carter (2001) reviews the effects of livestock grazing on riparian areas and water quality. This report is available on line at:

http://www.westernwatersheds.org/reports/grazeWQ_JCarter/WQWWP.doc

Review the use of various indicators such as riparian stubble height and bank trampling measures, their application and relation to stream bank stability, riparian vegetation productivity, in-stream aquatic habitat and restoration rates. This review will incorporate analysis of the literature we have referenced in addition to any sources BLM and its consultant may provide.

**4.2 <u>Assessment of Current Condition of Springs, Seeps and Wetlands</u>.** Locate and map all springs and wetlands not associated with perennial streams on BLM lands in the project area. Photograph and describe each, document whether and how they have been modified for water developments and if so, whether the development is still functioning. Assess their current condition, wetland extent (area) and flow using photographs and DOI (1994). These habitats should be surveyed to establish a current baseline. The surveys should also be repeated during each permit mid-term and one year prior to permit renewal. Conduct the baseline mapping, analysis and photographs for each project.

**4.3 <u>Develop a Monitoring Protocol for Springs, Seeps and Wetlands</u>.** Based on the science reviewed in section **4.1**, develop a systematic monitoring protocol for <u>livestock use</u> of riparian/wetland herbaceous vegetation at springs, streams and wetlands. This assessment protocol will:

    a  Establish stubble height and livestock trampling standards and assess these effects at each spring and wetland area and at multiple locations on each

BLM_0127005

flowing stream within each pasture. A defined protocol should specify the number of measurements to be taken at each location, the length of stream reach to assess and a method to evaluate trampling damage to springs and wetlands.

b   Measure percent use of riparian grasses, not sedges. These measurements will be taken in the riparian zone outside the stream channel, not along the greenline.

c   Monitor water quality for conformance to standards

d   Establish a schedule for each allotment/pasture that measures these parameters no later than 3 weeks after livestock enter a particular pasture or allotment subdivision. It is important to measure these use levels early in the grazing period so stocking rates and management can be adjusted in a timely manner to prevent exceeding the standards. Accelerated measurements during the first year, in particular, are necessary to refine the grazing schedule and stocking rate for future years.

e   Record the data, also including allotment, pasture, location designation, turn-in date, monitoring date, riparian species measured, percent bank trampling, eroding banks, percent area trampled (springs and wetlands) and stubble heights. Record raw data on prepared forms so that means and standard deviations can be calculated. Enter this information into an electronic database that can be regularly updated following each monitoring event and is accessible to interested parties either on-line or by request.

**4.4   Assessment of Current Condition of Streams.** Based on best available science, describe a methodology and schedule for performing stream habitat and water quality surveys. This should include analysis of existing data and collection of baseline habitat and water quality data, maps and photographs that will be included in each project analysis.

**4.5   Develop Stream and Water Quality Monitoring Protocol.** In addition to the baseline survey, the project analysis should develop a monitoring protocol that provides for assessment of stream habitat and water quality during succeeding permit terms near the permit or lease mid-term and the year prior to renewal. This monitoring protocol should continue to include PFC assessments using DOI (1993) as modified by Stevens et al (2002). Winward (2000) also provides insight into stream and riparian monitoring technology. Any of these protocols must be supplemented by collecting additional data that quantitatively documents certain critical stream habitat conditions. We suggest the Rosgen method, USDA (1992, 1997) or other acceptable fish habitat survey protocols. Regardless of method, certain critical pieces of information must be collected to supplement PFC assessments. The literature should be reviewed and analyzed and details of methodologies, data management, reporting and public access explained. This critical supplemental data includes:

a.   Establishing permanent, marked stream cross-section survey points for determining channel profile, width and depth similar to those used by Duff (1977). Priority locations are in Rosgen Type "C" channels, if available and should encompass a complete meander with multiple cross-sections (minimum 3 at each reach). These channel surveys and the following data must be collected for a minimum of two reaches of each perennial stream in each pasture.

25

b. Bank condition surveys including measurement of the following parameters over a minimum 100' stream reach or full meander on both sides of the stream (Winward, 2000, recommends 363 feet). Bank condition parameters (i – iv_ will be assessed from the water line to the top of the bank, not at the greenline:
   i. the linear feet of stream banks that are vegetated/stable
   ii. the linear feet of stream banks that are vegetated/unstable
   iii. the linear feet of stream banks that are unvegetated/stable
   iv. the linear feet of stream banks that are unvegetated/unstable
   v. the linear feet of stream banks that are undercut
   vi. the linear feet of stream bank with overhanging vegetation.

c. During the baseline survey, and during succeeding permit terms, at permit mid-term and last permit year, collect triplicate MacNeil Core Sediment samples of salmonid spawning gravels (<2") near the downstream extent of each stream in each pasture. Based on the literature, establish criteria for sediment fines (<6.35 mm) as a percent of substrate that allows successful salmonid reproduction. Generally, levels of sediment fines above 30% result in significant mortality of eggs and larvae.

d. Data collected will be systematic and quantitative in order that statistical analysis can be employed. All data will be entered into an electronic database for access by interested parties.

Describe the monitoring protocols. This description will include: the actual methodologies, data entry forms, schedules and locations; provide maps of all locations for monitoring; and incorporate an electronic database with links to maps that is accessible to the interested public. Include the baseline data in each project analysis. BLM must show it has the capability, either with its own staff or outside contractors, to do the necessary monitoring to ensure recovery and prevention of future degradation.

**4.6 <u>Develop Stream, Spring and Wetland Recovery Prescriptions</u>.** For streams, springs and wetlands that are not functioning properly and/or have impaired water quality, analyze available methods for their recovery. Include an anticipated time frame for recovery to take place based on the scientific literature. Discuss and evaluate these options for recovery, including their costs and benefits and review the scientific literature provided. Methods for recovery should include consideration of: (a) closing pastures; (b) exclosure fencing; (c) removal of water developments; (d) restoration/replanting of riparian areas; (e) active herding to minimize livestock use; (f) removal of livestock when utilization standards are reached, and any other methods discovered in the literature. Propose and adopt methods that will best recover these degraded streams during the first permit term. In the on-going permitting, management and monitoring of livestock grazing, the land use plan and permit documents should require documentation of condition and recovery rates by implementation of the described monitoring program. These will be analyzed to demonstrate the changes resulting from application of the particular prescription or combinations of methods adopted.

26

Yours truly,

*[signature: John G. Carter]*

John Carter
Utah Director

## 5.0 References

All references listed are incorporated into our comments and should be used by BLM in its planning and livestock-related project analyses.

Anderson, David C., Kimball T. Harper and Ralph C. Holmgren. 1982. Factors influencing development of cryptogammic soil crusts in Utah deserts. Journal of Range Management 35(2):180-185.

Anderson, Jay E. and Karl L. Holte. 1981. Vegetation development over 25 years without grazing on sagebrush-dominated rangelands in southeastern Idaho. Journal of Range Management 34(1):25-29

Anderson, Jay E. and Richard S. Inouye. 2001. Landscape-scale changes in plant species abundance and biodiversity of a sagebrush steppe over 45 years. Ecological Monographs 71(4):531-556.

Armour, C.L., D.A. Duff and W. Elmore. 1991. The effects of livestock grazing on riparian and stream ecosystems. Fisheries 16(1): 7 – 11.

Austin, Miriam. 2003a. Water developments and wildlife. Violating the public trust. Red Willow Research.

Austin, Miriam. 2003b. BLM Pleasantview allotment wildlife deaths, 2003. Red Willow Research.

Bartos, Dale L. and Robert B. Campbell, Jr. 1998a. Water depletion and other ecosystem values forfeited when conifer forests displace aspen communities. Rangeland Management and Water Resources of American Water Works Association. May 1998: 427-433.

Bartos, Dale L. and Robert B. Campbell, Jr. 1998b. Decline of Quaking Aspen in the Interior West – Examples from Utah. Rangelands 20(1):17-24.

Beck, Jeffrey, L. and Dean L. Mitchell. 2000. Influences of livestock grazing on sage grouse habitat. Wildlife Society Bulletin 28(4):993-1002.

Belnap, Jayne. 1995. Surface disturbances: their role in accelerating desertification. Environmental Monitoring and Assessment 37:39-57.

BLM_0127008

Belnap, Jayne.  1996.  Soil surface disturbances in cold deserts:  effects on nitrogenase activity in cyanobacterial-lichen soil crusts.  Biology and Fertility of Soils 23:362-367.

Belnap, Jayne and D. A. Gillette.  1997.  Disturbance of biological soil crusts:  impacts on potential wind erodibility of sandy desert soils in southeastern Utah.  Land Degradation and Development 8:355-362.

Belnap, Jayne, Roger Rosentreter, Steve Leonard, Julie H. Kaltnecker, John Williams and David Eldridge.  2001.  Biological soil crusts:  ecology and management.  U.S. D.O.I.  Bureau of Land Management Technical Reference 1730-2.

Belsky, A.J., A. Matzke, and S. Uselman. 1999. Survey of livestock influences on stream and riparian ecosystems in the western United States.  Journal of Soil and Water Conservation 54(1): 419-431.

Belsky, A. Joy and Dana M. Blumenthal.  1997.  Effects of livestock grazing on stand dynamics and soils in upland forests of the Interior West.  Conservation Biology 11(2):315-327.

Belsky, A. Joy, and Jonathan L. Gelbard.  2000.  Livestock Grazing and Weed Invasions in the Arid West.  A Scientific Report Published by the Oregon Natural Desert Association.  Portland, Oregon.

Beymer, Renee J. and Jeffrey M. Klopatek.  1992. Effects of grazing on cryptogamic crusts in pinyon-juniper woodlands in Grand Canyon National Park.  American Midland Naturalist 127:139-148.

Blaisdell, James P. and Ralph C. Holmgren.  1984.  Managing Intermountain Rangelands – Salt-Desert Shrub Ranges.  USDA Forest Service, Intermountain Forest and Range Experiment Station, Ogden, Utah.  General Technical Report INT-163. 52p.

Blackwell, Jack.  2001.  Letter on capability and suitability.  Regional Forester, Intermountain Region.

BLM.  1994.  Rangeland Reform '94 Draft Environmental Impact Statement.

BLM.  2003.  Proposed Revisions to Grazing Regulations for the Public Lands, Draft Environmental Impact Statement DES 03-62.

Bock, Carl E., Jane H. Bock, William R. Kenney and Vernon M. Hawthorne.  1984. Responses of birds, rodents and vegetation to livestock exclosure in a semidesert grassland site.  Journal of Range Management 37(3):239-242.

Brotherson, Jack D., Samuel R. Rushforth, and Jeffrey R. Johansen.  1983.  Effects of long term grazing on cryptogam crust cover in Navajo National Monument, Ariz. Journal of Range Management 36(5):579-581.

BLM_0127009

Braun, Clait E.  1977.  Guidelines for maintenance of sage grouse habitat.  Wildlife Society Bulletin 5(3):99-105.

Brotherson, Jack D., Samuel R. Rushforth and Jeffrey R. Johansen.  1983.  Effects of long-term grazing on cryptogam crust cover in Navajo National Monument, Ariz.  Journal of Range Management 36(5):579-581.

Bryant, H.T., R.E. Blaser, and J.R. Peterson.  1972.  Effect of trampling by cattle on bluegrass yield and soil compaction of a Meadowville loam.  Agronomy Journal.  64:331-334.

Carlson, Cathy and John Horning.  1992.  Big profits at a big price – Public Land ranchers profit at the expense of the range.  Publication No. 79950, National Wildlife Federation, 1400 Sixteenth St. N.W. Washington, D.C. 64p.

Carter, John. 1998.  Investigation of Spawn Creek, Utah Coliform Contamination and Stream Bank Stability in Relation to Cattle Grazing.  Willow Creek Ecology report.

Carter, John G.  2001.  Livestock and water quality.  Western Watersheds Project Report.

Catlin, James, Joro Walker, Allison Jone, John Carter and Joe Feller.  2003.  Multiple use grazing management in the Grand Staircase National Monument.  A tool provided to the Monument range staff by the Southern Utah Land Restoration Project.

Clary Warren and Bert Webster. 1989. Managing grazing of riparian areas in the Intermountain Region. Intermountain Research Station, Forest Service. General Technical Report INT-263

Cummins, K.W. and George L. Spengler.  1977. Stream ecosystems.  Water Spectrum.  10:1-9.

Cummins, K. W. 1974.  Stream ecosystem structure and function.  Bioscience 24:631-641.

Connelly, John W., Michael A. Schroeder, Alan R. Sands and Clait E. Braun.  2000.  Guidelines to manage sage grouse populations and their habitats.  Wildlife Society Bulletin 28(4):967-985.

Cottam, Walter P.  1947.  Is Utah Sahara bound?  Bulletin of the University of Utah 37(11):1-41.

Crider, Franklin J.  1955.  Root-growth stoppage resulting from defoliation of grass.  Technical Bulleting No. 1102.  USDA Soil Conservation Service.  23p

D'Antonio, C. M. and P. M. Vitousek.  1992.  Biological invasions by exotic grasses, the grass/fire cycle, and global change.  Annual Review of Ecology and Systematics 23:63-87.

29

Danvir, Rick.  Ca2003 (undated).  Sage grouse ecology and management in northern Utah sagebrush-steppe.  Deseret Land and Livestock, Woodruff, Utah.

Dodge, Marvin.  1972.  Forest fuel accumulation – a growing problem.  Science 177:139-142.

DOI.  1993.  Riparian Area Management:  Process for Assessing Proper Functioning Condition.  Department of Interior, BLM TR 1737-9.

DOI.  1994.  Riparian Area Management:  Process for Assessing Proper Functioning Condition for Lentic Riparian-Wetland Areas.  Department of Interior,  BLM TR 1737-11.

Donahue, Debra L.  1999.  The western range revisited – removing livestock from public lands to conserve native biodiversity.  University of Oklahoma Press, Norman.

Duff, D. A.  1977.  Livestock grazing impacts on aquatic habitat in Big Creek, Utah.  In:  Proceedings of the Workshop on Livestock and Wildlife-Fisheries Relationships in the Great Basin.  University of California Agric. Station, Sci. Spec. Publication 3301.  Berkeley, California.

Duff, Donald A. 1979.  Riparian habitat recovery on Big Creek, Rich County, Utah.  In Proceedings: Forum – Grazing and Riparian/Stream Ecosystems.  Trout Unlimited, Inc. 91 p.

Dyksterhuis, E. J.  1949.  Condition and management of range land based on quantitative ecology.  Journal of Range Management 2:104-115.

Ecosystem Research Institute.  1984.  1983 Annual Report Ecosystem Analysis.  Report to White River Shale Oil Corporation, Salt Lake City, Utah.  106p. Report available thru Western Watersheds Project Utah Office at P.O. Box 280, Mendon, Utah 84325.

EPA. 1998b. The quality of our Nation's water: 1996 – Executive Summary of the National Water Quality Inventory: 1996 Report to Congress.  EPA841-S-97-001 Office of Water, U.S. Environmental Protection Agency, Washington, D.C.

EPA. 1976.  Quality criteria for water, July 1976.  Fecal coliform bacteria.  U.S. Environmental Protection Agency, Washigton, D.C.: 42-50

Evanko, Anthony B. and Roald A. Peterson. 1955.  Comparisons of protected and grazed mountain rangelands in southwestern Arizona.  Ecology 36(1):71-82.

Fleischner, Thomas L.  1994.  Ecological costs of livestock grazing in western North America.  Conservation Biology 8(3):629-644.

GAO.  1988. Rangeland management:  more emphasis needed on declining and overstocked grazing allotments.  U.S. General Accounting Office, GAO/RCED-88-80, Washington, D.C.

BLM_0127011

GAO.  1991.  Public land management:  attention to wildlife is limited.  GAO/RCED-91-64

GAO. 1995. Animal waste managment and water quality issues.  Publication no. GAO/RCED-95-200BR. 97pp.  General Accounting Office, Washington, D.C.

Galt, Dee, Greg Mendez, Jerry Holechek and Jamus Joseph.  1999.  Heavy winter grazing reduces forage production:  an observation.  Rangelands 21(4):18-21

Galt, Dee, Francisco Molinar, Joe Navarro, Jamus Joseph and Jerry Holechek.  2000. Grazing capacity and stocking rate.  Rangelands 22(6):7-11.

Green, D. M. and J. B. Kauffman.  1995.  Succession and livestock grazing in a northeastern Oregon riparian ecosystem.  Journal of Range Management 48:307-313.

Gregory, Stanley V., Frederick J. Swanson, W. Arthur McKee and Kenneth W. Cummins.  1991.  An ecosystem perspective of riparian zones.  Bioscience 41(8): 540-550.

Hanley, T. H. and J. L. Page.  1981.  Differential effects of livestock use on habitat structure and rodent populations.  California Fish and Game 68:160-173.

Harper, K. T., R. Van Buren, and S. Kitchen.  1996.  Invasion of alien annuals and ecological consequences in salt desert shrublands of western Utah.  Pages 58 -65 in J. R. Barrow, E. Durant, R.E. Sosebee and R. J. Tausch, editors.  Proceedings:  Shrubland ecosystem dynamics in a changing environment.  General Technical Report-338.  U.S. Forest Service Intermountain Research Station, Ogden, Utah.

Hild, A.L., M.G. Karl, M.R. Heferkamp and R.K. Heitschmidt.  2001.  Drought and grazing III:  root dynamics and germinable seed bank.  Journal of Range Management 54(3):292-298.

Hobbs, R. J. and L. F. Huenneke.  1992.  Disturbance, diversity, and invasion: implications for conservation.  Conservation Biology 6:324-337.

Hockett, Glenn A.  2002.  Livestock impacts on the herbaceous components of sage grouse habitat:  a review.  Intermountain Journal of Sciences Vol 8(2):105-114.

Hoffman, L., and R.E. Ries.  1991.  Relationship of soil and plant characteristics to erosion and runoff on pasture and range.  Journal of Soil and Water Conservation, p. 143-147.

Holechek, Jerry L.  1996a.  Financial returns and range condition on southern New Mexico ranches.  Rangelands 18(2):52-56

Holechek, Jerry L.  1996b.  Drought and low cattle prices:  hardship for New Mexico ranchers.  Rangelands 18(1):11-13.

Holechek, Jerry L. and Karl Hess, Jr.  1996c.  Grazing lands: prices, value, and the future.  Rangelands 18(3):102-105

BLM_0127012

Holechek, Jerry L., Hilton de Souza Gomes, Francisco Molinar and Dee Galt. 1998. Grazing intensity: critique and approach. Rangelands 20(5):15-18

Holechek, Jerry L., Hilton Gomez, Francisco Molinar and Dee Galt. 1999a. Grazing studies: what we've learned. Rangelands 21(2):12-16

Holechek, Jerry L., Milton Thomas, Francisco Molinar and Dee Galt. 1999b. Stocking desert rangelands: what we've learned. Rangelands 21(6):8-12

Holechek, Jerry L., Hilton Gomez, Francisco Molinar, Dee Galt and Raul Valdez. 2000. Short-duration grazing: The facts in 1999. Rangelands 22(1):18-22.

Holechek, Jerry L., Rex D. Pieper and Carlton H. Herbel. 2001.Range Management: Principles and Practices, Fourth Edition. Prentice-Hall, New Jersey. 587p

Howard, Gary L., Steven R. Johnson and Stanley L. Ponce. 1983. Cattle grazing impact on surface water quality in a Colorado front range stream. J. Soil and Water Conservation. March-April 1983:124-128.

Hubbard, R.K., D.L. Thomas, R.A. Leonard and J.L. Butler. 1987. Surface runoff and shallow ground water quality as affected by center pivot applied dairy cattle wastes. Trans. ASAE 30(2):430-437.

Hutchings, S.S. and G. Stewart. 1953. Increasing forage yields and sheep production on Intermountain winter ranges. U.S. Department of Agriculture Circular 925. 63p.

Jacobs, Lynn. 1991. Waste of the West.

Johansen, Jeffrey R. 1993. Cryptogamic crusts of semiarid and arid lands of North America. Journal of Phycology 29:140-147.

Jones, Allison. 2000. Effects of cattle grazing on North American arid ecosystems: a quantitative review. Western North American Naturalist 60(2):155-163.

Jones, Allison L and William S. Longland. 1999. Effects of cattle grazing on salt desert rodent communities. The American Midland Naturalist. 141(1):1-11.

Julander, Odell. 1962. Range management in relation to mule deer habitat and herd productivity in Utah. Journal of Range Management 15(5):278-281.

Kauffman, J. Boone and W.C. Kreuger. 1984. Livestock impacts on riparian ecosystems and streamside management implications – a review. Journal of Range Managment 37(5): 430 – 437.

Kay, Charles E. and Dale L. Bartos. 2000. Ungulate herbivory on Utah aspen: assessment of long-term exclosures. Journal of Range Management 53(2):145-153.

BLM_0127013

Kay, Charles E.  2001.  The condition and trend of aspen communities on BLM administered lands in central Nevada – with recommendations for management.  Final Report to Battle Mountain Field Office, Bureau of Land Management.

Kie, John G.  1996.  The effects of cattle grazing on optimal foraging in mule deer (Odocoileus hemionus).  Forest Ecology and Management 88:131-138.

Kleiner, Edgar F. and K. T. Harper.  1972.  Environment and community organization in grasslands of Canyonlands National Park.  Ecology 53(2):299-309.

Knick, Steven T., David S. Dobkin, John T. Rotenberry, Michael A. Shroeder, W. Matthew Vander Haegen and Charles Van Riper III.  2003.  Teetering on the edge or too late?  Conservation and research issues for avifauna of sagebrush habitats.  The Condor 105:611-634.

Knopf, Fritz L., James A. Sedgwick and Richard W. Cannon.  1988.  Guild structure of a riparian avifauna relative to seasonal cattle grazing.  Journal of Wildlife Management 52(2):280-290.

Kreuger, William C. and A. H. Winward.  1974.  Influence of cattle and big-game grazing on understory structure of a Douglas-fir Ponderosa Pine- Kentucky bluegrass community.  Journal of Range Management 27(6):450-453.

Kreuper, David, Jonathan Bart and Terrell D. Rich.  2003.  Response of vegetation and breeding birds to the removal of cattle on the San Pedro River, Arizona (USA).  Conservation Biology 17(2):607-615.

Lacey, J. R. 1987.  The influence of livestock grazing on weed establishment and spread.  Proceedings: Montana Academy of Science 47:131-146.

Lile, David F., Kenneth W. Tate, Donald L. Lancaster and Betsy M. Karle.  2003.  Stubble height standards for Sierra Nevada meadows can be difficult to meet.  California Agriculture, 57(2):60-64.

Loft, Eric R., John W. Menke and John G. Kie.  1991.  Habitat shifts by mule deer: the influence of cattle grazing.  Journal of Wildlife Management.  55(1):16-26.

Loope, Walter L., and Neil E. West.  1979.  Vegetation in relation to environments of Canyonlands National Park.  In:  R. M. Linn (ed.) Proceedings of he First Conference on Scientific Research in the National Parks.  Vol. 1. U.S. Dept. of Interior, NPS Trans. And Proc. Series No. 5.

Lusby, Gregg C.  1979.  Effects of grazing on runoff and sediment yield from desert rangeland at Badger Wash in western Colorado, 1953-73.  U.S. Geological Survey Water Supply Paper 1532-1.

Lusby, Gregg C.  1970.  Hydrologic and biologic effects of grazing vs. non-grazing near Grand Junction, Colorado.  Journal of Range Management 23(4):256-260.

33

BLM_0127014

Mack, R. N. 1981.  Invasion of Bromus tectorum L.  into western North America:  An ecological chronicle.  Agro-ecosystems 7:145-165.

Mack, R. N. and J. N. Thompson.  1982.  Evolution in steppe with few large, hooved mammals.  American Naturalist 119:757-773.

Madany, Michael H. and Neil E. West.  1983.  Livestock grazing – fire regime interactions within montane forests of Zion National Park, Utah.  Ecology 64(4):661-667.

Marble, James R. and Kimball T. Harper.  1989.  Effect of timing of grazing on soil surface cryptogamic communities in a great basin low shrub desert:  a preliminary report.  Great Basin Naturalist 49(1):104-107.

Marcuson, Patrick E. 1977. Overgrazed streambanks depress fishery production in Rock Creek, Montana.  Fish and Game Federation Aid Program. F-20-R-21-11a.

Martin, John H. Jr. 1997. The Clean Water Act and animal agriculture.  J. Environmental Quality 26:1198-1203.

McKee, T.B., N.J. Doesken, and J. Kleist, 1993.  The relationship of drought frequency and duration ot time scales.  Eighth Conference on Applied Climatology, American Meteorological Society, Jan 17-23, 1993, Anaheim CA, pp. 179-186.

McLean, A. and E.W. Tisdale.  1972.  Recovery rate of depleted range sites under protection from grazing.  Journal of Range Management 25:178-184.

Medin, D. E., and W. P. Clary.  1990.  Small mammal populations in a grazed and ungrazed riparian habitat in Nevada.  Research Paper INT-413.  U.S. Forest Service, Intermountain Research Station, Ogden, Utah.

Moore, Elbert, Eric Janes, Floyd Kinsinger, Kenneth Pitney and John Sainsbury.  1979.  Livestock grazing management and water quality protection.  U.S. Environmental Protection Agency and the Bureau of Land Management.

National Research Council.  2002.  Riparian Areas: Functions and Strategies for Management,  National Research Council, Committee on Riparian Zone Functioning and Strategies for Management, Water Science and Technology Board, Board on Environmental Studies and Toxicology (National Academy Press, 2002).

NWF.  1997.  Comb Wash decision, National Wildlife Federation v. Bureau of Land Management, 140 IBLA 85 (Aug. 21, 1997)

Orr, Howard K.  1975.  Recovery from soil compaction on bluegrass range in the Black Hills.  Transactions of the ASAE 1076-1081.

Owens, L.B., W.M. Edwards and R.W. Van Keuren.  1996.  Sediment losses from a pastured watershed before and after stream fencing.  Journal of Soil and Water Conservation 51(1):90-94.

34

Packer, Paul. 1998.  Requirements for watershed protection on western mountain rangelands.  Unpublished manuscript.  Dr. Packer is retired from the USDA Intermountain Forest and Range Experiment Station, Logan, Utah.

Paige, Christine and Sharon A. Ritter.  1999.  Managing sagebrush habitats for bird communities.  Partners in Flight, Western Working Group, Boise, Idaho.

Pearce, Richard.  1988.  Where deer and cattle roam.  USDA Forest Service Pacific Southwest Research Station.

Pell, Alice N. 1997.  Manure and microbes:  public and animal health problem?  J. Dairy Sci. 80:2673-2681.

Peterjohn, W.T. and D. L. Correll.  1984.   Nutrient dynamics in an agricultural watershed:  observations of a riparian forest.  Ecology 65: 1466-1475

Platts, W. S. 1991.  Livestock Grazing.  *In:  Influence of Forest and Rangeland Management on Salmonid Fishes and Their Habitats.*  American Fisheries Society Special Publication 19:389-423.

Ratliff, Joe and Charles Keeports.  2000.  Surface water analysis and management recommendations for the Carico Lake Allotment.  U.S. Dept. of Interior Bureau of Land Management, Battle Mountain Field Office, Nevada.

Ray, D.E., A.M. Lane, C.B. Roubicek, and R.W. Rice.  2004.  Range beef herd growth statistics.  In: Arizona Rancher's Management Guide.  Arizona Cooperative Extension, College of Agriculture, University of Arizona.

