Lauren M. Rule (*ISB # 6863*)
ADVOCATES FOR THE WEST
PO Box 1612
Boise ID 83701
(208) 342-7024
lrule@advocateswest.org

Attorney for Plaintiff Western Watersheds Project

Jennifer R. Schemm (*OSB #970086*)
602 "O" Avenue
La Grande, OR 97850
(541) 962-0860
jschemm@eoni.com

Attorney for Plaintiffs Hells Canyon Preservation Council and The Wilderness Society

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, | ) | |
|      Plaintiff, | ) | Case No. 07-151-BLW |
| and | ) | |
| | ) | |
| HELLS CANYON PRESERVATION | ) | **DECLARATION OF TIM** |
| COUNCIL**,** an Oregon non-profit corporation, | ) | **SCHOMMER** |
| and THE WILDERNESS SOCIETY, a national | ) | |
| non-profit corporation, | ) | |
|      Co-Plaintiffs; | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. FOREST SERVICE, | ) | |
| | ) | |
|      Defendant. | ) | |

I, Tim Schommer, with full knowledge of the penalties for perjury, declare as follows:

1.   After receiving a Bachelor of Science degree in Wildlife Biology from the University of Washington and a Masters degree in Wildlife Habitat Management from Washington State University, I worked as a wildlife biologist for the United States Forest Service from 1978 to my retirement in January 2010.

2.   For almost thirty years, from 1981 until my retirement, I worked directly with bighorn sheep management and restoration.  Since 1993, I served as the Forest Service's National Bighorn Sheep Biologist.  In that role, I specialized in: (1) reducing the potential risk of disease transmission between bighorn sheep and domestic sheep and goats; (2) restoring bighorn sheep populations; (3) improving bighorn sheep habitat; and (4) evaluating impacts to bighorn sheep.

3.   Over nearly twenty years, I assisted approximately 28 National Forests in the western United States in developing, modifying, and/or evaluating grazing practices in the field to reduce potential disease transmission between bighorn and domestic sheep.  This required me to evaluate parameters such as habitat, domestic sheep grazing operations, bighorn populations and movements, and locations of buffers, all in order to develop risk ratings and management practices to mitigate impacts.

4.   For six years, I was a core Interdisciplinary Team member for the Payette National Forest in its development of the Supplemental Environmental Impact Statement (SEIS) amending its Forest Plan to address conflicts between domestic and bighorn sheep.  I also served as a representative from the Wallowa-Whitman National Forest, and on the Cooperating Agency Status Team. These three roles required me to use my knowledge in bighorn sheep biology movements, disease transmission, creating separation between the two species, and working with other organizations.

DECLARATION OF TIM SCHOMMER - 1

BLM_0127105

5.   Early in the SEIS process, I participated in tours of the bighorn sheep habitat on the Payette National Forest to reacquaint myself with bighorn sheep habitat in the Salmon River drainage and its tributaries, and the locations and operations of domestic sheep allotments on the Forest.  Previously, in the 1980s, I had worked as the District Wildlife Biologist on the Salmon River Ranger District of the Nez Perce National Forest, during which time I became familiar with the bighorn sheep populations, their habitats, and the range allotments surrounding the Main Salmon River.

6.   From about 1990 to 2010, while serving as a biologist on the Bighorn Sheep Restoration Committee for restoring bighorn sheep in Hells Canyon, I collected much of the existing bighorn sheep telemetry monitoring data on the west side of the Payette National Forest.

7.   From 1991 to 1995, I worked on an Environmental Assessment (EA) for resolving bighorn and domestic sheep conflicts on the Wallowa-Whitman National Forest in Hells Canyon. The decision notice for this EA was challenged, but upheld by the courts.

8.   I coauthored a Forest Service Publication entitled "A Process for Finding Management Solutions to the Incompatibility between Bighorn and Domestic Sheep" that is used on National Forests to address bighorn and domestic sheep issues. (Schommer, T.J., and M. Woolever. Washington D.C. USDA Forest Service, 62 p., 2001).  I also coauthored the Forest Service Publication "A Review of Disease Related Conflicts between Domestic Sheep and Goats and Bighorn Sheep" that summarized the science related to disease.  (Schommer, T.J, and M. Woolever, USDA Forest Service, GTR 209, 2008).

9.   Throughout my career, my work has required a great deal of coordination with state agencies, Native American Tribes, range permittees, other federal agencies, private wildlife organizations, and the general public.

DECLARATION OF TIM SCHOMMER - 2

BLM_0127106

10.  Through the highlighted experiences listed above, I have become intimately familiar with bighorn sheep populations and their habitats, domestic sheep allotments and their management, and bighorn-domestic sheep conflict issues within Hells Canyon and the Salmon River on and adjacent to the Payette National Forest.

11.  As noted above, I retired from the Forest Service in January 2010.  I had no involvement in the 2012 grazing authorizations by the Payette National Forest.

Status of Bighorn Sheep within the Salmon River drainage

12.  Bighorn Sheep within the Salmon River drainage are considered the last native population of bighorn sheep in the State of Idaho.  This unique status elevates the importance for their conservation from both a cultural (Keith Lawrence, Nez Perce Tribe, personal communication) and State management (Idaho Department of Fish and Game, 2010) perspective.

13.  The Idaho Department of Fish and Game (IDFG) has conducted periodic bighorn sheep trend surveys throughout the Salmon River drainage.  Trend survey data for the Salmon River within the Payette National Forest indicates a steady decline in the number of bighorns observed by nearly 70% since 1983 (Keith Lawrence, Nez Perce Tribe, personal communication).

14. Because of the importance of this native population, the Salmon River Bighorn Sheep Study (Study), a cooperative research project between the Nez Perce Tribe, the Forest Service, the Bureau of Land Management, and IDFG, was initiated in 2007.  This Study has gathered important data on bighorn sheep within the Salmon River on and adjacent to the Payette National Forest showing that bighorns (1) move much more than wildlife managers previously anticipated; (2) are well connected with one another; and (3) are found close to domestic sheep in some areas.

DECLARATION OF TIM SCHOMMER - 3

BLM_0127107

15. Radio telemetry monitoring for the Study has confirmed that the Main Salmon River herds, like the Snake River herds in Hells Canyon, are very much connected. These river canyons provide continuous habitat, which is why bighorn sheep individuals and herds move freely up and down the canyons. This is nature's way of providing genetic variability and long term survival.

16. Unfortunately, this high level of connectivity also facilitates a high degree of disease spread throughout the population. Because bighorn herds are interconnected, disease transmission between one domestic sheep and one bighorn sheep has the potential of spreading throughout the population up and down the river corridor resulting in a population wide die-off.

17. The most recent bighorn counts conducted by the Study indicate an estimated population level of around 285 animals (Mack, 2010, Salmon River Bighorn Sheep Project Annual Report 2009-2010). The Study has also demonstrated low lamb production and survival, far below that required to maintain stable populations. I believe this low lamb survival is due to disease. Based on radio-collared ewes monitored during 2009 and 2010, on average about 80% of ewes produced lambs, but only about 28% of those lambs survived through the summer (Mack, 2010, Salmon River Bighorn Sheep Project Annual Report 2009-2010). In healthy populations, lamb production would be expected to be around 90% and summer lamb survival over 50%. If this trend is not reversed, continued population declines would be expected.

18. In 2010, the IDFG adopted their "*Bighorn Sheep Management Plan 2010*" (State Plan). The State Plan divides bighorn populations into population management units (PMUs). Bighorns residing within the Salmon River canyon on and adjacent to the Payette National Forest are within the Lower Salmon River PMU. Although the State Plan recognizes this PMU is capable of supporting approximately 950 bighorns, there is a declining trend, low lamb

DECLARATION OF TIM SCHOMMER - 4

recruitment, and high mortality of bighorns within the PMU, all associated with disease caused by contact with domestic sheep.  The State Plan includes the following findings:

    a.  "Low recruitment rates and overall declines in sheep numbers over the years in these units may have been caused by disease and habitat conditions;"

    b.  "Population numbers have dwindled in the western portion of this PMU that is closest to active domestic sheep allotments;"

    c.  "Disease has resulted in low lamb survival in adjacent herds along the Salmon River;" and

    d.  "Respiratory disease is the most significant disease, resulting in negative effects on population dynamics through increased adult and lamb mortality."

19. In 2010, the Intermountain Region of the Forest Service, which includes the Payette National Forest, added bighorn sheep to their list of Sensitive species, recognizing the species' trend towards federal listing under the Endangered Species Act and the need for restoration.

20. In the final SEIS, the Payette National Forest indicated that continued domestic sheep grazing jeopardizes the viability of bighorn sheep on the Forest.  Disease transmission from domestic sheep is the single most important hurdle to bighorn sheep restoration and viability on the Forest.  All available information demonstrates current Salmon River bighorn populations exist at remnant population levels; have substantially declined over the past twenty years; and exhibit low lamb production and survival.  These factors indicate further declines are likely to occur, putting these populations at risk if this downward trend is not corrected.

<u>The Payette National Forest Record of Decision amending the Forest Plan to address conflicts between domestic and bighorn sheep and its implementation</u>

21. The Payette National Forest Record of Decision (ROD) selected Alternative 7O, with an implementation modification, from the final SEIS alternatives.  The Forest Supervisor selected Alternative 7O because it:

DECLARATION OF TIM SCHOMMER - 5

BLM_0127109

a.  Provides adequate habitat for current populations of bighorn sheep on the Forest and allows for needed future restoration and expansion of the species;

b.  Meets Native American tribal trust responsibilities and provides sufficient habitat to allow recovery of bighorn sheep and tribal hunting opportunities;

c.  Meets the compatibility requirements of the Hells Canyon National Recreation Area Act and all other Federal laws and regulations;

d.  Provides a lower risk of contact rating at full implementation which will improve the long term viability of bighorn sheep and allow expansion into new areas;

e.  Given the cumulative effects, meets the needs of bighorn sheep as a sensitive species by not further contributing to a downward trend in the population's numbers;

f.  Eliminates overlap of domestic sheep and goat allotments with core bighorn sheep herd home ranges;

g.  Provides a lower level of risk that is acceptable for continued long-term adaptive management of domestic sheep and goats while providing adequate habitat for native bighorns;

h.  Maintains the largest amount of domestic sheep grazing without immediately jeopardizing the bighorn sheep population; and

i.  Provides a significant amount of monitoring to collect data needed for long-term separation between domestic sheep and goats and bighorns.

22. Implementation of Alternative 7O was modified allowing a three-year phase-in approach. Under this approach, grazing on the Payette National Forest would be administered as under Alternative 7P during the 2011 grazing season, as under Alternative 7N during the 2012 grazing season and as under Alternative 7O during the 2013 and all subsequent grazing seasons. The phased in approach allowed affected permittees time to find alternative grazing lands.

23. By closing rangelands to domestic sheep grazing, Alternatives 7P, N, and O provide varying levels of protection for bighorn sheep, with Alternative7P providing the least and Alternative 7O the greatest protection. The ROD indicated that the level of risk associated with Alternatives 7P and 7N would only be acceptable for a single grazing season. Alternative 7P would be acceptable for the 2011 grazing season and Alternative 7N for the 2012 grazing season.

24. The Payette National Forest implemented the first year of the phased-in approach (Alternative 7P) during the 2011 grazing season, but has stalled further implementation of the

DECLARATION OF TIM SCHOMMER - 6

ROD for the 2012 grazing season.  During the 2012 grazing season, the Forest Service intends to continue domestic sheep grazing under Alternative 7P rather than under Alternative 7N as called for by the ROD.

25. In my opinion and based on all available data and the potential consequences of disease transmission, continued domestic sheep grazing under Alternative 7P, beyond one grazing season, poses an unacceptable level of risk to bighorn sheep.

Risk of continued grazing under Alternative 7P

26. The difference between Alternatives 7P and 7N is that under Alternative 7N, domestic sheep grazing will no longer be allowed on the Grassy Mountain, Vance Creek, and Hershey Lava allotments.  Retaining, rather than removing, domestic sheep grazing on the Grassy Mountain and Vance Creek allotments for the 2012 grazing season is of particular concern because of their proximity to known bighorn sheep in the Little Salmon River drainage.

27. In 2008, according to IDFG southwest regional biologist Jeff Rohlman, a young bighorn ram was reported with a bighorn ewe in the Little Salmon River drainage.  In March of that year, IDFG was able to put a radio collar on the ram.  Over the next two months, the ram was reported up and down the Little Salmon River drainage.  At one point, he was less than one kilometer from the Grassy Mountain Allotment boundary.  In May, he was shot by IDFG when he mixed in with some domestic goats about eight kilometers from the boundary of the Grassy Mountain Allotment.

28. IDFG has confirmed other recent sightings of bighorns in the Little Salmon River drainage.  Since 2008, there have been incidental sightings of single bighorn ewes between the Sheep Creek Rest Area, about six kilometers south of the town of Riggins, and just upstream from the town of Pinehurst.  A bighorn ewe was seen associating with 57 elk in February 2010

DECLARATION OF TIM SCHOMMER - 7

near Pinehurst.  On February 23, 2012, a ewe was again associated with sixteen elk near the
Sheep Creek Rest Area.  IDFG intended to capture and radio collar her on March 14th. The
capture attempt failed, however, due to inclement weather conditions.

29.  For purposes of its SEIS analyses, the Forest Service estimated a population of four
bighorns in the Little Salmon drainage based on telemetry and incidental observations of bighorn
sheep.  *See* final SEIS (Table W-3b and Figure W-9A).  I presume there are more bighorns using
the Little Salmon River area than have been reported based on the difficulty of detecting un-
collared bighorns, the remoteness of the landscape, and the lack of structured monitoring.  Just
because there are currently no radio-collared animals in the Little Salmon River drainage, does
not mean there are no bighorns present.

30. The bighorn sheep habitat in the Little Salmon River drainage is continuous with habitats
occupied by the Main Salmon River bighorn meta-population.  In addition, the Grassy and Vance
Creek allotments, as well as the area immediately north of the Grassy Mountain Allotment,
contain good bighorn sheep summer habitat.  Although there is some buffer of forest canopy
between this summer habitat and the continuous habitat in the Little Salmon River, I believe,
based on documentation of bighorn sheep presence, there is potential for bighorn sheep to use the
summer habitat on the allotments.

31. As described above, bighorn sheep have been known to occupy the little Salmon River
drainage.  These animals have been documented less than sixteen kilometers, and on some
occasions less than one kilometer, from the Grassy Mountain and Vance Creek allotments.  I
consider these animals to be close enough to the allotments to pose an unacceptable risk of
contact.  Because of the continuous nature of bighorn sheep habitat between the Little Salmon
and Main Salmon River drainages, I am concerned the close proximity of bighorn sheep to these

DECLARATION OF TIM SCHOMMER - 8

BLM_0127112

allotments could precipitate a widespread disease epidemic throughout the Main Salmon meta-population.

32. Unfortunately, when a disease outbreak starts in one area, it can quickly spread to other sheep herds.  Biologists have seen this happen many times.  For example, a bighorn sheep die-off in the winter of 1994/1995 began in Hells Canyon at the mouth of the Grande Ronde River when bighorn sheep managers believe two domestic goats shared similar deadly pathogens with a few bighorn sheep.  Over a course of three months, the disease spread over sixty kilometers and killed about 300 bighorns.  Poor lamb recruitment lasted for several years.

33. Because of the known presence of bighorn sheep in close proximity to active domestic sheep allotments (Grassy Mountain and Vance Creek), mapped bighorn sheep habitat within and adjacent to these active domestic sheep allotments, and the continuous nature of bighorn habitat between the Little Salmon River and Main Salmon River, continued grazing on the Grassy Mountain and Vance Creek allotments as described in Alternative 7P, past the 2011 grazing season, poses an unacceptable level of risk to bighorn sheep populations on the Payette National Forest.  I agree with Payette Forest Supervisor Suzanne Rainville's conclusion in the ROD that the risk of contact between bighorn and domestic sheep associated with Alternative 7P is acceptable only for the 2011 grazing season.

Importance of additional protection afforded by Alternative 7N

34. Alternative 7N protects 5,160 more acres of bighorn sheep summer habitat than Alternative 7P (FEIS Table W-10; Alternative 7P protects about 90 percent, Alternative 7N protects about 92 percent).  Although percentage-wise this difference seems small, total acres of bighorn sheep habitat is only one factor in determining the risk to bighorn sheep.

DECLARATION OF TIM SCHOMMER - 9

35. More importantly, it is the juxtaposition and configuration (patchy vs. continuous) of bighorn habitat in relation to domestic sheep allotments that determine important risk factors such as distance from bighorn sheep to the allotments, annual rates of contact, and probability of extirpation; which all combine to influence herd viability. In other words it is the location of habitat protected, not necessarily the amount of habitat protected, that is important. By not allowing grazing on the Grassy Mountain and Vance Creek allotments, Alternative 7N provides greater separation between the species.

36. The best and most prudent management approach for reducing disease transmission risk is to provide effective spatial separation between bighorn sheep and domestic sheep allotments. Monello et al. 2001 documented that bighorn sheep population density declined the closer you get to active allotments (Monello, R.J., D.L. Murray, and E.F. Cassirer. 2001). *See also* Ecological correlates of pneumonia epizooties in bighorn sheep herds. Canadian Journal of Zoology. 79:1423-1432.

37. The distance between known locations of bighorn sheep and the nearest domestic sheep allotment for Alternative 7P is only one kilometer, whereas for Alternative 7N, the distance is eight kilometers (final SEIS, Table W-24). Increasing spatial separation from one to eight kilometers reduces the likelihood of contact and provides additional protections for bighorns greater than suggested by the two percent difference in protected summer habitat acres between the alternatives.

38. Based on the amount of spatial separation afforded, the estimated probability of annual contact was 40% less for Alternative 7N than Alternative 7P (0.12 compared to 0.20; final SEIS, Table W-12). Similarly, the estimated probability of extirpation for the Little Salmon and Main Salmon River herds was 30% less for Alternative 7N than for Alternative 7P (.15 compared to

DECLARATION OF TIM SCHOMMER - 10

.21; final SEIS, Table W-12). Furthermore, this latter estimate is conservative because it was based on an estimated rate of disease transmission of 25% which is far less than what is documented in the scientific literature regarding penned research experiments.

39. The important point here is that even though the difference in total amount of habitat protected between Alternatives 7P and 7N seems small when viewed on a percentage bases (90% vs. 92%), the additional protections to bighorn sheep afforded by Alternative 7N in terms of risk of contact and probability of extirpation are substantial.

40. On the Snake River in the late 1980s, the Wallowa Whitman National Forest had a separation of over 40 kilometers between the Temperance Creek allotment and the Imnaha bighorn herd in very similar habitat to the Salmon River. The Forest Service had also implemented a full range of BMPs. Unfortunately, these actions did not keep the two species apart and the result was a bighorn die-off. This experience indicates that in bighorn sheep habitats on the Payette National Forest, a one kilometer separation as provided in Alternative 7P is insufficient to maintain separation. Furthermore, even the eight kilometer separation provided for in Alternative 7N might not be effective.

41. The decision in the ROD to implement Alternative 7O to establish and maintain separation, by protecting 94% of the bighorn sheep habitat, is necessary to provide for viable bighorn sheep herds on the Payette National Forest. I agree with the Forest Supervisor that the risk of contact inherent in Alternative 7P is high enough that it was only acceptable to endure for one year (ROD, p. 13). To reduce the risk of contact between domestic and bighorn sheep, and thus the risk of extirpation of the native bighorn sheep, the levels of bighorn sheep habitat provided in Alternative 7O must be protected.

DECLARATION OF TIM SCHOMMER - 11

42. In summary, for the upcoming 2012 grazing season, when the factors of acres of habitat, continuity of that habitat, likelihood of bighorn sheep using the Little Salmon River Canyon, kilometers of separation, annual rates of contact, and probability of extirpation are combined, there is a marked increase in the risk of contact, beyond that conveyed by simply looking at total number of acres affected, under Alternative 7P compared to 7N. I am convinced it is important to the survival of the bighorn sheep on the Payette National Forest to implement Alternative 7N for the 2012 grazing season as decided in the ROD and continue the full implementation of the ROD under 7O by 2013.

Impact of contact between domestic and bighorn sheep

43. If a bighorn sheep makes contact with domestic sheep, becomes infected with disease, and dies or is killed under management guidelines before infecting other bighorns, the contact may only impact the bighorn population by reducing numbers of reproductive animals.

44. Based on my experiences in Hells Canyon, however, if a bighorn makes contact with domestics, becomes infected with disease, and infects other bighorns, the contact is likely to create a significant die-off of the population. Major die-offs have normally resulted in a population decline of 50 to 100 percent. Where some adults have survived the disease, they continue to be carriers of disease to immigrating bighorns. Further, lambs born to surviving ewes almost always die from disease within four months of birth.

45. For example, in Hells Canyon, managers I worked with believe the McGraw herd made contact with domestics on the Smith Mountain allotment, became infected, and began dying. Since the McGraw herd is connected to the Upper Hells Canyon and Sheep Mountain bighorn sheep herds, the McGraw herd exposed all three herds to the disease. The McGraw herd died out, and about ninety percent of the Sheep Mountain and Upper Hells Canyon herds also died.

DECLARATION OF TIM SCHOMMER - 12

BLM_0127116

Some of the adults in Upper Hells Canyon and Sheep Mountain herds have survived for over ten years, but continue to expose immigrating bighorn to disease and have poor lamb recruitment to this day.

46. A die-off can happen due to contact between only one bighorn sheep and one domestic sheep. If a die-off starts in the Lower Salmon River PMU, it has the potential to move up river to other Main Salmon and Middle Fork herds. The consequences of this situation are so dire given the already depressed status of these herds, any potential for contact is too much because the risk is not worth the consequences. This is especially true for the Salmon River herds because, as IDFG's Bighorn Management Plan indicates on page 21, this native rocky mountain herd is a unique and irreplaceable resource.

47. In summary, it is accepted scientific knowledge that domestic sheep grazed in close proximity to bighorn sheep results in a high probability of population-wide bighorn sheep mortality from respiratory disease, primarily pneumonia. The disease transmission may have significant depressive population impacts for many years.

BMPs will not ensure separation of the species

48. In the SEIS, I provided a very detailed explanation why best management practices (BMPs) will not ensure separation between bighorn and domestic sheep, particularly in habitats characterizing the Snake and Salmon River canyons (final SEIS, Appendix F, pages 1-6). The Forest Service's BMPs proposed for the 2012 grazing season on the Payette National Forest, including monitoring, will not ensure separation of the species.

49. In 2009, pursuant to Idaho State Code Title 36-106 directing IDFG to develop voluntary BMP plans with domestic sheep permittees grazing public lands, IDFG developed several plans with domestic sheep producers in and adjacent to the Salmon River drainages designed to create

DECLARATION OF TIM SCHOMMER - 13

separation of the species. I know of no science that supports the Idaho legislature's assertion that these BMPs will provide separation and protect the viability of the bighorn sheep.

50. Furthermore, according to IDFG, there has been no monitoring of compliance by the producers, or evaluation of how effective these BMPs have been at maintaining separation. I have reviewed the IDFG BMP plan for the Grassy Mountain and Vance Creek allotments. Based on my experience, these BMPs will not insure separation between bighorn and domestic sheep.

51. The only significant reduction in risk of contact that I have witnessed is when BMPs are implemented in open, gentle, non-bighorn sheep habitat where domestic sheep can be easily controlled and monitored, and a large buffer exists between the two species. I know of no such settings on the Payette National Forest.

Literature published since the issuance of the Payette National Forest ROD

52. The Forest Service chose Alternative 7O modified in the ROD based on the existing science related to the transmission of disease between bighorn and domestic sheep. Since the ROD was issued, another article, *Domestic sheep, bighorn sheep, and respiratory disease: a review of the experimental evidence* was published, reconfirming the science relied upon by the Forest Service regarding potential disease transmission between the two species. Wehausen, J.D., S.T. Kelley, and R.R. Ramey 2011, Domestic sheep, bighorn sheep, and respiratory disease: a review of the experimental evidence. Calif. Dept. of Fish and Game. 97(1) 7-24.

Conclusion

53. In summary, to ensure the viability of the Salmon River bighorn populations, I strongly recommend Alternative 7N, not Alternative 7P, be implemented for the 2012 grazing season. After years of careful analysis, the Payette Forest Supervisor concluded in the ROD, and I concur, the level of risk associated with the grazing restrictions in Alternative 7P was acceptable

DECLARATION OF TIM SCHOMMER - 14

BLM_0127118

only for the 2011 grazing season.  Implementing Alternative 7N this year is important to the survival of native bighorn sheep on the Payette National Forest.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 5th day of April 2012 in Culdesac, Idaho.

<p style="margin-left:40%">__s/Tim Schommer_____<br>Tim Schommer</p>

DECLARATION OF TIM SCHOMMER - 15

# Evaluation of "Best Management Practices:" Position Statement Prepared by Tim Schommer, Wallowa-Whitman National Forest

## BACKGROUND

The Payette National Forest asked me to complete a position statement on the value of "best management practices" (BMPs) related to my past experience. This task is in preparation for their Final Supplemental Environmental Impact Statement (Final SEIS) to the Final Environmental Impact Statement (FEIS) for the Land and Resource Management Plan (Forest Plan). The Final SEIS is being prepared for their response to appeal direction received from the Chiefs Office of the Forest Service pertaining to bighorn sheep *(Ovis canadensis)* viability, transmission issues between domestic sheep *(Ovis aries)* and bighorn sheep and compliance with the National Forest Management Act and the Hells Canyon National Recreation Area Act.

## WHAT ARE BEST MANAGEMENT PRACTICES

The grazing term "Best Management Practice" has recently been utilized by Idaho State Agencies and the domestic sheep industry as a means to describe on-the-ground practices that reduce the risk of contact between domestic sheep and bighorn sheep where bighorn sheep exist. Many National Forest domestic sheep permittees have been using these practices in some form or another for at least 30 years. In some cases they have been added as terms and conditions to Federal Grazing Permits. Forest Plans or Comprehensive Management Plans (CMP) may also include the practices as direction in the form of standards or guidelines. To my knowledge they have not been called BMPs until just recently.

