.03A5

# 6720 - AQUATIC RESOURCE MANAGEMENT

5. Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.). Requires that public lands be managed in a manner that will provide food and habitat for fish and wildlife, and protect the quality of water resources. Section 201(a) provides for the preparation and maintenance of an inventory of public land resources on a continuing basis.

6. Oregon and California Act of 1937 (43 U.S.C. 1181). Provides for management of revested Oregon and California Railroad and reconveyed Coos Bay Wagon Road Grant Lands by BLM.

7. Water Quality Act of 1987, as amended from the Federal Water Pollution Control Act (Clean Water Act) of 1977 (33 U.S.C. 1251 et seq.). Provides for restoration and maintenance of the chemical, physical, and biological integrity of the Nation's water at a level of quality which provides protection for fish, shellfish, wildlife, and recreational use.

8. Public Rangelands Improvement Act of 1978 (43 U.S.C. 1901 et seq.). Directs and provides funds for rangeland improvements in accordance with land use planning.

9. Wild and Scenic Rivers Act of 1968 (16 U.S.C. 1271 et seq.). Provides for recognition and protection of certain rivers through designation as wild, scenic, or recreational.

B. Executive Orders.

1. Executive Order 11987, Exotic Organisms (dated May 24, 1977). Restricts the introduction of exotic species into natural ecosystems of the United States.

2. Executive Order 11988, Floodplain Management (dated May 24, 1977). Directs Federal agencies to avoid, to the extent possible, the long-term and short-term adverse impacts associated with the occupancy and modification of floodplains.

3. Executive Order 11990, Protection of Wetlands (dated May 24, 1977). Directs Federal agencies to minimize the destruction, loss, or degradation of wetlands and to preserve and enhance the natural and beneficial values of wetlands in carrying out programs affecting land use.

.04 Responsibility.

A. The Director and Deputy Director are responsible for overall aquatic resource management on public lands, and for the interactions between programs managing aquatic resources and all other BLM programs.

BLM MANUAL
Supersedes Rel. 6-92

Rel. 6-118
3/22/91

.04B

6720 - AQUATIC RESOURCE MANAGEMENT

B.  <u>Assistant Director, Land and Renewable Resources</u> is responsible for the overall coordination and integration of aquatic resource management, policies, and procedures.  The Assistant Director provides policy and program interpretations, direction, and leadership to ensure consistent field implementation of policies and procedures to manage aquatic resources.  The Assistant Director also reconciles aquatic resource-related issues and conflicts among Land and Renewable Resource programs.·

C.  <u>Assistant Director, Energy and Mineral Resources</u> is responsible for providing program interpretations, direction, and leadership to ensure consistent field implementation of necessary procedures to manage energy and mineral resources. This includes consideration of aquatic resources in development programs.

D.  <u>Chief, Division of Wildlife and Fisheries</u> is responsible for the following:

1.  Developing aquatic resource management policy, strategic plans, and technical guidance.

2.  Developing guidance for the preparation of habitat management plans to maintain aquatic habitats at desired levels and in compliance with applicable Federal laws, executive orders, and regulations.

3.  Ensuring that aquatic resource management procedures are incorporated into the BLM programs.

4.  Evaluating the effectiveness of aquatic resource management programs and procedures.

5.  Systematically reviewing rules, regulations, procedures, and proposed legislation to establish and update the BLM's efforts to maintain aquatic resources and habitats on public lands.

E.  <u>Chief, Division of Rangeland Resources</u> is responsible for developing and issuing guidelines for water quality, riparian and floodplain management on public lands.  These responsibilities also include ensuring compliance with Federal, State, and local water quality standards and developing policy and guidance for preparing allotment and watershed management plans, and to manage beneficial and natural floodplain functions in accordance with applicable executive orders.

BLM_0147244

.04F

## 6720 - AQUATIC RESOURCE MANAGEMENT

F.   Other Division and Office Chiefs are responsible for
ensuring that policies and guidelines for their respective
resources are coordinated with the aquatic resource management
policies and guidance, to the extent applicable.

G.   Service Center Director is responsible for providing
technical support to Field Offices in new and emerging natural
resource technologies, assistance to Washington Office, and
development and information transfer of aquatic resource-
related inventories, data storage, and other appropriate
technical expertise.

H.   State Directors are responsible for the following:

1.   Ensuring compliance with the BLM policies and
procedures for aquatic resource management and protection.

2.   Ensuring coordination and cooperation with the States
and other cooperators in aquatic resource management programs
and issues.

3.   Monitoring aquatic resource management effectiveness
on public lands within the State to ensure that every effort is
made to meet management objectives in State Fish and Wildlife
2000 plans, resource management plans, and activity plans.

4.   Ensuring that when aquatic habitats on public lands,
or portions thereof, are proposed for exchange, lease,
easement, or right-of-way that the BLM retains ownership of
aquatic habitats containing special status species, anadromous
species, or other significant aquatic resources, and attaches
appropriate stipulations to the uses of properties by the
grantee or purchaser and any successor that are necessary to
protect aquatic resources.

I.   District Managers are responsible for the following
(those in Alaska, also are responsible for items listed under
.04(J) below):

1.   Monitoring aquatic habitat, population and water
quality characteristics to assure maintenance of aquatic
communities in compliance with Federal laws, regulations, and
resource management plans.

2.   Storing aquatic habitat, population and water quality
information in approved data bases such as Riparian Aquatic
Information Data Summary (RAIDS), Threatened and Endangered
Species Data System (TEDS), Environmental Protection Agency
water quality data management system, Storage Retrieval
(STORET) (water quality), etc.

BLM MANUAL                                    Rel. 6-118
Supersedes Rel. 6-92                              3/22/91

.04J

## 6720 - AQUATIC RESOURCE MANAGEMENT

J.   Area Managers are responsible for the following:

1.   Maintaining up-to-date inventories of aquatic habitats and populations, analyzing and identifying protection and enhancement opportunities, and formulating management recommendations concerning aquatic resource management.

2.   Developing, implementing, and maintaining aquatic habitat management plans and projects that are consistent with legal and policy requirements.

.05  References.

A.   Fish Habitat Inventory and Monitoring.  BLM Manual Handbook 6720-1.

B.   Rapid Bioassessment Protocols for Use in Streams and Rivers: Benthic Macroinvertebrates and Fish.  U.S. Environmental Protection Agency Report No. EPA/444/4-89-001, dated May 1989.

C.   Fish and Wildlife 2000: a plan for the future.

D.   National Recreational Fisheries Policy, dated June 6, 1988.

E.   Forest Service and Bureau of Land Management Recreational Fisheries Policy, dated March 19, 1990.

F.   Riparian-Wetland Initiative for the 1990's.

.06  Policy.  See also Manual Sections 1737, 6500, and 6820. BLM policy with respect to aquatic resources is to:

A.   Inventory, evaluate, and monitor aquatic habitats on public lands to determine existing conditions and those habitats supporting aquatic vertebrate and macroinvertebrate species.

B.   Restore, enhance, and protect aquatic habitats by preventing their loss, and implementing and monitoring habitat management or restoration projects as identified during resource management planning process.

C.   Recover threatened or endangered aquatic species, and protect, restore, and monitor other special status aquatic species so that listing as threatened or endangered is not necessary.

BLM_0147246

.05D

## 6720 ~ AQUATIC RESOURCE MANAGEMENT

D.  Maintain or restore natural ecosystem functions, such as water flow regimes and energy cycles, that are necessary for maintenance of aquatic biodiversity at population, species, and ecosystem levels.

E.  Enhance anadromous fisheries by increasing habitat integrity and productivity in coastal drainages of the states of Alaska, California, Idaho, Oregon, and Washington.

F.  Enhance the quality and quantity of recreational fishing opportunities by increasing habitat integrity and productivity.

G.  Promote the use of native fishes for recreational use, where possible.  Introductions of nonnative and exotic species should be prevented in habitats where they would be harmful to the native biota or where it is against the established policy of the State fish and wildlife agency.

H.  Manage aquatic habitats in a manner that facilitates restoration of riparian areas to proper functional condition.

I.  Determine fisheries-related allocations, objectives, and management directions through resource management planning.

J.  Coordinate and cooperate among field managers/offices, State agencies, Federal agencies, fisheries organizations, conservation organizations and universities to identify and implement cooperative projects and activities for aquatic habitats as consistent with other policy statements.

.07  File and Records Maintenance.  See BLM Manual Section 1272 for records maintenance and the BLM Records Schedule for the disposition of records.

BLM_0147247

.1

# 6720 - AQUATIC RESOURCE MANAGEMENT

.1  Aquatic Resource Management Guidelines.

.11  Program Priorities.  Within the framework of BLM's overall program priorities, give attention to aquatic habitats in the following order:

A.  Threatened or Endangered Species.  Aquatic habitats supporting federally listed threatened or endangered species, or those species proposed for such designation by the Secretary of the Interior.

B.  Other Special Status Species.  Aquatic habitats supporting Federal candidate species, BLM sensitive species, or species listed by State governments as endangered or threatened.

C.  Anadromous Species.  Aquatic habitats supporting anadromous species.

D.  Resident Species.  Aquatic habitats supporting resident game and nongame species.

E.  Exotic Species.  Aquatic habitats supporting exotic species.

.12  Inventories.  To provide the necessary information for management decisions, including the resolution of planning issues, maintain and update aquatic resource inventories.

.13  Aquatic Resources and the Bureau Planning System.

A.  Policy Tier.  Policy guidance for managing aquatic resources is set forth in this Manual Section, Manual Sections concerning riparian-wetland management (M.S. 1737), introductions and transplants (1745), and special status species (6840), and further relevant directives that may be issued periodically by the Director.  These policies may be supplemented by pertinent State Director guidance issued pursuant to 43 CFR 1610.1(a)(3).

B.  RMP Tier.  How specific aquatic habitats and resources are to be managed is determined through resource management planning.  Aquatic resource condition objectives, allowable uses on aquatic habitats, and management prescriptions for aquatic habitats are established in resource management plans.  Resource management planning is the principal means for accomplishing interdisciplinary coordination and establishing integrated resource management.  Guidance is found in Manual Section 1622.1.

BLM_0147248

.13C

## 6720 - AQUATIC RESOURCE MANAGEMENT

C. <u>Activity Plan Tier</u>. Activity plans are prepared only when necessary to show how particular uses provided for at the RMP tier are to be carried out (see Manual Section 1601.12). Activity plans involving aquatic habitats and resources should describe more fully capital improvements, investment schedules and/or priorities, and goals and objectives. Activity plans may be for single or multiple activities. Wherever appropriate, activity-level provisions for aquatic resources may be included in any Bureau activity plan.

.14 <u>Protection for Special Status Species</u>. See also Manual Section 6840. The aquatic resource management program must include the following components to protect threatened and endangered species, species proposed for such designation, Federal candidate species, BLM sensitive species, or species listed by States as endangered, threatened, or of special concern:

A. <u>Species Identification</u>. Identification of special status aquatic species on public lands in cooperation with the States and the U.S. Fish and Wildlife Service (FWS).

B. <u>Habitat Identification</u>. Identification and protection of critical or essential habitat necessary for the survival or recovery of such designated aquatic species.

C. <u>Habitat Management Plans</u>. Develop, implement, and maintain habitat management plans to aid the recovery and possible delisting of threatened or endangered species, and to prevent the need to list candidate species as threatened or endangered.

D. <u>Use of FWS and State Plans</u>. Where approved recovery plans have been developed by the Fish and Wildlife Service for aquatic species, such plans provide the specific directions and habitat requirements to be included in the Habitat Management Plan (HMP). For those species that are listed by the State but not by the Federal Government, HMP's conform, as appropriate, to the direction and habitat requirements identified by the official State publication or status report. Should no recovery plan or status report exist, an HMP should be developed at the earliest practical opportunity based on best available data.

BLM_0147249

6720 - AQUATIC RESOURCE MANAGEMENT

.15 <u>Instream Flow Needs</u>. Water flow is a critical component of stream and spring habitats as well as for maintenance of many lakes and reservoirs. In all activities affecting these habitats, include estimates of flow requirements for maintenance of fisheries and aquatic habitats. Assessing streamflow requirements for maintaining aquatic habitats must be an integral part of all aquatic inventory and monitoring procedures. Instream flows necessary to protect aquatic resources should be secured in cooperation with State water management policies and regulations through guidance contained in Manual Section 7250 (Water Rights). Within this framework, the following habitats should receive priority for determination and appropriation of flow requirements.

A. <u>Special Status Species</u>. Habitats supporting special status aquatic species.

B. <u>Anadromous Species</u>. Habitats supporting species of salmon, steelhead, sea-run cutthroat, or other anadromous fish.

C. <u>Resident Species</u>. Habitats supporting resident game and nongame species.

D. <u>Riparian Areas</u>. Streams, rivers, or springs supporting significant riparian habitats.

.16 <u>Water Quality Requirements</u>. Resource management plans and activity plans should establish watershed management objectives where necessary to improve or protect downstream habitat quality for aquatic resources. Wherever possible, point and nonpoint water pollution sources detrimental to aquatic life should be identified. Measures to reduce sources of water pollution should be incorporated into landuse authorizations. BLM should work with States, the U.S. Environmental Protection Agency, and other appropriate agencies to ensure maintenance of water quality.

.17 <u>Aquatic Habitat Monitoring and Evaluation</u>. To maintain an effective aquatic habitat management program, regularly monitor aquatic habitats and/or populations, and evaluate impacts of management decisions and management practices on them to determine if management objectives are being met.

.18 <u>Studies and Research Involving Habitat and Multiple-Use Relationships</u>. Studies should be designed, when needed, to develop criteria for aquatic habitat management and overall management objectives. Cooperative studies should be encouraged when appropriate.

BLM_0147250

### 6720 - AQUATIC RESOURCE MANAGEMENT

.2  <u>Support and Coordination with Other BLM Resource Programs</u>.

It is essential that management of aquatic resources be coordinated with other resource uses and management activities. Many of BLM's aquatic resource responsibilities can best be met through incorporation of aquatic resource objectives and protective provisions in other BLM activities and programs. It is incumbent upon each program to ensure that its actions and plans are responsive to aquatic resource management on the public lands involved.

.21  <u>Energy and Minerals</u>.  Energy and mineral development programs affect aquatic organisms and their habitat, primarily in terms of water quality and quantity, and physical habitat disturbance or alteration.  Such development also may cause human population increases and may create additional demands or pressures on the local aquatic resources and habitats on public lands.  For these reasons, activities associated with the energy and minerals program must be coordinated with management of aquatic resources.  Aquatic resource program responsibilities include developing criteria to assess the impacts of energy and mineral development on aquatic resources.

.22  <u>Lands and Realty</u>.  The aquatic resource management program shall be coordinated with the withdrawal review and land disposal programs to ensure adequate consideration of valuable aquatic resources.  It also shall be coordinated with the processing of energy related applications that involve water use, such as small hydropower or geothermal projects. Resource specialists in both programs are responsible for ensuring adequate coordination.  Disposal of public land or acquisition of private lands or easements for fishery values shall be considered as they affect habitat significant to the survival or recovery of endangered or threatened aquatic species, areas designated as areas of critical environmental concern, important anadromous fish habitats, and public access to the land for fishing.  The existence and protection of aquatic resources shall be considered in any proposed land exchanges.  Exchanges to benefit the aquatic resource management program shall demonstrate a particular need for land acquisition and adhere to public interest criteria such as public access to fishing sites or acquisition of important aquatic habitat within a given watershed.

.23  <u>Rangeland Resources</u>.  Use of the public lands by cattle, sheep, horses, or other livestock may seriously affect aquatic resources on rangelands.  The aquatic resource management program assists in actions to improve range (including aquatic) conditions, by taking the following actions.

BLM_0147251

6720 - AQUATIC RESOURCE MANAGEMENT

A.  Rangeland EA's and EIS's.  Providing aquatic
    information and analyses for environmental
    assessments and environmental impact statements, as
    necessary.

B.  Grazing Systems.  Providing aquatic data, analyses
    and interpretations for grazing systems to ensure
    protection and enhancement of aquatic habitat and
    fishery values.

C.  Rangeland Monitoring.  Providing aquatic resource
    baseline data for monitoring and evaluating rangeland
    management decisions.

D.  Rangeland Practices Assessment.  Coordinating with
    Rangeland Resources personnel in developing and
    implementing monitoring programs, to assess impacts
    of alternative grazing practices on aquatic
    resources.

E.  Rangeland Improvement Project Assessment.  Providing
    analyses of rangeland improvement projects affecting
    aquatic habitats and recommending practices to
    provide optimum habitat protection or improvement.

   .24  Forestry.  The aquatic resource management program
assists this program by taking the following actions.

A.  Forest Management Plans.  Providing aquatic data and
    environmental analysis for the development and
    implementation of forest management plans where
    aquatic resources are affected.  Makes
    recommendations on protection and enhancement of
    aquatic resources.

B.  Forest Transportation Systems.  Providing design and
    layout information for forest transportation systems
    to ensure consideration and protection of aquatic
    resources.

C.  Forest Management Activities.  Providing information
    for monitoring forest management activities to
    protect aquatic resources.

   .25  Wildlife and Fisheries.  Coordination of the fish and
wildlife programs is needed if conflicting use demands occur.
Closing reservoirs to public use as part of waterfowl
management, thus precluding angling opportunities, is an
example.  Coordination of these programs also is needed to
quantify instream flow needs.  Flows identified as adequate for
fishery needs in certain streams may not suffice for
terrestrial wildlife needs.

BLM_0147202

## 6720 - AQUATIC RESOURCE MANAGEMENT

.26  Soil, Water, and Air.  Point and nonpoint sources of water pollution degrade aquatic habitats.  The soil and water management program provides support to improve aquatic conditions through the following:

A.  Best Management Practices.  Section 319 of the Clean Water Act of 1987 (P.L. 100-4) authorizes a program to restore waters impaired by nonpoint pollution sources.  A major emphasis is to restore fisheries impacted by sources such as silviculture, grazing, and mining.  Another goal is to prevent damage from future activities by implementation of best management practices.  Funds are available through this program to State agencies for public and private lands.  The aquatic resource management program should initiate projects to establish baseline water quality characteristics and to restore fisheries damaged by pollution sources.  Adequate program coordination also is necessary to ensure that soil erosion and sedimentation problems affecting aquatic resources are considered in developing Best Management Practices, and that aquatic resource needs are considered in constructing erosion control structures.

B.  Instream Flow Assessments.  The program also must coordinate instream flow assessments necessary to preserve, restore, or enhance aquatic resource habitats.  Methodologies may vary with the characteristics of the habitat in question, but should be compatible with methods utilized by other agencies, such as the Fish and Wildlife Service and·State fish and wildlife agencies.  Acceptable methodologies are discussed in Manual Handbook 6720-1.

.27  Recreation, Cultural, and Wilderness Resources. Aquatic resources and habitats often are a significant part of a wilderness or recreation experience, and should be considered in the review of Wilderness Study Areas.  Aquatic resource data, analyses, and interpretation may be needed to complete some wilderness studies.  The Recreation program is responsible for completing river management plans and providing river recreation permit programs on major recreation rivers, some of which are included in the National Wild and Scenic Rivers System.  Aquatic resource data may be needed to develop management plans for recreation users and to monitor impacts from increased visitation on aquatic resources.

BLM_0147253

6720 - AQUATIC RESOURCE MANAGEMENT

.3  Support and Coordination with Other Federal Agencies, States and Interested Parties.

.31  Other Federal Agencies.  Close coordination with other Federal agencies is necessary for optimum management of public lands.  Special status species programs should be coordinated with U.S. Fish and Wildlife Service (for freshwater species) or National Marine Fisheries Service (for anadromous species). Close coordination with Federal agencies that manage lands upstream of public lands is critical.  The joint Forest Service/BLM Recreational Fisheries Policy should facilitate and guide cooperation between those two agencies on matters relating to recreational fisheries.

.32  State Fish and Wildlife Agencies.  The aquatic resource specialist must coordinate aquatic resource programs with State agencies.  State fish and wildlife agencies or commissions typically are responsible for fishing regulations and introductions of game and forage species into aquatic habitats. Introductions of sportfishes should be coordinated so that the most suitable habitats are stocked and that stocking does not conflict with special status species management.

.33  Interested Parties.  The BLM maintains national-level and State Memorandum of Understandings (MOU's) with various organizations for the purposes of promoting cooperation with interested parties, facilitating volunteer participation in projects, and cooperative management programs.  Involvement of these parties, plus other interested organizations and landowners will facilitate better management.

     A.  Trout Unlimited.  The BLM maintains a master MOU and cooperative agreement with Trout Unlimited for maintaining and enhancing coldwater fish habitats on public lands.

     B.  The Nature Conservancy.  The BLM maintains a master MOU and cooperative agreement with The Nature Conservancy for maintaining and enhancing important aquatic habitats, including those containing special status species, on public lands.

     C.  Amerifish Corporation, Fishing Has No Boundaries. The BLM maintains a MOU with Amerifish Corporation for the purposes of promoting angling opportunities and increasing environmental awareness for disabled persons.

     D.  Other Parties.  The aquatic resource specialist should coordinate activities with affected landowners and other interested parties as appropriate.

BLM_0147254

6720 - AQUATIC RESOURCE MANAGEMENT

## Glossary of Terms

-A-

aquatic habitat:  habitat confined to streams, rivers, springs, lakes, ponds, or reservoirs; habitat confined to water.

aquatic resources:  fauna and flora that live within or are entirely dependent upon water to live; living resources of aquatic habitats (i.e., fishes, invertebrates, amphibians, etc.); aquatic species.

aquatic resource management program:  all BLM activities undertaken expressly to maintain, improve, and protect aquatic habitat for fisheries or other aquatic resources.

anadromous species:  species of fish that migrate upriver from the ocean to reproduce in freshwater.

-C-

candidate species:  those category 1 or 2 species considered by the Secretary of the Interior for listing as published in Notices of Review in the Federal Register.

critical habitat:  an area designated as such by the Secretary of the Interior on which are found those physical and biological features essential to the conservation of threatened or endangered species and which may require special management considerations or protection.  Critical habitat may include any portion of the range of a listed species.  Some listed species may not have any critical habitat designated.

-E-

essential habitat:  an area on which are found those physical and biological features essential to the conservation of threatened or endangered species and which may require special management considerations or protection.  Criteria for identifying essential habitat are the same as for critical habitat, although essential habitat has not been officially designated by the Secretary of the Interior.

exotic species:  any species not naturally occurring, either presently or historically, in any ecosystem of the United States.

BLM_0147255

Glossary, Page 2

## 6720 - AQUATIC RESOURCE MANAGEMENT

-F-

floodplain:  the lowland and relatively flat areas adjoining
    inland and coastal waters, including flood-prone areas of
    offshore islands, that at a minimum is subjected to a 1
    percent or greater chance of flooding in any given year.

-N-

native:  any species that naturally occurred within a given
    body of water.

-P-

proper functioning condition:  when riparian-wetland areas (1)
    dissipate energy associated with high water flows, thereby
    reducing erosion and improving water quality; (2) filter
    sediments and nutrients and aid in floodplain development;
    (3) contribute to root mass development that stabilize banks
    against cutting action; (4) develop diverse channel and
    ponding characteristics to provide the habitat necessary for
    fish production, waterfowl breeding and other uses; and (5)
    support greater biodiversity.

-R-

resident species:  any species naturally occurring, either
    presently or historically, in any ecosystem of the United
    States.  This definition excludes special status and
    anadromous species.

riparian habitat:  a specialized form of wetland restricted to
    areas with characteristic vegetation along, adjacent to, or
    contiguous with perennially and intermittently flowing
    stream, lake, spring, and reservoir shore areas.
    Characteristic vegetation may range from hydrophilic plants
    such as pondweed through more terrestrial forms such as
    sycamores, cottonwoods, conifers, and willows.  This habitat
    is transitional between true bottomland wetlands and upland
    terrestrial habitats, and while associated with water
    courses, may extend inland for considerable distances.

-S-

special status species:  any species listed as threatened or
    endangered by the Federal government, officially proposed
    for such designation, Federal candidate species, BLM
    sensitive species, or species listed by State government as
    threatened or endangered.

species:  any species, subspecies, or variety of flora or
    fauna.

BLM MANUAL                                                    Rel. 6-118
Supersedes Rel. 6-92                                           3/22/91

BLM_0147256

6720 - AQUATIC RESOURCE MANAGEMENT

-W-

water quality degradation:  any reduction in the biological, chemical, or physical values that describe the quality of water.

wetland or wetland habitat:  Areas that have a predominance of hydric soils and that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and under normal circumstances do support, a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions.  Marshes, shallows, swamps, muskegs, bogs, and wet meadows are examples of wetlands.

BLM_0147257

TC-1

# 7200 - WATER RESOURCES

## Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibility
.05  References
.06  Policy

.1  Program Operation
   .11  Programming
   .12  Program Functions
   .13  Cooperative Relations
     A.  Federal Agencies
     B.  Federal Interagency Advisory Committee on
        Water Data Acquisition (IACWD)
     C.  State
     D.  Local
   .14  Training

.2  Planning
   .21  Resource Management Plans
   .22  Activity Plans
   .23  Project Plans

.3  Inventory
   .31  Water Use
   .32  Watershed Condition

.4  Watershed Monitoring

.5  Watershed Improvements

.6  Project Maintenance
   .61  Dam Safety
   .62  Abandonment

.7  Water Rights

.8  Ground Water

BLM_0147258

TC-2

7200 - WATER RESOURCES

.9  Support Activities
   .91  Water Use/Rights
      A.  Legal Availability
      B.  Physical Availability
   .92  Floodplain Delineation and Mapping
   .93  Hydrologic Design
   .94  Water Power and Water Storage Assessments
   .95  Impact Assessment
   .96  Mitigative Measures
   .97  Compliance Monitoring

Illustration
1. Activities of the Soil and Water Resources Programs

BLM MANUAL

Rel. 7-107
10/5/89

BLM_0147259

.01

## 7200 – WATER RESOURCES

.01  Purpose.  This Manual Section presents overall objectives, responsibilities, and policies for conducting the Water Resources Program.

.02  Objectives.

A. ==Maintain or improve surface and ground water quality consistent with existing and anticipated uses and applicable State and Federal water quality standards.==

B. ==Minimize the harmful consequences of overland flow and surface runoff on, or arising from, Bureau-administered lands.==

C. ==Provide for the physical and legal availability of water to facilitate authorized== uses of the public lands.

.03  Authority.  The Water Resources Program is conducted under the following authorities:

A.  Statues.

1. Taylor Grazing Act of 1934, as amended, P.L. 73-482, 48 Stat. 1269, 43 U.S.C. 315, June 28, 1934.

2. Revested Oregon and California Railroad and Reconveyed Coos Bay Wagon Road Grant Lands Act of 1937, as amended, P.L. 75-405, 50 Stat. 874, 43 U.S.C. 1181, August 28, 1937.

3. Appropriations Act of 1952, McCarran Amendment, 66 Stat. 560, 43 U.S.C. 666, July 10, 1952.

4. Watershed Protection and Flood Control Act of 1954, as amended, P.L. 83-566, 68 Stat. 666, 16 U.S.C. 1001 et seq., August 4, 1954.

5. Water Resources Research Act of 1954, as amended, P.L. 88-379, 78 Stat. 329, 42 U.S.C. 1961, July 17, 1964.

6. National Environmental Policy Act (NEPA) of 1969, as amended, P.L. 91-190, 83 Stat. 852, 42 U.S.C. 4321 et seq., January 1, 1970.

7. Water Resources Development Act of 1974, P.L. 93-251, March 7, 1974.

8. Federal Land Policy and Management Act of 1976, as amended, P.L. 94-579, 90 Stat. 2743, 43 U.S.C. 1701 et seq., October 21, 1976.

9. Safe Drinking Water Amendments of 1977, amended Section 2 of the Safe Drinking Water Act, P.L. 95-190, 42 U.S.C. 201, November 16, 1977.

BLM_0147260

.0310

7200 – WATER RESOURCES

10. Public Rangelands Improvement Act of 1978, P.L. 95-514, 92 Stat. 1803, 43 U.S.C. 1901 et seq., October 25, 1978.

11. Classification and Multiple-Use Act (78 Stat. 986, 43 U.S.C. 1411-18), 43 CFR 1725.3-3(h) October 1, 1981.

12. Water Resources Planning Act of 1983, as amended, P.L. 97-449, 96 Stat. 2413, 49 U.S.C. 1962 et. seq., Jan. 12, 1983.

13. Colorado River Basin Salinity Control Act, as amended P.L. 98-569, 98 Stat. 2933, 43 U.S.C. 1593, Oct. 30, 1984.

14. Water Quality Act of 1987, P.L. 100-4, 101 Stat. 7, 33 U.S.C. 1251, Feb. 4, 1987.

15. Annual Appropriation Act of the Department of the Interior and Related Agencies.

B.  Executive Orders.

1.  Executive Order (Public Water Reserve No. 107) of April 17, 1926 (36 Stat. 847).

2.  Executive Order 11514, March 5, 1970, as amended by Executive Order 11991, May 24, 1977.  Executive order for the protection and enhancement of environmental quality.

3.  Executive Order 11738, September 10, 1973.  This Order directs each Federal agency to enforce the Clean Air Act and the Clean Water Act in the procurement of goods, materials, and services.

4.  Executive Order 11752, December 17, 1973.  This Order mandates that Federal agencies shall provide national leadership to protect and enhance the quality of air, water, and land resources through compliance with applicable Federal, State, interstate, and local pollution standards.

5.  Executive Order 11988, May 24, 1977, Floodplain Management, as amended by Executive Order 12148.

6.  Executive Order 11990, May 24, 1977, Protection of Wetlands.

7.  Executive Order 12322, September 17, 1981.  Under this Order, any report, proposal, or plan relating to a Federal or federally assisted water and related land resources project or program must be submitted to the Director, Office of Management and Budget, before submission to Congress.

BLM_0147261

.03C

7200 – WATER RESOURCES

C.  Circulars.

1.  OMB (Office of Management and Budget) Circular A-67 (August 28, 1964).  This Circular provides guidelines for coordination of water data activities and states that the U.S. Geological Survey shall acquire basic water data on the water resources of the Nation.  It further states that other agencies shall acquire special water data in support of their respective missions and that these activities be closely coordinated to assure effective and economical management of resources.

2.  Circular A-81, Reporting Requirements in Connection with Prevention, Control, and Abatement of Water Pollution at Existing Federal Facilities.

a.  Requires Federal agencies to:

(1)  Meet water quality standards and related plans which States have developed under the Federal Water Pollution Control Act.

(2)  Consult with the Secretary of the Interior at the earliest feasible time to determine standards applicable to particular facilities and, otherwise, cooperate with him/her.

(3)  Cooperate with State and local pollution control agencies and with other Federal agencies in the evaluation of their pollution control needs.

3.  Circular A-97, Specialized and Technical Services to State and Local Governments.  Sets forth rules and regulations to effect Title III of the Intergovernmental Cooperation Act authorizing Federal agencies to provide reimbursable technical services to State and local governments.

.04  Responsibility.

A.  The Director and Deputy Director are responsible for:

1.  Establishing Bureauwide objectives, developing and analyzing national level policies, and setting national priorities for the conduct of the Water Resources Program.

2.  Preparing, evaluating, and revising Bureau Manual Sections, Handbooks, and Technical References to maintain a current system of program policy and guidance.

3.  Providing liaison at the national level with other Federal agencies and organizations.

4.  Ensuring internal coordination between the Water Resources Program and other Bureau programs.

5.  Providing direction and leadership to Bureauwide water resources training courses.

BLM_0147262

.04B

7200 - WATER RESOURCES

B.  **The Service Center Director** is responsible for providing technical support to the Headquarters Office and Field Offices by:

1.  Responding to Field Office requests for technical assistance and/or training.

2.  Developing, testing, evaluating, and making recommendations to the Headquarters Office on the applicability of new technologies for the collection, storage and retrieval, analysis and interpretation, and application of water resources data.

3.  Preparing water resource Handbooks, technical notes, and references, and other Field-oriented guidance at the direction of the Headquarters Office or request of Field Offices.

4.  Providing liaison with research agencies, educational institutions, and professional organizations to maintain a "state-of-the-art" knowledge in water resources.

C.  **State Directors** are responsible for achieving the Bureau's Water Resources Program objectives (.02) within their respective States by:

1.  Implementing Bureauwide water resources policies, setting State water resources priorities, and preparing supplemental program directives for Statewide application.

2.  Providing liaison with other Federal agencies, State agencies, user groups, and adjoining BLM State Offices to ensure a coordinated Water Resources Program.

3.  Evaluating Statewide Water Resources Program effectiveness through periodic analyses of related decisions and products (e.g., Resource Management Plans (RMP), activity plans, data management).

4.  Providing, or otherwise making available, training, workshops, and technical support to ensure that Water Resources Program personnel are professionally equipped to comply with established technical standards.

D.  **District Managers** are responsible for achieving Bureau and State Water Resources Program objectives within their respective District boundaries by:

1.  Implementing Bureau and State water resources policies, setting District water resources priorities, and preparing supplemental program directives and guidelines for Districtwide application.

2.  Cooperating with other Federal, State, and local agencies, user groups; and adjoining BLM District Offices to ensure a coordinated Water Resources Program.

**BLM MANUAL**

.04D3

7200 – WATER RESOURCES

3. Evaluating Districtwide Water Resources Program effectiveness by periodically reviewing Resource Area work accomplishments for technical adequacy and compliance with Bureau, State, and District policies.

4. Maintaining sufficient professional expertise, within applicable budgets, in the District and Resource Area organizations to ensure that water resources management is carried out in accordance with established policies and technical standards.

E. Resource Area Managers are responsible for achieving Bureau, State, and District Water Resources Program objectives within their respective Resource Area boundaries by:

1. Conducting water resources inventories of water sources/uses and watershed condition.

2. Implementing water resources monitoring to document changes over time in water quality, water quantity, and sediment yield.

3. Analyzing and interpreting water resources and related data to determine and maintain a record of resource conditions.

4. Protecting, acquiring, and/or perfecting water rights to meet multiple-use management needs according to Bureau Policy and Manual Section 7250 procedures.

5. Preparing and implementing plans to develop, protect, and/or rehabilitate water resources and watersheds.

6. Identifying and resolving shortages or deficiencies in professional expertise needed to carry out the Water Resources Program.

.05 References.

A. Manual Section 1601 – Bureau Planning System.

B. Manual Section 1619 – Activity Plan Coordination.

C. Manual Section 1621 – Supplemental Program Guidance for Environmental Resources.

D. Handbook H-1684-1 – Fund Coding Handbook.

E. Manual Section 1734 – Inventory and Monitoring Coordination.

F. Handbook H-1734-2 – Rangeland Monitoring.

G. Manual Section 1740 – Renewable Resource Improvements and Treatments.

BLM_0147264

.05H

7200 – WATER RESOURCES

H.  Handbook H-1740-1 – Renewable Resource Improvement and Treatment Guidelines and Procedures.

I.  Manual Section 1741 – Renewable Resource Improvement, Practices, and Standards.

J.  Manual Section 1743 – Renewable Resource Investment Analysis.

K.  Handbook H-1743-3 - 1 Resource Investment Analysis.

L.  Manual Section 1780 – Cooperative Relations.

M.  Manual Section 7000 – Soil, Water, and Air Management.

N.  Manual Section 7240 – Water Quality.

O.  Manual Section 7250 – Water Rights.

P.  Manual Section 910  – Facility Planning

Q.  Manual Section 9104 – Facility Maintenance.

R.  Manual Section 9171 – Water Development.

S.  Manual Section 9172 – Water Control Structures.

T.  Manual Section 9177 – Maintenance and Safety of Dams.

U.  Manual Section 9184 – Drinking Water Supply.

V.  Manual Section 9188 – Nonpoint Source Pollution Control.

.06  <u>Policy</u>.

  A.  Water resources information will be collected and maintained consistent with land management needs and professionally accepted methodologies and standards.

  B.  Water resources information will be used through analysis and interpretation to set and monitor resource management objectives, determine compliance with State and Federal authorities, and assess environmental impacts from land use activities.

  C.  Water resources improvements and practices will be implemented through the resource management planning process, State water quality management programs, and budget directives.

BLM_0147265

.1

7200 - WATER RESOURCES

.1  **Program Operation.**  The Water Resources Program is administered as part of the Soil, Water, and Air subactivity.

.11  **Programming.**  All water resources programming and cost accounting shall use the available program elements in the financial management system (see H-1684-1).  The mix of program elements should be assessed periodically to ensure that they adequately reflect program emphasis and workload.

.12  **Program Function.**  The Water Resources Program includes three distinguishable, though closely related, areas of activity:  Watershed management, water use/rights, and ground water.  In each of the three areas, there are direct and support functions (see Illustration 1).  The Water Resources Program and Soil Resources Program together provide the policy and technical direction for accomplishing watershed management.  The Water Resources Program provides the policy and technical direction for water use/rights and ground water activities.

.13  **Cooperative Relations.**  Water resources management activities require cooperation with other agencies and organizations to provide for efficient data collection, information exchange, and the coordinated development or improvement of procedures, practices, and standards.  Due to the States' primary roles in water rights and water quality, the Bureau must establish and/or maintain effective communications and negotiative processes with State water resources administrators.  Principal agencies and organizations are listed below (also see Manual Section 1780).

A.  **Federal Agencies.**

1.  USDI Geological Survey, Water Resources Division.

2.  USDI Bureau of Reclamation.

3.  USDI Fish and Wildlife Service.

4.  USDA Forest Service.

5.  USDA Soil Conservation Service.

6.  Environmental Protection Agency.

7.  Army Corps of Engineers.

8.  NOAA, National Weather Service.

Rel. 7-107
10/5/89

BLM_0147266

.13B

7200 – WATER RESOURCES

B.  Federal Interagency Advisory Committee on Water Data Acquisition (IACWD).  The BLM is represented on the IACWD and on several of the permanent subcommittees listed below:

1.  Hydrology.

2.  Sedimentation.

3.  Ground Water.

4.  Water Data and Information Exchange.

5.  Water Use.

6.  Water Quality

C.  State.

1.  Department of Water Resources.

2.  Department of Forestry.

3.  State Water Quality Boards and Agencies.

4.  Universities.

5.  Water Resources Research Center.

6.  Water Right Administrators.

D.  Local.

1.  Irrigation/Drainage Districts.

2.  City/County Planning Agencies.

3.  Conservation Districts.

.14  Training.  The Water Resources Program will provide training for BLM employees on principles and techniques of hydrology as applied to water resources management on public lands.  These activities will be based on management needs identified through a periodic training needs analysis, performed by program leaders and training coordinators.  Training and technical guidance will be provided through professional meetings, workshops, formal classroom sessions, packaged training modules, and technical reference publications.

.2

7200 – WATER RESOURCES

.2  <u>Planning</u>.  Water Resources Program functions are carried out as part of the Bureau Planning System described in Manual Section 1601.12.

.21  <u>Resource Management Plans</u>.  Resource management plans (RMP's) are multiple use plans that establish allowable uses, levels of production and protection, and provide management direction for all public land resources. Water resources are addressed and analyzed in the RMP and related EIS to identify objectives and associated actions.  Examples of program specific factors of analysis, objectives, and actions, along with other guidance, are provided in Manual Section 1621.  Exceptions to RMP-required determinations are outlined in Manual Section 1620.06.

.22  <u>Activity Plans</u>.  Activity plans are more detailed, site-specific plans prepared as necessary to supplement and implement an RMP.  Water resources activity planning is carried out whenever such need is established in an approved RMP (or Management Framework Plan not yet replaced by an RMP).  Water resource activity planning is accomplished through specific Watershed Management Plans or by incorporating watershed management objectives and actions into other resource activity plans (e.g, Allotment Management Plans, Habitat Management Plans).  In either case, cooperation among activities is essential to minimize duplication of effort and to ensure the coordinated design to specific features or actions that benefit several activities. Activity plan coordination requirements are described in Manual Section 1619.

23.  <u>Project Plans</u>.  Watershed management objectives and/or actions identified through the planning process may provide the basis for development of site-specific plans such as project or detailed facility plans (see Manual Section 9101).

BLM_0147268

.3

7200 - WATER RESOURCES

.3  Inventory.  There are two water resources related inventories, one for
collecting water use information and the other for characterizing watershed
condition.

.31  Water Use.  All water uses on BLM-administered public land shall be
inventoried.  Water uses on public lands will be located, quantified, and
otherwise described to facilitate water rights processes and public
inquiries.  Each State Office is responsible for automating and managing
water-use inventory data and providing supplemental guidance addressing data
collection standards and informational requirements necessitated by individual
State water laws.

.32  Watershed Condition.  The watershed condition inventory provides a
rating of satisfactory or unsatisfactory for public land watersheds based on
soil, water, and related resource components.  The data used are primarily
derived from other inventories (e.g., soil surveys, ecological site
inventories, water-use inventories), ongoing monitoring efforts (e.g., water
quality, streamflow, erosion, climate), and other available descriptive
information (e.g., slope, landform).  The watershed condition inventory and
associated analyses are used to identify areas in need of rehabilitation or
protection and to aid in establishing priorities for improvements and
management action.

BLM_0147269

.4

7200 – WATER RESOURCES

.4  <u>Watershed Monitoring</u>.  Watershed monitoring is the systematic collection
and analysis of soil, water, and related resource data to evaluate progress
toward meeting specific watershed management objectives and to develop or
refine watershed protection practices routinely applied as mitigations or
standard operating procedures.  General requirements for renewable resource
monitoring are described in Manual Section 1734.  Additional direction for
watershed monitoring is provided in Manual Section 7240.

BLM_0147270

.5

7200 – WATER RESOURCES

.5  <u>Watershed Improvements</u>.  Watershed improvements consist of land treatments and structures whose primary function is to reduce soil loss, reduce sedimentation, stabilize streambanks and channels, improve water quality, augment water yields, and/or attenuate flood peaks.  General requirements for planning, coordination, and documentation of renewable resource improvements with specific exceptions and constraints are described in Manual Section 1740.

BLM_0147271

.6

7200 - WATER RESOURCES

.6  Project Maintenance.  Maintenance of existing watershed improvements is essential to assure the health and safety of public land users and to provide for continued benefits from previous Federal investments.  Facility maintenance policies in Manual Section 9104 require that all Bureau physical facilities be inventoried, have maintenance plans, and have condition surveys performed at regularly scheduled intervals and following unusually severe climatic events.

.61  Dam Safety.  In addition to the above requirements, BLM-administered dams must be assigned a hazard classification based on the potential for loss of life and property downstream from the structure.  Classification procedures and special requirements for dams with high or significant hazard ratings are described in Manual Section 9177.

.62  Abandonment.  Where it is determined that the benefits of an existing watershed improvement no longer justify the costs of continued maintenance, the project shall be abandoned or removed and the site stabilized or rehabilitated as necessary.  Such determinations must be documented in accordance with established environmental and investment analysis standards (see Manual Section 1740.1).

BLM_0147272

.7

## 7200 - WATER RESOURCES

.7 <u>Water Rights</u>.  The BLM shall ensure water availability for, and legally
protect, existing and proposed water uses needed by its resource management
programs.  Manual Section 7250 (Water Rights) provides direction on acquiring
and perfecting water rights.  The Water Resources Program coordinates and
directs responses to State-ordered adjudications, expert testimonies for
water-use litigation, and applications for State appropriations or assertions
of Federal water rights.  Where instream flow needs are addressed through
planning, the Bureau will perform necessary instream flow assessments,
determinations, and reports prior to any water-right assertions or
acquisitions.

BLM_0147273

.8

7200 - WATER RESOURCES

.8  <u>Ground Water</u>.  Regional or Areawide ground water studies provide resource information associated with supply and water quality determinations.  These studies are considered reconnaissance level or extensive in scope, and are conducted to satisfy multiresource data needs.  Examples of these studies would include Resource Areawide ground water data collection to supplement RMP's, or characterization of extensive subsurface water supplies potentially available to water users in general (not based on individual water project proposals).

Rel. 7-107
10/5/89

BLM_0147274

7200 - WATER RESOURCES

.9 <u>Support Activities</u>. The Water Resources Program provides input to other
BLM programs by incorporating hydrologic considerations, both on and offsite,
into proposed actions to protect water resources values. Examples of
appropriate input to the various Bureau programs are outlined below.

.91 <u>Water Use/Rights</u>.

A. <u>Legal Availability</u>. Provide direction and assistance to other
programs for quantification, acquisition, transfer, and protection of water
rights for specific uses such as recreation, wildlife, livestock, and mineral
development and exploration. The types and amounts of assistance are
specifically based on individual water project proposals. Activities in
support of land sales, purchases, and exchanges would require legal status
determinations of existing water uses(s) and proper transfer or acquisition of
water rights.

B. <u>Physical Availability</u>. Provide hydrologic determinations of water
supply during applicable project planning. Determinations include predicting
surface water yields available to proposed reservoirs and performing well-site
investigations. Due to the natural variability of ground water (e.g., depth
occurrence) and cost of developing ground water resources, a well-site
investigation is necessary and cost effective on all proposed well
developments.

.92 <u>Floodplain Delineation and Mapping</u>. Provide floodplain data for
proposed activities affecting these areas. Proposed activities such as
locating recreational sites, using rivers and streams for water sports,
managing wetlands, developing mineral resources, and lands exchanges must have
information regarding floodplain locations, elevations, and risks.

.93 <u>Hydrologic Design</u>. Provide hydrologic design assistance for proposed
water projects. Hydrologic design is the determination of flood volumes,
peaks, frequencies, and analyses of associated risks to allow for proper
operation and maintenance of facilities. Facilities that often need
hydrologic design input are roads, bridges, reservoirs, recreation sites,
channel stabilization projects, and wildlife habitat improvements. Provide
review of water development project proposals affecting public lands for
impacts to Bureau-managed resources, programs or activity plans.

.94 <u>Water Power and Water Storage Assessments</u>. Provide assistance in
assessing Federal lands for waterpower and water storage potential. Such
assessments shall be conducted to identify sites suitable for development for
hydro-power, irrigation, flood control, water supply, recreation, and other
uses. Such sites are subject to withdrawal to assure availability, free of
encumbrance, for future water project development.

BLM_0147275

.95

7200 - WATER RESOURCES

.95  Impact Assessments.  Provide analyses of water resources and watershed system impacts from planned land uses and resource development.  The analysis must be documented typically in an RMP environmental impact statement (EIS), specific activity EIS, or programmatic environmental assessments.  The following are specific examples of analyses for determining positive and negative effects on hydrologic systems:

A.  Providing hydrologic input to prescribed burn plans.

B.  Identifying impacts to water resource values from recreational uses such as off-road vehicles, camping, and boating.

C.  Evaluating vegetation and surface treatments and the changes to water resource values caused by the treatments.

D.  Analyzing impacts to water resources due to mineral exploration and development activities.

E.  Determining potential hydrologic changes resulting from silvicultural practices.

F.  Identifying hydrologic considerations where changes in land ownership are proposed.

G.  Identifying water resource problems associated with developing habitat improvements.

.96  Mitigative Measures.  Provide assistance in determining, recommending, and implementing mitigative measures for minimizing or avoiding water resource impacts from resource development.  Mitigative measures may include, but are not limited to, protective stipulations, reclamation standards and techniques, best management practices, land-use restrictions, and substitute resource provisions.  Grazing, timber harvesting, mineral exploration and development, and recreational activities are resource uses often encountered and typically requiring mitigative measures.

.97  Compliance Monitoring.  Provide technical and procedural input to activities such as testing drinking water at recreational facilities, evaluating permit compliance (e.g., mining operation plans, National Pollutant Discharge Elimination System-(NPDES), and verifying best management practices implementation.

BLM MANUAL

Illustration 1
(.1)

7200 – WATER RESOURCES



**ACTIVITIES OF THE
SOIL AND WATER RESOURCES PROGRAMS**

|← WATER RESOURCES PROGRAM →|

| | SOILS | WATERSHED MANAGEMENT | WATER USE/RIGHTS | GROUND WATER |
|---|---|---|---|---|
| D I R E C T | Soil Survey<br><br>Soil Interpretations<br>• Development<br>• Application<br><br>Research and Development | Watershed Condition Determination<br>• Erosion/Sedimentation<br>• Water Quality<br>• Runoff<br><br>Watershed Rehabilitation<br>• Planning/Implementation<br>• Monitoring<br>• Maintenance<br><br>RESEARCH AND DEVELOPMENT | Water Source Inventory<br><br>Water Rights<br>• Respond to State Adjudications<br>• Assert Federal Reservations<br>• Expert Witness<br><br>Instream Flow Quantification | Regional or Determination<br>• Water Quality<br>• Supply<br><br>Data Compilation<br><br>Research and Development |
| S U P P O R T | Soil/Vegetation Correlation<br><br>Site-Specific Evaluations<br><br>Impact Assessment and Mitigation | Floodplain Delineation<br><br>Hydrologic Design<br><br>Impact Assessment and Mitigation<br><br>Compliance Monitoring | Availability Determination<br><br>Individual Project Filings | Well Site Investigation<br><br>Impact Assessment and Mitigation<br><br>Compliance Monitoring |

|← SOIL RESOURCES PROGRAM →|

BLM_0147277

BLM. 2004. Proposed Upper Deschutes Resource Management Plan/Final Environmental Impact Statement.
BLM, Prineville District, Deschutes Resource Area. (September 2004). Vol. I: xxxiii.

## Table ES-1. Comparison of Grazing Management in Alternatives[1]

Alternative 7 (Preferred Alternative) would reduce the areas available for livestock grazing over those identified in Alternative 1 (current management) by up to approximately 121,000 acres, reducing available AUMs by about 20% percent in the planning area, if all permittees willingly relinquished their permits. This would reduce conflicts between livestock grazing and other uses on and adjacent to public land. About half of these acres would still be available as Reserve Forage Allotments, but the AUMs would not be allocated to specific permittees.

| Livestock Grazing | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 | Alternative 6 | Alternative 7 |
|---|---|---|---|---|---|---|---|
| Acres available for livestock grazing[5] | 389,900 | 389,348 | 389,348 | 348,682 | 228,625 | 347,890 | 268,815 |
| AUMs / Number of Allotments[6] | | | | | | | |
| Available (Open) | 25,840 / 124 | 25,779 / 124 | 25,779 / 124 | 23,545 / 86 | 13,261 / 61 | 24,375 / 115 | 20,785 / 84 |
| Open or available as RFA[7] | 0 | 0 | 0 | 0 | 0 | 0 | 472[9] / 1 |
| Available as RFA | 0 | 0 | 0 | 0 | 0 | 0 | 1,967[10] / 10 |
| RFA or not available[8] | 0 | 0 | 0 | 2,345 / 38 | 12,530 / 63 | 1,508 / 9 | 1,834[11] / 23 |
| Not available (Closed) | 0 | 69 / 0 | 69 / 0 | 0 | 0 | 0 | 721[12] / 6 |

[1] All numbers in this table are approximate. All percentages are in relation to the approximately 404,000 acres of BLM-administered public land within the planning area, not in relation to all land in the planning area.

[5] The available acres are not 100% of the acres in the planning area; several thousand acres remain unavailable to grazing in all alternatives.

[6] Allotments were counted as Open if any portion of the allotment remains Open in the alternative. Number of allotments counts La Pine unallotted as one.

[7] RFA = reserve forage allotment (see text for description)

[8] The "RFA or not available" column is a management discretion category.

[9] This figure assumes the permittees voluntarily relinquish their permits. If they don't, the figures would drop to 0 and "open" would increase correspondingly.

[10] ibid

[11] ibid

[12] ibid

BLM_0147278

BLM. 2004. Proposed Upper Deschutes Resource Management Plan/Final Environmental Impact Statement. BLM, Prineville District, Deschutes Resource Area. (September 2004). Vol. III: 50-58.

## Land Uses

### Livestock Grazing

Objective LG - 1: Provide for continued livestock grazing, while reducing conflicts with and meeting needs of other uses and resources.

Rationale:

During the planning process, public comments urged the BLM to modify or discontinue grazing in sensitive areas, critical plant/animal habitats, and areas not grazed in many years. Livestock grazing permittees who rely on public lands also expressed continued concerns about the difficulty of managing allotments in areas adjacent to resorts and residential areas, and in areas of high recreation uses. BLM management direction is to reduce threats to public health, safety, and property as well as to provide guidance for grazing management.

FLPMA, the Public Rangeland Improvement Act (PRIA), the Taylor Grazing Act, and other acts direct public lands to be managed for multiple use and sustained yield; and, among other things, to provide for improved forage conditions to benefit wildlife, watershed protection and livestock production.

The Standards for Rangeland Health and Guidelines for Livestock Management (BLM 1997), provide standards by which the condition of watersheds currently under livestock management can be measured to evaluate upland and riparian function, ecological processes, water quality, and habitat for native, Threatened and Endangered, and locally important species. Based on the condition assessment, this direction also guides actions to be taken if livestock grazing is found to be affecting those factors. These Standards and Guidelines have been incorporated into this plan by reference, and form the basis for future evaluation of livestock use. However, these Standards and Guidelines to not include evaluation social and economic conditions that are prevalent throughout the planning area. The Grazing Matrix establishes classifications into which each allotment is placed depending upon a number of factors in addition to the Rangeland Health Standards. This approach is described under guidelines, and the classifications displayed in the Grazing Matrix.

Allocations/Allowable Uses:

General Uses

1. Allow prescribed livestock grazing to control weeds, reduce fire danger, or accomplish other management objectives, regardless of parcel status (including active, vacant, RFA, or area of discontinued grazing).
   A. Prescribed grazing would only occur when BLM initiates such action.
   B. Vacant allotments and areas of discontinued grazing would not be available for temporary non-renewable grazing use.
2. Allotment classifications shown in appendix G may be adjusted by more site-specific information about allotments.
3. Livestock grazing would not be allowed in the fenced area around Mayfield Pond, after an alternate water source for livestock is established.
4. Additional direction for livestock grazing in Peck's Milkvetch ACEC is described in the Special Management Areas section.
5. After a disturbance event[11] which results in undesirable soil or plant conditions, livestock grazing would typically not be permitted the remainder of the calendar year, and through the growing season of the next year. Exceptions would be for cases where such grazing would either not impede site recovery, or where livestock are used as a tool to aid in achieving certain recovery objectives (such as cheatgrass control). Livestock grazing would resume after interdisciplinary review and determination that soil and vegetation have recovered sufficiently from the initial disturbance to support livestock grazing.
6. Livestock grazing would be allowed in pastures if the disturbance event does not result in undesirable soil or vegetative conditions. Livestock exclusion after disturbance events would also not be required if livestock would not be trailed through the affected area, and attractants (e.g., water, supplemental feed, salt) are not provided within one mile. Attractants could be closer than one mile if physical barriers (e.g., rimrock, fences) would prevent livestock access to the affected area.
7. Prescribed or permitted livestock grazing could occur any time after disturbances in pastures containing affected areas if an interdisciplinary team designs and monitors the grazing to accomplish resource objectives (e.g. to control noxious weeds, or assist in getting broadcast seeds worked into the soil).

[11] Natural and human-induced events including but not limited to wildland fire, prescribed burns, timber management treatments, juniper cuts, and rehabilitation seedings.

**Allotment Classification**

8. FEIS Map 5 and the "Alt 7" column in Appendix G show areas available for livestock grazing. Allotments are shown or listed in one of several categories: "Open," "If permit is relinquished (IPR), Open or create Reserve Forage Allotment (RFA)" (see explanation of RFA below under guidelines), "IPR, create RFA," "IPR, Close or create RFA," "IPR, Close" or "Close." Some of these categories allow manager discretion (ones with "or").

9. Livestock grazing would continue to be allowed for allotments in the "Open" category on the Grazing Matrix (Table PRMP-4). See section below on "Using the Grazing Matrix" for instructions on how to rate allotments, and see Table PRMP-5 for allotments' raw scores on each factor. Currently about 90 allotments (75 percent) of the allotments are in the "Open" category.

10. Livestock grazing would continue be allowed under permit or as an RFA for allotments falling in the "IPR, Open or Create RFA" category on the Grazing Matrix if the grazing permittee voluntarily relinquishes his or her grazing permit.

11. Allow livestock grazing as an RFA for allotments falling into the "IPR, Create RFA" category if the grazing permittee voluntarily relinquishes his or her grazing permit.

12. Livestock grazing would not be allowed under permit but could be allowed as an RFA for allotments falling into the "IPR, Close or Create RFA" category if the grazing permittee voluntarily relinquishes his or her grazing permit.

13. Livestock grazing would not be allowed for allotments falling in the "IPR, Close" category if the grazing permittee voluntarily relinquishes his or her grazing permit.

14. Livestock grazing would not be allowed for allotments falling in the "Close" category.

**Guidelines:**

1. Permits for Reserve Forage Allotments would not be held by specific grazing operators. In these allotments, temporary, non-renewable use could be granted to federal permit holders when there is a demonstrated need to rest a permittee's allotment. "Need" for rest would include but not be limited to the following reasons: Prior to prescribed fire or necessary fence construction, or during/after rehabilitation projects, wildland fire or prescribed fire, drought, flood, insect damage, or disease. Use would meet goals described for the area in the RMP and, if applicable, in an Allotment Management Plan.

2. Grazing operators in good standing can continue to hold or transfer permits to other qualified applicants in all but those allotments in the "Close" category on the Grazing Decision Matrix.

*Using the Grazing Matrix*

3. Estimate the potential demand for and social and ecological conflict in each allotment using the factors shown in Table PRMP-2. Note conflict/demand are interrelated, so there is some overlap of factors used in their estimates. The weighting of each factor in the conflict/demand rating is also shown in the Table PRMP-3.

BLM_0147280

Table PRMP-2 Grazing Matrix Factors[1]

| Factor title | What factor measures | How factor is calculated[2] | Social | Demand | Ecological |
|---|---|---|---|---|---|
| | | | | Weight of factor | |
| SMA Social | Percent of acres within allotment designated as a Special Management Area (SMA) in part for social values (e.g.: WSA for scenery, solitude) | Acres SMA-social / total acres in allotment. | 33 | | |
| Zoning | Miles of high-density zoning (resort, residential) along allotment boundary relative to number of AUMs in allotment, and relative to other allotments. | Miles X 4000 / AUMs in allotment.[3] | 33 | 20 | |
| Recreation | Amount of recreational use in allotment | If C3 on Allotment Categorization Form (see App. G) is "M" then the score is 75; if it is "H" the score is 100. | 33 | 12 | |
| Wait List | Rancher interest in allotment | Relative interest shown in an allotment compared to other allotments, based on considerations including but not limited to applications, letters of interest and personal contacts. | | 12 | |
| Fencing | Cost to install new fence and maintain existing fence, relative to other allotments. | Miles of fence maintenance X 4 X $50 / mi / yr + miles of new fence X $4,000 / mi / decade.[4] | | 12 | |
| Water | Percent of allotment needing water hauled to troughs | Permittee and BLM estimate of number of acres served by hauling water to troughs, divided by the total number of acres in the allotment. | | 12 | |
| Seasonal | Amount of seasonal restrictions on livestock grazing. | Grazing restricted to one season = 100, two seasons = 50, three seasons = 25, year-round permit = 0 | | 10 | |
| Forage | Relative amount of forage in allotment, compared to other allotments in planning area | For each allotment, 2500 / AUMs.[5] | | 12 | |
| Wildlife | Percent of allotment containing important deer, grouse, and elk habitats. | For each allotment, 0.5 X (percent of acres deer winter range + percent of acres sage grouse habitat + percent elk winter range)[6] | | 10 | 30 |
| SMA Ecological | Percent of acres within allotment designated SMA at least in part for ecological values (e.g. Peck's Milkvetch ACEC). | Acres SMA-ecological / total acres in allotment. | | | 30 |
| Rangeland Health Assessment | Percent of Standards not met during Rangeland Health Assessment, where livestock have been determined to be part of that failure. | Number of Standards not met where livestock are a factor / total number of Standards (5) | | | 40 |

[1] Each allotment's score on the above factors at the time of this printing is listed in Table LG2-XX. These scores are not constant; they change as the amount of residentially zoned land around allotments changes, as the proportion of the allotment where water is hauled vs. piped changes, and as each of the other factors making up the scores changes.
[2] All calculations are estimates, and would require site visit, updated information, and permittee input to get more accurate estimate. Scores at time of this printing are shown in Appendix G.
[3] Score is multiplied (by number indicated) and scores over 100 are set at 100, to get a more even spread of scores and to make the indicators sensitive enough to register differences.
[4] *Ibid*
[5] *Ibid*
[6] *Ibid*

BLM_0147281

Table PRMP-3 Grazing Matrix Rating

| Factor | Rating | | |
|---|---|---|---|
| | Low | Moderate | High |
| Social | <34 | 34-66 | >66 |
| Demand | >66 | 34-66 | <34 |
| Ecological | <34 | 34-66 | >67 |

Table PRMP-4: Grazing Matrix

| | | SOCIAL & ECOLOGICAL RATING | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low Ecological | | | Moderate Ecological | | | High Ecological | | |
| | | Low Social | Moderate Social | High Social | Low Social | Moderate Social | High Social | Low Social | Moderate Social | High Social |
| D E M A N D   R A T I N G | Low Demand | IPR¹, Close or create RFA² | IPR, Close or create RFA | IPR, Close or create RFA | IPR, Close or create RFA | IPR, Close | IPR, Close | IPR, Close | Close³ | Close |
| | Moderate Demand | Open | Open | IPR, create RFA | Open | IPR, Close or create RFA | IPR, Close | IPR, Close or create RFA | IPR, Close | IPR, Close |
| | High Demand | Open | Open | IPR, Open or create RFA | Open | IPR, Open or Create RFA | IPR, create RFA | IPR, Open or create RFA | IPR, create RFA | IPR, Close or create RFA |

¹ IPR = if permit is relinquished
² RFA = Reserve Forage Allotment
³ Close = Discontinue livestock grazing for the life of the plan. BLM would provide two years notice of cancellation unless waived by permittee.

BLM_0147282

Table PRMP-5: Indicators of and estimated levels of Conflict/Demand regarding Livestock Grazing (for use in Grazing Matrix).

| Allotment Number | Indicators (factors) | | | | | | | | | | | Estimated Levels Total score³ in category, and rating (Low, Moderate, High) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SMA Soc | Zoning | Recreation | Waiting List | Fences | Water | Seasonal | Forage | Wildlife | SMA Eco | S&Gs | Social | | Demand | | Ecological | |
| 0072 | 0 | 12 | 75 | 75 | 57 | 100 | 100 | 30 | 3 | 0 | 0 | 43 | M | 58 | M | 1 | L |
| 5001 | 0 | 100 | 75 | 90 | 29 | 100 | 50 | 100 | 3 | 0 | 0 | 88 | H | 72 | L | 1 | L |
| 5002 | 0 | 100 | 75 | 95 | 100 | 0 | 100 | 100 | 0 | 0 | 0 | 88 | H | 74 | L | 0 | L |
| 5003 | 0 | 100 | 0 | 95 | 100 | 100 | 50 | 100 | 0 | 0 | 0 | 51 | M | 72 | L | 0 | L |
| 5004 | 0 | 0 | 0 | 90 | 25 | 0 | 100 | 100 | 0 | 0 | 0 | 0 | L | 43 | M | 0 | L |
| 5006 | 0 | 100 | 75 | 95 | 100 | 100 | 50 | 100 | 100 | 100 | 0 | 88 | H | 91 | L | 60 | M |
| 5007 | 0 | 0 | 75 | 85 | 68 | 50 | 100 | 100 | 100 | 100 | 0 | 37 | M | 72 | L | 60 | M |
| 5011 | 0 | 0 | 0 | 0 | 17 | 0 | 0 | 100 | 100 | 0 | 0 | 0 | L | 24 | H | 30 | L |
| 5012 | 0 | 72 | 75 | 75 | 77 | 100 | 0 | 30 | 100 | 0 | 0 | 74 | H | 68 | L | 30 | L |
| 5018 | 0 | 41 | 75 | 50 | 27 | 0 | 50 | 51 | 100 | 0 | 0 | 58 | M | 48 | M | 30 | L |
| 5019 | 0 | 0 | 100 | 10 | 5 | 40 | 25 | 13 | 10 | 0 | 0 | 50 | M | 24 | H | 3 | L |
| 5022 | 0 | 100 | 75 | 75 | 42 | 0 | 100 | 40 | 0 | 0 | 20 | 88 | H | 56 | M | 8 | L |
| 5023 | 0 | 0 | 0 | 0 | 40 | 0 | 0 | 100 | 80 | 0 | 0 | 0 | L | 25 | H | 24 | L |
| 5024 | 0 | 0 | 0 | 0 | 20 | 0 | 25 | 100 | 100 | 0 | 0 | 0 | L | 27 | H | 30 | L |
| 5026 | 0 | 67 | 0 | 95 | 100 | 0 | 50 | 83 | 100 | 2 | 0 | 34 | M | 64 | M | 31 | L |
| 5031 | 0 | 0 | 75 | 90 | 100 | 0 | 0 | 37 | 100 | 0 | 40 | 37 | M | 53 | M | 46 | M |
| 5032 | 0 | 0 | 0 | 90 | 25 | 100 | 100 | 100 | 53 | 0 | 0 | 0 | L | 60 | M | 16 | L |
| 5050 | 0 | 0 | 100 | 85 | 11 | 100 | 50 | 89 | 100 | 0 | 0 | 50 | M | 68 | L | 30 | L |
| 5051 | 0 | 0 | 100 | 85 | 20 | 100 | 0 | 49 | 100 | 0 | 0 | 50 | M | 59 | M | 30 | L |
| 5052 | 0 | 0 | 100 | 85 | 50 | 100 | 0 | 100 | 82 | 0 | 0 | 50 | M | 67 | L | 25 | L |
| 5061 | 0 | 100 | 100 | 95 | 100 | 100 | 50 | 7 | 100 | 0 | 0 | 101 | H | 83 | L | 30 | L |
| 5064 | 0 | 0 | 0 | 65 | 23 | 100 | 50 | 57 | 100 | 0 | 0 | 0 | L | 50 | M | 30 | L |
| 5065 | 0 | 52 | 75 | 50 | 34 | 100 | 100 | 8 | 100 | 0 | 0 | 63 | M | 62 | M | 30 | L |
| 5066 | 0 | 29 | 0 | 75 | 32 | 100 | 100 | 74 | 100 | 0 | 0 | 15 | L | 63 | M | 30 | L |
| 5067 | 0 | 0 | 75 | 95 | 100 | 0 | 50 | 100 | 100 | 0 | 0 | 37 | M | 67 | L | 30 | L |
| 5068 | 0 | 0 | 75 | 95 | 100 | 100 | 50 | 54 | 100 | 0 | 0 | 37 | M | 74 | L | 30 | L |
| 5069 | 0 | 100 | 75 | 95 | 100 | 50 | 50 | 100 | 100 | 0 | 0 | 88 | H | 85 | L | 30 | L |
| 5070 | 0 | 0 | 75 | 95 | 100 | 100 | 50 | 13 | 100 | 0 | 0 | 37 | M | 69 | L | 30 | L |
| 5071 | 0 | 56 | 75 | 95 | 100 | 100 | 50 | 10 | 100 | 0 | 0 | 65 | M | 75 | L | 30 | L |

BLM_0147283

| Allotment Number | SMA Soc | Zoning | Recreation | Waiting List | Fences | Water | Seasonal | Forage | Wildlife | SMA Eco | S&Gs | Social | | Demand | | Ecological | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5072 | 0 | 42 | 100 | 90 | 90 | 100 | 50 | 17 | 100 | 0 | 0 | 71 | H | 75 | L | 30 | L |
| 5073 | 0 | 13 | 100 | 90 | 10 | 100 | 0 | 4 | 100 | 43 | 0 | 56 | M | 49 | M | 43 | M |
| 5075 | 0 | 71 | 100 | 60 | 50 | 100 | 0 | 22 | 100 | 65 | 0 | 86 | H | 63 | M | 50 | M |
| 5076 | 0 | 0 | 0 | 75 | 4 | 0 | 100 | 37 | 100 | 0 | 40 | 0 | L | 40 | M | 46 | M |
| 5078 | 0 | 100 | 100 | 75 | 12 | 100 | 50 | 13 | 100 | 100 | 40 | 101 | H | 69 | L | 76 | H |
| 5079 | 0 | 10 | 100 | 75 | 12 | 100 | 50 | 25 | 100 | 49 | 40 | 55 | M | 60 | M | 61 | M |
| 5080 | 0 | 24 | 75 | 50 | 37 | 100 | 0 | 12 | 100 | 0 | 0 | 49 | M | 50 | M | 30 | L |
| 5081 | 0 | 0 | 0 | 80 | 36 | 0 | 100 | 100 | 100 | 0 | 0 | 0 | L | 52 | M | 30 | L |
| 5082 | 0 | 0 | 0 | 95 | 100 | 0 | 50 | 100 | 100 | 0 | 0 | 0 | L | 58 | M | 30 | L |
| 5084 | 0 | 0 | 75 | 95 | 100 | 100 | 50 | 100 | 0 | 0 | 0 | 37 | M | 69 | L | 0 | L |
| 5086 | 0 | 0 | 0 | 90 | 100 | 0 | 100 | 100 | 20 | 0 | 0 | 0 | L | 54 | M | 6 | L |
| 5088 | 0 | 0 | 0 | 90 | 12 | 0 | 25 | 100 | 79 | 0 | 0 | 0 | L | 42 | M | 24 | L |
| 5089 | 0 | 0 | 75 | 90 | 100 | 25 | 100 | 100 | 0 | 0 | 0 | 37 | M | 64 | M | 0 | L |
| 5092 | 0 | 0 | 100 | 90 | 36 | 0 | 0 | 76 | 0 | 0 | 0 | 50 | M | 53 | M | 0 | L |
| 5093 | 0 | 0 | 0 | 90 | 84 | 0 | 50 | 100 | 0 | 0 | 0 | 0 | L | 45 | M | 0 | L |
| 5094 | 0 | 0 | 0 | 90 | 13 | 100 | 25 | 100 | 0 | 0 | 0 | 0 | L | 46 | M | 0 | L |
| 5096 | 0 | 83 | 0 | 90 | 25 | 0 | 0 | 100 | 100 | 0 | 0 | 43 | M | 53 | M | 30 | L |
| 5107 | 0 | 0 | 0 | 90 | 6 | 0 | 25 | 69 | 0 | 0 | 0 | 0 | L | 30 | H | 0 | L |
| 5108 | 15 | 0 | 100 | 80 | 17 | 0 | 25 | 33 | 100 | 0 | 0 | 57 | M | 47 | M | 30 | L |
| 5109 | 0 | 0 | 75 | 60 | 17 | 100 | 0 | 10 | 100 | 0 | 0 | 37 | M | 46 | M | 30 | L |
| 5110 | 0 | 0 | 0 | 90 | 11 | 0 | 25 | 71 | 0 | 0 | 0 | 0 | L | 30 | H | 0 | L |
| 5111 | 0 | 100 | 75 | 75 | 37 | 100 | 100 | 51 | 0 | 0 | 0 | 88 | H | 69 | L | 0 | L |
| 5112 | 0 | 4 | 75 | 60 | 15 | 50 | 50 | 10 | 0 | 0 | 0 | 39 | M | 36 | M | 0 | L |
| 5113 | 0 | 0 | 100 | 60 | 27 | 50 | 100 | 25 | 0 | 0 | 0 | 50 | M | 46 | M | 0 | L |
| 5114 | 0 | 0 | 100 | 60 | 11 | 50 | 25 | 14 | 0 | 0 | 0 | 50 | M | 36 | M | 0 | L |
| 5115 | 0 | 0 | 100 | 50 | 24 | 0 | 50 | 23 | 0 | 0 | 0 | 50 | M | 33 | H | 0 | L |
| 5116 | 2 | 60 | 100 | 50 | 11 | 0 | 100 | 4 | 0 | 0 | 0 | 81 | H | 41 | M | 0 | L |
| 5117 | 5 | 0 | 100 | 50 | 9 | 0 | 50 | 5 | 0 | 0 | 0 | 52 | M | 29 | H | 0 | L |
| 5119 | 0 | 0 | 0 | 50 | 4 | 0 | 100 | 50 | 0 | 0 | 0 | 0 | L | 26 | H | 0 | L |
| 5120 | 4 | 0 | 100 | 50 | 13 | 50 | 25 | 11 | 0 | 0 | 0 | 51 | M | 33 | M | 0 | L |
| 5121 | 0 | 0 | 75 | 25 | 13 | 100 | 0 | 21 | 0 | 0 | 0 | 37 | M | 30 | M | 0 | L |
| 5122 | 13 | 100 | 75 | 85 | 13 | 0 | 25 | 37 | 0 | 0 | 0 | 95 | H | 47 | M | 0 | L |
| 5123 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 49 | 100 | 0 | 0 | 0 | L | 17 | H | 30 | L |

*Indicators (factors)* — *Estimated Levels: Total score in category; and rating (Low, Moderate, High)*

BLM_0147284

| Allotment Number | Indicators (factors) | | | | | | | | | | | Estimated Levels — Total score[1] in category, and rating (Low, Moderate, High) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SMA Soc | Zoning | Recreation | Waiting List | Fences | Water | Seasonal | Forage | Wildlife | SMA Eco | S&Gs | Social | Demand | Ecological |
| 5125 | 0 | 0 | 100 | 50 | 14 | 50 | 25 | 8 | 0 | 0 | 0 | 50 M | 33 H | 0 L |
| 5127 | 0 | 0 | 100 | 25 | 14 | 100 | 25 | 4 | 100 | 0 | 0 | 50 M | 44 M | 30 L |
| 5130 | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 24 | 100 | 0 | 0 | 0 L | 14 H | 30 L |
| 5132 | 0 | 25 | 100 | 25 | 21 | 75 | 0 | 6 | 100 | 0 | 0 | 62 M | 42 M | 30 L |
| 5133 | 0 | 0 | 0 | 0 | 53 | 0 | 25 | 100 | 100 | 0 | 0 | 0 L | 31 H | 30 L |
| 5134 | 0 | 0 | 100 | 0 | 14 | 5 | 0 | 4 | 100 | 0 | 60 | 50 M | 25 H | 54 M |
| 5135 | 0 | 72 | 100 | 25 | 12 | 0 | 0 | 7 | 100 | 0 | 0 | 86 H | 38 M | 30 L |
| 5136 | 0 | 57 | 100 | 10 | 13 | 0 | 75 | 7 | 100 | 0 | 0 | 78 H | 41 H | 30 L |
| 5138 | 0 | 0 | 75 | 25 | 23 | 100 | 0 | 10 | 100 | 0 | 0 | 37 M | 40 M | 30 L |
| 5140 | 0 | 0 | 75 | 0 | 6 | 0 | 50 | 2 | 100 | 0 | 0 | 37 M | 25 H | 30 L |
| 5141 | 0 | 0 | 0 | 0 | 6 | 0 | 50 | 7 | 100 | 0 | 0 | 0 L | 17 H | 30 L |
| 5142 | 0 | 100 | 75 | 0 | 23 | 0 | 0 | 54 | 100 | 0 | 0 | 88 H | 40 M | 30 L |
| 5143 | 0 | 0 | 75 | 0 | 14 | 0 | 75 | 15 | 100 | 0 | 0 | 37 M | 30 H | 30 L |
| 5145 | 0 | 0 | 100 | 0 | 16 | 0 | 50 | 15 | 100 | 0 | 0 | 50 M | 31 H | 30 L |
| 5176 | 0 | 0 | 0 | 95 | 100 | 0 | 50 | 100 | 100 | 0 | 0 | 0 L | 58 M | 30 L |
| 5177 | 0 | 0 | 0 | 90 | 16 | 0 | 50 | 25 | 100 | 0 | 0 | 0 L | 38 M | 30 L |
| 5178 | 0 | 0 | 0 | 95 | 100 | 50 | 50 | 36 | 100 | 0 | 0 | 0 L | 56 M | 30 L |
| 5179 | 0 | 0 | 0 | 90 | 100 | 0 | 50 | 100 | 60 | 0 | 0 | 0 L | 53 M | 18 L |
| 5180 | 0 | 0 | 0 | 85 | 100 | 0 | 50 | 100 | 99 | 0 | 0 | 0 L | 50 M | 30 L |
| 5182 | 0 | 0 | 0 | 95 | 100 | 0 | 50 | 32 | 100 | 0 | 0 | 0 L | 50 M | 30 L |
| 5198 | 0 | 0 | 0 | 95 | 100 | 0 | 50 | 100 | 80 | 0 | 60 | 0 L | 56 M | 48 M |
| 5201 | 0 | 43 | 100 | 75 | 13 | 100 | 50 | 18 | 0 | 0 | 0 | 71 H | 53 M | 0 L |
| 5204 | 100 | 71 | 75 | 90 | 25 | 100 | 25 | 89 | 100 | 0 | 0 | 123 H | 74 L | 30 L |
| 5205 | 56 | 0 | 75 | 85 | 48 | 0 | 0 | 33 | 100 | 0 | 40 | 65 M | 46 M | 46 M |
| 5206 | 0 | 100 | 75 | 95 | 100 | 100 | 50 | 100 | 100 | 0 | 0 | 88 H | 91 L | 30 L |
| 5207 | 100 | 0 | 75 | 85 | 39 | 100 | 25 | 66 | 100 | 0 | 40 | 87 H | 63 L | 46 M |
| 5208 | 0 | 28 | 75 | 25 | 6 | 0 | 50 | 4 | 100 | 0 | 0 | 52 M | 34 M | 30 L |
| 5209 | 93 | 0 | 75 | 25 | 11 | 100 | 25 | 5 | 100 | 0 | 20 | 83 H | 40 M | 38 M |
| 5210 | 0 | 0 | 75 | 0 | 5 | 100 | 0 | 2 | 100 | 0 | 0 | 37 M | 32 H | 30 L |
| 5211 | 0 | 0 | 100 | 10 | 7 | 85 | 0 | 8 | 100 | 0 | 0 | 50 M | 36 M | 30 L |
| 5212 | 5 | 0 | 100 | 10 | 5 | 0 | 0 | 1 | 100 | 0 | 0 | 52 M | 25 H | 30 L |
| 5213 | 44 | 0 | 100 | 10 | 8 | 100 | 0 | 4 | 100 | 0 | 0 | 71 H | 37 M | 30 L |
| 5214 | 0 | 0 | 100 | 0 | 9 | 0 | 0 | 3 | 100 | 0 | 0 | 50 M | 23 H | 30 L |

| Allotment Number | Indicators (factors) | | | | | | | | | | | Estimated Levels Total score[1] in category, and rating (Low, Moderate, High) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SMA Soc | Zoning | Recreation | Waiting List | Fences | Water | Seasonal | Forage | Wildlife | SMA Eco | S&Gs | Social | | Demand | | Ecological | |
| 5216 | 0 | 0 | 75 | 85 | 75 | 0 | 100 | 100 | 0 | 0 | 20 | 37 | M | 57 | M | 8 | L |
| 5224 | 0 | 0 | 0 | 0 | 47 | 0 | 0 | 100 | 100 | 0 | 0 | 0 | L | 28 | H | 30 | L |
| 5228 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 15 | 100 | 0 | 0 | 0 | L | 13 | H | 30 | L |
| 5231 | 0 | 0 | 75 | 0 | 4 | 0 | 50 | 1 | 100 | 0 | 0 | 37 | M | 25 | H | 30 | L |
| 5233 | 0 | 0 | 0 | 0 | 3 | 10 | 0 | 5 | 100 | 0 | 0 | 0 | L | 12 | H | 30 | L |
| 5234 | 0 | 0 | 0 | 0 | 6 | 0 | 25 | 13 | 100 | 0 | 0 | 0 | L | 15 | H | 30 | L |
| 5252 | 0 | 0 | 75 | 95 | 79 | 0 | 50 | 74 | 0 | 0 | 0 | 37 | M | 51 | M | 0 | L |
| 5257 | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 100 | 42 | 0 | 0 | 0 | L | 17 | H | 13 | L |
| 5261 | 0 | 91 | 0 | 0 | 14 | 0 | 25 | 57 | 100 | 0 | 0 | 46 | M | 32 | H | 30 | L |
| 7502 | 0 | 4 | 0 | 85 | 43 | 100 | 0 | 2 | 100 | 0 | 0 | 2 | L | 45 | M | 30 | L |
| 7504 | 0 | 11 | 0 | 75 | 9 | 0 | 25 | 27 | 100 | 0 | 0 | 5 | L | 33 | H | 30 | L |
| 7509 | 0 | 100 | 75 | 75 | 55 | 0 | 50 | 28 | 100 | 0 | 0 | 88 | H | 61 | M | 30 | L |
| 7514 | 0 | 100 | 0 | 90 | 61 | 0 | 100 | 93 | 100 | 0 | 0 | 51 | M | 68 | L | 30 | L |
| 7515 | 0 | 0 | 75 | 85 | 13 | 0 | 25 | 42 | 100 | 0 | 0 | 37 | M | 45 | M | 30 | L |
| 7530 | 0 | 0 | 0 | 90 | 3 | 0 | 100 | 78 | 0 | 0 | 0 | 0 | L | 38 | M | 0 | L |
| 7538 | 0 | 100 | 75 | 95 | 100 | 0 | 50 | 96 | 100 | 0 | 0 | 88 | H | 79 | L | 30 | L |
| 7552 | 0 | 2 | 0 | 60 | 7 | 50 | 50 | 4 | 100 | 0 | 0 | 1 | L | 34 | M | 30 | L |
| 7554 | 0 | 0 | 0 | 90 | 27 | 0 | 50 | 100 | 40 | 0 | 20 | 0 | L | 42 | M | 20 | L |
| 7559 | 0 | 28 | 75 | 60 | 8 | 50 | 25 | 14 | 100 | 0 | 0 | 51 | M | 46 | M | 30 | L |
| 7571 | 0 | 38 | 0 | 95 | 42 | 0 | 50 | 96 | 0 | 0 | 0 | 20 | L | 45 | M | 0 | L |
| 7572 | 0 | 100 | 0 | 90 | 29 | 0 | 25 | 100 | 0 | 0 | 0 | 51 | M | 48 | M | 0 | L |
| 7574 | 0 | 0 | 0 | 95 | 41 | 100 | 50 | 74 | 39 | 0 | 0 | 0 | L | 54 | M | 12 | L |
| 7575 | 0 | 82 | 0 | 80 | 55 | 0 | 75 | 34 | 0 | 0 | 0 | 42 | M | 44 | M | 0 | L |
| 7582 | 0 | 0 | 0 | 75 | 29 | 100 | 0 | 100 | 99 | 0 | 0 | 0 | L | 52 | M | 30 | L |
| 7586 | 0 | 61 | 75 | 80 | 21 | 100 | 75 | 76 | 0 | 0 | 0 | 68 | H | 63 | M | 0 | L |
| 7594 | 0 | 0 | 0 | 95 | 25 | 0 | 25 | 100 | 13 | 0 | 0 | 0 | L | 38 | M | 4 | L |
| 7595 | 0 | 100 | 0 | 80 | 22 | 50 | 25 | 35 | 100 | 0 | 0 | 51 | M | 53 | M | 30 | L |
| 7597 | 0 | 0 | 75 | 73 | 5 | 0 | 50 | 10 | 100 | 0 | 0 | 37 | M | 40 | M | 30 | L |
| 9999 | 0 | 6 | 75 | 75 | 26 | 50 | 50 | 0 | 100 | 0 | 0 | 40 | M | 49 | M | 30 | L |

[1] The raw scores for some factors were proportionally adjusted to achieve a fairly even spread between 0 and 100 (aiming for about 1/3 falling above 67, at the "high" end). This was necessary to make the indicators sensitive enough to register differences between allotments. These adjustments are noted above by the adjusted factors.

BLM_0147286

**The Grazing Decision "Matrix" in the BLM Upper Deschutes Resource Management Plan**

The preferred alternative in the Proposed Upper Deschutes Resource Management Plan and Final Environmental Impact Statement published by the Bureau of Land Management, Prineville District proposes a new, efficient and amelioratory method to manage livestock grazing on the Deschutes Resource Area in eastern Oregon. Rather than continue the current management scheme, whereby conflicts between livestock grazing and other uses on public (and adjacent private) land are resolved on a case-by-case basis (and often are never resolved to anyone's satisfaction), the plan proposes a new decision matrix to help managers decide where potential grazing conflicts are so high that livestock grazing might no longer be manageable under current conditions (and there is a need to change conditions or discontinue livestock grazing).

The proposed matrix compares the value of a grazing allotment for livestock grazing to its ecological and social value for other uses (recreation, wildlife habitat, etc.), and measures the potential conflict that exists between grazing and other uses (*see* **Grazing Matrix Table**). The value of an allotment for livestock grazing is assessed based on demand among potential grazing permittees to use the allotment for grazing. If an allotment scores high for grazing on the decision matrix, and low for ecological and social uses, then the BLM will seek to continue livestock grazing on that allotment, resolving grazing conflicts on a case-by-case basis as necessary. However, if an allotment scores low for grazing use (i.e., low demand among grazing permittees to graze the allotment), and high for ecological or social values (e.g., allotment within Wilderness Study Area, conflict due to presence of sensitive species, allotment borders urban area), then the BLM may seek to close the allotment to livestock grazing or reallocate the forage as a grassbank ("Reserve Forage Allotment"). However, the BLM will only close or reallocate an allotment as a grassbank if the current grazing permittee voluntarily relinquishes the grazing permit to the agency.

The BLM devised a formula to determine the value of each allotment for grazing, ecological and social uses to estimate which allotments have the highest potential for conflicts. The plan applies the formula to each of the 124 active grazing allotments in the planning area (*see* **Grazing Guidelines – Allotment Evaluations**). Each allotment was given a "Social," "Demand," and "Ecological" score, which may be plotted on the decision matrix to help decide future management for each allotment when conflict occurs, or when a permit comes due for renewal.

The formula first measures the potential for social conflict on each grazing allotment, considering three factors: (1) miles of residential or resort zoning along allotment boundary; (2) amount of recreational use; and (3) percent of allotment within a special management area (e.g., Wilderness Study Area) that was designated at least in part for "social" values (e.g., visual resources, solitude). The factors making up the total social conflict score are weighted equally (each represents 33 percent of the total score).

Second, each allotment was scored for its demand for grazing, using eight factors: (1) waiting list for permit for allotment; (2) miles of residential or resort zoning along allotment boundary (this factor and factor #3 are calculated the same here as they are under social conflict); (3) amount of recreational use; (4) costs to install required new and maintain existing fence (assuming $50/mi maintenance and $4,000/mi new); (5) percent of allotment needing water hauled to troughs; (6)

BLM_0147287

amount of seasonal restrictions on grazing; (7) relative amount of forage (AUMs) on allotment; and (8) percent of allotment containing important deer, grouse, and elk habitats. Factors are weighted as follows: #1 is 20 percent of the total demand score, #2, #3, #4, #5, #7 are each 12 percent, and #6 and #8 are each 10 percent. An allotment's waiting list is based on professional judgment of a BLM Rangeland Management Specialist (12 years at Prineville District BLM).

Finally, criterion for determining the ecological value of grazing allotment include: (1) percent of the allotment failing to meet Standards for Rangeland Health; (2) percent of allotment containing important deer, grouse, and elk habitats; (3) percent of allotment within a special management area (e.g., Wilderness Study Area) that was designated at least in part for "ecological" values (e.g., sensitive species). The factors are weighted as follows: #1 makes up 40 percent of the total ecological conflict score, #2 and #3 are each 30 percent.

Further details on the formula, including explication of how each social, grazing demand, and ecological value was scored, and application of the grazing decision matrix is available in the proposed Upper Deschutes plan. Using the decision matrix, the preferred alternative would reduce areas available for livestock grazing in the planning area over current management by up to approximately 121,000 acres, reducing available AUMs by about 20% percent, if all permittees willingly relinquished their permits. About half of these acres would still be available as Reserve Forage Allotments, but the AUMs would not be allocated to specific permittees (*see* **Alternatives Grazing Comparison Chart**). While grazing operators may participate in voluntary permit relinquishment for any allotment under any alternative in the proposed plan, the grazing matrix provides additional opportunities for BLM managers to designate active allotments as other than "open" to reduce conflicts between livestock grazing and other uses on and adjacent to public lands in the planning area.

BLM_0147288

BLM. 2004. Proposed Upper Deschutes Resource Management Plan/Final Environmental Impact Statement. BLM, Prineville District, Deschutes Resource Area. (September 2004). Vol. I: 170.

## Alternative 7 (Preferred Alternative)

### Livestock Grazing

In this alternative the BLM would use a formula to estimate potential for conflict and demand to help identify where problems are likely to occur (for additional details of how this formula works see Common to 2-7 section in this chapter, and Chapter 4 livestock grazing assumptions). This formula is changed somewhat from alternatives 2-6; most notably, an ecological conflict factor is added, and allotments would not be placed in "closed" or Reserve Forage Allotment (RFA) status in most cases, unless the grazing permittee voluntarily relinquishes his or her permit. In this alternative, livestock grazing would be modified as directed in Table 2-27 when thresholds of conflict and demand are exceeded. Appendix G shows which allotments would be affected. When conflicts are below the thresholds described above, they would be solved (in all alternatives) on a case-by-case basis by modifying livestock grazing, recreational use, fences, roads, and/or other uses, activities or developments as needed to reduce conflicts.

Some allotments would be placed in RFA status. These allotments would not be allocated to a specific grazing operator. The BLM would allow temporary, non-renewable use to federal permit holders when there is a demonstrated need to rest the permittee's allotment. "Need" for rest would include but not be limited to the following reasons: Prior to prescribed fire or necessary fence construction, or during/after rehabilitation projects, wildland fire or prescribed fire, drought, flood, insect damage, or disease. Use would meet goals described for area in RMP and, if applicable, in AMP.

Grazing operators who have permits for allotments that fall into "IPR close," "IPR RFA," "IPR close or RFA," or "IPR open or RFA" status are under no obligation to relinquish their permits, and they are still able to transfer their permits to other qualified applicants.

## Table 2-27 Grazing Matrix

| | | SOCIAL & ECOLOGICAL RATING | | | | | | | | |
| | | Low Ecological | | | Moderate Ecological | | | High Ecological | | |
| | | Low Social | Moderate Social | High Social | Low Social | Moderate Social | High Social | Low Social | Moderate Social | High Social |
|---|---|---|---|---|---|---|---|---|---|---|
| DEMAND RATING | Low Demand | IPR[1], Close or create RFA[2] | IPR, Close or create RFA | IPR, Close or create RFA | IPR, Close or create RFA | IPR, Close | IPR, Close | IPR, Close | Close[3] | Close |
| | Moderate Demand | Open | Open | IPR, create RFA | Open | IPR, Close or create RFA | IPR, Close | IPR, Close or create RFA | IPR, Close | IPR, Close |
| | High Demand | Open | Open | IPR, Open or create RFA | Open | IPR, Open or Create RFA | IPR, create RFA | IPR, Open or create RFA | IPR, create RFA | IPR, Close or create RFA |

[1] IPR = if permit is relinquished
[2] RFA = Reserve Forage Allotment
[3] Close = Discontinue livestock grazing for the life of the plan. BLM would provide two years notice of cancellation unless waived by permittee.

**Western Watersheds Project, Inc.**
P.O. Box 280
Mendon, Utah 84325
435-881-1232 • utah@westernwatersheds.org



**Western Watersheds Project**

June 4, 2004

Mr. Bob Bennett, Director
BLM Wyoming State Office
5353 Yellowstone
P.O. Box 1828
Cheyenne, Wyoming 82003

Western Watersheds Project (WWP) is a 501c3 non-profit membership conservation organization. WWP, on behalf of all its members, has been working for over a decade to beneficially influence the management of BLM administered lands in the western United States. WWP has a long history of close involvement as an interested public on numerous grazing allotments administered by the BLM in Idaho, Nevada, Utah, Wyoming, eastern Oregon and southwest Montana.

WWP is submitting these comments and analysis for incorporation into the BLM's analysis of Range (Livestock Grazing) issues in its current and future planning and for inclusion in grazing permit renewal, vegetation treatments and range improvement project analyses. Copies of these comments and analyses are being submitted simultaneously by email to the State Office and all Wyoming Field Offices for incorporation into these efforts. We support sustainable multiple use without loss of the potential productivity and diversity of these lands and also support the restoration of these lands to their full biological potential. In accordance with BLM's multiple use mandate, you must include consideration of the intrinsic values of the native biodiversity of these lands and protect those values for the long-term benefit of the American people as described in 43 CFR 1601.0-5(f).

WWP is knowledgeable of literally hundreds of grazing allotments which are failing the most minimal of environmental health criteria because of livestock grazing on BLM administered lands. The evidence we provide in these comments makes the case that these lands continue to be <u>severely overstocked with livestock</u>. BLM's own data and current management shows this to be the case. The best quantitative and peer-reviewed range science shows that continued emphasis on structural facilities erroneously called "range improvements" is a flawed strategy. BLM typically proposes these projects rather than making the difficult decision to adjust livestock numbers and seasons to be within the current capacity of the land. Without addressing this issue, the productivity and diversity of the land will continue to fall with the result that the land, the public interest and livestock producers will suffer over the long term. Many irreplaceable resources, for example, springs, their associated wetlands and wildlife have been lost and many more will be lost or irreversibly damaged if management continues to ignore the limitations of the land and the scientific knowledge regarding livestock grazing.

As part of these comments, we refer to voluminous scientific literature and reports that BLM must consider in its analyses. Your review and analysis of these documents and inclusion of them in planning and grazing-related projects is necessary to provide

1

BLM_0147290

a "balanced" approach to the issues.  Their inclusion is also essential for BLM to comply with NEPA's mandate to take a "hard look" at science and do a thorough and integrated analysis of all disciplines.  WWP can provide copies of most of these publications to you for our costs of reproduction and postage, should you request them.

Our comments are organized by sections including:

1. Introduction
2. What Does Range Science Tell Us?
3. Management Recommendations for Uplands
4. Management Recommendations for Riparian Areas
5. References

## 1.0 Introduction

WWP is concerned that, in the past, BLM has not included consideration of the best available science in its environmental analyses.  BLM does not follow the well known and science-based principles of range management in managing livestock grazing. The three pertinent federal statutes (FLPMA, PRIA and the Taylor Grazing Act) require that BLM administer these lands in the long-term interests of the American people and not a handful of stockmen, who are permittees, on the public lands.

Livestock permittees are a small minority of livestock producers in the eleven western states and are insignificant in their numbers or their economic contribution to the States, their local and regional economies.  Their numbers and contribution pale in comparison to the natural values of our public lands.  Dr. Thomas Power, Chairman of the University of Montana's Economics Department, in Wuerthner and Matteson (2002) points out the minimal economic contribution of federal public lands livestock grazing to local, state and regional economies in the West, including Utah.  That reference can be found on-line at:

http://www.publiclandsranching.org/htmlres/PDF/wr_TAKING_STOCK.pdf

Dr. Power also points out that the majority of public lands livestock producers depend on non-agricultural sectors of these local, state and regional economies for employment, not livestock production.  It is not in the public's interest to blindly continue livestock grazing at unsustainable stocking levels in order to provide a short-term benefit to this small minority, while ignoring the values displaced by livestock grazing.

In its environmental analysis and subsequent land use plan, BLM must include detailed consideration of the information and data provided in several recent publications and the references cited herein before making its decision.  The following three books provide volumes of meaningful assessments of the unfortunate current condition of public lands and the failing economic and social realities of public lands ranching. These are:

2

- *Welfare Ranching, The Subsidized Destruction of the American West* (Wuerthner and Matteson 2002)
- *The Western Range Revisited: Removing Livestock from Public Lands to Conserve Native Biodiversity* (Donahue 1999)
- *Waste of the West* (Jacobs 1991)

In addition, BLM must consider in detail the publications referenced in these comments and also National Research Council (2002), *Riparian Areas: Functions and Strategies for Management.* All of these publications are clear in describing the flaws in current methods of livestock management on public lands and should form a core of its analysis.

In addition, the BLM's *Rangeland Reform '94 DEIS* and *Executive Summary* (RRDEIS, BLM 1995) reported that riparian areas *"have continued to decline and are considered to be in their worst condition in history"*; livestock grazing is identified as the chief cause. Indeed, some riparian areas have literally been destroyed; that is, they no longer exist or have any potential for restoration.

In its recent DEIS to revise its grazing regulations, BLM bypassed consideration of best available science. It pretended that current grazing management is fine if interested publics and environmental organizations would just quit holding up BLM and Permittee proposals by creating an administrative paperwork burden (BLM 2003). BLM asserted that greater cooperation with stockmen would somehow result in improvement by merely "tweaking" stocking rates, but then went on to state that this seldom happens, that changes in grazing really only amount to changes in season or location of use and that *"Changes in active grazing use in excess of 10% are infrequent."*

In its RRDEIS, BLM provided definitions describing the status of upland plant communities. These were:

- Potential Natural Community (PNC) = existing vegetation is between 75 – 100% of the sites potential natural plant community.
- Late Seral Community = existing vegetation is between 50 – 74% of the sites' potential natural plant community
- Mid Seral Community = existing vegetation is between 25 – 49% of the sites' potential natural community
- Early Seral Community = existing vegetation is between 0 – 24% of the sites' potential natural community.

Table 1 indicates that management of uplands since the passage of the last Rangeland Reform regulation in 1995 has not resulted in improvement of upland condition. In fact, by BLM's own definitions, condition has declined. It also shows that productivity of those lands is greatly below potential with 63% of its lands below 49% of potential. The data also show that BLM's management has failed in the intervening 10 years to take meaningful actions to improve conditions.

In spite of the evidence of widespread loss of plant productivity and ground cover, accelerated erosion and BLM's own documentation of rapid declines in species such as

3

BLM_0147292

sage grouse, BLM routinely chooses not to address livestock impacts in any scientific or sustainable fashion. Instead, BLM proposes more water developments and grazing systems. This ignores that in the 1960's, BLM began a massive program of developing water, putting streams and springs into pipelines, seeding with crested wheatgrass, building fences, engaging in rotation grazing, and spending millions of dollars to "even out livestock distribution".

**Table 1.  Comparison in BLM Upland Condition Between RRDEIS (1995) and Current Condition (BLM 2003)**

| Community Status | RRDEIS | Current DEIS | Change '94 to date |
|---|---|---|---|
| PNC | 4% | 6% | +2% |
| Late Seral | 34% | 31% | -3% |
| Mid Seral | 40% | 34% | -6% |
| Early Seral | 15% | 12% | -3% |
| Unclassified | 7% | 17% | +10% |

An early example of this, among others, was in BLM's Vale District, where millions of dollars were spent on crested wheatgrass seedings and structural range improvements. Today, across BLM lands in the west, many of these systems have fallen into disrepair, the land has failed to recover and we are faced with more and more proposals to install grazing systems, water developments, treat and seed – not reduce livestock numbers. This is in spite of the fact that long-term studies, including those from the Vale District have shown that stocking rate is the critical variable, not grazing systems. These are cited in a later section.

This is all in the context of BLM's failure to scientifically and accurately determine those lands which are capable and suitable for livestock grazing. We must add to this the further failure of BLM to accurately and quantitatively determine how much forage (i.e. forage capacity) is currently available. On top of this, there is the failure of BLM to properly allocate that forage to watershed and stream protection, wildlife habitat and food, then to livestock if available. Then there is the failure to provide for long-term rest to facilitate recovery. Finally, we must add the unwillingness of permittees to use peer-reviewed range science principles for management, instead they rely on "snake-oil" solutions such as time-controlled grazing and maintain strong opposition to the most minimal standards of performance. These failures by BLM and livestock permittees have prevented the recovery of damaged ecosystems in order that they might sustain use as envisioned in the Taylor Grazing Act and FLPMA.

Instead, BLM continues to use the take "half/leave half" principle for livestock use. In its planning, permits and analyses, BLM typically includes livestock use levels of 50% of forage as proper. They do this without providing any scientific foundation for this claim, nor do they adequately monitor this use and use it to manage livestock. The following paragraphs provide a summary of the relevant range science regarding utilization levels, plant growth and productivity, effects of precipitation regime, capability and suitability, capacity determinations, range improvements, stocking rates and range economics. These principles are well founded in the range science literature.

4

BLM_0147293

## 2.0  What Does Range Science Tell Us?

**2.1 Plant Growth and Precipitation.**   In order to understand the implications of grazing livestock at these heavy forage utilization levels in arid regions, it is important to understand the precipitation regime and its relationship to forage production. Holechek et al (2001) point out what we all understand at the most basic level.  That is, precipitation is the single most important factor determining the type and amount of vegetation in a particular area.  In the 11 Western States, 80% of the area receives less than 500 mm (19.6 inches) of annual average precipitation.  Further, this precipitation is subject to great year-to-year variation.

Four locations representative of precipitation patterns for Wyoming BLM lands are used for illustration.  Long-term precipitation records were analyzed for stations at Kemmerer, Rock Springs, LaBarge and Worland.  The effects of annual variations in precipitation on plant community production are important to understand in establishing livestock stocking rates and management.  Table 2 provides a summary of annual precipitation statistics for these locations.  Data was obtained from the Western Regional Climate Center database which can be found on line at http://www.wrcc.dri.edu/index.html .   Figure 1 provides plots of annual precipitation and occurrence of below average and drought years for these locations.

The analysis uses the Standard Precipitation Index (SPI) developed by McKee et al (1993) which considers drought, or extremely dry conditions, as years with 2" less than average precipitation.

**Table 2.  Summary of Precipitation Statistics for Four Wyoming Locations**

| Description | Kemmerer | LaBarge | Rock Springs | Worland |
|---|---|---|---|---|
| Period of Record | 1949 – 2003 | 1958 – 2003 | 1949 – 2003 | 1960 - 2003 |
| Years of Record | 43 | 28 | 50 | 43 |
| Average, inches | 10.26 | 7.94 | 8.7 | 7.63 |
| Range, inches | 5.06 – 23.72 | 3.44 – 17.82 | 4.53 – 14.54 | 3.75 – 11.27 |
| Year below average | 25 | 16 | 27 | 21 |
| Percent years below average | 58.1 | 57.1 | 54 | 48.8 |
| No drought years based on SPI | 14 | 5 | 13 | 6 |
| Percent drought years based on SPI | 30.2 | 17.8 | 26 | 13.9 |

Figure 2 shows the monthly distribution of precipitation at these locations. The differences in overall precipitation amounts are reflected in the relative magnitudes of monthly precipitation at each of the locations, with Worland being the driest.  All locations have increased precipitation during spring and late summer.  Winters are generally characterized by consistent, but lower precipitation from month to month.

5

BLM_0147294

These periods of precipitation vary in their effects on the plant communities. Increased precipitation during the spring-summer-fall months may not be effective due to the higher temperatures occurring then.  Typically, the fall-winter period is the period of greatest increase in soil moisture due to lower temperatures and lower evapo-transpiration.  Precipitation effectiveness during the warmer spring – fall periods varies with the storm intensity and soil condition.  Storms must be of high enough intensity to promote recharge of the soil profile into the root zone to be effective for plant growth.  Generally, this is greater than 0.6 inches in desert shrub types, although very high intensity storms may not be effective due to rainfall rates in excess of infiltration that result in overland runoff and flash events.

Spring plant growth in these arid areas depends on the amount of moisture received and retained during the fall-winter period.  Relatively dry summers may allow little regrowth and by the time fall comes, temperatures may be low and growth limited.  Trampled and compacted soils exacerbate this effect (Blaisdale and Holmgren 1984).  Some desert shrubs such as Artemisia sp. with both shallow and deep root systems can take advantage of both shallow and deep soil moisture (West 1983).

Annual production of available forage at the Desert Experimental Range in western Utah was highly correlated with total annual precipitation, showing an 800% variation in forage production between the driest and wettest years (Hutchings and Stewart, 1953).  Scientists developing quantitative ecosystem relationships for the Prototype Oil Shale Program managed by BLM in Utah's Uinta Basin found that annual sagebrush stem leader growth used as an index of production had a high correlation with winter precipitation (October – March) and that spring annual plant biomass was correlated with spring precipitation (ERI 1984; WRSOC 1984).  These studies were carried out under the supervision of BLM's Vernal Field Office.

Analysis of twenty years of data for perennial grass production and annual precipitation for a study area at the Chihuahuan Desert Rangeland Research Center in New Mexico showed a high correlation (Holechek et al, 2001).  A graph of this data is shown in Figure 3.  Annual perennial grass production varied between 6 and 750 lbs per acre, corresponding to the second-lowest and highest precipitation years.  The linear regression plot of the same data is provided in Figure 4.  Results of long term studies of crested wheatgrass production from experimental plots on BLM land at Malta, Idaho showed that crested wheatgrass production was most closely related to May-June precipitation (Sharp et al, 1992).  They found that annual production of crested wheatgrass during 35 years averaged about 500 pounds/acre and ranged between 130 and 1090 pounds/acre depending on precipitation (Figure 5).  These relationships demonstrate that this is a predictable phenomenon that should be taken into account in setting livestock grazing seasons, stocking rates and management on an annual basis as well as over the longer term.  A typical NRCS soil survey (USDA 1980) for these arid areas shows that total production of potential plant communities varies by about 300% between favorable and unfavorable years.  This wide range in production between dry and wet years is typical in the arid regions of the West and should be reflected in related levels of livestock use.

6

BLM_0147295









**Figure 1. Annual precipitation patterns in Kemmerer, LaBarge, Rock Springs and Worland, Wyoming**

7

BLM_0147296









**Figure 2.  Monthly precipitation patterns in Kemmerer, LaBarge, Rock Springs and Worland, Wyoming.**

8

BLM_0147297



Figure 3. Annual Precipitation vs Forage Production



Figure 4. Forage Production vs Precipitation

$y = 48.172x - 283.85$
$R^2 = 0.637$



Figure 5. Crested Wheatgrass Production at Malta, Idaho

9

BLM_0147298

**2.2  Grazing Intensity and Effects on Productivity.**  Much of the current research and analysis of livestock grazing management, plant productivity and economics has come out of the Department of Animal and Range Sciences at New Mexico State University.  This work has been presented in a series of textbooks and papers in the range science literature.  These references provide analyses of the interactions of livestock stocking rates, plant productivity and economics based on a set of long term grazing management studies from native rangeland types.  They provide recommendations for determining livestock grazing intensity to maintain vegetative productivity and economic stability, while taking into account the effects of inherent variation in precipitation in desert ecosystems.

The effects of different livestock grazing intensities on forage plant production was studied in a ponderosa pine type in Colorado as early as the 1940's (Schwan et al, 1949).  This study showed that forage consumption at a rate of 57% produced an average of twice as much forage as a rate of 71%.  An area left ungrazed by livestock for 7 years produced three times as much forage as the 71% use area.  The authors concluded that, as grazing use increased, forage production decreased.  During that same period, Dyksterhuis (1949), in a classic paper on the use of quantitative ecology in range management, presented examples of how stocking rates must be adjusted based on precipitation and range condition, which included a rating based on departure from the potential plant community.  NRCS (USDA, 1982) considers proper grazing management as that management that sustains the potential plant community.

The effects of conservative (30 – 35%) use vs. heavy (60 – 65%) grazing use on grasses and forbs by cattle was determined in a New Mexico study (Galt et al, 1999).  Both of these pastures had experienced conservative use for over 10 years.  In 1997, one pasture was changed to heavy use.  Quantitative measurements at key locations in both pastures in the following year, while being rested, provided the results shown in Table 3.

**Table 3. Standing Crop of Grasses and Forbs from Galt et al (1999)**

| Location/Forage Component | Spur Pasture Heavy Stocking Rate Pounds/acre | Deep Lake Pasture Conservative Stocking Rate Pounds/acre |
|---|---|---|
| Perennial Grasses | 352 | 824 |
| Forbs | 256 | 436 |
| Total Forage | 608 | 1260 |

This study showed that heavy stocking rates, even for a single year, resulted in serious declines in productivity in the succeeding year.  Perennial grass production was reduced by 57% and forbs by 41% in the heavily grazed pasture compared to the conservatively grazed pasture.  The authors cited a number of other studies in arid environments that showed heavy stocking rates were accompanied by decreases in forage production when compared to conservative use.  After drought, the ability of forage plants to recover was directly related to the standing crop levels maintained during the dry period.  The studies cited showed that grazing during different seasons was less important than grazing intensity.

BLM_0147299

Five long-term stocking rate studies from three different locations in Arizona, New Mexico and Utah documented similar patterns (Holechek et al 1999a). In the Desert Experimental Range in Utah, a 13-year study with moderate (35%) and heavy (60%) use by sheep resulted in annual forage production of 198 lbs/acre and 72 lbs/acre. The authors recommended 25 – 30% use of all forage species. A 10-year study at the Santa Rita Range in Arizona demonstrated that perennial grass cover and yield showed an inverse relationship to grazing intensity, while burroweed, an undesirable species, increased with increasing forage use. The authors recommended a 40% use level. A 37-year study in the Jornada Experimental range in New Mexico involving conservative (33%) and moderate (45%) use showed that the lower grazing intensity resulted in greater black grama (perennial grass) cover. Lowland areas with high clay content and periodic flooding grazed at moderate intensity had higher cover of Tobosa, a perennial grass, than heavily grazed areas. They recommended 30% be used as a stocking intensity with no more than 40% removed in any year. A 10-year study at the Chihuihuan Desert Rangeland Research Center looked at four grazing intensities of 25%, 35%, 50% and 60%. Light (25%) and moderate (35%) use produced 70% more forage than 50% use and more than double that achieved at 60% use. Here, the author recommended conservative stocking at 30 – 35%.

Hutchings and Stewart (1953), suggested that 25 – 30 % use of all forage species by livestock was proper. They recommended this level because routinely stocking at capacity will result in overgrazing in half the years and necessitate heavy use of supplemental feed. Even with this system, they recognized that complete destocking would be needed in 2 or 3 out of ten years. Holechek et al (1999a) concluded that the research is remarkably consistent in showing that conservative grazing at 30 – 35% use of forage will give higher livestock productivity and financial returns than stocking at grazing capacity. They also recognized that consumption by rodents and other wildlife must be taken into account as part of this utilization. Otherwise, rangeland productivity would suffer even at these levels of use. Galt et al (2000) recommended levels of 25% utilization for livestock and 25% for wildlife with 50% remaining for watershed protection. In none of these cases have the scientists recommended 50% utilization by livestock and they are clear that even at the lower use levels recommended, wildlife use is included.

BLM has never even looked into the issue of the relationship between its typical riparian greenline stubble height standard of 3 – 4", usually applied to Nebraska sedge and other sedge species, and the effects of applying this standard on adjacent riparian plant community productivity. Carter (1998) showed that before greenline N. sedge had been reduced in height to the standard of 6", riparian grasses had been reduced to 2" stubble height and 89% of stream banks had been trampled, compacted or were actively eroding into the stream. Monitoring data from the Wasatch-Cache National Forest (USDA 1993) included the observation that a Nebraska sedge stubble height of 7.6" corresponded to an estimated 70% use of riparian grasses. Lile et al (2003), compared clipping of N. sedge to stubble heights of 2" and 4" during early season, late season and multiple clippings to both heights. Late season use or 2" stubble height did not allow recovery. Only the 4" early season use achieved the 4" criteria, but did not regrow to meet the 6" criteria by the end of the growing season. This shows that season-long or late season use does not allow sufficient time for re-growth and that 3-4" stubble heights are not effective in protecting riparian vegetation.

11

BLM_0147300

Schulz and Leininger (1990) studied long-term riparian exclosures compared to areas that continued to be grazed. They found that, after 30 years, willow canopy cover was 8.5 times greater in livestock exclosures than in adjacent grazed riparian areas. Grasses were 4 to 6 times greater in cover within the exclosure than outside. Mean peak standing crop of grasses within the exclosure was 2,410 Kg/Ha, while outside in caged plots, mean peak standing crop was 1,217 Kg/Ha.

Often cited, Franklin Crider's study on root growth stoppage from plant top removal provided quantitative measurements of plant re-growth under different amounts of removal (Crider 1955). Three mid-west perennial grasses were grown from seed in pots under ideal conditions of watering and fertilization. After sixty days of growth, these potted grasses were clipped once at intervals from 10% to 90% of the above ground biomass. Repeat clippings of the potted grasses were made every two days to return the plants to the same height as the original clipped percent. The experiment lasted thirty three days at which time root growth of controls became inhibited by the size of the pot. Crider concluded that under these ideal growing conditions, if these species of grasses had 40% or less of their aboveground biomass clipped either once or many times, then the net root mass was the same or more at the end of the experiment. This was used to make the assumption that grazing during the entire growing season at 40% or less would sustain plants from one season to the next. This same study has been used to justify the 50% or "take half/leave half" proposition that range managers have used for decades. Clearly, the long-term range studies cited here show that under actual field conditions, these use levels are excessive and light grazing (25%) is most equitable to BLM's mandate for sustainable use.

**2.3 Forage Needs Other Than Livestock.** Let's assume for the moment that Crider's finding (40% removal in a growing season) applies to the very arid lands found on Wyoming BLM lands. If Crider's results apply, then the 40% removed needs to be shared with all the animals that require forage. Some is needed for wild grazers (insects, nematodes, mammals), some for the generation of litter and nutrient cycling. A certain amount of the plant needs to remain to ensure regeneration of the plant and to ensure plant community structure is sufficient for wildlife habitat needs and soil erosion protection. A certain proportion of plants must remain ungrazed to allow for seed and flower production to ensure propagation of the species and provide food for pollinators and granivores, an often overlooked requirement.

Existing research helps answer the question of how much of the annual plant growth is required for wild grazers. For a detailed review of this research we recommend that you download Catlin et al (2003) from:

http://rangenet.org/directory/jonesa/sulrprec/index.html

Based on a number of studies of mammal consumption of forage, some annual forage consumption needs for mammals where mammal populations are at or near their potential are provided in Table 4.

12

BLM_0147301

**Table 4.  Forage Needs of Mammals**

| Mammal | Forage Needs kg/hectare |
|--------|-------------------------|
| Deer | 12.7 |
| Rabbits | 72.7 |
| Rodents | 142.3 |
| Total | 227.6 |

Less is understood regarding the typical vegetation needs for insects.  What is known is that insects play a significant role.  For example, harvester ants are granivores with individual colony populations of tens of thousands of individuals.  Even in the driest and hottest parts of North America, the total biomass of one species of harvester ant, *Messor (Veromessor) pergandei* has approximately the same total biomass as the total rodent population in the same area.  One of many ecological roles harvester ants fulfill is dispersing plants as a result of accidental abandoning of seeds near the nest.  The analysis here focuses on the typical forage needs of insects.

A number of studies have reported the percent of plant growth consumed by insects. In grassland and savannah, insect consumption of a single species varied from less than 1% to 19% with a mean of 3.5% (Wiegert and Peterson, 1983).  Rangeland grasshoppers consume between 1- 3% in typical years (Mispagel 1978) and up to 99% in periods of super abundance (Nerny and Hamilton 1969).  Hewitt and Onsager (1983) suggest that between 21-23% of available range forage is consumed by all grasshopper species in the western U.S. each year.  This production is transferred to birds and mammals such as sage grouse and rodents as a food source, to the soil for nutrient cycling and to higher trophic levels such as raptors and other carnivores.  It is important for ecosystem function and cannot be dismissed.

Nematodes provide critical soil nutrient cycling and structure functions.  This complex array of species normally has a higher diversity and biomass than other rangeland flora and fauna combined. Some nematodes consume plants and should be considered as a component in the consumption of rangeland plants.  Ingham and Detling (1984) estimated that nematodes consumed between 6 and 13 % of below ground net productivity in the mixed grass prairie.  Other studies by Scott et al (1979) and Anderson (1987) found that root feeding arthropods and nematodes consume between 7-26% of the net productivity in normal years.  For the full citations to these studies please visit the paper at the web site shown above.

Holechek et al (2001) provide equivalents in forage consumption between livestock and wildlife.  They are summarized in Table 5.  Studies in the Vernal resource area during the 1970's and 1980's generated many years of quantitative data describing the abundance of many species of animal, bird and insect in the different vegetation types occurring there.  This information is available in the Vernal Field Office for review and analysis.  Some of it is provided in the (ERI 1984; WRSOC 1984) reports referenced.  Final determinations of livestock stocking rates and utilization criteria for livestock must take this information into account, using the current vegetation production for the area under consideration.

13

BLM_0147302

**Table 4.  Animal Equivalents from Holechek et al (2001)**

| Animal | Animal Unit Equivalents |
|---|---|
| Mature cow | 1.0 |
| Yearling cow | 0.75 |
| Domestic sheep | 0.15 |
| Horse | 1.8 |
| Bison | 1.8 |
| Elk | 0.7 |
| Moose | 1.2 |
| Bighorn sheep | 0.18 |
| Mule deer | 0.15 |
| Pronghorn | 0.12 |

**2.4  What is an AUM?**  Various estimates have been used in the past to define the amount of forage consumed by livestock (AUM).  BLM often uses the value of 800 lbs/AUM.  This section discusses some of that variability and proposes a standard forage amount for livestock consumption.  A check of USDA market statistics at:

http://www.ams.usda.gov/mnreports/lm_ct166.txt

shows that during 2003, auction weights of mature steers averaged 1268 lbs and mature heifers averaged 1157 pounds.  Recent auction weights for mature cows have seen ranges up to 1400 pounds.  Ray et al (2004) give a weaning weight of 480 pounds for calves. Holechek et al (2001) state that daily dry matter consumption averages  2% of body weight per day.  They then calculate that a 1000 pound cow will consume 20.0 lbs dry forage/day and a 750 pound yearling will consume 15 lbs dry forage/day, for a total of 35 lbs/day.  The 1969 AMP for the North Rich Allotment in Rich County and Cache Counties (Wasatch-Cache NF) used 30 lbs/day for a cow calf pair.  In its FEIS for the Land and Resource Management Plan for the Curlew National Grassland (USDA 2002), the Caribou-Targhee National Forest used 34 pounds per day for a cow/calf pair. There is little doubt that cattle weights have increased over time and a value that is accurate under current conditions must be applied.  In fact, Anderson et al (ca 2000) calculated a 35% increase in dressed weights per animal between 1975 and 1995.  Their analysis can be found at:

http://agecon.uwyo.edu/RiskMgt/marketrisk/TheCattleCycle.pdf

Using the average auction weight for heifers (1157 lbs), the weaning weight for calves (480 lbs) and the 2% consumption rate from Holechek et al (2001) results in forage dry weight consumption of:

(1157 + 480) x 0.02 x 30 days    =    982 lbs/month, or 32.7 lb/day

Even this will likely be an underestimate since calves graze all summer and are probably closer to the yearling weight given in Holechek et al (2001) and mature cows can be a good deal larger than the heifer weight used here.  BLM must also count

14

calves in its AUM for permitting purposes.  FLPMA requires that an AUM be the forage consumed by a mature cow or its equivalent each month.  Therefore, calves must be counted in the AUM allocation for permitting purposes.  We propose that BLM establish a forage consumption allocation for a cow/calf pair of 1,000 lbs/month = 1 AUM.

**2.5 <u>Grazing Systems</u>.**  In a review paper that considered grazing systems, grazing intensity and season of use, Holechek et al (1998) determined that, *"financial returns from livestock production, trend in ecological condition, forage production, watershed status and soil stability are all closely associated with grazing intensity."* They found that <u>grazing systems such as rest-rotation had limited or no benefit in arid systems</u>. Citing long-term studies in Arizona, they documented that after 12 years of rest-rotation management compared to continuous grazing, neither forage plant densities nor forage plant production differed between the treatments.  Grazing intensity employed was 30 – 35% use with occasional high use of 50% or more.  *"Rest and deferment were not sufficient to overcome the effects of periodic heavy use on primary forage plants when rest-rotation grazing was applied on big sagebrush range in northern Nevada."*  In an Arizona study comparing winter-spring grazing with summer-fall rest to continuous grazing, the rotation scheme was inferior to the year-long system from the standpoint of perennial grass density and production.  Perennial grass production was closely associated with the degree of use and was highest where grazing use was lowest.  In a Vale, Oregon study, lasting over 20 years at moderate grazing intensity, rotational grazing showed no advantage over season-long grazing in improving range condition or forage production.  *"The key factor in range improvement appeared to be the reductions in grazing intensities that were applied when the project was initiated..".*

A review of the "classic" range studies, which are the long-term stocking rate and grazing system studies that provide the scientific foundation for modern range management again showed that light use is closer to sustainable use, while heavy use is not (Holechek et al 1999a).  Definitions of "heavy", "moderate" and "light" grazing developed in 1961 were cited.  Heavy grazing was defined as the degree of forage utilization that does not allow desirable forage species to maintain themselves. Moderate grazing was defined as the level at which palatable species can maintain themselves. Light grazing was defined as the degree of utilization at which palatable species are able to maximize their herbage producing ability. <u>However, it is clear that using even "moderate" grazing in depleted areas will not allow them to recover.</u>

When averaged across all the long-term studies for all regions, heavy grazing was 57% use of primary forage species, moderate use was 43% and light use was 32%.  <u>In arid regions, the research showed that moderate grazing use was 35 – 45%.</u>  When the average forage production change over time was compared with use, heavy stocking resulted in a 20% decline in production, moderate use experienced no change and light use resulted in an 8% increase.  During drought, moderately stocked pastures produced 20% more forage than heavily stocked pastures, light grazing produced 49% more forage than heavy and 24% more than moderate stocking levels.  Heavy stocking resulted in a downward trend and light stocking an upward trend in ecological condition.  Moderate stocking showed a slight, but not significant increase in condition, resulting in depleted ranges being maintained in depleted condition.

15

Table 6 provides summary statistics from that paper.  It must be remembered that these comparisons are to prior heavy use, not to ungrazed lands.  It is apparent from these studies that "moderate" use levels will not allow significant recovery of severely depleted range.  In fact, in studies of long-term rest at Idaho National Engineering Laboratory, the recovery rate of grasses in sagebrush communities was slow, progressing from 0.28% to 5.8% over 25 years (Anderson and Holte, 1981 and Anderson and Inouye, 2001).  <u>It is clear from these examples that native plant communities in heavily depleted sites will require decades to recover in the absence of livestock, while their ability to recover in the presence of livestock at any level of use has not been demonstrated.</u>

Relying on additional water developments, fences and grazing systems will not alleviate the problem.  The use of range improvements and rotation systems is not sufficient to correct over-stocking.  Results from 18 western grazing system studies by Van Poollen et al (1979) found that adjustment of livestock numbers, or stocking intensity was more important than implementing grazing systems to improve herbage production.  Holechek et al (1999a) recognized that *"various rotation grazing systems cannot overcome the rangeland deterioration associated with chronic overstocking."*  Holechek et al (2000) also showed that the various claims made by advocates of short-duration or time-controlled grazing were false.

A comprehensive discussion of rest-rotation is found in Clary and Webster's General Technical Report titled *"Managing Grazing of Riparian Areas in the Intermountain Region."* (Clary and Webster 1989).  They summarized a dozen studies showing significant increases in forage production occurred with decreased intensities of grazing.  The article described the improvements found in reducing grazing from heavy, to moderate and then to light grazing.  Grazing with utilization above 50% was described as heavy, moderate was 30 - 50% and <25-30% was called light grazing in most of these studies.

**Table 5.  Summary of Data from 25 Classic Grazing Studies (Holechek et al 1999a)**

| Description | Heavy | Moderate | Light |
|---|---|---|---|
| Average Forage Use % | 57 | 43 | 32 |
| Average Forage Production lb/acre | 1,175 | 1,473 | 1,597 |
| Drought Years Production lb/acre | 820 | 986 | 1,219 |
| Average Calf Crop % | 72 | 79 | 82 |
| Average Lamb Crop % | 78 | 82 | 87 |
| Calf Weaning Weight lbs | 381 | 415 | 431 |
| Lamb Weaning Weight lbs | 57 | 63 | -- |
| Gain per Steer lbs | 158 | 203 | 227 |
| Steer/calf Gain per Day lbs | 1.83 | 2.15 | 2.3 |
| Steer/calf Gain per Acre lbs | 40.0 | 33.8 | 22.4 |
| Lamb Gain per Acre lbs | 26.0 | 20.4 | 13.8 |
| Net Returns per Animal $ | 38.06 | 51.57 | 58.89 |
| Net Returns per Acre $ | 1.29 | 2.61 | 2.37 |

16

BLM_0147305

Clary and Webster's study concluded that *"managers should place more emphasis on proper stocking intensity and less on grazing system implementation.  The concentrated use of grazing pastures is not compensated for during rest years if grazing use is heavy. In summary, although grazing systems have great intuitive appeal, they are apparently of less consequence than once thought.  In fact as long as good management is practiced so that there is control of livestock distribution and grazing intensity, the specific grazing system employed may not be significant."*

Holechek et al (2001) have indicated that, depending on topography, areas of severe degradation, or *"sacrifice areas"* occur around water sources including water developments.  These can extend from 1 mile to several miles from these sources and out further if stocking rates are too high. Based on this, a single water development can result in an area of soil compaction, erosion and severe loss of ground cover and vegetation for thousands of acres.  They also indicate that installing water developments in locations that have had limited access to livestock in the past may increase ecological damage to areas that are important refuges for relict plant communities and wildlife that have not been displaced by livestock.

Catlin et al (2003) provides a review of grazing systems.  It summarizes more than 40 studies concerning rest rotation and related issues.  Short term rest (one year) as typically applied does not lead to significant improvements of deteriorated ranges. Clearly, the long-term range studies we have cited show that it is stocking rate, not water developments, or grazing systems that are most important in maintaining or improving rangeland productivity. It is critical that BLM take this information into account in determining livestock stocking intensities and evaluating the efficacy of added water developments or grazing systems.

**2.6 <u>Economic Considerations.</u>**  The studies we have cited show that light stocking results in greater forage production and improvement in range condition when compared to both heavy and moderate use.  Moderate and light use also provided greater financial returns than those obtained with heavy use.  Because these financial figures included data from humid areas, a separate analysis taking into account the necessity for destocking during drought in arid regions showed that conservative stocking (35% use) would provide the highest long-term financial returns on semi-desert rangelands in Arizona.

Economic analyses in (Holechek et al, 1999b) show that conservative stocking rates yield better returns.  For example, in the sheep experiment at the Desert Experimental Range in Utah, the lower stocking rate (35% use) yielded a financial return of $0.39/acre compared to $0.14/acre for the higher stocking rate (60% use).  A modeling study that evaluated 29 years of financial returns for a cow-calf operation revealed that a relatively constant stocking rate of 35% use was considered the best approach.

Winder et al (2000) reported on comparisons of stocking rates and financial returns using 30 or 40% of current years perennial grass growth.  The 30% use level provided greater vegetation productivity and financial returns.  After drought in 1994 through 1996, forage production on the pastures with the lower stocking rate (30% use) increased 71% compared to 35% increase on those with the moderate stocking rate (40%).  Economic returns were $0.52/acre for the conservative use level and

17

BLM_0147306

$0.31/acre for the moderate use level.  <u>A combination of stubble heights, clippings and ocular measures were used to set annual stocking rates, termination of the grazing season, sale of cattle to balance numbers with capacity and destocking during drought.</u>  Under these criteria, all pastures were destocked in the summer of 1994 and the moderately stocked pasture was destocked in May, 1999.  After livestock were removed due to drought, pastures were rested for two years, then afterwards stocked in late fall according to current year's forage production.

Results of seven years' research in New Mexico's Chihuahuan Desert to evaluate the relationship between range condition and financial returns showed similar relationships (Holechek et al 1996a).  Condition was evaluated using the Dyksterhuis (1949) definitions based on departure from climax.  This study showed a relationship between forage production and range condition.  Higher condition range, or that nearer climax community plant composition, had higher production of forage and more preferred forage species than lower condition range.  <u>Excellent range condition provided over four times the financial return of fair condition range and 65% greater return than good condition range.</u>

The reasons for this were the high costs of management and the energy lost by livestock in seeking forage in lower condition range. In a companion paper, livestock returns were compared to conventional investments such as bonds or stocks (Holechek et al, 1996b).  This analysis showed that over-capitalization in infrastructure, coupled with over-stocking lead ranchers into a boom and bust cycle as climatic conditions change.  In wet years, they added livestock, generally when prices were high then sold off their herds during dry, or bust periods when prices and productivity are low.  <u>The final analysis concluded that conservative stocking, minimal investment in range improvements and greater spacing of watering points reduced fixed costs and insulated the operation from the vagaries of precipitation and market forces.</u>

In addition to the economics of livestock production, BLM is required to analyze other economic values and determine the values foregone by its proposed action.  NEPA (40CFR1508.8) recognizes that the analysis of effects must include ecological, aesthetic, historic, cultural, economic, social, or health issues.  BLM typically has clouded the distinction between "cultural" as applied to historical features such as buildings, artifacts, or paleo-resources with societal lifestyle issues.  In particular, in its recent DEIS to revise the grazing regulations, BLM used the abstraction called "lifeways" .  <u>This distinction needs to be clearly drawn.</u>  It appears BLM is trying to draw in "lifestyle" or "lifeways" as some sort of cultural feature that is given protection by the cultural preservation laws and SHPOs.  This is not the intent of these laws or NEPA.  If it were, would not "lifestyles" or "lifeways" other than livestock production also deserve protection, consideration and analysis?

NEPA, at 40 CFR 1501.2 (b) states that federal agencies must *"Identify environmental effects and values in adequate detail so they can be compared to economic and technical analysis."* 43 CFR 1601.0-5(f) defines Multiple Use as: *"Multiple use means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the lands for some or all of these*

18

*resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some lands for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the lands and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output."*

FLPMA requires BLM to manage the public lands for multiple use.  This means that the agency must make *"the most judicious use of the land for some or all of [the various] resource values . . . [and to] use . . . some land for less than all of the resources . . . ."* 43 U.S.C. § 1702(c).  This requires BLM to undertake a decision process *"to balance competing resource values to ensure that the public lands are managed in a manner 'that will best meet the present and future needs of the American people.'"* 43 U.S.C. § 1702(c); Comb Wash at 101.  BLM's balancing of values must be reasoned and well-informed.  Therefore, the agency must accumulate sufficient data and consider relevant rigorous science to determine what uses are appropriate in any given area.

Applied to the management of livestock grazing, the analysis must, on a site-specific level, weigh the benefits and harms of grazing to determine if BLM should allow this use in any given area.  Moreover, should the agency conclude that livestock grazing is an appropriate use, BLM must consider multiple-use values in determining how that area should be grazed.  National Wildlife Fed'n v. BLM, No. UT-06-91-1 (DOI, Office of Hearings and Appeals, Hearings Div.) (Dec. 20, 1993) at 25, *aff'd* Comb Wash (*citing* 43 U.S.C. §§ 1701(a)(8), 1702(c)).  Therefore, in establishing grazing thresholds such as stocking rates and utilization levels, BLM is required to abide by *"FLPMA's mandate [that it] protect the full spectrum of environmental, ecological, cultural, and recreational values."* Id.

Other than asserting in various ways that continued livestock grazing at current levels provides for preservation of rural values and lifestyles, BLM generally does not provide any economic analysis of the costs and benefits of public lands livestock grazing and its contribution to local and regional economies.  It does not analyze the values of uses foregone in favor of livestock grazing and its infrastructure.  See the detailed and quantitative analysis by Dr. Power in (Wuerthner and Matteson 2002) that is referenced above.

Dr. Power shows that *"Livestock grazing on federal lands is generally unimportant to local economies and even less so to state and regional economies.  In terms of income and numbers of jobs provided, the contribution of federal lands grazing is less than 0.1% across the West.  Farm and ranch operations are increasingly reliant on nonfarm income sources to be financially feasible, while livestock grazing competes with other uses of public lands – such as clean water, recreation, wildlife habitat – that contribute to the ongoing vitality of western economies."*

In his analysis of the economies of  individual rural counties, Dr. Power showed that federal lands grazing does not contribute significantly to those economies across the

19

west.  In fact, given the high percentage of ranching families that have jobs, either full or part time outside the ranch (60 – 70%), it is ranchers that depend on the other economic sectors for their ability to persist, not federal grazing.  Dr. Power states, *"It is not that towns depend on agriculture, but that agriculture increasingly depends on the vitality of urban and nonagricultural rural economies to provide the nonfarm income that keeps farm operations alive."*

Dr. Power states that claims about the relative importance of federal grazing to the economies of western states can be analyzed by answering these questions:

1. "What portion of the value produced by cattle and sheep operations is associated with feed used?

2. What portion of the feed for those cattle and sheep operations comes from grazing on federal lands?

3. What portion of the total agricultural activity involves raising cattle and sheep?

4. What part of the total economy is represented by agriculture."

Souder (1997) analyzed the economics of livestock grazing in the Central Winter Ecosystem Management Area on the Kaibab Plateau using readily available economic data.  His analysis showed the values of various activities in the study area generated values that are tabulated in Table 7.

**Table 7.  Summary of Values Received Annually in the Central Winter EMA**

| Resource | Local Benefits |
|---|---|
| Dispersed Recreation | $6,400,000 (Locally and Regionally) |
| Hunting Mule Deer and Turkey | $719,392 (Mule Deer = $470,528) |
| Livestock Grazing | $43,283 |
| Fuelwood Gathering | $45,492 |

BLM should include consideration and analysis of these sources in its planning and grazing-related project proposals and also provide more analysis of the economic benefits of wildlife through hunting, fishing and wildlife-watching associated recreation.  These benefits are summarized in the Fish and Wildlife Service *2001 National Survey of Fishing, Hunting and Wildlife-Watching Associated Recreation* (DOI 2002).  That survey showed that in Wyoming alone, expenditures for hunting, fishing and wildlife-associated recreation were $634,049,000.00 in 2001

**2.6 Grazing Capability and Suitability Determinations**.  Current range science recommendations include adjusting the stocking rate for livestock in order to account for distance from water and steepness of slope (Holechek et al, 2001).  The Natural Resources Conservation Service has adopted these guidelines for slope adjustments (Galt et al, 2000).  Their suggested reductions in grazing capacity for cattle with distance to water and increasing slope are provided in Table 8.

They note that on cold desert ranges of the U.S., snow reduces water availability problems in winter.  Also, sheep do not require water every day and can use areas further than 2 miles from water.  Sheep on New Mexico winter ranges used slopes of less than 45% with no adjustment necessary for slope, whereas slopes greater than 45% were hardly used.  Regional criteria for the Intermountain Region of the Forest

BLM_0147309

Service designate lands with greater than 30% slope as not capable for cattle and greater than 45% slope as not capable for sheep. Other factors used by the Intermountain Region of the Forest Service for determining lands that are not capable include: current vegetation production less than 200 lb/acre, forested areas and areas with highly erodible soils (Blackwell 2001; USDA 2001).

**Table 7.  Adjustments for Distance to Water and Slope for Cattle (Galt et al, 2000)**

| Distance from Water miles | Percent Reduction in Grazing Capacity |
|---|---|
| 0 – 1 | 0 |
| 1 – 2 | 50 |
| >2 | 100 |
| *Slope %* | |
| 0 – 10 | 0 |
| 11 – 30 | 30 |
| 31 – 60 | 60 |
| >60 | 100 |

Suitability determinations should be performed on those lands that are found capable for livestock to determine whether or not livestock grazing should be allowed. For example, important or critical fish and wildlife habitat, recreation areas, locations of sensitive populations, natural research areas, watershed protection areas among others should not be considered suitable and should be closed to livestock. These capability and suitability determinations are critical components in meeting the definitions and mandates of FLPMA, PRIA and NEPA regarding sustainability and multiple use. See also the discussion in the previous section regarding balancing of resource uses and values.

## 3.0  Management Recommendations for Uplands

It is critical for BLM to incorporate the science we have cited in its analysis for planning and grazing-related project documents to ensure that best available science is applied on the ground. In this way, it may be possible to sustain livestock grazing on those lands that are capable and suitable. The following steps should be implemented in each of these efforts.

**3.1  Literature Review.**  Review the literature on the effects of grazing livestock in arid environments. This review should address the effects of different levels of grazing intensity (stocking rate), grazing systems, range improvements and livestock exclusion on upland habitats. It should include an evaluation of their effects on maintenance, productivity and recovery rates of native plants and soil communities. It should also review the use of various standards, indicators and monitoring methods used to manage grazing and their ability to accurately and timely assess and be representative of plant and soil community characteristics.

BLM_0147310

**3.2 <u>Determine Soil and Plant Community Status</u>.** Using GIS, map all vegetation, range site types and soil types on BLM lands in the affected areas. Design and carry out a science-based review of existing information and a field survey to accurately assess current conditions in the plant and soil community. This survey should determine the distribution of plant species, their ground cover and production. It should do this by allotment, pasture and range site (soil) type. Survey locations should be selected to incorporate distance to the nearest source of water so effects due to proximity to water can be determined. The survey should also include considerations of slope in order to assess the interaction of susceptibility to erosion based on slope and proximity to water sources. Results should be analyzed in the context of past grazing management including type of livestock, seasons of use and grazing intensity. Summarize historical actual use records and grazing systems for each allotment to provide a basis for evaluating proposed actions.

**3.3 <u>Determine Capable and Suitable Acres for Livestock Grazing</u>.** Based on the science we have provided and criteria we have discussed (slope, distance to water, forage production, hazard of erosion, etc), establish a protocol for determining capable and suitable lands for livestock grazing. This protocol should include a recovery prescription for lands that are severely depleted of their native herbaceous plant communities or have bare ground exceeding thresholds that lead to accelerated erosion.

**3.3 <u>Determine a Sustainable Livestock Stocking Rate</u>.** Establish the percent of diets of domestic sheep, cattle, deer, elk, pronghorn and sage grouse that are grasses, forbs and shrubs and their seasonal variation in selection of these foods. We suggest information from Holechek et al (2001) as a starting point. Using this information and the population management goals for wildlife, calculate wildlife needs. This should include the stubble height and other criteria established in Braun et al (1977) and Connelly et al (2000). Based on the information we provided in section **2.0** above, and the limitations on use of perennial grasses established by the scientific review, calculate the available AUMs of palatable native forage grasses, forbs and shrubs that can be utilized by livestock without impairment of plant productivity. Use this analysis to determine livestock stocking rates for each allotment and pasture for normal and dry precipitation years. Livestock numbers should not be increased during above normal precipitation years to allow for improvement of plant and soil conditions.

**3.4 <u>Develop a Systematic Monitoring Protocol</u>.** Based on the science we have referenced here, develop a systematic monitoring protocol for assessing livestock use (forage amount) in a timely manner to avoid over use of any pasture. The timing of measurement must be established relative to the permitted grazing season of use. It is critical that during the early years of application, these must be assessed frequently in order to ascertain the length of time livestock may remain in each pasture before excessive use occurs. This information will lead to establishment of realistic grazing schedules that lower the risk of excessive livestock grazing and damage. If indicators such as stubble height are proposed, they must also have a demonstrated relationship to actual percent use on grasses, forbs and shrubs by field testing.

22

BLM_0147311

**3.5  Determine Recovery Prescriptions for Lands Below Potential.**  Analyze peer-reviewed science and government publications we have referenced as well as others that have specifically evaluated different grazing scenarios and their ability to recover native components of damaged arid lands to their potential.  Use this information to develop recovery prescriptions for allotments and pastures that are not at potential (based on their departure from potential species distribution, ground cover and productivity).  Prescriptions that should be evaluated should include options such as (a) long-term rest, (b) reduced stocking rates, (c) grazing systems, (d) reseeding with native species, (e) vegetation treatments and others.  The time required for recovery of potential should be evaluated for each method.

**3.6  Determine Impacts of Water Developments.**  Water developments have been used for decades on the promise that they would result in better livestock distribution and improvement in conditions on the ground.  BLM has never quantitatively assessed these claims.  It is critical that BLM provide this analysis based on evidence from the literature and its own survey of conditions in Wyoming.  The analysis described in sections **3.1** and **3.2** above should include an element that locates and maps all water developments in the area of interest.  Based on field surveys combined with historical range data and satellite imagery, determine the impacts and/or benefits of these past water developments on upland plant communities and soils.  The effects of these water developments on their source waters (spring, stream or seep) and associated wetland habitats should be assessed, documented and reported in each project analysis.

## 4.0  Management Recommendations for Riparian Areas

BLM must provide assured protection of springs, streams, riparian areas and wetlands as these areas are highest in wildlife values, yet occupy only a small land area.  While continuing to propose additional water developments and grazing systems as means of protecting riparian areas, BLM does not provide scientific evidence that the values of these areas are actually protected by these methods.  The evidence in the government and scientific literature is that excluding livestock from riparian areas is the only effective method of protection and recovery.  According to FLPMA, BLM is to "accelerate" recovery through its management options.

Don Duff (1977) published results of studies that showed greater fish and vegetation production and stream bank recovery occurred within exclosures on Big Creek, Utah than outside in grazed areas.  In fact, he stated that conditions outside the exclosures continued to decline.  He concluded that 6 to >8 years of rest were necessary to restore aquatic and riparian habitat.  Even after 30 years of excluding livestock, sediment from uplands and riparian areas outside the exclosures continues to impair salmonid spawning, rearing and feeding substrates.  The literature is consistent in showing that exclusion of livestock from riparian areas is the most effective method of restoring their ecological integrity.  There is little evidence that continued livestock grazing of degraded streams under various management schemes or at any level leads to recovery of habitat attributes required for native fish and wildlife.  BLM must objectively evaluate its alternatives to livestock exclosures in the literature review proposed in paragraphs (4.1) and (4.7) below and include those evaluations and the science upon which they are based in its project analysis.

23

We are concerned over the lack of quantitative monitoring of streams, springs and riparian areas. Some of the limitations of the current BLM PFC assessment technique are discussed in Stevens et al (2002). BLM has not provided any systematic protocol for this monitoring and in general does not assess spring or wetland conditions. We are concerned that reliance will be placed on stubble heights without providing any evidence that, in arid ecosystems, use of this standard promotes recovery of critical habitat elements in damaged stream or wetland systems, or for that matter, prevents degradation of those attributes.

If stubble height is used, it must be correlated with percent riparian vegetation use and a stubble height standard set so that livestock use is kept within constraints that do not lead to lowered production of riparian vegetation in future years. In addition, it must be shown to be protective of stream bank integrity through comparison to percent bank trampling, bank erosion and bank stability. The literature review we propose in section **4.1** should address these issues, establish and justify riparian utilization standards and bank trampling standards that are protective of stream banks and riparian vegetation. This analysis of this and other issues presented below must be incorporated into each project analysis.

**4.1  Literature Review.**  Review the literature on the effects of livestock grazing, grazing systems, range improvements and livestock exclusion on stream, spring and riparian habitats, their maintenance and recovery as well as water quality. Carter (2001) reviews the effects of livestock grazing on riparian areas and water quality. This report is available on line at:

http://www.westernwatersheds.org/reports/grazeWQ_JCarter/WQWWP.doc

Review the use of various indicators such as riparian stubble height and bank trampling measures, their application and relation to stream bank stability, riparian vegetation productivity, in-stream aquatic habitat and restoration rates. This review will incorporate analysis of the literature we have referenced in addition to any sources BLM and its consultant may provide.

**4.2  Assessment of Current Condition of Springs, Seeps and Wetlands.**  Locate and map all springs and wetlands not associated with perennial streams on BLM lands in the project area. Photograph and describe each, document whether and how they have been modified for water developments and if so, whether the development is still functioning. Assess their current condition, wetland extent (area) and flow using photographs and DOI (1994). These habitats should be surveyed to establish a current baseline. The surveys should also be repeated during each permit mid-term and one year prior to permit renewal. Conduct the baseline mapping, analysis and photographs for each project.

**4.3  Develop a Monitoring Protocol for Springs, Seeps and Wetlands.**  Based on the science reviewed in section **4.1**, develop a systematic monitoring protocol for livestock use of riparian/wetland herbaceous vegetation at springs, streams and wetlands. This assessment protocol will:

    a  Establish stubble height and livestock trampling standards and assess these effects at each spring and wetland area and at multiple locations on each

24

flowing stream within each pasture.  A defined protocol should specify the number of measurements to be taken at each location, the length of stream reach to assess and a method to evaluate trampling damage to springs and wetlands.

b   Measure percent use of riparian grasses, not sedges.  These measurements will be taken in the riparian zone outside the stream channel, not along the greenline.

c   Monitor water quality for conformance to standards

d   Establish a schedule for each allotment/pasture that measures these parameters no later than 3 weeks after livestock enter a particular pasture or allotment subdivision.  It is important to measure these use levels early in the grazing period so stocking rates and management can be adjusted in a timely manner to prevent exceeding the standards.  Accelerated measurements during the first year, in particular, are necessary to refine the grazing schedule and stocking rate for future years.

e   Record the data, also including allotment, pasture, location designation, turn-in date, monitoring date, riparian species measured, percent bank trampling, eroding banks, percent area trampled (springs and wetlands) and stubble heights.  Record raw data on prepared forms so that means and standard deviations can be calculated.  Enter this information into an electronic database that can be regularly updated following each monitoring event and is accessible to interested parties either on-line or by request.

**4.4  <u>Assessment of Current Condition of Streams</u>.**  Based on best available science, describe a methodology and schedule for performing stream habitat and water quality surveys.  This should include analysis of existing data and collection of baseline habitat and water quality data, maps and photographs that will be included in each project analysis.

**4.5  <u>Develop Stream and Water Quality Monitoring Protocol</u>.**  In addition to the baseline survey, the project analysis should develop a monitoring protocol that provides for assessment of stream habitat and water quality during succeeding permit terms near the permit or lease mid-term and the year prior to renewal. This monitoring protocol should continue to include PFC assessments using DOI (1993) as modified by Stevens et al (2002).  Winward (2000) also provides insight into stream and riparian monitoring technology.  Any of these protocols must be supplemented by collecting additional data that quantitatively documents certain critical stream habitat conditions.  We suggest the Rosgen method, USDA (1992, 1997) or other acceptable fish habitat survey protocols.  Regardless of method, certain critical pieces of information must be collected to supplement PFC assessments.  The literature should be reviewed and analyzed and details of methodologies, data management, reporting and public access explained.  This critical supplemental data includes:

a.   Establishing permanent, marked stream cross-section survey points for determining channel profile, width and depth similar to those used by Duff (1977).  Priority locations are in Rosgen Type "C" channels, if available and should encompass a complete meander with multiple cross-sections (minimum 3 at each reach).  These channel surveys and the following data must be collected for a minimum of two reaches of each perennial stream in each pasture.

25

BLM_0147314

b. Bank condition surveys including measurement of the following parameters over a minimum 100' stream reach or full meander on both sides of the stream (Winward, 2000, recommends 363 feet). Bank condition parameters (i – iv_ will be assessed from the water line to the top of the bank, not at the greenline:

    i. the linear feet of stream banks that are vegetated/stable
    ii. the linear feet of stream banks that are vegetated/unstable
    iii. the linear feet of stream banks that are unvegetated/stable
    iv. the linear feet of stream banks that are unvegetated/unstable
    v. the linear feet of stream banks that are undercut
    vi. the linear feet of stream bank with overhanging vegetation.

c. During the baseline survey, and during succeeding permit terms, at permit mid-term and last permit year, collect triplicate MacNeil Core Sediment samples of salmonid spawning gravels (<2") near the downstream extent of each stream in each pasture. Based on the literature, establish criteria for sediment fines (<6.35 mm) as a percent of substrate that allows successful salmonid reproduction. Generally, levels of sediment fines above 30% result in significant mortality of eggs and larvae.

d. Data collected will be systematic and quantitative in order that statistical analysis can be employed. All data will be entered into an electronic database for access by interested parties.

Describe the monitoring protocols. This description will include: the actual methodologies, data entry forms, schedules and locations; provide maps of all locations for monitoring; and incorporate an electronic database with links to maps that is accessible to the interested public. Include the baseline data in each project analysis. BLM must show it has the capability, either with its own staff or outside contractors, to do the necessary monitoring to ensure recovery and prevention of future degradation.

**4.6 <u>Develop Stream, Spring and Wetland Recovery Prescriptions</u>.** For streams, springs and wetlands that are not functioning properly and/or have impaired water quality, analyze available methods for their recovery. Include an anticipated time frame for recovery to take place based on the scientific literature. Discuss and evaluate these options for recovery, including their costs and benefits and review the scientific literature provided. Methods for recovery should include consideration of: (a) closing pastures; (b) exclosure fencing; (c) removal of water developments; (d) restoration/replanting of riparian areas; (e) active herding to minimize livestock use; (f) removal of livestock when utilization standards are reached, and any other methods discovered in the literature. Propose and adopt methods that will best recover these degraded streams during the first permit term. In the on-going permitting, management and monitoring of livestock grazing, the land use plan and permit documents should require documentation of condition and recovery rates by implementation of the described monitoring program. These will be analyzed to demonstrate the changes resulting from application of the particular prescription or combinations of methods adopted.

26

BLM_0147315

Yours truly,

*John G. Carter*

John Carter
Utah Director

## 5.0 References

All references listed are incorporated into our comments and should be used by BLM in its planning and livestock-related project analyses.

Anderson, David C., Kimball T. Harper and Ralph C. Holmgren. 1982. Factors influencing development of cryptogammic soil crusts in Utah deserts. Journal of Range Management 35(2):180-185.

Anderson, Jay E. and Karl L. Holte. 1981. Vegetation development over 25 years without grazing on sagebrush-dominated rangelands in southeastern Idaho. Journal of Range Management 34(1):25-29

Anderson, Jay E. and Richard S. Inouye. 2001. Landscape-scale changes in plant species abundance and biodiversity of a sagebrush steppe over 45 years. Ecological Monographs 71(4):531-556.

Armour, C.L., D.A. Duff and W. Elmore. 1991. The effects of livestock grazing on riparian and stream ecosystems. Fisheries 16(1): 7 – 11.

Austin, Miriam. 2003a. Water developments and wildlife. Violating the public trust. Red Willow Research.

Austin, Miriam. 2003b. BLM Pleasantview allotment wildlife deaths, 2003. Red Willow Research.

Bartos, Dale L. and Robert B. Campbell, Jr. 1998a. Water depletion and other ecosystem values forfeited when conifer forests displace aspen communities. Rangeland Management and Water Resources of American Water Works Association. May 1998: 427-433.

Bartos, Dale L. and Robert B. Campbell, Jr. 1998b. Decline of Quaking Aspen in the Interior West – Examples from Utah. Rangelands 20(1):17-24.

Beck, Jeffrey, L. and Dean L. Mitchell. 2000. Influences of livestock grazing on sage grouse habitat. Wildlife Society Bulletin 28(4):993-1002.

Belnap, Jayne. 1995. Surface disturbances: their role in accelerating desertification. Environmental Monitoring and Assessment 37:39-57.

BLM_0147316

Belnap, Jayne.  1996.  Soil surface disturbances in cold deserts:  effects on nitrogenase activity in cyanobacterial-lichen soil crusts.  Biology and Fertility of Soils 23:362-367.

Belnap, Jayne and D. A. Gillette.  1997.  Disturbance of biological soil crusts:  impacts on potential wind erodibility of sandy desert soils in southeastern Utah.  Land Degradation and Development 8:355-362.

Belnap, Jayne, Roger Rosentreter, Steve Leonard, Julie H. Kaltnecker, John Williams and David Eldridge.  2001.  Biological soil crusts:  ecology and management.  U.S. D.O.I.  Bureau of Land Management Technical Reference 1730-2.

Belsky, A.J., A. Matzke, and S. Uselman. 1999. Survey of livestock influences on stream and riparian ecosystems in the western United States.  Journal of Soil and Water Conservation 54(1): 419-431.

Belsky, A. Joy and Dana M. Blumenthal.  1997.  Effects of livestock grazing on stand dynamics and soils in upland forests of the Interior West.  Conservation Biology 11(2):315-327.

Belsky, A. Joy, and Jonathan L. Gelbard.  2000.  Livestock Grazing and Weed Invasions in the Arid West.  A Scientific Report Published by the Oregon Natural Desert Association.  Portland, Oregon.

Beymer, Renee J. and Jeffrey M. Klopatek.  1992. Effects of grazing on cryptogamic crusts in pinyon-juniper woodlands in Grand Canyon National Park.  American Midland Naturalist 127:139-148.

Blaisdell, James P. and Ralph C. Holmgren.  1984.  Managing Intermountain Rangelands – Salt-Desert Shrub Ranges.  USDA Forest Service, Intermountain Forest and Range Experiment Station, Ogden, Utah.  General Technical Report INT-163. 52p.

Blackwell, Jack.  2001.  Letter on capability and suitability.  Regional Forester, Intermountain Region.

BLM.  1994.  Rangeland Reform '94 Draft Environmental Impact Statement.

BLM.  2003.  Proposed Revisions to Grazing Regulations for the Public Lands, Draft Environmental Impact Statement DES 03-62.

Bock, Carl E., Jane H. Bock, William R. Kenney and Vernon M. Hawthorne.  1984. Responses of birds, rodents and vegetation to livestock exclosure in a semidesert grassland site.  Journal of Range Management 37(3):239-242.

Brotherson, Jack D., Samuel R. Rushforth, and Jeffrey R. Johansen.  1983.  Effects of long term grazing on cryptogam crust cover in Navajo National Monument, Ariz. Journal of Range Management 36(5):579-581.

BLM_0147317

Braun, Clait E.  1977.  Guidelines for maintenance of sage grouse habitat.  Wildlife Society Bulletin 5(3):99-105.

Brotherson, Jack D., Samuel R. Rushforth and Jeffrey R. Johansen.  1983.  Effects of long-term grazing on cryptogam crust cover in Navajo National Monument, Ariz.  Journal of Range Management 36(5):579-581.

Bryant, H.T., R.E. Blaser, and J.R. Peterson.  1972.  Effect of trampling by cattle on bluegrass yield and soil compaction of a Meadowville loam.  Agronomy Journal. 64:331-334.

Carlson, Cathy and John Horning.  1992.  Big profits at a big price – Public Land ranchers profit at the expense of the range.  Publication No. 79950, National Wildlife Federation, 1400 Sixteenth St. N.W. Washington, D.C. 64p.

Carter, John. 1998.  Investigation of Spawn Creek, Utah Coliform Contamination and Stream Bank Stability in Relation to Cattle Grazing.  Willow Creek Ecology report.

Carter, John G.  2001.  Livestock and water quality.  Western Watersheds Project Report.

Catlin, James, Joro Walker, Allison Jone, John Carter and Joe Feller.  2003.  Multiple use grazing management in the Grand Staircase National Monument.  A tool provided to the Monument range staff by the Southern Utah Land Restoration Project.

Clary Warren and Bert Webster. 1989. Managing grazing of riparian areas in the Intermountain Region. Intermountain Research Station, Forest Service. General Technical Report INT-263

Cummins, K.W. and George L. Spengler.  1977. Stream ecosystems.  Water Spectrum. 10:1-9.

Cummins, K. W. 1974.  Stream ecosystem structure and function.  Bioscience 24:631-641.

Connelly, John W., Michael A. Schroeder, Alan R. Sands and Clait E. Braun.  2000.  Guidelines to manage sage grouse populations and their habitats.  Wildlife Society Bulletin 28(4):967-985.

Cottam, Walter P.  1947.  Is Utah Sahara bound?  Bulletin of the University of Utah 37(11):1-41.

Crider, Franklin J.  1955.  Root-growth stoppage resulting from defoliation of grass.  Technical Bulleting No. 1102.  USDA Soil Conservation Service.  23p

D'Antonio, C. M. and P. M. Vitousek.  1992.  Biological invasions by exotic grasses, the grass/fire cycle, and global change.  Annual Review of Ecology and Systematics 23:63-87.

BLM_0147318

Danvir, Rick.  Ca2003 (undated).  Sage grouse ecology and management in northern Utah sagebrush-steppe.  Deseret Land and Livestock, Woodruff, Utah.

Dodge, Marvin.  1972.  Forest fuel accumulation – a growing problem.  Science 177:139-142.

DOI.  1993.  Riparian Area Management:  Process for Assessing Proper Functioning Condition.  Department of Interior, BLM TR 1737-9.

DOI.  1994.  Riparian Area Management:  Process for Assessing Proper Functioning Condition for Lentic Riparian-Wetland Areas.  Department of Interior,  BLM TR 1737-11.

Donahue, Debra L.  1999.  The western range revisited – removing livestock from public lands to conserve native biodiversity.  University of Oklahoma Press, Norman.

Duff, D. A.  1977.  Livestock grazing impacts on aquatic habitat in Big Creek, Utah.  In:  Proceedings of the Workshop on Livestock and Wildlife-Fisheries Relationships in the Great Basin.  University of California Agric. Station, Sci. Spec. Publication 3301.  Berkeley, California.

Duff, Donald A. 1979.  Riparian habitat recovery on Big Creek, Rich County, Utah.  In Proceedings: Forum – Grazing and Riparian/Stream Ecosystems.  Trout Unlimited, Inc. 91 p.

Dyksterhuis, E. J.  1949.  Condition and management of range land based on quantitative ecology.  Journal of Range Management 2:104-115.

Ecosystem Research Institute.  1984.  1983 Annual Report Ecosystem Analysis.  Report to White River Shale Oil Corporation, Salt Lake City, Utah.  106p. Report available thru Western Watersheds Project Utah Office at P.O. Box 280, Mendon, Utah 84325.

EPA. 1998b. The quality of our Nation's water: 1996 – Executive Summary of the National Water Quality Inventory: 1996 Report to Congress.  EPA841-S-97-001 Office of Water, U.S. Environmental Protection Agency, Washington, D.C.

EPA. 1976.  Quality criteria for water, July 1976.  Fecal coliform bacteria.  U.S. Environmental Protection Agency, Washigton, D.C.: 42-50

Evanko, Anthony B. and Roald A. Peterson. 1955.  Comparisons of protected and grazed mountain rangelands in southwestern Arizona.  Ecology 36(1):71-82.

Fleischner, Thomas L.  1994.  Ecological costs of livestock grazing in western North America.  Conservation Biology 8(3):629-644.

GAO.  1988. Rangeland management:  more emphasis needed on declining and overstocked grazing allotments.  U.S. General Accounting Office, GAO/RCED-88-80, Washington, D.C.

30

BLM_0147319

GAO.  1991.  Public land management:  attention to wildlife is limited.  GAO/RCED-91-64

GAO.  1995.  Animal waste managment and water quality issues.  Publication no. GAO/RCED-95-200BR.  97pp.  General Accounting Office, Washington, D.C.

Galt, Dee, Greg Mendez, Jerry Holechek and Jamus Joseph.  1999.  Heavy winter grazing reduces forage production:  an observation.  Rangelands 21(4):18-21

Galt, Dee, Francisco Molinar, Joe Navarro, Jamus Joseph and Jerry Holechek.  2000. Grazing capacity and stocking rate.  Rangelands 22(6):7-11.

Green, D. M. and J. B. Kauffman.  1995.  Succession and livestock grazing in a northeastern Oregon riparian ecosystem.  Journal of Range Management 48:307-313.

Gregory, Stanley V., Frederick J. Swanson, W. Arthur McKee and Kenneth W. Cummins.  1991.  An ecosystem perspective of riparian zones.  Bioscience 41(8): 540-550.

Hanley, T. H. and J. L. Page.  1981.  Differential effects of livestock use on habitat structure and rodent populations.  California Fish and Game 68:160-173.

Harper, K. T., R. Van Buren, and S. Kitchen.  1996.  Invasion of alien annuals and ecological consequences in salt desert shrublands of western Utah.  Pages 58 -65 in J. R. Barrow, E. Durant, R.E. Sosebee and R. J. Tausch, editors.  Proceedings: Shrubland ecosystem dynamics in a changing environment.  General Technical Report-338.  U.S. Forest Service Intermountain Research Station, Ogden, Utah.

Hild, A.L., M.G. Karl, M.R. Heferkamp and R.K. Heitschmidt.  2001.  Drought and grazing III:  root dynamics and germinable seed bank.  Journal of Range Management 54(3):292-298.

Hobbs, R. J. and L. F. Huenneke.  1992.  Disturbance, diversity, and invasion: implications for conservation.  Conservation Biology 6:324-337.

Hockett, Glenn A.  2002.  Livestock impacts on the herbaceous components of sage grouse habitat:  a review.  Intermountain Journal of Sciences Vol 8(2):105-114.

Hoffman, L., and R.E. Ries.  1991.  Relationship of soil and plant characteristics to erosion and runoff on pasture and range.  Journal of Soil and Water Conservation, p. 143-147.

Holechek, Jerry L.  1996a.  Financial returns and range condition on southern New Mexico ranches.  Rangelands 18(2):52-56

Holechek, Jerry L.  1996b.  Drought and low cattle prices:  hardship for New Mexico ranchers.  Rangelands 18(1):11-13.

Holechek, Jerry L. and Karl Hess, Jr.  1996c.  Grazing lands: prices, value, and the future.  Rangelands 18(3):102-105

BLM_0147320

Holechek, Jerry L., Hilton de Souza Gomes, Francisco Molinar and Dee Galt. 1998. Grazing intensity: critique and approach. Rangelands 20(5):15-18

Holechek, Jerry L., Hilton Gomez, Francisco Molinar and Dee Galt. 1999a. Grazing studies: what we've learned. Rangelands 21(2):12-16

Holechek, Jerry L., Milton Thomas, Francisco Molinar and Dee Galt. 1999b. Stocking desert rangelands: what we've learned. Rangelands 21(6):8-12

Holechek, Jerry L., Hilton Gomez, Francisco Molinar, Dee Galt and Raul Valdez. 2000. Short-duration grazing: The facts in 1999. Rangelands 22(1):18-22.

Holechek, Jerry L., Rex D. Pieper and Carlton H. Herbel. 2001.Range Management: Principles and Practices, Fourth Edition. Prentice-Hall, New Jersey. 587p

Howard, Gary L., Steven R. Johnson and Stanley L. Ponce. 1983. Cattle grazing impact on surface water quality in a Colorado front range stream. J. Soil and Water Conservation. March-April 1983:124-128.

Hubbard, R.K., D.L. Thomas, R.A. Leonard and J.L. Butler. 1987. Surface runoff and shallow ground water quality as affected by center pivot applied dairy cattle wastes. Trans. ASAE 30(2):430-437.

Hutchings, S.S. and G. Stewart. 1953. Increasing forage yields and sheep production on Intermountain winter ranges. U.S. Department of Agriculture Circular 925. 63p.

Jacobs, Lynn. 1991. Waste of the West.

Johansen, Jeffrey R. 1993. Cryptogamic crusts of semiarid and arid lands of North America. Journal of Phycology 29:140-147.

Jones, Allison. 2000. Effects of cattle grazing on North American arid ecosystems: a quantitative review. Western North American Naturalist 60(2):155-163.

Jones, Allison L and William S. Longland. 1999. Effects of cattle grazing on salt desert rodent communities. The American Midland Naturalist. 141(1):1-11.

Julander, Odell. 1962. Range management in relation to mule deer habitat and herd productivity in Utah. Journal of Range Management 15(5):278-281.

Kauffman, J. Boone and W.C. Kreuger. 1984. Livestock impacts on riparian ecosystems and streamside management implications – a review. Journal of Range Managment 37(5): 430 – 437.

Kay, Charles E. and Dale L. Bartos. 2000. Ungulate herbivory on Utah aspen: assessment of long-term exclosures. Journal of Range Management 53(2):145-153.

BLM_0147321

Kay, Charles E.  2001.  The condition and trend of aspen communities on BLM administered lands in central Nevada – with recommendations for management.  Final Report to Battle Mountain Field Office, Bureau of Land Management.

Kie, John G.  1996.  The effects of cattle grazing on optimal foraging in mule deer (Odocoileus hemionus).  Forest Ecology and Management 88:131-138.

Kleiner, Edgar F. and K. T. Harper.  1972.  Environment and community organization in grasslands of Canyonlands National Park.  Ecology 53(2):299-309.

Knick, Steven T., David S. Dobkin, John T. Rotenberry, Michael A. Shroeder, W. Matthew Vander Haegen and Charles Van Riper III.  2003.  Teetering on the edge or too late?  Conservation and research issues for avifauna of sagebrush habitats.  The Condor 105:611-634.

Knopf, Fritz L., James A. Sedgwick and Richard W. Cannon.  1988.  Guild structure of a riparian avifauna relative to seasonal cattle grazing.  Journal of Wildlife Management 52(2):280-290.

Kreuger, William C. and A. H. Winward.  1974.  Influence of cattle and big-game grazing on understory structure of a Douglas-fir Ponderosa Pine- Kentucky bluegrass community.  Journal of Range Management 27(6):450-453.

Kreuper, David, Jonathan Bart and Terrell D. Rich.  2003.  Response of vegetation and breeding birds to the removal of cattle on the San Pedro River, Arizona (USA).  Conservation Biology 17(2):607-615.

Lacey, J. R. 1987.  The influence of livestock grazing on weed establishment and spread.  Proceedings: Montana Academy of Science 47:131-146.

Lile, David F., Kenneth W. Tate, Donald L. Lancaster and Betsy M. Karle.  2003.  Stubble height standards for Sierra Nevada meadows can be difficult to meet.  California Agriculture, 57(2):60-64.

Loft, Eric R., John W. Menke and John G. Kie.  1991.  Habitat shifts by mule deer: the influence of cattle grazing.  Journal of Wildlife Management.  55(1):16-26.

Loope, Walter L., and Neil E. West.  1979.  Vegetation in relation to environments of Canyonlands National Park.  In:  R. M. Linn (ed.) Proceedings of he First Conference on Scientific Research in the National Parks.  Vol. 1. U.S. Dept. of Interior, NPS Trans. And Proc. Series No. 5.

Lusby, Gregg C.  1979.  Effects of grazing on runoff and sediment yield from desert rangeland at Badger Wash in western Colorado, 1953-73.  U.S. Geological Survey Water Supply Paper 1532-1.

Lusby, Gregg C.  1970.  Hydrologic and biologic effects of grazing vs. non-grazing near Grand Junction, Colorado.  Journal of Range Management 23(4):256-260.

BLM_0147322

Mack, R. N. 1981.  Invasion of Bromus tectorum L.  into western North America:  An ecological chronicle.  Agro-ecosystems 7:145-165.

Mack, R. N. and J. N. Thompson.  1982.  Evolution in steppe with few large, hooved mammals.  American Naturalist 119:757-773.

Madany, Michael H. and Neil E. West.  1983.  Livestock grazing – fire regime interactions within montane forests of Zion National Park, Utah.  Ecology 64(4):661-667.

Marble, James R. and Kimball T. Harper.  1989.  Effect of timing of grazing on soil surface cryptogamic communities in a great basin low shrub desert:  a preliminary report.  Great Basin Naturalist 49(1):104-107.

Marcuson, Patrick E. 1977. Overgrazed streambanks depress fishery production in Rock Creek, Montana.  Fish and Game Federation Aid Program. F-20-R-21-11a.

Martin, John H. Jr. 1997. The Clean Water Act and animal agriculture.  J. Environmental Quality 26:1198-1203.

McKee, T.B., N.J. Doesken, and J. Kleist, 1993.  The relationship of drought frequency and duration ot time scales.  Eighth Conference on Applied Climatology, American Meteorological Society, Jan 17-23, 1993, Anaheim CA, pp. 179-186.

McLean, A. and E.W. Tisdale.  1972.  Recovery rate of depleted range sites under protection from grazing.  Journal of Range Management 25:178-184.

Medin, D. E., and W. P. Clary.  1990.  Small mammal populations in a grazed and ungrazed riparian habitat in Nevada.  Research Paper INT-413.  U.S. Forest Service, Intermountain Research Station, Ogden, Utah.

Moore, Elbert, Eric Janes, Floyd Kinsinger, Kenneth Pitney and John Sainsbury. 1979.  Livestock grazing management and water quality protection.  U.S. Environmental Protection Agency and the Bureau of Land Management.

National Research Council.  2002.  Riparian Areas: Functions and Strategies for Management,  National Research Council, Committee on Riparian Zone Functioning and Strategies for Management, Water Science and Technology Board, Board on Environmental Studies and Toxicology (National Academy Press, 2002).

NWF.  1997.  Comb Wash decision, National Wildlife Federation v. Bureau of Land Management, 140 IBLA 85 (Aug. 21, 1997)

Orr, Howard K.  1975.  Recovery from soil compaction on bluegrass range in the Black Hills.  Transactions of the ASAE 1076-1081.

Owens, L.B., W.M. Edwards and R.W. Van Keuren.  1996.  Sediment losses from a pastured watershed before and after stream fencing.  Journal of Soil and Water Conservation 51(1):90-94.

BLM_0147323

Packer, Paul. 1998.  Requirements for watershed protection on western mountain rangelands.  Unpublished manuscript.  Dr. Packer is retired from the USDA Intermountain Forest and Range Experiment Station, Logan, Utah.

Paige, Christine and Sharon A. Ritter.  1999.  Managing sagebrush habitats for bird communities.  Partners in Flight, Western Working Group, Boise, Idaho.

Pearce, Richard.  1988.  Where deer and cattle roam.  USDA Forest Service Pacific Southwest Research Station.

Pell, Alice N. 1997.  Manure and microbes:  public and animal health problem?  J. Dairy Sci. 80:2673-2681.

Peterjohn, W.T. and D. L. Correll.  1984.   Nutrient dynamics in an agricultural watershed:  observations of a riparian forest.  Ecology 65: 1466-1475

Platts, W. S. 1991.  Livestock Grazing. *In: Influence of Forest and Rangeland Management on Salmonid Fishes and Their Habitats.*  American Fisheries Society Special Publication 19:389-423.

Ratliff, Joe and Charles Keeports.  2000.  Surface water analysis and management recommendations for the Carico Lake Allotment.  U.S. Dept. of Interior Bureau of Land Management, Battle Mountain Field Office, Nevada.

Ray, D.E., A.M. Lane, C.B. Roubicek, and R.W. Rice.  2004.  Range beef herd growth statistics.  In: Arizona Rancher's Management Guide.  Arizona Cooperative Extension, College of Agriculture, University of Arizona.

Rosenzweig, M. L. and J. Winakur.  1969.  Population ecology of desert rodent communities:  habitats and environmental complexity.  Ecology 50:558-572.

Rummell, Robert S.  1951.  Some effects of livestock grazing on Ponderosa pine forest and range in central Washington.  Ecology 32(4):594-607.

Saxon, Keith E., Lloyd F. Elliott, Robert I. Papendick, Michael D. Jawson and David H. Fortier. 1983. Effect of animal grazing on water qualiyt of non-point runoff in the Pacific Northwest.  Project Summary, Robert S. Kerr Environmental Research Laboratory, Ada, Oklahoma.  EPA-600/S2-83-071. 7p.

Schepers, J.S., B.L. Hackes and D.D. Francis. 1982. Chemical water quality of runoff from grazing land in Nebraska:  II. contributing factors.  J.Environ. Qual., Vol 11(3):355-359.

Schulz, Terri T and Wayne C. Leininger.  1990.  Differences in riparian vegetation structure between grazed areas and exclosures.  Journal of Range Management 43(4):295-299.

Sharp, Lee A., Ken Sanders and Neil Rimbey.  1992.  Variability of crested wheatgrass production over 35 years.  Rangelands 14(3):153-168

35

BLM_0147324

Schwan, H.E., Donald J. Hodges and Clayton N. Weaver.  1949.  Influence of grazing and mulch on forage growth. Journal of Range Management 2(3):142-148.

Stevens, Lawrence E., Peter Stacey, Don Duff, Chad Gourley and James C. Catlin.  2002.  Riparian ecosystem evaluation:  a review and test of BLM's proper functioning condition assessment guidelines.

Stewart, Kelley M., R. Terry Bowyer, John G. Kie, Norman J. Cimon, and Bruce K. Johnson.  2002.  Temprospatial distributions of elk, mule deer, and cattle:  resource partitioning and competitive displacement.  Journal of Mammalogy.  83(1):229-244.

Souder, Jon A.  ca1997.  How Does Livestock Grazing Fit Into the Larger Societal Uses of Wildlands?  Methods for Determining Benefits and Their Application to the Kaibab Plateau.  College of Ecosystem Science and Management, Northern Arizona University.

Taylor, Daniel M.  1986.  Effects of cattle grazing on passerine birds nesting in riparian habitat.  Journal of Range Management 39(3):254-258.

Thelin, Richard and Gerald F. Gifford.  1983.  Fecal coliform release patterns from fecal material of cattle.  Journal of Environmenatl Quality 12(1):57-63.

Tiedemeann, A.R., D.A. Higgins, T.M. Quigley, H.R. Sanderson and D.B. Marx.  Responses of fecal coliform in streamwater to four grazing strategies.  Journal of Range Management 40(4):322-329.

Trimble, Stanley W. and Alexandra C. Mendel.  1995.  The cow as a geomorphic agent – a critical review.  Geomorphology 13:233-253.

USDA. 1981. America's soil and water:  condition and trends.  U.S. Department of Agriculture Soil Conservation Service, Washington, D.C. 33p.

USDA.  1982.  Soil Survey of Rich County Utah.  USDA Soil Conservation Service, Forest Service and Bureau of Land Management.

USDA. 1992.  Integrated riparian evaluation guide.  U.S. Department of Agriculture, Region IV Forest Service, Ogden, Utah.

USDA.  1993.  Monitoring data from the North Rich allotment, Logan Ranger District, Wasatch-Cache National Forest.

USDA.  1996.  Intermountain Regional Assessment: Properly Functioning Condition.  USDA Forest Service, Region IV, Ogden, Utah.

USDA.  1997.  R1/R4 (Northern/Intermountain Regions) Fish and Fish Habitat Standard Inventory Procedures Handbook.  USDA Forest Service General Technical Report INT-GTR-346.

UDWR.  1997.  Conservation Agreement and Strategy for Bonneville Cutthroat Trout in Utah.  Utah Division of Wildlife Resources Publication 97-19.

BLM_0147325

USDA.  1998.  Draft Sub-regional Assessment of Properly Functioning Condition for
Areas Encompassing the National Forests of Northern Utah.  USDA Forest Service,
Region IV, Ogden, Utah.

USDA.  2001. Process Paper I: rangeland capability and suitability for sheep and cattle
ranges.  Caribou National Forest.

USDA.  2002.  Final Environmental Impact Statement for the Curlew National
Grassland.  Caribou National Forest.

U.S. Department of Interior, U.S. Fish and Wildlife Service, U.S. Department of
Commerce and U. S. Census Bureau. 2002.  2001 National Survey of Fishing, Hunting
and Wildlife-Watching Associated Recreation.  170 p.

VanHaveren, Bruce P., Eric B. Janes and William L. Jackson.  1985.  Nonpoint
pollution control on public lands.  Journal of Soil and Water Conservation p.92-94.

Van Poollen, H.W. and  J. R. Lacey.  1979.  Herbage response to grazing systems and
stocking intensities.  Journal of Range Management 32:250-253.

Walker, Larry.  2002.  Impact of grazing on 153 species of southwestern birds.
http://rangenet.org/directory/walker/swbirds.html .

Wambolt, C.L., K.S. Walhof and M.R. Frisina.  2001.  Recovery of big sagebrush
communities after burning in south-western Montana.  Journal of Environmental
Management 61:243-252.

Welch, Bruce L.   2002 (in editing).  Big sagebrush:  A sea fragmented into lakes,
puddles, and ponds.  Gen. Tech. Rep. RMRS-GTR-___.  Fort Collins, CO:  U.S.
Department of Agriculture, Forest Service, Rocky Mountain Research Station:  ___p.
Data on file at the Shrub Sciences Laboratory, 735 N  500 E, Provo, Utah 84606.

Welch, Bruce L.  and Craig Criddle.  2003.  Countering misinformation concerning big
sagebrush. Forest Service Rocky Mountain Research Station Research Paper RMRS-
RP-40.

West, Neil E.  1981.  Nutrient cycling in desert ecosystems.  In:  Arid Land
Ecosystems:  Structure, Functioning and Management, Volume 2.  Cambridge
University Press.

West, Neil E.  1983.  Western Intermountain Sagebrush Steppe.  In Temperate Deserts
and Semi-deserts, edited by N. E. West.  Elsevier Scientific Publishing, Amsterdam.
p351-373.

White, Clifford A., Charles E. Olmstead and Charles E. Kay.  1998.  Aspen, elk and fire
in the Rocky Mountain national parks of North America.  Wildlife Society Bulletin
26(3):449-462.

White, Richard K., Robert W. VanKeuren, Lloyd B. Owens, William M. Edwards and
Roberty H. Miller. 1983. Effects of livestock pasturing on non-point surface runoff.

BLM_0147326

Project Summary, Robert S. Kerr Environmental Research Laboratory, Ada, Oklahoma.  EPA-600/S2-83-011. 6p.

White River Shale Oil Corporation.  1984.  Progress Report Environmental Programs 1983.  White River Shale Oil Corporation, Salt Lake City, Utah.  785p.  Report available thru Western Watersheds Project Utah Office at P.O. Box 280, Mendon, Utah 84325

Winward, Alma.  2000.  Monitoring the Vegetation Resources in Riparian Areas. USDA Forest Service General Technical Report RMRS-GTR-47

Winder, J.A., C.C. Bailey, M.G. Thomas and J.L. Holechek.  2000.  Breed and stocking rate effects on Chihuahuan Desert cattle production.   Journal of Range Management 53(1):32-38.

Wuerthner, George and Mollie Matteson. 2002. Welfare ranching: the subsidized destruction of the west.  Island Press.

Zimmerman, G. Thomas and L.F. Neuenschwander.  1984.  Livestock grazing influences on community structure, fire intensity, and fire frequency within the Douglas-fir/ninebark habitat type.  Journal of Range Management 37)2):104-110.

38

BLM_0147327

Case No. 1:20-cv-02484-MSK   Document 71-16   filed 04/29/21   USDC Colorado   pg 86 of 192

| **BACK** |

# APPENDIX B: A SCIENCE-BASED TOOL FOR ASSESSING AVAILABLE FORAGE AND GRAZING CAPACITY OF GSENM GRAZING ALLOTMENTS TO MEET RANGELAND HEALTH STANDARDS

**A tool provided to the GSENM range staff, provided by the Southern Utah Land Restoration Project**

**September, 2003**

**Lead Authors:**

**James Catlin,[1] John Carter,[2] and Allison Jones[1]**

BLM_0147328

Case No. 1:20-cv-02484-MSK  Document 71-16  filed 04/29/21  USDC Colorado  pg 87 of
192
Proposed Outline for Forage Analysis/Grazing Capacity Model Manuscript                    Page 2 of 28

# CHAPTER 1:  INTRODUCTION

For public lands that support livestock grazing, grazing permits focus on two key variables: the number of allowed livestock measured in animal unit months (AUM), and the season of grazing.  The number of AUMs granted in a permit is contingent on enough forage being available for the quantity of AUMs granted.  The decision regarding the number of AUMs to assign to an allotment requires an assessment of the average forage biomass produced in that allotment and then the assignment of a fraction of the total forage to domestic grazers.  This section of the guidance document develops a model to use in calculating the amount of forage that can be allocated to livestock while still allowing for the ecological needs of the land to be met.

The economic viability of ranching and the continued existence of ranching-dependent communities is tied to the health and productivity of rangelands.  Today we recognize that we need to take a new look at past and current use and management of rangelands.  As the BLM itself has noted, "…the land itself is in jeopardy, and the variety of products and values that this land has produced may not be sustained for future generations unless ecosystems are healthy and productive" (Utah BLM 1997).  In addition to this general recognition by the agency that "the land is in jeopardy," we make a very strong case elsewhere in this guidance document that on a site-specific level (in this case, in GSENM), the rangelands in GSENM are impaired as well.

Part of the reason that BLM lands are "in jeopardy" is likely a result of many BLM grazing permits currently over-allocating existing forage.  Most permitted levels of grazing on BLM lands are the result of forage capacity assessments conducted by the agency long ago.  Unfortunately, these past forage capacity assessment methods are in conflict with BLM's current rangeland health standards.  Originally designed for grazing use for sustained yield, these earlier capacity assessment methods failed to meet ecological needs of the land and, as a result, many allotments today produce less than their potential.  Since the new Utah rangeland health standards were established in 1997, the BLM has developed several analysis tools to implement these standards.  However, BLM still lacks a tool to assess forage capacity consistent with these new rangeland standards.

Based on a wide array of range science, the ecologically-based forage capacity analysis described below is a tool to help BLM determine appropriate stocking levels for livestock in the GSENM.  This forage capacity model uses computer mapping and ecological field data to estimate the amount of grazing that a grazing permit can allow, while still complying with the standards and guidelines.

## 1.1 Past practices used to determine stocking levels.

Levels of livestock use on BLM lands have not always been determined as the result of a range capacity analysis.  Early livestock numbers assigned to grazing allotments were developed over a half-century ago.  In many cases, the number of livestock that were allowed to graze was the result of regional political processes that relied on personal experience and subjective data from field trips as part of a politically negotiated settlement (Grazing Service 1946).

In the 1960's, BLM began estimating the number of livestock that could graze on BLM lands based on a calculated production of forage.  Some allotments have records from this capacity analysis and others do not.  The method involved calculating forage production based on the size of the area and the forage production as assumed on a per acre basis.  The forage needs for one cow/calf pair for a month was used to calculate the number of AUMs that an allotment could support.  The methods and policies behind the capacity model of this earlier era are not remembered by most BLM staff, and have yet to be discovered by the authors.

In the mid- and late 1970s, a number of public land laws generated a change in BLM's approach to range management.  The Federal Land Policy management Act (FLPMA) of 1976 and the Public Rangeland

BLM_0147329

Case No. 1:20-cv-02484-MSK    Document 71-16    filed 04/29/21    USDC Colorado    pg 88 of
192
Proposed Outline for Forage Analysis/Grazing Capacity Model Manuscript    Page 3 of 28

Improvement Act of 1978 required BLM to maintain rangeland inventories. The Soil and Water Resources Conservation Act of 1977 required the Soil Conservation Service to establish a national resources inventory.

As a result of these laws the BLM, under the Carter Administration, developed the Soil-Vegetation Inventory Method (SVIM) in 1979. Originally designed to standardize rangeland sampling for grazing Environmental Impact Statements (CRC 1984), SVIM included calculations of forage capacity on an allotment basis. Field forage was clipped and weighed. Data collected included plant community composition and forage productivity. Areas with common soil and plant communities were the units used in calculating the expected forage production for rangelands. The results were converted into estimated forage production using adjustment factors for phenology, precipitation and proper utilization factors for livestock use (Menke and Miller, 1984). A cow/calf pair (or AUM) was assumed to consume 800 pounds of forage per month (Jensen 1984).

Range capacity often applied the concept of "take half and leave half" (50% utilization). In Appendix A (pg. 8), the origins of the 50% utilization policy now central to many BLM range decisions is explained. BLM commonly recommends stocking levels that assume that livestock will consume 50% of the annual production of grasses and forbs. The assumption made is that this level of consumption by livestock leaves adequate forage for wildlife, while allowing for sustained production of the forage itself. Many have questioned this assumption, especially on arid lands (e.g. Caldwell 1984, Galt et al. 1999, Holechek et al. 2001).

The capacity analysis built into SVIM focused on sustained forage production. As a result, this method did not consider key ecological factors such as plant community composition, excessive grazing use in key habitats such as riparian areas, soil nutrient cycle maintenance, and nongame wildlife needs. Yet in spite of these shortcomings, SVIM was a major step forward in range management.

In the early 1980's, BLM discontinued SVIM. It was replaced with a monitoring program that did not include collection of data on plant community productivity. Klemmendson et al. (1984) reported that the chief reason the BLM discontinued SVIM was political, and driven by the response of the ranching community to SVIM in 1983-84. For the past twenty years, BLM has not used forage capacity analysis in determining stocking levels. Based on the acknowledgement by the BLM that "the land is in jeopardy," as well as the general degraded state of BLM rangelands in southern Utah, we can say with some certainty that the policy of abandoning forage capacity analyses over the past 20 years "is not working."

This must change as BLM implements the new rangeland health standards developed six years ago. The standards call for management of grazing in deference to the health of ecosystems. Ecosystem health is linked to the productivity of the land and its ability to service local communities on a sustained basis (CRC 1994). The loss of biodiversity and ecosystem structure and function has long-term implications for the health of watersheds and the ability of the land to provide abundant forage for a number of uses. BLM needs to undertake forage capacity analyses that will allow the standards to be met, restore and maintain ecosystems, and provide for ecosystem resilience that maintains the productivity of the land over time.

## 1.2 The timeliness of grazing capacity analysis in the upcoming grazing EIS.

BLM's need for forage capacity analysis as part of the upcoming grazing EIS for the GSENM is justified by community needs, agency policy (both current and proposed), rangeland science, and the agency's legal requirements. Such an ecologically-based forage capacity analysis is timely because grazing capacity has not been systematically reviewed for GSENM allotments for at least two or perhaps four decades. BLM is required to periodically adjust management decisions based on ongoing inventories, and this EIS will be renewing permits for most, if not all, grazing allotments in the Monument. Furthermore, range capacity based on ecological needs was raised as a significant issue in the GSENM grazing EIS. BLM has a legal requirement to consider this issue as part of the EIS.

BLM_0147330

Case No. 1:20-cv-02484-MSK   Document 71-16   filed 04/29/21   USDC Colorado   pg 89 of 192

The following chapters will develop and illustrate a science-based model for determining appropriate stocking levels for cattle in GSENM grazing allotments. This new formula for calculating forage availability and capacity is based on both the range science literature and updated estimates of actual available forage for particular soil types. We have divided the ecological needs of the land and wildlife into several categories. These are: wild herbivore forage needs; insect and nematode forage needs; and plant community viability, resilience, and regeneration, including soil stability and (lack of) erosion. Based on literature on these topics, we develop an ecological allocation of the plant community to be used in the forage capacity model. We demonstrate the utility of this new model by using an actual example in the Monument: the Upper Hackberry grazing allotment.

The next section (Chapter 2) describes the method used in the new protocol. Then, Chapter 3 features the results of our test run of the new procedure in the Upper Hackberry allotment. This is followed by Chapter 4, which specifically makes the case for using our proposed capacity model for the GSENM Grazing DEIS, chiefly because it will ensure that allotments in the Monument will conform with the Standards and Guidelines in the future.

# CHAPTER 2: METHODS

This chapter outlines the methods used in our proposed science-based formula for determining appropriate stocking levels for cattle in GSENM grazing allotments. This process begins by identifying the areas that are capable and suitable for livestock grazing. For those lands suitable for livestock grazing, the forage produced each year is estimated for each individual soil community based on current field data and existing data collected as part of past BLM, Soil Conservation Service, and National Resources and Conservation Service (NRCS) surveys.

Vegetation requirements for wild herbivores, insects, nematodes, soil stability, nutrient recycling, plant regeneration, and plant resilience lead to an estimate of the amount of forage required to meet ecological needs. Measuring the composition, structure, function and various ecological processes for each specific habitat site in all GSENM allotments is beyond anyone's resources at this time. As a practical necessity, we must resort to the use of indicators to monitor ecosystem health and function. Total annual production of plant biomass and soil litter, for example, can be sampled while energy flows and soil nutrient regeneration are impractical to measure. When assessing the amount of forage that can be removed from an allotment, critical ecological considerations include but are not limited to soil nutrient recycling, soil resilience to erosion, wildlife habitat needs, and plant community productivity and resiliency.

Below, we describe how to use a Geographic Information System (GIS) to take various data inputs and generate a stocking rate that an allotment can support while still meeting rangeland health standards. The work reported here is derived from a study that is ongoing. As we continue to refine this work some changes may be incorporated but they are unlikely to make significant changes to our model and its outcomes.

## 2.1 Initial Adjustments made for Capability[3] of the Pasture to Support Cattle.

We rely on current range science and criteria used by the U.S. Forest Service for the arguments made below. These involve the application of quantitative criteria to adjust for the physical limitations of the land to support livestock grazing. Holechek et al. (2001) provide recommendations for adjusting the stocking rate for cattle in order to account for distance from water and steepness of slope. Galt et al. (2000) have indicated that the NRCS has adopted these guidelines for slope adjustments. Suggested reductions in grazing capacity with distance to water and increasing slope are provided in Table 1.

**Table 1.** Adjustments for distance to water and slope for cattle (Holechek et al. 2001)

| Distance from Water (miles) | Percent Reduction in Grazing |
|---|---|

BLM_0147331

|  | Capacity |
| --- | --- |
| 0 – 1 | 0 |
| 1 – 2 | 50 |
| >2 | 100 |
| **Slope (%)** |  |
| 0 – 10 | 0 |
| 11 – 30 | 30 |
| 31 – 60 | 60 |
| >60 | 100 |

Holecheck et al. note that snow reduces water availability problems in winter on cold desert ranges of the U.S. Also, sheep do not require water every day and can use areas further than two miles from water. Literature cited shows that sheep on New Mexico winter ranges used slopes of less than 45% with no adjustment necessary for slope, whereas slopes greater than 45% were hardly used.

The Caribou National Forest has produced a detailed process paper for determining rangeland capability and suitability for both cattle and sheep ranges (Caribou NF 2001). It is based on criteria used in Region IV of the Forest Service. 36 CFR 219.20 defines capability as "the potential of an area of land to produce resources, supply goods and services, and allow resource uses under an assumed set of management practices and at a given level of management intensity. Capability depends on current conditions such as climate, slope, landform, soils and geology, as well as the application of management practices, such as silviculture or protection from fire, insects and disease." Range surveys have historically been used to identify the land areas that were capable and then by knowing the average forage production, applying a utilization rate, the estimated grazing capacity of the allotment could be determined. This was then validated through on-ground monitoring, or that was the intent.

The Caribou National Forest lists the following criteria for determining capability:

1. Areas with less than 30% slope for cattle and less than 65% slope for sheep (note that here the Caribou NF differs from Region IV in that Region IV uses 45% slope for sheep)
2. Areas producing more than or having the potential to produce an average of 200 pounds of forage/acre on an air-dry basis over the planning period.
3. Areas with naturally resilient soils that are not unstable or highly erodible.
4. Areas where ground cover (vegetation, rocks, litter) is sufficient to protect the soil from erosion. They specify a minimum of 60% cover unless local data is available for setting more specific ground cover requirements.
5. Areas accessible to livestock (without dense timber, rock or other physical barriers).
6. Areas within one mile of water or where the ability to provide water exists.

Suitability criteria employed by the Caribou NF include consideration of the following as they determine whether livestock grazing is compatible with management goals for the areas descrbed:

1. Developed recreation use sites or special use sites.
2. Special area designations such as Research Natural Areas.
3. Administrative sites, research facilities or study sites.
4. Key wildlife habitat areas.
5. Important habitats for Threatened, Endangered or Sensitive (TES) species.
6. Noxious weed infestations where forage is not used by livestock or use would contribute to an increase of the infestation.
7. Unique habitats such as bogs, fens, jurisdictional wetlands, or rare plant communities.
8. Areas where livestock grazing is impracticable due to economic considerations, either from a permittee or agency standpoint.
9. Transitory range created by timber harvest where the associated mitigation costs to protect timber resource values is excessive.

BLM_0147332

10. Areas where the social consequences and values foregone are not acceptable.
11. Non-functional streams or stream segments where livestock grazing is the primary cause for the less than satisfactory condition.
12. 303D listed streams or stream segments where livestock grazing is the primary cause for the less than satisfactory conditions.
13. Areas with significant amounts of dispersed recreation.

We combine various features of the suitability and capability criteria used by the Caribou National Forest that are representative of criteria used by most National Forests in the Intermountain Region. These, along with other sources (cited below) are used to make our recommendations for adjustments to the land area that is suitable for grazing and capable of providing forage for grazing in the GSENM. These are:

Areas not capable:
1. Areas inaccessible to livestock (because of cliffs, canyons or other physical barriers)
2. Unstable or highly erodible soils (as defined by NRCS)
3. Areas producing less than or having the potential to produce an average of 19kg/ha (17 lb/acre) on an air-dry basis over the planning period (BLM 1981)[4]
4. Areas with greater than 30% slope
5. Areas more than 2 miles (3.2 km) from water (Fusco 1995, Holechek et al. 2001).

Areas not suitable:[5]
1. Key, identified habitats for TES species (i.e. critical habitat identified by USFWS or Utah Division of Wildlife Resources)
2. Unique habitats such as jurisdictional wetlands and springs
3. Rare plant communities
4. Areas that receive high levels of recreation use (i.e. canyon bottoms, like the Gulch)

The capability and suitability factors selected for our capacity model reflect the practical nature of grazing practices in the semiarid lands of southern Utah, ecological and biological considerations that should be of priority in a national monument (i.e. rare plant communities and TES habitat), and current BLM capacity methods. For example, the 19kg/ha (17lb/acre) forage requirement for productivity was borrowed from a 20 year-old grazing EIS for this area (BLM 1981). As noted above, at 200 lb/acre the minimal forage production threshold the Forest Service uses is more current and much higher. In addition, the distance from water factor for forage is appropriate for grazing in arid lands during the warmer time of the year. Most of the allotments in the Monument are spring and summer allotments. While cattle may benefit from snow, standing snow in this region is infrequent and does not remain for long periods of time, and thus cannot be relied on in making grazing management decisions. Even winter grazing, based on our experience in GSENM, relies on surface water sources most of the time. For these reasons, areas greater than 3.2 km from a surface water source are considered unsuitable for livestock grazing in terms of assessing the capacity for livestock grazing of an allotment.

Section 2.4 explains how to use a GIS to determine the amount of the grazing unit(pasture or allotment) that is capable and suitable for supporting livestock.

## 2.2  Determination of Forage Biomass in Allotment

Once the above capability and suitability adjustments to the grazing unit (pasture or allotment) are carried out, the next step is to estimate the kg/ha of annual production of grasses and forbs in the unit. We recommend three options for making this assessment (tiered in order of our opinion of what is most sound and credible, from a scientific standpoint):

BLM_0147333

- The first and most desirable option is for the land manager to perform actual clipping studies in the grazing unit being assessed. Methods of determining forage production that rely on plot clippings are described in BLM (1996). Our measurements were made using the beltline transect method (FSM 2209.21) to assess both cover and annual forage production (for all grasses and forbs, not shrubs) for each Range Site Type[6] in the grazing unit. Earlier BLM monitoring practices used prior to 1996 also used similar sampling methods (DOI 1984a, DOI 1984b, DOI 1985). At the end of each of five 100 ft. radial transects for each site, clip the standing vegetation within a 1 m$^2$ frame to arrive at estimated production of standing crop of grasses and forbs. Clippings should not be limited to palatable species only; clip all grasses and forbs. This could overestimate the available forage for a site. If time allows, be sure to replicate sampling in multiple patches of each Range Site Type, in which the number of replicate patches sampled is determined by the relative abundance of that Range Site Type in the grazing unit. Apply the forage production values for each Range Site Type to others of the same type in the grazing unit, using a GIS (as described below and in Section 2.4).

- If time and/or resources are not sufficient to conduct the clipping studies described above, we then recommend that the user obtain the **actual field data from the NRCS** that were recently used to revise NRCS estimations of forage biomass for Range Site Types in southern Utah.[7] This data, which exists for almost all (if not all) Range Site Types known to occur in the Monument, is an improvement over the traditional NRCS estimates of Range Site Type production (DOI 1984c), as these new clippings were completed for a variety of rangelands including many grazed by livestock. The values used in the traditional Range Site Type estimates made by the Soil Conservation Service and BLM were chiefly based on relict sites. Therefore, the raw clipping data recently collected by the NRCS on a variety of Range Site Types is more applicable to GSENM rangelands, most of which are grazed. Apply the forage production values for each Range Site Type (for all grasses and forbs, not shrubs) to all other Range Site Types of the same type in the grazing unit, using a GIS (as described below and in Section 2.4).

- If the new NRCS raw clipping data are not available for all Range Site Types in the grazing unit being assessed, we then recommend that the user utilize the old NRCS forage production predictions (DOI 1984c), but only for those Range Site Types where the new NRCS clipping data does not exist. These earlier estimates and soil surveys often have average, low, and highproduction estimates based on precipitation at, below, or above normal precipitation years. Based on our field clipping survey and a review of these earlier NRCS forage estimates, wesuggest using the below average forage productions if using the old NRCS predictions. These estimates seem to better reflect forage production on both typical years and drought conditions, which seem to be a common occurrence. In the absence of more current data (described above), apply the forage production data from these earlier NRCS forage estimates to the relevant Range Site Types as attributes in the GIS coverage for the allotment. This is described in more detail later in this section.

Using one of the three methods described above, the land manager should add to the GIS coverage production data as attributes to the coverage for soil map units. This tabular data associated with the coverage will later be exported from the GIS and, in a spreadsheet program, be used to calculate the capacity of the allotment. Additional discussion on the use of GIS and the spreadsheet program can be found in Section 2.4, below.

*2.2.1  Do results obtained from first two steps necessitate a "recovery prescription?"* We must stress that we mean for this forage capacity model to only be used to assess the carrying capacity of rangeland that has forage production quantities in the "good" or "excellent" range. This means that the amount of forage is 50% or greater of the potential production of the site, as defined by NRCS. If one is using our model to calculate stocking rates we are assuming that the allotment is currently meeting rangeland health standards or is moving toward its potential plant community.

BLM_0147334

Thus, if the range manager does follow our recommendation to clip the forage in the grazing unit and finds that the actual forage (grass and forb biomass) on the grazing unit is less than 50% of the potential plant community predicted for those soil types, then we argue that the allotment should receive a special management prescription that we call "recovery mode." See Chapter 4, Section 4.2.1.2 of the guidance document for further discussion of this prescription.

Little research exists concerning the level of livestock grazing that can occur on "recovering" arid or semi-arid rangelands where productivity is fair or poor.[8] Further, the literature in inconsistent as to exactly "how much rest" is required to recover degraded rangelands in arid or semi-arid environments. Below, we highlight some of the key literature that clearly shows that, in general, the recovery of impaired rangelands appears to require long periods of time – certainly more than a year or two of rest.

The literature confirms that total, long term rest is effective. Potter and Krenetsky (1967) found that grass densities and total ground cover tripled following 25 years of non-grazing. Blydenstein et al. (1957) similarly determined that perennial grass densities and the palatable shrub *Krameria grayi* increased in a Sonoran desert grassland protected from grazing for 50 years, and were most taken by the notable increase in overall plant cover and density. More recently, Anderson and Inouye (2001) found landscape-scale changes in plant species abundance (greater) and biodiversity (greater) of a previously grazed sagebrush steppe over four years of rest, with perennial grasses experiencing a 13-fold increase in cover during that time. Analyzing riparian areas, Platts and Nelson (1985) determined that herbaceous vegetation can recover within several growing seasons and woody vegetation within 5-10 years if grazing stress is removed from a deteriorated riparian area and sufficient residual shrubs are present to allow re-growth and expansion.

At the same time, others have concluded that short term rest from grazing may not sufficiently allow for recovery of ecosystem values. McPherson et al. (1990) compared ungrazed and a formerly grazed (with 5 years of rest) juniper woodlands, finding that the ungrazed plot had more grass, the grazed more forbs. The authors concluded that "[t]he effects of long-term continuous cattle grazing persisted 5 years after removal of livestock" and that the "succession following grazing will proceed slowly or will be unpredictable." In a study of the Kaiparowits Basin, Jeffries and Klopatek (1987) compared heavily grazed sites, a site ten years into recovery from heavy grazing, and a relict, never-before grazed site. The authors found that the relict site had significantly more herbaceous cover (comprised mostly of perennial grasses) than all other sites. There were no significant differences between the heavily grazed site and the recovering site for any of the measured parameters, leading the authors to conclude that recovery from grazing can take a very long time indeed.

An interesting study in Canyonlands National Park offers some insight into the difficulty of range recovery. Kleiner (1968) compared two rangelands sites with the Needles District of the Park: Chestler Park and Virginia Park. Grazing in Chestler Park occurred for one or two months at most in the winter and was dependent on snow as a water source for livestock. Four years before Kleiner collected his data, this grazing impact was removed. Virginia Park has been ungrazed for a long time and is a popular research area because of this. Kleiner's study compared vegetative cover and diversity between the "recently grazed" (four years rest) and ungrazed study sites (his data is summarized in Table 2).

**Table 2.** Comparison of grazed/ungrazed pastures in the Needles District, Canyonlands NP, 1968. Reprinted from Kleiner (1968).

| Comparison of grazed/ungrazed transects | Virginia Park (ungrazed) | Chestler Park (ungrazed 4 yrs) |
|---|---|---|
| Hectares | 97 | 389 |
| Plant species richness /sample site (average) | 21.5 | 15.4 |
| Cryptobiotic species richness/sample site (average) | 6.1 | 2 |
| Total living cover, % | 54.5 | 21.8 |
| Vascular plant living cover, % | 16.8 | 16.8 |
|  |  |  |

BLM_0147335

| Litter cover, % | 11.5 | 9.8 |
| Contribution of annuals to the total vegetation (%) | 11.8 | 15.5 |
| Average number of species / sample site | 7.1 | 3.2 |

Records are incomplete on the amount of grazing that occurred over time in Chestler Park. Kleiner reported that, typically, 30-35 horses grazed in Chestler Park for one or two winter months depending on snowfall each year. Rough, "back of the envelope" calculations indicate that this level of livestock grazing was equivalent to about 50 AUMs, at a density of eight acres per AUM. If we make the assumption that this area produces about 600 lb of forage per acre on average (based on the typical Range Site Types that occur in the Park), then Chestler Park would produce on average about 230,000 lb. of forage. Based on these numbers, the grazing use on average amounted to between 15 and 20% of the average forage produced. This is usually considered to be a level that is "lightly grazed."

The importance of this example is that even at this "low" grazing intensity and with four years of rest, the plant diversity, ground cover, cryptobiotic soil cover, and productivity was significantly less at Chestler Park than Virginia Park. Photos taken of Virginia and Chestler Park do not reveal the key differences between these sites, such as forage production and plant community diversity. Photographs that show details of ground conditions, however, do reveal differences, such as a loss of liter and cryptobiotic crusts in Chestler Park. The lesson that Kleiner teaches us is that so-called "light" grazing can lead to a substantial loss of plant community health. Moreover, had Chestler Park been grazed during the growing season, further degradation of the vegetative community would have been the likely result. We conclude that 15-20% winter utilization of forage in southern Utah is still too high to ensure recovery of rangelands to their potential plant community.

So, what level of grazing can occur on degraded rangelands that are only 50% or less of their potential productivity, while still allowing them to recover? As evidenced by the Chestler Park example, we feel the answer is likely to be none, at least for a few years. It is even more likely that complete rest for much longer periods, up to several decades may be necessary to allow even slight progress towards restoration of community diversity and production. Certainly the study by Anderson and Inouye (2001) shows that progress is very slow over a period of nearly 50 years in which the plant community still had not reached potential. How much rest is necessary to bring back the desired productivity of these impaired ranges? We don't have an answer to this question. However, as outlined above, the literature is filled with evidence that prescriptions of short periods of rest (like those used with rest-rotation schedules) are not enough to ensure recovery in semiarid desert lands. Is the answer 5 years, or 10 years, or 25 years? We look to the Monument to heed its own call for strong science within its borders, and establish long-term exclosures to study the effects of long term rest from grazing, to help determine an effective "rest prescription" for those allotments that clearly need to be put into "recovery mode." Further, the Monument must establish quantitative and significant goals against which to measure restoration progress either by comparison to exclosures or as gains toward potential productivity as described by NRCS and towards potential ground cover as the literature cited herein describes.

## 2.3  Forage allocations for ecological needs of the land

Those managers using our new capacity model will have by this point determined forage production for each Range Site Type in the grazing allotment. The next step requires that allocations of that available forage base be made to ensure: 1) needs of native mammals for cover and forage, 2) invertebrate forage needs and 3) viability and resilience of the native plant community, including soils, and in the face of drought. These allocations are based on the ecological literature regarding the specific needs of vegetative communities and native wildlife on lower elevation lands of the Colorado Plateau.

BLM_0147336

_**2.3.1  Allocations for mammalian herbivores.**_  We recommend that an allocation of about 225 kg/ha (see Table 3) be allocated for mammalian herbivores in the Monument.[9]  In order to calculate this allocation amount, we selected three primary herbivores (or in the case of folivorous/omnivorous rodents, a guild) that fairly adequately represent the mammalian herbivores present in the GSENM (we chose mule deer, jackrabbits, and rodents).  We conducted a thorough search of the scientific literature and located 50 studies that report on both typical densities of these herbivores and their eating habits – reported as biomass of forage (forbs and grasses) consumed.  We strove to primarily include studies that were conducted in lower elevation habitats of the Colorado Plateau, though a few others were located in various locations in the intermountain West and southwest.

To calculate the rough amount of forage consumed by these herbivores a year, we used the kilograms of total forage consumed per individual per day, then calculated the percent of the individual's diet that is herbaceous material, then extrapolated that forage amount to total consumed per year by species/guild by multiplying by days of the year and average herbivore densities (Table 3).

**Table 3.** Kg/ha/year of forage (grass and forb) biomass necessary to support typical mammal herbivore populations in southern Utah.

| Species | Density | Average total forage per individual | Herbaceous forage in diet | Herbaceous forage per individual | Herb. forage per population per day | Herb forage per population per year |
|---|---|---|---|---|---|---|
| | (individuals per hectare) | (kg./day/individual) | (percent, %) | (kg./day per individual) | (kg/ha/day) | (kg/ha/year) |
| **Deer** | 0.11 | 1.58 | 22.40% | 0.325 | 0.035 | 12.73 |
| _Deer Lit Citations_ | _1*,34,42,43,45_ | _2,9.11,12,27,29,37_ | _4,10,14,27,29,29_ | | | |
| **Jackrabbits** | 2.01 | 0.13 | 74.70% | 0.097 | 0.199 | 72.66 |
| _Jackrabbit Lit Citations_ | _5,6,8,20,22,29,29,40_ | _4,15,15,22,29,32,33,36_ | _3,21,23,24,24,32_ | | | |
| **Rodents** | 16.3 | 0.056 | 43% | 0.024 | 0.39 | 142.3 |
| _Rodent Lit Citations_ | _16, 17, 18 ,19 ,25 ,26 ,28 ,38,39 ,46,47_ | _29,30, 31,31,35_ | _38,41,44, 48_ | | | |
| | TOTAL HERBACEOUS FORAGE ALLOCATION FOR MAMMALIAN HERBIVORES = | | | | | 227.6 kg/ha/yr |

*References are as follows: 1.Chapman & Feldhamer 1982, 2.Demaras & Krausman 2000, 3. Fagerstone et al. 1980,      4. Krausman 1996,  5. Daniel et al. 1993,  6. Johnson & Anderson 1984,  7. Kufeld 1973, 8. Anderson and Shumar 1986,      9. Smith 1953, 10. Bueker et al. 1972, 11. Aldredge et al. 1974, 12. Smith 1952, 13. Hobbs et al. 1981, 14. Hansen & Clark 1977, 15. Currie and Goodwin 1966, 16. Fautin 1946, 17. Grant et al. 1982, 18. Nelson & Leege 1982, 19. Grant & Birney 1979, 20. Norris 1950, 21. Fagerstone et al. 1980, 22. Arnold 1942. 23. Alipayo & Daniel 1991, 24. Wansi 1989, 25 WRSOC  1983, 26. Hanley & Page 1981, 27. Umess 1981, 28. Rosenstock 1996, 29. Stoddart et al. 1955, 30. Golley 1960, 31. Koford 1958, 32. Hoffmeister 1986, 33. McAdoo & Young 1990, 34. UDWR 2003, 35.Detling, in prep, 36. Vorhies 1933, 37. Jensen 1984, 38. Goodwin & Hungerford 1979, 39. Shepard 1972, 40. Stoddart 1938, 41.Black & Frischknecht 1971, 42. Horejsi & Smith 1983, 43. Clegg 1994, 44. BLM 1998, 45. AGFD 2003, 46. West 1983a, 47. West 1983b. 48. Alston 2002.

The purpose of this exercise is to roughly estimate, based on the literature, the approximate forage biomass required by mammal herbivores on southern Utah rangelands.  Certainly, more research on this topic is needed.  The estimates presented here represent
the best information we could locate, and more studies are needed to validate theseestimates for the monument.  The proposed allocation we came up with does not include the needs of other mammals (i.e. cottontail rabbits, elk, bighorn sheep, pronghorn), nor do we anywhere in this model account for the forage needs of folivorous birds or reptiles.  As such, we argue that this allocation, which we mean to represent all forage and cover needs for all native wildlife on GSENM allotments, is conservative.

BLM_0147337

Case No. 1:20-cv-02484-MSK   Document 71-16   filed 04/29/21   USDC Colorado   pg 96 of
192

*2.3.2. Allocations for insects and soil invertebrates.*  Insects and soil invertebrates such as nematodes and mites are a critical part of rangeland systems.  These have important relationships with plant development, soil nutrient recycling, species interactions, and wildlife that is under-appreciated by many.  Loss of invertebrate biomass in rangelands can have a significant effect on the ecosystem.

While we have a fairly complete list of range plants found in Utah's rangelands, knowledge of the invertebrates found on our public lands is less understood.  What we do know is that these occupy a significant niche in the southwest deserts.  For example, harvester ants have colony populations of tens of thousands of individuals.  Even in the driest and hottest parts of North America, the total biomass of one species of harvester ants (*Messor veromesso pergandei*) has the same approximate total biomass as the rodent population in the same area (Hölldobler and Wilson 1990).  On a side note - one of the many important ecological functions that ants provide in addition to their role in nutrient cycling, is assisting in the dispersal of plant seeds, as the result of accidental abandonment of seed caches near the nest (Moggridge 1973).

Insect populations vary more radically than most other rangeland components.  Super abundances of, for example, the desert locust can consume the equivalent of what 150,000 head of cattle eat (Bullen 1996).  The forage capacity model used here will focus on the typical needs of insect population in southwest deserts.  Where populations of insects over a short period of time reach extraordinary populations, we suggest that those situations be treated with range management actions taken during a time of drought.

A number of studies have reported the percent of plant growth consumed by insects.  For grassland and savannah, insect consumption of a single species varied from less than 1% to 19% with a mean of 3.5% (Wiegert and Peterson, 1983).  Rangeland grasshoppers consume between 1-3% in typical years (Mispagel 1978) and up to 99% in periods of super abundance (Nerny and Hamilton 1969).  Hewitt and Onsager (1983) suggest that between 21-23% of available range forage is consumed by all grasshopper species in the western U.S. each year.

Nematodes and other soil invertebrates perform critical soil nutrient and structural functions.  This complex array of species normally has a higher diversity and biomass than any other rangeland flora and fauna combined.  They should be considered as an important component in the consumption of rangeland plants.  Ingham and Detling (1984) estimated that nematodes consumed between 6 and 13 % of below-ground net productivity in the mixed grass prairie.  Another study by Scott et al. (1979) and Anderson (1987) found that root feeding arthropods and nematodes consume between 7-26% of the net productivity in normal years.

The evidence is clear that a substantial part of the plant community is consumed by invertebrates on a regular basis.  Without this consumption, ecological change may occur that may contribute to the long-term loss of ecological health and productivity.  Many of the studies just cited occur in habitat conditions somewhat different from that found in the Grand Staircase-Escalante National Monument.  But one thing we know for certain is that the soils of this region do support nematodes and insects, which together form a critical component of the southern Utah desert ecosystem.  To understand the consumption needs of insects and nematodes within the Monument, the needs for a long list of currently unknown species would need to be compiled.  Clearly this is not possible at this time.  However, as we continue our research and as more knowledge become available, we hope to refine the number used in this model for invertebrate consumption.

For this analysis, we assume that 10% of the annual forage production is required to support invertebrate populations.  We suspect that additional research will find that this allocation is indeed too low.

*2.3.3  Allocations for biomass to provide necessary cover to avoid soil erosion, and to ensure resiliency and regeneration of vegetative community in the face of drought.*  We focused on published reviews to

BLM_0147338

find information regarding (1) potential ground cover (vegetation, litter, crust) for vegetation types occurring in the Colorado Plateau region, (2) the need for a certain "baseline" of cover to protect these communities from soil erosion, and (3) the principle needs of grasses to regenerate and have resiliency in the face of both livestock grazing and drought. More detailed research of source documents is ongoing. Using these three avenues of research, we propose a percent of the forage biomass to be set aside to meet the needs of the soils and vegetative communities in GSENM. Again, we stress that this third and final ecological allocation in our forage capacity model is still under development.

(1) Predicted ground cover in typical vegetation types in GSENM: Much of the research on plant community characteristics for the Colorado Plateau has been conducted as well as summarized by Dr. Neil West of Utah State University Department of Natural Resources. It is important to know potential ground cover in order to approximate historical (pre-livestock) erosion rates and to establish targets for grazing management or restoration. It should be noted that in many of these plant communities, much of the seed pool has been lost due to nearly continuous removal by livestock over the past century, so recovery in arid areas such as this will be slow as Anderson and Inouye (2001) have so well documented.

Sagebrush Semi-Desert vegetation occurs in the Great Basin and Colorado Plateau at intermediate elevations between 1300 – 1800 m in areas of precipitation ranging from 158 – 419 mm. In the Colorado Plateau, these vegetation types are generally associated with mesa tops, benches or pediments with sandy to gravelly soils. They occur immediately above the salt desert shrub type. A survey of a relict site on Cedar Mesa yielded six species of grass including: *oryzopsis hymenoides, bouteloua gracilis, hilaria jamesii, sporobolus airoides, sporobolus cryptandrus and stipa speciosa*. Sagebrush usually makes up over 70% of the relative cover and 90% of the biomass with absolute cover of higher plants ranging from 10 to 40%. Generally, perennial plants are found associated with shrubs and occur in the mounded portions of soil occupied by shrubs. Beneath the shrubs, the ground is litter-covered, with the interspaces between shrubs occupied by crusts. Annual net production varies between about 500 and 1500 kg/ha, most of which is sagebrush. The original estimated livestock grazing capacity for sagebrush semi-desert vegetation had been reduced from about 0.83 AUM/ha to 0.31 AUM/ha by 1970, mostly due to loss of perennial grasses (West, 1983a).

Salt Desert Shrublands occur in the Great Basin and Colorado Plateau at lower elevations and generally in valley bottoms in alkaline or saline soils where precipitation is generally less than 200 mm. Total cover of higher plants varies from 0 on salt pans to 25% on upland sites. Shrubs generally occur in clusters. Native grasses found in these types include: *bouteloua gracilis, elymus cinereus, hilaria jamesii, oryzopsis hymenoides, sitanion hystrix, sporobolus airoides, sporobolus cryptandrus and distichlis stricta*. Innerspaces between shrubs are generally lacking in vascular plants and the soil is covered with microphytic crust. Biomass of crust has been measured at 200 kg/ha. Forage production measured at the Desert Experimental Range in Utah varied over 800% between wet and dry years. Forage yield on a shadscale-winterfat range at the Desert Experimental Range varied from a minimum of 34 kg/ha in 1943 to a maximum of 190 kg/ha in 1947. (West, 1983b; Blaisdale and Holmgren, 1984; West et al, 2000).

Southeastern Utah Galleta-Threeawn Shrub Steppe (semi-desert grassland) type is found in deep silty and sandy wind-blown deposits derived from sandstone. Precipitation is a mixture of winter snow and late summer convectional storms. The flora consists of bunch and sod-forming grasses including (cover from transects in Canyonlands NP in %): *hilaria jamesii* (5%), *stipa comata* (5%), *oryzopsis hymenoides* (2%), *bouteloua gracilis* (9%), *vulpia octoflora* (1%), *sporobolus cryptandrus* (2%), *aristida fendleriana* (1%), *sporobolus flexuosus* (trace), *sporobolus airoides* (1%)and *sitanion hystrix* 1%). Vascular plant cover ranges from 25 – 60% and microphytic crust occupies nearly all the bare ground in ungrazed relict sites. In ungrazed Virginia Park in Canyonlands, microphytic crust cover was 38%, in adjacent grazed Chesler Park, crust cover was 5%. Productivity potential of forage on these sites averages 900 kg/ha in favorable years (West, 1983c).

Pinyon-Juniper Woodlands are described briefly by West and Young (2002) as having highly

BLM_0147339

Case No. 1:20-cv-02484-MSK   Document 71-16   filed 04/29/21   USDC Colorado   pg 98 of 192

variable understory to compared to adjacent grasslands.  On the Colorado Plateau, warm season sod grasses dominate.  Total vascular plant cover varies from 40 – 80% with shrubs, herbaceous plants and microphytes occurring in the interspaces between trees.  Litter accumulates beneath the tree crowns.  Grazing by livestock has depleted what once appeared much like a savanna where fires were frequent enough to keep trees restricted to steep, rocky or dissected topography.

Microphytic Crusts are best developed in semi-arid shrublands.  Pediceled (pinnacled) crusts are abundant in pinyon-juniper and sagebrush communities typical of the Colorado Plateau, while rough lichenized crusts are more typical in greasewood and shadscale communities (Johansen, 1993).  The soil-holding capabilities of crusts are destroyed by trampling and compaction, resulting in increased runoff.  "Total crust cover is inversely related to vascular plant cover, as less plant cover results in more surface available for colonization and growth of crustal organisms."  (Belnap et al, 2001).  This is also documented in the community-specific references cited earlier.

As the literature cited shows, microphytic crust cover potential is high in the Colorado Plateau vegetation types described, which include those in the Upper Hackberry allotment, where we applied the proposed capacity model (Section 3).  Personal surveys of relict areas (John Carter, co-author) as recent as spring 2003 in Grand Staircase indicates that ground cover in the sandy soil types described is greater than 90% including large portions of crust, generally covering the soil between plants.

(2) Erosion and Livestock Grazing.  White et al. (1983) found sediment yield 20-fold higher in a grazed watershed when compared to an ungrazed watershed.  USDA (1981) reported that topsoil erosion rates from grazed forest and rangeland were 4.2 tons/acre-year and 3.1 tons/acre-year compared to less than 1 ton for healthy forest and range.  Packer (1998) documented that loss of soil in Utah and Idaho watersheds through erosion and runoff increased as ground cover decreased.  A decrease in ground cover from 40% to 16% resulted in 6 times more runoff and 5.4 times more sediment yield.  Trimble and Mendel (1995) estimated that peak storm runoff from a 120 ha basin in Arizona would be 2 to 3 times greater when heavily grazed than when lightly grazed.  Lusby (1979) studied grazing systems including removal of livestock from control watersheds in Badger Wash, Colorado.  He found that during the period 1953 to 1973, complete exclusion of livestock resulted in over a 40% decrease in runoff and a reduction of 63% in sediment yield.

The following figure (Figure 1) was taken from Packer (1998) in order to show how soil erosion varies with slope and ground cover by plants and litter.  This figure was derived from 5-minute rainfall simulations.  At the lowest gradient of 5%, erosion begins to rapidly accelerate when ground cover drops below 60%.  At 35% slope, erosion is accelerating rapidly as ground cover decreases below 100%.  The fine-grained sandy soils occurring on the Hackberry allotment are susceptible to both wind and water erosion and will erode rapidly when ground cover declines below potential.  Management must be designed to minimize trampling of uplands by livestock in order to allow microphytic crusts to return to potential cover values and impede the rapid erosion observed in GSENM.

While the above literature demonstrating the relationship between livestock grazing and erosion rates is certainly instructive, even more telling are those studies that have measured both vegetative cover and erosion rates on both grazed and ungrazed sites in arid regions.  For example, Gamougoun et al. (1984) found that the 3-year average of standing biomass in a grazing exclosure in New Mexico was 1,550 kg/ha, whereas a nearby moderately grazed pasture contained a 3-year average of 637 kg/ha of standing biomass.  The same study found that the erosion rate (measured as the mean wet sediment production resulting from simulated rainfall) on the ungrazed site was 38 kg/ha, whereas the erosion rate on the moderately grazed site was 153 kg/ha.  In a similar study conducted by Meeuwig (1965) in Utah, it was found that combined grass and forb cover on the ungrazed site was 58.4%, whereas forb/grass cover on the grazed site was 49%.  The same study found that the erosion rate (measured as the mean wet sediment production resulting from simulated rainfall) on the ungrazed site was 173 lb/acre, whereas the erosion rate on the moderately grazed site was 840 lb/acre.

BLM_0147340

(3) Ensuring resiliency and regeneration of plant community.   The normal  utilization standard of 50%, developed from research on root-growth stoppage as a result of grazing (Crider 1955) and sometimes known as the "take half and leave half" policy, is inappropriate for the Colorado Plateau.   Crider grew several Mid-western perennial grasses under ideal precipitation and nutrient conditions and monitored root growth changes due to clipping over a period of two months  Crider concluded that root growth at the end of the growing season was not impaired when a single clipping removed 50% or less of the above ground biomass.



**Figure 1**.  Relationship between vegetative cover, slope and soil erosion.  Reprinted from from Packer (1998).

The results of Crider's research do not reflect a number of factors that come into play on BLM lands in the arid West, including the applicability to the broad diversity of rangeland plants, grazing practices commonly found on BLM lands, semiarid or arid conditions, plant regeneration, soil nutrient recycling, litter generation, plant community composition, and wildlife habitat structure.  As a result, range scientists have concluded that there is no scientific basis behind BLM's 50% policy for utilization (Caldwell 1984).  Still, allowable utilization rates of 50% seem to dominate AMPs on BLM lands in the intermountain West, while recent Forest Plans such as the Wasatch-Cache and Caribou are reducing utilization rates well below this figure to 30 – 40% for areas with much greater precipitation than GSENM.  While the range literature does not support even these lower levels, they still represent significant departures from the "take half leave half" philosophy.

Even within Crider's narrow area of research, current grazing utilization policy does not actually follow his recommendations.  Crider was only looking at root growth of perennial grasses under ideal

BLM_0147341

Case No. 1:20-cv-02484-MSK   Document 71-16   filed 04/29/21   USDC Colorado   pg 100 of
192
Proposed Outline for Forage Analysis/Grazing Capacity Model Manuscript                    Page 13 of 28

growing conditions.  Under those conditions, he concluded that up to 50% of the aboveground biomass could be clipped **once** without root growth being significantly impaired.  He further concluded that repeated clipping (which more accurately represents multi-month grazing periods common on BLM allotments) would significantly inhibit plant growth when a total of 50% of the biomass is removed.  BLM was incorrect to apply the "take half and leave half" utilization level where grazing leads to numerous clippings, and on arid lands.

This research tells us that, at the very least, 50% of the above-ground biomass needs to remain each season, to ensure that the plant community remains viable, and can regenerate itself and remain resilient, even in the face of drought (which we know we have to assume on the Colorado Plateau).  In fact, Jerry Holechek, well known Range Science Professor and textbook author from New Mexico State University, along with others are now recommending allocations of forage in arid areas that provide residuals of 50% for watershed protection aside from wildlife needs and livestock use (Holechek et al (2001).

Our recommended allocation for grass/forb biomass necessary to protect soils from erosion, while ensuring resiliency and regeneration of plant community.  In addition to the suggested forage allocations to mammal herbivores and invertebrates outlined above, we recommend an additional allocation, as do the current leading range scientists such as Holechek, that will ensure the needs of the soils to resist erosion and the vegetation community itself to be able to regenerate and be resilient in the face of both grazing and assumed drought.  While our research on this topic is ongoing, the literature featured above clearly shows us that (1) ground cover potential in GSENM is high and most allotments are not currently exhibiting predicted or historic levels of cover, (2) the reduction in ground cover because of livestock grazing definitively increases erosion potential, and (3) no more than 50% of the above ground biomass can be "clipped" (or eaten) by wildlife, invertebrates and livestock each season if the plant community is to remain viable and resilient.  Because the nature of the scientific literature is such that it is difficult to exactly say what percentage of annual productivity must remain on the land to resist erosion, for now we are simply recommending, as do Holechek et al (2001), that a 50% allocation of biomass be set aside to ensure the soil and vegetation needs in GSENM.

This allocation does not "overlap" with those we recommend for invertebrates and native mammals, as these allocations represent biomass that will be removed from the vegetative community over the course of a year, and the plant community needs to retain a certain minimum percentage (i.e. 50%) of its biomass to simply remain viable, resilient and regenerate itself.  We argue that this 50% allocation is conservative.

*2.3.5. Allocation of remaining forage for cattle.*  Once the above allocations are made, the remaining kg/ha of available forage production can be allocated to cattle.  Currently, the BLM divides the available forage by 800 lbs based on the presumed average weight of cattle.  For now, we also utilize the 800 lb. (or rather, 364 kg) allocation for our capacity model since this is a standard used by the agency.  However, we anticipate revising this number in future iterations of our model.  The 800 lb. allocation may not reflect the increased livestock size now seen on many BLM lands.  Holechek et al. (2001) uses 1000 lbs. as the average weight of cattle.  We recommend that the Monument use the Holechek number for mature cattle (1000 lbs) in order to reflect the larger size of animals today.  A check of the USDA market statistics at http://www.ams.usda.gov/mnreports/lm_ct166.txt reveals that these animals are very large today with average weights of mature cattle above 1000 lbs, more like 1200 lbs with calves running several hundred pounds each.  It is erring to the low side to consider a cow/calf pair as 1000 pounds.

We anticipate using Holecheck's cattle weight  the same in later versions of our model.  But as stated above, we resort for now (in the following Upper Hackberry example) to the cow/calf allocation used by the BLM, thus rendering our model even more conservative.

## 2.4 Using a GIS to assess available forage and make ecological allocations

This section describes how to apply a GIS, incorporating the above recommended capability and

BLM_0147342

Case No. 1:20-cv-02484-MSK   Document 71-16   filed 04/29/21   USDC Colorado   pg 101 of
192
Proposed Outline for Forage Analysis/Grazing Capacity Model Manuscript                     Page 16 of 28

suitability adjustments and ecological allocations of forage, to determine the amount of forage that might be available for livestock after these ecological needs are met.  Our recommended forage/capacity model utilizes ArcGIS ESRI (Environmental Systems Research Institute, Inc.) software, and a spreadsheet program such as MS Excel or Corel Quattro Pro.  The GIS data needed for this analysis includes a digital coverage of the grazing allotment boundaries, a soil coverage delineating NRCS soil map units, and a coverage that identifies areas as incapable and/or unsuitable (see page 7) for livestock grazing.  Each soil map unit comes with an associated description of the geology, soil, and plant community.[10]

The steps outlined below explain how values are achieved that are used in our suggested forage/capacity formula.  The formula applied to each soil map unit for forage capacity estimation is as follows:

$$S = \frac{F_s\,(1\text{-} E)AD_w}{800 \text{ (or 364 if using metric)}}$$

$S$ = Stocking capacity in terms of animal unit months
$F_s$ = total Seasonal Forage production
$E$ = Ecological forage allocation, here assumed to be 85%
$A$ = Area (in acres or hectares) of the soil map unit
$D_w$ = Distance to water factor (0-1.6km is 1, 1.6 to 3.2km is 0.5 and over 3.2 km is 0)

The first step of the forage analysis and capacity model requires that the user assemble the necessary information for the capability and suitability of the grazing unit (i.e. pasture or allotment).  This includes a topographic coverage depicting slopes of the grazing unit and areas inaccessible to livestock (because of cliffs, canyons or other physical barriers), a hydrographic coverage, and coverages showing other important factors that may render portions of an allotment unsuitable for grazing (i.e. important habitats for TES species, rare plant communities, high recreation use areas, etc.).  Using the clipping feature of the GIS, those parts of each soil map unit on the allotment that are either incapable or unsuitable for grazing are removed. Calculate the area within the grazing unit that remains within each soil unit.  Enter this value in the "Area" entry in the forage/capacity model formula.

Once the incapable and unsuitable portions of the grazing allotment are removed from each soil map unit, the land manager next determines the amount of available forage in the remaining area.  The NRCS soil coverage is used for this purpose.  A soil map unit may consist of several intermingled plant communities. For example, soil map unit 15 (SWA L151), consists of 75% semidesert sandy loam big sage, 20% semidesert loam, and 5% semi desert shallow loam vegetation communities.  In our forage capacity model, only grass and forb production is used when estimating the available forage on the grazing unit.  This decision is supported by research on livestock use of forage.  Kinuthia et al. (1992) found that for spring and summer diets of cattle in the Wyoming big sagebrush plant community, 96% of the diet for cattle was graminoids.  Holecheck et al (2001) report that cattle consumption of forage is comprised of 76% grasses and 10% forbs in Utah sagebrush communities.  In salt desert shrub communities, more consumption of shrubs will occur.  In most areas, the assumption that cattle forage capacity can be accurately represented by only considering grasses and forbs appears valid.

The estimated forage for each of these plant communities[11] is multiplied by the percent of the soil map unit comprised of that community type.  Repeat this step for each community type within the soil map unit, and add these values together to determine the total forage available on the soil map unit.  Enter this value as the "forage production" entry in the forage capacity model formula.

Next, determine the total percentage of available forage (grass and forb biomass) that is allocated to (1) mammal herbivores, (2) invertebrates, and (3) the needs of the soil and vegetative community.  Our model suggests 10% allocation to invertebrates, 50% allocation for the needs of soil and vegetation, and 227

BLM_0147343

Case No. 1:20-cv-02484-MSK   Document 71-16   filed 04/29/21   USDC Colorado   pg 102 of
192
Proposed Outline for Forage Analysis/Grazing Capacity Model Manuscript                    Page 17 of 28

kg/ha of forage for native mammals.  To convert this value into a percentage, use the estimated forage biomass that is predicted by the NRCS Range Site Type predictions for each soil unit, and determine what percentage our suggested value (227 kg/ha) is of the estimated kg/ha of forage for that soil unit.[12] Add the percent values of (1), (2), and (3), above, to achieve the total ecological allocation for each soil type.  Multiply this value with the estimated forage for that soil type, and enter this value as the "Ecological Forage allocations" entry in the forage capacity model formula.

There are many assumptions the user is making when using this model.  These are:
1. Grazing use is uniformly distributed across all suitable lands.
2. The forage estimates represent the forage production of a soil map unit.
3. Livestock capacity can be adequately estimated using grass and forb production.
4. Average year precipitation and plant production occurs (during below average years such as occur nearly half the time in GSENM, plant productivity will be significantly reduced and this should be taken into account in setting annual stocking rates).
5. Grazing use is uniform among forage plants in each of the distance-to-water zones.
6. Grazing does not occur in a manner or time that prevents the growth of the predicted forage biomass.  Heavy early spring grazing, for example, could curtail the total forage production for a season and grazing during drought could reduce forage production in following years (Galt et al 1999).

Obviously, there will be many situations where these assumptions are not met.  With a couple exceptions (i.e. number 3 above), the forage capacity of an allotment and the resulting estimated stocking rate should usually be further reduced if these assumptions are not met.

To review, here is the sequence of steps to run the capacity model, most of which have already been discussed above:
1. Assemble spatial data for allotment (i.e. allotment boundary, soil map, and unsuitable and incapable areas, hydrology, etc.)
2. Using a GIS, clip the soil map with the allotment boundary.
3. Remove from each soil map unit those lands found to be incapable and unsuitable for grazing (steep slopes, rock outcrops, productivity of less than 19kg/ha of forage)
4. For each soil map unit, add a factor on the amount of land available to graze based on distance from water (see Table 1).
5. Export the soil map unit attributes to a spreadsheet table.
6. Determine soil map unit productivity of grasses and forbs (see pages 7-8 for our recommendations on how to do this.  Actual, on-site clipping is preferred method).
7. Determine the percent of forage required for ecological needs of vegetation, soils and wildlife (ecological allocations).
8. Insert values into soil map unit spreadsheet.
9. Calculate number of animal unit months (AUMs) of forage available for livestock in each soil unit.

In the following chapter, we present an example of how to use this method of forage analysis and capacity estimation, on the Upper Hackberry allotment in the GSENM.

BLM_0147344

# CHAPTER 3: EXAMPLE AND DISCUSSION OF FORAGE ANALYSIS FOR THE UPPER HACKBERRY ALLOTMENT

We chose the Upper Hackberry allotment to demonstrate how our GIS model can assess capacity. This allotment was chosen in part because BLM has consistently reported that the grazing permit holder has been "doing a good job of managing their allotment" (BLM 1995), and also because this area represents Range Site Types that are generally common in the Monument. This allotment is part of a regional grazing planning effort and, for this reason, more recent digital data are available. Lastly, we chose this allotment because it is of more modest size (20,000 acres). This allowed us to easily conduct clipping studies of forage productivity.

This allotment is located a few miles south of Kodachrome Basin State Park and ten miles east of Bryce Canyon National Park (Figure 2). The area is dominated by sandy soils, pinyon juniper forests, sagebrush plateaus, sandstone escarpments, badland hills, and entrenched perennial streams on the allotment borders. Based on fifty years of precipitation data, the average annual rainfall for this area is 11 inches and drought occurs frequently.



**Figure 2**. Location map for Upper Hackberry allotment, GSENM

Before we conducted our own clipping survey in Upper Hackberry, we looked to the NRCS data for the soils types present to ascertain what the predicted productivity is for this allotment (Figure 3). For example, the upland loam - basin big sagebrush soil map unit (a prevalent soil type in the allotment) is predicted to produce between 300 to 800 lbs (reflecting the range from a dry year to a wet year) of annual plant growth per acre per year. The predicted composition of this potential plant community for this Range Site Type expects that 30 to 60% of the plant production would be from forbs and grasses and the rest from shrubs and trees. As described above in the Methods Section, we did not include shrubs in the forage base for livestock. Using the NRCS data, we determined that the potential production of the upland loam soil map unit for a potential native plant community would be 400 lbs per acre of grasses and forbs in an average

BLM_0147345

Case No. 1:20-cv-02484-MSK   Document 71-16   filed 04/29/21   USDC Colorado   pg 104 of
192

year.  Much less would be produced in a dry year.

We conducted our clipping studies of plant productivity in Upper Hackberry during a below average precipitation year (2001) and, for this reason, this analysis produced forage production values that are far less than would occur in an average precipitation year.  Since below average precipitation years occur frequently, capacity analysis based on these clipping surveys is very useful, and appropriately conservative.

Thanks to BLM's recent land use plan and upcoming grazing EIS for this area, BLM was able to supply a number of coverages that aided in this analysis.  The coverages used in this analysis include Site Writeup Area (SWA) maps (which described soil map units,), grazing allotment boundaries, and surface water sources.

While most of the coverages needed already existed, some modifications were needed.  We had to create a map of those lands identified as incapable and unsuitable for grazing.  Also, BLM's soil map did not show soil inventories for state and private lands, some of which are found inside the Upper Hackberry Allotment. Using geo-referenced aerial photos, we edited the soil map unit coverage to include polygons for adjacent parcels that used to be state lands.

A number of factors were used to determine which parts of the Upper Hackberry Allotment are capable, and incapable, of supporting grazing (shown in Figure 4 and summarized in Table 4, below).  Those parts of the allotment incapable for grazing include those lands where steep slopes and rock outcrops render certain areas inaccessible to cattle.  Many of these incapable areas were also identified by BLM in an earlier capacity assessment for Upper Hackberry (1984).  We also factored in steep slopes, removing those parts of the allotment from consideration that had slopes steeper than 30% (a criteria also used by the BLM in their 1984 assessment).  We also accounted for distance to water in our capability assessment, using the GIS to identify those parts of the allotment that are 0-1.6km from water, 1.6 to 3.2km from water, over 3.2 km from water. Areas over 3.2 km from water were completely removed from the capable area (treatment of the other two classes are described below).   Lastly, we removed those areas with annual forage production of less than 19kg/ha (or 17 lb/acre, BLM 1981) based on our clipping studies on the allotment.  These last two criteria were not considered by the BLM in their 1984 forage assessment, and we stress that more reasonable figures such as the 100 lb/acre suggested by Holechek (1996) be used as minimum criteria by GSENM.

BLM_0147346

Case No. 1:20-cv-02484-MSK   Document 71-16   filed 04/29/21   USDC Colorado   pg 105 of 192



**Figure 3.** Soil map units for the Upper Hackberry grazing allotment, GSENM

**Table 4.** Area capable and suitable for livestock grazing in the Upper Hackberry Allotment, defined both by the BLM from their 1984 capacity analysis, and by the authors, utilizing the proposed capacity model.

| Allotment size | 100% | 22,734 Acres |
|---|---|---|
| Capable and suitable for grazing (1984 BLM assessment) | 67% | 14,335 acres |
| Capable and suitable for grazing (based on BLM standards for slope and inaccessibility, plus areas with >19 kg | 26% | 5,819 Acres |

There were a number of capability and suitability

BLM_0147347

| forage/ha and <3.2 km to water) | | | | criteria |

recommended in our approach (see pages 7-8) that did not apply to the Upper Hackberry test case.  We felt that unstable or highly erodible soils (as defined by NRCS) were a moot point in this case, as our slope factor removed steep, erodible slopes, and in addition, we removed the pinyon-juniper dissected slopes Range Site Type because of its extremely low forage production (as demonstrated by our clipping studies).  These soil types are known to have unstable and erodible soils.  As for our four suitability factors (habitat identified as important for T/E/S species, jurisdictional wetlands and springs, rare plant communities, areas that receive very high levels of recreation use) we found that these components were completely missing or present in near negligible amounts on the Hackberry allotment.

After the parts of the allotment that were incapable of supporting grazing were removed from the analysis, we applied our forage production values (from our clipping studies) to each Range Site Type in each soil map unit the Upper Hackberry GIS coverage.  For each soil map unit, we added forage productivity estimates to the relational table generated by the GIS that we used to calculate the grazing capacity.  Table 5 shows the forage production, in terms of expected annual growth (lb/acre) of grass and forbs, that our clipping studies indicate is available, and what the NRCS's 1984 Site Write-up's indicate for those soil types.[13]

Using GIS, we added for each soil map unit (soil community) a factor that reflected the amount of forage relative to distance of the area from a water source.   For a distance of 0 to 1.6 km from water, all forage is allocated and the factor is 1.  For a distance of 1.6 km to 3.2 km from water, half of the forage is available or a factor of 0.5.  For distances from water of greater than 3.2 km, no forage is assumed available, or a factor of 0.

Next, the GIS estimated the size of each of these soil area units with their related attributes of capability/suitability, distance from water, and plant productivity.  The GIS table with these values was then exported and, using a spreadsheet program, the forage capacity model formula was applied to each individual soil community type.  As described in Section 2, our proposed ecological allocation for the Upper Hackberry allotment was 85%, thus leaving 15% of annual forage productivity for cattle.

BLM_0147348



**Figure 4.** Areas within the Upper Hackberry Allotment that are capable, and incapable, of supporting grazing.

In addition to running the model using our own recommendations for ecological allocations, the model was also run for the traditional "take half and leave half," or 50% allocation to cattle. The results of the capacity model are shown in Table 6. This table also depicts past capacity analyses conducted by the agency, current permitted use, and average livestock grazing use. Based on the Upper Hackberry Allotment file, the part of the allotment that has traditionally been used for grazing matches that area identified by our GIS model as suitable for grazing.

**Table 5.** Upper Hackberry soil community categories and forage production, as indicated by the authors' 2001 clipping studies in the Hackberry allotment, and the NRCS 1984 Site Write-ups.

As evidenced in Table 6 below, both the permitted use and actual use on Upper Hackberry are substantially higher than the level necessary to meet the ecological needs of healthy rangelands. This conclusion

BLM_0147349

Case No. 1:20-cv-02484-MSK   Document 71-16   filed 04/29/21   USDC Colorado   pg 108 of
192
Proposed Outline for Forage Analysis/Grazing Capacity Model Manuscript                    Page 23 of 28

is actually an understatement because this capacity analysis is only to be used for rangelands that are at our near their potential productivity, which is not the case in this allotment.  Moreover, the 191 AUMs represents a grazing level for plant production found in 1984 during a normal precipitation year.  The 93 AUMs represent a level of grazing based on recent plant community productivity clipping surveys during a dry year.

**Table 6.**  Forage capacity estimates for the Upper Hackberry Allotment

| | | |
|---|---|---|
| **1967 BLM capacity estimate** | **1,388** | **AUMs** |
| **Permit to graze** | **651** | **AUMs** |
| **Reported grazing use, 5 year average** | **408** | **AUMS** |
| **Amount of allotment BLM found suitable for grazing in 1984 (15,335 out of 22,734 acres)** | **67%** | **percent** |
| **Amount of allotment suitable based on our proposed capacity model (5,819 out of 22,734 acres)** | **26%** | **percent** |
| **Grazing capacity based on 50% forage use of 1984 BLM/SCS forage estimate and calculation of suitability** | **638** | **AUMs** |
| **Grazing capacity based on 15% forage use of 1984 BLM/SCS forage estimate and calculation of suitability** | **191** | **AUMs** |
| **Grazing capacity based on 15% use of 2001 WUP clipping survey forage data and calculation of suitability** | **93** | **AUMs** |

## 3.2 Discussion of results of forage capacity analysis for Upper Hackberry, in light of range conditions.

In addition to performing the necessary clipping studies to carry out our Upper Hackberry forage analysis described above, we also calculated coverage of vegetation on the allotment.  These data are featured in Figure 5.

**Figure 5.**  The authors' ground cover estimates (%) for various Range Site Type cover transects in the Upper Hackberry allotment (data collected fall 2001).

BLM_0147350



Our initial results of our forage capacity estimate for the Upper Hackberry allotment indicates these pastures are currently producing forage, and vegetative cover, far below their potential. We argue that it's important to analyze these results in light of past and current trend data, monitoring, and rangeland health assessments collected by and carried out by the BLM, in order to corroborate our findings.

BLM range monitoring and recent rangeland health assessments describe, in part, the range condition and ecological health of this allotment. In 2001, BLM visited two riparian sites and found that these riparian areas were functioning at risk, and without positive trends (Table 7). This indicates that these riparian areas were not meeting the rangeland health standards. Visits to the Rock Springs Bench site by the authors verified that heavy livestock grazing was a regular occurrence at these water sources.

**Table 7.** Riparian properly functioning condition assessments for the Upper Hackberry Allotment*

| OBS_ID | Riparian/ Wetlands Area | RATING | TREND | Notes |
|---|---|---|---|---|
| LE0505 | Rock Springs | FAR | DOWNWARD | This area is a small spring in a drainage on an upland slope so it's probably naturally marginal conditions. |
|  | Spring below |  |  | Trailing from recreation & possible livestock. Contact Spring in Kayenta. Headcut at mouth that may not be active. Part of wetland cut down to |

BLM_0147351

Case No. 1:20-cv-02484-MSK   Document 71-16   filed 04/29/21   USDC Colorado   pg 110 of
192
Proposed Outline for Forage Analysis/Grazing Capacity Model Manuscript                    Page 23 of 28

| | | | | |
|---|---|---|---|---|
| LE1003 | rockfall on Hackberry | FAR | NOT APPARENT | bedrock.  More willow would better hold wetland together… |

\* These data are reproduced from BLM's database created for the upcoming grazing EIS.  The notes are directly taken from BLM's records for these two observation sites.

We believe that BLM's rangeland health assessments for this allotment (Table 8) understate the ecological problems found in this allotment.  Field clipping data on plant community productivity was not collected by BLM when these assessments were made.  Based on our field data for Upper Hackberry, standing forage biomass is believed to be between 10 and 20% of its potential.  According to the BLM's criteria for evaluating rangeland health indicator No. 15 (plant production), this indicator should have received a rating of 2 rather than 3.[14]  Yet another problem with the Monument's rangeland health assessments for this allotment is that no ecological reference site was identified for the Upper Hackberry Allotment.  This would lead one to conclude that no suitable reference sites exist in this allotment, which is an unfortunate commentary on the ecological state of affairs in this area.

**Table 8.**  Rangeland health indicator ratings for the Upper Hackberry Allotment.  These are not ratings for individual indicators, but rather suites of indicators that describe similar categories (soils, hydrology, biotic integrity) are averaged together.

| Observation Site ID | Pasture | SWA soil identification | Soil stability | Hydrologic Function | Biotic Integrity |
|---|---|---|---|---|---|
| E0545 | Rock Springs | S167 | 3 | 3 | 3 |
| E0527 | South Jody | L172 | 3 | 3 | 4 |
| E0528 | South Native | M207 | 4 | 4 | 4 |
| E0546 | South Native | L172 | 5 | 5 | 4 |
| E0530 | South Native | M163 | 4 | 4 | 4 |
| E0531 | South Native | L172 | 4 | 4 | 4 |
| E0532 | Rock Springs | L182 | 4 | 4 | 4 |
| E0538 | Rock Springs | M163 | 4 | 4 | 4 |
| E0539 | Rock Springs | L172 | 4 | 4 | 4 |
| E0535 | South Jody | S149 | 3 | 3 | 3 |
| E0536 | South Jody | L172 | 5 | 5 | 4 |
| E0537 | South Jody | M191 | 5 | 5 | 5 |
| E0529 | South Native | M191 | 5 | 4 | 4 |
| E0533 | North Jody | L182 | 4 | 4 | 4 |
| E0534 | Middle Jody | M141 | 4 | 4 | 4 |
| E0540 | Middle Jody | S149 | 3 | 3 | 3 |

Permanent trend plot sites have been in place in the Upper Hackberry Allotment since 1969.  The data from these trend plots are presented in Table 9, which depicts percent ground cover for key grass species, such as crested wheatgrass (*Agropyron cristatum*, a seeded exotic) and other, native, grasses.  While these native species receive much less monitoring, that which is conducted shows that coverage of these species is much less than that predicted by the NRCS as the potential plant community, confirming the plot clipping results we obtained represent degraded conditions.

In summary, based on BLM's records and the authors clipping studies, the plant community composition and productivity of this allotment are not currently meeting the standards for rangeland health.  The productivity is much lower than it should be.  This capacity model assumes that the allotment under analysis meets rangeland health standards and has productivity of at least half or better of the potential productivity for the site.  This is not the case for the Upper Hackberry Allotment.  Thus, the Upper Hackberry allotment is a likely candidate for the "recovery prescription" described above, and elsewhere in this guidance

BLM_0147352

document.

**Table 9**.  Upper Hackberry Allotment monitoring data from
permanent trend plots, provided by BLM.  Some data is missing.

| Key Species | Plot | Date | Pasture Name | % ground cover |
|---|---|---|---|---|
| | | | | 0 |
| AGCR | 2-50 A | 7/1/1969 | Jody Pt. | 5 |
| AGCR | 2-50 A | 7/1/1976 | Jody Pt. | |
| AGCR | 2-50 A | 7/1/1993 | Jody Pt. | 1 |
| AGCR | 2-50 A | 7/1/1996 | Jody Pt. | 3 |
| AGCR | 2-50 B | 7/1/1969 | Jody Pt. | 6 |
| AGCR | 2-50 B | 7/1/1976 | Jody Pt. | |
| AGCR | 2-50 B | 7/1/1993 | Jody Pt. | 11 |
| AGCR | 2-50 B | 7/1/1996 | Jody Pt. | 11 |
| AGCR | 2-50 B | 9/15/1996 | Jody Pt. | 11 |
| AGCR | 2-51 A | 7/1/1969 | Jody Pt. | 6 |
| AGCR | 2-51 A | 7/1/1976 | Jody Pt. | 8 |
| AGCR | 2-51 A | 7/1/1993 | Jody Pt. | 10 |
| AGCR | 2-51 A | 7/1/1996 | Jody Pt. | 13 |
| AGCR | 2-51 B | 7/1/1969 | Jody Pt. | 6 |
| AGCR | 2-51 B | 7/1/1976 | Jody Pt. | |
| AGCR | 2-51 B | 7/1/1993 | Jody Pt. | 15 |
| AGCR | 2-51 B | 7/1/1996 | Jody Pt. | 15 |
| BOGR | HB-2B | 9/16/1996 | | 1 |
| MUHLY | HB-2B | 9/16/1996 | | 7 |
| ORHY | HB-2A | 7/13/1982 | | 0 |
| ORHY | HB-2B | 7/13/1983 | | 2 |
| ORHY | HB-2B | 9/11/1984 | | 0 |
| ORHY | HB-2B | 9/11/1984 | | 2 |
| ORHY | HB-2B | 5/16/1988 | | 0 |
| ORHY | HB-2C | 7/13/1982 | | 0 |
| ORHY | HB-2C | 9/11/1984 | | 0 |
| ORHY | HB-2C | 8/27/1985 | | 0 |
| ORHY | HB-2C | 8/27/1985 | | 0 |

# CHAPTER 4: CONCLUSIONS AND RECOMMENDATIONS

We offer a new way to assess forage availability and grazing capacity of southern Utah rangelands that uses up-to-date science and technology. The proposed methods provided in this work are all firmly grounded in the latest ecological literature and range science (with numerous allocations borrowed directly from Holechek et al. 2001). Moreover, the widespread adoption of GIS by land managers is aiding many with important management decisions such as setting permitted stocking levels. It is time for the Monument to also use this tool in this important capacity. The grazing capacity analysis described above promises to give permittees and land managers a tool for addressing grazing problems that they have not had before.

One of the key findings outlined in Section 3 (above) is that the forage/grazing capacity of the Hackberry allotment as determined by our proposed model is much less than that currently assumed by BLM. Section 3 also demonstrates many indicators of current overgrazing in the Upper Hackberry Allotment. There are many reasons that the BLM should seriously consider adopting our proposed method (or a variation of this method) to set stocking rates throughout the Monument during this DEIS process. At this time stocking rates established in current grazing permits appear without a systematic analysis of the forage production capacity. We realize that it can be difficult to do forage biomass clippings on every allotment. At the VERY least, the GSENM needs to do GIS analysis to reduce the allotment to truly "useable" sections and then reduce AUMs accordingly.

The chances of actually meeting the Standards and Guidelines are going to be much better if our capacity model (or a form of it) is used in this process. As we point out elsewhere in this guidance document, only about 35% of Monument allotments are so far meeting all four Standards (compared to about an 80% success rating on other Utah BLM lands thus far), and our analysis above indicates these might have been more favorably rated that actual data collection would show. It clearly behooves the Monument to use all available tools at its disposal to strive to do a better job meeting these standards in the future.

Our model reaffirms the need for key plant community data generated from ongoing monitoring. Plant community composition, forage biomass production, litter, and bare ground are a few of the key monitoring data necessary to assess the amount of livestock grazing that is consistent with rangeland health standards. Further, the trend plot data currently collected by the BLM provide inadequate information to analyze the range condition requirements established by the Standards and Guidelines. It is important that the Monument establish a quantitative monitoring protocol to ensure that forage allocations are not exceeded in order to protect ecological health, including plant productivity and wildlife habitat. This protocol must also measure ground cover in order to ensure that this vital component is restored and protected at near potential in order to correct the severe erosion evidenced across the Monument.

In closing, we stress that this is a work in progress. The material presented here will soon be submitted to an academic journal for further peer review. The review and suggestions by Monument DEIS staff is requested and values. We intend to run the model on additional GSENM allotment(s), and this will include new clipping studies. We look forward to working with Monument range staff in these endeavors.

**\*\* Cited Literature is in included in Literature Cited Section of the Guidance Document\*\***

---

[1] Project Director, the Wild Utah Project. 68 South Main Street, Suite 400. Salt Lake City, UT 84101

[2] Staff Scientist for the Utah Office of the Western Watersheds Project. 250 S. Main, Mendon, UT 84325

[3] The capability analysis recommended in this model is compatible with the Capability Analysis presented in Chapter 4, Section 4.1.3.4. The concept of "capability " in both of these models (assessing range capacity and stocking rates here, determining capability in terms of "FLPMA balancing" in Chapter 4) are the same. Here the concept is used to exclude particular areas as incapable of supporting livestock grazing when determining stocking rates with a GIS. In the context of FLPMA balancing,

BLM_0147354

Case No. 1:20-cv-02484-MSK   Document 71-16   filed 04/29/21   USDC Colorado   pg 113 of
192
Proposed Outline for Forage Analysis/Grazing Capacity Model Manuscript          Page 28 of 28

capacity is used to determine appropriateness of grazing in some or part of a pasture, as well as to inform appropriate grazing management decisions such as stocking rates and utilization levels. In other words, capacity analysis is required, whether by FLPMA or when setting stocking rates. This analysis should occur as a threshold matter, to determine if grazing is an appropriate use of an allotment or portion of an allotment, and it should occur again (or the same analysis reexamined), if the agency concludes grazing is appropriate, as a basis for making sound grazing management decisions in the context of BLM's multiple use mandate.

[4] Holechek (1996) stated, "When forage production drops below 100 lbs/acre, financial losses are likely even under high cattle prices and above average precipitation." While the current version of our forage capacity model retains the BLM's production threshold of 17 lb/acre (19kg/ha), we may raise this threshold in updated versions of the model, based on Holechek's recommendation.

[5] This analysis is not to be confused with the analysis mandated by FLPMA's multiple use management mandate and the Comb Wash case, which we explain in Chapter 4 of this guidance document. While some of the factors relevant to the Comb Wash/FLPMA balancing may be similar to those referenced here, the purpose of Comb Wash/FLPMA balancing is to determine if grazing is an appropriate use of particular public lands. A determination that grazing is not an appropriate use would likely necessitate closing some or all of a particular allotment to grazing. Here, in contrast, we maintain that certain attributes and uses of the land mean that the forage there should not be included in the calculation of available forage as explained above. Forage analysis to determine stocking rates is appropriate only where the BLM has already determined that grazing is an appropriate use of a particular area. In other words, Comb Wash/FLPMA balancing should happen first.

[6] As the reader knows, the Natural Resources Conservation Service (NRCS) provides key spatial data for use in this capacity analysis. NRCS soil surveys have developed soil map units which possess common soil characteristics, climate, and composition of the plant community. A grazing allotment usually contains a number of discrete soil map units. The description for a soil map unit includes a certain vegetative community (called "Range Site Type") and the NRCS estimates the annual amount of forage that the Service believes is typically produced for that specific soil unit type. This estimation, broken down into species, is usually based on relict sites and predicts the pounds per acre of annual production one would expect on a healthy and fully productive potential natural plant community for that soil map unit.

[7] The Natural Resources Conservation Service is about to release a new soil survey with updated information. When these data area available, capacity analysis can be run with more current information.

[8] While there are a number of studies that have looked at changes in rangeland plant communities with the removal of livestock, little is known about the continued forage use by wild herbivores during recovery. Any recovery plan must account for the plant consumption needs for wildlife, soil organisms and insects. In many cases, these forage consumers have depleted populations that need to be restored.

[9] In order to convert this to a percent for use in the GIS forage capacity analysis for the Upper Hackberry allotment described in Section 3, we calculated the percentage this numerical value represented of the (grass and forb) forage predicted by the NRCS Range Site Type descriptions for those range site types in the Upper Hackberry Allotment.

[10] In the early 1980s BLM, in coordination with NRCS (then the Soil Conservation Service) conducted range surveys as part of the preparation of a soil survey. These soil map unit descriptions were reported as "Site Write-up Areas" (SWAs). The SWAs recorded the percent weight of the total aboveground plant biomass grown each year for each observed plant species. The total annual plant growth (in lbs/acre) was also recorded. A number of other factors were sometimes recorded including percent bare ground, percent ground cover, and slope.

[11] Be sure to see pages 7-8 where we make recommendations on how forage for each vegetation community type, or Range Site Type is estimated.

[12] In the Upper Hackberry example we feature in the following section, this calculation resulted in a 25% allocation of forage for herbivores across the entire allotment. Combined with the other allocations for invertebrates, and soils and vegetation, this resulted in an 85% allocation for ecological needs on the allotment.

[13] The table and figure on the following section (Figure 5 on pg 29 and Table 7 on pg 30) shows that the transects the authors measured on the Upper Hackberry allotment range between 30 and 90% bare ground. Microphytic crust ranged in cover from 0 to 28% indicating that when trampling is minimal in areas where livestock don't linger, crust potential is high and ground cover potential therefore is also high.

[14] Part of the problem with this indicator is that in rangelands dominated by trees and shrubs, the indicator may not adequately describe loss of forage production in the common situation where forb and grass production is extremely low and shrub and tree production high.

BLM_0147355



**Wyoming Office**
**PO Box 1160**
**Pinedale, WY 82941**
**Email: Wyoming@WesternWatersheds.org**
**Web site: www.WesternWatersheds.org**

*Working to protect and restore Western Watersheds*

**Western**
**Watersheds**
**Project**

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401

BLM_0147356



**Wyoming Office**
**PO Box 1160**
**Pinedale, WY 82941**
**Tel: (877) 746-3628**
**Fax: (208) 475-4702**
**Email: Wyoming@WesternWatersheds.org**
**Web site: www.WesternWatersheds.org**          *Working to protect and restore Western Watersheds*

**Western**
**Watersheds**
**Project**

October 23, 2016

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401

Re:  RMP Comments

*"A thing is right when it tends to preserve the integrity, stability, and beauty of the biotic community. It is wrong when it tends otherwise."*

*"We abuse land because we regard it as a commodity belonging to us. When we see land as a community to which we belong, we may begin to use it with love and respect. There is no other way for land to survive the impact of mechanized man, nor for us to reap from it the esthetic harvest it is capable, under science, of contributing to culture."*

- Aldo Leopold

*"What we do with the public lands of the United States tells a great deal about what we are, what we care for and what is to become of us as a nation."*

- Senator Henry M. Jackson

*"And [multiple use is] harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output."*

- Federal Land Policy and Management Act 43 U.S.C. § 1702(c)

*"In managing the public lands the Secretary [of the Department of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands."*

- Federal Land Policy and Management Act 43 U.S.C. § 1732(b)


Dear Field Office Manager,

The first and foremost consideration must be the legal and regulatory framework within which the BLM operates. The overarching law is FLPMA. FLPMA requires that the BLM:

*Section 102 (2) the national interest will be best realized if the public lands and their resources are periodically and systematically inventoried and their present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts*

*Section 102 (8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will pro-vide for outdoor recreation and human occupancy and use*

*Section 201 (a) The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern. This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values. The preparation and maintenance of such inventory or the identification of such areas shall not, of itself, change or prevent change of the management or use of public lands.*(emphasis added)

Compliance with this subsection is the prerequisite of all planning and must be completed prior to initiation of the RMP revision process. Note also that the next Section B mentions funding. This indicates Section B is discretionary, whereas Section A is mandatory.

*Section 202 (c) In the development and revision of land use plans, the Secretary shall–*
*(1) use and observe the principles of multiple use and sustained yield set forth in this and other applicable law;*
*(2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;*
*(3) give priority to the designation and protection of areas of critical environmental concern;*
*(4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other values;*
*(5) consider present and potential uses of the public lands;*
*(6) consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;*
*(7) weigh long-term benefits to the public against short-term benefits;*
*(8) provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans;* (emphasis added)

BLM_0147358

*Section 302 B In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.*

The regulations implementing the FLPMA planning requirements are at 43 CFR 1600.

43 CFR 1601.0-2 Objective.

The objective of resource management planning by the Bureau of Land Management is to maximize resource values for the public through a rational, consistently applied set of regulations and procedures which promote the concept of multiple use management and ensure participation by the public, state and local governments, Indian tribes and appropriate Federal agencies. <u>Resource management plans are designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses.</u> (emphasis added)

It is clear from the above that RMP's are required to provide specific requirements, standards and limitations that are overarching for the Field Office and that guide the site-specific decisions later. The DEIS RMP direction are little more than aspirational with no requirements. This violates FLPMA.

This is made even more clear under Definition N, which states:

(n) Resource management plan means a land use plan as described by the Federal Land Policy and Management Act. The resource management plan generally establishes in a written document:
    (1) <u>Land areas for limited, restricted or exclusive use; designation, including ACEC designation;</u> and transfer from Bureau of Land Management Administration;
    (2) <u>Allowable resource uses (either singly or in combination) and related levels of production or use to be maintained;</u>
    (3) <u>Resource condition goals and objectives to be attained;</u>
    (4) <u>Program constraints and general management practices needed to achieve the above items;</u>
    (5) Need for an area to be covered by more detailed and specific plans;
    (6) <u>Support action, including such measures as resource protection, access development, realty action, cadastral survey, etc., as necessary to achieve the above;</u>
    (7) General implementation sequences, where carrying out a planned action is dependent upon prior accomplishment of another planned action; and
    (8) <u>Intervals and standards for monitoring and evaluating the plan to determine the effectiveness of the plan and the need for amendment or revision.</u>

 43 CFR 1610.4-4 requires that the BLM:

The Field Manager, in collaboration with any cooperating agencies, will analyze the inventory data and other information available to determine the ability of the resource area to respond to identified issues and opportunities. The analysis of the management situation shall provide, consistent with multiple use principles, the basis for formulating reasonable alternatives, including the types of resources for development or protection. Factors to be considered may include, but are not limited to:

BLM_0147359

(a) The types of resource use and protection authorized by the Federal Land Policy and Management Act and other relevant legislation;

(b) Opportunities to meet goals and objectives defined in national and State Director guidance;

(c) Resource demand forecasts and analyses relevant to the resource area;

(d) The estimated sustained levels of the various goods, services and uses that may be attained under existing biological and physical conditions and under differing management practices and degrees of management intensity which are economically viable under benefit cost or cost effectiveness standards prescribed in national or State Director guidance;

(e) Specific requirements and constraints to achieve consistency with policies, plans and programs of other Federal agencies, State and local government agencies and Indian tribes;

(f) Opportunities to resolve public issues and management concerns;

(g) Degree of local dependence on resources from public lands;

(h) The extent of coal lands which may be further considered under provisions of §3420.23(a) of this title;

and

(i) Critical threshold levels which should be considered in the formulation of planned alternatives.

43 CFR 1610.7-2 requires:

Areas having potential for Areas of Critical Environmental Concern (ACEC) designation and protection management shall be identified and considered throughout the resource management planning process (see §§1610.4–1 through 1610.4–9).

 (a) The inventory data shall be analyzed to determine whether there are areas containing resources, values, systems or processes or hazards eligible for further consideration for designation as an ACEC. In order to be a potential ACEC, both of the following criteria shall be met:

(1) Relevance. There shall be present a significant historic, cultural, or scenic value; a fish or wildlife resource or other natural system or process; or natural hazard.

(2) Importance. The above described value, resource, system, process, or hazard shall have substantial significance and values. This generally requires qualities of more than local significance and special worth, consequence, meaning, distinctiveness, or cause for concern. A natural hazard can be important if it is a significant threat to human life or property.

BLM Manual 1601 Land Use Planning further describes the requirements the BLM must comply with in the development of an RMP:

Section .1 B. The land use planning process is the key tool used by the BLM, in coordination with interested publics, to protect resources and designate uses on Federal lands managed by the BLM. Planning is critical to ensuring a coordinated, consistent approach to managing these lands. This Manual and Handbook provide guidance for preparing new Resource Management Plans (RMPs), plan revisions, plan amendments, other equivalent plans (e.g., plans adopted from other agencies), and subsequent implementation-level plans. Procedures and requirements are set forth to ensure that the BLM's plans meet regulatory and statutory requirements. (emphasis added)

Section .2 .02 Objectives. These plans help ensure that the public lands are managed in accordance with FLPMA (43 USC 1701 et seq.) and other applicable laws and regulations, under the principles of multiple use and sustained yield; in a manner that recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber; and in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water, and archaeological values. Where appropriate, lands will be managed to preserve and protect certain public lands in their natural condition to provide food and habitat for fish and wildlife and domestic animals, and to provide for outdoor recreation and human occupancy and use. The BLM will encourage collaboration and public participation throughout the planning process. To accomplish the above, the BLM will:

A. Provide on a continuing basis an inventory of all public lands and their resource and other values. This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values (FLPMA, Sec. 201 (a)).

B. Use an interdisciplinary process for evaluating resource information that considers physical, cultural, and biological resources in conjunction with social and economic factors to decide appropriate public land uses.

C. Ensure opportunities for participation by Indian tribes, State and local governments, other Federal agencies, and the public in a way that coordinates land use inventory, planning, and management activities with these other jurisdictional entities. Such participation will help ensure that land use plans for public lands are consistent with the plans and policies of these entities to the maximum extent consistent with Federal law (FLPMA, Sec. 202 (c) (9)), and that policies of approved Indian tribal land resource management programs are considered (FLPMA, Sec. 202 (b)).

D. Use collaborative and multijurisdictional approaches, to the extent possible, to encourage consistency in planning across different land ownerships and jurisdictions.

E. Provide to the public a documented record of land allocations and permissible resource uses and constraints.

F. Provide a framework to guide subsequent implementation decisions. (emphasis added)

Section .3 2. reiterates the requirements of FLPMA:

"Sec. 201 requires the Secretary of the Interior to prepare and maintain an inventory of the public lands and their resource and other values, **giving priority** to areas of critical environmental concern (ACECs), and, as funding and workforce are available, to determine the boundaries of the public lands, provide signs and maps to the public, and provide inventory data to State and local governments.

F. The Colorado River Basin Salinity Control Act, 43 U.S.C. 1593, requires a comprehensive program for minimizing salt contributions to the Colorado River from BLM lands.

Section .06 requires:

2. The BLM's mission is to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations. Land use plan decisions will further this mission by identifying desired outcomes and actions that restore and maintain the health of the land; preserve natural and cultural heritage; reduce threats to

public health, safety, and property; and provide opportunities for environmentally responsible recreational and commercial activities.

3. When making land use plan decisions, the BLM will consider information from all available sources, including scientific data gained from resource assessments, information regarding ecosystem protection and restoration needs, the reasonably foreseeable development of consumptive and nonconsumptive uses, and social and economic information.

The Manual provides specific definitions for the requirements that a RMP must contain:

Goal: a broad statement of a desired outcome. Goals are usually not quantifiable and may not have established time frames for achievement.

Guidelines: actions or management practices that may be used to achieve desired outcomes, sometimes expressed as best management practices. Guidelines may be identified during the land use planning process, but they are not considered a land use plan decision unless the plan specifies that they are mandatory. Guidelines for grazing administration must conform to 43 CFR 4180.2.

Land Use Allocation: the identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions.

Land Use Plan Decision: establishes desired outcomes and actions needed to achieve them. Decisions are reached using the planning process in 43 CFR 1600. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to IBLA.

Objective: a description of a desired condition for a resource. Objectives can be quantified and measured and, where possible, have established time frames for achievement.

Planning Criteria: the standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning. Planning criteria streamline and simplify the resource management planning actions.

Resource Use Level: the level of use allowed within an area. It is based on the desired outcomes and land use allocations in the land use plan. Targets or goals for resource use levels are established on an area-wide or broad watershed level in the land use plan. Site-specific resource use levels are normally determined at the implementation level, based on site-specific resource conditions and needs as determined through resource monitoring and assessments.

Standard: a description of the physical and biological conditions or degree of function required for healthy, sustainable lands (e.g., land health standards).

With the exception of some specific oil and gas related requirements, most of the other resource extraction sections fail to implement Objectives and Resource Use Levels as

BLM_0147362

defined above. Livestock grazing is a perfect example of this problem. It fails to implement limitations or specific requirements.

BLM H-1601-1 Land Use Planning Handbook, likewise provides further specificity and reiteration of the requirements the BLM must follow in the development of RMP's:

Land use plans and planning decisions are the basis for every on-the-ground action the BLM undertakes.

Land use plans ensure that the public lands are managed in accordance with the intent of Congress as stated in FLPMA (43 U.S.C. 1701 et seq.), under the principles of multiple use and sustained yield. As required by FLPMA and BLM policy, the public lands must be managed in a manner that protects the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; that will provide for outdoor recreation and human occupancy and use;

Land use plans are one of the primary mechanisms for guiding BLM activities to achieve the mission and goals outlined in the Department of the Interior (DOI) Strategic Plan.

Handbook at 1A

Decisions in land use plans guide future land management actions and subsequent site-specific implementation decisions. These land use plan decisions establish goals and objectives for resource management (desired outcomes) and the measures needed to achieve these goals and objectives (management actions and allowable uses). Section 202(c) of FLPMA (43 U.S.C. 1712) requires that in developing land use plans, the BLM:

1. Use and observe the principles of multiple use and sustained yield;
2. use a systematic interdisciplinary approach to integrate physical, biological, economic, and other sciences;
3. give priority to designating and protecting areas of critical environmental concern (ACECs);
4. rely, to the extent available, on an inventory of public lands, their resources, and other values;
5. consider present and potential uses of public lands;
6. consider the relative scarcity of the values involved and the availability of alternative means and sites for realizing those values;
7. weigh long-term benefits to the public against short-term benefits;
8. provide for compliance with applicable Tribal, Federal, and state pollution control laws, standards, and implementation plans; and
9. to the extent consistent with the laws governing the administration of public lands, coordinate the land use inventory, planning, and management activities of public lands with land use planning and management programs of other Federal departments/agencies and state/local governments, as well as the policies of approved Tribal and state land resource management programs. The BLM must, to the extent practical, assure that consideration is given to those Tribal, state, and local plans that are germane in the development of land use plans for public lands. Land use plans must be consistent with

BLM_0147363

state and local plans to the maximum extent consistent with Federal law. Refer to FLPMA for the full text of Federal responsibilities detailed under Section 202(c)(9).

Handbook at IIA

Further defining the required components of an RMP, the Handbook states in Section II B:
**B. Types of Land Use Plan Decisions**
<u>Land use plan decisions for public lands fall into two categories: desired outcomes (goals and objectives) and allowable (including restricted or prohibited) uses and actions anticipated to achieve desired outcomes.</u>

1. Desired outcomes
Land use plans must identify desired outcomes expressed in terms of <u>specific goals and objectives. Goals and objectives direct the BLM's actions in most effectively meeting legal mandates; numerous regulatory responsibilities; national policy, including the DOI Strategic Plan goals; State Director guidance (see 43 CFR 1610.0-4(b)); and other resource or social needs. Desired outcomes should be identified for and pertain to resources (such as natural, biological, and cultural), resource uses, (such as energy and livestock grazing), and other factors (such as social and economic conditions).</u> Definitions and examples of goals and objectives are listed below:

*Goals* are broad statements of desired outcomes (e.g., maintain ecosystem health and productivity, promote community stability, ensure sustainable development) that usually are not quantifiable. Since the release of the original Handbook, the BLM has worked with RACs to develop Land Health Standards applicable to all ecosystems and management actions. These Land Health Standards must be expressed as goals in the land use plan. Goals can also be drawn from the Departmental and/or the DOI Strategic Plan or other sources. A sample goal for a Land Health Standard is: "Maintain healthy, productive plant and animal communities of native and other desirable species at viable population levels commensurate with the species and habitat's potential." A sample goal from the Strategic Plan is: "Sustain desired biological communities on Department of the Interior-managed and -influenced lands and waters in a manner consistent with obligations regarding the allocation and use of water." These goals, or modifications thereof, could be used in a land use plan.

<u>*Objectives* identify specific desired outcomes for resources. Objectives are usually quantifiable and measurable and may have established timeframes for achievement (as appropriate). A sample objective is: "Manage vegetative communities on the upland portion of the Clear Creek Watershed to achieve, by 2020, an average 30 to 40 percent canopy cover of sagebrush to sustain sagebrush-obligate species." When quantified, the indicators associated with Land Health Standards are one possible source of objectives.</u>

While the DEIS has goals, the objectives as defined above are noticeably missing.

2. Allowable uses and management actions anticipated to achieve desired outcomes (goals and objectives)

BLM_0147364

After establishing desired outcomes, the BLM identifies allowable uses (land use allocations) and management actions for different alternatives that are anticipated to achieve the goals and objectives.

a. Allowable uses. <u>Land use plans must identify uses, or allocations, that are allowable, restricted, or prohibited on the public lands and mineral estate.</u> These allocations identify surface lands and/or subsurface mineral interests where uses are allowed, <u>including any restrictions that may be needed to meet goals and objectives. Land use plans also identify lands where specific uses are excluded to protect resource values. Certain lands may be open or closed to specific uses based on legislative, regulatory, or policy requirements or criteria to protect sensitive resource values.</u> If land use plan decisions close areas of 100,000 acres or greater in size to a principal or major use for 2 years or more, Congress must be notified of the closure upon its implementation as prescribed in 43 CFR 1610.6.

<u>The land use plan must set the stage for identifying site-specific resource use levels.</u> Site-specific use levels are normally identified during subsequent implementation planning or the permit authorization process. <u>At the land use plan level, it is important to identify reasonable development scenarios for allowable uses such as mineral leasing, locatable mineral development, recreation, timber harvest, utility corridors, and livestock grazing to enable the orderly implementation of future actions.</u> These scenarios provide a context for the land use plan's decisions and an analytical base for the NEPA analysis. <u>The BLM may also establish criteria in the land use plan to guide the identification of site-specific use levels for activities during plan implementation.</u>

b. Management actions. <u>Land use plans must identify the actions anticipated to achieve desired outcomes, including actions to maintain, restore, or improve land health. These actions include proactive measures (e.g., measures that will be taken to enhance watershed function and condition), as well as measures or criteria that will be applied to guide day-to-day activities occurring on public land. Land use plans also establish administrative designations such as ACECs, recommend proposed withdrawals, land tenure zones, and recommend or make findings of suitability for congressional designations (such as components of the National Wild and Scenic River System).</u> While protection and restoration opportunities and priorities are often related to managing specific land uses (such as commodity extraction, recreation, or rights-of-way corridors), they can be independent of these types of uses as well. In certain instances, it is insufficient to simply remove or limit a certain use, because unsatisfactory resource conditions may have developed over long periods of time that will not correct themselves without management intervention. For example, where exotic invasive species are extensive, active restoration may be necessary to allow native plants to reestablish and prosper. In these cases, identifying restoration opportunities and setting restoration priorities are critical parts of the land use planning process.

Again, the 'direction' contained in the DEIS utterly fails to meet the above requirements.

Appendix C of the Handbook states:

The application of program-specific guidance for land use plan decisions will vary, depending on the decision category, and must be applied as follows:

BLM_0147365

I. *Natural, Biological, and Cultural Resources:* <u>Decisions identified must be made during the land use planning process if the resource exists in the planning area.</u>

II. *Resource Uses:* <u>Decisions identified must be made during the land use planning process if the BLM anticipates it may authorize or allow a resource use. If uses are allowed, decisions must also be made regarding intensity and limits or restrictions.</u>

Again, take livestock grazing as an example, the DEIS 'direction' fails to implement requirements and limitations needed to meet goals.

III. *Special Designations:* <u>Special designation decisions identified must be made during the land use planning process when the BLM anticipates it may authorize or allow uses which could disqualify inventoried resource values from designation. Special designation decisions may be made during the land use planning process when there is no threat to the inventoried resource.</u>

IV. *Support:* Support needs and decisions may be determined through the land use planning process, based on individual planning situations.

Appendix C of the Handbook provides the heart of the planning process. Given its importance to complying with FLPMA, we are providing it, with highlights, in its entirety as Exhibit A.

Please review the

The Department of the Interior Departmental Manual 516 DM1 provides important guidance for the development of DEIS:

1.2   **Policy**. It is the policy of the Department:

      A.      To provide leadership in protecting and enhancing those aspects of the quality of the Nation's environment which relate to or may be affected by the Department's policies, goals, programs, plans, or functions in furtherance of national environmental policy;

Section D states, in part:

(4)      Shall monitor, evaluate, and control on a continuing basis their activities as needed to protect and enhance the quality of the environment.  Such activities will include both those directed to controlling pollution and enhancing the environment and those designed to accomplish other program objectives which may affect the quality of the environment. They will develop programs and measures to protect and enhance environmental quality. They will assess progress in meeting the specific objectives of such activities as they affect the quality of the environment.

Section E states, in part:

BLM_0147366

(2)     Shall use information obtained in the NEPA process, including pertinent information provided by those persons or organizations that may be interested or affected, to identify reasonable alternatives to proposed actions that will avoid or minimize adverse impacts to the human environment while improving overall environmental results.

(3)     Shall monitor, evaluate, and control their activities on a continuing basis to further protect and enhance the quality of the environment.

Subsection 1.19     **Methodology and Scientific Accuracy** (40 CFR 1502.24). Conclusions about environmental effects will be preceded by an analysis that supports that conclusion unless explicit reference by footnote is made to other supporting documentation that is readily available to the public.  Bureaus will also follow Departmental procedures for information quality as required under Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Pub. L.106-554, 114 Stat. 2763).

The DEIS failed to comply with this requirement.

The Department of the Interior Departmental Manual 520 DM1 provides important guidance for the development of RMP. We provide a highlighted version of this in full as Exhibit B.

We particularly draw your attention to the Policy statement, Section 1.7 C 4, 5 and 10 as well as 1.8.

These requirements were not implemented in the DEIS.

We also provide as highlighted version of BLM Manual 1737 Riparian-Wetland Area Management as Exhibit C. Of critical importance are:

.06 Department of the Interior and BLM Policy (p9)
.11C 1 through 6 (p12)  which define RMP minimum requirements
.41A (p19) grazing related RMP requirements for the protection of riparian areas
.41B (20) Wetland management requirements for RMP's
.42A 1, 2 and 3  RMP requirements for soil and water
.45A and D - RMP requirements for fish and wildlife habitat
Page 30 Salinity Control Act requirements

These requirements were not implemented in the DEIS.

We also provide as highlighted version of BLM Manual 6720 Aquatic Resource Management as Exhibit D. Of critical importance are:

.04J Manager responsibilities
.06 BLM Policy
.11 and .12 Inventory requirements
.13B (p9) RMP requirements
.16 (p11) RMP requirements

These requirements were not implemented in the DEIS.

We also provide as highlighted version of BLM Manual 7200 Water Resource Management as Exhibit E. Of critical importance are:

Objectives (p3)
.06C RMP requirements
.21 Planning and RMP requirements

These requirements were not implemented in the DEIS.

We also provide as highlighted version of BLM Manual 6840 Sensitive Species Management as Exhibit F. Of critical importance are:

.04E5 (p5) State director responsibilities
.06 (p7) ESA and Sensitive Species requirements
 Section D on p9
.12 (p14) Sensitive Species RMP requirements
.2 (p15)
.22 (p36 and on) Section A
.22D4C (p41) RMP requirements

These requirements were not implemented in the DEIS.

Without question, private livestock grazing is the most important RMP topic. Livestock grazing is permitted on 99% of the total Field Office acres. Livestock grazing has caused and is causing the most impacts over the entire Field Office. BLM permitted livestock grazing has caused a permanent ~50% loss in the productivity over most parts of the Field Office. BLM permitted livestock grazing has destroyed most of the riparian and hydrologic function throughout the Field Office. BLM permitted livestock grazing has degraded the water storage capacity of riparian areas throughout the Field Office which has lead to reduced flows, elimination of once productive fisheries and loss of riparian habitat. BLM permitted livestock grazing has not been properly managed. Trespassing livestock and excessive utilization are the rule not the exception. The BLM has known about these violations of permit terms and conditions for decade after decade, it has also known the ecosystem degradation caused by this lack of action for decade after decade, but has failed to take any effective actions to fulfill its public trust and legal responsibilities.

The RMP will not be morally or legally defensible if this most important of issues is not addressed properly. The RMP EIS must thoroughly and defensibly review the failures of the past RMP and what actions must be taken to correct these failures. The current DEIS fails to do this.

The BLM must include in each RMP alternative and in the final selected alternative a voluntary waiver and retirement provision for all grazing permits.

The RMP must include measurable (i.e. quantifiable) standards for livestock grazing including maximum upland and riparian utilization of 30% on any herbaceous graminoids; maximum bank or wetland trampling annually not to exceed 10% of hydric and mesic soils

areas; maximum use of woody browse by all sources not to exceed 15% of new leader growth annually.

In addressing range management in the revision the BLM should use and reference the quantitative data (including the methodologies used to collect them and the time they were collected) pertaining to the current and expected acreages which meet, or fail to meet, desired vegetative condition, and trends in vegetative condition. Using out-dated data or using methodologies which are no longer accepted, would be inappropriate. As we previously cited, the BLM's own planning handbook requires the use of the best available information. For example, the critical values of riparian areas were not well known even twenty years ago, so that most analyses at the time did not apply to riparian areas.

In many areas, winter use by wildlife follows the end of the livestock grazing period. It would be worthwhile to establish a standard and a monitoring plan for total use (by both wildlife and livestock) on an annual basis to determine if the standards for livestock use are achieving the desired objectives. In some areas, it is likely that combined use would be greater than expected for both riparian and upland total utilization and stricter standards may be necessary for livestock utilization.

It is widely recognized in the range management literature that monitoring is the key to successful range management program. The RMP revision should include standards/requirements for a range management monitoring protocol for both upland and riparian areas. Details of the stream stability monitoring protocol, including the frequency and intensity with which it will be utilized, and so forth, should be provided in the RMP revision.

The EIS must disclose the type, location, and number of the various "range improvements" (fencing, water developments, water pipelines, access roads, and so forth) that currently exist on the public lands that will be managed under the direction of the RMP revision. What cumulative impacts have these "improvements" had on vegetation, wildlife habitat, water quality, riparian areas, soils, and habitat fragmentation? What changes/impacts to upland vegetation, water quality, habitat values, and other resources near these developments have occurred as a result of these "improvements?" Have these management activities been successful at accomplishing the goals for which they were implemented? These questions must be answered.

Additionally, the EIS should document how domestic grazing activities on allotments has affected habitat for threatened, endangered, and sensitive species in the project area. How has vegetation changed as a result of a century of livestock grazing?

Claims based on the absence of streams from 303d lists or absence of monitoring data are not sufficient to document that water quality is not impaired. Research has shown that when livestock are present, fecal coliform bacteria increase, temperature increases due to removal of shading vegetation and streams become silt-laden, destroying their native aquatic life. Other factors such as eroding stream banks, cattle defecating in streams, etc. are violations of Narrative or Anti-degradation Standards. The altering of stream flows by degraded watershed conditions that allow greater runoff and siltation as well as late season dewatering of streams must all be considered.

BLM_0147369

The RMP must address how it will handle the buy-out of grazing permits by conservation and other organizations, and should identify how it will retire such permits through the planning process. BLM should work with permittees to identify those who are interested in retiring their permits or being relocated to prevent resource damage.

Grazing permits should require public access easements across private land. If permittees refuse to grant access to public lands, then all permits should be cancelled.

It is imperative that BLM, in its RMPs, recognize the value of ungrazed watersheds both from an economic and environmental point of view.  Not all areas should be grazed by livestock.  This should be based on a determination of suitability for livestock grazing considering alternative uses and their benefits as well as the current condition of the land.  In addition, sensitive soils must be protected.  This includes soils which occur on steep slopes, are susceptible to severe wind and water erosion or have been degraded from their potential by removal of ground covering vegetation and cryptogrammic crusts.  It also means that in areas of weed infestations, generally caused as a result of livestock grazing, livestock should be eliminated to allow recovery.  Unsuitable areas should be mapped and allotments in those areas phased out to provide necessary protections.  Those areas that are to continue being grazed by livestock must be stocked and managed in accordance with the condition of the land and its vegetation.

In areas to be grazed by livestock, the amount of forage produced must be determined and allocations of forage to watershed protection (50%), wildlife  (25%) and livestock (25%) be made as recommended by Holechek et al (1998)[1].  Field data collection will be necessary to accomplish this.

To summarize key components that the RMP must address:

> ➢ Drought – The RMP must lay out a clear and effective drought policy
> ➢ PFC – The BLM initiated in 1991, a program called Riparian-Wetland Initiative for the 1990's, Among other things, this initiative called for management improvements to insure that at least 75% of the BLM stream miles reached the minimum of PFC by 1997. The BLM has failed miserably in meeting this goal. The RMP must commit to and provide the direction necessary to maintain all streams in the FO at a minimum of PFC
> ➢ Fundamentals of Rangeland Health – Implementing the 4180 regulations within the FO has been spotty at best and in those areas that compliance with Standards and Guidelines have been reviewed, the actions proposed have either never been implemented or been proven to be  ineffective. The RMP must correct this deficiency and implement a schedule and regular feedback loops to complete the processes required under 4180. It also must prioritize reviews based on the need for change, such as I Category allotments first
> ➢ The EIS and RMP must address the fact that livestock sizes, and thus forage consumption, have increased dramatically since the AUM was defined. Failure to address this critical issue will lead to legal vulnerability under NEPA, APA and the False Claims Act.

---

[1] Holechek, Jerry L., Rex D. Piper and Carlton H. Herbel.  1998.  Range Management Principles and Practices.  542 pp. Prentice-Hall, New Jersey.

BLM_0147370

- ➤ To comply with FLMPA, TGA, PRIA, NEPA and the APA, the EIS and RMP must only approve livestock grazing within the limits of current productivity and suitability, not capacities determined many decades ago. Current data shows that productivity on BLM lands has declined significantly over the last 20-40 years.
- ➤ The EIS and RMP must analyze the successes and failures of the current RMP and analyze the validity of the assumptions and accuracy of the analysis of the EIS conducted to develop the current RMP. Such analyses are critical to learning from the mistakes of the past as well as to comply with NEPA
- ➤ The RMP must provide clear management direction for the protection of ESA listed and BLM Sensitive Species

PFC

In 1991 the BLM initiated a program called "Riparian-Wetland Initiative for the 1990's" (See BLM/WO/GI-91/001+4340). This initiative called for achievement of four overarching goals:

- ➤ Restore and maintain riparian-wetland areas so that 75% or more are in proper functioning condition by 1997
- ➤ Protect riparian-wetland areas and associated uplands through proper management and to avoid or mitigate negative impacts
- ➤ Ensure an aggressive riparian-wetland information and outreach program
- ➤ Improve partnerships and cooperative restoration

Strategies to implement these goals include:

- ➤ Inventory and Classification to determine current status and potential
- ➤ Land Use and Activity Planning revisions describing actions needed to meet these objectives
- ➤ Monitoring to determine if management actions are meeting goals and objectives
- ➤ Avoiding or mitigating impacts on riparian-wetland areas

Little progress has been made in the 20 years since.

The RMP must address this poor performance and lay out an action plan to achieve the goals laid out in the BLM's "Riparian-Wetland Initiative for the 1990's".

We would like the reader to note that attaining PFC is only the lowest acceptable level. PFC is not a goal but the basis on which other resource goals are met. We request the BLM review its own manual, TR 1737-15, for a more complete description of what PFC is and is not. We especially direct the BLM's attention to page 16 of this manual for a very clear description of the fact that PFC is only the lowest basis on which all other values are built upon. As such, the RMP must delineate management objects that go far beyond PCF to include watershed health values, fisheries values, water quality values and wildlife values.

FUNDAMENTALS OF RANGELAND HEALTH

BLM_0147371

The RMP must include timelines and priorities for the completion and review of progress of the Fundamentals of Rangeland Health Standards and Guidelines assessments and determinations as required under the 4180 regulations.

For further details on the implementation of the 4180 regulations, we request that the BLM review its 1/19/01 Manual Transmittal Sheet for H-4180-1 Rangeland Health Standards. We specifically bring the BLM's attention to its duties to make "significant progress" towards meeting Standards and Guidelines. The RMP must provide direction to achieve the Fundamentals of Rangeland Health and the Standards and Guidelines, and in those situations, of which there are many, where these are not being met, the RMP must provide sufficient direction that results in the required "significant progress".

The RMP must also provide feedback loops so that once Standards and Guidelines (S&G) evaluations are completed, that the BLM requires regular reviews to insure "significant progress" is being made.

LIVESTOCK SIZES, FORAGE CONSUMPTION AND THE AUM

The BLM can not just assume that an AUM is 800 lbs of forage consumption per month. The RMP/EIS must analyze the current and potentially available forage to satisfy the forage consumption by the number of livestock it currently permits or proposes to permit. It can not assume that the forage capacity determined 20-40 years ago is applicable today.

The Society for Range Management (SRM) in 1974 defined an Animal Unit *"to be one mature (1000 lb.) cow or the equivalent based upon average daily forage consumption of 26 lbs. dry matter per day."* [2]. SRM also defined an Animal Unit Month as *"The amount of feed or forage required by an animal-unit for one month."* NRCS defined the forage demand for a 1,000 pound cow as 26 pounds of oven-dry weight or 30 pounds air-dry weight of forage per day[3]. It is important to ensure that forage consumption rates by livestock are based on the size of animals present on the allotment and a reasoned estimate of their daily consumption rates. The following analysis provides some background and justifies a more current forage consumption rate for cow/calf pairs. It is BLM's obligation to ensure this forage is accurately accounted for as this is its fiduciary duty to the American People. Undercounting forage consumption by livestock results in undercharging for that forage. This is potentially defrauding the American public under the False Claims Act[4]

The University of Nevada Agricultural Experiment Station published a report on cattle production in 1943[5] (Brennan and Harris, 1943). That report analyzed 14 years of ranch operation for eleven ranches in northeastern Nevada. At that time, a mature cow was considered one unit and a branded calf or weaner as ½ cow unit, for a combined total of 1.5 cow units per cow/calf pair. Bulls were considered 1.5 cow units. For the period 1938 – 1940, the average turnoff weight (when they left the range) of mature cows was 959 pounds, calves were 381 pounds and bulls were 1222 pounds. This means that in the

---

[2] Society for Range Management. 1974. Glossary of terms used in range management.
[3] USDA. 1997. National Range and Pasture Handbook.
[4] Title 18 USC Section 1001.
[5] Brennan, C.A. and Fred B. Harris. 1943. Fourteen Years Cattle Production and Ranch Earning Power in Northeastern Nevada 1928 to 1941. University of Nevada Agricultural Experiment Station, Reno, Nevada.

1930's, a cow/calf pair was 1340 pounds. With breeding, supplements and hormones, weights have increased over time, for example, Anderson et al (ca 2000) calculated a 35% increase in dressed weights per animal between 1975 and 1995[6].

USDA market statistics[7] give the average weights of slaughter cattle for the week ending August 14, 2004 as 1251 pounds. The estimate for the same week in 2005 for slaughter cattle average weight was 1260 pounds. The USDA National Agricultural Statistics Service data for average live weight of cattle slaughtered in 2004 was 1242 pounds compared to 1187 pounds in 1995, or an increase of nearly 8.5% in those 10 years[8]. The Livestock Monitor is a newsletter produced by the North Dakota State University Extension Service Livestock Marketing Information Center in cooperation with USDA State Extension Services[9]. The Livestock Monitor shows for the week ending August 6, 2005, live weights of slaughter cattle averaged 1258 pounds.

The potential weights of mature cows can be even larger than these numbers. For example, NRCS in its National Range and Pasture Handbook, referenced above, defines body condition scores. A body condition score of 6 which is described as *"Good, smooth appearance throughout. Some fat deposits in brisket and over the tailhead. Ribs covered and back appears rounded."* This body condition score relates to a pregnancy percentage of 88%, which is important as a goal for cow/calf operations as dry cows are usually culled and replaced and the weight gain of calves is important for income. According to Dr. Larry W. Olson, Extension Animal Scientist at Clemson University, a medium frame cow in body condition score 6 could easily weigh 1300 – 1400 pounds[10].

Holechek et al (2001) summarized the weaning weights of calves grazed on various types of rangelands at different stocking rates[11]. The data for the period since 1990 produced an average weaning weight of 430 pounds and a range of 382 – 475 pounds. Ray et al (2004) gave a weaning weight of 480 pounds for calves. Using the current market statistics for slaughter cattle at about 1250 pounds and assuming a calf weight of 300 pounds to allow for weight gain during the grazing season, an estimate for the average weight of a cow/calf pair during the grazing season of 1,500 pounds seems reasonable.

As pointed out above, the NRCS used 26 lbs/day of oven dry weight for a 1,000 pound cow and stated this was equivalent to 30 pounds per day air-dry weight. The NRCS Range and Pasture Handbook value of 30 pounds air-dry weight would be 3% of body weight for a 1,000 pound cow. Applying this to the estimate of a current weight of 1,500 pounds for a cow/calf pair, the daily forage consumption would be 45 lbs of air-dry forage per day, or for a month (30.4 days), 1368 pounds of forage per AUM.

The forage needs for domestic sheep must also be determined. Based on current USDA published weights for ewes and lambs, adult domestic sheep weigh from 165 to 440

---

[6] http://agecon.uwyo.edu/RiskMgt/marketrisk/TheCattleCycle.pdf
[7] http://www.ams.usda.gov/mnreports/SJ_LS712.txt
[8] http://www.usda.gov/nass/pubs/agr05/acro05.htm
[9] http://www.ag.ndsu.nodak.edu/aginfo/lsmkt/monitor.htm
[10] Email correspondence with Dr. Olson dated 8/18/05.
[11] Holechek, Jerry L., Rex D. Pieper and Carlton H. Herbel. 2001.Range Management: Principles and Practices, Fourth Edition. Prentice-Hall, New Jersey. 587p

BLM_0147373

pounds,[12] and lambs about 129 pounds.[13] A low-end estimate of the weights of a sheep and two lambs grazing on these allotments would be 400 pounds (200 pounds for the ewe and 100 pounds each for two lambs). The forage consumption rate for sheep given in the 1964 R4 Range Analysis Handbook cited above was 3.3% of body weight per day consumed as air dry forage weight. Using these estimated weights of mature sheep (ewes) and lambs with two lambs per ewe and a total weight of 400 pounds would result in forage consumption of 13.2 pounds per day for each mature sheep with two lambs, or 6.6 pounds per day for a mature ewe weighing 200 pounds.

Forage consumption rates must be calculated based on the current weights and consumption rates of livestock in order to provide the forage needed for wildlife, plant community sustainability and watershed protection and to ensure the public trust is not violated by undercharging for the actual weights of cattle and calves grazed.

The current RMP authorizes a certain number of AUM's. However, that is based on an AUM equivalent to 800 lbs of forage per month. The most current information, reviewed above shows that number to be 1368 lbs/month per AUM. Therefore, if sufficient forage were available to satisfy all needs, the numbers of livestock grazed should be reduced to account for the increases in weight and correct the erroneous assumption that 800 lbs/month is an accurate consumption figure. Using the ratio between the current RMP's forage amount per AUM divided by the correct figure above, gives a needed reduction in permitted numbers and/or seasons of use of 42% to account for the RMP's understated forage consumption, without accounting for wildlife, plant and watershed needs.

CAPABILITY AND SUITABILITY ANALYSIS

The EIS can not just move forward allotment condition and use information from the current RMP to satisfy its NEPA, FLPMA, PRIA and APA requirements.

BLM RMP Planning Handbook Appendix C requires that lands available or not available for livestock grazing be determined by considering: other uses for the land; terrain characteristics; soil, vegetation and watershed characteristics; the presence of undesirable vegetation, including significant invasive weed infestations; and the presence of other resources that may require special management or protection, such as special status species, special recreation management areas (SRMAs), or ACECs.

Sec. 201. [43 U.S.C. 1711] states:

(c) In the development and revision of land use plans, the Secretary shall–

(1) use and observe the principles of multiple use and sustained yield set forth in this and other applicable law;

(2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;

(3) give priority to the designation and protection of areas of critical environmental concern;

---

[12] http://www.wildlifeprairiestatepark.org/animalpages/domestic_sheep.htm
[13] http://www.usda.gov/nass/pubs/agr04/04_ch7.pdf

BLM_0147374

(4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other values;

(5) consider present and potential uses of the public lands;

(6) consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;

(7) weigh long-term benefits to the public against short-term benefits;

(8) provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans; ...

Therefore, BLM must give priority to ACECs and the inventory must be current and reflect changes in conditions and identify new and emerging resources and other values. The revised RMP and the DEIS must show that the BLM identified the emerging issues of the public's increasing desire for wilderness values, unspoiled wildlife habitat, protected resources, and the value of public lands.

BLM should define specifically what, if any, animal damage control or predator control activities will be allowed and in what manner. The WWP opposes all animal damage control, predator control and wildlife services proposals made to date. The majority, if not all, of these types of activities are not appropriate and should not be allowed on public lands.

The BLM should establish goals, objectives, standards and limitations to ensure the protection of and recovery of threatened, endangered, sensitive and special status species. BLM should designate critical habitat for every endangered, sensitive, threatened and special status species. These habitat areas should be managed with the species survival and recovery as the highest and most valuable use. The BLM should look at all options for protecting activity centers through special status land designations, including, but not limited to, Areas of Critical Environmental Concern, Research Natural Areas, Outstanding Natural Areas, Wilderness Study Areas, Suitable Wild, Scenic and Recreational River miles, or other administrative designations.

One of the thorniest issues that the BLM has to consider is water quality of streams flowing through the lands it manages. The revision should provide a comprehensive plan for watershed analysis, restoration, monitoring, and adaptive management; particularly where livestock impact water quality; and to inventory, monitor and develop site-specific plans for riparian management, tailored to watershed needs as identified through these processes.

The DEIS does not accomplish this.

No BLM action or plan would be complete without considering TMDL listing, status, and planning. Therefore state data and information are incorporated by reference with the specific request that the BLM insure that TMDL goals are met and water quality is not further degraded. Furthermore, the revision should include details of the actions the BLM intends to take relative to state listed Water Quality Limited Stream Segments. The EIS needs to include a thorough discussion of how the BLM intends to meet its legal obligations under the federal Clean Water Act, State Water Quality Standards and FLPMA requirements in managing water quality limited segments (WQLSs). The RMP must also require water quality monitoring to determine the impacts of its authorized activities.

The BLM should also develop an expanded monitoring plan. Many activities on BLM lands degrade water quality but the BLM may not have a clear grasp on its waters' quality. This RMP revision and EIS must expand on other agencies' and individuals' monitoring efforts, to insure that no data-gaps exist on BLM lands.

Overall, the BLM must comply with the Clean Water Act. To this end, the BLM should look to required CWA reporting, such as 305(b) reports, the 303(d) list, and triennial reviews, and consider how high quality waters can be protected and how degraded waters can be improved. Additionally, the BLM should specially insure that anti-degradation provisions are met, and that principles of anti-degradation are applied to all facets of the RMP.

The RMP/EIS can not present livestock grazing as a given with little difference in AUM's between alternatives. This would not be a reasonable range of alternatives.

With current GIS technology, availability of soil surveys, and vegetation type information, developing a capability analysis is a relatively simple task.

Without balancing the currently available livestock AUM's with the physical and biological limitation of the land, the BLM avoids the most basic scientific principles which are aimed at providing for sustainable use without impairment. As a result of having no capability determination, combined with a realistic forage capacity determination, BLM cannot assure that sufficient forage exists to support the proposed livestock numbers and ignores the forage and habitat needs of wildlife and the need for nutrient cycling and soil protection provided by retaining plant matter to hold the soil and add nutrients.

A review of range science studies which we include as Appendix A, shows that forage for livestock should be allocated at conservative levels of about 25 - 30% utilization. This is necessary so that overgrazing does not place palatable, or preferred native species at risk of decline, prevents over grazing in dry years and provides forage and habitat for wildlife and watershed protection. As can be seen throughout the FO, failure to adjust for topographic, soil and other limitation and apply conservative use principles has lead to severely degraded conditions including soil erosion, loss of native forage species and infestations of noxious weeds and invasives.

Grazing and rest requirements for key species of grass can be critical. Native cool-season perennial bunchgrasses can be very sensitive to defoliation and growing season use. For example, Anderson (1991)[14] stated in regards to bluebunch wheatgrass, *"Effects of growing season defoliation injury are well documented: basal area, stem numbers and both root and forage yields are reduced and mortality can be high. ... Defoliation to very short stubble heights during the boot stage has been reported to essentially eliminate plants within as few as three years. ... Vigor recovery has been found to require most of a decade, even with complete protection from grazing."* The author went on to describe experiments in which a single clipping of the grass during the growing season produced 43% less herbage and 95% fewer flower stalks the following year than unclipped plants. Under a deferred system in eastern Oregon, it was reported that bluebunch wheatgrass could not be

---

[14] Anderson, Loren D. 1991. Bluebunch wheatgrass defoliation, effects and recovery – A Review. BLM Technical Bulletin 91-2, Bureau of Land Management, Idaho State Office.

BLM_0147376

maintained at 30 – 40% use in the boot stage (early June).  A one time removal of 50% of the shoot system during active growth may require six years' rest even in an area with 17" precipitation.[15]  Anderson (1991) also makes the point  regarding bluebunch wheatgrass that, *"The belief that range improvement will occur after one or two years of rest following a single season of more than 'light' use during the growing season is erroneous."*  Mueggler (1975) also determined that Idaho fescue of moderately low vigor required 3 years of rest for recovery and that plants of bluebunch wheatgrass and Idaho fescue in very low vigor may require 8 years and 6 years of rest, respectively for recovery.  BLM failed to consider the recovery, growth and maintenance requirements for these sensitive native grasses.

A failure by the BLM in its RMP to analyze utilization, stocking rates and precipitation is a failure to meet NEPA requirements for analysis.  The failure to provide sustainable utilization rates for upland and riparian area herbaceous vegetation, aspen suckers and riparian shrubs and incorporate those into grazing permits as terms and conditions leaves management uncontrolled and subject to bias, violating FLPMA.

We provide in C_Grazing Capacity Info Proposed Outline, a scientifically and legally defensible methodology for determining capability and suitability of BLM lands for livestock grazing. We request the BLM incorporate this process into the RMP as well as the EIS alternatives.

SPECIAL STATUS SPECIES

The RMP must provide scientifically defensible and clear direction for the recovery and management ESA listed and BLM Sensitive Species. The DEIS fails to accomplish this.

BLM must ensure full compliance with BLM Manual MS-6840.06.E  (Special Status Species Management).  BLM Manual MS-6840.06.E requires that "protection provided by the policy for candidate species shall be used as the minimum level of protection for BLM sensitive species"—that is:

Consistent with existing laws, the BLM shall implement management plans that conserve candidate species and their habitats and shall ensure that actions authorized, funded, or carried out by the BLM do not contribute to the need for the species to become listed. BLM Manual MS-6840.06.C & .06.E.  See BLM Manual MS-6840.06.C (1&3) (discussing BLM's responsibility to confer with U.S. Fish & Wildlife Service regarding individual species' needs).

BLM Manual MS-6840.06.C.2 imposes a series of additional substantive obligations on the BLM regarding candidate [and therefore sensitive] species management:

2.      For candidate species [and sensitive species] where lands administered by the BLM or BLM authorized actions have a significant effect on their status, [the BLM shall] manage the habitat to conserve the species by:

---

[15] Mueggler, W.F. 1975.  Rate and pattern of vigor recovery in Idaho fescue and Bluebunch wheatgrass.  Journal of Range Management 28(3):198-204.

> ➢ Ensuring candidate [and BLM sensitive species] are appropriately considered in land use plans (BLM 1610 Planning Manual and Handbook, Appendix C).
> ➢ Developing, cooperating with, and implementing range-wide or site-specific management plans, conservation strategies and assessments for candidate [and sensitive] species that include specific habitat and population management objectives designed for conservation, as well as management strategies necessary to meet those objectives.
> ➢ Ensuring that BLM activities affecting the habitat of candidate [and sensitive] species are carried out in a manner that is consistent with the objectives for managing those species.
> ➢ Monitoring populations and habitats of candidate [and sensitive] species to determine whether management objectives are being met.

Additionally, BLM must ensure compliance with BLM Manual MS¬6840.22. Provisions here require BLM to take a broad and proactive approach to special status species management, and in the context of planning require that, "<u>Land use plans shall be sufficiently detailed to identify and resolve significant land use conflicts with special status species without deferring conflict resolution to implementation-level planning</u>." (emphasis added).

Take for instance, bighorn sheep, the DEIS fails to even mention let alone implement the BLM's bighorn sheep manual.

**Migratory Birds:** Woodyard et al (2003) conducted bird censuses along an elevational gradient in east-central Nevada. These censuses were conducted in study plots monitored in 1981 and 1982 by Dean E. Medin and found fewer species and total numbers of birds (62% less)[16]. Parrish et al (2002)[17] also describe the declines in these birds due to a variety of factors relating to habitat. They provide descriptions of the birds in Utah most in need of conservation and describe their habitat requirements, threats and management considerations. They discuss habitats most in need of conservation. Habitats such as shrub-steppe occurring in the Pocatello Resource Area are described as in need of protection. Medin et al (2000) provide a discussion of bird-habitat relationships for the Great Basin that provide insight into the habitats that occur in the Pocatello Resource Area and their relationships to these birds. Many of these birds are dependent on riparian areas[18].

Paige and Ritter (1999) cite population declines of 63% and 70% in shrub dependent and grassland bird species during the last 30 years across the U.S. In the Intermountain West, more than 50% of shrub- and grassland species show downward trends with sagebrush steppe as the highest priority for conservation based on trends for habitat and bird populations[35]. They provide detailed descriptions of the history, characteristics and

---

[16] Woodyard, John, Melissa Renfro, Bruce L. Welch and Kristina Heister. 2003. A 20-year recount of bird populations along a Great Basin elevational gradient. USDA Forest Service Rocky Mountain Research Station Research Paper RMRS-RP-43.
[17] Parrish, Jimmie R., Frank Howe and Russell Norvell. 2002. Utah Partners in Flight Avian Conservation Strategy Version 2.0. Utah Division of Wildlife Publication No. 02-27. 305p.
[18] Medin, Dean E., Bruce L. Welch and Warren P. Clary. 2000. Bird habitat relationships along a Great Basin elevational gradient. USDA Forest Service Rocky Mountain Research Station Research Paper RMRS-RP-23. 22p.

BLM_0147378

management of these systems with management recommendations. They note that cattle grazing in sagebrush steppe first select grasses and forbs and avoid browsing on sagebrush. In addition, even light grazing can put pressure on the herbaceous plants favored by livestock and intensive spring grazing prevents bunchgrasses from reproducing, eventually eliminating the palatable native bunchgrasses. They also discuss the response time for recovery of these systems and parasitism by cowbirds, a significant factor in decline of songbirds in some areas.

Taylor (1986) evaluated the effects of cattle grazing on birds nesting in riparian habitats[19]. He found that increased grazing resulted in decreases shrub volume and density and decreased bird abundance. *"The longer the time since a transect was last grazed correlated significantly with increases in bird abundance, shrub volume and shrub height".* Bird species decreased with increased grazing, bird counts were 5 to 7 times higher on an area ungrazed since 1940 than on 2 areas grazed annually until 1980 and 11 to 13 times higher on a transect that was severely disturbed.

Krueper et al (2003) studied the changes in vegetation and breeding birds in the San Pedro River, Arizona following removal of cattle in 1987[20]. Birds were monitored for five years. Mean numbers detected along riparian transects increased by 23% per year or from 103/km in 1986 to 221/km in 1992. Earnst et al (2004) compared songbird abundance in 2000-2001 to that in 1991-1993, following cattle removal from the Sheldon National Wildlife Refuge in 1990[21]. Of 51 species for which abundances were sufficient to calculate changes, 71% exhibited a positive trend. Detections of ground/low cup and high cup nesting species, ground/understory foraging species, aerial and overstory foraging species increased significantly.

Rich (2002) evaluated the ability of riparian PFC assessments as employed by BLM and noted that they lacked the ability to incorporate assessment of land breeding bird communities[22]. He constructed a list of riparian-obligate birds that should occur on the site during the breeding season and used that to score the site based on the percent of those occurring there.

The RMP/EIS must review the habitat requirements for migrant birds, the effects of livestock grazing at the permitted numbers in combination with all other habitat altering management proposed and provide prescriptions that will assure migrant birds and their habitat improve.

CURRENT RMP PERFORMANCE AND ACCOMPLISHMENTS

---

[19] Taylor, Daniel M. 1986. Effects of cattle grazing on passerine birds nesting in riparian habitat. Journal of Range Management 39(3):254-258.

[20] Krueper, David, Jonathan Bart and Terrell D. Rich. 2003. Response of vegetation and breeding birds to the removal of cattle on the San Pedro River, Arizona (U.S.A.). Conservation Biology 17(2):607-615.

[21] Earnst, Susan L., Jennifer A. Ballard, and David S. Dobkin. 2004. Riparian songbird abundance a decade after cattle removal on Hart Mountain and Sheldon National Wildlife Refuges. USDA Forest Service PSW-GTR-191.

[22] Rich, Terrell D. 2002. Using breeding land birds in the assessment of western riparian systems. Wildlife Society Bulletin 30(4):1128-1139.

BLM_0147379

In order to comply with NEPA and the APA, the BLM must conduct a thorough review of the performance and accomplishments of the current RMP as well as the validity and accuracy of the current RMP's NEPA documents. Further, the BLM must analyze how effectively the RMP and ROD have been implemented, what goals and objective have been met and why aspects of the RMP and ROD were not implemented or not implemented effectively.

Such analyses must form the foundation for any RMP revision. Such analyses are fundamental not only compliance with the law by basic management principles.

ECONOMIC ANALYSIS

The RMP/EIS must adequately and honestly analyze the economic impacts of livestock grazing on BLM lands. The BLM has pandered to "lifestyles" for ranchers while ignoring the actual contribution of the livestock grazed to the local and regional economy or the economic impacts of the land degradation that takes place from livestock grazing. The Fish and Wildlife Service publishes reports on the value of wildlife-associated recreation that shows values of hundreds of millions of dollars to billions of dollars of revenue related to hunting, fishing and wildlife watching in each western state[23]. In addition, the cost of polluted water, loss of watershed storage due to soil compaction and loss of herbaceous cover are not counted in the costs of livestock grazing. As the reference below shows, in actuality, rural communities as well as livestock permittees depend on other sources of income. Laws require that public lands be administered in the long-term interests of the American people and not a handful of stockmen, who are permittees, on the public lands.

Livestock permittees are a small minority of livestock producers in the eleven western states and are insignificant in their numbers or their economic contribution to the States, their local and regional economies. Their numbers and contribution pale in comparison to the natural values of our public lands. Dr. Thomas Power, Chairman of the University of Montana's Economics Department, in Wuerthner and Matteson (2002)[24] points out the minimal economic contribution of federal public lands livestock grazing to local, state and regional economies in the West. That reference can be found on-line at:

**http://www.publiclandsranching.org/htmlres/PDF/wr_TAKING_STOCK.pdf**

Dr. Power also points out that the majority of public lands livestock producers depend on non-agricultural sectors of these local, state and regional economies for employment, not livestock production. It is not in the public's interest to blindly continue livestock grazing at unsustainable stocking levels in order to provide a short-term benefit to this small minority, while ignoring the values displaced by livestock grazing.

Dr. Power shows that *"Livestock grazing on federal lands is generally unimportant to local economies and even less so to state and regional economies. In terms of income and*

---

[23] U.S. Department of Interior, U.S. Fish and Wildlife Service, U.S. Department of Commerce and U. S. Census Bureau. 2002. 2001 National Survey of Fishing, Hunting and Wildlife-Watching Associated Recreation. 170 p.

[24] Wuerthner, George and Mollie Matteson. 2002. Welfare ranching: the subsidized destruction of the west. Island Press.

*numbers of jobs provided, the contribution of federal lands grazing is less than 0.1% across the West. Farm and ranch operations are increasingly reliant on non-farm income sources to be financially feasible, while livestock grazing competes with other uses of public lands – such as clean water, recreation, wildlife habitat – that contribute to the ongoing vitality of western economies."*

In his analysis of the economies of individual rural counties, Dr. Power showed that federal lands grazing does not contribute significantly to those economies across the west. In fact, given the high percentage of ranching families that have jobs, either full or part time outside the ranch (60 – 70%), it is ranchers that depend on the other economic sectors for their ability to persist, not federal grazing. Dr. Power states, *"It is not that towns depend on agriculture, but that agriculture increasingly depends on the vitality of urban and nonagricultural rural economies to provide the nonfarm income that keeps farm operations alive."*

Dr. Power states that claims about the relative importance of federal grazing to the economies of western states can be analyzed by answering these questions:

1. "What portion of the value produced by cattle and sheep operations is associated with feed used?

2. What portion of the feed for those cattle and sheep operations comes from grazing on federal lands?

3. What portion of the total agricultural activity involves raising cattle and sheep?

4. What part of the total economy is represented by agriculture?"

The RMP Economic analyses should include consideration of this information and the following:

➢ costs of administration
➢ costs of installation and maintenance of range improvements borne by the BLM and/or funded by county range improvement funds
➢ grazing fees collected and their distribution to various entities
➢ grazing fees collected and net return to the Forest Service and the American people, and separate out the dollars returned to grazing permittees and local counties.
➢ value of livestock grazing gross revenue to the permittee at current market rates
➢ value of wildlife-associated recreation (DOI 2002)
➢ loss in value of wildlife associated recreation to livestock grazing by using equivalent AUMS consumed by livestock as applied to wildlife needs (AUMs) and economic benefits
➢ cost of soil erosion and loss of groundwater recharge and streamflow
➢ cost of water pollution
➢ the net contribution of the individual livestock operations under consideration to the county and regional economy
➢ compare the individual livestock operation in dollars and jobs to the local, state and regional economy and report what percentage this allotment comprises of this total
➢ compare these various economic values with other economic and employment sectors at those local, state and regional levels.

BLM_0147381

BEDROCK ISSUES

The RMP and EIS must consider the bedrock management principles that direct all activities on BLM lands. FLPMA is one of these key bedrock laws. FLMPA requires the BLM to manage public lands under the principle of multiple use and sustained yield.

The definition of multiple use in FLPMA is long, but key provisions include the following:

 ➢ Public lands and their resource values must be managed so that they "best meet the present and future needs of the American people;"
 ➢ It is appropriate that some land be used "for less than all of the resources;"
 ➢ There must be harmonious and coordinated resource management that is done "without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or greatest unit output."

43 U.S.C. § 1702(c)

Sustained yield as defined in FLPMA can be achieved either by "high-level annual" or "regular periodic" output of resources, so long as this is accomplished in a way that can be maintained in perpetuity and is consistent with the definition of multiple use. 43 U.S.C. §1702(h).

These definitions give substance to the requirement that land use plans and resulting management actions are to use and observe multiple use and sustained yield principles. The purpose of this planning process must be to produce a plan that "best" meets the present and future needs of the American people. The RMP cannot adequately meet these needs, or generally meet these needs, or largely meet these needs, it must "best" meet them. FLPMA explicitly requires that what is "best" must be viewed from the perspective of the present and the future and all alternatives, including the proposed action, must be designed to satisfy this requirement. What is best now may not meet future needs, and since future needs may be unknown in some respects, the only way to "best" insure that future needs are met is to develop and select alternatives that have a large built in margin of safety. To achieve a large built in margin of safety the plan should emphasize resource and ecosystem protection, which will best ensure that future options are retained.

Furthermore, what is "best" must be determined with reference to the needs of the American people as a whole, not a small subset of the American people. FLPMA explicitly provides that the plan that is developed need not accommodate all resource uses on all lands. This provision has special significance relative to grazing, oil and gas leasing, exploration, and development because too often essentially all lands are made available by the BLM for oil and gas extraction. By this legally required measure, rare, unique, and sensitive native species have a relative value far in excess of more common or easily replaced public land resources, or resources that can be provided from other lands. The same is true of many other resources, such as cultural and wilderness resources. Accordingly, the alternative plans that are developed, and particularly the preferred

alternative, must give special emphasis to protecting and providing for relatively rare resources.

The FLPMA Section 1702(c) permanent impairment and Section 1732(b) prevention of unnecessary or undue degradation provisions are extremely important. They must inform and be the basis of all RMP direction.

**T**he BLM must base its management decisions upon inventories of the resources that occur on the public lands. The BLM must structure a comprehensive inventory program to inform the RMP process. This is a crucial and frequently overlooked aspect of the planning process.

The EIS and RMP must also address CWA compliance, including monitoring, anti-degradation and Class I waters issues. We are attaching a letter by Raymond Corning discussing some of these issues.

ECONOMICS

The Revised RMP should also contain a complete and unbiased economic analysis of livestock grazing, including the income to the federal government and counties of permitting grazing on allotments within the planning area and an accurate and thorough breakdown of costs of administering livestock grazing in the planning area.  Costs should include restoration of habitats, monitoring, fence maintenance, and administrative and planning expenses.  The costs of livestock grazing in terms of loss in ecological services should be analyzed.  Ecological services compromised by livestock grazing include watershed function as a result of reduced ground cover, soil compaction and loss of infiltration capacity and water storage, soil erosion, loss of forage and habitat for native species.  The forage consumed by livestock must be valued in terms of the value of deer and other wildlife species displaced, the loss of hunting and wildlife watching opportunities Further, in terms of the value of livestock grazing itself, Dr. Thomas Power (Power 2002) has developed questions that allow a determination of the significance of forage used on public lands to the economy as a whole.   These are:

5. "What portion of the value produced by cattle and sheep operations is associated with feed used?

6. What portion of the feed for those cattle and sheep operations comes from grazing on federal lands?

7. What portion of the total agricultural activity involves raising cattle and sheep?

8. What part of the total economy is represented by agriculture."

The following references provide insight into non-market or ecosystem service valuations of natural resources:  (1) Daily, Gretchen C and Katherine Ellison.  2002.  The New Economy of Nature; (2) Committee on Assessing and Valuing the Services of Aquatic and Related Terrestrial Ecosystems, National Research Council. 2004.*Valuing Ecosystem Services: Toward Better Environmental Decisionmaking*. Washington DC: National Academies Press; (3) Loomis, John., Paula Kent, Liz Strange, Kurt Fausch, and Alan Covich. Measuring the Total Economic Value of Restoring Ecosystem Services in an Impaired River Basin: Results from a Contingent Valuation Survey. *Ecological*

*Economics.* 33, pp. 103-117. 2000.  (4) Loomis, John. Environmental Valuation Techniques in Water Resource Decision Making. *Journal of Water Resources Planning and Management,* Vol. 126, No. 6, pp. 339-344. November/December 2000.

RESOURCES

Attached we provide a range of information we request the BLM to review and provide analysis of in the EIS and move into management direction in the RMP. If the BLM feels that any of the information supplied is not applicable to the RMP planning process, we request the BLM to supply rationale in the EIS to justify that decision. Without such justification the BLM will not be complying with NEPA and the APA.

We also request the BLM to review its own analyses, management and monitoring direction contained in:

BLM Application of Environmental Laws, September 1995

BLM TR 1734-6 Interpreting Indicators of Rangeland Health

BLM TR 1737-20 Grazing Management Processes and Strategies for Riparian-Wetland Areas

BLM TR 1737-17 A Guide to Managing, Restoring and Conserving Springs in the Western United States

USDA FS RMRS-GTR-160 Survey Responses From the Intermountain West: Are we Achieving the Public's Objectives for Forests and Rangelands

US EPA Managing Change – Livestock Grazing on Western Riparian Areas, 1993

USDA FS Research Paper INT-RP-492 Response of a Depleted Sagebrush Steppe Riparian System to Grazing Control and Woody Plantings, 1996

USDA FS Research Paper INT-425 Bird and Small Mammal Populations in a Grazed and Ungrazed Riparian Habitat in Idaho, 1990

Montana BLM Riparian Technical Bulletin #3 Effective Cattle Management in Riparian Zones – A Field Survey and Literature Review

Montana BLM Riparian Technical Bulletin #4 Successful Strategies for Grazing Cattle in Riparian Zones, 1998

BLM TR 1737-14 Grazing Management for Riparian Wetland Areas, 1997

BLM TR 1730-2 Biological Soil Crusts: Ecology and Management, 2001

BLM TR 1737-3 Inventory and Monitoring of Riparian Areas, 1989

BLM_0147384

USDA FS PNW-GTR-361 Role of Nonmarket Economic Values in Benefit-Cost Analysis of Public Forest Management, 1996

USDA FS RMRS-GTR-47 Monitoring the Vegetation Resources in Riparian Areas

USDA FS RMRS-GTR-121 Guide to Effective Monitoring of Aquatic and Riparian Resources

USDA FS RMRS-RP-40 Counter Misinformation Concerning Big Sagebrush, 2003

USDA FS RMRS-GTR-141 Big Sagebrush: A Sea Fragmented into Lakes, Ponds and Puddles, 2005

We incorporate by reference all of the above and request that the BLM analyze each of them and add these to the administrative record.

The DEIS stated that it was in compliance with WO IM 2012-169 but this is not the case. Clearly, just looking at the bighorn sheep issue, the IM was not implemented.

Let's look at Action #19 as an example of the failure to provide appropriate limitations and requirements. This "action" states:

> **Action:**
> Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values.

But this is a broad goal that lacks any specificity that would allow it to be implemented. As discussed in the earlier section on RMP requirements, this type of general,, 'apple pie' type statement does not drive or direct action. Appropriate actions would be such things as limitations on forage utilization, requirements for biological soil crust coverage by soil type with timeframes and repercussions if BSC recovery is not attained. This type of specificity, which the BLM's planning requirements mandate is totally absent from the DEIS.

In Action #25 we see that the BLM proposes to manage most of its lands to allow <50% of the areas to fail Rangeland Health Standards as long as the failing areas are "stable". This clearly does not comply with the 43 CFR 4180 mandate.

> Manage the remaining lands, streams, and wetlands to *fully meet* the BLM Colorado Public Land Health Standards or to *meet with problems* where needed to support resource uses, provided that lands meeting with problems are stable or trend toward achieving the BLM Colorado Public Land Health Standards.

Action #37 applies only to oil and gas, no other soil disturbing activity and that too only where BSC is in excellent condition. The vast majority of the FO has very low levels of BSC because of the impacts of livestock grazing but no recovery or protection actions are provided.

Goal #71 stunningly elevates resource extraction above other FLPMA requirements across nearly all the FO. Clearly, this does not comply with the wide range of requirements discussed above.

Frequently, we see such as in #74:

> **Objective:**
> Manage naturally occurring riparian and wetland areas <u>to maintain or improve</u> hydrologic and riparian vegetation conditions

But this is another typical way for the BLM to eliminate requirements. These kinds of statements must be changes to maintain areas exceeding objectives/standards and improve area not exceeding.

Another frequently abused weasely words rendering direction meaningless is the use of words such as "pursue" and "analyze" and "prioritize". All these modifiers render the subsequent direction utterly meaningless.

The primary impact to vegetation and the spread of weeds is livestock grazing yet the DEIS fails to address this primary issue.

#103 designates ecological emphasis areas but authorizes the same ecologically degrading activities, such as livestock grazing, in them. This renders the whole ecological emphasis area concept meaningless.

The elimination of #109 prioritized resource extraction of wildlife needs.

#116 fails to implement the recent WO IM regarding bighorn sheep management.

#126 is another example of meaningless direction that looks good on paper but does nothing:

> **Action:**
> Use adaptive management to conserve and avoid impacts on populations of Birds of Conservation Concern, Partners-in-Flight priority species, and other species of concern.

The action needs to properly define adaptive management triggers and response actions. As currently written it provides no management direction.

#128 is similar in its worthlessness:

> **Action:**
> Apply appropriate restrictions and mitigation to minimize impacts on migratory birds.

It is the RMP that is required to define what those "appropriate restrictions and mitigation" measures are and when they are to be applied.

#136 is the same rubbish:

> **Action:**
> Promote BLM-sensitive species conservation to reduce the likelihood and need for species to be listed

BLM_0147386

This is a general goal not an action.

#543 is just pure corruption. The BLM is so spineless that it allows the only significant impact to BSC to continue in the postage stamp sized ACEC to protect BSC.

It is quite similar to the bighorn sheep section that prohibits goat grazing that impacts bighorn sheep, because goat grazing does not exist, very much like prohibiting Martian landing sites, but leaves domestic sheep, which is very much a treat to bighorn sheep essentially unaddressed.

On p. 317 we see the statement: "The "meeting the standard with problems" category implies that less than half of the assessment sites within a soil polygon had a soil indicator rating of less than satisfactory, but overall, the soil condition in the polygon was meeting the standard."

We could find no support, either in the 4180 regulations or elsewhere to support the policy that 49% of a land area failing Rangeland Health Standards meets Rangeland Health Standards.

Please provide the regulatory basis for this approach in the revised EIS.

We see on 3-21 the statements:

> The most recent salinity management efforts in the UFO have concentrated on non-structural controls, such as managing soil surface-disturbing activities such as livestock grazing and off-highway vehicle (OHV) use to minimize salinity yields.

> Because high concentrations of selenium occur in Mancos Shale and soils derived from this formation, land management practices and actions that reduce soil surface disturbance and deep water percolation minimize the yield of selenium offsite, much like salinity management.

Yet the primary surface disturbing activity across the FO, livestock grazing, has no requirements or limitations put in place to reduce salinity or selenium.

3-29 states:

> Water quality of UFO surface waters is assessed and monitored by several means. The land health assessments conducted over the most recent ten-year period assessed water quality against BLM Colorado Public Land Health Standard 5. Data assessed for land health assessments include water chemistry, bacteriological analyses, density, and composition of aquatic macroinvertebrates, and the potential for accelerated levels of sediment, salinity, and selenium.

This statement implies that the BLM actually monitors the water quality impacts of its authorized actions. I deal with dozens of FO's in Wyoming Utah and Colorado and none of them do this. Is the UFO actually monitoring water quality impacts of its actions, such as e. coli, sediment from livestock grazing on each allotment it administers or is the above statement stretching the truth?

In the FEIS please clarify what data is being collected, where and how often and what percent of the FO the data collection efforts cover.

The DEIS lists a large number of water bodies on the 303d list, but the proposed RMP does not implement actions to bring these water bodies into compliance with the CWA.

3-32 states that the BLM is mandated to reduce salinity but the proposed RMP is entirely silent on requirements and limitations to reduce salinity from most of its action, including the most significant source of increased salinity, livestock grazing.

3-33 states:

> As part of the land health assessment process, several UFO streams with primary-contact recreation activities were monitored for fecal and *Escherichia coliform* bacteria concentrations. There is a strong correlation between these bacteria and the occurrence of other pathogens. Based on a limited number of samples per site (usually one or two samples collected in spring or summer months), none of the sampled streams exceeded state criteria for bacteria

Please provide information as to the dates when this sampling occurred and when livestock were present on the applicable allotment. WWP and the Forest Service have collected thousands of e. coli samples and exceedances of standards only occur when livestock are present. Natural background levels of e. coli are rarely above 25 CFU. So if your data was not collected when livestock were present on the allotment, the results are meaningless to conclude there are no exceedances.

3-37 states:

> However, because many livestock tanks were constructed prior to state permit filings or being cataloged in BLM databases, the actual number is considered to be much higher. Many of the tanks are poorly maintained or non-functional and cause accelerated levels of erosion and sedimentation. Invasive weed species commonly become established on areas disturbed by livestock tanks, which can degrade watershed conditions.

Certainly, if the BLM were serious about salinity, erosion and selenium control it would have inventoried these for the AMS and then put in specific actions in the RMP to deal with this problem.

3-46 states:

> Across all ten land health assessment units, cool season grasses were underrepresented in the plant communities. This is probably the result of livestock grazing in the spring and fall periods when these grasses are most vulnerable. Often perennial forbs are also underrepresented in the same areas. The reduced cool season grass and forb cover may make it easier for exotic species such as cheatgrass to move in. On many crucial big game winter ranges throughout the planning area, moderate to severe hedging of palatable shrubs is common. Usually reduced vigor of these shrubs is also evident.

Yet the RMP puts in place no requirements or limitations to recover cool season bunch grasses, eliminate growing season grazing or deal with the over-allocation of forage and winter range problems it fully knows about. The proposed RMP utterly fails to address these major FO-wide problems.

3-72 states:

> Within the last 10 years, two newly designated wilderness areas have effectively protected a substantial portion of the species' range from development-related impacts, and the Dominguez-Escalante and Gunnison Gorge NCAs have added or are likely to add new protections specific to the conservation of the Colorado hookless cactus.

But this inaccurately portrays the situation. None of these designations protect, and the RMP fails to implement protections, from the primary disturbance factor for this species, livestock grazing. The RMP fails to provide adequate protections in the BLM's rush to continue the status quo grazing.

Appendix C contains various BMP's but the RMP does not implement these. For instance in the livestock section we see rest and not doing repeated spring grazing yet the RMP fails to implement these BMP's despite the fact that repeated spring grazing is one of the major grazing problems on the FO.

So Appendix C looks good on paper but is worthless on the ground.

> 8. Colorado Best Management Practices and other scientifically developed practices that enhance land and water quality should be used in the development of activity plans prepared for land use.

But again these are not only undefined but not implemented.

Appendix G suffers from the same failure.

### GEOLOGY, SOILS, AND WATER

> • Implement guidelines from BLM Technical Reference 1737-17 (Sada et al. 2001), to protect or restore the functions of springs.
> • Measures designed to minimize erosion and water quality deterioration will be required in the site-specific plans for surface-disturbing land use activities.
> • Implement BMPs from the BLM/USGS Mancos shale research findings (Murphy 2011) applicable to livestock management, recreation management (e.g. location and limitations of OHV use areas), rights-of-way, and other surface disturbing activities.
> • Implement guidelines from BLM Technical Reference 1730-2 (BLM 2001), to protect or restore the functions of biological soil crusts.

Yet the RMP fails to implement any of these nor does the RMP require the implementation of these. So again it looks good on paper but is designed to to be worthless from a resource protection perspective.

> Maintaining healthy soil surface conditions on Mancos shale landscapes is more effective for the long term in limiting the yield of sediment, salinity and selenium than physical retention/detention structures

Again the RMP fails to put in place any requirements or limitations to achieve this. This is particularly obvious from the perspective of livestock which is the primary impact to soil surface conditions.

☐ Minimize livestock grazing and trailing impacts in riparian areas to protect vegetation, habitat values, streambank stability, and water quality.

Yet the RMP puts in place NO requirements or limitations to achieve this.

The livestock grazing section of Appendix G is another example of where the RMP fails to implement basic protections.

Appendix K fails to comply with the WO IM on bighorn sheep management. It also fails to utilize current science. We provide as an attachment a review of the use of this model in the North Delta process.

The analysis also fails to address disease transmission from cattle.

From a recent RMP revision:

https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=36859&dctmId=0b0003e88040d6d4

### 2.4.6 Alternative L – Allow Domestic Sheep and Goat Grazing on All Allotments with Leasing Terms and Conditions to Reduce Potential Interspecies Contact

The BLM considered an alternative that would make all four allotments available for domestic sheep and goat grazing with application of the leasing terms and conditions identified in Appendix C to reduce the potential for contact with bighorn sheep. These terms and conditions have previously been identified, recommended, or implemented by the USFS and the BLM as best management practices (BMPs). However, when bighorn sheep CHHR occur in or adjacent to a domestic sheep allotment, and especially when the allotment is within bighorn herd home range, development and implementation of effective separation measures is difficult; and contact between the species will most likely still occur. **In other words, special terms and conditions to avoid contact between bighorn and domestic sheep that are known to be in close proximity are generally ineffective to ensure separation of the species.** Furthermore, even with these extra measures, control of domestic sheep, or monitoring and locating bighorn sheep in forested/ dense vegetation or steep/rocky/rugged terrain is very difficult. Accordingly, without a large buffer between domestic and wild bighorn sheep, extra measures are not likely to result in a significant reduction in the risk of contact (Schommer 2009). No known studies, research, or peer reviewed literature has documented the effectiveness of BMPs preventing contact and disease transmission when domestic sheep or goats grazed within or adjacent to occupied bighorn sheep habitats. Appendix C contains a more detailed review of the effectiveness of BMPs.

BLM_0147390

The Partridge Creek allotment overlaps with bighorn sheep CHHR and the Marshall Mountain Allotment is in close proximity to CHHR. The Hard Creek allotment overlaps with the Little Salmon area of concern. The terrain on all three of these allotments is interspersed with dense vegetation and forested areas, with additional areas that are steep, rocky, and rugged. Therefore, application of the specified terms and conditions on these allotments would likely be ineffective at significantly reducing the potential for contact between bighorn sheep and domestic sheep. Hence, for the Partridge Creek, Hard Creek, and Marshall Mountain Allotments, this alternative would be effectively the same as Alternative A under which all four allotments would be available for domestic sheep grazing but without specified terms and conditions. Differing from the other three allotments, the Big Creek Allotment is not in or near bighorn sheep CHHR or the Little Salmon area of concern and has more open and moderately sloped rangeland. However, for this allotment, this alternative would be essentially the same as Alternatives B, which also makes Big Creek available for domestic sheep or goat grazing with application of the terms and conditions. Therefore this alternative was not analyzed in detail.

Appendix K relies on BMP's which have been shown to be ineffective and it ignores completely the WO IM for bighorn sheep which requires effective separation.

CONCLUSION:

The current RMP revision is BLM's traditional faith-based, politics-based management where no requirements or limitations are imposed. The BLM should review the Standards of Ethical Conduct for Federal Employees[25] that are based on Executive Order 12674, as amended by Executive Order 12731. In particular, three of the broad principles I believe apply here are:

> *"(1) Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private gain.*
>
> *(5) Employees shall put forth honest effort in the performance of their duties.*
>
> *(8) Employees shall act impartially and not give preferential treatment to any private organization or individual."*

Just because the BLM will be outsourcing much of this process does not mean it has any less legal or ethical responsibilities to the American people. I bring this up because, after years of working on livestock grazing and other issues on public lands and, with other WWP staff, having reviewed EAs and EISs on hundreds of grazing allotments and other projects, it is my belief that these documents are used to justify decisions that are already made and basically constitute a "shell game" in which evident degradation by livestock is explained away in every case due to some other cause even though livestock grazing is

---

[25] http://www.usdoj.gov/jmd/ethics/generalf.htm

widely recognized in the scientific literature as a cause of degradation to riparian areas, water quality, plant communities, soils and wildlife.  I cannot recall a single instance in all these cases, no matter how serious the environmental degradation, when the agency (Forest Service or BLM) performed an objective, science-based monitoring and analysis process directed at making an objective and logical decision concerning livestock grazing. Invariably, the decisions arrived at through these NEPA documents have amounted to a continuation of the status quo with at best, cosmetic changes that make little or no difference on the ground.  It is time for BLM to demonstrate to the public that it will engage in an honest, objective process in order to restore the public trust.

Sincerely yours,

Jonathan B Ratner
Director, WWP –Wyoming Office

BLM
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Thank you for the opportunity to comment on the Uncompahgre Field Office's draft Resource Management Plan (draft RMP).

- The current Resource Management Plan currently in effect was approved at least 26 years ago and did not account for the many changes that have occurred since that time.

- The socioeconomic benefits being derived from the agricultural operations that now exist in the North Fork Valley have changed in importance and character and unfortunately have not been accounted for in the current draft RMP either.

- The draft RMP only contains a brief acknowledgement of the existence of the unique agriculture that occurs in the North Fork Valle and has not adequately or appropriately described what makes the North Fork Valley of such unique agricultural, artistic and entrepreneurial importance to all of Colorado and surrounding states.

- This omission of fully describing this valley does not constitute meeting the requirement of "succinctly describing the environment of the area(s) to be affected by the alternatives under consideration" as required by **40 CFR 1502.15**.

**This valley is recognized for its unique agriculture (it contains the highest concentration of organic farms, orchards and vineyards in Colorado), local business, art, agribusiness, agritourism, and recreation industries and deserves protection from any threat of environmental degradation that would harm these endeavors.**

**Evidence for the uniqueness of this valley:**

a) It has been described as "**An American Provence**" in the book by the same name written by University of Colorado professor, Thomas Huber. He compares the North Fork Valley with its vineyards to the famous wine growing region of southern France. http://www.merchantherald.com/geographer-says-the-north-fork-is-an-american-provence/ This valley was also featured in the book **At Mesa's Edge: Cooking and Ranching in Colorado's North Fork Valley** https://www.amazon.com/At-Mesas-Edge-Ranching-Colorados/dp/0618221263

b) This valley was designated by the state of Colorado as **a Colorado Certified Creative District** in 2013. Information on the significance of this designation can be viewed at http://www.coloradocreativeindustries.org/showcase/colorado-creative-districts

c) Delta County was recently **awarded three Blueprint 2.0 Initiatives by the Colorado Office of Economic Development and International Trade**. The Initiatives include Strengthening Local Business Brand, Adaptive Reuse Workshop and Tourism Promotion. http://choosecolorado.com/lt-gov-donna-lynne-announces-colorado-blueprint-2-0-initiative-recipients/

1

d) The North Fork Valley has also been **designated as an American Viticulture Area** by the U.S. government. This designation was officially adopted in 2001 and codified at 27 CFR https://www.gpo.gov/fdsys/pkg/CFR-2016-title27-vol1/pdf/CFR-2016-title27-vol1-sec9-172.pdf An American Viticulture Area is a delineated grape-growing region having distinguishing features as established in Federal regulation and a name and delineated boundary. This is only one of two such designated areas in Colorado

e) The North Fork Valley has been featured in a number of articles by the New York Times including coverage of previous attempts to pursue drilling http://www.nytimes.com/2013/02/03/us/colorado-communities-take-on-fight-against-energy-land-leases.html?_r=0 and many other articles like this one: http://www.nytimes.com/2014/06/19/garden/he-found-his-corner-of-the-sky.html.

The potential environmental consequences presented in this draft RMP do not in any way address the depth and breadth of potential effects to the valley from fluid mineral exploration and production. This is in direct conflict with BLM regulation **40 CFR 1610.4-6**: Estimation of effects of alternatives, which requires that the Field Manager "will estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail." Without acknowledging and describing the North Fork Valley in detail, this requirement cannot and has not been achieved.

The inadequacy of the draft RMP is further exemplified by the following:

1) **Chapter 1, Section 1.4 and Table 1.3:** This section and table fail to appropriately and adequately acknowledge and discuss the North Fork Alternative Plan (NFAP) presented to the BLM during scoping by citizens and governmental entities in the North Fork Valley. The section summarizing the scoping comments received does not include this important scoping submittal and has consequently resulted in the lack of any meaningful reference to this agriculturally important area throughout the remainder of the draft RMP. This violates the Council on Environmental Quality (CEQ) regulation at **40 CFR 1501.7(a)(2)** which requires the lead agency to determine the significant issues to be analyzed in depth in an Environmental Impact Statement.

This absence of acknowledgment of the North Fork Valley's unique qualities is also in direct conflict with Section 1500.1(b) of the CEQ regulations which states that "NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."

2) **Chapter 1, Table 1-2, Step 7:** By not appropriately including the North Fork Valley and the potential negative environmental effects to it by the various proposed alternatives as a "planning issue," this draft RMP does not adequately meet the requirement that the preferred alternative be the "alternative that best resolves planning issues."

3) **Chapter 2, Section 2.2.3:** The lack of adequate discussion and acknowledgement of the North Fork Valley in Chapter 1 (as discussed above) has created a situation where the significance of each alternative to potentially impact the human and natural environment within the BLM planning area is missing from the fundamental underpinnings of the analysis. This absence of appropriate consideration is evident throughout the remainder of the document and in taking this approach, this document does not meet the level of analysis required by **CEQ regulations (40 CFR 1502.1; 1502.2; 1508.8; 1508.14 and 1508.27(a), (b)(3), (b)(4) and (b)(6))** or the **National Environmental Policy Act, Section 101(b).**

2

BLM_0147394

4)   **Chapter 2, Table 2-1 and Appendix D, Ecologic Emphasis Areas:** The North Fork Valley should have been included in this portion of the analysis. Although it does not fit the BLM's routine (boilerplate) areas of analysis - *unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors* – does not make this ecologically unique area any less worthy of consideration. In fact, minimizing impacts to this culturally and agriculturally significant geographic area should be the core value addressed throughout the draft RMP and presented under each of the Alternatives in Tables 2-1 through 2-6.

5)   **Chapter 3, Section 3.1.3 Geology and Soils:** The following statement is included in this section; "There are no farmlands of national or statewide importance **on BLM-administered lands within the planning area** (emphasis added). However, according to a report by the Soil Conservation Service, "irrigated and prime irrigated lands of statewide importance, most of which are situated at low elevations on valley floors, occur in the Uncompahgre, North Fork, Surface Creek, and Smith Fork drainage basins" (Soil Conservation Service 1980).

Analysis of potential impacts to irrigated and prime irrigated lands existing within the Uncompahgre planning area (North Fork Valley) resulting from federal actions taking place on BLM-administered lands must be analyzed and disclosed in Chapter 4 and they are not.  Chapter 4 is completely silent on the impacts to irrigated and prime irrigated lands occurring within the valley floors in the planning area which violates 40 CFR 1508.14.

6)   **Chapter 3, Section 3.1.5, Vegetation & Chapter 4, Section 4.3.4 Vegetation:** Section 3.1.5 fails to acknowledge or discuss any of the agricultural crops existing in the North Fork Valley which is part of the Uncompahgre Field Office planning area. Omission of these existing and important resources in Chapter 3 has resulted in the complete omission of possible effects to these resources in Chapter 4, Environmental Consequences. This violates **CEQ regulations at 40 CFR 1502.15**; Affected Environment and **40 CFR 1508.8**; Effects.

7)   **Chapter 4, Section 4.1.1 Analytical Assumption, fifth bullet:** This bullet asserts that "Direct and indirect impacts of implementing the RMP primarily occur on the decision area lands:" This is a seriously flawed assumption because many of the direct and indirect impacts of implementing the RMP on lands underlain by federal fluid mineral estate have the potential to seriously impact the people (and their livelihoods) living in the North Fork Valley.

"Planning area" is defined as the Uncompahgre Field Office boundary, including all lands, **regardless of land ownership** (emphasis added), except the Gunnison Gorge NCA Planning Area and the Dominguez-Escalante NCA" and is depicted on Figure 1-1 provided in the draft RMP. Whereas "decision area lands" are limited to public lands and federal mineral estate managed by the USDOI, Bureau of Land Management. The federal mineral estate managed by the BLM is depicted on Figure 1-2, also provided in the draft RMP.

The North Fork Valley's organic and traditional farming, fruit growing and viticulture areas occur less than one mile, in many places, from the BLM decision area boundary (but within the Uncompahgre planning area). This proximity is especially true for the thousands of acres of land surrounding Paonia, Hotchkiss and Crawford that would be made available for fluid minerals leasing according to the BLM's preferred alternative. Obviously, these agricultural lands are at risk of being either directly or indirectly impacted by gas activity occurring on the adjacent or contiguous decision area land.

3

BLM_0147395

**8)   Chapter 4, Section 4.3.2 Soils and Geology:** Because Chapter 3, Section 3.1.3 dismisses the need for identifying and describing irrigated and prime irrigated lands occurring within the planning area, this Section is completely silent on the environmental consequences of federal actions on these agriculturally significant lands. This is a serious omission which only further reinforces the fact that the BLM did not take the environment actually in existence in the planning area into consideration which violates **40 CFR 1502.15 of the CEQ** regulations.

**9)   Chapter 4, Section 4.3.3 Water Resources:** The following statement is made on page 4-84, "*The organic farming industry relies on clean water for agricultural production. Contamination of irrigation waters could affect the ability of local organic farms to maintain their designations.*" This is the only mention of organic farming in the entire draft RMP. Such a serious threat to the North Fork Valley cannot be allowed to ever occur. And the only way to prevent it is to close the entire area within the NFAP area to any new oil and gas leasing. Oil and gas drilling is absolutely incompatible with the existing land uses currently occurring in this valley.

The oil and gas industry in Colorado has reported at least 5,188 spills from statewide operations over the last ten years to the Colorado Oil and Gas Conservation Commission. It is not a matter of if a spill will happen, but when a spill associated with drilling activity occurring up valley and upstream from the North Fork Valley will create long-term devastating effects on the soils, surface water and groundwater supporting this agricultural area.

**Conclusion:**

The draft RMP states that "When there are conflicts among resource uses or when a land use activity could result in unacceptable or irreversible impact on the environment, the BLM may restrict or prohibit some land uses in specific areas."

Based on the comments presented above, there is definitely a conflict between the extraction of the gas resource and the prevailing land use in the North Fork Valley. Additionally, the land use activity of producing natural gas would result in unacceptable and irreversible impacts on the environment in the North Fork Valley. Therefore, the leasing of any federal fluid minerals within the borders of the NFAP should be prohibited and this prohibition on further leasing incorporated into the alternative chosen for the revised RMP. This is the only way to preserve and protect the integrity of this unique and renowned part of Colorado.

Gas exploration and development is not compatible with the economic culture of this valley and in fact, its very presence would threaten its highly regarded reputation as an organic agricultural area.

Thank you for your consideration,

Cory Obert
41218 Lamborn Mesa Rd / PO Box 927
970-527-5766
coryobert@tds.net

BLM_0147396

To: Dana Wilson, Acting Uncompahgre Field Manager

Thank you for the opportunity to comment on the Uncompahgre Field Office's draft Resource Management Plan (draft RMP).

The RMP currently in effect was approved at least 26 years ago (1989/scoping began in 1983) and it in no way accounts for the socioeconomic benefits being derived from the agricultural operations that now exist in the North Fork Valley. Unfortunately, this draft RMP is no better. It contains only cursory acknowledgement of the existence of this valley within the Uncompahgre Field Office planning area and has not adequately or appropriately described what makes it of such unique agricultural, artistic and entrepreneurial importance to all of Colorado, the resort towns surrounding the valley (Aspen, Telluride and Crested Butte) and surrounding states. This omission of fully describing this valley does not constitute meeting the requirement of "succinctly describing the environment of the area(s) to be affected by the alternatives under consideration" as required by 40 CFR 1502.15.

This valley has been formally identified through multiple means as a truly unique place:

a) It has been described as "An American Provence" in the book by the same name written by University of Colorado professor, Thomas Huber. He compares the North Fork Valley with its vineyards to the famous wine growing region of southern France.
http://www.merchantherald.com/geographer-says-the-north-fork-is-an-american-provence/

b) This valley was designated by the state of Colorado as a Colorado Certified Creative District in 2013. Information on the significance of this designation can be viewed at
http://www.coloradocreativeindustries.org/showcase/colorado-creative-districts

c) Delta County was recently awarded three Blueprint 2.0 Initiatives by the Colorado Office of Economic Development and International Trade. The Initiatives include Strengthening Local Business Brand, Adaptive Reuse Workshop and Tourism Promotion.
http://choosecolorado.com/lt-gov-donna-lynne-announces-colorado-blueprint-2-0-initiative-recipients/

d) The North Fork Valley has also been designated as an American Viticulture Area by the U.S. government. This designation was officially adopted in 2001 and codified at 27 CFR
https://www.gpo.gov/fdsys/pkg/CFR-2016-title27-vol1/pdf/CFR-2016-title27-vol1-sec9-172.pdf
An American Viticulture Area is a delineated grape-growing region having distinguishing features as established in Federal regulation and a name and delineated boundary. This is only one of two such designated areas in Colorado.

These accolades, awards and designations are presented here to make a point - - this valley is recognized for its unique agriculture (it contains the highest concentration of organic farms, orchards and vineyards in Colorado), local business, art, agribusiness, agritourism, and recreation industries and deserves protection from any threat of environmental degradation. Gas exploration and development is not compatible with the economic culture of this valley and in fact, its very presence would threaten its highly regarded reputation as an organic agricultural area.

Additionally, this draft RMP has been written using the standard BLM RMP boilerplate/template language. There is nothing boilerplate about the North Fork Valley. Its presence in the Uncompahgre planning area requires that effects to it from actions occurring in the BLM decision area must be thoroughly considered. This has not been done.

The potential environmental consequences presented in this draft RMP do not in any way address the depth and breadth of potential effects to the valley from fluid mineral exploration and production. This is in direct conflict with BLM regulation 40 CFR 1610.4-6: Estimation of effects of alternatives, which requires that the Field Manager "will estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail." Without acknowledging and describing the North Fork Valley in detail, this requirement cannot and has not been achieved.

The inadequacy of the draft RMP is further exemplified by the following:

**1)   Chapter 1, Section 1.4 and Table 1.3:**  This section and table fail to appropriately and adequately acknowledge and discuss the North Fork Alternative Plan (NFAP) presented to the BLM during scoping by citizens and governmental entities in the North Fork Valley.

The NFAP was submitted in order to provide the BLM with information about the uniqueness and renowned agricultural productivity of the valley and supported the request to remove the BLM land surrounding this valley from any future leasing. However, the section summarizing the scoping comments received does not include this important scoping submittal and has consequently resulted in the lack of any meaningful reference to this agriculturally important and productive area throughout the remainder of the draft RMP. This violates the Council on Environmental Quality (CEQ) regulation at 40 CFR 1501.7(a)(2) which requires the lead agency to determine the significant issues to be analyzed in depth in an Environmental Impact Statement.

This absence of acknowledgment of the North Fork Valley's unique qualities is also in direct conflict with Section 1500.1(b) of the CEQ regulations which states that "NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."

**2)   Chapter 1, Table 1-2, Step 7:** By not appropriately including the North Fork Valley and the potential negative environmental effects to it by the various proposed alternatives as a "planning issue," this draft RMP does not adequately meet the requirement that the preferred alternative be the "alternative that best resolves planning issues."

**3)   Chapter 2, Section 2.2.3:** The lack of adequate discussion and acknowledgement of the North Fork Valley in Chapter 1 (as discussed above) has created a situation where the significance of each alternative to potentially impact the human and natural environment within the BLM planning area is missing from the fundamental underpinnings of the analysis.  This absence of appropriate consideration is evident throughout the remainder of the document and in taking this approach, this document does not meet the level of analysis required by CEQ regulations (1502.1; 1502.2; 1508.8; 1508.14 and 1508.27(a), (b)(3), (b)(4) and (b)(6)) or the National Environmental Policy Act, Section 101(b).

BLM_0147398

**4)      Chapter 2, Table 2-1 and Appendix D, Ecologic Emphasis Areas:**  The North Fork Valley should have been included in this portion of the analysis. Although it does not fit the BLM's routine (boilerplate) areas of analysis - *unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors* – does not make this ecologically unique area any less worthy of consideration. In fact, minimizing impacts to this culturally and agriculturally significant geographic area should be the core value addressed throughout the draft RMP and presented under each of the Alternatives in Tables 2-1 through 2-6.

**5)      Chapter 3, Section 3.1.3 Geology and Soils:** The following statement is included in this section; "There are no farmlands of national or statewide importance **on BLM-administered lands within the planning area** (emphasis added). However, according to a report by the Soil Conservation Service, "irrigated and prime irrigated lands of statewide importance, most of which are situated at low elevations on valley floors, occur in the Uncompahgre, North Fork, Surface Creek, and Smith Fork drainage basins" (Soil Conservation Service 1980).

Analysis of potential impacts to irrigated and prime irrigated lands existing within the Uncompahgre planning area (North Fork Valley) resulting from federal actions taking place on BLM-administered lands must be analyzed and disclosed in Chapter 4 and they are not.  Chapter 4 is completely silent on the impacts to irrigated and prime irrigated lands occurring within the valley floors in the planning area which violates 40 CFR 1508.14.

**6)      Chapter 3, Section 3.1.5, Vegetation & Chapter 4, Section 4.3.4 Vegetation:** Section 3.1.5 fails to acknowledge or discuss any of the agricultural crops existing in the North Fork Valley which is part of the Uncompahgre Field Office planning area. Omission of these existing and important resources in Chapter 3 has resulted in the complete omission of possible effects to these resources in Chapter 4, Environmental Consequences. This violates CEQ regulations at 40 CFR 1502.15; Affected Environment and 40 CFR 1508.8; Effects.

**7)      Chapter 4, Section 4.1.1 Analytical Assumption, fifth bullet:** This bullet asserts that "Direct and indirect impacts of implementing the RMP primarily occur on the decision area lands:" This is a seriously flawed assumption because many of the direct and indirect impacts of implementing the RMP on lands underlain by federal fluid mineral estate have the potential to seriously impact the people (and their livelihoods) living in the North Fork Valley.

"Planning area" is defined as the Uncompahgre Field Office boundary, including all lands, **regardless of land ownership** (emphasis added), except the Gunnison Gorge NCA Planning Area and the Dominguez-Escalante NCA" and is depicted on Figure 1-1 provided in the draft RMP. Whereas "decision area lands" are limited to public lands and federal mineral estate managed by the USDOI, Bureau of Land Management. The federal mineral estate managed by the BLM is depicted on Figure 1-2, also provided in the draft RMP.

The North Fork Valley's traditional and organic farming, fruit and grape growing areas occur less than one mile in many places from the BLM decision area boundary (but within the Uncompahgre planning area). This proximity is especially true for the thousands of acres of land surrounding Paonia, Hotchkiss and Crawford that would be made available for fluid minerals

leasing according to the BLM's preferred alternative. Obviously, these agricultural lands are at risk of being either directly or indirectly impacted by gas activity occurring on the adjacent or contiguous decision area land.

**8)    Chapter 4, Section 4.3.2 Soils and Geology:** Because Chapter 3, Section 3.1.3 dismisses the need for identifying and describing irrigated and prime irrigated lands occurring within the planning area, this Section is completely silent on the environmental consequences of federal actions on these agriculturally significant lands. This is a serious omission which only further reinforces the fact that the BLM did not take the environment actually in existence in the planning area into consideration which violates 40 CFR 1502.15 of the CEQ regulations.

**9)    Chapter 4, Section 4.3.3 Water Resources:** The following statement is made on page 4-84, *"The organic farming industry relies on clean water for agricultural production. Contamination of irrigation waters could affect the ability of local organic farms to maintain their designations."* This is the only mention of organic farming in the entire draft RMP. Such a serious threat to the North Fork Valley cannot be allowed to ever occur. The only way to prevent it is to close the entire area within the NFAP area to any new oil and gas leasing. Oil and gas drilling is absolutely incompatible with the existing land uses currently occurring in this valley.

Conclusion:

The draft RMP states that "When there are conflicts among resource uses or when a land use activity could result in unacceptable or irreversible impact on the environment, the BLM may restrict or prohibit some land uses in specific areas."

Based on the comments presented above, there is definitely a conflict between the extraction of the gas resource and the prevailing land use in the North Fork Valley. Additionally, the land use activity of producing natural gas would result in unacceptable and irreversible impacts on the environment in the North Fork Valley. Therefore, the leasing of any federal fluid minerals within the borders of the NFAP should be prohibited and this prohibition on further leasing incorporated into the alternative chosen for the revised RMP. This is the only way to preserve and protect the integrity of this unique and renowned part of Colorado.

Thank you for your consideration,

Megan Kiatta
222 Logan St #307 Denver, CO 80203
713-822-2880
megan.kiatta@gmail.com

BLM_0147400

To: Dana Wilson, Acting Uncompahgre Field Manager

Thank you for the opportunity to comment on the Uncompahgre Field Office's draft Resource Management Plan (draft RMP).

The RMP currently in effect was approved at least 26 years ago (1989/scoping began in 1983) and it in no way accounts for the socioeconomic benefits being derived from the agricultural operations that now exist in the North Fork Valley. Unfortunately, this draft RMP is no better. It contains only cursory acknowledgement of the existence of this valley within the Uncompahgre Field Office planning area and has not adequately or appropriately described what makes it of such unique agricultural, artistic and entrepreneurial importance to all of Colorado, the resort towns surrounding the valley (Aspen, Telluride and Crested Butte) and surrounding states. This omission of fully describing this valley does not constitute meeting the requirement of "succinctly describing the environment of the area(s) to be affected by the alternatives under consideration" as required by 40 CFR 1502.15.

This valley has been formally identified through multiple means as a truly unique place:

a) It has been described as "An American Provence" in the book by the same name written by University of Colorado professor, Thomas Huber. He compares the North Fork Valley with its vineyards to the famous wine growing region of southern France. http://www.merchantherald.com/geographer-says-the-north-fork-is-an-american-provence/

b) This valley was designated by the state of Colorado as a Colorado Certified Creative District in 2013. Information on the significance of this designation can be viewed at http://www.coloradocreativeindustries.org/showcase/colorado-creative-districts

c) Delta County was recently awarded three Blueprint 2.0 Initiatives by the Colorado Office of Economic Development and International Trade. The Initiatives include Strengthening Local Business Brand, Adaptive Reuse Workshop and Tourism Promotion. http://choosecolorado.com/lt-gov-donna-lynne-announces-colorado-blueprint-2-0-initiative-recipients/

d) The North Fork Valley has also been designated as an American Viticulture Area by the U.S. government. This designation was officially adopted in 2001 and codified at 27 CFR https://www.gpo.gov/fdsys/pkg/CFR-2016-title27-vol1/pdf/CFR-2016-title27-vol1-sec9-172.pdf An American Viticulture Area is a delineated grape-growing region having distinguishing features as established in Federal regulation and a name and delineated boundary. This is only one of two such designated areas in Colorado.

These accolades, awards and designations are presented here to make a point - - this valley is recognized for its unique agriculture (it contains the highest concentration of organic farms, orchards and vineyards in Colorado), local business, art, agribusiness, agritourism, and recreation industries and deserves protection from any threat of environmental degradation. Gas exploration and development is not compatible with the economic culture of this valley and in fact, its very presence would threaten its highly regarded reputation as an organic agricultural area.

Additionally, this draft RMP has been written using the standard BLM RMP boilerplate/template language. There is nothing boilerplate about the North Fork Valley. Its presence in the Uncompahgre planning area requires that effects to it from actions occurring in the BLM decision area must be thoroughly considered. This has not been done.

1

BLM_0147401

The potential environmental consequences presented in this draft RMP do not in any way address the depth and breadth of potential effects to the valley from fluid mineral exploration and production. This is in direct conflict with BLM regulation 40 CFR 1610.4-6: Estimation of effects of alternatives, which requires that the Field Manager "will estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail." Without acknowledging and describing the North Fork Valley in detail, this requirement cannot and has not been achieved.

The inadequacy of the draft RMP is further exemplified by the following:

1)      **Chapter 1, Section 1.4 and Table 1.3:** This section and table fail to appropriately and adequately acknowledge and discuss the North Fork Alternative Plan (NFAP) presented to the BLM during scoping by citizens and governmental entities in the North Fork Valley.

The NFAP was submitted in order to provide the BLM with information about the uniqueness and renowned agricultural productivity of the valley and supported the request to remove the BLM land surrounding this valley from any future leasing. However, the section summarizing the scoping comments received does not include this important scoping submittal and has consequently resulted in the lack of any meaningful reference to this agriculturally important and productive area throughout the remainder of the draft RMP. This violates the Council on Environmental Quality (CEQ) regulation at 40 CFR 1501.7(a)(2) which requires the lead agency to determine the significant issues to be analyzed in depth in an Environmental Impact Statement.

This absence of acknowledgment of the North Fork Valley's unique qualities is also in direct conflict with Section 1500.1(b) of the CEQ regulations which states that "NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."

2)      **Chapter 1, Table 1-2, Step 7:** By not appropriately including the North Fork Valley and the potential negative environmental effects to it by the various proposed alternatives as a "planning issue," this draft RMP does not adequately meet the requirement that the preferred alternative be the "alternative that best resolves planning issues."

3)      **Chapter 2, Section 2.2.3:** The lack of adequate discussion and acknowledgement of the North Fork Valley in Chapter 1 (as discussed above) has created a situation where the significance of each alternative to potentially impact the human and natural environment within the BLM planning area is missing from the fundamental underpinnings of the analysis.  This absence of appropriate consideration is evident throughout the remainder of the document and in taking this approach, this document does not meet the level of analysis required by CEQ regulations (1502.1; 1502.2; 1508.8; 1508.14 and 1508.27(a), (b)(3), (b)(4) and (b)(6)) or the National Environmental Policy Act, Section 101(b).

4)      **Chapter 2, Table 2-1 and Appendix D, Ecologic Emphasis Areas:**  The North Fork Valley should have been included in this portion of the analysis. Although it does not fit the BLM's routine (boilerplate) areas of analysis - *unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors* – does not make this ecologically unique area any less worthy of consideration. In fact, minimizing impacts to this culturally and agriculturally significant geographic area should be the core value addressed throughout the draft RMP and presented under each of the Alternatives in Tables 2-1 through 2-6.

2

5)      **Chapter 3, Section 3.1.3 Geology and Soils:** The following statement is included in this section; "There are no farmlands of national or statewide importance **on BLM-administered lands within the planning area** (emphasis added). However, according to a report by the Soil Conservation Service, "irrigated and prime irrigated lands of statewide importance, most of which are situated at low elevations on valley floors, occur in the Uncompahgre, North Fork, Surface Creek, and Smith Fork drainage basins" (Soil Conservation Service 1980).

Analysis of potential impacts to irrigated and prime irrigated lands existing within the Uncompahgre planning area (North Fork Valley) resulting from federal actions taking place on BLM-administered lands must be analyzed and disclosed in Chapter 4 and they are not.  Chapter 4 is completely silent on the impacts to irrigated and prime irrigated lands occurring within the valley floors in the planning area which violates 40 CFR 1508.14.

6)      **Chapter 3, Section 3.1.5, Vegetation & Chapter 4, Section 4.3.4 Vegetation:** Section 3.1.5 fails to acknowledge or discuss any of the agricultural crops existing in the North Fork Valley which is part of the Uncompahgre Field Office planning area. Omission of these existing and important resources in Chapter 3 has resulted in the complete omission of possible effects to these resources in Chapter 4, Environmental Consequences. This violates CEQ regulations at 40 CFR 1502.15; Affected Environment and 40 CFR 1508.8; Effects.

7)      **Chapter 4, Section 4.1.1 Analytical Assumption, fifth bullet:** This bullet asserts that "Direct and indirect impacts of implementing the RMP primarily occur on the decision area lands:" This is a seriously flawed assumption because many of the direct and indirect impacts of implementing the RMP on lands underlain by federal fluid mineral estate have the potential to seriously impact the people (and their livelihoods) living in the North Fork Valley.

"Planning area" is defined as the Uncompahgre Field Office boundary, including all lands, **regardless of land ownership** (emphasis added), except the Gunnison Gorge NCA Planning Area and the Dominguez-Escalante NCA" and is depicted on Figure 1-1 provided in the draft RMP. Whereas "decision area lands" are limited to public lands and federal mineral estate managed by the USDOI, Bureau of Land Management. The federal mineral estate managed by the BLM is depicted on Figure 1-2, also provided in the draft RMP.

The North Fork Valley's traditional and organic farming, fruit and grape growing areas occur less than one mile in many places from the BLM decision area boundary (but within the Uncompahgre planning area). This proximity is especially true for the thousands of acres of land surrounding Paonia, Hotchkiss and Crawford that would be made available for fluid minerals leasing according to the BLM's preferred alternative. Obviously, these agricultural lands are at risk of being either directly or indirectly impacted by gas activity occurring on the adjacent or contiguous decision area land.

8)      **Chapter 4, Section 4.3.2 Soils and Geology:** Because Chapter 3, Section 3.1.3 dismisses the need for identifying and describing irrigated and prime irrigated lands occurring within the planning area, this Section is completely silent on the environmental consequences of federal actions on these agriculturally significant lands. This is a serious omission which only further reinforces the fact that the BLM did not take the environment actually in existence in the planning area into consideration which violates 40 CFR 1502.15 of the CEQ regulations.

BLM_0147403

**9)** **Chapter 4, Section 4.3.3 Water Resources:** The following statement is made on page 4-84, "*The organic farming industry relies on clean water for agricultural production. Contamination of irrigation waters could affect the ability of local organic farms to maintain their designations.*" This is the only mention of organic farming in the entire draft RMP. Such a serious threat to the North Fork Valley cannot be allowed to ever occur. And the only way to prevent it is to close the entire area within the NFAP area to any new oil and gas leasing. Oil and gas drilling is absolutely incompatible with the existing land uses currently occurring in this valley.

Conclusion:

The draft RMP states that "When there are conflicts among resource uses or when a land use activity could result in unacceptable or irreversible impact on the environment, the BLM may restrict or prohibit some land uses in specific areas."

Based on the comments presented above, there is definitely a conflict between the extraction of the gas resource and the prevailing land use in the North Fork Valley. Additionally, the land use activity of producing natural gas would result in unacceptable and irreversible impacts on the environment in the North Fork Valley. Therefore, the leasing of any federal fluid minerals within the borders of the NFAP should be prohibited and this prohibition on further leasing incorporated into the alternative chosen for the revised RMP. This is the only way to preserve and protect the integrity of this unique and renowned part of Colorado.

Thank you for your consideration,

Taylor Starnes
655 P St, Sacramento, CA 95814
530-574-7045
britneetaylor@gmail.com

4

BLM_0147404

**Bighorn Sheep Risk Of Contact with Domestic Sheep Is Not Adequately Analyzed, Prevented and Mitigated**

The Final RMP does not adequately address the risk of contact between bighorn sheep and domestic sheep and goats.  In fact, the Final Winnemucca RMP relies on only two, woefully outdated studies on bighorn sheep that don't address the risk of contact and consequences of contact between bighorn and domestic sheep or goats. The preferred alternative relies on scientifically untested and inadequate SOP's and BMP's with no real analysis of risk of contact between bighorn and domestic sheep or goats.

There have been a number of bighorn sheep die-off events in recent years with more than 1,000 bighorn sheep deaths.

- Hay's Canyon Range in northwestern Nevada (2008).

- Ruby Mountain and Humboldt Ranges, Nevada (1995 and 2009).

- Snowstorm Mountain Range, Nevada (2011).

- Mojave National Preserve (ongoing).

- River Mountains, Nevada (ongoing).

- Yakima River Canyon, Washington (2009).

- Uinta Mountains, Utah (2009).

- Gros Ventre, Wyoming (2009).

Many recent scientific articles have conclusively demonstrated that domestic sheep are capable of transmitting deadly diseases[1] such as *Mannheimia haemolytica, Pasteurella trehalosi, Pasteurella multocida,* and *Mycoplasma.*

WAFWA[2] recommends maintaining separation between bighorn and domestic sheep or goats.

The USFS has developed a tool called the *Bighorn Sheep Risk of Contact Tool*[3,4] which has been used by the BLM for analysis of risk of contact between bighorn sheep and domestic

---

[1] Wehausen et al (2011) Domestic sheep, bighorn sheep, and respiratory disease: a review of the experimental evidence. http://www.bio.sdsu.edu/faculty/kelley/47.pdf
[2] WAFWA (2012). Recommendations For Domestic Sheep and Goat Management in Wild Sheep Habitat. http://www.wafwa.org/documents/wswg/RecommendationsForDomesticSheepGoatManagement.pdf
[3] USDA USFS. (2013a). *Bighorn sheep risk of contact tool.* Prepared by USDA FS Bighorn Sheep Working Group, Critigen Inc. http://www.critigen.com/sites/critigen/files/case-studies/USFS_BigHorn-Sheep-Risk-Assessment-Tool.pdf
[4] USDA USFS. (2013b). Modeling and analysis technical report. USDA Forest Service, Intermountain Region, Prepared for the USDA FS Bighorn Sheep Working Group, Critigen Inc.

sheep or goats associated with BLM permitted grazing in the Owyhee Field Office of Idaho[5]. This tool is freely available to the agency and represents a tool developed with an understanding of current, best available science which overwhelmingly indicates that even one interaction between bighorn and domestic sheep or goats can result in a large scale die-off among bighorn sheep and can have very long lasting effects on the surviving individuals and their progeny.

This tool was developed as part of the Payette National Forest Supplemental Land and Resource Management Plan[6] which designated areas as suitable and unsuitable to domestic sheep and goat grazing based on risk of contact between those species and bighorn sheep.

This threat imposes an undue degradation of wildlife resources across much of the Winnemucca District and effects the economic values, wildlife values, and viability of an important wildlife species. The BLM is required to use the best available science to ensure that BLM approved activities don't threaten the viability of wildlife.

Both desert bighorn, a BLM sensitive species, and California bighorn sheep inhabit portions of Winnemucca District and the Nevada Department of Wildlife has identified an even greater amount of potential bighorn sheep habitat that is precluded from bighorn reintroductions because of BLM permitted sheep and goat grazing.

Because BLM permitted activities potentially threaten the viability of bighorn sheep and impose undue degradation on public resources, the BLM must conduct a proper risk analysis that ensures the prolonged viability and recovery of bighorn sheep on the Winnemucca District. This analysis must analyze the risk of contact between domestic sheep or goats and with existing bighorn populations within and nearby the Winnemucca District to ensure that surrounding populations are not put at undue risk of contact.

Once a proper analysis has been conducted the BLM must designate areas where the risk of contact threatens the viability of bighorn sheep populations as unsuitable for domestic sheep and goat grazing. Because bighorn sheep are mobile and routinely disperse to new areas, this risk analysis must be conducted whenever bighorn sheep are detected in new areas outside of the previous risk analysis areas to determine the suitability of domestic sheep and goat grazing.

As part of any adaptive management process, there must be triggers for action and, in this case, terms and conditions placed must be placed on any sheep and goat grazing permit that allows grazing nearby lands deemed unsuitable due to risk of contact.

To ensure that risk of contact is further mitigated, an emergency response plan (ERP) must be devised which keeps the BLM informed about conditions on the ground.

As a model, the Payette National Forest Supplemental Land and Resource Management Plan provides direction that instructs the Forest to evoke emergency management response measures if:

- Bighorn sheep presence is detected within 10 kilometers (6.21 miles) of active domestic sheep or goat grazing or trailing. Actions will be taken to ensure separation between bighorn sheep and domestic sheep or goats. RAST10;

---

[5] Jump Creek, Succor Creek, and Cow Creek Watersheds Grazing Permit Renewal Draft Environmental Impact Statement. https://www.blm.gov/epl-front-office/projects/nepa/24953/43104/46090/Group2DEIS_April_22_2013_508.pdf

[6] Payette National Forest Record of Decision Land and Resource Management Plan. http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5238683.pdf

2

BLM_0147406

- Domestic sheep and goat grazing may only be permitted where separation from bighorn sheep can be maintained. If separation cannot be maintained, permitted domestic sheep and goat grazing shall be prohibited. RAST11;

- Reassess the risk for contact when bighorn sheep are located within previously undocumented areas or new herd units are documented. WIST08; or

- Domestic sheep or goats shall not be utilized as a management tool for weed control where domestic sheep grazing is not suitable or where contact with bighorn sheep is possible. NPST13.

- To maintain separation, when bighorn sheep are found within 10 kilometers of an active domestic sheep and goat allotment, implementation of emergency actions for domestic sheep and goat grazing could include:

  1. Moving domestic sheep back to an identified ridgeline within the allotment;

  2. Notifying the Idaho Department of Fish and Game of the bighorn location;

  3. Removing domestic sheep and goats from the allotment; or

  4. Not authorizing domestic sheep or goats on an allotment or driveway for the current grazing season. RAGU13.

The ERP[7] defines instances in which an emergency response could be implemented include the following situations but is not limited to:

1. Bighorn sheep are found within the suitable area of an active domestic sheep and goat allotment or trailing route;
2. Bighorn sheep are found within 10 kilometers (6.21 miles) of the suitable area of an active domestic sheep and goat allotment or trailing route;
3. Domestic sheep or goats are found missing from a band;
4. Domestic sheep or goats stray and are found outside of their authorized allotment area and into areas deemed unsuited for domestic sheep or goat grazing; or
5. Domestic sheep or goats are found on the Payette National Forest after the authorized season of use.

The ERP should also require domestic sheep herders carry a GPS device that communicates its location to managers such as the SPOT[8]. These devices have been widely field tested and provide a simple way to communicate the location of the user, ask for assistance, or inform emergency response officials of an emergency by sending an email to designated people or the proper emergency response team. As part of the mandatory terms and conditions of any permit, within any area where the risk of contact is high, all herders should be required to carry such a device and be required to communicate the location of sheep bands on a daily basis.

Herders should also be required to report any sighting or sign of a bighorn sheep that is observed. Herders should also be required conduct daily counts of domestic sheep or goats and

---

[7] Emergency Response Plan for Potential Situations Regarding Bighorn Sheep and Domestic Sheep and Goats. Payette National Forest. 2003 Land and Resource Management Plan. March 29, 2011. http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5422479.pdf

[8] http://www.findmespot.com/en/

3

to notify the BLM when domestic sheep are missing from bands when in proximity to bighorn sheep areas.

In the event that any of these reasonable mandatory terms and conditions are not met, the ERP must be activated. In the event that a location provided by the herder using a SPOT device is located within any area deemed unsuitable for domestic sheep or goat grazing the ERP must be implemented.

**BLM fails to adequate analyze risk disease from cattle.**

Other outbreaks of deadly disease among bighorn sheep have been associated with contact with cattle[9].  The BLM must analyze the risks associated with BLM permitted cattle grazing, especially during severe drought conditions when cattle and bighorn sheep seek out water sources and may come into contact.

**BLM inadequately analyzes effects of conversion from cattle to sheep or sheep to cattle in bighorn sheep habitat.**

LG 4.1 and LG 4.2 allow for conversion of cattle grazing to sheep grazing and vice versa. When considering any such conversion a risk of contact analysis must be undertaken to ensure that domestic sheep or goat grazing does not imperil existing or potential bighorn sheep populations.  Any conversion of sheep to cattle grazing must analyze the differences in how each species uses a landscape using criteria such as forage availability, distance to water, and terrain. New water developments within bighorn sheep habitat must be analyzed for impacts on bighorn sheep and the risk of contact between cattle, domestic sheep or goats, and bighorn sheep.

**BLM inadequately presents a baseline condition of bighorn populations and domestic sheep and goat grazing.**

The Final Winnemucca RMP provides little information about the status and health of bighorn sheep populations within and nearby the Winnemucca District.  The reader can gain very little understanding about how current permitted actions have affected bighorn sheep and whether any of the proposed alternatives may influence the risk of contact between domestic sheep or goats, and bighorn sheep.

---

[9] Wolfe et al (2010) A bighorn sheep die-off in southern Colorado involving a Pasteurellaceae strain that may have originated from syntopic cattle. http://www.ncbi.nlm.nih.gov/pubmed/20966277

4

BLM_0147408



**Rocky Mountain
BIGHORN
SOCIETY**

P.O. Box 8320 • Denver, CO • 80201-8320

July 15, 2016

Field Office Manager
BLM Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Dear Uncompahgre Field Office Manager:

On behalf of the 800 members of the Rocky Mountain Bighorn Society (RMBS), please accept this **protest** of the Final Environmental Assessment (EA), Finding of No Significant Impact (FONSI), and Decision Notices on the North Delta Grazing Permit Renewals. Our primary concern is the long term viability of bighorn sheep (BHS) herds in the Uncompahgre Field Office (UFO) resource area.

The RMBS has previously submitted scoping comments on March 6, 2015 advocating for the BLM to provide greater protections to bighorn sheep, including the Dominguez desert bighorn sheep herd which is classified by Colorado Parks and Wildlife as a Tier 1 Primary Population and is a state-listed BLM sensitive species. We also provided timely comments to the Preliminary EA on September 24, 2015, pointing out numerous flaws in the EA and associated bighorn sheep risk assessment and proposed alternative, most of which were not addressed in the Final EA.

We address our **issues of protest** for each document below.

**<u>Environmental Assessment</u>**

<u>Limited Range of Alternatives</u>

The BLM considered only a No Action alternative, a Modified Grazing Alternative, and a No Grazing alternative. Only the No Grazing alternative provides adequate protection to bighorn sheep populations in the UFO resource area and surrounding jurisdictions. The BLM should have included alternatives that do not reauthorize grazing in allotments that are high risk to bighorn sheep, or that convert the class of livestock grazing on those allotments. By failing to consider an alternative that eliminates domestic sheep grazing in areas that were designated as high risk to bighorns under the Risk of Contact analysis, the EA failed to consider a reasonable range of alternative actions.

<u>MS 1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep</u>

This policy manual was issued by Deputy Director Steven A. Ellis on March 2, 2016, and establishes policy for the coordination and management of domestic sheep and goats to sustain wild sheep on the BLM managed lands. The EA notes the release of this manual in the Purpose and Need for the Action section, but does not discuss the new policy anywhere in the document. Specifically, we believe the BLM violated Management Practice 2 from the policy manual (Pg. 7):

> 2. Where domestic sheep or goats are authorized (including trailing and for vegetation management), or where recreational sheep or goats use (e.g., pack animals) may occur, and there is a potential for inter-species contact of wild sheep and domestic sheep or goats, land use plans and/or implementation-level plans will prescribe management practices **to provide effective separation**. Identify in the land use plan and/or implementation-level plan if opportunities exist for allotment or pasture management changes to help achieve effective separation.

The EA relies solely on Best Management Practices (BMP) in the Terms and Conditions, and the presence of a highway between the allotments and bighorn sheep Core Herd Home Range (CHHR) to achieve effective separation. The EA fails to discuss in detail the effectiveness of BMP to create effective separation, nor the fact that the majority of experts do not support the use of BMP to protect bighorn sheep. We will discuss BMP in greater detail below. While the presence of a highway between CHHR and the domestic sheep allotments may present an obstacle for bighorn sheep to navigate, there is no evidence to suggest that it will prevent bighorn sheep forays into active sheep allotments. Colorado Parks and Wildlife reports several known occasions of bighorn sheep being struck by vehicles on the highway in recent years (Banulis, CPW, pers. comm.), which confirms that movements across this obstacle do occur.

In light of the fact that the proposed action does not create effective separation between domestic and wild sheep, we believe the BLM should refer to Management Practices 11 through 15 in the policy manual:

> 11. If effective separation between wild sheep and domestic sheep or goats cannot be reasonably expected, and/or if reporting indicates that contact has occurred in spite of the best efforts to implement management practices to prevent contact, consider relocating the authorized sheep or goats to another allotment(s) where risk of contact is lower.

> 12. If the allotment/authorization cannot be managed in a manner that will provide effective separation, then seek voluntary non-use from the permittee (in accordance with the provisions in 43 C.F.R. §4110.3-3 – Grazing Qualifications and Preference) while seeking long-term solutions to achieve effective separation.

> 13. If the permittee/lessee is unwilling to apply for voluntary non-use, issue a final decision effective upon issuance or temporary suspension of domestic sheep or goat use in the allotment (in accordance with the provisions in 43 C.F.R. §4110.3-3 – Grazing Qualifications and Preference) while seeking long-term solutions to achieve effective separation.

BLM_0147410

14. If effective separation between wild sheep and domestic sheep or goats is not achievable, and relocating the permitted or authorized use is not possible, consider livestock use conversion from domestic sheep or goats.

15. If effective separation between wild sheep and domestic sheep or goats is not achievable, consider cancelling a domestic sheep or goat authorization or closing an allotment to domestic sheep and goat use, particularly when priority wild sheep populations or emphasis areas are in close proximity. Such actions must comply with NEPA, grazing regulations, and land use planning regulations.

By failing to discuss this new policy manual and whether the decisions here comply with the direction in that manual, the EA omits important information that must be disclosed to the public for a full and adequate analysis of the effects of the action.

<u>Use of Best Management Practices to Achieve Effective Separation</u>

The EA relies solely on the use of BMP recommendations from the Western Association of Fish and Wildlife Agencies (WAFWA) to achieve effective separation. However, the use of BMP has not been scientifically evaluated and proven to reduce the risk of contact between domestic sheep and bighorn sheep where spatial separation does not occur. There is no way to quantify the reduction of risk, and therefore no way to evaluate the overall risk to bighorn sheep under this management alternative. In fact, the WAFWA guidelines explicitly note that, "[e]ffectiveness of management practices designed to reduce risk of association are not proven and therefore **should not be solely relied upon to achieve effective separation**" (Pg. 15).

Additional expert opinions on the efficacy of BMP to achieve effective separation include:

In WESTERN WATERSHEDS PROJECT et al. vs. BUREAU OF LAND MANAGEMENT et al., case number 09-0507-E-BLW (attached), the United States District Court of Idaho enjoined the BLM from relying solely on the use of BMP to achieve effective separation on the Partridge Creek Allotment after reviewing a Nez Perce National Forest decision on the Allison-Berg Allotment across the river from the Partridge Creek Allotment (Bonn 2008, attached), which found that BMP would be ineffective to reduce the risk to bighorn sheep. The Court also reviewed the Fifth Declaration of Victor L. Coggins (*Civ. No. 07-151-BLW*, attached), the District Wildlife Biologist for the Oregon Department of Fish and Wildlife, in which he stated that, based on his forty-two years of experience as a state wildlife biologist, he believed BMP could not guarantee separation of bighorn sheep and domestic sheep.

Tim Schommer, retired National Bighorn Sheep Biologist for the USDA Forest Service, noted that in his nearly 30 years of experience in bighorn sheep management and restoration, he found that BMP were not effective to maintain separation and eliminate the risk of disease transmission between domestic sheep and bighorn sheep (Declaration of Tim Schommer, *Civ. No. 07-151-BLW*, attached).

Schommer also authored an Evaluation of Best Management Practices position statement (attached) included in Appendix F of the Final Supplemental Environmental Impact Statement

BLM_0147411

(FSEIS) (2010) for the 2003 Payette National Forest Land and Resource Management Plan. Schommer concludes that BMP are largely ineffective in areas of very rugged terrain and/or in areas with little or no buffer between wild sheep and domestic sheep.

In April 2016 the BLM Cottonwood Field Office in Idaho chose to not continue grazing high risk domestic sheep allotments, including those that did not overlap CHHR, in part because they determined that the use of BMP was largely ineffective at reducing risk.  The RMP amendment and FSEIS states (Pg. 45):

> **2.4.6 Alternative L – Allow Domestic Sheep and Goat Grazing on All Allotments with Leasing Terms and Conditions to Reduce Potential Interspecies Contact**
>
> The BLM considered an alternative that would make all four allotments available for domestic sheep and goat grazing with application of the leasing terms and conditions identified in Appendix C to reduce the potential for contact with bighorn sheep. These terms and conditions have previously been identified, recommended, or implemented by the USFS and the BLM as best management practices (BMPs). However, when bighorn sheep CHHR occur in or adjacent to a domestic sheep allotment, and especially when the allotment is within bighorn herd home range, development and implementation of effective separation measures is difficult; and contact between the species will most likely still occur. **In other words, special terms and conditions to avoid contact between bighorn and domestic sheep that are known to be in close proximity are generally ineffective to ensure separation of the species.** Furthermore, even with these extra measures, control of domestic sheep, or monitoring and locating bighorn sheep in forested/ dense vegetation or steep/rocky/rugged terrain is very difficult. Accordingly, without a large buffer between domestic and wild bighorn sheep, extra measures are not likely to result in a significant reduction in the risk of contact (Schommer 2009) **No known studies, research, or peer reviewed literature has documented the effectiveness of BMPs preventing contact and disease transmission when domestic sheep or goats grazed within or adjacent to occupied bighorn sheep habitats.** Appendix C contains a more detailed review of the effectiveness of BMPs.

David A. Jessup, Senior Wildlife Veterinarian (ret.) with the California Department of Fish and Game, summarized the overwhelming evidence that contact between bighorn sheep and domestic sheep increases disease and death in bighorns, including historical die-offs of wild bighorns after contact with domestic sheep, as well as intentional and accidental penned experiments (Declaration of David A. Jessup, *Case No. 1:12-cv-469 BLW*, attached).  He concludes that the preponderance of evidence supports the concept that spatial separation of the species is an appropriate tool to reduce the risk of disease transmission, and that more complicated approaches are not practical or effective at this time.

Dr. Thomas Besser, faculty at the Department of Veterinary Microbiology and Pathology, College of Veterinary Medicine, and the Washington Animal Disease Diagnostic Laboratory at Washington State University, also evaluated the evidence presented in Idaho Wool Growers et al. vs. Vilsack et al. (*Case No. 1:12-cv-00469-BLW*) and provided his expert opinion

BLM_0147412

that "physical separation of these species is the only known way to protect bighorn sheep from this disease transmission" (Declaration of Dr. Thomas Besser, attached).

The references above affirm that the Courts, the experts, and the BLM believe that BMP are not effective at mitigating the risk of contact between bighorn sheep and domestic sheep.  Therefore, the UFO should not rely on BMP to reduce the risk of contact in the North Delta analysis area.  The EA does not disclose these contrary views about use of BMP or discuss whether and to what extent BMP have been proven effective at mitigating risk of contact.

By failing to analyze whether BMP have proven effective at keeping the species separate and to disclose the views of many agency and outside experts that they are not effective, the EA has not adequately assessed and disclosed the effects of the action or responded to opposing scientific viewpoints.

<u>Inadequate Cumulative Effects Analysis</u>

The cumulative effects analysis for desert and Rocky Mountain bighorns does not include effects from domestic sheep on National Forest, state or private lands within the Cumulative Impacts Analysis Area (CIAA).  Likewise, there is no discussion about domestic sheep grazing on BLM lands outside of the UFO but within the CIAA.

There is no explanation for truncating the CIAA at 22 miles.  As the Risk of Contact (RoC) model only identifies forays out to 22 miles (35 km), it may actually underestimate the risk of contact. Using the model for evaluating all alternatives and both subspecies of BHS will permit a consistent approach for this analysis. The potential for underestimating the risk of contact can be described as one of the uncertainties in the analysis.

The map of the bighorn sheep CIAA (Figure 10, Pg. 113) does not include CHHR for the Main Canyon bighorn sheep herd nor for the Battlement Mesa bighorn sheep herd, both of which lie partially within the CIAA.  It does appear that these herds were included in the RoC analysis.

Therefore, the EA's cumulative effects analysis was flawed because it used an unreasonably small CIAA, did not assess effects to all bighorn sheep herds within the CIAA, and did not combined effects to bighorn sheep herds from domestic sheep grazing on other land outside the UFO but within the CIAA added to the grazing on UFO land.  This flawed analysis drastically underestimated the combined cumulative effects of domestic sheep grazing on bighorn sheep herds in the relevant area.

<u>Faulty RoC Analysis</u>

The following statement in the EA suggests a basic misunderstanding by the author of what the RoC model analyzes and what the results mean:

> "…since there is no bighorn CHHR within the North Delta area, there are no effects to core habitat areas." (Pg. 116)

BLM_0147413

The RoC model utilizes bighorn sheep CHHR information, a summer source habitat model representing suitable bighorn summer habitat, ram and ewe foray rates, and domestic sheep allotment boundaries to calculate probabilities that rams and ewes may **leave a CHHR, undertake a foray, and subsequently contact a specific domestic sheep allotment.** Output from the tool also calculates rates of contact between individual bighorns from specific bighorn herds with specific domestic sheep allotments. Using the resulting contact rate, managers can evaluate a range of effective contact probabilities (i.e. the probability that contact with an allotment will result in a bighorn sheep disease outbreak) and determine extirpation probabilities based on the effective contact probabilities. Therefore, the RoC model evaluates the potential for disease transmission and extirpation of a bighorn herd due to a foraying bighorn coming into contact with a domestic sheep grazing allotment outside of CHHR. The statement that there are no effects because there is no overlap is a misinterpretation of how the RoC model works.

Probability of Interaction Model

The RMBS does not understand why the Probability of Interaction Model (PoIM) is included in this EA. We have repeatedly stated that the model is based on several flawed assumptions which are not supported in any peer-reviewed literature. The PoIM does not seem to be used as the decision-making tool in this analysis, and therefore only serves to confuse the reader and decision maker by inserting meaningless information into the decision document. Specifically, our concerns with the PoIM are noted below. The first comments address incorrect assumptions used to develop the Probability of Interaction Model.

Page 192, item 3a - The authors cited publications by Holecheck, Pieper, and Herbel (1989) and McDaniel and Tiedeman (1981) that continuous cliffs (>70% slope) and continuous steep slopes (40-70%) were a barrier to movement or were a partial barrier to domestic sheep movement. Both of these publications were discussing the use of forage resources on the landscape by domestic sheep not their movements across the landscape. These publications identified that, as the slope of the landscape increased, domestic sheep use of available forage decreased. These publications did not identify steeper slopes as barriers. McDaniel and Tiedeman (1981) further stated on page 103 of their publication the following: "Sheep used all slopes regardless of steepness but when terrain was especially rough the animals mostly trailed through the area making little use of the available forage." This statement alone negates two important assumptions for the model (3a, i and 3a, iii) and incorrectly describes domestic sheep use of a landscape.

Page 192, item 3b, ii – We question the validity of the 9-mile buffer employed in the model, that the presence of a bighorn sheep is extremely low, and interaction is unlikely. The authors cited the WAFWA guidelines for the use of this distance; however, the WAFWA guidelines do not recommend the use of this buffer distance, and certainly do not support the notion that the "the presence of a bighorn sheep is extremely low, and interaction is unlikely." Based on the literature cited, it appears that the authors cited Johnson (1995) and Johnson and Swift (2000) for the use of this distance. This study was to develop a model for evaluating habitat suitable for Rocky Mountain bighorn sheep translocations. This distance was then used to formulate past BLM policy/guidelines that stated that domestic sheep allotments should not occur within 9

BLM_0147414

miles (buffer) of desert bighorn sheep habitat. The 9-mile buffer is no longer included in BLM policy because it is not supported by science.

Page 192, item 3b, iii – We are not aware of any study that describes distances greater than two miles from bighorn sheep range, including extensive flat terrain and interconnected areas greater than 0.5 miles in diameter, would increase barriers outside typical bighorn sheep range. There are numerous examples (some published and many unpublished) of both Rocky Mountain and desert bighorn sheep foraying movements outside of typical habitats (steep, rugged terrain) used by bighorn sheep. For example, bighorn sheep have been documented crossing flat land in valleys to reach other mountain ranges, a distance that required traveling across more than 2 miles of flat valley-bottom land. Therefore, this is an inappropriate assumption for foraying bighorn sheep.

Page 193, Probability of Interaction Model Methods, #1 – There is no rationale for identifying why >75% equals a high risk and less than or equal to 75% is an undetermined risk. If 50% of a domestic sheep grazing allotment contains bighorn sheep and that same 50% is also used by bighorn sheep then one would surmise that this would also have a high risk value. It appears that this part of the model is arbitrary and has no basis in science. If any part of a domestic sheep allotment overlaps occupied bighorn range, there is certainly a high risk of contact. No science supports any other conclusion.

Page 193, Probability of Interaction Model Methods, #2 – As stated in the previous comments, the undetermined areas for physiographic barriers to movement and the compounding temporal effects that allotment usage incurs appear to be arbitrary and have no basis in science.

Page 193, Probability of Interaction Model Methods, #3 – Although the model takes into consideration season of use, this by itself does not indicate that there will not be any contact between the species. The environmental consequences section does not address stray domestic sheep that may not be located by the permittee or BLM for a number of days, weeks, or months. Straying domestic sheep are a common occurrence when grazed in rangeland conditions. Straying may result from a number of natural factors, including steep rugged terrain, weather events, and predators separating individuals from the band. Human error with poor husbandry practices can also result in straying. These straying domestic sheep can also have deleterious impacts through the potential for disease transmission to bighorn sheep. Courts and bighorn experts have recognized the high likelihood of straying domestic sheep that pose a risk to bighorn sheep. It is unreasonable to assume that domestic sheep will only be on allotments during the permitted season when data from around the West shows that straying is a common occurrence.

Based on the above information, the RMBS believes all references to the scientifically unsupported PoIM should be removed from the EA.

For the reasons explained above, the EA is flawed because it did not consider a reasonable range of alternative actions, did not disclose and discuss information necessary to assess the effects of the action, and therefore did not properly analyze the direct, indirect, and cumulative effects of the action that is needed to take the required "hard look" at the actions' impacts.

BLM_0147415

## Finding Of No Significant Impact

The RMBS protests the Finding of No Significant Impact (FONSI). We believe the proposed action may have a significant effect on bighorn sheep populations, which would require an Environmental Impact Statement (EIS). Our rationale for believing the FONSI is based on inadequate analysis and inaccurate assumptions are outlined in the EA section above.

The Context statement in the FONSI ignores the wide public interest in bighorn sheep as both a watchable wildlife species and as a highly desired big game hunting opportunity, at the national, regional and statewide level. The Context statement does not consider the ramifications to local bighorn sheep populations if the domestic sheep grazing permits are renewed.

Intensity factor number 1 does not address the adverse effects of a bighorn sheep die-off should contact and disease transmission occur. The Environmental Consequences section of the EA states of the proposed action, "…by continuing domestic sheep presence in the area, there will continue to be 25,691 acres predicted from the RoC model to have disease outbreaks in local bighorn populations on an interval less than every 25 years. If this model result is accurate, this results in those local populations of bighorn sheep never recovering from those disease outbreaks" (EA, Pg. 116-117). This is clearly an adverse effect that was ignored in the FONSI.

Intensity factor number 4 does not acknowledge that these decisions to continue grazing domestic sheep in high risk areas to bighorn sheep are highly controversial. The fact that the BLM considered all comments received is irrelevant. These decisions are highly controversial due to their potential effects to bighorn sheep herds, and whether proposed BMP will work to reduce risk and maintain bighorn populations.

Intensity factor number 5 completely ignores the uncertainty about data and modeling results addressed in the EA. Due to these factors, there is considerable uncertainty about the effects to bighorn sheep. There is also considerable uncertainty about the effectiveness of BMP to reduce the risk to bighorn sheep.

Intensity factor number 6 incorrectly states that the BLM preferred alternative neither establishes precedent for future BLM actions with significant effects, nor represents a decision in principle about a future consideration. These decisions are the first by the BLM in Colorado to use the RoC model to determine risk ratings and then make decisions. The decision to continue to graze high risk allotments and to rely on unproven BMP to ameliorate that risk does indeed set a precedent.

Intensity factor number 7 incorrectly states that cumulative impacts of the BLM preferred alternative have been analyzed and considered. The EA did not analyze cumulative impacts of preferred alternative and domestic sheep grazing on private lands, Forest Service lands, or other BLM lands outside the resource area but within the CIAA.

BLM_0147416

The RMBS rejects the conclusion to intensity factor number 10.  We assert that the proposed alternative violates the Federal Land Policy and Management Act (FLPMA) based on the intensity factors above.

Because the context and intensity factors show that there may be significant effects from the proposed action, an EIS is required and the FONSI is arbitrary and capricious.

**Decision Notices**

The Decision Notices (DN) violate NEPA because they rely on a flawed EA and risk assessment and an arbitrary and capricious FONSI, as noted above.

The DN violate FLPMA because they are inconsistent with direction in the current UFO RMP (1989) to protect bighorn populations.  For example, the current RMP states:

> Habitat in the Gunnison Gorge and Camel Back areas would be managed for bighorn sheep; disturbances in these areas would be minimized. (Pg. 2)

And:

> Bighorn sheep habitat in the Smith Fork Canyon (2,250 acres) would be monitored and protected.  Activities and land uses that are consistent with maintaining the necessary forage and isolated habitat requirements of bighorn sheep would be permitted. (Pg. 149)

The preferred alternative authorizes grazing activities which put both the Dominguez and Gunnison Gorge bighorn sheep herds at risk.  The authorized grazing therefore does not comply with these and other provisions in the UFO RMP that require protection of bighorn sheep habitat and maintenance of their populations.

The DN violate FLPMA because they do not comply with rangeland health guidelines in 43 CFR 4180.2 that require the BLM to meet state standards and guidelines.  The DN do not comply with standard 4 which requires the BLM to maintain or enhance special status species by sustaining healthy native animal communities.  As a BLM sensitive species, desert bighorn sheep are a special status species.

The DN violate FLPMA because they do not comply with BLM policy manual MS 1730 - Management of Domestic Sheep and Goats to Sustain Wild Sheep.  MS 1730 requires BLM managers to maintain effective separation between domestic sheep and wild sheep.  The manual does not suggest that high risk can be mitigated through implementation of unproven BMP.

In summary, we find the decision to continue grazing high risk domestic sheep allotments in the absence of scientifically proven mitigation to reduce the risk to an acceptable level to be arbitrary and capricious and in violation of FLPMA and NEPA.  We believe the BLM must either choose the No Grazing alternative or complete a full Environmental Impact Statement.

Thank you for this opportunity to participate in the analysis process.  Please keep us apprised of future opportunities and/or future decisions on the North Delta analysis.

Sincerely,

Terry E. Meyers
Conservation Director
(970) 640-6892
meyers.terry@gmail.com

BLM_0147418

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, et al., | ) ) ) ) | |
| | ) | Civ. No. 09-0507-E-BLW |
| Plaintiffs, | ) ) | MEMORANDUM DECISION |
| v. | ) ) | AND ORDER |
| BUREAU OF LAND MANAGEMENT, et al., | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**INTRODUCTION**

The Court has before it a motion for TRO against the Bureau of Land

Management (BLM), originally filed by plaintiff WWP in *WWP v. U.S. Forest*

*Service, 07-151-E-BLW* and set for argument on October 6, 2009.  Because the

BLM was not a named defendant in that case, WWP also filed a motion to amend

its complaint to add the agency as a defendant.

The Court denied the motion to amend, requiring WWP to file a new action

against the BLM.  Because WWP was seeking emergency relief, the Court

maintained the October 6, 2009, hearing date, and deemed filed in the new action

**Memorandum Decision & Order – page 1**

BLM_0147419

the TRO motion and all associated materials that had been filed in the earlier action.

The Court heard oral argument on the TRO on October 6, 2009, and took the motion under advisement. For the reasons expressed below, the Court will grant the motion.

## STANDARD OF REVIEW

A plaintiff seeking injunctive relief must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365 (2008). A "possibility" of irreparable harm is insufficient; irreparable injury must be "likely" in the absence of an injunction. *Id.* A preliminary injunction is "an extraordinary remedy never awarded as of right." *Id.* at p. 376. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at p. 376.

## LITIGATION BACKGROUND

WWP seeks to enjoin the BLM from allowing grazing on the Partridge Creek allotment. The BLM has authorized the Carlson Livestock Company to

**Memorandum Decision & Order – page 2**

graze up to 833 domestic sheep on the allotment beginning October 15th, just a few days away. WWP argues that the domestic sheep will transmit a deadly disease to a nearby herd of bighorn sheep.

## Carlson Livestock

Guy Carlson, the President of Carlson Livestock Company, resides in Riggins and has been grazing the Partridge Creek allotment since 1937. *See Carlson Declaration at p. 2, ¶ 3.* He owns 37% of the land encompassed by the allotment, while the BLM owns 59%, and the Idaho Department of Lands 4%. *See Unsworth Declaration at p. 3, ¶ 8.*

Carlson's current permit was originally issued in 2003, after the BLM conducted a Standards and Guidelines Determination showing that the allotment was meeting all eight of the Standards. *See Determination (docket no. 167-6).* Each year thereafter, Carlson had to obtain an authorization from the BLM that contained terms and conditions governing grazing on the Partridge Creek allotment. For the 2009 grazing season, Carlson's annual authorization was issued in February of 2009. *See Authorization (docket no. 151-7).*

The Partridge Creek allotment is located on the south side of the Salmon River, ten miles east of Riggins. Across the river to the north lies the Nez Perce National Forest; to the south lies the Payette National Forest. The Partridge Creek

**Memorandum Decision & Order – page 3**

allotment is an island of BLM land (along with state and private land) sandwiched between Forest Service land.

In past grazing seasons, Carlson rotated his sheep through the Partridge Creek allotment and into allotments on the National Forest lands to the north and the south.  His typical rotation pattern is set forth in the table below:

| Time | Carlson Sheep Location |
|------|------------------------|
| October 15 to November 30 | Partridge Creek allotment (BLM land) |
| November 15 to March 1 | Allison-Berg allotment (Nez Perce National Forest) |
| March 1 to April 11 | Private land |
| April 11 to July 15 | Partridge Creek allotment |
| July 15 to October 7 | Payette National Forest allotments |
| October 7 to October 15 | Trail sheep to Partridge Creek |

Recently, however, Carlson has not been able to follow this rotation pattern because the Forest Service has closed the Allison-Berg allotment entirely and closed 60% of the allotments he used in the Payette National Forest.  Those allotments were near bighorn herds, and the Forest Service decided to close them while it prepared a Supplemental Environmental Impact Statement (SEIS) to examine the relationship between domestic sheep grazing and bighorn die-offs.

Carlson states that the closure of the Partridge Creek allotment, on top of the closures of these Forest Service allotments, would mean that he could not continue

**Memorandum Decision & Order – page 4**

BLM_0147422

to operate in a "profitable manner." *See Carlson Declaration at p. 3, ¶ 5.* If he is barred from grazing during the 47 days from October 15 to November 30, he would "incur $3,000 in trucking costs to move the sheep off the Riggins area to Emmett for private pasturage plus an additional $5,481 associated with labor and feed on private ground in Emmett." *Id.* He states that he would also continue to use his private ground "on both sides of the river for domestic sheep use for as long as possible." *Id.*

## Bighorn Status

The Forest Service closures of allotments to the north and south of the Partridge Creek allotment were prompted by dramatic declines in populations of bighorn sheep throughout this Salmon River drainage area. *See Lawrence Declaration* at p. 3, ¶ 5. In the area including the Partridge Creek allotment, bighorn numbers have dropped 70% over the past 20 years. *See Idaho Department of Fish & Game Strategy at p. 2 (docket no. 167-8).*

The Forest Service assembled a team of experts that prepared a Risk Analysis concluding that the scientific literature demonstrates that "clinically healthy bighorn sheep have developed pneumonia and died within days to weeks following contact with clinically healthy domestic sheep." *See Risk Analysis at p. 3.* They found a broad consensus that "domestic sheep and bighorn sheep must be

**Memorandum Decision & Order – page 5**

BLM_0147423

kept separated in order to maintain healthy bighorn populations." *Id.*

The BLM relied on the Forest Service's Risk Analysis in preparing a Proposed Resource Management Plan EIS (PRMP/EIS) for lands including the Partridge Creek allotment. *See Cooper Declaration at p. 5, ¶ 15.* After reviewing the PRMP/EIS, the BLM's Director upheld it except as it applied to 4 allotments, including the Partridge Creek allotment. As to those four allotments, the Director was persuaded by the protests of the Nez Perce Tribe and environmental groups to direct that a further analysis be done through an SEIS on the impacts of grazing on bighorns. *See BLM Letter (docket no. 167-4); Exhibit 23 to Declaration of Lawrence at p. 3.*

Although the BLM relied on the Forest Service's Risk Analysis, the BLM came to a different conclusion on whether to allow grazing while the SEIS was being prepared – the BLM decided to continue to permit grazing under the prior management plans that were developed more than 25 years ago. *See BLM Letter to Carlson (docket no. 167-1).* The SEIS will take about two years to prepare.

**<u>Strategy For Reducing Risk</u>**

To set the conditions on which grazing would continue during this interim period, the BLM worked together with Carlson, the Idaho Department of Agriculture, the Idaho Department of Fish and Game (IDFG), and the Idaho

**Memorandum Decision & Order – page 6**

BLM_0147424

Department of Lands (IDL). Together, they entered into an agreement entitled "Strategy for Reducing Risk of Contact between Bighorn Sheep and Domestic Sheep in the Salmon River Area." This Strategy – signed in April of 2009 – provides generally that BLM and the IDL will monitor grazing on the Partridge Creek allotment, and when they observe bighorns within a mile of domestic sheep and presenting a risk of contact, the sheep will be moved immediately to avoid contact. *See Strategy at p. 7.*

**Best Management Practices**

Shortly after the Strategy was signed by all parties, the Idaho Legislature passed a law requiring the IDFG to cooperatively develop best management practices with grazing permittees on federal and/or state allotments. The statute goes on to state that

> [u]pon commencement of the implementation of [BMPs], the director [of IDFG] shall certify that the risk of disease transmission, if any, between bighorn and domestic sheep is acceptable for the viability of the bighorn sheep. The director's certification shall continue for as long as the best management practices are implemented. The director may also certify that the risk of disease transmission, if any, between bighorn and domestic sheep is acceptable for the viability of the bighorn sheep based upon a finding that other factors exist, including but not limited to previous exposure to pathogens that make separation between bighorn and domestic sheep unnecessary.

The IDFG entered into negotiations with Carlson to comply with this statutory command to develop best management practices. A team of IDFG

**Memorandum Decision & Order – page 7**

managers and biologists, along with IDFG's counsel, prepared a draft for Carlson's

consideration.  After some negotiation, the parties signed in August of 2009 an

agreement entitled "Best Management Practices for Separation Between Domestic

Sheep and Bighorn Sheep" [BMPs].  *See BMPs (docket no. 167-9).*  Like the

Strategy, the BMPs provide for monitoring of the allotment by BLM and state

officials.  Carlson agreed to use two herders, three guard dogs, and three herding

dogs, with each band of sheep.  If co-mingling occurs, Carlson may kill the

bighorn and notify the IDFG immediately.  *Id. at BMP #10.*

   But in one important respect, the BMPs are not as strict as the Strategy.

While the Strategy directed the immediate movement of sheep when bighorns were

observed within a mile and there was a risk of contact, the BMPs state merely that

officials from the BLM and IDFG must be notified – there is no provision for

immediate movement of the sheep.  *Id. at BMPs #4 & #10.*  The BMPs depend on

voluntary compliance – they are not part of the terms and conditions of Carlson's

permit and cannot be enforced by the BLM.

   At the conclusion of the BMPs is the "Director's Certification" required by

the statute once the BMPs are implemented.  While the statute directs the IDFG

Director to certify "that the risk of disease transmission, if any, between bighorn

and domestic sheep is acceptable for the viability of the bighorn sheep," the

**Memorandum Decision & Order – page 8**

BLM_0147426

Director in this case merely certified that the BMPs "provide for separation that reduces the risk from disease transmission between domestic sheep and bighorn sheep to an acceptable level based on other factors that exist consistent with Idaho Code § 36-106(e)(5)(E)." The phrase in the certification regarding "other factors that exist" was explained by IDFG's James Unsworth as referring to the "intermingled land management pattern of the Partridge Creek allotment as it related to achieving separation through implementation of the BMPs." *See Unsworth Declaration* at p. 4.

Thus, the Director here certified that the risk has been reduced to an acceptable level. Acceptable to who? Acceptable under what standard? These questions are not answered in either the certification or Unsworth's Declaration. Moreover, the certification does not track the statutory language. The statute says nothing about *reducing* a risk of disease transmission merely to some undefined *acceptable* level. Instead, the statute requires a certification that the *risk* of disease transmission "is acceptable *for the viability of the bighorn sheep.*" *Id.* at *subsection (E) (emphasis added).* There is no certification in this case that upon implementation of the BMPs, the risk of disease transmission will be acceptable for the viability of the bighorn sheep.

**Tribe's Analysis**

**Memorandum Decision & Order – page 9**

The Nez Perce Tribe has conducted the most extensive scientific review of bighorns in this area, and set forth their findings in the Salmon River Bighorn Sheep Study. It examined a 70-mile stretch of the Salmon River from Riggins east to Big Mallard Creek, an area that encompasses the Partridge Creek allotment. The Tribe tracked radio-collared bighorns in this area to study their distribution and overlap with domestic sheep allotments. *Id.* at p. 6, ¶ 10.

The Study showed that a group of 11 bighorn rams resides directly across the river from the Partridge Creek allotment. *Id.* at p. 8, ¶ 15. GPS data retrieved from one of the radio-collars showed that a ram identified as R14 crossed over the Salmon River into the Partridge Creek allotment on four different occasions. *Id.* at p. 8, ¶ 16. During the rut season (mid-October to mid-December), this ram traveled east along the Salmon River for over 25 miles, interacting with 4 of the 5 ewe groups in the study area. *Id.* This was typical of bighorns, who frequently interact with each other all along the 70-mile stretch of the study area. Thus, a contagious disease would spread quickly over a large geographical area. *Id.* at p. 9, ¶ 19.

Based on this Study, the Tribe's experts concluded that there was a "very high risk of contact and potential for disease transmission" on the Partridge Creek allotment, given that (1) bighorns were just across the river, (2) the river posed no

**Memorandum Decision & Order – page 10**

BLM_0147428

barrier to contact, (3) one bighorn was shown to have crossed over the river into the allotment, and (4) an infected bighorn may travel far up-river to spread the disease among the Salmon River drainage population, the last native population of bighorns in the State. *See Mack Declaration at p. 11, ¶ 23.* The Tribe's experts met with the BLM to convey these concerns prior to the BLM's decisions on the Partridge Creek allotment. *Id. at p. 8, ¶ 15.*

## Evaluation of BMPs

The high risk of contact – and the lethal nature of the disease – led the Tribe's experts to conclude that BMPs would be ineffective. *Id. at p. 11, ¶ 23.* This opinion was shared by Victor Coggins, the District Wildlife Biologist for the Oregon Department of Fish and Wildlife. He has over 30 years of experience with the bighorns in Hells Canyon, which has terrain similar to that of the Salmon River drainage. *See Fifth Declaration of Scoggins at p. 1, ¶ 3.* He pointed out that similar BMPs have been ineffective in Oregon because domestic sheep stray from their band and contact the bighorns. While these BMPs require two herders, and dogs, they cannot keep a lookout over each of the more than 600 sheep, especially in this steep, rugged terrain. Two strays survived for four or five months in the nearby Smith Mountain allotment, wandering in bighorn habitat during that time. *Id. at p. 3, ¶ 11.*

**Memorandum Decision & Order – page 11**

BLM_0147429

Case No. 1:20-cv-02484-MSK   Document 71-16   filed 04/29/21   USDC Colorado   pg 188 of
192
Case 4:09-cv-00507-BLW   Document 5   Filed 10/14/09   Page 12 of 17

The Forest Service reached similar conclusions in evaluating BMPs for the

Allison-Berg allotment, across the river from the Partridge Creek allotment. *See*

*Evaluation (docket no. 153-4).* After reviewing similar BMPs, the Forest Service

concluded that their implementation would render the risk of disease transmission

"moderately high," because it was unlikely that the BMPs would be successful in

keeping the sheep separate from the bighorns.[1]  *Id. at p. 2.*

## ANALYSIS

In past decisions, the Court reviewed the scientific literature concerning the

transmission of disease between domestic sheep and bighorns, concluding that

"domestic sheep stand accused by the overwhelming majority of experts" of

transmitting a form of lethal pneumonia to the bighorns. *See WWP v. U.S. Forest*

*Service, 07-151-E-BLW, Memorandum Decision at p. 8 (docket no. 54).*  The Court

also found that "[p]ast attempts to separate bighorns from domestic sheep appear to

have been unsuccessful, and there is a powerful natural attraction between the

animals." *Id.*  In reviewing the group of bighorns on the Allison-Berg allotment,

---

[1] The Court is aware that the danger of interaction between bighorn and domestic sheep
may be  substantially greater on the Allison-Berg allotment than on the Partridge Creek
allotment.   This is suggested by telemetry data and visual sitings which indicate that bighorns
frequent the Allison-Berg allotment with far greater regularity.   It is possible that a detailed
scientific analysis would have concluded that this difference justified the BLM in reaching a
different conclusion for Partridge Creek allotment than did the Forest Service for the Allison-
Berg allotment.   However, as discussed below, no such scientific analysis was undertaken by the
BLM before it decided to authorize grazing while the SEIS was being completed.

**Memorandum Decision & Order – page 12**

BLM_0147430

just across the river from the Partridge Creek allotment, the Court found that they "are a native species, and thus the loss of that herd would be particularly devastating to the genetic diversity of bighorns." *Id, Memorandum Decision at p. 7 (docket no. 103).*

The unrebutted evidence in this case shows that (1) bighorns congregate just across the river, (2) the river is no barrier, (3) sheep stray and seek out the bighorns, (4) the steep terrain makes it very difficult to monitor stray sheep or mingling bighorns, (5) stray sheep can wander in bighorn territory for months, and (6) bighorns can travel long distances up and down the Salmon River drainage to visit other bighorn herds.

Evaluating these factors under the injunction standard set forth above, the Court finds first that the infection of bighorns across the river would constitute irreparable harm, as it is highly likely that they could infect not only their immediate companions but herds far up-river in the drainage. The loss of the only remaining native bighorns would be devastating.

In weighing the equities, the Court considers the economic harm that Carlson will suffer. As discussed, he will incur expenses of about $9,000 if the allotment is closed, and will not be able to operate in a "profitable manner." He does not say he will be forced out of business but merely that he will be forced to

**Memorandum Decision & Order – page 13**

BLM_0147431

consider other options like more intensive grazing of his private ground or real estate development of the river-front property. In comparison to the loss of the bighorns described above, the equities weigh clearly in favor of an injunction. Moreover, an injunction would be in the public interest.

With regard to the likelihood of success, WWP alleges that it is likely to prevail on its NEPA claim. NEPA and its regulations prohibit agencies from making any irreversible or irretrievable commitment of resources before an EIS is completed so that the agency does not do damage before even considering the effects of its action. *See Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000).

Irreversible damage is possible here. Well before the SEIS is completed many months from now, bighorns could become infected and roam far up-river in the Salmon River drainage, infecting the other native bighorns along the way causing large-scale losses.

In explaining his decision to keep the Partridge Creek allotment open for grazing, BLM District Manager Gary Cooper noted that the bighorns are not listed under the Endangered Species Act, and have not been identified as a sensitive species by the BLM. *See Cooper Declaration at p. 9, ¶ 42(f).* He does not discuss, however, whether he considered (1) the fact that the bighorns in the Salmon River drainage are the last remaining native population of bighorn sheep in Idaho, and

Memorandum Decision & Order – page 14

BLM_0147432

(2) the threat this poses to genetic diversity if these bighorns are killed by pneumonia transmitted by domestic sheep.

Cooper also cites as a factor in keeping the allotment open the certification issued by the IDFG under Idaho Code § 36-106(e)(5)(E). He does not discuss, however, the certification's failure to track the statutory language – as discussed above – because it is silent on whether the risk of disease transmission is acceptable for the viability of the bighorns.

Even a certification that tracked the statute would be meaningless, however. While the statutory language requires that the Director certify that the risk is acceptable for bighorn viability if BMPs are implemented, the statute does not actually require the BMPs to meet that standard. Indeed, the statute contains no standards for the BMPs. Hence, the statute allows the Director to negotiate whatever BMPs he can with the permit holder – without regard for their effect on bighorns – and then when the permit holder implements those BMPs, the Director is compelled to certify that the risk is acceptable for bighorn viability.

The Court will assume the best of all parties that had a hand in drafting this statute and presume that this result was not intended. Certainly it is highly unlikely that the IDFG, which has a sterling reputation for integrity, would take advantage of this language to ignore bighorn survival.

**Memorandum Decision & Order – page 15**

BLM_0147433

Nevertheless, the mere fact of certification remains meaningless under the plain language of the statute. The record must reveal that the IDFG and the BLM went further than the language of the statute and set in place BMPs that had some science behind them. The present record – obviously thin on a motion for TRO – shows no supporting science for the BMPs.

All the evidence in the record – discussed above – indicates that BMPs are ineffective in the steep terrain of the Partridge Creek allotment. The Forest Service found them ineffective on similar terrain just across the river. There is no explanation by the IDFG or the BLM as to why they would be more effective on the Partridge Creek allotment.

For all these reasons, the Court finds that injunctive relief is warranted under the standard set forth in *Winter* discussed above. The Court will therefore grant WWP's motion to enjoin grazing on the Partridge Creek allotment until such time as the Court can hold an evidentiary hearing.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for TRO filed in Civ. No. 07-151-E-BLW (docket no. 148) is deemed filed in this case and GRANTED and that grazing on the Partridge Creek allotment is enjoined.

**Memorandum Decision & Order – page 16**