groundwater wells (Dw) and by phreatophytes (Dp). The shallow groundwater subsystems in this Mesa Top and Hillslope area have little connection to the local bedrock or the regional groundwater systems, or to nearby alluvial systems, such as Surface or Currant Creeks. Google Earth can be used to visualize these relationships (for example, Figure 23).



**Figure 21a. Google Earth View of the Mesa Top and Hillslope Subsystem at Redlands Mesa, Looking North. Note Groundwater Discharge in the Gullies at the Southern Slopes of Redlands Mesa and the Line of Seepage from a Ditch Halfway Down the Slopes (dark green areas).**



**Figure 21b. Google Earth View of the Mesa Top and Hillslope Subsystem at Redlands Mesa, Looking Northeast. Note Groundwater Discharge Areas in Discontinuous Hillslope Deposits on Northwestern Side of Redlands Mesa. In Some Areas Hillslope Deposits Connect Gravels on Top of Mesa with Currant Creek Alluvium.**

North Fork Valley and Terrace Study Area, Delta County, Colorado          HSA/HHI          page 33

BLM_0148697

Groundwater discharge from the Cedar Mesa subsystem enters the surface water system in ditches and gaining streams, and contributes to the surface water flow into the north side of Fruitgrowers Reservoir (Figures 20 and 22).



**Figure 22. North-south Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope Subsystem in the Cedar Mesa Area (C-C' in Figure 16).**

*2.6.2 Valley Bottom Shallow Aquifer Subsystems*

As stated in Section 2.4.2, there are three significant hydrogeologic groups in the Valley Bottom Shallow Aquifer Subsystems, which include the Currant Creek Subsystem, the Surface Creek Subsystem, and the Tongue Creek (and affiliated tributaries) Subsystem:

1. Quaternary unconsolidated clastic materials (Qal and Qgy) in Table 2a and Figure 13), which are predominantly alluvial valley bottom and terrace deposits;
2. Bedrock units, including the Tertiary Wasatch Formation (including the Ohio Creek Member; Twa in Table 2b and Figure 14); Cretaceous Mesa Verde Group (Kmv in Table 2b and Figure 14); Cretaceous Mancos Shale bedrock unit (Km in Table 2b and Figure 14); and Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb in Table 2b and Figure 14); and
3. Northeast-trending and north-south trending fault/fracture zone/lineament hydrostructures (Figure 15).

BLM_0148698



**Figure 23a.  Google Earth View of the Mesa Top and Hillslope Subsystem at Cedar Mesa, Looking North. Note Groundwater Discharge at the Southeastern Slopes along Currant Creek and towards Harts Basin on the Southwestern Slopes (dark green areas).**



**Figure 23b.  Google Earth View of the Mesa Top and Hillslope Subsystem at Harts Basin, Looking Northeast. Note Groundwater Discharge from Harts Basin Is Towards Fruitgrowers Reservoir; Groundwater Discharge from Antelope Hill Is Primarily Through Springs and Seeps (dark green areas).**

The shallow Quaternary unconsolidated materials in these subsystems are ubiquitous, and include modern alluvium (Qal) and younger valley gravels (Qgy) (Figure 13 and Table 2a). These highly-permeable deposits are locally heterogeneous, with a mix of coarser and finer materials in the alluvial deposits (usually coarser sediments on the bottom grading to finer sediments on top).  These deposits are underlain by a paleo-topographic surface carved out by

North Fork Valley and Terrace Study Area, Delta County, Colorado          HSA/HHI          page 35

paleo-fluvial systems that eventually deposited the Quaternary unconsolidated materials that are the aquifers being evaluated.

The general aspects of groundwater flow in the Quaternary unconsolidated materials have been discussed in Section 2.5. Specifically, the shallow groundwater in the Currant Creek subsystem is dominated by the Quaternary alluvium (Qal), which receives natural recharge by infiltration of precipitation (snow and rain; Rp) and losing streams (Rs); input from hillside (slope) deposits derived from the glacial gravels (Rsd); and additional recharge from leaky irrigation ditches originating from both Leroux Creek and Currant Creek (Rd); and return flow from irrigation locally (Ri) (Figures 18b and 24). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands) (Figures 18b and 24).



**Figure 24. North-south Cross-sectional View of the Conceptual Site Models of the Valley Bottom Shallow Aquifer Subsystem in the Surface Creek Valley (D-D' in Figure 16).**

Groundwater flow in the Currant Creek alluvium moves in the same direction as the stream with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface topography, saturated thickness of the alluvium, or the seasonal variations caused by snowpack runoff or storm events. Springs are observed at the Qal/Mancos Shale (Km) interface along the stream bed (Figures 18b and 20). There is also groundwater discharge from the alluvium locally by groundwater wells (Dw) and by phreatophytes (Dp). The shallow groundwater in the Currant Creek subsystem would normally have little connection to the local bedrock or the regional groundwater systems, given the Mancos Shale bedrock. However, underlying the Currant Creek alluvium is the Lower Currant Creek Lineament – Fracture Zone, the Cedar Gulch lineament, the Upper Currant Creek Lineament, and the Cactus Park Fault Zone (Figure 15). These areas of hydrostructures are hypothesized to be open conduits, where the faulted and fractured bedrock

BLM_0148700

may combine with the alluvium (Qal) to form a French Drain affect resulting in increased groundwater flow and storage, and connectivity to deeper hydrologic systems (Figure 18b). This could result in decreased water quality either naturally (Mancos Shale water has higher TDS, metals) or due to human activities, such as fracking or waste disposal activities. A Google Earth view of the Valley Bottom subsystem in the Currant Creek drainage is shown in Figure 25a.



**Figure 25a. Google Earth View of the Valley Bottom Subsystem in the Currant Creek Drainage, Looking Southwest.**

A second valley bottom hydrologic system exists along Surface Creek, a subsystem that extends from the top of Grand Mesa and west of Cedar Mesa through the towns of Cedaredge and Orchard City ending at the Gunnison River (Figures 20 and 24). The Surface Creek subsystem is dominated by the Quaternary unconsolidated younger gravels (Qgy), which receive natural recharge by infiltration of precipitation (snow and rain; Rp) system-wide, by input from adjacent uplands to gravels (Ru) and by hillside (slope) deposits derived from the glacial gravels (Rsd) in the upper reaches of the subsystem, and major recharge from leaky irrigation ditches originating from upper and middle Surface Creek and upper Ward Creek (Rd); and return flow from irrigation throughout the middle and lower part of the subsystem (Ri) (Figures 20 and 24). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands) (Figures 20 and 24).

Groundwater flow in the Surface Creek younger valley gravels (Qgy) moves in the same direction as Surface Creek with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface topography, saturated thickness of the alluvium, or the seasonal variations caused by snowpack runoff or storm events (Figure 20 and 24). Generally, the upper part of Surface Creek is gaining when flowing through the hillside (slope) gravels (Qs) as these gravels are discharging groundwater into the stream (Ds). However, at depth, the Surface Creek hillside (slope) gravels and younger valley gravels (Qgy) are recharging the Wasatch (Two) and Mesa Verde (Kmv) bedrock aquifers (Rgb) (Figures 20 and 24).

BLM_0148701

As Surface Creek crosses into the younger valley gravels (Qgy) underlain by the Mancos Shale (Km), the surface flow decreases as groundwater recharge occurs to the gravels (Rs). This function is reversed above Cedaredge and Surface Creek becomes a gaining stream due to an increase in groundwater discharge derived from leaky irrigation ditches and return flow from irrigation.   Springs are observed near Cedaredge due to the thinning of the Qgy at the Qgy/Mancos Shale (Km) interface beneath the stream bed (Figure 20 and 24).   There is also groundwater discharge from the gravels locally by groundwater wells (Dw) and by phreatophytes (Dp).

The shallow groundwater in the Surface Creek subsystem would normally have little connection to the local bedrock or the regional groundwater systems in the central and southern part of the subsystem, given the Mancos Shale bedrock.  However, underlying the Surface Creek gravels is the Surface Creek Lineament – Fracture Zone (Figure 15).  This hydrostructure is hypothesized to be an open conduit, where the faulted and fractured bedrock may combine with the younger valley gravels (Qgy) to form a French Drain affect resulting in increased groundwater flow and storage, and connectivity to deeper hydrologic systems.  This could result in decreased water quality either naturally (Mancos Shale water has higher TDS, metals) or due to human activities, such as fracking or waste disposal activities.

A Google Earth view of the Valley Bottom subsystem  in the Surface Creek drainage is shown in Figure 25b (upper part of valley) and Figure 25c (lower part of valley).



**Figure 25b. Google Earth View of the Upper Section of the Valley Bottom Subsystem at Surface Creek, Looking Northeast. Note the Shale Outcroppings in the Lower Left and Right Indicative of Local Near-surface Bedrock.**

The Tongue Creek Subsystem (and tributaries including Oak Creek, Dirty George Creek, Ward Creek, and Cottonwood Creek, is a third Valley Bottom subsystem (Figures 20 and 25). The shallow groundwater in the Tongue Creek Subsystem is dominated by the Quaternary alluvium (Qal), which receives natural recharge by infiltration of precipitation (snow and rain; Rp) and losing streams (Rs); input from hillside (slope) deposits derived from the glacial gravels (Rsd) in the upper reaches of the tributaries and from younger valley gravels (Qgy) on the

BLM_0148702

drainage divides in the middle and lower reaches of the drainage; and additional recharge from return flow from irrigation along most of the alluvial sections of the stream (Ri) (Figures 20 and 24). The return flow from irrigation (Ri) discharges locally to nearby streams (Figure 20).



**Figure 25c.  Google Earth View of the Lower Part of the Valley Bottom Subsystems at Surface and Tongue Creeks and Tributaries, Looking North. Note Groundwater Discharge Zones at Southern Slopes of Surface Creek Valley System (dark green areas directly below terrace) and Effects of Leaking Ditch Along Bottom of Southern Slopes.**

Groundwater flow in the Tongue Creek alluvium moves in the  same direction as the stream with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface topography, saturated thickness of the alluvium, proximity to irrigation areas, or the seasonal variations caused by snowpack runoff or storm events.  Springs are observed along several reaches of the stream bed due to the thinning of the Qal at the Qal/Mancos Shale (Km) interface beneath the stream bed, or where mass wasting deposits (landslides) connect the gravels of the drainage divide (Qgy) with the Tongue Creek alluvium (Qal) (Figure 20).  There is also groundwater discharge from the gravels locally by groundwater wells (Dw) and by phreatophytes (Dp).

The shallow groundwater in the middle and lower Tongue Creek subsystem would normally have little connection to the local bedrock or the regional groundwater systems, given the Mancos Shale bedrock.  However, underlying the Tongue Creek alluvium is the Lower Tongue Creek Lineament – Fracture Zone, the Upper Dirty George Creek Lineament-Fracture Zone, the Oak Creek Lineament – Fracture Zone, the Ward Creek Lineament-Fault Zone, and the Cottonwood Creek Fault Zone (Figure 15).  These areas of hydrostructures are hypothesized to be open conduits, where the faulted and fractured bedrock may combine with the alluvium (Qal) to form a French Drain affect resulting in increased groundwater flow and storage, and connectivity to deeper hydrologic systems.  This could result in decreased water quality either naturally (Mancos Shale water has higher TDS, metals) or due to human activities, such as fracking or waste disposal activities.

BLM_0148703

A Google Earth view of the Valley Bottom subsystem in the Tongue Creek drainage is shown in Figure 25c (lower part) and Figure 25d (upper part). Figure 25e shows a detail of the western slope of the Surface Creek Valley terrace and Tongue Creek near the confluence with Surface Creek,



**Figure 25d.  Google Earth View of the Upper Part of the Valley Bottom Subsystem at Tongue Creek and Tributaries, Looking North.**



**Figure 25e.  Google Earth View of Detail of Central Part of the Valley Bottom Subsystem at Tongue Creek and Tributaries, Looking East. Note Seepage Faces and 'Wet' Landslide Deposits on Terrace Slopes.**

BLM_0148704

### 2.6.3 Regional Bedrock Aquifer Subsystems

The regional hydrogeologic units in the SCV study area, discussed in Section 2.4, are the Tertiary and Cretaceous bedrock units (Figure 15 and Table 2b), including the following potentially water-bearing units: Tertiary Wasatch Formation including the Ohio Creek Formation (Two); Cretaceous Mesaverde Formation (Kmv), including the Barren, and Upper and Lower Coal Bearing members (Kmv), as well as the Rollins Sandstone member (Kmvr); and the Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb). The general aspects of the bedrock hydrogeology and hydrostructures are discussed in Section 2.5. The bedrock units are variably to fully saturated based on location and proximity to recharge area. Groundwater recharge by infiltration of precipitation (snow and rain) and by losing streams, for example Currant Creek and Surface Creek, occurs through the Hillside (slope) deposits (Qs) and younger valley gravels (Qgy) in the outcrop area (Rgb; Figures 20 and 24), and groundwater flows laterally to the north along the dip of the bedrock, where it becomes incorporated into the regional groundwater flow system. The groundwater flow direction in the regional bedrock systems is from south to north beneath the SCV Study Area and Grand Mesa (Figures 24 and 26). This flow direction is away from human activities and Delta County in general.



**Figure 26. Plan View of the Conceptual Site Model of the Regional Bedrock Subsystems.**

BLM_0148705

## 2.7 Anthropogenic Influences

Human activity in the SCV study area has affected both the surface and subsurface parts of the hydrologic systems.  Past land use and human activity was mostly associated with agricultural production and reservoir construction and operation, and has resulted in removal of native vegetation, introduction of irrigation and high-ET (evapotranspiration) crops, construction of (often leaking) irrigation ditches, and the drilling of primarily domestic wells.  This activity has resulted in long-term increase of water levels in local, shallow aquifers of the Quaternary materials (Qgf and Qs) both on top of the Mesa Top and Hillslope subsystems, such as the Redlands Mesa and Cedar Mesa Subsystems, and in the alluvium (Qal) and younger valley gravels (Qgy) of Currant Creek, Surface Creek, and the Tongue Creek (with tributaries) Subsystems.

### 2.7.1 Effects of Land Use Changes on Groundwater Systems

Traditionally, agricultural activities take place on the bottomlands and terraces of the valleys, while most grazing activities focus in a relative small area on the uplands.  Agricultural production is supported by surface water irrigation, often delivered through an extensive conveyance system. The main irrigation method in use is flood irrigation, which tends to provide more water to the fields than can be consumed by vegetation.  Excess water from irrigation results in infiltration to the water table and recharge of the groundwater system (*i.e.*, irrigation return flow). At this time, this part of Delta County is experiencing a shift from agricultural to nonagricultural land use, particularly around the towns of Cedaredge and Orchard City and in the Surface Creek Valley. This may lead to decreasing return flow from irrigation and subsequent reduced groundwater recharge, and to changes in groundwater quality due to fertilization practices or urban activities.

The SCV study area consists primarily of mesa top, hillslope, bottomland and terraces, limiting the irrigated areas to the top and lower portions of the subsystems (Figures 27).  Here, there are a number of mostly unlined irrigation ditches that are excavated primarily in unconsolidated Quaternary deposits (Figures 8, 13, and 27).  When carrying water, the ditches may leak, as evidenced by the phreatophytes often found alongside. The ditch system in the study area contains two types of ditches: 1) primary ditches, which carry water during most of the growing season; and 2) secondary ditches, which carry water only during an actual irrigation cycle. The water leaking from the ditches may be used by vegetation and discharged as evapotranspiration, or may recharge the underlying groundwater system, forming a local groundwater mound or divide.  As most of the groundwater systems in the study area are local in nature, ditch leakage may contribute significantly to the local water balance, increase the water table elevation, and influence groundwater flow patterns.

As discussed previously, irrigation return flow and leaky irrigation ditches can be a significant recharge element in the local and regional groundwater balance.  Taking irrigated fields out of production and re-allocating ditch-conveyed water reduces recharge of groundwater resulting in lowered water tables, reduced groundwater discharges to wetlands and streams, and decreased water supplies. Note that the change in irrigation acreage between 1993 and 2005 has been minimal (Figure 27).

BLM_0148706



**Figure 27. Anthropogenic Influences: Irrigated Areas and Irrigation Ditches in the SCV Area (Source: Delta County GIS, 2010; CDWR GIS, 2011).**

Water wells are found throughout the SCV study area, primarily in the unconsolidated Quaternary deposits at the mesa tops and valley bottoms (Figure 28). Most of these wells serve domestic water supply needs, or the needs of municipalities located along Surface Creek (for example Cedaredge), and the effect on the groundwater system locally may be significant. However, if additional water is needed by urban or agricultural development, or water is displaced by oil and gas activities, for example, the compound effect on the groundwater system could be more significant in the future, resulting in a possible lowering of the water table, changes in flow direction, decreasing discharge to streams or increasing stream loss to groundwater, draining of wetlands, or even depletion of local aquifers.

## 2.7.2 Potential Effects of Oil and Gas on Hydrology

The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and

BLM_0148707

discharges. Changes to the natural groundwater system will likely have ecological, geo-hydrological, and, potentially, legal consequences. The effects of water disposal after fracking and oil and gas well development are not discussed in this report as relevant information on the planned oil and gas development and operations is not available at this time. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail. Currently, there are no oil/gas lease parcels present in the SCV area.



**Figure 28. Anthropogenic Influences: Constructed Wells in the SCV Study Area**
**(Source: CDWR GIS, 2014).**

The Redlands Mesa and Cedar Mesa Subsystems are least likely to be affected by oil and gas operations because they are located in the recharge area and have a shallow groundwater flow system above the affected bedrock zones and have relatively few hydrostructures that could promote connectivity (Figures 13, 15, 18, and 20). However, the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems, including Currant Creek, Surface Creek, and Tongue Creek, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities (Figures 13, 15, 18, 20 and 24), which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal.

BLM_0148708

The regional groundwater subsystem may be affected by the oil and gas operations, but these systems are not currently being explored for water supplies.  However, the interconnectivity between these deeper systems and the shallow unconsolidated systems is hypothesized, but currently undetermined (Figures 14, 15, and 26).

BLM_0148709

# 3    GIS MAPS, LAYERS, DATABASES, AND DATA SOURCES

## 3.1 GIS and GIS Maps

Geographical information system (GIS)-based maps provide a flexible and efficient way to analyze and display spatial information. The strength of a GIS system is that data from various sources can be collected in local or remotely accessed databases, which can be easily maintained and updated. GIS maps support optimal analysis, specifically in hydrogeologic evaluations at different scales, geographic distribution densities, and different levels of accuracy and information value.

A GIS map consists of a series of layers, each containing a single or multiple topological features. These features can represent a variety of geographic items, such as rivers and lakes, roads, towns and cities, land use, land ownership, wells, etc. Selected features can be further described with associated attribute tables and linked to other types of information by their attribute tables or via their spatial location. At each step of a geographic analysis, individual features can be displayed, analyzed, and combined with other features via layers, and individual features interrogated with respect to their attributes. Switching scales, like enlarging (zooming in to) a particular detail or regionalizing (zooming out) to encompass a larger set of features can be accomplished at any time; the ability to selectively visualize (switch) layers, perform advanced searches, and use select and overlay capabilities, further enhances the utility of a GIS map.

The GIS maps resulting from this study allow for informed planning and management of groundwater resources in the SCV area. The database formats that have been used in this study include ESRI shape files, database tables, georeferenced images, Microsoft Excel files, and ESRI GRID files (for the digital elevation model [DEM], among others). The GIS map and database for the SCV study were prepared using ArcView™ version 8.3 and evaluated using Arc-Desktop™ version 10.2 (ESRI®, Redlands, California).

## 3.2 Use of GIS in the SCV Area Study

In this study, GIS has been used in support of the HESA described in Chapter 2 and in the preparation of report figures. In addition, the GIS maps and databases will provide a base for further studies of the hydrology and hydrogeology of SCV area, as well as other parts of Delta County. Three multi-layer GIS maps have been prepared for this study: 1) a map with hydrologic and hydrogeologic features of Delta County (Figure 29); 2) a map with hydrologic and hydrogeologic features of the SCV area (Figure 30); and 3) a map with hydrologic and hyrdogeologic features of the combined SCV (Surface Creek Valley), NFVT (North Fork Valley and Terraces, *Kolm and van der Heijde 2013*), and the Oak Mesa (*Kolm and van der Heijde 2012*) study areas referred to as the NFVSC area (Figure 31). The GIS maps consist of a number of layers representing various data types relevant to the assessment of the groundwater resources at user-specified locations. Below is a detailed description of the layers and the related data sources.

BLM_0148710



**Figure 29. Delta County GIS Map Showing SCV Study Area, Area Covered by Hydrogeological Databases, Streams, Ditches and Roads on Top of County-wide Geology.**
(The left display area is the table of contents [TOC] showing all available layers; the right side of the window is the map display area showing the activated layers.)



**Figure 30. SCV GIS Map Showing Streams, Ditches and Irrigated Areas on Top of Unconsolidated Hydrogeologic Units and Groundwater Discharge Areas.**
(The left display area is the TOC showing all available layers; the right side of the window is the map display area showing the activated layers.)

North Fork Valley and Terrace Study Area, Delta County, Colorado          HSA/HHI          page 47

BLM_0148711



**Figure 31. NFVSC GIS Map Showing Streams, Ditches and SCV Study Area on Top of Hydrogeologic Unconsolidated and Bedrock Units and Hydrogeologic Structures.**

Enabling the *Table of Contents* (TOC; the left side of the display in Figures 29, 30 and 31) in ArcGIS provides information on the layers displayed in the *Map Display* area (the right side of the display in Figures 29, 30 and 31). The GIS layers of the three GIS maps contain three types of geographic information: 1) general geographic information (county border, roads, towns, DEM-elevations) used primarily for orientation purposes; 2) hydrologic information (including precipitation, watersheds, streams, lakes/ponds, irrigation ditches, and irrigated areas); and 3) hydrogeologic information (including hydrogeologic units, faults and hydro-structures, springs and wells). Most layers have been georeferenced with respect to State Plane, Colorado Central Zone, NAD83 (units of measure in feet), except for some public data obtained from state and federal sources.

3.3 GIS Map, Layers, and File Structure

Each line in the TOC is a GIS layer representing a set of features of the same type, such as streams, parcels, wells, etc. By clicking on a check box in the TOC, elements of the activated layer become visible in the map display area. A layer may consist of point values (*e.g.*, wells), line features (*e.g.*, roads, streams, ditches), and area features (*e.g.*, parcels, lakes, hydrogeologic units). Right-clicking on a layer in the TOC and selecting the *open attribute table* option, provides additional information on the layer, such as the names of particular features (Figure 32). This additional information can be used to label the features in the map display area.

The order of the layers in the GIS maps may be changed, affecting which layer(s) are in the foreground in the map and which layers are in the background. When enabled, a layer is shown on top of the layer listed below it in the TOC. When this layer is opaque, the layer beneath it is not visible. Some layers are (partially) transparent, others are opaque, dependent on the type of information they display and the use in the assessment procedure. Layer

BLM_0148712

transparency/opaqueness can be changed by the user using the layer properties option under the display tab. The order of the layers can be changed by the user by dragging a layer to the desired location in the TOC.



**Figure 32. GIS Map Showing the Attribute Table for the Hydrogeologic Structures (Hydrostructures) Layer in the SCV Area** *(right side of figure).*

The map is designed to show relevant labels (text) for most of the layers based on the contents of one of the fields in the attribute table, such as stream name, well number, etc. When zooming in on a particular area of the map, additional information of a selected layer can be displayed by activating the *Label* feature. This can be done by right-clicking the layer and selecting *Label Feature*. The label feature can be set by right-clicking the layer, selecting *Properties*, clicking the *Label* tab, and selecting the appropriate field of the database table. Database information regarding a particular feature on the map can also be obtained by using the ⓘ (*Identify*) option from the *Tools* toolbar, clicking on the feature of interest, and selecting the appropriate layer in the popup *Identify Results* window.

### 3.4 Data Sources and Databases

Delta County and study area GIS maps retrieve various files included in five relative-path subdirectories: 1) CDWR_CDSS; 2) Delta_County; 3) HHI; 4) NRCS; and 5) USGS_DEM. The directories reflect the various data sources used for the three GIS maps introduced in the previous section. Selection of the relative-path option in the GIS program provides for straightforward portability between computers. Note that layers that refer to a state-wide data set (such as the NRCS precipitation file), or a multi-county data set (such as the CDSS irrigated areas files), have been clipped on the maps to show only the Delta County, NFVSC, or SCV area coverage.

The *CDWR_CDSS* subdirectory contains seven sets of GIS files and databases downloaded from Colorado Division of Water resources (CDWR) water rights and well permits databases and from the Colorado Decision Support System (CDSS), which is managed by the Colorado Water Conservation Board and the Colorado Division of Water Resources (CDWR). These file sets are 1) irrigated areas in CDWR Division 4 on the Western Slope as of 1993 (*Irrigated_Parcels_1993* files); 2) irrigated areas in CDWR Division 4 on the Western Slope as of 2000 (*Irrigated_Parcels_2000* files); 3) irrigated areas in CDWR Division 4 on the Western Slope as of 2005 (*Irrigated_Parcels_2005* files); 4) permitted wells that have been completed (*WellPermits_WellConstructed* files); 5)permitted wells that have not yet been drilled (*WellPermits_PermitIssued* files); 6) appropriated springs and seeps (*NorthForkSurfaceCr_Springs* files); and 7) precipitation stations in Colorado (*co_precipstations* files). The well, spring and irrigation data have been downloaded in 2013 and 2014. The irrigated areas data sets provide a single year snapshot of the irrigated lands and crop types of the western slope of Colorado.  In the GIS maps, the 2000 data layer lies on top of the 1993 data layer, and the 2005 data layer lies on top of the 1993 and 2000 data layers, showing the irrigated acreage taken out between 1993 and 2000 and  between 2000 and 2005.  The CDSS files can be downloaded from: *http://water.state.co.us/DataMaps/Pages/default.aspx#onlinedata*.The well records can be accessed at: *http://www.dwr.state.co.us/wellpermitsearch/*, and the springs and seeps records at: *http://cdss.state.co.us/onlineTools/Pages/WaterRights.aspx*. More details about the springs and seeps layer can be found in Appendix 1 of Kolm and Van der Heijde (2013).

The *Delta_County* subdirectory contains selected files received from the Delta County GIS department in 2012. Coverages used in this project include county boundary, highways, roads, streams and ditches, lakes, irrigation ditches (and enhanced streams), water planning areas, and towns. The ditch data provided by the county does not distinguish between primary and secondary ditches. Additional field verification is needed to assess the hydrologic importance of individual ditches. It should be noted that the GIS-based aerial photography provided by the county has been used, in conjunction with GIS-based topographic images obtained from the NRCS data portal and Google™ Earth imagery, to remotely assess topography, vegetation and hydrology in preparation of this report.

The *HHI* subdirectory contains the databases produced for this project by Heath Hydrology, Inc. It contains various hydrogeology files, including: *NorthFork_SurfaceCreek_Hydrogeol_xxx, NorthFork_SurfaceCreek_Hydrostructures,* and *DeltaCounty_Geology;* and files related to the location of current and previous study areas: *SurfaceCreek_StudyArea, NorthForkValley_ StudyArea, OakMesa_StudyArea,*and *NorthFork_SurfaceCreek_DisplayArea).* The *SCV_SelectedStreams* files were created to separately show the more important streams in the SCV study area and are based on Delta County's stream layer. The hydrogeology layer resulted from digitizing and evaluating the 1:24.000 scale geological map of the Orchard City quad (*Noe and  Zawaski 2013*), 1:48,000 scale geologic maps of the Cedaredge and Hotchkiss areas (*Hail, 1972a, 1972b*), and the 1:100,000 scale geologic map of the Paonia and Gunnison area (*Ellis and Others, 1987*), and combining and editing the GIS versions (*Day and Others, 1999*) of the Leadville, Montrose, Grand Junction and Moab 1° x 2° quadrangle geologic maps (scale 1:250,000) (*Tweto and Others, 1976; Tweto and Others, 1978; Whitney, 1981; Williams, 1964).* The NFVSC hydro-structures layer is in part based on the 1:100,000 scale geologic map of the Paonia and Gunnison area (*Ellis and Others, 1987*), and enhanced through analysis of geomorphic features, including lineaments, by the project team.

BLM_0148714

There are seven GIS layers and databases for the hydogeologic units in the SCV (and NFVSC) area (*i.e.*, "hydro units" for short) (Figures 13, 14, 30 and 31): 1) a layer showing the Quaternary unconsolidated deposits grouped by their hydrogeological characteristics (*NFVSC hydro-units [HSA/HHI 2014] - Unconsolidated Sediments*); and 2) six layers each showing the extent of an individual bedrock hydrogeologic unit (*NFVSC hydro-units [HSA/HHI 2014] – Tertiary Intrusions, NFVSC hydro-units [HSA/HHI 2014] - Wasatch and Ohio Creek Formation, NFVSC hydro-units [HSA/HHI 2014] - Mesaverde Formation [incl. Rollins Sandstone], NFVSC hydro-units [HSA/HHI 2014] - Mancos Shale, NFVSC hydro-units [HSA/HHI 2014] - Dakota-Burro Canyon,* and *NFVSC hydro-units [HSA/HHI 2014] – Morrison & Wanakah Formations, Entrada Sandstone*). When all six bedrock layers are activated, the GIS map shows top bedrock (see Figure 14).

The *NRCS* subdirectory contains state-wide averaged annual precipitation data for the period 1961–1990 obtained from the NRCS (*precip_a_co* files). These data have been developed from the NWS precipitation data using PRISM (Parameter elevation Regression on Independent Slopes Model), which utilizes a rule-based combination of point measurements and a DEM and includes consideration of topographic facets *(Daly and Johnson, 1999).* The *NRCS* subdirectory also includes files for the watersheds in the county (*wbdhu12_a_14020002 - 06*). The NRCS data can be downloaded from: *http://datagateway.nrcs.usda.gov/GatewayHome.html.*

The *USGS_DEM* subdirectory contains the raster-based DEM and the 100ft elevation contours for Delta County. In the database, surface elevations are stored in meters; however, in the TOC of the GIS maps, the elevations are given in feet for display purposes. The USGS DEM was downloaded from the NRCS Data Gateway portal in May 2012 and is based on the USGS version published in April 2012.

BLM_0148715

**4 SUMMARY AND CONCLUSIONS**

A Hydrologic and Environmental Systems Analysis (HESA) of the groundwater system of the Surface Creek Valley area (SCV) in Delta County, Colorado, and the development of supporting GIS databases and maps of hydrogeologic and hydrologic characteristics, have been completed to provide support for planning, zoning, and other decision-making tasks of county staff, including those related to protection of groundwater resources for use as public or communal water supplies. This study consisted of the following tasks: 1) conduct a comprehensive HESA and formulate relevant conceptual hydrologic models to provide the physical framework for assessment of potential impacts of anthropogenic system modifications on groundwater resources and interrelated surface water resources; 2) develop a consistent and practical hydrogeologic nomenclature that can be expanded to county-wide use; 3) digitize existing geologic maps and convert them to hydrogeologic system layers and databases in the GIS, including layers showing hydrogeologic units and characteristic stacks of such units, and hydrostructures; and 4) adapt additional hydrological and other GIS maps and databases needed to evaluate the groundwater resources in the county; these databases will contain data from various public domain sources.

The HESA analysis showed that there are two significant groups of hydrogeologic units in the SCV study area: 1) Quaternary unconsolidated clastic materials, which are predominantly glacial-fluvial outwash plains and terrace gravels (older mesa top gravels and glacial drift), hillside (slope) deposits, alluvial fans and bajadas (coalescing fans) and lower mesa gravels, younger valley gravels and river terraces, and alluvial valley bottom deposits; overlying 2) Tertiary and Cretaceous bedrock, including the following potentially water-bearing units: Tertiary Wasatch Formation including the Ohio Creek Formation (Two); Cretaceous Mesaverde Formation (Kmv), including the Barren, and Upper and Lower Coal Bearing members (Kmv), as well as the Rollins Sandstone member (Kmvr); and the Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb). The Mancos Shale unit (Km) may act as a thick, poorly transmissive confining layer.

The Quaternary unconsolidated clastic units (Qal, Qgy, Qat, Qs, Qd, Qgf, and Qgo) are locally heterogeneous, with predominantly a mix of coarser and finer materials in the older alluvial deposits, and finer materials in the younger deposits. These deposits, which are moderately to highly permeable, are recharged by infiltration from precipitation that is non-uniformly distributed due to the slope steepness, slope aspect, and to position in the landscape, and by the incidental leaky irrigation ditch and irrigation return flow. The unconsolidated units are variably to fully saturated based on spatial location and seasonal precipitation events. There may be lateral and vertical groundwater flow connection between the unconsolidated materials and the Tertiary and Cretaceous sedimentary units in the underlying bedrock formations.

Three broad hydrostructure sets occur in the SCV area: 1) the northeast-trending faults and fractures that parallel the Currant and Surface Creek fault zones and associated en-echelon faults and fracture zones to the east (for example, Upper Leroux Creek fault zone and the North Fork Valley lineament); 2) the north-south-trending Tongue Creek lineament and fault zone, which parallels the Lower Leroux Creek fault zone; and 3) the east-west trending Gunnison River lineament.

The northeast-trending and north-south trending faults and fracture zones are relatively young, as the geomorphic systems of Currant Creek and Surface Creek are responding with

BLM_0148716

considerable downcutting, allowing for partial to full penetration of the unconsolidated hydrogeologic unit aquifers. It is hypothesized that these faults/fracture zones/lineaments are "open" and function like French drains. Groundwater moves laterally down valley and vertically downward along the northeast-trending fault and fracture zone planes, and may move vertically up along the fault and fractures plane near the lower reaches of the various drainages.

Based on the presence and orientation of various hydrogeologic and hydrostructural units, hydrography and topography, three CSMs observed in the SCV study area: 1) Mesa Top and Hillslope Shallow Aquifer Subsystems; 2) Valley Bottom Shallow Aquifer Subsystems; and 3) Regional Bedrock Aquifer Subsystems are discussed. The Mesa Top and Hillslope Subsystems, including the Redlands Mesa Subsystem and the Cedar Mesa\Fruitgrowers Reservoir Subsystem, and Valley Bottom Shallow Aquifer Subsystems, including the Currant Creek, Surface Creek, and Tongue Creek (with associated tributaries) subsystems, in the SCV area are dominated by the Quaternary unconsolidated materials. Specifically, the shallow groundwater on Redlands Mesa and Cedar Mesa is dominated by the Quaternary unconsolidated materials (Qgf and Qs), which receive natural recharge by infiltration of precipitation (snow and rain; Rp), and major recharge from leaky irrigation ditches (Rd) and reservoirs locally, and return flow from flood irrigation locally (Ri). The unlined ditches are "line" groundwater recharge sources (Rd) at the top of the irrigated field areas, and water leaks from the ditches into all of the connected gravels underneath and downgradient. The return flow from flood irrigation are "area" groundwater recharge sources (Ri) located downgradient and along the nearby irrigation ditches.

Groundwater flow on top of the gravel-capped Redlands Mesa and Cedar Mesa then moves with topography or subsurface paleo-topography to discharge into springs at the gravel/Mancos Shale interface along the incised drainages that bound the mesas (Dsp), discharge directly out the front of the mesa as seeps or springs (Dsp) at the gravel/Mancos Shale interface, or discharge into the hillslope slope and mudslide deposits (Qs) causing further mass wasting activity. Given the "new" water that has recharged the aquifer, springs may have been developed and claimed as being "new" springs. There is also groundwater discharge from the gravels locally by groundwater wells (Dw) and by phreatophytes (Dp). The shallow groundwater subsystems in this Mesa Top and Hillslope area have little connection to the local bedrock or the regional groundwater systems, or to nearby alluvial systems, such as Leroux Creek, Currant Creek, or Surface Creek.

