The lands identified for disposal were identified on Appendix A, Figure 2-60[41] and legal descriptions were provided in Appendix N.[42] It appears that only the lands recommended for disposal under the agency preferred alternative D are shown in Figure 2-60.

We recommend that it would be very helpful for the reviewing public and agencies if the UFO made more readily available the Land Tenure/Land Disposal GIS files on the UFO RMP GIS web page, and also if the name of the county were provided in Appendix N.  We were able to obtain from UFO GIS staff the land tenure shapefile via email.  While actual reasons for recommending individual parcels for disposal or non-disposal in the four alternatives were not located in the DRMP/EIS, there were some cryptic rationales present within the land tenure shapefile attribute table for a few but not all parcels.

San Miguel County does not desire any parcels to be disposed of that would interfere with existing public roads or trails, existing private driveways or access roads, irrigation ditches or other easements.  Any parcels disposed of should conform with the criteria and standards set forth in the San Miguel County Comprehensive Plan.  Parcels that contain critical habitat for sensitive or listed species or that provide connectivity between other public lands should not be disposed of.  If the BLM doesn't want to manage such parcels, then the adjacent federal or state agency should be given an opportunity for management or ownership.

The metadata from the land tenure shapefile for the 10 parcels analyzed by the DRMP/EIS for disposal within San Miguel County is below:

| SMC Parcel Ref # | RMP | gis_ac res | alt _A | alt _B | alt _C | alt _D | alt_B_c ode | alt_C_c ode | alt_D_c ode | Comment_ |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | San Juan / San Miguel Planning Area RMP 1985 | 35 | Yes | No | Yes | No | | DISPOS AL | | Riparian |
| 2 | San Juan / San Miguel Planning Area RMP 1985 | 35 | Yes | No | Yes | No | | DISPOS AL | | Riparian |
| 3 | San Juan / San Miguel Planning Area RMP 1985 | 214 | Yes | No | Yes | No | | DISPOS AL | | Range, Veg, Riparian |
| 4 | San Juan / San Miguel Planning Area RMP 1985 | 88 | Yes | No | Yes | No | | DISPOS AL | | Range, Veg, Riparian, Recreation |
| 5 | San Juan / San Miguel Planning Area RMP 1985 | 82 | Yes | No | Yes | No | | DISPOS AL | | Range, Veg, Riparian, Recreation |
| 6 | San Juan / San Miguel Planning Area RMP 1985 | 38 | Yes | Yes | Yes | Yes | DISPOS AL | DISPOS AL | DISPOS AL | |
| 7 | San Juan / San Miguel Planning Area RMP 1985 | 40 | Yes | Yes | Yes | No | DISPOS AL | DISPOS AL | | |
| 8 | San Juan / San Miguel Planning Area RMP 1985 | 41 | Yes | Yes | Yes | Yes | DISPOS AL | DISPOS AL | DISPOS AL | |
| 9 | San Juan / San Miguel Planning Area RMP 1985 | 133 | Yes | No | Yes | No | | DISPOS AL | | salinity/selenium, GuSG |
| 10 | 2011 RMP | 40 | No | Yes | No | Yes | DISPOS AL | | DISPOS AL | |

Table 7.1 -- the land tenure GIS shapefile attribute table for parcels within San Miguel County.

### a. Fall Creek Area Parcels.
We attempted to map the legal descriptions of the parcels (SMC Parcel Reference #s 1 & 2 in the table above) within San Miguel County and found that these two of the parcels (in T42N R11W Section 2) were

---

[41] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.78374.File.dat/App%20A%20Combined.pdf
[42] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.77552.File.dat/N_Disposal_UFO-DRMP-2016_508.pdf

BLM_0148826

just east of Little Cone, adjacent to Fall Creek Road, County Road 57 P (see pink outlines below).  It appears these two parcels were currently listed for disposal by the existing RMP (Alternative A), and are not recommended for disposal in Alternatives B or D.  They are located within the Fall Creek riparian corridor.  San Miguel County agrees with the Alternative D (no disposal) for these parcels.



Figure 7a.  Fall Creek area parcels in T42N R11W Section 2, not recommended by SMC or agency preferred Alternative D for disposal.

**b. Beaver Creek and Saltado Creek Area Parcels.**

We could not quite get the legal descriptions rectified for the parcels in Saltado Creek between Appendix N and the GIS land tenure file provided.  However, the parcel within the Saltado Creek area intersects the Saltado Creek WSR segment, the existing ACEC and the SRMA.  It also is adjacent to critical occupied Gunnison Sage-grouse habitat.  It is within 1 to 2 miles of 3 active leks.  It should not be disposed of.

The Beaver Creek parcel in T43N R12W Sections 9 & 10 is within the Beaver Creek WSR segment, existing ACEC and SRMA.  It also is adjacent to critical occupied Gunnison Sage-grouse habitat.  It is within 0.3 to 0.75 mile of 3 active leks.  It should not be disposed of.

BLM_0148827

Both of these areas appear also to be within the San Miguel River Expansion ACEC (which San Miguel County recommends be designated. The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "retain lands in public ownership when it will serve the public interest, protect valuable resources, or achieve management goals." [43] Alternative B and Alternative D state that the UFO action will be to retain lands that are within ACECs or SRMAs. [44] Lands immediately adjacent to critical Gunnison Sage-grouse habitat should not be disposed of. The 2005 Gunnison Sage-grouse Rangewide Conservation Plan[45] and the presence of occupied critical habitat more than 6 to 6.25 miles from leks within the San Miguel Basin subpopulation show that GuSG is found occupying habitat and using seasonal habitat 6 or more miles away from leks. [46]

---

[43]Page 2-321;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_U
FO-DRMP-2016_508.pdf
[44]Page 2-322;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_U
FO-DRMP-2016_508.pdf
[45]http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx
[46]Page J-5;
http://cpw.state.co.us/Documents/WildlifeSpecies/SpeciesOfConcern/GunnisonSageGrouse/ConsPlan/AppendixJSGHabitat
Use03.pdf

BLM_0148828



Figure 7b.  Showing the Beaver Creek (left) and Saltado Creek (right) area disposal parcels in T43N R12W Sections 9 & 10; not recommended by SMC or agency preferred Alternative D for disposal.  If sold for private development, there would be impacts to the scenic and primitive qualities of these areas, as well as the important riparian ecosystem and wildlife.  Alternatives B and D do not recommend these parcels for disposal.  San Miguel County believes it is best for the public and for the protection of valuable river corridors, ORVs, and Gunnison Sage-grouse if these parcels are not disposed of.

### c. Lone Cone & Gurley Reservoir Area Parcels.

The BLM land tenure shapefile identified 3 parcels in the Lone Cone/Gurley Reservoir area that are recommended for disposal under the agency preferred Alternative D (according to the shapefile attribute table). They are shown with the bright blue highlight around the pink parcel boundaries in Figure 7c below:

BLM_0148829



Figure 7c.  Lone Cone Reservoir and Gurley Reservoir Area Parcels identified in GIS metadata within the provided land tenure GIS shapefile as being recommended for disposal in the agency preferred Alternative D.

 Appendix N only recommends two parcels for disposal in the agency preferred Alternative D.  So we are concerned that there is an error in mapping the southernmost parcel on Figure 7c.  It appears to be within T43N R13W S12.  However, this does not match a legal description in Appendix N.  Appendix N, and the land tenure shapefile should be rectified before the final RMP and ROD.  The southernmost parcel is entirely surrounded by Gunnison Sage-grouse occupied habitat and is also mapped on top of (or under?) the Lone Cone Reservoir.  This parcel is within 0.5 miles of an active lek and 0.7 miles of a second inactive lek.  <u>San Miguel County does not support disposal of this parcel.</u>

The parcel directly west of Gurley Reservoir (just south of Red Cone Rd.) is the parcel with the legal description of T44N R13W Section 35.  The parcel directly north of Gurley Reservoir in the northern portion of Figure 7c is the parcel with the legal description of T44N R13W Section 35.

BLM_0148830

The northernmost parcel in Section 24 is 1.5 miles north of occupied Gunnison Sage-grouse habitat but is also surrounded by private land.  It is 3.5 miles from the nearest active lek and 2 miles from the nearest inactive lek.  If a parcel were to be disposed of, this would probably be the only parcel that makes sense.  There are some undesignated BLM routes mapped on the fringes of this parcel.

The parcel in Section 35 is within 0.5 miles of an active lek and is adjacent to occupied Gunnison Sage-grouse critical occupied habitat.  There is an undesignated BLM route mapped on this parcel.  <u>San Miguel County does not recommend disposal of this parcel.</u>

**d. Hastings Mesa Area Parcel**
One additional isolated BLM parcel was analyzed for disposal is located on Hastings Mesa near Alder Creek in T44N R10W Section 29 adjacent to the Alder Creek Ranches subdivision.  This parcel is entirely surrounded by private land.  It was recommended for disposal in Alternatives A-C.  However, no reason is given why it is not included for disposal in the agency preferred Alternative D.  It is close to the Alder Creek riparian area.  We would like an opportunity to review this parcel further with the UFO to examine it with respect to our Comprehensive plan, public rights of way, easements and other items, and to understand the UFO rationale for not including it for disposal in Alternative D.  San Miguel County desires that if the BLM disposes of parcels it ensures there are either public ROW or private easements already in place prior to disposal, to ensure ingress/egress for future owners.

BLM_0148831



Figure 7c.  Hastings Mesa/Alder Creek Area Parcel within T44N R10W Section 29.  This parcel is not recommended for disposal in the agency preferred Alternative D.

**e. Big Bear Creek Area Parcels**

These parcels are within T42N R10W Section 4.  Under the agency preferred alternative they are not recommended for disposal.  San Miguel County agrees that they should not be disposed of by the BLM.  They are within the Big Bear Creek riparian corridor, and the San Miguel River Expansion ACEC desired to be designated by San Miguel County.  The San Miguel SRMA boundary should be expanded to match the San Miguel River Expansion ACEC boundary in this area.

BLM_0148832



Figure 7e.  Showing the Big Bear Creek Area parcels.  If sold for private development, there would be impacts to the scenic and primitive qualities of these areas, as well as the important riparian ecosystem and wildlife.  Alternatives B and D do not recommend these parcels for disposal.  <u>San Miguel County believes it is best for the public and for the protection of valuable river corridors and riparian habitat if these parcels are not disposed of.  The San Miguel River Expansion ACEC should be designated, and it would include these parcels.  The San Miguel River SRMA boundary should be expanded to include all of these parcels and the expansion ACEC.</u>

## Section 8.  Wildlife management.

San Miguel County urges the BLM to further consult and consider the Colorado Parks and Wildlife (CPW), formerly Colorado Department of Wildlife (CDOW), detailed list of Best Management Practices (BMPs) for oil and gas development titled "Actions to Minimize Adverse Impacts to Wildlife Resources." with species-specific BMPs, including recommendations on protective buffers, timing information, and recommendations on surface density caps, referenced in their letter to BLM State Director Helen Hankins dated December 13, 2010.

BLM_0148833

We appreciate the statement in the DRMP/EIS on Page I-11 of Volume 1[47] that says "The BLM will consult with Colorado Parks and Wildlife (CPW).  The RMP will recognize the State's responsibility and authority to manage wildlife."  At the UFO RMP co-operator meeting in Montrose on October 15, 2016, we heard CPW staff say that their information was not incorporated into at least one alternative and that the RMP has not included BMPs, timing limitations or stipulations offered by CPW.

San Miguel County supports CPW's desire that at least a "No Surface Occupancy" (NSO) stipulation be applied to all Federal minerals within the boundaries of State Wildlife Areas (SWAs) and State Park boundaries to balance mineral extraction with the protection of surface resources.

San Miguel County has assisted in the protection of thousands of acres of private lands with important wildlife habitat values, including GuSG critical habitat, during the last few decades by participating in the acquisition of conservation easements intended to preserve and protect GuSG habitat.  San Miguel County has contributed between roughly $1.4 and $1.6 million during this period for habitat conservation and improvements through the County's Land Heritage Program, co-funding of the GuSG working group, and other actions to benefit GuSG.

U.S. Fish and Wildlife Service did not include in its final listed critical habitat private lands that were under conservation easement.  However, the BLM states in the GuSG DRMPa on Page ii, in the introductory discussion of occupied habitat for Gunnison Sage-grouse[48] that "Occupied Habitat includes specific properties coinciding with BLM-administered federal minerals that the [US] FWS excluded from critical habitat designation.  While the removal of surface lands with these properties from critical habitat is appropriate, the removal of subsurface public lands from Occupied Habitat is not."  In other words, the BLM in its GuSG DRMPa understands that subsurface mineral estate actions should not be precluded from management actions.  San Miguel County requests that the UFO RMP obtain from San Miguel County our GIS shapefile and database of private land conservation easements, and where split estate managed by the BLM exists, that the BLM implement NSO and other stipulations consistent with the primary conservation easement values on these properties.

San Miguel County supports CPW in their statement in the 2010 letter, "As the surface density of development increases beyond one well pad per section, literature sources strongly suggest that avoidance and minimization measures alone are no longer sufficient to address adverse impacts to some species, and compensatory mitigation is necessary to offset the permanent loss of wildlife resources." We support the concept that the UFO (and Tres Rios) RMP incorporate ways to obtain compensatory mitigation when surface density exceeds one well pad per section (within habitats identified by CPW).

San Miguel County requests that the UFO examine carefully CPW recommended species-specific stipulations and ensured that the stipulations in the final UFO RMP/ROD meet or exceed the recommended species-specific stipulations.  We also request that standards and guidelines be developed for oil and gas activities in Gunnison Sage-grouse habitat, mule deer winter range, raptor nesting areas, bighorn sheep lambing areas, lynx denning and winter foraging habitat to address impacts from oil and gas operations to the maximum extent possible.  Such standards and guidelines within these habitats should require that operators use the best technically and economically available development technology to meet the intent of guidelines while acting on a right to develop a lease.

---

[47]Page I-11;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.7326.File.dat/1_UFO-DRMP-2016_508.pdf
[48]Page ii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

BLM_0148834

San Miguel County requests that the UFO RMP also consider adding winter range to ungulate protection strategies, which we understand has implications across all management activities. CPW has strongly recommended the use of deer and elk winter range as defined in CPW species mapping when applying protection strategies for deer and elk in RMP documents in Colorado[49]. CPW states, "Winter concentration areas and critical winter range are more narrowly defined subsets within the broader winter range category that fail to capture the totality of important wintering areas for ungulates. 'Winter Range' is defined as that part of the overall range where 90% of individuals reside during five winters out of ten. During an 'average' winter, animals residing in 'winter range' are no less sensitive to disturbance than those on severe winter range or winter concentration areas."

San Miguel County requests revisions to the DRMP/EIS and stipulations to acknowledge the increasing body of evidence that Timing Limitation Stipulations on oil and gas development activities are not adequate to protect winter habitats and migratory corridors for big game, and that additional limitations on the density of surface facilities may be necessary to maintain big game populations in developing areas. [50,51,52,53,54]

San Miguel County further requests that a Master Leasing Plan be prepared and implemented as required by BLM IM No. 2010-117.

### Section 9. Watchable Wildlife Viewing Areas.

Incorporating a watchable wildlife viewing area under the federal Watchable Wildlife Program to foster education and appreciation of wildlife in their habitats would be a positive addition within the UFO. When there are enhanced opportunities for public and educational institutions like local and regional schools to view, enjoy, and learn about wildlife, then there are tangible positive benefits for the local and regional economies and for appreciation of the national treasure that our public lands are. When people know about the needs and impacts of human activities on species, then they are more likely to support resource conservation and the hard choices of altering human activities that lead to climate change.

The San Miguel River is identified as being a very rich terrestrial bird habitat within North America by the BLM, the Audubon Society, and others. [55] San Miguel County supports the concept of studying the San Miguel River ACEC and San Miguel River Expansion ACEC for creating one or more watchable wildlife viewing areas. We believe this will actually help with future mitigation of threats such as invasive plants, non-native species, feral cats, and other disturbances. The scenic qualities of this area also further enhance the potential high-quality viewing experience.

---

[49]Such as in the CPW San Juan Plan Revision comment letter dated April 11, 2008 titled "San Juan Public Lands Center, Draft Land Management Plan and Draft Environmental Impact Statement, 72 Fed. Reg. 71148 (December 14, 2007)" and addressed to the San Juan Plan Revision, P.O. Box 162909 Sacramento, CA 95816-2909.
[50]http://fwpiis.mt.gov/content/getItem.aspx?id=35572
[51]http://www.wyofile.com/wp-content/uploads/2011/04/Deer.2010annualreport_muledeer.pdf
[52]http://onlinelibrary.wiley.com/doi/10.2193/2008-478/abstract
[53]http://www.blm.gov/style/medialib/blm/wy/information/NEPA/pfodocs/anticline/revdr-comments/eg.Par.10425.File.dat/02Bio-attach1.pdf
[54]https://www.fws.gov/southwest/ES/Documents/Oil-Gas-Fragmentation-Wilbert%20et%20al%202008.pdf
[55]Page 3-171;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.96289.File.dat/3_UFO-DRMP-2016_508.pdf

BLM_0148835

We appreciate your consideration of these comments for the Uncompahgre Field Office Draft Resource Management Plan/Environmental Impact Statement.  As we have offered specific requests, we hope the final RMP and ROD will not simply take the recommendations of a single alternative but will create a final hybrid decision that will incorporate our specific requests.


Respectfully,



SAN MIGUEL COUNTY
BOARD OF COUNTY COMMISSIONERS



Joan May, Chair

BLM_0148836

ATTACHMENT A:  RESOLUTION 2015-009
ATTACHMENT B: COMPARISON TABLES

BLM_0148837

**RESOLUTION OF THE BOARD OF COUNTY COMMISSIONERS OF
SAN MIGUEL COUNTY, COLORADO,
PUBLICLY STATING THE VALUE OF PUBLIC LANDS TO THE COUNTY'S ECONOMY,
RECREATION, HERITAGE, AND QUALITY OF LIFE; AND OPPOSING ANY EFFORT TO
CLAIM, TAKE OVER, LITIGATE FOR, OR SELL OFF FEDERAL PUBLIC LANDS WITHIN
SAN MIGUEL COUNTY, COLORADO**

**Resolution #2015 - 9**

**WHEREAS,** San Miguel County includes many beautiful, natural landscapes, including mountains, rivers, forests, lakes, basins and plateaus; and

**WHEREAS,** many of those stunning places are public lands owned by all Americans; and

**WHEREAS,** public land under the management of the U.S. Forest Service and U.S. Bureau of Land Management constitutes more than 60% of the land in San Miguel County; and

**WHEREAS,** these federal public lands are essential to the quality of life in San Miguel County, providing public recreational opportunity for wildlife watching, hiking, hunting, fishing, backpacking, horseback riding, skiing, bicycling, sightseeing, and numerous other outdoor recreational activities; and

**WHEREAS,** these federal public lands provide essential habitat for wildlife; and

**WHEREAS,** wildlife and the scenic landscape on public lands attract outdoor recreation and tourism that are the dominant drivers of San Miguel County's economy; and

**WHEREAS,** the unified, consistent management of Federal land by the Federal Land Agencies across the nation best protects the national value and utility of the public lands for all Americans and the values on which the economy in San Miguel County is dependent; and

**WHEREAS,** San Miguel County business owners attract employees in large part because of the iconic landscape and recreational opportunities on federal public lands; and

**WHEREAS,** San Miguel County's agriculture industry includes numerous ranchers and sheepherders who depend on grazing on federal public land; and

**WHEREAS,** there is a broad consensus in San Miguel County of the need for effective management of our federal public lands and wildlife, and that collaborative approaches in which federal public land management agencies cooperate with Colorado Parks and Wildlife, San Miguel County officials, and our community are more likely to produce effective management than would ownership or management of federal public lands by the state of Colorado; and

**WHEREAS,** San Miguel County residents are actively collaborating among diverse interests and with public land managers to improve public land management and public access; and

**WHEREAS,** federal public land management agencies employ residents of San Miguel County who are passionate and expert at their jobs, despite lack of adequate federal funding, pay taxes, and contribute to our community; and

**WHEREAS,** Americans from throughout the country value these public lands as a part of our national

BLM_0148838

heritage and as our inalienable birthright as Americans; and

**WHEREAS,** San Miguel County's forests are naturally prone to fire, including periodic large-scale fires, as part of the ecosystem in which they have evolved over millennia, although a warming climate has accentuated the process; and

**WHEREAS,** federal money and expertise to suppress wildfires is essential to protecting our communities, infrastructure, and public lands.

**NOW, THEREFORE, BE IT RESOLVED** by the Board of Commissioners of San Miguel County, Colorado, as follows:

That the Board of County Commissioners opposes any effort to claim, take over, litigate for, or sell off federal public lands within San Miguel County except pursuant to legislative processes established by Congress in the Recreation and Public Purposes Act, National Environmental Policy Act, Federal Land Policy and Management Act, and other applicable federal laws, following public participation and site-based analysis of the wildlife, ecological and community implications of the proposed land transfer.

**NOW, THEREFORE, BE IT RESOLVED** by the Board of Commissioners of San Miguel County, Colorado, as follows:

1. The Board of County Commissioners strongly supports federal land management in San Miguel County and the irreplaceable value public lands bring to our county's economy, recreation, heritage, and quality of life.

2. The Board of County Commissioners enthusiastically commends the dedicated federal employees who manage America's public lands in San Miguel County, and the dedicated employees of Colorado Parks and Wildlife who manage wildlife in San Miguel County, in partnership with the federal public land managers.

**DONE AND APPROVED** by the Board of Commissioners of San Miguel County, Colorado, at a duly noticed public meeting held in Telluride, Colorado, on March 25, 2014.

**BOARD OF COUNTY COMMISSIONERS**
**SAN MIGUEL COUNTY, COLROADO**

_Joan May_

Joan May, Chair

ATTEST:

_John Huebner_

John Huebner, Chief Deputy Clerk to the Board

VOTE:

| | | Nay | Abstain | Absent |
|---|---|---|---|---|
| Joan May | Aye | Nay | Abstain | Absent |
| Elaine R.C. Fischer | Aye | Nay | Abstain | Absent |
| Art Goodtimes | Aye | Nay | Abstain | Absent |

2

BLM_0148839

| BLM CODES | San Miguel Enhanced Ecological Areas (EEAs) [overlaps some of existing San Miguel River ACEC and some of] | | WSR San Miguel River Segment 1 Stipulations | | | | San Miguel SMRA Stipulations San Miguel River Segment (Zone 1) (includes BLM lands within existingSan | | San Miguel EXISTING ACEC Stipulations | | | San Miguel EXPANSION (big) ACEC Stipulations | San Miguel EXPANSION (river parts) ACEC Stipulation | San Miguel EXPANSION (3 sliver parts) ACEC Stipulation | Fluid Minerals | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Alt B | Alt D | Alt A | Alt B | Alt C | Alt D | Alt B | Alt D | Alt A | Alt C | Alt D | Alt B | Alt B | Alt B | Alt A | Alt B | Alt C | Alt D |
| 7 | | | | | | | 7 | 7 | 14 | | 7 | 7 | 7 | 7 | | | | |
| AVOID | | AVOID | AVOID | AVOID | AVOID | | AVOID | | | | | | AVOID | | | | | |
| BSC | | | | | | | | | | | | | | | | | | |
| CAMPFIRE | | | | | | | | | | CAMPFIRE | CAMPFIRE | CAMPFIRE | CAMPFIRE | CAMPFIRE | | | | |
| CAMPSITE | | | | | | | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | | | | |
| COAL | | | | | | COAL | COAL | COAL | | | COAL | COAL | COAL | COAL | | | | |
| COMPETE1 | | | | | | | | | | | | | | | | | | |
| COMPETE2 | | | | | | | COMPETE2 | | | | | | | | | | | |
| COMPETE3 | | | | | | | | COMPETE3 | | | | | | | | | | |
| CSU | | CSU | CSU | CSU | CSU | CSU | | | | CSU | | | | | CSU | | CSU | |
| CWOD | | | | | | | | | | | CWOD | CWOD | CWOD | CWOD | | | | |
| DAY | | | | | | | | | | | | | | | | | | |
| DES | | | | | | | DES | DES | DES | DES | DES | DES | DES | DES | | | | |
| DR_TIMING | DR_TIMING | | | | | | | | | | | | | | | | | |
| EXCL | | | | | | | | | EXCL | | | EXCL | | | | | | |
| FAC | | | | | | | | | | | | | | | | | | |
| FORAGE | | | | | | | | | | FORAGE | | | | | | | | |
| HYDROA | | HYDROA | | | | | | | | HYDROA | | | | | | | | |
| HYDROE | HYDROE | | HYDROE* | HYDROE* | HYDROE* | HYDROE* | | | | | HYDROE | HYDROE | HYDROE | HYDROE | | | | |
| LOCATE | | | | | | | LOCATE | | | | LOCATE | LOCATE | LOCATE | LOCATE | | | | |
| MM | | | | | | | | | | | | | | | | | | |
| MOT | | | | | | | | | | | | | | | | | | |
| NGD | | | | | | | | | | | | | | | | | | |
| NL | | | | | | | NL | | | | | NL | NL | NL | NL | | | |
| NSO | NSO | ** | | | | ** | | NSO | | | NSO | | | | | | | NSO |
| OPEN | | | | | | | | | | | | | | | | | | |
| RANGE | | | | | | | | | | | | RANGE | RANGE | RANGE | | | | |
| RECMINE | | | | | | | | | | | | RECMINE | RECMINE | RECMINE | | | | |
| RIVER | | | | | | | | | | | | | | | | | | |
| ROCK | | | | | | | | | | | | | | | | | | |
| SALABLE | | | | | | SALABLE | SALABLE | | SALABLE | | SALABLE | SALABLE | SALABLE | SALABLE | | | | |
| SEED | | | | | | | | | | | SEED | SEED | SEED | SEED | | | | |
| SHEEP | | | | | | | | | | | | | | | | | | |
| SOLARA | | SOLARA | | | | | | | | SOLARA | | | | | | | | |
| SOLARE | SOLARE | | SOLARE* | SOLARE* | SOLARE* | SOLARE* | | | | | SOLARE | SOLARE | SOLARE | SOLARE | | | | |
| SOLID | | | | | | SOLID | SOLID | SOLID | | | SOLID | SOLID | SOLID | SOLID | | | | |
| SRPs | | | | | | | | | | | | | | | | | | |
| SSR | SSR | SSR | SSR | SSR | SSR | SSR | | | | | | SSR | SSR | SSR | | | | |
| TAR | | | | | | | TAR | TAR | | | TAR | TAR | TAR | TAR | | | | |
| TL | | | | | | | | | | | | | | | | | | |
| V-1 | | | | | | | | | | | | | | | | | | |
| V-2 | | | | | | V-2 | | | V-2 | | | | | | | | | |
| V-3 | | | V-3 | V-3 | V-3 | | V-3 | V-3 | | V-3 | V-3 | V-3 | V-3 | V-3 | | | | |
| V-4 | | | | | | | | | | | | | | | | | | |
| WINDA | | | | | | | | | | WINDA | | | | | | | | |
| WINDE | WINDE | | WINDE* | WINDE* | WINDE* | WINDE* | | | | | WINDE | WINDE | WINDE | WINDE | | | | |
| WOOD | WOOD | | | | | | WOOD | WOOD | WOOD | | WOOD | WOOD | WOOD | WOOD | | | | |

* occurs as BLM surface but not private/USFS surface

** mapped as NSO in fluid minerals Alt D shapefile

BLM_0148840

| BLM CODES | WSR Beaver Creek Stip. Alt B | WSR Alt D | SMRA Beaver Creek (Zone 2) Alt B | SMRA Beaver Alt D | EEA (Enhanced Ecological Areas) Alt B | EEA Alt D | SMRA San Miguel (Zone 1) Alt B | SMRA San Miguel Alt D | EXISTING ACEC Alt A | EXISTING ACEC Alt C | EXISTING ACEC Alt D | EXPANSION(big) ACEC Alt B | EXPANSION (river parts) ACEC Alt B | EXPANSION (3 sliver parts) ACEC Alt B | Fluid Alt A | Fluid Alt B | Fluid Alt C | Fluid Alt D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7 | | | 7 | 7 | 7 | | 7 | 7 | 14 | | 7 | 7 | 7 | 7 | | | | |
| AVOID | AVOID | | AVOID | AVOID | | AVOID | AVOID | | | | | | | | | | | |
| BSC | | | | | | | | | | | | | | | | | | |
| CAMPFIRE | | | | | | | | | | CAMPFIRE | CAMPFIRE | CAMPFIRE | CAMPFIRE | CAMPFIRE | | | | |
| CAMPSITE | | | CAMPSITE | CAMPSITE | | | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | | | | |
| COAL | | COAL | COAL | COAL | | | COAL | COAL | | | COAL | COAL | COAL | COAL | | | | |
| COMPETE1 | | | | | | | | | | | | | | | | | | |
| COMPETE2 | | | COMPETE2 | COMPETE2 | | | COMPETE2 | | | | | | | | | | | | |
| COMPETE3 | | | | | | | | COMPETE3 | | | | | | | | | | |
| CSU | CSU | CSU | | | | CSU | | | | CSU | | | | | CSU | | CSU | |
| CWOD | | | | | | | | | | | CWOD | CWOD | CWOD | CWOD | | | | |
| DAY | | | | | | | | | | | | | | | | | | |
| DES | | DES | | | | | DES | DES | DES | DES | DES | DES | DES | DES | | | | |
| DR_TIMING | | | | | DR_TIMING | | | | | | | | | | | | | |
| EXCL | | | | | | | | | EXCL | | | EXCL | | | | | | |
| FAC | | | | | | | | | | | | | | | | | | |
| FORAGE | | | | | | | | | | FORAGE | | | | | | | | |
| HYDROA | | | | | | HYDROA | | | | HYDROA | | | | | | | | |
| HYDROE | | HYDROE* | | | HYDROE | | | | | HYDROE | HYDROE | HYDROE | HYDROE | HYDROE | | | | |
| LOCATE | | | LOCATE | | | | LOCATE | | | | LOCATE | LOCATE | LOCATE | LOCATE | | | | |
| MM | | | MM | | | | | | | | | | | | | | | |
| MOT | | | | | | | | | | | | | | | | | | |
| NGD | | | | | | | | | | | | | | | | | | |
| NL | | | NL | | | | NL | | NL | | | NL | NL | | | NL | | |
| NSO | | ** | | NSO | NSO | | | NSO | | | NSO | | | | | | | NSO |
| OPEN | | | | | | | | | | | | | | | | | | |
| RANGE | | | | | | | | | | | | RANGE | RANGE | RANGE | | | | |
| RECMINE | | | | | | | | | | | | RECMINE | RECMINE | RECMINE | | | | |
| RIVER | | | | | | | | | | | | | | | | | | |
| ROCK | | | | | | | | | | | | | | | | | | |
| SALABLE | | SALABLE | SALABLE | SALABLE | | | SALABLE | | SALABLE | | SALABLE | SALABLE | SALABLE | SALABLE | | | | |
| SEED | | | | | | | | | | | SEED | SEED | SEED | SEED | | | | |
| SHEEP | | | | | | | | | | | | | | | | | | |
| SOLARA | | | | | | SOLARA | | | | SOLARA | | | | | | | | |
| SOLARE | | SOLARE* | | | SOLARE | | | | | | SOLARE | SOLARE | SOLARE | SOLARE | | | | |
| SOLID | | | SOLID | | | | SOLID | SOLID | | | SOLID | SOLID | SOLID | SOLID | | | | |
| SRPs | | | | | | | | | | | | | | | | | | |
| SSR | SSR | SSR | | | | | SSR | SSR | | | | SSR | SSR | SSR | | | | |
| TAR | | | TAR | TAR | | | TAR | TAR | | | TAR | TAR | TAR | TAR | | | | |
| TL | | | | | | | | | | | | | | | | | | |
| V-1 | | | | | | | | | | | | | | | | | | |
| V-2 | V-2 | *** | V-2 | | | | | | V-2 | | | | | | | | | |
| V-3 | | | | V-3 | | | V-3 | V-3 | | V-3 | V-3 | V-3 | V-3 | V-3 | | | | |
| V-4 | | | | | | | | | | | | | | | | | | |
| WINDA | | | | | | WINDA | | | | WINDA | | | | | | | | |
| WINDE | | WINDE* | | | WINDE | | | | | | WINDE | WINDE | WINDE | WINDE | | | | |
| WOOD | | | WOOD | WOOD | WOOD | | WOOD | WOOD | WOOD | | WOOD | WOOD | WOOD | WOOD | | | | |

