the valley are primary components of what makes the North Fork a uniquely inspirational base for a growing creative community.[51]

**Footloose Economy**
Economic activity that follows quality-of-life cannot not be understated in quantifying value of nearby public lands. This is especially true for the North Fork, due to the outstanding opportunities to access top quality public lands and the spectacular backdrop these lands provide our community, paired with the other initiatives happening in the valley. This includes current efforts to bring a food enterprise hub, new educational facilities, and gigabyte speed broadband. Combined these efforts at economic development can continue to attract consultants, start-up entrepreneurs, educators and students, creative industries such as photography, art, design, and music, tele-commuters, and many other of the self-employed—all drawn to the area's high quality of life, rural and healthy environment, and adjacent non-industrialized public lands. The North Fork Alternative goes furthest in protecting and maintaining these features.[52]

**Real Estate**
Real estate sales in the North Fork Valley continue to be driven be those seeking a rural, non-industrial, and agricultural lifestyle. "The argument repeated many times was that gas development on public lands this close to organic farms and wineries who are marketing the healthy setting and perceived purity of their production as well as the product itself, is incompatible and would result in the federal government willfully vandalizing a local economy. A group of area realtors filed a joint protest that echoed this thought."[53]

**2. The RMP does not adequately take into account economic trends such as the decline of local coal production**

The BLM has not completed the necessary research needed to develop an accurate economic impact study. It is recommended the BLM reconsider their assumption for mineral development with regards to coal extraction. Specifically, in the Somerset coal field in order to take into account market forces that have caused coal mines to close. This will change the results of the economic impact study in regards to anticipated economies and population growth in the next 20 years. (Vol II, paragraph 2, 4-458, Paragraph 2, 4-457)

**B. Air Quality**

**1. Cumulative Air Quality Impacts**
Impacts to air quality begin when the first exploratory well is drilled—according to some recent studies, including research by Paonia-based The Endocrine Disruptor Exchange, according to an article in the *Glenwood Springs Post-Independent* ("Study calls for scrutiny of air emissions at gas well sites" November 20, 2012).

---

[51]"Supporting the Creative Industries of Colorado's North Fork Valley," North Fork Valley Creative Coalition at http://northforkcreative.org/
[52] "Understanding the Recreation Economy on Nearby Public Lands," Headwaters Economic white paper, November 2014 at http://headwaterseconomics.org/public-lands/insights-understanding-the-recreation-economy/. "Colorado: Assessing the Economic Value of Public Lands," OurPubliclnds.org at www.ourpubliclands.org/public-lands-report-co. "Western Public Lands," Wilburforce Foundation, September 2014 at www.wilburforce.org/files/western-lands-messaging-report/at_download/file
[53] "BLM Deadline Passes – The Valley Waits to See Results of Protests," Merchant Herald, December 2012 at www.merchantherald.com/blm-deadline-passes-the-valley-waits-to-see-results-of-protests/

These effects continue and build cumulatively in regards to other oil and gas activity in the region. Communities in the West that are near BLM lands subject to oil and gas development are seeing significant problems with winter smog, believed to be—in large part—caused by federal leasing of these lands for oil and gas.  But the draft RMP does incorporate adequate data collected from relevant state and federal agencies, including the Colorado Oil and Gas Conservation Commission (COGCC) before determining final management actions.

The lack of cumulative air analysis was at the heart of a recent decision by the BLM-Uncompahgre Office to complete an EIS for the Bull Mountain Master Development Plan,[54] located within the upper North Fork Watershed. The air quality analysis in the Bull Mountain MDP FEIS has not yet been incorporated into the draft RMP's discussion of environmental consequences of the alternatives nor the cumulative impacts of regional oil and gas activity on air quality.

BLM has lost in court on several notable occasions of late on very similar issues: its failure to consider the impacts on air quality of leasing lands for oil and gas development given the other activity it is permitting in the region. Notably, a federal judge sent the Roan Plateau RMP amendment back to the BLM due to these concerns (and due to the failure of the agency to adequately consider an alternative management plan put forward by local stakeholders).

The clean and usually clear air of the North Fork Valley is a high quality community and shared resource. The BLM in Colorado has already been brought to task on its failure to properly consider the cumulative impacts of its own actions on the region's air quality, particularly in regards to oil and gas leasing.  This has happened elsewhere as well, like at Otero Mesa in New Mexico.  The final RMP revision that properly considers this activity in relation to the area's air quality.

The draft RMP states explicitly that oil and gas development are a major contributor to total pollutant emissions:

> Emissions from oil and gas (fluid minerals) development are a major contributor to total estimated emissions under all alternatives. For the Uncompahgre planning area, this category includes conventional oil and gas and coalbed natural gas development. Activities quantified in this category include well drilling and completion, road and well pad construction, flaring and venting, compressor operations, dehydrator and separator operations, tank venting and load out, wellhead fugitives, pneumatic device operations, and vehicle traffic. The quantities of emissions estimated from these activities are based on reasonably foreseeable estimates of development rates, well counts, production rates, and existing technologies. (DEIS 4-25)

It also states that Alternative B1 would produce the lowest level of emissions, followed by Alternative B. The draft RMP simultaneously states plainly that emissions from all four alternatives included in the draft RMP could produce a number of negative impacts to local air quality and corresponding public health:

> estimated emissions from oil and gas development would increase for all pollutants over the base year due to increased development. The emissions of carbon monoxide, nitrogen oxide, sulfur dioxide, volatile organic compounds, and particulate matter could impact air quality and air quality-related values. Nitrogen oxide and volatile organic compound emissions could contribute to regional ozone formation. The CARMMS analysis presented below estimates these emissions

---

[54] BLM Bull Mountain MDP FEIS 2016. 4.2.1
http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html

BLM_0148943

sources' impacts on air quality (including potential ozone formation) and air quality-related values (visibility and atmospheric deposition) in planning Year 10.

Hazardous air pollutants emissions could increase the risk of localized human health impacts. (DEIS 4-37)

The unknown risks to local human health impacts of air pollutant emissions is unacceptable, and the BLM must include in the final plan adequate management of oil and gas leasing, including significant no leasing and no surface occupancy stipulations to safeguard the health of community members and residents who live within the Uncompahgre planning area.

**2. Methane Capture in the North Fork Valley**
The Western Slope Conservation Center believes the final RMP must take into account possible changes related to the Coal Leasing PEIS that the Department of the Interior is currently undertaking. The DOI will be mitigating the challenges our communities face in weathering the boom-bust cycles of mining which will require the highest degree of reclamation standards, full bonding (not self-bonding) for future reclamation activities, thorough analysis of all impacts to air, water and wildlife prior to issuing new leases, and assurance of a fair return from coal leasing.

One additional step that the BLM and DOI can take over the coming years is to incentivize and expedite the capture of coal mine methane, which the North Fork produces in excess. The OxBow mine coal methane recapture demonstration project is the ideal example.[55] It repurposes coal mine methane (CMM) gas, an unseen, toxic greenhouse gas, between 20-25 times more potent than carbon dioxide, into 3-megawatts of electricity for Aspen Ski Corporation. The project is at the now-closed OxBow Elk Creek mine in Somerset. It was collaboration between the Western Slope Conservation Center, a 501c3 non-profit organization headquartered in Paonia, Colorado, OxBow Delta Montrose Electric (DMEA), Holy Cross Electric, Aspen Ski Company, and mine that purchases the electricity, the BLM and others. It is expected to eliminate approximately 96,000 tons of $CO_2$ a year, with a projected life of at least 15 years.[56]

On June 18, 2016, the Federal Energy Regulatory Commission ruled in favor of DMEA, the local rural electric COOP. It struck down a "lost revenue recovery fee" imposed by Tri-State Generation & Transmission Association (Tri-State) reaffirming that DMEA couldn't be financially disadvantaged for following the law and purchasing local, renewable power.[57] This opens the door for DMEA to purchase locally recaptured CMM. This would meet member demands for clean energy, hedge against fossil-fuel price increases, promote economic development, and save money.

In many ways, the North Fork is a best-case scenario for coal mining communities. North Fork mines produce some of the cleanest burning coal in the country. Our communities have benefited from this wealth over many decades without sacrificing the other riches that our local land, water, and air provide. That, coupled with the methane recapture project and the methane off-gassing from our closed and operational mines, puts us in an excellent position for the federal government to leverage us as a methane recapture research and training site. It could create training and jobs for some displaced miners while diversifying our local economy and energy generation.

---

[55] Aspen Times. "Coal Mine Is Key to Utility's 'Green' Goals." April 5, 2012. Retrieved June 25, 2016.
[56] Ray, Kecia. The Invisible Plume/ Why coal mine methane is worth looking at. Colorado Independent. May 2, 2016. Retrieved Jul 10, 2016.
[57] Federal Energy Regulatory Commission Summary, June 16, 2016 Meeting

The North Fork also possesses a wealth of other renewable energy sources like micro-hydro, solar and biomass. Public lands that once extracted coal could become solar farms, as the infrastructure to transport this source of energy already exists at those sites. We would welcome an opportunity to pilot some innovative ways to leverage those sources of energy for our homes, farms, businesses, government and community centers. This could similarly diversify our economy, create new jobs and realize the mass potential for renewable energies.

The final RMP must include adequate analysis of the air quality, climate change, and social costs of coal mine methane venting. These impacts are local, regional, and national. As our above comments attest, the North Fork Valley is primed to benefit massively from improved methane capture administrative policy.

The final RMP should also include stipulations that allow for coal mine methane drilling while excluding other forms of fluid mineral leasing and withdrawal associated with oil and gas development. However, the Western Slope Conservation Center believes coal *bed* methane leasing and extraction, which would occur above coal seams that have not yet been mined, should be subject to all the same standards and stipulations of other fluid mineral leasing and development.

## C. Wildlife

### 1. Imperiled Species

Oil and gas exploration and development authorized through the Preferred Alternative in the draft RMP is likely to have negative impacts on several special status species. Federally listed threatened, endangered or candidate species that could occur or have potential habitat in the vicinity of lands open to leasing include Canada lynx, Gunnison Sage-grouse, greenback cutthroat trout and Colorado hookless cactus. Other special status species that could be impacted by the lease sale include white-tailed prairie dogs, clay-loving wild buckwheat, roundtail chub and Debeque milkvetch. BLM has not taken the requisite hard look at the impacts of unconventional oil and gas development on wildlife, including threatened and endangered species, and other sensitive species. BLM's existing analysis in the draft RMP does not fulfill the requirements of NEPA to assess the impacts of oil and gas leasing on these species. Nor do the CSU's as included in the Preferred Alternative adequately protect the following species from adverse impacts from surface activities, and primarily those surface activities related to leasing of oil and gas.

1. Canada Lynx

The Canada lynx *(Lynx canadensis)* is a Federally Listed Threatened species and Colorado Parks and Wildlife (CPW) Endangered Species. The BLM has previously identified Lynx potential habitat, which also contains lynx winter habitat. Lynx Analysis Units (LAUs) have also been identified. In spite of the potential for negative impacts on lynx that could result from leasing within the planning area, BLM failed to prepare sufficient NEPA analysis of the impacts on lynx from leasing, failed to include No Surface Occupancy or No Leasing stipulations to protect lynx habitat.

During scoping for recent lease sales located within the North Fork Valley, comments were submitted by the U.S. Fish and Wildlife Service (FWS) expressing concern with the lease sale's potential impacts to lynx. The FWS determined that several lease parcels abutted primary and secondary suitable habitat for lynx. The Service stated that "[t]o date, *BLM has not updated their mapping or assessment of habitat suitability for Canada lynx. Therefore, these parcels, and others, should be evaluated for suitability for Canada lynx prior to leasing*." BLM has not undertaken the requisite evaluation of the lands included for leasing in the Preferred Alternative, and must provide No Surface Occupancy and No Leasing stipulations until it can determine that leasing and development will not jeopardize the species.

BLM_0148945

In 2000, when FWS concluded that listing the lynx as a threatened species under the ESA was warranted, it identified inadequate regulatory mechanisms in existing RMPs as a primary factor contributing to the lynx's decline. *Recognizing this, the UFO's draft Preferred Alternative of the RMP revision proposes new stipulations for Canada lynx habitat that are not included in the 1989 RMP*. Alternative B, however, provides the most protective stipulations, and should be included in the final RMP.

In this case, leasing without non-waivable NSO stipulations could result in jeopardy to lynx. Thus any future proposed leasing would require consultation with the FWS. Leasing any parcels in lynx habitat would violate the ESA, and these lands should be protected with No Surface Occupancy or No Leasing for the BLM to meet its obligations under the ESA.

2. Gunnison Sage-grouse
We support protective non-waivable NSO and No Leasing stipulations for all seasonal Gunnison sage-grouse habitat, as included in Alternative B.

Recent research indicates that all Gunnison Sage-grouse populations must be increased in size in order to avoid inbreeding depression and/or maintain adaptive potential and avoid increased extinction risk. It is now widely agreed that it will be necessary to maintain large expanses of suitable sagebrush habitat across the landscape to conserve populations. As such, BLM must consider what impacts leasing and development on suitable, former Gunnison Sage-grouse habitat would have on ongoing efforts to save this species from the brink of extinction. The Gunnison Sage-grouse Rangewide Conservation Plan states that "the issues of primary focus for [the Crawford] population are habitat enhancement and restoration, expansion of occupied habitat, and protection of habitat from permanent loss, especially in potential areas of expansion," and that "*expansion of the area occupied by sage-grouse is necessary in this population in order to meet population goals.*"

All parcels with Historic or Potential Gunnison Sage-grouse habitat should be protected with non-waivable NSO or No Leasing stipulations in the final RMP.

4. Colorado Hookless Cactus
The draft RMP includes extensive description of documented existence of Colorado hookless cactus, a federally-listed threatened species, within the planning area, including in areas that would remain open to oil and gas leasing under the draft Preferred Alternative. The draft RMP also indicates that some individuals are being impacted by OHC use in the North Delta area (DEIS 3-115). For this reason, the BLM must include the Adobe Badlands LWC, Adobe Ecological Emphasis Area, and the Salt Desert Shrub Ecosystem ACEC in the final RMP.

5. White-tailed Prairie Dog
Active White-tailed Prairie Dog colonies occur within lands open to oil and gas leasing in the Preferred Alternative. The White-tailed Prairie Dog is a USFS Sensitive Species and Colorado BLM Sensitive Species. We support non-waivable stipulations, including NSO-41,
 that includes No Surface Occupancy and No Leasing within close proximity to active prairie dog colonies.

6. Clay-loving Wild Buckwheat
The draft RMP states that clay-loving wild buckwheat is found within the planning area, and we support the proposed Action 20. in Alternative B:
> Seven ACECs (92,900 acres) would be designated to protect special status and rare plants
> (Colorado hookless cactus, clay-loving wild buckwheat, Adobe Hills beardtongue, Colorado

desert parsley, good-neighbor bladderpod, kachina daisy, Naturita milkvetch, Paradox Valley lupine, Paradox breadroot, and Grand Junction milkvetch), the most of any alternative. OHVs would be limited to designated trails on portions of the Kinikin Hills SRMA, where there are clay-loving wild buckwheat populations.

Any lesser protection would be inadequate to protect clay-loving wild buckwheat and other special status species within the planning area.

8. Debeque Milkvetch
The UFO planning area contains populations of Debeque Milkvetch, a Colorado BLM Sensitive plant. In spite of this recognition, the draft RMP does not analyze or recommend any substantive protections for the species. BLM should survey the planning area for Debeque milkvetch to determine whether the species is present, with corresponding stipulations added for protections.

**B. Areas of High Conservation Value**
Oil and gas exploration and development related to oil and gas leasing allowed in the Preferred Alternative is likely to have significant negative impacts on numerous areas of high conservation value, including elk winter range, mule deer winter range, and the Roeber and McCluskey State Wildlife Areas.

1. Big Game Winter Range
The final RMP must take into account significant new research demonstrating the effects of natural gas development on wildlife. See comments on Ecological Emphasis Areas. We commend the BLM for designating Ecological Emphasis Areas and encourage their inclusion in the final plan.

Critical big game winter range is dispersed across much of the land open to oil and gas leasing in the North Fork in the Preferred Alternative. The North Fork's deer and elk populations are vital for the local economy, and a key component of the landscape's ecosystem health.

We ask that the final RMP include additional analysis regarding the impacts on terrestrial wildlife habitat from oil and gas development specifically. Development across BLM lands in the North Fork particularly would result in additional roads, pipelines, habitat loss, fences and increased human disturbance on winter ranges used by thousands of elk and mule deer. BLM must determine how, when and to what degree elk and mule deer populations would be impacted. Reduction in effective winter range size caused by extensive oil and gas development in the North Fork cold increase deer density on remaining winter ranges, reducing forage quality, fawn survival and overwinter carrying capacity. Given the quality of big game habitat within the proposed lease parcels and the social and economic importance of hunting to the North Fork communities, it would be a travesty to rely on inadequate analysis.

3. Roeber and McCluskey State Wildlife Area
The leasing of lands adjacent to McCluskey and Roeber State Wildlife Areas is inappropriate. McCluskey SWA is popular for hunting deer, elk, dusky grouse and rabbit. Roeber SWA is a popular location for hunting deer, elk and rabbit, and for fishing in the cold water lake. State wildlife areas are paid for by revenue from sportsmen and under state law, Colorado Parks and Wildlife (CPW) is required to manage the areas for the benefit of wildlife. However, activities that conflict with the primary mission of providing wildlife recreation on State Wildlife Areas are discouraged. Oil and gas development adjacent to these protected areas could have negative impacts on the wildlife and recreational opportunities for which the lands have been set aside.

**D. Lands with Wilderness Characteristics**

We appreciate that BLM has inventoried lands with wilderness characteristics in the planning area and that the Draft RMP considers multiple alternatives to protectively manage those lands. Specifically, we are particularly concerned with the Adobe Badlands WSA Adjacent and Camel Backs WSA Adjacent units, both of which have been partially included within Alternative B to be Lands Managed to Protect Wilderness Characteristics (LWCs). We strongly support all acres of these units to be included as LWCs within the final plan.

We recognize that the Uncompahgre Field Office has been a leader in Colorado in regards to complying with the updated inventory requirements, as the field office publicly posted inventory information in a timely fashion when the new policy was released and refined that information in 2015 to better align with BLM Manual 6310. We value the UFO's commitment to addressing this resource through the RMP revision. However, BLM should make some adjustments in the draft RMP to better comply with agency policy, and the agency's obligations under FLPMA and NEPA, to achieve a more balanced land use plan that embodies multiple use and sustained yield.

FLPMA requires BLM to inventory and consider lands with wilderness characteristics during the land use planning process. 43 U.S.C. § 1711(a); *see also Ore. Natural Desert Ass'n v. BLM,* 625 F.3d 1092, 1122 (9th Cir. 2008) (holding that "wilderness characteristics are among the values the FLPMA specifically assigns to the BLM to manage in land use plans).[58] IM 2011-154 and Manuals 6310 and 6320 contain mandatory guidance on implementing that requirement. The IM directs BLM to "conduct and maintain inventories regarding the presence or absence of wilderness characteristics, and to consider identified lands with wilderness characteristics in land use plans and when analyzing projects under [NEPA]." This includes the "necessary forms for each area" including photo logs, route analysis forms and inventory area evaluations (Manual 6310, Appendices A-D). Manual 6310 reiterates that, "[r]egardless of past inventory, the BLM must maintain and update as necessary, its inventory of wilderness resources on public lands." Manual 6320 requires BLM to consider lands with wilderness characteristics in land use planning, both in evaluating the impacts of management alternatives on lands with wilderness characteristics and in evaluating alternatives that would protect those values. Wilderness inventories are to be done on a *continuing* basis and relevant citizen-submitted data is to be evaluated. BLM Manual 6310 at .04(C)(1).

**1. Inventory**

There are a few specific instances in which BLM's LWC inventory is inconsistent with current agency policy. Below are comments addressing where and how BLM's inventory fails to follow the guidance for conducting lands with wilderness characteristics inventories detailed in BLM Manual 6310.

Adobe Badlands WSA Adjacent

---

[58] In an April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and the State of Utah, the BLM abdicated its authority to designate any additional WSAs, and we maintain that this agreement is invalid and will ultimately be overturned. In addition, the Utah Settlement is based on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with BLM Manual 6330. This administration has the authority to create new WSAs under § 202 and BLM should be considering this within its range of reasonable alternatives that are deserving of consideration in this NEPA process.

BLM's inventory for the Adobe Badlands LWC unit is 6,200 acres, while partner assessments, submitted in their comments on this draft RMP show the unit to be about 8,200 acres. The major difference is in the far southwest portion of the unit, where BLM drew boundary lines to cut out two portions of the unit (downslope towards the power lines) based on the argument those areas do not have either outstanding opportunities for solitude or primitive recreation. However, these areas are contiguous with the Adobe Badlands WSA, and therefore inherit the outstanding opportunities already identified in the WSA. BLM Manual 6310 provides that if a polygon of land is contiguous with lands currently managed to protect their wilderness character (e.g. WSA) and that contiguous land meets the naturalness criterion, then that naturally appearing contiguous land meets the criteria for LWC because it inherits the outstanding opportunities already identified in the adjacent WSA. BLM Manual 6310 is clear that not every acre needs to have outstanding opportunities, including when the area is contiguous with a WSA: "The area does not have to possess outstanding opportunities for both elements, nor does it need to have outstanding opportunities on every acre, even when an area is contiguous to lands with identified wilderness characteristics." BLM Manual 6310 at .06(C)(2)(c). BLM finds in its inventory report for the Adobe Badlands LWC unit that the eliminated areas are both contiguous with the WSA and natural; therefore, they should qualify as LWC. Furthermore, BLM should not cut out areas that don't have outstanding opportunities; cut outs should be for impacts related to naturalness only according to BLM Manual 6310.

Camel Back WSA Adjacent
BLM's Camel Back LWC unit only includes lands from the canyon rims down, eliminating obviously qualifying lands on the mesa tops, which may total 1,000-2,000 additional acres. BLM's report for this unit states that BLM removed 1,750 acres on Monitor Mesa for further consideration as lands with wilderness characteristics because of "substantial evidence of human modification" on "most" of Monitor Mesa, including "constructed and maintained routes that run the length of the mesa top" and mechanical vegetative treatments…that are obvious to the casual observer.

However, while two constructed and maintained routes do traverse the length of the mesa top, these routes are easily cherry-stemmed from the larger unit; stating that these routes contribute to "substantial evidence of human modification" across "most of Monitor Mesa" is entirely misleading. These two routes only make up a small portion of the mesa top, and because of significant vegetative screening along there length, they have little impact on the naturalness of the area as a whole.

Further, BLM's claims that "most of" Monitor Mesa "shows substantial evidence of human modification" and that old vegetative treatment areas are "obvious to a casual observer" is factually incorrect. Such statements are an indication that BLM inventoried this area using aerial imagery, rather than on-the-ground investigation.

**Summary of Comments**: BLM should refine the LWC inventory to address the inconsistencies with BLM Manual 6310 identified above, and should include LWC management status for all acreage of Adobe Badlands WSA Adjacent and Camel Back WSA Adjacent units


**2. Environmental Consequences Analysis**


Manual 6320 provides that BLM must "consider the benefits that may accrue to other resource values and uses as a result of protecting wilderness characteristics." BLM Manual 6320.06(A)(1)(b). Those benefits should be analyzed in the RMP, particularly in the environmental effects analysis. They include the following:

(a) Scenic values – FLPMA specifically identifies "scenic values" as a resource of BLM lands for purposes of inventory and management (43 U.S.C. § 1711(a)), and the unspoiled landscapes of lands with wilderness characteristics generally provide spectacular viewing experiences. The scenic values of these lands will be severely compromised if destructive activities or other visual impairments are permitted.

(b) Recreation – FLPMA also identifies "outdoor recreation" as a valuable resource to be inventoried and managed by BLM. 43 U.S.C. § 1711(a). Lands with wilderness characteristics provide opportunities for primitive recreation, such as hiking, camping, hunting and wildlife viewing. Most, if not all, primitive recreation experiences will be foreclosed or severely impacted if the naturalness and quiet of these lands are not preserved.

(c) Wildlife habitat, connectivity and riparian areas – FLPMA acknowledges the value of wildlife habitat found in public lands and recognizes habitat as an important use. 43 U.S.C. § 1702(c). Due to their unspoiled state, lands with wilderness characteristics provide valuable habitat for wildlife, thereby supporting additional resources and uses of the public lands. As part of their habitat, many species are also dependent on riparian and other wetland habitats, especially during either seasonal migrations or seasons and years when surrounding habitats are dry and unproductive. Wilderness-quality lands support biodiversity, watershed protection and overall healthy ecosystems. In addition, they provide connectivity that facilitates wildlife migration, seasonal movements and dispersal of young. The low route density, absence of development activities and corresponding absence of motorized vehicles, which are integral to wilderness character, also ensure the clean air, clean water and lack of disturbance necessary for productive wildlife habitat, large scale connectivity and riparian areas (which support both wildlife habitat and human uses of water).

(d) Cultural resources – FLPMA also recognizes the importance of "historical values" as part of the resources of the public lands to be protected. 43 U.S.C. § 1702(c). The lack of intensive human access and activity on lands with wilderness characteristics helps to protect these resources. Managing lands to protect wilderness qualities will also help protect cultural and archaeological sites.

(e) Quality of life – The wildlands located within the planning area help to define the character of this area and are an important component of the quality of life for local residents and future generations, providing wilderness values in proximity to the population centers spread across the planning area. Their protection enables the customs and culture of this community to continue.

(f) Balanced use – The vast majority of BLM lands are open to motorized use and development. FLPMA recognizes that "multiple use" of the public lands requires "a combination of balanced and diverse resource uses" that includes recreation, watershed, wildlife, fish, and natural scenic and historical values. 43 U.S.C. § 1702(c). FLPMA also requires BLM to prepare land use plans that may limit certain uses in some areas. 43 U.S.C. § 1712. Many other multiple uses of public lands are compatible with protection of wilderness characteristics – in fact, many are enhanced if not dependent on protection of wilderness qualities (such as primitive recreation and wildlife habitat). Protection of wilderness characteristics will benefit many of the other multiple uses and values of BLM lands such as air and water quality, night skies, soundscapes, and viewsheds, while other more exclusionary uses (such as off-road vehicle use and timber harvesting) will still have adequate opportunities on other BLM lands.

(g) Economic benefits – The recreation opportunities provided by wilderness quality lands also yield direct economic benefits to local communities. According to the U.S. Fish & Wildlife Service, in 2011

BLM_0148950

state residents and non-residents spent $3 billion on wildlife recreation in Colorado.[59] In addition, local communities that protect wildlands reap measurable benefits in terms of employment and personal income. Sonoran Institute 2004. Other "non-market" economic values arise from the ability of wildlands to contribute to recreation and recreation-related jobs, scientific research, scenic viewsheds, biodiversity conservation, and watershed protection. Morton 1999; Loomis 2000. All of these economic benefits are dependent upon adequate protection of the wilderness characteristics of the lands.

We appreciate that the Draft RMP acknowledges in many instances that protecting lands with wilderness characteristics will also protect other resources such as soil, water, vegetation, fish and wildlife, and wild and scenic river ORVs. *See, e.g.,* Uncompahgre Draft RMP at 4-68, 4-91, 4-115, 4-151, 4-414. However, those analyses do not appear to inform the decisions made in the Draft RMP, particularly the preferred alternative, because BLM would only manage 18,320 acres of lands with wilderness characteristics in the preferred alternative – less than 3% of the public land in the planning area. This preferred plan does not reflect BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics.

Additionally, the Draft RMP does not adequately analyze or acknowledge the economic benefits of protecting lands with wilderness characteristics. We appreciate that BLM discusses nonmarket values, including the fact that setting land aside for protection can maintain and enhance nonmarket values associated with natural amenities. Uncompahgre Draft RMP at 4-460. However, the Draft RMP fails to meaningfully analyze nonmarket values, stating: "Nonmarket values are difficult to quantify, and insufficient data exists in order to assess the impacts of management actions." *Ibid.* The brief and qualitative treatment of nonmarket values in the Draft RMP is not adequate to inform management decisions in the RMP, and does not conform to agency guidance. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics.

BLM has current guidance on estimating nonmarket environmental values and analyzing those values in land use planning.[60] IM 2013-131 directs BLM to "utilize estimates of nonmarket environmental values in NEPA analysis supporting planning and other decision-making." Nonmarket values are described as values that "reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions and therefore lack prices," such as "the perceived benefit of hiking in wilderness."

BLM's guidance directs the agency to analyze nonmarket values for each alternative and adopt management decisions that are informed by that analysis:

> In framing information for management decisions, focus on the *difference in changes to nonmarket values* between action alternatives. Such information can highlight tradeoffs. For example, an alternative designating an additional thirty miles of trails for off-highway vehicles may *increase* the visitor days of use – therefore the total nonmarket benefits – from motorized recreation, but may *decrease* the benefits of subsistence hunting and watershed protection in this area. The *difference* between the changes to nonmarket values between this alternative and an alternative that, for example, only designates an additional ten miles of trails, can inform the choice among action alternatives. IM 2013-131, Attachment 1-5.

---

[59] USFWS 2011, National Survey of Hunting, Fishing and Wildlife-associated Recreation, available at http://www.census.gov/prod/2013pubs/fhw11-co.pdf
[60] IM 2013-131, available at: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-131__Ch1.print.html.

BLM_0148951

The guidance also directs that <u>quantitative</u> analysis of nonmarket values is strongly encouraged when "the alternatives to be considered present a strong contrast between extractive and non-extractive uses of land and resources. For example, an RMP may include alternative resource allocations that vary between managing land primarily for oil and gas development or managing it for habitat conservation and recreation." IM 2013-131, Attachment 1-7. Because the Uncompahgre RMP is evaluating a range of alternatives that has a development-focused alternative at one end of the spectrum and a conservation-focused alternative at the other, this criterion applies to the RMP and BLM should conduct quantitative analysis of nonmarket values.

**<u>Summary of Comments:</u>** BLM should adopt a final plan that actually reflects BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics. BLM should analyze the economic benefits of protecting lands with wilderness characteristics for each alternative and utilize that analysis to inform the management decisions ultimately adopted in the RMP.

### 3. Management

       i. <u>An accurate and comprehensive inventory of lands with wilderness characteristics is necessary to inform management alternatives, impact analysis and decision-making.</u>

Evaluating management alternatives for lands with wilderness characteristics requires an accurate inventory to serve as baseline information. FLPMA requires BLM to inventory the resources of the public lands in order to development management plans. 43 U.S.C. § 1711(a). The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." *See* 40 C.F.R. § 1502.15. Establishment of baseline conditions is a requirement of NEPA. In *Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

The U.S. Court of Appeals for the Ninth Circuit has held: "wilderness characteristics are among the 'resource and other values' of the public lands to be inventoried under § 1711.  BLM's land use plans, which provide for the management of these resources and values, are to 'rely, to the extent it is available, on the inventory of the public lands, their resources, and other values.' 43 U.S.C. § 1712(c)(4)." *Ore. Natural Desert Ass'n v. Bureau of Land Management*, 531 F.3d at 1119.  Therefore, BLM is required to consider "whether, and to what extent, wilderness values are now present in the planning area outside of existing WSAs and, if so, how the Plan should treat land with such values." *Id.* at 1143.

Conducting an accurate and comprehensive inventory as directed by Manual 6310 is BLM's current policy for establishing the baseline conditions required by NEPA. While we appreciate that the Uncompahgre Field Office has completed lands with wilderness characteristics inventory under BLM Manual 6310, BLM must correct the remaining inconsistencies with the Manual in order to have an inventory that is sufficient to inform land use planning.

**Summary of Comments:** In order to establish a true set of baseline conditions as required under NEPA, BLM must refine its lands with wilderness characteristics to fully comply with BLM Manual 6310 in order to adequately evaluate management alternatives and environmental consequences in the Uncompahgre RMP.

### ii. BLM should manage additional lands to protect their wilderness characteristics in the final RMP in order to meet its statutory and regulatory obligations.

Although the BLM identified 42,150 acres of lands with wilderness characteristics, the preferred alternative would only manage 18,320 acres to protect those values. This is less than half of the inventoried wilderness resource and less than 3% of the public land in the planning area. This approach does not evidence a meaningful consideration of the value of this important resource in the planning area or balanced land management.

FLPMA directs BLM to inventory for the many values of the public lands and consider ways to protect them in the RMP (i.e., not all uses are appropriate in all places). 43 U.S.C. §§ 1711, 1712. FLPMA further requires that: "In managing the public lands the [Secretary of Interior] shall, by regulation or otherwise, **take any action necessary to prevent unnecessary or undue degradation** of the lands." 43 U.S.C. §1732(b) (emphasis added). BLM's duty to prevent unnecessary or undue degradation under FLPMA is mandatory, and BLM must, at a minimum, demonstrate compliance with this standard. *See, Sierra Club v. Hodel,* 848 F.2d 1068, 1075 (10th Cir. 1988). As the court found in *Mineral Policy Center v. Norton,* "in enacting FLPMA, Congress's intent was clear: **Interior is to prevent, not only unnecessary degradation, but also degradation that, while necessary to mining, is undue or excessive**." 292 F.Supp.2d 30 (D.D.C. 2003) (emphasis added). Further: "FLPMA, by its plain terms, vests the Secretary of the Interior with the authority—and indeed the obligation—to disapprove of an otherwise permissible mining operation because the operation though necessary for mining, would unduly harm or degrade the public land." *Id.* at 20.

Protecting all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office is arguably appropriate to prevent unnecessary and/or undue degradation to wilderness resources on the public lands. BLM has not shown that such a decision is infeasible. Accordingly, BLM is under a statutory obligation to demonstrate compliance with FLPMA's requirement to not cause undue or unnecessary degradation to important resources. *See e.g., Kendall's Concerned Area Residents,* 129 IBLA 130, 138 (1994). In fact, declining to manage the reasonable amount of land BLM has found to possess wilderness characteristics could be a choice **not** to avoid unnecessary or undue degradation. BLM should discuss a variety of options to protect this important resource, including through explicitly managing to protect wilderness characteristics.

BLM also is not in compliance with its regulations regarding off-road vehicles in the management alternatives under consideration in the Draft RMP. While Alternative B would close lands managed to protect wilderness characteristics to off-road vehicle use, the preferred alternative would limit motorized travel to designated routes. Uncompahgre Draft RMP at 2-149. In allowing ORV use to be designated as limited in lands with wilderness characteristics, the Draft RMP is in direct violation of Executive Orders and agency regulations implementing these Orders. Executive Orders (EO No. 11644 (1972)) as amended by Executive Order No. 11989 (1977)) and the BLM's regulations (43 C.F.R. § 8342.1) require BLM to ensure that areas and trails for off-road vehicle use are located:

- to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability; to minimize harassment of wildlife or significant

disruption of wildlife habitats, and especially for protection of endangered or threatened species and their habitats;

- to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands; and
- outside officially designated wilderness areas or primitive areas and in natural areas only if the agency determines that off-road vehicle use will not adversely affect their natural, aesthetic, scenic, or other values for which such areas are established.

These Executive Orders put the burden of proof on the BLM to make sure that sensitive and protected conservation lands are not harmed by ORV use. Given the small amount of public land managed to protect wilderness characteristics, and the high likelihood of off-road vehicle use causing conflict with quiet recreation experiences and other public lands resources that benefit from protected lands with wilderness characteristics, these areas should be closed to ORV use.

Furthermore, BLM should maximize protection of wilderness characteristics through layering management, as contemplated in several areas in the Draft RMP. Layering management that protects a variety of resources is an important tool that BLM consistently uses. Protection of wilderness characteristics can be effective as a standalone management approach but is also effective along with designation of ACECs and other conservation-oriented designations, as well as portions of special and extensive recreation management areas.

In the RMP for the Monticello Field Office, BLM responded to resistance to layering designations in the following appropriate way:

> "Layering" is planning. Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands. Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives. Under the multiple use concept, BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands. The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering". BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area. Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land use plan, and litigation. Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner. All uses and values cannot be provided for on every acre. That is why land use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan. Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.

Monticello Proposed RMP, Response to Comments, at 7-48. This rationale is equally applicable to the many opportunities to layer management of LWC with management of other values and uses in this plan.

**Summary of Comments:** BLM should better balance the multiple uses of public lands and prevent unnecessary or undue degradation by managing significantly more lands for protection of wilderness characteristics, including closing those areas to motorized use and layering them with other special management areas.

iii. <u>Management prescriptions must be robust to adequately protect wilderness resources identified for protection in the RMP and BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics.</u>

BLM must adopt meaningful protections for wilderness resources as part of its multiple use mission. Manual 6320 directs that "an alternative that protects lands with wilderness characteristics must contain management actions to achieve protection." Manual 6320 at .06(A)(2)(d). The manual provides examples of land use plan decisions that could protect wilderness characteristics, including: recommend withdrawal from mineral entry; close to leasing or NSO with no exceptions, waivers or modifications; right-of-way exclusion; close to construction of new roads; close or limit motorized and/or mechanized use; designate as VRM I or II; among others. We appreciate that the Uncompahgre Draft RMP evaluates management decisions for lands with wilderness characteristics consistent with BLM Manual 6320.

BLM also has wide discretion regarding how it manages lands with wilderness characteristics outside of lands prioritized for protection of wilderness characteristics over other multiple uses. While certain lands with wilderness characteristics units undoubtedly deserve the highest levels of protection to ensure that their outstanding wilderness, wildlife, cultural, scenic, and/or recreation values are protected, other lands with wilderness characteristics units may overlap with different types of multiple uses that suggest BLM should consider a wider range of uses for those lands. In this case the Draft RMP simply selects all identified lands with wilderness characteristics and gives them identical management prescriptions (Alternative B), or selects a sub-set of those units for protection and gives that smaller set an identical set of management prescriptions (Alternative D).

Analyzing alternatives that would "avoid or minimize" adverse environmental effects is a requirement of NEPA, and current guidance outlined in Manual 6320 states that land use planning efforts should consider several outcomes for lands with wilderness characteristics. BLM should not simply analyze alternatives that would protect or leave unprotected lands with wilderness characteristics, but can also consider additional management options for these lands, where other multiple uses are emphasized "while applying management restrictions (conditions of use, mitigation measures) to reduce impacts to wilderness characteristics." Manual 6320 at .06(A). In fact, even for areas where BLM specifically decides to not protection wilderness characteristics, BLM is still required to "consider measures to minimize impacts on those characteristics." Manual 6320 at .06(A)(2)(d).

The only goal for lands with wilderness characteristics in the Draft RMP is to: "Manage lands with wilderness characteristics that are identified for protection to maintain those characteristics." Uncompahgre Draft RMP at 2-148. Where lands with wilderness characteristics are not explicitly managed for protection in the draft alternatives, no description of management goals or objectives is provided that describes how impacts to any of the other identified lands with wilderness characteristics areas might be minimized "to reduce impacts to wilderness characteristics" as outlined in Manual 6320. For example, the Rio Puerco (NM) Draft RMP developed three approaches for managing lands with wilderness characteristics: Protect Wilderness Characteristics, Minimize Impacts to Wilderness Characteristics, and Not Managed to Protect Wilderness Characteristics (Rio Puerco Draft RMP, p. 2-38—40; excerpt included as Attachment 1). All three categories, **including lands not managed to protect wilderness characteristics**, have management prescriptions in place to minimize impacts to wilderness characteristics.

