WSCC Volunteer Water Quality Monitoring Data Report, 2016



84

BLM_0149103



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## No oil and gas development in the North Fork Valley

1 message

**Monica Zarley** <monicazarley@gmail.com>          Tue, Nov 1, 2016 at 8:45 PM
To: uformp@blm.gov

I have lived in the North Fork valley for 19 years. I am a teacher in Delta County School District. I love this valley and I feel very strongly that we should not allow oil and gas development or fracking here! The financial gain for a few is not worth the risk. Our economy based on farming, hunting, and ranching will be compromised! The beauty that brought us here must be preserved for this generation and future generations. Thank you, Monica Zarley 222 Box Elder, Paonia CO 81428.

BLM_0149104



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

# Colorado Department of Natural Resources Comments on UFO DRMP/EIS
1 message

---

**Laughlin - DNR, Amy** <amy.laughlin@state.co.us>                    Tue, Nov 1, 2016 at 3:01 PM
To: uformp@blm.gov

Dear Ms. Pfifer:

The Colorado Department of Natural Resources submits the attached comments on the Uncompahgre Field Office Draft Resource Management Plan/ Draft Environmental Impact Statement including letters from two of our divisions: Colorado Parks and Wildlife and the Colorado Water Conservation Board.

Thank you for the opportunity to submit these comments, and we look forward to working with you and your staff as this planning process moves forward.

--
Amy Laughlin
Policy Advisor
Executive Directors Office

<div style="border:1px solid red; color:red">
For CWCB comment letter,
see UFORMP_000562
</div>



P 303.866.3311 x 8671  |  F 303.866.2115  |  C 720.662.4778
1313 Sherman Street, Room 718, Denver, CO 80203
amy.laughlin@state.co.us   |   www.colorado.gov/DNR

---

📄 **DNR Comments_UFO DRMP EIS_Final.pdf**
1272K



**COLORADO**

**Department of Natural Resources**

Executive Director's Office
1313 Sherman Street, Room 718
Denver, CO 80203

November 1, 2016

Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Uncompahgre Field Office Draft Resource Management Plan/ Environmental Impact Statement

Dear Ms. Pfifer:

The Colorado Department of Natural Resources submits the following comments on the Uncompahgre Field Office (UFO) Draft Resource Management Plan / Environmental Impact Statement prepared by two of our divisions: Colorado Parks and Wildlife (CPW) and the Colorado Water Conservation Board (CWCB).

CPW recommends additional detail be included in the preferred alternative in the final RMP/EIS to incorporate the desired conditions, suggested standards, and best management practices related to the management, preservation, and conservation of fish and wildlife species and habitat, while also remaining consistent with species management plans, agreements, listing decisions, and BLM policies. CPW also offers specific comments related to aquatic species, bighorn sheep, land health standards, and stipulations for fluid mineral leasing and other surface disturbing activity.

Further, the draft RMP/EIS lacks the appropriate analysis and protections related to the Gunnison Sage Grouse (GuSG) given its current listing status as a threatened species under the Endangered Species Act. (Indeed, Chapter 3 and Appendix O both state incorrectly that the Gunnison sage-grouse is merely a candidate species, with a proposal to list it as endangered. That changed two years ago when the U.S. Fish & Wildlife Service issued a rule listing the species as threatened.) Although the language in Section 2.2.4 of the Draft RMP acknowledges the concurrent planning process under way for a Gunnison sage-grouse ranngewide RMP amendment intended to provide specific management guidance to conserve Gunnison sage-grouse and their habitat (GuSG RMP), we are concerned that Section 2.2.4 contains no commitment either to amend the final UFO RMP with the provisions of the final GuSG RMP (should the UFO RMP be finalized before the GuSG RMP) or to incorporate the provisions of the final GuSG RMP into the UFO RMP (should the GuSG RMP be finalized first). BLM must provide stronger assurances that the UFO RMP will provide adequate protection for this federally listed species.

CWCB offers specific comments related to the preferred alternative (Alternative D) and the findings of the Draft Wild and Scenic River Suitability Report. CWCB's comments reflect a dual purpose of addressing Colorado's water-related needs, while also continuing to afford the appropriate environmental protections for stream segments with outstanding remarkable values (ORVs). I would encourage the BLM to work with the CWCB to consider the possibility of utilizing its Instream Flow Program as an alternative method of flow protection for flow-related ORVs.



BLM_0149106

Finally, CPW has devoted significant staff resources to reviewing and attempting to improve the Draft RMP throughout the multi-year planning process, yet the BLM at times seemed disinclined to utilize CPW's special expertise in wildlife management and in the status and needs of wildlife in the planning area. Accordingly, the Draft RMP contains factual inaccuracies, methodological errors, conflicts with other planning documents, and critical omissions. As described in CPW's comment letter, we see a need for significant revisions to address these deficiencies before issuance of a Final RMP/EIS. CPW staff continue to be available to assist in these efforts, and we remain hopeful that future cooperative processes result in more productive outcomes.

Thank you for the opportunity to submit these comments. DNR looks forward to finding solutions to these matters and to continue working with the UFO as this important planning process moves forward.

Sincerely,

Robert Randall
Executive Director



**COLORADO**
**Parks and Wildlife**
Department of Natural Resources

Montrose Service Center
2300 South Townsend Avenue
Montrose, CO 81401
Phone (970) 252-6000

November 1, 2016

Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

**RE: UNCOMPAHGRE FIELD OFFICE DRAFT RESOURCE MANAGEMENT PLAN AND ENVIRONMENTAL IMPACT STATEMENT-MAY 2016**

Dear Ms. Pfifer:

Colorado Parks and Wildlife (CPW) reviewed the Bureau of Land Management's (BLM) Draft Resource Management Plan (RMP) and Environmental Impact Statement (EIS) for the Uncompahgre Field Office (UFO). CPW became a Cooperating Agency in 2010 and last submitted cooperating agency comments to the BLM on the administrative final version of this document in June of 2012. In summary, CPW has concerns about the lack of integration of several species management plans and agreements[1], absence of desired condition and standards for big game ungulates, raptors and fishes, the use of Ecological Emphasis Areas to achieve ecosystem functionality (without regulatory protections), the inclusion of a risk of contact model for bighorn sheep that is built on several incorrect assumptions, and an inadequate analysis of Gunnison sage grouse, given its current listing status and BLM policies. Our detailed comments are included below.

CPW enters into cooperating agency relationships on large scale NEPA documents when the requesting federal agency has a sincere desire for CPW's expertise, a willingness to collaborate on the impact analysis, and common goals to implement strategies that avoid, minimize, and mitigate impacts to wildlife resources. CPW asked to be included during the earliest planning/conceptualization/alternatives development stages, and volunteered to provide staff to assist with writing and reviewing sections of the RMP where particular expertise in wildlife, wildlife habitat, and wildlife management in areas where other resources may have impacts on wildlife. CPW participated in all official cooperating agency meetings, provided substantive written and verbal comments, and met with UFO field staff outside of formal cooperating agency meetings on numerous occasions between 2010-2012 in an attempt to discuss and resolve outstanding issues in the development of the RMP.

Based on the cooperating agency process and RMP document review, CPW's input was largely confined to reviewing and commenting on draft text rather than being utilized as an agency with 'special expertise' (40 CFR 1508.26). The BLM did not respond to our cooperating agency comments (see administrative

---

[1] Gunnison Sage-grouse Range-wide Conservation Plan (2005), Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015).

Bob D. Broscheid, Director, Colorado Parks and Wildlife • Parks and Wildlife Commission: Robert W. Bray • Chris Castilian, Chair • Jeanne Horne, Vice-Chair
John Howard • Bill Kane • Dale Pizel • James Pribyl, Secretary • James Vigil • Dean Wingfield • Michelle Zimmerman • Alex Zipp



record Cooperating Agency Meeting #10 Minutes). We were not provided a final administrative copy of the RMP to review prior to the document being finalized and sent to the Colorado State Office or the Washington Office. Nor, were we provided an opportunity to review the Draft RMP prior to it being distributed to the public after nearly 4 years since our last review.

The Cooperating Agency meeting notes in the administrative record detail some of the concerns that we raised, and were recorded as 'Action Items' for the BLM and their contractor to address within the RMP. These action items are not reflected in the Draft RMP. Outlined below is a reiteration of many of the comments previously submitted via direct written, verbal or email communication that were left unaddressed in this Draft RMP. In addition, in many instances on the ground conditions within the planning area and BLM policies have changed. The Draft RMP does not adequately reflect those changed conditions or the latest BLM guidance, policy or law.

## Wildlife

The goals and objectives for resource condition, the proposed actions and management practices fail to describe the desired conditions of wildlife populations and wildlife habitat across the planning area per 43 CFR 1601.0-5(n). There are few metrics with which to evaluate the range of alternatives, the affected environment, and environmental consequences of the RMP resource allocation.

The wildlife section does not identify specific opportunities that the BLM will pursue for individual species conservation and management, and does not clearly identify how wildlife issues will be managed in association with competing resource values. CPW recommends including clear descriptions of the desired resource condition, goals, and objectives within the planning area so that the EIS can substantively and reliably evaluate BLMs proposed land use allocations with respect to wildlife. Those descriptions would also allow for comparison of each alternative with the desired outcomes stated in applicable State and Federal wildlife conservation and management plans, ensuring their compatibility and consistency, as required by FLPMA. The RMP should incorporate the objectives and commitments contained in the following plans and agreements: Gunnison Sage-grouse Range-wide Conservation Plan (2005), The Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015). Currently, the RMP does not incorporate these plans or contain clear rationale describing why the desired conditions, goals and objectives in these plans are not addressed.

Previous administrative RMP drafts contained "priority species and habitat types" and had specific desired conditions, goals, objectives, and actions to promote, enhance, and conserve wildlife and wildlife habitat within the UFO boundary. During the cooperating agency process UFO staff explained that there are no unique habitats or key species within the planning boundaries except for Federally designated critical habitat under the ESA. As a result, opportunities for species conservation were purposely removed from the Draft RMP. Regardless of key habitats or priority species designations, the RMP should contain descriptions and criteria for the management, preservation, and conservation of fish and wildlife species and habitat within the planning area.

2

Below is a list of suggested Desired Conditions and suggested Standards to include in the Final Draft RMP, many of which are incorporated into the BLM Tres Rios RMP (2015). CPW recommends incorporating these into the UFO RMP to provide consistency between the Field Offices and to reflect the commitments and strategies associated with the aforementioned plans.

## Desired Conditions

- Big game severe winter range, winter concentration areas, production areas and desert bighorn sheep summer ranges are capable of supporting populations that meet State of Colorado population objectives. These areas provide sustainable forage and habitat in areas with acceptable levels of human disturbance which do not reduce habitat effectiveness.
- Invasive exotic wildlife species and diseases do not become established within the planning area. Existing invasive exotic wildlife species and diseases do not spread.
- Habitat components (e.g., snags and downed logs) are maintained. Unique habitat types (e.g., springs, seeps, willow carrs, caves, and cliffs) support associated flora and fauna (with abundance and distribution commensurate with the capability of the land).
- Large predator species contribute to ecological diversity and ecosystem functioning.
- Projects and activities occurring on BLM lands near state and federal highways are designed to provide for long-term connectivity and integrity of habitats to facilitate effective wildlife movement.
- Effective raptor nesting habitat occurs throughout the planning area with abundance and distribution commensurate with the capability of the land to sustain populations.
- Ecosystems and habitat conditions for terrestrial wildlife species sensitive to human disturbance are maintained.
- Vegetation openings created through management actions preserve the natural patchiness inherent in Southern Rocky Mountain ecosystems.
- Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats.
- Populations are conserved by maintaining or improving habitat availability and quality through the incorporation of conservation strategies and species' habitat needs during project development and implementation.
- Riparian and aquatic habitat, including springs and fens, support well-distributed populations of invertebrate and vertebrate riparian and aquatic dependent wildlife.
- Disturbances from management activities occur at levels that support critical life functions and sustain key habitat characteristics for wildlife species.
- Areas identified as critical habitat or proposed critical habitat for special status wildlife species have the characteristics to support sustainable populations, promoting recovery of the species.
- Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species.
- Special status species are able to disperse within the planning area and into adjacent lands. This will allow for the interchange between populations and the maintenance of genetic diversity.
- Wildlife are able to disperse freely across the planning area allowing for the interchange between populations and the maintenance of genetic diversity.

## Standards

- **Raptors**: Raptor nesting disturbance buffers and timing limitations adhere to CPW's Raptor Buffer Recommendations (**CDOW 2008**)
- **Ungulates:** Projects or activities in big game critical winter range, winter concentration areas, severe winter range, production areas, and important migration corridors are designed and

3

conducted in a manner that preserves and does not reduce habitat effectiveness within those mapped areas.

- **Ungulates:** In order to provide for healthy ungulate populations capable of meeting state population objectives, anthropomorphic activity and improvements across the planning area are designed to maintain and continue to provide effective habitat components that support critical life functions. This includes components of size and quality on the landscape providing connectivity to seasonal habitats (wildlife travel corridors), production areas, critical winter range, severe winter range, and winter concentration areas, along with other habitat components necessary to support herd viability.

- **Road and Trail Density for Ungulate Production Areas, Winter Concentration Areas, Severe Winter Range, and Critical Winter Range on BLM Lands:** The intent is to ensure no net loss of existing habitat effectiveness within the areas listed below. In order to maintain wildlife habitat effectiveness of BLM lands, road and trail densities should be addressed when analyzing and approving management actions that affect routes. Where management actions would result in road and trail densities exceeding 1 mile/square mile on UFO lands actions should be designed to maintain habitat effectiveness on UFO lands throughout each mapped wildlife habitat listed below.
  - o Habitat effectiveness is considered maintained when road and trail densities within the CPW mapped big game production areas (calving or lambing areas), elk and deer severe winter range, elk and deer winter concentration areas, mule deer critical winter range, pronghorn summer concentration areas, and bighorn sheep summer concentration areas on UFO lands are less than or equal to 1 mile/square mile. If route densities exceed 1 mile/square mile within the CPW mapped areas listed below on UFO lands, densities should not be increased without compensatory mitigation designed to maintain habitat effectiveness.

**Aquatic Species**

Section 3.1.7 does not include a adequate discussion of the distribution, status, or baseline habitat conditions of the endangered fish species that are in the Gunnison River and its tributaries including the Colorado pikeminnow, razorback sucker and bonytail chub, the three species (roundtail chub, bluehead sucker and flannelmouth sucker) and the Colorado River cutthroat trout. Likewise, the wildlife section of the draft RMP does not identify actions to sustain in-stream conditions, attempt to address other resource management issues that contribute to aquatic habitat degradation (e.g. sedimentation from stream bank destabilization resulting in degraded habitat and the loss of spawning habitat), or identify a desired future conditions for the aquatic environment.

Below we have outlined several additional desired conditions, many of which are incorporated into the BLM Tres Rios RMP (2015) for the benefit of aquatic species. CPW recommends incorporating these into the UFO RMP as they are consistent with the commitments and strategies associated with the aforementioned plans.

- Streams, lakes, riparian vegetation, and adjacent uplands provide habitats adequate to maintain healthy aquatic ecosystems capable of supporting a variety of native and desired non-native aquatic communities.
- The quantity and quality of aquatic habitats are maintained or enhanced to provide for the long-term sustainability of biological diversity and population viability of all native and/or desired non-native vertebrate species.
- Channel characteristics, water quality, flow regimens, and physical habitat features are diverse and appropriately reflect the climate, geology, and natural biota of the area.

4

BLM_0149111

- An adequate range of stream flow provides for the long-term maintenance of physical habitat features. Channel features, including bank stability, width-to-depth ratio, pool/riffle ratio, pool depth, slope, sinuosity, cover, and substrate composition, are commensurate with those expected to occur under natural ranges of stream flow.
- Water flow conditions in streams, lakes, springs, seeps, wetlands, fens, and aquifers support functioning habitats for a variety of aquatic and semi-aquatic species and communities.
- Macroinvertebrate diversity and abundance reflect high water quality.
- Populations of aquatic species are adequately mobile, genetically diverse, and functionally diverse throughout the planning area.
- Aquatic systems are connected in a manner that avoids fragmentation of aquatic habitats and isolation of aquatic species.
- Connectivity between water bodies provides for all life history functions of aquatic species except where barriers are beneficial and necessary to achieve conservation goals for certain aquatic species.
- Non-native fish removal is a supported and encouraged management strategy in areas where CPW identifies restoration efforts for native aquatic species conservation and recovery.

**Ecological Emphasis Areas**

BLM staff selected Ecological Emphasis Areas (EEA) using very narrow criteria to provide connectivity between large blocks of relatively un-fragmented habitats. The purpose of the EEA designation was to dominantly manage for ecological processes and functionality. We were initially encouraged by BLM's efforts to identify and designate areas where core wildlife and native plant habitat were provided extra protection in the RMP. CPW provided recommendations on criteria to identify important core wildlife habitat and management strategies for their protection. In particular we suggested defining some EEA's using limiting habitat factors for ungulates, given that priority species designations and key habitats were removed from the administrative draft RMP.

The RMP includes one CPW suggested EEA, Simms Mesa (designated for Gunnison Sage Grouse). CPW has identified several areas that we recommend be designated as Ecological Emphasis Areas (Figure 1). These areas incorporate some of the highest densities of wintering big game within the UFO boundary, and were selected by CPW staff based on mapped winter concentration areas, CPW classification flight data, and VHF and GPS collar data. These polygons represent the best available data in their development. Some of the EEAs overlap with portions of the CPW identified big game polygons, however it is unclear what data sources were used to develop the proposed EEAs and thus the overlap appears to be largely coincidental.

CPW is concerned that the draft RMP will not achieve the purpose for which the Ecological Emphasis Areas were selected. RMP land use authorizations are not restrictive enough and allow competing uses that may preclude or significantly impact the functionality of these areas for wildlife. For instance, without density restrictions in mineral leasing and development, wintering wildlife may be displaced or avoid the Ecological Emphasis Area. It is not clear in the draft RMP how these competing uses such as grazing, travel management, mineral leasing and development, ROW authorizations, recreation, lands and realty will be managed to support the values that are contained within each unique Ecological Emphasis Area.

Many EEAs (or significant portions of them) have also been identified as Special Recreation Management Areas (SRMAs). Of the twelve identified EEAs in the Draft RMP, nine are also designated as an SRMA. We agree that similar allocation restrictions may benefit both recreationist and wildlife within the same

5

BLM_0149112

geographic area, yet they are also potentially in conflict. The draft RMP does not indicate how these types of potential conflicts will be managed.

Despite the lack of detail in how the resources with the Ecological Emphasis Areas will be managed, we have been generally supportive of the concept through the development of the RMP during the Cooperating Agency process since 2010. However, during a recently convened Cooperating Agency Meeting (10-14-2016) we learned that the BLM does not consider EEAs as an area designation, but rather as a "resource designation". This is a contradictory statement to the development of these areas and is not reflected in the language within the RMP. The lack of communication continues to create disconnects regarding the intent of the Cooperating Agency relationship in the development of the UFO RMP.

## Big Horn Sheep

The BLM Washington Office recently issued policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016) and the Colorado BLM State Office recently designated Rocky Mountain bighorn sheep as a BLM Sensitive Species[2]. The recent policy and status designation are not reflected in the Draft RMP. In addition, the Draft RMP lacks desired conditions to promote the conservation of special status species, and thus is in conflict with BLM Handbook H-6840, *Special Status Species Management.*

The Draft RMP/EIS details the methodology and results of both the "Probability of Interaction" (a.k.a the local model) and the "Risk of Contact" (a.k.a. the national model) for domestic sheep and bighorn sheep. The local model was developed by the Uncompahgre Field Office and the national model was developed by the BLM and U.S. Forest Service.

In our cooperating agency role throughout the completion of the UFO RMP/EIS, we reiterated that the local model relies on numerous incorrect assumptions, is not based on the best available science, and has not undergone peer review. CPW recommends that BLM use its national Risk of Contact model for the analysis in the UFO RMP/EIS and work with stakeholders to develop meaningful management prescriptions. An abbreviated summary of our concerns with the local model is detailed below.

- The local model assumes that CPW's mapped bighorn sheep range is equivalent to "suitable habitat." CPW's mapped bighorn sheep range is "occupied habitat." There is a considerable difference between suitable and occupied habitat particularly when attempting to model interaction.
- The local model assumes high, moderate or "some" risk categories based on the percentage of overlap between domestic and bighorn sheep. The existing biological and behavioral bighorn sheep data indicates that the distance between wild and domestic sheep increases the risk of contact. When there is no distance between sheep, i.e., direct overlap there is high risk of contact.
- The local model assumes that temporal separation may affect risk. CPW assumes year round occupancy in some areas mapped as bighorn sheep habitat.
- The local model assumes that bighorn sheep are not attracted to domestic sheep outside of the breeding season. Sheep are gregarious and CPW has documented domestic and bighorn sheep at the same location within hours of each other outside of the breeding season. Desert bighorn sheep have been documented to breed year round.
- The local model assumes that slopes greater than or equal to 60% lower the probability of

---

[2] BLM Information Bulletin No. CO-2015-034

BLM_0149113

        contact. Slope, as used in this assessment, is not a barrier to interaction and meets the
        definition of suitable bighorn habitat.
- The local model assumes flat terrain as a 100% barrier to wild sheep. CPW GPS collar data
  illustrates that flat terrain is not a barrier to wild sheep, especially rams.

The RMP allows the conversion of "Some" and "Moderate" probability allotments from cattle to sheep. We are concerned that conversion of cattle allotments to sheep allotments in areas identified as Some Probability could have the unintended consequence of moving domestic sheep into closer proximity or directly onto existing occupied bighorn sheep habitat. The EIS does not disclose this potential conflict and demonstrates a major shortcoming with the RMP's reliance on the PoI model results. We recommend the BLM clarify in the RMP that conversion of allotments will not result in any degradation or increased risk of disease transmission to BLM sensitive species.

The UFO RMP/EIS incorporates some but not all of the 2012 WAFWA Best Management Practices (BMPs) in its allotment management prescriptions described in Figure K-3 Management of Risk. CPW agrees with the BLM that incorporating BMPs should reduce risk of contact and that they are necessary and reasonable steps that land managers and operators can implement in instances where existing conditions have resulted in domestic sheep and wild sheep being in relatively close proximity. The effectiveness of the many of the BMPs at preventing contact remains untested and uncertain. BMPs in recent domestic-wild sheep contact events were unsuccessful in preventing contact.

The capacity of BMPs to prevent contact in these instances, and the heavy reliance on BMPs within the EIS to manage contact does not 'construe a high degree of confidence that there is low or no risk of contact[3]' with wild sheep as a result of the management actions outlined in the RMP. We recommend that the BLM remove this model from the UFO RMP and to exclude it from future planning efforts to inform or manage for effective separation between domestic and bighorn sheep in Colorado until it has been peer reviewed. We recommend that the BLM's National Risk of Contact model be used in its place.

In addition, to the 2012 WAFWA BMPs, CPW recommends the following BMPs be included in the RMP where there is overlap and/or a risk of contact:

- Prohibit supplemental feeding of domestic sheep on allotments. If the range condition cannot support the energy demands of domestic sheep, allotment management should be adjusted accordingly. Supplemental feeding may attract bighorn sheep into close proximity with domestics.
- Require reporting of any bighorn sheep sighting within 2 miles proximity of domestic sheep within 24 hours to the BLM and CPW.
- Require removal plan for live or dead domestic sheep left on allotment following sweeping. Clarify removal responsibilities, courses of action, and timelines if permittee is not available.
- In existing allotments with overlap or where the RoC is High Probability- maintain domestic sheep band of no greater than 2000 head, based on manageability by herder **only** if grazing period will be shorter than running a smaller band.
- Annual operating plans should include adaptive changes to allotment management that address issues identified the previous year.
- Require trucking of sheep to allotments where trailing routes are within existing overlap or the RoC modeled risk categories of High or Moderate.

---

[3] BLM WO policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016)

BLM_0149114

- Modify allotment boundaries or pasture boundaries to eliminate grazing in direct overlap with occupied habitat.
- Require count-on and count-off reports for all domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
- Require report within 24 hours of known missing sheep and notify CPW and BLM in domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
- Require entire domestic sheep band in treed habitat to be within .5 mile of each other to minimize opportunity for domestic sheep to be spread out and lose track of smaller groups.
- Develop plan to allow for authorized removal of bighorn sheep that interact with domestic sheep by herder or permittee following defined criteria, immediate follow up with CPW and BLM personal following action, and incident evaluation to determine legitimacy of kill.

In the Final RMP, Chapter 4 should include a discussion of the effects of potential disease transmission and potential impacts on bighorn sheep within the planning area.

## Gunnison Sage Grouse

The Gunnison Sage-grouse (GuSG) was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on November 20, 2014 (79 Fed. Reg. 69192).[4] The RMP fails to include the necessary land protection, resource allocation, and stipulations to protect and enhance GuSG within the UFO. The BLM has initiated a planning effort to amend all of the RMPs throughout the GuSG range to address the federally threatened status of the species and outline management actions that will conserve and assist in the recovery of GuSG (GuSG Rangewide RMP Amendments). The Draft UFO RMP does not contain consistent habitat definitions with BLM's administrative Draft GuSG Rangewide RMP Amendments and does not contain consistent proposed management actions to conserve and recover GuSG. Instead, the UFO RMP agency preferred alternative relies on the use of an EEA in GuSG with few land use restrictions associated with that designation (see EEA discussion above). The use of EEAs for GuSG as the sole land designation and source of management emphasis for GuSG in the preferred alternative is not consistent with the approach in BLM's administrative Draft GuSG Rangewide RMP Amendments, and is inadequate for GuSG conservation and recovery efforts. We recommend that the BLM commit to providing a consistent management approach in the UFO RMP and the GuSG Rangewide Plan Amendments, either by amending the final UFO RMP with the provisions of the final GuSG Rangewide Plan or by incorporating the final GuSG Rangewide Plan into the final UFO RMP as discussed in Section 2.2.4. We recommend that the EEAs for GuSG in the UFO RMP be incorporated as ACECs in the preferred alternative. ACECs are supported by established BLM policy and law.

## Land Health Standards

The draft RMP does not have any discussion on how Land Health Standards (LHS) will be achieved through grazing implementation. The Draft EIS indicates that out of the 181 grazing allotments, 30 of those allotments are "not meeting" or "meeting with problems" the LHS with grazing identified as the cause. The RMP should indicate that the best available science will be used to design grazing systems that

---

[4] Table 3-23 should be updated to include GuSG, and the information included for the GuSG on page 3-73 should be corrected by removing the statement, "The species is proposed for listing under the ESA," and replacing with the current listing status. Additionally, the western yellow-billed cuckoo was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on October 03, 2014, effective November 03, 2014 (79 Fed. Reg. 59992). This species should also be included in Table 3-23.

8

allow the LHS to be achieved and describe the monitoring frequency that is necessary to substantiate the grazing forage allocations.

**Stipulations for Fluid Mineral Leasing and other Surface Disturbing Activity**
CPW appreciates BLM including a "No Surface Occupancy" stipulation for fluid mineral leasing within State Parks and State Wildlife Areas in the Draft RMP (Appendix B, Table B-2, p. B-38). This stipulation will help avoid conflicts between mineral development and existing and planned recreational activities on State Parks and State Wildlife Areas while continuing to allow mineral resources to be developed.

In many instances, stipulations intended to address impacts to wildlife vary across alternatives in ways that render the stipulations ineffective for reducing impacts. For example, the shortening of a seasonal timing limitation on development may no longer provide any intended benefit to wildlife if it does not correspond with the life history requirements of the species for the sensitive biological season it was intended to address. CPW recommends varying wildlife-related stipulations across alternatives by geographic application of the stipulation, not by changing the substance of biologically-based stipulations in ways that may render their intended benefit to wildlife meaningless. CPW is not aware of this approach being used as a planning tool by any other BLM Resource Area in Colorado.

In some cases, the stipulations identified for the preferred alternative are not consistent with lease stipulations recommended to BLM by CPW. On December 13, 2010, CPW provided BLM's State Office recommendations for fluid mineral lease stipulations relevant to Resource Management Plan (RMP) revisions and quarterly lease sales in Colorado (statewide stipulation letter). CPW has provided this document to UFO staff and EMPSI in 2011. CPW's statewide stipulation recommendations reflect our understanding of the best available science regarding protective lease stipulations necessary to maintain existing wildlife populations. Moreover, many of these stipulations can also be applied to minimize impacts from other land use authorizations (travel management, coal, uranium, recreation, etc).

CPW has provided extensive background information to UFO regarding the need to implement these stipulations to minimize the impacts to wildlife resources from specific developments (please refer to 3 February 2012 CPW August 2012 Lease Sale Comments and CPW 24 April 2012 Bull Mountain Master Development Plan Preliminary Environmental Assessment (DOI-BLM-CO-S050-2009-0005). CPW recommends that Appendix B be modified where necessary to include these statewide stipulation recommendations for the preferred alternative. If the BLM elects to not incorporate our recommendations in the preferred alternative, we recommend the analysis provide data, with clear rationale supporting that decision and alternative recommendations to avoid, minimize, and mitigate impacts.

Finally, the stipulations and restrictions on surface disturbance in the RMP intended to protect GuSG are inconsistent with the stipulations and restrictions described in BLM's recently released Draft GuSG Rangewide RMP Amendments. These documents need to be consistent. Please update the RMP as needed to reference and incorporate the stipulations and surface use constraints contained in BLM's Draft GuSG Rangewide RMP Amendments.

**Conclusion**
The BLM did not use CPW as a cooperating agency resource with special expertise in wildlife management to help guide development of the RMP. The RMP is lacking resource allocation direction for wildlife and contains resource management decisions that conflict with and/or fail to incorporate other BLM and CPW planning documents. We see a need for significant revisions before publishing the Final

9

RMP/EIS and CPW staff are available to assist in these efforts. We are hopeful that future cooperating agency processes result in shared efforts with meaningful outcomes.

Sincerely,

Renzo DelPiccolo, Area Wildlife Manager- Montrose

xc: Broscheid, Dorsey, A. McLaughlin, Magee, Wenum, Wait, Alves, Holst, SWRO File, Area 18 File, DNR File

10

BLM_0149117

BLM_0149118

Figure 1:  CPW recommened big game winter range emphasis areas and BLM proposed ecological emphasis areas.



### Legend

| | | | |
|---|---|---|---|
| Winter range emphasis areas | | Draft Proposed Ecological Emphasis Areas | |
| Elk Winter Range | | Uncomaphgre Field Office - BLM | |
| Mule Deer Winter Range | | | |

Map developed by:
Brad Banulis
Wildlife Biologist
10.18.2016

Miles
0   4   8        16        24        32

DEPARTMENT OF THE INTERIOR Mail - UFORMP Comment letter



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## UFORMP Comment letter
1 message

---

**Ed Marston** <edhmarston@paonia.com>                              Tue, Nov 1, 2016 at 9:08 AM
Reply-To: edhmarston@paonia.com
To: uformp@blm.gov

Hello, BLM Office,
   My comments on the UFORMP are below in the body of this email and as
an attachment.

Sincerely,
Ed Marston
Paonia, Colorado
970.527.3166
970.261.2737

Ed Marston
POB 279
Paonia, CO 81428

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office
By Email to: uformp@blm.gov

TO: BLM-UFO Staff and RMP Comment Team,

Other respondents will have adequately responded to the deficiencies in the Bureau of
Land Management's Resource Management Plan and the threat that the preferred alternative
poses to the emerging economy of eastern Delta County, aka the North Fork Valley.

I write as the owner and manager of 17,000 square feet of offices, shops, a restaurant and
bar. In past years, I remodeled another almost 5,000 square feet of commercial space on Paonia's
Grand Avenue. So I write as someone whose living and whose estate is in mortal danger from the
preferred alternative D. I write as someone whose enjoyment of life in the North Fork Valley will be
ruined by Alternative D.

I have lived in Paonia for 41 years. My spouse and I founded and ran the weekly
newspaper *North Fork Times* from 1975 to 1980. It is now part of the *Delta County Independent*.

We moved the regional environmental newspaper *High Country News* to Paonia in 1983 and ran it for 19 years. I was a director of Delta Montrose Electric Association, serving for six elected terms/18 years, between 1983 and 2013. At present, I serve as Board President of Solar Energy International, which trains people to install and design solar panels and small hydroelectric operations. It has an 8-acre campus west of Paonia and over 40,000 alumni around the world. I have written or edited several books about the interior West.

To summarize my remarks, if the BLM with its preferred alternative D had deliberately set out to destroy an economy and a way of life, it could not have done better. The fact that the destruction of our livings and lives is an accidental by-product of the working of the BLM Montrose office makes it all the worse.

How did this preferred alternative come about? How did our fellow citizens who work for the federal government create a document that will destroy or cause to be still born our growing economy? Why is our government doing this to us?

There is no reason rooted in public policy or in the Constitutional mandate to "form a more perfect union." The BLM's Organic Act, aka FLPMA, has at its heart Multiple Use, defined in the Act as "management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people."

We know that the roading and drilling of public land eliminates all other uses. There is no "combination" when 95 percent of the land is leased. There is only roading and drilling and fracking. There is only the destruction of country roads by massive trucks. Once the land is roaded and drilled and fracked it is no longer available for hunting or hiking or bird watching or other forms of recreation. Gradually, grazing becomes more and more problematic as the land is industrialized and as trucks race through the forest. Wildlife is squeezed. Putting 95 percent of the land up for leasing turns it into a single use.

This is a clear violation of the multiple use mandate. It is also a violation of the main purpose of FLPMA: to keep the land in public hands. FLPMA ended the privatization of the land via homesteading. And yet the roading, drilling and fracking that will be done under Alt D essentially privatizes what was meant by the Congress to be forever public. This preferred alternative betrays the agency's organic act. It betrays its core principles.

Perhaps worse than this betrayal is the fact that there is no need at this time for the resource in question. Natural gas is a drug on the market, with the current price roughly $2 per thousand cubic feet under the price needed with present technology to bring it to market profitably.

Beyond dollars, we know that natural gas is not the so-called bridge fuel that the Sierra Club, President Obama and the gas industry promoted it as. We now know that because of inevitable pipeline and storage leakages, and the fact that in its first few years in the atmosphere $CH_4$ is 90 times more potent a greenhouse gas than $CO_2$, that coal should be our bridge fuel.

BLM_0149120

My scientific authority for this can be found in Bill McKibben's article in The Nation: https://www.thenation.com/article/global-warming-terrifying-new-chemistry/

The damage to the atmosphere will be intensified in part because rural gathering pipelines are unregulated. This area is the worst possible place to drill and lay pipelines. Given the marginal nature of the economics of developing gas in this region, we can be sure that the developers will have to cut every corner to save money. The unregulated pipelines will inevitably leak.

So why are the employees of the federal government issuing a document in which the preferred alternative will damage those of us who live in the North Fork Valley, damage the climate and damage the nation, and violate the agency's founding document?

From the outside, it appears that the BLM staff are trudging along a well-worn path of agency obedience to the fossil fuel industry. This nation's prosperity was based on fossil fuel development. There was good reason for the federal agencies to favor them, to subsidize them, to do everything possible to strengthen fossil fuels.

That day is now past. We now know that fossil fuels are a threat to the nation. And in this particular case, natural gas development is a threat to a fertile and beautiful valley. Unlike many rural areas, the North Fork Valley is thriving. Its only threat is the federal government's apparent intention to lease a huge expanse of land within the valley itself and north of it.

It has never been more important that our federal agencies make decisions based on current information and current conditions. It has never been more important than now our federal agencies behave with integrity.

The consequences of not behaving with integrity and bravery are in today's headlines. Because the BLM/Department of Interior dodged its responsibilities in Nevada and let the Bundys steal federal grass and trespass for decades we ended up with the Malheur takeover – you can never appease bullies - and now their inexplicable vindication by a federal jury. That decision can only mean more lawlessness on the federal estate. The failure of the BLM/DOI to do the right thing in Nevada initially – to take the easy path – has led to a threat to our land and to our federal land managers.

What does that have to do with this preferred alternative? Am I holding the Montrose office of the BLM responsible for the Bundy thefts and rampages? Not exactly. But the Bundys' prominence is due in part to the fact that the BLM, on its own hook or because of orders from higher up, failed to do its job with regard to the Bundy family's grazing privileges. The failure to enforce its regulations has discredited the agency and endangered its employees.

The people who work for the BLM Montrose office have also failed to do their job in writing this RMP and in the choice of the preferred alternative. Alternative D could only be chosen by deliberately looking away from the agency's fundamental mandates: To keep the federal estate in public hands and in multiple use. Leasing 95 percent of the land privatizes it in all but title because

DEPARTMENT OF THE INTERIOR Mail - UFORMP Comment letter

all other uses become impossible. The Montrose staff in charge of our federal estate are on the brink of putting this land off limits to almost all of us and to all but one use.

My conclusion is that the Uncompahgre Field Office should withdraw its preferred alternative D and study and substitute a no leasing or a very light leasing alternative. The only honorable path is for the UFO to go back to the drawing board.  The only path that can preserve public ownership and multiple use is to re-examine the foundations of the process that led to this preferred alternative. It may also be the only path to preserve the Bureau of Land Management itself.  As we saw with the Bundy situation, bad decisions made out of political convenience will inevitably damage and perhaps even destroy the agency itself.

Sincerely,

Ed Marston
POB 279
Paonia, Colorado 81428
970.527.3166
edhmarston@paonia.com



**RMP testimony, 10.30.16.doc**
33K

BLM_0149122

Ed Marston
POB 279
Paonia, CO 81428

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office
By Email to: uformp@blm.gov

TO: BLM-UFO Staff and RMP Comment Team,

Other respondents will have adequately responded to the deficiencies in the Bureau of Land Management's Resource Management Plan and the threat that the preferred alternative poses to the emerging economy of eastern Delta County, aka the North Fork Valley.

I write as the owner and manager of 17,000 square feet of offices, shops, a restaurant and bar. In past years, I remodeled another almost 5,000 square feet of commercial space on Paonia's Grand Avenue. So I write as someone whose living and whose estate is in mortal danger from the preferred alternative D. I write as someone whose enjoyment of life in the North Fork Valley will be ruined by Alternative D.

I have lived in Paonia for 41 years. My spouse and I founded and ran the weekly newspaper *North Fork Times* from 1975 to 1980. It is now part of the D*elta County Independent*. We moved the regional environmental newspaper *High Country News* to Paonia in 1983 and ran it for 19 years. I was a director of Delta Montrose Electric Association, serving for six elected terms/18 years, between 1983 and 2013. At present, I serve as Board President of Solar Energy International, which trains people to install and design solar panels and small hydroelectric operations. It has an 8-acre campus west of Paonia and over 40,000 alumni around the world. I have written or edited several books about the interior West.

To summarize my remarks, if the BLM with its preferred alternative D had deliberately set out to destroy an economy and a way of life, it could not have done better. The fact that the destruction of our livings and lives is an accidental by-product of the working of the BLM Montrose office makes it all the worse.

How did this preferred alternative come about? How did our fellow citizens who work for the federal government create a document that will destroy or cause to be still born our growing economy? Why is our government doing this to us?

There is no reason rooted in public policy or in the Constitutional mandate to "form a more perfect union." The BLM's Organic Act, aka FLPMA, has at its heart Multiple Use, defined in the Act as "management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people."

We know that the roading and drilling of public land eliminates all other uses. There is no "combination" when 95 percent of the land is leased. There is only roading and drilling and fracking. There is only the destruction of country roads by massive trucks. Once the land is roaded and drilled and fracked it is no longer available for hunting or hiking or bird watching or other forms of recreation. Gradually, grazing becomes more and more problematic as the land is industrialized and as trucks race through the forest. Wildlife is squeezed. Putting 95 percent of the land up for leasing turns it into a single use.

This is a clear violation of the multiple use mandate. It is also a violation of the main purpose of FLPMA: to keep the land in public hands. FLPMA ended the privatization of the land via homesteading. And yet the roading, drilling and fracking that will be done under Alt D essentially privatizes what was meant by the Congress to be forever public. This preferred alternative betrays the agency's organic act. It betrays its core principles.

Perhaps worse than this betrayal is the fact that there is no need at this time for the resource in question. Natural gas is a drug on the market, with the current price roughly $2 per thousand cubic feet under the price needed with present technology to bring it to market profitably.

Beyond dollars, we know that natural gas is not the so-called bridge fuel that the Sierra Club, President Obama and the gas industry promoted it as. We now know that because of inevitable pipeline and storage leakages, and the fact that in its first few years in the atmosphere $CH_4$ is 90 times more potent a greenhouse gas than $CO_2$, that coal should be our bridge fuel.

My scientific authority for this can be found in Bill McKibben's article in The Nation: https://www.thenation.com/article/global-warming-terrifying-new-chemistry/

The damage to the atmosphere will be intensified in part because rural gathering pipelines are unregulated. This area is the worst possible place to drill and lay pipelines. Given the marginal nature of the economics of developing gas in this region, we can be sure that the developers will have to cut every corner to save money. The unregulated pipelines will inevitably leak.

So why are the employees of the federal government issuing a document in which the preferred alternative will damage those of us who live in the North Fork Valley, damage the climate and damage the nation, and violate the agency's founding document?

From the outside, it appears that the BLM staff are trudging along a well-worn path of agency obedience to the fossil fuel industry. This nation's prosperity was based on fossil fuel development. There was good reason for the federal agencies to favor them, to subsidize them, to do everything possible to strengthen fossil fuels.

That day is now past. We now know that fossil fuels are a threat to the nation. And in this particular case, natural gas development is a threat to a fertile and beautiful valley. Unlike

many rural areas, the North Fork Valley is thriving. Its only threat is the federal government's apparent intention to lease a huge expanse of land within the valley itself and north of it.

It has never been more important that our federal agencies make decisions based on current information and current conditions. It has never been more important than now our federal agencies behave with integrity.

The consequences of not behaving with integrity and bravery are in today's headlines. Because the BLM/Department of Interior dodged its responsibilities in Nevada and let the Bundys steal federal grass and trespass for decades we ended up with the Malheur takeover – you can never appease bullies - and now their inexplicable vindication by a federal jury. That decision can only mean more lawlessness on the federal estate. The failure of the BLM/DOI to do the right thing in Nevada initially – to take the easy path – has led to a threat to our land and to our federal land managers.

What does that have to do with this preferred alternative? Am I holding the Montrose office of the BLM responsible for the Bundy thefts and rampages? Not exactly. But the Bundys' prominence is due in part to the fact that the BLM, on its own hook or because of orders from higher up, failed to do its job with regard to the Bundy family's grazing privileges. The failure to enforce its regulations has discredited the agency and endangered its employees.

The people who work for the BLM Montrose office have also failed to do their job in writing this RMP and in the choice of the preferred alternative. Alternative D could only be chosen by deliberately looking away from the agency's fundamental mandates: To keep the federal estate in public hands and in multiple use. Leasing 95 percent of the land privatizes it in all but title because all other uses become impossible. The Montrose staff in charge of our federal estate are on the brink of putting this land off limits to almost all of us and to all but one use.

My conclusion is that the Uncompahgre Field Office should withdraw its preferred alternative D and study and substitute a no leasing or a very light leasing alternative. The only honorable path is for the UFO to go back to the drawing board.  The only path that can preserve public ownership and multiple use is to re-examine the foundations of the process that led to this preferred alternative. It may also be the only path to preserve the Bureau of Land Management itself.  As we saw with the Bundy situation, bad decisions made out of political convenience will inevitably damage and perhaps even destroy the agency itself.

Sincerely,

Ed Marston
POB 279
Paonia, Colorado 81428
970.527.3166
edhmarston@paonia.com

11/2/2016                            DEPARTMENT OF THE INTERIOR Mail - Uncompahgre RMP comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Uncompahgre RMP comments
1 message

---

**Dan and Sandi Antonelli** <dansandi@acsol.net>                   Tue, Nov 1, 2016 at 7:56 PM
To: uformp@blm.gov
Cc: Dan Antonelli <dantonelli00@gmail.com>

To:     Bureau of Land Management, Uncompahgre Field Office      uformp@blm.gov

From:  Daniel Antonelli, member Colorado Plateau Mountain Bike Trail Association

Re:    Comments regarding Draft Resource Management Plan & Environmental Impact Statement, May,
2016

Date:  October 31, 2016

I would like to comment on the management of BLM lands located in the West End of San Miguel county. I
have family in the area and have been working, exploring and recreating in that area for nearly 35 years.

I have been riding mountain bikes in the back country since 1988. I believe mountain bike use has very low
impacts on the environment, wildlife and BLM resources. It is highly beneficial to the physical and mental
health of a community. The positive economic impacts of popular trails could be extremely beneficial to
struggling communities such as Nucla and Naturita. As an active member of COPMOBA for 15 years I can
assure you that we have been and will continue to be trail stewards in that area.

Singletrack trail is what most mountain bike users seek out and have the best experience riding. There are
some trails in this area that qualify for some of the best experiences I have had. I would highly recommend
that the single track trails in this area be inventoried and protected. I would be willing to work with your
office in identifying areas and trails that would be of benefit to all concerned.

There are several that come to mind and are listed below:
1) Single track trail leading down the Atkinson Creek drainage from the Paradox trail intersection
downstream to an intersection with a 4x4 road near Hog Point. A good return route uses a trail on the east
ridge above the same Atkinson Creek drainage.

2) The Beehive Canyon trail from the water tank near Biscuit rock to the intersection with a 4x4 road on
Carpenter Flats is a very cool ride. There are several mine buildings along the way to explore.

3) And a big favorite, Y11 trail leaving from the lower portion of the Uravan site leading down the south
side of the San Miguel River and then still high on the cliff following the Dolores River upstream to a fork.
One fork leads down to the river road and the other is a trail leading higher up and to the south east to
connect with 4x4 roads in the Saucer Basin. A return on theses roads then a short switchback trail returns to
the start of the Y11 trail.

4) A trail on the west side of the Dolores River starting just downstream from the bridge at Biscuit rock and
then eventually climbing up on top of the mesa at the northernmost point of Carpenter Flats to an
intersection with a 4x4 drive road is a challenge but rewarding adventure.

5) Another favorite is an old road almost single track trail starting above and east of the Tabaguache Creek
and San Miguel River confluence. It travels upstream on the north side of the San Miguel River for 6-8

BLM_0149126

miles and the forks.  One fork leads up Coal Creek with and exit up Box Canyon.  The other fork in the trail crosses Coal Creek and stays next to the San Miguel River and heads upstream to a shallow ford and one can access Highway 141 or other trails for a return trip.  This trail is always good as an out and back also.

6)  A trail leading up the South Fork of Mesa Creek and connecting with trails on Forest Service lands

7) Farther west and up onto Carpenter Ridge there are two different trails that are located on a bench just below the rim that overlook the Paradox valley in spectacular fashion.  One takes off of 6 Road coming out of Paradox Valley and heads to the southeast.  The other is a few miles west and is near the Forest Boundary.  The views off of the bench these trails are on is also spectacular.

8) There a several trails starting on south side of Highway 141 near the the San Miguel River and Coal Creek confluence.  These trails make very interesting loops up to the rim of Sawtooth Ridge and back.  There is some mining history, slick rock formations, small canyons and interesting vegetation in this area.

9) One of the trails on Sawtooth Ridge follows the very edge of the rim for several miles making for spectacular views of the Paradox Valley and the La Sal mountains.

10)  There are several other old or abandoned 4x4 roads that make for wonderful experiences on a bike in the Atkinson Breaks and Martin Mesa Areas.  Many of these trails have a bunch of mining ruins, great views and challenging terrain.  I can elaborate on these if you would like.

There are several trails in the Burro Creek area that are near or in the area proposed as Lands with Wilderness Characteristics.  I would like to protect the area but recommend another form of protection that does not exclude mountain bike access.  I would be willing to look at adjusting the boundary of the LWC with BLM personnel if that is the only option.

I would like to see these trails be accessible to mountain bike users for years to come.  I would be willing to help GPS the routes or meet with BLM personnel to perform tasks to make this happen.

Thanks for accepting my comments,
Daniel Antonelli        2295 N. Arriba Circle          Grand Junction, CO 81507
970-270-8575            dansandi@acsol.net

 **Uncompahgre Field office comments Oct 31.doc**
33K

BLM_0149127

To:     Bureau of Land Management, Uncompahgre Field Office    uformp@blm.gov

From:  Daniel Antonelli, member Colorado Plateau Mountain Bike Trail Association

Re:     Comments regarding Draft Resource Management Plan & Environmental Impact
Statement, May, 2016

Date:   October 31, 2016

I would like to comment on the management of BLM lands located in the West End of
San Miguel county.  I have family in the area and have been working, exploring and
recreating in that area for nearly 35 years.

I have been riding mountain bikes in the back country since 1988.  I believe mountain
bike use has very low impacts on the environment, wildlife and BLM resources.  It is
highly beneficial to the physical and mental health of a community.  The positive
economic impacts of popular trails could be extremely beneficial to struggling
communities such as Nucla and Naturita.  As an active member of COPMOBA for 15
years I can assure you  that we have been and will continue to be trail stewards in that
area.

Singletrack trail is what most mountain bike users seek out and have the best experience
riding.  There are some trails in this area that qualify for some of the best experiences I
have had.  I would highly recommend that the single track trails in this area be
inventoried and protected.  I would be willing to work with your office in identifying
areas and trails that would be of benefit to all concerned.

There are several that come to mind and are listed below:
1) Single track trail leading down the Atkinson Creek drainage from the Paradox trail
intersection downstream to an intersection with a 4x4 road near Hog Point.  A good
return route uses a trail on the east ridge above the same Atkinson Creek drainage.

2) The Beehive Canyon trail from the water tank near Biscuit rock to the intersection
with a 4x4 road on Carpenter Flats is a very cool ride.  There are several mine buildings
along the way to explore.

3) And a big favorite, Y11 trail leaving from the lower portion of the Uravan site leading
down the south side of the San Miguel River and then still high on the cliff following the
Dolores River upstream to a fork.  One fork leads down to the river road and the other is
a trail leading higher up and to the south east to connect with 4x4 roads in the Saucer
Basin.  A return on theses roads then a short switchback trail returns to the start of the
Y11 trail.

4) A trail on the west side of the Dolores River starting just downstream from the bridge
at Biscuit rock and then eventually climbing up on top of the mesa at the northernmost

point of Carpenter Flats to an intersection with a 4x4 drive road is a challenge but rewarding adventure.

5) Another favorite is an old road almost single track trail starting above and east of the Tabaguache Creek and San Miguel River confluence.  It travels upstream on the north side of the San Miguel River for 6-8 miles and the forks.  One fork leads up Coal Creek with and exit up Box Canyon.  The other fork in the trail crosses Coal Creek and stays next to the San Miguel River and heads upstream to a shallow ford and one can access Highway 141 or other trails for a return trip.  This trail is always good as an out and back also.

6)  A trail leading up the South Fork of Mesa Creek and connecting with trails on Forest Service lands

7) Farther west and up onto Carpenter Ridge there are two different trails that are located on a bench just below the rim that overlook the Paradox valley in spectacular fashion. One takes off of 6 Road coming out of Paradox Valley and heads to the southeast.  The other is a few miles west and is near the Forest Boundary.  The views off of the bench these trails are on is also spectacular.

8) There a several trails starting on south side of Highway 141 near the the San Miguel River and Coal Creek confluence.  These trails make very interesting loops up to the rim of Sawtooth Ridge and back.  There is some mining history, slick rock formations, small canyons and interesting vegetation in this area.

9) One of the trails on Sawtooth Ridge follows the very edge of the rim for several miles making for spectacular views of the Paradox Valley and the La Sal mountains.

10)  There are several other old or abandoned 4x4 roads that make for wonderful experiences on a bike in the Atkinson Breaks and Martin Mesa Areas.  Many of these trails have a bunch of mining ruins, great views and challenging terrain.  I can elaborate on these if you would like.

There are several trails in the Burro Creek area that are near or in the area proposed as Lands with Wilderness Characteristics.  I would like to protect the area but recommend another form of protection that does not exclude mountain bike access.  I would be willing to look at adjusting the boundary of the LWC with BLM personnel if that is the only option.

I would like to see these trails be accessible to mountain bike users for years to come.  I would be willing to help GPS the routes or meet with BLM personnel to perform tasks to make this happen.

Thanks for accepting my comments,
Daniel Antonelli      2295 N. Arriba Circle        Grand Junction, CO 81507
970-270-8575         dansandi@acsol.net

11/2/2016                                    DEPARTMENT OF THE INTERIOR Mail - Uncompahgre RMP comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Uncompahgre RMP comments
1 message

**lmb@tds.net** <lmb@tds.net>                                                Tue, Nov 1, 2016 at 11:51 AM
To: uformp@blm.gov

Comments below are also attached as a PDF

Bureau of Land Management
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

uformp@blm.gov

October 29, 2016

RE: Comments on the Draft Resource Management Plan and Environmental Impact Statement
for the Uncompahgre Field Office, Colorado

Thank you to all who participated in assembling the vast amount of data and analysis for this large and very important
part of Western Colorado. Altho I consider this region important to the country, the state and to my own personal
experience of Western Colorado, I am limiting my comments to those which pertain or emanate from my home location
in the North Fork Vailey where I have lived since 1973.

DELINEATION OF ALTERNATIVES

In reading the brief synopses of the alternatives, it became clear that the drafting authorities consider Alternative B to be
what one might call a "conservation" alternative. The draft describes this alternative to emphasize: "... improving,
rehabilitating, and restoring resources and sustaining the ecological integrity of habitats for for ali priority plant, wildlife,
and fish species, while allowing appropriate development scenarios for allowable uses.... Goals and objectives focus on
environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and
cultural resource values for current and future generations..... Appropriate and allowable uses and restrictions would be
contingent on minimizing impacts on natural and cultural resources.

In contrast, the PREFERRED Alternative D emphasizes balancing resources and resource use among competing human
interest, land uses, and the conservation of natural and cultural resources values, while sustaining and enhancing
ecological integrity across the landscape, including plant, wildlife and fish habitat. This alternative incorporates a
balanced level of protection, restoration, enhancement and use of resources....

The point I want to make is that I believe Alternative B-1, "the North Fork Alternative", in the form of its "ACTIONS" and
"ALLOWABLE USES", are more appropriately integrated into the PREFERRED ALTERNATIVE than into ALTERNATIVE
B. The extensive public involvement effort and the resulting detailed recommended actions and allowable uses embody
the incorporation of local knowledge and fine-tuning that results in "balancing resources and resource use among
competing human interest, land uses, and the conservation of natural and cultural resources values" which is the
objective stated above for the PREFERRED ALTERNATIVE.

No doubt your office has received a high volume of comments recommending no oil and gas leasing at all for the North
Fork Valley. Stipulations in support of that objective would be appropriately housed within Alternative B. I strongly
submit that the stipulations itemized below which represent the lengthy research and discussion at the local level within
Delta County and the North Fork Valley are more appropriately housed within the PREFERRED ALTERNATIVE: D as
representing not the most stringent "conservation alternative" but rather a "balanced" alternative.

ACTIONS AND ALLOWABLE USES of the NORTH FORK ALTERNATIVE which should be included in the PREFERRED
ALTERNATIVE D

All references and numbers below pertain to TABLE 2.2: Descriptions of Alternatives A, B/B-1, C and D:

    Line 28: Soils and Water Uses

BLM_0149130

North Fork items on Lines 34,35,40,44,47,50,55,56
Line 73: Vegetation. Riparian
    North Fork items on Line 81
Line 111: Terrestrial Wildlife
    North Fork items on Line 114
Line 145: Special Status Fish and Aquatic Life
    North Fork items on Lines 148, 149
Line 161: Special Status Terrestrial Wildlife - Gunnison Sage-Grouse
    North Fork items on Line 166
Line 168: Raptors
    North Fork items on Line 171
Line 248: Visual Resources
    North Fork items on Lines 253,257
Line 319: Coal
    North Fork items on Line 327
Line 330: Fluid Minerals
    North Fork items on Lines 333 through 338
Line 524: Areas of Critical Environmental Concern
    North Fork items on Line 532


In addition, I think there are at least two impact areas that have not been adequately covered by the current analysis.

On Line 17 of Table 2.2 (Description of Alternatives), the RMP states a goal of managing resources "in response to stresses induced by climate change". I do not find an analysis of climate change IMPACTS CAUSED BY VARIOUS ALTERNATIVES. Specifically, I do not find that the net energy and net CO2 effects of a massive oil and gas leasing in this area of Western Colorado have been adequately analyzed.(nor have they been adequately analyzed nationally). However, as responsible land managers, I believe we have control in our local area to consider this important impact before leasing is permitted. I am cognizant that stipulations can to a certain extent limit environmental impacts of energy development, but also that the act of leasing conveys a property right...and rightly so since companies invest a good deal of resources in just the initial act of acquiring these leases. I think it is incumbent upon the BLM, for both public and private interests, to have adequately considered ALL IMPACTS of development, and the societal costs thereof, before putting forward a mineral leasing green light in their RMP.

On Line 191-206 Wildland Fire Ecology and Management, it was interesting to see the detailed commitment the BLM has/will have for managing the fuels on public land to minimize wildfire issues. I am particularly sensitive to this issue because my property was affected by the 1994 Wake Fire of 3,500+ acres. That was a lightening-caused fire; and I applaud the BLM and other local agencies for their public education and incentive programs to protect private property since that fire. However, I do not find an analysis of the potential fire-creating impacts of various activities on the public lands, specifically the concentrated oil and gas development of BLM and other private surface lands in fire-prone Pinon-Juniper and Sagebrush habitats. I believe these risks and their accompanying costs should be considered in your analysi


Linda Bacigalupi
36291 Sunshine Mesa Road
Hotchkiss, CO  81419

--
Linda Bacigalupi
970-270-9932
lmb@tds.net

---

 **BacigalupiUncRMP.pdf**
48K

BLM_0149131

Bureau of Land Management
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

uformp@blm.gov

October 29, 2016

RE: Comments on the Draft Resource Management Plan and Environmental Impact Statement
for the Uncompahgre Field Office, Colorado

Thank you to all who participated in assembling the vast amount of data and analysis for this
large and very important part of Western Colorado.  Altho I consider this region important to the
country, the state and to my own personal experience of Western Colorado, I am limiting my
comments to those which pertain or emanate from my home location in the North Fork Valley
where I have lived since 1973.

DELINEATION OF ALTERNATIVES

In reading the brief synopses of the alternatives, it became clear that the drafting authorities
consider **Alternative B** to be what one might call a "conservation" alternative.  The draft
describes this alternative to emphasize: "... improving, rehabilitating, and restoring resources
and sustaining the ecological integrity of habitats for for all priority plant, wildlife, and fish
species, while allowing appropriate development scenarios for allowable uses.... Goals and
objectives focus on environmental and social outcomes achieved by sustaining relatively
unmodified physical landscapes and natural and cultural resource values for current and future
generations..... Appropriate and allowable uses and restrictions would be **contingent on
minimizing impacts on natural and cultural resources.**

In contrast, the **PREFERRED Alternative D** emphasizes **balancing resources and resource
use among competing human interest, land uses, and the conservation of natural and
cultural resources values,** while sustaining and enhancing ecological integrity across the
landscape, including plant, wildlife and fish habitat. This alternative incorporates a balanced
level of protection, restoration, enhancement and use of resources....

The point I want to make is that I believe Alternative B-1, "the North Fork Alternative", in the form
of its "ACTIONS" and "ALLOWABLE USES", are more appropriately integrated into the
PREFERRED ALTERNATIVE than into ALTERNATIVE B.  The extensive public involvement
effort and the resulting detailed recommended actions and allowable uses embody the
incorporation of local knowledge and fine-tuning that results in "balancing resources and
resource use among competing human interest, land uses, and the conservation of natural and
cultural resources values"  which is the objective stated above for the PREFERRED
ALTERNATIVE.

No doubt your office has received a high volume of comments recommending **no** oil and gas
leasing at all for the North Fork Valley.  Stipulations in support of that objective would be
appropriately housed within Alternative B.  I strongly submit that the stipulations itemized below
which represent the lengthy research and discussion at the local level within Delta County and
the North Fork Valley are more appropriately housed within the PREFERRED ALTERNATIVE: D
as representing not the most stringent "conservation alternative" but rather a "balanced"
alternative.

BLM_0149132

ACTIONS AND ALLOWABLE USES of the NORTH FORK ALTERNATIVE which should be included in the PREFERRED ALTERNATIVE D

All references and numbers below pertain to TABLE 2.2: Descriptions of Alternatives A, B/B-1, C and D:

  Line 28: Soils and Water Uses
    North Fork items on Lines 34,35,40,44,47,50,55,56
  Line 73: Vegetation. Riparian
    North Fork items on Line 81
  Line 111: Terrestrial Wildlife
    North Fork items on Line 114
  Line 145: Special Status Fish and Aquatic Life
    North Fork items on Lines 148, 149
  Line 161: Special Status Terrestrial Wildlife - Gunnison Sage-Grouse
    North Fork items on Line 166
  Line 168: Raptors
    North Fork items on Line 171
  Line 248: Visual Resources
    North Fork items on Lines 253,257
  Line 319: Coal
    North Fork items on Line 327
  Line 330: Fluid Minerals
    North Fork items on Lines 333 through 338
  Line 524: Areas of Critical Environmental Concern
    North Fork items on Line 532

In addition, I think there are at least two impact areas that have not been adequately covered by the current analysis.

On Line 17 of Table 2.2 (Description of Alternatives), the RMP states a goal of managing resources "in response to stresses induced by climate change". I do not find an analysis of climate change IMPACTS CAUSED BY VARIOUS ALTERNATIVES. Specifically, I do not find that the net energy and net CO2 effects of a massive oil and gas leasing in this area of Western Colorado have been adequately analyzed.(nor have they been adequately analyzed nationally). However, as responsible land managers, I believe we have control in our local area to consider this important impact before leasing is permitted. I am cognizant that stipulations can to a certain extent limit environmental impacts of energy development, but also that the act of leasing conveys a property right...and rightly so since companies invest a good deal of resources in just the initial act of acquiring these leases. I think it is incumbent upon the BLM, for both public and private interests, to have adequately considered ALL IMPACTS of development, and the societal costs thereof, before putting forward a mineral leasing green light in their RMP.

On Line  191-206 Wildland Fire Ecology and Management, it was interesting to see the detailed commitment the BLM has/will have for managing the fuels on public land to minimize wildfire issues. I am particularly sensitive to this issue because my property was affected by the 1994 Wake Fire of 3,500+ acres. That was a lightening-caused fire; and I applaud the BLM and other local agencies for their public education and incentive programs to protect private property since that fire. However, I do not find an analysis of the potential fire-creating impacts of various activities on the public lands, specifically the concentrated oil and gas development of BLM and other private surface lands in fire-prone Pinon-Juniper and Sagebrush habitats. I believe these risks and their accompanying costs should be considered in your analysi

BLM_0149133

Linda Bacigalupi
36291 Sunshine Mesa Road
Hotchkiss, CO  81419

BLM_0149134

11/2/2016                                    DEPARTMENT OF THE INTERIOR Mail - RMP comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## RMP comments
1 message

**Bockus, Danguole** <danguole_bockus@nps.gov>                    Tue, Nov 1, 2016 at 10:54 AM
To: uformp@blm.gov

Hello,

Attached are comments from 2 NPS staff.  Please feel free to contact either of us if more information is needed.

Thank you


><)))'>  ><)))'>  ><)))'>  ><)))'>  ><)))'>  ><)))'>  ><)))'>
Danguole B. Bockus
Ecologist
Black Canyon of the Gunnison NP/Curecanti NRA
970-249-1914 x432
><)))'>  ><)))'>  ><)))'>  ><)))'>  ><)))'>  ><)))'>  ><)))'>

"Most of the shadows of this life are caused by our standing in our own sunshine."  Ralph Waldo Emerson

---

📄 **Uncompahgre Draft Resource Management Plan - NPS staff comments.docx**
21K

BLM_0149135

**Uncompahgre Draft Resource Management Plan (RMP) – NPS Comments**        8/22/2016

| Reviewer | Page/paragraph | Comment | |
|---|---|---|---|
| ZAENGER | 1-10 | Issue 3 in Planning Issue Statements: how does interpretation fit in with human activities, specifically, recreation.  Or should it?  It remains unmentioned in the table. | |
| ZAENGER | 1-10 | Issue 5 in Planning Issue Statements:  How does interpretation fit with the management and protection of cultural, historic and paleontological resources?  Careful attention to all resources needs to be given before interpretation is developed.  Not all resources need on site interpretation, including easy-to-access resources.  This is unmentioned here. | |
| ZAENGER | Table 2 Alternatives, 2-259, 2-263, 2-271, 2-281 | Although the analysis shows some recreation areas would be developed, and some would not, it's important to note that not every location needs recreational facilities developed.  Sustainability in relationship to cost, upkeep, and the staff to manage far-flung recreational facilities should be recognized.  Too often, facilities are put in place, often through partner or community financing, but no plan exists to maintain them after they are vandalized, wear out or just fall apart.  And sometimes there isn't necessarily a need.  A few locations show 2 or more trails are built in the very close proximity which have greater impacts on the landscape than necessary. | |
| ZAENGER | 3-202/203 | 3.5.2 – Interpretation and Environmental Education.  We strongly suggest that the RMP calls for a separately developed strategy for interpretation which would help guide the development of interpretive services.  Current use of partners to disseminate travel information & brochures is sound and reduces impact on the land.  Yet, not every place or location needs to be interpreted, and many partners see "Interpretation" only as tourism development.  It might be helpful to realize how the interpretive function can address management "issues in a way that relates those issues to the visitors' experiences" as already mentioned in the plan.  A range of interpretation could be considered which would provide services at important or unique locations, but others would be open for self-discovery by those who arrive at those resources, and should be addressed in such a strategy. | |

| | | | |
|---|---|---|---|
| | | The idea of working through various digital media, where available and appropriate is also sound.  This helps to reduce on-site impacts, and may target specific messages and stories relevant to particular resources. | |
| ZAENGER | 3-203 | Trends section.   The western Colorado landscape is littered with "interpretation," usually wayside panels, created decades ago, which are now terribly outdated.  The information contained on them is sometimes incorrect, and the materials, often fiberglass embedded, are so weather-worn they are difficult to read and present an embarrassing condition.  The plan seems to foreshadow many places to be "interpreted," but doesn't suggest how the places will be monitored to determine if the interpretation has encouraged visitor impacts to the point that the resources are damaged or destroyed.  It also suggests that many partners will likely provide the financial resources to install them (often through grant money, for which there are seldom replacement dollars), without a plan to update or replace dilapidated or vandalized materials.  As mentioned above, a separate strategy to identify the most worthwhile places, which can also be protected, would be a worthy consideration.  Sometimes government offices embrace opportunities because "interpretation" buys agency good will.  While this is a valid goal, it often creates unsustainable conditions and unintended resource impacts which become impossible to reverse.  Coupled with all of the trails and recreational facilities identified in this plan, it's possible that BLM could become overextended.  Good advance planning helps to interface with communities and partners so understanding can be realized with them, while also providing for sustainable conditions and good resource stewardship. | |
| ZAENGER | 3-154 | The Needle Rock ACEC is a perfect example of the kind of resource which might benefit from interpretive planning mentioned above.  A greater analysis of existing services may lead to a determination to increase the level of services, leave the existing conditions as is, or lower the level.  Opening a great conversation on a desired condition, though would help clarify the level of priority the place should have in overall UFO management and then steer BLM to sustainable services which also protect the site.<br><br>Similar, a strategy to evaluate existing interpretive signage and services might be helpful.  Planning to identify all of the sites on Scenic Byway sections within the UFO, the San Miguel river corridor, and other locations should be considered before moving forward.  In some cases | |

| | | | |
|---|---|---|---|
| | | coordination with other field offices might be appropriate. As mentioned above, this would be instrumental in preventing BLM from becoming over-extended in its ability to manage resources. | |
| ZAENGER | 4-292 | The bullet statement, "Development of improved facilities especially recreation trails, would result in increased use," suggests that sustainability of facilities should be considered when in facility development is contemplated. | |
| Bockus | Vol III, Appendix E Grazing Allotments | There are grazing allotments listed in this table that include NPS and/or private lands that are not accounted for under "other acres". These allotments are: Dead Horse Common, Spring Gulch and Rawhide-Coffeepot. NPS would like re-initiate the update of the 1993 Grazing MOU between our agencies to increase the level of communication and coordination of grazing management activities in these and other allotments that include NPS lands. | |
| Bockus | Vol III, Appendix F Wilderness Characteristics Inventory | The 2008 publication of "Keeping It Wild: An Interagency Strategy for Monitoring Wilderness Character Across the National Wilderness Preservation System" (Landres and others 2008) provided the first nationally consistent interagency strategy to assess whether wilderness character is being preserved. This strategy was recently updated by the 2015 publication of "Keeping It Wild 2: An Updated Strategy to Monitor Trends in Wilderness Character Across the National Wilderness Preservation System". Will the BLM UFO be adopting this interagency strategy to monitor for wilderness **character** in WSAs, proposed or designated wilderness that have wilderness characteristics? The adoption of this monitoring strategy may assist with future wilderness planning and management. | |
| Bockus | Table 2-1, 2-9 | The Preferred Alternative D should include all areas with wilderness characteristics to be protected and managed as such. If not protected, the wilderness character of these lands could become degraded and eventually lost. 42,150 acres is a very small percentage of the total land area covered in this plan, so why not protect these areas? | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

BLM_0149138

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

BLM_0149139

11/2/2016 DEPARTMENT OF THE INTERIOR Mail - Comments, Draft Uncompahgre FO RMP/EIS



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comments, Draft Uncompahgre FO RMP/EIS
1 message

**Schroeder, Alan** <aschroeder@usbr.gov>                    Tue, Nov 1, 2016 at 4:08 PM
To: uformp@blm.gov
Cc: "Ozga, Kathleen" <kozga@usbr.gov>

Thank you for the opportunity to review and comment on the Draft Uncompahgre Field Office Resource Management Plan and Environmental Impact Statement (DRMP/EIS). The attachment is the BOR, Western Colorado Area Office's comments and recommendations regarding the DRMP/EIS.

If you have any questions regarding these comments/recommendations, please contact me. Thank you.

--
Alan Schroeder
Natural Resource Specialist
Bureau of Reclamation
Western Colorado Area Office
445 W Gunnison Ave., Suite 221
Grand Junction, CO 81501
Phone: 970-248-0692
Fax: 970-248-0601

📄 **UFO Draft RMP revu cmt wcao 110116.docx**
40K

BLM_0149140

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

*General*

1. BOR has approximately 16,270 acres of acquired or withdrawn lands associated with constructed and active projects (i.e., 5A lands), plus another undetermined acres of land associated with non-authorized or non-constructed projects (i.e., 5B lands). These lands and land interests generally are not identified separately in Tables and Figures. Rather, they are included under other federal, private, state, or BLM lands. It is often unclear which BOR lands, if any, are included within a given land category. BOR lands (both acquired/withdrawn) associated with constructed and active projects ( i.e., 5A BOR lands) , include the following: Aspinall Unit, CRSP-7200 A; Bostwick Park- 236 A; Dallas Creek- 3448 A; Fruitgrowers- 575 A; Paonia- 1943 A; Paradox Valley Unit, CRBSCP- 458 A; SF- 741 A; Uncompahgre- 1671 (withdrawn only; acquired- not calculated). BOR lands (withdrawn) associated with non-constructed projects (i.e., 5B BOR lands), include the following:  Whitewater Unit, CRSP (aka Dominguez Project) and Fruitland Mesa; GIS acreage determinations are needed for the portions of these 2 withdrawals within the planning area.

2. BOR facilities (canals, laterals, etc.) on public domain are valid existing rights, whether or not there is a formal BLM authorization identified. They were generally authorized by Reclamation or other applicable law, but may not have been formally reserved by Reclamation previously. BOR will work with BLM to formalize necessary rights-of-way for undocumented BOR facilities on public domain lands.

3. All of BOR's current withdrawn lands are reserved for reclamation purposes (i.e., project/irrigation works) and are closed to location under the mining laws, but not to leasing under the mineral leasing acts.

4. The Curecanti National Recreation Area (CNRA) is a special management area. BOR withdrew or acquired most of the lands currently within CNRA for reclamation purposes. The Aspinall Unit, CRSP, is the constructed Reclamation project associated with the CNRA lands. BOR and NPS jointly manage the CNRA under their respective and applicable laws, policies, regulations, and management agreements.

5. BLM is a cooperating agency on the Paradox Valley Unit EIS which is being conducted to evaluate alternatives to the existing injection well for salinity control in the Paradox Valley. As alternatives are further developed, there may be a need [for BOR/Reclamation] to acquire easements, rights-of-ways, or request withdrawal of land from BLM in order to implement a selected alternative. Reclamation will continue to coordinate [with] and seek BLM's input and expertise as a cooperating agency regarding alternatives and potential effects to lands managed by BLM.

6. There appear to be inaccuracies or discrepancies in BOR withdrawn acreages throughout the document. BOR and BLM should confirm these acreages and BLM should revise the RMP/EIS accordingly.

7. BOR is attempting to get its withdrawals revoked on certain lands within the UFO planning area. This effort includes the entire Whitewater Unit, CRSP (aka Dominguez Project) and Fruitland Mesa Project, and an isolated 40-acre parcel associated with the Dallas Creek Project. The withdrawals associated with the Whitewater Unit and the Fruitland Mesa Project are included within the 28,060 acres which BLM repeatedly identifies as continuing the withdrawal from location under the mining laws. We would appreciate BLM's full cooperation and assistance in expediting BOR's recommended revocations of its withdrawals. Any subsequent BLM decision to withdraw those lands from location under the mining

1

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

laws should be based on its needs; BOR no longer needs to retain these withdrawal to protect its interests. The document should be revised throughout, as necessary, to show this difference.

8. Various aspects of BOR's lands, projects and related resources are generally managed under contract or agreement by other entities, although BOR generally retains an oversight role in the overall management.  These managing entities may include private organizations, State or local agencies, or other federal agencies.

9. Do not use the terms "BOR project land" or "BOR non-project land." All BOR acquired or withdrawn lands are associated with at least a contemplated Reclamation project. However, not all contemplated projects were authorized for construction, or constructed, even if authorized. We recommend the following wording be used to identify the two classes of BOR lands: "5A BOR lands" for lands associated with a BOR project authorized for construction or constructed (I.e. BOR administered lands) and "5B BOR lands" for lands associated with a BOR project not authorized for constructed or not constructed (I.e. BLM administered lands). The recommended wording is based on Section 5 of the 1983 BOR/BLM IA.

10. BLM decisions which create general surface use restrictions (e.g., no ground disturbance, row exclusion/avoidance, site-specific relocation etc.) on BLM lands adjacent to or in close proximity to BOR facilities may limit BOR's options to expand project facilities outside of current footprints if necessary. This is of particular concern for BOR's efforts to reduce salt loading in the Colorado River basin (e.g., CRBSCP and associated salinity reduction programs such as lining/piping of irrigation ditches/canals and the Paradox brine disposal (injection, evaporation). The following table lists the constructed and active BOR projects, or portions thereof, within the UFO planning area and lists the general surface use restrictions of concern by project.

BOR Constructed Projects/Facilities within the UFO Planning Area

| Project | Location | Managers | Major Facilities | BLM Decision Areas of Concern |
|---|---|---|---|---|
| Aspinall Unit (portion only) | Along Gunnison River between the Black Canyon of the Gunnison NP and Gunnison, CO. | ▪ Project O&M-BOR ▪ Recreation (CNRA; Sec. 8, CRSPA)- NPS ▪ Land Use (CNRA)- Joint BOR and NPS ▪ Recreation and Land Use (Non-CNRA)- BOR | ▪ Crystal Dam and Reservoir ▪ Crystal Dam Access Road | ▪ Sims-Cerro Gunnison Sage Grouse ACEC ▪ ROW avoidance and exclusion areas ▪ Travel Management: use of existing or designated trails that adjoin BOR lands or facilities ▪ Surface Disturbing Activity Restrictions- NGD and SSR ▪ National Trails and Scenic Byways- Old |

2

BLM_0149142

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

| Project | Location | Managers | Major Facilities | BLM Decision Areas of Concern |
|---|---|---|---|---|
| | | | | Spanish Trail, West Elk Loop Scenic Byway |
| Bostwick Park | From Silver Jack Reservoir between the Cimarron River and Cimarron Ridge, over Cerro Summit to Bostwick Park, east of Montrose, CO | • Project O&M- Bostwick Park WCD • Recreation (Silver Jack Reservoir)- USFS • Land Use (Silver Jack Reservoir)- joint, BOR, USFS, BPWCD | • Silver Jack Dam and Reservoir • Cimarron Canal System (BPWCD) | • Sims-Cerro Gunnison Sage Grouse ACEC • ROW avoidance and exclusion areas • Surface Disturbing Activity Restrictions- NGD and SSR National Trails and Scenic Byways- Old Spanish Trail |
| Dallas Creek | Along Uncompahgre River between Ridgway, CO and Colona, CO | • Project O&M- Tri-County Water Conservancy District (TCWCD) • Recreation (Ridgway Reservoir)- CP&W • Land Use- Joint, BOR, TCWCD, CP&W | • Ridgway Dam and Reservoir | • SRMAs/ERMAs: Ridgway Trails • Travel Management: use of existing or designated trails that adjoin BOR lands or facilities • Ecological Emphasis Area- Ridgway • Surface Disturbing Activity Restrictions- NGD and SSR |
| Fruitgrowers Project | Along Alfalfa Run between Eckert, CO, and Corey, CO and Austin, CO | • Project O&M- Orchard City Irrigation District • Recreation- BOR • Land Use- Joint, BOR, OCID | • Fruitgrowers Dam and Reservoir • Diversion dam and feeder canal | • ROW avoidance and exclusion areas • Travel Management: use of existing or designated trails that adjoin BOR lands or facilities • Surface Disturbing Activity Restrictions- NGD and SSR |
| Paradox Valley Unit, CRBSCP | Along Dolores River in Paradox Valley near Bedrock, CO | • Project O&M- BOR • Land Use- BOR | • Brine Collection wells and pumping station • Brine injection well | • ROW avoidance and exclusion areas • ACECs: La Sal Creek, West Paradox, East |

3

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

| Project | Location | Managers | Major Facilities | BLM Decision Areas of Concern |
|---|---|---|---|---|
| | | | | Paradox, Coyote Wash, Dolores Slick Rock Canyon, and Biological Soil Crust.<br>• Dolores River Canyon WSA<br>• Wilderness Characteristics Protection: Dolores River Canyon WSA adjacent<br>• Travel Management: use of existing or designated trails or roads that adjoin or provide access to BOR lands or facilities<br>• Wild/Scenic Rivers- Dolores River Seg. 1a, Dolores River Seg. 1B, Dolores River Seg. 2, La Sal Creek Seg. 1, La Sal Creek Seg 2, La Sal Creek Seg. 3, Ice Creek Seg. 2, Lion Creek, Seg. 2, and Spring Creek<br>• SRMAs/ERMAs: Dolores River Canyon, Paradox Valley<br>• Ecological Emphasis Area- La Sal<br>• Surface Disturbing Activity Restrictions- NGD and SSR National Trails and Scenic Byways- Paradox Trail |
| Paonia Project | Along Muddy Creek and the north side of the North Fork | • Project O&M- North Fork Water | • Paonia Dam and Reservoir | • ROW avoidance and exclusion areas |

4

BLM_0149144

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

| Project | Location | Managers | Major Facilities | BLM Decision Areas of Concern |
|---|---|---|---|---|
| | of the Gunnison River from Paonia Reservoir to Hotchkiss, CO | Conservancy District and Fire Mountain Reservoir & Canal Co.<br>• Recreation (Paonia Reservoir)- CP&W<br>• Land Use (Paonia Reservoir)- joint, BOR, NFWCD, FMCR&CC CP&W<br>• Land Use (FMC)- joint, BOR, NFWCD, FMCR&CC | • Fire Mountain Canal | • Travel Management: use of existing or designated trails that adjoin BOR lands or facilities<br>• W/SRs: Deep Creek?<br>• Coal Leasing; Adjacent to and underlying Paonia Reservoir<br>• Oil/Gas Leasing; Adjacent to and underlying Paonia Reservoir?<br>• Ecological Emphasis Area- Terror Creek<br>• Surface Disturbing Activity Restrictions- NGD and SSR<br>• National Trails and Scenic Byways- West Elk Loop Scenic Byway |
| Smith Fork Project | Area surrounding Crawford, CO | • Project O&M- Crawford Water Conservancy District<br>• Recreation (Crawford Reservoir)- CP&W<br>• Land Use (Crawford Reservoir)- joint, BOR, CWCD, CP&W | • Crawford Dam and Reservoir<br>• Aspen Canal | • ROW avoidance and exclusion areas<br>• Travel Management: use of existing or designated trails that adjoin BOR lands or facilities<br>• ACECs: Needle Rock<br>• WSAs: Needle Rock<br>• Surface Disturbing Activity Restrictions- NGD and SSR National Trails and Scenic Byways- West Elk Loop Scenic Byway |

BLM_0149145

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

| Project | Location | Managers | Major Facilities | BLM Decision Areas of Concern |
|---|---|---|---|---|
| Uncompahgre Project (portion only) | From the East Portal Area on the Gunnison River along the Gunnison Tunnel alignment and within the Uncompahgre Valley from about Colona to Delta | • Project O&M- Uncompahgre Valley Water Users Association<br>• Recreation (East Portal area)- NPS<br>• Recreation (elsewhere)- joint, BOR, UVWUA<br>• Land Use (East Portal area - joint, BOR, UVWUA, NPS<br>• Land Use (elsewhere)- joint, BOR, UVWUA | • Gunnison Diversion Dam and Tunnel<br>• South Canal system<br>• Loutzenhiser Canal system<br>• Selig Canal system<br>• Delta/Montrose Canal system<br>• West Canal system<br>• Others?<br>• | • ROW avoidance and exclusion areas<br>• Travel Management: use of existing or designated trails that adjoin BOR lands or facilities<br>• ACECs: Sims-Cerro Gunnison Sage Grouse, Lower Uncompahgre Plateau, Fairview South/Expansions<br>• W/SRs: Robideau Creek Seg. 2<br>• SRMAs/ ERMAs: Kinikin Hills, Spring Creek, Dry Creek<br>• Ecological Emphasis Areas- Sims Mesa, Ridgway, Spring Canyon, Dry Creek, Monitor-Potter-Robideau<br>• Surface Disturbing Activity Restrictions- NGD and SSR National Trails and Scenic Byways- Old Spanish Trail |

**Chapter 1- Introduction**

Pg 1-4, ¶4 *Comment:* This paragraph is inaccurate and should be revised.

*Recommendation:* Reword the paragraph along the following lines:

"The federal mineral estate underlying that portion of the Curecanti National Recreation Area (CNRA) within the planning area is not part of the RMP decision area. BOR withdrew or acquired the land underlying the CNRA for reclamation purposes. BOR and NPA jointly manage the CNRA pursuant to applicable laws, regulations, and agreements. BOR's land is closed to location under the mining laws and BOR determines whether leasing under the mineral leasing laws is appropriate on lands under its administrative jurisdiction. NPS regulations in 36 CFR Chapter 1, Parts 1-7 include prohibitions on location under the mining laws and leasing under the mineral leasing laws."

6

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

*Rationale:* This paragraph appears to be describing the status of the federal mineral estate under the CNRA and BLM's role in managing same. Within the planning area, these lands are under BOR's and NPS's administrative jurisdiction as defined in an MOA. They were withdrawn or acquired by BOR for reclamation purposes and there is a constructed project. NPS is responsible for carrying out Section 8 of the Colorado River Storage Project Act (CRSPA) on these lands (i.e. management for recreation/wildlife purposes). BOR's withdrawal is a withdrawal from public entry, including under the mining laws. Leasing or sale of federal minerals on those CNRA lands within the RMP planning area is a joint discretionary decision of BOR and NPS based on applicable laws, regulations, and agreements. Further, CNRA is a National Park system unit and NPS regulations in 36 CFR Chapter 1 include prohibitions on location under the mining laws and leasing under the mineral leasing laws on its units.

**Chapter 2- Alternatives**
Pg 2-2, ¶4
*Comment:* This paragraph is oversimplified and somewhat inaccurate.
*Recommendation:* The paragraph should be revised along the same line as ¶5 (DOE management). The following wording is suggested:

"BOR currently manages ten constructed and active projects on approximately 11,674 acres of withdrawn and acquired lands within the planning area. BOR has agreements or contracts with entities for management of its projects and/or the associated resources and recreation, but retains an oversight and/or cooperative role in said management. The 1983 interagency agreement between BOR and BLM outlines the roles and responsibilities of these agencies on BOR lands within the planning area. On BOR acquired and withdrawn lands on which there are authorized for construction or constructed Reclamation projects (5A lands), BOR has full management jurisdiction. On BOR acquired and withdrawn lands not within National Forest boundaries or under another agency administration and on which there are no authorized for construction or constructed projects (5B lands), BLM has full administrative responsibility, subject to protection of BOR's interests. On BOR lands, BLM has the general responsibility for management of mineral and geothermal leasing, but BOR determines whether or not leasing is permissible and, if so, under what terms and conditions. On 5A lands, BLM will not issue permits, leases or licenses without BOR's consent and concurrence on all conditions and stipulations. On 5B lands, BOR's recommendations are advisory only insofar as Reclamation planned or current project uses are not adversely affected. (BLM and BOR 1983)

*Rationale:* The above wording is more reflective of the overall intent and wording in the 1983 IA.

Pg 2-11 (Table 2-1)- BLM Surface/Federal Minerals[6].
*Comment:* It is unclear which BOR withdrawn lands, if any, are included in this category; we presume it is only BOR's 5B withdrawn lands. The [6]table note on page 2-15 should be revised to be more specific as to the BOR withdrawn lands included in this category.
Recommendation: Replace the current [6]table note wording on page 2-15 with, "Includes BOR withdrawn lands for the Whitewater Unit, CRSP and the Fruitland Mesa Project."

BLM_0149147

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

*Rationale:* BOR has no withdrawn "non-project" lands. We presume only the 5B lands for which BLM has full administrative responsibility pursuant to the 1983 BOR/BLM Interagency Agreement are included in these acreages. Those lands include those portions of the Whitewater Unit, CRSP (aka, Dominguez Project) and Fruitland Mesa Project withdrawals within the planning area.

Pg 2-11, Table 2-1, Private, State, or BOR Project Lands Surface/Federal Minerals: Withdrawn from locatable mineral entry
*Comment:* The table shows no BOR acreage withdrawn from locatable minerals. There should be approximately 11,764 acres [to be verified] of BOR withdrawn lands in this category within the planning area.
*Recommendation:* The table should be revised to show the acreages of BOR 5A withdrawn lands within the planning area; they are withdrawn from locatable mineral entry. Acreages for this category should include the following constructed and active projects or portions thereof within the planning area: Paonia Project; Dallas Creek Project; Bostwick Park Project; Aspinall (formerly Curecanti) Unit, CRSP; Fruitgrowers Dam Project; Smith Fork Project; and Uncompahgre Project. Actual acres within the planning area should be determined through GIS applications, if necessary.
*Rationale:* The table does not show any acreages for BOR project lands withdrawn from locatable mineral entry. We presume this category consists of BOR 5A withdrawn lands pursuant to the '83 IA. All current BOR withdrawn lands are withdrawn from locatable mineral entry.

Pg 2-208: Table 2-2, Line 347 - maintain following areas as WD from locatable minerals: BOR 9,010 acres.
*Comment:* How was this acreage derived? BOR records indicate about 11,764 acres of BOR 5A withdrawn lands within the UFO planning area, plus another undetermined acreage of 5B lands. A 2,754 acre difference in 5A lands is substantial.
*Recommendation:* Verify the acreage, and revise as necessary.
*Rationale:* This document is going to be cited by various entities throughout its life; it needs to be accurate.

Figs 2-32, 2-33, 2-34, 2-35 (Alts A, B, C, D, respectively), - Lands withdrawn and to be Recommended for withdrawal from Locatable Mineral Entry; and Fig 2-82 Land Withdrawals and Powersite Classifications
*Comment:* These figures do not show all current BOR withdrawals within the planning area. They are missing portions of the withdrawals for the Uncompahgre and Bostwick Park (USFS lands) Projects and Whitewater and Aspinall Units, CRSP; and all of the withdrawals for the Dallas Creek, Smith Fork, Paonia, and Fruitgrowers Projects.
*Recommendation:* Revise these figures to show all current BOR withdrawn lands (approximately 14,000 acres).
*Rationale:* All of the lands currently under BOR withdrawals are withdrawn from locatable mineral entry.

**Chapter 4- Environmental Consequences**
Pg 4-16; Table 4-1: Paradox Valley Unit desalination plant

8

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

*Comment:* The first sentence is inaccurate; the plant is not seven miles south of Bedrock, CO. The injection well and appurtenant facilities are about 1.3 miles south of Bedrock and the brine collection well field and pump plant are about 2.1 miles east-northeast of Bedrock.
*Recommendation:* Revise the first sentence as appropriate.
*Rationale:* Provide accurate information.

Pg 4-265; Table 4-33:
*Comment:* This table is confusing and is inaccurate. All current BOR withdrawals are withdrawn from locatable mineral entry, but are not shown as such. Current BOR withdrawals fall under either the "BLM surface/federal minerals" or the "Private, state, or Bureau of Reclamation project lands surface/federal minerals" headings.
*Recommendation:* Revise the table so that it is more easily understood and is more accurate.
*Rationale:* All current BOR withdrawals (approximately 13,000 acres) are withdrawn from locatable mineral entry.

Pg 4-330; Bullet 2:
*Comment:* This bullet implies a level of withdrawal that may not exist under current withdrawals.
*Recommendation:* Revise this bullet along the following lines: "The BLM would continue to manage all previously withdrawn BLM-administered lands in accordance with the applicable withdrawal order(s) and its associated legislation. That may include withdrawal from entry, appropriation, or disposal under the public land laws; location, entry, and patent under the mining laws; or operation of the mineral leasing, mineral materials, and geothermal leasing laws." Also, some of the terms used, should be defined in the glossary (See comments under "Glossary").
*Rationale:* There is no universal withdrawal wording for current withdrawals, as implied by this bullet; a withdrawal does not necessarily withdraw lands from all of the actions described in this bullet. Each withdrawal order is specifically worded based on legislation or intent. For example, a BOR withdrawal of land under the first form of withdrawal pursuant to Sec. 3 of the Reclamation Act of 1902, withdraws land from public entry and reserves it for Reclamation irrigation works contemplated under the provisions of that act. Based on subsequent rulings as noted in the USDI book, Federal Reclamation and Related Laws Annotated, Reclamation's first form withdrawal apparently withdrew lands from entry under the various disposal or appropriation acts, such as the mining laws and homestead acts, but not from the mineral or other leasing acts.


**Glossary**
*Comment/Recommendation:* Add the following terms with their appropriate definition, especially as they apply to the various land and mining laws, to the Glossary:
- *appropriation (under the mining and public land laws)*
- *disposal (under the public land laws)*
- *entry (under the mining and public land laws)*
- *location (under the mining laws and/or public land laws)*
- *public land laws*

BLM_0149149

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

_Rationale:_ These terms have specific meanings regarding land and mineral management which many people may not know or understand. Also, some of these terms (such as appropriation, entry, location, and disposal) may have general definitions that apply regardless of the various land and mining laws which may allow the action.

10

BLM_0149150

11/2/2016                                    DEPARTMENT OF THE INTERIOR Mail - Uncompahgre RMP Comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Uncompahgre RMP Comments
1 message

**Owen - CDA, Les** <les.owen@state.co.us>                    Tue, Nov 1, 2016 at 3:29 PM
To: ufomp@blm.gov

Attached are CDA's comments regarding the Uncompahgre Draft RMP and EIS.  Please contact me with any questions or concerns.

Sincerely,

—

Les Owen

Conservation Services Division Director



P 303.869.9032
305 Interlocken Parkway, Broomfield, CO 80021
les.owen@state.co.us  |  www.colorado.gov/ag

📄 **20161101_BLM_Uncompahgre RMP.pdf**
2303K

BLM_0149151



**COLORADO**
Department of Agriculture

November 1, 2016

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, Colorado 81401

Dear Sir or Madam:

The Colorado Department of Agriculture (CDA) submits the following comments regarding the Bureau of Land Management (BLM) Uncompahgre Field Office Draft Resource Management Plan (RMP) and Environmental Impact Statement (EIS).

CDA's mission is to strengthen and advance Colorado agriculture; promote a safe, high quality, and sustainable food supply; and protect consumers, the environment, and natural resources. It is with this mission in mind that we focus our comments on effects this RMP may have on the range livestock industry and natural resources associated with the 675,800 acres of BLM administered federal lands and 971,220 acres of federal subsurface mineral estate in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties in southwestern Colorado. CDA supports sustainably managed livestock grazing as a congressionally mandated use of federal lands that is vital to the ranching industry and beneficial to wildlife and associated natural resources.

The range of alternatives provided in the RMP for levels of livestock grazing is inconsistent with guidance provided in the Forty Most Asked Questions Concerning the Council on Environmental Quality's National Environmental Policy Act Regulations[1] (CEQ40). CEQ40 states in 1b that, *"...a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS."* Alternatives in the RMP allow only for livestock grazing to decrease from current levels; none of the alternatives provide for an increase in domestic livestock grazing.

The Federal Land Policy and Management Act of 1976[2] (FLPMA) defines domestic livestock grazing as one of the principal or major uses of federal land. A reasonable range of alternatives that covers the full spectrum should include management options that allow for an increase in domestic livestock grazing provided that land health requirements are met as described in the

---

[1] https://ceq.doe.gov/nepa/regs/40/40p3.htm
[2] 43 USC §1701 et seq.

305 Interlocken Parkway, Broomfield, CO 80021   P 303.869.9000   F 303.466.2867
www.colorado.gov/ag



Uncompahgre Draft RMP/EIS
Page 2
November 1, 2016

BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing
Management (Standards and Guidelines).

The preferred alternative objective for livestock grazing, Table 2-2 Line 295, provides the
needed management direction to ensure that watershed, wildlife, and other resource needs are
met. Adherence to the Standards and Guidelines ensures that livestock grazing would not be the
causal factor in compromising other resources. Proposed restrictions or changes to livestock
grazing management beyond those described in the Standards and Guidelines should be removed
from the RMP. Decisions to reduce or increase livestock grazing use on federal lands should be
based on data from site-specific, scientifically defensible resource monitoring techniques.

The analysis of livestock grazing impacts fails to consider relevant science regarding the positive
impacts that properly managed livestock grazing has on vegetative communities. Research has
shown that in arid and semiarid areas, grazing at use levels below 40 percent can have positive
impacts to forage plants compared to exclusion of grazing.[3] Additionally, the analysis
understates the importance of water systems developed on federal land as part of a livestock
grazing operation to wildlife habitat.

The preferred alternative states that restrictions on domestic sheep allotments due to bighorn
sheep would be based on the probability of interaction assessment. The Probability of
Interaction and Risk of Contact models used for the assessment are based on limited data,
numerous uncertainties, and unjustified assumptions. Further, the assessment does not take into
account the significant role that domestic sheep management plays in reducing the risk of
interaction between domestic and bighorn sheep. Implementation of restrictions based on the
flawed assessment methodology would likely result in domestic sheep operations going out of
business with little benefit for bighorn sheep.

The EIS estimates the value of BLM forage to livestock producers to be the difference between
private land grazing fees and the BLM grazing fee. This represents a major flaw in the analysis.
Extensive cost of grazing studies have shown that ranchers, on average, spend as much per unit
of forage on public lands (current fees plus additional costs of use) as is paid for private land
grazing leases.[4] The estimated value of BLM forage provided in the EIS actually represents
additional costs of use incurred by permitted ranching operations compared to grazing on private
land.

An animal unit month (AUM) of forage is the quantified amount of forage necessary to maintain
an animal unit (1 cow or 5 sheep) for one month. The value of this forage to a livestock
producer is the gross revenue from livestock production made possible by having access to the
forage. Revenue from livestock production is the same regardless of land ownership.

---

[3] Holechek, J.L., T.T. Baker, J. C. Boren, and D. Galt. 2006. Grazing Impacts on Rangeland Vegetation: What We
Have Learned. Rangelands 28:7-13.
[4] Whittlesey, N.K., R.G. Huffaker, and W.R. Butcher. 1993. Grazing Policy on public lands. Choices 3rd Quarter:
15-19.

BLM_0149153

Uncompahgre Draft RMP/EIS
Page 3
November 1, 2016

Colorado State University produces Colorado Livestock Enterprise Budgets[5] that provide an estimate of total gross revenues from production for rangeland sheep and cattle operations. The 2014-2015 rangeland sheep estimate of the gross revenue from production per ewe is $204.54. This can be converted to an annual gross revenue from production per AUM of forage by multiplying $204.54 by 5 ewes/animal unit and dividing by 12 months resulting in an annual gross revenue from production per sheep AUM of $84.39. The 2014-2015 cow-calf estimate of the gross revenue from production per cow is $1,256.80. This can be converted to an annual gross revenue from production per AUM of forage by dividing by 12 months resulting in an annual gross revenue from production per cattle AUM of $104.73. AUM values provide a metric to compare alternatives and can be used to analyze the magnitude of impacts that changes to authorized livestock use under each alternative would have on individual allotments and communities within the planning area. For example, the preferred alternative would reduce maximum permitted cattle AUMs by 1,940. This reduction represents an estimated decrease of $202,176.40 per year in gross revenue from cattle production.

In summary, the importance of consistent access to forage on federal lands cannot be overstated for the ranching industry in Colorado. Many ranchers have invested significant resources into range improvements on federal lands that benefit both wildlife and livestock. These operations rely on consistent access to forage on federal lands in order to maintain economic viability. Properly managed livestock grazing is a valuable resource management tool that can improve wildlife habitat, biodiversity, and overall ecological conditions while providing cultural and economic benefits to communities.

Thank you for the opportunity to comment on this RMP and EIS analysis. Please keep us informed about this and other management decisions within the Uncompahgre Field Office. Contact Mr. Les Owen at 303-869-9032 or les.owen@state.co.us for questions about these comments.

Sincerely,

Don Brown
Commissioner

---

[5] Available at: http://www.coopext.colostate.edu/ABM/livestock.shtml

11/2/2016                                   DEPARTMENT OF THE INTERIOR Mail - UFO RMP comments from Rick Dimick



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## UFO RMP comments from Rick Dimick
1 message

**Jennifer Thurston** <jethurston@gmail.com>                    Tue, Nov 1, 2016 at 12:00 PM
To: uformp@blm.gov
Cc: efranz@blm.gov

Hello BLM,

A comment letter on the Draft RMP for the UFO is attached. It is from Rick Dimick, P.O. Box 31, Bedrock, CO. Rick
does not have an email address so I am sending it on his behalf. Should you have questions, Rick can be contacted at
970-859-7392.

Thanks, Jennifer Thurston


**rick-dimick-letter.docx**
131K

BLM_0149155

Field Manager Barbara Sharrow
BLM Uncompahgre Field Office
Email:UFORMP@blm.gov

Nov. 1, 2016

Dear BLM Uncompahgre Field Office Manager,

I would like to comment on the UFO Draft Resource Management Plan and support the Conservation Alternative. I have lived in Paradox Valley since 2004 and moved here to enjoy the remoteness. I regularly use BLM lands for recreation, personal enjoyment, to appreciate quiet uses, dark skies at night, and quiet days. I regularly kayak on the San Miguel and Dolores Rivers. I also use public lands to hunt, fish, hike, watch wildlife, collect firewood and visit cultural and archeological sites.

I am a carpenter and find it difficult to make a living here and I can see that a certain amount of development is necessary for the economic health of the area. But I don't see that the oil and gas area has really helped this area economically and I can see a small but steady growth in the quiet and recreational uses of the area. In lieu of the gas and oil industry, I believe that encouraging quiet recreational use of the area could be economically beneficial. Moab, as an example, has created a huge industry and is quite successful in their biking and hiking uses of public lands and we should encourage that here as well.

One of the real pleasures of this area is that the kayaking is close by and the Dolores River is one of the finest floats of all. One of the major disappointments is that the Dolores River is being managed without consideration for the recreational development of the area. When there are releases from the dam, BLM needs to communicate the times in order to reduce crowding and make it more pleasant for all. I'm for Wild & Scenic designations if it will help protect the rivers and improve communications. Wild & Scenic should also help protect soils from washing into the river, and that can effect the kayaking.

Economic development of BLM land should be in balance so that we are not so dependent on mining, oil and gas, and other earth-destroying activities. Organic farming and activities in Paradox Valley are just beginning to get started and with a little bit of encouragement could help economically. I think it's important to have areas designated to protect organic farms from pollution caused by mining and oil and gas. These industries can also have a big influence on the dark skies that this part of the country provides. It is so spectacular that even the local school has built an astronomical observing platform so students can be educated.

Living where I do with great views allows me to see amazing wildlife activities. I especially enjoy seeing peregrine falcons, prairie falcons, golden eagles and migratory travellers that come through. I also get to see bugling elk, big bucks, coyotes and weasels,

all of which contribute to the peaceful pleasures of the Paradox Valley. Anything the BLM can do to protect the habitat for the big and little wildlife is appreciated.

Please also don't sell any BLM lands or turn them over to the states.

Please select Alternative B and Alternative B-1 for the Roaring Fork Valley for the new BLM Resource Management Plan.

Sincerely,

Rick Dimick
P.O. Box 31
Bedrock, CO 81411

11/2/2016                    DEPARTMENT OF THE INTERIOR Mail - Draft RMP comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Draft RMP comments
1 message

**Michael Drake** <mldht1@live.com>                    Mon, Oct 31, 2016 at 4:29 PM
To: "uformp@blm.gov" <uformp@blm.gov>

To Whom it concerns,

Please find my comments on the Draft RMP for the UFO area.

Thanks,

Michael Drake
Home Office - (970) 527-4535
Cell - (801) 710-8372
Be your own toughest critic, learn from your mistakes, and **never** stop believing in yourself!


**BLM RMP response final signed.pdf**
530K

BLM_0149158

Michael L. Drake

Paonia, CO, 81428

October 31, 2016

BLM, Uncompahgre Field Office

2465 S. Townsend Ave.

Montrose, CO 81401

**Re: Draft Resource Management Plan for the Uncompahgre Field Office**

Dear BLM Uncompahgre Field Office (UFO) Staff and RMP Comment Team,

      The UFO draft Resource Management Plan (RMP) does not contain an alternative that offers the level of protection these lands warrant. The current draft RMP appears to have ignored:

- What the communities and the public in your planning area have specifically suggested/requested
- The economic development plans that Gunnison and Delta Counties are implementing
- What federal law requires.

**Declaration of Impacts** – The "preferred" Alternative D, as well as the rest of the Alternatives, would have a significant impact on my family's life in the North Fork Valley (NFV). The following details the impacts on my life if any of the current RMP alternatives are adopted.

In 1977 I started my almost annual trip from Ohio to Colorado to hunt. In 2000, my job moved me from Dayton, Ohio to Ogden, Utah, which greatly reduced my trip to hunt in Colorado. In 2001, my wife and I started evaluating where in the West we were going to live when we retired. We investigated and visited multiple places in Idaho, Wyoming, Montana, and Colorado. We decided that Colorado was the best place for us to live. We looked across the state from Canon City to Craig. In late 2002, we found Paonia, in the NFV.

It was 2004 before we found and closed on our home in the NFV. We became permanent residents in February 2008. We live on a 7-acre mini-farm where we have an organic home garden. We have been improving much of our property to allow organic grazing for sheep and goats, and expect to start the grazing operation in 2017.

We choose the NFV because of the following:

- The abundant organic animal, vegetable, and fruit farms
- The organic wineries
- The traditional farms and ranches
- The year-round outdoor activities such as hiking, biking, fishing, hunting, camping and cross-country skiing
- The clean air and water
- The small town and rural environment
- The brilliant night sky

BLM_0149159

Both the indigenous Ute Indians and the US immigrant population that settled this area after the Utes were forced out, were in the NFV because of the valley's abundant clean water, fertile soil, and climate. At the 1893 World Fair in Chicago, all six NFV fruits entered in that Fair won the Gold Medal for their category. The NFV continues to be known for the fruits, vegetables and livestock grown here.

My wife and I started hiking, camping, and fishing in the NFV in 2003. In 2006 we started archery hunting in the NFV. I have killed two elk and two deer here, and my wife has killed two deer.

My direct impacts from the development of oil and gas in the North Fork Valley occur in each of the three major parts of my life – farm operations, home life, and outdoor activities.

**Farm Operations** – My farm, like most farms in the valley, exists because of the irrigation water rights that I own. Clean irrigation water is the key to successful farming in the NFV.

Two separate irrigation water facts combine to prove that O&G development in the NFV will have a devastating impact on my farm and farming in general within the NFV. The first fact is that all irrigation water in the NFV will be impacted directly by any surface water contamination. The second fact is that reports from all O&G development sites document a variety of regular spills that result in surface water contamination. In 2014 there were over 700 spills reported in Colorado. The only mitigation plan for a contaminated open dirt ditch irrigation system is the remediation of the contaminated ditch dirt and all the contaminated farms served by that ditch, including the on-farm irrigation systems such as sprinkler systems. I should note that my particular irrigation company used sections of naturally occurring creeks, in conjunction with both dirt ditches and piped ditches, to deliver irrigation water to the farms served.

Air pollution from O&G development will provide a significant risk to both organic and traditional farming operations in the NFV, including my farm.

**Home Life** – We use irrigation water for our home organic garden. Therefore, all the comments above about irrigation water contamination from O&G applies to our organic garden. When a spill contaminates our irrigation water, our garden system of 10 raised beds will require complete replacement of the contaminated soil.

Our home drinking water comes from springs in the mountains close to Paonia. O&G spills will directly impact our drinking water source. The entire water system from the source, raw water storage, purification system, treated water storage, and water delivery will require decontamination. Not only will there be a large loss of water from the contamination event, but there also will be a large amount of water lost through the decontamination process. Water wasted in Colorado should be a crime because of the limited amount of water available and the predicted large water shortage by 2050.

Most of the drinking water in the NFV will be directly impacted by O&G spills that contaminate surface water. The town of Somerset and the three coal mines in the area get their drinking water directly from the North Fork of the Gunnison River, with the mines also getting their industrial water for mining operations directly from the North Fork River. All creeks in the NFV Mountains flow into this river. Again, the cost of remediation of the town and coal mine water systems would be large.

BLM_0149160

**Life Activities** – This first paragraph details a very personal impact of O&G air pollution.

As the Executive Director of Painted Sky Resource Conservation and Development, I had the opportunity to observe a demonstration of a new technology for handling O&G produced water. The demonstration was being conducted at a Vernal Utah outdoors O&G evaporation pond facility. My wife and a co-worker accompanied me on the trip to see the demonstration. The tech demo was on the far side of the facility. Within a couple of minutes of us driving through this large multi-pond facility, my wife started feeling lightheaded and sick to her stomach. The people running the demonstration told her to stay inside the office trailer, which had an air conditioners in a couple of the windows and all the rest of the windows were closed. They told us that other folks have had the same reaction. My co-worker and I had no problem. Our demonstration and tour lasted about 30 minutes. About an hour after leaving the facility, my wife's symptoms remained and we stopped in Rangely, Colorado to get something to settle her stomach. The rapid onset of my wife's symptoms demonstrated my wife's susceptibility to O&G air pollution. BLM's responsibility is to protect those with the highest levels of sensitivities. Obviously, we cannot go hiking, biking, fishing, hunting, camping or cross-country skiing in an area where there is O&G development.

Hunting and fishing will be directly impacted by O&G development. The impact will require us stop hunting 45 minutes from the house and revert to driving 3 to 7 hours to get to a place with no O&G development to hunt. Needless to say, this defeats one of the main reasons we moved to the NFV. The impacts on hunting and fishing involve surface water contamination, air pollution, habitat fragmentation. Additional impacts are the industrial light and noise, traffic and human activities that O&G development brings to the area. Combined, the impacts cause the game to avoid these areas and disrupt migration patterns. We saw directly the habitat fragmentation impact from the results of logging in the area that reduced the elk population. The elk simply left the area because of the changes in the required elk habitat and to avoid the human traffic and activities. As the area recovers from the logging, the elk are slowing coming back.

Our hiking, biking, camping and cross-country skiing activities (including wildlife viewing during all these activities) will all be impacted by the industrialization from O&G development in the NFV. The prime drivers of the impacts will be the surface water contamination and the air pollution, industrial noise, traffic and human activities that O&G development brings. The impacts defined above also cause the wildlife to avoid these areas, disrupt migration patterns and greatly reducing the area's wildlife viewing opportunities.

There are multiply problems that come with surface water contamination. One of the major concerns would be that safe drinking water would not be available. All current water filters that most hunters, anglers, hikers, bikers, campers, and skiers do not provide protection from O&G pollution.

**Major Flaws in the RMP** – the BLM Mission statement from the draft RPM states, "It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations."

1. My declaration of impact makes it clear that the current RMP does not meet the mission statement of the BLM.

2. The RMP is the management plan for the next 20 to 30 years. The plan presents a process in Table ES-2 for the resource categories and planning issues statement for these resource categories. The plan includes a process to analyze and evaluate projected impacts. These processes are detailed throughout Volume 1 and 2 of the RMP.

   Although this detailed process covers many of the requirements for a management plan, it is missing the key management element required for successful implementation of any management plan. That key element is a Risk Management Plan.

   A risk is defined as "an uncertain event or condition that, if it occurs, has a positive or negative effect on a project's objectives." Risk is inherent with any project, and project managers should assess risks continually and develop plans to address them. The risk management plan contains an analysis of likely risks with both high and low impact, as well as mitigation strategies to help the project avoid being derailed should common problems arise. Risk management plans should be periodically reviewed by the project team to avoid having the analysis become stale and not reflective of actual potential project risks.

   A Risk Management Plan is a document prepared by a project manager to foresee/define risks, to estimate both the probability of the occurrence and the details of the impact for the risks defined (the risk assessment matrix), rank the identified risks by the level of impact, to create mitigation plans to reduce the probability of occurrence of the risks, and to create recovery plans for the most critical impact risks.

   With the current state of risk management technology and the utilization of the risk management technology by many different organizations within the US government, the lack of a detailed Risk Management Plan makes the BLM look like an archaic organization and potentially criminally liable for the occurrence of the BLM identified risks in the RMP.

3. There is no doubt that if the UFO had completed a Risk Management Plan that there would be multiple areas within the UFO region what would have been identified as appropriate for a "No Lease for O&G" option. Considering the O&G risk impacts and the current worldwide surplus with O&G, it is obvious that delaying O&G development for the next 20 years is reasonable. There is little doubt that the extraction technologies will greatly improve in the next 20 years and the risks associated with the O&G development will drop.

4. The RMP does not consider the O&G water use impact on the Colorado Water Conservation Board's (CWCB) studies indicating that the Colorado will have a water deficit as early as 2030. The O&G development uses about 0.5% of the total water usage in Colorado in a year. That means that every decade the total amount of water available in Colorado drops by 5% because the water used by O&G development is removed from the earth's water cycle. The earth isn't generating any new water, just reusing what has been here for millennials. CWCB's website is http://cwcb.state.co.us/water-management/Pages/WaterManagementHome.aspx

5. The majority of your reference materials were not generated within the last five years. This situation is totally unacceptable because of the rapid advancements in technology

and studies in the O&G area. I am confident that multiple organizations are providing you with recommendations on how to update your reference materials, which would greatly affect some of the conclusions in the RPM and any Risk Management Plan.

**6.** Delta County and the Delta County Economic Development organization received a grant from the federal government to complete a study aimed at defining the best ways to develop a resilient and sustainable economy in Delta County. The Better City Company located in Utah developed that plan. The bottom line from that plan was to expanded the agriculture base, increase "value-added" agriculture businesses, increase Agri-tourism, and increase recreational and arts tourism. If you refer to the above "Farm Operations" and "Home Life" sections, you can rapidly see how O&G development poses a great risk to the plan that Delta County has started to implement.

The final Resource Management Plan must:

- Include a complete Risk Management Plan

- Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans. There is little doubt that multiple areas with the UFO, like the NFV and all of Delta County, need the no-leasing alternative to be incorporated in the final "Preferred Alternative"

- Include the detailed evaluation of the reduction in Colorado water supply in future years based on the fact that the water used in O&G development is removed from the earth's water cycle.

- Include the detailed evaluation of the impacts of O&G on the economic development effort underway in Delta and Gunnison counties.

Without detailed consideration of the bullet list above and considering how the no-leasing option would be integrated into the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities.

Sincerely,

Michael L. Drake

11/2/2016                     DEPARTMENT OF THE INTERIOR Mail - UFO Draft RMP Comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## UFO Draft RMP Comments
1 message

**Rodney Fitzhugh** <fitzearl1953@gmail.com>                    Tue, Nov 1, 2016 at 10:52 PM
To: uformp@blm.gov

Please see attached Comments from RAT/COPMOBA.

Thanks.

--
Rodney Fitzhugh
(970)209-1007

 **rmp comment.doc**
449K

BLM_0149164

**COPMOBA/RAT**

November 1, 2016

Joseph Meyer, Southwest District Manager
Dana Wilson, Acting Uncompahgre Field Office Manager
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Via Email: uformp@blm.gov

Dear Joe and Dana,

On behalf of the Ridgway Area Trails Chapter (RAT) of Colorado Plateau Mountain Bike Trail Association, Inc. (COPMOBA) I submit these comments on the Uncompahgre Field Office of the Bureau of Land Management (UFO) Draft UFO Resource Management Plan/Environmental Impact Statement (DRMP).

By way of background, RAT and COPMOBA have worked cooperatively with the UFO for many years to create and maintain non-motorized, single track trail recreational opportunities on BLM lands. RAT is extremely proud of the working relationship built with the UFO over the past several years, especially concerning recent trail development northeast of Ridgway.  That development has already produced large social, recreational and economic dividends for the local community.  In the past 2 years bicycle tourism has begun to impact many local businesses, bringing an influx of user traffic during the summer and fall.  RAT and the entire Ouray/Ridgway community would  benefit immensely from addition of more non-motorized, single track recreation opportunities to Ouray County.  RAT has identified the McKenzie Butte area between Highway 550 and County Road 1, north of Ridgway Reservoir, as an ideal area for trail development. It is within easy vehicle access of both Ridgway and Colona.  With BLM land touching highway 550 just south of Colona, and the proximity to County Road 1, trail users could potentially access the area via bicycle from Colona and Log Hill Village.  All these considerations influence the following comments.

1. **Land Disposals.**

   The DRMP states that in Alternatives B-D, identifies a number of in-holdings for possible disposal.  RAT has long range plans to develop additional non-motorized recreational opportunities, including trails, on public lands that are adjacent to lands currently owned by BLM.  RAT prefers that BLM not dispose of any public lands that either (a) would increase the amount of private land intersected by public rights-of-way, especially trails, or (b) are located adjacent to USFS or other public lands which may be suitable for further development of recreation opportunities.

BLM_0149165

2.  **Special Recreation Management Areas (SRMAs).**

As noted above, the new trail system currently under development north of Ridgway has provided a major, positive economic impact on the community.  Ridgway now has a new bike shop employing at least two Ridgway residents. The trails have brought new people to town and helped current residents develop new social networks and a strong sense of pride in the community, and local businesses have noticed a definite increase in traffic during the summer and fall when the trails are open.

RAT essentially endorses the Ridgway SRMA objectives stated in Alternatives B and D of the DRMP.  Rat generally agrees with the stipulations for both zones of the Ridgway SRMA, as described in Appendix J. RAT also generally supports DRMP comments submitted by the Montrose, Delta and West End Chapters of COPMOBA concerning various other RMP's designated in the DRMP.  We believe careful and consistent management of the Burn Canyon, Dry Creek, Kinikin Hills, Jumbo Mountain and Ridgway RMP's will have a synergistic effect to enhance social, recreational and economic benefits in the adjacent communities.

3.  **Enhanced Ecological Areas (EEAs).**

RAT values immensely the recent cooperation of BLM in expanding the trail opportunities on BLM lands within Ouray County.  As noted above, RAT has identified additional potential trails systems which could be developed within Ouray County, particularly opportunities to increase non-motorized recreation on McKenzie Butte.  RAT has already had discussions with CPW concerning the potential for trail development in that area, and strategies for minimizing impact on wildlife habitat, particularly that of big game.  RAT has also worked with private contractors to create a conceptual trail system for consideration by CPW.  We have tried to get up front with CPW on this plan, because we realize the importance of the area for wildlife management.

With this in mind, we notice that McKenzie Butte and Pinon Ridge on Log Hill Mesa are recommended to be included in a Ridgway EEA. While we certainly appreciate that the UFO's efforts to preserve connectivity of core habitat for big game and other wildlife, we are concerned about the stipulations recommended that include ROW avoidance in Alternative D.

The parcel of most concern to RAT is depicted in Figure 2-4 of the DRMP (the westernmost parcel labeled "Ridgway"). RAT would support the designation of the western parcel (Core Zone 1) to be included in this EEA, only if only if its inclusion would not have a substantial negative impact on the development of enhanced single-track trail systems in the area.  We note the proximity of this area to  Log Hill Mesa, where about a third of all Ouray County citizens reside.

In reviewing the summary of concept and purpose for EEA's (at appendix D, page D-2), we note the purpose seems to be the preservation of migration corridors between critical areas of wildlife habitat, and we are encouraged by the following comment:  "Resource management planning offers the opportunity to emphasize certain uses over others in different parts of the landscape. If important core areas and corridors are designated during planning, then

**conflicting uses could be** emphasized and located in other areas, core or **modified to minimize impacts within core and corridor habitat."**  We consider that language in light of the Appendix D description of the proposed Ridgway EEA:

| | | | |
|---|---|---|---|
| Ridgway | BLM land on Log Hill Mesa and around Billy Creek State Wildlife Area. Contributes to linkage between Cimarron Ridge and Uncompahgre Plateau, in critical big game wintering area. Divided into four zones. | Pinyon-juniper, mountain shrub | Mountain lion, mule deer, elk, bear |

This suggests that the area is especially valued as a game wintering area.  We believe that to the extent trail development may be considered in conflict with management of this proposed EEA, that conflict can be minimized by well defined, publicized and enforced winter closures, and by development of a suitable travel management plan to elimate some of the multitude of motorized trails currently located in the area, and prevent their further proliferation.

Thanks for considering this comment.

RAT/COPMOBA
By: Rodney E. Fitzhugh
fitzearl1953@gmail.com
525 Chipeta Drive
Ridgway, CO 81432
(970)209-1007.



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comments on UFO RMP
1 message

**Jeremiah Paul** <jeremiahpaulg@gmail.com>                    Tue, Nov 1, 2016 at 2:30 PM
To: uformp@blm.gov

To: Uncompahgre Field Office, Bureau of Land Management

Re: Resource Management Plan Revision

Uncompahgre Field Office

2465 South Townsend Avenue

Montrose, CO 814201

To whom is responsible for determining the fate of young families, like my own, in the North Fork Valley:

Fall of 2016 is unusually hot, with lower than expected rainfall. This is the trend we are expecting to see if we do nothing. We will continue to see worse heatwaves and prolonged drought if we continue to develop oil and gas infrastructure. But if we decide to be responsible stewards of this beautiful land, then we can begin to mitigate and alleviate these dire trends. The way we achieve this is by growing food, medicine, fiber, and even fuel in a regenerative manner that will increase carbon in the soil. Not only will agrarian economic development help us in addressing the changing climate, it will create opportunities for young families to become first-time homeowners as well as build resilience into our food system and ecosystems.

With this in mind, I strongly urge you to adopt a no-leasing alternative in the North Fork Valley, instead supporting the thriving, resilient organic agriculture and eco-tourism industries that have taken root in our communities and pose an excellent economic alternative to oil and gas development.

Sincerely,
Jeremiah P Garcia
38620 Pitkin Rd
Paonia, CO 81428

BLM_0149168



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Uncompahgre Field Office Draft Resource Management Plan
1 message

**Brad Robinson** <Brad.Robinson@oxbow.com>                    Tue, Nov 1, 2016 at 3:39 PM
To: "uformp@blm.gov" <uformp@blm.gov>

Please see the attached comments to the Uncompahgre Field Office Draft Resource Management Plan.


Thank you.

📄 **Gunnison Energy LLC Comments to Resource Management Plan 103116.pdf**
1140K

BLM_0149169



**GUNNISON ENERGY LLC**

**AN OXBOW COMPANY**

Delivered via Overnight Currier and E-Mail

October 31, 2016

Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO  81401

**Re: Draft Resource Management Plan**

Dear Project Manager:

Gunnison Energy LLC ("Gunnison") is an independent, privately owned natural gas exploration and production company doing business primarily in Gunnison, Delta and Mesa Counties of Colorado.  Gunnison has been actively engaged in natural gas exploration and production in the area for almost fifteen years and is one of the largest oil and gas operators in the area.  Gunnison hereby submits its comments to the Uncompahgre Field Office Draft Resource Management Plan and related environmental impact statement (the "Draft RMP").

Gunnison has reviewed the comments to the Draft RMP submitted by Mesa County, Montrose County and the Western Energy Alliance.  Gunnison endorses the comments made by these entities and for the sake of brevity will not relist those comments.

Gunnison asks that the Preferred Alternative be rejected.  Specifically, this alternative lacks flexibility and attempts to make vast areas closed to all minerals extraction and oil and gas development.  The over use of no surface occupancy and other onerous stipulations is a not so vailed attempt to merely ban all future oil and gas activity in the area.

The area in question has been the site of oil and gas development for more than fifty years.  During this time, there has never been a significant adverse event or impact to the area.  The current oil and gas operators in the area have demonstrated a responsible approach to development.  This responsible development can continue in harmony with land other uses.

Thank you and I urge the BLM to reconsider its proposed action.

Yours very truly,

M. Brad Robinson
President
Gunnison Energy LLC

BLM_0149170

**BLM Uncompahgre Field Office**
**October 31, 2016**
**Page 2**


CC:     Senator Cory Gardner
        Senator Michael Bennet
        Congressman Scott Tipton
        Delta County Board of County Commissioners
        Gunnison County Board of County Commissioners
        Mesa County Board of County Commissioners

BLM_0149171

11/2/2016                                                DEPARTMENT OF THE INTERIOR Mail - UFO RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## UFO RMP
1 message

---

**Heidi Hudek** <vistaverve@gmail.com>                                    Tue, Nov 1, 2016 at 10:05 AM
To: uformp@blm.gov

To the Uncompahgre Field Office

Regarding its Resource Management Plan,

I am a resident of Paonia, Colorado. I choose to live here because it is a healthy environment to raise
my son; quiet, entertaining, and beautiful, with a plethora of fresh food, clean air, and outdoor
recreation.

I am deeply concerned about the BLM proposal to lease much of our North Fork Valley BLM lands to
Oil and Gas development. This development would threaten our clean drinking and irrigation water,
and our recreational activities. I am a single mother with three jobs, and I choose this so I may live in
this beautiful, healthy place. I am taking a lot of time (not easy to allocate) to research and write to you
because the health of our valley and my son is of vital importance to me. I am writing today in favor of
a No Lease Alternative to the BLM Resource Management Plan for the North Fork Valley. A No Lease
Alternative is the responsible and most appropriate option for the culture and health of our valley.

There are many studies and incidents that prove that the industry causes health threats. The New York
State Department of Health released <u>A Public Health Review of High Volume Hydraulic Fracturing for
Shale and Gas Development</u> in December 2014. It found that residents living near "fracking" activities
had the following health problems: skin rash, nausea or vomiting, abdominal pain, breathing difficulty,
cough, nosebleed, anxiety, stress, headache, and eye and throat irritation. The study led to
recommending that "fracking" be banned in New York State. Concerned Health Professionals of New
York and Physicians for Social Responsibility cited a number of studies in <u>The Compendium of
Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional
Gas and Oil Extraction).</u> One was a study in rural Colorado stating that there are several chemicals
emitted by natural gas development known to increase risk of birth defects, and finding congenital
heart defects and neural tube defects in births mothers living within a 10 mile radius of natural gas
wells. (pg 76) Health Professionals in Vernal, UT reported a 6-fold increase in infant death rates in a
three year period, and the air quality in Uintah County, UT – which was formerly pristine – received an
"F" rating by the American Lung Association's <u>2013 State of the Air Report.</u>

The current clean water we have is necessary for the organic foods I choose to buy locally. While
developing a Resource Management Plan, the BLM is required to honor Source Water Protection Plans,
as were developed by the Towns of Paonia, Crawford and Hotchkiss. These Protection Plans were not
taken in consideration by the BLM for its Preferred Alternative. Please consider these plans.

Please also consider the permanent removal of water required to support the drilling process. Our
hydrologic cycle and the water needs down the flow would be greatly damaged if the amount of water
needed for the potential development of the Preferred Alternative were taken from our environment –
an environment which is more often troubled by drought.

Drinking and irrigation water sources have been contaminated by naturally occurring gasses and
radioactive materials released by geologic disturbance, processing chemicals, leaks, spills, and

BLM_0149172

11/2/2016                                    DEPARTMENT OF THE INTERIOR Mail - UFO RMP

airborne contaminants. According to the Center for Western Priorities, 2015 Colorado Oil and Gas Toxic Release Tracker, there were 615 spills in Colorado in 2015! Colorado does not have regulations in place to manage radioactive waste from oil and gas operations, and these operations are exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our water resources. Please take the time to analyze the risks of exposure to these chemicals and radioactive waste.

Please also consider pipeline safety. Rural gas gathering lines are exempt from Federal pipeline safety regulations. Extreme weather casing flash floods, mudslides and geologic instability can cause damage to pipelines that has yet to be considered in our safety. From 2003 to 2013 there were 85 incidences in which storms or other natural conditions damaged pipelines resulting in failure.  In 1994 flooding in the San Jacinto River led to the failure of eight hazardous liquid pipelines. The escaping liquid ignited, lead to injuries of 547 people.

These are just some of many examples as to the importance of considering the safety of residents and our water. Please take these studies, lack of regulation, and our health into consideration.

Our health also relies on the outdoor recreation we enjoy. My 10 year old son and I have explored and learned about different environments including bugs in The North Fork of the Gunnison River, plants on the 'dobies southwest of Bone Mesa, geology on Lone Cabin Road, and many more. The learning opportunities in these many environments has been enlightening and fun.

The North Fork community has put great effort and our souls into developing a trail system for hiking, trail running, and mountain biking on Jumbo Mountain. While I enjoy the hiking, he is learning to mountain bike – a good choice to occupy his time, giving him freedom and responsibility. Please designate BLM lands on and surrounding Jumbo Mountain as a Special Recreation Management Area, and include Elephant Hill, Lone Cabin Rd, McDonald Creek, and "C" hill - where my son's school takes regular hikes, learning about plants, animals, and geology.

I implore you, as a mother concerned with my child's health and our vital recreational activities, to consider all I have taken time to write about today. A No Leasing Alternative is the most responsible way to protect the North Fork Valley. However, the next best compromise is the North Fork Alternative (B1) because it requires that areas chosen for development be set back from agriculture lands, and best preserves the rural culture of the area. It also does the best to protect rivers and watersheds, trail areas, Jumbo Mountain area, and the outskirts of the West Elk Wilderness. If we must have a compromise, please include all proposed actions in the North Fork Alternative, B1, in the final RMP.

I am interested in your response and being informed of ways I may help the UFO in their conclusions and maintenance of our public lands. Please send a reply and keep me informed of available opportunities.

Thank you for your time and consideration,


Heidi Hudek

BLM_0149173

11/2/2016                                DEPARTMENT OF THE INTERIOR Mail - BLM Drilling Decision



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## BLM Drilling Decision
1 message

---

**Shawn La Bounty** <shawnlab@tds.net>                    Tue, Nov 1, 2016 at 6:47 AM
To: uformp@blm.gov
Cc: mroeber@deltacounty.com, bhovde@deltacounty.com, datchley@deltacounty.com, kerry.donovan.sd5@gmail.com, millie@milliehamner.com, millie.hamner.house@state.co.us, pswenson@gunnisoncounty.org, jhouck@gunnisoncounty.org, pchamberland@gunnisoncounty.org, rmpcomments@citizensforahealthycommunity.org, Alex Johnson <director@theconservationcenter.org>, Cary Denison <cdenison@tu.org>

To All It Concerns,

I don't envy these monumental tasks before the BLM in regards to these leases here in the North Fork and around our region.   I know that this issue has some bipartisan support at the federal and state levels.  But I implore you to think hard about these leases. I hope and pray that you will think about the present and future of the community impacted, and the motivations that drive both sides of this issue.   Drilling in the North Fork Valley makes very little since, and these parcels are dangerous parcels to extract more resources from.   The stigma associated with this drilling is severe for the vast majority of people, and the impact will be devastating and long lasting.  Geologically, politically, and realistically it makes since to choose not to pursue further drilling in the North Fork Valley.

I have iived on the North Fork of the Gunnison River East of Paonia since 1994, and in Paonia my entire life with the exception of college.  My property has a series of springs which come from higher ground on a BLM Parcel.  These springs feed a series of active Beaver Ponds creating one of the largest wetlands and active floodplains on the North fork of the Gunnison River.  These wetlands under your care were cited by Rob Molicek of the NRCS in his 1997-2000 study as "the most pristine section of wetlands with the best example of native species on the entire North Fork of the Gunnison and Lower Gunnison River".  Our spring is known as the Toltec Spring.  This spring has purposes domestic agriculture as well as for the use of wildlife.

I hold a degree in Geoiogy, and know the Geology of this valley well.  I have spent vast amounts of time hiking this land, and know these sections as well as anyone.  I know the parcels being considered for drilling are composed of unstable geology.  Many of the parcels contain massive escarpments which make up the steep valley walls, and are in view of everything around.  These escarpments are pitted with current and historical mine shafts that go to great depths and have highly fractured the bedrock all the way to the surface.  The past and current mining and natural geology make these escarpments prone to subsidence and massive landslides.     The long term danger is that the proposed well casings will fracture due to landslide pressures and the highly fractured bedrock will make groundwater pollutants had to track and allow them to reenter the watershed through the course of time.  A simple quick glance of the landscape will prove that our landscape is shaped by recent, historic and prehistoric landslides.  I am afraid many are blind to the geological and practical dangers due to current political and fiscal pressures.

The biggest problem with drilling and fracking is the horrible stigma that "fracked" communities are subjected to.  We are currently and historically an agriculture/ recreation based economy that reiies on our wildland reputation for our livelihoods.  The stigma brought on by this gas extraction puts a stain on our community that would infect us from now on:  The type of people we hoping will join our community will make the decision not to move here, and the people that are here already will decide to move.  Fracking brings on a series of negative events that spells devastation to our way of life; if that is fair to the reality of fracking of not.  It is public opinion that has the weight when it comes to the lifestyle people choose, and people are not going to choose a place that has fracking stigma over them.   You must realize that there are reasons why communities with grace and beauty always fight against this marring of the land by fracking.  It is so unfair that such short term profits of such a very few current people can outweigh the infinitely long multitudes of generations of lives of everyone else.

I beg you to follow the thought process of your predecessors who, originally, preserved public land for future benefits.  I hope and pray that you can remember who and what you work for, and don't lose site on the long term vision of what public land means.  These recourses are not currently being considered for extraction because of necessity of a country short on energy, or because of an emergency in our world: some noble and worthy reason to sacrifice.  BUT NO!  These resources are being considered to satisfy the hunger of insatiable greed of a few, and only for a few modest years.   We are talking about the marring and scarring of our land and our hearts and our minds of a whole region for virtually nothing, and for no good reason.     Please, don't give away this land, and water for short term monetary and political reasons.  Take the high road and make the wise choice.   Take this land off the chopping block!

Best Regards
Shawn LaBounty

---

BLM_0149174

 **BLM Paper 11-1-16.docx**
15K

BLM_0149175

To All It Concerns,

I don't envy these monumental tasks before The BLM in regards to these leases here in the North Fork and around our region.   I know that this issue has some bipartisan support at the federal and state levels.  But I implore you to think hard about these leases. I hope and pray that you will think about the present and future of the community impacted, and the motivations that drive both sides of this issue.   Drilling in the North Fork Valley makes very little since, and these parcels are dangerous parcels to extract more resources from.   The stigma associated with this drilling is severe for the vast majority of people, and the impact will be devastating and long lasting.  Geologically, politically, and realistically it makes since to choose not to pursue further drilling in the North Fork Valley.

I have lived on the North Fork of the Gunnison River East of Paonia since 1994, and in Paonia my entire life with the exception of college.   My property has a series of springs which come from higher ground on a BLM Parcel.  These springs feed a series of active Beaver Ponds creating one of the largest wetlands and active floodplains on the North fork of the Gunnison River.  These wetlands under your care were cited by Rob Molicek of the NRCS in his 1997-2000 study as "the most pristine section of wetlands with the best example of native species on the entire North Fork of the Gunnison and Lower Gunnison River".  Our spring is known as the Toltec Spring.  This spring has purposes domestic agriculture as well as for the use of wildlife.

I hold a degree in Geology, and know the Geology of this valley well.  I have spent vast amounts of time hiking this land, and know these sections as well as anyone.  I know the parcels being considered for drilling are composed of unstable geology.  Many of the parcels contain massive escarpments which make up the steep valley walls, and are in view of everything around.  These escarpments are pitted with current and historical mine shafts that go to great depths and have highly fractured the bedrock all the way to the surface.  The past and current mining and natural geology make these escarpments prone to subsidence and massive landslides.    The long term danger is that the proposed well casings will fracture due to landslide pressures and the highly fractured bedrock will make groundwater pollutants had to track and allow them to reenter the watershed through the course of time.   A simple quick glance of the landscape will prove that our landscape is shaped by recent, historic and prehistoric landslides.  I am afraid many are blind to the geological and practical dangers due to current political and fiscal pressures.

The biggest problem with drilling and fracking is the horrible stigma that "fracked" communities are subjected to.  We are currently and historically an agriculture/ recreation based economy that relies on our wildland reputation for our livelihoods.  The stigma brought on by this gas extraction puts a stain on our community that would infect us from now on:  The type of people we hoping will join our community will make the decision not to move here, and the people that are here already will decide to move.  Fracking brings on a series of negative events that spells devastation to our way of life; if that is fair to the reality of fracking of not.  It is public opinion that has the weight when it comes to the lifestyle people choose, and people are not going to choose a place that has fracking stigma over them.   You

must realize that there are reasons why communities with grace and beauty always fight against this marring of the land by fracking.  It is so unfair that such short term profits of such a very few current people can outweigh the infinitely long multitudes of generations of lives of everyone else.

I beg you to follow the thought process of your predecessors who, originally, preserved public land for future benefits.  I hope and pray that you can remember who and what you work for, and don't lose site on the long term vision of what public land means.  These resources are not currently being considered for extraction because of necessity of a country short on energy, or because of an emergency in our world: some noble and worthy reason to sacrifice.  BUT NO! These recourses are being considered to satisfy the hunger of insatiable greed of a few, and only for a few modest years.   We are talking about the marring and scarring of our land and our hearts and our minds of a whole region for virtually nothing, and for no good reason.    Please, don't give away this land, and water for short term monetary and political reasons.  Take the high road and make the wise choice.   Take this land off the chopping block!

Best Regards

Shawn LaBounty

BLM_0149177

11/2/2016                                      DEPARTMENT OF THE INTERIOR Mail - RMP Comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## RMP Comments
1 message

**Jere Lowe** <jere.lowe@paonia.com>                                Tue, Nov 1, 2016 at 3:17 PM
To: ufomp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org, info@theconservationcenter.org, Alex Johnson
<director@theconservationcenter.org>

Thanks
Jere Lowe
jere.lowe@paonia.com

The information transmitted via this e-mail is intended only for the person or
entity to which it is addressed and may contain confidential and/or privileged
material.  Any review, retransmission, dissemination or other use of, or
taking of any action in reliance upon this information by persons or entities
other than the intended recipient is prohibited. If you received this in error,
please contact the sender and delete the material from any computer

October 30, 2016

BLM_0149178

BLM, Uncompahgre Field Office 2465 S. Townsend Ave. Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office Dear BLM-UFO Staff and RMP Comment Team,

Thank you for the opportunity to comment on the draft Uncompahgre plan.
The outcome is important to me because it will affect my home, farm, commercial business and community for years to come.

At this writing,
It so happens that I am currently running for Delta County Commissioner of District 3. That said, I think it safe to say that the North Fork Valley is extremely important to me, my family and my constituents.

That Is why I am taking a strict no oil and gas extraction position.

I sincerely believe that some places like the North Fork Valley should simply be left wild no matter the amount of carbon energy that may be in the ground.
I lived right next to it in Erie, Colorado and I can **firmly** attest that we do not want that around here.

One of the main reasons we moved here was to get away from that mess.
Our home was well within 2000 ft. of an existing gas well. I personally experienced nausea and migraine headaches as well as vertigo in my 8 years living next to this well.
Upon moving to the North Fork Valley ten years ago my symptoms literally disappeared.
I will take our well managed coal mines over fracking and continuous extraction any day.

Instead I am asking that the BLM designate their areas in the North Fork Valley to be changed over to either an SRMA (Special Recreation Management Area), or an ACEC (Area of Critical Environmental Concern), or an EEA (Ecological Emphasis Area).
At a minimum, simply sustainable energy leases on the affected BLM land only!

I am quite confident that the United States, Colorado, and even Delta County will still survive hundreds of more years, even if we choose to leave that oil and gas in the ground. I am also quite confident that should that industry come to the North Fork Valley it will hurt our property values and could potentially ruin all of our health and livelihoods.

That is why I propose that should you decide against a no extraction policy for Colorado's North Fork Valley that you at least apply the following conditions in the RMP.

Given our extremely crucial, sensitive and volatile ecosystem, these conditions are necessary to the long term health and well being of our local ecosystem, watersheds, economy and our community.

Full and complete compliance at all times with the Clean Water Act for every wellhead / drilling site.

Full and complete compliance at all times with the Clean Air Act for every wellhead / drilling site.

A $500MM security bond per wellhead / drilling site for all immediate and ongoing issues that may arise up to and including complete shut down and clean up / restoration.

A one time $250K roads and associated infrastructure improvement fee per well head for the life of the well.

A one time community impact fee of $250K fee per well head for the life of the well.

A one time Sustainable Energy Research and Development fee of $250K per well head for the life of the well.

A one time Science and Engineering grant fee of $100k per well head for the life of the well.

A bi-annual water resources improvement fee of $150K per well head for the life of the well.

If the vested interests think this is excessive then they are not part of the community they wish to extract from and should be denied any potential extraction rights and leases.

BLM_0149179

11/2/2016                              DEPARTMENT OF THE INTERIOR Mail - RMP Comments

We are the head waters of some of the nations freshest, cleanest waters. Climate Change has certainly reared it's head here in the west however. And our water resources are sparse.

Even the slightest little spill or accident could have a devastatingly destructive impact on our community and watershed.

We are one of the wildest places left in the lower 48.
Seeing that they cannot submit letters to the BLM, I believe I speak for the Mountains and the Rivers and the Trout and the Deer and the Elk and the Bears and the Trees and the Flora when I say No Thank You!

Please do not jeopardize that for the short term gains of the private for profit oil and gas extraction industry. Whilst the People are far too poorly compensated for our resources.

The strongest level of protection should be afforded to the North Fork Valley

Thank You,
Jere Lowe

 **RMP.pdf**
47K

BLM_0149180

FROM THE DESK OF

# JERE LOWE

October 30, 2016
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Thank you for the opportunity to comment on the draft Uncompahgre plan.
The outcome is important to me because it will affect my home, farm, commercial business and community for years to come.

At this writing,
It so happens that I am currently running for Delta County Commissioner of District 3.
That said, I think it safe to say that the North Fork Valley is extremely important to me, my family and my constituents.

That Is why I am taking a strict no oil and gas extraction position.

I sincerely believe that some places like the North Fork Valley should simply be left wild no matter the amount of carbon energy that may be in the ground.
I lived right next to it in Erie, Colorado and I can **firmly** attest that we do not want that around here.

One of the main reasons we moved here was to get away from that mess.
Our home was well within 2000 ft. of an existing gas well. I personally experienced nausea and migraine headaches as well as vertigo in my 8 years living next to this well.
Upon moving to the North Fork Valley ten years ago my symptoms literally disappeared.
I will take our well managed coal mines over fracking and continuous extraction any day.

Instead I am asking that the BLM designate their areas in the North Fork Valley to be changed over to either an SRMA (Special Recreation Management Area), or an ACEC (Area of Critical Environmental Concern), or an EEA (Ecological Emphasis Area).
At a minimum, simply sustainable energy leases on the affected BLM land only!

I am quite confident that the United States, Colorado, and even Delta County will still survive hundreds of more years, even if we choose to leave that oil and gas in the ground.
I am also quite confident that should that industry come to the North Fork Valley it will hurt our property values and could potentially ruin all of our health and livelihoods.

That is why I propose that should you decide against a no extraction policy for Colorado's North Fork Valley that you at least apply the following conditions in the RMP.

Given our extremely crucial, sensitive and volatile ecosystem, these conditions are necessary to the long term health and well being of our local ecosystem, watersheds, economy and our community.

EARTH FRIENDLY FARMS 12441 MINERICH ROAD   PAONIA, CO 81428   970.399.7598

BLM_0149181

Full and complete compliance at all times with the Clean Water Act for every wellhead / drilling site.

Full and complete compliance at all times with the Clean Air Act for every wellhead / drilling site.

A $500MM security bond per wellhead / drilling site for all immediate and ongoing issues that may arise up to and including complete shut down and clean up / restoration.

A one time $250K roads and associated infrastructure improvement fee per well head for the life of the well.

A one time community impact fee of $250K fee per well head for the life of the well.

A one time Sustainable Energy Research and Development fee of $250K per well head for the life of the well.

A one time Science and Engineering grant fee of $100k per well head for the life of the well.

A bi-annual water resources improvement fee of $150K  per well head for the life of the well.

If the vested interests think this is excessive then they are not part of the community they wish to extract from and should be denied any potential extraction rights and leases.

We are the head waters of some of the nations freshest, cleanest waters.
Climate Change has certainly reared it's head here in the west however.
And our water resources are sparse.

Even the slightest little spill or accident could have a devastatingly destructive impact on our community and watershed.

We are one of the wildest places left in the lower 48.
Seeing that they cannot submit letters to the BLM, I believe I speak for the Mountains and the Rivers and the Trout and the Deer and the Elk and the Bears and the Trees and the Flora when I say No Thank You!

Please do not jeopardize that for the short term gains of the private for profit oil and gas extraction industry.  Whilst the People are far too poorly compensated for our resources.

The strongest level of protection should be afforded to the North Fork Valley

Thank You,

Jere Lowe



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Draft UFO RMP Comments
1 message

**Alli Melton** <alli.melton@gmail.com>                              Tue, Nov 1, 2016 at 3:09 PM
Reply-To: Alli Melton <alli.melton@gmail.com>
To: ufomp@blm.gov

Dear Decisionmaker:

Please see the attached comment letter regarding the UFO Draft RMP.  Do not hesitate to contact me should you have any difficulties with the attachment.

Sincerely,

Allison N. Melton

> 📄 **16-11-1 anm comments on ufo rmp.pdf**
> 363K

BLM_0149183

November 1, 2016
uformp@blm.gov
*Submitted electronically*

**Re: BLM UFO Draft RMP**

Dear Decisionmaker:

This comment focuses on two aspects of the BLM UFO's Draft RMP: coal and oil and gas.

Coal
It is necessary that BLM analyze *and* adopt a "no leasing" alternative for coal. Such an alternative is a required to counterbalance the current alternatives that skew heavily in favor of coal leasing. A "no leasing" alternative for coal is also the only effective way to realistically minimize climate impacts. It is irresponsible for the BLM to ignore the real and lasting impacts of its preferred alternative, especially when the neighboring and overlapping sister agency's (GMUG's) recent analysis in a forest-wide project (Spruce Beetle Aspen Decline Management Response DEIS) demonstrates that these public lands and surrounding lands are going to have substantial negative impacts as the result of climate change. For too long BLM has ignored the climate change ramifications of coal leasing and mining. Now is the time for BLM to use the revision process to inform management for years to come in a manner that will work towards climate stability and security for our local communities and public lands. At a minimum, the Final RMP must include up-to-date data concerning coal markets, coal production and coal employment in the area. Much of the Draft RMP's data dates back to 2010 or older. As such, it is stale in light of shrinking coal production and employment.

Oil and Gas
I support the "North Fork Alternative," which provides for no oil and gas leasing across 75% of the North Fork Valley. The North Fork Valley is where much of the food I buy comes from, and this is true for many that live in my community just on the other side of Kebler Pass. It is also an area that I routinely recreate in because of its towering and intact aspen galleries that blanket rolling hillsides and the robust oak scrub landscape. As the organic and general breadbasket of the state, it is thoughtless for BLM to allow the North Fork to be overrun with incompatible oil and gas industrialization that would threaten the strong and sustainable economic drivers of this area of the state. Tourism in the North Fork and where I live (Upper Gunnison Valley), rely heavily on eco-tourism; tourism that is driven by the pristine public lands, scenic and intact vistas, healthy and vibrant farms, as well as remote and pleasant scenic country drives. Pock-marked landscapes, spiderwebs of roads, increased industrial traffic (semis, etc.), and the deleterious air quality impacts that result from Volatile Organic Compounds, methane, and more, jeopardizes our way of life and the very core of our communities' economic drivers.

Please ensure the adopted RMP will protect our public lands and communities for years to come by protecting them from coal and oil and gas leasing.

Sincerely,

*/s Allison N. Melton*
Allison N. Melton
PO Box 3024
Crested Butte, CO 81224

11/2/2016                                DEPARTMENT OF THE INTERIOR Mail - BLM Resource Management Plan



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

# BLM Resource Management Plan
1 message

**Laurie Milford** <lkmilford@gmail.com>                        Tue, Nov 1, 2016 at 12:17 PM
To: uformp@blm.gov
Cc: info@theconservationcenter.org

Please accept these comments on the revision of the Uncompahgre RMP.

Laurie Milford
Paonia, CO 81428

 **Uncompahgre161031.docx**
124K

BLM_0149185

October 31, 2016


Laurie Milford
418 Delta Ave.
Paonia, CO 81428


BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

I am a resident of Paonia and live near BLM lands. I have lived in the North Fork
Valley for two months. Prior to that, I lived and worked in Laramie, Casper, and
Lander, Wyoming for nearly twenty years. During that time, I came to know many
landscapes and communities that have been drilled intensely for oil and gas,
including the Pinedale, Worland, Casper, and Rawlins Field Offices. In these places,
oil and gas drilling severely degraded air quality, polluted sources of household
water and water used for livestock, harmed mule deer, sage-grouse, and other
wildlife, and left the landscape pocked with drilling rigs and, later, wells. By the mid-
2000s, within a decade of the beginning of the Town of Pinedale was an "ozone
nonattainment zone." The Wind River Range was dimmed by haze, and the lights of
drilling rigs lit up a sky that was dark for eons before. Now the North Fork Valley of
Colorado is home to my husband, young son, and me. We moved here because the
landscape is still beautiful, and the water and air are still clean. I'm writing to ask
that you consider carefully the opportunity of the Uncompahgre Resource
Management Plan to protect these resources.

My family and I care deeply about BLM lands around Paonia, including Jumbo Rocks
and the foothills of the West Elks. We trail-run and walk, and our son is learning to
ride his pedal bike on some of these beautiful trails. In fact, walking on public lands
is one of our favorite activities—one of the top reasons we live in the West and why
we have chosen to bring our community service and tax dollars to Delta County.

But it isn't just one or a few specific points on a map that need to be protected. Our
clean air and water must be safeguarded as well. When we moved to Paonia from
Portland, OR, in August, our son had an elevated level of lead in his blood—perhaps
from the high levels of lead found recently in the air and soil in Portland, where we
lived until this summer. We chose the Western Slope in part because the air here is
still clean, and we believed our son would have the chance to grow up breathing

BLM_0149186

cleaner air and drinking clean water. The water at our house comes from the Paonia municipal water supply. If nearby BLM lands are drilled according to the draft, preferred alternative, North Fork Valley water would risk contamination, and air could see significant degradation.

One of the great joys of Paonia—and one of the main amenities attracting people to visit or make their homes here—is fresh, organic produce. The final management plan must protect the health of the watershed for the sake of people and of agriculture. For that reason, I ask that you exclude all oil and gas activities within a half-mile of all surface and ground domestic water sources, including municipal waters supplies. Most of the domestic water sources in the North Fork Valley are surface springs and streams that are either on or near BLM lands affected by this plan. Please also protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, and canals. This is a minimum distance required to safeguard direct and rapid contamination from spills and other oil and gas activity.

The final plan must also protect streams and surface water quality, protecting ecological resources, aquatic habitat, recreational attractions, water storage, and flood control by closing areas within a half mile of lakes, ponds, wetlands, and reservoirs to oil and gas activities including leasing. The final plan should also recognize that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters are priority habitats with adequate protections from all surface activities.

Thank you for the opportunity to comment on the draft Uncompahgre Field Office resource management plan. I am glad the BLM is considering ways to protect important natural resources like wildlife habitat, domestic and irrigation water, wild and scenic rivers, air quality, and recreation. In particular, I support the designation of ecological emphasis areas and special recreation management areas. These will preserve habitat connectivity, wildlife corridors, undeveloped open space, and recreation opportunities within our region.

Sincerely,


Laurie Milford

11/2/2016                    DEPARTMENT OF THE INTERIOR Mail - Comments on Draft Resource Management Plan



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comments on Draft Resource Management Plan
1 message

**Mountain Trip** <info@mountaintrip.com>                    Tue, Nov 1, 2016 at 9:23 AM
To: ufomp@blm.gov

Dear Partners at the BLM,

We would like to respectfully submit the attached letter of comment on the Uncompahgre Draft Resource Management Plan.  Please find a letter of comment attached.

Respectfully,
Todd Rutledge

Guide/Director
**Mountain Trip**
*PO Box 3325*
*Telluride, CO 81435*
T. +1-970-369-1153 (GMT -6)
F. +1-303-496-0998
info@mountaintrip.com
www.mountaintrip.com
Find us on Facebook!



Proud Partners with **PATAGONIA** clothing and equipment!



📄 **Comment Letter on BLM Draft Resource Management Plan.pdf**
    700K

BLM_0149188



**MOUNTAIN TRIP**

398 W. Colorado Ave
P.O. Box 658
Ophir, CO 81426

T  970.369.1153
F  303.496.0998

info@mountaintrip.com

www.MountainTrip.com

Mountain Trip International, LLC
PO Box 3325, Telluride, CO 81435

October 28, 2016

Project Manager, Uncompahgre RMP
Bureau of Land Management, Uncompahgre Field Office
2465 S. Townsend Ave. | Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Thank you for this opportunity to comment on the Draft Resource Management Plan (RMP) for the
Uncompahgre Field Office of the BLM.

Mountain Trip International (dba Mountain Trip) has been leading outdoor enthusiasts into wild spaces
in southwest Colorado for the past 12 years.  Our company has grown from a small, regional guide
service to a world-renown industry leader, operating on all seven continents and serving a global
clientele.  In the past two years, our local operations, operating under a BLM permit issued by the
Uncompahgre Field Office and under USFS permits issued by the Norwood District, have increased over
500%.  Our greatest resources are the wild and scenic spaces for which our area is world famous.  We
help people from around the world explore and enjoy our local public lands.

We are concerned how the often short-term benefits from rampant energy development harm the
environment around such projects, yet often have negative long-term impacts on tourism, recreation
and community health. While there are many economic drivers to host energy development, many are
short-sighted and don't take into consideration the public's enjoyment of these public lands, which can
be forever altered.

We ask the BLM to fully protect all river and stream segments identified in the BLM Uncompahgre Wild
& Scenic eligibility report as being suitable for Wild and Scenic designation. These river and stream
segments have been recognized for their free-flowing condition and for their outstanding and
remarkable values, including providing critical habitat for fish and excellent places to fly fish, raft and
recreate.  Having boated and explored many stretches threatened by potential development, we plead
you to embrace the necessity of keeping such wild places in their natural condition.
We therefore urge you to strongly support the suitability finding for the 104.6 miles that have been
identified in the agency's "Preferred Alternative," and urge you to retain all those stretches in the final

RMP.  Please include the 154 miles of streams and rivers found suitable in Alternative B to be included in your final plan.

Also, please support the Lands with Wilderness Characteristics (LWCs), and Areas of Critical Environmental Concern (ACECs) identified in Alternative B, ensuring that this land does not default to mineral leasing.  The landscape itself is a natural resource, and one of the highlights for our guests is to capture wild spaces that are free from the blight of mineral development and its associated infrastructure.  The areas of concern also contain numerous archaeological sites and unique plant species.  We ask that you include no surface occupancy on any of the EEAs identified in Alternative B in order to protect wildlife habitat and migration corridors.

In the "Preferred Alternative," Alternative D - over 90% of land would be open for oil and gas leasing. This is the default, yet many of these lands have low potential for oil and gas, or possess other outstanding values and should be protected for recreation, wildlife, or other conservation values.

We ask that the BLM set reasonable limits to mineral extraction on our public land.  Our understanding of climate change has come a long way in the last two decades, and we need to take proactive steps to address these impacts by reducing fossil fuel extraction and leasing.  A segment of our business is dependent on the snowpack in the San Juan Mountains, which has seen negative changes in recent years from climate change as well as from dust layers likely generated by increased mineral development on the Utah side of the border.

The majority of the land at stake in our interest area is along the San Miguel River downstream from the Telluride valley and west of Naturita to the Paradox Valley. The BLM's Preferred Alternative would allow these areas to be leased to oil and gas companies, and compromise air and water quality and recreation. Energy development would also have a direct negative effect on local tourism.  The economic future of our region will depend upon the health and quality of our land and environment, and the diverse opportunities and economies this offers. The BLM's final plan should limit available oil and gas leasing lands west of Naturita, on public lands in the Paradox Valley, and anywhere else that energy development encroaches on recreational areas.

Please take into full consideration the negative impact that energy development would have to local tourism and the human-powered activities that many of us enjoy in those areas. As the stewards of the 675,800 acres of public lands at stake, the BLM needs to protect these lands for the future, not sell them off for immediate, short-term gain.

We appreciate the opportunity to comment on the Draft Resource Management Plan.

Sincerely,

Todd Rutledge
Director, Mountain Trip International, LLC

BLM_0149190



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Draft UFO RMP Comments
1 message

**Sue Navy** <suenavy@gmail.com>                                   Tue, Nov 1, 2016 at 11:06 AM
Reply-To: Sue Navy <suenavy@gmail.com>
To: uformp@blm.gov

Dear BLM,
Please find attached my comments on the Draft UFO RMP.

Thank you,
Sue Navy

 Virus-free. www.avast.com

 **BLM UFO RMP comments 11-1-16.pdf**
111K

BLM_0149191

*Sue Navy*
*Box 432 ~ 324 Gothic*
*Crested Butte CO 81224*
*970-349-5886*

November 1, 2016

Re: Draft UFO RMP comments

Dear BLM representative,
I am writing to address the Draft UFO RMP, which I find disappointing and lacking in several areas. Knowing that it was written by informed people makes it harder to understand the emphasis on continued coal and gas production.

Since the final plan will stand for possibly decades, it is completely counterproductive to rely on methods of the past that are soon to be relegated to history books. As we go further into the 21st century, fossil fuels are, of necessity, going to be further discounted, and therefore should not be encouraged by this plan.

Greenhouse gas emissions need to be curtailed, in conjunction with the proliferation of clean energy sources, which are now overtaking fossil fuels as suppliers of energy globally:

"According to the International Energy Agency (IEA), total clean power capacity increased by 153 gigawatts, overtaking coal for the first time...The agency also raised its five-year forecast for renewable energy by 13 percent and now expects renewables to be 42 percent of global energy capacity by 2021."
[http://www.ecowatch.com/renewable-energy-overtakes-coal-electricity-2062921638.html].

"Renewable energy has surpassed coal as the largest source of global electricity generation and it is expected to grow at a faster pace than originally thought, industry experts have found." [http://www.investopedia.com/news/renewable-energy-overtakes-coal-fslr-nee/].

The North Fork Valley depends on organic farming, wineries and ranches, all of which depend on clean water. As the North Fork progresses into the future, it no longer can afford to rely on the outmoded and unhealthy industries that coal and gas represent.

With the health of the environment and citizens of the North Fork at stake, along with those of us who live and recreate downwind of coal and gas emissions (i.e. Gunnison

BLM_0149192

County), it is imperative that you choose the North Fork Alternative. This alternative would limit fossil fuel extraction throughout the North Fork, and is thus the most valid approach to reducing these causative sources of climate change.

It is absolutely time to change our ways if we want to sustain ourselves, our economies, our environment into the future. Continuing on an antiquated and destructive path would only heighten the uncertainty of human and natural life on our planet.

Thank you for acting responsibly.

Sincerely,

Sue Navy



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Fwd: Public Comment - Include The Paradox Special Recreation Management Area in the RMP
1 message

**Pfifer, Teresa** <tpfifer@blm.gov>                                                    Tue, Nov 1, 2016 at 9:15 AM
To: BLM_CO UFO_RMP <uformp@blm.gov>

--------- Forwarded message ---------
From: **Jake Niece** <jacobniece@gmail.com>
Date: Tue, Nov 1, 2016 at 9:03 AM
Subject: Public Comment - Include The Paradox Special Recreation Management Area in the RMP
To: tpfifer@blm.gov

One last public comment to you. I've lived in Colorado my whole life, and and I value our wide open spaces. I recreate in both motorized and non-motorized ways, including hunting. I have also been a wildland firefighter in southwest Colorado for the last six years, and have spent a lot of time working in the oil patches southeast of Durango. Seeing the extent of oil and gas development there has been very disheartening, and I wish for protection of as much public land against it as possible.

The damage wreaked in the oil patches goes beyond the checkerboard of noisy wells, pads, and maze of roads. I've personally been sickened by hydrogen sulfide gas expelled from these wells, and I've happened across a lot of dead wildlife on the ground that I surmise was killed by it. In 2008 several firefighters were evacuated from the area and hospitalized because of hydrogen sulfide exposure (see the Maverick Fire Hydrogen Sulfide Gas Exposure Incident). I realize H2S gas may not necessarily be present in the The Paradox Special Recreation Management Area, but this is one of the unintended consequences brought on by mineral extraction.

Here are more unintended consequences. The water at my house in the area of Arboles, CO was undrinkable because of fracking contamination, and the oil roads are used as trash dumps, meth lab locations, and poaching hotspots. We also now know that fracking can cause earthquakes, and poison the groundwater. The jobs provided by mineral extraction are boom-and-bust style that mostly bring drillers and pipeliners from out of the region, and do little to provide long-term stability.

I fear the day when every square foot of land that isn't a designated wilderness or national park is either dotted by a gas well every quarter mile, or covered by tailings piles. Do you want to see what this looks like? Attached is an image from google earth of the Southern Ute Indian Reservation where oil and gas development is unrestricted. You can see it yourself if you fly out of the Durango airport. This is what our future looks like if we don't protect SOME space from mineral extraction. There is so much area already available to mining, why don't we leave some un-ruined pieces for our kids? Please include the Paradox Special Recreation Management Area in the final RMP.

Jake Niece
720 352 2250
www.jakeniece.com


**web-43.jpg**
645K

BLM 0149196

11/2/2016                            DEPARTMENT OF THE INTERIOR Mail - Resource Management Plan Revision



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Resource Management Plan Revision
1 message

**Greg Norris** <gsnorris@gmail.com>                                    Tue, Nov 1, 2016 at 2:22 PM
To: uformp@blm.gov, rmpcomments@citizensforahealthycommunity.org, rwelch@blm.gov,
millie.hamner.house@state.co.us, bsharrow@blm.gov
Cc: info@theconservationcenter.org, info@citizensforahealthycommunity.org

November 1, 2016


Subject: Resource Management Plan Revision


I am a resident of Paonia, CO and I support Alternative B and B1 for the future plan. Thank you for including plan B1 in the draft RMP process.


There are multiple reasons for my concern regarding the draft Resource Management Plan:


The area under consideration is one of the most beautiful and environmentally rich areas for humans, wildlife, fish, ranching, farming and recreation.  Careful consideration must be given to future use.


We purchased a home in paradise, that is Paonia, which we use for our work and our retirement.  We chose to live in this location for its beauty, climate, clean air and water, abundance of farms, ranches, orchards, wineries and the diversity of people who live and work here.


We, along with many other residents, have many fruit trees that rely on uncontaminated water from the mountains streams and rivers.


Drilling and hydraulic fracturing and resuitant harm to the water table will have a negative impact on all of this.   There will also be increased air poilution and negative impacts on the abundant and diverse local wildlife.


The reasons for my statements are as follows:


1-6 million gallons of water per well will be used.  That is water taken out of the water needed for all the above. This amounts to 70-140 billion gallons nationwide.


Fracking affects groundwater and surface water resources.


1 million gallons of fracking "water" contains 4500 gallons of chemicals.

BLM_0149196

Flow back can contaminate streams and shallow aquifers.

Potential leakage of wells.

A good example of unintended consequences is the Animas River disaster.

The EPA reports the over 1000 chemicals are used in fracking. 659 organic compounds are used. In addition, fracking companies hide which chemicals they use by "confidential product exclusion".

The US has > 112,000 wells. Do we really need more?

Fracking has proven to increase earthquakes.

Many "culprit" old wells didn't have deep enough casings on them.

If the workers at the fracking sites don't live in the area in which they are drilling, I'm worried that they won't care enough about the quality of their work.

With reference to section 2.3 and 2.3.4 on page 2-7 of the DRMP, alternatives B and B1, pleae protect the areas where we fish north of Hotchkiss and hike in the North Fork Valley, close to our area of residence. We routinely hike Jumbo Mountain and support Jumbo Mountain for the designation of Special Recreation Management Area.

Again, the North Fork Valley is an agricultural and ranching community that has organic farms, wineries and ranchlands.

Drilling and horizontal hydraulic fracturing have negative impacts to the water, air and land in this area.

This area does not have the infrastructure to support the increases in industrialization that are part of drilling and hydraulic fracturing. Our community is developing agriculture, recreation and tourism as the economic base at this time. The ability to sustain and protect the views, watersheds and wildlife areas is important to the future of this area.

I respectfully request that you find Plan B and B1 as the RMP that will be the plan for the future for the Uncompahgre Field Office area.

Yours truly,

Gregory Norris, M.D.

BLM_0149197

BLM_0149198

11/2/2016 DEPARTMENT OF THE INTERIOR Mail - comments on UFO RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## comments on UFO RMP
1 message

---

**Deborah Paulson <deborah.paulson@gmail.com>**                    Tue, Nov 1, 2016 at 12:44 PM
To: uformp@blm.gov

I will attach my comments, as well as pasting in the text here:

Thank you for the opportunity to comment on the draft Uncompahgre Field Office RMP.  I strongly support the citizens' Alternative B1 and Alternative B.  The "balanced" approach you recommend in Alternative D will result in losses of quality of life in the North Fork Valley, loss of wilderness  and ecological values in areas that deserve greater protections, and threats to endangered species.

It is especially important that species on the edge, like the Gunnison Sage-grouse, be given the strongest protections possible.  As someone who has worked with the San Miguel Basin GSG Working Group, I have watched the transformation of Dry Creek Basin with the development of the oil and gas over the last decade.  The road traffic and noise have increased dramatically, almost certainly with negative impacts for the grouse.  The plan to withdraw leases in GSG habitat as they expire is helpful, but not sufficient.  Restrictions on surface activities should err on the side of protection, using the maximum buffer distances from the literature to protect nesting, resting and winter habitat, as well as leks. According to the USGS Open-File Report 2014-1239, the maximum effect of most types of disturbance on grouse behavior and survival is about 5 miles. Buffers should be at least that much, as we are not currently succeeding in stopping the decline of this species. The ACECs for Gunnison Sage-grouse should be implemented.

The North Fork Valley is a beautiful and productive rural landscape. To open this area to oil and gas leasing makes no sense at all. The area will begin losing economic value as this peaceful agricultural landscape is industrialized with drilling, even without the spills and pollution of water this is likely. As a person who has visited the North Fork Valley many times as a tourist, buying  fruit, visiting the towns and recreating on the BLM and FS lands nearby, I can assure you that O& G development in the valley would ruin that area's attraction; I would likely not go there anymore on my vacation time.  Even more important, the people of the valley do not want the level of leasing you propose. I support them in favoring Alternative B1.

You have identified far more areas of critical environmental concern than you plan to protect in the RMP. Why would you not give the full protection to any area of critical concern that meets your criteria?  In general, the Uncompahgre Plateau and surrounding area is probably more special than we have realized. All of the areas that you have identified as potential ACECs deserve strong protection in the face of the recreational and other pressures you document.

I value wilderness highly.  I seek quiet recreation in landscapes with wilderness qualities. These areas are incredibly important to me personally.  This includes those lower elevation areas, like the Adobe Badlands that are most threatened by motorized use.  When I last visited the Adobe Badlands WSA, it was clear that it was being violated.  It deserves wilderness designation and enforcement.  So much of the badlands have already been made accessible to motorized recreation, you should protect the areas that still have wilderness qualities.  I have also spent time in the lower Tabeguache Creek and Shavano Creek areas, hiking, birdwatching and botanizing with my husband. These, too, are areas that deserve recognition and protection of their wilderness values

Deborah Paulson
7852 CR 203
Durango, CO 81301

---

 **UFO RMP comments.docx**
14K

---

BLM_0149199

Thank you for the opportunity to comment on the draft Uncompahgre Field Office RMP.  I strongly support the citizens' Alternative B1 and Alternative B.  The "balanced" approach you recommend in Alternative D will result in losses of quality of life in the North Fork Valley, loss of wilderness  and ecological values in areas that deserve greater protections, and threats to endangered species.

It is especially important that species on the edge, like the Gunnison Sage-grouse, be given the strongest protections possible.  As someone who has worked with the San Miguel Basin GSG Working Group, I have watched the transformation of Dry Creek Basin with the development of the oil and gas over the last decade.  The road traffic and noise have increased dramatically, almost certainly with negative impacts for the grouse.  The plan to withdraw leases in GSG habitat as they expire is helpful, but not sufficient.  Restrictions on surface activities should err on the side of protection, using the maximum buffer distances from the literature to protect nesting, resting and winter habitat, as well as leks. According to the USGS Open-File Report 2014-1239, the maximum effect of most types of disturbance on grouse behavior and survival is about 5 miles. Buffers should be at least that much, as we are not currently succeeding in stopping the decline of this species. The ACECs for Gunnison Sage-grouse should be implemented.

The North Fork Valley is a beautiful and productive rural landscape. To open this area to oil and gas leasing makes no sense at all. The area will begin losing economic value as this peaceful agricultural landscape is industrialized with drilling, even without the spills and pollution of water this is likely. As a person who has visited the North Fork Valley many times as a tourist, buying  fruit, visiting the towns and recreating on the BLM and FS lands nearby, I can assure you that O& G development in the valley would ruin that area's attraction; I would likely not go there anymore on my vacation time.  Even more important, the people of the valley do not want the level of leasing you propose. I support them in favoring Alternative B1.

You have identified far more areas of critical environmental concern than you plan to protect in the RMP. Why would you not give the full protection to any area of critical concern that meets your criteria? In general, the Uncompahgre Plateau and surrounding area is probably more special than we have realized. All of the areas that you have identified as potential ACECs deserve strong protection in the face of the recreational and other pressures you document.

I value wilderness highly.  I seek quiet recreation in landscapes with wilderness qualities. These areas are incredibly important to me personally.  This includes those lower elevation areas, like the Adobe Badlands that are most threatened by motorized use.  When I last visited the Adobe Badlands WSA, it was clear that it was being violated.  It deserves wilderness designation and enforcement.  So much of the badlands have already been made accessible to motorized recreation, you should protect the areas that still have wilderness qualities.  I have also spent time in the lower Tabeguache Creek and Shavano Creek areas, hiking, birdwatching and botanizing with my husband. These, too, are areas that deserve recognition and protection of their wilderness values

Deborah D. Paulson
7852 CR 203
Durango, CO 81301

BLM_0149200



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

# Uncompahgre Draft Resource Management Plan/EIS
1 message

**Platt, Amy** <Platt.Amy@epa.gov>                                    Tue, Nov 1, 2016 at 4:31 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Cc: Gina Jones <gmjones@blm.gov>

Hello: Please find attached EPA's comments on the subject document. A hard copy of the letter was placed in today's mail. If further explanation of our comments is desired, please don't hesitate to contact me.


Thanks,

*Amy*

..................................................................

Amelia A. Platt, Environmental Scientist

EPA Region 8 NEPA Program (8EPR-N)

1595 Wynkoop Street

Denver, CO 80202


303-312-6449; Platt.Amy@epa.gov

http://www.epa.gov/compliance/nepa/

..................................................................


---

📄 **EPA 11-1-16 Comments UFO RMP DEIS.pdf**
1553K

BLM_0149201



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 8**
1595 Wynkoop Street
Denver, CO   80202-1129
Phone 800-227-8917
www.epa.gov/region08
NOV 1 - 2016

Ref:  8EPR-N

Dana Wilson, Acting Field Manager
Uncompahgre Field Office
Bureau of Land Management
Attn: Gina Jones, NEPA Coordinator
2465 S. Townsend Avenue
Montrose, Colorado 81401

RE:  Uncompahgre Field Office Draft RMP/EIS, **CEQ #20160118**

Dear Ms. Wilson:

The U.S. Environmental Protection Agency Region 8 has reviewed the May 2016 Draft Resource Management Plan (RMP) and Environmental Impact Statement (EIS) prepared by the Bureau of Land Management for the Uncompahgre Field Office (UFO). The Draft EIS is intended to analyze impacts associated with the BLM's long-range decisions concerning the use and management of resources in the UFO RMP planning area. Our comments are provided for your consideration pursuant to our responsibilities and authority under Section 102(2)(C) of the National Environmental Policy Act (NEPA) and Section 309 of the Clean Air Act (CAA).

**Background**

The UFO planning area consists of approximately 3.1 million acres in southwestern Colorado and includes BLM, U.S. Forest Service (USFS), National Park Service, Bureau of Reclamation, state and private lands in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties. Of this large planning area, about 675,800 surface acres and 971,000 mineral acres are administered by the BLM. If approved, the new RMP will replace applicable portions of the BLM's San Juan/San Miguel Planning Area RMP (1985) and the entire Uncompahgre Basin RMP (1989a).

Alternatives identified in the Draft RMP/EIS include: Alternative A (No Action), Alternative B (emphasis on improving and restoring resources), Alternative B.1 (resource-based partial alternative developed from recommendations provided by a community group and specific to oil and gas leasing/development in the North Fork and Smith Fork drainages of the Gunnison River – referred to as the "North Fork Area"), Alternative C (emphasis on maximizing resource uses), and Alternative D – the BLM's Preferred Alternative (emphasis on balancing resource conservation and resource use among competing interests).

**The EPA's Comments and Recommendations**

Based on the EPA's review of the Draft RMP/EIS, an overarching observation is that much of the existing conditions information is dated. For example, some of the discussion under the Affected Environment sections for air, water, and energy resources rely on data that are 5-9 years old. An accurate representation of existing conditions is prerequisite to the ability to assess future impacts. We recommend updating the existing conditions information, including the maps, for the Final RMP/EIS and providing an explanation for any older data that the BLM considers representative of current conditions.

It appears that many aspects of the draft analysis are responsive to the EPA's recommendations provided in our April 5, 2010 scoping letter. Given potential energy development over the Draft RMP's 15-20 year planning horizon and the high value air and water resources of the area, the EPA is interested in the BLM's approach to ensuring protection of these valuable resources. The EPA's remaining recommendations are intended to further inform the decision to be made and the public's understanding of potential impacts to public health and the environment.

The EPA's specific comments and recommendations pertain to the following issues: (1) air resources and climate change; (2) solid leasable minerals – coal; (3) groundwater resources; (4) surface water resources; (5) public drinking water supply sources; (6) water management and water resource monitoring; and (7) wetlands, riparian areas and floodplains. These issues serve as the basis for the EPA's EC-2 rating discussed at the conclusion of this letter.

## 1. Air Resources and Climate Change

### Air Quality Analyses and Disclosure of Potential Impacts

The Draft RMP/EIS relies on the Colorado Air Resources Management Modeling Study (CARMMS) for far-field and regional air quality impacts, and focuses exclusively on the CARMMS high scenario for the UFO planning area. Although a primary purpose of NEPA is to enable the decision-maker and the public to understand the potential impacts of the alternatives analyzed, the air quality impacts (both detriments and benefits) of each of the alternatives are not identified in the Draft RMP/EIS. Further, it is unclear whether the CARMMS scenarios are representative of the level(s) of development being analyzed for this action because the CARMMS scenarios do not directly align with each project alternative, and the Draft RMP/EIS does not explain how the model scenarios are associated with the alternatives for the UFO planning area. As a result, the decision-maker and the public may not be sufficiently informed regarding air quality impacts associated with the alternatives' varying levels of development over the full planning horizon.

We recommend that the analysis be amended to include results from the low and medium CARMMS scenarios, and to the extent possible, the analysis explain how those impacts could be interpreted with regard to each of the Draft RMP/EIS alternatives. We recommend that comparisons of impacts be made between the alternatives and not between base-year and future-year model results alone.

We also recommend considering whether the selected future year of 2021 is still representative or needs

BLM_0149203

to be updated given that it is only 5 years from the date of this Draft EIS. For NEPA purposes, we recommend that the analysis of the cumulative impacts be based on the maximum emission year during the RMP planning horizon of about 15-20 years. The appendices to the June 2011 MOU for Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions through NEPA (AQ MOU) include an example that could be adapted for use with a reusable modeling framework such as CARMMS. This example emphasizes the importance of designing future year projections "to examine the potential for maximum growth in the planning area." At a minimum, we recommend that the Final RMP/EIS update current conditions with the most recently available information for the planning area counties, and then update the analysis to highlight any significant differences in air quality impacts between the alternatives.

Greenhouse Gas (GHG) Emissions and Climate Change

While the Draft RMP/EIS includes the direct and indirect emissions associated with the proposed activities and alternatives within the planning area, further clarification around the coal production assumptions is needed to ensure the estimates are reasonable. For example, given the projected continued decline in demand for coal, the BLM's assumption in the Draft EIS that coal mine production will remain unchanged from the base year (2008) and any existing mine production will be replaced by production from future mine development in the area may greatly overestimate associated GHG emissions. In addition, further clarification is needed on the source of information for the BLM's estimate of the current maximum expected production rate of approximately 11 million metric tons per year, versus the current permitted rates used for the direct emissions analysis. Given this RMP covers the same North Fork Area recently analyzed under the USFS's Colorado Roadless Rule EIS,[1] we recommend the BLM consider this analysis and incorporate relevant information regarding a range of potential future coal production scenarios and their associated direct and indirect GHG emissions into the Final RMP/EIS.

As mentioned earlier, the Draft RMP/EIS relies on the CARMMS for calculating indirect emissions, and focuses exclusively on the CARMMS high scenario for the UFO planning area. Therefore, we recommend that the Final RMP/EIS utilize the low and medium CARMMS scenarios to provide a reasonable range of indirect GHG emissions and explain to the decision-maker and the public how those impacts could be interpreted with regard to each of the Draft RMP/EIS alternatives.

In the Draft RMP/EIS, the BLM compares the proposal's estimated GHG emissions to U.S. and Colorado Statewide GHG emission levels. Such comparisons are "not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and

---

[1] Colorado Roadless Rule Website:
http://www.fs.usda.gov/wps/portal/fsinternet/!ut/p/c4/04_SB8K8xLLM9MSSzPy8xBz9CP0os3gDfxM
DT8MwRydLA1cj72BTFzMTAwjQL8h2VAQAJp-
nEg!!/?ss=119930&navtype=BROWSEBYSUBJECT&cid=null&navid=111000000000000&pnavid=nu
ll&position=BROWSEBYSUBJECT&ttype=roadmain&pname=Roadless-
%2520Colorado%2520Roadless%2520Rule

3

BLM_0149204

mitigations because this approach does not reveal anything beyond the nature of the climate change itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact."[2] EPA recommends that BLM follow the approach outlined by the CEQ's GHG Guidance regarding the analysis of GHG emissions and climate change.

The Draft RMP/EIS incorrectly states that "the tools to analyze or predict how global or regional climate systems may be affected by a particular activity or activities within the planning area are not currently available." In addition, BLM inappropriately references conclusions from a 2008 modeled source to determine that activities under the UFO planning area would have no measureable impact on the climate. We recommend removing these statements and instead refer to CEQ's GHG Guidance for how to analyze climate change impacts.

## 2. Solid Leasable Minerals – Coal

Acres Proposed as Acceptable for Coal Leasing

The Draft RMP alternatives appear to substantially increase the amount of acres available for coal leasing (e.g., the 145,270 acres currently acceptable would be increased to 374,450 acres under the Preferred Alternative D) without explaining the change in management emphasis. Such an increase in available acreage would have inherent resource impacts at the development stage, including potential air and water resources impacts associated with developing or expanding a mine in areas with limited previous commercial coal mining. Perhaps most importantly, the Draft RMP/EIS does not identify which coal fields have high levels of methane that would be vented prior to and during mining.

Coal demand is currently at low levels, and a number of energy market analysts predict a continuing decline in demand. In September 2016, Tri-State Generation and Transmission Association announced that its Nucla Station will be retired by the end of 2022. Coal for this power plant is supplied by the one operating coal mine in the Nucla-Naturita coal field. Accordingly, we recommend that the Final RMP/EIS assess whether coal demand in the Nucla-Naturita coal field will be short term and whether the amount of coal needed through 2022 may already be covered by existing leases.

Further, the coal technical report[3] prepared for the Draft RMP/EIS identified areas with potential for coal development during the plan life. The conclusions of the report include no expectation of commercial mining for the Tongue Mesa or Grand Mesa coalfields over the next 20 years (p. 59). In addition, the Draft RMP/EIS alternatives propose a new area for coal leasing in the Dakota Formation west of Montrose even though, according to the report, this area appears to have poor prospects for commercial mining.

With the above issues in mind, we recommend that the Draft RMP/EIS alternatives be revised regarding acreage proposed for coal leasing in order to reflect the predicted potential for development and

---

[2] CEQ Guidance, p.11.
[3] Coal Resource and Development Potential Report, Uncompahgre Field Office, Colorado, April 2010

4

anticipated market conditions for the planning horizon of the RMP (i.e., 15-20 years). To reflect changes in coal demand, specifically, we recommend that the Preferred Alternative be revised as follows: reduce the acreage available for leasing in the Nucla-Naturita field to the amount of coal needed to continue operating the power plant until 2022; delete available leasing for the Tongue Mesa and Grand Mesa coal fields due to the lack of commercial scale mining anticipated over the planning horizon of this analysis; and delete the proposed acreage acceptable for coal leasing in the area of the Dakota Formation west of Montrose due to poor prospects for commercial mining over the next 15-20 years. These changes to the Preferred Alternative would help to limit the potential for air and water resources impacts resulting from project-level development. Should coal market conditions dramatically change, the decision to open any of these areas to coal leasing should be more fully analyzed with a site-specific environmental analysis, including whether these coal fields contain high methane coals and if there could be additional impacts related to accessing, mining and shipping coal from these fields.

If the BLM does not agree with the above recommendation to revise the Preferred Alternative's acreage proposed as acceptable for coal leasing, then it will be important to provide a more detailed rationale for proposing such a large increase over the existing acreage - particularly given the Draft RMP/EIS's prediction of lack of commercial mining interest in certain areas over the planning horizon.

Methane Mitigation Measures

As described in the Draft RMP/EIS and supporting documents, coal leasing and development activities are likely to continue around the existing operations at the Somerset coal field. This coal field is well known for being a gassy formation with substantial GHG emissions of methane. This ongoing issue has been analyzed in a number of the BLM's leasing decision environmental assessments and the USFS's EISs and EAs for exploration activities, vent holes and roads located on USFS land. The majority of methane from these coal mines is vented directly into the atmosphere. We recommend that new leases in this area include stipulations that require the successful lessee to either use or combust a substantial portion of the methane vented from these mines. Given the magnitude of GHG emissions from these uncontrolled vents, if it is not economical to install methane mitigation measures then we recommend not issuing the leases until economic conditions improve sufficiently to make methane reduction feasible.

**3. Groundwater Resources**

Groundwater Characterization

It is important to characterize both the existing and potential groundwater and drinking water resources in the planning area. We recommend that the Final EIS identify and describe the quality of all groundwater sources that meet both the BLM definition of usable water under Onshore Order No. 2, and those considered underground sources of drinking water (USDW) under the Safe Drinking Water Act (SDWA). Useable waters are "those waters containing up to 10,000 ppm of total dissolved solids" which must be reported, protected and/or isolated under BLM Onshore Order No. 2; these aquifers are also considered Underground Sources of Drinking Water (USDW) if their total dissolved solids (TDS) concentrations are < 10,000 mg/L. As such, these USDWs are subject to protection under the SDWA

5

BLM_0149206

unless an aquifer exemption has been granted.

One option to address this recommendation is to provide a set of stratigraphic column diagrams representative of the planning area that includes those formations containing mineral resources and all aquifers and water-bearing intervals. We recommend including additional information regarding water quality (TDS) and whether or not the groundwater may be considered useable or USDW. It would also be informative to describe what (if any) current use exists for those water bearing zones.

We note that Figure 3-8, displaying the major geologic structures, is helpful. We recommend that the Final RMP/EIS map include all known geologic structures (i.e., faults and fractures) to further inform well placement at the project level and to avoid structures that are more likely to act as conduits for deeper fluid flow into shallower aquifers. Please also include the outline of the Piceance Basin Province, not just the structural boundary.

We would welcome the opportunity to discuss these recommendations further with you and/or the BLM Colorado State Office Hydrogeologist, if desired.

<u>Mitigation for Impacts from Resource Extraction</u>

Potential impacts to groundwater quality and quantity from resource extraction, such as mining and oil and gas production, are of concern in the planning area, including those associated with the following: leaks and spills; production and disposal of produced water or processing waters; use of pits, underground injection control (UIC) wells, infiltration basins and evaporation ponds; production wellbore integrity; closure requirements; pipeline use; and impacts associated with restimulation and abandonment of existing wells. The BLM's Preferred Alternative D includes leasing stipulations that will address some of these groundwater concerns. For example, No Leasing (NL) and Controlled Surface Use (CSU) stipulations are identified to protect groundwater wells and springs used in Public Water Supply systems. In addition, Alternative D includes a No Surface Occupancy (NSO) leasing stipulation that requires a 500 foot buffer from occupied dwellings – which by default would protect the associated domestic water wells in those areas. We support these measures.

In addition, the EPA recommends that the Final RMP/EIS include the following:

- A mitigation plan for remediating future unanticipated impacts to drinking water wells, such as requiring the operator to remedy those impacts through treatment, replacement or other appropriate means.
- A general production wellbore diagram and discussion to demonstrate how near-surface and deeper useable waters will be isolated and protected from fluid migration that may occur during oil and gas development activities. At a minimum, current Colorado Oil and Gas Conservation Commission (COGCC) protections for groundwater resources should be implemented. Specifically, we recommend that a discussion of the requirements of COGCC Rule 317, most recently updated on March 16, 2016, be included in the Final RMP/EIS. These requirements apply wherever "freshwater" groundwater sources exist (as described by COGCC Rule 317). In addition, we suggest requiring disclosure of all chemicals introduced to the wellbore (including

6

maintenance chemicals) used at well pads to inform response decisions in the event of a spill or other impact.
- Abandonment procedures for sealing wells no longer in use in order to reduce the potential for inactive wells to serve as the conduits for fluid movement between production zone(s) and aquifer(s). This is particularly important where existing wells do not have surface casing set into the base of USDWs and lack sufficient production casing cement.

Lastly, please update the reference to the EPA's hydraulic fracturing study (p. 4-83). While the original draft concluded that no "widespread" contamination related to oil and gas exploration was evident, there are scientific studies of groundwater impacts directly related to oil and gas operations in the Piceance Basin, Colorado, and elsewhere. We can provide a list of references if so desired. Please discuss these impacts in the Piceance Basin and what well construction practices will be required to prevent similar groundwater contamination within the planning area.

**4. Surface Water Resources**

Surface Water Characterization

Draft RMP/EIS Figure 3-10, Hydrologic Units, does not provide the level of detail necessary to understand the existing water resources of the planning area. The EPA recommends the Final RMP/EIS include maps with the following information:

- Water bodies in the planning area, including perennial, intermittent and ephemeral water bodies;
- Using the most recent EPA-approved CWA Section 303(d) list (which is 2016), water body segments classified by the CDPHE as water quality impaired or threatened under the Clean Water Act (CWA) Section 303(d); water bodies considered not impaired by CDPHE, and water bodies that have not yet been assessed by the CDPHE for impairment status. We also recommend that a table be provided to identify the designated uses of water bodies and the specific pollutants of concern, where applicable.

In addition, Tables 3-9 through 3-11 present data from the 2007-2008 timeframe, including some sampling data from 1998-2007. To ensure an adequate representation of existing conditions, we recommend that this information be updated for the Final EIS with the most recent available data. We recommend comparing existing conditions to existing water quality standards or other reference conditions and presenting associated water quality status and trends.

Surface Water Impacts

The Draft RMP/EIS presents information on impaired waterbodies based on the Colorado 2008 CWA Section 303(d) list. We recommend that the Final RMP/EIS address potential impacts to impaired water bodies within and/or downstream of the planning area based on the most recent EPA-approved CWA Section 303(d) list (which is 2016). The BLM should coordinate with CDPHE if there are identified potential impacts to impaired water bodies (in order to avoid causing or contributing to the exceedance of water quality standards). Where a Total Maximum Daily Load (TMDL) exists for impaired waters in

7

the area of potential impacts, we recommend that pollutant loads from activities on BLM lands comply with the TMDL allocations for point and nonpoint sources. Where new loads or changes in the relationships between point and nonpoint source loads are created, we recommend that the BLM work with CDPHE to revise TMDL documents and develop new allocation scenarios that ensure attainment of water quality standards. Where TMDL analyses for impaired water bodies within, or downstream of, the planning area still need to be developed, we recommend that proposed activities in the drainages of CWA impaired or threatened water bodies be either carefully limited to prevent any worsening of the impairment or avoided where such impacts cannot be prevented.

<u>Erosion and Sediment Load Analysis</u>

As noted in the Draft RMP/EIS, the Mancos Shale Formation, which overlays much of the planning area, often contains high levels of selenium and soluble salts that can degrade water quality in receiving streams and may represent a significant source of pollutants when mobilized by natural and human-caused soil disturbances. Both salinity and selenium yields can be accelerated by the same processes that increase sediment. Depending on a host of variables including soil characteristics, industrial operations and topography, associated runoff could introduce sediments, selenium and salts, as well as heavy metals, radium isotopes, biological pathogens, nutrients and other pollutants into surface waters.

We note that fragile soils such as those with elevated levels of salinity or selenium and/or those prone to erosion have been identified in the planning area. Because sediment loading is already a concern, and future activities (including livestock grazing, oil and gas development, and mining) that may be authorized under this RMP would result in new surface disturbance that may enable erosion, it is important the Final RMP/EIS include information about this issue. To fully disclose and, if necessary, mitigate the potential impacts of soil disturbance, we recommend that the Final RMP/EIS include an estimate of erosion rates and resulting impacts to water quality for each alternative. For example, the Wyoming BLM's Bighorn Basin Draft RMP/EIS estimated erosion rates based on projected amount of surface disturbance, types of surface disturbance and general characteristics of the basin (erodible soils, slopes, etc.). Erosion rates were calculated using the Water Erosion Prediction Project model (WEPP), a web-based interface developed by the U.S. Department of Agriculture, Agricultural Research Service, which can be accessed at http://www.ars.usda.gov/Research/ docs.htm?docid=18084&pf=1. We recommend that the BLM consider using this model or another appropriate model that would be applicable to this planning area.

<u>Surface Water Mitigation</u>

We support the Best Management Practices (BMPs) and Standard Operating Procedures (SOPs) identified in the Draft RMP/EIS Appendix G. In particular, BMPs and SOPs applicable to livestock grazing, roads, oil and gas development, stream crossings, forestry, and travel management should reduce impacts to soils, wetlands/riparian areas and water resources from BLM-authorized activities in the planning area. We recommend augmenting these measures with the EPA's recommendations, described below.

8

BLM_0149209

*Fluid Minerals Leasing and Other Surface-Disturbing Activities*

Contaminants from surface events such as spills, pit and pipeline leaks, and nonpoint source runoff from surface disturbance have the potential to enter and impact surface water resources if these events occur in close proximity to water bodies. If surface activities are set back from the immediate vicinity of surface water, wetlands, and designated source water protection zones, this provides an opportunity for accidental releases to be detected and remediated before impacts reach water resources. If accidental releases are not detected, the setback provides a safety factor and some possibility of natural attenuation occurring. Setbacks also help prevent nonpoint source pollutants such as sediments from impacting surface waters.

The Draft RMP/EIS contemplates a large increase in acreage subject to restrictions applicable to fluid minerals leasing and other surface-disturbing activities as compared to the existing RMPs. The Preferred Alternative D includes NL, NSO, CSU, and Timing Limitation (TL) fluid mineral leasing stipulations and No Ground Disturbance (NGD) and Site-Specific Relocation (SSR) restrictions for other surface-disturbing activities. These measures will be applied at the project level to protect water resources, including public water supplies; major rivers; perennial, intermittent, and ephemeral streams; and riparian areas, fens, springs and wetlands. Taken together, these leasing stipulations and surface-disturbing restrictions represent a significant improvement over the existing requirements, and we encourage you to continue this positive trend in protecting the UFO's valuable water resources.

Some of the BLM's proposed lease stipulations are not completely consistent with the EPA's general recommendations. For example, we generally recommend a minimum 100 foot NSO setback buffer from slopes greater than 30%; a minimum 500 foot NSO setback for flowing waters (rivers and streams) or 100-year floodplain, whichever is greater; a minimum 500 foot NSO setback for lakes, ponds and reservoirs, wetland and riparian areas and springs; and a minimum 750 foot NSO setback for 303(d) impaired waters. With this in mind, we recommend that the BLM's Preferred Alternative incorporate either these EPA recommendations or the stipulations described for Alternatives B/B.1 (which the Draft RMP/EIS describes as being more protective of water resources). In addition, we recommend clarifying Appendix B stipulation CSU-12 regarding protection of hydrology features under Alternative D. The stipulation description notes that CSU restrictions would apply from 325-500 feet of perennial streams, but it does not provide the related distances from intermittent and ephemeral streams; riparian areas, fens, wetlands; and water impoundments.

*Locatable Minerals – Uranium*

The Draft RMP/EIS notes that there is a high occurrence potential for uranium in the planning area and predicts an increase in uranium extraction and processing over the planning horizon. It is unclear from the Draft RMP/EIS discussion (p. 4-287) which BMPs will be required for uranium exploration and reclamation. We recommend using existing roads to the fullest extent possible and following strict standards for any necessary road construction, stockpiling of topsoil, and sediment basins, similar to those identified in Appendix G., BMPs and SOPs, under the categories of Water, Riparian, Forestry, and Fluid Minerals practices and procedures for protection of water resources. We also recommend including a discussion of requirements for the adequate bonding of exploration activities to restore the

BLM_0149210

mining site and repair any road damage that may occur from high runoff events. In addition, we recommend including a discussion and/or map to specify the areas more likely to experience heavy exploration in the future or to be the sites of new mines (we note that Figure 3-22 identifies current active exploration sites). We encourage higher reclamation and bonding standards for exploration and mining in areas that have not been previously mined. Conversely, if the exploration and mining will be in an area with previous mining and incomplete reclamation, we recommend encouraging the proponent to improve reclamation for historic mining activities as part of the permitting process.

*Livestock Grazing*

We support the development of design criteria to be utilized and refined during site specific analyses, including adaptive management/mitigation and monitoring measures to reduce the potential for impacts to aquatic resources. We recommend that the Final RMP/EIS include an expanded list of BMPs with consideration of the following:

- Management to limit deposition of animal waste in and adjacent to waterbodies, including protecting or repairing any existing exclusions, providing upland water developments, and development of new range improvements to discourage congregation near waterbodies.
- Enhanced monitoring of resource conditions adjacent to high value water resources.
- Monitoring to assess effectiveness of range improvements in protecting aquatic resources.

We recommend that the Final RMP/EIS clarify whether adaptive management techniques would be applied under all alternatives since it currently appears to be discussed only under Alternative B. If adaptive management is included, we recommend that the Final RMP/EIS also identify the features of an effective adaptive management plan that would be utilized at the project level, including the following:

- Achievable and measureable objectives to provide accountability and guide future decisions;
- Specific decision thresholds with identified indicators for each impacted resource;
- Targets that specify a desired future condition;
- Commitment to implement a monitoring plan with protocols to assess whether thresholds are being met;
- Commitment to use monitoring results to modify management strategies as necessary; and
- Designated timeframes for completion of necessary management modifications.

## 5. Public Drinking Water Supply Sources

The Preferred Alternative D includes fluid minerals leasing stipulations, including NL and CSU, to protect Public Water Supply systems. We support these measures as a strong step forward in protecting these valuable resources.

Note that for groundwater and groundwater under the direct influence of surface water (GWUDI) public drinking water supply sources, we generally recommend a minimum one-half mile (2,640 feet) NSO or

10

CSU concentric buffer. This recommendation is based on the professional judgment of the CDPHE Source Water Protection Program (SWPP). For additional information, please contact the CDPHE SWPP Coordinator, John Duggan, at 303-692-3534.

To further strengthen the BLM's efforts to protect public drinking water supply sources, we recommend that the Final RMP/EIS Preferred Alternative's Public Water Supply leasing stipulations incorporate either the above EPA recommendation for protection of groundwater and GWUDI public drinking water supply sources or the related stipulations described for Alternatives B/B.1 and noted by the BLM as being more protective of water resources.

## 6. Water Management and Water Resource Monitoring

### Water Management

Water demand associated with mining or the drilling and completion of new wells in the planning area is an important consideration that will benefit from analysis and disclosure in the Final EIS. Although the oil and gas reasonably foreseeable development scenario for the planning area is relatively low over the RMP planning horizon, depletion of surface water in the planning area watersheds may affect major rivers and produced water from oil and gas development may affect groundwater. We recommend that the Final RMP/EIS include a general discussion of the following:

- A range of water demand per well developed in the planning area (based on predicted well depths, formation characteristics, and well designs, as well as hydraulic fracturing operations, if used);
- Possible sources of water needed for oil and gas development; and
- Potential impacts of the water withdrawals (e.g., drawdown of aquifer water levels, reductions in stream flow, impacts on aquatic life, wetlands, and other aquatic resources).

In addition, the EPA recommends the Final RMP/EIS include a general discussion of how flow back and produced water will be managed including:

- Estimated volume of produced water per well;
- Options and potential locations for managing the produced water (i.e., UIC wells, evaporation ponds, and surface discharges);
- Possible target injection formations, formation characteristics and depth of any UIC wells; and
- Potential impacts of produced water management.

The EPA also recommends the BLM encourage operators to consider recycling produced water for use in well drilling and stimulation, thereby decreasing the need for water withdrawals and for produced water management/disposal facilities and minimizing the associated impacts.

### Water Resource Monitoring

We fully support the intent of the Draft RMP/EIS Alternatives B and D to require more water resource monitoring than the No Action Alternative in an effort to inform protection of water resources, including

11

detection of any impacts before they become widespread. We were unable to locate a monitoring plan in the available documents and recommend that one be provided in the Final RMP/EIS. We have identified some specific recommendations below for your consideration.

*Fluid Minerals Leasing and Other Surface-Disturbing Activities*

The EPA recommends that the Final RMP/EIS address how water quality monitoring in the planning area will occur at the project level prior to, during, and after anticipated development to detect impacts to both surface water and groundwater resources, including private well monitoring. The EPA notes that for groundwater, operators will at a minimum need to conform to the COGCC requirements for pre-development and post-development groundwater monitoring described in Rule 609. As Colorado has no present requirements for surface water pre- and post-development monitoring, the EPA recommends the Final RMP/EIS describe how project-level monitoring will occur to identify any impacts to surface water resources resulting from oil & gas exploration and production. A recent example of a surface and groundwater quality monitoring plan is the "Water Quality Monitoring Plan" developed by the BLM for the Monument Butte Oil and Gas Development Project Final EIS.[4]

*Livestock Grazing*

We recommend that Section 4.4.2, Livestock Grazing, include a discussion of how monitoring requirements will be applied at the project level to ensure that the BLM Colorado Public Land Health Standards are met. An explanation regarding how the Annual Operating Instructions will ensure compliance with project level monitoring requirements for parameters such as water quality would be helpful. To evaluate and adjust grazing management strategies, we recommend a monitoring section that describes how monitoring will be implemented on an allotment level and watershed or sub-watershed level to determine rangeland conditions including water quality status and trends. A wide array of monitoring options exist, and we are available to discuss the options if desired.

## 7. Wetlands, Riparian Areas, and Floodplains

Existing Conditions

We recommend that the Final RMP/EIS present inventories and maps of existing wetlands and waters of the U.S. within the planning area, including waters that are regulated under Section 404 of the CWA and wetlands and waters that are protected under Executive Order 11990 – Protection of Wetlands (May 24, 1977). Providing information on existing acreage and functional health of these areas will be a valuable addition to the Final RMP/EIS in order to understand baseline conditions.

Avoidance and Mitigation

It appears that activities approved under the Draft RMP could create adverse impacts to waters of the

---

[4] Under "Documents" please see Final EIS, Appendix H: http://go.usa.gov/xqjTJ

BLM_0149213

U.S., including wetlands, due to redundant road crossings, impacts form oil and gas pads (minimum of 1 acre) and grazing impacts from concentrated watering activity. Since BLM-authorized activities in the planning area, including grazing, oil and gas development and mining activities, have the potential to cause changes in hydrology due to surface disturbance, compaction and increased run-off, these changes in hydrology may result in stream structure failure and additional sediment loading of wetlands and riparian areas.

With this in mind, we recommend that the Final RMP/ EIS describe how the BLM intends "to minimize the destruction, loss or degradation of wetlands, and to preserve and enhance the natural and beneficial values of wetlands" as described in EO 11990, including how wetlands will be identified and avoided, and how unavoidable impacts would be mitigated. Methods to protect wetlands, riparian areas and floodplains, include the following:

- Application of minimum setback requirements through leasing stipulations such as NSO for wetlands and riparian areas. The EPA recommends NSO within the footprint of wetland and riparian areas, as well as a 500 foot NSO setback from wetland and riparian areas (described in the Surface Water Mitigation section of Comment #4 above);
- Leasing stipulations to protect floodplains, such as NSO within the 100-year floodplain (described in the Surface Water Mitigation section of Comment #4 above); and
- Delineation and marking of perennial seeps, springs and wetlands on maps and on the ground prior to project level development to ensure identification of these resources to facilitate their protection.

As noted above under Comment #4, the Preferred Alternative D's proposed increase in planning area acreage subject to restrictions applicable to fluid minerals leasing and other surface-disturbing activities at the project level to protect water resources, including riparian areas, fens, springs and wetlands, represent a significant improvement over the existing requirements. Again, we recommend clarifying Appendix B, stipulation CSU-12 regarding protection of hydrology features under Alternative D to provide the related setback distances from intermittent and ephemeral streams; riparian areas, fens, wetlands; and water impoundments. In addition, we recommend further strengthening these proposed protections by including either (1) the EPA's recommendations identified above or (2) the stipulations described for Alternatives B/B.1 (which the Draft RMP/EIS describes as being more protective of water and riparian/wetland resources).

We also recommend that the Preferred Alternative include special protections from livestock grazing, such as buffer zones for high quality riparian and wetland resources including springs and fens. In addition, we note that 11 grazing allotments were identified as "having problems meeting," or "not meeting," the BLM Colorado Public Land Health Standard 2 (riparian/water quality standard). We support including the full acreage of these affected 11 allotments in the "Improve" management category under the Preferred Alternative D.

Lastly, we support the Preferred Alternative D proposal for several Areas of Critical Environmental Concern (ACEC) that will protect riparian/wetland resources and aquatic species values. We recommend that the BLM consider broadening these protections by including the additional or expanded ACECs related to riparian/wetland values identified under Alternative B (i.e., Dolores Slickrock

BLM_0149214

Canyon, Roubideau-Potter-Monitor, and San Miguel River Expansion).

**Other Issues**

Mancos Shale Development Potential

We suggest that the Final RMP/EIS include a discussion regarding how or if the updated development potential of the Mancos Shale in the Piceance Basin, as recently determined by the U.S. Geological Survey, affects reasonably foreseeable development for the planning area. Based on this discussion, it may be necessary to update related sections of the Environmental Consequences chapter. (See Assessment of continuous (unconventional) oil and gas resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah, 2016: https://pubs.er.usgs.gov/publication/fs20163030.)

Threatened and Endangered Species

The Draft RMP/EIS identifies numerous Endangered Species Act-listed species known to exist or potentially exist in the UFO RMP planning area. We recognize that the BLM will discuss its determinations and findings regarding these species with the U.S. Fish and Wildlife Service (USFWS). Documentation of the USFWS's consultation and recommendations for mitigation and monitoring will be a valuable addition to the Final RMP/EIS.

In addition, given that water consumption and produced water disposal considerations identified in our Comment #6 above could impact four Colorado River endangered fish species, we recommend the Final RMP/EIS describe how the BLM will ensure that future projects will comply with the recovery goals of the Upper Colorado River Endangered Fish Recovery Program.

**The EPA's Rating**

Based on our review, the EPA is rating Alternative D, the Preferred Alternative, as "Environmental Concerns – Insufficient Information" (EC-2). The "EC" rating means that the EPA's review has identified potential impacts that should be avoided in order to fully protect the environment, including potential impacts to air quality and water quality. The "2" rating means that the Draft EIS does not contain sufficient information for the EPA to fully assess environmental impacts. A description of EPA's rating system can be found at: http://www2.epa.gov/nepa/environmental-impact-statement-rating-system-criteria.

Although we rated Alternative D as the BLM's Preferred Alternative, we recommend that the BLM's decision incorporate either the EPA's additional recommendations for water resource protections (described above) or the water resource protection measures identified under Alternatives B/B.1 since, as noted numerous times in the Draft RMP/EIS, these alternatives provide greater protection of water and wetland/riparian resources in the planning area. Relevant measures that were not part of the Preferred Alternative include additional restrictions applicable to fluid minerals leasing and other surface-disturbing activities (e.g., NL, NSO, CSU, TL, NGD, and SSR) to protect water and

14

wetland/riparian resources and the additional or expanded ACECs related to riparian resource values.

We appreciate the opportunity to comment on this document and hope our suggestions for improving it will assist you with preparation of the Final RMP/EIS. We would be happy to discuss these comments and our recommendations. If you have any questions, please feel free to contact me at 303-312-6704 or Amy Platt, of my staff, at 303-312-6449 or by email at platt.amy@epa.gov.

Sincerely,

Philip S. Strobel
Director, NEPA Compliance and Review Program
Office of Ecosystems Protection and Remediation

15

*Printed on Recycled Paper*

BLM_0149217



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## RFMBA Comment Letter on UFO RMP
1 message

**Mike Pritchard** <mike.pritchard@imba.com>                          Tue, Nov 1, 2016 at 12:18 AM
To: uformp@blm.gov

Please see attached pdf for comments on the Bureau of Land Management, Uncompahgre Field Office's Resource Management Plan.

Sincerely,

**Mike Pritchard**
**RFMBA, Executive Director / IMBA, Associate Region Director**
**(970) 948-3486 . www.rfmba.org**
**(303) 545-9011. www.imba.com**



📄 **RFMBA_NF BLM RMP Comments_10-31-16.pdf**
   247K

BLM_0149218



Our mission is to create and sustain the best possible mountain bike trail system and experience in the Roaring Fork Valley.

**Executive Director**
Mike Pritchard

**Board of Directors**
Charlie Eckart
   Chairman
Todd Fugate
   Vice-Chair
Matt Layne
   Secretary
Ian Philips
   Treasurer
Art Burrows
Nic Degross
Jack Boyd
Jim Pokrandt
Adam Cornely

RFMBA, a Chapter of the International Mountain Bicycling Association, is a 501(c)(3) charitable organization.

Post Office Box 2635
Aspen, CO, 81612
www.RFMBA.org

October 31, 2016

Attention: Bureau of Land Management, Uncompahgre Field Office
Send Via Email: uformp@blm.gov

Please accept the following comments, provided by the Roaring Fork Mountain Bike Association, a Chapter of the International Mountain Bicycling Association, regarding the draft Resource Management Plan for the BLM public lands managed by the Uncompahgre Field Office.

RFMBA recommends selection of Alternative B (and where it applies, Alt. B1) to provide the best management strategies for the preservation of public lands while providing support for local economies based on recreational activities and development. The Roaring Fork Valley, managed by the BLM's Colorado River Valley Field Office, benefits from two Special Recreation Management Areas (SRMA's) as well as additional Extensive Recreation Management Areas (ERMA's). These designations allow for BLM land managers and community partners to agree on the areas where specific investment in developing high quality recreation amenities, especially non-motorized trail systems, will serve the greatest needs of local populations. RFMBA wholeheartedly recommends that SRMA's and ERMA's be designated within UFO's final RMP.

While our board members, and members at large, are focused on maintaining and evolving the trail systems within the Roaring Fork Valley, many of us often travel to neighboring regions to explore public lands and high quality trail systems. We stay in local hotels and B&B's with our families, and search out new restaurants while enjoying time away from work. The economic benefit story of high quality trails is one that has been grasped by communities throughout Colorado, and we hope that towns like Delta and Paonia will benefit similarly based upon decisions that will be made within this RMP.

In consultation with our mountain bike and trail advocacy contacts at the Delta Area Mountain Bikers, we support the creation of an SRMA for the Jumbo Mountain area (as outlined in Alt. B1). Maximizing the size of this SRMA will ensure a diversity of recreation uses will be possible throughout the life of this Resource Management Plan.

**Imagine! The best trails on the planet – right outside your door!**



**Our mission is to create and sustain the best possible mountain bike trail system and experience in the Roaring Fork Valley.**

In addition, we recommend designation of SRMA's and/or ERMA's for:

- -North Delta (to connect the Grand Mesa to Delta City limits with mechanized routes).
- -Hotchkiss High School Area (transformative educational pursuits on public lands).
- -The Youngs Peak area near Crawford (community benefits: health, wellness, destination tourism).
- -Elephant Hill / Lone Cabin (remote non-motorized backcountry experiences near Paonia).
- -Paonia State Park & Reservoir (increased public access and amenity to existing state assets).
- -Powell Mesa / Oak Mesa near Hotchkiss (community benefits: health, wellness, destination tourism).
- -McDonald Mesa (remote non-motorized backcountry experiences near Crawford).
- -Stevens Gulch (reclamation of mining impacted lands for recreation near Paonia).

Given the BLM's National Recreation Strategy of Connecting with Communities, implementing multiple SRMA's and ERMA's throughout the Uncompahgre Field Office will help to streamline the process of creating strong partnerships with the constituent communities in this region.

Please don't hesitate to contact me at (970) 948-3486 or mike.pritchard@imba.com.  Thank you for your consideration of our recommendations.


Sincerely,

Mike Pritchard
RFMBA, Executive Director
IMBA CO/WY Associate Region Director

**Imagine! The best trails on the planet – right outside your door!**

BLM_0149220

11/2/2016                                    DEPARTMENT OF THE INTERIOR Mail - Comments on UFO RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Comments on UFO RMP
1 message

---

**Jim Riddell** <jriddell@frontier.net>                                    Tue, Nov 1, 2016 at 11:55 PM
Reply-To: Jim Riddell <jriddell@frontier.net>
To: uformp@blm.gov

Attached are my comments on the Draft RMP for the Uncompahgre Field Office.

I have included three formats. I hope at least one will work.

Thank you for considering them.

---

**2 attachments**

 **UFO RMP Comments - Jim Riddell - 2016.doc**
17K

 **UFO RMP Comments - Jim Riddell - 2016.pdf**
245K

BLM_0149221

BLM_0149222

# Comments to the BLM
## regarding the Draft Resource Management Plan (RMP) of 2016 for the Uncompahgre Field Office (UFO) Colorado

**Date: Nov. 1, 2016**
**From: James Riddell**

**Personal Information:** I moved to Montrose Colorado in January 1999. For about the last three years, I have been sharing my time between Grand Junction and Montrose, and still own a home on Uncompahgre Road south of Montrose. My primary uses of public lands are quiet uses, such as hiking, mountain biking, skiing, backpacking, photography, wildlife watching, nature study, and stress relief.

I am a member of the Uncompahgre Valley Association and the Public Lands Committee of the Western Colorado Congress. I have helped promote wilderness protections for public lands in Western Colorado through those organizations as well as others, such as the Colorado Environmental Coalition (now merged into Conservation Colorado), the Colorado Mountain Club, the Wilderness Society, the Sierra Club, the Colorado Wilderness Network, and others. As such, I support the comments submitted jointly by those conservation groups.

I wish to add a few personal comments of my own about the UFO's current draft RMP and its impact on the resources of the UFO and its implications for me.

## LANDS WITH WILDERNESS CHARACTERISTICS

To me, these are the most important lands managed by the UFO, as well as the most highly at risk. The assessments I have seen indicate that only about 6% of the land area covered by the RMP are inventoried as Lands with Wilderness Characteristics (LWCs),. To me, this shows how thoroughly overrun and overused our local public lands already are. A guiding principle in Resource Management must be that the rarest resources deserve the most protection.

Sadly, the Preferred Alternative only recommends less than half of those lands for LWC designation. From half, will we take away another half, then another half, until there isn't enough left to be worth protecting? **I urge the BLM to include far more of the inventoried LWCs in the final plan.**

These lands are valuable not just because they are rare. They provide a human experience that is desperately important in our society: the opportunity to see how the world works when it is not all managed and damaged by humans, the opportunity to get away from the pressures of modern life and experience a slower, quieter, in some ways simpler, but also

Comments on BLM's UFO RMP 2016, Jim Riddell  page 2

mode of living, within a dynamic, creative system far larger than ourselves. Not to mention, it's beautiful!

Natural places like LWCs also serve its previous inhabitants: the plants, animals, rocks, water systems. Those systems depend on far larger interconnected areas that go way beyond the boundaries of the tiny parcels we contemplate in our small plans like RMPs. Roads and drilling rigs and OHVs may come and go, but the natural systems are impacted far beyond our momentary impulses. As John Muir observed over a century ago, it only takes moments to destroy something that took millennia to grow or build.

I also encourage the BLM to consider that not all lands with naturalness, opportunities for solitude and unconfined recreation need to be ultimately destined to become permanent Wilderness Areas for them to deserve to have their wilderness characteristics protected as they currently exist.

It is also worth noting that motorized uses have far more impact per person than non-motorized. Sound carries for miles in the dry desert, they create more erosion, have more visually disturbing impact, require more parking. Therefore, in terms of maximizing the recreational opportunities, the more land that is set aside for quiet uses, the more recreational opportunities overall. Taking a few percent of the land out of motorized use only decreases the motorized opportunity a tiny fraction. Taking away quiet use lands takes away a large fraction of those opportunities, for those of us (and there are many) who truly value most our recreation when it is out of sight and sound of "civilization."

Specifically, **the LWCs in the Preferred Alternative are both too small, and too few.**

**Roubideau, Potter and Monitor Canyons and surrounding mesas:**

This canyon system is both unique and spectacular. It has BY FAR the most remote feeling of any place I have explored in Western Colorado. But the experience of naturalness, unconfined recreation, and solitude is dependent on minimizing encroachment from surrounding areas. I have spent many days over the last 15 years in these canyons and absolutely adore them for their wild, primitive, pristine qualities. I have noted with delight that these lands have actually increased in their wildness over the years I have been traveling in them. There is less illegal motorized use, less vandalism, especially of signage, less impact from livestock due to improved rangeland management, the areas on the mesa tops that had vegetative treatments like herbicides, chaining and rollerchopping have continued to regenerate. And a massive flood in Potter and Monitor about 10 years ago cut a far deeper stream channel and left debris scattered in a 100 foot swath up to 15 feet deep in some places. Nature is trying to reassert herself.

And Monitor Canyon, which currently has the least protection, also currently is the wildest. Access is challenging. There is no followable trail along the canyon floor, and the brush is thick and progress on foot is slow as I found a few weeks ago when I was there. This gives the opportunity for a type of "unconfined recreation" that is especially rare and valuable. The recreation of Discovery! Going where others haven't, or at least where signs that they

Comments on BLM's UFO RMP 2016, Jim Riddell  page 3

BLM_0149224

have are nearly non-existent. Finding my own way. Knowing that bighorns or mountain lions or deer, elk, and smaller critters are more likely to be close by than people. Where else in the UFO can one get that, and still be so near to frequently traveled roads?

**I urge the BLM to give full LWC, ACEC, EEA and Wild & Scenic designation to the entire region around Roubideau, Potter and Monitor Canyons.** From the riparian habitat along the streams, one can easily look right up to the canyon rim roughly 1,000 feet above. Why should that area have more than a single management designation? If I can see any activity from the rim to the creek, so can the wildlife. And the hydrology suggests any human activity anywhere within the canyon will affect the stream at the bottom. The canyons are a whole. They should be treated as such.

**I urege the BLM to create adequate buffers around the canyons.** While the land surfaces on the mesa tops are not pristine to the trained eye, they still have a quality of wildness worth preserving. Plus, any motorized activity which might get right to the rim would certainly break the magic spell and destroy the soundscape within the wildest parts. **I urge the BLM to keep motorized uses near the canyon rims to a minimum (no large groupd or competitive events), and keep them more than 100 feet away from the rim wherever possible.** This will benefit not only the quiet users and wildlife, but will enhance the experience for motorized users on the rim as well. It feels very different to stand at the edge of a vast chasm in silence, hearing only the wind, rather than sitting in or on a vehicle with the motor still running. Motorized users who park and walk a few feet to the rim may discover a far more satisfying experience. If they choose not to turn off and get away from their vehicles, then it wouldn't have mattered so much where they were, and they can have their experiences elsewhere where it won't destroy this unique wild place.

In addition, there are cultural resources, such as rock shelters, petroglyphs, historic rock carving, sheep-herder stone huts, Ute wickiups, etc. both along the canyon floor and on the top of Monitor Mesa. These irreplaceable resources will be far likelier to be preserved, the less vehicular travel is near them. **I urge the BLM to close Monitor Mesa to any motorized travel**.

These lands have no known mineral reserves, and the likelihood of finding something precious enough to make it worth developing is very low, while the likelihood of losing wild places is very high. **I further urge the BLM to remove these lands from any mineral development, or new Rights of Way.**

I understand from conversations with hunters that some prize Monitor Mesa **I urge the BLM that if Monitor Mesa is left open to motorized use, that such use be seasonal only, for the hunting season, and that camping be limited to designated sites only, to minimize the loss of naturalness, and potential harm to archeological sites even on the mesa top**.

**Dry Creek:**
This is another unexpected gem. The lands upstream (south) of where the Tabeguache Trail crosses Dry Creek is not as isolated or wild feeling as Roubideau/Potter/Monitor, but

Comments on BLM's UFO RMP 2016, Jim Riddell  page 4

they are far wilder than anything else in the neighborhood (except R/P/M). **I urge the BLM to designate the inventoried LWCs as LWC in the Final RMP.**

One of the few signs of modern human activity is a single-track trail that cuts through the area. My explorations recently suggested that there has been very little motorized use in recent years. Any motorized use, especially increased motorized use, would severely diminish the quality of solitude and naturalness of this area. There are other areas nearby that have recently been developed with new trails for mountain bikes, and many for single-track, ATV, and 4WD in the area, which I am content with. They can stay in their areas. They don't need to destroy the few remaining wild places. **I urge the BLM to close the LWC-inventoried portions of Dry Creek valley to motorized and mechanized uses.**

## West-End LWCs: Tabeguache Creek, Shavano Creek, Roc Creek, Dolores Canyon Addition

I am not as familiar with the wild lands in the western portions of the UFO, but soon I would like to explore them. If they are still there to explore. There are clearly segments there which have been inventoried to have wilderness qualities. I have heard no compelling arguments to allow them to be used for other purposes, and there certainly are reasons to protect those wilderness characteristics.

The population is growing in Western Colorado, and public land use per person is also growing rapidly. These areas are still wild because they have been farther away from population centers than most people have been willing to travel, and they have had little or no publicity. Let's keep it that way. They also are important as wildlife corridors, and connecting with higher-altitude ecosystems, including some areas that already have extensive Congressionally-approved protections within the National Forest. **I urge the BLM to set aside all lands that have been inventoried to have wilderness qualities.** It only takes a short time to reopen for other purposes a wild area that has been set aside. Oh sure, maybe a few years of hearings and EIRs and procedures. But it takes centuries for lands that have been used for other purposes to become truly wild and pristine again.

## NON-MOTORIZED MECHANIZED USES (BICYCLES)

While I am arguing for more places with no motorized or mechanized uses at all, I must also speak up for mountain biking. I have had it pointed out from mountain bikers that they are often forgotten in planning processes. While I know that Travel Management in the UFO is largely being handled separately from the RMP process, I feel it is worth including a few thoughts here.

In my experience, bikes and horses don't mix well. Bikes move too quickly and too quietly and can easily spook horses, and horses cannot quickly get off a trail to allow mountain bikes to pass, so nobody's happy. Hikers and horseback riders seem to co-exist much more easily, and while I find that trails are often much looser, deeper and rougher when used heavily by horses, I don't begrudge them that experience. Otherwise, as long as they follow proper grazing, tethering and weed-free feed rules, they don't interfere with my enjoyment of wild places.

Comments on BLM's UFO RMP 2016, Jim Riddell  page 5

But all too often in planning processes, routes are open to a progression of priorities, from 4WD to ATV to Single-track motorized to hikers and horses. Bikes are left out, and do not get to have quiet recreation experiences but get lumped in with motorcycles. There deserve to be two parallel designations in the priority chain: 1) Hikers and horses, such as Wilderness or LWCs,. and 2) Hikers and non-motorized mechanized (bicycles). Occasionally there ought to be hiking only with no horses or bicycles, but I have found that to be rarely needed.

**TARGET SHOOTING**

I see no reason why target shooting needs to be allowed in most areas of the UFO, with the possible exception of during hunting season. I find it frightening to hear gunshots out of season. I worry about the reliability and responsibility of gun users. **I urge the BLM to limit target shooting to designated areas and times throughout the UFO.**

**THE NORTH FORK:**

The district known as the North Fork of the Gunnison really deserves a special look. It, too is unique, not necessarily for its wild experiences, so much as for an isolated valley with a unique culture. It's idyllic. It's pastoral. It represents almost a throw-back to an earlier era.

Qualities that make it unique: Organic farming. Diverse, small, family operated farms both organic and conventional. Natural landscapes all around. A clear, clean river. Access to mountains, including one of the best fall color roads in the country.

These qualities would all be severely compromised by oil and gas development. The mineral development potential is not superior to that found elsewhere, or it would have already been developed. The pastoral character and culture is superior. It should be preserved, and that preservation can be aided by BLM management.

The only argument I can imagine for allowing it to be drilled/extracted is to hold it open "in case we need it later." We already know we will need clean water, clean air, wildlife and natural undisturbed places NOW and IN THE FUTURE.

**I urge the BLM to close the North Fork Valley to Oil and Gas development. At the very least adopt Alternative B/B1 to protect the communities, culture and character of the North Fork Valley.**

Comments on BLM's UFO RMP 2016, Jim Riddell  page 6

BLM_0149227

11/2/2016                                                  DEPARTMENT OF THE INTERIOR Mail - RMP comments addendum



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## RMP comments addendum

1 message

**Jim Riddell** <jriddell@frontier.net>                                                          Wed, Nov 2, 2016 at 12:42 AM
Reply-To: Jim Riddell <jriddell@frontier.net>
To: uformp@blm.gov

Dear UFO RMP team,

I just submitted my comments on the Uncompahgre Field Office's Draft Resource Management Plan revision, and as midnight was rapidly approaching, I didn't want to have my carriage turn into a pumpkin, and the comments not get entered, so I sent them in quickly before thorough proof-reading.

But I just noticed a comment I wanted to mention before I ran out of time. If it's not too late...

CLIMATE CHANGE

It's real. It's happening. We've known that for decades. We don't know exactly what all its effects will be, but we know some of them.

Ecosystems will shift higher in altitude, when they can. Some elements of the ecosystem will shift quickly, others more slowly. Some species will gain an advantage and increase, while others will decline. Species diversity will surely decline, as extinctions happen quicker than adaptations that lead to new species. The smaller the niche a species or ecosystem occupies, the more at risk it will be. Habitat loss will not be the only threat. Some damaging insects and diseases will increase exponentially, threatening even currently secure species. Invasive animals and plants (weeds) will become more difficult to manage. Droughts and flooding will be more frequent, along with wildfires. These changes and others are already severely impacting the resources the BLM manages, and that process will accelerate.

The RMP will probably be in force for at least 25 years, more likely closer to 35 or 40. In that time, climate will have shifted even more dramatically than it has already. Certain forest systems will already be starting to disappear. Vulnerable plants and animals will be starting to get rarer or disappear entirely. **The RMP has a mandate to take these "reasonably foreseeable developments"of Climate Change into account.**

**Do research and implementation, both separately and together.** As soon as knowledge is available on what can be done, start doing it. Make sure ecosystems have a place to go as they shift uphill. Make sure that the species that will have the greatest difficulty with the shift have the most protection and advantage. Humans in this area, so far above sea level, will have little trouble with the shift. Other species won't be so lucky.

And slow down the change as much as possible. **Design a management plan that gives the best opportunity to minimize human contributions to global warming. Demand best practices to reduce CO2 emissions, and especially methane emissions, particularly from energy mineral extraction and livestock.**

**I urge the BLM to include thorough planning for global warming and climate change in the final RMP. In fact, in this case, as a citizen, I feel I have the obligation to demand it.**

Thank you for considering this comment in addition to my previous ones.

- James Riddell

BLM_0149228

# Comments to the BLM
## regarding the Draft Resource Management Plan (RMP) of 2016 for the Uncompahgre Field Office (UFO) Colorado

**Date: Nov. 1, 2016**
**From: James Riddell**

**Personal Information:** I moved to Montrose Colorado in January 1999. For about the last three years, I have been sharing my time between Grand Junction and Montrose, and still own a home on Uncompahgre Road south of Montrose. My primary uses of public lands are quiet uses, such as hiking, mountain biking, skiing, backpacking, photography, wildlife watching, nature study, and stress relief.

I am a member of the Uncompahgre Valley Association and the Public Lands Committee of the Western Colorado Congress. I have helped promote wilderness protections for public lands in Western Colorado through those organizations as well as others, such as the Colorado Environmental Coalition (now merged into Conservation Colorado), the Colorado Mountain Club, the Wilderness Society, the Sierra Club, the Colorado Wilderness Network, and others. As such, I support the comments submitted jointly by those conservation groups.

I wish to add a few personal comments of my own about the UFO's current draft RMP and its impact on the resources of the UFO and its implications for me.

## LANDS WITH WILDERNESS CHARACTERISTICS

To me, these are the most important lands managed by the UFO, as well as the most highly at risk. The assessments I have seen indicate that only about 6% of the land area covered by the RMP are inventoried as Lands with Wilderness Characteristics (LWCs),. To me, this shows how thoroughly overrun and overused our local public lands already are. A guiding principle in Resource Management must be that the rarest resources deserve the most protection.

Sadly, the Preferred Alternative only recommends less than half of those lands for LWC designation. From half, will we take away another half, then another half, until there isn't enough left to be worth protecting? **I urge the BLM to include far more of the inventoried LWCs in the final plan.**

These lands are valuable not just because they are rare. They provide a human experience that is desperately important in our society: the opportunity to see how the world works when it is not all managed and damaged by humans, the opportunity to get away from the pressures of modern life and experience a slower, quieter, in some ways simpler, but also mode of living, within a

---

Comments on BLM's UFO RMP 2016, Jim Riddell                                page 1

BLM_0149229

dynamic, creative system far larger than ourselves. Not to mention, it's beautiful!

Natural places like LWCs also serve its previous inhabitants: the plants, animals, rocks, water systems. Those systems depend on far larger interconnected areas that go way beyond the boundaries of the tiny parcels we contemplate in our small plans like RMPs. Roads and drilling rigs and OHVs may come and go, but the natural systems are impacted far beyond our momentary impulses. As John Muir observed over a century ago, it only takes moments to destroy something that took millennia to grow or build.

I also encourage the BLM to consider that not all lands with naturalness, opportunities for solitude and unconfined recreation need to be ultimately destined to become permanent Wilderness Areas for them to deserve to have their wilderness characteristics protected as they currently exist.

It is also worth noting that motorized uses have far more impact per person than non-motorized. Sound carries for miles in the dry desert, they create more erosion, have more visually disturbing impact, require more parking. Therefore, in terms of maximizing the recreational opportunities, the more land that is set aside for quiet uses, the more recreational opportunities overall. Taking a few percent of the land out of motorized use only decreases the motorized opportunity a tiny fraction. Taking away quiet use lands takes away a large fraction of those opportunities, for those of us (and there are many) who truly value most our recreation when it is out of sight and sound of "civilization."

Specifically, **the LWCs in the Preferred Alternative are both too small, and too few.**

**Roubideau, Potter and Monitor Canyons and surrounding mesas:**

This canyon system is both unique and spectacular. It has BY FAR the most remote feeling of any place I have explored in Western Colorado. But the experience of naturalness, unconfined recreation, and solitude is dependent on minimizing encroachment from surrounding areas. I have spent many days over the last 15 years in these canyons and absolutely adore them for their wild, primitive, pristine qualities. I have noted with delight that these lands have actually increased in their wildness over the years I have been traveling in them. There is less illegal motorized use, less vandalism, especially of signage, less impact from livestock due to improved rangeland management, the areas on the mesa tops that had vegetative treatments like herbicides, chaining and rollerchopping have continued to regenerate. And a massive flood in Potter and Monitor about 10 years ago cut a far deeper stream channel and left debris scattered in a 100 foot swath up to 15 feet deep in some places. Nature is trying to reassert herself.

And Monitor Canyon, which currently has the least protection, also currently is the wildest. Access is challenging. There is no followable trail along the canyon floor, and the brush is thick and progress on foot is slow as I found a few weeks ago when I was there. This gives the opportunity for a type of "unconfined recreation" that is especially rare and valuable. The

---

Comments on BLM's UFO RMP 2016, Jim Riddell                                                     page 2

BLM_0149230

recreation of Discovery! Going where others haven't, or at least where signs that they have are nearly non-existent. Finding my own way. Knowing that bighorns or mountain lions or deer, elk, and smaller critters are more likely to be close by than people. Where else in the UFO can one get that, and still be so near to frequently traveled roads?

**I urge the BLM to give full LWC, ACEC, EEA and Wild & Scenic designation to the entire region around Roubideau, Potter and Monitor Canyons.** From the riparian habitat along the streams, one can easily look right up to the canyon rim roughly 1,000 feet above. Why should that area have more than a single management designation? If I can see any activity from the rim to the creek, so can the wildlife. And the hydrology suggests any human activity anywhere within the canyon will affect the stream at the bottom. The canyons are a whole. They should be treated as such.

**I urege the BLM to create adequate buffers around the canyons.** While the land surfaces on the mesa tops are not pristine to the trained eye, they still have a quality of wildness worth preserving. Plus, any motorized activity which might get right to the rim would certainly break the magic spell and destroy the soundscape within the wildest parts. **I urge the BLM to keep motorized uses near the canyon rims to a minimum (no large groupd or competitive events), and keep them more than 100 feet away from the rim wherever possible.** This will benefit not only the quiet users and wildlife, but will enhance the experience for motorized users on the rim as well. It feels very different to stand at the edge of a vast chasm in silence, hearing only the wind, rather than sitting in or on a vehicle with the motor still running. Motorized users who park and walk a few feet to the rim may discover a far more satisfying experience. If they choose not to turn off and get away from their vehicles, then it wouldn't have mattered so much where they were, and they can have their experiences elsewhere where it won't destroy this unique wild place.

In addition, there are cultural resources, such as rock shelters, petroglyphs, historic rock carving, sheep-herder stone huts, Ute wickiups, etc. both along the canyon floor and on the top of Monitor Mesa. These irreplaceable resources will be far likelier to be preserved, the less vehicular travel is near them. **I urge the BLM to close Monitor Mesa to any motorized travel.**

These lands have no known mineral reserves, and the likelihood of finding something precious enough to make it worth developing is very low, while the likelihood of losing wild places is very high. **I further urge the BLM to remove these lands from any mineral development, or new Rights of Way.**

I understand from conversations with hunters that some prize Monitor Mesa **I urge the BLM that if Monitor Mesa is left open to motorized use, that such use be seasonal only, for the hunting season, and that camping be limited to designated sites only, to minimize the loss of naturalness, and potential harm to archeological sites even on the mesa top.**

**Dry Creek:**

---

BLM_0149231

This is another unexpected gem. The lands upstream (south) of where the Tabeguache Trail crosses Dry Creek is not as isolated or wild feeling as Roubideau/Potter/Monitor, but they are far wilder than anything else in the neighborhood (except R/P/M). **I urge the BLM to designate the inventoried LWCs as LWC in the Final RMP.**

One of the few signs of modern human activity is a single-track trail that cuts through the area. My explorations recently suggested that there has been very little motorized use in recent years. Any motorized use, especially increased motorized use, would severely diminish the quality of solitude and naturalness of this area. There are other areas nearby that have recently been developed with new trails for mountain bikes, and many for single-track, ATV, and 4WD in the area, which I am content with. They can stay in their areas. They don't need to destroy the few remaining wild places. **I urge the BLM to close the LWC-inventoried portions of Dry Creek valley to motorized and mechanized uses.**

## West-End LWCs: Tabeguache Creek, Shavano Creek, Roc Creek, Dolores Canyon Addition

I am not as familiar with the wild lands in the western portions of the UFO, but soon I would like to explore them. If they are still there to explore. There are clearly segments there which have been inventoried to have wilderness qualities. I have heard no compelling arguments to allow them to be used for other purposes, and there certainly are reasons to protect those wilderness characteristics.

The population is growing in Western Colorado, and public land use per person is also growing rapidly. These areas are still wild because they have been farther away from population centers than most people have been willing to travel, and they have had little or no publicity. Let's keep it that way. They also are important as wildlife corridors, and connecting with higher-altitude ecosystems, including some areas that already have extensive Congressionally-approved protections within the National Forest. **I urge the BLM to set aside all lands that have been inventoried to have wilderness qualities.** It only takes a short time to reopen for other purposes a wild area that has been set aside. Oh sure, maybe a few years of hearings and EIRs and procedures. But it takes centuries for lands that have been used for other purposes to become truly wild and pristine again.

## NON-MOTORIZED MECHANIZED USES (BICYCLES)

While I am arguing for more places with no motorized or mechanized uses at all, I must also speak up for mountain biking. I have had it pointed out from mountain bikers that they are often forgotten in planning processes. While I know that Travel Management in the UFO is largely being handled separately from the RMP process, I feel it is worth including a few thoughts here.

In my experience, bikes and horses don't mix well. Bikes move too quickly and too quietly and can easily spook horses, and horses cannot quickly get off a trail to allow mountain bikes to pass, so nobody's happy. Hikers and horseback riders seem to co-exist much more easily, and

BLM_0149232

while I find that trails are often much looser, deeper and rougher when used heavily by horses, I don't begrudge them that experience. Otherwise, as long as they follow proper grazing, tethering and weed-free feed rules, they don't interfere with my enjoyment of wild places.

But all too often in planning processes, routes are open to a progression of priorities, from 4WD to ATV to Single-track motorized to hikers and horses. Bikes are left out, and do not get to have quiet recreation experiences but get lumped in with motorcycles. There deserve to be two parallel designations in the priority chain: 1) Hikers and horses, such as Wilderness or LWCs,. and 2) Hikers and  non-motorized mechanized (bicycles). Occasionally there ought to be hiking only with no horses or bicycles, but I have found that to be rarely needed.

## TARGET SHOOTING

I see no reason why target shooting needs to be allowed in most areas of the UFO, with the possible exception of during hunting season.  I find it frightening to hear gunshots out of season. I worry about the reliability and responsibility of gun users. **I urge the BLM to limit target shooting to designated areas and times throughout the UFO.**

## THE NORTH FORK:

The district known as the North Fork of the Gunnison really deserves a special look. It, too is unique, not necessarily for its wild experiences, so much as for an isolated valley with a unique culture. It's idyllic. It's pastoral. It represents almost a throw-back to an earlier era.

Qualities that make it unique: Organic farming. Diverse, small, family operated farms both organic and conventional. Natural landscapes all around. A clear, clean river. Access to mountains, including one of the best fall color roads in the country.

These qualities would all be severely compromised by oil and gas development. The mineral development potential is not superior to that found elsewhere, or it would have already been developed. The pastoral character and culture is superior. It should be preserved, and that preservation can be aided by BLM management.

The only argument I can imagine for allowing it to be drilled/extracted is to hold it open "in case we need it later." We already know we will need clean water, clean air, wildlife and natural undisturbed places NOW and IN THE FUTURE.

**I urge the BLM to close the North Fork Valley to Oil and Gas development. At the very least adopt Alternative B/B1 to protect the communities, culture and character of the North Fork Valley.**

---

Comments on BLM's UFO RMP 2016, Jim Riddell                                                    page 5

BLM_0149233

11/2/2016                                    DEPARTMENT OF THE INTERIOR Mall - Wild and Scenic designation



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Wild and Scenic designation
1 message

**Chason Russell** <chasonphoto@gmail.com>                    Tue, Nov 1, 2016 at 4:30 PM
To: ufomrp@blm.gov

Fall Greetings BLM,

I am writing in favor of the Wild and Scenic designation for the San Miguel and Dolores rivers. These rivers are the life blood of southwestern Colorado. Understanding there is a large demand from the agricultural industry to divert a vast majority of the water, a balance must be reached to insure a sustainable flow for fish and other wildlife.

Our greatest assets are free flowing rivers in this region. When sufficient flows allow, both the San Miguel and Dolores provide vast recreational opportunities, boosting economies in an otherwise quiet part of the sate. Unfortunately the lack of water released from the McPhee reservoir has all but decimated the wildlife habitat on the lower reaches of the Dolores river canyons. This is apparent to any river runner fortunate enough to float down either of the canyon sections below the dam when sufficient flows are returned to the river corridor.

The San Miguel has long since been a favorite location for moderate whitewater and pristine scenery and wildlife viewing. Because of the free flowing nature of the San Miguel, wildlife sightings and fishing opportunities are abundant. It is important this river corridor remains this way through the protection of a Wild and Scenic designation. Below the confluence of the two rivers the Dolores holds on to survival by thread of hope provided by whats left after diversions in the San Miguel River.

Please consider both the Dolores and San Miguel for Wild and Scenic designation. It is both important for the present and the future.

Thank you,

Chason Russell
144 Woody Creek Plaza
Woody Creek, CO
81656

BLM_0149234



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Draft Resource Management Plan for the Uncompahgre Field Office Comments
1 message

**Kim Schultz** <kim@tedx.org>                                      Tue, Nov 1, 2016 at 9:58 AM
To: ufomp@blm.gov
Cc: director@blm.gov, rwelch@blm.gov, jmeyer@blm.gov, tpfifer@blm.gov, paonia@townofpaonia.com,
datchley@deltacounty.com, bhovde@deltacounty.com, mroeber@deltacounty.com, kerry.donovan.sd5@gmail.com,
millie.hamner.house@state.co.us, rmpcomments@citizensforahealthycommunity.org–, info@theconservationcenter.org

To Whom It May Concern,

Please see the attached comments submitted by The Endocrine Disruption Exchange to the BLM regarding the Draft
Resource Management Plan for the Uncompahgre Field Office.

Thanks,

Kim Schultz


--
Kim Schultz | Research Assistant | The Endocrine Disruption Exchange (TEDX)
PO Box 1407 Paonia, CO 81428 | (970)527-4082
www.tedx.org


📄 **RMP_final_comments.pdf**
212K

BLM_0149235

TEDX
The Endocrine Disruption Exchange

P.O. Box 1407, Paonia, CO 81428    tedxadmin@tds.net    970-527-4082    www.tedx.org

U.S. Department of the Interior
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Nov. 1, 2016

Re: Draft Resource Management Plan for the Uncompahgre Field Office

**Introduction**
The Endocrine Disruption Exchange (TEDX) located in Paonia, Colorado, is a non-profit 501(c)3 organization dedicated to compiling and disseminating technical information on chemicals that affect health and the environment. Our clientele includes all levels of government, academicians, small to large non-profit organizations, and individuals involved in public health across the US and internationally. More information on the work of TEDX can be found at www.tedx.org.

While we are pleased that the BLM is updating the outdated Resource Management Plan (RMP), TEDX would like to see Alternative D, the BLM's Preferred Alternative, strengthened to better protect human and environmental health. Specifically, the BLM did not adequately take into account risks to human health from increased oil and natural gas development when drafting the Alternatives. For example, Alternative D has the second highest estimated total emissions level yet remains the Preferred Alternative. Coloradans already live with degraded air quality from oil and gas activity (Colborn et al 2014, McDuffie et al 2016). Nearly 16,000 people live within one-half mile of an oil or gas well drilled on public land in Colorado and new well development will further degrade our air quality, increasing the risk of health impacts in exposed populations (Oil and Gas Threat Map 2016). Further, under Alternative D total acreage available for leasing for fluid mineral development decreased by only 1% throughout the Planning Area.

Alternative B1, the North Fork Alternative Plan (NFAP), still allows fluid mineral leasing, but potential development estimates and associated emissions are much lower due to the increased buffer area between oil and gas development and population centers (4-32). The NFAP requires the strongest protections for air, groundwater, and surface water. While the BLM was required to consider the NFAP, none of the recommendations were included in Alternative D.

**Public Health Risks from Oil and Natural Gas Development**
Three hundred articles have been published in peer-reviewed journals since the NFAP was submitted in 2013. Articles documenting air and water pollution have expanded beyond chemical detections to include pollutant exposure pathways, and these articles indicate an increased potential public health risk from exposure to chemicals found near oil and gas development.

1

Sensitive populations, including pregnant women, children, and the elderly residents, are more susceptible to adverse impacts from chemical exposure.

Six articles were published on endocrine disruption and unconventional oil and gas development (UOG). Three of these studies target prenatal exposure from populations impacted by UOG in Colorado and Pennsylvania. Associated developmental outcomes include congenital heart defects (McKenzie 2014), babies born with low birth weight and small for gestational age (Stacy et al 2015), and preterm birth (Casey et al 2015). Endocrine effects from environmentally relevant exposure levels to fracking fluids in laboratory mice include altered organ weights (testes, thymus, uterus, ovary), disrupted hormone activity, and potential impacts on fertility (Kassotis et al 2016a,b).

UOG emissions can also impact the respiratory system. New research has found an association between proximity to UOG activity and an increase in asthma exacerbations (Rasmussen et al 2016). Inhalation of silica, a proppant used during fracking, and diesel exhaust from increased truck traffic and on-site equipment, can increase respiratory disease (McCawley 2015). Pride et al found that short-term exposure to rising ozone levels near UOG was associated with increased visits to a health clinic for respiratory effects in an impacted community in Wyoming (2015).

Exposure to chemicals detected near UOG have led to other adverse health outcomes as well. A health symptom survey from a densely drilled area in Pennsylvania found that residents living within 1 km of a natural gas well more frequently reported respiratory as well as dermal symptoms compared to residents living 2 km or more from a well (Rabinowitz et al 2015). Another Pennsylvania study found a relationship between well density and hospitalization rates for cardiac, neurologic, and dermal effects among others (Jemielita et al 2015). Tustin et al found a relationship between residents living near UOG in Pennsylvania and nasal, sinus, migraine, and fatigue symptoms (2016). Like Colorado, Pennsylvania is heavily impacted by UOG. Due to concerns over health effects, the Pennsylvania Medical Association recently called for a moratorium on new drilling and hydraulic fracturing until the health risks are more thoroughly understood.

Given that the BLM did not consider a No-Leasing Alternative and in light of the above research indicating significant adverse health impacts from UOG, the BLM should, at a minimum, adopt NFAP regarding fluid mineral leasing in the North Fork Valley, and the BLM should apply this conservation framework to cover leasing throughout the Planning Area. The BLM needs to consider the health risk to the populations living near leasable public lands.

**BLM should be required to do the following:**
- *The BLM must begin with a realistic estimate of impact.* The BLM estimates 1,271 wells could be drilled in the Planning Area, 418 wells on land managed by the BLM, identifying impacts from only coalbed methane wells and conventional natural gas wells (3-121). Impacts from UOG including horizontal drilling and hydraulic fracturing were not analyzed.

- *The BLM must take into account that UOG is more damaging to the health and the*

2

*environment than conventional oil and gas extraction.* UOG wells are deeper and horizontal laterals can stretch up to a mile requiring larger amounts of toxic chemicals. Drilling muds containing weighting agents, emulsifiers, and lubricants are used to help move the drill bit down the well bore and can contain toxic chemicals; naphthalene (endocrine, immune, and neurologic system toxicant, mutagen, carcinogen), and petroleum distillates (gastrointestinal, respiratory, and neurologic system toxicants) are some of the most common ingredients found in drilling products (Colborn et al 2011).

Fracking requires millions of gallons of water to mix with thousands of pounds of chemicals per well, increasing the impact with additional truck trips to bring this water to the well site. Chemical products used for fracking include biocides, solvents, corrosion and scale inhibitors, friction reducers, and surfactants. Among the most common chemicals used during fracking are crystalline silica (respiratory toxicant, carcinogen), methanol (endocrine, cardiovascular, neurologic, and respiratory system toxicant), and 2-butoxyethanol (endocrine, immune, cardiovascular, neurologic, and respiratory system toxicant) (Colborn et al 2011). In addition, an estimated 30% to 70% of the fracking fluid will resurface as flowback, which, along with produced wastewater, will need to be trucked offsite for disposal. Recent studies by Colorado State University have found flowback to be the largest contributor to air pollution of any phase of well development (Colorado State University 2016a,b).

- *The BLM must assess impact from development of the Mancos Shale underlying the Upper North Fork Valley.* This formation was recently discovered to have the second largest reservoir of natural gas in the country, increasing interest in this area from the natural gas industry. Extraction from the Mancos Shale is obtainable only through UOG.

- *The BLM must begin testing air quality immediately throughout the Planning Area beginning with the EPA Criteria Pollutants list rather than estimating averages and relying on models.* Table 3-1 reports Average Annual Air Pollutant Emissions using data from 2008, when there was limited oil and gas development. Also, potential emissions from Criteria Pollutants were estimated for reasonably foreseeable activities until 2021, but the RMP may be in place as long as 30 years if following the current RMP timeframe. These emission levels significantly underestimate potential impacts to air quality. Due to varied characteristics such as elevation and topography, locations where the existing measurements are taken should be representative of the Planning Area.

- *The BLM needs to address the cumulative air pollution contribution from multiple sources.*
  The BLM cannot assume that rural air is cleaner than towns and cities as it can already be impacted from industrial activities associated with natural resource extraction (3-4). In addition to oil and gas development, air pollution comes from coal mine methane vents, diesel exhaust, and mineral extraction among other sources. Increases of emissions from these sources are predicted to increase levels of particulate matter and encourage ozone formation in the Planning Area (4-21).

- *The BLM needs to establish background air quality in the 139,540 acres in the North*

BLM_0149238

*Fork area open for leasing under Alternative D.* Multiple tests should be carried out in several locations throughout the proposed lease areas. These need to include analysis for volatile organic compounds (VOCs), nitrous oxides, polycyclic aromatic hydrocarbons, aldehydes, and sulfides.

- *The BLM needs to test for Hazardous Air Pollutants (HAPs).* Increased emissions of HAPs from oil and gas extraction are predicted for all Alternatives (4-21). HAPs are toxic compounds recognized as causing adverse impacts on health and the environment. Health effects associated with exposure to HAPs include endocrine effects such as increases in reproductive and developmental disorders, impacts on the cardiovascular and immune systems, and increased rates of cancer among many others.

- *The BLM needs to test for secondary pollutant VOCs in areas near oil and gas development.* Multiple ozone precursors are released during well development and production, and Table 3-2 shows existing ozone concentrations are out of compliance under the National Ambient Air Quality Standards. The BLM acknowledges that ozone concentrations will increase under all Alternatives both near oil and gas activities and downwind of the Planning Area (4-20). Reliable data should be collected from the Planning Area rather than modeled using measurements taken outside of the Planning Area that is not impacted by UOG.

  Ozone has historically been considered a summertime problem, but research from the last 10 years has shown that winter ozone levels near oil and gas production can exceed summer levels when snow cover and weather inversions are present. Even low levels of ozone can cause short term respiratory effects like coughing, wheezing, and shortness of breath. and exacerbates existing conditions such as asthma and emphysema. Children are particularly vulnerable because their lungs are still developing until about age 18. Children get a higher "dose" of the ozone because they breathe in more air per pound of body weight and spend more time being active outdoors. Women exposed to ozone during pregnancy deliver low birth weight babies with compromised lung function (American Lung Association 2016).

- *The BLM must mandate the use of Best Management Practices in the final RMP.* Community safety and environmental health needs to be a priority and strong guidelines must be adopted as standard operating procedure.

**Conclusion**

Alternative D should not be the Preferred Alternative regarding fluid mineral leasing. There is a large body of evidence that the BLM has not considered showing that reduced air quality near UOG can impact human and environmental health. The large leasable acreage available for fluid mineral extraction places potential development close to rural populations. The BLM needs to address the shortcomings of the available air quality data and risk to public health before allowing oil and gas development to proceed. At the very minimum, the BLM should incorporate the NFAP into the Preferred Alternative. Thank you for accepting these comments.

4

Sincerely,

Carol Kwiatkowski
Executive Director

Kim Schultz
Research Assistant

cc:
Sally Jewel, Secretary Department of the Interior
Neil Kornze, Director Bureau of Land Management
Ruth Welch, State Director Bureau of Land Management
Joseph Meyer, Southwest District Manager Bureau of Land Management
Teresa Pfifer, Uncompahgre Field Office Manager Bureau of Land Management
Town of Hotchkiss
Town of Paonia
Doug Atchley, Delta County Commissioner
Bruce Hovde, Delta County Commissioner
Mark Roeber, Delta County Commissioner
Colorado State Senator Kerry Donovan
Colorado State Representative Millie Hamner
United States Senator Michael Bennet
United States Senator Cory Gardner
United States Representative Scott Tipton
Colorado Governor John Hickenlooper
Western Slope Conservation Center
Citizens for a Healthy Community

**References**

American Lung Association. 2016. Ozone. Available at http://www.lung.org/our-initiatives/healthy-air/outdoor/air-pollution/ozone.html.

Casey JA, Savitz DA, Rasmussen SG, Ogburn EL, Pollak J, Mercer DG, Schwartz BS. 2015. Unconventional natural gas development and birth outcomes in Pennsylvania, USA. Epidemiology 27(2):163-172, doi: 10.1097/ede.0000000000000387.

BLM_0149240

Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2011. Natural gas operations from a public health perspective. Hum Ecol Risk Assess 17(5):1039-1056, doi: 10.1080/10807039.2011.605662.

Colborn T, Schultz K, Herrick L, Kwiatkowski C. 2014. An exploratory study of air quality near natural gas operations. Hum Ecol Risk Assess 20(1):86-105, doi:10.1080/10807039.2012.749447.

Colorado State University. 2016a. Characterizing Emissions from Natural Gas Drilling and Well Completion Operations in Garfield County, CO. Available at http://www.garfield-county.com/air-quality/air-emissions-study.aspx.

Colorado State University. 2016b. North Front Range Oil and Gas Air Pollutant Emission and Dispersion Study. Available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0ahUKEwj7pbHb5vjPAhUIx2MKHfLdDj0QFggcMAA&url=http%3A%2F%2Fsource.colostate.edu%2Fwp-content%2Fuploads%2F2016%2F09%2FCSU_NFR_Report_Final_20160908.pdf&usg=AFQjCNFImddRt3awfZVMah4QJVl4yJ3npQ&cad=rja.

Jemielita T, Gerton GL, Neidell M, Chillrud S, Yan B, Stute M, Howarth M, Saberi P, Fausti N, Penning TM, et al. 2015. Unconventional gas and oil drilling is associated with increased hospital utilization rates. PloS One 10(7):e0131093, doi: 10.1371/journal.pone.0131093.

Kassotis CD, Bromfield JJ, Klemp KC, Meng CX, Wolfe A, Zoeller RT, Balise VD, Isiguzo CJ, Tillitt DE, Nagel SC. 2016. Adverse reproductive and developmental health outcomes following prenatal exposure to a hydraulic fracturing chemical mixture in female C57Bl/6 Mice. Endocrinology 157(9):3469-3481, doi: 10.1210/en.2016-1242.

Kassotis CD, Klemp KC, Vu DC, Lin C-H, Meng C-X, Besch-Williford CL, Pinatti L, Zoeller RT, Drobnis EZ, Balise VD, et al. 2016b. Endocrine-disrupting activity of hydraulic fracturing chemicals and adverse health outcomes after prenatal exposure in male mice. Endocrinology 156(12):4458-4473, doi: 10.1210/en.2015-1375.

McCawley M. 2015. Air contaminants associated with potential respiratory effects from unconventional resource development activities. Semin Respir Crit Care Med 36(3):379-387, doi: 10.1055/s-0035-1549453.

McDuffie EE, Edwards PM, Gilman JB, Lerner BM, Dubé WP, Trainer M, Wolfe DE, Angevine WM, deGouw J, Williams EJ, et al. 2016. Influence of oil and gas emissions on summertime ozone in the Colorado Northern Front Range. J Geophys Res Atmos 121, doi: 10.1002/2016JD025265.

McKenzie LM, Guo R, Witter RZ, Savitz DA, Newman LS, Adgate JL. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environ Health Perspect: 122(4):412-417, doi: 10.1289/ehp.1306722.

BLM_0149241

The Oil and Gas Threat Map. 2016. Available at http://oilandgasthreatmap.com/threat-map/colorado/#pl.

Pride KR, Peel JL, Robinson BF, Busacker A, Grandpre J, Bisgard KM, Yip FY, Murphy TD. 2015. Association of short-term exposure to ground-level ozone and respiratory outpatient clinic visits in a rural location – Sublette County, Wyoming, 2008–2011. Environ Res 137:1-7, doi: 10.1016/j.envres.2014.10.033.

Rabinowitz PM, Slizovskiy IB, Lamers V, Trufan SJ, Holford TR, Dziura JD, Peduzzi PN, Kane MJ, Reif JS, Weiss TR, et al. 2015. Proximity to natural gas wells and reported health status: results of a household survey in Washington County, Pennsylvania. Environ Health Perspect 123(1):21-26, doi: 10.1289/ehp.1307732.

Rasmussen SG, Ogburn EL, McCormack M, Casey JA, Bandeen-Roche K, Mercer DG, Schwartz BS. 2016. Association between unconventional natural gas development in the Marcellus Shale and asthma exacerbations. JAMA Intern Med 176(9):1334-1343, doi: 10.1001/jamainternmed.2016.2436.

Stacy SL, Brink LL, Larkin JC, Sadovsky Y, Goldstein BD, Pitt BR, Talbott EO. 2015. Perinatal outcomes and unconventional natural gas operations in southwest Pennsylvania. PLoS ONE 10(6):e0126425, doi: 10.1371/journal.pone.0126425.

Tustin AW, Hirsch A, Rasmussen S, Casey J, Bandeen-Roche K, Schwartz B. 2016. Associations between unconventional natural gas development and nasal and sinus, migraine headache, and fatigue symptoms in Pennsylvania. Envion Health Perspect doi: 10.1289/EHP281.

BLM_0149242

11/2/2016 DEPARTMENT OF THE INTERIOR Mail - UFO RMP Comment



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## UFO RMP Comment
1 message

**Scott Shishim** <shishim79@gmail.com>                         Tue, Nov 1, 2016 at 8:24 AM
To: uformp@blm.gov, director@blm.gov, rwelch@blm.gov

Hi,
Please see the attached letter and accept it as a comment for the UFO RMP.
Thank you,
Scott Shishim

▤ **RMP Comment**

BLM_0149243

Dear BLM,

Thank you for the opportunity to comment on the Uncompahgre Field Office's draft Resource Management Plan.

I am commenting as; a father, a teacher, a homeowner and a business owner.

I wish to see Jumbo Mountain achieve Special Recreation Management Area (SRMA) status. My family and I use these trails multiple times per week. It was one of the reasons were chose to move to Paonia. I love the quiet solitude you get, the views, the smells of the Juniper and the scant amount of Pinon that remain, the wildlife I see, the flowers in the spring and the chance to get away and exercise either by trail running or mountain biking. Occasionally I see eagles, which is very exciting. I love being able to look out from the trail below the Jumbo cliff and see all the way out to the mesas West of Delta. The air quality is great and I hope that it will remain pristine for generations to come. The view is void of serious development, the air is clean, the ground is clean and I see very little trash. Jumbo is a place for people to get back to nature and recharge their batteries. They keep me sane and physically fit. I consider these trails a treasure of the Valley. Please maintain these experiences for generations to come.

This spring was a special time on the Jumbo Trails because the cattle weren't grazing there and there were many flowers which my 5 year old daughter and her friend were very interested in. We took our flower book and did some plant identification. There is more grass growing now and no cow poop to step or ride through. If in the future this could be better managed for both the cattle and the people I would appreciate it. It would help the experience for all users, especially people from out of town. No one wants to hike or bike through a hoof hole filled trail system that's devoid of vegetation and has lots of poop on it. Please consider this an option if there is a future Travel Management Plan done on the Jumbo Trails.

As a business owner I am well aware of the benefits of having this unofficial trail network close to town. If it did not exist, I don't believe my business would either. 75% of my business comes from fixing mountain bikes that are primarily used in the Jumbo area or around town. I do work on road bikes as well, but they make up a fraction of my sales.

During this past summer, it was a daily occurrence that someone from out of town would come into the shop and ask how to get to the Jumbo trails. Both hikers and bikers. I would draw them a map and send them to the Pan American entrance. The trails are listed on Mountain Bike Project, an app for smartphones that locates trails. People are coming to Paonia to ride these trails, have lunch or dinner and look around town. Some people were staying the night at the Bross and riding the trails. I met a group in town from Denver to have a bachelor party and they stayed two nights and were mountain biking and road biking. I see first hand the economic benefits of having Jumbo trails and I believe that with SRMA status it would only increase the users on the trails, improve the trail system, benefit wildlife with possible seasonal closures and

bring more money to Paonia and the North Fork Valley. I know the draw is small now, but I can only see it growing in popularity in the future.

According to americantrails.org over 50% of bicyclists earn over $100,000 a year and over 80% of bicyclists earn over $50,000 a year. This is a group of people that Delta County could benefit having visit and spend some money in the area. Keeping the Jumbo trails open and giving them SRMA status would only help the town of Paonia and surrounding communities.

Other places of interest to me and in need of development/management for trails are Elephant Hill, the BLM area north of the Hotchkiss Pool and High School, McDonald Mesa, Steven's Gulch, Powell Mesa/Oak Mesa, Paonia State Park/Paonia Reservoir and Young's Peak in Crawford. Young's Peak has some really interesting terrain on it and one of the most gorgeous 360 views from the top for a small mountain/hill.

Being the part time P.E. teacher at the Crawford school, Young's Peak and the southern side especially, is used frequently by our students. We play games, do orienteering, do outdoor education activities and hike through the pinon junipers regularly. At the end of each year we take 1st through 6th graders hiking to the top. The children love this activity and look forward to it. I also take the primary students (3-6 year olds) hiking through the lower trails.

As a hiker/biker, this place has potential for some great trails. There is one that follows the Western cliff for about a mile and it is technical, unique, has great views and is worth driving there for it. Young's Peak area would need some better access, but I could see Crawford only benefiting from trails in their backyard. There isn't much else for people to stop in Crawford for, but at least they could ride or hike some trails and go eat some food or stay the night.

Thank you for reading about my experiences and interests.

Scott Shishim
40487 O Rd.
Paonia, CO 81428
970-759-9452

Shish Kabikes LLC / Owner
Shishkabikes.com
shishkabikes@gmail.com
970-527-2221

NFM@C Physical Education Teacher
scott.shishim@deltaschools.com
970-921-4935

BLM_0149246

11/1/2016                                  DEPARTMENT OF THE INTERIOR Mail - BLM UFO RMP comment



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## BLM UFO RMP comment
1 message

**Phyllis Swackhamer** <pslyons@tds.net>                          Tue, Nov 1, 2016 at 9:01 PM
To: uformp@blm.gov
Cc: director <director@blm.gov>, rwelch@blm.gov, jmeyer@blm.gov, tpfifer@blm.gov, kerry donovan senate
<kerry.donovan.senate@state.co.us>, millie.hamner.house@state.co.us

November 1, 2016
BLM
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 814101

Submitted via uformp@blm.gov

Cc: director@blm.gov, rwelch@blm.gov, jmeyer@blm.gov, tpfifer@blm.gov,
kerry.donovan.sd5@gmail.com millie.hanmer.house@state.co.us
Also Cc:  Sally Jewell, Secretary of the Dept. of Interior, Governor John Hickenlooper, Senator Cory
Gardner, Representative Scott Tipton, Senator Michael Bennett

Re.  Draft RMP for the UFO, citizen comments

To:  BLM and Dept of Interior Personnel and Elected Officials

I am a resident in the UFO area, specifically near the town of Paonia.  I have lived here for 20
years and am currently retired here.  My husband and I moved here because of the quality of life,
including the Public Lands with wilderness areas close by.  Wildlands located within this planning
area are a primary definer of the culture of the community here.  People live here because
of the beauty and the access to recreation in the mountains and rivers,  They also live here
because of relatively clean air and water and the abundant produce that is grown here.  These
elements
create a community culture that appeals to a diverse group of people.

Opening almost 95% of the area managed by the BLM to an industry that is a major cause of
Climate Change absolutely does not make economic, environmental, ethical or moral sense given
what
we now know about Fossil Fuels.  Therefore I believe that there are deficiencies in your dEIS/RMP
that have to be addressed.

The areas I have investigated most are the impacts to Human and Animal Health from the Toxicity
of various aspects of drilling and fracking including pollution of air, water, and land.  Most of my
comments are in these areas.  I think this comment from Brian S. Schwartz, the lead researcher
and a professor in the Department of Environmental Health Sciences at Johns Hopkins
 Bloomberg School
of Public Health, who published a recent study on health in the journal Epidemology  is a fitting
summary of what has happened in this country: **"The growth in the fracking industry has
gotten way out ahead of our ability to assess what the environmental and, just as
importantly, public health impacts are."**  Johns Hopkins has published three health studies
within the last year.

As health and other science studies continue to come in regarding the harms of unconventional oil
and gas extraction (fracking) and production, it is no wonder that citizens are becoming alarmed

BLM_0149247

and see the need to take action. Over 80% of the peer reviewed science studies exposing the harms of fracking have only come out since 2013.

One Johns Hopkins study associated Unconventional Natural Gas Development (UNGD) with nasal and sinus, migraine headache, and fatigue symptoms. **http://www.ehponline.org/EHP281**. Another Hopkins study showed the connection between UNGD and the risk of Asthma Attacks. July 18 in *JAMA Internal Medicine*,  In the third, an online study published in Epidemology, researchers found that expectant mothers living in the most active area of fracking, drilling and production activity were 40 percent more likely to give birth prematurely (before 37 weeks of gestation). Eleven percent of babies in this study were born pre-term. In addition, the women were 30 percent more likely to have a pregnancy labeled "high-risk," which can refer to factors such as high blood pressure or excessive weight gain (Low birth weight is a leading cause of infant mortality). This study was done in Pennsylvania, where the fracking industry now operates more than 8,000 active natural gas wells—up from 100 in 2006. Compare that to Colorado, which now has almost 55,000 active oil and gas wells.

A rural Colorado study of almost 25,000 births from 1996-2009 found congenital heart defects and neural tube defects (defects of the brain, spine or spinal cord) associated with the density and proximity of natural gas wells **within a 10-mile radius of mothers' residences. (McKenzie, L. M., et al. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environmental Perspectives 122:412-417.)**

The Endocrine Disruption Exchange (TEDX) has published research and aggregated data identifying low-dose exposure to chemicals associated with oil and gas development and operations as Endocrine Disrupting Chemicals (EDC). These chemicals affect not only reproduction and fetal development, but are linked to respiratory health, metabolism issues, and malignancy.

Data from a recent study suggest that natural gas drilling operations may result in elevated endocrine-disrupting chemical activity in surface and ground water. The majority of water samples collected from sites in a drilling-dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than sites with limited nearby drilling operations. (Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology DOI: http://dx.doi.org/10.1210/en.2013-1697)

The New York State Department of Health (NYSDOH) released A Public Health Review Of High Volume Hydraulic Fracturing For Shale Gas Development in December 2014. This review found that residents living near fracking activities had the following health problems: skin rash, nausea or vomiting, abdominal pain, breathing difficulties, cough, nosebleed, anxiety, stress, headache, dizziness, and eye and throat irritation. This led to their recommendation that fracking should be banned in New York State. Following that review another publication, *The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction)*, Third Edition, October 14, 2015, by Concerned Health Professionals of New York and the Physicians for Social Responsibility cites a number of studies. Please refer to the *Compendium*.

This study just out from the Environment America Research & Policy Center exposes the proximity of fracking near schools, hospitals, day care centers and nursing homes in 9 states: AR, CA, CO, NM, ND, OH, PA, TX and WV. Statistics from this report: More than 650,000 kindergarten through 12th grade children in 9 states attend school within one mile of a fracked well. Additionally 1,947 child care facilities, 1,376 schools, 236 nursing care providers and 103 hospitals are within a one-mile radius of fracked wells in the nine states examined. http://readersupportednews.org/news-section2/318-66/39676-650000-children-in-9-states-attend-school-within-1-mile-of-a-fracking-well

Although there aren't data yet for Delta County, neighboring counties' air quality has already been graded as F to C for high ozone days by the American Lung Association. A study of air quality in the Denver area found that about 18% of their ozone was produced by oil and gas wells. High levels or ozone are bad news for

BLM_0149248

anyone with asthma or other respiratory conditions. There can also be consequences for your animals from exposure to chemicals released by gas drilling (Bamberger, M., Oswald, R. (2012). Impacts of Gas Drilling on Animal and Human Health. *New Solutions: A Journal of Environmental and Occupational Health*, 22(1): 51-77.

Besides these chemicals and the pollution generated in the air and water, a Very Disturbing result of the industry is the "wastewater" produced in the drilling and fracking operations.  I did not see the safety and handling of wastewater addressed in the draft RMP,  This is a deficiency that has to be addressed for the future of all of us.  Polluting our soils, water and air with radioactivity should
relegate this technology to the Dark Ages!

 Naturally Occurring Radioactive Material (NORM) is found many places on Earth, including deep underground. Fracking (for both oil and gas) and the wastewater brought up in that process can concentrate that radioactive material. Here I will quote, "The rise of hydraulic fracturing over the past decade has created another boom: tons of radioactive materials experts call an "orphan" waste stream. *No federal agency fully regulates oil and gas drilling byproducts*—which include brine, sludge, rock and soiled equipment—leaving tracking and handling to states that may be reluctant to alienate energy interests." A study this spring from Duke University examined 3,900 *wastewater spills* over a 5 year period in North Dakota. Researchers found levels of radioactivity many times higher than allowed in streams, rivers, and soils. So down stream people are drinking and irrigating with "up-streams" radioactive wastes. Radioactive substances can last for millennia. **Concentrations of salts and heavy metals are also in this wastewater.** An 2013 study by Duke U. in PA. found that wastewater treated in a facility specifically for that purpose still discharged water with radioactive levels beyond acceptable levels.

These studies showing the magnitude of the risks to ground and surface waters from the increase of spills from waste water including toxic fracking chemicals have to be addressed.  There does not seem to be any safe way to deal with this wastewater (except not to create it in the first place).  Injection of wastewater not only produces earthquakes, but realistically who can know where these toxins will end up
whether from the fracturing due to the Earthquake or the drilling and fracking process themselves.
 I already submitted one comment regarding a hydrology study commissioned by our Delta Co. Commissioners in 2013, that concluded that ,"The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. ..."

Storing wastewater in plastic lined ponds is also unacceptable because of spills, leaks, evaporation and no adequate way to reclaimate.   Hauling these wastes is obviously dangerous--- and there is no
safe way to dispose of them.

As this research grows, frankly it seems evident that our government including the BLM  should be banning any more leasing to the oil and gas industry. It is NOT the mission of the BLM to use our Public Lands and Public Minerals to ruin the Health of the Public and the Environment that sustains us.

It is not as if we do not have options to this dirty extraction and burning of fossil fuels. Scientists have been working for years to determine a way forward to get our nation and our world off of fossil fuels. Please look up the work of Mark Z. Jacobson, Stanford University's director of Atmosphere and Energy Program. Their team has determined that without the use of any new technologies, we have the resources for each of the 50 states to generate 80-85% of America's power with wind, sun, and water by 2030 (14 years away). 100% could be generated by 2050. The team has also offered similar plans for over 139 nations. With

BLM_0149249

this opportunity so close, why would we continue to pollute our land, air and water, compromising our health and the future of those who come after us?

While I am sure that  many organizations and individuals have cited Climate Change science, I will merely conclude with the recognition that we cannot as a nation or as a planet continue to create more of
the same mistakes that have put us on the edge of destruction for billions of people on this planet.
 Climate Change must be addressed and it must be addressed aggressively if we are to have a habitable
planet on which to live.

Given the facts, the only reasonable conclusion is that fossil fuel leasing should cease and not be a part of plans to manage Public Lands as we go forward.

Thank you for this opportunity to comment.

Sincerely,

Phyllis Swackhamer
Paonia, Colorado

BLM_0149250

11/2/2016                    DEPARTMENT OF THE INTERIOR Mail - Comments on 2016 Draft Resource Management Plan



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Comments on 2016 Draft Resource Management Plan
1 message

---

**Mike Tarbell** <mkt-aux1@tds.net>                              Tue, Nov 1, 2016 at 11:08 PM
To: uformp@blm.gov

To: Bureau of Land Management - Uncompahgre Field Office
From: Michael K. Tarbell
Date: 31 Oct 2016
RE: Comments on 2016 Draft Resource Management Plan

This is to express my objections to the draft Resource Management Plan (RMP), as published at
www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html. These objections pertain specifically to the proposed level(s) of
availability of public lands for the industrial extraction of fossil fuels, particularly extraction of natural gas via hydraulic
fracturing techniques.

As I'm sure you're aware, there is ongoing, urgent research underway worldwide regarding the effects of extraction and
combustion of fossil hydrocarbon fuels. Your proposed levels of availability for fossil fuel extraction are completely at
odds with current scientific research and public welfare in general, and your preferred Alternative D is transparently
subsidizing private corporations at the expense of taxpayers, not to mention the entire ecosystem.

Aside from the ecological implications, even if natural gas were in short supply domestically (which it very clearly is not,
and indeed is now being exported for profit in tremendous volume), it is completely ludicrous to open up public land in
the immediate vicinity of homes, schools, public water systems, etc, to extractive industry when the resource itself is
abundant across a vastly larger encompassing region (e.g., see Hawkins, S. J., et al, "Assessment of Continuous
(Unconventional) Oil and Gas Resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta-Piceance
Province, Colorado and Utah, 2016", U.S. Geological Survey Fact Sheet 2016-3030, Jun 2016).

Moreover, your estimates for greenhouse gas emissions (Tables 4-2, 4-9, etc) associated with these extractive activities
must be revised in light of recent results indicating that rogue methane emissions have been profoundly underestimated
(e.g., Howard, T., "University of Texas Study Underestimates National Methane Emissions at Natural Gas Production
Sites due to Instrument Sensor Failure", Energy Science & Engineering, 23 Jun 2015; Schwietzke, S., "Upward Revision
of Global Fossil Fuel Methane Emissions Based on Isotope Database", Nature, Vol 538, pp 88-91, 06 Oct 2016).

I hope you will reconsider and revise your Resource Management Plan so as to much more severely restrict extraction
of fossil fuels from public lands.

Sincerely,
Michael K. Tarbell
13495 Chickory Rd.
Hotchkiss CO  81419
970-527-5565
mkt-aux1@tds.net

---

BLM_0149251



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comment Letter to draft RMP
1 message

**Kathryn Thompson** <kthompson2898@gmail.com>                    Tue, Nov 1, 2016 at 3:57 PM
To: uformp@blm.gov

*Please see attached comment letter.  Thank you for the opportunity to comment on the draft RMP.*

*Kathy Thompson*

 **Response to draft RMP 10-31-16.pdf**
889K

BLM_0149252

FROM: Kathy Thompson
40249 Swanson Road
P. O. Box 633
Paonia, CO  81428


TO: BLM, Uncompahgre Field Office
2465 Townsend Ave.
Montrose, CO  81401

RE: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

> *Washington, D.C., and America itself, have been compared to "a shining city on a hill."
> First, John Winthrop, in 1630 aboard the flagship Arbella en route to America, said "We
> must always consider that we shall be as a city upon a hill-the eyes of all people are upon
> us." Two American Presidents, followed, John F. Kennedy in 1961,and Ronald Reagan
> in 1980, one democrat, one republican, who,  respectively said, "Today the eyes of all
> people are truly upon us - and our governments, in every branch,at every level, must be
> as a city upon a hill - constructed and inhabited by men aware of their great trust and
> their great responsibilities," and "I believe that Americans in 1980 are as committed to
> that vision of a shining 'city on a hill,' as they were 350 years ago."*

As I put my thoughts on paper tonight regarding the serious matter before us ~ what is a
compatible/working resolution to human beings, wildlife and beautiful, natural land co-existing
with the oil and gas industry in the North Fork Valley of the Gunnison ~ my question to you is
"are you committed to the vision of America, and our government, representing "a shining city
on a hill," or a vast industrial waste land?

I acknowledge the responsibility that confronts you in executing the mission of the BLM.  That
mission is "to sustain the health, diversity, and productivity of America's public lands for the use
and enjoyment of present and future generations." I also understand the challenges that you face
in considering all sides of an issue when making decisions that affect the land and its people.
You have my utmost respect as you deal with opposing forces.  And I appreciate your research
and hard work in developing the draft Resource Management Plan (RMP).

**With that said, I am opposed to any oil and gas activity in or around the North Fork Valley
(NFV) and  favor a once and for all moratorium on such activity in the area, in other words
"a no leasing alternative." If that is impossible to achieve, then my only support would be
for the *North Fork Alternative, Alternative B1, of the draft Resource Management Plan*.**

My reasons for opposing any oil and gas activity in this region is supported by the following:

    1.    Extraction Activity and What it Entails is Incompatible with the Geology of the
Region. The draft RMP fails to adequately consider the fragile geology that surrounds the NFV.
Highway 133, which runs from Carbondale to Hotchkiss over McClure Pass, is 2-lanes, curvy,

mountainous, with lots of rocky terrain that hugs the Highway. McClure Pass, near the Paonia Reservoir, is often closed these days, due to rock slides. It is highly likely that the rock slides are caused by the rumbling vibration of heavy trucks speeding down the narrow mountain road. If the heavy truck traffic increases exponentially, which *will* happen as it has in *all* regions where extraction activity occurs, McClure Pass may become impassable to the private citizen due to increased slides which I believe, if studied, could be proven to be directly caused by increased traffic of large, heavy, fast moving trucks which are typically carrying several tons of water or gravel, making them even heavier. Neither the nature of the roads, nor the geology itself, can withstand the impacts of the truck traffic nor of the extraction activity anywhere near the NFV.

Related to this is the danger in there being so many trucks on the steep, rocky, narrow roads. The oil and gas trucks that I have witnessed are driven aggressively, which puts other drivers and their vehicles (cars and motorcyles) at risk of needless injury and damage. I am aware of personal instances in which trucks have hit rocks that have shot into the tires of passing vehicles, ruining tires and front end suspensions.

Also, much of Highway 133 is designated as a "Scenic Byway." It is so designated because it winds through some of the prettiest countryside and mountains in Colorado. The NFV is unique in its beauty because the West Elk mountain range contrasts exquisitely against the bucolic countryside. Neither the terrain nor the natural beauty of the NFV are conducive to heavy truck traffic, extraction activities, or unsightly industrial materials.

     2.     Draft RMP Fails to Consider Recent Findings Associating Earthquakes with Fracking Activity. Recent studies have concluded that earthquake activity, especially in Oklahoma, is directly caused by fracking activity. Your failure to consider this recent information is irresponsible. Having lived in Washington, D.C., I recognize that the Federal government moves at snail's pace sometimes. But, lives and livelihoods are at stake here. I applaud you for updating the obsolete RMP from 1989. The draft RMP, however, admits to not considering data from the last few years. The most recent data is some of the most important data to consider because it shows a direct correlation between fracking and injury to the land. You are not serving the people when you the oil and gas industry a blank check to frack when the recent studies are showing how dangerous it is.

     3.     Prohibition by Citizens to Enter Lands Occupied by Oil and Gas Activity. The mission of the BLM becomes meaningless if one industry, oil and gas, is permitted to occupy public lands to the exclusion of other activities, such as recreating and hunting. Your mission says "multiple-use." Yet when oil and gas activity is present, all other persons and activities are prohibited from entering the property. It is against public policy to forbid the citizens from entering the public lands because of the oil and gas industry is hoarding the land for its own use and profits.

     4.     Additional Draft Resource Management Plan Omissions. The RMP does not adequately address the unique qualities of the NFV, most notably the bowl shape of the Valley and the post coal mining prolific organic farming and related businesses.

The effects of fracking on the Front Range of Colorado, for example, while far from positive, differ significantly from the probable negative effects to inhabitants of the NFV, if it is allowed to go forward. The NFV is a Valley, and it is a small. It isn't a flat region where toxic chemicals may only penetrate the surface. The NFV is a small funnel-like environment in which toxicity, if present, will be concentrated in the lower regions of the Valley, where we all live. Thus, because of the size and structure of our Valley, our water sheds and air quality have a significant chance of being negatively impacted by heavy concentrated amounts of toxicity that would unequivocally impair the health of the citizens, causing respiratory and cancer related problems, and cause the demise of our magnificent wildlife (birds, eagles, elk, deer, mountain lions, bobcats) and their natural ecological habitats.

5.     Draft RMP Fails to Consider the Negative Impacts to Burgeoning Economic Activity in the NFV. The NFV has cohabited with neighboring coal mines for over 100 years. The mines are closing, as you know. This has caused employment challenges for many whom the mines employed. Some of those people are pursuing alternative livelihoods with alternative energy industries, such as solar, wind, nuclear, geothermal, and others, or by joining other long-time farmers and ranchers as well as newcomers to the "organic farming revolution."

Our most important resource is FOOD, not oil and gas; we can't live if we don't eat. If we don't eat nutritional food, in a clean environment, our health suffers. Some of the best, and healthiest food in America is grown right here in the NFV because of the high quality of our water, our clean air, our unique climate, and the high standards of the farming practices employed by our farmers and ranchers. The NVF in fact was named the Garden Spot of Colorado at the turn of the 20th century. It is incumbent upon us, you and me, the current stewards of the land, to make sure this remains true.

In addition, the economy of the NFV is finally recovering from the slow-down in the coal industry because we have used our ingenuity and creativity to revive, reinvent and reinvigorate ourselves and our economy for the good of the Valley. We are engaged in all facets of healthy food production and, given the opportunity, could feed a much broader segment of society if even the mere threat of oil and gas, and especially fracking, completely disappeared from our horizon.

6.     Personal Impact and Declining Property Values. My husband and I moved to Paonia 4+ years ago from Denver to savor the beauty and special sense of place and community that the NFV offers. Many of our residents, including myself, have lived all over the country and, before making the move, concluded that Paonia is the best town in the country to live. We therefore invested our life savings to build new homes and start farms. It is our wish to preserve what makes Paonia special ~ the quality of the irrigation and drinking water; the clear, clean air; the pristine views of Mt. Lamborn, Lands End, Gunnison, and other mountain peaks; the numerous hiking and biking trails; the unobstructed views of pastoral land, country roads, organic orchards and vineyards (which include ours, which we started from scratch); and the incredible community of diverse yet compatible folks. Such preservation will be impossible, and our property values will suffer irreparable damage, if you submit to the will of the oil and gas industry in or near this region.

The mission of the BLM is appealing and gives the public a false sense of security with words like "to sustain the health, diversity, and productivity...for the use and enjoyment of present and future generations; and "the BLM will ensure that the nation's public lands are managed and conserved for future generations...to use and enjoy." We, the citizenry, feel that you are doing everything but following your own mission. This unfortunately makes us lose faith in our government, and in you.

If your final RMP cannot recommend a "no leasing alternative," please do the least harm to our pristine Valley by recommending the "NFV Alternative, B1 Alternative." Please.

I humbly ask you to return to the drawing table, think long and hard about the consequences of your actions, and come out on the right side of history by retaining America's reputation of being a beacon to the world and a "shining city on a hill."

Thank you for the opportunity to respond to the draft Resource Management Plan.

Yours truly,

Kathy Thompson
303-919-2029

November 1, 2016

*Submitted via email (uformp@blm.gov) and US mail (with attachments)*

Teresa Pfifer, Acting Field Manager
BLM Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401

Re:   **Comments on the Uncompahgre Draft Resource Management Plan and Environmental Impact Statement**

Dear Ms. Pfifer,

Thank you for considering these comments on the Uncompahgre Draft Resource Management Plan (RMP). We appreciate the opportunity to engage in management decisions for our public lands, and our organizations have longstanding interests and investments in the BLM-managed lands in Colorado and across the West. We are glad to see the BLM acknowledging the important fish and wildlife, wilderness, recreation and other values on these public lands that will be affected by management decisions encompassed in the Uncompahgre RMP and evaluating alternatives to protect and conserve those public lands resources.

We hope to see continued improvements in the RMP that commit the agency to meaningful conservation measures and provide a better balance with energy development and other resource uses. We have proposed specific changes that will allow BLM to build upon the work included in the Draft RMP and provided reasoned analysis to support them in these comments.

| Issue Addressed | Page |
|---|---|
| I.     General Management Framework | 2 |
| II.    Lands with Wilderness Characteristics | 3 |
| III.   Recreation | 18 |
| IV.    Travel Management | 27 |
| V.     Ecological Emphasis Areas and Areas of Critical Environmental Concern | 36 |
| VI.    Wild and Scenic Rivers | 46 |
| VII.   Wilderness Study Areas | 60 |
| VIII.  Night Sky Resources | 61 |
| IX.    Management of the North Fork Area | 62 |
| X.     Oil and Gas Management | 93 |
| XI.    Uranium | 113 |
| XII.   Coal | 118 |
| XIII.  Climate Change | 126 |
| XIV.   Mitigation | 137 |
| List of Attachments & Literature Cited | 142 |

1

I.        **General Management Framework**

The Uncompahgre Resource Management Plan will provide management direction for 675,000 acres of public lands in western Colorado, including significant natural resources that must be balanced with other resource uses to fulfill BLM's multiple use and sustained yield mandate. The Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.*, imposes a duty on BLM to identify, protect and monitor the many natural resources found on public lands governed by RMPs.  FLPMA requires BLM to inventory its lands and their resource and values, "including outdoor recreation and scenic values." 43 U.S.C. § 1711(a).  FLPMA also obligates BLM to take this inventory into account when preparing land use plans, using and observing the principles of multiple use and sustained yield. 43 U.S.C. § 1712(c)(4); 43 U.S.C. § 1712(c)(1).

Through management plans, BLM can and should protect wildlife, scenic values, recreation opportunities and wilderness character present in the public lands through various management decisions, including by excluding or limiting certain uses of the public lands. *See* 43 U.S.C. § 1712(e). This is necessary and consistent with the definition of "multiple use," which identifies the importance of various aspects of wilderness characteristics (such as recreation, wildlife, natural scenic values) and requires BLM to consider the relative values of these resources but "not necessarily to the combination of uses that will give the greatest economic return." 43 U.S.C. § 1702(c).

Further, FLPMA requires that: "In managing the public lands the [Secretary of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation (UUD) of the lands." 43 U.S.C. §1732(b). BLM's duty to prevent unnecessary or undue degradation under FLPMA is mandatory, and BLM must, at a minimum, demonstrate compliance with the UUD standard. *See, Sierra Club v. Hodel*, 848 F.2d 1068, 1075 (10th Cir. 1988) (the UUD standards provides the "law to apply" and "imposes a definite standard on the BLM").

The Uncompahgre Draft RMP recognizes in many instances the values and vulnerabilities of natural resources within the Uncompahgre Field Office. The range of alternatives includes management scenarios that would protect and enhance these resources and identifies critical opportunities for BLM to promote conservation and achieve balance among the multiple uses of our public lands. For example, we highlight BLM evaluating a new management tool – Ecological Emphasis Areas – to protect and enhance habitat connectivity across the broader landscape. Uncompahgre Draft RMP at 2-68. Considering and eventually adopting a network of lands managed to protect and conserve natural resources on our public lands fits squarely within the agency's governing laws and policies, as well as forward-looking initiatives such as BLM's Planning 2.0 rule.

However, the Draft RMP ultimately fails to consider or implement reasonable management alternatives for oil and gas resources that would adequately protect local communities from oil and gas development or meaningfully analyze and respond to climate change. The prioritization of oil and gas development above all other multiple uses at the expense of healthy communities and climate solutions must be remedied before BLM finalizes the Uncompahgre RMP. Additionally, the Draft RMP misses other opportunities to appropriately balance multiple uses on Colorado's public lands and meet BLM's obligations under relevant laws and policies. Our comments demonstrate where and how BLM can create a lasting vision for conserving natural resources and balancing multiple uses through the RMP revision.

BLM_0149258

**Summary of Comments:** The Uncompahgre Draft RMP has laid out a management framework that could protect and enhance natural resources as directed by FLPMA through conservation management of valuable public lands such as lands with wilderness characteristics, Ecological Emphasis Areas, ACECs and quiet recreation management areas. However, BLM's approach to oil and gas management and addressing climate change is inconsistent with relevant law and policy and reflects an antiquated bias that the agency is proactively seeking to overcome. BLM must substantially adapt the Uncompahgre RMP to evaluate reasonable alternatives for energy development and meaningfully address climate change, including adaptation strategies and consistency with national climate goals.

## II.    Lands with Wilderness Characteristics

FLPMA requires BLM to inventory and consider lands with wilderness characteristics during the land use planning process. 43 U.S.C. § 1711(a); *see also Ore. Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1122 (9th Cir. 2008) (holding that "wilderness characteristics are among the values the FLPMA specifically assigns to the BLM to manage in land use plans).[1] IM 2011-154 and Manuals 6310 and 6320 contain mandatory guidance on implementing that requirement. The IM directs BLM to "conduct and maintain inventories regarding the presence or absence of wilderness characteristics, and to consider identified lands with wilderness characteristics in land use plans and when analyzing projects under [NEPA]." This includes the "necessary forms for each area" including photo logs, route analysis forms and inventory area evaluations (Manual 6310, Appendices A-D).  Manual 6310 reiterates that, "[r]egardless of past inventory, the BLM must maintain and update as necessary, its inventory of wilderness resources on public lands."  Manual 6320 requires BLM to consider lands with wilderness characteristics in land use planning, both in evaluating the impacts of management alternatives on lands with wilderness characteristics and in evaluating alternatives that would protect those values. Wilderness inventories are to be done on a *continuing* basis and relevant citizen-submitted data is to be evaluated. BLM Manual 6310 at .04(C)(1).

We appreciate that BLM has inventoried lands with wilderness characteristics in the planning area and that the Draft RMP considers multiple alternatives to protectively manage those lands. We recognize that the Uncompahgre Field Office has been a leader in Colorado in regards to complying with the updated inventory requirements, as the field office publicly posted inventory information in a timely fashion when the new policy was released and refined that information in 2015 to better align with BLM Manual 6310. We value the UFO's commitment to addressing this resource through the RMP revision. However, BLM should make some adjustments in the Proposed RMP to better comply with agency policy, and the agency's obligations under FLPMA and NEPA that policy is rooted in, and to achieve a more balanced land use plan that embodies multiple use and sustained yield.

---

[1] In an April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and the State of Utah, the  BLM abdicated its authority to designate any additional WSAs, and we maintain that this agreement is invalid and will ultimately be overturned. In addition, the Utah Settlement is based on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with BLM Manual 6330. This administration has the authority to create new WSAs under § 202 and BLM should be considering this within its range of reasonable alternatives that are deserving of consideration in this NEPA process.

3

BLM_0149259

a.  **Inventory**

There are a few specific instances in which BLM's LWC inventory is inconsistent with current agency policy. Below are comments addressing where and how BLM's inventory fails to follow the guidance for conducting lands with wilderness characteristics inventories detailed in BLM Manual 6310.

<u>Adobe Badlands WSA Adjacent</u>
BLM's inventory for the Adobe Badlands LWC unit is 6,200 acres, while our assessment shows the unit to be about 8,200 acres. The major difference is in the far southwest portion of the unit, where BLM drew boundary lines to cut out two portions of the unit (downslope towards the powerlines) based on the argument those areas do not have either outstanding opportunities for solitude or primitive recreation. However, these areas are contiguous with the Adobe Badlands WSA, and therefore inherit the outstanding opportunities already identified in the WSA. BLM Manual 6310 provides that if a polygon of land is contiguous with lands currently managed to protect their wilderness character (e.g. WSA) and that contiguous land meets the naturalness criterion, then that naturally appearing contiguous land meets the criteria for LWC because it inherits the outstanding opportunities already identified in the adjacent WSA.  BLM Manual 6310 is clear that not every acre needs to have outstanding opportunities, including when the area is contiguous with a WSA: "The area does not have to possess outstanding opportunities for both elements, nor does it need to have outstanding opportunities on every acre, even when an area is contiguous to lands with identified wilderness characteristics." BLM Manual 6310 at .06(C)(2)(c). BLM finds in its inventory report for the Adobe Badlands LWC unit that the eliminated areas are both contiguous with the WSA and natural; therefore they should qualify as LWC. Furthermore, BLM should not cut out areas that don't have outstanding opportunities; cut outs should be for impacts related to naturalness only according to BLM Manual 6310.

<u>Camel Back WSA Adjacent</u>
BLM's Camel Back LWC unit only includes lands from the canyon rims down, eliminating obviously qualifying lands on the mesa tops, which may total 1,000-2,000 additional acres. BLM's report for this unit states that BLM removed 1,750 acres on Monitor Mesa for further consideration as lands with wilderness characteristics because of "substantial evidence of human modification" on "most" of Monitor Mesa, including "constructed and maintained routes that run the length of the mesa top" and mechanical vegetative treatments...that are obvious to the casual observer. (Emphasis added).

However, while two constructed and maintained routes do traverse the length of the mesa top, these routes are easily cherry-stemmed from the larger unit; stating that these routes contribute to "substantial evidence of human modification" across "most of Monitor Mesa" is entirely misleading. These two routes only make up a small portion of the mesa top, and because of significant vegetative screening along there length, they have little impact on the naturalness of the area as a whole.

4



Image 4634 (above) shows the main route traversing Monitor Mesa from the southwest to the northeast.  This route is clearly constructed and maintained.  However, because this route is bordered on both sides by large vegetation including juniper trees exceeding 10 feet in height as well as dense stands of mature sagebrush, this route has little impact on the naturalness of the mesa top as a whole.

Further, BLM's claims that "most of" Monitor Mesa "shows substantial evidence of human modification" and that old vegetative treatment areas are "obvious to a casual observer" is factually incorrect.  Such statements are an indication that BLM inventoried this area using aerial imagery, rather than on-the-ground investigation.  A visit to the area clearly shows that the areas of former vegetative treatments are largely recovered, as seen in the following photos, all of which were taken amidst the vegetative treatment areas cited in BLM's report.  These photos are representative of the entirety of Monitor Mesa as of May 2014:

5





BLM_0149262



The photo below looks generally west and southwest along BLM's proposed boundary for this unit.  To the left of the photo is an area BLM found to be natural in appearance, to the right is an area removed from the unit because of "substantial evidence of human modification" that would be "obvious" to the average visitor:



BLM Manual 6310 is clear that "apparent naturalness refers to whether or not an area looks natural to the average visitor who is not familiar with the biological composition of natural ecosystems versus human-affected ecosystems".  The above photos show, and any visit to the area would confirm, that

7

BLM_0149263

Monitor Mesa "looks natural to the average visitor".  BLM must revise its inventory of the Camel Back WSA Addition unit to incorporate the areas of removed because of former vegetative treatments, such as Upper Long Gulch, which BLM removed from the unit and which is shown below:



<u>Dolores River Canyon WSA Adjacent</u>
Similar to BLM's inventory of the Adobe Badlands LWC unit, the portions of the Dolores River LWC unit that are contiguous with the WSA should inherit the outstanding opportunities for solitude or primitive and unconfined recreation already found to exist in the Dolores River Canyon WSA.

<u>Dry Creek Basin</u>
Similar to the Camel Back LWC unit, BLM eliminated areas with past vegetation treatments that should actually qualify as LWC, as they now appear largely natural to the average visitor. BLM also eliminates small parcels within the larger unit for lack of outstanding opportunities, contrary to guidance which states: "The area does not have to possess outstanding opportunities…on every acre." BLM Manual 6310 at .06(C)(2)(c). BLM should not cut out areas that don't have outstanding opportunities; cut outs should be for impacts related to naturalness only according to BLM Manual 6310.

<u>Shavano Creek</u>
Again, BLM inappropriately cuts out areas due to past vegetation treatments that do not appear unnatural to the average visitor.

<u>Atkinson Breaks</u>
It appears BLM has not inventoried Atkinson Breaks area. BLM should inventory the area north of the Lower Tabeguache/Campbell Creek LWC unit, including the numerous canyons known as the Atkinson Breaks, as well as the steeper slopes abutting USFS lands of the Uncompahgre Plateau. In particular, the BLM lands below Campbell Point and around South Fork Mesa Creek and Blue Basin are likely to meet the criteria for lands with wilderness characteristics.

8

**Summary of Comments**: BLM should refine the LWC inventory to address the inconsistencies with BLM Manual 6310 identified above.

### b. Environmental Consequences Analysis

Manual 6320 provides that BLM must "consider the benefits that may accrue to other resource values and uses as a result of protecting wilderness characteristics." BLM Manual 6320.06(A)(1)(b). Those benefits should be analyzed in the RMP, particularly in the environmental effects analysis. They include the following:

(a) Scenic values – FLPMA specifically identifies "scenic values" as a resource of BLM lands for purposes of inventory and management (43 U.S.C. § 1711(a)), and the unspoiled landscapes of lands with wilderness characteristics generally provide spectacular viewing experiences.  The scenic values of these lands will be severely compromised if destructive activities or other visual impairments are permitted.

(b) Recreation – FLPMA also identifies "outdoor recreation" as a valuable resource to be inventoried and managed by BLM. 43 U.S.C. § 1711(a).  Lands with wilderness characteristics provide opportunities for primitive recreation, such as hiking, camping, hunting and wildlife viewing.  Most, if not all, primitive recreation experiences will be foreclosed or severely impacted if the naturalness and quiet of these lands are not preserved.

(c) Wildlife habitat, connectivity and riparian areas – FLPMA acknowledges the value of wildlife habitat found in public lands and recognizes habitat as an important use. 43 U.S.C. § 1702(c).  Due to their unspoiled state, lands with wilderness characteristics provide valuable habitat for wildlife, thereby supporting additional resources and uses of the public lands.  As part of their habitat, many species are also dependent on riparian and other wetland habitats, especially during either seasonal migrations or seasons and years when surrounding habitats are dry and unproductive.  Wilderness-quality lands support biodiversity, watershed protection and overall healthy ecosystems.  In addition they provide connectivity that facilitates wildlife migration, seasonal movements and dispersal of young. The low route density, absence of development activities and corresponding absence of motorized vehicles, which are integral to wilderness character, also ensure the clean air, clean water and lack of disturbance necessary for productive wildlife habitat, large scale connectivity and riparian areas (which support both wildlife habitat and human uses of water).

(d) Cultural resources – FLPMA also recognizes the importance of "historical values" as part of the resources of the public lands to be protected. 43 U.S.C. § 1702(c).  The lack of intensive human access and activity on lands with wilderness characteristics helps to protect these resources.  Managing lands to protect wilderness qualities will also help protect cultural and archaeological sites.

(e) Quality of life – The wildlands located within the planning area help to define the character of this area and are an important component of the quality of life for local residents and future generations, providing wilderness values in proximity to the population centers spread across the planning area. Their protection enables the customs and culture of this community to continue.

(f) Balanced use – The vast majority of BLM lands are open to motorized use and development.  FLPMA recognizes that "multiple use" of the public lands requires "a combination of balanced and diverse resource uses" that includes recreation, watershed, wildlife, fish, and natural scenic and historical values. 43 U.S.C. § 1702(c).   FLPMA also requires BLM to prepare land use plans that may limit certain

9

BLM_0149265

uses in some areas. 43 U.S.C. § 1712.  Many other multiple uses of public lands are compatible with protection of wilderness characteristics – in fact, many are enhanced if not dependent on protection of wilderness qualities (such as primitive recreation and wildlife habitat).  Protection of wilderness characteristics will benefit many of the other multiple uses and values of BLM lands such as air and water quality, night skies, soundscapes, and viewsheds, while other more exclusionary uses (such as off-road vehicle use and timber harvesting) will still have adequate opportunities on other BLM lands.

(g) Economic benefits – The recreation opportunities provided by wilderness quality lands also yield direct economic benefits to local communities.  According to the U.S. Fish & Wildlife Service, in 2011 state residents and non-residents spent $3 billion on wildlife recreation in Colorado.[2] In addition, local communities that protect wildlands reap measurable benefits in terms of employment and personal income. Sonoran Institute 2004. Other "non-market" economic values arise from the ability of wildlands to contribute to recreation and recreation-related jobs, scientific research, scenic viewsheds, biodiversity conservation, and watershed protection. Morton 1999; Loomis 2000. All of these economic benefits are dependent upon adequate protection of the wilderness characteristics of the lands.

We appreciate that the Draft RMP acknowledges in many instances that protecting lands with wilderness characteristics will also protect other resources such as soil, water, vegetation, fish and wildlife, and wild and scenic river ORVs. *See, e.g.,* Uncompahgre Draft RMP at 4-68, 4-91, 4-115, 4-151, 4-414. However, those analyses do not appear to inform the decisions made in the Draft RMP, particularly the preferred alternative, because BLM would only manage 18,320 acres of lands with wilderness characteristics in the preferred alternative – less than 3% of the public land in the planning area. This preferred plan does not reflect BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics.

Additionally, the Draft RMP does not adequately analyze or acknowledge the economic benefits of protecting lands with wilderness characteristics. We appreciate that BLM discusses nonmarket values, including the fact that setting land aside for protection can maintain and enhance nonmarket values associated with natural amenities. Uncompahgre Draft RMP at 4-460. However, the Draft RMP fails to meaningfully analyze nonmarket values, stating: "Nonmarket values are difficult to quantify, and insufficient data exists in order to assess the impacts of management actions." *Ibid.* The brief and qualitative treatment of nonmarket values in the Draft RMP is not adequate to inform management decisions in the RMP, and does not conform to agency guidance. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics.

BLM has current guidance on estimating nonmarket environmental values and analyzing those values in land use planning.[3] IM 2013-131 directs BLM to "utilize estimates of nonmarket environmental values in NEPA analysis supporting planning and other decision-making." Nonmarket values are described as values that "reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions and therefore lack prices," such as "the perceived benefit of hiking in wilderness."

---

[2] USFWS 2011, National Survey of Hunting, Fishing and Wildlife-associated Recreation, available at http://www.census.gov/prod/2013pubs/fhw11-co.pdf
[3] IM 2013-131, available at: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-131__Ch1.print.html.

BLM_0149266

BLM's guidance directs the agency to analyze nonmarket values for each alternative and adopt management decisions that are informed by that analysis:

> In framing information for management decisions, focus on the *difference in changes to nonmarket values* between action alternatives. Such information can highlight tradeoffs. For example, an alternative designating an additional thirty miles of trails for off-highway vehicles may *increase* the visitor days of use – therefore the total nonmarket benefits – from motorized recreation, but may *decrease* the benefits of subsistence hunting and watershed protection in this area. The *difference* between the changes to nonmarket values between this alternative and an alternative that, for example, only designates an additional ten miles of trails, can inform the choice among action alternatives.

IM 2013-131, Attachment 1-5. The guidance also directs that <u>quantitative</u> analysis of nonmarket values is strongly encouraged when "the alternatives to be considered present a strong contrast between extractive and nonextractive uses of land and resources. For example, an RMP may include alternative resource allocations that vary between managing land primarily for oil and gas development or managing it for habitat conservation and recreation." IM 2013-131, Attachment 1-7. Because the Uncompahgre RMP is evaluating a range of alternatives that has a development-focused alternative at one end of the spectrum and a conservation-focused alternative at the other, this criterion applies to the RMP and BLM should conduct quantitative analysis of nonmarket values.

**Summary of Comments:** BLM should adopt a final plan that actually reflects BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics. BLM should analyze the economic benefits of protecting lands with wilderness characteristics for each alternative and utilize that analysis to inform the management decisions ultimately adopted in the RMP.

    c.   **Management**

        i.   <u>An accurate and comprehensive inventory of lands with wilderness characteristics is necessary to inform management alternatives, impact analysis and decision-making.</u>

Evaluating management alternatives for lands with wilderness characteristics requires an accurate inventory to serve as baseline information. FLPMA requires BLM to inventory the resources of the public lands in order to development management plans. 43 U.S.C. § 1711(a). The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." *See* 40 C.F.R. § 1502.15. Establishment of baseline conditions is a requirement of NEPA. In *Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

The U.S. Court of Appeals for the Ninth Circuit has held: "wilderness characteristics are among the 'resource and other values' of the public lands to be inventoried under § 1711.  BLM's land use plans,

11

which provide for the management of these resources and values, are to 'rely, to the extent it is available, on the inventory of the public lands, their resources, and other values.' 43 U.S.C. § 1712(c)(4)." *Ore. Natural Desert Ass'n v. Bureau of Land Management*, 531 F.3d at 1119.  Therefore, BLM is required to consider "whether, and to what extent, wilderness values are now present in the planning area outside of existing WSAs and, if so, how the Plan should treat land with such values." *Id.* at 1143.

Conducting an accurate and comprehensive inventory as directed by Manual 6310 is BLM's current policy for establishing the baseline conditions required by NEPA. While we appreciate that the Uncompahgre Field Office has completed lands with wilderness characteristics inventory under BLM Manual 6310, BLM must correct the remaining inconsistencies with the Manual in order to have an inventory that is sufficient to inform land use planning.

**Summary of Comments:** In order to establish a true set of baseline conditions as required under NEPA, BLM must refine its lands with wilderness characteristics to fully comply with BLM Manual 6310 in order to adequately evaluate management alternatives and environmental consequences in the Uncompahgre RMP.

ii.   BLM should manage additional lands to protect their wilderness characteristics in the final RMP in order to meet its statutory and regulatory obligations.

Although the BLM identified 42,150 acres of lands with wilderness characteristics, the preferred alternative would only manage 18,320 acres to protect those values. This is less than half of the inventoried wilderness resource and less than 3% of the public land in the planning area. This approach does not evidence a meaningful consideration of the value of this important resource in the planning area or balanced land management.

FLPMA directs BLM to inventory for the many values of the public lands and consider ways to protect them in the RMP (i.e., not all uses are appropriate in all places). 43 U.S.C. §§ 1711, 1712. Protecting all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office is appropriate to achieve BLM's multiple use and sustained yield mandate.

BLM also is not in compliance with its regulations regarding off-road vehicles in the management alternatives under consideration in the Draft RMP. While Alternative B would close lands managed to protect wilderness characteristics to off-road vehicle use, the preferred alternative would limit motorized travel to designated routes. Uncompahgre Draft RMP at 2-149. In allowing ORV use to be designated as limited in lands with wilderness characteristics, the Draft RMP is in direct violation of Executive Orders and agency regulations implementing these Orders. Executive Orders (EO No. 11644 (1972)) as amended by Executive Order No. 11989 (1977)) and the BLM's regulations (43 C.F.R. § 8342.1) require BLM to ensure that areas and trails for off-road vehicle use are located:

- to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability; to minimize harassment of wildlife or significant disruption of wildlife habitats, and especially for protection of endangered or threatened species and their habitats;
- to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands; and

12

- outside officially designated wilderness areas or primitive areas and in natural areas only if the agency determines that off-road vehicle use will not adversely affect their natural, aesthetic, scenic, or other values for which such areas are established.

These Executive Orders put the burden of proof on the BLM to make sure that sensitive and protected conservation lands are not harmed by ORV use. Given the small amount of public land managed to protect wilderness characteristics, and the high likelihood of off-road vehicle use causing conflict with quiet recreation experiences and other public lands resources that benefit from protected lands with wilderness characteristics, these areas should be closed to ORV use.

Furthermore, BLM should maximize protection of wilderness characteristics through layering management, as contemplated in several areas in the Draft RMP. Layering management that protects a variety of resources is an important tool that BLM consistently uses. Protection of wilderness characteristics can be effective as a standalone management approach but is also effective along with designation of ACECs and other conservation-oriented designations, as well as portions of special and extensive recreation management areas.

In the RMP for the Monticello Field Office, BLM responded to resistance to layering designations in the following appropriate way:

> "Layering" is planning. Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands. Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives. Under the multiple use concept, BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands. The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering". BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area. Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land use plan, and litigation. Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner. All uses and values cannot be provided for on every acre. That is why land use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan. Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.

Monticello Proposed RMP, Response to Comments, at 7-48. This rationale is equally applicable to the many opportunities to layer management of LWC with management of other values and uses in this plan.

**Summary of Comments:** BLM should better balance the multiple uses of public lands and prevent unnecessary or undue degradation by managing significantly more lands for protection of wilderness characteristics, including closing those areas to motorized use and layering them with other special management areas.

13

BLM_0149269

iii.   Management prescriptions must be robust to adequately protect wilderness resources identified for protection in the RMP and BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics.

BLM must adopt meaningful protections for wilderness resources as part of its multiple use mission. Manual 6320 directs that "an alternative that protects lands with wilderness characteristics must contain management actions to achieve protection." Manual 6320 at .06(A)(2)(d). The manual provides examples of land use plan decisions that could protect wilderness characteristics, including: recommend withdrawal from mineral entry; close to leasing or NSO with no exceptions, waivers or modifications; right-of-way exclusion; close to construction of new roads; close or limit motorized and/or mechanized use; designate as VRM I or II; among others. We appreciate that the Uncompahgre Draft RMP evaluates management decisions for lands with wilderness characteristics consistent with BLM Manual 6320.

BLM also has wide discretion regarding how it manages lands with wilderness characteristics outside of lands prioritized for protection of wilderness characteristics over other multiple uses. While certain lands with wilderness characteristics units undoubtedly deserve the highest levels of protection to ensure that their outstanding wilderness, wildlife, cultural, scenic, and/or recreation values are protected, other lands with wilderness characteristics units may overlap with different types of multiple uses that suggest BLM should consider a wider range of uses for those lands. In this case the Draft RMP simply selects all identified lands with wilderness characteristics and gives them identical management prescriptions (Alternative B), or selects a sub-set of those units for protection and gives that smaller set an identical set of management prescriptions (Alternative D).

Analyzing alternatives that would "avoid or minimize" adverse environmental effects is a requirement of NEPA, and current guidance outlined in Manual 6320 states that land use planning efforts should consider several outcomes for lands with wilderness characteristics. BLM should not simply analyze alternatives that would protect or leave unprotected lands with wilderness characteristics, but can also consider additional management options for these lands, where other multiple uses are emphasized "while applying management restrictions (conditions of use, mitigation measures) to reduce impacts to wilderness characteristics." Manual 6320 at .06(A). In fact, even for areas where BLM specifically decides to not protection wilderness characteristics, BLM is still required to "consider measures to minimize impacts on those characteristics." Manual 6320 at .06(A)(2)(d).

The only goal for lands with wilderness characteristics in the Draft RMP is to: "Manage lands with wilderness characteristics that are identified for protection to maintain those characteristics." Uncompahgre Draft RMP at 2-148. Where lands with wilderness characteristics are not explicitly managed for protection in the draft alternatives, no description of management goals or objectives is provided that describes how impacts to any of the other identified lands with wilderness characteristics areas might be minimized "to reduce impacts to wilderness characteristics" as outlined in Manual 6320. For example, the Rio Puerco (NM) Draft RMP developed three approaches for managing lands with wilderness characteristics: Protect Wilderness Characteristics, Minimize Impacts to Wilderness Characteristics, and Not Managed to Protect Wilderness Characteristics. Rio Puerco Draft RMP, p. 2-38—40; excerpt included as Attachment 1. All three categories, **including lands not managed to protect wilderness characteristics**, have management prescriptions in place to minimize impacts to wilderness characteristics. Similarly, the White River (CO) Proposed RMPA grouped inventoried LWC into 3 management tiers ranging from most restrictive management to least. Even the least restrictive tier

14

allows for applying management decisions to avoid and minimize impacts to wilderness characteristics. White River Proposed RMPA at Table 2-22; excerpt included as Attachment 2.

For the Uncompahgre RMP, we recommend BLM manage lands with wilderness characteristics in two categories: high quality LWC meriting the strongest levels of protection; and additional LWC managed to protect wilderness characteristics while providing for other multiple uses. Because all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office comprise just 6% of the public land in the planning area, it is perfectly reasonable to manage all LWC to protect wilderness resources in some form. Both categories should include management direction to consider impacts to wilderness characteristics in implementation-level decisions and avoid, minimize or mitigate those impacts to the extent possible.

### (1)  High quality LWC meriting the strongest levels of protection

This management category should include Camel Back WSA-adjacent, Dry Creek Basin, Roc Creek, Lower Tabeguache and Shavano Creek. Management prescriptions should include:

- VRM I
- Closed to oil and gas leasing
- Closed to renewable energy development
- Closed to new rights-of-way (ROW exclusion)
- Closed to motorized and mechanized use
- Construction of new permanent and temporary roads is prohibited
- Close to mineral material disposal and non-energy solid leasable mineral exploration and development
- Recommend withdrawal from locatable mineral entry
- Closed to commercial timber harvest
- Vegetation treatments must utilize the minimum tool necessary
- Seek opportunities to acquire and incorporate non-federal inholdings
- Retain lands in federal ownership
- Close area to military training activities, including landings associated with High Altitude Mountain Environment Training.

These areas are proposed for management to protect their wilderness characteristics in the Draft RMP preferred alternative, with the addition of Lower Tabeguache and Shavano Creek. Our rationale for those additions is as follows:

- The Lower Tabeguache LWC unit is adjacent to the specially managed Tabeguache Area and Shavano Creek, and would therefore create an important protected core area.

- The Lower Tabeguache and Shavano Creek units also encompasses the Tabeguache Pueblo and Tabeguache Caves area considered but rejected for ACEC designation to protect cultural resource values. In addition, the stream segment through Lower Tabeguache was found eligible but rejected as suitable under WSR designation. Those values can be effectively protected with enhanced LWC management if not WSR and ACEC.

15

- LWC management would offer better protections to the habitat values and species in the overlapping Ecological Emphasis Area, detailed in Table D-1. BLM recognizes these areas as important wildlife habitat because they are part of a large undisturbed area that connects directly to the USFS land on the Uncompahgre Plateau, and thus is an important migration corridor for species moving between the high and low lands of the Plateau.

- Shavano Creek is adjacent to the Windy Gap Colorado Roadless Area, further extending this protected core area into the adjacent forest land. The Draft RMP acknowledges that this adjacent management would enhance the qualities of naturalness and solitude of the areas by extending them over a larger area. Uncompahgre Draft RMP at 4-225.

We furthermore reiterate our support for the protective management of the Camel Back WSA-adjacent LWC unit. The Potter/Monitor addition to the Camelback WSA has been in the Colorado Wilderness Network's Brown Book of proposed Wilderness Areas for 30 years and is clearly area considered to have "wilderness characteristics." Indeed, the wild quality of the area has improved rather than degraded since the BLM's original inventory - less dispersed travel, fewer illegal motorized and mechanized uses in closed areas and "administrative use only" areas, less vandalism of signage, regrowth on the mesa tops from vegetative treatments like chaining and roller-chopping, less impact of livestock due to improved range management.

The area also provides a unique recreational experience. The sense of isolation and solitude is unparalleled within 50 miles, in spite of nearly 200,000 people living within that radius, and yet access is relatively quick and easy year-round. Because of the close connection between Potter and Monitor Canyons and the Camelback WSA in Roubideau Canyon, the opportunities for unconfined recreation, outstanding solitude, and naturalness is greatly enhanced by having all three canyon and stream segments protected as fully as possible for their wild characteristics.

### (2) Additional LWC managed to protect wilderness characteristics while providing for other multiple uses

This management category should include Adobe Badlands WSA-adjacent and Dolores River Canyon WSA-adjacent. Management prescriptions should include:

- VRM II
- NSO stipulation for fluid minerals without exception, modification, or waiver.[4]
- Closed to renewable energy development
- Closed to new rights-of-way (ROW exclusion) outside of designated utility corridors
- Motorized and mechanized use limited to designated routes
- Construction of new permanent and temporary roads is prohibited
- Close to mineral material disposal and non-energy solid leasable mineral exploration and development
- Recommend withdrawal from locatable mineral entry
- Closed to commercial timber harvest
- Vegetation treatments must not have long-term impacts on wilderness characteristics

---

[4] By way of example, the White River RMPA would apply an NSO stipulation without exception, modification or waiver for Tier 1 LWC in the proposed plan. White River Proposed RMPA at A-42.

16

BLM_0149272

- Seek opportunities to acquire and incorporate non-federal inholdings
- Retain lands in federal ownership

These areas are evaluated for management to protect their wilderness characteristics in Alternative B of the Draft RMP preferred alternative. Our rationale for managing them in a second category of LWC management in the proposed plan is as follows:

-   The Dolores River Canyon WSA-adjacent areas have some impacts, but still meet the criteria for LWC and therefore provide important roadless areas adjacent to the WSA that are valuable for backcountry recreation opportunities and wildlife habitat. Additional impacts to these areas should be minimized. Nyswonger Mesa in particular offers spectacular vistas into the canyon and is readily accessible on long-since closed routes from the Bedrock store.[5]

-   LWC management for the Dolores River Canyon WSA-adjacent units would offer better protections to the habitat values and species in the overlapping La Sal Ecological Emphasis Area, detailed in Table D-1.

-   The Adobe Badlands WSA-adjacent unit provides a critical resource as a place for quiet and unconfined recreation close to the city of Delta. Although close to a population center, once one hikes into the unit away from the boundary roads and past the WSA, the area clearly still has wilderness characteristics in terms of solitude, naturalness and unconfined recreation:
    o   *Solitude*: After hosting multiple hikes into the area over a three year period, we only once saw other people in the area and they were on the boundaries of the WSA, not in the LWC unit boundaries. The further in you hike; the eroded hills and gullies of the Mancos shale hide the signs of human proximity and can give a person the feeling of hiking in a desert far from other people. Once you are in the higher topography with pinon and juniper, the vegetative screening provides additional privacy. This area provides the public a rare opportunity to find solitude without having to travel far distances from home.
    o   *Unconfined recreation*: The unit also allows people a large area to explore through primitive and unconfined recreation. Again, if one stays close to the boundary roads, the character of the area is very different from when you hike further in.  Apart from the boundary roads, there are not recreational developments or established/maintained trails. One can find opportunities for both easy and challenging hiking. People are able to explore freely through the gullies and climb the mesas of their own accord.
    o   *Naturalness:* Again, on the boundaries of the greater Adobes area and in proximity to the private inholdings, there are obvious signs of human disturbance and encroachment of motorized recreation. However, the further one explores the area and heads north, the more natural it becomes as you travel towards the Grand Mesa FS boundary. The proposed LWC boundaries encompass the core of this natural area.
    BLM should manage this area to protect and maintain these rare characteristics in a place where they provide valued opportunities for people to find solitude and naturalness literally

---

[5] We also note that the La Sal Creek ACEC proposed in Alternative B would provide enhanced protections for some of these WSA adjacent areas, and would be a useful layer to overlap lands inventoried for wilderness character.

17

BLM_0149273

in their backyard. The need for added protection is only heightened because of its proximity to a population center, not lessened, and we encourage the BLM to protect this unit to the highest degree possible through LWC management in the final RMP.

- BLM should manage the Adobe LWC unit in the Final RMP in order to fulfill the agency's mandate to protect the Adobe Badlands WSA. A larger area managed for wilderness characteristics adjacent to the WSA will only help protect and enhance the Wilderness that has already been designated.

- The Adobe Badlands WSA-adjacent unit contains oil and gas leases that are part of the Whitewater Unit. However, the Master Development Plan for the Whitewater Unit that is currently under evaluation only proposes development in the northern portion of the unit and explicitly states that "development in the southern portion of the Whitewater Unit is not reasonably foreseeable." Fram Whitewater Unit MDP EA at 1.1. Therefore, BLM should not preclude management to protect the highly valuable wilderness characteristics of the Adobe Badlands WSA-adjacent unit based on the existing leases.[6]

**Summary of Comments:** BLM must adopt robust management prescriptions for lands managed to protect wilderness characteristics to ensure wilderness resources are adequately protected. BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics to allow for management of other multiple uses in conjunction with maintaining wilderness characteristics. BLM should manage specific LWC units in the Uncompahgre Field Office as described above.

### III.    Recreation

#### a. Planning for Recreation and Visitor Services

In the Draft RMP, we note that there is an apparent lack of background data conducted or provided by BLM to inform the recreation analysis and alternatives development. As indicated in BLM Manual 8320, planning, management and monitoring of recreation and visitor services is an iterative process. Monitoring methods such as social surveys and visitation rates are essential for assessing the effectiveness of recreation planning and implementation actions. Under all planning phases of the RMP, BLM should collect data that is sufficient to address the nature and complexity of existing and potential issues. BLM Manual 8320 at .06(B)(1)(b).

In general, we support the extensive Recreation Management Areas that are evaluated in the range of alternatives, including in the preferred alternative, targeting primitive and non-motorized recreation opportunities. We recommend the Uncompahgre Field Office build on these opportunities for quiet recreation such as hiking, wildlife viewing, back country hunting and horseback riding in the final RMP, which are popular activities for public lands visitors in the planning area. The draft RMP states that the

---

[6] According to the unitization agreement, the Whitewater Unit was supposed to contract, and lands outside the "participating area" (PA) of the unit were supposed to be automatically eliminated, in July 2015. However, BLM granted a suspension that tolled contraction of the unit based on a pending APD for the Federal 12-98-24-2 well. The relevant BLM orders indicate that the unit will now contract roughly 120 days after BLM approves the APD. Therefore, BLM should ignore the presence of the overlapping unit for purposes of planning decisions in the RMP, because it is likely the unit will contract to exclude the Adobe LWC prior to the RMP being finalized.

18

primary recreation activities in the planning area are hunting, fishing, whitewater rafting, OHV use, canoeing, kayaking, camping, hiking, backpacking, mountain biking, horseback riding, rock climbing, photography, and scenery and wildlife viewing. Uncompahgre Draft RMP at 3-130. However, the draft RMP fails to provide sound data on the relative prevalence of these uses, stating: "Most public land use and activity participation estimates depend on a mix of computerized trail counter data, field observations, and professional judgment of the recreation staff and hence are not scientifically based." *Id.* at 3-132. This is not sufficient to analyze recreation trends and make long range management decisions that reflect accurate data.

Public lands surveys in nearby areas have found that non-motorized recreation activities are dominant among public lands visitors. For example, a 2006-2007 visitor field survey and focus group study of BLM lands coordinated by the Colorado River Valley Field Office and Arizona State University found that hiking is the most popular activity, at 33%, followed by mountain biking, at 26%. Colorado River Valley Draft RMP at 3-151. The Moab Field Office completed a National Visitor Use Monitoring Program (NVUM)[7] as a pilot project for visitor use monitoring on BLM lands, which showed that motorized use is a small portion of recreation activity on public lands in the Moab Field Office. The NVUM states: "In terms of total participation, the top five recreation activities of the visits to the Moab Field Office were viewing natural features, hiking/walking/trail running, relaxing (hanging out, escaping heat and noise), viewing wildlife and driving for pleasure (Table 16)."

We would expect similar results in the Uncompahgre Field Office, which would support the designation of expansive Recreation Management Areas for quiet recreation as contemplated in the range of alternatives. Guidance issued in 2010 indicates that Recreation Management Area designations should reflect recreation demand and issues (IM 2011-004). BLM must include recreation data and foreseeable impacts in the baseline assessment in order to provide reasonable explanation and analysis of SRMA and ERMA designations in the range of alternatives. Moreover, environmental consequences described in Chapter 4 should more closely align to the expected increases in recreation demand (particularly of OHV use) described in Chapter 3, and account for the differences in recreation management area designations put forth in the range of alternatives.

**Summary of Comments**:  In creating management objectives and allowable uses for recreation management areas, BLM should utilize and include monitoring data and trends by user type in the RMP. Recreation Management Area designations should reflect recreation demand. We also point out that managing lands for wilderness characteristics is another way for BLM to provide opportunities for quiet recreation in natural and scenic areas within the Uncompahgre Field Office. We therefore recommend the RMP protect expansive areas as lands with wilderness characteristics to provide desirable recreation experiences for hikers, back country hunters, and other non-motorized public land users.

### b.  Designating Recreation Management Areas for Non-motorized Recreation

In 2010, BLM issued new guidance (IM 2011-004) for recreation and visitor services planning in the land use planning process. This guidance was incorporated into BLM Manual 8320 in 2011 as well as BLM's updated recreation planning handbook (H-8320-1) in 2014.  The guidance changes recreation management to a three-category system wherein lands in the planning area can be designated as special recreation management areas (SRMAs), managed as extensive recreation management areas (ERMAs), or classified as public lands not designated as recreation management areas.

---

[7] http://www.blm.gov/wo/st/en/prog/Recreation/national_recreation/visitor_use_surveys.html

BLM_0149275

Management focus for SRMAs is to "protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics," whereas ERMAs are managed to "support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA." In SRMAs, recreation is to be the dominant use, and in ERMAs management is "commensurate with the management of other resources and resource uses." Whereas SRMAs are intended for more intensive management, ERMAs may be appropriate to designate for quiet-use, backcountry experiences and layer with other special designations that are compatible with quiet recreation, such as ACECs and lands with wilderness characteristics. Both SRMAs and ERMAs provide mechanisms for the BLM to actively manage different types of recreation to the benefit of users while protecting the other resources of the public lands.

We support efforts made by the BLM to include management for quiet-use and non-motorized recreation in many Recreation Management Areas (RMAs) evaluated in the Draft RMP. Developing and differentiating recreation areas for various user groups are important to protect multiple recreation resources and avoid conflict, consistent with the agency's regulations. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." 43 C.F.R. § 8342.1.

BLM's ORV regulations also provide for protection of other values that are critical parts of not only a healthy ecosystem on BLM lands, but also of enjoying quiet recreation activities, such as hunting, photography and bird-watching, requiring that management minimize "damage to soil, watershed, vegetation, air, or other resources of the public lands" and "harassment of wildlife or disruption of habitat; and to prevent impairment of wilderness suitability or adverse effects on natural areas." *Ibid*.

The Draft RMP considers a comprehensive approach to managing recreation through a framework of SRMA and ERMA designations in each alternative. We support BLM's approach, which offers alternatives for multiple RMA designations and associated management prescriptions for important recreation areas. Uncompahgre RMP at Appendix J. This is consistent with agency policy and offers the public an opportunity to consider alternative management regimes for recreation areas, opportunities and experiences they are interested in accessing during the life of the RMP.

While we support the RMA framework provided in the draft RMP, we have gotten feedback from our members and the public that the mosaic of potential RMAs is highly complex, especially in the context of other designations and allocations under consideration in the RMP, and is therefore difficult for the public to understand. We do not believe BLM needs to simplify its approach, but instead encourage the agency to conduct additional public education and outreach on this important and complex issue. For example, BLM could conduct public workshops in the near future where the public can review spatial data for RMA and other designations/allocations and ask questions of resource specialists. BLM could accept additional public input on RMAs specifically through these workshops. This would not needlessly or extensively delay the RMP, but could greatly assist BLM in developing a proposed RMP with the best information submitted by the public on recreation resources, ultimately leading to a better RMP that serves the public and local communities and is implemented successfully.

20

**Summary of Comments:** BLM should move forward with designating Recreation Management Areas for quiet, non-motorized recreation, which is an appropriate way to implement the minimization criteria and provide opportunities for multiple recreation uses. BLM should consider public workshops to further educate the public on recreation management alternatives and collect better information and comments from the public on recreation management.

### c. Comments on specific RMAs

*Paradox Valley*

We recommend that the BLM carry forward the Paradox Valley SRMA as proposed in Alternative B into the Final RMP rather than the ERMA that is currently proposed in Alternative D. An SRMA is a more appropriate designation as it would provide better and more focused guidance for the management of the varied recreational activities the Paradox Valley has to offer visitors and residents alike. Most notably, there is increased interest in river-based recreation as well as the history of the area---including its uranium mining and role in U.S. nuclear history as well as pre-European settlement history. In particular, the historic mining flume, with the restored section near the confluence of the Dolores and San Miguel rivers, is a unique draw. Mountain bike trails are beginning to crop up in the area, and rock climbing is popular along the EE22 Road on Sawtooth Ridge, and this part of the SRMA would be appropriate for more intensive human-powered recreation development because of the extensive existing surface disturbance from mining.

With the seeming over-saturation of tourists in places like Moab, people are looking elsewhere for similar red rock recreation experiences, and the Paradox Valley and Dolores/San Miguel confluence area offer similarly spectacular landscapes and recreation experiences. People will discover this area, whether or not BLM plans for it. It will be better for both the resources and land to get ahead on management.

Local communities are struggling with economic change. Low prices for uranium and the announcement of the closure of the Nucla power plant and its coal mine have people on the West End of Montrose County facing an uncertain future. Recreation on public lands is one of the best options for helping to revive local economies and could be a real chance for turnaround for struggling communities like Nucla, Naturita and Bedrock. The BLM has an opportunity to lay the groundwork for well-managed recreational opportunities in this area before the demand rises, and to do it in a way that protects the land and benefits local communities.

Management for VRM Class II would also protect the stunning views of the red rock cliff walls, canyons and the La Sals that make the Paradox Valley such a unique a beautiful place to live and visit. Stronger and more focused recreation management as provided in the SRMA would also better protect the many other values recognized in this area in the various ACECs proposed.

We are strongly supportive the NSO stipulations that are proposed for RMZ 1,2 and 3 in Alternative B and having RMZ 4 closed to leasing. Again, we believe the BLM has recognized many other highly valued resources in this area that should be prioritized over oil and gas leasing.

RMZ 4 should be expanded to include all identified Lands with Wilderness Characteristics on Carpenter Mesa, and managed in a way that will continue to provide a recreational experience of solitude and primitive recreation experiences. Combined with the large, scenic Roc Creek drainage, and contiguous

21

roadless lands on the Manti-La Sal National Forest, and Sewemup Mesa WSA, this area creates a larger complex of undeveloped lands to support more extensive wilderness recreational opportunities. Therefore, we recommend that RMZ 4 be expanded to capture all of the LWC lands.

*Roubideau*

This SRMA provides additional recreational opportunities to provide a quiet alternative to the busier Dominguez-Escalante NCA to the north. The management prescriptions for Roubideau could help enhance the wilderness experiences available in the Camel Back WSA and the adjacent congressionally-designated Roubideau Area on the Uncompahgre National Forest. These existing designations provide protections to the whole of Roubideau Creek, from the top of the Uncompahgre Plateau down to the valley floor. Additionally, the Camel Back WSA is being considered for designation in legislation pending before Congress (H.R. 3336, the Colorado Wilderness Act of 2015), so BLM should take care to ensure that the wilderness characteristics are unimpaired given the high level of interest in eventual wilderness designation as a companion to the Roubideou Area.

The management objectives are good though we are concerned that an emphasis to move majority of the zones closer to "front country" management. BLM should make sure that the WSA areas are adequately protected to ensure that solitude and primitive recreation remain as a recreational opportunity.

We support motorized being limited to RMZ 4 and to designated trails within that zone.   However, motorized uses in RMZ4 should be minimized to preserve the highly rare wild qualities of the other RMZs. Competitive and large-group motorized events belong elsewhere, not in the Roubideau SRMA. Also, wherever practicable, motorized roads/trails/routes within RMZ4 should be routed a minimum of 100 feet away from the canyon rims. Users can park and walk to the rim, thus improving the quality of the visual and auditory experience for all users, including the motorized users. While we understand and generally support BLM's desire to leave routes in RMZ 3 open for hunting purposes, we recommend that BLM include seasonal closures for off-season use.   We also recommend RMZ 1 and RMZ2 being closed to motorized and mechanized uses to prioritize hiking, back pacing and horseback riding in LWC areas.

We support Alt B closing RMZ 1 to all fluid and recommending locatable mineral withdraw- as it is within the WSA. No leasing should be applied to RMZ 2 and 3 as we as it overlaps with the LWC proposal and we recommend that all "Tier 1" LWC units should be closed to leasing.

Similarly, the area is also identified as and ACEC and EEA. In order to manage for these areas to protect the identified vulnerable resources   (riparian forest and montane ecosystems with identified BLM and CNHP sensitive species), should carry Alt B management prescription of no mineral leasing for all parts of the SRMA that overlap with the Roubideau ACEC as identified in Alternative B1.

Similar logic applies to the over lapping EEA designation for the Roubideau area. As mentioned in our broader comments, EEAs should require stronger management requirements for mineral leasing. The BLM identifies sensitive species such as the Grand Junction milkvetch, desert bighorn sheep and northern leopard frog in the area and should manage the area to protect these natural values that make it a unique and special place for people to visit and have a pleasant recreation experience.

Portions of the SRMA within the Camel Back WSA should be managed to VRM I. Manual 6330 stipulates that all WSAs should be managed to VRM I.

22

*Dolores River Canyon*

The SRMA overlaps with a portion of the Dolores River Canyon WSA in UFO. Because of this fact, the management prescriptions for the Dolores River Canyon SRMA should align with BLM WSA Manual 6330. For instance, draft RMP appendix J recommends VRM II management for this SRMA, however Manual 6330 stipulates that all WSAs should be managed to VRM I.

Additionally, the Dolores River Canyon WSA is recommended by BLM for wilderness designation by Congress, and is being considered for designation in legislation pending before Congress (H.R. 3336, the Colorado Wilderness Act of 2015) as well as subject to inclusion in the legislative proposal of the Dolores River Stakeholders Group, which is developing stakeholder-driven recommendations for public lands below McPhee Reservoir to Bedrock as a substitution for wild and scenic river suitability.

The Dolores River Canyon SRMA, like the Paradox Valley SRMA, has the potential to help benefit the economies of nearby communities by providing well-managed recreational opportunities. Unlike the Paradox Valley SRMA, the Dolores River Canyons SRMA is a wilderness setting and the WSA management and care for wilderness values necessitate a much lower level of recreational development. This makes it all the more sensible to designate the Paradox Valley SRMA as a companion, to help provide a spectrum of recreational opportunities in the region.

> 1. RMZ 1 is entirely within the WSA, so appropriately limits recreation to types appropriate to a wilderness setting, with a focus on boating, water-based activities. However, hiking is also a popular activity to gain access up the river corridor starting from the Y9 Road in Bedrock below the BLM boat ramp and picnic facility. Also, the plan and BLM's travel management should reflect that motorized access is blocked about ¼ miles below the boat ramp and picnic facility on Bureau of Reclamation land (exactly at coord. 38.30116, -108.89630).

> 2. RMZ 2 is also entirely within the WSA and as such also appropriately focuses on wilderness setting activities like hiking and backpacking in high-walled Wingate sandstone canyons such as La Sal Creek, Big Steer Canyon and Coyote Wash.

*San Miguel River*

This SRMA is an extremely popular river corridor, and BLM has made major improvements to the recreational facilities over the last decade. Tourism and outdoor recreation are the largest economic drivers in San Miguel County, and this river corridor is key infrastructure providing great opportunities for boating, fishing, camping and other activities. Additionally, the canyon and its tributaries support bighorn sheep and other wildlife cherished for hunting and wildlife viewing. BLM should set management prescriptions to protect and safeguard this river and the recreation it supports.

BLM should adopt the recommended mineral withdrawal proposed in Alternative B to protec the corridor and provide for a level of reasonable certainty regarding the management of the SRMA for the life of the RMP. BLM has conducted administrative withdrawals elsewhere, such as along popular recreational stretches of the Arkansas River as well as for wildlands such as Vermillion Basin. Water quality is essential to this stretch, and rivers in Southwest Colorado already have to contend with a

23

legacy of pollution from the mines of yesteryear, so any additional mining or fluid mineral development in the SRMA is an unacceptable risk.

Finally, portions of this SRMA are being considered for designation in legislation pending before Congress (H.R. 3336, the Colorado Wilderness Act of 2015) as the proposed Norwood Canyon Wilderness. BLM should take care to make sure that lands proposed for wilderness not be impaired in the interim.

### d.   Special Recreation Permits

The BLM authorizes special recreation permits (SRPs) for specified recreation uses. Accordingly, the Draft RMP offers guidance and limitations for the issuance of SRPs. *See, e.g.,* Uncompahgre Draft RMP at 2-220—221; G-30. We are concerned, however, with the general lack of specificity provided by the Draft RMP on guiding the authorization of special recreation permits.

The BLM Handbook on Recreation Permit Administration states that field offices can and should develop guidelines for issuing SRPs, including thresholds for when permits are required for organized groups and events for specific types of recreation activities, land areas, or resource settings. BLM Handbook 2930-1 at 13.  Analysis of the impacts of permits on a cumulative basis is best accomplished in the RMP. The Uncompahgre RMP should include a clear decision making framework for reviewing SRP applications. The Price (Utah) and Grand Junction (Colorado) RMPs offer exemplary guidance for this process (See Grand Junction SRP guidance, included as Attachment 3). The standards set out in these RMPs are very specific so that BLM can easily determine whether and where to issue an SRP, and can better estimate cumulative impacts from such permits.

**Summary of Comments:** In the Uncompahgre RMP, BLM should provide specific criteria for evaluating special recreation permits to guide agency staff on processing applications.

### e.   Game Retrieval

We support the prohibition on cross-country motorized/mechanized travel for big game retrieval (with very narrowly limited exceptions). Uncompahgre Draft RMP at 2-307. This management action is necessary to prevent unnecessary resource damage as well as to address safety and private property concerns. A key component of the RMP and future travel planning is to create a travel network that protects resources and is enforceable. This restriction should be carried forth in the final RMP.

**Summary of Comments:** BLM should prohibit cross-country motorized/mechanized travel for game retrieval as proposed in the draft RMP preferred alternative.

### f.   Natural Soundscapes

Natural soundscapes are a public lands resource that deserves careful consideration when planning for recreation. Like viewsheds and air quality, sound is one of the resources on the public lands that is affected by agency-authorized uses and can impact other resources as well, such as recreation and wildlife.  BLM has a statutory obligation to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their

24

natural condition." 43 U.S.C. § 1701(8). To fulfill this mandate, it is important for BLM to consider natural soundscapes in order to give meaningful effect to this provision, especially on those lands which are to be managed in their "natural condition," including Wilderness Study Areas and lands with wilderness characteristics.

For recreation in particular, BLM's obligation to preserve natural soundscapes is further described in Executive Order 11644 (1972), as amended by Exec. Order 11989 (1977), which directs the BLM to locate areas and trails so as to: "Minimize conflicts between off-road vehicle use and other existing or proposed recreation uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." We recommend the agencies incorporate soundscapes in the designation and management of backcountry recreation areas, as preserving the natural soundscape is an essential component of protecting and enhancing the backcountry experience.

BLM should furthermore utilize acoustic modeling to analyze and preserve natural soundscapes, especially in special management areas managed for quiet use recreation.  The Wilderness Society has developed a GIS-based model based on The System for the Prediction of Acoustic Detectability (SPreAD; Harrison et al. 1980), which is a tool that was developed nearly 30 years ago by FS and EPA to predict the acoustic impacts of recreational activity in wildland settings.  SPreAD was originally developed as a system of worksheets and tables, where the user could enter information about the sound source and environment and manually calculate noise propagation from a single point source to a single point receiver.  We have adapted the SPreAD model to ArcGIS, automating the hand calculation method to predict the propagation of noise for all directions throughout the area of interest.

SPreAD-GIS can be used to 1) determine the areas within a planning unit where the natural soundscape is predominant and protect that setting through recreation planning; and 2) model sound propagation from uses such as motorized vehicles in a proposed quiet-use recreation area to determine what planning decisions, such as route closures, could restore and enhance the natural soundscape. In this way, the agencies could ensure that travel and recreation planning decisions provide opportunities for experiencing naturalness and solitude. There are other models and methodologies available, but we highlight SPreAD-GIS because it is available by request from TWS.[8]

One possible method for BLM to manage sound resources on the federal lands would be to model the approach BLM uses to manage visual resources, with a classification gradient ranging from most protective of natural soundscapes to allowing significant impacts to the soundscape.[9] This would provide for areas where maintaining the natural soundscape is prioritized to benefit recreation, wildlife, wilderness and other natural values on the public lands. It would also assist the agency with managing activities that impact sound resources by clearly defining where and how those impacts may occur. The classification system should primarily be based on desired and achieved experiences of public lands visitors.

The following classes provide an example of possible BLM guidance for inventorying and managing sound resources in landscape-level planning:

---

[8] The tool is free, but installation of SPreAD-GIS requires an ArcInfo-level licensed copy of ArcGIS 9.3 or higher with the Spatial Analyst extension.
[9] See information on BLM's Visual Resource Management system at http://www.blm.gov/wo/st/en/prog/Recreation/recreation_national/RMS/2.html.

BLM_0149281

- *Class I Objective*: The objective of this class is to preserve the natural soundscape. This class would be appropriate for lands managed to preserve wilderness characteristics, promote primitive recreation experiences, and protect wildlife habitat and ecological systems. The level of change to the characteristic soundscape should be very low and must not attract attention.

- *Class II Objective*: The objective of this class is to retain the natural soundscape such that noticeable impacts are infrequent and isolated instances. The level of change to the natural soundscape should be low. Management activities may be *heard on occasion*, such as a passing motorized vehicle, but should not detract from the experience of the natural landscape.

- *Class III Objective*: The objective of this class is to partially retain the natural soundscape where practicable. Management activities may attract attention but should not dominate the auditory experience of the casual observer. This class would be appropriate for front country recreation areas or other areas where natural soundscapes are not critical to the experience being sought out by visitors.

- *Class IV Objective*: The objective of this class is to provide for management activities which require significant impacts to the natural soundscape, including highly impactful events or impacts sustained over the long term. These management activities may dominate the sound of the landscape and may be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating basic elements.

These potential management objectives for sound resource classes are similar to the BLM Manual for Visual Resource Classes (BLM Manual 8400). Likewise, planning areas could be delineated into sound quality rating units for management purposes. Considerations on rating sound resources, such as landform, vegetation, and scarcity, are among the factors that could logically be incorporated into baseline data and management objectives for auditory resources. Acoustic modeling would be an important component of assessing sound quality rating units.

By going beyond a simple dichotomy of quiet-zones and zones with noise, BLM can position itself in a way that adequately addresses the adverse effects of noise on public land resources, resource-uses, and existing land designations. Soundscape classes give land managers both the authority and the flexibility to make management decisions that enhance landscape-level planning. Recognizing that lands have different soundscapes, and visitor expectations and experiences vary within a planning area, soundscape classes provide a way to determine appropriate levels of management.

**Summary of Comments:** BLM should acknowledge the sound resource on the public lands and address the soundscape as a separate resource which must be analyzed; complete sound modeling to the extent practicable to assess noise impacts of management alternatives on recreation and wildlife; adopt management decisions based on sound modeling data or other information generated from soundscape analysis that minimize or mitigate noise impacts on recreation and wildlife; and identify areas of the public lands where protection of the natural soundscape is prioritized.

26

IV.   **Travel Management**

    a.   **Area allocations for off-road vehicles**

        i.   Providing and protecting quiet recreation opportunities

The Draft RMP defers comprehensive travel planning, but evaluates a range of alternatives for vehicle use designations (open, limited, closed). BLM's preferred alternative would only close 58,560 acres to motorized use, representing less than 9% of the planning area. Uncompahgre Draft RMP at 2-301. This includes statutorily closed areas (such as Wilderness Study Areas), meaning BLM is hardly exercising any discretion to close areas to motorized use so they may be allocated for other multiple uses such as quiet recreation, wildlife habitat or cultural resource protection. Even Alternative B would only close 17% of the planning area to motorized vehicle use. *Ibid*. This does not represent balanced management, and is inconsistent with current BLM travel planning guidance. It is also inconsistent with the agency's obligations to comply with the minimization criteria, as detailed below.

Travel and transportation considerations play an important role in the experience of the recreation user and the management provided by BLM. The area designations that the RMP will put in place will be key determinants of recreation setting characteristics as well as fundamental tools for providing specific recreation experiences.

As such, BLM should implement OHV area designations that protect recreation opportunities for quiet and non-motorized recreation users throughout the planning area. The public land in the UFO has ample opportunity for recreation activities such as hiking, camping, and mountain biking. In this regard, the agency's Travel and Transportation Management (TTM) Manual generally recognizes that:

> TTM's comprehensive approach is driven by the need to provide access to and across public lands for a wide variety of users (including authorized, administrative, commercial, recreational, traditional, and other travel purposes), **while also addressing the equally wide variety of uses, including all forms of motorized, non-motorized, mechanized, and non-mechanized travel**.

BLM Manual 1626 at 1.6 (emphasis added).

BLM must adequately address the needs of non-motorized and quiet users in addition to motorized use. Ensuring opportunities for a full range of non-motorized travel is crucial for creating a *comprehensive* transportation and travel plan. In places managed primarily for non-motorized recreation, travel allocations and designations should reflect this desired recreation character setting. This should include restrictions and closures in areas that provide opportunities for non-motorized recreation such as lands with wilderness characteristics, areas of critical environmental concern, and other special designations.

        ii.   Applying the minimization criteria to area allocations

In response to the growing use of off-road vehicles (ORVs) and corresponding environmental damage, Presidents Nixon and Carter issued Executive Orders 11644 and 11989 in 1972 and 1977, respectively, requiring federal land management agencies to plan for ORV use based on protecting resources and

27

other recreational uses.[10] When designating areas or trails available for ORV use, agencies must locate them to:

(1) minimize damage to soil, watershed, vegetation, or other resources of the public lands;
(2) minimize harassment of wildlife or significant disruption of wildlife habitats; and
(3) minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands.[11]

BLM codified these "minimization criteria" in its OHV regulations at 43 C.F.R. § 8342.1, which provide:

The authorized officer shall designate all public lands as either open, limited, or closed to off-road vehicles. All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands; and in accordance with the following criteria:

(a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

(b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.

(c) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

(d) Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

Despite its long-standing legal obligation, BLM has struggled to properly apply and implement the minimization criteria in its travel management decisions. Federal courts have repeatedly sent BLM, Forest Service, and National Park Service travel management plans back to the agencies for failure to satisfy their obligation to minimize resource damage and conflicts between recreational uses.[12]

---

[10] Exec. Order No. 11644, 37 Fed. Reg. 2877 (Feb. 9, 1972); Exec. Order No. 11989, 42 Fed. Reg. 26,959 (May 24, 1977).

[11] Exec. Order No. 11644, § 3(a).

[12] See WildEarth Guardians v. U.S. Forest Service, 790 F.3d 920, 929-32 (9th Cir. 2015) (Forest Service failed to "apply the minimization criteria to each area it designated for snowmobile use" and to provide the "granular analysis [necessary] to fulfill the objectives of Executive Order 11644"); Friends of the Clearwater v. U.S. Forest Service, No. 3:13-CV-00515-EJL, 2015 U.S. Dist. LEXIS 30671, at *37-52 (D. Idaho Mar. 11, 2015) (Forest Service's conclusory statements failed to show how it selected motorized routes with the objective of minimizing their impacts); SUWA v. Burke (SUWA), 981 F. Supp. 2d 1099, 1104-06 (D. Utah 2013) (BLM acknowledgement of minimization criteria insufficient where record showed no analysis of specific impacts of designated OHV routes); The Wilderness Society v. U.S. Forest Service, No. CV08-363-E-EJL, 2013 U.S. Dist. LEXIS 153036, at *22-32 (D. Idaho Oct. 22, 2013) (remanding travel plan where Forest Service relied on unsupported conclusion that route closures

28

Collectively, these cases confirm the agencies' *substantive* obligation to meaningfully apply and implement – not just identify or consider – the minimization criteria when designating each area or trail, and show in the administrative record how they did so.[13] As a recent circuit court of appeals decision confirmed, agencies must "document how [they] applied [relevant] data on an area-by-area [or route-by-route] basis with the objective of minimizing impacts."[14] BLM's Travel and Transportation Manual confirms that BLM must pay particular attention to thoroughly documenting its application of the minimization criteria in making both OHV area designations and route designations. BLM Manual 1626 at 1.7; 3.1.

As Executive Order 11644, 43 C.F.R. § 8342.1, and Manual 1626 make clear, the substantive duty to minimize impacts applies equally to OHV area allocations made in resource management plans. With RMP area allocations setting the framework for where route designations will occur and providing the best opportunity to analyze OHV impacts across the broader landscape, it is critical that the Uncompahgre RMP apply and implement the minimization criteria when making area designations. To satisfy its *substantive* duty to minimize impacts, BLM must apply a transparent and common-sense methodology for meaningful application of the minimization criteria to *each* area being considered for designation. That methodology must include several key elements:

First, proper application of the minimization criteria is not solely an office exercise. As the courts have repeatedly made clear, use of cryptic spreadsheets or matrices that favor OHV use and do not facilitate implementation of the substantive duty to minimize impacts is inadequate.[15] Rather, BLM must get out on the ground, gather site- and resource-specific information, ground-truth desk-top analyses, and then utilize that data to actually apply the criteria to minimize resource damage and use conflicts associated with each designated area and route. This necessarily will require the agency to incorporate monitoring data and other information identifying resource or recreational use conflicts compiled by the agency or submitted by the public.[16] That information must be applied in what courts have described as a "granular analysis [necessary] to fulfill the objectives of Executive Order 11644."[17]

---

and elimination of cross-country travel minimized impacts); *Defenders of Wildlife v. Salazar*, 877 F. Supp. 2d 1271, 1304 (M.D. Fla. 2012) (record failed to demonstrate how Park Service decision to reopen trails was made with the objective of minimizing impacts); *Central Sierra Environmental Resource Center v. U.S. Forest Service*, 916 F. Supp. 2d 1078, 1094-98 (E.D. Cal. 2012) (Forest Service failed to show that it actually aimed to minimize environmental damage when designating motorized routes); *Idaho Conservation League v. Guzman*, 766 F. Supp. 2d 1056, 1071-74 (D. Idaho 2011) (record did not reflect whether or how the Forest Service applied the minimization criteria); *Center for Biological Diversity v. BLM*, 746 F. Supp. 2d 1055, 1071-81 (N.D. Cal. 2009) (record provided no indication that BLM considered or applied minimization criteria).

[13] *See, e.g.*, *CBD v. BLM*, 746 F. Supp. 2d at 1080-81 ("the BLM is required to place routes specifically to minimize" impacts); *Idaho Conservation League*, 766 F. Supp. 2d at 1072-73 (consideration of the minimization criteria insufficient where agency failed to demonstrate that the criteria "were then implemented into the decision process").

[14] *WildEarth Guardians*, 790 F.3d at 931.

[15] *See, e.g.*, *Idaho Conservation League*, 766 F. Supp. 2d at 1071-74 (agency may not rely on "Route Designation Matrices" that fail to show if or how the agency selected routes with the objective of minimizing their impacts); *SUWA*, 981 F. Supp. 2d at 1105 ("cryptic spreadsheet for each route segment provides inadequate information . . . for someone other than the BLM to know why or how the routes were chosen").

[16] *See* 43 C.F.R. § 8342.2(a) (public participation required in travel management decision-making); *Idaho Conservation League*, 766 F. Supp. 2d at 1074-77 (invalidating travel management plan that failed to utilize monitoring and other site-specific data submitted by the public showing resource damage).

[17] *WildEarth Guardians*, 790 F.3d at 931.

29