Second, application of the minimization criteria should be informed by the best available scientific information and associated strategies and methodologies for minimizing impacts to particular resources.[18] In 2012, the Journal of Conservation Planning published a literature review and best management practices (BMPs) for ORVs on national forest lands.[19] The BMPs provide guidelines, based on peer-reviewed science, for ORV designation decisions, implementation actions, and monitoring activities that are intended to minimize impacts to soils, water quality, vegetation, and wildlife, and conflicts with other recreational uses. Although they were formulated for national forest lands, most of the BMPs are applicable to OHV designation decisions on BLM lands as well. Travel management planning processes should reference and incorporate these BMPs.[20]

Third, proper application of the minimization criteria must address both site-specific and larger-scale impacts.[21] For example, agencies must assess and minimize landscape-scale impacts such as habitat fragmentation, cumulative noise and air and water quality impacts, and degradation of wilderness characteristics and associated opportunities for primitive forms of recreation. The agency also must assess and minimize site-specific impacts to soils, vegetation, water, and other public lands resources, sensitive wildlife habitat, and important areas for non-motorized recreation.

Fourth, application of the minimization criteria must take into account available resources for monitoring and enforcement of the designated system.[22] BLM is obligated under Executive Orders 11644 and 11989 and its travel management regulations to monitor the effects of OHV use on designated areas and routes and make adjustments to the designated system as necessary.[23] To ease enforcement obligations and ensure user compliance in the first place, OHV area designations and identification of Travel Management Areas should establish clear boundaries and simple, consistent restrictions designed to minimize resource damage and user conflicts.

Finally, attempts to *mitigate* impacts associated with an existing OHV system are insufficient to fully satisfy the duty to *minimize* impacts, as specified in the executive orders. The language of the executive orders makes this clear: "[a]reas and trails shall be *located* to minimize" impacts and conflicts.[24] 43 C.F.R.

---

[18] *See Friends of the Clearwater*, 2015 U.S. Dist. LEXIS 30671, at *24-30, 40-52 (invalidating route designations that failed to consider best available science on impacts of motorized routes on elk habitat effectiveness or to select routes with the objective of minimizing impacts to that habitat and other forest resources).

[19] T. Adam Switalski and Allison Jones, *Off-road vehicle best management practices for forestlands: A review of scientific literature and guidance for managers*, 8 Journal of Conservation Planning 12-24 (2012), *available at* http://www.journalconsplanning.org/2012/JCP_v8_2_Switalski.pdf. Development of a BLM-specific literature review and set of BMPs is in progress.

[20] The Bitterroot National Forest recently referenced and applied BMPs from Switalski and Jones in its Decision Notice/Finding of No Significant Impact for a project involving the designation of ORV trails. *See* Bitterroot National Forest, Darby Lumber Lands Phase I – Decision Notice and Finding of No Significant Impact, pp. 13-14, *available at* http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/80742_FSPLT3_2541294.pdf.

[21] *See, e.g.*, *Idaho Conservation League*, 766 F. Supp. 2d at 1066-68, 1074-77 (invaliding travel plan that failed to consider aggregate impacts of short motorized routes on wilderness values or site-specific erosion and other impacts of particular routes).

[22] *See Sierra Club v. U.S. Forest Serv.*, 857 F. Supp. 2d 1167, 1176-78 (D. Utah 2012) (NEPA requires agency to take a hard look at the impacts of illegal motorized use on forest resources and the likelihood of illegal use continuing under each alternative).

[23] Exec. Order No. 11644, § 8(a); 43 C.F.R. § 8342.3.

[24] Exec. Order 11644, § 3(a); *see also Center for Biological Diversity*, 746 F. Supp. 2d at 1080-81 ("'Minimize' as used in the regulation . . . refers to the *effects* of route designations, i.e. the BLM is required to place routes

30

§ 8342.1 mirrors that language. Thus, application of the minimization criteria should be approached in two steps: first, the agency locates areas and routes to minimize impacts, and second, the agency establishes site-specific management actions to further reduce impacts. The best available science confirms this tiered approach.[25] As described above, this approach is consistent with DOI's Landscape Mitigation Policy that prioritizes project design and siting to avoid adverse impacts in the first instance, followed by other minimization and mitigation measures.

### iii.   ORV "open" areas

We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP. Uncompahgre Draft RMP at 2-301. Nationally, BLM has for many years been moving away from allowing cross-country motorized use on a large scale or designating large ORV play areas. This type of motorized use is difficult for BLM field offices to properly manage; it damages natural, cultural and other resources; and it leads to conflict with other users of the public lands. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors."  43 C.F.R. § 8342.1.  BLM Manual 1626 reiterates that "open area designation must address the designation criteria (43 CFR 8342.1)." BLM Manual 1626 at 3.1(A).

**Summary of Comments:** BLM should close more of the planning area to motorized use to protect natural resources and quiet recreation opportunities and create more balanced management among the multiple uses and recreation visitors in the Uncompahgre Field Office. BLM must apply the executive order minimization criteria to demonstrate how each OHV area has been located to *minimize* resource damage and conflicts with other recreational uses. This will require a granular analysis of the impacts of OHV use in each area that addresses both site-specific and landscape-scale impacts, incorporates the best available scientific information and best management practices for minimizing impacts to particular resources, utilizes site- and resource-specific data, and accounts for available monitoring and enforcement resources. We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP.

### b.   Comprehensive Travel and Transportation Management Planning

The Uncompahgre RMP defers comprehensive travel and transportation planning, as provided for in BLM's regulations. While the Draft RMP includes several important components such as a prioritization scheme for future travel planning and criteria to guide route designations, the Draft RMP is not fully compliant with BLM's policy for deferred travel planning. BLM policy provides for deferred travel planning and interim designation of "Limited to Existing Routes" as long as a preliminary network is

---

specifically to minimize 'damage' to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts' of uses." (footnote and citations omitted)).

[25] *See* Switalski and Jones, 2012 (cataloguing best management practices for: (1) siting/locating routes to minimize impacts; (2) implementation, including maintenance, restoration, adaptive management, and other mitigation measures; and (3) monitoring).

BLM_0149287

identified and a process established to select a final travel management network. Specifically, BLM Manual 1626 provides a list of requirements for deferring travel planning:

> If the transportation network is to be deferred in the RMP, then the RMP documents the decision-making process used to develop the initial network, provides the basis for future implementation level decisions, and helps set guidelines for making transportation network adjustments throughout the life of the plan. The following tasks should be completed in the RMP for each planning area or TMA:
>
> a. <u>Produce a map of the known network of transportation linear features, including modes of travel</u>;
> b. <u>Define the long term management goals for the transportation system</u>;
> c. <u>Define interim management objectives for areas or sub-areas where route designations were not completed concurrent with the RMP.</u> Clearly state the process of moving from an interim designation of "limited to existing roads, primitive roads, and trails" to a designation of "limited to designated roads primitive roads and trails" upon completion of TMP.
> d. Identify any incomplete travel and transportation tasks:
>    i. Outline additional data needs and a strategy to collect needed information;
>    ii. Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints;
>    iii. Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process; and
>    iv. Identify any easements and rights-of-way (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.

BLM Manual 1626 at .06(B)(2). Those components underlined above are absent from the Uncompahgre Draft RMP. Manual 1626 also provides that "If the decision on delineating travel and transportation networks is deferred in the land use plan to the implementation phase, the work should be completed within five (5) years of the signing of the Record of Decision (ROD) for the RMP." *Id.* at .06(B)(3).

The Draft RMP does not include a map of the known network of transportation linear features, and in fact indicates that BLM has not completed an inventory of the existing routes that motorized travel will be limited to. Uncompahgre Draft RMP at M-2. BLM is required to complete this inventory during the land use planning process and utilize that inventory to inform travel planning decisions, even if those decisions are being deferred from the RMP. BLM cannot limit travel to existing routes unless those routes are known and mapped. The draft RMP also does not detail long-term management goals for the transportation system or interim management objectives other than some interim management guidance for areas limited to existing routes. *Id.* at 2-306—308. These elements must be fleshed out in the Proposed RMP to comply with agency policy.

We support BLM's commitment to identifying travel management areas, setting a prioritization scheme for completing comprehensive route designation, and completing route designations within 5 years of signing the ROD. The draft RMP identifies the following management action across the range of alternatives:

32

BLM_0149288

Establish Travel Management Areas and, within five years of the Approved RMP/Record of Decision, initiate comprehensive travel management plans within each the following Travel Management Areas and in the following order unless a change is deemed necessary by the BLM Authorized Officer (Figure 2-81, Appendix A):
1. North Fork (71,020 acres)
2. South Montrose (66,180 acres)
3. North Delta (61,270 acres)
4. San Miguel (74,960 acres)
5. West End (289,960 acres)

Uncompahgre Draft RMP at 2-308. Furthermore, those areas may be too large for efficient and effective route designation processes, especially the West End. The draft RMP appropriately indicates that, "At the time of comprehensive travel management planning, the Travel Management Area may be broken down into subareas to address different resource management objectives." *Id.* at 2-309. We encourage BLM to retain this language in the RMP and follow through with creating smaller areas for travel management planning at the route designation stage.

We also greatly support BLM's commitment that "Route density for designated public routes will be used as an analysis tool" in future travel management planning. *Id.* at M-9. However, BLM does not set route density targets in the RMP, but seems to defer identifying those targets to comprehensive travel planning. BLM should not defer using route density as a tool but should instead utilize that important tool in the Uncompahgre RMP. Setting route density targets is an appropriate way for BLM to address habitat fragmentation in travel planning in the absence of route-by-route designations. For example, BLM must consider alternatives to minimize and mitigate impacts to habitat fragmentation in the RMP, such as closing areas to motorized use, setting route density limits, and designating wildlife corridors, conservation rights-of-way or other mitigating land use allocations. Thus, BLM should set route density limits in the RMP to guide future route designations that minimize impacts to wildlife.

Route density targets must be based on the best available science, and must meet scientifically-based thresholds or be combined with mitigating actions. BLM should complete density analysis of existing transportation network features, buffer analysis to examine the effect zone of the transportation network and core area analysis to identify habitat that remains unaffected by the transportation network. BLM should use wildlife literature to interpret fragmentation metrics developed through spatial analyses and adopt management decisions that minimize and mitigate habitat fragmentation.

**Summary of Comments:** The Uncompahgre RMP must comply with BLM's guidance for deferred travel planning. This includes mapping the existing route network, setting long-term goals for the transportation network and identifying interim travel management objectives. BLM should carry forward other elements of the preliminary travel plan, including the prioritization of travel management areas, route designation criteria and commitment to utilizing route density as a travel planning tool.

### c. Non-motorized trail networks

BLM is not planning to make route designations through this planning process. In order to set management direction for future travel planning efforts, the RMP should specify the criteria that BLM will use to designate a non-motorized trail network. While BLM is designating routes for motorized use, pursuant to the minimization criteria and agency guidance, BLM can and should also designate non-motorized trail systems.

33

In implementing its 2006 Roads and Trails Terminology Report, BLM emphasized the importance of taking a "holistic" approach to the management of roads and trails (see, Instruction Memorandum 2006-173), which includes non-motorized trails. Likewise, IM 2008-014 states that the travel planning process "requires recognition and designation of non-motorized trails or routes." In this planning process, BLM should not simply addresses motorized use in individual travel management areas, but should set a broad vision for protecting and enhancing the experiences of non-motorized users.

FLPMA requires BLM to develop land use plans that "consider the relative scarcity of values involved and the availably of alternative means and sites for realization of those values." 43 U.S.C. § 1712(C)(6). Access to a "quiet use" recreation experience on our public lands through non-motorized trails is a growing need as opportunities for this use is shrinking with an increasing motorized population. As motorized recreation continues to grow in the region, BLM must be more proactive and deliberate in designing travel networks that preserve quiet recreation opportunities.

The RMP should specifically address and identify how BLM will meet the needs of quiet recreation users and provide non-motorized trail opportunities as part of its transportation system. The guidelines for deferring route designations set forth in BLM Manual 1626 should be fully incorporated by defining the goals for the use, location, and development/decommissioning; *specifically for a long-term, non-motorized trail system*. BLM H- 8342 at 18.

In order to set management direction for future travel planning efforts, BLM should specify the process that will be used to designate a non-motorized trail network. As discussed previously in these comments, BLM's travel and transportation planning manual specifies the types of travel planning decisions that should be included in a travel planning process when route designations are being deferred. The RMP should ensure these decisions are applied specifically to non-motorized travel management, including:
- Define the long term management goals for the transportation system;
- Define interim management objectives for areas or sub-areas where route designations are not being completed
- Identify any incomplete travel and transportation tasks:
  - Outline additional data needs and a strategy to collect needed information;
  - Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints;
  - Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process

BLM Manual 1626 at .06(B)(2). As part of developing a preliminary travel plan for the non-motorized route network, BLM should identify management goals and objectives for travel management areas where primitive recreation experiences will be emphasized and develop criteria for future non-motorized trail designation.

One of these criteria should be identifying and implementing opportunities to convert existing routes to non-motorized trails, which is less impactful than creating new trails and requires fewer resources. The initial route inventories BLM has released show that there is an abundance of existing routes in the field office and therefore plentiful opportunities to designate existing routes for non-motorized use. To minimize the impact from a non-motorized trail network, BLM should prioritize existing linear features

34

that are in low-conflict and low-impacts places on the landscape. In any travel designation, BLM should minimize impacts to sensitive resources such take the necessary steps to avoid impacts wildlife habitat and other sensitive resources.

BLM should evaluate and include additional criteria for new trails in the RMP. One example of considering non-motorized trail networks comes from the Beaver Dam Wash NCA Draft RMP. This Draft RMP sets out criteria for designing a non-motorized trail system as follows:

> a) Addresses the needs of equestrians, hikers, climbers, and mountain bikers;
> b) Protects diverse NCA resource values from direct or indirect recreation impacts by promoting compliance with regulatory requirements and visitor use restrictions;
> c) Results in sustainable systems;
> d) Provides high quality experiences;
> e) Serves the abilities of non-motorized recreational users;
> f) Offers opportunities for looping, varying distances, linking between geographic areas and trailheads, and connecting to heritage and other educational resources.
> g) Minimizes user conflicts by separating user groups whenever feasible;
> h) Limits the desire to venture off-trail.

Beaver Dam Wash NCA Draft RMP at 150. BLM should set similar criteria in the Uncompahgre RMP.

As BLM considers any motorized use allocations and/or motorized trail designations, it should consider how those decisions might foreclose or limit an opportunity to designate the same or a nearby trail as non-motorized. Motorized trails can have far reaching impacts throughout the region. Designating an area as open to motorized use may preclude BLM's ability to effectively manage an adjacent or nearby area for quiet recreation. As such, BLM should give strong consideration to potential user-conflict generated from travel designations, in accordance with the minimization criteria. BLM should provide sufficiently large non-motorized areas to provide quality primitive recreation experiences and minimize disturbance to quiet-use activities from other forms of travel and recreation.

**Summary of Comments**: BLM should make allocations and designations in the RMP that provide for non-motorized recreation, and limit impacts from motorized use on quiet users. For areas that are intended to provide a semi-primitive or primitive recreation experience, the RMP should provide direction for completion of non-motorized trail systems in compliance with agency policy for completing a preliminary travel plan. BLM should prioritize lands with wilderness characteristics for non-motorized travel networks and should protect the primitive recreation resources and values found in lands with wilderness characteristics.

### d.   Temporary Closures

BLM has authority to institute temporary route closures to protect public lands and resources. 43 C.F.R. § 8364.1. BLM must immediately close any areas where the agency finds that OHVs are or will cause considerable adverse effects upon natural or cultural resources. 43 C.F.R. § 8341.2. BLM has policy guidance (Instruction Memorandum 2013-035) that describes how RMPs and TMPs should address temporary closures including defining thresholds for when OHV-related closures will take place. The IM states that all RMPs and TMPs shall include the following statement in accordance with 43 C.F.R. § 8341.2 with regard to OHV use:

BLM_0149291

> Where off-road vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, the affected areas shall be immediately closed to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.

IM 2013-035, Attachment 1. The IM goes on to state that the RMP and TMP should also describe the resources, uses, situations, and locations likely to be adversely affected by OHV use. Moreover, the IM provides that if BLM analyzes potential for temporary closures properly, then there will be no further need for additional NEPA analysis and the temporary closure can be issued with a DNA.

**_Summary of Comments:_** The above guidance from IM 2013-035 on incorporating analysis of potential for temporary closures should be included in the RMP. BLM should issue temporary closures for any area where ORVs are currently harming or may harm natural or cultural resources in the interim.

### e. Revised Statute 2477

The Draft RMP appropriately asserts that BLM does not address the validity of R.S. 2477 assertions through the planning process:

> Although the courts may recognize adjudicated Revised Statute 2477 rights-of-way as valid existing rights, current BLM policy does not allow BLM to consider unadjudicated Revised Statute 2477 claims as valid existing rights. The current moratorium precluding the BLM from processing Revised Statute 2477 claims is still in effect, making Revised Statute 2477 assertions a legal issue beyond the scope of this planning effort.

Uncompahgre Draft RMP at ES-6, I-13; _see also_ 2-309. We support this approach, and note it is the correct approach under relevant law and policy. BLM must ensure it does not make inappropriate decisions based on R.S. 2477 claims, and must communicate clearly to cooperating agencies and the public that BLM is prohibited from considering such claims in this planning process.

**Summary of Comments:** BLM should uphold its assertion that R.S. 2477 claims are not addressed in the agency's planning process.

### V.    Ecological Emphasis Areas and Areas of Critical Environmental Concern

We support that BLM is considering innovative planning approaches for managing natural resources at a landscape scale and implementing a comprehensive conservation framework in the Uncompahgre RMP. The networks of Ecological Emphasis Areas (EEAs) and Areas of Critical Environmental Concern (ACECs) evaluated in the range of alternatives create integrated conservation designations that, in context with other specially designated areas and allocations evaluated in the RMP, aspire to protect and enhance the ecological integrity of the Uncompahgre Field Office.

We also see this approach as consistent with BLM's Planning 2.0 initiative. The landscape-level approach committed to through the agency's Planning 2.0 initiative will guide agency planning for the foreseeable future. While the Uncompahgre RMP is not currently being developed under Planning 2.0, consistency with the new agency direction will lead to more forward-thinking plan that aligns better with BLM's new planning rule and principles. Planning 2.0 presents an important opportunity for BLM to develop a

36

landscape level strategy for conservation on our public lands. BLM's approach to EEAs and ACECs in the Uncompahgre Draft RMP fits well within BLM's movement towards a landscape approach to managing public lands articulated in Planning 2.0.

Developing integrated networks of land use allocations to manage ecosystems at a landscape scale is critical to addressing climate change and the future of land management, and modern science emphasizes the importance of this approach as well as provides useful data for successful implementation. The rate of land use change across the conterminous United States has been, and is projected to continue increasing into the future. These changes are resulting in habitat fragmentation, loss of biodiversity, and are negatively impacting sensitive habitats and important ecological processes. Theobald 2010; Theobald et al. 2011.  The effects of anthropogenic changes upon landscapes are no longer explicitly localized, rather the scale, speed of change, and subsequent impacts are having increasingly pronounced consequences at regional and global scales. Foley et al. 2005. Significant shifts in climate and climate change velocity are changing public lands, and the effects have been reliably modeled and observed across the United States. Loarie et al. 2009; Dobrowski et al. 2013. Specifically in the Southwest region, broad scientific consensus supports an imminent shift in climate towards increasing seasonal temperatures and a significant reduction of annual precipitation, resulting in an increasingly arid climate with prolonged periods of drought. Seager et al. 2007.

These changes in climate and land use patterns are projected to continue causing an increase in habitat fragmentation and shifts in the distribution of plants, animals, and ecological processes across local, regional, and global scales. Opdam and Wascher 2004; Loarie et al. 2009; Dobrowski et al. 2013; Ordonez et al. 2014. At the global scale, species migration and shifts in habitat range that match climate change projections have been empirically observed. Parmesan and Yohe 2003; Parmesan 2006. At a regional level, biodiversity in the Southwest, including Colorado, are modeled to undergo significant shifts in plant distributions. It is expected that grass communities will expand and dominate in lower elevations, as the distribution of forested communities will migrate to higher elevations and potentially occupy smaller, favorable areas of refugia. Notaro et al. 2012.

In order for species to survive, the persistence of suitable climates is necessary, but in some cases may be insufficient. Loarie et al. 2009. Species must also have the capacity to migrate and disperse at a velocity that keeps pace with suitable climates as they shift across the landscape. Pearson and Dawson 2003, Pearson 2006. The ability of ecosystems to adapt and persist in a changing climate will be dependent on the ability of species and ecological processes to migrate over and operate at broad scales. Theobald et al. 2012. The rate at which species must adapt and migrate to keep pace with human- and climate-driven landscape change may vary widely and be difficult to predict, but migration capacity and ability will be necessary for survival. Pearson 2006.

For species and ecological processes to migrate and persist over different temporal and geographical scales, it is crucial that they have access to landscape areas capable of supporting high levels of biotic and abiotic diversity. This diversity is known as landscape heterogeneity, and includes areas with a diversity of terrestrial, riparian, and aquatic ecosystems, and the associated plants and animals they support. Landscape heterogeneity also includes a diverse range of geophysical characteristics including; topographic complexity, large elevation ranges, soil type and structure, soil chemistry, soil moisture availability, and underlying geological features. Albano 2015. Together, all of these characteristics comprise landscape heterogeneity and are crucial for maintaining the long-term persistence of habitat, biodiversity, and ecological processes at the landscape scale, especially under changing climate and land use conditions. Anderson et al. 2014. Landscape heterogeneity provides increased opportunities for

37

biodiversity to occupy small habitat areas that serve as a refuge in a changing climate. Habitat 'refugia' created by a diverse and heterogeneous landscape are important land characteristics that allow species to migrate to, persist in, and expand from during times of a rapidly changing climate. Pearson 2006; Dobrowski 2011; Keppel et al. 2012.

In an effort to increase the capacity of plants, animals, and important ecological processes to migrate, adapt, and persist across the West, a systematic and increased network of conserved and protected areas needs to be implemented by conservation and land management planners. Heller and Zavaleta 2009.  An increasingly large and diversified network of conserved areas in the West will help ensure the protection of important geophysical, biological, and ecological heterogeneity and allow for conservation management of large landscape level processes containing many important ecological processes. Noss 1983; Pickett and Cadenasso 1995; Margules and Pressey 2000.

A networked, connected, and dynamic regional system of protected areas will provide the greatest conservation benefit as single species conservation programs may become too costly, administratively complicated, and ultimately unsuccessful in the face of unpredictable, site-specific landscape and climate driven change. Opdam and Wascher 2004. The regional approach to land conservation management, drawing from biogeography and landscape ecology, have great implications for understanding the importance of incorporating different ecological scales (single species vs. multiple ecosystems) at which biodiversity conservation will be most successful. Simberloff 1998.

The BLM also can utilize EEAs and ACECs to more effectively manage ecologically valuable resources, particularly in the face of shifting climates. Many significantly large, road-less areas managed by BLM have been identified as having very high conservation value, yet much of this land is currently not allocated or managed with any type of conservation protection or special management prescriptions. Dickson et al. 2014. By utilizing a landscape level strategy for conservation planning, BLM can fulfill its responsibility and exercise its capacity to expertly manage our valuable public landscapes.

### a.  Ecological Emphasis Areas

The UFO Draft RMP proposes a new designation across the range of alternatives, called Ecological Emphasis Areas. BLM defines EEAs as "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," and they are identified with the intention of contributing to connectivity across the larger landscape. Uncompahgre Draft RMP at D-1. This innovative approach would complement ACECs, as well as other land use allocations and conservation designations considered and applied across the landscape. The stated objective of designating EEAs is to "manage to preserve the continuity of habitats, vegetation communities, and native wildlife within." *Id.* at 2-68. The draft RMP includes a range of alternatives for management actions to achieve that objective. This is an important and admirable management objective as the BLM is looking for new ways to manage public lands at a landscape scale in a way that facilitates climate change resilience and adaptation.

While we fully support BLM considering and designating EEAs to achieve these important management goals and objectives, we encourage the agency to utilize modern research to improve the designation and management of these areas. The scientific literature referenced in the RMP appendix addressing EEAs is decades old (Faaborg 1980; Samson 1980; Noss 1983; Kushlan 1979; Miller 1979.) The only somewhat recent research is from 2001 (Noss, R. 2001. Beyond Kyoto: Forest Management in a time of rapid climate change. Conservation Biology. Vol. 15, Issue 3, pg. 578-590.) BLM should utilize more modern science to evaluate and designate EEAs that achieve the stated goals and objectives of the EEAs

38

and habitat management in the RMP generally. For example, The Wilderness Society has conducted recent research that would be valuable in identifying potential EEAs in the Uncompahgre Field Office, detailed below.

*Mapping Wildland Values to Support Conservation Strategies Across the US*

**Overview:** For over 100 years, conservation efforts have led to the establishment of hundreds of protected areas covering millions of hectares in the United States. These conservation reserves form the foundation of strategies to protect biological diversity and ecological processes upon which species and people depend. However, there is growing recognition that these existing conservation reserves may be insufficient in sustaining biodiversity as climate change and land use continues to impact natural ecosystems. Recent calls have been made to "complete the system" of protected areas by establishing an ecologically-connected network that is more inclusive of ecosystems and species currently under-represented in protected areas. Here, we conduct a national assessment of priorities for expanding conservation reserves that protect the most ecologically intact lands, establishes a national connected network, and better represents ecosystem and hotspots of range-limited species.

**Ecological integrity and "wildness":** The relative wildness of land is based on its ecological condition and the degree of human control over ecological processes (Aplet 1999, Aplet et al. 2000). Places that are ecologically intact and are maintained in a natural condition with minimal influence by human impacts or management are wilder than those with degraded ecological conditions and a high degree of human influence. The Wilderness Society works to protect the last remaining wild places (Figure 1a, upper left). For our national assessment, we used a high resolution dataset on the degree of human modification and ecological integrity (Theobald 2013) to serve as a surrogate for wildness. Maps of wildness are highly correlated with Theobald's map of ecological integrity, but is higher resolution and more updated than the wildness index.

**Connectivity:** The importance of creating a connected network of protected areas has emerged as one of the most important conservation strategies in the face of a changing climate (Rudnick et al. 2012). Our connectivity model identifies the wildest and most natural corridors linking large protected core areas across the lower 48 states (Belote et al. 2016). Maintaining the wildest and least human modified corridors between protected areas may give the most numbers of species the best opportunities to move and disperse as the climate change and development continues to fragment other areas (Figure 1b, upper right). We are working to bring this science to bear on additional conservation protections on federal lands so that these wild corridors are maintained or improved.

**Ecosystem representation:** Effectively conserving all of nature's biological diversity requires that protected areas be representative of all habitat types (Dietz et al. 2015). Unfortunately, our protected areas systems currently does not include full representation of all habitats, but we are working to identify those places across the country that – if protected – would diversify the protected areas system making it more representative of our entire natural heritage (Aycrigg et al. 2015). Lands in red and yellow represent ecological systems (i.e., different habitats) that are not well-protected in wilderness, national parks, or other protected areas (Figure 1c, lower left). As we prioritize the conservation lands of the future, adding diversity to our existing wilderness and parks will ensure that all of nature's diversity is protected.

**Hotspots of endemic biodiversity:** There are some places where many rare species co-occur. These lands are said to be rich in endemic biodiversity. Alarmingly, many of these places are home to species

39

BLM_0149295

that occur nowhere else on earth and are currently unprotected in conservation lands. The index developed by Clinton Jenkins and colleagues and appearing in the Proceedings of the National Academy of Science in 2015 maps these unprotected hotspots as conservation priorities (Jenkins et al. 2015). We are including these data into our wildland conservation priority index to ensure that we work on protecting those rare and precious places that are globally significant homes to many rare species (Figure 1d, lower right).



**Figure 1. Multiple criteria used to map wildland conservation priorities and values including wildness, connectivity, representation, and endemic species diversity. These criteria were combined to produce map in Figure 2.**

**Wildland conservation priorities:** We combined the mapped data described above (ecological integrity, connectivity, representation, and hotspots of endemic biodiversity) into one index by simply adding up the mapped layers (Figure 2). This new index allows us to identify wildland conservation priorities based on the land's relative wildness, its importance for creating a connected network of protected areas, its value in adding to the representation of habitats, and whether it has been identified as a hotspot of endemic species diversity. Ultimately, this approach will foster a national protected system of wildlands that is more prepared to handle the projected consequences of climate change.

40



**Figure 2. Composite wildland values map based on criteria in Figure 1. The composite value was produced by setting each criterion to the same scale and summing.**

Applying this data to the Uncompahgre Field Office, we can review how the EEAs evaluated in the draft RMP align with criteria used to map conservation priorities and overall wildland conservation values. As seen on the maps below in Figure 3, additional or alternative areas should be considered for EEA designation to ultimately achieve a network of conservation areas that maximize their potential to contribute to connectivity across the larger landscape.

BLM_0149297



**Figure 3. Wildland conservation values and potential Ecological Emphasis Areas in the Uncompahgre Field Office.**

Additionally, this research could also help BLM prioritize management prescriptions for EEAs. In the draft RMP, BLM considers essentially one set of management prescriptions for all EEAs in each alternative. Given the large amount of acreage under consideration, the more reasonable approach may be to tailor management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs. This is how BLM develops management prescriptions for ACECs, and this approach could give the agency flexibility to designate large amounts of EEAs while giving each area the level of protective management that is required.

**Summary of Comments:** BLM should move forward with designating Ecological Emphasis Areas in the Uncompahgre RMP to create a network of interconnected habitat areas that contributes to the ecological integrity of the broader landscape. We encourage the agency to utilize modern research to improve the designation and management of these areas, such as the wildland values mapping information provided above. BLM should consider tailoring management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs.

42

BLM_0149298

i.    Comments on Specific Ecological Emphasis Areas

*Adobe Ecological Emphasis Area*
Alternatives B and D would manage part of the greater Adobe area under an Ecological Emphasis area designation, which we support. Uncompahgre Draft RMP at 2-68. However, the specific proposal for the Adobe EEA changes drastically from Alterative B to Alternative D. Alternative D significantly guts the EEA through the center, leaving only portions of the area designated on the northwest and far eastern boundaries. This would leave the center of the Adobes/greater saltbrush area completely without any special management status to protect the many unique values and resources that have been highlighted through the LWC, ACEC and EEA analyses.

As proposed in Alternative D, the Adobe EEA is insufficient because much of the white-tailed prairie dog habitat is omitted. This includes one of the UFOs few recent burrowing owl nests. For the BLM to truly protect this area from further degradation and maintain the landscape scale habitat management it aspires to, the final RMP should designate the larger Adobe EEA considered in Alternative B.

Taken altogether, the LWC, ACEC and EEA management for the greater Adobe area would create a holistic management approach that will protect a large area of unique a vulnerable desert shrub lands and habitat that connect to Forest Service lands on the Grand Mesa.

*Roubideau Ecological Emphasis Area*

We support BLM including the Roubideau EEA as identified in both Alterative B and Alternative D in the Final RMP as it maintains its full acreage in both. As the Roubideau area is identified as a high value are for habitat, wilderness and recreation values, we recommend that it be closed to oil and gas leasing in accordance to our larger comments on oil and gas leasing throughout the field office. The area is clearly valued for other resources other than oil and gas development and should be managed to highlight and protect these values over oil and gas minerals that have low development potential in this area. Closing the Roubideau EEA to oil and gas leasing is important to protect sensitive species such as the Grand Junction milkvetch, desert bighorn sheep and northern leopard frog which BLM has identified in the area. Uncompahgre Draft RMP at D-3.

The Roubideau area has many high valued resources that qualify it for LWC, ACEC, EEA and SRMA management. In order to fully protect all the canyons, mesa tops and connecting areas - and manage for future recreational use - a layered management decision utilizing all of these designations and allocations is warranted.

*Dry Creek Ecological Emphasis Areas*

We are supportive the Dry Creek EEA as it is proposed in Alternative B, as the area is significantly reduced in the Dry Creek EEA as proposed in Alternative D. We are also concerned about the overlap of the Dry Creek SRMA in the same area as the EEA.

BLM is proposing to manage the Dry Creek SRMA for front country management and for "operational recreation setting characteristics), allowing competitive events and choosing other "less restrictive actions" to manage the area, including a CSO stipulation for oil and gas leasing for parts of the SRMA rather than an NSO. Uncompahgre Draft RMP at 4-319.

43

BLM_0149299

Although we understand this is a popular area with much motorized and mechanized activity, we are concerned that the SRMA proposal in Alternative D is in conflict with BLM's proposed EEA in the same area. The EEA centers on three large drainages that link the Uncompahgre Valley to the Plateau and identified riparian, cliff and canyon pinon-juniper ecosystems as well as areas of sage brush and ponderosa. The area supports bear, mountain lion, mule deer and native warm water fish.

We believe the SRMA proposal as laid out in Alternative B, which would close the area to leasing, recommend ROW avoidance, and recommended the area for mineral withdraw, would help achieve the EEA objectives.

### a.   Areas of Critical Environmental Concern

Under FLPMA, BLM is obligated to develop and revise land use plans to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values…[and] where appropriate, will preserve and protect certain public lands in their natural condition…" 43 U.S.C. §1701(a)(8). FLPMA obligates BLM to "give priority to the designation and protection of areas of critical environmental concern [ACECs]." 43 U.S.C. § 1712(c)(3).  ACECs are areas "where special management is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes." 43 U.S.C. § 1702(a).

BLM's ACEC Manual (1613) provides additional detail on the criteria to be considered in ACEC designation, as discussed in the applicable regulations, as well.  *See*, BLM Manual 1613 at .1 (Characteristics of ACECs); 43 C.F.R. § 8200.  An area must possess relevance (such that it has significant value(s) in historic, cultural or scenic values, fish & wildlife resources, other natural systems/processes, or natural hazards) and importance (such that it has special significance and distinctiveness by being more than locally significant  or especially rare, fragile or vulnerable).  In addition, the area must require special management attention to protect the relevant and important values.

For potential ACECs, management prescriptions are to be "fully developed" in the RMP. BLM Manual 1613 at .22 (Develop Management Prescriptions for Potential ACECs).  These management prescriptions include general policies and mitigation measures that "protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources…" BLM Manual 1613 at .02.

We support that BLM is considering a robust range of ACECs for designation in the Uncompahgre RMP. The fact that the proposed Planning 2.0 rule emphasizes ACECs, as well as the fact that BLM is currently updating its ACEC Manual, speaks to both the importance of incorporating ACEC designation into the agency's landscape-level strategy for land use planning and the unique position that ACECs will have in the next chapter of BLM land use planning. Therefore, the limited number and acreage of ACECs that would be designated in the preferred alternative is inadequate to support a connected landscape and maintain its ecological integrity. At the same time, we note that many of the ACECs under consideration in the draft RMP overlap with potential EEAs, particularly in Alternative B. Uncompahgre Draft RMP at Figures 2-2 and 2-64. We encourage BLM to ultimately designate a network of ACECs and EEAs that is consistent with FLPMA and agency policy, and also maximizes the ability of these designations to create a connected network of protected areas across the Uncompahgre Field Office.

44

BLM_0149300

**Summary of Comments:** In compliance with FLPMA and BLM's obligation to designate ACECs where lands exhibit relevant and important qualifying criteria, we recommend that BLM adopt a comprehensive ACEC framework that designates adequate new ACECs, applies robust management prescriptions to protect relevant and important criteria, and creates an integrated network with EEAs and other conservation allocations and designations in the planning area.

i.   Comments on Specific Areas of Critical Environmental Concern

*Adobe Badlands and Salt Desert Shrub Ecosystem ACECs*

The greater Adobe badlands in north Delta are a fascinating and vulnerable environment. It is a system based on fragile shales and soil crusts that in turn support rare high desert plant and animal species. The Colorado Natural Heritage Program considered salt desert shrub lands in the area to be globally vulnerable and locally imperiled. These fragile desert systems need a high level of preservation to retain an intact ecosystem as they have a high difficulty in recovery from disturbance.

The greater Adobe area has two different proposed ACECs that overlap. One is the existing Adobe Badland ACEC which basically overlaps the WSA.  The other is the Salt Desert Shrub Ecosystem ACEC which is much larger in size and would go further in protecting these fragile systems. Uncompahgre Draft RMP at 2-137—138. We encourage the BLM to carry the Salt Desert Shrub Ecosystem ACEC into the Final RMP with the full acreage as identified in Alternative B.  This management decision would lessen the impacts to Special Status Species and protect a system that is already facing encroachment and fragmentation.

The Salt Desert Shrub Ecosystem ACEC meets BLM's ACEC criteria and should be designated as such:
-   The area has significant wildlife values: populations of white tallied prairie dogs, kit fox, burrowing owl, ferruginous hawk and pronghorn antelope.  All together it has been ranked as an area of "very high biodiversity significance" by the Colorado Natural Heritage Program.
-   Natural processes or systems:  significant populations of hookless cactus, adobe penstemon, and clay-loving buckwheat, all endangered or threatened endemic sensitive plants
-   More than local qualities: In addition to providing an important natural area for local residents to enjoy, the area is listed in the state and regional hiking guide books because of its scenic formations. If one looks on line, there is evidence of evidence of visitors from as far away a Europe who post photos and GPS coordinates of their trips into this area.
-   Vulnerable qualities: the area is clearly vulnerable to high levels of erosion and without special management.  Issues such as illegal off road recreation, dumping and other damaging uses are difficult for systems such as these to recover from. Saline soils are vulnerable to adverse change. Without added management protection, the area could be damaged for decades to come.

*Roubideau-Potter-Monitor ACEC*

In BLM's ACEC analysis, the Roubideau-Potter and Monitor mesa and canyon complex is recognized as a potential ACEC of 20,502 acres in size with valuable resources of riparian vegetation. The area is recognized by the CNHP for its high biodiversity rating, giving it statewide and global significance. The area also has cultural and historical sites that are vulnerable to change and warrant protection as an ACEC. If the BLM is planning to manage this area as an SRMA expecting more visitation in the future (as explained in the rationale for moving it towards "front country management") these historic resources

45

BLM_0149301

need to be managed so increased recreational use does not damage them. *See, e.g.,* Uncompahgre Draft RMP at 4-320.

The Roubideau ACEC is present in Alternative D and named "Roubideau Corridors," but is drastically reduced in size to 8,720 and only includes the canyons, not the mesa tops. Uncompahgre Draft RMP at 2-345—347. This proposal would leave the mesa tops without either LWC or ACEC protection, only selectively managing to protect the riparian vegetation in the canyons and not the montane forest also identified in the area.  The montane forest is not rare, nor is it pristine. However, wildlife including desert bighorn sheep are known to move back and forth between the zones in search of forage and water, and need the full ecosystem. After leading many on the ground hikes in both the canyons and the mesa tops, it is clear the area should be treated as a holistic unit and not separated into canyons and mesas. The experience of being in this area in not complete without being able to enjoy a hike through the canyons and then climb up to the mesa tops to get a full view of the surrounding area. Note that the Wickiup site with 13 wickiups on Monitor Mesa is on the Mesa top, not in the canyon. It is likely that other archaeological sites exist that have not been identified, since that particular site was found essentially by accident. Therefore, additional protection for the cultural resources on the mesa top is warranted.

We recommend that the BLM include the full Roubideau-Potter-Monitor ACEC as identified in Alternative B in the Final RMP. This is especially important if BLM does not manage the mesa tops as part of the LWC unit, in which case an ACEC designation should include to mesa tops to ensure the holistic management of the area to protect it and maintain the quality of the experience.

*La Sal Creek ACEC*

BLM should designate the 10,490-acre La Sal Creek ACEC as proposed in Alternative B to protect unique vegetation communities and BLM sensitive plant, fish, and wildlife species, including Paradox breadroot, Paradox Valley lupine, desert bighorn sheep, and peregrine falcon. Uncompahgre Draft RMP at 2-341. The La Sal Creek ACEC would provide enhanced protections for wilderness-quality lands adjacent to the Dolores River Canyon WSA, including the important species and scenic values associated with those lands that merit ACEC designation.

## VI.     __Wild and Scenic Rivers__

Our organizations and members have carefully researched both the field and documented values of free-flowing rivers across the Uncompahgre Field Office. We also are readily available to discuss and clarify the comments below, regarding resource management plan protections for potential Wild & Scenic Rivers and to provide other assistance and information as may be useful to you.

Many of the same organizations and individuals have participated in the BLM's wild & scenic (W&S) review process completed so far, and they have previously submitted comments during RMP scoping and during W&S eligibility and suitability reviews. Representatives of these organizations also participated in the citizen-engagement processes hosted by the BLM and by others during consideration of wild & scenic suitability.

46

### a.  Legal and procedural requirements

We appreciate the BLM's conscientious and professional compliance with requirements regarding wild & scenic analyses and decisions within the RMP process, including section 5(d)(a) of the Wild and Scenic Rivers Act and by the BLM Manual at 8351 and 6400. Beyond mere compliance, we also thank the BLM for its thoroughness in reviewing potential rivers at each stage of its W&S analysis—including initial inventory of rivers, eligibility report, and suitability report—and for its extra efforts in community outreach and in field assessment of potential rivers.

We believe that the W&S suitability findings included in the BLM's *Wild and Scenic River Suitability Report*, February 2013 (included as Appendix P to the draft RMP), provides a fair and sound analysis and set of recommendations. We believe that the suitability findings should be fully implemented in the final RMP, as represented in the preferred alternative of the Draft RMP.

### b.  Critique of working groups

One component in the W&S suitability analysis was a series of public-engagement meetings and negotiations, structured separately for the Gunnison River basin and the San Miguel-Dolores River basin.

The citizens' working group focused on eligible segments within the Gunnison River basin was loosely organized and marginally facilitated, open to a frequently changing array of interested individuals, without consistent representation, and with changing protocols for discussion and decision-making.

As a result, no consensus was reached on recommendations to the BLM. Two reports were submitted from that process:  One report recommended no stream segments be found suitable; the other recommended three segments be found suitable (Monitor Creek, Potter Creek, Roubideau Creek segment 1). Both reports are included on the BLM's website for the RMP, and we appreciate that fact that both were considered by the BLM in crafting its draft RMP.

For the San Miguel and upper Dolores river basin, the BLM's *Southwest Resource Advisory Council* (RAC) appointed a diverse citizens committee to review candidate rivers.

The sub-RAC, as it was known, was thoughtfully and fairly structured, was professionally facilitated and recorded, hosted nine public-comment meetings, and included a deliberately selected membership intended to represent a comprehensive spectrum of community and resource interests.

That group studied each eligible river in detail and recommended thirteen stream segments be found suitable, those recommendations later affirmed by the full RAC and forwarded to the BLM. In many instances, river segments were adjusted in length—most typically to remove private land from suitability implications—and some were adjusted in classification to better fit local water use and other resource needs.

### c.  Watershed approach to rivers management and protection

The BLM's suitability findings in the San Miguel-Dolores River basin are correspondingly well founded in careful analysis, in strong public engagement and support, and in a constructive spirit of compromise and mutual accommodation among protection, commodity, and community interests.

47

BLM_0149303

Moreover, the suitability findings for the San Miguel River, for portions of the Dolores River, and for key tributaries to both are consistent with suitability determinations in adjacent federal land management units. Specifically, W&S suitability findings recently established or affirmed in the watershed by the San Juan National Forest, the BLM Tres Rios Field Office, and the BLM Grand Junction Field Office will now be complemented by similar findings of suitability—and corresponding protective management—in the Uncompahgre Field Office.

That consistency is further enhanced by the BLM's recent realignment of management districts, now including in the entire Dolores River watershed in one coordinating district.

The call for a comprehensive and coordinated watershed approach to rivers management and protection was a frequent and consistent refrain during the working group processes. The management decisions noted above, the BLM organization restructuring, and now strong and well-founded suitability decisions in the Uncompahgre Field Office provide affirmative response to those requests.

### d.  Opportunities for federal-state cooperation

The BLM's administrative management and protection for potential Wild & Scenic Rivers, through eligibility or suitability, affords an important opportunity to comprehensively address river values. A combination of federal land management prescriptions under the RMP and streamflow protections using the State of Colorado's *Stream and Lake Protection Program* will ensure the continued health and natural vibrancy of the full spectrum of river flow and river corridor features.

Correspondingly, we appreciate the position recently taken by the *Colorado Water Conservation Board* (CWCB) (which manages the state stream protection program), acknowledging the potential value of W&S suitability findings in both watersheds and requesting several specific accommodations from the BLM.

Specifically, we encourage the BLM to a) incorporate into its final RMP preparation information and documents prepared under the state's Basin Roundtable process, b) acknowledge existing state instream flow water rights affecting W&S suitable stream segments and encourage cooperation on the selective expansion of those rights and establishment of new rights to complement the suitability status, c) affirmation of stipulation between the CWCB and the Dolores Water Conservation District in the matter of CWCB staff recommendation for instream flow appropriation on the Dolores River, d) incorporate updates regarding CWCB instream flow water rights, both established and pending, e) include clarification regarding effects that W&S suitability may or may not have on potential development conditional water-storage rights held by Montrose County, and f) provide clarifications regarding the effects that W&S suitability may or may not have on continued operation of McPhee Reservoir and the Dolores Project.

While we understand that the pending RMP is probably not the correct context in which to address potential federal legislation, we encourage the BLM to otherwise acknowledge and affirm the its openness to streamflow protection for potential W&S rivers by means other than pursuit of federal reserved water rights.

At the same time, we recommend that the BLM should not adjust its RMP suitability findings for stream segments being discussed for possible federal legislation (upper Dolores River, La Sal Creek *e.g.*), leaving final or adjusted determinations to Congress or to future BLM administrative processes. It is important

48

that legislative deliberations benefit from the BLM's professional and objective assessment of particular stream values and of their potential for inclusion in the *Wild and Scenic Rivers System* or other protective designation.

### e. Comments on specific stream segments

We strongly endorse all the W&S suitability findings included in the BLM's *Wild and Scenic Suitability Report*, highlighted in Appendix P to the draft RMP, and we urge BLM to include those findings in the final RMP, along with protective management prescriptions appropriate to suitability status and classification.

Further, we urge BLM to fully and reliably implement, in the RMP, other protection measures for rivers and river corridors determined to be W&S eligible but found not suitable. In many instances, a combination of recommendations from the citizen working groups and acknowledgements in the draft RMP have asserted that suitability was not necessary for certain stream segments specifically because other measures are in place to protect the free-flowing condition and the outstandingly remarkable values that warranted the original eligibility determination. It is important that the BLM ensure the continued protection of values identified under eligibility.

Related, the BLM, through the RMP and otherwise, should continue to monitor the presence and effectiveness of those alternative protection measures. If those measures fail or are discontinued for any stream segments that had been found eligible, BLM should promptly reconsider, through an RMP amendment, eligibility and suitability for those segments.

*Gunnison River Basin*

Gunnison River Segment 2
As documented in the BLM's W&S eligibility report, this regionally significant river warrants strong and enduring protection as an important recreational opportunity, as the hydrologic heart of unique adjacent public lands, and as essential habitat for at least two endangered species of native fish, along with three other species of ancient native fish that are imperiled primarily because of loss of habitat or changes in river flows.

Other federal programs—primarily the Endangered Species Act—and evolving federal management efforts—including re-operation the Aspinall Unit dams upstream—contribute, or will contribute, to the reliability of those critical-habitat flows.

It therefore is not necessary to apply a finding of wild & scenic suitability to this portion of the Gunnison River, *so long as* those other federal measures are implemented and properly maintained. If those measures are either removed or fail to protect the native fish and their habitat, the BLM should reconsider a finding of suitability in future planning processes.

Monitor Creek
This stream is an important feature flowing through the heart of federal lands with wilderness character and wilderness characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

49

BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values identified by the BLM (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Monitor Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and Outstandingly Remarkable Value (ORV)) identified by the BLM for nearby Roubideau Creek (*desert bighorn sheep*). The features, condition, and importance of this wildlife habitat along Monitor Creek are of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Monitor Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), the version found along Monitor Creek is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Monitor Creek are also present in Roubideau Creek, which is included, stream and corridor, in the Roubideau (Camel Back) Wilderness Study Area, thus necessarily defined by those same backcountry recreation opportunities.

Meanwhile, a finding of wild & scenic suitability for Monitor Creek—a finding most directly applicable to the lands in the stream corridor—will provide reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*).

Federal ownership of 100% of this stream segment, and of 96.2% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 104.9 acres of private land within the stream corridor are actually separate from the stream, further simplifying protective management, especially if that management were applied specifically to the federal lands.

**We recommend that the full length of the Monitor Creek segment be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should be expanded to include recreational opportunities and wildlife habitat.**

<u>Potter Creek</u>
This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

BLM_0149306

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values originally identified in the BLM's eligibility report (*vegetation*), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Potter Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and ORV) identified by the BLM for adjacent Roubideau Creek (*desert bighorn sheep*). The features, condition, and importance of that wildlife habitat along Potter Creek is of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Potter Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), it is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Potter Creek are also present in Roubideau Creek. Roubideau Creek and its corridor are included in the Roubideau (Camel Back) Wilderness Study Area, which is necessarily defined by those same backcountry recreation opportunities.

Meanwhile, the BLM's decision to remove the one outstandingly remarkable value originally identified in the agency's eligibility report is in error. The BLM's rather arbitrary distinction between a classification as critically imperiled globally (G1) and vulnerable throughout its range (G2) is not well founded.

A plant community that is currently vulnerable throughout its range warrants the highest possible level of protection in each of its occurrences, lest damage from human activity, climate change, or other harmful factors translate vulnerable to imperiled. The best way to avoid plant community failures in the future is an active protection in the present. A finding of suitability, and accompanying protective management, is an appropriate and timely tool for this plant community.

A finding of wild & scenic suitability for Potter Creek—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*).

Federal ownership of 100% of this stream segment, and of 98.5% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 44.3 acres of private land are located at the far lower end of the stream segment, further simplifying protective management, especially if that management were applied specifically to the federal lands.

**We recommend that the full length of the Potter Creek be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should continue to**

BLM_0149307

**include the highlighted vegetation communities, and they should be expanded to include recreational opportunities and wildlife habitat.**

Roubideau Creek Segment 1

This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, both within the long-standing Roubideau (Camel Back) Wilderness Study Area and in the larger citizens' wilderness proposal of the same name. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

A finding of wild & scenic suitability for Roubideau Creek Segment 1—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring protection for the continued health of the ORVs identified in the BLM's eligibility report, including:  rare plant communities (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*); wildlife (*northern leopard frog, desert bighorn sheep*); cultural; and recreational (*primitive and non-mechanical exploration and exercise*).

Federal ownership of 93% of this stream segment, and of 94.8% of the land in the stream corridor simplifies the effective implementation of protective management.

**We recommend that the full length of the Roubideau Creek Segment 1 be found suitable, applicable at least to the federal lands in the corridor.**

Roubideau Creek Segment 2

The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (45.5%, 60.2%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Roubideau Creek Segment 2.

Deep Creek

The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

In particular, the critical rarity of greenback cutthroat trout warrants the highest level of protective management, especially management and cooperative measures to ensure reliable and seasonally natural stream flows.

52

BLM_0149308

The relatively low percentage of federal land ownership along the stream and in the stream corridor (22.7%, 15.8%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Deep Creek, *so long as* those other methods continue to successfully protect the trout and its habitat.

<u>West Fork Terror Creek</u>
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (39.2%, 47.5%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for West Fork Terror Creek, *so long as* those other methods continue to successfully protect the trout and its habitat.

<u>Beaver Creek</u>
Traversing a narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad, otherwise private-land, geography. The creek is also an important contributing tributary to the San Miguel River.

Federal land ownership of nearly 100% will simplify effective implementation of protective management.

**We recommend that the full length of Beaver Creek be found suitable with modifications recommended by the SWRAC.**

<u>Dry Creek</u>
This stream traverses a uniquely un-roaded landscape, providing important wildlife support and general ecological vibrancy. It is also a seasonally large streamflow contributor to the San Miguel River.

The very distinctive scenery and geology of the area—formed in large part by the creek itself—warrant strong protective management for the stream and corridor.

Nearly 100% federal ownership of land along the stream corridor, and extensive federal land beyond the corridor, simplify effective implementation of protective management.

We concur with the SWRAC recommendation that the Dry Creek segment may be sufficiently protected by ACEC designation and no-surface-occupancy stipulations, so long as those alternative measures continue to protect the stream's free-flowing condition and identified ORVs.

<u>Naturita Creek</u>
This rare habitat for exemplary populations of endangered native fish and/or fish species of concern warrants the strongest possible protection, for both streamflows, related corridor vegetation, and water quality.

While the low percentage of federal ownership along the corridor might preclude a finding of suitability or wild & scenic designation, other immediate, effective, and enduring administrative protections—

BLM_0149309

including cooperative measures with landowners and with other government agencies—should be included in the resource management plan and its implementation.

Saltado Creek
Traversing a relatively narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad otherwise private-land geography. The creek is also an important and reliable streamflow-contributing tributary to the San Miguel River.

The healthy and remarkably undisturbed nature of this segments riparian vegetation and soils, worthy of strong protection itself, helps ensure clean streamflow in the San Miguel River.

100% federal land ownership along the lower four miles of the segment simplifies effective implementation of protective management.

**We recommend that the full length—certainly the federally owned portion—of Saltado Creek segment be found suitable with modifications recommended by the SWRAC.**

San Miguel River Segment 1
This large, regionally iconic river is inherently significant, and it provides important streamflow contribution to the Dolores River, itself severely diminished above its confluence with the San Miguel. This flow contribution is particularly important for the surviving population of endangered native fish, and/or fish species of concern, inhabiting the portion of the Dolores River just below that confluence. With flows from the upper reaches of the Dolores still highly variable and generally low, the San Miguel flow contribution is critical and must be protected.

This segment includes unparalleled scenery and attendant natural and cultural features.

The patchwork of federal-private land ownership along the segment may complicate protective management, but the segment's features warrant the extra effort that might be necessary to secure a finding of suitability and to implement cooperative measures to protect those features.

**We recommend that all of San Miguel River Segment 1 be found suitable.**

San Miguel River Segment 2
This relatively short segment of the San Miguel River contains unusually undisturbed stream and corridor features, warranting the strongest possible protection. The corridor includes stunning geological and landform scenery, much of it formed by the river itself, along with a uniquely undisturbed and vibrant riparian ecosystem.

Federal land ownership along the segment is 100%, simplifying effective implementation of protective management.

**We recommend that San Miguel River Segment 2 be found suitable with modifications recommended by the SWRAC.**

54

BLM_0149310

San Miguel River Segment 3
This segments uniquely wild condition affords recreational experiences important to local economy and to local sense of place. The segment also provides critical habitat for endangered native fish and/or fish species of concern, which must be protected in order to ensure continued local use of the river's flows.

While federal land ownership along the segment is only 72.5%, the bulk of private land is found at one location, facilitating the cooperative measures important for implementing protective measures essential for this segment.

**We recommend that San Miguel River Segment 3 be found suitable with modifications recommended by the SWRAC.**

San Miguel River Segment 5
In addition to ensuring strong and enduring protection for the public lands segments of the river traversing primarily federal public lands, the BLM should engage landowners and other land managers in Segment 5 to ensure cooperative measures to a) protect a continuous healthy stream corridor and b) to ensure natural-hydrograph flow contributions to the Dolores River. These and other measures should be undertaken to, among other things, enhance and preserve important habitat for imperiled native fish noted in the BLM's Final Eligibility Report.

**We recommend that San Miguel River Segment 5 be found suitable with modifications recommended by the SWRAC.**

San Miguel River, segment 6
This final segment to the San Miguel River's confluence with the Dolores River is of critical importance to a) preserve the beauty and natural dynamics of the confluence, to ensure a final, reliable, and healthy contribution to streamflows important for imperiled native fish uniquely flourishing in the segment and just downstream from the confluence, and c) to protect and enhance the healthy native riparian vegetation along the segment.

While less than 70% of the land along segment is federally owned, 100% of the final two miles above the confluence is federally owned, facilitating effective implementation of protective management.

**We recommend that San Miguel River segment 6—or at least the federal portion—be found suitable with modifications recommended the SWRAC.**

Tabeguache Creek Segment 1
This stream traverses a uniquely un-roaded, wild landscape on public lands, providing important wildlife support and general ecological vibrancy along the stream itself, and complementing congressionally designated national forest lands protected upstream.

Reliable protection is also needed for the segment's uniquely and flourishing riparian vegetation communities, and noted in the BLM's Final Eligibility Report.

Federal land ownership along the segment is 100%, simplifying effective implementation of protective management.

BLM_0149311

**We recommend that Tabeguache Creek Segment 1 be found suitable with modifications recommended by the SWRAC.**

Tabeguache Creek Segment 2

This segment contributes reliable and significant volume of streamflow to the San Miguel River, and the health of segment should be protected in order to maintain and enhance the quality of the contributed streamflows.

The segment's superior examples of unique stream-dependent riparian vegetation communities should themselves be preserved and enhanced.

Although less than 70% of the land along the segment is federally owned, 100% of the land immediately above the stream's confluence with the San Miguel River is federally owned. This facilitates effective implementation of protective management.

We reluctantly concur with the SWRAC recommendation that the free-flowing condition and outstandingly remarkable values of Tabeguache Creek Segment 2 be protected by means other than w&s suitability.

Lower Dolores River

Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is essential to, and appropriate for, that protection.

The esthetically and economically important recreation opportunities provided by the Lower Dolores River segment present sufficient justification for protecting the natural appearance and health of that segment. The existence of healthy populations of regionally imperiled native fish, as noted in the BLM's eligibility and suitability reports, make that protection even more important.

In conjunction with a finding of suitability, and protective management, for the San Miguel River segments upstream, corresponding protections for this segment complete an important recognition of the two rivers' importance, locally and nationally.

While just over 65% of the land along the segment is federally own, 100% of the upper portion of the segment is federally owned. This facilitates effective implementation of protective management for that federal portion; it also facilitates—and warrants—cooperative agreements and actions in the lower portions, lined primarily by private land, to help complete that protective management.

**We recommend that that full length of Lower Dolores River segment—or at least the upper federally owned portion—be found suitable with modifications recommended by the SWRAC.**

56

BLM_0149312

<u>North Fork Mesa Creek</u>
This segment warrants the strongest of protective measures for two basic reasons. First is the BLM-recognized presence of globally imperiled narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian woodlands along the segment. Second, and related, the segment contributes perennial, high quality streamflows to Mesa Creek, and thus to the severely depleted Dolores River itself.

A finding of suitability for this segment corresponds to the BLM's separate finding of eligibility for the upstream segment of the North Fork. In any case, the Uncompahgre and Grand Junction field offices should confer and protect effective coordinated protective management for both segments.

While just over 68% of the land along the segment is federally owned, 100% of the upper portion of the segment is federal. This facilitates effective implementation of protective management, and facilitates the implementation of cooperative agreements and actions for portions of the segment lined with private land.

We reluctantly concur with the SWRAC recommendation the free-flowing condition and outstandingly remarkable values of North Mesa Creek be protected by means other than w&s suitability.

<u>Dolores River, segment 1</u>
Identified as eligible in the San Juan Public Lands management plan, this segment complements and is essentially a component of Dolores River Segment 2. As such, its extensive and diverse outstandingly remarkable values and values-related flows, warrant the highest possible protection.

Suitability is consistent with the values and protective management for the adjacent Wilderness Study Area.

Such protections are described in our comments related to Dolores River Segment 2, and we advocated those protections for Dolores River segment 1 as well.

**We recommend that the full length of Dolores River segment 1 be found suitable with modifications recommended by the SWRAC.**

<u>Dolores River Segment 2</u>
Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is key to that protection.

With the longest and most diverse list of outstandingly remarkable values (seven) recognized in this segment, the segment is eminently qualified for the highest possible protective status and measures.

The healthy presence of regionally imperiled native fish in this segment and downstream, as recognized in the BLM's Final Eligibility Report, the importance of protecting the stream and supportive corridor in this segment is greatly magnified.

BLM_0149313

Only 47% of land along the segment is federally owned, but 100% of the corridor land in the upper half of the segment is federal. This facilitates the effective implementation of protective measures in that federal portion and facilitates cooperative agreements and measures for providing similar protections to the rest of the segment.

**We recommend that the full length of Dolores River segment 2—or at least the federally owned upper portion—be found suitable with modifications recommended by the SWRAC.**

Ice Lake Creek Segment 2
This important tributary to La Sal Creek warrants strong protection for it free-flowing condition, water quality, and stream corridor values.

We concur with the SWRAC recommendation that, because of its short length and concerns about adjacent land and water uses, Ice Lake Creek should be protected by means other than w&s suitability.

La Sal Creek Segment 1
We concur with the SWRAC recommendation that, because of extensive private land ownership in the segment, the values of La Sal Creek Segment 1 should be protected by means other than w&s suitability.

La Sal Creek Segment 2
This stream traverses a distinctive canyon corridor, affording a stunning backdrop to outstanding recreation opportunities. The stream itself provides important streamflow source for the Dolores River, and it includes essential and healthy riparian environment in an otherwise arid area.

The presence of healthy populations of regionally imperiled native fish, and the presence of globally rare riparian ecosystem, provide complete justification for the strongest possible protective status and measures in this segment. In addition, the segment provides essential streamflows and healthy continuity for riparian habitats in the Dolores River Canyon Wilderness Study Area immediately downstream, and to the Dolores River itself.

Federal land ownership along the segment is 84.5%, facilitating effective implementation of protective management, particularly in the upper portion, which is 100% federal.

**We recommend that La Sal Creek segment 2 be found suitable with modifications recommended by the SWRAC.**

La Sal Creek, segment 3
If ever a stream segment were suitable under that definition of the *Wild and Scenic Rivers Act*, this is one. The segment lies wholly within the Dolores River Canyon Wilderness Study Area, supporting regionally rare riparian and scenic vibrancy. That habitat health is reflected in the presence of healthy populations of regionally imperiled native fish.

In addition, La Sal creek is among the more significant streamflow contributors to the severely depleted Dolores River.

Federal ownership of land along the segment is 100%, facilitating—and requiring—the strongest possible form of protective management.

58

BLM_0149314

**We recommend that the full length of La Sal Creek segment 3 be found suitable.**

Lion Creek
This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surround wilderness-quality lands and to the Dolores River.

While the length, location and federal ownership percentage of Lion Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed.

Spring Creek
This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surrounding wilderness-quality lands and to the Dolores River.

While the length, location and federal ownership percentage of Spring Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed.

*Additional river segments*

Roc Creek
Current w&s eligibility status for Roc Creek segments in the Manti-La Sal National Forest management plan warrant equal or stronger status and protection for segments in the UFO planning area, where Roc Creek traverses unique and sensitive areas with wilderness characteristics (both as identified by citizen inventory and by the BLM's own wilderness characteristics review) and other unique stream-related features.

The UFO's failure to find Roc Creek even eligible is doubly incongruous, both in light of those remarkable stream-related values and in light of the Manti-La Sal National Forest's determination that its portion of Roc Creek is eligible (with Wild classification and with Scenic and Geologic/Hydrologic Outstandingly Remarkable Values identified).

**This should be corrected with UFO affirmation of Roc Creek's eligibility, plus determination that it is suitable.**

**<u>Summary of Comments:</u>** We recommend that the BLM reach a finding of suitability, and implement corresponding strong protective management measures for:
- Monitor Creek
- Potter Creek
- Roubideau Creek Segment 1
- Beaver Creek
- Saltado Creek
- San Miguel River Segment 1
- San Miguel River Segment 2
- San Miguel River Segment 3
- San Miguel River Segment 5

59

- San Miguel River Segment 6
- Tabeguache Creek Segment 1
- Lower Dolores River
- Dolores River Segment 1
- Dolores River Segment 2
- La Sal Creek Segment 2
- La Sal Creek Segment 3
- Roc Creek

We recommend that the BLM implement the strongest possible protective management measures, other than a finding of wild & scenic suitability, for:
- Gunnison River Segment 2
- Roubideau Creek Segment 2
- Deep Creek
- West Fork Terror Creek
- Dry Creek
- Naturita Creek
- Tabeguache Creek Segment 2
- North Fork Mesa Creek
- Ice Lake Creek Segment 2
- La Sal Creek Segment 1
- Lion Creek Segment 2
- Spring Creek

### VII.   Wilderness Study Areas

We support that the Uncompahgre Draft RMP identifies management actions for Wilderness Study Areas in the event they are released from wilderness consideration by Congress. Uncompahgre Draft RMP at 2-357—358. Particularly, we support the robust management actions for Sewemup Mesa WSA in Alternatives B and D, and encourage BLM to carry those management actions through to the Proposed RMP. BLM should manage Sewemup Mesa as ROW exclusion rather than ROW avoidance, as contemplated in Alternative B. *Ibid.* Additionally, the commitment to managing the Adobe Badlands and Dolores River Canyon WSAs consistent with overlapping ACEC designations is appropriate to ensure the relevant and important values of these areas continue to be proactively managed in the event the WSAs are released from wilderness study by Congress.

The Camel Back WSA would receive minimal protections for its natural resource values under the preferred alternative in the Draft RMP if it were to be released from WSA status. The only overlapping designations in the preferred alternative are the Roubideau Corridors ACEC and Roubideau SRMA. Uncompahgre Draft RMP at Maps 2-66 and 2-47. The Roubideau Corridors ACEC is small relative to the Camel Back WSA, and the Roubideau SRMA as considered in Alternative D would not provide adequate protection to the important public lands resources in the Camel Back WSA. Therefore, the final RMP should adopt the Roubideau SRMA as contemplated in Alternative B; designate the Roubideau-Potter-Monitor ACEC as contemplated in Alternative B; or identify specific management actions to protect the natural resources of the Camel Back WSA in the event of Congressional release similarly to how the draft RMP would manage the Sewemup Mesa WSA in the event of Congressional release.

60

BLM_0149316

We also note that Special Recreation Management Areas overlapping with Wilderness Study Areas apply Visual Resource Management classes that are inconsistent with WSA policy, and how BLM states WSAs will be managed in the Draft RMP. BLM Manual 6330 states: "All WSAs should be managed according to VRM Class I management objectives until such time as Congress decides to designate the area as wilderness or release it for other uses." BLM Manual 6330 at 1.6(D)(9). Indeed, the Draft RMP states that all WSAs will be managed as VRM I across the range of alternatives. Uncompahgre Draft RMP at 2-355.

The Dolores River Canyon SRMA overlaps with the Dolores River Canyon WSA, but the SRMA would be assigned VRM II while the WSA is to be managed as VRM I. Uncompahgre Draft RMP at J-11, J-13. Similarly, the Roubideau SRMA overlaps with the Camel Back WSA. The Roubideau SRMA would be assigned VRM II while the WSA is to be managed as VRM I. *Id.* at J-63. BLM must clarify that where the SRMAs overlap with WSAs, those lands will be managed as VRM I consistent with BLM policy for WSA management and the direction for WSA management provided in the Draft RMP.

**Summary of Comments:** BLM should carry forward the management actions for Sewemup Mesa WSA from Alternative B. BLM should carry forward the commitment to manage released WSAs consistent with overlapping ACEC and SRMA designations, as stated in Alternatives B and D. Particularly for Camel Back WSA, if BLM does not designate the Roubideau-Potter-Monitor ACEC or Roubideau SRMA as outlined in Alternative B, BLM should identify specific management actions in the final RMP to protect the area similar to Sewemup Mesa. BLM must clarify that where the SRMAs overlap with WSAs, those lands will be managed as VRM I consistent with BLM policy for WSA management and the direction for WSA management provided in the Draft RMP.

### VIII.    Night Sky Resources

We support that the Uncompahgre Draft RMP addresses protection of dark night skies across the range of alternatives. In the alternatives table for visual resources, one of the identified objectives is to: "Maintain dark night sky conditions in areas that are generally unaffected by man-made light sources." Uncompahgre Draft RMP at 2-147. The draft RMP goes on to detail actions for achieving this objective, including prohibiting permanent outdoor artificial lighting in VRM I and II areas, requiring that permanent and temporary artificial outdoor lighting be shielded and downward-facing, and requiring that permanent artificial outdoor lighting be turned off when it is not needed. *Id* at 2-147—148. These are appropriate actions to ensure that night sky resources, which are important visual resources of our public lands, are protected from light pollution.

BLM has been given an explicit mandate to manage the lands under its jurisdiction for their scenic and atmospheric values, which includes night skies. *See,* FLPMA, 43 U.S.C. § 1701(a)(8) (stating that "...the public lands be managed in a manner that will protect the quality of the...scenic...[and] air and atmospheric...values..."); National Environmental Policy Act, 43 U.S.C. § 4331(b)(2) (requiring measures to be taken to "...assure for all Americans...esthetically pleasing surroundings..."); National Historic Preservation Act, 36 C.F.R. § 800.1(a) (requiring federal agencies to consider measures to avoid impacts on historic properties, including their "settings").  A dark night sky is undoubtedly a scenic and atmospheric value within that term's meaning as defined in FLPMA.

Since 1984, BLM has interpreted its mandate as a "stewardship responsibility" to "protect visual values on public lands" by managing all BLM-administered lands "in a manner which will protect the quality of scenic (visual) values."  Visual Resource Management Handbook, H-8400-1 at .02, .06(A).  Night sky

61

management is an inherent component of this responsibility.  VRM is not restricted to land-based resources.  To this end, BLM should develop  minimum management prescriptions to be included in its resource management plan that give due consideration to the value of a dark night sky, consistent with BLM's multiple use mandate, as defined at 43 U.S.C. § 1702(c).

In addition to carrying forward the management actions contemplated in the Draft RMP, BLM should adopt minimal additional management actions to even better steward this important visual resource. The Arizona Strip District incorporated the following prescriptions in the RMPs for the District in 2008, which would be appropriate for the Uncompahgre Field Office:

- Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review. These measures may include directing all light downward, using shielded lights, using only the minimum illumination necessary, using lamp types such as sodium lamps (less prone to atmospheric scattering), using circuit timers, and using motion sensors.
- Any facilities authorized will use the best technology available to minimize light emissions.

Arizona Strip RMP at 65; Grand Canyon-Parashant National Monument RMP at 67; Vermilion Cliffs National Monument RMP at 47-48.

Furthermore, the Uncompahgre RMP should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that BLM can accurately and appropriately apply the dark night sky management actions in RMP implementation.

**Summary of Comments:** BLM should adopt management actions contemplated in Alternative B of the Uncompahgre Draft RMP, which extends the prohibition on permanent artificial outdoor lighting to VRM II areas in addition to VRM I areas. BLM should also adopt the following management actions to further protect dark night sky resources:
- Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review.
- Any facilities authorized will use the best technology available to minimize light emissions.
Additionally, BLM should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that these management actions can be applied in implementation.

IX.    **Management of the North Fork Area**

a.  **Oil and Gas Management**

1.  BLM can and should close the North Fork area to oil and gas leasing in the final RMP.

The existing range of alternatives in the Draft RMP adequately supports closing the North Fork area to oil and gas leasing in the final RMP. The planning area for the Uncompahgre RMP includes 917,030 acres of fluid minerals, of which the North Fork area is 139,540 acres. Alternative B1 would close 104,750 acres in the North Fork area (75% of the minerals in the North Fork area) to leasing. Uncompahgre Draft RMP at 2-189—191. Closing the full North Fork area to leasing would only close an additional 34,790 acres in a 917,030-acre decision area, which is 3.8% of the planning area. This change fits within the range of alternatives and would not require supplemental NEPA.

62

BLM can increase the areas closed to leasing in the Proposed RMP without requiring supplemental NEPA analysis if BLM determines that those changes are not "substantial." The CEQ regulations note, "Agencies shall prepare supplements... if: the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9. There is ample precedent for BLM making similar changes between draft and final EISs without determining supplemental NEPA is required.

As an example, we refer the agency to the changes made between the Draft and Proposed plans for the Little Snake Resource Management Plan in Colorado. In the Proposed RMP, BLM added a new surface disturbance limitation but concluded this was within the range of alternatives since "***The public had an opportunity to review and comment on such a management technique and its impacts***" based on the application of a different surface disturbance cap level to a different set of lands in the Draft RMP. *See* Draft Little Snake RMP at pp. 1-18 – 1-19.[26]

More recently, the Nevada and Northern California Greater Sage-Grouse Proposed LUPA/FEIS designated approximately 2.8 million acres of priority habitat as Sagebrush Focal Areas (SFA) to receive more protective management, even though this designation was not used in the Draft LUPA. BLM explained that, because the purpose of the planning effort was to protect habitat, the Draft EIS noted further refinements to habitat could be made, and elements of the management applied to SFAs appeared in other alternatives, "the management of these areas as SFAs and the impacts of the associated management decisions was addressed in the DEIS and is qualitatively within the spectrum of alternatives analyzed."  Nevada and Northern California Greater Sage-Grouse Proposed LUPA/FEIS at pp. 2-2 – 2-3.[27]

In another example, the Lower Sonoran Field Office found that adding lands managed for wilderness characteristics in the Proposed RMP that were not evaluated for such management in the Draft RMP did not require supplemental NEPA analysis through application of the CEQ regulation. The Lower Sonoran Field Office (LSFO) added 32,700 acres of lands to be managed for wilderness characteristics between draft and final RMP based on public comment and new policy.

In order to determine whether this new information was "significant," which would have required BLM to prepare a Supplemental EIS before incorporating this new information into the PRMP/FEIS, the LSFO reviewed the CEQ NEPA regulations and guidance and found that the new inventory data did not show that the actions in the PRMP/FEIS would affect the human environment to a substantial extent not already considered in the EIS. The difference in acreage proposed to manage to protect wilderness characteristics in the PRMP/FEIS Alternative E (Proposed RMP) are not appreciably different from those presented in the DRMP/DEIS's Alternative E (preferred alternative). The DRMP/DEIS's Alternative E would manage 166,300 acres, whereas the PRMP's Alternative E would manage 199,000 acres, a 32,700-acre increase. This increase represents an area of about 3.5 percent of the entire acreage in the Lower

---

[26] Available at
http://www.blm.gov/style/medialib/blm/co/field_offices/little_snake_field/rmp_revision/final_docs.Par.40673.File.dat/03_LS-FEIS_Vol-I_Chapter-1.pdf
[27] Available at: https://eplanning.blm.gov/epl-front-office/projects/lup/21152/58708/63771/7_Volume_1_Chapter_2_NVCA_GRSG.pdf

BLM_0149319

Sonoran and SDNM Decision Areas – almost exactly the same acreage and proportion of the planning area as the additional acreage at stake in the North Fork area.

Although the LWC unit locations vary slightly based on the final inventory findings, the Sonoran Desert environment and resource conditions are comparable, as are the environmental impacts. The impacts disclosed in the PRMP/FEIS are similar or identical to those described in Chapter 4, Environmental Consequences, of the DRMP/DEIS, such as those impacts related to travel management, minerals, lands and realty, wilderness characteristics, and recreation. In addition, the BLM found that the new information did not invalidate any conclusions in the DRMP/DEIS to a significant extent. Finally, the BLM found that the qualities presented in this new information are reflected in the goals, management actions, and mitigation measures in the DRMP/DEIS. The LSFO determined that the analysis in the DRMP/DEIS sufficiently disclosed impacts to management actions on the lands with wilderness characteristics.

Based on these findings, the LSFO concluded that the new information does not affect the environment to a significant extent not already considered and, therefore, BLM can include this new information in the PRMP/FEIS without issuing a Supplemental EIS. However, the new information did lead BLM to revise the PRMP/FEIS in those sections pertaining to lands with wilderness characteristics.

The Uncompahgre Field Office can similarly conclude that closing an additional 34,790 acres in a 917,030-acre decision area to oil and gas leasing would not be a significant change requiring supplemental NEPA. Based on the wide range of options for management for conservation and energy development considered in the Draft RMP, we believe the public has been provided with sufficient information on management techniques and impacts on other resources, such that the additional lands can and should be considered for closure to oil and gas leasing in the proposed RMP. Furthermore, Alternative B1 in the Draft RMP would apply No Surface Occupancy stipulations on 27,280 acres of the 34,790 left open to oil and gas leasing, meaning BLM has analyzed significant limitations on oil and gas development across 95% of the North Fork area. Uncompahgre Draft RMP at 2-198.

**Summary of Comments:** BLM can and should close the North Fork area to oil and gas leasing in the proposed RMP. This can be accomplished without requiring supplemental NEPA under the CEQ regulations, as the additional acreage would represent just 3.8% of the planning area and is therefore not "substantial." There is ample precedent for BLM making similar changes between draft and final EISs without supplemental NEPA.

2.   If BLM does not close the North Fork area to leasing, it must adopt Alternative B/B1 to protect the public lands resources and communities in the North Fork Valley.

Regarding oil and gas leasing and development we support the incorporation into the final RMP of Alternative B1 (North Fork Alternative) as the only management alternative evaluated in the draft RMP that could provide the protection warranted for the North Fork area; and then the general provisions of Alternative B, or as otherwise indicated throughout these comments.

Alternative B1 is derived from a detailed document submitted by stakeholders, organizations and individuals from the North Fork Valley to the Uncompahgre Field Office of BLM in December 2013. *The North Fork Alternative Plan: A Proposal to the BLM for Managing Oil and Gas Development in the North Fork Valley* was developed over an 18-month period by a group of stakeholders and supported by local governments. It seeks to manage oil and gas leasing and development on the North Fork Valley's public

64

lands and minerals in balance with the unique and highly cherished resources that those lands contain, surround and impact directly, indirectly, and cumulatively.[28]

The North Fork Alternative Plan (NFAP) is included in the draft RMP/EIS as Alternative B1:

> Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in portions of Delta and Gunnison Counties. Alternative B.1 is a resource-based set of recommendations provided by a community group.

Uncompahgre Draft RMP at 2-7. Alternative B1 reinforces broader community-wide efforts to establish a more resilient, place-based economy in Delta County. In 2015 Better City was retained through a federal grant to help strategize ways to strengthen the local economy. That report reinforces what the stakeholders who crafted the NFAP have long maintained. Economic resiliency and growth in the North Fork Valley depends on safeguarding the area's natural resources not exploiting them.

> Delta County is home to a number of unique resources, attributes, organizations, and conditions that help differentiate it from other communities. The County is home to natural attractions including two rivers, the Grand Mesa National Forest, and two National Conservation Areas. The County enjoys a more temperate climate than the majority of the state, has a large amount of farmland, and has access to water resources and clean air. ... Although its coal deposits remain a vital asset for the community, they are not a source of future growth. [29]

The NFAP sets out to protect six key sets of resources that are dependent on, tied to, and impacted by activity on the area's BLM-administered lands. These include: the existing economy, towns and community areas, water source areas and delivery systems, river corridors and riparian areas, important wildlife habitat and migration routes, and sensitive landscapes and soils. In addition, the NFAP seeks protective management to safeguard outstanding recreational opportunities at Jumbo Mountain and the overall highly scenic visual character of the valley and its surrounding mesas. These characteristics of the valley, its high quality scenery features, good water and abundant wildlife, and outstanding recreational opportunities are the backbone of the area's growing, emerging, and future economy.

These comments are overall supportive of Alternative B1 in the draft RMP, however they recommend some changes and additions, as well as raise some concerns and weaknesses in the draft RMP/EIS and the analysis. Comments will first consider four major areas of emphasis that should guide management objectives and that must be part of any acceptable resource plan.

We furthermore emphasize that the agency-identified Preferred Alternative (Alternative D) is especially unacceptable for the North Fork Valley. We also urge that the agency not only adopt the provisions to protect public lands resources and communities from oil and gas development included in Alternative B1 for the North Fork, but begin to apply this level of protection to additional public lands under its purview.

---

[28] "North Fork Submits Community-based Management Plan to the BLM," News release, December 4, 2013. Online at www.citizensforahealthycommunity.org/wp-content/uploads/2013/12/North-Fork-Community-submit-Alternative-Plan.pdf

[29] Economic Development Strategic Plan Executive Summary Delta County, CO prepared by Better City, 2015. Available online at www.deltacountyed.org/resources/Documents/EDA%20Study%20Summary%202016.pdf

65

### A.   Purpose and Need: North Fork Alternative Plan

The North Fork Alternative Plan (NFAP) was crafted by North Fork Valley stakeholders, organizations and individuals that wanted to ensure any potential future oil and gas leasing and development would not jeopardize the many important values, resources and features of the area's public lands—which in many cases form the basis of the local economy, carry and are source areas for water supplies, represent critical wildlife lands, and provide outstanding recreational opportunities for residents and visitors alike.

The NFAP identifies critical resources and shared values, and researched appropriate leasing and oil and stipulations, best management practices, and public land designations. It was derived as a resource-based approach to oil and gas leasing and development to achieve the necessary level of management to protect cherished features, public land resources, wildlife and economic well-being of the valley.

Development of the NFAP started with a careful review of the thousands of comments submitted to the BLM in response to the withdrawn lease sales (Dec. 2011, Nov. 2012), and through conversations with valley residents and stakeholders. The NFAP was incorporated into the draft RMP/EIS as Alternative B.1, as noted in the DEIS Executive Summary:

> The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area.

Uncompahgre Draft RMP at ES-8. Since the NFAP in its entirety has been submitted and accepted by the BLM, and has formed the basis of the draft RMP/EIS sub-alternative B1, these comments incorporate that submitted information herein by reference, and direct discussion—unless otherwise noted—to the agency's presentation of the information in the draft RMP/EIS.

In both cases—as a stakeholder proposal and as the sub-alternative B1 in the draft RMP/EIS — NFAP/B1 sets out to protect the important character, resources, and features that make the North Fork Valley both beloved and unique. For the purpose of these comments, those can be described as 1) Character of place, 2) Water supply, 3) Wildlife habitat and migration routes, 4) Recreational opportunities and access.

### 1.   Character of place.

The North Fork Valley is a nationally unique landscape: geographically, geologically, ecologically, economically, and socially. As the Better City report notes, the area is 44th in the United States as a hub of organic agriculture, is one of only two federally recognized wine regions in the state, and is Colorado's only multi-jurisdictional and rural Creative District. The Valley is known for its dark skies, rural charm, bucolic beauty, and stunning views. Thomas Huber, a Colorado geographer and author describes the area in An American Provence, a book linking the North Fork with France's Coulon River valley, according to a January 2012 article in the Grand Junction Daily Sentinel:

> The landscapes of the two valleys have one critical thing in common, the reason they are near-clones of each other in the broader dimension: they are both human-scale places," he writes. "The towns and villages are all easily walkable, the fields are small and individually tended, the

66

trails are suitable for walking and biking, the food comes from local farmers as much as possible, and the wine is a personal statement from the vintner, not a corporate artifact.

This economy-of-place, coupled with the area's more standard tourist fare—hunting season—is a driving force in the North Fork, a trend noted in a 2007 Colorado State University study and report.[30]

Colorado's abundant wildlife, vineyards and vast agricultural landscapes help draw thousands of visitors to the state and are ripe in potential to anchor emerging agritourism markets, according to a recent Colorado State University study.

The North Fork's scenic features, rural communities, and bucolic charm are critical components of the area's existing and emerging economy that must be safeguarded under any management regime. Furthermore, the character of place includes its sense of health and well-being, clean living, fresh water, healthy land. The North Fork strives to be a place that welcomes families at all stages and ages.

Public health considerations, the known impacts to air quality, water quality, and other health factors that oil and gas development can contribute to are not to be understated.[31] Both in terms of real and meaningful threat, and also in terms of intense public concern that the agency is obligated to consider in weighing the significance of its actions and the effectiveness of its management.

## 2.   Water supply.

Colorado agriculture depends on irrigation, along with area residents. The North Fork is well-situated even as climate change threatens increased scarcity, being primarily gravity fed and located just below the source areas on the Grand Mesa and West Elk Mountains.

The water quality of the North Fork remains good, and industrial pollutants remain low. The primary water quality issues for irrigators are related to salinity and selenium loads, which increase as the river and ditches flow down valley, and which are exacerbated by development on the highly erodible Mancos soils that comprise much of the region.

Irrigation in the valley relies on an interconnected series or canal, ditches and tail-water impoundments. Surface contamination and spills, which occur regularly in Colorado oil and gas fields, could spread rapidly though the irrigation systems that water the valley.[32]

In addition, impacts in source areas carry real risk of groundwater harm. Recharge areas for aquifers are both broad and shallow, as noted in a comment from one local domestic water company.

These springs are primarily fed by subsurface collection of precipitation percolating through talus deposits and glacial deposits into a larger sub-surface groundwater storage in the till deposits. These springs are dependent entirely upon precipitation and surface runoff for their supply and recharge of the underground well system (Wright Engineering Study of 1977, extracting data

---

[30] CSU: "Colorado's Agritourism Market Climbing, Says New CSU Report," August 14, 2007.

[31] Intermountain Oil and Gas BMP Project: Public Health. Online at www.oilandgasbmps.org/resources/public_health.php. See the Grand Junction Daily Sentinel, "Ursa holds off on plan to drill close to school," October 6, 2016.

[32] "Oil and gas companies in Colorado reported 615 spills in 2015," Denver Post March 17, 2016. Online at www.denverpost.com/2016/03/17/oil-and-gas-companies-in-colorado-reported-615-spills-in-2015/

BLM_0149323

from U.S. Geological Survey's Professional Paper No. 617 entitled "Quaternary Geology of the Grand and Battlement Mesas Area, Colorado") and do so from an area of greater than 1 sq. mi.[33]

Finally, the North Fork and Smith Fork rivers sit in the Gunnison Basin, a major headwaters area for the Colorado River System. The Gunnison Basin is identified as a "water bank" to ensure adequate flows remain in the Colorado River to meet Colorado River Compact requirements. Adequate flows in the Gunnison are also needed to maintain water quality considerations due to selenium and salinity loads, and to avoid irrigators being forced to cut back on water use under the Endangered Species Act.[34]

### 3. Wildlife habitat and migration routes.

Situated between the West Elk Mountains (and Wilderness Area) Grand and Black Mesas, and encompassing two significant river riparian areas, the North Fork (and Smith Fork) Valley is a wildlife haven. The West Elk Mountains and the flanks that lie on BLM lands are known as concertation areas for black bears, especially in the crucial late summer and early fall period when this species is preparing for winter hibernation.[35] BLM lands in the area are critical winter range for both deer and elk. Public lands in and surrounding the North Fork are home to threatened, endangered and sensitive species including the Gunnison Sage Grouse, and important hunting and migration routes for others including the Canada lynx. Yellow-billed cuckoos nest in the riparian vegetation along the North Fork River and tributaries. Raptors frequent the area, including wintering bald eagles and nesting peregrine falcons.

Streams and rivers that head on the Grand Mesa and West Elks contain important trout fisheries, and the Gunnison River just below the confluence is a Colorado Gold Medal trout stream. The Gunnison River is also home to three species of endangered fish that are known to be impacted by activity on the selenium rich soils of the valley.

Wildlife have been utilizing the valley for millennia, and the ethical importance of protecting wildlife habitat, managed jointly with the state as a "public trust," is paramount.[36] Colorado Parks and Wildlife, in previous comments on the scuttled lease sale, emphasized the importance not only of protecting the critical winter habitat that covers nearly all of the valley, but of the important migration routes that connect the winter range with uplands and calving areas.

### 4. Recreational opportunities and access.

The North Fork is a public lands paradise, nestled among national forest, park and conservation lands managed by the Forest Service, National Park Service, BLM and the State of Colorado.[37] Hunting is a mainstay that brings large revenue for western Colorado coffers. The economic contributions made by maintaining healthy and abundant fish and wildlife populations are substantial. The CPW comments emphasized the economic importance of protecting this habitat for the hunting opportunities provided.

---

[33] Pitkin Mesa Pipeline Company draft RMP/EIS comments.
[34] "Program Overview," Gunnison Basin Selenium Task Force. Online at www.usbr.gov/uc/wcao/progact/smp/overview.html
[35] Oil and Gas Leasing and Development Final EIS, Grand Mesa Uncompahgre Gunnison National Forest 1993.
[36] DEIS at Volume II 4-127.
[37] DeltaCountyColorado.com – Public Lands: Diverse Destinations at www.deltacountycolorado.com/public_lands/

68

...benefits from hunting and fishing recreational activities are a sustainable annual source of economic benefit for Delta and Gunnison counties only if wildlife populations, and particularly big game populations, are maintained and quality hunting opportunities continue to exist.[38]

Hunting and fishing are multimillion dollar industries in the region, estimated at over $80 million annually (in 2007) for the two counties.[39] River sports, hiking, camping, mountain biking, climbing and trail running are other highly popular public lands pursuits in which the North Fork excels.

And then there are the "windshield tourists" and those that bask in the beauty of the surrounding landscape while enjoying a more settled visit. The communities and farms of the valley are stitched together by the world-famous West Elk Loop Scenic Byway. Among area features that must be protected to safeguard recreation and tourism opportunities include the overall rural and scenic character of the place—which draws in an ever-increasing number of tourists and residents, benefits the wineries and farm stands, fuels the creative muses of the area's growing number of artists, performers and authors.

Finally, the revised RMP must start to actively manage recreation on BLM lands, through designation of recreation management areas. Jumbo Mountain is the obvious example that deserves designation as a Special Recreation Management Area (SRMA). Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance.

Jumbo Mountain is not the only area on North Fork BLM lands likely to need special attention to better direct recreation activity, especially during the life of the RMP.  BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use.

> Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.

Public lands recreation is a multi-billion-dollar industry on Colorado's public lands, and forms not only the basis for tourism based economies across the state, but also as a draw for new residents, new business, and new economic opportunity.[40]

## B. Sub-alternative B1: North Fork Alternative

    i.   Alternative B1 is the best approach evaluated in the draft RMP, which BLM should adopt for the North Fork.

We support the protections outlined in Alternative B1 as those that provide the strongest protection (of any alternative in the draft RMP/EIS) for the important features of the North Fork Valley that are

---

[38] Colorado Park and Wildlife comments on March 2012 oil and gas lease sale, February 3 2012.
[39] Ibid.
[40] Ray Rasker, Patricia H. Gude, and Mark Delorey, "The Effect of Protected Federal Lands on Economic Prosperity in the Non-metropolitan West," Headwaters Economics, 2013. Online at http://headwaterseconomics.org/wphw/wp-content/uploads/ProtectedPublicLands_Manuscript_2012.pdf

69

interwoven with management on the adjacent and proximate public lands.[41] Only B1 provides the level and type of protections that the resources and public land values of the North Fork warrant.

> The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area.

Uncompahgre Draft RMP at 2-7. B1 would place 75% of the North Fork area into a No Leasing category, impose strict nonwaivable, nonmodifiable No Surface Occupancy stipulations on an additional 20% of the area, and manage the remaining 5% of the BLM lands/minerals under Controlled Surface Use stipulations.

> In the North Fork area, 104,750 acres (75 percent of the North Fork area) would be unavailable for leasing, compared to 10,610 acres in Alternative B, and 27,280 acres (20 percent of the North Fork area) would have an NSO stipulation.

Uncompahgre Draft RMP at 4-276. The NFAP considers oil and gas leasing and development for BLM lands and BLM-administered minerals under private/nonfederal lands ("split estate"); and it imposes protective measures for six key resources, plus management designations for recreation areas and visual resource protection.[42]

For features vital to the area's character of place, B1 includes the strongest protections. This includes leasing and development setbacks for certain visual and scenic resources, leasing and development setbacks from towns and community facilities, and leasing and development setbacks and other protection for sensitive soils and delicate landscapes. B1 provides the strongest protection for the North Fork's water supply, with setbacks from water source areas and systems, irrigation facilities, and waterbodies; and prohibitions on leasing on the areas with highest potential for selenium loading. These measures will help to ensure that the area's nationally significant water supplies are protected.

B1 prohibits development within critical fish and wildlife habitat, and includes leasing and development setbacks from rivers—all measures that serve to provide strong protections to the important fish and wildlife species of the valley, including threatened, endangered, and sensitive species.

B1 would designate 5,020 acres at Jumbo Mountain area as a Special Recreation Management Area (SRMA), and provides the strongest level of protection for the highly scenic features of the valley, including a Visual Resource Management (VRM) II classification ensuring the scenic and rugged features of Jumbo Mountain are not degraded. B1 includes leasing and development setbacks from rivers and riparian areas. These protective measures, together with protection for wildlife habitat, help ensure that the valley's recreational assets will not be diminished by ill-conceived oil and gas development.

---

[41] See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22.
[42] "Executive Summary," North Fork Alternative Plan. Citizens for a Healthy Community, et al. December 2013.

70

ii.   Alternative B1 includes reasonable but strong stipulations to protect resources in the North Fork.

Given the unique quality of the resources at stake, directly, indirectly and cumulatively from the agency's land use decisions, and the management outlined for oil and gas leasing and development under all four alternatives and sub-alternative B1, only B1 provides the level of protection warranted.

Only Alternative B1 closes to all oil and gas leasing the areas with the most severe selenium loading problems, area within a half mile of rivers and riparian corridors, water bodies and waterways, areas around communities and community facilities, and for protection of the valley's exceptional scenic qualities. And only Alternative B1 includes protective surface development prohibitions that are not waivable or modifiable, for features and resources such as agricultural operations, moderate and high geologic hazards, critical wildlife habitat, unstable geology, irrigation facilities, and recreational lands.

> [B1] would be the most restrictive to oil and gas exploration and development activities because a larger percentage of the planning area would be unavailable for leasing, and areas open to leasing would have major restrictions. …[Under] Alternative B.1, approximately 280,840 acres would be unavailable for oil and gas leasing, exploration, development, or production, 6 times the acreage under Alternative A. In the North Fork area, 104,750 acres would be closed to leasing, 94,140 acres more than in Alternative B. Approximately 635,190 acres would be open to leasing, 27 percent less than under Alternative A.

Uncompahgre Draft RMP at 4-276. Even in comparison to Alternative B, which is the most conservation-oriented full alternative in the draft RMP/EIS, none come close to the protection offered in B1. Alternative B1 provides a baseline of management to safeguard the valley's character of place, water supply, wildlife habitat, and recreation.

*Character of place*

The overall character of place in the North Fork Valley, its high quality scenic features, its rural charm, its backdrop of undeveloped public lands, mesas melting into mountains, is of utmost importance to the area residents, businesses, and economic future. Character of place relies on healthy communities and vibrant economies, and the rural, farm-based settlement of the valley. We support the B1 stipulations NL-13 Coal leases; [43] NSO-68 Community facilities; and NSO-3 Agricultural operations. These provide reasonable and prudent leasing and development restrictions and stipulations to protect current and emerging economic activity, and to provide setbacks from communities and community facilities.

The quality 'character of place,' is difficult to under-emphasize as a critical component to what is special about, and must be preserved of, the North Fork Valley. Specifically, given the high importance of protecting the area's visual features and sensitive landscapes we support the VRM classifications in Alternative B1, and the protection of landscape and visual characteristics through the following stipulations: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors;

---

[43] Re: Agency comment at DEIS Volume II 4-276: We think that the NL-Coal lease areas can be made available for Coal Mine Methane capture by classifying them as 'Leasable' and stipulating that is only in conjunction with an approved coal mine methane capture/utilization facility. This would also have a climate benefit.

BLM_0149327

NSO-7 Major river corridors; NSO-5 High geologic hazards; CSU-47 Vistas; CSU-7 Moderate geologic hazards.[44]

*Water supply*

Protection of the valley's water supply relies on preventing pollution, protecting source water areas, protecting water bodies and riparian areas, and protecting water systems and conveyances. For agricultural operators, water quantity and quality are both of utmost importance. Organic agriculture, specialty crops and high quality hay all depend on abundant water, free from contamination.

The combination of individual wells, several private and public water companies, and with source water areas ringing the valley—safeguarding water quality is a top concern. Oil and gas development is known to contaminate water supplies, both above and below ground, and to harm water bodies, rivers and source areas.[45] That is a risk too great for many operators in the valley, home to Colorado's highest concentration of organic farms, an agritourism haven, and major headwaters to the Colorado River system.

We support the following stipulations to protect water supply. In cases where other alternatives in the draft RMP/EIS provide more protection than B1 for water supply resources, and where those stipulations overlap with B1, we recommend that the more protective stipulations apply. Here we recommend both the NL- 6 stipulation (from Alternative B) and NL- 7 stipulation (B1) be included in the final RMP. To adequately protect the water supply, we favor—at a minimum—the following stipulations for oil and gas leasing and development in the valley: NL-1 Selenium soils; NL-3 Major river corridors; NL-4 Water bodies; NL-6 Public water supplies (*Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NSO-15 Domestic wells and water systems; NSO-55 Bureau of Reclamation dams & facilities (*Alts. B, C, D); NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-2 Selenium soils; NSO-7 Major river corridors.

*Wildlife habitat and migration routes*

The BLM lands in and around the valley provide for an abundance and diversity of wildlife, from moose, bear and lynx in the upper reaches, to Gunnison sage grouse, Yellow-bill Cuckoo, fox and coyote in the bottomlands—which are critical winter range for herds of elk and deer. Waterbodies and riparian areas provide important habitat and travel routes for a variety of species. Upland migration routes and connectivity are critical elements to maintaining healthy populations, from endangered and sensitive species to big game. Specific habitat areas—nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the strongest protections.

In cases where species or habitat management plans, other considerations, or other alternatives in the draft RMP/EIS propose stronger protections for resources than in Alternative B1, we prefer the stronger stipulation; for instance, with Gunnison sage grouse habitat: we recommend that the No Leasing stipulation from Alternative B also be carried forward and applied where applicable. We support the

---

[44] NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B1 cannot be waived, modified or excepted.

[45] "Stanford scientist weighs the risk of groundwater contamination from oil and gas wells," Stanford News: February 8, 2016. Article online at http://news.stanford.edu/2016/02/18/aaas-jackson-water-021816/

BLM_0149328

following stipulations as providing a minimum level of protection for wildlife habitat: NL-4 Waterbodies; NL-3 Major river corridors; NL- NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.

*Recreational access and opportunities*

Recreational opportunities surround the North Fork's homes, farms and communities – from those provided by the public lands directly, to the indirect benefit the scenic nature of the area provides for tourists and visitors. The rivers, nearby trailheads, unique public lands features, mountain biking and hiking opportunities, together with the scenic landscape wound together with farm roads, wineries, and rolling hayfields. The following stipulations provide protection for recreational areas and amenities, and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mnt SRMA (with VRM Call II). At Jumbo Mountain, Alternative B1 closes the SRMA to competitive events, which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA through the stakeholder/planning process.

**TABLE 1: Recommended oil and gas stipulations**
*Several stipulations are recommended from other alternatives in the draft RMP/EIS, as noted.

| Alt. B1+ Stipulations* | No Leasing | No Surface Occupancy | Controlled Surface Use |
|---|---|---|---|
| **Character of place** | | | |
| Visual resources, local economies, farms & communities, sensitive landscapes, river corridors | NL-11 Prominent landmarks; NL-13 Coal leases; NL-3 Major river corridors. | NSO-52 Travel & Scenic Corridors; NSO-5 High geologic hazards; NSO-67* High occupancy buildings (Alts. B, D); NSO-68 Community facilities; NSO-3 Agricultural operations; NSO-7 Major river corridors. | CSU-7 Moderate geologic hazards; CSU-47 Vistas. |
| **Water supply** | | | |
| Waterbodies, private wells, water systems, public water source areas, irrigation facilities, river system | NL-1 Selenium soils; NL-4 Water bodies; NL-6* Public water supplies (Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NL-5 Water ways; NL-3 Major river corridors. | NSO-2 Selenium soils; NSO-15 Domestic wells and water systems; NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-55* BuRec dams & facilities (Alts. B,C,D). | |

73

BLM_0149329

| Wildlife habitat and migration | | | |
|---|---|---|---|
| Wildlife and species habitat, floodplains, riparian areas | NL-4 Water bodies; NL-5 Water ways; NL-10* Gunnison sage grouse (Alt. B). | NSO-35 Raptor sites; NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-30* Yellow billed cuckoo (Alt. B); NSO-39* Mexican spotted owl (Alt. B); NSO-21 Deer & elk habitat; NSO-17* Rare plant communities (Alt. B); NSO-20* Ecological Emphasis Area (Alt. B); NSO-8 Floodplains. | |
| Recreational areas and access | | | |
| Jumbo Mountain SRMA, river access, hunting opportunities, visual resource protection | NL-11 Prominent landmarks; NL-14* Parks (Alt. B); NL-3 Major river corridors. | NSO-57 Recreation-Jumbo Mnt SRMA (VRM II); NSO-52 Travel & Scenic Corridors; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-7 Major river corridors. | CSU-47 Vistas. |

Table 1 provides a summary of recommended oil and gas stipulations for the North Fork area. Most are those proposed are from Alternative B1, although some other stipulations from among the other alternatives are also recommended, as noted in the table above and in the narrative.

     iii.   Alternative B1 better protects the North Fork than the conservation-oriented Alternative B.

*Character of place: visual resources, healthy communities, farms, landscapes, river corridors*

The scenic qualities of the valley are a driving force for business, for increasing property values, a force behind the burgeoning creative economy, a central ingredient to the marketing of bed and breakfasts, wineries, retreat centers, guest ranches and numerous other ventures. Visual scarring raises a point in general, that much of the opposition to oil and gas development is a response to industrial impacts that are incompatible with this growing economy. Alternative B1 goes furthest to address this general concern, closing most BLM lands in the North Fork to oil and gas leasing altogether.[46]

And in considering North Fork visual resource management (VRM) classifications specifically, under Alternative B1 over 82,218 acres are classified as either the VRM I or II, the most protective. Under Alternative B only 15,824 acres in the North Fork fall into VRM I or II.[47] And B1 not only protects more acres than Alternative B, but it also applies stronger stipulations to do so.

---

[46] DEIS II 4-91
[47] Acreages developed from analysis of GIS data downloaded from BLM.

74

BLM_0149330

Depending on the location, VRM Class II under Alternative B.1 would be closed to leasing, have an NSO stipulation, or have a CSU stipulation, compared to Alternative B where VRM Class II would have a CSU stipulation.

Uncompahgre Draft RMP at 4-208. Other community issues include loss of dark sky, increased traffic, noxious odors, declining property values, and harm to reputation. Public health impacts are also a top concern. Community and residential setbacks attempt to lessen these threats. B1 includes NSO setbacks from community facilities, including schools, recreation facilities, and parks (NSO-68).[48] B1 reduces these threats, from poor air quality.

Alternative B.I emission estimates result in the lowest total air pollutant emissions in future planning years and decreases in emissions of some pollutants over the base year. ...Alternative B.1 would likely result in the least adverse impacts on air quality.

Uncompahgre Draft RMP at 4-21. The BLM analysis anticipates "increased benefit to non-extractive uses in [the North Fork]" under Alternative B1. Uncompahgre Draft RMP at 4-473. This is, of course, exactly what economic experts recommend for the North Fork, including the Better City report.[49]

Efforts to identify opportunities in other industries that provide a diverse employment base could help mitigate the boom bust cycle associated with extractive industries.

The Better City report goes on to highlight the area's agricultural industry and heritage as a strong sector upon which to build for a more diverse economy.[50]

Based on its rich agriculture base, Delta County is well positioned to leverage the existing boom in organic food markets.

Impacts from oil and gas development on agriculture and ranching operations would less under B1 which includes specific protections and a 0.25-mile No Surface Occupancy setback from "prime and unique farmlands, livestock operations, organic farm, conventional farm, ranch, orchard, and the West Elks American Viticultural area, thereby protecting these." Uncompahgre Draft RMP at 4-69. Importantly B1 is also the most protective of the valley's water supply including irrigation facilities.

*Water supply: river system, waterbodies, private wells, water systems, public water source areas, irrigation facilities*

The rivers in the area provide broad benefit, including to the valley's character, water supply, wildlife habitat, and recreational opportunities. Alternative B1 is the most protective of the river corridors.

In addition to these Alternative B restrictions, Alternative B.1 would also apply NL areas within 0.5-mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, lakes, ponds,

---

[48] If stipulation NSO-67 (Alt. B) for "high occupancy buildings," provides protections beyond B1; then we recommend it be carried forward as well.
[49] "New Study Repeats Changing of Delta County Economic Basics," Merchant Herald, 11/12/15. Article online at www.merchantherald.com/new-study-repeats-changing-of-delta-county-economic-basics-new-study-repeats-changing-of-delta-county-economic-basics/
[50] "Better City presents economic development visions for Delta, Gunnison Counties," Region 10 Website, article at www.region10.net/better-city-presents-economic-development-visions-for-delta-gunnison-counties/

75

BLM_0149331

naturally occurring wetlands and impounding reservoirs, streams, watercourses, and waterways; and would apply NSO within 0.5 to 1.0 mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, and within the 100-year floodplain of any stream or river system. These NL areas (96,910 acres) and NSO restrictions (9,680 acres) would further protect riparian and wetland vegetation in the North Fork area.

Uncompahgre Draft RMP at 4-117. B1 is also more protective generally of other water supply resources, as noted at DEIS II 4.90:

> Unlike Alternative B, Alternative B.1 also includes an NSO stipulation within 1,320 feet of any dam, ditch, irrigation intake, canal, or other water conveyance. ...Alternative B.1 offers the most protection of private water supplies and would only apply to the North Fork area.

While B1 is overall more protective of water resources: from river systems, water bodies and irrigation facilities to water wells and systems; in two cases regarding public water supplies, the stipulations in Alternative B area stronger.[51] We have recommended (in Table 1 and the discussion above) that the stronger (Alternative B) stipulation be included in the final RMP regarding public water supplies.

The river systems, riparian corridors, and other water resources are important not only to the character of place and the water supply, but also for all life in the valley. River systems are a critical component of the West's habitat. In the winter deer and elk concentrate in the river bottom, and the riparian corridors provide year-round habitat for birds, reptiles and mammals, and migration routes for larger species.

*Wildlife habitat and migration: wildlife and species habitat, floodplains riparian areas*

Protecting the abundant wildlife populations is a top priority and main component of the North Fork Alternative Plan.

B1 would be the most protective of wildlife habitat in the North Fork.[52] The DEIS notes:

> Under Alternative B.1, an NSO would be applicable within 0.25 mile of any active or historic bald eagle or golden eagle nest site, and within 0.50-mile of any active or historic peregrine falcon nest site. This would further protect these species within the North Fork area. Alternative B.1 also includes an NSO on mule deer and elk crucial winter range, including severe winter range and winter concentration areas, and in elk reproduction areas, as well as in big game migration corridors, which would further protect big game within the North Fork area.

Uncompahgre Draft RMP at 4-136. Alternative B1 best protects riparian corridors, which are critical components in the habitat systems in the valley: "These actions would reduce the potential for impacts on vegetation in the North Fork area more than Alternative B." *Id* at 4-116. The stronger management in B1 include more protection for the valley's special status species: "These actions would reduce the potential for impacts on special status species in the North Fork area more than Alternative B." *Id* at 4-

---

[51] DEIS II 4-90: Under Alternative B.1, a buffer of 1,320 feet from public water supplies would be closed to oil and gas leasing and geophysical exploration, half the distance as under Alternative B. As such, Alternative B provides greater protection than Alternative B.1 for public water supplies from a classified surface water-supply stream segment. Beyond 1,320 feet and up to 2,640 feet, such water supplies would be subject to NSO stipulations. This would offer more protection than Alternative A but less than Alternative B.
[52] DEIS Volume II 4-134

BLM_0149332

155. Overall protections in B1 are the strongest proposed, and this includes for fish as well as wildlife habitat: "Alternative B.1 provides more enhanced protection of aquatic and riparian species and their habitats than Alternative B." *Id* at 4-154. Alternative B1 provides the strongest level of protections proposed for the native Colorado River cutthroat trout: "In addition, Alternative B.1 would apply NSO within 0.50-mile of stream segments that have existing and potential habitat for native cutthroat trout, further protecting this species in the North Fork area." *Id* at 4-155.

And it is not only the direct management prescriptions that benefit wildlife. A number of the prescriptions in Alternative B1 overlap to provide the strongest proposed levels of habitat protection: "[VRM] Classes I and II, which preserve or retain the existing character of the landscape, would restrict surface-disturbing activities, reduce direct impacts on fish and wildlife, and retain habitats." *Id* at 4-131.

In a few cases, Alternative B identifies stipulations for species that are not included in B1. In these cases, we recommend those stipulations be included in the final RMP (as indicated above and in Table 1). However, in addition to best protecting important features to the humans that occupy the North Fork—in nearly every case B1 provides the best protections for furred, finned and feathered residents as well.

*Recreation areas and access: river access, hunting opportunities, visual resource protection, Jumbo Mountain SRMA*

Alternative B1 best preserves the valleys river corridors and riparian areas, which is important to protecting the valley, its water supply, and its wildlife, and for the recreational opportunities provided. Alternative B1 provides the strongest protections overall for recreational access, resources, and opportunities in the North Fork, and for the features in the valley that help drive tourism.

Oil and gas development poses a direct threat to the scenic features of the valley, as the DEIS notes: "Development could also add to the changes in the scenic values and other non-market commodities." Uncompahgre Draft RMP at 4-479.

Thus the stronger visual resource protections under B1 is a plus for tourism and recreation in the valley.

> [Fewer] acres available to fluid minerals leasing would result in fewer areas impacted from construction and operation. Applying NSO stipulations on 325,940 acres of BLM-administered lands would preserve the natural character of the landscape and would maintain existing recreation opportunities.

Uncompahgre Draft RMP at 4-301. The DEIS notes that recreation and tourism related activity is likely to increase across the resource area: "Recreation is expected to increase as the Colorado population and the desire to live near or recreate on BLM-administered lands increase. This follows the trend of recent years seen across the state." *Id* at 4-479.

The Jumbo Mountain area is important to the Town of Paonia and to many who recreate and live in the valley. Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo Mountain as a SRMA, with B1 acreage and stipulations. Under B1 the entire Jumbo SRMA would have NSO stipulations, rather than only a slice as under Alternative B. Uncompahgre Draft RMP at 4-306.

BLM_0149333

Given the likelihood that use at Jumbo will increase, and that the Town of Paonia and other local stakeholders are likely to incorporate the area into marketing and planning, keeping incompatible activity out of this close-in and primarily nonmotorized recreational area only makes sense. However, and although the draft RMP/EIS notes that pubic use is likely to increase, under all alternatives except B1 the agency leaves most of the area open to oil and gas leasing and development.

Tourism is booming in the North Fork, and the current (Summer 2016) season is reportedly the busiest ever according to numerous area merchants. This trend is consistent with reports from across the state. B1 specifically protects scenic vistas and travel corridors.

> Other potential growth areas include recreation and information industries. Identifying avenues to support the development of these industries could provide additional diversification to the local economy.

Uncompahgre Draft RMP at 4-208. These stronger protections benefit recreation directly, and also indirectly in many cases, for example through strong fish and habitat protections under B1 that enhance hunting and fishing opportunities.

In addition to stipulations included in B1 to protect recreational lands, access, and opportunities, we also recommend the NL-14 from Alternative B be carried forward to the final RMP, to protect public lands administered by the National Park Service. Regarding competitive events in the Jumbo Mountain SRMA, we propose the decision to allow some of these events be deferred until the SRMA planning process. And although not part of the North Fork Alternative Plan, and not identified in earlier scoping, new information that BLM should consider includes potential future Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use. The decision record should note this eventuality.

### C.   BLM's Preferred Alternative

As detailed above, what is clear is that Alternative B1 provides the level of protection that best meets the needs of the public and best protects the public's resources, as the only alternative that adequately protects the resources and public land values of the North Fork Valley. As such Alternative B1 has the support of many local residents, area businesses, Delta and Gunnison County organizations and associations, local governments, water companies, irrigators, farmers, ranchers and others.

That is because, as the DEIS shows, the resources that the public, myriad stakeholders, local governments, and resource professionals have all urged be protected are in fact best protected by Alternative B1. The superior level of management that Alternative B1 provides includes better protections for special status species, delicate soils, sensitive landscapes, recreation, visual resources, plant, fish and wildlife habitat, water resources, new economic activity, agriculture, communities, public health, river systems, and other cherished features of the valley. None of the other alternatives presented in the draft RMP/EIS offer the level protection afforded by B1, and all others fail to provide adequate management for the valley's resources, public uses, and cherished features.

Moreover, the agency's identified Preferred Alternative (D) proposes a management regime for the valley that is simply unacceptable. Not only would it leave the majority of public lands open to oil and gas leasing, many with only a CSU stipulation, but its impacts would be higher across the full range of resources in the valley, including those identified by the public as most important to the community.

78

BLM_0149334

Problems with Alternative D are discussed elsewhere in these comments. Regarding mitigating impacts from oil and gas development, the superiority of B1 is clear as detailed above. However, some particular examples of how badly Alternative D misses the mark in protecting the North Fork are the following.

Consider Visual Resource Management, in which B1 alone has the strongest nonwaivable stipulations to protect visual resources, and the largest areas designated for their important and high quality scenic features (VRM Classifications I & II). In Alternative D, the agency Preferred Alternative, only 17,170 acres are classified in these most protective categories. In B1 it is 82,218 acres.[53]

Regarding Ecological Emphasis Areas, the DEIS notes "Protections are reduced under Alt. D." Uncompahgre Draft RMP at 4-160. On wildlife impacts: "These measures ... do not provide as much protection as Alternative B." *Id* at 4-163. And on air quality and climate pollution: the Preferred Alternative "results in the second-highest estimated emission levels", including the second highest level of greenhouse gas emissions. *Id* at 4-21, Table 4-10.

The Preferred Alternative relegates over six times as much public lands to the lowest visual resource management classification. Alternative D closes less than 25% of what Alternative B does to oil and gas leasing in the resource area, and only a miniscule fraction of what B1 closes in the North Fork.

The Preferred Alternative includes far fewer protections for the valley's water supply, allowing drilling and fracking on lands adjacent to private water wells, where B1 prohibits leasing altogether and Alternative B requires No Surface Occupancy. Stipulations to protect special status species are far weaker under Alternative D than Alternative B.

On highly seleniferous soils Alternative B1 follows the recommendations of the Gunnison Basin Selenium Task Force, and applies No Leasing stipulations. Alternative D applies only the much weaker Controlled Surface Use (CSU) restriction. Unlike Alternative B and B1, the Preferred Alternative would allow oil and gas development on steep slopes of up to 40 percent. Uncompahgre Draft RMP at 2-30.

At Jumbo Mountain the Preferred Alternative protects one-fifth the acreage of what Alts B and B1 do, with NSO stipulations applying to just over 1,000 acres (DEIS I Table ES-3). Across the entire range of resource identified through scoping, comment on previous agency activity, and this comment period Alternative D, the Agency Preferred, fails to provide the management required.

### D.   Alternative B1 would have minimal impacts on oil and gas resources

Alternative B1 would have no impact on currently leased federal minerals, and a negligible impact on federal minerals overall. B1 would likely not affect energy production or jobs in the region. To anticipate the miniscule impact B1 might have, consider the overall oil and gas jobs anticipated across the resource area under Alternative D, which would allow a higher level of development in the North Fork: "It is likely, however, that less than one percent of employment and labor income would continue to be supported by oil and gas extraction under Alternative D." Uncompahgre Draft RMP at 4-476.

---

[53] Acreages developed from analysis of GIS data downloaded from BLM.

BLM_0149335

Leasing in the North Fork is simply not needed. For one there is a natural gas glut, and the resource's abundance is certainly projected far beyond the life of this resource management plan.[54]

B1 is clearly the responsible choice: Given that the impact on developable resources is insignificant while the public benefit is significant, that the impacts to resources across the board from oil and gas development are reduced under B1 while the overabundance of natural gas, likely to last for another decade or longer by most accounts, remains unchanged; then closing most, or even all, of the North Fork to oil and gas leasing seems to be more than just a reasonable course of action.

The North Fork sits at the southern edge of the gas-rich Piceance Basin, recently subject to an updated USGS estimate for the shale resource that sits beneath the sandstone formations previously targeted:

> The new estimate could mean the Piceance Basin has the second-largest natural gas reserves in the country, after the Marcellus Shale formation in Pennsylvania and neighboring states... [55]

Leasing in the North Fork is not in the public interest, which benefits more from managing to protect the valley's unique resources and communities. There are hundreds of thousands of public lands already leased in the Piceance Basin.[56] Hundreds of thousands of additional acres are owned outright or otherwise under control of the oil and gas industry, including major companies like ExxonMobil:

> Rio Blanco County, home of ExxonMobil's Piceance project, covers an area larger than 3,000 square miles and contains enough clean-burning, domestic natural gas to benefit millions of people. With interest in approximately 300,000 acres in the Piceance Basin, ExxonMobil's leases hold a potential recoverable resource of more than 45 trillion cubic feet of gas over the life of the project. That's enough natural gas to power 50 million homes for almost a decade. While this expansive gas resource will take years to produce, ExxonMobil is committed to increasing natural gas production more efficiently and with less environmental impact. [57]

These lands in the Piceance Basin provide decades of suitable sites for drilling:

> The acquired assets consist of a 200,000-net-acre position in the Piceance basin of Colorado with recent net production of 500 MMcfd of natural gas equivalent. Terra estimates that the assets contain 2 tcf of proved developed producing reserves and an extensive inventory of low-risk drilling locations. The assets also include deep rights across 150,000 net acres prospective for the emerging horizontal Mancos-Niobrara play. [58]

Drilling in the North Fork would not materially alter the amount of gas available for development over the life of the Uncompahgre RMP. Adoption of the North Fork Alternative will not affect the number of jobs available in the oil and gas industry regionally, the numbers of rigs operating, or the amount of

---

[54] "Shale gas production drives world natural gas production growth," U.S. Energy Information Administration August 2016. Online at www.eia.gov/todayinenergy/detail.php?id=27512

[55] "40 Times More Natural Gas Underground in Colorado's Piceance Basin, USGS Report Finds," Colorado Public Radio, June 29, 2016. Online at www.cpr.org/news/story/40-times-more-natural-gas-underground-colorados-piceance-basin-usgs-report-finds

[56] "Oil & Gas Development Proposed RMPA/Final EIS," White River Field Office-Powerpoint for RAC, June 4 2015. Online at www.blm.gov/style/medialib/blm/co/resources/resource_advisory/northwest_rac/minutes.Par.30953.File.dat/WRFO%20Presentation%20to%20RAC_6.4.15a.pdf

[57] "Piceance," ExxonMobil website at http://corporate.exxonmobil.com/en/energy/natural-gas/operations/piceance

[58] "E&P startup agrees to buy WPX's Piceance unit for $910 million," Oil and Gas Journal, 2/15/16. Online at http://www.ogj.com/articles/print/volume-114/issue-2b/general-interest/e-p-startup-agrees-to-buy-wpx-s-piceance-unit-for-910-million.html

BLM_0149336

energy being produced. Rather given the abundance of resource available for exploitation, the large number of existing leases and owned minerals, and eager lessees, owners and operators—it is the market and industry's willingness alone that will determine how many rigs employ how many people.

### E.  Alternative B1 is consistent with relevant law and policy

FLPMA establishes public lands policy that, among other things, sets it as law that:

> (7) …management be on the basis of multiple use and sustained yield unless otherwise specified by law;
> (8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use; and that
> (12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber…

Alternative B1 clearly meet the requirements of FLPMA, which directs much of BLM's resource management, as per the agency's land use planning regulations:

> The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

In the case of Alternative B1 the management proposed do best meet the "present and future need" of the American people; makes judicious use of the lands for a variety of purposes both within the North Fork area and across the resource area; balances use, not allowing all uses on all lands in a manner that accounts for the needs of future generations, for recreation, watershed, wildlife and fish, natural scenic, scientific and historical values, range, timber, and minerals; and that seeks to avoid impairment of the public land resources in consideration of their relative value.

Alternative B1 clearly is superior in protecting the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values resources of the North Fork. Finally, Alternative B1 is consistent with the Mineral Leasing Act (MLA), which clearly gives the

BLM_0149337

agency authority to close 75% of the North Fork area, or of the entire resource area for that matter, to oil and gas leasing and development.[59]

**Summary of Comments:** Alternative B1, which is the DEIS' version of the North Fork Alternative Plan, provides the best management options of oil and gas leasing and development presented in the draft RMP/EIS, and it should be adopted by the BLM into the final RMP. The North Fork Alternative Plan fits a clear and pressing public need by proposing a set of strong oil and gas management stipulations and protective designations to safeguard the area's character of place, water supply, wildlife habitat and recreational opportunities. Alternative B1 presents reasonable but strong management to protect the North Fork's most important resources and uses, and only B1 provides the level of management that is warranted to protect these resources. B1 is a reasonable and prudent approach to managing the resources in the North Fork Valley which the agency should select as part of its final Resource Management Plan.

### b. Water Resources

The Draft RMP, and particularly the agency's preferred alternative, fail to put necessary measures in place to protect the valuable water resources of the North Fork Valley and Lower Gunnison Watershed. As documented in the comments submitted by the West Slope Conservation Center, the Draft RMP and preferred alternative fail to adequately protect surface and groundwater quality, stream and water body health, and threatened and endangered aquatic and riparian species from surface activities including oil and gas development, road building, and naturally occurring salinity and selenium within the watershed. The final RMP must include a detailed discussion and analysis of water resource impacts with a much higher degree of specificity to location, scale, and scope of impacts. The final RMP must also adopt robust management decisions to protect this vital resource.

We herein reference and support West Slope Conservation Center's comments to BLM on the Uncompahgre Draft RMP regarding water resources.

### c. Air Quality

#### i. Cumulative Air Quality Impacts

Impacts to air quality begin when the first exploratory well is drilled—according to some recent studies, including research by Paonia-based The Endocrine Disruptor Exchange, according to an article in the *Glenwood Springs Post-Independent* ("Study calls for scrutiny of air emissions at gas well sites" November 20, 2012).

These effects continue and build cumulatively in regards to other oil and gas activity in the region. Communities in the West that are near BLM lands subject to oil and gas development are seeing significant problems with winter smog, believed to be—in large part—caused by federal leasing of these lands for oil and gas. But the draft RMP does incorporate adequate data collected from relevant state and federal agencies, including the Colorado Oil and Gas Conservation Commission (COGCC) before determining final management actions.

---

[59] 10th U.S. Circuit Court of Appeals, WESTERN ENERGY ALLIANCE v. KEN SALAZAR, No. 11-8071 March 12, 2013. Online at www.eenews.net/assets/2013/03/13/document_ew_01.pdf

82

The lack of cumulative air analysis was at the heart of a recent decision by the BLM-Uncompahgre Office to complete an EIS for the Bull Mountain Master Development Plan,[60] located within the upper North Fork Watershed. The air quality analysis in the Bull Mountain MDP FEIS has not yet been incorporated into the draft RMP's discussion of environmental consequences of the alternatives nor the cumulative impacts of regional oil and gas activity on air quality.

BLM has lost in court on several notable occasions of late on very similar issues: its failure to consider the impacts on air quality of leasing lands for oil and gas development given the other activity it is permitting in the region. Notably, a federal judge sent the Roan Plateau RMP amendment back to the BLM due to these concerns (and due to the failure of the agency to adequately consider an alternative management plan put forward by local stakeholders).

The clean and usually clear air of the North Fork Valley is a high quality community and shared resource. The BLM in Colorado has already been brought to task on its failure to properly consider the cumulative impacts of its own actions on the region's air quality, particularly in regards to oil and gas leasing.  This has happened elsewhere as well, like at Otero Mesa in New Mexico.  The final RMP revision that properly considers this activity in relation to the area's air quality.

The draft RMP states explicitly that oil and gas development are a major contributor to total pollutant emissions:

> Emissions from oil and gas (fluid minerals) development are a major contributor to total estimated emissions under all alternatives. For the Uncompahgre planning area, this category includes conventional oil and gas and coalbed natural gas development. Activities quantified in this category include well drilling and completion, road and well pad construction, flaring and venting, compressor operations, dehydrator and separator operations, tank venting and load out, wellhead fugitives, pneumatic device operations, and vehicle traffic. The quantities of emissions estimated from these activities are based on reasonably foreseeable estimates of development rates, well counts, production rates, and existing technologies.

Uncompahgre Draft RMP at 4-25. It also states that Alternative B1 would produce the lowest level of emissions, followed by Alternative B. The draft RMP simultaneously states plainly that emissions from all four alternatives included in the draft RMP could produce a number of negative impacts to local air quality and corresponding public health:

> Estimated emissions from oil and gas development would increase for all pollutants over the base year due to increased development. The emissions of carbon monoxide, nitrogen oxide, sulfur dioxide, volatile organic compounds, and particulate matter could impact air quality and air quality-related values. Nitrogen oxide and volatile organic compound emissions could contribute to regional ozone formation. The CARMMS analysis presented below estimates these emissions sources' impacts on air quality (including potential ozone formation) and air quality-related values (visibility and atmospheric deposition) in planning Year 10.

> Hazardous air pollutants emissions could increase the risk of localized human health impacts.

---

[60] BLM Bull Mountain MDP FEIS 2016. 4.2.1
http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html

83

Uncompahgre Draft RMP at 4-37. The unknown risks to local human health impacts of air pollutant emissions is unacceptable, and the BLM must include in the final plan adequate management of oil and gas leasing, including significant no leasing and no surface occupancy stipulations to safeguard the health of community members and residents who live within the Uncompahgre planning area.

ii.   Methane Capture in the North Fork Valley

The final RMP must take into account possible changes related to the Coal Leasing PEIS that the Department of the Interior is currently undertaking. The DOI will be mitigating the challenges our communities face in weathering the boom-bust cycles of mining which will require the highest degree of reclamation standards, full bonding (not self-bonding) for future reclamation activities, thorough analysis of all impacts to air, water and wildlife prior to issuing new leases, and assurance of a fair return from coal leasing.

One additional step that the BLM and DOI can take over the coming years is to incentivize and expedite the capture of coal mine methane, which the North Fork produces in excess. The OxBow mine coal methane recapture demonstration project is the ideal example.[61] It repurposes coal mine methane (CMM) gas, an unseen, toxic greenhouse gas, between 20-25 times more potent than carbon dioxide, into 3-megawatts of electricity for Aspen Ski Corporation. The project is at the now-closed OxBow Elk Creek mine in Somerset. It was collaboration between the Western Slope Conservation Center, a 501c3 non-profit organization headquartered in Paonia, Colorado, OxBow Delta Montrose Electric (DMEA), Holy Cross Electric, Aspen Ski Company, and mine that purchases the electricity, the BLM and others. It is expected to eliminate approximately 96,000 tons of $CO_2$ a year, with a projected life of at least 15 years.[62]

On June 18, 2016, the Federal Energy Regulatory Commission ruled in favor of DMEA, the local rural electric COOP. It struck down a "lost revenue recovery fee" imposed by Tri-State Generation & Transmission Association (Tri-State) reaffirming that DMEA couldn't be financially disadvantaged for following the law and purchasing local, renewable power.[63] This opens the door for DMEA to purchase locally recaptured CMM. This would meet member demands for clean energy, hedge against fossil-fuel price increases, promote economic development, and save money.

In many ways, the North Fork is a best-case scenario for coal mining communities. North Fork mines produce some of the cleanest burning coal in the country. Our communities have benefited from this wealth over many decades without sacrificing the other riches that our local land, water, and air provide. That, coupled with the methane recapture project and the methane off-gassing from our closed and operational mines, puts us in an excellent position for the federal government to leverage us as a methane recapture research and training site. It could create training and jobs for some displaced miners while diversifying our local economy and energy generation.

The North Fork also possesses a wealth of other renewable energy sources like micro-hydro, solar and biomass. Public lands that once extracted coal could become solar farms, as the infrastructure to transport this source of energy already exists at those sites. We would welcome an opportunity to pilot

---

[61] Aspen Times. "Coal Mine Is Key to Utility's 'Green' Goals." April 5, 2012. Retrieved June 25, 2016.

[62] Ray, Kecia. The Invisible Plume/ Why coal mine methane is worth looking at. Colorado Independent. May 2, 2016. Retrieved Jul 10, 2016.

[63] Federal Energy Regulatory Commission Summary, June 16, 2016 Meeting

BLM_0149340

some innovative ways to leverage those sources of energy for our homes, farms, businesses, government and community centers. This could similarly diversity our economy, create new jobs and realize the mass potential for renewable energies.

The final RMP must include adequate analysis of the air quality, climate change, and social costs of coal mine methane venting. These impacts are local, regional, and national. As our above comments attest, the North Fork Valley is primed to benefit massively from improved methane capture administrative policy.

The final RMP should also include stipulations that allow for coal mine methane drilling while excluding other forms of fluid mineral leasing and withdrawal associated with oil and gas development. However, coal *bed* methane leasing and extraction, which would occur above coal seams that have not yet been mined, should be subject to all the same standards and stipulations of other fluid mineral leasing and development.

### d.   Recreation

The final RMP must actively manage recreation on BLM lands within the North Fork and Lower Gunnison Watersheds through designation of recreation management areas (RMAs) and other recreation management stipulations.

We support following stipulations in the draft RMP which provide for improved recreation management and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mnt SRMA (with VRM Call II).

Other areas within the North Fork watershed also need recreation management designation to adequately manage the current and highly likely increased future recreation use on these lands within the lifetime of the RMP.  BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) and other recreation stipulations for places such as Elephant Hill, and Youngs Peak—all of which are seeing increasing, but unmanaged use. Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.

*Jumbo Mountain*

All 5,020 acres of the Jumbo Mountain unit deserves management as a Special Recreation Management Area (SRMA) in the final RMP. Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance. Documented activities include mountain biking, horseback riding, trail running, birding, hiking, hunting, and infrequent OHV use. Jumbo Mountain sits prominently within the valley, and the visual resources of the BLM parcels on Jumbo are significant to the quality of life in the entire valley. We also support all VRM stipulations and protective management prescriptions as well.

The final RMP should include the entire Jumbo Mountain unit as a SRMA, RMZ-1 and RMZ-2 as included in Alternative B. Uncompahgre Draft RMP at J-4. Members of the community attest to increasing use of

85

the Jumbo Mountain area, despite a lack of management and oversight. We believe the trend of use will continue to increase, and that the full area will be used heavily for recreation over the lifetime of the plan. RMZ-2, as defined in Alternative B, allows for trail connectivity with other current and future recreation areas. We also strongly support stipulations that would limit all oil and gas leasing and surface activities in this area, including those in the draft RMP (NSO-56, NSO-57), as these activities would not be compatible for the recreation experience, and would diminish the many other resources already identified in this area.

Support has been building for Jumbo Mountain to become an SRMA, with the Paonia Town Council, local trail advocacy and mountain bike clubs, and local businesses and chambers fully supporting the Jumbo Mountain SRMA as outlined in alternative B with all 5,020 acres included in the SRMA status. The full acreage deserves SRMA status since local trends of use indicate that recreation users will continue to expand into adjacent BLM lands due to the high quality of the recreational resources. Additionally, the full SRMA status will allow for the current Jumbo Mountain trail network to be connected to other existing and future recreational trails within the lifetime of this RMP.

ERMA status for Jumbo, as proposed for 5,020 acres in Alternative C, is inadequate to protect the visual resources of this unit, as well as mitigate future conflicts of multiple uses on this unit. Members of the public frequently take part in a number of different recreational activities, including hiking, biking, and running, almost exclusively non-motorized, on these acres, and these activities must be managed for the quality of the experience for all users.

The North Fork watershed currently suffers from a dearth of officially acknowledged and managed biking areas, despite numerous landscapes with superb terrain for mountain biking.[64] The trails on Jumbo have been built outside of established protocols and as such cannot be utilized for the gain of the community as trail systems like 18 Rd in Fruita.[65] We the trails and conditions on the Jumbo Mountain unit surpass those at 18 Rd, but without management and acknowledgment from the BLM with SRMA status, the full potential of the recreational resource on the Jumbo trails cannot be realized.

In addition to the economic and conflict mitigation gains that could come about from designating Jumbo Mountain as an SRMA, the acknowledgement of trails on Jumbo will allow trail building expertise, environmental considerations, signage, and enforcement to come together to produce a more sustainable trail network.

Lastly, the location of the Jumbo trails is quite unique in that the trails are located very close to the town of Paonia and thus the type of impacts on the land seen at locations like 18 Rd. can be shifted to the urbanized areas of Paonia, reducing the impact to natural landscapes.

---

[64] See https://www.mtbproject.com/
[65] http://www.gjsentinel.com/sports/articles/a-good-change

86

BLM_0149342



**Figure 1. Map of existing and proposed recreation routes on Jumbo Mountain.**
All routes shown in green and red are existing routes (except for the red route leading north from
slantindicular). All segments in blue are proposed connector routes.

The draft RMP includes closure of the SRMA to competitive events (Appendix J-28, SRPs), which seems
like a premature determination. Instead the final RMP should consider the possibility for limited
competitive events in the SRMA identified through the stakeholder/planning process. It is important to
the economy of Paonia to be able to hold several non-motorized competitions on the Jumbo trails every
year as these events can be major economic drivers for the community.

We also support the Ecological Emphasis Area designation for Jumbo Mountain/McDonald Creek, which
we believe do not conflict with SRMA and successful recreation management of these areas. Please see
our comments below on the proposed EEA.

*Elephant Hill*

We support SRMA or ERMA designation along with other recreation stipulations for proactive
management of the BLM acreage surrounding Elephant Hill, located directly south of Jumbo Mountain.
These lands have been identified as a prime recreational resource for mountain biking, hiking, and other
day-use activities. There is currently some local recreational use of these lands, but summer and winter
recreational use is likely to significantly increase over the lifetime of this RMP. SRMA or ERMA
designation would provide resources and management for these lands to maintain and develop access,
trails, and management plans that mitigate conflict between multiple users.

87

BLM_0149343



**Figure 2. Map of existing routes and proposed recreation routes on Elephant Hill.**
All solid green routes are proposed routes for recreation travel. Dotted green routes represent recreation winter routes located on preexisting roads.

*Youngs Peak*

We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Youngs Peak, located directly north of the town of Crawford. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer recreational use is likely to increase over the lifetime of this RMP. SRMA or ERMA designation would provide adequate resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.

BLM_0149344



**Figure 3. Map of existing routes and proposed recreation routes on Elephant Hill.**
All routes shown in red or green are proposed routes. Some primitive trails exist in the western area of Young's peak.

*North Delta SRMA*

We support the designation of the North Delta SRMA as well as the inclusion of mountain biking in the North Delta SRMA RMZ-1 and RMZ-2 for the development of non-motorized singletrack trails. Cyclists are not currently considered in the SRMA plan for North Delta.

*Hotchkiss High School Area*

We support ERMA designation for BLM lands in the immediate vicinity of Hotchkiss High School, which is a prime location for a trail network that would provide easy access to youth and families in the Hotchkiss area. There would be strong support for this recreation area due to an outdoor education coalition called the Nature Connection. The Nature Connection plans to give kids and families easy access to mountain bike equipment, for short-term use, to gain experience in a sport that promotes good health, and opportunities of adventure.  By developing a fun and exciting trail network on public lands in this area, residents of Delta County will have turnkey access to a healthy sport that allows them access to the natural environment, opportunities to improve outdoor knowledge and self-confidence, improve outdoor recreation skills, and gain more understanding of our community's dependence and impact on public lands.

89

BLM_0149345

### e.   Wildlife

#### i.   Jumbo Mountain/McDonald Creek Ecological Emphasis Area

We strongly support the designation of all 17,220 acres of all five zones of the Jumbo Mountain / McDonald Creek Ecological Emphasis Area included in Alternative B. Uncompahgre Draft RMP at Table 2-2, 103; Figure 2-2. As BLM outlines in the draft RMP, these areas are highly valuable for the habitat connectivity for a number of wildlife species within our region, particularly mule deer, elk, mountain lion, and black bear. *Id.* at D-2.

The draft RMP describes the ecological value of these areas as follows:

> Links North Fork Valley with the National Forest and West Elk Wilderness. Adjoins several conservation easements that link the southern three parcels. Important for landscape-scale linkage.

Uncompahgre Draft RMP at D-1. Based on the years of experience hunting, recreating, and living in close proximity to these lands, we can attest without any reservation that these lands provide exactly the quality of connectivity described. The wildlife value of these lands is difficult to overstate.

We also strongly support overlapping designations of both the Jumbo Mountain/McDonald Creek EEA, the Jumbo Mountain SRMA, and any additional overlapping ERMA or SRMA designations in the final plan (see above comments in support of additional recreation designations). We see no inherent conflict in these designations, which will not only protect the world-renowned mule deer herds and other wildlife, but also has the possibility of improving the recreation experience by limiting activities in late winter/early spring when recreation conditions, due to precipitation and soil moisture, are poor, and impacts to trails are greatest.

It should be clear from these comments and others that there exists a rare degree of cooperation and enthusiasm for increased management of the lands in the North Fork Valley, with many different users supportive of careful management of multiple resources that can be mutually managed on these lands. A unifying concern, however, is that oil and gas development of these lands will be prioritized over these many other resources upon which our communities depend for quality of life, economic gain, and recreation.

#### ii.   Imperiled species

Oil and gas exploration and development authorized through the Preferred Alternative in the draft RMP is likely to have negative impacts on several special status species. Federally listed threatened, endangered or candidate species that could occur or have potential habitat in the vicinity of lands open to leasing include Canada lynx, Gunnison Sage-grouse, greenback cutthroat trout and Colorado hookless cactus. Other special status species that could be impacted by the lease sale include white-tailed prairie dogs, clay-loving wild buckwheat, roundtail chub and Debeque milkvetch. BLM has not taken the requisite hard look at the impacts of unconventional oil and gas development on wildlife, including threatened and endangered species, and other sensitive species. BLM's existing analysis in the draft RMP does not fulfill the requirements of NEPA to assess the impacts of oil and gas leasing on these species. Nor do the CSU's as included in the Preferred Alternative adequately protect the following

BLM_0149346

species from adverse impacts from surface activities, and primarily those surface activities related to leasing of oil and gas.

*Canada Lynx*

The Canada lynx *(Lynx canadensis)* is a Federally Listed Threatened species and Colorado Parks and Wildlife (CPW) Endangered Species. The BLM has previously identified Lynx potential habitat, which also contains lynx winter habitat. Lynx Analysis Units (LAUs) have also been identified. In spite of the potential for negative impacts on lynx that could result from leasing within the planning area, BLM failed to prepare sufficient NEPA analysis of the impacts on lynx from leasing, failed to include No Surface Occupancy or No Leasing stipulations to protect lynx habitat.

During scoping for recent lease sales located within the North Fork Valley, comments were submitted by the U.S. Fish and Wildlife Service (FWS) expressing concern with the lease sale's potential impacts to lynx. The FWS determined that several lease parcels abutted primary and secondary suitable habitat for lynx. The Service stated that "[t]o date, *BLM has not updated their mapping or assessment of habitat suitability for Canada lynx. Therefore, these parcels, and others, should be evaluated for suitability for Canada lynx prior to leasing*." BLM has not undertaken the requisite evaluation of the lands included for leasing in the Preferred Alternative, and must provide No Surface Occupancy and No Leasing stipulations until it can determine that leasing and development will not jeopardize the species.

In 2000, when FWS concluded that listing the lynx as a threatened species under the ESA was warranted, it identified inadequate regulatory mechanisms in existing RMPs as a primary factor contributing to the lynx's decline. *Recognizing this, the UFO's draft Preferred Alternative of the RMP revision proposes new stipulations for Canada lynx habitat that are not included in the 1989 RMP*. Alternative B, however, provides the most protective stipulations, and should be included in the final RMP.

In this case, leasing without non-waivable NSO stipulations could result in jeopardy to lynx. Thus any future proposed leasing would require consultation with the FWS. Leasing any parcels in lynx habitat would violate the ESA, and these lands should be protected with No Surface Occupancy or No Leasing for the BLM to meet its obligations under the ESA.

*Gunnison Sage-grouse*

We support protective non-waivable NSO and No Leasing stipulations for all seasonal Gunnison sage-grouse habitat, as included in Alternative B.

Recent research indicates that all Gunnison Sage-grouse populations must be increased in size in order to avoid inbreeding depression and/or maintain adaptive potential and avoid increased extinction risk. It is now widely agreed that it will be necessary to maintain large expanses of suitable sagebrush habitat across the landscape to conserve populations. As such, BLM must consider what impacts leasing and development on suitable, former Gunnison Sage-grouse habitat would have on ongoing efforts to save this species from the brink of extinction. The Gunnison Sage-grouse Rangewide Conservation Plan states that "the issues of primary focus for [the Crawford] population are habitat enhancement and restoration, expansion of occupied habitat, and protection of habitat from permanent loss, especially in potential areas of expansion," and that "*[e]xpansion of the area occupied by sage-grouse is necessary in this population in order to meet population goals*."

91

All parcels with Historic or Potential Gunnison Sage-grouse habitat should be protected with non-waivable NSO or No Leasing stipulations in the final RMP.

*Colorado Hookless Cactus*

The draft RMP includes extensive description of documented existence of Colorado hookless cactus, a federally-listed threatened species, within the planning area, including in areas that would remain open to oil and gas leasing under the draft Preferred Alternative. The draft RMP also indicates that some individuals are being impacted by OHC use in the North Delta area (DEIS 3-115). For this reason, the BLM must include the Adobe Badlands LWC, Adobe Ecological Emphasis Area, and the Salt Desert Shrub Ecosystem ACEC in the final RMP.

*White-tailed Prairie Dog*

Active White-tailed Prairie Dog colonies occur within lands open to oil and gas leasing in the Preferred Alternative. The White-tailed Prairie Dog is a USFS Sensitive Species and Colorado BLM Sensitive Species. We support non-waivable stipulations, including NSO-41, that includes No Surface Occupancy and No Leasing within close proximity to active prairie dog colonies.

*Clay-loving Wild Buckwheat*

The draft RMP states that clay-loving wild buckwheat is found within the planning area, and we support the proposed action in Alternative B:

> Seven ACECs (92,900 acres) would be designated to protect special status and rare plants (Colorado hookless cactus, clay-loving wild buckwheat, Adobe Hills beardtongue, Colorado desert parsley, good-neighbor bladderpod, kachina daisy, Naturita milkvetch, Paradox Valley lupine, Paradox breadroot, and Grand Junction milkvetch), the most of any alternative. OHVs would be limited to designated trails on portions of the Kinikin Hills SRMA, where there are clay-loving wild buckwheat populations.

Uncompahgre Draft RMP at 2-394. Any lesser protection would be inadequate to protect clay-loving wild buckwheat and other special status species within the planning area.

*Debeque Milkvetch*

The UFO planning area contains populations of Debeque Milkvetch, a Colorado BLM Sensitive plant. In spite of this recognition, the draft RMP does not analyze or recommend any substantive protections for the species. BLM should survey the planning area for Debeque milkvetch to determine whether the species is present, with corresponding stipulations added for protections.

### iii.   Other wildlife considerations

Oil and gas exploration and development related to oil and gas leasing allowed in the Preferred Alternative is likely to have significant negative impacts on numerous areas of high wildlife conservation value, including elk winter range, mule deer winter range, and the Roeber and McCluskey State Wildlife Areas.

BLM_0149348

*Big Game Winter Range*

The final RMP must take into account significant new research demonstrating the effects of natural gas development on wildlife. See comments on Ecological Emphasis Areas. We commend the BLM for designating Ecological Emphasis Areas and encourage their inclusion in the final plan.

Critical big game winter range is dispersed across much of the land open to oil and gas leasing in the North Fork in the Preferred Alternative. The North Fork's deer and elk populations are vital for the local economy, and a key component of the landscape's ecosystem health.

We ask that the final RMP include additional analysis regarding the impacts on terrestrial wildlife habitat from oil and gas development specifically. Development across BLM lands in the North Fork particularly would result in additional roads, pipelines, habitat loss, fences and increased human disturbance on winter ranges used by thousands of elk and mule deer. BLM must determine how, when and to what degree elk and mule deer populations would be impacted. Reduction in effective winter range size caused by extensive oil and gas development in the North Fork cold increase deer density on remaining winter ranges, reducing forage quality, fawn survival and overwinter carrying capacity. Given the quality of big game habitat within the proposed lease parcels and the social and economic importance of hunting to the North Fork communities, it would be a travesty to rely on inadequate analysis.

*Roeber and McCluskey State Wildlife Area*

The leasing of lands adjacent to McCluskey and Roeber State Wildlife Areas is inappropriate. McCluskey SWA is popular for hunting deer, elk, dusky grouse and rabbit. Roeber SWA is a popular location for hunting deer, elk and rabbit, and for fishing in the cold water lake. State wildlife areas are paid for by revenue from sportsmen and under state law, Colorado Parks and Wildlife (CPW) is required to manage the areas for the benefit of wildlife. However, activities that conflict with the primary mission of providing wildlife recreation on State Wildlife Areas are discouraged. Oil and gas development adjacent to these protected areas could have negative impacts on the wildlife and recreational opportunities for which the lands have been set aside.

## X.   Oil and Gas Management

### a.   BLM should close additional lands to oil and gas leasing to conserve important resources and meet the agency's multiple use and sustained yield mandate.

The preferred alternative would make available 865,970 acres to oil and gas leasing, including lands with wilderness characteristics, areas of critical environmental concern, and important wildlife habitat. The acreage left open to leasing is 95% of the planning area, and is practically unchanged from the no action alternative. This is inappropriate management of resources BLM is charged with stewarding, does not balance conservation with development, and is unsupportable in an area with low potential for oil and gas development. BLM should close lands with conservation values to oil and gas leasing in the RMP.

BLM must consider the following when deciding which areas to allow fluid mineral leasing and development: 1) the BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development. 43 U.S.C. § 1712(c)(1); 2) BLM should significantly limit lands available for oil and gas leasing and development in order to support the effectiveness and long term

BLM_0149349

viability of conservation measures; and 3) the potential for development of oil and gas resources should inform oil and gas allocations in the land use plan.

>   1. <u>The BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development.</u>

FLPMA obligates BLM to abide by the principles of multiple use and sustained yield, especially during the land use planning process.  Specifically, multiple-use is defined as:

> ...the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

43 U.S.C. § 1702(c).  The definition of multiple use makes it clear that the BLM is obligated to manage the land for a number of resources other than oil and gas leasing, and states specifically that the BLM should manage some land for less than all of the resources and should not always be concerned with managing the land in order to receive the greatest economic return.  The definition of multiple-use makes it clear that simply because a particular resource exists does not mean that the BLM needs to be able to extract that resource for a profit.  It is well within the realm of BLM's multiple-use mandate to not have a significant portion of the planning area open to oil and gas leasing. In fact, the U.S. Court of Appeals for the 10th Circuit has reiterated in relation to this planning area: "[i]t is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses." *New Mexico v. Bureau of Land Management*, 563 F.3d 683, 710 (10th Cir. 2009).

IM 2010-117 plainly states that "under applicable laws and policies, there is no presumed preference for oil and gas development over other uses." It recognizes that oil and gas leasing is sometimes inconsistent with protecting other important resources and values. BLM must consider the range of resource values being managed on the public lands and close lands to oil and gas leasing where other resources are more important.

>   2. <u>BLM should significantly limit lands available for oil and gas leasing and development in order to support the effectiveness and long term viability of conservation measures.</u>

BLM has an opportunity in this RMP to make great strides in conservation and recreation management, as well as other multiple uses.  However, the long term viability of these strategies, programs and goals could be severely impacted by oil and gas development.  Oil and gas development is known to cause a variety of problems that are detrimental to natural resource conservation, and by leaving a large amount of the planning area open to leasing, BLM may undermine any conservation efforts or goals it identifies in the RMP.  Making areas available to oil and gas leasing also allows for speculative leasing, which can preclude conservation management of those areas. Even leases in areas with low potential for development or where leaseholders have no plans for development tie up the land for the duration of the lease due to the lease being a valid existing right. For example, BLM could not commit to

BLM_0149350

mitigation efforts in leased areas due to the possibility of the lease(s) eventually being developed. Therefore, BLM should limit lands available to leasing to ensure the viability and durability of conservation efforts.

Planning ahead to conserve other resources can avoid conflicts and damage. The impacts from oil and gas development are now well known, and therefore, areas of high ecological or cultural resource density should simply not be available for leasing. For example, Clait Braun, a leading researcher on sage grouse in the west, has stressed the impacts that oil and gas development can have on sage grouse populations:

> Road building, well pad construction, and noise disturbance associated with oil and gas development can fragment effective sage grouse habitat and compromise the quality of seasonal use areas. In addition, by creating more linear areas and smaller habitat patches, energy development can boost predation rates on sage grouse. So, for a variety of reasons, major oil and gas development reduces the area useable by sage grouse, which often leads to greater isolation of populations and a reduced ability to handle droughts, severe winters, or other natural disturbances.[66]

BLM simply cannot expect to have ecologically effective wildlife habitat and unlimited oil and gas development in the same area. Rather, the agency is then creating a situation where the goals, programs, and designations expected to protect valuable resources are only effective until such time that the right technology and/or price of oil and gas reaches a point that a previously non-economically extractable supply becomes economically extractable, or until a previously unknown supply not thought to exist is discovered, or prices encourage speculative leasing and drilling. History tells us that BLM must consider the impacts of oil and gas development across the planning area and close areas that have important wildlife, cultural, or wilderness values.

All lands managed for conservation values should be closed to oil and gas leasing, including all Areas of Critical Environmental Concern and lands with wilderness characteristics. This is consistent with multiple-use management and ensuring conservation management is appropriately carried out. For example, the White River National Forest in its recent oil and gas amendment acknowledged that in some places conservation values outweigh the benefits derived from fluid mineral development and closed areas of high development potential. The ROD states:

> There are a total of 198,513 acres of 'high oil and gas potential' on the White River National Forest... I chose to close through management direction approximately 61,000 acres of high potential lands on the Forest in order to maintain the natural character of the landscape and continue to protect the outstanding wildlife and recreation values of these lands.

WRNF ROD on Oil and Gas Leasing at 6.[67]

---

[66] This paragraph is adapted from detailed scoping comments on Upper Green sage grouse population trends and management issues prepared by Dr. Braun and submitted to the Pinedale BLM in October, 2002. Contact Linda Baker, Upper Green River Valley Coordinator (307-360-7198) to receive a copy of his 14 page comment letter.
[67] http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/61875_FS PLT3_2595815.pdf

BLM_0149351

BLM should close significant areas to oil and gas leasing, including areas managed for uses that are incompatible with oil and gas development, such as wilderness, wildlife and recreation, to appropriately steward the public lands resources and meet the agency's multiple use and sustained yield mandate.

3.  The potential for development of oil and gas resources should inform oil and gas allocations in the land use plan.

In the preferred alternative, 865,970 of the 916,030 acres fluid federal mineral estate (95%) remains open to oil and gas leasing. Uncompahgre Draft RMP at 2-187—207. Of the 865,970 acres open to leasing, 433,230 acres are considered low potential for conventional oil and gas and 449,330 acres are considered no potential for coal bed methane. Out of the 433,230 total acres of low potential oil and gas BLM has kept 410,600 acres open (95%). Out of the 449,330 acres of no potential coal bed methane, BLM has kept 413,650 acres open (92%). Despite being classified as low or no potential and a severe lack of operator interest (only 5 leases have been issues in the field office since 2009[68]), BLM has chosen to keep a large amount of land open to leasing. This comes at the expense of protecting other resource values like wildlife, recreation and wilderness.

Clearly, BLM's analysis of development potential and reasonable foreseeable development in the planning area is not informing management alternatives in the Draft RMP. BLM should instead utilize this analysis to implement a management decision that reflects the likely development in the planning area during the life of the RMP. All areas identified as having "low" oil and gas potential should be removed from consideration for leasing. BLM can (and frequently does) amend land use plans to accommodate new interest in leasing and developing a resource when that interest transpires. Without such interest, it is irresponsible to allow for speculative leases to tie up public land that should instead be managed for multiple uses.

Making low development potential areas available for leasing compromises protections for wildlife, recreation and other resources while encouraging speculative leasing. An examination of current BLM policies and management practices shows that there is little effort to protect at least some public lands from oil and gas leasing.[69] Fundamental flaws in BLM's guidance have led to a current total of 32 million acres leased for oil and gas development, with less than 13 million under development.[70] And a Congressional Budget Office report recently found that, for parcels leased between 1996 and 2003 (all of which have reached the end of their 10-year exploration period), only about 10 percent of onshore leases issued competitively and three percent of those issued noncompetitively actually entered production.[71]

BLM's Handbook H-1624-1 guides the agency on planning for fluid mineral resources. Chapter III of Handbook H-1624-1 directs BLM to plan for oil and gas development on federal lands in light of where recoverable deposits of oil and gas are most likely to exist. The guidance requires that BLM use "development potential" to predict where future drilling activity will take place and where impacts from

---

[68] LR2000 Report

[69] See No Exit (http://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web_0.pdf) and accompanying technical report (https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%286.6.16%29.pdf).

[70] www.blm.gov/style/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTECTION_/energy/oil__gas_statistics/data_sets.Par.69959.File.dat/summary.pdf

[71] https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51421-oil_and_gas_options.pdf

96

oil and gas development will likely to be focused within a planning area. Using this information, the guidance directs BLM to assign lease stipulations and other management prescriptions to protect competing resources and mitigate unwanted impacts from drilling and development.

However, when applied in land use planning, this guidance often produces illogical allocation decisions and management prescriptions that result in significant resource conflicts. It tends to lead BLM to *open* low and no potential lands to leasing, and, in many instances, apply weaker protections and stipulations in these areas than high potential areas. Since low potential lands are open to leasing with weak stipulations, they are frequently targeted for speculative leasing. In turn, speculative leases in low potential areas often preclude management decisions that might benefit other public lands resources, such as wilderness-quality lands, wildlife and recreation.

The guidance prescribes a sequence of steps by which development potential is applied to make oil and gas lease stipulation planning and allocation decisions. Essentially, development potential is used to predict the location and intensity of oil and gas development assuming that existing management prescriptions will remain in place. Then, alternatives to existing management are formulated to mitigate impacts and resolve conflicts that would likely result from continuing with existing management.

Under Handbook H-1624-1, stipulations beyond existing management prescriptions or standard terms and conditions are to be applied where impacts from development require mitigation. That is, heightened protections are imposed in areas where more significant impacts are predicted. However, impacts are more likely to exist in areas with moderate to high development potential. The implied corollary is that strict constraints and strong protections are not necessary in low potential areas because standard or existing lease terms are likely to mitigate the impacts from oil and gas development to an acceptable level. Consequently, application of the sequence of steps prescribed by the guidance produces stricter lease stipulations in areas with high development potential than in areas with low development potential.

The following flowchart illustrates how application of the guidance can result in decisions to make low potential areas open to leasing with relatively weak lease stipulations, regardless of the presence of other resources that could be harmed should development happen:[72]

---

[72] See https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%20%286.6.16%29.pdf for detailed case studies.

97



The outcome of this approach to decision-making is that low development potential lands are frequently nominated and leased, presumably for speculative purposes, leading to public conflict and precluding protective management of other resources.

For example, in the Colorado River Valley Resource Management Plan, BLM decided not to manage lands for the protection of wilderness characteristics in the Grand Hogback lands with wilderness characteristics unit based on the presence of oil and gas leases, even though the leases had never experienced any development:

> The Grand Hogback citizens' wilderness proposal unit contains 11,360 acres of BLM lands. All of the proposed area meets the overall criteria for wilderness character...There are six active oil and gas leases within the unit, totaling approximately 2,240 acres. None of these leases shows any active drilling or has previously drilled wells. The ability to manage for wilderness characteristics in the unit would be difficult. If the current acres in the area continue to be leased and experience any development, protecting the unit's wilderness characteristics would be infeasible. . . .

Colorado River Valley PRMP (2015) at p. 3-135.

The Colorado River Valley RMP was finalized in July 2015, and already 5 of the 6 leases in the Grand Hogback lands with wilderness characteristics unit have expired. Yet, BLM has made a 20-year decision to not protect the wilderness qualities of this area. The Uncompahgre RMP can and should make better-reasoned decisions.

Similarly, last year, Wyoming BLM declined to manage the Rough Gulch area in the Cody Field Office for wilderness protection because "64% of the area [was] covered] by oil and gas leases," even though the leases had never been drilled. Rough Gulch borders a WSA—the McCullough Peaks WSA—and has "very low" potential for oil and gas development. Like most federal leases, especially those in areas with low development potential, the leases in Rough Gulch were never drilled, and they expired earlier this year. Yet, because the leases were in effect last year, when WY BLM made its land use planning decision for the area, BLM is not currently managing Rough Gulch for wilderness protection.

98

BLM_0149354

Prioritizing leasing outside of low potential areas also makes sense from an economic perspective. Leases in low potential areas generate minimal revenue but can carry significant costs. In terms of revenue, they are most likely to be sold at or near the minimum bid of $2/acre, and they are least likely to actually produce oil or gas and generate royalties.[73] *See* Bighorn Basin PRMP (2015) at p. 73 ("Leasing may be based on speculation, with leases within high risk prospects usually purchased for the lowest prices."); White River PRMP (1996) at p. A-7 ("At any given time, most of the acreage that is available for oil and gas leasing in the WRRA is under lease. . . . Most of the area is leased for speculative purposes and consequently only a small percentage of leases will ever be developed."). In terms of costs, leasing in low potential areas requires processing lease nominations, preparing environmental reviews, and resolving protests and resource use conflicts.

On the other hand, limiting leasing in low potential areas conflicts the least with industry objectives and can confer significant public benefits. Low potential lands are the "low-hanging fruit" by which the BLM can fulfill other objectives of its multiple-use mission, such as managing for fish, wildlife and recreation. Yet, as described above, speculative leases on low potential lands can prevent the BLM from otherwise managing lands for alternative purposes and fulfilling its multiple-use mandate. *See also* White River DRMPA (2012) at p. 4-377 (". . . authorized oil and gas uses would likely preclude other incompatible land use authorizations"). In addition, limiting exploration and development on low potential lands necessarily conflicts the least with industry objectives. As discussed in the Bighorn Basin PRMP (2015):

> [A]lternatives D and F place additional stipulations on oil and gas-related surface disturbances in the Absaroka Front, Fifteenmile, and Big Horn Front MLP analysis areas for the protection of big game, geologic features, and LRP soils. As a result, alternatives D and F could have additional adverse impacts on oil and gas development in these MLP analysis areas. . . . However, because of the generally low to very low potential for oil and gas development and redundancies with other restrictions on mineral leasing from the management of other program areas, management specific to the MLP is less likely to adversely affect oil and gas development in these areas.

Bighorn Basin PRMP at p. 4-87*; see also* White River DRMP (1994) at p. 4-21 ("Prohibiting development in Class I areas would not affect oil and gas production because oil and gas potential in these areas is low.").

The White River National Forest similarly utilized development potential to inform management alternatives and ultimately management decisions. There, the U.S. Forest Service in its Record of Decision on Oil and Gas Leasing used development potential to dictate what areas would remain open and what areas would be closed to oil and gas leasing. The ROD states:

> My decision includes closing through management direction, 1,281,726 acres of the Forest to oil and gas leasing for the life of this plan. It is very important to understand the context of this part

---

[73] Center for Western Priorities, "A Fair Share" ("Oil Companies Can Obtain an Acre of Public Land for Less than the Price of a Big Mac. The minimum bid required to obtain public lands at oil and gas auctions stands at $2.00 per acre, an amount that has not been increased in decades. In 2014, oil companies obtained nearly 100,000 acres in Western states for only $2.00 per acre. . . .Oil companies are sitting on nearly 22 million acres of American lands without producing oil and gas from them. It only costs $1.50 per year to keep public lands idle, which provides little incentive to generate oil and gas or avoid land speculation.").

99

of my decision. Approximately 1,067,000 of these acres are closed because there is little or no potential for oil and gas production due to the geology of the area. These lands have had no past drilling or natural gas production to speak of… The geology simply does not support natural gas formation.

WRNF ROD on Oil and Gas Leasing at 6.

There are also legal arguments for changing how BLM manages low potential lands for oil and gas development. As described in Instruction Memorandum 2010-117, the multiple-use mandate requires that "there [be] no presumed preference for oil and gas development over other uses." *See* p. 2; *see also New Mexico Ex. Rel. Richardson v. BLM*, 565 F.3d 683, 710 (10th Cir. 2009) ("It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses."). Yet, H-1624-1 provides that all lands, regardless of development potential, are presumptively open to oil and gas leasing under "least restrictive" stipulations. *See* H-1624-1 at p. III-11 ("The least restrictive stipulations that effectively accomplishes the resource objectives or uses for a given alternative should be used . . . the preferred alternative of the RMP/EIS should provide evidence that less restrictive measures were considered but found inadequate to provide effective protection for other land use or resource values determined through the planning process to be deserving of protection."). Stricter stipulations and closures are only applied when necessary to mitigate conflicts and unwanted environmental impacts. *See, e.g.*, Kremmling PRMP (2014) at p. 2-1 ("It is the policy of the BLM that lands are generally available for oil and gas leasing where measures can be taken to mitigate conflicts and environmental consequences to an acceptable level. . . ."). Yet, as described above, leaving lands open to oil and gas leasing does not simply allow oil and gas resources to compete on a level playing field with other resources—it gives preference to oil and gas development over other uses.[74]

As demonstrated, BLM's typical application of the guidance leaves low and no potential lands open to leasing and assigns weak stipulations and protective measures in these areas. Several significant problems stemming from this practice are detailed in The Wilderness Society's 2016 report, *No Exit*:[75]
- It precludes lands from being managed for multiple values.
- It impedes meaningful conservation from taking place on sensitive lands.
- Other resources are endangered by oil and gas leases that do not include sufficient protections.
- It undermines the public's engagement in the land planning process.
- It causes poor fiscal stewardship of taxpayer-owned resources.
- It prevents us from effectively achieving our national climate targets.

Since low potential lands have favorable lease stipulations and can be acquired and held for minimal cost, low potential areas are often targeted for speculative leasing, though rarely drilled and developed. Although leases on low potential lands generate minimal revenue, BLM devotes significant administrative resources to managing nominations and protests and administering leases on low

---

[74] Oil and gas interests can obtain valid existing rights (i.e., leases) in interim periods between RMP revisions that can later preclude management decisions benefiting alternative resources and uses. There is no analogous mechanism for uses alternative to oil and gas to gain interim vested rights that will later preclude oil and gas development. In this sense, presumptively opening lands to oil and gas development gives preference to oil and gas development over other uses.

[75] See *No Exit* (http://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web_0.pdf) and accompanying technical report (https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%286.6.16%29.pdf).

BLM_0149356

potential lands. In addition, undeveloped leases on low potential lands impose less obvious opportunity costs in the form of precluding designations and management decisions that would otherwise benefit alternative resources. This, in turn, limits the ability of the BLM to fully comply with its multiple-use mandate. Eliminating the presumption that all lands, regardless of development potential, should be open to leasing would help ensure that other resources and uses of the public lands, such as wildlife and recreation, are on equal footing with oil and gas development. Doing so would also create opportunities to enhance the management of those other resources, particularly in areas with low or no development potential.

The TWS report *No Exit* (included as Attachment 4) argues that BLM should update agency guidance to reflect a smarter, more balanced approach to oil and gas management. However, BLM has the ability to apply a more balanced approach in current land use planning efforts in the absence of new guidance. A more thoughtful, realistic approach would be consistent with BLM's mandate to manage the public lands for multiple use and sustained yield. The agency's governing statute identifies a wide range of uses and values and provides for using lands "for some or all of these resources" and "with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." 43 U.S.C. § 1702(c). Other aspects of BLM's legal obligations also support limiting or eliminating leasing in low- and no-potential areas, including for purposes of protecting other important resources. For example, BLM is subject to numerous requirements to "minimize" the environmental and other impacts of oil and gas leasing and development.[76] By taking a proactive approach to managing oil and gas development as just one of the many uses of our public lands, BLM can also reduce unnecessary costs associated with speculative leasing and undeveloped lands, while making room for designating and managing lands for other uses, such as recreation, wilderness values, and fish and wildlife.

We are including with these comments a proposed approach to making oil and gas allocations consistent with development potential in the Uncompahgre RMP. (See Attachment 5.) Our recommended approach is unquestionably consistent with BLM's multiple use mandate and overarching guidance. Faithfully applying a current understanding of laws and policies would lead to closing more lands to oil and gas leasing, consistent with the agency's multiple use obligations. We therefore urge the Uncompahgre Field Office to apply these principles to the ongoing Uncompahgre RMP to achieve a more balanced land use plan that protects important resources and reduces the potential for public conflict over oil and gas leasing and development.

**Summary of Comments:** BLM should close all areas identified as having low or very low potential for oil and gas development to leasing to ensure speculative or unexpected leasing does not undermine conservation efforts. BLM should close significant areas to oil and gas leasing, including areas managed for uses that are incompatible with oil and gas development, such as wilderness, wildlife and recreation, to appropriately steward the public lands resources and meet the agency's multiple use and sustained yield mandate. BLM should utilize the proposal included as Attachment 5 to reevaluate oil and gas

---

[76] See 43 C.F.R. § 3101.1-2 (reasonable measures may be required to minimize adverse impacts on leases); 43 C.F.R. § 2920.7(b)(2) (land use authorizations shall minimize damage to specified environmental resources); BLM Standard Lease Form 3100-11 (lessees "must" conduct their operations so as to minimize adverse impacts); Onshore Order No. 1 §§ IV and III(F)(a)(3) (operators "must" minimize adverse impacts and BLM may require reasonable measures to minimize adverse impacts when APDs are approved); BLM Gold Book (several provisions referencing minimization including a provision to "minimizes undesirable impacts to the environment").

101

allocations in the Uncompahgre RMP.

    **b.** **Reasonable Foreseeable Development Scenario**

An updated and accurate Reasonable Foreseeable Development Scenario (RFD) for oil and gas is critical to the RMP planning process. The RFD analysis plays an important role the development of an adequate range of alternatives and provides key assumptions used to assess the cumulative impacts and environmental consequences of each alternative on the affected environment. The draft RMP relies heavily on RFD data and ultimately factors into the selection of the preferred alternative and Approved RMP. Clearly, the RFD has severe implications for fluid mineral management decisions made on BLM lands. Due to the importance of this analysis we believe BLM should take the opportunity to update the UFO RFD itself to address the shortcomings detailed below.

The UFO RFD was completed in July 2012 and as a result relies on severely outdated information. Since 2012 we have seen the bottom fall out of both the domestic and international oil and gas markets. Henry Hub spot prices for natural gas have fallen from a high of $12 per million Btu in 2008 to $2 per million Btu today and crude futures on the West Texas Intermediate (WTI) are trading at $44 per barrel compared to $134 per barrel in 2008[77]. As a result, the planning area has seen a significant decline in exploration and production activities. According to data from the Colorado Oil and Gas Conservation Commission, in 2015 only 4 wells were started and 2 wells spudded between the five counties of Delta, Gunnison, Ouray and San Miguel[78]. Statewide, the number of drilling permits issued has decline 50% since 2010 and the number of active rigs has fallen from 73 in January 2012 to just 22 in January of 2015[79]. In fact, there are currently only 4 active rigs in the entire Piceance basin[80].

According to recent projections from the Energy Information Administration (EIA), the oil and gas markets will not be recovering to the near historic levels of production experienced from 2008 to 2014 any time soon. EIA predicts that domestic crude oil and condensate production will grow 0.9% by 2040 and natural gas consumption will grow by only 0.5%[81]. This corresponds with much slower growth in terms of price as well. Henry Hub spot prices are projected to average around $6/MMBtu in 2035 while WTI spot prices for crude and condensate are estimated to reach around $110 per barrel; significantly lower figures than those assumed by the 2012 RFD. And even those estimates are likely overly optimistic. The dramatically different and unforeseen change in market conditions necessitate a reevaluation of the RFD scenario and in particular the development potential estimates in the planning area.

The RFD made projections based on a number of assumptions that have proven to be wildly inaccurate. The RFD states that shale gas production would grow almost fourfold from 2009 to 2035 and that "Rising fuel prices [will] spur domestic energy production across all fuels."[82] It also relies on the EIA's 2012 Annual Energy Outlook (AEO) which projected natural gas prices to rise to $10.35/MMBtu and crude oil prices to move above $125 per barrel by 2035. Revised estimates from EIA show the 2012 projections to be overstated and recent inactivity in the Piceance basin clearly illustrates that shale gas

---

[77] http://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=rclc1&f=m
[78] http://cogcc.state.co.us/documents/library/Staff_Reports/2016/201608_StaffReport.pdf
[79] http://cogcc.state.co.us/documents/library/Staff_Reports/2016/201608_StaffReport.pdf
[80] http://www.naturalgasintel.com/topics/395
[81] http://www.eia.gov/forecasts/aeo/data/browser/#/?id=1-AEO2015
[82] 2012 UFO RFD, p. 57-58

BLM_0149358

production is not occurring to the extent predicted in 2012. Based on inaccurate assumptions and projections, BLM estimated that by 2035 the planning area could see as many as 1,271 wells drilled; 782 of those for the production of coalbed methane. The RFD analysis was then used to inform the development potential and environmental consequences for the area and eventually contributed to the development of the range of draft alternatives and selection of a preferred alternative[83].

The assumptions underlying the 2012 development potential projections and the RFD scenario have changed dramatically. BLM needs to reevaluate development potential and the RFD based on this new information. A new RFD and analysis of development potential will change the assumptions used in the development of the draft alternatives, in analyzing environmental consequences, in projecting the impact of oil and gas development in terms of jobs and revenues and ultimately the selection of the appropriate preferred alternative. We argue that new data would indicate the initial analysis grossly overestimated development potential and the associated positive impacts of fossil fuel development in the region. A new RFD would make the case for selecting a more balanced alternative that prioritizes protecting those resources and values that are most important to the local communities and broader public over fossil fuel extraction. We know the importance of wildlife, agriculture and wilderness as an economic driver in the region.[84] More realistic and conservative oil and gas development projections that would come from a reevaluation of the RFD in light of new data could drastically alter the decisions made in this RMP.

### c.   Inadequate range of alternatives

Under the preferred alternative, 865,970 of the 916,030 acres fluid federal mineral estate (95%) remains open to oil and gas leasing. Uncompahgre Draft RMP at 2-187—207. Of the 50,060 mineral acres that would be closed to leasing in Alternative D, nearly 90% (44,220 acres) are statutorily closed areas.  In other words, BLM is using its discretionary authority provided in this RMP to close a mere 5,840 additional acres to oil and gas leasing over the no action alternative. Furthermore, the other two action alternatives only contemplate closing 219,580 acres and 306,670 acres. *Ibid*. This means that the full range of alternatives only contemplates closing 5%-33% of the planning area to oil and gas leasing. This does not represent a true range of alternatives.

As discussed above, BLM has a wide range of authority under FLPMA's multiple use mandate to specify that not all uses are appropriate in all places.  The many other natural resources present in the planning area (such as wilderness characteristics, scenic values, cultural resources, recreation, and fish and wildlife habitat) can and should be protected for public enjoyment.  By limiting the options for closing areas to oil and gas development, BLM is improperly constraining the range of management alternatives in contravention of NEPA.  Although many acres are open to oil and gas development subject to various lease stipulations, BLM often offers companies exceptions, modifications or waivers from the

---

[83] BLM notes in Chapter 4 that "It can be anticipated that assuming current rates of severance and royalty taxes, as presented in Chapter 3, increased production of oil and gas on BLM-administered lands would result in a comparable increase in contributions to local counties and communities."

[84] According to a PEW study, in 2014 there were 4.9 million visits to BLM lands in CO, $372 million in overall spending ($275 million on quiet recreation), $113 million generated in personal income specifically tied to quiet recreation on BLM lands and 3,412 jobs supported quiet recreation on BLM lands. See http://www.pewtrusts.org/en/research-and-analysis/analysis/2016/03/31/the-economic-value-of-quiet-recreation-on-blm-lands

103

application of "no surface occupancy" (NSO) stipulations.  Appendix B to the Draft RMP sets out a wide variety of "criteria" that could support a request for exceptions, modifications or waivers.

NEPA requires the BLM to consider and evaluate a reasonable range of alternatives for oil and gas development. The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R.  § 1502.14. NEPA requires BLM to "rigorously explore and objectively evaluate" a range of alternatives to proposed federal actions. See 40 C.F.R. §§ 1502.14(a) and 1508.25(c); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72-73 (D.C. Cir. 2011) (requiring the BLM to consider a reasonable range of alternatives for oil and gas activity); IM 2010-117 (requiring consideration of "alternatives to the proposed action that may address unresolved resource conflicts."). "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action." *Northwest Envtl Defense Center v. Bonneville Power Admin.*, 117 F.3d 1520, 1538 (9th  Cir. 1997). "[R]easonableness is judged with reference to an agency's objectives for a particular project."  *New Mexico ex rel. Richardson*, 565 F.3d at 709.

Here, the BLM's objectives are set forth in the Draft RMP's "purpose and need" statement.  According to that statement, the RMP will "provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area."  Draft RMP at I-2.  The Draft RMP elaborates that "It also establishes the allowable uses, management actions, and special designations that will enable the BLM to achieve the desired outcomes."  *Ibid.*  An alternative (or alternatives) that significantly restricts oil and gas leasing, including by prohibiting leasing in areas with low potential for development, clearly satisfies that "purpose and need" statement.

An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1310 (9th  Cir. 1990) (quoting 40 C.F.R. § 1502.14), which extends to considering more environmentally protective alternatives and mitigation measures.  See, e.g., *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094,1122-1123 (9th Cir. 2002) (and cases cited therein).  For this RMP, the consideration of more environmentally protective alternatives, including alternatives to severely limit oil and gas leasing availability, is consistent with the requirement of FLPMA to "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved."  43 U.S.C. §1732(d)(2)(a).

In order to comply with NEPA, BLM must consider a broad spectrum of alternatives in regards to which lands will be available for oil and gas leasing.  A draft RMP which leaves all the lands within the planning area open to oil and gas leasing or only allows for very slight differences between the alternatives in this regard fails to meet the "reasonable range of alternatives" directive. BLM has an obligation to rigorously explore and evaluate a range of alternatives, including closing areas currently open to leasing in order to protect wildlife, wilderness and other important resource values, especially those areas with low potential for oil and gas development.

**Summary of Comments:**  BLM's obligation to manage these public lands for a variety of resources, of which oil and gas is only one, requires consideration of alternatives to close substantial areas to oil and gas leasing and a preferred alternative that better balances energy development with other multiple uses of the public lands.

104

### d. Health Impact Assessment

As we stated in our scoping comments for the Uncompahgre RMP, BLM should conduct a Health Impact Assessment to adequately evaluate potential impacts of fossil fuel development on public health and adopt management decisions to minimize or eliminate those impacts. NEPA intends that human health be thoroughly considered in any Environmental Impact Statement. Congress stated that "...it is the continuing responsibility of the Federal Government to use all practicable means...to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may....assure for all Americans safe, healthful, productive and aesthetically and culturally pleasing surroundings.." and "...attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences..."[85] NEPA implementing regulations direct agencies to consider "the degree to which the proposed action affects public health or safety."[86] These regulations also state that Federal agencies shall to the fullest extent possible "Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment."[87]

Oil and gas development is acknowledged to have potentially severe impacts on human health, as noted below, and the Draft EIS should incorporate a formal methodology to evaluate all health issues and potential mitigations.  We therefore recommend that BLM incorporate a Health Impact Assessment (HIA), which is a systematic, comprehensive methodology for assessing human health impacts, as part of the EIS for the Uncompahgre RMP. A HIA looks at all the possible health effects from a decision, including contaminants and air pollutants but also water contamination, accidents and injuries, alcoholism and substance abuse, mental health impacts, and more. Not only is this approach used by U.S. and international health agencies, but it is used by the oil and gas industry itself in overseas operations.[88]

Two papers authored by environmental health experts at the University of Colorado's School of Public Health examined available information regarding the health effects of oil and gas drilling and production.  Among their findings is that: "Most of the hazardous chemicals associated with oil and gas production are well documented to produce adverse health effects in individuals." [89]  They also looked at information specific to Garfield County, Colorado, which can serve as a model to other western Colorado counties.[90] Some of their conclusions that are specifically relevant to the RMP revision include:

- Air and water quality studies conducted to date indicate that potential exposures to hazardous emissions exist.

---

[85] 42 USC § 4331
[86] 40 CFR 1508.27(b)2
[87] 40 CFR 1500.2(f)
[88] International Petroleum Industry Environmental Conservation Association and the International Association of Oil and Gas Producers, *A Guide to Health Impact Assessments in the Oil and Gas Industry*, (London; 2005): http://www.ipieca.org/activities/health/health_publications.php
[89] Witter, R. et al, " Potential Exposure-Related Human Health Effects of Oil and Gas Development: A Literature Review (2003-2008)," August 1, 2008, hea_08091702b.pdf.
[90] Witter, R. et al, "Potential Exposure-Related Human Health Effects of Oil and Gas Development: A White Paper," September 15, 2008, hea_08091702a.pdf.

BLM_0149361

- Many air toxics are essentially unmeasured in Garfield County and current plans for further air sampling may not be comprehensive enough to enable public health officials to determine the community health impact of oil and gas development.
- Preliminary testing results indicate that ozone levels in some places are exceeding National Ambient Air Quality Standards and may be hazardous to humans.
- There are no plans for comprehensive and systematic monitoring of surface and subsurface waters.
- Environmental monitoring must be relevant to the areas where oil and gas development activity is occurring and the results must be readily available to the public. Unbiased interpretation of the results must occur in a timely manner and be made available to the public.
- It is important not to ignore what is already known. There is an immediate need for specific information on exposures and the impact from oil and gas development on all aspects of human health.
- An adequate monitoring program should be developed through a rigorous scientific process that addresses all currently recognized data gaps and health risks. This process should be developed in a transparent and explicitly unbiased way.
- A Health Impact Assessment (HIA) is a practical tool to evaluate future impacts, alternatives and appropriate strategies to promote and protect human health.

**Summary of Comments:** BLM should incorporate a Health Impact Assessment (HIA) into the EIS accompanying the Uncompahgre RMP.

### e. Reclamation

BLM's current approach to well site reclamation is inadequate. We propose a change in the way reclamation is currently managed by moving away from relying on site-specific BMPs and COAs (which is accompanied by an increased level of inconsistency across the planning area) and instead implement a performance-based standards approach. Under such a system BLM would no longer dictate exactly how to proceed with reclamation. Instead, BLM would include reclamation goals in a reclamation plan or other planning document and allow companies to utilize their intellectual and financial resources to find the best way to achieve those goals. We recommend that BLM consider using this approach to well site reclamation in the Uncompahgre RMP.

BLM's approach to well pad reclamation for fluid mineral leases has remained unchanged since 2007 when BLM revised Onshore Oil and Gas Order No. 1 and the Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (Gold Book).

Onshore Oil and Gas Order No. 1 requires operators to submit a "Surface Use Plan of Operations" along with their Application for Permit to Drill (APD) package. The surface use plan must "include adequate measures for stabilization and reclamation of disturbed lands." The operator is required to elaborate on the methods that will be employed in the *Plan for Surface Reclamation,* a key element of the surface use plan[91]. The operator may elect to modify the reclamation plan at any time up to submission of the Notice of Intent to Abandon. Final abandonment however will not be approved until "the surface reclamation work required in the Surface Use Plan of Operations or Subsequent Report of Plug and Abandon has been completed to the satisfaction of the BLM or the FS and Surface Managing Agency..."[92]

---

[91] Onshore Oil and Gas Order No.1 (III.D.4)
[92] Onshore Oil and Gas Order No. 1 (XII.B)

BLM_0149362

In addition to the reclamation plan, BLM may include Conditions of Approval (COAs) and Best Management Practices (BMPs) as mitigation measures in the approved APD.[93] These BMPs and COAs are typically developed and identified in the field office's Resource Management Plan (RMP) and/or Master Leasing Plan (MLP). Commonly used reclamation standards and BMPs can also be found in the Gold Book.

Historically, each field office has used the requirements of Order No. 1 to create its own reclamation programs in an RMP. An RMP can address reclamation in a variety of ways. It can establish reclamation as a goal or objective, it can include specific management decisions where reclamation is necessary to achieve the larger objective, it can include reclamation stipulations, or it can recommend COAs and BMPs to be included with an operator's APD. In practice, it is rare that reclamation is included as a goal or objective. Occasionally a management decision may reference the need to conduct some form of reclamation or restoration in order to meet the goals and objectives of the plan. But, more often than not reclamation is handled through the incorporation of Conditions of Approval (COAs) or Best Management Practiced (BMPs) into APDs and Master Development Plans (MDPs).

The Draft RMP relies on this outdated approach to reclamation.  Under the "Management Common to all Alternatives" BLM states it will:

> Apply conditions of approval, best management practices (BMPs), standard operating procedures (shown in Appendix G), other site-specific mitigation, and/or off-site mitigation measures to all resource uses to promote rapid reclamation, maximize resource protection, and minimize soil erosion.

Uncompahgre Draft RMP at 2-23. In other words, reclamation will be dealt with on a case-by-case basis through the inclusion of COAs and BMPs at the APD stage. This concept of addressing reclamation is the same as it has always been as illustrated by the general statement included as an action common to all alternatives (including the no action alternative) under the fluid mineral stipulations in Chapter 2:

> Require operators to meet the current BLM Goldbook standards for soil and water protection and plans for surface reclamation, plus other BMPs (Appendix G), as applicable, for all permitted fluid minerals (i.e., oil and gas and geothermal) actions.

*Id.* at 2-207. The only other explicit reference reclamation in the context of fluid mineral development comes in the form of a very broad objective statement, "Lease federal fluid mineral and geothermal resources to facilitate economically and environmentally responsible exploration, development, and reclamation using the best available technology." *Id.* at 2-187. Otherwise, reclamation-centric stipulations tend to focus only on soil issues. The proposed alternative includes CSU-3/SSR-3, CSU-6/SSR-6 and NSO-6/SSR-8 state that an operator *may* be required to submit a reclamation plan if the proposed action will impact saline or selenium soils, biological soil crust or is located on a slope greater than 40%. *Id.* at 2-30, 2-32 and 2-34.

The current way in which reclamation is regulated has led to ongoing issues with unreclaimed, orphaned or abandoned sites as well as improperly reclaimed sites. This is not a new issue. According to a 2005 Government Accountability Office (GAO) study, seven of eight field offices reviewed had a backlog of

---

[93] Onshore Oil and Gas Order No. 1 (III.F.3)

BLM_0149363

reclamation inspections.[94] Additionally, the review revealed that 1,975 wells in the eight field offices had been abandoned over 4 years ago and did not have an approved Final Abandonment Notice.[95] While funding and personnel deficiencies certainly play a role in these issues, it can also be argued that an inefficient and burdensome reclamation program makes it harder for both operators to reclaim sites and for BLM officials to approve final reclamation. A new reclamation program can help to streamline the process for both operators and the agency.

All of these unreclaimed or improperly reclaimed sites can have devastating effects on wildlife, water quality, soil quality as well as local ecosystems and those services which they provide. The surface disturbance associated with energy development leads to increased habitat fragmentation that can disrupt migratory pathways, alter wildlife behavior and increase mortality, and allow for the proliferation of invasive species. Additionally, new research shows that the loss and degradation of ecosystems, through the direct removal of vegetation, associated with drilling for oil and gas has greatly reduced net primary productivity (NPP) across the United States.[96] It is crucial that well sites be properly reclaimed to protect wildlife, native ecosystems and preserve our ecosystem services.

There is no denying that unreclaimed sites have negative environmental impacts. However, it is also important to note the negative fiscal impact they have on the BLM. Reclamation can cost as much as $15,000 per acre and the cost to plug and reclaim a single way can easily exceed $100,000.[97] According to a 2011 GAO report, "The agency spent a total of about $3.8 million to reclaim 295 orphan wells in 10 states from fiscal years 1988 through 2009. BLM also estimated that there were an additional 144 orphan wells in seven states that needed to be reclaimed, with an estimated cost of approximately $1.7 million for 102 of these wells."[98] Establishing a program with input from the oil and gas industry could help to ensure that mutually agreed upon reclamation objectives are met, helping to eliminate the problem of unreclaimed orphaned and abandoned well sites.

In order to resolve these issues, some field offices have begun to move away from this approach and allocate more time and resources to develop reclamation plans. In particular, the White River Field Office created its own 40-page "Surface Reclamation Plan" as an Appendix to its recently finalized RMP amendment for oil and gas development. White River Approved RMPA (2015) at Appendix 3. This plan provides the minimum information and operation standards that the field office expects in reclamation plans, specific criteria the field office will implement which will determine if reclamation is successful, and it identifies a number of techniques and methodologies that can be incorporated into a site specific reclamation plans. The reclamation standards in the appendix apply to all surface disturbing activities in the field office. It is a unique standards-based approach that, with some improvement, could help inform the future of reclamation on BLM lands.

A similar approach has also been used by Colorado's Division of Minerals and Geology which established a performance based standards system for the state's coal mine reclamation program. Rule 4 of Colorado's "Regulations of the Colorado Mined Land Reclamation Board for Coal Mining" establishes performance standards for a variety of categories, including - and perhaps most relevant to this

---

[94] GAO-05-418
[95] GAO-05-418
[96] Ecosystem Services Lost to Oil and Gas in North America by Brady W. Allred, W. Kolby Smith, Dirac Twidwell, Julia H. Haggerty, Steven W. Running, David. Naugle, Samuel D. Fuhlendorf; Science, 24 APR 2015 : 401-402
[97] GAO-11-292
[98] GAO-11-292

BLM_0149364

conversation – revegetation. Under Rule 4.15.1 the state establishes a general requirement that, "Each person who conducts surface coal mining operations shall establish on all affected land a diverse, effective and permanent vegetation cover of the same seasonal variety native to the area of disturbed land, or species that support the approved postmining land use." Section 15.2 goes on to dictate more specific goals that all work toward "prompt establishment of vegetation cover and recovery of productivity levels compatible with the approved postmining land use," including achieving permanent vegetation cover as specified in 15.1 and erosion control. The rule also creates a system for monitoring and reporting.

We propose BLM establish a new performance standard based reclamation program for interim and final reclamation using some of the principles from Colorado's coal mine program and the White River Field Office RMPA. Several key elements would need to be developed in order to move forward with this including defining the reclamation standards, creating a reporting framework and establishing a monitoring and review system. While that level of detail may be beyond the scope of the RMP, BLM could lay the groundwork for the establishment of such a program at the implementation stage by including specific fluid mineral objectives that commit the agency to creating and implementing a comprehensive fluid mineral reclamation program for the planning area. Alternatively, BLM could develop a reclamation plan and include it as an appendix to the RMP similar to the approach taken by the WRFO.

### f.  Additional management actions that should be considered and implemented

#### i.  Phased leasing and development and surface disturbance caps

Phased leasing is the concept of limiting the number of parcels offered for sale in a given time period or otherwise leasing parcels in a strategic manner. BLM includes phased leasing as a "Resource Protection Measure" in its formal guidance on MLPs. Handbook H-1624-1, Section V.C.2. Phased development is used to manage the timing and location of oil and gas development in a given area. As stated by the BLM, phased development "refers to prescribing the sequence of drilling operations by geographic area to allow for the development of certain areas while restricting or temporarily restricting development of other areas. Subsequent development occurs as areas developed earlier are completed and reclaimed." Phased development can be applied in a variety of ways. It can be based on timing - developing one area, then completing reclamation before moving to another area. It can be based on location - delaying development in wildlife corridors.  Phased development can also be used to limit the amount of surface disturbance on a lease at any given time (applying surface disturbance caps – as a percent of a lease or unit or using an acreage figure) and requiring successful restoration before permitting additional disturbance. This concept allows development to proceed in a controlled manner and gives BLM the flexibility and time necessary to address any problems that may arise and develop a solution before the same issue arises somewhere else.

Phased leasing and development have been used effectively in a number of land-use planning decisions. We have seen phased leasing successfully incorporated into both the Dinosaur Trail MLP and Beaver Rim MLP. In Dinosaur Trail, BLM includes phased leasing as an approach to achieve the overall RMP objective:

> Within the Dinosaur Trail MLP, the BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by

109

managing leasing opportunities in a phased approach in order to take advantage of new information and the best available technology.

White River Field Office Approved RMPA at 1-4. Within the Dinosaur Trail MLP, BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by managing leasing opportunities in a phased approach in order to take advantage of new information and the best available technology. Under the phased approach, leasing will first proceed in that portion of the Dinosaur Trail planning area with the most accessible oil and gas resources and fewest potential resource conflicts, and later proceed to areas with lower development potential.

Phased development was also incorporated into the Beaver Rim MLP which utilizes a surface disturbance cap approach to phased development and provides that the BLM will:

> Allow no more than 5 percent surface disturbance in the township in which the parcel is located until interim reclamation goals are achieved. Require co-location of new disturbance if technically feasible. If new disturbances cannot be co-located, they must be at least 1.2 miles from existing disturbance.

Lander Record of Decision and Approved RMP, Record No. 2028.

In the Uncompahgre RMP, BLM could apply a similar phased approach as described in Dinosaur Trail, by first providing for leasing and development in that portion of the planning area where industry interest is most heavily focused, where development potential is medium to high, where infrastructure already exists, and where resource conflicts are minimal. Once high and medium potential lands have been fully leased and there is expressed interest from industry, the agency would then consider leasing parcels in low potential areas, pending additional planning. This framework is essential to ensuring the adequate protection of other resources in undesirable oil and gas areas. The Uncompahgre RMP could also incorporate phased development by establishing a surface disturbance cap as done was done in the Beaver Rim MLP to incentive successful final reclamation prior to approving new APDs.

> ii.    Clustered leasing and development

Clustered development based upon best available technology can minimize surface area development and impacts as well as reduce noise and dust caused by traffic to and from drill sites. In the Uncompahgre Field Office, BLM should focus development in places where there are active wells or where there is existing infrastructure like piping and roads. This is a viable way of reducing habitat fragmentation and protecting sensitive species while allowing development activities to proceed responsibly.

We encourage BLM to create mechanisms and make land use allocations that results in clustered development for oil and gas. There are at least 17 wells in the planning area, but the RFD estimates that during the planning cycle of 2010 through 2030, as many as 1,271 wells could be drilled in the planning area with 418 under BLM management. Uncompahgre Draft RMP at 3-120. While this number is speculative and contingent upon stipulations and authorizations made in the RMP, it points to future

110

opportunities to concentrate development in a way that limits the extent of lateral development and the overall impact of oil and gas activities.

> iii.   Master Development Plans

A critical drawback to the BLM's reliance upon stipulations and COAs on an individual lease and permit basis is that is does not allow for comprehensive and holistic management or effective cumulative impact analysis. The best way to promote those positive management strategies is for BLM to require comprehensive development plans through Master Development Plans (MDPs). By requiring the submission of multi-well plans that include details on proposed locations, access points and ancillary facilities, the agency can gain a clearer picture of the scope and scale of not just the development, but the potential impacts to surrounding resources and values. Although MDPs have been used in this field office - most recently with Whitewater and Bull Mountain - BLM fails to identify MDPs as a tool for minimizing impacts associated with fluid mineral development in the Draft RMP. In fact, there is no reference to MDPs anywhere in the draft alternatives.

Other field offices have encouraged the use of MDPs by including specific stipulations in planning documents. This approach was adopted in the White River Field Office's Dinosaur Trail MLP, which directs that "Master Development Plans would be required for all oil and gas activities, including exploratory drilling, within the Dinosaur Trail MLP." White River Field Office Approved RMPA at 2-45. Notably, within the Dinosaur Trail MLP, "specific resource protection measures would be evaluated when an operator submits a Master Development Plan"; and those measures can include unitization, phased development, limitations on surface disturbance, multi-well pads, protections for scenic values and placing all linear disturbances (e.g., power lines, pipelines, roads) in common corridors and interim reclamation. *Id.* at 2-46. The Grand Junction Field Office utilizes this approach in the recently revised RMP as well. Fluid mineral Stipulation MIN-MA-05 states:

> In areas being actively developed, the operator will be encouraged to submit a Master Development Plan (formerly known as Geographic Area Proposal) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM). Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation. The extent of the analysis will be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.

GJFO Approved RMP at 181.

MDPs can also be a useful tool in managing oil and gas units. Requiring MDPs can help BLM manage how development occurs across a unit and protect important public lands resources while providing for development of the unit.

MDPs are an effective tool for minimizing impacts from oil and gas development and help incentivize smart and systematic development. They are an efficient way for BLM to manage oil and gas resources in the planning area. We encourage BLM to require MDPs for all fluid mineral development in the planning area.

111

iv.     New drilling techniques

Relatively recent drilling approaches such as stacked and biplanar horizontal drilling or a "wine rack" approach are reducing surface infrastructure and overall impacts, while making monitoring, inspection and enforcement more efficient for the agency. For instance, stacked horizontal or lateral drilling can allow numerous wells to be drilled from a pad that can access different depths and conditions; as discussed in a recent article on drilling in shale formations, "Pioneer can drill 30 to 40 wells from the same pad site to different depths before turning them horizontally through six different strata, each with its own characteristics."[99] This technique can limit surface disturbance and infrastructure, while also providing access to fluid mineral resources.

The Dinosaur Trail Master Leasing Plan, in the White River Field Office, includes taking advantage of the best available technology in its overall vision for the WRFO Oil and Gas Development Amendment:

> Within the Dinosaur Trail MLP, the BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by managing leasing opportunities in a phased approach in order to **take advantage of new information and the best available technology**.

White River Field Office Approved RMPA at 1-4. Recognizing that technology already exists and is rapidly evolving to minimize impacts and maximize efficiencies should be an integral component of oil and gas planning on public lands, and BLM should incorporate stipulations encouraging the use new technologies in the Uncompahgre RMP.

As noted above, BLM can incorporate requirements such as surface disturbance limitations and placing multiple wells on a pad in COAs and/or MDPs. In addition to including a stipulation incentivizing the use of new technologies, BLM should also require advanced drilling techniques as COAs within the planning area at the APD level to minimize impacts and increase efficiencies as part of fulfilling the overall goals of the RMP.

v.     Suspensions

Pursuant to 43 CFR 3103.4-4 and 43 CFR 3165.1, operators are allowed to apply for and BLM may approve a request for suspension of an existing lease. A suspension effectively puts a lease on hold, stopping the clock and ensuring the lease will not expire. While in suspension, operators are exempt from making rental payments on that lease and have no obligation to diligently develop those resources that would otherwise be subject to royalty payments. Nationally, 10% (3.25 million acres) of currently leased federal minerals are held in suspension, often without appropriate justification. This deprives American taxpayers of the royalty and rental payment revenues they are owed while allowing industry to pad their books for investors. A study conducted by The Wilderness Society found that approximately $82 million have been lost on rental payments not made due to suspensions.[100] Additionally, suspensions tie up land and keep BLM from protecting other resource values like wildlife, wilderness and recreation.

---

[99] Online at http://www.bizjournals.com/dallas/blog/2013/05/pioneer-using-stacked-laterals-in.html
[100] Online at: https://wilderness.org/sites/default/files/TWS%20Hoarders%20Report-web.pdf

BLM_0149368

Compounding this problem is inadequate monitoring and review of suspended leases by the agency. Often, suspension orders expire or the stated justification for the suspension is resolved, but the suspension is not lifted by the BLM. This results in leases remaining in suspension well beyond the timeframe specified in the order and in some instances allows suspensions to remain even when a suspension is no longer permissible under the agency's own rules and regulations.

The revision to the Uncompahgre RMP provides BLM with an opportunity to address this issue across the entire planning area to ensure suspensions are issued and rescinded appropriately. We encourage BLM to pursue the following actions:

- **Include a management action that commits the agency to a review of all suspensions within the planning area**. The BLM should lift suspensions on all leases where there are no valid reasons to continue suspension and cancel all those that have expired. The BLM should take immediate action to address problematic lease suspensions by cleaning up records, lifting unnecessary and expired suspensions and issuing expiration notices on leases that should have expired by the terms of applicable suspension agreements.

- **The BLM should increase transparency and opportunities for public involvement in lease suspensions and monitoring**. The BLM should post documentation of lease suspension requests and decisions, including on its NEPA log, but also in a dashboard available via state office websites. Information on suspended leases, including status and reason for suspension, should be made public to provide for public oversight and accountability on the length of suspensions in annual oil and gas program reports. A summary of lease suspensions should be included in the BLM's annual reporting of oil and gas statistics, as well.

- The field office **should develop and issue guidance for considering suspension requests that includes clear criteria for when the authorized official does and does not have discretion to grant a suspension request and provides the authorized official with parameters on issuing suspensions**. This guidance should also clarify when the agency should exercise its discretion to approve or deny a suspension request and establish a monitoring and tracking system for suspensions.

## XI.   Uranium

The Draft RMP presents an unrealistic expectation of the viability of future uranium mining based on an unsupported assertion that "because past mining operations did not completely remove all potential uranium and vanadium resources in the area, the potential for new economically profitable mines in the region remains strong." Uncompahgre Draft RMP at 3-128.

Unfortunately, the draft RMP is based on an outdated 2011 Mineral Potential Report ("MPR") that only identified the potential occurrence of uranium and vanadium deposits, and speculated on future mining viability based on an artificially inflated 2011 spot price.  If accepted mining economic analysis were applied to the plan-level NEPA analysis, which includes social and environmental costs, it is likely that the MPR would confirm that there is very low potential for viable claims on BLM-managed uranium deposits in the plan area.  The uranium mines are of such low viability, that a properly conducted socio-economic analysis would likely support an area-wide uranium withdrawal to protect other resource values <u>and</u> improve the regional economy.

113

The MPR is silent as to the effect of the high production costs on the economic and commercial viability of these deposits. It is well established that the validity of a federal mining claim on BLM lands is dependent on a consideration of all costs.  "Claim validity is determined by the ability of the claimant to show that a profit can be made after accounting for the costs of compliance with all applicable laws . . ." *Great Basin Mine Watch*, 146 IBLA 248, 256 (1999) (emphasis added).  In addition to production costs, environmental compliance costs must also be factored in the claimant's economic analysis in order to prove the existence of a valuable mineral deposit.  Since a profitable mining operation must be proven for any mining claim to be considered valuable, determining the costs of environmental compliance is a necessary precursor towards validating a discovery. *Great Basin Mine Watch*, 146 IBLA 248, 256 (1999); *U.S. v. Pittsburgh Pacific Company*, 30 IBLA 388,405 (1977), *citing U.S. v. Kosanke Sands*, 12 IBLA 282, 298-99 (1973).  As the Board in *Pittsburgh Pacific* recognized, environmental cost factors may be significant enough to "stand in the way of a profitable mining operation" and therefore, must be factored in by the BLM.  *Id.* at 393.

The draft RMP's use of the term "mineral resources" is misleading, and ignores the financial viability parameters that must be addressed in "mining claim validity exams."  If this analysis is carried out at the RMP level, which NEPA reasonably requires, it is foreseeable that there would be no valid mineral claims due to the prohibitively high cost to conventionally mine and mill yellowcake from the ores located in the sandstone deposits. Uncompahgre Draft RMP at 2-413.  Historically, uranium mines have not made enough money to carry out necessary reclamation and decontamination of the mine sites. The draft RMP conclusion that price exceeds cost of production is supported by the mere recognition that "over 400 documented abandoned uranium mines in the planning area." *Id.* at 3-175.  Focus should be placed on the undisclosed number of inactive federally owned mines in the planning area.  Ideally, the federal taxpayers should not pay for the clean-up costs at claims that the claimants have failed to reclaim, due in part to deficiencies in the 1872 Mining Law and the 43 C.F.R.§ 3809 regulations.  However, at many of the inactive federal mines, the operators are long gone and the responsibility falls on the federal government to carry out clean up.

The MPR analysis is based on an unrealistic "price of uranium (U3O8) at $72 per pound and the price of ferro-vanadium at $31 per kilogram as of February 14, 2011."  The $72 level is simply not supportable. This price may be indicative of the hedge fund bubble of 2007 that drove the price into the $140 range, but bears no relation to current market conditions or production costs.  The $72 spot price ignores the post-Fukishima realities as they apply to nuclear energy and the ongoing disposal of Department of Energy uranium stockpiles.

The plan-level NEPA analysis must be based on a current analysis that recognizes $20.00 per pound price reported by TradeTech as of Oct. 21, 2016.  The $20 per pound spot price is more reflective of the supply/demand and production costs for this global commodity.  Because in situ leach uranium mining and mining richer deposits involves dramatically lower production costs, it is likely that the Uravan Mineral Belt deposits will never be economically viable.

The Mineral Potential Report provides an unsupportable account of the history of uranium mining that is brought into the draft RMP. Uncompahgre Draft RMP at 4-477, MPR at 30.   The uranium deposits in the Uravan Mineral Belt have never supported a viable uranium industry. Reported opinions from the lawsuits brought against the federal government provide details of federal buying programs and price supports in the 1950s that created a non-market boom. *Cotter Corp. v. Seaborg*, 370 F.2d 686, 690 (10th Cir. 1966)(describing Atomic Energy Commission buying program).  Due to new discoveries, such as the "uranium-bearing ore deposits on the Spokane Reservation, located near Ford, Washington," the Atomic

114

BLM_0149370

Energy Commission curtailed its price support programs. *Gay v. United States*, 174 Ct. Cl. 420, 460, 356 F.2d 516, 525 (1966). Early controversies over mining included "court orders that [Bureau of Land Management] must be given the opportunity to expeditiously review Cotter's reclamation plan." *Utah v. Andrus*, 486 F. Supp. 995, 1009 (D. Utah 1979). The Uravan Mineral Belt crashed shortly after federal price support program ended in 1958, with area uranium mills staying open and only sporadically operating under various agreements with the United States Atomic Energy Commission." *Duman v. Commissioner*, 1967 Tax Ct. Memo LEXI S 99, at *4 (U.S. T.C. Aug. 3, 1967). The history of the industry between 1958 and 1970 is thus misstated.

After 1958, the largely bankrupt uranium industry did not, and was not required to reclaim or clean up the impacts of mines and mills. The federal government spent an undisclosed billions of tax dollars under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. and the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA), to remedy the damage caused by a patchwork of ineffective state regulatory programs. *Dep't of Health v. Mill*, 887 P.2d 993, 1004 (Colo. 1994) *citing* 42 U.S.C. § 7901.3. The MPR also misstates the status of the Uravan Mill. MPR at 31. Uravan has still not achieved full clean-up and closure, and remains subject to Colorado-issued UMTRCA license and EPA CERCLA actions. *W. Colo. Cong. v. Umetco Minerals Corp.*, 919 P.2d 887, 890 (Colo. App. 1996). The passage of modern pollution and mining laws intended to ensure the pollution prevention and clean-up costs fall on the mining company, not the federal fisc are not addressed in the draft RMP and MPR. Preliminary comparisons suggest that billions of dollars spent on disposal and maintenance of uranium mill tailings has eclipsed the income generated from the mining and milling activity in the Uravan Mineral Belt.

The MPR is based on outdated information. The Cotter mill in Cañon City has been demolished, and Denison Mines has abandoned its United States holdings. The status of the mills in the region is also outdated. The Piñon Ridge Mill license has been twice rejected by the Colorado Courts and is now being held in abeyance during remand. The future tailings disposal capacity of the White Mesa Mill is highly questionable, and it is not clear whether the mill will accept any new sources of mined uranium ore. Rather, a new business model is emerging at White Mesa that focuses exclusively on charging disposal fees and processing "alternate feed materials" from commercial, industrial, and military clean-ups.[101] In short, the existing infrastructure to support Uravan Mineral Belt uranium mining has either been demolished, is nearing the end of its serviceable life, or has been shelved.

BLM's analysis must include data on the full economic and financial cost of producing uranium into yellowcake, rather than reliance on anecdotal "communication with industry experts and government officials." MPR at 40. Reliance on a 2004 report to suggest that $15 prices over the next 20 years would support a uranium industry is not supportable. MPR at 42 citing (Spanski et al 2004). To the contrary, industry reports establish costs of at least $80/lb to mine and mill uranium into yellowcake. "The simple fact is that the World is currently oversupplied with uranium. Utilities appear to be well-covered for now."[102]

The DOE-leased mines in the plan area remain subject to a permanent injunction that invalidated the underlying NEPA analysis relied upon in the MPR. MPR at 42. *Colorado Environmental Coalition v. Office of Legacy Management,* 819 F. Supp. 2d 1193, 1217 (D. Colo. 2001) *amended by* 2012 U.S. Dist. LEXIS

---

[101] *See*:  http://www.energyfuels.com/news-pr/energy-fuels-secures-new-processing-contract/ (last visited 10/31/2016).

[102] http://www.energyfuels.com/news-pr/energy-fuels-issues-letter-shareholders. (last visited 10/31/2016).

BLM_0149371

24126, 2012 WL 628547 (D. Colo. Feb. 27, 2012). DOE has not properly asked the District Court to lift the permanent injunction. The 2014 Final Environmental Impact Statement contains many of the same deficiencies identified by the 2011 District Court opinion, especially the failure of the programmatic NEPA analysis to address site-specific impacts to inform the cumulative impacts analysis.  Reliance on the DOE approach and analysis has infused BLM's DEIS analysis with the same legal deficiencies.

The prospects of mines reopening are also based on unreasonable and inapplicable assumptions about price. MPR at 45.  In reality, these mines are opened sporadically due to Colorado mining laws applicable to five year "temporary cessation" periods.  There is a financial incentive to avoid reclamation and clean-up by keeping these mines in an "active" status under Colorado mining law.  The assumed relationship between price and activity in the MPR is disproven by a mining industry that has not re-opened any mine since 2009, even though the price has remained above the assumed $15 threshold.  At no place in the analysis does BLM reveal the production costs that are publicly reported by Energy Fuels and other publicly traded companies.  This data is available, but was not included in the MPR analysis.  The draft RMP does contain a correct conclusion that high energy costs and high transportation costs have resulted in mine and mill closures. Uncompahgre Draft RMP at 4-10.

The socioeconomic analysis ignores the data generated during the Colorado licensing of the Piñon Ridge mill.  Of key importance is the report generated by Dr. Tom Powers. (See Attachment 5.)  In short, uranium mining is simply not economically viable, and the RMP and DEIS repeat demonstrably false myths that perpetuate "false hopes" of a uranium revival and create a negative economic impact on viable sources of economic development.[103]

The draft RMP assumes an active uranium mining and milling economy, yet there are zero active mines and mills in the plan area.  The draft RMP asserts "[a]ctivities associated with underground coal mining and surface uranium and vanadium mining are also predicted to be major contributors to particulate matter emissions, albeit at levels consistent with current conditions." Uncompahgre Draft RMP at 4-20. No data is provided to support the conclusion that major contributions from an active uranium mining industry would remain consistent with the emissions from the currently inactive industry.  The lack of analysis must be addressed because emissions from current and potential uranium production is expected to have serious impacts on "Class I airsheds and sensitive Class II areas." *Id.* at 4-25. The draft RMP confirms the importance of mine validity exams on the RMP and site-specific scale: "The magnitude and rate of increased mining operations over the life of the RMP is dependent on economics and the demand for the materials as well as the construction of product transportation facilities and mineral processing facilities." *Id.* at 4-29.

Informed planning decisions cannot be made without informing the public and the decisionmakers that uranium mining has never been economically viable in the Uravan Mineral Belt without direct (ore buying) or indirect (reclamation and clean-up) subsidies.  If equipped with this information, planning can couple mineral withdrawal with terms that protect the BLM and federal taxpayers from the predictable impacts left behind a half-century of uranium mine speculation that has left BLM with more than 4000 federal mines that lack easily identifiable operators to pay for reclamation costs.  At this stage, most operators are insolvent and short of a region-wide Superfund designation, BLM will be stuck with these stranded land management costs.

---

[103] http://www.durangoherald.com/article/20140507/OPINION01/140509617/ (last visited 10/31/2016)

116

The draft RMP lacks information to support reasoned decisions involving "[c]hanges in restrictions that can be placed on mineral claiming, leasing, or development activities." Uncompahgre Draft RMP at 4-254. None of the alternatives consider the past costs, current impacts, and future costs of deferred reclamation. Taken together, the historical and current lack of viability supports analysis, and selection, of an alternative withdrawing all uranium from mineral entry. *Id.* at 4-290.

Plan conformance allows specific mining-related proposals to be conditioned or restricted based on the specifics in the land use plan. BLM should revise the draft RMP to consider alternatives that ensure that all mining-related proposals are conducted only in a manner to protect public health, water quality, and wildlife. This includes such concepts as restricting the placement of wastes or ores in riparian areas, requiring radiometric surveys as part of baseline and reclamation plan analyses, and seasonal closures for wildlife as appropriate. Such provisions are well within BLM's authority. BLM regulations state that: "All future resource management authorizations and actions . . . shall conform to the approved plan." 43 C.F.R. § 1610.5-3(a). Further, "Conformity or conformance means that a resource management action shall be specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan or amendment." 43 C.F.R. § 1601.0-5(b). The draft RMP does not conform with the actual conditions on the ground.

FLPMA governs the management of, and planning for, all BLM administered federal lands. FLPMA provides that:

> The Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands. Land use plans shall be developed for the public lands regardless of whether such lands previously have been classified, withdrawn, set aside, or otherwise designated for one or more uses.

43 U.S.C. § 1712(a). The planning process "may be implemented by including in land-use plans restrictions aimed at Mining Law activities in particular planning areas or in parts of them. . . . FLPMA gives the Department of the Interior authority to restrict Mining Law activities through the process of land-use planning." John D. Leshy, The Mining Law, A Study In Perpetual Motion (1987); *see also* Michael Graf, *Application of Takings Law to the Regulation of Unpatented Mining Claims*, 24 ECOLOGY LAW QUARTERLY 57, at 84-87 (1997).

Similar to the BLM's land use planning authority, the authority of the U.S. Forest Service to condition mining activities through land use plans is well-established. The Ninth Circuit has held that, "[p]ursuant to the NFMA, the Forest Service must demonstrate that a site-specific project would be consistent with the land resource management plan of the entire forest." *Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372, 1377 (9th Cir. 1998) (citing 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(c)). *See also Friends of the Southeast's Future v. Morrison*, 153 F.3d 1059 (9th Cir. 1998). "The Forest Service must comply with the requirements of their Forest Plans, and failure to comply violates NFMA." *Siskiyou Regional Educ. Project v. Rose*, 87 F. Supp. 2d 1074 (D. Or. 1999) (court rejected Forest Service approval of mining without compliance with Forest Plan). *See also Friends*, 153 F.3d at 1070-71.

117

XII. **Coal**

a. **The Draft RMP Fails to Consider a Reasonable Range of Alternatives**

Under FLPMA, BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for coal development. 43 U.S.C. § 1712(c)(1). As such, in the NEPA analysis for the Uncompahgre RMP, BLM must consider a reasonable range of alternatives regarding areas open to coal leasing. The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14). This evaluation extends to considering more environmentally protective alternatives. See, e.g., *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1122-1123 (9th Cir. 2002) (and cases cited therein).

The consideration of more environmentally protective alternatives in the BLM's analysis is consistent with FLPMA's requirement to "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved." 43 U.S.C. §1732(d)(2)(a). FLPMA does not mandate that every use be accommodated on every piece of land; instead, it demands a delicate balancing. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage." *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)). As held by the Tenth Circuit, "[i]f all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined." *Rocky Mtn. Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 738 n. 4 (10th Cir.1982) (quoting *Utah v. Andrus*, 486 F.Supp. 995, 1003 (D.Utah 1979)); *see also* 43 U.S.C. § 1701(a)(8) (stating, as a goal of FLPMA, the necessity to "preserve and protect certain public lands in their natural condition"); *Pub. Lands Council,* 167 F.3d at 1299 (citing § 1701(a)(8)).

As further provided by the Tenth Circuit:

> *It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses* . . . . BLM's obligation to manage for multiple use does not mean that development *must* be allowed on [a particular piece of public land]. Development is a *possible* use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

*New Mexico ex rel. Richardson*, 565 F.3d 683, at 710 (10th Cir. 2009) (emphasis added). BLM manages federal coal leasing under the Mineral Leasing Act (MLA) of 1920, as amended by the 1976 Federal Coal Leasing Amendments Act. 30 U.S.C. § 181, et seq. The statute directs the agency to authorize leasing of coal on federal lands, in its "discretion," only as the agency "finds appropriate and in the public interest." 30 U.S.C. § 201. Furthermore, BLM must be guided by its statutory mandate to administer federal coal leasing in a manner that protects the Nation's "environmental, air and

118

atmospheric, [and] water resource[s]," takes into "account the long-term needs of future generations," and considers "the use of some land for less than all of the resources" to accomplish these objectives. 43 U.S.C. § 1701(a)(8), § 1701(c). Put differently, the driving force behind agency-authorized coal development must be the long-term and broad public interest, not the often short-term and narrow interest of coal companies. Thus, the RMP is obligated to consider the enduring legacy of coal development, which is to be balanced against other critical multiple-use resource values.

An examination of the RMP finds no evidence that BLM considered alternatives that balance uses and impacts within areas known to have coal resources. Rather, the agency across all alternatives not only prioritizes coal leasing and development over other, equally valid resource considerations, but posits no alternatives that consider, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal. BLM cannot ignore its obligation to evaluate these competing uses, and must give due weight to FLPMA's mandate to preserve and protect public lands in their natural condition. *See* 43 U.S.C. § 1701(a)(8).

The objective reasonableness of alternatives can be judged by how they relate to the RMP's purpose and need statement. As stated in the Draft RMP:

> The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses . . . BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy.

Uncompahgre Draft RMP at I-2.This purpose does not accept coal development as a foregone conclusion. The BLM has a responsibility in this planning process to match its expansive land and resource management to current conditions and evolving demands, not business-as-usual expectations from the coal industry.

As further explained in BLM's NEPA Handbook:

> The purpose and need statement dictates the range of alternatives, because action alternatives are not "reasonable" if they do not respond to the purpose and need for the action. The broader the purpose and need statement, the broader the range of alternatives that must be analyzed. The purpose and need statement will provide a framework for issue identification and will form the basis for the eventual rationale for selection of an alternative. Generally, the action alternatives will respond to the problem or opportunity described in the purpose and need statement, providing a basis for eventual selection of an alternative in a decision.

BLM NEPA Handbook at 6.2.1. To adequately address current resource conditions, changes in circumstances, and new or revised national-level policy, the UFO RMP must provide more than a one-sided range of alternatives.

By the measures identified above, BLM's range of alternatives fails to satisfy its procedural obligations under NEPA, its statutory obligation under FLPMA and MLA, and the purpose and need of the RMP. All of the alternatives in the Draft RMP propose to leave available vast amounts of land for coal leasing and development, with little difference in direct, indirect or cumulative impacts. While the alternatives may

119

reflect subtle differences in acreage open for coal leasing, there is virtually no difference in the foreseeable range of coal leasing and development, or in greenhouse gas (GHG) rates across alternatives.

## Summary of Alternatives (Coal)

| Resource | Alt. A | Alt. B | Alt. B.1 | Alt. C | Alt. D |
|---|---|---|---|---|---|
| Maximum Annual Indirect GHG from Coal (MMTCO$_2$e)[104] | 27.1 | 27.1 | 27.1 | 27.1 | 27.1 |
| Coal Acceptable to Leasing (Acres)[105] | 144,790 | 320,440 | 320,440 | 405,230 | 371,400 |
| Coal Unsuitable or Closed to Leasing (Acres)[106] | 1,070 (0.7%) | 101,060 (24.0%) | 101,060 (24.0%) | 16,270 (3.9%) | 50,100 (11.9%) |

The unreasonableness of the BLM's alternatives analysis with respect to coal leasing is remarkable. For example, the Draft RMP considers four alternatives with varying levels of lands "acceptable" for coal leasing. But the alternatives leave open to leasing between 76% and 99.3% of all lands with coal development potential. *See also id.* at 4-274 ("Within the coal potential area, [Alternative B] would be the most restrictive, with 24 percent of the coal potential area unavailable for leasing"). The draft RMP indicates that coal leasing restrictions in the most active coal field – the Somerset – vary between 0% and 12% of the lands in that field that "would be unacceptable for further consideration of leasing and development," meaning that every alternative left *at least* 88% of the most active coal field open for development. *Id.* at 4-289 – 4-290. In other words, across the planning area the BLM would sanction mining on more than three out of every four acres where mining is technologically practicable, prioritizing one use over the myriad other uses and values within the landscape.

Yet even under this lopsided "range" of alternatives, the likely amount of coal produced and burned across all of them is *identical*. Under each alternative, the Draft RMP predicts the same amount of GHG emissions from coal combustion – 27.1 million tons. This entails that none of the alternatives would limit coal production or GHG-related impacts in any way. The BLM specifically assumes that for every alternative, "[t]he output from the two active mines on BLM-administered land within this coal field is estimated to *remain the same as current production*, between 9 and 11 million tons of coal each year for the next 20 years." Uncompahgre Draft RMP at 4-454 (emphasis added).

The similarity in available acreage and the identical emissions resulting from coal development conflicts with NEPA's requirement that an *actual range* of alternatives is considered, such that will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished by only one alternative . . . ." *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999), citing *Simmons v. United States Corps of Engineers*, 120 F.3d 664, 669 (7th Cir. 1997). A fair reading of the Draft RMP strongly suggests that the objective of the BLM is to maximize coal leasing and development in a manner unencumbered by other resource considerations, making its

---

[104] Uncompahgre Draft RMP at 4-41 – 4-42 (maximum figures for indirect GHG emissions from coal production); *id.* at 2-409; 4-297 ("coal production is expected to remain the same across all alternatives").

[105] *Id.* at 2-9 – 2-10, Table 2-1.

[106] *Id.*

BLM_0149376

analysis only a "foreordained formality" in violation of NEPA. *City of New York v. Department of Transp.*, 715 F.2d 732, 743 (2nd Cir. 1983). See also, *Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002).

The "range" of alternatives regarding coal production is unreasonably narrow across the various coal fields in the planning area. For example, the vast majority of the Tongue Mesa coal field is left open under each action alternative (92% or more), despite the fact that the RMP predicts no coal will be produced there because the area's geology makes it "economically unviable to mine in the next 20 years." Uncompahgre Draft RMP at 4-289 – 4-290, 4-454. Similarly, while most of the Grand Mesa coal field is open to coal leasing under all three action alternatives, coal there is also unlikely to be mined in the next two decades. *Id.* at 4-289 – 4-290, 4-454 – 4-455. It appears then that the BLM is unwilling to even consider any reasonable limitations on coal mining, no matter how economically unviable development may be. At the very least the BLM should have considered an alternative that eliminates coal mining in the Tongue Mesa and Grand Mesa coal fields, fields that realistically cannot be mined.

For perspective, compare the RMP's coal scenario to its treatment of renewable energy. For wind and solar development, the draft RMP considers alternatives that would open the planning area to a relatively small acreage (5%), about a third of the acreage, a little over half the acreage, and most of the acreage (83%). Uncompahgre Draft RMP at Table 2-3, 2-379. That table shows that the following acres (% of total acres) would be open to solar and wind under the alternatives:  Alt. A: 561,200 acres (83%); Alt. B: 34,040 acres (5%); Alt. C: 369,970 acres (55%); Alt. D: acres (34%). Thus the *greatest* percentage of land open to wind and solar under any of the alternatives (83%) is still *smaller* than the *least* percentage of land open to coal mining under any alternative (88% of coal-bearing lands).

**Summary of Comments:** BLM must evaluate a robust range of alternatives for coal management in the Uncompahgre RMP. This includes considering alternatives that balance uses and impacts within areas known to have coal resources rather than prioritizing coal leasing and development over other multiple uses across all alternatives. BLM should develop a truer range of alternatives that considers, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal.

### b.   The Draft RMP Relies on Stale Data

NEPA mandates that EISs contain "high quality" information and "[a]ccurate scientific analysis" sufficient to "help public officials make decisions that are based on understanding environmental consequences." 40 C.F.R. § 1500.1(b), (c). Agencies must affirmatively collect new scientific and technical information to support their hard look at impacts where "available information" is stale. See *Northern Plains Resource Council v. Surface Transportation Bd.* 668 F.3d 1067, 1085---87 (9th Cir. 2011). To satisfy the "hard look" requirement of NEPA, the BLM must supplement its existing analyses when new circumstances "raise significant new information relevant to environmental concerns . . . ." *Portland Audubon Soc'y v. Babbitt*, 998 F.2d 705, 708 (9th Cir. 2000). An "agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a hard look at the environmental effects of [its] planned actions." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000). Federal courts have long held that agency reliance on data that is stale or inaccurate invalidates environmental review. *See, e.g.*, *Northern Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085-86 (9th Cir. 2011) (ten-year old survey data for wildlife "too stale" thus reliance on it in EIS was arbitrary and capricious); *Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005) (six year-old survey data for cutthroat trout was "too outdated to carry the weight assigned to it" and reliance on that data violated NEPA); *Seattle Audubon Soc. v. Espy*, 998 F.2d 699, 704-05 (9th Cir. 1993) (reliance on

121

"stale scientific evidence" regarding owl population data without adequate discussion of scientific uncertainty violated NEPA).

Yet in several important respects that relate to climate and socioeconomic impacts, the Draft RMP uses outdated evidence, despite having access to readily available information. Relying on antiquated data runs counter to basic NEPA requirements, and precludes the public from understanding the impacts of the alternatives and reasonable ways to avoid those effects.

      i.    Stale Climate Change Data

The Draft RMP almost wholly relies on climate change data from 2010 or earlier, ignoring new science emphasizing the growing impacts from climate change, as well as new economic conditions reflective of the increasingly problematic connection between coal and climate change. For example, the Draft RMP's description of climate change in Chapter Three relies on three studies: an EPA study published in 2007 and two state studies published in 2008. Uncompahgre Draft RMP at 3-14 – 3-16. The RMP's description of projected climate change in Colorado relies on a single study from 2008. *Id.* at 3-26 – 3-27; 3-57. To affirm that impacts from climate change are already occurring, the BLM relies on a 2009 report. *Id.* at 3-93. The information in Chapter Four is little better. It describes potential GHG emissions based on EPA reports from 2010 – 2012, and dismisses the relative level of direct GHG emissions from activities in the planning area based on a discredited EPA letter from 2008. *Id.* at 4-38 – 4-40. In its discussion of the cumulative impacts of climate change in the project area, the BLM relies on studies published between 1996 and 2010. *Id.* at 4-125.

The Draft RMP's brief look at methane emissions exemplifies its reliance on outdated science, and how that misplaced reliance can falsely minimize impacts analysis. The Draft RMP uses a scientifically stale warming potential of 21 for methane on the basis, presumably, of the Intergovernmental Panel on Climate Change's (IPCC's) 1996 Second Assessment Report (AR2).[107] Even though EPA has since taken action to update methane's warming potential based on the Fourth Assessment Report (AR4),[108] wherein methane's 100-year warming potential is measured at 25, the Draft RMP adopts EPA's obsolete warming potential of 21. Uncompahgre Draft RMP at 4-38. Moreover, the IPCC has issued a new report, the 2013 Fifth Assessment Report (AR5), which supersedes its previous reports. The IPCC AR5 explains that methane, over a 100-year time frame and accounting for climate-carbon feedbacks, is *36 times as potent as carbon dioxide, not 21 or 25.*[109]

The data utilized and conclusions drawn in the Draft RMP are stale to the point that they do little to aid the public's understanding of the relationship between coal mining and the affected landscape, climate or socioeconomics. In 2011, the U.S. Court of Appeals for the Ninth Circuit in *Northern Plains Resource Council v. Tongue River Railroad* addressed the duty of federal agencies to gather "baseline data" during

---

[107] Intergovernmental Panel on Climate Change, *Second Assessment Report* (1996). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016).

[108] Intergovernmental Panel on Climate Change, *Fourth Assessment Report* (2007). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016).

[109] IPCC, *Climate Change 2013: The Physical Science Basis, Working Group I Contribution to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change*, at Ch. 8, p. 714, Table 8.7 (2013). Available at www.climatechange2013.org/ (last viewed October 20, 2016).

BLM_0149378

the NEPA process. *Northern Plains Resource Council v. Tongue River Railroad*, 668 F.3d 1067, 1083-85 (9th Cir. 2011). The court found that "[r]eliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious." *Id.* at 1086. Like the agency in *Northern Plains*, the BLM here cannot to rely on old and generalized data in considering the impacts from coal leasing and development. There is abundant data that has been generated over the last four years concerning most facets of the climate change issue, yet no new information since 2012 is included or cited in the Draft RMP. Any subsequently prepared NEPA document must include and refer to this data.

ii.   Stale Coal Production and Employment Data

To understand the nature of GHG emission impacts on the environment, the BLM must first quantify the *amount* of emissions that result from the various alternatives. But to quantify the GHG pollutants attributable to the UFO RMP management scheme, the BLM must first accurately project the volume of coal that the RMP would make available that otherwise would remain in the ground. Unfortunately, the production forecasts and scenarios in the BLM's analysis are stale and not indicative of current or anticipated future output.

Since 2010 (the date of much of the Draft RMP's coal production data – see below), much has changed in national and international coal markets in general, and to mines in the North Fork Valley in particular. Some of the most significant developments include:

- the closure of the Elk Creek mine in 2013, its demolition in 2016, and the layoff of virtually all of its employees;[110]
- the idling of the Bowie No. 2 mine in February 2016, and the layoff of most of its employees;[111]
- layoffs and production declines at the West Elk mine in 2016 from "continuing challenges" in domestic and international coal markets;[112] and
- the announcement that the Nucla coal mine, and the power station it serves, will close in 2022.[113]

These market conditions are unlikely to improve, due to low natural gas prices, the increasingly competitive pricing of wind and solar energy, and international commitments to address climate change. In fact, a coal company executive recently predicted that mines in Colorado and Utah would be shipping zero coal west for export by 2030 due to deteriorating overseas markets and because West Coast states are moving swiftly toward a renewable energy future.[114] As a result of these changes,

---

[110] D. Webb, Oxbow shifts to permanent shutdown of Elk Creek Mine, Grand Junction Sentinel (April 30, 3016). Available at http://www.gjsentinel.com/news/articles/oxbow-shifts-to-permanent-shutdown-of-elk-creek-mi (last viewed October 20, 2016).
[111] D. Webb, Bowie idles Paonia mine, Grand Junction Sentinel (Feb. 26, 2016). Available at http://www.gjsentinel.com/breaking/articles/bowie-idles-paonia-mine (last viewed October 20, 2016).
[112] D. Webb, West Elk Mine undergoes layoffs, Grand Junction Sentinel (June 2, 2016). Available at http://www.gjsentinel.com/breaking/articles/ west-elk-mine-undergoes-layoffs (last viewed October 20, 2016).
[113] G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 20, 2016).
[114] C. Coates, Murray Energy CEO sees end of westbound Uinta coal by 2030, SNL (June 10, 2016). Available at https://www.snl.com/InteractiveX/articleabstract.aspx?id=36796676&KPLT=8 (last viewed June 28, 2016).

BLM_0149379

employment and production in the Somerset coal field has fallen dramatically since 2010, as the table below indicates:

**Coal Production and Employment, Somerset Coal Field and Colorado, 2010 and 2016^**

| | Coal production, Somerset coal field mines (million tons) | Coal production, Colorado (million tons) | % of total Colorado coal production from Somerset coal mines | Coal employment, Somerset coal field* | Coal employment, Colorado | % of total Colorado coal employment from Somerset coal mines |
|---|---|---|---|---|---|---|
| 2010 | 9.96 | 25.21 | 39.5% | 923 | 2,041 | 45.2% |
| 2016 (through July) | 1.48 | 6.64 | | 228 | 1,123 | 20.3% |
| 2016 (annualized) | 2.55 | 11.38 | 22.4% | 228 | | |

^ All coal production and employment figures derived from Colorado Division of Reclamation, Mining and Safety website (http://mining.state.co.us/Reports/Reports/Pages/Coal.aspx).
* Employment figures are calculated from the last reported date of the period: Dec. 2010 for 2010, and July 2016 for this year.

The Draft RMP's data, much of it dating back to 2010 or older, is especially stale in light of dwindling coal production and employment in the Somerset Coal Field. As a result, the RMP's assumptions and conclusions are misplaced. For example, much of its coal conclusions derive from a BLM document entitled "Coal Resource and Development Potential," dated April 2010. *See, e.g.*, Uncompahgre Draft RMP at 4-13. Similarly, the BLM relies on the July 2010 "Socioeconomic Baseline Assessment Report," which, for coal resources, again relies on outdated coal data from 2009 and before that paints an exceedingly optimistic picture of the importance and value of coal to the local economy in the future. *Id.* at 3-178.

Over six years of data are available for the agency to consider, data which reveals upheaval in the national coal industry and for coal field mines in the UFO planning area in particular. Any subsequently prepared NEPA document must include up-to-date data concerning coal markets, coal production and coal employment.

The following data and conclusions are stale given the changes in the local coal industry:
- The Draft RMP uses production averages from June 2014 and June 2015, though an additional 13 months of data exist demonstrating a steep drop in production since last year. *Id.* at 3-126.
- The Draft RMP assumes a coal production rate of "9 to 11 million tons per year," which is well above the permitted level of the West Elk mine, the only remaining operating mine in the area. *Id.* at 4-255; *See also id.* at 4-289 – 4-290.
- The Draft RMP states that projections from the "Energy Information Administration indicate that demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal," citing 2010 data. *Id.* at 3-126 – 3-127. Production of coal from Colorado mines fell 41% in the first half of 2016 compared to the

BLM_0149380

same period in 2015.[115]  The state's Division of Reclamation Mining and Safety reported that Colorado mines produced 5.73 million tons of coal in the first six months of 2016, compared to 9.80 million tons in the first half of 2015.[116] Colorado's drop is consistent with, but larger than, the national trend. The EIA estimates that 2016 total U.S. coal production through July 23 was down 26% compared to the same period in 2015.[117]

- The Draft RMP cites EIA data indicating coal production contributes nearly $400 million annually based on the local production of over 12 million tons of coal from the region. *Id.* at 3-193 – 3-194. *See also* BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-18 (containing same assumptions and conclusions). In 2016, the Somerset field provides less than a quarter of Colorado's coal, and production has fallen by three-quarters.

- The Draft RMP bases its socioeconomic analysis on assumptions about the level of coal production that appear to be far higher than current levels: "Approximately 13.8 million tons of coal would be mined in the planning area in Delta, Gunnison, and Montrose Counties in 2012, with approximately 13.1 million tons of that being federal coal (see Table 4-89 [2012 Coal Extraction Levels]). Coal contributions to employment and income from these uses would annually provide approximately 2,018 jobs and over $175 million in labor income, with these figures increasing to 50,350 jobs and over $3.5 billion in labor income over the expected 20 year lifespan of the RMP." *Id.* at 4-468. Similarly optimistic assumptions are contained in the BLM's 2010 Socioeconomic Baseline report. *See* BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-6; 2-17. These critical economic assumptions are outdated and inaccurate; the annual rate for coal production in 2016 is well under three million tons, and employment has dropped by roughly 75% since 2012. Nearly 1,000 miners worked three active coal mines in the Somerset field in 2012;[118] today that number is less than 250.

- The Draft RMP describes the Bowie #2 mine as "actively producing," and suggests that the Elk Creek mine may someday resume production. Uncompahgre Draft RMP at 3-125. *See also id.* at 4-11 – 4-12; *id.* at 4-258 – 4-259. But Bowie #2 is idle, and Elk Creek is permanently closed.

- The Draft RMP also appears to assume that the New Horizon mine will continue to produce coal at its current rate indefinitely, although its operator agreed to close it in 2022.[119] *Id.* at 4-289 – 4-290.

- The Draft RMP makes assumptions about coal mining rates to address potential impacts to natural resources. For example, it predicts an increase in impacts to some natural resources because coal mining, among other activities, is "becoming more active once again and energy and mineral resources are expected to increase over time, likely resulting in increasing demand for extraction." *Id.* at 3-41. While some mineral extraction may be increasing, coal is falling compared to historic levels.

---

[115] D. Worthington, Colorado coal production down 42 percent for first six months of 2016, injuries up 20 percent, Denver Post (August 3, 2016). Available at http://www.denverpost.com/2016/08/03/colorado-coal-production-2016-down-42-percent/ (last viewed October 26, 2016).

[116] *Id.*

[117] *Id.*

[118] See DRMS coal production and employment data for 2012, available at http://mining.state.co.us/SiteCollectionDocuments/2012RevisedDetail2013.pdf (last viewed October 20, 2016).

[119] G. Harmon, *Power station slated to close; coal mine will shut down in 2022*, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 26, 2016).

BLM_0149381

- To address air quality impacts, the Draft RMP assumes that "Coal mine production remains unchanged from base year rates with any drop off in existing mine production replaced by production from future mine development in the area." *Id.* at 4-28. In the base year of 2011, Colorado produced 27 million tons of coal, more than twice as much as it is likely to produce this year, and Somerset coal field mines produced 11 million tons, about four times their likely output this year. Thus, the Draft RMP's assumption that coal production rates are "unchanged" from 2011 are false. *See id.* at 4-20.

The fact that the BLM relies on stale data is significant because it distorts the agency's analysis of both climate impacts and economic values. Assuming an inflated value for coal production and employment in the future misrepresents the economic health and long-term viability of this industry. Similarly, relying on stale climate data diminishes our understanding of the relationship between UFO-sanctioned coal management and climate change. Given deteriorating market conditions and the urgent need to transition away from coal combustion, it is imperative that the BLM provide accurate information.

**Summary of Comments:** BLM must utilize current, high quality information to analyze coal management alternatives in the Uncompahgre RMP, including updated climate and production and employment data. Relying on antiquated data runs counter to basic NEPA requirements, and precludes the public from understanding the impacts of the alternatives and reasonable ways to avoid those effects.

XIII.   **Climate Change**

a.   **BLM's Obligation and Authority to Analyze Climate Change in RMPs**

BLM has a legal duty to address the impacts of climate change both from land management actions and to the resource area in the Uncompahgre RMP. The Uncompahgre Field Office will undoubtedly experience real effects of climate change during the 20 year period that the RMP is in effect and beyond. Many management decisions in the RMP may contribute to and exacerbate the impacts of human-induced global climate change, and BLM stewards many resources that must be managed so as to maximize their ability to adapt and endure in the face of climate change.

We appreciate that BLM acknowledges the need to manage for climate change impacts, analyzes some of those impacts from BLM actions and from other actions affecting the Uncompahgre Field Office, quantifies greenhouse emissions from alternatives under consideration in the RMP and proposes a goal and objective specifically related to climate change in the draft RMP. *See, e.g.,* Uncompahgre Draft RMP at 2-24; 3-14—16; 4-37—43; Appendix Q. These are all important initial steps in bringing climate change analysis and management into resource management planning. However, at this time, BLM has access to significant amounts of data and useful tools to assist with climate change analysis, relevant policy and guidance for completing robust climate analysis in environmental reviews, and an obligation to make management decisions that more comprehensively address climate change impacts and adaptation. The Uncompahgre RMP is wholly inadequate in addressing this important issue at this critical time.

1.   BLM must take a hard look at climate change impacts from management decisions in the environmental impact statement for the resource management plan.

Impacts to the ecosystem from climate change include shrinking water resources; extreme flooding events; invasion of more combustible non-native plant species; soil erosion; loss of wildlife habitat; and larger, hotter wildfires. Many of these impacts have been catalogued in recent studies by federal

126

agencies showing the impacts of climate change specifically in the United States such as the National Climate Assessment.[120]

An important source of information for impacts from climate change is BLM's Rapid Ecoregional Assessment (REA) for the Colorado Plateau.[121] BLM should be using the results of the REA to inform the RMP/EIS and to address management issues at the landscape-scale, such as climate change. The Draft RMP states that, "Data in the Colorado Plateau Rapid Ecological Assessment [sic] will be considered as appropriate." Uncompahgre Draft RMP at 1-12. However, BLM appears to rely very little on data available from the REA, as there is hardly any reference to the REA other than that vague commitment, and the RMP fails to consider management alternatives that reflect data derived from the REA. The REA should be a central tool relied upon in resource management planning to plan for climate change adaptation:

> REAs are timely in supporting planning, management, and mitigation strategies for impacts anticipated from rapidly-developing issues related to traditional and renewable energy development, the spread of invasive species, changing fire regimes, and climate change. REAs provide a foundation for an adaptive management approach that will allow implementation strategies to be adjusted for new information and changing conditions. REAs represent a baseline condition from which to evaluate the results of adaptive management and to characterize potential trends in resource condition both in the near-term (2025)—as a consequence of development activities—and in the long-term (2060) as a result of climate change. The final chapter of this REA report (Chapter 6) provides examples showing how the data and results may be arranged and manipulated using mapped and tabular results, for all land ownerships and BLM-lands only, for areas of intact habitats, resource value hotspots, and opportunities for connectivity with existing designated lands.

Colorado Plateau REA Final Report II-3-c at viii.

Unfortunately, with all of this data available, BLM fails to address climate change in a meaningful way, instead intimating that the agency is incapable of managing public lands and resources to reduce impacts to climate change or adapt to climate change impacts. For example, under the stated goal to: "Manage native vegetation and wildlife species, soil and water resources, and wildlife habitats to maintain productivity, viability, and natural processes in response to stresses induced by climate change," BLM includes the vague management action to "Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values." Uncompahgre Draft RMP at 2-24. The only other actions under the climate change goal are to seed local native species to improve survival of plan populations and to minimize soil and vegetation disturbance in ecological emphasis areas. Id at 2-25.

This does not meet the obligation of the agency to assess impacts from climate change and contributions to climate change from agency actions. On August 2, 2016, the Council on Environmental Quality (CEQ) released its long-awaited final guidance on considering greenhouse gas (GHG) emissions and the effects of climate change in NEPA reviews. The overarching goal of the guidance is to provide greater clarity and more consistency in how federal agencies address climate change in their NEPA

---

[120] Available at http://nca2014.globalchange.gov/
[121] Information on the REA is available at:
http://www.blm.gov/wo/st/en/prog/more/Landscape_Approach/reas/coloplateau.html.

BLM_0149383

reviews and to facilitate compliance with existing NEPA requirements. The guidance recognizes that "[c]limate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview." CEQ Guidance at 2. It recognizes that identifying and analyzing the interactions between our changing climate and the environmental impacts from a proposed action can have a number of benefits, including identifying opportunities to reduce and mitigate GHG emissions, to improve environmental outcomes, and to help safeguard communities, infrastructure, and resources against the effects of climate change.

The guidance counsels agencies to use the information developed during the NEPA review to consider alternatives that are more resilient to the effects of a changing climate. CEQ Guidance at 5. BLM must not only analyze greenhouse gas emissions from proposed actions, but use that information to make better decisions for public lands resources and, equally importantly, assess likely impacts to our public lands from climate changes already underway in order to respond and adapt. Notably, the guidance contains special considerations for biogenic sources of greenhouse gas emissions from land management actions, such as prescribed burning. CEQ Guidance at 18. While the final CEQ guidance was recently released, a second draft of this guidance has been out since 2014. Therefore, the Uncompahgre RMP is not exempt from considering and using this guidance in analyzing climate change, and BLM should have incorporated principles from the CEQ guidance into the draft RMP.

Additionally, BLM has other requirements to analyze climate change in NEPA analyses that are not met in the draft RMP. NEPA regulations and U.S. courts direct that BLM must fully analyze the cumulative and incremental impacts of the proposed decisions in the RMP. *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d 1172, 1217 (9th Cir. 2008). In *CBD v. NHTSA*, the NHTSA failed to provide analysis for the impact of greenhouse gas emissions on climate change and was rebuked by the U.S. Court of Appeals for the Ninth Circuit, which observed that "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." 538 F.3d at 1217. For example, off-road vehicle designations, oil and gas management stipulations, and renewable energy development may significantly increase or reduce greenhouse gas emissions contributing to climate change and must be analyzed under NEPA.

Further, NEPA regulations require that NEPA documents address not only the direct effects of federal proposals, but also "reasonably foreseeable" indirect effects.  These are defined as:

> Indirect effects, which are caused by the action and are later in time or farther removed in distance, *but are still reasonably foreseeable.* Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b) (emphasis added).

BLM is required to take a hard look at direct, indirect, and cumulative impacts to and from climate change in the planning area in the RMP. BLM baseline data on climate change must be sufficient to permit analysis of impacts under NEPA. Importantly, 40 C.F.R. § 1502.15 requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." Establishment of baseline conditions is a requirement of NEPA.  In *Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA."  The court further held that

BLM_0149384

"[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

There is a growing body of scientific information already available on climate change baseline conditions, much of it generated by or available through federal agencies. Where there is scientific uncertainty, NEPA imposes three mandatory obligations on BLM: (1) a duty to disclose the scientific uncertainty; (2) a duty to complete independent research and gather information if no adequate information exists unless the costs are exorbitant or the means of obtaining the information are not known; and (3) a duty to evaluate the potential, reasonably foreseeable impacts in the absence of relevant information, using a four-step process. Unless the costs are exorbitant or the means of obtaining the information are not known, the agency must gather the information in studies or research. 40 C.F.R. § 1502.22.  Courts have upheld these requirements, stating that the detailed environmental analysis must "utiliz[e] public comment and the best available scientific information." *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1171-72 (10th Cir. 1999) (citing *Robertson v. Methow Valley Citizens' Council*, 490 U.S. at 350); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1521-22 (10th Cir. 1992).

As the Supreme Court has explained, while "policymaking in a complex society must account for uncertainty," it is not "sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions."  *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 52 (1983).  Instead, in this context, as in all other aspects of agency decision-making, "[w]hen the facts are uncertain," an agency decision-maker must, in making a decision, "identify the considerations he found persuasive." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 520 (D.C. Cir. 1983), quoting Ind. *Union Dept., AFL-CIO v. Hodgson*, 499 U.S. 467, 476 (D.C. Cir. 1974).

BLM's duty to evaluating reasonably foreseeable significant adverse impacts includes "impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22(b). Such impacts are especially significant in the face of climate change.

Finally, BLM Instruction Memorandum 2013-094 regards management during drought. This IM requires BLM to modify uses and management to lessen impacts from drought including activities such as grazing, recreation, lands actions and minerals activities. IM 2013-094 also states that BLM should consider the information in BLM's Rapid Ecoregional Assessments in assessing drought and mitigation measures and states a preference for RMPs and other plans to proactively address potential drought and its effects.

2.   BLM must craft long-term management prescriptions without permanent impairment and unnecessary or undue degradation to the resources in the face of climate change.

FLPMA gives BLM the authority to manage and plan for emerging issues and changing conditions that global climate change will affect in the planning area.  FLPMA mandates that when BLM revises land use plans, it must "use and observe the principles of multiple use and sustained yield set forth in this and other applicable law" 43 U.S.C. § 1712(c).

The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future

129

needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions. . . a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources. . . and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.  43 U.S.C. § 1702(c) (emphasis added).

Additional pertinent requirements of FLPMA that specifically apply to land use planning include using "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences; consider[ing] relative scarcity of the values involved; and weigh[ing] long-term benefits to the public against short-term benefits. *Id.* FLPMA also provides that BLM must "take any action necessary to prevent unnecessary or undue degradation to managed resources." 43 U.S.C. § 1732(b). Collectively, the provisions of FLPMA highlighted above necessitate on-the-ground implementation of climate change policies.

In addition to the agency's duty under NEPA to take a hard look at the impacts of climate change to and from decisions in the resource management plan, BLM must also include a range of alternatives that includes a strategy for mitigating these impacts. CEQ regulations instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact, specifically stating that "[f]ederal agencies shall to the fullest extent possible: . . . Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e) (emphasis added); *see also*, 40 C.F.R. §§ 1502.14, 1502.16.

The impacts of climate change should be a major factor in every alternative that is created since it is an undeniable reality that will drive all land use planning decisions. As provided in the Oregon/Washington BLM State Office guidance document IM OR-2010-012, "[r]esource management plans and other broad programmatic analyses are actions that would typically have a long enough duration that climate change could potentially alter the choice among alternatives."

Further, general statements that BLM will conduct monitoring are also not an appropriate form of mitigation.  Simply monitoring for expected damage does not actually reduce or alleviate any impacts. Instead, a vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem. A detailed monitoring approach is also required under the BLM's planning regulations:

> The proposed plan shall establish intervals and standards, as appropriate, for monitoring and evaluation of the plan. Such intervals and standards shall be based on the sensitivity of the resource to the decisions involved and shall provide for evaluation to determine whether mitigation measures are satisfactory, whether there has been significant change in the related plans of other Federal agencies, State or local governments, or Indian tribes, or whether there is new data of significance to the plan. The Field Manager shall be responsible for monitoring and evaluating the plan in accordance with the established intervals and standards and at other times as appropriate to determine whether there is sufficient cause to warrant amendment or revision of the plan. 43 C.F.R. § 1610.4-9 (emphasis added).

130

BLM_0149386

Such vigilant monitoring is absolutely necessary in order to create an effective adaptive management framework in the face of climate change.

3.  BLM must estimate the potential increase in vulnerability to climate change impacts.

As discussed above, the agency must evaluate the direct, indirect and cumulative impacts of climate change emissions from the project. The agency must also take a hard look at the impacts of climate change and the potential increase in vulnerability to the project area from climate change. As stated in the CEQ Guidance:

> The analysis of climate change impacts should focus on those aspects of the human environment that are impacted by both the proposed action and climate change. Climate change can make a resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change. This increase in vulnerability can exacerbate the effects of the proposed action . . . Such considerations are squarely within the scope of NEPA and can inform decisions on whether to proceed with, and how to design, the proposed action to eliminate or mitigate impacts exacerbated by climate change. They can also inform possible adaptation measures to address the impacts of climate change, ultimately enabling the selection of smarter, more resilient actions.

CEQ Guidance at 21-22. In order to fulfill its responsibilities under NEPA, the BLM must fully evaluate the potential increased vulnerabilities to the landscape and communities caused by climate change and the impacts of this project to potentially exacerbate those vulnerabilities. This will provide the agency, the project proponent and the public with more information on possible mitigation measures that could be implemented as well as measures to boost the resiliency of the landscape.

4.  BLM must evaluate climate emissions in the context of U.S. climate commitments and seek to meet those national goals.

The climate change impacts observed from GHG emissions are already evident and will worsen unless emissions of GHGs are greatly reduced. The wide range of impacts from climate change, including melting glaciers and earlier snow melts in our mountains that disrupt water supplies in the west, thawing permafrost, forest fires, widespread drought, rising sea levels, and the spread of invasive species, have been rigorously and scientifically documented by the Intergovernmental Panel on Climate Change (IPCC), as well as American researchers and agencies. These have led to substantial commitments made by this Administration to reduce our national contribution to climate change. As part of these commitments, federal agencies must begin to not just measure, but to act on the basis of potential GHG emissions.

Our public lands and minerals are held in trust for the public. We must ensure this trust is not broken when authorizing actions on our public lands that contribute to climate emissions. In particular, fossil fuel production on federal public lands and mineral estates is extensive and the production of GHGs resulting from the exploration, extraction, transportation and combustion of these fuels is significant. The federal fossil fuels program must provide assurance the public trust will not be violated by carefully considering climate change issues and taking steps to avoid, minimize and offset impacts through

131

compensatory mitigation. In 2012, as much as 21 percent of the Nation's GHG emissions originated from coal, oil and natural gas extracted from the public lands.[122]

**Leading science has firmly established the need for developing thresholds of acceptable fossil energy extraction for the planet based on expected GHG emissions.** The scientific understanding that the global increase in temperature due to greenhouse gas emissions must be capped at or below 2-degree Celsius to avoid unmanageable climate change consequences is well-established. The 2-degree Celsius threshold was first enshrined in the 2009 Copenhagen Accord[123] and reaffirmed in the 2015 Paris Agreement as the limit for "acceptable" warming.[124] During that time, the international scientific community's understanding of the interaction between fossil fuel development and temperature thresholds has greatly increased, and today it is widely agreed that development of additional reserves should be considered in the context of warming goals—giving rise to the idea of a carbon budget for the planet. In fact, this notion has been assessed and supported by the IPCC in all assessment reports going back to 1990 and has yielded a methodology routinely employed and updated annually by the Global Carbon Project.[125]

The IPCC's analytic method was further advanced in January 2015 in a journal paper that evaluated known fossil fuel reserves to determine, based on current emissions factors and global warming potential, how much should be left in-place to maximize the planet's chances of remaining below 2 degrees Celsius.[126] Importantly, it quantifies the regional distribution of known fossil-fuel reserves and

---

[122] Claire Moser, Joshua Mantell, Nidhi Thakar, Chase Huntley and Matt Lee-Ashley. *Cutting Greenhouse Gas from Fossil-Fuel Extraction on Federal Lands and Waters*. March 19, 2015. Policy brief and underlying analysis is available at http://wilderness.org/blog/blind-spot-plan-reduce-emissions-slowing-progress-fight-against-climate-change (accessed July 28, 2016).

[123] Copenhagen Accord ¶ 1, *agreed* Dec. 18, 2009, FCCC/CP/2009/11/Add.1, *available at* http://unfccc.int/resource/docs/2009/cop15/eng/11a01.pdf ("recognizing the scientific view that the increase in global temperature should be below 2 degrees Celsius" relative to pre-industrial temperatures to "stabilize greenhouse gas concentration in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system"); *id.* at ¶ 2 (agreeing that "deep cuts in global emissions are required according to science" to meet this goal).

[124] The United States and other signatory nations committed to reducing greenhouse gas emissions "well below 2 °C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5 °C above pre-industrial levels." Paris Agreement art. 2, ¶ 1(a), *adopted* Dec. 12, 2015, FCCC/CP/2015/L.9, *available at* http://unfccc.int/resource/docs/2015/cop21/eng/l09r01.pdf. The authority cited in the letter is being provided via regualtions.gov and it should be included in the administrative record for this decision.

[125] The IPCC has produced and reviewed a carbon budget for the planet in all assessment reports (Ciais et al., 2013; Denman et al., 2007; Prentice et al., 2001; Schimel et al., 1995; Watson et al., 1990), as well as by others (e.g. Ballantyne et al., 2012). These assessments included carbon budget estimates for the decades of the 1980s, 1990s (Denman et al., 2007) and, most recently, the period 2002–2011 (Ciais et al., 2013). The IPCC methodology has been adapted and used by the Global Carbon Project (GCP, www.globalcarbonproject.org), which has coordinated a cooperative community effort for the annual publication of global carbon budgets up to the year 2005 (Raupach et al., 2007), 2006 (Canadell et al., 2007), 2007 (published online; GCP, 2007), 2008 (Le Quéré et al., 2009), 2009 (Friedlingstein et al., 2010), 2010 (Peters et al., 2012b), 2012 (Le Quéré et al., 2013; Peters et al., 2013), 2013 (Le Quéré et al., 2014), and most recently 2014 (Friedlingstein et al., 2014; Le Quéré et al., 2015). Each of these papers updated previous estimates with the latest available information for the entire time series. From 2008, these publications projected fossil fuel emissions for one additional year using the projected world gross domestic product (GDP) and estimated trends in the carbon intensity of the global economy (Rogelj, 2016).

[126] McGlade, Christophe and Paul Ekins, *The Geographical Distribution of Fossil Fuels Unused When Limiting Global Warming to 2 °C*, 517 Nature (187) (2015).

BLM_0149388

resources and, through modeling a range of scenarios based on least-cost climate policies, identifies geographically-specific resources that should not be burned between 2010 and 2050 to ensure the world stays within a 2-degree Celsius limit in the most cost-efficient manner.[127] Importantly, this study demonstrates that there are geographically-specific analyses available that support comparative judgments about the appropriateness of tapping into different resources and plays.

**The United States has set national commitments to reduce GHG emissions.** The United States has submitted its target to cut net GHG emissions to the United Nations Framework Convention on Climate Change. This Intended Nationally Determined Contribution (INDC), as provided for in the Paris Agreement, is a formal statement of the U.S. target to reduce emissions by 26 to 28 percent below 2005 levels by 2025. In addition, to achieve a no more than 2 degrees Celsius temperature increase, heat trapping gasses in the atmosphere must be kept at or below 450 parts per million CO2-eq., which means that industrialized nations like the U.S. will have to reduce their emissions an average of 70 to 80 percent below 2000 levels by 2050.

In addition, on June 29, 2016 the leaders of Canada, Mexico, and the United States committed to the North American Climate, Clean Energy, and Environment Partnership. Under this agreement, the countries will pursue an historic goal for North America to strive to achieve 50 percent clean power generation by 2025. "Canada, the U.S., and Mexico will work together to implement the historic Paris Agreement, supporting our goal to limit temperature rise this century to well below 2 degrees C, and pursuing efforts to limit the temperature increase to 1.5 degrees C."[128]

These commitments are consistent with and required by The President's Climate Action Plan (June 2013) which calls for many steps to combat climate change such as reductions in CO2 emissions from power plants, increased use of renewable energy, improved automobile efficiency standards, and reducing methane emissions, among many other things.[129] But to achieve the goals of the Climate Action Plan, which include "steady, responsible action to cut carbon pollution, [so] we can protect our children's health and begin to slow the effects of climate change so that we leave behind a cleaner, more stable environment," it will also be necessary to address issues related to fossil fuel extraction from our public lands, such as establishing a carbon management system.

The RMP must analyze climate emissions and alternatives for managing climate change in the context of these national commitments and targets, both in terms of fossil fuel management and other activities authorized under the RMP that would contribute to GHG emissions.

5.   Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

BLM has significant obligations and authority related to mitigation for all unavoidable impacts. Secretarial Order 3330 requires the development of a landscape-scale mitigation policy for the Department of the Interior. Section 4(c) of Secretarial Order 3330 directs the Task Force to: "[I]dentify

---

[127] *See id.* at 187-90.

[128] See https://www.whitehouse.gov/the-press-office/2016/06/29/leaders-statement-north-american-climate-clean-energy-and-environment (presenting Leaders' Statement on a North American Climate, Clean Energy, and Environment Partnership).

[129] *See also* Climate Action Plan Strategy to Reduce Methane Emissions (March 2014) (presenting the President's methane reduction strategy).

BLM_0149389

any new policies or practices, revisions to existing policies or practices, or regulatory or other changes that could be implemented to incorporate landscape-scale planning into mitigation-related decisions…"

In a report to the Secretary of the Interior, the Energy and Climate Change Task Force laid out a landscape approach to mitigation.[130] This approach contained the following steps:

1. Identifying key landscape attributes, and the conditions, trends and baselines that characterize these attributes;

2. Developing landscape-scale goals and strategies;

3. Developing efficient and effective compensatory mitigation programs for impacts that cannot be avoided or minimized; and

4. Monitoring and evaluating progress and making adjustments, as necessary, to ensure that mitigation is effective despite changing conditions.

BLM is also considering new tools and approaches the agency could use to increase the effectiveness of mitigation on public lands, including layering protective management and designations and exploring creative ways existing authorities could be used for conservation benefits. Effective new mitigation tools and approaches should be integrated into planning as well.

Mitigating climate-related impacts includes avoiding and minimizing generation of GHG emissions through management prescriptions and preventing harm to carbon sinks. The CEQ guidance on considering climate change in NEPA analyses provides that agencies should analyze reasonable alternatives that would mitigate both direct and indirect GHG emissions impacts and the cumulative effects of climate change (e.g., enhanced energy efficiency, carbon sequestration, lower GHG-emitting technology). CEQ Guidance at 19. BLM must address the quality of mitigation measures as well as ensure they are additional, verifiable, durable, enforceable, and will be implemented.

It is important to underscore that, as a land manager, the federal government is facing huge and rapidly escalating costs to address the impacts caused by fossil-fuel driven climate change. Forest fires, widespread drought, unusual flooding, rising sea levels, spread of invasive species and spread of disease already result in significant costs to the federal government, and each new oil production project the BLM authorizes increases these problems and the associated costs. Research from the University of Vermont's Gund Institute for Ecological Economics and The Wilderness Society suggests that total costs in degraded ecosystem services could exceed $14.5 billion annually under a 2-degree Celsius warming scenario.[131] These costs are ultimately borne by all American taxpayers, and BLM has a responsibility to minimize and recoup these costs when it makes decisions authorizing activities that cause these impacts and associated costs.

---

[130] Clement, J.P. et al. 2014. A strategy for improving the mitigation policies and practices of the Department of the Interior. A report to the Secretary of the Interior from the Energy and Climate Change Task Force, Washington, D.C., 25 p.

[131] See Esposito, Valerie; Phillips, Spencer; Boumans, Roelof; Moulaert, Azur; Boggs, Jennifer. 2011. "Climate change and ecosystem services: The contribution of and impacts on federal public lands in the United States." In: Watson, Alan; Murrieta-Saldivar, Joaquin; McBride, Brooke, comps. *Science and stewardship to protect and sustain wilderness values: Ninth World Wilderness Congress symposium*; November 6-13, 2009; Merida, Yucatan, Mexico. Proceedings RMRS-P-64. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. 155-164. Available at http://www.fs.fed.us/rm/pubs/rmrs_p064.pdf? (accessed July 23, 2016).

134

BLM_0149390

**Summary of Comments:** The Uncompahgre RMP provides BLM with an excellent opportunity to analyze the impacts from climate change to the planning area over the next two decades, including increases in vulnerability, as well as the contribution to climate change from management decisions made in the plan. This analysis should lead to the development of thoughtful management prescriptions and alternatives in the land use plan that will address how BLM will mitigate these causes and adapt its management over the coming years to prevent permanent impairment and unnecessary or undue degradation to the resources in the face of climate change. BLM must analyze climate emissions in the context of national climate commitments detailed above. Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

### b.   Recommended Approach to Managing Climate Change in RMPs

Under the pressures of global change, it must be acknowledged that many objects of conservation are at risk wherever they are found, and the traditional natural resource management paradigm of modifying ecosystems to increase yield must change to a new paradigm of managing wildland ecosystems to minimize loss – specifically loss of the ecosystem composition, structure, and function that yields the benefits we seek from wildlands. Natural resource management must change from a paradigm of maximum sustained yield to a paradigm of risk management.

Although there is no widely-accepted method of assessing and managing risk, we recommend breaking risk down into its component parts—vulnerability, exposure, and uncertainty—as a useful way to think about risk to biodiversity and productive potential. In the TWS report, "Recommended Risk Assessment and Management Approach for Addressing Climate Change in BLM Land Use Planning" (included as Attachment 6), we recommend an approach for assessing risk in the planning area as well as an approach for management of that risk for BLM to comply with its legal obligations under NEPA and FLPMA as set out above.

**Summary of Comments:** BLM should utilize the attached management framework to address and manage climate change in the RMP.

### c.   Adapting to Climate Change

In addition to the analyzing the impacts of climate change, The Department of Interior Manual for climate change adaptation (523 DM 1) requires BLM to plan for uncertainty and risk in the face of climate change. Among other things, this policy guidance requires BLM to:
- use the best available science of climate change risks, impacts and vulnerabilities,
- use the network of Landscape Conservation Cooperatives, Climate Science Centers and other partnerships to understand and respond to climate change,
- use well-defined and established approaches for managing through uncertainty including vulnerability assessments, scenario planning and other risk management approaches,
- promote landscape-scale, ecosystem-based management approaches to enhance the resilience and sustainability of linked human and natural systems,
- Manage linked human and natural systems that help mitigate climate change impacts, such as:
  - protect diversity of habitat, communities and species,
  - protect and restore core, unfragmented habitat areas and key habitat linkages,
  - maintain key ecosystem services,
  - monitor, prevent and slow the spread of invasive species,

135

o focus development activities in ecologically disturbed areas and avoid ecologically sensitive landscapes, culturally sensitive areas, and crucial wildlife corridors.

The biggest question that land managers face today is how we respond to uncertainty in the face of global climate change. It is especially challenging for planners to make predictions about future ecosystem dynamics 10, 20 or 50 years down the line. Adaptation to changing conditions is and will be essential. However, general statements that BLM will plan to "be adaptive" is not planning—it is a strategy that is reactive only. A true plan for climate adaptation will require applying knowledge and foresight gained from a "learn as you go" approach.

We recommend using an experimental, adaptive design known as the "portfolio approach" of management strategies (Belote et al.)[132] in the RMP. As stated by Belote et al., "[u]ncertainty about how ecosystems and species will respond to co-occurring, interactive, and synergistic impacts of the Anthropocene precludes our ability to know which strategy will best sustain wildland values in to the future." Thus, Belote et al. concludes that land managers should use an experimental zoning approach for managing certain lands that include the following zones as management strategies:

- **Restoration Zones:** areas that are devoted to forestalling change through the process of ecological restoration;
- **Innovation Zones:** areas that are devoted to innovative management that anticipates climate change and guides ecological change to prepare for it; and
- **Observation Zones:** areas that are left to change on their own time to serve as scientific "controls" and to hedge against the unintended consequences of active management elsewhere.

These strategies should be used in conjunction with each other in order to spread the risk among the different strategies and to allow for diverse outcomes to inform rapid learning about management strategies in the future. This is the kind of deliberate yet dynamic planning process that BLM should be fostering in RMPs.

The BLM is especially equipped to apply this type of portfolio approach due to its wide variety of designations and management regimes. The purpose of **restoration zones** is to sustain existing or historical ecosystems. This type of strategy lends itself to designations such as national conservation areas, ACECs and other lands that are set aside for conservation of natural and cultural resources, but that may also be appropriate for restoration in certain areas.

Due to the acknowledgement that returning to historical range of variability is an increasingly challenging concept in the study of climate change, **innovation zones** are also necessary. This is where the forecasting of climate change may drive greater intervention to experiment with things like anticipatorily boosting resiliency or facilitating transition to an altered future state where shifts seem inevitable. This strategy would be more appropriate for BLM-managed lands that have already sustained substantial change or where future impacts of climate change may severely disrupt the production of ecosystem goods and services. Conservation designations or allocations would typically not fall within this management strategy.

---

[132] These concepts are set out in Belote, et al. "Wilderness and Conservation Strategy in the Anthropocene." The Pinchot Letter (Spring 2014).

BLM_0149392

The third strategy of establishing **observation zones** is necessary to allow for ecosystems to generally change without specific intervention, as a scientific control. This management strategy would be most appropriate for Wilderness, WSAs, and lands managed for wilderness characteristics, but would also be the default strategy for lands that could not be managed for treatment under the restoration and innovation zones due to budget and operational constraints or in lands between such designations where connectivity is desirable to facilitate movement in response to climate change.

**Summary of Comments:** BLM should implement a portfolio approach to land use planning that allows for diverse strategies and adaptive, dynamic planning as a climate change adaptation strategy. This involves establishing restoration, innovation and observation zones in order to "learn while doing."

### XIV.    Mitigation

A robust policy framework exists to guide mitigation considerations in land use planning. In addition to mitigation requirements under FLPMA and NEPA, numerous other policies and guidance documents direct the BLM to require mitigation and specify how mitigation must be employed. These include the Presidential Memorandum: Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment (2015); Secretarial Order 3330, Improving Mitigation Policies and Practices of the Department of the Interior (2013);[133] the follow-up report entitled *A Strategy for Improving the Mitigation Policies and Practices of The Department of the Interior* (2014);[134] the Department of the Interior's Landscape-Scale Mitigation Manual (2015);[135] and BLM's Draft Regional Mitigation Manual (2013).[136]

Secretarial Order 3330 called for a departmental mitigation strategy with five central components: (1) the use of a landscape-scale approach to identify and facilitate investment in key conservation priorities in a region; (2) early integration of mitigation considerations in project planning and design; (3) ensuring the durability of mitigation measures over time; (4) ensuring transparency and consistency in mitigation decisions; and (5) a focus on mitigation efforts that improve the resilience of our Nation's resources in the face of climate change.

In response to S.O. 3330, the Energy and Climate Change Task Force issued a report that outlined a strategy for improving departmental mitigation policies and practices ("Task Force Report," April 2014[137]). The Task Force Report emphasizes the importance of landscape-scale mitigation planning to enable the Interior Department to appropriately manage and conserve our public lands resources and meet its statutory obligations:

> Consideration of the landscape-scale context provides the opportunity to see project development in the context of the larger landscape it will occupy and associated resource values it will affect; enhances the ability to evaluate cumulative effects of multiple projects; expands the capacity to avoid, minimize, and offset project impacts; and allows managers to make

---

[133] https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Secretarial-Order-Mitigation.pdf
[134] https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Mitigation-Report-to-the-Secretary_FINAL_04_08_14.pdf
[135] https://www.doi.gov/sites/doi.gov/files/uploads/TRS and Chapter FINAL.pdf
[136] http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/im_attachments/2013.Par.57631.File.dat/IM2013-142_att1.pdf
[137] Available at http://www.doi.gov/news/loader.cfm?csModule=security/getfile&pageid=526203.

BLM_0149393

avoidance and compensatory mitigation site selection decisions that optimize for multiple resource values. Task Force Report at 9.

It identifies several principles to guide landscape-scale mitigation, including utilizing the full mitigation hierarchy, advance mitigation planning, ensuring durability and promoting transparency and collaboration, which are reiterated in BLM's draft mitigation manual.

Of particular relevance to resource management planning, BLM is currently implementing draft MS-1794[138], which the agency is instructed to utilize as interim policy while the guidance is finalized. Instruction Memorandum No. 2013-142.[139] Draft MS-1794 provides for BLM to use the land use planning process to identify potential mitigation sites and measures. Draft MS-1794 at 1.6(C). This would be appropriate for the Uncompahgre RMP to balance reasonably foreseeable development and the various resource values present throughout the planning area. Mitigation is most effective when planned at a regional scale so that development avoids impacting critical conservation resources and compensatory mitigation investments are directed to areas and activities that will best fully address unavoidable development impacts. In outlining a landscape-scale mitigation strategy for the Uncompahgre Field Office, BLM should apply the mitigation hierarchy of avoidance, minimization, and offsets.

BLM is directed to incorporate four elements into mitigation planning at the land use planning stage per the Task Force Report and Draft MS-1794:

   a. Describe regional baseline conditions against which unavoidable impacts are assessed;
   b. Establish and prioritize regional mitigation objectives for the planning area;
   c. Identify appropriate land-use allocations or areas for landscape-level conservation and management actions to achieve regional mitigation objectives (e.g., Areas of Critical Environmental Concern (ACEC) or sage-grouse priority habitat); and
   d. Develop long-term monitoring and adaptive management requirements to evaluate and maximize the effectiveness of mitigation projects and measures.

*Ibid.* Importantly, regional mitigation measures must have additionality – that is, the offsetting conservation measures would not have occurred otherwise. Task Force Report at 6. BLM should not simply cast land use allocations currently under consideration in the Draft RMP as contributing to the achievement of regional mitigation objectives. Rather, BLM must identify foreseeable unavoidable impacts, account for impacts to resource values throughout the relevant range of the resource that is being impacted, and identify conservation designations and other land use allocations that are appropriate to those impacts.

Conservation designations and other land use allocations that are intended as regional mitigation measures must have strong protective management prescriptions to ensure effective and durable conservation, restoration, and management and adequate funding for and commitment to enforcement. In directing BLM to ensure long-term durability of compensatory mitigation, the

---

[138] Available at
http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/im_attachments/2013.Par.57631.File.dat/IM2013-142_att1.pdf.
[139] Available at
http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-142.html.

BLM_0149394

mitigation guidance notes that "the land use plan may be the most effective tool for protecting important regional mitigation sites on BLM-managed lands from future impacts in order to ensure the durability of mitigation projects." Draft MS-1794 at 1.6(D)(12). To achieve long-term durability, BLM must commit to and implement management actions, such as restoration projects and enforcement, within mitigation-based conservation designations that are appropriate to specific unavoidable impacts and that provide beneficial effects that are additional to conservation that would have otherwise occurred.

**Summary of Comments:** BLM should include the four elements of landscape-scale mitigation planning outlined in Draft MS-1794 in the Uncompahgre RMP. By establishing regional mitigation objectives for the planning area, BLM can identify durable, additional land use allocations that appropriately mitigate likely impacts from development authorized under the RMP.

We reiterate that we appreciate the effort BLM has put into the Uncompahgre RMP to this point and look forward to continuing working with the agency on finalizing the RMP and other management and planning efforts in the Uncompahgre Field Office.

Sincerely,

Juli Slivka, Planning Specialist
**The Wilderness Society**
1660 Wynkoop St. Ste. 850
Denver, CO 80202
(303) 650-1179
jslivka@tws.org

Steve Allerton, President
**Western Colorado Congress**
134 N 6th St
Grand Junction, CO 81501
(970) 256-7650

Karen Tuddenham, Executive Director
**Sheep Mountain Alliance**
220 W. Colorado Ave
PO Box 189
Telluride, CO 81435
(970) 728-3729
lexi@sheepmountainalliance.org

Jimbo Buickerood, Lands and Forest Protection Program Manager
**San Juan Citizens Alliance**
1309 East Third Avenue #5
PO Box 2461
Durango, CO 81302
(970) 259-3583
jimbo@sanjuancitizens.org

139

Matt Rice, Director, Colorado River Basin Program
**American Rivers**
1536 Wynkoop Street, Office 321
Denver, CO 80202
(303) 454-3395
mrice@americanrivers.org

Amber Clark, Program Coordinator
**Dolores River Boating Advocates**
PO Box 1173
Dolores, CO 81323
(970) 799-8704
amber@doloresriverboating.org

Steve Smith
Glenwood Springs
ssmith@rof.net
(970) 618-8264

Luke Schafer, West Slope Advocacy Director
**Conservation Colorado**
529 Yampa Ave
Craig, CO 81625
(970) 824-5241
luke@conservationco.org

Shelley Silbert, Executive Director
**Great Old Broads for Wilderness**
Box 2924
Durango, CO 81302
(970) 385-9577
shelley@greatoldbroads.org

Robyn Cascade, Northern San Juan Chapter Leader
**Great Old Broads for Wilderness**
Ridgway, CO
northernsanjuanbroadband@gmail.com

Sherry Schenk, Grand Junction Area Broadband Co-leader
**Great Old Broads for Wilderness**
Grand Junction, CO
sherryleeschenk@gmail.com

Alan Apt, Wilderness Chair
**Sierra Club**
Rocky Mountain Chapter
P.O. Box 620
Nederland, CO 80466

140

BLM_0149396

Megan Mueller, Senior Conservation Biologist
**Rocky Mountain Wild**
1536 Wynkoop Street, Suite 900
Denver, Colorado 80202
(303) 704-9760
megan@rockymountainwild.org

Christine Canaly, Director
**San Luis Valley Ecosystem Council**
P.O. Box 223
Alamosa, CO 81101
(719) 589-1518
slvwater@fairpoint.net

Peter Hart, Staff Attorney/Conservation Analyst
**Wilderness Workshop**
PO Box 1442
Carbondale, CO 81623
(970) 963-3977
peter@wildernessworkshop.org

141

**List of Attachments**
1. Rio Puerco Draft RMP, Section 2.2.8 (Management of Lands with Wilderness Characteristics)
2. White River Proposed RMPA, Table 2-22 (Management of Lands with Wilderness Characteristics)
3. Grand Junction Approved RMP, Appendix L (Special Recreation Permit Program Overview)
4. The Wilderness Society. *No Exit: Fixing the BLM's Indiscriminate Energy Leasing.* 2016.
5. Recommended Approach for Using Oil and Gas Development Potential to Inform Land Use Planning Decisions: A Proposal to the Uncompahgre Field Office
6. A Socioeconomic Analysis of the Impact of the Proposed Piñon Ridge Uranium Project on Western Mesa, Montrose, and San Miguel Counties, Colorado. Power Consulting, 2010.
7. The Wilderness Society. "Recommended Risk Assessment and Management Approach for Addressing Climate Change in BLM Land Use Planning."

**Literature cited in these comments and bibliography of literature BLM should consult in this planning process**

Albano, C. M. 2015. Identification of geophysically diverse locations that may facilitate species' persistence and adaptation to climate change in the southwestern United States. Landscape Ecology 30:1023–1037.

Anderson, M. G., M. Clark, and A. O. Sheldon. 2014. Estimating climate resilience for conservation across geophysical settings. Conservation Biology 28:959–970.

Aplet, G. H. 1999. On the Nature of Wildness: Exploring What Wilderness Really Protects. Denver Law Review 76:347–367.

Aplet, G., J. Thomson, and M. Wilbert. 2000. Indicators of wildness: Using attributes of the land to assess the context of wilderness. Pages 89–98 *in* S. F. McCool, D. N. Cole, W. T. Borrie, and J. O'Laughlin, editors.Proceedings: Wilderness science in a time of change.

Attanasi, E.D. 1998. Economics and the 1995 National Assessment of United States Oil and Gas Resources. US Geological Survey Circular 1145.

Aycrigg, J. L., J. Tricker, R. T. Belote, M. S. Dietz, L. Duarte, and G. H. Aplet. 2015. The Next 50 Years : Opportunities for Diversifying the Ecological Representation of the National Wilderness Preservation System within the Contiguous United States. Journal of Forestry 114:1–9.

Belote, R. T., M. S. Dietz, B. H. McRae, D. M. Theobald, M. L. McClure, G. H. Irwin, P. S. McKinley, J. A. Gage, and G. H. Aplet. 2016. Identifying Corridors among Large Protected Areas in the United States. PLoS ONE 11:e0154223.

Belote, Travis et al. *Wilderness and Conservation Strategy in the Anthropocene.* The Pinchot Letter (Spring 2014).

Confluence Consulting, Inc. 2005. Annotated bibliography of the potential impacts of gas and oil exploration and development on coldwater fisheries. Report prepared for Trout Unlimited. Confluence Consulting, Inc. Bozeman, MT. 30 p.

142

BLM_0149398

Corn, M.L., B.A. Gelb and P. Baldwin. 2001. The Arctic National Wildlife Refuge: The Next Chapter. Congressional Research Service. Updated August 1, 2001.

Dickson, B. G., L. J. Zachmann, and C. M. Albano. 2014. Systematic identification of potential conservation priority areas on roadless Bureau of Land Management lands in the western United States. Biological Conservation 178:117–127.

Dietz, M. S., R. T. Belote, G. H. Aplet, and J. L. Aycrigg. 2015. The world's largest wilderness protection network after 50 years: An assessment of ecological system representation in the U.S. National Wilderness Preservation System. Biological Conservation 184:431–438.

Dobrowski, S. Z. 2011. A climatic basis for microrefugia: the influence of terrain on climate. Global Change Biology 17:1022–1035.

Dobrowski, S. Z., J. Abatzoglou, A. K. Swanson, J. a Greenberg, A. R. Mynsberge, Z. a Holden, and M. K. Schwartz. 2013. The climate velocity of the contiguous United States during the 20th century. Global change biology 19:241–51.

Foley, J. a, R. Defries, G. P. Asner, C. Barford, G. Bonan, S. R. Carpenter, F. S. Chapin, M. T. Coe, G. C. Daily, H. K. Gibbs, J. H. Helkowski, T. Holloway, E. a Howard, C. J. Kucharik, C. Monfreda, J. a Patz, I. C. Prentice, N. Ramankutty, and P. K. Snyder. 2005. Global consequences of land use. Science (New York, N.Y.) 309:570–4.

*Forman, R.T.T., et al. 2003. Road ecology: science and solutions. Island Press: Washington, D.C.*

Fortmann, L.P. et al. 1989. Community stability: The foresters' fig leaf. In D.C. Le Master and J.H. Beuter (Eds.) Community stability in forest-based economies. Timber Press.

Freeman, L. R.; March, F.; Spensley, J.W. 1994. NEPA Compliance Manual, 2nd Edition. Government Institutes, Inc., Rockville, MD.

Freudenburg, W.R. 1992. Addictive economies: extractive industries and vulnerable localities in a changing world economy. Rural Sociology. Vol. 57:305-332.

Freudenburg, W.R. and R. Gramling. 1994. Natural resources and rural poverty: A closer look. Society and Natural Resources. Vol. 7.

Gauthier-Warinner, R.J. 2000. Oil and gas development. In: Drinking water from forests and grasslands: A synthesis of the scientific literature. Dissmeyer, G. E. ed. Gen. Tech. Rep.  SRS-39. Asheville, NC: U.S. Department of Agriculture, Forest Service, Southern Research Staiton. 246 p.

*Gill, Thomas E. 1996*. Eolian sediments generated by anthropogenic disturbance of playas: human impacts on the geomorphic system and geomorphic impacts on the human system. Geomorphology 17: 207–228.

Goldsmith, O.S. 1992. Economic instability in petroleum-based economies. Presented at OPEC/Alaska Conference on Energy Issues in the 1990's. Anchorage AK, July 23-24, 1992.

143

BLM_0149399

Guilliford, A. 1989. Boomtown Blues: Colorado Oil Shale 1885-1985. Niwot, CO: University Press of Colorado.

Harrison, R.T., R.N. Clark and G.H. Stankey.  1980.  Predicting impact of noise on recreationists.  USDA Forest Service, Equipment Technology & Development Center, San Dimas, CA.

Havlick, D.G.  2002.  No Place Distant: Roads and Motorized Recreation on America's Public Lands. Island Press, Washington, D.C.

Haynes, R. W.; Horne, A.L. 1997. Economic Assessment of the Basin. In T.M. Quigley and S.J. Arbelbide (eds.), An assessment of ecosystem components in the Interior Columbia Basin and portions of the Klamath and Great Basins: Volume IV. 1715-1870. USDA Forest Service, PNW-GTR-405, Pacific Northwest Research Station, Portland, OR.

Heller, N. E., and E. S. Zavaleta. 2009. Biodiversity management in the face of climate change: A review of 22 years of recommendations. Biological Conservation 142:14–32.

Hoekstra, T.W., Alward, G.S., Dyer, A.A., Hof, J.G., Jones, D.B., Joyce, L.A., Kent, B.M., Lee, R., Sheffield, R.C., Williams, R. 1990. Analytical tools and information. Critique of Land Management Planning, Volume 4. USDA Forest Service, FS-455. 47 pp.

Hoffman, S.A. and Fortmann, L. 1996. Poverty in forested counties: an analysis based on aid to families with dependent children. In *Sierra Nevada Ecosystem Project: Final report to Congress,* vol. II, *Assessments and scientific basis for management options.* Davis: University of California, Centers for Water and Wildland Resources, 1996.

Humphrey, C.R. et al. 1993. Theories in the study of natural resource-dependent communities and persistent poverty in the United States. In Persistent poverty in rural America., ed. Rural Sociological Society Task Force on Persistent Rural Poverty. Boulder, CO: Westview Press.

Jenkins, C. N., K. S. Van Houtan, S. L. Pimm, and J. O. Sexton. 2015. US protected lands mismatch biodiversity priorities. Proceedings of the National Academy of Sciences of the United States of America 112:5081–5086.

Johnson, J. and R. Rasker. 1993. The role of amenities in business attraction and retention. Montana Policy Review, Vol. 3, No. 2.

Johnson, J.; Rasker, R. 1995. The role of economic and quality of life variables in rural business location. Journal of Rural Studies, 11(4), 405-416.

Keppel, G., K. P. Van Niel, G. W. Wardell-Johnson, C. J. Yates, M. Byrne, L. Mucina, A. G. T. Schut, S. D. Hopper, and S. E. Franklin. 2012. Refugia: identifying and understanding safe havens for biodiversity under climate change. Global Ecology and Biogeography 21:393–404.

Knight, R. L. and K. J. Gutzwiller, editors. 1995. Wildlife and recreationists: coexistence through management and research. Island Press, Washington, D.C.

144

BLM_0149400

Krikelas, A.C. 1991. Industry structure and regional growth: A vector autoregression forecasting model of the Wisconsin regional economy. Ph.D. Dissertation. University of Wisconsin-Madison.

Krikelas, A.C. 1992. Why regions grow: A review of research on the economic base model. Economic Review. Vol. 77(4).

LaTourrette, T., Bernstein, M., Holtberg, P., Pernin, C., Vollaard, B., Hanson, M., Anderson, K., Knopman, D. 2002. Assessing Gas and Oil Resources in the Intermountain West: Review of Methods and Framework for a New Approach. RAND Science and Technology, Santa Monica, CA. 94 pp.

Limerick, Patricia Nelson; Travis, William; Scoggin, Tamar. 2002. Boom and bust in the American West. Workshop Report. Center of the American West, University of Colorado, Boulder, CO.

Loarie, S. R., P. B. Duffy, H. Hamilton, G. P. Asner, C. B. Field, and D. D. Ackerly. 2009. The velocity of climate change. Nature 462:1052–5.

Loomis, J. 1992. Importance of joint benefits of wilderness in calculating wilderness recreation benefits. In: C. Payne; and others (Eds.) The economic value of wilderness. USDA Forest Service, GTR SE-78, Southeastern Forest Experiment Station, Asheville, NC.

Loomis, J. 1993. Integrated public lands management. Columbia University Press, New York.

Loomis, J. 2000. Economic values of wilderness recreation and passive use: what we think we know at the turn of the 21st century. In: Cole, David N.; McCool, Stephen F. 2000. Proceedings: Wilderness Science in a Time of Change. Proc. RMRS-P-000. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Loomis, J., and R. Walsh. Future economic values of wilderness. In *The Economic Value of Wilderness*, ed. C. Payne et al. Southeastern Forest Experiment Station. GTR SE-78.

Lorah, P. 2001. Population growth, economic security and cultural change in wilderness counties. In: Cole, David N.; McCool, Stephen F. 2000. Proceedings: Wilderness Science in a Time of Change. Proc. RMRS-P-000. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Mace, Britton L. et al., *Aesthetic, Affective, and Cognitive Effects of Noise on Natural Landscape Assessment*, Society & Natural Resources, 12: 225-242, 1999.

Margules, C. R., and R. L. Pressey. 2000. Systematic conservation planning. Nature 405:243–253. Noss, R. F. 1983. A Regional Landscape Approach to Maintain Diversity. BioScience 33:700–706.

Morton, P. 1997. Sustaining recreation resources on the Southern Appalachian National Forests. Journal of Park and Recreation Administration. Vol. (15):4, pp61-78.

Morton, P. 1999. The economic benefits of wilderness: theory and practice. University of Denver Law Review. Volume 76, No. 2 pp. 465-518.

BLM_0149401

Morton, P. 2000a. Wildland economics: theory and practice. In: Cole, David N.; McCool, Stephen F. 2000. Proceedings: Wilderness Science in a Time of Change. Proc. RMRS-P-000. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. http://www.wilderness.org/Library/Documents/upload/Wildland-Economics-Theory-Practice-Morton.pdf

Morton, P. 2000b. Wilderness, the silent engine of the west's economy. The Wilderness Society: Washington, DC.

Morton, P., C. Weller, and J. Thomson, 2002. *Energy and western wildlands: A GIS analysis of economically recoverable oil and gas*. The Wilderness Society, Denver, CO and Seattle, WA http://www.wilderness.org/Library/Documents/Energy_WesternWildlands.cfm

Morton, P., Weller, C., Thomson, J., Haefele, M., Culver, N. 2004. Drilling in the Rockies: How much and at what cost? http://www.wilderness.org/Library/Documents/upload/Drilling-in-the-Rocky-Mountains-How-Much-and-at-What-Cost.pdf

Nakata, J. K., H. G. Wilshire, and G. C. Barnes. 1976. Origin of Mojave Desert dust plume photographed from space. Geology 4: 644- 648.

Neff JC, Ballantyne AP, Farmer GL, *et al*. 2008. Increasing eolian dust deposition in the western United States linked to human activity. *Nat Geosci* doi:10.1038/ngeo133.

Nie, Martin A. & Schultz, Courtney A. *Decision-Making Triggers in Adaptive Management*, at 26. Conservation Bio. 1137 (April 2012).

Notaro, M., A. Mauss, and J. Williams. 2012. Projected vegetation changes for the American Southwest: combined dynamic modeling and bioclimatic-envelope approach. Ecological Applications 22:1365–1388.

Opdam, P., and D. Wascher. 2004. Climate change meets habitat fragmentation: linking landscape and biogeographical scale levels in research and conservation. Biological Conservation 117:285–297.

Ordonez, A., S. Martinuzzi, V. C. Radeloff, and J. W. Williams. 2014. Combined speeds of climate and land-use change of the conterminous US until 2050. Nature Climate Change 4:811–816.

Ouren, D.S., C. Haas, C.P. Melcher, S.C. Stewart, P.D. Ponds, N.R. Sexton, L. Burris, T. Fancher and Z.H. Bowen.  2007.  Environmental effects of off-highway vehicles on Bureau of Land Management lands: a literature synthesis, annotated bibliographies, extensive bibliographies, and internet resources.  U.S. Geological Survey, Open-File Report 2007-1353, Reston, VA.

Painter, Thomas H., et al. Impact of Disturbed Desert Soils on Duration of Mountain Snow Cover, Geophysical Research Letters, Vol. 24, L12502 (June 23, 2007).

Painter, Thomas H. Presentation, Colorado River District Water Seminar, September 18, 2009, Grand Junction, Colorado.

Parmesan, C. 2006. Ecological and Evolutionary Responses to Recent Climate Change. Annual Review of Ecology Evolution and Systematics 37:-.

BLM_0149402

Parmesan, C., and G. Yohe. 2003. A globally coherent fingerprint of climate change impacts across natural systems. Nature 421:37–42.

Pearson, R. G. 2006. Climate change and the migration capacity of species. Trends in ecology & evolution 21:111–3.

Pearson, R. G., and T. P. Dawson. 2003. Predicting the impacts of climate change on the distribution of species: are bioclimate envelope models useful? Global Ecology and Biogeography 12:361–371.

Pederson Planning Consultants, 2001. Appendix D in the Wyoming Energy Commission, Preliminary Progress Report to the Wyoming Legislature, Joint Minerals, Business and Economic Development Committee, December 14, 2001. Draft Report commission by the Wyoming Energy Commission. 34 pages.

Peterson, G. L.; Sorg, C. F. 1987. Toward the measurement of total economic value. USDA Forest Service. GTR RM-148. Rocky Mountain Forest and Range Experiment Station, Fort Collins, CO.

Pickett, S., and M. Cadenasso. 1995. Landscape ecology: spatial heterogeneity in ecological systems. Science-AAAS-Weekly Paper Edition 269:331–334.

Power, T. 1995. Economic well being and environmental protection in the Pacific Northwest: a consensus report by Pacific Northwest economists. Missoula, MT: University of Montana.

Power, T. M. 1996. Lost landscapes and failed economies. Island Press, Covelo, CA.

Randall, A.; Stoll, J. 1983. Existence value in a total valuation framework. In: (R, Rowe and L, Chestnut (eds.), Managing Air Quality and Scenic resources at the National Parks and Wilderness areas. Boulder, CO: Westview Press.

Rasker, R. 1994. A new look at old vistas: the economic role of environmental quality in western public lands. University of Colorado Law Review. Volume 52, Issue 2 pp369-399.

Rasker, R., Alexander, B., van den Noort, J., Carter, R. 2004. Public Lands Conservation and Economic Well-Being. The Sonoran Institute, Tucson, AZ.

Richardson, H.W. 1985. Input-Output and Economic Base Multipliers: Looking backward and forward. Journal of Regional Science Vol. 25(4).

Rohlf, D.J. 2004. Science, Law, and Policy in Managing Natural Resources: Toward a Sound Mix Rather than a Sound Bite. Pages 127-142 *in* K. Arabas and J. Bowersox, editors. *Forest futures: science, politics, and policy for the next century*. Rowman and Littlefield, Lanham, Maryland, USA.

Rudnick, D. A., S. J. Ryan, P. Beier, S. A. Cushman, F. Dieffenbach, C. W. Epps, L. R. Gerber, J. Hartter, J. S. Jenness, J. Kintsch, A. M. Merenlender, R. M. Perkl, D. V. Preziosi, and S. C. Trombulak. 2012. The Role of Landscape Connectivity in Planning and Implementing Conservation and Restoration Priorities. Page Issues in Ecology.

147

BLM_0149403

Rudzitis, G.; Johansen, H. E. 1989. Amenities, Migration, and Nonmetropolitan Regional Development. Report to Nat. Science Foundation, Dept. of Geography, Univ. of Idaho.

Rudzitis, G.; Johansen, H. E. 1991. How important is wilderness? Results from a United States survey. Environmental Management, Vol. (15):2, pp 227-233.

Seager, R., M. Ting, I. Held, Y. Kushnir, J. Lu, G. Vecchi, H. Huang, N. Harnik, A. Leetma, N. Lau, C. Li, J. Velez, and N. Naik. 2007. Model projections of an imminent transition to a more arid climate in southwestern North America. Science (New York, N.Y.) 316:1181–1184.

Shanley, K.W.; Robinson, J.; Cluff, R.M. 2004. Tight-gas myths, realities have strong implications for resource estimation, policymaking, operating strategies. Oil and Gas Journal, August 2, 2004

Simberloff, D. 1998. Flagships, umbrellas, and keystones: Is single-species management passe in the landscape era? Biological Conservation 83:247–257.

Smith, Edward J. 1986. Boom and bust in energy extraction. Agriculture and Rural Economics Division, Economic Research Service, U.S. Department of Agriculture, Washington, DC. Staff Report No. AGES860423.

Stevens, J.B. 1978. The Oregon wood products labor force; job rationing and worker adaptions in a declining industry. Special Report 529, Ag. Exp. Station, Oregon St. Univ., Corvallis OR.

Theobald, D. M. 2010. Estimating natural landscape changes from 1992 to 2030 in the conterminous US. Landscape Ecology 25:999–1011.

Theobald, D. M., K. R. Crooks, and J. B. Norman. 2011. Assessing effects of land use on landscape connectivity: Loss and fragmentation of western U.S. forests. Ecological Applications 21:2445–2458.

Theobald, D. M., S. E. Reed, K. Fields, and M. Soulé. 2012. Connecting natural landscapes using a landscape permeability model to prioritize conservation activities in the United States. Conservation Letters 5:123–133.

Theobald, D. M. 2013. A general model to quantify ecological integrity for landscape assessments and US application. Landscape Ecology 28:1859–1874.

Tiebout, C.M. 1956. Exports and regional economic growth. Journal of Political Economy 64:160-64.

US Congress, Office of Technology Assessment. 1992. Forest Service planning: Accommodating uses, producing outputs, and sustaining ecosystems, OTA-F-505. Washington, DC.

Westec Services. 1979. Fugitive dust impacts during off-road vehicle (ORV) events in the California desert. Westec Services Inc: Tustin, California.

Western Organization of Resource Councils. 1999. Coal-bed methane development: boon or bane for rural residents? Billings, MT.

BLM_0149404

Western Organization of Resource Councils. 2005. Law and order in the oil and gas fields: a review of inspection and enforcement programs for five western states. WORC: Billings MT. 37 p.

Whitelaw, E.; Niemi, E. G.. 1989. Migration, economic growth, and the quality of life, In: Proceedings of the twenty-third annual Pacific Northwest regional economic conference, pp 36-38.

Whitelaw, E., et al. 2003. A letter from economists to President Bush and the governors of eleven western states regarding the economic importance of the west's natural environment. (100 total authors) http://www.econw.com/pdf/120303letter.pdf.

Williams, B. K., R. C. Szaro, and C. D. Shapiro. 2009. Adaptive Management: The U.S. Department of the Interior Technical Guide. Adaptive Management Working Group, U.S. Department of the Interior, Washington, DC.

Williams, P.B. 1998. Considering the role of science within the policy and planning process for the Grand Staircase-Escalante National Monument.  In: Learning from the Land: Grand Staircase-Escalante National Monument Science Symposium proceedings. Hill, L.M. and Koselak, J.J. (eds.) 455-465. U.S. Dept. of Interior, Bureau of Land Management, Grand Staircase-Escalante National Monument, BLM/UT/GI-98/006+1220.

149

BLM_0149405

## 2.2.8 Lands with Wilderness Characteristics

The BLM has identified lands with wilderness characteristics (LWCs) for management consideration in this planning effort. Wilderness characteristics include the combination of size (the area has at least 5,000 acres or is of sufficient size to be managed as Wilderness), naturalness (the area generally appears to have been affected primarily by the forces of nature, with the imprint of human work substantially unnoticeable), and outstanding opportunities for solitude or primitive and unconfined recreation.

### 2.2.8.1    Goal

- Protect wilderness characteristics on those lands with wilderness characteristics (as defined in section 3.2.11) that are identified for protection through this RMP.

### 2.2.8.2    Objectives

- Minimize surface disturbing activities such that the natural quality of the area is maintained.
- Maintain opportunities for solitude and primitive recreation where they occur in these areas.

### 2.2.8.3    Management Common to All Alternatives

- Land areas identified as having wilderness characteristics that would be protected or impacted minimally would be a priority for acquisition.

### 2.2.8.4    Alternatives

For the seven areas identified as lands with wilderness characteristics, the BLM selected one of three sets of management decisions for each area under each alternative: protect wilderness characteristics, minimize impacts to wilderness characteristics, or no protection of wilderness characteristics. Descriptions of each set of management decisions are described below.

#### 2.2.8.4.1    Protect Wilderness Characteristics

Lands with wilderness characteristics that would be managed to protect wilderness characteristics by applying the following prescriptions:

- Close to extraction of leasable minerals.
- Close to mineral sales.
- Withdraw from mineral location.
- Retain public lands in federal ownership.
- Prohibit forest product removal.
- Close to travel, except for authorized use.
- Allow no new rights-of-way.
- Allow no new wildlife developments.
- Allow no new recreational developments.

BLM_0149406

- Allow surface disturbance activities on a case-by-case basis when necessary for reclamation, emergencies, or valid existing rights. Include mitigation to minimize impacts to wilderness characteristics.
- Manage lands as VRM II.

### 2.2.8.4.2 Minimize Impacts to Wilderness Characteristics

Lands with wilderness characteristics that would be managed to minimize impacts to wilderness characteristics by applying the following prescriptions:

- Close to extraction of leasable minerals.
- Evaluate surface disturbance activities, including extraction of saleable minerals, on a case-by-case basis. Include mitigation to minimize impacts to wilderness characteristics.
- Retain public lands in federal ownership.
- Manage forest product removal consistent with wilderness characteristics by assuring new routes are not established and that harvested areas are followed by prescribed fire to eliminate evidence of stumps.
- Manage vehicle use as limited to designated routes as of the approval date of the RMP. In areas with overlapping designations, the more restrictive travel designation will prevail.
- Allow current authorized livestock grazing in lands with wilderness characteristics.
- Allow construction of new range improvements that are consistent with maintenance of wilderness characteristics.
- Manage lands as VRM II.

### 2.2.8.4.3 Not Managed to Protect Wilderness Characteristics

Lands with wilderness characteristics that would not be managed to protect wilderness characteristics would have the following prescriptions applied:

- Evaluate surface disturbance activities, including extraction of salable and leasable minerals, on a case-by-case basis. Include mitigation to minimize impacts to wilderness characteristics, when possible.
- Retain public lands in federal ownership.
- Open to forest product removal.
- Cimarron Mesa Only: Open to vehicle use as of the approval date of the RMP. Vehicle use management in this area will be further refined during Travel Management Planning.
- Petaca Pinta A and Volcano Hill: Manage vehicle use as limited to designated routes as of the approval date of the RMP. In areas with overlapping designations, the more restrictive travel designation will prevail.

**Table 2.14:  Summary of Management Decisions for LWCs by Alternative**

| Unit | Alternative A (No Action) | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| Chamisa E (2,239 acres) | Lands with wilderness characteristics | Protect | Protect | Protect |
| Ignacio Chavez A | | Protect | Minimize Impacts | Not Protected |

BLM_0149407

| Unit | Alternative A (No Action) | Alternative B | Alternative C (Preferred) | Alternative D |
|---|---|---|---|---|
| (2,462 acres) | were not addressed in the 1986 RMP, as amended. | | | |
| Ignacio Chavez B (1,541 acres) | | Protect | Minimize Impacts | Not Protected |
| Ignacio Chavez C (72 acres) | | Protect | Minimize Impacts | Not Protected |
| Petaca Pinta A (38 acres) | | Protect | Protect | Not Protected |
| Volcano Hill (23,833 acres) | | Protect | Protect | Not Protected |
| Cimarron Mesa (7,329 acres) | | Protect | Not Protected | Not Protected |
| Total acres Protected | | **37,514** | **26,110** | **2,239** |
| Total acres Minimize Impacts | | **0** | **4,075** | **0** |
| Total acres Not Protected | | **0** | **7,329** | **35,275** |

## 2.2.9 Livestock Grazing

### 2.2.9.1   Goals

- Manage to achieve the New Mexico Standards for Public Land Health (BLM 2001) and other desired resource conditions through the implementation of the Guidelines for Livestock Grazing Management (BLM 2001).
- Achieve healthy, sustainable rangeland ecosystems that support the livestock industry while providing for other multiple resource values such as wildlife habitat, recreational opportunities, clean water, and functional watersheds.

### 2.2.9.2   Objectives

- Integrate livestock grazing management planning (Allotment Management Plans/Coordinated Resource Management Plans) and actions with other resource program objectives.
- Determine if existing livestock management practices are meeting land use planning and resource objectives through the collection of monitoring data.
- Develop grazing prescriptions throughout the Planning Area to be consistent with the New Mexico Standards and Guidelines (BLM 2001), which include meeting required forage and cover requirements for species of wildlife that could occur within an allotment based on the quality and quantity of habitat present. Areas to prioritize such action include those with high wildlife value (i.e., riparian areas, threatened and endangered species habitat, and special designation areas for wildlife).
- Define Selective Management Categorization (M, I, and C) for allotments through administrative procedures based on monitoring and land health data.

BLM_0149408

## Table 2-22. Comparison of Alternatives – Lands with Wilderness Characteristics

| Record Number | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E (Proposed) |
|---|---|---|---|---|---|
| 11 | No similar action. | Lands with wilderness characteristics that have been identified for retention of their resource value would be exclusion areas for new ROW authorizations. | Lands with wilderness characteristics that have been identified for retention of their resource value would be avoidance areas for new ROW authorizations. | In areas where lands with wilderness characteristics occur; mitigation that would minimize impacts to wilderness character may be required on new linear ROWs. | For rights-of-way authorizations the following will apply:<br>■ All Tier 1 areas will be managed as ROW exclusion areas;<br>■ All Tier 2 areas will be managed as ROW avoidance areas; and<br>■ All Tier 3 areas will be open for ROWs and other land use authorizations. |
| 12 | No similar action. | In areas where lands with wilderness characteristics have been identified for retention of their resource value, restoring the appearance of naturalness may require the establishment of native grasses, forbs, shrubs or trees and the addition of rocks, felled trees, or other locally sourced materials. | In areas where lands with wilderness characteristics occur, restoring the appearance of naturalness within lands may require the establishment of native grasses, forbs, shrubs or trees and the addition of rocks, felled trees, or other locally sourced materials. | Same as Alternative A. | Same as Alternative C. |
| 13 | No similar action. | Existing facilities in support of oil and gas development that are not consistent with the management of lands with wilderness character, would be removed as opportunities arise. | Existing facilities in support of oil and gas development that are not consistent with the management of lands with wilderness character, would be examined on a case by case basis and only removed as per the reclamation plan of each individual location. | | Same as Alternative A. |

Table 2-22–6

BLM_0149409

*Chapter 2 – Alternatives*

### Table 2-22. Comparison of Alternatives – Lands with Wilderness Characteristics

| Record Number | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E (Proposed) |
|---|---|---|---|---|---|
| 9 | No similar action. | In areas where lands with wilderness characteristics have been identified for retention of their resource value, no new road construction or upgrading/ improvements of existing roads, would be allowed. | New road construction or upgrading/improvements of existing roads in lands with wilderness characteristics would be allowed. Whenever possible, roads will be maintained as a primitive road or two-track (as per the Gold Book's [DOI and USDA 2007 pg. 23] discussion on non-constructed roads and routes). | | New road construction or improving/maintaining primitive roads would: <br> • Not be allowed within Tier 1 areas; and <br> • Be allowed in Tier 2 and Tier 3 areas. <br> Appropriate COAs (as described above) may be applied. |
| 10 | No similar action. | No new facility construction would be considered. | Construction of new facilities would be considered on a case-by-case basis where lands with wilderness characteristics have been identified. | | Construction of new facilities would: <br> • Not be allowed within Tier 1 areas; and <br> • Be allowed in Tier 2 and Tier 3 areas. <br> Appropriate COAs (as described above) may be applied. |

BLM_0149410

**Table 2-22. Comparison of Alternatives – Lands with Wilderness Characteristics**

| Record Number | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E (Proposed) |
|---|---|---|---|---|---|
| 8 | No similar action. | Stipulations or COAs identified as appropriate through environmental analysis may be applied for the maximum protection of wilderness characteristics. | Stipulations or COAs identified as appropriate through environmental analysis may be applied for the minimum protection of wilderness characteristics. | | Consistent with existing lease rights and the management objective for each tier, COAs may be applied to leased acreage in Tier 1, 2 and 3 areas that contain wilderness characteristics. Examples of such COAs could include, but are not limited to: <br><br>• Roads will not bisect the unit; <br>• Visual resources will be managed similar to VRM Class II; <br>• Siting of facilities will be considered in facility design (topographic screening may be applied); and <br>• Timing restrictions on use of helicopters may be applied during big game hunting seasons. |

*Table 2-22–4*

BLM_0149411

## Table 2-22. Comparison of Alternatives – Lands with Wilderness Characteristics

| Record Number | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E (Proposed) |
|---|---|---|---|---|---|
| 7 | No similar action. | In areas where lands with wilderness characteristics have been identified for retention of their resource values, the BLM would apply an NSO stipulation until an RMP revision is completed which addresses whether or not these areas should be open to oil and gas surface disturbance (121,300 acres). | For lands with wilderness characteristics, the BLM may apply a lease notice containing measures and limitations intended to maintain naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation. Examples of the measures and limitations in the lease notices may include:<br>▪ Limiting motorized access to trails and unimproved, non-maintained routes only;<br>▪ Vegetative screening and contouring; and<br>▪ Additional siting considerations to minimize visual impacts. | | For lands with wilderness characteristics the BLM will apply the following:<br>▪ Tier 1 areas would be open to leasing with an NSO stipulation (70,000 acres);<br>▪ Tier 2 areas would be open to leasing with a CSU stipulation (67,900 acres); and<br>▪ Tier 3 areas would be open to leasing without any lease stipulations designed to protect wilderness characteristics (164,000 acres). |

BLM_0149412

## Table 2-22. Comparison of Alternatives – Lands with Wilderness Characteristics

| Record Number | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E (Proposed) |
|---|---|---|---|---|---|
| Allowable Uses and Management Actions | | | | | |
| 3 | No similar action. | Lands with wilderness characteristics inventories will be maintained for the WRFO on an ongoing basis. Inventories will be reviewed and updated prior to issuing any land use authorizations, permits, or leases for proposed actions. | | | |
| 4 | No similar action. | Where reasonable, seek funding to update the inventory from project proponents on a cost recovery basis to facilitate the project review process. | | | Same as Alternative A. |
| 5 | No similar action. | Temporary fencing in support of reclamation will be approved on a case-by-case basis in lands with wilderness characteristics. | | | Same as Alternative A. |
| 6 | No similar action. | In areas where lands with wilderness characteristics have been identified for retention of their resource value, motorized or mechanized use will be allowed if necessary to protect life (e.g., helicopter life flight or OHV evacuation). | In areas where lands with wilderness characteristics occur, motorized or mechanized use will be allowed as necessary to protect life (e.g., helicopter life flight or OHV evacuation) or property. | | Same as Alternative A. |

Table 2-22–2

BLM_0149413

## Table 2-22. Comparison of Alternatives – Lands with Wilderness Characteristics

| Record Number | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E (Proposed) |
|---|---|---|---|---|---|
| | | | **Management Goal** | | |
| 1 | No similar goal. | Maintain lands with wilderness characteristics (naturalness, outstanding opportunities for solitude, or outstanding opportunities for primitive and unconfined recreation) where possible, considering manageability and the context of competing resource demands. | | | |
| | | | **Management Objectives** | | |
| 2 | No similar objective. | Lands with wilderness characteristics may be managed to retain their resource value if the parcels are 5,000 acres in size or greater and 20 percent or less of the area is encumbered by existing oil and gas leases scheduled to expire by the year 2016. | Manage lands with wilderness characteristics to give priority to other resource values and uses and give consideration to retaining some of their wilderness characteristics, such as naturalness and/or opportunities for solitude or primitive and unconfined recreational activities. | Manage lands with wilderness characteristics to give priority to other uses over the protection of wilderness characteristics by implementing the minimum protection required by laws and regulations. | Manage lands with wilderness characteristics in the following tiers (Map 2-6):<br>• Tier 1 areas will be managed to protect wilderness characteristics as a priority over other multiple uses.<br>• Tier 2 areas will be managed to emphasize other multiple uses while applying management restrictions to reduce impacts to wilderness characteristics.<br>• Tier 3 areas will be managed to emphasize other multiple uses as a priority over protecting wilderness characteristics. |

# Appendix L
## Special Recreation Permit Program Overview

BLM_0149415

BLM_0149416

# APPENDIX L
# SPECIAL RECREATION PERMIT PROGRAM OVERVIEW

The BLM will evaluate all commercial, competitive, and organized group special recreation permit (SRP) proposals on a case-by-case basis, and their approval or disapproval will be at the discretion of the authorized officer. All SRPs are considered undertakings under the National Environmental Policy Act (NEPA). Permit approval is dependent on conformance with all applicable land use planning documents and environmental review in accordance with NEPA. All existing permits will be analyzed for conformance to the Land Use Plan Revision.

In order to provide good customer service, to reduce unnecessary application submissions, and to ensure consistent consideration of permit proposals, all new SRP proposals will be evaluated using the process described below. The BLM will complete additional implementation guidance for activities in the GJFO, and this will provide applicants with specific information including but not limited to application deadlines, timelines for processing, application package requirements, fees, use reporting, and penalties.

## 1. PERMIT PROCESS

### Pre-Application Consultation

The BLM will use a pre-application consultation to determine whether an SRP is required and allowed, and if so, what type of permit is required. Proposals will be evaluated to determine whether they are consistent with recreation objectives; whether the opportunity is already available under an existing permit; whether there is adequate market competition; and whether the event would create conflict with the public and/or other existing permitted activities; among other factors. Additionally, during the pre-application consultation, permit proposals will be classified using the classification criteria described below. Once a class determination is made and the type of permit (competitive,

BLM_0149417

organized, or commercial) is established, the following guidelines and administration practices will apply:

1. **Commercial Administration**: If a proposed activity conforms to the BLM's land use planning decisions, will not exceed the carrying capacity of the proposed area, and is within the deadlines described in the GJFO permit policy, the applicant will be asked to fulfill all the required SRP application package requirements and pay applicable fees.

2. **Competitive Event Administration**: If a proposed activity conforms to the BLM's land use planning decisions and is submitted at least 180 days prior to the event date, the applicant will be asked to fulfill all the required SRP application package requirements and pay applicable fees.

3. **Vending**: If a proposed activity conforms to the BLM's land use planning decisions, will be held in conjunction with a competitive event sponsored by an organized group, and the proposal is submitted at least 180 days prior to the event date, the applicant will be asked to fill out the required paperwork and pay applicable fees.

4. **Organized Group Permit Administration**: Organized group/event permits are for group outdoor recreational activities or events that are neither commercial nor competitive. The authorized officer determines when a permit is required on the basis of planning decisions, resource concerns, user conflicts, public health and safety, and/or the need for monitoring.

Organized groups above the group size limit of 12* in the WSAs and lands with wilderness characteristics or above 25 in the remaining GJFO at a single location for more than two hours are required to contact the BLM prior to their event to determine whether an SRP is required. After reviewing the activity and location with the organizers, the BLM will determine whether or not a permit is required (see Section 1.3, Matrix for Determining Need for Organized Group SRP). If a permit is not required, the BLM may document this determination in the form of a *Letter of Agreement.*

### General Permit Administration

All permit administration will be done in accordance with National Environmental Policy Act (NEPA), BLM Manual: H-2930-1-Recreation Permit Administration, BLM Colorado State SRP Handbook, and all associated BLM SRP instruction memoranda (IMs) and information bulletins (IBs).

## 2. APPLICATION EVALUATION

The authorized officer will evaluate the application using the permit application review criteria listed below. The criteria include specific objectives identified in

BLM_0149418

the land use plan for recreation management areas. The issuance or denial of SRPs will be made in accordance with these criteria:

### Permit Application Review Criteria

Permit proposals described in business and operating plans will be evaluated using the following criteria. These criteria establish an objective framework for the evaluation of SRP applications. The authorized officer will use any or all of the criteria to approve or deny a permit (subject to potential modifications):

1. **Compliance History**: Applicant must be in compliance, and have a history of compliance, with local, State and Federal regulations. Applicant or authorized representatives must not have been convicted of a Federal, State, or local violation in connection with the proposed activities within the last three years.

2. **Safety and Safety History**: Applicant must demonstrate that they have a history of providing an acceptable level of safety for clients and the affected public.

3. **Consistency with Land Use Planning documents**: Proposals will be evaluated for consistency with current planning documents, including but not limited to the most current revision of the GJFO resource management plan and other applicable implementation plans. All activities in the wilderness study areas must be consistent with BLM Manual 6330, Management of Wilderness Study Areas.

4. **Conflicts**: Permits will not be issued in areas where conflicts exist between permittees or between permittees and the public or landowners. Valid conflicts include but are not limited to the following:

   - Overlapping use areas where the same type of use is currently permitted
   - Conflicts with livestock grazing
   - Limited public land ownership and/or related access
   - Camps; location, number, and distance between camps
   - Types of activities permitted
   - Overcrowding and/or use levels during specific time periods, supporting infrastructure at capacity
   - Enforcement/compliance problems
   - Improper conduct by permittee or employees
   - Unacceptable resource impacts

5. **Diversity of Services**: Applicants must demonstrate that their activity will enhance the diversity of recreational opportunities available for visitors and that the services are needed by the public.

BLM_0149419

6. **Low Percentage of BLM Public Lands:** Applications may be refused where public lands comprise a low percentage of the total area and recreational management goals are already being met.

7. **Adjoining Lands and Joint Permits:** Preference will not be given to applicants who own or lease private land adjacent to BLM public lands. Preference will not be given to permittees that have a joint permit issued by another land management agency.

These criteria are a means to analyze applications and offset potential problems. Many complex issues are best addressed through an ongoing dialogue between the permittees and the BLM.

If the proposal meets the application review criteria, the appropriate NEPA document will be completed. Permits may be denied as a result of issues identified during the NEPA process. Any stipulations identified during the NEPA process will be included on approved permits.

## 3. MATRIX FOR DETERMINING NEED FOR AN ORGANIZED GROUP SRP

Organized Group SRPs are for group outdoor recreational activities or events that are neither commercial nor competitive. The authorized officer determines when a permit is required on the basis of planning decisions, resource concerns, user conflicts, public health and safety, and/or the need for monitoring. This matrix is to guide a decision process to determine whether a SRP is needed. When determining if an SRP is needed, first determine if the activity is recreational. If it is not recreational, it may need a lands permit. Second, determine if the proposal is consistent with recreation program goals and objectives. If the proposal is not consistent with recreation program goals and objectives, the proposal should be denied. If the proposal is recreational and it is consistent with recreation program goals and objectives, consider the criteria in the matrix to help determine if a permit is needed. If a permit is not needed, consider using a Letter of Agreement to document that if the outing is conducted as proposed, a permit is not needed.

| Criteria | Decision Guidance | | |
|---|---|---|---|
| | **Permit Not Required** | **Permit Required** | **Deny as proposed** |
| Is the use appropriate to the site? Is there a management concern for cultural or natural resources or facilities on public land? | Yes; site very conducive to the proposed use; provided for in planning. | Site is appropriate for group size and activity; not specifically provided for in plan. | No; site is not appropriate for use as proposed; does not conform with recreation planning goals; violates ROS class or experience prescriptions. |
| Is monitoring needed? | Nothing beyond one simple site visit. | Monitoring beyond a one-time site visit is required. | Long term monitoring of one or more resources is required. |
| Are there any health and safety concerns? | None | The health and safety of event participants | Unmitigated, high risk to human health and safety; |

BLM_0149420

| Criteria | Decision Guidance | | |
|---|---|---|---|
| | Permit Not Required | Permit Required | Deny as proposed |
| | | or other public land users may be jeopardized. | unreasonable risk, especially to non-participants. |
| Is bonding desirable to cover reclamation or damage to government property or resources? | No | Bonding is desirable or required. | |
| Is insurance desirable to protect the U.S. Government from claims by group participants or third parties? | No, liability exposure is negligible. | Insurance is desirable due to possible claims for personal injury or property damage. | |
| Are special services required, such as law enforcement, fire protection, exclusive use of public lands, reserved sites, etc? | No | Yes | |

## 4.    DETERMINING PERMIT CLASSIFICATION

The purpose of classifying SRPs is to screen proposals to ensure they are consistent with and support planning objectives.

All permit proposals will be evaluated using the classification criteria in Table I.1 and will be assigned to one of the classes in the classification matrix (Table I.2). The classification criteria table includes factors to determine the potential impacts to resources as a result of the proposed activities. Each factor is evaluated as either present or not present or along a continuum ranging from low to moderate or high for each resource.

After permit proposals have been evaluated using the classification criteria table, the results will be applied to the classification matrix to determine whether the proposal is either Class I (low impact), Class II (medium impact), Class III (moderate impact), or Class IV (high impact). Different proposed activities and outings will have different impacts to the various resources. Not all proposed activities will clearly be classified as I, II, III, or IV. In many situations, there will be one or two resources where impacts are higher than impacts to the other resources. In these cases, the BLM may deny the application, require modification to the proposal, or mitigate the resource concern through permit stipulations.

BLM_0149421

**Table. Permit Classification Criteria**

| Resource | | Anticipated Impact | Description of Impact |
|---|---|---|---|
| **Wildlife** | **Visual** | No | Artificial lighting system will not be used or will be less than 1000 candle power. |
| | | Yes | Artificial lighting system will be 1000 candle power or greater. |
| | **Audio** | No | A loudspeaker or other broadcasting device will not be used. |
| | | Yes | A loudspeaker or other broadcasting device will be used. |
| **Water Quality** | | No | Proposed activity will not fall within a water quality impaired stream segment or won't affect stream. |
| | | Yes | Proposed activity will fall within a water quality impaired stream segment, and the activity would affect the stream. |
| **Cultural Sensitivity Zones** | | Low | Proposed activity will be within area classified as low in the Class 1 cultural survey. |
| | | Moderate | Proposed activity will be within area classified as medium in the Class 1 cultural survey. |
| | | High | Proposed activity will be within area classified as high in the Class 1 cultural survey. |
| **Paleontological** | | Low | Surface geology consists of PFYC Class 1-3 formations. |
| | | Moderate | Surface geology consists of PFYC Class 4-5 formations. |
| | | High | Known vertebrate fossil site(s) can be seen. |
| **Soils/Vegetation** | | Low | Site and associated features demonstrate resilience and resistance to anticipated activity or are sufficiently disturbed that they would not be affected. |
| | | Moderate | Site and associated features demonstrate some ability to resist/recover from impacts. |
| | | High | Site and associated features demonstrate limited ability to resist/recover from impacts. |
| **Desert Shrub/Saltbush Vegetation Type** | | Low | Proposed activity will be outside of desert shrub/saltbush community. |
| | | Moderate | Proposed activity will be within desert shrub/saltbush community but outside intact desert shrub/saltbush vegetation. |
| | | High | Proposed activity will be within intact desert shrub/saltbush vegetation. |
| **Riparian Vegetation, Perennial Waters, Seeps and Springs** | | Low | Proposed activity will be more than 100 meters from the edge of riparian vegetation and wetlands. |
| | | Moderate | Proposed activity will include use within 100 meters of riparian vegetation on designated trails that cross riparian vegetation or camping at designated campsites. |
| | | High | Proposed activity will include use within riparian vegetation off designated trails or outside designated campsites. |

BLM_0149422

| Resource | Anticipated Impact | Description of Impact |
|---|---|---|
| Bighorn Sheep | Low | Proposed activity will be outside bighorn sheep production and summer concentration areas. |
| | Moderate | Proposed activity will be outside bighorn sheep production areas and within summer concentration areas. |
| | High | Proposed activity will be within bighorn sheep production areas. |
| Special Status Species (Colorado Hookless Cactus, Special Status Raptors, Kit Fox, Bats, Prairie Dogs, Gunnison Sage-Grouse, DeBeque phacelia and Parachute penstemon) | Low | Proposed activity will be greater than 200 meters from sensitive species. |
| | Moderate | Proposed activity will be greater than 100 meters from sensitive species. |
| | High | Proposed activity will be less than 100 meters from sensitive species. |
| Timing for Wildlife | Low | Proposed activity will not occur between November 1 and April 30 or between May 15 and July 15. |
| | Moderate | Proposed activity will occur between November 1 and April 30 or between May 15 and July 15 and will not affect wildlife. |
| | High | Proposed activity will occur between November 1 and April 30 or between May 15 and July 15 and will affect wildlife. |
| Within Existing Disturbance (Designated Routes, Staging Areas, Designated Campsites, etc.) | Low | < 5 acres |
| | Moderate | 5 to 40 acres |
| | High | > 40 acres |
| Duration of Use | Low | One day or less |
| | Moderate | Two to six days |
| | High | > Six days |
| Anticipated Number of Participants | Low | < 12 |
| | Moderate | 13-25 |
| | High | 25+ |
| Anticipated Number of Vehicles | Low | 1-6 |
| | Moderate | 6-10 |
| | High | 10+ |
| Competitive Event | Yes | The event or activity will be competitive in nature. |
| | No | The event or activity will be noncompetitive. |
| Motorized/Mechanized Support | Yes | Vehicles or other mechanized equipment will be required to support activity. |
| | No | No vehicles or other mechanized equipment will be required. |

BLM_0149423

| Resource | Anticipated Impact | Description of Impact |
|---|---|---|
| **BLM Monitoring and Inspection Requirements** | Low | No significant pre- or post-permit oversight activities will be required |
| | Moderate | Pre- or post-permit activities will require up to eight hours of BLM oversight. |
| | High | Pre- or post-permit activities will require more than eight hours of BLM oversight. |

**Table. Permit Classification Matrix Evaluation Factors**

| | Permit Class | | | |
|---|---|---|---|---|
| | **I** | **II** | **III\*** | **IV\*** |
| **Wildlife (Visual)** | No | Yes | Yes | Yes |
| **Wildlife (Audio)** | No | Yes | Yes | Yes |
| **Water Quality** | No | Yes | Yes | Yes |
| **Cultural** | Low | Moderate | Moderate | High |
| **Paleontological** | Low | Moderate | Moderate | High |
| **Soils/Vegetation** | Low | Moderate | Moderate | High |
| **Desert Shrub/Saltbush Vegetation** | Low | Moderate | Moderate | High |
| **Riparian Vegetation** | Low | Moderate | Moderate | High |
| **Bighorn Sheep** | Low | Moderate | Moderate | High |
| **Sensitive Species** | Low | Moderate | Moderate | High |
| **Timing for Wildlife** | Low | Moderate | Moderate | High |
| **Within Existing Disturbance** | Low | Low | Moderate | High |
| **Duration of Use** | Low | Moderate | Moderate | High |
| **Anticipated Number of Participants** | Low | Moderate | Moderate | High |
| **Anticipated Number of Vehicles** | Low | Low | Moderate | High |
| **Competitive Event** | No | No | Yes | Yes |
| **Motorized Support** | No | No | Yes | Yes |
| **Monitoring and Inspection Requirements** | Low | Low | Moderate | High |

*\*Class III and IV events are more likely to require cost recovery, because these events will probably need more than 50 hours of BLM staff time for permit administration.*

BLM_0149424





THE **WILDERNESS** SOCIETY

## FIXING THE BLM'S
### Indiscriminate Energy Leasing

Decades of adherence to the belief that all lands should be available for oil and gas leasing has kept our public lands from being protected and put them at unnecessary risk for destruction. It's time to update the BLM's approach and give the public more of a say in managing our public lands.

## Introduction

This report describes how the U.S. government agency that oversees 700 million subsurface acres of oil and gas resources on nearly 250 million acres of public lands is saddled with outdated and unbalanced policies, often contradicting its own mandate to manage the land for multiple uses.

Ninety percent of the public lands managed by the Bureau of Land Management are open to open to oil and gas leasing and mineral resources even in areas with little or no potential for developing these resources, compromising potential for protecting wildlife and recreation, while encouraging speculative leasing.

The report provides a series of recommendations that would, if adopted by the BLM, lead to more balanced decision-making. It lays out specific ways for the agency to better weigh the benefits of leasing a particular area with the potential harm. Such an approach would drive better decisions for the American people, the owners of U.S. public lands.

## The Problem

*The BLM is not fulfilling its duty to manage public lands for multiple uses.*

The Bureau of Land Management rarely closes lands to oil and gas leasing in its resource management plans, despite the risk leasing poses to wildlife, cultural and other valuable resources. But this approach is in conflict with the agency's guiding management principle, the multiple use mandate.

Oil and gas development threaten many of our public lands, like the Pawnee National Grassland in Colorado.
Photo: Mason Cummings/TWS

Common sense would dictate that the BLM close areas with other important values than oil and gas potential, particularly areas unlikely to be developed. But the BLM's internal guidance, and the way that the agency interprets that guidance, has made it extremely difficult to actually close lands to leasing. Instead, the BLM continues to create opportunities for energy speculation at a high cost to recreation, wilderness and wildlife.

**An examination of current BLM policies and management practices shows that there is little effort to protect at least some public lands from oil and gas leasing.[1]**

As a result, the vast majority of U.S. public lands (90 percent) are available for leasing—regardless of whether those lands have other important values that should be protected and regardless of whether the BLM's own data show there is low—or even no—potential for oil and gas. This fundamental flaw in the BLM's guidance has led to a current total of 32 million acres leased for oil and gas development, with less than 13 million under development.[2]

When public lands with low energy development potential are leased to oil and gas companies, taxpayers lose out on revenue, as well as other important uses of these lands like recreation and wildlife management. In fact, a Congressional Budget Office report recently concluded that, for parcels leased between 1996 and 2003 (all of which have reached the end of their 10-year exploration period), only about 10 percent of onshore leases issued competitively and three percent of those issued noncompetitively actually entered production.[3]

The BLM needs to update its approach—it's time to bring 25-year-old policies into this century. In the short term this means issuing immediate guidance for protecting sensitive lands and lands with low energy development potential, and in the long term, commencing a formal revision to BLM's planning guidance.

## Misguided Guidance

*The BLM's handbook and how BLM interprets that handbook are out of step with the agency's guiding principles.*

No decisions affect the future of public lands more than those made in BLM resource management plans. In these plans, created for all public lands being considered for development, the agency sets out management guidelines.

Typically, some areas are open for recreation, some are set aside for grazing and others are designated as open or closed to oil and gas leasing. Then different conditions are set forth for how those activities— particularly oil and gas leasing— are to be carried out.

BLM's Handbook on Planning for Fluid Mineral Resources (Handbook H-1624-1[4]) provides guidance to field offices on how to navigate the planning process for oil and gas resources. Under this guidance, field offices are supposed make decisions based



**The energy trumps all approach from BLM is out of balance with the many other uses of public lands.**

BLM_0149426



The White River Watershed in northwest Colorado is an example of how undeveloped leases on low-potential land effectively block conservation measures. Photo: Soren Jespersen/TWS

on the likelihood of certain resources being developed in a particular area. They take steps to identify the potential of oil and gas development and to predict where future drilling activity will take place and where impacts from this development will be focused.

This handbook directs the agency staff to formulate management prescriptions for oil and gas resources in light of where recoverable deposits of oil and gas are most likely to exist, referred to as "development potential."[5] The handbook, and additional guidance, also direct BLM to project "reasonably foreseeable development," looking at both potential and "resource conflicts or controversies," which can form the basis for refining expectations of where development is most likely and appropriate.[6]

However, the agency does not utilize that information to prepare for and address potential resource conflicts at the planning stage. The approach mandated by the mineral resources handbook *should* enable BLM to focus on the areas most likely to be targeted for development, and leave open for other uses the areas with low development potential or the potential to come into conflict with other values.

But under current BLM management policy—despite the guidance in its own handbook—the agency does not close areas with no or low development potential to leasing, regardless of the potential for resource conflict.

In fact, rather than closing areas with high conservation value which are unlikely to be developed, the agency actually tends to set less protective conditions for leasing in areas with no or low development potential. As a result, resource conflicts are often exacerbated, where they could be avoided.

## A Road to Nowhere

*The BLM has lost control of leasing and development decisions on the lands it manages, leading to many other problems.*

The BLM is required to hold quarterly lease sales; the lands auctioned off are usually nominated by the industry—regardless of the other uses and values of those lands. Once lands are nominated, they will almost certainly be put up for sale. Once they are sold, it is nearly impossible for the BLM to manage them for other uses. As long as most lands are open for leasing, the BLM will continue to have its management policies dictated by the fossil fuel industry.

Allowing oil and gas companies to control the leasing process leads to many other issues:

➤ **It precludes lands from being managed for multiple values.**

The BLM's mandate to manage our public lands for multiple use and sustained yield requires consideration of a host of natural and cultural resources.[7] BLM's

BLM_0149427

## Greater Sage-Grouse: A Conservation Case Study



Greater sage-grouse
Photo: Mason Cummings/TWS

In 2015, the BLM finalized plans for federal lands in 10 states to address conservation of the greater sage-grouse and its habitat—including the threat of oil and gas development. Yet of approximately 104 million acres of federal minerals, only about two percent—were actually closed to oil and gas leasing.

Notably, in many western land management plans written to address greater sage-grouse protection, almost all of the designated priority (high-value) habitat was completely outside of areas with high or medium oil and gas potential (96 percent in Nevada, 100 percent in California, 100 percent in the Idaho/Southwestern Montana plan, 100 percent in Oregon and over 90 percent in Utah). However, none of these plans closed any areas to oil and gas leasing; instead, they remain open to speculative leasing—a lost opportunity to make stronger decisions for conserving the greater sage-grouse.

current guidance reiterates that some lands are more valuable for other uses than for oil and gas leasing,[8] but the agency's own policies create numerous and daunting obstacles to achieving a balance between development and other uses.

Chief amongst these is the fact that BLM often identifies the presence of development potential and undeveloped leases as precluding other designations and management actions that would otherwise benefit recreation, wilderness and wildlife.

➤ **It impedes meaningful conservation from taking place on sensitive lands.**

While leases in low-potential areas (most federal leases) are not likely to be developed, their presence serves to preclude proactive management for other important resources.

For example:

- In the **Bighorn Basin Resource Management Plan in Wyoming**, the BLM considered whether to manage 43 inventoried units, totaling over 476,000 acres, to protect their wilderness characteristics.[9] But ultimately, none of the units are being managed to protect wilderness characteristics, because they contain oil and gas leases.[10]

- In the **White River Resource Management Plan Amendment in Colorado**, the BLM expressly stated that undeveloped leases on low-potential lands had effectively prevented management to protect wilderness characteristics, stating: "139,900 acres of lands with wilderness characteristics have been classified as having low, very low, or no potential….While there is no potential for fluid mineral development in most of the lands with wilderness characteristics units, the majority of the areas, totaling 101,100 acres (59 percent), are already leased for oil and gas development."[11]

- Similarly, in the **Colorado River Valley Resource Management Plan in Colorado**, the BLM stated it would not manage the Grand Hogback Citizens' Wilderness Proposal for the protection of wilderness characteristics based on the presence

BLM_0149428

# WHY SPECULATIVE LEASING MATTERS

## It's putting a majority of our public lands at risk

*A staggering amount of lands with low or no oil and gas potential are open to leasing.*

Our analysis of areas with low or no potential for oil and gas development shows that the vast majority of these lands are still open to leasing. And they often are leased, presumably with the hope that energy prices will rise, that new ways to extract marginal energy will be found or that the leases could be sold to another company.

The resulting speculative, non-producing leases have precluded forward-thinking, commonsense policies such as managing for wilderness-quality lands and important wildlife habitat.

Our analysis showed that:

- 95 percent of low-, very low- and no-potential lands are open to leasing in the **Bighorn Basin Resource Management Plan in Wyoming**.[15]

- 88 percent of low- and no-potential areas are open to leasing in the **Kremmling Resource Management Plan in Colorado.**[16]

- 80 percent of low-potential lands are open to leasing in the **Price Resource Management Plan in Utah.**[17]

- All of the low-potential sage-grouse habitat is open to leasing in Idaho. No productive oil and gas wells have ever been drilled in Idaho.

## It allows a designation double standard

*Its easy to get a speculative lease that prevents conservation of environmentally valuable areas, but very difficult to get a designation that would protect them.*

For lands to be protected for their wilderness characteristics, an intensive land inventory process must occur. The process seeks to determine if lands meet specific criteria; then a determination of whether they can be managed as wilderness must take place.[18]

In the same way, protection and designation of Areas of Critical Environmental Concern (lands with identified important natural and cultural values) are mandated under BLM's governing statute.[19] However, in order to maintain or designate new Areas of Critical Concern in its resource management plans, the BLM requires that an analysis demonstrate the area hold certain relevant and important characteristics that require special management.

Even then, designating the land as an Area of Critical Environmental Concern is only one of the options considered by the agency.[20] Consequently, while oil and gas leasing does preclude other management uses, conservation-focused management faces a higher bar. That is an unacceptable double standard.

BLM_0149429

of oil and gas leases, even though the leases had never been developed.[12]

> **It prevents us from effectively achieving our national climate targets.**

Implicit in the decision to leave lands open for development is the lack of consideration of the climate consequences of developing the resources found there—even though the Secretary of the Interior and the Director of the BLM have both called upon the BLM to do more to anticipate and address the contributions of public lands to climate change.

For many reasons, including climate impacts, it is unrealistic and unwise to presume 90 percent of oil and gas resources on public lands should be developed—yet that is precisely the position the BLM takes each time it refuses to close areas to oil and gas leasing.

> **It undermines the public's engagement in the land planning process.**

Time and again, public input and polling show that Americans strongly support managing important lands for something other than oil and gas development. But the current practice of keeping oil and gas resources open at any cost conflicts with that input. It is also, as we have shown, out of step with other federal policies directing identification and management of natural and cultural resources and features for conservation purposes.

> **It causes poor fiscal stewardship of taxpayer-owned resources.**

Lands are routinely obtained for well below-market value, according to research from the non-partisan Congressional Budget Office, and can be held for a nominal annual fee for the duration of the 10-year lease term.[13] Oil and gas companies routinely extend the terms of the leases they hold indefinitely through "suspensions," which can last decades, with no annual fees.

Under these circumstances, it is no surprise that speculation and hoarding of publicly managed oil and gas resources are commonplace. This rampant speculation contributes to the nearly two-thirds of

leased acreage not being developed. Not only is this a waste of the agency resources invested in preparing these leases for sale, it also deprives taxpayers of potential income.

When leases are not developed and not producing, they are not a good investment for the public. Non-producing leases generate less than two percent of total revenue generated by the federal onshore system; 90 percent comes from royalties paid on producing leases.[14]

> **Other resources are endangered by oil and gas leases that include insufficient protections.**

The Kremmling Field Office in Colorado provides an object lesson in the problems arising from leasing lands with low development potential without meaningful protections. For example, in each of the five lease sales including the Kremmling Field Office from 2010 to 2015, nominations have included low- or no-potential areas.[21]

Lease nominations within low-potential areas are also regularly (and often successfully) protested specifically because of the weak stipulations and lack of protection for other resources. Nominations in the Kremmling Field Office within low or no potential areas were protested based on inadequate protections for fisheries and water quality (June 2014), wildlife (August 2012) and permitted recreation activities (May 2013), and also highlighted the contradiction of BLM putting these resources at risk from speculative leasing and drilling in areas that it had already concluded had no value for oil and gas development.[22]

Land within low- and no-potential areas has frequently been leased by the Kremmling Field Office, even though it is rarely drilled. In fact, most active leases issued by the office fall in low- or no-potential areas, and, unsurprisingly, they are not being actively developed.[23]

Better decision-making during the planning process would have helped the BLM avoid administration and preparation cost for lease sales, handle subsequent protests and prevent undue risks to other important resources.

BLM_0149430



"Well, we know better now. We know that healthy, intact ecosystems are fundamental to the health of our wildlife—and our nation. They clean our air and provide our drinking water, they store carbon and combat climate change, and they are critical to our economy.

But if their integrity is undermined by a haphazard web of transmission lines, pipelines and roads, where does that leave us 50 years from now? Or 500?

It's an issue that can't be solved by simply creating a new national park or wildlife refuge—although there's no doubt that we need those places to serve as critical anchors for conservation.

What we need is smart planning, on a landscape-level, irrespective of manmade lines on a map.

We need to take a holistic look at an ecosystem—on land or in the ocean—to determine where it makes sense to develop, where it makes sense to protect the natural resources, and where we can accomplish both."

-SECRETARY OF THE INTERIOR, SALLY JEWELL

Continental Divide Trail in Colorado.
Photo: Bob Wick/BLM

BLM_0149431

# Solutions for Better Management practices

*The BLM's policies must reflect the interests of all stakeholders.*

The BLM's policies are long overdue for an update that includes input from others besides just the oil and gas industry. A prime example is the agency's Handbook on Planning for Fluid Mineral Resources, which has not been overhauled since 1990.

Both in theory and in practice, the handbook undermines opportunities for protecting lands for other uses, does not provide a path for closing areas to leasing and leads to low- and no-potential areas being open to oil and gas leasing without necessary protections.

BLM's approach to leasing must be updated to reflect the agency's legal mandate, and it must take into account both development potential and conflicts with other resources and users:

➤ **More lands must be closed to oil and gas development.**

BLM plans should set out a framework for oil and gas development that would support closing lands to leases where warranted and opening lands to leasing, with appropriate protections, where development is likely. Lands that have low or no potential for leasing should not be open to leasing unless and until conditions change—an eventuality that BLM has addressed in the Dinosaur Trail Master Leasing Plan:

> Leasing within the MLP would progress in phases to address resource values and concerns. Leasing would first occur in the southern portion of the MLP where the oil and gas occurrence potential is rated medium to high. Leasing within…areas of low oil and gas potential… would occur once the BLM has completed additional analysis and planning.[24]

If the BLM closes or defers leasing in low-potential areas, and conditions change to make development in those areas more likely, the agency can then complete additional analysis and planning to ensure that development occurs responsibly and accounts for current resource conditions. For example, BLM could commit to completing a master leasing plan in the event that there is demonstrated industry interest in leasing and developing low-potential areas.

By taking a proactive approach to managing oil and gas development as just one of the many uses of our public lands, BLM can also reduce unnecessary costs associated with speculative leasing and undeveloped lands, while making room for designating and managing lands for other uses, such as recreation, wilderness values, and fish and wildlife.

In addition, by taking control of leasing, BLM can better meet other priority goals for land use planning, such as accounting for and managing the contribution of federal lands to climate change and protecting important wildlife migration corridors.

➤ **More balanced management is needed.**

A more thoughtful, realistic approach would be consistent with BLM's mandate to manage the public lands for multiple use and sustained yield.

The agency's governing statute identifies a wide range of uses and values and provides for using lands "for some or all of these resources" and "with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output."[25]

The courts have ruled that "[i]t is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses."[26] Even the BLM itself has made it clear that this is a practice that is out of step with its own directives:

> The BLM recognizes that, in some cases, leasing of oil and gas resources may not be consistent with protection of other important resources and values, including units of the National Park System; national wildlife refuges; other specially designated areas; wildlife; and cultural, historic, and paleontological values. **Under applicable laws and policies, there is no presumed preference for oil and gas development over other uses.**"[27]

BLM_0149432



Photo: Simon Fraser University - flickr

BLM_0149433

Other aspects of BLM's legal obligations also support limiting or eliminating leasing in low- and no-potential areas, including for purposes of protecting other important resources. For example, BLM is subject to numerous requirements to "minimize" the environmental and other impacts of oil and gas leasing and development.[28]

Faithfully applying a current understanding of laws and policies would lead to closing more lands to oil and gas leasing, consistent with the agency's multiple use obligations.

➤ **A smarter approach would have minimal impacts on oil and gas production.**

Modernizing the handbook with an approach that provides for closing lands to leasing and limits leasing in low- or no-potential areas would not only support BLM's obligation to consider managing lands for fish and wildlife, recreation and wilderness values, but also have minimal impacts on industry objectives.

In locations like the Ely District in Nevada, where federal minerals are almost 90 percent open to leasing, only 32 wells were authorized over the past 101 years (as of May 21, 2014), even though there are 936 active leases covering just over two million acres of public land.[29]

Closing these lands to speculative leasing will not harm responsible oil and gas development. If conditions change so that development in those areas is more likely, BLM can then complete additional analysis and planning to manage additional development. For example, BLM could commit to completing a master leasing plan in the event that there is demonstrated industry interest in leasing and developing low potential areas.

➤ **The BLM's own master leasing plans provide a working model for improved management.**

The BLM has already taken a more proactive and prescriptive approach to managing oil and gas leasing and development through master leasing plans. Master leasing plans incorporate practices such as closing lands to leasing to minimize resource conflicts and requiring phasing of leasing and development to reflect oil and gas potential.[30] As the handbook states,

"The MLP establishes a guiding framework for the development of the area and provides a vision for how future development will proceed."[31]

These tools and concepts could be scaled up to inform agency decision-making at the land-use planning level.

# Recommendations

*These policy recommendations provide an exit from the "energy trumps all" path the BLM is currently pursuing.*

We recommend these specific steps be taken:

**1. INTERIM GUIDANCE SHOULD BE ISSUED IMMEDIATELY**. To clarify the manner in which Handbook 1624-1 should be applied in preparing resource management plans, guidance should be issued that:

a. There is no presumption that lands should be available for oil and gas leasing; rather, determinations should be based on resource potential, likely conflicts and potential harm to other resources or uses.

b. The BLM should collect and update information on development potential, likely impacts of development on other resources and uses, and possible designations or management priorities that would conflict with leasing. Based on this information, the BLM should construct a development framework taking into account support for a variety of resources and uses.

c. Lands that have high or medium development potential should be considered for designation as available for leasing, but with appropriate protections where other uses or resources are present—and with the understanding that some lands with high or medium potential may still be better suited to management for other uses.

d. Lands that have low or no development potential should be considered for closure or deferral pursuant to phased leasing, with the understanding that where there is a significant potential for other uses to be supported by closure or harmed by development, these lands should be closed.

BLM_0149434

**2. THE HANDBOOK ON PLANNING FOR FLUID MINERAL RESOURCES SHOULD BE UPDATED TO CLARIFY AND INCORPORATE THESE KEY CONCEPTS AS SOON AS POSSIBLE.**

**3. INTERIM GUIDANCE ON EVALUATING LEASE SALE NOMINATIONS SHOULD BE ISSUED TO ADDRESS THE CURRENT IMBALANCE AND SIGNIFICANT PROBLEMS THE HANDBOOK HAS ALREADY GENERATED.** When assessing lease proposals under existing resource management plans where more than 75 percent of minerals are open for leasing, BLM should take a hard look at whether decisions on availability for leasing would have been made differently based on current guidance.

An updated approach to planning for oil and gas leasing should meaningfully account for development potential and conflicts with other resources, as depicted in the below table.



BLM_0149435

1  A more in-depth study accompanies this report. https://wilderness.org/resource/no-exit-fixing-blm%E2%80%99s-indiscriminate-energy-leasing-whitepaper

2  http://www.blm.gov/style/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTECTION_/energy/oil__gas_statistics/data_sets.Par.69959.File.dat/summary.pdf

3  https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51421-oil_and_gas_options.pdf, p. 19.

4  http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.44374.File.dat/H_1624_1.pdf

5  There are eight steps set out in the handbook, which focus first on identifying existing conditions and potential, as well as the impacts that would arise from oil and gas development if existing management remains in place. In the process of formulating alternatives to the existing management, the handbook directs the BLM to focus on how to maximize keeping lands open to leasing, stating that alternatives should be "exploring opportunities for enhancing or expanding resources or resource uses" and will "identify any subsurface management constraints or mitigating measures that are required to take advantage of opportunities and to resolve any problems." A detailed overview of the decision process set out in the Handbook accompanies this report. https://wilderness.org/sites/default/files/Planning%20for%20Leasing%20Overview.pdf. See H-1624-1, pp. III-10 - III-11.

6  See H-1624-1, pp. III-7 – III-8, Instruction Memorandum 2004-089.

7  See 43 U.S.C. §§ 1701(a)(7)-(8), 1702(c), 1702(h).

8  See Instruction Memorandum 2010-117, p. 2. ("The BLM recognizes that, in some cases, leasing of oil and gas resources may not be consistent with protection of other important resources and values, including units of the National Park System; national wildlife refuges; other specially designated areas; wildlife; and cultural, historic, and paleontological values. Under applicable laws and policies, there is no presumed preference for oil and gas development over other uses.")

9  Bighorn Basin Proposed RMP, p. 3-191.

10  See Bighorn Basin Proposed RMP, Appendix S at Table S-1. ("Rationale for Not Managing Lands with Wilderness Characteristics for Naturalness, Outstanding Opportunities for Solitude, and Primitive and Unconfined Recreation, by Field Office and Unit".) See, e.g., regarding Unit 508 AK: "It is recommended not to manage for wilderness characteristics because of the existing leases for oil and gas.".

11  See White River Proposed RMP, pp. 4-289-4-290.

12  See Colorado River Valley Proposed RMP, p. 3-135.

13  The Congressional Budget Office found that fully one-quarter of leases are issued for the minimum bid of $2 per acre–meaning the cost of holding public lands is de minimus. See https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51421-oil_and_gas_options.pdf, p. 18.

14  https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51421-oil_and_gas_options.pdf, p. 2.

15  Bighorn Basin Proposed RMP, p. 4-89.

16  Kremmling Proposed RMP, p. 2-28.

17  Price Proposed RMP, p. 304.

18  See BLM Manuals 6310 (Conducting Wilderness Characteristics Inventory of BLM Lands) and 6320 (Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process).

19  43 U.S.C. § 1712(c)(3).

20  See BLM Manual 1613 (Areas of Critical Environmental Concern).

21  See EA for the KFO June 2014 Competitive Oil & Gas Lease Sale (November 2013) at p. 10 ("According to the Reasonable Foreseeable Development report (RFD), there is low potential for oil and gas development in the location of the Jackson County parcels (BLM, 2008)."); May 2013 Competitive Oil & Gas Lease Sale PDF Maps at p. 2 (showing nominated lease parcels in T. 11 N, R. 76 W, an area with no potential for oil or gas under the 1991 RFD); August 2011 Competitive Oil & Gas Lease Sale Map (showing the location of COC74901 within T. 2 N, 79 W, an area with low or no oil and gas potential under the 1991 RFD); August 2010 Competitive Oil & Gas Lease Sale Map (showing the location of COC74518 within T. 11 N, R. 81 W and within an areas of low or no oil or gas potential under the 1991 RFD); May 2010 Competitive Oil & Gas Lease Sale Map (showing the location of COC74397 within T. 10 N, R. 82 W, an area with low or no oil or gas potential under the 1991 RFD).

22  Leases within areas with low or no potential have been protested in at least each of the past three lease sales in the KFO. See CO BLM Lease Sale Archive June 2014, May 2013 and August 2011 lease sale protests.

23  See 2008 RFD Report, p. 6 (stating that 210,852 acres of federal mineral estate are currently under lease) and Draft Kremmling RMP Appendix V, p. V-3 (indicating that at least 115,200 acres of low and no potential areas–more than half of the total leased–are under lease in the KFO); see Rocky Mountain Wild. "Oil and Gas Leasing and Development in Colorado as of March 2015.".

24  White River Proposed RMP, Table 2-17a-2.

25  43 U.S.C. § 1702(c).

26  New Mexico Ex. Rel. Richardson v. BLM, 565 F.3d 683, 710 (10th Cir. 2009).

27  Instruction Memorandum 2010-117, p. 2.

28  See 43 C.F.R. § 3101.1-2 (reasonable measures may be required to minimize adverse impacts on leases); 43 C.F.R. § 2920.7(b)(2) (land use authorizations shall minimize damage to specified environmental resources); BLM Standard Lease Form 3100-11 (lessees "must" conduct their operations so as to minimize adverse impacts); Onshore Order No. 1 §§ IV and III(F)(a)(3) (operators "must" minimize adverse impacts and BLM may require reasonable measures to minimize adverse impacts when APDs are approved); BLM Gold Book (several provisions referencing minimization including a provision to "minimizes undesirable impacts to the environment").

29  See BLM Nevada Preliminary EA for the Dec. 2015 Oil and Gas Lease Sale, p. 1.4.

30  H-1624-1, Chapter V, pp. V-1-V-7.

31  Ibid., p. V-2.

*Our mission is to protect wilderness and inspire Americans to care for our wild places.*



1615 M Street N.W.
Washington, D.C. 20036

(202) 833-2300

wilderness.org



**THE**
# WILDERNESS
— S O C I E T Y —

# Recommended Approach for Using Oil and Gas Development Potential to Inform Land Use Planning Decisions:

# A Proposal to the Uncompahgre Field Office

Submitted to the BLM Uncompahgre Field Office on November 1, 2016, with our comments on the Uncompahgre Draft Resource Management Plan.

Contact: Juli Slivka; (303) 650-1179, juli_slivka@tws.org

1660 Wynkoop Street, Suite 850, Denver, CO  80202  |  ph  303.650.5818  |  **wilderness.org**

100% post consumer fiber

BLM_0149437

This document is a proposal for an updated approach to making oil and gas allocations and management decisions that BLM can and should use in the Uncompahgre Resource Management Plan (RMP). Our proposal stems from research The Wilderness Society conducted into BLM's decision-making process for oil and gas allocations, summarized along with policy recommendations in our report, *No Exit: Fixing the BLM's Indiscriminate Energy Leasing*.[1] The proposal draws on recommendations that should be applied to BLM resource management planning everywhere, including in national guidance, and is tailored herein to the Uncompahgre RMP.

The proposal includes three parts:

I.   The case for an updated approach to oil and gas management in land use planning
II.  Recommended methodology for this new approach
III. Outcomes from applying our recommended methodology to the Uncompahgre RMP

These concepts have been applied successfully in other field offices, and they are clearly consistent with BLM's multiple use mandate and overarching guidance.[2] In fact, as detailed in the introductory section of this proposal, BLM's Handbook H-1624-1 directs BLM to base oil and gas allocation decisions on development potential for oil and gas resources, which is the starting point for our recommended approach as well.  Additionally, this proposal could be largely implemented within the range of alternatives for the Uncompahgre Draft RMP.

This is a proposal to the Uncompahgre Field Office for managing oil and gas resources in the Uncompahgre RMP. At the same time, it includes a strong case for BLM to manage oil and gas resources similarly across the West and describes in general terms how these concepts should be applied to BLM planning, in addition to how they should be applied to the Uncompahgre RMP specifically.

**This proposal does not apply to the North Fork area. We support the North Fork Valley community's vision for public lands management in their region, including oil and gas management.**

An online data portal for exploring the data and recommendations included in this proposal is available at http://arcg.is/2fnGM8C.

---

[1] http://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web_0.pdf.
[2] For example, the Dinosaur Trail Master Leasing Plan, as adopted by the BLM White River Field Office, implements a phased leasing and development approach based on oil and gas development potential in which leasing would occur first in areas with medium to high development potential. Leasing within areas of low oil and gas potential would occur "once the BLM has completed additional analysis and planning." White River Approved RMPA for Oil and Gas Development (2015) at p. 2-45.

1

BLM_0149438

I.    **The case for a new approach to oil and gas management in land use planning**

Ninety percent of the public lands and minerals managed by the Bureau of Land Management are open to open to oil and gas leasing, even in areas with little or no potential for developing those resources. Making low development potential areas available for leasing compromises protections for wildlife, recreation and other resources while encouraging speculative leasing. An examination of current BLM policies and management practices shows that there is little effort to protect at least some public lands from oil and gas leasing.[3] Fundamental flaws in BLM's guidance have led to a current total of 32 million acres leased for oil and gas development, with less than 13 million under development.[4] And a Congressional Budget Office report recently found that, for parcels leased between 1996 and 2003 (all of which have reached the end of their 10-year exploration period), only about 10 percent of onshore leases issued competitively and three percent of those issued noncompetitively actually entered production.[5]

BLM's Handbook H-1624-1 guides the agency on planning for fluid mineral resources. Chapter III of Handbook H-1624-1 directs BLM to plan for oil and gas development on federal lands in light of where recoverable deposits of oil and gas are most likely to exist. The guidance requires that BLM use "development potential" to predict where future drilling activity will take place and where impacts from oil and gas development will likely be focused within a planning area. Using this information, the guidance directs BLM to assign lease stipulations and other management prescriptions to protect competing resources and mitigate unwanted impacts from drilling and development.

However, when applied in land use planning, this guidance often produces illogical allocation decisions and management prescriptions that result in significant resource conflicts. It tends to lead BLM to *open* low and no potential lands to leasing, and, in many instances, apply weaker protections and stipulations in these areas than high potential areas. Since low potential lands are open to leasing with weak stipulations, they are frequently targeted for speculative leasing. In turn, speculative leases in low potential areas often preclude management decisions that might benefit other public lands resources, such as wilderness-quality lands, wildlife and recreation.

The guidance prescribes a sequence of steps by which development potential is applied to make oil and gas lease stipulation planning and allocation decisions. Essentially, development potential is used to predict the location and intensity of oil and gas development assuming that existing management prescriptions will remain in place. Then, alternatives to existing management are formulated to mitigate impacts and resolve conflicts that would likely result from continuing with existing management.

Under Handbook H-1624-1, stipulations beyond existing management prescriptions or standard terms and conditions are to be applied where impacts from development require mitigation. That is, heightened protections are imposed in areas where more significant impacts are predicted. However, impacts are more likely to exist in areas with moderate to high development potential. The implied corollary is that strict constraints and strong protections are not necessary in low potential areas because standard or existing lease terms are likely to mitigate the impacts from oil and gas development

---

[3] See No Exit (http://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web_0.pdf) and accompanying technical report (https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%286.6.16%29.pdf).
[4] www.blm.gov/style/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTECTION_/energy/oil__gas_s tatistics/data_sets.Par.69959.File.dat/summary.pdf
[5] https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51421-oil_and_gas_options.pdf

2

BLM_0149439

to an acceptable level. Consequently, application of the sequence of steps prescribed by the guidance produces stricter lease stipulations in areas with high development potential than in areas with low development potential.

The following flowchart illustrates how application of the guidance can result in decisions to make low potential areas open to leasing with relatively weak lease stipulations, regardless of the presence of other resources that could be harmed should development happen:[6]



The outcome of this approach to decision-making is that low development potential lands are frequently nominated and leased, presumably for speculative purposes, leading to public conflict and precluding protective management of other resources.

For example, in the Colorado River Valley Resource Management Plan, BLM decided not to manage lands for the protection of wilderness characteristics in the Grand Hogback lands with wilderness characteristics unit based on the presence of oil and gas leases, even though the leases had never experienced any development:

> The Grand Hogback citizens' wilderness proposal unit contains 11,360 acres of BLM lands. All of the proposed area meets the overall criteria for wilderness character…There are six active oil and gas leases within the unit, totaling approximately 2,240 acres. None of these leases shows any active drilling or has previously drilled wells. The ability to manage for wilderness characteristics in the unit would be difficult. If the current acres in the area continue to be leased and experience any development, protecting the unit's wilderness characteristics would be infeasible. . . .

Colorado River Valley PRMP (2015) at p. 3-135.

---

[6] See https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%20%286.6.16%29.pdf for detailed case studies.

3

The Colorado River Valley RMP was finalized in July 2015, and already 5 of the 6 leases in the Grand Hogback lands with wilderness characteristics unit have expired. Yet, BLM has made a 20-year decision to not protect the wilderness qualities of this area. The Uncompahgre RMP can and should make better-reasoned decisions.

Similarly, last year, Wyoming BLM declined to manage the Rough Gulch area in the Cody Field Office for wilderness protection because "64% of the area [was] covered] by oil and gas leases," even though the leases had never been drilled. Rough Gulch borders a WSA—the McCullough Peaks WSA—and has "very low" potential for oil and gas development. Like most federal leases, especially those in areas with low development potential, the leases in Rough Gulch were never drilled, and they expired earlier this year. Yet, because the leases were in effect last year, when WY BLM made its land use planning decision for the area, BLM is not currently managing Rough Gulch for wilderness protection.

Prioritizing leasing outside of low potential areas also makes sense from an economic perspective. Leases in low potential areas generate minimal revenue but can carry significant costs. In terms of revenue, they are most likely to be sold at or near the minimum bid of $2/acre, and they are least likely to actually produce oil or gas and generate royalties.[7] *See* Bighorn Basin PRMP (2015) at p. 73 ("Leasing may be based on speculation, with leases within high risk prospects usually purchased for the lowest prices."); White River PRMP (1996) at p. A-7 ("At any given time, most of the acreage that is available for oil and gas leasing in the WRRA is under lease. . . . Most of the area is leased for speculative purposes and consequently only a small percentage of leases will ever be developed."). In terms of costs, leasing in low potential areas requires processing lease nominations, preparing environmental reviews, and resolving protests and resource use conflicts.

On the other hand, limiting leasing in low potential areas conflicts the least with industry objectives and can confer significant public benefits. Low potential lands are the "low-hanging fruit" by which the BLM can fulfill other objectives of its multiple-use mission, such as managing for fish, wildlife and recreation. Yet, as described above, speculative leases on low potential lands can prevent the BLM from otherwise managing lands for alternative purposes and fulfilling its multiple-use mandate. *See also* White River DRMPA (2012) at p. 4-377 (". . . authorized oil and gas uses would likely preclude other incompatible land use authorizations"). In addition, limiting exploration and development on low potential lands necessarily conflicts the least with industry objectives. As discussed in the Bighorn Basin PRMP (2015):

> [A]lternatives D and F place additional stipulations on oil and gas-related surface disturbances in the Absaroka Front, Fifteenmile, and Big Horn Front MLP analysis areas for the protection of big game, geologic features, and LRP soils. As a result, alternatives D and F could have additional adverse impacts on oil and gas development in these MLP analysis areas. . . . However, because of the generally low to very low potential for oil and gas development and redundancies with other restrictions on mineral leasing from the management of other program areas, management specific to the MLP is less likely to adversely affect oil and gas development in these areas.

---

[7] Center for Western Priorities, "A Fair Share" ("Oil Companies Can Obtain an Acre of Public Land for Less than the Price of a Big Mac. The minimum bid required to obtain public lands at oil and gas auctions stands at $2.00 per acre, an amount that has not been increased in decades. In 2014, oil companies obtained nearly 100,000 acres in Western states for only $2.00 per acre. . . .Oil companies are sitting on nearly 22 million acres of American lands without producing oil and gas from them. It only costs $1.50 per year to keep public lands idle, which provides little incentive to generate oil and gas or avoid land speculation.").

4

Bighorn Basin PRMP at p. 4-87; *see also* White River DRMP (1994) at p. 4-21 ("Prohibiting development in Class I areas would not affect oil and gas production because oil and gas potential in these areas is low.").

There are also legal arguments for changing how BLM manages low potential lands for oil and gas development. As described in Instruction Memorandum 2010-117, the multiple-use mandate requires that "there [be] no presumed preference for oil and gas development over other uses." *See* p. 2; *see also New Mexico Ex. Rel. Richardson v. BLM*, 565 F.3d 683, 710 (10th Cir. 2009) ("It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses."). Yet, H-1624-1 provides that all lands, regardless of development potential, are presumptively open to oil and gas leasing under "least restrictive" stipulations. *See* H-1624-1 at p. III-11 ("The least restrictive stipulations that effectively accomplishes the resource objectives or uses for a given alternative should be used . . . the preferred alternative of the RMP/EIS should provide evidence that less restrictive measures were considered but found inadequate to provide effective protection for other land uses or resource values determined through the planning process to be deserving of protection."). Stricter stipulations and closures are only applied when necessary to mitigate conflicts and unwanted environmental impacts. *See, e.g.*, Kremmling PRMP (2014) at p. 2-1 ("It is the policy of the BLM that lands are generally available for oil and gas leasing where measures can be taken to mitigate conflicts and environmental consequences to an acceptable level. . . ."). Yet, as described above, leaving lands open to oil and gas leasing does not simply allow oil and gas resources to compete on a level playing field with other resources—it gives preference to oil and gas development over other uses.[8]

As demonstrated, BLM's typical application of the guidance leaves low and no potential lands open to leasing and assigns weak stipulations and protective measures in these areas. We detail several significant problems stemming from this practice in our report *No Exit*:
- It precludes lands from being managed for multiple values.
- It impedes meaningful conservation from taking place on sensitive lands.
- Other resources are endangered by oil and gas leases that do not include sufficient protections.
- It undermines the public's engagement in the land planning process.
- It causes poor fiscal stewardship of taxpayer-owned resources.
- It prevents us from effectively achieving our national climate targets.

Since low potential lands have favorable lease stipulations and can be acquired and held for minimal cost, low potential areas are often targeted for speculative leasing, though rarely drilled and developed. Although leases on low potential lands generate minimal revenue, BLM devotes significant administrative resources to managing nominations and protests and administering leases on low potential lands. In addition, undeveloped leases on low potential lands impose less obvious opportunity costs in the form of precluding designations and management decisions that would otherwise benefit alternative resources. This, in turn, limits the ability of the BLM to fully comply with its multiple-use mandate. Eliminating the presumption that all lands, regardless of development potential, should be open to leasing would help ensure that other resources and uses of the public lands, such as wildlife and recreation, are on equal footing with oil and gas development. Doing so would also create opportunities

---

[8] Oil and gas interests can obtain valid existing rights (i.e., leases) in interim periods between RMP revisions that can later preclude management decisions benefiting alternative resources and uses. There is no analogous mechanism for uses alternative to oil and gas to gain interim vested rights that will later preclude oil and gas development. In this sense, presumptively opening lands to oil and gas development gives preference to oil and gas development over other uses.

5

to enhance the management of those other resources, particularly in areas with low or no development potential.

We argue in our report *No Exit* that BLM should update agency guidance to reflect a smarter, more balanced approach to oil and gas management. However, BLM has the ability to apply a more balanced approach in current land use planning efforts in the absence of new guidance. A more thoughtful, realistic approach would be consistent with BLM's mandate to manage the public lands for multiple use and sustained yield. The agency's governing statute identifies a wide range of uses and values and provides for using lands "for some or all of these resources" and "with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." 43 U.S.C. § 1702(c). Other aspects of BLM's legal obligations also support limiting or eliminating leasing in low- and no-potential areas, including for purposes of protecting other important resources. For example, BLM is subject to numerous requirements to "minimize" the environmental and other impacts of oil and gas leasing and development.[9] By taking a proactive approach to managing oil and gas development as just one of the many uses of our public lands, BLM can also reduce unnecessary costs associated with speculative leasing and undeveloped lands, while making room for designating and managing lands for other uses, such as recreation, wilderness values, and fish and wildlife.

The approach described below is unquestionably consistent with BLM's multiple use mandate and overarching guidance. Faithfully applying a current understanding of laws and policies would lead to closing more lands to oil and gas leasing, consistent with the agency's multiple use obligations. We therefore urge the Uncompahgre Field Office to apply these principles to the ongoing Uncompahgre RMP to achieve a more balanced land use plan that protects important resources and reduces the potential for public conflict over oil and gas leasing and development.

---

[9] See 43 C.F.R. § 3101.1-2 (reasonable measures may be required to minimize adverse impacts on leases); 43 C.F.R. § 2920.7(b)(2) (land use authorizations shall minimize damage to specified environmental resources); BLM Standard Lease Form 3100-11 (lessees "must" conduct their operations so as to minimize adverse impacts); Onshore Order No. 1 §§ IV and III(F)(a)(3) (operators "must" minimize adverse impacts and BLM may require reasonable measures to minimize adverse impacts when APDs are approved); BLM Gold Book (several provisions referencing minimization including a provision to "minimizes undesirable impacts to the environment").

6

## II.  Recommended methodology for a new approach

We developed a flow chart that BLM should follow in determining oil and gas allocations and management prescriptions in land use planning. This recommended methodology better reflects the agency's multiple use and sustained yield mandate, would lead to development of more balanced resource management plans, and would reduce conflict and costs associated with speculative leasing. Following BLM's current guidance, the first step is identifying oil and gas development potential across the planning area. We group development potential into two categories in the first step in the flowchart: high/medium development potential and low/no development potential. From there, BLM should determine levels of resource conflict and make land use planning decisions that protect important resources while providing for oil and gas development in areas with high/medium development potential, and prioritize management of other public lands resources in areas with low/no development potential.

Our methodology includes the following four steps to work through our recommended flowchart:

1.  Map oil and gas development potential
2.  Define areas of high, medium, low and no resource conflict
3.  Make allocations for areas with high and medium oil and gas development potential
4.  Make allocations for areas with low or no oil and gas development potential

We describe these steps in detail below. The next section of this proposal describes the outcomes of applying this methodology to the Uncompahgre RMP.

7



BLM_0149445

**Step #1: Map oil and gas development potential**

*Generally*

This methodology is based on making oil and gas allocations dependent on oil and gas development potential. Therefore, the first step in the process, and one which BLM already completes in developing RMPs, is to map oil and gas development potential across the planning area. The success of this approach relies on the collection of accurate resource potential data, precise mapping, a mechanism for utilizing this information in the planning process and the desire to allow it to inform management decisions. BLM has well-established and defensible data collection and mapping processes and utilizes this information in developing the reasonably foreseeable development (RFD) analysis.

As discussed above, current guidance on resource potential data collection and analysis is set forth in BLM Handbook H-1624-1 (Planning for Fluid Mineral Resources), Chapter III. This Handbook section establishes procedural guidance and outlines a multi-step process for field offices to follow when making fluid mineral resource determinations. Most relevant to this discussion, the Handbook addresses how to assemble data, analyze resource capability and potential and project reasonably foreseeable development.

When initiating this process, BLM requires a review of data from all available sources in order to determine what resources are present as well as other factors that could influence the economic viability of those reserves. That includes historic drilling and leasing trends and expressions of interest in the planning area. BLM utilizes data from the Department of Energy, the American Petroleum Institute, state agencies, professional societies, and academic sources as well as previous BLM documentation and analysis. Perhaps the most integral information comes from the geologic data provided by the U.S. Geological Survey (USGS).

USGS conducts periodic assessments of both continuous and conventional recoverable oil and gas resources. This program was initiated in 2000 under the National Oil and Gas Assessment and provides the most comprehensive and accurate oil and gas potential data available. These assessments are regional in scale and develop geology-based estimates of technically recoverable resources. It is important to note that USGS includes "resources which cannot currently be drilled because of economic limits." H-1624-1 at Chapter III (B)(1)(c). These USGS assessments are key in the development of "occurrence potential" estimates in the RFD.

Occurrence potential is defined by BLM as:

> A rating of the potential for the presence of hydrocarbon resources to occur within the Study Area. The rating is based on geological and geophysical indications that hydrocarbons are present. Other factors, such as, accessibility, exploration cost, risk, oil and gas prices, and analysis period are not include[ed] in an analysis of Occurrence Potential.

2012 Uncompahgre Field Office RFD, Glossary.

While BLM assumes occurrence potential is constant within a play, it "does not imply a uniform distribution of the oil and gas resources nor of development within the play." H-1624-1 at Chapter III (B)(3). BLM addresses some of this variability by breaking down occurrence potential into four

9

categories: high, medium, low and none. "High" and "medium" designations signify demonstrated existence or an indication of the presence of the necessary geologic features, while "low" or "none" show a demonstrated absence of or indications that one or more of the necessary geologic features are absent in a given area.

Based on occurrence potential, and taking into consideration anticipated exploration and development activity, operator input, past and present activity, economics, drilling and completion technology, and accessibility to drilling locations and infrastructure, BLM estimates "development potential." Development potential is projected through the preparation of an RFD, and a map detailing the location of high, medium, low and no potential areas accompanies the final document.

The RFD is instrumental in the development of draft alternatives in an RMP. While the data collection and analysis processes used to determine development potential in the RFD do not require any major modifications, BLM's utilization of the development potential and RFD to analyze and ultimately adopt management decisions must be modified for reasons detailed previously in this proposal.

Given that this methodology, and the outcomes that result from applying it in the planning process, hinge on development potential data, BLM must be prepared to reevaluate oil and gas allocations as new information regarding development potential becomes available or there is significant a shift in a key variable used to generate the initial projection. Energy markets can crash or emerge, new reserves can be identified, technology can improve or other market forces can change drastically enough to alter supply and demand. BLM should include in the RMP or RFD examples of new information which would trigger such a reevaluation and commit to utilizing similar methodology in considering and deciding on new allocations when necessary. We note that changing oil and gas allocations based on new information would require an RMP amendment. By adhering to a systematic process such as the methodology proposed herein, BLM could have an efficient and expedient targeted amendment process.

*Specific to the Uncompahgre RMP*

The Uncompahgre RFD was completed in July 2012 and as a result relies on severely outdated information. The RFD made projections based on a number of assumptions that have proven to be wildly inaccurate. The RFD states that shale gas production would grow almost fourfold from 2009 to 2035 and that "Rising fuel prices [will] spur domestic energy production across all fuels."[10] It also relies on the EIA's 2012 Annual Energy Outlook (AEO) which projected natural gas prices to rise to $10.35/MMBtu and crude oil prices to move above $125 per barrel by 2035. Revised estimates from EIA show the 2012 projections to be overstated and recent inactivity in the Piceance basin clearly illustrates that shale gas production is not occurring to the extent predicted in 2012. Based on inaccurate assumptions and projections, BLM estimated that by 2035 the planning area could see as many as 1,271 wells drilled; 782 of those for the production of coalbed methane. The RFD analysis was then used to inform the development potential and environmental consequences for the area and eventually contributed to the development of the range of draft alternatives and selection of a preferred alternative.[11]

---

[10] 2012 UFO RFD, p. 57-58

[11] BLM notes in Chapter 4 that "It can be anticipated that assuming current rates of severance and royalty taxes, as presented in **Chapter 3**, increased production of oil and gas on BLM-administered lands would result in a comparable increase in contributions to local counties and communities."

10

The assumptions underlying the 2012 development potential projections and the RFD scenario have changed dramatically. BLM needs to reevaluate development potential and the RFD based on this new information. A new RFD and analysis of development potential will change the assumptions used in the development of the draft alternatives, in analyzing environmental consequences, in projecting the impact of oil and gas development in terms of jobs and revenues and ultimately the selection of the appropriate preferred alternative. It's likely that new data would indicate the initial analysis grossly overestimated development potential and the associated positive impacts of fossil fuel development in the region. A new RFD would make the case for developing a more balanced management plan that prioritizes protecting those resources and values that are most important to the local communities and broader public over fossil fuel development. More realistic and conservative oil and gas development projections that would come from a reevaluation of the RFD in light of new data could drastically alter the decisions made in the Uncompahgre RMP.

**Step #2: Define areas of high, medium, low and no resource conflicts**

**a. Defining/identifying areas with high resource conflicts**

*Generally*

Areas of high resource conflict are those for which BLM is prioritizing management for resources, values and uses other than oil and gas development. These generally include special management areas and other lands that are allocated for specific management that would conflict with oil and gas development. Lands with wilderness characteristics, Areas of Critical Environmental Concern, Recreation Management Areas and Backcountry Conservation Areas are all areas that BLM delineates in Resource Management Plans for emphasizing values and uses that would conflict with oil and gas, such as recreation, wildlife habitat, cultural resources and wilderness experiences.

*Specific to the Uncompahgre RMP*

In the Uncompahgre Draft RMP, BLM is considering the following management tools and designations that denote high resource conflict with oil and gas development: lands with wilderness characteristics, Areas of Critical Environmental Concern, Ecological Emphasis Areas, Special Recreation Management Areas, Extensive Recreation Management Areas, Wild and Scenic Rivers, and National Historic Trails. All of these potential special management areas should be considered high resource conflict under this methodology.

**b. Defining/identifying areas with medium to low resource conflicts**

*Generally*

Outside of special designations and areas allocated for specific management other than oil and gas, there is a wide range of public lands resource and uses that warrant restrictions on oil and gas development. This could include a number of factors such as special status species, fragile soils, visual resources, or any number of site-specific characteristics. It could also include places where oil and gas development counters management objectives for an area, such as places identified for ecological restoration or compensatory mitigation actions. BLM should fully consider the needs of resources and other resource uses, management goals and objectives, and compatible land use decisions in identifying locations with medium to low conflict.

BLM_0149448

*Specific to the Uncompahgre RMP*

In the Uncompahgre Draft RMP, BLM evaluates restrictions on oil and gas development for resources and areas that occur outside of special management areas. These resources include:

- Sensitive and special soils
- Steep slopes
- Agricultural operations
- Water resources
- Vegetation
- Terrestrial wildlife
- Big game species
- Fisheries
- Special Status Species
- Migratory birds, raptors and other bird species
- Cultural resources
- Visual resources
- Public health and safety
- Land health
- Paleontological resources
- Geologic hazards

Evidently, BLM has determined a potential need for limiting the impacts of oil and gas development on these resources. All resources which BLM considers protective stipulations for in Alternative B of the Draft RMP should be considered medium to low conflict, outside of areas that were previously established as high conflict.

### c.   Defining/identifying areas with no resource conflicts

Generally speaking, there are very few lands that contain no resources which would conflict with oil and gas development. This is evidenced by the fact that in modern RMPs, BLM applies at least one stipulation to significant portions of the planning area. For example, the recently-completed RMP amendment for oil and gas development in the White River Field Office made zero acres of federal mineral estate open to leasing with standard lease terms. White River Approved RMPA (2015) at p. 2-35. Similarly, the proposed Moab Master Leasing Plan would apply stipulations to 100% of the federal minerals addressed in the plan across the range of action alternatives. Moab MLP Final EIS (2016) at p. 2-18. Some areas have minimal resource conflicts that require minimal stipulations. However, if BLM identifies lands with no resource conflicts, those areas should be documented and addressed appropriately through this methodology.

12

**Step #3: Make allocations for areas with high and medium oil and gas development potential**



a. **Planning in areas with high/medium oil and gas development potential and high resource conflicts**

*Generally*

When an area has high or medium oil and gas development potential and overlaps with an identified special management area, it should be considered as having high potential for resource conflict. In high conflict areas the agency should apply robust management measures including NSO stipulations without waiver, exception or modification, or with specifically limited exceptions. In some cases, closures to leasing may be necessary to protect extraordinarily important and vulnerable resources. These areas may also be good candidates for Master Leasing Plans or other detailed planning decisions. MLPs are a "stepped-down leasing analysis" that evaluates "in greater detail than the RMP the impacts of leasing and likely development" and identifies "key issues such as protection of air quality, watersheds, wilderness, wildlife, and nearby land uses" and "leasing and higher-level development mitigation measures to protect the environment.[12] Agency guidance directs that MLPs are appropriate for areas with high development potential and high likelihood of conflict with other resources.

*Specific to the Uncompahgre RMP*

BLM should close the following lands with wilderness characteristics to oil and gas leasing to protect the extraordinarily valuable wilderness resources that exist in these areas from oil and gas development:
-   Roc Creek

---

[12]http://www.blm.gov/style/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTECTION_/energy/leasing_reform.Par.54947.File.dat/Leasing_Reform_05-11-2011.pdf (emphases in original).

11

BLM_0149450

- Adobe Badlands WSA Adjacent[13]

BLM should apply strong stipulations to the following areas with high resource conflict that overlap with high and medium development potential.
- Lands with wilderness characteristics: Shavano Creek, Lower Tabeguache/Campbell Creek, Dolores River Canyon WSA Adjacent
- Areas of Critical Environmental Concern (ACECs): Salt Desert Shrub Ecosystem[14], East Paradox, West Paradox, Paradox Rock Art, La Sal Creek, San Miguel River, San Miguel Gunnison Sage-grouse, Tabeguache Pueblo and Tabeguache Caves
- Ecological Emphasis Areas: Adobe, Tabeguache, La Sal, Naturita Canyon, San Miguel
- Recreation Management Areas: San Miguel River, Burn Canyon, Paradox Valley
- Suitable Wild and Scenic River segments: San Miguel River, Dolores River, Beaver Creek, Saltado Creek, Naturita Creek, Dry Creek, Tabeguache Creek, La Sal Creek, Spring Creek, Lion Creek, North Fork Mesa Creek, Deep Creek, West Fork Terror Creek, Ice Lake Creek, Gunnison River

### b. Planning in areas with high/medium oil and gas development potential and medium or low resource conflicts

*Generally*

When an area has high or medium oil and gas development potential and does not overlap with any special management areas but does contain resources that warrant protective stipulations, it should be considered as having medium to low potential for resource conflict. In these areas, BLM is not prioritizing management of specific other resources as is the case in special management areas. However, BLM must give attention to all public lands resources and minimize impacts from oil and gas development.  In these areas the agency should apply protective but flexible resource-specific stipulations as appropriate.

*Specific to the Uncompahgre RMP*

In areas with moderate and high potential for oil and gas and medium to low potential for resource conflict outside, BLM should adopt the stipulations contemplated in Alternative B. This only applies

---

[13] The Adobe Badlands WSA-adjacent unit contains oil and gas leases that are part of the Whitewater Unit. However, the Master Development Plan for the Whitewater Unit that is currently under evaluation only proposes development in the northern portion of the unit and explicitly states that "development in the southern portion of the Whitewater Unit is not reasonably foreseeable." Fram Whitewater Unit MDP EA at 1.1. Furthermore, According to the unitization agreement, the Whitewater Unit was supposed to contract, and lands outside the "participating area" (PA) of the unit were supposed to be automatically eliminated, in July 2015. However, BLM granted a suspension that tolled contraction of the unit based on a pending APD for the Federal 12-98-24-2 well. The relevant BLM orders indicate that the unit will now contract roughly 120 days after BLM approves the APD. Therefore, BLM should ignore the presence of the overlapping unit for purposes of planning decisions in the RMP, because it is likely the unit will contract to exclude the Adobe LWC prior to the RMP being finalized.

[14] Because this ACEC overlaps with some high development potential and some very low development potential, we consider the overall potential for conflict to be high and recommend BLM put robust management prescriptions in place to protect the ACEC values while providing for oil and gas development where appropriate. The same rationale applies to all special management areas that overlap with some high/medium development potential and some low development potential.

12

outside of special management areas such as lands with wilderness characteristics, ACECs and recreation management areas. Although there are few if any areas with high energy development potential no resource conflict, if such areas are identified we recommend BLM allow that acreage to remain open under standard leasing terms.

**Step #4 Make allocations for areas with low or no oil and gas development potential**



a. **Planning in areas with low/no oil and gas development potential and high resource conflicts**

*Generally*

Areas with low or no development potential that overlap with special management areas should be closed to leasing. There is no reason to allow for speculative leasing to put other important resources at risk and lead to public conflict.

*Specific to the Uncompahgre RMP*

All lands with wilderness characteristics, Areas of Critical Environmental Concern, Ecological Emphasis Areas, recreation management areas, suitable Wild and Scenic River segments, and National Historic Trails that occur in areas with low or no development potential should be closed to leasing. These include the following:
  - Dry Creek Basin, Camel Back WSA Adjacent LWCs
  - Roubideau Corridors, Roubideau-Potter-Monitor, Lower Uncompahgre Plateau Cultural, Sims-Cerro Gunnison Sage-grouse, Fairview South ACECs
  - Monitor-Potter-Roubideau, Dry Creek, Spring Canyon, Sims Mesa, Ridgway EEAs
  - Dry Creek, Spring Creek, Roubideau, North Delta, Kinikin Hills, Ridgway Trails RMAs
  - Old Spanish National Historic Trail
  - Roubideau Creek, Potter Creek, Monitor Creek Suitable Wild and Scenic River segments

13

**b. Planning in areas with low/no oil and gas development potential and medium or low resource conflict**

*Generally*

BLM should also consider closing areas with low or no development potential to new leasing that overlap with medium or low resource conflict areas. Speculative leasing limits BLM's authority to make management decisions for public lands and disservices American taxpayers, and there is not a good argument for allowing industry to lease lands with little or no potential of producing oil and gas. While technology and resource information may change over time, thus making these areas desirable for development, this is actually an argument for ensuring an RMP amendment is required in such a situation so that the necessary analysis for developing those areas occurs. BLM must retain its ability to adequately plan for development in these areas if development become feasible.

If BLM does not simply close all lands with low or no development potential to oil and gas leasing, the agency should consider alternative planning decisions for areas with medium or low resource conflict to ensure speculative leasing does not put these other resources at risk. One option would be requiring phased and clustered leasing so that BLM drives where and how leasing occurs across the low and no development potential areas. Another option would be to defer all leasing in low or no development potential areas pending a Master Leasing Plan. BLM would not need to complete a Master Leasing Plan unless and until industry interest in developing the low and no development potential area arises. This would ensure that speculative leasing doesn't put resources at risk in areas with no and low development potential and would commit BLM to conducting adequate planning and analysis at the time that such analysis is warranted.

*Specific to the Uncompahgre RMP*

We recommend BLM close all areas with low or no development potential to leasing in the Uncompahgre RMP. This would be the best way to ensure other resources are not put at risk from speculative or inadequately analyzed leasing and development. This would also prevent BLM from wasting resources conducting NEPA analysis for lease parcels and managing leases that will never enter production. Alternatively, BLM should defer all leasing in areas with low or no development potential pending completion of Master Leasing Plans. BLM would not need to conduct analysis required to support leasing until industry shows interest in developing those areas, which would likely result from new resource information becoming available. At that time, BLM could conduct Master Leasing Plans to analyze and plan for reasonably foreseeable development. This would ensure resources are not put at risk to speculative leasing, ensure necessary planning and analysis is conducted in the event these areas become desirable for development, and ensure BLM does not waste resources analyzing leasing where development is highly unlikely to occur.

14

### III. Outcomes from applying our recommended methodology to the Uncompahgre RMP

a.   Maps (included at the end of this document)

1.   Oil and gas development potential and areas of high resource conflict
2.   Oil and gas development potential and areas of medium to low resource conflict
3.   Web mapper available at http://arcg.is/2fnGM8C

b.   Allocations recommended for the Uncompahgre RMP[15]

1.   High/medium development potential

**BLM should close the following lands with wilderness characteristics to oil and gas leasing to protect the extraordinarily valuable wilderness resources that exist in these areas from oil and gas development:**
-   Roc Creek
-   Adobe Badlands WSA Adjacent[16]

**BLM should apply robust stipulations to the following areas with high resource conflict that overlap with high and medium development potential.**
-   Lands with wilderness characteristics: Shavano Creek, Lower Tabeguache/Campbell Creek, Dolores River Canyon WSA Adjacent
-   Areas of Critical Environmental Concern (ACECs): Salt Desert Shrub Ecosystem[17], East Paradox, West Paradox, Paradox Rock Art, La Sal Creek, San Miguel River, San Miguel Gunnison Sage-grouse, Tabeguache Pueblo and Tabeguache Caves
-   Ecological Emphasis Areas: Adobe, Tabeguache, La Sal, Naturita Canyon, San Miguel
-   Recreation Management Areas: San Miguel River, Burn Canyon, Paradox Valley
-   Suitable Wild and Scenic Rivers segments: San Miguel River, Dolores River, Beaver Creek, Saltado Creek, Naturita Creek, Dry Creek, Tabeguache Creek, La Sal Creek, Spring Creek, Lion Creek, North Fork Mesa Creek, Deep Creek, West Fork Terror Creek, Ice Lake Creek, Gunnison River

**BLM should adopt the stipulations contemplated in Alternative B for all areas outside of special management areas.**

---

[15] The majority of these recommendations fit squarely within the range of alternatives in the Draft RMP, particularly in Alternative B which considers robust closures and restrictions for oil and gas leasing in areas evaluated for special management and other areas with important resource values. While other recommendations do not fit squarely within the range of alternatives, the concepts are considered in the RMP and therefore would require minimal supplementary analysis.

[16] See footnote 10.

[17] Because this ACEC overlaps with some high development potential and some very low development potential, we consider the overall potential for conflict to be high and recommend BLM put robust management prescriptions in place to protect the ACEC values while providing for oil and gas development where appropriate. The same rationale applies to all special management areas that overlap with some high/medium development potential and some low development potential.

15

BLM_0149454

2.  Low development potential

**BLM should close to oil and gas leasing all special management areas that occur in areas with low or no development potential:**
-   Dry Creek Basin, Camel Back WSA Adjacent LWCs
-   Roubideau Corridors, Roubideau-Potter-Monitor, Lower Uncompahgre Plateau Cultural, Sims-Cerro Gunnison Sage-grouse, Fairview South ACECs
-   Monitor-Potter-Roubideau, Dry Creek, Spring Canyon, Sims Mesa, Ridgway EEAs
-   Dry Creek, Spring Creek, Roubideau, North Delta, Kinikin Hills, Ridgway Trails RMAs
-   Old Spanish National Historic Trail
-   Roubideau Creek, Potter Creek, Monitor Creek Suitable Wild and Scenic River segments

**BLM should close all areas with low or no development potential to leasing in the Uncompahgre RMP. Alternatively, BLM should defer all leasing in areas with low or no development potential pending completion of Master Leasing Plans, which would be completed at the time that industry shows interest in developing those areas and/or development is reasonably foreseeable.**

16

BLM_0149455

# Oil and Gas Development Potential and Areas of High Resource Conflict
## Uncompahgre Field Office





# Oil and Gas Development Potential and Areas of Medium to Low Resource Conflict
## Uncompahgre Field Office

North Fork Area

**Legend:**

- ⌐ ⌐ Uncompahgre Field Office
- —— Old Spanish National Historic Trail
- ■ Special Management Areas (High Resource Conflict)
- ■ Designated Wilderness
- ■ National Conservation Area (NCA)
- ■ National Park Service Land
- ■ USFS Land

High / Medium Oil and Gas Development Potential

Low / No Oil and Gas Development Potential (Closed or Deferred to Leasing)

**Proposed Oil & Gas Stipulations**
- ■ Controlled Surface Use
- ■ Not Available to Leasing
- ■ No Surface Occupancy

0   5   10   15   20 Miles

CO
Uncompahgre Field Office

BLM_0149457

# A Socioeconomic Analysis
# of the Impact of the Proposed Piñon Ridge Uranium Project on
# Western Mesa, Montrose, and San Miguel Counties, Colorado

Prepared for

**Sheep Mountain Alliance**

By

**Power Consulting**
**Thomas M. Power, PhD**
**Donovan S. Power, MS**
920 Evans Avenue
Missoula, Montana 59801
www.powereconconsulting.com

December 2010

BLM_0149458

# Executive Summary

## Introduction

Since the American uranium industry went bust in the early- to mid-1980s, no company has built a new uranium mill in the United States. Now, Energy Fuels Resources Corp., a subsidiary of Energy Fuels Inc., has requested a permit from the State of Colorado to construct the Pinon Ridge Mill about seven miles west of Bedrock, Colo., in western Montrose County. If built, the proposed project will pulverize and process about 500 tons of uranium ore each day to produce fuel for nuclear reactors, leaving behind hundreds of tons of radioactive waste each day.

This report is based on comprehensive socioeconomic modeling of the potential economic impacts – negative and positive – that the proposed mill and associated mines would have on rural economies in western Montrose, San Miguel, and Mesa Counties. Previous analyses commissioned by Energy Fuels and Montrose County failed to consider potentially significant economic costs and the boom and bust nature of the uranium industry.

Other key findings from the report include:

**FINDING 1:** *Energy Fuels and Montrose County's analyses overestimate the number jobs likely to be generated by the mill*

Energy Fuels projects that the mill would create 315 well-paying jobs. The analysis commissioned by Montrose County estimates that 516 to 649 new jobs would be created directly or indirectly by the mill and mines.

However, this report found that the mill would likely generate about 116 jobs in the West End of Montrose County  – or between 35 percent and 80 percent fewer jobs than predicted by the mining company and the county

**FINDING 2:** *The positive economic impact from the proposed mill will likely be short-term and relatively small.*

This report found  that the total impact on employment in western Montrose County including multiplier impacts, will be 116 jobs – far below the hundreds of jobs Energy Fuels and Montrose County officials have suggested. The projected impact is small for several reasons:

·    Western  Montrose County does not have the commercial infrastructure to hold and circulate the spending associated with the mill and that much of it could leak to bigger cities like Grand Junction.

i

· Little, if any uranium mining to supply the mill will initially take place in Montrose County – making it unlikely that mining and hauling jobs will be filled by Montrose County residents.

· It is highly unlikely that most or all of the 85 mill jobs will go to currently unemployed workers or currently out-commuting workers who live in western Montrose County. The pool of qualified workers applying for the jobs will be much broader than that.

· Workers may choose to live at some distance from the mill and mines to protect the investments they put into their homes. Some businesses serving the mill and mines and their workers may choose to do the same.

**FINDING 3** *Uranium milling and mining will likely have significant, long-term negative effects on the local economy.*

Studies commission by Energy Fuels and Montrose County fail to consider the mill's negative impact on the local economy. The mill will generate huge volumes of radioactive waste that will remain on site permanently. That radioactivity is the source of significant human health concerns that can lead to negative local economic impacts, including discouraging new residents and businesses to locate in the area.

**FINDING 4:** *Energy Fuels socioeconomic analysis fails to acknowledge economic instability that comes from uranium mining – a legacy marked by several periods of booms and busts.*

Despite the past unstable pattern associated with uranium milling and mining in southwestern Colorado, Energy Fuels assumes that its proposed mill and associated mines will operate uninterrupted for 40 to 50 years. There is no uranium mine or mill in the United States that has operated with such sustained stability. Economic projections based on such faulty assumptions are misleading and cannot lay the basis for reasonable socioeconomic analysis.

**FINDING 5:** *Local economies expanded as mining and milling declined in the 1980s – with the surge attributable to the growth of a visitor economy, the attraction of retirees and their investment income, and the in-migration of new residents and businesses.*

Montrose, Mesa and San Miguel counties experienced significant economic expansion after the collapse of the uranium industry in the mid-1980s. These three counties added over 66,000 jobs, gained almost 73,000 new residents primarily through in-migration, and saw aggregate real income increase by two and a half fold.

Many of these new sources of economic vitality were associated with the attractiveness of this region as a place to live, work, do business, and raise a family as well as a place to visit or live part-time.

BLM_0149460

**FINDING 6:** *At least as many jobs could be generated by cleaning up contaminated, abandoned uranium mines than could come from the new mill*

Economic modeling indicates that this activity could provide at least as many jobs and associated payroll as the proposed mill. Clean up of abandoned mines could also help increase economic growth by protecting the region's quality of life, which has attracted thousands of new businesses and residents in the last several decades.

Ultimately, because Energy Fuels uses its socioeconomic analysis primarily as a public relations and marketing tool for its proposed mill, that socioeconomic analysis does not provide the realistic and pragmatic view of both the costs and benefits that is necessary for rational public decision-making.

The critical question is whether the relatively small size of the expected new local jobs, income, and net fiscal benefits justify the downside costs and risks associated with this new mill. Those risks include additional radioactive waste and pollution problems and the impact of that environmental damage on the dominant sources of economic vitality in the region: local natural and social amenities and quality of life that have supported in-migration of new residents and businesses as well as the visitor economy.

The past and expected future instability of the uranium industry and its expected impact on the reliability and duration of the small positive economic impacts also has to be considered.

BLM_0149461

## About the Authors

**_Thomas Michael Power_** is Research Professor and Professor Emeritus in the Economics Department at the University of Montana. He has a BA in Physics from Lehigh University and a MA and PhD from Princeton University in Economics. He served on the faculty of the University of Montana for 40 years, 30 of those years as Chair of the Economics Department. He has been a Principal in Power Consulting since 1975.

**_Donovan S. Power_** has a BA in Geosciences from the University of Montana and an MS in Geology from the University of Washington. He has been associated with Power Consulting since 2008.

iv

BLM_0149462

| Table of Contents |
|---|

**Executive Summary** ...............................................................................i
**About the Authors** .............................................................................iv

**1. Introduction and Conclusions**.............................................................1
   The Actual Experience of Western Colorado with Uranium Milling and Mining...........2
   Economic Expansion amid Mining and Milling Decline.................................3
   The Environmental Costs and Risks Associate with the Uranium Industry .................4
   The Projected Jobs and Income Impacts of the Piñon Mill Will Be Small...................5
   An Alternative Development Proposal: Repair the Environment and Boost Jobs .......5
   The Public Decision to Be Made....................................................6
**2. A Short Economic History of the Colorado Uravan Mineral Belt Area**.................6
   Economic Conditions in the Uravan Mineral Belt Region .............................10
   Mineral Development and Local Economic Development in the Colorado Uravan
      Mineral Belt...................................................................13
**3. The Economies of Our Three-County Study Area:Mesa, Montrose, and San
   Miguel Counties**..............................................................25
   Economic Vitality in the Face of Declines in the Mining Industry in Western
      Colorado ......................................................................25
   Defining the "Economic Base" of the Study Area Counties ..........................29
   Thinking Analytically about the Local Economy and Local Economic Well Being:
      The Limits of the "Export Base" View of the Local Economy ......................36
**4. Economic Modeling of the Local Impacts of the Proposed    Uranium Mill**........44
   The Appropriate Economy to Model to Understand the Local Economic Impact of
      the Proposed Uranium Mill and Mines ............................................44
   The Residence of Mill and Mine Workers ..........................................47
   The Stability and Duration of the Jobs Associated with the Mills and Mines.............48
   Accurately Modeling the Impact of the Proposed Mill on the Rural West End of
      Montrose County...............................................................49
   IMPLAN Modeling of Uranium Mine Reclamation in Rural Montrose County.............53
**5. Potential Negative Economic Impacts of a Revived Uranium Industry in the
   Uravan Region of Western Colorado**............................................56
   The Sources of Economic Vitality: A Restatement ..................................56
   The Potential Negative Economic Impact of Noxious Facilities.....................57
   The Potential "Stigma" Associated with Uranium Milling and Mining.........................59
   Residents' and Potential Residents' Concerns about Radioactive Waste.................61
   Dealing with Uncertainty ........................................................65
**6. The Instability in the Uranium Industry and Its Implications for Uranium-
   Dependent Communities** ......................................................66
   The Historical Experience in Western Colorado .....................................66
   Instability Across the Metal Mining Industries......................................68
   Shortages of Uranium and Future Higher Prices?....................................72
   Implications of Uranium Mining Instability for Local Communities.............................75
**Bibliography**.................................................................................78

BLM_0149463

# 1. Introduction and Conclusions

Energy Fuels Resources Corporation (Energy Fuels) has proposed to build a uranium mill in the Paradox Valley in the west end of Montrose County (West End) in western Colorado. The uranium ore for this proposed mill would come from Energy Fuels' mines on the Utah border in Mesa County, a mine in the La Sal area of southeastern Utah, and from many other mines in western Colorado and eastern Utah over the stated life of the project. Because Energy Fuels seeks permits for its Piñon Ridge mill from the State of Colorado, this study will primarily focus on the expected socioeconomic impacts on a three-county study area in Colorado including Montrose, Mesa, and San Miguel Counties with special emphasis on Montrose County's West End where the mill would be located.

Energy Fuels has characterized the socioeconomic impacts of its Piñon Ridge project entirely in positive terms. The proposed uranium mill and associated mines have been presented as a significant boost to local economic development in the surrounding rural areas. Energy Fuels projects that the mill will directly and indirectly create 315 new jobs that pay unusually high wages. The average annual labor income per job will be almost $60,000.[1] The socioeconomic impact analysis commissioned by Montrose County was even more expansive in its job projections, estimating that 516 to 649 new jobs would be created directly or indirectly by the mill and mines.[2] The expenditures of the mines and mills as well as the spending of their high-paid workers were projected to circulate in the local economy causing ripple or multiplier impacts that create positive impacts far beyond the direct employment and payroll of the proposed mill. This will, it is suggested, lay the basis for a significant economic expansion in the area, potentially stimulating ongoing economic development in this rural area.

As this report will document, that is a seriously incomplete story that exaggerates the positive economic impacts that the Piñon Ridge project will have on the rural west ends of Montrose, Mesa, and San Miguel Counties while ignoring the negative economic impacts. In addition, the Energy Fuels and Montrose County socioeconomic analyses mischaracterize these counties' economies and the primary sources of their economic vitality. This report will show that the expected positive impacts of the mill and associated mines will be relatively small, with multiplier effects 116 total jobs, *not* 300 to 650 jobs, while the economic risks are substantial.

---

[1] See Energy Fuels' "Socioeconomics Baseline and Impact Analysis for the Proposed Piñon Ridge Uranium Mill Montrose County, Colorado, The Louis Berger Group, November 5, 2009, Table 27, page 46.
[2] "Montrose County Socioeconomic Impact Study," Economic & Planning Systems, Mike Retzlaff, and Lloyd Levy Consulting, (EPS #19841), March 31, 2010, Table 14, p. 35.

BLM_0149464

***The Actual Experience of Western Colorado with Uranium Milling and Mining***

There is no need to guess or speculate as to the likely impact of a revival of uranium milling and mining on the economies and communities of the west ends of Montrose, Mesa, and San Miguel Counties. These rural areas have lived with the uranium industry for a century, experiencing the instability in employment and income and environmental degradation and health risks typical of areas dependent on mining.

The uranium booms and busts in the region had a major, destabilizing, impact on the rural areas and small communities in the west ends of the three counties. The West End of Montrose County, for instance, lost almost 60 percent of its population between 1960 and 1990. One of the mill towns in Montrose County, Uravan, and its surrounding area had 600 residents in 1950 and ceased to exist altogether by 1986. The west end of San Miguel County went from less than 200 residents to over 1,000, and then collapsed to about 100 residents between 1930 and 1990.  For the three-county study area estimated real mining payroll went from $82 million at its peak in 1979 to $7 million in 2000, over a 90 percent loss. By the end of the 20th century, the Gateway area in Mesa County and the Slick Rock area of San Miguel County showed no remnants of mining-related economic development. The same was true of most of the West End of Montrose County.

This instability in uranium prices, production, and employment is not just a matter of the distant past. The recent fly up in uranium prices between 2004 and 2007 stimulated uranium mining and milling, the development of new mines, and the proposal for the Piñon Ridge mill. The precipitous decline in uranium prices between 2007 and 2009 led to the closing of mines, the failure to open the new mines, and the closing of Colorado's only operating uranium mill and the associated loss of jobs and income.

As Colorado and the Mountain West know, this is not an unusual story for mining dependent communities. In fact, this is a familiar pattern in metal mining. High commodity prices bring new mines and additional mineral production on line around the globe. The resulting increase in supply then puts downward pressure on metal prices, undermining the viability of the higher cost mining and milling operations that are then forced to shut down. That reduction in supply helps the economy absorb the excess production and prices stabilize. As the world economy expands, demand for metals grows and metal prices begin to rise, again stimulating actions that expand supply, and again putting downward pressure on prices and production. This cycle tends to be regularly repeated, as the Uravan Mineral Belt knows all to well.

This endemic instability in uranium and other mineral commodity markets discourages economic development by discouraging private and public investment. Given that no one knows how long a mining expansion and the income it generates will last, workers, local businesses and local governments act in ways that will protect their investments in the face of uncertainty. Mill and mine employees may live at some distance from the mill and mines so that the value of their homes will not be threatened by a shutdown. Local businesses will be hesitant to expand when spending expands because they do not

BLM_0149465

know how long the higher spending will last. Local schools and governments are hesitant to borrow money to make investments in local infrastructure because they know their future revenue streams are uncertain. The net result is depressed local economic development despite the high wages paid and the wealth extracted from the earth.

Despite this past unstable pattern associated with uranium milling and mining in the Uravan Mineral Belt area, Energy Fuels projects its economic impacts by assuming that its proposed mill and associated mines will operate uninterrupted for 40 to 50 years. There is no uranium mine or mill in the United States that has operated with such sustained stability. Economic projections based on such counter-factual assumptions are misleading and cannot lay the basis for reasonable socioeconomic analysis.

### Economic Expansion amid Mining and Milling Decline

Despite the decline in uranium and other mining and milling activities after 1980 in the west ends of Montrose, Mesa, and San Miguel Counties, these counties overall did not suffer severe economic reverses. Quite the contrary, these three counties experienced significant economic expansion after the collapse of the uranium industry in the mid-1980s. These three counties added over 66,000 jobs, gained almost 73,000 new residents primarily through in-migration, and saw aggregate real income increase by two and a half fold. See Table 1.

**Table 1**

| Economic Vitality in the Three-County Study Area after the Last Uranium Bust: 1985-2008 | | | | | | | | |
|---|---|---|---|---|---|---|---|
| Measure of Economic Vitality | Montrose | | Mesa | | San Miguel | | Three Counties | |
| | Change | %Change | Change | %Change | Change | %Change | Change | %Change |
| Jobs | 12,700 | 100% | 47,100 | 50% | 6,600 | 310% | 66,400 | 61% |
| Population | 15,600 | 60% | 52,500 | 60% | 4,570 | 160% | 72,670 | 62% |
| Real Income ($mill) | $712 | 140% | $3,100 | 140% | $329 | 480% | $4,141 | 148% |

Source: US Dept. Commerce, BEA, REIS

This ongoing economic vitality took place despite the stagnation or decline in these three counties traditional economic bases: agriculture, mineral extraction, manufacturing, and state and federal government expenditures. It was clear both that these counties' economic bases were broader that the traditional focus on export-oriented activities and that there were new, strong, economic forces supporting these counties' economic vitality.

The dynamic, non-traditional, parts of these counties' new economic bases included:
- The growth of income not associated with current labor force activities, including retirement and investment income.
- The retention and attraction of retirees and their "foot loose' income.
- The in-migration of new residents and businesses.
- The growth of a visitor economy including tourists, recreationists, and second homeowners.

3

BLM_0149466

- The growing trade center role of these counties' population centers as they increasingly served larger geographic area.

Many of these new sources of economic vitality were associated with the attractiveness of this region as a place to live, work, do business, and raise a family as well as a place to visit or live part-time. This underlines the reality of ongoing economic development supported by local amenities or quality-of-life characteristics. It also underlines the economic threat associated with any activities that degrade those amenities or quality of life.

Socioeconomic analysis that primarily focuses on the potentially positive aspects of the expansion of one of the traditional export base activities such as uranium mining while ignoring its negative impacts on the primary sources of local economic vitality is misleading and dangerous to local economic well being.

### *The Environmental Costs and Risks Associate with the Uranium Industry*

There is convincing economic evidence that people care where they live and that they act on those preferences, making economic sacrifices to pursue locations that are attractive to them and expending effort and resources to escape or avoid locations that they perceive to be inferior or noxious. That, at the most basic level, is what "high rent" and "low rent" neighborhoods are all about. Negative environmental characteristics tend to drive down property values and suppress economic vitality. It would be economically shocking if this were not true.

There are two physical characteristics of uranium mining and milling that could lead to a negative impact on the local economy. They are also the characteristics that led to costly uranium mill and mine cleanup efforts that began in the Uravan Mineral Belt area in the mid-1980s and continue today.

First, only a very tiny percentage of the uranium ore, about 0.2 percent, is actually recoverable uranium. The vanadium concentration is higher, but only about one percent. This means that huge volumes of waste "tailings" are generated in the process of recovering the uranium and vanadium.

Second, the uranium ore itself is radioactive not just due to the presence of the target mineral, uranium, but also due to the radioactive decay of the other uranium isotopes and elements in the progression of uranium decaying toward lead. Most of the radioactivity of the ore remains in those waste tailings after the extraction of the uranium. That radioactivity is the source of significant human health concerns.

Survey data confirms the negative image radioactive materials have to Colorado residents and the likely impact of the presence of those materials on residential location decisions. Other Western states that have wrestled with the benefits and costs associated with radioactive economic activities projected negative economic impacts. In a different report, the firm that Energy Fuels hired to do its socioeconomic impact

BLM_0149467

analysis for the Piñon Ridge mill projected those types of negative economic impacts associated with the transportation of radioactive materials in Nevada.

### The Projected Jobs and Income Impacts of the Piñon Mill Will Be Small

The local economic impact on the West End of Montrose County of the proposed uranium mill and related mines will be quite modest. IMPLAN modeling of the rural West End indicates that the total impact on employment, including multiplier impacts will be 116 jobs. The projected impact is small for several reasons.

First, the rural West End does not have the commercial infrastructure to hold and circulate the spending associated with the mill, regional mines, and employee spending. Most of the expenditures will immediately leak out of the local economy to the larger trade centers such as Grand Junction in Mesa County. The Uncompahgre Plateau physically and economically separates Montrose County's main trade center, the City of Montrose, from the West End. That makes it inappropriate to model the West End, as Energy Fuels did, as part of a unified, countywide economy containing a major trade center.

Second, initially none of the uranium mining is likely to take place within the West End. Energy Fuels will draw on its mines in Mesa and San Miguel Counties in Colorado and Grand and San Juan Counties in Utah. The mining and haul jobs are unlikely to be primarily filled by residents of the Montrose West End.

Third, it is highly unlikely that most or all of the 85 mill jobs will go to currently unemployed workers or currently out-commuting workers who live in the West End. A broad range of applicants for the mill jobs will come from a seven-county area across two states. If Energy Fuels hires the most qualified workers, there is no reason to believe that it is only residents of the West End who will fill those jobs.

Finally, as mentioned above, workers may purposely choose to live at some distance from the mill and mines. Given the volatile nature of the mining and milling activity and the environmental damage and/or stigma associated with the mining and milling of radioactive material, workers may want to reside some distance away to protect the value of their investment in their homes. Some businesses serving the mill and mines and their workers may choose to do the same.

### An Alternative Development Proposal: Repair the Environment and Boost Jobs

There are over a thousand uranium mines located in the Uravan Mineral Belt. Most of them are abandoned but represent an ongoing environmental and safety threat to people. An alternative to starting a new cycle of uranium mining, milling, and waste production in the Paradox Valley would be to focus instead on repairing the damage done to the landscape during past uranium booms and begin systematically to clean up the abandoned mines and their associated wastes. IMPLAN modeling indicates that this activity could provide the region with job creation and payroll similar to that associated

BLM_0149468

with the operation of the proposed mill: 111 jobs with annual labor income of $9.1 million over a 20-year period or double that over a 10-year period.

***The Public Decision to Be Made***

In making the public decision about permitting the proposed Piñon Ridge uranium mill and its associated uranium mines, careful decision making would take into account, as carefully as possible, all of the potential positives and negatives, the benefits and costs, associated with the proposed mill. Because Energy Fuels uses its socioeconomic analysis primarily as a public relations and marketing tool for its proposed mill, that socioeconomic analysis does not provide the realistic and pragmatic view of both the costs and benefits that is necessary for rational public decision-making.

The critical question is whether the relatively small size of the expected local jobs, income, and net fiscal benefits justify the downside costs and risks associated with additional radioactive waste and pollution problems and the impact of that environmental damage and risk on the other, dominant, sources of economic vitality in the region: local natural and social amenities and quality of life that have supported in-migration of new residents and businesses as well as the visitor economy. The past and expected future instability of the uranium industry and its expected impact on the reliability and duration of the small positive economic impacts also has to be considered.

To the extent that Colorado's Uravan Mineral Belt counties get caught up in a rush to rebuild the uranium industry, they may well ride the economically, socially, and environmentally disruptive uranium roller coaster once again with similar results. We need only look at the last 100 years in the Uravan Mineral Belt to see that such uranium industry roller coaster rides do not bring sustained economic vitality.

## 2. A Short Economic History of the Colorado Uravan Mineral Belt Area

Rising uranium prices between 2004 and 2007 triggered a renewed interest in uranium mining and milling in western Colorado. New uranium claims that have been staked combined with older ones now cover most of the western portions of Montrose and San Miguel Counties in western Colorado. See Figure 1. Most of these are likely speculative claims that will never be developed, but they reflect the enthusiasm and hopes of miners and mining companies. The proposed Piñon Ridge uranium mill and its associated mines are part of that response to what thus far has turned out to be temporarily very high uranium prices. Energy Fuels bought the site for its proposed mill and began the process of obtaining the necessary permits in July of 2007, in the month following a record high uranium price of $136 per pound.[3]  Since then uranium prices have fell to less than a third of that value and then rebounded somewhat, reaching $60

---

[3] Energy Fuels website, viewed 11-3-2010, http://www.energyfuels.com/projects/Piñon-ridge/index.html .

BLM_0149469

per pound at the beginning of December 2010.  See Figure 2. This price volatility is likely to affect the viability of the proposed mill and associated mines.

**Figure 1**



**Figure 1.**  Map of the West side of San Miguel, Montrose and Mesa Counties in Colorado produced by Power Consulting.  The known uranium-vanadium deposits are redrawn from Motica, 1970, Geology and Uranium-Vanadium Deposits in the Uravan Mineral Belt, Southwestern Colorado.  The uranium mining claims are redrawn from Uranium Mining Claims in South West Colorado produced by the Southern Rockies Conservation Alliance by the Center for Native Ecosystems.

Energy Fuel's proposed Piñon Ridge uranium mill would be located in western Colorado not far from the Utah border. It would be located at about the center of the Uravan Mineral Belt that forms a crude semi-circle through western San Miguel, Montrose, and Mesa Counties in Colorado, beginning and ending in Utah, just across the Colorado border. See Figure1 above.

BLM_0149470