Rosenzweig, M. L. and J. Winakur.  1969.  Population ecology of desert rodent communities:  habitats and environmental complexity.  Ecology 50:558-572.

Rummell, Robert S.  1951.  Some effects of livestock grazing on Ponderosa pine forest and range in central Washington.  Ecology 32(4):594-607.

Saxon, Keith E., Lloyd F. Elliott, Robert I. Papendick, Michael D. Jawson and David H. Fortier. 1983. Effect of animal grazing on water qualiyt of non-point runoff in the Pacific Northwest.  Project Summary, Robert S. Kerr Environmental Research Laboratory, Ada, Oklahoma.  EPA-600/S2-83-071. 7p.

Schepers, J.S., B.L. Hackes and D.D. Francis. 1982. Chemical water quality of runoff from grazing land in Nebraska:  II. contributing factors.  J.Environ. Qual., Vol 11(3):355-359.

Schulz, Terri T and Wayne C. Leininger.  1990.  Differences in riparian vegetation structure between grazed areas and exclosures.  Journal of Range Management 43(4):295-299.

Sharp, Lee A., Ken Sanders and Neil Rimbey.  1992.  Variability of crested wheatgrass production over 35 years.  Rangelands 14(3):153-168

BLM_0127016

Schwan, H.E., Donald J. Hodges and Clayton N. Weaver.  1949.  Influence of grazing and mulch on forage growth. Journal of Range Management 2(3):142-148.

Stevens, Lawrence E., Peter Stacey, Don Duff, Chad Gourley and James C. Catlin. 2002.  Riparian ecosystem evaluation:  a review and test of BLM's proper functioning condition assessment guidelines.

Stewart, Kelley M., R. Terry Bowyer, John G. Kie, Norman J. Cimon, and Bruce K. Johnson.  2002.  Temprospatial distributions of elk, mule deer, and cattle:  resource partitioning and competitive displacement.  Journal of Mammalogy.  83(1):229-244.

Souder, Jon A.  ca1997.  How Does Livestock Grazing Fit Into the Larger Societal Uses of Wildlands?  Methods for Determining Benefits and Their Application to the Kaibab Plateau.  College of Ecosystem Science and Management, Northern Arizona University.

Taylor, Daniel M.  1986.  Effects of cattle grazing on passerine birds nesting in riparian habitat.  Journal of Range Management 39(3):254-258.

Thelin, Richard and Gerald F. Gifford.  1983.  Fecal coliform release patterns from fecal material of cattle.  Journal of Environmenatl Quality 12(1):57-63.

Tiedemeann, A.R., D.A. Higgins, T.M. Quigley, H.R. Sanderson and D.B. Marx. Responses of fecal coliform in streamwater to four grazing strategies.  Journal of Range Management 40(4):322-329.

Trimble, Stanley W. and Alexandra C. Mendel.  1995.  The cow as a geomorphic agent – a critical review.  Geomorphology 13:233-253.

USDA. 1981. America's soil and water:  condition and trends.  U.S. Department of Agriculture Soil Conservation Service, Washington, D.C. 33p.

USDA.  1982.  Soil Survey of Rich County Utah.  USDA Soil Conservation Service, Forest Service and Bureau of Land Management.

USDA. 1992.  Integrated riparian evaluation guide.  U.S. Department of Agriculture, Region IV Forest Service, Ogden, Utah.

USDA.  1993.  Monitoring data from the North Rich allotment, Logan Ranger District, Wasatch-Cache National Forest.

USDA.  1996.  Intermountain Regional Assessment: Properly Functioning Condition. USDA Forest Service, Region IV, Ogden, Utah.

USDA.  1997.  R1/R4 (Northern/Intermountain Regions) Fish and Fish Habitat Standard Inventory Procedures Handbook.  USDA Forest Service General Technical Report INT-GTR-346.

UDWR.  1997.  Conservation Agreement and Strategy for Bonneville Cutthroat Trout in Utah.  Utah Division of Wildlife Resources Publication 97-19.

BLM_0127017

USDA. 1998. Draft Sub-regional Assessment of Properly Functioning Condition for Areas Encompassing the National Forests of Northern Utah. USDA Forest Service, Region IV, Ogden, Utah.

USDA. 2001. Process Paper I: rangeland capability and suitability for sheep and cattle ranges. Caribou National Forest.

USDA. 2002. Final Environmental Impact Statement for the Curlew National Grassland. Caribou National Forest.

U.S. Department of Interior, U.S. Fish and Wildlife Service, U.S. Department of Commerce and U. S. Census Bureau. 2002. 2001 National Survey of Fishing, Hunting and Wildlife-Watching Associated Recreation. 170 p.

VanHaveren, Bruce P., Eric B. Janes and William L. Jackson. 1985. Nonpoint pollution control on public lands. Journal of Soil and Water Conservation p.92-94.

Van Poollen, H.W. and J. R. Lacey. 1979. Herbage response to grazing systems and stocking intensities. Journal of Range Management 32:250-253.

Walker, Larry. 2002. Impact of grazing on 153 species of southwestern birds. http://rangenet.org/directory/walker/swbirds.html .

Wambolt, C.L., K.S. Walhof and M.R. Frisina. 2001. Recovery of big sagebrush communities after burning in south-western Montana. Journal of Environmental Management 61:243-252.

Welch, Bruce L. 2002 (in editing). Big sagebrush: A sea fragmented into lakes, puddles, and ponds. Gen. Tech. Rep. RMRS-GTR-___. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station: ___p. Data on file at the Shrub Sciences Laboratory, 735 N 500 E, Provo, Utah 84606.

Welch, Bruce L. and Craig Criddle. 2003. Countering misinformation concerning big sagebrush. Forest Service Rocky Mountain Research Station Research Paper RMRS-RP-40.

West, Neil E. 1981. Nutrient cycling in desert ecosystems. In: Arid Land Ecosystems: Structure, Functioning and Management, Volume 2. Cambridge University Press.

West, Neil E. 1983. Western Intermountain Sagebrush Steppe. In Temperate Deserts and Semi-deserts, edited by N. E. West. Elsevier Scientific Publishing, Amsterdam. p351-373.

White, Clifford A., Charles E. Olmstead and Charles E. Kay. 1998. Aspen, elk and fire in the Rocky Mountain national parks of North America. Wildlife Society Bulletin 26(3):449-462.

White, Richard K., Robert W. VanKeuren, Lloyd B. Owens, William M. Edwards and Roberty H. Miller. 1983. Effects of livestock pasturing on non-point surface runoff.

BLM_0127018

Project Summary, Robert S. Kerr Environmental Research Laboratory, Ada, Oklahoma. EPA-600/S2-83-011. 6p.

White River Shale Oil Corporation. 1984. Progress Report Environmental Programs 1983. White River Shale Oil Corporation, Salt Lake City, Utah. 785p. Report available thru Western Watersheds Project Utah Office at P.O. Box 280, Mendon, Utah 84325

Winward, Alma. 2000. Monitoring the Vegetation Resources in Riparian Areas. USDA Forest Service General Technical Report RMRS-GTR-47

Winder, J.A., C.C. Bailey, M.G. Thomas and J.L. Holechek. 2000. Breed and stocking rate effects on Chihuahuan Desert cattle production. Journal of Range Management 53(1):32-38.

Wuerthner, George and Mollie Matteson. 2002. Welfare ranching: the subsidized destruction of the west. Island Press.

Zimmerman, G. Thomas and L.F. Neuenschwander. 1984. Livestock grazing influences on community structure, fire intensity, and fire frequency within the Douglas-fir/ninebark habitat type. Journal of Range Management 37)2):104-110.

BLM_0127019

| **BACK** |

# APPENDIX B: A SCIENCE-BASED TOOL FOR ASSESSING AVAILABLE FORAGE AND GRAZING CAPACITY OF GSENM GRAZING ALLOTMENTS TO MEET RANGELAND HEALTH STANDARDS

**A tool provided to the GSENM range staff, provided by the Southern Utah Land Restoration Project**

**September, 2003**

**Lead Authors:**

**James Catlin,[1] John Carter,[2] and Allison Jones[1]**

# CHAPTER 1: INTRODUCTION

For public lands that support livestock grazing, grazing permits focus on two key variables: the number of allowed livestock measured in animal unit months (AUM), and the season of grazing. The number of AUMs granted in a permit is contingent on enough forage being available for the quantity of AUMs granted. The decision regarding the number of AUMs to assign to an allotment requires an assessment of the average forage biomass produced in that allotment and then the assignment of a fraction of the total forage to domestic grazers. This section of the guidance document develops a model to use in calculating the amount of forage that can be allocated to livestock while still allowing for the ecological needs of the land to be met.

The economic viability of ranching and the continued existence of ranching-dependent communities is tied to the health and productivity of rangelands. Today we recognize that we need to take a new look at past and current use and management of rangelands. As the BLM itself has noted, "…the land itself is in jeopardy, and the variety of products and values that this land has produced may not be sustained for future generations unless ecosystems are healthy and productive" (Utah BLM 1997). In addition to this general recognition by the agency that "the land is in jeopardy," we make a very strong case elsewhere in this guidance document that on a site-specific level (in this case, in GSENM), the rangelands in GSENM are impaired as well.

Part of the reason that BLM lands are "in jeopardy" is likely a result of many BLM grazing permits currently over-allocating existing forage. Most permitted levels of grazing on BLM lands are the result of forage capacity assessments conducted by the agency long ago. Unfortunately, these past forage capacity assessment methods are in conflict with BLM's current rangeland health standards. Originally designed for grazing use for sustained yield, these earlier capacity assessment methods failed to meet ecological needs of the land and, as a result, many allotments today produce less than their potential. Since the new Utah rangeland health standards were established in 1997, the BLM has developed several analysis tools to implement these standards. However, BLM still lacks a tool to assess forage capacity consistent with these new rangeland standards.

Based on a wide array of range science, the ecologically-based forage capacity analysis described below is a tool to help BLM determine appropriate stocking levels for livestock in the GSENM. This forage capacity model uses computer mapping and ecological field data to estimate the amount of grazing that a grazing permit can allow, while still complying with the standards and guidelines.

## 1.1 Past practices used to determine stocking levels.

Levels of livestock use on BLM lands have not always been determined as the result of a range capacity analysis. Early livestock numbers assigned to grazing allotments were developed over a half-century ago. In many cases, the number of livestock that were allowed to graze was the result of regional political processes that relied on personal experience and subjective data from field trips as part of a politically negotiated settlement (Grazing Service 1946).

In the 1960's, BLM began estimating the number of livestock that could graze on BLM lands based on a calculated production of forage. Some allotments have records from this capacity analysis and others do not. The method involved calculating forage production based on the size of the area and the forage production as assumed on a per acre basis. The forage needs for one cow/calf pair for a month was used to calculate the number of AUMs that an allotment could support. The methods and policies behind the capacity model of this earlier era are not remembered by most BLM staff, and have yet to be discovered by the authors.

In the mid- and late 1970s, a number of public land laws generated a change in BLM's approach to range management. The Federal Land Policy management Act (FLPMA) of 1976 and the Public Rangeland

BLM_0127021

Improvement Act of 1978 required BLM to maintain rangeland inventories.  The Soil and Water Resources Conservation Act of 1977 required the Soil Conservation Service to establish a national resources inventory.

As a result of these laws the BLM, under the Carter Administration, developed the Soil-Vegetation Inventory Method (SVIM) in 1979.  Originally designed to standardize rangeland sampling for grazing Environmental Impact Statements (CRC 1984), SVIM included calculations of forage capacity on an allotment basis.  Field forage was clipped and weighed.  Data collected included plant community composition and forage productivity.  Areas with common soil and plant communities were the units used in calculating the expected forage production for rangelands.  The results were converted into estimated forage production using adjustment factors for phenology, precipitation and proper utilization factors for livestock use (Menke and Miller, 1984).  A cow/calf pair (or AUM) was assumed to consume 800 pounds of forage per month (Jensen 1984).

Range capacity often applied the concept of "take half and leave half" (50% utilization).  In Appendix A (pg. 8), the origins of the 50% utilization policy now central to many BLM range decisions is explained.  BLM commonly recommends stocking levels that assume that livestock will consume 50% of the annual production of grasses and forbs.  The assumption made is that this level of consumption by livestock leaves adequate forage for wildlife, while allowing for sustained production of the forage itself.  Many have questioned this assumption, especially on arid lands (e.g. Caldwell 1984, Galt et al. 1999, Holechek et al. 2001).

The capacity analysis built into SVIM focused on sustained forage production.  As a result, this method did not consider key ecological factors such as plant community composition, excessive grazing use in key habitats such as riparian areas, soil nutrient cycle maintenance, and nongame wildlife needs.  Yet in spite of these shortcomings, SVIM was a major step forward in range management.

In the early 1980's, BLM discontinued SVIM.  It was replaced with a monitoring program that did not include collection of data on plant community productivity.  Klemmendson et al. (1984) reported that the chief reason the BLM discontinued SVIM was political, and driven by the response of the ranching community to SVIM in 1983-84.  For the past twenty years, BLM has not used forage capacity analysis in determining stocking rates.  Based on the acknowledgement by the BLM that "the land is in jeopardy," as well as the general degraded state of BLM rangelands in southern Utah, we can say with some certainty that the policy of abandoning forage capacity analyses over the past 20 years "is not working."

This must change as BLM implements the new rangeland health standards developed six years ago.  The standards call for management of grazing in deference to the health of ecosystems.  Ecosystem health is linked to the productivity of the land and its ability to service local communities on a sustained basis (CRC 1994).  The loss of biodiversity and ecosystem structure and function has long-term implications for the health of watersheds and the ability of the land to provide abundant forage for a number of uses.  BLM needs to undertake forage capacity analyses that will allow the standards to be met, restore and maintain ecosystems, and provide for ecosystem resilience that maintains the productivity of the land over time.

## 1.2 The timeliness of grazing capacity analysis in the upcoming grazing EIS.

BLM's need for forage capacity analysis as part of the upcoming grazing EIS for the GSENM is justified by community needs, agency policy (both current and proposed), rangeland science, and the agency's legal requirements.   Such an ecologically-based forage capacity analysis is timely because grazing capacity has not been systematically reviewed for GSENM allotments for at least two or perhaps four decades.  BLM is required to periodically adjust management decisions based on ongoing inventories, and this EIS will be renewing permits for most, if not all, grazing allotments in the Monument.  Furthermore, range capacity based on ecological needs was raised as a significant issue in the GSENM grazing EIS.  BLM has a legal requirement to consider this issue as part of the EIS.

BLM_0127022

The following chapters will develop and illustrate a science-based model for determining appropriate stocking levels for cattle in GSENM grazing allotments. This new formula for calculating forage availability and capacity is based on both the range science literature and updated estimates of actual available forage for particular soil types. We have divided the ecological needs of the land and wildlife into several categories. These are: wild herbivore forage needs; insect and nematode forage needs; and plant community viability, resilience, and regeneration, including soil stability and (lack of) erosion. Based on literature on these topics, we develop an ecological allocation of the plant community to be used in the forage capacity model. We demonstrate the utility of this new model by using an actual example in the Monument: the Upper Hackberry grazing allotment.

The next section (Chapter 2) describes the method used in the new protocol. Then, Chapter 3 features the results of our test run of the new procedure in the Upper Hackberry allotment. This is followed by Chapter 4, which specifically makes the case for using our proposed capacity model for the GSENM Grazing DEIS, chiefly because it will ensure that allotments in the Monument will conform with the Standards and Guidelines in the future.

## CHAPTER 2: METHODS

This chapter outlines the methods used in our proposed science-based formula for determining appropriate stocking levels for cattle in GSENM grazing allotments. This process begins by identifying the areas that are capable and suitable for livestock grazing. For those lands suitable for livestock grazing, the forage produced each year is estimated for each individual soil community based on current field data and existing data collected as part of past BLM, Soil Conservation Service, and National Resources and Conservation Service (NRCS) surveys.

Vegetation requirements for wild herbivores, insects, nematodes, soil stability, nutrient recycling, plant regeneration, and plant resilience lead to an estimate of the amount of forage required to meet ecological needs. Measuring the composition, structure, function and various ecological processes for each specific habitat site in all GSENM allotments is beyond anyone's resources at this time. As a practical necessity, we must resort to the use of indicators to monitor ecosystem health and function. Total annual production of plant biomass and soil litter, for example, can be sampled while energy flows and soil nutrient regeneration are impractical to measure. When assessing the amount of forage that can be removed from an allotment, critical ecological considerations include but are not limited to soil nutrient recycling, soil resilience to erosion, wildlife habitat needs, and plant community productivity and resiliency.

Below, we describe how to use a Geographic Information System (GIS) to take various data inputs and generate a stocking rate that an allotment can support while still meeting rangeland health standards. The work reported here is derived from a study that is ongoing. As we continue to refine this work some changes may be incorporated but they are unlikely to make significant changes to our model and its outcomes.

## 2.1 Initial Adjustments made for Capability[3] of the Pasture to Support Cattle.

We rely on current range science and criteria used by the U.S. Forest Service for the arguments made below. These involve the application of quantitative criteria to adjust for the physical limitations of the land to support livestock grazing. Holechek et al. (2001) provide recommendations for adjusting the stocking rate for cattle in order to account for distance from water and steepness of slope. Galt et al. (2000) have indicated that the NRCS has adopted these guidelines for slope adjustments. Suggested reductions in grazing capacity with distance to water and increasing slope are provided in Table 1.

**Table 1.** Adjustments for distance to water and slope for cattle (Holechek et al. 2001)

| Distance from Water (miles) | Percent Reduction in Grazing |
|---|---|

BLM_0127023

| | Capacity |
|---|---|
| 0 – 1 | 0 |
| 1 – 2 | 50 |
| >2 | 100 |
| **Slope (%)** | |
| 0 – 10 | 0 |
| 11 – 30 | 30 |
| 31 – 60 | 60 |
| >60 | 100 |

Holecheck et al. note that snow reduces water availability problems in winter on cold desert ranges of the U.S. Also, sheep do not require water every day and can use areas further than two miles from water. Literature cited shows that sheep on New Mexico winter ranges used slopes of less than 45% with no adjustment necessary for slope, whereas slopes greater than 45% were hardly used.

The Caribou National Forest has produced a detailed process paper for determining rangeland capability and suitability for both cattle and sheep ranges (Caribou NF 2001). It is based on criteria used in Region IV of the Forest Service. 36 CFR 219.20 defines capability as "the potential of an area of land to produce resources, supply goods and services, and allow resource uses under an assumed set of management practices and at a given level of management intensity. Capability depends on current conditions such as climate, slope, landform, soils and geology, as well as the application of management practices, such as silviculture or protection from fire, insects and disease." Range surveys have historically been used to identify the land areas that were capable and then by knowing the average forage production, applying a utilization rate, the estimated grazing capacity of the allotment could be determined. This was then validated through on-ground monitoring, or that was the intent.

The Caribou National Forest lists the following criteria for determining capability:

1. Areas with less than 30% slope for cattle and less than 65% slope for sheep (note that here the Caribou NF differs from Region IV in that Region IV uses 45% slope for sheep)
2. Areas producing more than or having the potential to produce an average of 200 pounds of forage/acre on an air-dry basis over the planning period.
3. Areas with naturally resilient soils that are not unstable or highly erodible.
4. Areas where ground cover (vegetation, rocks, litter) is sufficient to protect the soil from erosion. They specify a minimum of 60% cover unless local data is available for setting more specific ground cover requirements.
5. Areas accessible to livestock (without dense timber, rock or other physical barriers).
6. Areas within one mile of water or where the ability to provide water exists.

Suitability criteria employed by the Caribou NF include consideration of the following as they determine whether livestock grazing is compatible with management goals for the areas descrbed:

1. Developed recreation use sites or special use sites.
2. Special area designations such as Research Natural Areas.
3. Administrative sites, research facilities or study sites.
4. Key wildlife habitat areas.
5. Important habitats for Threatened, Endangered or Sensitive (TES) species.
6. Noxious weed infestations where forage is not used by livestock or use would contribute to an increase of the infestation.
7. Unique habitats such as bogs, fens, jurisdictional wetlands, or rare plant communities.
8. Areas where livestock grazing is impracticable due to economic considerations, either from a permittee or agency standpoint.
9. Transitory range created by timber harvest where the associated mitigation costs to protect timber resource values is excessive.

BLM_0127024

10. Areas where the social consequences and values foregone are not acceptable.
11. Non-functional streams or stream segments where livestock grazing is the primary cause for the less than satisfactory condition.
12. 303D listed streams or stream segments where livestock grazing is the primary cause for the less than satisfactory conditions.
13. Areas with significant amounts of dispersed recreation.

    We combine various features of the suitability and capability criteria used by the Caribou National Forest that are representative of criteria used by most National Forests in the Intermountain Region. These, along with other sources (cited below) are used to make our recommendations for adjustments to the land area that is suitable for grazing and capable of providing forage for grazing in the GSENM. These are:

Areas not capable:
1. Areas inaccessible to livestock (because of cliffs, canyons or other physical barriers)
2. Unstable or highly erodible soils (as defined by NRCS)
3. Areas producing less than or having the potential to produce an average of 19kg/ha (17 lb/acre) on an air-dry basis over the planning period (BLM 1981)[4]
4. Areas with greater than 30% slope
5. Areas more than 2 miles (3.2 km) from water (Fusco 1995, Holechek et al. 2001).


Areas not suitable:[5]
1. Key, identified habitats for TES species (i.e. critical habitat identified by USFWS or Utah Division of Wildlife Resources)
2. Unique habitats such as jurisdictional wetlands and springs
3. Rare plant communities
4. Areas that receive high levels of recreation use (i.e. canyon bottoms, like the Gulch)

    The capability and suitability factors selected for our capacity model reflect the practical nature of grazing practices in the semiarid lands of southern Utah, ecological and biological considerations that should be of priority in a national monument (i.e. rare plant communities and TES habitat), and current BLM capacity methods. For example, the 19kg/ha (17lb/acre) forage requirement for productivity was borrowed from a 20 year-old grazing EIS for this area (BLM 1981). As noted above, at 200 lb/acre the minimal forage production threshold the Forest Service uses is more current and much higher. In addition, the distance from water factor for forage is appropriate for grazing in arid lands during the warmer time of the year. Most of the allotments in the Monument are spring and summer allotments. While cattle may benefit from snow, standing snow in this region is infrequent and does not remain for long periods of time, and thus cannot be relied on in making grazing management decisions. Even winter grazing, based on our experience in GSENM, relies on surface water sources most of the time. For these reasons, areas greater than 3.2 km from a surface water source are considered unsuitable for livestock grazing in terms of assessing the capacity for livestock grazing of an allotment.

    Section 2.4 explains how to use a GIS to determine the amount of the grazing unit (pasture or allotment) that is capable and suitable for supporting livestock.

## 2.2  Determination of Forage Biomass in Allotment

    Once the above capability and suitability adjustments to the grazing unit (pasture or allotment) are carried out, the next step is to estimate the kg/ha of annual production of grasses and forbs in the unit. We recommend three options for making this assessment (tiered in order of our opinion of what is most sound and credible, from a scientific standpoint):

BLM_0127025

- The first and most desirable option is for the land manager to perform actual clipping studies in the grazing unit being assessed. Methods of determining forage production that rely on plot clippings are described in BLM (1996). Our measurements were made using the beltline transect method (FSM 2209.21) to assess both cover and annual forage production (for all grasses and forbs, not shrubs) for each Range Site Type[6] in the grazing unit. Earlier BLM monitoring practices used prior to 1996 also used similar sampling methods (DOI 1984a, DOI 1984b, DOI 1985). At the end of each of five 100 ft. radial transects for each site, clip the standing vegetation within a 1 m$^2$ frame to arrive at estimated production of standing crop of grasses and forbs. Clippings should not be limited to palatable species only; clip all grasses and forbs. This could overestimate the available forage for a site. If time allows, be sure to replicate sampling in multiple patches of each Range Site Type, in which the number of replicate patches sampled is determined by the relative abundance of that Range Site Type in the grazing unit. Apply the forage production values for each Range Site Type to others of the same type in the grazing unit, using a GIS (as described below and in Section 2.4).

- If time and/or resources are not sufficient to conduct the clipping studies described above, we then recommend that the user obtain the **actual field data from the NRCS** that were recently used to revise NRCS estimations of forage biomass for Range Site Types in southern Utah.[7] This data, which exists for almost all (if not all) Range Site Types known to occur in the Monument, is an improvement over the traditional NRCS estimates of Range Site Type production (DOI 1984c), as these new clippings were completed for a variety of rangelands including many grazed by livestock. The values used in the traditional Range Site Type estimates made by the Soil Conservation Service and BLM were chiefly based on relict sites. Therefore, the raw clipping data recently collected by the NRCS on a variety of Range Site Types is more applicable to GSENM rangelands, most of which are grazed. Apply the forage production values for each Range Site Type (for all grasses and forbs, not shrubs) to all other Range Site Types of the same type in the grazing unit, using a GIS (as described below and in Section 2.4).

- If the new NRCS raw clipping data are not available for all Range Site Types in the grazing unit being assessed, we then recommend that the user utilize the old NRCS forage production predictions (DOI 1984c), but only for those Range Site Types where the new NRCS clipping data does not exist. These earlier estimates and soil surveys often have average, low, and highproduction estimates based on precipitation at, below, or above normal precipitation years. Based on our field clipping survey and a review of these earlier NRCS forage estimates, wesuggest using the below average forage productions if using the old NRCS predictions. These estimates seem to better reflect forage production on both typical years and drought conditions, which seem to be a common occurrence. In the absence of more current data (described above), apply the forage production data from these earlier NRCS forage estimates to the relevant Range Site Types as attributes in the GIS coverage for the allotment. This is described in more detail later in this section.

Using one of the three methods described above, the land manager should add to the GIS coverage production data as attributes to the coverage for soil map units. This tabular data associated with the coverage will later be exported from the GIS and, in a spreadsheet program, be used to calculate the capacity of the allotment. Additional discussion on the use of GIS and the spreadsheet program can be found in Section 2.4, below.

*2.2.1  Do results obtained from first two steps necessitate a "recovery prescription?"*  We must stress that we mean for this forage capacity model to only be used to assess the carrying capacity of rangeland that has forage production quantities in the "good" or "excellent" range. This means that the amount of forage is 50% or greater of the potential production of the site, as defined by NRCS. If one is using our model to calculate stocking rates we are assuming that the allotment is currently meeting rangeland health standards or is moving toward its potential plant community.

BLM_0127026

Thus, if the range manager does follow our recommendation to clip the forage in the grazing unit and finds that the actual forage (grass and forb biomass) on the grazing unit is less than 50% of the potential plant community predicted for those soil types, then we argue that the allotment should receive a special management prescription that we call "recovery mode." See Chapter 4, Section 4.2.1.2 of the guidance document for further discussion of this prescription.

Little research exists concerning the level of livestock grazing that can occur on "recovering" arid or semi-arid rangelands where productivity is fair or poor.[8] Further, the literature in inconsistent as to exactly "how much rest" is required to recover degraded rangelands in arid or semi-arid environments. Below, we highlight some of the key literature that clearly shows that, in general, the recovery of impaired rangelands appears to require long periods of time – certainly more than a year or two of rest.