## OBJECTIVES OF BEST MANAGEMENT PRACTICES

BMPs would be applied to grazing activities on permitted Federal allotments for several reasons, ranging from utilization levels and range readiness to resource protection. For the issue of disease transmission between domestic sheep and bighorn sheep, the objective of implementing BMPs is simply to avoid contact at any time between the two sheep species. Any contact may effectively transmit disease, and result in mortality of bighorn sheep. BMPs are designed to reduce the risk of contact by providing for adequate separation. Implemented BMPs that result in contact are ineffective.

Some Forest Service biologists and range conservationists have extensive field experience of where and when these practices are effective. During my role as National Bighorn Sheep Biologist for the Forest Service for the last 18 years, I worked with range conservationists using several of these grazing practices to increase the potential for effective separation. I have assisted approximately 28 National Forests in the western United States in developing and evaluating grazing practices in the field to increase effective separation between bighorn and domestic sheep. I believe I have a unique

BLM_0127120

set of skills and experiences for evaluating BMPs.

## HOW TO DETERMINE BEST MANAGEMENT PRACTICES

Most annual operating plans/instructions for domestic sheep allotments contain some of these grazing practices. Each allotment includes grazing practices specific to the allotment and permittee and each allotment carries its own set of unique circumstances that need to be evaluated. What works in one location may not work in another. The following factors affect the success or failure of a grazing practice: topography, bighorn sheep source habitat connectivity, bighorn sheep population size, proximity of domestic sheep grazing allotments to bighorn sheep populations, timing of allotment use, density of vegetation, and escape terrain. None of the BMPs discussed below can be determined effective without an active monitoring effort to detect the presence or absence of bighorn sheep near domestic sheep bands. To my knowledge, no peer reviewed literature exists that evaluates the effectiveness of these grazing practices for reducing the risk of contact between the two species.

## EVALUATION OF BEST MANAGEMENT PRACTICES

The following is a list of BMPs that I have used, and the effectiveness that I have seen with each type:

1) ***Guard Dogs:*** Guard dogs are typically added to a band of sheep to help control predators and monitor the domestic sheep. Using guard dogs for keeping bighorn sheep away from domestic sheep has had limited success. These dogs are designed to protect domestic sheep and goats from predators, not other sheep. Some dogs have been quite tolerant of bighorn sheep (Figure F-7). It is also hard for guard dogs to be at every location of domestic sheep if they are loosely herded across forested and irregular steep terrain.

BLM_0127121

**Figure 7. Photo illustrating the ineffective use of guard dogs to keep bighorn sheep and domestic sheep separated**



2) ***Extra Herders:*** Some operators have added an extra herder. This practice may be of value in open gentle terrain with good visibility. Extra observers will help locate bighorn sheep and

BLM_0127122

improve domestic sheep control during daylight hours.

3) ***Propane Guns:*** Using propane guns at the edge of domestic sheep flocks to scare away bighorn sheep has not been successful because most states do not shoot females and young bighorns and have very restrictive ram hunting. Also, bighorn sheep do not regularly associate negative effects with loud noise. Our experience in northeastern Oregon is that deer and elk become conditioned to the noise in 2–3 days and continue to damage crops. Continually moving these propane guns with the bands of sheep is also costly.

4) ***Trucking of Sheep:*** Trucking of domestic sheep instead of trailing has been effective in reducing strays. Strays increase the probability of contact with a bighorn sheep. However, because of cost and the potential for domestic sheep disease associated with this practice, most operators prefer to not truck their sheep.

5) ***Bedding of Sheep at Night:*** Although domestic sheep herders may want to bed the sheep together in a 5-acre area at night, this practice is difficult in steep terrain because sheep are spread out in a "loose herd" fashion and having fenced pens is not realistic. Predators such as coyotes, cougar, and wolves are very effective at killing or scattering domestic sheep at night. In open gentle terrain, this practice can be helpful in controlling domestic sheep.

6) ***Counting of Sheep:*** Most National Forests conduct a 100% count of all domestic sheep onto the allotment at the beginning of the grazing season. Normally, the sheep are not counted during or after the grazing season by the Forest Service. Counting at the end of the season can give an approximation of how many have been killed or lost. Looking for strays during and after the season can reduce the risk of contact with bighorn sheep. Marking domestic sheep is difficult and expensive for the operators. Some operators provide one marker sheep for every 25 head of domestic sheep and count the marker sheep daily. This practice can tell the operator if they are missing any large numbers of domestic sheep. However, this technique has limited effectiveness because it may only take one domestic sheep to transmit disease to bighorn sheep.

7) ***Herder Communication:*** Some operators are now equipping their herders with cell or satellite phones so they can immediately call authorities when bighorn sheep are observed in or close to domestic sheep. Authorities can either shoot, remove, or haze bighorn sheep. These practices can be helpful in preventing contact. However, some operators do not report to authorities when bighorn sheep are near their domestic sheep.

8) ***Bighorn Monitoring:*** Having observers out looking for bighorn sheep is always helpful in keeping the two species apart and radio collars on bighorn sheep can make that effort more productive. However, bighorn sheep monitoring is expensive and not all bighorn sheep are collared. Most of the radio collaring has been with conventional collars (VHF) which are usually monitored only twice a month. The new GPS collars report locations several times a day and are more beneficial than VHF collars. However, people need to be mindful of the following aspects: (1) only a sample of the bighorn sheep population is collared; (2) collaring is typically skewed toward ewes, which do not foray as far or as often as rams; (3) nobody knows where the bighorn sheep have been between monitoring efforts with VHF collars; and (4) collaring is expensive.

9) ***Sick Domestics:*** Not turning sick domestic sheep out on the allotment is standard practice. Unfortunately, the diseases that are transmitted from domestic to bighorn sheep do not make domestic sheep appear sick. While helpful, this practice does not reduce risk of contact or disease transmission.

10) ***Stray Domestics:*** Stray domestic sheep off the allotment need to be quickly removed.

Unfortunately, most Forest allotments are in big areas of remote country with some timber where it is hard to detect strays. Many examples exist of strays being out for several weeks without detection. When they are detected, they are often very hard to find and remove. Grazing operators are usually very busy and can't redirect their attention to finding a few strays. Recently, a few operators have been willing to let authorities remove sheep for them under certain conditions. This practice can be helpful in reducing risk of contact, but many strays go undetected.

When all or most of the BMPs are implemented on an allotment, will enough separation be provided to effectively reduce the risk of contact and avoid contact? The key to successful BMPs depends on whether or not BMPs are consistently implemented on the ground, the operators have the ability to maintain tight control of domestics, the allotment is connected to quality bighorn sheep habitat, and bighorn sheep are in or adjacent to the allotment (up to 9 miles).

1) **Implementation:** Agreeing to BMPs on paper is easier; implementing them on the ground for the entire grazing season year after year is more difficult. Many examples of BMPs not always being implemented on the ground exist. And BMPs can only be effective if fully implemented and readily adapted if not working.

2) **Maintaining Control of Domestics:** Controlling domestic sheep in terrain that is forested, steep, or rocky is very difficult. In allotments such as the Allison-Berg on the Nez Perce National Forest, the best possible way to manage vegetation with domestic sheep in this steep rocky terrain is to "loose herd" the domestic sheep-spreading the sheep out over large areas during the day and not tightly controlling them. Such a practice makes it is easy for domestic sheep to stray from the herder(s). Visibility is very difficult for the herders, especially in forested habitat and predators such as wolves can cut into the herd and scatter them for miles. Under these situations BMPs are not likely to be effective. The Rock Creek allotment on the Inyo National Forest is open gentle terrain where a herder can see for miles and can detect bighorn sheep. The Rock Creek Allotment is not in bighorn sheep habitat. BMPs implemented on these types of allotments can be effective in keeping the two species separate and reducing the risk of contact.

3) **Bighorn Sheep Habitat and Presence:** Bighorn sheep source habitat is usually in steep, open, rocky terrain as described above where tight control of domestic sheep is usually difficult and herder visibility is limited. In and around the Payette National Forest, high quality source habitat is not a limiting factor. Habitat is well connected and well distributed across the Payette National Forest and no natural barriers exist to dissuade bighorn sheep from pioneering, colonizing, and exploring their landscapes as demonstrated by the telemetry and sighting data. This ease of movement for bighorns across the Payette National Forest leaves questions about the effectiveness of BMPs to successfully provide for avoiding contact or reducing the risk of contact between the two species. Bighorn sheep presence in habitat that is in or adjacent to an allotment makes developing effective BMPs even more difficult. Separation is highly unlikely, and if the allotment is within the herd home range of the bighorn sheep population, contact with the allotment is all but a guarantee. Last year's mixing of a radio-collared ram with domestics on the Allison-Berg Allotment, despite the implementation of BMPs, is an example of their limitations. When bighorn sheep habitat is high quality and continuous for many miles, keeping the two species separate is very difficult.

Although bighorn sheep do not favor timbered areas, they will pass through them and are extremely

BLM_0127124

hard to detect when this happens. Such was the case when a band of domestics was grazing near Josephine Lake on the Payette National Forest; no one noticed the bighorn sheep ram until it was caught in a wolf snare trap. Without radio collars, bighorn sheep can be very difficult to detect. Even with radio collars, detection on the ground can be difficult. On the Smith Mountain Allotment on the Payette National Forest, radio collar data showed bighorn sheep located within the allotment during the grazing season without detection by the permittee.

On the Temperance Creek Allotment in Hells Canyon in the 1980s and early 1990s, domestic and bighorn sheep were separated by over 20 air miles and almost all of the BMPs described above were implemented. Despite these grazing practices and large separation distances, the two species could not be kept apart. Detecting bighorn and domestic sheep in this open, rocky, continuous bighorn sheep habitat was very difficult. Known mixing of the two species approximately every other year resulted in large catastrophic bighorn sheep die-offs.

### CONCLUSION

To avoid disease transmission between domestic and bighorn sheep, contact between the two sheep species should be avoided. In limited situations, implementing BMPs can lead a reduced risk for contact. BMPs that work in one situation may, or may not, work in another so all BMPs need to be developed for site-specific situations. Connectivity of bighorn sheep source habitat, terrain, density of vegetation, and ruggedness all affect the ability to successfully implement BMPs. Monitoring bighorn sheep presence should be conducted in areas of high risk for contact. Based on my experience, the only significant reduction in risk of contact that I have witnessed is when BMPs are implemented in open, gentle, non-bighorn sheep habitat where domestic sheep can be easily controlled and monitored, and a large buffer exists between the two species.

BLM_0127125

WENDY J. OLSON, IDAHO STATE BAR 7634
UNITED STATES ATTORNEY
JOSHUA D. HURWIT, NEW YORK STATE BAR NO. 4503363
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
800 E. PARK BLVD., SUITE 600
BOISE, IDAHO 83712-7788
TELEPHONE:  (208) 334-1211
FACSIMILE:   (208) 334-1414
E-mail:  Joshua.Hurwit@usdoj.gov
ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice
DAVID B. GLAZER (D.C. 400966)
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California  94105
TELEPHONE:  (415) 744–6491
FACSIMILE:   (415) 744-6476
E-mail:  david.glazer@usdoj.gov

Attorneys for Federal Defendants

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO WOOLGROWERS ASS'N, *et al.*, | Case No. 1:12-cv-469 BLW |
| Plaintiffs, | DECLARATION OF DR. DAVID A. JESSUP SUBMITTED IN SUPPORT OF THE FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT |
| v. | |
| TOM VILSACK, *et al.*, | Hearing:  February 5, 2014, 1:30 p.m. |
| Defendants. | |

BLM_0127126

I, Dr. David A. Jessup, declare as follows:

1.      I hereby submit this declaration in the above-captioned case. I have carefully reviewed the declaration and if called upon to testify, I could testify competently to the matters set forth herein.

2.      I reside in Royal Oaks, California. I am over 18 years of age and have personal knowledge of the matters stated herein and make this declaration based upon my personal knowledge.

3.      I have submitted a professional resume (Exhibit 1) showing employment in various capacities over the last 40 years. Most recently I retired in November 2010 after over 33 years employment with the California Department of Fish and Game (now Fish and Wildlife) as a wildlife veterinarian and am now employed in a consulting capacity as Executive Manager of the Wildlife Disease Association, a 501(c)(3) non-profit scientific society. I work out of my home in Royal Oaks, California.

4.      Over the last 25 years I have been an adjunct faculty member and affiliated in various capacities with the University of California-Davis, School of Veterinary Medicine (various Departments and Centers) and with the Institute for Marine Science at University of California-Santa Cruz.

5.      I have a Bachelor of Science degree in Zoology (cum laude) from the University of Washington (1971); a Doctor of Veterinary Medicine (cum laude) from Washington State University (1976); and a Masters in Preventive Veterinary Medicine from University of California-Davis. I am board certified in the wildlife specialty area of zoological medicine by the American College of Zoological Medicine (ACZM) and since 1998 have been a Certified

BLM_0127127

Wildlife Biologist.

6.      I have received a number of awards and acknowledgements for my work including, but not limited to, the Harry Jalanka medal in 1995, a Sustained Superior Accomplishment Award from the California Department of Fish and Game in 1997, the Distinguished Service Award from the Wildlife Disease Association in 2000, Outstanding Achievement Award from the Wild Sheep Foundation in 2008, Alumni Achievement Award from the University of California-Davis, School of Veterinary Medicine in 2009, the Tom Thorne and Beth Williams Memorial Award from the American Association of Wildlife Veterinarians and the Wildlife Disease Association in 2010, and the Emil Dolensek Award from the American Association of Zoo Veterinarians in 2010.

7.      Over the course of 35 years, I have conducted research concerning health and diseases of wild animals, and on other conservation issues, and have written or co-written over 250 popular and peer-reviewed articles, papers, and book chapters. I have applied this knowledge to the management and conservation of marine and terrestrial wildlife, including bighorn sheep, in the United States and several other countries (see Exh. 1). I have authored or co-authored approximately 110 peer-reviewed publications, including some published in the Proceedings of the National Academy of Science, PLOS One, Journal of the American Veterinary Medical Association, American Journal of Veterinary Research, and Journal of Wildlife Diseases. Twenty eight of theses have been on bighorn sheep diseases, health, and management,

8.      In 2006, I was asked by a contractor working for the U.S. Forest Service to serve on the Payette National Forest Science Panel. This consisted of reviewing a recently finished qualitative risk assessment and other information related to a risk of disease transmission and

BLM_0127128

subsequent morbidity and mortality associated with contact between domestic sheep and bighorn sheep, and working with a panel of experts with a broad range of backgrounds in both domestic sheep and bighorn sheep disease and management. I participated in the review team meeting held in Boise Idaho in November 2006 and in subsequent discussions. Subsequently, several collaborators and I received funding and support from the National Fish and Wildlife Foundation, Foundation for North American Wild Sheep (FNAWS, now Wild Sheep Foundation), California chapter of FNAWS, California Department of Fish and Game, and University of California-Davis to plan, host, facilitate, and provide information from a series of three western state regional workshops on bighorn sheep and domestic sheep respiratory diseases. These three workshops were held in Davis, California in April 2006, Tucson, Arizona in September 2006, and Salt Lake City, Utah in February 2007. The documents, information provided, and presentations from those meetings are available at aawv.net/bighorn/.

9.     The Department of Justice has requested my assistance in reviewing and commenting on a declaration provided in this action by Donald P. Knowles and Margaret A. Highland, which required a review of pertinent scientific literature regarding contact between domestic and bighorns sheep, documentation of outcomes and evidence suggesting such contact may jeopardize health and survival of bighorn sheep, and previous efforts to determine disease transmission risks. In fulfilling this request, I am providing information on the topics outlined immediately below:

- **Evidence that contact between bighorn and domestic sheep increases risk of disease and death of bighorn:**

  o **Historic dieoffs following domestic sheep bighorn sheep contact**

Declaration of Dr. David A. Jessup Submitted in Support of the Federal Defendants Cross-Motion
for Summary Judgment                                                                                          3

BLM_0127129

       o   **More recent morbidity and mortality following contact**

       o   **Results of accidental and planned experimental contact**

       o   **Inoculation experiments and laboratory research**

       o   **Searching for the ideal experiment**

       o   **Formal risk assessments**

- **Why sheep and goats are a particular threat**
- **Review and comment on Knowles and Highland Declaration**

**Evidence that contact between bighorn and domestic sheep increases risk of disease and death of bighorn sheep:**

    **Historic dieoffs following domestic / bighorn sheep contacts**

10.    A central tenant of Plaintiffs' position is that the U.S. Forest service does not have sufficient evidence to support a decision to separate domestic sheep from bighorn sheep for the purpose of reducing the risk of disease transmission and death of bighorn sheep, or that disease and death of bighorn consistently follows contact between the two species. There is a large body of evidence supporting the Forest Service's decision to optimize separations of bighorn sheep from domestic sheep.

11.    One source is general historical observation and documentation of bighorn sheep population declines following presumed and/or documented contact. Observations of obvious disease morbidity and mortality following contact with domestic sheep and goats go back over 100 years and are numerous. Rather than list each observation, some of which are of limited value in isolation, several summaries and literature reviews are available, including Goodson

BLM_0127130

1982 (FS008830), Martin *et al.* 1996 (FS010331), Singer *et al.* 1996, Monello *et al.* 2001 (FS006881), Singer *et al.* 2001 (FS011357), and Wehausen *et al.* 2011 (attached as Exhibit 2). I have read each of these and believe they provide factually accurate information about historic dieoffs. Earlier observations, those from before 1980, were often general in nature or only mentioned diseases that were obvious or very unsightly, like scabies and other parasites. Many of the older citations also include observations of bighorn sheep coughing and showing other signs of respiratory disease. These older citations described outbreaks that were often devastating to the bighorn sheep, morbidity and mortality that was often prolonged in course, and which often led to losses of entire herds as well as regional extinctions. As recently as 2013, mortality events connected to contact with goats or domestic sheep have continued. Specifically, the large scale dieoff of bighorn sheep in California's Old Dad Peak population, previously one of the largest and most healthy in the state, followed the abandonment of a goat in an adjacent mountain range and the dumping of sick and dying sheep from a truck passing through the area.

**More recent morbidity and mortality following documented contact**

12.    A second source of evidence comes from the more recent incidents of disease and dieoffs in free-ranging bighorn sheep populations since the early 1980's. These more recent reports not only documented the observations of symptoms/conditions bighorn sheep exhibited following contact with domestic sheep or goats, but more closely investigated and identified the causal agents. These reports include, but are not limited to, Foreyt and Jessup 1982 (FS011110), Onderka and Wishart 1984 (FS012002), Rudolph *et al.* 2003 (FS011285), Jansen *et al.* 2006 (FS006988), George *et al.* 2008 (FS FS012398), and Besser *et al.* 2008 (FS012571). Much of this literature was summarized by Wehausen *et al.* 2011. Death of bighorn sheep in these cases

BLM_0127131

was most often attributed to pneumonia caused by bacteria of the Pasteurellacae family, as well

as *Mycoplasma ovipneumonia*, and infection with *Mycoplasma* spp. Many similar bighorn

dieoffs in the last 30 years have been less well documented ,including large ones in the Lostine

herd of the Wallowa Mountains of Oregon, the Hells Canyon bighorn population in Idaho, and

the bighorn herd in Ruby Mountains of Nevada, to name a few.

### Results of accidental and planned experimental contact

13.    A third source of evidence that contact between domestic sheep and bighorn

sheep has serious consequences for the bighorn sheep's survival comes from observations and

documentation from a series of experiments where the two species were either accidentally or

purposefully mixed under conditions of loose confinement. An excellent summary of these trials

up to the year 2010 can be found in Tables 1 and 2 of Wehausen *et al.* 2011, reproduced below.

From Wehausen *et al.* 2011 a portion of Table 1. Summary of data from contact trials of bighorn sheep co-pastured with domestic sheep.

|  | Number of trials | Wild sheep tested | Wild sheep dying | Domestic sheep and other species used | Domestic sheep and other species dying |
|---|---|---|---|---|---|
| Unplanned Pen Trials with domestic sheep | 2 | 57 | 56 |  |  |
| Planned Pen Trials with domestic sheep | 10 | 23 | 23 | 167 | 0 |
| Planned Pen Trials with other species | 9 | 55 | 4 | 32 | 0 |

BLM_0127132

14.     As noted by Wehausen *et al.* 2011, the results of planned and unplanned contact trials with domestic sheep are extremely consistent: 79 of 80 bighorn sheep involved in the studies died. Another report worth noting is the Black *et al.* 1988 (FS011877), which showed that penning Dall's sheep (*Ovis Dalli dalli*), a species closely related to bighorn sheep (but pure white in color) that live only in Canada and Alaska, with apparently healthy domestic sheep over winter in a zoo resulted in all Dall's sheep dying of pneumonia caused by *Mycoplasma ovipneumonia*. A complete listing of bighorn sheep contact trials with a wider variety of species from Wehausen et al 2011 provides an understanding of how many trials have been conducted in the effort to understand whether contact with domestic sheep is uniquely lethal.

BLM_0127133

<u>Wehausen *et al.* 2011 Table 2. Details from contact experiments involving bighorn sheep co-pastured with domestic sheep (dom. sheep), mouflon sheep, domestic goats (dom. goats), white-tailed deer (w-t deer), mule deer, elk, mountain goats (mt. goats), llamas, horses, and cattle.</u>

| bighorn used | bighorn dead | co-pastured with: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | dom. sheep | mouflon sheep | dom. goats | w-t deer | mule deer | elk | mt. goats | llamas | horses | cattle |
| 2 | 2 | 2 | - | - | - | - | - | - | - | - | - |
| 6 | 6 | 6 | - | - | - | - | - | - | - | - | - |
| 2 | 2 | 2 | - | - | - | - | - | - | - | - | - |
| 6 | 6 | - | 5 | - | - | - | - | - | - | - | - |
| 2 | 2 | 2 | - | - | - | - | - | - | - | - | - |
| 1 | 1 | 30[a] | - | - | - | - | - | - | - | - | - |
| 1 | 1 | 30[a] | - | - | - | - | - | - | - | - | - |
| 1 | 1 | 30[a] | - | - | - | - | - | - | - | - | - |
| 1 | 1 | 30[a] | - | - | - | - | - | - | - | - | - |
| 1 | 1 | 30[a] | - | - | - | - | - | - | - | - | - |
| 10 | 0 | - | - | - | 2 | 1 | 4 | - | - | - | - |
| 3 | 0 | - | - | - | - | - | 4 | - | - | - | - |
| 9 | 0 | - | - | - | - | - | - | 2 | - | - | - |
| 9 | 0 | - | - | - | - | - | - | - | 3 | - | - |
| 4 | 0 | - | - | - | - | - | - | - | - | - | 3 |
| 5 | 1 | - | - | - | - | - | - | - | - | - | 3 |
| 6 | 1[b] | - | - | - | - | - | - | - | - | 3 | - |
| 2 | 0 | - | - | 3 | - | - | - | - | - | - | - |
| 7 | 2 | - | - | 4 | - | - | - | - | - | - | - |

[a] mixture of domestic sheep and mouflon-argali hybrids
[b] animal in poor condition at beginning of experiment; death likely caused by tooth anomalies and feeding difficulty.

15.     Recently, Lawrence *et al.* 2010 (FS12510) provided the most convincing confirmation to date of fatal results when bighorn sheep were allowed contact with domestic sheep.

**Inoculation experiments and laboratory research**

16.     A fourth source of information supporting the contention that contact between bighorn sheep and domestic sheep can be lethal to the bighorn sheep is biomedical research, primarily experimental inoculation of some of these organisms known to be associated with respiratory disease into bighorn sheep kept as research animals. This research documents that organisms found in the oropharynx or other tissues of domestic sheep, including entirely healthy appearing individuals, may be lethal to bighorn sheep. Further laboratory evidence comes from research comparing the relative ability of white blood cells of domestic sheep and those of bighorn sheep to kill known disease causing bacteria (see Paragraph 19 below).

17.     A number of independent researchers have inoculated bacteria isolated from domestic sheep or cattle into bighorn sheep to determine whether these organisms cause pneumonia and death. These include, but are not limited to, Onderka *et al.* 1998 (FS011274), Foreyt *et al.* 1994 (FS011790), and Dassanayake *et al.* 2008 (FS012495). Results of inoculation trials are also summarized by Wehausen *et al.* 2011. Again, results were very consistent with bacteria (usually *Pasteurella – Mannheimia haemolytica*) isolated from domestic sheep being fairly uniformly lethal, with bacteria originating from cattle only somewhat less so.

BLM_0127135

From Wehausen *et al*. 2011, a portion of Table 1.  Inoculation trials of bighorn sheep and Dall's sheep (planned inoculation trials only) that used *M. haemolytica* cultured from domestic sheep.

| | Number of trials | Wild sheep tested | Wild sheep dying | Domestic sheep and other species used | Domestic sheep and other species dying |
|---|---|---|---|---|---|
| Unplanned Inoculation Trials | 1 | 13 | 6 | | |
| Planned Inoculation Trials | 6 | 15 | 14 | 9 | 0 |

18.    One further trial as reported by Dassanayake *et al*. 2010 (but not included in Wehausen *et al*. 2011) involved inoculation of four bighorn sheep with one of two sources of *Mycoplasma ovipneumonia*. All four developed signs of respiratory infection, but only one bighorn, one that was carrying *Mannheimia haemolytica* in its upper respiratory tract, died quickly. The remaining three bighorn were then inoculated with a known *Mannheimia haemolytica* isolate. They all died of pneumonia. The authors concluded that "*M. ovipneumonia* alone may not cause fatal pneumonia in BHS, but can predispose them to fatal pneumonia due to *M. haemolytica* infection."

19.    Another laboratory approach to understanding why domestic sheep may be able to harbor organisms that are lethal to bighorn sheep is to look for differences in the ability of their immune responses to process and kill the types of bacteria that are known to cause pneumonia. In "*Pasteurella haemolytica* cytotoxin dependent killing of neutrophils in bighorn and domestic sheep," published in Journal of Wildlife Disease 29(1):30-35, Silflow *et al*. 1994 showed that

BLM_0127136

one basic innate immunologic function of the white blood cells that limits bacterial ability to replicate and cause disease is considerably less developed in bighorn as compared to domestic sheep. Similar work has been done testing alveolar macrophages, immune system cells that line the upper respiratory tract. Studies looking at other cellular level immune functions have provided similar conclusions (Silflow *et al.* 1989 (FS012051), Silflow and Foreyt 1994 (FS012044), Ward *et al.* 1999 (FS012619)). This work supports the concept that spatial separation of the species is an very appropriate tool to reduce the risk of disease transmission, and that more complicated approaches like vaccination are not practical or effective at the present time. Essentially, bighorn sheep inherently lack resistance to organisms that evolved in their European counterparts.