The shallow groundwater flow in the Current Creek, Surface Creek, and Tongue Creek Valley Bottom subsystems is dominated by the Quaternary unconsolidated materials, and include modern alluvium (Qal) and younger valley gravels (Qgy). Specifically, the shallow groundwater in the Currant Creek and Tongue Creek subsystems is dominated by the Quaternary alluvium (Qal), which receives natural recharge by infiltration of precipitation (snow and rain; Rp) and losing streams (Rs); input from hillside (slope) deposits derived from the glacial gravels (Rsd); and additional recharge from leaky irrigation ditches (Rd); and return flow from irrigation locally (Ri). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands).

Groundwater flow in the Currant Creek and Tongue Creek alluvium moves in the same direction as the streams with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface topography, saturated thickness of the alluvium, or the seasonal variations caused by snowpack runoff or storm events. Springs are observed at the Qal/Mancos Shale (Km)

BLM_0148717

interface along the stream bed or due to the thinning of the Qal/Mancos Shale (Km) interface beneath the stream bed, or where mass wasting deposits (landslides) connect the gravels of the drainage divide (Qgy) with local alluvium (Qal). There is also groundwater discharge from the alluvium locally by groundwater wells (Dw) and by phreatophytes (Dp). The shallow groundwater in the Currant Creek and middle and lower Tongue Creek subsystems would normally have little connection to the local bedrock or the regional groundwater systems, given the Mancos Shale bedrock. However, underlying the Currant Creek and Tongue Creek alluvium is the Lower Currant Creek Lineament – Fracture Zone, the Cedar Gulch lineament, the Upper Currant Creek Lineament, the Cactus Park Fault Zone Lower Tongue Creek Lineament – Fracture Zone, the Upper Dirty George Creek Lineament-Fracture Zone, the Oak Creek Lineament – Fracture Zone, the Ward Creek Lineament-Fault Zone, and the Cottonwood Creek Fault Zone. These areas of hydrostructures are hypothesized to be open conduits, where the faulted and fractured bedrock may combine with the alluvium (Qal) to form a French Drain affect resulting in increased groundwater flow and storage, and connectivity to deeper hydrologic. This could result in decreased water quality either naturally (Mancos Shale water has higher TDS, metals) or due to human activities, such as fracking or waste disposal activities.

By comparison, the Surface Creek Valley Bottom subsystem extends from the top of Grand Mesa and west of Cedar Mesa through the towns of Cedaredge and Orchard City ending at the Gunnison River. The Surface Creek subsystem is dominated by the Quaternary unconsolidated younger gravels (Qgy), which receive natural recharge by infiltration of precipitation (snow and rain; Rp) system-wide, by input from adjacent uplands to gravels (Ru) and by hillside (slope) deposits derived from the glacial gravels (Rsd) in the upper reaches of the subsystem, and major recharge from leaky irrigation ditches originating from upper and middle Surface Creek and upper Ward Creek (Rd); and return flow from irrigation throughout the middle and lower part of the subsystem (Ri). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands).

Groundwater flow in the Surface Creek younger valley gravels (Qgy) moves in the same direction as Surface Creek with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface topography, saturated thickness of the alluvium, or the seasonal variations caused by snowpack runoff or storm events. Generally, the upper part of Surface Creek is gaining when flowing through the hillside (slope) gravels (Qs) as these gravels are discharging groundwater into the stream (Ds). However, at depth, the Surface Creek hillside (slope) gravels and younger valley gravels (Qgy) are recharging the Wasatch (Two) and Mesa Verde (Kmv) bedrock aquifers (Rgb).

As Surface Creek crosses into the younger valley gravels (Qgy) underlain by the Mancos Shale (Km), the surface flow decreases as groundwater recharge occurs to the gravels (Rs). This function is reversed above Cedaredge and Surface Creek becomes a gaining stream due to an increase in groundwater discharge derived from leaky irrigation ditches and return flow from irrigation. Springs are observed near Cedaredge due to the thinning of the Qgy at the Qgy/Mancos Shale (Km) interface beneath the stream bed . There is also groundwater discharge from the gravels locally by groundwater wells (Dw) and by phreatophytes (Dp).

The shallow groundwater in the Surface Creek subsystem would normally have little connection to the local bedrock or the regional groundwater systems in the central and southern part of the subsystem, given the Mancos Shale bedrock. However, underlying the Surface Creek

BLM_0148718

gravels is the Surface Creek Lineament – Fracture Zone. This hydrostructure is hypothesized to be an open conduit, where the faulted and fractured bedrock may combine with the younger valley gravels (Qgy) to form a French Drain affect resulting in increased groundwater flow and storage, and connectivity to deeper hydrologic systems. This could result in decreased water quality either naturally (Mancos Shale water has higher TDS, metals) or due to human activities, such as fracking or waste disposal activities.

The regional hydrogeologic units in the SCV study area, discussed in Section 2.4, are the Tertiary and Cretaceous bedrock units, including the following potentially water-bearing units: Tertiary Wasatch Formation including the Ohio Creek Formation (Two); Cretaceous Mesaverde Formation (Kmv), including the Barren, and Upper and Lower Coal Bearing members (Kmv), as well as the Rollins Sandstone member (Kmvr); and the Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb). The general aspects of the bedrock hydrogeology and hydrostructures are discussed in Section 2.5. The bedrock units are variably to fully saturated based on location and proximity to recharge area. Groundwater recharge by infiltration of precipitation (snow and rain) and by losing streams, for example Currant Creek and Surface Creek, occurs through the Hillside (slope) deposits (Qs) and younger valley gravels (Qgy) in the outcrop area (Rgb), and groundwater flows laterally to the north along the dip of the bedrock, where it becomes incorporated into the regional groundwater flow system. The groundwater flow direction in the regional bedrock systems is from south to north beneath the SCV Study Area and Grand Mesa. This flow direction is away from human activities and Delta County in general.

Human activity in the SCV study area has affected both the surface and subsurface parts of the hydrologic systems. Past land use and human activity was mostly associated with agricultural production and reservoir construction and operation, and has resulted in removal of native vegetation, introduction of irrigation and high-ET (evapotranspiration) crops, construction of (often leaking) irrigation ditches, and the drilling of primarily domestic wells. This activity has resulted in long-term increase of water levels in local, shallow aquifers of the Quaternary materials (Qgf and Qs) both on top of the Mesa Top and Hillslope subsystems, such as the Redlands Mesa and Cedar Mesa Subsystems, and in the alluvium (Qal) and younger valley gravels (Qgy) of Currant Creek, Surface Creek, and the Tongue Creek (with tributaries) Subsystems. At this time, this part of Delta County is not experiencing a shift from agricultural to nonagricultural land use at the same rate as many other areas of the western United States.

The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.

The Redlands Mesa and Cedar Mesa Subsystems are least likely to be affected by oil and gas operations because they are located in the recharge area and have a shallow groundwater flow system above the affected bedrock zones and have relatively few hydrostructures that could promote connectivity. However, the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems, including Currant Creek,

BLM_0148719

Surface Creek, and Tongue Creek, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities, which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal.

The GIS maps resulting from this study provide for use in planning and management of groundwater resources in the SCV area. The database formats that have been used in this study include ESRI shape files, database tables, georeferenced images, and ESRI GRID files (for the DEM, among others). The GIS map and database for the NFVT study were prepared using ArcView™ version 8.3 and evaluated using Arc-Desktop™ version 10.2 (ESRI®, Redlands, California).

Three multi-layer GIS maps have been prepared for this study: 1) a map with hydrologic and hydrogeologic features of Delta County; 2) a map with hydrologic and hydrogeologic features of the SCV area; and 3) a map with hydrologic and hyrdogeologic features of the combined SCV (Surface Creek Valley), NFVT (North Fork Valley and Terraces), and the Oak Mesa study areas referred to as the NFVSC area.  The GIS maps consist of a number of layers representing various data types relevant to the assessment of groundwater resources at user-specified locations. The GIS layers of the Delta County, SCV and NFVSC maps contain three types of geographic information: 1) general geographic information (county border, roads, towns, imagery) used primarily for orientation purposes;  2) hydrologic information (including precipitation, watersheds, streams, lakes/ponds, irrigation ditches, and irrigated areas); and 3) hydrogeologic information (including hydrogeologic units, faults and hydrostructures, recharge and discharge areas, springs/seeps, and wells. The hydrogeological databases prepared for the SCV area include all data collected and prepared for the previous studies (Oak Mesa and North Fork Valley and Terraces).

BLM_0148720

## 5    REFERENCES

Ackerman, D.J., and T. Brooks. 1986. *Reconnaissance of Ground-Water Resources in the North Fork Gunnison River Basin, Southwestern Colorado.* U.S. Geological Survey. Water Resources Investigations 85-4230.

ASTM Standard D5979, 1996 (2008), Standard Guide for Conceptualization and Characterization of Groundwater Systems. ASTM International, West Conshohocken, PA, DOI: 10.1520/D5979-96R08.

Brooks, T. 1983. *Hydrology and subsidence potential of proposed coal-lease tracts in Delta County, Colorado.* U.S. Geological Survey. Water Resources Investigations 83-4069.

Brooks, T., and D.J. Ackerman. 1985. *Reconnaissance of Ground-Water Resources in the Lower Gunnison River Basin, Southwestern Colorado.* U.S. Geological Survey. Water Resources Investigations 84-4185

CDWR 2014. *State Water Rights Database.* CDSS Water Rights Data Selector, Division of Water Resources - State of Colorado. [cdss.state.co.us/onlineTools/Pages/WaterRights.aspx].

Cordilleran Compliance Services, Inc. 2002. *Hydrogeology of the South Flank of the Grand Mesa in the Vicinity of Cedaredge and Paonia, Delta County, Colorado.* Prepared for Gunnison Energy Corporation.

Daly, C., and G.L. Johnson. 1999. PRISM *Spatial Climate Layers: An Overview of the USDA-NRCS Spatial Climate Mapping Project.* PRISM Guide Book. PRISM Group, Oregon State University in cooperation with USDA-NRCS.

Davis, S.N., and R.J.M. DeWiest. 1966. *Hydrogeology.* John Wiley & Sons, New York.

Day, W.C., G.N. Green, D.H. Knepper, Jr., and R.C. Phillips. 1999. *Mineral Resource Assessment Area, Southwestern Colorado and Digital Data for the Leadville, Montrose, Durango, and Colorado Parts of the Grand Junction, Moab, and Cortez 1° X 2° Geologic Maps'.* U.S. Geological Survey. Open-File Report 99-427.

Ellis, M.S., D.L. Gaskill, and C.R. Dunrud. 1987. *Geologic Map of the Paonia and Gunnison Area, Delta and Gunnison Counties, Colorado.* U.S. Geological Survey. Coal Investigations Map C-109.

Freethey, G.W., and G.E. Cordy. 1991. *Geohydrology of Mesozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin.* U.S. Geological Survey. Professional Paper 1411-C.

Geldon, A.L. 2003. *Hydrologic Properties and Ground-Water Flow Systems of the Paleozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin.* U.S. Geological Survey. Professional Paper 1411-B.

Hail, W. J., Jr. 1972a. *Reconnaissance Geologic Map of the Cedaredge Area, Delta County, Colorado.* U.S. Geological Survey. IMAP 697.

BLM_0148721

Hail, W. J., Jr. 1972b. *Reconnaissance Geologic Map of the Hotchkiss Area, Delta and Montrose Counties, Colorado.* U.S. Geological Survey. IMAP 698.

Kolm, K.E., and P.K.M. van der Heijde. 2012. *Groundwater Systems of Delta County, Colorado: Oak Mesa Area -- GIS-Based Hydrological and Environmental Systems Analysis and Formulation of Conceptual Site Models (With Addendum).* Report prepared for Delta County Board of County Commissioners, Integral Consulting, Louisville, Colorado.

Kolm, K.E., and P.K.M. van der Heijde. 2013. *Groundwater Systems in Delta County, Colorado: North Fork Valley and Terraces Area.* Report prepared for Delta County Board of County Commissioners; Hydrologic Systems Analysis, LLC, Golden, Colorado and Heath Hydrology, Inc., Boulder, Colorado.

Kolm, K.E., P K.M. van der Heijde, J.S. Downey, and E.D. Gutentag. 1996. *Conceptualization and Characterization of Ground-Water Systems.* In: Subsurface Fluid-Flow (Ground Water and Vadose Zone) Modeling, ASTM STP 1288, J. D. Ritchey and J. O. Rumbaugh, eds., American Society for Testing and Materials, West Conshohocken, PA.

Noe, D.C., and M.J. Zawaski. 2013. *Orchard City Quadrangle Geologic Map, Delta County, Colorado.* Colorado Geological Survey.

Robson, S.G., and E.R. Banta. 1995. Groundwater Atlas of the United States: Colorado Plateau Aquifer. U.S. Geological Survey, HA 730-C.

Topper, R., K.L. Spray, W.H. Bellis, J.L. Hamilton, and P.E. Barkmann, 2003. *Ground Water Atlas of Colorado.* Colorado Geological Survey, Special Publication 53.

Tweto, O., R.H. Moench, and J.C. Reed. 1978. *Geologic Map of the Leadville 1 Degree x 2 Degrees Quadrangle, Northwestern Colorado.* U.S. Geological Survey. Miscellaneous Investigations Series Map I-999, scale 1:250000.

Tweto, O, T.A. Steven, W.J. Hail, and R.H. Moench. 1976. *Preliminary Geologic Map of the Montrose 1 Degree x 2 Degrees Quadrangle, Northwestern Colorado.* U.S. Geological Survey. Miscellaneous Field Studies Map MF-761, scale 1:250000.

Watts, K.R., 2008. *Availability, Sustainability, and Suitability of Ground Water, Rogers Mesa, Delta County, Colorado—Types of Analyses and Data for Use in Subdivision Water-supply Reports.* U.S. Geological Survey. Scientific Investigation Report 2008–5020.

Whitney, J.W. 1981. *Surficial Geologic Map of the Grand Junction 1 Degree x 2 Degrees Quadrangle, Colorado and Utah.* U.S. Geological Survey. Miscellaneous Investigations Series Map I-1289, scale 1:250000.

Williams, P.L. 1976. *Geology, Structure, and Uranium Deposits of the Moab Quadrangle, Colorado and Utah.* U.S. Geological Survey. Miscellaneous Field Studies MF-360, scale 1:250000.

BLM_0148722

11/1/2016                    DEPARTMENT OF THE INTERIOR Mail - Oh to be in PROVENCE...PAONIA...TELLURIDE...



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Oh to be in PROVENCE...PAONIA...TELLURIDE...
1 message

**D F** <dfonke@outlook.com>                                          Tue, Nov 1, 2016 at 5:30 PM
To: "uformp@blm.gov" <uformp@blm.gov>

Please accept this image with text as a letter of comment for the BLM's Uncompahgre Field Office's Draft Resources Management Plan 30 year plan.

Please consider it with great care!

Thanks! - Daniel



**WouldYouFrackProvence_SFW.jpg**
467K

BLM_0148723



Uncompahgre Field Office

Flash back on Provence...18th, 19th, 20th, 21st centuries
Consider the present & the next 30 years...
Flash forward on Uncompahgre Region...21st, 22nd, 23rd centuries
...where is the true wealth & sustainable economy?

The Centuries-old Economy of PROVENCE, France
~ agriculture
~ fresh local food & drink
~ natural beauty & gentle climate
~ arts & culture
~ rest, relaxation, recreation & tourism
~ retirement & seasonal living
~ water-wise practices in a dry climate
~ family businesses
~ cottage industries
~ working artists & craftspeople
~ strong schools & civic institutions
~ natural beauty
~ unique quality of life

Economy of North Fork Valley, Colorado
~ ditto
~ minus nearby seaside, beaches, etc...

Economy of Uncompahgre Region, Colorado
~ ditto
~ plus winter sports & recreation, etc...

BLM_0148724

11/1/2016                          DEPARTMENT OF THE INTERIOR Mall - Peaches & Corn...



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

**Peaches & Corn...**
1 message

---

**D F** <dfonke@outlook.com>                                    Tue, Nov 1, 2016 at 10:05 PM
To: "uformp@blm.gov" <uformp@blm.gov>

Please accept this image with text as a letter of comment for the BLM's Uncompahgre Field Office's Draft Resources Management Plan 30 year plan.

Please consider it with great care!

Thank you for protecting our lands & livelihoods! - Daniel



**WhoWillBuyOurTrustedBrands_SFW.jpg**
571K

BLM_0148725



Established, beloved & famous…

Organic mesa-grown fruit?

Famous Olathe sweet corn?

Who will buy them if…

across Colorado    & beyond.

➡ Our hard-earned reputations & valued brands are at risk, even if nothing goes wrong.

BLM_0148726



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comments on the draft resource management plan
1 message

**Steve Ela** <steve@elafamilyfarms.com>                          Tue, Nov 1, 2016 at 6:18 PM
To: uformp@blm.gov

To whom it may concern:

I would like to express my support for including the North Fork Alternative plan in the Uncompahgre Resource Management Plan.

As a fourth generation Colorado fruit grower and a certified organic grower for twenty years, I feel it is imperative to protect the water and air resources of the North Fork Valley. The North Fork Alternative Plan does not preclude oil or gas development in the area, but it does focus on protecting the parts of our area that our criticial to maintaining the agricultural integrity of the North Fork.

We are located on Rogers Mesa, an alluvial fan of Leroux Creek. The United States Geological Survey of the groundwater resources of Rogers Mesa noted that most of the groundwater that is currently being accessed for domestic and irrigation purposes comes from the infiltration of surface water into the aquifer. Any degradation or pollution of the water flowing down Leroux Creek would find its way into our agricultural ditch systems and ultimately into the aquifer through this direct link of surface water recharging our aquifer. The same would be true for any contamination finding its way into the Fire Mountain Ditch system which also flows across Rogers Mesa.

Additionally, our organic certification is dependent on demonstrating that no contamination on non-allowable substances occurs. We have to test the water we use for contaminants and if they were to appear, we would potentially lose our certification and one of our main marketing attributes. Since we annually generate over a million dollars of revenue from our marketing, this would have a dramatic impact on our income and livelihood.

In addition to water, our orchards depend on the clean air of the valley. While the main wind direction during the day is from the southwest, at night we experience a wind shift and the main flow is from the north east as the downslope winds kick in. This means that there is the potential for any air contaminants from anywhere to the east or west of us to be distributed over our area. Again, our organic certification depends on documenting no outside contaminants and we are obligated to maintain buffer strips around our orchards to prevent contamination. However, any air contaminant would be very difficult to mitigate and could again jeopardize our certification.

The North Fork Alternative plan helps to protect the critical water and air supplies around the North Fork Valley, thus helping to protect the resources that we all depend on for our livelihood. I support the more detailed comments that have been submitted by the Western Slope Conservation Center, the Valley Organic Growers Association and Citizens for a Healthy Community. I urge you to include the North Fork Alternative plan in the final Resource Management Plan.

Sincerely,

Steve Ela

Steve Ela
Ela Family Farms
30753 L Rd
Hotchkiss, CO  81419
970 872 3488
www.elafamilyfarms.com
steve@elafamilyfarms.com
www.facebook.com/elafamilyfarms



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Public Comment Letter for UFO RMP
1 message

**Ben Graves** <benjgraves@gmail.com>                                    Tue, Nov 1, 2016 at 6:58 PM
To: uformp@blm.gov

BLM Uncompahgre Field Office,

2465 S. Townsend Ave.

Montrose, CO 81401

November 1, 2016

To Whom It May Concern,

Thank you for the allowing the public to comment on the resource management plan. I moved to Delta County in 2012 to teach high school in Paonia. I now am a science teacher at Delta High School. I have been an avid mountain biker, hiker, backcountry skier and wilderness user of the BLM areas in Delta County including the Jumbo Mountain, Adobe Badlands, lower Roubideau Canyon, Lone Cabin and Steven's Gulch areas for the last 5 years. I strongly support Alternatives B and B1 in the RMP because they best preserve the quality of life that will help Delta County recover from the declines in the coal industry.

My wife's and my primary motivation for living in Delta County are the landscape, the tight-knit communities and access to high-quality recreation experiences. We now own two homes and have structured our lives around staying in Delta County (despite some of the lowest teacher salaries in the state) because of the quality of life we enjoy in the North Fork. As hundreds of coal miners were laid-off, many in Delta County and the school district feared huge losses of students and families. However, enrollment in 2016 is up in the North Fork and real estate is booming. I think a major piece of this growth, despite declines in the traditional energy industry is due to families, like my own, who value the quality of life and access to recreation in the North Fork. The BLM needs to ensure that the RMP prioritizes recreational access and preserving the air, water and wildlife habitat so that the North Fork can redefine itself as a recreation destination.

The Preferred Alternative in the draft plan would keep 90 percent of the UFO area open to oil and gas leasing, endangering wildlife, recreation, wilderness-quality lands, and cultural sites. It would also put at-risk the air and water quality, along with compromising the scenic viewsheds, on which our local communities and economies depend. Because of the low potential for economically practicable oil and gas development in much of the Jumbo Mountain and North Fork area, the trade-off with respect to less oil and gas revenue and royalties is minimal. I recognize there is ongoing oil and gas development in the area, and more development, when located in areas where it is the higher/best use, is appropriate and part of a diversified economy. Yet with high enough oil and gas prices, the Preferred Alternative would put some specific public lands at odds with higher-valued amenities directly adjacent to North Fork communities: recreation, scenery, water and wildlife. The BLM must adopt a final plan that makes such important wildlife habitat, recreation areas, and sensitive air, water, and viewsheds off-limits to energy development.

I especially support Alternative B and the protections for Jumbo Mountain as a SRMA because I see first-hand the growth in the trail system over the last 5 years and the increased use of the trails and want to make sure the resource is managed responsibly for recreation. I am an avid trail user and I mountain bike or trail run almost every day. I live about 3 blocks from Jumbo trails and a major reason for my family moving to Paonia was this trail access. The ability for children, the elderly and

BLM_0148728

tourists to have access to a scenic wildlife-viewing and high quality singletrack recreation experience from downtown Paonia is a unique feature of our community and is a draw for people around the state.

The Mancos shale geology, steep, rugged trails and fragile desert vegetation are not compatible with heavily motorized, industrial oil and gas development or off-trail use. Some existing user-created trails are not sustainable. SRMA status for the Jumbo Mountain area and the 4000 acreas east of Jumbo Mountain would enable the BLM to improve the current management of this fragile landscape and help put Paonia on the map as an outdoor recreation destination. In Alternative B, the added room for growth of the existing trail system into the areas east of Jumbo Mountain towards the Sunset Roadless Area and the National Forest, would be a way for the Paonia community to continue to attract mountain bike and singletrack recreation users from around the state. Motorized use in the close to town trails is just not compatible with the high amount of non-motorized use. In order to prevent use-conflict, the BLM should expand the SRMA as proposed in Alternative B and encourage motorized use and expand hunting access in the areas east of Jumbo Mountain. I support Alternative B over the Preferred Alternative because the Jumbo area needs room to grow so we can balance recreation conflicts and expand the availability of high-quality recreation experiences for locals and tourists that are easily accessible from town.

The only provision in Alternative B that I disagree with is that I would like to see provisions for the local community to host small competitive events. From the mid-2000s until 2014, local groups hosted charity runs on the Jumbo Trails for Cherry Days and Harvest Festival. These events drew competitors from around the Western Slope to Paonia. In 2013 Paonia High School hosted a regional cross-country meet on the Jumbo trails. Our local businesses would benefit greatly from community groups hosting non-motorized, small-scale events like trail runs and mountain bike competitions. This would further allow our community to redefine itself as a recreation destination.

River and trail recreation are a growing economic opportunity in the North Fork, with these industries bringing millions of dollars to communities in Colorado. The North Fork Alternative B1 provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area. These protections must be included in the final plan. Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land- and water-based recreation. The final plan should include Special Recreation Management Areas identified in Alternative B. Recreation activities in these areas include mountain biking, horseback riding, motor biking, OHV use, trail running, snowmobile use, hunting, fishing, cross-country skiing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, Lone Cabin, the North Fork of the Gunnison River corridor in the Paonia area and the Smith Fork river corridor, McDonald Creek, Elephant Hill, Adobe Butte, and Roubideau Canyon in the rest of Delta County.

With the decline in the coal industry, the North Fork Valley needs to redefine and continue to diversify the economy. As a classroom teacher, I see firsthand what the loss of jobs and steady incomes does to the fabric of a community. I believe the BLM should do everything in its power to help the North Fork maintain the potential for a diversified economy through embracing public lands access, wildlife protection, scenic viewsheds and recreation with a balanced approach toward oil and gas development. Such a balanced approach recognizes that some locations are not appropriate for such development, when the development would compromise higher-valued amenities. Alternative B1 would ensure that industrial development does not dominate the agricultural and recreational lands that are helping the North Fork redefine itself post-coal mines.

In conclusion, the BLM should listen to the local residents in Crawford, Hotchkiss, and Paonia and adopt the North Fork Alternative, B1, for the area in and around the North Fork Valley and Alternative B for the whole UFO. This locally-driven proposal is a balanced way to manage the entire Gunnison Watershed, and will contribute to re-building a sustainable rural economy on Colorado's Western Slope.

Sincerely,

Ben Graves

1004 3rd St

BLM_0148729

Paonia, CO 81428



Ben Graves

**Bgraves UFO RMP comment letter.docx**
156K

BLM_0148730

BLM Uncompahgre Field Office,
2465 S. Townsend Ave.
Montrose, CO 81401

November 1, 2016

To Whom It May Concern,

Thank you for the allowing the public to comment on the resource management plan. I moved to Delta County in 2012 to teach high school in Paonia. I now am a science teacher at Delta High School. I have been an avid mountain biker, hiker, backcountry skier and wilderness user of the BLM areas in Delta County including the Jumbo Mountain, Adobe Badlands, lower Roubideau Canyon, Lone Cabin and Steven's Gulch areas for the last 5 years. I strongly support Alternatives B and B1 in the RMP because they best preserve the quality of life that will help Delta County recover from the declines in the coal industry.

My wife's and my primary motivation for living in Delta County are the landscape, the tight-knit communities and access to high-quality recreation experiences. We now own two homes and have structured our lives around staying in Delta County (despite some of the lowest teacher salaries in the state) because of the quality of life we enjoy in the North Fork. As hundreds of coal miners were laid-off, many in Delta County and the school district feared huge losses of students and families. However, enrollment in 2016 is up in the North Fork and real estate is booming. I think a major piece of this growth, despite declines in the traditional energy industry is due to families, like my own, who value the quality of life and access to recreation in the North Fork. The BLM needs to ensure that the RMP prioritizes recreational access and preserving the air, water and wildlife habitat so that the North Fork can redefine itself as a recreation destination.

The Preferred Alternative in the draft plan would keep 90 percent of the UFO area open to oil and gas leasing, endangering wildlife, recreation, wilderness-quality lands, and cultural sites. It would also put at-risk the air and water quality, along with compromising the scenic viewsheds, on which our local communities and economies depend. Because of the low potential for economically practicable oil and gas development in much of the Jumbo Mountain and North Fork area, the trade-off with respect to less oil and gas revenue and royalties is minimal. I recognize there is ongoing oil and gas development in the area, and more development, when located in areas where it is the higher/best use, is appropriate and part of a diversified economy. Yet with high enough oil and gas prices, the Preferred Alternative would put some specific public lands at odds with higher-valued amenities directly adjacent to North Fork communities: recreation, scenery, water and wildlife. The BLM must adopt a final plan that makes such important wildlife habitat, recreation areas, and sensitive air, water, and viewsheds off-limits to energy development.

I especially support Alternative B and the protections for Jumbo Mountain as a SRMA because I see first-hand the growth in the trail system over the last 5 years and the increased use of the trails and want to make sure the resource is managed responsibly for recreation. I am an avid trail user and I mountain bike or trail run almost every day. I live about 3 blocks from Jumbo trails and a major reason for my family moving to Paonia was this trail access. The ability for children, the elderly and tourists to have access to a scenic

wildlife-viewing and high quality singletrack recreation experience from downtown Paonia is a unique feature of our community and is a draw for people around the state.

The Mancos shale geology, steep, rugged trails and fragile desert vegetation are not compatible with heavily motorized, industrial oil and gas development or off-trail use. Some existing user-created trails are not sustainable. SRMA status for the Jumbo Mountain area and the 4000 acreas east of Jumbo Mountain would enable the BLM to improve the current management of this fragile landscape and help put Paonia on the map as an outdoor recreation destination. In Alternative B, the added room for growth of the existing trail system into the areas east of Jumbo Mountain towards the Sunset Roadless Area and the National Forest, would be a way for the Paonia community to continue to attract mountain bike and singletrack recreation users from around the state. Motorized use in the close to town trails is just not compatible with the high amount of non-motorized use. In order to prevent use-conflict, the BLM should expand the SRMA as proposed in Alternative B and encourage motorized use and expand hunting access in the areas east of Jumbo Mountain. I support Alternative B over the Preferred Alternative because the Jumbo area needs room to grow so we can balance recreation conflicts and expand the availability of high-quality recreation experiences for locals and tourists that are easily accessible from town.

The only provision in Alternative B that I disagree with is that I would like to see provisions for the local community to host small competitive events. From the mid-2000s until 2014, local groups hosted charity runs on the Jumbo Trails for Cherry Days and Harvest Festival. These events drew competitors from around the Western Slope to Paonia. In 2013 Paonia High School hosted a regional cross-country meet on the Jumbo trails. Our local businesses would benefit greatly from community groups hosting non-motorized, small-scale events like trail runs and mountain bike competitions. This would further allow our community to redefine itself as a recreation destination.

River and trail recreation are a growing economic opportunity in the North Fork, with these industries bringing millions of dollars to communities in Colorado. The North Fork Alternative B1 provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area. These protections must be included in the final plan. Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land- and water-based recreation. The final plan should include Special Recreation Management Areas identified in Alternative B. Recreation activities in these areas include mountain biking, horseback riding, motor biking, OHV use, trail running, snowmobile use, hunting, fishing, cross-country skiing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, Lone Cabin, the North Fork of the Gunnison River corridor in the Paonia area and the Smith Fork river corridor, McDonald Creek, Elephant Hill, Adobe Butte, and Roubideau Canyon in the rest of Delta County.

With the decline in the coal industry, the North Fork Valley needs to redefine and continue to diversify the economy. As a classroom teacher, I see firsthand what the loss of jobs and steady incomes does to the fabric of a community. I believe the BLM should do everything in its power to help the North Fork maintain the potential for a diversified economy through embracing public lands access, wildlife protection, scenic viewsheds

and recreation with a balanced approach toward oil and gas development. Such a balanced approach recognizes that some locations are not appropriate for such development, when the development would compromise higher-valued amenities. Alternative B1 would ensure that industrial development does not dominate the agricultural and recreational lands that are helping the North Fork redefine itself post-coal mines.

In conclusion, the BLM should listen to the local residents in Crawford, Hotchkiss, and Paonia and adopt the North Fork Alternative, B1, for the area in and around the North Fork Valley and Alternative B for the whole UFO. This locally-driven proposal is a balanced way to manage the entire Gunnison Watershed, and will contribute to re-building a sustainable rural economy on Colorado's Western Slope.

Sincerely,
Ben Graves
1004 3rd St
Paonia, CO 81428

BLM_0148733

Resubmitted Comments with Contact Info
1 message
Matt Reed <matt@hccacb.org> Tue, Nov 1, 2016 at 3:42 PM
ReplyTo:
Matt Reed <matt@hccacb.org>
To: uformp@blm.gov
Please find attached comments from HCCA, resubmitted with my contact information on the comment. Apologies for the inconvenience.
Thank you.

Matt Reed
Public Lands Director
High Country Conservation Advocates
PO Box 1066
Crested Butte, CO 81224
(303) 5059917
HCCA Comments_Draft UFO RMP_Final.pdf
684K

November 1, 2016
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Submitted via email to: uformp@blm.gov
Re: Comments on Draft RMP

Dear Bureau of Land Management,

Please accept and fully consider the following comments from High Country Conservation Advocates (HCCA) regarding the Uncompahgre Field Office (UFO) Draft Resource Management Plan (RMP). HCCA was founded in 1977 to keep Mount Emmons, located above the Town of Crested Butte, molybdenum mine-free. HCCAs work now addresses other issues that affect Gunnison Countys clean air, clean water, public lands and healthy wildlife. HCCA has over 800 members who enjoy the rural and wild character of Gunnison County and Western Slope public lands. While the UFO RMP encompasses a wide geographic area and many resource issues, our focus in these comments is the issue of coal leasing, development, and related impacts. Leasing and development of coal resources sanctioned under all alternatives in the Draft RMP would lead to significant, unacceptable and irreversible environmental impacts across a wide landscape. Unfortunately, the Draft RMP not only maintains the untenable status quo for coal mining, but it significantly expands the amount of coal available for leasing and development, while also failing to adequately consider environmental impacts. By sanctioning greater exploration, leasing and mining, the Draft RMP undercuts our national commitments to address and rectify the worst impacts of climate change at a time when limiting fossil fuel extraction is obligatory. Regarding oil and gas development, BLM can and should close the North Fork area to oil and gas leasing in the proposed RMP. This can be accomplished without requiring supplemental National Environmental Policy Act (NEPA) under the Council on Environmental Quality (CEQ) regulations, as the additional acreage would represent just 3.8% of the planning area and is therefore not substantial. If it does not close the North Fork area to leasing, HCCA supports the incorporation into the final RMP of Alternative B1 (North Fork Alternative) as the only management alternative evaluated in the draft RMP that could provide the protection warranted for the North Fork area. Alternative B1 provides the best management options for oil and gas leasing and development presented in the Draft RMP, and it should be adopted by BLM into the final RMP. The North Fork Alternative Plan fits a clear and pressing public need by proposing a set of strong oil and gas management stipulations and protective designations to safeguard the areas character of place, water supply, wildlife habitat and recreational opportunities.

The Draft RMP Fails to Consider a Reasonable Range of Alternatives
NEPA Requirements BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for coal development.1 [1 43 U.S.C.  1712(c)(1).] As such, in its NEPA analysis the agency must consider a reasonable range of alternatives regarding areas open to coal leasing. The range of alternatives is the heart of the environmental impact statement.2 [2 40 C.F.R. 1502.14.] An agency violates NEPA by failing to rigorously explore and objectively evaluate all reasonable alternatives to the proposed action.3 [3 City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R.  1502.14).] This evaluation extends to considering more environmentally protective alternatives.4 [4 See, e.g., Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1122-1123 (9th Cir. 2002) (and cases cited therein).]

FLPMA and MLA Obligations
The consideration of more environmentally protective alternatives in BLMs analysis is consistent with the requirement of the Federal Lands Policy and Management Act (FLPMA) to minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved.5 [5 43 U.S.C. 1732(d)(2)(a).] FLPMA does not mandate that every use be accommodated on every piece of land; instead, it demands a delicate balancing.6 [6 See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 58 (2004). ] Multiple use requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage.7 [7 Public Lands Council v. Babbitt, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C.  1702 (c)).]