\* occurs for BLM surface but not private/USFS surface

\*\* mapped as NSO in fluid minerals Alt D shapefile

| BLM CODES | WSR Saltado Creek Stipulations [BLM surface portion overlaps existing San Miguel River ACEC] | | | | San Miguel SMRA Stipulations Saltado Creek River Segment (Zone 2) (includes BLM lands within existing San Miguel ACEC and Expansion of... | | San Miguel Enhanced Ecological Areas (EEAs) [overlaps some of existing San Miguel River ACEC and some of WSR but not all] | | San Miguel EXISTING ACEC Stipulations | | | NSION(big) A | San Miguel EXPANSION (river parts) ACEC Stipulation | San Miguel EXPANSION (3 sliver parts) ACEC Stipulation | Fluid Minerals | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Alt A | Alt B | Alt C | Alt D | Alt A | Alt B | Alt B | Alt D | Alt A | Alt C | Alt D | Alt B | Alt B | Alt B | Alt A | Alt B | Alt C | Alt D |
| 7 | | | | | 7 | 7 | | | 14 | | 7 | 7 | 7 | 7 | | | | |
| AVOID | | | | | AVOID | AVOID | | AVOID | | | | | | | | | | |
| BSC | | | | | | | | | | | | | | | | | | |
| CAMPFIRE | | | | | | | | | | CAMPFIRE | CAMPFIRE | CAMPFIRE | CAMPFIRE | CAMPFIRE | | | | |
| CAMPSITE | | | | | CAMPSITE | CAMPSITE | | | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | | | | |
| COAL | COAL | COAL | COAL | COAL | COAL | COAL | | | | | COAL | COAL | COAL | COAL | | | | |
| COMPETE1 | | | | | | | | | | | | | | | | | | |
| COMPETE2 | | | | | COMPETE2 | COMPETE2 | | | | | | | | | | | | |
| COMPETE3 | | | | | | | | | | | | | | | | | | |
| CSU | | | | | | | | CSU | CSU | | | | | | CSU | | CSU | |
| CWOD | | | | | | | | | | | CWOD | CWOD | CWOD | CWOD | | | | |
| DAY | | | | | | | | | | | | | | | | | | |
| DES | | | | | | | | | DES | DES | DES | DES | DES | DES | | | | |
| DR_TIMING | | | | | | | DR_TIMING | | | | | | | | | | | |
| EXCL | EXCEL | EXCEL | EXCEL | EXCEL | | | | | EXCL | | | EXCL | | | | | | |
| FAC | | | | | | | | | | | | | | | | | | |
| FORAGE | | | | | | | | | | FORAGE | | | | | | | | |
| HYDROA | | | | | | | | HYDROA | | HYDROA | | | | | | | | |
| HYDROE | HYDROE* | HYDROE* | HYDROE* | HYDROE* | | | HYDROE | | | | HYDROE | HYDROE | HYDROE | HYDROE | | | | |
| LOCATE | LOCATE | LOCATE | LOCATE | LOCATE* | LOCATE | | | | | | LOCATE | LOCATE | LOCATE | LOCATE | | | | |
| MM | | | | | MM | MM | | | | | | | | | | | | |
| MOT | | | | | | | | | | | | | | | | | | |
| NGD | NGD | NGD | NGD | | | | | | | | | | | | | | | |
| NL | | | | | NL | | | | | | | NL | NL | NL | | NL | | |
| NSO | NSO | NSO | NSO | NSO | | NSO | NSO | | | | | | NSO | | | | | NSO |
| OPEN | | | | | | | | | | | | | | | | | | |
| RANGE | | | | | | | | | | | | RANGE | RANGE | RANGE | | | | |
| RECMINE | | | | | | | | | | | | RECMINE | RECMINE | RECMINE | | | | |
| RIVER | | | | | | | | | | | | | | | | | | |
| ROCK | | | | | | | | | | | | | | | | | | |
| SALABLE | SALABLE | SALABLE | SALABLE | SALABLE | SALABLE | SALABLE | | | SALABLE | | SALABLE | SALABLE | SALABLE | SALABLE | | | | |
| SEED | | | | | | | | | | | SEED | SEED | SEED | SEED | | | | |
| SHEEP | | | | | | | | | | | | | | | | | | |
| SOLARA | | | | | | | | SOLARA | | SOLARA | | | | | | | | |
| SOLARE | SOLARE* | SOLARE* | SOLARE* | SOLARE* | | | SOLARE | | | | SOLARE | SOLARE | SOLARE | SOLARE | | | | |
| SOLID | SOLID | SOLID | SOLID | SOLID | SOLID | SOLID | | | | | SOLID | SOLID | SOLID | SOLID | | | | |
| SRPs | | | | | | | | | | | | | | | | | | |
| SSR | | | | SSR | | | SSR | SSR | | | | SSR | SSR | SSR | | | | |
| TAR | | | | | TAR | TAR | | | | | TAR | TAR | TAR | TAR | | | | |
| TL | | | | | | | | | | | | | | | | | | |
| V-1 | V-1 | V-1 | V-1 | | | | | | | | | | | | | | | |
| V-2 | | | | V-2 | V-2 | | | | V-2 | | | | | | | | | |
| V-3 | | | V-3 | | | | | | | V-3 | V-3 | V-3 | V-3 | V-3 | | | | |
| V-4 | | | | | | | | | | | | | | | | | | |
| WINDA | | | | | | | | WINDA | | WINDA | | | | | | | | |
| WINDE | WINDE* | WINDE* | WINDE* | WINDE* | | | WINDE | | | | WINDE | WINDE | WINDE | WINDE | | | | |
| WOOD | | | | | WOOD | WOOD | WOOD | | WOOD | | WOOD | WOOD | WOOD | WOOD | | | | |

* occurs for BLM surf* occurs for BLM surface but not private surface

** mapped as NSO In fluid minerals Alt D shapefile

BLM_0148842



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Sierra Club comments on Uncompahgre Draft RMP/EIS
1 message

**Nathan Matthews** <nathan.matthews@sierraclub.org>                    Tue, Nov 1, 2016 at 7:55 PM
To: ufomp@blm.gov, Nathaniel Shoaff <nathaniel.shoaff@sierraclub.org>

Please accept these comments from Sierra Club on the draft RMP/EIS. These comments are in addition to the comments submitted by the Western Environmental Law Center et al., to which Sierra Club is also a signatory.

Please confirm receipt of these comments, and let me know if you have any difficulty with the attachemnt.

Thanks,

Nathan Matthews

--
Nathan Matthews
Staff Attorney
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5695
Nathan.Matthews@sierraclub.org

---

📄 **SCRockyMountainChapterUncompahgreComment.pdf**
241K

BLM_0148843



November 1, 2016

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401
Email: uformp@blm.gov

Submitted via email

**Re:    Comments on the Uncompahgre Field Office's Draft Resource Management Plan and Environmental Impact Statement**

Dear Uncompahgre RMP Project Manager:

The Sierra Club's Rocky Mountain Chapter and Our Wild America and Beyond Coal Campaigns submit the following submit the following comments regarding the Bureau of Land Management ("BLM") Uncompahgre Field Office ("UFO") Draft Resource Management Plan ("Draft RMP") and Environmental Impact Statement ("EIS"). These comments are in addition to the comments submitted by the Western Environmental Law Center *et al.*, to which Sierra Club is also a signatory.

We agree that revision to the Uncompahgre RMP is long overdue, as the existing plan does not reflect present circumstances and national climate policies. DEIS 1-2. As has been made abundantly clear by President Obama, addressing climate change is one of our most important and urgent national priorities. In recent years, the United States has become an international leader in the fight against climate change and the Obama Administration has taken important and ambitious steps to start to address the problem and our contribution to it. Unfortunately, the Draft Plan for the Uncompahgre, if finalized as proposed, would be a step backward on critically important climate issues.

1

BLM_0148844

Under BLM's Draft Plan, the public lands at issue here would be used to generate more than 11 million tons of coal, 7,500 barrels of oil, and more than 3,746,000 thousand cubic feet of natural gas every year for the next two decades. DEIS p. 4-42, Table 4-11. All told, BLM's plan would result in the massive methane and carbon dioxide emissions -- more than half a billion tons of CO2e over twenty years -- at precisely the same time that our President and the world's leading climate scientists are saying it is more important than ever to sharply reduce our greenhouse gas emissions.

It is clear that emissions from the use and development of coal, oil, and natural gas resources are the primary driver of climate change. BLM has the opportunity to lead the Administration's efforts to address the climate problem by setting management priorities for these public lands that help us achieve our national climate objectives rather than perpetuate status quo management that we can no longer afford. As President Obama stated in his final State of the Union: "Now we've got to accelerate the transition away from old, dirtier energy sources. Rather than subsidize the past, we should invest in the future . . . ."[1] On behalf of our millions of members and supporters, Sierra Club and its Rocky Mountain Chapter, Beyond Coal and Our Wild America Campaigns urge BLM to consider -- and ultimately adopt -- an alternative that prevents new leasing of coal, oil, and natural gas in the Uncompahgre planning area. Any other approach would harm the climate, contribute to myriad environmental and public health effects of climate disruption, and hinder our ability to meet our national climate objectives and international greenhouse gas reduction targets.

Sierra Club is America's largest and most influential grassroots environmental organization, with more than 2.4 million members and supporters nationwide. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

The Sierra Club and its Rocky Mountain Chapter, which includes more than 17,000 members that live in Colorado, have spent many years working to protect communities and public lands in Colorado from the harmful effects of coal, oil, and natural gas development. The Rocky Mountain Chapter has helped communities across the Front

---

[1] President Obama, State of the Union (Jan. 13, 2016), available at https://www.whitehouse.gov/the-press-office/2016/01/12/remarks-president-barack-obama-%E2%80%93-prepared-delivery-state-union-address.

BLM_0148845

Range and elsewhere advocate for a local voice in the development of fossil fuels, and in particular fracking, near their homes and schools, supported drilling moratoria in Ft. Collins, Longmont, Broomfield, Boulder County, and elsewhere, and worked collaboratively with the U.S. Forest Service to help protect the pristine Thompson Divide in the White River National Forest. The Sierra Club and its Rocky Mountain Chapter spent years with allies fighting to protect the Roan Plateau from oil and gas development and have been a key part of the coalition working to protect the Sunset Roadless Area and nearby wilderness-capable public lands from the harmful effects of coal mining and exploration.

## I.    Contents

I.    The RMP Must Include Goals and Objectives for Limiting Contributions to Climate Change ................................................................................................................. 4

II.    BLM Must Fully Consider Additional Alternatives, Including "No Fossil Fuel Leasing" Alternatives ...................................................................................................... 6

    A.    BLM Must Consider, and Should Adopt, an Alternative That Prohibits All Future Fossil Fuel Leasing ................................................................................... 6

    B.    BLM Must Consider Other Alternatives that Limit Additional Fossil Fuel Development ............................................................................................. 9

    C.    BLM Must Consider Alternatives That Mandate Additional Mitigation Measures ................................................................................................................ 10

        1.    Coal Mine Methane Capture or Flaring ........................................................ 10

        2.    Planning to Reduce Oil and Gas Methane Emissions .................................. 13

III.    BLM Failed to Take a Hard Look at Numerous Impacts ........................................... 14

    A.    The Draft RMP/EIS Fails to Consider the Full Range of Reasonably Foreseeable Oil and Gas Development ...................................................................................... 14

    B.    The Draft RMP/EIS Fails to Take A Hard Look at Climate Impacts ................. 15

        1.    BLM Understates Greenhouse Gas Emissions .............................................. 15

        2.    BLM Must Take A Hard Look at Indirect Effects on U.S. Energy Markets 18

        3.    BLM Must Address the Severity and Significance of Greenhouse Gas Emissions ......................................................................................................... 21

    C.    The Draft RMP/EIS Fails to Take a Hard Look at Impacts to Surface and Groundwater ......................................................................................................... 24

IV.    Conclusion ................................................................................................................... 26

3

## II.     The RMP Must Include Goals and Objectives for Limiting Contributions to Climate Change

According to the President, "no challenge poses a greater threat to our children, our planet, and future generations than climate change."[2] Climate change poses two challenges for federal agencies: first, an agency must prepare for climate change's effects on the agency's mission and actions, and second, agencies must also limit their actions' contribution to climate change.[3]

Here, the goals and objectives proposed for the RMP only do the former. BLM proposes to adopt the goal of ensuring resilience in the face of climate change. DEIS at 2-24. But BLM must also adopt the goal of preventing, rather than merely withstanding, climate change's harms, as the agency has recently done for RMPs covering adjacent areas. BLM's recently adopted RMP for the adjacent Tres Rios field office provides an appropriate example, where BLM included the following goal: "Administrative and permitted activities emit the lowest practicable greenhouse gas emissions and have the smallest ecological footprint possible to promote sustainable natural resource management."[4] Objectives adopted for individual alternatives to effectuate this goal should specify specific emission limits and budgets.

Prevention, rather than merely adaptation to, climate change is required by the Federal Land Management Policy Act ("FLPMA") and federal policy. FLPMA requires that "[i]n managing the public lands the Secretary [of the Interior] shall, by regulation or otherwise, take any action necessary to *prevent* unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b) (emphasis added). The recent Presidential Memorandum, *Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment*, affirms that "It shall be the policy of the Department[] of ... the Interior, ...

---

[2] https://www.whitehouse.gov/sites/whitehouse.gov/files/achievements/atf_climate_booklet.pdf

[3] Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews at 2 (August 1, 2016), https://www.whitehouse.gov/sites/whitehouse.gov/files/documents/nepa_final_ghg_guidance.pdf

[4] Record of Decision for the Approved Resource Management Plan for Public Lands Administered by the Tres Rios Field Office, Dolores, Colorado at II-63, (Feb. 27, 2015), http://www.blm.gov/style/medialib/blm/co/field_offices/san_juan_public_lands/land_use_planning/approved_lrmp.Par.81229.File.dat/TRFO%20ROD%20and%20ARMP%20508%20Compliant.pdf

4

BLM_0148847

_to avoid and then minimize_ harmful effects to land, water, wildlife, and other ecological resources (natural resources) caused by land- or water-disturbing activities."[5] BLM's recently-proposed "Planning 2.0" rule recognizes that this policy should apply to land use planning, adopting "avoiding impacts" as the first and most important step in the "mitigation hierarchy," 81 Fed. Reg. at 9686, _id. at_ 9725 (proposed 40 C.F.R. § 1601.0-5). President Obama has specifically instructed BLM, in its management of fossil fuel extraction on federal lands, to reduce the greenhouse gas emissions that contribute to climate change.[6]

These policies and concerns must be integrated into land use planning; they cannot be postponed to the lease or later stage. Climate change presents the quintessential situation in which BLM must "weigh long-term benefits to the public against short-term benefits," 43 U.S.C. § 1712(c)(7), and BLM's development and adoption of land use plans must consider the available scientific evidence, _id._ § 1712(c)(2), including the evidence regarding climate change, the impact of fossil fuel extraction and use in general, and the effects of _federal_ fossil fuel leasing in particular.[7]

The proposed RMP's failure to adopt goals and objectives regarding limiting greenhouse gas emissions from activities in the decision area was arbitrary and capricious. BLM adopted precisely such goals in the recent amendment to plan for the adjacent Tres Rios field office, and BLM has not provided -- and cannot provide -- a rational basis for failing to do so here.

---

[5] https://www.whitehouse.gov/the-press-office/2015/11/03/mitigating-impacts-natural-resources-development-and-encouraging-related (emphasis added).

[6] _See, e.g.,_ White House, Fact Sheet: Administration Takes Steps Forward on Climate Action Plan by Announcing Actions to Cut Methane Emissions (Jan. 14, 2015) https://www.whitehouse.gov/the-press-office/2015/01/14/fact-sheet-administration-takes-steps-forward-climate-action-plan-anno-1.

[7] _See, e.g.,_ Peter Erickson and Michael Lazarus, How Would Phasing Out U.S. Federal Leases for Fossil Fuel Extraction Affect $CO_2$ Emissions and 2°C Goals? 1, 31-32, Stockholm Environment Institute Working Paper 2016-02 (May 2016), available at https://www.sei-international.org/mediamanager/documents/Publications/Climate/SEI-WP-2016-US-fossilfuel-leases-climate.pdf.

5

BLM_0148848

### III.   BLM Must Fully Consider Additional Alternatives, Including "No Fossil Fuel Leasing" Alternatives

NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E), (2)(C). The analysis of alternatives "is characterized as 'the heart' of the environmental impact statement." *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999) (quoting 40 C.F.R. § 1502.14). In the EIS, the agency must "[r]igorously explore and objectively evaluate *all* reasonable alternatives" in response to a "specif[ied] ... purpose and need." 40 C.F.R. §§ 1502.13, 1502.14(a) (emphasis added); *see also New Mexico ex rel. Richardson*, 565 F.3d at 703 (stating that "an EIS must 'rigorously explore and objectively evaluate' all reasonable alternatives to a proposed action, in order to compare the environmental impacts of all available courses of action," (quoting 40 C.F.R. § 1502.14)).

### A.   BLM Must Consider, and Should Adopt, an Alternative That Prohibits All Future Fossil Fuel Leasing

As the President has recognized, "ultimately, if we're going to prevent large parts of this Earth from becoming not only inhospitable but uninhabitable in our lifetimes, we're going to have to keep some fossil fuels in the ground rather than burn them and release more dangerous pollution into the sky."[8] BLM is uniquely situated among federal agencies in its ability to keep fossil fuels in the ground.

The draft RMP/EIS's elimination of alternatives that would prohibit future coal, oil, and gas leasing without detailed analysis, DEIS 2-15, was improper. BLM believed that these alternatives were: prohibited by the Federal Land Management Policy Act and Mineral Leasing Act, inconsistent with the goals adopted by the RMP, and not necessary to protect resource values. DEIS 2-16. Each argument is mistaken.

FLPMA's incorporation of "the principles of multiple use and sustained yield", 43 U.S.C. 1712(c)(1), does not preclude BLM from closing the Uncompahgre decision area, or any other land management unit, to further fossil fuel leasing. The Tenth Circuit has squarely rejected the argument that FLPMA's multiple use provisions permit BLM to exclude no lease alternatives from review in the RMP context:

---

[8] President Barack Obama, Statement by the President on the Keystone XL Pipeline (Nov. 6, 2015), https://www.whitehouse.gov/the-press-office/2015/11/06/statement-president-keystone-xl-pipeline

BLM_0148849

> BLM's obligation to manage for multiple use does not
> mean that development *must* be allowed on [a particular
> piece of public lands]. Development is a *possible* use, which
> BLM must weigh against other possible uses – including
> conservation to protect environmental values, which are
> best assessed through the NEPA process. Thus, an
> alternative that closes the [proposed public lands] to
> development does not necessarily violate the principle of
> multiple use, and the multiple use provision of FLPMA is
> not a sufficient reason to exclude more protective
> alternatives from consideration.

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 710 (10th Cir. 2009).

The keystone of multiple use is to "take[] into account the long-term needs of future generations for renewable and nonrenewable resources;" closing the planning area to future fossil fuel leasing is essential to, rather than inconsistent with, that purpose. 43 U.S.C. § 1702(3). In addition, substantial portions of the planning area will be open to fossil fuel development even if BLM closes the area to *further* leasing. Twenty-five percent of the fluid mineral estate is already leased. DEIS 4-12. Insofar as FLPMA requires some accommodation of fossil fuel extraction on federal lands, that accommodation has already been provided, as the Uncompahgre and other planning areas have been open to such extraction throughout their history, substantial portions are already leased, and development of those leases will likely continue even if areas are entirely closed to further leasing. FLPMA's principle of "multiple use" must be understood in light of the FLPMA obligation to prevent "unnecessary or undue degradation," 43 U.S.C. § 1732(b). Because BLM has not shown any need for additional fossil fuel leasing and development, and degradation caused by such development would be unnecessary and undue.

Nor does the Mineral Leasing Act preclude no-lease alternatives.[9] Contrary to the draft RMP/EIS's assertion, nothing in the MLA "directs field offices to apply the least

---

[9] Although not relied upon by BLM, we also note that neither the Federal Coal Leasing Act Amendments nor the Federal Onshore Oil and Gas Leasing Reform Act limit BLM's authority to close some or all areas to further coal, oil, or gas leasing in the RMP process. *See WildEarth Guardians v. Salazar*, 859 F. Supp. 2d 83, 87 (D.D.C. 2012) , 43 C.F.R. § 3425.1-8(a)(3), *Western Energy Alliance v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013).

BLM_0148850

restrictive management constraints necessary to achieve resource goals and objectives for principal uses of public lands" in any way that would preclude adopting an RMP that prohibits further leasing. DEIS at 2-16. Courts have consistently held that section 226 of the MLA provides BLM with the discretion to decline to issue leases. *See, e.g., Udall v. Tallman*, 30 U.S. 1, 4 (1965), *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1229-30 (9th Cir. 1988). *See also Ash Creek Min. Co. v. Lujan*, 969 F.2d 868, (10th Cir. 1992) (affirming that federal courts lack authority to order federal lands to be leased and "the decision to offer the lands in question for competitive leasing would be in the sole discretion of the Secretary. MLA § 2(a), [30] U.S.C. § 201"). The language quoted above from the Draft Plan does not appear in the MLA or the implementing regulations. BLM's Land Use Planning Handbook states that "When applying leasing restrictions, the least restrictive constraint *to meet the resource protection objective* should be used."[10] Even on its own terms, however, this non-binding policy statement does not apply to the threshold question of whether BLM can adopt a goal of reducing contribution to climate change, or objectives of eliminating greenhouse gas emissions. BLM can and should adopt such a goal, and leasing restrictions are the only means of achieving it guaranteed to be effective.

Further fossil fuel leasing categorically fails to meet even the goals and objectives proposed by the draft RMP/EIS, which would only permit coal, oil, and gas development that is "environmentally sound" or "environmentally responsible." DEIS 2-178, 2-187. As BLM has recognized, fossil fuel development is the major source of air pollution within the planning area, and the level of pollution correlates with the amount of such development. DEIS 2-385. Additional leasing and development will have significant direct and indirect effects, especially with regard to greenhouse gas emissions. Prohibiting that leasing is the only way to fully prevent the harm done by these emissions: although the draft RMP includes some technological measures to limit greenhouse gas emissions, and we have proposed others, these measures cannot reduce downstream indirect emissions, and only partially reduce direct emissions.Therefore, the only way achieve the necessary reduction in greenhouse gas emissions, and to avoid additional harm to all "resource values" impacted by climate change, is to prohibit

---

[10] BLM, Land Use Planning Handbook, H-1601-1 (March 11, 2005), (emphasis added) http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.38665.File.dat/h1601-1.pdf.

BLM_0148851

further expansion of fossil fuel extraction by closing the decision area to further leasing.[11]

Finally, prohibiting further fossil fuel leasing does not conflict with the proposed RMP/EIS's other goals. BLM proposes the goal of "provid[ing] opportunities to develop fluid minerals consistent with other resource goals and uses to support local and national energy needs," DEIS 2-187, but nothing in the draft RMP/EIS evaluates those energy needs, much less shows that satisfying those needs requires development of *additional* fossil fuels beyond areas already leased.

**B.     BLM Must Consider Other Alternatives that Limit Additional Fossil Fuel Development**

BLM must "'[r]igorously explore and objectively evaluate all reasonable alternatives.'" *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 708 (10th Cir. 2009) (quoting 40 C.F.R. § 1502.14(a)). Here, by BLM's own admission, the alternatives selected for detailed analysis each present only a "a *slightly different* mix of resources and resource uses." DEIS 2-6 (emphasis added). BLM did not evaluate any alternative that BLM expected to result in decreases in future coal production: BLM anticipates the *exact same* level of coal production and associated air emissions across all alternatives. *See, e.g.*, DEIS at 4-27 to 4-36, 4-42. For oil and gas, BLM expects the alternatives to lead to only slight changes in production: between 16 and 19 conventional, and between 23 and 31 coalbed methane, new oil and gas wells per year.[12]

These slight differences fail to span the "full spectrum" of available alternatives.[13] For example, CEQ had explained that when considering " a proposal to designate wilderness areas within a National Forest …. [a]n appropriate series of alternatives might include dedicating 0, 10, 30, 50, 70, 90, or 100 percent of the Forest to wilderness."[14]

---

[11] *See* Land Use Planning Handbook at 24 (areas should be closed when "appropriate protection can be ensured only by closing the lands to leasing.").

[12] *See* Emissions Inventory Technical Support Document at A-1 and B-1.

[13] CEQ, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," Question 1, http://energy.gov/sites/prod/files/G-CEQ-40Questions.pdf.

[14] *Id.*

9

Here, alternatives that would have reduced future fossil fuel development below these levels were reasonable. BLM must consider alternatives that lead to reduced coal development, and more significant reductions in oil and gas activity, whether by closing areas to further fossil fuel leasing or by some other method. These alternatives should span a range of possible development intensities. For example, BLM could develop an alternative that reduces greenhouse gas emissions, relative to a no action/business as usual baseline, by the amounts specified in U.S. emission reduction targets.[15] Another benchmark would be an alternative that restricted oil and gas development to levels sufficient to avoid contributing to ozone levels that violate the recently-adopted national ambient air quality standard. DEIS 4-49 to 4-50. All told, alternatives could impose substantial restrictions on future fossil fuel leasing and development while still falling far short of "implement[ing] exclusive" or "maximum" environmental protection. DEIS 2-15.

C.    **BLM Must Consider Alternatives That Mandate Additional Mitigation Measures**

1.    *Coal Mine Methane Capture or Flaring*

BLM must consider and analyze alternative that requires all coal mines operating in the Uncompahgre planning area to mitigate climate impacts by capturing or flaring the mine's methane emissions. Technologies to capture or flare methane are readily available, both flaring and capture have been studied or used at coal mines in the planning area, and BLM has already confirmed that it has the authority to require methane capture and flaring at underground mines on public lands. Moreover, doing so here would generate significant savings on the greenhouse gas emissions that will result from BLM's plan over the next two decades.

As noted, NEPA requires agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives" and to "[d]evote substantial treatment to each alternative considered." 40 C.F.R. § 1502.14(a)-(b). These alternatives must "include reasonable alternatives not within the jurisdiction of the lead agency." *Id.* at 1502.14(c). NEPA also requires agencies to identify measures to mitigate the adverse environmental impacts of their actions. 40 C.F.R. §§ 1502.14(f), 1502.16(h). According to CEQ's recent NEPA Climate Guidance, when analyzing the climate impacts under NEPA, "an agency

---

[15] We reiterate that meeting these *nationwide* targets will require *federal* agencies to do more than a pro-rata share, such that BLM should instead adopt a no fossil fuel leasing alternatives.

10

BLM_0148853

should compare the anticipated levels of GHG emissions from each alternative – including the no-action alternative – and mitigation actions to provide information to the public and enable the decision maker to make an informed choice."[16] Both the CEQ's 2014 Draft and 2016 Final NEPA climate guidance instruct agencies to "consider the potential for mitigation measures to reduce or mitigate GHG emissions and climate change effects when those measures are reasonable and consistent with achieving the purpose and need for the proposed action."[17] The guidance specifies that mitigation measures could include, among other things, "capturing or beneficially using GHG emissions such as methane."[18]

BLM's draft plan, however, does not address potential climate mitigation measures and does not consider an alternative requiring methane capture,  methane flaring, or any other way to mitigate the climate impact of methane emissions from coal mines in the planning area. This is a significant oversight for an area containing some of the most methane-heavy mines in the country. BLM estimates that under each of the alternatives considered, coal mines in the planning area will emit more than 3 million tons of $CO_2$-e every year in direct emissions from operation of the mines, "primarily from fugitive methane emissions." DEIS at 4-39; *see* DEIS Tables 4-9 and 4-10, pp. 4-38, 4-39.

Although neither mitigation measures nor alternatives must be within an agency's jurisdiction in order to be incorporated in the agency's NEPA review, (40 C.F.R. 1502.14(c)), BLM has explicitly stated that it has authority to require coal mines operating on public lands to capture methane in order to mitigate climate impacts. In 2014, as part of BLM's "advanced notice of proposed rulemaking" on coal mine methane capture, BLM spelled out this authority in clear terms both as to new and existing mines:

> Based on the readjustment authority [30 U.S.C. § 207], the BLM may readjust lease terms to both authorize <u>and require lessees to capture otherwise vented [waste mine methane] to use or sell</u>.  The BLM also has authority under the same section of the MLA to include such terms and conditions in new coal leases.[19]

---

[16] CEQ Guidance at 11.

[17] *Id.* at 19.

[18] *Id.*

[19]   79 Fed. Reg. 23,923 (Apr. 29, 2014) (emphasis added).

11

BLM_0148854

Coal mine methane generally is removed from underground mines one of two ways, and in both instances coal companies can either capture the methane and put it to beneficial use generating power or flare it in ways that lowers its climate impact. First, methane can be removed by moving vast quantities of air, including dilute quantities of methane, through a mine's ventilation system. This is termed "ventilation air methane" (often called "VAM"). Second, methane drainage wells drilled into the coal seam from above can be used to capture, flare, or (more commonly) vent methane directly into the atmosphere. Captured methane can then be used to generate electricity either at the site or sold into the marketplace. A number of underground coal mines operating on federal lands use both methods to remove methane – including the West Elk Mine, which has thus far resisted all voluntary incentives to either capture or flare its methane emissions and instead currently emits all of its methane directly into the atmosphere.

A recent report published by the state of Colorado confirms that both methane capture and flaring are feasible within the Uncompahgre planning area.[20] As explained in that 2016 report, the Oxbow mine has been flaring methane since 2012, and the West Elk mine has the potential to generate more than 17 megawatts of electricity from the mine's ventilation air methane system.[21] Moreover, EPA reported in 2014 that it had identified "40 projects where flaring has been practiced, either in conjunction with energy recovery technologies or as a stand-alone mitigation technology."[22]

BLM's failure to consider an alternative requiring methane flaring or capture as a condition of mining coal on public lands in the planning area violates NEPA and must be corrected by the agency.

---

[20] State of Colorado, Coal Mine Methane in Colorado, Market Research Report at 14 (Mar. 2016), available at https://www.colorado.gov/pacific/sites/default/files/atoms/files/Coal%20Mine%20Methane%20Report%202016%20FINAL%203_2016.pdf (last viewed Oct. 21, 2016).

[21] *Id.* at 18, 38.

[22] EPA, Coal Mine Methane Flaring: Technology and Case Studies (Sep. 2014).

12

BLM_0148855

## 2. *Planning to Reduce Oil and Gas Methane Emissions*

BLM also should have considered an alternative that would have imposed planning measures to reduce the air pollution emitted from oil and gas production by, for example:

1. Controlling the timing, pace, and location of development to maximize economies of scale in oil and gas fields;

2. Aligning oil and gas production with construction of gas capture infrastructure on the lease, unit, or communitization area  so that oil production does not outpace gas capture; and

3. Synchronizing upstream production operations with midstream gas pipeline and processing capacity to ensure that gas is transported to market for sale and use by consumers.