For the Uncompahgre RMP, we recommend BLM manage lands with wilderness characteristics in two categories: high quality LWC meriting the strongest levels of protection; and additional LWC managed to

BLM_0148955

protect wilderness characteristics while providing for other multiple uses. Because all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office comprise just 6% of the public land in the planning area, it is perfectly reasonable to manage all LWC to protect wilderness resources in some form. Both categories should include management direction to consider impacts to wilderness characteristics in implementation-level decisions and avoid, minimize or mitigate those impacts to the extent possible.

For example, the Rio Puerco (NM) Draft RMP developed three approaches for managing lands with wilderness characteristics: Protect Wilderness Characteristics, Minimize Impacts to Wilderness Characteristics, and Not Managed to Protect Wilderness Characteristics. Rio Puerco Draft RMP, p. 2-38—40; excerpt included as Attachment A.1. All three categories, **including lands not managed to protect wilderness characteristics**, have management prescriptions in place to minimize impacts to wilderness characteristics. Similarly, the White River (CO) Proposed RMPA grouped inventoried LWC into 3 management tiers ranging from most restrictive management to least. Even the least restrictive tier allows for applying management decisions to avoid and minimize impacts to wilderness characteristics. White River Proposed RMPA at Table 2-22; excerpt included as Attachment A.2.

## 4. High quality LWC meriting the strongest levels of protection

Management prescriptions for Camel Back WSA-adjacent should include:

- VRM I
- Closed to oil and gas leasing
- Closed to renewable energy development
- Closed to new rights-of-way (ROW exclusion)
- Closed to motorized and mechanized use
- Construction of new permanent and temporary roads is prohibited
- Close to mineral material disposal and non-energy solid leasable mineral exploration and development
- Recommend withdrawal from locatable mineral entry
- Closed to commercial timber harvest
- Vegetation treatments must utilize the minimum tool necessary
- Seek opportunities to acquire and incorporate non-federal inholdings
- Retain lands in federal ownership
- Close area to military training activities, including landings associated with High Altitude Mountain Environment Training.

This area is proposed for management to protect its wilderness characteristics in the Draft RMP preferred alternative.

      (1)  **Additional LWC managed to protect wilderness characteristics while providing for other multiple uses**

Management prescriptions for Adobe Badlands WSA Adjacent should include:

- VRM II

BLM_0148956

- NSO stipulation for fluid minerals without exception, modification, or waiver.[61]
- Closed to renewable energy development
- Closed to new rights-of-way (ROW exclusion) outside of designated utility corridors
- Motorized and mechanized use limited to designated routes
- Construction of new permanent and temporary roads is prohibited
- Close to mineral material disposal and non-energy solid leasable mineral exploration and development
- Recommend withdrawal from locatable mineral entry
- Closed to commercial timber harvest
- Vegetation treatments must not have long-term impacts on wilderness characteristics
- Seek opportunities to acquire and incorporate non-federal inholdings
- Retain lands in federal ownership

This area is evaluated for management to protect its wilderness characteristics in Alternative B of the Draft RMP preferred alternative. Our rationale for managing it in a second category of LWC management in the proposed plan is as follows:

**Adobes LWC**
The Adobe Badlands WSA-adjacent unit contains oil and gas leases that are part of the Whitewater Unit. However, the Master Development Plan for the Whitewater Unit that is currently under evaluation only proposes development in the northern portion of the unit and explicitly states that "development in the southern portion of the Whitewater Unit is not reasonably foreseeable." (Fram Whitewater Unit MDP EA at 1.1). Therefore, BLM should not preclude protection of highly valuable wilderness characteristics of the Adobe Badlands WSA-adjacent unit based on the existing Whitewater leases.

The Adobe Badlands WSA adjacent unit also provides a critical resource as a place for quiet and unconfined recreation close to the city of Delta. Although close to a population center, once one hikes into the unit away from the boundary roads and past the WSA, the area clearly still has wilderness characteristics in terms of solitude, naturalness and unconfined recreation.

*Solitude*: After hosting multiple hikes into the area over a three-year period, we only once saw other people in the area and they were on the boundaries of the WSA, not in the LWC unit boundaries. The further in you hike; the eroded hills and gullies of the Mancos shale hide the signs of human proximity and can give a person the feeling of hiking in a desert far from other people. Once you are in the higher topography with pinon and juniper, the vegetative screening provides additional privacy. This area provides the public a rare opportunity to find solitude without having to travel far distances from home.

*Unconfined recreation*: The unit also allows people a large area to explore through primitive and unconfined recreation. Again, if one stays close to the boundary roads, the character of the area is very different from when you hike further in. Apart from the boundary roads, there are not recreational developments or established/maintained trails. One can find opportunities for both easy and challenging hiking. People are able to explore freely through the gullies and climb the mesas of their own accord.

*Naturalness:* Again, on the boundaries of the greater Adobes area and in proximity to the private inholdings, there are obvious signs of human disturbance and encroachment of motorized recreation. However, the further one explores the area and heads north, the more natural it becomes as you travel

---

[61] By way of example, the White River RMPA would apply an NSO stipulation without exception, modification or waiver for Tier 1 LWC in the proposed plan. White River Proposed RMPA at A-42.

towards the Grand Mesa FS boundary. The proposed LWC boundaries encompass the core of this natural area.

In summary, the BLM should manage this area to protect and maintain these rare characteristics in a place where they provide valued opportunities for people to find solitude and naturalness literally in their backyard. The need for added protection is only heightened because of its proximity to a population center, not lessened, and we encourage the BLM to protect this unit to the highest degree possible through a LWC designation in the final RMP. The surrounding adobe areas that do not meet LWC qualifications should then be protected as ACECS and EEA, as described later.

**Summary of Comments:** BLM must adopt robust management prescriptions for lands managed to protect wilderness characteristics to ensure wilderness resources are adequately protected. BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics to allow for management of other multiple uses in conjunction with maintaining wilderness characteristics.

## E. Recreation

### 1. Specific RMA Recommendations for the North Fork and Lower Gunnison Watersheds

The final RMP must actively manage recreation on BLM lands within the North Fork and Lower Gunnison Watersheds through designation of recreation management areas (RMAs) and other recreation management stipulations.

We support following stipulations in the draft RMP which provide for improved recreation management and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mountain SRMA (with VRM Call II).

Other areas within the North Fork watershed also need recreation management designation to adequately manage the current and highly likely increased future recreation use on these lands within the lifetime of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) and other recreation stipulations for places such as Elephant Hill, and Youngs Peak—all of which are seeing increasing, but unmanaged use.

Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.

### a. Jumbo Mountain
All 5,020 acres of the Jumbo Mountain unit deserves management as a Special Recreation Management Area (SRMA) in the final RMP. Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance. Documented activities include mountain biking, horseback riding, trail running, birding, hiking, hunting, and infrequent OHV use. Jumbo Mountain sits prominently within the valley, and the visual resources of the BLM parcels on Jumbo are significant to the quality of life in the entire valley. We also support all VRM stipulations and protective management prescriptions as well.

The final RMP should include the entire Jumbo Mountain unit as a SRMA, RMZ-1 and RMZ-2 as included in Alt B (DEIS J-4). Our members attest to increasing use of the Jumbo Mountain area, despite a lack of management and oversight. We believe the trend of use will continue to increase, and that the full area will be used heavily for recreation over the lifetime of the plan. RMZ-2, as defined in Alt B, allows for trail connectivity with other current and future recreation areas. We also strongly support stipulations that would limit all oil and gas leasing and surface activities in this area, including those in the draft plan (DEIS NSO-56, NSO-57), as these activities would not be compatible for the recreation experience, and would diminish the many other resources already identified in this area.

Support has been building for Jumbo Mountain to become an SRMA, with the Paonia Town Council, local trail advocacy and mountain bike clubs, and local businesses and chambers fully supporting the Jumbo Mountain SRMA as outlined in alternative B with all 5,020 acres included in the SRMA status. The full acreage deserves SRMA status since local trends of use indicate that recreation users will continue to expand into adjacent BLM lands due to the high quality of the recreational resources. Additionally, the full SRMA status will allow for the current Jumbo Mountain trail network to be connected to other existing and future recreational trails within the lifetime of this RMP.

ERMA status for Jumbo, as proposed for 5,020 acres in Alternative C, is inadequate to protect the visual resources of this unit, as well as mitigate future conflicts of multiple uses on this unit. Members of the public frequently take part in a number of different recreational activities, including hiking, biking, and running, almost exclusively non-motorized, on these acres, and these activities must be managed for the quality of the experience for all users.

The North Fork watershed currently suffers from a dearth of officially acknowledged and managed biking areas, despite numerous landscapes with superb terrain for mountain biking.[62] The trails on Jumbo have been built outside of established protocols and as such cannot be utilized for the gain of the community as trail systems like 18 Rd in Fruita.[63] The trails and conditions on the Jumbo Mountain unit surpass those at 18 Rd, but without management and acknowledgment from the BLM with SRMA status, the full potential of the recreational resource on the Jumbo trails cannot be realized.

In addition to the economic and conflict mitigation gains that could come about from designating Jumbo Mountain as an SRMA, the acknowledgement of trails on Jumbo will allow trail building expertise, environmental considerations, signage, and enforcement to come together to produce a more sustainable trail network.

Lastly the location of the Jumbo trails is quite unique in that the trails are located very close to the town of Paonia and thus the type of impacts on the land seen at locations like 18 Rd. can be shifted to the urbanized areas of Paonia, reducing the impact to natural landscapes.

Please see the Figure 2a for mapped current and proposed trails within the Jumbo Mountain area.

**Figure 2a. Map of existing and proposed recreation routes on Jumbo Mountain.**

---

[62] See https://www.Mountainbproject.com/
[63] http://www.gjsentinel.com/sports/articles/a-good-change



All routes shown in green and red are existing routes (except for the red route leading north from slantindicular). All segments in blue are proposed connector routes.

The draft RMP includes closure of the SRMA to competitive events (DEIS Appendix J-28, SRPs), which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA identified through the stakeholder/planning process. It is important to the economy of Paonia to be able to hold several non-motorized competitions on the Jumbo trails every year as these events can be major economic drivers for the community.

We also support the Ecological Emphasis Area designation for Jumbo Mountain/McDonald Creek, which we believe do not conflict with SRMA and successful recreation management of these areas. Please see our comments below (WSCC RMP Comments Part III.G).

**b. Elephant Hill**
We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Elephant Hill, located directly south of Jumbo Mountain. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer and winter recreational use is likely to significantly increase over the lifetime of this RMP. SRMA or ERMA designation would provide resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.

Please see Figure 2b for mapped current and proposed trails on Elephant Hill.

BLM_0148960

**Figure 2b. Map of existing routes and proposed recreation routes on Elephant Hill.**



All solid green routes are proposed routes for recreation travel. Dotted green routes represent recreation winter routes located on preexisting roads.

**c. Youngs Peak**

We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Youngs Peak, located directly north of the town of Crawford. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer recreational use is likely to increase over the lifetime of this RMP. SRMA or ERMA designation would provide adequate resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.

Please see Figure 2c for mapped current and proposed trails on Youngs Peak.

BLM_0148961

**Figure 2c. Map of existing routes and proposed recreation routes on Youngs Peak**



All routes shown in red or green are proposed routes. Some primitive trails exist in the western area of Young's peak.

**d. North Delta SRMA -** WSCC supports the designation of the North Delta SRMA as well as the inclusion of mountain biking in the North Delta SRMA RMZ-1 and RMZ-2 for the development of non-motorized singletrack trails. Cyclists are not currently considered in the SRMA plan for North Delta.

**e. Hotchkiss High School Area** – WSCC supports ERMA designation for BLM lands in the immediate vicinity of Hotchkiss High School, which is a prime location for a trail network that would provide easy access to youth and families in the Hotchkiss area. There would be strong support for this recreation area due to an outdoor education coalition called the Nature Connection. The Nature Connection plans to give kids and families easy access to mountain bike equipment, for short-term use, to gain experience in a sport that promotes good health, and opportunities of adventure.  By developing a fun and exciting trail network on public lands in this area, residents of Delta County will have turnkey access to a healthy sport that allows them access to the natural environment, opportunities to improve outdoor knowledge and self-confidence, improve outdoor recreation skills, and gain more understanding of our community's dependence and impact on public lands.

**f. Roubideau SRMA**

We support designation, as proposed in Alternative B and the Preferred Alternative, of all 25,350 acres of Roubideau as a SRMA. This designation, however, should not supersede protections for wildlife management. We:

- Support motorized being limited to RMZ 4 and to designated trails within that Zone.  Understand desire to leave routes in RMZ 3 open for hunting purposes however recommend that it include seasonal closures for off-season use.
- Support RMZ 1 and RMZ2 being closed to motorized and mechanized uses to prioritize hiking, back pacing and horseback riding in LWC areas.
- Support Alt B closing RMZ 1 to all fluid and recommending locatable mineral withdraw- as it is within the WSA. No leasing should be applied to RMZ 2 and 3 as we as it overlaps with the LWC proposal and we recommend that all "Tier 1" LWC units should be closed to leasing.

Similarly, the area is also identified as and ACEC and EEA. In order to manage for these areas to protect the identified vulnerable resources (riparian forest and montane ecosystems with identified BLM and CNHP sensitive species), should carry Alt B management prescription of NO LEASING for all parts of the SRMA that overlap with the Roubideau ACEC as identified in Alternative B1.

Similar logic applies to the over lapping EEA designation for the Roubideau area. As mentioned in our broader comments, EEAs should require stronger management requirements for leasing. The BLM identifies sensitive species such as the Grand Junction milkvetch, desert bighorn sheep and northern leopard frog in the area and should manage the area to protect these natural values that make it a unique and special place for people to visit and have a pleasant recreation experience.

In summary, the Roubideau area has many high valued resources that qualify it for LWC, ACEC, EEA and SRMA management. In order to fully protect all the canyons, mesa tops and connecting areas- and manage for future recreational use- a layered management decision utilizing all of these designations is warranted.

As the Roubideau area is identified as a high value are for habitat, wilderness and recreation values, we recommend that it be closed to oil and gas leasing in accordance to our larger comments on oil and gas leasing throughout the field office. The area is clearly valued for other resources other than oil and gas development and should be managed to highlight and protect these values over oil and gas minerals that have low development potential in this area.

## 2. Planning for Recreation and Visitor Services

In the Draft RMP, we note that there is an apparent lack of background data conducted or provided by BLM to inform the recreation analysis and alternatives development. As indicated in BLM Manual 8320, planning, management and monitoring of recreation and visitor services is an iterative process. Monitoring methods such as social surveys and visitation rates are essential for assessing the effectiveness of recreation planning and implementation actions. Under all planning phases of the RMP, BLM should collect data that is sufficient to address the nature and complexity of existing and potential issues. BLM Manual 8320 at .06(B)(1)(b).

In general, we support the extensive and special Recreation Management Areas that are evaluated in the range of alternatives targeting primitive and non-motorized recreation opportunities. We recommend the Uncompahgre Field Office build on these opportunities for quiet recreation such as hiking, wildlife viewing, back country hunting and horseback riding in the final RMP, which are popular activities for public lands visitors in the planning area. The draft RMP states that the primary recreation activities in the planning area are hunting, fishing, whitewater rafting, OHV use, canoeing, kayaking, camping, hiking, backpacking, mountain biking, horseback riding, rock climbing, photography, and scenery and wildlife viewing. Uncompahgre Draft RMP at 3-130. However, the draft RMP fails to provide sound data on the

BLM_0148963

relative prevalence of these uses, stating: "Most public land use and activity participation estimates depend on a mix of computerized trail counter data, field observations, and professional judgment of the recreation staff and hence are not scientifically based." *Id.* at 3-132. This is not sufficient to analyze recreation trends and make long range management decisions that reflect accurate data.

Public lands surveys in nearby areas have found that non-motorized recreation activities are dominant among public lands visitors. For example, a 2006-2007 visitor field survey and focus group study of BLM lands coordinated by the Colorado River Valley Field Office and Arizona State University found that hiking is the most popular activity, at 33%, followed by mountain biking, at 26%. Colorado River Valley Draft RMP at 3-151. The Moab Field Office completed a National Visitor Use Monitoring Program (NVUM)[64] as a pilot project for visitor use monitoring on BLM lands, which showed that motorized use is a small portion of recreation activity on public lands in the Moab Field Office. The NVUM states: "In terms of total participation, the top five recreation activities of the visits to the Moab Field Office were viewing natural features, hiking/walking/trail running, relaxing (hanging out, escaping heat and noise), viewing wildlife and driving for pleasure (Table 16)."

We would expect similar results in the Uncompahgre Field Office, which would support the designation of expansive Recreation Management Areas for quiet recreation as contemplated in the range of alternatives. Guidance issued in 2010 indicates that Recreation Management Area designations should reflect recreation demand and issues (IM 2011-004). BLM must include recreation data and foreseeable impacts in the baseline assessment in order to provide reasonable explanation and analysis of SRMA and ERMA designations in the range of alternatives. Moreover, environmental consequences described in Chapter 4 should more closely align to the expected increases in recreation demand (particularly of OHV use) described in Chapter 3, and account for the differences in recreation management area designations put forth in the range of alternatives.

**Summary of Comments**:  In creating management objectives and allowable uses for recreation management areas, BLM should utilize and include monitoring data and trends by user type in the RMP. Recreation Management Area designations should reflect recreation demand. We also point out that managing lands for wilderness characteristics is another way for BLM to provide opportunities for quiet recreation in natural and scenic areas within the Uncompahgre Field Office. We therefore recommend the RMP protect expansive areas as lands with wilderness characteristics to provide desirable recreation experiences for hikers, back country hunters, and other non-motorized public land users.

### 3. Designating Recreation Management Areas for Non-Motorized Recreation

In 2010, BLM issued new guidance (IM 2011-004) for recreation and visitor services planning in the land use planning process. This guidance was incorporated into BLM Manual 8320 in 2011 as well as BLM's updated recreation planning handbook (H-8320-1) in 2014.  The guidance changes recreation management to a three-category system wherein lands in the planning area can be designated as special recreation management areas (SRMAs), managed as extensive recreation management areas (ERMAs), or classified as public lands not designated as recreation management areas.

Management focus for SRMAs is to "protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics," whereas ERMAs are managed to "support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA." In SRMAs, recreation is to be the dominant use, and in ERMAs management is "commensurate with the management of other resources and resource uses." Whereas SRMAs are intended for more intensive

---

[64] http://www.blm.gov/wo/st/en/prog/Recreation/national_recreation/visitor_use_surveys.html

BLM_0148964

management, ERMAs may be appropriate to designate for quiet-use, backcountry experiences and layer with other special designations that are compatible with quiet recreation, such as ACECs and lands with wilderness characteristics. Both SRMAs and ERMAs provide mechanisms for the BLM to actively manage different types of recreation to the benefit of users while protecting the other resources of the public lands.

We support efforts made by the BLM to include management for quiet-use and non-motorized recreation in many Recreation Management Areas (RMAs) evaluated in the Draft RMP. Developing and differentiating recreation areas for various user groups are important to protect multiple recreation resources and avoid conflict, consistent with the agency's regulations. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." 43 C.F.R. § 8342.1.

BLM's ORV regulations also provide for protection of other values that are critical parts of not only a healthy ecosystem on BLM lands, but also of enjoying quiet recreation activities, such as hunting, photography and bird-watching, requiring that management minimize "damage to soil, watershed, vegetation, air, or other resources of the public lands" and "harassment of wildlife or disruption of habitat; and to prevent impairment of wilderness suitability or adverse effects on natural areas." *Ibid.*

The Draft RMP considers a comprehensive approach to managing recreation through a framework of SRMA and ERMA designations in each alternative. We support BLM's approach, which offers alternatives for multiple RMA designations and associated management prescriptions for important recreation areas. Uncompahgre RMP at Appendix J. This is consistent with agency policy and offers the public an opportunity to consider alternative management regimes for recreation areas, opportunities and experiences they are interested in accessing during the life of the RMP.

While we support the RMA framework provided in the draft RMP, we have gotten feedback from our members and the public that the mosaic of potential RMAs is highly complex, especially in the context of other designations and allocations under consideration in the RMP, and is therefore difficult for the public to understand. We do not believe BLM needs to simplify its approach, but instead encourage the agency to conduct additional public education and outreach on this important and complex issue. For example, BLM could conduct public workshops in the near future where the public can review spatial data for RMA and other designations/allocations and ask questions of resource specialists. BLM could accept additional public input on RMAs specifically through these workshops. This would not needlessly or extensively delay the RMP, but could greatly assist BLM in developing a proposed RMP with the best information submitted by the public on recreation resources, ultimately leading to a better RMP that serves the public and local communities and is implemented successfully.

**Summary of Comments:** BLM should move forward with designating Recreation Management Areas for quiet, non-motorized recreation, which is an appropriate way to implement the minimization criteria and provide opportunities for multiple recreation uses. BLM should consider public workshops to further educate the public on recreation management alternatives and collect better information and comments from the public on recreation management.

BLM_0148965

## 4. Special Recreation Permits

The BLM authorizes special recreation permits (SRPs) for specified recreation uses. Accordingly, the Draft RMP offers guidance and limitations for the issuance of SRPs. *See, e.g.,* Uncompahgre Draft RMP at 2-220—221; G-30. We are concerned, however, with the general lack of specificity provided by the Draft RMP on guiding the authorization of special recreation permits.

The BLM Handbook on Recreation Permit Administration states that field offices can and should develop guidelines for issuing SRPs, including thresholds for when permits are required for organized groups and events for specific types of recreation activities, land areas, or resource settings. BLM Handbook 2930-1 at 13. Analysis of the impacts of permits on a cumulative basis is best accomplished in the RMP. The Uncompahgre RMP should include a clear decision making framework for reviewing SRP applications. The Price (Utah) and Grand Junction (Colorado) RMPs offer exemplary guidance for this process. The standards set out in these RMPs are very specific so that BLM can easily determine whether and where to issue an SRP, and can better estimate cumulative impacts from such permits.

**Summary of Comments:** In the Uncompahgre RMP, BLM should provide specific criteria for evaluating special recreation permits to guide agency staff on processing applications.


## 5. Game Retrieval

We support the prohibition on cross-country motorized/mechanized travel for big game retrieval (with very narrowly limited exceptions). Uncompahgre Draft RMP at 2-307. This management action is necessary to prevent unnecessary resource damage as well as to address safety and private property concerns. A key component of the RMP and future travel planning is to create a travel network that protects resources and is enforceable. This restriction should be carried forth in the final RMP.

**Summary of Comments:** BLM should prohibit cross-country motorized/mechanized travel for game retrieval as proposed in the draft RMP preferred alternative.


## 6. Natural Soundscapes

Natural soundscapes are a public lands resource that deserves careful consideration when planning for recreation. Like viewsheds and air quality, sound is one of the resources on the public lands that is affected by agency-authorized uses and can impact other resources as well, such as recreation and wildlife. BLM has a statutory obligation to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition." 43 U.S.C. § 1701(8). To fulfill this mandate, it is important for BLM to consider natural soundscapes in order to give meaningful effect to this provision, especially on those lands which are to be managed in their "natural condition," including Wilderness Study Areas and lands with wilderness characteristics.

For recreation in particular, BLM's obligation to preserve natural soundscapes is further described in Executive Order 11644 (1972), as amended by Exec. Order 11989 (1977), which directs the BLM to locate areas and trails so as to: "Minimize conflicts between off-road vehicle use and other existing or proposed recreation uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors."

We recommend the agencies incorporate soundscapes in the designation and management of backcountry recreation areas, as preserving the natural soundscape is an essential component of protecting and enhancing the backcountry experience.

BLM should furthermore utilize acoustic modeling to analyze and preserve natural soundscapes, especially in special management areas managed for quiet use recreation. The Wilderness Society has developed a GIS-based model based on The System for the Prediction of Acoustic Detectability (SPreAD; Harrison et al. 1980), which is a tool that was developed nearly 30 years ago by FS and EPA to predict the acoustic impacts of recreational activity in wildland settings. SPreAD was originally developed as a system of worksheets and tables, where the user could enter information about the sound source and environment and manually calculate noise propagation from a single point source to a single point receiver. We have adapted the SPreAD model to ArcGIS, automating the hand calculation method to predict the propagation of noise for all directions throughout the area of interest.

SPreAD-GIS can be used to 1) determine the areas within a planning unit where the natural soundscape is predominant and protect that setting through recreation planning; and 2) model sound propagation from uses such as motorized vehicles in a proposed quiet-use recreation area to determine what planning decisions, such as route closures, could restore and enhance the natural soundscape. In this way, the agencies could ensure that travel and recreation planning decisions provide opportunities for experiencing naturalness and solitude. There are other models and methodologies available, but we highlight SPreAD-GIS because it is available by request from TWS.[65]

One possible method for BLM to manage sound resources on the federal lands would be to model the approach BLM uses to manage visual resources, with a classification gradient ranging from most protective of natural soundscapes to allowing significant impacts to the soundscape.[66] This would provide for areas where maintaining the natural soundscape is prioritized to benefit recreation, wildlife, wilderness and other natural values on the public lands. It would also assist the agency with managing activities that impact sound resources by clearly defining where and how those impacts may occur. The classification system should primarily be based on desired and achieved experiences of public lands visitors.

The following classes provide an example of possible BLM guidance for inventorying and managing sound resources in landscape-level planning:

- *Class I Objective*: The objective of this class is to preserve the natural soundscape. This class would be appropriate for lands managed to preserve wilderness characteristics, promote primitive recreation experiences, and protect wildlife habitat and ecological systems. The level of change to the characteristic soundscape should be very low and must not attract attention.

- *Class II Objective*: The objective of this class is to retain the natural soundscape such that noticeable impacts are infrequent and isolated instances. The level of change to the natural soundscape should be low. Management activities may be *heard on occasion*, such as a passing motorized vehicle, but should not detract from the experience of the natural landscape.

---

[65] The tool is free, but installation of SPreAD-GIS requires an ArcInfo-level licensed copy of ArcGIS 9.3 or higher with the Spatial Analyst extension.
[66] See information on BLM's Visual Resource Management system at http://www.blm.gov/wo/st/en/prog/Recreation/recreation_national/RMS/2.html.

- *Class III Objective*: The objective of this class is to partially retain the natural soundscape where practicable. Management activities may attract attention but should not dominate the auditory experience of the casual observer. This class would be appropriate for front country recreation areas or other areas where natural soundscapes are not critical to the experience being sought out by visitors.

- *Class IV Objective*: The objective of this class is to provide for management activities which require significant impacts to the natural soundscape, including highly impactful events or impacts sustained over the long term. These management activities may dominate the sound of the landscape and may be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating basic elements.

These potential management objectives for sound resource classes are similar to the BLM Manual for Visual Resource Classes (BLM Manual 8400). Likewise, planning areas could be delineated into sound quality rating units for management purposes. Considerations on rating sound resources, such as landform, vegetation, and scarcity, are among the factors that could logically be incorporated into baseline data and management objectives for auditory resources. Acoustic modeling would be an important component of assessing sound quality rating units.

By going beyond a simple dichotomy of quiet-zones and zones with noise, BLM can position itself in a way that adequately addresses the adverse effects of noise on public land resources, resource-uses, and existing land designations. Soundscape classes give land managers both the authority and the flexibility to make management decisions that enhance landscape-level planning. Recognizing that lands have different soundscapes, and visitor expectations and experiences vary within a planning area, soundscape classes provide a way to determine appropriate levels of management.

**Summary of Comments:** BLM should acknowledge the sound resource on the public lands and address the soundscape as a separate resource which must be analyzed; complete sound modeling to the extent practicable to assess noise impacts of management alternatives on recreation and wildlife; adopt management decisions based on sound modeling data or other information generated from soundscape analysis that minimize or mitigate noise impacts on recreation and wildlife; and identify areas of the public lands where protection of the natural soundscape is prioritized.

## F. Travel Management

### 1. Area allocations for off-road vehicles

i.  Providing and protecting quiet recreation opportunities

The Draft RMP defers comprehensive travel planning, but evaluates a range of alternatives for vehicle use designations (open, limited, closed). BLM's preferred alternative would only close 58,560 acres to motorized use, representing less than 9% of the planning area. Uncompahgre Draft RMP at 2-301. This includes statutorily closed areas (such as Wilderness Study Areas), meaning BLM is hardly exercising any discretion to close areas to motorized use so they may be allocated for other multiple uses such as quiet recreation, wildlife habitat or cultural resource protection. Even Alternative B would only close 17% of the planning area to motorized vehicle use. *Ibid.* This does not represent balanced management, and is inconsistent with current BLM travel planning guidance. It is also inconsistent with the agency's obligations to comply with the minimization criteria, as detailed below.

Travel and transportation considerations play an important role in the experience of the recreation user and the management provided by BLM. The area designations that the RMP will put in place will be key determinants of recreation setting characteristics as well as fundamental tools for providing specific recreation experiences.

As such, BLM should implement OHV area designations that protect recreation opportunities for quiet and non-motorized recreation users throughout the planning area. The public land in the UFO has ample opportunity for recreation activities such as hiking, camping, and mountain biking. In this regard, the agency's 2011 Travel and Transportation Management (TTM) Manual generally recognizes that:

> The recreation program has a specific need to recognize and manage motorized recreational use of off-highway vehicles (OHVs) and non-motorized travel, such as foot, equestrian, and non-motorized mechanical travel. **The planning process should consider and address the full range of various modes of travel on public lands, not only motorized access needs.**

BLM Manual 1626 at .06(A)(1) (emphasis added).

BLM must adequately address the needs of non-motorized and quiet users in addition to motorized use. Ensuring opportunities for a full range of non-motorized travel is crucial for creating a *comprehensive* transportation and travel plan. In places managed primarily for non-motorized recreation, travel allocations and designations should reflect this desired recreation character setting. This should include restrictions and closures in areas that provide opportunities for non-motorized recreation such as lands with wilderness characteristics, areas of critical environmental concern, and other special designations.

### ii.   Applying the minimization criteria to area allocations

In response to the growing use of off-road vehicles (ORVs) and corresponding environmental damage, Presidents Nixon and Carter issued Executive Orders 11644 and 11989 in 1972 and 1977, respectively, requiring federal land management agencies to plan for ORV use based on protecting resources and other recreational uses.[67] When designating areas or trails available for ORV use, agencies must locate them to:

(1)  minimize damage to soil, watershed, vegetation, or other resources of the public lands;
(2)  minimize harassment of wildlife or significant disruption of wildlife habitats; and
(3)  minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands.[68]

BLM codified these "minimization criteria" in its OHV regulations at 43 C.F.R. § 8342.1, which provide:

> The authorized officer shall designate all public lands as either open, limited, or closed to off-road vehicles. All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands; and in accordance with the following criteria:

---

[67] Exec. Order No. 11644, 37 Fed. Reg. 2877 (Feb. 9, 1972); Exec. Order No. 11989, 42 Fed. Reg. 26,959 (May 24, 1977).
[68] Exec. Order No. 11644, § 3(a).

(a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

(b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.

(c) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

(d) Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

Despite its long-standing legal obligation, BLM has struggled to properly apply and implement the minimization criteria in its travel management decisions. Federal courts have repeatedly sent BLM, Forest Service, and National Park Service travel management plans back to the agencies for failure to satisfy their obligation to minimize resource damage and conflicts between recreational uses.[69] Collectively, these cases confirm the agencies' *substantive* obligation to meaningfully apply and implement – not just identify or consider – the minimization criteria when designating each area or trail, and show in the administrative record how they did so.[70] As a recent circuit court of appeals decision confirmed, agencies must "document how [they] applied [relevant] data on an area-by-area [or route-by-route] basis with the objective of minimizing impacts."[71] BLM's Travel and Transportation Manual confirms that BLM must pay particular attention to thoroughly documenting its application of the minimization criteria in making both OHV area designations (Manual 1626.06(A)) and route designations (Manual 1626.06(B)).

As Executive Order 11644, 43 C.F.R. § 8342.1, and Manual 1626 make clear, the substantive duty to minimize impacts applies equally to OHV area allocations made in resource management plans. With RMP area allocations setting the framework for where route designations will occur and providing the best opportunity to analyze OHV impacts across the broader landscape, it is critical that the Uncompahgre RMP apply and implement the minimization criteria when making area designations. To satisfy its *substantive* duty to minimize impacts, BLM must apply a transparent and common-sense methodology

---

[69] *See WildEarth Guardians v. U.S. Forest Service*, 790 F.3d 920, 929-32 (9th Cir. 2015) (Forest Service failed to "apply the minimization criteria to *each area* it designated for snowmobile use" and to provide the "granular analysis [necessary] to fulfill the objectives of Executive Order 11644"); *Friends of the Clearwater v. U.S. Forest Service*, No. 3:13-CV-00515-EJL, 2015 U.S. Dist. LEXIS 30671, at *37-52 (D. Idaho Mar. 11, 2015) (Forest Service's conclusory statements failed to show how it selected motorized routes with the objective of minimizing their impacts); *SUWA v. Burke (SUWA)*, 981 F. Supp. 2d 1099, 1104-06 (D. Utah 2013) (BLM acknowledgment of minimization criteria insufficient where record showed no analysis of specific impacts of designated OHV routes); *The Wilderness Society v. U.S. Forest Service*, No. CV08-363-E-EJL, 2013 U.S. Dist. LEXIS 153036, at *22-32 (D. Idaho Oct. 22, 2013) (remanding travel plan where Forest Service relied on unsupported conclusion that route closures and elimination of cross-country travel minimized impacts); *Defenders of Wildlife v. Salazar*, 877 F. Supp. 2d 1271, 1304 (M.D. Fla. 2012) (record failed to demonstrate how Park Service decision to reopen trails was made with the objective of minimizing impacts); *Central Sierra Environmental Resource Center v. U.S. Forest Service*, 916 F. Supp. 2d 1078, 1094-98 (E.D. Cal. 2012) (Forest Service failed to show that it actually aimed to minimize environmental damage when designating motorized routes); *Idaho Conservation League v. Guzman*, 766 F. Supp. 2d 1056, 1071-74 (D. Idaho 2011) (record did not reflect whether or how the Forest Service applied the minimization criteria); *Center for Biological Diversity v. BLM*, 746 F. Supp. 2d 1055, 1071-81 (N.D. Cal. 2009) (record provided no indication that BLM considered or applied minimization criteria).

[70] *See, e.g., CBD v. BLM*, 746 F. Supp. 2d at 1080-81 ("the BLM is required to place routes specifically to minimize" impacts); *Idaho Conservation League*, 766 F. Supp. 2d at 1072-73 (consideration of the minimization criteria insufficient where agency failed to demonstrate that the criteria "were then implemented into the decision process").

[71] *WildEarth Guardians*, 790 F.3d at 931.

for meaningful application of the minimization criteria to *each* area being considered for designation. That methodology must include several key elements:

First, proper application of the minimization criteria is not solely an office exercise. As the courts have repeatedly made clear, use of cryptic spreadsheets or matrices that favor OHV use and do not facilitate implementation of the substantive duty to minimize impacts is inadequate.[72] Rather, BLM must get out on the ground, gather site- and resource-specific information, ground-truth desk-top analyses, and then utilize that data to actually apply the criteria to minimize resource damage and use conflicts associated with each designated area and route. This necessarily will require the agency to incorporate monitoring data and other information identifying resource or recreational use conflicts compiled by the agency or submitted by the public.[73] That information must be applied in what courts have described as a "granular analysis [necessary] to fulfill the objectives of Executive Order 11644."[74]

Second, application of the minimization criteria should be informed by the best available scientific information and associated strategies and methodologies for minimizing impacts to particular resources.[75] In 2012, the Journal of Conservation Planning published a literature review and best management practices (BMPs) for ORVs on national forest lands.[76] The BMPs provide guidelines, based on peer-reviewed science, for ORV designation decisions, implementation actions, and monitoring activities that are intended to minimize impacts to soils, water quality, vegetation, and wildlife, and conflicts with other recreational uses. Although they were formulated for national forest lands, most of the BMPs are applicable to OHV designation decisions on BLM lands as well. Travel management planning processes should reference and incorporate these BMPs.[77]

Third, proper application of the minimization criteria must address both site-specific and larger-scale impacts.[78] For example, agencies must assess and minimize landscape-scale impacts such as habitat fragmentation, cumulative noise and air and water quality impacts, and degradation of wilderness characteristics and associated opportunities for primitive forms of recreation. The agency also must assess and minimize site-specific impacts to soils, vegetation, water, and other public lands resources, sensitive wildlife habitat, and important areas for non-motorized recreation.

---

[72] *See, e.g., Idaho Conservation League*, 766 F. Supp. 2d at 1071-74 (agency may not rely on "Route Designation Matrices" that fail to show if or how the agency selected routes with the objective of minimizing their impacts); *SUWA*, 981 F. Supp. 2d at 1105 ("cryptic spreadsheet for each route segment provides inadequate information . . . for someone other than the BLM to know why or how the routes were chosen").

[73] *See* 43 C.F.R. § 8342.2(a) (public participation required in travel management decision-making); *Idaho Conservation League*, 766 F. Supp. 2d at 1074-77 (invalidating travel management plan that failed to utilize monitoring and other site-specific data submitted by the public showing resource damage).

[74] *WildEarth Guardians*, 790 F.3d at 931.

[75] *See Friends of the Clearwater*, 2015 U.S. Dist. LEXIS 30671, at *24-30, 40-52 (invalidating route designations that failed to consider best available science on impacts of motorized routes on elk habitat effectiveness or to select routes with the objective of minimizing impacts to that habitat and other forest resources).

[76] T. Adam Switalski and Allison Jones, *Off-road vehicle best management practices for forestlands: A review of scientific literature and guidance for managers*, 8 Journal of Conservation Planning 12-24 (2012), *available at* http://www.journalconsplanning.org/2012/JCP_v8_2_Switalski.pdf and attached. Development of a BLM-specific literature review and set of BMPs is in progress.

[77] The Bitterroot National Forest recently referenced and applied BMPs from Switalski and Jones in its Decision Notice/Finding of No Significant Impact for a project involving the designation of ORV trails. *See* Bitterroot National Forest, Darby Lumber Lands Phase I – Decision Notice and Finding of No Significant Impact, pp. 13-14, *available at* http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/80742_FSPLT3_2541294.pdf.

[78] *See, e.g., Idaho Conservation League*, 766 F. Supp. 2d at 1066-68, 1074-77 (invaliding travel plan that failed to consider aggregate impacts of short motorized routes on wilderness values or site-specific erosion and other impacts of particular routes).

BLM_0148971

Fourth, application of the minimization criteria must take into account available resources for monitoring and enforcement of the designated system.[79] BLM is obligated under Executive Orders 11644 and 11989 and its travel management regulations to monitor the effects of OHV use on designated areas and routes and make adjustments to the designated system as necessary.[80] To ease enforcement obligations and ensure user compliance in the first place, OHV area designations and identification of Travel Management Areas should establish clear boundaries and simple, consistent restrictions designed to minimize resource damage and user conflicts.

Finally, attempts to *mitigate* impacts associated with an existing OHV system are insufficient to fully satisfy the duty to *minimize* impacts, as specified in the executive orders. The language of the executive orders makes this clear: "[a]reas and trails shall be *located* to minimize" impacts and conflicts.[81] 43 C.F.R. § 8342.1 mirrors that language. Thus, application of the minimization criteria should be approached in two steps: first, the agency locates areas and routes to minimize impacts, and second, the agency establishes site-specific management actions to further reduce impacts. The best available science confirms this tiered approach.[82] As described above, this approach is consistent with DOI's Landscape Mitigation Policy that prioritizes project design and siting to avoid adverse impacts in the first instance, followed by other minimization and mitigation measures.

iii.   ORV "open" areas

We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP. Uncompahgre Draft RMP at 2-301. Nationally, BLM has for many years been moving away from allowing cross-country motorized use on a large scale or designating large ORV play areas. This type of motorized use is difficult for BLM field offices to properly manage; it damages natural, cultural and other resources; and it leads to conflict with other users of the public lands. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." 43 C.F.R. § 8342.1.