The literature confirms that total, long term rest is effective. Potter and Krenetsky (1967) found that grass densities and total ground cover tripled following 25 years of non-grazing. Blydenstein et al. (1957) similarly determined that perennial grass densities and the palatable shrub *Krameria grayi* increased in a Sonoran desert grassland protected from grazing for 50 years, and were most taken by the notable increase in overall plant cover and density. More recently, Anderson and Inouye (2001) found landscape-scale changes in plant species abundance (greater) and biodiversity (greater) of a previously grazed sagebrush steppe over four years of rest, with perennial grasses experiencing a 13-fold increase in cover during that time. Analyzing riparian areas, Platts and Nelson (1985) determined that herbaceous vegetation can recover within several growing seasons and woody vegetation within 5-10 years if grazing stress is removed from a deteriorated riparian area and sufficient residual shrubs are present to allow re-growth and expansion.

At the same time, others have concluded that short term rest from grazing may not sufficiently allow for recovery of ecosystem values. McPherson et al. (1990) compared ungrazed and a formerly grazed (with 5 years of rest) juniper woodlands, finding that the ungrazed plot had more grass, the grazed more forbs. The authors concluded that "[t]he effects of long-term continuous cattle grazing persisted 5 years after removal of livestock" and that the "succession following grazing will proceed slowly or will be unpredictable." In a study of the Kaiparowits Basin, Jeffries and Klopatek (1987) compared heavily grazed sites, a site ten years into recovery from heavy grazing, and a relict, never-before grazed site. The authors found that the relict site had significantly more herbaceous cover (comprised mostly of perennial grasses) than all other sites. There were no significant differences between the heavily grazed site and the recovering site for any of the measured parameters, leading the authors to conclude that recovery from grazing can take a very long time indeed.

An interesting study in Canyonlands National Park offers some insight into the difficulty of range recovery. Kleiner (1968) compared two rangelands sites with the Needles District of the Park: Chestler Park and Virginia Park. Grazing in Chestler Park occurred for one or two months at most in the winter and was dependent on snow as a water source for livestock. Four years before Kleiner collected his data, this grazing impact was removed. Virginia Park has been ungrazed for a very long time and is a popular research area because of this. Kleiner's study compared vegetative cover and diversity between the "recently grazed" (four years rest) and ungrazed study sites (his data is summarized in Table 2).

**Table 2.** Comparison of grazed/ungrazed pastures in the Needles District, Canyonlands NP, 1968. Reprinted from Kleiner (1968).

| Comparison of grazed/ungrazed transects | Virginia Park (ungrazed) | Chestler Park (ungrazed 4 yrs) |
|---|---|---|
| Hectares | 97 | 389 |
| Plant species richness /sample site (average) | 21.5 | 15.4 |
| Cryptobiotic speciesrichness/sample site (average) | 6.1 | 2 |
| Total living cover, % | 54.5 | 21.8 |
| Vascular plant living cover, % | 16.8 | 16.8 |
| | | |

| | | |
|---|---|---|
| Litter cover, % | 11.5 | 9.8 |
| Contribution of annuals to the total vegetation (%) | 11.8 | 15.5 |
| Average number of species / sample site | 7.1 | 3.2 |

Records are incomplete on the amount of grazing that occurred over time in Chestler Park. Kleiner reported that, typically, 30-35 horses grazed in Chestler Park for one or two winter months depending on snowfall each year. Rough, "back of the envelope" calculations indicate that this level of livestock grazing was equivalent to about 50 AUMs, at a density of eight acres per AUM. If we make the assumption that this area produces about 600 lb of forage per acre on average (based on the typical Range Site Types that occur in the Park), then Chestler Park would produce on average about 230,000 lb. of forage. Based on these numbers, the grazing use on average amounted to between 15 and 20% of the average forage produced. This is usually considered to be a level that is "lightly grazed."

The importance of this example is that even at this "low" grazing intensity and with four years of rest, the plant diversity, ground cover, cryptobiotic soil cover, and productivity was significantly less at Chestler Park than Virginia Park. Photos taken of Virginia and Chestler Park do not reveal the key differences between these sites, such as forage production and plant community diversity. Photographs that show details of ground conditions, however, do reveal differences, such as a loss of liter and cryptobiotic crusts in Chestler Park. The lesson that Kleiner teaches us is that so-called "light" grazing can lead to a substantial loss of plant community health. Moreover, had Chestler Park been grazed during the growing season, further degradation of the vegetative community would have been the likely result. We conclude that 15-20% winter utilization of forage in southern Utah is still too high to ensure recovery of rangelands to their potential plant community.

So, what level of grazing can occur on degraded rangelands that are only 50% or less of their potential productivity, while still allowing them to recover? As evidenced by the Chestler Park example, we feel the answer is likely to be none, at least for a few years. It is even more likely that complete rest for much longer periods, up to several decades may be necessary to allow even slight progress towards restoration of community diversity and production. Certainly the study by Anderson and Inouye (2001) shows that progress is very slow over a period of nearly 50 years in which the plant community still had not reached potential. How much rest is necessary to bring back the desired productivity of these impaired ranges? We don't have an answer to this question. However, as outlined above, the literature is filled with evidence that prescriptions of short periods of rest (like those used with rest-rotation schedules) are not enough to ensure recovery in semiarid desert lands. Is the answer 5 years, or 10 years, or 25 years? We look to the Monument to heed its own call for strong science within its borders, and establish long-term exclosures to study the effects of long term rest from grazing, to help determine an effective "rest prescription" for those allotments that clearly need to be put into "recovery mode." Further, the Monument must establish quantitative and significant goals against which to measure restoration progress either by comparison to exclosures or as gains toward potential productivity as described by NRCS and towards potential ground cover as the literature cited herein describes.

## 2.3  Forage allocations for ecological needs of the land

Those managers using our new capacity model will have by this point determined forage production for each Range Site Type in the grazing allotment. The next step requires that allocations of that available forage base be made to ensure: 1) needs of native mammals for cover and forage, 2) invertebrate forage needs and 3) viability and resilience of the native plant community, including soils, and in the face of drought. These allocations are based on the ecological literature regarding the specific needs of vegetative communities and native wildlife on lower elevation lands of the Colorado Plateau.

BLM_0127028

*2.3.1  Allocations for mammalian herbivores.*  We recommend that an allocation of about 225 kg/ha (see Table 3) be allocated for mammalian herbivores in the Monument.[9]  In order to calculate this allocation amount, we selected three primary herbivores (or in the case of folivorous/omnivorous rodents, a guild) that fairly adequately represent the mammalian herbivores present in the GSENM (we chose mule deer, jackrabbits, and rodents).  We conducted a thorough search of the scientific literature and located 50 studies that report on both typical densities of these herbivores and their eating habits – reported as biomass of forage (forbs and grasses) consumed.  We strove to primarily include studies that were conducted in lower elevation habitats of the Colorado Plateau, though a few others were located in various locations in the intermountain West and southwest.

To calculate the rough amount of forage consumed by these herbivores a year, we used the kilograms of total forage consumed per individual per day, then calculated the percent of the individual's diet that is herbaceous material, then extrapolated that forage amount to total consumed per year by species/guild by multiplying by days of the year and average herbivore densities (Table 3).

**Table 3.** Kg/ha/year of forage (grass and forb) biomass necessary to support typical mammal herbivore populations in southern Utah.

| Species | Density | Average total forage per individual | Herbaceous forage in diet | Herbaceous forage per individual | Herb. forage per population per day | Herb forage per population per year |
|---|---|---|---|---|---|---|
| | (individuals per hectare) | (kg./day/individual) | (percent, %) | (kg./day per individual) | (kg/ha/day) | (kg/ha/year) |
| **Deer** | 0.11 | 1.58 | 22.40% | 0.325 | 0.035 | 12.73 |
| *Deer Lit Citations* | *1\*,34,42,43,45* | *2,9.11,12,27,29,37* | *4,10,14,27,29,29* | | | |
| **Jackrabbits** | 2.01 | 0.13 | 74.70% | 0.097 | 0.199 | 72.66 |
| *Jackrabbit Lit Citations* | *5,6,8,20,22,29,29,40* | *4,15,15,22,29,32,33,36* | *3,21,23,24,24,32* | | | |
| **Rodents** | 16.3 | 0.056 | 43% | 0.024 | 0.39 | 142.3 |
| *Rodent Lit Citations* | *16, 17, 18 ,19 ,25 ,26 ,28 ,38,39 ,46,47* | *29,30, 31,31,35* | *38,41,44, 48* | | | |
| TOTAL HERBACEOUS FORAGE ALLOCATION FOR MAMMALIAN HERBIVORES = | | | | | | **227.6 kg/ha/yr** |

*References are as follows: 1.Chapman & Feldhamer 1982, 2.Demaras & Krausman 2000, 3. Fagerstone et al. 1980, 4. Krausman 1996, 5. Daniel et al. 1993, 6. Johnson & Anderson 1984, 7. Kufeld 1973. 8. Anderson and Shumar 1986, 9. Smith 1953, 10. Bueker et al. 1972. 11. Aldredge et al. 1974, 12. Smith 1952, 13. Hobbs et al. 1981, 14. Hansen & Clark 1977, 15. Currie and Goodwin 1966, 16. Fautin 1946, 17. Grant et al. 1982. 18. Nelson & Leege 1982, 19. Grant & Birney 1979, 20. Norris 1950, 21. Fagerstone et al. 1980, 22. Arnold 1942. 23. Alipayo & Daniel 1991, 24. Wansi 1989, 25 WRSOC 1983, 26. Hanley & Page 1981, 27. Umess 1981, 28. Rosenstock 1996, 29. Stoddart et al. 1955, 30. Golley 1960, 31. Koford 1958, 32. Hoffmeister 1986, 33. McAdoo & Young 1990, 34. UDWR 2003, 35.Detling, in prep, 36. Vorhies 1933, 37. Jensen 1984, 38. Goodwin & Hungerford 1979, 39. Shepard 1972, 40. Stoddart 1938, 41.Black & Frischknecht 1971, 42. Horejsi & Smith 1983, 43. Clegg 1994, 44. BLM 1998, 45. AGFD 2003, 46. West 1983a, 47. West 1983b. 48. Alston 2002.

The purpose of this exercise is to roughly estimate, based on the literature, the approximate forage biomass required by mammal herbivores on southern Utah rangelands.  Certainly, more research on this topic is needed.  The estimates presented here represent the best information we could locate, and more studies are needed to validate theseestimates for the monument.  The proposed allocation we came up with does not include the needs of other mammals (i.e. cottontail rabbits, elk, bighorn sheep, pronghorn), nor do we anywhere in this model account for the forage needs of folivorous birds or reptiles.  As such, we argue that this allocation, which we mean to represent all forage and cover needs for all native wildlife on GSENM allotments, is conservative.

BLM_0127029

### 2.3.2. *Allocations for insects and soil invertebrates*.
Insects and soil invertebrates such as nematodes and mites are a critical part of rangeland systems. These have important relationships with plant development, soil nutrient recycling, species interactions, and wildlife that is under-appreciated by many. Loss of invertebrate biomass in rangelands can have a significant effect on the ecosystem.

While we have a fairly complete list of range plants found in Utah's rangelands, knowledge of the invertebrates found on our public lands is less understood. What we do know is that these occupy a significant niche in the southwest deserts. For example, harvester ants have colony populations of tens of thousands of individuals. Even in the driest and hottest parts of North America, the total biomass of one species of harvester ants (*Messor veromesso pergandei*) has the same approximate total biomass as the rodent population in the same area (Hölldobler and Wilson 1990). On a side note - one of the many important ecological functions that ants provide in addition to their role in nutrient cycling, is assisting in the dispersal of plant seeds, as the result of accidental abandonment of seed caches near the nest (Moggridge 1973).

Insect populations vary more radically than most other rangeland components. Super abundances of, for example, the desert locust can consume the equivalent of what 150,000 head of cattle eat (Bullen 1996). The forage capacity model used here will focus on the typical needs of insect population in southwest deserts. Where populations of insects over a short period of time reach extraordinary populations, we suggest that those situations be treated with range management actions taken during a time of drought.

A number of studies have reported the percent of plant growth consumed by insects. For grassland and savannah, insect consumption of a single species varied from less than 1% to 19% with a mean of 3.5% (Wiegert and Peterson, 1983). Rangeland grasshoppers consume between 1-3% in typical years (Mispagel 1978) and up to 99% in periods of super abundance (Nerny and Hamilton 1969). Hewitt and Onsager (1983) suggest that between 21-23% of available range forage is consumed by all grasshopper species in the western U.S. each year.

Nematodes and other soil invertebrates perform critical soil nutrient and structural functions. This complex array of species normally has a higher diversity and biomass than any other rangeland flora and fauna combined. They should be considered as an important component in the consumption of rangeland plants. Ingham and Detling (1984) estimated that nematodes consumed between 6 and 13 % of below-ground net productivity in the mixed grass prairie. Another study by Scott et al. (1979) and Anderson (1987) found that root feeding arthropods and nematodes consume between 7-26% of the net productivity in normal years.

The evidence is clear that a substantial part of the plant community is consumed by invertebrates on a regular basis. Without this consumption, ecological change may occur that may contribute to the long-term loss of ecological health and productivity. Many of the studies just cited occur in habitat conditions somewhat different from that found in the Grand Staircase-Escalante National Monument. But one thing we know for certain is that the soils of this region do support nematodes and insects, which together form a critical component of the southern Utah desert ecosystem. To understand the consumption needs of insects and nematodes within the Monument, the needs for a long list of currently unknown species would need to be compiled. Clearly this is not possible at this time. However, as we continue our research and as more knowledge become available, we hope to refine the number used in this model for invertebrate consumption.

For this analysis, we assume that 10% of the annual forage production is required to support invertebrate populations. We suspect that additional research will find that this allocation is indeed too low.

### 2.3.3  *Allocations for biomass to provide necessary cover to avoid soil erosion, and to ensure resiliency and regeneration of vegetative community in the face of drought.*
We focused on published reviews to

BLM_0127030

find information regarding (1) potential ground cover (vegetation, litter, crust) for vegetation types occurring in the Colorado Plateau region, (2) the need for a certain "baseline" of cover to protect these communities from soil erosion, and (3) the principle needs of grasses to regenerate and have resiliency in the face of both livestock grazing and drought.  More detailed research of source documents is ongoing.  Using these three avenues of research, we propose a percent of the forage biomass to be set aside to meet the needs of the soils and vegetative communities in GSENM.  Again, we stress that this third and final ecological allocation in our forage capacity model is still under development.

(1) Predicted ground cover in typical vegetation types in GSENM:  Much of the research on plant community characteristics for the Colorado Plateau has been conducted as well as summarized by Dr. Neil West of Utah State University Department of Natural Resources. It is important to know potential ground cover in order to approximate historical (pre-livestock) erosion rates and to establish targets for grazing management or restoration.  It should be noted that in many of these plant communities, much of the seed pool has been lost due to nearly continuous removal by livestock over the past century, so recovery in arid areas such as this will be slow as Anderson and Inouye (2001) have so well documented.

Sagebrush Semi-Desert vegetation occurs in the Great Basin and Colorado Plateau at intermediate elevations between 1300 – 1800 m in areas of precipitation ranging from 158 – 419 mm.  In the Colorado Plateau, these vegetation types are generally associated with mesa tops, benches or pediments with sandy to gravelly soils.  They occur immediately above the salt desert shrub type.  A survey of a relict site on Cedar Mesa yielded six species of grass including:  *oryzopsis hymenoides, bouteloua gracilis, hilaria jamesii, sporobolus airoides, sporobolus cryptandrus and stipa speciosa*.  Sagebrush usually makes up over 70% of the relative cover and 90% of the biomass with absolute cover of higher plants ranging from 10 to 40%.  Generally, perennial plants are found associated with shrubs and occur in the mounded portions of soil occupied by shrubs.  Beneath the shrubs, the ground is litter-covered, with the interspaces between shrubs occupied by crusts.  Annual net production varies between about 500 and 1500 kg/ha, most of which is sagebrush.  The original estimated livestock grazing capacity for sagebrush semi-desert vegetation had been reduced from about 0.83 AUM/ha to 0.31 AUM/ha by 1970, mostly due to loss of perennial grasses (West, 1983a).

Salt Desert Shrublands occur in the Great Basin and Colorado Plateau at lower elevations and generally in valley bottoms in alkaline or saline soils where precipitation is generally less than 200 mm.  Total cover of higher plants varies from 0 on salt pans to 25% on upland sites.  Shrubs generally occur in clusters.  Native grasses found in these types include:  *bouteloua gracilis, elymus cinereus, hilaria jamesii, oryzopsis hymenoides, sitanion hystrix, sporobolus airoides, sporobolus cryptandrus and distichlis stricta*.  Innerspaces between shrubs are generally lacking in vascular plants and the soil is covered with microphytic crust.  Biomass of crust has been  measured at 200 kg/ha.  Forage production measured at the Desert Experimental Range in Utah varied over 800% between wet and dry years.  Forage yield on a shadscale-winterfat range at the Desert Experimental Range varied from a minimum of 34 kg/ha in 1943 to a maximum of 190 kg/ha in 1947. (West, 1983b; Blaisdale and Holmgren, 1984; West et al, 2000).

Southeastern Utah Galleta-Threeawn Shrub Steppe (semi-desert grassland) type is found in deep silty and sandy wind-blown deposits derived from sandstone.  Precipitation is a mixture of winter snow and late summer convectional storms.  The flora consists of bunch and sod-forming grasses including (cover from transects in Canyonlands NP in %):  *hilaria jamesii* (5%), *stipa comata* (5%), *oryzopsis hymenoides* (2%), *bouteloua gracilis* (9%), *vulpia octoflora* (1%), *sporobolus cryptandrus* (2%), *aristida fendleriana* (1%), *sporobolus flexuosus* (trace), *sporobolus airoides* (1%)and *sitanion hystrix* 1%).  Vascular plant cover ranges from 25 – 60% and microphytic crust occupies nearly all the bare ground in ungrazed relict sites.  In ungrazed Virginia Park in Canyonlands, microphytic crust cover was 38%, in adjacent grazed Chesler Park, crust cover was 5%.  Productivity potential of forage on these sites averages 900 kg/ha in favorable years (West, 1983c).

Pinyon-Juniper Woodlands are described briefly by West and Young (2002) as having highly

BLM_0127031

variable understory to compared to adjacent grasslands. On the Colorado Plateau, warm season sod grasses dominate. Total vascular plant cover varies from 40 – 80% with shrubs, herbaceous plants and microphytes occurring in the interspaces between trees. Litter accumulates beneath the tree crowns. Grazing by livestock has depleted what once appeared much like a savanna where fires were frequent enough to keep trees restricted to steep, rocky or dissected topography.

Microphytic Crusts are best developed in semi-arid shrublands. Pediceled (pinnacled) crusts are abundant in pinyon-juniper and sagebrush communities typical of the Colorado Plateau, while rough lichenized crusts are more typical in greasewood and shadscale communities (Johansen, 1993). The soil-holding capabilities of crusts are destroyed by trampling and compaction, resulting in increased runoff. "Total crust cover is inversely related to vascular plant cover, as less plant cover results in more surface available for colonization and growth of crustal organisms." (Belnap et al, 2001). This is also documented in the community-specific references cited earlier.

As the literature cited shows, microphytic crust cover potential is high in the Colorado Plateau vegetation types described, which include those in the Upper Hackberry allotment, where we applied the proposed capacity model (Section 3). Personal surveys of relict areas (John Carter, co-author) as recent as spring 2003 in Grand Staircase indicates that ground cover in the sandy soil types described is greater than 90% including large portions of crust, generally covering the soil between plants.

(2) Erosion and Livestock Grazing. White et al. (1983) found sediment yield 20-fold higher in a grazed watershed when compared to an ungrazed watershed. USDA (1981) reported that topsoil erosion rates from grazed forest and rangeland were 4.2 tons/acre-year and 3.1 tons/acre-year compared to less than 1 ton for healthy forest and range. Packer (1998) documented that loss of soil in Utah and Idaho watersheds through erosion and runoff increased as ground cover decreased. A decrease in ground cover from 40% to 16% resulted in 6 times more runoff and 5.4 times more sediment yield. Trimble and Mendel (1995) estimated that peak storm runoff from a 120 ha basin in Arizona would be 2 to 3 times greater when heavily grazed than when lightly grazed. Lusby (1979) studied grazing systems including removal of livestock from control watersheds in Badger Wash, Colorado. He found that during the period 1953 to 1973, complete exclusion of livestock resulted in over a 40% decrease in runoff and a reduction of 63% in sediment yield.

The following figure (Figure 1) was taken from Packer (1998) in order to show how soil erosion varies with slope and ground cover by plants and litter. This figure was derived from 5-minute rainfall simulations. At the lowest gradient of 5%, erosion begins to rapidly accelerate when ground cover drops below 60%. At 35% slope, erosion is accelerating rapidly as ground cover decreases below 100%. The fine-grained sandy soils occurring on the Hackberry allotment are susceptible to both wind and water erosion and will erode rapidly when ground cover declines below potential. Management must be designed to minimize trampling of uplands by livestock in order to allow microphytic crusts to return to potential cover values and impede the rapid erosion observed in GSENM.

While the above literature demonstrating the relationship between livestock grazing and erosion rates is certainly instructive, even more telling are those studies that have measured both vegetative cover and erosion rates on both grazed and ungrazed sites in arid regions. For example, Gamougoun et al. (1984) found that the 3-year average of standing biomass in a grazing exclosure in New Mexico was 1,550 kg/ha, whereas a nearby moderately grazed pasture contained a 3-year average of 637 kg/ha of standing biomass. The same study found that the erosion rate (measured as the mean wet sediment production resulting from simulated rainfall) on the ungrazed site was 38 kg/ha, whereas the erosion rate on the moderately grazed site was 153 kg/ha. In a similar study conducted by Meeuwig (1965) in Utah, it was found that combined grass and forb cover on the ungrazed site was 58.4%, whereas forb/grass cover on the grazed site was 49%. The same study found that the erosion rate (measured as the mean wet sediment production resulting from simulated rainfall) on the ungrazed site was 173 lb/acre, whereas the erosion rate on the moderately grazed site was 840 lb/acre.

BLM_0127032

(3) Ensuring resiliency and regeneration of plant community.   The normal  utilization standard of 50%, developed from research on root-growth stoppage as a result of grazing (Crider 1955) and sometimes known as the "take half and leave half" policy, is inappropriate for the Colorado Plateau.   Crider grew several Mid-western perennial grasses under ideal precipitation and nutrient conditions and monitored root growth changes due to clipping over a period of two months.  Crider concluded that root growth at the end of the growing season was not impaired when a single clipping removed 50% or less of the above ground biomass.



**Figure 1**.  Relationship between vegetative cover, slope and soil erosion.  Reprinted from from Packer (1998).

The results of Crider's research do not reflect a number of factors that come into play on BLM lands in the arid West, including the applicability to the broad diversity of rangeland plants, grazing practices commonly found on BLM lands, semiarid or arid conditions, plant regeneration, soil nutrient recycling, litter generation, plant community composition, and wildlife habitat structure.  As a result, range scientists have concluded that there is no scientific basis behind BLM's 50% policy for utilization (Caldwell 1984).  Still, allowable utilization rates of 50% seem to dominate AMPs on BLM lands in the intermountain West, while recent Forest Plans such as the Wasatch-Cache and Caribou are reducing utilization rates well below this figure to 30 – 40% for areas with much greater precipitation than GSENM.  While the range literature does not support even these lower levels, they still represent significant departures from the "take half leave half" philosophy.

Even within Crider's narrow area of research, current grazing utilization policy does not actually follow his recommendations.  Crider was only looking at root growth of perennial grasses under ideal

BLM_0127033

growing conditions. Under those conditions, he concluded that up to 50% of the aboveground biomass could be clipped **once** without root growth being significantly impaired. He further concluded that repeated clipping (which more accurately represents multi-month grazing periods common on BLM allotments) would significantly inhibit plant growth when a total of 50% of the biomass is removed. BLM was incorrect to apply the "take half and leave half" utilization level where grazing leads to numerous clippings, and on arid lands.

This research tells us that, at the very least, 50% of the above-ground biomass needs to remain each season, to ensure that the plant community remains viable, and can regenerate itself and remain resilient, even in the face of drought (which we know we have to assume on the Colorado Plateau). In fact, Jerry Holechek, well known Range Science Professor and textbook author from New Mexico State University, along with others are now recommending allocations of forage in arid areas that provide residuals of 50% for watershed protection aside from wildlife needs and livestock use (Holechek et al (2001).

Our recommended allocation for grass/forb biomass necessary to protect soils from erosion, while ensuring resiliency and regeneration of plant community. In addition to the suggested forage allocations to mammal herbivores and invertebrates outlined above, we recommend an additional allocation, as do the current leading range scientists such as Holechek, that will ensure the needs of the soils to resist erosion and the vegetation community itself to be able to regenerate and be resilient in the face of both grazing and assumed drought. While our research on this topic is ongoing, the literature featured above clearly shows us that (1) ground cover potential in GSENM is high and most allotments are not currently exhibiting predicted or historic levels of cover, (2) the reduction in ground cover because of livestock grazing definitively increases erosion potential, and (3) no more than 50% of the above ground biomass can be "clipped" (or eaten) by wildlife, invertebrates and livestock each season if the plant community is to remain viable and resilient. Because the nature of the scientific literature is such that it is difficult to exactly say what percentage of annual productivity must remain on the land to resist erosion, for now we are simply recommending, as do Holechek et al (2001), that a 50% allocation of biomass be set aside to ensure the soil and vegetation needs in GSENM.

This allocation does not "overlap" with those we recommend for invertebrates and native mammals, as these allocations represent biomass that will be removed from the vegetative community over the course of a year, and the plant community needs to retain a certain minimum percentage (i.e. 50%) of its biomass to simply remain viable, resilient and regenerate itself. We argue that this 50% allocation is conservative.

***2.3.5. Allocation of remaining forage for cattle.*** Once the above allocations are made, the remaining kg/ha of available forage production can be allocated to cattle. Currently, the BLM divides the available forage by 800 lbs based on the presumed average weight of cattle. For now, we also utilize the 800 lb. (or rather, 364 kg) allocation for our capacity model since this is a standard used by the agency. However, we anticipate revising this number in future iterations of our model. The 800 lb. allocation may not reflect the increased livestock size now seen on many BLM lands. Holechek et al. (2001) uses 1000 lbs. as the average weight of cattle. We recommend that the Monument use the Holechek number for mature cattle (1000 lbs) in order to reflect the larger size of animals today. A check of the USDA market statistics at http://www.ams.usda.gov/mnreports/lm_ct166.txt reveals that these animals are very large today with average weights of mature cattle above 1000 lbs, more like 1200 lbs with calves running several hundred pounds each. It is erring to the low side to consider a cow/calf pair as 1000 pounds.

We anticipate using Holecheck's cattle weight the same in later versions of our model. But as stated above, we resort for now (in the following Upper Hackberry example) to the cow/calf allocation used by the BLM, thus rendering our model even more conservative.