### Searching for "proof positive" or an ideal experiment

20.    A group of approximately 50 veterinary and animal health professionals met in Davis, California in April of 2007 for a professionally facilitated workshop to review domestic and bighorn sheep respiratory disease (aawv.net/bighorn/workshop2007.html); FS018411. Although there was general consensus that there was strong evidence to support the hypothesis that domestic sheep carried organisms that could cause respiratory disease in bighorn sheep, there was not unanimity supporting that conclusion. During breakout sessions two proposed "ideal research trials" to prove that respiratory disease transmission can occur following domestic/bighorn contact were developed, one for free-ranging and one for captive animals, and they were presented to the group. The free-ranging trial would utilize a herd of healthy bighorn sheep without previous pneumonia history or contact with domestic sheep, and then introduce a domestic sheep, record the contact, and determine whether a pneumonia dieoff occurred and

Declaration of Dr. David A. Jessup Submitted in Support of the Federal Defendants Cross-Motion
for Summary Judgment                                                                                    11

BLM_0127137

what it did to the previously healthy herd. The captive trial would involve the introduction of known infected domestic sheep to clean bighorn sheep, with very close investigation and observation of microbiologic respiratory flora and recording of behaviors and outcomes to see under what conditions the organisms were transmitted. It was generally agreed that results of such experiments would constitute strong evidence for or against causation.

21.    One way scientists establish whether hypotheses are true is to propose ideal experiments to test them and then observe whether the results of the experiment confirm or fail to confirm what was predicted. In concept, if one understands the dynamics of a phenomenon, designs a trial, and predicts the outcome, and then experimentally replicates it (here, transmission of pneumonic disease from domestic sheep to bighorn sheep under controlled captive conditions and also under free-ranging conditions), this would provide "proof positive" and be enough to convince skeptics that contact is potentially lethal to bighorn sheep and that separation is necessary to protect them. If the experiments proved the hypothesis, they would also support federal and State agency efforts to minimize contact. Since 2007 both of these experiments, one planned and one unplanned, have taken place.

22.    The ideal penned domestic sheep/bighorn contact trial proposed in 2007 is essentially what Lawrence *et al.* report on in 2010, in "Transmission of *Mannheimia haemolytica* from domestic sheep (*Ovis aries*) to bighorn sheep (*Ovis Canadensis*): Unequivocal demonstration with green fluorescent protein-tagged organisms," in Journal of Wildlife Diseases (JWD) 46(3):706-717 (FS012510). The authors state, "The results unequivocally demonstrate transmission of *Mannheimia haemolytica* from domestic sheep to bighorn sheep, resulting in pneumonia and death of bighorn sheep." See additional comments below and the Declaration of Dr.

Declaration of Dr. David A. Jessup Submitted in Support of the Federal Defendants Cross-Motion
for Summary Judgment                                                                                    12

BLM_0127138

Subramaniam Srikumaran.

23.     Something very close to the ideal free-ranging contact trial proposed in 2007 was
reported on in "Epidemic pasteurellosis in a bighorn sheep population coinciding with the
appearance of a domestic sheep," by George *et al.* in 2008, Journal of Wildlife Diseases 44(2):
388-403 (FS012398). The authors document the onset of an epidemic of pneumonia in
previously healthy bighorn sheep that coincided spatially and temporally with the appearance of
a single domestic sheep and that eventually spread through 3 interconnected wintering herds. The
epidemic dramatically lowered monthly adult bighorn survival in all 3 herds, and lamb recruit-
ment following the epidemic was depressed compared to years before the outbreak in all 3 herds.
The authors state, "Based on observations presented here, pasteurellosis epidemics in free-
ranging bighorn sheep can arise through incursion of domestic sheep onto native ranges, and thus
minimizing contact between domestic and bighorn sheep appears to be a logical principal for
bighorn sheep conservation."

**Formal domestic/ bighorn sheep contact/disease risk assessments**

24.     Assessments of risk associated with various actions or policies come in two
forms, qualitative and quantitative, and these provide, arguably, one of the strongest tools to
enlist political and bureaucratic support for setting management policies.

25.     Qualitative risk assessment basically requires that experts consider available
information, research, and scientific knowledge and rate or select proposed management actions
based on whether they increase, decrease, or do not change risk. Qualitative risk assessment is
generally favored when there are many variables or unknowns, as is often the case with free-
ranging wildlife. This is the most common form of risk assessment and the type earlier used by

BLM_0127139

the Payette National Forest with regard to bighorn/domestic sheep management in 2005. The
Payette National Forest Risk Assessment Review Team, which included several scientists who
were strongly aligned with domestic sheep interests, upheld the findings of that qualitative risk
assessment.

26.     Quantitative risk assessment requires assigning numerical values or mathematical
formulas to all questions or actions, and this form of risk assessment is very difficult when free-
roaming wildlife are involved. However, a quantitative risk assessment has been done for
bighorn/domestic sheep contact and likelihood of mortality in bighorn sheep for the Sierra
Nevada Mountains of California. I am reasonably familiar with both the Payette National Forest
and Sierra Nevada grazing and bighorn issues and believe the situations are fairly similar. In
"Assessing disease risk at the wildlife-livestock interface: A study of Sierra Nevada bighorn
sheep," by Clifford *et al.*, in Biological Conservation 142(11): 2559-2568 (FS012456), the
authors concluded: "Even when management strategies reduced risk of interspecies contact to
less than 2% per year, our model predicted a 50% probability of a catastrophic respiratory
disease outbreak during the next 10 bighorn sheep generations. If an outbreak occurs in the near
future, the model predicts that the smallest Sierra Nevada bighorn sheep population would have a
33% probability of quasi-extinction. To eliminate all risk of contact and potential disease
transmission, domestic sheep cannot be grazed on allotments that overlap with areas utilized by
Sierra Nevada bighorn sheep." The Payette assessment in the Final Supplemental Environmental
Impact Statement, even though utilizing some different modeling techniques, arrived at similar
conclusions that domestic sheep grazing was deemed not suitable in areas where the risk for
contact between bighorn sheep and active domestic sheep allotments was too high for the

Declaration of Dr. David A. Jessup Submitted in Support of the Federal Defendants Cross-Motion
for Summary Judgment                                                                                    14

bighorn sheep to maintain a viable population.

**Why sheep and goats pose a particular threat:**

27.    There are no historic or field observations that suggest that contact between bighorn sheep and other North American wild ungulates (moose, caribou, elk, bison, mountain goats, pronghorn antelope, white-tailed or mule deer) result in bighorn sheep getting sick or dying. There have been a limited number of trials where bighorn were penned with other wild ruminants (see Wehausen *et al.* 2011), but none of those pen contacts with white-tailed and mule deer, elk, llamas, mountain goats, or horses resulted in bighorn getting sick or dying.

28.    Similarly penning bighorn with cattle has not generally resulted in disease or death, and when cattle and bighorn sheep encounter one another on open range they generally avoid each other. They do not have similar foraging patterns, vocalizations, smells, or behaviors. Bighorn instinctively seek sheer cliffs and steep open terrain where cattle cannot follow. However, there is at least one observation showing that under severe weather conditions and food and water limitations, bighorn and cattle may be forced into close contact to survive and that apparent transmission of disease agents between the species and subsequent pneumonia can occur in bighorn. Wolfe *et al.* 2010 report that 21 bighorn appear to have died over a 3 month period on the Fossil Ridge winter range in Colorado under such conditions. Pneumonia and *Mannheimia haemolytica* (1 of cattle origin, 1 of bighorn origin) were identified from 8 bighorn carcasses, but the dieoff did not lead to a subsequent herd decline as often seen when bighorn contact domestic sheep.

29.    Some field observations, dieoff investigations, and some experimental mixing trials suggest that goats may be a source of organisms lethal to bighorn sheep. Fairly well

BLM_0127141

documented cases include Rudolph *et al.* 2003 (FS011285), and Jansen *et al.* 2006 (FS006988).

30.     Domestic sheep, and goats used for brush clearance, are grazed in flocks, often with minimal supervision, and individual animals easily stray or become lost when the flock is disturbed. Straying and loss of animals is not only common, it is expected. It is very well known and understood that sheep of all species are very uncomfortable if alone. This is an evolved protection strategy many tens of thousands of years old. They seek the protection of the flock, even if that flock is made up of strange sheep and/or goat-like animals. Anyone who has observed goats and sheep in a barnyard recognizes that goats and sheep interact socially. These types of intimate contacts generally do not occur with less closely related species; and size and anatomic variations, as well as behavioral and biochemical differences, help assure that.

31.     Bighorn and domestic sheep are attracted to one another. They are approximately the same size, eat the same foods, have the same behaviors, and emit the same odors and phero-mones. They commonly nuzzle and breed when given the opportunity. In summary, two very basic biological phenomena, that of biological identity and attraction and the evolution of herd protection survival strategies, help explain why goats and sheep are particularly likely to come into close, prolonged, and intimate contact with bighorn sheep.

32.     It is also well understood in biology, microbiology, and biomedicine that closely related species can harbor or carry organisms that are lethal their close relatives. Primates (macaques) carry herpes viruses that are lethal to humans (and humans carry at least one lethal to monkeys); wildebeest carry viruses that are lethal to cattle; and bullfrogs carry fungi that are lethal to many other amphibian species. So it is quite logical that domestic sheep and goats, which across thousands of years were raised in close confinement and in dense herds or bands,

BLM_0127142

and were naturally and purposely selected for thousands of years for disease resistance, may be more resistant to potentially pathogenic organisms in their upper respiratory tract. While domestic sheep were evolving with their pathogens, bighorn sheep were evolving in low density bands, and in high, dry, hot or high, cold environments. Drs. Knowles and Highland in Paragraphs 14 and 24 of their Declaration note that dry, or very hot conditions are not conducive to survival of respiratory disease organisms outside the body. This same observation and reasoning applies to dry cold environments. Thus, bighorn sheep evolved under conditions where contact between animals was less common and where respiratory disease causing organisms do not survive for any length of time in the environment, so those organisms were likely more rarely encountered, and evolution of resistance to them was not as important to their survival. The laboratory findings of Silflow *et al*. 1989 (FS012051), 1994 (FS012044) further support the concept that bighorn are inherently less capable of killing respiratory pathogens and provide a cellular level explanation for why bighorn sheep often die following contact with apparently normal domestic sheep (and goats).

33.     In many Western states, it is policy that any bighorn sheep that has had contact with domestic sheep is lethally removed to keep it from potentially bringing pneumonia causing organisms back to its herd of origin. Literally dozens of bighorn have been killed to protect their source herds in 7 Western states over the last 15 years and they provide mute evidence that bighorn will seek out and join sheep/goat herds.

34.     In my own experience, when I investigated the pneumonia mortality events at the Lavabeds National Monument in summer of 1980, I saw and photographed 3 stray domestic sheep and one lamb within 40 feet of the bighorn sheep enclosure fence line and the carcass of a

dead domestic sheep within 5 feet of that fence line while the bighorn dieoff was in progress. This was 3 weeks after all domestic sheep from an adjacent grazing allotment were supposed to have been removed. These were clearly stray sheep that had been left behind, and that was later confirmed. A peer-reviewed published description of that situation is provided in Foreyt and Jessup 1982 (FS011110). Photographs I took are shown in Exhibit 3, attached, all taken the second week in July 1980. From upper left and moving counterclockwise the pictures are a. 3 domestic ewes and one lamb about 40 feet from the Lavabeds bighorn sheep perimeter fence; b. the carcass of a dead domestic sheep on the perimeter road about 5–6 feet from the fence line; c. the carcass of a dead domestic sheep ewe within about 10 feet of a drinker used by bighorn (and the only local standing water, so likely used by both domestic and bighorn sheep); d. (center bottom) Jessup doing a postmortem examination on one of the dead bighorn rams at the Lavabeds, with a National Park Service uniformed person in background; e. (bottom right) the lung of one of the dead bighorn showing fibrinopurulent bronchopneumonia from which a *Pasteurella* was cultured; e. (top right) a dead bighorn ewe within the Lavabeds enclosure (none of approximately 43 bighorn survived the outbreak); f. (top middle) the dead bighorn ram shown below before postmortem examination showing markings in the dirt suggesting it was struggling to rise before it died. I saw only two live bighorn by the time I got there, and all bighorn at the Lavabeds died within about 30 days of when signs or respiratory disease were first reported, presumably of pneumonia, as per Foreyt and Jessup 1982.

35.     In 1978 during helicopter surveys of the Santa Rosa Mountains in California, I observed a domestic goat running with bighorn sheep. The surveys being conducted at that time were meant to help determine why the herd numbers had apparently declined over the previous

BLM_0127144

several years. On two other occasions, I have seen goats running with bighorn sheep. In 1988, during an investigation of a bighorn sheep pneumonia dieoff in the South Warner Mountains of California, I saw photographs taken by colleagues a few days earlier showing stray domestic sheep mixed in with Warner Mountains bighorn sheep. I viewed carcasses of those stray domestic sheep shot by the rancher and also looked at the carcasses of three stray goats collected from Warner Pass at the northern end of the former bighorn sheep range. I did postmortem examinations on 3 reasonably fresh bighorn sheep carcasses and they died of pneumonia. The result of that dieoff was effectively extinction of the Warner Mountain bighorn sheep herd.

36. Several large libraries of photo-documentation exist of bighorn sheep comingling with domestic sheep, and domestic sheep and goats comingling with bighorn sheep. These include photos of intimate contact, including breeding behaviors and even documented hybrid animals born into domestic sheep herds. There is no better evidence of more intimate contact, contact more likely to result in disease transmission, or better evidence that bighorn and domestic sheep can come into close contact under free-ranging conditions than is provided in these photographs. The attached photographs, Exhibit 4, were provided to me by Kevin Hurley of the Wild Sheep Foundation, and in my experience they accurately depict typical interactions between domestic and bighorn sheep under open range conditions when the two species come into contact.

37. Another source of evidence that contact between domestic sheep and wild bighorn sheep occurs, and that it results in mortality to the bighorn sheep, comes from the records of the Idaho Department of Fish and Game, which captured and held bighorn sheep that had come into contact with domestic sheep, goats, or cattle to see what happened to them. Both wandering rams

BLM_0127145

and wandering ewes were collected. In a paper in press, Drew and colleagues report on 14 bighorn sheep taken into captivity following contact with livestock (domestic sheep-10, goats-3, sheep and goats-1). Four died within 7 days, and 10 survived anywhere from 47 days to 57 months. A total of five of the 14 bighorn died of pneumonia. The results of that study were presented at the 2013 Annual International Wildlife Disease Association Conference in Knoxville, Tennessee, held from July 27 to August 2, 2013.  An abstract of the information to be published is attached as Exhibit 5.

38.    Clearly, under open range conditions domestic sheep and goats can come into close contact with bighorn sheep. Stray domestic sheep and goats seek out bighorn sheep herds, and bighorn sheep occasionally stray into and join domestic sheep/goat bands. The results are frequently catastrophic for the bighorn sheep.

**Review and comment on Knowles and Highland Declaration**

39.    In general, the microbiology information and many of the background comments and details of the Knowles and Highland declaration appear to be correct and appropriate. However, some statements (Knowles and Highland Paragraphs 17, 18, 21, 22, 23, 38) are missing details critical to the question of whether domestic sheep contact with bighorn is likely to have detrimental results. For example, domestic sheep are commonly found to have *Mannheimia haemolytica* and/or *Mycoplasma ovipneumonia* in their oropharynx or upper respiratory tract, even when they are apparently healthy and not just when they come from flocks with a history of illness or exposure to disease. Conversely, although *Mannheimia haemolytica* has been found in the oropharynx of bighorn sheep not suffering from apparent disease, this is not a common finding in healthy bighorn. When *Mycoplasma ovipneumonia* is found in bighorn,

BLM_0127146

it is usually from animals from herds that have survived a pneumonia outbreak. Bighorn sheep herds with *Mycoplasma ovipneumonia* carriers are usually marked by chronic and recurrent respiratory disease and poor lamb survival. It should be noted that the healthy bighorn selected for the Lawrence *et al.* 2010 research were free from *M. ovipneumonia.*

40.     Specific responses to the Knowles/Highland Declaration concerning Lawrence *et al.* 2010 have been provided by. Dr. Subramaniam Srikumaran and are, in my view, a correct representation of the Lawrence *et al.* study. Dr. Knowles submitted a letter to the Forest Service in August 2010, in which he raised many of the criticisms of the Lawrence *et al.* paper that he makes in the declaration submitted in this case. I responded to those criticisms in a letter I provided to the Forest Service in September 2010, a copy of which is attached as Exhibit 6. The following remarks from the Knowles/Highland Declaration warrant more detailed comment.

41.     Dr. Knowles' August 2010 written comments express the view that the most significant problem with Lawrence et al 2010 was the lack of death following fence line contact for two months. Additionally, in his declaration in this case Dr. Knowles states that it was significant that bighorn death did not occur until there was confined commingling of domestic and bighorn sheep.

42.     As I note in Paragraph 34 above, the type of fenceline contact described in Lawrence *et al.* 2010 is the same as can occur when stray domestic sheep encounter a herd of bighorn sheep, or when stray bighorn sheep encounter a band of domestic sheep. The pneumonia process that killed the first bighorn in Lawrence *et al.* 2010 clearly began before comingling was allowed, the period of time when only fenceline contact was possible. The fact that transmission was delayed for some period of time is not unusual. As Drs. Knowles and Highland have pointed

Declaration of Dr. David A. Jessup Submitted in Support of the Federal Defendants Cross-Motion
for Summary Judgment                                                                                                      21

out, transmission requires the right set of circumstances. Nor is this a reason to doubt that fence line contact constitutes a disease transmission risk, albeit perhaps a lower level of risk, than prolonged intimate contact. Lawrence *et al.* 2010 shows fenceline contact is sufficient to allow respiratory disease transmission, but clearly, comingling accelerates the process.

43.      Drs. Knowles and Highland state that it is not known from the Lawrence *et al.* study when the bighorn sheep acquired the *Mycoplasma ovipneumoniae*. But since the bighorn sheep were negative when the trial began and had the organism when they died at the trial's end, we do know when they got it — sometime during the exposure trials, most likely toward the end when they were in fence line contact or comingling. This is very consistent with what is known about that organism, that it is difficult to transmit except under close contact conditions. Black *et al.* 1988 (FS011877) document that penning domestic sheep from a petting zoo with Dall's sheep (a wild northern cousin of bighorn sheep) during the winter in Toronto resulted in the death of the Dall's sheep from pneumonia caused by *Mycoplasma ovipneumoniae* over a course of several months, even though all of the sheep were previously healthy. In that case the exact moment of transmission for each animal was not known, but the outcome clearly was: all Dall's sheep died or were euthanized *en extremis*, while all of the domestic sheep remained healthy.

44.      Knowles and Highland (Paragraphs 14, 17 and 18) state that both *Mycoplasma ovipneumonia* and *Mannheimia haemolytica* are common in the upper respiratory tract of domestic sheep and are transmitted by aerosol over short distances. A central contention of their declaration in this case is that Lawrence *et al.* 2010 does not prove *Mannheimia haemolytica* from domestic sheep causes pneumonia in bighorn sheep, despite the fact that Knowles is a coauthor and the paper states that it provides "unequivocal evidence" of that. This is quite

BLM_0127148

unusual. But, it should be noted that Dr. Knowles is also a co-author on another peer reviewed paper, one involving inoculation of organisms rather than nose-to-nose contact, which concludes that "*M. ovipneumonia* alone may not cause fatal pneumonia in BHS, but can predispose them to fatal pneumonia due to *M. haemolytica* infection." (Dassanayake *et al.* 2010). So, that paper too supports the conclusion that *Mannheimia haemolytica* of sheep origin can cause pneumonia in bighorn sheep, and that risk of pneumonia is increased when *M. ovipneumonia* is also present. And as noted, they have stated both are commonly found in, and easily spread short distances from, the noses of domestic sheep.

45.     Most importantly, in attempting to increase separation between domestic sheep and bighorn sheep, the Forest Service is attempting to reduce the potential for contact and the spread of disease that can result. Taking measures to prevent transmission of disease in animal and human populations does not require knowing the exact moment when a pathogenic organism is transmitted from one animal to another, nor when that organism begins to overwhelm the immune response of the susceptible animal. It only requires knowing what behaviors constitute risk or increase risk, and then avoiding those.

46.     Drs. Knowles and Highland state in Paragraph 41 of their declaration that commingling of bighorn sheep and domestic goats and cattle may cause bighorn mortality, although at a lower rate than caused when bighorn sheep are commingled with domestic sheep. I agree and note that while death rates from pneumonia are somewhat lower when bighorn sheep are commingled with domestic goats or cattle, most scientists who have studied this problem recommend that all precautions that apply to reducing risk of contact between domestic sheep and bighorn sheep should apply to domestic goats as well. There is no evidence from field

Declaration of Dr. David A. Jessup Submitted in Support of the Federal Defendants Cross-Motion
for Summary Judgment                                                                                         23

BLM_0127149

observations that contact between bighorn sheep and any other wild or domestic ungulates (except sheep and goats) commonly results in disease transmission and/or bighorn dying of pneumonia. So, although every possible species has not been tested, much lower rates of disease are seen when cattle are involved and essentially none with other ungulates except domestic sheep and goats. And, importantly, bighorn sheep do not nuzzle or mate with cattle, deer, elk, llamas or horses. As Drs. Knowles and Highland have noted, it isn't just the presence of the organisms that causes disease; other factors, like attraction and intimate contact, enhance transmission. Indeed, as Drs. Knowles and Highland note, contact trials have not been conducted with 150 species of wild and domestic ruminants, but none of those hundred-odd species of exotic ungulates are grazed in the mountainous terrain used by bighorn sheep, whereas sheep, goats, and cattle are. At the same time, the likely wildlife contact species, mule and white-tailed deer, elk, and mountain goats have been tested in contact trials, albeit to a limited extent, for disease transmission and found negative.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 23rd day of September, 2013, in Royal Oaks, California.

/s/ *David A. Jessup*
DAVID A. JESSUP

DAVID A. JESSUP   9/23/2013

Declaration of Dr. David A. Jessup Submitted in Support of the Federal Defendants Cross-Motion
for Summary Judgment                                                                                   24

BLM_0127150

**Literature Cited**

Besser, T. E., E. F. Cassirer, K. A. Potter, J. Vanderschalie, A. Fischer, D. P. Knowles, D. R. Herndon, F. R. Rurangirwa, G. C. Weiser, and S. Srikumaran. 2008. Association of *Mycoplasma ovipneumoniae* infection with population-limiting respiratory disease in free-ranging Rocky Mountain bighorn sheep (*Ovis canadensis canadensis*). Journal of Clinical Microbiology 46:423-230.

Black, S.R, I.K. Barker, K.G. Mehren, G.J. Crawshaw, S. Rosendal, L. Ruhnke, J. Thorsen, P.S. Carman, 1998. An epizootic of Mycoplasma ovipneumoniae infection in captive Dall's sheep (Ovis dalli dalli), Journal of Wildlife Diseases, 24(4):627-635.

Callan, R. J., T. D. Bunch, G. W. Workman, and R. E. Mock. 1991. Development of pneumonia in desert bighorn sheep after exposure to a flock of exotic wild and domestic sheep. Journal of the American Veterinary Medical Association 198:1052-1056.

Cassirer, E. F., K. M. Rudolph, P. Fowler, V. L. Coggins, D. L. Hunter, and M. W. Miller, 2001. Evaluation of ewe vaccination as a tool for increasing bighorn lamb survival following pasteurellosis epizootics. Journal of Wildlife Diseases 37:49-57.

Clifford, D.L., B.A. Schumaker, T.R. tephenson, V.C. Bliech, M.L. Cahn, B.J. Gonzales, W.M. Boyce, J.A.K. Mazet. 2009, Assessing disease risk at the wildlife-livestock interface: A study of Sierra Nevada bighorn sheep", Biological Conservation 142(11): 2559-2568.

Dassanayake, R. P., S. Shanthalingam, C. N. Herndon, P. K. Lawrence, E. F. Cassirer, K. A. Potter, W. J. Foreyt, K. D. Clinkenbeard, and S. Srikumaran, 2009. Mannheimia haemolytica serotype A1 exhibits differential pathogenicity in two related species, Ovis canadensis and Ovis aries. Veterinary Microbiology 133:366-71.

Dassanayake RP, Shanthalingam S, Herndon CN, Subramaniam R, Lawrence PK, Bavananthasivam J, Cassirer EF, Haldorson GJ, Foreyt WJ, Rurangirwa FR, Knowles, DP, Besser TE, Srikumaran S. 2010 Mycoplasma ovipneumoniae can predispose bighorn sheep to fatal Mannheimia haemolytica pneumonia. Vet Microbiol. 145(3-4):354-359.

Foreyt, W. J., and D. A. Jessup, 1982. Fatal pneumonia of bighorn sheep following association with domestic sheep. Journal of Wildlife Diseases 18:163-168.

Foreyt, W. J. 1989. Fatal Pasteurella haemolytica pneumonia in bighorn sheep after direct contact with clinically normal domestic sheep. American Journal of Veterinary Research 50:341-344.

Foreyt, W. J. 1990. Pneumonia in bighorn sheep: effects of Pasteurella haemolytica from domestic sheep and effects on survival and long-term reproduction. Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council 7:92-101.

BLM_0127151

Foreyt, W. J. 1992a. Experimental contact association between sheep, elk, and deer with known Pasteurella haemolytica infections. Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council 8:213-218.

Foreyt, W. J. 1992b. Failure of an experimental Pasteurella haemolytica vaccine to prevent respiratory disease and death in bighorn sheep after exposure to domestic sheep. Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council 8:155-163.

Foreyt, W. J. 1994. Effects of controlled contact exposure between healthy bighorn sheep and llamas, domestic goats, mountain goats, cattle, domestic sheep, or mouflon sheep. Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council 9:7-14.