As held by the Tenth Circuit, [i]f all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and

mined.8 [8 Rocky Mtn. Oil & Gas Ass'n v. Watt, 696 F.2d 734, 738 n. 4 (10th Cir.1982) (quoting Utah v. Andrus, 486 F.Supp. 995, 1003 (D.Utah 1979)); see also 43 U.S.C. 1701(a)(8) (stating, as a goal of FLPMA, the necessity to preserve and protect certain public lands in their natural condition); Pub. Lands Council, 167 F.3d at 1299 (citing 1701(a)(8)).] As further provided by the Tenth Circuit: It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses . . . . BLMs obligation to manage for multiple use does not mean that development must be allowed on [a particular piece of public land]. Development is a possible use, which BLM must weigh against other possible uses including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.9 [9 New Mexico ex rel. Richardson, 565 F.3d 683, at 710 (10th Cir. 2009) (emphasis added).]

BLM manages federal coal leasing under the Mineral Leasing Act (MLA) of 1920, as amended by the 1976 Federal Coal Leasing Amendments Act.10 [10 30 U.S.C. 181, et seq.] The statute directs the agency to authorize leasing of coal on federal lands, in its discretion, only as the agency finds appropriate and in the public interest.11 [11 30 U.S.C. 201.]

Furthermore, BLM must be guided by its statutory mandate to administer federal coal leasing in a manner that protects the Nations environmental, air and atmospheric, [and] water resource[s],12 [12 43 U.S.C. 1701(a)(8).] takes into account the long-term needs of future generations, and considers the use of some land for less than all of the resources to accomplish these objectives.13 [13 Id. 1702(c).] Put differently, the driving force behind agency-authorized coal development must be the long-term and broad public interest, not the often short-term and narrow interest of coal companies. Thus, the RMP is obligated to consider the enduring legacy of coal development, which is to be balanced against other critical multiple-use resource values. An examination of the RMP finds no evidence that the BLM considered alternatives that balance uses and impacts within areas known to have coal resources. Rather, the agency across all alternatives not only prioritizes coal leasing and development over other, equally valid resource considerations, but posits no alternatives that consider, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal. The BLM cannot ignore its obligation to evaluate these competing uses, and must give due weight to FLPMAs mandate to preserve and protect public lands in their natural condition.14 [14 See 43 U.S.C. 1701(a)(8).]

Purpose and Need

The objective reasonableness of alternatives can be judged by how they relate to the RMPs purpose and need statement. As stated by BLM: The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses . . BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy.15 [15 Bureau of Land Management Uncompahgre Field Office, Draft Resource Management Plan and Environmental Impact Statement (May 2016), at I-2 (hereinafter Draft RMP).] This purpose does not accept coal development as a foregone conclusion. The BLM has a responsibility in this planning process to match its expansive land and resource management to current conditions and evolving demands, not business-as-usual expectations from the coal industry. As further explained in BLMs NEPA Handbook:

The purpose and need statement dictates the range of alternatives, because action alternatives are not reasonable if they do not respond to the purpose and need for the action. The broader the purpose and need statement, the broader the range of alternatives that must be analyzed. The purpose and need statement will provide a framework for issue identification and will form the basis for the eventual rationale for selection of an alternative. Generally, the action alternatives will respond to the problem or opportunity described in the purpose and need statement, providing a basis for eventual selection of an alternative in a decision.16 [16 BLM NEPA Handbook at 6.2.1.] To adequately address current resource conditions, changes in circumstances, and new or revised national-level policy, the UFO RMP must provide more than a one-sided range of alternatives. Inadequate Range of Alternatives By the measures identified above, BLMs range of alternatives fails to satisfy its procedural obligations under NEPA, its statutory obligation under FLPMA and MLA, and the purpose and need of the RMP. All of the alternatives in the Draft RMP propose to leave available vast amounts of land for coal leasing and development, with little difference in direct, indirect or cumulative impacts. While the alternatives may reflect subtle differences in acreage open for coal leasing, there is virtually no difference in the foreseeable range of coal leasing and development, or in greenhouse gas (GHG) rates across alternatives.

Summary of Alternatives (Coal) [see PDF for table]

The unreasonableness of the BLMs alternatives analysis with respect to coal leasing is remarkable. For example, the draft RMP considers four alternatives with varying levels of lands acceptable for coal leasing. But the alternatives leave open to leasing between 76% and 99.3% of all lands with coal development potential.20 [20 [See also id. at 4-274 (Within the coal potential area, [Alternative B] would be the most restrictive, with 24 percent of the coal potential area unavailable for leasing).] The draft RMP indicates that coal leasing restrictions in the most active coal field  the Somerset  vary between 0% and 12% of the lands in that field that would be unacceptable for further consideration of leasing and development, meaning that every alternative left at least 88% of the most active coal field open for development. Id. at 4-289  4-290.]
In other words, across the planning area BLM would sanction mining on more than three out of every four acres where mining is technologically practicable, prioritizing one use over the myriad other uses and values within the landscape.

Yet even under this lopsided range of alternatives, the likely amount of coal produced and burned across all of them is identical. Under each alternative, the Draft RMP predicts the same amount of GHG emissions from coal combustion  27.1 million tons. This entails that none of the alternatives would limit coal production or GHG-related impacts in any way. The BLM specifically assumes that for every alternative, [t]he output from the two active mines on BLM-administered land within this coal field is estimated to remain the same as current production, between 9 and 11 million tons of coal each year for the next 20 years.21 [21 Id. at 4-454 (emphasis added).]

BLM_0148735

The similarity in available acreage and the identical emissions resulting from coal development conflicts with NEPAs requirement that an actual range of alternatives is considered, such that will preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished by only one alternative . . . .22 [22 Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999), citing Simmons v. United States Corps of Engineers, 120 F.3d 664, 669 (7th Cir. 1997).] A fair reading of the Draft RMP strongly suggests that the
objective of the BLM is to maximize coal leasing and development in a manner unencumbered by other resource considerations, making its analysis only a foreordained formality in violation of NEPA.23 [23 City of New York v. Department of Transp., 715 F.2d 732, 743 (2nd Cir. 1983). See also, Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002).]

The range of alternatives regarding coal production is unreasonably narrow across the various coal fields in the planning area. For example, the vast majority of the Tongue Mesa coal field is left open under each action alternative (92% or more), despite the fact that the RMP predicts no coal will be produced there because the areas geology makes it economically unviable to mine in the next 20 years.24 [24 Draft RMP at 4-289  4-290 (percentage of Tongue Mesa coal field acceptable for coal leasing); id. at 4-454 (economically unviable).] Similarly, while most of the Grand Mesa coal field is open to coal leasing under all three action alternatives, coal there is also unlikely to be mined in the next two decades.25 [25 Id. at 4-289  4-290 (90% or more of Grand Mesa coal field open to mining under all action alternatives); id. at 4-454  4-455 (due to the Grand Mesa coal fields low coal quality and transportation constraints, no coal mining is forecast in the area for the next 20 years).]

It appears then that the BLM is unwilling to even consider any reasonable limitations on coal mining, no matter how economically unviable development may be. At the very least the BLM should have considered an alternative that eliminates coal mining in the Tongue Mesa and Grand Mesa coal fields, fields that realistically cannot be mined.

The Draft RMP indicates that almost all of the coal production in the resource area will come from the Somerset Coal Field. This 40,000 acre area is almost entirely open to leasing under every alternative.26 [26 Id. at 4-454  4-455.]

The most restrictive alternative closes only 12% of the Somerset field to leasing, while the Preferred Alternative leaves 98% open to leasing. But again, GHG emissions would remain the same, rendering the slight acreage difference irrelevant in terms of climate impacts. The only way to address a reasonable range of coal scenarios and outcomes would be to analyze alternatives that place significant portions of the Somerset coal field off-limits to coal mining, which the BLM has chosen not to do.
For perspective, compare the RMPs coal scenario to its treatment of renewable energy. For wind and solar development, the draft RMP considers alternatives that would open the planning area to a relatively small acreage (5%), about a third of the acreage, a little over half the acreage, and most of the acreage (83%).27 [27 See Table 2-3, id. at 2-379. That table shows that the following acres (% of total acres) would be open to solar and wind under the alternatives: Alt. A: 561,200 acres (83%); Alt. B: 34,040 acres (5%); Alt. C: 369,970 acres (55%); Alt. D: acres (34%).]
Thus the greatest percentage of land open to wind and solar under any of the alternatives (83%) is still smaller than the least percentage of land open to coal mining under any alternative (88% of coal-bearing lands).

Alternative leaves 98% open to leasing. But again, GHG emissions would remain the same, rendering the slight acreage difference irrelevant in terms of climate impacts. The only way to address a reasonable range of coal scenarios and outcomes would be to analyze alternatives that place significant portions of the Somerset coal field off-limits to coal mining, which the BLM has chosen not to do. For perspective, compare the RMPs coal scenario to its treatment of renewable energy. For wind and solar development, the draft RMP considers alternatives that would open the planning area to a relatively small acreage (5%), about a third of the acreage, a little over half the acreage, and most of the acreage (83%).27 Thus the greatest percentage of land open to wind and solar under any of the alternatives (83%) is still smaller than the least percentage of land open to coal mining under any alternative (88% of coal-bearing lands).

BLM must consider the following when deciding which areas to allow for coal leasing and development:
1) the BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for coal development;28 [28 43 U.S.C.  1712(c)(1).]
2) BLM must consider a reasonable range of alternatives in regards to areas open to coal leasing;29 [29 40 C.F.R.  1502.14] and
3) any decision which leaves the vast majority of the field office open to coal development will preclude the effectiveness or long-term viability of conservation measures.

The Draft RMP largely ignores these considerations, and in doing so violates its legal obligations under NEPA and FLPMA. The BLM Must Consider a No Leasing Alternative and Should Adopt it as the Preferred Alternative To comply with NEPAs requirements for a reasonable range of alternatives, the BLM should consider a no leasing alternative for coal resources in the planning area. Such an alternative is a necessary counterbalance to the current alternatives that skew heavily in favor of coal leasing. A no leasing alternative is critical because, [c]learly, it is pointless to consider environmental costs without also seriously considering action to avoid them.30 [30 Calvert Cliffs Coordinating Comm., Inc. v. U.S. Atomic Energy Commn., 449 F.2d 1109, 1128 (D.C. Cir. 1971).] Because all of the alternatives posited in the Draft RMP would lead to identical GHG emissions (27.1 million tons) and open nearly identical acreage to leasing, a no leasing alternative is necessary to take a hard look at environmental impacts and how to avoid them. The BLMs consideration of a no leasing alternative is also reasonable in light of information, science, and national policy related to climate change, discussed in detail below.

In its skeletal analysis of indirect GHG emissions from BLM actions in the planning area, the agency notes that [a]ll of the alternatives outlined above provide for continued coal, oil, and gas exploration and development within the UFO. As such, the BLM understands that the majority, if not all, of any developed resources will eventually be consumed to produce energy.31 [31 Draft RMP at 4-41.] This assumption of unrestricted fossil fuel consumption is reflective of a fundamental disconnect between how our public lands are managed for energy production and national policies and expectations to limit GHG emissions.

BLM_0148736

Importantly, the Draft RMP fails to consider any alternatives that would meaningfully address GHG emissions and climate change impacts in the planning area and that are reflective of current science and national policy. To address these impacts, a no leasing alternative must be analyzed. In order for the BLM to comply with FLPMA and NEPA the agency should, at a minimum, consider and rigorously explore the possibility and design alternatives which do not leave a significant portion of the planning area open to coal leasing.32 [32 See 43 U.S.C.  1712(c)(1) and 40 C.F.R.  1502.14(a) and 1508.25(c).] We recommend, at a minimum, that the areas identified as having low coal potential be removed from consideration for leasing. As it stands, the BLM has identified 180,000 acres where the coal resource is present, contribute to the coal development potential area, but they are not further discussed in this analysis because they have low coal potential and no interest from industry.33 [33 Draft RMP at 4-264.] If that is the case, why does the agency leave at least 130,000 acres of those lands available for leasing under every alternative? If there is low potential and no interest in this coal, BLM should make that coal unavailable in the RMP.

It is evident that there are lands in the Planning Area where other resource values besides coal should prevail. FLPMA affords BLM great authority to appropriately balance these competing interests, which expressly includes the responsibility to preserve and protect certain public lands in their natural condition.34 [34 43 U.S.C.  1701(a)(8).]
Moreover, FLPMA further delegates BLM authority to permanently withdraw lands from consideration.35 [35 See 43 U.S.C.  1714.] This ability authorizes the Secretary to make, modify, extend, or revoke withdrawals.36 [36 Id.] The BLM has the legal authority and obligation to consider and adopt a no leasing alternative, and we request that it do so in the planning process. Not only is BLMs consideration of a no leasing alternative reasonable in light of new information, science, and national policy related to climate change, and therefore must be included in the UFOs RMP, but this information underscores the unreasonableness of the UFOs action alternatives.

The BLM Fails to Take a Hard Look at Climate Change

To address the impacts of climate change and manage for vibrant ecosystems, healthy wildlife and sustainable recreation, not only must environmental analysis take a hard look at GHG emissions from coal development, but the agencys decision must reflect the challenges faced by residents and visitors of the UFO planning area and surrounding landscapes. A fair reading of the Draft RMP reveals that it places undue emphasis on coal mining while deflecting the climate-related challenges that are already occurring and will worsen in the future. In 2005, Colorados greenhouse emissions were 35 percent higher than they were in 1990. They are projected to grow 81 percent above the 1990 levels by 2020.37 [37 U.S. Dept. of Agriculture, Spruce Beetle Epidemic and Aspen Decline Management Response Final Environmental Impact Statement (February 2016), at 228.] Current and proposed coal leasing and development on lands managed by the UFO directly contribute to Colorados GHG emissions and directly impact public lands, resources and communities. Approximately 21% of Americas GHG emissions in 2012 originated from coal, oil and gas extracted from public lands. The federal coal program accounts for the bulk of those emissions  over 57% of emissions from federal fossil fuel production, or 12% of total U.S. GHG emissions.38 [38 See Dustin Mulvaney et al., Center for Biological Diversity and Friends of the Earth, The Potential Greenhouse Gas Emissions of U.S. Federal Fossil Fuels (Aug. 2015).]

As noted above, NEPA imposes action forcing procedures . . . requir[ing] that agencies take a hard look at environmental consequences.39 [39 Methow Valley, 490 U.S. 332, 350 (1989) (citations omitted).] These environmental consequences may be direct, indirect, or cumulative.40 [40 40 C.F.R.  1502.16, 1508.7, 1508.8.] Even if science cannot isolate every single contribution to overall emissions, this does not obviate BLMs responsibility to consider coal development in the action area. In other words, the UFO cannot ignore the larger relationship that its coal mining management decisions have to the broader climate crisis. The RMPs analysis must include the full scope of GHG emissions from its coal management scenarios.41 [41 See Neighbors of Cuddy Mountain v. U.S. Forest Service, 137 F.3d 1372, 1379 (9th Cir. 1998) (To consider cumulative effects, some quantified or detailed information is required. Without such information, neither the courts nor the public, in reviewing the [agencys] decisions, can be assured that the [agency] provided the hard look that it is required to provide.).] If we are to realistically avoid climate disaster, the BLMs decisionmaking must acknowledge this reality and plan accordingly. An examination of the Draft RMP reveals that this has not happened.

The Draft RMP acknowledges that mounting evidence suggests that numerous climate change impacts are already occurring in the Mountain West and Great Plains region, including warming temperatures, less snowfall, earlier snowmelt, more drought, greater wildfire risk, and the expansion of grasslands and rangelands into previously forested areas.42 [42 Draft RMP at 4-41.] The Draft RMP further acknowledges that these climate change impacts will cause ecosystem and wildlife damage and stress in numerous ways. For example, [I]f global climate change results in a warmer and drier climate, increased particulate matter impacts could occur due to increased windblown dust from drier and less stable soils;43 [43 Id.] extinction of endemic threatened or endangered plants may be accelerated;44 [44 Id.] and the population of some animal species may be reduced.45 [45 Id.]

The Draft RMP acknowledges that [c]oal mining activities would be the largest contributor to greenhouse gas emissions for all alternatives.46 [46 Id. at 4-39.] Yet in spite of these concerns, the UFO completely avoids taking meaningful action to address the specific cause of climate change that it confronts in planning process, namely the mining and burning of coal. The BLM could reduce GHG impacts by limiting development, declining to lease coal resources, or by requiring significant emission controls. Instead, the UFO abdicates its responsibility by providing an extensive list of excuses as to why action is not possible, including:

? Several activities contribute to climate change beyond fossil fuel development, including fires, combustion engines, changes to the natural carbon cycle, and changes to radiative forces and reflectivity.47 [47 Id.]

? Projected changes are likely to occur over several decades to a century and may not be measurably discernable within the reasonably foreseeable future.48 [48 Id. at 4-40.]

? Assessing the impacts of GHG emissions on global climate change requires modeling on a global scale which is beyond the scope of this analysis.49 [49 Id.]

? It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP.50 [50 Id.]

? It is not possible to distinguish the impacts on global climate change from GHG emissions originating from the planning area.51 [51 Id.] These excuses do not comport with the agencys responsibilities under law and policy. The BLM Must Consider Existing, New and Revised National Policy on Climate Change On June 20, President Obama spoke at Yosemite National Park, declaring that climate change is the biggest challenge were going to face in protecting this place and places like it.52 [52 The White House, Remarks by the President at Sentinel Bridge, Yosemite National Park, Office of the Press Secretary (June 20, 2016), available at https://www.whitehouse.gov/the-press-office/2016/06/20/remarkspresident-sentinel-bridge (last viewed October 20, 2016).] He could just have easily been discussing public lands in western Colorado. President Obama condemned those who pay lip service to protecting Americas natural areas while making climate change worse.53 [53 Id.] Unfortunately, it appears that the UFO has not taken this to heart. On the one hand, the Draft RMP acknowledges the impacts of climate change on the planning areas iconic landscapes, but on the other hand its alternatives allow and promote coal development across the same affected landscape, with little or no constraint.

In 2014, President Obama described climate change as an urgent and growing threat . . . that will define the contours of this century more dramatically than any other.54 [54 The White House, Remarks by the President at U.N. Climate Change Summit (Sept. 23, 2014), available at: https://www.whitehouse.gov/the-press-office/2014/09/23/remarks-president-un-climate-change-summit (last viewed October 20, 2016).]
In that same year, the U.S. pledged to reduce its GHG emissions 26-28 percent below 2005 levels by 2020.55 [55 U.S.-China Joint Announcement on Climate Change (Nov. 11, 2014), available at:https://www.whitehouse.gov/the-press-office/2014/11/11/us-china-joint-announcement-climate-change (last viewed October 20, 2016).] In his final State of the Union address, President Obama again noted the federal governments commitment to fighting climate change, vowing to accelerate the transition away from old, dirtier energy sources, and making a powerful promise to change the way we manage our oil and coal resources so that they better reflect the costs they impose on taxpayers and our planet.56 [56 President Barack Obama, State of the Union (Jan. 12, 2016), available at: https://www.whitehouse.gov/sotu (last viewed October 20, 2016).] These statements culminated in December, 2015 where the President joined with 194 other nations in recognizing that climate change represents an urgent and potentially irreversible threat to human societies and the planet and setting the goal of holding the increase in the global average temperature to well below 2C above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5C.57 [57 United Nations Framework Convention on Climate Change, Conference of the Parties (Nov 30-Dec. 11, 2015), Adoption of the Paris Agreement, Art. 2, U.N. Doc. FCCC/CP/2015/L.9 (Dec. 12, 2015), available at: http://unfccc.int/resource/docs/2015/cop21/eng/l09.pdf (Paris Agreement) (last viewed October 20, 2016).] The President ratified the Paris Agreement, along with China, on September 3, 2016.58 [58 The White House, President Obama: The United States Formally Enters the Paris Agreement (Sept. 3, 2016), available at: https://www.whitehouse.gov/blog/2016/09/03/president-obama-united-states-formally-enters-parisagreement (last viewed October 20, 2016).] Unfortunately, the Alternatives identified in the Draft RMP undermine this commitment by increasing and extending GHG emissions from coal and by suppressing generation of renewables.

The Secretary of the United States Department of the Interior stated, in Secretarial Order 3226, Evaluating Climate Change Impacts in Management Planning (January 19, 2001), that [t]here is a consensus in the international community that global climate change is occurring and that it should be addressed in governmental decision making. Secretarial Order 3226 commits the Department of the Interior to address climate change through its planning and decisionmaking processes, having established the responsibility of agencies to consider and analyze potential climate change impacts
when undertaking long-range planning exercises, when setting priorities for scientific research and investigations, when developing multi-year management plans, and/or when making major decisions regarding potential utilization of resources under the Departments purview.59 [59 Id. (emphasis added).] The Order specifically provides that Departmental activities covered by this Order include management plans and activities developed for public lands and planning and management activities associated with oil, gas and mineral development on public lands.60 [60 Id.] Development of the UFO RMP as it pertains to coal and coalrelated climate effects are thus contemplated by and subject to the Order.

The BLM is also subject to Secretarial Order 3289, Addressing the Impacts of Climate Change on Americas Water, Land, and Other Natural and Cultural Resources (September 14, 2009). That Order reinstated the provisions of Order 3226, and recognized that the realities of climate change require us to change how we manage land, water, fish and wildlife, and cultural heritage and tribal lands and resources we oversee, and acknowledged that the Department of the Interior is responsible for helping protect the nation from the impacts of climate change. In Executive Order No. 13514, Federal Leadership in Environmental, Energy, and Economic Performance (Oct. 5, 2009), President Obama called on all federal agencies to measure, report, and reduce their
greenhouse gas emissions from direct and indirect activities.61 [61 74 Fed. Reg. 52,117 (Oct. 8, 2009) (emphasis added).]
This directive was followed by Executive Order No. 13693, Planning for Federal Sustainability in the Next Decade (March 25, 2015), which reaffirmed the federal governments commitment to reducing GHG emissions.62 [62 80 Fed. Reg. 15,871 (March 25, 2015).] On August 1, 2016, the White House Council on Environmental Quality issued Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews.63 [63 See Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews (Aug. 1, 2016) (hereafter CEQ Final Guidance).] The Final Guidance applies to all proposed federal agency actions, including land and resource management actions.64 [64 Id. at 9.] Notably, while CEQs final guidance post-dates the UFOs release of the Draft RMP, (draft guidance was published December 18, 2014), it is intended to facilitate compliance with existing NEPA requirements.65 [65 Id. at 1.] In other words, the Final Guidance is meant to emphasize BLMs existing legal obligations to disclose and consider the foreseeable effects that, for example, Federal coal leasing and development have on climate change.

Consistent with NEPA, Federal agencies should consider the extent to which a proposed action and its reasonable alternatives would contribute to climate change through GHG emissions, and take into account the ways in which a changing climate may impact the proposed action and any alternative actions, change the actions environmental effects over the lifetime of those effects, and alter the

overall environmental implications of such actions.66 [66 Id. at 9.] The responsibilities identified above can be properly implemented through effective use of NEPA. To comply with NEPA, the BLM must take a hard look at direct, indirect, and cumulative impacts.67 [67 40 C.F.R. 1502.16(a), (b); 1508.25(c).]

In evaluating impacts, the agency must discuss [e]nergy requirements and conservation potential of various alternatives and mitigation measures, [n]atural or depletable resource requirements and conservation potential of various alternatives and mitigation measures, and [m]eans to mitigate adverse environmental impacts . . . .68 [68 40 C.F.R. 1502.16(e), (f), (h).] This was not done in the Draft RMP. In a statement detached from the reality of climate change, the science used to understand it, and national policy meant to address it, the Draft RMP asserts: It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP. It is important to note that projected changes are likely to occur over several decades to a century. Many of the projected changes associated with climate change may not be measurably discernible within the reasonably foreseeable future. Existing climate prediction models are global or continental in scale; therefore, they are not appropriate to estimate potential impacts of climate change on the planning area. The current state of the science involves calculating potential quantities of greenhouse gases that may be added to the atmosphere from a particular activity. However, tools to analyze or predict how global or regional climate systems may be affected by a particular activity or activities within the planning area are not currently available. Assessing the impacts of greenhouse gas emissions on global climate change requires modeling on a global scale which is beyond the scope of this analysis. Potential impacts on climate change are influenced by greenhouse gas emission sources from around the globe and it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area.69 [69 Draft RMP at 4-40.] The BLM then concluded: The projected UFO planning area emissions are a fraction of the EPAs modeled sources and are shorter in duration, and therefore it is reasonable to conclude that these activities would have no measurable impact on climate, although the emissions would add incrementally to the global GHG loading burden.70 [70 Id]

This total disregard for any meaningful analysis in the Draft RMP equates to the BLM failing to tak informed action to address climate change, as required by Order 3226 and Order 3289. Furthermore, it signals a deep misunderstanding of the tools and methodologies for quantifying GHG emissions and comparing GHG quantities across alternative scenarios.71 [71 See CEQ Final Guidance at 11.] As stated in Order 3289, BLM must appl[y] scientific tools to increase understanding of climate change and to coordinate an effective response to its impacts, and management decisions made in response to climate change impacts must be informed by [this] science. Through statements meant to avoid any actual analysis, BLM fails to take a hard look at the climate impacts of coal leasing and development on public lands in the planning area, as required by NEPA and emphasized by CEQ.

As a starting point, the direct, indirect and cumulative impacts from burning the 829 million tons of recoverable coal in the Somerset Coal Field are undeniable.72 [72 Bureau of Land Management Uncompahgre Field Office, Coal Resource and Development Potential Report (April 2010), at 63.] Compare this with the comparatively small 172 million tons of coal that could be accessed and burned under the auspices of the North Fork Coal Area Exemption to the Colorado Roadless Rule.73 [73 See U.S. Dept. of Agriculture, Rulemaking for Colorado Roadless Areas, Supplemental Draft Environmental Impact Statement (November 2015).] The total gross accumulated GHG emissions from mining and burning that coal could range from approximately 449 to 486 million metric tons $CO_2$eq, depending up the production scenario,74 [74 Id. at 39.] with about 10% 15% of the total coming from methane emissions during coal mine production.75 [75 Id. at 37, Table 3-3.] Assuming average levels of coal production, mining and burning the coal in the North Fork coal mining area would likely result in an additional 28.1 million tons of $CO_2$eq into the atmosphere every year for 17 years. That is the equivalent of more than one-fifth of all human-caused climate pollution in the State of Colorado annually,76 [76 Id. at 48.] or three times the volume of annual carbon emissions from Colorados single largest climate pollution source, the Craig Station coalfired power plant.77 [77 See EPA, Facility Level Information on Greenhouse gasses Tool for Craig Station. Available at http://ghgdata.epa.gov/ghgp/main.do (last viewed Dec. 14, 2015).]

The GHG emissions from BLM actions in the planning area are significant. The UFO estimates annual direct emissions from BLM actions under the Uncompahgre RMP of 3,110,000 metric tons $CO_2$e, and maximum indirect emissions from BLM actions of 27,366,562 tons $CO_2$.78 [78 See Draft RMP at 4-39 (Table 4-10); DEIS at 4-42 (Table 4-11).] Such emissions would make a significant contribution to total emissions from federal lands, and contribute significantly to total U.S. emissions.79 [79 The Wilderness Society, Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters, February 2012, available at: http://wilderness.org/sites/default/files/FINAL%20STRATUS%20REPORT.pdf.] The Draft RMPs off-hand dismissal of climate change impacts and mitigation measures fails to satisfy the guidance outlined in Department of Interior policy, CEQ guidance, or the requirements of NEPA. Reasonable forecasting and speculation is . . . implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labelling any and all discussion of future environmental effects as crystal ball inquiry.80 [80 Save Our Ecosystems v. Clark, 747 F.2d 1240, 1246 n.9 (9th Cir. 1984 (quoting Scientists Inst. for Pub. Info., Inc. v. Atomic Energy Comm., 481 F.2d 1079, 1092 (D.C. Cir. 1973)).] In an effort to discount the significance of the GHG impacts of the BLMs actions under the UFO RMP, the BLM compares the emissions from the RMP to statewide greenhouse emissions, to the carbon dioxide emissions from a power plant in Montrose County, and to total U.S. 2008 greenhouse gas emissions. Such comparisons are unhelpful and misleading. As explained by the Council on Environmental Quality, these comparisons do not reveal anything beyond the nature of the climate change challenge itself:

[A] statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA. Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact. When considering GHG emissions and their significance, agencies should use appropriate tools

and methodologies for quantifying GHG emissions and comparing GHG quantities across alternative scenarios. Agencies should not limit themselves to calculating a proposed actions emissions as a percentage of sector, nationwide, or global emissions in deciding whether or to what extent to consider climate change impacts under NEPA.81 [81 CEQ Final Guidance, at 9.]

As CEQs Climate Change Guidance explains, although [c]limate change is a particularly complex challenge given its global nature and inherent interrelationships among its sources, causation, mechanisms of action, and impacts, it is a fundamental environmental issue, and the relation of Federal actions to it falls squarely within NEPAs purview.82[82 Id. at 2 (emphasis added).]  This is consistent with CEQs Cumulative Impacts Guidance, which calls on agencies to consider impacts on the global atmosphere.83[83 Council on Environmental Quality, Guidance on Cumulative Impacts (1997), at 16.] To suggest that the agency does not have to account for GHG pollution from coal development authorized by the RMP would be to suggest that coal development is not relevant to climate change. This flawed, reductive thinking is problematic, and is contradicted by the BLMs own management framework that requires an accounting of specific pollution sources to ensure that the broader public interest is protected. CEQ recognizes that many agency NEPA analyses to date have concluded that GHG emissions from an individual agency action will have small, if any, potential climate change effects.84 [84 CEQ Guidance at 9.] But government action occurs incrementally, and climate impacts are exacerbated by numerous smaller decisions. Therefore, the statement that emissions from coal leasing in the UFO planning area represent only a small fraction of global emissions is more a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether to consider climate impacts under NEPA. Moreover, these comparisons are not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations.85 [85 Id.] In short, every Alternative in the Draft RMP is designed to result in long-term coal mining. But while the BLM sustains and champions significant coal mining under the Alternatives, it fails to disclose the impacts of that increased mining in terms of climate change pollution. The reality of climate change is that it is caused by numerous, specific sources of GHG pollution. Therefore, for BLM to disavow itself of responsibility for these specific emissions, as it does in the Draft RMP, is to condemn us to the consequences of unabated GHG emissions.

The BLM Relies on Stale Data

NEPA mandates that EISs contain high quality information and [a]ccurate scientific analysis sufficient to help public officials make decisions that are based on understanding environmental consequences.86 [86 40 C.F.R.  1500.1(b), (c).] Agencies must affirmatively collect new scientific and technical information to support their hard look at impacts where available information is stale.87 [87 See Northern Plains Resource Council v. Surface Transportation Bd. 668 F.3d 1067, 1085---87 (9th Cir. 2011).]

To satisfy the hard look requirement of NEPA, the BLM must supplement its existing analyses when new circumstances raise significant new information relevant to environmental concerns . . . .88 [88 Portland Audubon Socy v. Babbitt, 998 F.2d 705, 708 (9th Cir. 2000).] An agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a hard look at the environmental effects of [its] planned actions.89 [89 Friends of the Clearwater v. Dombeck, 222 F.3d 552, 557 (9th Cir. 2000).] Federal courts have long held that agency reliance on data that is stale or inaccurate invalidates environmental review.90 [90 See, e.g., Northern Plains Resource Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1085-86 (9th Cir. 2011) (ten-year old survey data for wildlife too stale thus reliance on it in EIS was arbitrary and capricious); Lands Council v. Powell, 395 F.3d 1019, 1031 (9th Cir. 2005) (six year-old survey data for cutthroat trout was too outdated to carry the weight assigned to it and reliance on that data violated NEPA); Seattle Audubon Soc. v. Espy, 998 F.2d 699, 704-05 (9th Cir. 1993) (reliance on stale scientific evidence regarding owl population data without adequate discussion of scientific uncertainty violated NEPA).]

Yet in several important respects that relate to climate and socioeconomic impacts, the Draft RMP uses outdated evidence, despite having access to readily available information. Relying on antiquated data runs counter to basic NEPA requirements, and precludes the public from understanding the impacts of the alternatives and reasonable ways to avoid those effects.

Stale Climate Change Data

The Draft RMP almost wholly relies on data climate change data from 2010 or earlier, ignoring new science emphasizing the growing impacts from climate change, as well as new economic conditions reflective of the increasingly problematic connection between coal and climate change. For example, the Draft RMPs description of climate change in Chapter Three relies on three studies: an EPA study published in 2007 and two state studies published in 2008.91 [91 Draft RMP at 3-14  3-16.] The RMPs description of projected climate change in Colorado relies on a single study from 2008.92 [92 Id. at 3-26  3-27; 3-57.] To affirm that impacts from climate change are already occurring, the BLM relies on a 2009 report.93 [93 Id. at 3-93.]

The information in Chapter Four is little better. It describes potential GHG emissions based on EPA reports from 2010  2012, and dismisses the relative level of direct GHG emissions from activities in the planning area based on a discredited EPA letter from 2008.94 [94 Id. at 4-38  4-40.] In its discussion of the cumulative impacts of climate change in the project area, the BLM relies on studies published between 1996 and 2010.95 [95 Id. at 4-125.] The Draft RMPs brief look at methane emissions exemplifies its reliance on outdated science, and how that misplaced reliance can falsely minimize impacts analysis. The Draft RMP uses a scientifically stale warming potential of 21 for methane on the basis, presumably, of the Intergovernmental Panel on Climate Changes (IPCCs) 1996 Second Assessment Report (AR2).96 [96 Intergovernmental Panel on Climate Change, Second Assessment Report (1996).Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016).]

 Even though EPA has since taken action to update methanes warming potential based on the Fourth Assessment Report (AR4),97 [97 Intergovernmental Panel on Climate Change, Fourth Assessment Report (2007). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016).] wherein methanes 100-year warming potential is measured at 25, the Draft RMP adopts EPAs obsolete warming potential of 21.98 [98 Draft RMP at 4-38.]

 Moreover, the IPCC has issued a new report, the 2013 Fifth Assessment Report (AR5), which supersedes its previous reports. The IPCC AR5 explains that methane, over a 100-year time frame and accounting for climate-carbon feedbacks, is 36 times as potent as carbon dioxide, not 21 or 25.99 [99 IPCC, Climate Change 2013: The Physical Science Basis, Working Group I Contribution to the Fifth

Assessment Report of the Intergovernmental Panel on Climate Change, at Ch. 8, p. 714, Table 8.7 (2013). Available at www.climatechange2013.org/ (last viewed October 20, 2016).]
 The data utilized and conclusions drawn in the Draft RMP are stale to the point that they do little to aid the publics understanding of the relationship between coal mining and the affected landscape, climate or socioeconomics.

In 2011, the U.S. Court of Appeals for the Ninth Circuit in Northern Plains Resource Council v. Tongue River Railroad addressed the duty of federal agencies to gather baseline data during the NEPA process.100 [100 Northern Plains Resource Council v. Tongue River Railroad, 668 F.3d 1067, 1083-85 (9th Cir. 2011).] The court found that [r]eliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious.101 [101 Id. at 1086.] Like the agency in Northern Plains, the BLM here cannot to rely on old and generalized data in considering the impacts from coal leasing and development. There is abundant data that has been generated over the last four years concerning most facets of the climate change issue, yet no new information since 2012 is included or cited in the Draft RMP. Any subsequently prepared NEPA document must include and refer to this data. Stale Coal Production and Employment Data To understand the nature of GHG emission impacts on the environment, the BLM must first quantify the amount of emissions that result from the various alternatives. But to quantify the GHG pollutants attributable to the UFO RMP management scheme, the BLM must first accurately project the volume of coal that the RMP would make available that otherwise would remain in the ground. Unfortunately, the production forecasts and scenarios in the BLMs analysis are stale and not indicative of current or anticipated future output. Since 2010 (the date of much of the Draft RMPs coal production data  see below), much has changed in national and international coal markets in general, and to mines in the North Fork Valley in particular.
Some of the most significant developments include:

? the closure of the Elk Creek mine in 2013, its demolition in 2016, and the layoff of virtually all of its employees;102 [102 D. Webb, Oxbow shifts to permanent shutdown of Elk Creek Mine, Grand Junction Sentinel (April 30, 3016). Available at http://www.gjsentinel.com/news/articles/oxbow-shifts-to-permanent-shutdown-of-elk-creek-mi (last viewed October 20, 2016).]