We previously recommended these measures in comments regarding BLM's anticipated methane venting and flaring rule.[23] BLM responded by explaining that it was "considering the integrated approach suggested by the commenters" and that BLM recognized that "[p]art of the solution to flaring, … is to align the timing of well development with that of capture and processing infrastructure development, and to create incentives for operators to capture rather than flare." 81 Fed. Reg. 6616, 6662 (Feb. 8, 2016). However, neither the proposed methane rule nor the proposed RMP adopt measures to achieve this effect. Thus, at this stage, it is entirely unclear precisely how in fact BLM "is considering the integrated approach" we have recommended.

---

[23] See Comments submitted to the U.S. Bureau of Land Management by Western Environmental Law Center et al. on April 22, 2016, pp. 30-41 (https://www.regulations.gov/#!documentDetail;D=BLM-2016-0001-9084).

13

BLM_0148856

## IV.    BLM Failed to Take a Hard Look at Numerous Impacts

### A.    The Draft RMP/EIS Fails to Consider the Full Range of Reasonably Foreseeable Oil and Gas Development

The draft RMP/EIS fails to consider the full scope of reasonably foreseeable future oil and gas development, and associated environmental impacts, by failing to adequately address likely growth in Mancos Shale oil and gas development. The draft relies on outdated estimates of the amount of gas available, and fails to account for the possibility of future boom in development of this gas. By underestimating reasonably foreseeable future oil and gas development, BLM impermissibly understated the likely greenhouse gas and other air emissions from those activities.

The Reasonably Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office (Feb. 16, 2012) ("RFD") acknowledges that "[s]hale gas production could become important in the part of the Piceance Basin that lays in the northeast part of the Study Area ... if Mancos Shale exploration occurring there is determined to be economically successful." RFD at 57. However, the RFD and draft RMP/EIS do not appear to have included such development in their predictions of future activity. *Id.*; DEIS at 3-120 to 3-121.

Although shale gas production in the decision area has not reached levels seen in some other regions, future growth beyond that predicted in the RFD is reasonably foreseeable. As BLM recently recognized in the foreseeable development scenario for the Farmington, New Mexico office, unfavorable economics may delay "significant activity ... for the Mancos gas play" for several years, but "once the economics become favorable, the activity is anticipated to rapidly increase."[24] Here, however, the forecasts of foreseeable future development do not appear to have accounted for such an increase. More broadly, the draft RMP/EIS and RFD do not appear to have followed BLM's instruction, in BLM's Fluid Mineral Leasing Handbook, to "Always assume at least one boom and bust cycle over the life of the plan."[25]

---

[24] BLM, RFD for Farmington, NM, Executive Summary (Oct. 2014), http://www.blm.gov/style/medialib/blm/nm/field_offices/farmington/farmington_planning/ffo_pla nning_docs/rmpa_mancos.Par.52727.File.dat/SJB%20Mancos%20RFD%20final%20report-10.27.pdf

[25] Fluid Mineral Leasing Handbook at III-8, http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_han dbook.Par.44374.File.dat/H_1624_1.pdf

14

BLM_0148857

While an increase in Mancos Shale production could be foreseen even on the basis of material cited in the RFD, the RFD and draft RMP/EIS also fail to account for recent information demonstrating that far higher levels of development are possible. The RFD relies on a 2003 assessment of the amount of gas available in the broader Uinta-Piceance Basin. RFD at 82 (citing U.S. Geological Survey Uinta-Piceance Assessment Team, 2002[26]). The USGS has recently explained that its prior assessments sorely understated technically recoverable oil and gas volumes. As USGS explained, "The previous USGS assessment of the Mancos Shale in the Piceance Basin ... estimated 1.6 trillion cubic feet of shale natural gas."[27] USGS now believes that this understates recoverable gas by a factor of 40, and that "The Mancos Shale in the Piceance Basin of Colorado contains an estimated mean of 66 trillion cubic feet of shale natural gas, 74 million barrels of shale oil and 45 million barrels of natural gas liquids."[28] These revised USGS estimates must be incorporated into the NEPA and planning process.[29]

## B.   The Draft RMP/EIS Fails to Take A Hard Look at Climate Impacts

### 1.   *BLM Understates Greenhouse Gas Emissions*

The draft RMP/EIS understates impacts on climate by both understating the impact of each ton of greenhouse gas emitted and by understating the likely total of emissions.

First, the draft RMP/EIS errs by using long-outdated estimates of the "global warming potential," or "GWP," of greenhouse gases other than carbon dioxide. GWP expresses warming caused by a greenhouse gas relative to the warming caused by an equivalent mass of carbon dioxide. GWP allows emissions of non-$CO_2$ pollutants to be expressed in terms of $CO_2$-equivalent. The draft RMP/EIS uses estimates provided by the Intergovernmental Panel on Climate Change more than twenty years ago. DEIS 4-38. These estimates have twice been superseded by updated IPCC reports, most recently, in

---

[26] https://pubs.usgs.gov/dds/dds-069/dds-069-b/

[27] https://www.usgs.gov/news/usgs-estimates-66-trillion-cubic-feet-natural-gas-colorado-s-mancos-shale-formation

[28] *Id.*

[29] Fluid Mineral Leasing Handbook at III-4.

BLM_0148858

September 2013, when the IPCC released its Fifth Assessment Report.[30]  For example, this report estimates, on the basis of more recent and thorough science, that methane from fossil sources has 36 times the global warming potential of carbon dioxide over a 100 year time frame and at least 87 times the global warming potential of carbon dioxide over a 20-year time frame.[31]  Both the EPA and the Department of Energy have recognized that the newer estimates represent the best available science regarding the impact of non-CO2 GHGs. Specifically, although EPA uses the older IPCC values in compiling EPA's GHG Inventory, EPA has explained that EPA believes more recent estimates to be more accurate and better reflect scientific consensus; EPA uses the old values for the narrow purpose of compiling the inventory because the convention establishing the inventory has specified old values and has not been updated.[32] The Department of Energy has similarly recognized that the Fifth Assessment Report values using climate feedbacks (*e.g.*, 36 and 87 for methane) reflect the current scientific consensus.[33]

Second, the draft RMP/EIS understates the volume of greenhouse gases likely to be emitted by oil and gas development. BLM estimates emissions using a "bottom up" methodology that principally functions by multiplying "emission factor" estimates of emissions from individual activities, such as venting associated with completion of a single well, by "activity factors," estimates of those events' frequency. *See* Garvin Heath, *et al.*, National Renewable Energy Laboratory, Estimating U.S. Methane Emissions from the Natural Gas Supply Chain at iv (August 2015) (describing these terms and methodology)[34], Air Emission Inventory Technical Support Document at 10-37 (explaining analysis conducted here).

---

[30] IPCC, Climate Change 2013: The Physical Science Basis: Chapter 8, page 714, Table 8.7.

[31] *Id.*

[32] https://www3.epa.gov/climatechange/ghgemissions/gwps.html

[33] Department of Energy, Opinion and Order 3357-C, DOE/FE Dkt. 11-161-LNG, at 30 (Dec. 4, 2015) ("We agree with Sierra Club that using 20- and 100-year methane GWPs of 87 and 36 is most appropriate for use today and that climate carbon feedbacks should be captured in the GWP values for methane."), *available at* www.fossil.energy.gov/programs/gasregulation/authorizations/2011_applications/ord3357c.pdf.

[34] http://www.nrel.gov/docs/fy16osti/62820.pdf; *but see* https://www.epa.gov/sites/production/files/2016-08/documents/revision_under_consideration_for_ghgi_ng_and_petro_uncertainty_4_2016.pdf at 2 ("For natural gas systems, calculations are commonly more complex than simply multiplying an emission factor by an activity factor.").

BLM_0148859

Here, the draft RMP/EIS relies on long-outdated inputs in applying this method of assessment. Many of the emission factor estimates used in the Air Emission Inventory TSD are taken from a _1995_ EPA document. However, as EPA has recognized, those estimates were developed "when the industry practices were much different from now. In some cases, the emissions factors were developed using limited sample data and knowledge about the industry's operations (e.g., wells, compressors)."[35] More recent and accurate is available, and should have been used here. There have been numerous published, peer-reviewed studies providing more recent measurements of emissions, which BLM should have used.[36] For example, EPA, in preparing its most recent nationwide inventory of greenhouse gas emissions, "used multiple recently published studies as well as [greenhouse gas reporting program] Subpart W data to revise the [1990s era] emission factors and activity data for majority of the natural gas systems emission sources and many petroleum systems production segment emission sources."[37] Reflecting this improved data, EPA's estimate of methane emissions from the oil and gas sector rose by 34%, relative to the prior estimate.[38]

---

[35] EPA, Greenhouse Gas Emissions Reporting from the Petroleum and Natural Gas Industry: Background Technical Support Document at 47 (Apr. 12, 2010), _available at_ https://www.epa.gov/sites/production/files/2015-05/documents/subpart-w_tsd.pdf.

[36] _See, e.g., See_ Allen, _et al.,_ Measurements of methane emissions at natural gas production sites in the United States, Proceedings of the National Academy of Sciences 110:44 (Oct. 29, 2013) at 17,768-17,773, _available at_ http://www.pnas.org/content/110/44/17768.full.pdf+html (supplemental appendices and tables _available at_ http://www.pnas.org/content/suppl/2013/09/11/1304880110.DCSupplemental/sapp.pdf); Prasino Group, _Final Report For Determining Bleed Rates for Pneumatic Devices in British_

_Columbia_ (Dec. 18, 2013), at 15, available at http://scek.ca/sites/default/files/ei-2014-01-final-report20140131.pdf.

[37] EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks: Revisions under Consideration for Natural Gas and Petroleum Systems Uncertainty Estimates at 7, (April 2016), https://www.epa.gov/sites/production/files/2016-08/documents/revision_under_consideration_for_ghgi_ng_and_petro_uncertainty_4_2016.pdf

[38] See, e.g., Envt'l Def. Fund, New EPA Stats Confirm: Oil & Gas Methane Emissions Far Exceed Prior Estimates (Apr. 15, 2016), https://www.edf.org/media/new-epa-stats-confirm-oilgas-methane-emissions-far-exceed-prior-estimates; Gina McCarthy, Remarks on Climate Action at CERA in Houston, Texas (Feb. 24, 2016), available at https://yosemite.epa.gov/opa/admpress.nsf/8d49f7ad4bbcf4ef852573590040b7f6/5c432a7068e191e985257f630054fea8!OpenDocument (acknowledging that "methane emissions from existing sources in the oil and gas sector are substantially higher than we previously understood").

17

BLM_0148860

Even EPA's revised inventory likely likely underestimates the total amount of methane that is emitted by the oil and gas sector, because "bottom-up" analyses, such as the one BLM used here and EPA's inventory, consistently produce estimates far lower than those indicated by "top-down" studies that measure atmospheric concentrations of methane in areas with heavy oil and gas development, and estimate the oil and gas sector's contribution to those levels using isotopic analysis. One top-down analysis of emissions of Colorado's Denver-Julesberg Basin estimates an emission rate of 2.6% to 5.6%.[39] Another study of Utah's Uinta Basin indicated an emission rate of 6% to 12%.[40] Peer-reviewed studies that have compared bottom-up and top-down studies have recognized that top-down studies consistently produce higher estimates, and indicate likely underestimates in bottom-up studies.[41]

Here, BLM must recalculate its emission estimates using more recent data, and BLM must address whether the resulting estimates are consistent with the emissions estimates provided by these top-down studies. Because the draft RMP/EIS and air emission inventory TSD do not identify methane emissions from gas production specifically, Sierra Club, decisionmakers, and the public cannot readily provide this comparison.

### 2. *BLM Must Take A Hard Look at Indirect Effects on U.S. Energy Markets*

Federal agencies have long understood that decisions they make regarding management of public lands and waters impact not only the resources within those areas, but can also affect broader energy markets. By expanding or contracting the supply of coal, oil, and natural gas, BLM's decisions here will alter not only how much of the planning area's resources are used, but also the prices at which they are available

---

[39] Gabrielle Pétron et al., A New Look at Methane & Non-Methane Hydrocarbon Emissions from Oil and Natural Gas Operations in the Colorado Denver-Julesburg Basin, 119 J. Geophysical Research 6836, 6850 (2014), available at http://onlinelibrary.wiley.com/doi/10.1002/2013JD021272/epdf.

[40] Anna Karion et al., Methane Emissions Estimate from Airborne Measurements Over a Western United States Natural Gas Field, 40, Geophysical Research Letters 4393, 4393 (2013), available at http://onlinelibrary.wiley.com/doi/10.1002/grl.50811/full.

[41] A.R. Brandt et al., Methane Leaks from North American Natural Gas Systems, 343 Science 733 (2014), available at http://www.novim.org/images/pdf/ScienceMethane.02.14.14.pdf (comaring top-down and bottom-up estimates); *see also* Clean Air Task Force, NRDC, and Sierra Club, *Waste Not*: Common Sense Ways to Reduce Methane Pollution from the Oil and Natural Gas Industry at 9-11 (Jan. 2015), http://catf.us/resources/publications/files/WasteNot.pdf

BLM_0148861

in the market. Those price shifts will most certainly be significant enough to alter demand for both fossil fuels and renewable resources such as wind and solar, and those changes in the market could lead to stark differences in greenhouse gas emissions that must be quantified here. Admittedly, if each of the alternatives BLM evaluates are identical in the amount of fossil fuels produced -- as is the currently the case for coal and nearly so for oil and gas -- then the market impacts of those alternatives will be identical. However, this analysis would be particularly useful comparing BLM's action alternatives with a "no leasing" conservation alternative that limits supply of coal, oil, and natural gas. BLM's failure to even acknowledge this issue flies in the face of decades of Department of Interior precedent, ignores relevant modeling already conducted on the market and climate impacts of expanding coal production in the Uncompahgre planning area, and fails to use readily available tools that would allow BLM to analyze and disclose the climate impacts of its proposal.

As the Secretary of Interior has recognized, opening up more federal lands for fossil fuel production could not only affect the amount of coal produced, but also the amount of wind and solar generation in our energy grid. That is why, in ordering a comprehensive study of the climate impacts of the federal coal program, the Secretary directed the Department of Interior to evaluate "how the administration, availability, and pricing of Federal coal affect regional and national economies (including job impacts), and energy markets in general, including the pricing and viability of other coal resources... and other energy sources."[42] The Secretary further directed the Department to study, "[t]he impact of possible program alternatives on the projected fuel mix and cost of electricity in the United States."[43]

BLM makes no attempt to analyze market changes and instead ignores the issue altogether. Nor can BLM simply punt on market effects until it finishes that programmatic review. Simply because BLM might complete a discretionary review, untethered from any particular proposal, at some point in the future does not mean that BLM can dodge meaningful consideration of its proposals here. The Draft Plan prepared by BLM, if not vastly improved, would constitute an unlawful dodge – preventing both the public and decisionmakers from fully understanding the environmental impacts of the choice BLM is making.

---

[42] Secretarial Order 3338 at 8 (Jan. 15, 2016) available at http://www.blm.gov/style/medialib/blm/wo/Communications_Directorate/public_affairs/news_rele ase_attachments.Par.4909.File.dat/FINAL%20SO%203338%20Coal.pdf (last visited July 1, 2016).

[43] Id.

BLM_0148862

BLM's failure to study the market effects of its plan is particularly egregious because BLM was a cooperating agency on the U.S. Forest Service's preparation of a supplemental Draft EIS that looked at the market effects of a proposal to open up additional lands *for coal production in much of the Uncompahgre planning area*. The U.S. Forest Service's 2015 analysis, though flawed in significant respects, nonetheless used a robust energy-economy model to predict impacts to wind and solar generation from a proposal that would open up approximately 170 million tons of coal on otherwise protected lands in Colorado. After using ICF's Integrated Planning Model to study the market and climate impacts of its proposal, the Forest Service concluded:

> Changes in gross production and consumption of coal from the North Fork Coal Mining Area are expected to have an effect on production and consumption of other fuel sources, including alternative supplies of coal, natural gas, and other energy supplies such as renewables.[44]

The Forest Service explained that opening up 170 million tons of coal for mining would cause "the mixture of fuels [to] shift[], including increases in production and consumption of underground coal, and decreases in production and consumption of substitute fuel sources such as surface coal, natural gas, and renewable energy," with the result being a net 131 million ton increase in greenhouse gas emissions.[45] As a cooperating agency to that analysis, BLM cannot now pretend that it does not exist. If the BLM no longer stands by that analysis, it should say so. If it somehow does not think the analysis is relevant to BLM's decision here, it should say so. But ignoring recent analysis looking at the same resources studied here, prepared with input from the same agency, is arbitrary and capricious.

In addition to the recent Forest Service analysis, ICF International's Integrated Planning Model has been used to evaluate these types of market responses to numerous state and federal proposals in recent years. A recent, but by no means exhaustive list, of examples include the following projects and analyses: EPA, Clean Power Plan; State Department, Keystone XL Pipeline; Surface Transportation Board, Tongue River Railroad; and

---

[44] U.S. Forest Service, Rulemaking for Colorado Roadless Areas Supplemental Draft Environmental Impact Statement, p. 80 (November 2015), *available at* http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd485194.pdf (last visited Nov. 1, 2016).

[45] *Id.* at 81.

BLM_0148863

Washington Department of Ecology, Millennium Bulk Export Terminal. There are additional energy market models that could further inform BLM's evaluation here, particularly with regard to oil and gas. We point to the recent use of the Integrated Planning Model not to suggest BLM must use this particular model in revamping its analysis, but rather to note that this analysis can and has been done across a wide range of agencies studying the market and climate impacts of a variety of fossil fuel extraction and infrastructure proposals. BLM's refusal to study the market impacts of its decision here is thus not only out of touch with how energy markets work, it is out of step with the way in which other federal agencies review the market and climate impacts of their decisions under NEPA.

Understanding the market and climate impacts of a decision to allow extensive development of coal, oil, and natural gas resources is essential to making an informed decision -- particularly when weighed against an alternative that would prohibit new fossil fuel leasing in the area, as Sierra Club and others have advocated. BLM violated NEPA by failing to either use available tools to provide that essential information or explain why it could not do so. Under NEPA regulations, agencies "shall" explain in an EIS (1) why essential information is incomplete or unavailable; (2) its relevance to reasonably foreseeable impacts; (3) a summary of existing science on the topic; and (4) the agency's evaluation based on any generally accepted theoretical approaches.  40 C.F.R. § 1502.22(b). BLM's failure to conduct this analysis violates NEPA and must be corrected before BLM finalizes the Uncompahgre RMP revision.

### 3.   *BLM Must Address the Severity and Significance of Greenhouse Gas Emissions*

In addition to correcting BLM's flawed assessment of the amount and potency of greenhouse gas emissions, BLM must provide discussion and context for assessing the severity or significance of those emissions. One way to do so is by using the social cost of carbon dioxide and other greenhouse gases, as discussed in the separate comments submitted by Western Environmental Law Center *et al.*, p. 62-68. Another tool BLM must use is to address the impact of BLM's management plan for the Uncompahgre planning area -- which anticipates adding more than half a billion tons of CO2-e to the atmosphere over the next twenty years -- on the numerous federal policies and international agreements that call for steep reductions in U.S. greenhouse gas emissions by 2025 and 2030.

21

BLM_0148864

In order to take the hard look NEPA requires, BLM must provide the public and decision-makers with an up to date review of the Obama Administration's climate objectives and international climate agreements and assess whether its Draft Plan is consistent with those goals and commitments.

NEPA regulations direct federal agencies, "to discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned)," 40 C.F.R. § 1506.2(d), and require agencies to address "possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned." 40 C.F.R. § 1502.16(c). CEQ's NEPA Climate Guidance interprets these regulations to encompass the requirement to address "approved federal, regional, state, tribal, or local plans, policies, or laws for GHG emission reductions or climate adaptation to make clear whether a proposed project's GHG emissions are consistent with such plans or laws."[46]

BLM has made no attempt to comply with this mandate. The U.S. has set ambitious greenhouse gas emission reduction targets and established itself as an international leader on protecting the climate. For example, in December 2015 the international climate summit in Paris produced an historic agreement establishing the ambitious goal of limiting warming to 1.5 degrees Celsius above pre-industrial times, a target that will require ambitious emission reductions beyond those currently identified.[47]

Domestically, President Obama's Clean Power Plan, currently stayed pending litigation, calls for reducing power sector emissions to 30 percent below 2005 levels by 2030.[48] In November 2014, the President announced a joint U.S.-China agreement aimed at reducing climate pollution that called for even more aggressively cutting net greenhouse gas emissions to 26-28 percent below 2005 levels by 2025. *Id.*

---

[46] CEQ NEPA Climate Guidance at 28-29.

[47] White House, U.S. Leadership and the Historic Paris Agreement to Combat Climate Change (Dec. 12, 2015), https://www.whitehouse.gov/the-press-office/2015/12/12/us-leadership-and-historic-paris-agreement-combat-climate-change (last visited Oct. 30, 2016).

[48] White House Fact Sheet, U.S.-China Joint Announcement on Climate Change and Clean Energy Cooperation (November 11, 2014), available at http://www.whitehouse.gov/the-press-office/2014/11/11/fact-sheet-us-china-joint-announcement-climate-change-and-clean-energy-c (last visited Oct. 30, 2016).

22

BLM_0148865

Although much of the climate information in BLM's Draft Plan is from 2010 or earlier, recent climate science demonstrates that increasing greenhouse gas emissions from coal, oil, and natural gas extraction and combustion would undermine our national climate objectives and conflict with the international commitments our country made as part of the historic United Nations Framework Convention on Climate Change conference in Paris in December 2015.

In September 2016, both the White House Council of Economic Advisors and the peer-reviewed journal Nature published reports concluding that existing domestic climate policies are very likely insufficient to meet our commitments made as part of the December 2015 Paris Agreement.[49] Even the White House's own analysis shows that existing policies -- including the currently stayed Clean Power Plan -- *might* allow us to meet our Paris commitments, but only if we make the most optimistic assumptions possible for each of several uncertainties in our assessment of likely emissions and their impact.

Finally, Oil Change International's recent "The Sky's Limit" report identifies the global carbon budget needed to reach the Paris and Clean Power Plan emission reduction goals and concludes that "[t]he oil, gas, and coal in already-producing fields and mines are more than we can afford to burn while keeping likely warming below 2°C;" and that "[t]he oil and gas alone [in already producing fields] are more than we can afford for a medium chance of keeping to 1.5°C."[50] The report further concludes that "at current rates of emissions, the carbon budget for a likely chance of limiting warming to 2°C will be fully exhausted by 2037, and by 2025 for a medium chance at 1.5°C."[51] This dramatic finding underscores the urgent need to take immediate and drastic steps to reduce greenhouse gas emissions. Merely ten more years of status quo emissions would

---

[49] Jeffrey B. Greenblatt and Max Wei, Assessment of the climate commitments and additional mitigation policies of the United States, Nature Climate Change (Sept. 26, 2016); White House Council of Economic Advisors, The Economic Record of the Obama Administration: Addressing Climate Change (Sept. 2016), available at https://www.whitehouse.gov/sites/default/files/page/files/20160921_record_climate_energy_cea.pdf (last viewed Sept. 30, 2016).

[50] Oil Change International, The Sky's Limit: Why The Paris Climate Goals Require A Managed Decline Of Fossil Fuel Production, ES-6 (Sep. 2016), and available at http://priceofoil.org/content/uploads/2016/09/OCI_the_skys_limit_2016_FINAL_2.pdf.

[51] *Id.* at 12.

23

BLM_0148866

entirely exhaust the total amount of carbon dioxide we can emit – forever – and still have even a "medium chance (50%)" of limiting global temperatures to the internationally-agreed upon 1.5°C increase above pre-industrial times.[52]

Decisions that purport to merely extend the status quo for greenhouse gas emissions would in reality drive us dangerously close to expensive and destructive global temperature increases. BLM must acknowledge this reality in order to give the public and decisionmakers the appropriate context in which to view the competing alternatives here. As proposed, BLM's Draft plan predicts that the coal, oil, and natural gas generated in the Uncompahgre planning area over the twenty years would release more than half a billion tons of $CO_2$-e into our atmosphere. BLM's plan is thus in direct conflict with our international climate commitments and domestic greenhouse gas reduction targets, but BLM fails to reconcile or even acknowledge this conflict.

More fossil fuel leasing, or even a continuation of the status quo, is totally out of step both with our Administration's priorities and the latest science on the urgent need to reduce greenhouse gas emissions. At a minimum, NEPA requires BLM to address these inconsistencies and explain the extent of the conflict so that both the public and decisionmakers have an accurate understanding of the climate impacts of BLM's proposal.

C.       **The Draft RMP/EIS Fails to Take a Hard Look at Impacts to Surface and Groundwater**

BLM has recognized, as it must, that fluid mineral leasing, exploration, and development impact water resources. "Use, storage, and transportation of fluids, such as produced water, hydraulic fracturing fluids, and condensate, have the possibility of spills that could migrate to surface or groundwater, causing human health impacts." DEIS 4-83. Waters can also be affected by activities other than fluid spills, such as sedimentation or mobilization of underground contaminants. "Hydraulic fracturing," in particular, "could disturb surface water and groundwater hydrology and impact water quality." DEIS 4-130.

---

[52] *Id.* at 13.

BLM_0148867

However, BLM failed to take a hard look at these impacts. While we summarize many areas where additional analysis is required in the companion comment submitted with Western Environmental Law Center *et al.*, we highlight several of these impacts here.

For one, BLM cannot provide a "hard look" at the impacts of spills without discussing the contaminants that might be present in spilled fluid. BLM recognizes that fracturing fluid contains numerous "chemical additives," and that hydraulic fracturing presents a risk of spill of these chemicals, or of fracturing fluid or wastewater that contains them. DEIS 4-83; *see also id.* at 4-61, 4-80,[53] 4-445. But BLM provides no discussion of what these additives might be, the amounts used, or the consequences of a spill of any particular additive, chemical, or other hazardous material.

We agree that, insofar as hydraulic fracturing occurs at all, the chemicals used should be "biodegradable, non-toxic neutral pH, residual free, non-corrosive, non-polluting and non-hazardous in the forms and concentrations being used," and we support BLM's identification of this as a "best management practice." DEIS at G-10.  BLM must do more, however, and prohibit use of chemicals that fail to meet these criteria. The draft RMP/EIS does not clearly state that adherence to identified best management practices is mandatory. Even if BLM requires that additives meet this standard, a "hard look" requires BLM to identify chemicals that are likely to be used, and to assess the impacts of a spill of those particular chemicals.

In addition to discussing the particular chemicals that will foreseeably be used and potentially spilled, BLM must take a hard look at the broader efficacy of the BLM's Onshore Orders, the Colorado Oil and Gas Conservation Commission's requirements for well completions, and the "stipulations and site-specific condition of approvals for drilling, completions, and fluids management" that BLM asserts will protect water resources. DEIS at 4-83. As explained by BLM's Handbook on Planning for Fluid Mineral Resources, it is not enough for BLM to identify mitigation measures: BLM must take a hard look at "The residual impacts that would remain following the application of the mitigation measures ... *i.e.*, effectiveness of mitigation measures in ameliorating potential impacts."[54] *See New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 481 (D.C.

---

[53] The DEIS identifies "spills of hazardous materials *in water bodies*" as an "indicator" of impacts on water resources. DEIS at 4-80 (emphasis added). BLM must recognize that spills are likely to impact water resources even when the spill is not directly into a water body; for example, material spilled on soil can be mobilized by rain and then reach surface or groundwater.

[54] Planning for Fluid Mineral Resources at III-8.

BLM_0148868

Cir. 2012) ("merely pointing to [a] compliance program is in no way sufficient to support a scientific finding" of no "significant environment[al] impact."). BLM has not provided such an analysis. For example, although BLM argues that effects would be minimized by adherence to BLM's onshore orders, DEIS 4-83, in formulating Onshore Order #8, "Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands," BLM's NEPA analysis was "not intended to analyze the effects that may result from actual hydraulic fracturing activities," and instead only considered the incremental effects of the "procedures" the rule would require "prior to, during, and subsequent to hydraulically fracturing an oil and gas well," such as performing a cement evaluation log.[55]

In short, although BLM has recognized that fluid mineral development in general, and hydraulic fracturing of shale and other tight formations in particular, poses a risk of spills or other releases of hazardous chemicals into the environment, BLM has not provided an assessment of the likelihood of such a release or the consequences thereof. This falls far short of the hard look NEPA requires.

### V.    Conclusion

We appreciate your consideration of these comments, and BLM's willingness to facilitate public participation by extending the public comment period. For the reasons described above, however, we believe the draft RMP/EIS to be seriously flawed in its treatment of fossil fuel production. BLM should consider and adopt an alternative that prohibits further fossil fuel leasing, and additional analysis is needed to provide a hard look at the impacts of fossil fuel development.

Sincerely,

Nathan Matthews
Staff Attorney
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
415.977.5695
nathan.matthews@sierraclub.org

Nathaniel Shoaff
Staff Attorney
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
415.977.5610
nathaniel.shoaff@sierraclub.org

---

[55] BLM, Environmental Assessment: Proposed Hydraulic Fracturing Rule, at 4, https://www.regulations.gov/contentStreamer?documentId=BLM-2013-0002-0003.

26

11/1/2016    DEPARTMENT OF THE INTERIOR Mail - Tri-State G&T Response to Comment on BLM Uncompahgre RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Tri-State G&T Response to Comment on BLM Uncompahgre RMP
1 message

**Leiker, Diana** <dleiker@tristategt.org>                                Tue, Nov 1, 2016 at 4:18 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Cc: "Teresa Pfifer (teresa_pfifer@blm.gov)" <tpfifer@blm.gov>, "Gina Jones (gmjones@blm.gov)" <gmjones@blm.gov>,
"Myers, Karl" <kmyers@tristategt.org>

Good afternoon,

Please find attached Tri-State's comments on the Uncompahgre Draft RMP. Please feel free to contact with us any
additional information needs or comments on our letter.


We appreciate the opportunity to be involved in this planning effort. Have a good afternoon.


Diana


*Diana Leiker*

*Senior Transmission Siting and Environmental Planner*

*Tri-State Generation and Transmission Association, Inc*

*1100 W. 116th Avenue*

*Westminster, CO 80234*

*Office: 303-254-3565*

*Cell: 303-241-5653*



📄 **Tri-State's Comments on the BLM UFP RMP 161031.pdf**
   83K

BLM_0148870

**TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.**
HEADQUARTERS:   P.O. BOX 33695   DENVER, COLORADO 80233-0695   303-452-6111

November 1, 2016

RMP Project Manager
Bureau of Land Management-Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Co 81401

RE: Response to Request for Comments on the Bureau of Land Management's Uncompahgre
Field Office- Resource Management Plan Revision and Draft Environmental Impact Statement

Dear Project Manager,

Tri-State Generation and Transmission Association, Inc. (Tri-State) is a wholesale electric power
producer/supplier that serves 43 rural electric cooperatives and public power districts in
Colorado, Nebraska, New Mexico and Wyoming.  Tri-State's member distribution systems serve
nearly 578,000 metered customers (translating to a population of more than 1.4 million people).
Tri-State's 250,000-square-mile member service territory includes all or parts of 56 of Colorado's
64 counties, all or parts of 27 counties throughout New Mexico, all or parts of 20 counties in
western Nebraska and all or parts of 14 counties in central and northern Wyoming.  Tri-State's
transmission system includes approximately 5,600 miles of high-voltage transmission line and
135 substations and switching stations.