**Summary of Comments:** BLM should close more of the planning area to motorized use to protect natural resources and quiet recreation opportunities and create more balanced management among the multiple uses and recreation visitors in the Uncompahgre Field Office. BLM must apply the executive order minimization criteria to demonstrate how each OHV area has been located to *minimize* resource damage and conflicts with other recreational uses. This will require a granular analysis of the impacts of OHV use in each area that addresses both site-specific and landscape-scale impacts, incorporates the best available scientific information and best management practices for minimizing impacts to particular resources, utilizes site- and resource-specific data, and accounts for available monitoring and enforcement

---

[79] *See Sierra Club v. U.S. Forest Serv.*, 857 F. Supp. 2d 1167, 1176-78 (D. Utah 2012) (NEPA requires agency to take a hard look at the impacts of illegal motorized use on forest resources and the likelihood of illegal use continuing under each alternative).

[80] Exec. Order No. 11644, § 8(a); 43 C.F.R. § 8342.3.

[81] Exec. Order 11644, § 3(a); *see also Center for Biological Diversity*, 746 F. Supp. 2d at 1080-81 ("'Minimize' as used in the regulation . . . refers to the *effects* of route designations, i.e. the BLM is required to place routes specifically to minimize 'damage' to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts' of uses." (footnote and citations omitted)).

[82] *See* Switalski and Jones, 2012 (cataloguing best management practices for: (1) siting/locating routes to minimize impacts; (2) implementation, including maintenance, restoration, adaptive management, and other mitigation measures; and (3) monitoring).

BLM_0148972

resources. We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP.

**2. Comprehensive Travel and Transportation Management Planning**

The Uncompahgre RMP defers comprehensive travel and transportation planning, as provided for in BLM's regulations. While the Draft RMP includes several important components such as a prioritization scheme for future travel planning and criteria to guide route designations, the Draft RMP is not fully compliant with BLM's policy for deferred travel planning. BLM policy provides for deferred travel planning and interim designation of "Limited to Existing Routes" as long as a preliminary network is identified and a process established to select a final travel management network. Specifically, BLM Manual 1626 provides a list of requirements for deferring travel planning:

> If the transportation network is to be deferred in the RMP, then the RMP documents the decision-making process used to develop the initial network, provides the basis for future implementation level decisions, and helps set guidelines for making transportation network adjustments throughout the life of the plan. The following tasks should be completed in the RMP for each planning area or TMA:
>     a. Produce a map of the known network of transportation linear features, including modes of travel;
>     b. Define the long term management goals for the transportation system;
>     c. Define interim management objectives for areas or sub-areas where route designations were not completed concurrent with the RMP. Clearly state the process of moving from an interim designation of "limited to existing roads, primitive roads, and trails" to a designation of "limited to designated roads primitive roads and trails" upon completion of TMP.
>     d. Identify any incomplete travel and transportation tasks:
>         i. Outline additional data needs and a strategy to collect needed information;
>         ii. Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints;
>         iii. Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process; and
>         iv. Identify any easements and rights-of-way (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.

BLM Manual 1626 at .06(B)(2). Those components underlined above are absent from the Uncompahgre Draft RMP. Manual 1626 also provides that "If the decision on delineating travel and transportation networks is deferred in the land use plan to the implementation phase, the work should be completed within five (5) years of the signing of the Record of Decision (ROD) for the RMP." *Id.* at .06(B)(3).

The Draft RMP does not include a map of the known network of transportation linear features, and in fact indicates that BLM has not completed an inventory of the existing routes that motorized travel will be limited to. Uncompahgre Draft RMP at M-2. BLM is required to complete this inventory during the land use planning process and utilize that inventory to inform travel planning decisions, even if those decisions are being deferred from the RMP. BLM cannot limit travel to existing routes unless those routes are known and mapped. The draft RMP also does not detail long-term management goals for the transportation system or interim management objectives other than some interim management guidance

BLM_0148973

for areas limited to existing routes. *Id.* at 2-306—308. These elements must be fleshed out in the Proposed RMP to comply with agency policy.

We support BLM's commitment to identifying travel management areas, setting a prioritization scheme for completing comprehensive route designation, and completing route designations within 5 years of signing the ROD. The draft RMP identifies the following management action across the range of alternatives:

> Establish Travel Management Areas and, within five years of the Approved RMP/Record of Decision, initiate comprehensive travel management plans within each the following Travel Management Areas and in the following order unless a change is deemed necessary by the BLM Authorized Officer (Figure 2-81, Appendix A):
> 1. North Fork (71,020 acres)
> 2. South Montrose (66,180 acres)
> 3. North Delta (61,270 acres)
> 4. San Miguel (74,960 acres)
> 5. West End (289,960 acres)

Uncompahgre Draft RMP at 2-308. Furthermore, those areas may be too large for efficient and effective route designation processes, especially the West End. The draft RMP appropriately indicates that, "At the time of comprehensive travel management planning, the Travel Management Area may be broken down into subareas to address different resource management objectives." *Id.* at 2-309. We encourage BLM to retain this language in the RMP and follow through with creating smaller areas for travel management planning at the route designation stage.

We also greatly support BLM's commitment that "Route density for designated public routes will be used as an analysis tool" in future travel management planning. *Id.* at M-9. However, BLM does not set route density targets in the RMP, but seems to defer identifying those targets to comprehensive travel planning. BLM should not defer using route density as a tool but should instead utilize that important tool in the Uncompahgre RMP. Setting route density targets is an appropriate way for BLM to address habitat fragmentation in travel planning in the absence of route-by-route designations. For example, BLM must consider alternatives to minimize and mitigate impacts to habitat fragmentation in the RMP, such as closing areas to motorized use, setting route density limits, and designating wildlife corridors, conservation rights-of-way or other mitigating land use allocations. Thus, BLM should set route density limits in the RMP to guide future route designations that minimize impacts to wildlife.

Route density targets must be based on the best available science, and must meet scientifically-based thresholds or be combined with mitigating actions. BLM should complete density analysis of existing transportation network features, buffer analysis to examine the effect zone of the transportation network and core area analysis to identify habitat that remains unaffected by the transportation network. BLM should use wildlife literature to interpret fragmentation metrics developed through spatial analyses and adopt management decisions that minimize and mitigate habitat fragmentation.

**Summary of Comments:** The Uncompahgre RMP must comply with BLM's guidance for deferred travel planning. This includes mapping the existing route network, setting long-term goals for the transportation network and identifying interim travel management objectives. BLM should carry forward other elements of the preliminary travel plan, including the prioritization of travel management areas, route designation criteria and commitment to utilizing route density as a travel planning tool.

### 3. Non-motorized trail networks

BLM is not planning to make route designations through this planning process. In order to set management direction for future travel planning efforts, the RMP should specify the criteria that BLM will use to designate a non-motorized trail network. While BLM is designating routes for motorized use, pursuant to the minimization criteria and agency guidance, BLM can and should also designate non-motorized trail systems.

In implementing its 2006 Roads and Trails Terminology Report, BLM emphasized the importance of taking a "holistic" approach to the management of roads and trails (see, Instruction Memorandum 2006-173), which includes non-motorized trails. Likewise, IM 2008-014 states that the travel planning process "requires recognition and designation of non-motorized trails or routes." In this planning process, BLM should not simply addresses motorized use in individual travel management areas, but should set a broad vision for protecting and enhancing the experiences of non-motorized users.

FLPMA requires BLM to develop land use plans that "consider the relative scarcity of values involved and the availabty of alternative means and sites for realization of those values." 43 U.S.C. § 1712(C)(6). Access to a "quiet use" recreation experience on our public lands through non-motorized trails is a growing need as opportunities for this use is shrinking with an increasing motorized population. As motorized recreation continues to grow in the region, BLM must be more proactive and deliberate in designing trail networks that preserve quiet recreation opportunities.

The RMP should specifically address and identify how BLM will meet the needs of quiet recreation users and provide non-motorized trail opportunities as part of its transportation system. The guidelines for deferring route designations set forth in BLM Manual 1626 should be fully incorporated by defining the goals for the use, location, and development/decommissioning; *specifically, for a long-term, non-motorized trail system*. BLM H- 8342 at 18.

In order to set management direction for future travel planning efforts, BLM should specify the process that will be used to designate a non-motorized trail network. As discussed previously in these comments, BLM's travel and transportation planning manual specifies the types of travel planning decisions that should be included in a travel planning process when route designations are being deferred. The RMP should ensure these decisions are applied specifically to non-motorized travel management, including:

- Define the long term management goals for the transportation system;
- Define interim management objectives for areas or sub-areas where route designations are not being completed
- Identify any incomplete travel and transportation tasks:
  - Outline additional data needs and a strategy to collect needed information;
  - Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints;
  - Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process

BLM Manual 1626 at .06(B)(2). As part of developing a preliminary travel plan for the non-motorized route network, BLM should identify management goals and objectives for travel management areas where primitive recreation experiences will be emphasized and develop criteria for future non-motorized trail designation.

One of these criteria should be identifying and implementing opportunities to convert existing routes to non-motorized trails, which is less impactful than creating new trails and requires fewer resources. The initial route inventories BLM has released show that there is an abundance of existing routes in the field office and therefore plentiful opportunities to designate existing routes for non-motorized use. To minimize the impact from a non-motorized trail network, BLM should prioritize existing linear features that are in low-conflict and low-impacts places on the landscape. In any travel designation, BLM should minimize impacts to sensitive resources such take the necessary steps to avoid impacts wildlife habitat and other sensitive resources.

BLM should evaluate and include additional criteria for new trails in the RMP. One example of considering non-motorized trail networks comes from the Beaver Dam Wash NCA Draft RMP. This Draft RMP sets out criteria for designing a non-motorized trail system as follows:

> a) Addresses the needs of equestrians, hikers, climbers, and mountain bikers;
> b) Protects diverse NCA resource values from direct or indirect recreation impacts by promoting compliance with regulatory requirements and visitor use restrictions;
> c) Results in sustainable systems;
> d) Provides high quality experiences;
> e) Serves the abilities of non-motorized recreational users;
> f) Offers opportunities for looping, varying distances, linking between geographic areas and trailheads, and connecting to heritage and other educational resources.
> g) Minimizes user conflicts by separating user groups whenever feasible;
> h) Limits the desire to venture off-trail.

Beaver Dam Wash NCA Draft RMP at 150. BLM should set similar criteria in the Uncompahgre RMP.

As BLM considers any motorized use allocations and/or motorized trail designations, it should consider how those decisions might foreclose or limit an opportunity to designate the same or a nearby trail as non-motorized. Motorized trails can have far reaching impacts throughout the region. Designating an area as open to motorized use may preclude BLM's ability to effectively manage an adjacent or nearby area for quiet recreation. As such, BLM should give strong consideration to potential user-conflict generated from travel designations, in accordance with the minimization criteria. BLM should provide sufficiently large non-motorized areas to provide quality primitive recreation experiences and minimize disturbance to quiet-use activities from other forms of travel and recreation.

**Summary of Comments**: BLM should make allocations and designations in the RMP that provide for non-motorized recreation, and limit impacts from motorized use on quiet users. For areas that are intended to provide a semi-primitive or primitive recreation experience, the RMP should provide direction for completion of non-motorized trail systems in compliance with agency policy for completing a preliminary travel plan. BLM should prioritize lands with wilderness characteristics for non-motorized travel networks and should protect the primitive recreation resources and values found in lands with wilderness characteristics.

## 4. Temporary Closures

BLM has authority to institute temporary route closures to protect public lands and resources. 43 C.F.R. § 8364.1. BLM must immediately close any areas where the agency finds that OHVs are or will cause considerable adverse effects upon natural or cultural resources. 43 C.F.R. § 8341.2. BLM has policy guidance (Instruction Memorandum 2013-035) that describes how RMPs and TMPs should address

temporary closures including defining thresholds for when OHV-related closures will take place. The IM states that all RMPs and TMPs shall include the following statement in accordance with 43 C.F.R. § 8341.2 with regard to OHV use:

> Where off-road vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, the affected areas shall be immediately closed to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.

IM 2013-035, Attachment 1. The IM goes on to state that the RMP and TMP should also describe the resources, uses, situations, and locations likely to be adversely affected by OHV use. Moreover, the IM provides that if BLM analyzes potential for temporary closures properly, then there will be no further need for additional NEPA analysis and the temporary closure can be issued with a DNA.

***Summary of Comments:*** The above guidance from IM 2013-035 on incorporating analysis of potential for temporary closures should be included in the RMP. BLM should issue temporary closures for any area where ORVs are currently harming or may harm natural or cultural resources in the interim.

**5. Revised Statute 2477**

The Draft RMP appropriately asserts that BLM does not address the validity of R.S. 2477 assertions through the planning process:

> Although the courts may recognize adjudicated Revised Statute 2477 rights-of-way as valid existing rights, current BLM policy does not allow BLM to consider adjudicated Revised Statute 2477 claims as valid existing rights. The current moratorium precluding the BLM from processing Revised Statute 2477 claims is still in effect, making Revised Statute 2477 assertions a legal issue beyond the scope of this planning effort.

Uncompahgre Draft RMP at ES-6, I-13; *see also* 2-309. We support this approach, and note it is the correct approach under relevant law and policy. BLM must ensure it does not make inappropriate decisions based on R.S. 2477 claims, and must communicate clearly to cooperating agencies and the public that BLM is prohibited from considering such claims in this planning process.

**Summary of Comments:** BLM should uphold its assertion that R.S. 2477 claims are not addressed in the agency's planning process.

**G. Ecological Emphasis Areas and Areas of Critical Environmental Concern**

We support that BLM is considering innovative planning approaches for managing natural resources at a landscape scale and implementing a comprehensive conservation framework in the Uncompahgre RMP. The networks of Ecological Emphasis Areas (EEAs) and Areas of Critical Environmental Concern (ACECs) evaluated in the range of alternatives create integrated conservation designations that, in context with other specially designated areas and allocations evaluated in the RMP, aspire to protect and enhance the ecological integrity of the Uncompahgre Field Office.

We also see this approach as consistent with BLM's Planning 2.0 initiative. The landscape-level approach committed to through the agency's Planning 2.0 initiative will guide agency planning for the foreseeable

BLM_0148977

future. While the Uncompahgre RMP is not currently being developed under Planning 2.0, consistency with the new agency direction will lead to more forward-thinking plan that aligns better with BLM's new planning rule and principles. Planning 2.0 presents an important opportunity for BLM to develop a landscape level strategy for conservation on our public lands. BLM's approach to EEAs and ACECs in the Uncompahgre Draft RMP fits well within BLM's movement towards a landscape approach to managing public lands articulated in Planning 2.0.

Developing integrated networks of land use allocations to manage ecosystems at a landscape scale is critical to addressing climate change and the future of land management, and modern science emphasizes the importance of this approach as well as provides useful data for successful implementation. The rate of land use change across the conterminous United States has been, and is projected to continue increasing into the future. These changes are resulting in habitat fragmentation, loss of biodiversity, and are negatively impacting sensitive habitats and important ecological processes. The effects of anthropogenic changes upon landscapes are no longer explicitly localized, rather the scale, speed of change, and subsequent impacts are having increasingly pronounced consequences at regional and global scales. Significant shifts in climate and climate change velocity are changing public lands, and the effects have been reliably modeled and observed across the United States. Specifically, in the Southwest region, broad scientific consensus supports an imminent shift in climate towards increasing seasonal temperatures and a significant reduction of annual precipitation, resulting in an increasingly arid climate with prolonged periods of drought.

These changes in climate and land use patterns are projected to continue causing an increase in habitat fragmentation and shifts in the distribution of plants, animals, and ecological processes across local, regional, and global scales. At the global scale, species migration and shifts in habitat range that match climate change projections have been empirically observed. At a regional level, biodiversity in the Southwest, including Colorado, are modeled to undergo significant shifts in plant distributions. It is expected that grass communities will expand and dominate in lower elevations, as the distribution of forested communities will migrate to higher elevations and potentially occupy smaller, favorable areas of refugia.

In order for species to survive, the persistence of suitable climates is necessary, but in some cases may be insufficient. Species must also have the capacity to migrate and disperse at a velocity that keeps pace with suitable climates as they shift across the landscape. The ability of ecosystems to adapt and persist in a changing climate will be dependent on the ability of species and ecological processes to migrate over and operate at broad scales. The rate at which species must adapt and migrate to keep pace with human- and climate-driven landscape change may vary widely and be difficult to predict, but migration capacity and ability will be necessary for survival.

For species and ecological processes to migrate and persist over different temporal and geographical scales, it is crucial that they have access to landscape areas capable of supporting high levels of biotic and abiotic diversity. This diversity is known as landscape heterogeneity, and includes areas with a diversity of terrestrial, riparian, and aquatic ecosystems, and the associated plants and animals they support. Landscape heterogeneity also includes a diverse range of geophysical characteristics including; topographic complexity, large elevation ranges, soil type and structure, soil chemistry, soil moisture availability, and underlying geological features. Together, all of these characteristics comprise landscape heterogeneity and are crucial for maintaining the long-term persistence of habitat, biodiversity, and ecological processes at the landscape scale, especially under changing climate and land use conditions. Landscape heterogeneity provides increased opportunities for biodiversity to occupy small habitat areas that serve as a refuge in a changing climate. Habitat 'refugia' created by a diverse and heterogeneous

BLM_0148978

landscape are important land characteristics that allow species to migrate to, persist in, and expand from during times of a rapidly changing climate.

In an effort to increase the capacity of plants, animals, and important ecological processes to migrate, adapt, and persist across the West, a systematic and increased network of conserved and protected areas needs to be implemented by conservation and land management planners. An increasingly large and diversified network of conserved areas in the West will help ensure the protection of important geophysical, biological, and ecological heterogeneity and allow for conservation management of large landscape level processes containing many important ecological processes.

A networked, connected, and dynamic regional system of protected areas will provide the greatest conservation benefit as single species conservation programs may become too costly, administratively complicated, and ultimately unsuccessful in the face of unpredictable, site-specific landscape and climate driven change. The regional approach to land conservation management, drawing from biogeography and landscape ecology, have great implications for understanding the importance of incorporating different ecological scales (single species vs. multiple ecosystems) at which biodiversity conservation will be most successful.

The BLM also can utilize EEAs and ACECs to more effectively manage ecologically valuable resources, particularly in the face of shifting climates. Many significantly large, road-less areas managed by BLM have been identified as having very high conservation value, yet much of this land is currently not allocated or managed with any type of conservation protection or special management prescriptions. Dickson et al. 2014. By utilizing a landscape level strategy for conservation planning, BLM can fulfill its responsibility and exercise its capacity to expertly manage our valuable public landscapes.

### 1. Ecological Emphasis Areas

The UFO Draft RMP proposes a new designation across the range of alternatives, called Ecological Emphasis Areas. BLM defines EEAs as "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," and they are identified with the intention of contributing to connectivity across the larger landscape. Uncompahgre Draft RMP at D-1. This innovative approach would complement ACECs, as well as other land use allocations and conservation designations considered and applied across the landscape. The stated objective of designating EEAs is to "manage to preserve the continuity of habitats, vegetation communities, and native wildlife within." *Id.* at 2-68. The draft RMP includes a range of alternatives for management actions to achieve that objective. This is an important and admirable management objective as the BLM is looking for new ways to manage public lands at a landscape scale in a way that facilitates climate change resilience and adaptation.

While we fully support BLM considering and designating EEAs to achieve these important management goals and objectives, we encourage the agency to utilize modern research to improve the designation and management of these areas. The scientific literature referenced in the RMP appendix addressing EEAs is decades old. The only somewhat recent research is from 2001.[83] BLM should utilize more modern science to evaluate and designate EEAs that achieve the stated goals and objectives of the EEAs and habitat management in the RMP generally. For example, The Wilderness Society has conducted recent research that would be valuable in identifying potential EEAs in the Uncompahgre Field Office, detailed below.

---

[83] Noss, R. 2001. Beyond Kyoto: Forest Management in a time of rapid climate change. Conservation Biology. Vol. 15, Issue 3, pg. 578-590.)

BLM_0148979

*Mapping Wildland Values to Support Conservation Strategies Across the US*

**Overview:** For over 100 years, conservation efforts have led to the establishment of hundreds of protected areas covering millions of hectares in the United States. These conservation reserves form the foundation of strategies to protect biological diversity and ecological processes upon which species and people depend. However, there is growing recognition that these existing conservation reserves may be insufficient in sustaining biodiversity as climate change and land use continues to impact natural ecosystems. Recent calls have been made to "complete the system" of protected areas by establishing an ecologically-connected network that is more inclusive of ecosystems and species currently under-represented in protected areas. Here, we conduct a national assessment of priorities for expanding conservation reserves that protect the most ecologically intact lands, establishes a national connected network, and better represents ecosystem and hotspots of range-limited species.

**Ecological integrity and "wildness":** The relative wildness of land is based on its ecological condition and the degree of human control over ecological processes. Places that are ecologically intact and are maintained in a natural condition with minimal influence by human impacts or management are wilder than those with degraded ecological conditions and a high degree of human influence. The Wilderness Society works to protect the last remaining wild places (Figure 3a, upper left). For our national assessment, we used a high resolution dataset on the degree of human modification and ecological integrity to serve as a surrogate for wildness. Maps of wildness are highly correlated with Theobald's map of ecological integrity, but is higher resolution and more updated than the wildness index.

**Connectivity:** The importance of creating a connected network of protected areas has emerged as one of the most important conservation strategies in the face of a changing climate. Our connectivity model identifies the wildest and most natural corridors linking large protected core areas across the lower 48 states. Maintaining the wildest and least human modified corridors between protected areas may give the most numbers of species the best opportunities to move and disperse as the climate change and development continues to fragment other areas (Figure 3b, upper right). We are working to bring this science to bear on additional conservation protections on federal lands so that these wild corridors are maintained or improved.

**Ecosystem representation:** Effectively conserving all of nature's biological diversity requires that protected areas be representative of all habitat types. Unfortunately, our protected areas systems currently do not include full representation of all habitats, but we are working to identify those places across the country that – if protected – would diversify the protected areas system making it more representative of our entire natural heritage. Lands in red and yellow represent ecological systems (i.e., different habitats) that are not well-protected in wilderness, national parks, or other protected areas (Figure 3c, lower left). As we prioritize the conservation lands of the future, adding diversity to our existing wilderness and parks will ensure that all of nature's diversity is protected.

**Hotspots of endemic biodiversity:** There are some places where many rare species co-occur. These lands are said to be rich in endemic biodiversity. Alarmingly, many of these places are home to species that occur nowhere else on earth and are currently unprotected in conservation lands. The index developed by Clinton Jenkins and colleagues and appearing in the Proceedings of the National Academy of Science in 2015 maps these unprotected hotspots as conservation priorities. We are including these data into our wildland conservation priority index to ensure that we work on protecting those rare and precious places that are globally significant homes to many rare species (Figure 3d, lower right).

**Wildland conservation priorities:** We combined the mapped data described above (ecological integrity, connectivity, representation, and hotspots of endemic biodiversity) into one index by simply adding up

BLM_0148980

the mapped layers (Figure 4). This new index allows us to identify wildland conservation priorities based on the land's relative wildness, its importance for creating a connected network of protected areas, its value in adding to the representation of habitats, and whether it has been identified as a hotspot of endemic species diversity. Ultimately, this approach will foster a national protected system of wildlands that is more prepared to handle the projected consequences of climate change.

Applying this data to the Uncompahgre Field Office, we can review how the EEAs evaluated in the draft RMP align with criteria used to map conservation priorities and overall wildland conservation values. As seen on the maps in Figure 5 (WSCC Comment Appendix I), additional or alternative areas should be considered for EEA designation to ultimately achieve a network of conservation areas that maximize their potential to contribute to connectivity across the larger landscape.

Additionally, this research could also help BLM prioritize management prescriptions for EEAs. In the draft RMP, BLM considers essentially one set of management prescriptions for all EEAs in each alternative. Given the large amount of acreage under consideration, the more reasonable approach may be to tailor management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs. This is how BLM develops management prescriptions for ACECs, and this approach could give the agency flexibility to designate large amounts of EEAs while giving each area the level of protective management that is required.

**Summary of Comments:** BLM should move forward with designating Ecological Emphasis Areas in the Uncompahgre RMP to create a network of interconnected habitat areas that contributes to the ecological integrity of the broader landscape. We encourage the agency to utilize modern research to improve the designation and management of these areas, such as the wildland values mapping information provided above. BLM should consider tailoring management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs.


## 2. Comments on Specific Ecological Emphasis Areas

### a. Jumbo Mountain/McDonald Creek

We strongly support the designation of all 17,220 acres of all five zones of the Jumbo Mountain / McDonald Creek Ecological Emphasis Area included in Alternative B (DEIS Table 2-2, 103; DEIS Figure 2-2, Appendix A) As the BLM outlines in the draft RMP (DEIS Appendix D-2), these areas are highly valuable for the habitat connectivity for a number of wildlife species within our region, particularly mule deer, elk, mountain lion, and black bear.

The draft RMP describes the ecological value of these areas as follows:

> Links North Fork Valley with the National Forest and West Elk Wilderness. Adjoins several conservation easements that link the southern three parcels. Important for landscape-scale linkage. (DEIS Table D-1)

Based on the years of experience hunting, recreating, and living in close proximity to these lands, we can attest without any reservation that these lands provide exactly the quality of connectivity described. The wildlife value of these lands is difficult to overstate.

We would also like to express our strong support for overlapping designations of both the Jumbo Mountain / McDonald Creek EEA, the Jumbo Mountain SRMA, and any additional overlapping ERMA

BLM_0148981

or SRMA designations in the final plan (see WSCC and DAMB/COPMOBA Comments in support of additional recreation designations). We see no inherent conflict in these designations, which will not only protect the world-renowned mule deer herds and other wildlife, but also has the possibility of improving the recreation experience by limiting activities in late winter/early spring when recreation conditions, due to precipitation and soil moisture, are poor, and impacts to trails are greatest.

It should be clear from these comments and others (DAMB/COPMOBA), that there exists a rare degree of cooperation and enthusiasm for increased management of the lands in the North Fork Valley, with many different users supportive of careful management of multiple resources that can be mutually managed on these lands. A unifying concern, however, is that oil and gas development of these lands will be prioritized over these many other resources upon which our communities depend for quality of life, economic gain, and recreation.

**b. Adobe Ecological Emphasis Area**

The BLM is also proposing to manage part of the greater Adobes area under an Ecological Emphasis area designation, which as described above, we support. However, the specific proposal for the Adobe area changes drastically from Alterative B to Alternative D as it is basically gutted through the center, leaving only portions of the area designated on the northwest and far eastern boundaries.

This would leave the center of the Adobes/Desert Salt Brush Ecosystem ACEC area completely without any special designation status to protect the many unique values and resources that have been highlighted through the LWC, ACEC and EEA analysis. For the BLM to truly protect this area from further degradation and maintain the landscape scale habitat management it aspires to, the full acreage of the Adobes EEA must be restored in the Final RMP.

Taken altogether, the LWC, ACEC and EEA designations will create a holistic management proposal that will protect a large area of unique a vulnerable desert shrub lands and habitat that connect to Forest Service lands on the Grand Mesa.

**c. Monitor/Potter/Roubideau**

We support BLM including the Roubideau EEA as identified in both Alterative B and Alternative D in the Final RMP as it maintains its full acreage in both.

**3. Areas of Critical Environmental Concern**

Under FLPMA, BLM is obligated to develop and revise land use plans to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values…[and] where appropriate, will preserve and protect certain public lands in their natural condition…" 43 U.S.C. §1701(a)(8). FLPMA obligates BLM to "give priority to the designation and protection of areas of critical environmental concern [ACECs]." 43 U.S.C. § 1712(c)(3).  ACECs are areas "where special management is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes." 43 U.S.C. § 1702(a).

BLM's ACEC Manual (1613) provides additional detail on the criteria to be considered in ACEC designation, as discussed in the applicable regulations, as well.  *See*, BLM Manual 1613 at .1 (Characteristics of ACECs); 43 C.F.R. § 8200.  An area must possess relevance (such that it has significant value(s) in historic, cultural or scenic values, fish & wildlife resources, other natural

BLM_0148982

systems/processes, or natural hazards) and importance (such that it has special significance and distinctiveness by being more than locally significant or especially rare, fragile or vulnerable). In addition, the area must require special management attention to protect the relevant and important values.

For potential ACECs, management prescriptions are to be "fully developed" in the RMP. BLM Manual 1613 at .22 (Develop Management Prescriptions for Potential ACECs). These management prescriptions include general policies and mitigation measures that "protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources…" BLM Manual 1613 at .02.

We support that BLM is considering a robust range of ACECs for designation in the Uncompahgre RMP. The fact that the proposed Planning 2.0 rule emphasizes ACECs, as well as the fact that BLM is currently updating its ACEC Manual, speaks to both the importance of incorporating ACEC designation into the agency's landscape-level strategy for land use planning and the unique position that ACECs will have in the next chapter of BLM land use planning. Therefore, the limited number and acreage of ACECs that would be designated in the preferred alternative is inadequate to support a connected landscape and maintain its ecological integrity. At the same time, we note that many of the ACECs under consideration in the draft RMP overlap with potential EEAs, particularly in Alternative B. Uncompahgre Draft RMP at Figures 2-2 and 2-64. We encourage BLM to ultimately designate a network of ACECs and EEAs that is consistent with FLPMA and agency policy, and also maximizes the ability of these designations to create a connected network of protected areas across the Uncompahgre Field Office.

**Summary of Comments:** In compliance with FLPMA and BLM's obligation to designate ACECs where lands exhibit relevant and important qualifying criteria, we recommend that BLM adopt a comprehensive ACEC framework that designates adequate new ACECs, applies robust management prescriptions to protect relevant and important criteria, and creates an integrated network with EEAs and other conservation allocations and designations in the planning area.

## 4. Comments on Specific Areas of Critical Environmental Concern

### a. Needle Rock

We support managed of Needle Rock as an Area of Critical Environmental Concern.

### b. Roubideau – Potter – Monitor

In BLMs ACEC analysis, the Roubideau-Potter and Monitor mesa and canyon complex is recognized as an ACEC of 20,502 acres in size with valuable resources of riparian vegetation. The area is recognized by the CNHP for its high biodiversity rating, giving it statewide and global significance.

The area also has cultural and historical sites that are vulnerable to change and warrant protection as an ACEC. If the BLM is planning to manage this area as an SRMA expecting more visitation in the future (as explained in the rational for moving it towards "front country management") these historic resources need to be managed so increased recreational use does not damage them.

The Roubideau ACEC is present in Alternative D and named "Roubideau Corridors," but is drastically reduced in size to 8,720 and only includes the canyons, not the mesa tops. This proposal would leave the mesa tops without either LWC or ACEC protection, only selectively managing to protect the riparian vegetation in the canyons and not the montane forest also identified in the area.

After leading many on the ground hikes in both the canyons and the mesa tops, it is clear the area should be treated as a holistic unit and not separated into canyons and mesas. The experience of being in this area in not complete without being able to enjoy a hike through the canyons and then climb up to the mesa tops to get a full view of the surrounding area. If BLM is not going to manage the mesa tops as part of the LWC unit, an ACEC designation should include to mesa tops to ensure the holistic management of the area to protect it and maintain the quality of the experience.

We recommend that the BLM include the full Roubideau ACEC as identified in Alternative B in the Final RMP.

### d. Adobe Badlands and Salt Desert Shrub Ecosystem ACECs

i. The greater Adobe badlands in north Delta are a fascinating and vulnerable environment. It is a system based on fragile shales and soil crusts that in turn support rare high desert plant and animal species. The Colorado Natural Heritage Program considered salt desert shrub lands in the area to be globally vulnerable and locally imperiled. These fragile desert systems need a high level of preservation to retain an intact ecosystem as they have a high difficulty in recovery from disturbance.

ii. The greater adobes area has two different proposed ACECs that overlap. One is the existing Adobe Badland ACEC which basically overlaps the WSA. The other is the Salt Desert Shrub Ecosystem ACEC which is much larger in size and would go further in protecting these fragile systems. We encourage the BLM to carry the Salt Desert Shrub Ecosystem ACEC into the final RMP with the full acreage as identified in Alternative. This management decision would lessen the impacts to Special Status Species and protect a system that is already facing encroachment and fragmentation.

iii. The proposed ACEC meets BLM's ACEC criteria and should be designated as such:
- a. The area has significant wildlife values: populations of white tallied prairie dogs, kit fox, burrowing owl, ferruginous hawk and pronghorn antelope. All together it has been ranked as an area of "very high biodiversity significance" by the Colorado Natural Heritage Program.
- b. Natural processes or systems: significant populations of hookless cactus, adobe penstemon, and clay-loving buckwheat, all endangered or threatened endemic sensitive plants
- c. More than local qualities: In addition to providing an important natural area for local residents to enjoy, the area is listed in the state and regional hiking guide books because of its scenic formations. If one looks on line, there is evidence of evidence of visitors from as far away a Europe who post photos and GPS coordinates of their trips into this area.
- d. Vulnerable qualities: the area is clearly vulnerable to high levels of erosion and without special management. Issues such as illegal off road recreation, dumping and other damaging uses are difficult for systems such as these to recover from. Saline soils are vulnerable to adverse change. Without added management protection, the area could be damaged for decades to come.

## H. Wild & Scenic

### 1. Legal and procedural requirements

We appreciate the BLM's conscientious and professional compliance with requirements regarding wild & scenic analyses and decisions within the RMP process, including section 5(d)(a) of the Wild and Scenic Rivers Act and by the BLM Manual at 8351 and 6400. Beyond mere compliance, we also thank the BLM for its thoroughness in reviewing potential rivers at each stage of its W&S analysis—including initial inventory of rivers, eligibility report, and suitability report—and for its extra efforts in community outreach and in field assessment of potential rivers.

We believe that the W&S suitability findings included in the BLM's *Wild and Scenic River Suitability Report*, February 2013 (included as Appendix P to the draft RMP), provides a fair and sound analysis and set of recommendations. We believe that the suitability findings should be fully implemented in the final RMP, as represented in the preferred alternative of the Draft RMP.

## 2. Critique of working groups

One component in the W&S suitability analysis was a series of public-engagement meetings and negotiations, structured separately for the Gunnison River basin and the San Miguel-Dolores River basin.

The citizens' working group focused on eligible segments within the Gunnison River basin was loosely organized and marginally facilitated, open to a frequently changing array of interested individuals, without consistent representation, and with changing protocols for discussion and decision-making.

As a result, no consensus was reached on recommendations to the BLM. Two reports were submitted from that process: One report recommended no stream segments be found suitable; the other recommended three segments be found suitable (Monitor Creek, Potter Creek, Roubideau Creek segment 1). Both reports are included on the BLM's website for the RMP, and we appreciate that fact that both were considered by the BLM in crafting its draft RMP.

For the San Miguel and upper Dolores river basin, the BLM's *Southwest Resource Advisory Council* (RAC) appointed a diverse citizens committee to review candidate rivers.

The sub-RAC, as it was known, was thoughtfully and fairly structured, was professionally facilitated and recorded, hosted nine public-comment meetings, and included a deliberately selected membership intended to represent a comprehensive spectrum of community and resource interests.

That group studied each eligible river in detail and recommended thirteen stream segments be found suitable, those recommendations later affirmed by the full RAC and forwarded to the BLM. In many instances, river segments were adjusted in length—most typically to remove private land from suitability implications—and some were adjusted in classification to better fit local water use and other resource needs.

## 3. Watershed approach to rivers management and protection

The BLM's suitability findings in the San Miguel-Dolores River basin are correspondingly well founded in careful analysis, in strong public engagement and support, and in a constructive spirit of compromise and mutual accommodation among protection, commodity, and community interests.

Moreover, the suitability findings for the San Miguel River, for portions of the Dolores River, and for key tributaries to both are consistent with suitability determinations in adjacent federal land management units. Specifically, W&S suitability findings recently established or affirmed in the watershed by the San Juan National Forest, the BLM Tres Rios Field Office, and the BLM Grand Junction Field Office will

now be complemented by similar findings of suitability—and corresponding protective management—in the Uncompahgre Field Office.

That consistency is further enhanced by the BLM's recent realignment of management districts, now including in the entire Dolores River watershed in one coordinating district.

The call for a comprehensive and coordinated watershed approach to rivers management and protection was a frequent and consistent refrain during the working group processes. The management decisions noted above, the BLM organization restructuring, and now strong and well-founded suitability decisions in the Uncompahgre Field Office provide affirmative response to those requests.

## 4. Opportunities for federal-state cooperation

The BLM's administrative management and protection for potential Wild & Scenic Rivers, through eligibility or suitability, affords an important opportunity to comprehensively address river values. A combination of federal land management prescriptions under the RMP and streamflow protections using the State of Colorado's *Stream and Lake Protection Program* will ensure the continued health and natural vibrancy of the full spectrum of river flow and river corridor features.

Correspondingly, we appreciate the position recently taken by the *Colorado Water Conservation Board* (CWCB) (which manages the state stream protection program), acknowledging the potential value of W&S suitability findings in both watersheds and requesting several specific accommodations from the BLM.

Specifically, we encourage the BLM to a) incorporate into its final RMP preparation information and documents prepared under the state's Basin Roundtable process, b) acknowledge existing state instream flow water rights affecting W&S suitable stream segments and encourage cooperation on the selective expansion of those rights and establishment of new rights to complement the suitability status, c) affirmation of stipulation between the CWCB and the Dolores Water Conservation District in the matter of CWCB staff recommendation for instream flow appropriation on the Dolores River, d) incorporate updates regarding CWCB instream flow water rights, both established and pending, e) include clarification regarding effects that W&S suitability may or may not have on potential development conditional water-storage rights held by Montrose County, and f) provide clarifications regarding the effects that W&S suitability may or may not have on continued operation of McPhee Reservoir and the Dolores Project.

While we understand that the pending RMP is probably not the correct context in which to address potential federal legislation, we encourage the BLM to otherwise acknowledge and affirm the its openness to streamflow protection for potential W&S rivers by means other than pursuit of federal reserved water rights.

At the same time, we recommend that the BLM should not adjust its RMP suitability findings for stream segments being discussed for possible federal legislation (upper Dolores River, La Sal Creek *e.g.*), leaving final or adjusted determinations to Congress or to future BLM administrative processes. It is important that legislative deliberations benefit from the BLM's professional and objective assessment of particular stream values and of their potential for inclusion in the *Wild and Scenic Rivers System* or other protective designation.

## 5. Comments on specific stream segments

We strongly endorse all the W&S suitability findings included in the BLM's *Wild and Scenic Suitability Report*, highlighted in Appendix P to the draft RMP, and we urge BLM to include those findings in the

final RMP, along with protective management prescriptions appropriate to suitability status and classification.

Further, we urge BLM to fully and reliably implement, in the RMP, other protection measures for rivers and river corridors determined to be W&S eligible but found not suitable. In many instances, a combination of recommendations from the citizen working groups and acknowledgements in the draft RMP have asserted that suitability was not necessary for certain stream segments specifically because other measures are in place to protect the free-flowing condition and the outstandingly remarkable values that warranted the original eligibility determination. It is important that the BLM ensure the continued protection of values identified under eligibility.

Related, the BLM, through the RMP and otherwise, should continue to monitor the presence and effectiveness of those alternative protection measures. If those measures fail or are discontinued for any stream segments that had been found eligible, BLM should promptly reconsider, through an RMP amendment, eligibility and suitability for those segments.