## 2.4 Using a GIS to assess available forage and make ecological allocations

This section describes how to apply a GIS, incorporating the above recommended capability and

BLM_0127034

suitability adjustments and ecological allocations of forage, to determine the amount of forage that might be available for livestock after these ecological needs are met. Our recommended forage/capacity model utilizes ArcGIS ESRI (Environmental Systems Research Institute, Inc.) software, and a spreadsheet program such as MS Excel or Corel Quattro Pro. The GIS data needed for this analysis includes a digital coverage of the grazing allotment boundaries, a soil coverage delineating NRCS soil map units, and a coverage that identifies areas as incapable and/or unsuitable (see page 7) for livestock grazing. Each soil map unit comes with an associated description of the geology, soil, and plant community.[10]

The steps outlined below explain how values are achieved that are used in our suggested forage/capacity formula. The formula applied to each soil map unit for forage capacity estimation is as follows:

$$S = \frac{F_s (1- E)AD_w}{800 \text{ (or 364 if using metric)}}$$

S = Stocking capacity in terms of animal unit months
$F_s$ = total Seasonal Forage production
E = Ecological forage allocation, here assumed to be 85%
A = Area (in acres or hectares) of the soil map unit
$D_w$ = Distance to water factor (0-1.6km is 1, 1.6 to 3.2km is 0.5 and over 3.2 km is 0)

The first step of the forage analysis and capacity model requires that the user assemble the necessary information for the capability and suitability of the grazing unit (i.e. pasture or allotment). This includes a topographic coverage depicting slopes of the grazing unit and areas inaccessible to livestock (because of cliffs, canyons or other physical barriers), a hydrographic coverage, and coverages showing other important factors that may render portions of an allotment unsuitable for grazing (i.e. important habitats for TES species, rare plant communities, high recreation use areas, etc.). Using the clipping feature of the GIS, those parts of each soil map unit on the allotment that are either incapable or unsuitable for grazing are removed. Calculate the area within the grazing unit that remains within each soil unit. Enter this value in the "Area" entry in the forage/capacity model formula.

Once the incapable and unsuitable portions of the grazing allotment are removed from each soil map unit, the land manager next determines the amount of available forage in the remaining area. The NRCS soil coverage is used for this purpose. A soil map unit may consist of several intermingled plant communities. For example, soil map unit 15 (SWA L151), consists of 75% semidesert sandy loam big sage, 20% semidesert loam, and 5% semi desert shallow loam vegetation communities. In our forage capacity model, only grass and forb production is used when estimating the available forage on the grazing unit. This decision is supported by research on livestock use of forage. Kinuthia et al. (1992) found that for spring and summer diets of cattle in the Wyoming big sagebrush plant community, 96% of the diet for cattle was graminoids. Holechek et al (2001) report that cattle consumption of forage is comprised of 76% grasses and 10% forbs in Utah sagebrush communities. In salt desert shrub communities, more consumption of shrubs will occur. In most areas, the assumption that cattle forage capacity can be accurately represented by only considering grasses and forbs appears valid.

The estimated forage for each of these plant communities[11] is multiplied by the percent of the soil map unit comprised of that community type. Repeat this step for each community type within the soil map unit, and add these values together to determine the total forage available on the soil map unit. Enter this value as the "forage production" entry in the forage capacity model formula.

Next, determine the total percentage of available forage (grass and forb biomass) that is allocated to (1) mammal herbivores, (2) invertebrates, and (3) the needs of the soil and vegetative community. Our model suggests 10% allocation to invertebrates, 50% allocation for the needs of soil and vegetation, and 227

kg/ha of forage for native mammals.  To convert this value into a percentage, use the estimated forage biomass that is predicted by the NRCS Range Site Type predictions for each soil unit, and determine what percentage our suggested value (227 kg/ha) is of the estimated kg/ha of forage for that soil unit.[12] Add the percent values of (1), (2), and (3), above, to achieve the total ecological allocation for each soil type.  Multiply this value with the estimated forage for that soil type, and enter this value as the "Ecological Forage allocations" entry in the forage capacity model formula.

There are many assumptions the user is making when using this model.  These are:
1. Grazing use is uniformly distributed across all suitable lands.
2. The forage estimates represent the forage production of a soil map unit.
3. Livestock capacity can be adequately estimated using grass and forb production.
4. Average year precipitation and plant production occurs (during below average years such as occur nearly half the time in GSENM, plant productivity will be significantly reduced and this should be taken into account in setting annual stocking rates).
5. Grazing use is uniform among forage plants in each of the distance-to-water zones.
6. Grazing does not occur in a manner or time that prevents the growth of the predicted forage biomass.  Heavy early spring grazing, for example, could curtail the total forage production for a season and grazing during drought could reduce forage production in following years (Galt et al 1999).

Obviously, there will be many situations where these assumptions are not met.  With a couple exceptions (i.e. number 3 above), the forage capacity of an allotment and the resulting estimated stocking rate should usually be further reduced if these assumptions are not met.

To review, here is the sequence of steps to run the capacity model, most of which have already been discussed above:
1. Assemble spatial data for allotment (i.e. allotment boundary, soil map, and unsuitable and incapable areas, hydrology, etc.)
2. Using a GIS, clip the soil map with the allotment boundary.
3. Remove from each soil map unit those lands found to be incapable and unsuitable for grazing (steep slopes, rock outcrops, productivity of less than 19kg/ha of forage)
4. For each soil map unit, add a factor on the amount of land available to graze based on distance from water (see Table 1).
5. Export the soil map unit attributes to a spreadsheet table.
6. Determine soil map unit productivity of grasses and forbs (see pages 7-8 for our recommendations on how to do this.  Actual, on-site clipping is preferred method).
7. Determine the percent of forage required for ecological needs of vegetation, soils and wildlife (ecological allocations).
8. Insert values into soil map unit spreadsheet.
9. Calculate number of animal unit months (AUMs) of forage available for livestock in each soil unit.

In the following chapter, we present an example of how to use this method of forage analysis and capacity estimation, on the Upper Hackberry allotment in the GSENM.

BLM_0127036

# CHAPTER 3: EXAMPLE AND DISCUSSION OF FORAGE ANALYSIS FOR THE UPPER HACKBERRY ALLOTMENT

We chose the Upper Hackberry allotment to demonstrate how our GIS model can assess capacity. This allotment was chosen in part because BLM has consistently reported that the grazing permit holder has been "doing a good job of managing their allotment" (BLM 1995), and also because this area represents Range Site Types that are generally common in the Monument. This allotment is part of a regional grazing planning effort and, for this reason, more recent digital data are available. Lastly, we chose this allotment because it is of more modest size (20,000 acres). This allowed us to easily conduct clipping studies of forage productivity.

This allotment is located a few miles south of Kodachrome Basin State Park and ten miles east of Bryce Canyon National Park (Figure 2). The area is dominated by sandy soils, pinyon juniper forests, sagebrush plateaus, sandstone escarpments, badland hills, and entrenched perennial streams on the allotment borders. Based on fifty years of precipitation data, the average annual rainfall for this area is 11 inches and drought occurs frequently.



**Figure 2**. Location map for Upper Hackberry allotment, GSENM

Before we conducted our own clipping survey in Upper Hackberry, we looked to the NRCS data for the soils types present to ascertain what the predicted productivity is for this allotment (Figure 3). For example, the upland loam - basin big sagebrush soil map unit (a prevalent soil type in the allotment) is predicted to produce between 300 to 800 lbs (reflecting the range from a dry year to a wet year) of annual plant growth per acre per year. The predicted composition of this potential plant community for this Range Site Type expects that 30 to 60% of the plant production would be from forbs and grasses and the rest from shrubs and trees. As described above in the Methods Section, we did not include shrubs in the forage base for livestock. Using the NRCS data, we determined that the potential production of the upland loam soil map unit for a potential native plant community would be 400 lbs per acre of grasses and forbs in an average

BLM_0127037

year.  Much less would be produced in a dry year.

We conducted our clipping studies of plant productivity in Upper Hackberry during a below average precipitation year (2001) and, for this reason, this analysis produced forage production values that are far less than would occur in an average precipitation year.  Since below average precipitation years occur frequently, capacity analysis based on these clipping surveys is very useful, and appropriately conservative.

Thanks to BLM's recent land use plan and upcoming grazing EIS for this area, BLM was able to supply a number of coverages that aided in this analysis.  The coverages used in this analysis include Site Writeup Area (SWA) maps (which described soil map units,), grazing allotment boundaries, and surface water sources.

While most of the coverages needed already existed, some modifications were needed.  We had to create a map of those lands identified as incapable and unsuitable for grazing.  Also, BLM's soil map did not show soil inventories for state and private lands, some of which are found inside the Upper Hackberry Allotment.  Using geo-referenced aerial photos, we edited the soil map unit coverage to include polygons for adjacent parcels that used to be state lands.

A number of factors were used to determine which parts of the Upper Hackberry Allotment are capable, and incapable, of supporting grazing (shown in Figure 4 and summarized in Table 4, below).  Those parts of the allotment incapable for grazing include those lands where steep slopes and rock outcrops render certain areas inaccessible to cattle.  Many of these incapable areas were also identified by BLM in an earlier capacity assessment for Upper Hackberry (1984).  We also factored in steep slopes, removing those parts of the allotment from consideration that had slopes steeper than 30% (a criteria also used by the BLM in their 1984 assessment).  We also accounted for distance to water in our capability assessment, using the GIS to identify those parts of the allotment that are 0-1.6km from water, 1.6 to 3.2km from water, over 3.2 km from water. Areas over 3.2 km from water were completely removed from the capable area (treatment of the other two classes are described below).   Lastly, we removed those areas with annual forage production of less than 19kg/ha (or 17 lb/acre, BLM 1981) based on our clipping studies on the allotment.  These last two criteria were not considered by the BLM in their 1984 forage assessment, and we stress that more reasonable figures such as the 100 lb/acre suggested by Holechek (1996) be used as minimum criteria by GSENM.

BLM_0127038



**Figure 3.** Soil map units for the Upper Hackberry grazing allotment, GSENM

**Table 4.** Area capable and suitable for livestock grazing in the Upper Hackberry Allotment, defined both by the BLM from their 1984 capacity analysis, and by the authors, utilizing the proposed capacity model.

| Allotment size | 100% | **22,734 Acres** |
|---|---|---|
| Capable and suitable for grazing (1984 BLM assessment) | 67% | **14,335 acres** |
| Capable and suitable for grazing (based on BLM standards for slope and inaccessibility, plus areas with >19 kg | 26% | **5,819 Acres** |

There were a number of capability and suitability

BLM_0127039

Case No. 1:20-cv-02484-MSK   Document 65-4   filed 04/29/21   USDC Colorado   pg 97 of 160

| forage/ha and <3.2 km to water) | | | | criteria |

recommended in our approach (see pages 7-8) that did not apply to the Upper Hackberry test case. We felt that unstable or highly erodible soils (as defined by NRCS) were a moot point in this case, as our slope factor removed steep, erodible slopes, and in addition, we removed the pinyon-juniper dissected slopes Range Site Type because of its extremely low forage production (as demonstrated by our clipping studies). These soil types are known to have unstable and erodible soils. As for our four suitability factors (habitat identified as important for T/E/S species, jurisdictional wetlands and springs, rare plant communities, areas that receive very high levels of recreation use) we found that these components were completely missing or present in near negligible amounts on the Hackberry allotment.

After the parts of the allotment that were incapable of supporting grazing were removed from the analysis, we applied our forage production values (from our clipping studies) to each Range Site Type in each soil map unit the Upper Hackberry GIS coverage. For each soil map unit, we added forage productivity estimates to the relational table generated by the GIS that we used to calculate the grazing capacity. Table 5 shows the forage production, in terms of expected annual growth (lb/acre) of grass and forbs, that our clipping studies indicate is available, and what the NRCS's 1984 Site Write-up's indicate for those soil types.[13]

Using GIS, we added for each soil map unit (soil community) a factor that reflected the amount of forage relative to distance of the area from a water source. For a distance of 0 to 1.6 km from water, all forage is allocated and the factor is 1. For a distance of 1.6 km to 3.2 km from water, half of the forage is available or a factor of 0.5. For distances from water of greater than 3.2 km, no forage is assumed available, or a factor of 0.

Next, the GIS estimated the size of each of these soil area units with their related attributes of capability/suitability, distance from water, and plant productivity. The GIS table with these values was then exported and, using a spreadsheet program, the forage capacity model formula was applied to each individual soil community type. As described in Section 2, our proposed ecological allocation for the Upper Hackberry allotment was 85%, thus leaving 15% of annual forage productivity for cattle.

BLM_0127040



**Figure 4.** Areas within the Upper Hackberry Allotment that are capable, and incapable, of supporting grazing.

In addition to running the model using our own recommendations for ecological allocations, the model was also run for the traditional "take half and leave half," or 50% allocation to cattle. The results of the capacity model are shown in Table 6. This table also depicts past capacity analyses conducted by the agency, current permitted use, and average livestock grazing use. Based on the Upper Hackberry Allotment file, the part of the allotment that has traditionally been used for grazing matches that area identified by our GIS model as suitable for grazing.

**Table 5.** Upper Hackberry soil community categories and forage production, as indicated by the authors' 2001 clipping studies in the Hackberry allotment, and the NRCS 1984 Site Write-ups.

As evidenced in Table 6 below, both the permitted use and actual use on Upper Hackberry are substantially higher than the level necessary to meet the ecological needs of healthy rangelands. This conclusion

BLM_0127041

is actually an understatement because this capacity analysis is only to be used for rangelands that are at our near their potential productivity, which is not the case in this allotment. Moreover, the 191 AUMs represents a grazing level for plant production found in 1984 during a normal precipitation year. The 93 AUMs represent a level of grazing based on recent plant community productivity clipping surveys during a dry year.

**Table 6.** Forage capacity estimates for the Upper Hackberry Allotment

| 1967 BLM capacity estimate | 1,388 | AUMs |
|---|---|---|
| Permit to graze | 651 | AUMs |
| Reported grazing use, 5 year average | 408 | AUMS |
| Amount of allotment BLM found suitable for grazing in 1984 (15,335 out of 22,734 acres) | 67% | percent |
| Amount of allotment suitable based on our proposed capacity model (5,819 out of 22,734 acres) | 26% | percent |
| Grazing capacity based on 50% forage use of 1984 BLM/SCS forage estimate and calculation of suitability | 638 | AUMs |
| Grazing capacity based on 15% forage use of 1984 BLM/SCS forage estimate and calculation of suitability | 191 | AUMs |
| Grazing capacity based on 15% use of 2001 WUP clipping survey forage data and calculation of suitability | 93 | AUMs |

## 3.2 Discussion of results of forage capacity analysis for Upper Hackberry, in light of range conditions.

In addition to performing the necessary clipping studies to carry out our Upper Hackberry forage analysis described above, we also calculated coverage of vegetation on the allotment. These data are featured in Figure 5.

**Figure 5.** The authors' ground cover estimates (%) for various Range Site Type cover transects in the Upper Hackberry allotment (data collected fall 2001).

BLM_0127042



Our initial results of our forage capacity estimate for the Upper Hackberry allotment indicates these pastures are currently producing forage, and vegetative cover, far below their potential. We argue that it's important to analyze these results in light of past and current trend data, monitoring, and rangeland health assessments collected by and carried out by the BLM, in order to corroborate our findings.

BLM range monitoring and recent rangeland health assessments describe, in part, the range condition and ecological health of this allotment. In 2001, BLM visited two riparian sites and found that these riparian areas were functioning at risk, and without positive trends (Table 7). This indicates that these riparian areas were not meeting the rangeland health standards. Visits to the Rock Springs Bench site by the authors verified that heavy livestock grazing was a regular occurrence at these water sources.

**Table 7.** Riparian properly functioning condition assessments for the Upper Hackberry Allotment*

| OBS_ID | Riparian/ Wetlands Area | RATING | TREND | Notes |
|--------|------------------------|--------|-------|-------|
| LE0505 | Rock Springs | FAR | DOWNWARD | This area is a small spring in a drainage on an upland slope so it's probably naturally marginal conditions. |
|  | Spring below |  |  | Trailing from recreation & possible livestock. Contact Spring in Kayenta. Headout at mouth that may not be active. Part of wetland cut down to |

| | | | | |
|---|---|---|---|---|
| LE1003 | rockfall on Hackberry | FAR | NOT APPARENT | bedrock.  More willow would better hold wetland together… |

* These data are reproduced from BLM's database created for the upcoming grazing EIS.  The notes are directly taken from BLM's records for these two observation sites.

We believe that BLM's rangeland health assessments for this allotment (Table 8) understate the ecological problems found in this allotment.  Field clipping data on plant community productivity was not collected by BLM when these assessments were made.  Based on our field data for Upper Hackberry, standing forage biomass is believed to be between 10 and 20% of its potential.  According to the BLM's criteria for evaluating rangeland health indicator No. 15 (plant production), this indicator should have received a rating of  2 rather than 3.[14]  Yet another problem with the Monument's rangeland health assessments for this allotment is that no ecological reference site was identified for the Upper Hackberry Allotment.  This would lead one to conclude that no suitable reference sites exist in this allotment, which is an unfortunate commentary on the ecological state of affairs in this area.

**Table 8.**  Rangeland health indicator ratings for the Upper Hackberry Allotment. These are not ratings for individual indicators, but rather suites of indicators that describe similar categories (soils, hydrology, biotic integrity) are averaged together.

| Observation Site ID | Pasture | SWA soil identification | Soil stability | Hydrologic Function | Biotic Integrity |
|---|---|---|---|---|---|
| E0545 | Rock Springs | S167 | 3 | 3 | 3 |
| E0527 | South Jody | L172 | 3 | 3 | 4 |
| E0528 | South Native | M207 | 4 | 4 | 4 |
| E0546 | South Native | L172 | 5 | 5 | 4 |
| E0530 | South Native | M163 | 4 | 4 | 4 |
| E0531 | South Native | L172 | 4 | 4 | 4 |
| E0532 | Rock Springs | L182 | 4 | 4 | 4 |
| E0538 | Rock Springs | M163 | 4 | 4 | 4 |
| E0539 | Rock Springs | L172 | 4 | 4 | 4 |
| E0535 | South Jody | S149 | 3 | 3 | 3 |
| E0536 | South Jody | L172 | 5 | 5 | 4 |
| E0537 | South Jody | M191 | 5 | 5 | 5 |
| E0529 | South Native | M191 | 5 | 4 | 4 |
| E0533 | North Jody | L182 | 4 | 4 | 4 |
| E0534 | Middle Jody | M141 | 4 | 4 | 4 |
| E0540 | Middle Jody | S149 | 3 | 3 | 3 |

Permanent trend plot sites have been in place in the Upper Hackberry Allotment since 1969.  The data from these trend plots are presented in Table 9, which depicts percent ground cover for key grass species, such as crested wheatgrass (*Agropyron cristatum*, a seeded exotic) and other, native, grasses.  While these native species receive much less monitoring, that which is conducted shows that coverage of these species is much less than that predicted by the NRCS as the potential plant community, confirming the plot clipping results we obtained represent degraded conditions.

In summary, based on BLM's records and the authors clipping studies, the plant community composition and productivity of this allotment are not currently meeting the standards for rangeland health.  The productivity is much lower than it should be.  This capacity model assumes that the allotment under analysis meets rangeland health standards and has productivity of at least half or better of the potential productivity for the site.  This is not the case for the Upper Hackberry Allotment.  Thus, the Upper Hackberry allotment is a likely candidate for the "recovery prescription" described above, and elsewhere in this guidance

BLM_0127044

document.

**Table 9**.  Upper Hackberry Allotment monitoring data from
permanent trend plots, provided by BLM.  Some data is missing.

| Key Species | Plot | Date | Pasture Name | % ground cover |
|---|---|---|---|---|
| | | | | 0 |
| AGCR | 2-50 A | 7/1/1969 | Jody Pt. | 5 |
| AGCR | 2-50 A | 7/1/1976 | Jody Pt. | |
| AGCR | 2-50 A | 7/1/1993 | Jody Pt. | 1 |
| AGCR | 2-50 A | 7/1/1996 | Jody Pt. | 3 |
| AGCR | 2-50 B | 7/1/1969 | Jody Pt. | 6 |
| AGCR | 2-50 B | 7/1/1976 | Jody Pt. | |
| AGCR | 2-50 B | 7/1/1993 | Jody Pt. | 11 |
| AGCR | 2-50 B | 7/1/1996 | Jody Pt. | 11 |
| AGCR | 2-50 B | 9/15/1996 | Jody Pt. | 11 |
| AGCR | 2-51 A | 7/1/1969 | Jody Pt. | 6 |
| AGCR | 2-51 A | 7/1/1976 | Jody Pt. | 8 |
| AGCR | 2-51 A | 7/1/1993 | Jody Pt. | 10 |
| AGCR | 2-51 A | 7/1/1996 | Jody Pt. | 13 |
| AGCR | 2-51 B | 7/1/1969 | Jody Pt. | 6 |
| AGCR | 2-51 B | 7/1/1976 | Jody Pt. | |
| AGCR | 2-51 B | 7/1/1993 | Jody Pt. | 15 |
| AGCR | 2-51 B | 7/1/1996 | Jody Pt. | 15 |
| BOGR | HB-2B | 9/16/1996 | | 1 |
| MUHLY | HB-2B | 9/16/1996 | | 7 |
| ORHY | HB-2A | 7/13/1982 | | 0 |
| ORHY | HB-2B | 7/13/1983 | | 2 |
| ORHY | HB-2B | 9/11/1984 | | 0 |
| ORHY | HB-2B | 9/11/1984 | | 2 |
| ORHY | HB-2B | 5/16/1988 | | 0 |
| ORHY | HB-2C | 7/13/1982 | | 0 |
| ORHY | HB-2C | 9/11/1984 | | 0 |
| ORHY | HB-2C | 8/27/1985 | | 0 |
| ORHY | HB-2C | 8/27/1985 | | 0 |

BLM_0127045

Case No. 1:20-cv-02484-MSK   Document 65-4   filed 04/29/21   USDC Colorado   pg 103 of 160

# CHAPTER 4: CONCLUSIONS AND RECOMMENDATIONS

We offer a new way to assess forage availability and grazing capacity of southern Utah rangelands that uses up-to-date science and technology. The proposed methods provided in this work are all firmly grounded in the latest ecological literature and range science (with numerous allocations borrowed directly from Holechek et al. 2001). Moreover, the widespread adoption of GIS by land managers is aiding many with important management decisions such as setting permitted stocking levels. It is time for the Monument to also use this tool in this important capacity. The grazing capacity analysis described above promises to give permittees and land managers a tool for addressing grazing problems that they have not had before.

One of the key findings outlined in Section 3 (above) is that the forage/grazing capacity of the Hackberry allotment as determined by our proposed model is much less than that currently assumed by BLM. Section 3 also demonstrates many indicators of current overgrazing in the Upper Hackberry Allotment. There are many reasons that the BLM should seriously consider adopting our proposed method (or a variation of this method) to set stocking rates throughout the Monument during this DEIS process. At this time stocking rates established in current grazing permits appear without a systematic analysis of the forage production capacity. We realize that it can be difficult to do forage biomass clippings on every allotment. At the VERY least, the GSENM needs to do GIS analysis to reduce the allotment to truly "useable" sections and then reduce AUMs accordingly.

The chances of actually meeting the Standards and Guidelines are going to be much better if our capacity model (or a form of it) is used in this process. As we point out elsewhere in this guidance document, only about 35% of Monument allotments are so far meeting all four Standards (compared to about an 80% success rating on other Utah BLM lands thus far), and our analysis above indicates these might have been more favorably rated that actual data collection would show. It clearly behooves the Monument to use all available tools at its disposal to strive to do a better job meeting these standards in the future.

Our model reaffirms the need for key plant community data generated from ongoing monitoring. Plant community composition, forage biomass production, litter, and bare ground are a few of the key monitoring data necessary to assess the amount of livestock grazing that is consistent with rangeland health standards. Further, the trend plot data currently collected by the BLM provide inadequate information to analyze the range condition requirements established by the Standards and Guidelines. It is important that the Monument establish a quantitative monitoring protocol to ensure that forage allocations are not exceeded in order to protect ecological health, including plant productivity and wildlife habitat. This protocol must also measure ground cover in order to ensure that this vital component is restored and protected at near potential in order to correct the severe erosion evidenced across the Monument.

In closing, we stress that this is a work in progress. The material presented here will soon be submitted to an academic journal for further peer review. The review and suggestions by Monument DEIS staff is requested and values. We intend to run the model on additional GSENM allotment(s), and this will include new clipping studies. We look forward to working with Monument range staff in these endeavors.

**** Cited Literature is in included in Literature Cited Section of the Guidance Document****

---

[1] Project Director, the Wild Utah Project. 68 South Main Street, Suite 400. Salt Lake City, UT 84101

[2] Staff Scientist for the Utah Office of the Western Watersheds Project. 250 S. Main, Mendon, UT 84325

[3] The capability analysis recommended in this model is compatible with the Capability Analysis presented in Chapter 4, Section 4.1.3.4. The concept of "capability" in both of these models (assessing range capacity and stocking rates here, determining capability in terms of "FLPMA balancing" in Chapter 4) are the same. Here the concept is used to exclude particular areas as incapable of supporting livestock grazing when determining stocking rates with a GIS. In the context of FLPMA balancing,

BLM_0127046

capacity is used to determine appropriateness of grazing in some or part of a pasture, as well as to inform appropriate grazing management decisions such as stocking rates and utilization levels. In other words, capacity analysis is required, whether by FLPMA or when setting stocking rates. This analysis should occur as a threshold matter, to determine if grazing is an appropriate use of an allotment or portion of an allotment, and it should occur again (or the same analysis reexamined), if the agency concludes grazing is appropriate, as a basis for making sound grazing management decisions in the context of BLM's multiple use mandate.

[4] Holechek (1996) stated, "When forage production drops below 100 lbs/acre, financial losses are likely even under high cattle prices and above average precipitation." While the current version of our forage capacity model retains the BLM's production threshold of 17 lb/acre (19kg/ha), we may raise this threshold in updated versions of the model, based on Holechek's recommendation.

[5] This analysis is not to be confused with the analysis mandated by FLPMA's multiple use management mandate and the Comb Wash case, which we explain in Chapter 4 of this guidance document. While some of the factors relevant to the Comb Wash/FLPMA balancing may be similar to those referenced here, the purpose of Comb Wash/FLPMA balancing is to determine if grazing is an appropriate use of particular public lands. A determination that grazing is not an appropriate use would likely necessitate closing some or all of a particular allotment to grazing. Here, in contrast, we maintain that certain attributes and uses of the land mean that the forage there should not be included in the calculation of available forage as explained above. Forage analysis to determine stocking rates is appropriate only where the BLM has already determined that grazing is an appropriate use of a particular area. In other words, Comb Wash/FLPMA balancing should happen first.

[6] As the reader knows, the Natural Resources Conservation Service (NRCS) provides key spatial data for use in this capacity analysis. NRCS soil surveys have developed soil map units which possess common soil characteristics, climate, and composition of the plant community. A grazing allotment usually contains a number of discrete soil map units. The description for a soil map unit includes a certain vegetative community (called "Range Site Type") and the NRCS estimates the annual amount of forage that the Service believes is typically produced for that specific soil unit type. This estimation, broken down into species, is usually based on relict sites and predicts the pounds per acre of annual production one would expect on a healthy and fully productive potential natural plant community for that soil map unit.

[7] The Natural Resources Conservation Service is about to release a new soil survey with updated information. When these data area available, capacity analysis can be run with more current information.

[8] While there are a number of studies that have looked at changes in rangeland plant communities with the removal of livestock, little is known about the continued forage use by wild herbivores during recovery. Any recovery plan must account for the plant consumption needs for wildlife, soil organisms and insects. In many cases, these forage consumers have depleted populations that need to be restored.