Foreyt, W. J., and J. E. Lagerquist. 1996. Experimental contact of bighorn sheep (Ovis canadensis) with horses and cattle, and comparison of neutrophil sensitivity to Pasteurella haemolytica cytotoxins. Journal of Wildlife Diseases 32:594-602.

Foreyt, W. J., and R. M. Silflow. 1996. Attempted protection of bighorn sheep (Ovis canadensis) from pneumonia using a nonlethal cytotoxic strain of Pasteurella haemolytica Biotype A, Serotype. Journal of Wildlife Diseases 32:315-321.

Foreyt, W. J., K. P. Snipes, and R.W. Kasten. 1994a. Fatal pneumonia following inoculation of healthy bighorn sheep with Pasteurella haemolytica from healthy domestic sheep. Journal of Wildlife Diseases 30:137-145.

Foreyt, W. J. 1994. Effects of controlled contact exposure between healthy bighorn sheep and llamas, domestic goats, mountain goats, cattle, domestic sheep, or mouflon sheep. Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council 9:7-14.

Foreyt, W. J., R. M. Silflow, and J. E. Lagerquist. 1996. Susceptibility of Dall sheep (Ovis dalli dalli) to pneumonia caused by Pasteurella haemolytica. Journal of Wildlife Diseases 32:586-593.

George, J. L., D. J. Martin, P. M. Lukacs, and M. W. Miller. 2008. Epidemic pasteurellosis in a bighorn sheep population coinciding with the appearance of a domestic sheep. Journal of Wildlife Diseases 44:388-403.

Goodson, N. J. 1982. Effects of domestic sheep grazing on bighorn sheep populations: a review. Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council 3:287-313.

BLM_0127152

Jansen, B. D., J. R. Heffelfinger, T. H. Noon, P. R. Krausman, and J. C. deVos. 2006. Infectious keratoconjunctivitis in bighorn sheep, Silver Bell Mountains, Arizona, USA. Journal of Wildlife Diseases 42:407-411.

Kraabel, B. J., M. W. Moller, J. A. Conlon, and H. J. McNeil. 1998. Evaluation of a multivalent Pasteurella haemolytica vaccine in bighorn sheep: protection from experimental challenge. Journal of Wildlife Diseases 34:325-333.

Lawrence P.K., Shanthalingam S, Dassanayake RP, Subramaniam R, Herndon CN, Knowles, DP, Rurangirwa FR, Foreyt WJ, Wayman G, Marciel AM,Highlander SK, Srikumaran S. 2010. Transmission of Mannheimia haemolytica from domestic sheep (Ovis aries) to bighorn sheep (Ovis canadensis): Unequivocal demonstration with green fluorescent protein-tagged organisms.J Wildl Dis. 46(4):1346-7.

Martin, K. D., T. Schommer, and V. L. Coggins. 1996. Literature review regarding the compatibility between bighorn and domestic sheep. Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council 10:72-77.

Miller, M. W., J. A. Conlon, H. J. McNeil, J. M. Bulgin, and A. C. S. Ward. 1997. Evaluation  of multivalent Pasteurella haemolytica vaccine in bighorn sheep: safety and serologic responses. Journal of Wildlife Diseases 33:738-748.

Monello, R. J., D. L. Murray, and E. F. Cassirer. 2001. Ecological correlates of pneumonia epizootics in bighorn sheep herds. Canadian Journal of Zoology 79:1423-1432.

Onderka, D. K., and W. D. Wishart. 1984. A major bighorn sheep die-off from pneumonia in southern Alberta. Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council. 4:356-363.

Onderka, D. K., and W. D. Wishart. 1988. Experimental contact transmission of Pasteurella haemolytica from clinically normal domestic sheep causing pneumonia in Rocky Mountain bighorn sheep. Journal of Wildlife Diseases 24:663-667.

Onderka, D. K., S. A. Rawluk, and W. D. Wishart. 1988. Susceptibility of Rocky Mountain bighorn sheep and domestic sheep to pneumonia induced by bighorn and domestic livestock strains of Pasteurella haemolytica.  Canadian Journal of Veterinary Research 52:439-444.

Rudolph, K. M., D. L. Hunter, W. J. Foreyt, E. F. Cassirer, R. B. Rinder, and A. C. S. Ward. 2003. Sharing of Pasteurella spp. between free-ranging bighorn sheep and feral goats. Journal of Wildlife Diseases 39:897-903.

BLM_0127153

Silflow, R. M., W. J. Foreyt, and R. W. Leid. 1993. Pasteurella haemolytica cytotoxin-dependent killing of neutrophils from bighorn and domestic sheep. Journal of Wildlife Diseases 29:30-35.

Silflow, R. M., W. J. Foreyt, S. M. Taylor, W. W. Laegreid, H. D. Liggit, and R. W. Leid. 1989. Comparison of pulmonary defense mechanisms in Rocky Mountain bighorn (Ovis canadensis canadensis) and domestic sheep. Journal of Wildlife Diseases 25:514-520.

Silflow, R. M., and W. J. Foreyt. 1994. Susceptibility of phagocytes from elk, deer, bighorn sheep, and domestic sheep to Pasteurella haemolytica cytotoxins. Journal of Wildlife Diseases 30:529-535.

Silflow, R. M., W. J. Foreyt, and J. E. Lagerquist. 1994. Evaluation of the cytotoxicity of various isolates of Pasteurella haemolytica from bighorn sheep and other ungulate populations. Proceedings of the Biennial Symposium of the Northern Wild Sheep and Goat Council 9:1-6.

Singer, F. J., L. C. Zeigenfuss, and L. Spicer. 2001. Role of patch size, disease, and movement in rapid extinction of bighorn sheep. Conservation Biology 15:1347-1354.

Ward, A. C. S., D. L. Hunter, K. M. Rudolph, W. J. DeLong, J. M. Bulgin, L. M. Cowan, H. J. McNeil, and M. W. Miller. 1999. Immunologic responses of domestic and bighorn sheep to a multivalent Pasteurella haemolytica vaccine. Journal of Wildlife Diseases 35:285-296.

Wehausen, J.D., S.T. Kelly, R.R. Ramey, 2011, Domestic sheep, bighorn sheep respiratory disease: A review of experimental evidence. California Fish and Game Quarterly 97(1): 17-24.

Wolfe L.L., B. Diamond, T.R. Spraker, M.A. Sirochman, D.P. Walsh DP, C.M. Machin, D.J. Bade, M.W.Miller. 2010. A bighorn sheep die-off in southern Colorado involving a Pasteurellaceae strain that may have originated from syntopic cattle. Journal of Wildlife Diseases 46(4):1262-1268.

BLM_0127154

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 28, 2013, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

William G. Myers
wmyers@hollandhart.com

Murray D. Feldman
mfeldman@hollandhart.com

Andrew A. Irvine
aairvine@hollandhart.com

Laurie M. Rule
lrule@advocateswest.org

Jennifer R. Schemm
jschemm@eoni.com

Dated:  October 28, 2013             /s/*David B. Glazer*
                                     David B. Glazer

Declaration of Dr. David A. Jessup Submitted in Support of the Federal Defendants Cross-Motion
for Summary Judgment                                                                    29

BLM_0127155

Lauren M. Rule (*ISB # 6863*)
ADVOCATES FOR THE WEST
PO Box 1612
Boise ID 83701
(208) 342-7024
lrule@advocateswest.org

Jennifer R. Schemm (*OSB #970086*)
Attorney at Law
602 "O" Avenue
La Grande, OR 97850
(541) 962-0896
jschemm@eoni.com

Attorneys for Intervenors The Wilderness Society, Western Watersheds Project,
and Hells Canyon Preservation Council

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IDAHO WOOL GROWERS ASSOCIATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:12-cv-00469-BLW |
| v. | ) ) | |
| TOM VILSACK, *et al.*, | ) ) | **DECLARATION OF DR. THOMAS BESSER** |
| Defendants. | ) ) | |
| and | ) ) | |
| THE WILDERNESS SOCIETY, WESTERN WATERSHEDS PROJECT, and HELLS CANYON PRESERVATION COUNCIL, | ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

BLM_0127156

I, Thomas Besser, with full knowledge of the penalties of perjury, declare as follows:

1.      I am a member of the faculty in the Department of Veterinary Microbiology and Pathology, College of Veterinary Medicine, and the Washington Animal Disease Diagnostic Laboratory at Washington State University, Pullman, Washington.

2.      I have been asked by Defendant-Intervenors in this litigation to provide my expert opinion on the validity of the information and conclusions presented in Plaintiffs' expert declarations as well as the U.S. Forest Service's 2010 Final Supplemental Environmental Impact Statement (FSEIS) and Record of Decision (ROD) to amend the Payette National Forest Land and Resource Management Plan to provide for viability of bighorn sheep.

**I.      Professional Qualifications and Experience.**

3.      I have more than twenty-five years of experience researching the epidemiology and ecology of infectious diseases caused by pathogens across host species.  My CV is attached as Exhibit A.

4.      I hold a Bachelor of Science degree in Zoology from the University of Wisconsin (1973), a Doctor of Veterinary Medicine degree from the University of Minnesota (1981), and a PhD in Veterinary Science from Washington State University (1986).

5.      I currently serve as the faculty head of the Washington Animal Disease Diagnostic Laboratory's Molecular Diagnostics Section, where I have worked since 1990.  I was previously the Director of Laboratory Services for the Washington Animal Disease Diagnostic Laboratory from 2001-2004.  I also direct the University's graduate program in Immunology and Infectious Diseases and am an adjunct professor in the Paul G. Allen School for Global Animal Health at the University.

DECLARATION OF DR. THOMAS BESSER - 1

BLM_0127157

6.      I am a member of the American College of Veterinary Microbiologists, and served on the Board of Governors from 2009 to 2012.  I am also a member of the American Society for Microbiology, serving as the Society's Animal Health Microbiology Chair from 2006 to 2007, and as a member of its Applied and Environmental Microbiology Editorial Board from 2008 to present.  I am also a member of the American Association of Veterinary Laboratory Diagnosticians.

7.      I have received honors for my work from the University of Minnesota, Washington State University, Washington State Academy of Sciences, and American Association for the Advancement of Science, and was a Fulbright Research Fellow at the University of Edinburgh in 2000-2001.

8.      I have been conducting research in the fields of veterinary immunology, epidemiology, and microbiology since 1982.  One of the three primary areas of focus for my research currently is pneumonia in bighorn sheep, investigating the cause of this disease by conducting laboratory and field-based microbiological and epidemiological studies.

9.      In particular, my research has focused on the role of the bacterium *Mycoplasma ovipneumoniae* in bighorn sheep pneumonia.  I began this research in 2005, working on the microbiology of bighorn lambs with pneumonia in the Hells Canyon populations.  In 2009, I joined the Bighorn Sheep Disease Research Consortium, an association of experts studying many aspects of bighorn sheep pneumonia, including transmission, immunity, microbial etiology, connectivity and habitat modeling, pneumonia disease dynamics, and chronic carriage.  As a member of this consortium and in my roles as a research microbiologist in the Department of Veterinary Microbiology and Pathology and a diagnostician at the Washington Animal Disease Diagnostic Laboratory, I have been and am currently engaged in researching the role of *M.*

DECLARATION OF DR. THOMAS BESSER - 2

BLM_0127158

*ovipneumoniae*, including the pneumonia outbreaks that follow its introduction into previously healthy bighorn sheep populations, and how this agent (and the disease it causes) persists in bighorn sheep populations after it is introduced.

10.     I am principal investigator in current research projects looking at disease transmission to bighorn sheep, including a cost share agreement with the U.S. Forest Service on the "Use of molecular strain typing of *Mycoplasma ovipneumoniae* to document transmission routes and sources," and a grant from the Idaho Wildlife Disease Research Oversight Committee on "Development and assessment of novel techniques for detecting bighorn sheep pneumonia pathogens." I am also co-investigator on a study entitled "Developing an evidence base for managing bighorn sheep pneumonia: understanding the role of carriers." My prior studies on bighorn sheep disease issues included research funded by the Washington Department of Fish and Wildlife, Idaho Department of Fish and Game, and the Hells Canyon Initiative of Washington, Oregon, and Idaho.

11.     I have published approximately 190 research papers and 11 book chapters on various topics in my field, including six papers on the causes of pneumonia epizootics among bighorn sheep and identification of patterns of immunity to the disease. These papers include: *Association of* Mycoplasma ovipneumoniae *infection with population limiting respiratory disease in free-ranging Rocky Mountain Bighorn Sheep* (Ovis canadensis canadensis) (2008) (FS012571); Mycoplasma ovipneumoniae *can predispose bighorn sheep to fatal* Mannheimia haemolytica *pneumonia* (2010); *Causes of Pneumonia Epizootics among Bighorn Sheep, Western United States, 2008-2010* (2012); *Survival of Bighorn Sheep Commingled with Domestic Sheep in the Absence of* Mycoplasma ovipneumoniae (2012); *Use of exposure history*

DECLARATION OF DR. THOMAS BESSER - 3

BLM_0127159

*to identify patterns of immunity to pneumonia in bighorn sheep* (Ovis canadensis) (2013); and

*Bighorn sheep pneumonia: Sorting out the cause of a polymicrobial disease* (2013).

12.     I have given invited presentations on veterinary immunology and epidemiology at conferences, institutions of higher education, symposiums, colloquiums, workshops, and consortia both nationally and internationally since 1986.  These include addresses on the role of *Mycoplasma ovipneumoniae* in bighorn sheep pneumonia outbreaks in a scientific workshop on bighorn sheep pneumonia at the University of California at Davis (2007), and before the Association of State Wildlife Agencies (2008), Washington/Oregon/Idaho Bighorn Sheep Disease Consortium (2010), the Association for Veterinary Epidemiology and Preventive Medicine Symposium (2011), Northern Wild Sheep and Goat Council (2012), the Wild Sheep Society of British Columbia (2013), and the Wild Sheep Working Group of the Western Association of Fish & Wildlife Agencies (2013).

13.     I also provided scientific opinions to the U.S. Forest Service in its development of the FSEIS at issue here.  For instance, in 2009 I contributed a presentation to the agency that discussed transmission of pneumonia from domestic sheep to bighorn sheep (FS011022). Additionally, in November 2010 I wrote a letter to Suzanne Rainville providing my perspective on the publication *Transmission of* Mannheimia haemolytica *from Domestic Sheep to Bighorn Sheep; Unequivocal Demonstration with Green Fluorescent Protein-Tagged Organisms* by Lawrence, et al (letter attached as Exhibit B).  In the letter, I directly responded to comments Dr. Knowles raised about the study, and I generally addressed the relevance of the study to the agency's decision.

14.     The central finding of that study was demonstration of transmission of respiratory pathogens from domestic sheep to bighorn sheep following fence line or direct contact.  Further,

DECLARATION OF DR. THOMAS BESSER - 4

BLM_0127160

the common findings of the Lawrence study and previous studies remain significant and uncontested to this day: that nearly all bighorn sheep die after contact with domestic sheep and that fatal bighorn sheep pneumonia can occur as soon as the first week following contact. As discussed below, my previous and subsequent research into the etiology of bighorn pneumonia and transmission of the disease confirms the statements I made in my November 2010 letter to the Forest Service and is consistent with the scientific consensus about disease transmission and risk domestic sheep pose to bighorn sheep.

**II.      Relevant Scientific Studies on Bighorn Sheep Disease.**

15.      As mentioned above, I have conducted a number of studies on the etiology of bighorn pneumonia and on transmission of this disease. My studies have utilized data and specimens collected from hundreds of domestic sheep farms, dozens of wild bighorn sheep populations, and from laboratory experiments. Extensive evidence shows that contact between domestic sheep and bighorn sheep results in pneumonia outbreaks in bighorn sheep populations. My research evaluating the evidence regarding the cause of bighorn pneumonia, including that resulting from contact with domestic sheep, points to *Mycoplasma ovipneumoniae* as having a key role in the disease epizootics. I have co-authored many of my bighorn studies with others at Washington State University, including Dr. Donald Knowles, Dr. Margaret Highland, Dr. William Foreyt, and Dr. Subramaniam Srikumaran.

16.      Some of my bighorn research has involved field-based studies in which specimens were collected from bighorn sheep in the wild. For instance, my first study focused on the association of *Mycoplasma ovipneumoniae* infection with pneumonia epizootics in free-ranging bighorn sheep by collecting specimens from lambs from three populations of bighorn sheep in the Hells Canyon region during lamb pneumonia outbreaks. A later study looked at lung tissue of 44

DECLARATION OF DR. THOMAS BESSER - 5

bighorn sheep from 8 different bighorn sheep populations affected by pneumonia outbreaks in the western United States. I also contributed to a fourteen-year-long study of patterns of immunity to pneumonia in Hells Canyon bighorn sheep, where data was gathered on 388 radio-collared adults and 753 ewe-lamb pairs by locating animals at least every two weeks from the ground or air; data included survival, causes of mortality, movement, productivity, and lamb survival.

17.     My bighorn research has also included laboratory studies and captive bighorn sheep (pen) experiments. These studies involved experimental infection of bighorn sheep using defined sources of pneumonia-associated bacterial pathogens, and also comingling studies of domestic sheep and captive bighorn sheep using animals with defined carrier or non-carrier status of pneumonia-associated bacterial pathogens. In the publication *Bighorn sheep pneumonia: Sorting out the cause of a polymicrobial disease* (2013) (attached as Exhibit C), we evaluated the evidence for and against several candidate causal microbial agents proposed as causes of epizootic pneumonia of bighorn sheep. We concluded that the evidence strongly supports a primary role for *M. ovipneumoniae* in this disease across the western U.S.

18.     As a result of these studies, I believe there is strong evidence that *M. ovipneumoniae* is exotic to and triggers epidemic pneumonia in bighorn sheep, and that domestic sheep are a common source of this bacterium.

19.     Data suggest that *M. ovipneumoniae* does not naturally occur in bighorn sheep, and if found, was introduced from some other source. Indeed, in more than 90% of healthy herds of bighorn sheep (defined as those in which pneumonia has not been documented in either lambs or adults within the past 10 years or longer), *M. ovipneumoniae* cannot be detected in nasal secretions, and blood tests show no evidence of exposure to this bacterium. Neither epidemic

DECLARATION OF DR. THOMAS BESSER - 6

pneumonia nor evidence of *M. ovipneumoniae* infection or exposure are detected in free-ranging thinhorn sheep (Dall sheep or Stone sheep), wild sheep that live in northern Canada and in Alaska where there is little or no opportunity for contact with domestic sheep or goats.

20.     However, an outbreak of fatal pneumonia in Dall sheep was reported in the Toronto zoo after contact with domestic sheep, and *M. ovipneumoniae* was documented as the cause of this outbreak.  Additionally, this agent is present in every bighorn sheep pneumonia outbreak that we have investigated to date (N=40 currently).  In several outbreaks where banked blood serum samples were available, we were able to demonstrate that the exposure to *M. ovipneumoniae* first occurred the same year that the outbreak occurred.  These data are summarized in *Bighorn sheep pneumonia: Sorting out the cause of a polymicrobial disease* (2013) (*see* Exhibit C).

21.     In contrast, domestic sheep are a common source of *M. ovipneumoniae*, and most naturally carry the bacterium.  The hosts capable of carrying this bacterium are restricted to the sub-family Caprinae, which includes sheep and goats.  As a result, Caprinae are the animals that present the highest risk of transmission of this bacterium into naïve bighorn sheep populations.

22.     A large body of scientific evidence exists showing that contact between domestic sheep and bighorn sheep creates a very high risk of fatal pneumonia in bighorn populations.  As reviewed in our 2012 publication, *Survival of Bighorn Sheep Commingled with Domestic Sheep in the Absence of Mycoplasma ovipneumoniae* (2012) (attached as Exhibit D), there were at least 9 publications describing 11 experiments or direct observations of situations in which captive bighorn sheep were commingled or had fence line contact with domestic sheep or mouflon (a wild subspecies of domestic sheep), and of the 90 bighorn sheep involved in these studies, 98% died of pneumonia.  In contrast, 5 other publications described 9 experiments in which researchers placed bighorn sheep in contact with other (non-sheep) animals including cattle,

DECLARATION OF DR. THOMAS BESSER - 7

BLM_0127163

llamas, horses, deer and elk, and in which the bighorn sheep mortality was markedly lower (4 of 56 bighorn sheep, 7%).  Together, these studies show that domestic sheep present a very grave health risk to bighorn sheep, and that risk is greater than posed by other domestic or wild animal species.

23.      In the same 2012 paper, we also showed that when domestic sheep that are free of *M. ovipneumoniae* are mingled with susceptible bighorn sheep, the risk of pneumonia death is much lower, not significantly different from that experienced by bighorn sheep commingled with other (non-sheep) animals.  These studies provide strong evidence that this organism has a primary role in bighorn sheep pneumonia outbreaks, and that domestic sheep are a high risk of pneumonia transmission to bighorn sheep compared to other domestic or wild animals.

24.      Although these studies were done in experimental settings where frequency of transmission events is likely higher than would be expected from contacts that are less confined, the relatively higher risk of pneumonia transmission following contact with sheep (compared to non-sheep animals) would be expected to hold true regardless of whether the contact occurs in captivity or on the range.

**III.      Scientific Opinions on the Knowles/Highland Declaration and the Forest Service's EIS and ROD.**

25.      I have reviewed the Declaration of Dr. Donald Knowles and Dr. Margaret Highland submitted by Plaintiffs in this case (ECF #38).  I am also familiar with the Forest Service's 2010 FSEIS and ROD concerning bighorn sheep viability on the Payette National Forest.  Based on my professional knowledge and experience, I offer the following opinions.

26.      I find the use of the term 'under range conditions,' used in several contexts in their declaration, to be unclear or imprecise (*see, e.g.*, paragraph 40).  The essence of scientific experimentation is to carefully control as many conditions as possible.  'Range conditions'

DECLARATION OF DR. THOMAS BESSER - 8

BLM_0127164

includes a very diverse set of conditions, including temperature, humidity, habitat, climate and weather. Requiring studies to be performed under 'range conditions' is equivalent to requiring hundreds of study replicates under highly diverse conditions, which is not practically possible or necessary. On the other hand, the very diversity of 'range conditions' means that pretty much all experiments are conducted under conditions that fall well within the variety of conditions that do occur on the range.

27.     In paragraph 27, they argue that the many studies in which domestic and bighorn sheep were mingled did not document the time at which pathogen(s) were transmitted, but rather just documented the time to occurrence of disease or death. However, the transmission of the pathogens that result in disease must precede the time of disease onset, so the studies in question actually do set upper limits on the transmission times of the agents; these upper limits are less than one week in some cases, and less than 100 days in all cases, based on the times to observed deaths.

28.     In discussing the Lawrence paper that he co-authored, Dr. Knowles states in paragraph 29 that the labeled *Mannheimia haemolytica* "was identified in the first bighorn 21 days following the commencement of the fence line contact." However, the transmission may actually have occurred at any time during the first three weeks of fence line contact or the four weeks of separated pens that preceded fence line contact, since day 21 of fence line contact was the first day the animals were reported to have been sampled to detect transmission.

29.     I am puzzled by Dr. Knowles' statement in paragraph 30 that he did not review the pathology of the experimental animals in his study. The paper includes written descriptions of the gross and microscopic pathology (FS012517, page 713) and gross and microscopic photos of the lung lesions (FS012518, p. 714, Figure 5). Based on this content, informed pathologic

DECLARATION OF DR. THOMAS BESSER - 9

BLM_0127165

evaluation of these tissues did take place.  It is not clear why Dr. Knowles chose not to review this information, especially given his responsibilities as co-author.

30.      In paragraph 32, Dr. Knowles indicates that authors of the Lawrence paper did not conclusively determine the role of the *M. haemolytica* in the pneumonia. This comment suggests that it is actually possible to make a conclusive determination of the role of a single bacterial species in any case or cases of a disease.  In reality, this is not true and instead determination of the cause of death is typically based on the expert opinion of the pathologist who reviews the animal's history, gross and microscopic lesions, and ancillary laboratory findings.  As a microbiologist, based on the information provided in the manuscript, I believe that sufficient evidence is provided to reasonably conclude that the disease process is consistent with *M. haemolytica* induced pneumonia.

31.      In paragraphs 43 – 48, Dr. Knowles discusses the role of stress in bighorn sheep disease. I agree that various forms of stress may enhance the occurrence of infectious disease, including pneumonia.  I also agree that stress could be a contributing factor to the very high (98%) mortality rate experienced by bighorn sheep experimentally commingled with domestic sheep. However, various other data suggest that stress is not the largest factor determining the outcome of these studies. First, I would expect that bighorn sheep would experience a similar or greater degree of stress when experimentally commingled with less closely related livestock such as cattle, llamas, and horses, and yet the bighorn pneumonia mortality was relatively insignificant (7%) in those experiments.  Second, as pointed out in paragraph 45, wild bighorn sheep are obviously more greatly stressed in captivity compared to hand-reared bighorn sheep acclimatized to human contacts, yet wild and captive-reared bighorn sheep have equally experienced nearly 100% mortality when experimentally commingled with domestic sheep.  Third, bighorn sheep in

DECLARATION OF DR. THOMAS BESSER - 10

BLM_0127166

the wild routinely face a large number of severe stresses in dealing with harsh environmental conditions, mountain lions and other predators, and other factors, but since these stresses are common to both healthy and pneumonic populations, stress clearly does not explain the health differences between those populations.

32.     In paragraph 51, Dr. Knowles discusses the likely lower degree of contact between domestic sheep and bighorn sheep that occurs 'under natural range conditions,' which he suggests would decrease the frequency of transmission compared to that observed in captive studies.  My opinion is that while the frequency of transmission is likely lower under range conditions, the risk of contact is still significant given that contact transmission is possible, and even a single *M. ovipneumoniae* transmission event from one domestic sheep carrier to one naïve bighorn sheep is likely to then result in epidemic spread within the bighorn sheep population, causing significant initial mortality, a generation of chronic carrier bighorn sheep, and subsequent lamb pneumonia for years or decades afterwards.  That is, I believe that it is not the average likelihood of direct contact or the average duration of contact between the species that matters; instead, what really matters is that even a rare contact event that results in transmission of the bacterium to a bighorn sheep is likely to have long-term devastating consequences for the bighorn population.