? the idling of the Bowie No. 2 mine in February 2016, and the layoff of most of its employees;103 [103 D. Webb, Bowie idles Paonia mine, Grand Junction Sentinel (Feb. 26, 2016). Available at http://www.gjsentinel.com/breaking/articles/bowie-idles-paonia-mine (last viewed October 20, 2016).]

? layoffs and production declines at the West Elk mine in 2016 from continuing challenges in domestic and international coal markets;104 [104 D. Webb, West Elk Mine undergoes layoffs, Grand Junction Sentinel (June 2, 2016). Available at http://www.gjsentinel.com/breaking/articles/ west-elk-mine-undergoes-layoffs (last viewed October 20, 2016).] and

? the announcement that the Nucla coal mine, and the power station it serves, will close in 2022.105 [105 G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 20, 2016).] These market conditions are unlikely to improve, due to low natural gas prices, the increasingly competitive pricing of wind and solar energy, and international commitments to address climate change. In fact, a coal company executive recently predicted that mines in Colorado and Utah would be shipping zero coal west for export by 2030 due to deteriorating overseas markets and because West Coast states are moving swiftly toward a renewable energy future.106 [106 C. Coates, Murray Energy CEO sees end of westbound Uinta coal by 2030, SNL (June 10, 2016). Available at https://www.snl.com/InteractiveX/articleabstract.aspx?id=36796676&KPLT=8 (last viewed June 28, 2016).] As a result of these changes, employment and production in the Somerset coal field has fallen dramatically since 2010, as the table below indicates:
Coal Production and Employment, Somerset Coal Field and Colorado, 2010 and 2016 [See Table in PDF]

The Draft RMPs data, much of it dating back to 2010 or older, is especially stale in light of dwindling coal production and employment in the Somerset Coal Field. As a result, the RMPs assumptions and conclusions are misplaced. For example, much of its coal conclusions derive from a BLM document entitled Coal Resource and Development Potential, dated April 2010.107 [107 See, e.g., Draft RMP at 4-13 (citing the report to reach conclusions about predicted coal production).] Similarly, the BLM relies on the July 2010 Socioeconomic Baseline Assessment Report, which, for coal resources, again relies on outdated coal data from 2009 and before that paints an exceedingly optimistic picture of the importance and value of coal to the local economy in the future.108 [108 Id. at 3-178.]

Over six years of data are available for the agency to consider, data which reveals upheaval in the national coal industry and for coal field mines in the UFO planning area in particular. Any subsequently prepared NEPA document must include up-to-date data concerning coal markets, coal production and coal employment.

The following data and conclusions are stale given the changes in the local coal industry:

? The Draft RMP uses production averages from June 2014 and June 2015,109 [109 Id. at 3-126,] though an additional 13 months of data exist demonstrating a steep drop in production since last year.The Draft RMP assumes a coal production rate of 9 to 11 million tons per year,110 [110 Id. at 4-255.] which is well above the permitted level of the West Elk mine, the only remaining operating mine in the area.111 [111 See also id. at 4-289  4-290 (Over the last six years, total yearly production for these underground coal mines have been between 8 and 11 million tons, and is expected to remain about the same).]

? The Draft RMP states that projections from the Energy Information Administration indicate that demand for Somersets compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorados coal, citing 2010 data.112 [112 Id. at 3-126  3-127] Production of coal from Colorado mines fell 41% in the first half of 2016 compared to the same period in 2015.113 [113 D. Worthington, Colorado coal production down 42 percent for first six months of 2016, injuries up 20 percent,Denver Post (August 3, 2016). Available at http://www.denverpost.com/2016/08/03/colorado-coal-production-2016-down-42-percent/ (last viewed October 26, 2016).]

BLM_0148741

The states Division of Reclamation Mining and Safety reported that Colorado mines produced 5.73 million tons of coal in the first six months of 2016, compared to 9.80 million tons in the first half of 2015.114 [114 id.]
Colorados drop is consistent with, but larger than, the national trend.
The EIA estimates that 2016 total U.S. coal production through July 23 was down 26% compared to the same period in 2015.115 [115 Id.]

? The Draft RMP cites EIA data indicating coal production contributes nearly $400 million annually based on the local production of over 12 million tons of coal from the region.116 [116 Id. at 3-193  3-194. See also BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-18 (containing same assumptions and conclusions).]
 In 2016, the Somerset field provides less than a quarter of Colorados coal, and production has fallen by three-quarters.

? The Draft RMP bases its socioeconomic analysis on assumptions about the level of coal
production that appear to be far higher than current levels: Approximately 13.8 million tons of coal would be mined in the planning area in Delta, Gunnison, and Montrose Counties in 2012, with approximately 13.1 million tons of that being federal coal (see Table 4-89 [2012 Coal Extraction Levels]). Coal contributions to employment and income from these uses would annually provide approximately 2,018 jobs and over $175 million in labor income, with these figures increasing to 50,350 jobs and over $3.5 billion in labor income over the expected 20 year lifespan of the RMP.117 [117 Id. at 4-468.] Similarly optimistic assumptions are contained in the BLMs 2010 Socioeconomic Baseline report.118 [[118 See BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-6; 2-17.] These critical economic assumptions are outdated and inaccurate; the annual rate for coal production in 2016 is well under three million tons, and employment has dropped by roughly 75% since 2012. Nearly 1,000 miners worked three active coal mines in the Somerset field in 2012;119 [119 See DRMS coal production and employment data for 2012, available at http://mining.state.co.us/SiteCollectionDocuments/2012RevisedDetail2013.pdf (last viewed October 20, 2016).] today that number is less than 250.

? The Draft RMP describes the Bowie #2 mine as actively producing, and suggests that the Elk Creek mine may someday resume production.120 [120 Draft RMP at 3-125. See also id. at 4-11  4-12 (making similar statements); id. at 4-258  4-259 (same).] But Bowie #2 is idle, and Elk Creek is permanently closed.

? The Draft RMP also appears to assume that the New Horizon mine will continue to produce coal at its current rate indefinitely,121 [121 Id. at 4-289  4-290] although its operator agreed to close it in 2022.122 [122 Id. at 4-289  4-290G. See Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-toclose-coal-mine-will-sh (last viewed October 26, 2016).]

? The Draft RMP makes assumptions about coal mining rates to address potential impacts to natural resources. For example, it predicts an increase in impacts to some natural resources because coal mining, among other activities, is becoming more active once again and energy and mineral resources are expected to increase over time, likely resulting in increasing demand for extraction.123 [123 Id. at 3-41.] While some mineral extraction may be increasing, coal is falling compared to historic levels.

? To address air quality impacts, the Draft RMP assumes that Coal mine production remains unchanged from base year rates with any drop off in existing mine production replaced by production from future mine development in the area.124 [124 Id. at 4-28.]
In the base year of 2011,125 [125 See id. at 4-20)] Colorado produced 27 million tons of coal, more than twice as much as it is likely to produce this year, and Somerset coal field mines produced 11 million tons, about four times their likely output this year.

Thus, the Draft RMPs assumption that coal production rates are unchanged from 2011
are false. The fact that the BLM relies on stale data is significant because it distorts the agencys analysis of both climate impacts and economic values. Assuming an inflated value for coal production and employment in the future misrepresents the economic health and long-term viability of this industry. Similarly, relying on stale climate data diminishes our understanding of the relationship between UFO-sanctioned
coal management and climate change. Given deteriorating market conditions and the urgent need to transition away from coal combustion, it is imperative that the BLM provide accurate information.

BLM Fails to Consider the Social Cost of Carbon

Research conducted by the National Research Council has confirmed the fact that the negative impacts of energy generation from fossil fuels are not represented in the market price for such generation.126 [ 126 See, e.g., National Research Council, Hidden Costs of Energy: Unpriced Consequences of Energy Production and Use (2010); Nicholas Muller, et. al., Environmental Accounting for Pollution in the United States Economy, AMERICAN ECONOMIC REVIEW (Aug. 2011); see also, Generation Investment Management, Sustainable Capitalism, (Jan. 2012) (advocating a paradigm shift to a framework that seeks to maximize long-term economic value creation by reforming markets to address real needs while considering all costs and stakeholders.).] In other words, failing to internalize the externalities of energy generation from fossil fuelssuch as the impacts to climate change and human healthhas resulted in a market failure that requires government intervention. Executive Order 12866 directs federal agencies to assess and quantify such costs and benefits of regulatory action, including the effects on factors such as the economy, environment, and public health and safety, among others.127 [127 See Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993).See also Executive Order 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011) (reaffirming the framework of EO 12866 and directing federal agencies to conduct regulatory actions based on the best available science).]

The Ninth Circuit has ruled that agencies must include the climate benefits of a significant regulatory action in federal cost-benefit analyses to comply with EO 12866.

[T]he fact that climate change is largely a global phenomenon that includes actions that are outside of [the agencys] control ... does not release the agency from the duty of assessing the effects of its actions on global warming within the context of other actions that also affect global warming.128 [128 Ctr. for Biological Diversity v. Natl Highway Traffic Safety Admin., 538 F.3d 1172, 1217 (9th Cir. 2008) (quotations and citations omitted); see also Border Power Plant Working Grp. v. U.S. Dept of Energy, 260 F. Supp. 2d 997, 1028-29 (S.D. Cal. 2003) (finding agency failure to disclose projects indirect carbon dioxide emissions violates NEPA).]

In response, an Interagency Working Group (IWG) was formed to develop a consistent and defensible estimate of the social cost of carbon (SCC)allowing agencies to incorporate the social benefits of reducing carbon dioxide (CO2) emissions into cost-benefit analyses of regulatory actions that impact cumulative global emissions.129 [129 See Interagency Working Group on the Social Cost of Carbon, United States Government, Technical Support Document: Technical Update on the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 (May 2013) at 2 (hereinafter 2013 TSD).]

In other words, SCC is a measure of the benefit of reducing greenhouse gas emissions now and thereby avoiding costs in the future.130 [130 See Ruth Greenspan and Dianne Callan, More than Meets the Eye: The Social Cost of Carbon in U.S Climate Policy, in Plain English, WORLD RESOURCES INSTITUTE (July 2011).']

The agencys obligation to analyze the costs associated with GHG emissions through NEPA was directly affirmed by the court in High Country Conservation Advocates v. U.S. Forest Service, 52 F.Supp.3d 1174 (D.Colo. 2014) (a decision the agency decided not to appeal, thus implicitly recognizing the importance of incorporating a social cost of carbon analysis into NEPA decisionmaking). In his decision, Judge Jackson identified the IWGs SCC protocol as a tool to quantify a projects contribution to costs associated with global climate change.131 To fulfill this mandate, they agency must disclose the ecological[,] . . . economic, [and] social impacts of the proposedaction.132 [131 the b. at 1190. See also id. at 18 (noting the EPA recommendation to explore other means to characterize the impact of GHG emissions, including an estimate of the social cost of carbon associated with potential increases in GHG emissions.) (citing Sarah E. Light, NEPAs Footprint: Information Disclosure as a Quasi-Carbon Tax on Agencies, 87 Tul. L. Rev. 511, 546 (Feb. 2013)).]

[ 132 40 C.F.R.  1508.8(b)] Simple calculations applying the SCC to GHG emissions from this project offer a straightforward comparative basis for analyzing impacts, and identifying very significant costs.133 [133 It is important to note that, although the 2010 IWG SCC protocol did not address methane impacts, the 2013 IWG Technical Update explicitly addresses methane impacts. Thus, it is appropriate to calculate a SCC outcome that takes into account the full CO2e emissions associated with the proposed leasing.]

As noted by Judge Jackson, the SCC protocol provides a tool to quantify the costs of these emissions.134 [134 See High Country Conservation Advocates, 52 F.Supp.3d at 1190.] By failing to consider the costs of GHG emissions from the Proposed Action, the agencys analysis effectively assumes a price of carbon that is $0.135 [135 See id. at 21 (holding that although there is a wide range of estimates about the social cost of GHG emissions[,] neither the BLMs economist nor anyone else in the record appears to suggest the cost is as low as $0 per unit. Yet by deciding not to quantify the costs as all, the agencies effectively zeroed out the cost in its quantitative analysis.).] The agencys failure to consider the SCC is arbitrary and capricious, and ignores the explicit directive of EO 12866.

Conclusion

Any subsequent "hard look" at impacts from coal leasing and development should include a range of alternatives with varying degrees of environmental protections. These alternatives should be consistent with comments provided herein, and include a "no lease" alternative that would leave coal in the ground. HCCA requests that the agency specifically consider an alternative that would withdraw the planning areas coal from operation of the public lands laws, including the Mineral Leasing Act, and that would remove these resources from their availability for lease or other extractive activity.136 [136 See 43 U.S.C.  1712, 1714.]

Thank you for your consideration of these comments.
Sincerely,
Matt Reed
Public Lands Director
High Country Conservation Advocates
PO Box 1066
Crested Butte, CO 81224
(303) 505-9917
matt@hccacb.org

11/1/2016                              DEPARTMENT OF THE INTERIOR Mail - Draft Resource Management Plan Comments



                                                                    **UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

# Draft Resource Management Plan Comments
1 message

**Brent Helleckson** <brent@stonecottagecellars.com>                         Tue, Nov 1, 2016 at 1:45 PM
To: uformp@blm.gov

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision Team

Thank you for the opportunity to comment on the Draft Resource Management Plan (DRMP).

Terror Ditch and Reservoir Company (TDRC) remains opposed to oil and gas development in the watershed of Terror Creek, a tributary to the North Fork of the Gunnison.

The BLM preferred alternative, alternative D, opens nearly all of the North Fork watershed to oil and gas exploration and development (DRMP at 2-409). While the underlying assumption is a well count of 1,271 throughout the UFO region by the year 2030 (DRMP at 3-14), statements by the energy companies currently operating in the North Fork, on lands already leased by the BLM, exceed that number by a factor of 2 to 3. This is in advance of the recent USGS study identifying the Mancos Shale as a likely significant gas resource. Therefore, offering nearly all of the North Fork watershed as available for oil and gas leasing virtually guarantees the industrialization of that watershed, including the Terror Creek watershed. While the specifics of each well will be unique, the commonly accepted impacts include multiple millions of gallons of water per well, multiple thousands of truck trips per well, multiple millions of gallons of produced waste per well and multiple miles of roadway per well pad. No reasonable person could claim that the current rural/arboreal landscape would suffer "no significant impact" from such a change of use. The DRMP admits as much at page 3-176.

The farms that are stockholders in TDRC depend upon the reliable availability of clean irrigation water, stock water and domestic water. Industrial development of the scale proposed by the DRMP and the preferred alternative poses significant, unmitigated risks to each.

The Denver Post reports that over the last 3 years, the oil and gas industry has reported nearly 2 spills per day or nearly 700 per year, all of which had the potential to contaminate surface water and 15% of which did contaminate ground water. As the State relies on self-reporting by industry, this number must be assumed to be a lower bound. At the scale of development proposed by the DRMP preferred alternative, the North Fork watershed should expect similar spill activity. Multiple thousands of truck trips per well, many of which carry hazardous or noxious chemicals, will likely add to this number. This is yet another example of a risk/cost that is tacitly expected to be borne by the residents down gradient of the oil and gas extraction activity in support of the profitability of the industry and the revenue streams of various governmental agencies. The absence of viable mitigation measures, the absence of mechanisms to compensate affected entities and penalize responsible parties argues for the realization that the proposed development in the preferred alternative is incompatible with existing uses and with the BLM mandate to manage for multiple use and sustained yield. Further it argues for a "no leasing in the North Fork watershed" option.

Contamination of ground water by oil and gas development, hydraulic fracturing, and associated activity is well documented and of great concern. Although there is little or no data specific to Colorado or specific to the Terror Creek drainage, Ingraffea et. al., prominent researchers on the effects of oil and gas development, estimate the failure rate of gas well bores to be between 7% and 60%, depending upon the age of the well. Further they describe, "Fluid migration from faulty wells is a well-known chronic problem with an expected rate of occurrence." Should such scientific evidence be supported under North Fork conditions, the extremely conservative estimate in the DRMP of 1,271 wells provides that something like 90 wells would begin leaking shortly after completion and nearly 800 wells might be expected to leak over multiple decades. These wells would leak not only methane but also the 40% to 75% of the fracking fluid volume used to produce the methane. For reasons described earlier, the number of wells in the North Fork is expected to be much higher than that assumed in the DRMP, thereby increasing the expected number of failed wells by a similar factor.

The topology of the watershed introduces another risk not addressed either in the scientific literature or in the DRMP. In order for the efficient exploitation of the natural gas resource to occur, wells must be drilled on a grid pattern within the bearing strata such that the horizontal portions of one well cluster meet or nearly meet the horizontal portions of an adjacent cluster. The fracturing operation would be expected to open pathways such that trapped gas might find its way to one or the other well bore and migrate to the collection system. This communication between horizontal well bores provides a pathway for water accumulating in a failed well bore of higher elevation to establish hydrostatic pressure in an adjacent well bore. Should that well bore fail and should it exit the surface at a lower elevation than the first, the result may well be a man-made toxic spring spewing fracking fluid, methane, and other chemicals and radioactive material dissolved in the gas-bearing strata. The resulting effect is reminiscent of the "Gold King" fiasco in Durango Colorado or the on-going struggle in the watershed above Crested Butte to contain and treat mine outflow from the Keystone Mine. The latter requires a million dollar per year treatment plant to be operated indefinitely.

The sum total of groundwater protection measures defined in the DRMP preferred alternative seems to be found on page 2-47 with an exhortation for companies to extend casings through the aquifer and use freshwater mud for drilling. This is wholly inadequate for the risks involved. Again the residents of the North Fork and the shareholders of TDRC are being tacitly forced to bear the cost of well-bore failures. The absence of any analysis of well bore failures and their effects, any proposed long term mitigation, or any method to assign responsibility, and funding, for the long-term monitoring and remediation of well bores argues that the proposed development embodied in the DRMP preferred alternative is incompatible with existing enterprise in the Valley and incompatible with the BLM mandate for multiple use and sustained yield. It also argues for a "no leasing in the North Fork watershed" alternative.

Wastewater generated during hydraulic fracturing operations is commonly disposed of in injection wells. Several such wells are already proposed for the North Fork watershed. The link between wastewater disposal wells and earthquake exacerbation is now well established in Oklahoma and in Ohio. Further, experiments with similar disposal techniques on the Rocky Mountain Arsenal outside of Denver in the 1960's

BLM_0148744

and 70's produced similar results, i.e. an activation of faults beneath Denver and the Front range. The geology of the North Fork is replete with fault zones, fractures, etc. Highway 133 has experienced multiple, extended closures due to rockslides in the past several years. Indeed, the DRMP identifies 683 movement features (e.g. rockslides, debris flows, debris slides, etc.) between Paonia and McClure Pass (DRMP at 3-178). The increased seismic activity resulting from oil and gas operations can be expected to increase the disturbance of these movement features. TDRC expends significant money each year to clear our conveyance system of rockfall and slides. We also monitor a slide above our reservoir yearly to assure that no motion is occurring. The dam retaining our reservoir water has recently been reclassified to reflect the increased risk of damage to new downstream development, should a dam failure occur. Increased seismicity presents an immediate increase in risk and likely increase in direct cost to TDRC for insurance, monitoring and compliance. Further, increased seismic activity must almost certainly be correlated to increased well bore failure, exacerbating the issues outlined in the previous section.

The geologic character of the North Fork watershed make it uniquely susceptible to induced seismicity and again argues for a "no leasing in the North Fork watershed" alternative.

As mentioned previously, at the shareholders of TDRC rely exclusively on the timely availability of clean irrigation water. That can only be accomplished via a healthy, vegetated watershed. Multiple years of drought combined with increasing temperatures have stressed the Terror Creek watershed in multiple ways. Sudden Aspen Decline, a drought and temperature-induced dieback of aspen groves, has caused a decline in the shadowing protecting the snowpack in mid to late spring. The resultant early runoff occurs at a time when farms are not able to use the runoff water to irrigate, The reservoirs fill as they should but are tapped earlier because the runoff water is no longer available when crops are ready to use it. Various beetle infestations threaten to decimate the conifer cover of higher elevations in the watershed, again contributing to snowpack degradation and early runoff. The level of development inherent in the DRMP preferred alternative further exacerbates the degradation of the watershed by road construction, well pad development, pipeline construction and dust. In addition to directly contradicting the DRMP goal of minimizing habitat fragmentation, the DRMP preferred alternative passes the cost of energy extraction on to the shareholders of TDRC in the form of decreased irrigation water supply. There is no mitigation for the construction of the infrastructure necessary to support the development scenario likely to occur as a result of the DRMP preferred alternative. This again argues for the adoption of a "no leasing in the North Fork watershed" alternative.

The DRMP explicitly acknowledges the fact of climate change (DRMP at 3-15). The effects of climate change will likely increase the amount of land in the North Fork that fails to fully meet the land health standard from the current approx. 50% to something significantly more than 50% (DRMP at 3-18). The effects of climate change are already being felt at the individual farm as lower than typical snow pack, warmer and earlier spring thaws, earlier bud break, warmer summertime highs, warmer falls, etc. As mandated by the Council on Environmental Quality, the BLM must begin to assess the contribution of its actions to climate change and, by extension, to avoid them where possible. When finding oneself in a hole and wishing to get out, the first step is to stop digging. When tasked with combating climate change the first step is to reduce the production of greenhouse gasses and the first places that should be removed from production are those with the highest risk of damage to non oil and gas resources and enterprises. The Terror Creek watershed is certainly one of those places and should be protected with a no leasing alternative.

The development inherent in the DRMP preferred alternative is incompatible with the existing mandate of the BLM and incompatible with the existing uses of the lands under your management. In stark contrast to the stated mission of the BLM, the preferred alternative will degrade the health, diversity and productivity of public lands and will curtail the use and enjoyment of present and future generations. It will result in neither multiple use nor sustained yield. It will force the costs of energy extraction onto the residents of the North Fork and the shareholders of Terror Ditch and Reservoir Company in multiple ways, supporting the profitability of the oil and gas industry and the tax, royalty and severance income of multiple governmental agencies at the expense of those of us who live here.

We Strongly urge the BLM to adopt a no fluid mineral leasing policy for the North Fork of the Gunnison as a whole and for the Terror Creek watershed in particular.


Board of Directors
Terror Ditch and Reservoir Company

Brent Helleckson, Secretary

BLM_0148745



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Draft Resource Management plan comments.
1 message

**Katie Klingsporn** <katie.klingsporn@gmail.com>                    Tue, Nov 1, 2016 at 4:58 PM
To: uformp@blm.gov

Please see the attached comments.

Best,
Katie Klingsporn

---

📄 **RMP comments.docx**
144K

BLM_0148746

Nov., 2016

Acting Field Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave
Montrose, CO 81401

Submitted electronically via email to uformp@blm.gov

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-Uncompahgre Field Office Staff and RMP Comment Team,

Thank you for this opportunity to comment on the Draft Resource Management Plan
(RMP) for the Uncompahgre Field Office of the BLM. I am a resident of Norwood but
have lived in the Telluride area for a decade.
The lands managed by the BLM within the Uncompahgre Field Office include many
places that I personally care about, and regularly visit. They are critical for the health and
happiness of me and of my community—they are where we recreate, where we relax, and
where we find opportunities for exercise, joy, solitude and solace. Our public lands both
shape and represent our identity as a community. In large part, they are why many of us
have chosen to live here.
At the same time, with nearly 500,00 visitors per year coming to these public lands, they
are a critical resource that drive the dominant economy of our region, tourism.
My quality of life and my identity, but also my livelihood depends on maintaining the
beauty, integrity, and diversity of these unique landscapes. Despite a long history of
extractive use, Telluride has been able to successfully transition to a tourism-driven
economy based on sustainable use of these lands that surround us. The income our
visitors have brought in has even enabled us to start cleaning up the legacy of scarred
land and toxic drainage that mining left behind. We do not want to move backward in
time.
While grazing, oil and gas leasing, and other forms of resource development are also
significant and historic uses on lands in the UFO, I ask you to consider as well the much
more significant revenue generated in tourism every year in Telluride. Conversely,
protection of terrestrial and riparian habitats through means such as the Ecological
Emphasis Areas, Special Recreation Management Areas, Areas of Critical Environmental
Concern, Lands with Wilderness Characteristics identified in Alternative B will serve to
strengthen our economy, improve our resilience, and provide our visitors and residents
with high-quality outdoor experiences.
However, out of the 42,150 acres found in the Conservation Alternative to have
wilderness characteristics, only 18,320 are included in the BLM Preferred Alternative.
Areas like Shavano Creek, Atkinson Breaks, and the Dolores Canyon WSA-adjacent area
should all be included with the other LWCs in Alternative D, as they each possess
qualities of solitude, outstanding views, or other attributes that would not be sufficiently
protected by lower levels of protection.  Lands that are managed for their wilderness

characteristics have a host of other benefits, including air, water, and soil protection, wildlife habitat, and reduction in sound and light pollution.

Similarly, only 51,320 acres of the 215,840 acres of recommended ACECs in Alternative B were recommended in the Preferred Alternative. Significant omissions include the East and West Paradox ACECs, as well as the Coyote Wash ACEC, the La Sal Creek ACEC, and the Tabeguache Pueblo and Tabeguache Cave ACECs. Both East and West Paradox ACECs, (as well as the Paradox Rock Art ACEC, which is included) have irreplaceable cultural resources that could easily be degraded through mineral development or improper management. Specifically, these ACECs have "rare northern extent Anasazi rock art" and signs of occupation that show a relationship between the Fremont and Anasazi cultures. They are significant at local, regional and national levels, holding importance for Native American people and our larger national story and identity.

I commend the BLM for creating Special Recreation Management Areas as an important tool for protecting the many places throughout this field office where recreation abounds. Unfortunately, the Paradox Extensive Recreation Management Area included in Alternative D does not contain sufficient protections for the conservation and recreational values contained in this section of land. Only the Paradox Special Recreation Management Area outlined in Alternative B (for the purposes of rock climbing, hiking, biking, and camping) would provide for some of the protections (such as withdrawal from or limitation to oil and gas, coal, and mineral leasing of all types) that this area is worthy of. This is an area that receives consistent use by recreationalists. Many young people have learned to climb on the short pitches and excellent rock of what is locally known as "Atomic Energy Crag." In addition, an SRMA in this area would help protect the outstanding scenic and historical values of the confluence of the Dolores and the San Miguel, the "Hanging Flume," relics of uranium mining, and fanstastic views of the San Juans and La Sals.

In general, the mere 3% of lands in Alternative D that are currently to be managed as "quiet use" should be expanded—the majority of recreation in this area is non-motorized, and an expansion of these areas through careful travel management planning would help to protect recreational and habitat values, and reduce user conflict.

I support the Wild and Scenic suitability findings of the Draft RMP, and ask the BLM to protect the 104.6 miles of these sections as wild and freeflowing rivers. The SW Resource Advisory Council, which helped to come up with these suitable reaches on the San Miguel and the Dolores Rivers, facilitated an extremely inclusive, collaborative process, that brought together user groups from across the board. Wild and Scenic suitability is an important tool for protecting our water resources for drinking water, ecological function, and many other uses. As a headwater community, these values are no less important for us; we recognize that every deficiency in downstream water quality and quantity also affects us. Therefore, I additionally support all of the Ecological Emphasis Areas, Special Recreation Management Areas, and ACECs proposed along the San Miguel River and Dolores River Corridors in Alternative B. Layered protection of the rivers and their terrestrial surroundings is critical in an era of increasingly scarce water resources.

Under current management plans, approximately 95% of BLM-managed mineral estate in the UFO is available for oil and gas leasing. This is deeply concerning given the fact that

BLM_0148748

much of this land lacks significant and commercially viable fluid mineral resources. At the same time, management for leasing impairs the other important values that these lands possess, such as wildlife habitat, recreation opportunities, and conservation. Oil and gas leasing maps need to be redrawn to reflect current values and climate change science, not speculative possibilities for future development or historical mineral interests. Recreation is a far more sustainable driver of local economies than the boom and bust cycles of resource extraction. Current uranium prices do not support the sort of mineral leasing proposed in Alternative D, nor will they ever, if a thorough accounting is made for the remediation costs that are so often eliminated from economic valuations. The last thing we need is to further compromise our air and water with yet more sources of contamination, compounding the health burden already placed on our people and ecosystems by the thousands of abandoned mining claims that continue to leak toxic runoff into our rivers and streams. Instead, the BLM should be supporting sustainable, diversified local economies.

The West End of San Miguel County is struggling socioeconomically, but resource extraction cannot provide a long-term solution to the problems that these communities face. The fact that the BLM Alternative D continues to outline extensive areas for potential coal leasing highlights the fact that much of the information it is working off is out of date. Current climate change directives, enacted at the federal level, require that public agencies such as the BLM account for climate change mitigation and adaptation in their planning, policy, and operations.

Unfortunately this Draft RMP does not incorporate current science or policy in any of its alternatives. Even Alternative B would open up 494,580 acres to fluid mineral leasing. Alternative D would leave 627,290 acres, or 95% of the mineral estate open to fluid mineral leasing, an insignificant reduction from the current plan, which leaves 631,580 open.

Finally, our health as a community is tied into the resilience of our region as a whole. For this reason, I support the North Fork Alternative (B.1). This is a community-generated plan that received broad support from a diversity of interests, from farmers and ranchers to conservationists. The North Fork Alternative is an excellent example of the way in which federal land agencies can empower local communities to take an active role in determining the future of their local environment. Furthermore, much of the fresh, organic food that is served in Telluride's top-notch restaurants come from the verdant fields and orchards of the North Fork Valley. An increase in oil and gas leasing in this area—particularly in fracking—would have direct impacts on the safety and reputation of our food sources.

Our community depends on thoughtful management and strong public lands protections for into the future. I thank you for considering my comment on the Draft Resource Management Plan of the Uncompahgre Field Office of the BLM.

Sincerely,

Katie Klingsporn

BLM_0148750

11/1/2016                                         DEPARTMENT OF THE INTERIOR Mail - Fwd: Plan comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Fwd: Plan comments
1 message

---

**Mark and Robbie LeValley** <tlazytbarnone@gmail.com>                    Tue, Nov 1, 2016 at 6:33 PM
To: UFORMP@blm.gov

---

———— Forwarded message ————
From: **MDaemon at blm.com** <MDaemon@blm.com>
Date: Tuesday, November 1, 2016
Subject: Plan comments
To: tlazytbarnone@gmail.com


uformp@blm.com - no such user here.

: Message contains [1] file attachments



--
*Robbie LeValley*

---

📄 **LeValleyRanchcommentsUFORMP2016.docx**
26K

BLM_0148751

November 1, 2016


LeValley Ranch

P.O. Box 835

Hotchkiss, CO  81419


RMP Project Manager

2465 South Townsend Avenue

Montrose, CO  81401

UFORMP@blm.gov

RE:  Resource Management Plan Comments

Project Manager,

LeValley Ranch and Mark, Robbie and Hank LeValley supports Alternative C for the Uncompahgre Field Office Resource Management Plan and submit the following comments.

Alternative C also provides a greater separation between broad requirements and site specific issues that should only be addressed during the review of proposed site specific activities.  Alternative C, therefore, allows for greater flexibility for the public and the BLM to address and regulate those sight specific requirements through various then current permitting processes.

The few portions of Alternative C that _____ believes should be changed or removed noted below and identified by the page and corresponding line number in Table 2.2 (Description of Alternatives) in Chapter 2 of the proposed RMP.

BLM_0148752

**Table 2.2 Description of Alternatives**

- **Land Health**
  - **Page 2-25, Line 24,** Given the lower precipitation rate over the entire UFO resource area, it is more realistic to manage for upward trend for land health
  - **Page 2-27, Line 26,** add recreation to actions that can cause land health problems
- **Vegetation**
  - **Page 2-53, Line 71,** add livestock grazing where the language describes uplands to support big game species habitat and fuels reduction given the threats listed for Gunnison Sage grouse
  - **Page 2-62, Line 89,** add threatened and endangered species for weed control treatments
- **Special Status Terrestrial Wild Life**
  - Designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive. Habitats at site specific locations would be addressed during the application for a specific activity.
  - **Page 2-95, Line 152,** designate defined habitats as *species occupied* habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive.
  - **Page 2-102-105, Line 161-167,** Gunnison Sage Grouse, see comment regarding Gunnison Sage Grouse plan amendment.

- **Recreation and Visitor Services**
  - **Page 2-243, Line 395,** the mental benefits section does not belong in a RMP. This language opens the BLM up to additional litigation and undoes process. Who determines what creates the well-being and happiness of an individual.
- **Ecological Emphasis Areas**
  - The UFO RMP calls out 12 areas as Ecological Emphasis Areas for the basis of unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors. In researching FLMPA and other BLM legal documents, Delta County can find no legal basis for Ecological Emphasis Areas (EEAs). Additionally, the RMP specifically calls out the multiple use mandate of the BLM as causing habitat fragmentation. Multiple use and sustained yield are the reason BLM lands were set aside and continue to be managed for today. This is especially troubling when cross referencing the livestock grazing language in an EEA. EEAs appear to be a way to designate defacto Wilderness Study Areas without going

through the extensive studies and public process.  This designation is not backed up by any legal designation nor is the prioritization given an EEA needed with the tremendous number of planning tools at the BLM's disposal.  This is deficiency in this plan and should be removed.  Protecting wildlife and plant habitat is already occurring within the planning tools and designations that BLM has.

- **Livestock Grazing**
  - **Page 2-165 Line 298**, reactivate Winter-Monitor allotment
  - **Page 2-166 Line 299,** Trailing overnight in sensitive areas.  This needs to be clarified to not unduly penalize moving through an area.
  - **Page2-163, Line 294,** add counties to the statement regarding supporting local agricultural communities
  - **Page 2-164, Line 295,** maintain the ability to increase AUMs
  - **Page 2-165, Line 297,** before acreage is removed for AUM on ACEC, write language in to change management of livestock use.  Increase the flexibility of management.
  - **Page 2-166, Line 299,** define that trailing livestock is not the same as gathering and moving livestock from pasture to pasture.
  - **Page 2-168, Line 302,** add counties to the fourth bullet for consultation
  - **Page 2-169, Line 303,** add Colorado Resource Monitoring Imitative to the list of plans to base decisions on.  In addition, include the MOU with CCA, CWGA, BLM, USFS, and Department of Ag.
  - **Page 2-167, Line 300,** no mention of using livestock as tool for vegetation treatments.  Targeted grazing is an economical, viable tool and has been extensively researched to benefit sage grouse and big game habitat.  In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other shrubs.
  - **Page 2-167, Line 301,** Alternative B is very subjective and open to individual interpretation.  Closure of permits is sufficiently covered in other sections of the RMP.
  - **Page 2-170, Line 304,** add forage quantity to Alternative D.  Increases to forage can also come from improved management in Alternative C
  - **Page 2-172, Line 306,** Major ecological damage does not equate to maintaining range improvements
  - **Page 2-172, Line 307,** alternative C is more feasible and allows for the sustainability of multi-generational use of working landscapes.