Tri-State welcomes the opportunity to provide comments to the Bureau of Land Management
(BLM) regarding the proposed revisions to the Uncompahgre Field Office (UFO), Resource
Management Plan (RMP) and Draft Environmental Impact Statement (DEIS). Tri-State is
committed to siting, routing, designing, constructing, and maintaining generation, transmission,
and telecommunication facilities in a manner that will result in minimal disturbance to the
natural and human environment.

Tri-State's overall siting and maintenance operations for the electric transmission system are
aligned to comply with the BLM regulations and principles of multiple use contained in the
Federal Land Policy and Management Act of 1976 (FLPMA)  to: (1) conserve BLM managed
land values and characteristics; (2) protect human health and safety; (3) supply continuous,
affordable reliable electricity; (4) preserve wildlife habitats where necessary; (5) maintain
existing facilities and access to those facilities; and (6) construct new facilities and access with a
regard to BLM requirements and resource protection.

Tri-State has one substation (Starr Nelson), six telecommunication facilities, and approximately
132 miles of transmission line that occurs within the UFO Planning Area as detailed below and
depicted in the attached figure.

*AN EQUAL OPPORTUNITY / AFFIRMATIVE ACTION EMPLOYER*
A Touchstone Energy® Cooperative

CRAIG STATION
P.O. BOX 1307
CRAIG, CO  81626-1307
970-824-4411

ESCALANTE STATION
P.O. BOX 577
PREWITT, NM  87045
505-876-2271

NUCLA STATION
P.O. BOX 698
NUCLA, CO  81424-0698
970-864-7316

BLM_0148871



BLM RMP Project Manager
November 1, 2016

<u>Transmission Lines that Occur Within the UFO Planning Boundary</u>

- o Nucla-Cahone transmission line (currently 115-kV): 3.6 miles
- o Montrose-Nucla (currently 115-kV): 14.7 miles
- o Cow Creek-Dallas Creek 115kV: .9 miles
- o Cow Creek-South Canal 115-kV: 7.1 miles
- o Doughspoon-Gunnison Valley 115kV: 1.5 miles
- o Doughspoon-Starr Nelson 115kV: 7.4 miles
- o East Montrose-Peach Valley 115kV: 4.7 miles
- o Garnet Mesa-Hotchkiss 115kV: 6.2 miles
- o Garnet Mesa Tap-Peach Valley 115kV: 6.2 miles
- o Grand Junction-Montrose 115kV: 25.3 miles
- o Grand Junction-Montrose 345kV: 33.2 miles
- o Hesperus-Montrose 345Kv: 6.5 miles
- o Hesperus to Montrose 115kV:
- o Hotchkiss-North Fork 115kV: 4.1 miles
- o Juanita-North Fork 115kV: 2 miles
- o Nucla-Norwood 115kV: 3.6 miles
- o Norwood-Wilson Mesa 115kV: 1.1

<u>Telecommunication Facilities that Occur Within the UFO Planning Boundary</u>

- o Sheebs Knob
- o Tv Hil
- o Storm King
- o Dallas Creek
- o South Canal
- o Starr Nelson

Tri-State respectfully submits the following comments on the proposed revisions to the UFO Draft Resource Management Plan and Draft Environmental Impact Statement (DEIS) as they pertain to the construction and maintenance generation facilities and electric transmission lines and substations within the RMP planning area.

**Areas of Critical Environmental Concern (ACEC):**

BLM_0148872



BLM RMP Project Manager
November 1, 2016

Tri-State has multiple facilities under each alternative that occur within proposed ACECs. Tri-State has concerns that these designations have incorporated portions of existing rights-of-ways (ROWS) and associated access roads which could affect line maintenance activities including access road authorization, use, new development, and improvement. Tri-State is currently working with the BLM on re-authorization of existing roads for the Grand Junction-Montrose 115-kV transmission line. Access is critical to Tri-State providing safe and reliable power to our member cooperatives.

For Alternatives B and D use of existing and designated routes in the most of the proposed ACECs that affect Tri-State facilities are permitted. However, there may be occasions where a new overland route or short spur route is needed in the future to replace existing transmission line structures or repair damaged wires.

It is not clear if major maintenance activities, rebuilds, upgrades (which may require a ROW expansion) or major structure replacement/line re-conductoring would be permitted in a designated ACEC, even if the line is an existing authorized use. The ACEC designation under all proposed alternatives should either 1.) Allow for use of existing access and allow for development of new access when necessary for existing infrastructure within ACEC boundaries and allow for upgrade and replacement within authorized and expanded ROWs or 2.) Tri-State would request that the BLM exclude all existing utility ROWs and associated access roads from incorporation into the ACEC. The BLM has been provided GIS shapefiles for access and transmission line locations within the UFO during project development and as part of re-authorization of older lines and construction of new transmission lines. Tri-State requests that this data is utilized in the future to assist with management decisions as they pertain to authorized uses. If there are data sets the BLM may be missing, we would be happy to provide under the terms of our data sharing agreement (2015).

A detailed list of our facilities within proposed ACECs as proposed in Alternatives A and B are included below:

> The proposed Salt Desert Shrub Ecosystem ACEC proposed under Alternative B would incorporate portions of the Grand Junction-Montrose 345-kV and 115kV lines, the Star Nelson-Doughspoon 115kV line, the Star Nelson Substation, and associated access roads. A portion of the area also occurs in a designated energy corridor which may conflict with resource management objectives. Exclusion of the corridor from the ACEC designation would still allow for protection and management of the federally listed Colorado hookless cactus. Exclusion of the transmission ROWs in this area would still require Tri-State's compliance and due diligence under Section 7 of the Endangered Species Act to avoid, minimize, and mitigate impacts to federally listed plant species.

BLM_0148873



BLM RMP Project Manager
November 1, 2016

> The Lower Uncompahgre Plateau Cultural ACEC proposed under Alternative B would incorporate portions of the Grand Junction-Montrose 115kV and 345kV transmission lines and associated access roads.

> The San Miguel River Expansion proposed under Alternative B would incorporate portions of the Norwood-Wilson Mesa 115-kV line in two locations.

> The San Miguel River ACEC proposed under Alternatives A, C, and D would also incorporate the same Norwood-Wilson Mesa 115kV transmission lines.

> The Fairview South (CNHP) Expansion proposed under Alternative B would incorporate portions of the South Canal-Cow Creek transmission line.

**Right-of-Way Avoidance and Exclusion Areas**

In Tri-State's original scoping letter regarding the RMP amendment, we had requested that Tri-State's facilities be incorporated onto the Utility Planning figures along with other existing facilities owned/operated by Western Area Power Association, Kinder Morgan TransColorado Pipeline. The Draft RMP and DEIS does not appear to specifically acknowledge Tri-State facilities in the planning area, nor was Tri-State contacted as requested to specifically discuss ROW avoidance and exclusion area designations. As a major stakeholder in the RMP revisions, we feel that Tri-State's electrical facilities should be considered for planning purposes when discussing ROW avoidance and exclusion designations. This focus of the RMP would have directly benefitted from utilities involvement throughout the development process.

Similar to our concerns regarding the incorporation of existing transmission facilities into ACECs, there are also proposed ROW avoidance and exclusion areas that currently have existing electrical infrastructure present. Tri-State's facilities that occur in proposed ROW exclusion/avoidance areas include the following:

*Alternative A: (Exclusion Areas)*:
　　　　Norwood-Wilson Mesa 115-kV
　　　　Starr Nelson-Doughspoon

*Alternative B: (Avoidance and Exclusion)*:
　　　　Norwood-Wilson Mesa 115kV
　　　　Nucla-Norwood 115kV
　　　　Montrose-Nucla-Cahone 115-k (proposed for 230kV upgrade)
　　　　Hotchkiss-North Fork 115kV
　　　　Juanita-North Fork 115kV

BLM_0148874



BLM RMP Project Manager
November 1, 2016

        Starr-Nelson Doughspoon 115kV
        Grand Junction-Montrose 115 and 345 kV

*Alternative C: (Avoidance and Exclusion):*
        Grand Junction-Montrose 115 and 345kV
        Starr Nelson-Doughspoon 115kV
        Starr Nelson Substation
        Hotchkiss-North Fork 115kV
        Montrose-Nucla-Cahone existing 115-kV
        South Canal-Cow Creek 115kV
        Norwood-Wilson Mesa

*Alternative D (Avoidance):*
        Grand Junction-Montrose 115 and 345kV
        Starr Nelson-Doughspoon 115kV
        Starr Nelson Substation
        Hotchkiss-North Fork 115kV
        South Canal-Cow Creek 115kV
        Montrose-Nucla-Cahone existing 115-kV
        Juanita-North Fork 115kV
        Nucla-Norwood 115kV
        Norwood-Wilson Mesa115kV

Tri-State formally requests that these existing ROWs and substation are excluded from the ROW exclusion categories for all Draft RMP and DEIS alternatives to permit lawful and authorized maintenance and operation activities including access roads use and improvement to continue. Tri-State has no foreseeable plans to construct new power lines in the UFO planning area, but in general, prefer to utilize existing utility corridors for upgrades or new alignments whenever feasible to reduce impacts to land use and the natural and human environment. The BLM should consider encouraging the use of existing corridors whenever feasible for future development. Designating existing corridors and ROW exclusion areas in areas with existing electrical infrastructure may result in greater impacts to the environment from future development.

**Surface Disturbing Activities**

Tri-State also has facilities located within areas proposed for reducing surface disturbing activities. The following Tri-State facilities are incorporated into areas proposed for eliminating or reducing surface disturbing activities in the UFO planning area (by alternative):

*Alternative A:* Starr Nelson-Doughspoon 115kV

BLM_0148875



BLM RMP Project Manager
November 1, 2016

*Alternative B:* Montrose-Nucla-Cahone 115kV
Norwood-Wilson Mesa 115kV
Hotchkiss-North Fork 115kV
North Fork-Juanita 115kV
South Canal-Cow Creek 115kV
Starr Nelson-Doughspoon 115kV
Starr Nelson Substation
Grand Junction-Montrose 115kV and 345kv

*Alternative C:* Montrose-Nucla-Cahone 115kV
Norwood-Wilson Mesa 115kV
South Canal-Cow Creek 115kV
Starr Nelson-Doughspoon 115kV
Starr Nelson Substation
Hotchkiss-North Fork 115kV
North Fork-Juanita 115kV
Grand Junction-Montrose 115kV and 345kv

*Alternative D:* Montrose-Nucla-Cahone 115kV
Norwood-Wilson Mesa 115kV
Hotchkiss-North Fork 115kV
North Fork-Juanita 115kV
South Canal-Cow Creek 115kV
Starr Nelson-Doughspoon 115kV
Starr Nelson Substation
Grand Junction-Montrose 115kV and 345kv

The discussion of this surface disturbance category primarily focused on fluid mineral leasing. Appendix B, however, addresses non-fluid mineral leasing activities, which would presumably include transmission ROWs. Tri-State would again request the Final RMP acknowledges these existing facilities and the right to continue to maintain, access, and improve authorized infrastructure.

**Travel Management Plan**

Tri-State is required to access and maintain electrical infrastructure in compliance with federal standards and requirements. Tri-State has existing permitted facilities within the BLM UFO planning area that were constructed and permitted prior to travel management planning objectives. In the case of Grand Junction-Montrose 115-kV transmission line, access has been

BLM_0148876



**BLM RMP Project Manager**
November 1, 2016

used since the line was constructed in the early 1960s, but that access was never formally incorporated into the right-of-way grant, which necessitates a request to the BLM to provide for access to this and other older facilities. Tri-State is currently working with the UFO to formally authorize access to this facility.

For many years, Tri-State has effectively worked with BLM to identify and designate access (or administrative) roads for our existing and new transmission infrastructure. The GIS data for these transmission lines and associated access roads have been provided to the BLM through a data sharing agreement.

It is critical that Tri-State is able to maintain access rights to our transmission, telecom, and substation facilities within the Planning Area. Motorized cross-country travel should be allowed in areas designated as open, limited to existing roads and trails, limited to designated roads and trails and closed to motorized use, for maintenance of existing and planned transmission lines and associated facilities.  The BLM should leave areas open for OHV use where an existing use or ROW grant is issued or for those areas designated as critical to the health and safety of the public. Access should be allowed in coordination with the BLM for new facilities and ROWs within the planning area that will minimize disturbance to the greatest extent feasible. We believe that formally designating access routes for transmission operation and maintenance will concentrate and reduce environmental impacts to any given area over time.

This process of permit renewal has been effective and efficient; however, it would be helpful to all in the industry if BLM, in this case, could identify the issue and provide for continued access to transmission facilities for maintenance and emergency services in any final promulgated rule.

**Surface Disturbance for Non-Fluid Mineral Activities**

Tri-State believes in the implementation of seasonal restrictions to reduce impacts to soils, vegetation, and wildlife. It is imperative; however, that with the implementation of these surface disturbing restrictions that it is still feasible for permittees to construct and maintain their authorized facilities in an efficient and cost effective manner. Complying with overlapping and in some cases yearlong seasonal restrictions for long linear projects can make maintenance and construction of permitted facilities challenging if not impossible.  Tri-State appreciates that Table B-4 of Appendix B incorporates exceptions, modifications, and waivers to permit construction/maintenance activities based on current conditions. It is unclear, however, what this process would require. Tri-State would request that the Final RMP clarifies what is required of a permittee if a modification is required.

BLM_0148877



BLM RMP Project Manager
November 1, 2016

The Final RMP should be consistent with our existing ROW Grants which allow year-round access of our facilities in emergency situations that pose a threat to electric reliability, health, and safety.

**Visual Resource Management**

Existing transmission lines and associated facilities are located within the boundaries of the planning area. We urge the BLM to continue to allow valid existing rights and uses such as existing and planned utilities to be considered with appropriate and reasonable mitigation measures.

**Renewable Energy Development**

Tri-State is supportive of alternatives that improve renewable energy development opportunities. It is crucial to these developments that the interconnection of these facilities (transmission lines) is also incorporated into this planning process and that the final Right-of-Way Exclusion boundaries consider interconnection of renewable resources.

**Target Shooting/Vandalism Concerns**

Vandalism (shooting) of Tri-State's infrastructure on the UFO district is a past and ongoing health and safety concern. Significant damage has been done to our lines on the district and more frequent and substantial repairs have been required. Our maintenance staff is regularly repairing shot conductor wire, static wire, and insulators. Many of our lines also carry critical communications in the form of an optical ground wire (OPGW). These wires in many cases are carrying internet and 911 services. Damage to electrical infrastructure is serious threat from an electrical reliability perspective but also from a public health and safety perspective. Tri-State is formally requesting that the BLM incorporate a no shooting policy around electric infrastructure similar to what has been implemented for trails and roads into the Final RMP and EIS. We would also request that all existing distribution and transmission ROWs are formally designated as no target shooting areas under Alternatives A through D.

Thank you for your consideration of our comments. We appreciate ongoing project coordination with the BLM UFO staff and we look forward to continuing to work with the BLM through the RMP planning revision. Please don't hesitate to contact us for further information or data needs.

BLM_0148878



BLM RMP Project Manager
November 1, 2016

Sincerely,

Karl Myers
Manager, Transmission Siting, Permitting and
Environmental

Attachment: Figure: Tri-State Facilities in BLM UFO Planning Area

CC: Teresa Pfifer-BLM Acting Field Manager

9

BLM_0148879



BLM RMP Project Manager
November 1, 2016

BLM_0148880



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Trout Unlimited DRMP comments
1 message

**Garrett Hanks** <ghanks@tu.org>                                    Tue, Nov 1, 2016 at 8:42 PM
To: "uformp@blm.gov" <uformp@blm.gov>

To Whom it May Concern,


Please find the attached comments from Trout Unlimited to the Uncompahgre Field Office Draft Resource Management Plan. We appreciate the opportunity to be involved in this public process, and look forward to the Final Resource Management Plan.


Sincerely,


Garrett Hanks



--



**Garrett Hanks** / Southwest Colorado Field Coordinator
ghanks@tu.org / 970.590.9367

**Trout Unlimited**
1309 E 3rd Ave, Suite 109 Durango, CO 81301
http://www.tu.org




 **TU Comments Uncompahgre RMP.pdf**
343K



**Sent via email to: uformp@blm.gov**

November 1, 2016

RMP Project Manager
BLM, Uncompahgre Field Office
2465 S. Townsend Ave., Montrose, CO 81401

**RE:  Comments on Uncompahgre Field Office Draft Resource Management Plan**

Dear RMP Project Manager,

Please accept the following comments from Trout Unlimited (TU) on the Uncompahgre Field Office (UFO) Draft Resource Management Plan (DRMP) document. We appreciate the BLM's invitation to participate in the planning process and for working with TU and other stakeholders in the management of our public resources.

Trout Unlimited is the nation's oldest and largest coldwater conservation non-profit organization with more than 150,000 members nationwide dedicated to conserving, protecting and restoring North America's trout and salmon fisheries and their watersheds. Since 1959, TU staff and volunteers have worked toward the protection of sensitive ecological systems necessary to support robust native and wild trout populations in their respective ranges. We recognize the high value of public lands and the role public lands play in providing habitat to coldwater fisheries, drinking water, and wildlife habitat. Trout Unlimited believes that the actions taken on public lands are ultimately reflected in the quality of fish and wildlife habitat and their populations.

In Colorado, TU plays a critical role in watershed conservation, restoration, and rehabilitation on public lands. Twenty-four chapters and 10,000 members statewide actively participate in projects with the federal land managers, local communities, and private landowners in order to maintain healthy watersheds that are so vital to the social and economic community in this area.

The DRMP footprint is host to headwater habitat for truly unique and native fish – the Colorado River cutthroat trout (CRCT) and Greenback cutthroat trout (GBCT). Because these fish are only found in specific and limited places, protection of their watersheds and habitats are especially important. Colorado River cutthroat trout have adapted to this region for eons; they are a part of our culture and angling heritage. Trout Unlimited has worked on CRCT and GBCT issues consistently over many years, and we are excited to take advantage of this opportunity in the planning process to ensure even better protections for these fish.

As sportsmen and women we have considerable stake in the management direction, strategy, and priorities of the BLM planning process. These are the lands on which we fish and hunt, and we feel privileged to participate in the public process that guides the management of those resources. Members of TU believe in multiple uses of public lands but have greatest interest in their coldwater fisheries, big game habitat, pristine watersheds, and backcountry areas.

**General Comments to Uncompahgre Field Office Draft Resource Management Plan**

*Cutthroat Trout*

Colorado River cutthroat trout (CRCT) historically occupied numerous tributary systems of the Upper Colorado and Green River systems. Today the CRCT is found in only 16% of historically occupied subwatersheds, even less in the Gunnison Basin. Habitat alterations and non-native trout have pushed remaining populations into isolated tributaries where the habitat quality continues to remain high and risk from non-native introductions is reduced. Many of these small populations, however, do not meet minimum habitat and abundance requirements for long-term persistence[1].

As identified on page 1-12, it was indicated by BLM that "Additional planning criteria received in public scoping comments included incorporation of the Conservation Agreement or Strategy for Colorado River Cutthroat Trout." Neither of these documents were referenced in the DRMP or used to evaluate potential threats or opportunities within the DRMP footprints for conservation of native cutthroat trout. Furthermore the 1998 Greenback Recovery plan that is cited is dated, and even without a new recovery plan in place, Trout Unlimited would like to see more and updated references guiding the current and future managements on the Uncompahgre Field Office.

The failure to obtain and incorporate identified sources of information specific to native trout is a concern, and potentially a cause for further revision to the RMP. The Cutthroat trout Species and Conservation Assessment for the Grand Mesa, Uncompahgre, and Gunnison National Forests[2] clearly identifies populations of conservation status for both CRCT and GBCT, as well as threats, habitat types, and management suggestions.

As this study shows CRCT are not only isolated to high elevations, as is claimed on page 3-78 of the DRMP. Presented in Trout Unlimited's original comments for the scoping of this DRMP was a map and information regarding suitable waters for CRCT reintroduction. CRCT area BLM identified Sensitive Species, there should be more consideration put on these resources during the planning process.

Trout Unlimited does support the directives of some alternatives to prioritize native trout fisheries by removing barriers and competitive non-native species. These are all tactics towards a successful future for our native fish, but more needs to be done on this front to ensure the longterm viability of the cutthroat legacy.

---

[1] Williams, J.E., A.L. Haak, N.G.Gillespie, and W.T.Colyer. 2007b. The Conservation Success Index: synthesizing and communicating salmonid condition and management needs. Fisheries 32:477-492

[2] Dare, M., M. Carrillo, and C. Speas. 2011. Cutthroat trout (Oncorhynchus clarkii) Species and Conservation Assessment for the Grand Mesa, Uncompahgre, and Gunnison National Forests. Grand Mesa, Uncompahgre, and Gunnison National Forests, Delta, Colorado.

BLM_0148883

*Coldwater Fisheries*

Even though Trout Unlimited puts a large emphasis on native trout, non-native recreation focused fisheries are also important to our organization and membership. Within the DRMP footprint reside some of the most storied and healthy fisheries in the state of Colorado. Rivers like the Gunnison, the North Fork of the Gunnison, the Little Cimarron, the San Miguel, and the Dolores, amongst many others are not native trout fisheries but still deserve acknowledgement and protections. As is detailed below, this is one reason to reconsider some of the riparian language in the DRMP to better protect these coldwater resources.

The fisheries of the DRMP footprint play a huge part in the local economy. Indeed they are managed as a resource by the state wildlife agency, and revered for their recreational and business opportunities by locals and tourists. The socioeconomic impacts of these waters are elaborated on later in this document, but as of a 2013 report, an economic output from fishing alone in the South West region of Colorado, totaled $110 million[3]. The monies raised through state fishing license sales and the nationwide, Dingell-Johnson excise tax, earmarked for the conservation of these resources should be added to the total value of habitat based economy. Angler dollars are being spent on BLM land and will continue to be into the future so long as these fisheries remain healthy and productive.

Although some language pertaining to fish and wildlife in general was found within the DRMP, there was no reference to the overall fisheries aspect on the DRMP footprint. Like hunting, recreational fishing requires a different type of relationship with the wildlife we pursue as sportsmen and women. Overall, year round, health of the total population is important, not just singular instances or point impacts. With recreational travel management, recreational shooting, and wildlife viewing areas requiring complete analyses and sections within the DRMP, we ask for similar level of consideration for the traditional sporting recreation of hunting and fishing. Our chosen form of recreation may not come with some of the larger impacts of others, but it is certainly affected by management decisions within the DRMP and, not free from serious cumulative implications.

*Watershed approach to management*

Trout Unlimited's mission, more than anything, revolves around watershed health. We believe that impacts, negative or beneficial, are cumulative and compounding moving down a watershed. Rather than using site specific impacts, often times a bigger picture is a better perspective. Water quality, temperature, sediment, grazing, and water resources, all are addressed in the DRMP in terms of site specific impacts, but not addressed cumulatively. A better scale of analysis would be more appropriate in many cases when examining environmental consequences specifically.

Water resources, for example, throughout the DRMP footprint are heavily taxed by existing water uses resulting in water shortages, water quality impacts, and conflict amongst water users locally and in the

---

[3] "The Economic Contributions of Outdoor Recreation: A regional and county-level analysis." Southwick Associates study conducted for Colorado Parks and Wildlife, http://c.ymcdn.com/sites/www.cpra-web.org/resource/resmgr/imported/Colorado%20SCORP%20Econ%20Report%2011-27-13.pdf

BLM_0148884

greater Colorado River Basin. By looking at both scales now, the DRMP would be strengthened well into the plan's lifespan.

An example of more watershed based management can be found by looking to the Beaverhead-Deerlodge National Forest implementation of a protection approach where they applied NSO stipulations to entire drainages for the protection of cutthroat trout in key watersheds (Beaverhead-Deerlodge Final Forest's Management Plan, 2009). Outside of designated key watersheds, there is a drainage-wide controlled surface use (CSU) that requires no net increase in sediment loading. These kind of federal land use plans represent proactive efforts addressing oil and gas drilling on public lands where there is potential to degrade or permanently impact important riparian and trout habitat.

## Alternatives

TU does not support any one alternative, rather pieces from each. In general, Trout Unlimited supports strict protections for waterways and riparian health. Over the course of the DRMP's lifespan, we can reasonably expect variable and changing conditions in overall watershed health. Throughout the DEIS is language to address some of the collective impacts from various different development scenarios, but also from larger possible impacts from climate change and natural variability. Because of the sensitive nature of our high desert waterways and our pristine headwaters, TU hopes that more protections, rather than less, can sustain these priceless and irreplaceable habitats.

## Environmental Consequences

*4.3 Resources*

### *4.3.1 Air Quality and Climate*

The DRMP fails to adequately address the impacts of climate change on fish and wildlife habitat. Impacts of climate change are particularly threatening in the western U.S. where warmer water, changes in the timing of spring snowmelt, and increased droughts, floods, and wildfires are attributed to changes in ecological processes brought on by a warmer planet. The health of the landscape has a direct influence on the ability of natural systems to rebound after a catastrophic event and adapt to a changing climate.

Coldwater species such as trout are, by definition, especially vulnerable to climate change because of their dependence on clean, cold water. Cutthroat trout are exceptionally vulnerable. Existing stressors from reduced populations, loss of life history forms, degraded and fragmented habitat and non-native species have already pushed many native trout populations to the edge of extinction. The added effects of climate change may take these populations over the edge.

The first and most important component of TU's conservation strategies is to *protect remaining critical habitat areas*. Protecting the strongholds is more cost-effective and has a higher likelihood of success

BLM_0148885

than trying to restore an area that has already been substantially degraded. These fish cannot afford any further reduction in available habitat across their range. They have already been extirpated or severely reduced from the lower elevation edges of their historic range so it is critical that the remaining headwater strongholds remain intact.

Removal of vegetation, road construction, and other surface disturbing activities all pose a risk for increased sedimentation and degradation of native trout habitat in the project area. Since the UFO contains locations holding GBCT and CRCT, TU contends the DRMP must develop a more comprehensive analysis of the impacts climate change will potentially have on native trout and other native fish species in the UFO DRMP footprint. Such discussion and analysis should include:

- Analyze the latest innovative technologies that will contribute to minimizing impacts to trout streams that are important spawning and rearing areas.
- Evaluate the potential for removal or elimination of any stream barriers within the UFO boundaries that may impact instream flows.
- Develop a science-based protection plan of streamside habitats that may be impacted by oil and gas development in the UFO.
- Identify the most important reaches of these streams which contain pure conservation populations of cutthroat and develop protection measures.
- Provide an annual monitoring program that establishes goals and objectives for improving stream habitat and minimizes contamination from drilling and production.
- Implement conservation strategies for water management required for all operators that helps minimize water decreases during low water periods.

### 4.3.2 Soils and Geology

Trout Unlimited originally requested that underlying soils be identified across the UFO DRMP footprint, specifically in CRCT watersheds. Native fish are especially susceptible to the ill-effects of sedimentation to their habitat. Though we recognize the included mapping efforts with soil classifications, nowhere was referenced the local soils and potential consequences to CRCT or any other coldwater fisheries. The DRMP failed to provide a review of the numerous impacts to critical and sensitive fish and wildlife habitat from act of massive soil movement and changes from oil and gas development and we request that such information be provided in the Final RMP.

The DRMP fails to adequately analyze the impacts of soil sedimentation and revegetation as it impacts fish and wildlife habitat. Exploration and extraction of oil and gas resources does create alterations to the subsurface and surface environment. Analysis of the gravel and soil regime and its behavior during spring thaw events, flooding events, impacts to wetlands, and streams was inadequate in the DEIS. TU feels that the DRMP presents inadequate discussion of the long term and short term impacts from exploration and drilling activities that can be damaging to the soils and geology and the aquatic ecology of the surrounding areas.

BLM_0148886

*4.3.3 Water Resources*

Water resources, water quantity specifically, are of concern in the part of the state underlying the UFO. In this region water resources are already taxed, and where those implications are felt locally every day, increased water development would add additional stresses to an over appropriated system.. Increased water demand would advance conflicts between users, interest groups, and fish and wildlife habitat. Currently, existing instream flow rights, which only protect minimum flow necessary to maintain native environment, go unmet on normal years on many streams in the UFO. These rights are typically not monitored in real time and are junior to existing senior irrigation rights some of which place calls on upstream junior users thereby curtailing existing users.  Increased water use in this area will increase structural deficits on the Colorado mainstem further jeopardizing existing water users.

A good example of water resource issues that should be considered is the North Fork of the Gunnison watershed. In this area water users often are curtailed to provide water to downstream seniors, tributaries are disconnected from the mainstem, CWCB instream flow rights go unmet, and trout habitat and populations have been diminished as a result of diversions for irrigation and other users. Trout Unlimited is concerned that further water development would stress water resources and currently healthy portions of the basin and drive continued conflict amongst users.

Currently, groups like Trout Unlimited are working to promote mutually beneficial water partnerships just to keep enough water in its natural banks to support fish. Unlike other water uses, there can be no break in supply for trout and other aquatic wildlife. We would like to work with BLM on this issue so that any impacts to water resources are not a battle but instead a partnership with positive outcomes for all.

Water resources to Trout Unlimited have similar meaning as outlined in section 4.3.3 of the DRMP. Page 4-80 states the impacts on water resources as:

*"Every management action that directly or indirectly has the potential to alter aquifer properties and water quality and quantity and the natural hydrograph can have accompanying temporary or permanent impacts on water resources. The discussion of impacts on water resources includes the effects of surface- and subsurface-disturbing actions on water quality, water quantity, and cumulative watershed health."*

And implications to water resources as:

- *Alteration of the physical characteristics of streams, springs/seeps/fens, wetlands, riparian areas, and groundwater aquifers that affect the properly functioning condition and sustainability of these resources*
- *Ability to maintain sustainable yield of groundwater resources*
- *Number of state and federal water quality standard exceedances for surface and groundwater*
- *Changes in water quality that affect the survival rate of downstream aquatic or riparian species*
- *Number of spills of hazardous materials in water bodies*
- *Acre-feet of water depleted*

Trout Unlimited certainly agrees with all of these impacts. Yet, the remainder of section 4.3.3 does not

BLM_0148887

explicitly quantify the potential impacts to any of these bullet points in terms of water quantity. Furthermore, the BLM focuses on different alternative's mitigations rather than direct impacts of development. What is lacking are the numbers on streamflows, groundwater use, and strain on water rights for agriculture and municipalities, all caused from potential energy development scenarios. Without this imperative information and analysis, we are hard pressed to support any alternative as believers in responsible energy development on our public lands. Also missing from the evaluation is cumulative impacts to overall watershed health. In fact, the DRMP does not provide information pertinent to expected withdrawals.

Trout Unlimited urges the UFO to seriously consider reevaluating the environmental consequences to water resources before the Final RMP is complete. A revision of this section would be necessary to compile the information necessary to make a responsible decision on any proposed alternative.

### 4.3.5 Fish and Wildlife

The DRMP identifies CRCT as species of specific concern, and GBCT as federally threatened and though not expressly listed, identifies populations of these fish in waterways of the UFO. Given the level of oil and gas development along with other factors affecting water quality and quantity, TU remains particularly concerned with the management of these streams and the overall watershed condition. Most of these populations are isolated from one another and without implementing stringent protection measures; a single damaging event could exterminate any one of these populations. TU believes that these high value water bodies deserve full protective measures from oil and gas development, should be identified and mapped, and be assigned strict stipulations that include strong buffers (as defined below), NGD language, and ongoing defined water quality monitoring.

The BLM is within its regulatory and management jurisdiction to prioritize the protection of all of these streams. Such measures will ensure the retention and proliferation of these populations in both the short- and long-term including restoration efforts that expand the ranges in and around these streams.