**a. Gunnison River Segment 2**
As documented the BLM's W&S eligibility report, this regionally significant river warrants strong and enduring protection as an important recreational opportunity, as the hydrologic heart of unique adjacent public lands, and as essential habitat for at least two endangered species of native fish, along with three other species of ancient native fish that are imperiled primarily because of loss of habitat or changes in river flows.

Other federal programs—primarily the Endangered Species Act—and evolving federal management efforts—including re-operation the Aspinall Unit dams upstream—contribute, or will contribute, to the reliability of those critical-habitat flows.

It therefore is not necessary to apply a finding of wild & scenic suitability to this portion of the Gunnison River, *so long as* those other federal measures are implemented and properly maintained. If those measures are either removed or fail to protect the native fish and their habitat, the BLM should reconsider a finding of suitability in future planning processes.

**b. Monitor Creek**
This stream is an important feature flowing through the heart of federal lands with wilderness character and wilderness characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values identified by the BLM (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Monitor Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and Outstandingly Remarkable Value (ORV)) identified by the BLM for nearby Roubideau Creek (*desert bighorn sheep*). The features, condition, and importance of this wildlife habitat along Monitor Creek are of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Monitor Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), the version found along Monitor Creek is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Monitor Creek are also present in Roubideau Creek, which is included, stream and corridor, in the Roubideau (Camel Back) Wilderness Study Area, thus necessarily defined by those same backcountry recreation opportunities.

Meanwhile, a finding of wild & scenic suitability for Monitor Creek—a finding most directly applicable to the lands in the stream corridor—will provide reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*).

Federal ownership of 100% of this stream segment, and of 96.2% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 104.9 acres of private land within the stream corridor are actually separate from the stream, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Monitor Creek segment be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should be expanded to include recreational opportunities and wildlife habitat.

#### c. Potter Creek

This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values originally identified in the BLM's eligibility report (*vegetation*), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Potter Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and ORV) identified by the BLM for adjacent Roubideau

BLM_0148988

Creek (*desert bighorn sheep*). The features, condition, and importance of that wildlife habitat along Potter Creek is of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Potter Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), it is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Potter Creek are also present in Roubideau Creek. Roubideau Creek and its corridor are included in the Roubideau (Camel Back) Wilderness Study Area, which is necessarily defined by those same backcountry recreation opportunities.

Meanwhile, the BLM's decision to remove the one outstandingly remarkable value originally identified in the agency's eligibility report is in error. The BLM's rather arbitrary distinction between a classification as critically imperiled globally (G1) and vulnerable throughout its range (G2) is not well founded.

A plant community that is currently vulnerable throughout its range warrants the highest possible level of protection in each of its occurrences, lest damage from human activity, climate change, or other harmful factors translate vulnerable to imperiled. The best way to avoid plant community failures in the future is an active protection in the present. A finding of suitability, and accompanying protective management, is an appropriate and timely tool for this plant community.

A finding of wild & scenic suitability for Potter Creek—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*).

Federal ownership of 100% of this stream segment, and of 98.5% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 44.3 acres of private land are located at the far lower end of the stream segment, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Potter Creek be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should continue to include the highlighted vegetation communities, and they should be expanded to include recreational opportunities and wildlife habitat.

## d. Roubideau Creek Segment 1

This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, both within the long-standing Roubideau (Camel Back) Wilderness Study Area and in the larger citizens' wilderness proposal of the same name. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

A finding of wild & scenic suitability for Roubideau Creek Segment 1—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring protection for the continued health of the ORVs identified in the BLM's eligibility report, including: rare plant communities (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*); wildlife (*northern leopard frog, desert bighorn sheep*); cultural; and recreational (*primitive and non-mechanical exploration and exercise*).

Federal ownership of 93% of this stream segment, and of 94.8% of the land in the stream corridor simplifies the effective implementation of protective management.

We recommend that the full length of the Roubideau Creek Segment 1 be found suitable, applicable at least to the federal lands in the corridor.

**e. Roubideau Creek Segment 2**
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (45.5%, 60.2%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Roubideau Creek Segment 2.

**I. Wilderness Study Areas**

We support that the Uncompahgre Draft RMP identifies management actions for Wilderness Study Areas in the event they are released from wilderness consideration by Congress.

The Camel Back WSA would receive minimal protections for its natural resource values under the preferred alternative in the Draft RMP if it were to be released from WSA status. The only overlapping designations in the preferred alternative are the Roubideau Corridors ACEC and Roubideau SRMA. Uncompahgre Draft RMP at Maps 2-66 and 2-47. The Roubideau Corridors ACEC is small relative to the Camel Back WSA, and the Roubideau SRMA as considered in Alternative D would not provide adequate protection to the important public lands resources in the Camel Back WSA. Therefore, the final RMP should adopt the Roubideau SRMA as contemplated in Alternative B; designate the Roubideau-Potter-Monitor ACEC as contemplated in Alternative B; or identify specific management actions to protect the natural resources of the Camel Back WSA in the event of Congressional release similarly to how the draft RMP would manage the Sewemup Mesa WSA in the event of Congressional release.

**J. Night Sky Resources**

We support that the Uncompahgre Draft RMP addresses protection of dark night skies across the range of alternatives. In the alternatives table for visual resources, one of the identified objectives is to: "Maintain dark night sky conditions in areas that are generally unaffected by man-made light sources." Uncompahgre Draft RMP at 2-147. The draft RMP goes on to detail actions for achieving this objective, including prohibiting permanent outdoor artificial lighting in VRM I and II areas, requiring that permanent and temporary artificial outdoor lighting be shielded and downward-facing, and requiring that

BLM_0148990

permanent artificial outdoor lighting be turned off when it is not needed. *Id* at 2-147—148. These are appropriate actions to ensure that night sky resources, which are important visual resources of our public lands, are protected from light pollution.

BLM has been given an explicit mandate to manage the lands under its jurisdiction for their scenic and atmospheric values, which includes night skies. *See*, FLPMA, 43 U.S.C. § 1701(a)(8) (stating that "…the public lands be managed in a manner that will protect the quality of the…scenic…[and] air and atmospheric…values…"); National Environmental Policy Act, 43 U.S.C. § 4331(b)(2) (requiring measures to be taken to "…assure for all Americans...esthetically pleasing surroundings…"); National Historic Preservation Act, 36 C.F.R. § 800.1(a) (requiring federal agencies to consider measures to avoid impacts on historic properties, including their "settings"). A dark night sky is undoubtedly a scenic and atmospheric value within that term's meaning as defined in FLPMA.

Since 1984, BLM has interpreted its mandate as a "stewardship responsibility" to "protect visual values on public lands" by managing all BLM-administered lands "in a manner which will protect the quality of scenic (visual) values." Visual Resource Management Handbook, H-8400-1 at .02, .06(A). Night sky management is an inherent component of this responsibility. VRM is not restricted to land-based resources. To this end, BLM should develop minimum management prescriptions to be included in its resource management plan that give due consideration to the value of a dark night sky, consistent with BLM's multiple use mandate, as defined at 43 U.S.C. § 1702(c).

In addition to carrying forward the management actions contemplated in the Draft RMP, BLM should adopt minimal additional management actions to even better steward this important visual resource. The Arizona Strip District incorporated the following prescriptions in the RMPs for the District in 2008, which would be appropriate for the Uncompahgre Field Office:

- Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review. These measures may include directing all light downward, using shielded lights, using only the minimum illumination necessary, using lamp types such as sodium lamps (less prone to atmospheric scattering), using circuit timers, and using motion sensors.
- Any facilities authorized will use the best technology available to minimize light emissions.

Arizona Strip RMP at 65; Grand Canyon-Parashant National Monument RMP at 67; Vermilion Cliffs National Monument RMP at 47-48.

Furthermore, the Uncompahgre RMP should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that BLM can accurately and appropriately apply the dark night sky management actions in RMP implementation.

**Summary of Comments:** BLM should adopt management actions contemplated in Alternative B of the Uncompahgre Draft RMP, which extends the prohibition on permanent artificial outdoor lighting to VRM II areas in addition to VRM I areas. BLM should also adopt the following management actions to further protect dark night sky resources:
- Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review.
- Any facilities authorized will use the best technology available to minimize light emissions.

BLM_0148991

Additionally, BLM should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that these management actions can be applied in implementation.

## K. Climate Change

### 1. BLM's Obligation and Authority to Analyze Climate Change in RMPs

BLM has a legal duty to address the impacts of climate change both from land management actions and to the resource area in the Uncompahgre RMP. The Uncompahgre Field Office will undoubtedly experience real effects of climate change during the 20-year period that the RMP is in effect and beyond. Many management decisions in the RMP may contribute to and exacerbate the impacts of human-induced global climate change, and BLM stewards many resources that must be managed so as to maximize their ability to adapt and endure in the face of climate change.

We appreciate that BLM acknowledges the need to manage for climate change impacts, analyzes some of those impacts from BLM actions and from other actions affecting the Uncompahgre Field Office, quantifies greenhouse emissions from alternatives under consideration in the RMP and proposes a goal and objective specifically related to climate change in the draft RMP. *See, e.g.,* Uncompahgre Draft RMP at 2-24; 3-14—16; 4-37—43; Appendix Q. These are all important initial steps in bringing climate change analysis and management into resource management planning. However, at this time, BLM has access to significant amounts of data and useful tools to assist with climate change analysis, relevant policy and guidance for completing robust climate analysis in environmental reviews, and an obligation to make management decisions that more comprehensively address climate change impacts and adaptation. The Uncompahgre RMP is wholly inadequate in addressing this important issue at this critical time.

a. BLM must take a hard look at climate change impacts from management decisions in the environmental impact statement for the resource management plan.

Impacts to the ecosystem from climate change include shrinking water resources; extreme flooding events; invasion of more combustible non-native plant species; soil erosion; loss of wildlife habitat; and larger, hotter wildfires. Many of these impacts have been catalogued in recent studies by federal agencies showing the impacts of climate change specifically in the United States such as the National Climate Assessment.[84]

An important source of information for impacts from climate change is BLM's Rapid Ecoregional Assessment (REA) for the Colorado Plateau.[85] BLM should be using the results of the REA to inform the RMP/EIS and to address management issues at the landscape-scale, such as climate change. The Draft RMP states that, "Data in the Colorado Plateau Rapid Ecological Assessment [sic] will be considered as appropriate." Uncompahgre Draft RMP at 1-12. However, BLM appears to rely very little on data available from the REA, as there is hardly any reference to the REA other than that vague commitment, and the RMP fails to consider management alternatives that reflect data derived from the REA. The REA should be a central tool relied upon in resource management planning to plan for climate change adaptation:

> REAs are timely in supporting planning, management, and mitigation strategies for impacts anticipated from rapidly-developing issues related to traditional and renewable energy

---

[84] Available at http://nca2014.globalchange.gov/
[85] Information on the REA is available at: http://www.blm.gov/st/en/prog/more/Landscape_Approach/reas/coloplateau.html.

BLM_0148992

development, the spread of invasive species, changing fire regimes, and climate change. REAs provide a foundation for an adaptive management approach that will allow implementation strategies to be adjusted for new information and changing conditions. REAs represent a baseline condition from which to evaluate the results of adaptive management and to characterize potential trends in resource condition both in the near-term (2025)—as a consequence of development activities—and in the long-term (2060) as a result of climate change. The final chapter of this REA report (Chapter 6) provides examples showing how the data and results may be arranged and manipulated using mapped and tabular results, for all land ownerships and BLM-lands only, for areas of intact habitats, resource value hotspots, and opportunities for connectivity with existing designated lands.

Colorado Plateau REA Final Report II-3-c at viii.

Unfortunately, with all of this data available, BLM fails to address climate change in a meaningful way, instead intimating that the agency is incapable of managing public lands and resources to reduce impacts to climate change or adapt to climate change impacts. For example, under the stated goal to: "Manage native vegetation and wildlife species, soil and water resources, and wildlife habitats to maintain productivity, viability, and natural processes in response to stresses induced by climate change," BLM includes the vague management action to "Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values." Uncompahgre Draft RMP at 2-24. The only other actions under the climate change goal are to seed local native species to improve survival of plan populations and to minimize soil and vegetation disturbance in ecological emphasis areas. *Id* at 2-25.

This does not meet the obligation of the agency to assess impacts from climate change and contributions to climate change from agency actions. On August 2, 2016, the Council on Environmental Quality (CEQ) released its long-awaited final guidance on considering greenhouse gas (GHG) emissions and the effects of climate change in NEPA reviews. The overarching goal of the guidance is to provide greater clarity and more consistency in how federal agencies address climate change in their NEPA reviews and to facilitate compliance with existing NEPA requirements. The guidance recognizes that "[c]limate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview." CEQ Guidance at 2. It recognizes that identifying and analyzing the interactions between our changing climate and the environmental impacts from a proposed action can have a number of benefits, including identifying opportunities to reduce and mitigate GHG emissions, to improve environmental outcomes, and to help safeguard communities, infrastructure, and resources against the effects of climate change.

The guidance counsels agencies to use the information developed during the NEPA review to consider alternatives that are more resilient to the effects of a changing climate. CEQ Guidance at 5. BLM must not only analyze greenhouse gas emissions from proposed actions, but use that information to make better decisions for public lands resources and, equally importantly, assess likely impacts to our public lands from climate changes already underway in order to respond and adapt. Notably, the guidance contains special considerations for biogenic sources of greenhouse gas emissions from land management actions, such as prescribed burning. CEQ Guidance at 18. While the final CEQ guidance was recently released, a second draft of this guidance has been out since 2014. Therefore, the Uncompahgre RMP is not exempt from considering and using this guidance in analyzing climate change, and BLM should have incorporated principles from the CEQ guidance into the draft RMP.

Additionally, BLM has other requirements to analyze climate change in NEPA analyses that are not met in the draft RMP. NEPA regulations and U.S. courts direct that BLM must fully analyze the cumulative

and incremental impacts of the proposed decisions in the RMP.[86] In *CBD v. NHTSA*, the NHTSA failed to provide analysis for the impact of greenhouse gas emissions on climate change and was rebuked by the U.S. Court of Appeals for the Ninth Circuit, which observed that "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." 538 F.3d at 1217. For example, off-road vehicle designations, oil and gas management stipulations, and renewable energy development may significantly increase or reduce greenhouse gas emissions contributing to climate change and must be analyzed under NEPA.

Further, NEPA regulations require that NEPA documents address not only the direct effects of federal proposals, but also "reasonably foreseeable" indirect effects.  These are defined as:

> Indirect effects, which are caused by the action and are later in time or farther removed in distance, *but are still reasonably foreseeable*. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b) (emphasis added).

BLM is required to take a hard look at direct, indirect, and cumulative impacts to and from climate change in the planning area in the RMP. BLM baseline data on climate change must be sufficient to permit analysis of impacts under NEPA. Importantly, 40 C.F.R. § 1502.15 requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." Establishment of baseline conditions is a requirement of NEPA.  In *Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA."  The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

There is a growing body of scientific information already available on climate change baseline conditions, much of it generated by or available through federal agencies. Where there is scientific uncertainty, NEPA imposes three mandatory obligations on BLM: (1) a duty to disclose the scientific uncertainty; (2) a duty to complete independent research and gather information if no adequate information exists unless the costs are exorbitant or the means of obtaining the information are not known; and (3) a duty to evaluate the potential, reasonably foreseeable impacts in the absence of relevant information, using a four-step process. Unless the costs are exorbitant or the means of obtaining the information are not known, the agency must gather the information in studies or research. 40 C.F.R. § 1502.22.  Courts have upheld these requirements, stating that the detailed environmental analysis must "utiliz[e] public comment and the best available scientific information."[87]

As the Supreme Court has explained, while "policymaking in a complex society must account for uncertainty," it is not "sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions."[88]  Instead, in this context, as in all other aspects of agency decision-making,

---

[86] *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d 1172, 1217 (9th Cir. 2008).
[87] *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1171-72 (10th Cir. 1999) (citing *Robertson v. Methow Valley Citizens' Council*, 490 U.S. at 350); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1521-22 (10th Cir. 1992).
[88] *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 52 (1983).

BLM_0148994

"[w]hen the facts are uncertain," an agency decision-maker must, in making a decision, "identify the considerations he found persuasive."[89]

BLM's duty to evaluating reasonably foreseeable significant adverse impacts includes "impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22(b). Such impacts are especially significant in the face of climate change.

Finally, BLM Instruction Memorandum 2013-094 regards management during drought. This IM requires BLM to modify uses and management to lessen impacts from drought including activities such as grazing, recreation, lands actions and minerals activities. IM 2013-094 also states that BLM should consider the information in BLM's Rapid Ecoregional Assessments in assessing drought and mitigation measures and states a preference for RMPs and other plans to proactively address potential drought and its effects.

b. BLM must craft long-term management prescriptions without permanent impairment and unnecessary or undue degradation to the resources in the face of climate change.
FLPMA gives BLM the authority to manage and plan for emerging issues and changing conditions that global climate change will affect in the planning area. FLPMA mandates that when BLM revises land use plans, it must "use and observe the principles of multiple use and sustained yield set forth in this and other applicable law" 43 U.S.C. § 1712(c).

> The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions. . . a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources. . . and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output. 43 U.S.C. § 1702(c) (emphasis added).

Additional pertinent requirements of FLPMA that specifically apply to land use planning include using "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences; consider[ing] relative scarcity of the values involved; and weigh[ing] long-term benefits to the public against short-term benefits. Id. FLPMA also provides that BLM must "take any action necessary to prevent unnecessary or undue degradation to managed resources." 43 U.S.C. § 1732(b). Collectively, the provisions of FLPMA highlighted above necessitate on-the-ground implementation of climate change policies.

In addition to the agency's duty under NEPA to take a hard look at the impacts of climate change to and from decisions in the resource management plan, BLM must also include a range of alternatives that includes a strategy for mitigating these impacts. CEQ regulations instruct agencies to consider alternatives

---

[89] *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 520 (D.C. Cir. 1983), quoting Ind. *Union Dept., AFL-CIO v. Hodgson*, 499 F.2d 467, 476 (D.C. Cir. 1974).

BLM_0148995

to their proposed action that will have less of an environmental impact, specifically stating that "[f]ederal agencies shall to the fullest extent possible: . . . Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e) (emphasis added); *see also*, 40 C.F.R. §§ 1502.14, 1502.16.

The impacts of climate change should be a major factor in every alternative that is created since it is an undeniable reality that will drive all land use planning decisions. As provided in the Oregon/Washington BLM State Office guidance document IM OR-2010-012, "[r]esource management plans and other broad programmatic analyses are actions that would typically have a long enough duration that climate change could potentially alter the choice among alternatives."

Further, general statements that BLM will conduct monitoring are also not an appropriate form of mitigation.  Simply monitoring for expected damage does not actually reduce or alleviate any impacts. Instead, a vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem. A detailed monitoring approach is also required under the BLM's planning regulations:

> The proposed plan shall establish intervals and standards, as appropriate, for monitoring and evaluation of the plan. Such intervals and standards shall be based on the sensitivity of the resource to the decisions involved and shall provide for evaluation to determine whether mitigation measures are satisfactory, whether there has been significant change in the related plans of other Federal agencies, State or local governments, or Indian tribes, or whether there is new data of significance to the plan. The Field Manager shall be responsible for monitoring and evaluating the plan in accordance with the established intervals and standards and at other times as appropriate to determine whether there is sufficient cause to warrant amendment or revision of the plan. 43 C.F.R. § 1610.4-9 (emphasis added).

Such vigilant monitoring is absolutely necessary in order to create an effective adaptive management framework in the face of climate change.

c. BLM must estimate the potential increase in vulnerability to climate change impacts.

As discussed above, the agency must evaluate the direct, indirect and cumulative impacts of climate change emissions from the project. The agency must also take a hard look at the impacts of climate change and the potential increase in vulnerability to the project area from climate change. As stated in the CEQ Guidance:

> The analysis of climate change impacts should focus on those aspects of the human environment that are impacted by both the proposed action and climate change. Climate change can make a resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change. This increase in vulnerability can exacerbate the effects of the proposed action . . . Such considerations are squarely within the scope of NEPA and can inform decisions on whether to proceed with, and how to design, the proposed action to eliminate or mitigate impacts exacerbated by climate change. They can also inform possible adaptation measures to address the impacts of climate change, ultimately enabling the selection of smarter, more resilient actions.

CEQ Guidance at 21-22. In order to fulfill its responsibilities under NEPA, the BLM must fully evaluate the potential increased vulnerabilities to the landscape and communities caused by climate change and the

impacts of this project to potentially exacerbate those vulnerabilities. This will provide the agency, the project proponent and the public with more information on possible mitigation measures that could be implemented as well as measures to boost the resiliency of the landscape.

<u>d. BLM must evaluate climate emissions in the context of U.S. climate commitments and seek to meet those national goals.</u>

The climate change impacts observed from GHG emissions are already evident and will worsen unless emissions of GHGs are greatly reduced. The wide range of impacts from climate change, including melting glaciers and earlier snow melts in our mountains that disrupt water supplies in the west, thawing permafrost, forest fires, widespread drought, rising sea levels, and the spread of invasive species, have been rigorously and scientifically documented by the Intergovernmental Panel on Climate Change (IPCC), as well as American researchers and agencies. These have led to substantial commitments made by this Administration to reduce our national contribution to climate change. As part of these commitments, federal agencies must begin to not just measure, but to act on the basis of potential GHG emissions.

Our public lands and minerals are held in trust for the public. We must ensure this trust is not broken when authorizing actions on our public lands that contribute to climate emissions. In particular, fossil fuel production on federal public lands and mineral estates is extensive and the production of GHGs resulting from the exploration, extraction, transportation and combustion of these fuels is significant. The federal fossil fuels program must provide assurance the public trust will not be violated by carefully considering climate change issues and taking steps to avoid, minimize and offset impacts through compensatory mitigation. In 2012, as much as 21 percent of the Nation's GHG emissions originated from coal, oil and natural gas extracted from the public lands.[90]

**Leading science has firmly established the need for developing thresholds of acceptable fossil energy extraction for the planet based on expected GHG emissions.** The scientific understanding that the global increase in temperature due to greenhouse gas emissions must be capped at or below 2-degree Celsius to avoid unmanageable climate change consequences is well-established. The 2-degree Celsius threshold was first enshrined in the 2009 Copenhagen Accord[91] and reaffirmed in the 2015 Paris Agreement as the limit for "acceptable" warming.[92] During that time, the international scientific community's understanding of the interaction between fossil fuel development and temperature thresholds has greatly increased, and today it is widely agreed that development of additional reserves should be considered in the context of warming goals—giving rise to the idea of a carbon budget for the planet. In fact, this notion has been assessed and supported by the IPCC in all assessment reports going

---

[90] Claire Moser, Joshua Mantell, Nidhi Thakar, Chase Huntley and Matt Lee-Ashley. *Cutting Greenhouse Gas from Fossil-Fuel Extraction on Federal Lands and Waters.* March 19, 2015. Policy brief and underlying analysis is available at http://wilderness.org/blog/blind-spot-plan-reduce-emissions-slowing-progress-fight-against-climate-change (accessed July 28, 2016).

[91] Copenhagen Accord ¶ 1, *agreed* Dec. 18, 2009, FCCC/CP/2009/11/Add.1, *available at* http://unfccc.int/resource/docs/2009/cop15/eng/11a01.pdf ("recognizing the scientific view that the increase in global temperature should be below 2 degrees Celsius" relative to pre-industrial temperatures to "stabilize greenhouse gas concentration in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system"); *id.* at ¶ 2 (agreeing that "deep cuts in global emissions are required according to science" to meet this goal).

[92] The United States and other signatory nations committed to reducing greenhouse gas emissions "well below 2 °C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5 °C above pre-industrial levels." Paris Agreement art. 2, ¶ 1(a), *adopted* Dec. 12, 2015, FCCC/CP/2015/L.9, *available at* http://unfccc.int/resource/docs/2015/cop21/eng/l09r01.pdf. The authority cited in the letter is being provided via regualtions.gov and it should be included in the administrative record for this decision.

back to 1990 and has yielded a methodology routinely employed and updated annually by the Global Carbon Project.[93]

The IPCC's analytic method was further advanced in January 2015 in a journal paper that evaluated known fossil fuel reserves to determine, based on current emissions factors and global warming potential, how much should be left in-place to maximize the planet's chances of remaining below 2 degrees Celsius.[94] Importantly, it quantifies the regional distribution of known fossil-fuel reserves and resources and, through modeling a range of scenarios based on least-cost climate policies, identifies geographically-specific resources that should not be burned between 2010 and 2050 to ensure the world stays within a 2-degree Celsius limit in the most cost-efficient manner.[95] Importantly, this study demonstrates that there are geographically-specific analyses available that support comparative judgments about the appropriateness of tapping into different resources and plays.

**The United States has set national commitments to reduce GHG emissions.** The United States has submitted its target to cut net GHG emissions to the United Nations Framework Convention on Climate Change. This Intended Nationally Determined Contribution (INDC), as provided for in the Paris Agreement, is a formal statement of the U.S. target to reduce emissions by 26 to 28 percent below 2005 levels by 2025. In addition, to achieve a no more than 2 degrees Celsius temperature increase, heat trapping gasses in the atmosphere must be kept at or below 450 parts per million CO2-eq., which means that industrialized nations like the U.S. will have to reduce their emissions an average of 70 to 80 percent below 2000 levels by 2050.

In addition, on June 29, 2016 the leaders of Canada, Mexico, and the United States committed to the North American Climate, Clean Energy, and Environment Partnership. Under this agreement, the countries will pursue an historic goal for North America to strive to achieve 50 percent clean power generation by 2025. "Canada, the U.S., and Mexico will work together to implement the historic Paris Agreement, supporting our goal to limit temperature rise this century to well below 2 degrees C, and pursuing efforts to limit the temperature increase to 1.5 degrees C."[96]

These commitments are consistent with and required by The President's Climate Action Plan (June 2013) which calls for many steps to combat climate change such as reductions in CO2 emissions from power plants, increased use of renewable energy, improved automobile efficiency standards, and reducing methane emissions, among many other things.[97] But to achieve the goals of the Climate Action Plan, which include "steady, responsible action to cut carbon pollution, [so] we can protect our children's

---

[93] The IPCC has produced and reviewed a carbon budget for the planet in all assessment reports (Ciais et al., 2013; Denman et al., 2007; Prentice et al., 2001; Schimel et al., 1995; Watson et al., 1990), as well as by others (e.g. Ballantyne et al., 2012). These assessments included carbon budget estimates for the decades of the 1980s, 1990s (Denman et al., 2007) and, most recently, the period 2002–2011 (Ciais et al., 2013). The IPCC methodology has been adapted and used by the Global Carbon Project (GCP, www.globalcarbonproject.org), which has coordinated a cooperative community effort for the annual publication of global carbon budgets up to the year 2005 (Raupach et al., 2007), 2006 (Canadell et al., 2007), 2007 (published online; GCP, 2007), 2008 (Le Quéré et al., 2009), 2009 (Friedlingstein et al., 2010), 2010 (Peters et al., 2012b), 2012 (Le Quéré et al., 2013; Peters et al., 2013), 2013 (Le Quéré et al., 2014), and most recently 2014 (Friedlingstein et al., 2014; Le Quéré et al., 2015). Each of these papers updated previous estimates with the latest available information for the entire time series. From 2008, these publications projected fossil fuel emissions for one additional year using the projected world gross domestic product (GDP) and estimated trends in the carbon intensity of the global economy (Rogelj, 2016).

[94] McGlade, Christophe and Paul Ekins, *The Geographical Distribution of Fossil Fuels Unused When Limiting Global Warming to 2 °C*, 517 Nature (187) (2015).

[95] *See id.* at 187-90.

[96] See https://www.whitehouse.gov/the-press-office/2016/06/29/leaders-statement-north-american-climate-clean-energy-and-environment (presenting Leaders' Statement on a North American Climate, Clean Energy, and Environment Partnership).

[97] *See also* Climate Action Plan Strategy to Reduce Methane Emissions (March 2014) (presenting the President's methane reduction strategy).

health and begin to slow the effects of climate change so that we leave behind a cleaner, more stable environment," it will also be necessary to address issues related to fossil fuel extraction from our public lands, such as establishing a carbon management system.

The RMP must analyze climate emissions and alternatives for managing climate change in the context of these national commitments and targets, both in terms of fossil fuel management and other activities authorized under the RMP that would contribute to GHG emissions.

e. Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

BLM has significant obligations and authority related to mitigation for all unavoidable impacts. Secretarial Order 3330 requires the development of a landscape-scale mitigation policy for the Department of the Interior. Section 4(c) of Secretarial Order 3330 directs the Task Force to: "[I]dentify any new policies or practices, revisions to existing policies or practices, or regulatory or other changes that could be implemented to incorporate landscape-scale planning into mitigation-related decisions…"

In a report to the Secretary of the Interior, the Energy and Climate Change Task Force laid out a landscape approach to mitigation.[98] This approach contained the following steps:
   1. Identifying key landscape attributes, and the conditions, trends and baselines that characterize these attributes;
   2. Developing landscape-scale goals and strategies;
   3. Developing efficient and effective compensatory mitigation programs for impacts that cannot be avoided or minimized; and
   4. Monitoring and evaluating progress and making adjustments, as necessary, to ensure that mitigation is effective despite changing conditions.

BLM is also considering new tools and approaches the agency could use to increase the effectiveness of mitigation on public lands, including layering protective management and designations and exploring creative ways existing authorities could be used for conservation benefits. Effective new mitigation tools and approaches should be integrated into planning as well.

Mitigating climate-related impacts includes avoiding and minimizing generation of GHG emissions through management prescriptions and preventing harm to carbon sinks. The CEQ guidance on considering climate change in NEPA analyses provides that agencies should analyze reasonable alternatives that would mitigate both direct and indirect GHG emissions impacts and the cumulative effects of climate change (e.g., enhanced energy efficiency, carbon sequestration, lower GHG-emitting technology). CEQ Guidance at 19. BLM must address the quality of mitigation measures as well as ensure they are additional, verifiable, durable, enforceable, and will be implemented.

It is important to underscore that, as a land manager, the federal government is facing huge and rapidly escalating costs to address the impacts caused by fossil-fuel driven climate change. Forest fires, widespread drought, unusual flooding, rising sea levels, spread of invasive species and spread of disease already result in significant costs to the federal government, and each new oil production project the BLM authorizes increases these problems and the associated costs. Research from the University of Vermont's Gund Institute for Ecological Economics and The Wilderness Society suggests that total costs in degraded

---

[98] Clement, J.P. et al. 2014. A strategy for improving the mitigation policies and practices of the Department of the Interior. A report to the Secretary of the Interior from the Energy and Climate Change Task Force, Washington, D.C., 25 p.

BLM_0148999

ecosystem services could exceed $14.5 billion annually under a 2-degree Celsius warming scenario.[99] These costs are ultimately borne by all American taxpayers, and BLM has a responsibility to minimize and recoup these costs when it makes decisions authorizing activities that cause these impacts and associated costs.

**Summary of Comments:** The Uncompahgre RMP provides BLM with an excellent opportunity to analyze the impacts from climate change to the planning area over the next two decades, including increases in vulnerability, as well as the contribution to climate change from management decisions made in the plan. This analysis should lead to the development of thoughtful management prescriptions and alternatives in the land use plan that will address how BLM will mitigate these causes and adapt its management over the coming years to prevent permanent impairment and unnecessary or undue degradation to the resources in the face of climate change. BLM must analyze climate emissions in the context of national climate commitments detailed above. Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

## 2. Recommended Approach to Managing Climate Change in RMPs

Under the pressures of global change, it must be acknowledged that many objects of conservation are at risk wherever they are found, and the traditional natural resource management paradigm of modifying ecosystems to increase yield must change to a new paradigm of managing wildland ecosystems to minimize loss – specifically loss of the ecosystem composition, structure, and function that yields the benefits we seek from wildlands. Natural resource management must change from a paradigm of maximum sustained yield to a paradigm of risk management.

Although there is no widely-accepted method of assessing and managing risk, we recommend breaking risk down into its component parts—vulnerability, exposure, and uncertainty—as a useful way to think about risk to biodiversity and productive potential. In the TWS report, "Recommended Risk Assessment and Management Approach for Addressing Climate Change in BLM Land Use Planning," we recommend an approach for assessing risk in the planning area as well as an approach for management of that risk for BLM to comply with its legal obligations under NEPA and FLPMA as set out above.

## 3. Adapting to Climate Change

In addition to the analyzing the impacts of climate change, The Department of Interior Manual for climate change adaptation (523 DM 1) requires BLM to plan for uncertainty and risk in the face of climate change. Among other things, this policy guidance requires BLM to:
- use the best available science of climate change risks, impacts and vulnerabilities,
- use the network of Landscape Conservation Cooperatives, Climate Science Centers and other partnerships to understand and respond to climate change,
- use well-defined and established approaches for managing through uncertainty including vulnerability assessments, scenario planning and other risk management approaches,
- promote landscape-scale, ecosystem-based management approaches to enhance the resilience and sustainability of linked human and natural systems,

---

[99] See Esposito, Valerie; Phillips, Spencer; Boumans, Roelof; Moulaert, Azur; Boggs, Jennifer. 2011. "Climate change and ecosystem services: The contribution of and impacts on federal public lands in the United States." In: Watson, Alan; Murrieta-Saldivar, Joaquin; McBride, Brooke, comps. *Science and stewardship to protect and sustain wilderness values: Ninth World Wilderness Congress symposium*; November 6-13, 2009; Merida, Yucatan, Mexico. Proceedings RMRS-P-64. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. 155-164. Available at http://www.fs.fed.us/rm/pubs/rmrs_p064.pdf? (accessed July 23, 2016).

- Manage linked human and natural systems that help mitigate climate change impacts, such as:
    - protect diversity of habitat, communities and species,
    - protect and restore core, unfragmented habitat areas and key habitat linkages,
    - maintain key ecosystem services,
    - monitor, prevent and slow the spread of invasive species,
    - focus development activities in ecologically disturbed areas and avoid ecologically sensitive landscapes, culturally sensitive areas, and crucial wildlife corridors.

The biggest question that land managers face today is how we respond to uncertainty in the face of global climate change. It is especially challenging for planners to make predictions about future ecosystem dynamics 10, 20 or 50 years down the line. Adaptation to changing conditions is and will be essential. However, general statements that BLM will plan to "be adaptive" is not planning—it is a strategy that is reactive only. A true plan for climate adaptation will require applying knowledge and foresight gained from a "learn as you go" approach.

We recommend using an experimental, adaptive design known as the "portfolio approach" of management strategies (Belote et al.)[100] in the RMP. As stated by Belote et al., "[u]ncertainty about how ecosystems and species will respond to co-occurring, interactive, and synergistic impacts of the Anthropocene precludes our ability to know which strategy will best sustain wildland values in to the future." Thus, Belote et al. concludes that land managers should use an experimental zoning approach for managing certain lands that include the following zones as management strategies:

- **Restoration Zones:** areas that are devoted to forestalling change through the process of ecological restoration;
- **Innovation Zones:** areas that are devoted to innovative management that anticipates climate change and guides ecological change to prepare for it; and
- **Observation Zones:** areas that are left to change on their own time to serve as scientific "controls" and to hedge against the unintended consequences of active management elsewhere.

These strategies should be used in conjunction with each other in order to spread the risk among the different strategies and to allow for diverse outcomes to inform rapid learning about management strategies in the future. This is the kind of deliberate yet dynamic planning process that BLM should be fostering in RMPs.

The BLM is especially equipped to apply this type of portfolio approach due to its wide variety of designations and management regimes. The purpose of **restoration zones** is to sustain existing or historical ecosystems. This type of strategy lends itself to designations such as national conservation areas, ACECs and other lands that are set aside for conservation of natural and cultural resources, but that may also be appropriate for restoration in certain areas.

Due to the acknowledgement that returning to historical range of variability is an increasingly challenging concept in the study of climate change, **innovation zones** are also necessary. This is where the forecasting of climate change may drive greater intervention to experiment with things like anticipatorily boosting resiliency or facilitating transition to an altered future state where shifts seem inevitable. This strategy would be more appropriate for BLM-managed lands that have already sustained substantial change or where future impacts of climate change may severely disrupt the production of ecosystem goods and

---

[100] These concepts are set out in Belote, et al. "Wilderness and Conservation Strategy in the Anthropocene." The Pinchot Letter (Spring 2014).

services. Conservation designations or allocations would typically not fall within this management strategy.

The third strategy of establishing **observation zones** is necessary to allow for ecosystems to generally change without specific intervention, as a scientific control. This management strategy would be most appropriate for Wilderness, WSAs, and lands managed for wilderness characteristics, but would also be the default strategy for lands that could not be managed for treatment under the restoration and innovation zones due to budget and operational constraints or in lands between such designations where connectivity is desirable to facilitate movement in response to climate change.

**<u>Summary of Comments:</u>** BLM should implement a portfolio approach to land use planning that allows for diverse strategies and adaptive, dynamic planning as a climate change adaptation strategy. This involves establishing restoration, innovation and observation zones in order to "learn while doing."

## L. Mitigation

A robust policy framework exists to guide mitigation considerations in land use planning. In addition to mitigation requirements under FLPMA and NEPA, numerous other policies and guidance documents direct the BLM to require mitigation and specify how mitigation must be employed. These include the Presidential Memorandum: Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment (2015); Secretarial Order 3330, Improving Mitigation Policies and Practices of the Department of the Interior (2013);[101] the follow-up report entitled *A Strategy for Improving the Mitigation Policies and Practices of The Department of the Interior* (2014);[102] the Department of the Interior's Landscape-Scape Mitigation Manual (2015);[103] and BLM's Draft Regional Mitigation Manual (2013).[104]

Secretarial Order 3330 called for a departmental mitigation strategy with five central components: (1) the use of a landscape-scale approach to identify and facilitate investment in key conservation priorities in a region; (2) early integration of mitigation considerations in project planning and design; (3) ensuring the durability of mitigation measures over time; (4) ensuring transparency and consistency in mitigation decisions; and (5) a focus on mitigation efforts that improve the resilience of our Nation's resources in the face of climate change.

In response to S.O. 3330, the Energy and Climate Change Task Force issued a report that outlined a strategy for improving departmental mitigation policies and practices ("Task Force Report," April 2014[105]). The Task Force Report emphasizes the importance of landscape-scale mitigation planning to enable the Interior Department to appropriately manage and conserve our public lands resources and meet its statutory obligations:

> Consideration of the landscape-scale context provides the opportunity to see project development in the context of the larger landscape it will occupy and associated resource values it will affect; enhances the ability to evaluate cumulative effects of multiple projects; expands the capacity to avoid, minimize, and offset project impacts; and allows managers to make avoidance and

---

[101] https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Secretarial-Order-Mitigation.pdf
[102] https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Mitigation-Report-to-the-Secretary_FINAL_04_08_14.pdf
[103] https://www.doi.gov/sites/doi.gov/files/uploads/TRS_and_Chapter_FINAL.pdf
[104] http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/im_attachments/2013.Par.57631.File.dat/IM2013-142_att1.pdf
[105] Available at http://www.doi.gov/news/loader.cfm?csModule=security/getfile&pageid=526203.

compensatory mitigation site selection decisions that optimize for multiple resource values. Task Force Report at 9.

It identifies several principles to guide landscape-scale mitigation, including utilizing the full mitigation hierarchy, advance mitigation planning, ensuring durability and promoting transparency and collaboration, which are reiterated in BLM's draft mitigation manual.