[9] In order to convert this to a percent for use in the GIS forage capacity analysis for the Upper Hackberry allotment described in Section 3, we calculated the percentage this numerical value represented of the (grass and forb) forage predicted by the NRCS Range Site Type descriptions for those range site types in the Upper Hackberry Allotment.

[10] In the early 1980s BLM, in coordination with NRCS (then the Soil Conservation Service) conducted range surveys as part of the preparation of a soil survey. These soil map unit descriptions were reported as "Site Write-up Areas" (SWAs). The SWAs recorded the percent weight of the total aboveground plant biomass grown each year for each observed plant species. The total annual plant growth (in lbs/acre) was also recorded. A number of other factors were sometimes recorded including percent bare ground, percent ground cover, and slope.

[11] Be sure to see pages 7-8 where we make recommendations on how forage for each vegetation community type, or Range Site Type is estimated.

[12] In the Upper Hackberry example we feature in the following section, this calculation resulted in a 25% allocation of forage for herbivores across the entire allotment. Combined with the other allocations for invertebrates, and soils and vegetation, this resulted in an 85% allocation for ecological needs on the allotment.

[13] The table and figure on the following page (Figure 5 on pg 29 and Table 7 on pg 30) shows that the transects the authors measured on the Upper Hackberry allotment range between 30 and 90% bare ground. Microphytic crust ranged in cover from 0 to 28% indicating that when trampling is minimal in areas where livestock don't linger, crust potential is high and ground cover potential therefore is also high.

[14] Part of the problem with this indicator is that in rangelands dominated by trees and shrubs, the indicator may not adequately describe loss of forage production in the common situation where forb and grass production is extremely low and shrub and tree production high.

BLM_0127047

**Bighorn Sheep Risk Of Contact with Domestic Sheep Is Not Adequately Analyzed, Prevented and Mitigated**

The Final RMP does not adequately address the risk of contact between bighorn sheep and domestic sheep and goats.  In fact, the Final Winnemucca RMP relies on only two, woefully outdated studies on bighorn sheep that don't address the risk of contact and consequences of contact between bighorn and domestic sheep or goats. The preferred alternative relies on scientifically untested and inadequate SOP's and BMP's with no real analysis of risk of contact between bighorn and domestic sheep or goats.

There have been a number of bighorn sheep die-off events in recent years with more than 1,000 bighorn sheep deaths.

- Hay's Canyon Range in northwestern Nevada (2008).

- Ruby Mountain and Humboldt Ranges, Nevada (1995 and 2009).

- Snowstorm Mountain Range, Nevada (2011).

- Mojave National Preserve (ongoing).

- River Mountains, Nevada (ongoing).

- Yakima River Canyon, Washington (2009).

- Uinta Mountains, Utah (2009).

- Gros Ventre, Wyoming (2009).

Many recent scientific articles have conclusively demonstrated that domestic sheep are capable of transmitting deadly diseases[1] such as *Mannheimia haemolytica, Pasteurella trehalosi, Pasteurella multocida,* and *Mycoplasma.*

WAFWA[2] recommends maintaining separation between bighorn and domestic sheep or goats.

The USFS has developed a tool called the *Bighorn Sheep Risk of Contact Tool*[3],[4] which has been used by the BLM for analysis of risk of contact between bighorn sheep and domestic

---

[1] Wehausen et al (2011) Domestic sheep, bighorn sheep, and respiratory disease: a review of the experimental evidence. http://www.bio.sdsu.edu/faculty/kelley/47.pdf

[2] WAFWA (2012). Recommendations For Domestic Sheep and Goat Management in Wild Sheep Habitat. http://www.wafwa.org/documents/wswg/RecommendationsForDomesticSheepGoatManagement.pdf

[3] USDA USFS. (2013a). *Bighorn sheep risk of contact tool.* Prepared by USDA FS Bighorn Sheep Working Group, Critigen Inc. http://www.critigen.com/sites/critigen/files/case-studies/USFS_BigHorn-Sheep-Risk-Assessment-Tool.pdf

[4] USDA USFS. (2013b). Modeling and analysis technical report. USDA Forest Service, Intermountain Region, Prepared for the USDA FS Bighorn Sheep Working Group, Critigen Inc.

BLM_0127048

sheep or goats associated with BLM permitted grazing in the Owyhee Field Office of Idaho[5]. This tool is freely available to the agency and represents a tool developed with an understanding of current, best available science which overwhelmingly indicates that even one interaction between bighorn and domestic sheep or goats can result in a large scale die-off among bighorn sheep and can have very long lasting effects on the surviving individuals and their progeny.

This tool was developed as part of the Payette National Forest Supplemental Land and Resource Management Plan[6] which designated areas as suitable and unsuitable to domestic sheep and goat grazing based on risk of contact between those species and bighorn sheep.

This threat imposes an undue degradation of wildlife resources across much of the Winnemucca District and effects the economic values, wildlife values, and viability of an important wildlife species. The BLM is required to use the best available science to ensure that BLM approved activities don't threaten the viability of wildlife.

Both desert bighorn, a BLM sensitive species, and California bighorn sheep inhabit portions of Winnemucca District and the Nevada Department of Wildlife has identified an even greater amount of potential bighorn sheep habitat that is precluded from bighorn reintroductions because of BLM permitted sheep and goat grazing.

Because BLM permitted activities potentially threaten the viability of bighorn sheep and impose undue degradation on public resources, the BLM must conduct a proper risk analysis that ensures the prolonged viability and recovery of bighorn sheep on the Winnemucca District. This analysis must analyze the risk of contact between domestic sheep or goats and with existing bighorn populations within and nearby the Winnemucca District to ensure that surrounding populations are not put at undue risk of contact.

Once a proper analysis has been conducted the BLM must designate areas where the risk of contact threatens the viability of bighorn sheep populations as unsuitable for domestic sheep and goat grazing. Because bighorn sheep are mobile and routinely disperse to new areas, this risk analysis must be conducted whenever bighorn sheep are detected in new areas outside of the previous risk analysis areas to determine the suitability of domestic sheep and goat grazing.

As part of any adaptive management process, there must be triggers for action and, in this case, terms and conditions placed must be placed on any sheep and goat grazing permit that allows grazing nearby lands deemed unsuitable due to risk of contact.

To ensure that risk of contact is further mitigated, an emergency response plan (ERP) must be devised which keeps the BLM informed about conditions on the ground.

As a model, the Payette National Forest Supplemental Land and Resource Management Plan provides direction that instructs the Forest to evoke emergency management response measures if:

- Bighorn sheep presence is detected within 10 kilometers (6.21 miles) of active domestic sheep or goat grazing or trailing. Actions will be taken to ensure separation between bighorn sheep and domestic sheep or goats. RAST10;

---

[5] Jump Creek, Succor Creek, and Cow Creek Watersheds Grazing Permit Renewal Draft Environmental Impact Statement. https://www.blm.gov/epl-front-office/projects/nepa/24953/43104/46090/Group2DEIS_April_22_2013_508.pdf

[6] Payette National Forest Record of Decision Land and Resource Management Plan. http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5238683.pdf

2

- Domestic sheep and goat grazing may only be permitted where separation from bighorn sheep can be maintained. If separation cannot be maintained, permitted domestic sheep and goat grazing shall be prohibited. RAST11;

- Reassess the risk for contact when bighorn sheep are located within previously undocumented areas or new herd units are documented. WIST08; or

- Domestic sheep or goats shall not be utilized as a management tool for weed control where domestic sheep grazing is not suitable or where contact with bighorn sheep is possible. NPST13.

- To maintain separation, when bighorn sheep are found within 10 kilometers of an active domestic sheep and goat allotment, implementation of emergency actions for domestic sheep and goat grazing could include:

  1. Moving domestic sheep back to an identified ridgeline within the allotment;

  2. Notifying the Idaho Department of Fish and Game of the bighorn location;

  3. Removing domestic sheep and goats from the allotment; or

  4. Not authorizing domestic sheep or goats on an allotment or driveway for the current grazing season. RAGU13.

The ERP[7] defines instances in which an emergency response could be implemented include the following situations but is not limited to:

1. Bighorn sheep are found within the suitable area of an active domestic sheep and goat allotment or trailing route;
2. Bighorn sheep are found within 10 kilometers (6.21 miles) of the suitable area of an active domestic sheep and goat allotment or trailing route;
3. Domestic sheep or goats are found missing from a band;
4. Domestic sheep or goats stray and are found outside of their authorized allotment area and into areas deemed unsuited for domestic sheep or goat grazing; or
5. Domestic sheep or goats are found on the Payette National Forest after the authorized season of use.

The ERP should also require domestic sheep herders carry a GPS device that communicates its location to managers such as the SPOT[8]. These devices have been widely field tested and provide a simple way to communicate the location of the user, ask for assistance, or inform emergency response officials of an emergency by sending an email to designated people or the proper emergency response team. As part of the mandatory terms and conditions of any permit, within any area where the risk of contact is high, all herders should be required to carry such a device and be required to communicate the location of sheep bands on a daily basis.

Herders should also be required to report any sighting or sign of a bighorn sheep that is observed. Herders should also be required conduct daily counts of domestic sheep or goats and

---

[7] Emergency Response Plan for Potential Situations Regarding Bighorn Sheep and Domestic Sheep and Goats. Payette National Forest. 2003 Land and Resource Management Plan. March 29, 2011. http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5422479.pdf
[8] http://www.findmespot.com/en/

3

BLM_0127050

to notify the BLM when domestic sheep are missing from bands when in proximity to bighorn sheep areas.

In the event that any of these reasonable mandatory terms and conditions are not met, the ERP must be activated. In the event that a location provided by the herder using a SPOT device is located within any area deemed unsuitable for domestic sheep or goat grazing the ERP must be implemented.

**BLM fails to adequate analyze risk disease from cattle.**

Other outbreaks of deadly disease among bighorn sheep have been associated with contact with cattle[9]. The BLM must analyze the risks associated with BLM permitted cattle grazing, especially during severe drought conditions when cattle and bighorn sheep seek out water sources and may come into contact.

**BLM inadequately analyzes effects of conversion from cattle to sheep or sheep to cattle in bighorn sheep habitat.**

LG 4.1 and LG 4.2 allow for conversion of cattle grazing to sheep grazing and vice versa. When considering any such conversion a risk of contact analysis must be undertaken to ensure that domestic sheep or goat grazing does not imperil existing or potential bighorn sheep populations. Any conversion of sheep to cattle grazing must analyze the differences in how each species uses a landscape using criteria such as forage availability, distance to water, and terrain. New water developments within bighorn sheep habitat must be analyzed for impacts on bighorn sheep and the risk of contact between cattle, domestic sheep or goats, and bighorn sheep.

**BLM inadequately presents a baseline condition of bighorn populations and domestic sheep and goat grazing.**

The Final Winnemucca RMP provides little information about the status and health of bighorn sheep populations within and nearby the Winnemucca District. The reader can gain very little understanding about how current permitted actions have affected bighorn sheep and whether any of the proposed alternatives may influence the risk of contact between domestic sheep or goats, and bighorn sheep.

---

[9] Wolfe et al (2010) A bighorn sheep die-off in southern Colorado involving a Pasteurellaceae strain that may have originated from syntopic cattle. http://www.ncbi.nlm.nih.gov/pubmed/20966277

4

BLM_0127051



**Rocky Mountain BIGHORN SOCIETY**

**P.O. Box 8320 • Denver, CO • 80201-8320**

July 15, 2016

Field Office Manager
BLM Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Dear Uncompahgre Field Office Manager:

On behalf of the 800 members of the Rocky Mountain Bighorn Society (RMBS), please accept this **protest** of the Final Environmental Assessment (EA), Finding of No Significant Impact (FONSI), and Decision Notices on the North Delta Grazing Permit Renewals. Our primary concern is the long term viability of bighorn sheep (BHS) herds in the Uncompahgre Field Office (UFO) resource area.

The RMBS has previously submitted scoping comments on March 6, 2015 advocating for the BLM to provide greater protections to bighorn sheep, including the Dominguez desert bighorn sheep herd which is classified by Colorado Parks and Wildlife as a Tier 1 Primary Population and is a state-listed BLM sensitive species. We also provided timely comments to the Preliminary EA on September 24, 2015, pointing out numerous flaws in the EA and associated bighorn sheep risk assessment and proposed alternative, most of which were not addressed in the Final EA.

We address our **issues of protest** for each document below.

**Environmental Assessment**

Limited Range of Alternatives

The BLM considered only a No Action alternative, a Modified Grazing Alternative, and a No Grazing alternative. Only the No Grazing alternative provides adequate protection to bighorn sheep populations in the UFO resource area and surrounding jurisdictions. The BLM should have included alternatives that do not reauthorize grazing in allotments that are high risk to bighorn sheep, or that convert the class of livestock grazing on those allotments. By failing to consider an alternative that eliminates domestic sheep grazing in areas that were designated as high risk to bighorns under the Risk of Contact analysis, the EA failed to consider a reasonable range of alternative actions.

MS 1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep

BLM_0127052

This policy manual was issued by Deputy Director Steven A. Ellis on March 2, 2016, and establishes policy for the coordination and management of domestic sheep and goats to sustain wild sheep on the BLM managed lands. The EA notes the release of this manual in the Purpose and Need for the Action section, but does not discuss the new policy anywhere in the document. Specifically, we believe the BLM violated Management Practice 2 from the policy manual (Pg. 7):

2. Where domestic sheep or goats are authorized (including trailing and for vegetation management), or where recreational sheep or goats use (e.g., pack animals) may occur, and there is a potential for inter-species contact of wild sheep and domestic sheep or goats, land use plans and/or implementation-level plans will prescribe management practices **to provide effective separation**. Identify in the land use plan and/or implementation-level plan if opportunities exist for allotment or pasture management changes to help achieve effective separation.

The EA relies solely on Best Management Practices (BMP) in the Terms and Conditions, and the presence of a highway between the allotments and bighorn sheep Core Herd Home Range (CHHR) to achieve effective separation. The EA fails to discuss in detail the effectiveness of BMP to create effective separation, nor the fact that the majority of experts do not support the use of BMP to protect bighorn sheep. We will discuss BMP in greater detail below. While the presence of a highway between CHHR and the domestic sheep allotments may present an obstacle for bighorn sheep to navigate, there is no evidence to suggest that it will prevent bighorn sheep forays into active sheep allotments. Colorado Parks and Wildlife reports several known occasions of bighorn sheep being struck by vehicles on the highway in recent years (Banulis, CPW, pers. comm.), which confirms that movements across this obstacle do occur.

In light of the fact that the proposed action does not create effective separation between domestic and wild sheep, we believe the BLM should refer to Management Practices 11 through 15 in the policy manual:

11. If effective separation between wild sheep and domestic sheep or goats cannot be reasonably expected, and/or if reporting indicates that contact has occurred in spite of the best efforts to implement management practices to prevent contact, consider relocating the authorized sheep or goats to another allotment(s) where risk of contact is lower.

12. If the allotment/authorization cannot be managed in a manner that will provide effective separation, then seek voluntary non-use from the permittee (in accordance with the provisions in 43 C.F.R. §4110.3-3 – Grazing Qualifications and Preference) while seeking long-term solutions to achieve effective separation.

13. If the permittee/lessee is unwilling to apply for voluntary non-use, issue a final decision effective upon issuance or temporary suspension of domestic sheep or goat use in the allotment (in accordance with the provisions in 43 C.F.R. §4110.3-3 – Grazing Qualifications and Preference) while seeking long-term solutions to achieve effective separation.

BLM_0127053

14. If effective separation between wild sheep and domestic sheep or goats is not achievable, and relocating the permitted or authorized use is not possible, consider livestock use conversion from domestic sheep or goats.

15. If effective separation between wild sheep and domestic sheep or goats is not achievable, consider cancelling a domestic sheep or goat authorization or closing an allotment to domestic sheep and goat use, particularly when priority wild sheep populations or emphasis areas are in close proximity. Such actions must comply with NEPA, grazing regulations, and land use planning regulations.

By failing to discuss this new policy manual and whether the decisions here comply with the direction in that manual, the EA omits important information that must be disclosed to the public for a full and adequate analysis of the effects of the action.

<u>Use of Best Management Practices to Achieve Effective Separation</u>

The EA relies solely on the use of BMP recommendations from the Western Association of Fish and Wildlife Agencies (WAFWA) to achieve effective separation. However, the use of BMP has not been scientifically evaluated and proven to reduce the risk of contact between domestic sheep and bighorn sheep where spatial separation does not occur. There is no way to quantify the reduction of risk, and therefore no way to evaluate the overall risk to bighorn sheep under this management alternative. In fact, the WAFWA guidelines explicitly note that, "[e]ffectiveness of management practices designed to reduce risk of association are not proven and therefore **should not be solely relied upon to achieve effective separation**" (Pg. 15).

Additional expert opinions on the efficacy of BMP to achieve effective separation include:

In WESTERN WATERSHEDS PROJECT et al. vs. BUREAU OF LAND MANAGEMENT et al., case number09-0507-E-BLW (attached), the United States District Court of Idaho enjoined the BLM from relying solely on the use of BMP to achieve effective separation on the Partridge Creek Allotment after reviewing a Nez Perce National Forest decision on the Allison-Berg Allotment across the river from the Partridge Creek Allotment (Bonn 2008, attached), which found that BMP would be ineffective to reduce the risk to bighorn sheep. The Court also reviewed the Fifth Declaration of Victor L. Coggins (*Civ. No. 07-151-BLW*, attached), the District Wildlife Biologist for the Oregon Department of Fish and Wildlife, in which he stated that, based on his forty-two years of experience as a state wildlife biologist, he believed BMP could not guarantee separation of bighorn sheep and domestic sheep.

Tim Schommer, retired National Bighorn Sheep Biologist for the USDA Forest Service, noted that in his nearly 30 years of experience in bighorn sheep management and restoration, he found that BMP were not effective to maintain separation and eliminate the risk of disease transmission between domestic sheep and bighorn sheep (Declaration of Tim Schommer, *Civ. No. 07-151-BLW*, attached).

Schommer also authored an Evaluation of Best Management Practices position statement (attached) included in Appendix F of the Final Supplemental Environmental Impact Statement

(FSEIS) (2010) for the 2003 Payette National Forest Land and Resource Management Plan. Schommer concludes that BMP are largely ineffective in areas of very rugged terrain and/or in areas with little or no buffer between wild sheep and domestic sheep.

In April 2016 the BLM Cottonwood Field Office in Idaho chose to not continue grazing high risk domestic sheep allotments, including those that did not overlap CHHR, in part because they determined that the use of BMP was largely ineffective at reducing risk.  The RMP amendment and FSEIS states (Pg. 45):

> **2.4.6 Alternative L – Allow Domestic Sheep and Goat Grazing on All Allotments with Leasing Terms and Conditions to Reduce Potential Interspecies Contact**
>
> The BLM considered an alternative that would make all four allotments available for domestic sheep and goat grazing with application of the leasing terms and conditions identified in Appendix C to reduce the potential for contact with bighorn sheep. These terms and conditions have previously been identified, recommended, or implemented by the USFS and the BLM as best management practices (BMPs). However, when bighorn sheep CHHR occur in or adjacent to a domestic sheep allotment, and especially when the allotment is within bighorn herd home range, development and implementation of effective separation measures is difficult; and contact between the species will most likely still occur. **In other words, special terms and conditions to avoid contact between bighorn and domestic sheep that are known to be in close proximity are generally ineffective to ensure separation of the species.** Furthermore, even with these extra measures, control of domestic sheep, or monitoring and locating bighorn sheep in forested/ dense vegetation or steep/rocky/rugged terrain is very difficult. Accordingly, without a large buffer between domestic and wild bighorn sheep, extra measures are not likely to result in a significant reduction in the risk of contact (Schommer 2009) **No known studies, research, or peer reviewed literature has documented the effectiveness of BMPs preventing contact and disease transmission when domestic sheep or goats grazed within or adjacent to occupied bighorn sheep habitats.** Appendix C contains a more detailed review of the effectiveness of BMPs.

David A. Jessup, Senior Wildlife Veterinarian (ret.) with the California Department of Fish and Game, summarized the overwhelming evidence that contact between bighorn sheep and domestic sheep increases disease and death in bighorns, including historical die-offs of wild bighorns after contact with domestic sheep, as well as intentional and accidental penned experiments (Declaration of David A. Jessup, *Case No. 1:12-cv-469 BLW*, attached).  He concludes that the preponderance of evidence supports the concept that spatial separation of the species is an appropriate tool to reduce the risk of disease transmission, and that more complicated approaches are not practical or effective at this time.

Dr. Thomas Besser, faculty at the Department of Veterinary Microbiology and Pathology, College of Veterinary Medicine, and the Washington Animal Disease Diagnostic Laboratory at Washington State University, also evaluated the evidence presented in Idaho Wool Growers et al. vs. Vilsack et al. (*Case No. 1:12-cv-00469-BLW*) and provided his expert opinion

BLM_0127055

that "physical separation of these species is the only known way to protect bighorn sheep from this disease transmission" (Declaration of Dr. Thomas Besser, attached).

The references above affirm that the Courts, the experts, and the BLM believe that BMP are not effective at mitigating the risk of contact between bighorn sheep and domestic sheep. Therefore, the UFO should not rely on BMP to reduce the risk of contact in the North Delta analysis area. The EA does not disclose these contrary views about use of BMP or discuss whether and to what extent BMP have been proven effective at mitigating risk of contact.

By failing to analyze whether BMP have proven effective at keeping the species separate and to disclose the views of many agency and outside experts that they are not effective, the EA has not adequately assessed and disclosed the effects of the action or responded to opposing scientific viewpoints.

Inadequate Cumulative Effects Analysis

The cumulative effects analysis for desert and Rocky Mountain bighorns does not include effects from domestic sheep on National Forest, state or private lands within the Cumulative Impacts Analysis Area (CIAA). Likewise, there is no discussion about domestic sheep grazing on BLM lands outside of the UFO but within the CIAA.

There is no explanation for truncating the CIAA at 22 miles. As the Risk of Contact (RoC) model only identifies forays out to 22 miles (35 km), it may actually underestimate the risk of contact. Using the model for evaluating all alternatives and both subspecies of BHS will permit a consistent approach for this analysis. The potential for underestimating the risk of contact can be described as one of the uncertainties in the analysis.

The map of the bighorn sheep CIAA (Figure 10, Pg. 113) does not include CHHR for the Main Canyon bighorn sheep herd nor for the Battlement Mesa bighorn sheep herd, both of which lie partially within the CIAA. It does appear that these herds were included in the RoC analysis.

Therefore, the EA's cumulative effects analysis was flawed because it used an unreasonably small CIAA, did not assess effects to all bighorn sheep herds within the CIAA, and did not combined effects to bighorn sheep herds from domestic sheep grazing on other land outside the UFO but within the CIAA added to the grazing on UFO land. This flawed analysis drastically underestimated the combined cumulative effects of domestic sheep grazing on bighorn sheep herds in the relevant area.

Faulty RoC Analysis

The following statement in the EA suggests a basic misunderstanding by the author of what the RoC model analyzes and what the results mean:

> "…since there is no bighorn CHHR within the North Delta area, there are no effects to core habitat areas." (Pg. 116)

BLM_0127056

The RoC model utilizes bighorn sheep CHHR information, a summer source habitat model representing suitable bighorn summer habitat, ram and ewe foray rates, and domestic sheep allotment boundaries to calculate probabilities that rams and ewes may **leave a CHHR, undertake a foray, and subsequently contact a specific domestic sheep allotment.** Output from the tool also calculates rates of contact between individual bighorns from specific bighorn herds with specific domestic sheep allotments.  Using the resulting contact rate, managers can evaluate a range of effective contact probabilities (i.e. the probability that contact with an allotment will result in a bighorn sheep disease outbreak) and determine extirpation probabilities based on the effective contact probabilities. Therefore, the RoC model evaluates the potential for disease transmission and extirpation of a bighorn herd due to a foraying bighorn coming into contact with a domestic sheep grazing allotment outside of CHHR.  The statement that there are no effects because there is no overlap is a misinterpretation of how the RoC model works.

<u>Probability of Interaction Model</u>

The RMBS does not understand why the Probability of Interaction Model (PoIM) is included in this EA.  We have repeatedly stated that the model is based on several flawed assumptions which are not supported in any peer-reviewed literature.  The PoIM does not seem to be used as the decision-making tool in this analysis, and therefore only serves to confuse the reader and decision maker by inserting meaningless information into the decision document.  Specifically, our concerns with the PoIM are noted below.  The first comments address incorrect assumptions used to develop the Probability of Interaction Model.

Page 192, item 3a - The authors cited publications by Holecheck, Pieper, and Herbel (1989) and McDaniel and Tiedeman (1981) that continuous cliffs (>70% slope) and continuous steep slopes (40-70%) were a barrier to movement or were a partial barrier to domestic sheep movement.  Both of these publications were discussing the use of forage resources on the landscape by domestic sheep not their movements across the landscape.  These publications identified that, as the slope of the landscape increased, domestic sheep use of available forage decreased. These publications did not identify steeper slopes as barriers.  McDaniel and Tiedeman (1981) further stated on page 103 of their publication the following:  "Sheep used all slopes regardless of steepness but when terrain was especially rough the animals mostly trailed through the area making little use of the available forage."  This statement alone negates two important assumptions for the model (3a, i and 3a, iii) and incorrectly describes domestic sheep use of a landscape.

Page 192, item 3b, ii – We question the validity of the 9-mile buffer employed in the model, that the presence of a bighorn sheep is extremely low, and interaction is unlikely.  The authors cited the WAFWA guidelines for the use of this distance; however, the WAFWA guidelines do not recommend the use of this buffer distance, and certainly do not support the notion that the "the presence of a bighorn sheep is extremely low, and interaction is unlikely."  Based on the literature cited, it appears that the authors cited Johnson (1995) and Johnson and Swift (2000) for the use of this distance. This study was to develop a model for evaluating habitat suitable for Rocky Mountain bighorn sheep translocations.  This distance was then used to formulate past BLM policy/guidelines that stated that domestic sheep allotments should not occur within 9

BLM_0127057

miles (buffer) of desert bighorn sheep habitat.  The 9-mile buffer is no longer included in BLM policy because it is not supported by science.

Page 192, item 3b, iii – We are not aware of any study that describes distances greater than two miles from bighorn sheep range, including extensive flat terrain and interconnected areas greater than 0.5 miles in diameter, would increase barriers outside typical bighorn sheep range.  There are numerous examples (some published and many unpublished) of both Rocky Mountain and desert bighorn sheep foraying movements outside of typical habitats (steep, rugged terrain) used by bighorn sheep.  For example, bighorn sheep have been documented crossing flat land in valleys to reach other mountain ranges, a distance that required traveling across more than 2 miles of flat valley-bottom land.  Therefore, this is an inappropriate assumption for foraying bighorn sheep.

Page 193, Probability of Interaction Model Methods, #1 – There is no rationale for identifying why >75% equals a high risk and less than or equal to 75% is an undetermined risk.  If 50% of a domestic sheep grazing allotment contains bighorn sheep and that same 50% is also used by bighorn sheep then one would surmise that this would also have a high risk value.  It appears that this part of the model is arbitrary and has no basis in science.  If any part of a domestic sheep allotment overlaps occupied bighorn range, there is certainly a high risk of contact.  No science supports any other conclusion.

Page 193, Probability of Interaction Model Methods, #2 – As stated in the previous comments, the undetermined areas for physiographic barriers to movement and the compounding temporal effects that allotment usage incurs appear to be arbitrary and have no basis in science.