33.     We know from the captive studies that pneumonia disease agents can be transmitted by fence line or commingled contact.  There have been many documented observations of direct contact events between free-ranging bighorn sheep and domestic sheep.  While many of these contacts likely fail to result in transmission, nevertheless each such contact presents a real risk of transmission with a strong potential for severe health impacts on the bighorn sheep.

DECLARATION OF DR. THOMAS BESSER - 11

34.     In sum, a preponderance of evidence exists that domestic sheep transmit pathogenic bacteria to bighorn sheep that results in epidemic bighorn sheep pneumonia. This conclusion is supported by anecdotal evidence (many reports over nearly a century of bighorn pneumonia outbreaks following contact with domestic sheep or goats, compared to only sparse reported outbreaks following contact with other animals), as well as experimental evidence (experimental contact with domestic sheep resulting in pneumonia deaths of 98% of bighorn sheep; the significantly lower pneumonia mortality in bighorn sheep placed in contact with other livestock). Based on this evidence, a strong scientific consensus exists that domestic sheep pose a real and grave danger to bighorn sheep when the two species are on the range together.

35.     It is extremely unlikely that the actual transmission events that result in disease transmission will ever be observed under range conditions, given that the contact that results in the transmission may involve any single animal within a population of hundreds of bighorn sheep coming into contact with any one of hundreds or thousands of domestic sheep grazing in their range, and given the weeks-long incubation period between transmission and disease onset. However, it is not necessary to understand the detailed transmission mechanism or to observe the specific transmission event for one to conclude, based on abundant anecdotal, experimental, and observational evidence, that pathogen and disease transmission from domestic sheep to bighorn sheep does occur and results in severe disease and death losses in the bighorn sheep.

36.     Based on the available evidence and existing scientific consensus, the USFS was reasonable to conclude in its FSEIS and ROD that domestic sheep pose a significant risk to bighorn sheep due to the threat of disease transmission.  At present, I am not aware of any available means to reduce or eliminate the risk of pneumonia in bighorn sheep that come into

DECLARATION OF DR. THOMAS BESSER - 12

BLM_0127168

contact with domestic sheep.  Therefore, physical separation of these species is the only known way to protect bighorn sheep from this disease transmission.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED this 6th day of November, 2013 in Pullman, Washington.

 /s/ Dr. Thomas Besser
Dr. Thomas Besser

DECLARATION OF DR. THOMAS BESSER - 13

10/20/2016                                    DEPARTMENT OF THE INTERIOR Mail - TARGET SHOOTING ON PUBLIC LAND



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## TARGET SHOOTING ON PUBLIC LAND
1 message

---

**Darrell Hammond** <darrellh@pelsue.com>                    Thu, Sep 29, 2016 at 2:15 PM
To: "uformp@blm.gov" <uformp@blm.gov>

Hello,

    I live in Conifer (to close to Denver) and see the target shooting conflicts all the time. Instead

of shutting off the land too target shooters (that pay taxes and have rights too) some basic problem

solving should come into play. I would think about making some designated areas for shooters to use.

This way you can control where shooting accrues and their unfortunate mess. No one wants to see a shot-up

refrigerator in the middle of the woods. I understand & see there are too many people hiking

thru the woods to have random shooters shooting up the trees and not paying attention to their backstops.

Designated shooting areas  would help control dangers, keep the trash in the areas it was created, save some

trees from being shoot up and would be easier to monitor target shooters. Could even make some revenue as

a non-monitored Fee Area like some wilderness campgrounds.

Thanks for listening

A loyal NRA Member that Votes

Darrell Hammond

Quality & Process

Improvement Manager

T. A. Pelsue Co.

2500 S. Tejon St.

Englewood, CO. 80110

303-975-5224

darrelh@pelsue.com

BLM_0127170

10/30/2016                                    DEPARTMENT OF THE INTERIOR Mail - comments on resource management plan



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

### comments on resource management plan
1 message

---

**Bonnie Inouye** <bonnieinouye@gmail.com>                                    Sat, Oct 29, 2016 at 8:59 PM
To: uformp@blm.gov

38213 Highway 133, Hotchkiss, CO 81419

October 28, 2016

BLM, Uncompahgre Field Office

2465 S. Townsend Ave.

Montrose, CO 81401

Dear BLM-UFO Staff and RMP Comment Team,

I live in the North Fork Valley, between Paonia and Hotchkiss. My husband and I chose this location for retirement because it is peaceful and quiet and friendly, with many organic orchards and vineyards. Our 34-acre property is bounded by the Fire Mountain Canal on the north side, and we irrigate our vegetable garden and small orchard with our shares of canal water. We depend on this source of clean water to produce our food, but the water comes from the river which would be severely threatened by the process of fracking and by the pipes leading from the extraction sites.

Our driveway comes directly off the two-lane highway which is generally pretty quiet now. Our property is bounded on the west by land owned by the BLM and Borough of Reclamation. When we bought our property in 2003, I thought that it was nice to be next to land owned by the citizens of our nation. But now I am afraid that the BLM does not listen to neighbors. I know that development of public land by oil and gas companies always means a huge increase in truck traffic, 24-hour noise, 24-hour light pollution, major air pollution and increase in ozone levels, water pollution, and it contributes to global climate change. I wish that the BLM could become a good neighbor and think about the long-term effects of any oil and gas "development", which surely outweighs the short-term gain in dollars to the agency.

This part of Colorado has a dry climate. When meadows or forests are damaged, it takes a very long time for the land to recover. When streams are polluted, it affects the fish and aquatic insects and the wetlands, which then have an impact on birds and animals in the valley and those who visit while migrating.

The North Fork Valley is a very special place. It is well-known throughout the state for the high quality of the food, which is now featured in many restaurants that value our locally produced fruits and cheeses and meat and eggs and wine and beer and hard cider. City people come from Denver and Colorado Springs to unwind in the peaceful area around Paonia, taste the wines and enjoy the cherry festival, our amazing apricots, flavorful peaches, nectarines, pears and apples. Perhaps you have tasted our fruit? If you have not been here in a while, please come visit out peaceful valley! And please consider helping us protect this wonderful place so our grandchildren

BLM_0127171

will be able to enjoy fishing and camping and hiking and biking with us here. We have four delightful grandchildren who like to visit us now.

Yours, Bonnie Inouye

BLM_0127172

10/30/2016                DEPARTMENT OF THE INTERIOR Mail - Comment on Draft Resource Management Plan for the Uncompahgre Field Office



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comment on Draft Resource Management Plan for the Uncompahgre Field Office
1 message

**Dave Knutson** <orionrisingllc@gmail.com>                          Sat, Oct 29, 2016 at 5:55 PM
To: uformp@blm.gov
Cc: Alex Johnson <director@theconservationcenter.org>, Robbie LaValley <rlevalley@deltacounty.com>

Dear Staff and Comment Team,

This letter addresses two areas of concern for me: 1. Recognition and sensitivity to the changes in the North Fork Valley; and 2. The Jumbo Trails Recreation area on BLM land near Paonia.

1. I urge your team to seriously consider and incorporate the "North Fork Alternative Plan, B1" in the final RMP. My wife and I have lived in the North Fork valley since 2003 and are homeowners there. We deeply appreciate the access we have to clean water, clear air, and local organic food sources. I am concerned that if the North Fork alternative is not incorporated, we could experience a deterioration in water quality and air quality due to increased industrial hydraulic fracturing as allowed in other alternatives of your draft plan. We would be personally impacted by loss of real estate value and concerns for our health - we are both in our 60's and our respiratory systems would not tolerate poor air quality. Since 2003, we have seen a renaissance in our valley of new organic farms, wineries, and ranching. Our little valley is now widely known as a center for the locavore food movement. Increased industrial activity in our valley would stomp out progress we've made in organic agriculture and could put organic certifications for our growers at risk. As a footnote, we recently visited the Bainbridge Island Art Museum and were pleasantly surprised to see our town featured as part of a display in the museum. I have attached photos of the author's bio and her citation mentioning Paonia, Colorado as a place that inspired her. The North Fork Valley's progress in providing high quality organic food needs strong support and the North Fork Alternative Plan, B1 is our heartfelt request.

2. Jumbo Trail Recreation. I am a trail runner and have administered special use permits with Federal Land Agencies for recreation events since 1980. My first permit was for a half-marathon trail race in the Coconino National Forest. I was issued a special use permit for 5k and 10k trail runs on the Jumbo trails by the Montrose BLM office. At first, the permit was renewed annually, then we were granted a five year permit. Our home is on the east side of Paonia right near the trail system, primarily so that I can go out the door to access our trails. I am pleased to see that your draft plan recognizes the recreation value of this area and I urge you to place protections and resources to improve this fantastic trail system. I anticipate that as the years go by, your office will see multiple requests for Special Use Recreation Event Permits. The area is well known to trail runners and mountain bikers.

I sincerely appreciate the time and effort your team has put into a massive update of the Resource Management Plan for UFO and look forward to positive consideration of this modest request from a committed resident.

Sincerely,
/s/
David A. Knutson
401 Vista Drive (PO Box 1016)
Paonia, CO 81428


**Paonia Organic.pdf**
3951K

BLM_0127173

10/31/2016                    DEPARTMENT OF THE INTERIOR Mail - Comment re the Draft Resource Management Plan from Ali Lightfoot



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comment re the Draft Resource Management Plan from Ali Lightfoot
1 message

**Ali Lightfoot <thistrain@gmail.com>**                                Sat, Oct 29, 2016 at 9:59 AM
To: uformp@blm.gov

BLM Uncompahgre Field Office

2465 S. Townsend Ave.

Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

To Whom It May Concern,

Thank you for the opportunity to comment on the BLM UFO RMP.  My name is Ali Lightfoot and I am a resident of

Paonia, Colorado  I moved here in 2008 so that my kids could explore nature and grow up eating locally produced fresh food.

We live at the edge of the Jumbo Mountain trails where we enjoy hiking, biking, and exploring.

I am writing this comment today because I am concerned with the proposed protection via the UFO

RMP draft.   As a citizen of the North Fork Valley and a resident of Paonia, I have educated myself on

the matter of the BLM UFO RMP draft and I support the North Fork Alternative, known as B1. I

would like alternative B1 to be added to the final plan; it is the best alternative to protect our

valuable water resources and wildlife that are vital to our agricultural and recreational economy.

I also believe that If we open the area to more oil and gas development,  it will compromise the more sustainable

 and desirable economies of agriculture and recreation that so many people come

here to enjoy and have been working to build in the area for generations.

I also agree with Appendix D in terms of the importance of connectivity between the wilderness

areas and I would like the BLM to provide such connectivity as much as possible.

One concern with the proposed draft (Alternative D) involves the lack of protection for

the Gunnison sage-grouse. Based on the best scientific evidence, it is suggested that the distance necessary between surface

disturbance/exploration and an active lek is 4 miles and I ask that the BLM increases this radius

from 0.6 miles to 4 miles and to further protect this species by making this area no surface

occupancy.

Surface disturbances increases the chance of cheatgrass and weeds to invade the area. This invasion can change the fire regime of the area and

BLM_0127176

Case No. 1:20-cv-02484-MSK   Document 65-5   filed 04/29/21   USDC Colorado   pg 74 of 129

10/31/2016                    DEPARTMENT OF THE INTERIOR Mail - Comment re the Draft Resource Management Plan from Ali Lightfoot

outcompete native plants, both of which would affect the sage-grouse negatively. With climate change, the impact of fire and cheatgrass will

increase, so the BLM needs to plan for the unavoidable changes we know that we will see in the future.

I would also like the BLM to designate all BLM lands on and surrounding Jumbo

Mountain as a Special Recreation Management Area. As I said, I live at the top of Pan

American Avenue in Paonia by the base of the mountain and believe that this area needs to be

fully protected to secure the entire viewshed and its use as a recreational area. I can attest that

this area is used by a large number of recreational users from cyclists, hikers, dog

walkers, runners, and horseback riders based on my location to the 'trail head' that everyone

uses. Additionally, I use these trails nearly every day of the week and want to ensure this area is

properly protected so I can continue to enjoy 'my backyard'. This area needs to be set aside for

recreational use rather than industrial activity such as oil and gas and I would like to see all oil

and gas leases removed from land on and surrounding Jumbo. It is an important area that draws

in economic benefits to the town as out-of-towners visit our area to hike or bike and provides

spectacular views that make Paonia unique to other nearby towns. It would also prevent possible

contamination issues of irrigation water and surrounding lands. Lastly, I would like the BLM to

manage Jumbo Mountain for multiple uses to ensure user and resident safety and I ask that the

BLM please perform future travel management planning for motorized and non-motorized uses.

The BLM should keep in mind that these trails are in a residential area and that the concerns of

the residents should be listened to.

In closing, the conservation protections in Alternative B1 should be included in the final plan as

well as the above changes for the benefit of sage-grouse and Jumbo Mountain. Thank you again

for accepting my comments for the RMP process. The outcome is important to me since it affects

my home and community for years to come.

Sincerely,

--
Ali Lightfoot
65 Cedar Drive
Paonia, CO 81428
thistrain@gmail.com

BLM_0127177

10/31/2016                                    DEPARTMENT OF THE INTERIOR Mail - Rmp evaluation North Fork Valley



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Rmp evaluation North Fork Valley
1 message

**brian stratton** <briancstratton@gmail.com>                          Sat, Oct 29, 2016 at 12:00 PM
To: Uformp@blm.gov

To whom it may concern,

I am writing in regards to the future of the North fork valley and the leasing of our public lands to oil and gas hydraulic fracturing.

The areas included in the preferred alternative D of the north for valley leases threaten the economic future of our citizens and put a heavy burden upon our counties infrastructure.

The North Fork Valley is home to those seeking alternative methods of agricultural production and relationship to the earths resources. The area has one of the highest rates of organic farms per capita than anywhere else in the country and is home to fruit growers, winemakers, and produce farmers whose organically grown desirable products are sought out and enjoyed across the state.

The combination of clean abundant water, and ancient seabeds at an altitude able to sustain a long agricultural production seasons makes this area extremely unique and petitions protection. This combination of resources and the high volume of hundreds of varieties produce has created a desirable reputation. The economic future of these producers are completely dependent on this.

People from across the nation come to visit this area not only to admire is beauty but to indulge in what the valley can provide. These visitors bring a significant much needed income to the population, an income that paints a sustainable future for the North Fork Valley.

What will happen to this influx when there are gas wells lining the roadsides? what will happen to produce sales when this area is know as "Frack Valley?" I was at a restaurant in Carbondale last week at they had "Paonia grown melons" on the menu. When the image of an abundant "garden of eden" or "Napa valley of colorado" that has taken decades to manifest is suddenly replaced by that of big oil, the economic futures of these sustainable products are meagre. There will be no more advertisements or pride in procuring such foods, people will hear the name "Paonia peaches" and an image of oil and gas wells will fill their mind. These wells will literally "suck" the magic and reputation right out of our economy.

Another issue to seriously consider is our counties infrastructure and resources. Each well demands an average 10 million gallons of our water, water that will be pumped into the earth never to be seen or used again. The water that is the life blood of not only our community but that of the millions who rely upon products being provided for them. Useable water is not infinite. We are blessed with this resource and it will not always be this way. you only need look to California to see the how precious and finite this abundance is. One marginal season and our irrigable days are limited sometimes to that of just 3 weeks on Fruitland Mesa. We do not have the buffer to support such a demanding industry. We must protect and naturally recycle this resource, we must continue to let it flow freely into its natural systems so that is can continue to move about the earth, continue to rain. When it is sequestered into shale layers we will never see it again.

Another issue is the trucks. The thousands of fleet, transport, and personal vehicles that will be tearing up our road systems for the next 20 years. If there is not a local source of water it has to be trucked in. This means a nonstop flow of heavily loaded, heavily polluting Haulers driving day in and out through our towns, through our orchards. And for all this the county receives no restitution, nothing to offset this heavy use. Our roads will be destroyed and we, a county with limited resources to begin with, will be left to foot the bill. It is not fair, or appreciated.

I am 31 years old and moved to the area to farm organically on Fruitland mesa. I think i represent a good percentage of my generation. We see what is happening in this world and are drawn to support sustainable practices. Organic food production in the US was a 35 billion dollar industry in 2014 and growing every year. I am asking you to please support what little we have to work with in our county. The leasing of our surrounding lands to oil and gas, an industry that is fickle and unpredictable in global markets, will not provide any substantial job creation and will replace what little sustainable ways of life that the citizens of this county have been cultivating for the last 30 years. In essence the industry will take much from us and literally provide nothing but debt.

BLM_0127178

Please consider

Please think of us

Thank you

Brian Stratton

BLM_0127179



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## RMP PLAN COMMENTS:
1 message

---

**Alan brown** <acebrown@vci.net>                                        Sat, Oct 29, 2016 at 10:43 AM
To: uformp@blm.gov
Cc: Sven Edstrom <svenedstrom@icloud.com>

Dear BLM staff,

I am a long time mountain biker with over 25 years in the sport. Four years ago I moved to Cedaredge, CO. I had a friend who lived there also and I knew he was a long time MTB rider, in fact his friends called him "The Grandfather of Mountain Biking" in the Grand Valley. What I did not discover until later was he earned that title from riding and building trail near Fruita. So I was very disappointed to learn that virtually there were no non-motorized trails in Delta County. I have heard my county called "the black hole of mountain biking" on the entire Western Slope. From Fruita all the way to Cortez every sizable town has significant riding opportunities. I would like to see MTB riding blossom here as it has all over the remainder of Western Colorado. Delta County is quite economically depressed with so much closing of the local coal industry. Mountain biking has shown it is always a significant economic boost to an area where it was developed. Towns such as Fruita and Moab being classic examples of economic benefit.

We have two very large tracts of public land near Delta; Gunison Gorge NCA and Domingues-Escalante NCA. Both of these areas would lend themselves very well to non-motorized singletrack trail development. I am a member of the Delta Area Mountain Bikers (DAMB), a fast growing chapter of Colorado Plateau Mountain Bike Association (COPMOBA). We now have over 220 members who are all striving to put new trails on the ground. DAMB has done a lot of preliminary work to layout potential trails on paper maps as well as Google Earth and other resources. Most of this effort was focused on Smith Mountain as it's the closest public area to Delta. I also see great potential in the DENCA that could be a good destination for mountain biking. I understand that the two NCAs mentioned do not fall under the current RMP but my comments apply to all public land within the UFO jurisdiction. One specific location is Jumbo Mountain. I keep mentioning mountain bike riding but I recognize these trails would be shared with other non-motorized users.

Mountain biking is a quiet self-propelled sport. Most riders really enjoy the quiet and solitude of the backcountry. I do not desire to share this with the motorized crowd. Their noise, smoke, dust, scattering of rocks are all detrimental to our enjoyment of our sport. That does not mean I would wish them to be excluded entirely, I simply don't want to share in close proximity.

Many of DAMB's members have had formal trail building training and a lot of on the ground experience. We stand ready to assist the BLM in trail construction when approval is given

I'm 73 years old, and truly believe my good health is directly related to the physical and mental benefits of mountain biking. The general health of most citizens of America has declined over the past two decades, obesity is too common.  If more young people had a good place to ride trails this trend could be slowed and possibly reversed.

We also must make the transition from resource extraction to protecting the pristine nature of our wildlands, so that future generations will be able to experience the freedom and beauty that we enjoy today.

Thank you for your consideration.

Alan "Ace" Brown
Cedaredge, CO
DAMB

Sent from my iPhone

BLM_0127180

10/30/2016                    DEPARTMENT OF THE INTERIOR Mail - Support No-lease Alternative in the Final RMP for the North Fork Valley



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Support No-lease Alternative in the Final RMP for the North Fork Valley
1 message

**Judith Chamberlin** <JudiChamberlin@gmail.com>                    Sat, Oct 29, 2016 at 7:55 PM
Reply-To: JudiChamberlin@gmail.com
To: UFORMP@blm.gov

Dear

Dear BLM-UFO Staff and RMP Comment Team,

I am writing to provide comment on the draft Uncompahgre plan for the North Fork Valley. I believe that oil and gas development is incompatible with a community and its economy that depend on clean air, water, and food. I am concerned about the BLM's proposal to leave 95% of the planning area open to oil and gas leasing, even in areas where there is low potential for development. This is not balanced land use planning.

I live in Ridgway, CO but travel to the North Fork Valley to buy organic produce, tour the wineries, and enjoy the beautiful country-side. This is a unique place of natural beauty. The local residents have worked hard to transition the economy from coal mining to more sustainable and environmentally friendly industries such as tourism, organic farming, and the arts. The area has been designated by the Governor as a Creative Cultural District and is has the largest concentrations of organic farms in Colorado.

I feel the BLM did not consider the unique nature of the North Fork Valley in its draft RMP for the area. The current plan did not consider, and is incompatible with, the community's plans for a diversified, resilient economy. The North Fork Valley is and should be kept as protected area for agriculture and recreation, and it's biodiversity must be protected.

Thank you for you consideration in this important matter.

Judith Chamberlin
700 Sabeta Dr
Ridgway, CO 81432

BLM_0127181

10/31/2016                           DEPARTMENT OF THE INTERIOR Mail - UFO RMP COMMENTS



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

# UFO RMP COMMENTS
1 message

---

**Shannon Castle** <castle.s.art@gmail.com>                           Sat, Oct 29, 2016 at 10:50 AM
To: uformp@blm.gov

<div align="right">

Shannon Castle

PO Box 854-800 Short Rd

Hotchkiss, CO 81419

</div>

BLM, Uncompahgre Field Office

2465 S. Townsend Ave.

Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Please consider the important issues raised in my comments on the Uncompahgre Field Office draft Resource Management Plan. None of the alternatives in this plan provide an acceptable level of protection for the lands that people in the North Fork Valley rely on for economic viability and treasure as a way of life.

I live with my family in Hotchkiss, Colorado. We have been here for eleven years and were originally attracted to the area because of the beautiful landscape and the availability of local, organic foods. I am teacher at a local school and an artist. The health and sustainability of the land and our way of life is extremely important to me as a mother and a teacher. I am committed to the future of our valley. **I oppose the leasing of North Fork Valley lands to oil and gas companies.**

The public recreational use of land in the North Fork Valley would be negatively impacted by hydraulic fracking and other extraction. Locals and visitors here value our outdoor environment for hiking, biking, fishing, hunting, cross-country skiing, and agro-tourism. The health and safety of our children attending local schools would also be threatened by hydraulic fracking and other extraction based on proximity to the leased land. There are many cases that provide evidence of the negative health and economic impacts of hydraulic fracking on local communities.

Specifically, the final Resource Management Plan should:

- Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.
- Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.
- Protect the water and soil quality that our local farmers and ranchers depend on.

      Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities.

BLM_0127182

DEPARTMENT OF THE INTERIOR Mail - UFO RMP COMMENTS

I appreciate the opportunity to give feedback about this important issue.

Sincerely,

Shannon Castle

Get a signature like this: **Click here!**

BLM_0127183

BISON CONNECT

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

# RMP comments

1 message

**Mary Bachran** <marybachran@gmail.com> Sat, Oct 29, 2016 at 10:26 AM
To: uformp@blm.gov
Cc: info@theconservationcenter.org, info@citizensforahealthycommunity.org

Attached are my comments on the RMP.

Mary Bachran

**Comment letter 2016.docx**
13K

**Mary Bachran**
**511 Box Elder Ave**
**Paonia, CO 81428**
**970-433-1433**

UFO RMP
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401

October 29, 2016

Dear BLM Managers and Directors:

I have lived in the North Fork Valley since 2002.  My father moved here in 1980 and farmed a small acreage above the town of Paonia until 2008, at the time of his death.  I was part of that operation during his life and remain connected to the people who bought his land and have continued to farm it in the intervening years.

My father moved here to come back to a place that replicated his youth growing up on the west side of Grand Mesa, where his father ranched until he lost the land during the 1930's.  Our family has a long history on the Western Slope of Colorado, beginning in the late 1800's when my great-great grandfather worked in the mines in Aspen and lost his life there.  All the generations of my family have lived close to the land, nurtured it and were nurtured by it.  We appreciated the clean air, the pristine water, the abundance of wildlife, the silence and the stars.  Allowing oil and gas development in this small valley will endanger all of that and profit only a few who have no stake in the history and legacy of this land.

I am not a farmer, but I do grow organic fruit, vegetables and flowers on my small plot of land inside the city limits of Paonia.  I take my dog for a hike every morning on Jumbo Mountain and am fed by the views unencumbered by smoke, the air that carries the scent of sage, cedar and juniper, not the stench of diesel fuel exhaust, and the silence broken only by my breath and the soft sound of paws and feet on dirt.  I treasure the ability to walk in the wilds, just minutes from my home, to grow my garden knowing the air and water I use are not tainted by industrial pollutants, to hear my neighbors, not trucks.  I am thrilled to be able to drink local wines made with unpolluted grapes, to eat organic foods created by local farmers, ranchers and artisan chefs, to watch the kids in town roam the streets in safety, parents not worried about the influx of crime and drug use that gas development brings to the surrounding communities.  I am grateful that the

BLM_0127185

air is not laced with BTEX and ozone and that babies will not develop asthma, or other breathing disorders, due to the pollution associated with gas development.  I love my home.  I love my town.  I love this valley.  And I want to keep it clean.

I have studied the impacts of oil and gas development across the nation, but particularly in Rifle and Parachute and the surrounding areas.  I have seen the changes there, dealt with the huge uptick in truck traffic, air pollution, light pollution, noise pollution.  I have read about the health effects to the people living adjacent to this type of industrial development.  Not just the operating wells, but the drilling, the waste water ponds, the spills and leaks.  I do not want the North Fork Valley to become a sacrifice zone.  I do not want to see us become another Rifle or Parachute.  We have too much to lose for a short term monetary gain that won't even be felt by most of the people who live in this area.  This Valley is a treasure and should be protected as such.

I urge the BLM to include all the actions in the North Fork Alternative (B1) in the final RMP.  This includes the communities of Paonia, Crawford and Hotchkiss, the lands that surround them, the watersheds that provide all our water (municipal, irrigation and free running), the wildlife, their ranges and migration corridors, and the air we all breathe.  I want to see long term protection for all our resources.

I also urge you to include all the conservation protections included in Alternative B.  I especially want to see Jumbo Mountain designated at a Special Recreation Management Area to preserve the trails and woods that I use almost every day of the year.