  - Grazing is but one of many factors influencing grass height with others including precipitation, soils and temperature.  Grass and forb vegetation

expressed as herbaceous cover and height in sagebrush ecosystems is subject to wide annual variation that is related to precipitation. Grass height also depends on shrub density and morphology of the shrub community. Grass and forb height and diversity do matter, as documented by numerous studies, but to say that grass height alone can predict whether or not a nest will be successful is not consistent with recent science. Enforcing an annual stubble height requirement is at best, suspect.

o The BLM Instruction Memorandum and Handbook provides clear direction that before any adjustment is made, rangeland monitoring and vegetation trend must show a downward trend and that livestock grazing is the causal factor. Plant composition at any one point in time varies because plant communities are constantly changing in composition and production owing to changes in environmental influences and site potential (Rangeland Health: New Methods to Classify, Inventory and Monitor Rangelands 1994). An ecological site is recognized and described on the basis of the characteristics that differentiate it from other sites in its ability to produce and support a characteristic plant community. This variation on the landscape makes managing for a single standard not reflective of the ability of the various sites to produce the desired vegetation and does not account for the full breadth of environmental influences that determine vegetation composition and structure.

o **Page 2-175, Line 316,** given that the Desert bighorn sheep were introduced into the UFO, utilize current rotations and life cycle of the domestic sheep and wild sheep to reduce the potential for interaction. The 9-mile buffer reduces the available forage and managed grazing that the majority of the sheep grazing adheres to. Delta Board of County Commissioners (BoCC) represents 17,000 head of sheep in our county and we see similar pressures to reduce sheep grazing in numerous BLM and USFS planning documents. The UFO RMP is covered by the MOU between the Colorado Department of Agriculture, Colorado Parks and Wildlife, Colorado Wool growers and BLM. The MOU covered what would be done in the case of contact and how to minimize risk. These guidelines already accomplish the temporal and spatial separation which the RMP claims will effectively redress disease transmission. The mentioned practices provide for the separation needed and are closer to what is actually seen on the landscape. The experiments mentioned in

BLM_0148755

the UFO RMP have been conducted under laboratory conditions and in small pens and again do not reflect the largeness of the landscape. The Delta BoCC urges BLM to discontinue using the presence of bighorn sheep as a means to reduce or eliminate domestic sheep grazing in the Uncompaghre Resource Area.

o   Delta County opposes any reduction or elimination of AUMs based on the proximity of bighorn sheet to domestic sheep grazing areas, and encourages the BLM and permittees to work together to minimize the risk of potential contact between domestic and bighorn sheep.  In 2014, Colorado Parks and Wildlife, the Colorado Wool Growers Association, the Colorado Department of Agriculture and the BLM and USFS renewed the *Memorandum of Understanding for Management of Domestic Sheep and Bighorn Sheep.*  This MOU is not mentioned or referenced in the RMP. Additionally, the RMP does not mention the USDA Agriculture Research Service specific to the potential disease transmission and impacts from contact on large landscapes.  The RMP should contain the full body of research and not selected citations.  The degree of risk of potential disease transmission from domestic sheep to bighorns in open range conditions is unknown and it is not clearly understood even in experimental confinement settings.

o   This document details the management of potential interaction and should be included in the RMP.  Currently used management practices that were agreed upon by all parties include constant herder supervision, compliance monitoring, turning out bred females, adhering to on/off dates for grazing allotments, removal of sheep after the grazing season, removal of stray domestic sheep, hazing of bighorn sheep nearing domestic sheep flocks and reporting known contact, and cleaning up salting areas upon departure.  These guidelines already accomplish temporal and spatial separation.

**Table 2.3 Renewable Energy exclusion and Avoidance Areas**

- **Solar, Wind and Hydropower**
  o   **Page2-377, Line 640,** Given the hundreds of species that are listed in the mega settlement with Wild Earth Guardians and Center for Biological Diversity and the ever increasing potential for hundreds of more species, this section is tying the hands of the BLM for decades to even mitigate habitat for renewable energy.  Technology is ever changing and there is

significant need to retain flexibility of where the renewable energy infrastructure can be located.


**Table 2.6 Summary of Environmental Consequences**

- **Summary of Environmental Consequences**
  - **Page 389, line 9,** Alternative B is written to equate all use to vegetation diversity.  These landscapes are disturbance driven and need periodic use to maintain diversity in the age classes of primarily shrubs.  This particular section makes broad generalizations.
  - **Page2-391 Line 391,** the statement that SRMAs could concentrate weed populations is a stretch.  Weeds are not discriminatory of which method of dispersal they take advantage of.
  - **Page 2-407, Line 39.** Alternative D, improving range improvements is allowed if it is compatible with other resources uses, however this is not defined and subject to interpretation and potential abuse.
  - **Chapter 4 Page 4-131,** the benefits of livestock grazing should also be included in this section.  The one paragraph on this page only presents one side of the equation.
  - **Chapter 4 Page 4-235,** no such management term as low duration grazing system.  Duration is generally described as short or long.  If big game herbivory is found to be the causal effect of a downward trend, livestock should not be the mitigation tool for this particular impact.
  - Acreage closed to grazing for VRM I and II are not clearly defined and subject to misinterpretation.


All management decisions related to Gunnison Sage Grouse habitat should be amended to defer to the BLM's Gunnison Sage-Grouse Rangewide Resource Management Plan Amendment and Environmental Impact Statement, which is currently in draft form.

Sincerely,


LeValley Ranch
Mark, Robbie, Hank LeValley

11/1/2016   DEPARTMENT OF THE INTERIOR Mail - Please recognize and protect wilderness in the Uncompahgre region, don't lease in the North Fork Valley, an...



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Please recognize and protect wilderness in the Uncompahgre region, don't lease in the North Fork Valley, and reduce carbon emissions -- Uncompahgre Field Office Draft Resource Management Plan

1 message

---

**Chris Lish** <lishchris@yahoo.com>                                      Tue, Nov 1, 2016 at 5:36 PM
Reply-To: Chris Lish <lishchris@yahoo.com>
To: "uformp@blm.gov" <uformp@blm.gov>, "director@blm.gov" <director@blm.gov>

Tuesday, November 1, 2016

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401

Subject: Please recognize and protect wilderness in the Uncompahgre region, don't lease in the North Fork Valley, and reduce carbon emissions -- Uncompahgre Field Office Draft Resource Management Plan

Dear Uncompahgre field manager Barbara Sharrow and BLM Director Neil Kornze,

I am writing today concerning the Bureau of Land Management's recently released Draft Resource Management Plan (RMP) and Environmental Impact Statement (EIS) for the Uncompahgre Field Office, which includes Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties in southwestern Colorado. I feel that the draft RMP should be strengthened to better safeguard lands with wilderness character as well as critical habitat for wildlife. I am also deeply concerned that the draft RMP fails to seriously address climate change, the most significant threat to Colorado's public lands and to the planet.

> *"Our duty to the whole, including to the unborn generations, bids us to restrain an unprincipled present-day minority from wasting the heritage of these unborn generations. The movement for the conservation of wildlife and the larger movement for the conservation of all our natural resources are essentially democratic in spirit, purpose and method."*
> *-- Theodore Roosevelt*

The Uncompahgre Field Office (UFO) manages 675,000 acres of public lands. Within this area, the Bureau of Land Management (BLM) has identified 24,910 acres of lands with wilderness character—roadless lands that would qualify for designation under the Wilderness Act. Additionally, the BLM has identified more than 242,500 acres of potential Ecological Emphasis Areas—places that contain vulnerable networks of interconnected habitat and migration corridors —throughout the Uncompahgre Field Office. While the identification of these lands is a great first step, many of them are not recommended for protection in the draft RMP. The BLM needs to safeguard the entirety of these vulnerable wild lands in the proposed RMP.

> *"It is horrifying that we have to fight our own government to save the environment."*
> *-- Ansel Adams*

BLM_0148758

Every alternative the BLM is considering would allow coal mining to continue at current levels for the next 10 to 20 years, a decision that your own EIS admits could result in more than half a billion tons of climate pollution. In fact, every single alternative the EIS analyzes would increase climate pollution over baseline levels, and none would result in any reduction of coal production. Every alternative would allow more leasing, more fracking, and more drilling for oil and gas.

> *"Our government is like a rich and foolish spendthrift who has inherited a magnificent estate in perfect order, and then has left his fields and meadows, forests and parks to be sold and plundered and wasted."*
> *-- John Muir*

I am opposed to oil and gas leasing on public lands, particularly in the North Fork Valley, which is one of the most beautiful and fertile places in the world. The North Fork Valley is located in Delta County and includes the towns of Paonia, Crawford, and Hotchkiss and is surrounded by public lands. This area is positioned to be as iconic as Napa Valley in Northern California and Provence in the south of France.

> *"As we peer into society's future, we—you and I, and our government—must avoid the impulse to live only for today, plundering for our own ease and convenience the precious resources of tomorrow. We cannot mortgage the material assets of our grandchildren without risking the loss also of their political and spiritual heritage. We want democracy to survive for all generations to come, not to become the insolvent phantom of tomorrow."*
> *-- Dwight D. Eisenhower*

I urge the BLM to reconsider opening 95% of lands to oil and gas leasing without adequate analysis of the risks large-scale oil and gas development poses to human and animal health, the environment, and the economy of this unique corner of Colorado, and adopt a no-leasing alternative. The draft RMP is a roadmap to industrializing the UFO region, and in particular, contaminating the air, water, soil, and agricultural lands of the very special North Fork Valley.

> *"It is our task in our time and in our generation, to hand down undiminished to those who come after us, as was handed down to us by those who went before, the natural wealth and beauty which is ours."*
> *-- John F. Kennedy*

It is unacceptable and unconscionable to not only risk destroying this vital ecosystem, but to sanction additional greenhouse gas emissions, which increase disastrous climate change impacts. The only way to prevent irreparable harm to this special area is to close off all BLM lands and minerals in the area to oil and gas leasing. At a minimum it BLM must impose a moratorium on oil and gas leasing and development until rural gas gathering pipelines are subject to federal pipeline safety regulations. As long as operators are not subject to the Pipeline Hazardous Materials and Safety Administration regulations on rural gas gathering pipelines, they are allowed to use public lands to put the public and the environment at even higher risk of leaks, spills, and explosions. This is unacceptable.

> *"Then I say the Earth belongs to each generation during its course, fully and in its own right, no generation can contract debts greater than may be paid during the course of its own existence."*
> *-- Thomas Jefferson*

Federal public lands must be part of the climate solution, not continue to make the problem worse. I therefore urge the BLM to:

BLM_0148759

11/1/2016    DEPARTMENT OF THE INTERIOR Mail - Please recognize and protect wilderness in the Uncompahgre region, don't lease in the North Fork Valley, an...

- Adopt goals for the planning area that include significantly reducing the climate pollution from BLM-approved actions on these lands
- Seriously consider alternatives that prohibit new leases for climate-polluting fossil fuels, including coal, oil and natural gas
- Honestly disclose the direct and indirect climate emissions of fossil fuel leasing, including the costs of climate pollution (the "social cost of carbon")
- Take a hard look at how to work with communities in the area to transition from fossil fuels to cleaner economies

*"Every man who appreciates the majesty and beauty of the wilderness and of wild life, should strike hands with the farsighted men who wish to preserve our material resources, in the effort to keep our forests and our game beasts, game-birds, and game-fish—indeed, all the living creatures of prairie and woodland and seashore—from wanton destruction. Above all, we should realize that the effort toward this end is essentially a democratic movement."*
*-- Theodore Roosevelt*

I urge you to maximize conservation for lands with wilderness character as well as Ecological Emphasis Areas in the Uncompahgre Field Office's proposed RMP in order to safeguard western Colorado's wild places for our future generations.

*"A thing is right when it tends to preserve the integrity, stability, and beauty of the biotic community. It is wrong when it tends otherwise."*
*-- Aldo Leopold*

Thank you for your consideration of my comments. Please do NOT add my name to your mailing list. I will learn about future developments on this issue from other sources.

Sincerely,
Christopher Lish
San Rafael, CA

BLM_0148760



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## comments on non-motorized recreation for the UFO RMP

1 message

**Brandt, Laurie** <LBrandt@dowl.com>                              Tue, Nov 1, 2016 at 5:07 PM
To: "uformp@blm.gov" <uformp@blm.gov>

TO: uformp@blm.gov<mailto:uformp@blm.gov>

FROM: Laurie Brandt, mountain biker

Date: 11/1/16

RE: Comments about RMP regarding non-motorized recreation


Dear UFO RMP staff,


Thank you for the opportunity to comment on the draft RMP for the UFO.

This was a massive undertaking and I appreciate the effort the BLM has put forth to protect the resources of our local public lands.  There are a wide variety of users and demands on the resources that you are tasked to protect and you have a mandate to balance the needs of those users.  With that in mind, I would like to comment that I feel that none of the alternatives offered adequately provide for the needs of non-motorized, quiet users, especially mountain bikers.  In other words, none of the alternatives offer a balance between motorized and non-motorized use.  I would like to see the BLM come up with an alternative that includes a focus on setting aside more non-motorized areas, especially areas where bicycles are welcome and encouraged.


Hikers and horseback riders can use wilderness areas and "Areas with Wilderness Characteristics," but mountain bikers are pushed into motorized areas.  Except for a few SRMA's that focus on mountain biking such as the RAT trails, Buzzard Gulch and Jumbo Mountain, there are relatively few miles where we can ride in peace and quiet when compared with the many hundreds of miles of motorized trails in our region.  The immense popularity of the RAT and Buzzard Gulch trails speak to the demand for trails designed for mountain biking.  These areas are becoming destination trails for locals and visitors and this helps drive our economy and promotes a healthy lifestyle.  If you look at the BLM model in the Grand Junction and Fruita areas, they have successfully designated separate areas for motorized and non-motorized use.  They have achieved more of a balance of these two user groups and it has made for world-class recreation for both groups.


We need to have multiple non-motorized areas in all portions of the region that are easily accessible to Montrose, Olathe, Delta, Paonia, Norwood and other towns within the UFO's region.  We as mountain bikers like the proposed Kinikin Hills area and expanding Buzzard Gulch/Spring Creek, but there can be more areas in Dry Creek, for example, that can be designated as non-motorized or mountain biking areas.


As mountain bikers, we like the quiet and peaceful nature of non-motorized trails.  We see wildlife and their tracks and we smell the plants around us.  It is disruptive and startling to have motorcycles or ATV's come upon us and their exhaust smells bad and lingers in the air.  We are out on our bicycles because we love the fresh air and exercise we are getting.  We also love the skills and challenges that singletrack trails provide.  We don't prefer dirt roads or two-track; singletrack trails are what we seek and love to ride.  Motorized trails are also often too steep, rutted, and unsustainable, which can be difficult or impossible to ride on a bicycle.  We are looking for a different experience and we are more compatible with hikers and other non-motorized users because of our slower speed, quietness, and desire to be self-propelled.

BLM_0148761

To create more of a balance of motorized and non-motorized use, I request that you come up with an alternative that provides for more quiet user areas, some of which are designated for mountain biking.  With your areas with wilderness characteristics, where bikes presumably wouldn't be allowed, this will ensure that there are more opportunities for mountain biking in the UFO planning area.   We have world-class terrain on vast areas of BLM land managed by the UFO, so let's have a more equal designation for low impact, environmentally-friendly activities like mountain biking.


Thank you,


Laurie Brandt

1681 6429 Circle

Montrose, CO 81403

970-596-4801

lbrandt@dowl.com


**Laurie J. Brandt, CPG**
Certified Professional Geologist



(970) 497-8821 (direct) ■ (970) 316-1746 (mobile)
(970) 249-6828 (office) ■ (800) 865-9847 (fax)
222 South Park Avenue
Montrose, Colorado  81401


Consider the environment before printing.

BLM_0148762

11/1/2016                    DEPARTMENT OF THE INTERIOR Mail - CBMBA In support of SRMA on Jumbo Mountain



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

***

## CBMBA in support of SRMA on Jumbo Mountain
1 message

***

**David Ochs <dave@cbmba.org>**                                    Tue, Nov 1, 2016 at 4:49 PM
To: ufomp@blm.gov

David Ochs
Crested Butte Mountain Bike Association
*Since 1983*
dave@cbmba.org
970.349.7324

***

**2 attachments**


**PastedGraphic-4.png**
8K

**CBMBA support Jumbo.pdf**
181K

BLM_0148763



October 31, 2016

Attention: Bureau of Land Management, Uncompahgre Field Office

Re: Response to Draft Resource Management Plan 1610 (COS050)

The Crested Butte Mountain Bike Association (CBMBA) supports the creation of an SRMA on Jumbo Mountain east of Paonia as outlined in Alternative B (lines 377-428) of Resource Management Plan 1610(COSO50). The North Fork area has no established mountain biking network and the creation of an SRMA on Jumbo Mtn will provide this area with a recreation amenity that will serve the local and surrounding communities with an economic driver and healthy lifestyle opportunities.

The North Fork area has suffered economically from reductions in mining activities. Communities and areas surrounding the North Fork area are providing healthy and positive lifestyle choices with a tourist and recreation based economy, to great success. Jumbo Mountain is an existing and responsible means for providing this amenity for the Paonia area specifically.

A recreation based economy provides jobs and growth opportunities, and supports initiatives from Governor Hickenlooper's office to 'connect' more Colorado communities via trails and recreation.

CBMBA would ultimately like to see a backcountry connection with Paonia and the North Fork Valley, and feels the connection between Gunnison, Paonia, and Crested Butte would be a destination amenity for the future. Jumbo Mountain would be a large piece of that puzzle, and provides a responsible and sustainable network of trails and connectivity.

Thank you for your consideration.


David Ochs
Executive Director
Crested Butte Mountain Bike Association
Since 1983
dave@cbmba.org



11/1/2016

DEPARTMENT OF THE INTERIOR Mail - 4cblm letter



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## 4cblm letter
1 message

**Michael P. Cleary** <mikecleary@orbisengr.com>
To: "UFORMP@blm.gov" <UFORMP@blm.gov>

Tue, Nov 1, 2016 at 9:11 PM

 **4cblm letter.doc**
113K

BLM_0148765



**4C Ranch, LLC**
**4500 3675 Road**
**Crawford, Colorado**

November 1, 2016

RMP Project Manager
2465 South Townsend Avenue
Montrose, CO  81401

UFORMP@blm.gov

RE:  Resource Management Plan Comments

Project Manager:

      I, Mike Cleary, owner of the 4C Ranch in Crawford  appreciate the opportunity to submit comments on the Uncompahgre Field Office's (UFO) Draft Resource Management Plan (RMP) Revision and Environmental Impact Statement. My ranch runs 400 head of cattle and grazing is of utmost importance to me.   I continue to support full multiple use opportunities balanced against the positive and negative impacts and the protection of private property rights within the UFO area. Therefore, I support Alternative C with some changes and additions outlined in the following text.  I  believe Alternative C preserves a greater amount of multiple use and protection of private party rights within the plan.  Alternative C also provides a greater separation between broad requirements and site specific issues that should only be addressed during the review of proposed site specific activities.  Alternative C, therefore, allows for greater flexibility for the public and the BLM to address and regulate those sight specific requirements through various then current permitting processes.

The few portions of Alternative C that the I  believe should be changed or removed noted below and identified by the page and corresponding line number in Table 2.2 (Description of Alternatives) in Chapter 2 of the proposed RMP.

Special Status Terrestrial Wild Life
- o   Page 2-95, Line 152, designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive.

- o   Page 2-102-105, Line 161-167, Gunnison Sage Grouse,.  Need to write language that allows for range improvements.  When Alternative C says no permanent structures, that includes range improvements.

BLM_0148766

**4500 3675 Road**
**Crawford, Colorado 81415**

Land Health
- o Page 2-25, Line 24, Given the lower precipitation rate over the entire UFO resource area, it is more realistic to manage for upward trend for land health
- o Page 2-27, Line 26, add recreation to actions that can cause land health problems
- o Page 2-164, Line 295, maintain the ability to increase AUMs
- o Page 2-165, Line 297, before acreage is removed for AUM on ACEC, write language in to change management of livestock use. Increase the flexibility of management.
- o Page 2-166, Line 299, define that trailing livestock is not the same as gathering and moving livestock from pasture to pasture.
- o Page 2-169, Line 303, add Colorado Resource Monitoring Initiative to the list of plans to base decisions on. In addition, include the MOU with CCA, CWGA, BLM, Department of Ag.
- o Page 2-167, Line 300, no mention of using livestock as tool for vegetation treatments. Targeted grazing is an economical, viable tool and has been extensively researched to benefit sage grouse and big game habitat. In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other shrubs.
- o Page 2-167, Line 301, No permits or allotments should be closed
- o Page 2-172, Line 306, Major ecological damage does not equate to maintaining range improvements
- o Page 2-172, Line 307, alternative c is more feasible and allows for the sustainability of multi-generational use of working landscapes
- o Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of Delta County. This is a more accurate way to reflect livestock grazing in the RMP.
- o IMPLAN calculates economic impact based on forage used in the UFO; however additional analysis needs to include the value of the livestock for the entire year. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus Delta County. If livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers.

Water / ROW issues:

The issue of perpetual easements for irrigation ditches that traverse BLM holdings is not addressed in the RMP. The government is promoting and financing piping of irrigation ditches and that brings up 2 issues:
- o Irrigation ditches have a perpetual ROW. Currently the BLM will not allow a ditch company to straighten a piped ditch outside of its existing perpetual right without losing that right and trading it for a 30 year term ROW. The BLM needs to be more flexible here as that would save the government money, clean up erosion issues in existing ditches and reduce pipeline operating costs.

BLM_0148767

**4500 3675 Road**
**Crawford, Colorado 81415**

 ○ 5% of construction cost is allocated to mitigate the environmental impact of drying up ditches. It would be wise for the BLM to adopt a policy that focuses the location of the mitigation near the proposed piping project, and that the a priority of the allocated funds be directed to providing access to water for wildlife in arid areas.

Another water issue that should be addressed is under no circumstance should the Federal government be allowed to appropriate water that impact the beneficial use of by the people of Colorado.

Oil and Gas issues:

The board should not support any language that infringes on privately owned surface property that is situated above a federally owned mineral estate.

The BLM is disingenuous when it promotes drilling on private agricultural land to provide access to federal minerals. Instead, the BLM should develop a "corridor rule" that allows for easier access to federal land that border prime farmland , provided that the adjacent land owner supports mineral activity in BLM land that is adjacent to his or her land.

The BLM should take a more active interest in the dewatering of coal seam wells for natural gas exploitation on the federal estate. They should ensure that studies (during the dewatering process) are undertaken to verify that ground and surface water is not expropriated by fresh water coal seam dewatering operations.

Apply the following requirements ( as taken verbatim from Alternative D) to oil and gas well bores that are within 305 meters (1,000 feet) of a domestic water well, beginning at the ground surface and extending through the freshwater aquifer:
-  Extend surface casing through the freshwater aquifer.
-  Require freshwater mud for drilling the surface casing.

Visual Resource Management (VRM) :

The Board recommends all applications of VRM that apply to privately held land are removed from the document. This has the potential of usurping private land owner rights.
Yours truly,

Mike Cleary, Manager
4C Ranch
Cell: 720-883-2774

**4500 3675 Road**
**Crawford, Colorado 81415**

Email: Mikecleary@orbisengr.com

BLM_0148769



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

# Comments for BLM RMP -- protect adobe badlands
1 message

---

**Paul Larmer** <paul@hcn.org>                                    Tue, Nov 1, 2016 at 8:23 AM
To: uformp@blm.gov

See attached letter and photos. Thanks.


Paul Larmer
Publisher | High Country News | hcn.org
970-527-4898

For people who care about the West

---

**3 attachments**



**adobebadland2.jpg**
1082K



**adobebadland1.jpg**
961K



**BLMRMPadobebadland10:31:16.docx**
61K

BLM_0148770

October 31. 2016

Dear BLM:

I am writing to urge you to maintain all lands with wilderness qualities in their within the RMP, and expand the Adobe Badlands WSA to the west, as outlined in the citizen's alternative. I hike these lands often, and they provide an incredible, quite experience just minutes away from Delta.  This weekend, however, I saw three motorcyclists carving new tracks through the WSA. See the attached photo. They were having fun, but there are plenty of badlands to the east for them to enjoy without disrupting the rare beauty, ecology and quiet of the Adobe Badlands.

Obviously, protecting these lands in name is not enough. There needs to be better signage that clearly restricts motorized access to these lands, and a more consistent presence of BLM staff.

Thanks for your consideration,

Paul Larmer
Paonia, Colorado

BLM_0148771



BLM_0148772

BLM 0148773





**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Uncompaghre Field Office Draft Resource Management Plan
1 message

**Cynthia Malleck** <cynthiamalleck@gmail.com>                 Tue, Nov 1, 2016 at 8:41 AM
To: uformp@blm.gov

Hello,

Thank you for extending the period to comment as the past few months have been busy, and though my comments are short, I appreciate your consideration.

As a resident of the western slope for eight years which included working in Olathe and living in Montrose last year, I am in strong support of Option B.1 on the planning report.

As a native of Colorado, I have seen my access to clean air and clean water depleted over a lifetime.  I have also witnessed first hand the loss of habitat and habitat fragmentation for wildlife.  Eight years ago I moved to the western slope from the Front Range, away from where I was born, raised and where I obtained two college degrees.  I moved to the western slope to have access to cleaner air, and also cleaner water, better access public lands and hunting as well as high quality local produce and orchards.

Our public land resources are most important for providing clean air and clean water and land for wildlife and hunting.  Secondarily they are best used for sustainable tourism.  Option B.1 best supports these most important uses of our public lands.  The other options are a detriment to our clean air, our clean water, wildlife uses etc. and a detriment to our quality of life on the western slope.  Any other option in the plan does not protect these most valuable resources.

Thank you for your additional efforts to involve the local communities on this extremely important issue for our most valuable resources, our clean air, our clean water and the subsequent medical health benefits of protecting these resources on our communities!


Sincerely,


Cynthia Malleck
Field Biologist and Physical Therapist Assistant

1410 White Ave
Grand Junction, CO  81501
cynthiamalleck@gmail.com

11/1/2016                                  DEPARTMENT OF THE INTERIOR Mail - RMP comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## RMP comments
1 message

---

**Jane McGarry** <westelk@tds.net>                                      Tue, Nov 1, 2016 at 12:09 PM
To: uformp@blm.gov, info@theconservationcenter.org

November 1, 2016

RE: UFO Draft RMP

Dear Public Servants at the BLM,

Thank you for the opportunity to comment on the Bureau of Land Management – Uncompahgre Field Office (BLM-UFO) Resource Management Plan (RMP).

Thank you for BLM's hard work on the RMP; it is a big improvement over RMP documents in the past.

We feel that only Alternatives B and B1 adequately address planning for long-term and UFO-wide wildlife habitat and for non-consumptive and less-intrusive recreation, like hiking, biking, camping, and fishing. The other alternatives do not adequately address the lack of habitat connectivity and scarcity of undeveloped core areas of habitat in the region.

We think the BLM-UFO RMP document contains sufficient reasons to incorporate all of the EEAs and LWCs and nearly all of the ACECs from Alternative B into the final preferred alternative. This is the most important part of the plan for long-term preservation of the remaining wildlife core areas and connectivity of the UFO. We also support Alternative B1 regarding oil and gas development, and Alternative B regarding NGD stipulations.

Specifically, these points are all made again in Table 2-6, Summary Comparison of Environmental Comparisons, especially on Lines 6 and 9 (No ground disturbance), Line 15 (Fish and Wildlife / EEAs), Line 18 (Special Status Species), Line 34 (LWCs), Line 43 (Fluid minerals), Line 65 (ACECs), and Line 87 (socioeconomics).

Finally, we encourage the BLM to take examine *No Exit: Fixing the BLM's Indiscriminate Energy Leasing*, published by The Wilderness Society ( https://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web.pdf ).

This draft RMP proposes to lease nearly 95% of the acreage within the UFO analysis area. Since the U.S. is now producing much more oil and gas domestically than it is using, while damaging more habitat and non-mineral resources than at any time in our country's history, it makes no sense for the BLM to continue wide-scale and wholesale leasing. The oil and gas glut is projected to continue for the near future, while the extinction of flora and fauna species is likely to accelerate. Is the BLM abandoning its multiple-use mandate in favor of leasing to multinational corporations for speculative purposes? This overemphasis on leasing is contrary to the spirit and letter of the recent Paris Agreement on Climate Change. How can the U.S. assure the rest of the world that we will reduce greenhouse gases as soon as possible while simultaneously encouraging domestic fossil fuel extraction via the BLM's leasing program? The BLM should analyze its energy-leasing program and site-specific projects as they relate to the Paris Agreement and the quantities of greenhouse gases either both generated or prevented from entering the atmosphere.

Following are our comments on specific lines of the alternatives and their impacts:

- Table 2-1, page 2-11, **Restrictions for Ground Disturbing Activities, No Ground Disturbance.** Alternative B is excellent. This is very important. The other alternatives do not include enough NGD.

- Lines (L) 17-19 (from Table 2.2). BLM discusses this on page 4-151, and we concur. "These protections would provide the most intact natural landscapes, the greatest amount of corridor conservation for species movements, and the greatest resiliency against climate change or other long-term changes that might require species or communities to move over time." The actions here are the same, but they all require preserving connectivity, which requires incorporating all of the Ecological Emphasis Areas (EEAs) from Alternative B into the preferred alternative.

- L 44. **No lease setbacks.** The larger setback from Alternative B1 is better.

- L 45 to 50, and 55. No Surface Occupancy stipulations as described for Alternatives C and D do not allow for as much protection of this critically important resource as the No Lease stipulation. Under Alternatives C and D, horizontal drilling could occur sub-surface under a flood plain, irrigation canal, reservoir, or water course, introducing the possibility of major water pollution and degradation. The rationale for larger setbacks and/or No

BLM_0148775

Lease stipulations can be found by how far toxic chemical plumes have traveled at various locations around the state, such as at the leaking underground storage tanks and chemical-use facilities at Commerce City and Denver. For example, the underground volatile organic compound (VOC) plume and Superfund clean-up at Chemical Sales Co. covered 5 square miles.

- L 50. **Municipal water setbacks.** The larger buffer in Alternative B is better.

- L 69. **Exemplary, ancient, rare, and relict vegetation.** Only Alternative B has NGD and NSO stipulations, which should be in the final preferred alternative.

- L 71. **Non-game wildlife.** Alternative B is good. We disagree with Alternative D's plan to manage all land mainly for resource production and big game, except for special designations and a few others. All of the proposed EEAs and Areas of Critical Environmental Concern (ACECs) from Alternative B should be included in Alternative D.

- L 103-105. **Ecological Emphasis Areas (EEAs).** Only Alternative B is sufficient, as is made clear from evidence on page 4-129 and 130, and Volume 3 Appendix D introduction. All of the EEAs in their full size and management from Alternative B should be incorporated into the final preferred alternative. Reasons include the need for more elevations for wildlife to use in adapting to climate change; the historic loss of most migration routes, which should be considered under cumulative impacts of past management; and the importance of big game to local economies.

- The Naturita, Dry Creek, Tabeguache, and Adobe EEAs should be carried forward to the preferred alternative in their full Alternative B sizes. Adobe, as it is in Alternative D, is insufficient because much of the white-tailed prairie dog habitat is omitted (burrowing owls here).

- L. 127. **Migratory birds.** Alternatives B and D are good. Lines 126 and 128 mention species lists but do not describe possible actions. Habitat should be protected year round, even when the birds are not nesting.

- L 133. **Special Status and Sensitive Species (SSS).** Some combination of Alternatives B and D would be better. Alternative D doesn't include enough habitat protections. Apparently no Pinyon-Juniper species are included in Alternative D.

- L 177. **NGD in prairie dog towns.** Alternative B is better because of the slightly earlier closure, but NGD should apply all year, because of the two prairie dog species and other SSS that rely on them.

- L 178. **No shooting in prairie dog towns.** Hunting could be allowed, but not target shooting. How can one state that BLM is trying to preserve the Special Status Species otherwise.

- L251. **Visual Resources.** Alternatives B and B1 are much better for wildlife and recreation. As stated in Volume 2, page 4-132, Visual Resource Management (VRM) Classes I and II are important.

- L 265. **Lands with Wilderness Characteristics (LWCs).** LWCs are indeed the core areas regarding wildlife, as stated on page 4-154. All of the few remaining eligible areas should be managed to protect their wilderness characteristics (i.e., manage all 42,150 acres of LWCs under Alternative B).

- L 332-336. **No Leasing (NL) and No Surface Occupancy (NSO).** We generally agree with Alternative B1 regarding Line 333, No Leasing and Line 336 No Surface Occupancy stipulations. NSO is especially needed for Exemplary vegetation, all EEAs, the larger four-mile buffer around Gunnison sage-grouse leks, VRM Class 1, and for the areas described in Alternative B1's list, including setbacks from water, agricultural areas, and big game migration corridors. The 1,000-ft. setbacks of Alternative D are inadequate, given the daily multiple leaks at oil and gas operations in Colorado. See the above discussion of leaks and VOC plumes. The Draft RMP offers no legitimate rationale for the levels of leasing in Alternative D.

- L 380. **Special Recreation Management Areas (SRMAs).** We favor SRMAs in general and support BLM's effort to manage these areas through zones. We worry about the possibility of stimulating too much human activity in some of the most important wildlife habitat, which is discussed well on page 4-135. Recreation, especially motorized recreation, has to be planned carefully in or near the EEAs and other important wildlife areas. Most of these areas, such as Jumbo Mountain (in its Alternative B full size), are probably fine. It is difficult for the public to assess how the areas overlap with which uses and zones in the different alternatives. BLM must plan this very carefully, regardless of what general comments say. Dry Creek, Spring Canyon, and Ridgway/Kinikin Hills might be especially important ones to look at closely.

- L 478 and 480. **Travel closures.** Alternative B is better because it has more ACECs and EEAs and includes elk calving areas.

- L 524to 528. **Areas of Critical Environmental Concern (ACEC).** We support Alternative B. Proposed areas that don't qualify have already been eliminated. La Sal, Salt Desert, and Tabeguache should be included in the final preferred alternative. Others, including the Gunnison Sage-grouse ACECs, should get at least EEA or similar status.

BLM_0148776

- L 586. **Wild and Scenic Rivers.** It is hard to see why any of the segments that are really suitable would not be included. Alternative B makes more sense.

- Page 3-66. **Habitat fragmentation is understated.** Typically, species (such as Sage-grouse) that can afford disturbance the least are discounted because they have already declined. Changes resulting in habitat fragmentation usually only benefit the few species (ravens, red fox) that are increasing, causing further damage to struggling species.

- Page 3-80. **Prairie dogs.** BLM accurately says threats include plague, habitat loss and rec shooting. BLM has most of the responsibility for the survival of these two declining species and for the other species that depend on them.

- P 3-82. **Burrowing owls.** Burrowing owls have been yearly for the last several years in the part of the Salt Desert ACEC that is not proposed as an EEA in Alternative D, according to reports on West Slope Birding Network (WSBN) on the internet.

- Volume 2, pages 126-135. This section (4.3.5 **Environmental Consequences, Fish and Wildlife**) is very good, and explains in detail why only Alternative B satisfies the Multiple Use components of wildlife and non-motorized recreation, especially regarding LWCs, EEs and ACECs. All of the travel management and energy citations on pages 129 and 130 should be considered in every part of the RMP.