We strongly disagree that buffer recommendations of less than 500 feet would protect all fish-bearing streams. Riparian and stream setbacks, or buffers, must be expanded to provide better protection from accidents and spills. Current stipulation proposals are inadequate and insufficient to protect the fisheries and riparian components should a spill occur. Strong buffers provide significant protections. We support the quarter-mile buffer required on major rivers; however, many sensitive populations of native trout (CRCT and GBCT) exist outside of those major rivers and are located in more isolated first order streams. Any other buffer size, such as proposed 325 foot, from a multi-well pad oil and gas rig will offer little protection. Instead, we recommend one-quarter mile buffer for all perennial waters, similar to that which the Little Snake River Field Office has implemented (October 2011). For sensitive fish species, such as CRCT, we recommend minimum one-half mile buffer.

It is TU's assertion, supported by science (see discussion on buffers below) that the larger a buffer area, the better protection measures are allowed. Oil and gas activities involve extreme disturbances to surface and subsurface lands. We are advocating for stronger buffer stipulation requirements in the

BLM_0148888

DRMP, reasoning that it is easier to modify larger buffer protections to lesser buffer protections through negotiated conditional use approvals and agreements, science-backed exemptions, and increased monitoring.

Potential impacts to surface and groundwater sources include increased sedimentation, turbidity of surface water, erosion, wetland loss, effects on water quality from contamination with drilling fluids, petroleum, hydraulic fracturing chemicals, other industrial chemicals used during drilling practices, and the disruption of historic and normal flow patterns of surface water due to the increased number of roads, well pads, permanent surface facilities, and traffic. The DRMP fails to adequately address these significant impacts.

### Intermittent Stream Buffers

We applaud the BLM for implementing a buffer on intermittent and ephemeral streams across alternatives. However, the protection of intermittent and ephemeral streams merits further consideration in the DRMP. In most mountain regions during runoff or sudden event storms, ephemeral drainages can become perennial mountain streams in a matter of hours and can run for a period of weeks or often months (Elmore, 2008). Trout may enter these drainages and may be spawning or have spawned and are at an early life stage. A thorough inventory of the streams and drainages in the planning area would potentially reveal those areas containing new flow systems or potential flow systems and would be subject to stronger buffering protections. Again, as we have mentioned above, by implementing a planning wide buffer requirement at the RMP level (such as that recently completed in the Little Snake FO RMP; October 2011), it will be easier to mitigate specific project cases to a more reasonable buffer based on case by case project applications and review.

### Riparian Buffers

Because of the chances for accidents and contamination through surface runoff from well pads, TU strongly advocates for the implementation of stronger, more effective buffers along perennial streams. Riparian setbacks, or buffers, are valuable in a variety of ways. From headwaters to downstream municipal communities, protection of our nation's water systems remains a top priority. Protecting water systems provide a healthy benefit for more than just fish; terrestrial wildlife including big game, large and small mammals, birds, insects, amphibians and reptiles all benefit by having clean water. Additionally, livestock and agricultural operations benefit from managed riparian areas. Scientific literature for management states that a stream buffer, a riparian setback, or forested buffer should be viewed as not only a parcel-specific best management practice, such as a stormwater management pond or a bioretention structure, but also as a watershed-scale management system[5].

TU's concerns center on the harms done to riparian and stream areas when an oil or gas pad is situated too close to a water body. Surface runoff from rain and/snow events provides both benefits and damage. On well pads where industrial contaminants including oil, diesel, chemicals and an assorted variety of other equipment lubricants, transporting of these harmful materials becomes a problem when a pad is situation too close to water. Surface runoff is a conduit for sediment and particulate pollutants,

---

[5] Chagrin River Watershed Partners, Inc. 2006. "Riparian Setbacks: Technical Information for Decision Makers.

BLM_0148889

particularly in areas that have little vegetative material (or buffers) or on steep slopes with erodible soils.

We now understand the greater role of water quality on the physical association between streams and their riparian corridor. Moreover, small first order streams that generate more of the runoff in watersheds and are home to Colorado's cutthroat trout species appear to play a significant role in intercepting runoff that reaches the downstream system. These small streams provide important water quality filtration services that extend far downstream and enhance water quality throughout the watershed. When these systems become contaminated with pollutants, large acreage distribution of these pollutants becomes a significant impact, affecting more than just the localized surface area, it affects the entire watershed[6].

By implementing half-mile buffers on sensitive fish bearing streams and one-quarter mile buffer on all perennial waters provides an effective barrier to intercept any potential spill or subsurface contamination event, and potentially minimizing costly remediation efforts.

*Precedent Setting for Increased Buffers*

The BLM and the Forest Service are tending to increase buffer setbacks, as recently witnessed in multiple examples:

- Establishment of a half-mile stream buffer for occupied and potential cutthroat trout habitat (Montana's Butte BLM RMP, 2009);
- Establishment of up to one-quarter mile stream buffer for all perennial streams (Colorado's Little Snake BLM RMP, 2011); and
- Implementation of one-quarter mile buffer for all native Yellowstone cutthroat trout habitat (Wyoming's Lander BLM Final RMP, ROD soon to be released, 2014).
- Implementation of a 500-foot stream buffer for native trout habitat (Utah's Dixie National Forest LUP, 2011).

TU suggests that the Final RMP implement a one-half mile NSO buffer stipulation as a progressive management strategy in providing the needed attention to cutthroat trout management in the UFO resource planning area. Implementing stronger setbacks assists in meeting the conservation objectives of the CRCT Conservation Agreement, of which the BLM is a signature to. These suggested and agency supported buffer stipulation recommendations will help in the co-existence of native trout protection and restoration, and oil and gas development, potentially lessening the impacts to quality fish habitat.

*Timing Limitations*

TU is concerned about the use of Timing Limitations (TL) in lieu of NSO in areas of big game winter range and strongly support NSO applications both during oil and gas exploration and development, and operations and maintenance. Timing limitations are temporary and do not account for loss of

---

[6] Burkhart, M.R., D.E. James, and M.D. Tomer. 2004. "Hydrologic and terrain variables to aid strategic location of riparian buffers". Journal of Soil and Water Conservation. 59(5): p.216-223

BLM_0148890

habitat once an area can be accessed and disturbed after the timing limitations expire. Current science supports the recommendation of NSO stipulations in critical winter range. Critical winter ranges contain the important cover, forage, and security that assure the survival of mule deer and elk herds, even in the worst of winters. Any direct habitat loss to these important lands compromises the ability of populations to survive when snowpack is at a maximum and temperatures are coldest. TU felt the DRMP failed to discuss the possibility of NSO in critical winter big game habitat under any alternative.

## 4.4 Resource Uses

### 4.4.4 Recreation and Visitor Services

Total economic output from hunting, fishing, and wildlife watching accounts for $405 million annually and provides approximately 6,600 jobs in the South West region (inclusive of Delta, Gunnison, Mesa, Montrose, Ouray and San Miguel counties) of the state according to a 2013 Southwick and Associates report for Colorado Parks and Wildlife. Not only are sportsmen and women dependent on quality habitat and healthy wildlife, they are actively contributing to the conservation of these places and species. Traditional sporting values were not discussed in the consequences section of the DRMP. Trout Unlimited has highlighted many possible impacts to habitat, wildlife, and access throughout our comments, and ask the BLM to evaluate the costs and benefits in future management decisions made under the Final RMP to hunting, fishing, and wildlife watching.

### 4.4.5 Comprehensive Travel and Transportation Management

Below are suggestions for consideration in formulating the Final RMP from the Proposed Alternatives. Trout Unlimited supports many different uses of our public lands, and responsible OHV use is one of them. Striking a balance between these uses and others, while weighing impacts from each is an important part of this RMP process.

Minimum road system: In order to protect fish and wildlife resources, allow for management, provide quality motorized access and develop a financially maintainable system of roads, the plan set forth should be the minimum road system capable of fulfilling these goals. Furthermore, TU strongly supports the decommissioning of unused, unnecessary and illegal routes. Numerous studies show the benefits, both fiscally and ecologically, of road and route decommissioning and the consequent positive effects on the general quality of public lands.

Road density: To preserve the backcountry experience, we believe that the route density outside of Wilderness and areas without roads should be less than 1 mile per square mile. One mile of road for every square mile of area is still a high road density and this should be the bare minimum for all districts – outside of designated motorized recreation areas – in order to protect road and traffic sensitive animals such as elk, mule deer, bighorn sheep, and cutthroat trout.

Water resources: In accordance with riparian area BMPs, we recommend that new motorized routes be located a minimum of 500 feet from all streams, springs, wetlands, lakes, and rivers. Routes that cannot be relocated in order to protect streams and riparian areas should be closed or have appropriate

BLM_0148891

sediment reduction materials installed.

Protection of wild and native fish: Coldwater fish and native CRCT in particular are sensitive to runoff and streambed degradation that can occur when motorized use is inadequately managed or poorly planned. Route management planning is inherently good for fish as it tends to eliminate redundant routes and limit motorized use in riparian areas and areas of sensitive soils. CRCT are designated as a species of special concern in Colorado and we fully expect BLM will protect the watersheds containing CRCT by limiting route density, eliminating routes in riparian corridors and carefully considering how motorized travel will impact sediment loads in these valuable watersheds. Sportsmen also place a high value on wild, non-native trout that exist in other watersheds inside the planning area and we are confident that the BLM will seek reasonable protections for the watersheds while still providing sportsmen access.

## Special Designations

### 4.5.3 Wild and Scenic Rivers

TU supports BLM managing all eligible and suitable Wild and Scenic waterways to retain their Outstanding Values, and in general supports the recommended suitability designations as proposed in the DRMP, with some exceptions.

#### West Fork Terror Creek

Preventing the listing of suitability in this RMP is the lack of information on Greenback Cutthroat trout. Instead of dropping the suitability of the segment, Trout Unlimited would prefer a directive to gather more information and retain management as if found suitable until presence of GBCT is researched.

#### Deep Creek

The suitability study for Deep Creek (segment 12) recommends that BLM manage to prevent any more degradation to flows, but says reason for recommendation of non-suitable is because of lack of instream flow in the future. If BLM is committed to managing for a beneficial outcome in regards to flow, what justification is left for not suggesting suitability? Trout Unlimited would like to add to the conversation that in Deep Creek are Greenback lineage native trout with less than 1% non-native genes. This classification of a conservation population is the cornerstone of recovery for a successful recovery of the entire species. This information was not mentioned or considered in the suitability study, and should be re-evaluated as an Outstanding Remarkable Value. The classification of a conservation population would give incentive to pursue some of the identified possibilities to secure necessary water sources in order to meet suitability standards on Deep Creek.

## Appendices

### Appendix C. BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado

BLM_0148892

Trout Unlimited has been partners to federal agencies and grazing permittees on past projects in many places. Partnerships like these can lead to mutually beneficial relationships that are good for the land, the recreational users of the land, water users, the grazing operations, and the overseeing agency. Through these types of partnerships appropriate monitoring can done and standards upheld or exceeded. We would like to see the prioritization of partnerships and mutually beneficial projects added to the grazing management section of the Final RMP.

*Appendix D. Ecological Emphasis Areas*

The concept of Ecological Emphasis Areas is intriguing to Trout Unlimited since it is focused on landscape level connectivity and watershed health, two of TU's guiding principles in public lands management. We would like to suggest to BLM to include more than vegetation and terrestrial language in making these designations. Connectivity and landscape level analysis for coldwater fisheries is also important. Two examples of where this has played out on federal lands is the Beaverhead-Deerlodge National Forest mentioned previously and Flathead National Forest's creation of a Watershed Conservation Network for Native Fish[7]. Similar analysis and management directions could be applied in the case of an Ecological Emphasis Area on the UFO, and should be considered for the Final RMP and future planning.

*Appendix I. Drought Management*

Drought is not only a term reserved to the natural input of a water balance, it needs to be evaluated by water uses too. By defining drought conditions using only the Palmer index, it does not take into consideration human use or influence. If these considerations were factored, including traditional, municipal, and proposed development use, an extreme classification as baseline would be likely. As such, according to Appendix I, prohibition of surface disturbing activities, closure of open OHV areas, and additional BMP's for erosion control would be implemented. In this light, rather than being retroactive, Trout Unlimited is asking the UFO to use thoughtful planning when it comes to development scenarios and water resources. TU would like to point out that the strategy of monitoring existing CWCB instream flow rights would prove inadequate to protect valuable fisheries. Few of the instream flow rights have adequate measurement and monitoring that can provide real time information about flows and administrative processes would likely not completed in time to prevent tributaries from running dry or below the established minimum flow necessary to protect the riparian resources.

**Specific Stipulations**

*p. 2 -36/37 – Stipulations for Hydrologic setbacks on major rivers*

Trout Unlimited supports NL-2/NGD-3: Hydrology River across all major rivers in the DRMP footprint. The Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores Rivers make up the bulk of recreational trout fishing in the DRMP. These places are all amazing fisheries in their own right, some

---

[7] http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd502201.pdf

BLM_0148893

holding or qualifying for Gold Medal designation. As discussed elsewhere in this document, with new technology available to make NDG possible in these corridors, and the potential negative impacts to financially and ecologically rich these resources, TU hopes to see more NL-2/NGD-3 adopted in the Final RMP.

*p. 2 – 38/39 - ROW exclusions (Alt B) in riparian 0.25 mi for riparian, 325 ft for perennial*

Road and sediment impacts to fish and fisheries can be as deadly as any other form of water quality degradation. This does not only apply to small waterways, and the 0.25 mile ROW on major rivers should be upheld in the Agency Preferred Alternative and Final RMP. Although TU applauds BLM for consideration of perennial streams and the Preferred Alternative's 325 foot ROW avoidance buffer, TU urges BLM to consider potential cumulative impacts to overall watershed health and increase protections on perennial streams with a wider buffer or ROW exclusion on these systems.

*p. 2- 67/68 Wildlife Native and Sports Fish*

Trout Unlimited encourages using TL-3 rather than TL-5 in the Final RMP based on disturbance of Brown Trout spawning dates. These fish, though non-native, are not typically not stocked fish, making them valuable wild fisheries. Their spawning cycles in the fall are arguably extremely valuable from an economic and ecologic standpoint. During this critical time of year, projects should at minimum need additional review and approval.

*Cutthroat Trout Specific Stipulations*

Trout Unlimited strongly supports Stipulation NSO-25: Occupied Native Cutthroat Trout Habitat, to prohibit surface occupancy within 0.50-mile of stream segments occupied by native cutthroat trout. We also feel that Stipulation NSO-26/ SSR-25 of the Preferred Alternative is absolutely unacceptable. As discussed frequently in this document, cutthroat trout are a highly sensitive species, and already face numerous threats on the DRMP footprint. Allowing such development so close to our native coldwater trout strongholds seems not only irresponsible, but outright hostile. Furthermore, conservation populations deserve NL/NGD stipulations rather than CSU/SSR language. These places might be the last remaining stock of these fish left in their name stake state. Failure to adequately address this issue in planning likely cause for future failures on the ground.

*Stipulation CSU-16 Hydrology Features:*

Protections of perennial streams is more important than the DRMP has made it out to be. Trout Unlimited feels the cumulative downstream, watershed wide, effects are worthy of analysis and evaluated for best possibilities of mitigating any potentially negative impacts. Also problematic is the BLM definition of perennial streams, which can vary from year to year based on hydrology and water balance. As such, Trout Unlimited asks for minimum of 500 feet CSU on wetlands, springs and seeps, and perennial streams in the Final DRMP.

*Stipulation TL-6 Wildlife Big Game Winter Habitat:*

BLM_0148894

Trout Unlimited would like to support Timing Limitations as detailed in Stipulation TL-6 with one exception. TU feels that excluding CPW data is unreasonable and irresponsible. As the managing agency of the wildlife itself, a partnership and collaboration between agencies would be greatly preferred to complete exclusion. BLM's reasoning that the area is too large and therefore "compromises a considerable proportion of the resource area" is not a valid reason to not implement protections. If the science indicates winter range, and that impacts to big game in winter range is significant (see previous comments) then BLM cannot ignore this issue. A better refined dataset of winter range may be beneficial, but that should be spelled out in the stipulation language rather than ignored. Otherwise, TU supports Timing Limitations for all big game species, not just elk and deer.

**Conclusion**

Trout Unlimited acknowledges the intent of the Uncompahgre Field Office's Resource Management Plan for managing resources with the dual mandate of multiple use and sustained yield. As users of public lands and as a conservation stewardship organization, we hope that these comments have assisted in forming a plan that is implementable and true to its intent of multiple use. Our concerns of watershed health, and riparian ecosystem integrity are core to the mission of Trout Unlimited, and are hopeful to see how those values additionally considered in the next planning stage. Mostly, we hope to continue to be partners to the BLM through the remaining planning process and through the implementation of the Final Resource Management Plan.

Sincerely,

Garrett Hanks
Trout Unlimited
SW Colorado Field Coordinator
1309 E 3rd Ave, Suite 107
Durango, CO 81401
ghanks@tu.org

David Nickum
Colorado Trout Unlimited
Executive Director
1536 Wynkoop Street, Suite 320
Denver, CO 80302
dnickum@tu.org

BLM_0148895

11/1/2016                          DEPARTMENT OF THE INTERIOR Mail - FWS comments on UFO RMP revision



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## FWS comments on UFO RMP revision
1 message

---

**Creed Clayton** <creed_clayton@fws.gov>                          Tue, Nov 1, 2016 at 1:19 PM
To: ufomp@blm.gov
Cc: "Melissa (Missy) Siders" <msiders@blm.gov>, Kenneth Holsinger <kholsing@blm.gov>, Ann Timberman
<ann_timberman@fws.gov>, Dara Taylor <dara_taylor@fws.gov>, Mark Brennan <mark_brennan@fws.gov>, Kurt
Broderdorp <kurt_broderdorp@fws.gov>

Thank you for the opportunity to comment on your Resource Management Plan revision. Our comments are attached.
Please let us know if you have any questions.

Note: Just before sending this we noticed that the Gunnison Gorge NCA boundary (and thus the RMP revision area)
appears to have expanded sometime in the recent past. Our comments were crafted based on the old NCA boundary.

Thanks, Creed.

J. Creed Clayton, PhD

Fish and Wildlife Biologist

U.S. Fish and Wildlife Service

445 W Gunnison Ave, Suite 240          creed_clayton@fws.gov

Grand Junction, CO 81501               970-628-7187

---

📄 **20161101 BLM_UFO_FWS 2016 Draft RMP revision comments.docx**
35K

---

BLM_0148896

**U.S. Fish and Wildlife Service, Western Colorado Field Office Comments on the BLM-Uncompahgre Field Office Resource Management Plan Revision**

November 1, 2016

**General Comments**

Our comments are focused on Alternative B, which typically provides the most protection for threatened and endangered species and on Alternative D, the Agency Preferred Alternative.

We provide some comments below relating to conservation of the Gunnison sage-grouse (GUSG). However, we realize that the GUSG RMP amendment is underway as a separate effort. We are a cooperating agency for the GUSG RMP amendment and we will provide the bulk of our comments on GUSG conservation through this other effort at a later date.

In this proposed RMP revision, particularly in Alternative D, descriptors such as 'may be' or 'might be' are often used for management actions that could be taken to protect listed species such as GUSG or listed plant species. Instead, we recommend using terms such as 'will be' or 'shall be' taken. This more definitively addresses the requirements of section 7(a) as they pertain to Federal action agencies under the Endangered Species Act.

**Specific comments**

| Page | Line | Comment |
| --- | --- | --- |
| 2-50 | 64 | Alternative B: Does this include all areas that have degraded vegetation, including all of the areas mentioned in alternative D? What criteria will be used to determine if restoration in an area will have a high probability of success? How long will the test plots be monitored for success? Why is off-site mitigation added in alternative D and not alternative B? |
| 2-89 | 142 | Alternative D: When will the buffer be used? When will operations be required to move? Given that this CSU states that operations *may* be relocated, it is difficult to know if they *will* be relocated. It would be helpful if some criteria were provided or some indication was given as to when relocation would or would not be required. |
| 2-89 | 143 | Alternative D: We believe that an NSO (as in alternative B) would be more appropriate for areas where threatened and endangered plants are found than a CSU. The plan states that an inventory of habitat *may* be required before drilling. How will we know when inventory of habitat be required? What criteria will be used to determine when an inventory of habitat is required?<br><br>Also, is there an ACEC proposed for any Colorado hookless cactus populations to protect core areas? We recommend protection, such as an ACEC designation, for one or more large, dense, healthy hookless cactus populations to aid in the recovery of the species. |
| 2-103 | 163 | Surface use closure dates should be from March 1- July 15 (also change in |

BLM_0148897

| | | |
|---|---|---|
| | | Appendix A and B). These are our current guidelines to include the entire breeding season, including lekking, nesting and early brood-rearing (comparable to greater sage-grouse). Please change these dates elsewhere in the RMP when referencing GUSG reproductive/breeding season closures. It is also unclear why Alternative B applies to "Gunnison Sage-Grouse Breeding (*Non-lek*) Habitat" whereas Alternative D applies to "Gunnison Sage-Grouse Breeding (*Lek and Non-lek*) Habitat." Why would Alternative B not include lek habitat? We recommend that both lek and non-lek habitat be included in Stipulation 17 (Alternative B). |
| 2-104 | 166 | Alternative B.1 describes restrictions that only apply within mapped GUSG nesting and early brood rearing habitat. This alternative should also describe the indirect effects of any activity occurring outside of mapped habitat that would impact GUSG (such as noise, tall structures, etc.) and what restrictions would be included to address these indirect effects. Indirect effects from activities occurring outside of mapped habitat should be included elsewhere in this RMP when describing activities within buffer distances or CH boundaries. |
| 2-170 | 304 | There is no mention of vegetation criteria for wildlife, including listed species such as GUSG, in any of these alternatives. For example, the GUSG Rangewide Conservation Plan's Structural Habitat Guidelines are not referenced. We recommend including this criterion in the development of these grazing systems. |
| 2-187 to 191 | 333 to 334 | Alternative B specifies no leasing of Federal minerals within 0.6 mile of GUSG leks. We recommend a 1-mile no-leasing zone, as in the BLM Northwest Colorado plan to protect greater sage-grouse. |
| 2-195 | 336 | Alternative B: Where leasing is allowed, we recommend an NSO throughout all GUSG CH and within 4 miles of a lek.<br><br>Alternative D: A 0.6 mile buffer only offers protection for lekking and mating. A 4.0 mile buffer will include most nesting and brood-rearing protection. An NSO throughout all occupied habitat would protect all nesting and brood-rearing habitat from direct impacts. See our related comment on NSO-32 below. |
| 2-201 | 337 | Alternative B does not have specific protective CSU stipulations for GUSG or its CH. Furthermore, this action does not describe how CSUs can avoid or minimize effects to GUSG. A GUSG CSU needs to be included in the stipulations.<br><br>In addition, oil and gas activities outside but adjacent to CH could still have indirect effects on GUSG inside CH (e.g., noise and tall structures which avian predators can use to nest or perch, allowing for an increase their hunting effectiveness within CH). Those effects should be considered and could be addressed via a CSU surrounding and between GUSG CH units. |
| 2-205 | 338 | The timelines in Table B-4 should be updated for breeding season, from March 1- July 15 |
| 2-304 | 480 | Alternative B: GUSG closure to vehicles in San Miguel/CSCSM population areas should be from March 1- July 15. |

BLM_0148898

| | | |
|---|---|---|
| | | No alternatives appear to specify a closure period for GUSG in the Crawford population—this should be added.  The lekking and nesting periods should be protected.  The closure should also be timed to address and minimize the effects of high-intensity elk use on vegetation in the Crawford CH unit.<br><br>Alternative D: no specific reference to GUSG closure needs.<br>We recommend specifying GUSG closures for this alternative as was done in Alternative B. |
| 2-313 | 494 | Alternative D: only specifies avoidance for occupied habitat, leks, and 0.6 mile buffer.  If GUSG CH is not designated as an exclusion area (as in Alternative B line 493), we recommend ROW avoidance for all CH and within 4 miles of a lek to include the majority of GUSG nesting and brood-rearing habitat and to address indirect effects.  If avoidance is selected, adaptive management that would address downward trends is recommended. |
| 2-329 | 531 | Alternative B: The Service supports the CNHP expansion to Fairview South, in particular the areas that are occupied by clay-loving wild buckwheat.  Also, we support this area being closed to sheep and cattle grazing. |
| 2-348 | 554 | The Service supports the proposal of the Salt Desert Shrub Ecosystem ACEC/Research Natural Area and the inclusion of the Adobe Badlands into this ACEC, in particular the areas that are occupied by Colorado hookless cactus. |
| B-27 | NSO-32 /NGD-13 | We recommend NSO/NGD protection throughout all GUSG CH, including unoccupied CH.<br><br>For an exception, modification, or waiver, we recommend only allowing this if the action would not impair the function or utility of the site for current or subsequent GUSG use in *any* season (e.g., reproductive display, nesting, brood rearing, wintering, etc.) and would not adversely affect GUSG. |
| B-87 | TL-14 | We recommend extending the Timing Limitation (TL) through August 31 to protect nesting cuckoos that have not yet finished nesting and might still have un-fledged young.  We also recommend extending the TL buffer out to 800 m instead of 100 m (at least for major activities such as drilling, use of explosives, pile-driving, etc.).  And we recommend that the TL not be restricted to riparian areas—noise and human disturbance outside of and adjacent to riparian habitats could indirectly disturb nesting cuckoos nearby.  Exceptions could be appropriate within this area for minor disturbances meeting specified criteria. |

11/1/2016                                    DEPARTMENT OF THE INTERIOR Mail - Draft RMP EIS Comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Draft RMP EIS Comments
1 message

---

**Welt, Kathy** <KWelt@archcoal.com>                          Tue, Nov 1, 2016 at 5:51 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Cc: "Norris, Weston" <WNorris@archcoal.com>, "Smith, Casey" <CSmith@archcoal.com>

Please see the attached comments on the Draft RMP EIS.


*Kathy Welt,*

Environmental Engineer III

Mountain Coal Company, LLC

West Elk Mine

5174 Highway 133

Somerset, CO  81434

Phone (970) 929-2238

Cell     (970) 433-1022

Fax      (970) 929-5050

---

***Email Disclaimer: The information contained in this e-mail, and in any accompanying documents, may constitute confidential and/or legally privileged information. The information is intended only for use by the designated recipient. If you are not the intended recipient (or responsible for delivery of the message to the intended recipient), you are hereby notified that any dissemination, distribution, copying, or other use of, or taking of any action in reliance on this e-mail is strictly prohibited. If you have received this e-mail communication in error, please notify the sender immediately and delete the message from your system.

 **RMP EIS comments.pdf**
92K

---

BLM_0148900



**Mountain Coal Company, LLC**
**West Elk Mine**
5174 Highway 133
Somerset, CO 81434

**Kathleen G. Welt**
Environmental Engineer III
**kwelt@archcoal.com**
**Phone:** 970.929.2238

November 1, 2016

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Submitted by Email:
uformp@blm.gov

**RE: BLM Uncompahgre Resource Management Plan (RMP) for the Uncompahgre Planning Area.**

Project Manager; Uncompahgre Field Office,

Mountain Coal Company, LLC (MCC) and Ark Land Company (ALC) submit the following brief comments, in reference to the Uncompahgre Draft Resource Management Plan (RMP) revision, as provided in the Uncompahgre Field Office Draft RMP/Environmental Impact Statement (EIS).  MCC and ALC appreciate that the BLM recognizes that public input is critical to refining the RMP.  We remain concerned, however, that this public process will be politicized by publishing the number of comments submitted "for" and/or "against" one or more alternatives analyzed, as in a vote.  NEPA was never intended to be a "vote" and as such we ask that the number of comments received not be published and instead focus on each individual substantive comment.

MCC and ALC understand the importance of balancing multiple resource uses on federal lands, and our 30+ year history of mining along with grazing, recreation, water rights and other uses exemplifies how to successfully accomplish this mission.  We have strived for and accomplished environmental compliance excellence and effective stewardship of the land. Although we believe that sustainability ecological resources must be addressed, we do not believe that the intent of the Multiple Use Sustained Yield Act can be fulfilled if ecological resources are given priority as presented in Alternative B.  Similarly, to exclude/prohibit uses, such as potential future oil and gas development as presented in Alternative B1 of the RMP EIS, seems to conflict with the BLM's mission of Maximum Economic Recovery of mineral resources.  Mineral resource extraction, whether coal, oil and gas, or other resources, has improved dramatically over the past several decades and will continue to improve while protecting and even enhancing the environment.

To preclude any of these resources in this 20-year Plan does not recognize or allow for improvements or advancements in technology to overcome/mitigate potential issues or concerns.  Site specific applications would seem to be the best process for restricting or eliminating the development of any resource.  This is recognized in the BLM's May 27th press release that states, "Additionally, the plans do not authorize any specific leases or mining operations; any new coal leases would require environmental reviews specific to

BLM_0148901



**Mountain Coal Company, LLC**
**West Elk Mine**
P.O. Box 591
Somerset, CO 81434

**Kathleen G. Welt**
Environmental Engineer III
**kwelt@archcoal.com**
**phone:**  970.929.2238

the particular lease application. The purpose of the RMP is to provide balanced management of all of the resources in the area including wildlife habitat, ranching, recreation, conservation and mineral development."   The RMP should be broad enough to allow for these site-specific applications, not eliminate/restrict them at the Planning stage.

Other items to consider:

1.) Reference L-2: 4) "Consult with the surface owner regarding private surface land overlying federal coal." -   Landowner considerations for coal operations are already addressed by SMCRA, and requiring consultation seems excessive.

2.) Reference L-2: "Somerset Coal Field contains three active mines on federal leases." This needs to be updated as one mine has been permanently sealed and is in final reclamation, and another mine is in cessation of operations.

3.) Reference L-10:  Criterion 17 - Municipal Watersheds and Criterion 18 - Natural Resource Waters
This criterion is a concern could be mis-interpreted, resulting in the unintentional restrictions/exclusions over broad areas (i.e. "municipal watersheds is likely to increase over time".)   Again, many years of successful, environmentally-compliant coal operations have been conducted within municipal watersheds and it is not a viable reason to exclude these reserves at the Plan stage.

4.) Pages 3-125 & 126:  The coal operations data and trends need to be updated to reflect more current information and potential in the coming decades.  Mines and reserves in the Somerset and Nucla/Naturita area have or are planned to experience significant changes.

Sincerely,


Kathleen G. Welt,
Environmental Engineer III

cc:    Weston Norris – MCC
       Casey Smith -ALC

BLM_0148902



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comments from the Western Slope Conservation Center on Uncompahgre Field Office Draft Resource Management Plan

1 message

**Alex Johnson** <director@theconservationcenter.org>                    Tue, Nov 1, 2016 at 3:25 PM
To: uformp@blm.gov
Cc: Teresa Pfifer <tpfifer@blm.gov>, jmeyer@blm.gov, Ruth Welch <rwelch@blm.gov>, Director@blm.gov

November 1, 2016

Bureau of Land Management
Colorado State Office
2815 Youngfield St.
Lakewood, CO 80215

Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401

Submitted electronically to uformp@blm.gov via Google Drive. These comments are also available via http://
westernslopeconservation.org/wp-content/uploads/2016/11/WSCCDraftRMPComments-Final.pdf.