Of particular relevance to resource management planning, BLM is currently implementing draft MS-1794[106], which the agency is instructed to utilize as interim policy while the guidance is finalized. Instruction Memorandum No. 2013-142.[107] Draft MS-1794 provides for BLM to use the land use planning process to identify potential mitigation sites and measures. Draft MS-1794 at 1.6(C). This would be appropriate for the Uncompahgre RMP to balance reasonably foreseeable development and the various resource values present throughout the planning area. Mitigation is most effective when planned at a regional scale so that development avoids impacting critical conservation resources and compensatory mitigation investments are directed to areas and activities that will best fully address unavoidable development impacts. In outlining a landscape-scale mitigation strategy for the Uncompahgre Field Office, BLM should apply the mitigation hierarchy of avoidance, minimization, and offsets.

BLM is directed to incorporate four elements into mitigation planning at the land use planning stage per the Task Force Report and Draft MS-1794:

a. Describe regional baseline conditions against which unavoidable impacts are assessed;
b. Establish and prioritize regional mitigation objectives for the planning area;
c. Identify appropriate land-use allocations or areas for landscape-level conservation and management actions to achieve regional mitigation objectives (e.g., Areas of Critical Environmental Concern (ACEC) or sage-grouse priority habitat); and
d. Develop long-term monitoring and adaptive management requirements to evaluate and maximize the effectiveness of mitigation projects and measures.

*Ibid.* Importantly, regional mitigation measures must have additionality – that is, the offsetting conservation measures would not have occurred otherwise. Task Force Report at 6. BLM should not simply cast land use allocations currently under consideration in the Draft RMP as contributing to the achievement of regional mitigation objectives. Rather, BLM must identify foreseeable unavoidable impacts, account for impacts to resource values throughout the relevant range of the resource that is being impacted, and identify conservation designations and other land use allocations that are appropriate to those impacts.

Conservation designations and other land use allocations that are intended as regional mitigation measures must have strong protective management prescriptions to ensure effective and durable conservation, restoration, and management and adequate funding for and commitment to enforcement. In directing BLM to ensure long-term durability of compensatory mitigation, the mitigation guidance notes that "the land use plan may be the most effective tool for protecting important regional mitigation sites on BLM-managed lands from future impacts in order to ensure the durability of mitigation projects." Draft MS-1794 at 1.6(D)(12). To achieve long-term durability, BLM must commit to and implement

---

[106] Available at
http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/im_attachments/2013.Par.57631.File.dat/IM2013-142_att1.pdf.
[107] Available at
http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-142.html.

management actions, such as restoration projects and enforcement, within mitigation-based conservation designations that are appropriate to specific unavoidable impacts and that provide beneficial effects that are additional to conservation that would have otherwise occurred.

**Summary of Comments:** BLM should include the four elements of landscape-scale mitigation planning outlined in Draft MS-1794 in the Uncompahgre RMP. By establishing regional mitigation objectives for the planning area, BLM can identify durable, additional land use allocations that appropriately mitigate likely impacts from development authorized under the RMP.

BLM_0149004

**IV) Conclusion. The Preferred Alternative does not provide a necessary level of management for the North Fork Valley**

Only Alternative B1 provides the scope and level of protection that is required for the North Fork's cherished and concentrated set of important and sensitive resources. This is not only the case due the better classification of resources and more protective management prescriptions in general, but also due to the nature of the stipulations themselves. Only under Alternative B1 are the protective stipulations not open to exceptions, waivers and modifications (DEIS III Appendix B-2).

And this high level of protection in Alternative B1 has the added advantage of safeguarding other resources, and of mitigating other harmful impacts beyond those directly covered by the stipulations. Under Alternative B1, for instance, 96 % of the highest potential areas for paleontological resources are protected with either No Leasing or No Surface Occupancy stipulations.[108]

Climate change is another matter—the elephant in the room, really, when it comes to questions of fossil fuel development, long term land use planning, and the resiliency many key features we cherish in the valley. Alternative B1 is the only action alternative in the draft RMP/EIS projected to contribute less to greenhouse gas emissions (and climate change) than Alternative A: No Action/Continuation of Current Management (Table 4-10, DEIS II 4-39). And B1 also has the added benefit of doing most to ensure natural system resiliency to the effects of climate change (DEIS II 4-114 and 4-151).

**A. Only B1 meets the needs of the North Fork Valley**

As detailed above, what is clear is that Alternative B1 provides the level of protection that best meets the needs of the public and best protects the public's resources, as the only alternative that adequately protects the resources and public land values of the North Fork Valley. As such Alternative B1 has the support of many local residents, area businesses, Delta and Gunnison County organizations and associations, local governments, water companies, irrigators, farmers, ranchers and others.

That is because, as the DEIS shows, the resources that the public, myriad stakeholders, local governments, and resource professionals have all urged be protected are in fact best protected by Alternative B1. The superior level of management that Alternative B1 provides includes better protections for special status species, delicate soils, sensitive landscapes, recreation, visual resources, plant, fish and wildlife habitat, water resources, new economic activity, agriculture, communities, public health, river systems, and other cherished features of the valley. None of the other alternatives presented in the draft RMP/EIS offer the level protection afforded by B1, and all others fail to provide adequate management for the valley's resources, public uses, and cherished features.

**B. Alternative D is unacceptable**

As shown above, only Alternative B1 provides the level of protection that the North Fork's resources warrant, even as compared to Alternative B—the next most protective alternative in the draft RMP/EIS.

Outside the North Fork, and on matters that B1 is silent on within the North Fork, we support much of the management proposed in Alternative B, as indicated elsewhere in these comments.  But the contrast it provides in the North Fork compared to B1 is striking.

---

[108] DEIS II 4-193

BLM_0149005

Moreover, the agency's identified Preferred Alternative (D) proposes a management regime for the valley that is simply unacceptable. Not only would it leave the majority of public lands open to oil and gas leasing, many with only a CSU stipulation, but its impacts would be higher across the full range of resources in the valley, including those identified by the public as most important to the community.

Problems with Alternative D are discussed elsewhere in these comments. Regarding mitigating impacts from oil and gas development, the superiority of B1 is clear as detailed above. However, some particular examples of how badly Alternative D misses the mark in protecting the North Fork are the following.

Consider Visual Resource Management, in which B1 alone has the strongest nonwaivable stipulations to protect visual resources, and the largest areas designated for their important and high quality scenic features (VRM Classifications I & II). In Alternative D, the agency Preferred Alternative, only 17,170 acres are classified in these most protective categories. In B1 it is 82,218 acres.[109]

Regarding Ecological Emphasis Areas, the DEIS notes "Protections are reduced under Alt. D" (DEIS II 4-160). On wildlife impacts: "These measures ... do not provide as much protection as Alternative B" (DEIS II 4-163). The Preferred Alternative "results in the second-highest estimated emission levels" (DEIS II 4-21), including the second highest level of greenhouse gas emissions (DEIS II Table 4-10).

The Preferred Alternative relegates over six times as much public lands to the lowest visual resource management classification. Alternative D closes less than 25% of what Alternative B does to oil and gas leasing in the resource area, and only a miniscule fraction of what B1 closes in the North Fork.

The Preferred Alternative includes far fewer protections for the valley's water supply, allowing drilling and fracking on lands adjacent to private water wells, where B1 prohibits leasing altogether and Alternative B requires No Surface Occupancy. Stipulations to protect special status species are far weaker under Alternative D than Alternative B.

On highly seleniferous soils Alternative B1 follows the recommendations of the Gunnison Basin Selenium Task Force, and applies No Leasing stipulations. Alternative D applies only the much weaker Controlled Surface Use (CSU) restriction. Unlike Alternative B and B1, the Preferred Alternative would allow oil and gas development on steep slopes of up to 40 percent. (DEIS I 2-30, Table 2-2).

At Jumbo Mountain the Preferred Alternative protects one-fifth the acreage of what Alts B and B1 do, with NSO stipulations applying to just over 1,000 acres (DEIS I Table ES-3). Across the entire range of resource identified through scoping, comment on previous agency activity, and this comment period Alternative D, the Agency Preferred, fails to provide the management required.

## C. Range of alternatives might be lacking, analysis too narrow

Regarding oil and gas development, as well as in other matters, the analysis offered is limited by the somewhat narrow range of alternatives in the draft EIS. There is certainly a growing national movement, as well as strong local support, to stop leasing federal lands for oil and gas altogether.[110] A No Leasing alternative, an alternative that closes all of the North Fork, or a North Fork-like (B1) alternative across the resource area, would each alter the scope of analysis and possible decisions that could be made.

---

[109] Acreages developed from analysis of GIS data downloaded from BLM.
[110] "Groups to Obama: Keep It in the Ground, Cancel Colorado Oil and Gas Sale," Great Old Broads for Wilderness website, at www.greatoldbroads.org/groups-to-obama-keep-it-in-the-ground-cancel-colorado-oil-and-gas-sale/

BLM_0149006

A range of alternatives should represent the full suite of management choices available to the decision-maker. This allows the decision-maker to consider all her options to best protect the resource while meeting other agency obligations and priorities.

> When there are conflicts among resource uses or when a land use activity could result in unacceptable or irreversible impacts on the environment, the BLM may restrict or prohibit some land uses in specific areas. When there are conflicts among resource uses or when a land use activity could result in unacceptable or irreversible impacts on the environment, the BLM may restrict or prohibit some land uses in specific areas. (DEIS II 4-2)

Regardless, the level of protection provided by B1 reduces impacts from subsequent management decisions and reduces the likelihood for an irretrievable commitment of resources (via more NSO and NL stipulations). Thus of the alternative presented, adopting Alternative B1 is the most prudent action.

## D. Alternative B1 is prudent and reasonable, best fulfilling agency obligations and future resource needs

B1 best protects North Fork resources. B1 is within the scope of agency authority. The DEIS notes that:

> Implementing actions from any of the RMP alternatives would be in compliance with all valid existing rights, federal regulations, BLM policies, and other requirements. (DEIS II 4-2)

Alternative B1 would be highly protective of the North Fork Valley but leave the majority of resource area and Colorado BLM lands and federal minerals, open to oil and gas leasing. B1 barely impacts the federal mineral estate, and fulfills the purposes of all public lands and resource laws.

## 1. B1 is highly protective of North Fork yet represents only a small impact to oil and gas resource

Alternative B1 would have no impact on currently leased federal minerals, and a negligible impact on federal minerals overall. B1 would likely not affect energy production or jobs in the region. To anticipate the miniscule impact B1 might have, consider the overall oil and gas jobs anticipated across the resource area under Alternative D, which would allow a higher level of development in the North Fork.

> It is likely, however, that less than one percent of employment and labor income would continue to be supported by oil and gas extraction under Alternative D. (DEIS II 4-476)

Leasing in the North Fork is simply not needed. For one there is a natural gas glut, and the resource's abundance is certainly projected far beyond the life of this resource management plan.[111]
B1 is clearly the responsible choice: Given that the impact on developable resources is insignificant while the public benefit is significant, that the impacts to resources across the board from oil and gas development are reduced under B1 while the overabundance of natural gas, likely to last for another decade or longer by most accounts, remains unchanged; then closing most, or even all, of the North Fork to oil and gas leasing seems to be more than just a reasonable course of action.

---

[111] "Shale gas production drives world natural gas production growth," U.S. Energy Information Administration August 2016. Online at www.eia.gov/todayinenergy/detail.php?id=27512

The North Fork sits at the southern edge of the gas-rich Piceance Basin, recently subject to an updated USGS estimate for the shale resource that sits beneath the sandstone formations previously targeted.[112]

> The new estimate could mean the Piceance Basin has the second-largest natural gas reserves in the country, after the Marcellus Shale formation in Pennsylvania and neighboring states...

Leasing in the North Fork is not in the public interest, which benefits more from managing to protect the valley's unique resources and communities. There are hundreds of thousands of public lands already leased in the Piceance Basin.[113] Hundreds of thousands of additional acres are owned outright or otherwise under control of the oil and gas industry, including major companies like ExxonMobil.[114]

> Rio Blanco County, home of ExxonMobil's Piceance project, covers an area larger than 3,000 square miles and contains enough clean-burning, domestic natural gas to benefit millions of people. With interest in approximately 300,000 acres in the Piceance Basin, ExxonMobil's leases hold a potential recoverable resource of more than 45 trillion cubic feet of gas over the life of the project. That's enough natural gas to power 50 million homes for almost a decade. While this expansive gas resource will take years to produce, ExxonMobil is committed to increasing natural gas production more efficiently and with less environmental impact.

These lands in the Piceance Basin provide decades of suitable sites for drilling.[115]

> The acquired assets consist of a 200,000-net-acre position in the Piceance basin of Colorado with recent net production of 500 MMcfd of natural gas equivalent. Terra estimates that the assets contain 2 tcf of proved developed producing reserves and an extensive inventory of low-risk drilling locations. The assets also include deep rights across 150,000 net acres prospective for the emerging horizontal Mancos-Niobrara play.

Drilling in the North Fork would not materially alter the amount of gas available for development over the life of the Resource Management Plan. Adoption of the North Fork Alternative will not affect the number of jobs available in the oil and gas industry regionally, the numbers of rigs operating, or the amount of energy being produced. Rather given the abundance of resource available for exploitation, the large number of existing leases and owned minerals, and willing lessees, owners and operators—it is the market and industry's willingness alone that will determine how may rigs employ how many people.

## 2. B1 meets public needs, provides strong protections, and fulfills public lands and resource laws

The Federal Lands Policy and Management Act establishes public lands policy that, among other things, sets it as law that:

> (7) ...management be on the basis of multiple use and sustained yield unless otherwise specified by law;

---

[112] "40 Times More Natural Gas Underground in Colorado's Piceance Basin, USGS Report Finds," Colorado Public Radio, June 29, 2016. Online at www.cpr.org/news/story/40-times-more-natural-gas-underground-colorados-piceance-basin-usgs-report-finds
[113] "Oil & Gas Development Proposed RMPA/Final EIS," White River Field Office-Powerpoint for RAC, June 4 2015. Online at www.blm.gov/style/medialib/blm/co/resources/resource_advisory/northwest_rac/minutes.Par.30953.File.dat/WRFO%20Presenta tion%20to%20RAC_6.4.15a.pdf
[114] "Piceance," ExxonMobil website at http://corporate.exxonmobil.com/en/energy/natural-gas/operations/piceance
[115] "E&P startup agrees to buy WPX's Piceance unit for $910 million," Oil and Gas Journal, 2/15/16. Online at http://www.ogj.com/articles/print/volume-114/issue-2b/general-interest/e-p-startup-agrees-to-buy-wpx-s-piceance-unit-for-910-million.html

(8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use; and that (12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber...

Alternative B1 clearly meet the requirements of the Multiple Use/Sustained Yield Act, which directs much of BLM's resource management, as per the agency's land use planning regulations:

The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

In the case of Alternative B1 the management proposed do best meet the "present and future need" of the American people; makes judicious use of the lands for a variety of purposes both within the North Fork area and across the resource area; balances use, not allowing all uses on all lands in a manner that accounts for the needs of future generations, for recreation, watershed, wildlife and fish, natural scenic, scientific and historical values, range, timber, and minerals; and that seeks to avoid impairment of the public land resources in consideration of their relative value.

Alternative B1 clearly is superior in protecting the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values resources of the North Fork. Finally, Alternative B1 balances the need to protect resources with ensuring that public lands provide a balance of minerals, fiber, and food: B1 is consistent with the Mineral Leasing Act (MLA), which clearly gives the agency authority to close 75% of the North Fork area, or of the entire resource area for that matter, to oil and gas leasing and development.[116]

### E. BLM should select Alternative B1 for the North Fork Valley

Based on the large quantity of information provided by the WSCC, community residents, and other individuals and organizations, it is clear that the North Fork Alternative, B1, is the only reasonable alternative for the BLM to include in the final RMP that would mitigate impacts from oil and gas leasing and corresponding oil and gas development.

---

[116] 10th U.S. Circuit Court of Appeals, WESTERN ENERGY ALLIANCE v. KEN SALAZAR, No. 11-8071 March 12, 2013. Online at www.eenews.net/assets/2013/03/13/document_ew_01.pdf

**1. The North Fork Alternative fits a clear and pressing public need.**

Alternative B1 proposes a set of strong oil and gas management stipulations and protective designations to safeguard the area's character of place, water supply, wildlife habitat and recreational opportunities.

Alternative B1, which is the DEIS' version of the North Fork Alternative Plan provides the best management options of oil and gas leasing and development presented in the draft RMP/EIS, and it should be adopted by the BLM into the final RMP.

Alternative B1 presents reasonable but strong management to protect the North Fork's most important resources and uses, and only B1 provides the level of management that is warranted to protect these resources.

Alternative B1 is a reasonable and prudent approach to managing the resources in the North Fork Valley which the agency should select as part of its final Resource Management Plan.


**2. Alternative B1 is the best management decision in the face of uncertainty regarding the adoption and implementation of the final RMP.**

While a challenge to the final RMP decision is likely, given the many interests and perspectives involved among organizations, industry and stakeholders the protections provided by Alternative B1 would help ensure that the resources there are secure. BLM should move to adopt and implement as much of the North Fork Alternative Plan as it can, even if it is compelled to amend, supplement, or otherwise update its NEPA analysis.

BLM_0149010

## APPENDIX I

**Table 1: Recommended oil and gas stipulations**

*Several stipulations are recommended from other alternatives in the draft RMP/EIS, as noted.

| Alt. B1+ Stipulations* | No Leasing | No Surface Occupancy | Controlled Surface Use |
|---|---|---|---|
| **Character of place** | | | |
| Visual resources, local economies, farms & communities, sensitive landscapes, river corridors | NL-11 Prominent landmarks; NL-13 Coal leases; NL-3 Major river corridors. | NSO-52 Travel & Scenic Corridors; NSO-5 High geologic hazards; NSO-67* High occupancy buildings (Alts. B, D); NSO-68 Community facilities; NSO-3 Agricultural operations; NSO-7 Major river corridors. | CSU-7 Moderate geologic hazards; CSU-47 Vistas. |
| **Water supply** | | | |
| Waterbodies, private wells, water systems, public water source areas, irrigation facilities, river system | NL-1 Selenium soils; NL-4 Water bodies; NL-6* Public water supplies (Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NL-5 Water ways; NL-3 Major river corridors. | NSO-2 Selenium soils; NSO-15 Domestic wells and water systems; NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-55* BuRec dams & facilities (Alts. B,C,D). | |
| **Wildlife habitat and migration** | | | |
| Wildlife and species habitat, floodplains, riparian areas | NL-4 Water bodies; NL-5 Water ways; NL-10* Gunnison sage grouse (Alt. B). | NSO-35 Raptor sites; NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-30* Yellow billed cuckoo (Alt. B); NSO-39* Mexican spotted owl (Alt. B); NSO-21 Deer & elk habitat; NSO-17* Rare plant communities (Alt. B); NSO-20* Ecological Emphasis Area (Alt. B); NSO-8 Floodplains. | |

| Recreational areas and access | | | |
|---|---|---|---|
| Jumbo Mountain SRMA, river access, hunting opportunities, visual resource protection | NL-11 Prominent landmarks; NL-14* Parks (Alt. B); NL-3 Major river corridors. | NSO-57 Recreation-Jumbo Mountain SRMA (VRM II), NSO-52 Travel & Scenic Corridors; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-7 Major river corridors. | CSU-47 Vistas. |

Table 1 provides a summary of recommended oil and gas stipulations for the North Fork area. Most are those proposed are from Alternative B1, although some other stipulations from among the other alternatives are also recommended, as noted in the table above and in the narrative.

**Figure 1. Table from Public Health Risks of Oil and Natural Gas**

Table 1. Relationships between Sources, Processes and Hazards That May Lead to Human Exposure, Health Effects or Population Health Effects[a]

| source | process | chemical hazards | | | physical hazards | safety hazards | water scarcity hazard |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | air | ground water | surface water soil/ sediments | | | |
| large trucks | all | DE | | | noise, vibration | spills and accidents | |
| heavy equipment | well pad construction, drilling, and well abandonment | DE | | | noise, vibration | spills and accidents | |
| dust | well pad construction, well abandonment | PM | | | | | |
| drilling mud | drilling | DMV | DM | DM | | | |
| fracturing fluid | hydraulic fracturing, flowback | Silica, FFV | FF | FF | | spills | removes water from hydrological cycle |
| generators | drilling, hydraulic fracturing | DE | | | noise | | |
| produced water | drilling and construction, flowback | DMV, PHC | DM, PHC, IN | DM, PHC, IN | | spills | |
| drill cuttings | drilling and construction | PM, DMV, PHC | DM, PHC, IN | DM, PHC, IN | | spills | |
| flowback water | flowback | FFV, PHC | FF, PHC, IN | FF, PHC, IN | | | |
| deep injection | flowback | | | | seismic activity | | |
| gas venting | drilling, flowback, production | $CH_4$, $H_2S$, PHC | | | | accidents | |
| gas flaring pigging[b] | drilling, flowback, production | $NO_x$, $CO_2$ | | | noise | | |
| | production | $CH_4$, PHC | | | | accidents | |
| pipelines | production | $CH_4$, PHC | | | | accidents | |
| condensate tanks | production | $CH_4$, PHC | | | | | |

[a] $CH_4$: methane; $CO_2$: carbon dioxide; DE: diesel emissions, including particulate matter (PM), nitrogen oxides ($NO_x$), polyaromatic, aliphatic, and aromatic hydrocarbons, aldehydes, and sulfur dioxides (SOx); DM: drilling muds, e.g., boric acid, borate salts, rubber-based oil, synthetic oil; DMV: drilling Muds, Volatile, e.g., rubber-based oil, synthetic oil, aluminum tristearate, choline chloride; FF: fracturing fluids, e.g., lauryl sulfate, guar gum and others (see Table 2); FFV: fracturing fluids, volatile: e.g., glutaraldehyde, ethylene glycol, methanol, petroleum distillate; $H_2S$: hydrogen sulfide; IN: inorganic chemicals; barium, strontium, bromine, heavy metals, salts and NORM (naturally occurring radioactive materials); $NO_x$: nitrogen oxides; PHC: aromatic and aliphatic petroleum hydrocarbons. Refs: King, G.E., Hydraulic Fracturing 101: What Every Representative, Environmentalist, Regulator, Reporter, Investor, University Researcher, Neighbor and Engineer Should Know About Estimating Frac Risk and Improving Frac Performance in Unconventional Gas and Oil Wells. *SPE Hydraulic Fracturing Technology*, Woodlands, TX, 2012; Jiang, M., et al. Life cycle greenhouse gas emissions of Marcellus shale gas. *Environ. Res. Lett.* 2011. 6(3); United States Department of Energy, *Modern Shale Gas Development in the United States: A Primer*; Oklahoma City, OK, 2009. [b]The process of using gauges to perform maintenance on gas lines without stopping the flow of gas in the pipe line.

Table from Adgate_etal2014_PublicHealthRisksOilandNaturalGas

BLM_0149013

**Figure 2. Maps of Jumbo Mountain, Elephant Hill, and Youngs Peak.**



*Jumbo Mountain*
All routes shown in green and red are existing routes (except for the red route leading north from slantindicular). All segments in blue are proposed connector routes.

*Elephant Hill*

BLM_0149014

All solid green routes are proposed routes for non-motorized travel. Dotted green routes represent non-motorized winter routes located on preexisting roads.



*Youngs Peak*
All routes shown in red or green are proposed routes. Some primitive trails exist in the western area of Young's peak.

**Figure 3. Multiple criteria used to map wildland conservation priorities and values including wildness, connectivity, representation, and endemic species diversity. These criteria were combined to produce map in Figure 4.**



**Wildland conservation priorities:** We combined the mapped data described above (ecological integrity, connectivity, representation, and hotspots of endemic biodiversity) into one index by simply adding up the mapped layers (Figure 4). This new index allows us to identify wildland conservation priorities based on the land's relative wildness, its importance for creating a connected network of protected areas, its value in adding to the representation of habitats, and whether it has been identified as a hotspot of endemic species diversity. Ultimately, this approach will foster a national protected system of wildlands that is more prepared to handle the projected consequences of climate change.

BLM_0149016

**Figure 4. Composite wildland values map based on criteria in Figure 3. The composite value was produced by setting each criterion to the same scale and summing.**



Applying this data to the Uncompahgre Field Office, we can review how the EEAs evaluated in the draft RMP align with criteria used to map conservation priorities and overall wildland conservation values. As seen on the maps below in Figure 5, additional or alternative areas should be considered for EEA designation to ultimately achieve a network of conservation areas that maximize their potential to contribute to connectivity across the larger landscape.

BLM_0149017

**Figure 5. Wildland conservation values and potential Ecological Emphasis Areas in the Uncompahgre Field Office.**



**APPENDIX II. North Fork Water Quality Report**

See following pages.

BLM_0149019

# Western Slope Conservation Center

## VOLUNTEER WATER QUALITY MONITORING NETWORK
*April 2001 – April 2014 Data Report*



*Volunteer collecting a sample on the North Fork of the Gunnison River.*

Western Slope Conservation Center
204 Poplar Ave
Paonia, CO 81428

**Phone:** (970) 527-5307
**Mailing Address**: PO Box 1612 Paonia CO 81428
**Street Address**: 204 Poplar Ave Paonia CO 81428
**Phone**: 970-527-5307
**Email**: info@theconservationcenter.org
www.westernslopeconservation.org

1

BLM_0149020

<u>WSCC Volunteer Water Quality Monitoring Data Report, 2016</u>

**Contributors:**

Julia Bowman
Barbara Galloway
Mike Galloway
Alex Johnson
Dawn Reeder
Teresa Shishim
Hannah Stevens

2

BLM_0149021

<u>WSCC Volunteer Water Quality Monitoring Data Report, 2016</u>

Table of Contents

Contributors:.................................................................................................2
Table of Contents:.........................................................................................3
Table of Figures:............................................................................................5
Table of Tables:.............................................................................................6
List of Acronyms:...........................................................................................7
Definitions.....................................................................................................8
1.   INTRODUCTION .....................................................................................9
Western Slope Conservation Center (WSCCC)...............................................9
North Fork Volunteer Water Quality Monitoring Network...............................9
2.   DESCRIPTION OF THE NORTH FORK WATERSHED ...............................10
Land Use.....................................................................................................12
Flow Data....................................................................................................12
Point Sources..............................................................................................14
Water Quality Pollution Risks.......................................................................14
Other Water Quality Monitoring Efforts .......................................................14
3.   WATER QUALITY STANDARDS...............................................................15
Report Analysis Rating and Standards ..........................................................15
Stream Segment Classifications and Standards...............................................15
Total Phosphorus and Total Nitrogen Standards .............................................22
E. coli Standards .........................................................................................22
4.   NORTH FORK VOLUNTEER MONITORING NETWORK ...........................23
Introductions ..............................................................................................23
Water Quality Monitoring Stations................................................................23
Water Quality Parameters Monitored ...........................................................25
Where Are Samples Analyzed? ....................................................................25
Sample Collection and Analytical Procedures................................................27
Volunteer Training and Certification .............................................................28
Quality Control/Quality Assurance Measures.................................................28
Data Reporting ...........................................................................................28
Project Sponsors..........................................................................................28
5.   FIELD DATA ..........................................................................................30
Hardness ....................................................................................................30
Alkalinity ...................................................................................................32
pH ..............................................................................................................33
Conductivity ...............................................................................................34
Dissolved Oxygen and Temperature .............................................................37
Temperature................................................................................................39
6.   NUTRIENT AND OTHER INORGANICS DATA.........................................42
Sulfate........................................................................................................42
Total Suspended Solids (TSS) ......................................................................44
Phosphorus .................................................................................................46
Nitrate and Nitrite........................................................................................47
Ammonia.....................................................................................................48
7.   METALS DATA .......................................................................................49

BLM_0149022

WSCC Volunteer Water Quality Monitoring Data Report, 2016

Aluminum ....................................................................................................................................50
Arsenic .......................................................................................................................................50
Cadmium ....................................................................................................................................51
Calcium ......................................................................................................................................52
Copper ........................................................................................................................................52
Iron .............................................................................................................................................53
Lead ............................................................................................................................................54
Manganese .................................................................................................................................54
Magnesium .................................................................................................................................55
Selenium .....................................................................................................................................56
Zinc ............................................................................................................................................57

8.   BACTERIA DATA .................................................................................................................59

9.   MACROINVERTEBRATE DATA ..........................................................................................63

10.  LONG TERM TRENDS AND SEASONAL VARIABILITY ......................................................66

11.  CONCLUSIONS ....................................................................................................................68
Field Parameters ........................................................................................................................68
Nutrients and Other Inorganic Parameters ...............................................................................68
Metals .........................................................................................................................................68
Bacteria ......................................................................................................................................69
Macroinvertebrates....................................................................................................................69

12.  WORKS CITED.....................................................................................................................70

13.  APPENDICES:.......................................................................................................................71
A. 2001 to 2014 Water Quality Results .....................................................................................72
B. CDPHE WQCC Regulation No. 31 .......................................................................................72
C. CDPHE WQCC Regulation No. 35 .......................................................................................75
D. Hydrographs...........................................................................................................................78

BLM_0149023

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

**TABLE OF FIGURES:**

Figure 2-1: Headwaters Of The North Fork   10
Figure 2-2: Location And Topography: North Fork Watershed   11
Figure 2-3: Land Cover: North Fork And Lower Gunnison Watershed   13
Figure 3-1: Wbid Segments In The North Fork   21
Figure 4-1: Volunteers Collecting And Processing Water Quality Samples   28
Figure 5-1: Average, Maximum, And Minimum Total Hardess Concentrations For Main Stem And Upper Tributaries On The North Fork   31
Figure 5-2: Average, Max And Min Total Hardness Values For Lower Tributaries   31
Figure 5-3: Seasonal Total Hardness (Average Of All Stations By Month)   32
Figure 5-4: Average, Max And Min Total Alkalinity Values At All Stations   33
Figure 5-5: Seasonal Alkalinity (Average Of Stations By Month)   33
Figure 5-6: Average, Maximum And Minimum Ph Values At All Stations   34
Figure 5-7: Conductivity: North Fork Of The Gunnison Mainstem   35
Figure 5-8: Specific Conductivity And Flow   36
Figure 5-9: Dissolved Oxygen In The Upper North Fork And Tributaries   37
Figure 5-10: Dissolved Oxygen In The Upper North Fork   38
Figure 5-11: Dissolved Oxygen In Lower Tributaries   38
Figure 5-12: Dissolved Oxygen And Temperature At Station Nf-3a   39
Figure 5-13: River Temperature In Upper Tributaries, Cold Stream I Classified Sites.   40
Figure 5-14: River Temperature In The Upper North Fork, Cold Stream Ii Classified Sites.   40
Figure 5-15: River Temperature In The Lower North Fork, Cold Stream Ii Classified Sites.   41
Figure 5-16: River Temperature In Lower Tributaries, Cold Stream Ii Classified Sites   41
Figure 6-1: Sulfate Concentration   43
Figure 6-2: Sulfur (Sulfate) Maximum, Average And Minimum At All Stations   44
Figure 6-3: Total Suspended Solids Maximum, Average And Minimum At All Stations At All Stations   45
Figure 6-4: Total Phosphorus Maximum, Average And Minimum At All Stations   47
Figure 6-5: Nitrate+Nitrite Average Concentration At All Stations   48
Figure 7-1: Dissolved Cadmium Concentration   51
Figure 7-2: Average, Maximum And Minimum Dissolved Calcium Values (Mg/L)   52
Figure 7-3: Dissolved Copper Concentrations (μg/L)   53
Figure 7-4: Dissolved Iron Concentrations At All Stations (μg/L)   54
Figure 7-5: Dissolved Lead Concentration   54
Figure 7-6: Dissolved Manganese Concentrations (μg/L)   55
Figure 7-7: Average, Minimum, And Maximum Dissolved Magnesium Concentrations   56
Figure 7-8: Dissolved Selenium Concentrations (μg/L)   57
Figure 7-9: Dissolved Zinc Concentrations (μg/L)   58
Figure 8-1: Monthly Geometric Mean Of *E.Coli*, (November Only) 2009   59
Figure 8-2: Monthly Geometric Mean Of *E.Coli*, 2010   60
Figure 8-3: Seasonal Geometric Mean Of *E. Coli* In The North Fork, 2011   60
Figure 8-4: Seasonal Geometric Mean Of *E. Coli* In The North Fork, 2012   61
Figure 8-5: Seasonal Geometric Mean Of *E. Coli* In The North Fork, 2013   61
Figure 8-6: Seasonal Geometric Mean Of *E. Coli* In The North Fork, 2014   62
Figure 9-1: Functional Feeding Groups In The North Fork   65
Figure 10-1: Total Phosphorus Concentrations   66
Figure 10-2: Dissolved Iron Concentration   67

BLM_0149024

WSCC Volunteer Water Quality Monitoring Data Report, 2016

**TABLE OF TABLES:**

Table 1: USGS Gaging Stations In The North Fork Watershed...................................................12
Table 2: List Of Npdes Discharge Facilities............................................................................14
Table 3: Stream Segment Classification Summary ..................................................................16
Table 4: Stream Segments And Water Quality Standards ........................................................17
Table 5: Impaired Segments On The 303(D) List And Monitoring And Evaluation List ...........20
Table 6: Interim Total Phosphorus Values .............................................................................22
Table 7: Interim Total Nitrogen Values..................................................................................22
Table 8: Stream Segments Temperature Standards. ................................................................22
Table 9: Network Water Monitoring Stations ........................................................................24
Table 10: Parameters Monitored By the River Watch Volunteer Water Quality Monitoring Network......25
Table 11: Parameters Monitored By the Network ...................................................................27
Table 12: Methods And Reporting Limits ..............................................................................27
Table 13: Epa Hardness Ranges ............................................................................................30
Table 14: Range Of Measured Conductivities At Sampled Locations (2001-2014)...................36
Table 15: Metals Sampling Date Ranges For Each Station......................................................49
Table 16: Average Hardness Used To Calculate Standards At Each Station .............................50
Table 17: Evaluation Matrix Of North Fork Macroinvertebrates.............................................64

BLM_0149025

## WSCC Volunteer Water Quality Monitoring Data Report, 2016
## LIST OF ACRONYMS:

| | |
|---|---|
| % EPT | Percent of ephemeroptera, plecoptera and trichoptera species |
| °C | Degrees Celsius |
| µg/L | Micrograms per Liter |
| CaCO3 | Calcium Carbonate |
| CDPHE | Colorado Department of Public Health and Environment |
| CPW | Colorado Parks and Wildlife |
| cfs | Cubic feet per second |
| CSU | Colorado State University |
| DO | Dissolved Oxygen |
| E. coli | Escherichia coli |
| EPA | Environmental Protection Agency |
| $H^+$ | Hydrogen ions |
| HBI | The Hilsenhoff Biotic Index (HBI) |
| ISDS | Independent Sewage Disposal System |
| MCL | Maximum Contaminant Level |
| mg/L | Milligrams per Liter |
| WSCC | Western Slope Conservation Center |
| PCS | Permit Compliance System |
| O2 | Oxygen |
| $OH^-$ | Hydroxyl ion |
| ppb | Parts per billion |
| PO4 | Phosphate |
| QA | Quality Assurance |
| QAPP | Quality Assurance Project Plan |
| QC | Quality Control |
| SO4 | Sulfate |
| SOPs | Standard Operating Procedures |
| TVS | Table Value Standard |
| USFS | US Forest Service |
| USGS | US Geological Survey |
| WS | Water Supply |
| WWTP | Wastewater Treatment Plant |
| WQCC | Colorado Water Quality Control Commission |

BLM_0149026

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

**Definitions**

**Acute standard** — the concentration value of a contaminant or substance in water that will result in adverse effects either from a single exposure or from multiple exposures in a short period of time

**Chronic standard** — the concentration value of a contaminant or substance in water that is deemed to cause adverse effects as a result of long term exposure.

**Dissolved solids** — refer to any minerals, salts, metals, cations or anions dissolved in water. Total dissolved solids (TDS) comprise inorganic salts (principally calcium, magnesium, potassium, sodium, bicarbonates, chlorides, and sulfates) and some small amounts of organic matter that are dissolved in water. Concentrations of total dissolved solids are reflected in conductivity measurements.

**Mode –** The number which appears most often in a set of numbers.

8

BLM_0149027

<u>WSCC Volunteer Water Quality Monitoring Data Report, 2016</u>

## 1. INTRODUCTION

### Western Slope Conservation Center (WSCCC)

Established in 1977, the Western Slope Conservation Center (WSCC) is a 501(c)3 non-profit group that formed to disseminate information about regional energy development and its impacts on the region's natural resources. Today, our mission is to build an active and aware community to protect and enhance the lands, air, water and wildlife of the Lower Gunnison Watershed.

> **WSCC Mission:**
> To build an active and aware community to protect and enhance the lands, air, water and wildlife of the Lower Gunnison Watershed.

As a result of our work, in 35 years the communities of the Lower Gunnison Watershed will be characterized by intact and functioning ecosystems, clean and abundant water resources, well-managed lands with the highest level of protection they deserve, and informed and an engaged citizenry that understand the connection between the vitality of its ecological and social communities.

In 2015, the Board of Directors affirmed our commitment to the following goal areas:
- Watershed Stewardship
- Advocacy for the Protection of Public Lands
- Education and Public Outreach

We distinguish ourselves by committing to four unique values.
- **Transparent, responsible, and ethical in our actions.** We strive for integrity in all of our efforts. We are accountable to our mission, membership, donors, partners, and the public.
- **Guided by science.** We use reliable, relevant, and the best-available scientific research to guide our decisions whenever possible.
- **Respect for the environment and diverse communities.** We strive to include the active involvement of the people and partners who are linked to the ecosystems we endeavor to protect. We consider the needs and values of our community. We build relationships based on trust and mutual benefit.
- **We seek tangible and enduring results.** We use informed debate and creative problem solving to develop locally appropriate solutions to complex conservation problems.

### North Fork Volunteer Water Quality Monitoring Network

The North Fork Volunteer Water Quality Monitoring Network (the Network) was initiated in April 2001. The goal of the program is to obtain credible water quality information for the North Fork of the Gunnison watershed. This project is run entirely by local volunteers, with the donation of time and services from a variety of local businesses, educational institutions and state, local and federal organizations. It represents the efforts of dozens of volunteers, and thousands of hours spent preparing and analyzing samples. This report summarizes the results of water quality monitoring conducted from October 2004 to April 2014 at fifteen sites located along the North Fork of the Gunnison River and two in the Lower Gunnison watershed. The project monitors water quality parameters of concern, including fecal coliform, nutrients, sediment and metals.

Data gathered from the Network is provided to the U.S. Environmental Protection Agency (EPA), the State of Colorado, Colorado Data Sharing Network and Colorado River Watch for inclusion in their publicly available databases. In the long run, it is hoped that the information collected will encourage

9

BLM_0149028

<u>WSCC Volunteer Water Quality Monitoring Data Report, 2016</u>

informed decision-making by local citizens, government agencies, and local officials. The Network is intended to continue indefinitely and supply the people of the North Fork Valley with reliable information about the state of their watershed.

## 2.  DESCRIPTION OF THE NORTH FORK WATERSHED



**Figure 2-1: Headwaters of the North Fork**

The North Fork of the Gunnison River (North Fork) is located in west-central Colorado, flowing through northwestern Gunnison and eastern Delta Counties. Flanked by the West Elk mountain range to the east, the peak elevation in the North Fork watershed is 13,687 feet. The headwaters of the North Fork are located in the Gunnison National Forest. The North Fork is formed by the confluence of Muddy Creek and Anthracite Creek downstream of the Paonia Reservoir Dam (Figure 2-2). The North Fork flows 33 miles in a southwesterly direction from this point to its junction with the Gunnison River at 4,553 ft elevation, approximately 8.5 miles west of the Town of Hotchkiss in Delta County. Terror, Hubbard, Minnesota, Roatcap, Cottonwood, and Leroux Creeks enter the North Fork between Paonia Reservoir and Hotchkiss. The North Fork watershed (HUC 14020004) drains a basin of approximately 986 square miles. Five small communities line the banks of the North Fork as it flows west towards the Gunnison River: Somerset, Bowie, Paonia, Hotchkiss, and Lazear. Figure 2-2 shows the location and topographical relief of the North Fork watershed.