Page 193, Probability of Interaction Model Methods, #3 – Although the model takes into consideration season of use, this by itself does not indicate that there will not be any contact between the species.  The environmental consequences section does not address stray domestic sheep that may not be located by the permittee or BLM for a number of days, weeks, or months.  Straying domestic sheep are a common occurrence when grazed in rangeland conditions.  Straying may result from a number of natural factors, including steep rugged terrain, weather events, and predators separating individuals from the band.  Human error with poor husbandry practices can also result in straying.  These straying domestic sheep can also have deleterious impacts through the potential for disease transmission to bighorn sheep.  Courts and bighorn experts have recognized the high likelihood of straying domestic sheep that pose a risk to bighorn sheep.  It is unreasonable to assume that domestic sheep will only be on allotments during the permitted season when data from around the West shows that straying is a common occurrence.

Based on the above information, the RMBS believes all references to the scientifically unsupported PoIM should be removed from the EA.

For the reasons explained above, the EA is flawed because it did not consider a reasonable range of alternative actions, did not disclose and discuss information necessary to assess the effects of the action, and therefore did not properly analyze the direct, indirect, and cumulative effects of the action that is needed to take the required "hard look" at the actions' impacts.

BLM_0127058

## Finding Of No Significant Impact

The RMBS protests the Finding of No Significant Impact (FONSI). We believe the proposed action may have a significant effect on bighorn sheep populations, which would require an Environmental Impact Statement (EIS). Our rationale for believing the FONSI is based on inadequate analysis and inaccurate assumptions are outlined in the EA section above.

The Context statement in the FONSI ignores the wide public interest in bighorn sheep as both a watchable wildlife species and as a highly desired big game hunting opportunity, at the national, regional and statewide level. The Context statement does not consider the ramifications to local bighorn sheep populations if the domestic sheep grazing permits are renewed.

Intensity factor number 1 does not address the adverse effects of a bighorn sheep die-off should contact and disease transmission occur. The Environmental Consequences section of the EA states of the proposed action, "…by continuing domestic sheep presence in the area, there will continue to be 25,691 acres predicted from the RoC model to have disease outbreaks in local bighorn populations on an interval less than every 25 years. If this model result is accurate, this results in those local populations of bighorn sheep never recovering from those disease outbreaks" (EA, Pg. 116-117). This is clearly an adverse effect that was ignored in the FONSI.

Intensity factor number 4 does not acknowledge that these decisions to continue grazing domestic sheep in high risk areas to bighorn sheep are highly controversial. The fact that the BLM considered all comments received is irrelevant. These decisions are highly controversial due to their potential effects to bighorn sheep herds, and whether proposed BMP will work to reduce risk and maintain bighorn populations.

Intensity factor number 5 completely ignores the uncertainty about data and modeling results addressed in the EA. Due to these factors, there is considerable uncertainty about the effects to bighorn sheep. There is also considerable uncertainty about the effectiveness of BMP to reduce the risk to bighorn sheep.

Intensity factor number 6 incorrectly states that the BLM preferred alternative neither establishes precedent for future BLM actions with significant effects, nor represents a decision in principle about a future consideration. These decisions are the first by the BLM in Colorado to use the RoC model to determine risk ratings and then make decisions. The decision to continue to graze high risk allotments and to rely on unproven BMP to ameliorate that risk does indeed set a precedent.

Intensity factor number 7 incorrectly states that cumulative impacts of the BLM preferred alternative have been analyzed and considered. The EA did not analyze cumulative impacts of preferred alternative and domestic sheep grazing on private lands, Forest Service lands, or other BLM lands outside the resource area but within the CIAA.

BLM_0127059

The RMBS rejects the conclusion to intensity factor number 10. We assert that the proposed alternative violates the Federal Land Policy and Management Act (FLPMA) based on the intensity factors above.

Because the context and intensity factors show that there may be significant effects from the proposed action, an EIS is required and the FONSI is arbitrary and capricious.

## Decision Notices

The Decision Notices (DN) violate NEPA because they rely on a flawed EA and risk assessment and an arbitrary and capricious FONSI, as noted above.

The DN violate FLPMA because they are inconsistent with direction in the current UFO RMP (1989) to protect bighorn populations. For example, the current RMP states:

> Habitat in the Gunnison Gorge and Camel Back areas would be managed for bighorn sheep; disturbances in these areas would be minimized. (Pg. 2)

And:

> Bighorn sheep habitat in the Smith Fork Canyon (2,250 acres) would be monitored and protected. Activities and land uses that are consistent with maintaining the necessary forage and isolated habitat requirements of bighorn sheep would be permitted. (Pg. 149)

The preferred alternative authorizes grazing activities which put both the Dominguez and Gunnison Gorge bighorn sheep herds at risk. The authorized grazing therefore does not comply with these and other provisions in the UFO RMP that require protection of bighorn sheep habitat and maintenance of their populations.

The DN violate FLPMA because they do not comply with rangeland health guidelines in 43 CFR 4180.2 that require the BLM to meet state standards and guidelines. The DN do not comply with standard 4 which requires the BLM to maintain or enhance special status species by sustaining healthy native animal communities. As a BLM sensitive species, desert bighorn sheep are a special status species.

The DN violate FLPMA because they do not comply with BLM policy manual MS 1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep. MS 1730 requires BLM managers to maintain effective separation between domestic sheep and wild sheep. The manual does not suggest that high risk can be mitigated through implementation of unproven BMP.

In summary, we find the decision to continue grazing high risk domestic sheep allotments in the absence of scientifically proven mitigation to reduce the risk to an acceptable level to be arbitrary and capricious and in violation of FLPMA and NEPA. We believe the BLM must either choose the No Grazing alternative or complete a full Environmental Impact Statement.

BLM_0127060

Thank you for this opportunity to participate in the analysis process.  Please keep us apprised of future opportunities and/or future decisions on the North Delta analysis.

Sincerely,

Terry E. Meyers
Conservation Director
(970) 640-6892
meyers.terry@gmail.com

BLM_0127061

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, et al., | ) ) ) ) | |
| | ) | Civ. No. 09-0507-E-BLW |
| Plaintiffs, | ) ) | MEMORANDUM DECISION |
| v. | ) | AND ORDER |
| | ) | |
| BUREAU OF LAND MANAGEMENT, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**INTRODUCTION**

The Court has before it a motion for TRO against the Bureau of Land

Management (BLM), originally filed by plaintiff WWP in *WWP v. U.S. Forest*

*Service, 07-151-E-BLW* and set for argument on October 6, 2009.  Because the

BLM was not a named defendant in that case, WWP also filed a motion to amend

its complaint to add the agency as a defendant.

The Court denied the motion to amend, requiring WWP to file a new action

against the BLM.  Because WWP was seeking emergency relief, the Court

maintained the October 6, 2009, hearing date, and deemed filed in the new action

Memorandum Decision & Order – page 1

BLM_0127062

the TRO motion and all associated materials that had been filed in the earlier action.

The Court heard oral argument on the TRO on October 6, 2009, and took the motion under advisement. For the reasons expressed below, the Court will grant the motion.

## STANDARD OF REVIEW

A plaintiff seeking injunctive relief must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365 (2008). A "possibility" of irreparable harm is insufficient; irreparable injury must be "likely" in the absence of an injunction. *Id.* A preliminary injunction is "an extraordinary remedy never awarded as of right." *Id.* at p. 376. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at p. 376.

## LITIGATION BACKGROUND

WWP seeks to enjoin the BLM from allowing grazing on the Partridge Creek allotment. The BLM has authorized the Carlson Livestock Company to

**Memorandum Decision & Order – page 2**

BLM_0127063

graze up to 833 domestic sheep on the allotment beginning October 15th, just a few days away.  WWP argues that the domestic sheep will transmit a deadly disease to a nearby herd of bighorn sheep.

**Carlson Livestock**

Guy Carlson, the President of Carlson Livestock Company, resides in Riggins and has been grazing the Partridge Creek allotment since 1937.  *See Carlson Declaration at p. 2, ¶ 3.*  He owns 37% of the land encompassed by the allotment, while the BLM owns 59%, and the Idaho Department of Lands 4%.  *See Unsworth Declaration at p. 3, ¶ 8.*

Carlson's current permit was originally issued in 2003, after the BLM conducted a Standards and Guidelines Determination showing that the allotment was meeting all eight of the Standards.  *See Determination (docket no. 167-6).*  Each year thereafter, Carlson had to obtain an authorization from the BLM that contained terms and conditions governing grazing on the Partridge Creek allotment.  For the 2009 grazing season, Carlson's annual authorization was issued in February of 2009.  *See Authorization (docket no. 151-7).*

The Partridge Creek allotment is located on the south side of the Salmon River, ten miles east of Riggins.  Across the river to the north lies the Nez Perce National Forest; to the south lies the Payette National Forest.  The Partridge Creek

**Memorandum Decision & Order – page 3**

BLM_0127064

allotment is an island of BLM land (along with state and private land) sandwiched between Forest Service land.

In past grazing seasons, Carlson rotated his sheep through the Partridge Creek allotment and into allotments on the National Forest lands to the north and the south. His typical rotation pattern is set forth in the table below:

| Time | Carlson Sheep Location |
|------|------------------------|
| October 15 to November 30 | Partridge Creek allotment (BLM land) |
| November 15 to March 1 | Allison-Berg allotment (Nez Perce National Forest) |
| March 1 to April 11 | Private land |
| April 11 to July 15 | Partridge Creek allotment |
| July 15 to October 7 | Payette National Forest allotments |
| October 7 to October 15 | Trail sheep to Partridge Creek |

Recently, however, Carlson has not been able to follow this rotation pattern because the Forest Service has closed the Allison-Berg allotment entirely and closed 60% of the allotments he used in the Payette National Forest. Those allotments were near bighorn herds, and the Forest Service decided to close them while it prepared a Supplemental Environmental Impact Statement (SEIS) to examine the relationship between domestic sheep grazing and bighorn die-offs.

Carlson states that the closure of the Partridge Creek allotment, on top of the closures of these Forest Service allotments, would mean that he could not continue

**Memorandum Decision & Order – page 4**

BLM_0127065

to operate in a "profitable manner." *See Carlson Declaration at p. 3, ¶ 5.* If he is barred from grazing during the 47 days from October 15 to November 30, he would "incur $3,000 in trucking costs to move the sheep off the Riggins area to Emmett for private pasturage plus an additional $5,481 associated with labor and feed on private ground in Emmett." *Id.* He states that he would also continue to use his private ground "on both sides of the river for domestic sheep use for as long as possible." *Id.*

**Bighorn Status**

The Forest Service closures of allotments to the north and south of the Partridge Creek allotment were prompted by dramatic declines in populations of bighorn sheep throughout this Salmon River drainage area. *See Lawrence Declaration* at p. 3, ¶ 5. In the area including the Partridge Creek allotment, bighorn numbers have dropped 70% over the past 20 years. *See Idaho Department of Fish & Game Strategy at p. 2 (docket no. 167-8).*

The Forest Service assembled a team of experts that prepared a Risk Analysis concluding that the scientific literature demonstrates that "clinically healthy bighorn sheep have developed pneumonia and died within days to weeks following contact with clinically healthy domestic sheep." *See Risk Analysis at p. 3.* They found a broad consensus that "domestic sheep and bighorn sheep must be

**Memorandum Decision & Order – page 5**

BLM_0127066

kept separated in order to maintain healthy bighorn populations." *Id.*

The BLM relied on the Forest Service's Risk Analysis in preparing a Proposed Resource Management Plan EIS (PRMP/EIS) for lands including the Partridge Creek allotment. *See Cooper Declaration at p. 5, ¶ 15.* After reviewing the PRMP/EIS, the BLM's Director upheld it except as it applied to 4 allotments, including the Partridge Creek allotment. As to those four allotments, the Director was persuaded by the protests of the Nez Perce Tribe and environmental groups to direct that a further analysis be done through an SEIS on the impacts of grazing on bighorns. *See BLM Letter (docket no. 167-4); Exhibit 23 to Declaration of Lawrence at p. 3.*

Although the BLM relied on the Forest Service's Risk Analysis, the BLM came to a different conclusion on whether to allow grazing while the SEIS was being prepared – the BLM decided to continue to permit grazing under the prior management plans that were developed more than 25 years ago. *See BLM Letter to Carlson (docket no. 167-1).* The SEIS will take about two years to prepare.

**Strategy For Reducing Risk**

To set the conditions on which grazing would continue during this interim period, the BLM worked together with Carlson, the Idaho Department of Agriculture, the Idaho Department of Fish and Game (IDFG), and the Idaho

**Memorandum Decision & Order – page 6**

Department of Lands (IDL). Together, they entered into an agreement entitled "Strategy for Reducing Risk of Contact between Bighorn Sheep and Domestic Sheep in the Salmon River Area." This Strategy – signed in April of 2009 – provides generally that BLM and the IDL will monitor grazing on the Partridge Creek allotment, and when they observe bighorns within a mile of domestic sheep and presenting a risk of contact, the sheep will be moved immediately to avoid contact. *See Strategy at p. 7.*

**<u>Best Management Practices</u>**

Shortly after the Strategy was signed by all parties, the Idaho Legislature passed a law requiring the IDFG to cooperatively develop best management practices with grazing permittees on federal and/or state allotments. The statute goes on to state that

> [u]pon commencement of the implementation of [BMPs], the director [of IDFG] shall certify that the risk of disease transmission, if any, between bighorn and domestic sheep is acceptable for the viability of the bighorn sheep. The director's certification shall continue for as long as the best management practices are implemented. The director may also certify that the risk of disease transmission, if any, between bighorn and domestic sheep is acceptable for the viability of the bighorn sheep based upon a finding that other factors exist, including but not limited to previous exposure to pathogens that make separation between bighorn and domestic sheep unnecessary.

The IDFG entered into negotiations with Carlson to comply with this statutory command to develop best management practices. A team of IDFG

**Memorandum Decision & Order – page 7**

BLM_0127068

managers and biologists, along with IDFG's counsel, prepared a draft for Carlson's

consideration. After some negotiation, the parties signed in August of 2009 an

agreement entitled "Best Management Practices for Separation Between Domestic

Sheep and Bighorn Sheep" [BMPs]. *See BMPs (docket no. 167-9).* Like the

Strategy, the BMPs provide for monitoring of the allotment by BLM and state

officials. Carlson agreed to use two herders, three guard dogs, and three herding

dogs, with each band of sheep. If co-mingling occurs, Carlson may kill the

bighorn and notify the IDFG immediately. *Id. at BMP #10.*

But in one important respect, the BMPs are not as strict as the Strategy.

While the Strategy directed the immediate movement of sheep when bighorns were

observed within a mile and there was a risk of contact, the BMPs state merely that

officials from the BLM and IDFG must be notified – there is no provision for

immediate movement of the sheep. *Id. at BMPs #4 & #10.* The BMPs depend on

voluntary compliance – they are not part of the terms and conditions of Carlson's

permit and cannot be enforced by the BLM.

At the conclusion of the BMPs is the "Director's Certification" required by

the statute once the BMPs are implemented. While the statute directs the IDFG

Director to certify "that the risk of disease transmission, if any, between bighorn

and domestic sheep is acceptable for the viability of the bighorn sheep," the

**Memorandum Decision & Order – page 8**

Director in this case merely certified that the BMPs "provide for separation that reduces the risk from disease transmission between domestic sheep and bighorn sheep to an acceptable level based on other factors that exist consistent with Idaho Code § 36-106(e)(5)(E)." The phrase in the certification regarding "other factors that exist" was explained by IDFG's James Unsworth as referring to the "intermingled land management pattern of the Partridge Creek allotment as it related to achieving separation through implementation of the BMPs." *See Unsworth Declaration* at p. 4.

Thus, the Director here certified that the risk has been reduced to an acceptable level. Acceptable to who? Acceptable under what standard? These questions are not answered in either the certification or Unsworth's Declaration. Moreover, the certification does not track the statutory language. The statute says nothing about *reducing* a risk of disease transmission merely to some undefined *acceptable* level. Instead, the statute requires a certification that the *risk* of disease transmission "is acceptable *for the viability of the bighorn sheep*." *Id.* at *subsection (E) (emphasis added)*. There is no certification in this case that upon implementation of the BMPs, the risk of disease transmission will be acceptable for the viability of the bighorn sheep.

**Tribe's Analysis**

**Memorandum Decision & Order – page 9**

BLM_0127070

The Nez Perce Tribe has conducted the most extensive scientific review of bighorns in this area, and set forth their findings in the Salmon River Bighorn Sheep Study. It examined a 70-mile stretch of the Salmon River from Riggins east to Big Mallard Creek, an area that encompasses the Partridge Creek allotment. The Tribe tracked radio-collared bighorns in this area to study their distribution and overlap with domestic sheep allotments. *Id.* at p. 6, ¶ 10.

The Study showed that a group of 11 bighorn rams resides directly across the river from the Partridge Creek allotment. *Id.* at p. 8, ¶ 15. GPS data retrieved from one of the radio-collars showed that a ram identified as R14 crossed over the Salmon River into the Partridge Creek allotment on four different occasions. *Id.* at p. 8, ¶ 16. During the rut season (mid-October to mid-December), this ram traveled east along the Salmon River for over 25 miles, interacting with 4 of the 5 ewe groups in the study area. *Id.* This was typical of bighorns, who frequently interact with each other all along the 70-mile stretch of the study area. Thus, a contagious disease would spread quickly over a large geographical area. *Id.* at p. 9, ¶ 19.

Based on this Study, the Tribe's experts concluded that there was a "very high risk of contact and potential for disease transmission" on the Partridge Creek allotment, given that (1) bighorns were just across the river, (2) the river posed no

**Memorandum Decision & Order – page 10**

BLM_0127071

barrier to contact, (3) one bighorn was shown to have crossed over the river into the allotment, and (4) an infected bighorn may travel far up-river to spread the disease among the Salmon River drainage population, the last native population of bighorns in the State. *See Mack Declaration at p. 11, ¶ 23.* The Tribe's experts met with the BLM to convey these concerns prior to the BLM's decisions on the Partridge Creek allotment. *Id. at p. 8, ¶ 15.*

## Evaluation of BMPs

The high risk of contact – and the lethal nature of the disease – led the Tribe's experts to conclude that BMPs would be ineffective. *Id. at p. 11, ¶ 23.* This opinion was shared by Victor Coggins, the District Wildlife Biologist for the Oregon Department of Fish and Wildlife. He has over 30 years of experience with the bighorns in Hells Canyon, which has terrain similar to that of the Salmon River drainage. *See Fifth Declaration of Scoggins at p. 1, ¶ 3.* He pointed out that similar BMPs have been ineffective in Oregon because domestic sheep stray from their band and contact the bighorns. While these BMPs require two herders, and dogs, they cannot keep a lookout over each of the more than 600 sheep, especially in this steep, rugged terrain. Two strays survived for four or five months in the nearby Smith Mountain allotment, wandering in bighorn habitat during that time. *Id. at p. 3, ¶ 11.*

**Memorandum Decision & Order – page 11**

BLM_0127072

The Forest Service reached similar conclusions in evaluating BMPs for the Allison-Berg allotment, across the river from the Partridge Creek allotment. *See Evaluation (docket no. 153-4)*. After reviewing similar BMPs, the Forest Service concluded that their implementation would render the risk of disease transmission "moderately high," because it was unlikely that the BMPs would be successful in keeping the sheep separate from the bighorns.[1] *Id. at p. 2.*

## ANALYSIS

In past decisions, the Court reviewed the scientific literature concerning the transmission of disease between domestic sheep and bighorns, concluding that "domestic sheep stand accused by the overwhelming majority of experts" of transmitting a form of lethal pneumonia to the bighorns. *See WWP v. U.S. Forest Service, 07-151-E-BLW, Memorandum Decision at p. 8 (docket no. 54).* The Court also found that "[p]ast attempts to separate bighorns from domestic sheep appear to have been unsuccessful, and there is a powerful natural attraction between the animals." *Id.* In reviewing the group of bighorns on the Allison-Berg allotment,

---

[1] The Court is aware that the danger of interaction between bighorn and domestic sheep may be substantially greater on the Allison-Berg allotment than on the Partridge Creek allotment. This is suggested by telemetry data and visual sitings which indicate that bighorns frequent the Allison-Berg allotment with far greater regularity. It is possible that a detailed scientific analysis would have concluded that this difference justified the BLM in reaching a different conclusion for Partridge Creek allotment than did the Forest Service for the Allison-Berg allotment. However, as discussed below, no such scientific analysis was undertaken by the BLM before it decided to authorize grazing while the SEIS was being completed.

**Memorandum Decision & Order – page 12**

BLM_0127073

just across the river from the Partridge Creek allotment, the Court found that they "are a native species, and thus the loss of that herd would be particularly devastating to the genetic diversity of bighorns." *Id, Memorandum Decision at p. 7 (docket no. 103).*

The unrebutted evidence in this case shows that (1) bighorns congregate just across the river, (2) the river is no barrier, (3) sheep stray and seek out the bighorns, (4) the steep terrain makes it very difficult to monitor stray sheep or mingling bighorns, (5) stray sheep can wander in bighorn territory for months, and (6) bighorns can travel long distances up and down the Salmon River drainage to visit other bighorn herds.

Evaluating these factors under the injunction standard set forth above, the Court finds first that the infection of bighorns across the river would constitute irreparable harm, as it is highly likely that they could infect not only their immediate companions but herds far up-river in the drainage. The loss of the only remaining native bighorns would be devastating.

In weighing the equities, the Court considers the economic harm that Carlson will suffer. As discussed, he will incur expenses of about $9,000 if the allotment is closed, and will not be able to operate in a "profitable manner." He does not say he will be forced out of business but merely that he will be forced to

**Memorandum Decision & Order – page 13**

consider other options like more intensive grazing of his private ground or real estate development of the river-front property. In comparison to the loss of the bighorns described above, the equities weigh clearly in favor of an injunction. Moreover, an injunction would be in the public interest.

With regard to the likelihood of success, WWP alleges that it is likely to prevail on its NEPA claim. NEPA and its regulations prohibit agencies from making any irreversible or irretrievable commitment of resources before an EIS is completed so that the agency does not do damage before even considering the effects of its action. *See Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000).

Irreversible damage is possible here. Well before the SEIS is completed many months from now, bighorns could become infected and roam far up-river in the Salmon River drainage, infecting the other native bighorns along the way causing large-scale losses.

In explaining his decision to keep the Partridge Creek allotment open for grazing, BLM District Manager Gary Cooper noted that the bighorns are not listed under the Endangered Species Act, and have not been identified as a sensitive species by the BLM. *See Cooper Declaration at p. 9, ¶ 42(f).* He does not discuss, however, whether he considered (1) the fact that the bighorns in the Salmon River drainage are the last remaining native population of bighorn sheep in Idaho, and

**Memorandum Decision & Order – page 14**

BLM_0127075

(2) the threat this poses to genetic diversity if these bighorns are killed by pneumonia transmitted by domestic sheep.

Cooper also cites as a factor in keeping the allotment open the certification issued by the IDFG under Idaho Code § 36-106(e)(5)(E).  He does not discuss, however, the certification's failure to track the statutory language – as discussed above – because it is silent on whether the risk of disease transmission is acceptable for the viability of the bighorns.

Even a certification that tracked the statute would be meaningless, however. While the statutory language requires that the Director certify that the risk is acceptable for bighorn viability if BMPs are implemented, the statute does not actually require the BMPs to meet that standard.  Indeed, the statute contains no standards for the BMPs.  Hence, the statute allows the Director to negotiate whatever BMPs he can with the permit holder – without regard for their effect on bighorns – and then when the permit holder implements those BMPs, the Director is compelled to certify that the risk is acceptable for bighorn viability.

The Court will assume the best of all parties that had a hand in drafting this statute and presume that this result was not intended.  Certainly it is highly unlikely that the IDFG, which has a sterling reputation for integrity, would take advantage of this language to ignore bighorn survival.

**Memorandum Decision & Order – page 15**

BLM_0127076

Nevertheless, the mere fact of certification remains meaningless under the plain language of the statute.  The record must reveal that the IDFG and the BLM went further than the language of the statute and set in place BMPs that had some science behind them.  The present record – obviously thin on a motion for TRO – shows no supporting science for the BMPs.

All the evidence in the record – discussed above – indicates that BMPs are ineffective in the steep terrain of the Partridge Creek allotment.  The Forest Service found them ineffective on similar terrain just across the river.  There is no explanation by the IDFG or the BLM as to why they would be more effective on the Partridge Creek allotment.

For all these reasons, the Court finds that injunctive relief is warranted under the standard set forth in *Winter* discussed above.  The Court will therefore grant WWP's motion to enjoin grazing on the Partridge Creek allotment until such time as the Court can hold an evidentiary hearing.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for TRO filed in Civ. No. 07-151-E-BLW (docket no. 148) is deemed filed in this case and GRANTED and that grazing on the Partridge Creek allotment is enjoined.

**Memorandum Decision & Order – page 16**

IT IS FURTHER ORDERED, that the plaintiffs submit a bond in the sum of $9,000 pursuant to Rule 65(c).

IT IS FURTHER ORDERED, that this TRO shall last until an evidentiary hearing to be held on **November 2, 2009, at 9:00 a.m.** in the Federal Courthouse in Poctatello Idaho.



DATED:  **October 14, 2009**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision & Order – page 17**

BLM_0127078

Evaluation of Inyo National Forests Domestic Sheep Operation and BMP relative to the Allison-Berg Allotment
June 4, 2008
Prepared by Joanne Bonn

| Factor being Evaluated | Inyo National Forest - Rock Creek Allotment | Nez Perce National Forest – Allison-Berg Allotment |
|---|---|---|
| Type bighorn sheep | Sierra Nevada (ESA listed) | Rocky Mountain bighorn sheep, native population |
| Timing of Grazing | August 14-September 15 | April 1-July 7 (spring/summer), October 28-March 1 (fall/winter) |
| Number and Type of Sheep | 1000-1500 pregnant ewes (3rd trimester) | 1632 ewes/lambs (spring/summer), 2450 mature sheep (primarily ewes, pregnant???) (fall/winter) |
| Is allotment considered bighorn sheep habitat | No | Yes and east half is currently occupied |
| Distance to bighorn sheep population | 4-5 miles (southern bdy, currently not being grazed), 1-1/2 mile (north) | bighorn sheep currently occupy portions of the eastern half of the allotment |
| Terrain on the allotment | rolling hills, steep glaciated ridges and alluvial fans, 6000-9000 feet elevation, shrubs, pine forests | Steep, rugged, highly dissected, rock outcrops, cliffs, grasslands (lower elevations), shrubs and forests upper elevations,  1800-7800 feet elevation, steep highly incised draws |

Livestock operations and the Best Management Practices the Inyo National Forest applies to their domestic sheep allotments may not be as successful on the Allison-Berg Allotment on the Nez Perce National Forest for the following reasons:

1) The terrain is different between the allotments on the Inyo and Nez Perce. The Rock Creek Allotment on the Inyo is considered to be gentle terrain compared to the steep, rugged terrain on the Allison-Berg Allotment. The Rock Creek Allotment consists of rolling hills of sagebrush and bitterbrush and pine forests and riparian draws.  Vegetation on the Allison-Berg Allotment consists of grasslands in the lower third of the allotment; dense shrubs in xeric pine/fir forests in the mid elevation; mesic, mixed conifer forests in the upper elevations; and steep riparian draws.