Please protect this Valley and the lives and work of those who live here.  You are welcome to contact me for any assistance I can provide.  Thank you for your attention.

Sincerely,

Mary Bachran

BLM_0127186

11/1/2016                               DEPARTMENT OF THE INTERIOR Mail - UFO RMP Response



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## UFO RMP Response
1 message

**Gerald Espinosa <gm.espinosa@yahoo.com>**                    Sat, Oct 29, 2016 at 10:46 PM
Reply-To: Gerald Espinosa <gm.espinosa@yahoo.com>
To: "uformp@blm.gov" <uformp@blm.gov>

Please see my attached response to the proposed UFO RMP changes and my preference for the NFV B-1 Alternative.

Thank you,
Gerald

 **Dear BLM- UFO RMP Response_Gerald.docx**
153K

BLM_0127187

Dear BLM and fellow Western Slope Lovers,

I am a resident of the North Fork Valley, writing in response to the RMP before the BLM UFO office. I am one of the people who will have to live with your final decision who, along with the next generation of residents and our present children who explore and are schooled here, could see upwards of 95% of our public lands be developed for the benefit of the oil and gas industry. I urge you to consider a no lease option though I am willing to settle on safeguards present in the B1 alternative. In the spirit of your multiple purpose mandate, please consider my below comments about the other natural resources and immeasurable externalities of the place I call home.

I call it home because it is the first place in 10 years of moving for school and work where I have desired to settle and build. The NFV to me is a place of friendships, a new career, mental and physical healing, and potential homeownership. Since moving to the North Fork Valley two years ago, something remarkable has happened to me. I know and believe for the first time in my life that there is an alternative way to living and moving through this world.

I want to share with you my experiences as an impacted citizen who does not wish to see this sacred place turned into a wasteland. Oil and gas development is a threat to the vital watersheds in our valley and downriver neighbors. These waters sustain the highest concentration of organic farms in the state, which provide food that have not only healed me, but also feed many more outside our region. Only behind family, an honest wage and community, we cherish clean mountain water and the soil it percolates into.

As our own valley transitions from coal, in the midst of rebuilding our local economy and reclaiming our land, I firmly reject the notion that a far more invasive energy industry like fracking is compatible with the future of this valley. To suggest so neglects the contribution our surrounding lands have given us, beyond just fossil fuels.

The greater Delta County recognizes the need to diversify from boom and bust extraction industry, dating back to their 1996 Master Plan, where today's initiatives to promote recreation and value-added agriculture were first articulated as a community. Jumbo Mountain is a premiere mountain biking spot, where locals are willing to share their track (try finding that elsewhere in Colorado). Before the trains were laid for coal, our fruit was carried to acclaim at the 1893 Chicago World Fair. Today's Mountain Harvest Fest and Cherry Days are a gathering in celebration of our bumper-crops but more so our community.

Today the Delta County Commissioners and economic development agencies like REGION 10 and DCED are working on a broad range of regional initiatives from commercial kitchens, co-branding of tourism, riverfront development and urban revitalization as strategies of economic and community resilience. DMEA, the largest

equity-holder in the two counties, is advancing high-speed fiber and local energy as a means of economic injection to our community. These share broad communal support, unlike fracking and the selloff of our shared public lands.

A short drive out of town yields views of the Ragged Mountains, the West Elks, San Juans or the Grand Mesa depending where you are facing, and the rift of Escalante-Dominquez and Black Canyons on the land. Pullouts in our public lands offer a hike after work with my rescued dog, launch pads for hunter camps, snowmobiles readied for an excursion. Last weeks backpacking trip, the last before the snow settles, was interjected by mountain lion calls. I saw a mountain goat family last summer, on a ridge in the Gunnison National Forest. I picked up a fishing pole for the first time this summer, the first time since my childhood after having learned from my father. Excursions into our lands sustain us just as much as the water it sheds down to our orchards below sustain the produce.

I do not need to be a biologist, public lands defender, environmentalist, or air quality specialist to understand the magnitude of what can be lost should we permit the privatization of mineral resources and the further socialization of costs, measurable or immeasurable, should this vision of our public lands go forward.

The BLM directive is multi-purpose management. I urge you to remember this in your decision and hope you affirm that no single industry (particularly a foreign one at that) can trample the voices of impacted citizens. They certainly will not overpower our (local) voices. I stand for the B-1 alternative, but strongly prefer a no lease option of our public lands.

Sincerely,

Gerald Espinosa
Paonia Fall 2016

BLM_0127190

11/1/2016                                DEPARTMENT OF THE INTERIOR Mail - feedback on RMP draft



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## feedback on RMP draft
1 message

**Adrian Fielder** <adrissafall@gmail.com>                                    Sat, Oct 29, 2016 at 3:39 AM
To: uformp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org

Adrian Fielder

Carbondale, CO 81623

October 29, 2016

BLM, Uncompahgre Field Office

2465 S. Townsend Ave.

Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Thank you for taking the time to consider my comments on the Uncompahgre Field Office draft Resource Management Plan (RMP). As presented, none of the alternatives offer the level of protection these lands warrant, that communities and the public in your planning area have specifically asked for and favored, and which federal law requires.

A large portion of my family's diet consists of food grown in the North Fork Valley, and so our health would be directly and negatively impacted by the mining activity that would be allowed in Alternative D of the RMP. There is no denying that food security depends on clean air and water, and that unconventional fossil fuel extraction threatens air and water quality in many lasting ways. Unconventional reserves have only recently been made commercially viable and accessible through horizontal drilling and hydraulic fracturing, and yet a rich and voluminous body of peer-reviewed scholarly research already provides us with ample evidence of the dangers posed by the same types of development that Alternative D would allow.[1] **Alternative D is therefore an assault on the basic human rights of my family and my community to drink water, breathe air and grow food that is uncontaminated by industrial pollution associated with fossil fuel extraction.**

Furthermore, the mining activities allowed by this RMP draft pose a grave threat to the sustainable economic development of our region. Indeed, the sectors upon which our communities depend most – tourism, agriculture, real estate, hunting and fishing and other types of wilderness recreation – would all be adversely affected by fossil fuel extraction.[2] My own business – and therefore my family's security – depends on the continuing vitality of these same sectors, and the majority of citizens living in this region are similarly beholden. Worst of all, the operators who wish to conduct mining activity on these lands are not required by your RMP to prove the safety of their proposed activity, as would be the case if this agency were applying the Precautionary Principle to its decisions. In the absence of proof that industrial activity on these public lands would cause no harm to the communities living here, **it is not acceptable, or even permissible, for your agency to allow forms of development that could undermine the economic vitality of our region, as fossil fuel extraction would most likely do.**

BLM_0127191

Finally, as stewards of public assets that have a real, measurable effect when mined, processed and released into the atmosphere, you have a moral and legal obligation to protect the human population -- in this region and elsewhere -- from the effects of anthropogenic climate change. Governments and agencies are already being held accountable for making climate-wise decisions in accordance with the Public Trust Doctrine, and the number of environmental justice court cases will continue to increase exponentially in the years to come. In light of the well-established scientific principles of climate science, and in recognition of our country's commitment to the Paris Climate Agreement, the carbon contained in these public assets must be left in the ground in order to maintain their highest possible worth and to preserve the habitability of Earth for human civilization. Far from opening new areas to exploration and exploitation, you should be forbidding access to the remaining carbon reserves in the ground. Secure the legacy our grandchildren will expect of us by protecting those carbon reserves on BLM lands.

The following points illustrate areas in which the draft RMP is lacking adequate information:

- There is no alternative being considered that would prohibit the leasing of these lands for mining operations, and as such, it fails to evaluate the full range of reasonable management plans.
- There is no Social Cost of Carbon (SCC) analysis of any of the alternatives, despite the fact that respected scientists within your agency have attempted to conduct such analysis and have advocated for the inclusion of such analysis in the RMPs and EISs conducted by your agency.
- There is no consideration of how this RMP complies with the Public Trust Doctrine and thus how it measures up to the moral and legal obligations of the federal government to the citizens of the United States.
- There is no consideration of the Precautionary Principle in making agency decisions.

To compensate for these failures, the final Resource Management Plan should:

- Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.
- Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.
- Comply with the legal obligations of the Public Trust Doctrine.
- Include an in-depth analysis of the Social Cost of Carbon associated with fossil fuel extraction in these locations, so that the operators wishing to develop these lands are liable for the true costs of their activities. Without such analysis, the costs of the health and environmental impacts of those operators' activities will be paid for primarily by people and communities who are not in favor of oil and gas development on these lands, including current residents of the region, future generations, the plant and animal communities that depend on clean air and water, and people around the world affected by anthropogenic climate change.
- Require the application of the Precautionary Principle in making agency decisions, and hence the establishment of incontrovertible proof of the safety of any proposed activity on these lands before the approval of such activity.

Thank you for your service and for your openness to this input.

Sincerely,

Adrian Fielder

---

[1] As a start, please refer to the New York State Department of Health's study "A Public Health Review of High Volume Hydraulic Fracturing for Shale Gas Development" (Dec 2014) and "The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction)," 3rd edition (Oct 2015), by Concerned Health Professionals of New York and the Physicians for Social Responsibility.

[2] For starters, see: "Drilling vs. the American Dream: Fracking impacts on property rights and home values," *Resource Media*, March 14, 2014, http://www.resource--media.org/drilling--vs--the-- american--dream--fracking--impacts--on--property--rights--and--home--values/#.V354cs7I89Y; "The fracking/real estate conundrum," *Boulder Weekly*, December 12, 2013 http://www.boulderweekly.com/news/the--frackingreal--estate--conundrum/; "The

BLM_0127192

economic dark side of the West's oil and gas boom," *The Washington Post* (Dec 12, 2013) https://www.washingtonpost.com/news/wonk/wp/2013/12/12/the--dark--side--of--the-- wests--oil--and--gas--boom/; "Quantifying the Effects of Underground Natural Gas Storage on Nearby Residents," by Michaela Jellicoe and Michael S. Delgado, Department of Agricultural Economics, Purdue University, September 29, 2014  http://web.ics.purdue.edu/~delgado2/JD%202014.pdf; "Local fiscal effects of oil and gas development in eight states," Daniel Raimi and Richard G. Newell, Duke University Energy Initiative, May 2016 https://energy.duke.edu/sites/default/files/attachments/2a.%20Local%20fiscal%20effects%20of%_20oil%20and%20gas%20development%20in%20eight%20states%20FINAL.pdf



**RMP letter Fielder.pdf**
87K

BLM_0127193

Adrian Fielder
Carbondale, CO 81623
October 29, 2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Thank you for taking the time to consider my comments on the Uncompahgre Field Office draft Resource Management Plan (RMP). As presented, none of the alternatives offer the level of protection these lands warrant, that communities and the public in your planning area have specifically asked for and favored, and which federal law requires.

A large portion of my family's diet consists of food grown in the North Fork Valley, and so our health would be directly and negatively impacted by the mining activity that would be allowed in Alternative D of the RMP. There is no denying that food security depends on clean air and water, and that unconventional fossil fuel extraction threatens air and water quality in many lasting ways. Unconventional reserves have only recently been made commercially viable and accessible through horizontal drilling and hydraulic fracturing, and yet a rich and voluminous body of peer-reviewed scholarly research already provides us with ample evidence of the dangers posed by the same types of development that Alternative D would allow.[1] **Alternative D is therefore an assault on the basic human rights of my family and my community to drink water, breathe air and grow food that is uncontaminated by industrial pollution associated with fossil fuel extraction.**

Furthermore, the mining activities allowed by this RMP draft pose a grave threat to the sustainable economic development of our region. Indeed, the sectors upon which our communities depend most – tourism, agriculture, real estate, hunting and fishing and other types of wilderness recreation – would all be adversely affected by fossil fuel extraction.[2] My own business – and therefore my family's security – depends on the continuing vitality of these same sectors, and the majority of citizens living in this region are similarly beholden. Worst of all, the operators who wish to conduct mining activity on these lands are not required by your RMP to prove the safety of their proposed activity, as would be the case if this agency were applying the Precautionary Principle to its decisions. In the absence of proof that industrial activity on these public lands would cause no harm to the communities living here, **it is not acceptable, or even permissible, for your agency to allow forms of development that could undermine the economic vitality of our region, as fossil fuel extraction would most likely do.**

Finally, as stewards of public assets that have a real, measurable effect when mined, processed and released into the atmosphere, you have a moral and legal obligation to protect the human population – in this region and elsewhere – from the effects of anthropogenic climate change. Governments and agencies are already being held accountable for making climate-wise decisions in accordance with the Public Trust Doctrine, and the number of environmental justice court cases will continue to increase exponentially in the years to come. In light of the well-established scientific principles of climate

---

[1] As a start, please refer to the New York State Department of Health's study "A Public Health Review of High Volume Hydraulic Fracturing for Shale Gas Development" (Dec 2014) and "The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction)," 3rd edition (Oct 2015), by Concerned Health Professionals of New York and the Physicians for Social Responsibility.

[2] For starters, see: "Drilling vs. the American Dream: Fracking impacts on property rights and home values," *Resource Media*, March 14, 2014, http://www.resource---media.org/drilling---vs---the--- american---dream---fracking---impacts---on---property- --rights---and---home---values/#.V354cs7l89Y; "The fracking/real estate conundrum," *Boulder Weekly*, December 12, 2013 http://www.boulderweekly.com/news/the---frackingreal---estate---conundrum/; "The economic dark side of the West's oil and gas boom," *The Washington Post* (Dec 12, 2013) https://www.washingtonpost.com/news/wonk/wp/2013/12/12/the---dark---side- --of---the--- wests---oil---and---gas---boom/; "Quantifying the Effects of Underground Natural Gas Storage on Nearby Residents," by Michaela Jellicoe and Michael S. Delgado, Department of Agricultural Economics, Purdue University, September 29, 2014 http://web.ics.purdue.edu/~delgado2/JD%202014.pdf; "Local fiscal effects of oil and gas development in eight states," Daniel Raimi and Richard G. Newell, Duke University Energy Initiative, May 2016 https://energy.duke.edu/sites/default/files/attachments/2a.%20Local%20fiscal%20effects%20of% 20oil%20and%20gas%20development%20in%20eight%20states%20FINAL.pdf

science, and in recognition of our country's commitment to the Paris Climate Agreement, the carbon contained in these public assets must be left in the ground in order to maintain their highest possible worth and to preserve the habitability of Earth for human civilization. Far from opening new areas to exploration and exploitation, you should be forbidding access to the remaining carbon reserves in the ground. Secure the legacy our grandchildren will expect of us by protecting those carbon reserves on BLM lands.

The following points illustrate areas in which the draft RMP is lacking adequate information:
- There is no alternative being considered that would prohibit the leasing of these lands for mining operations, and as such, it fails to evaluate the full range of reasonable management plans.
- There is no Social Cost of Carbon (SCC) analysis of any of the alternatives, despite the fact that respected scientists within your agency have attempted to conduct such analysis and have advocated for the inclusion of such analysis in the RMPs and EISs conducted by your agency.
- There is no consideration of how this RMP complies with the Public Trust Doctrine and thus how it measures up to the moral and legal obligations of the federal government to the citizens of the United States.
- There is no consideration of the Precautionary Principle in making agency decisions.

To compensate for these failures, the final Resource Management Plan should:
- Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.
- Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.
- Comply with the legal obligations of the Public Trust Doctrine.
- Include an in-depth analysis of the Social Cost of Carbon associated with fossil fuel extraction in these locations, so that the operators wishing to develop these lands are liable for the true costs of their activities. Without such analysis, the costs of the health and environmental impacts of those operators' activities will be paid for primarily by people and communities who are not in favor of oil and gas development on these lands, including current residents of the region, future generations, the plant and animal communities that depend on clean air and water, and people around the world affected by anthropogenic climate change.
- Require the application of the Precautionary Principle in making agency decisions, and hence the establishment of incontrovertible proof of the safety of any proposed activity on these lands before the approval of such activity.

Thank you for your service and for your openness to this input.

Sincerely,

*Adrian V. Fielder*

Adrian Fielder

BLM_0127195

11/1/2016                                          DEPARTMENT OF THE INTERIOR Mail - Comments on RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Comments on RMP
1 message

---

**Lee Dusa** <lee@getdusa.com>                                          Sat, Oct 29, 2016 at 12:39 PM
To: uformp@blm.gov
Cc: Rich Jakino <richjakino@hotmail.com>, FRANK HOLLENDONNER <snw460@yahoo.com>, Linda Busker
<marg.busker@gmail.com>, Lee and Gail Dusa <gail@getdusa.com>

> BLM UFO,

> Dear Sirs,

> The Uncompahgre Valley Trail Riders is pleased to offer the attached documents as comments to the RMP process.
> The attachments to this email include a cover letter and three pages of comments.  If you have any difficulty opening
> the documents please call or email me right away.  And, if you want or need clarification on the comments made we are
> available locally at most times to meet with you to discuss.  We do look forward to working with you for many years in
> the future.

> Rich Jackino, President

> Uncompahgre Valley Trail Riders

> (970)209-8900

---

**2 attachments**

 **BLM COMMENT Cover LETTER.pdf**
340K

 **Draft RMP Comments Three pages.docx**
18K

BLM_0127196




# UNCOMPAHGRE VALLEY
# TRAIL RIDERS

## P.O. BOX 3503 | MONTROSE, CO 81402

*Year Round Fun Club!*

October 26, 2016

Bureau of Land Management

Uncompahgre Field Office

2465 South Townsend Avenue

Montrose, Colorado 81410

RE:  Draft RMP

Dear Sirs,

Our organization would like to make some comments pertaining to the Draft RMP.  These comments are included in the pages that follow this letter.  But first, permit us to introduce our organization to you.

Formed some 18 years ago we are a Montrose based ATV and snowmobile club.  We have 123 families currently in our membership.  We place great importance on the availability of trails for recreational use on public land in the Montrose and Delta areas.  For this we are thankful and appreciative.  We also value a positive working relationship with USFS and BLM personnel and want to work hard to continue this relationship.  We recognize the importance of making our contribution in this two way affair.

For example, our club has an arrangement with the USFS to provide maintenance on 85 miles of ATV trails in the area.  In addition, our club, using club owned grooming equipment, maintains 95 miles of snow trails on the Uncompaghre Plateau and Cimarron areas.  And, we are currently offering our club's services to the UFO for trail maintenance responsibilities.

Our club has assumed an attitude of inclusiveness in working with other land users.  We appreciate others rights to use the land and support them.  For example, we do not schedule club rides during hunting seasons.  And we are supporting a local bicycle group in their efforts to expand single track opportunities.

In a larger sense, we are interested in working with Montrose County, and the City of Montrose in developing efforts which result in economic opportunities for the area.  We recognize the importance of outdoor recreation as one of the key drivers of local quality of life for residents and visitors alike.

Respectfully submitted,

*Rich Jakino*

Rich Jakino,  President

Uncompahgre Valley Trail Riders

# Comments on RMP Draft

## STATEMENT OF **UVTR** VALUES and OBJECTIVES

The UVTR club values well established trails (routes) which access pretty country, with viewpoints, which are well marked and maintained.  We do not value nor want helter skelter "go anywhere" use of the land by ATV's.  If the **end product of this RMP results in some 30 to 40 well defined trails, each several miles in length, in the UFO, we would consider this process a huge success**.  Times have changed.  High quality trail experiences now define the ATV/UTV users of today, rather than the "rip em up" "go anywhere" days of the past.  Both local people and visitors alike will access BLM land by transporting their machines to trailheads on trailers.  The ATV/UTV riders will then appreciate unique trail experiences, interesting destinations and "loop" routing.  These riders truly want a quality nature oriented experience.  Trees, rocks, canyons, overlooks, streams, an occasional pond will provide the juice that keep these riders happy.  They can get this experience on carefully crafted trails.

These to be established **designated trails** can become "signature" level experiences for the user and destinations worthy of the time and effort to use then.  They can be a foundation for local economic advantage, providing for a quality outdoor experience for locals and visitors alike.

A good example is the 2009 Dry Creek Travel Plan which provides a reasonable approach to motorized use even after closing over 300 miles of legacy trails.  Some work still needs to be done to fully mature the current approved trails in this area but the plan is going in the right direction by the implementation of **designated trails** as a planning and management approach.

## TRAVEL MANAGEMENT

OPEN AREAS

An exception to the designated trails approach are the "open" areas in Peach Valley and north of Delta which are viewed as small discreet special use areas for a small segment of the motorized crowd.  **Those should remain in their current condition** as there are few of them available anywhere in Colorado.  The users of these areas have special needs which should not/cannot be met in any other areas managed by BLM.  In fact, **we recommend that BLM designate one additional open area in the West End of Montrose County comprised of a few thousand acres**.  Doing so would accommodate these special need users in that part of the county. Hopefully by providing these approved open areas motorized users needs will be met in these confined areas and they will refrain from violating other BLM lands.  It would be much more effective to manage all lands if BLM permitted these users to use specified areas, otherwise they will infringe on lands where they are not welcome by BLM.  In summary, **we support Alternative A in ITEM 476 with one exception** and that is the creation of one additional open area in the West End.

TRAILHEADS:

The user of designated trails will travel to the trailhead in a vehicle with a trailer hauling their machine.  Therefore a parking area is required for loading and unloading, and parking during the day while the user is out on the trail.  An area large enough for twenty vehicles with trailers will accommodate most

trail users.  These trailheads will be served by county roads and therefore it will be important for the BLM to work with the county to establish trailhead locations.  Where none exist today the trailhead will need to be created with land clearing, gravel surface, signage, etc.  As a part of this Draft RMP we respectfully submit that **trailhead locations be anticipated when determining management plans**.  No management plan should be enacted which would prevent the establishment of these trailheads in the future.  With these thoughts in mind **we support ITEM 485 as written.**

DRAFT RMP ITEMS:

While the current RMP does not specify individual ATV/UTV trails, it is important that selection of alternatives throughout the RMP today does not close the door to the establishment of trails in the future.  Therefore, **we recommend that Alternative A (ITEM 475) be selected <u>at this time</u>**.  This NO ACTION Alternative will then permit the BLM much latitude when it embarks on a UFO-wide travel management plan in the future.  Please remember that the overall objective from our viewpoint is the creation of 30 to 40 designated trails, looped, several miles long each throughout the whole UFO.

Travel Management items:

ITEM 475: See above paragraph recommending NO ACTION with exception for OPEN areas noted above.

ITEM 476:  See above paragraph on OPEN areas

ITEM 477:  We support Alternative D but this could wait until overall travel management plan is executed.

ITEM  478:  We support Alternative A as we recommend the status quo until a new plan is executed.

ITEM 479:  We support Alternative A as we recommend the status quo be maintained until a new plan is executed.

ITEM 480:  We support Alternative A as we recommend no action until the new plan is executed.

ITEM 481: The weight limit of 1200 pounds does not reflect the reality of present day ATV/UTV equipment.  Why have a weight limit at all?  If BLM requires a weight limit, then make it 2400 pounds which reflects new equipment on the market when fully loaded with accessories.

ITEM 482:  This item, if implemented, has no standards of measurement.  It will be too subjective to administer and therefore we recommend abandonment of this item.

ITEM 484:  We heartily support the implementation of this item and will be glad to commit our resources to work with BLM to assist in the development of this item.

ITEM 485:  See above paragraph

ITEM 486:  Wait until a travel plan is developed so take no action now.

ITEM 487:  Wait until a travel plan is developed so take no action now.

ITEM 488:  Wait until a travel plan is developed so take no action now.

BLM_0127199

ITEM 489:  We support this item as integration with local partners and jurisdictions is necessary to ensure a comprehensive western slope vision for outdoor recreation.  See Western Governors Outdoor Vision Report.

## ACEC's PROLIFERATION

There is concern regarding the expansion within the Draft RMP of areas proposed as ACEC's.  Our concern is based on the proposal to limit or close acreage to motorized travel when an area is designated as ACEC.  In Alternative D there are 21,560 acres of NEW ACEC's recommended.  The total acreage becomes 51,320 acres within Alternative D, a 42 % increase.  In our estimate, some ACEC areas merit closure to ATV/UTV use.  Others can accommodate the designated trails approach.  Again, our club's objective is to establish a few, high quality, designated trails for ATV/UTV use.

Throughout the eight ACEC's noted in **ITEM 526 Alternative D, which we support**, we would ask BLM, through the future travel plan development, to create some number of designated trails.  An exception is in **ITEM 541, Alternative D, that <u>closure to motorized</u> should be changed to <u>limited to designated trails</u> within these 9780 acres**.

We also request that in the remaining 34,560 ACEC acres which are recommended for **designated trails**, in Alternative D, that a number of high quality looped trails be created.  This can be a part of the travel management process in the future but nothing should be decided at this point in time that would restrict this trail development from happening.

## RECREATION AND VISITOR SERVICES

Table 2-6 ITEM 52:  Our group favors Alternative C as we support the continued development on public lands surrounding the Montrose/Delta areas for ATV/UTV use.  Again, our vision is the implementation of designated trails on BLM lands where appropriate.

## WILDERNESS STUDY AREAS

Over thirty years ago these areas were designated, restrictions were put in place and they have languished in a "hold" state for all this time.  FEW STUDIES have been performed even though that was the stated intent.  These areas do NOT include any special wilderness characteristics, with maybe a couple of exceptions.  Few, if any, inventories have been completed documenting special characteristics.  These 36,160 acres have been locked up while we all wait for congressional action to return these areas to BLM management.  **We request that one of these areas (Camel Back – 10,680 acres) be immediately managed with the creation of a few designated ATV trails.**  This area is located in close proximity to the population centers of Delta and Montrose and will serve the recreational needs of these communities.  The designated trails approach does not create harm to other fauna and flora attributes of these areas if any exist.

**Thank you for your consideration of these comments.**

**Uncompahgre Valley Trail Riders**

11/2/2016                                    DEPARTMENT OF THE INTERIOR Mall - Comment on UFO proposed RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comment on UFO proposed RMP
1 message

**Randy or Sharon Campbell** <randyc@paonia.com>                    Sat, Oct 29, 2016 at 10:13 PM
To: ufomp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org

See attachment

Regards,
Randy and Sharon Campbell
Paonia

 **BLM RMP Comment letter 2016.doc**
30K

BLM_0127201

Randall B. and Sharon G. Campbell
P.O. Box 457
Paonia, CO  81428
(970) 527-3633
-----------------------------------------------------------------------------------------------------------------

October 29, 2016

Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401

Re: Comment on proposed new RMP

Re:     17440 Farmers Mine Rd.
        Township T13S
        Range R91W
        Section 20

To Whom it may concern,

    We are responding to the call for public comments regarding the updated Resource
Management Plan.