- Page 4-8. **Cumulative impacts.** Migrating elk is a good example of a resource that has been affected by past and current actions. This is exactly the case (along with mule deer) throughout the UFO and is why we believe all of the proposed EEAs from Alternative B should be in the eventual preferred alternative.

- Page 4-142. **Special Status Species.** The bullets on NGD and especially on roads are good. Road density and distance of roads from Special Status Species is as important as anything in this plan. This is why we need more EEAs, LWCs, and ACECs in Alternative D.

- Page 4-153. This summarizes what we think is the most important part of the RMP, and why we want to see all of these potentially protected areas put into the final preferred alternative. BLM discusses the much lessened impacts to Special Status Species under alt B, due largely to the larger area of EEAs and ACECs.

- Pages 4-460 and 461. Special designations, including wilderness, increase nonmarket values, property values, and local economic activity. Actions that emphasize resource development have greater impacts on nonmarket values and quality of life. This applies especially to oil and gas development.

- Page 4-484. **NEPA requirement for short term use versus long term productivity.** Alternative B provides the greatest long-term productivity. This should be a big part of planning, and it makes it hard to justify considering the more resource-producing-intensive alternatives.

- Volume 3, Table B-6, **No Ground Disturbance stipulations for surface disturbing activities.** Alternative B is excellent. Alternative D does not have enough regarding soil, wildlife, visual resources, cultural, hydrology, public water, SRMAs, or ACECs. The LWC stipulations in Alternative D should be extended to all or most of the above.

Thank you for considering our comments. We look forward to the final Resource Management Plan.

Jane McGarry and Chuck Behrensmeyer

Paonia, Colorado

BLM_0148777

11/1/2016                    DEPARTMENT OF THE INTERIOR Mail - Citizen comment letter regarding UFO-RMP attached



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Citizen comment letter regarding UFO-RMP attached
1 message

**David Noe** <dcnoe@hotmail.com>                                    Tue, Nov 1, 2016 at 4:39 PM
To: "uformp@blm.gov" <uformp@blm.gov>

Dear BLM-UFO Staff and RMP Comment Team,

Please find, attached, my comment letter for the UFO Resource Management Plan.

I am a resident of Paonia, in west-central Colorado's North Fork Valley, and am active in the community there as a volunteer, musician, and, as a recently retired geologist who has conducted research in the region, a source of geologic knowledge. These comments incorporate my unique perspective of knowing the landscape and its resources intimately.

Thank you for your interest in contributing to the economic vitality and the ecological integrity of this fantastic area! With BLM's assistance, I look forward to living a productive life in the valley, and to having a diverse and robust economy that utilizes but also preserves our natural scenery, vegetation and wildlife habitat, sustainable organic agriculture, and clean air and water.

David C. Noe

Paonia, Colorado

 **DNoe comment letter - blm-ufo-rmp.docx**
44K

BLM_0148778

October 27, 2016

Uncompahgre Field Office
U.S. Bureau of Land Management
2465 South Townsend Avenue
Montrose, CO 81401

Submitted electronically to uformp@blm.gov

**Re:  Citizen comments regarding BLM-UFO Resource Management Plan**

Dear BLM-UFO Staff and RMP Comment Team,

Thank you for the opportunity to comment on this document.  I am a resident of Paonia since 2015.  Before that, from 2006 to 2014, I conducted geologic field studies and made geologic maps for the State of Colorado in the Montrose, Delta, Orchard City, and North Fork areas.  In work and now in retirement, I have spent extensive time driving and hiking on BLM lands and adjacent USFS and private lands in these areas.  I have provided geologic maps and expertise to BLM-UFO staff and worked with them from time to time on volunteer projects and geology-related issues.  At present I am a board member with the Western Slope Conservation Center in Paonia, where I contribute my expertise on local public-land initiatives and provide public education and outreach.

For this letter, I am providing my own comments as a private citizen.  Where applicable, I shall use my knowledge of the region's geology to frame support for various RMP land-use alternatives as proposed by BLM-UFO.  I hope that this approach will be valuable and substantive, and that it will be a different approach than is used by other comment writers.

Finally, thank you for your work that went into formulating these alternatives.  And, in particular, thank you for considering the community-developed North Fork Alternative for oil & gas leasing, exploration, and development (**Alternative B.1**) and including it as one of the official alternatives.


**Fluid Mineral Leasing (Oil & Gas)**

I am in full support of **Alternative B.1** ("The North Fork Alternative") as BLM's management plan for oil & gas development in the North Fork area, and **Alternative B** for the remainder of the BLM planning area.  The "North Fork Alternative" (NFA) was conceived by a broad group of stakeholders in the North Fork Gunnison River area, and it considers the protection of air, water, and existing and future uses of private and public land in this region.  Although I did not live in the area at the time of its formulation, my coincident geologic mapping in the area was used as part of the background data for the NFA.  As a State employee at the time, I could not directly take part in or provide language to the NFA.

Now that I am retired and speaking for myself, I can provide more-specific bases for the geological reasoning behind the NFA's significant reduction in leasable BLM parcels.  In short, and beyond the obvious protections of water and agricultural resources in the North Fork area, the NFA reflects that *the target production zones for oil & gas drilling in the Piceance Basin do not exist in the North Fork Region*:

BLM_0148779

- The Niobrara Formation is the focus of the current oil & gas boom in Colorado.  It has prolific production in the Denver Basin.  Niobrara-equivalent strata within the Mancos Shale is productive in northwestern Colorado and in the Piceance Basin.  Oil & gas production from this formation is achieved using horizontal drilling and hydro-fracturing of the rock; before this modern methodology was adopted, this formation was long considered to be non-productive.

- In the North Fork area, I mapped the surface outcrops of the Mancos Shale, including twelve different sub-formations (called members).  This is the first time that the Mancos Shale has been mapped in such detail.  The Niobrara-equivalent strata include the Fort Hays and Smoky Hill Members.  References for the geologic-map publications produced by myself and my colleagues are listed at the end of this letter.

- My mapping in the North Delta, Orchard City, Lazear, Hotchkiss, Paonia, and Crawford quadrangles shows that Niobrara-equivalent strata and older strata in the Mancos Shale are found in extensive outcrops to the north and south of the Gunnison and North Fork Gunnison Rivers in the Delta to Hotchkiss areas, and along Cottonwood Creek, the Smith Fork River, and other tributary drainages in the Crawford area.  *In these areas, the Niobrara target zone either exists at the ground surface or has been eroded away.  In short, the target zone no longer exists and no oil & gas production is possible.*  These areas would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense.

- To the north of the Niobrara outcrops, there is a topographic escarpment that forms the southern edge of the traditional Piceance Basin.  It becomes several thousand feet higher than the adjacent North Fork Gunnison River valley.  The Niobrara-equivalent strata are covered progressively, as one goes northward, by overlying formations, including younger members of the Mancos Shale, the Mesaverde Formation, and the Wasatch and Green River Formations.  As a consequence of higher-elevation topography and bedrock that dips (tilts) and deepens into the basin northward, a significant amount of *overburden* strata become present atop the Niobrara zone.  For safe oil & gas drilling using horizontal drilling and hydro-fracturing, there needs to be enough overburden to separate the deep "frac'ing" or production zone from overlying, near-surface aquifers.  (I do not know how much overburden is "safe."  However, oil & gas promotional literature appears to state that the production depth needs to be 5,000-7,000 feet below the ground surface.  I assume that this requisite amount of overburden exists in the central Piceance Basin in order to make for a viable Niobrara play there.)  From these relationships, it can be easily inferred that, *at the southern edge of the Piceance Basin, there will be a broad area to the north of the Niobrara where there is insufficient overburden to safely and practically develop and produce from the subsurface Niobrara zone.  The northern edge of this area (i.e., the boundary between "non-sufficient" and "sufficient" overburden is not known, and is probably highly dependent upon the surface topography, which can vary markedly in the presence of deep tributary canyons.*  In the most general terms, these areas of insufficient overburden would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense.

- My mapping, and previous geological studies by the USGS in the area show that ground-water from certain formations migrates from deeper in the Piceance Basin to outcrops along the Gunnison and North Fork Gunnison Rivers, forming naturally occurring mineral springs.  Many of these springs form along Dakota Sandstone outcrops.  However, in the LeRoux Creek valley, I have found and mapped mineral springs that align with the outcrops of limestone-bearing

BLM_0148780

members of the Mancos Shale, including the Juana Lopez and the Fort Hays and Smoky Hill Members. *This out-of-basin migration and surface discharge of Niobrara-equivalent formation waters onto the landscape is a potential red flag for oil & gas development, in that it would be potentially risky to perform hydro-fracturing and pump millions of gallons of toxic "frac'ing" fluids into a formational zone that conveys water to and is in contact with surface aquifers and surface streams.* The risk, and the velocity at which the ground-water moves through these zones is unknown and unstudied. It should be mentioned ground-water flow and temperature modeling studies done by Lazear (2006; 2009) found that infiltrating surface waters on the southern flanks of Grand Mesa most likely flow downward into the underlying formations before coming to the surface as formation-water seeps and springs. He postulated that vertical fractures with depths of up to 1 km (3,280 feet) influence the apparently deep flow paths of the ground-water. *With regard to oil & gas production and potential contamination of aquifers, the problem is that, because of the geometry of the sedimentary rocks, both formation and downward circulating meteoric ground-waters flow along certain bedrock layers toward the outcrops at the southern edge of the basin, bringing those waters into contact with shallow aquifers and with surface waters. As a result, there is an area of unknown width that extends northward from the springs into the Piceance Basin where "frac'ing" fluids should not be mixed with migrating formation waters on account of transport (of unknown duration) and potential contamination of the surface and near-surface water aquifers and streams.* And also very generally, this area (roughly coincident with insufficient overburden area) would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense.

- *The NFA removes parcels that are coincident or proximal to a number of drinking water springs, both along the North Fork Gunnison River valley between Hotchkiss and Paonia, and on the western flanks of Mt. Lamborn and Landsend Peak.* This is an appropriate and necessary protection. It should be noted, however, that *some of the allowed leases in the upper Roatcap Creek drainage basin are upstream and up (ground-water) gradient from four drinking water springs. I would urge you to withdraw those parcels as part of your final RMP.*

- In the northern Piceance Basin, and in northwestern Colorado and the Denver Basin as well, the productive zones in the Niobrara consist of closely stacked layers of limestone, ranging up to 20-40 feet thick and sandwiched between expanses of claystone. The limestone layers are an ideal medium for horizontal drilling, as they are brittle yet soft, and they can yield much oil & gas. The bounding claystones cannot be drilled or developed so efficiently and are not regarded as production targets. My mapping has found that limestones along the Delta-to-Paonia outcrop corridor are present as widely separated, individual beds that are each a foot thick or less. Most of the Niobrara-equivalent outcrops are comprised of claystone. Interpolating, *this means that there is a major facies change somewhere in the subsurface Piceance Basin, between the limestone-rich New Castle outcrops and productive oil & gas fields in the north and the limestone-poor outcrops along the southern margin of the Basin. Thin, individual limestone beds cannot be drilled horizontally, and they cannot possibly yield oil & gas in commercially viable quantities.* I have taken groups of oil & gas geologists to Niobrara-equivalent outcrops near Delta and Paonia, and they cannot believe they are seeing the same formation that they are drilling to the north! But the difference is real. There is some yet-unknown place beneath the Piceance Basin where the reservoir rock undergoes a facies change and the limestone all but disappears to the south. While it is not up to BLM to delineate that boundary, *it is clear that the Mancos strata in the southern part of the Basin do not contain enough limestone to constitute a viable reservoir rock.* (As a point of reference, Gunnison Energy's recent Oak Mesa exploratory

BLM_0148781

well was drilled into this limestone-poor Niobrara zone.  It was a very costly dry hole.)  In a general way, these Limestone-poor areas along the Piceance Basin escarpment areas would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense.

- Much of the terrain in the RMP planning area is underlain by Mancos Shale.  The Mancos is a prolific contributor to salt and salinity levels in the lower Gunnison River drainage basin.  From my work with the interagency Salinity Task Force in recent years, I am aware of efforts that have been done to understand how human actions can increase salt and selenium concentrations in streams, and also of the mitigative activities that have been funded for purposes of lowering salt and selenium levels.  Oil & gas drilling and associated activities, such as road and drilling pad building, emplacement of drainage pits, and erosion of the emplaced infrastructure, would undoubtedly increase the transport of salt and selenium into the local streams.  I am concerned that, with the exception of **Alternative B.1** in the North Fork (and **Alternative B** elsewhere), none of the other alternatives offers a means of keeping salt and selenium concentrations at manageable levels.

- Horizontal drilling and hydro-fracturing cannot be done in hard, brittle, silica-rich formations, including the Dakota Sandstone, Morrison Formation, and Entrada Sandstone that underlie the Mancos Shale.  All of these formations were drilled and tested during the early to mid 20th century, using conventional vertical drilling, throughout the BLM-UFO planning area.  With the exception of a minor oil-production well near Crawford, these wildcat wells were all dry holes.  Unlike horizontal drilling, which can exploit target formations in a variety of structural configurations, vertical drilling requires that there must be some type of structural closure or facies change to trap oil & gas in order for production to occur.  The previous drilling has already tested those traps, mostly without success.  From this, I conclude that *a deeper, sub-Mancos oil & gas resource does not exist in the North Fork and nearby areas.*

- Please note that the Cozzette and Cameo Sandstone Members of the Mesaverde Group, which are listed as potential conventional drilling targets in the RMP document (page 3-120), do not exist in the North Fork area.  My mapping shows that these zones pinch out to the west, near North Delta/Cedaredge.  This lack of conventional targets in the North Fork area further justifies the limiting of leases in the North Fork area, as provided in **Alternative B.1.**

In the paragraphs above, I have outlined many reasons why the Niobrara-equivalent strata of the Mancos Shale constitute a very poor to non-existent oil & gas play, based on geologic mapping and the distribution and character of the formation.  *I believe that there is a mistaken assumption – that all potentially leasable parcels on BLM lands are also potentially productive.*  If all of the parcels were potentially equally productive, then removing parcels from leasing would constitute a serious loss of oil & gas production and income.  However, this assumption is most definitively untrue, for the reasons noted in the previous paragraphs.  *Removing a large number of low-quality or outwardly unproductive parcels will not have a large effect on the oil & gas production potential of BLM lands.*

"The North Fork Alternative" plan (**Alternative B.1**) removes most of these parcels from leasing, and rightfully so.  All of the other alternatives introduce leasing into these areas of very poor production potential, and are therefore inappropriate, impractical, and economically unsound.  Lease restrictions would be of little use if the resource is not there!  The remaining parcels that are leasable under **Alternative B.1**, particularly in the Oak Mesa area, probably have low economic potential.  After the failure of the Oak Mesa well, I would be surprised if those parcels are actually drilled in the future.

BLM_0148782

For BLM-UFO lands that are not covered under the NFA (including the Cedaredge area and south of Delta), I would imagine that many of these same basic geologic limitations would be in play. *This would mean that viable target production zones do not exist in those areas, as well*. Unlike the North Fork, however, this has not been studied for these other areas. I strongly suggest that **Alternative B** is the most appropriate alternative for these other areas. **Alternatives A, C, and D** are entirely inappropriate, not only because they afford inadequate protections to land and water resources, but also because maximizing leasable parcels will not result in huge gains in oil & gas production in this region.

My other concerns for oil & gas development in the North Fork area include the following:

- Induced earthquakes seismic activity. In my work at the state geological survey of Colorado, we were well aware of the effect of deep, waste-fluid disposal injection wells in causing seismic instability and earthquakes. Colorado contains some famous and well-documented examples (including the Rocky Mountain Arsenal near Denver, the Rangely oil field, the Raton Basin coal-gas play near Trinidad, and the U.S. Bureau of Reclamation's brine injection well near Bedrock. In addition to general concerns to the public, induced-earthquake hazards are a potential threat to coal mine operations and the Paonia Reservoir dam. Many of the hillsides in the North Fork area are comprised of metastable to active landslides and sandstone cliffs that regularly produce rockfalls. These hazards are recognized by the Colorado Geological Survey, which names the North Fork Gunnison River corridor and the 2nd-highest landslide hazard area in Colorado (Rogers, 2003). The additional occurrence of induced earthquakes in this area could potentially increase the frequency and magnitude of damaging landslides and rockfalls.

- Water and air quality. Any plan involving oil & gas needs to contain provisions for protecting the water and air quality in the North Fork area. The valley contains an extensive infrastructure of domestic and private drinking water supply systems (many of which are sourced from ground-water springs) and irrigation systems (canals and ditches that support organic agriculture). Clean water is essential for these systems and their uses, and must be protected from potential spills. Riparian health must be protected, as well. The North Fork area is influenced by daily up- and down-valley breezes. Higher-elevation oil & gas operations could contribute to potential degradation of down-valley air quality by increasing the concentrations of dust, methane, VOCs, ozone, and other particulates and gases hazardous to public health.

- Water supply. The North Fork Gunnison River is already mostly allocated to supporting organic agriculture. The river has a short annual period of snowmelt runoff. During the summer months, when water is shunted into numerous irrigation canals, the stream flows at a trickle. It would appear that the additional water needed to support extensive oil & gas drilling and disposal operations is not available from the North Fork drainage basin.

- Economic impacts. Oil & gas development would have an adverse effect on recreation, agri-tourism, scenic viewsheds, and real estate in the North Fork area. This part of Colorado is gaining renown for it idyllic character, organic farming, recreation lifestyles, and for its clean air and water. Compared to long-cycle employment opportunities that exist here from coal mining, boom-and-bust oilfield economics offer little in the way of long-term economic solutions.

Given these varied and serious concerns, the only alternative in BLM's RMP that provides adequate protections for the North Fork area is **Alternative B.1.**

BLM_0148783

**Coal Mineral Leasing**

Coal mining has been a livelihood of the North Fork populace for over a hundred years.  Unlike the oil & gas industry, which relies on a largely imported work force and works in short boom-and-bust cycles, the coal mines have provided longer-term, high-paying employment.  Mine workers and their families make up an important part of our communities.  The coal mines themselves have been good neighbors to the North Fork community, providing severance taxes, sponsorships, and participating in conservation and stream-health monitoring initiatives (including a pilot methane capture initiative).  The Western Slope Conservation Center (WSCC) has historically been supportive of coal mining in the North Fork area so long as the ecological function of the North Fork Gunnison River is maintained.  The high quality of North Fork coal is a source of pride in the community.  However, a series of recent events have occurred that have significantly slowed coal production and shuttered two of the three remaining mining operations.

In assessing BLM's RMP alternatives for coal leasing, I find that I am most supportive of **Alternative B**. This alternative has the smallest amount of leasable acreage; however, I agree that the excluded areas are those such as Areas of Critical Ecological Concern, which warrant protections and would therefore be incompatible for coal leasing.  Ultimately, I believe that market forces and governmental actions will influence the amount of actual leasing that will take place in the UFO-managed area over the next 20 years.  The focus would still be in the North Fork area, because of its higher quality of coal versus the other coal fields in the UFO-managed area.  All new mining initiatives should be assessed in terms of environmental impacts and contribution to climate change.  I would encourage BLM to continue to pursue partnership opportunities for methane venting as an alternative power source.

I favor the stipulations listed in the North Fork Alternative (**Alternative B.1**) that call for no oil & gas leasing within 0.25 miles of various types of coal leases, with the exception of methane-capture wells. This only makes sense to me, as coal mining and oil & gas exploration are non-compatible land uses and should not have overlapping footprints.  Maximum economic coal recovery should be managed.

**Recreation Management Areas**

North Delta.  I am quite familiar with the lands contained within the North Delta off-road area, as a consequence of my geologic mapping fieldwork studies.  I support designating it a Special Recreation Management Area (SRMA) (**Alternative B**), rather than an Extensive Recreation Management Area (ERMA) (**Alternative D**).  The call for a more comprehensive management plan is warranted, in my mind, because of the geologic character of the Mancos Shale.  This is one of the few areas of the Adobes where ice-age streams did not flow; it is a bypass area.  As a result, there are few gravel-capped mesas. Instead, there is an abundance of shale peaks, cuestas, and rounded summits, forming an *extensive badlands terrain that is quite susceptible to erosion*.  This high erodibility of the landscape is a cause for a more comprehensive scrutiny and long-term management of off-road land uses here.

Jumbo Mountain.  Again, I am quite familiar with this area because of my geologic mapping fieldwork studies, and also because I mountain bike and hike in the area.  The BLM is aware of the numerous, "citizen-built" trails that have been constructed in this area.  At present, this trail systems represents a minor draw for out-of-town tourists, and a source of revenue for businesses in the town of Paonia.  I applaud the BLM for recognizing this, and for proposing two variants of Special Recreation Management Area (SRMA) status that would bring the trail system under federal management.  The preferred alternative (**Alternative D**) is limited to the present extent of trails, on the western flank of Jumbo

6

Mountain.  A potential problem here is that motorized travel is not represented.  The SRMA under this scenario is OK for biking and hiking, by motorized vehicle use would be incompatible.  I prefer **Alternative B**, which features a much-expanded SRMA that encompasses most of Jumbo Mountain.  This larger area holds promise for future, managed recreational uses, including a possible minor expansion of the mountain bike trail system, plus the possibility of locating motorized off-road vehicle and dirt-bike trails around the bulk of Jumbo Mountain, in its central and eastern parts.  I feel that this is an opportunity to account for numerous recreation uses for Jumbo Mountain, while giving incompatible or conflicting uses their own territories.  With the opportunity for increased future recreational uses comes an opportunity for the town of Paonia to capitalize and prosper from those uses.  This is the time to seize that opportunity and manage it properly.  Thank you for proposing these areas!

Kinikin Hills.  Similar to the Adobe Badlands and McDonald Creek, this is an area of Mancos Shale and gravel-capped hills near Montrose.  I am quite familiar with this area as a result of my geologic mapping.  Among other things, it contains some notable geologic features, including (a) upland gravel deposits of a prehistoric river system (termed "the Bostwick River") that existed prior to the development of the modern Uncompahgre River valley, and (b) a deposit of the Lava Creek B tephra, an ashfall deposit that came from an enormous volcanic eruption in Wyoming's Yellowstone region, about 640,000 years ago (see Noe and others, 2007 for discussions).  I support **Alternative B** for this area, which calls for a Special Recreation Management Area (SRMA) and non-motorized day use.  I feel this is an appropriate plan for managing the full range of Adobes-type terrains here.


**Lands With Wilderness Characteristics and Areas of Critical Ecological Concern**

Adobe Badlands.  This area is just to the north of the town of Delta.  The agency-preferred Area of Critical Ecological Concern (ACEC) (listed as the agency-preferred **Alternative D** in the RMP) is a rather small area of very pristine Adobes badland landscape that contains various ice-aged, mesa-top gravels and shale peaks to the west of Petrie Mesa.  Although lacking certain wilderness characteristics, in my geologic-mapping ramblings I have found it to contain stunning scenery; the sense of solitude there is almost unbelievable!

I much prefer **Alternative B**, with its provisions for a much larger ACEC that includes the root area near Petrie Mesa but extends far to the north, south, and west, as far as the U.S. Highway 50 corridor.  Though broken by some large "island" parcels of private land, this large ACEC contains a rather complete complex of Adobes landscape types.  In addition to many more gravel mesas and shale peaks, it also contains extensive mud-fan complexes (which are not present in the smaller, **Alternative D** area).  The result is that the expanded ACEC would contain a greater biodiversity and greater protection for the specialized types of plants that occupy all of the Adobes ecological niches.  In particular, the mud-fan complexes house a large population of prairie dogs, which in turn are an important food source for many species of raptors.  The mud-fans and shale slopes in this area are often encrusted with biotic soil crusts that favor the clayey soils.  (And, interestingly, include the Delta Range Munitions Response Site for unexploded ordnance!)  The northward extensions extend into the mid-slope area of Grand Mesa, and into pinon-juniper forests and shrublands.  I urge you to adopt the alternative (**Alternative B**) that allows for the opportunity to manage an entire interconnected ecosystem, and not just parts of it.

**Alternative B** also contains the provision of designating an area of Lands With Wilderness Characteristics (LWC) ("Adobe Badlands Adjacent") along the middle slopes at the southern tip of Grand Mesa.  This is to the north of the proposed ACEC, and it borders USFS lands that are on the higher slopes of the mesa.

BLM_0148785

I have been near this area a few times while doing my geologic mapping.  But mainly, I found it to be largely inaccessible due to lack of roads, as well as landslide terrain that supports heavy pinon-juniper forest and shrubland growth.  In other words, it contains many things that are earmarks of wilderness characteristics!  I would imagine that this type of terrain is under-represented in the LWC realm, and so I would encourage you to adopt this area as a LWC.

McDonald Creek.  I know this little-visited area well as a result of my geologic mapping.  It contains some varied, upland and Adobes-type terrains.  The bedrock is Mancos Shale and many of the mesas are gravel capped.  This area is somewhat similar to the Adobe Badlands/Devils Thumb area near North Delta and the Kinikin Hills area near Montrose.  I could not find in the RMP document a specific listing of potential use alternatives or designations for this area, except for being named as an Ecological Emphasis Area, grouped along with Jumbo Mountain (RMP Appendix A, Figure 2-2).  It possibly contains the Lone Cabin, Elephant Hill, and Youngs Peak ('C' Hill) areas, as well.  Because of the geologic and ecological similarities of this area with the Adobes Hills and Kinikin Hills, I would support a use alternative (such as an Extensive Recreation Management Area, or ERMA designation) for McDonald Creek and the other nearby areas that is in line with the **Alternative B** designation for that area.

Needle Rock.  I support the maximum level of protection for this unique landform.  Please note, for future interpretational materials and signage for this area: In our geologic mapping of the Crawford quadrangle (Noe and Klink, 2015), my colleague and I have devised a new and different interpretation for this intriguing geologic feature!  Rather than being an eroded volcanic neck, we re-interpret it to be the crown dike at the top of a buried igneous laccolith of unknown size.  We need to test this amongst other geologists by writing and publishing a peer-reviewed paper.  If the idea seems to have merit, I would be happy to work with BLM-UFO staff in the future to create new interpretive materials.

As a general statement, I believe that the time is now to enact the highest levels of protection for all of the unique landform areas within the UFO-managed area (e.g., SRMA'S instead of ERMA's, ACEC's instead of nothing at all).  It will be difficult to upgrade the protection status in the future, particularly working within a 20-year time frame.  I thank you for including these designations and opportunities within your RMP alternatives.


**Other RMP Resource Management Plan Categories**

I am pleased to see that many of the agency preferred actions (**Alternative D**) are the same or close to the actions listed in the "conservation" actions (**Alternative B**) for RMP items such as Climate Change, Land Health, Soils and Water Resources, Vegetation, Weeds, Wildlife, Special Status Species, Wildland Fire and Ecology Management, Cultural Resources, Paleontological Resources, Visual Resources, Forestry and Woodland Products, and Livestock Grazing.  For all of these items, I hope that you will adopt **Alternative B** over **Alternative D** in all cases where the two alternative differ, as this will best protect the integrity and function of the lands from erosion and other degradations.  In all cases, I believe that **Alternatives A or C** are not warranted at all, as they do not provide for adequate resource protections.

In the North Fork area, the "North Fork Alternative" (**Alternative B.1**) contains specific and strong stipulations that were designed to protect the integrity of that watershed and its vegetation and wildlife.  As I've already discussed, this alternative makes the most sense for the North Fork area for geologic reasons.  The proposed stipulations not only make good sense for limiting potentially negative effects of

BLM_0148786

oil & gas drilling, but they additionally provide other beneficial protections for those lands.  Wherever possible, I urge that you adopt the stipulations detailed in **Alternative B.1.**

**In Conclusion**

Again, I thank you for considering my comments.  I have attempted to approach these issues from a geology perspective, based on my expertise and knowledge of the northern part of the BLM-UFO district, and in particular, the North Fork Gunnison River valley.  I am also a resident of this area.  You have no doubt received many letters extolling the sustainable rural economy of the North Fork, and the need for protecting those resources and life activities.  Clean air and fresh water, viewsheds, and the support of organic farming and high-quality coal production are important to me, as well.  I hope that you will consider adopting **Alternative B.1** into your management plan wherever possible.

Sincerely,

David C. Noe
Geologist, retired
P.O. Box 191
Paonia, CO 81428

**References**

Lazear, G.D., 2006, Evidence for deep groundwater flow and convective heat transport in mountainous terrain, Delta County, Colorado, USA: Hydrogeology Journal, v. 14, p. 1582-1598.

Lazear, G.D., 2009, Fractures, convection and underpressure – hydrogeology on the southern margin of the Piceance basin, west-central Colorado, USA: Hydrogeology Journal, v. 17, p. 641-664.

Noe, D.C., 2015, Geologic map of the Paonia quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 15-08, 50 p., scale 1:24,000.

Noe, D.C., and Klink, A.T., 2015, Geologic map of the Crawford quadrangle, Delta and Montrose Counties, Colorado: Colorado Geological Survey Open-File Report 15-06, scale 1:24,000.

Noe, D.C., Logan, Z.D., McCall, K.J., and Warden, G.W., 2015, Geologic map of the Lazear quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 15-08, 11 p., scale 1:24,000.

Noe, D.C., Morgan, M.L., Hanson, P.R., and Keller, S.M., 2007, Geologic map of the Montrose East quadrangle, Montrose County, Colorado: Colorado Geological Survey Open-File Report 07-02, 92 p., scale 1:24,000.

Noe, D.C., and Rodgers, E.L., 2014, Geologic map of the Hotchkiss quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 14-15, 41 p., scale 1:24,000.

Noe, D.C., White, J.L, and Nelson, M., 2015, Geologic map of the North Delta quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 15-09, 9 p., scale 1:24,000.

Noe, D.C., and Zawaski, M.J., 2013, Geologic map of the Orchard City quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 13-05, 40 p., scale 1:24,000.

Rogers, W.P., 2003, Critical landslides in Colorado – a year 2002 review and priority list: Colorado Geological Survey Open-File Report 03-16, 55 p., 1 map plate, scale 1:500,000.

BLM_0148787

**CC:'s Submitted Electronically**

Teresa Pfifer, Field Manager, BLM Uncompahgre Field Office; tphifer@blm.gov
Ruth Welch, BLM State Director for Colorado; rwelch@blm.gov
Neil Kornze, BLM Director; director@blm.gov
Sally Jewell, Secretary, U.S. Department of the Interior; via web site
Doug Atchley, Delta County Commissioner; datchley@deltacounty.com
Bruce Hovde, Delta County Commissioner; bhovde@deltacounty.com
Mark Roeber, Delta County Commissioner; mroeber@deltacounty.com
Kerry Donovan, State Senator; kerry.donovan.sd5@gmail.com
Millie Hamner, State Representative; millie.hamner.house@state.co.us
Michael Bennet, U.S. Senator; via web site
Cory Gardner, U.S. Senator; via web site
Scott Tipton, U.S. Representative; via web site
John Hickenlooper, Colorado Governor; via web site
Alex Johnson, Director, Western Slope Conservation Center; director@theconservationcenter.org

BLM_0148788

11/1/2016     DEPARTMENT OF THE INTERIOR Mail - National Park Service Comments, Uncompahgre Field Office Draft Resource Management Plan



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## National Park Service Comments, Uncompahgre Field Office Draft Resource Management Plan
1 message

**NPS_Environ_Rev@noreply.nps.gov** <NPS_Environ_Rev@noreply.nps.gov>          Tue, Nov 1, 2016 at 10:12 AM
To: uformp@blm.gov
Cc: imrextrev@nps.gov, samuel_fox@nps.gov

Dear Sir/Madam,

Please use the link(s) below to download National Park Service comments on the Uncompahgre Field Office Draft Resource Management Plan.

If you have questions, please contact David Hurd at imrextrev@nps.gov.

NPS comments on the Uncompahgre Field Office Draft RMP.docx:  https://irma.nps.gov/ERTS/Download/382f62785471753475444b564b4364654538704b4141636752546c4d666e6e4d352b46576d3357434b6d4a516e76577974585a6c675763365349694945075071346e38434d484f6379354c7a305533592f4733664b4e492b344c5a694f6c4e7734

BLM_0148789



**United States Department of the Interior**
NATIONAL PARK SERVICE
National Trails Intermountain Region
324 South State Street, Suite 200
Salt Lake City, Utah 84111



IN REPLY REFER TO:  EQ-16/0060 Uncompahgre Field Office Draft Resource Management Plan

October 31, 2016

VIA ELECTRONIC MAIL:  NO HARD COPY TO FOLLOW

Memorandum

To:            Gina Jones, Tres Rios Field Office, Bureau of Land Management

From:        Jill Jensen, Archaeologist

Subject:    NPS comments on the Uncompahgre Field Office Draft Resource Management Plan, Delta,
                Gunnison, Mesa, Montrose, Ouray and San Miguel Counties, Colorado.

Thank you for the opportunity to review the draft Resource Management Plan (RMP) for the Uncompahgre Field Office.   As noted in the draft RMP, the Old Spanish National Historic Trail is located within the planning area for the Uncompahgre Field Office of the BLM.  As the federal co-administrators of this National Historic Trail (alongside the Bureau of Land Management), we appreciate the thoughtful consideration your office has invested in the incorporation of the Old Spanish National Historic Trail in your long range planning efforts.  We offer the following comments and corrections for the draft RMP, please don't hesitate to contact us if you would like to discuss any of these comments.

General Comment #1:  We would like to see a section clearly describing how the requirements of BLM Manual 6280 were (or will be) met in the land use planning process.

General Comment #2: We would prefer to see a more flexible, viewshed based avoidance area approach for National Historic Trails.

Table 2-2, Line 595:  Please explain why all National Historic Trails *except* the Old Spanish National Historic Trail will be managed as VRM Class II.  This appears to be an arbitrary decision with a bias against preserving existing viewshed along the Old Spanish National Historic Trail.

Table 2-5, Line 596-598: In our opinion Alternative D is not a balance between Alternatives B and C.  We would propose that viewshed-based avoidance areas would present a more balanced alternative.

Table 2-3: Please provide a definition of what is mean by "avoid" versus "exclude".  How will avoidance be achieved?

Chapter 3, page 3-168: The Comprehensive Management Plan referred to in this section (and elsewhere) is now a Comprehensive Administrative Strategy (CAS).  Unfortunately, the CAS will not provide the type of management guidance you seem to be referring to here.  While it does identify high potential sites and segments, as well as provide some very general high-level administrative goals, it does not identify the National Trail Right-of-Way nor does it provide management suggestions.

2

Chapter 3, page 170:  The local office needs to work with the federal trail administrators (in the case of the Old Spanish Trail, this would be National Park Service *and* the Utah State office of the BLM) as first point of contact, in addition to including the Old Spanish Trail Association as a consulting party.

Chapter 4, page 4-420 (consultation): This section seems to imply that the field office will only consult with the SHPO for undertakings on the National Historic Trails.  With respect to the Old Spanish National Historic Trail, the National Park Service, the Old Spanish Trail Association and any other interested party are also consulting parties under section 106 of the National Historic Preservation Act.  Unless other arrangements are made (e.g. Programmatic Agreement, Memorandum of Understanding, etc.) the federal trail administrators are to be consulted for all actions on the National Historic Trails, as all such actions are subject to compliance with the National Trails System Act.

Chapter 4, page 4-420 (assumptions): We couldn't agree more heartily with the following statement made in this section: "Recognizing that national trails often comprise numerous routes rather than a single trace, all protective zones begin at the outer edges of trails rather than at a centerline, which is difficult to define."  However, all of the protective measures for the Old Spanish National Historic Trail outlined in this draft RMP are based on a somewhat arbitrary centerline.  BLM Manual 6280 directs the development of a National Historic Trail Management Corridor in the land use planning process, it does not appear that these directions have been carried out with respect to the Old Spanish National Historic Trail.