Cc:
Ruth Weich, Colorado State Director, Bureau of Land Management, rwelch@blm.gov
Joe Meyer, District Manager, Southwest District of Colorado, BLM, jmeyer@blm.gov
Teresa Pfifer, Field Manager, Uncompahgre Field Office, BLM, tpfifer@blm.gov

Neil Kornze, Director, BLM, director@blm.gov
Secretary Sally Jewell, Department of Interior

RE: Draft Uncompahgre Field Office Resource Management Plan Public Comments

Dear Ms. Pfifer, Mr. Meyer, and Ms. Welch:

Please accept these comments on the draft Uncompahgre Field Office Resource Management Plan on behalf of the
staff, board, and members of the Western Slope Conservation Center (WSCC). The WSCC is a grassroots non-profit
with 450 members who live in the North Fork Valley and Western Slope of Colorado. The WSCC has a 40-year legacy of
conservation environmental resources in the North Fork Valley, and we are dedicated to the mission of building an active
and aware community to protect and enhance the lands, air, water and wildlife of the Lower Gunnison Watershed.

The WSCC understands the magnitude of the challenge that the BLM faces in producing a new Resource Management
Plan (RMP) for the Uncompahgre planning area, and we appreciate the significant amount of time and energy that has
gone into the current draft plan. The WSCC also recognizes the significance of this RMP in determining the future of the
BLM lands that surround our homes, farms, businesses, and recreational areas for the next 20-30 years. Consequently,
we have engaged our members in a thorough analysis of the draft plan and ask that the BLM incorporate the
following additional information and comments into the final plan.

The WSCC has determined that the Preferred Alternative will not provide adequate management protections for the
water, air, viewshed, wildlife, recreational opportunities, foodshed, or economies of the North Fork Valley and Western
Slope. We would like to thank the BLM for including the North Fork Alternative within the draft plan as Alternative B1,
which provides a minimum degree of protection for these resources identified by our community members. For all other
management actions not associated with oil and gas leasing in the North Fork planning area, Alternative B provides a
minimum degree of protection for the resources identified above.

Our following comments are organized into three main sections: I) Detailed information and support for Alternative B1,
the only alternative in the plan that adequately protects the communities in the North Fork Valley from unreasonable
impacts from oil and gas leasing and corresponding development activities; II) Specific concerns regarding water
resources in the planning area, especially as related to actions included

BLM_0148903

in the Preferred Alternative; and III) Additional specific concerns and support for management prescriptions in the draft RMP.

Sincerely,
Alex
—
Alex Johnson
Executive Director
Western Slope Conservation Center
director@theconservationcenter.org
Office: 970-527-5307
Cell: 970-778-8181
—
www.theconservationcenter.org
Follow us on Facebook
Follow us on Twitter

> 📄 **WSCCDraftRMPComments-Final.pdf**

BLM_0148904

November 1, 2016

Bureau of Land Management
Colorado State Office
2815 Youngfield St.
Lakewood, CO 80215

Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401

Submitted electronically to uformp@blm.gov

Cc:
Ruth Welch, Colorado State Director, Bureau of Land Management, rwelch@blm.gov
Joe Meyer, District Manager, Southwest District of Colorado, BLM, jmeyer@blm.gov
Teresa Pfifer, Field Manager, Uncompahgre Field Office, BLM, tpfifer@blm.gov

Neil Kornze, Director, BLM, director@blm.gov
Secretary Sally Jewell, Department of Interior


RE: Draft Uncompahgre Field Office Resource Management Plan Public Comments

Dear Ms. Pfifer, Mr. Meyer, and Ms. Welch:

Please accept these comments on the draft Uncompahgre Field Office Resource Management Plan on behalf of the staff, board, and members of the Western Slope Conservation Center (WSCC). The WSCC is a grassroots non-profit with 450 members who live in the North Fork Valley and Western Slope of Colorado. The WSCC has a 40-year legacy of conservation environmental resources in the North Fork Valley, and we are dedicated to the mission of building an active and aware community to protect and enhance the lands, air, water and wildlife of the Lower Gunnison Watershed.

The WSCC understands the magnitude of the challenge that the BLM faces in producing a new Resource Management Plan (RMP) for the Uncompahgre planning area, and we appreciate the significant amount of time and energy that has gone into the current draft plan. The WSCC also recognizes the significance of this RMP in determining the future of the BLM lands that surround our homes, farms, businesses, and recreational areas for the next 20-30 years. Consequently, we have engaged our members in a thorough analysis of the draft plan and ask that the BLM incorporate the following additional information and comments into the final plan.

The WSCC has determined that the Preferred Alternative will not provide adequate management protections for the water, air, viewshed, wildlife, recreational opportunities, foodshed, or economies of the North Fork Valley and Western Slope. We would like to thank the BLM for including the North Fork Alternative within the draft plan as Alternative B1, which provides a minimum degree of protection for these resources identified by our community members. For all other management actions not associated with oil and gas leasing in the North Fork planning area, Alternative B provides a minimum degree of protection for the resources identified above.

BLM_0148905

Our following comments are organized into three main sections: I) Detailed information and support for Alternative B1, the only alternative in the plan that adequately protects the communities in the North Fork Valley from unreasonable impacts from oil and gas leasing and corresponding development activities; II) Specific concerns regarding water resources in the planning area, especially as related to actions included in the Preferred Alternative; and III) Additional specific concerns and support for management prescriptions in the draft RMP.

Sincerely,

Alex Johnson
Executive Director
Western Slope Conservation Center
director@theconservationcenter.org
970-527-5307x201



# Comment Contents

I) The North Fork Alternative (B1) and Oil and Gas Leasing in the North Fork Valley ............... 6

  A. Purpose and Need: North Fork Alternative Plan .................................................................. 7

    1. Character of place. ........................................................................................................ 8

    2. Water supply. ................................................................................................................ 8

    3. Wildlife habitat and migration routes. ......................................................................... 9

    4. Recreational opportunities and access. ...................................................................... 10

  B. Sub-alternative B1: North Fork Alternative ...................................................................... 11

    1. Alternative B1 is the best alternative proposed in the RMP, which the BLM should adopt for the North Fork Valley ............................................................................................. 11

    2. Alternative B1 includes reasonable but strong stipulations to protect resources in the North Fork ........................................................................................................................ 12

    3. Only B1 provides management that North Fork's unique character, culture, and resources requires ............................................................................................................. 14

II) Specific concerns for water resources in the planning area, particularly as related to the Preferred Alternative ............................................................................................................... 21

  A. Fluid Minerals ................................................................................................................... 21

    1. Surface Occupancy, No Surface Occupancy, and No Leasing stipulations .................... 21

    2. Controlled Surface Use Stipulations in Preferred Alternative not adequate for protection of water resources in the North Fork Valley ................................................................... 22

    3. Best Management Practices for Fluid Mineral Management ........................................ 22

    4. Not enough data exists to make decisions about processing produced water ................. 23

    5. The RMP does not address concerns to groundwater health, potential seismic activity, and surface water impacts associated with produced water ............................................. 23

  B. Concerns regarding impacts to Soils and Water Resources ................................................ 24

    1. Water Quality Impacts to Domestic and Agricultural Water Use ................................... 25

    2. Salinity and selenium .................................................................................................. 27

    3. Stream and water body health ...................................................................................... 28

    4. Drought Management .................................................................................................. 32

  C. Right Of Way (ROW) Concerns - The draft RMP does not adequately protect surface water quality from development impacts including increased sedimentation, pollutants, etc. .......... 33

  D. Special Status Species, Wildlife & Vegetation (Aquatic and Riparian) .............................. 33

  E. Best Management Practices and Standard Operating Procedures not adequate for protecting Water Resources ..................................................................................................................... 34

    1. Road construction and management .............................................................................. 34

BLM_0148907

2. Water – Oil and Gas .......................................................................................... 34

3. Vegetation – Riparian ....................................................................................... 35

4. Forestry – Best Management Practices .............................................................. 35

5. Reducing Fluid Mineral Development Footprint ............................................... 35

III) Additional specific concerns regarding the Preferred Alternative and support for protective management prescriptions in the draft Resource Management Plan ............................. 36

A. Socio-economics ................................................................................................ 36

1. Economic sectors to be included in full socio-economic analysis .................... 36

2. The RMP does not adequately take into account economic trends such as the decline of local coal production .......................................................................................... 38

B. Air Quality ......................................................................................................... 38

C. Wildlife .............................................................................................................. 41

D. Lands with Wilderness Characteristics .............................................................. 44

1. Inventory ......................................................................................................... 44

2. Environmental Consequences Analysis ............................................................ 45

3. Management ..................................................................................................... 48

4. High quality LWC meriting the strongest levels of protection ......................... 52

E. Recreation .......................................................................................................... 54

1. Specific RMA Recommendations for the North Fork and Lower Gunnison Watersheds 54

2. Planning for Recreation and Visitor Services ................................................... 59

3. Designating Recreation Management Areas for Non-Motorized Recreation .................. 60

4. Special Recreation Permits .............................................................................. 62

5. Game Retrieval ................................................................................................ 62

6. Natural Soundscapes ........................................................................................ 62

F. Travel Management ............................................................................................ 64

1. Area allocations for off-road vehicles .............................................................. 64

2. Comprehensive Travel and Transportation Management Planning .................... 69

3. Non-motorized trail networks .......................................................................... 71

4. Temporary Closures ......................................................................................... 72

5. Revised Statute 2477 ....................................................................................... 73

G. Ecological Emphasis Areas and Areas of Critical Environmental Concern ....................... 73

1. Ecological Emphasis Areas .............................................................................. 75

2. Comments on Specific Ecological Emphasis Areas .......................................... 77

3. Areas of Critical Environmental Concern ........................................................ 78

BLM_0148908

    4. Comments on Specific Areas of Critical Environmental Concern .................................... 79

  H. Wild & Scenic ......................................................................................................................... 80

  I. Wilderness Study Areas ........................................................................................................... 86

  J. Night Sky Resources ................................................................................................................ 86

  K. Climate Change ...................................................................................................................... 88

    1. BLM's Obligation and Authority to Analyze Climate Change in RMPs ......................... 88

    2. Recommended Approach to Managing Climate Change in RMPs ................................. 96

    3. Adapting to Climate Change ........................................................................................ 96

  L. Mitigation .............................................................................................................................. 98

IV) Conclusion. The Preferred Alternative does not provide a necessary level of management for
the North Fork Valley ................................................................................................................. 101

  A. Only B1 meets the needs of the North Fork Valley ............................................................. 101

  B. Alternative D is unacceptable ............................................................................................. 101

  C. Range of alternatives might be lacking, analysis too narrow .............................................. 102

  D. Alternative B1 is prudent and reasonable, best fulfilling agency obligations and future
  resource needs ......................................................................................................................... 103

    1. B1 is highly protective of North Fork yet represents only a small impact to oil and gas
    resource ................................................................................................................................ 103

    2. B1 meets public needs, provides strong protections, and fulfills public lands and resource
    laws ...................................................................................................................................... 104

  E. BLM should select Alternative B1 for the North Fork Valley ............................................... 105

    1. The North Fork Alternative fits a clear and pressing public need. ............................... 106

    2. Alternative B1 is the best management decision in the face of uncertainty regarding the
    adoption and implementation of the final RMP ................................................................. 106

APPENDIX I .................................................................................................................................. 107

  Table 1: Recommended oil and gas stipulations ...................................................................... 107

  Figure 1. Table from Public Health Risks of Oil and Natural Gas .......................................... 109

  Figure 2. Maps of Jumbo Mountain, Elephant Hill, and Youngs Peak. ................................. 110

  Figure 3. Multiple criteria used to map wildland conservation priorities and values including
  wildness, connectivity, representation, and endemic species diversity. These criteria were
  combined to produce map in Figure 4. .................................................................................. 112

  Figure 4. Composite wildland values map based on criteria in Figure 3. The composite value
  was produced by setting each criterion to the same scale and summing. ............................... 113

  Figure 5. Wildland conservation values and potential Ecological Emphasis Areas in the
  Uncompahgre Field Office. ..................................................................................................... 114

APPENDIX II. North Fork Water Quality Report ...................................................................... 115

BLM_0148909

**I) The North Fork Alternative (B1) and Oil and Gas Leasing in the North Fork Valley**

Regarding oil and gas leasing and development, we support the incorporation into the final RMP of Alternative B1 (North Fork Alternative) as the only proposed management prescriptions and designations that provide the protection warranted for the North Fork area; with all additional general provisions beyond oil and gas leasing of Alternative B, or as otherwise indicated throughout these comments.

Alternative B1 is derived from a detailed document submitted by stakeholders, organizations and individuals from the North Fork Valley to the Uncompahgre Field Office of BLM in December 2013. *The North Fork Alternative Plan: A Proposal to the BLM for Managing Oil and Gas Development in the North Fork Valley* was developed over an 18-month period by a group of stakeholders and supported by local governments. It seeks to manage oil and gas leasing and development on the North Fork Valley's public lands and minerals in balance with the unique and highly cherished resources that those lands contain, surround and impact directly, indirectly, and cumulatively.[1]

The North Fork Alternative Plan (NFAP) is included in the draft RMP/EIS as Alternative B1:

> Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in portions of Delta and Gunnison Counties. Alternative B.1 is a resource-based set of recommendations provided by a community group.        [DEIS at 2-7]

Alternative B1 reinforces broader community-wide efforts to establish a more resilient, place-based economy in Delta County. In 2015 Better City was retained through a federal grant to help strategize ways to strengthen the local economy. That report reinforces what the stakeholders who crafted the NFAP have long maintained. Economic resiliency and growth in the North Fork Valley depends on safeguarding the area's natural resources not exploiting them.

> Delta County is home to a number of unique resources, attributes, organizations, and conditions that help differentiate it from other communities. The County is home to natural attractions including two rivers, the Grand Mesa National Forest, and two National Conservation Areas. The County enjoys a more temperate climate than the majority of the state, has a large amount of farmland, and has access to water resources and clean air. ... Although its coal deposits remain a vital asset for the community, they are not a source of future growth.[2]

The NFAP, incorporated as Alternative B1, set out to protect six key sets of resources that are dependent on, tied to, and impacted by activity on the area's BLM-administered lands. These include: the existing economy, towns and community areas, water source areas and delivery systems, river corridors and riparian areas, important wildlife habitat and migration routes, and sensitive landscapes and soils. In addition, the NFAP sought protective management to safeguard outstanding recreational opportunities at Jumbo Mountain and the overall highly scenic visual character of the valley and its surrounding mesas.

---

[1] "North Fork Submits Community-based Management Plan to the BLM," News release, December 4, 2013. Online at www.citizensforahealthycommunity.org/wp-content/uploads/2013/12/North-Fork-Community-submit-Alternative-Plan.pdf
[2] Economic Development Strategic Plan Executive Summary Delta County, CO prepared by Better City, 2015. Available online at www.deltacountyed.org/resources/Documents/EDA%20Study%20Summary%202016.pdf

BLM_0148910

These characteristics of the valley, its high quality scenery features, good water and abundant wildlife, and outstanding recreational opportunities are the backbone of the area's growing, emerging, and future economy.

Our comments are overall supportive of Alternative B1 in the draft RMP/EIS, however they recommend some changes and additions, as well as raise some concerns and weaknesses in the draft RMP/EIS and the analysis. Our comments regarding Alternative B1 will first consider four major areas of emphasis that should guide management objectives and that must be part of any acceptable resource plan.

It is our belief that the agency-identified Preferred Alternative (Alternative D) is especially unacceptable for the North Fork Valley regarding oil and gas leasing; and that other deficiencies in the draft RMP/EIS could leave the overall decision open to challenge, especially under a management regime like that proposed under Alternative D. Thus we urge that the agency not only adopt the provisions in Alternative B1 for the North Fork, but begin to apply this level of protection to additional public lands under its purview. We will outline specific deficiencies identified in Alternative D in section III and the conclusion of these comments.

## A. Purpose and Need: North Fork Alternative Plan

The North Fork Alternative Plan (NFAP) was crafted by North Fork Valley stakeholders, organizations and individuals that wanted to ensure any potential future oil and gas leasing and development would not jeopardize the many important values, resources and features of the area's public lands—which in many cases form the basis of the local economy, convey and/or are source areas for water supplies, represent critical wildlife lands, and provide outstanding recreational opportunities for residents and visitors alike.

The NFAP identified critical resources and shared values, and researched appropriate leasing and oil and stipulations, best management practices, and public land designations. It was derived as a resource-based approach to oil and gas leasing and development to achieve the necessary level of management to protect cherished features, public land resources, wildlife and economic well-being of the valley.

Development of the NFAP started with a careful review of the thousands of comments submitted to the BLM in response to the withdrawn lease sales (Dec. 2011, Nov. 2012), and through conversations with valley residents and stakeholders. The NFAP was incorporated into the draft RMP/EIS as Alternative B1, as noted in the DEIS Executive Summary:

> The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area.  [DEIS, ES-8]

Since the NFAP in its entirety has been submitted and accepted by the BLM UFO, and has formed the basis of the draft RMP/EIS sub-alternative B1, these comments incorporate that submitted information herein by reference, and refer—unless otherwise noted—to the agency's presentation of the information in the draft RMP/EIS.

In both cases—as a stakeholder proposal and as the sub-alternative B1 in the draft RMP/EIS — NFAP/B1 sets out to protect the important character, resources, and features that make the North Fork Valley both beloved and unique. For the purpose of these comments, those can be described as 1) Character of place, 2) Water supply, 3) Wildlife habitat and migration routes, 4) Recreational opportunities and access.

BLM_0148911

**1. Character of place.**

The North Fork Valley is a nationally unique landscape: geographically, geologically, ecologically, economically, and socially. As the Better City report notes, the area is 44th in the United States as a hub of organic agriculture, is one of only two federally recognized wine regions in the state, and is Colorado's only multi-jurisdictional and rural Creative District. The Valley is known for its dark skies, rural charm, bucolic beauty, and stunning views. Thomas Huber, a Colorado geographer and author describes the area in An American Provence, a book linking the North Fork with France's Coulon River valley, according to a January 2012 article in the *Grand Junction Daily Sentinel*:

> The landscapes of the two valleys have one critical thing in common, the reason they are near-clones of each other in the broader dimension: they are both human-scale places," he writes. "The towns and villages are all easily walkable, the fields are small and individually tended, the trails are suitable for walking and biking, the food comes from local farmers as much as possible, and the wine is a personal statement from the vintner, not a corporate artifact."

This economy-of-place, coupled with more standard regional tourist attractions—popular mule deer and elk hunting seasons, U-pick orchards, whitewater rafting, mountain biking, horse packing, and backpacking—is a driving force in the North Fork, a trend noted in a 2007 Colorado State University study and report.[3]

> Colorado's abundant wildlife, vineyards and vast agricultural landscapes help draw thousands of visitors to the state and are ripe in potential to anchor emerging agritourism markets, according to a recent Colorado State University study.

The North Fork's scenic features, rural communities, and bucolic charm are critical components of the area's existing and emerging economy that must be safeguarded under any management regime. Furthermore, the character of place includes its sense of health and well-being, clean living, fresh water, healthy land. The North Fork strives to be a place that welcomes families at all stages and ages.

Public health considerations, the known impacts to air quality, water quality, and other health factors that oil and gas development can contribute to are not to be understated.[4] Both in terms of real and meaningful threat, and also in terms of intense public concern that the agency is obligated to consider in weighing the significance of its actions and the effectiveness of its management.


**2. Water supply.**

Colorado agriculture depends on irrigation, along with area residents. The North Fork is well-situated even as climate change threatens increased scarcity, being primarily gravity fed and located just below the source areas on the Grand Mesa and West Elk Mountains.

The water quality of the North Fork remains good, and industrial pollutants remain low. The primary water quality issues for irrigators are related to salinity and selenium loads, which increase as the river

---

[3] CSU: "Colorado's Agritourism Market Climbing, Says New CSU Report," August 14, 2007.

[4] Intermountain Oil and Gas BMP Project: Public Health. Online at www.oilandgasbmps.org/resources/public_health.php. See the Grand Junction Daily Sentinel, "Ursa holds off on plan to drill close to school," October 6, 2016.

BLM_0148912

and ditches flow down valley, and is exacerbated by development on the highly erodible Mancos soils that comprise much of the region. Irrigation in the valley relies on an interconnected series of canals, ditches and water impoundments. Surface contamination and spills, which occur regularly in Colorado oil and gas fields, could spread rapidly through the irrigation systems that water the valley, and in turn provide fresh food locally, regionally, and nationally.[5] With such a short pathway from water source to table, oil and gas contaminants from a surface spill in the North Fork Valley could enter the irrigation water supply, irrigate plants that are then harvested, and be served to customers locally at one of our farm-to-table restaurants before the oil and gas company is even mandated to report the spill.

In addition, impacts in source areas carry real risk of groundwater harm. Recharge areas for aquifers are both broad and shallow, as noted in a comment from one local domestic water company.

> These springs are primarily fed by subsurface collection of precipitation percolating through talus and glacial deposits into a larger sub-surface groundwater storage in the till deposits. These springs are dependent entirely upon precipitation and surface runoff for their supply and recharge of the underground well system (Wright Engineering Study of 1977, extracting data from U.S. Geological Survey's Professional Paper No. 617 entitled "Quaternary Geology of the Grand and Battlement Mesas Area, Colorado") and do so from an area of greater than 1 sq. mi.[6]

Finally, the North Fork and Smith Fork Rivers sit in the Gunnison Basin, a major headwater for the Colorado River System. The Gunnison Basin is identified as a "water bank" to ensure adequate flows remain in the Colorado River to meet Colorado River Compact requirements. Adequate flows in the Gunnison are also needed to maintain water quality considerations due to selenium and salinity loads, and to avoid irrigators being forced to cut back on water use under the Endangered Species Act.[7] Any water quality impacts that occur within the North Fork and Smith Fork Rivers could produce corresponding impacts to the full downstream Colorado River System.


**3. Wildlife habitat and migration routes.**

Situated between the West Elk Mountains and Wilderness Area, Grand and Black Mesas, and encompassing two significant river riparian areas, the North Fork (and contiguous Smith Fork) Valley is a wildlife haven. The West Elk Mountains and the flanks that lie on BLM lands are known as concertation areas for black bears, especially in the crucial late summer and early fall period when this species is preparing for winter hibernation.[8] BLM lands in the area are critical winter range for both deer and elk. Public lands in and surrounding the North Fork are home to threatened, endangered and sensitive species including the Gunnison Sage Grouse, and important hunting and migration routes for others including the Canada lynx. Yellow-billed cuckoos nest in the riparian vegetation along the North Fork River and tributaries. Raptors frequent the area, including wintering bald eagles and peregrine falcons.

Streams and rivers that begin on the Grand Mesa and West Elks contain important trout fisheries, and the Gunnison River just below the confluence with the North Fork is a Colorado Gold Medal trout stream.

---

[5] "Oil and gas companies in Colorado reported 615 spills in 2015," Denver Post March 17, 2016. Online at www.denverpost.com/2016/03/17/oil-and-gas-companies-in-colorado-reported-615-spills-in-2015/

[6] Pitkin Mesa Pipeline Company draft RMP/EIS comments.

[7] "Program Overview," Gunnison Basin Selenium Task Force. Online at www.usbr.gov/uc/wcao/progact/smp/overview.html

[8] Oil and Gas Leasing and Development Final EIS, Grand Mesa Uncompahgre Gunnison National Forest 1993.

The Gunnison River is also home to three species of endangered fish that are known to be impacted by activity on the selenium rich soils of the valley.[9]

Wildlife have been utilizing the valley for millennia, and the ethical importance of protecting wildlife habitat, managed jointly with the state as a "public trust," is paramount.[10] Colorado Parks and Wildlife, in previous comments on the recently deferred lease sales in the North Fork Valley, emphasized the importance not only of protecting the critical winter habitat that covers nearly all of the valley, but of the important migration routes that connect the winter range with uplands and calving areas.

### 4. Recreational opportunities and access.

The North Fork is a public lands paradise, nestled among national forest, park, and conservation lands managed by the Forest Service, National Park Service, BLM, and the State of Colorado.[11] Hunting is a mainstay that brings large revenue for western Colorado coffers. The economic contributions made by maintaining healthy and abundant fish and wildlife populations are substantial. The CPW comments emphasized the economic importance of protecting this habitat for the hunting opportunities provided.

> ...benefits from hunting and fishing recreational activities are a sustainable annual source of economic benefit for Delta and Gunnison counties only if wildlife populations, and particularly big game populations, are maintained and quality hunting opportunities continue to exist.[12]

Hunting and fishing are multimillion dollar industries in the region, estimated at over $80 million annually (in 2007) for the two counties.[13] River sports, hiking, camping, mountain biking, climbing and trail running are other highly popular public lands pursuits in which the North Fork excels.

And then there are the "windshield tourists" and those that bask in the beauty of the surrounding landscape while enjoying a visit requiring less physical exertion. The communities and farms of the valley are stitched together by the world-famous West Elk Loop Scenic Byway. Area features that must be protected to safeguard recreation and tourism opportunities include the overall rural and scenic character of the place—which draws in an ever-increasing number of tourists and residents, benefits the wineries and farm stands, fuels the creative muses of the area's growing number of artists, performers and authors.

Finally, the final RMP must start to actively manage recreation on BLM lands, through designation of recreation management areas. Jumbo Mountain is the obvious example that deserves designation as a Special Recreation Management Area (SRMA). Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance. Jumbo Mountain sits prominently within the valley, and the visual resources of the BLM parcels on Jumbo are significant to the quality of life in the entire valley.

Jumbo Mountain is not the only area on North Fork BLM lands likely to need special attention to better direct recreation activity, especially during the life of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use.

---

[9] "Aspinall Unit Operations Biological Assessment," US Bureau of Reclamation
https://www.usbr.gov/uc/envdocs/ba/AspinallUnitOps/ch4.pdf
[10] DEIS at Volume II 4-127.
[11] DeltaCountyColorado.com – Public Lands: Diverse Destinations at www.deltacountycolorado.com/public_lands/
[12] Colorado Park and Wildlife comments on March 2012 oil and gas lease sale, February 3 2012.
[13] Ibid.

BLM_0148914

> Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.

Public lands recreation is a multi-billion-dollar industry on Colorado's public lands, and forms not only the basis for tourism based economies across the state, but also as a draw for new residents, new business, and new economic opportunity.[14]

## B. Sub-alternative B1: North Fork Alternative

### 1. Alternative B1 is the best alternative proposed in the RMP, which the BLM should adopt for the North Fork Valley

We support the protections outlined in Alternative B1 as those that provide the strongest protection (of any alternative in the draft RMP/EIS) for the important features of the North Fork Valley that are interwoven with management on the adjacent and proximate public lands.[15] Only B1 provides the level and type of protections that the resources and public land values of the North Fork warrant.

> The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area (DEIS I 2-7).

B1 would place 75% of the North Fork area into a No Leasing category, impose strict nonwaivable, nonmodifiable No Surface Occupancy stipulations on an additional 20% of the area, and manage the remaining 5% of the BLM lands/minerals under Controlled Surface Use stipulations.

> In the North Fork area, 104,750 acres (75 percent of the North Fork area) would be unavailable for leasing, compared to 10,610 acres in Alternative B, and 27,280 acres (20 percent of the North Fork area) would have an NSO stipulation... (DEIS II 4-276).

The NFAP considers oil and gas leasing and development for BLM lands and BLM-administered minerals under private/nonfederal lands ("split estate"); and it imposes protective measures for six key resources, plus management designations for recreation areas and visual resource protection.[16]

For features vital to the area's character of place, B1 includes the strongest protections. This includes leasing and development setbacks for certain visual and scenic resources, leasing and development setbacks from towns and community facilities, and leasing and development setbacks and other protection for sensitive soils and delicate landscapes. B1 provides the strongest protection for the North Fork's water supply, with setbacks from water source areas and systems, irrigation facilities, and waterbodies; and

---

[14] Ray Rasker, Patricia H. Gude, and Mark Delorey, "The Effect of Protected Federal Lands on Economic Prosperity in the Non-metropolitan West," Headwaters Economics, 2013. Online at http://headwaterseconomics.org/wphw/wp-content/uploads/ProtectedPublicLands_Manuscript_2012.pdf

[15] See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22.

[16] "Executive Summary," North Fork Alternative Plan. Citizens for a Healthy Community, et al. December 2013.

BLM_0148915

prohibitions on leasing on the areas with highest potential for selenium loading. These measures will help to ensure that the area's nationally significant water supplies are protected.

B1 prohibits development within critical fish and wildlife habitat, and includes leasing and development setbacks from rivers—all measures that serve to provide strong protections to the important fish and wildlife species of the valley, including threatened, endangered, and sensitive species.

B1 would designate 5,020 acres at Jumbo Mountain area as a Special Recreation Management Area (SRMA), and provides the strongest level of protection for the highly scenic features of the valley, including a Visual Resource Management (VRM) II classification ensuring the scenic and rugged features of Jumbo Mountain are not degraded. B1 includes leasing and development setbacks from rivers and riparian areas. These protective measures, together with protection for wildlife habitat, ensure that the valley's recreational assets will not be diminished by ill-conceived oil and gas development.

## 2. Alternative B1 includes reasonable but strong stipulations to protect resources in the North Fork.

Given the unique quality of the resources at stake, directly, indirectly and cumulatively from the agency's land use decisions, and the management outlined for oil and gas leasing and development under all four alternatives and sub-alternative B1, only B1 provides the level of protection warranted.

Only Alternative B1 closes to all oil and gas leasing the areas with the most severe selenium loading problems, area within a half mile of rivers and riparian corridors, water bodies and waterways, areas around communities and community facilities, and for protection of the valley's exceptional scenic qualities. And only Alternative B1 includes protective surface development prohibitions that are not waivable or modifiable, for features and resources such as agricultural operations, moderate and high geologic hazards, critical wildlife habitat, unstable geology, irrigation facilities, and recreational lands.

> [B1] would be the most restrictive to oil and gas exploration and development activities because a larger percentage of the planning area would be unavailable for leasing, and areas open to leasing would have major restrictions. ...[Under] Alternative B.1, approximately 280,840 acres would be unavailable for oil and gas leasing, exploration, development, or production, 6 times the acreage under Alternative A. In the North Fork area, 104,750 acres would be closed to leasing, 94,140 acres more than in Alternative B. Approximately 635,190 acres would be open to leasing, 27 percent less than under Alternative A.                    (DEIS II 4-276)

Even in comparison to Alternative B, which is the most conservation-oriented full alternative in the draft RMP/EIS, none come close to the protection offered in B1. Alternative B1 provides a baseline of management to safeguard the valley's character of place, water supply, wildlife habitat, and recreation.

## a. Character of place.

The overall character of place in the North Fork Valley, its high quality scenic features, its rural charm, its backdrop of undeveloped public lands, mesas melting into mountains, is of utmost importance to the area residents, businesses, and economic future. Character of place relies on healthy communities and vibrant economies, and the rural, farm-based settlement of the valley. We support the B1 stipulations NL-13 Coal

leases; [17] NSO-68 Community facilities; and NSO-3 Agricultural operations. These provide reasonable and prudent leasing and development restrictions and stipulations to protect current and emerging economic activity, and to provide setbacks from communities and community facilities.

The quality 'character of place,' is difficult to under-emphasize as a critical component to what is special about, and must be preserved of, the North Fork Valley. Specifically, given the high importance of protecting the area's visual features and sensitive landscapes we support the VRM classifications in Alternative B1, and the protection of landscape and visual characteristics through the following stipulations: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors; NSO-7 Major river corridors; NSO-5 High geologic hazards; CSU-47 Vistas; CSU-7 Moderate geologic hazards. [18]

### b. Water supply.

Protection of the valley's water supply relies on preventing pollution, protecting source water areas, protecting water bodies and riparian areas, and protecting water systems and conveyances. For agricultural operators, water quantity and quality are both of utmost importance. Organic agriculture, specialty crops and high quality hay all depend on abundant water, free from contamination.

The combination of individual wells, several private and public water companies, and with source water areas ringing the valley—safeguarding water quality is a top concern. Drilling is known to contaminate water supplies, both above and below ground, and to harm water bodies, rivers and source areas. [19] That is a risk too great for many operators in the valley, home to Colorado's highest concentration of organic farms, an agritourism haven, and major headwaters to the Colorado River system.