The North Fork Valley consists of multiple river terraces positioned laterally along a highly dissected broad valley with gentle down-valley elevation relief. The soils along the river are deep to moderately deep, nearly level to steep, well-drained gravelly loam and stony loam that formed in outwash alluvium derived from igneous rock. Upstream of Somerset, the Mesa Verde Formation overlies the Mancos Shale. Downstream of Somerset, the North Fork Gunnison River is incised in the Mancos Shale west of Hotchkiss. Some of Leroux Creek and much of Cottonwood Creek is incised in the Mancos Shale. The vegetation is classified as northern desert scrub and consists primarily of juniper, sagebrush, western wheatgrass, muttongrass, fourwing saltbush, and bitterbrush.

10

BLM_0149029

WSCC Volunteer Water Quality Monitoring Data Report, 2016

**Regional Map of the North Fork Watershed**



**Figure 2-2: Location and Topography: North Fork Watershed**

BLM_0149030

WSCC Volunteer Water Quality Monitoring Data Report, 2016

**Land Use**

Current land uses in the study area are predominantly agricultural. Of the more than 1,000 parcels adjoining the river, 35 percent are classified as agricultural, consisting of cattle and sheep ranches, crop production and fruit orchards. Extractive industries include hard rock coal mining, gravel mining and logging. Tourism and outdoor recreation supplement the general economy. The majority of riverfront property is privately owned and used for agriculture, recreation and gravel mining.

The land cover in the upper reaches of the watershed, above Somerset, is a mixture of aspen deciduous and coniferous forest. Much of this land is federally owned and managed by the US Forest Service and Bureau of Land Management. Beginning in Paonia and stretching downstream to the confluence with the Gunnison River, the land cover changes to agriculture and shrub/scrub. South West Regional Gap Project land cover data in the North Fork is illustrated in Figure 2-3.

**Flow Data**

The North Fork of the Gunnison River is a fourth order perennial stream, fed predominantly by snowmelt, with average bankfull widths of 100 to 200 feet. The average flow during spring runoff is approximately 3,000 cubic feet per second (cfs); irrigation diversions can reduce late summer flows to less than 20 cfs. The predominant alluvial landforms can produce high bedload and sediment concentrations, especially during spring runoff.

Major flooding may also occur during spring runoff months from rapid snowmelt that is sometimes augmented by rain. The Network does not manually collect flow data. The U.S. Geological Survey (USGS) and Colorado Division of Water Resources (DWR) both manage gaging stations along the North Fork of the Gunnison River and its tributaries. The gages provide real-time flow data that is electronically available. Table 1 summarizes the stream flow gaging stations utilized by the Network.

| USGS/DWR Gaging Stations in the North Fork Watershed | | | |
|---|---|---|---|
| USGS Gage Number | DWR Gage Name | Period of Record Used for this Report | Location |
| 9131490 | MUDAPRCO | 2001-2014 | Muddy Creek above Paonia Reservoir |
| -- | MUDBPRCO | 2001-2014 | Muddy Creek below Paonia Reservoir |
| 9132960 | HUBBOWCO | 2001-2013 | Hubbard Creek at Highway 133 at Mouth near Bowie |
| 9132500 | NFGSOMCO | 2001-2014 | North Fork near Somerset |
| 9134100 | NFGPANCO | 2001-2014 | North Fork below Paonia |
| 9136100 | -- | 2009-2014 | North Fork Gunnison River above mouth near Lazear |
| 9143500 | SURACECO | 2001-2014 | Surface Creek at Cedaredge |

**Table 1: USGS Gaging Stations in the North Fork Watershed**

BLM_0149031

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

**Southwest Regional Gap Analysis Project Land Cover**



**Figure 2-3: Land Cover: North Fork and Lower Gunnison Watershed**

13

BLM_0149032

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

**Point Sources**

There are twenty discharge facilities in the North Fork watershed documented by the CDPHE. Table 2 lists all the currently permitted dischargers in the North Fork watershed. There are three permitted wastewater treatment plants (WWTPs) within the watershed: Town of Somerset, Town of Paonia and Town of Hotchkiss. All other towns, businesses and private residences in the area utilize independent sewage disposal systems (ISDS).

| National Pollution Discharge Elimination System Facilities in the North Fork Watershed | |
|---|---|
| 4D Gravel Pit Paonia | SH 92 Stengels Hill |
| Anderson Pit | Sheep Gas Gathering System |
| Bowie No 2 Mine | Somerset Central WTF |
| Hotchkiss Water Storage Facility | Spaulding Peak Production System |
| Hotchkiss WWTF | Town of Hotchkiss Drain Seep Line |
| Janet Pit | Tri County Pit |
| Lemoine Gravel Pit | West Elk Mine |
| Paonia WWTF | Williams Construction |

**Table 2: List of NPDES Discharge Facilities**

**Water Quality Pollution Risks**

In addition to natural sources of pollutants, potential anthropogenic pollution sources exist in the North Fork Watershed, including, but not limited to:

- cattle and sheep ranches
- irrigation return flows
- independent sewage disposal systems
- municipal wastewater treatment discharges
- the annual bulldozing of in-stream diversion structures
- sand and gravel mining
- coal mining operations.

**Other Water Quality Monitoring Efforts**

The North Fork Volunteer Water Quality Monitoring Project, in conjunction with Colorado River Watch, is the only active comprehensive water quality data collection program in the North Fork watershed. The Colorado Department of Public Health and Environment (CDPHE) typically collects samples in the watershed every five years near the Town of Lazear. Other agencies, such as U.S. Geological Survey, the local mining companies and Colorado Parks and Wildlife (CPW) have collected limited water quality samples.

14

BLM_0149033

WSCC Volunteer Water Quality Monitoring Data Report, 2016

## 3. Water Quality Standards

### Report Analysis Rating and Standards

This report evaluates stream health based on ratings that are dependent on conductivity and the presence and health of macroinvertebrates. These variables were used because they are good indicators of river health both independently and combined. Ratings for the two variables may not be the same for each at a particular location. Conductivity varies seasonally, so the conductivity rating typically varies seasonally.

The ratings are as follows:

**Excellent -**
Macroinvertebrates: No major differences in community structure and abundance between stations, high percentage of collectors and scrapers
Conductivity:  0 – 800 µS/cm

**Good –**

Macroinvertebrates:  Some differences in community structure and abundance between stations, adequate percentage of collectors and scrapers
Conductivity:  800 – 1,200 µS/cm

**Moderate -**
Macroinvertebrates: Differences in community structure and abundance between stations, median percentage of collectors and scrapers
Conductivity:  1,200 – 1,800 µS/cm

**Poor -**
Macroinvertebrates: Major differences in community structure and abundance between stations, low percentage of collectors and scrapers
Conductivity:  > 1,800 µS/cm

### Stream Segment Classifications and Standards

The Colorado Water Quality Control Commission (WQCC) created a regulatory framework called Basic Standards and Methodologies for Surface Water, or Regulation 31, to protect water quality in Colorado. Excerpts of these standards are provided in Appendix B.  Water quality standards are dependent on current and desired future beneficial uses and are applied on a segment-by-segment basis. The official designated uses for the North Forkwatershed include Aquatic Life Cold 1 (for water bodies supporting salmonid species), Aquatic Life Cold 2, Recreation E (existing primary contact use, such as swimming and boating), Recreation P (potential primary contact use, but uncertain until studied further), Water Supply and Agriculture.

The WQCC most recently modified designated uses and segmentation of the Upper and Lower Gunnison basins in 2012, effective March 30, 2012.

BLM_0149034

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

Table 4 shows the updated stream segments, or water body identification (WBIDs) from Regulation 35 Classifications and Numeric Standards for Gunnison and Lower Dolores River Basins that are sampled by the North Fork Volunteer Water Quality Monitoring Project and the state's applicable water quality standards for those segments. Table 3 shows a summary of stream segment (and subsequent station) classification. The WBID segments are also displayed in Figure 3-1. Excerpts from Regulation 35 can be found in Appendix C.

Every two years, CDPHE is required to prepare a list of impaired streams not meeting water quality standards called the 303(d) Impaired Waters List, as well as the regulatory precursor to the 303(d) list, the Monitoring and Evaluation List (M&E List). The M&E List identifies waters of questionable water quality that may be on their way to the 303(d) List. Regulation 94 lists segments in the Upper and Lower Gunnison basins (5 CCR 1002-94). The stream segments sampled by the North Fork Monitoring Network can be found in Table 5.

| | | CLASSIFICATION | | | | | |
| Stream Segment | Station | Water Supply | Agriculture | Aq Life Cold 1 | Aq Life Warm 2 | Recreation E | Recreation P |
|---|---|---|---|---|---|---|---|
| COGUNFO2 | NF-2, NF-1 | X | X | X | | X | |
| COGUNFO3 | RP-1, NF-3, NF-3a, NF-3b, NF-4, NF-4a, NF-5 | X | X | X | | X | X |
| COGUNFO4 | EM-1, AN-1 | X | X | X | | X | |
| COGUNFO5A | HC-1, LC-1 | X | X | X | | | X |
| COGUNFO6A | | | X | | X | | X |
| COGULGO7B | CC-1 | X | X | X | | | X |

**Table 3: Stream Segment Classification Summary**

BLM_0149035

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

### Table 4: Stream Segments and Water Quality Standards

**2. Mainstem of North Fork of the Gunnison River from its inception at the confluence of Muddy Creek and Coal Creek to the Black Bridge (41.75 Drive) above Paonia.**

| COGUNF02 | Classifications |
|---|---|
| Designation | Agriculture |
| Reviewable | Aq Life Cold 1 |
| | Recreation E |
| | Water Supply |
| Qualifiers: | |
| Other: | |
| Temporary Modification(s): | |
| Arsenic(chronic) = hybrid | |
| Expiration Date of 12/31/2021 | |

**Physical and Biological**

| | DM | MWAT |
|---|---|---|
| Temperature °C | CS-II | CS-II |
| | acute | chronic |
| D.O. (mg/L) | — | 6.0 |
| D.O. (spawning) | — | 7.0 |
| pH | 6.5 - 9.0 | — |
| chlorophyll a (mg/m²) | — | — |
| E. Coli (per 100 mL) | — | 126 |

**Inorganic (mg/L)**

| | acute | chronic |
|---|---|---|
| Ammonia | TVS | TVS |
| Boron | — | 0.75 |
| Chloride | — | 250 |
| Chlorine | 0.019 | 0.011 |
| Cyanide | 0.005 | — |
| Nitrate | 10 | — |
| Nitrite | — | 0.05 |
| Phosphorus | — | — |
| Sulfate | — | WS |
| Sulfide | — | 0.002 |

**Metals (ug/L)**

| | acute | chronic |
|---|---|---|
| Aluminum | — | — |
| Arsenic | 340 | 0.02(T) |
| Beryllium | — | — |
| Cadmium | TVS(tr) | TVS |
| Chromium III | 50(T) | TVS |
| Chromium VI | TVS | TVS |
| Copper | TVS | TVS |
| Iron | — | WS |
| Iron | — | 1000(T) |
| Lead | TVS | TVS |
| Manganese | TVS | TVS |
| Manganese | — | WS |
| Mercury | — | 0.01(t) |
| Molybdenum | — | 160(T) |
| Nickel | TVS | TVS |
| Selenium | TVS | TVS |
| Silver | TVS | TVS(tr) |
| Uranium | — | — |
| Zinc | TVS | TVS |
| Zinc | — | TVS(sc) |

**3. Mainstem of North Fork of the Gunnison River from the Black Bridge (41.75 Drive) above Paonia to the confluence with the Gunnison River.**

| COGUNF03 | Classifications | |
|---|---|---|
| Designation | Agriculture | |
| Reviewable | Aq Life Cold 1 | |
| | Recreation E | 4/1 - 9/30 |
| | Recreation P | 10/1 - 3/31 |
| | Water Supply | |
| Qualifiers: | | |
| Other: | | |

**Physical and Biological**

| | | DM | MWAT |
|---|---|---|---|
| Temperature °C | | CS-II | CS-II |
| | | acute | chronic |
| D.O. (mg/L) | | — | 6.0 |
| D.O. (spawning) | | — | 7.0 |
| pH | | 6.5 - 9.0 | — |
| chlorophyll a (mg/m²) | | — | — |
| E. Coli (per 100 mL) | 4/1 - 9/30 | — | 126 |
| E. Coli (per 100 mL) | 10/1 - 3/31 | — | 205 |

**Inorganic (mg/L)**

| | acute | chronic |
|---|---|---|
| Ammonia | TVS | TVS |
| Boron | — | 0.75 |
| Chloride | — | 250 |
| Chlorine | 0.019 | 0.011 |
| Cyanide | 0.005 | — |
| Nitrate | 10 | — |
| Nitrite | — | 0.05 |
| Phosphorus | — | — |
| Sulfate | — | WS |
| Sulfide | — | 0.002 |

**Metals (ug/L)**

| | acute | chronic |
|---|---|---|
| Aluminum | — | — |
| Arsenic | 340 | 0.02(T) |
| Beryllium | — | — |
| Cadmium | TVS(tr) | TVS |
| Chromium III | 50(T) | TVS |
| Chromium VI | TVS | TVS |
| Copper | TVS | TVS |
| Iron | — | WS |
| Iron | — | 1000(T) |
| Lead | TVS | TVS |
| Manganese | TVS | TVS |
| Manganese | — | WS |
| Mercury | — | 0.01(t) |
| Molybdenum | — | 160(T) |
| Nickel | TVS | TVS |
| Selenium | TVS | TVS |
| Silver | TVS | TVS(tr) |
| Uranium | — | — |
| Zinc | TVS | TVS |

BLM_0149036

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

4. Muddy Creek, including all tributaries and wetlands, from the source to the confluence with Coal Creek, Coal Creek, including all tributaries and wetlands, from the source to the confluence with Muddy Creek, All tributaries to the North Fork of the Gunnison from its inception at the confluence of Muddy Creek and Coal Creek to the confluence with the Gunnison River within national forest boundaries, except for the specific listing in Segment 1.

| COGUNF04 | Classifications | Physical and Biological | | | Metals (ug/L) | | |
|---|---|---|---|---|---|---|---|
| Designation | Agriculture | | DM | MWAT | | acute | chronic |
| Reviewable | Aq Life Cold 1 | Temperature °C | CS-I | CS-I | Aluminum | — | — |
| | Recreation E | | acute | chronic | Arsenic | 340 | 0.02(T) |
| | Water Supply | D.O. (mg/L) | — | 6.0 | Beryllium | — | — |
| Qualifiers: | | D.O. (spawning) | — | 7.0 | Cadmium | TVS(tr) | TVS |
| Other: | | pH | 6.5 - 9.0 | — | Chromium III | 50(T) | TVS |
| Temporary Modification(s): | | chlorophyll a (mg/m²) | — | — | Chromium VI | TVS | TVS |
| Arsenic(chronic) = hybrid | | E. Coli (per 100 mL) | — | 126 | Copper | TVS | TVS |
| Expiration Date of 12/31/2021 | | | | | Iron | — | WS |
| | | Inorganic (mg/L) | | | Iron | — | 1000(T) |
| | | | acute | chronic | Lead | TVS | TVS |
| | | Ammonia | TVS | TVS | Manganese | TVS | TVS |
| | | Boron | — | 0.75 | Manganese | — | WS |
| | | Chloride | — | 250 | Mercury | — | 0.01(t) |
| | | Chlorine | 0.019 | 0.011 | Molybdenum | — | 160(T) |
| | | Cyanide | 0.005 | — | Nickel | TVS | TVS |
| | | Nitrate | 10 | — | Selenium | TVS | TVS |
| | | Nitrite | — | 0.05 | Silver | TVS | TVS(tr) |
| | | Phosphorus | — | — | Uranium | — | — |
| | | Sulfate | — | WS | Zinc | TVS | TVS |
| | | Sulfide | — | 0.002 | Zinc | — | TVS(sc) |

5a. Mainstems of Hubbard Creek, Terror Creek, Minnesota Creek, and Leroux Creek from the national forest boundary to their confluences with the North Fork of the Gunnison River; mainstem of Jay Creek from its source to its confluence with the North Fork of the Gunnison River.

| COGUNF05A | Classifications | Physical and Biological | | | Metals (ug/L) | | |
|---|---|---|---|---|---|---|---|
| Designation | Agriculture | | DM | MWAT | | acute | chronic |
| Reviewable | Aq Life Cold 1 | Temperature °C | CS-I | CS-I | Aluminum | — | — |
| | Recreation P | | acute | chronic | Arsenic | 340 | 0.02(T) |
| | Water Supply | D.O. (mg/L) | — | 6.0 | Beryllium | — | — |
| Qualifiers: | | D.O. (spawning) | — | 7.0 | Cadmium | TVS(tr) | TVS |
| Other: | | pH | 6.5 - 9.0 | — | Chromium III | 50(T) | TVS |
| Temporary Modification(s): | | chlorophyll a (mg/m²) | — | — | Chromium VI | TVS | TVS |
| Arsenic(chronic) = hybrid | | E. Coli (per 100 mL) | — | 205 | Copper | TVS | TVS |
| Expiration Date of 12/31/2021 | | | | | Iron | — | WS |
| | | Inorganic (mg/L) | | | Iron | — | 1000(T) |
| | | | acute | chronic | Lead | TVS | TVS |
| | | Ammonia | TVS | TVS | Manganese | TVS | TVS |
| | | Boron | — | 0.75 | Manganese | — | WS |
| | | Chloride | — | 250 | Mercury | — | 0.01(t) |
| | | Chlorine | 0.019 | 0.011 | Molybdenum | — | 160(T) |
| | | Cyanide | 0.005 | — | Nickel | TVS | TVS |
| | | Nitrate | 10 | — | Selenium | TVS | TVS |
| | | Nitrite | — | 0.05 | Silver | TVS | TVS(tr) |
| | | Phosphorus | — | — | Uranium | — | — |
| | | Sulfate | — | WS | Zinc | TVS | TVS |
| | | Sulfide | — | 0.002 | Zinc | — | TVS(sc) |

BLM_0149037

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

6a. All tributaries, including wetlands, to the North Fork of the Gunnison River from its inception at the confluence of Muddy Creek and Coal Creek to the confluence with the Gunnison River, and not within national forest boundaries, except for the specific listings in Segments 5a, 5b, and 6b.

| COGUNF06A | Classifications | Physical and Biological | | | Metals (ug/L) | | |
|---|---|---|---|---|---|---|---|
| Designation | Agriculture | | DM | MWAT | | acute | chronic |
| Reviewable | Aq Life Warm 2 | Temperature °C | WS-II | WS-II | Aluminum | — | — |
| | Recreation P | | acute | chronic | Arsenic | 340 | 100(T) |
| Qualifiers: | | D.O. (mg/L) | — | 5.0 | Beryllium | — | — |
| Other: | | pH | 6.5 - 9.0 | — | Cadmium | TVS | TVS |
| | | chlorophyll a (mg/m²) | — | — | Chromium III | TVS | TVS |
| | | E. Coli (per 100 mL) | — | 205 | Chromium III | — | 100(T) |
| | | Inorganic (mg/L) | | | Chromium VI | TVS | TVS |
| | | | acute | chronic | Copper | TVS | TVS |
| | | Ammonia | TVS | TVS | Iron | — | 1000(T) |
| | | Boron | — | 0.75 | Lead | TVS | TVS |
| | | Chloride | — | — | Manganese | TVS | TVS |
| | | Chlorine | 0.019 | 0.011 | Mercury | — | 0.01(t) |
| | | Cyanide | 0.005 | — | Molybdenum | — | 160(T) |
| | | Nitrate | 100 | — | Nickel | TVS | TVS |
| | | Nitrite | — | 0.05 | Selenium | TVS | TVS |
| | | Phosphorus | — | — | Silver | TVS | TVS |
| | | Sulfate | — | — | Uranium | — | — |
| | | Sulfide | — | 0.002 | Zinc | TVS | TVS |

7b. Mainstem of Surface Creek from the point of diversion of water supply to the confluence with Tongue Creek; mainstem of Tongue Creek from its inception at the confluence of Ward Creek and Dirty George Creek to the confluence with the Gunnison River; mainstem of Youngs Creek from the national forest boundary to the confluence with Kiser Creek; mainstem of Kiser Creek from the national forest boundary to the confluence with Youngs Creek.

| COGULG07B | Classifications | Physical and Biological | | | Metals (ug/L) | | |
|---|---|---|---|---|---|---|---|
| Designation | Agriculture | | DM | MWAT | | acute | chronic |
| Reviewable | Aq Life Cold 1 | Temperature °C | CS-II | CS-II | Aluminum | — | — |
| | Recreation P | | acute | chronic | Arsenic | 340 | 0.02(T) |
| | Water Supply | D.O. (mg/L) | — | 6.0 | Beryllium | — | — |
| Qualifiers: | | D.O. (spawning) | — | 7.0 | Cadmium | TVS(tr) | TVS |
| Other: | | pH | 6.5 - 9.0 | — | Chromium III | 50(T) | TVS |
| | | chlorophyll a (mg/m²) | — | — | Chromium VI | TVS | TVS |
| | | E. Coli (per 100 mL) | — | 205 | Copper | TVS | TVS |
| | | | | | Iron | — | WS |
| | | Inorganic (mg/L) | | | Iron | — | 1000(T) |
| | | | acute | chronic | Lead | TVS | TVS |
| | | Ammonia | TVS | TVS | Manganese | TVS | TVS |
| | | Boron | — | 0.75 | Manganese | — | WS |
| | | Chloride | — | 250 | Mercury | — | 0.01(t) |
| | | Chlorine | 0.019 | 0.011 | Molybdenum | — | 160(T) |
| | | Cyanide | 0.005 | — | Nickel | TVS | TVS |
| | | Nitrate | 10 | — | Selenium | TVS | TVS |
| | | Nitrite | — | 0.05 | Silver | TVS | TVS(tr) |
| | | Phosphorus | — | — | Uranium | — | — |
| | | Sulfate | — | WS | Zinc | TVS | TVS |
| | | Sulfide | — | 0.002 | Zinc | | TVS(sc) |

All metals are dissolved unless otherwise noted.
T = total recoverable                           DM = daily maximum
t = total                                       MWAT = maximum weekly average
tr = trout                                      temperature
sc = sculpin                                    WS = Water Supply
D.O. = dissolved oxygen                         TVS = Table Value Standard
Table Value Standards (TVS) for ammonia are based on temperature and pH and for metals it is based on hardness
See WQCC Regulation 31 for details on TVS, TVS(tr), TVS(sc), WS, temperature standards

BLM_0149038

<u>WSCC Volunteer Water Quality Monitoring Data Report, 2016</u>

Table 5: Impaired Segments on the 303(d) List and Monitoring and Evaluation List (CDPHE Regulation 93_2016(03)

| Water Body ID (WBID) | Sampling Station | Segment Description | Portion | Colorado's Monitoring & Evaluation Parameter(s) | Clean Water Act Section 303(d) Impairment | 303(d) Priority |
|---|---|---|---|---|---|---|
| COGUNF04 | EM-1, AN-1 | Muddy Creek and all tributaries, Coal Creek and all tributaries; all tributaries to the North Fork of the Gunnison within the national forest boundary | East Muddy Creek | Lead, Selenium | Iron (Trec) | High |
| | | | Muddy Creek | E. coli (May-Oct) | | |
| | | | Ruby Anthracite Creek | | Arsenic | Low |
| COGUNF06b | CC-1 | Bear Creek, Reynolds Creek, Bell Creek, McDonald Creek, Cottonwood Creek, Love Gulch, Cow Creek, Dever Creek, German Creek, Miller Creek, Stevens Gulch, Big Gulch, Stingley Gulch and Alum Gulch not on national forest lands from the source to the North Fork of the Gunnison River | Cottonwood Creek | Iron (Trec), Manganese, Sulfate | | |
| COGULG07b | TC-1, SC-1 | Surface Creek from the diversion of water supply to Tongue Creek; Tongue Creek to the Gunnison River; Youngs Creek from USFS boundary to Kiser Creek; Kiser Creek from the USFS boundary to the confluence with Youngs Creek | Tongue Creek | | Selenium, Iron (Trec) | Medium |

20

WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 3-1: WBID Segments in the North Fork and Lower Gunnison Basin**

BLM_0149040

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

**Total Phosphorus and Total Nitrogen Standards**

Both Total Phosphorus and Total Nitrogren standards are evaluated by the interim values outlined in the tables below.

| Interim Total Phosphorus Values | |
|---|---|
| Lakes and Reservoirs, cold, >25 acres | 25 µg/L [1] |
| Lakes and Reservoirs, warm > 25 acres | 83 µg/L [1] |
| Lakes and Reservoirs, <=25 acres | RESERVED |
| Rivers and Streams – cold | 110 µg/L [2] |
| Rivers and Streams - warm | 170 µg/L [2] |
| [1] summer (July 1–September 30) average Total Phosphorus (µg/L) in the mixed layer of lakes (median of multiple depths), allowable exceedance frequency 1-in-5 years. [2] annual median Total Phosphorus (µg/L), allowable exceedance frequency 1-in-5 years. | |

**Table 6: Interim Total Phosphorus Values**

| Interim Total Nitrogen Values (Effective May 31, 2017) | |
|---|---|
| Lakes and Reservoirs, cold, >25 acres | 426 µg/L [1] |
| Lakes and Reservoirs, warm > 25 acres | 910 µg/L [1] |
| Lakes and Reservoirs, <=25 acres | RESERVED |
| Rivers and Streams – cold | 1,250 µg/L [2] |
| Rivers and Streams - warm | 2,010 µg/L [2] |
| [1] summer (July 1–September 30) average Total Nitrogen (µg/L) in the mixed layer of lakes (median of multiple depths), allowable exceedance frequency 1-in-5 years. [2] annual median Total Nitrogen (µg/L), allowable exceedance frequency 1-in-5 years. | |

**Table 7: Interim Total Nitrogen Values**

Temperature standards are based on the use of the river and the aquatic life it supports. They are included in the table below.

| Site(s) | Classification | *Warm Season Maximum Weekly Average Temperature Standard(MWAT) (Deg C) | Warm Season Daily Maximum Temperature Standard (DM) (Deg C) | *Cold Season MWAT (Deg C) | Cold Season DM (Deg C) |
|---|---|---|---|---|---|
| EM-1, AN-1, HC-1, LC-1 | Cold Stream I | 17.0 | 21.7 | 9 | 13 |
| NF-1, NF-2, NF-3, NF-3a, NF-3b, NF-4, NF-4a, NF-5, SC-1, TC-I | Cold Stream II | 18.3 | 23.9 | 9 | 13 |
| CC-1 | Warm Stream II | 27.5 | 28.6 | 13.8 | 14.3 |
| *Warm and Cold season month designations vary for each standard. | | | | | |

**Table 8: Stream Segments Temperature Standards.**

### *E. coli* Standards

*E. coli* standards used in this report are based on the regulatory standard (235 organisms/mL) outlined by the CDPHE Water Quality Control Division (WQCD) for natural swimming areas.

BLM_0149041

WSCC Volunteer Water Quality Monitoring Data Report, 2016

## 4.  NORTH FORK VOLUNTEER MONITORING NETWORK

### Introductions

Since April 2001, Network volunteers have been collecting water quality samples in the North Fork Valley. As part of this joint project, coordinated by the Western Slope Conservation Center (WSCC) and Colorado River Watch, volunteers receive lab and field training on EPA-approved water sampling procedures. Volunteers travel once a month to sample different sites throughout the watershed. Stations start as high as East Muddy Creek and proceed down the North Fork of the Gunnison River as far as the confluence with the main stem of the Gumison River. Two additional sites were adopted by the Network in 2004 in the Lower Gunnison Watershed on Tongue and Surface Creeks and are monitored every other month. The Network began sampling Hubbard Creek, Cottonwood Creek and Leroux Creek tributaries in 2011, and they are now monitored monthly.

Samples are collected for analysis of temperature, dissolved oxygen, alkalinity, conductivity, hardness, pH, metals, nutrients, other inorganic parameters, macroinvertebrates and bacteria. The majority of samples collected and analyzed by the Network are done in conjunction with Colorado River Watch (River Watch). River Watch is a state-wide volunteer monitoring program that focuses on collecting baseline water quality data. River Watch provides volunteer groups like WSCC with training, water monitoring equipment, chemicals for analysis of field parameters and lab analysis for metals, nutrients and other inorganic parameters. All River Watch data are publicly available on the River Watch website.



The Network bacteria monitoring program commenced in 2001 in partnership with the Environmental Protection Agency (EPA) after water quality standards in segments in the North Fork were upgraded to reflect recreational uses. Bacteria samples are not collected for regulatory or compliance purposes. Rather, these data (total coliforms and E. Coli) provide a screening-level assessment of bacterial concentrations.

The following sections explain the specifics of the Network's water sampling program, including the location of the water quality monitoring stations, parameters analyzed and the volunteer training program.

### Water Quality Monitoring Stations

The North Fork Volunteer Monitoring Network has collected water quality data at fifteen locations throughout the North Fork watershed and two stations in the Lower Gunnison watershed. Table 9 outlines the location, description and active period for each station. The stations are strategically located to provide baseline coverage of the watershed stretching from the headwaters downstream. Monitoring locations and frequencies have changed over the years to reflect changing priorities. Figure 2-2 shows a map of all active Network monitoring stations.

BLM_0149042

WSCC Volunteer Water Quality Monitoring Data Report, 2016

| | | | | | | Table 9: Network Water Monitoring Stations | |
|---|---|---|---|---|---|---|---|
| Station Name | Station # | Lat | Long | Date Started | Date ended | Station Description | WBID |
| AN-1 | 645 | 38.93995 | -107.35796 | Apr-2001 | May-02 | **Anthracite Creek:** Turn right on CR 135 to Kebler Pass. After bridge over Muddy Creek, access along Crystal Meadows Ranch fence, use USBOR access to Anthracite Creek. | COGUN04 |
| EM-1 | 644 | 38.997075 | -107.35712 | Apr-2001 | on-going | **Muddy Creek:** 1/2 mile north of Paonia State Park entrance on HWY 133, just below confluence of East and West Muddy Creeks. | COGUN04 |
| NF-1 | 646 | 38.92595 | -107.43372 | Apr-2001 | on-going | **North Fork of Gunnison:** USGS Gauging Station accessed off HWY 133, 2/10 of mile above entrance to West Elk Mine. | COGUN02 |
| NF-2 | 649 | 38.927316 | -107.47828 | Apr-2001 | on-going | **North Fork of Gunnison:** Along HWY 133, west of the town of Somerset, just below the Fire Mountain Canal irrigation diversion. | COGUN02 |
| NF-3 | 238 | 38.8688 | -107.60461 | Apr-2001 | Jun-08 | **North Fork of Gunnison:** Off HWY 133, turn south onto the Samuel Wade Rd into Paonia. Sample just downstream of the "County Road Bridge". | COGUN03 |
| NF-3a | 875 | 38.8508 | -107.6359 | Jun-2002 | on-going | **North Fork of Gunnison:** From Old River Road between Paonia and Hotchkiss, turn north on N-25 Road and then immediately left. Take this road until is crosses the railroad tracks, and then turn right into the first driveway. Follow the private road down toward the river. | COGUN03 |
| NF-3b | 272 | 38.83738253 | -107.658315 | Jul-2008 | on-going | **North Fork of Gunnison:** In Hotchkiss, from the intersection of Hwy 92 and Hwy 133, travel northeast on Hwy 133, 4.9 miles to Campbell Road. Turn right on Campbell road and continue .4 miles, continue south on private road .2 miles. Park before gate. Walk .2 miles south. | COGUN03 |
| NF-4 | 269 | 38.792 | -107.72628 | Apr-2001 | May-02 | **North Fork of Gunnison:** From downtown Hotchkiss, turn south onto Cedar Drive (3400 Rd). Follow road to bridge, turn right just before bridge, sample next to red gate. | COGUN03 |
| NF-4a | 876 | 38.78312 | -107.74386 | Jun-2002 | on-going | **North Fork of Gunnison:** From downtown Hotchkiss, turn south onto Cedar Drive (3400 Rd). Follow this road across bridge, and then turn right onto River Park Road. Follow this dirt road thru gate, and then take the right fork down to the river. | COGUN03 |
| NF-5 | 650 | 38.7839 | -107.8346 | Apr-2001 | on-going | **North Fork of Gunnison:** From HWY 133, turnoff at the Pleasure Park entrance, follow road to river. At bottom, turn left into BLM parking area. Trails to river. | COGUN03 |
| CC-1 | 10425 | 38.806141 | -107.6878 | Jan-2011 | on-going | **Cottonwood Creek:** From downtown Hotchkiss, head southeast on HWY 92 and then turn left on Back River Road. Site is across from the turnoff to K-50 Ln. Sample just downstream of the culvert. | COGUNF06a |
| LC-1 | 893 | 38.795449 | -107.731000 | Jan-2011 | on-going | **Leroux Creek:** From Hwy 92 in Hotchkiss, turn south on Pinion Drive. Go strait through stop sign, turn right and then quickly angle left onto Hotchkiss Ave/Riverside Dr. Turn left at 461 Riverside Dr opposite the Hotchkiss brick barn. Drive past the house and workshop on the left. Park and walk straight back to through tree line to the creek. | COGUNF05a |
| HC-1 | 892 | 38.927208 | -107.517526 | Jan-2011 | on-going | **Hubbard Creek:** Head north on Hwy 133 from Paonia and turn left at Bowie Road at Industrial Building. Pass the mine, go down the hill with the North Fork River is on your right. Park on the left at cottone, go to the left of the garage, turn right down to the river. | COGUNF05a |
| SC-1 | 260 | 38.90159438 | -107.921243 | Apr-2005 | on-going | **Surface Creek:** Proceed up HWY 65 to Cedaredge NE 4th Street. Turn right and pass fenced pond on left to next driveway (310 NE 4th Street). Walk over lawn down stairs to path to creek. | COGULG07b |
| TC-1 | 262 | 38.7877898 | -107.995277 | Apr-2005 | on-going | **Tongue Creek:** From HWY 92 turn right at HWY 65 (toward Cedaredge).  Left on Fairview Drive for ¼ mile - creek is at bottom of grade.  Walk blocked road to locked barbed wire fence and go thru fence to creek. | COGULG07b |

BLM_0149043

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

**Water Quality Parameters Monitored**

The Network's water quality monitoring program collects information on the chemistry, biology and physical habitat of the North Fork River. During the October 2004 to April 2014 sample period, Network volunteers collected monthly field parameter, metal, metals, nutrient and other inorganic parameter samples and bacteria samples. Macroinvertebrate/physical habitat analyses were conducted annually. Table 10 lists the water quality parameters the Network monitors, and Table 11 provides a brief description of each parameter.

| Parameters Monitored by the Network | | | |
|---|---|---|---|
| **Field Parameters** | **Nutrients and Other Inorganics** | **Metals\*** | **Biological** |
| pH<br>Temperature<br>Conductivity<br>Alkalinity<br>Hardness<br>Dissolved Oxygen<br>Flow | Total suspended solids (TSS)<br>Sulfate<br>Chloride<br>Total Phosphorus<br>Nitrate+nitrite<br>Ammonia | Aluminum<br>Arsenic<br>Cadmium<br>Calcium<br>Copper<br>Iron<br>Lead<br>Magnesium<br>Manganese<br>Selenium<br>Zinc<br>***Total and dissolved*** | Total coliforms<br>*E. Coli*<br>Macroinvertebrates<br>Physical Habitat |

**Table 10: Parameters Monitored by the River Watch Volunteer Water Qualty Monitoring Network**

**Where Are Samples Analyzed?**

- Field Parameters: in field and at local River Watch laboratory
- Metals: River Watch/CPW Laboratory, Fort Collins, Colorado
- Nutrients: River Watch/CPW Laboratory, Fort Collins, Colorado
- Bacteria: EPA Region 8 Laboratory, Golden, Colorado
- Macroinvertebrates: River Watch contract laboratory in Ft. Collins, Colorado

BLM_0149044

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

| Parameters Monitored by the Network | |
|---|---|
| **Parameter** | Description/Relationships Field Parameters |
| pH | Measure of hydrogen ion (H+) concentration. Water with a pH below 7.0 is acidic; a pH above 7.0 is alkaline. |
| Temperature | Varies seasonally, fish and aquatic life require specific temperatures to reproduce and thrive. |
| Total Alkalinity, as CaCO3 | Measure of carbonate (HCO3-) and bicarbonate (CO3-) anions present. Reflects the river's buffering capacity. |
| Total Hardness, as CaCO3 | The amount of dissolved calcium and magnesium in water.  Mitigates metals toxicity for fish. |
| Dissolved Oxygen | Amount of oxygen in the water in its dissolved form. DO varies with temperature and flow and is indirectly related to temperature. |
| **Nutrients and Other Inorganic Parameters** | |
| Total suspended solids | Minerals and soil particles suspended in the water column. In slow or low flows, this material can be deposited in the streambed. |
| Sulfate | This form of sulfur (SO4) is most common in the oxidizing conditions of flowing waters. |
| Chloride | Can originate from natural sources, but also associated with evaporation, road salts or water treatment plants. |
| Total phosphorus | Common constituent in soil and some fertilizers. |
| N, Nitrate+nitrite | Nitrates and nitrites are oxidized forms of nitrogen commonly found in flowing water. |
| N, Ammonia | Ammonia is a common component of organic wastes (e.g., sewage) and fertilizers. Can be toxic to fish in high concentrations. |
| **Bacteria** | |
| Total Coliform | A family of microorganisms that originate in the intestines of humans and other warm-blooded animals. Not always pathogenic (disease-causing), although high concentrations indicate risk. |
| *Escherichia Coli (E. Coli)* | Bacteria associated with water-borne diseases such as dysentery and cholera. Many *E. Coli* bacteria cause no health problems, others may be highly pathogenic. |
| **Metals** | |
| Aluminum | Most abundant naturally occurring metal in the earth's surface. |
| Arsenic | Naturally occurring element in the earth's crust and mineral deposits. May enter the soil from natural or manmade sources. Can cause cancer and skin lesions. It has also been associated with developmental effects, cardiovascular disease, neurotoxicity and diabetes. |
| Cadmium | Naturally occurring, the largest source of cadmium is often burning of fossil fuels and incineration of municipal waste. Chronic exposure can cause kidney, bone and lung disease. |
| Calcium | The most abundant cation in the world's rivers and a common constituent of local soils. Important contributor to hardness. A major component of hardness. |
| Copper | Found in mineralized ore deposits. Rarely found in pristine source water, may reflect mining impacts. |
| Iron | Second most abundant metallic element in earth's crust. Excessive amounts may cause staining of plumbing fixtures and laundry. |
| Lead | Naturally occurring, highly toxic; can accumulate in fish and human tissue with negative health effects. |
| Magnesium | A major component of hardness and is primarily derived from the weathering of rocks. |
| Manganese | Essential element in plant and animal metabolism. |

26

BLM_0149045

# WSCC Volunteer Water Quality Monitoring Data Report, 2016

| Selenium | A naturally occurring metal common in the Mancos shale. Leaches from soils via irrigation. Can be toxic to fish and wildlife. |
| --- | --- |
| Zinc | Zinc is relatively abundant, but may be released to the environment by coal burning, mining, and other industrial activities. |
| **Macroinvertebrates** | |
| The presence of a diverse range of macroinvertebrate species serve as "bioindicators" and are a sign of adequate habitat and a healthy river ecosystem. The presence of pollution-sensitive species is a sign that pollution is absent in a stream. | |

**Table 11: Parameters Monitored by the Network**

## Sample Collection and Analytical Procedures

The majority of Network samples are collected using the grab sample technique. Grab samples are collected by volunteers wading into the stream and collecting water using a clean, large bucket. Water from this bucket is used to fill all subsequent sample bottles. When river water levels permit, volunteers may collect composite samples. Composite samples are collected at multiple locations moving across a stream channel.