2) The Rock Allotment is not considered bighorn sheep habitat and the likelihood that bighorn sheep would wander and linger on the sagebrush flats is considered very low.  The Allison-Berg Allotment is considered good bighorn sheep habitat and bighorn sheep are known to occur on the eastern portion of the allotment.

3) Because the Rock Creek Allotment is gentle terrain, a person can see for miles and someone can keep track of the two species of sheep.  It is also easier to control and pen the domestic sheep.  The terrain on the Allison-Berg Allotment makes it difficult to see any great distance in any one direction.  It is also difficult to pinpoint radio-collared bighorn sheep due to the steep, rugged, highly-dissected landscape of the breaklands of the Salmon River canyon along the southern portion of the Allison-Berg Allotment.

4) There seems to be no documented evidence of disease in the Sierra Nevada bighorn sheep and is a strong and vigorous population.  Over the last 100-125 years there have been significant declines in the bighorn sheep in the Salmon River Canyon due to combined effects of overharvest, habitat loss,

BLM_0127079

competition for forage caused by livestock overgrazing, settlements, and diseases transmitted by domestic livestock. Currently, the bighorn sheep population in the Salmon River Canyon is declining along with low lamb survival.

5) The type of domestic sheep and time they would be grazing are different. Pregnant ewes are on the Rock Creek Allotment at a time when they are not attracted to by bighorn sheep rams or at a time when bighorn sheep rams would be more likely to wander away from the main herd(s). Domestic sheep are on the Allison-Berg Allotment at a time when bighorn sheep rams are more likely to wander, particularly in the fall when they are looking for a mate. It is not known at this time if the mature sheep on the Allison-Berg Allotment are ewes that have already been bred on the private land are even pregnant before going onto the allotment.

Given the terrain, the timing the domestic sheep are on the allotments, and type of domestic sheep, are very different between the two Forests, the Inyo and the Nez Perce. It seems that the Inyo NF has been successful in keeping domestic and bighorn sheep separated. The conditions are favorable and the BMPs are workable on the Rock Creek Allotment in keeping the two species separated. In addition, the Rock Creek Allotment on the Inyo is not considered bighorn sheep habitat or is of low value. The conditions along the Salmon River and on the Allison-Berg Allotment are more similar to those on the Wallowa-Whitman National Forest to the west of the Nez Perce. The Wallowa-Whitman NF has tried to keep both domestic and bighorn sheep apart and haven't been successful, even with having BMPs in place similar to the ones the Nez Perce NF are proposing to use.

It has been determined that the risk of contact between bighorn and domestic sheep on the Allison-Berg Allotment with BMPs is considered to be "MODERATELY HIGH". After reviewing the probable success of the Inyo National Forest in keeping the two species separated, it seems unlikely that the Nez Perce National Forest would be as successful in keeping domestic and bighorn sheep separated or significantly reducing the risk of contact given the terrain, the timing and type of domestic sheep on the allotment, the inability to keep track of the domestic and the bighorn sheep, and the presence of predators.

Prepared by:

/s/ Joanne M. Bonn

Joanne M. Bonn
Wildlife Biologist
Salmon River Ranger District
Nez Perce National Forest

Reviewed by:

Timothy J. Schommer

USDA Forest Service
National Bighorn Sheep Biologist
Wallowa-Whitman National Forest

Case No. 1:20-cv-02484-MSK    Document 65-4    filed 04/29/21    USDC Colorado    pg 138 of
160
Case 4:07-cv-00151-BLW    Document 153-5    Filed 09/23/2009    Page 3 of 18

May 23, 2008

**Allison-Berg Allotment/Bighorn Sheep Risk Assessment**
**Process**

Note: This document has been revised from the March 21, 2008 version, to evaluate the Best
Management Practices (BMPs) developed to reduce the risk of contact between domestic and
bighorn sheep.

The objective is to conduct and document a risk assessment for the Allison-Berg allotment on the Nez
Perce National Forest similar to the risk assessments completed for the Payette National Forest
allotments in "Risk Analysis of Disease Transmission Between Domestic Sheep and Bighorn Sheep on
the Payette National Forest" (2006) (hereinafter Payette Risk Analysis).

In the Payette Risk Analysis the Allison-Berg allotment was discussed but a risk ranking similar to the
Payette allotments was not provided. The Payette Risk Analysis regarding the Allison-Berg allotment
stated: "The Allison-Berg domestic sheep allotment on the Nez Perce NF would seem to present a
substantially greater risk of contact to the Main Salmon River population in Unit 19 than would the Payette
NF sheep allotments (Figure 1)." Payette Risk Analysis at 17. However, the Allison-Berg allotment was
not given a rating of risk of contact. (For the Payette NF allotments – 1 allotment ranked very high risk; 4
allotments ranked high risk; 5 allotments moderate risk; 6 allotments low risk; and 7 allotments very low
risk. See pages 12-14.) It was felt that it would be appropriate to attempt to conduct a similar review
using the same risk factors for the Allison-Berg to provide information for use in management of the
allotment. The wildlife biologist for the Salmon River Ranger District on the Nez Perce National Forest
evaluated the allotment using a similar process the Payette National Forest went through with the
exception that an expert panel was not used in evaluating the allotment.

The Allison-Berg allotment risk assessment followed the risk factors identified in the Payette Risk Analysis
at pages 10-12. Risk factors include: 1) distance between sheep allotment and nearest bighorn sheep
populations; 2) amount of GIS-modeled bighorn habitat within the sheep allotment, between the allotment
and the nearest bighorn sheep herd, and the relative continuity of that habitat; 3) knowledge of the
amount and quality of bighorn habitat within the allotment and around the allotment; 4) presence of
incidental bighorn sightings within or near the allotment; 5) the level of knowledge about bighorn sheep
distribution and movements in the area around the allotment; 6) characteristics of the sheep allotment
such as number of permitted sheep and permitted season of use.

The Allison-Berg allotment risk assessment also considered similar information as provided to the expert
panel for the Payette Risk Analysis:
- Allotment information was considered including: permittee, class of livestock, permitted number of
  sheep, permitted season-on-date, permitted season-off date, permitted number of livestock and
  head months and grazing methods utilized.
- Maps of Bighorn sheep population ranges or distribution and of GIS-modeled bighorn habitat
  were considered along with incidental bighorn sheep observations and distribution.
- Map showing distribution of large wildfires (Figure 4 of the Payette Risk Analysis), an updated
  wildfire map prepared by the Forest Service showing large fire perimeters for the 2007 fire
  season (Docket # 72 Exhibit F) and the Idaho Department of Fish and Game letter of October 9,
  2007 discussing unstable habitat conditions due to fire.

Concerning maps of bighorn sheep ranges or distribution, Figure 1 in the Payette Risk Analysis shows
the map of bighorn sheep population range utilized in the 2006 Risk Analysis. This map identifies that
"'[r]anges of bighorn populations in Salmon River Mountains (east side of map) were estimated by wildlife
biologists from Idaho Department of Fish and Game based on knowledge of winter range and distribution
of suitable habitat." Payette Risk Analysis at p. 37. This map shows that the range of the bighorn sheep
population on the north side of the Salmon River extends to and abuts the eastern boundary of the
Allison-Berg allotment. However, two newer maps have been produced that identify bighorn range or
distribution. One of these maps is the recent draft map prepared by the Idaho Department of Fish and

1

BLM_0127081

Game (March 2008) titled "Bighorn Sheep Distribution." This map shows bighorn sheep distribution on both sides of the Main Salmon River from Riggins east encompassing the entire length of the Allison-Berg allotment. The other map is the Geographic Population Ranges map developed by the Payette National Forest. This map shows the population ranges for both the Salmon River and the Snake River bighorn sheep populations. For the Salmon River population the map shows the bighorn sheep range extending from Riggins eastward up the river encompassing again the entire length of the Allison-Berg allotment.

Concerning maps identifying bighorn sheep habitat, the map of bighorn sheep habitat utilized was the map of GIS-modeled bighorn sheep habitat as prepared by the Payette National Forest. This map is titled "Bighorn Sheep Telemetry, Habitat, and Sheep Allotment." The map shows summer bighorn sheep habitat. This map is an update of the map found at Figure 4 of the Payette Risk Analysis on page 40. The GIS habitat model used was modified from a model developed by Idaho Department of Fish and Game for Hells Canyon. Using the same data from the Payette "Bighorn Sheep Telemetry, Habitat, and Sheep Allotments" map the Nez Perce produced a map showing just the modeled GIS habitat on the Allison-Berg allotment. This map is titled "Allison-berg Allotment and Bighorn Sheep Habitat."

Also considered in this risk assessment are the recent sighting records of bighorn sheep in or adjacent to the Allison-Berg allotment. Recent observations are summarized in the document "Recent Bighorn Sheep Observations In or Near Allison-Berg Allotment."

Based on the above information a risk assessment was conducted for the Allison-Berg allotment. The risk assessment is attached. The March 21, 2008, risk assessment concluded, utilizing the factors considered in the Payette Risk Analysis, that the risk of contact for the Allison-Berg allotment is "High/Very High."

**Interim Strategy and Best Management Practices**
Best Management Practices (BMPs) have been developed by the Idaho Department of Fish and Game, the permittee, and the Forest Service for the Allison-Berg Allotment as part of the Idaho Fish and Game Commission's *"Interim Strategy for Managing Separation between Bighorn Sheep and Domestic Sheep"*. These BMPs are designed to reduce the risk of contact between domestic and bighorn sheep.

Additional guard dogs, herders, bedding the sheep at night, and "pop guns" are designed to discourage bighorn sheep from entering the area where domestic sheep would be grazing. With additional herders and on-site observers during the grazing period, the intent is to be able to better detect or not bighorn sheep in the area of the domestic sheep. This would lead to prompt notification of responsible officials to take appropriate action if contact is suspected. Counting of sheep would identify the amount of missing domestic sheep. However, the ability to determine cause of missing sheep is difficult given the terrain and presence of predators. Keeping sick or diseased sheep off of the allotment would reduce the potential for disease transmission between domestic and bighorn sheep on the range. All these factors are intended to reduce the risk of contact between domestic and bighorn sheep on the Allison-Berg Allotment.

**Conclusion**
The development of Best Management Practices by both the Forest Service and the Idaho Department of Fish and Game, in conjunction with the permittee, help to reduce the risk of contact between domestic and bighorn sheep. However, given that the terrain is steep, rugged, and has dense vegetation in the higher portions of the allotment, the ability to accurately account for all of the domestic and bighorn sheep would be difficult even with additional observers, herders, guard dogs and the use of telemetry equipment. The presence of predators also adds a degree of complexity to managing the domestic sheep.

Grazing domestic sheep for only 4-6 weeks and only on the western portion of the allotment also helps by concentrating the domestic sheep away from the radio-collared sheep further upstream. However, bighorn can move long distances and the separation of three miles from the main Salmon River population of bighorn sheep may not be adequate.

2

The use of these Best Management Practices would reduce the risk of contact slightly, but only to a level of "MODERATELY HIGH". Even with the reduction in the length of the grazing season and the limited amount of area identified to be grazed this spring along with the BMPs, there could still be the potential for contact with the presence of bighorn sheep in close proximity to domestic sheep.

Prepared by:

/s/ Joanne M. Bonn

Joanne M. Bonn
Wildlife Biologist
Salmon River Ranger District
Nez Perce National Forest

Reviewed by:

Timothy J. Schommer

USDA Forest Service
National Bighorn Sheep Biologist
Wallowa-Whitman National Forest

Citations:
Idaho Department of Fish and Game, 2008. "Bighorn Sheep Distribution" map (draft)

Payette National Forest. 2006. Risk analysis of disease transmission between domestic sheep and bighorn sheep on the Payette National Forest. Unpublished Report. USDA Forest Service, Payette National Forest. McCall, Idaho. (41 pp).

Payette National Forest, 2008. "Geographic Population Ranges" map.

Nez Perce National Forest, 2008. "Allison-Berg Allotment and Bighorn Sheep Habitat" map.

Nez Perce National Forest, 2008. "Recent Bighorn Sheep Observations In or Near Allison-Berg Allotment."

3

BLM_0127083

May 23, 2008

**ALLISON-BERG ALLOTMENT**
**BIGHORN SHEEP RISK ASSESSMENT**

**Note: This document has been revised from the March 21, 2008 version, to evaluate the Best Management Practices (BMPs) developed to reduce the risk of contact between domestic and bighorn sheep.**

| Risk Factors | Assessment |
|---|---|
| 1- Distance between sheep allotment and nearest bighorn sheep populations. | Eastern boundary of the Allison-Berg allotment is Robbins Creek. Figure 1 included in the Payette Risk Analysis identified the range of bighorn sheep populations in the Salmon River as extending west to the Allison-Berg allotment boundary with the Risk Analysis stating [t]he Allison-Berg domestic sheep allotment on the Nez Perce NF is located adjacent to the range of bighorn sheep along the Salmon River (Figure 1)." (Payette Risk Analysis at 10; see also Docket #72.4 Exhibit C and Docket #72.5 Exhibit D. However, the recent draft map prepared by the Idaho Department of Fish and Game (March 2008) titled "Bighorn Sheep Distribution" map shows bighorn sheep distribution on both sides of the Main Salmon River from Riggins east encompassing the entire length of the Allison-Berg allotment. In addition, the Geographic Population Ranges map developed by the Payette National Forest (February 2008) shows the population ranges for the Salmon River bighorn sheep population extending from Riggins eastward up the river encompassing again the entire length of the Allison-Berg allotment. Both of these recent maps extend the bighorn sheep range to include the entire allotment. Guidelines adopted by the BLM and the Western Association of Fish and Wildlife Agencies (WAFWA) suggest that bighorn sheep and domestic sheep be spatially separated by buffer strips of 13.5km (8.4 miles) except where topographic features or other barriers minimize contact between native sheep and domestic sheep. Payette Risk Analysis at 4. According to Schommer and Woolever (2007, WAFWA guidelines), in continuous habitat, buffer zones may not be effective in reducing the opportunity for interaction and that buffer zones may have to be determined on a case by case situation. Of the three allotments directly across the Salmon River from the Allison-Berg allotment two are in complete non-use to protect bighorn sheep populations and one allotment has the portion of the allotment closest to the Salmon River in non-use. Two of these allotments were rated "Moderate" and one rated "High." |
| 2- Amount of GIS modeled bighorn sheep habitat within the sheep allotment, between the allotment and the nearest bighorn sheep herd, and the relative continuity of that habitat. | Based on the mapping efforts of bighorn sheep habitat by the Payette National Forest, the allotment does contain habitat. Habitat consists of upland grasslands, altered grasslands, mountain mahogany, bitterbrush, shadscale, exposed rock, barren areas, snow fields, all forest types with <=10% canopy cover on slopes between 31 and 85 degrees. GIS modeled bighorn sheep habitat shows continuous habitat on the north side of the Salmon River with approximately 286,000 acres of bighorn sheep habitat on the NPNF. Approximately 32% (or 12,230 acres) of the 37,250 acre Allison Berg allotment has been modeled as bighorn sheep habitat. See Payette National Forest "Geographic Populaiton Ranges" map and Nez Perce National Forest "Allison-Berg Allotment and Bighorn Sheep Habitat" map utilizing the Payette habitat data. (See also prior maps provided as Docket #72-5 Exhibit D and Figure 4 of Payette Risk Assessment 2006). |
| 3- First hand knowledge of the amount and quality of bighorn habitat within the allotment and around the allotment. | Bighorn sheep habitat exists on the Allison-Berg allotment in the form of grasslands with occasional rocky outcrops/cliffs low on the slope. The grasslands contain the native bluebunch wheatgrass community, however, it is in a somewhat disturbed state because of areas inundated with cheatgrass and rush skeletonweed and other weedy species. The quality of the habitat is generally good. |
| 4- Presence of incidental bighorn sightings within or near the allotment. | Recent sightings of bighorn sheep within the allotment boundary. See "Recent Sightings of Bighorn Sheep In or Near the Allison-Berg Allotment." The Nez Perce NF is conducting periodic visits to the allotment during the grazing season to record and verify sightings of bighorn sheep within the allotment. Bighorn sheep have been detected on the allotment by Forest Service employees on January 10, 2008 (6 rams), and one ram and one ewe on February 14, 2008. |

| 5- The level of knowledge about bighorn sheep distribution and movements in the area around the allotment. | There is a lack of knowledge about bighorn sheep distribution and movements in and around the allotment (other than sighting observations).  The Nez Perce National Forest along with the Payette National Forest, IDFG and the BLM are supporting efforts to study bighorn sheep to obtain data on the Salmon River population through collaring and tracking bighorn sheep.  Bighorn sheep were captured and collared in November and December 2007.  Capture operations have continued through the winter to focus on collaring additional bighorn sheep along the lower end of the study area from Riggins up to Wind River.  To date, five monitoring flights have been conducted to monitor movement of collared sheep.  Collared sheep were located on lower slopes close to their original capture location.  Data is just beginning to be collected from this study.  As of March 14, 2008, the Idaho Department of Fish and Game were able to locate bighorn sheep on the allotment near Manning Crevice Bridge and Chamberlain Gulch and outfit 4 rams with radio collars. |
|---|---|
| 6- Characteristics of the sheep allotment such as number of permitted sheep and permitted season of use. | The allotment is bounded on the west by the forest boundary, the east by West Fork Robbins Creek, and the south by the Salmon River.  The northern boundary of the allotment runs from Lightning Creek Saddle to Nut Basin to Looking Glass Butte.  The allotment is managed as two pastures, Berg Mountain (west pasture – roughly the forest boundary east to Allison Creek) and Kelly Mountain (east pasture – Allison Creek east to Robbins Creek).  The most northern portion of the allotment near Nut Basin is in non-use.  Domestic sheep grazing is permitted from April 1st through July 7th for spring/summer (1632 ewes/lambs) and again October 28th through March 1st for fall/winter use periods (2450 ewes).  During the fall grazing season, domestic sheep are in small bands scattered low along the south boundary of the allotment (the elevation of the snow depicts were the grazing areas are in the fall/winter).  The allotment was not grazed in the fall/winter 2007-2008.  The permittee had agreed to measures to minimize contact with bighorn sheep that included herder presence occurring daily on the eastern edge of the area being grazed to maintain separation and interaction with bighorn sheep.  However, it was determined by the Nez Perce NF that due to the recent sightings of bighorn sheep during the grazing season the measures to minimize contact were not adequate.  The spring/summer grazing areas are higher on the slope above the areas that are grazed in the fall/winter.  In the spring/summer grazing methods include a daily herder who camps with the sheep.  In addition, the sheep are gathered together at night.  There still remains the possibility that not all sheep are gathered, the inability to know whether there is interaction at night, and the inability to watch all sheep at all times.  In terms of potential contact with bighorn sheep it is believed that bighorn sheep travel to higher elevations in the Gospel Hump Wilderness during the summer (Jay Crenshaw, IDFG personal communication).  However, IDFG has identified Unit 14 as containing scattered bighorn sheep and the spring/summer grazing occurs on mapped bighorn habitat.  Given this information, the potential for contact during the spring/summer domestic sheep grazing season is less than that of the fall/winter grazing season.  However, it is not possible to ensure that there will be no contact. |

Based on the above the Allison-Berg allotment rating for risk of contact is "HIGH/VERY HIGH" based on the following key factors:  1) the Allison-Berg Allotment contains bighorn sheep habitat (as mapped by the Payette) which shows habitat continuous along the north side of the Salmon river from Riggins upstream;  2) recent and continued sightings of bighorn sheep on the allotment; 3) the distribution or range of bighorn sheep mapped (by the Payette and IDFG) as extending the length of the allotment from Riggins east up the river, and 4) the tendency for rams to wander longer distance particularly in the fall during the rut and the potential that movement of bighorn sheep in the spring/summer could lead to contact with domestic sheep.

**Best Management Practices (BMPs)**

On February 14, 2008, the Idaho Fish and Game Commission endorsed an "*Interim Strategy for Managing Separation between Bighorn Sheep and Domestic Sheep*".  This interim strategy provides guidance for developing management strategies at the allotment level to provide spatial and temporal separation between bighorn sheep populations and domestic sheep and goats.  Best Management Practices have been developed to reduce the risk of contact between domestic sheep and are outlined in a "*Strategy for Managing Separation between Bighorn Sheep and Domestic Sheep and Goats in the Salmon River Area*".  The following BMPs include those from the Salmon River Sheep Strategy (dated May 20, 2008), as well as those developed by the Nez Perce National Forest (letter dated May 12, 2008 to Jim Unsworth-IDFG) are summarized below.

1) Addition guard dogs, herders, and bedding the sheep closely at night, and the use of "pop guns" to discourage bighorn sheep from entering area
2) Observers on all directional sides of the domestic sheep to locate bighorn sheep during the grazing period on the allotment
3) Counting the domestic sheep going onto and off the allotment, providing one marker sheep for every 25 head of domestic sheep, conducting weekly counts, and counting marker sheep three times a day and notifying USFS and IDFG if counts reveal domestic sheep are missing
4) Use of satellite phones to notify agencies and other responsible officials when bighorn sheep are within 1 mile of domestic sheep
5) Use of radio telemetry equipment to track radio-collared bighorn sheep
6) Do not turn sick or diseased domestic sheep out on the allotment

Case No. 1:20-cv-02484-MSK   Document 65-4   filed 04/29/21   USDC Colorado   pg 143 of
160
Case 4:07-cv-00151-BLW   Document 153-5   Filed 09/23/2009   Page 8 of 18

**Review of Risk Factors**

Risk Factor #1 – Distance between sheep allotment and nearest bighorn sheep population: bighorn sheep radio-collared in January and February 2008. Those bighorn sheep have not moved appreciatively from their capture and collar location near Manning Crevice Bridge and Wind River.

Risk Factor #2 – Amount of GIS modeled habitat: no change

Risk Factor #3 – Knowledge of bighorn habitat: no change

Risk Factor #4 – Presence of incidental bighorn sheep sightings: no change

Risk Factor #5 – bighorn sheep distribution and movement: Information to date regarding the movement of the bighorn sheep collared near Manning Crevice Bridge and Wind River show that the bighorn sheep have not moved appreciable from the location that they were collared (Mack May 13, 2008 flight log). No additional observations of bighorn sheep on or near the Allison-Berg Allotment have been reported to the Nez Perce National Forest since March 2008.

Risk Factor #6 – Number of domestic sheep permitted and season of use: What is being evaluated for the purposes of this review is what is left of the 2008 spring grazing season (end of May to July 7, 4-6 weeks). In addition, the proposal is to only have grazing on the west half of the allotment from the Forest boundary near Riggins, Idaho, east to Allison Creek.

**Analysis of Best Management Practices**

1) Observers, "pop guns", and additional herders and guard dogs can help discourage bighorn sheep from using the same general area that domestic sheep are in. However, given the terrain (steep, rugged, highly dissected, brushy and timbered as move up in elevation, rocky outcrops), there is not guarantee that all the bighorn sheep and domestic sheep can be accounted for. There is no way to guarantee that bighorn sheep are not in the area if observers can't see more than from the ridge to the draw, sometimes only a few hundred yards or so. Sometimes the draws are heavily vegetated with shrubs and/or timber making observing domestic sheep, let alone bighorn sheep difficult.
2) Observers and bedding domestic sheep closely at night may have limited success. Observers would only be out during daylight hours, not at night when bighorn sheep are more apt to move, especially with the weather starting to get warmer. There is no way to assess whether bighorn sheep have come in contact with domestic sheep or guarantee separation.
3) The presence of predators is high. There is a high likelihood that predators may get into the flock of domestic sheep and scatter the animals either during the day or at night. This makes it difficult to account for all of the domestic sheep.
4) The counting of domestic sheep and the frequency of the count does not account for why the count is off and where the domestic sheep are. The domestic sheep could be hiding in a draw or behind vegetation or a rock; could have fallen and become injured or died; or injured or killed by predators. There is no way of accounting for the loss or the level of contact or not.
5) Having measures in place (satellite phones, radio telemetry equipment) so that if bighorn sheep come in close proximity to domestic sheep (1-2 miles) appropriate measures can be taken to reduce that potential for can also help in reducing the potential for contact. However, there is no guarantee that the radio telemetry equipment or the satellite phones will work in steep, high dissected, rugged terrain. Keeping track of radio-collared bighorn sheep lets us know the location of radio-collared bighorn sheep, not ones that are not radio-collared.
6) Having healthy domestic sheep on the allotment is always a plus and a sign of good livestock husbandry. Sick, injured, and/or diseased domestic livestock will straggle behind the rest of the herd and could possibly attract predators that could get into the rest of the flock and scatter the animals. There is also no guarantee that bighorn sheep are not in the area and won't come in contact with domestic sheep even with all the observers in place.
7) Grazing only the west half of the allotment would concentrate domestic sheep away from the radio-collared sheep that are further upstream. However, the radio-collared sheep are only three air miles to the east of Allison Creek. In 2007, two observations of un-collared bighorn sheep were reported within close proximity to the western portion of the Allison-Berg Allotment. One near the western edge of the allotment and one close to Allison Creek. Given that bighorn sheep habitat is considered to be continuous within the Allison-Berg Allotment and that bighorn sheep can move considerable distances, the distance between the collared bighorn sheep within three miles of domestic sheep and the wandering un-collared bighorn sheep is not adequate to guarantee that bighorn sheep won't wander into the domestic sheep flock.

Case No. 1:20-cv-02484-MSK   Document 65-4   filed 04/29/21   USDC Colorado   pg 144 of
160
Case 4:07-cv-00151-BLW   Document 153-5   Filed 09/23/2009   Page 9 of 18

**Conclusion**

The development of Best Management Practices by both the Forest Service and the Idaho Department of Fish and Game, in conjunction with the permittee, help to reduce the risk of contact between domestic and bighorn sheep. However, given that the terrain is steep, rugged, and has dense vegetation in the higher portions of the allotment, the ability to accurately account for all of the domestic and bighorn sheep would be difficult even with additional observers, herders, guard dogs and the use of telemetry equipment. The presence of predators also adds a degree of complexity to managing the domestic sheep.

Grazing domestic sheep for only 4-6 weeks and only on the western portion of the allotment also helps by concentrating the domestic sheep away from the radio-collared sheep further upstream. However, bighorn can move long distances and the separation of three miles from the main Salmon River population of bighorn sheep may not be adequate.

The use of these Best Management Practices would reduce the risk of contact slightly, but only to a level of "MODERATELY HIGH". Even with the reduction in the length of the grazing season and the limited amount of area identified to be grazed this spring along with the BMPs, there could still be the potential for contact with the presence of bighorn sheep in close proximity to domestic sheep.

Prepared by:

/s/ *Joanne M. Bonn*

Joanne M. Bonn
Wildlife Biologist
Salmon River Ranger District
Nez Perce National Forest

Reviewed by:

Timothy J. Schommer

USDA Forest Service
National Bighorn Sheep Biologist
Wallowa-Whitman National Forest



BLM_0127088

## NEZ PERCE NATIONAL FOREST BIGHORN SHEEP RE-EVALUATION

### MAY 28, 2008  TIM SCHOMMER

On March 28, 2008 I conducted a field review of the Allison-Berg Allotment on the Nez Perce National Forest. My report consisted of 3 parts: 1) verifying the habitat, 2) reviewing recent bighorn sightings, and 3) evaluating whether effective separation was possible. I concluded that it would be "extremely difficult" to keep the two species separate.