    We are limiting our comments to the question of policies regarding potential oil and gas
leasing in the North Fork Valley.  We are aware that the RMP addresses a number of other
land use issues, but time constraints have prevented us from analyzing the RMP in its entirety.

    We favor the North Fork Alternative plan in this regard.

    During the breathing space afforded by the time you have been working on the updated
RMP, our economy has continued to develop in the direction of small scale organic forms,
wineries, farm-to-table, agri-and-arts tourism.  This is not a pipe dream, as an analysis
prepared by Better Cities recommended exactly this kind of economic development in the
wake of the loss of roughly two thirds of our coal mining jobs.  This development and the
"lifestyle economy" which is attracting many retirees to the area, are critical to our economic
survival.  The specter of drilling in the valley floor is anathema to this direction.  We have seen
in other areas that gas activity provides little in the way of long-term employment opportunity
and provides much in the way of threats to the very quality of life that is sustaining us with a
longer-term outlook.

    Just don't.  Don't do that to us.  We're working hard to recover from the blow of the mining
cutbacks.  Many of us, us two included, are actively involved in volunteer organizations striving
to strengthen and improve our communities and make the North Fork Valley a long-term,
sustainable and enjoyable place to live.  Please don't undermine that.

    The following paragraphs are excerpted from our 2012 letter in response to the gas leasing
proposal.  These concerns are the same now as then, to wit:

BLM_0127202

Campbell

-------------------------------------------------------------------------------------------------------------------

WATER:  Our drinking water is hauled from the Town of Paonia.  Thus our concern there would be with extraction activities across the valley near the Paonia domestic water source on the side of Mt. Lamborn.

We use irrigation water from the Terror Ditch for our landscaping and gardening.  We have received a copy of a letter submitted to the BLM by the Terror Ditch Board of Directors detailing the threats to our irrigation supply, and we will not enumerate them here; we only stress that contamination or interruption of the Terror Ditch would be disastrous for us and our neighbors who rely on this resource for their agricultural livelihoods.

RECREATION and OTHER USES: The adjacent BLM lands are used by us and other local residents as informal hiking access and for hunting.  These activities would be negatively impacted by drilling activity.  We might emphasize that hunting is a significant contributor to the local economy, bringing in not only locals, but hunters from around the country.  Anything that discourages hunting will hurt the local economy.  Some of these lands are leased by local ranchers for grazing.  The real and potential pollution from drilling would negatively impact that use which is very important in our area.

WILDLIFE: Considerable numbers of deer, elk and wild turkeys travel through our property and adjacent BLM lands, including the area of lease parcel 6207.  We occasionally see bear, mountain lions, bobcats and coyotes.  A nearby gulch is a significant migration alley for seasonal movement of elk between high country to the north and the valley bottom to the south.  We fear this habitat and these movements would be severely disrupted by extraction work.

PROXIMITY TO RESIDENCE:  How close to our house might drilling take place? Theoretically within 100 yards – the boundary of parcel 6207 is about 50 yards upslope from our residence.  Sites within ¼ mile seem feasible. If drilling were to take place anywhere near that close, the effects on us would likely include (but not necessarily be limited to):

- Pollution by dust, machine exhaust, fracking chemicals, etc., with attendant health effects.  Sharon is already known to have some chemical sensitivity, so we have a very real concern that nearby drilling would make her ill.
- Loss of sleep due to lights and noise.
- Impairment of travel (see more below).
- General reduction in quality of life.
- Loss of property value.

ROAD and TRAFFIC:  Farmers Mine Rd. is a narrow, steep gravel road, hardly two lanes wide in many places.  Transport of large equipment and supply trucks would seriously impair residents' ability to use the road safely and conveniently.  Large trucks and equipment moving slowly have the potential to impede emergency vehicles.

We sincerely hope that this input is useful, and that by taking it into account, impacts on the lives, health and economy of the North Fork residents will be minimized.

Regards,

Randy and Sharon Campbell

BLM_0127203

Case No. 1:20-cv-02484-MSK Document 65-5 filed 04/29/21 USDC Colorado pg 101 of 129



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comment letter on Draft RMP/EIS

1 message

**Craig Grother** <craiggrother@yahoo.com>         Sat, Oct 29, 2016 at 2:22 PM
Reply-To: Craig Grother <craiggrother@yahoo.com>
To: "uformp@blm.gov" <uformp@blm.gov>

Attached is my response to the opportunity to comment on the Draft RMP/EIS for the Uncompahgre Field Office of the Bureau of Land Management. I am submitting these comments on behalf of the Colorado Chapter of Backcountry Hunters and Anglers. I represent Backcountry Hunters and Anglers as the Habitat Watchman for the Uncompahgre and the Regional Director for the Central Western Slope of Colorado.

I would appreciate acknowledgement of receipt of these comments from the project manager and/or acting field office manager.

Craig Grother
PO Box 156
Norwood, CO. 81423

craiggrother@yahoo.com



**RMP Comments.doc**
504K

BLM_0127204



Colorado Backcountry Hunters & Anglers
*"The sportsmen's voice for our wild public lands, waters and wildlife"*
www.backcountryhunters.org

Project Manager, Uncompahgre RMP                          October 29, 2016
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401

**Comments on the Draft RMP/EIS for the Uncompahgre Field Office**

Submitted by:

Craig Grother
P.O. Box 156
Norwood, CO. 81423
(970) 327-4850

Representing:  Backcountry Hunters and Anglers

Thank you for the opportunity to comment on the Draft Resource Management Plan and
Environmental Impact Statement (Draft RMP/EIS) for the Uncompahgre Field Office (UFO).  I am
a resident of Norwood Colorado and have lived and worked in the area since 1989.  I have
worked as a wildlife biologist for the US Forest Service for 33 years on various Ranger Districts in
Idaho, Nevada, and Colorado.  For the last 20 years of my career I was the wildlife biologist for
the Norwood and Ouray Ranger Districts of the GMUG National Forest.  During that time I was
able to work with various staff members of the UFO on cooperative wildlife habitat
improvement projects through programs and initiatives such as the Habitat Partnership Program
and the Uncompahgre Plateau Project.

I am submitting my comments on behalf of the Colorado Chapter of the Backcountry Hunters
and Anglers.  I represent our State Chapter as the Habitat Watchman for the Uncompahgre and
as the Regional Director for the Central Western Slope.  Backcountry Hunters and Anglers is a
grass roots organization of sportsmen and women who strongly believe in the principals of the
North American Wildlife Conservation Model and the value of our public lands for fish and
wildlife habitat and the traditional fishing and hunting opportunities that are available to all
sportsmen.  As a group of sportsmen, we are highly dependent upon our public lands to support
the fish and wildlife species we all enjoy.  We believe in the conservation and management of
fish and wildlife habitats on our public lands, and in providing undisturbed backcountry areas for
fish and wildlife and the opportunity for traditional methods of hunting and fishing that
challenge us physically and mentally and emphasize the principals of fair chase.

Our membership can also be characterized as families who enjoy undisturbed backcountry for
reasons other than hunting and fishing.  We cherish the opportunity to venture into areas free
of the noise and activity of OHV's and bicycles to enjoy the peace and solitude of the outdoors
with our friends and family on river trips, day hikes, backpacking trips, and horse pack trips.  We

1

BLM_0127205

also strongly feel that these opportunities should not only be available to us now but to our future generations as well.

Although I have reviewed much of the Draft EIS and Supporting Documents for this RMP, my comments are focused on those Appendices which are of primary concern to Backcountry Hunters and Anglers. I would appreciate any opportunity to discuss these comments with you and BLM staff working on this revision.

**Appendix G – Best Management Practices and Standard Operating Procedures**

There have been several wildlife habitat improvement projects implemented on the UFO to enhance winter range for big game. Several of those projects were developed and implemented in cooperation with the US Forest Service and Colorado Parks and Wildlife. The primary objective of these projects was to enhance existing winter range conditions and encourage elk and mule deer to utilize traditional winter ranges on public lands by improving winter forage and browse condition and production. These projects in combination with wildfire rehab efforts were largely successful in meeting these objectives.
During that time the Uncompahgre National Forest also developed and implemented a forest-wide travel management plan which includes specific direction and actions to further encourage big game use of these winter ranges through an active program of reducing open road and trail densities through route decommissioning and seasonally closing big game winter range areas to all forms of motorized and mechanized travel from December 1 through April 15. In combination, these efforts have had a significant effect on seasonal use patterns and distribution of big game.

While the BLM did implement the vegetation projects, there has not been an equal effort to reclaim or manage the existing roads, trails, or fire lines within these areas, or to control use by the public. This was largely due to the lack of direction in the current RMP, or a comprehensive travel management plan for the UFO. The effectiveness of the vegetation treatments for big game on BLM lands has been reduced by this lack of travel management. Over the years of implementing these projects and suppressing and rehabbing wildfires, there has been a steady progression and increase in open road and OHV trail densities which are having a significant impact upon big game habitat effectiveness.

The UFO has made the decision to approach travel management on a watershed or implementation-level scale. There is a lot of merit to this approach, but there needs to be stronger direction and guidance in the RMP to prevent cumulative effects to wildlife habitat and our remaining unroaded landscapes. As one recent example, a travel management plan was developed for the Burn Canyon area south of Norwood. The final decision intends to provide a mix of recreation opportunities for hiking/horseback, bicycle, and OHV recreation. The Burn Canyon area is located within one of the most heavily used big game winter ranges of the San Miguel watershed. The decision includes seasonal use restrictions on the BLM roads and trails to mitigate impacts to wintering big game. Unfortunately, use within the project areas has not gone according to plan. Bicycles continue to use the horse & foot use only trails in McKee Draw. Access to BLM lands is provided by a system of county roads which the BLM has no jurisdiction over. People are using any and all of the trails whenever they physically can, regardless of their seasonal restriction or use designation. The area attracts more use now that trail systems have been formally developed, and the impacts to big game have increased as a result of the project.

2

The following comments are specific to some of the resources area BMP's and SOP's included in Appendix G that I believe are necessary to provide direction in the RMP.

Vegetation – General and Upland

Retain the following direction to meet landscape objectives and enhance success of treatments:

- Limit authorized use levels and activities where needed to allow vegetation to recover from fire, drought, disease and insect outbreaks

- Incorporate strategies in grazing plans which manage fuel build up to enhance natural fire use.

- Defer vegetation disturbing activities during severe or extreme drought to allow for vegetation recovery.

- On a landscape scale, maintain a diversity of age classes. Any 100 square mile patch of pinyon-juniper should encompass the full range of seral stages. Preferentially achieve diversity by actions in younger age classes rather than reductions of older stands.

- To benefit species sensitive to habitat fragmentation, maintain unroaded stands or patches no less than 1.2 square miles in size.

- Maintain connectivity between stands of pinyon-juniper, sagebrush, and ponderosa pine by preserving corridors of similar vegetation.

- Reclaim unused or undesired roadbeds in pinyon-juniper woodland, salt desert shrub, and ponderosa pine.

- Place high requirements for justifying creation or retention of roads (or other linear features that fragment the habitat) in sagebrush. Reclaim unused or undesired roadbeds in sagebrush land cover types.

Wildlife – Terrestrial

Retain the following direction to improve habitat effectiveness:

- In all habitat improvements and manipulations, and maintenance of those areas, including projects designed to improve livestock grazing, reduce fuel loading, or otherwise, consider the habitat requirements of native wildlife communities, game and non-game alike, and acknowledge the ecological tradeoffs.

BLM_0127207

- During severe or extreme drought years, to the extent possible, assure that some pastures retain the maximum herb cover (even standing dead material) possible for ground-nesting birds.

Modify or add the following direction to improve habitat effectiveness:

- "Where winter range areas are not protected by lease stipulations, operations such as construction, drilling, completion, work-overs and other intensive activities will be avoided from January 1 to March 1 to minimize impacts to wintering big game."   Modify this direction to include seasonal closures on public recreation use to avoid impacts to wintering big game, and change the dates to December 1 through March 1.  These dates encompass the winter season for big game animals, and would be more consistent with seasonal closures on adjacent National Forest lands.

- Manage big game winter ranges to provide habitat conditions and seclusion that will encourage use of public lands by elk and mule deer.

Livestock Grazing

Retain the following direction to meet landscape objectives and enhance success of treatments:

- Grazing will be deferred on new vegetation treatments and rehabilitated burned areas to the extent necessary to comply with BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997).

- Seasonal utilization levels on palatable forage species should not exceed 50 percent unless required to meet specific range management objectives as identified in an allotment management plan or other activity plan.

- During any time of the year, livestock use shall not exceed an average of 30 percent on native woody vegetation in riparian areas unless required to meet specific range or riparian management objectives as identified in an allotment management plan or other activity plan.

- Develop rotational grazing strategies, incorporating rest, deferment, and/or other grazing methods to improve rangeland health. All developed strategies that are not during dormant periods should ensure livestock grazing does not occur in the same location during the same time period in any two consecutive years.

4

Comprehensive Trails and Travel Management

Appendix G currently lacks any direction specific to wildlife.  The following direction should be added to improve habitat effectiveness:

- Recreational trail systems will not be developed in areas identified as big game winter concentration areas, severe winter range, or critical winter range.

- All proposals for the establishment, modification, and funding of recreational trails will be reviewed by local District Wildlife Managers and Biologists with Colorado Parks and Wildlife prior to BLM proceeding with implementation.

- Where effective, the use of seasonal route and/or area restrictions will be in effect from December 1 through March 1 regardless of current weather and snow conditions.

- The analysis of OHV and bicycle trail system proposals will include identification of open road and trail densities and the potential impacts of the alternatives on habitat effectiveness.

- The implementation of travel management plans will include corresponding measures and funding to decommission roads and user-developed routes concurrently with trail development.

## Appendix F - Lands with wilderness characteristics

The Draft RMP/EIS identifies a total of eight areas that meet the qualifications for lands with wilderness characteristics.  Lands that qualify for this designation are of primary interest to Backcountry Hunters and Anglers.  They can provide essential habitat and security for wildlife and fish as well as high quality backcountry hunting and fishing opportunities.  In reviewing the analysis and management alternatives for these areas in the Draft RMP/EIS, it is apparent that the BLM recognizes that several of these areas have been severely impacted by roads and trails used for past mining and energy development, utilities, livestock grazing, and OHV use.  We are adamant that the remaining areas that retain their wilderness character be protected from further energy and recreation development and emphasized for the improvement of land health objectives and habitat for terrestrial wildlife.

The Camel Back WSA Adjacent area includes a total of 8,700 acres of BLM lands that include Monitor and Potter Canyons as well as most of the Monitor Mesa area in between.  According to the BLM's analysis, at least 6,950 acres still retain their wilderness character.  In combination with the Camel Back WSA and adjacent National Forest lands, this area represents some of the best remaining roadless and backcountry habitat on this portion of the Uncompahgre Plateau.  It provides high quality habitat for a population of desert bighorn sheep as well as winter range for elk and mule deer.  Management of the Camel Back area should emphasize the retention and enhancement of its roadless character and wildlife habitat.  The RMP should acknowledge the resource values of this landscape for wildlife and its primitive backcountry character, and develop a management prescription that is specific to these values.  As a minimum, the RMP

5

BLM_0127209

should specify that there will not be any motorized or mechanized trail development within this area.  It should also specify that vegetation treatments will be utilized and livestock grazing will be managed to maintain or improve land health objectives while providing residual forage for big game.  The RMP should also specify that domestic sheep grazing will only be authorized and managed to achieve no contact between domestic sheep and desert bighorn to prevent disease transmission.

The Lower Tabeguache/Campbell Creek area includes 11,060 acres of BLM lands that include Long Mesa, Burro Creek Mesa, Wild Cow Mesa, and Spring Creek Mesa.  This area represents another large block of unroaded backcountry habitat that has escaped the development associated with past uranium mining on this portion of the Uncompahgre Plateau.   This portion of the Uncompahgre Plateau also contains high quality big game winter range and important security from the disturbance of roads and OHV trails.  In order to retain and improve habitat for elk and mule deer, and encourage them to remain on public lands during the winter months, the RMP should include specific direction for this area that will prohibit any development of motorized and mechanized trails.  Some attempts by the BLM and Forest Service have been made to allow OHV and bicycle trail development within big game winter range while mitigating impacts to wildlife through the use of seasonal closures.  Unfortunately this has not prevented use of these trail systems by the public.  If the conditions on the ground are favorable, people use the roads and trails regardless of the seasonal closure.  The agencies do not have the law enforcement presence capable of ensuring compliance.  It is far better to not create a trail system in these areas in the first place.

Shavano Creek includes 6,090 acres of BLM lands in the upper Campbell Creek and West Campbell Creek adjacent to the north side of the Tabeguache SMA.  In combination with the adjacent National Forest lands, this area provides a significant roadless area on this portion of the Uncompahgre Plateau.  The Upper Campbell Creek drainage of the BLM would increase the size of this area if it were not for a county road (U472) going to a stock pond development, presumably for maintenance of this pond.  Other user-developed OHV trails have been created off county road 226 in to Shavano Creek.  Much of this area burned in the Campbell Creek wildfire of 2004 which significantly enhanced habitat conditions on big game winter range, creating a large winter concentration area.  The RMP should acknowledge the resource values of this area for wildlife and its primitive backcountry character, and develop a management prescription that is specific to these values.  As a minimum, the RMP should specify that there will not be any motorized or mechanized trail development within this area, and implement an aggressive decommissioning program to eliminate the user-developed OHV trails.  It should also specify that vegetation treatments will be utilized and livestock grazing will be managed to maintain or improve land health objectives while providing residual forage for big game.  Implementing these management standards would encourage elk and mule deer to remain on preferred habitats on public lands and reduce game damage occurring to adjacent private lands in and around Nucla.

Norwood Canyon contains 5,600 acres of BLM lands along the San Miguel River between Norwood Bridge and Pinyon Bridge.  This part of the San Miguel River canyon provides river rafting, kayaking, and fishing opportunities that are not adjacent to the noise and activities of highway 145 or 141.  River recreation and fishing activities are far less than the section above Norwood Bridge so the area provides opportunities for more solitude and quiet use.  There are currently at least two ways to legally hike into the Norwood Canyon to gain fishing access.  Both

6

access routes are not official "government" trails which further limits activity in this area and provides a high quality backcountry fishing experience.  This situation needs to be maintained by the BLM and the RMP should specify that there will not be any trail development or OHV/bicycle use into or within the Norwood Canyon.  Access on the BLM would continue to be provided by boat and/or hiking the old road on the north side of the river which goes around the Cascabel Ranch private land.

**Appendix J – Recreation Management Areas**

Appendix J provides a series of tables that outlines goals and objectives for various Recreation Management Areas on BLM lands under various alternatives.  Some of the RMA's include the entire range of alternatives in the Draft EIS, while others do not.  Presumably the areas that do not include a range of alternatives already have a recently approved travel management plan in place (such as Burn Canyon, Ridgway, Dry Creek).

One of the primary concerns we have with increased trail development for OHV's and bicycles on BLM lands is where this development is occurring, and the level to which it is being developed.  Most big game winter range occurs in the lower elevation valleys and foothills, and extends upward in elevation on the drier south and west facing slopes.  Much of the habitat for big game and other species that occurs in the valleys is now developed for our towns and housing in the rural areas surrounding these towns, or for agricultural production.  As a result, extensive areas of winter habitat have been lost to this development and its associated roads, traffic, and other human activities.  This has generally displaced big game to higher elevation winter ranges on the foothills and mesas of the adjacent public lands.  With our increase in human population there is also a tremendous increase in recreation on the adjacent public lands and pressure on the BLM to build and/or authorize more and more OHV and bicycle trails to accommodate this use.  Once a few trails are established, other user-developed trails appear and additional proposals from user-groups come to the BLM for even more trails that reach farther and farther into areas that have provided big game winter range.  The result has been a dramatic increase in the displacement of wildlife off their limited winter range areas and a subsequent decline in the health and productivity of our big game herds.

This RMP provides an opportunity for the BLM to define which areas are critical for wildlife and should not be developed for recreational use, and which areas can be developed for recreation while still protecting other resource values.  We strongly feel that the BLM should provide this direction in the RMP instead of continuing to react to proposals from user-groups that are only focused on their own goals and activities.

In general, we support the efforts to manage use of the most popular destinations by providing good maps, access to the trailheads, and education for the users of those areas.  However, we are very concerned that there are no Management Actions or Allowable Use Decisions for fish or wildlife in any proposed RMA's, and request that the BLM include this direction in the Final RMP.  The following are some specific comments on a few of the proposed RMA's.

*Burn Canyon SRMA.*  A travel management plan was recently developed for this SRMA and projects are currently being implemented within the planning area.  As previously stated, the Burn Canyon area is located within one of the most heavily used big game winter ranges of the San Miguel watershed.  The decision includes seasonal use restrictions on the BLM roads and

BLM_0127211

trails to mitigate impacts to wintering big game.  Unfortunately, use within the project areas has not gone according to plan.  Bicycles continue to use the horse & foot use only trails in McKee Draw.  Access to BLM lands is provided by a system of county roads which the BLM has no jurisdiction over.  People are using any and all of the trails whenever they physically can, regardless of their seasonal restriction or use designation.  The area attracts more use now that trail systems have been formally developed, and the impacts to big game have increased as a result of the project.

The BLM promised in its decision to monitor use of the area and apply adaptive management to further actions.  The main lessons that should be learned from here is that 1) seasonal restrictions to protect big game winter range are ineffective when the BLM has no jurisdiction over primary access roads managed by the county, 2) overall use of the area increases substantially after becoming a designated RMA, 3) people do not comply with allowable trail use designations, 4) the UFO does not have the resources to monitor and enforce compliance with established regulations for recreational use.

*Dolores River Canyon SRMA.*  We agree entirely with the management goals and objectives for this SRMA.  We are also aware of several user-developed OHV trails in the area that access the south rim of the Dolores River canyon, as well as go all the way into the bottom of the Dolores River canyon from Sylvia's Pocket.  Appendix J should also include direction to obliterate these trails to restore the primitive nature of this Canyon.

*Dry Creek SRMA.*  Management emphasis within this area is primarily for a variety of motorized and mechanized recreation, both trail based and off-trail rock crawling.  The matrix in Appendix J does not have any mitigation measures for wildlife.  There are substantial areas of big game winter range within this SRMA and there is currently a proposal to construct another 50 miles of mountain bike trails.  As stated above, we are concerned with the continued loss of big game winter range to recreation development and the additional trail development proposed in this area would result in an extreme density of trails and associated disturbance.  The BLM needs to develop and include a standard for open route density to alleviate these impacts.  Similar to Burn Canyon, we believe that the presence of county roads and the ineffectiveness of a seasonal closure (if there is one) would not adequately minimize harassment of wildlife or significant disruption of wildlife habitat.

*Paradox Valley SRMA.*  Zone 3 of this SRMA includes a substantial amount of area that should be included in the Zone 4 management strategy.  Any plans to provide OHV and bicycle trail riding in this area should be limited to existing roads that are managed by the county or that are roads that remain from previous mining activity that are somewhat used and maintained, and would create a logical and safe trail system.  Much of the area near the rim of the Paradox Valley and Dolores River canyon is very primitive in nature, and should be left available for dispersed hiking, hunting, and exploring.  Appendix J only includes one alternative, and the BLM should at least consider and analyze an alternative that retains and enhances the primitive nature of this area for wildlife habitat and undeveloped, dispersed uses.

*San Miguel River SRMA.*  The San Miguel River is the most significant fishery in the west end of the UFO and provides other river based recreation opportunities such as rafting and kayaking.  The UFO has done an excellent job in providing river access and overnight camping facilities on this portion of the San Miguel.  The San Miguel River above the Cascabel Ranch is also adjacent

8

BLM_0127212

——

to public highways and county roads which provide unlimited public access to the river for fishing.  We are opposed to any trail development into the Norwood Canyon below the Cascabel Ranch.  This area is already accessible on foot, and provides an excellent opportunity for more solitude and quiet use.  We also oppose any plans to develop trails into the Beaver Creek and Saltado Creek Canyons, which is compatible with the recreation strategy for zone 2.  These two major tributary canyons also provide excellent opportunities for solitude and backcountry hunting or fishing experiences adjacent to the main river corridor.

**Appendix K – Bighorn/Domestic Sheep Risk of Association Modeling**

Rocky Mountain and desert bighorn sheep represent one of the premier backcountry hunts available in Colorado, and are of very high interest to us in the BHA.  We are extremely concerned about the health and productivity of our limited bighorn sheep herds.  There is an abundance of research and anecdotal evidence to undeniably support the devastating effects of disease transmission between wild and domestic sheep.  To prevent this disaster from occurring, the only certain method to avoid disease transmission is to prevent contact between wild and domestic sheep.

We appreciate the efforts the BLM and CPW has taken to utilize both the PoI and RoC Risk Assessment Models to evaluate and compare the results for potential risk of contact between wild and domestic sheep within the UFO.  Although we are skeptical of the assumptions utilized in the local PoI model, we do feel that it adds some perspective to the planning-level analysis when compared to the results of the national RoC model.  When the results of both models are examined, it is very apparent that there are allotments where domestic sheep grazing is authorized directly within and adjacent to existing populations of bighorn sheep, and the BLM needs to take action to eliminate this threat to bighorn sheep.  Based upon the current science and professional experience and judgement of range and wildlife managers, we believe the only effective way to achieve this is to prevent physical contact between wild and domestic sheep.  Domestic sheep herd management practices and mitigation measures included in Appendix K have been short term and marginally effective at preventing contact.

The RMP should use the results of the analysis presented in Appendix K to determine the suitability of existing grazing allotments for domestic sheep grazing.  The risk of contact should preclude other suitability criteria such as historic/current use, terrain, forage type, etc.  We believe this is a planning-level decision that is appropriate and missing from the current Draft RMP/EIS.  In addition to a suitability determination, there should be specific direction to remove domestic sheep from allotments that have potential for contact, and that there will be no conversion of class of livestock from cattle to sheep where there is any potential for contact with bighorn.