Chapter 4, page 4-422:  As discussed in previous comments, the Comprehensive Administrative Strategy (CAS) will not provide the type of guidance you are referring to here.  We suggest that you cite BLM Manual 6280 instead of the CAS.

Please don't hesitate to contact me should you need clarification or additional information.  I can be reached via phone (801-741-1012 ext 115), email (jill_jensen@nps.gov) or the address listed above for future notices regarding this project.

Sincerely,

Jill Jensen
Archaeologist

Cc:
Rob Sweeten, Co-administrator Old Spanish National Historic Trail
Bureau of Land Management
Utah State Office
440 West 200 South, Suite 500
Salt Lake City, UT 84101-1345

BLM_0148791

11/1/2016          DEPARTMENT OF THE INTERIOR Mail - Ouray County Uncompahgre Field Office Resource Management Plan Comment Letter



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Ouray County Uncompahgre Field Office Resource Management Plan Comment Letter

1 message

**Hannah Hollenbeck** <hhollenbeck@ouraycountyco.gov>          Tue, Nov 1, 2016 at 12:53 PM
To: uformp@blm.gov
Cc: dbatchelder <dbatchelder@ouraycountyco.gov>, lpadgett <lpadgett@ouraycountyco.gov>, btisdel
<btisdel@ouraycountyco.gov>, mwhitmore <mwhitmore@ouraycountyco.gov>, Connie Hunt <chunt@ouraycountyco.gov>,
Hannah Hollenbeck <hhollenbeck@ouraycountyco.gov>

Please find attached Ouray County Board of County Commissioner's Comment Letter regarding the Uncompahgre Field
Office Resource Management Plan.


Thank you,

Hannah Hollenbeck


_____

Hannah Hollenbeck

Deputy Clerk of the Board

Ouray County


P.O. Box C

Ouray, CO  81427

(970) 325-7320 x32

_____



 **BOCC Comment Letter re BLM UFO RMP.pdf**
354K

BLM_0148792



LYNN M. PADGETT

BEN TISDEL

DON BATCHELDER

## BOARD OF COUNTY COMMISSIONERS

541 4ᵗʰ Street   •   P.O. Box C   •   Ouray, Colorado 81427   •   970-325-7320   •   FAX: 970-325-0452

November 1, 2016

Joseph Meyer, Southwest District Manager
Dana Wilson, Acting Uncompahgre Field Office Manager
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Via Email: uformp@blm.gov

Dear Joe and Dana,

Ouray County is pleased to be able to provide comments on the Uncompahgre Field Office of the Bureau of Land Management (UFO BLM) Draft UFO Resource Management Plan (RMP) / Environmental Impact Statement (EIS) [hereafter, "*DRMP/EIS*"].

In 2015, Ouray County Board of County Commissioners approved Resolution 2015-014 "Stating the value of public lands to Ouray County's economy, recreation, heritage and quality of life, and supporting continued federal ownership of federal public lands."

Ouray County's Master Plan[1], Land Use Code[2] and zoning[3], orient higher density development and commercial activity towards our municipalities in exchange for preserving our rural working landscapes, scenic vistas, open space, wildlife habitat, and outdoor recreation opportunities towards the unincorporated portions of the county and our public lands. We have sections of our land use code addressing visual impact mitigation of development to protect our economically important scenic vistas, wildfire mitigation, protecting wildlife corridors and sensitive landscapes, avoiding geohazards and floodplains, and protecting dark skies. Our countywide economic goals include working toward abundant, affordable and redundant broadband, and enhancing outdoor recreation opportunities in all seasons. [4,5]

We offer the following comments on the DRMP/EIS:

**1. Land Disposals.**

> The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "consider disposal of lands that would consolidate public ownership for greater management efficiency while serving the public interest, including communities and their expanding needs." [6]

---

[1] http://co-ouraycounty.civicplus.com/DocumentCenter/View/144
[2] http://ouraycountyco.gov/DocumentCenter/Index/41
[3] http://ouraycountyco.gov/DocumentCenter/View/145
[4] http://www.ouraycountyco.gov/ArchiveCenter/ViewFile/Item/96
[5] http://www.ouraycountycolorado.org/bottomup/Ouray_County_Resolution_2011_022.pdf
[6] Page 2-319;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

BLM_0148793

The lands identified for disposal were identified on Appendix A, Figure 2-59 to 2-62[7] and legal descriptions were provided in Appendix N.[8]

BLM has a number of "in-holdings" within Ouray County that may be subject to disposal by BLM. Ouray County would like to have notice of any proposed disposal so that the County may engage in discussions regarding any proposed transfer of lands and potential new uses.

Ouray County desires that the BLM not dispose of any public lands that would increase the amount of private land intersected by public rights-of-way, including county roads and trails. Please see Ouray County Resolution 2014-014[9] and the map that comprises Exhibit A[10] for an inventory of designated public rights-of-way. There may be others, including some new trails within the system known as the "RAT" trails in the Ridgway area that are not yet on Exhibit A.

In general, Ouray County does not want land disposals to create parcels that are non-conforming to our county land use code and minimum parcel sizes within our zones.

A GIS shapefile of land disposal parcels was obtained from UFO staff on October 31, 2016. We could not match up the legal descriptions of the parcels as described in Appendix N with the parcel legal descriptions in the GIS shapefile.

A parcel of approximately 22 acres, that our GIS shows is in T45N R8W Section 9 and lies on the west side of the Uncompahgre River and contains a portion of the Uncompahgre Riverway trail is not recommended for disposal under Alternatives A, C and D, but is recommended for disposal under alternative B. Ouray County does not support disposal of this parcel, as it is imperative for trail linkage and recreation that it remain accessible to the public. The public uses this parcel as a popular picnicking area, bird watching area, and for quiet reflection by the river. It has facilities that are used for needed breaks along the approximately 4-mile trailway.

There are two parcels east of US 550 within T44N R8W Section 13 that are adjacent to U.S. Forest Service lands, in the general vicinity of Lake Lenore. These parcels are recommended for deferral under Alternative C but not the agency preferred alternative D. Because they are proximal to other public lands and are mapped as having a public trail intersecting them. Ouray County does not support disposal of these parcels.

There are two parcels west of US 550 that are recommended for disposal under several alternatives but not Alternative D, south of Portland. The northern of these two is also within T44N R8W Section 13 and contains the Uncompahgre River corridor and riparian habitat. It should not be disposed of. The southern parcel is within T44N R9W Section 14 and contains portions of a public trail. It also should not be disposed of.

A parcel consisting of approximately 129 acres within T44N R8W Section 11, lies on the slopes of Miller Mesa. It appears that it contains a public trail and contains Elk Ridge Trail Road, used as access for private lands. It is recommended for disposal under Alternative D. Prior to disposal the county should be consulted so that a full investigation can be conducted to learn if there will be any loss of historic access to other properties or public rights of way. If disposed of, the BLM should ensure that it is transferred so that no ROWs are altered or lost. A portion of County Road 17 intersects the southwest corner of this parcel. This parcel also contains the drainage that feeds into Black Lake. It is the desire of Ouray County that any diseased forests be treated prior to any land disposal, and we are aware of significant forest health issues on this parcel.

There are two parcels within Cow Creek Valley area on the east side of U.S. 550 not recommended for disposal in Alternative D due to saline soil conditions.

---

[7] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.78374.File.dat/App%20A%20Combined.pdf
[8] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.77552.File.dat/N_Disposal_UFO-DRMP-2016_508.pdf
[9] http://ouraycountyco.gov/ArchiveCenter/ViewFile/Item/229
[10] http://ouraycountyco.gov/documentcenter/view/2476

The three isolated approximately 35-40 acre parcels on Log Hill Mesa recommended for disposal seems to make sense for disposal so long as there is access for a new private owner.  County Road 1 splits one of the parcels, and Ouray County would desire that any lands disposed of be done in a way that does not create parcels that do not conform to our underlying zoning.  This should be able to be accomplished with this parcel.

## 2. Areas of Critical Environmental Concern (ACEC)s.

There are no existing ACECs in Ouray County.  Alternative B contemplates creating the Cerro Summit-Sims Mesa Gunnison Sage-grouse ACEC in northern Ouray County, where there is BLM land proximal to occupied habitat.

On November 12, 2014, the U.S. Fish and Wildlife Service (USFWS) announced that it determined that the Gunnison Sage-grouse, a ground-dwelling bird found only in southwestern Colorado and southeastern Utah, required the protection of the Endangered Species Act (ESA) as a threatened species.  The USFWS originally proposed to list the species as 'endangered' under the ESA in January 2013, but efforts by the two states, tribes, local communities, private landowners and other stakeholders to conserve the species and its habitat were found to have helped reduce the threats to the bird sufficiently to give it the more flexibly protected status of 'threatened.' [11]

The supporting EIS for the Threatened Status designation of the Gunnison Sage-grouse[12] and for the Designation of Critical Habitat for the Gunnison Sage-grouse[13] is dated November 9, 2014.

These designations prompted a process for the BLM to prepare a draft Gunnison Rangewide Plan Amendment that would potentially result in multiple resource plan amendments (GuSG DRMPa) and a companion draft environmental impact statement (GuSG DEIS) which more closely analyzes planning issues, including energy and minerals actions, in order "to analyze the addition of GuSG conservation measures to several existing RMPs", including the BLM UFO DRMP/EIS.  The deadline for comments on the GuSG DRMPa is after the deadline to comment on this UFO DRMP/EIS.  The GuSG DRMPa documents were released as drafts in August 2016.

In the GuSG DRMPa, the BLM states, "The BLM manages approximately 40 percent of GUSG habitat across twelve counties in southwestern Colorado and southeastern Utah…The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision." [14]

The Purpose section of the GuSG DRMPa states, *"This RMP amendment provides a framework for conserving and assisting with the recovery of the GuSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird."* The Need section of this document states, *"The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs 'shall be revised as necessary based on …, new data, new or revised policy…(43 CFR 1610.5-6).'"* [15]

Due to the UFO DRMP/EIS alternative formulation and scoping work occurring mostly between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS.   The UFO Gunnison Sage-grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.

Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM DRMPa ROD so that the BLM DRMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices.  All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease

---

[11] https://www.fws.gov/mountain-prairie/pressrel/2014/11122014_ServiceProtectsGunnisonSageGrouseAsThreatenedUnderESA.php
[12] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf
[13] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GuSGCriticalHabitat_11202014.pdf
[14] Page I; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf
[15] Page iii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

BLM_0148795

is allowed a 20-year period with out-of-date stipulations and practices.  While the GuSG DRMPa goes much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and habitat enhancement and connectivity measures, it still needs additional work and we plan on providing comments for the GuSG DRMPa separately.

**3. Special Recreation Management Areas (SRMAs).**

Ouray County appreciates the collaborative work the UFO staff did with the Ridgway Area Trails (RAT) group (now a chapter of Colorado Plateau Mountain Bike Trail Association, COPMOBA) to allow for a multi-use single-track trail system to be accomplished on BLM lands just north of Ridgway.  This new trail system has been successful economically, in that as soon as the first 3 miles of trails were open, Ridgway had a new bike shop and two new jobs. During the season the trails are open, it is typical to see vehicles with plates from multiple states and from all over Colorado.  Local families with children are also enjoying the highly scenic trail system.   These trails also leverage other trails along the Uncompahgre Riverway and Ridgway State Park.  We support RAT and COPMOBA in their comments and requests to enhance our trail systems.  The Ridgway Trails and Spring Creek SRMAs will be welcome in Ouray County.

Ouray County fully supports the Zone 1 Objective of the Ridgway Trails SRMA, which states "Through the life of the plan, manage Zone 1 for visitors of all abilities to engage in day use nonmotorized and educational activities, including disabled accessible trails…" and supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in day use, stacked loop, nonmotorized, trail activities, including challenging, natural surfaced, disabled accessible trails…"[16]  We are curious if "single-track" should have been included in the objective for Zone 2?

Ouray County fully supports the Zone 1 Objective of the Spring Creek SRMA, which states "…manage Zone 1 for visitors to engage in day use, nonmotorized, single-track, stacked loop, trail activities…"; supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in canyon viewing through single-track trail activities..."; and supports the Zone 3 Objective, "…manage Zone 3 for visitors to engage in camping and scenic viewing through motorized and nonmotorized trail activities…"[17]  Only Zones 2 and 3 occur within Ouray County, but the three zones are complimentary of each other.

Ouray County agrees with the stipulations for both SRMAs and all Zones, presented in Appendix J. [18]

**4. Enhanced Ecological Areas (EEAs).**

The County applauds the BLM for the recent cooperative efforts in enlarging the trail opportunities on BLM lands within Ouray County.  It appears that BLM has identified additional potential trails systems which could be developed within Ouray County, including opportunities to increase travel and recreation on McKenzie Butte.  The County supports these efforts to increase recreation, including hunting, hiking, horseback riding, trail biking, and OHV uses.

In this spirit, we notice that McKenzie Butte and Pinon Ridge on Log Hill Mesa are recommended to be included in a Ridgway EEA.

Ouray County appreciates that the UFO is trying to incorporate connectivity of core habitat for multiple species into the management plan.  However, we are concerned about the stipulations recommended that include ROW avoidance in Alternative D.

---

[16]Pages 2-258 to 2-262;

http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

[17]Pages 2-281 to 2-287;

http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

[18]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.40130.File.dat/J_Rec_UFO-DRMP-2016_508.pdf

Appendix D describes the proposed Ridgway EEA as:

| Ridgway | BLM land on Log Hill Mesa and around Billy Creek State Wildlife Area. Contributes to linkage between Cimarron Ridge and Uncompahgre Plateau, in critical big game wintering area. Divided into four zones. | Pinyon-juniper, mountain shrub | Mountain lion, mule deer, elk, bear |
|---|---|---|---|

We encourage the UFO to work with Ouray County trails groups and stakeholders to ensure that there can be a companion trail system, similar to the quality and benefits of the RAT trail system north of Ridgway, that can be located on the McKenzie Butte parcel.  It will be important to refine any stipulations for this  Core Zone 1, to ensure that this possibility can be realized in the next few years.

The parcel outlined in bright blue below, is where McKenzie Butte and Pinon Ridge are located:



Figure 5.a.  Showing parcels of the proposed Ridgway EEA.

Ouray County does not desire the designation of the western parcel (Core Zone 1) to be included in this EEA, if this would interfere and prohibit the ability to develop enhanced single-track trail systems for pedestrians, horses, and mountain biking.  Log Hill Mesa is home to approximately ⅓ of Ouray Country residents and this area.

The ridge and butte are also topographically advantageous to expanding cell phone service and wireless broadband on the mesa.  Currently, outside of the southern portion of Log Hill Mesa, where

infrastructure on Tower Road is able to serve residents and where limited DSL exists, much of the mesa area suffers from little landline, spotty cell phone, and no broadband service. It appears the EEA stipulations being contemplated for Alternative D, and certainly for Alternative B, for Core Zone 1 could prohibit a ROW for communications and/or broadband infrastructure. Cell phones and satellite dishes are neither affordable, nor reliable replacements for broadband. Ouray County continues to be a place that attracts entrepreneurs, telecommuters, and "creatives". It will be essential to have a topographically suitable location to provide essential communications and broadband services with a minimum of towers or infrastructure. Power and fiber are generally needed to be able to be extended to sites for infrastructure.

## 5. Wildlife and Watchable Wildlife Viewing Areas

Ouray County encourages the BLM to work with Colorado Parks and Wildlife (CPW) to ensure that the species-specific buffers, timing limitations, best management practices and other wildlife data relating to alternatives and stipulations is incorporated into the final RMP/Record of Decision. At the October 15, 2016 cooperators' meeting with the BLM in Montrose, CPW staff indicated that information they had provided was not yet incorporated. Ouray County also supports CPW's desire to protect big game winter range and other important habitats by limiting well pad densities to no more than 1 per 160 acres, and requiring Master Leasing Plans and implementing compensatory mitigation requirements.

Ouray County would support the creation of watchable wildlife viewing sites within BLM lands as discussed in Chapter 3 (page 3-170) near Billy Creek State Wildlife Area and the Uncompahgre Riverway. Winter bald eagle viewing is very popular along the Uncompahgre Riverway by locals and visitors. Increasing educational opportunities adds value to our public lands and promotes conservation and consideration of human impacts on wildlife.

Ouray County prefers Alternative B stipulations for fluid minerals over the agency preferred Alternative D.

Ouray County has had several landowners place conservation easements on their property, thousands of acres in aggregate, to benefit big game habitat, riparian habitat, Gunnison Sage-grouse habitat, and scenic open space. We request that the BLM obtain from the county and other sources GIS files showing the locations of these conservation easements, and that an NSO stipulation be placed on all private conserved lands with split estate.

## 6. Slopes

Ouray County is concerned about the Alternative D stipulations that change 30% slopes to 40% slopes for the threshold of applying a stipulation. We have highly saline and easily erodible soils and loose rocks. We desire that the BLM leave stipulations that are related to slopes at the percentages they are in Alternative A and B.

## 7. Visual Resources and Dark Skies.

Ouray County appreciates the language in the RMP providing protections to dark skies and limiting lights. Please add language that says that lights left on at night should be directed downward, which is good for wildlife and for preserving our dark skies. Dark skies are good for our economy, star gazing, astronomy, and protect our rural character.

## 8. Top of the Pines.

Ouray County has specific comments or requested revisions as follows:

The current RMP contains an action item to transfer timber rights on the property conveyed to Ouray County known as the Top of the Pines property (approximately 168 acres that was formerly a Girl Scout camp, conveyed to the County in 2000). The Draft RMP/EIS is unclear as to the intent of BLM with regard to the reserved timber resource. Table 2-2 at page 2-156 seems to indicate that the preferred alternative is the same as the current RMP. If that is an accurate interpretation of Table 2-2, page 2-156, then the County supports the preferred alternative. To the extent that Table 2-2 simply reflect that 168 acres have been deeded to the County, but BLM retains the timber resource, the County requests that BLM clarify Table 2-2, page 2-156, to reflect that BLM will proceed to deed to the County the currently-reserved retained interest in the timber resource at the Top of the Pines property. The County believes that conveyance of the timber will eliminate unnecessary potential disagreements between

BLM and the County over fire mitigation work and other non-commercial uses and stewardship of the timber and the property that has already been conveyed to the County. Given that BLM has eliminated the timber from its commercial resource inventory, conveyance of the reserved interest to the County would seem to have negligible impact to BLM.

If there are any questions or clarifications regarding Ouray County's comments, please do not hesitate to contact us.

Respectfully submitted,

Lynn M. Padgett
Chair, Ouray County Board of County Commissioners

BLM_0148799

11/1/2016                          DEPARTMENT OF THE INTERIOR Mail - BLM UFO Draft RMP Comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## BLM UFO Draft RMP Comments
1 message

**Leigh Robertson** <leighrobertson3@gmail.com>                    Tue, Nov 1, 2016 at 7:43 PM
To: uformp@blm.gov

Hi Gina,

Thanks for considering the attached comments!

Kind regards,

Leigh Robertson
970-316-1650

 **UFO RMP GUSG LR personal comments.docx**
168K

BLM_0148800

10/31/16

To: Gina Jones, National Environmental Policy Act Coordinator

Re: Comments on Uncompahgre Field Office Draft Resource Management Plan

Dear Gina,

Thanks for considering the following comments on the Uncompahgre Field Office Draft Resource Management Plan. If possible, I'd prefer that my name and contact information are not made public.

These are my personal comments, but as some background, I've been the coordinator for the San Miguel Basin Gunnison Sage-grouse Working Group for the past 10 years. I have a B.S. degree in Natural Resources and have been working in the field for 25 years.

Since the Gunnison Sage-grouse has been listed as a threatened specie since this plan was started, I feel it's imperative that the RMP uses the recommendations in Alternative B in order to protect this rare bird and its habitat. Actually, in some cases I believe the science warrants even stricter protections, as I'll reference below.

If the BLM goes generally chooses the recommendations in Alternative D, I request that the following specific changes be made:

Change to recommendations in those in Alternative B (or larger buffers) *at least* on the following pages:
2-102,
2-377: Within GUSG designated critical habitat: exclude wind, solar and hydropower.
2-103, 2-195 ideally change the buffer to 6.2 miles, or 4 miles at a minimum.
References to support larger buffers:
    Per BLM Instruction Memorandum No. 2014-100 Disturbance will be focused outside of a 4-mile buffer around leks.
    A multiscale assessment of factors associated with lek abandonment between 1965 and 2007 found that the level of the human footprint within 5 km (3.1 mi) of the lek was negatively associated with lek persistence (Knick and Hanser, 2011).
    Coates and others (2013) suggested that an 8 km (5 mi) protection area centered on an active lek location should encompass the seasonal movements and habitat use of 90-95% of sage-grouse associated with the lek.
    The Colorado Plan [Colorado Greater Sage-grouse Steering Committee, 2008] recommended a 6.4 km [4 mi] circular buffer.
    Holloran and Anderson (2005) reported 64% of monitored nests fell within 5 km (3.1 mi) of a lek, and response to industrial development (decreased nesting rates and success rates) was observable to distances between 5 and 10 km (3.1 – 6.2 mi) from a lek.
    Gregory and Beck (2014) suggested significant immediate effects on lek attendance with one well pad within 2 km (1.2 mi) of a lek and time-lagged effects due to industrial development within 10 km (6.2 mi) of a lek. Direct impacts of energy development on sage-grouse habitats and populations, such as loss of sagebrush canopy or nest failure, have been estimated to occur within a 1.2-ha (3-acre) area of leks (radius: 62 m [68 yards]); indirect influences, such as habitat degradation or utilization displacement, have been estimated to extend out to 19 km (11.8 mi) from leks (Naugle and others, 2011).
    Regional analyses of well-density and distance effects (Johnson and others, 2011) suggested negative trends in populations (lek counts) when distance was less than 4 km (2.5 mi) to the nearest producing well; whereas density effects were evident rangewide based on decreasing population trends when greater than eight active wells occurred within 5 km (3.1 mi) of leks, or when more than 200 active wells occurred within 18 km (11 mi) of leks.

BLM_0148801

p. 2-104: Would line 165, Alternative B prohibit brush-beating of a lek? If so, the wording should be changed to allow it.

p. 2-105 line 167 and 2-314 line 494 Need greater than a 0.6 mile radius around a lek for ROW exclusion, based on the following from:
Manier, D.J., Bowen, Z.H., Brooks, M.L., Casazza, M.L., Coates, P.S., Deibert, P.A., Hanser, S.E., and Johnson, D.H., 2014, Conservation buffer distance estimates for Greater Sage-Grouse—A review: U.S. Geological Survey Open-File Report 2014–1239, 14 p., http://dx.doi.org/10.3133/ofr20141239.
        Recent research has added important information to previous speculations and estimations, specifying concentrated foraging behaviors by common ravens (a common predator of sage-grouse nests) at 2.2 km (1.4 mi) from electrical transmission towers with the observed foraging area extending out to 11 km (6.8 mi; Coates, and others, 2014a). According to estimates, the greatest potential impact on sage-grouse nests occurs within 570 m (0.35 mi) of structures (Howe and others, 2014). Negative trends in lek counts were associated with increasing number of communication towers within 18 km of leks range wide (Johnson and others 2011). Johnson and others (2011) also documented negative trends in lek counts for Great Plains populations within 20 km (12.4 mi) of a power transmission line or when the linear density of powerlines within 5 km (3.1 mi) of leks was greater than 10 km (6.2 mi)—notably, affected areas may be greater in these habitats (compared to other intermountain communities) because visibility is often greater in gentle terrain.

All: lek area avoidance should start March 15, not April 1, or customize it to the appropriate date for the subpopulation, e.g., page 2-350.

2-349 Alternative B: Follow recommendations in San Miguel Basin Gunnison Sage-grouse Conservation Plan…ADD: with adjustments as needed to incorporate the latest science and/or findings from monitoring after management activities.

Pages 3-76, 3-77: changed GUSG to Threatened.

Thank you!

Sincerely,

*Leigh Robertson*

Leigh Robertson
596 Sabeta Drive, Unit D
Ridgway, CO 81432
970-316-1650

BLM_0148802

11/1/2016                    DEPARTMENT OF THE INTERIOR Mail - UFO DRMP Comments from San Miguel County



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## UFO DRMP Comments from San Miguel County
1 message

**Lynn Padgett** <lynnp@sanmiguelcountyco.gov>                    Tue, Nov 1, 2016 at 5:25 PM
To: uformp@blm.gov
Cc: Lynn Black <lynnb@sanmiguelcountyco.gov>, Steve Zwick <stevez@sanmiguelcountyco.gov>, Mike Rozycki <miker@sanmiguelcountyco.gov>, Joan May <joanm@sanmiguelcountyco.gov>, Amy Levek <amyl@sanmiguelcountyco.gov>, Art Goodtimes <artg@sanmiguelcountyco.gov>, lynnp@sanmiguelcountyco.gov, Janet Kask <janetk@sanmiguelcountyco.gov>

Greetings,

The San Miguel County Board of County Commissioners is pleased to provide our comments on the UFO Draft Resource Management Plan/EIS.

## Government Affairs / Natural Resources



San Miguel County · PO Box 1170 Telluride CO 81435

Lynn Padgett · 970-369-5441 · lynnp@sanmiguelcountyco.gov

---

📄 **SMC_NOVEMBER12016_UFORMP_COMMENTS_FIN.pdf**
     6274K

BLM_0148803

# SAN MIGUEL COUNTY
## BOARD OF COMMISSIONERS

| ART GOODTIMES | AMY LEVEK | JOAN MAY |
|---|---|---|

October 31, 2016

Joseph Meyer, Southwest District Manager
Dana Wilson, Acting Uncompahgre Field Office Manager
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Via Email: uformp@blm.gov

Dear Joe and Dana,

San Miguel County (SMC) is pleased to be offered the opportunity to comment on the Uncompahgre Field Office of the Bureau of Land Management (UFO BLM) Draft UFO Resource Management Plan (RMP) / Environmental Impact Statement (EIS) [hereafter, "*DRMP/EIS*"]

In 2015, the San Miguel County Board of County Commissioners approved Resolution 2015-009[1] (Attachment A), stating that public land under the management of the U.S. Forest Service and BLM constitute more than 60% of the land within San Miguel County and included the following statements:

- federal public lands are essential to the quality of life in San Miguel County, providing public recreational opportunities for wildlife watching, hiking, hunting, fishing, backpacking, horseback riding, skiing, bicycling, sightseeing, and numerous other outdoor recreational activities;
- federal public lands provide essential habitat for wildlife;
- wildlife and scenic landscapes on the public lands attract outdoor recreation and tourism that are the dominant drivers of San Miguel County's economy;
- San Miguel County business owners attract employees in large part because of the iconic landscape and recreational opportunities on federal public lands;
- San Miguel County's agriculture industry includes numerous ranchers and sheepherders who are dependent on grazing on federal public land;
- San Miguel County residents are actively collaborating among diverse interests and with public land managers to improve public land management and public access.

We have attempted to recommend actions that San Miguel County would like to have incorporated into the Final RMP and Record of Decision (ROD) and recommend improvements for what we consider shortcomings in portions of the plan and. We are not asking for just a single alternative to be implemented. We have identified places where we do not agree with the agency preferred Alternative D, and might agree in whole or in part with another Alternative, such as Alternative B. However, we have tried to approach each item that we perceive to be within or directly affecting San Miguel County in such a way as to offer desired actions and stipulations, which may be a customized mix or hybrid of different alternatives. We have attempted to offer our desires so that they can be practically accomplished when implementation of the Final RMP begins. We believe incorporating our

---

[1] http://www.sanmiguelcountyco.gov/301/Document-Viewer

1

BLM_0148804

recommendations will strengthen the document so that it provides clearer guidance and expectations in resource management programs, practices, and protections for the present and for the future.

Our comments are also offered in the spirit of the DRMP/EIS statement, "The BLM's planning regulations require that RMPs be consistent with officially approved or adopted resource-related plans ...so long as they are also consistent with the purposes, policies, and programs of federal laws and regulations applicable to BLM-administered lands." [2]

We also offer our comments in the spirit that the BLM attempted to "explore opportunities to enhance management of resources and resources uses; resolve conflicts among resources and resource uses; meet the purpose and need for the RMP; and are feasible to accomplish."

While San Miguel County philosophically is more supportive of the intent of Alternative B over Alternatives C and D, there are times where our comments realize that a balanced multiple use and human activities and structures are necessary for economic development and recreation, where they can avoid or mitigate impacts to other activities or wildlife needs.

---

### 2.3.3   Alternative B

Alternative B emphasizes improving, rehabilitating, and restoring resources and sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species, while allowing appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, ROWs, and livestock grazing). It particularly targets the habitats needed for the conservation and recovery of federally listed, proposed, or candidate threatened and endangered plant and animal species. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural resource values for current and future generations. This alternative would establish the greatest number of special designation areas such as ACECs and special recreation management areas, with specific measures designed to protect or enhance resource values. Appropriate and allowable uses and restrictions would be contingent on minimizing impacts on natural and cultural resources.

(From Page 2-7 of the DRMP/EIS)

---

### 2.3.6   Alternative D: Agency Preferred

Alternative D is the agency-preferred alternative, which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. This alternative incorporates a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses. Goals and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape. **Section 2.5** (Considerations in Selecting a Preferred Alternative) outlines the selection process for the preferred alternative.

(From Page 2-8 of the DRMP/EIS)

---

[2] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.7326.File.dat/1_UFO-DRMP-2016_508.pdf

BLM_0148805

With the intent that our comments are practical, we are not commenting on Alternative B-1 or designations that are not within or do not have direct impacts on San Miguel County.

We have prepared our comments mostly by special designation or resource use categories, and our comments are generally specific to areas, resources, resource uses, and potential designations within San Miguel County.  In some cases where the RMP decision may affect San Miguel County, we have also commented.  We have attempted to provide clear comments and recommendations, but in reviewing a plan, supporting materials, and spatial data, we realize our comments may not be as clear as we intended.  Please encourage the UFO staff to contact our staff lead, at 970-369-5441 or lynnp@sanmiguelcountyco.gov if there are any questions or clarifications needed.

1. **LANDS WITH WILDERNESS CHARACTERISTICS/WILDERNESS STUDY AREAS (WSAs)**
   <u>Summary:</u>  There are no Lands with Wilderness Characteristics or WSAs mapped within San Miguel County.  San Miguel County appreciates that these lands were inventoried by the BLM and supports comments being submitted by Conservation Colorado and Western Colorado Congress on this subject.

2. **WILD AND SCENIC RIVER (WSR) SUITABILITY.**
   <u>Summary:</u>
   - San Miguel County fully supports the designations of the identified river segments with in the San Miguel Basin as suitable.
   - San Miguel County fully supports the designation as "suitable" of the segments proposed in DRMP/EIS Alternative D, with some differences in the Alternative D stipulations.
   - See Rational/Discussion for specific comments on segment management stipulations.

   <u>Rationale/Discussion:</u>

   **Determination of Suitability**
   By making a determination of "suitable" for inclusion in the National Wild and Scenic Rivers System for the segments contained in Alternative D of the DRMP/EIS, the UFO BLM is honoring the countless hours of work from local stakeholders, citizens, sub-RAC (Resource Advisory Council), RAC members, and state and federal agency specialists, along with all of the public input gathered in-person and via multiple written comment periods.

   The number of segments recommended as "suitable" is a very small subset of the number of segments analyzed and their designation as suitable was found to be the best locally acceptable method to maintaining important native fish or other critical wildlife habitat, recreation and scenic values. Private property rights and water rights were carefully considered during the suitability process led by the stakeholder group and had been appropriately respected in Alternative D of the draft RMP/EIS. [3, 4]

   San Miguel County urges the UFO BLM to support these determinations of suitability within the Dolores and San Miguel Basin and to work with the Colorado Water Conservation Board (CWCB) to obtain flow protections using state processes to support the flow-related Outstandingly Remarkable Values (ORVs) where they do not already exist within these segments.

   In June 2010, the UFO BLM published their findings of eligibility for 174 river segments studied and evaluated in advance of the Uncompahgre Resource Management Plan (RMP). The analysis area included

---

[3]<u>Pages 3-164-167;</u>
<u>http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.96289.File.dat/3_UFO-DRMP-2016_508.pdf</u>
[4]<u>http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.2133.File.dat/P_WSR-Suit_UFO-DRMP-2016_508.pdf</u>

BLM_0148806

a portion of the Dominguez-Escalante National Conservation Area (NCA). An additional segment of the Dolores River, identified in the San Juan Public Lands Draft Land Management Plan, was evaluated by the UFO BLM because the northernmost 11.8-mile downstream portion of this segment is within the UFO planning area.

The BLM found after completion of field assessments and data analysis that informed their eligibility determination process, that 34 segments out of the 174 segments scoped were determined to be both free-flowing and to possess one or more outstandingly remarkable values (ORVs) that are necessary for Wild and Scenic River eligibility.  During the eligibility process, reviews of free-flowing character and determinations of ORVs were made by Colorado Parks and Wildlife (formerly Colorado Division of Wildlife; CPW), U.S. Fish and Wildlife Service (USFWS), and Colorado Natural Heritage Program (CNHP). The Draft Eligibility Report had a typical public comment period with comments received by the BLM from diverse interests.

In addition, fish values were assessed by Colorado Parks and Wildlife (CPW) on the San Miguel and Dolores Rivers. A presentation by Dan Kowalski, Aquatic Biologist, CPW, stated that San Miguel River Segments 1 and 2 are very important and highly used fisheries with important recreational fishing values. San Miguel River Segment 2 was identified as exceeding the Gold Medal Biomass standard in some years. Native fish species identified on the San Miguel River are Colorado Pikeminnow (Federally Endangered/State Threatened); Bluehead Sucker (State Threatened); Flannelmouth Sucker (State Threatened); Roundtail chub (State Species of Special Concern; BLM Sensitive Species); Colorado River Cutthroat Trout (State Species of Special Concern); Speckled Dace and Mottled Sculpin.[5]

In February 2013, the UFO BLM published their final Wild and Scenic River Suitability Report, which further analyzed the suitability of 28 river segments, including the 11.88-mile segment of the Dolores River.[6] (Six river segments, found eligible, were separately analyzed for suitability within the Dominguez-Escalante NCA RMP.)

During the robust suitability process, the BLM weighed protective measures for eligible river segments and the corresponding corridor in relation to current and potential identified uses. Possible environmental and economic consequences of, management issues resulting from, and reasonable alternatives to WSR designation were considered. Preliminary segment boundaries and classifications were reevaluated in response to public input. Geographic information systems data was recalculated, at times resulting in modified segment lengths and land ownership measures. Public participation and comments resulted in refinement of which segments were considered suitable for 10 stakeholder group meetings within the Dolores/San Miguel Basin.  (Separate stakeholder processes were initiated for segments in the Gunnison River Basin and those in the Dolores and San Miguel river basins.) Stakeholder groups held public meetings during late 2010 and early 2011. The Dolores/San Miguel Basin subgroup considered BLM analysis and public input and developed recommendations for each of the Dolores-San Miguel segments. A second public comment period was held to receive even more input prior to suitability recommendations from the stakeholder group. Hundreds of public comments were considered during the formal suitability public comment period.

San Miguel County fully believes that the stakeholder group, co-chaired by John Reams, a construction and mining contractor and rancher based in Norwood and Naturita, and Peter Mueller, a project director for the Nature Conservancy, based in Telluride, represented diverse backgrounds and interests and solicited diverse input from the public that was deeply considered in the final results of the process.