We support the following stipulations to protect water supply. In cases where other alternatives in the draft RMP/EIS provide more protection than B1 for water supply resources, and where those stipulations overlap with B1, we recommend that the more protective stipulations apply. Here we recommend both the NL- 6 stipulation (from Alternative B) and NL- 7 stipulation (B1) be included in the final RMP. To adequately protect the water supply, we favor—at a minimum—the following stipulations for oil and gas leasing and development in the valley: NL-1 Selenium soils; NL-3 Major river corridors; NL-4 Water bodies; NL-6 Public water supplies (*Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NSO-15 Domestic wells and water systems; NSO-55 Bureau of Reclamation dams & facilities (*Alts. B, C, D); NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-2 Selenium soils; NSO-7 Major river corridors.

### c. Wildlife habitat and migration routes.

The BLM lands in and around the valley provide for an abundance and diversity of wildlife, from moose, bear and lynx in the upper reaches, to Gunnison sage grouse, Yellow-bill Cuckoo, fox and coyote in the bottomlands—which are critical winter range for herds of elk and deer. Waterbodies and riparian areas

---

[17] Re: Agency comment at DEIS Volume II 4-276: We think that the NL-Coal lease areas can be made available for Coal Mine Methane capture by classifying them as 'Leasable' and stipulating that is only in conjunction with an approved coal mine methane capture/utilization facility. This would also have a climate benefit.

[18] NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B1 cannot be waived, modified or excepted.

[19] "Stanford scientist weighs the risk of groundwater contamination from oil and gas wells," Stanford News: February 8, 2016. Article online at http://news.stanford.edu/2016/02/18/aaas-jackson-water-021816/

provide important habitat and travel routes for a variety of species. Upland migration routes and connectivity are critical elements to maintaining healthy populations, from endangered and sensitive species to big game. Specific habitat areas—nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the strongest protections.

In cases where species or habitat management plans, other considerations, or other alternatives in the draft RMP/EIS propose stronger protections for resources than in Alternative B1, we prefer the stronger stipulation; for instance, with Gunnison sage grouse habitat: we recommend that the No Leasing stipulation from Alternative B also be carried forward and applied where applicable. We support the following stipulations as providing a minimum level of protection for wildlife habitat: NL-4 Waterbodies; NL-3 Major river corridors; NL- NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.

### d. Recreational access and opportunities

Recreational opportunities surround the North Fork's homes, farms and communities – from those provided by the public lands directly, to the indirect benefit the scenic nature of the area provides for tourists and visitors. The rivers, nearby trailheads, unique public lands features, mountain biking and hiking opportunities, together with the scenic landscape wound together with farm roads, wineries, and rolling hayfields. The following stipulations provide protection for recreational areas and amenities, and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mountain SRMA (with VRM Call II). At Jumbo Mountain, Alternative B1 closes the SRMA to competitive events, which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA through the stakeholder/planning process. See below (WSCC RMP Comments III.E) for additional comments on recreation management not specific to the North Fork Alternative.

### 3. Only B1 provides management that North Fork's unique character, culture, and resources requires

In considering important features of the North Fork, only B1 provides the level of management needed.

### a. Alternative B1 protects what matters, even where Alternative B mostly fails

B1 best protects the North Fork even when contrasted with the conservation-oriented Alternative B.

### i. Character of place: visual resources, healthy communities, farms, landscapes, river corridors

The scenic qualities of the valley are a driving force for business, for increasing property values, a force behind the burgeoning creative economy, a central ingredient to the marketing of bed and breakfasts, wineries, retreat centers, guest ranches and numerous other ventures. Visual scarring raises a point in general, that much of the opposition to oil and gas development is a response to industrial impacts that are

incompatible with this growing economy. Alternative B1 goes furthest to address this general concern, closing most BLM lands in the North Fork to oil and gas leasing altogether.[20]

And in considering North Fork visual resource management (VRM) classifications specifically, under Alternative B1 over 82,218 acres are classified as either the VRM I or II, the most protective. Under Alternative B only 15,824 acres in the North Fork fall into VRM I or II.[21] And B1 not only protects more acres than alternative B, but it also applies stronger stipulations to do so.

> Depending on the location, VRM Class II under Alternative B.1 would be closed to leasing, have an NSO stipulation, or have a CSU stipulation, compared to Alternative B where VRM Class II would have a CSU stipulation.                                  (DEIS II 4-208)

Other community issues include loss of dark sky, increased traffic, noxious odors, declining property values, and harm to reputation. Public health impacts are also a top concern. Community and residential setbacks attempt to lessen these threats. B1 includes NSO setbacks from community facilities, including schools, recreation facilities, and parks (NSO-68).[22] B1 reduces these threats, from poor air quality.

> Alternative B.I emission estimates result in the lowest total air pollutant emissions in future planning years and decreases in emissions of some pollutants over the base year. ...Alternative B.1 would likely result in the least adverse impacts on air quality.  (DEIS II 4-21)

The BLM analysis anticipates "increased benefit to non-extractive uses in [the North Fork]" under Alternative B1 (DEIS II 4-473). This is, of course, exactly what economic experts recommend for the North Fork, including the Better City report.[23]

> Efforts to identify opportunities in other industries that provide a diverse employment base could help mitigate the boom bust cycle associated with extractive industries.

The Better City report goes on to highlight the area's agricultural industry and heritage as a strong sector upon which to build for a more diverse economy.[24]

> Based on its rich agriculture base, Delta County is well positioned to leverage the existing boom in organic food markets.

Impacts from oil and gas development on agriculture and ranching operations would less under B1 which includes specific protections and a 0.25-mile No Surface Occupancy setback from "prime and unique farmlands, livestock operations, organic farm, conventional farm, ranch, orchard, and the West Elks American Viticultural area, thereby protecting these" (DEIS II at 4-69).  Importantly B1 is also the most protective of the valley's water supply including irrigation facilities.

> **ii.    Water supply: river system, waterbodies, private wells, water systems, public water source areas, irrigation facilities**

---

[20] DEIS II 4-91
[21] Acreages developed from analysis of GIS data downloaded from BLM.
[22] If stipulation NSO-67 (Alt. B) for "high occupancy buildings," provides protections beyond B1; then we recommend it be carried forward as well.
[23] "New Study Repeats Changing of Delta County Economic Basics," Merchant Herald, 11/12/15. Article online at www.merchantherald.com/new-study-repeats-changing-of-delta-county-economic-basics-new-study-repeats-changing-of-delta-county-economic-basics/
[24] "Better City presents economic development visions for Delta, Gunnison Counties," Region 10 Website, article at www.region10.net/better-city-presents-economic-development-visions-for-delta-gunnison-counties/

BLM_0148919

The rivers in the area provide broad benefit, including to the valley's character, water supply, wildlife habitat, and recreational opportunities. Alternative B1 is the most protective of the river corridors.

> In addition to these Alternative B restrictions, Alternative B.1 would also apply NL areas within 0.5-mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, lakes, ponds, naturally occurring wetlands and impounding reservoirs, streams, watercourses, and waterways; and would apply NSO within 0.5 to 1.0 mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, and within the 100-year floodplain of any stream or river system. These NL areas (96,910 acres) and NSO restrictions (9,680 acres) would further protect riparian and wetland vegetation in the North Fork area.       (DEIS II 4-117)

B1 is also more protective generally of other water supply resources, as noted at DEIS II 4.90:

> Unlike Alternative B, Alternative B.1 also includes an NSO stipulation within 1,320 feet of any dam, ditch, irrigation intake, canal, or other water conveyance.  ...Alternative B.1 offers the most protection of private water supplies and would only apply to the North Fork area.

While B1 is overall more protective of water resources: from river systems, water bodies and irrigation facilities to water wells and systems; in two cases regarding public water supplies, the stipulations in Alternative B area stronger.[25] We have recommended (in WSCC Comments Table 1 and the discussion above) that the stronger (Alternative B) stipulation be included in the final RMP regarding public water supplies.

The river systems, riparian corridors, and other water resources are important not only to the character of place and the water supply, but also for all life in the valley. River systems are a critical component of the West's habitat. In the winter deer and elk concentrate in the river bottom, and the riparian corridors provide year-round habitat for birds, reptiles and mammals, and migration routes for larger species.

---

[25] DEIS II 4-90: Under Alternative B.1, a buffer of 1,320 feet from public water supplies would be closed to oil and gas leasing and geophysical exploration, half the distance as under Alternative B. As such, Alternative B provides greater protection than Alternative B.1 for public water supplies from a classified surface water-supply stream segment. Beyond 1,320 feet and up to 2,640 feet, such water supplies would be subject to NSO stipulations. This would offer more protection than Alternative A but less than Alternative B.

**Table 1: Recommended oil and gas stipulations**

*Several stipulations are recommended from other alternatives in the draft RMP/EIS, as noted.

| Alt. B1+ Stipulations* | No Leasing | No Surface Occupancy | Controlled Surface Use |
|---|---|---|---|
| **Character of place** | | | |
| Visual resources, local economies, farms & communities, sensitive landscapes, river corridors | NL-11 Prominent landmarks; NL-13 Coal leases; NL-3 Major river corridors. | NSO-52 Travel & Scenic Corridors; NSO-5 High geologic hazards; NSO-67* High occupancy buildings (Alts. B, D); NSO-68 Community facilities; NSO-3 Agricultural operations; NSO-7 Major river corridors. | CSU-7 Moderate geologic hazards; CSU-47 Vistas. |
| **Water supply** | | | |
| Waterbodies, private wells, water systems, public water source areas, irrigation facilities, river system | NL-1 Selenium soils; NL-4 Water bodies; NL-6* Public water supplies (Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NL-5 Water ways; NL-3 Major river corridors. | NSO-2 Selenium soils; NSO-15 Domestic wells and water systems; NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-55* BuRec dams & facilities (Alts. B,C,D). | |
| **Wildlife habitat and migration** | | | |
| Wildlife and species habitat, floodplains, riparian areas | NL-4 Water bodies; NL-5 Water ways; NL-10* Gunnison sage grouse (Alt. B). | NSO-35 Raptor sites; NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-30* Yellow billed cuckoo (Alt. B); NSO-39* Mexican spotted owl (Alt. B); NSO-21 Deer & elk habitat; NSO-17* Rare plant communities (Alt. B); NSO-20* Ecological Emphasis Area (Alt. B); NSO-8 Floodplains. | |

BLM_0148921

| Recreational areas and access | | | |
|---|---|---|---|
| Jumbo Mountain SRMA, river access, hunting opportunities, visual resource protection | NL-11 Prominent landmarks; NL-14* Parks (Alt. B); NL-3 Major river corridors. | NSO-57 Recreation-Jumbo Mountain SRMA (VRM II), NSO-52 Travel & Scenic Corridors; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-7 Major river corridors. | CSU-47 Vistas. |

Table 1 provides a summary of recommended oil and gas stipulations for the North Fork area. Most are those proposed are from Alternative B1, although some other stipulations from among the other alternatives are also recommended, as noted in the table above and in the narrative.

### iii.   Wildlife habitat and migration: wildlife and species habitat, floodplains riparian areas

Protecting the abundant wildlife populations is a top priority and main component of the North Fork Alternative Plan.

B1 would be the most protective of wildlife habitat in the North Fork.[26] The DEIS notes:

> Under Alternative B.1, an NSO would be applicable within 0.25mile of any active or historic bald eagle or golden eagle nest site, and within 0.50-mile of any active or historic peregrine falcon nest site. This would further protect these species within the North Fork area. Alternative B.1 also includes an NSO on mule deer and elk crucial winter range, including severe winter range and winter concentration areas, and in elk reproduction areas, as well as in big game migration corridors, which would further protect big game within the North Fork area.  (DEIS II 4-136)

B1 best protects riparian corridors, which are critical components in the habitat systems in the valley.

> These actions would reduce the potential for impacts on vegetation in the North Fork area more than Alternative B.          (DEIS II 4-116)

The stronger management in B1 include more protection for the valley's special status species.

> These actions would reduce the potential for impacts on special status species in the North Fork area more than Alternative B.     (DEIS II 4-155)

Overall protections in B1 are the strongest proposed, and this includes for fish as well as wildlife habitat.

> Alternative B.1 provides more enhanced protection of aquatic and riparian species and their habitats than Alternative B.         (DEIS II 4-154)

B1 provides the strongest level of protections proposed for the native Colorado River cutthroat trout.

---

[26] DEIS Volume II 4-134

In addition, Alternative B.1 would apply NSO within 0.50-mile of stream segments that have existing and potential habitat for native cutthroat trout, further protecting this species in the North Fork area.                    (DEIS II 4-155)

And it is not only the direct management prescriptions that benefit wildlife. A number of the prescriptions in Alternative B1 overlap to provide the strongest proposed levels of habitat protection.

[VRM] Classes I and II, which preserve or retain the existing character of the landscape, would restrict surface-disturbing activities, reduce direct impacts on fish and wildlife, and retain habitats.                    (DEIS II 4-131)

In a few cases, Alternative B identifies stipulations for species that are not included in B1. In these cases, we recommend those stipulations be included in the final RMP (as indicated above and in Table 1). However, in addition to best protecting important features to the humans that occupy the North Fork—in nearly every case B1 provides the best protections for furred, finned and feathered residents as well.

### iv.  Recreation areas and access: river access, hunting opportunities, visual resource protection, Jumbo Mountain SRMA

Alternative B1 best preserves the valleys river corridors and riparian areas, which is important to protecting the valley, its water supply, and its wildlife, and for the recreational opportunities provided. Alternative B1 provides the strongest protections overall for recreational access, resources, and opportunities in the North Fork, and for the features in the valley that help drive tourism.

Oil and gas development poses a direct threat to the scenic features of the valley, as the DEIS notes:

Development could also add to the changes in the scenic values and other non-market commodities.                    (DEIS II 4-479)

Thus the stronger visual resource protections under B1 is a plus for tourism and recreation in the valley.

[Fewer] acres available to fluid minerals leasing would result in fewer areas impacted from construction and operation. Applying NSO stipulations on 325,940 acres of BLM-administered lands would preserve the natural character of the landscape and would maintain existing recreation opportunities.                    (DEIS II 4-301)

The DEIS notes that recreation and tourism related activity is likely to increase across the resource area.

Recreation is expected to increase as the Colorado population and the desire to live near or recreate on BLM-administered lands increase. This follows the trend of recent years seen across the state.                    (DEIS II 4-479)

The Jumbo Mountain area is important to the Town of Paonia and to many who recreate and live in the valley. Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo Mountain as a SRMA, with B1 acreage and stipulations. Under B1 the entire Jumbo SRMA would have NSO stipulations, rather than only a slice as under Alternative B (DEIS II 4-306).

BLM_0148923

Given the likelihood that use at Jumbo will increase, and that the Town of Paonia and other local stakeholders are likely to incorporate the area into marketing and planning, keeping incompatible activity out of this close-in and primarily non-motorized recreational area only makes sense. However, and although the draft RMP/EIS notes that public use is likely to increase, under all alternatives except B1 the agency leaves most of the area open to oil and gas leasing and development.

Tourism is booming in the North Fork, and the current (Summer 2016) season is reportedly the busiest ever according to numerous area merchants. This trend is consistent with reports from across the state. B1 specifically protects scenic vistas and travel corridors (DEIS II 4-208).

> Other potential growth areas include recreation and information industries. Identifying avenues to support the development of these industries could provide additional diversification to the local economy.

These stronger protections benefit recreation directly, and also indirectly in many cases, for example through strong fish and habitat protections under B1 that enhance hunting and fishing opportunities.

In addition to stipulations included in B1 to protect recreational lands, access, and opportunities, we also recommend the NL-14 from Alternative B be carried forward to the final RMP, to protect public lands administered by the National Park Service. Regarding competitive events in the Jumbo Mountain SRMA, we propose the decision to allow some of these events be deferred until the SRMA planning process. And although not part of the North Fork Alternative Plan, and not identified in earlier scoping, new information that BLM should consider includes potential future Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use. The decision record should note this eventuality.

BLM_0148924

## II) Specific concerns for water resources in the planning area, particularly as related to the Preferred Alternative

For the last 40 years, the Western Slope Conservation Center has advocated for our public lands as well as stewarded our water resources within the North Fork Valley and Lower Gunnison watershed. Consequently, we would be remiss not to include a detailed description of our water resource concerns beyond the geographic scope of the North Fork Alternative, B1, as well as our water resource concerns unrelated to oil and gas within the greater Lower Gunnison watershed.

We have focused these comments primarily on the failures of the draft RMP and Preferred Alternative, Alternative D, to adequately protect surface and groundwater quality, stream and water body health, and threatened and endangered aquatic and riparian species from surface activities including oil and gas development, road building, and naturally occurring salinity and selenium within the watershed.

The draft RMP (DEIS 4.3.3) provides only a general outline for impacts to water resources within the planning area. There is no discussion of impacts or mitigations to water resources due to specific management actions in particular locations. The final RMP must include a detailed discussion and analysis of water resource impacts with a much higher degree of specificity to location, scale, and scope of impacts.

The final RMP must also include all best available data regarding impacts of oil and gas development on water quality as well as water resources within the planning area, which includes a number of studies and reports references in these comments as well as other concerned parties. Part of this data includes a newly released Western Slope Conservation Center report on the Water Quality of the North Fork Watershed based on water quality monitoring conducted monthly between April 2001 and April 2014. (WSCC Comments, Appendix II) All of the following comments should be read in reference to this newly released report.

## A. Fluid Minerals

It is clear that the final RMP's treatment of fluid mineral leasing and development will determine the water quality and watershed health of the Lower Gunnison watershed for decades to come.

### 1. Surface Occupancy, No Surface Occupancy, and No Leasing stipulations

Surface occupancy can produce highly consequential impacts to water resources, particularly with regards to the application, handling, and transport of liquids and chemicals associated with oil and gas activities. Surface occupancy can result in the following:
- Increased risk for surface and groundwater contamination as "current scientific consensus is that accidents and malfunctions, such as well blowouts, leaking casings, and spills of drilling fluids or wastewater, are more likely to contaminate surface and groundwater supplies than the process of high-volume hydraulic fracturing itself"[27]

---

[27] Adgate, John L., Bernard D. Goldstein, and Lisa M. Mckenzie. "Potential Public Health Hazards, Exposures and Health Effects from Unconventional Natural Gas Development." *Environmental Science & Technology Environ. Sci. Technol.* 48.15 (2014): 8307-320. Web. 19 Oct. 2016.

BLM_0148925

- The development and maintenance of new roads and/or increased traffic on existing roads, and the corresponding negative impacts to surface and groundwater contamination.
- Increased air and water pollution due to "(1) direct and fugitive emissions of methane and non-methane hydrocarbons from the well and associated infrastructure (e.g., production tanks, valves, pipelines, and collection and processing facilities); (2) diesel engines that power equipment, trucks, and generators; (3) drilling muds, fracturing fluids, and flowback water; and (4) deliberate venting and flaring of gas and related petroleum products"[28]
- Negative impacts on federally protected fish habitats and the native cutthroat trout and other species of concern.

The Preferred Alternative does not include adequate limitations to surface occupancy through the No Surface Occupancy and No Leasing management prescriptions. NSO and No Leasing buffer zones for domestic and irrigation water sources, stream bodies, and other sensitive ecological and agricultural resources as identified in Alternative B and B1 are supported by all referenced documentation in the NFAP as previously submitted to the BLM, as well as in these comments. These prescriptions are absolutely necessary to provide a minimum degree of protection for the water resources within the North Fork and Lower Gunnison watersheds, and similar buffers and protections should be extended to the full planning area.

## 2. Controlled Surface Use Stipulations in Preferred Alternative not adequate for protection of water resources in the North Fork Valley

It is clear that the Preferred Alternative attempts to address many of the impacts of oil and gas leasing and development on water resources in the planning area through the use of non-binding, waivable controlled surface use (CSU) stipulations. Nearly across the board, these CSUs do not provide adequate protections for water resources compared to the management prescriptions in Alternatives B1 and B. (See Table 2 in Appendix)

There is a 73%-96% difference in No Leasing prescription acreage between Alternatives B and D, with Alternative D drastically limiting the use of No Leasing, and therefore minimizing protections for water resources. Alternative D does not include B1 protections within .50 mile of Paonia, Hotchkiss, and Crawford. Alternative D also fails to include 76%-86% of acreage closure/withdrawal from locatable mineral entry as compared to Alternatives B (DEIA VI, Table 2-2: action 333,334,336, 348,352)(DEIS Vol II 4-92,4-99, 4-98)

## 3. Best Management Practices for Fluid Mineral Management

The Best Management Practices outlined in the draft RMP are inadequate for providing minimum degrees of protection for water resources within the planning area.

### a. Final plan should exclude oil and gas activities on slopes steeper than 30%

Best Management Practices as outlined in the agency preferred alternative do not sufficiently protect slopes steeper than 30%, listing them as avoidance areas rather than exclusion areas (table 2-2, actions 39 and 40). Furthermore, a stipulation is made in Alternative D for slopes between 30-39% to allow occupancy and use along with special designs, construction, and implementation measures (including the possibility of an operator submitted engineering report) to maintain soil stability. Based on decades of local knowledge, along with a long record of local surface instability within the region, we recommend that the agency adopts surface use stipulations included in alternatives B and B1 for slopes over 30%

---

[28] (8310 Adgate et al)

rather than the stipulations outlined in action 40, alternative D. Unstable geology in the North Fork of the Gunnison watershed lead to broad destabilization resulting in high sediment loads within waterways as well as landslides.[29]

**b. Abandoned and non-viable wells**

The BLM's Preferred Alternative does not address best management practices or standard operating procedures for the processes involved with plugging and abandoning wells that are no longer viable. The final RMP must include mitigation and protection from impacts to water resources from abandoned, plugged, and non-viable wells.

**4. Not enough data exists to make decisions about processing produced water.**

Throughout the BLM's draft RMP, actions in the Preferred Alternative lack informed data to make informed decisions. This is particularly evident with regard to the best management plans (and lack thereof) for produced water associated with hydraulic fracturing for oil and gas development. The relationship between the injection of produced water and its impacts to the environment is still too new and too dynamic for the best available science to make prudent decisions that will protect our natural resources for future generations. From the initial diversion from the natural water system to disposal and processing post processing, produced water has the potential to negatively impact natural resources such as surface and groundwater, riparian and stream health, and geologic functions. For example, some have alleged that the storage of produced water in Oklahoma has caused an increase in the quantity and intensity of earthquakes in the area.[30] However, in the past year, the number of earthquakes has decreased since their peak.[31] Because of the consumptive nature of this water use and the potentially toxic chemicals and components that are present in produced water, this is highly concerning for what it indicates about possible impacts to the North Fork Valley of future oil and gas drilling. The potential impacts that produced water could incur on the environment and communities are too great, and too little data exists to make scientifically sound decisions that allow for safe development of oil and gas while protecting the communities that will be impacted by the BLM's final RMP.

**5. The RMP does not address concerns to groundwater health, potential seismic activity, and surface water impacts associated with produced water**

Not only does too little data exist to make informed decisions, but no action in the RMP addresses the potential environmental impacts of any part of the process that involves produced water. It is highly concerning that the preferred alternative opens 865,970 acres to oil and gas development but does not address the impacts and corresponding best management practices associated with management of produced water.

The local impacts of withdrawing significant quantities of water for hydraulic fracturing on stream and riparian health, local industry other than oil and gas development, and community health have also not been addressed by the draft RMP. A conservative estimate of water needed for hydraulic fracturing is 500,000 gallons per well.[32] While this totals into a relatively small percentage compared to total water use compared to agricultural and municipal water use statewide and nationally, the amount of water required

---

[29] Regmi, N.R., Giardino, J.R. & Vitek, J.D. Landslides (2014) 11: 589. doi:10.1007/s10346-013-0412-6

[30] Ellsworth, W. L. "Injection-Induced Earthquakes." *Science* 341.6142 (2013): 1225942. Web. 19 Oct. 2016.

[31] Regan, Michael D. "Why Is Oklahoma Seeing Fewer Earthquakes? Scientists Point to New Oil & Gas Rules." *PBS*. PBS, 28 Aug. 2016. Web. 19 Oct. 2016.

[32] Jackson, Robert B., Avner Vengosh, J. William Carey, Richard J. Davies, Thomas H. Darrah, Francis O'sullivan, and Gabrielle Pétron. "The Environmental Costs and Benefits of Fracking." *Annual Review of Environment and Resources Annu. Rev. Environ. Resour.* 39.1 (2014): 327-62. Web. 19 Oct. 2016.

locally can be comparatively significant within the immediate water system's supply and use. This dynamic can have serious repercussions on local river health, especially when the North Fork of the Gunnison River already experience flows of under 20 cubic feet per second (cfs) during summer months. For example, in the Marcellus Shale of Pennsylvania, the early shale gas boom led to water withdrawal problems that had to be rectified by the state due to withdrawing too much water.[33]

The final RMP must include adequate best management practices to mitigate impacts of storing, transporting, or disposing produced water.

On-site storage of produced water (and flowback water) typically occurs in surface pits or sealed tanks prior to reuse and/or disposal.[34] While current evidence "suggests that wastewater is more effectively treated onsite because effluents discharged to publicly owned treatment plants may not be able to be sufficiently treated by such treatment plants for this waste stream," the proposed RMP lacks any actions to address protocol for this potentially toxic fluid.[35]

Should 100 percent of the produced water and condensate from oil and gas development be transported by truck, the transport will exhibit significant risks to the environmental and population. On-site release incidents from leaks, faulty equipment, and inadvertent human error can have significant and permanent impacts.

The transport of produced water and condensates will also produce negative impacts such as: increased local traffic along small, rural highways; increased emissions from heavy truck travel (thus contributing to greenhouse gases that exacerbate climate change); poor air quality due to increased particulate in the air due to dirt-road travel; and the negative impacts to the North Fork Valley and Western Slope way of life.

These persistent impacts would have little consequence compared to the high-impact potential of an accident of a vehicle that is transporting produced water and condensate. Any release that might occur along local highways and roads would contaminate local rivers and streams, negatively impacting water quality in a water system that is part of the Colorado River's headwaters. Additionally, we are concerned that the transport of produced water from the Uncompahgre region to be injected at another site would induce undue negative impacts on other communities and environments.

Should less than 100 percent of the produced water and condensate from oil and gas development not be transported by truck, the remaining produced water and condensate would likely be injected into earth or recycled.

The final RMP must address best management practices for these activities, and include management actions that mitigate possible impacts on other resources as detailed in these comments.

## B. Concerns regarding impacts to Soils and Water Resources

The Preferred Alternative in the draft RMP does not provide adequate safeguards for sensitive soil and water resources within the planning area.

---

[33] (Jackson et al 335).
[34] (8313, Adgate et al).
[35] (8313, Adgate et al).

BLM_0148928

**1. Water Quality Impacts to Domestic and Agricultural Water Use**

Residents within the North Fork Valley and Uncompahgre planning area are fully dependent on the quality of their domestic and agricultural water supply for their health, happiness, and livelihoods. The Preferred Alternative in the draft RMP does not provide adequate protections for these essential water resources.

**a. RMP does not adequately describe protections for groundwater**

Domestic groundwater sources vary greatly throughout the planning area. The protections outlined in the agency's preferred alternative are not sufficient for protecting groundwater aquifers. Objective 54 in Table 2-2, states "Protect groundwater resources and recharge areas to maintain functioning condition of all parameters within the hydrologic cycle, including groundwater quantity and quality." However, the agency's actions do not meet this proposed objective.

Action 55 allows an unlimited surface occupancy distance (no prohibition or setbacks) and only vaguely describes the required mechanisms for sealing the interface of casing and substrate. The interconnected nature of groundwater aquifers (some of them quite shallow), and the potential loss of drilling fluid into aquifers during exploration poses too high a risk for permanent contamination. It is recommended that the BLM adopt the protections outlined in Alternative B and B1 to meet the objective outlined in line 54.

Fluid mineral exploration and development often produces significant amounts of saltwater/ produced water containing oil, sand, polymers, chemicals, and dissolved solids. As this water is no longer usable, it is recycled or disposed of in underground reservoirs, which produces significant surface disturbance in addition to the surface disturbance of the oil and gas producing wells. If these disposal wells are permitted by the BLM, they should be subject to at least the same surface restrictions as oil/gas wells. The draft RMP does not address regulatory specifics associated with fluid mineral exploration and development.

**b. Water Rights**

While the BLM supports existing water rights through quantitative protections, it does not protect the quality of the water associated with those rights. Current uses of the water rights depend on a historical standard of water quality.

The WSCC supports Objective 51 and the agency preferred alternatives 52 and 53 to provide sufficient water quantity on BLM lands for multiple use management and functioning, healthy riparian and aquatic ecosystems. Healthy instream flows are vital for fisheries, wetlands, and riparian areas. Action 52 will help keep those ecosystems that depend on instream flows viable and healthy. Additionally, maintaining historical water quality standards is critical for human and economic health.

The Preferred Alternative, however, would allow oil and gas development (fluid mineral exploration and development, non-fluid mineral exploration and development, construction and maintenance of roads, and other surface disturbing activities including recreation) which would negatively impact the *quality* of the water within the watershed, through the inadvertent release of potentially and proven toxic chemicals, increased particulate matter in air and watersheds due to increased surface activity, etc. Historical water use, primarily associated with farming, depends on the continuation of the high standards of water quality that have persisted in the area for generations.

The final RMP must include specific stipulations, actions, and best management practices for maintaining the historical water quality standards and mitigating potential negative impacts to water quality. This

BLM_0148929

should include publicly available monitoring for conductivity, total and dissolved metals including selenium, nutrients, and field parameters to evaluate conditions. The final RMP must also include enforceable action plans should water quality conditions exceed state and national water quality standards or shift substantially from historical records. The Western Slope Conservation Center has gathered water quality on the North Fork of the Gunnison River for 15 years and has used this data to establish a water quality baseline (WSCC, See Appendix). Management thresholds should be based on the site specific water quality classifications determined by the state of Colorado.[36]

### c. Final plan must include adequate buffers for domestic and irrigation water sources

The North Fork Valley and Colorado's Western Slope have been defined for over one hundred years by their idyllic, agricultural landscapes. In a water scarce landscape, the hard work of farming families over the course of generations to channel and beneficially use the water that is available is nothing less than extraordinary. Some of the ditches that provide these farms were built by hand with mule teams. Now, those ditches provide water for people who are keeping the agricultural tradition of the region alive. The agricultural products and value-added goods are sold nationally, statewide, and locally. Neighboring resort communities like Aspen, Telluride, and Crested Butte particularly benefit from the North Fork Valley's agricultural production because they attract tourists who are interested in human powered lifestyles like hiking and skiing that heavily emphasize the consumption of local foods. Locally, it is universally known that Paonia peaches are the best in the country.

The value of agriculture is "often understated because some of its most valuable attributes are intrinsic and qualitative. It is valuable because it is an iconic part of the culture and heritage, its expansive landscape provides value to residents and visitors, it has a strong and complementary relationship to visitor enjoyment, return flows from irrigation sustain late season stream flows for fisheries and recreation and replenish underground aquifers needed for some rural residential real estate."[37]

The final plan must include adequate buffers for irrigation and domestic water sources in order to protect the livelihoods, foodshed, and residents of the North Fork Valley. Fruit, hay, corn, vegetables, and more depend on clean water that is free of highly toxic chemicals, components, and condensates. In the North Fork Valley, many people raise their crops organically, but even if someone uses agricultural aids to maximize their production, those crops will still be negatively impacted by poor water quality. While the North Fork's quintessential way of life is shaped by fields and orchards, many local residents also nurture gardens that help feed their families throughout the year. Those gardens depend on clean domestic and municipal water, as do the people who tend them.