Sampling and analysis procedures utilized by the Network follow Standard Methods and/or EPA approved methods. Table 12 lists the sample method code and laboratory reporting limits for each parameter monitored.

| Methods and Reporting Limits | | | | |
| --- | --- | --- | --- | --- |
| **Parameters** | **Unit** | **Method** | **Source** | **Reporting Limit** |
| Aluminum | µg/L | 200.7 | USEPA | 15 |
| Ammonia | mg/L | 350.1 | USEPA | .01 |
| Arsenic | µg/L | 200.7 | USEPA | 15 |
| Cadmium | µg/L | 200.7 | USEPA | .15 |
| Calcium | µg/L | 200.7 | USEPA | 100 |
| Chloride | mg/L | 375.4 | USEPA | 1.0 |
| Copper | µg/L | 200.7 | USEPA | 1 |
| DO | mg/L | 421 B | SM | .5 |
| E. coli | MPN/100 mL | 9223b 24hr | | 1 |
| Iron | µg/L | 200.7 | USEPA | 10 |
| Lead | µg/L | 200.7 | USEPA | 3 |
| Magnesium | µg/L | 200.7 | USEPA | 100 |
| Manganese | µg/L | 200.7 | USEPA | 5 |
| Nitrate + Nitrite | mg/L | 353.2 | USEPA | .02 |
| pH | SU | | | .01 |
| Potassium | µg/L | 200.7 | USEPA | 100 |
| Selenium | µg/L | 200.7 | USEPA | 5 |
| Sodium | µg/L | 200.7 | USEPA | 100 |
| Sulfate | mg/L | 375.4 | USEPA | .5 |
| Temperature | Deg C | | | |
| Total Alkalinity | mg/L | 310.1 | USEPA | 2 |
| Total Coliforms | MPN/100 mL | 9223b 24hr | | 1 |
| Total Hardness | mg/L | 314 | SM | 2 |
| Total Nitrogen | mg/L | 353.2 | USEPA | 0.02 |
| Total Phosphorus | µg/L | 365.1 | USEPA | 5 |
| Total Suspended Solids | mg/L | 160.2 | USEPA | 4 |
| Zinc | µg/L | 200.7 | USEPA | 3 |

**Table 12: Methods and Reporting Limits**

27

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

**Volunteer Training and Certification**

All volunteers must attend a River Watch training workshop before they can join the Network. The River Watch training provides in-depth instruction on all aspects of water monitoring: sample preparation, collection, analyses, shipping, data management and Quality Assurance & Quality Control (QA/QC) procedures.

The WSCC Technical Advisor accompanies volunteers on the first several sampling runs until satisfied that the volunteers can complete the sampling procedures independently. Volunteers between the ages of 10 and 18 can be trained and work alongside at least one adult in the field and lab. Figure 4-1 shows Network volunteers collecting samples and processing them in the lab.


**Figure 4-1: Volunteers collecting and processing water quality samples**

### Quality Control/Quality Assurance Measures

Quality control measures both in the field and in the lab are detailed in Quality Assurance Project Plans (QAPPs) developed in 2001. For this project three separate QAPPs were created, one each for nutrients and other inorganic parameters, bacteria and metals. The QAPP documents are available for inspection at the WSCC office in Paonia. The River Watch Program follows the CDPHE QAPP and is updated as the CDPHE QAPP is updated.

As part of the River Watch program, the Network participates in a rigorous annual QA/QC regime. Network QA/QC controls include twenty percent duplicate and blank samples, analysis of unknown samples twice per year and an annual site visit from a River Watch staff member. The QA/QC measures evaluate techniques, chemicals and equipment. Chains-of-custody forms accompany all shipped samples.

### Data Reporting

Volunteers use standardized reporting forms developed by River Watch for every sample collection event. Hard copies documenting sample location, date, time, field conditions and field parameters are stored at the ERO Resources office in Hotchkiss and the River Watch office in Denver. Digital copies are on file at the WSCC office in Paonia. Information from the data sheets is validated and then entered into the online River Watch database (except for bacteria data), where it is eventually combined with metals, nutrients and other inorganics results. Bacteria data are stored with the EPA. The River Watch data are publicly available online at: http://wildlife.state.co.us/riverwatch/. River Watch data are also uploaded to the Colorado Data Sharing Network (www.codsnstoret.com) and EPA's STORET (www.epa.gov/storet).

### Project Sponsors

The North Fork Volunteer Water Quality Monitoring Project would not be possible without the support of many different State, Federal, and local organizations. Each group provides critical support, either in the form of technical assistance, lab equipment, or volunteer recruitment. The following is a list of the project partners:

BLM_0149047

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

- **Western Slope Conservation Center** is responsible for water quality data management, volunteer recruitment and training, report creation and technical support to the project. In addition, WSCC advertises the project to the local community, initiates fundraising efforts and assists with map and report creation efforts.
- **River Watch Program**, co-sponsored by the *Colorado Watershed Assembly* and the *Colorado Division of Wildlife* was instrumental for the start-up of this program. The Colorado Watershed Assembly helps supply critical training, technical support, equipment, and encouragement to get activities started. They also help link this project with the numerous other volunteer water monitoring projects throughout the State.
- **U.S. Environmental Protection Agency** Region 8 provides all bacteriological sample analysis for this project, as well as significant technical assistance. They provide crucial high quality data for this key parameter of concern in the North Fork watershed.
- **ERO Resources Corporation** provides use of their facility for laboratory space in Hotchkiss, Colorado.
- **Colorado Parks and Wildlife** Aquatic Biologist Barb Horn conducts annual site visits and provides technical advice.
- **Paonia Farm and Home** provides donation to help with shipping costs.
- **Hardin's Natural Foods** provided snacks to volunteers every month.
- **Bureau of Reclamation** provided a WaterSMART Cooperative Watershed Management Program Grant that has helped fund the compilation and analysis of data in this report.

BLM_0149048

WSCC Volunteer Water Quality Monitoring Data Report, 2016

## 5. FIELD DATA

WSCC field parameters consist of those sampled and analyzed "in house" by the Network. Field parameters include: total hardness, total alkalinity, phenolphthalein alkalinity, conductivity, pH, temperature (air and stream temperature measured at the site) and dissolved oxygen. Samples are collected and analyzed by project volunteers in a laboratory at the ERO Resources Corporation building in Hotchkiss. The following section summarizes the results from April 2001 to April 2014. Many of the graphs in the sub-sections below illustrate values from selected stations. A complete water quality dataset can be found online or by getting in touch with the Conservation Center. For more information, refer to Appendix A. Please refer to Figure 2-2 for a map of all water quality monitoring stations.

### Hardness

Hardness is a measure of the most prevalent polyvalent cations (ions with a positive charge greater than +1) in water: calcium ($Ca^{2+}$) and magnesium ($Mg^{2+}$). Hardness is measured in mg/L of calcium carbonate ($CaCO_3$).

The ions contributing to the hardness of water are often derived from the drainage of calcareous (calcite-rich) sediments such as limestone, dolomite or gypsum. The dissolution of calcium, magnesium and other polyvalent cations, such as iron and manganese, from rocks and soils can also contribute to hardness in natural systems. Mine drainage, certain industrial processes, sewage outflow and irrigation can artificially increase hardness in waterways.

Waters with high hardness values are referred to as "hard," while those with low hardness values are "soft". Table 4-1 shows EPA's defined hardness ranges. Hard water can prevent soap from producing lather, leaves behind undesirable films or scum on hair, fabrics and glassware, and can form scale when used in boilers and water heaters. Water softeners can make hard water functional for household purposes by replacing calcium ($Ca^{2+}$) and magnesium ($Mg^{2+}$) with sodium ($Na^+$) and potassium ($K^+$) ions.

| EPA Hardness Ranges | |
|---|---|
| **Hardness Level Concentration (mg/L CaCO₃)** | |
| Soft | 0-75 |
| Moderate | 75-150 |
| Hard | 150-300 |
| Very Hard | 300+ |

**Table 13: EPA Hardness Ranges**

Hardness is advantageous in aquatic systems because it can mitigate the toxic effects of metals. While the exact mechanism is unknown, $Ca^{2+}$, $Mg^{2+}$ and other polyvalent cations prevent fish from absorbing metals such as lead, arsenic and cadmium into their bloodstream through their gills. The greater the hardness, the more difficult it is for toxic metals to be absorbed through the gills. Therefore, hardness is inversely related to metals toxicity. For this reason, many metals standards are calculated based on hardness results.

Figure 5-1, Figure 5-2, and Figure 5-3 show total hardness data from October 2004 to April 2014. Overall, stations in the upper reaches of the watershed (EM-1 and NF-1) exhibit hardness values in the "soft to "moderate" hardness range. Station EM-1 occasionally yielded maximum values in the "hard" range. Lower stations showed increasing hardness values. High hardness concentrations are due to calcium and magnesium in the soils developed from the Mancos shale[1]. The high hardness values at the

---

[1] Liebermann, Timothy D. *Characteristics and Trends of Streamflow and Dissolved Solids in the Upper Colorado*

30

BLM_0149049

WSCC Volunteer Water Quality Monitoring Data Report, 2016

lower stations may also be due to the influences of irrigated agriculture from irrigation water absorbing calcium and magnesium and being returned to the river[2].



**Figure 5-1: Average, maximum, and minimum total hardess concentrations for main stem and upper tributaries on the North Fork**



**Figure 5-2: Average, max and minimum total hardness values for lower tributaries**

Peak hardness concentrations typically occured between the months of July and September during low stream flow. The lowest hardness concentrations at the lower stations occurred between March and June. At high flows during snowmelt runoff, calcium and magnesium concentrations in the river and tributaries are lower due to dilution.

*River Basin, Arizona, Colorado, New Mexico, Utah, and Wyoming.* Washington, D.C.: U.S. Dept. of the Interior, U.S. Geological Survey, 1989. 1989. Web. 28 Oct. 2016.
[2] http://www.fao.org/docrep/005/y4263e/y4263e07.htm

BLM_0149050



WSCC Volunteer Water Quality Monitoring Data Report, 2016

**Figure 5-3: Seasonal total hardness (average of all stations by month)**

**Alkalinity**

Alkalinity is a measure of buffering capacity, or the ability of water to resist change in pH when an acid or base is added. It represents the balance of carbon dioxide in water and is reported as mg/L $CaCO_3$, but is actually a measure of the amount of $HCO_3$ (bicarbonates) and $CO3^{2-}$ (carbonates) anions that are present. The  presence of buffering materials such as carbonates, bicarbonates, and occasionally hydroxide ($OH^-$), help neutralize acids as they are added to water.

Moderate alkalinity concentrations are desirable in aquatic systems because it can limit, or buffer, the effects of acid mine drainage or acid rain. Waters with low alkalinity (below 10 mg/L) are poorly buffered and very susceptible to changes in pH. Systems with alkalinity concentrations above 100 mg/L are able to resist major shifts in pH. The North Fork drainage basin consists of Tertiary igneous rocks (as individual laccoliths) and sedimentary rocks in the headwaters, and Cretaceous sandstones, coal measures, and calcareous marine shales at the lower elevations. Alkalinity typically increases downstream as the geology changes from igneous rocks and carbonate-poor soils in the headwaters to limestone, sedimentary rock and carbonate-rich soils in lower portions of the watershed. Alkalinity is also beneficial because it can mitigate the toxic impacts of dissolved metals. Carbonate and bicarbonate ions bind with dissolved metals such as lead, arsenic and cadmium, causing them to precipitate out of solution and become unavailable for aquatic life.

The highest recorded alkalinity concentration at NF-4 is 852 mg $CaCO_3$/L, January 23, 2008. There is one recorded instance of "poor" buffering capacity (below 10 mg $CaCO_3$/L) at NF-1 on July 14, 2010.

BLM_0149051

## WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 5-4: Average, maximum and minimum total alkalinity values at all stations**

Like hardness, alkalinity is inversely related to flow. Peak concentrations in the lower stations occurred during low flow conditions between June and August and dips in alkalinity occurred between April and June during peak flow conditions. Alkalinity at the lower stations and EM-1 is generally adequate to buffer against changes in pH.



**Figure 5-5 Seasonal alkalinity (average of stations by month)**

## pH

pH measures the acidity of a solution. It is determined by the relative concentration of hydrogen ($H^+$) and hydroxide ($OH^-$) ions. The pH scale is negatively logarithmic and ranges from 0 to 14. Solutions with low pH values, below 7, are acidic and have more $H^+$ than $OH^-$. Basic solutions have high pH values, above 7, and have more $OH^-$ than $H^+$. A neutral solution has a pH of 7 and equal concentrations of $H^+$ and $OH^-$. Aquatic ecosystems have adapted to tolerate a narrow range of pH, but most prefer pH values between 6.5 and 8.0. If the pH becomes too high or too low, it can lead to problems in reproduction and even death.

pH can also influence the state of metals in water. Low pH concentrations can liberate toxic metals from rocks or sediments in a stream, which can affect fish metabolism and lead to death in juvenile fish. The WQCC has set a standard of 6.5 to 9 for pH in natural waters.

BLM_0149052

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

Figure 5-6 displays the maximum, average and minimum pH values of for all stations. The pH of the North Fork is slightly basic. The majority of pH values are between 8.0 and 8.5. The highest pH value exceeds the standard and occurred at station NF-1 (9.1) on August 11, 2004. The lowest recorded pH value is within the state's allowed range and was 7.0 at station NF-1 in December 2005.



**Figure 5-6 Average, maximum and minimum pH values at all stations**

## Conductivity

A plot of conductivity measurements from the North Fork Gunnison River sites that were sampled frequently for conductivity since 2010 (Figure 5-7) shows the progression of water quality changes that occur along the reach of the river from just downstream of Somerset (NF-2) to Pleasure Park (NF-5). Because conductivity is an analog for total dissolved solids (TDS), this method provides a good indicator as to how dissolved constituents change in the river, both seasonally and from upstream to downstream. TDS is typically 55 to 75 percent of conductivity[3], depending on the site-specific chemistry. For the purposes of this document, a midway conversion of 60 percent was used (and then the resulting TDS concentration rounded), given that River Watch does not have TDS measurements for comparison. River Watch measures and reports conductivity in micro mhos per cm, but the current practice is to use micro Siemens per cm (µS/cm), which is equivalent.

---

[3] Hem, J.D., 1992, Study and interpretation of chemical characteristics of natural water (3d ed.): U.S. Geological Survey Water-Supply Paper 2254

BLM_0149053

WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 5-7: Conductivity: North Fork of the Gunnison Mainstem**

The primary observation is that conductivity, and therefore TDS concentrations, vary seasonally depending on the dominant source of water to the river (see Figure 5-8). During the spring runoff/snowmelt season, conductivity values were at their lowest, increasing through the summer as runoff decreased and ground water and irrigation return flows become the dominant source of water to the river. All of the sites show this seasonal pattern, but the frequency of sampling at individual sites provide either more detail, such as at NF-2, or less detail, such as at NF-4a. In other words, apparent variance from the seasonal pattern is likely an artifact of the frequency of measurements.

Other general observations include the progression or increase in conductivity (and TDS) from upstream to downstream and the lack of any apparent long-term trend within the 2001 to 2014 period of record.

The upstream-most site (NF-2) showed a relatively small range of conductivity values (82-333 μmhos, or 50 -200 mg/L TDS) seasonally. NF-2 had the smallest range and lowest measured conductivity compared to the other River Watch sites on the North Fork. Both the range and magnitude of the conductivity measurements increased downstream, with the highest values at the NF-4a and NF-5 locations. The small range and low conductivity values at NF-2 reflects the geology, in that NF-2 is located very near to the contact between the Mancos Shale and the Mesa Verde Formation. Downstream of NF-2 the river is incised in Mancos Shale. The higher conductivities that started at NF-3a and were observed at NF-4a and NF-5 in the post runoff season reflect ground water and surface water contributions from areas of Mancos Shale. During spring runoff, all sites had relatively low conductivity (and, therefore, low TDS concentrations), typical of a snowmelt dominated flow system.

35

<u>WSCC Volunteer Water Quality Monitoring Data Report, 2016</u>



**Figure 5-8: Specific Conductivity and Flow**

The range of conductivity measurements (135-400 μmhos (80-240 mg/L TDS) from East Fork of the Muddy (EM-1) are similar, but slightly higher, than those observed at the upstream-most site NF-2 on the North Fork (Table 14). Other tributaries to the North Fork, such as Cottonwood Creek and Leroux Creek, contribute water with very high TDS concentrations (as measured by conductivity) to the North Fork, particularly right after the spring runoff period. Even during spring runoff, Cottonwood Creek contributes water to the North Fork with TDS concentrations of nearly 1,000 mg/L. This is a result of surface runoff from areas of Mancos Shale and ground water discharge to the creek from the Mancos Shale. Irrigation return flows from areas of Mancos shale likely also contribute water with high TDS concentrations to Cottonwood Creek, Leroux Creek, and the North Fork. These high conductivity measurements in the tributaries are reflected in the high conductivity measured at NF-4a and NF-5.

| SampleLocation | Measured Conductivity Range (μmhos) | Calculated TDS Range (mg/L) |
|---|---|---|
| NF-2 | 82-333 | 50-200 |
| NF-3a | 109-890 | 65-530 |
| NF-4a | 179-1700 | 110-1020 |
| NF-5 | 188-1466 | 110-880 |
| EM-1 | 135-400 | 80-240 |
| HC-1 | 51-610 | 30-360 |
| CC-1 | 1609-3510 | 965-2100 |
| LC-1 | 159-1354 | 95-810 |

**Table 14: Range of Measured Conductivities at Sampled Locations (201-2014)**

BLM_0149055

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

### USGS Continuous Conductivity Measurements

The USGS has continuously measured conductivity (as well as flow and temperature) at a site very near NF-5 since April 2009. The conductivity range measured at this site is comparable to the range measured at NF-5. The USGS data also show the same seasonal pattern in conductivity observed by River Watch. When river flow is included in the graph (Figure 2), it is clear that the lowest conductivity occurs when the flow is the highest, and are the highest when flow is the lowest. Because the USGS data were recorded continuously, the data provide significantly more detail concerning the seasonal conductivity pattern (and thus TDS concentration pattern) along the river than the monthly measurements.

### Dissolved Oxygen and Temperature

Dissolved oxygen (DO) is the amount of oxygen ($O_2$) dissolved in water. It is an important indicator of a water body's ability to support life because most aquatic organisms require oxygen to breathe. The WQCC standard for DO for most stations is 6.0 mg/L or greater except during spawning, when it is 7.0 mg/L or greater. Cottonwood Creek (CC-1) is the exception, with a chronic standard of 5.0 mg/L or greater. Low DO concentrations are common in late summer/early fall due to low stream flow, warm water temperatures and the increased oxygen uptake of aquatic plants.

Water becomes oxygenated directly from the atmosphere and by photosynthesis of aquatic plants and algae. Oxygen is removed from the water by respiration and decomposition of organic matter. Dissolved oxygen concentrations vary with water temperature, altitude, salinity, depth and flow. Dissolved oxygen concentrations typically exhibit diurnal patterns due to cycles of photosynthesis/respiration.

Dissolved oxygen concentrations are illustrated below in Figure 5-9, Figure 5-10 and Figure 5-11.



**Figure 5-9 Dissolved Oxygen in the Upper North Fork and Tributaries**
*Note: A result of less than the state standard is in exceedance*

BLM_0149056

## WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 5-10 Dissolved Oxygen in the Upper North Fork**
*Note: A result of less than the state standard is in exceedance*



**Figure 5-11 Dissolved Oxygen in Lower Tributaries**
*Note: A result of less than the state standard is in exceedance*

Seasonal trends also occur because of the relationship between oxygen and temperature. Cold water has the ability to hold more oxygen. As a general rule, dissolved oxygen is inversely related to temperature. The dissolved oxygen and temperature relationship at station NF-3a is illustrated in Figure 5-12.

38

BLM_0149057

## WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 5-12 Dissolved Oxygen and Temperature at Station NF-3a**
*Note: A result of less than the state standard is in exceedance*

### Temperature

Temperature is an important factor for aquatic life. In addition to influencing how much oxygen water can hold, temperature affects the rate of metabolic and reproductive activities. Most aquatic organisms are "cold-blooded," which means they are unable to control their body temperature. Cold-blooded organisms are adapted to specific temperature ranges. The stream segments monitored by the Network's volunteer monitoring program are classified for temperature standards as shown in Table 8.



Figure 5-13 through Figure 5-16 show reported monthly temperatures in the North Fork watershed from April 2001 to April 2014. The upper stations (EM-1, AN-1, NF-1 and NF-2) had the coolest temperatures.

The volunteer program typically collects samples in the morning, thus the reported values do not represent the maximum weekly average temperature (MWAT) or daily maximum temperature (DM) to

39

BLM_0149058

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

which the temperature standards are applied.



**Figure 5-13 River Temperature in Upper Tributaries, Cold Stream I Classified Sites.**



**Figure 5-14 River Temperature in the Upper North Fork, Cold Stream II Classified Sites.**

40

BLM_0149059

WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 5-15 River Temperature in the Lower North Fork, Cold Stream II Classified Sites.**



**Figure 5-16 River Temperature in Lower Tributaries, Cold Stream II Classified Sites.**

41

BLM_0149060

WSCC Volunteer Water Quality Monitoring Data Report, 2016

# 6. NUTRIENT AND OTHER INORGANICS DATA

Network nutrient and other inorganic parameters are collected by Network volunteers and analyzed by River Watch staff at the Division of Wildlife laboratory in Ft. Collins. Nutrient and other inorganic parameters include nitrate+nitrite, ammonia, sulfate, total phosphorus, chloride and total suspended solids. The following section summarizes the results from April 2001 to April of 2014. All stations are represented, but Anthracite Creek (AN-1) was not sampled for nutrients and is not included. Surface and Tongue Creeks have very few data points (sample size is four or less for each), but are still included where available. Many of the graphs represent data from select stations. The complete dataset can be found online on the Conservation Center's website: westernslopeconservation.org. Refer to the map in Figure 2-2 for station locations.

## Sulfate

In aquatic systems, sulfate concentrations are dependent on the geochemistry of the soils and rocks that water comes in contact with. Common sources of sulfur include gypsum ($CaSO_4$), and other sulfate minerals. Atmospheric deposition from the combustion of sulfur-containing fuels by cars and industrial operations can also contribute sulfate to aquatic systems. In small amounts, sulfur is important to aquatic life. Cells require sulfur to metabolize protein compounds responsible for energy transformations. When combined with metals, sulfur reacts with dissolved oxygen to create sulfate ions and sulfuric acid, which causes the water to become more acidic. Excessive amounts of sulfate in the water, however, can be toxic.

The graph of sulfate concentrations versus time (Figure 6-20) for the North Fork River sites shows a seasonal pattern similar to that of conductivity (see Conductivity). In addition, the graph indicates that sulfate concentrations in the river increase downstream, as does conductivity. Because conductivity is an analog for TDS and sulfate is a major contributor to the total dissolved solids concentration, the similarity between the two constituents is expected. The sulfate concentration at each site is lowest during the period of spring runoff when snowmelt is the dominant source of water to the river, and highest when there is very little runoff and the dominant source of water to the river is ground water and irrigation return flows. There are no long-term trends in sulfate concentration for the period for which data were collected.

BLM_0149061



**Figure 6-1: Sulfate Concentration**

Interestingly, after reaching peak concentrations in July and August, the sulfate concentrations at sites NF-3a, 4a, and 5 decreased in late September/early October and through the winter season. This is consistent with the continuous USGS conductivity measurements near NF-5 and may be related to the end of most irrigation in the fall and therefore a reduction in diversions from the North Fork. Reduced diversions from the North Fork, particularly from upstream areas, would leave more water in the river from low sulfate areas upstream of the Mancos Shale to dilute water from areas draining the Mancos Shale. This observation suggests that diversions for irrigation from the upper reaches of the North Fork result in less water to dilute contributions to the North Fork from tributaries that drain areas of Mancos Shale, resulting in higher dissolved sulfate and TDS concentrations during the summer months.

BLM_0149062

WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 6-2: Sulfur (Sulfate) maximum, average and minimum at all stations**

Sulfate has a secondary drinking water standard of 250 mg/L due to its undesirable taste above this concentration. Secondary drinking water standards are not enforceable, but are intended as guidelines to maintain aesthetic qualities relating to public acceptance of drinking water. Downstream sulfate concentrations regularly exceed the 250 mg/L standard.

**Total Suspended Solids (TSS)**

Total Suspended Solids (TSS) are the solids in water that are kept in suspension by turbulence in the water column. TSS can include minerals, sediment, decaying plant and animal matter, bacteria and waste material that a river transports. High concentrations of suspended solids can cause many problems for stream health and aquatic life. Suspended materials can clog fish and insect gills, smother spawning beds, impair sight dependent predation, trap sunlight, increase water temperature and possibly lower dissolved oxygen concentrations. There are currently no water quality standards for TSS, although most people consider water with a TSS concentration less than 20 mg/L to be clear. Water with TSS concentrations between 40 and 80 mg/L tends to appear cloudy, while water with concentrations over 150 mg/L usually appears "dirty" [4]. The nature of the particles that comprise the suspended solids may cause these numbers to vary.

---

[4] http://www.michigan.gov/documents/deq/wb-npdes-TotalSuspendedSolids_247238_7.pdf

BLM_0149063

WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 6-3 Total Suspended solids maximum, average and minimum at all stations at all stations**



Figure 6-3 shows available data for maximum, minimum and average TSS concentrations in the North Fork for all stations. The TSS concentrations at all stations experience periods of relatively clear conditions and periods of cloudy to extremely turbid conditions. The highest recorded TSS concentration is 2,571 mg/L at station NF-3a on September 12, 2012. Stations EM-1 and CC-1 exhibit the highest TSS concentrations, which likely reflects geological conditions within their watersheds.

Stream discharge is a primary factor affecting TSS concentrations. Fast moving water can transport more particles and larger-sized sediment. As water slows, it loses its holding capacity and deposits the

BLM_0149064

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

suspended sediments at the bottom of a stream or lake bottom. The relationship between TSS and flow is not statistically significant, but in general increases in TSS correlate to increases in flow. This relationship is opposite of that with flow and hardness, alkalinity and sulfur; high flow events increase TSS concentrations rather than dilute them. High TSS concentrations correlate to peak flow conditions for nearly all sampling events.

### Phosphorus

Phosphorus is a nutrient required by all organisms for the basic processes of life. It is a naturally occurring element found in rocks, soils and organic material. In comparison to the rich supply of the other major nutrients required for metabolism of aquatic life (carbon, nitrogen, oxygen and sulfur), phosphorus is the least abundant and most commonly limits biological productivity. Phosphorus is often referred to as a limiting nutrient in most freshwater systems.

Phosphorus binds tightly to soil particles, metal oxides and hydroxides under aerobic conditions. In clean waters, phosphorous concentrations are typically very low. However, phosphorus is used extensively in fertilizers and concentrated in sewage, so it can be found in high concentrations near human activity. The most significant form of phosphorus is dissolved inorganic phosphorus, or orthophosphate ($PO4^{3-}$). However, over 90% of the phosphorus in freshwater systems occurs as organic phosphates that adhere to inorganic particles[5]. Total Phosphorus (TP) is a measure of all phosphorus constituents in aquatic systems.

Colorado utilizes interim standards described in

Table 6 for total phosphorus that are similar to the EPA's recommendations to control eutrophication (excessive biological activity due to inputs of nutrients). Cold water rivers and streams that do not discharge directly into lakes or reservoirs[6] should not exceed 0.11 mg/L. As shown in Figure 6-4, TP concentrations are below Colorado's interim standards on average, but maximums exceeded the recommended standard.

TP concentrations increased in the spring during snowmelt/spring runoff and decreased during low flow

---

[5] Wetzel, Robert. 2001. Limnology: Lake and River Ecosystems, 3rd Ed. Academic Press, San Diego. pp 239-240.

[6] Mueller, David K. and Helsel, Dennis R. 1999. "Nutrients in the Nation's Waters--Too Much of a Good Thing?" U.S. Geological Survey Circular 1136. National Water-Quality Assessment Program. http://water.usgs.gov/nawqa/circ-1136.html

BLM_0149065

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

conditions in the late summer/fall. TC-1 had the average highest TP concentration of 0.09705 mg/L.



**Figure 6-4 Total Phosphorus maximum, average and minimum at all stations**

## Nitrate and Nitrite

Nitrogen is one of the most abundant elements on earth. Gaseous nitrogen comprises about 80% of the air we breathe. Nitrogen is found in cells of all living things and is a major component of proteins. Inorganic nitrogen may exist in the free state as a gas $N_2$, or as nitrate $NO_3^-$, nitrite $NO_2$, or ammonia $NH_3^+$. Nitrate and nitrite are oxidized forms of nitrogen that together normally constitute most of the dissolved nitrogen in well aerated streams. Nitrite readily oxidizes to nitrate in natural waters; therefore, nitrate is generally by far the more abundant of the two forms.

Nitrogen-containing compounds act as nutrients in streams and rivers. At high concentrations, nitrate can overstimulate the growth of aquatic plants and algae (known as eutrophication), resulting in high dissolved oxygen consumption, causing fish and other aquatic organism mortality. At high enough concentrations, nitrate can limit the ability of red blood cells to transport oxygen. In fish, this condition is known as "brown blood disease," and in humans it is called methemoglobinemia, or "blue baby" disease.

Nitrate concentrations at all of the monitored sites did not come close to approaching the $NO_3$ standard (10mg/L) or the interim total nitrogen standard.

BLM_0149066

WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 6-5 Nitrate+Nitrite average concentration at all stations**

Nitrate + nitrite concentrations in the North Fork were highest during the winter, but still remained well below the standards. The data show that winter nitrate + nitrite concentrations increase moving downstream. Nitrate and nitrite are both very soluble and do not bind to soils, so they have a high potential to migrate through groundwater. Groundwater may be a source of nitrate and nitrite to the river, resulting in higher concentrations when stream flow is lower. Other sources that would be less diluted during the winter during low flow conditions may be septic systems, livestock, and wastewater treatment effluent.

### Ammonia

Ammonia is a form of inorganic nitrogen. The least stable form of nitrogen in water, ammonia is easily transformed to nitrate or nitrogen gas. Ammonia is found in water in two forms: the ammonium ion ($NH_4^+$) and the dissolved, unionized (no electrical charge) ammonia gas ($NH_3$). Total ammonia is the sum of ammonium and unionized ammonia. The dominant form depends on the pH and temperature of the water.

$NH_3$ is the principal form of toxic ammonia. Exposure to high concentrations of ammonia in humans can cause loss of equilibrium, convulsions, coma, and death. Ammonia concentrations can affect hatching and growth rates of fish; changes in tissues of gills, liver, and kidneys may occur during structural development.

The State of Colorado has developed chronic and acute table value standards (TVS) for ammonia based on temperature and pH. The chronic standard is 2.21 mg/L, and in most instances, ammonia concentrations are very low.

BLM_0149067

WSCC Volunteer Water Quality Monitoring Data Report, 2016

## 7. METALS DATA

Network metal parameters are collected by Network volunteers and analyzed by River Watch staff at the Division of Wildlife laboratory in Fort Collins. Metals sampled include aluminum, arsenic, cadmium, calcium, copper, iron, manganese, lead, magnesium, selenium and zinc. The following metal results include samples collected from April 2001 through October 2014. The results are based on all available data and provide general information regarding comparison against state metal standards. The following is a chart of date ranges for each station:

| Station | Beginning | End |
|---------|-----------|-----|
| EM-1 | 4/25/01 | 11/13/13 |
| AN-1 | 4/25/01 | 4/10/02 |
| NF-1 | 4/25/01 | 11/10/10 |
| NF-2 | 4/25/01 | 11/13/13 |
| NF-3 | 4/4/01 | 1/29/14 |
| NF-3a | 6/12/02 | 8/14/13 |
| NF-3b | 6/11/08 | 11/10/2010 |
| *NF-4 | 04/23/2001 | 01/29/2014 |
| NF-4a | 06/12/2002 | 11/13/2013 |
| NF-5 | 04/25/2001 | 11/13/2013 |
| *CC-1 | 01/11/2005 | 05/24/2005 |
| HC-1 | 04/13/2011 | 11/13/2013 |
| LC-1 | 04/13/2011 | 11/13/2013 |
| *SC-1 | 10/19/04 | 10/08/14 |
| *TC-1 | 10/19/04 | 10/08/14 |

**Table 15: Metals Sampling Date Ranges for Each Station**
*Stations with an * have Riverwatch data available for prior dates, but it was not collected by the Network and therefore was not reported herein.*

In general, metal concentrations appear to be lower during spring runoff due to dilution and higher during late summer low flow conditions. The graphs below illustrate patterns and concentrations in relation to state metal standards.

Information regarding complete metals dataset can be found in Appendix A. Refer to the map in Figure 2-2 for station locations.

Standards in this section were calculated using State of Colorado classifications and numeric standards for the North Fork of the Gunnison River[7]. Copper, cadmium, lead, and zinc standard calculations are based on hardness values at the time the metals were collected. Aquatic life standards are generally applied to the dissolved metals because this measurement provides a better representation of the biologically available fraction of a metal than total metals, which are present in the particulates in the water. The

---

[7] This report identifies instances when discrete water samples exceeded state water quality standards, as determined by the WQCC. For regulatory purposes, the state applies the 85th percentile methodology when determining if segments violate water quality standards. The 85th percentile methodology allows for 15 percent of the data for a given segment to exceed standards without being in violation of water quality standards. See the WQCC Basic Standards Methodologies for Surface Water (Regulation No. 31) for more information.

BLM_0149068

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

formulas used to determine numeric standards are from the Colorado Department of Public Health and Environment Water Quality Control Commission, 5 CCR 1002-35, Regulation No. 35: Classifications and Numeric Standards for Gunnison and Lower Dolores River Basins. Average hardness for each site was used to calculate standards, as opposed to the hardness reading for each sample taken.

| Station | Average Hardness (mg/L) |
|---------|-------------------------|
| EM-1 | 122 |
| AN-1 | 64 |
| NF-1 | 75 |
| NF-2 | 81 |
| NF-3 | 155 |
| NF-3a | 193 |
| NF-3b | 199 |
| NF-4 | 310 |
| NF-4a | 398 |
| NF-5 | 518 |
| CC-1 | 979 |
| HC-1 | 118 |
| LC-1 | 491 |
| SC-1 | 105 |
| TC-1 | 624 |

**Table 16: Average Hardness used to calculate standards at each station**

### Aluminum

Aluminum is the most abundant naturally occurring metal in the earth's surface and comprises, on average, about eight percent of the earth's crust. Geologic formations are, therefore, common sources of aluminum in aquatic systems.

In humans, aluminum has been shown to be neurotoxic if it enters the bloodstream. Aluminum toxicity can cause encephalopathy (defect of the brain) and/or bone mineralization disorders. Aluminum toxicity is driven by pH. At low pH concentrations, aluminum toxicity has been documented in invertebrates, fish and amphibian larvae. Aluminum can interfere with cation exchange, electrolyte balance, calcium absorption and respiration in aquatic life. Aluminum is also reported to cause fragile eggs in birds.

Colorado has developed aluminum standards for aquatic life based on pH and hardness based on total recoverable aluminum; however, unless a stream segment is at risk of high dissolved aluminum concentrations, the standard is not included in stream segment standards. The stream segments evaluated do not have aluminum standards.

High total aluminum concentrations are characteristic of spring snowmelts/runoff periods. Spring snowmelt, naturally acidic, can liberate naturally occurring aluminum from geologic sources into stream systems. The highest aluminum concentrations were detected during spring runoff, when TSS concentrations were high, and the lowest concentrations were measured during summer and fall low flow.

### Arsenic

Arsenic is a naturally occurring element in rocks, soils and the water in contact with them. It is known to cause cancer in high doses, and Colorado has developed numeric standards for dissolved arsenic concentrations. All stations have a water supply standard of .02 µg/L, except Cottonwood Creek (CC-1),

BLM_0149069

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

which is not classified for water supply and has a 100 µg/L agricultural standard. The River Watch Laboratory arsenic reporting limit is 15 µg/L.

From late 2006 to early 2008, arsenic concentrations consistently exceeded River Watch laboratory reporting limits, unlike samples collected prior to and after this period. This indicates a problem with the laboratory results during late 2006 to early 2008. After evaluating the data, the Conservation Center has not included the late 2006 to early 2008 results in its analysis.

The average and mode concentration for all stations from 2001 through 2014 was less than the reporting limit of 15 µg/L. Due to the high reporing limit, it is not known of the water supply standard was exceeded, but it is known that in Cottonwood Creek, where all results were less than the reporting limit, the agricultural standard was not exceeded. On one occasion, the total arsenic concentration exceeded the reporting limit (at CC-1 in July 2015 the total arsenic concentration was 44 µg/L) and on one occasion the dissolved arsenic concentration exceeded the reporting limit (at NF-5 in March 2013 the dissolved arsenic concentration was 40 µg/L).

### Cadmium

Cadmium is an element that is non-essential for life and is a potential carcinogen. It is widely distributed in the environment at low concentrations. Colorado has hardness based aquatic life standards for cadmium, and every sample site exceeded both chronic and acute standards.



**Figure 7-1: Dissolved Cadmium Concentration**

BLM_0149070

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

### Calcium

Calcium is the most abundant cation in the world's rivers. One of the most important contributors to hardness, calcium is found in water due to the leaching of soils or from anthropogenic sources such as sewage and industrial wastes. Calcium influences the growth and population dynamics of aquatic life. It is required for plant, animal and bacteria to maintain structural and functional integrity of cell membranes. There are no water quality standards for calcium.

High calcium concentrations are a characteristic of highly calcareous soils in the watershed. In general, dissolved calcium concentrations increase as water travels downstream through the watershed. Calcium concentrations at station NF-4, NF-4a, LC-1 and TC-1 are higher than other stations at all times of the year, except during spring runoff when it is diluted to nearly the same concentration as stations higher in the watershed. The highest recorded calcium concentration was 483 mg/L at station CC-1 on May 9, 2014.



**Figure 7-2 Average, Maximum and Minimum Dissolved Calcium values (mg/L)**

### Copper

Copper is a naturally occurring trace element. At low concentrations, copper is an essential micronutrient that is used in cellular metabolism and oxygen transport. At high concentrations, copper can be toxic to aquatic life. The state of Colorado has developed hardness-based aquatic life standards for copper.

Figure 7-3 shows dissolved copper concentrations for all stations.

BLM_0149071

WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 7-3: Dissolved Copper Concentrations (μg/L)**

### Iron

Iron is the fourth most abundant element, by weight, in the earth's crust. It is naturally present in aquatic systems but in variable amounts depending on the local geology. It is an important micronutrient that is required for life in small quantities, but can be toxic in excessive amounts. Iron is normally present in waterways in its soluble ferrous form ($Fe^{2+}$). However, iron is easily oxidized into its insoluble form, ferric iron ($Fe^{2+}$). In alkaline streams, such as the North Fork, iron primarily exists in colloidal and particulate (solid) forms. This is because iron solubility is very low above pH 5 (Wetzel 2001).