Recently, the Nez Perce National Forest has asked me to re-evaluation that conclusion based on three additional mitigation factors: 1) applying the "Best Management Practices". 2) grazing the west side of the Allotment only (west of Allison Creek), and 3) what remains of the grazing season (approx. June 1 to July 7).

**Evaluation of BMP's:**

The "Best Management Practices" are described in the "Strategy for Managing Separation between Bighorn Sheep and Domestic Sheep and Goats in the Salmon River Area", and the May 12, 2008 letter from District Ranger Darcy Pederson to IDFG (Jim Unsworth).

The Allison-Berg Allotment has some of the most rugged, steep, and rocky domestic sheep grazing that I have seen anywhere. Consequently, the ability to control domestic sheep and maintain sight of them will continue to be very difficult. The necessity of "Loose Herding" further complicates the control and location of all domestic sheep. Visibility in the Salmon River breaks is difficult due to the rocky terrain and equally difficult above the Salmon River breaks due to extensive brush and trees.

The use of propane guns to scare away bighorns will likely have little success, since the bighorn sheep in this area are not hunted and do not associate a negative effect from a loud noise. I would also expect the bighorns to get used to the noise in 2-3 days, like we have experienced with deer and elk in Northeast Oregon.

The use of guard dogs will likely have limited success in keeping the two species separate. These dogs are designed to protect domestic sheep from predators, not other sheep. Some guard dogs have shown to be quite tolerate of bighorn sheep (see attached photo).

Extra observers will help locate bighorn sheep and improve control of domestic sheep during daylight hours. However, I expect the largest movement of bighorn sheep during the period from very late evening to very early morning. At this time, observers will not be working.

The state (IDFG) and Allison-Berg Allotment Permittee have reported high populations of bears, lions, coyotes, and wolves in the allotment area. These predators can frequently

BLM_0127089

get into domestic sheep flocks, kill some, and spread others in various directions. Often this is at night, making separation and finding domestics even more difficult.

Close monitoring of radio-collared bighorn sheep will help reduce risk of contact. Bighorn sheep with radio-collars are frequently hard to locate in steep remote country such as the Allison-Berg Allotment. Many times we just can't complete a visual on them even though we know they are very close. Un-collared bighorn sheep are even harder to find and see than collared bighorns. Consequently, separation of un-collared bighorns with domestic sheep will be difficult.

The counting of marked domestic sheep (1 in 25) will help a little with losses of large numbers of domestic sheep. However, what is important here is the loss of individual domestic sheep. It only takes one domestic sheep to led to massive die offs of bighorn sheep. Recently, one domestic sheep male was reported to have lead to a massive die-off of 3 interconnected bighorn populations in central Colorado (George et al 2008, Epidemic Pasteurellosis in a bighorn sheep population coinciding with the appearance of a domestic sheep, Journal of Wildlife Disease).

On the Wallowa-Whitman NF in the 1990's, we used most of these "Best Management Practices" on the Temperance and Sheep Creek Allotments for the purposes of keeping the two species separate. Habitat in those two allotments is very similar to the continuous river breaks country of the Allison-Berg Allotment. The distance between all three allotments (both forests) is less than 20 air miles. We had buffers between the two species up to 25 air miles. We required the permittees to use extra herders and guard dogs, count marker sheep and continuously pick up strays, and pen the sheep at night. The Oregon Department of Fish and Wildlife (ODFW) was required to closely monitor radio-collared bighorn sheep. All of these practices combined did not maintain effective separation between the two species, despite investing a lot of time and energy into it. Several bighorn sheep were killed, which either contacted domestics or stray domestics joined with bighorn sheep herds. Despite killing these bighorn sheep, contact between the two species lead to several bighorn sheep disease dieoffs. We could not keep the species separate because the bighorn sheep habitat was continuous, domestic sheep strays were not always found, predators scattered the flocks, bighorn ewes and rams were attracted to domestics, poor ability to control domestics, and the country was remote and vast.

**Evaluation of using West Half Only:**

The use of only the west half of the Allison-Berg Allotment will help a little by concentrating the domestic sheep into a smaller area and further from radio-collared bighorn sheep. However, radio collared bighorn sheep are only three air miles to the east of Allison Creek. In 2007, two observations of un-collared bighorn sheep were reported within close proximity to the western portion of the Allison-Berg Allotment. One near the western edge of the allotment and one close to Allison Creek. Given that bighorn sheep habitat is considered to be continuous within the Allison-Berg Allotment and that

bighorn sheep can move considerable distances, the distance between the collared bighorn and domestic sheep is not likely to provide effective separation.

In addition, last week the Nezperce Tribe reported a new lambing area with eight ewes and 9 lambs in the Wind River area. This area is about 4 miles from the eastern boundary of the Allison-Berg Allotment. This indicates the potential for contact between the two species is with both rams and ewes and therefore, any rams that are infected with deadly pathogens may contact bighorn ewe groups upriver.

**Evaluation of Rest of Season:**

There is not much time left in the grazing season, which could be from approximately June 1 to July 7. Since the time period is short, the probability of contact will be reduced.

**Conclusion:**

In my opinion, the 3 mitigation factors listed above will only slightly reduce the risk of contact between the two species. The risk rating of High/Very High from the Allison-Berg Allotment Bighorn Sheep Risk Assessment (3/08) would be reduced to only a Moderately High rating.

Tim Schommer
National Forest Service Bighorn Sheep Biologist



BLM_0127092

**To:**    Jim Wickel, Region 1 Rangeland Program Leader

**From:**  Mary Beth Hennessy, Inyo National Forest Resources Staff

**Date:**  June 4, 2008

**Re:**    **Inyo National Forest Domestic-Wild Sheep Contact Prevention Practices**

The Inyo National Forest administers a domestic sheep allotment (Rock Creek) adjacent to endangered Sierra Nevada bighorn sheep ( *Ovis canadensis sierrae*) occupied habitat with concurrence from the U. S. Fish and Wildlife Service (FWS). To date, there have not been any documented instances of negative impacts to wild sheep resulting from domestic sheep operations within the allotment. The mitigations used, the rigor in implementing the practices by the permittee, the presence of a four-lane divided highway, natural topographic and vegetative features, and non use of the unit (Rock Creek Unit) in closest proximity to the occupied habitat, have all contributed to the success of the program.

<u>Background</u>

The Rock Creek Allotment is located entirely in Mono County, California. The allotment is located east of the Sierra crest in a foothill area consisting of rolling hills, steep non-glaciated ridges and alluvial fans ranging in elevation from 6,000-9,000 feet. The four contiguous units of the Rock Creek Allotment cover approximately 12,342 acres with an additional 1,725 acres within the disjunct Hilton Unit. The allotment is comprised primarily of bitterbrush/sagebrush vegetation with riparian vegetation along Lower Rock Creek, Birch Creek in the Witcher Meadow area. Coniferous forest, consisting of both Jeffrey and pinyon pine is present along the south and west portions of the allotment which abut Wheeler Crest.

Sierra Nevada bighorn sheep (SNBS) were emergency listed as endangered in 1999 followed by a final rule granting endangered status in January 2000. The primary threats to SNBS were identified as predation by mountain lions and disease transmission by domestic sheep.

There are currently about 400 of these unique animals in eight small but increasing populations comprising three distinct management units of SNBS. The Wheeler Ridge herd is one of these populations and is in proximity to the Rock Creek allotment. The total number of rams on Wheeler Ridge is above 50 animals (Fourth Quarter Report of the Sierra Nevada Bighorn Sheep Recovery Program, 2007).

The southern portion (Rock Creek Unit) of the Rock Creek sheep allotment borders the northern end of Wheeler Crest. The Crest is a massive granitic ridge which juts out from the main Sierra escarpment in a northeasterly direction. It has steep escarpments on the north and east sides, gentler escarpments on the west side, and joins the Sierra range on the south end. According to SNBS expert Dr. John Wehausen, occupied SNBS habitat is limited to the southern two-thirds of the Crest, probably due to more favorable winter range and lamb rearing habitat at the southern end. The north escarpment and northern third of the eastern escarpment is considered as potential but lower-value bighorn habitat, which has served as an apparent buffer between domestic sheep and the bighorn themselves during the last two decades the herd has been occupying the Crest.

It is conceivable that a wandering domestic sheep from the allotment could climb the ridge and walk south for several miles into bighorn habitat. To reduce the probability of this occurring, the

1

BLM_0127093

Inyo National Forest modified the southern boundary of the allotment to exclude a strip of approximately 1280 acres as a buffer to potential habitat on Wheeler Crest and as part of a larger buffer to occupied habitat. With this buffer in place, the distance between the sheep allotment and occupied bighorn habitat is approximately 4-5 miles. The buffering distance between the allotment and potential SNBS habitat on the north escarpment varies between one mile and one-half mile of uneven, fairly rugged terrain with large patches of brush, Jeffrey or pinyon pine. A moderately steep-sided canyon (Birch Creek) also separates the allotment from potential habitat.

Mitigations

The Inyo National Forest requested concurrence from FWS to graze domestic sheep on portions of the Rock Creek allotment in 2000 and has been operating under concurrence direction from a letter dated August 22, 2000. The Forest has not changed the direction in subsequent operating years, indicating that change to the direction would be in response to newer science in regards to minimizing contact and the potential for disease transmission from domestic sheep to wild sheep.

During the past 6 years, a Recovery Plan was drafted and finalized (September 2007) while a "risk assessment" team has been developing an approach for assessing risk of contact between Sierra Nevada bighorn sheep and domestic sheep. The risk assessment document provides the most recent scientific information, including habitat suitability informed by GPS collared bighorn and modeling of potential movement. The process provides land managers and livestock managers a tool for determing risk and identifying ways to prevent contact. The Risk Assessment is currently in draft and could be finalized within the next 6 months. The Inyo NF has participated on this team over the past several years and incorporated draft approaches into our request to USFWS for concurrence on operating practices for continued grazing.

The Annual Operating Instructions (AOI) allow 1,000 to 1,500 pregnant ewes to enter the southern unit of the Rock Creek allotment for the period (normally) from August 14-September 15, with up to two weeks variation on either end depending on resource conditions, and with more dramatic variations in numbers and summer season in the event of unusual resource conditions. The season of use coincides with a time of year when SNBS are least likely to be in the lower elevations of Wheeler Crest, thus minimizing their potential of contact with domestic sheep. The class of domestic sheep (pregnant ewes) is unlikely to attract wandering bighorn rams searching for ewes in estrus. Furthermore, the heavy ewes are in the least mobile condition for a sheep to be in. Descending into Birch Creek and ascending up the south side of the canyon would be highly unattractive to these animals who already have excellent watering facilities and easily accessible forage on the gently sloping, open bitterbrush terrain that is available for grazing to the north.

Language in the annual operating instructions that outlines current required practices with concurrence from FWS is detailed below:

CURRENT (2007) ANNUAL OPERATING INSTRUCTIONS (AOI)

The following language comes from the 2007 AOI for the Rock Creek Allotment.

The following mitigation measures outlined in the Interagency Domestic Sheep Management Strategy (2001) are required to protect endangered Sierra Nevada bighorn sheep from the threat of disease transmission from domestic sheep on Rock Creek Allotment:

2

BLM_0127094

1. The permittee shall notify the Forest Service at least 24 hours before entering the allotment.
2. The permittee shall count all individual sheep upon entering and exiting the allotment. 100% counts will also be conducted following any type of scatter event. This number should be provided to the Forest Service within 24 hours of the count (recommend Forest Service range personnel accompany counts).
3. The permittee shall use marker sheep at a ratio of at least 1 to 35 (1 to 20 is recommended).
4. The permittee is responsible for assuring all permitted sheep are accounted for at all times. A combination of 100% counts and marker sheep counts is a critical tool in meeting this permit requirement. A daily log of sheep numbers and counts will be maintained by the permittee's representative (herder or camptender). The permittee shall conduct daily counts of marker sheep following any significant change in sheep distribution (after leaving bed grounds, trailing, or movement to new feeding areas, etc). These counts will be documented in the log. Sheep mortality and sheep removed from the allotment due to sickness will also be documented. The log will be provided to the Forest Service at the end of the season and any time upon request.
5. The Forest Service and the permittee shall develop a detailed escape management plan in the event a stray is detected, where the agency is notified immediately and comprehensive measures are taken to recover the stray sheep as follows:

   If at any time during the grazing season a domestic sheep is unaccounted for, the permittee will notify the Forest Service immediately, as follows: a person-to-person conversation, in addition to leaving telephone recorded messages, starting with **Tamara Sawinski (760) 924-5535 or 934-7026; Jon Regelbrugge 760-914-0797, Mary Beth Hennessy (760) 873-2404; or Forest Dispatch (760) 873-2405.** The permittee will assist the Forest Service with immediate search actions to locate missing or dead sheep as soon as practical by road, foot, horseback, helicopter, fixed wing, climbing, or tracking dogs. Areas will be searched first that are most likely for domestic sheep to move into, as well as searching bighorn habitat. Discrepancies in sheep numbers identified by the Forest Service during the post-season counts or evaluation of count records will also trigger a comprehensive search (as described above) for missing animals.

6. The permittee shall ensure all sheep that arrive on Rock Creek Allotment west of Hwy 395 are confirmed to be in their third trimester of pregnancy. The Rock Creek Unit near Witcher Canyon and the base of Wheeler Crest were determined to be High Risk areas due to proximity of domestic sheep and bighorn and the lack of physical barriers. The Hilton Unit was determined to be Low Risk area due to significant distance between domestic sheep and bighorn, physical barriers, and non-concurrent timing of domestic sheep operations. **Note: The Rock Creek Unit is closed due to Birch Fire.**
7. During the time spent on the allotment west of Hwy 395 the permittee shall conduct one mid-season full count, document any mortality or removal of sick or injured animals, and provide this information to the Forest Service within 24 hours of the count **(Hilton Unit only in 2007).**
8. After using the allotment west of Hwy 395, the permittee shall assist the Forest Service to conduct a post-season sweep. The post-season sweep will consist of checking the Hilton Unit and along Hilton Creek (adjacent to allotment boundary) for any sign of fresh sheep tracks or actual sighting of stray animal(s).

During the past 3 years, monitoring of radio collared bighorn rams has shown an increase in their movement outside of traditional habitat. Their movements have been closer in proximity to domestic sheep in the June Lake, Rock Creek, Sherwin/Deadman, McGee Creek and Casa Diablo allotments. The Forest's review of this tracking data did not result in identifying a higher risk level for these allotments. At this time, the Forest did not reinitiate consultation with U.S. Fish and Wildlife Service (FWS).

3

BLM_0127095

The Forest Service has requested from California Department of Fish and Game (CDFG) weekly updates (minimum) on bighorn monitoring results, with immediate notification of both the Forest Service and the affected permittees if their monitoring indicates an increased risk of contact between domestic and wild sheep. **If notified directly by CDFG that bighorn sheep have been sighted in or near your allotment, the permittee is authorized to deviate from the grazing schedule as necessary to accommodate moving your domestic sheep band away from the sighting location.**

If bighorn sheep are observed in close proximity of a domestic sheep band, the permittee will immediately notify the Forest Service and CDFG. If a possible nose-to-nose contact occurred, the CDFG will determine whether to pursue take authority from FWS. **Contacts with CDFG are Dr. Vern Bleich at 760-872-1137 or 760-937-5020 (cell); Dr. Tom Stephensen at 760-873-4305 or 760-937-0238; or Becky Pierce 760-873-7452 or 760-937-0138.** Forest Service contacts are listed above.

### Non Use of Rock Creek Unit due to Birch Fire

Due to the extent and intensity of the Birch Fire in 2002 it was necessary to rest the Rock Creek Unit. This unit is the furthest south in the Rock Creek Allotment and in closest proximity to the areas utilized by the Wheeler Ridge herd. Approximately 1,834 acres of the 2,500 acres burned at a moderate intensity consuming all of the living vegetation within the area. The closure affected an average of 1600 Head Months (HMs) of the 4500 total permitted HMs. This action reduced the permitted HMs to 2900 until the vegetation reaches standards described in the letter from District Ranger. This has provided even more of a physical buffer between the wild and domestic sheep, contributing to success of contact prevention on the Rock Creek Allotment.

### Summary

The Rock Creek Allotment has operated without incident of domestic/wild sheep contact for the past 8 years since listing of the Sierra Nevada bighorn sheep. This is due to the use of best science utilizing the risk assessment team's recommendations as they have evolved. The team is made up of interagency scientists, land and resource managers and sheep producers and has worked on quantifiable means of predicting risk and measures that mitigate the risks of contact. Secondly, these practices have been rigorously embraced and carefully implemented by the permittee which has contributed to the success of the program. Finally, one of the more problematic units of the allotment, the one in closest proximity to the wild sheep herd, has been temporarily closed for resource protection since 2002, which further reduces the probability of contact between wild and domestic sheep. Together these measures and circumstances have led to a successful program to date, the measures listed in the AOI for responding to a contact have never needed to be implemented.

4

BLM_0127096

Lauren M. Rule (*ISB # 6863*)
ADVOCATES FOR THE WEST
PO Box 1612
Boise ID 83701
(208) 342-7024
lrule@advocateswest.org

Attorney for Plaintiff Western Watersheds Project

Jennifer R. Schemm (*OSB #97008*)
602 "O" Avenue
La Grande, OR 97850
(541) 962-0860
jschemm@oregontrail.net

Attorney for Plaintiffs Hells Canyon Preservation Council and The Wilderness Society

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT et al, | ) | |
| | ) | Case No. 07-151-BLW |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | **FIFTH DECLARATION** |
| U.S. FOREST SERVICE, BUREAU OF LAND MANAGEMENT, and SECRETARY OF INTERIOR KEN SALAZAR, | ) ) ) | **OF VICTOR L. COGGINS** |
| | ) | |
| Defendants. | ) | |
| | ) | |

I, Victor L. Coggins, with full knowledge of the penalties for perjury, declare as follows:

1.   In my first declaration I described my qualifications and experience related to interactions between bighorn sheep herds in Hells Canyon and domestic sheep, and the resulting detrimental impacts to the bighorn sheep populations. *Declaration of Victor Coggins* ¶¶ 1-5, 40 (qualifications and experience)(Dckt. No. 9). I discussed in detail the impacts on these herds from domestic sheep grazing on the Smith Mountain and Curren Hill allotments on the Payette National Forest. *Id.* ¶¶ 22-56. I have filed four subsequent declarations expounding upon these matters and issues of domestic sheep trailing, the significance of telemetry data, and the effectiveness of various management practices in preventing interactions between domestic and bighorn sheep. This information remains true and accurate and supports my opinions and conclusions in this fifth declaration.

2.   I am submitting this declaration to discuss the effectiveness of the best management practices ("BMPs") proposed to be implemented on the Partridge Creek allotment within the BLM Cottonwood Field Office in Idaho. My opinion is based on my experiences with the implementation of similar practices in Hells Canyon and other locations in Northeast Oregon.

The BMPs for the Partridge Creek allotment cannot ensure effective separation between domestic and wild sheep.

3.   Based on my forty-two years of experience as a state wildlife biologist, over thirty of which have focused on bighorn sheep in Hells Canyon, a terrain similar to the Salmon River Canyon, my opinion is that the proposed BMPs for the Partridge Creek allotment cannot guarantee separation. Rather, they will merely reduce risk compared to previous years.

4.   In continuing to allow domestic sheep grazing on the Partridge Creek allotment this fall, the BLM is relying on numerous BMPs in an attempt to keep domestic sheep and bighorn sheep separated. *See Fifth Declaration of Lauren M. Rule, Ex. 9* (BMP Plan for Carlson Livestock).

FIFTH DECLARATION OF VICTOR L. COGGINS - 1

BLM_0127098

5.  To the best of my knowledge, these BMPs were not peer reviewed by any bighorn sheep experts.  Further, in my opinion, no bighorn sheep expert would find that the BMPs proposed for the Partridge Creek allotment would ensure separation between bighorn and domestic sheep in occupied bighorn sheep habitat such as the Partridge Creek allotment.

6.  The underlying premise for these BMPs is that separation between domestic and bighorn sheep is not necessary after a bighorn sheep population has been exposed to disease-causing bacteria from previous encounters with domestic sheep or goats.  This premise is incorrect.  The previous exposure may not have infected every bighorn and the surviving animals, unfortunately, do not appear to become immune from further disease transmission.  Additional contact with domestic sheep could cause more disease outbreaks and die-offs within the population.  I am unaware of any viable bighorn herd that has had prolonged regular contact with domestic sheep or goats that doesn't eventually have a disease outbreak.

7.  The primary reason the BMPs cannot ensure separation in occupied bighorn sheep habitat is because domestic sheep inevitably stray from their band.  Sheep operators in Oregon have used many of the proposed practices, yet domestic sheep still stray, and contact between domestic and bighorn sheep has occurred.  This is particularly true in the steep and rugged terrain of Hells Canyon.  The Salmon River Canyon has similar terrain.

8.  The BMPs prevent the permittee from turning out apparently sick or physically infirmed domestic sheep on to the allotment.  *BMP Plan, BMP #3.*  This action, however, will not prevent transmission of pneumonia from domestic sheep to bighorn sheep because healthy domestic sheep can also be carriers of disease-causing bacteria.

9.  Further, the BMP requiring two domestic sheep herders and several dogs per band cannot ensure that every domestic sheep remains with the band of over 600 sheep, particularly when

FIFTH DECLARATION OF VICTOR L. COGGINS - 2

grazing within steep, rugged terrain.  *See Fifth Rule Decl., Ex. 13* (2009 grazing authorization);

*BMP Plan, BMP #5*.  The herders simply cannot be expected to always have an eye on every

member of the band or always locate bighorn sheep that are on the allotment.

10.  Once a domestic sheep strays from its large band, discovery of the animal in steep,

rugged, remote terrain is difficult and contact with bighorn sheep may not be detected.  Two

herders per domestic sheep band simply cannot ensure a domestic sheep will not stray.  *See BMP

Plan, BMP #5*.  Neither can two herders ensure that a bighorn sheep will not come in contact with

the band, particularly when the domestic sheep are foraging.  In my experience, domestic sheep

scatter or spread out while grazing, making interactions with nearby bighorns more likely to go

undetected.  Further, it is very unlikely the herders would detect a bighorn sheep up to one mile

away from the domestic sheep band in order to notify the agencies as required by the BMPs.

*BMP Plan, BMP #4*.

11.  Moreover, once a domestic sheep strays, it can survive for some time providing ample

opportunity to make contact with bighorn sheep, particularly in light of the fact that bighorn and

domestic sheep are attracted to each other and gregarious in nature.  For example, two strays

presumably spent four to five months in Fall 2006 and Winter 2007 wandering unattended in good

bighorn sheep habitat on the nearby Smith Mountain allotment in Hells Canyon.  *See Coggins

Decl. ¶ 54* (Dckt No. 9).  It is not known whether contact with bighorn sheep occurred during this

time but bighorn sheep from the Upper Hells Canyon Oregon herd use this area.  In general,

contact in the steep rugged terrain of these canyons is probably undetected most of the time.

Thus, the practice of destroying only those individual bighorn sheep known or suspected to come

in contact with domestic strays may be ineffective to insure contact did not in fact occur.

FIFTH DECLARATION OF VICTOR L. COGGINS - 3

BLM_0127100

12.   Requiring the BLM to maintain the cattle guard and gate across Partridge Creek bridge will not prevent bighorn sheep from moving from the north to the south side of the Salmon River and vice versa.  *BMP Plan, BMP #6.*  Bighorn sheep can jump fences as tall as eight feet and cattle guards generally do not deter bighorns.  Further, bighorn sheep can swim across large bodies of water, including the Salmon and Snake Rivers.  I have observed two different bighorn rams swimming across the Snake River, the larger of these two rivers, near Pittsburgh Landing in Hells Canyon.

13.   In addition, counting marker sheep on a daily basis is not sufficient to ensure that no straying will occur.  It is impossible to account for every single sheep in the band simply by counting the small percentage of sheep that are marked.  *BMP Plan, BMP #8.*  If a few unmarked sheep stray in this rugged remote area, their absence will likely not be discovered and if it is, locating the strays may be extremely difficult.

14.   The BMPs discuss the requirement to count each domestic sheep after "herd scattering events" such as attacks by predators.  *Id.*  They do not discuss, however, how they will locate any missing sheep.  As discussed previously, it is difficult to locate scattered or stray sheep, even in relatively open areas.  In steep rugged forested terrain such as the Hells Canyon and Salmon River canyon, the difficulty in locating stray animals will be extreme.

15.   Also, the BMP requiring the killing of a bighorn mingling with domestic sheep is not always effective at keeping the bighorn from contacting and infecting other bighorns, particularly when the domestic sheep allotment is in occupied bighorn habitat.  *BMP Plan, BMP #10.*  The practice of lethally removing bighorn sheep that come into contact with domestic sheep or goats is normally applied outside of bighorn sheep range where occupied bighorn sheep habitat and domestic sheep operations are spatially separated. Under this situation, the policy is applied

FIFTH DECLARATION OF VICTOR L. COGGINS - 4

typically to young dispersing bighorn sheep that travel outside of their normal range and habitat and come into contact with domestic sheep or goat operations. Under this typical situation, the need to remove bighorn sheep that come into contact with domestic sheep or goats occurs infrequently as bighorn sheep spend the majority of their time within their occupied range and suitable habitats away from domestic livestock operations.

16.   In contrast, the policy of lethally removing bighorns within their own range becomes less effective as a disease management tool because, although there is probably more contact between the species, the rate of detection of these contacts is low.  Further, successful removal of bighorn sheep is difficult in the rugged, steep terrain.  And finally, disease spread is almost unavoidable as resident herds within the range occur in social groups of multiple animals.  It is likely that an infected bighorn sheep will interact with other members of its social group, potentially spreading deadly disease before it can be removed from the population.

17.  The death of even one bighorn sheep from a small population can be extremely detrimental to that population. A good example is the Sheep Mountain Oregon herd located near Brownlee Dam.  The 2009 herd count totaled eleven bighorns, with only one ram (ten years ago, this population had approximately ninety animals).  Obviously, losing even one member of this small population of bighorns, one that is already below a viable level, could permanently impair the population and lead toward the herd's extirpation.

18.  For all of the above reasons, any BMPs for domestic sheep grazing must include a buffer between the domestic sheep and occupied bighorn sheep habitat.  The BMPs approved by the BLM for the Partridge Creek allotment do not.  Bighorns sheep experts consistently recommend using a minimum of nine air miles as a buffer to achieve separation between the species.  *See Fourth Declaration of Victor Coggins, ¶ 19 & Ex. B (*WAFWA recommendations) (Dckt No. 64).

FIFTH DECLARATION OF VICTOR L. COGGINS - 5

BLM_0127102

In steep, rugged open terrain, often a larger buffer is required because of the difficulty of detecting stray domestic sheep or bighorn sheep.  In Hells Canyon, even a 25 mile buffer was not enough to keep domestic sheep and bighorns separated.

19.  In summary, according to the scientific literature and in my experience, complete separation between bighorn and domestic sheep is the only known way to prevent disease transmission to bighorns.  *See Coggins Decl. ¶ 44.*  To ensure separation, domestic sheep must be kept out of occupied bighorn sheep habitat, including the Partridge Creek allotment.  Even the best intentions to implement the listed BMPs will not ensure separation.  By allowing domestic sheep to graze the Partridge Creek allotment, the BLM is putting the native Salmon River bighorn population at risk.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 23rd day of September, 2009.

   /s/Victor L. Coggins
Victor L. Coggins

FIFTH DECLARATION OF VICTOR L. COGGINS - 6