Implementation of the decisions within the final RMP would occur through subsequent updates and revisions of allotment management plans.  Those updates and revisions should occur in a timely (5 years) fashion and be based upon the suitability determinations in the RMP with input from the CPW and the public.  This could be achieved through the development of an implementation plan for allotment management plans and permit actions.

BLM_0127213

**Appendix M – Travel Management**

The RMP will determine planning level decisions for the UFO, such as which areas are open, closed, or limited to OHV and bicycle use, and which types of uses will be emphasized within those broad allocations (Recreation Management Areas – Appendix J). We believe the BLM should strive to provide a balance in those allocations, and to recognize the values we place on providing large blocks of undisturbed habitat for fish and wildlife and the opportunity for traditional methods of hunting and fishing in the backcountry. That balance would include a priority for the retention and enhancement of lands with wilderness characteristics and/or lands with low densities of open routes, lands that currently provide seasonally important big game habitat and migration corridors, and lands adjacent to communities surrounding the UFO that will provide opportunities for quiet use and solitude.

Appendix M includes a description of the process and criteria that will be considered by the BLM when evaluating routes within area-specific travel management plans during implementation of the RMP. Within Appendix M we would like to see the BLM include additional management goals and objectives for big game habitat capability and effectiveness. We strongly fell there is a need for additional consideration and recognition of the impacts of motorized and mechanized recreation use upon big game distribution, productivity, vulnerability, and population structure, as well as hunter success in relation to open road/trail density on the landscape. There is a large and growing body of research available that needs to be recognized and implemented by the BLM. We have posted several of the most relevant research studies on our website at backcountryhunters.org:

Literature Reviews of OHV Impacts on Hunting, Fishing and Habitat:

1. ATV Impacts on the Landscape and Wildlife (2011). A white paper by BHA which provides a synthesis of OHV-related articles in three sections focused on the effects of ATV use on: 1) soils, water quality and vegetation 2) wildlife (primarily elk) 3) the habitat and environment that wildlife depend upon.

2. Off Road Vehicle Impacts on Hunting and Fishing. An excellent illustrated literature review by the Isaac Walton League highlighting the impacts that off road vehicle use has on our sporting heritage.

3. Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands (2007). A synthesis of literature compiled by the Department of Interior.

4. The Effects of Off-Road Vehicles on Ecosystems. A research review by Texas Parks and Wildlife.

5. Effects of Roads on Elk: Implication for Management in Forested Ecosystems (2005). Research which builds on a large body of research demonstrating the impacts of roads on elk behavior and habitat.

10

6. Behavioral Responses of North American Elk to Recreational Activity (2008).  A study which found that "activities of elk can be substantially affected by off-road recreation. Mitigating these effects may be appropriate where elk are a management priority. Balancing management of species like elk with off-road recreation will become increasingly important as off-road recreational uses continue to increase on public lands in North America."

7. Reproductive Success of Elk Following Disturbance Following Disturbance by Humans During Calving Season (2011).  A study which shows that cow/calf ratios decease when disturbance increases and therefore "maintaining disturbance-free areas for elk during parturitional periods" is necessary.

There are additional Goals and Objectives and the associated Actions that relate to open road/trail densities, the impacts of bicycle trails and use, and the conservation of our existing backcountry areas that I request the BLM to include in Appendix M to guide implementation of travel management on the UFO.  These additional Goals, Objectives, and Actions  will also enable the BLM to fully comply with 43CFR 8342.1 b) Areas and trails will be located to minimize harassment of wildlife or significant disruption of wildlife habitat, and c) Areas and trails will be located to minimize conflicts between OHV's and other uses.

Goal/Objective – Locate and manage OHV and mechanized routes and trails to minimize harassment of wildlife or significant disruption of wildlife habitat.

Action #1 – Limit and reduce motorized and mechanized routes and trails in areas managed for mixed uses.  Implement road and trail density standards within these areas that are favorable to big game habitat requirements as defined in current scientific research.

Action #2 – Motorized and mechanized routes and trails will avoid lands managed for wilderness characteristics, critical wildlife areas, and wildlife emphasis areas.

Action #3 – No motorized off-route down game retrieval will be allowed anywhere within the UFO.

Action #4 – Seasonal closures to protect big game winter range will include snowmobiles.

Action #5 – Routes designated for administrative use within all mixed use areas, lands managed for wilderness characteristics, critical wildlife areas, and wildlife emphasis areas will be closed to public OHV and bicycle use yearlong.

**Appendix O - Areas of Critical Environmental Concern**

The Draft RMP/EIS includes analysis of several potential ACEC's that demonstrate the exceptional biological and environmental resource values of several areas within the UFO (Appendix O).  We at Backcountry Hunters and Anglers support the designation of ACEC's for the Roubideau-Potter-Monitor, San Miguel River Expansion, and Dolores River-Slickrock Canyon areas of the UFO.  The Draft RMP/EIS does not appear to contain integrated resource

11

management direction under any alternative that would fully protect these resource values. Designation of these ACEC's does not preclude livestock grazing, mining, energy development, utility corridors, or recreation emphasis designations such as SMRA or ERMA. The designation of these ACEC's should provide further emphasis in the RMP to manage these areas for their unique character and biological resources and substantially reduce and limit impacts to these values from recreation, livestock grazing, and energy development.

The Roubideau-Potter-Monitor and Dolores-Slickrock Canyon ACEC's provide crucial habitat for existing populations of desert bighorn sheep. It is essential that the RMP include clear direction for both wildlife and livestock grazing resources to emphasize the perpetuation of healthy populations of desert bighorn sheep within these ACEC's and any other occupied habitat areas within the UFO through active vegetation management and the elimination of any potential contact between wild and domestic sheep. The BLM must utilize the most current science-based information and nationally accepted analysis methods to determine potential contact between wild and domestic sheep on these landscapes, and implement permit actions to resolve the issues associated with disease transmission to these populations. The RMP should include specific direction to subsequently develop an implementation plan to resolve the conflicts identified in the EIS through permit actions and/or updated allotment management plans within a five year time period.

Both of these ACEC's also provide critical big game winter range and security areas for elk and mule deer. The RMP should include clear direction for wildlife, vegetation, and livestock grazing resources to manage vegetation to provide habitat conditions favorable to big game, and to manage livestock grazing use in these areas to provide abundant residual forage for wildlife. The management prescriptions for recreation included in Appendix J do not adequately address mitigation of the potential impacts of current and future OHV and bicycle use or development within big game winter ranges. As I stated previously, attempts have been made locally by the BLM and Forest Service to allow OHV and bicycle trail development within big game winter range while mitigating impacts to wildlife through the use of seasonal closures. Unfortunately this has not prevented use of these trail systems by the public and the impacts from these activities continue to degrade habitat quality and displace big game from preferred wintering areas. If the conditions on the ground are favorable, people use the roads and trails regardless of a seasonal closure. The agencies do not have the law enforcement presence capable of ensuring compliance. It is far better to not create a trail system in these areas in the first place. Recreation strategies within Appendix J also need to include no motorized or mechanized use in these important wildlife areas. If there are user-developed routes already in place within these areas, the RMP should also include direction to actively decommission those routes to prevent continued disturbance to wildlife and restore habitat effectiveness.

We also support designation of the San Miguel River ACEC. It would expand the current ACEC to a total of 35,480 acres, and include the entire river corridor as well as the major tributaries. The San Miguel River is the most significant fishery in the west end of the UFO and provides other river based recreation opportunities such as rafting and kayaking. The UFO has done an excellent job in providing river access and overnight camping facilities on this portion of the San Miguel. The San Miguel River above the Cascabel Ranch is also adjacent to public highways and county roads which provide unlimited public access to the river for fishing. As previously stated, we are opposed to any trail development into the Norwood Canyon below the Cascabel Ranch. This area is already accessible on foot, and provides an excellent opportunity for more solitude

12

and quiet use.  We also oppose any plans to develop trails into the Beaver Creek and Saltado Creek Canyons.  These two major tributary canyons also provide excellent opportunities for solitude and backcountry hunting or fishing experiences adjacent to the main river corridor.

13

BLM_0127217

11/2/2016                    DEPARTMENT OF THE INTERIOR Mail - North Fork Valley oil and gas lease public comment



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## North Fork Valley oil and gas lease public comment
1 message

**Judi & Dave** <drdjjc@gmail.com>                                  Sat, Oct 29, 2016 at 9:48 PM
To: uformp@blm.gov, rmpcomments@citizensforahealthycommunity.org

Dear BLM staff,
I have attached a letter detailing why I think no oil and gas leases should be offered in the North Fork Valley.  I sincerely appreciate your review and consideration.

Thank you,
David L. Jones, COL USA Ret
Ridgway, CO

 **Letter to the BLM UFO Field Manager concerning North Fork oil and gas leases.docx**
17K

BLM_0127218

29 October, 2016

Dear Acting UFO Field Manager, Joseph Meyer, Neil Kornze, and Ruth Welch,

I am writing concerning BLM's recently released Draft Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office, which includes Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties in southwestern Colorado.

This letter details why I am totally opposed to oil and gas leasing on public lands in the North Fork Valley. The North Fork Valley, famed for its orchards and vineyards, is home to the largest concentration of organic farms in Colorado. It is home to thriving communities, a Creative Cultural District, and the surrounding areas provide great fishing, hunting, and other outdoor recreation. The heart and soul of these growing communities is based on their clean water, clean air, and beautiful natural setting.

My wife and I travel to the North Fork Valley often to pick apples and peaches and to visit the towns and vineyards. We are canoeing tomorrow on the beautiful Gunnison River with six friends. The only way to prevent irreparable harm to this special area is to close off BLM lands and minerals in the area to oil and gas leasing. (At a minimum the BLM should impose a moratorium on oil and gas leasing and development until rural gas gathering pipelines are subject to federal pipeline safety regulations. As long as operators are not subject to the Pipeline Hazardous Materials and Safety Administration regulations on rural gas gathering pipelines, they are allowed to use public lands to put the public and the environment at even higher risk of leaks, spills, and explosions. This is unacceptable.)

The U.S. has committed to a clean energy future, and most Colorado citizens fully support that change. Colorado is a tremendous site for generating clean energy, and the North Fork Valley has long been at the forefront of that effort. Paonia-based Solar Energy International (SEI), now in its third decade, provides industry-leading technical training and expertise in renewable energy. Graduates of that program move into renewable energy jobs locally, nationally, and internationally.

While fossil fuels are currently critical to our economy, the U.S. already has a tremendous number of oil and gas extraction sites. Today, our economy is shifting toward non-carbon based fuels. The three largest coal companies in the U.S., two located in CO, filed for bankruptcy last year. In 2015 the U.S. had the smallest number of active oil rigs since 1940. Ninety U.S. oil and gas companies went bankrupt last year, sometimes leaving abandoned wells with inadequate clean-up funds. At this time, there is twice as much global investment in clean energy as in fossil fuels, and the North Fork stands ready to re-train those who have lost those carbon-based fuel jobs. While there may be future oil and gas boom/bust cycles, clean energy will continue to grow and dominate. We do not need new oil and gas drilling surrounding a community whose businesses, educational institutions and ecotourism focus on its pristine environment, from its award winning organic orchards and vineyards to an internationally recognized institution that provides critical alternative energy training.

The mission of the BLM is to sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations. I urge the BLM to reconsider opening 95% of lands to oil and gas leasing without adequate analysis of the risks large-scale oil and gas development poses to human and animal health, the environment, and the economy of this unique corner of Colorado. Please adopt a no-leasing alternative.

Thank you,

David L. Jones, COL USA RET
700 Sabeta Drive
Ridgway, CO 81432



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## UFO Draft RMP Comments
1 message

**Lindsay Cusack** <lecusack@yahoo.com>                                    Sat, Oct 29, 2016 at 2:06 PM
Reply-To: Lindsay Cusack <lecusack@yahoo.com>
To: "uformp@blm.gov" <uformp@blm.gov>
Cc: info@theconservationcenter.org

Lindsay Cusack
40797 M Rd
Paonia, CO 81428

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

October 29, 2016

Dear BLM-UFO Staff and RMP Comment Team,

I am a resident of and small business owner in Paonia and live on M Rd. near BLM lands.  I
moved to Paonia just over one year ago because of the local-organic agriculture, clean
watersheds, because of the community and local economy, and the beautiful landscapes, wildlife,
views and recreation activities on BLM lands and hope to make my home here for many years to
come.  I am writing to express my support for the inclusion of Alt B1 into the final Resource
Management Plan. It balances the development of our natural resources without threatening our
way of life including water resources, wildlife, hunting and recreation activities that are an
important part of our local economy, and as discussed in Appendix D, the importance of
connectivity between wilderness areas.

Thank you for the opportunity to comment on the draft Uncompahgre plan. I am glad the BLM is
considering ways to protect important natural resources like wildlife habitat and wild and scenic
rivers. In particular, I support the BLM designating "ecological emphasis areas" to preserve habitat
connectivity and wildlife corridors.

However, the Preferred Alternative in the draft plan would open 90 percent of the Uncompahgre
area to oil and gas leasing, endangering wilderness-quality lands, wildlife, recreation and cultural
sites. Much of the area doesn't even have oil and gas reserves that are feasible for development,
meaning the BLM is putting our public lands at risk for speculative leasing. The BLM should
change course and adopt a final plan that makes wilderness-quality lands, important wildlife
habitat and recreation areas off-limits to energy development. I support the inclusion of Alternative
B1 which balances all the resources managed by the BLM.

Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat
are critical components that help sustain the multi-million-dollar hunting industry in the area. The
final plan should include ecological emphasis areas for all critical winter habitat within the North
Fork Valley. The final plan should also include the protections of B1 which prohibits surface
activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy
setbacks from streams, riparian areas, and water bodies.

I ask that The BLM listen to the local community in Crawford, Hotchkiss and Paonia and adopt the North Fork Citizens' Alternative for the area in and around the North Fork Valley. This locally-driven proposal is the right way to protect the Gunnison Watershed--supporting farmers and building a sustainable rural economy on Colorado's Western Slope.

Sincerely,
Lindsay Cusack

Lindsay E. Cusack, MSW, LCSW
http://www.paoniapsychotherapy.com
312.912.4845

BLM_0127221

0229 RP

Krista Dudley
Paonia, CO 81428
10/29/2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft Resource Management Plan. As presented, none of the alternatives offer the level of protection these lands warrant, that communities and the public in your planning area have specifically asked for and favored, and which federal law requires.

I recently moved to Colorado from the state of Washington . Part of the allure to the North Folk Valley for me was the clean air, water, fertile land and the small organic farms . Upon moving here I was appalled to learn about the possibility of fracking in this pristine valley. In reviewing BLM's proposed alternatives that were presented to the community, I was appalled to discover in the "preferred" alternative, Alternative D, that 95% of the planning area is being allowed to be leased to oil and gas companies including most of the parcels that were nominated in the 2009 30,000 acre proposal.

I am requesting that the final Resource Management Plan should:
- Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.
- Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.

Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to fulfill it's duty to consider the full range of reasonable management possibilities.

It is my hope and request to keep fracking out of the North Folk Valley and to continue to work together to find alternative solutions that will keep our air and waters clean so that this valley might continue to provide a variety of organic food sources for generations to come.

Sincerely,
Krista Dudley

P.O. Box 812
Paonia, CO
81428

GRAND JUNCTION CO 815

RECEIVED

OCT 3 1 2016

UNCOMPAHGRE FIELD OFFICE

29 OCT 2016 PM 11

USA FOREVER

BLM Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO
81401

8140185436

M. Puttule
41924 Lamborn Mesa Rd.
Paonia, CO 81428

GRAND JUNCTION CO 815

29 OCT 2016 PM 1 T

USA FOREVER 2014

RECEIVED
OCT 31 2016
UNCOMPAHGRE FIELD OFFICE

BLM
2465 S. Townsend Ave.
Montrose, CO 81401

8140185436

Dear BLM,                                      Oct. 28, 16
          I am writing this letter to ask you
to please STOP the leasing of our forrest
to the gas and oil companies. We who have
lived here 30 plus years are very concerned
for our way of life. Please do not allow
them to poison our water and the air we
breathe. Please stop the leasing and do not
allow alternative leasing. You also need
to impose a moratorium on oil and gas.
leasing. It seems to be the general conscious
that only Democrats don't want this. Well I
am a Republican and I do not want oil and
gas anywhere in our county. We moved
here for the way things are, we are
not miners and had to travel to the
Roaring fork for work. We did it, and
so can anyone else who needs work. I
I love this place and would love to watch
my grandchildren grow up here and get the
luxury of drinking the water and breathing
clean air. Please hear the cry of Delta
County and DO NOT ALLOW THIS.

                    Sincerly
                      Marilyn Pitterle

BLM_0127225

| | |
|---|---|
| **From:** | Bill Dvorak |
| **To:** | uformp@blm.gov |
| **Subject:** | Dolores RMP comments |
| **Date:** | Sunday, October 30, 2016 10:24:25 AM |

RMP Project Manager, Uncompahgre Field Office

Thank you for the opportunity to comment on the Draft Uncompahgre Resource Management Plan. As a concerned river advocate I believe that the Dolores and San Miguel River segments meet suitability requirements for Wild & Scenic designation based on their outstanding recreational and scenic values, and that the BLM should maintain their suitability as part of their Resource Management Plan. I appreciate and support the time and effort that has gone into crafting this plan and I especially am supportive of the forward thinking exhibited in the Wild and Scenic River suitability determinations and the creation of Ecological Emphasis Areas.

I further ask that the draft support the Colorado Water Conservation Board's request to manage flows through the Colorado State Instream Flow Program (ISF) and I expect the BLM and the Secretary of the Interior to pursue other flow protections if the ISF's are not sufficient to protect whitewater recreation and ecological values. I urge that the plan place an emphasis on protecting important wildlife habitat and key waterways as critical to not just conserving this unique landscape, but also enabling more sustainable and diversified local economies. I also support Alternative B's approach to protecting the over 41,000 acres identified as lands with wilderness character and managing those lands to preserve their wilderness character. I also greatly prefer the BLM's approach to Areas of Critical Environmental Concern and Ecological Emphasis Areas in Alternative B versus the lack of protections the other alternatives provide for our unique plant and wildlife communities.

However, I do not support a preferred alternative that opens over 90% of the field office to oil and gas leasing. Instead I support the community-driven North Fork Alternative and an overall modified approach to oil and gas leasing that prevents speculative leasing and focuses on balancing uses across the landscape.

The care and conservation of these public lands is very important to me, truly one of North America's greatest canyon systems worthy of the highest regard. We must conserve them so future generations may enjoy all that they have to offer. I appreciate your consideration of my comments and look forward to continuing to engage in the planning process.

*Bill Dvorak*
National Wildlife Federation
17921 US Highway 285
Nathrop, CO 81236
email: dvorakb@nwf.org
719 221-3212 cell

BLM_0127226

719 539-6851 office
719 539-3378 fax

BLM_0127227

| | |
|---|---|
| **From:** | Bill Dvorak |
| **To:** | uformp@blm.gov |
| **Subject:** | Dolores RMP comments |
| **Date:** | Sunday, October 30, 2016 10:25:09 AM |

RMP Project Manager, Uncompahgre Field Office

Thank you for the opportunity to comment on the Draft Uncompahgre Resource Management Plan. As a concerned river advocate I believe that the Dolores and San Miguel River segments meet suitability requirements for Wild & Scenic designation based on their outstanding recreational and scenic values, and that the BLM should maintain their suitability as part of their Resource Management Plan. I appreciate and support the time and effort that has gone into crafting this plan and I especially am supportive of the forward thinking exhibited in the Wild and Scenic River suitability determinations and the creation of Ecological Emphasis Areas.

I further ask that the draft support the Colorado Water Conservation Board's request to manage flows through the Colorado State Instream Flow Program (ISF) and I expect the BLM and the Secretary of the Interior to pursue other flow protections if the ISF's are not sufficient to protect whitewater recreation and ecological values. I urge that the plan place an emphasis on protecting important wildlife habitat and key waterways as critical to not just conserving this unique landscape, but also enabling more sustainable and diversified local economies. I also support Alternative B's approach to protecting the over 41,000 acres identified as lands with wilderness character and managing those lands to preserve their wilderness character. I also greatly prefer the BLM's approach to Areas of Critical Environmental Concern and Ecological Emphasis Areas in Alternative B versus the lack of protections the other alternatives provide for our unique plant and wildlife communities.

However, I do not support a preferred alternative that opens over 90% of the field office to oil and gas leasing. Instead I support the community-driven North Fork Alternative and an overall modified approach to oil and gas leasing that prevents speculative leasing and focuses on balancing uses across the landscape.

The care and conservation of these public lands is very important to me, truly one of North America's greatest canyon systems worthy of the highest regard. We must conserve them so future generations may enjoy all that they have to offer. I appreciate your consideration of my comments and look forward to continuing to engage in the planning process.

*Bill Dvorak*

**Dvorak Expeditions**
17921 US Highway 285
Nathrop, CO 81236

(719) 539-6851 office
(719) 221-3212 cell
Bill@DvorakExpeditions.com
www.DvorakExpeditions.com

**Colorado's 1st Licensed Outfitter**

BLM_0127229

| | |
|---|---|
| **From:** | Cody Perry |
| **To:** | uformp@blm.gov |
| **Subject:** | DRMP Public Comment |
| **Date:** | Saturday, October 29, 2016 8:32:11 PM |
| **Attachments:** | DRMP Comment UFO.pdf |

Attached is my public comment.
Because it's very important to have comment submitted I will copy and paste within the email text below and attach as a PDF.

RMP Project Manager, Uncompahgre Field Office

Thank you for the opportunity to comment on the Draft Uncompahgre Resource Management Plan. As a concerned river advocate I believe that the Dolores and San Miguel River segments meet suitability requirements for Wild & Scenic designation based on their outstanding recreational and scenic values, and that the BLM should maintain their suitability as part of their Resource Management Plan. I appreciate and support the time and effort that has gone into crafting this plan and I especially am supportive of the forward thinking exhibited in the Wild and Scenic River suitability determinations and the creation of Ecological Emphasis Areas.

I further ask that the draft support the Colorado Water Conservation Board's request to manage flows through the Colorado State Instream Flow Program (ISF) and I expect the BLM and the Secretary of the Interior to pursue other flow protections if the ISF's are not sufficient to protect whitewater recreation and ecological values. I urge that the plan place an emphasis on protecting important wildlife habitat and key waterways as critical to not just conserving this unique landscape, but also enabling more sustainable and diversified local economies. I also support Alternative B's approach to protecting the over 41,000 acres identified as lands with wilderness character and managing those lands to preserve their wilderness character. I also greatly prefer the BLM's approach to Areas of Critical Environmental Concern and Ecological Emphasis Areas in Alternative B versus the lack of protections the other alternatives provide for our unique plant and wildlife communities.

However, I do not support a preferred alternative that opens over 90% of the field office to oil and gas leasing. Instead I support the community-driven North Fork Alternative and an overall modified approach to oil and gas leasing that prevents speculative leasing and focuses on balancing uses across the landscape.

The care and conservation of these public lands is very important to me, truly one of North America's greatest canyon systems worthy of the highest regard. We must conserve them so future generations may enjoy all that they have to offer. I appreciate your consideration of my comments and look forward to continuing to engage in the planning process.

Cody M. Perry
Project Director
Rig To Flip
PO BOX 882382
Steamboat Springs CO
80488

--
Cody M Perry
Project Director Rig To Flip
9708191610

**Rig to Flip.org**
water  education  awareness

BLM_0127230

| | |
|---|---|
| **From:** | Pfifer, Teresa |
| **To:** | BLM_CO UFO_RMP |
| **Subject:** | Fwd: comment on the Uncompahgre Resource Management Plan |
| **Date:** | Tuesday, November 01, 2016 9:14:35 AM |

---------- Forwarded message ----------
From: **Info, BLM_CO** <blm_co_info@blm.gov>
Date: Tue, Nov 1, 2016 at 6:26 AM
Subject: Fwd: comment on the Uncompahgre Resource Management Plan
To: tpfifer@blm.gov

something for you

---------- Forwarded message ----------
From: **Mary Hertert** <colorcreek49@gmail.com>
Date: Mon, Oct 31, 2016 at 5:02 PM
Subject: comment on the Uncompahgre Resource Management Plan
To: blm_co_info@blm.gov

UFO RMP Project manager.

Thank you for the opportunity to comment on the Draft Uncompahgre Resource Management Plan. I appreciate and support the time and effort that has gone into crafting this plan and I especially am supportive of the forward thinking exhibited in the Wild and Scenic River suitability determinations and the creation of Ecological Emphasis Areas. Protecting important wildlife habitat and key waterways is critical to not just conserving this unique landscape, it's also paramount in creating sustainable and diversified local economies.

I am a co-organizer of the outdoor meetup group, Western Slope Adventurers with over 400 members. While I do not speak for each individual I do represent the value this group receives from having public lands available to us specifically for hiking and boating.  Many of us participate with BLM in annual cleanups on the Gunnison and Colorado Rivers as well as in volunteering to help maintain trails throughout the BLM public lands.

I am also a member of the Colorado Archaeology Association-Grand Junction Chapter which is now the largest chapter in CAS. We are adamantly in support of preserving sensitive cultural habitat as necessary to the historical preservation of human heritage in this area.

It is imperative in this day of advanced motor capabilities that we ramp up protection of sensitive areas as well as maintain our vigilance while ensuring that we do not continue to allow our industrialized selves to overwhelm our need for wild and scenic places.  Every step that we give in regards to oil and gas, motorized vehicles in the back country or industrial access to our rivers are steps we will not be able to regain again.

The conservation of these spectacular public lands is important to me, but it is also important to conserve them so future generations may enjoy all that they have to offer. I appreciate your consideration of my comments and look forward to continuing to engage in the planning process.

Sincerely,



Mary Hertert

929 Crown Ct, Fruita, CO 81521

--
Mary Hertert  (970) 778-5985
Located at 1150 N. 25th St, Grand Junction *CO*

[?]

**[www.colorcreekfiberart.com](http://www.colorcreekfiberart.com)**

--
BLM-COSO-Information Access Center
2850 Youngfield St
Lakewood Co 80215
303-239-3600