---

[5] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/wsr_docs.Par.32765.File.dat/San%20Miguel%20Dolores%20Fish%20DOW%20Presentation%20Dan%20Kowalski.pdf
[6] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.70506.File.dat/WSR%20Suitability%20Report_Final_04272012.pdf

BLM_0148807

Stakeholder meetings were held in Norwood, Naturita, and Telluride, whose residents are known to have very different political views on energy, minerals, recreation, agriculture, and forestry.[7] The Dolores/San Miguel Basin subgroup examined 21 different stream segments and public input received was incorporated into their findings.[8] The stakeholder group found 7 segments to be Suitable with modifications, 6 segments to be Suitable, and 8 to be Not Suitable.[9] Their recommendations were then considered by the BLM Southwest Resource Advisory Council (SW RAC) which voted unanimously to recommend that 8 segments in the San Miguel Basin and 5 segments in the Dolores Basin be found suitable. The BLM incorporated these recommendations into its preferred Alternative D of the UFO draft RMP/EIS.

San Miguel County is supportive of NCA legislation on the Dolores River Segments 1 and 2 and the La Sal Creek Segments 2 and 3, which overlap with the Tres Rios and Uncompahgre BLM offices.  If the NCA is successful, we believe that a Suitability determination would no longer be relevant. However, until an NCA is agreed upon, Suitability is a powerful tool to bring stakeholders and governments to the table to agree on NCA terms. Currently, there is no guarantee that an NCA will happen in the near future or that there will be agreement as to how the NCA will protect flows in place of current Suitability. Therefore, until such time as an NCA may be established that protects both flow-related and non-flow dependent ORVs, San Miguel County urges the CWCB to support the Alternative D suitability recommendations for the Dolores River. If an NCA is established that accomplishes full protection of ORVs, we would then support the determination for these 4 segments to be changed to not suitable.

San Miguel County understands that when the CWCB voted to appropriate an Instream Flow right (ISF) on the Dolores River from the San Miguel to Gateway (Lower Dolores Segment), the BLM offered in an unprecedented agreement, not to seek a federal water right on this river segment to protect the ORV flows. This was a very important consideration by the CWCB in voting to appropriate the ISF. We support the CWCB in asking for this language to be carried through on the other Dolores River sections.

While the ISF is important to protect the Lower Dolores segment (25), the ISF alone would not protect the wide array of ORVs, including: recreational and the extraordinary rafting, kayaking and canoeing opportunities; peregrine falcon habitat, including for breeding and nesting; and geologic and scenic, including the historic hanging flume.  The BLM's Report admits that due to the limited unappropriated water, it is unlikely that the high flows needed to sustain recreational activities could be secured. The Suitability determination on the Lower Dolores sections would complement the State's ISF by adding land management protection for this incredibly scenic and remote stretch of river with its historical, cultural and wildlife attributes.

San Miguel County also understands that The Lower Dolores from McPhee Dam to Bedrock already operates with a Suitability designation that was in place when the dam was built. The BLM has made it clear that it can't take away the senior water rights of the Dolores Project or require new reservoir releases through Suitability; rather it must work within the Colorado water rights system. The current Suitability determination on the Dolores has not appeared to affect Drought Contingency Planning or any coordinated management efforts.

    **A.  San Miguel River Segment 1** – ORVs are Scenic, Recreational, Wildlife, Historic, Vegetation, and Paleontology.  Over 19 miles of this segment lies within the existing San Miguel ACEC, and it

---

[7] http://www.telluridenews.com/news/article_d60c6f40-91d2-542e-8dad-e06bb13d4e85.html
[8] http://matchbin-assets.s3.amazonaws.com/public/sites/165/assets/64CW_The_Watch__March_17__2011.pdf
[9] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/wsr_docs.Par.31074.File.dat/2011-0225%20WSR%20Dolores%20San%20Miguel%20Segment%20Analysis%20RAC%20Recommendation.pdf

BLM_0148808

appears nearly the whole segment lies within the proposed San Miguel Expansion ACEC (GIS files).[10]

The San Miguel River corridor is extremely important for the local economy.  Preserving scenic views while allowing for high-quality boating, fishing, and retaining the existing travel management plan uses/limitations is extremely important to San Miguel County.

Due to the scenic and recreational ORVs, the fact that this segment is within the designated San Juan Skyway Scenic Byway and the Unaweep-Tabeguache Scenic and Historic Byway, it is very important to retain no less than a V-2 category for visual resource management.  This is consistent with the San Juan Scenic Byway Management Plan[11], the Unaweep-Tabeguache Scenic and Historic Byway Corridor Management Plan[12], and the San Miguel County Comprehensive Development Plan[13].  While the DRMP/EIS states "The BLM would not permit any actions that would adversely affect the free-flowing condition, ORVs, and adequate water quality to support those ORVs or tentative classification of any of the segments, or would result in the reduction of water quality to the extent that it would no longer support the ORVs…"[14], the stipulations provided in Alternative D do not provide the safeguards needed to make this a true statement.  If this is indeed a fact, then stronger stipulations are needed to replace those in Alternative D and/or in addition to the Alternative D stipulations.  Also, reaches within this segment contain four globally vulnerable (G3) riparian communities.

**B.  Saltado Creek** – This segment is proposed for a WSR designation of Wild in Alternative D.  The stated ORV for this segment is Vegetation, described as an "A-ranked" superior occurrence of globally vulnerable (G3) narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest, which is a primary reason the existing San Miguel ACEC was created.[15]

**C.  Beaver Creek** --

This segment is proposed for a WSR designation of Recreational in Alternative D.  The stated ORV for this segment is Vegetation, described as an "A-ranked" superior occurrence of globally vulnerable (G3) narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest, which is a primary reason the existing San Miguel ACEC was created.[16]  The designation of Recreational received strong support from a primary private landowner and San Miguel County, and was chosen to provide "reasonable certainty that future water development projects would receive consideration and could move forward with minimal difficulty."[17]

---

[10] http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp/ufo_draft_rmp_shape.html
[11] https://www.codot.gov/travel/scenic-byways/southwest/san-juan-skyway/SanJuanSkywayCorridorManagmentPlan.pdf/at_download/file
[12] https://www.codot.gov/travel/scenic-byways/southwest/unaweep-tabeguache/unaweep-tageguache-byway-corridor-management-plan-sep-2013
[13] http://www.sanmiguelcountyco.gov/DocumentCenter/Home/View/222
[14] Page 4-409; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_2.Par.12939.File.dat/4_UFO-DRMP-2016_508.pdf
[15] Page 64; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.16348.File.dat/Final%20WSR%20Eligibility%20Report%20Final%20Web%20071210.pdf
[16] Page 64; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.16348.File.dat/Final%20WSR%20Eligibility%20Report%20Final%20Web%20071210.pdf
[17] Page 37; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.70506.File.dat/WSR%20Suitability%20Report_Final_04272012.pdf

6

**3. SAN MIGUEL RIVER/SALTADO CREEK/BEAVER CREEK AREA COMMENTS:**

First, the San Miguel River corridor along with tributaries Saltado and Beaver Creeks was analyzed by San Miguel County staff holistically.  These areas have several existing and proposed designations within either Alternative A, Alternative B, and/or Alternative D.  However, we found that the stipulations provided in the UFO BLM DRMP/EIS GIS files did not match the language within the RMP, and added quite literally, layers of complexity to understand which stipulation (generally the most protective or stringent) would apply to which portion of land within this area.

To aid in this analysis, San Miguel County staff prepared a comparison table (Attachment B) that showed the stated stipulations for each designation category, for the San Miguel River mainstem and surrounding canyon/Area of Critical Environmental Concern (ACEC) lands; the Saltado Creek drainage and surrounding canyon/ACEC lands; and the Beaver Creek drainage and surrounding canyon/ACEC lands.

As one example of the inconsistencies of stipulations in this area, a single place within the San Miguel River proposed Wild and Scenic River (WSR) Segment 1, near the confluence with Specie Creek -- was within:
- the Alternative D WSR segment proposed as Suitable, Recreation;
- the Alternative D San Miguel River Special Recreation Management Area (SRMA);
- the Alternative A and D existing San Miguel River Area of Critical Environmental Concern (ACEC) designated in 1993 to protect the high-quality riparian vegetation resources, habitat for many bird species, and the scenic value of the corridor, within or proximal to a State designated Scenic Byway; (According to the BLM's ACEC Final Report of 2013, the riparian vegetation community exists "mainly due to the undammed San Miguel River and its intact hydrology."  The report when on to state, "Such communities are becoming increasingly rare in Colorado." [18] The report also states that the Visual Resource Index (VRI) should be V-2 for the existing San Miguel River ACEC.)
- the Alternative D San Miguel Ecological Emphasis Area;
- the Alternative D fluid minerals stipulation: No Surface Occupancy (NSO)
- the Alternative B San Miguel River Expansion ACEC which would expand the ACEC to protect additional lands having high-quality riparian vegetation resources, bird habitats, and scenic values, within or proximal to State designated Scenic Byways; (The BLM's ACEC Final Report states that the VRI should be V-2 for the San Miguel River Expansion ACEC.)
- the Alternative B fluid minerals stipulation: No Lease (NL);
- the Alternative A lands shown as <u>not</u> having Coal potential.

What we found in our comparison table was that the preferred Alternative D, for the above designations and shapefiles, would classify this with a hodge-podge of V-2 within the WSR polygon, but V-3 within the ACEC and SRMA.  This makes no sense because these lands are proximal/in/adjacent to two state-designated scenic byways.  The Enhanced Ecological Area and WSR would have a Controlled Surface Occupancy (CSO) stipulation, while the overlapping ACEC, SMRA, and fluid minerals layers would have No Surface Occupancy (NSO) for Alternative D.  The SMRA, ACEC Expansion, and fluid minerals Alternative B stipulation would be NL.

---

[18] Page 41: http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.52182.File.dat/ACEC%20Report%20Final%2001152013.pdf

BLM_0148810

Rather than have so many overlapping layers with varying and conflicting stipulations overlying each other on the ground, a situation that will certainly be more prone to human error in interpretation and implementation, San Miguel County desires that the lands within the San Miguel Expansion ACEC and/or San Miguel SMRA Alternative B boundaries be given protections that will be simplified, allow for appropriate recreation, allow for adequate protection for the ACEC and WSR values, provide co-protection for wildlife, and adequately protect the visual resources.

**The final decision should:**

A.  Include a determination of "suitable" for inclusion in the National Wild and Scenic Rivers System for San Miguel River Segment 1, Beaver Creek and Saltado Creek.

B.  Expand the San Miguel River ACEC to include all of the lands within the existing San Miguel River ACEC and the proposed San Miguel River Expansion ACEC in Alternative B.

C.  Continue the existing San Miguel River SRMA which is included in the agency preferred Alternative D.  There are an additional 76 acres that would be included in the SRMA just southwest of the confluence of Willow Creek and the San Miguel River.  San Miguel County does not want this SRMA changed to become the San Miguel River Corridor Extensive Recreation Management Area (ERMA) that is proposed in Alternative C.  The VRM classification should be changed from VRM-III to VRM-II to be consistent with the ACEC and the two state-designated scenic byways.  The incredible scenic qualities of this area are very important economically to the region and should be maintained and managed at VRM-II.  The SRMA should be expanded to match the San Miguel River Expansion ACEC boundary, such as in Big Bear Creek area.

According to the BLM, any area not identified as an SRMA is automatically managed as an ERMA.  On the BLM UFO Recreation Management Area web page, the BLM states:  "Within ERMAs, recreation is unstructured and does not require intensive management or significant investment in trails or facilities.  This type of custodial or "dispersed" recreation management provides minimal visitor services and few developed recreational facilities."[19] Because there is a large identified local, regional, national and international market demand for structured recreation, the San Miguel River SRMA is the best management fit.  Within the San Miguel River SRMA, there are developed recreation sites, including campgrounds, staging areas, visitor information, and limited facilities.

D.  With appropriate stipulations for the above, the complex mosaic of Enhanced Ecological Areas as proposed in the San Miguel River Expansion ACEC/SRMA areas should <u>not</u> be needed as wildlife will be getting protection benefits from the management decisions and implementation of the WSRs, SMRA, and expanded ACEC.  The stipulations contained in the Enhanced Ecological Area shapefile for Alternatives B and D are much weaker than those for the other intersecting designations of ACEC, SRMA, and WSR (see Attachment A). [20]

The BLM's stated reason for contemplating an EEA in the San Miguel River is provided in its description in the DRMP/EIS Appendix D[21]:

---

[19] http://www.blm.gov/co/st/en/fo/ufo/recreation.print.html

[20] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.60521.File.dat/ecological_emphasis_areas.zip

[21] Page D4;http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.39615.File.dat/D_EEAs_UFO-DRMP-2016_508.pdf

8

BLM_0148811

| Ecological Emphasis Area Name | Description | Habitat Type | Primary Benefiting Species |
|---|---|---|---|
| San Miguel | Links the Mount Wilson area on National Forest across the San Miguel Canyon to the Uncompahgre Plateau, and contributes to linkage between Mount Sneffels area and Lizard Head area; includes parts of the existing San Miguel ACEC. Divided into seven zones. | Riverine and riparian, cliff and canyon, mountain shrub, pinyon-juniper, montane forest | Bear, mountain lion, lynx, mule deer, elk, native cold water fish |

San Miguel County desires that within the San Miguel River existing/expansion ACEC - San Miguel River SRMA - San Miguel Segment 1/Beaver Creek/Saltaldo Creek WSRs that the final RMP/ROD does not designate the additional San Miguel Enhanced Ecological Areas.  With the stipulations recommended below, these areas will be well served.  All of the stipulations recommended for Alternative D for creating the San Miguel EEA are included or exceeded in our list of stipulations below.

The BLM defines Ecological Emphasis Areas (EEAs) as areas that are "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," with the objective of having a designated EEA being "manage to preserve the continuity of habitats, vegetation communities, and native wildlife within, while following vegetation mosaic objectives" [22]

E.  San Miguel County believes that the San Miguel River, including the Saltado and Beaver Creek areas, can be served by a single set of stipulations that meet the needs and criteria of all of the overlapping designations recommended by the BLM and/or requested by San Miguel County (San Miguel ACEC Expansion, San Miguel River SRMA, and all 3 WSR segments).  The stipulations for these lands collectively should include:

- "7" = Limit camping to 7 days, 6 nights maximum within a 30-day period for dispersed camping.
  - SMC Note: Do not change the current maximum length of stays at the improved BLM campgrounds: Fall Creek (7 days), Caddis Flats (14 days), or Lower Beaver (7 days).
- "AVOID" = ROW Avoidance.
  - SMC Note: San Miguel County would support an EXCL = ROW Exclusion for some areas where no ROWs currently exist, however, it is the county's desire to have the ability to scope a bike path or trail from Telluride to Placerville somewhere off of State Highway 135 and near the San Miguel River and/or additional broadband infrastructure on existing ROWs or short segments of new ROW, if there are not significant negative impacts to ACECs, WSR, or recreation.
- "CAMPFIRE" = No Campfires for dispersed camping.
  - SMC Note:  San Miguel County is ok with campfires in existing campgrounds - - Fall Creek, Caddis Flats and Lower Beaver if already allowed.
- "COAL" = Closed to coal mineral leasing.
  - SMC Note:  BLM data that there is little to no actual coal potential and allowing for coal mineral disposal would negatively impact ORVs with little actual mineral resource benefit.  This entire area is given a classification of no coal potential in Alternative A.

---

[22]Page 2-68;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

BLM_0148812

- **"CWOD"** = Closed to commercial wood cutting.
- **"DES"** = Limited to designated routes / Limited to existing routes.
- **"DR_Timing"** = Designated routes - Timing Limitations, Limited to designated routes all other times (for wildlife).
- *"**HYDROE**" = Exclusion area for hydropower.
  - o SMC Note:  This is consistent with the importance of this segment for fishing and recreational boating.
- **"LOCATE"** = Petition Secretary of Interior to withdrawal for locatable minerals.
- **"NL"** = No lease.
  - o SMC Note: There are low oil and gas potential in the eastern portion of the expanded San Miguel River ACEC.  According to Colorado Oil & Gas Commission (COGCC), Well Data downloaded in September 2016, only one well has been drilled within 2 miles of the proposed WSR suitable segments.  This well was a wildcat well near Placerville, drilled in 1960 and was "DA:  dry and abandoned."
  - o SMC Note:  SMC finds that the negative impacts to the San Miguel River, Beaver Creek, and Saltado Creek corridors, scenic byways, traffic, recreation, visual resources, and wildlife in an area without any oil/gas infrastructure, identified oil/gas fields, and history of interest or past production far outweighs any possible benefits from resource exploration or extraction within this area.  According to the Fluid Minerals Alt D code in the Fluid Minerals Alt D shapefile[23], the entire San Miguel River Segment 1, Beaver Creek, and Saltado Creek WSRs, and the existing and expanded San Miguel ACEC and San Miguel SRMA is coded as NSO for the preferred alternative.  However, this stipulation seems to missing from the WSR Alt D shapefile attribute table[24].  Alternative B gives all these areas the stipulation of "NL" which is preferred by San Miguel County as it conserves valuable staff time and resources from even going through the federal lease process.
- **"RANGE"** = Closed to livestock grazing.
  - o SMC Note: essentially already recommended in Alternatives B and D.  This is a high conflict area with many uses constrained in a narrow canyon.  Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer.  Grasses and forbs should not be grazed as they provide protection.  Wildlife needs this food source.
- **"RECMINE"** = No recreational mining.
  - o SMC Note:  SMC has found recreational mining is disruptive to other quiet uses, wildlife, and has caused conflicts with public access, boating, fishing, hiking, photography and other quiet use activities within the San Miguel River corridor.  Non-motorized recreational mining does not have the same level of impact and disruption to the aquatic and riparian ecosystems as motorized recreational mining.  San Miguel County believes that to protect the WSR, ACEC, SRMA, and highly scenic and important riparian and aquatic ecosystems, there at should be no motorized recreational mining on the San Miguel River Segment 1, and the Beaver and Saltado Creek segments found suitable for WSR designation.
- **"SALABLE"** = Closed to salable mineral disposal.

---

[23] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_1.Par.20291.File.dat/fluid_minerals_alt_d.zip
[24] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.28698.File.dat/WSR_ALT_D_FINAL.zip

BLM_0148813

- o  SMC Note:  Gravel and dimension stone mining is not consistent with the ORVs and ACEC riparian values.
- **"SEED"** = Area closed to seed collection.
- **"SHEEP"** = Grazing of sheep and goats not permitted
  - o  SMC Note: essentially already recommended in Alternatives B and D.  SMC Note:  This is a high conflict area with many uses constrained in a narrow canyon.  Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer.  Grasses and forbs should not be grazed as they provide protection.  Wildlife needs this food source.
- *"SOLARE"** = Exclusion area for solar.
  - o  SMC Note: Commercial solar concentrators or PV panels are not compatible with the WSR/SRMA/ACEC/scenic and wildlife values here.  The San Miguel River corridor is determined to have "Very Good" Solar PV potential by the UFO BLM Renewable Energy Potential Report (2010), which doesn't take into account distance from substations.  PV arrays for off-site uses need to be proximal to substations. [25]
- **"SOLID"**= Closed to non-energy solid mineral leasing.
  - o  SMC Note:  Ground disturbing activities, such as surface mining, are not consistent with the ORVs, wildlife and ACEC values, nor the important scenic qualities.
- **"SSR"** = Site-Specific Relocation.
- **"TAR"**=Prohibit target shooting.
  - o  SMC Note:  Target shooting in the narrow rock-walled canyons results in amplified noise and disturbances to the wildlife, birds and pristine experiences of these areas.
- **"V-2"**=VRM II
  - o  SMC Note:  WSR and San Miguel River Existing/Expansion ACEC should have a VRM II, as the DRMP/EIS states "Managing the segments according to VRM Class 1 or II objectives would provide direct protection to segments with a scenic ORV by requiring that the alterations to the landscape be done so as not to dominate the viewshed.  If alterations cannot be mitigated to reach the VRM class objective, they would not be permitted...In turn, this would provide indirect protection to segments with a cultural or historical ORV." [26]  As noted elsewhere, the BLM 2013 ACEC Final Report states that the San Miguel existing and expansion ACECs should have VRM II.
  - o  SMC Note:  Beaver Creek was not provided any VRM stipulation in the WSR Alt D shapefile.  WSR should have a VRM II.
- *"WINDE"**=Exclusion area for the wind.
  - o  SMC Note:  The San Miguel River corridor is determined to have "Poor" wind potential by the UFO BLM Renewable Energy Potential Report (2010). [27]
- **"WOOD"**=Closed to wood cutting.

---

[25]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf
[26]Page 4-412;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_2.Par.12939.File.dat/4_UFO-DRMP-2016_508.pdf
[27]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf

BLM_0148814

*All above stipulations apply where there is BLM surface estate, however, HYDROE, SOLARE, AND WINDE are not included as stipulations on the non-BLM surface estate (private, U.S. Forest Service lands).

We obtained definitions of these codes from BLM GIS metadata made available for each BLM UFO DRMP/EIS shapefile, such as the WSR Alt D shapefile metadata.[28]

3. **Special Recreation Management Areas (SRMAs) & Extensive Recreation Management Areas (ERMAs)**
   Summary:  There are two SRMAs discussed in the DRMP/EIS within San Miguel County:  San Miguel River (which includes the San Miguel River Segment 1, Saltado Creek and Beaver Creek segments determined to be suitable for Wild & Scenic River designation in Alternative D; and Burn Canyon.  We commented above that we desire to continue the designation of the San Miguel River SRMA.  The San Miguel River SRMA already exists but the preferred Alternative D would add approximately 76 acres to this SRMA, just southwest of the confluence of Willow Creek and San Miguel River.

   Specific to the Burn Canyon SRMA, we note that it is within the proposed Naturita Canyon EEA.  The Burn Canyon SRMA is recommended in Alternative B, but not in the agency preferred alternative, Alternative D.  Under Alternative B, if designated, the Burn Canyon SRMA would have the following management stipulations:

**SRMA Scenario (Alternative B)**



---

[28]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.87378.File.dat/WSR_ALT_D_FINAL.html

BLM_0148815

Figure 3.1 -- showing the Burn Canyon SRMA Alternative B scenario.

It would have travel restricted to mostly designated routes, portions (purple) would be closed to mechanized (bikes) and motorized vehicles, and would not allow competitive events.  It would be closed to coal and solid mineral leasing, the BLM would petition for withdrawal of locatable minerals, and there would be no surface occupancy for oil and gas.  It would have VRM II.

Targeted activities would be hiking and horseback riding and enjoyment of nature in the canyons.  On the mesa tops and slopes, activities would also include mountain biking.

Under the agency preferred ERMA in Alternative D, the ERMA would have VRM III and controlled surface use for oil/gas development only.  The SRMA and ERMA have the same boundary.  However, under the ERMA scenario, the lands would be managed to allow ATVs and motorcycles, mountain biking, and hiking in both the canyons and the mesa top/slopes, while retaining a natural appearing landscape and providing necessary recreation facilities such as trails/trailheads/staging areas/signage to facilitate recreational activities. [29]

---

[29]Pages J-5-7; J-91;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.40130.File.dat/J_Rec_UFO-DRMP-2016_508.pdf

13

**ERMA Scenario (Alternative D)**



alt_d_code
CSU,V-3

Figure 3.2 -- showing the Burn Canyon SRMA Alternative D scenario.

San Miguel County desires that the Burn Canyon SMRA as mapped and stipulated in Alternative B be approved and incorporated into the final RMP. We believe that the SRMA will complement the proposed Naturita Canyon EEA as mapped and recommended in Alternative B, along with the fluid minerals stipulations from Alternative B in this area.

**4.  Enhanced Ecological Areas (EEAs)**

**A.  San Miguel EEA.**

The BLM UFO DRMP/EIS contemplates two EEAs within San Miguel County:  San Miguel EEA and Naturita Canyon EEA. [30]  The San Miguel River Expanded ACEC preferred by San Miguel County, the existing San Miguel SRMA and the Alternative D recommended WSR segments for San Miguel River Segment 1,

---

[30] Pages D-3 & D-4;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.39615.File.dat/D_EEAs_UFO-DRMP-2016_508.pdf

BLM_0148817

Beaver Creek and Saltado Creek.  San Miguel County recommended a standardized set of stipulations (pages 7-9 of this document) that would meet the needs of all of these San Miguel County desired designations, and also meet and exceed the stipulations that had been proposed by the BLM for the San Miguel EEA.

**B.  Naturita Canyon EEA.**

The BLM describes the reasons for considering Naturita Canyon EEA on Page D-4 of Appendix D of the DRMP/EIS as:

| Ecological Emphasis Area Name | Description | Habitat Type | Primary Benefiting Species |
|---|---|---|---|
| Naturita Canyon | Adjoins National Forest System lands leading up to Lone Cone area; includes the major Naturita Canyon drainage, which has wildlife/indicator species emphasis on adjoining National Forest. Divided into four zones. | Riparian, cliff and canyon, pinyon-juniper | Bear, mountain lion, mule deer elk, native warm water and cold water fish |

Geographically, there are several parcels mapped as comprising the Naturita Canyon EEA for Alternative B.  The purple and red polygons (see figures below) make up the Naturita Canyon EEA.  It would provide linkages between adjacent State land (blue) and National Forest land (green).  The hatching shows occupied critical Gunnison Sage-grouse habitat as designated by U.S. Fish and Wildlife Service (USFWS).  The DRMP/EIS does not list Gunnison Sage-grouse (GuSG) as a species that the EEA would be managed to benefit.

BLM_0148818



Figure 4b.1 -- Showing the Naturita Canyon EEA Alternative B.

In Alternative D, the agency preferred alternative, only the two red parcels of the Naturita Canyon EEA would actually be designated as an EEA:

BLM_0148819



Figure 4b.2 is showing Naturita Canyon EEA Alternative D and Colorado Oil and Gas Commission (COGCC) wells.

Above, the BLM surface that would not be part of the Naturita Canyon EEA is shown in yellow. We also show oil and gas wells, with green wells being producing oil or gas wells, and red wells being mostly wildcat wells that are non-producing. An EEA consisting of just the red polygons, especially with simply controlled surface use (CSU) and ROW avoidance (AVOID), instead of no surface occupancy (NSO), designated routes- timing limitations (DR_TIMING), seems this would result in two small token EEA parcels without meaningful habitat protection or connectivity, beyond what is already anticipated by the fluid minerals management in Alternative D. Most of these two polygons are already anticipated to be

17

NSO. However, the remainder of the area that is analyzed for Naturita Canyon EEA is CSU under alternative D.

Alternative D, agency preferred, for Naturita Canyon EEA and fluid minerals stipulations:





Figure 4b.3 -- showing the Naturita Canyon EEA Alternative D with fluid minerals Alternative D

18

Alternative B, San Miguel County preferred, for Naturita Canyon EEA and fluid minerals stipulations:



Figure 4b.4 showing Naturita Canyon Alternative B and fluid minerals Alternative B.

San Miguel County believes that since the wildlife values warranted studying the Naturita Canyon area for an EEA, that Alternative B for the EEA boundary and EEA stipulations, as well as Alternative B fluid

19

BLM_0148822

minerals stipulations, should be applied by the final decision in this area.  We could not locate a discussion in the DRMP/EIS explaining the BLM rationale for how choosing Alternative D over Alternative B with respect to this EEA and the fluid minerals stipulations that overlap, would achieve the stated objectives of preserving the continuity of habitats, vegetation communities, and native wildlife. [31]

<u>San Miguel County recommends that the full Naturita Canyon EEA be designated, as mapped in Alternative B, along with Alternative B fluid minerals stipulations.  This will be complimented by also designating the Burn Canyon SRMA as mapped in Alternative B.</u>

## 5.  Areas of Critical Environmental Concern (ACECs)

The UFO DRMP/EIS contemplates three ACECs within San Miguel County:

### A.  San Miguel River ACEC and San Miguel River Expansion ACEC.

These ACECs have been discussed in detail in this document above, and San Miguel County strongly supports Alternative B, which would designate the additional lands within the San Miguel River Expansion ACEC.  According to the BLM's Final ACEC report (2013), all of the relevance and importance criteria were met, just as with the existing San Miguel River ACEC. [32]  San Miguel County also strongly supports a cohesive management of the overlapping ACEC lands, SRMA lands, and WSR segments within San Miguel River Segment 1, Beaver Creek and Saltado Creek through one set of stipulations, with a VRM II stipulation.  The agency preferred VRM III stipulation does not adequately protect the exceptional scenic qualities of this area, nor the regional economy, nor the viewshed of the two state-designated Scenic Byways.  Please see this document, Section 3, pages 5-9 above for specific requests for changes and implementation that San Miguel County desires in the final decision.

### B.  San Miguel Gunnison Sage-grouse ACEC.

This ACEC is comprised of 470 acres in multiple parcels occurring on scattered critical Gunnison Sage-grouse habitat that whose surface estate is managed by the BLM.  San Miguel County was originally one of the proponents of this ACEC.  When the BLM's Final ACEC report was published in 2013, this was prior to the federal decision to list the Gunnison Sage-grouse as Threatened and designate critical habitat in 2014.

On November 12, 2014, the U.S. Fish and Wildlife Service (USFWS) announced that it determined that the Gunnison Sage-grouse, a ground-dwelling bird found only in southwestern Colorado and southeastern Utah, required the protection of the Endangered Species Act (ESA) as a threatened species.  The USFWS originally proposed to list the species as 'endangered' under the ESA in January 2013, but efforts by the two states, tribes, local communities, private landowners and other stakeholders to conserve the species and its habitat were found to have helped reduce the threats to the bird sufficiently to give it the more flexibly protected status of 'threatened.' [33]

The supporting EIS for the Threatened Status designation of the Gunnison Sage-grouse[34] and for the Designation of Critical Habitat for the Gunnison Sage-grouse[35] is dated November 9, 2014.

---

[31] Pages 2-68 & 2-69;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

[32] Pages 41-47;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.52182.File.dat/ACEC%20Report%20Final%2001152013.pdf

[33] https://www.fws.gov/mountain-prairie/pressrel/2014/11122014_ServiceProtectsGunnisonSageGrouseAsThreatenedUnderESA.php

[34] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf

[35] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GuSGCriticalHabitat_11202014.pdf

BLM_0148823

The Gunnison Sage-grouse ACEC as proposed in this UFO DRMP/EIS does not contemplate the status of the species or critical habitat as listed in the federal register in 2014, does not contemplate surface disturbance and other disturbances on critical habitat that may be non-BLM surface estate but is BLM-managed federal mineral estate, and does not contemplate guidelines within numerous plans and the latest best management practices for stipulations and buffers from leks.

The UFO DRMP/EIS does not take into consideration that Occupied GuSG Habitat includes specific properties (and split estate) that the USFWS excluded from the critical habitat designation.  The political removal of surface lands coinciding within these specific private properties under conservation easements from listed critical habitat is appropriate, but the removal of subsurface public lands from Occupied Habitat is not appropriate because it excludes the subsurface mineral estate from the management actions contained in the UFO DRMP/EIS.

A. In summary, San Miguel County does not support the Gunnison Sage-grouse ACEC as proposed in Alternative B of this UFO DRMP/EIS.  The proposed alternatives with regards to Gunnison Sage-grouse and this ACEC are neither adequate, accurate, nor informed by the most recent federal actions and data available.  The UFO DRMP/FEIS also predates the new alternative B analysis within the GuSG DRMPa/DEIS which analyzes an ACEC for all GUSG Occupied and Unoccupied Habitat.  Please see Section 6, Gunnison Sage-grouse.

**6. Gunnison Sage-grouse.**

These designations prompted a process for the BLM to prepare a draft Gunnison Rangewide Plan Amendment that would potentially result in multiple resource plan amendments (GuSG DRMPa) and a companion draft environmental impact statement (GuSG DEIS) which more closely analyzes planning issues, including energy and minerals actions, in order "to analyze the addition of GuSG conservation measures to several existing RMPs", including the BLM UFO DRMP/EIS.  The deadline for comments on the GuSG DRMPa is after the deadline to comment on this UFO DRMP/EIS.  The GuSG DRMPa documents were released as drafts in August 2016.

In the GuSG DRMPa, the BLM states, "The BLM manages approximately 40 percent of GUSG habitat across twelve counties in southwestern Colorado and southeastern Utah...The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision." [36]

We realize that since much of the UFO DRMP/EIS work occurred between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS.  The San Miguel Gunnison Sage Grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.

Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM RMPa ROD so that the BLM RMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices.  All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease is allowed a 20-year period with out-of-date stipulations and practices.   While the GuSG DRMPa goes much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and habitat enhancement

---

[36]Page I; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

BLM_0148824

and connectivity measures, it still needs additional work, which San Miguel County will comment on separately under that comment process. The GuSG DRMPa does contemplate that removal of subsurface public lands from Occupied Habitat management actions is inappropriate, which is differently than how these lands are treated in the UFO DRMP/EIS.

It would be remiss to issue leases under any circumstances within the UFO until there is a final decision on the Gunnison Sage-grouse amendments.

The Purpose section of the GuSG DRMPa states, *"This RMP amendment provides a framework for conserving and assisting with the recovery of the GuSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird."* The Need section of this document states, *"The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs 'shall be revised as necessary based on …, new data, new or revised policy…(43 CFR 1610.5-6).'"* [37]

San Miguel County believes that the listing of the GuSG and designation of critical habitat is a new circumstance that requires modification of the UFO DRMP/EIS, but to be consistent where the San Miguel Basin population has key areas such as Miramonte Reservoir area that are split among the UFO and Tres Rios Field Office (TRFO) there needs to be a consistent set of management guidelines and stipulations across the entire San Miguel Basin population. There may be different lek buffers and needs between the different subpopulations, such as the Gunnison Basin and the San Miguel Basin populations. Seasonal habitat has not been delineated within the San Miguel Basin population the way it has in the Gunnison population. The fact that the BLM is conducting the GuSG DRMPa/DEIS process and recommending a preferred alternative that would amend the TRFO RMP seems to point to that need. San Miguel County also does not agree that the range of alternatives analyzed in the 2013 TRFO RMP/FEIS nor this UFO DRMP/EIS is appropriate with respect to the needs of GuSG.

The range of alternatives considered in the GuSG DRMP/DEIS includes having the stipulation of No Surface Occupancy being applied to all BLM lands within 4-miles of a lek. These documents analyze all BLM lands within occupied, unoccupied or a 4-mile buffer of a lek as the decision area. Yet, the 2005 Gunnison Sage-grouse Rangewide Conservation Plan[38] and the presence of occupied critical habitat more than 4 miles from leks within the San Miguel Basin show that GuSG is found occupying habitat and using seasonal habitat 6 or more miles away from leks. [39] For example, the occupied habitat within the Dry Creek Basin area, San Miguel Basin GuSG population, shown on Map 1 that is beyond the 4-mile lek buffer, is between 6- and 6.25-miles from leks. The BLM should allow for additional review of appropriate protections for Gunnison Sage-Grouse habitat from oil and gas development within at least a 6-mile buffer, preferably a 6.2-mile buffer of leks within the San Miguel Basin.

### Section 7. Lands Identified For Disposal.

The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "consider disposal of lands that would consolidate public ownership for greater management efficiency while serving the public interest, including communities and their expanding needs." [40]

---

[37]Page iii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

[38]http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx

[39]Page J-5; http://cpw.state.co.us/Documents/WildlifeSpecies/SpeciesOfConcern/GunnisonSageGrouse/ConsPlan/AppendixJSGHabitatUse03.pdf

[40]Page 2-319; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

BLM_0148825