The preferred Alternative does not give this legacy of agriculture the protections that the farmers deserve. The BLM's preferred alternative in Table 2-2, does not stipulate surface occupancy protections with regards to agricultural water conveyance systems. Ditches that were dug by hand and fields and orchards that have been tended by generations will not be protected from the potential inadvertent accidents and releases associated with surface occupancy.

In addition to failing to protect local farms, the BLM's proposed RMP does not provide adequate protection for domestic water supplies and does not fulfill the BLM's objective to "manage lands within

---

[36] https://www.colorado.gov/pacific/sites/default/files/42_2014%2807%29withmaps.pdf

[37] Coley/Forrest, Inc. "Water and Its Relationship to the Economies of Headwater Counties." *Http://nwccog.org/wp-content/uploads/2015/03/QQStudy_Report_Jan-2012.pdf*. The Northwest Colorado Council of Governments Foundation, Inc, Dec. 2011. Web. 19 Oct. 2016. 10.

BLM_0148930

municipal watersheds and public water supply areas to provide clean drinking water to local communities."

Some of the proposed actions include the following:
- Applying inadequate restrictions and closures on lands to activities such as fluid mineral leasing and geophysical exploration, mineral materials disposal, etc. (Action 50).
- Manage land within 1,000 feet of a surface water supply-stream as a right of way avoidance area.
- Allow well bores to be drilled within 1,000 feet of a domestic water well (Action 55).
- Allow fluid mineral drilling leasing and geophysical exploration on 36,810 acres more than Alternative B by only prohibiting leasing and exploration on land that is within 1,000 feet of public water supply water (Action 334).
- Allowing surface occupancy on 214,790 acres more than Alternative B by stipulating only minimal protections for rivers and streams (Action 336)
- Allowing controlled surface occupancy on 333,330 acres by stipulating only minimal protections for rivers and streams (Action 337)

None of these actions give public water supplies the protection they deserve because of the highly consequential impacts of development. Currently, no comprehensive, population-based study of the public health effects of unconventional natural gas operations exists.[38] As such, the proposed alternative's actions that impact public water supplies and subsequently public health are a highly inappropriate and arbitrary attempt at minimizing the impacts from surface occupancy, leasing, and exploration associated with oil and gas development in addition to other minerals.

Furthermore, the protection amount of 1,000 feet is applied widely throughout the draft RMP, under the agency preferred alternative D, as a buffer to streams, wetlands, domestic water sources (including wells and springs), as well as irrigation ditches and other water conveyance systems. Clarification supported by the best available science is needed to clarify the otherwise arbitrary distances proposed in the preferred Alternative. In its absence, it is recommended that the BLM adopt the protections described in alternative B and B.1 for buffer zones as they are more specific to the needs of each particular use.

For all actions that address public water supply, it is recommended that the BLM adopt Alternatives B and B1 in order to meet the RMP's objectives related to water supply.

## 2. Salinity and selenium

The watersheds within the UFO have been the subject of much attention because of the high levels of salinity and selenium that have negative downstream impacts when they are released into rivers and streams. Indeed, "[t]he Lower Gunnison Basin represents the largest contribution of salinity to the Colorado River system, with a total annual loading of 1,440,000 tons."[39] "The Mancos Shale is a major source of dissolved solids and selenium in the study area. The Mancos Shale is the lateral equivalent to the Niobrara Shale, Cody Shale, and Pierre Shale in Colorado, Montana, Nebraska, South Dakota, and Wyoming (Tweto, 1979; Green, 1992; Wright and Butler, 1993)".[40]

---

[38] (Adgate et al).
[39] URS, and US Department of the Interior / Bureau of Reclamation. *Final Findings and Strategies: Comprehensive Planning Studies for Salinity Control Measures in the Upper Colorado River Basin*. Rep. N.p.: n.p., 2013. Print.
[40] Thomas, Judith C., Jennifer L. Moore, Keelin R. Schaffrath, Jean A. Dupree, Cory A. Williams, and Kenneth J. Leib. "Characterization and Data-Gap Analysis of Surface-Water Quality in the Piceance Study Area, Western Colorado, 1959–2009." *Scientific Investigations Report 2013–5015* (2013): Iii-300. Web. 19 Oct. 2016, 4.

Salinity control efforts in the Gunnison River Basin dates back to the 1970s with the creation of the Colorado River Basin Salinity Control Forum. "The Bureau of Reclamation (2011a) estimated that 47 percent of the salinity load in the entire Colorado River Basin is derived from natural sources, including geological formations, saline springs, and surface runoff; 37 percent results from irrigation; and the remaining 16 percent results from reservoir-storage effects and municipal and industrial activities".[41] In response, the "Natural Resources Conservation Service and US Bureau of Reclamation have been replacing irrigation ditches with buried pipe to conserve water and reduce salinity and selenium within the Colorado River system" (RMP Volume II, 4-17). The effect of these efforts has resulted in the reduction of "227,100 tons per year by both on-farm and off- farm measures through combined efforts from Reclamation, USDA/NRCS, and the BLM."[42]

The Western Slope Conservation Center is concerned that the agency preferred alternative in the proposed RMP will exacerbate the concentrations of salinity and selenium in the Lower Gunnison River and Colorado River Basins through run-off and erosion due to the deterioration of aging, existing agricultural infrastructure and surface disturbing activities (such as fluid mineral exploration and development, off-trail recreation, and road and infrastructure construction and maintenance) coupled with wind and water erosion, the effects of drought, and the unpredictability and extreme weather events and trends associated with global climate change. Additionally, as stated in the proposed RMP (Volume I, 3-32): "Management actions in the planning area that could result in accelerated selenium yields from deep water percolation include ROWs involving open water sources (such as irrigation ditches and canals), and land sales or exchanges that involve lands dominated by Mancos Shale."

Already, millions of dollars have been invested in the watershed to minimize salinity and selenium leaching. The Western Slope Conservation Center is concerned that the preferred alternative will negate that investment of time and money and will increase salinity and selenium loading in the Lower Gunnison River. This will result in a failure to protect domestic and agricultural water within the UFO and downstream in the Colorado River Basin. It is recommended that the BLM adopt Alternative B in order to meet Objective 30 in Table 2-2 to "manage the activities to minimize the yield of sediment, salt, and selenium contributions from BLM administered lands to water resources."

As referenced in Vol. II, page 4-84, motorized travel has detrimental effects on erosion, soil health, water quality, and watershed health. It is suggested that to minimize the detrimental effects of motorized travel on saline/selenium soils and to minimize saline/ selenium loading in this watershed and the greater Colorado River watershed, that soils with high concentrations for saline/selenium be managed as ROW exclusion areas. Table 2-2, Action 33 outlines management of saline/selenium soils with relation to ROW travel. It is recommended that the BLM adopt the actions outlined in alternative B rather than the preferred alternative D which is "no action".

Table 2-2, Action 31: The agency preferred alternative D supports activities to minimize the yield of sediment, salt, and selenium contributions from BLM administered lands to water resources as outlined in Objective 30.

### 3. Stream and water body health

Streams, wetlands, and riparian corridors are of critical importance to watershed health. While riparian areas only account for one percent of land cover, they "are among the most productive and valuable

---

[41] Thomas, Judith C., Jennifer L. Moore, Keelin R. Schaffrath, Jean A. Dupree, Cory A. Williams, and Kenneth J. Leib. "Characterization and Data-Gap Analysis of Surface-Water Quality in the Piceance Study Area, Western Colorado, 1959–2009." *Scientific Investigations Report 2013–5015* (2013): Iii-300. Web. 19 Oct. 2016. 12.

[42] (URS, 1-5).

BLM_0148932

natural resources," and in western desert areas, "riparian areas are the major providers of habitat for endangered and threatened species."[43] These sensitive areas are critical for the services they provide. These services include, but are not limited to: helping control nonpoint source pollution; supplying food, cover, and water a large diversity of animals including threatened and endangered species; providing migration routes and stopping points during migration; streambank stabilization and floodwater mitigation.[44]

### a. RMP does not adequately protect sensitive areas

Proposed management actions in the preferred alternative of the draft RMP fail to protect sensitive areas such as streams, wetlands, and riparian corridors, and as such, the proposed actions fail to protect the species, livelihoods, and economies dependent on the health of that habitat. What follows includes a list of concerns and recommendations related to particular actions of the preferred alternative. Unless otherwise stated, the Western Slope Conservation Center recommends the adoption of alternatives B and B1 as a minimum compromise to protect and preserve these sensitive and valuable areas and the species that are dependent on them.

- **Table 2-2, Action 44** fails to protect the Gunnison, North Fork Gunnison, Smith Fork, San Miguel, Uncompahgre, and Dolores Rivers from oil and gas leasing, geophysical exploration, surface occupancy, and its subsequent impacts. These rivers provide invaluable economic, environmental, and public health resources, and the proposed action has the potential to negatively impact all of these resources indefinitely. Only Alternatives B and B.1 adequately provide protections for these riverine resources while still allowing for surface occupancy, exploration, and development in more appropriate areas.
- **Table 2-2, Actions 63 & 64** outline methods and actions for maximizing native vegetation throughout BLM lands. The maximization of native vegetation is essential for the health of riparian areas, wetlands, and other sensitive habitats. The BLM has taken great effort to promote the success of native vegetation in this section. The agency preferred alternative D is a reasonable option, but when allowing for the use of non-native revegetation, the agency should add the words "as a last and final option" or "when all other native re-vegetation options have been exhausted."
- **Table 2-2, Action 75** fails to protect valuable riparian and wetland areas by managing a 325-foot buffer zone as a right of way avoidance area. Avoidance areas do not guarantee that these valuable habitat resources will receive the levels of protection that they deserve.
- **Table 2-2, Action 76** does not provide an adequate buffer to protect the valuable riparian habitat within the UFO. It is recommended that the BLM modify their preferred Alternative D to include a 500-foot buffer (rather than the 100ft buffer currently drafted), in addition to requiring stipulations for commercial special recreation permits.
- **Table 2-2, Action 79** does not ensure that wetlands and riparian areas impacted by historic land use and flow regime modification will be enhanced and restored. It is suggested that the words "Pursue opportunities to" are removed from Alternative D to ensure that wetlands and riparian areas impacted by historic land use and flow regime modification are enhanced and restored.
- **Table 2-2, Action 81** fails to protect the ecological values, water quality, aquatic value, recreational attractions, water storage, and flood control services provided by lakes, ponds, naturally occurring wetlands and impounding reservoirs from the impacts of surface occupancy and use. The proposed action of the preferred alternative does not give ample protections to these

---

[43] "Natural Resources Conservation Service." *Riparian Areas Environmental Uniqueness, Functions, and Values.* NRCS, 1996. Web. 19 Oct. 2016.
[44] (NRCS).

BLM_0148933

water bodies, subsequently endangering the viability of the species, farms and irrigated acreage, public health, and environmental health dependent on them. Only alternatives B and B.1 offer a minimum level of protection for these invaluable resources.

- **Table 2-2, Action 88** fails to manage lands under Integrated Weed Management strategies to support BLM Colorado Public Land Health Standards. Invasive species negatively impact riparian and wetland health. Suppressing and eradicating noxious and invasive species is essential for the health of these habitats.

- **Table 2-2, Actions 99, 139, and 147** endanger the health of fisheries by failing to protect aquatic habitat to the most prudent extent necessary to ensure a viable and healthy fish habitat into the future. The pursuit of "opportunities to enhance, protect, or restore native aquatic species habitats" (Action 99) does not guarantee that such goals will be met. Additionally, the preferred alternative fails to recognize priority habitats for special status fish and aquatic wildlife which include perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters. These failures have the potential to place undue stress on these species and threaten the community health of these organisms (Action 133). Threatened and endangered species are particularly under threat because the habitat they occupy will be managed under the proposed preferred alternative as right of way avoidance, rather than exclusion areas (Action 139). Finally, the proposed alternative fails to provide adequate protection for the Native Cutthroat Trout (Action 147). This federally listed fish species requires the maintenance of its habitat integrity and the promotion of their recovery, and the buffer zones and other restrictions threaten that integrity and recovery.

### b. RMP does not put in place adequate monitoring metrics including macro-invertebrates

The preferred alternative proposes actions that have the potential to negatively impact stream health and water quality. However, the RMP does not put into place adequate monitoring metrics for parameters for evaluating stream health and water quality, nor does it establish best management practices for entities that might engage in resource development on the landscapes addressed by the RMP. This is unacceptable because it fails to provide metrics to evaluate the impacts of activity on the landscape. In order to understand the impacts of activity, it is recommended that a baseline for parameters including but not limited to conductivity, dissolved metals, and macroinvertebrates be established where surface activity occurs and monitoring continues during and after such activity.

### c. Stream health standards in RMP do not equate to healthy ecosystems, but instead are inadequate minimum-level protections

Stream health is a vital component for functioning land and water-based ecosystems. Should the quality of rivers, streams, and their riparian and wetland areas falter, the entire system and the economies dependent on it will falter as well. Because the health of streams and sensitive areas such as riparian and wetland areas play an important role in not just a functioning ecosystem but also a functioning economy, it is critical to afford them maximum protections. However, the stream health standards in the RMP outline measures that do not meet even minimum needs for protection.

The preferred alternative, as stated in Table 2-2, Action 43, will promote the delisting of state impaired water bodies for 303[d]-listed water bodies only, and that it will "develop a water and aquatic monitoring plan, if necessary, to determine areas where adaptive management is needed." Alternative B will promote the delisting of state impaired 303[d]-listed and Monitoring and Evaluation list water bodies. It is recommended that the final RMP include water bodies which are on the Monitoring and Evaluation List in order to address issues on less impaired streams before they become more impaired and more

BLM_0148934

expensive to improve. The final RMP must also define what requirements necessitate adaptive management plans and the process required to develop a water and aquatic monitoring plan. The final RMP should include all other available water quality data and reports for the planning area, including the Western Slope Conservation Center's newly released "VOLUNTEER WATER QUALITY MONITORING NETWORK, April 2001 – April 2014 Data Report." (WSCC Comments, Appendix II)

Though the draft RMP makes an effort at protecting sensitive areas (DEIS Table 2-2, Actions 23-24), there are many objectives and actions that need to be modified to better reach the goals outlined for land health (Table 2-2, Goal 22). The preferred alternative, Objective 24 partitions some of BLM lands (those specially designated as sensitive areas) to be managed and protected to "fully meet Colorado Public Land Health Standards", but leaves the remaining lands to be managed "with problems" as long as they are trending in the general direction of meeting Colorado Public Land Health Standards. We ask that the BLM manage all lands to fully meet Colorado Public Land Health Standards, thereby closing loopholes that could allow ambiguous protections for sensitive areas left undesignated.

**d. RMP standards and Best Management Practices do not adequately protect water bodies**

The WSCC is extremely concerned that the standards and Best Management Practices outlined in the RMP are inadequate to meet the goals and objectives listed for Water Resources (Table 2-2, Action 29). Table 2-2, Action 32 describes methods to protect water bodies in areas with high levels of salt and selenium. While Alternatives B and B1 mandate inventory assessments for activities completed within these hazardous areas (and also outlines specific geographic hazards), the agency preferred alternative leaves site assessments/evaluation as an option to be completed or ignored "when feasible." The preferred alternative here falls far short of outlining the protections necessary to meet aforementioned goals.

In regard to riparian areas, the preferred alternative states: "Manage naturally occurring riparian and wetland areas to maintain or improve hydrologic and riparian vegetation conditions and to improve or exceed proper functioning conditions" (Table 2-2, Objective 74). However, the supporting agency preferred actions fail to adequately meet that objective. It is our concern that by managing buffer zones as "avoidance areas" rather than "exclusion areas" (Action 75) these sensitive areas are open to all manner of disturbance which would result in irreversible ecological damage.

The WSCC is also concerned that the preferred alternative actions outlined to meet Objective 74 are too ambiguous in their management of sensitive areas such as water bodies. For example, Action 79, alternative B mandates that the agency "create, enhance, and restore wetland and riparian areas impacted by historic land use and flow regime modification" however, the agency preferred alternative dictates the action to only "pursue" such measures and in effect gives this action very little in the way of requirements to complete restoration measures. It is of great concern to the WSCC that these types of vague measures as outlined in the agency's preferred alternative will result in vague management and therefore negatively impact sensitive ecological areas.

The WSCC also recommends that the BLM adopt the measures described in alternatives B and B1 for allowable use and surface occupancy (Table 2-2, Action 81). While the preferred alternative describes stipulations that would allow for various types of use and occupancy (including oil and gas leasing), the stipulations described are inadequate for the protection of these water bodies. For example, the preferred alternative prohibits use and occupancy within 325'-500' of the water bodies listed and briefly describes how to determine the mapped extent of such water bodies according to observed vegetation. However, such boundaries such as riparian and wetland margins can be difficult to determine and are not necessarily dictated by the vegetation observed in the field. Hydrologic conditions must be taken into account as well as the connectivity of source water for such impounded ponds, perennial, intermittent /ephemeral streams,

BLM_0148935

wetland, fens, springs, seeps, and riparian areas. At times, the source water for such sensitive ecological areas is not easily observable and can originate from a myriad of locations, many of them much further than the 500' buffer. We highly recommend that the BLM adopt the measures described in Alternatives B and B1 for allowable use and surface occupancy when it comes to these important water bodies.

**e. BLM has not completed research or accrued necessary information to make an informed or accurate management plan for water bodies**

The Western Slope Conservation Center is disappointed with the extent to which the draft RMP addresses the cumulative impacts of the preferred alternative's proposed actions to water resources. As it stands, the actions included in the preferred alternative are deficient in addressing water resource concerns. The lack of baseline monitoring and evaluation current conditions will make it impossible to understand and address changes in water quality and stream health which in turn will impact public health and the economy.

While Alternative B and B1 do provide more support for water resources, they too fail to address the impacts of the potential consumptive water use of fluid minerals development on watershed, stream, riparian, and wetland health.

The final RMP must include additional baseline data (see Appendix II) and a more thorough analysis of cumulative impacts to water bodies, including from all consumptive water uses.

**f. Ecological Impacts from motorized use**

The WSCC is concerned about the impacts from motorized use particularly near sensitive areas such as intermittent streams, wetlands, fens, seeps, springs, water bodies, and other ACEC's.

The draft RMP describes (in acres) the amount of area impacted by motorized use according to each alternative (Volume II, Tables 4-21, 4-22, 4-23). In all tables, the agency preferred alternative D opens more land to motorized use than any of the other alternatives, barring Alternative C. Table 4-22 shows the amount of lands closed to motorized use for slopes greater than 30%. The preferred alternative closes only 40 acres of this highly erodible topography (compared with the alternative B, 2,440acres). Alternative C, in this case, opens all lands over 30% slope for motorized use. The agency's preferred alternative D and alternative C are unacceptable options for sensitive areas and will lead to harmful ecological impacts for streams and waterbodies throughout the UFO.

**4. Drought Management**

Under severe drought conditions (D2), Appendix I (DEIS) of the draft RMP states that drought letters would be sent to grazing permittees and other land users. Please provide information in Appendix I on what these letters would say, and what follow up in management would occur with these letters, including actions by the land users, if required.

Similarly, Appendix I (DEIS) states that under severe drought conditions (D2), the BLM will "prepare local seasonal precipitation graphs." Please explain how "local" are these graphs, how many of these are prepared within the planning area, how the data are collected that are used in these graphs, and what is done with the graphs after they are prepared.

Also, Appendix I (DEIS) states that under extreme drought conditions (D3), OHV Open Areas and designated routes would be temporarily closed. Please explain what conditions would allow these areas to be re-opened, and what a reasonable timeline for that reopening would look like.

BLM_0148936

**C. Right Of Way (ROW) Concerns - The draft RMP does not adequately protect surface water quality from development impacts including increased sedimentation, pollutants, etc.**

The WSCC is concerned that the preferred alternative does not protect surface water quality from surface activities as determined by Right of Way. ROW buffers outlined under the agency's preferred alternative D fall far short of the protections needed to meet goals and objectives for surface water quality throughout the draft RMP. The WSCC recommends that the BLM adopt the guidelines expressed in alternative B and B1 for ROW buffers. The following actions are examples of inadequate protections as outlined in the agency preferred alternative D and recommendations for modification.

- (Table 2-2, Action 45) Alternative B designates a ROW avoidance area within 0.25 miles along major river corridors. However, the agency preferred alternative D is "no action". Though ROW exclusion of major river corridors is infeasible, it is recommended that the BLM adopt ROW avoidance areas outlined in Alternative B to meet the agency objectives.

- (Table 2-2, Action 46) The agency preferred alternative would manage a 325-foot buffer along perennial streams as ROW avoidance areas as the preferred alternative. Alternative B would manage a 325-foot buffer along perennial streams as ROW exclusion areas. The WSCC is concerned that perennial streams will be impacted by the construction and use of roads, pipelines, etc. While these areas would be operated with stipulation, by managing the areas as avoidance areas some perennial streams would ultimately be adversely impacted by the construction and development of roads, pipelines, and utility lines, etc. It is recommended that these impacts be avoided by managing the area according to Alternative B as an exclusion area. *(Vol. I, Table 2-2: Action 45, 46, 49, 493, 494); (Vol. II: 4-90, 4-93, 4-97, 4-99, 4-100)*

- (Table 2-2, Action 75-84) The ROW protections in the agency's preferred alternative D for Riparian and Wetland areas as described in Table 2-2, are not adequate to meet the corresponding Objective 74. For example: In addition to the action proposed in alternative D, there needs to be a ROW "exclusion" in the naturally occurring riparian and wetland areas, seeps, and springs instead of an ROW "avoidance" buffer.

- (Table 2-2, Action 49) Alternative D manages lands within 1,000 feet of a surface water supply-stream segment as ROW avoidance areas. Alternative B manages lands within 2,640 (.5 mile) of a supply stream segment as ROW exclusion areas. As listed above in section II.3, until clarification supported by the best available science is given for the otherwise arbitrary buffer distance of "1,000ft," the WSCC recommends that the BLM adopt the ROW buffers outlined in alternatives B and B.1 as they are specific to the needs of each particular use

- (Table 2-2, Action 26) The overall goal for land health as stated in Table 2-2 is to "Manage soils, riparian- wetland areas, native plant and animal communities, special status species, and water quality to meet land health standards". However, the corresponding actions do not support the objectives outlined to meet that goal. For example: It is stated in Action 26 "Limit, modify, or manage the cause..." It is suggested that the BLM should add "Close" to these management actions in Alternative D in order to fully meet the goal for land health as described in Table 2-2.

## D. Special Status Species, Wildlife & Vegetation (Aquatic and Riparian)

The draft RMP does not adequately protect fish from adverse surface activity. The WSCC is concerned the BLM has not taken sufficient measures within the draft RMP to protect and support and growth of fisheries within the UFO. Inadequate buffers zones described in the agency's preferred alternative D for

BLM_0148937

ROW, surface use, and travel management are pervasive throughout the draft RMP.  It is imperative that the BLM protect special status fish and aquatic wildlife by recognizing that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters as priority habitats (Action 133, Alt. B).

Furthermore, it is vitally important that the BLM protect federally listed fish species, maintain the integrity of habitat for federally listed species, and promote their recovery by prohibiting surface occupancy and restricting all ground disturbances within one mile of federally listed fish occupied habitat as described in Action 147, Alt. B; Appendix B, B-24.

The WSCC has found that throughout the draft RMP there are multiple areas where the agency preferred alternative leaves far too much uncertainty in its prescribed actions. For example, in Table 2-2, action 99, the preferred alternative dictates that the action "pursue opportunities to enhance, protect or restore native aquatic species habitat".  The word "Pursue" allows for incompletion of the presented objective of the action.  However, Alternative B dictates precise actions to enhance protect and restore native aquatic species habitat' The WSCC recommends the BLM adopt actions described in alternative B to protect habitat for fisheries and aquatic animals by enhancing, protecting, and restoring at least 5 miles of aquatic habitat by doing things like modifying or removing fish migration barriers and improving stream vegetation and structure to benefit non-game native species (Action 99, Alt. B) and thereby achieve the intended objective.

## E. Best Management Practices and Standard Operating Procedures not adequate for protecting Water Resources

In the draft RMP's discussion of Best Management Practices and Standard Operating Procedures, it does not provide adequate information regarding these practices and procedures in order to assess mitigation of impacts to water resources within the planning area.

### 1. Road construction and management

Please address the management of the construction of permanent and semi-permanent roads as related to Forestry and Woodland Products.  It is noted that in Table 2-2, Action 270, that there doesn't seem to be any action under Forestry and Woodland Products that addresses the construction of permanent or semi-permanent roads, and the corresponding impacts to surface water and stream bodies. (DEIS 2.4.91 and 2.4.97)

Also, the draft RMP does not sufficiently explain how the BLM will prevent "using roads during wet periods if use will damage the road drainage features?" (DEIS G-10). WSCC members have observed that historically the BLM continually fails to close roads during wet periods, and BLM roads are substantially damaged by heavy rutting caused by use during said wet periods.

### 2. Water – Oil and Gas

In Appendix G, the WSCC suggests that the word "should" be replaced by "is required to" or "will" to make it clear that the BMPs and SOPs listed in this section are required by BLM rather than suggested (DEIS G-10).

BLM_0148938

### 3. Vegetation – Riparian

Please describe the methods to be used by BLM or land users to minimize livestock grazing and trailing impacts in riparian areas (DEIS G-13).

### 4. Forestry – Best Management Practices

It is suggested that the bullet that states "perform construction, installation, and removal work during low-water flow if circumstances allow" be changed to state that all instream and near-stream work be performed during low water flows. (DEIS G-28)

### 5. Reducing Fluid Mineral Development Footprint

It is stated that drilling will be done with closed loop systems as much as possible within municipal watersheds, and that the operator will develop and implement a Watershed Protection Plan in municipal watersheds. Within the UFO area, there are numerous private water companies whose watersheds also need protection to ensure that their drinking water supplies are not impaired and human health is not adversely affected. It is suggested that the bullets on page G-34 that refer to municipal watersheds be changed to say "in watersheds used to supply water to public or private domestic water systems…" (DEIS G-34)

BLM_0148939

**III) Additional specific concerns regarding the Preferred Alternative and support for protective management prescriptions in the draft Resource Management Plan**

In addition to the concerns and recommendations already outlined in these comments regarding the North Fork Alternative, B1, and water resources in the planning area, the WSCC would like to address concerns related to other resources not otherwise mentioned, and provide support for corresponding prescription recommendations.

**A. Socio-economics**

We have clearly state in Part I of these comments why the North Fork Alternative, B1, is the only alternative in the draft RMP that would adequately protect against the negative socio-economic impacts of oil and gas activities within the North Fork planning area.

This support notwithstanding, we strongly urge the BLM to include in the final RMP more robust analysis on socio-economic impacts from oil and gas development within the full Uncompahgre planning area. The U.S. Bureau of Land Management should ensure that management of public lands do not harm, but rather enhance, the economic opportunities that exist within the Uncompahgre planning area by working to maintain the area's current character, visual and scenic resources, clean air and water, non-industrialized public lands and recreational trails and access.

**1. Economic sectors to be included in full socio-economic analysis.**

The final RMP should provide protections that enhance the following inputs into the economies of the Uncompahgre planning area:

**Trails-based and River Recreation**
Colorado is emerging as a leader in the recreation economy, and both nonmotorized (i.e. hiking, trail running, mountain biking, etc.) and motorized (snowmobiling, OHV, etc.) trail-based recreation on Colorado's public lands contribute millions of dollars into local economies. River recreation is a growing opportunity in the North Fork, one being increasingly prioritized by area communities and stakeholders. The North Fork Alternative provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area.[45]

**Hunting and Angling**
Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The North Fork Alternative would prohibit any surface occupancy in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.[46]

---

[45] "Colorado emerging as a national leader in developing a recreational-based economy," Denver Post June 5, 2016
"The Economic Value of Quiet Recreation on BLM Lands: Colorado," Pew Charitable Trust fact sheet, www.pewtrusts.org/~/media/assets/2016/03/wli_co_quietrec_final.pdf?la=en.
[46] "Big game hunting pours massive money into state, regional economy," Glenwood Springs Post Independent, October 25, 2015
www.postindependent.com/news/local/big-game-hunting-pours-massive-money-into-state-regional-economy/. "Colorado Parks & Wildlife 2016 Fact Sheet," at http://cpw.state.co.us/Documents/About/Reports/StatewideFactSheet.pdf

BLM_0148940

**North Fork Valley Festivals and Events**

Festivals and events, including agritourism-related activities like the *West Elk Wine Trail*, farm-to-field dining, car, bike and motorcycle rallies, races, and groups rides, community festivals (like Cherry Days, the Harvest Festival, Pioneer Days, Sheep Camp Stock Dog Trials in Hotchkiss) rely in part on the characteristics provided by the small town atmosphere and undeveloped public lands in and around our valley. The North Fork Alternative prohibits leasing and development on the edges of towns and away from farms and residences, schools, parks, and community facilities.[47]

**Windshield Tourism**

The North Fork Valley sits at the very heart of the West Elk Loop Scenic Byway, world renowned for its scenery and rural character, called "the closest you can come to a wilderness experience in a passenger car." Oil and gas development could jeopardize the scenic qualities of the area. The North Fork Alternative includes the strongest protections for the Valley's scenic features.[48]

**Agritourism**

Agritourism relies on a character inherent in the place, the North Fork Valley in this case, which is home to the West Elk Wine region and has been called America's Provenance, Colorado's Farm-to-Table Capital, and other laudatory titles. That character would be jeopardized by industrialization that accompanies oil and gas development. Alternative B1 requires development setbacks from agricultural lands, prevents damage to visual qualities, and best preserves the current rural character of the valley.[49]

**Farming, Ranching and Food-based Enterprise**

Agriculture remains the dominant force in the valley, known for its concentration of organic and sustainable farms, orchards, and ranches. The brand that food-based enterprise already in the North Fork Valley relies on is its reputation for high quality, organic or natural products. This North Fork brand has been acknowledged widely throughout the state and region, including in a recent federally funded economic study for Delta County completed by Better Cities.[50] Impacts to agriculture from the management of nearby and adjacent public lands, which include water conveyances for, lie upslope, and otherwise directly impact farms and private lands from oil and gas development poses a legitimate concern and potential, if uncertain, threat.

**Creative Industries**

The North Fork Valley is an emerging hotspot for the creative industries—from musicians and poets, founders, sculptures and glassblowers, to authors, playwrights, photographers and painters—and is Colorado's only rural state-designated Creative District. The agricultural roots and bucolic character of

---

[47] "Annual Festivals & Events," North Fork Visitors Guide, at www.northforkvisitorguide.com/annual-festivals--events.html. Behind the Vines: Stone Cottage Cellars, 5280 Magazine, June 30 2016 at www.5280.com/digital/2016/06/behind-vines-stone-cottage-cellars

[48] "Scenic Byways of Colorado: West Elk Scenic and Historic Byway," GrandCircle.org at http://www.grandcircle.org/scenic-byways/scenic-byways-of-colorado/324-west-elk-scenic-and-historic-byway

[49] "Agritourism in the North Fork Valley Is Blooming," Slow Food Western Slope, July 18 2014 at http://slowfoodwesternslope.org/agritourism-in-the-north-fork-valley-is-blooming/. "Agritourism," Delta County Tourism Cabinet, at http://www.deltacountycolorado.com/about/agritourism.aspx

[50] "Shale Development and Agriculture, Agricultural and Applied Economics Association," 2014 at http://www.choicesmagazine.org/choices-magazine/theme-articles/is-the-natural-gas-revolution-all-its-fracked-up-to-be-for-local-economics/shale-development-and-agriculture. "Economic opportunities lie in ag, tourism and manufacturing," Delta County Independent, August 25, 2015.

BLM_0148941