Sections of segment COGUNF06A, Cottonwood Creek (CC-1), are on the State Monitoring and Evaluation list for total recoverable iron.

BLM_0149072

WSCC Volunteer Water Quality Monitoring Data Report, 2016



Figure 7-4 shows dissolved iron concentrations in the North Fork at all stations. The dissolved iron standard (300 μg/l) was exceeded twice at NF-1 (August 2001 and May 2009), once at NF-2 (May 2005) and multiple times at NF-3a, NF-4, NF-4a and NF-5. In many Colorado streams, high iron concentrations are due to natural occurrences.



**Figure 7-4 Dissolved Iron Concentrations at all Stations (μg/L)**

### Lead

Lead is toxic to aquatic life in the 10-100 μg/L range (River Watch 2006). Natural occurrences of lead in aquatic systems are rare. Lead commonly occur in ores with zinc, silver and copper. Lead concentrations in the North Fork are very low. Only 11% of the reported total lead concentrations exceeded the River Watch laboratory reporting limit of 3 μg/L during the reporting period.

Lead concentrations were well below the acute standard. Sample averages exceeded the chronic standard at NF-1, NF-2, and SC-1.

BLM_0149073

WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 7-5: Dissolved Lead Concentration**

## Manganese

Manganese is a naturally occurring free (uncombined) element that usually occurs with iron. It is an essential element in plant and animal metabolism, but toxic in excessive amounts. Colorado has hardness based-standards for manganese.

Maximum dissolved manganese values exceeded the 50 µg/L drinking water standard at most sites. CC-1 is the only sampling site that is not classified as a water supply stream segments. CC-1 was evaluated against the agricultural standard of 200 µg/L, which was not exceeded.

55

BLM_0149074

## WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 7-6 Dissolved Manganese Concentrations (µg/L)**

## Magnesium

Like calcium, magnesium is a major component of hardness and is primarily derived from the weathering of rocks. Magnesium is much more soluble than calcium and rarely precipitates. There are no water quality standards for magnesium.



Figure 7-7 shows average, minimum and maximum magnesium concentrations. The highest reported total magnesium value in the North Fork, 220 mg/L, was on March 10, 2013 at CC-1. In general, total

56

BLM_0149075

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

magnesium concentrations increased in the lower watershed.



**Figure 7-7 Average, Minimum, and Maximum Dissolved Magnesium Concentrations (mg/L)**

**Selenium**

In the North Fork watershed, selenium is commonly associated with the Mancos shale, which is present throughout western Colorado. Locally, these soils are called "adobe."

Selenium is a naturally occurring trace element that is needed for metabolism in aquatic life and humans. Selenium is a bioaccumulative metal and subject to a range of toxicity values depending upon numerous site-specific variables. Selenium is known to cause reproductive failure and deformities in fish and aquatic birds[8]. Significant human consumption of fish containing high concentrations of selenium may result in human health problems. Selenium is widely distributed in rocks, soils and living organisms. Selenium may be leached from the soil into local waterways when water used for irrigation and other purposes passes through soils derived from the Mancos shale.

Irrigated agriculture can increase the amount of selenium in surface awater and groundwater. Deep percolation from irrigation can mobilize large quantities of selenium in groundwater, where it eventually may discharge to surface water. The Gunnison/Grand Valley Selenium Task Force has been studying selenium for over a decade. The Taskforce found that upstream of major irrigated areas in the Gunnison basin, selenium concentrations are generally less than 1 µg/L, but downstream from irrigated areas selenium concentrations of surface waters often exceeded 5 µg/L[7].

The State of Colorado has numeric standards for dissolved and total recoverable selenium (Table 2-7). Selenium is designated as a Colorado Monitoring and Evaluation parameter by the State for East Muddy Creek (EM-1) and Tongue Creek (TC-1) and Surface Creek are on the 303(d) list for selenium.

---

[8] http://www.seleniumtaskforce.org/aboutselenium/whatistheproblem.html

BLM_0149076

WSCC Volunteer Water Quality Monitoring Data Report, 2016



Figure 7-8 shows that dissolved selenium concentrations at all monitored stations exceeded state aquatic life standards. Due to laboratory QA/QC issues, only selenium data collected prior to 2007 were used for this report.



**Figure 7-8 Dissolved Selenium Concentrations (µg/L)**

Average concentrations for stations CC-1, HC-1, LC-1, NF-3b, NF-4, NF-4a, NF-5, SC-1, and TC-1 all exceeded the chronic water quality standard for selenium during the time of sampling up to 2007. Cottonwood Creek (Station CC-1) had the consistently highest reported selenium concentrations, with the highest being 50 µg/L for dissolved selenium and 48.5 µg/L for total selenium.

Due to the concentrated efforts of the Selenium Task force and local ranchers and farmers, irrigation water lower in the watershed is increasingly being piped rather than being moved via unlined ditches. This may decrease selenium concentrations in future water samples.

**Zinc**

58

BLM_0149077

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

Zinc is a naturally occurring element that is essential for cell growth. It can bioaccumulate and is toxic to aquatic life at concentrations above 50 µg/L in waters with low hardness (River Watch 2006). Dissolved zinc concentrations in the North Fork were below both the acute and chronic standards.



**Figure 7-9 Dissolved Zinc Concentrations (µg/L)**

BLM_0149078

WSCC Volunteer Water Quality Monitoring Data Report, 2016

## 8. BACTERIA DATA

Total coliform bacteria is a collection of relatively harmless microorganisms that live in the intestines of warm and cold blooded animals and aid in digestion. Fecal coliforms are a subset of intestinal bacteria that are associated only with the fecal material of warm-blooded animals. The most common type of fecal coliform is *Escherichia coli (E. coli).*

The presence of *E. coli* in aquatic environments indicates that water has been contaminated with fecal materials from sewage or animal waste. This is an important water quality indicator because the presence of fecal contamination means water may be contaminated by waterborne pathogenic diseases such as typhoid fever and hepatitis. *E. coli* can be washed into water ways during rainfall, snow melt and other precipitation events. Sources of *E. coli* in the North Fork watershed may include livestock, septic systems, and wildlife. The survival of waterborne pathogens, such as *E. coli*, in streams and rivers is variable. Conditions such as turbidity, oxygen, presence of nutrients and pesticides, pH, organic matter, and solar radiation can impact pathogen survival rates[9]. In particular, bacteria are known to have significantly longer survival times in sediment- laden waters[10].

Measured *E. coli* concentrations were compared to the Colorado Depatment of Public Health and Environment Water Quality Control Commission Natural Swimming Areas standard of 235 organisms/mL. Figure 8-1 and Figure 8-2 show the monthly geometric *E. coli* means for 2009 and 2010. In several reported instances, the *E. coli* results were over the quantitation value of 2,419.6 MPN/100 mL. In these instances, 2,419.6 MPN/100 mL was used to calculate the geometric mean. In general, *E. coli* concentrations peaked during summer months.



**Figure 8-1 Monthly Geometric Mean of *E. coli*, (November only) 2009**

---

[9] Moore et al, 1988, Moore, J. A., J. Smyth, S. Baker, and J. R. Miner. 1988. Evaluating coliform concentrations in runoff from various animal waste management systems. Special Report 817. Agricultural Experiment Stations Oregon State Univ. Corvallis, and USDA, Portland, OR. Pell, A. N. 1997. Manure and microbes: Public and animal health problem? J. Dairy Sci. 80:2673-2681.

[10] Sherer, B. M., J. R. Miner, J. A. Moore, and J. C. Buckhouse. 1992. Indicator bacterial survival in stream sediments. J. Environ. Qual. 21:591-595.

BLM_0149079

WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 8-2 Monthly Geometric Mean of *E. coli*, 2010**

In 2011, two changes to bacteria sampling took place. Instead of three replicate samples per station, one was taken and analyzed, with one duplicate taken on each sampling date that rotated between stations. Instead of three results per station per sampling date, this returned one result per station per sampling date. In addition, stations were sampled with less frequency, some years being sampled every other month, and some being sampled every third month.

In the graphs that follow, sample size (n) is provided for each geometric mean calculated and graphed.



**Figure 8-3 Seasonal Geometric Mean of *E. coli* in the North Fork, 2011**

61

WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 8-4 Seasonal Geometric Mean of *E. coli* in the North Fork, 2012**



**Figure 8-5 Seasonal Geometric Mean of *E. coli* in the North Fork, 2013**

BLM_0149081

WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 8-6 Seasonal Geometric Mean of *E. coli* in the North Fork, 2014**

*E. coli* was consistently above the natural swimming area standard (235 organisms/mL) at East Muddy Creek (EM-1), Cottonwood Creek (CC-1) and Leroux Creek (LC-1) for the last five years of sampling, but there is little or no primary contact recreation in these streams. NF-4a on the North Fork, a location where primary contact recreation (boating) occurs, also exceeded the recreation standard in 2011 and 2012. Because sample size is less than desired, more sampling is needed at these stations in order to better assess the frequency of exceedances.

BLM_0149082

WSCC Volunteer Water Quality Monitoring Data Report, 2016

## 9. MACROINVERTEBRATE DATA

Biological monitoring focuses on the aquatic organisms that live in streams and rivers. Changes that occur in the number and types of organisms present in a stream system may indicate the effects of human activity in a stream. Biological monitoring is based on the fact that different species react to pollution in different ways. Pollution-sensitive organisms are more susceptible to the effects of physical or chemical changes in a stream than other organisms. These organisms act as indicators of the absence of pollution. Pollution-tolerant organisms are less susceptible to changes in the environment and act as an indirect measure of pollution. Pollution-sensitive organisms will decrease in number or disappear in polluted streams, while pollution-tolerant organisms will increase in number and variety.

Benthic macroinvertebrates are animals without backbones that are large enough to see with the naked eye and live on the river bottom. Macroinvertebrates are commonly used as water quality indicators because they are easy to sample, continuous indicators and sit near the bottom of the aquatic food web.

Macroinvertebrates were sampled ten times between October 2004 and October 2013. Network volunteers collected macroinvertebrates using the River Watch rocky substrate collection method. Samples were collected from the kick net and sent to the River Watch laboratory in Fort Collins for professional analysis.

Table 17 summarizes seven common metrics uses to evaluate macroinvertebrate communities. The table briefly defines each metric and indicates how the predicted community response to disturbance. Note that samples were collected at different stations in different years.

Overall, the metrics indicate that the North Fork has a healthy and thriving macroinvertebrate community. There are no major differences in community structure and abundance between stations, as indicated by the total number of organisms and taxa richness. This suggests that the biological community has not experienced any significant disturbance. The metrics that evaluate pollution tolerance include the percent of ephemeroptera, plecoptera and trichoptera species (% EPT) and the Hilsenhoff Biotic Index (HBI), developed by Hilsenhoff[11], indicate that the macroinvertebrate community is relatively intolerant of pollution. Nearly half of the macroinvertebrates collected are pollution-sensitive EPT taxa and the HBI values indicate good to excellent water quality.

The trophic structure in streams is often defined in comparison to the River Continuum Concept (RCC). The RCC describes the longitudinal changes that occur in a river as related to differences in size and terrestrial setting. The RCC is particularly useful for describing how ecological function varies along riverine ecosystems. Figure 9-1 illustrates the distribution of functional feeding groups at stations in the North Fork. The North Fork, a 4th order stream, functions like a RCC mid-order stream. This is expected because the North Fork does not have a wooded riparian zone to contribute shade and allochthonous material to the system. The distribution of functional feeding groups (e.g. high percentage of collectors and scrapers) suggests that the North Fork has a variety of energy inputs and is partially autotrophic.

---

[11] Hilsenhoff, W.L. 1988. Rapid Field Assessment of Organic Pollution with a Family Level Biotic Index. Journal of the North American Benthological Society 7:65-68.

BLM_0149083

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

**Table 17 Evaluation Matrix of North Fork Macroinvertebrates**

| Metric | NF-1 10/04 | NF-3 10/04 | NF-4a 11/05 | NF-3a 10/07 | NF-3a 12/08 | NF-3a 10/09 | NF-3a 10/10 | NF-3a 10/11 | NF-3a 10/12 | NF-3a 10/13 | Interpretation | Predicted response to increasing disturbance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Community Structure and Abundance** | | | | | | | | | | | | |
| Total # of organisms | 344 | 321 | 324 | 321 | 620 | 636 | 373 | 356 | 314 | 317 | Organism density is variable and affected by loss of habitat, low pH and toxic substances | Decrease |
| Taxa Richness | 7 | 7 | 8 | 6 | | | | | | | Measures diversity. | Decrease |
| **Pollution Tolerance** | | | | | | | | | | | | |
| % EPT | 59% | 45% | 39% | 53% | 71% | 65% | 71% | 78% | 75% | 56% | Summarizes taxa richness within the orders Ephemeroptera, Plecoptera and Trichoptera (groups considered to be pollution sensitive) | Decrease |
| HBI | 3.04 | 4.64 | 3.6 | 1.81 | | | | | | | Summarizes overall pollution tolerance to organic and sediment pollution (above 5.5= poor water quality ) | Increase |
| **Trophic Structure** | | | | | | | | | | | | |
| % Scrapers | 18% | 15% | 13% | 26% | 13% | 2% | 1% | 2% | 2% | 1% | Reflects riffle community food base, indicates availability of periphyton. Will decrease following sediment and organic pollution. | Decrease |
| % Collectors/ Filterers | 53% | 14% | 16% | 12% | 62% | 59% | 65% | 59% | 68% | 63% | Filter feeders increase in response to fine particulate organic matter (FPOM). Filter feeders can be sensitive to toxicants bound to FPOM. | Variable |

BLM_0149084

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

**Functional Feeding Groups for Macroinvertebrates in the North Fork**



Figure 9-1: Functional Feeding Groups in the North Fork

66

BLM_0149085

WSCC Volunteer Water Quality Monitoring Data Report, 2016

## 10. Long Term Trends and Seasonal Variability

In general, the North Fork Watershed exhibits seasonal variability and lacks any particular long term trends during the time of sampling.

Conductivity measurements indicate that concentrations of TDS were at their lowest during spring runoff/snowmelt season and then increased through the summer as runoff decreased and ground water and irrigation return flows become the dominant source of water to the river. For many parameters, the increased flows associated with spring runoff correlate with lower concentration values due to dillution. For example, sulfate had the lowest concentrations during times when snowmelt was the dominant source of water and highest concentrations during times when the dominant source of water to the river is ground water and irrigation return flows. Sulfate, like the other parameters, did not exhibit any particular long term trend during the time of sampling beyond the seasonal variability described above.

While TDS decreases during spring runoff/snowmelt season indicates lower concentrations of salts, metals, minerals, etc., concentrations for parameters such as total phosphorus and iron increased during times of higher flows and decreased during lower flows. This is because both phosphorus and iron bind tightly with sediment particles in the water which increase with runoff events typical of spring. Accordingly, total suspended solids concentrations typically increase during high flow events. As TSS increases and decreases, parameters like iron and phosphorus which bind to sediment exhibit corresponding concentration increases and decreases.

Total phosphorus (TP) concentrations increased in the spring during snowmelt/spring runoff and decreased during low flow conditions in the late summer/fall. These concentrations correlate with the concentration of total suspended solids as TP binds tightly with sediments, metal oxides and hydroxides under aerobic conditions. This correlation is illustrated by Figure 10-1.



**Figure 10-1: Total Phosphorus Concentrations**

There is some seasonality reflected in sample concentrations of iron as concentrations increase during times of higher flow. However, there is not a clear relationship. This is likely because there are many contributing sources including storm and snowmelt runoff, ground water inflow, and potentially irrigation return flows at different locations that inhibit not only a clear seasonal trend but also any clear trend in concentration upstream to downstream. Iron concentrations are illustrated in Figure 10-2.

BLM_0149086

## WSCC Volunteer Water Quality Monitoring Data Report, 2016



**Figure 10-2: Dissolved Iron Concentration**

BLM_0149087

<u>WSCC Volunteer Water Quality Monitoring Data Report, 2016</u>

## 11. CONCLUSIONS

The water quality data presented in this report were not collected for compliance or regulatory purposes; rather these data are designed to give background information on water quality conditions in the watershed, help water users understand seasonal and natural variation within the watershed, and provide a basic understanding of how the water quality of the North Fork Gunnison River compares to state stream standards.

The North Fork Watershed exhibits seasonal variability and lacks any particular long term trends. Concentrations of parameters typically decrease during times of high flows and increase during times of low flows. Parameters such as TP and iron exhibit an opposite seasonal trend, increasing during times of high flows and decreasing during times of low flows. Besides these seasonal trends of various strengths, the North Fork's lack of long term trends indicates that human-caused effects have not obviously degraded nor improved water quality during this time. One potential exception to this may regard selenium; however this report does not utilize enough data to make any conclusions that might relate to the work of the Selenium Taskforce and other salinity control efforts.

Water quality samples collected by the Network between 2001 and 2014 indicated that overall, the North Fork Gunnison River has excellent to good water quality in the upper watershed and excellent to moderate water quality in the lower watershed largely due to natural sources that increase metal and dissolved solids concentrations in the lower portions of the watershed. Increases in concentrations as water travels downstream are a reflection of the natural soils and geology of the North Fork Valley. During times of high flows, the North Fork Gunnison River and its tributaries more frequently exhibit higher water quality standards, and as flows decrease, water quality standards appear to decrease. Hubbard Creek has excellent water quality, and Leroux Creek and Surface Creek have excellent to good water quality. Tongue Creek and Lower Cottonwood Creek have moderate to poor water quality, depending on flow.

### Field Parameters

The geology and natural soils of the watershed provide the North Fork with the capacity to buffer against changes in pH and the toxic effects of metals. The North Fork watershed has water that is slightly basic and pH values are within an acceptable range for aquatic life. The alkaline character of the water decreases the solubility of many of the toxic metals that are present in the North Fork. Buffering capacity, as measured by hardness and alkalinity, was highest at downstream locations. Local geology and irrigation return flows are likely the sources of the parameters that contribute to hardness and alkalinity. Conductivity reflects seasonal variability that is dependent on the dominant source of water to the river, and conductivity increases from upstream to downstream stations.

### Nutrients and Other Inorganic Parameters

In general, nutrient concentrations are well below state and/or federal standards indicating there are no significant nutrient problems in the North Fork Watershed. The exception is for sulfate, with concentrations near Hotchkiss routinely exceeding the secondary drinking water.

### Metals

The water quality data indicate that metals are not a significant concern in the North Fork watershed, with the exception of selenium. Concentrations of other metals have seldom exceeded applicable water quality standards. Maximum dissolved iron concentrations exceeded water supply standards at some stations, although average concentrations were below the water supply standard. Average concentrations for dissolved selenium exceeded the chronic standard at most stations during the time of sampling up to

BLM_0149088

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

2007.

### Bacteria

The presence of *E. coli* in aquatic environments indicates that water has been contaminated with fecal materials from sewage and/or animal waste. When sampled year-round, *E. coli* values were highest during summer months.

### Macroinvertebrates

Overall, the North Fork has a healthy and thriving macroinvertebrate community. The metrics that evaluate pollution tolerance, % EPT and HBI, indicate that the macroinvertebrate community is relatively intolerant of pollution. Nearly half of the macroinvertebrates collected are pollution-sensitive EPT taxa and the HBI values indicate moderate to good water quality.

BLM_0149089

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

## 12. WORKS CITED

Cohen, Andrew. 2004. Calcium Requirements and the Spread of Zebra Mussels. San Francisco Estuary Institute. http://repositories.cdlib.org/csgc/rp/PPInvSp0401

Colorado Department of Public Health and Environment, Water Quality Control Commission. Regulation 31.

Colorado Department of Public Health and Environment, Water Quality Control Commission. Regulation 35.

Colorado Department of Public Health and Environment, Water Quality Control Commission. Regulation No. 35. The Basic Standards and Methodologies for Surface Water. 5 CCR 1002-35.

Colorado Department of Public Health and Environment, Water Quality Control Commission. Regulation No. 93. 2016. Section 303(d) List Water-Quality-Limited Segments Requiring TMDLs. 5 CCR 1002-93.

Colorado Department of Public Health and Environment, Water Quality Control Commission. Regulation No. 93. 2012. Colorado's Section 303(D) List of Impaired Waters and Monitoring and Evaluation List. 5 CCR 1002-93.

Corvallis, and USDA, Portland, OR. Pell, A. N. 1997. Manure and microbes: Public and animal health problem? J. Dairy Sci.80:2673-2681.

Hem, J.D., 1992, Study and interpretation of chemical characteristics of natural water (3d ed.): U.S. Geological Survey Water-Supply Paper 2254.

Hilsenhoff, W.L. 1988. Rapid Field Assessment of Organic Pollution with a Family Level Biotic Index. Journal of the North American Benthological Society 7:65-68.

Liebermann, Timothy D. Characteristics and Trends of Streamflow and Dissolved Solids in the Upper Colorado River Basin, Arizona, Colorado, New Mexico, Utah, and Wyoming. Washington, D.C.: U.S. Dept. of the Interior, U.S. Geological Survey, 1989. 1989. Web. 28 Oct. 2016.

Michigan Department of Environmental Quality. Total Suspended Solids. http://www.michigan.gov/documents/deq/wb-npdes- TotalSuspendedSolids_247238_7.pdf

Moore et al, 1988, Moore, J. A., J. Smyth, S. Baker, and J. R. Miner. 1988. Evaluating coliform concentrations in runoff from various animal waste management systems. Special Report 817. Agricultural Experiment Stations Oregon State Univ.

No. 31. The Basic Standards and Methodologies for Surface Water. 5 CCR 1002-31.

Rivers of Colorado Water Watch Network. Raw data from 2001 through 2014. http://wildlife.state.co.us/riverwatch/

Rivers of Colorado Water Watch Network. Water Quality Sampling Manual. http://wildlife.state.co.us/riverwatch/

Sherer, B. M., J. R. Miner, J. A. Moore, and J. C. Buckhouse. 1992. Indicator bacterial survival in stream sediments. J. Environ. Qual.21:591-595.

US Environmental Protection Agency (USEPA). 2009. Enviromapper for Envirofacts.

US Environmental Protection Agency (USEPA). Region 8. Raw bacteria data from 2004 through 2014.

US Geological Survey (USGS). Real Time flow data from 2001 through 2014. http://waterdata.usgs.gov/nwis/rt

US Geological Survey (USGS). Southwest Regional Gap Analysis Project. Gap Analysis Program. Land Cover Data.

Wetzel, R.G. 2001. Limnology: Lake and River Ecosystems. Third Edition. Academic Press.

BLM_0149090

<u>WSCC Volunteer Water Quality Monitoring Data Report, 2016</u>

**13. Appendices:**
- **A.  2001 to 2014 Water Quality Results**
- **B.  CDPHE WQCC Regulation No. 31**
- **C.  CDPHE WQCC Regulation No. 35**
- **D.  Hydrographs**

BLM_0149091

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

### A. 2001 to 2014 Water Quality Results

The data gathered by the North Fork Volunteer Water Quality Monitoring Network is available online at the Western Slope Conservation Center's website or by request. Please call (970) 527-5307 and the Conservation Center will send you the data.

### B. CDPHE WQCC Regulation No. 31

Below include Colorado standards for specific physical, biological, inorganic, and metal parameters. Additional information regarding these standards can be found in the Colorado Department of Public Health and Environment's Water Quality Control Commission Regulation No. 31.

| TABLE I PHYSICAL AND BIOLOGICAL PARAMETERS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Parameter | Recreational | | | Aquatic Life | | | Agriculture | Domestic Water Supply |
| | CLASS E (Existing Primary Contact) and CLASS U (Undetermined Use) | CLASS P (Potential Primary Contact Use) | CLASS N (Not Primary Contact Use) | CLASS 1 COLD WATER BIOTA | CLASS 1 WARM WATER BIOTA | CLASS 2 | | |
| PHYSICAL | | | | | | | | |
| D.O. (mg/l)[(1)(9)] | 3.0(A) | 3.0(A) | 3.0(A) | 6.0[(2)](G) 7.0(spawning) | 5.0[(2)](G) | 5.0(A) | 3.0(A) | 3.0(A) |
| pH (Std. Units)[(3)] | 6.5–9.0 (Bm) | 6.5–9.0 (Bm) | 6.5–9.0 (Bm) | 6.5–9.0(A) | 6.5–9.0(A) | 6.5–9.0(A) | | 5.0–9.0(A) |
| Suspended Solids[(4)] | | | | | | | | |
| Temperature (°C) [(5)] | | | | Rivers & Streams:<br>Tier I[5]:<br>June-Sept = 17.0 (ch), 21.7(ac)<br><br>Oct –May = 9.0 (ch), 13.0 (ac)<br><br>Tier II[5]:<br>Apr-Oct =18.3 (ch), 23.9 (ac)<br><br>Nov-Mar =9.0 (ch), 13.0 (ac)<br><br>Lakes & Res:<br>Apr-Dec = 17.0 (ch), 21.2 (ac)<br><br>Jan-Mar = 9.0 (ch), 13.0 (ac)<br><br>Large Lakes & Res[5]:<br>Apr-Dec = 18.3(ch), 23.8 (ac)<br><br>Jan-Mar = 9.0(ch), 13.0 (ac) | Rivers & Streams:<br>Tier I[5]:<br>Mar-Nov = 24.2(ch), 29.0 (ac)<br><br>Dec-Feb= 12.1(ch), 14.5(ac)<br><br>Tier II[5]:<br>Mar-Nov= 27.5(ch), 28.6(ac)<br><br>Dec-Feb=13.8 (ch), 14.3 (ac)<br><br>Tier III[5]:<br>Mar-Nov = 28.7 (ch), 31.8 (ac)<br><br>Dec-Feb = 14.3 (ch), 15.9 (ac)<br><br>Lakes & Res:<br>Apr-Dec = 26.3 (ch), 29.5 (ac)<br><br>Jan-Mar = 13.2 (ch), 14.8 (ac) | Same as Class 1 | | |

73

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

| TABLE II INORGANIC PARAMETERS | | | | | | |
|---|---|---|---|---|---|---|
| PARAMETER | AQUATIC LIFE | | | | AGRICULTURE | DOMESTIC WATER SUPPLY |
| | CLASS 1 Cold Water Biota | | CLASS 1 Warm Water Biota | | CLASS 2 | | |
| **INORGANICS:** | | | | | | |
| Ammonia (mg/l as N) Total | chronic = elsp or elsa [1] acute = sp [1] (N) | | chronic = Apr 1-Aug 31=elsp [1] Sept 1-Mar 29=elsa [1] acute = sa [1] (N) | | Class 2 Cold/Warm have the same standards as Class 1 Cold/Warm (N) | | |
| Total residual Chlorine (mg/l) | 0.019 (L) (1-day) | 0.011 (L) (30-day) | 0.019 (L) (1-day) | 0.011 (L) (30-day) | 0.011 (L) (30-day) | | |
| Cyanide - Free (mg/l) | 0.005(H) (1-day) | | 0.005(H) (1-day) | | 0.005(H) (1-day) | 0.2(G) (1-day) | 0.2(B,D[m]) (1-day) |
| Fluoride (mg/l) | | | | | | | 2.0[3](E) (1-day) |
| Nitrate (mg/l as N) | | | | | | 100[z](B) | 10[19](K) (1-day) |
| Nitrite (mg/l as N) | TO BE ESTABLISHED ON A CASE BY CASE BASIS [3] | | | | A CASE BY CASE BASIS [3] | 10[z](B) (1-day) | 1.0(2)[18](K) (1-day) |
| Sulfide as $H_2S$ (mg/l) | 0.002 undissociated(A) (30-day) | | 0.002 undissociated(A) (30-day) | | 0.002 undissociated(A) (30-day) | | 0.05(F) (30-day) |
| Boron (mg/l) | | | | | | 0.75(A,B) (30-day) | |
| Chloride (mg/l) | | | | | | | 250(F) (30-day) |
| Sulfate (mg/l) | | | | | | | 250(F) (30-day) |
| Asbestos | | | | | | | 7,000,000 fibers/L [5] |
| NOTE: Capital letters in parentheses refer to references listed 31.16(3); numbers in parentheses refer to table II footnotes. | | | | | | | |

| TABLE III METAL PARAMETERS (Concentration in ug/l) | | | | | | |
|---|---|---|---|---|---|---|
| METAL [1] | AQUATIC LIFE [1](3)(4)(J) | | AGRICULTURE [2] | DOMESTIC WATER-SUPPLY [2] | WATER + FISH [7] | FISH INGESTION [10] |
| | ACUTE | CHRONIC | | | | |
| Aluminum | $e^{(1.3695(ln(hardness)(+1.8308)}$ (tot.rec.) | 87 or $e^{(1.3695(ln(hardness)(-0.1158)}$ (tot.rec.) [11] | | --- | --- | --- |
| Antimony | | | | 6.0 (30-day) | 5.6 | 640 |
| Arsenic | 340 | 150 | 100[A] (30-day) | $0.02 - 10^{[17]}$ (30-day) [14] | 0.02 | 7.6 |
| Barium | | | | 1,000[B] (1-day) 490 (30-day) | --- | --- |
| Beryllium | | | 100[X,W] (30-day) | 4.0 (30-day) | --- | --- |
| Cadmium | $(1.136672-[ln(hardness) x (0.041838)]) x e^{0.9151(ln(hardness))(-3.1485}$ $(Trout)=(1.136672-[ln(hardness)]x (0.041838)]) x e^{0.9151(ln(hardness))(-3.6236}$ | $(1.101672-[ln(hardness) x(0.041838)] x e^{0.7852(ln(hardness))(-2.4461}$ | $10^{[J]}$ (30-day) | 5.0[E] (1-day) | --- | --- |
| Chromium III[5] | $e^{(0.8190(ln(hardness))+2.5736)}$ | $e^{(0.8190(ln(hardness))+0.5340)}$ | 100[B] (30-day) | 50[R] (1-day) | --- | --- |
| Chromium VI[5] | 16 | 11 | 100[B] (30-day) | 50[R] (1-day) | 100(30-day) | --- |
| Copper | $e^{(0.9422(ln(hardness))+1.7408)}$ | $e^{(0.8545(ln hardness))(-1.7428)}$ | 200[B] | 1,000[P] (30-day) | 1,300 | --- |
| Iron | 1,000(tot.rec.) [A,C] | | | 300(dis) [P] (30-day) | --- | --- |
| Lead | $(1.46203-[(ln(hardness)* (0.145712)])*e^{(1.273(ln hardness)(-1.46)}$ | $(1.46203-[(ln(hardness)* (0.145712)])*e^{(1.273(ln hardness)(-4.705)}$ | 100[B] (30-day) | 50[E] (1-day) | --- | --- |
| Manganese | $e^{(0.3331(ln hardness))(+6.4676)}$ | $e^{(0.3331(ln hardness))(+5.8743)}$ | 200[B] (30-day) [12] | 50(dis) [P] (30-day) | --- | --- |
| Mercury | FRV(fish) [6] = 0.01 (Total) | | | 2.0[R] (1-day) | --- | --- |
| Molybdenum | | | 300[O] (30-day) [14] | 210 (30-day) | | |

74

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

| METAL[1] | AQUATIC LIFE[1)(3)(4)(2)] | | AGRICULTURE[2] | DOMESTIC WATER-SUPPLY[2] | WATER + FISH[7] | FISH INGESTION[10] |
|---|---|---|---|---|---|---|
| | ACUTE | CHRONIC | | | | |
| Nickel | $e^{(0.846[\ln\,hardness]+2.253)}$ | $e^{(0.846[\ln\,hardness]+0.0554)}$ | 200[B] (30-day) | 100[B] (30-day) | 610 | 4,600 |
| Selenium[9] | 18.4 | 4.6 | 20[B,D] (30-day) | 50[B] (30-day) | 170 | 4,200 |
| Silver | $\frac{1}{2}e^{(1.72[\ln\,hardness]-6.52)}$ | $e^{(1.72[\ln\,hardness]-9.06)}$ (Trout) $= e^{(1.72[\ln\,hardness]-10.51)}$ | | 100[F] (1-day) | — | — |
| Thallium | 15[G] | | | 0.5 (30-day) | 0.24 | 0.47 |
| Uranium[17] | $e^{(1.1021[\ln\,hardness]+2.7088)}$ | $e^{(1.1021[\ln\,hardness]+2.2382)}$ | | 16.8 – 30[13] (30-day) | — | — |
| Zinc | $0.978*e^{(0.9094[\ln\,hardness]+0.9095)}$ | $0.986*e^{(0.9094[\ln\,hardness]+0.6235)}$ (sculpin)[15] $= e^{(2.14[0[\ln\,hardness])-5.084)}$ | 2000[B] (30-day) | 5,000[F] (30-day) | 7,400 | 26,000 |

NOTE:  Capital letters in parentheses refer to references listed in section 31.16(3); Numbers in parentheses refer to Table III footnote

75

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

**C. CDPHE WQCC Regulation No. 35 Classifications and Numeric Standards For Gunnison And Lower Dolores River Basins**

The selected formulas below present standards for stream segments in the Gunison and Lower Dolores River Basins for various parameters examined in this report. Additional information regarding these standards can be found in the Colorado Department of Public Health and Environment's Water Quality Control Commission Regulation 35.

(3)    Table Value Standards

In certain instances in the tables in Appendix 35-1, the designation "TVS" is used to indicate that for a particular parameter a "table value standard" has been adopted. This designation refers to numerical criteria set forth in the Basic Standards and Methodologies for Surface Water. The criteria for which the TVS are applicable are on the following table.

### TABLE VALUE STANDARDS
(Concentrations in µg/l unless noted)

| PARAMETER[1] | TABLE VALUE STANDARDS [2][3] |
|---|---|
| Aluminum (Trec) | Acute = $e^{(1.3695[\ln(hardness)]+1.8308)}$ |
| | pH equal to or greater than 7.0 |
| | Chronic = $e^{(1.3695[\ln(hardness)]-0.1158)}$ |
| | pH less than 7.0 |
| | Chronic = $e^{(1.3695[\ln(hardness)]-0.1158)}$ or 87, whichever is less |
| Copper | Acute = $e^{(0.9422[\ln(hardness)]-1.7408)}$ |
| | Chronic = $e^{(0.8545[\ln(hardness)]-1.7428)}$ |
| Lead | Acute = $(1.46203-[(\ln(hardness)*(0.145712)])*e^{(1.273[\ln(hardness)]-1.46)}$ |
| | Chronic = $(1.46203-[(\ln(hardness)*(0.145712)])*e^{(1.273[\ln(hardness)]-4.705)}$ |
| Manganese | Acute = $e^{(0.3331[\ln(hardness)]+6.4676)}$ |
| | Chronic = $e^{(0.3331[\ln(hardness)]+5.8743)}$ |
| Nickel | Acute = $e^{(0.846[\ln(hardness)]+2.253)}$ |
| | Chronic = $e^{(0.846[\ln(hardness)]+0.0554)}$ |
| Selenium[6] | Acute = 18.4 |
| | Chronic = 4.6 |

76

BLM_0149095

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

Temperature

| TEMPERATURE TIER | TIER CODE | SPECIES EXPECTED TO BE PRESENT | APPLICABLE MONTHS | TEMPERATURE STANDARD ($^0$C) | |
|---|---|---|---|---|---|
| | | | | MWAT | DM |
| Cold Stream Tier 1 | CS-I | brook trout, cutthroat trout | June – Sept. | 17.0 | 21.7 |
| | | | Oct. – May | 9.0 | 13.0 |
| Cold Stream Tier 2 | CS-II | all other cold-water species | April – Oct. | 18.3 | 23.9 |
| | | | Nov. – March | 9.0 | 13.0 |
| Cold Lakes | CL | brook trout, brown trout, cutthroat trout, lake trout, rainbow trout, Arctic grayling, sockeye salmon | April – Dec. | 17.0 | 21.2 |
| | | | Jan. – March | 9.0 | 13.0 |
| Cold Large Lakes (>100 acres surface area) | CLL | rainbow trout, brown trout, lake trout | April – Dec. | 18.3 | 23.8 |
| | | | Jan. – March | 9.0 | 13.0 |
| Warm Stream Tier 2 | WS-II | brook stickleback, central stoneroller, creek chub, longnose dace, Northern redbelly dace, finescale dace, razorback sucker, white sucker | March – Nov. | 27.5 | 28.6 |
| | | | Dec. – Feb. | 13.8 | 14.3 |
| Warm Stream Tier 3 | WS-III | all other warm-water species | March – Nov. | 28.7 | 31.8 |
| | | | Dec. – Feb. | 14.3 | 15.9 |
| Warm Lakes | WL | black crappie, bluegill, common carp, gizzard shad, golden shiner, largemouth bass, Northern pike, pumpkinseed, sauger, smallmouth bass, spottail shiner, striped bass, tiger muskellunge, walleye, wiper, white bass, white | April – Dec. | 26.3 | 29.5 |
| | | | Jan. – March | 13.2 | 14.8 |

Zinc

Acute = 0.978 * $e^{(0.9094[\ln(\text{hardness})]+0.9095)}$

Chronic = 0.986 * $e^{(0.9004[\ln(\text{hardness})]+0.6235)}$

Where hardness is less than 102 mg/L CaCO$^3$ and mottled scuplin are expected to be present:

Chronic (sculpin) = $e^{(2.140[\ln(\text{hardness})]-5.084)}$

77

BLM_0149096

# WSCC Volunteer Water Quality Monitoring Data Report, 2016

**Ammonia** [4]

Cold Water = (mg/l as N)Total

$$acute = \frac{0.275}{1 + 10^{7.204 - pH}} + \frac{39.0}{1 + 10^{pH - 7.204}}$$

$$chronic = \left( \frac{0.0577}{1 + 10^{7.688 - pH}} + \frac{2.487}{1 + 10^{pH - 7.688}} \right) * MIN\left(2.85, 1.45 * 10^{0.028(25 - T)}\right)$$

Warm Water = (mg/l as N)Total

$$acute = \frac{0.411}{1 + 10^{7.204 - pH}} + \frac{58.4}{1 + 10^{pH - 7.204}}$$

$$chronic (Apr1 - Aug31) = \left( \frac{0.0577}{1 + 10^{7.688 - pH}} + \frac{2.487}{1 + 10^{pH - 7.688}} \right) * MIN\left(2.85, 1.45 * 10^{0.028(25 - T)}\right)$$

$$chronic (Sep1 - Mar31) = \left( \frac{0.0577}{1 + 10^{7.688 - pH}} + \frac{2.487}{1 + 10^{pH - 7.688}} \right) * 1.45 * 10^{0.028(25 - MAX(T, 7))}$$

**Cadmium**

Acute = (1.136672 - [ln(hardness) x (0.041838)] ) x $e^{0.9151[ln(hardness)] - 3.1485}$

Acute(Trout) = (1.136672 - [ln(hardness) x (0.041838)] ) x $e^{0.9151[ln(hardness)] - 3.6236}$

Chronic = (1.101672 - [ln(hardness) x (0.041838)] ) x $e^{0.7998[ln(hardness)] - 4.4451}$

78

BLM_0149097

## WSCC Volunteer Water Quality Monitoring Data Report, 2016

**D. Hydrographs**

Included below are hydrographs with data gathered from USGS gaging stations within the North Fork of the Gunnison watershed. The hydrographs illustrate the mean daily discharge rates of flow.



BLM_0149098

WSCC Volunteer Water Quality Monitoring Data Report, 2016



80

BLM_0149099



## WSCC Volunteer Water Quality Monitoring Data Report, 2016



BLM_0149100

WSCC Volunteer Water Quality Monitoring Data Report, 2016



82

BLM_0149101

WSCC Volunteer Water Quality Monitoring Data Report, 2016



BLM_0149102