**Figure 2**

### Spot Ux U3O8 Price



Source: The Ux Consulting Company, LLC, http://www.uxc.com/

As the name of the mineral belt indicates, this mineralized area contains substantial deposits of uranium and vanadium ore that have been mined for almost 140 years. Initially the target mineral was radium. Later the objective was vanadium, a steel hardener. Uranium was a contaminant and waste product in those two early Uravan mineral production efforts. Then, beginning with the U.S. government's Manhattan nuclear weapons project during World War II, uranium became the primary mineral being sought. Civilian nuclear-fueled electric generation added to and continued the demand for uranium into the early 1980s.[4]

Over 1,200 uranium-vanadium mines were developed in the Uravan Mineral Belt, most of which are located in Mesa, Montrose, and San Miguel Counties in Colorado but the mineralized belt stretches somewhat into Grand and San Juan Counties in Utah (See Figure 1 above). Between 1936 and 1984 these mines were the source of over 84 million pounds of uranium and 220 million pounds of vanadium.[5] The uranium-vanadium ores produced by these mines contained very low concentrations of uranium and vanadium, currently a small fraction of one percent.[6] Because of that, it was not economic to ship the ores very far from the mines and concentrating mills had to be built nearby. This led to two mills being built in western Montrose County in Naturita and

---

[4] See "History of Uranium Prospecting and Mining in Colorado—a Story of Boom and Bust, ***Rocktalk*** 9(2), p. 4, Colorado Geological Survey, http://geosurvey.state.co.us/portals/0/rtv9n2%20LR-web.pdf .
[5] See "History of Uranium Prospecting and Mining in Colorado—a Story of Boom and Bust, ***Rocktalk*** 9(2), p. 4, Colorado Geological Survey, http://geosurvey.state.co.us/portals/0/rtv9n2%20LR-web.pdf
[6] Energy Fuels expects that the ore shipped to the mill would typically average 0.15 to 0.25 percent uranium oxide. Piñon Ridge Project Environmental Report, November 2009, p. 2-4.

BLM_0149471

Uravan, a mill at Slick Rock in San Miguel County, and mills in Grand Junction and Gateway in Mesa County. Mills also operated across the Colorado border in Utah at Moab and Blanding. The Moab mill ceased operating in 1984 and has been largely dismantled although its tailings continue to be the focus of relocation and remediation efforts. The Blanding, Utah, mill is the only uranium mill still operating in the United States at this time. The mill in Cañon City in central Colorado has not processed uranium ore since 2007, is not permitted to receive or process new uranium ore, and is in the process of being demolished although its owner plans to apply for permits to build a new mill at that site.[7]

Part of the economic impetus for the proposed Piñon Ridge uranium mill is that it has not been economic for Energy Fuels and other uranium mines to ship their ores as far as Cañon City and Blanding given how low uranium prices were for parts of the 2008 to 2010 period. In addition, when the Cañon mill was operating it was not always willing to process uranium ores, choosing instead to process alternative feed stock or simply to store nuclear waste materials at its site.

If the demand for uranium rises relative to supply, causing uranium prices to rise substantially above the $40 per pound level that characterized part of the 2008-2010 period, a topic that will be discussed later in this report, conventional uranium mining could be revived in western Colorado especially if there were a mill within economic haul distance of the supplying mines.  When prices were in the $40 range, conventional underground and open pit uranium mining and milling was not economic which is why in 2010 there were no conventional uranium mining taking place in western Colorado despite recent investments in bringing regional uranium mines back into production.

Back in 2005 and 2006 when uranium prices were at or below average 2010 prices, about 90 percent of uranium production was being produced using chemical extraction techniques that dissolve the uranium in place in the ground and then pump the uranium-rich solution out and recover the uranium from the liquid (*in situ* mining).[8] If ground water quality contamination due to in situ mining does not have to be eliminated, those chemical mining techniques appear to have a cost advantage over conventional mining and milling, but *in situ* uranium mining can only be used in limited geological circumstances where ground water can be isolated. Concern over ground water pollution from *in situ* uranium mining has thus far prevented its use in Colorado.

Energy Fuels has indicated that most of the mined uranium that will be processed at the proposed Piñon Ridge mill will come from Energy Fuels' own mines. Energy Fuels developed a mine outside of Gateway in southwestern Mesa County literally on the Utah border, the Whirlwind Mine, which would be one source of supply. Energy Fuels'

---

[7] *The Daily Record* Cañon, Colorado, 8/28/2010 and 8/19/2010. http://www.canoncitydailyrecord.com/Top-Story.asp?ID=14430 and http://www.canoncitydailyrecord.com/Top-Story.asp?ID=14507 Pueblo **Chieftan**, August 20th, 2009, http://www.chieftain.com/news/local/article_1323cd57-3f0-5151-8d75-5c554d85d5e4.html.
[8] Domestic Uranium Production Report, July 15, 2010, U.S. Uranium Mine Production and Number of Mines and Sources, USDOE EIA, http://www.eia.doe.gov/cneaf/nuclear/dupr/umine.html .

BLM_0149472

Energy Queen Mine in the La Sal area of Utah to the west of the proposed mill site would be another source. Each of these mines is fully permitted and capable of producing 200 tons per day of ore. Together they could supply 80 percent of the 500 tons per day milling capacity of the proposed mill, but Energy Fuels, in its mining plan, indicates that initially only 64 percent of the uranium needed by the mill will come from those two mines. These two Energy Fuels mines, however, could supply the proposed mill for only a limited number of years. Energy Fuels also owns approximately 20 additional uranium properties in western Colorado and eastern Utah that could be used as additional sources of ore. Energy Fuels has also left open the possibility that it will purchase ore from independent mines in the area. [9]

### *Economic Conditions in the Uravan Mineral Belt Region*

The proposed Piñon Ridge mill and its associated mines will primarily impact three counties of western Colorado and two counties in eastern Utah. Because the permitting decision will be made by the State of Colorado, we will focus on the three Colorado counties: Mesa, Montrose, and San Miguel.

The Uravan Mineral Belt and its associated uranium-vanadium deposits and mines are located in the extreme western portions of these three counties. These portions of the counties are very rural, often with very low populations despite the fact that each of these counties has a substantial population center.

The north end of the Uravan Mineral Belt lies in Mesa County. Grand Junction is the trade center that dominates Mesa County and most of western Colorado. Grand Junction is a metropolitan area with a 2009 population of about 60,000. But Gateway, the small Mesa County town located near the Energy Fuels' Whirlwind Mine and the only town in southwestern Mesa County, is well outside of the urban sprawl associated with Grand Junction, 55 miles to the north. The 2008 Business Patterns data from the U.S. Department of Commerce indicates that there were only five business establishments in the Gateway zip code with a total of only a few dozen employees. That data, however, does not appear to include the employment and payroll associated with either the Gateway Canyons Resort or Energy Fuels' Whirlwind Mine.[10] Because

---

[9] Section 2.2.3, , Piñon Ridge Project Environmental Report, Edge Environmental for Energy Fuels Resources Corporation, November 2009, pp. 2-3 and 2.4.

[10] The Business Patterns information does not report self-employed individuals (sole proprietorships). Government employment is also not included. This federal data source measures employment and payroll during the week of March 12 of each year. The Business Patterns data appear not to include the employment at the Gateway Canyons Resort, which during the peak summer months employs 120 workers. That resort, however, may have much lower employment in March when the data is collected. The Energy Fuels Whirlwind mine, which EF has asserted would employ as many a 60 production worker when operating at full capacity, EF (EF VP Gary Steel, quoted in Grand Junction Sentinel, 9/3/2010), was not scheduled to open until after March 2008 when 2008 Business Patterns measured employment and payroll. The Whirlwind mine never did open in 2008 (or 2009 and 2010) because of plummeting uranium prices. In late 2008 that mine was put in stand-by mode laying off five workers and retaining only three part-time workers to maintain the mine and environmental controls. (Grand Junction *Free* Press, December 10, 2008). These two sets of circumstances likely explain why the mine was not counted in the Business Patterns data.

BLM_0149473

Gateway is an unincorporated town and too small even to be a U.S. Census designated "place," there are no contemporary demographic or economic data on the area.[11] There may be between 100 and 200 residents in the town and surrounding rural area.[12]

The demographic and economic situation at the southern end of the Uravan Mineral Belt in San Miguel County is similar. About 80 percent of the county population is located in the southeastern third of the county adjacent to Telluride. In 2009 about 40 percent of the county population was located just in the towns of Telluride and Mountain Village. On the other hand, the western third of the county, the part containing the southern end of the Uravan Mineral Belt, had only two percent of the county population, a mere 141 residents, in 2000.[13] This west end of San Miguel County contains the town of Slick Rock, where two different uranium mills serving surrounding uranium mines operated on and off until 1961, as well as the town of Egnar. The 2008 County Business Patterns data indicated that there were only six business establishments in the west end of San Miguel County with a total of only 77 employees. This is a rural area with unusually low population and economic density.

The west end of Montrose County, where the proposed Piñon Ridge mill would be located, sits in the center of the Uravan Mineral Belt. While the immediate area around the proposed mill site and the Paradox Valley stretching west to the Utah border are also very lightly settled areas, the west end of Montrose County does have significant population centers in the "twin" cities of Nucla and Naturita about 15 miles east of the proposed mill. The combined population of these adjacent towns was about 1,400 in 2009, about evenly divided between them. The much smaller town of Paradox, located about 15 miles west of the proposed mine site, has 230 residents in its zip code area.

In comparison to the Uravan Mineral belt areas in Mesa and San Miguel Counties, the west end of Montrose County has a significantly more diversified economy. The County Business Pattern data for the whole of the Montrose west end indicate that in 2009 there were 71 businesses employing 519 workers. Ninety percent of these jobs were in the adjacent towns of Naturita and Nucla.

The very small town and rural character of most of the areas within the Uravan Mineral Belt is important in understanding the likely local and regional economic impacts associated with the proposed Piñon Ridge mill and associated mines. In rural areas and small towns the people who live there may well not work or shop where they live. Those that work there may not live or shop there and those that shop there may not work or

---

[11] The U.S. Census identifies the Glade Park-Gateway County Division but this area includes parts of Grand Junction and Fruita and the residential and business sprawl surrounding the Grand Junction metropolitan area. No data are available on Gateway itself and the surrounding rural area.

[12] For the U.S. Census years 1930 through 1950, the Census identified "minor civil divisions" labeled "precincts," including Gateway. This 20 by 20 mile geographic area covered the entire southwest corner of Mesa County beginning about 35 miles south of Grand Junction. Sixty years ago there were about 200 residents in the area surrounding and including the town of Gateway.

[13] The west end of San Miguel County is the Gladel Census County Division and contains the towns of Slick Rock and Egnar. In between the Telluride Census County Division and the Gladel CCD is the Norwood CCD, which has the balance of the population.

BLM_0149474

live there. Because of the incomplete nature of such rural and small town economies, residents are likely to commute in or out to work and shop. For instance, the 2000 Census indicated that in the West End of Montrose County almost three-quarters of residents work outside of the towns in which they live and almost a third work outside of Montrose County itself. That means that the impact of additional employment and payroll is likely to be diffused over a relatively large geographical area and not be focused locally.

Consider a few examples. The Gateway Canyons Resort was reported to provide a shuttle service between Gateway and Grand Junction for 40 percent of its workforce, about 50 workers in peak season. Another third of all of the resort workers lived at the resort in employee housing but were not permanent residents of Gateway.[14] Only about a quarter of the workforce is from the surrounding area. Given the very limited commercial infrastructure in the Gateway area, almost all shopping takes place in the Grand Junction area. When and if the Energy Fuels' Whirlwind Mine opens, it is likely that it too will draw its employees from a very wide geographic area, including Grand Junction, not primarily from the Gateway area.

Residents of Nucla and Naturita are said to commute to the Telluride area where there are a broader range of jobs in construction, retail trade, and services.[15] Although Nucla and Naturita are located in Montrose County and the City of Montrose is a major regional trade center, there is no direct highway route to the city of Montrose across the Uncompahgre Plateau. For that reason a significant amount of Nucla and Naturita spending flows to the Grand Junction area. That relative isolation from the Montrose city may be one of the reasons that more complete economies developed in the Montrose County's west end in the cities of Naturita and Nucla.

Workers in mining and mineral processing have to be relatively mobile, taking jobs wherever they happen to open up. In addition, mineral industry workers know that employment and income at any given location can fluctuate with international prices and economic conditions and that mines are ultimately depleted. To protect the value of their investment in their homes, miners and mill workers are likely to choose to live in more diversified economies rather than in a mining town or mill town so that when a mine or mill shuts down, the value of their and other workers' homes are not threatened. Because of the instability of employment in the minerals industries, mineral workers regularly commute long distances to jobs. Mineral jobs are often not filled by "local" residents but by in-commuting workers or relocating workers. Clearly in southwestern Mesa County and western San Miguel County that almost has to be the case since there are so few local residents to begin with. But given the pattern of long distance commuting in rural areas, it is also likely to be the case in the West End of Montrose County.

---

[14] *Grand Junction Sentinel*, September 3, 2010, Penny Stine.
[15] The 2000 Census of Population provides information on commuting patterns at the sub-county level. As mentioned earlier, for the West End of Montrose County (Nucla Census County Division) a third of the working residents reported commuting outside of Montrose County to work.

BLM_0149475

### Mineral Development and Local Economic Development in the Colorado Uravan Mineral Belt

Obviously the Uravan Mineral Belt region is not unfamiliar with uranium mining and milling activity. Over the last one hundred years the region has been through several booms and busts. Between 1910 and 1921 the uranium-vanadium ores were mined to extract radium for medical and illumination purposes. During World War I, the demand for vanadium for strengthening the steel used for military equipment also supported mining in the Uravan region. When much richer uranium ores were discovered in Africa in the early 1920s, the Uravan ores could not compete and the mining and processing activities largely halted with virtually no production between 1923 and 1937.

With the build up to World War II, the demand for vanadium was revived by the military and the federal government's secret development of nuclear weapons created a demand for uranium from the Uravan area. After a post-war lull, the federal government through the Atomic Energy Commission triggered a much more substantial mineral boom by entering into long-term contracts that included guaranteed prices for uranium ore production and guaranteed cost recovery and return on investments in uranium mills. This government-supported demand for uranium maintained a two-decade-long period of mining and milling in the Uravan region, from 1948 to 1970. The federal government began to phase out those financial subsidies supporting the uranium industry in the 1960s and ended them in 1970.

After 1970, uranium production and sale largely became private, commercial, operations, subject to the same sort of competitive pressures and cycles that characterized other mineral businesses. As a result, many of the older uranium mills and buying stations closed. The demand for nuclear fuel from civilian nuclear electric power plants supported some ongoing mining and milling operations in the Uravan region as uranium prices rose relative to the fixed prices previously maintained by the federal government. Those higher prices triggered expanded production across the United States. Accidents at nuclear power plants in the United States and the Soviet Union as well as the build out of the initial set of civilian nuclear power plants in the United States led to a stabilization and then decline in the demand for uranium, and in the late 1970s the price of uranium plummeted, leading to an almost complete shutdown of the uranium mining and milling industry by the mid-1980s.[16]

#### The West End of Montrose County

In the Montrose County portion of the Uravan Mineral Belt, the expansion of uranium and vanadium production between 1930 and 1960 led to a major expansion of the economy. The population increased over four fold from 1,200 to 5,500. As the federal government phased out its subsidization of uranium mining and milling, the uranium

---

[16] For a history of the booms and busts in the Uravan Mineral Belt and in the national uranium industry see "History of Uranium Prospecting and Mining in Colorado—a Story of Boom and Bust," Rocktalk 9(2):4-9, Fall 2006 ; Colorado Geological Survey; "U.S. Regulatory History of Uranium Mills, Appendix A of the Piñon Ridge Project Environmental Report, November 2009, Energy Fuels Resources.

BLM_0149476

industry in western Montrose County began to shrink almost as dramatically as it had expanded. The population fell from 5,500 in 1960 to 2,300 in 1990. As the population data indicates, the uranium industry began to shrink somewhat in the Montrose County West End in the late 1950s. The uranium mill in Naturita closed in 1958, was replaced by an upgrader plant that, in turn, was shut down in 1963 and the mill site was dismantled. The high uranium prices in the 1970s stabilized the Montrose County West End population briefly but as the uranium industry nationwide shut down in the early 1980s, the same thing happened in the West End of Montrose County. See Figure 3.

**Figure 3.**

**Population of the West End of Montrose County: 1930-2000**



Nationwide the uranium industry expanded production through the 1970s despite the end of federal subsidies, buoyed by then rising market-based uranium prices. See Figure 4. However, in Montrose County employment in metal mining, primarily uranium mining, initially fell dramatically, eliminating almost half the mining jobs as federal subsidies ended. Metal mining employment then rebounded in Montrose County, largely following the national expansion in uranium production during the 1970s. By 1978 there were 100 more mining jobs than at the start of the 1970s. Then, however, also following the nation uranium production trend, uranium employment in Montrose County's West End plummeted to near zero levels by the late 1980s. See Figure 5.

14

BLM_0149477

**Figure 4**

### Uranium Price and U.S. Production



BLM_0149478

**Figure 5**





In 1986 the town of Uravan, which in 1950 supported a population of over 600 in the town and the surrounding area, was evacuated by the federal government. The town was then demolished, all 260 structures in the town, as part of what was to become a two-decade effort to stabilize and remediate the radioactive material from almost a century of uranium mining and milling.

By 2000, two decades after the uranium industry collapsed in the West End of Montrose County, the population of the area had stabilized at 1930-1950 levels and had begun to grow modestly. The economy supporting residents now is a relatively diverse one with only modest dependence on mining. The detailed results of the 2010 Census are not yet available, but the 2000 Census revealed the mix of economic activities that support the residents of the West End. See Figure 6. These jobs that residents hold, however, are not necessarily *in* the West End towns or even in the West End of Montrose County. The 2000 Census indicated that almost three-quarters of residents work outside the towns in which they reside and almost a third work outside of Montrose County.

16

**Figure 6**



**Industry of Employment of Residents: Westend Montrose County**
[Nucla Census County Division, 2000 Census of Population]

In 2000 mining was still the source of 4 percent of jobs. This would include the New Horizon coal mine that supplies the Nucla Station electric generator operated by the Tri-State Generation & Transmission Association. The presence of that electric facility also explains the relatively large role of Transportation and Utilities in the local economy. Figure 6 shows 10 sectors in the West End economy that provide as many jobs or more than mining in 2000.

*The West End of San Miguel County*

In the Uravan Mineral Belt region in the west end of San Miguel County, uranium production was centered on the area around the unincorporated town of Slick Rock where a uranium mill was first built in 1931 but abandoned in 1943. A separate concentrator was built in 1957 at a different Slick Rock site and operated until 1961. By 1982 the concentrator plant buildings and equipment had been removed from the site. The uranium milling and related mining led to a significant increase in the population of the west end of San Miguel County. It rose from 161 in 1930 to almost 1,100 in 1960, a seven-fold increase. After the closing of the mill, the population fell to below its earlier levels, to 119 in 1990 and 141 in 2000. See Figure 7. This west end Census County

17

BLM_0149480

Division contains about 544 square miles implying a population density of about 1 person for every 4 square miles of land area.

**Figure 7.**

**Change in Population: West End of San Miguel County**



The apparently stable population in the 1970 to 1980 period is misleading because we only have population information at the sub-county level every ten years when the federal Census is carried out. Between 1970 and 1980 mining employment in San Miguel County almost doubled but then, during the 1980s fell to near zero. See Figure 8. below.  Between 1970 and 1980 mining employment grew by 74. Adding  those 74 mining jobs might be expected to have lead to an expansion in the population, but after one boom and bust in the 1960s, miners may have been hesitant to move to the west end of San Miguel County for what was to again be a smaller boom and bust.

18

BLM_0149481

**Figure 8.**

Estimated Mining Employment: San Miguel County, CO



*The West End of Mesa County*

At the north end of the Uravan Mineral Belt in southwest Mesa County, a uranium mill was built in Grand Junction in 1950, one of the first mills built specifically to produce uranium as the primary product and vanadium as a byproduct. That mill operated as long as the subsidies implicit in its contracts with the Atomic Energy Commission lasted. The last contract expired in 1966. The mill tried to operate serving the private commercial market but was closed permanently in 1970. It did not benefit from the increase in uranium prices and market opportunities in the 1970s.

Because Grand Junction is a major trade center for western Colorado and a metropolitan area with a diversified economy and 50,000 residents in 1970, the shut down of a single uranium mill served by mines lying outside of the city and the loss of a few hundred jobs was unlikely to have had a major impact.

Despite the loss of the uranium mill and, assumedly, the loss of some of the mines supplying the mill, the growth of the city of Grand Junction economy and the greater Grand Junction metropolitan area (Mesa County) accelerated between 1970 and 1980 rather than slowing down. A much broader range of economic activities was driving this metropolitan area than uranium milling. See Figure 9. Some of this expanded economic

19

BLM_0149482

activity in the 1970s *was* mineral-related as metal mining (including uranium mining), coal mining, and oil and gas extraction expanded during the 1970s before collapsing in the 1980s.  But the overall economy in the Grand Junction area continued to expand despite the overall mineral sector collapsed during the 1980s. See Figure 10.

**Figure 9.**

**Population Growth: Grand Junction, Colorado**



20

**Figure 10.**



This absorption of the loss the uranium sector without significantly damaging the larger economy was not limited to the Grand Junction or the Mesa County economies. The same phenomenon is apparent in the San Miguel and Montrose County economies where the loss of jobs and population in the west ends of the counties took place simultaneously with the expansion of the rest of the county economies. For instance, as the workforce and residents drawn to the west end of San Miguel County during the uranium boom of the 1940s and 1950s began to dissipate during the 1960s and 1970s, growth elsewhere in the San Miguel County expanded dramatically with the population increasing four-fold between 1970 and 2000. See Figure 11 below.

21

BLM_0149484

**Figure 11**

Population in West End of San Miguel County and the Rest of the County



In Montrose County a similar pattern is found. As uranium mills and mines in the West End shutdown and population declined, the rest of the county economy, largely centered around the city of Montrose, expanded significantly. While the population of the uranium-dependent West End cities of Naturita and Nucla *declined* by 25 percent, the more diversified cities of Montrose and Olathe expanded 3.5 fold between 1960 and 2009. While the whole of the uranium-dependent West End lost half of its population between 1960 and 2000, the Greater Montrose area saw its population increased 140 percent.  See Figure 12 below.

BLM_0149485

**Figure 12**



*Uranium Production and West End Economic Development: Conclusions*

There are several lessons that can be taken from this brief economic history of the role that the uranium industry has played in the west ends of Mesa, Montrose, and San Miguel Counties.

i. The uranium industry has had almost no permanent economic development impacts in the purely rural parts of the Uravan Mineral Belt. In the Slickrock area of western San Miguel County and the Gateway area of southwestern Mesa County, the population has largely fallen back to the very low densities that existed before the WW II uranium boom.[17]

ii. In the West End of Montrose County there were more substantial settlements before the uranium boom. "Utopian" communal settlement in the Nucla-Naturita area at the beginning of the 20th century led to the development of irrigated agriculture and higher population densities compared to the open-range cattle ranching of the surrounding area.

---

[17] In 1930 there were 161 residents in the west end of San Miguel County. In 2000 there were 141. In 1960 there were 1,100 residents. In the West End of Montrose County there were 2,732 residents in 1940 and in 2000 there were 2,776. The Gateway area of Mesa County was never a Census County Division or a Census Place by itself. For that reason historical population data is not readily available for that area.

23

Irrigated agriculture also played a role in the area around the town of Paradox at the other end of the Paradox Valley. The relative isolation of these areas from larger trade centers led to the development of a more diversified commercial infrastructure than would have been found if the area were within easy reach of other trade centers. Uranium mining, of course, had a significant impact, boosting populations significantly. But as uranium declined, these communities were dramatically and painfully downsized, back towards pre-uranium boom levels and one town, Uravan, disappeared completely.

iii.   The 1950-1970 boom in the uranium industry was not a market phenomenon. The expansion of the industry was supported by the federal government as it sought to assure a ready supply of nuclear materials to support American weapons programs during the Cold War. Without that federal government support, there would likely have been more instability in the uranium industry than was actually experienced until that government support was removed. The market supported uranium expansion of the 1970s lasted less than a decade before market forces brought it to an end.

iv.   The population declines in the west ends of these counties were not tied to a lack of economic potential in western Colorado or in these three counties. While population was falling back to levels seen in the early 20th century in these mining-dependent areas, the economies elsewhere in these counties were expanding significantly. We will discuss that economic vitality in the face of the relative decline in mining in the next section of this report. Here we simply wish to point out that this economic vitality was tied to the much more diverse nature of these western Colorado economies and their ability to attract and hold new residents and new businesses. As will also be discussed later, mining and mill towns often have difficulty diversifying and developing in this way partially *because* they are dependent on mining.

BLM_0149487

## 3. The Economies of Our Three-County Study Area: Mesa, Montrose, and San Miguel Counties

### *Economic Vitality in the Face of Declines in the Mining Industry in Western Colorado*

As pointed out above, the west end areas of our three-county study area that came to rely on the uranium industry have been through enthusiastic booms and painful busts but have not been left with more prosperous local economies. Meanwhile, the more diversified parts of these counties have seen sustained economic development and vitality.[18] Given that mining usually pays significantly above average wages and is regularly trumpeted as bringing local prosperity in its wake, it is important to explore this economic anomaly.

Changes in local economies are usually explained in terms of the expansion or contraction of export-oriented economic activities. This "export base" or "economic base" view of the engine driving the local economy is built around the dollars these economic base activities bring into the local economy, which then get spent, and re-spent amplifying or "multiplying" the local impacts.

The export-oriented economic activities traditionally have been identified as agriculture, mineral extraction, manufacturing, and government activities that are not tied to serving local residents such as military installations or state or federal prisons.

That view of our three-county study area, however, is of limited usefulness because for long periods over the last forty years, the traditional export bases of these counties have not expanded, but other sources of income did expand in an impressive way. Montrose County provides a good example. Between 1969 and 1985, the traditional export base shrank by about a third while the rest of the economy more than doubled. By 1992 the traditional economic base had regained its 1969 level, but the rest of the economy was generating 2.4 times as much real income as it had in 1969. By 2008 the traditional export base had doubled the real income it was producing, but the rest of the economy had expanded almost five fold. See Figure 13.

---

[18] The financial crisis and Great Recession that began in 2008 has had an impact across the nation. For the period for which we have population estimates (through 2009), The Telluride area and San Miguel County have seen almost no growth since 2007. Montrose City and Grand Junction have seen ongoing population growth between 2007 and 2009 as did Montrose and Mesa Counties. The cities of Nucla and Naturita saw almost no growth. However, real personal income in both San Miguel and Montrose Counties turned downward in 2008 as the recession got underway.

BLM_0149488

**Figure 13**



Traditional Export Sectors and the Rest of the Economy: Real Income
Montrose County, CO

Clearly there were economic forces afoot in Montrose County creating considerable local economic vitality other than the traditional economic base.  Between 1990 and 2008 total real pay, with inflation remove, for residents rose 117 percent, total personal income increased 113 percent, jobs expanded by 80 percent, and population grew by 65 percent.  See Figure 14

BLM_0149489

**Figure 14**



Indicators of Local Economic Vitality: Montrose County

Similar patterns can be found in San Miguel and Mesa Counties. In San Miguel, the traditional export base declined between 1969 and 2004 but real income in the rest of the economy expanded ten fold.  In Mesa County the real earnings in the export sectors was less in 2005 than it was in 1981, yet income received from other sectors on the economy had more than doubled.

The source of new income and earnings despite the shrinkage in parts of the traditional export base are found in a variety of sectors that often are not treated as independent sources of growth in the local economy. These include investment and retirement income that flows to owners of assets and retirees wherever they make their residences. Construction activity associated with in-migrating new residents, new businesses, second homeowners, and other parts of the visitor economy also were a major source of new income. Health services, other professional services, financial and real estate services, and retail and wholesale trade were also importance sources of expansion. These are often treated as serving only local residents and not drawing new income into the local economy. However, cities that reach a certain size become regional trade centers providing services to customers outside of those urban centers. They also serve visitors and are part of the visitor economy. Finally there are services that are aimed primarily at visitors, including recreation and entertainment services, accommodations, and eating and drinking establishments.

27

BLM_0149490

Table 2 shows the sectors of the three county economies that were the primary sources of expansion in real income between 1990 and 2008, the latest data available at the time this report was written, November 2010. Note that mineral extraction, including oil and gas production, continued to play a significant role in these counties during this period. Out of the ten economic sectors listed, mineral extraction was the 3rd most important sources of the growth in real income in Mesa County, the 6th most important source of growth in Montrose County, and the 7th most important source of growth in San Miguel County.

However, almost all of this increase in earnings in mineral extraction between 1990 and 2008 was associated with increased earnings in oil and gas operations after 2000 rather than increases in mining activity. In Mesa County, for instance, labor earnings in mining fell after 1990 and all of the growth in mineral extraction earnings was due to expansion in oil and gas production. In Montrose County, the $40 million increase in real income from mineral extraction was associated with a $42 million change between 2000 and 2001 in the estimated self-employment income associated with oil and gas sole proprietorships. This caused mineral extraction earnings to jump from about $9 million in 2000 to $51 million in 2001.[19] Estimated metal mining employment actually declined during this period and 87 percent of the increase in labor earnings in mineral extraction was in oil and gas production. In San Miguel County all of the growth in labor earnings between 1990 and 2008 in mineral extraction were in oil and gas production while estimated earnings in metal mining declined.

---

[19] The U.S. Department of Commerce BEA Regional Economic Information System provides data on both wage and salary earnings by industry as well as total earning including estimated self-employment income that is based on Internal Revenue data and the address of the tax return. Comparing these two Montrose County data sets allows the self-employment income by industry to be identified. The large six-fold increase in oil and gas labor earnings between 2000 and 2001 appears to be a change in industry definition or a change in the geographic area to which this self-employment income was assigned rather than an actual change in economic activity in Montrose County. It is also uncertain whether this income actually is spent and circulates in Montrose County.

28

BLM_0149491

**Table 2**

| Economic Sector | Montrose County | | San Miguel County | | Mesa County | |
|---|---|---|---|---|---|---|
| | Change in Real Income ($millions) | % of Total Change in Real Income | Change in Real Income ($millions) | % of Total Change in Real Income | Change in Real Income ($millions) | % of Total Change in Real Income |
| Investment and Retirement Income | $252 | 39% | $105 | 37% | $909 | 32% |
| Other Services | $84 | 13% | $48 | 17% | $368 | 13% |
| Construction | $83 | 13% | $38 | 14% | $309 | 11% |
| State & Local Government | $63 | 10% | $27 | 10% | $188 | 7% |
| Retail/Wholesale Trade | $61 | 9% | $13 | 5% | $217 | 8% |
| Health Services | $47 | 7% | $7 | 2% | $286 | 10% |
| Finance, Insurance, Real Estate | $35 | 5% | $43 | 15% | $161 | 6% |
| Visitor Services | $18 | 3% | $38 | 14% | $94 | 3% |
| Mineral Extraction | $40 | 6% | $8 | 3% | $317 | 11% |
| Manufacturing | $25 | 4% | $7 | 2% | $50 | 2% |
| Total of These Sectors | $708 | 109% | $334 | 119% | $2,899 | 102% |
| Total Increase in Real Income | $650 | 100% | $281 | 100% | $2,843 | 100% |

Source: U.S. Dept. Comm, BEA, Regional Economic Information System

### *Defining the "Economic Base" of the Study Area Counties*

There are two explanations for the failure of the "traditional export base" to explain the actual economic vitality exhibited by the three counties in our study area. First, the "traditional" definition may be misleading. It may ignore other sources of income that flow into the local economy. The second is that the "economic base" approach to understanding the local economy may be incomplete. That view may ignore other economic forces that can drive the local economy. As we will see, these are related explanations, both of which require us to think more comprehensively about the sources of local economic vitality and well being. We will first discuss the need to more carefully define the sources of income flowing into these local economies. We will then turn to the need to supplement the economic base approach with a broader view of the sources of local economic vitality.

The "traditional" export base tends to focus on those land-based activities that facilitated the original European-American settlement of the West: Ranching, farming, mining, timber harvest etc. In addition, the industrialization of the economy in the twentieth century is recognized by including manufacturing. As the word "traditional" suggests, this tends to be a view of the local economy that is tied to a past economic reality that is reinforced by the continued significant presence of these economic activities in the contemporary economy. There may, however, be relatively new sources of income flowing into local economies that this focus on the past tends to ignore.

The most obvious of these have been mentioned above in discussing the major sources of increased employment and income over the last two decades:

 i.  The importance of investment, retirement, and other flows of income not associated with current participation in the workforce. Some have labeled

29

BLM_0149492

this type of income "non-employment" income. We have labeled it above "investment and retirement income."

ii.    The role of the spending of visitors and part-time residents on the local economy. Above we labeled that the "visitor economy."

iii.   The role that urban areas can play as trade, service, entertainment, and educational centers that draw expenditures from the residents of the surrounding region.

*i. Investment and Retirement Income*

Although we often discuss household income as if it almost exclusively comes from wages and salaries, there are other income flows that have become increasingly important to households and local economies that are not related to current participation in the workforce. Social Security, Medicare reimbursements of medical expenses, veterans' benefits, etc. flow to most retirees.  In addition, many citizens, both retired and working receive dividends, interest, and rents from past investments they have made directly themselves or through a retirement plan. Finally there are federal programs that seek to temporarily support people with low or interrupted incomes: unemployment compensation payments, food stamps, Medicaid reimbursements for low income households' medical expenses, etc.

Together these forms of non-employment income have made up about 40 percent of the income received by households since the mid-1980s. Put slightly differently, this non-employment income adds about two-thirds to employment income to make up total income. Clearly these non-employment income flows represent a very substantial flow of income into the local economy.[20] Figure 16 shows how these income flows contributed to total income in Montrose County over the last 40 years. Mesa and San Miguel Counties show a similar pattern although non-employment income makes up a somewhat smaller percentage of total income, 34 to 37 percent respectively. Note that income support programs represent a relatively minor part, about 10 percent, of total non-employment income. Ninety percent of non-employment income represents investment and retirement income, which is why we use that label. It is more informative that "non-employment income." In Mesa and San Miguel Counties, however, the income support programs make up 25 and 30 percent, respectively, of the non-employment income. Retirees' residential location decisions were especially important in Mesa and Montrose Counties. These counties are classified as 'Retirement Destination' counties by the US Department of Agriculture because the number of residents 60 and older grew by 15 percent or more between 1990 and 2000.[21]

---

[20] It is important to note that some of the "rent" included in investment income is not an actual cash flow. It represents the value of the housing services provided to those who own their own homes. In addition, a significant part of investment income is not spent locally; it is simply reinvested to support asset accumulation and spending in the future, not the present although the resulting increased wealth does tend to support higher levels of expenditures.

[21] Delta, Ouray, Dolores, and Montezuma Counties were also Retirement Destination Counties. Economic Research Service, County Typology, U.S. Department of Agriculture.

30

BLM_0149493

This growth in retirees impacts not only the level of spending in local businesses but also the level of investment in new housing. Between 1990 and 2000 the number of owner-occupied homes built after 1990 increased by almost 13,000 in the three-county study area. In 2000 39 percent of these "new" homes were occupied by residents over 55.[22]

**Figure 16**

**Employment and Non-Employment Income: Montrose County, CO**



### ii. The Visitor Economy

Most communities recognize the importance of visitor spending in creating local jobs and income. Sometimes simply labeled "tourism," usually meaning a sightseer, "visitors" are more diverse than that. "Visitors" include a broad variety of temporary residents including "sightseers" but also including people engaged in a variety of cultural and recreation pursuits as well as people attending business and professional conventions. It also includes second or seasonal homeowners and homebuilders. Colleges and universities also draw relatively longer term "visitors" in the form of students who usually bring an income source with them.

---

[22] 2000 Census Table HCT-5, Tenure by Age of Householder by Year Structure, Summary File 3.

BLM_0149494

Dean Runyan Associates working for the Colorado Tourism Office[23] has tracked the economic impacts of the Colorado travel industry on the state as a whole but also on smaller regions and individual counties. For our three-county study area, visitors were directly responsible for over five thousand jobs as a result of visitor expenditures of almost a half billion dollars. See Table 3.

**Table 3**

| The Economic Impacts of Overnight Visitors on the Colorado Economy | | | | | |
|---|---|---|---|---|---|
| Direct Overnight Travel Impacts 2009 | | | | | |
| County | Spending ($millions) | Earnings ($millions) | Jobs | Local Tax Revenues ($millions) | State Tax Revenues ($millions) |
| Mesa | $241.9 | $66.8 | 3,030 | $6.8 | $5.7 |
| Montrose | $111.6 | $27.2 | 980 | $1.8 | $2.2 |
| San Miguel | $122.5 | $40.5 | 1,170 | $4.6 | $2.9 |
| Total | $476.0 | $134.5 | 5,180 | $13.2 | $10.8 |

"The Economic Impact of Travel on Colorado 1996-2009p",
Dean Runyan Associates for Colorado Tourist Office, June 2010.

The economic impact of visitors includes the economic impact of those part-time residents who own or rent vacation homes. In the west end of our San Miguel County, the Gladel-Egnar area, about 15 percent of housing units is seasonal homes. In the Gateway area of southwest Mesa County about 5 percent of homes are seasonal. In the West End of Montrose County only about 3 percent of homes are seasonal.  For the counties as a whole, over a third of the housing units in San Miguel County, the home of the Telluride resort, are seasonal. In Montrose and Mesa Counties, only about one percent of the homes are seasonal.[24]

*iii. Trade Center Activities*

One group of "visitors" comes to urban areas to take advantage of the broader array of commercial businesses and non-commercial organizations that are found in urban centers. Usually, the larger the city, the broader the range of specialized businesses found there. Medical clinics, hospitals and  medical centers, for instance can draw people from a relative broad geographical region depending on the level of expertise and specialization found there. Larger cities have a broader array of stores selling consumer durables, clothing, recreational equipment etc. They also have a broader array of restaurants, nightclubs, and entertainment venues. The same is true for legal, financial, accounting, and other professional services. As a result of this specialization, larger urban centers tend to serve a much broader geographic area than just the residents of the city or county in which those trade centers are located. This brings a flow of revenue into the urban area from outside, supporting local jobs and income.

---

[23] *The Economic Impact of Travel on Colorado 1996-2009p*, June 2010.
[24] 2000 Census, Summary File 1, table H5, Vacancy Status, and H1, Housing Units.

BLM_0149495

*A Broader View of the "Local Economic Base"*

The Colorado State Demography Office regularly analyzes the economic base of each county in the state.[25] It begins its analysis with the "traditional economic base," as we have done above, including in it agriculture, mineral extraction, manufacturing, and part of state and federal government. Although the amount of government the Demography Office includes in its definition of the "traditional economic base" is more expansive that the one we have used, the Demography Office finds that, in terms of jobs, only about a quarter of the actual economic base in Montrose and Mesa Counties is associated with those historical export activities.[26] For San Miguel County, because of the dominant role of the visitor economy around Telluride, the traditional economic base makes up only 8 percent of the actual basic employment with the visitor economy making up 65 percent of San Miguel County basic employment. Not surprisingly, the Economic Research Service of the U.S. Department of Agriculture categorizes San Miguel County as a "Recreation County," meaning that commercial recreation infrastructure, employment, and income represent a significant part of the overall economy.[27]

The economic base approach taken by these Colorado state economists also identifies the part of the economic base associated with trade center activities, the visitor economy, and the spending supported by non-employment income (retirement, investment, and income support programs). The impact of those who commute in or out of counties to work is also included. Those commuting into another county to work bring back income to their county of residence while reducing the income available to be spent in the county in which they work.

Measured in terms of jobs, regional trade center activities and the flow of non-employment income were each about as important as the traditional economic base in Montrose and Mesa Counties: Each contributed about a quarter of the total basic jobs. The visitor economy contributed another 10 percent and local activities supplying materials and services to these basic sectors contributed about a sixth of the basic jobs. These "basic" jobs represented about 60 percent of all jobs in Montrose and Mesa Counties. The purely locally oriented jobs that focused on supplying services to local residents made up the remaining 40 percent of jobs.

In San Miguel County, where the visitor economy dominates the local economic base in terms of jobs, the traditional economic base, the regional trade center activities, and the role of non-employment income were much less important, together totaling 15 percent rather

---

[25] http://www.dola.colorado.gov/demog_webapps/economic_base_analysis Accessed November 2, 2010. For documentation of this Colorado approach see: https://dola.colorado.gov/dlg/demog/leifadocumentation.html .

[26] This website information is provided in terms of employment rather than earnings or income. Since mineral extraction, manufacturing, and government jobs tend to pay above average wages, the impact of those jobs on spending within the local economy will be higher than the number of jobs indicates. For agricultural jobs, the difference between jobs and earnings varies from year to year. Hired farm workers get paid below average wages but in years of high agricultural prices farm proprietors can earn very high incomes; in poor years farm proprietors and total farm earnings can be negative.

[27] County Typology Codes, http://www.ers.usda.gov/Data/TypologyCodes/ .

BLM_0149496

than about 75 percent of basic jobs as was the case in Montrose and Mesa Counties. The visitor economy largely dominates the entire San Miguel County economy. See Table 4.[28]

**Table 4**

| Sectors of the County Economy | Montrose County | | Mesa County | | San Miguel County | |
|---|---|---|---|---|---|---|
| | Employment | % of Econ. Base | Employment | % of Econ. Base | Employment | % of Econ. Base |
| **2008 County Economic Bases: Employment** | | | | | | |
| Traditional Economic Base: Agriculture, Mineral, Manufacture, & Government | 3,079 | 24% | 12,858 | 25% | 417 | 8% |
| Regional Trade Center Activities: Medical, Educational, Retail, Services, etc. | 3,306 | 26% | 12,670 | 25% | 312 | 6% |
| Visitor Economy: Tourism, Recreation, etc. | 1,392 | 11% | 4,050 | 8% | 3,459 | 65% |
| Retirement, Investment, Income Support and Commuter Income | 2,969 | 23% | 11,870 | 23% | 77 | 1% |
| Activities Supplying Goods and Services to the Economic Base | 2,013 | 16% | 9,366 | 18% | 1,069 | 20% |
| Total Economic Base Employment | 12,759 | 100% | 50,814 | 100% | 5,334 | 100% |
| Employment Associated with Local Residential Spending (Non-Basic) | 8,355 | | 30,221 | | 1,598 | |
| Total Employment | 21,114 | | 81,035 | | 6,932 | |
| Ratio: Total Employment to Basic Employment | 1.65 | | 1.59 | | 1.30 | |

Source: http://www.dola.colorado.gov/demog_webapps/economic_base_analysis accessed 11-2-2010; adjusted by author.

This analysis underlines several important aspects of the economies of these three Uravan Mineral Belt counties: Even from an export base or economic base point of view

a. It is important to look beyond mining, agriculture and manufacturing to understand the sources of jobs and income. While mineral extraction (mostly oil and gas production currently) represents seven percent of the three-county area economic base and provides 4,600 jobs directly, the trade center role of the urban health care and educational institutions are responsible for almost twice that number of jobs. The same is true of the visitor industry as well as the expenditures of retirees. See Table 5 below.

b. The visitor economy is obviously an important part of the local economic base providing almost 9,000 jobs in the three-county study area;

c. The income associated with retirees is an important source of jobs and income, larger than agriculture, mineral extraction or other elements of the traditional economic base. More broadly, the impact of the expenditures of all non-employment income rivals the impact of the entire traditional economic base in terms of job creation, amounting to 91 percent of the employment associated with the traditional economic base .

d. The large urban centers serve a much broader geographic area, generating jobs and income because of those trade center activities. The size of this trade center impact on employment is almost the same as the employment impact of the entire traditional economic base.

---

[28] Because the various job totals in the summary reports from the Colorado Demography website did not exactly match the sum of the jobs in different categories, this table was adjusted so that the totals and the individual job counts were consistent. Also, job categories were relabeled to make them clearer.

BLM_0149497

Table 5

| The Economic Base of the Three-County Study Area: Employment | | |
|---|---|---|
| Sources of Jobs | Three County Study Area | |
| | Employment | % of Economy |
| **Traditional Economic Base** | 16,354 | 24% |
| Agribusiness | 4,585 | 7% |
| Mineral Extraction | 4,643 | 7% |
| Manufacturing | 3,507 | 5% |
| Government | 3,619 | 5% |
| **Regional Trade Center Impacts** | 16,288 | 24% |
| Construction | 3,385 | 5% |
| Communications | 519 | 1% |
| Trade and Transportation | 2,439 | 4% |
| Professional and Business Services | 1,274 | 2% |
| Finance, Insurance and Real Estate | 470 | 1% |
| Education and Health Services | 8,201 | 12% |
| **Visitor Economy: Tourism, Recreation, Visitors** | 8,901 | 13% |
| **Households Spending Non-Labor Income** | 14,916 | 22% |
| Commuters' income | 886 | 1% |
| Retirees' income | 7,737 | 11% |
| Public Assistance Income | 2,995 | 4% |
| Investment Income (Dividends, Interest, Rent) | 3,298 | 5% |
| **Indirect Basic Jobs (supplying Basic Industries)** | 12,448 | 18% |
| **Total Basic Jobs** | 68,907 | 100% |
| **Non-Basic Jobs: Local Residential Services** | 40,174 | |
| **All Jobs** | 109,081 | |

http://www.dola.colorado.gov/demog_webapps/economic_base_analysis

It should be noted that these conclusions reinforce our earlier analysis of the sources of additional income and jobs between 1990 and 2008. That historical review underlined the limited role of the traditional economic base as a source of new jobs and income, the importance of the expansion of the service sectors, and increasing role of retirement and investment income.

In evaluating the impact of the proposed uranium mill and associated mines on the economies of these three counties it is important to keep in mind this more complete picture of the economic base. The expansion of the uranium industry in this region will add to what has been a volatile but declining sector of the traditional economic base. To the extent that an expanded uranium industry is perceived to be an environmental threat to the surrounding area, it could have a negative impact on several of the primary sources of local economic vitality: the "footloose" income associated with retirees and in-migrating new residents, the income brought into the region by tourists, recreationists and other visitors, and the trade center activities associated with the regions growing urban centers. We will discuss further the economic impact both of the volatility of the mining industry as well as the potential stigma attached to uranium mining and milling later in this report.

35

BLM_0149498

### Thinking Analytically about the Local Economy and Local Economic Well Being: The Limits of the "Export Base" View of the Local Economy

The export base or economic base view of the local economy is one of the most widely shared pieces of popular economic understanding. Most of us learned this way of understanding our local economies from our parents, grandparents, elementary school teachers, and neighbors. We were informally taught "tales of livelihoods" that explained to us how our families several generations back came to inhabit areas and made livings for themselves. That *popular* or *folk economics* tends to stick with us just as other cultural values and traditions do. It simply becomes part of the way we look at the world.

The traditional economic base of an area is usually associated with folk tales of how European-Americans came to inhabit any particular area and built a successful and thriving economy. This view is called an export base view because it focuses on the economic activities in which the local population specializes, producing more than it needs for its own consumption, and exports the surplus to the rest of the national or international economy. Those exports are seen as bringing money into the local economy from outside. That money then can circulate within the local economy putting people to work in locally-oriented economic activities and to import vital goods and services that could not easily or economically be produced locally. Unless the local residents want to live a self-sufficient non-monetary, subsistence way of life, those exports and the resulting income flows into the economy from outside sources are necessary for a modern, vital economy. In that sense those export-oriented activities are the region's *economic base*: the economic energy driving the local economy.

Most regions have an export-oriented folk story: In Colorado it is mining, ranching, and other agricultural activities . In Arizona it is "cattle, cotton, and copper." It is automobiles in Detroit, dairy farms in Wisconsin, corn in Iowa, wheat and cattle on the Great Plains, timber and hydroelectric power in the Pacific Northwest, coal in Appalachia, etc.

No widely held popular understanding of this sort could have become established and persisted for so long unless it had an important element of truth to it. In the context of the European-American settlement of a continent depopulated of its indigenous population by disease and warfare, the export base view was largely accurate in depicting how settlers were able to move from subsistence homesteads on a wilderness frontier to a prosperous commercial economy. Whatever its historical accuracy, however, it is important to ask whether that original 19th and early 20th century economic insight is a sufficient guide for understanding a modern 21st century economy. As we will explain below that the export base view of the local economy, even as broadened in the discussion of the economic base above, is now seriously incomplete and needs to be supplemented in several ways that allow us to accurately look at the *total* economy and all the sources of local economic well being when making public economic policy decisions.
.

36

BLM_0149499

*Completing Our Analytical View of the Local Economy: The Total Economy*

As we will develop in more detail below, there are three important other economic insights that have to be integrated with the export base view to complete our view of the local economy:

i. The export base view focuses only on what creates a local demand for workers. In that sense it ignores the other half of the twin supply-demand blades of the "economic scissors," the important role of the local supply of labor in encouraging the expansion of local economic activity.

ii. The export base view focuses only on commercial goods and services sold in markets in exchange for money. It ignores non-commercial, non-market sources of scarce and valuable goods and services that support and facilitate commercial activities and contribute to local economic well being.

iii. The export base view, as the name makes clear, focuses on exports as the sole determinant of local economic vitality. Its message is that "only exports matter." We need to understand that locally-oriented economic activity is not a passive, unimportant or "secondary" aspect of the local economy. By capturing, holding, and re-circulating income that comes into the local economy, the web of locally-oriented economic activities creates the "multiplier" impacts associated with exports and other income injected into the local economy.

*i. Incorporating Labor Supply into Our View of the Local Economy*

The export base view focuses on the commercial forces that draw workers and population to a particular area. What are the export-oriented activities the local area can support and thus create a local demand for workers? In a frontier economy these are likely to be land-based economic activities, hence the focus on ranching, farming, mineral extraction, and forest products.

That narrative has a compelling historical ring to it. But most economic activities in the 21st century are not land-based. The total of all jobs in agriculture, mineral extraction, and forest products represents only about 3 percent of total jobs in the American economy in 2008.[29] Clearly we cannot explain the location of economic activity across the American landscape on the basis of this tiny part of the total economy. We have to be able to explain why non-land-based economic activity locates where it does independent of this land-based tiny sliver of the overall economy.

Even if we stick with a focus on export-oriented economic activities as the engine driving a local economy, we are still left with the question of why a particular export-oriented firm chose to locate where it did. If we cannot explain that, we have not really

---

[29] Agriculture, agricultural services, fishing, forestry, mining (including oil and gas), wood products, paper, and primary metals. U.S. Department of Commerce, BEA, REIS data base. http://www.bea.gov/regional/spi/default.cfm?selTable=SA25N&selSeries=NAICS

BLM_0149500

explained what the economic forces are supporting the local economy. For instance, much of light manufacturing (computer assembly, chip manufacturing, appliance manufacturing, etc.) as well as export-oriented services (publishers, information businesses, financial services, technical support, professional services, etc.) are relatively "foot-loose" in terms of where they locate. The fertility of the land, minerals in the ground, commercially valuable natural vegetation including livestock forage and timber are unlikely to provide an explanation for why most of the firms found in the Montrose or Grand Junction or Telluride areas chose to locate there. For that reason, the export base view of the economy provides only limited insight into the local sources of economic vitality.

Businesses locate in particular areas for a wide variety of reasons, but two considerations are almost always important: i. the availability of a sufficiently skilled workforce at an affordable cost, and ii. access at an affordable cost to the markets for the firm's products. The geographic distribution of the population and people's preferences for where they would like to live influence both of these important economic considerations. Businesses cannot afford to ignore either of these: markets and the cost of reaching them and an adequate labor supply at a reasonable cost are central to any business location decision.

The export base view of the world implicitly assumes that people do not care where they live. People are assumed to passively go to where the jobs are because they have no choice if they want to be employed and their families to prosper. But in the 21st century continental-wide American economy, individuals and families do have a choice as to where they live. They face a broad range of economic opportunities mixed with an equally broad range of regions and communities that have diverse sets of attractive and unattractive characteristics that are unrelated to job availability and pay. Individuals and families can make tradeoffs and choices that mix labor market opportunities and the level of pay with other local characteristics such as quality of schools, crime rates, levels of congestion and commuting time, intensity of social conflict, pace of life, neighborliness, cultural variety, recreation and cultural opportunities, etc.

Areas that have mixes of qualities that make it easy for those areas to attract and hold residents will have a relatively large, diverse, and skilled workforce available at a somewhat lower price. Alternatively, such areas can get workers to move to the area without wages being bid up significantly. That makes such areas attractive to businesses. The fact that businesses are run by people who also have preferences about where they and their families live only adds to the economic importance of a community's attractive qualities. To the extent the dynamic between the attractiveness of a community to new residents and businesses has triggered ongoing economic development, local markets for goods and services will also be expanding, increasing the economic attractiveness of the area to firms.

In brief, labor supply and its cost and the location of population concentrations matter to businesses. Areas that attract high quality workers at a relatively low price will, in turn, be attractive to business firms. Ignoring labor supply and focusing only on labor

BLM_0149501

demand, as the export base view does, is inappropriate economic analysis. As in most components of a market economy, both supply and demand matter.

It is important to keep in mind that conceptually, we do not have to choose between the export base view of the economy and the residential location choice view. These two views encompass between the two of them the two primary market forces of supply and demand. We should be careful to consider both. The relative importance of labor supply and labor demand can be expected to shift over time and vary across geographic areas. At any particular location at a given time, the relative importance of these two sets of forces is an empirical matter. Local economic development policy, however, may choose to focus strategically on some elements of one or both of these sets of economic forces.

All three of our study area counties have seen significant population growth primarily supported by the net in-migration of new residents. Between 1990 and 2009 net in-migration added about 50 percent to each of these counties' populations. For Montrose and Mesa Counties more than 80 percent of the growth was due to net in-migration. For San Miguel over 60 percent of population growth was the result of net in-migration. About 70,000 new residents moved into the region during this time period.

> ii. Looking at **All** Sources of Economic Value Including Non-Market Economic Values

The economic dynamic described above has been called *amenity-supported local economic development*. This economic potential in some ways is the opposite of the economic force that the export base view of the economy emphasizes. Within the export base view, people move to where the jobs are. Within the amenity-supported economic development model, economic activity follows the residential preferences of the population. Economic activity shifts in this way because the existence of local amenities provides businesses with access to a lower cost skilled labor force and to markets for their goods and services. In essence, because workers and families value local amenities, they are willing to sacrifice a certain amount of income to gain access to those site-specific qualities. They accept lower wages than they could earn in less attractive locations as an effective "price of admission" to what potential residents judge to be a more valuable set of local qualities. The *total real income* being received by residents comes in two parts: The value of the conventional paycheck and the value of the site specific amenities to which living in that location provides access. The value of those local amenities provides residents with a "second paycheck." [30]

---

[30] Ed Whitelaw at the University of Oregon and with ECONorthwest coined that phrase. Local economies can be a bit more complicated than this. As the local economy expands, limited supplies of land for commercial and residential development can lead to land values rising, increasing both the cost of living and the cost of doing business. This can ultimately work to stabilize community size, limiting that location to those for whom it is the most productive site for a business and to those residents who most highly value the qualities of that location. The higher cost of living will reduce the purchasing power of local wages and residents will pay an effective access fee in the form of lower real (cost of living adjusted) wages. To the extent that the available land base is not a serious constrain on ongoing development, the

BLM_0149502

This is not a new way of looking at the local economy. Since the mid-1950s economists have emphasized the importance of residential location decisions as a powerful economic force. They focused on the role of local environmental "amenities" such as climate and natural landscapes in the settlement of the desert Southwest (including Arizona, New Mexico, and Southern California), Florida, and the Pacific Northwest.[31] Tiebout underlined the fact that people "shop around" for the social amenities produced by different levels of local government taxation and different public spending patterns such as on schools, parks, and roads.[32]  Borts and Stein argued that in a mobile, open economy, it would be an area's ability to attract and hold a labor force without bidding up labor costs that would determine the geographic distribution of economic activity.[33] More recently the rapid growth along Colorado's Front Range, the explosive growth within many small Rocky Mountain communities as well as the growth in the cities on the West Slope has provided another manifestation of amenity-supported local economic vitality.

But these economic forces tied to local amenities have transformed many parts of the nation's economic geography and help to explain the above average economic performance across most of the Mountain West, not just in Colorado, as well as in the Southeast and the Pacific Northwest over the last two decades before the Great Recession struck.[34] Ten years ago the Economic Research Service of the U.S. Department of Agriculture published a special edition of *Rural Development Perspectives* on the rapid growth in population in the rural counties of the Mountain West. That growth attracted attention of analysts because it could not be explained by the Mountain West's traditional land-based activities of farming, ranching, forest products, and mineral extraction, all of which were in relative or absolute decline. These USDA studies were focused on the non-metropolitan West, where one would expect these traditional land-based economic activities would dominate. The titles of the studies indicated the common theme: "Amenities Increasingly Draw People to the Rural West." "Quality of Life, Nontraditional Income and Economic Growth: New Development Opportunities for the Rural West," "Wildlife Conservation and Economic Development in the West," and "Jobs Follow People in the Rocky Mountain West." [35]

---

effective price residents pay to gain access to the qualities associated with that location are likely to be reflected in the lower pay they accept compared to what they could earn in less attractive locations.

[31] Ullman, Edward, 1954, "Amenities As a Factor in Regional Growth, *Geographic Review*, 44(1):119-132.

[32] Tiebout, Charles, 1956, "A Pure Theory of Local Expenditures, *Journal of Political Economy*, 64(2):160-164.

[33] Borts, G.H., and J.L. Stein, 1964, *Economic Growth in a Free Market*, New York: Columbia University     Press

[34] Thomas M. Power and Richard Barrett, *Post Cowboy Economics: Pay and Prosperity in the New American* West, Island Press, Spring 2000; Power, Thomas M., 1995, editor,  "Economic Well-Being and Environmental Protection in the Pacific Northwest:  A Consensus Report by Pacific Northwest Economists", Department of Economics, University of Montana, Missoula, MT, December.

[35] See the special issue of *Rural Development Perspectives* on the rural West, 14(2), August 1999, USDA, Economic Research Service.

BLM_0149503

This half-century of economic research simply underlines the important role that non-commercial, non-market goods and services can play both in contributing to the economic well-being of individuals and households as well as the economic vitality of communities. Some of these non-market economic values are human created, others are gifts of nature, flowing as they do from well functioning natural systems. All of them are often encompassed in the larger concept of "quality of life" or "local amenities."

### iii. Capturing, Holding, and Circulating Income in the Local Economy

We return to a discussion of how the modeling of the local economic impacts has to move beyond an "only exports matter" point of view. Most economic impact modeling, including that done on the proposed Piñon Ridge uranium mill and associated mines, implicitly takes that point of view, effectively dismissing the bulk of local economic activity as "secondary" or "passive." This is an important error. Earlier in this report we pointed out the failure of a traditional export base modeling approach to explain the actual economic vitality of the Colorado Uravan Mineral Belt counties. Here we focus on the important economic role of locally-oriented economic activity in boosting the local economy.

Exports by themselves do not create a local economy. On the North Slope of Alaska billions of dollars worth of oil have been produced but there is almost no "local economy" on the North Slope. The value of that oil and the wages earned producing it all flow to other areas a great distance from the North Slope where people actually live and where there is the commercial infrastructure in which that income can be spent. This is an extreme example, but the mining, timber, cattle, and farm towns that grew up around a primary export often had similar limiting characteristics: the income generated by the exports primarily went to fund imports. That is, the income from the exports almost immediately "leaked out" of the region. That is why many of the mining and mill towns became the equivalent of ghost towns as demand for the exports declined or technological change reduced the size of the workforce needed to produce the exports. Empirical economic analysis of the impact of natural resource activities in rural areas confirms that the multiplier impacts associated with natural resource extraction activities in contemporary rural areas can also be nearly zero.[36] This is likely to be the case also in the rural west ends of our three Colorado Uravan Mineral Belt counties.

The actual size of the impact of an export activity on the local economy is determined by the interaction of two sets of local economic characteristics: The size of the flow of income into the local economy from the outside and the web of local economic interconnections among residents that captures and circulates that income among businesses and households. The "multiplier" impacts associated with export income is determined by that ability to capture and circulate income locally. It is the local web of specialized and interdependent businesses and households that actually make up the

---

[36] "A Test of the Economic Base Hypothesis in the Small Forest Communities of Southeast Alaska," Guy C. Robertson, U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station, General Technical Report, PNW-GTR-592, December 2003. http://www.fs.fed.us/pnw/pubs/pnw_gtr592.pdf

BLM_0149504

local economy. Without those locally-oriented businesses there can be enormous export flows but only a primitive local economy.

Both export-oriented and locally-oriented businesses contribute to the vitality of the local economy. It can be a serious economic error to ignore either of these two sides of the local economy.

As pointed out above, much of the west ends of our three county study area are only very lightly settled with little or no economic infrastructure to capture and hold the dollars the proposed uranium mill and associated mines may generate. With the exception of Nucla and Naturita, almost all of that income and many of the jobs will flow to more distant trade centers, primarily Grand Junction. Even Nucla and Naturita, which together have about 1,400 residents, do not meet the conventional definition for an urban area (greater than 2,000 residents) and are classified as part of an entirely rural area. That, of course, is part of the attraction of small town America, but that rural character also assures that most of the economic impact associated with the proposed uranium production will be felt elsewhere. That will comfort those who do not look for economic change but discourage those looking for sustained economic development to flow from a renewed uranium industry.

*Conclusions on the Limits of the Export Base View of the Local Economy*

The importance of amenity supported local economic vitality in transforming Colorado's economic geography as well as that of much of the United States cannot be safely ignored when evaluating the likely economic impacts of the proposed Piñon Ridge uranium project. Local economic vitality and local economic well being are not primarily determined by those land-based economic activities that facilitated the original European American settlement of the West Slope in earlier centuries. Although those traditional economic activities remain significant to local economies, they have not been the source of new jobs and income for the region. The economic impacts of the proposed uranium mining and milling operations need to be put into a long-run economic development context: What are these uranium activities likely to contribute to the sustained economic development of the region?

In answering that question, the importance of the attractiveness of a region to new residents and businesses has to be considered along side any particular proposal to boost the region's exports. To the extent that a re-industrializing of the region around the production of radioactive materials damages the region's attractiveness as a place to live, work, raise a family, and do business, it may undermine future economic vitality rather than stimulate it. To the extent that those mineral extraction activities are also unstable, generating booms and busts that weaken communities and economies rather than strengthen them, there is even more reason to be concerned about what that revival of a uranium industry in the region can actually contribute to local economic vitality and well being.

BLM_0149505

In the following sections we turn to a discussion of those potential negative economic impacts associated with a revival of the uranium industry in our three-county study area. Here we simply wish to point out the part of basic employment that may be at risk to any deterioration in the qualities of this three-county region that has supported not only a significant visitor economy but also have supported the ongoing in-migration of working age families as well as retirees. This in-migration boosts the regional population, making feasible a much broader range of businesses that can help capture, hold, and circulate the income that flows into the region. Those income flows include the "footloose" investment and retirement income as well as the spending by tourists, recreationists, as well as visitors taking advantage of the broader array of medical and other professional services, entertainment and cultural institutions, and other trade center businesses.

As discussed above, the visitor economy is responsible for 13 percent of basic employment in our three-county study area. The inflow of retirement and investment income as well as the income brought back into the area by those who commute out to work are responsible for 22 percent of basic jobs. The continued inflow of that "footloose" income could also be put at risk by a perceived deterioration of quality of life in the region. Some of the regional trade center activity is also tied to the region's ability to attract new, working age, in-migrants.  Post-secondary education schools that draw students from a larger region are part of that. Amenity-migrants to the surrounding area both created the demand for what trade centers can provide while also providing the technical and professional workers who support trade center service businesses. If a third of the trade center impacts can be attributed to amenity migrants, that employment contribution would be about 7 percent. Finally, the indirect basic jobs that support these amenity-sensitive elements of the regional economy have to be included. They represent another 10 percent of the total basic sector jobs. In total these amenity-sensitive basic job sectors represent 52 percent of all basic employment in the three-county area. See Table 6 below.

**Table 6**

| Basic Employment Jobs Sensitive to Local Amenities | | |
|---|---|---|
| Tri-County Study Area: Mesa, Montrose, and San Miguel | | |
| Economic Sector | Basic Jobs | % of Basic Jobs |
| Visitor Economy | 8,901 | 13% |
| Non-Employment Income | 14,916 | 22% |
| One-third Regional Trade Center | 5,429 | 8% |
| Share of Indirect Basic | 6,448 | 9% |
| Total Amenity-Sensitive Basic Jobs | 35,695 | 52% |

BLM_0149506

## 4. Economic Modeling of the Local Impacts of the Proposed Uranium Mill

One set of the socioeconomic impacts of the proposed uranium mill and associated mines that is of considerable interest to residents, businesses, and governments is the conventional economic impacts: number of jobs, level of new income, and total business spending that is likely to be brought to the local economy.  Both the Energy Fuels socioeconomic study and the study commissioned by Montrose County used the IMPLAN economic model to estimate those economic impacts. In this section we will present our own IMPLAN modeling of those impacts and compare them to these two previous studies.

But first it is important to decide what we mean by the "local" economy that is being impacted. Depending on how the geographic area that is being studied is defined, quite different impacts can be legitimately calculated. In general, the larger the geographic area being considered, the more likely it is that the needs of new business activity and the needs of the new workers and their families can be met within that economy. The smaller the geographic area being studied, the more likely it is that businesses and households will have to go outside the area to make many of their purchases and the smaller the "ripple" or "multiplier" impacts will be in the local area because the spending that is stimulated "leaks" out of the area. On the other hand, a larger geographic area is likely to have a larger economy, especially if that larger area contains a substantial trade center. So, although the additional job and income impact are larger, so is the size of the overall economy and the relative, *percentage* impact could actually be smaller.

Thus as we go from a small, rural town to a larger contiguous area that includes an urban trade center to an entire state to the entire nation, the total impact of a change in economic activity will grow larger as more and more of the total change in economic activity is captured within the larger geographic area economy being studied. But the percentage impact and relative importance of those changes to that much larger economy may shrink. Accurate impact analysis may find the indirect and induced impacts of an economic change to be quite small in a lightly settled rural area while finding them to be considerably larger at the regional or state level.

In our analysis we assume the primary focus of the socioeconomic analysis should be on the likely economic impacts within the West End of Montrose County where the proposed mill will be located. We discuss the reasons for focusing on just part of Montrose County below.

### *The Appropriate Economy to Model to Understand the Local Economic Impact of the Proposed Uranium Mill and Mines*

Both the Energy Fuels and Montrose County socioeconomic impact analyses chose to use Montrose County as the economic area for which the economic impacts associated

BLM_0149507

with the proposed Piñon Ridge uranium mill and associated mines should be calculated. Although that might appear to be appropriate given that the mill would be built in Montrose County and some of the uranium mining might take place there, using Montrose County as the economic focus ignores geographic and economic reality.

As the Energy Fuels socioeconomic analysis states:

> The Uncompahgre Plateau runs northwest to southeast through the central part of [Montrose] county. This geological feature divides the County into the Uncompahgre/Gunnison River basins on the east and the Dolores/San Miguel River basins on the west. (p. 3)

The Montrose County socioeconomic analysis spells out the economic consequences of this geographic divide: The West End of Montrose County where the proposed mill would be built is reachable from the City of Montrose and the more densely settled eastern part of Montrose County only by a circuitous route "of 85 miles, which passes through two neighboring counties" to the south, Ouray and San Miguel, before swinging back north to the Naturita-Nucla area of the Montrose County West End.  As the study put it:

> "…[U]nder current circumstances, many of the residents of the West End travel outside of [Montrose] County (mostly to Grand Junction) for many of their retail purchases. It is estimated that this represents a significant portion of these resident's expenditure potential lost to surrounding jurisdictions." (p. 30)

The Montrose County study actually proposes the construction of a highway across the Uncompahgre Plateau at an estimated cost of $100 million to provide a "more direct transportation link to eastern Montrose County" from the West End. (p.3) This would enhance "an expansion of commerce between Eastern Montrose County and the West End, i.e. in terms of an increased capture of the expenditure potential within the County from West End residents."  (p. 29)

Note the implicit acknowledgement at the end of this statement that with the current highway route between the east and west ends of Montrose County there would be limited impact of new economic activity, such as the proposed mill in the West End, on eastern Montrose County. In fact, most of the expenditure impact would be felt, instead, in the Grand Junction area in Mesa County. This is important to the economic modeling of the impact of the proposed mill in the West End on Montrose County. Given the barrier that the plateau currently represents to commerce between the West End and the Montrose city area, expenditures in the West End are unlikely to flow to businesses in the Montrose city area. Instead they are likely to flow out of Montrose County to neighboring counties in Colorado and Utah.

In fact, the Montrose Countystudy points out that the Montrose city area would be "an unlikely option for West End employees" to live because of the commuting difficulties. In

45

BLM_0149508

fact, the study estimated that only one percent of the new jobs in the West End would be filled by residents of the City of Montrose. (pp. 36-37) The Energy Fuels analysis concludes that "the majority of indirect and induced spending associated with the construction of the Mill is likely to occur in other municipalities" that Naturita and Nucla "due to limited commercial and retail outlets" in the West End. Energy Fuels "analysis assumed that only 10 percent of indirect and induced spending would occur in each of these towns." (p. 44)

> ""[T]he mill is expected to generate an additional 284 jobs through additional economic activity. These jobs would be generated at indirect businesses that support the mill (e.g. mining, trucking, vendors) and as a result of additional household spending (e.g. retail). It is uncertain where all these jobs would be located, but they would be spread among the small communities of western Montrose County and adjacent counties in Colorado and Utah." (pp. 46-47)

> "The employment situation with the miners and truck drives is more complicated. Energy Fuels' Mine Operations Plan identified potential ore feed from Energy Fuels' mines and mines operated by others over a six county area (Montrose, Mesa, and San Miguel in Colorado and San Juan, Grand, and Emery in Utah)." (p. 45)

Because of this, Energy Fuels concluded its socioeconomic analysis with the observation that: "This project is expected to create a broad, **regional** stimulus centered in western Montrose County, rather than a localized boom." (p. 51, emphasis added).

Despite recognizing the fact that the mill and mine would be located in a rural area with little connection to the more densely settled east side of Montrose County, both the Energy Fuels and Montrose IMPLAN modeling used Montrose County as the economic area of analysis, implicitly including in that economy the city of Montrose and the rest of the east side of the county that taken together has a population almost 14 times that of the West End from which the eastern portion of Montrose County is economically and geographically separated.

Within the IMPLAN model of all of Montrose County, the diverse set of commercial businesses located in the greater Montrose City area on the east side is treated as a source that can provide the West End with the goods, services, and workers that business and households in the West End need to support new economic activity. But in reality, that is not the case since the West End is largely economically and geographically isolated from the large urban economy on the east side. The West End expenditures and economic impacts will be felt elsewhere, outside of Montrose County. That is the reason that the economic impact analysis should have focused on the rural West End and not the whole of Montrose County. If that had been done, the rapid leakage of most of the spending impacts out of the West End and out of Montrose County would have been recognized and lower and more realistic local economic impacts would have been calculated.

BLM_0149509

Instead these two socioeconomics studies project erroneously large impacts of the mill on the West End and Montrose County. The Montrose County study, for instance, projects a total of 516 to 649 jobs created in the West End by the mill and associated mining, depending on whether 50 or 100 percent of the uranium mining to support the mill takes place entirely within the West End of Montrose County. (Table 4, p. 21 and Tables 9 and 10, p.27)[37]

The Energy Fuels study is more conservative, recognizing that it is difficult to project where in a five county area the mining, ore hauling, indirect, and induced jobs will be located. It estimates that 315 total jobs will be created just by the operation of the mill in the West End of Montrose County. (Table 27, p. 46)

Our estimates of the total employment impact in the West End and Montrose County, as explained later in this section, is just 116 jobs, one-third to one-sixth of the other estimates. Our estimate takes into account the fact that initially none of the mining may take place in the West End but will be located instead in Mesa and San Miguel Counties in Colorado and Grand and San Juan Counties in Utah. It also recognizes that much of the impact of the spending associated with the operation of the mill will quickly leak out of this rural area because of its limited commercial infrastructure.

### The Residence of Mill and Mine Workers

Energy Resources estimates that of the 85 jobs associated with the proposed uranium mill, 80 percent or about 65 of the jobs will be filled by "local hires."  This will be true, they say, because "Energy Fuels desires to hire local employees." (p. 45) This suggests that rather than hiring the best workers out of the pool that apply for the jobs, Energy Fuels will discriminate in favor of local residents. Energy Fuels' analysis indicates that it would focus its hiring on the unemployed workers available locally as well as local residents who currently commute out of the local area to work.[38] It is certain, however, that many very qualified non-local workers within commuting distance of the mill will also apply. It seems unlikely that Energy Fuels would want to limit its hires only to the narrow pool of local unemployed and existing out-commuting residents when a broader pool of skilled and experienced workers will be available. Energy Fuels does not expect the remaining 20 direct hires at the mill will initially live in the West End but does project that they will ultimately move there. We share Energy Fuels expectations that a significant portion of the employees will live outside of the West End. We, however, believe, that that pattern of commuting into the West End to work will continue over the life of the project. For these reasons, we conservatively assume that at least 20 of the workers will be in-commuters who do not live in the West End.

---

[37] The Montrose County socioeconomic study assumed that the uranium mill and mining would not be fully operational until 2020, rejecting the Energy Fuels projection that operations would commence in 2012. (p. 20)

[38] Table 23, p. 39.

BLM_0149510

It should be noted that "local" in the Energy Fuels' analysis includes not only residents of the West End of Montrose County but also residents of northern San Miguel County (Norwood area) and residents of eastern San Juan County, Utah, (La Sal area). (Table 23, p. 39)  Energy Resources, however, expects 90 percent of the Energy Fuels mill employees will choose to make their residence in the West End. (p. 45). In contrast, Energy Fuels assumed that many of the 230 projected indirect and induced jobs would not be residents of the West End. Energy Fuels says that: "It is uncertain where all these jobs would be located, but they would be spread among the small communities of western Montrose County and adjacent counties in Colorado and Utah." (pp. 46-47)  In fact, many of them are likely to be located in Grand Junction, the primary trade center in the region, not in the small communities in surrounding rural area.

The Montrose County economic impact analysis includes the impact not only of the jobs at the mill but also the jobs associated with the mines that will supply the mill. The IMPLAN modeling was done assuming that the impact of all of the mill jobs and either half or all of the associated mining and ore hauling jobs would be captured in Montrose County. This led to a Montrose County employment impact of 199 to 313 direct jobs and 516 to 649 total jobs. The total job impact is so large because the analysis *assumed* that 50 to 100 percent of the mining and hauling jobs would be located in the West End or the miners and haulers would live in the West End *and assumed* that the indirect and induced jobs would also be largely located in the West End.  Over 80 percent of all of the new jobs, between 420 and 520 jobs, are assumed to go to existing residents or to non-residents who then move to the West End to live. Less than 20 percent of the jobs are assumed to go to workers who continue to live outside of Montrose County. Given the rural nature of the West End and the limited ability of that rural economy to supply the needs of the mill, mining companies, and households, this is pure wishful thinking. Given that the initial Energy Fuels mines will be located in Mesa, San Juan, and Grand Counties in Colorado and Utah and that the mix of mines that will provide the long run supply of uranium ore will be spread over a five county areas in Colorado and Utah, there is absolutely no reason to assume that 50 percent of the miners will live in the West End, not to mention 100 percent.

Finally, it should be pointed out that mill and mine workers may purposely choose to live as some distance from the mill and mine. Given the volatile nature of the mining and milling activity and the environmental damage and/or stigma associated with the mining and milling of radioactive material, workers may want to reside some distance away to protect the value of their investment in their homes. Some businesses serving the mill and mines and their workers may choose to do the same.

### *The Stability and Duration of the Jobs Associated with the Mills and Mines*

Energy Fuels' socioeconomic analysis assumed without analysis or discussion that the proposed mill will operate continuously for 40 to 50 years and could possibly double its ore processing capacity in the future.[39] As the history of the uranium mills in the region documents, this is highly unlikely and would be unprecedented. As will be discussed

---

[39] Ibid. p. 45.

BLM_0149511

later in this report, when uranium prices fall, the mill will cut back production or shut down completely. When uranium prices rise again, it will hire back workers. In addition, when uranium prices remain low for an extended period of time, the mill may be permanently closed and dismantled. This is not speculation. In recent years both the Cotter mill in Cañon City and the Denison mill outside of Blanding have ceased processing conventional uranium ore and laid off much of their workforce. The Cañon mill has been shutdown for several years and is now being dismantled. The Shootaring Canyon mill to the west of the Blanding mill in Utah is also currently in "standby" status. Historically none of the uranium mills have ever been operated continuously at full capacity for forty or fifty years. The proposed Piñon Ridge mill will not either.

In the socioeconomic analysis of the proposed uranium mill and its associated mines this instability in employment, income, and purchases from local businesses has to be taken into account to provide a realistic view of the benefits and costs of the proposed mill. Assuming stability in employment, income, spending, and production that is unlikely to be experienced does not provide an accurate picture of the jobs, income, and tax revenue impacts on the local area.


### *Accurately Modeling the Impact of the Proposed Mill on the Rural West End of Montrose County*

Energy Fuels' proposed Piñon Ridge mill would be built west of the towns of Nucla and Naturita in western Montrose County, Colorado. See Figure 15. The proposed Piñon Ridge mill would be the first new uranium mill built in the United States in 25 years. In this section we present the results of our economic modeling of the impacts of that proposed uranium mill as well as the impacts of an alternative: Remediation, reclamation, and closure of the many abandoned mines in western Montrose County.

#### *Project Workforce and Population*

Energy Fuels expects that the Piñon Ridge mill will directly create 65 new jobs in the West End once it is processing 500 tons per day (tpd) of uranium-vanadium ore.  That is Energy Fuel's estimate of the number of local hires that they plan to employ in the uranium mill.  Energy Fuels assumed that the 65 uranium mill jobs would be filled by residents already living in the West End, which includes the towns of Nucla and Naturita.[40]  Energy Fuels anticipates that they will need to hire a total of 85 people to run the uranium mill but anticipates that 20 of the more specialized jobs will be filled from outside Montrose County and those employees may not live in the West End.  Energy Fuels estimates that the employee compensation for the mill workers would be in the range of $40,000-$75,000 per year.  Keeping within this range we chose to model the mill jobs at $65,000 per year per employee[41].

---

[40] Elsewhere in this report, we will question this assumption but to be conservative, we used it in our modeling.

[41] In the Socioeconomic Baseline and Impact Analysis for the Proposed Piñon Ridge Uranium Mill report prepared for Energy Fuels by the Berger Group (November 2009) the pay range is given on page 45.

BLM_0149512

Uranium mills need uranium ore but the modeling of that employment becomes significantly more difficult because Energy Fuels does not have a permitted uranium mine in the same county as the Piñon Ridge mill and does not plan to rely on any given set of mines over the projected life of the mill. Energy Fuels notes, "The employment situation with the miners and truck drivers is more complicated." We, like Energy Fuels, chose not to model the impact of the uranium mines or the truck drivers needed to haul the uranium ore to the mill because those mines are very likely to have a limited impact on the West End economy. As of June 2010, Energy Fuels owned two fully permitted uranium mines.[42] According to Energy Fuels' mining plan, the two fully permitted mines could initially produce 64percent the uranium that they annually plan to mill at Piñon Ridge[43]. In October 2010 Energy Fuels acquired a 641 acre uranium-vanadium lease in San Miguel County.[44] It also has numerous other leases throughout the seven-county, two-state region.

The problem with these mines as far as modeling is concerned is that neither mine is in the study area. The Energy Queen mine is just outside of La Sal, Utah in San Juan County and the Whirlwind mine is just south of Gateway, Colorado in Mesa County on the border with Grand County, UT. In addition, the location of the other 35 percent of the mining is unspecified and, according to Energy Fuels is likely to vary over time as new sources are developed and older sources abandoned. Even Energy Fuels' Whirlwind and Energy Queen Mines do not have the capacity to support the proposed mill for more than a quarter of the claimed 40 year life of the mill. Because Energy Fuels' initial primary supply mines are in other counties, it is unlikely that the most of the miners would live in or contribute substantively to the West End economy. The same is true for the truck drivers who would be hauling the ore to the mill There are larger and closer (or at least similarly distanced) towns near each mine compared to Naturita or Nucla (e.g. Moab, Utah and Grand Junction, Colorado). Because of the proximity of Energy Fuel's primary uranium mines to larger towns with far more developed local economies, we did not include the hauling or the mining of the uranium ore as part of the Montrose County West End economy.

*Economy and Employment*

The economic impact of the Piñon Ridge mill was modeled using the input-output model IMPLAN (version 3). Because of the rural nature of the West End, isolated as it is from the city of Montrose, the impacts were modeled for a four zip code rural area instead of all of Montrose County. The zip codes that were modeled were 81411, 81422, 81424,

---

[42] http://www.energyfuels.com/news

[43] In the Piñon Ridge Project Environmental Report prepared for EF by Edge Environmental (November 2009), it was asserted that at the 500 tpd production rate "most of the ore would be produced and delivered by mines owned by Energy Fuels" and that each of EF's Whirlwind and Energy Queen mine "is capable of producing 200 tpd or more of uranium ore." Page 2-3. At those outputs these two mines could provide 80 percent or more of the mill's 500 tons per day design capacity but for only a 10-year period.

[44] http://www.telluridewatch.com/view/full_story/10002092/article-Energy-Fuels-Acquires-San-Miguel-County-Uranium-Lease?instance=secondary_story_left_column

BLM_0149513

and 81431. (See Figure 15.) Because we did not include the town of Montrose in the modeling, much of the indirect and induced benefits of the Piñon Ridge mill quickly leaks out of the modeled area due to its rural nature.

The economic impact of the proposed mill was modeled under Industry Code 125 "other basic inorganic chemical manufacturing" which is the sector that best represents uranium processing in IMPLAN.[45] The model was modified slightly to allow for the mill employment and employee compensation proposed by Energy Fuels. The results of the modeled milling can be seen in Table 7 where the direct, indirect, induced, and total effects can be seen on local employment, labor income, value added, and output or sales on an annual basis.

**Figure 15**



The modeled zip codes are outlines by the dashed lines in Figure 15.

---

[45] Energy Fuels' economic modeling also uses IMPLAN and used the same industrial sector for the mill. It gives the North American Industrial Classification System number for the sector (150) rather than the IMPLAN Industry Code.

BLM_0149514

**Table 7**

| Impact Type | Employment | Labor Income | Value Added | Output |
|---|---|---|---|---|
| Direct Effect | 65 | $5,756,319 | $10,306,680 | $50,189,544 |
| Indirect Effect | 37 | $3,199,825 | $8,080,188 | $13,090,667 |
| Induced Effect | 14 | $425,902 | $1,293,909 | $2,008,505 |
| Total Effect | 116 | $9,382,046 | $19,680,776 | $65,288,717 |

Using Energy Fuel's direct employment of 65 new resident jobs, the operation of the mill is anticipated to create an additional 51 jobs from indirect and induced effects in this rural area.[46]  This can be compared to Energy Fuel's projection of 230 additional jobs. The uranium mill is expected to generate $9.4 million in labor income and have an impact on total business sales of $65 million each year that the mill is in operation.  This can be compared to Energy Fuel's prediction of $18.7 million in labor income and a total effect of $140 million in additional business sales)[47].

This discrepancy between our results and those of Energy Fuels' modeling can be accounted for by looking at the total area modeled.  Energy Fuels chose to model all of Montrose County, which includes the city of Montrose.  We chose to model the rural four zip code area of the West End of the county in which the mill will be located and some of the workers will be living. Because the city of Montrose is large compared to the West End, a model that includes the city of Montrose assumes that much more of the money generated in the West End by new economic activity would re-circulate in the form of indirect and induced jobs and income than the actual rural economy could actually support.

We feel that it is more accurate to model the effects of the uranium mill on the West End alone since it is not clear where the uranium mill workers will choose to spend their money. The greater Grand Junction area is almost five times larger than the Greater Montrose area[48] and it is only about a half hour farther away than the City of Montrose from Nucla or Naturita. Because of the range of amenities that Grand Junction can offer, it is unrealistic to assume that residents of the West End would travel to the city of

---

[46] We have focused on the longer term operations jobs once the mill is constructed. Construction jobs are short-run, one-time-only, jobs that usually draw on a mobile construction workforce of specialized workers. That brief surge of construction jobs does not contribute to sustained development.

[47] In the Socioeconomic Baseline and Impact Analysis for the Proposed Piñon Ridge Uranium Mill report prepared for Energy Fuels by the Berger Group (November 2009) table 27 gives the economic impacts from the operations of the mill.

[48] Based on the 2000 Census County Divisions encompassing the Grand Junction urban area (Grand Junction, Clifton, Fruita, Glade Park-Gateway, and Whitewater-Kahnah CCDs and the Montrose CCD. Table 5, 2000 Census of Population and Housing, PHC-3-7.

BLM_0149515

Montrose when modeling the impact of a mill located in the rural West End on Montrose County.[49]

Energy Fuels' economic modeling assumes that 80 percent of the operational mill jobs will be filled by current residents of the West End of Montrose County. It also assumes that 90 percent of all the mill employees will reside in the West End. As will be discussed later in this report, this may be an overly optimistic assumption. Applicants for the jobs will come from locations throughout the multi-county region in western Colorado and eastern Utah that can be reached by commuting to the mill. Workers may not want to invest in homes close to the mill for fear that a mill shutdown or perceived environmental problems associated with the mill and mining would reduce the value of their homes. We have nonetheless modeled the mill impacts assuming 80 percent of the mill employees would be residents of the West End. In that sense our estimates are on the high side.

### IMPLAN Modeling of Uranium Mine Reclamation in Rural Montrose County

The Uravan Mineral Belt has 1200 uranium mines located within it[50]. In the history of uranium mining in the Uravan Mineral Belt, some 84 million pounds of uranium oxide were produced between 1936 and 1984.[51] Here we present an alternate scenario where the Piñon Ridge Mill is not built but the existing uranium mines in the Uravan Mineral Belt are cleaned up, sites reclaimed, and waste piles remediated.

This alternative has the advantage of improving the overall environment, livability, and attractiveness of this region rather than risking adding the "stigma" of turning the west ends of these three Colorado counties back into an industrial center that produces large quantities of long-lived radioactive waste. In the next section of this report we discuss that risk of creating a disamenity or stigma that discourages new residents, businesses, and visitors, thus weakening local economic vitality rather than enhancing it. In addition, with appropriate funding, such a reclamation-remediation program would not add instability to the local economy due to the cyclical fluctuation of uranium prices.

---

[49] *If* the focus of the economic impact analysis was on the entire seven-county area of Colorado and Utah where the impacts of a revived uranium industry are likely to be felt, then we would certainly seek to take into account *all* of these impact. However, the focus of the socioeconomic analysis has been on the rural west ends of the three Colorado counties where the mill and some of the mines will be located. Adding, instead, primarily to the growth of the Grand Junction economy instead of supporting the rural West End of Montrose County is likely to be a somewhat lower priority to the rural areas that are supposed to be helped by the mill and mine developments and where the environmental costs and risks will be experienced. Exaggerating the positive impacts on the rural areas when the impacts will actually be in the larger rural areas is seriously misleading.

[50] http://mining.state.co.us/UraniumMininginColorado.pdf

[51] History of Uranium Prospecting and Mining in Colorado—a Story of Boom and Bust, *Rocktalk* 9(2), p. 4, Colorado Geological Survey, http://geosurvey.state.co.us/portals/0/rtv9n2%20LR-web.pdf

BLM_0149516

In 2006 the EPA published a technical report on uranium reclamation[52]. The EPA looked at the cleanup costs of 75 production facilities including 21 uranium mines. The report presents a "reasonable average" cost of cleanup per pound of uranium oxide ultimately produced.[53]  Having an estimated monetary reclamation cost per pound of uranium ultimately produced, allows us to calculate a rough estimate of the total cost of cleaning up the Uravan Mineral Belt's uranium mines. This modeling focuses on the jobs and worker compensation associated with cleaning up uranium mines instead of the creation of more uranium waste through a revival of mining and milling in the region.

### *Project Workforce and Population*

As mentioned above, the Colorado Uravan Mineral Belt is a rural area. There are no major population centers included within its boundaries. Because of the rural nature, we chose to model the reclamation of all of its uranium mines based on the four rural West End zip codes used for modeling the proposed mill and shown in Figure 15 above. We are not implying that all of the employment and income associated with this scenario will flow to the West End of Montrose County. The West End is an appropriate proxy for the larger Uravan Mineral Belt area because of its rural nature. Like the West End, much of the direct labor income will likely leave the area in the form of indirect and induced spending and employment to the larger population centers around the region. The West End however, is in the center of the Uravan Mineral Belt and will likely see an opportunity for significant employment under this clean up scenario.

### *Economy and Employment*

IMPLAN version 3 was also used in this modeling. Uranium mine reclamation was modeled using industry code 390, "waste management and remediation services," which is the sector that best represents mine reclamation and remediation in IMPLAN. The zip codes that were modeled were again 81411, 81422, 81424, and 81431. See Figure 15.

Using the EPA uranium reclamation report value of $5.16 of reclamation costs per pound of uranium oxide produced and the fact that the Uravan Mineral Belt has produced approximately 84 million pound of uranium oxide[54] it would cost about $433 million to reclaim all of the mines in the Uravan Mineral Belt. Using this value as an input in IMPLAN for Industry sales allows us to look at the impact of this scale of reclamation on the rural Uravan Mineral Belt. Tables 7 and 8 show the results of the reclamation taking place over either a 10 or 20 year period.

---

[52] Technically Enhanced Naturally Occurring Radioactive Materials From Mining - Volume 1: Mining and Reclamation Background

[53] EPA's adjusted average was calculated by dropping the uranium operation with the highest cleanup cost and then taking the average of the remaining operations. This is the average of all of the mines being reclaimed minus the most expensive reclamation project. This essentially drops the cost of the outlier in an attempt to produce a more representative reclamation cost.

[54] History of Uranium Prospecting and Mining in Colorado—a Story of Boom and Bust, *Rocktalk* 9(2), p. 4, Colorado Geological Survey, http://geosurvey.state.co.us/portals/0/rtv9n2%20LR-web.pdf

BLM_0149517

The 10 year scenario is the amount of employment and money generated every year for ten years if all of the reclamation took place over a ten year period (Table 8).  The direct employment would be 157 jobs per year with total employment (direct, indirect and induced) being be 222 jobs per year.  The labor income associated with the direct employment would be about $15 million per year with the total labor income (direct, indirect and induced) being approximately $18 million per year. The direct total output would be about $43 million per year with a total effect of about $54 million per year.

**Table 8**

**10-year Reclamation of Uravan Mines**

| Impact Type | Employment | Labor Income | Value Added | Output |
|---|---|---|---|---|
| Direct Effect | 157 | $   15,057,022 | $ 23,932,906 | $ 43,333,331 |
| Indirect Effect | 37 | $     2,294,920 | $   3,742,029 | $   6,617,105 |
| Induced Effect | 27 | $        810,232 | $   2,471,074 | $   3,833,131 |
| Total Effect | 222 | $   18,162,174 | $ 30,146,009 | $ 53,783,567 |

**Table 9**

**20-year Reclamation Uravan Mines**

| Impact Type | Jobs | Labor Income | Value Added | Output |
|---|---|---|---|---|
| Direct Effect | 79 | $   7,528,511 | $ 11,966,453 | $   21,666,666 |
| Indirect Effect | 19 | $   1,147,460 | $   1,871,014 | $     3,308,552 |
| Induced Effect | 13 | $      405,116 | $   1,235,537 | $     1,916,566 |
| Total Effect | 111 | $   9,081,087 | $ 15,073,004 | $   26,891,784 |

The 20 year scenario is the amount of employment and money generated every year for twenty years if the mine reclamation was stretched over 20 years (Table 9).

BLM_0149518

The direct employment would be 79 jobs per year with total employment (direct, indirect and induced) being 111 jobs per year.  The labor income associated with the direct employment would be about $7.5 million per year with the total labor income (direct, indirect and induced) being approximately $9 million per year. The direct total output would be about $22 million per year with a total effect of about $27 million per year.

Note that a 20-year reclamation effort would have an impact similar to that we have estimated for the proposed mill. It should be kept in mind, however, that these two modeling efforts are not directly comparable since in the economic impact modeling of the mill, we explicitly did not include mining, hauling, and specialized mill jobs because the employees did not necessarily live in the West End.  In the reclamation modeling, some of the employment and income impacts are highly likely to take place in rural areas outside of the Montrose County West End.  Given that we find the assumption that almost all of the regular employees of the mill will live in the West End overly optimistic, our modeling of the impacts of the mill may be too high for the West End alone, just as our modeling of the impacts of a Uravan Belt reclamation program may also be too high for the West End alone. Both somewhat exaggerate the likely impacts on the West End.

## 5. Potential Negative Economic Impacts of a Revived Uranium Industry in the Uravan Region of Western Colorado

### *The Sources of Economic Vitality: A Restatement*

The sources of economic vitality over the last two decades in Montrose, Mesa, and San Miguel Counties have not primarily been in the traditional economic base: agriculture, mineral extraction, and manufacturing. Instead, the additional income flowing into these county economies has been associated with:

    i. the trade center roles of the cities of Grand Junction and Montrose as they provided medical, professional, technical, financial, and educational services as well as retail trade, cultural, and entertainment opportunities to a larger geographic area with a growing number of residents and income;

    ii. the flow of investment and retirement income into the region associated with the in-migration of large numbers of new residents including retirees;

    iii. the attraction of visitors to the region to enjoy the natural, recreation, and cultural amenities of the region.

All of these major sources of new income and employment rely directly or indirectly on the attractiveness of the region to new residents, businesses, and visitors. The region's economic vitality has been tied, among other things, to the social, natural, and cultural amenities of the region. For that reason, ongoing economic vitality is partially tied to preventing new economic activities that are land, air, and water intensive from damaging the very characteristics that have made this region an attractive place to live,

BLM_0149519

work, raise a family, and operate a business. As shown in an earlier section, these amenity-sensitive basic jobs represent over half of all basic jobs in the tri-country study area.

### The Potential Negative Economic Impact of Noxious Facilities

Because of its legacy of environmental damage and radioactive pollution, a revived uranium industry in the region could threaten these existing sources of economic vitality. Past uranium milling and mining have been the source of serious environmental and health problems. The uranium mill town of Uravan in the West End of Montrose County was so polluted with radioactive materials that when the last uranium boom came to an end in the early 1980s and the mill shut down, the federal government ordered the town evacuated, all of its structures removed, and the town effectively obliterated. That was just the beginning of a nearly 25-year remediation[55] process that cost over $120 million.[56] Similar costly mill cleanups took place in Naturita, Grand Junction, and Slick Rock at a cost of more than $640 million.[57] The remnants of a mill near Gateway in the west end of Mesa County were remediated. Costly remediation of uranium mill sites is still underway in the Moab, UT and Cañon City, CO areas.

In addition to the remediation of the environmental damage and threats associated with these previous uranium mills serving the Uravan Mineral Belt, there are also the environmental problems associated with the more than 1,200 uranium mines that supplied those mills in the past. Most of these mines have been abandoned but few have been remediated and reclaimed. Among these mines are 32 active permitted mines in the tri-county area: 17 in Montrose, 13 in San Miguel, and 2 in Mesa County.[58] The primary public safety efforts thus far has been simply to put gates or other closure devices on those mines that represent a clear hazard. There have been, however, some efforts to reclaim and remediate mines in the vicinity of the old town of Uravan.[59] The need to remove, relocate, and/or isolate the mine wastes from these 1,200 uranium

---

[55] "Remediation" typically refers to the collection and isolation or encapsulation of the toxic materials on site or near the site rather than the actual removal of the toxic materials. In some cases, as with the Naturita mill site and the Moab site the toxic materials have been moved to another site for encapsulation.
[56] U.S. EPA, News Release, 9-29-2008, "Cleanup of historic Uravan uranium mill completed," http://yosemite.epa.gov/opa/admpress.nsf/3ee0a48cce87f7ca85257359003f533d/de3216b095602308852574d3006e8c12!OpenDocument
[57] U.S. Energy Information Administration, Uranium Mill Sites Under the UMTRA Project, http://www.eia.doe.gov/cneaf/nuclear/page/umtra/title1sum.html .
[58] Uranium Mining in Colorado 2010, Colorado Division of Reclamation, Mining, and Safety, updated June 28, 2010. For the number of uranium mines in the Colorado portion of the Uravan Miner Belt see: http://mining.state.co.us/UraniumMininginColorado.pdf .
[59] The Colorado Department of Public Health and Environment (CDPHE) and the Division of Minerals and Geology, now known as the Colorado Division of Reclamation, Mining and Safety (DRMS), have entered into a contract whereby CDPHE allocated $852,360.00 from the Uravan Natural Resource Damage Fund for DRMS to reclaim and safeguard abandoned, historical mine areas to benefit terrestrial and water resources and optimize riparian habitat along the San Miguel River in Montrose County. This has involved moving some material out of the floodplain, backfilling some pits, and moving some waste rock back to a mine.  However, this activity is relatively small compared to the total number of abandoned mines.

BLM_0149520

mines remains one of the legacies of the several mining booms in this area over the last 100 years. This mining legacy unavoidably has an effect on the environmental character of the area.

As discussed earlier, there is convincing economic evidence that people care where they live and that they act on those preferences, making economic sacrifices to pursue locations that are attractive to them and expending effort and resources to escape or avoid locations that they perceive to be inferior or noxious. That, at the most basic level, is what "high rent" and "low rent" neighborhoods are all about. It would be economically shocking if this were not true. After all, subjective preferences for certain goods and services are what determine the economic demand that drives the commercial economy. Guided by their subjective preferences, people buy different "tasty" foods, different "stylish" clothes, different interior designs, different entertainment, different landscaping for their homes, different styles of cars or trucks, etc. It would be jarring and disturbing to economists and real estate professionals if they were to discover that people did not have preferences for the character and qualities of the place where they lived and raised their families and/or that those preferences did not affect their behavior when choosing a location and purchasing a home.

The empirical evidence is quite the contrary. Analysis of what home buyers and renters are willing to pay clearly indicates that they pay significantly more to reside where air quality is better, the threat of crime to person and property is lower, congestion and noise are lower, etc. They also are willing to pay to live closer to parks and other open space, better schools, lake and ocean sides, scenic vistas, etc.

Those same studies of people's willingness to pay to gain access to public amenities and avoid public disamenities have also documented the impact of noxious facilities or environmental risks on home values. Superfund sites, polluted surface and ground water, land fills, regular severe air pollution events, animal feedlots and processing facilities, airport landing lanes, high voltage power lines, heavily used railroads and highways, large industrial facilities, coal-fired and nuclear electric generators, to name just a dozen potentially "noxious" settings, tend to drive down property values.[60]

This is a common enough phenomenon that real estate professionals as well as economists talk about the "stigma" that comes to be attached to certain areas because of the perceived noxious or dangerous characteristics of a particular location. That "stigma" tends to discourage residential and business location, reducing the demand for and value of local property, and reducing local economic vitality. It is important to understand that this stigma is not necessarily tied to narrow, technical expert opinion

---

[60] For recent review articles summarizing this literature see: "A Meta-Analysis of the Effect of Environmental Contamination and Positive Amenities on Residential Real Estate Values, *Journal of Real Estate Research,* Robert A. Simons and Jesse D. Saginor, 2006;"The Impact of Superfund Sites on Local Property Values: Are All Sites the Same?, Katherine A. Kiel and Michael Williams, *Journal of Urban Economics*, 2007, 61:170-192; "The Effects of Environmental Contamination on Real Estate: A Literature Review," Thomas O Jackson, *Journal of Real Estate Literature,* 2001; Undesirable Facilities and Property Values: A Summary of Empirical Studies, Stephen Farber, *Ecological Economics,* 24(1998):1-14.

BLM_0149521

about environmental risks but to popular perceptions and judgments that emerge from the public dialogue about the negative qualities associated with a particular site.[61] That role of subjective judgments in motivating economic action, of course, is not unusual in a market economy. As pointed out above, buyers' subjective preferences are one of the primary forces behind economic demand in most markets.

### *The Potential "Stigma" Associated with Uranium Milling and Mining*

There are two characteristics of uranium mining and milling that could lead to a negative impact on the local economy. They are also the characteristics that led to costly uranium mill and mine cleanup efforts that began in the Uravan Mineral Belt area in the mid-1980s and continue today. First, only a very tiny percentage of the uranium ore, about 0.2 percent, is actually recoverable uranium. The vanadium concentration is higher, but only about one percent. This means that huge volumes of waste "tailings" are generated in the process of recovering the uranium and vanadium. Most of the radioactivity of the ore remains in those waste tailings. Second, the uranium ore itself is radioactive not just due to the presence of the uranium being sought but also associated with the radioactive decay of the other uranium isotopes and elements as uranium decays toward lead. The radioactive nature of uranium, of course, is why it is sought, to fuel both nuclear reactors generating electricity and nuclear weapons. That radioactivity is also the source of human health concerns.

Most of the mines supplying the proposed Piñon Ridge mill would be conventional underground mines. Although miners seek to remove only the uranium ore from the mine, the highly mechanized mining methods involve also removing rock with no or only non-commercial amounts of uranium. The rock without a high enough concentration of uranium for commercial milling is separated from the desired ore at the mine site. The remaining waste rock, which can be contaminated with radioactive materials and the precursors of acid mine drainage, is stored near the mine site indefinitely.

The remaining uranium ore, however, is also 98.8 percent waste material, which, after most of the uranium and vanadium have been removed, has to be stored at the mill site. These large volumes of waste have to be handled carefully because they remain toxic even after the uranium is removed. About 85 percent of the radioactivity of the ore remains after the uranium has been removed from it because uranium milling only seeks to remove one of the radioactive components of the ore, the uranium. The milling leaves other radioactive materials as well as a significant amount of uranium in the waste product.  The radioactive elements that make up the waste product are not just radioactive for a little while.  The half life of uranium 238 is 4.5 billion years, the half life of uranium 235 (the isotope that the mines and mills are after) is 700 million years, and the half life of radium is 1600 years.  As a result, once this material is dug from the

---

[61] See "Section III. Stigma," pp. 23-27 in Socioeconomic Analysis Receipt of Maywood Material: Cotter Corporation Milling Facility," RPI Consulting Inc., prepared for Fremont County, May 2003. Also see "Evaluating Environmental Stigma with Multiple Regression Analysis," Thomas O. Jackson, *The Appraisal Journal*, 2005; "Stigma and Value" Bill Mundy' *The Appraisal Journal*, 60(1) 1992,

BLM_0149522

ground and concentrated on the surface of the earth, it becomes a hazard to life for time scales that are very hard for humans to comprehend.  In addition, the tailings contain other toxic materials including heavy metals and the chemical solvents used to extract the uranium. That makes disposal of the tailings a serious toxic waste problem. [62]

It was the improper handling of these large volumes of waste rock at mine sites and the tailings and chemical reagents at the mill sites that created the costly toxic waste problems associated with previous uranium and vanadium booms. In the Uravan Mineral Belt, the obliteration of the town of Uravan in order to remediate the extensive radioactive pollution stands as a reminder of how severe the consequences can be of mishandling radioactive materials.

When they were first discovered, naturally radioactive materials were seen as benign curiosities, important scientific tools, materials used for illuminating clock and watch dials at night, and for hypothesized cures for various diseases. The health dangers associated with these radioactive materials were not widely recognized until well into the 20th century. Madame Curie, who won two Nobel prizes for her explanation of radioactivity and her discovery of radium and other new elements, died of what is now diagnosed as radiation poisoning. With the building of the first atomic bombs around a uranium core, the power and dangers of radioactive materials became well known. Civil defense training of the citizenry in preparation for nuclear warfare and health concerns over radioactive fall out from the testing of nuclear weapons in the atmosphere educated the public about the dangers of radioactive materials. Nuclear accidents, large and small, reinforced the health concerns associated with radioactivity.

The health consequences to miners associated with past uranium mining reinforces the perceived risk. As of the end of November 2010, the federal government had paid about $700 million to former uranium workers or their families for the diseases and deaths associated with their exposure to radiation during employment in uranium mines and mills and in hauling uranium ore.[63] These payments have been made under the Radiation Exposure Compensation Act (RECA) which provides compensation awards of up to $100,000 each to people who worked in the uranium industry between 1942 and 1971.[64] Unfortunately, uranium workers employed after 1971 are not eligible for such compensation benefits under that law.

---

[62]National Research Council. *Scientific Basis for Risk Assessment and Management of Uranium Mill Tailings.* Uranium Mill Tailings Study Panel, Board on Radioactive Waste Management, Commission on Physical Sciences, Mathematics and Resources, National Research Council. National Academy Press (Washington, DC), 1986; p. 10. U.S. Environmental Protection Agency. *Final Environmental Impact Statement for Standards for the Control of Byproduct Materials from Uranium Ore Processing (40 CFR 192).* EPA 520/1-83-008-1, September 1983, Volume I; p. 3-1. Tsivoglou EC, O'Connell RL. *Waste Guide for the Uranium Milling Industry.* U.S. Department of Health, Education and Welfare, Public Health Service, Robert A. Taft Sanitary Engineering Center (Cincinnati), Technical Report W62-12, 1962; p. 5.
[63]U.S. Department of Justice, Civil Division. Radiation Exposure Compensation System Claims to Date: Summary of Claims Received by 07/28/2008; All Claims.
(http://www.usdoj.gov/civil/omp/omi/Tre_SysClaimsToDateSum.pdf)
[64]U.S. Department of Justice. Radiation Exposure Compensation Program. About the Program.
(http://www.usdoj.gov/civil/torts/const/reca/about.htm)

BLM_0149523

These past health damages and expensive toxic waste cleanups are reminders that radioactive material that is not handled very carefully can do significant damage. As with other risks to our health that cannot be directly sensed (disease pathogens, poison gas, etc), radioactivity raises additional fears because of its "mysterious" or "insidious" nature.

Energy Fuels proposes to help "jump start" a revival of the uranium industry in the West End of Montrose County by building a uranium mill that will then make feasible (if the price of uranium is high enough) the revival of uranium mining in the region. The mill, within in economic hauling distance of the area's uranium mines, will allow the extraction of concentrated uranium oxide which is then economic to transport to enrichment plants across the nation. To the extent that Energy Fuels is successful in reviving the uranium industry in the west ends of Mesa, Montrose, and San Miguel Counties and making that region a uranium production zone some attention must be given to how that type of industrialization of these rural areas may affect other potential sources of economic vitality because of the perceived environmental risks associated with the uranium industry.

### Residents' and Potential Residents' Concerns about Radioactive Waste

In 2003 RPI Consulting of Durango, Colorado, was commissioned by Fremont County Commission to study the socioeconomic impacts of the proposal by Cotter Corporation to import, process, and store radioactive waste from outside of Colorado.[65] The waste would be stored at the Cotter Corporations uranium mill adjacent to Cañon City, CO. One of the concerns expressed by residents was that if this area became a national waste dump for radioactive material, that identification of the greater Cañon City area with nuclear waste would damage its economy, its growth potential, and property values.

As part of its analysis of whether this additional radioactive waste storage would "stigmatize" and damage the local and regional economy, RPI Consulting conducted a statewide survey of Coloradans to determine if and to what degree Colorado residents were concerned with radioactive materials. Interviewees were told that the radioactive materials would be stored in facilities that met state and federal environmental standards. Nevertheless, most respondents (91 percent) indicated that they were concerned about health risks and economic risks associated with living adjacent to radioactive waste storage. In addition, 58 percent of those residents questioned believed that there was some likelihood that the additional radioactive waste storage would lower property values. Also, 53 percent of residents were concerned that the environment would be damaged.[66]

---

[65] Socioeconomic Analysis Receipt of Maywood Material: Cotter Corporation Milling Facility," RPI Consulting Inc., prepared for Fremont County, May 2003.
[66] Ibid. Figure 15, p. 25.

61

When asked if the presence of stored radioactive materials in their county of residence would cause them to relocate, 58 percent of the Fremont County residents interviewed said that such relocation was not at all likely or not very likely. Statewide respondents appeared to be somewhat more adverse to radioactive materials. Only 42 percent reported that they were unlikely to move to another county; 56 percent said that they were very likely or somewhat likely to relocate. In Fremont County 40 percent of respondents said they were at least somewhat likely to move.[67]

The respondents also indicated that it was residing in close proximity to radioactive materials that most bothered them. While 55 percent said that they would be willing to reside 10 miles or more from the radioactive materials only 16 percent said that they were willing to live within a mile of those materials[68].

These responses by Colorado residents were similar to the results of economic analyses of people's reactions across the nation to noxious facilities. The strength of the aversion declines with distance from the facility. In addition, the impact on residential location is not so much due to residents relocating out of the area to avoid the perceived environmental and health risks but, rather, due to a decline in the likelihood of new residents in-migrating into the area. Depressing in-migration, one of the forces supporting economic vitality in our tri-county study region, could lead to a slowed or stagnant local economy.[69]

RPI Consultants also surveyed Fremont County real estate professionals about the past impact on property values of the presence of the Cotter uranium mill and its associated stored radioactive wastes before the proposal was made to begin storing out-of-state nuclear waste. About 60 percent said it had no impact or they weren't sure it had any impact. Another 16 percent thought the presence of the mill actually boosted property value, possibly because of the employment opportunities the mill provided. Only 9 percent said the mill had depressed property values. When asked about increasing the stored waste by accepting out of state waste, 57 percent said they thought that would lower property values while 29 percent said it would have no impact and 4 percent said it would boost property values slightly.[70]

RPI Consulting did *not* conclude that the Fremont County economy would be damaged by the expansion of radioactive waste storage at the Cotter mill. Rather RPI laid out what evidence there was that the expansion of the storage of radioactive materials might cause residents, potential residents, visitors, and businesses to react negatively to such a location. Economic decisions based on those negative reactions, such as avoiding the area, can reduce local economic vitality. RPI Consulting also pointed out that there was evidence from elsewhere in Colorado and around the nation that local economies can thrive despite the presence of radioactive materials in the area. That

---

[67] Ibid. Figure 16, p. 25.
[68] Ibid. Figure 17, p. 26.
[69] "The Association between Environmental Risk and Internal Migration Flows," Lori M. Hunter, *Population and Environment*, 1998.
[70] Op.cit. RPI Consulting, p. 37.

BLM_0149525

makes forecasting exactly what the impact of concentrations of radioactive materials at any particular location difficult. RPI Consulting tried to lay out the range of likely outcomes from near zero impacts to modest but significant local economic costs. The intention was to layout the possible range of risks associated with the proposal to become a national nuclear waste dump and compare that to the relatively modest potential commercial economic benefits associated with the proposed expanded storage so that citizens and decision makers could make a more informed decision.

Partially on the basis of this analysis of the risks and benefits to the local economy, the Fremont County Commissioners opposed Cotter Corporations proposal to import more nuclear waste and the State of Colorado denied Cotter the permits to do so.

Other jurisdictions in the West have also sought to analyze the impact that radioactive facilities may have on local economic vitality. The State of Nevada and City of Las Vegas have been concerned about the potential impact of the Yucca Mountain high-level radioactive waste repository proposed for a site about 90 miles from Las Vegas. The concern was with both the location of the storage site and the need to transport the nuclear wastes on public highways through Nevada's urban areas. Both those urban areas and the state of Nevada as a whole emphasized that their economies relied on recreation and entertainment and they funded a significant amount of research on the source and impact of environmental stigma. That research, too, documented the very negative mental image associated with radioactive materials and that this posed a risk that potential visitors, new residents, and business would make alternative location decisions that shifted economic activity away from Nevada and the Las Vegas area.[71]

In 2000 the Louis Berger Group, the consulting firm that prepared the socioeconomic impact study from Energy Fuels' proposed Piñon Ridge mill, did an "Assessment of Hazards of Transporting Spent Nuclear Fuel and High Level Radioactive Waste to the Proposed Yucca Mountain Repository Using the Proposed North Las Vegas Beltway" for the City of North Las Vegas. It concluded that the perceived environmental risks and stigma effects associated with radioactive materials would lead to much reduced commercial development in the area around the highway that would be carrying the nuclear waste. In particular, the Louis Berger Group projected very little office development in the area, an impact that could significantly slow the expansion of the area economy in the following decades. An earlier economic analysis in the southeastern United States had found that there was empirical evidence that residential property values were depressed near a highway that carried radioactive waste through the Charleston, SC, urban area.[72]

---

[71] 2000, State of Nevada Comments, Appendix I, Radioactivity, Stigma, and Socioeconomic Impacts: The Need for an Assessment of Impacts on Nevada's Principal Economic Sectors in the U.S. Department of Energy's Yucca Mountain Draft Environmental Impact Statement.

[72] Interestingly, that study did not find depressed property value in the rural areas through which the nuclear materials were hauled.  "Nuclear Waste Transportation and Residential Property Values: Estimating the Effects of Transient Perceived Risks," Kishore Gawande and Hank Jenkins-Smith, *Journal of Environmental Economic and Management*, 42(2):207-233, September 2001.

BLM_0149526

The U.S. Department of Energy, which was charged with building the Yucca Mountain waste storage facility, disputed Nevada's and Las Vegas' views of the risks to the sate and local economies. The Department of Energy argued that because the Yucca Mountain site was 90 miles away from Las Vegas, there would be little sigma because the negative impacts of noxious facilities decline significantly with distance. Unless there were a serious accident at the storage site or a series of smaller accidents in the process of transporting nuclear wastes to it, the Department of Energy did not believe people living in distant urban centers would be concerned enough about the nuclear waste facility to behave in ways that would reduce property values, discourage tourism, or otherwise damage the economy.[73]

This response by the proponent of a radioactive facility and its associated radioactive activity is typical of the frustration that technical experts feel when confronted by what, in their minds, is an uninformed, almost hysterical, response by the public to a proposal that they believe is objectively much less dangerous than the public assumes. That, however, is the economic reality when it comes to environmental stigma. What matters is the subjective judgment that local residents and businesses actual make about the perceived risks and how those subjective judgments affect their economic behavior. To the extent that economic behavior is driven by subjective judgments that experts believe to be wrong, the economic losses will nonetheless be real. Public relations campaigns can seek to change people's minds, but, as with all economic transactions, individual preferences and judgments drive the outcomes in market economies. To the extent that people are worried about radioactive materials moving through their communities or worry about a low probability but possibly high impact accident, they may behave in ways that reduce property values and local economic vitality. We *know* that is the case. People seek to avoid living in proximity to a broad variety of activities that create what they judge to be nuisances or hazards.

In the west ends of Mesa, Montrose, and San Miguel Counties, it is likely that many residents, because they are familiar with uranium mining and milling may have positive or neutral attitudes towards a revival of that industry. That is, to many existing (especially long-term) residents, there may be little or no stigma. In the study of the impact of transporting nuclear wastes on property values in South Carolina, no impact was found along the rural sections of the highway, only on the urban sections. The analysts speculated that rural residents are more familiar with environmental and other risks and expect to be able to safely balance these risks and benefits themselves. Some of the media stories that have been written recently about how residents in the West End of Montrose County have responded to the proposed Piñon Ridge uranium mill suggest that this might be true in the Paradox Valley although there are also reports that interest in purchasing property in the west end of the Valley near the town of Paradox

---

[73] "Are Fear and Stigmatization Likely, and How Do They Matter? Lessons from Research on the Likelihood of Adverse Socioeconomic Impacts from Public Perceptions of the Yucca Mountain Repository," Robert O'Connor, Jason Technologies Corporation, September 8, 2001, Appendix N to Final Environmental Impact Statement for a Geologic Repository for the Disposal of Spent Nuclear Fuel and High-Level Radioactive Waste at Yucca Mountain, DOE/EIS 0250.

BLM_0149527

has cooled since the proposal to revive the uranium industry in the area have become public .[74]

This attitude on the part of long-time residents, however, does not eliminate the possibility that in turning back to uranium, the region could be foreclosing more stable and sustainable economic alternatives. "More of the same" or "a return to the past" are rarely good economic development strategies. Economies are more dynamic and complex than that. A broader overview needs to be taken of just how revived uranium mining and milling fit into an overall sustainable economic development policy for the region.

To the extent that the existing economic vitality in Mesa, Montrose, and San Miguel Counties is at least partially tied to what has been labeled amenity-supported local economic development built around the ongoing in-migration to an area perceived to provide high quality living environments, it is important to examine the possibility that a revived uranium industry would undermine that existing source of economic vitality. Recall that all three of our study area counties have seen significant population growth primarily supported by the net in-migration of new residents. Between 1990 and 2009 net in-migration added about 50 percent to each of these counties' populations. For Montrose and Mesa Counties more than 80 percent of the growth was due to net in-migration. For San Miguel over 60 percent of population growth was the result of net in-migration. About 70,000 new residents moved into the region during this time period. Just as attractive characteristics of an area can draw new residents and businesses, noxious characteristics can do the opposite: repel potential residents and businesses.

### Dealing with Uncertainty

Although we *know* that people generally avoid noxious and/or dangerous location when they choose their place of residence, we do not know exactly how potential residents, visitors, and new businesses will evaluate the presence of a revived uranium industry in the Uravan Mineral Belt counties. This uncertainty is not unusual when developing public policy. When a tax is imposed or cut, when zoning or environmental regulations are adopted or modified, when investments are made in schools, roads, and parks, when the police or firefighting force is expanded or contracted, etc. we also cannot be certain exactly what the impact will be on the economy. Sometimes we are not certain even what the direction of the impact will be. Despite that uncertainty, we still have to make informed judgments as to how to proceed. The same is true of the impacts associated with a revived uranium industry centered on the proposed uranium mill in the West End of Montrose County. We do not really know exactly what the conventional employment, income, and fiscal impacts will be since we do not know where the workers will come from or where the miners' families, the mines, and the mill will spend their income. We also do not know how stable a revived uranium industry will be and

---

[74] "The Uranium Widows," Peter Hessler, **The New Yorker**, September 13, 2010, p. 30; "Colorado's New Uranium Boom in Paradox, Stephen Allen, **Denver Environmental News Examiner**, May 12, 2010; "The Half-Life of Belonging," Jen Jackson, **Inside/Outside Southwest** magazine;

BLM_0149528

how long the jobs, incomes, and tax revenues will last before the next bust hits and how long that bust will last. Finally, we do not know how large the negative "stigma" impacts will be on the amenity-supported economic vitality the tri-county area as enjoyed over the last two decades.

Of course, it is not just governments who have to make decisions despite the uncertainty that surrounds the future. Businesses have to do it every day and many small businesses regularly fail. Most of the major life decisions individuals have to make are also embedded in uncertainty: where to go to college, what job to take, where to live, when and who to marry, etc. We rarely make decisions in a context of certainty about outcomes.

A public decision has to be made about the proposed Piñon Ridge uranium mill and its associated uranium mines. Careful decision making would weigh as carefully as possible all of the potential positives and negatives, benefits and costs, associated with the proposed mill. Looking at the relative size and likelihood of the expected jobs, income, tax revenues and public expenditures, do those positive features more than justify the downside risks associated with additional radioactive waste and pollution problems and the impact of that on the other sources of economic vitality in the region: amenity in-migrants including new small businesses and the visitor economy. The past and expected future instability of the uranium industry and its expected impact on the reliability and duration of the positive economic impacts also has to be considered.

We turn to this latter topic next.

## 6. The Instability in the Uranium Industry and Its Implications for Uranium-Dependent Communities

### *The Historical Experience in Western Colorado*

Between 1930 and 1960 the population of the West End of Montrose County quadrupled as both uranium and vanadium mining and milling expanded to meet the needs of World War II and the Cold War weapons programs. That thirty year growth pattern was followed by a 30 year contraction once the uranium price supports justified by national security interests began to be dismantled during the 1960s and the uranium industry was largely left to market forces. That steep decline in population was interrupted by a revival of uranium mining for civilian nuclear power in the 1970s but the loss of population continued with the uranium bust of the 1980s. See Figure 16.

A similar pattern of population gain and loss took place in southwestern Mesa County and western San Miguel County. The dramatic decline in real earnings in the metal mining industry, which in our tri-county study area is dominated by uranium, confirms the shock to these rural areas. Over 90 percent of that $82 million metal mining payroll in 1979 was lost by 2000. Most of it was lost in the six-year period, 1979-1985. This was

BLM_0149529

not the first time the region had been disrupted by a decline in the uranium industry. Mining payroll and regional population also plummeted in the 1960s as the industry adjusted to a market setting. See Figure 17.

**Figure 16**

Population of the West End of Montrose County: 1930-2000



67

BLM_0149530

**Figure 17**



Real Metal Mining Payroll in Colorado Uravan Mineral Belt Counties

## Instability Across the Metal Mining Industries

It was not only uranium ore mining and processing that suffered major reverses in the early 1980s, and it was not only in western Colorado. Copper mining and smelting also largely collapsed in New Mexico, Arizona, Montana, Utah, and Michigan. The iron mining industry of Minnesota and Michigan also largely shut down.

Nationwide almost 60 percent of metal mining jobs, including uranium mining jobs, were lost between 1981 and 2000, a loss of over 65,000 jobs. In Colorado 5 out of 6 metal mining jobs were lost during the same period, a loss of over 10,000 jobs. See Figure 18. By the early 2000s, the copper mining job losses in the United States had neared 80 percent, or 30,000 jobs. In addition, many metal smelters and refineries shut down, laying off many thousands more metal workers.  As with uranium, after 2003 metal prices rebounded only to plummet again in 2009. Unlike uranium, during 2010 some metal prices rebounded dramatically as did some metal mining production. This is not shown in Figure 18 because the federal government no longer reports metal mining at the state and local level as a specific sub-category of mining.

The reason for discussing the declines in uranium, copper and iron mining at the same time is to underline the fact that there were international economic forces operating between 1980 and 2000 that affected metal mining nationwide, not just uranium mining

BLM_0149531

and not just in western Colorado. As the United States' economy was increasingly integrated into the world economy, American mining and manufacturing faced increased competition from production around the world that brought metal prices down, rendering many American operations uneconomic.

**Figure 18**

**Colorado and United States Metal Mining Employment**



This is a familiar pattern in metal mining. High commodity prices bring new mines and additional production on line around the globe. The resulting increase in supply then puts downward pressure on metal prices, undermining the viability of the higher cost operations that are forced to shut down. That reduction in supply helps absorb the excess production and prices stabilize. As the world economy expands, demand for metals grows and metal prices begin to rise, again stimulating actions that expand supply. This cycle tends to be regularly repeated

That price and production pattern can be seen in the expansion and then dramatic contraction in uranium production in the United States and Colorado in the 1970s and 1980s. As uranium prices rose, so did production until supply exceeded demand and uranium prices plummeted as did uranium production after a lag of a couple of years.. See Figure 19

69

BLM_0149532

**Figure 19**

**Uranium Prices and Production: 1972-1992**



It is the volatility of metal prices that leads to instability in employment and payroll in the metal mining and processing industry. It is important to keep that in mind in evaluating the current price for uranium along with many other metal prices including copper. If uranium prices are adjusted for inflation (i.e. converted to "real" prices), current uranium prices are not unprecedented. They were as high or higher in the 1970s at the time of the last uranium boom in western Colorado, just before the bust of the 1980s. Figure 20 contrasts such "real," inflation-adjusted prices with the actual ("nominal") prices.  Also note the continued volatility in uranium prices: They fell 70 percent from their mid-2007 peak of $138 per pound to $40 per pound in May 2010. By November 2010 uranium prices were approaching $60 per pound.

Also note that the real price of uranium was above $50 per pound (real) for only seven years in the boom of the late seventies and early eighties. In the most recent fly up in uranium prices, the price was above $50 for only about two years before falling to around $40. In early December 2010 it was again above $50.

Energy Fuels projects its economic impacts by assuming that its proposed mill and associated mines will operate uninterrupted for 40 years, possibly shifting from 500 tons per day to 1,000 tons per day. There is no uranium mine or mill in the United States that has performed with such sustained stability. Economic projections based on such

70

BLM_0149533

assumptions are fantasies that do not lay the basis for reasonable socioeconomic analysis.

**Figure 20**

**Uranium Spot Market Prices: Annual Average, Nominal and Real**



Because federal regulation and subsidies controlled uranium production between 1940 and the mid-1960s and releases from US and Russian government stockpiles has affected market supply since the end of the Cold War, it could be argued that the uranium price and production swings were not primarily due to market forces but to government policy. However, if we look at other metal prices, we see similar wide fluctuation in market prices. Figure 21 shows over a century of real copper price fluctuations. Note that the recent peak copper prices are not historical peaks in real terms. Similar peaks were seen in the 1950s and 1970s as well as in the early 20th century. Also note that copper prices regularly fell dramatically after reaching those peak values. For instance, between 1914 and 1916 real copper prices rose 97 percent followed by a 73 percent decline between 1916 and 1921 that wiped all of the gains and then some. Between 1949 and 1956 copper prices rose by 89 percent followed by a 40 percent decline between 1956 and 1958, almost carrying copper prices back to their previous level. High prices were rarely sustained for more than a few years in this international commodity market.

71

BLM_0149534

**Figure 21**

**Changes in Real Copper Prices 1900-2008**



Source: US Geological Survey: Copper Statistics

## Shortages of Uranium and Future Higher Prices?

Because there is not an organized uranium market in which uranium is bought and sold in a relatively transparent manner, there is less information available and more uncertainty than, for example, in gold or copper markets. Most uranium transactions involve private bilateral deals. In addition, government decisions control a significant part of the overall supply of nuclear materials. Private consulting firms estimate both spot market and average long-term contract prices. This private price estimation adds to the uncertainty and makes the uranium market particularly susceptible to speculative swings in apparent prices.[75]

From a longer run point of view (the next 10 to 20 years), there was no reason to believe that uranium prices will remain as high as they were in mid-2007.  There is no shortage of known uranium ore deposits around the world. The World Nuclear Association, a global nuclear energy advocacy group, estimated in 2010 that world's present resources could serve existing demand for uranium from conventional nuclear

---

[75] UxC Consulting publishes the UxC Weekly and TradeTech publishes The Nuclear Market Review.

72

BLM_0149535

reactors for about 80 years. It commented that "This represents a higher level of assured resources than is normal for most minerals."[76] The 2010 Uranium Red Book estimated that there are sufficient identified conventional uranium reserves to meet current usage rate for 100 years. If other, less certain, uranium reserves are included in the count, hundreds of years of supply are projected to be available. [77] For the shorter term, through the coming decade, Denison Mines, owner of the Blanding Uranium Mill, in its presentation to its stockholders at its 2010 annual meeting, cited the Uranium Market Outlook of Ux Consulting Company showing adequate supply to meet demand through at least 2018.[78] That projection, however, assumes a significant decline in the availability of unconventional sources of uranium, limited development of new supply sources, and an ambitious nuclear construction programs around the world.

Technological advances in nuclear reactor design could considerably expand that effective supply by increasing the efficiency with which energy is extracted from the nuclear fuel. Currently only a small fraction of the total energy contained in uranium fuel is used.[79] The rest remains in the highly radioactive waste materials that have been so difficult to disposed of.

Uranium production companies *do* forecast future shortages and uranium price increases over the next decade or two. These forecasts are tied to predictions of a dramatic shift towards nuclear electric generation around the world. Denison Mines, for instance, in its May 2010 presentation to its stockholders at its General Annual Meeting forecast 54 new nuclear reactors under construction, 148 additional reactors planned, and 342 reactors proposed by governments or energy companies. That would represent a 124 percent increase in the number of nuclear-fuel electric generators in the next decade or so. Denison projects this substantial increase in nuclear generation because of the economic growth taking place, especially in the developing world, and pressure to reduce the use of coal in order to cut greenhouse gas as well as other emissions. It is not clear, however, that the economics of electric generation favor massive investments in nuclear generation. The nuclear option remains the most costly conventional source of electricity. The economic alternative to coal-fired generation in North America and other regions around the world is the use of natural gas in place of coal. Estimates of natural gas reserves have increased dramatically in recent year and the price of natural gas in North American has fallen considerably. Without substantial government subsidies, it is not clear the nuclear alternative for generating electricity would be chosen.

---

[76] http://www.world-nuclear.org/info/inf75.html accessed November 15, 2010.
[77] *Uranium 2009: Resources, Production and Demand*, a joint report of the OECD Nuclear Energy Agency and the International Atomic Energy Agency. http://www.nea.fr/press/2010/2010-03.html
[78] Slide17,
http://www.denisonmines.com/SiteResources/data/MediaArchive/pdfs/investor_presentations/agm_may_6_2010_web.pdf .
[79] This "new generation" of nuclear reactors faces serious problems, however. Their fuel cycle increases the opportunity to divert weapons-grade material and aggravate nuclear weapons proliferation problems. In addition, these reactors have faced a variety of technical difficulties that have made their operation unreliable.

BLM_0149536

In 2009 the US was the source of only 2.8 percent of worldwide uranium oxide production.. Of this small United States contribution, none came from Colorado operations that year. Kazakhstan was the source of about 28 percent of world production, Canada 20 percent, and Australia 16 percent. Namibia, Russia, Niger, and Uzbekistan each were the source of between 5 and 10 percent of total world production.[80]   The known recoverable uranium resources estimated in 2009 were distributed somewhat differently than actual production that year. However, even on that basis, the United States had only 4 percent of total known uranium resources while South Africa and Brazil would be added to the list of significant producers, each with about 5 percent of the known uranium resources.[81]

The United States' reasonably assured uranium resources, however, are mostly (about 80 percent) in the more costly range, costing between $36 and $59 per pound while almost all of the Australian and most of the Canadian and Kazakhstani resources are available at less that $36 per pound. Of the countries with significant uranium resources, only Namibia is in a worse cost situation than the United States.[82]

This array of countries, many of which are low cost developing countries, indicate the array of competitors Colorado uranium producers must face and beat on the basis of cost to be competitive. It is important to note that many of these lower cost countries are planning major expansions: Kazakhstan, Saskatchewan (Cigar Lake), Australia (Olympic Dam), among many other planned expansions which collectively are projected to meet reactor demand through 2030.[83]

As mentioned above, Denison Mines Corporation is the owner of the only operating conventional uranium mill in the United States (as of November 2010), the White Mesa mill outside of Blanding, Utah. In its presentation at its Annual General Meeting with stockholders in April 2009, Denison pointed out that its costs of mining and milling uranium surpassed the then spot price of uranium. The spot price was $44 per pound while Denison's cost of mining and milling in the United States was almost $66 per pound and its costs in Canada were about $55.[84] It is important to keep in mind that Denison's White Mesa mill was built 30 years ago. The Sunday uranium mines in San Miguel County, which Denison owns and partially supplies its Blanding mill, date back to the 1950s and have operated under Colorado permit since 1978. Despite having this uranium milling and mining infrastructure already in place, Denison still faces costs in excess of recent uranium prices and ceased both mining and milling convention ore

---

[80] Data published by UxCo and presented in Denison Mines' 2010 Annual General Meeting, slide 15, http://www.denisonmines.com/SiteResources/data/MediaArchive/pdfs/investor_presentations/agm_may_6_2010_web.pdf .
[81] World Nuclear Association, http://www.world-nuclear.org/info/inf75.html .
[82] Ibid. Based on IAEA estimates.
[83] 2010 Uranium Red Book (Uranium 2009: Resources, Production and Demand—A Joint Report by the OECD Nuclear Energy Agency and the International Atomic Energy Agency)
[84] Slide 22
http://www.denisonmines.com/SiteResources/data/MediaArchive/pdfs/investor_presentations/agm_apr_30_09_web.pdf

BLM_0149537

feed stock until March 2010.[85] Energy Fuels, on the other hand, faces the cost of building its proposed Pinon Ridge mill as well as paying for its recent development of the mines intended to supply it. Energy Fuels will need to do this when uranium costs from other sources, such as Denison's Canadian operations, and *in situ* uranium operations in the United States are lower.

Furthermore, extensive uranium supplies also exist in such "secondary" sources as the highly enriched uranium in surplus nuclear warheads, "tails" from uranium enrichment processes, and government and commercial inventories.[86] The World Nuclear Association (WNA) reported that 45 percent of the uranium consumed in the world in 2005 came from such secondary sources. While current policies and laws of the U.S. restrict the volume of uranium that can be released from government stockpiles or "blended" with weapons-grade uranium to make reactor fuel, changes in such government policies could free up substantial quantities of uranium to offset or replace the need for new mining in the US and abroad.[87] In fact, it has been the use of those "politically controlled" secondary sources of uranium that have kept the price of uranium so low that most uranium mines in the United States could not operate during the 1990s. These secondary sources will continue to impact the viability of new uranium mines in the United States for the foreseeable future.[88]

### *Implications of Uranium Mining Instability for Local Communities*

Uranium mining, like other metal mining, tends to be an unstable industry prone to booms and busts.  Colorado's Uravan Mineral Belt knows this well since it has lived through several mining booms and busts and the metal mining industry elsewhere in Colorado and across the West has also had the same experience with other metal mining. The most recent fly up and then decline in uranium prices confirms the volatility of the uranium industry and the impact of that volatility on employment, income, and tax

---

[85] Denison has been investing in the White Mesa Mill. It spent $31 million on mill modernization and improvements in its tailings cells in 2008. Ibid slide 28.

[86]"Military Warheads as a Source of Nuclear Fuel", WNA, October 2009,  http://www.world-nuclear.org/info/inf13.html ; "Processing of Used Nuclear Fuel," October 2010, http://www.world-nuclear.org/info/inf69.html ; http://www.world-nuclear.org/info/inf75.html; "Secondary Supplies: Future Friend or Foe," James C. Cornell, World Nuclear Association 2005 Symposium http://213.198.118.156/sym/authidx.htm .

[87]Ibid. As with any nuclear technology, including uranium extraction and enrichment, down-blending presents a risk of nuclear proliferation.
[88] The New York Times reported in November 2009 that the United States was negotiating another agreement  to continue diluting Russia's highly enriched uranium after the expiration of the current agreement, using some or all of the material from warheads that the nations have agreed to take out of their arsenals. http://www.nytimes.com/2009/11/10/business/energy-environment/10nukes.html?_r=1&hp Even if the new START Treaty is not ratified, the uranium resources in the weapons grade material that could, and in the long run almost certainly will, be converted to reactor fuel serves as an available supply that can easily come into the market.

BLM_0149538

revenues. The temporarily high prices brought conventional uranium mills back into production in western Colorado and provided conventional feedstock to local uranium mills. Those high prices also spawned Energy Fuels' Piñon Ridge mill proposal. The dramatic drop in price that soon followed also led those mining operations to shut down, newly developed mines not to start up, and one of the mills to cease operations.

Mining industry instability makes the potential employment, payrolls, royalties, and taxes associated with uranium mining uncertain and risky. Colorado's Uravan Mineral Belt will be competing with other areas in the United States, including *in situ* operations, and around the world to expand uranium mining and milling to take advantage of uranium prices the developers hope will go significantly higher and stay high. Given the relatively low quality and high cost associated with the Uravan and other conventional American uranium supplies, it may well be that the Uravan supplies will be uneconomic as countries with larger and lower-cost supplies, such as Australia, Kazakhstan, and Canada bring large increments of supply on line. In addition to the production from existing and new mines, large amounts of uranium from secondary sources could be released to the market if currently restrictive government policies are eased. The rush in the United States and around the world to expand production from existing and new mines as well as secondary sources when uranium prices are high will have the effect of putting downward pressure on uranium prices as supplies increase.

In previous studies of the economies of mining towns and regions, I have found that despite the great wealth that is extracted and the relatively high wages paid to workers, mining rarely makes mining towns prosperous places, primarily because of the economic instability associated with mining.[89] In addition, the labor needs of mining operations are continually declining as new labor-saving technologies are deployed. Miners and their families, businesses that serve them, and governments that provide infrastructure and services do not know how long the jobs and payroll will last. As a result, everyone is cautious about making investments in homes, businesses, and public infrastructure because they do not know when the next big layoff will come.  It should not be surprising, then, that mining, milling, and smelter towns tend to have higher unemployment rates, lower average incomes, and slower rates of growth in jobs and aggregate real income. Mining, in general, does not support sustained local economic vitality. That is the "economic anomaly" of mining.[90]

This too represents a significant social cost that has to be weighed against the economic benefits of mining. When communities become specialized in metal mining, they go through severe cycles of economic expansion followed by economic collapse that severely stresses families and tends to tear the social fabric of communities as

---

[89]***Lost Landscapes and Failed Economies: The Search for a Value of Place***, Island Press, Washington DC, 1995.
[90] See the author's "The Economic Anomaly of Mining—Great Wealth, High Wages, Declining Communities," in Chapter 3 of ***Mining in New Mexico: The Environment, Water, Economics, and Sustainable Development***, L.Greer Price, et al., editors. New Mexico Bureau of Geology and Mineral Resources, New Mexico Institute of Mining and Technology, 2005. Also the author's ***Lost Landscapes and Failed Economies: The Search for a Value of Place***, 1996, Island Press, Washington, DC.

BLM_0149539

workers have to commute out to work or they and their families have to move away.[91] The ongoing decline in labor demand can strand substantial local government infrastructure as well as private commercial infrastructure as the population declines. Mining communities come to be dominated by abandoned businesses and buildings and take on a run-down appearance. The massive damage to the surrounding landscape associated with extracting very low grade ores and disposing of the waste also discourages the in-migration of people and businesses not associated with mining. The result is ongoing local economic decline despite the high wages paid to miners and the huge amounts of wealth extracted.[92]

To the extent that Colorado's Uravan Mineral Belt counties join the rush to rebuild a uranium industry infrastructure, it may well ride the economically and socially disruptive uranium roller coaster once again with similar results. Such mineral industry roller coaster rides do not bring sustained economic vitality.

---

[91]For a recent review of this literature see William R. Freudenburg and Lisa J. Wilson, 2002. "Mining the Data: Analyzing the Economic Implications of Mining for Nonmetropolitan Regions," *Sociological Inquiry,* 72(4):549-75. See, also, Richard S. Krannich and A.E. Luloff, 2992, "Problems of Resource Dependency in U.S. Rural Communities, *Progress in Rural Policy and Planning* 1:5-18; Nancy L. Peluso, Craig R. Humphrey, and Louise P. Fortmann, 1994, "The Rock, the Beach, and the Tidal Pool: People and Poverty in Natural Resource-Dependent Areas," *Society and Natural Resources* 7(1):23-38; Lisa J. Wilson, 2001, *Riding the Resource Roller Coaster: A Comparison of Socioeconomic Well-Being in Two Midwestern Metal-Mining Communities*, Ph.D. dissertation, Department of Sociology, University of Wisconsin, Madison, WI.
[92] Power, T. P. Chapters 4 and 5 of *Lost Landscapes and Failed Economies: The Search for a Value of Place*, Island Press, Washington, D.C., 1996.

BLM_0149540

# Bibliography

Alexander, R, *Hamrick: Cotter plans to proceed with 2014 target*, Canon City Daily Record, August 28, 2010, http://www.canoncitydailyrecord.com/Top-Story.asp?ID=14507

Allen, S, *Colorado's New Uranium Boom in Paradox*, Denver Environmental News Examiner, May 12, 2010

Berger Group, *Socioeconomic Baseline and Impact Analysis for the Proposed Piñon Ridge Uranium Mill*, report prepared for Energy Fuels, November 2009

Borts, H, *Economic Growth in a Free Market*, New York: Columbia University Press, 1964

Colorado Division of Local Government, *Economic Base Analysis-Parameters*, https://dola.colorado.gov/demog_webapps/eba_parameters.jsf, Accessed November 2, 2010. For documentation of this Colorado approach see: https://dola.colorado.gov/dlg/demog/leifadocumentation.html

Colorado Division of Reclamation, Mining, and Safety, *Uranium Mining in Colorado*, 2010  http://mining.state.co.us/UraniumMininginColorado.pdf

Colorado Geologic Survey, *History of Uranium Prospecting and Mining in Colorado—a Story of Boom and Bust*, Rocktalk 9(2), p. 4, Fall 2006, http://geosurvey.state.co.us/portals/0/rtv9n2%20LR-web.pdf .

Dean Runyan, *The Economic Impact of Travel on Colorado 1996-2009p*, prepared for Colorado Tourist Office, June 2010 http://www.deanrunyan.com/doc_library/COImp.pdf

Denison Mines, *2009 Annual General Meeting of Shareholders*, accessed 11-17-2010 http://www.denisonmines.com/SiteResources/data/MediaArchive/pdfs/investor_presentations/agm_apr_30_09_web.pdf

Denison Mines, *Annual General Meeting of Shareholders*, 5-6-2010 http://www.denisonmines.com/SiteResources/data/MediaArchive/pdfs/investor_presentations/agm_may_6_2010_web.pdf

Edge Environmental Inc., *Piñon Ridge Project Environmental Report*, prepared for Energy Fuels Resources Corporation, November 2009, http://www.co.montrose.co.us/DocumentView.aspx?DID=857

Edge Environmental Inc., *Piñon Ridge Project Environmental Report-Appendix A- U.S. Regulatory History of Uranium Mills*, prepared for Energy Fuels Resources Corporation, November 2009,

BLM_0149541

Energy Fuels, *Energy Fuels Provides Project Update and Corporate Status Review,* website viewed 11-16-2010, http://www.energyfuels.com/news/2010/index.html

Energy Fuels, *Piñon Ridge Mill,* website, viewed 11-3-2010, http://www.energyfuels.com/projects/pinon-ridge/index.html

Farber, S, *Undesirable Facilities and Property Values: A Summary of Empirical Studies,* Ecological Economics, 24 p.1-14, 1998

Freudenburg, W, *Mining the Data: Analyzing the Economic Implications of Mining for Nonmetropolitan Regions,* Sociological Inquiry, 72(4):549-75, 2002

Gwande, K. *Nuclear Waste Transportation and Residential Property Values: Estimating the Effects of Transient Perceived Risks,* Journal of Environmental Economic and Management, 42(2):207-233, September 2001

Harmon, T, *Cotter Uranium Mill cleanup completed,* Pueblo Chieftan, August 20th, 2009, http://www.chieftain.com/news/local/article_1323cd57-b3f0-5151-8d75-5c554d85d5e4.html

Hessler, P, *The Uranium Widows,* The New Yorker, p. 30, September 13, 2010

Hunter, I, *The Association between Environmental Risk and Internal Migration Flows,* Population and Environment, Vol 19(3) p. 247-277, 1998

Jackson, J, *The Half-Life of Belonging,* Inside/Outside Southwest magazine, December 2009

Jackson, T, *Evaluating Environmental Stigma with Multiple Regression Analysis,* The Appraisal Journal, 2005

Jackson, T, The *Effects of Environmental Contamination on Real Estate: A Literature Review,* Journal of Real Estate Literature, 2001

Kiel, K, *The Impact of Superfund Sites on Local Property Values: Are All Sites the Same?,* Journal of Urban Economics, 61:170-192, 2007

Kramer, A, *Power for U.S. From Russia's Old Nuclear Weapons,* New York Times, 11-9-2009, http://www.nytimes.com/2009/11/10/business/energy-environment/10nukes.html?_r=1&hp

Krannich, R, *Problems of Resource Dependency in U.S. Rural Communities,* Progress in Rural Policy and Planning 1:5-18, 1994

BLM_0149542

Motica, JE, *Geology and uranium-vanadium deposits In the Uravan mineral belt, southwestern Colorado, Ore Deposits of the United States, 1933-1967*, In Ore Deposits of the United States 1933-1967, vol. I, 1968

Mundy, B, *Stigma and Value*, The Appraisal Journal, 60(1) 1992

National Research Council. *Scientific Basis for Risk Assessment and Management of Uranium Mill Tailings. Uranium Mill Tailings Study Panel, Board on Radioactive Waste Management, Commission on Physical Sciences, Mathematics and Resources*, National Academy Press (Washington, DC),p. 10, 1986

Nuclear Energy Agency, *Uranium 2009: Resources, Production and Demand, a joint report of the OECD Nuclear Energy Agency and the International Atomic Energy Agency*, accessed 11-17-2010 http://www.nea.fr/press/2010/2010-03.html

O'Connor , R, *Are Fear and Stigmatization Likely, and How Do They Matter? Lessons from Research on the Likelihood of Adverse Socioeconomic Impacts from Public Perceptions of the Yucca Mountain Repository*, *Appendix N to Final Environmental Impact Statement for a Geologic Repository for the Disposal of Spent Nuclear Fuel and High-Level Radioactive Waste at Yucca Mountain*, September 8, 2001, DOE/EIS 0250

Power, T, *Lost Landscapes and Failed Economies: The Search for a Value of Place*, 1996, Island Press, Washington, DC

Power, T, *Post Cowboy Economics: Pay and Prosperity in the New American West*, Island Press, Spring 2000

Price, G, *The Economic Anomaly of Mining—Great Wealth, High Wages, Declining Communities*, in Chapter 3 of Mining in New Mexico: The Environment, Water, Economics, and Sustainable Development New Mexico Bureau of Geology and Mineral Resources, New Mexico Institute of Mining and Technology, 2005

Robertson, G, *A Test of the Economic Base Hypothesis in the Small Forest Communities of Southeast Alaska, U.S. Department of Agriculture*, Forest Service, Pacific Northwest  Research Station, General Technical Report, PNW-GTR-592, December 2003. http://www.fs.fed.us/pnw/pubs/pnw_gtr592.pdf

RPI Consulting Inc., *Socioeconomic Analysis Receipt of Maywood Material: Cotter Corporation Milling Facility*, prepared for Fremont County, May 2003

Simons, R, *A Meta-Analysis of the Effect of Environmental Contamination and Positive Amenities on Residential Real Estate Values*, Journal of Real Estate Research, 2006

Southern Rockies Conservation Alliance, *Uranium Mining Claims in South West Colorado*, produced for the Center for Native Ecosystems.

BLM_0149543

Staff, W, *Energy Fuels Acquires San Miguel County Uranium Lease,* The Watch, October 21, 2010, http://www.telluridewatch.com/view/full_story/10002092/article-Energy-Fuels-Acquires-San-Miguel-County-Uranium-Lease?instance=secondary_story_left_column

State of Nevada Comments, *Appendix I, Radioactivity, Stigma, and Socioeconomic Impacts: The Need for an Assessment of Impacts on Nevada's Principal Economic Sectors in the U.S. Department of Energy's Yucca Mountain Draft Environmental Impact Statement*, 2000

Stine, P, *A Perfect Getaway*, *Grand Junction Sentinel*, September 3, 2010,

Tiebout, Charles, *A Pure Theory of Local Expenditures*, Journal of Political Economy, 64(2):160-164, 1956

Tsivoglou, C, *Waste Guide for the Uranium Milling Industry*, U.S. Department of Health, Education and Welfare, Public Health Service Engineering Center (Cincinnati), Technical Report W62-12, p. 5, 1962

Ullman, E, *Amenities As a Factor in Regional Growth*, Geographic Review, 44(1):119-132, 1954

U.S. Census Bureau, *2000 Census of Population*

U.S. Census Bureau*, 2000 Census of Population*, Colorado, Table HCT-5, Tenure by Age of Householder by Year Structure, Summary File 3

U.S. Census Bureau, 2000 *Census of Population*, Colorado, Table H5, Vacancy Status, and H1, Housing Units, Summary File 1

U.S. Department of Agriculture, *Rural Development Perspectives on the rural West*, Economic Research Service, 14(2), August 1999

U.S. Department of Agriculture, Technically *Enhanced Naturally Occurring Radioactive Materials From Mining - Volume 1: Mining and Reclamation Background*, Economic Research Service, County Typolog, Retirement Destination Counties, http://www.ers.usda.gov/Data/TypologyCodes/

U.S. Department of Commerce, *BEA, REIS data base* http://www.bea.gov/regional/spi/default.cfm?selTable=SA25N&selSeries=NAICS

U.S. Department of Justice, Civil Division, *Radiation Exposure Compensation System Claims to Date: Summary of Claims*, 07-28-2008 http://www.usdoj.gov/civil/omp/omi/Tre_SysClaimsToDateSum.pdf

BLM_0149544

U.S. Department of Justice, Radiation Exposure Compensation Program. *About the Program*, accessed 11-17-2010
http://www.usdoj.gov/civil/torts/const/reca/about.htm

U.S. Energy Information Administration, *U.S. Uranium Mine Production and Number of Mines and Sources*, July 15, 2010,
http://www.eia.doe.gov/cneaf/nuclear/dupr/umine.html

U.S. Energy Information Administration, *Uranium Mill Sites Under the UMTRA Project*,
http://www.eia.doe.gov/cneaf/nuclear/page/umtra/title1sum.html

U.S. Environmental Protection Agency, *Cleanup of historic Uravan uranium mill completed*, 9-29-2008
http://yosemite.epa.gov/opa/admpress.nsf/3ee0a48cce87f7ca85257359003f533d/de3216b095602308852574d3006e8c12!OpenDocument

U.S. Environmental Protection Agency, *Final Environmental Impact Statement for Standards for the Control of Byproduct Materials from Uranium Ore Processing (40 CFR192)*. EPA 520/1-83-008-1, Volume I; p. 3-1, September 1983

UxCo, *Denison Mines 2010 Annual General Meeting*, slide 15, accessed 11-17-2010
http://www.denisonmines.com/SiteResources/data/MediaArchive/pdfs/investor_presentations/agm_may_6_2010_web.pdf

UxC, *The UxC Weekly and TradeTech publishes The Nuclear Market Review*

Vader, M, *Whirlwind Uranium Mine Temporarily Closed*, Grand Junction Free Press, December 10, 2008,
http://www.gjfreepress.com/article/20081210/COMMUNITY_NEWS/812099952

Wilson, J, *Riding the Resource Roller Coaster: A Comparison of Socioeconomic Well-Being in Two Midwestern Metal-Mining Communities*, Ph.D. dissertation, Department of Sociology, University of Wisconsin, Madison, WI., 2001

Wilson, L, *The Rock, the Beach, and the Tidal Pool: People and Poverty in Natural Resource-Dependent Areas*, Society and Natural Resources 7(1):23-38, 2001

World Nuclear Association, *Military Warheads as a Source of Nuclear Fuel*, October 2009, http://www.world-nuclear.org/info/inf13.html

World Nuclear Association, *Processing of Used Nuclear Fuel*, October 2010,
http://www.world-nuclear.org/info/inf69.html

World Nuclear Association, *Secondary Supplies: Future Friend or Foe*, James C. Cornell, World Nuclear Association 2005 Symposium, http://www.world-nuclear.org/info/inf75.html

BLM_0149545

World Nuclear Association, *Supply of Uranium*, accessed 11-15-2010, http://www.world-nuclear.org/info/inf75.html

BLM_0149546



CONTACT:

PHIL HANCEFORD
ASSOCIATE ATTORNEY
(303) 650-5818, Ext. 122
phil_hanceford@tws.org

**THE WILDERNESS SOCIETY**
BLM ACTION CENTER

## RECOMMENDED RISK ASSESSMENT AND MANAGEMENT APPROACH FOR ADDRESSING CLIMATE CHANGE IN BLM LAND USE PLANNING

In order to comply with its legal obligations, the BLM should adopt the following approaches to both risk assessment and risk management in connection with climate change as part of land use planning processes. [1]

### I. RISK ASSESSMENT: A RECOMMENDED APPROACH

**We strongly recommend that the agency use the following "risk assessment" strategy when evaluating impacts to the planning area under NEPA and relevant guidance.**

Efforts to manage risk begin with a risk assessment, which characterizes risk in terms of vulnerability, exposure, and uncertainty, or, as Bartell (1998) has written, an inquiry into "What can go wrong?" and "How likely is it to happen?" To these questions, Bartell adds a third, "So what if it does?" as a gauge to determine if action is needed to address the risk. Bartell's rendering is intended to frame the topic of formal, quantitative risk assessment, but the framework applies to less formal assessments of vulnerability, exposure, and uncertainty, as well.

**Assessing Vulnerability**
The vulnerability of ecosystems and the species and physical elements they comprise depends on their inherent qualities and their ability to change or adapt to address new climatic conditions. A system may be considered vulnerable if it is sensitive to the effects of climate change and has limited ability to adjust to those effects. For example, the rocky intertidal ecosystem may be highly sensitive to the effect of rising sea level (and the inundation of the intertidal zone) but less vulnerable if its species are capable of colonizing new habitat created by the rising seas (i.e., high sensitivity, high adaptive capacity). Conversely, a mountain stream community that is dependent on cold summer water from a melting glacier may be very vulnerable once the glacier has melted away, despite the ability of its constituent species to move great distances (i.e., high sensitivity, low adaptive capacity).

Vulnerability of component species can be affected by the tolerance of individual organisms to the direct effects of climate change, the ability of populations to adapt to those conditions through the expression of genetic variability, and the ability to adjust behaviorally to changes in the ecosystem, such as prey shifts. For example, dandelions (*Taraxacum officinale*), which occupy a broad range of climatic conditions despite possessing essentially no genetic variability in the species, would not seem to be inherently sensitive to climate, whereas pikas (*Ochotona princeps*), which live only in the narrow alpine zone of western mountains, may be highly sensitive (Holtcamp 2010). Some species that are able to move easily may be able to adapt well to climate change even if they are inherently sensitive, provided that they can find the conditions they need to live, and others may be able to remain in place, if the

---

[1] This approach is a truncated version from a larger research paper developed by The Wilderness Society during the scoping period for the Forest planning revision in the Sierra Nevada entitled "Managing the Risk of Climate Change to Wildlands of the Sierra Nevada" (2010). This broader paper illustrates the concepts we describe in this document and can be found at: http://wilderness.org/content/managing-risk-climate-change-wildlands-sierra-nevada.

BLM_0149547

population can produce offspring that are adapted to the new conditions. Pollen records indicate that some species have been able to survive dramatic changes in climate in a given place, even though the individuals making up the current population may themselves be quite sensitive. A vulnerability assessment would examine the species and physical elements of existing wildland ecosystems and determine which elements are sensitive, which have the ability to adapt, and what the likely consequences would be of anticipated changes in climate.

Because ecosystems are so complex, it is impossible to evaluate the vulnerabilities of every population, species, community, or other element of the system in question. Instead, risk assessment must focus on particular, high-priority elements or "key vulnerabilities." In its 4th Assessment Report, the IPCC (Schneider et al. 2007) suggested the following criteria for identifying key vulnerabilities:

- magnitude of impacts,
- timing of impacts,
- persistence and irreversibility of impacts,
- likelihood of impacts and vulnerabilities,
- potential for adaptation,
- distributional aspects of impacts and vulnerabilities,
- importance of the system(s) at risk.

In other words, key vulnerabilities are likely to occur where the effects of climate change are large and intense, imminent, long-lasting, highly probable, and likely to limit the distribution of highly valued systems or system elements.

The IPCC uses their criteria to select key vulnerabilities across a broad array of systems: infrastructure, health, markets, agriculture, migration and conflict, as well as biological and geophysical systems. Focusing their thinking only on wildland systems, Running and Mills (2009) suggest that the most vulnerable elements of ecosystems are those that are 1) rare; 2) long-lived (with fewer generations in which to evolve); 3) isolated; 4) dependent on special habitats (especially those directly affected by climate, such as deep snow and ephemeral wetlands); and 5) susceptible to the kinds of disturbances likely to result from climate change (fire, floods, extreme drought). In addition to these "highly vulnerable" species, they recommend focusing on a) species with "a high public profile;" b) "data-rich" species; and c) "strongly interacting" species (keystone and dominant species). Species with a high profile are those that are appreciated for their strong contribution to ecosystems services, providing utilitarian, recreational, and aesthetic value. "Data rich" species provide the information necessary to devise potential conservation strategies, and "strongly interacting" species, by definition, control ecosystem function. Running and Mills apply their criteria specifically to species, but similar considerations may apply to features, such as glaciers, rare soils, riparian vegetation, and old growth forests. A vulnerability assessment should explicitly examine species and other ecosystem elements that meet these criteria and explore the factors that make them vulnerable.

***Recommendation***: The BLM should evaluate the planning area for key vulnerabilities according to the criteria above, and the nature of the climate threat to selected ecosystem elements should be fully examined and presented as part of the plan revision process in order to comply with its legal obligations under NEPA and other relevant laws and regulations. Such an assessment should include careful consideration of species and habitats of conservation concern.

**Assessing Exposure**
The assessment of exposure to climate change requires both the examination of the probability and timing of future climate change and the likely changes to which ecosystem elements may be vulnerable.

BLM_0149548

Changes in average temperature and precipitation are important first-order effects to which many species are sensitive, but there are many other effects that constitute exposure. As mentioned, melting glaciers may cause an increase in summer stream temperature. Increased droughts may stress plants and animals, and early onset of spring is already increasing exposure to fire activity (Westerling et al. 2006). More subtle changes are also expected. Plants may be exposed to pollinator shortages, and species range shifts may turn native species into invasive species. A risk assessment should examine the probability of exposure to these and other likely effects.

Assessing exposure probability involves combining information about likely climate change and its effects. Possible climate change can be assessed using predictive models that can be run under a variety of future scenarios. The results of these climate models can then be linked to other models to explore effects on future vegetation, fire regimes, hydrology, etc. (Lenihan et al. 2006). Where models agree with each other and produce similar results under multiple scenarios, the results can be viewed with a high degree of confidence. Where models produce a range of behaviors, prediction is less robust. In general, as the spatial resolution of models increases through the process of "statistical downscaling," agreement, and hence confidence, decreases. Millar et al. (2007) note, "We might feel confident of broad-scale future environmental changes (such as global mean temperature increases), but we cannot routinely predict even the direction of change at local and regional scales (such as increasing or decreasing precipitation)." Nevertheless, models can be used to explore possibilities, "game different scenarios, and gain qualitative insight on the range and direction of possible future changes without committing to them as forecasts" (Millar et al. 2007).

In addition to examining the probability of various changes in climate, an assessment of exposure should examine the consequences of those changes and where they are likely to occur in space and time. For example, sea-level rise is a highly likely and potentially devastating consequence of climate change but one that is limited in extent to coastlines. Increased fire activity is also to be expected, but exposure is likely to be of greater concern near homes than away from them. An exposure assessment should examine where the threat of increased fire activity is likely to be most acute, including how that threat will change with growth of the "wildland-urban interface." Potential future effects are many, and precise quantification of probabilities may be beyond the limits of existing tools and budgets. In these cases, future possibilities can be explored through "scenario planning," in which groups of analysts or stakeholders consider a broad range of possible consequences of climate change (Welling 2008).

**_Recommendation_**: A risk assessment conducted as part of the plan revision should identify the direct and indirect modes of exposure to climate change and attempt to quantify them based on the best available science as required by NEPA and other laws and regulations.

**Assessing Uncertainty**

Because assessing the risks associated with climate change involves predicting future conditions, it is no surprise that it is fraught with uncertainty. Limitations in predictive ability derive not only from uncertainty about future conditions but from limitations of our understanding of current and historical conditions and the factors that drive ecosystem behavior. Table 1 lists only a few of the many sources of uncertainty that plague the assessment of risk from climate change. Each of these sources contributes to risk, and the better they are understood, the more complete the assessment of risk.

The sources in Table 1 are not an exhaustive list but only illustrate the range of unanswered questions. As vulnerabilities and exposure are assessed, many more uncertainties will be revealed. It is critically important that these uncertainties be explicitly documented and incorporated into the risk assessment so that strategies can be developed to reduce uncertainty in the plan.

BLM_0149549

| Table 1. Sources of uncertainty in understanding future climate change and its effects | |
|---|---|
| Data limitations | ◆ Poor records of past climate surfaces <br> ◆ Poor records of species occurrences |
| Limitations in ecological knowledge | ◆ Habitat/range models ("climate envelopes") <br> ◆ Limited understanding of species response to climate change <br> ◆ Mortality rates and thresholds of mortality and recruitment <br> ◆ Dispersal <br> ◆ Species interactions <br> ◆ Behavior of novel ecosystems <br> ◆ Effects of interacting stressors |
| Model limitations and variability | ◆ Limited understanding of the climate system <br> ◆ Intermodel variation in model output <br> ◆ Intramodel variation in model output <br> ◆ Downscaling coarse resolution global output to generate higher resolution future climate (especially in topographically diverse terrain) |
| Vagaries of human behavior | ◆ Future emissions scenarios <br> ◆ Institutional resources <br> ◆ Public support <br> ◆ Planning horizon <br> ◆ Shifting decision processes and loci |

Under such an indeterminate future, assessing vulnerability and exposure will be especially difficult, placing added importance on the identification and reduction of uncertainty in land management plans.

**_Recommendation_**: Pursuant to NEPA, BLM should identify and document known sources of uncertainty and data needs and initiate action to fill those gaps at the earliest possible point in the RMP revision process. Where data gaps remain, the plan should include strategies to reduce uncertainties.

## II.   MANAGING THE RISK OF CLIMATE CHANGE: A RECOMMENDED APPROACH

**We strongly recommend that the agency use the following "risk management" strategy in conjunction with the "risk assessment" strategy laid out above when developing management prescriptions in the face of climate change.**

Adaptation is the management of risk to reduce the adverse effects of climate change on ecosystem services received from wildlands. Actions that reduce the vulnerability to, exposure to, and uncertainty

BLM_0149550

of climate change impacts contribute to adaptation. Each of these aspects of risk can be managed to reduce the negative consequences of climate change to wildlands.

Unfortunately, which techniques will be most effective remains to be determined. Learning will require an experimental approach, tailored as appropriate to the specific lands on which they are applied. Silviculture and other intensive management actions will not be appropriate in lands designated to protect wilderness character, but they may be tested on less-restrictive parts of the landscape. The important thing is that these methods are approached experimentally, with monitoring to facilitate rapid learning (Lawler et al. 2010). Finally, the diversity of administrative designations present in most landscapes can themselves provide a framework for experimentation that can accelerate discovery of approaches to climate change adaptation.

**Reducing Vulnerability**
Depending on which ecosystem elements are identified as "key vulnerabilities" in the risk assessment, a variety of options are available to decrease vulnerability by reducing the sensitivity to climate change or by enhancing adaptive capacity. One of the simplest and most direct ways to reduce sensitivity is to address the stressors in addition to climate change that make species and ecosystems vulnerable to climate change. Reducing these anthropogenic stressors has been called the "low-hanging fruit" of climate change adaptation (Joyce 2009) and includes increasing the size and number of protected reserves, restoring altered disturbance regimes, halting and repairing the loss and fragmentation of habitat, managing invasive species, cleaning up air and water pollution, and addressing the legacy of past management. According to Galatowitsch et al. (2009), "Key resilience actions include providing buffers for small reserves, expanding reserves that lack adequate environmental heterogeneity, prioritizing protection of likely climate refuges, and managing forests for multi-species and multi-aged stands."

In addition to reducing susceptibility, actions can be taken to enhance the capacity of species and ecosystem elements to remain viable in the face of climate change. Enhancing adaptive capacity consists of actions to facilitate or improve the ability of species (usually) to respond favorably to climate change. The following are several examples of strategies to enhance adaptive capacity derived from the burgeoning literature of "adaptation options" (Noss 2001, Millar et al. 2007, Joyce et al. 2008, Biringer 2003, CNRA 2009, Glick et al. 2009, Running and Mills 2009).

♦ *Promote connected landscapes.* Restoring and maintaining habitat connectivity provides species with the "room to roam" they need to respond to a changing climate. Without connected habitat, species may not be able to disperse to new locations exhibiting a favorable climate. Providing corridors and habitat connectivity facilitates the innate capacity to disperse in response to climate change.

♦ *Facilitate migration.* Where movement in response to climate change is blocked by habitat fragmentation or where species lack the dispersal ability to "keep up with" a changing climate, species can be physically moved across barriers. Of course, such decisions must be weighed extremely carefully to avoid the well-known consequences of the arrival of invasive species into novel habitats. McLachlan et al. (2007) offer guidelines for consideration of assisted migration.

♦ *Provide opportunities for rapid evolution.* The ability of species to adapt to new climates is enhanced where new genotypes are frequently exposed to new conditions. Restoration of disturbance regimes, such as fire, that provide for frequent opportunities for expression of genetic variability can accelerate the process of adaptation.

♦ *Maintain genetic diversity.* Running and Mills (2009) note, "Contemporary adaptive evolution is facilitated by a medium level of gene flow," suggesting that adaptation may be aided better in the short run by moving genes, rather than species. Maintaining habitat and dispersal

BLM_0149551

connectivity among subpopulations will ensure continued opportunities for interbreeding and cross-pollination and help maintain adaptive capacity in populations. Also, guidelines for replanting following timber harvest currently require seedlings to be derived from local seed sources. Expanding the range from which seedlings are derived could help introduce new, better-adapted genotypes into the population.

♦ *Promote species diversity.* At the community or ecosystem level, adaptation and the maintenance of ecosystem services is well served by maintaining a rich diversity of species. Different species possess different thresholds of response to climate change. The loss of an individual species due to climate change will have a less dramatic effect on an ecosystem if other species are present that can fill at least part of that species' niche.

♦ *Manage for "asynchrony".* Populations are more vulnerable when all the individuals are in the same demographic stage. The current mountain pine beetle epidemic exemplifies the consequences of a synchronous population, in this case due to the establishment of a single cohort of lodgepole pine throughout the West following widespread mining and fires in the late 19th century. Restoring disturbance regimes can help maintain a heterogeneous landscape with multiple age classes and help reduce vulnerability to climate change.

♦ *Enhance seed banks and ex situ conservation.* Owing to the unpredictability of the consequences of climate change, it is not too early to consider enhancing and expanding seed banks and other "off site" conservation efforts. Climate change may lead to localized extinctions, especially of isolated populations, and, in these cases, enhancing adaptive capacity will depend on the artificial reintroduction of stock maintained elsewhere.

♦ *Allow establishment of "neo-native" ecosystems.* The species that exist today have generally been around far longer than the ecosystems they currently compose, often in locales outside of their current range where the climate was historically suitable. As the climate changes, species can be expected to reoccupy their former range where suitable. Also, where species are to be introduced for purposes other than biodiversity conservation (e.g., timber plantations, pastures), review of the paleoecological record may provide insights into where species may thrive in their historically "native" range under an altered climate. Ecosystems so established may be considered "neo-native" in that they would consist of native species in their historical range, though in combinations that may not currently exist.

**Recommendation**: BLM has a legal duty to prevent permanent impairment and unnecessary or undue degradation to the resources, and to manage the resources for the long-term needs of future generations. This obligation requires the agency to reduce the vulnerability of the ecosystem to the very real threats posed by climate change. BLM can comply with this duty by adopting several or all of the strategies listed above, depending on the ecological composition and land tenure of the area.

**Reducing Exposure**

As with vulnerability, the climate adaptation literature indicates several options to manage risk by reducing exposure. Most important, but least directly affected by management, is mitigation of greenhouse gas emissions themselves. More under managers' control is the exposure to the effects, both direct and indirect, of climate change. Last, managers can identify and protect those places that are least likely to be affected by climate change, so called "climate refugia."

*Mitigation.* While the vast majority of emission reduction must be accomplished in the energy sector, there are several actions that wildland managers can take to prevent unnecessary release of greenhouse gases to the atmosphere. One of the easiest sources to control is the conversion of old growth to young forest. It is well established that when older forest is harvested and regenerated to younger forest, a net

BLM_0149552

release of carbon dioxide results from the decomposition of coarse and fine debris and soil organic matter that occurs in the warm post-harvest environment (Harmon et al. 1990).

*Reducing exposure to the effects of climate change.* While it is clear that forest management can affect exposure through its influence on greenhouse gas emissions, it is also clear that climate change has become inevitable, and risk management must focus on reducing exposure to its effects. One of the most likely of these effects is drought, due to more rapid melting of snowpack and increased evapotranspiration – even if precipitation does not change (National Research Council 2008). Increased drought will result in lower levels of summer streamflow and warmer water temperatures, with potentially devastating effects on aquatic ecosystems and impacts on the ability of ecosystems to provide water for human use. In addition to drought, extreme flood events are likely to increase as a result of rain-on-snow events where they have not occurred historically. To address these effects, actions will need to be taken to build up the buffering capacity of watersheds and restore riparian ecosystems degraded by grazing, water diversion, and channeling. The U.S. Climate Change Science Program offers a number of adaptation options for managers of Wild and Scenic Rivers that can be applied as well wherever riparian ecosystems are exposed to the effects of climate change (*See,* Palmer et al. 2008).

Among the emerging strategies to buffer the effects of climate change is to restore the water retaining capacity of river systems. Opperman et al. (2009) argue for actively reconnecting rivers to their floodplains. Similarly, Running and Mills (2009) suggest in some cases it may be helpful to construct "pico-dams" in headwater streams, tiny impoundments intended to retain runoff and maintain late-season flows. Such a strategy may be implemented through the restoration of wet meadows that were drained to facilitate livestock grazing and other uses. In any case, actions such as fish stocking or impoundment should be done to sustain ecosystem integrity and functionality, not simply to enhance sport fishing or manage water supply. Closing and rehabilitating roads can also restore subsurface flow and slow the delivery of runoff to channels.

*Climate Refugia.* In some cases, it may be possible to avoid exposure to many of the effects of climate change by identifying and protecting those places where climate is unlikely to change. Noss (2001) notes that refugia from past unfavorable climates harbored much of the genetic and species diversity from which extant populations and communities derive and are important objects of conservation for the diversity they still harbor. Similarly, we can expect some places to be less prone to change in the future, and these places will be important to protect for their potential to harbor diversity in the face of regional climate change. For example, Noss cites the case of talus slopes in Iowa that occur in cold-air drainages below ice-filled caves that now support dozens of vascular plant species that are disjunct from boreal forests to the north and west and at least eight landsnail taxa that were previously thought to have gone extinct at the end of the Pleistocene. As downscaled climate models continue to improve, it may be possible to use them to identify places that will be less exposed to climate change and can be protected for their conservation value (Loarie et al. 2009), though much work remains to determine the appropriate size, configuration, etc., for such refugia.

**<u>Recommendation</u>**:  BLM has a legal duty to prevent permanent impairment and unnecessary or undue degradation to the resources, and to manage the resources for the long-term needs of future generations. This obligation requires the agency to reduce exposure of the ecosystem to the very real threats posed by climate change.  BLM can comply with this duty by adopting several or all of the options listed above, depending on the ecological composition and land tenure of the area.

**Reducing Uncertainty**

BLM_0149553

Uncertainty appears as an obstacle to climate change adaptation in virtually every treatment of the subject; reducing uncertainty may therefore be considered critical to progress in managing risk from climate change. Much uncertainty derives from insufficient knowledge of current conditions and management effects and may be reduced simply through increased emphasis on *monitoring*. Reducing uncertainty about the nature of ecological and social systems and their future behavior requires investment in *research*. Learning can be greatly accelerated by the process of *adaptive management* that combines aspects of both research and monitoring to reduce uncertainty. Where knowledge of the future is especially high and control over the consequences of climate change is low, *scenario planning* may be used to prepare for possible outcomes, thus reducing uncertainty and anxiety over how to respond.

*Monitoring*. A major impediment to the reduction of uncertainty regarding future impacts of climate change is simply a lack of knowledge of current baseline conditions and the ability to detect change in the future. The U.S. Climate Change Science Program (Kareiva et al. 2008) identifies establishing baseline conditions and monitoring as key elements of impact assessment necessary to support adaptation. In their review of the climate change adaptation literature, Glick et al. (2009) identify increased monitoring as one of five general principles of adaptation. Monitoring is needed not only to detect the effects of climate change but to assess the success of adaptation actions.

*Research*. Many of the uncertainties associated with climate change can only be addressed through formal research, and research will continue to be essential to climate change adaptation. Accomplishment of much of this research will require cooperation with the agencies managing the land. Reduction of future uncertainty can be greatly accelerated if the managing agencies work closely with scientists to facilitate, advise, and assist in climate change research. If it has not done so already, BLM should invite broad participation from DOI's Landscape Conservation Cooperatives and Regional Science Centers throughout the RMP amendment.

*Adaptive management*. When aspects of monitoring and research are combined into an approach to management that is explicitly intended to accelerate learning, it is called "adaptive management." According to Innes et al. (2009), "adaptive management can be viewed as a systematic process for continually improving management policies and practices by monitoring and then learning from the outcomes of operational programmes. Within the context of climate change,...adaptive forest management is one tool that could enable managers to adjust the structure and the consequent functioning of the forest ecosystem to resist harmful impacts of climate change, and to utilize the opportunities created by climate change." (p.137). Typically, adaptive management follows a continuous cycle of planning, implementation, monitoring and evaluation (DeLuca et al. in press).

Adaptive management is sometimes described as either "passive", when management is modified simply as a result of observing the consequences of past action, or "active", when management actions are designed explicitly as an experiment to test competing hypotheses (Kareiva et al. 2008). Whatever the case, monitoring is essential to the process of evaluation and modification. Experience has also shown that adaptive management functions best when it involves the public in the identification of the hypotheses to be tested, in the design of the monitoring strategy, and in the implementation of the monitoring program (Bliss et al. 2001, Innes et al 2009). So important is stakeholder involvement to the development of the "social license" necessary for management action that "the entire concept has been renamed adaptive collaborative management or adaptive co-management" (Innes et al. 2009).  In the end, BLM must apply the lessons learned from monitoring and research to amend their decision path as necessary.

BLM_0149554

*Scenario planning.* When uncertainty is high and the "controllability" of the outcome is low, there may be little that managers can do to design management strategies "to resist harmful impacts of climate change" as referred to above (Innes et al. 2009). In these cases, uncertainty, or at least anxiety over the uncertainty of climate change, can be reduced by scenario planning. Scenario planning is (usually) a qualitative process "that involves exploration and articulation of a wide set of possible or alternative futures" (Baron et al. 2008). Scenarios are plausible stories or narratives describing what might happen under an uncertain future. Their development can be aided by quantitative data or models, but the idea is to explore a range of possible futures, rather than try to predict a single "most likely" case. When developed in the context of broad stakeholder participation, they can increase understanding of key uncertainties, facilitate the incorporation of alternative perspectives into planning, and improve the capacity for adaptive management (Welling 2008).

**<u>Recommendation</u>**:  Reducing uncertainty of baseline conditions and the impacts of management in the face of climate change should be a major priority of any risk management strategy set forth by the agency to reduce the risk posed by climate change. BLM should build in robust research, monitoring, adaptive management, and scenario planning into the land use plan in order to address this challenging aspect of risk management.

## References

Baron, J.S., C.D. Allen, E. Fleishman, L. Gunderson, D. McKenzie, L. Meyerson, J. Oropeza and N. Stephenson. National Parks. Pages 85-120 in S. Herrod Julius and J. M. West (eds.), Preliminary Review of Adaptation Options for Climate-Sensitive Ecosystems and Resources. Final Report, Synthesis and Assessment Product 4.4. U.S. Climate Change Science Program, U.S. Environmental Protection Agency, Washington, DC.

Bartell, S.M. 1998. Ecology, environmental impact statements, and ecological risk assessment: a brief historical perspective. Human and Ecological Risk Assessment 4:843-851.

Biringer, J. 2003. Forest ecosystems threatened by climate change: promoting long-term forest resilience. Pages 43-71 in Hansen, L.J., J.L. Biringer and J.R. Hoffman (eds.), Buying time: a user's manual for building resistance and resilience to climate change in natural systems. World Wildlife Fund, Washington, DC. http://assets.panda.org/downloads/buyingtime.pdf (visited November 26, 2009).

Bliss, J., G. Aplet, C. Hartzell, P. Harwood, P. Jahnige, D. Kittredge, S. Lewandowski, and M.L. Soscia. 2001. Community-based ecosystem monitoring. Journal of Sustainable Forestry 12:143-167.

Boyd, J.W., and H.S. Banzhaf. 2005. Ecosystem services and government accountability: the need for a new way of judging nature's value. Resources Magazine. Summer:16-19.

Braat, L.a.B., P. ten, Bakkes, J., Bolt, K., Braeuer, I., ten Brink, B., Chiabai, A., Ding, H., Gerdes, H., Jeuken, M., Kettunen, M., Kirchholtes, U., Klok, C., Markandya, Al, Nunes, P., Oorschot, M. Van, Peralta-Bezerra, N., Rayment, M., Travisi, C., Walpole, M. 2008. The Cost of Policy Inaction: The case of not meeting the 2010 biodiversity target. Brussels: European Commission.

CNRA. 2009. 2009 California Climate Adaptation Strategy Discussion Draft: A Report to the Governor of the State of California in Response to Executive Order S-13-2008 (Public Review Draft). California Natural Resources Agency, Sacramento, CA.

BLM_0149555

DeLuca, T.H., G.H. Aplet, B. Wilmer, and J. Burchfield. The Unknown Trajectory of Forest Restoration: A Call for Ecosystem Monitoring. Journal of Forestry (in press).

Esposito, V., S.R. Phillips, R. Boumans, A. Moulert, and J. Boggs. 2009. Climate change and ecosystem services: the contribution of and impacts on federal public lands in the United States. Presented at Ninth World Wilderness Congress, Merida, Mexico, November 6-13.

Fischlin, A., G.F. Midgley, J.T. Price, R. Leemans, B. Gopal, C. Turley, M.D.A. Rounsevell, O.P. Dube, J. Tarazona, A.A. Velichko, 2007: Ecosystems, their properties, goods, and services. Climate Change 2007: Impacts, Adaptation and Vulnerability. Pages 211-272 in Parry, M.L., O.F. Canziani, J.P. Palutikof, P.J. van der Linden and C.E. Hanson (eds.), Contribution of Working Group II to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change, Cambridge University Press, Cambridge.

Galatowitsch, S., L. Frelich, and L. Phillips-Mao. 2009. Regional climate change adaptation strategies for biodiversity conservation in a midcontinental region of North America. Biological Conservation 142:2012-2022.

Glick, P., A. Staudt and B. Stein. 2009. A new era for conservation: review of climate change adaptation literature. National Wildlife Federation, Washington, DC.

Harmon, M.E., W.K. Ferrell, and J.F. Franklin. 1990. Effects on carbon storage of conversion of old-growth forests to young forests. Science 247:699:702.

Holtcamp, W. 2010. Silence of the pikas. Bioscience 60:8-12.
Holton, G.A. 2004. Defining risk. Financial Analysts Journal 60(6):19-25.

Innes, J., L.A. Joyce, S. Kellomäki, L. Louman, A. Ogden, J. Parrotta and I. Thompson. 2009. Management for adaptation. Pages 135-185 in R. Seppälä, A Buck and P. Katila (eds.), Adaptation of forests and people to climate change – a global assessment report. IUFRO World Series Volume 22. International Union of Forest Research Organizations (IUFRO), Vienna, Austria.

IPCC. 2007. Climate Change 2007: Synthesis Report, Contribution of Working Groups I, II and III to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change, Pachauri, R.K. and Reisinger, A. (Eds.). Geneva, Switzerland. (http://www.ipcc.ch/publications_and_data/publications_ipcc_fourth_assessment_report_synthesis_report.htm)

IUCN. 2008. Guidelines for applying protected area management categories: final draft of revised guidelines. IUCN, Gland, Switzerland.

Joyce, L.A, G.M. Blate, J.S. Littell, S.G. McNulty, C.I. Millar, S.C. Moser, R.P. Neilson, K.A. O'Halloran, D.L. Peterson. National Forests. Pages 19-84 in S. Herrod Julius and J. M. West (eds.), Preliminary Review of Adaptation Options for Climate-Sensitive Ecosystems and Resources. Final Report, Synthesis and Assessment Product 4.4. U.S. Climate Change Science Program, U.S. Environmental Protection Agency, Washington, DC.

BLM_0149556

Joyce, L. 2009. Forests. In Adaptation 2009: Safeguarding Fish, Wildlife and Natural Systems in the Face of Climate Change. Conference Summary Report. National Council for Science and the Environment, Washington, DC.

Kareiva, P., C. Enquist, A. Johnson, S.H. Julius, J. Lawler, B. Petersen, L. Pitelka, R. Shaw, and J.M. West. 2008. Synthesis and conclusions. Pages 9-1 to 9-66 in Julius, S.H., J.M. West (eds.), Preliminary review of adaptation options for climate-sensitive ecosystems and resources. A Report by the U.S. Climate Change Science Program and the Subcommittee on Global Change Research. U.S. Environmental Protection Agency, Washington, DC.

Lawler, J.J., T.H. Tear, C Pyke, M.R. Shaw, P. Gonzalez, P. Kareiva, L. Hansen, L. Hannah, K. Klausmeyer, A. Aldous, C. Bienz, and S. Pearsall. 2010. Resource management in a changing and uncertain climate. Frontiers in Ecology and the Environment 8(1):35-43.

Lenihan, J.M., D. Bachelet, R. Drapek and R.P. Neilson. 2006. The response of vegetation distribution, ecosystem productivity, and fire in California to future climate scenarios simulated by the MC1 dynamic vegetation model. California Climate Change Center CEC-500-2005-191-SF.

Loarie, S.R., P.B. Duffy, H. Hamilton, G.P. Asner, C.B. Field, and D.D. Ackerly. 2009. The velocity of climate change. Nature 462:1052-1055.

McLachlan, J.S., J.J. Hellman and M.W. Schwartz. 2007. A framework for debate of assisted migration in an era of climate change. Conservation Biology 21:297-302.

Millar, C.I., N.L. Stephenson and S.L. Stephens. 2007. Climate change and forests of the future: managing in the face of uncertainty. Ecological Applications 17:2145-2151.

National Research Council. 2008. Ecological impacts of climate change: free executive summary. National Research Council, Committee on Ecological Impacts of Climate Change. National Academy of Sciences. (available at: http://www.nap.edu/catalog.php?record_id=12491)

Noss, R.F. 2001. Beyond Kyoto: Forest management in a time of rapid climate change. Conservation Biology 15:578-590.

Opperman, J.J., G.E. Galloway, J. Fargione, J.F. Mount, B.D. Richter, S. Secchi. Sustainable floodplains through large-scale reconnection to rivers. Science 326:1487-1488.

Palmer, M.A., D. Lettenmeier, N.L. Poff, S. Postel, B. Richter and R. Warner. 2008. Wild and Scenic Rivers. Pages 177-214 in Julius, S.H., J.M. West (eds.), Preliminary Review of Adaptation Options for Climate-Sensitive Ecosystems and Resources. Final Report, Synthesis and Assessment Product 4.4. U.S. Climate Change Science Program, U.S. Environmental Protection Agency, Washington, DC.

Parry, M.L., O.F. Canziani, J.P. Palutikof and co-authors. 2007. Technical Summary Climate Change 2007: Impacts, Adaptation and Vulnerability. Pages 23-78 in Parry, M.L., O.F. Canziani, J.P. Palutikof, P.J. van der Linden and C.E. Hanson (eds.), Contribution of Working Group II to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change, Cambridge University Press, Cambridge, UK.

Running, S.W. and L.S. Mills. 2009. Terrestrial Ecosystem Adaptation. Resources for the Future, Washington, DC.

BLM_0149557

Schneider, S.H., S. Semenov, A. Patwardhan, I. Burton, C.H.D. Magadza, M. Oppenheimer, A.B. Pittock, A. Rahman, J.B. Smith, A. Suarez and F. Yamin. 2007. Assessing key vulnerabilities and the risk from climate change. Chapter 19 in Climate Change 2007: Impacts, Adaptation and Vulnerability. Contribution of Working Group II to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change, M.L. Parry, O.F. Canziani, J.P. Palutikof, P.J. van der Linden and C.E. Hanson, Eds., Cambridge University Press, Cambridge, UK, 779-810.

Welling, L. 2008. "Climate Change Scenario Planning: A Tool for Managing Resources in an Era of Uncertainty." National Park Service. (available at: http://www.fs.fed.us/psw/cirmount/meetings/mtnclim/2008/talks/pdf/Welling_Talk2008.pdf)

Westerling, A.L., H.G. Hidalgo, D.R. Craven, and T.W. Swetnam. 2006. Warming and earlier spring increase Western U.S. forest wildfire activity. Science 313: 940-943.

BLM_0149558

11/2/2016                      DEPARTMENT OF THE INTERIOR Mail - Comments on the Uncompahgre Draft RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Comments on the Uncompahgre Draft RMP
1 message

---

**Juli Slivka** <jslivka@tws.org>                              Tue, Nov 1, 2016 at 3:05 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Cc: "tpfifer@blm.gov" <tpfifer@blm.gov>, "Jones, Gina" <gmjones@blm.gov>

Hi Teresa and Gina,


Attached please find comments from The Wilderness Society and our partner organizations on the Uncompahgre Draft RMP. I am also mailing you a flash drive today with these comments and the attachments.


Please let me know if you have any questions.


Thanks very much,

Juli


Juli Slivka

Planning Specialist

The Wilderness Society

BLM Action Center

O: (303) 650-1179

C: (303) 241-9431

---



📄 **UFO DRMP - TWS et al comments - Nov 1 2016.pdf**
2886K

BLM_0149559

November 1, 2016

*Submitted via email (uformp@blm.gov) and US mail (with attachments)*

Teresa Pfifer, Acting Field Manager
BLM Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401

Re:     **Comments on the Uncompahgre Draft Resource Management Plan and Environmental Impact
        Statement**

Dear Ms. Pfifer,

Thank you for considering these comments on the Uncompahgre Draft Resource Management Plan
(RMP). We appreciate the opportunity to engage in management decisions for our public lands, and our
organizations have longstanding interests and investments in the BLM-managed lands in Colorado and
across the West. We are glad to see the BLM acknowledging the important fish and wildlife, wilderness,
recreation and other values on these public lands that will be affected by management decisions
encompassed in the Uncompahgre RMP and evaluating alternatives to protect and conserve those
public lands resources.

We hope to see continued improvements in the RMP that commit the agency to meaningful
conservation measures and provide a better balance with energy development and other resource uses.
We have proposed specific changes that will allow BLM to build upon the work included in the Draft
RMP and provided reasoned analysis to support them in these comments.

| Issue Addressed | Page |
|---|---|
| I.     General Management Framework | 2 |
| II.    Lands with Wilderness Characteristics | 3 |
| III.   Recreation | 18 |
| IV.    Travel Management | 27 |
| V.     Ecological Emphasis Areas and Areas of Critical Environmental Concern | 36 |
| VI.    Wild and Scenic Rivers | 46 |
| VII.   Wilderness Study Areas | 60 |
| VIII.  Night Sky Resources | 61 |
| IX.    Management of the North Fork Area | 62 |
| X.     Oil and Gas Management | 93 |
| XI.    Uranium | 113 |
| XII.   Coal | 118 |
| XIII.  Climate Change | 126 |
| XIV.   Mitigation | 137 |
| List of Attachments & Literature Cited | 142 |

BLM_0149560

I.    **General Management Framework**

The Uncompahgre Resource Management Plan will provide management direction for 675,000 acres of public lands in western Colorado, including significant natural resources that must be balanced with other resource uses to fulfill BLM's multiple use and sustained yield mandate. The Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.*, imposes a duty on BLM to identify, protect and monitor the many natural resources found on public lands governed by RMPs.  FLPMA requires BLM to inventory its lands and their resource and values, "including outdoor recreation and scenic values." 43 U.S.C. § 1711(a).  FLPMA also obligates BLM to take this inventory into account when preparing land use plans, using and observing the principles of multiple use and sustained yield. 43 U.S.C. § 1712(c)(4); 43 U.S.C. § 1712(c)(1).

Through management plans, BLM can and should protect wildlife, scenic values, recreation opportunities and wilderness character present in the public lands through various management decisions, including by excluding or limiting certain uses of the public lands. *See* 43 U.S.C. § 1712(e). This is necessary and consistent with the definition of "multiple use," which identifies the importance of various aspects of wilderness characteristics (such as recreation, wildlife, natural scenic values) and requires BLM to consider the relative values of these resources but "not necessarily to the combination of uses that will give the greatest economic return." 43 U.S.C. § 1702(c).

Further, FLPMA requires that: "In managing the public lands the [Secretary of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation (UUD) of the lands." 43 U.S.C. §1732(b). BLM's duty to prevent unnecessary or undue degradation under FLPMA is mandatory, and BLM must, at a minimum, demonstrate compliance with the UUD standard. *See, Sierra Club v. Hodel*, 848 F.2d 1068, 1075 (10th Cir. 1988) (the UUD standards provides the "law to apply" and "imposes a definite standard on the BLM").

The Uncompahgre Draft RMP recognizes in many instances the values and vulnerabilities of natural resources within the Uncompahgre Field Office. The range of alternatives includes management scenarios that would protect and enhance these resources and identifies critical opportunities for BLM to promote conservation and achieve balance among the multiple uses of our public lands. For example, we highlight BLM evaluating a new management tool – Ecological Emphasis Areas – to protect and enhance habitat connectivity across the broader landscape. Uncompahgre Draft RMP at 2-68. Considering and eventually adopting a network of lands managed to protect and conserve natural resources on our public lands fits squarely within the agency's governing laws and policies, as well as forward-looking initiatives such as BLM's Planning 2.0 rule.

However, the Draft RMP ultimately fails to consider or implement reasonable management alternatives for oil and gas resources that would adequately protect local communities from oil and gas development or meaningfully analyze and respond to climate change. The prioritization of oil and gas development above all other multiple uses at the expense of healthy communities and climate solutions must be remedied before BLM finalizes the Uncompahgre RMP. Additionally, the Draft RMP misses other opportunities to appropriately balance multiple uses on Colorado's public lands and meet BLM's obligations under relevant laws and policies. Our comments demonstrate where and how BLM can create a lasting vision for conserving natural resources and balancing multiple uses through the RMP revision.

2

BLM_0149561

**Summary of Comments:** The Uncompahgre Draft RMP has laid out a management framework that could protect and enhance natural resources as directed by FLPMA through conservation management of valuable public lands such as lands with wilderness characteristics, Ecological Emphasis Areas, ACECs and quiet recreation management areas. However, BLM's approach to oil and gas management and addressing climate change is inconsistent with relevant law and policy and reflects an antiquated bias that the agency is proactively seeking to overcome. BLM must substantially adapt the Uncompahgre RMP to evaluate reasonable alternatives for energy development and meaningfully address climate change, including adaptation strategies and consistency with national climate goals.

## II.   Lands with Wilderness Characteristics

FLPMA requires BLM to inventory and consider lands with wilderness characteristics during the land use planning process. 43 U.S.C. § 1711(a); *see also Ore. Natural Desert Ass'n v. BLM,* 625 F.3d 1092, 1122 (9th Cir. 2008) (holding that "wilderness characteristics are among the values the FLPMA specifically assigns to the BLM to manage in land use plans).[1] IM 2011-154 and Manuals 6310 and 6320 contain mandatory guidance on implementing that requirement. The IM directs BLM to "conduct and maintain inventories regarding the presence or absence of wilderness characteristics, and to consider identified lands with wilderness characteristics in land use plans and when analyzing projects under [NEPA]." This includes the "necessary forms for each area" including photo logs, route analysis forms and inventory area evaluations (Manual 6310, Appendices A-D).  Manual 6310 reiterates that, "[r]egardless of past inventory, the BLM must maintain and update as necessary, its inventory of wilderness resources on public lands."  Manual 6320 requires BLM to consider lands with wilderness characteristics in land use planning, both in evaluating the impacts of management alternatives on lands with wilderness characteristics and in evaluating alternatives that would protect those values. Wilderness inventories are to be done on a *continuing* basis and relevant citizen-submitted data is to be evaluated. BLM Manual 6310 at .04(C)(1).

We appreciate that BLM has inventoried lands with wilderness characteristics in the planning area and that the Draft RMP considers multiple alternatives to protectively manage those lands. We recognize that the Uncompahgre Field Office has been a leader in Colorado in regards to complying with the updated inventory requirements, as the field office publicly posted inventory information in a timely fashion when the new policy was released and refined that information in 2015 to better align with BLM Manual 6310. We value the UFO's commitment to addressing this resource through the RMP revision. However, BLM should make some adjustments in the Proposed RMP to better comply with agency policy, and the agency's obligations under FLPMA and NEPA that policy is rooted in, and to achieve a more balanced land use plan that embodies multiple use and sustained yield.

---

[1] In an April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and the State of Utah, the  BLM abdicated its authority to designate any additional WSAs, and we maintain that this agreement is invalid and will ultimately be overturned. In addition, the Utah Settlement is based on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with BLM Manual 6330. This administration has the authority to create new WSAs under § 202 and BLM should be considering this within its range of reasonable alternatives that are deserving of consideration in this NEPA process.

BLM_0149562

a. **Inventory**

There are a few specific instances in which BLM's LWC inventory is inconsistent with current agency policy. Below are comments addressing where and how BLM's inventory fails to follow the guidance for conducting lands with wilderness characteristics inventories detailed in BLM Manual 6310.

Adobe Badlands WSA Adjacent
BLM's inventory for the Adobe Badlands LWC unit is 6,200 acres, while our assessment shows the unit to be about 8,200 acres. The major difference is in the far southwest portion of the unit, where BLM drew boundary lines to cut out two portions of the unit (downslope towards the powerlines) based on the argument those areas do not have either outstanding opportunities for solitude or primitive recreation. However, these areas are contiguous with the Adobe Badlands WSA, and therefore inherit the outstanding opportunities already identified in the WSA. BLM Manual 6310 provides that if a polygon of land is contiguous with lands currently managed to protect their wilderness character (e.g. WSA) and that contiguous land meets the naturalness criterion, then that naturally appearing contiguous land meets the criteria for LWC because it inherits the outstanding opportunities already identified in the adjacent WSA.  BLM Manual 6310 is clear that not every acre needs to have outstanding opportunities, including when the area is contiguous with a WSA: "The area does not have to possess outstanding opportunities for both elements, nor does it need to have outstanding opportunities on every acre, even when an area is contiguous to lands with identified wilderness characteristics." BLM Manual 6310 at .06(C)(2)(c). BLM finds in its inventory report for the Adobe Badlands LWC unit that the eliminated areas are both contiguous with the WSA and natural; therefore they should qualify as LWC. Furthermore, BLM should not cut out areas that don't have outstanding opportunities; cut outs should be for impacts related to naturalness only according to BLM Manual 6310.

Camel Back WSA Adjacent
BLM's Camel Back LWC unit only includes lands from the canyon rims down, eliminating obviously qualifying lands on the mesa tops, which may total 1,000-2,000 additional acres. BLM's report for this unit states that BLM removed 1,750 acres on Monitor Mesa for further consideration as lands with wilderness characteristics because of "substantial evidence of human modification" on "most" of Monitor Mesa, including "constructed and maintained routes that run the length of the mesa top" and mechanical vegetative treatments...that are obvious to the casual observer. (Emphasis added).

However, while two constructed and maintained routes do traverse the length of the mesa top, these routes are easily cherry-stemmed from the larger unit; stating that these routes contribute to "substantial evidence of human modification" across "most of Monitor Mesa" is entirely misleading. These two routes only make up a small portion of the mesa top, and because of significant vegetative screening along there length, they have little impact on the naturalness of the area as a whole.

4



Image 4634 (above) shows the main route traversing Monitor Mesa from the southwest to the northeast.  This route is clearly constructed and maintained.  However, because this route is bordered on both sides by large vegetation including juniper trees exceeding 10 feet in height as well as dense stands of mature sagebrush, this route has little impact on the naturalness of the mesa top as a whole.

Further, BLM's claims that "most of" Monitor Mesa "shows substantial evidence of human modification" and that old vegetative treatment areas are "obvious to a casual observer" is factually incorrect.  Such statements are an indication that BLM inventoried this area using aerial imagery, rather than on-the-ground investigation.  A visit to the area clearly shows that the areas of former vegetative treatments are largely recovered, as seen in the following photos, all of which were taken amidst the vegetative treatment areas cited in BLM's report.  These photos are representative of the entirety of Monitor Mesa as of May 2014:

5

BLM_0149564





BLM_0149565



The photo below looks generally west and southwest along BLM's proposed boundary for this unit.  To the left of the photo is an area BLM found to be natural in appearance, to the right is an area removed from the unit because of "substantial evidence of human modification" that would be "obvious" to the average visitor:



BLM Manual 6310 is clear that "apparent naturalness refers to whether or not an area looks natural to the average visitor who is not familiar with the biological composition of natural ecosystems versus human-affected ecosystems".  The above photos show, and any visit to the area would confirm, that

7

Monitor Mesa "looks natural to the average visitor".  BLM must revise its inventory of the Camel Back WSA Addition unit to incorporate the areas of removed because of former vegetative treatments, such as Upper Long Gulch, which BLM removed from the unit and which is shown below:



Dolores River Canyon WSA Adjacent
Similar to BLM's inventory of the Adobe Badlands LWC unit, the portions of the Dolores River LWC unit that are contiguous with the WSA should inherit the outstanding opportunities for solitude or primitive and unconfined recreation already found to exist in the Dolores River Canyon WSA.

Dry Creek Basin
Similar to the Camel Back LWC unit, BLM eliminated areas with past vegetation treatments that should actually qualify as LWC, as they now appear largely natural to the average visitor. BLM also eliminates small parcels within the larger unit for lack of outstanding opportunities, contrary to guidance which states: "The area does not have to possess outstanding opportunities…on every acre." BLM Manual 6310 at .06(C)(2)(c). BLM should not cut out areas that don't have outstanding opportunities; cut outs should be for impacts related to naturalness only according to BLM Manual 6310.

Shavano Creek
Again, BLM inappropriately cuts out areas due to past vegetation treatments that do not appear unnatural to the average visitor.

Atkinson Breaks
It appears BLM has not inventoried Atkinson Breaks area. BLM should inventory the area north of the Lower Tabeguache/Campbell Creek LWC unit, including the numerous canyons known as the Atkinson Breaks, as well as the steeper slopes abutting USFS lands of the Uncompahgre Plateau. In particular, the BLM lands below Campbell Point and around South Fork Mesa Creek and Blue Basin are likely to meet the criteria for lands with wilderness characteristics.

8

**Summary of Comments**: BLM should refine the LWC inventory to address the inconsistencies with BLM Manual 6310 identified above.

### b. Environmental Consequences Analysis

Manual 6320 provides that BLM must "consider the benefits that may accrue to other resource values and uses as a result of protecting wilderness characteristics." BLM Manual 6320.06(A)(1)(b). Those benefits should be analyzed in the RMP, particularly in the environmental effects analysis. They include the following:

(a) Scenic values – FLPMA specifically identifies "scenic values" as a resource of BLM lands for purposes of inventory and management (43 U.S.C. § 1711(a)), and the unspoiled landscapes of lands with wilderness characteristics generally provide spectacular viewing experiences. The scenic values of these lands will be severely compromised if destructive activities or other visual impairments are permitted.

(b) Recreation – FLPMA also identifies "outdoor recreation" as a valuable resource to be inventoried and managed by BLM. 43 U.S.C. § 1711(a). Lands with wilderness characteristics provide opportunities for primitive recreation, such as hiking, camping, hunting and wildlife viewing. Most, if not all, primitive recreation experiences will be foreclosed or severely impacted if the naturalness and quiet of these lands are not preserved.

(c) Wildlife habitat, connectivity and riparian areas – FLPMA acknowledges the value of wildlife habitat found in public lands and recognizes habitat as an important use. 43 U.S.C. § 1702(c). Due to their unspoiled state, lands with wilderness characteristics provide valuable habitat for wildlife, thereby supporting additional resources and uses of the public lands. As part of their habitat, many species are also dependent on riparian and other wetland habitats, especially during either seasonal migrations or seasons and years when surrounding habitats are dry and unproductive. Wilderness-quality lands support biodiversity, watershed protection and overall healthy ecosystems. In addition they provide connectivity that facilitates wildlife migration, seasonal movements and dispersal of young. The low route density, absence of development activities and corresponding absence of motorized vehicles, which are integral to wilderness character, also ensure the clean air, clean water and lack of disturbance necessary for productive wildlife habitat, large scale connectivity and riparian areas (which support both wildlife habitat and human uses of water).

(d) Cultural resources – FLPMA also recognizes the importance of "historical values" as part of the resources of the public lands to be protected. 43 U.S.C. § 1702(c). The lack of intensive human access and activity on lands with wilderness characteristics helps to protect these resources. Managing lands to protect wilderness qualities will also help protect cultural and archaeological sites.

(e) Quality of life – The wildlands located within the planning area help to define the character of this area and are an important component of the quality of life for local residents and future generations, providing wilderness values in proximity to the population centers spread across the planning area. Their protection enables the customs and culture of this community to continue.

(f) Balanced use – The vast majority of BLM lands are open to motorized use and development. FLPMA recognizes that "multiple use" of the public lands requires "a combination of balanced and diverse resource uses" that includes recreation, watershed, wildlife, fish, and natural scenic and historical values. 43 U.S.C. § 1702(c). FLPMA also requires BLM to prepare land use plans that may limit certain

9

BLM_0149568

uses in some areas. 43 U.S.C. § 1712.  Many other multiple uses of public lands are compatible with protection of wilderness characteristics – in fact, many are enhanced if not dependent on protection of wilderness qualities (such as primitive recreation and wildlife habitat).  Protection of wilderness characteristics will benefit many of the other multiple uses and values of BLM lands such as air and water quality, night skies, soundscapes, and viewsheds, while other more exclusionary uses (such as off-road vehicle use and timber harvesting) will still have adequate opportunities on other BLM lands.

(g) Economic benefits – The recreation opportunities provided by wilderness quality lands also yield direct economic benefits to local communities.  According to the U.S. Fish & Wildlife Service, in 2011 state residents and non-residents spent $3 billion on wildlife recreation in Colorado.[2] In addition, local communities that protect wildlands reap measurable benefits in terms of employment and personal income. Sonoran Institute 2004. Other "non-market" economic values arise from the ability of wildlands to contribute to recreation and recreation-related jobs, scientific research, scenic viewsheds, biodiversity conservation, and watershed protection. Morton 1999; Loomis 2000. All of these economic benefits are dependent upon adequate protection of the wilderness characteristics of the lands.

We appreciate that the Draft RMP acknowledges in many instances that protecting lands with wilderness characteristics will also protect other resources such as soil, water, vegetation, fish and wildlife, and wild and scenic river ORVs. *See, e.g.,* Uncompahgre Draft RMP at 4-68, 4-91, 4-115, 4-151, 4-414. However, those analyses do not appear to inform the decisions made in the Draft RMP, particularly the preferred alternative, because BLM would only manage 18,320 acres of lands with wilderness characteristics in the preferred alternative – less than 3% of the public land in the planning area. This preferred plan does not reflect BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics.

Additionally, the Draft RMP does not adequately analyze or acknowledge the economic benefits of protecting lands with wilderness characteristics. We appreciate that BLM discusses nonmarket values, including the fact that setting land aside for protection can maintain and enhance nonmarket values associated with natural amenities. Uncompahgre Draft RMP at 4-460. However, the Draft RMP fails to meaningfully analyze nonmarket values, stating: "Nonmarket values are difficult to quantify, and insufficient data exists in order to assess the impacts of management actions." *Ibid.* The brief and qualitative treatment of nonmarket values in the Draft RMP is not adequate to inform management decisions in the RMP, and does not conform to agency guidance. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics.

BLM has current guidance on estimating nonmarket environmental values and analyzing those values in land use planning.[3] IM 2013-131 directs BLM to "utilize estimates of nonmarket environmental values in NEPA analysis supporting planning and other decision-making." Nonmarket values are described as values that "reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions and therefore lack prices," such as "the perceived benefit of hiking in wilderness."

---

[2] USFWS 2011, National Survey of Hunting, Fishing and Wildlife-associated Recreation, available at http://www.census.gov/prod/2013pubs/fhw11-co.pdf
[3] IM 2013-131, available at:
http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-131__Ch1.print.html.

BLM_0149569

BLM's guidance directs the agency to analyze nonmarket values for each alternative and adopt management decisions that are informed by that analysis:

> In framing information for management decisions, focus on the *difference in changes to nonmarket values* between action alternatives. Such information can highlight tradeoffs. For example, an alternative designating an additional thirty miles of trails for off-highway vehicles may *increase* the visitor days of use – therefore the total nonmarket benefits – from motorized recreation, but may *decrease* the benefits of subsistence hunting and watershed protection in this area. The *difference* between the changes to nonmarket values between this alternative and an alternative that, for example, only designates an additional ten miles of trails, can inform the choice among action alternatives.

IM 2013-131, Attachment 1-5. The guidance also directs that <u>quantitative</u> analysis of nonmarket values is strongly encouraged when "the alternatives to be considered present a strong contrast between extractive and nonextractive uses of land and resources. For example, an RMP may include alternative resource allocations that vary between managing land primarily for oil and gas development or managing it for habitat conservation and recreation." IM 2013-131, Attachment 1-7. Because the Uncompahgre RMP is evaluating a range of alternatives that has a development-focused alternative at one end of the spectrum and a conservation-focused alternative at the other, this criterion applies to the RMP and BLM should conduct quantitative analysis of nonmarket values.

**Summary of Comments:** BLM should adopt a final plan that actually reflects BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics. BLM should analyze the economic benefits of protecting lands with wilderness characteristics for each alternative and utilize that analysis to inform the management decisions ultimately adopted in the RMP.

### c. Management

    i. <u>An accurate and comprehensive inventory of lands with wilderness characteristics is necessary to inform management alternatives, impact analysis and decision-making.</u>

Evaluating management alternatives for lands with wilderness characteristics requires an accurate inventory to serve as baseline information. FLPMA requires BLM to inventory the resources of the public lands in order to development management plans. 43 U.S.C. § 1711(a). The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." *See* 40 C.F.R. § 1502.15. Establishment of baseline conditions is a requirement of NEPA. In *Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

The U.S. Court of Appeals for the Ninth Circuit has held: "wilderness characteristics are among the 'resource and other values' of the public lands to be inventoried under § 1711.  BLM's land use plans,

11

which provide for the management of these resources and values, are to 'rely, to the extent it is available, on the inventory of the public lands, their resources, and other values.' 43 U.S.C. § 1712(c)(4)." *Ore. Natural Desert Ass'n v. Bureau of Land Management*, 531 F.3d at 1119.  Therefore, BLM is required to consider "whether, and to what extent, wilderness values are now present in the planning area outside of existing WSAs and, if so, how the Plan should treat land with such values." *Id.* at 1143.

Conducting an accurate and comprehensive inventory as directed by Manual 6310 is BLM's current policy for establishing the baseline conditions required by NEPA. While we appreciate that the Uncompahgre Field Office has completed lands with wilderness characteristics inventory under BLM Manual 6310, BLM must correct the remaining inconsistencies with the Manual in order to have an inventory that is sufficient to inform land use planning.

**Summary of Comments:** In order to establish a true set of baseline conditions as required under NEPA, BLM must refine its lands with wilderness characteristics to fully comply with BLM Manual 6310 in order to adequately evaluate management alternatives and environmental consequences in the Uncompahgre RMP.

ii.   BLM should manage additional lands to protect their wilderness characteristics in the final RMP in order to meet its statutory and regulatory obligations.

Although the BLM identified 42,150 acres of lands with wilderness characteristics, the preferred alternative would only manage 18,320 acres to protect those values. This is less than half of the inventoried wilderness resource and less than 3% of the public land in the planning area. This approach does not evidence a meaningful consideration of the value of this important resource in the planning area or balanced land management.

FLPMA directs BLM to inventory for the many values of the public lands and consider ways to protect them in the RMP (i.e., not all uses are appropriate in all places). 43 U.S.C. §§ 1711, 1712. Protecting all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office is appropriate to achieve BLM's multiple use and sustained yield mandate.

BLM also is not in compliance with its regulations regarding off-road vehicles in the management alternatives under consideration in the Draft RMP. While Alternative B would close lands managed to protect wilderness characteristics to off-road vehicle use, the preferred alternative would limit motorized travel to designated routes. Uncompahgre Draft RMP at 2-149. In allowing ORV use to be designated as limited in lands with wilderness characteristics, the Draft RMP is in direct violation of Executive Orders and agency regulations implementing these Orders. Executive Orders (EO No. 11644 (1972)) as amended by Executive Order No. 11989 (1977)) and the BLM's regulations (43 C.F.R. § 8342.1) require BLM to ensure that areas and trails for off-road vehicle use are located:
- to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability; to minimize harassment of wildlife or significant disruption of wildlife habitats, and especially for protection of endangered or threatened species and their habitats;
- to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands; and

12

- outside officially designated wilderness areas or primitive areas and in natural areas only if the agency determines that off-road vehicle use will not adversely affect their natural, aesthetic, scenic, or other values for which such areas are established.

These Executive Orders put the burden of proof on the BLM to make sure that sensitive and protected conservation lands are not harmed by ORV use. Given the small amount of public land managed to protect wilderness characteristics, and the high likelihood of off-road vehicle use causing conflict with quiet recreation experiences and other public lands resources that benefit from protected lands with wilderness characteristics, these areas should be closed to ORV use.

Furthermore, BLM should maximize protection of wilderness characteristics through layering management, as contemplated in several areas in the Draft RMP. Layering management that protects a variety of resources is an important tool that BLM consistently uses. Protection of wilderness characteristics can be effective as a standalone management approach but is also effective along with designation of ACECs and other conservation-oriented designations, as well as portions of special and extensive recreation management areas.

In the RMP for the Monticello Field Office, BLM responded to resistance to layering designations in the following appropriate way:

"Layering" is planning. Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands. Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives. Under the multiple use concept, BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands. The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering". BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area. Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land use plan, and litigation. Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner. All uses and values cannot be provided for on every acre. That is why land use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan. Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.

Monticello Proposed RMP, Response to Comments, at 7-48. This rationale is equally applicable to the many opportunities to layer management of LWC with management of other values and uses in this plan.

**Summary of Comments:** BLM should better balance the multiple uses of public lands and prevent unnecessary or undue degradation by managing significantly more lands for protection of wilderness characteristics, including closing those areas to motorized use and layering them with other special management areas.

13

BLM_0149572

iii.   Management prescriptions must be robust to adequately protect wilderness resources identified for protection in the RMP and BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics.

BLM must adopt meaningful protections for wilderness resources as part of its multiple use mission. Manual 6320 directs that "an alternative that protects lands with wilderness characteristics must contain management actions to achieve protection." Manual 6320 at .06(A)(2)(d). The manual provides examples of land use plan decisions that could protect wilderness characteristics, including: recommend withdrawal from mineral entry; close to leasing or NSO with no exceptions, waivers or modifications; right-of-way exclusion; close to construction of new roads; close or limit motorized and/or mechanized use; designate as VRM I or II; among others. We appreciate that the Uncompahgre Draft RMP evaluates management decisions for lands with wilderness characteristics consistent with BLM Manual 6320.

BLM also has wide discretion regarding how it manages lands with wilderness characteristics outside of lands prioritized for protection of wilderness characteristics over other multiple uses. While certain lands with wilderness characteristics units undoubtedly deserve the highest levels of protection to ensure that their outstanding wilderness, wildlife, cultural, scenic, and/or recreation values are protected, other lands with wilderness characteristics units may overlap with different types of multiple uses that suggest BLM should consider a wider range of uses for those lands.  In this case the Draft RMP simply selects all identified lands with wilderness characteristics and gives them identical management prescriptions (Alternative B), or selects a sub-set of those units for protection and gives that smaller set an identical set of management prescriptions (Alternative D).

Analyzing alternatives that would "avoid or minimize" adverse environmental effects is a requirement of NEPA, and current guidance outlined in Manual 6320 states that land use planning efforts should consider several outcomes for lands with wilderness characteristics.  BLM should not simply analyze alternatives that would protect or leave unprotected lands with wilderness characteristics, but can also consider additional management options for these lands, where other multiple uses are emphasized "while applying management restrictions (conditions of use, mitigation measures) to reduce impacts to wilderness characteristics." Manual 6320 at .06(A). In fact, even for areas where BLM specifically decides to not protection wilderness characteristics, BLM is still required to "consider measures to minimize impacts on those characteristics." Manual 6320 at .06(A)(2)(d).

The only goal for lands with wilderness characteristics in the Draft RMP is to: "Manage lands with wilderness characteristics that are identified for protection to maintain those characteristics." Uncompahgre Draft RMP at 2-148. Where lands with wilderness characteristics are not explicitly managed for protection in the draft alternatives, no description of management goals or objectives is provided that describes how impacts to any of the other identified lands with wilderness characteristics areas might be minimized "to reduce impacts to wilderness characteristics" as outlined in Manual 6320. For example, the Rio Puerco (NM) Draft RMP developed three approaches for managing lands with wilderness characteristics: Protect Wilderness Characteristics, Minimize Impacts to Wilderness Characteristics, and Not Managed to Protect Wilderness Characteristics. Rio Puerco Draft RMP, p. 2-38—40; excerpt included as Attachment 1. All three categories, **including lands not managed to protect wilderness characteristics**, have management prescriptions in place to minimize impacts to wilderness characteristics. Similarly, the White River (CO) Proposed RMPA grouped inventoried LWC into 3 management tiers ranging from most restrictive management to least. Even the least restrictive tier

14

allows for applying management decisions to avoid and minimize impacts to wilderness characteristics. White River Proposed RMPA at Table 2-22; excerpt included as Attachment 2.

For the Uncompahgre RMP, we recommend BLM manage lands with wilderness characteristics in two categories: high quality LWC meriting the strongest levels of protection; and additional LWC managed to protect wilderness characteristics while providing for other multiple uses. Because all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office comprise just 6% of the public land in the planning area, it is perfectly reasonable to manage all LWC to protect wilderness resources in some form. Both categories should include management direction to consider impacts to wilderness characteristics in implementation-level decisions and avoid, minimize or mitigate those impacts to the extent possible.

**(1)  High quality LWC meriting the strongest levels of protection**

This management category should include Camel Back WSA-adjacent, Dry Creek Basin, Roc Creek, Lower Tabeguache and Shavano Creek. Management prescriptions should include:

- VRM I
- Closed to oil and gas leasing
- Closed to renewable energy development
- Closed to new rights-of-way (ROW exclusion)
- Closed to motorized and mechanized use
- Construction of new permanent and temporary roads is prohibited
- Close to mineral material disposal and non-energy solid leasable mineral exploration and development
- Recommend withdrawal from locatable mineral entry
- Closed to commercial timber harvest
- Vegetation treatments must utilize the minimum tool necessary
- Seek opportunities to acquire and incorporate non-federal inholdings
- Retain lands in federal ownership
- Close area to military training activities, including landings associated with High Altitude Mountain Environment Training.

These areas are proposed for management to protect their wilderness characteristics in the Draft RMP preferred alternative, with the addition of Lower Tabeguache and Shavano Creek. Our rationale for those additions is as follows:

- The Lower Tabeguache LWC unit is adjacent to the specially managed Tabeguache Area and Shavano Creek, and would therefore create an important protected core area.

- The Lower Tabeguache and Shavano Creek units also encompasses the Tabeguache Pueblo and Tabeguache Caves area considered but rejected for ACEC designation to protect cultural resource values. In addition, the stream segment through Lower Tabeguache was found eligible but rejected as suitable under WSR designation. Those values can be effectively protected with enhanced LWC management if not WSR and ACEC.

15

BLM_0149574

- LWC management would offer better protections to the habitat values and species in the overlapping Ecological Emphasis Area, detailed in Table D-1. BLM recognizes these areas as important wildlife habitat because they are part of a large undisturbed area that connects directly to the USFS land on the Uncompahgre Plateau, and thus is an important migration corridor for species moving between the high and low lands of the Plateau.

- Shavano Creek is adjacent to the Windy Gap Colorado Roadless Area, further extending this protected core area into the adjacent forest land. The Draft RMP acknowledges that this adjacent management would enhance the qualities of naturalness and solitude of the areas by extending them over a larger area. Uncompahgre Draft RMP at 4-225.

We furthermore reiterate our support for the protective management of the Camel Back WSA-adjacent LWC unit. The Potter/Monitor addition to the Camelback WSA has been in the Colorado Wilderness Network's Brown Book of proposed Wilderness Areas for 30 years and is clearly and area considered to have "wilderness characteristics." Indeed, the wild quality of the area has improved rather than degraded since the BLM's original inventory - less dispersed travel, fewer illegal motorized and mechanized uses in closed areas and "administrative use only" areas, less vandalism of signage, regrowth on the mesa tops from vegetative treatments like chaining and roller-chopping, less impact of livestock due to improved range management.

The area also provides a unique recreational experience. The sense of isolation and solitude is unparalleled within 50 miles, in spite of nearly 200,000 people living within that radius, and yet access is relatively quick and easy year-round. Because of the close connection between Potter and Monitor Canyons and the Camelback WSA in Roubideau Canyon, the opportunities for unconfined recreation, outstanding solitude, and naturalness is greatly enhanced by having all three canyon and stream segments protected as fully as possible for their wild characteristics.

### (2) Additional LWC managed to protect wilderness characteristics while providing for other multiple uses

This management category should include Adobe Badlands WSA-adjacent and Dolores River Canyon WSA-adjacent. Management prescriptions should include:

- VRM II
- NSO stipulation for fluid minerals without exception, modification, or waiver.[4]
- Closed to renewable energy development
- Closed to new rights-of-way (ROW exclusion) outside of designated utility corridors
- Motorized and mechanized use limited to designated routes
- Construction of new permanent and temporary roads is prohibited
- Close to mineral material disposal and non-energy solid leasable mineral exploration and development
- Recommend withdrawal from locatable mineral entry
- Closed to commercial timber harvest
- Vegetation treatments must not have long-term impacts on wilderness characteristics

---

[4] By way of example, the White River RMPA would apply an NSO stipulation without exception, modification or waiver for Tier 1 LWC in the proposed plan. White River Proposed RMPA at A-42.

16

- Seek opportunities to acquire and incorporate non-federal inholdings
- Retain lands in federal ownership

These areas are evaluated for management to protect their wilderness characteristics in Alternative B of the Draft RMP preferred alternative. Our rationale for managing them in a second category of LWC management in the proposed plan is as follows:

- The Dolores River Canyon WSA-adjacent areas have some impacts, but still meet the criteria for LWC and therefore provide important roadless areas adjacent to the WSA that are valuable for backcountry recreation opportunities and wildlife habitat. Additional impacts to these areas should be minimized. Nyswonger Mesa in particular offers spectacular vistas into the canyon and is readily accessible on long-since closed routes from the Bedrock store.[5]

- LWC management for the Dolores River Canyon WSA-adjacent units would offer better protections to the habitat values and species in the overlapping La Sal Ecological Emphasis Area, detailed in Table D-1.

- The Adobe Badlands WSA-adjacent unit provides a critical resource as a place for quiet and unconfined recreation close to the city of Delta. Although close to a population center, once one hikes into the unit away from the boundary roads and past the WSA, the area clearly still has wilderness characteristics in terms of solitude, naturalness and unconfined recreation:
  - *Solitude*: After hosting multiple hikes into the area over a three year period, we only once saw other people in the area and they were on the boundaries of the WSA, not in the LWC unit boundaries. The further in you hike; the eroded hills and gullies of the Mancos shale hide the signs of human proximity and can give a person the feeling of hiking in a desert far from other people. Once you are in the higher topography with pinon and juniper, the vegetative screening provides additional privacy. This area provides the public a rare opportunity to find solitude without having to travel far distances from home.
  - *Unconfined recreation*: The unit also allows people a large area to explore through primitive and unconfined recreation. Again, if one stays close to the boundary roads, the character of the area is very different from when you hike further in. Apart from the boundary roads, there are not recreational developments or established/maintained trails. One can find opportunities for both easy and challenging hiking. People are able to explore freely through the gullies and climb the mesas of their own accord.
  - *Naturalness:* Again, on the boundaries of the greater Adobes area and in proximity to the private inholdings, there are obvious signs of human disturbance and encroachment of motorized recreation. However, the further one explores the area and heads north, the more natural it becomes as you travel towards the Grand Mesa FS boundary. The proposed LWC boundaries encompass the core of this natural area. BLM should manage this area to protect and maintain these rare characteristics in a place where they provide valued opportunities for people to find solitude and naturalness literally

---

[5] We also note that the La Sal Creek ACEC proposed in Alternative B would provide enhanced protections for some of these WSA adjacent areas, and would be a useful layer to overlap lands inventoried for wilderness character.

BLM_0149576

in their backyard. The need for added protection is only heightened because of its proximity to a population center, not lessened, and we encourage the BLM to protect this unit to the highest degree possible through LWC management in the final RMP.

- BLM should manage the Adobe LWC unit in the Final RMP in order to fulfill the agency's mandate to protect the Adobe Badlands WSA.  A larger area managed for wilderness characteristics adjacent to the WSA will only help protect and enhance the Wilderness that has already been designated.

- The Adobe Badlands WSA-adjacent unit contains oil and gas leases that are part of the Whitewater Unit. However, the Master Development Plan for the Whitewater Unit that is currently under evaluation only proposes development in the northern portion of the unit and explicitly states that "development in the southern portion of the Whitewater Unit is not reasonably foreseeable." Fram Whitewater Unit MDP EA at 1.1. Therefore, BLM should not preclude management to protect the highly valuable wilderness characteristics of the Adobe Badlands WSA-adjacent unit based on the existing leases.[6]

**Summary of Comments:** BLM must adopt robust management prescriptions for lands managed to protect wilderness characteristics to ensure wilderness resources are adequately protected. BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics to allow for management of other multiple uses in conjunction with maintaining wilderness characteristics. BLM should manage specific LWC units in the Uncompahgre Field Office as described above.

**III.**     **Recreation**

**a.  Planning for Recreation and Visitor Services**

In the Draft RMP, we note that there is an apparent lack of background data conducted or provided by BLM to inform the recreation analysis and alternatives development. As indicated in BLM Manual 8320, planning, management and monitoring of recreation and visitor services is an iterative process. Monitoring methods such as social surveys and visitation rates are essential for assessing the effectiveness of recreation planning and implementation actions. Under all planning phases of the RMP, BLM should collect data that is sufficient to address the nature and complexity of existing and potential issues. BLM Manual 8320 at .06(B)(1)(b).

In general, we support the extensive Recreation Management Areas that are evaluated in the range of alternatives, including in the preferred alternative, targeting primitive and non-motorized recreation opportunities. We recommend the Uncompahgre Field Office build on these opportunities for quiet recreation such as hiking, wildlife viewing, back country hunting and horseback riding in the final RMP, which are popular activities for public lands visitors in the planning area. The draft RMP states that the

---

[6] According to the unitization agreement, the Whitewater Unit was supposed to contract, and lands outside the "participating area" (PA) of the unit were supposed to be automatically eliminated, in July 2015. However, BLM granted a suspension that tolled contraction of the unit based on a pending APD for the Federal 12-98-24-2 well. The relevant BLM orders indicate that the unit will now contract roughly 120 days after BLM approves the APD. Therefore, BLM should ignore the presence of the overlapping unit for purposes of planning decisions in the RMP, because it is likely the unit will contract to exclude the Adobe LWC prior to the RMP being finalized.

18

primary recreation activities in the planning area are hunting, fishing, whitewater rafting, OHV use, canoeing, kayaking, camping, hiking, backpacking, mountain biking, horseback riding, rock climbing, photography, and scenery and wildlife viewing. Uncompahgre Draft RMP at 3-130. However, the draft RMP fails to provide sound data on the relative prevalence of these uses, stating: "Most public land use and activity participation estimates depend on a mix of computerized trail counter data, field observations, and professional judgment of the recreation staff and hence are not scientifically based." *Id.* at 3-132. This is not sufficient to analyze recreation trends and make long range management decisions that reflect accurate data.

Public lands surveys in nearby areas have found that non-motorized recreation activities are dominant among public lands visitors. For example, a 2006-2007 visitor field survey and focus group study of BLM lands coordinated by the Colorado River Valley Field Office and Arizona State University found that hiking is the most popular activity, at 33%, followed by mountain biking, at 26%. Colorado River Valley Draft RMP at 3-151. The Moab Field Office completed a National Visitor Use Monitoring Program (NVUM)[7] as a pilot project for visitor use monitoring on BLM lands, which showed that motorized use is a small portion of recreation activity on public lands in the Moab Field Office. The NVUM states: "In terms of total participation, the top five recreation activities of the visits to the Moab Field Office were viewing natural features, hiking/walking/trail running, relaxing (hanging out, escaping heat and noise), viewing wildlife and driving for pleasure (Table 16)."

We would expect similar results in the Uncompahgre Field Office, which would support the designation of expansive Recreation Management Areas for quiet recreation as contemplated in the range of alternatives. Guidance issued in 2010 indicates that Recreation Management Area designations should reflect recreation demand and issues (IM 2011-004). BLM must include recreation data and foreseeable impacts in the baseline assessment in order to provide reasonable explanation and analysis of SRMA and ERMA designations in the range of alternatives. Moreover, environmental consequences described in Chapter 4 should more closely align to the expected increases in recreation demand (particularly of OHV use) described in Chapter 3, and account for the differences in recreation management area designations put forth in the range of alternatives.

**Summary of Comments**:  In creating management objectives and allowable uses for recreation management areas, BLM should utilize and include monitoring data and trends by user type in the RMP. Recreation Management Area designations should reflect recreation demand. We also point out that managing lands for wilderness characteristics is another way for BLM to provide opportunities for quiet recreation in natural and scenic areas within the Uncompahgre Field Office. We therefore recommend the RMP protect expansive areas as lands with wilderness characteristics to provide desirable recreation experiences for hikers, back country hunters, and other non-motorized public land users.

**b.  Designating Recreation Management Areas for Non-motorized Recreation**

In 2010, BLM issued new guidance (IM 2011-004) for recreation and visitor services planning in the land use planning process. This guidance was incorporated into BLM Manual 8320 in 2011 as well as BLM's updated recreation planning handbook (H-8320-1) in 2014.  The guidance changes recreation management to a three-category system wherein lands in the planning area can be designated as special recreation management areas (SRMAs), managed as extensive recreation management areas (ERMAs), or classified as public lands not designated as recreation management areas.

---

[7] http://www.blm.gov/wo/st/en/prog/Recreation/national_recreation/visitor_use_surveys.html

BLM_0149578

Management focus for SRMAs is to "protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics," whereas ERMAs are managed to "support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA." In SRMAs, recreation is to be the dominant use, and in ERMAs management is "commensurate with the management of other resources and resource uses." Whereas SRMAs are intended for more intensive management, ERMAs may be appropriate to designate for quiet-use, backcountry experiences and layer with other special designations that are compatible with quiet recreation, such as ACECs and lands with wilderness characteristics.  Both SRMAs and ERMAs provide mechanisms for the BLM to actively manage different types of recreation to the benefit of users while protecting the other resources of the public lands.

We support efforts made by the BLM to include management for quiet-use and non-motorized recreation in many Recreation Management Areas (RMAs) evaluated in the Draft RMP. Developing and differentiating recreation areas for various user groups are important to protect multiple recreation resources and avoid conflict, consistent with the agency's regulations. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors."  43 C.F.R. § 8342.1.

BLM's ORV regulations also provide for protection of other values that are critical parts of not only a healthy ecosystem on BLM lands, but also of enjoying quiet recreation activities, such as hunting, photography and bird-watching, requiring that management minimize "damage to soil, watershed, vegetation, air, or other resources of the public lands" and "harassment of wildlife or disruption of habitat; and to prevent impairment of wilderness suitability or adverse effects on natural areas." *Ibid*.

The Draft RMP considers a comprehensive approach to managing recreation through a framework of SRMA and ERMA designations in each alternative. We support BLM's approach, which offers alternatives for multiple RMA designations and associated management prescriptions for important recreation areas. Uncompahgre RMP at Appendix J. This is consistent with agency policy and offers the public an opportunity to consider alternative management regimes for recreation areas, opportunities and experiences they are interested in accessing during the life of the RMP.

While we support the RMA framework provided in the draft RMP, we have gotten feedback from our members and the public that the mosaic of potential RMAs is highly complex, especially in the context of other designations and allocations under consideration in the RMP, and is therefore difficult for the public to understand. We do not believe BLM needs to simplify its approach, but instead encourage the agency to conduct additional public education and outreach on this important and complex issue. For example, BLM could conduct public workshops in the near future where the public can review spatial data for RMA and other designations/allocations and ask questions of resource specialists. BLM could accept additional public input on RMAs specifically through these workshops. This would not needlessly or extensively delay the RMP, but could greatly assist BLM in developing a proposed RMP with the best information submitted by the public on recreation resources, ultimately leading to a better RMP that serves the public and local communities and is implemented successfully.

20

**Summary of Comments:** BLM should move forward with designating Recreation Management Areas for quiet, non-motorized recreation, which is an appropriate way to implement the minimization criteria and provide opportunities for multiple recreation uses. BLM should consider public workshops to further educate the public on recreation management alternatives and collect better information and comments from the public on recreation management.

### c. Comments on specific RMAs

*Paradox Valley*

We recommend that the BLM carry forward the Paradox Valley SRMA as proposed in Alternative B into the Final RMP rather than the ERMA that is currently proposed in Alternative D. An SRMA is a more appropriate designation as it would provide better and more focused guidance for the management of the varied recreational activities the Paradox Valley has to offer visitors and residents alike. Most notably, there is increased interest in river-based recreation as well as the history of the area---including its uranium mining and role in U.S. nuclear history as well as pre-European settlement history. In particular, the historic mining flume, with the restored section near the confluence of the Dolores and San Miguel rivers, is a unique draw.  Mountain bike trails are beginning to crop up in the area, and rock climbing is popular along the EE22 Road on Sawtooth Ridge, and this part of the SRMA would be appropriate for more intensive human-powered recreation development because of the extensive existing surface disturbance from mining.

With the seeming over-saturation of tourists in places like Moab, people are looking elsewhere for similar red rock recreation experiences, and the Paradox Valley and Dolores/San Miguel confluence area offer similarly spectacular landscapes and recreation experiences. People will discover this area, whether or not BLM plans for it. It will be better for both the resources and land to get ahead on management.

Local communities are struggling with economic change. Low prices for uranium and the announcement of the closure of the Nucla power plant and its coal mine have people on the West End of Montrose County facing an uncertain future. Recreation on public lands is one of the best options for helping to revive local economies and could be a real chance for turnaround for struggling communities like Nucla, Naturita and Bedrock. The BLM has an opportunity to lay the groundwork for well-managed recreational opportunities in this area before the demand rises, and to do it in a way that protects the land and benefits local communities.

Management for VRM Class II would also protect the stunning views of the red rock cliff walls, canyons and the La Sals that make the Paradox Valley such a unique a beautiful place to live and visit. Stronger and more focused recreation management as provided in the SRMA would also better protect the many other values recognized in this area in the various ACECs proposed.

We are strongly supportive the NSO stipulations that are proposed for RMZ 1,2 and 3 in Alternative B and having RMZ 4 closed to leasing. Again, we believe the BLM has recognized many other highly valued resources in this area that should be prioritized over oil and gas leasing.

RMZ 4 should be expanded to include all identified Lands with Wilderness Characteristics on Carpenter Mesa, and managed in a way that will continue to provide a recreational experience of solitude and primitive recreation experiences. Combined with the large, scenic Roc Creek drainage, and contiguous

21

BLM_0149580

roadless lands on the Manti-La Sal National Forest, and Sewemup Mesa WSA, this area creates a larger complex of undeveloped lands to support more extensive wilderness recreational opportunities. Therefore, we recommend that RMZ 4 be expanded to capture all of the LWC lands.

*Roubideau*

This SRMA provides additional recreational opportunities to provide a quiet alternative to the busier Dominguez-Escalante NCA to the north. The management prescriptions for Roubideau could help enhance the wilderness experiences available in the Camel Back WSA and the adjacent congressionally-designated Roubideau Area on the Uncompahgre National Forest. These existing designations provide protections to the whole of Roubideau Creek, from the top of the Uncompahgre Plateau down to the valley floor. Additionally, the Camel Back WSA is being considered for designation in legislation pending before Congress (H.R. 3336, the Colorado Wilderness Act of 2015), so BLM should take care to ensure that the wilderness characteristics are unimpaired given the high level of interest in eventual wilderness designation as a companion to the Roubideou Area.

The management objectives are good though we are concerned that an emphasis to move majority of the zones closer to "front country" management. BLM should make sure that the WSA areas are adequately protected to ensure that solitude and primitive recreation remain as a recreational opportunity.

We support motorized being limited to RMZ 4 and to designated trails within that zone.   However, motorized uses in RMZ4 should be minimized to preserve the highly rare wild qualities of the other RMZs. Competitive and large-group motorized events belong elsewhere, not in the Roubideau SRMA. Also, wherever practicable, motorized roads/trails/routes within RMZ4 should be routed a minimum of 100 feet away from the canyon rims. Users can park and walk to the rim, thus improving the quality of the visual and auditory experience for all users, including the motorized users. While we understand and generally support BLM's desire to leave routes in RMZ 3 open for hunting purposes, we recommend that BLM include seasonal closures for off-season use.   We also recommend RMZ 1 and RMZ2 being closed to motorized and mechanized uses to prioritize hiking, back pacing and horseback riding in LWC areas.

We support Alt B closing RMZ 1 to all fluid and recommending locatable mineral withdraw- as it is within the WSA. No leasing should be applied to RMZ 2 and 3 as we as it overlaps with the LWC proposal and we recommend that all "Tier 1" LWC units should be closed to leasing.

Similarly, the area is also identified as and ACEC and EEA. In order to manage for these areas to protect the identified vulnerable resources   (riparian forest and montane ecosystems with identified BLM and CNHP sensitive species), should carry Alt B management prescription of no mineral leasing for all parts of the SRMA that overlap with the Roubideau ACEC as identified in Alternative B1.

Similar logic applies to the over lapping EEA designation for the Roubideau area. As mentioned in our broader comments, EEAs should require stronger management requirements for mineral leasing. The BLM identifies sensitive species such as the Grand Junction milkvetch, desert bighorn sheep and northern leopard frog in the area and should manage the area to protect these natural values that make it a unique and special place for people to visit and have a pleasant recreation experience.

Portions of the SRMA within the Camel Back WSA should be managed to VRM I. Manual 6330 stipulates that all WSAs should be managed to VRM I.

22

BLM_0149581

*Dolores River Canyon*

The SRMA overlaps with a portion of the Dolores River Canyon WSA in UFO. Because of this fact, the management prescriptions for the Dolores River Canyon SRMA should align with BLM WSA Manual 6330. For instance, draft RMP appendix J recommends VRM II management for this SRMA, however Manual 6330 stipulates that all WSAs should be managed to VRM I.

Additionally, the Dolores River Canyon WSA is recommended by BLM for wilderness designation by Congress, and is being considered for designation in legislation pending before Congress (H.R. 3336, the Colorado Wilderness Act of 2015) as well as subject to inclusion in the legislative proposal of the Dolores River Stakeholders Group, which is developing stakeholder-driven recommendations for public lands below McPhee Reservoir to Bedrock as a substitution for wild and scenic river suitability.

The Dolores River Canyon SRMA, like the Paradox Valley SRMA, has the potential to help benefit the economies of nearby communities by providing well-managed recreational opportunities. Unlike the Paradox Valley SRMA, the Dolores River Canyons SRMA is a wilderness setting and the WSA management and care for wilderness values necessitate a much lower level of recreational development. This makes it all the more sensible to designate the Paradox Valley SRMA as a companion, to help provide a spectrum of recreational opportunities in the region.

> 1. RMZ 1 is entirely within the WSA, so appropriately limits recreation to types appropriate to a wilderness setting, with a focus on boating, water-based activities. However, hiking is also a popular activity to gain access up the river corridor starting from the Y9 Road in Bedrock below the BLM boat ramp and picnic facility. Also, the plan and BLM's travel management should reflect that motorized access is blocked about ¼ miles below the boat ramp and picnic facility on Bureau of Reclamation land (exactly at coord. 38.30116, -108.89630).

> 2. RMZ 2 is also entirely within the WSA and as such also appropriately focuses on wilderness setting activities like hiking and backpacking in high-walled Wingate sandstone canyons such as La Sal Creek, Big Steer Canyon and Coyote Wash.

*San Miguel River*

This SRMA is an extremely popular river corridor, and BLM has made major improvements to the recreational facilities over the last decade. Tourism and outdoor recreation are the largest economic drivers in San Miguel County, and this river corridor is key infrastructure providing great opportunities for boating, fishing, camping and other activities. Additionally, the canyon and its tributaries support bighorn sheep and other wildlife cherished for hunting and wildlife viewing. BLM should set management prescriptions to protect and safeguard this river and the recreation it supports.

BLM should adopt the recommended mineral withdrawal proposed in Alternative B to protec the corridor and provide for a level of reasonable certainty regarding the management of the SRMA for the life of the RMP. BLM has conducted administrative withdrawals elsewhere, such as along popular recreational stretches of the Arkansas River as well as for wildlands such as Vermillion Basin. Water quality is essential to this stretch, and rivers in Southwest Colorado already have to contend with a

BLM_0149582

legacy of pollution from the mines of yesteryear, so any additional mining or fluid mineral development in the SRMA is an unacceptable risk.

Finally, portions of this SRMA are being considered for designation in legislation pending before Congress (H.R. 3336, the Colorado Wilderness Act of 2015) as the proposed Norwood Canyon Wilderness. BLM should take care to make sure that lands proposed for wilderness not be impaired in the interim.

### d.   Special Recreation Permits

The BLM authorizes special recreation permits (SRPs) for specified recreation uses. Accordingly, the Draft RMP offers guidance and limitations for the issuance of SRPs. *See, e.g.,* Uncompahgre Draft RMP at 2-220—221; G-30. We are concerned, however, with the general lack of specificity provided by the Draft RMP on guiding the authorization of special recreation permits.

The BLM Handbook on Recreation Permit Administration states that field offices can and should develop guidelines for issuing SRPs, including thresholds for when permits are required for organized groups and events for specific types of recreation activities, land areas, or resource settings. BLM Handbook 2930-1 at 13.  Analysis of the impacts of permits on a cumulative basis is best accomplished in the RMP. The Uncompahgre RMP should include a clear decision making framework for reviewing SRP applications. The Price (Utah) and Grand Junction (Colorado) RMPs offer exemplary guidance for this process (See Grand Junction SRP guidance, included as Attachment 3). The standards set out in these RMPs are very specific so that BLM can easily determine whether and where to issue an SRP, and can better estimate cumulative impacts from such permits.

**Summary of Comments:** In the Uncompahgre RMP, BLM should provide specific criteria for evaluating special recreation permits to guide agency staff on processing applications.

### e.   Game Retrieval

We support the prohibition on cross-country motorized/mechanized travel for big game retrieval (with very narrowly limited exceptions). Uncompahgre Draft RMP at 2-307. This management action is necessary to prevent unnecessary resource damage as well as to address safety and private property concerns. A key component of the RMP and future travel planning is to create a travel network that protects resources and is enforceable. This restriction should be carried forth in the final RMP.

**Summary of Comments:** BLM should prohibit cross-country motorized/mechanized travel for game retrieval as proposed in the draft RMP preferred alternative.

### f.   Natural Soundscapes

Natural soundscapes are a public lands resource that deserves careful consideration when planning for recreation. Like viewsheds and air quality, sound is one of the resources on the public lands that is affected by agency-authorized uses and can impact other resources as well, such as recreation and wildlife.  BLM has a statutory obligation to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their

24

natural condition." 43 U.S.C. § 1701(8). To fulfill this mandate, it is important for BLM to consider natural soundscapes in order to give meaningful effect to this provision, especially on those lands which are to be managed in their "natural condition," including Wilderness Study Areas and lands with wilderness characteristics.

For recreation in particular, BLM's obligation to preserve natural soundscapes is further described in Executive Order 11644 (1972), as amended by Exec. Order 11989 (1977), which directs the BLM to locate areas and trails so as to: "Minimize conflicts between off-road vehicle use and other existing or proposed recreation uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." We recommend the agencies incorporate soundscapes in the designation and management of backcountry recreation areas, as preserving the natural soundscape is an essential component of protecting and enhancing the backcountry experience.

BLM should furthermore utilize acoustic modeling to analyze and preserve natural soundscapes, especially in special management areas managed for quiet use recreation.  The Wilderness Society has developed a GIS-based model based on The System for the Prediction of Acoustic Detectability (SPreAD; Harrison et al. 1980), which is a tool that was developed nearly 30 years ago by FS and EPA to predict the acoustic impacts of recreational activity in wildland settings.  SPreAD was originally developed as a system of worksheets and tables, where the user could enter information about the sound source and environment and manually calculate noise propagation from a single point source to a single point receiver.  We have adapted the SPreAD model to ArcGIS, automating the hand calculation method to predict the propagation of noise for all directions throughout the area of interest.

SPreAD-GIS can be used to 1) determine the areas within a planning unit where the natural soundscape is predominant and protect that setting through recreation planning; and 2) model sound propagation from uses such as motorized vehicles in a proposed quiet-use recreation area to determine what planning decisions, such as route closures, could restore and enhance the natural soundscape. In this way, the agencies could ensure that travel and recreation planning decisions provide opportunities for experiencing naturalness and solitude. There are other models and methodologies available, but we highlight SPreAD-GIS because it is available by request from TWS.[8]

One possible method for BLM to manage sound resources on the federal lands would be to model the approach BLM uses to manage visual resources, with a classification gradient ranging from most protective of natural soundscapes to allowing significant impacts to the soundscape.[9] This would provide for areas where maintaining the natural soundscape is prioritized to benefit recreation, wildlife, wilderness and other natural values on the public lands. It would also assist the agency with managing activities that impact sound resources by clearly defining where and how those impacts may occur. The classification system should primarily be based on desired and achieved experiences of public lands visitors.

The following classes provide an example of possible BLM guidance for inventorying and managing sound resources in landscape-level planning:

---

[8] The tool is free, but installation of SPreAD-GIS requires an ArcInfo-level licensed copy of ArcGIS 9.3 or higher with the Spatial Analyst extension.

[9] See information on BLM's Visual Resource Management system at http://www.blm.gov/wo/st/en/prog/Recreation/recreation_national/RMS/2.html.

BLM_0149584

- *Class I Objective*: The objective of this class is to preserve the natural soundscape. This class would be appropriate for lands managed to preserve wilderness characteristics, promote primitive recreation experiences, and protect wildlife habitat and ecological systems. The level of change to the characteristic soundscape should be very low and must not attract attention.

- *Class II Objective*: The objective of this class is to retain the natural soundscape such that noticeable impacts are infrequent and isolated instances. The level of change to the natural soundscape should be low. Management activities may be *heard on occasion*, such as a passing motorized vehicle, but should not detract from the experience of the natural landscape.

- *Class III Objective*: The objective of this class is to partially retain the natural soundscape where practicable. Management activities may attract attention but should not dominate the auditory experience of the casual observer. This class would be appropriate for front country recreation areas or other areas where natural soundscapes are not critical to the experience being sought out by visitors.

- *Class IV Objective*: The objective of this class is to provide for management activities which require significant impacts to the natural soundscape, including highly impactful events or impacts sustained over the long term. These management activities may dominate the sound of the landscape and may be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating basic elements.

These potential management objectives for sound resource classes are similar to the BLM Manual for Visual Resource Classes (BLM Manual 8400). Likewise, planning areas could be delineated into sound quality rating units for management purposes. Considerations on rating sound resources, such as landform, vegetation, and scarcity, are among the factors that could logically be incorporated into baseline data and management objectives for auditory resources. Acoustic modeling would be an important component of assessing sound quality rating units.

By going beyond a simple dichotomy of quiet-zones and zones with noise, BLM can position itself in a way that adequately addresses the adverse effects of noise on public land resources, resource-uses, and existing land designations. Soundscape classes give land managers both the authority and the flexibility to make management decisions that enhance landscape-level planning. Recognizing that lands have different soundscapes, and visitor expectations and experiences vary within a planning area, soundscape classes provide a way to determine appropriate levels of management.

**Summary of Comments:** BLM should acknowledge the sound resource on the public lands and address the soundscape as a separate resource which must be analyzed; complete sound modeling to the extent practicable to assess noise impacts of management alternatives on recreation and wildlife; adopt management decisions based on sound modeling data or other information generated from soundscape analysis that minimize or mitigate noise impacts on recreation and wildlife; and identify areas of the public lands where protection of the natural soundscape is prioritized.

26

BLM_0149585

IV.     **Travel Management**

    a.   **Area allocations for off-road vehicles**

        i.     Providing and protecting quiet recreation opportunities

The Draft RMP defers comprehensive travel planning, but evaluates a range of alternatives for vehicle use designations (open, limited, closed). BLM's preferred alternative would only close 58,560 acres to motorized use, representing less than 9% of the planning area. Uncompahgre Draft RMP at 2-301. This includes statutorily closed areas (such as Wilderness Study Areas), meaning BLM is hardly exercising any discretion to close areas to motorized use so they may be allocated for other multiple uses such as quiet recreation, wildlife habitat or cultural resource protection. Even Alternative B would only close 17% of the planning area to motorized vehicle use. *Ibid*. This does not represent balanced management, and is inconsistent with current BLM travel planning guidance. It is also inconsistent with the agency's obligations to comply with the minimization criteria, as detailed below.

Travel and transportation considerations play an important role in the experience of the recreation user and the management provided by BLM. The area designations that the RMP will put in place will be key determinants of recreation setting characteristics as well as fundamental tools for providing specific recreation experiences.

As such, BLM should implement OHV area designations that protect recreation opportunities for quiet and non-motorized recreation users throughout the planning area. The public land in the UFO has ample opportunity for recreation activities such as hiking, camping, and mountain biking. In this regard, the agency's Travel and Transportation Management (TTM) Manual generally recognizes that:

        TTM's comprehensive approach is driven by the need to provide access to and across public lands for a wide variety of users (including authorized, administrative, commercial, recreational, traditional, and other travel purposes), **while also addressing the equally wide variety of uses, including all forms of motorized, non-motorized, mechanized, and non-mechanized travel**.

BLM Manual 1626 at 1.6 (emphasis added).

BLM must adequately address the needs of non-motorized and quiet users in addition to motorized use. Ensuring opportunities for a full range of non-motorized travel is crucial for creating a *comprehensive* transportation and travel plan. In places managed primarily for non-motorized recreation, travel allocations and designations should reflect this desired recreation character setting. This should include restrictions and closures in areas that provide opportunities for non-motorized recreation such as lands with wilderness characteristics, areas of critical environmental concern, and other special designations.

        ii.     Applying the minimization criteria to area allocations

In response to the growing use of off-road vehicles (ORVs) and corresponding environmental damage, Presidents Nixon and Carter issued Executive Orders 11644 and 11989 in 1972 and 1977, respectively, requiring federal land management agencies to plan for ORV use based on protecting resources and

27

other recreational uses.[10] When designating areas or trails available for ORV use, agencies must locate them to:

(1) minimize damage to soil, watershed, vegetation, or other resources of the public lands;
(2) minimize harassment of wildlife or significant disruption of wildlife habitats; and
(3) minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands.[11]

BLM codified these "minimization criteria" in its OHV regulations at 43 C.F.R. § 8342.1, which provide:

The authorized officer shall designate all public lands as either open, limited, or closed to off-road vehicles. All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands; and in accordance with the following criteria:

(a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.
(b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.
(c) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.
(d) Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

Despite its long-standing legal obligation, BLM has struggled to properly apply and implement the minimization criteria in its travel management decisions. Federal courts have repeatedly sent BLM, Forest Service, and National Park Service travel management plans back to the agencies for failure to satisfy their obligation to minimize resource damage and conflicts between recreational uses.[12]

---

[10] Exec. Order No. 11644, 37 Fed. Reg. 2877 (Feb. 9, 1972); Exec. Order No. 11989, 42 Fed. Reg. 26,959 (May 24, 1977).

[11] Exec. Order No. 11644, § 3(a).

[12] See WildEarth Guardians v. U.S. Forest Service, 790 F.3d 920, 929-32 (9th Cir. 2015) (Forest Service failed to "apply the minimization criteria to each area it designated for snowmobile use" and to provide the "granular analysis [necessary] to fulfill the objectives of Executive Order 11644"); Friends of the Clearwater v. U.S. Forest Service, No. 3:13-CV-00515-EJL, 2015 U.S. Dist. LEXIS 30671, at *37-52 (D. Idaho Mar. 11, 2015) (Forest Service's conclusory statements failed to show how it selected motorized routes with the objective of minimizing their impacts); SUWA v. Burke (SUWA), 981 F. Supp. 2d 1099, 1104-06 (D. Utah 2013) (BLM acknowledgement of minimization criteria insufficient where record showed no analysis of specific impacts of designated OHV routes); The Wilderness Society v. U.S. Forest Service, No. CV08-363-E-EJL, 2013 U.S. Dist. LEXIS 153036, at *22-32 (D. Idaho Oct. 22, 2013) (remanding travel plan where Forest Service relied on unsupported conclusion that route closures

28

Collectively, these cases confirm the agencies' *substantive* obligation to meaningfully apply and implement – not just identify or consider – the minimization criteria when designating each area or trail, and show in the administrative record how they did so.[13] As a recent circuit court of appeals decision confirmed, agencies must "document how [they] applied [relevant] data on an area-by-area [or route-by-route] basis with the objective of minimizing impacts."[14] BLM's Travel and Transportation Manual confirms that BLM must pay particular attention to thoroughly documenting its application of the minimization criteria in making both OHV area designations and route designations. BLM Manual 1626 at 1.7; 3.1.

As Executive Order 11644, 43 C.F.R. § 8342.1, and Manual 1626 make clear, the substantive duty to minimize impacts applies equally to OHV area allocations made in resource management plans. With RMP area allocations setting the framework for where route designations will occur and providing the best opportunity to analyze OHV impacts across the broader landscape, it is critical that the Uncompahgre RMP apply and implement the minimization criteria when making area designations. To satisfy its *substantive* duty to minimize impacts, BLM must apply a transparent and common-sense methodology for meaningful application of the minimization criteria to *each* area being considered for designation. That methodology must include several key elements:

First, proper application of the minimization criteria is not solely an office exercise. As the courts have repeatedly made clear, use of cryptic spreadsheets or matrices that favor OHV use and do not facilitate implementation of the substantive duty to minimize impacts is inadequate.[15] Rather, BLM must get out on the ground, gather site- and resource-specific information, ground-truth desk-top analyses, and then utilize that data to actually apply the criteria to minimize resource damage and use conflicts associated with each designated area and route. This necessarily will require the agency to incorporate monitoring data and other information identifying resource or recreational use conflicts compiled by the agency or submitted by the public.[16] That information must be applied in what courts have described as a "granular analysis [necessary] to fulfill the objectives of Executive Order 11644."[17]

---

and elimination of cross-country travel minimized impacts); *Defenders of Wildlife v. Salazar*, 877 F. Supp. 2d 1271, 1304 (M.D. Fla. 2012) (record failed to demonstrate how Park Service decision to reopen trails was made with the objective of minimizing impacts); *Central Sierra Environmental Resource Center v. U.S. Forest Service*, 916 F. Supp. 2d 1078, 1094-98 (E.D. Cal. 2012) (Forest Service failed to show that it actually aimed to minimize environmental damage when designating motorized routes); *Idaho Conservation League v. Guzman*, 766 F. Supp. 2d 1056, 1071-74 (D. Idaho 2011) (record did not reflect whether or how the Forest Service applied the minimization criteria); *Center for Biological Diversity v. BLM*, 746 F. Supp. 2d 1055, 1071-81 (N.D. Cal. 2009) (record provided no indication that BLM considered or applied minimization criteria).

[13] *See, e.g.*, *CBD v. BLM*, 746 F. Supp. 2d at 1080-81 ("the BLM is required to place routes specifically to minimize" impacts); *Idaho Conservation League*, 766 F. Supp. 2d at 1072-73 (consideration of the minimization criteria insufficient where agency failed to demonstrate that the criteria "were then implemented into the decision process").

[14] *WildEarth Guardians*, 790 F.3d at 931.

[15] *See, e.g.*, *Idaho Conservation League*, 766 F. Supp. 2d at 1071-74 (agency may not rely on "Route Designation Matrices" that fail to show if or how the agency selected routes with the objective of minimizing their impacts); *SUWA*, 981 F. Supp. 2d at 1105 ("cryptic spreadsheet for each route segment provides inadequate information . . . for someone other than the BLM to know why or how the routes were chosen").

[16] *See* 43 C.F.R. § 8342.2(a) (public participation required in travel management decision-making); *Idaho Conservation League*, 766 F. Supp. 2d at 1074-77 (invalidating travel management plan that failed to utilize monitoring and other site-specific data submitted by the public showing resource damage).

[17] *WildEarth Guardians*, 790 F.3d at 931.

29

BLM_0149588

Second, application of the minimization criteria should be informed by the best available scientific information and associated strategies and methodologies for minimizing impacts to particular resources.[18] In 2012, the Journal of Conservation Planning published a literature review and best management practices (BMPs) for ORVs on national forest lands.[19] The BMPs provide guidelines, based on peer-reviewed science, for ORV designation decisions, implementation actions, and monitoring activities that are intended to minimize impacts to soils, water quality, vegetation, and wildlife, and conflicts with other recreational uses. Although they were formulated for national forest lands, most of the BMPs are applicable to OHV designation decisions on BLM lands as well. Travel management planning processes should reference and incorporate these BMPs.[20]

Third, proper application of the minimization criteria must address both site-specific and larger-scale impacts.[21] For example, agencies must assess and minimize landscape-scale impacts such as habitat fragmentation, cumulative noise and air and water quality impacts, and degradation of wilderness characteristics and associated opportunities for primitive forms of recreation. The agency also must assess and minimize site-specific impacts to soils, vegetation, water, and other public lands resources, sensitive wildlife habitat, and important areas for non-motorized recreation.

Fourth, application of the minimization criteria must take into account available resources for monitoring and enforcement of the designated system.[22] BLM is obligated under Executive Orders 11644 and 11989 and its travel management regulations to monitor the effects of OHV use on designated areas and routes and make adjustments to the designated system as necessary.[23] To ease enforcement obligations and ensure user compliance in the first place, OHV area designations and identification of Travel Management Areas should establish clear boundaries and simple, consistent restrictions designed to minimize resource damage and user conflicts.

Finally, attempts to *mitigate* impacts associated with an existing OHV system are insufficient to fully satisfy the duty to *minimize* impacts, as specified in the executive orders. The language of the executive orders makes this clear: "[a]reas and trails shall be *located* to minimize" impacts and conflicts.[24] 43 C.F.R.

---

[18] *See Friends of the Clearwater*, 2015 U.S. Dist. LEXIS 30671, at *24-30, 40-52 (invalidating route designations that failed to consider best available science on impacts of motorized routes on elk habitat effectiveness or to select routes with the objective of minimizing impacts to that habitat and other forest resources).

[19] T. Adam Switalski and Allison Jones, *Off-road vehicle best management practices for forestlands: A review of scientific literature and guidance for managers*, 8 Journal of Conservation Planning 12-24 (2012), *available at* http://www.journalconsplanning.org/2012/JCP_v8_2_Switalski.pdf. Development of a BLM-specific literature review and set of BMPs is in progress.

[20] The Bitterroot National Forest recently referenced and applied BMPs from Switalski and Jones in its Decision Notice/Finding of No Significant Impact for a project involving the designation of ORV trails. *See* Bitterroot National Forest, Darby Lumber Lands Phase I – Decision Notice and Finding of No Significant Impact, pp. 13-14, *available at* http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/80742_FSPLT3_2541294.pdf.

[21] *See, e.g.*, *Idaho Conservation League*, 766 F. Supp. 2d at 1066-68, 1074-77 (invaliding travel plan that failed to consider aggregate impacts of short motorized routes on wilderness values or site-specific erosion and other impacts of particular routes).

[22] *See Sierra Club v. U.S. Forest Serv.*, 857 F. Supp. 2d 1167, 1176-78 (D. Utah 2012) (NEPA requires agency to take a hard look at the impacts of illegal motorized use on forest resources and the likelihood of illegal use continuing under each alternative).

[23] Exec. Order No. 11644, § 8(a); 43 C.F.R. § 8342.3.

[24] Exec. Order 11644, § 3(a); *see also Center for Biological Diversity*, 746 F. Supp. 2d at 1080-81 ("'Minimize' as used in the regulation . . . refers to the *effects* of route designations, i.e. the BLM is required to place routes

30

BLM_0149589

§ 8342.1 mirrors that language. Thus, application of the minimization criteria should be approached in two steps: first, the agency locates areas and routes to minimize impacts, and second, the agency establishes site-specific management actions to further reduce impacts. The best available science confirms this tiered approach.[25] As described above, this approach is consistent with DOI's Landscape Mitigation Policy that prioritizes project design and siting to avoid adverse impacts in the first instance, followed by other minimization and mitigation measures.

### iii.   ORV "open" areas

We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP. Uncompahgre Draft RMP at 2-301. Nationally, BLM has for many years been moving away from allowing cross-country motorized use on a large scale or designating large ORV play areas. This type of motorized use is difficult for BLM field offices to properly manage; it damages natural, cultural and other resources; and it leads to conflict with other users of the public lands. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors."  43 C.F.R. § 8342.1.  BLM Manual 1626 reiterates that "open area designation must address the designation criteria (43 CFR 8342.1)." BLM Manual 1626 at 3.1(A).

<u>**Summary of Comments:**</u> BLM should close more of the planning area to motorized use to protect natural resources and quiet recreation opportunities and create more balanced management among the multiple uses and recreation visitors in the Uncompahgre Field Office. BLM must apply the executive order minimization criteria to demonstrate how each OHV area has been located to *minimize* resource damage and conflicts with other recreational uses. This will require a granular analysis of the impacts of OHV use in each area that addresses both site-specific and landscape-scale impacts, incorporates the best available scientific information and best management practices for minimizing impacts to particular resources, utilizes site- and resource-specific data, and accounts for available monitoring and enforcement resources. We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP.

### b.   Comprehensive Travel and Transportation Management Planning

The Uncompahgre RMP defers comprehensive travel and transportation planning, as provided for in BLM's regulations. While the Draft RMP includes several important components such as a prioritization scheme for future travel planning and criteria to guide route designations, the Draft RMP is not fully compliant with BLM's policy for deferred travel planning. BLM policy provides for deferred travel planning and interim designation of "Limited to Existing Routes" as long as a preliminary network is

---

specifically to minimize 'damage' to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts' of uses." (footnote and citations omitted)).

[25] *See* Switalski and Jones, 2012 (cataloguing best management practices for: (1) siting/locating routes to minimize impacts; (2) implementation, including maintenance, restoration, adaptive management, and other mitigation measures; and (3) monitoring).

31

identified and a process established to select a final travel management network. Specifically, BLM Manual 1626 provides a list of requirements for deferring travel planning:

> If the transportation network is to be deferred in the RMP, then the RMP documents the decision-making process used to develop the initial network, provides the basis for future implementation level decisions, and helps set guidelines for making transportation network adjustments throughout the life of the plan. The following tasks should be completed in the RMP for each planning area or TMA:
>
>     a. <u>Produce a map of the known network of transportation linear features, including modes of travel;</u>
>
>     b. <u>Define the long term management goals for the transportation system;</u>
>
>     c. <u>Define interim management objectives for areas or sub-areas where route designations were not completed concurrent with the RMP.</u> Clearly state the process of moving from an interim designation of "limited to existing roads, primitive roads, and trails" to a designation of "limited to designated roads primitive roads and trails" upon completion of TMP.
>
>     d. Identify any incomplete travel and transportation tasks:
>
>         i. Outline additional data needs and a strategy to collect needed information;
>
>         ii. Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints;
>
>         iii. Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process; and
>
>         iv. Identify any easements and rights-of-way (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.

BLM Manual 1626 at .06(B)(2). Those components underlined above are absent from the Uncompahgre Draft RMP. Manual 1626 also provides that "If the decision on delineating travel and transportation networks is deferred in the land use plan to the implementation phase, the work should be completed within five (5) years of the signing of the Record of Decision (ROD) for the RMP." *Id.* at .06(B)(3).

The Draft RMP does not include a map of the known network of transportation linear features, and in fact indicates that BLM has not completed an inventory of the existing routes that motorized travel will be limited to. Uncompahgre Draft RMP at M-2. BLM is required to complete this inventory during the land use planning process and utilize that inventory to inform travel planning decisions, even if those decisions are being deferred from the RMP. BLM cannot limit travel to existing routes unless those routes are known and mapped. The draft RMP also does not detail long-term management goals for the transportation system or interim management objectives other than some interim management guidance for areas limited to existing routes. *Id.* at 2-306—308. These elements must be fleshed out in the Proposed RMP to comply with agency policy.

We support BLM's commitment to identifying travel management areas, setting a prioritization scheme for completing comprehensive route designation, and completing route designations within 5 years of signing the ROD. The draft RMP identifies the following management action across the range of alternatives:

32

Establish Travel Management Areas and, within five years of the Approved RMP/Record of Decision, initiate comprehensive travel management plans within each the following Travel Management Areas and in the following order unless a change is deemed necessary by the BLM Authorized Officer (Figure 2-81, Appendix A):

1. North Fork (71,020 acres)
2. South Montrose (66,180 acres)
3. North Delta (61,270 acres)
4. San Miguel (74,960 acres)
5. West End (289,960 acres)

Uncompahgre Draft RMP at 2-308. Furthermore, those areas may be too large for efficient and effective route designation processes, especially the West End. The draft RMP appropriately indicates that, "At the time of comprehensive travel management planning, the Travel Management Area may be broken down into subareas to address different resource management objectives." *Id.* at 2-309. We encourage BLM to retain this language in the RMP and follow through with creating smaller areas for travel management planning at the route designation stage.

We also greatly support BLM's commitment that "Route density for designated public routes will be used as an analysis tool" in future travel management planning. *Id.* at M-9. However, BLM does not set route density targets in the RMP, but seems to defer identifying those targets to comprehensive travel planning. BLM should not defer using route density as a tool but should instead utilize that important tool in the Uncompahgre RMP. Setting route density targets is an appropriate way for BLM to address habitat fragmentation in travel planning in the absence of route-by-route designations. For example, BLM must consider alternatives to minimize and mitigate impacts to habitat fragmentation in the RMP, such as closing areas to motorized use, setting route density limits, and designating wildlife corridors, conservation rights-of-way or other mitigating land use allocations. Thus, BLM should set route density limits in the RMP to guide future route designations that minimize impacts to wildlife.

Route density targets must be based on the best available science, and must meet scientifically-based thresholds or be combined with mitigating actions. BLM should complete density analysis of existing transportation network features, buffer analysis to examine the effect zone of the transportation network and core area analysis to identify interior habitat that remains unaffected by the transportation network. BLM should use wildlife literature to interpret fragmentation metrics developed through spatial analyses and adopt management decisions that minimize and mitigate habitat fragmentation.

**Summary of Comments:** The Uncompahgre RMP must comply with BLM's guidance for deferred travel planning. This includes mapping the existing route network, setting long-term goals for the transportation network and identifying interim travel management objectives. BLM should carry forward other elements of the preliminary travel plan, including the prioritization of travel management areas, route designation criteria and commitment to utilizing route density as a travel planning tool.

### c.   Non-motorized trail networks

BLM is not planning to make route designations through this planning process. In order to set management direction for future travel planning efforts, the RMP should specify the criteria that BLM will use to designate a non-motorized trail network. While BLM is designating routes for motorized use, pursuant to the minimization criteria and agency guidance, BLM can and should also designate non-motorized trail systems.

33

BLM_0149592

In implementing its 2006 Roads and Trails Terminology Report, BLM emphasized the importance of taking a "holistic" approach to the management of roads and trails (see, Instruction Memorandum 2006-173), which includes non-motorized trails. Likewise, IM 2008-014 states that the travel planning process "requires recognition and designation of non-motorized trails or routes." In this planning process, BLM should not simply addresses motorized use in individual travel management areas, but should set a broad vision for protecting and enhancing the experiences of non-motorized users.

FLPMA requires BLM to develop land use plans that "consider the relative scarcity of values involved and the availably of alternative means and sites for realization of those values." 43 U.S.C. § 1712(C)(6). Access to a "quiet use" recreation experience on our public lands through non-motorized trails is a growing need as opportunities for this use is shrinking with an increasing motorized population. As motorized recreation continues to grow in the region, BLM must be more proactive and deliberate in designing travel networks that preserve quiet recreation opportunities.

The RMP should specifically address and identify how BLM will meet the needs of quiet recreation users and provide non-motorized trail opportunities as part of its transportation system. The guidelines for deferring route designations set forth in BLM Manual 1626 should be fully incorporated by defining the goals for the use, location, and development/decommissioning; *specifically for a long-term, non-motorized trail system.* BLM H- 8342 at 18.

In order to set management direction for future travel planning efforts, BLM should specify the process that will be used to designate a non-motorized trail network. As discussed previously in these comments, BLM's travel and transportation planning manual specifies the types of travel planning decisions that should be included in a travel planning process when route designations are being deferred. The RMP should ensure these decisions are applied specifically to non-motorized travel management, including:
- Define the long term management goals for the transportation system;
- Define interim management objectives for areas or sub-areas where route designations are not being completed
- Identify any incomplete travel and transportation tasks:
  - Outline additional data needs and a strategy to collect needed information;
  - Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints;
  - Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process

BLM Manual 1626 at .06(B)(2). As part of developing a preliminary travel plan for the non-motorized route network, BLM should identify management goals and objectives for travel management areas where primitive recreation experiences will be emphasized and develop criteria for future non-motorized trail designation.

One of these criteria should be identifying and implementing opportunities to convert existing routes to non-motorized trails, which is less impactful than creating new trails and requires fewer resources. The initial route inventories BLM has released show that there is an abundance of existing routes in the field office and therefore plentiful opportunities to designate existing routes for non-motorized use. To minimize the impact from a non-motorized trail network, BLM should prioritize existing linear features

34

BLM_0149593

that are in low-conflict and low-impacts places on the landscape. In any travel designation, BLM should minimize impacts to sensitive resources such take the necessary steps to avoid impacts wildlife habitat and other sensitive resources.

BLM should evaluate and include additional criteria for new trails in the RMP. One example of considering non-motorized trail networks comes from the Beaver Dam Wash NCA Draft RMP. This Draft RMP sets out criteria for designing a non-motorized trail system as follows:

> a) Addresses the needs of equestrians, hikers, climbers, and mountain bikers;
> b) Protects diverse NCA resource values from direct or indirect recreation impacts by promoting compliance with regulatory requirements and visitor use restrictions;
> c) Results in sustainable systems;
> d) Provides high quality experiences;
> e) Serves the abilities of non-motorized recreational users;
> f) Offers opportunities for looping, varying distances, linking between geographic areas and trailheads, and connecting to heritage and other educational resources.
> g) Minimizes user conflicts by separating user groups whenever feasible;
> h) Limits the desire to venture off-trail.

Beaver Dam Wash NCA Draft RMP at 150. BLM should set similar criteria in the Uncompahgre RMP.

As BLM considers any motorized use allocations and/or motorized trail designations, it should consider how those decisions might foreclose or limit an opportunity to designate the same or a nearby trail as non-motorized. Motorized trails can have far reaching impacts throughout the region. Designating an area as open to motorized use may preclude BLM's ability to effectively manage an adjacent or nearby area for quiet recreation. As such, BLM should give strong consideration to potential user-conflict generated from travel designations, in accordance with the minimization criteria. BLM should provide sufficiently large non-motorized areas to provide quality primitive recreation experiences and minimize disturbance to quiet-use activities from other forms of travel and recreation.

**Summary of Comments**: BLM should make allocations and designations in the RMP that provide for non-motorized recreation, and limit impacts from motorized use on quiet users. For areas that are intended to provide a semi-primitive or primitive recreation experience, the RMP should provide direction for completion of non-motorized trail systems in compliance with agency policy for completing a preliminary travel plan. BLM should prioritize lands with wilderness characteristics for non-motorized travel networks and should protect the primitive recreation resources and values found in lands with wilderness characteristics.

### d.  Temporary Closures

BLM has authority to institute temporary route closures to protect public lands and resources. 43 C.F.R. § 8364.1. BLM must immediately close any areas where the agency finds that OHVs are or will cause considerable adverse effects upon natural or cultural resources. 43 C.F.R. § 8341.2. BLM has policy guidance (Instruction Memorandum 2013-035) that describes how RMPs and TMPs should address temporary closures including defining thresholds for when OHV-related closures will take place. The IM states that all RMPs and TMPs shall include the following statement in accordance with 43 C.F.R. § 8341.2 with regard to OHV use:

35

> Where off-road vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, the affected areas shall be immediately closed to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.

IM 2013-035, Attachment 1. The IM goes on to state that the RMP and TMP should also describe the resources, uses, situations, and locations likely to be adversely affected by OHV use. Moreover, the IM provides that if BLM analyzes potential for temporary closures properly, then there will be no further need for additional NEPA analysis and the temporary closure can be issued with a DNA.

**_Summary of Comments:_** The above guidance from IM 2013-035 on incorporating analysis of potential for temporary closures should be included in the RMP. BLM should issue temporary closures for any area where ORVs are currently harming or may harm natural or cultural resources in the interim.

### e.   Revised Statute 2477

The Draft RMP appropriately asserts that BLM does not address the validity of R.S. 2477 assertions through the planning process:

> Although the courts may recognize adjudicated Revised Statute 2477 rights-of-way as valid existing rights, current BLM policy does not allow BLM to consider unadjudicated Revised Statute 2477 claims as valid existing rights. The current moratorium precluding the BLM from processing Revised Statute 2477 claims is still in effect, making Revised Statute 2477 assertions a legal issue beyond the scope of this planning effort.

Uncompahgre Draft RMP at ES-6, I-13; _see also_ 2-309. We support this approach, and note it is the correct approach under relevant law and policy. BLM must ensure it does not make inappropriate decisions based on R.S. 2477 claims, and must communicate clearly to cooperating agencies and the public that BLM is prohibited from considering such claims in this planning process.

**Summary of Comments:** BLM should uphold its assertion that R.S. 2477 claims are not addressed in the agency's planning process.

### V.   Ecological Emphasis Areas and Areas of Critical Environmental Concern

We support that BLM is considering innovative planning approaches for managing natural resources at a landscape scale and implementing a comprehensive conservation framework in the Uncompahgre RMP. The networks of Ecological Emphasis Areas (EEAs) and Areas of Critical Environmental Concern (ACECs) evaluated in the range of alternatives create integrated conservation designations that, in context with other specially designated areas and allocations evaluated in the RMP, aspire to protect and enhance the ecological integrity of the Uncompahgre Field Office.

We also see this approach as consistent with BLM's Planning 2.0 initiative. The landscape-level approach committed to through the agency's Planning 2.0 initiative will guide agency planning for the foreseeable future. While the Uncompahgre RMP is not currently being developed under Planning 2.0, consistency with the new agency direction will lead to more forward-thinking plan that aligns better with BLM's new planning rule and principles. Planning 2.0 presents an important opportunity for BLM to develop a

36

landscape level strategy for conservation on our public lands. BLM's approach to EEAs and ACECs in the Uncompahgre Draft RMP fits well within BLM's movement towards a landscape approach to managing public lands articulated in Planning 2.0.

Developing integrated networks of land use allocations to manage ecosystems at a landscape scale is critical to addressing climate change and the future of land management, and modern science emphasizes the importance of this approach as well as provides useful data for successful implementation. The rate of land use change across the conterminous United States has been, and is projected to continue increasing into the future. These changes are resulting in habitat fragmentation, loss of biodiversity, and are negatively impacting sensitive habitats and important ecological processes. Theobald 2010; Theobald et al. 2011. The effects of anthropogenic changes upon landscapes are no longer explicitly localized, rather the scale, speed of change, and subsequent impacts are having increasingly pronounced consequences at regional and global scales. Foley et al. 2005. Significant shifts in climate and climate change velocity are changing public lands, and the effects have been reliably modeled and observed across the United States. Loarie et al. 2009; Dobrowski et al. 2013. Specifically in the Southwest region, broad scientific consensus supports an imminent shift in climate towards increasing seasonal temperatures and a significant reduction of annual precipitation, resulting in an increasingly arid climate with prolonged periods of drought. Seager et al. 2007.

These changes in climate and land use patterns are projected to continue causing an increase in habitat fragmentation and shifts in the distribution of plants, animals, and ecological processes across local, regional, and global scales. Opdam and Wascher 2004; Loarie et al. 2009; Dobrowski et al. 2013; Ordonez et al. 2014. At the global scale, species migration and shifts in habitat range that match climate change projections have been empirically observed. Parmesan and Yohe 2003; Parmesan 2006. At a regional level, biodiversity in the Southwest, including Colorado, are modeled to undergo significant shifts in plant distributions. It is expected that grass communities will expand and dominate in lower elevations, as the distribution of forested communities will migrate to higher elevations and potentially occupy smaller, favorable areas of refugia. Notaro et al. 2012.

In order for species to survive, the persistence of suitable climates is necessary, but in some cases may be insufficient. Loarie et al. 2009. Species must also have the capacity to migrate and disperse at a velocity that keeps pace with suitable climates as they shift across the landscape. Pearson and Dawson 2003, Pearson 2006. The ability of ecosystems to adapt and persist in a changing climate will be dependent on the ability of species and ecological processes to migrate over and operate at broad scales. Theobald et al. 2012. The rate at which species must adapt and migrate to keep pace with human- and climate-driven landscape change may vary widely and be difficult to predict, but migration capacity and ability will be necessary for survival. Pearson 2006.

For species and ecological processes to migrate and persist over different temporal and geographical scales, it is crucial that they have access to landscape areas capable of supporting high levels of biotic and abiotic diversity. This diversity is known as landscape heterogeneity, and includes areas with a diversity of terrestrial, riparian, and aquatic ecosystems, and the associated plants and animals they support. Landscape heterogeneity also includes a diverse range of geophysical characteristics including; topographic complexity, large elevation ranges, soil type and structure, soil chemistry, soil moisture availability, and underlying geological features. Albano 2015. Together, all of these characteristics comprise landscape heterogeneity and are crucial for maintaining the long-term persistence of habitat, biodiversity, and ecological processes at the landscape scale, especially under changing climate and land use conditions. Anderson et al. 2014. Landscape heterogeneity provides increased opportunities for

37

biodiversity to occupy small habitat areas that serve as a refuge in a changing climate. Habitat 'refugia' created by a diverse and heterogeneous landscape are important land characteristics that allow species to migrate to, persist in, and expand from during times of a rapidly changing climate. Pearson 2006; Dobrowski 2011; Keppel et al. 2012.

In an effort to increase the capacity of plants, animals, and important ecological processes to migrate, adapt, and persist across the West, a systematic and increased network of conserved and protected areas needs to be implemented by conservation and land management planners. Heller and Zavaleta 2009. An increasingly large and diversified network of conserved areas in the West will help ensure the protection of important geophysical, biological, and ecological heterogeneity and allow for conservation management of large landscape level processes containing many important ecological processes. Noss 1983; Pickett and Cadenasso 1995; Margules and Pressey 2000.

A networked, connected, and dynamic regional system of protected areas will provide the greatest conservation benefit as single species conservation programs may become too costly, administratively complicated, and ultimately unsuccessful in the face of unpredictable, site-specific landscape and climate driven change. Opdam and Wascher 2004. The regional approach to land conservation management, drawing from biogeography and landscape ecology, have great implications for understanding the importance of incorporating different ecological scales (single species vs. multiple ecosystems) at which biodiversity conservation will be most successful. Simberloff 1998.

The BLM also can utilize EEAs and ACECs to more effectively manage ecologically valuable resources, particularly in the face of shifting climates. Many significantly large, road-less areas managed by BLM have been identified as having very high conservation value, yet much of this land is currently not allocated or managed with any type of conservation protection or special management prescriptions. Dickson et al. 2014. By utilizing a landscape level strategy for conservation planning, BLM can fulfill its responsibility and exercise its capacity to expertly manage our valuable public landscapes.

### a. Ecological Emphasis Areas

The UFO Draft RMP proposes a new designation across the range of alternatives, called Ecological Emphasis Areas. BLM defines EEAs as "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," and they are identified with the intention of contributing to connectivity across the larger landscape. Uncompahgre Draft RMP at D-1. This innovative approach would complement ACECs, as well as other land use allocations and conservation designations considered and applied across the landscape. The stated objective of designating EEAs is to "manage to preserve the continuity of habitats, vegetation communities, and native wildlife within." *Id.* at 2-68. The draft RMP includes a range of alternatives for management actions to achieve that objective. This is an important and admirable management objective as the BLM is looking for new ways to manage public lands at a landscape scale in a way that facilitates climate change resilience and adaptation.

While we fully support BLM considering and designating EEAs to achieve these important management goals and objectives, we encourage the agency to utilize modern research to improve the designation and management of these areas. The scientific literature referenced in the RMP appendix addressing EEAs is decades old (Faaborg 1980; Samson 1980; Noss 1983; Kushlan 1979; Miller 1979.) The only somewhat recent research is from 2001 (Noss, R. 2001. Beyond Kyoto: Forest Management in a time of rapid climate change. Conservation Biology. Vol. 15, Issue 3, pg. 578-590.) BLM should utilize more modern science to evaluate and designate EEAs that achieve the stated goals and objectives of the EEAs

38

BLM_0149597

and habitat management in the RMP generally. For example, The Wilderness Society has conducted recent research that would be valuable in identifying potential EEAs in the Uncompahgre Field Office, detailed below.

*Mapping Wildland Values to Support Conservation Strategies Across the US*

**Overview:** For over 100 years, conservation efforts have led to the establishment of hundreds of protected areas covering millions of hectares in the United States. These conservation reserves form the foundation of strategies to protect biological diversity and ecological processes upon which species and people depend. However, there is growing recognition that these existing conservation reserves may be insufficient in sustaining biodiversity as climate change and land use continues to impact natural ecosystems. Recent calls have been made to "complete the system" of protected areas by establishing an ecologically-connected network that is more inclusive of ecosystems and species currently under-represented in protected areas. Here, we conduct a national assessment of priorities for expanding conservation reserves that protect the most ecologically intact lands, establishes a national connected network, and better represents ecosystem and hotspots of range-limited species.

**Ecological integrity and "wildness":** The relative wildness of land is based on its ecological condition and the degree of human control over ecological processes (Aplet 1999, Aplet et al. 2000). Places that are ecologically intact and are maintained in a natural condition with minimal influence by human impacts or management are wilder than those with degraded ecological conditions and a high degree of human influence. The Wilderness Society works to protect the last remaining wild places (Figure 1a, upper left). For our national assessment, we used a high resolution dataset on the degree of human modification and ecological integrity (Theobald 2013) to serve as a surrogate for wildness. Maps of wildness are highly correlated with Theobald's map of ecological integrity, but is higher resolution and more updated than the wildness index.

**Connectivity:** The importance of creating a connected network of protected areas has emerged as one of the most important conservation strategies in the face of a changing climate (Rudnick et al. 2012). Our connectivity model identifies the wildest and most natural corridors linking large protected core areas across the lower 48 states (Belote et al. 2016). Maintaining the wildest and least human modified corridors between protected areas may give the most numbers of species the best opportunities to move and disperse as the climate change and development continues to fragment other areas (Figure 1b, upper right). We are working to bring this science to bear on additional conservation protections on federal lands so that these wild corridors are maintained or improved.

**Ecosystem representation:** Effectively conserving all of nature's biological diversity requires that protected areas be representative of all habitat types (Dietz et al. 2015). Unfortunately, our protected areas systems currently does not include full representation of all habitats, but we are working to identify those places across the country that – if protected – would diversify the protected areas system making it more representative of our entire natural heritage (Aycrigg et al. 2015). Lands in red and yellow represent ecological systems (i.e., different habitats) that are not well-protected in wilderness, national parks, or other protected areas (Figure 1c, lower left). As we prioritize the conservation lands of the future, adding diversity to our existing wilderness and parks will ensure that all of nature's diversity is protected.

**Hotspots of endemic biodiversity:** There are some places where many rare species co-occur. These lands are said to be rich in endemic biodiversity. Alarmingly, many of these places are home to species

39

BLM_0149598

that occur nowhere else on earth and are currently unprotected in conservation lands. The index developed by Clinton Jenkins and colleagues and appearing in the Proceedings of the National Academy of Science in 2015 maps these unprotected hotspots as conservation priorities (Jenkins et al. 2015). We are including these data into our wildland conservation priority index to ensure that we work on protecting those rare and precious places that are globally significant homes to many rare species (Figure 1d, lower right).



**Figure 1. Multiple criteria used to map wildland conservation priorities and values including wildness, connectivity, representation, and endemic species diversity. These criteria were combined to produce map in Figure 2.**

**Wildland conservation priorities:** We combined the mapped data described above (ecological integrity, connectivity, representation, and hotspots of endemic biodiversity) into one index by simply adding up the mapped layers (Figure 2). This new index allows us to identify wildland conservation priorities based on the land's relative wildness, its importance for creating a connected network of protected areas, its value in adding to the representation of habitats, and whether it has been identified as a hotspot of endemic species diversity. Ultimately, this approach will foster a national protected system of wildlands that is more prepared to handle the projected consequences of climate change.

BLM_0149599



**Figure 2. Composite wildland values map based on criteria in Figure 1. The composite value was produced by setting each criterion to the same scale and summing.**

Applying this data to the Uncompahgre Field Office, we can review how the EEAs evaluated in the draft RMP align with criteria used to map conservation priorities and overall wildland conservation values. As seen on the maps below in Figure 3, additional or alternative areas should be considered for EEA designation to ultimately achieve a network of conservation areas that maximize their potential to contribute to connectivity across the larger landscape.

BLM_0149600



**Figure 3. Wildland conservation values and potential Ecological Emphasis Areas in the Uncompahgre Field Office.**

Additionally, this research could also help BLM prioritize management prescriptions for EEAs. In the draft RMP, BLM considers essentially one set of management prescriptions for all EEAs in each alternative. Given the large amount of acreage under consideration, the more reasonable approach may be to tailor management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs. This is how BLM develops management prescriptions for ACECs, and this approach could give the agency flexibility to designate large amounts of EEAs while giving each area the level of protective management that is required.

**Summary of Comments:** BLM should move forward with designating Ecological Emphasis Areas in the Uncompahgre RMP to create a network of interconnected habitat areas that contributes to the ecological integrity of the broader landscape. We encourage the agency to utilize modern research to improve the designation and management of these areas, such as the wildland values mapping information provided above. BLM should consider tailoring management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs.

42

          i.   Comments on Specific Ecological Emphasis Areas

*Adobe Ecological Emphasis Area*

Alternatives B and D would manage part of the greater Adobe area under an Ecological Emphasis area designation, which we support. Uncompahgre Draft RMP at 2-68. However, the specific proposal for the Adobe EEA changes drastically from Alterative B to Alternative D. Alternative D significantly guts the EEA through the center, leaving only portions of the area designated on the northwest and far eastern boundaries. This would leave the center of the Adobes/greater saltbrush area completely without any special management status to protect the many unique values and resources that have been highlighted through the LWC, ACEC and EEA analyses.

As proposed in Alternative D, the Adobe EEA is insufficient because much of the white-tailed prairie dog habitat is omitted. This includes one of the UFOs few recent burrowing owl nests. For the BLM to truly protect this area from further degradation and maintain the landscape scale habitat management it aspires to, the final RMP should designate the larger Adobe EEA considered in Alternative B.

Taken altogether, the LWC, ACEC and EEA management for the greater Adobe area would create a holistic management approach that will protect a large area of unique a vulnerable desert shrub lands and habitat that connect to Forest Service lands on the Grand Mesa.

*Roubideau Ecological Emphasis Area*

We support BLM including the Roubideau EEA as identified in both Alterative B and Alternative D in the Final RMP as it maintains its full acreage in both. As the Roubideau area is identified as a high value are for habitat, wilderness and recreation values, we recommend that it be closed to oil and gas leasing in accordance to our larger comments on oil and gas leasing throughout the field office. The area is clearly valued for other resources other than oil and gas development and should be managed to highlight and protect these values over oil and gas minerals that have low development potential in this area. Closing the Roubideau EEA to oil and gas leasing is important to protect sensitive species such as the Grand Junction milkvetch, desert bighorn sheep and northern leopard frog which BLM has identified in the area. Uncompahgre Draft RMP at D-3.

The Roubideau area has many high valued resources that qualify it for LWC, ACEC, EEA and SRMA management. In order to fully protect all the canyons, mesa tops and connecting areas - and manage for future recreational use - a layered management decision utilizing all of these designations and allocations is warranted.

*Dry Creek Ecological Emphasis Areas*

We are supportive the Dry Creek EEA as it is proposed in Alternative B, as the area is significantly reduced in the Dry Creek EEA as proposed in Alternative D. We are also concerned about the overlap of the Dry Creek SRMA in the same area as the EEA.

BLM is proposing to manage the Dry Creek SRMA for front country management and for "operational recreation setting characteristics), allowing competitive events and choosing other "less restrictive actions" to manage the area, including a CSO stipulation for oil and gas leasing for parts of the SRMA rather than an NSO. Uncompahgre Draft RMP at 4-319.

43

BLM_0149602

Although we understand this is a popular area with much motorized and mechanized activity, we are concerned that the SRMA proposal in Alternative D is in conflict with BLM's proposed EEA in the same area. The EEA centers on three large drainages that link the Uncompahgre Valley to the Plateau and identified riparian, cliff and canyon pinon-juniper ecosystems as well as areas of sage brush and ponderosa. The area supports bear, mountain lion, mule deer and native warm water fish.

We believe the SRMA proposal as laid out in Alternative B, which would close the area to leasing, recommend ROW avoidance, and recommended the area for mineral withdraw, would help achieve the EEA objectives.

### a.  Areas of Critical Environmental Concern

Under FLPMA, BLM is obligated to develop and revise land use plans to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values…[and] where appropriate, will preserve and protect certain public lands in their natural condition…" 43 U.S.C. §1701(a)(8). FLPMA obligates BLM to "give priority to the designation and protection of areas of critical environmental concern [ACECs]." 43 U.S.C. § 1712(c)(3).  ACECs are areas "where special management is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes." 43 U.S.C. § 1702(a).

BLM's ACEC Manual (1613) provides additional detail on the criteria to be considered in ACEC designation, as discussed in the applicable regulations, as well.  *See*, BLM Manual 1613 at .1 (Characteristics of ACECs); 43 C.F.R. § 8200.  An area must possess relevance (such that it has significant value(s) in historic, cultural or scenic values, fish & wildlife resources, other natural systems/processes, or natural hazards) and importance (such that it has special significance and distinctiveness by being more than locally significant  or especially rare, fragile or vulnerable).  In addition, the area must require special management attention to protect the relevant and important values.

For potential ACECs, management prescriptions are to be "fully developed" in the RMP. BLM Manual 1613 at .22 (Develop Management Prescriptions for Potential ACECs).  These management prescriptions include general policies and mitigation measures that "protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources…" BLM Manual 1613 at .02.

We support that BLM is considering a robust range of ACECs for designation in the Uncompahgre RMP. The fact that the proposed Planning 2.0 rule emphasizes ACECs, as well as the fact that BLM is currently updating its ACEC Manual, speaks to both the importance of incorporating ACEC designation into the agency's landscape-level strategy for land use planning and the unique position that ACECs will have in the next chapter of BLM land use planning. Therefore, the limited number and acreage of ACECs that would be designated in the preferred alternative is inadequate to support a connected landscape and maintain its ecological integrity. At the same time, we note that many of the ACECs under consideration in the draft RMP overlap with potential EEAs, particularly in Alternative B. Uncompahgre Draft RMP at Figures 2-2 and 2-64. We encourage BLM to ultimately designate a network of ACECs and EEAs that is consistent with FLPMA and agency policy, and also maximizes the ability of these designations to create a connected network of protected areas across the Uncompahgre Field Office.

44

BLM_0149603

**Summary of Comments:** In compliance with FLPMA and BLM's obligation to designate ACECs where lands exhibit relevant and important qualifying criteria, we recommend that BLM adopt a comprehensive ACEC framework that designates adequate new ACECs, applies robust management prescriptions to protect relevant and important criteria, and creates an integrated network with EEAs and other conservation allocations and designations in the planning area.

i.   Comments on Specific Areas of Critical Environmental Concern

*Adobe Badlands and Salt Desert Shrub Ecosystem ACECs*

The greater Adobe badlands in north Delta are a fascinating and vulnerable environment. It is a system based on fragile shales and soil crusts that in turn support rare high desert plant and animal species. The Colorado Natural Heritage Program considered salt desert shrub lands in the area to be globally vulnerable and locally imperiled. These fragile desert systems need a high level of preservation to retain an intact ecosystem as they have a high difficulty in recovery from disturbance.

The greater Adobe area has two different proposed ACECs that overlap. One is the existing Adobe Badland ACEC which basically overlaps the WSA.  The other is the Salt Desert Shrub Ecosystem ACEC which is much larger in size and would go further in protecting these fragile systems. Uncompahgre Draft RMP at 2-137—138. We encourage the BLM to carry the Salt Desert Shrub Ecosystem ACEC into the Final RMP with the full acreage as identified in Alternative B.  This management decision would lessen the impacts to Special Status Species and protect a system that is already facing encroachment and fragmentation.

The Salt Desert Shrub Ecosystem ACEC meets BLM's ACEC criteria and should be designated as such:
-   The area has significant wildlife values: populations of white tallied prairie dogs, kit fox, burrowing owl, ferruginous hawk and pronghorn antelope.  All together it has been ranked as an area of "very high biodiversity significance" by the Colorado Natural Heritage Program.
-   Natural processes or systems:  significant populations of hookless cactus, adobe penstemon, and clay-loving buckwheat, all endangered or threatened endemic sensitive plants
-   More than local qualities: In addition to providing an important natural area for local residents to enjoy, the area is listed in the state and regional hiking guide books because of its scenic formations. If one looks on line, there is evidence of evidence of visitors from as far away a Europe who post photos and GPS coordinates of their trips into this area.
-   Vulnerable qualities: the area is clearly vulnerable to high levels of erosion and without special management.  Issues such as illegal off road recreation, dumping and other damaging uses are difficult for systems such as these to recover from. Saline soils are vulnerable to adverse change. Without added management protection, the area could be damaged for decades to come.

*Roubideau-Potter-Monitor ACEC*

In BLM's ACEC analysis, the Roubideau-Potter and Monitor mesa and canyon complex is recognized as a potential ACEC of 20,502 acres in size with valuable resources of riparian vegetation. The area is recognized by the CNHP for its high biodiversity rating, giving it statewide and global significance. The area also has cultural and historical sites that are vulnerable to change and warrant protection as an ACEC. If the BLM is planning to manage this area as an SRMA expecting more visitation in the future (as explained in the rationale for moving it towards "front country management") these historic resources

45

BLM_0149604

need to be managed so increased recreational use does not damage them. *See, e.g.,* Uncompahgre Draft RMP at 4-320.

The Roubideau ACEC is present in Alternative D and named "Roubideau Corridors," but is drastically reduced in size to 8,720 and only includes the canyons, not the mesa tops. Uncompahgre Draft RMP at 2-345—347. This proposal would leave the mesa tops without either LWC or ACEC protection, only selectively managing to protect the riparian vegetation in the canyons and not the montane forest also identified in the area.  The montane forest is not rare, nor is it pristine. However, wildlife including desert bighorn sheep are known to move back and forth between the zones in search of forage and water, and need the full ecosystem. After leading many on the ground hikes in both the canyons and the mesa tops, it is clear the area should be treated as a holistic unit and not separated into canyons and mesas. The experience of being in this area in not complete without being able to enjoy a hike through the canyons and then climb up to the mesa tops to get a full view of the surrounding area. Note that the Wickiup site with 13 wickiups on Monitor Mesa is on the Mesa top, not in the canyon. It is likely that other archaeological sites exist that have not been identified, since that particular site was found essentially by accident. Therefore, additional protection for the cultural resources on the mesa top is warranted.

We recommend that the BLM include the full Roubideau-Potter-Monitor ACEC as identified in Alternative B in the Final RMP. This is especially important if BLM does not manage the mesa tops as part of the LWC unit, in which case an ACEC designation should include to mesa tops to ensure the holistic management of the area to protect it and maintain the quality of the experience.

*La Sal Creek ACEC*

BLM should designate the 10,490-acre La Sal Creek ACEC as proposed in Alternative B to protect unique vegetation communities and BLM sensitive plant, fish, and wildlife species, including Paradox breadroot, Paradox Valley lupine, desert bighorn sheep, and peregrine falcon. Uncompahgre Draft RMP at 2-341. The La Sal Creek ACEC would provide enhanced protections for wilderness-quality lands adjacent to the Dolores River Canyon WSA, including the important species and scenic values associated with those lands that merit ACEC designation.

## VI.  **Wild and Scenic Rivers**

Our organizations and members have carefully researched both the field and documented values of free-flowing rivers across the Uncompahgre Field Office. We also are readily available to discuss and clarify the comments below, regarding resource management plan protections for potential Wild & Scenic Rivers and to provide other assistance and information as may be useful to you.

Many of the same organizations and individuals have participated in the BLM's wild & scenic (W&S) review process completed so far, and they have previously submitted comments during RMP scoping and during W&S eligibility and suitability reviews. Representatives of these organizations also participated in the citizen-engagement processes hosted by the BLM and by others during consideration of wild & scenic suitability.

46

BLM_0149605

### a.   Legal and procedural requirements

We appreciate the BLM's conscientious and professional compliance with requirements regarding wild & scenic analyses and decisions within the RMP process, including section 5(d)(a) of the Wild and Scenic Rivers Act and by the BLM Manual at 8351 and 6400. Beyond mere compliance, we also thank the BLM for its thoroughness in reviewing potential rivers at each stage of its W&S analysis—including initial inventory of rivers, eligibility report, and suitability report—and for its extra efforts in community outreach and in field assessment of potential rivers.

We believe that the W&S suitability findings included in the BLM's *Wild and Scenic River Suitability Report*, February 2013 (included as Appendix P to the draft RMP), provides a fair and sound analysis and set of recommendations. We believe that the suitability findings should be fully implemented in the final RMP, as represented in the preferred alternative of the Draft RMP.

### b.   Critique of working groups

One component in the W&S suitability analysis was a series of public-engagement meetings and negotiations, structured separately for the Gunnison River basin and the San Miguel-Dolores River basin.

The citizens' working group focused on eligible segments within the Gunnison River basin was loosely organized and marginally facilitated, open to a frequently changing array of interested individuals, without consistent representation, and with changing protocols for discussion and decision-making.

As a result, no consensus was reached on recommendations to the BLM. Two reports were submitted from that process:  One report recommended no stream segments be found suitable; the other recommended three segments be found suitable (Monitor Creek, Potter Creek, Roubideau Creek segment 1). Both reports are included on the BLM's website for the RMP, and we appreciate that fact that both were considered by the BLM in crafting its draft RMP.

For the San Miguel and upper Dolores river basin, the BLM's *Southwest Resource Advisory Council* (RAC) appointed a diverse citizens committee to review candidate rivers.

The sub-RAC, as it was known, was thoughtfully and fairly structured, was professionally facilitated and recorded, hosted nine public-comment meetings, and included a deliberately selected membership intended to represent a comprehensive spectrum of community and resource interests.

That group studied each eligible river in detail and recommended thirteen stream segments be found suitable, those recommendations later affirmed by the full RAC and forwarded to the BLM. In many instances, river segments were adjusted in length—most typically to remove private land from suitability implications—and some were adjusted in classification to better fit local water use and other resource needs.

### c.   Watershed approach to rivers management and protection

The BLM's suitability findings in the San Miguel-Dolores River basin are correspondingly well founded in careful analysis, in strong public engagement and support, and in a constructive spirit of compromise and mutual accommodation among protection, commodity, and community interests.

47

BLM_0149606

Moreover, the suitability findings for the San Miguel River, for portions of the Dolores River, and for key tributaries to both are consistent with suitability determinations in adjacent federal land management units. Specifically, W&S suitability findings recently established or affirmed in the watershed by the San Juan National Forest, the BLM Tres Rios Field Office, and the BLM Grand Junction Field Office will now be complemented by similar findings of suitability—and corresponding protective management—in the Uncompahgre Field Office.

That consistency is further enhanced by the BLM's recent realignment of management districts, now including in the entire Dolores River watershed in one coordinating district.

The call for a comprehensive and coordinated watershed approach to rivers management and protection was a frequent and consistent refrain during the working group processes. The management decisions noted above, the BLM organization restructuring, and now strong and well-founded suitability decisions in the Uncompahgre Field Office provide affirmative response to those requests.

### d. Opportunities for federal-state cooperation

The BLM's administrative management and protection for potential Wild & Scenic Rivers, through eligibility or suitability, affords an important opportunity to comprehensively address river values. A combination of federal land management prescriptions under the RMP and streamflow protections using the State of Colorado's *Stream and Lake Protection Program* will ensure the continued health and natural vibrancy of the full spectrum of river flow and river corridor features.

Correspondingly, we appreciate the position recently taken by the *Colorado Water Conservation Board* (CWCB) (which manages the state stream protection program), acknowledging the potential value of W&S suitability findings in both watersheds and requesting several specific accommodations from the BLM.

Specifically, we encourage the BLM to a) incorporate into its final RMP preparation information and documents prepared under the state's Basin Roundtable process, b) acknowledge existing state instream flow water rights affecting W&S suitable stream segments and encourage cooperation on the selective expansion of those rights and establishment of new rights to complement the suitability status, c) affirmation of stipulation between the CWCB and the Dolores Water Conservation District in the matter of CWCB staff recommendation for instream flow appropriation on the Dolores River, d) incorporate updates regarding CWCB instream flow water rights, both established and pending, e) include clarification regarding effects that W&S suitability may or may not have on potential development conditional water-storage rights held by Montrose County, and f) provide clarifications regarding the effects that W&S suitability may or may not have on continued operation of McPhee Reservoir and the Dolores Project.

While we understand that the pending RMP is probably not the correct context in which to address potential federal legislation, we encourage the BLM to otherwise acknowledge and affirm the its openness to streamflow protection for potential W&S rivers by means other than pursuit of federal reserved water rights.

At the same time, we recommend that the BLM should not adjust its RMP suitability findings for stream segments being discussed for possible federal legislation (upper Dolores River, La Sal Creek *e.g.*), leaving final or adjusted determinations to Congress or to future BLM administrative processes. It is important

48

that legislative deliberations benefit from the BLM's professional and objective assessment of particular stream values and of their potential for inclusion in the *Wild and Scenic Rivers System* or other protective designation.

### e. Comments on specific stream segments

We strongly endorse all the W&S suitability findings included in the BLM's *Wild and Scenic Suitability Report*, highlighted in Appendix P to the draft RMP, and we urge BLM to include those findings in the final RMP, along with protective management prescriptions appropriate to suitability status and classification.

Further, we urge BLM to fully and reliably implement, in the RMP, other protection measures for rivers and river corridors determined to be W&S eligible but found not suitable. In many instances, a combination of recommendations from the citizen working groups and acknowledgements in the draft RMP have asserted that suitability was not necessary for certain stream segments specifically because other measures are in place to protect the free-flowing condition and the outstandingly remarkable values that warranted the original eligibility determination. It is important that the BLM ensure the continued protection of values identified under eligibility.

Related, the BLM, through the RMP and otherwise, should continue to monitor the presence and effectiveness of those alternative protection measures. If those measures fail or are discontinued for any stream segments that had been found eligible, BLM should promptly reconsider, through an RMP amendment, eligibility and suitability for those segments.

*Gunnison River Basin*

Gunnison River Segment 2
As documented in the BLM's W&S eligibility report, this regionally significant river warrants strong and enduring protection as an important recreational opportunity, as the hydrologic heart of unique adjacent public lands, and as essential habitat for at least two endangered species of native fish, along with three other species of ancient native fish that are imperiled primarily because of loss of habitat or changes in river flows.

Other federal programs—primarily the Endangered Species Act—and evolving federal management efforts—including re-operation the Aspinall Unit dams upstream—contribute, or will contribute, to the reliability of those critical-habitat flows.

It therefore is not necessary to apply a finding of wild & scenic suitability to this portion of the Gunnison River, *so long as* those other federal measures are implemented and properly maintained. If those measures are either removed or fail to protect the native fish and their habitat, the BLM should reconsider a finding of suitability in future planning processes.

Monitor Creek
This stream is an important feature flowing through the heart of federal lands with wilderness character and wilderness characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

49

BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values identified by the BLM (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Monitor Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and Outstandingly Remarkable Value (ORV)) identified by the BLM for nearby Roubideau Creek (*desert bighorn sheep*). The features, condition, and importance of this wildlife habitat along Monitor Creek are of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Monitor Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), the version found along Monitor Creek is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Monitor Creek are also present in Roubideau Creek, which is included, stream and corridor, in the Roubideau (Camel Back) Wilderness Study Area, thus necessarily defined by those same backcountry recreation opportunities.

Meanwhile, a finding of wild & scenic suitability for Monitor Creek—a finding most directly applicable to the lands in the stream corridor—will provide reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*).

Federal ownership of 100% of this stream segment, and of 96.2% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 104.9 acres of private land within the stream corridor are actually separate from the stream, further simplifying protective management, especially if that management were applied specifically to the federal lands.

**We recommend that the full length of the Monitor Creek segment be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should be expanded to include recreational opportunities and wildlife habitat.**

<u>Potter Creek</u>
This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

50

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values originally identified in the BLM's eligibility report (*vegetation*), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Potter Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and ORV) identified by the BLM for adjacent Roubideau Creek (*desert bighorn sheep*). The features, condition, and importance of that wildlife habitat along Potter Creek is of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Potter Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), it is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Potter Creek are also present in Roubideau Creek. Roubideau Creek and its corridor are included in the Roubideau (Camel Back) Wilderness Study Area, which is necessarily defined by those same backcountry recreation opportunities.

Meanwhile, the BLM's decision to remove the one outstandingly remarkable value originally identified in the agency's eligibility report is in error. The BLM's rather arbitrary distinction between a classification as critically imperiled globally (G1) and vulnerable throughout its range (G2) is not well founded.

A plant community that is currently vulnerable throughout its range warrants the highest possible level of protection in each of its occurrences, lest damage from human activity, climate change, or other harmful factors translate vulnerable to imperiled. The best way to avoid plant community failures in the future is an active protection in the present. A finding of suitability, and accompanying protective management, is an appropriate and timely tool for this plant community.

A finding of wild & scenic suitability for Potter Creek—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*).

Federal ownership of 100% of this stream segment, and of 98.5% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 44.3 acres of private land are located at the far lower end of the stream segment, further simplifying protective management, especially if that management were applied specifically to the federal lands.

**We recommend that the full length of the Potter Creek be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should continue to**

51

BLM_0149610

**include the highlighted vegetation communities, and they should be expanded to include recreational opportunities and wildlife habitat.**

Roubideau Creek Segment 1

This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, both within the long-standing Roubideau (Camel Back) Wilderness Study Area and in the larger citizens' wilderness proposal of the same name. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

A finding of wild & scenic suitability for Roubideau Creek Segment 1—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring protection for the continued health of the ORVs identified in the BLM's eligibility report, including:  rare plant communities (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*); wildlife (*northern leopard frog, desert bighorn sheep*); cultural; and recreational (*primitive and non-mechanical exploration and exercise*).

Federal ownership of 93% of this stream segment, and of 94.8% of the land in the stream corridor simplifies the effective implementation of protective management.

**We recommend that the full length of the Roubideau Creek Segment 1 be found suitable, applicable at least to the federal lands in the corridor.**

Roubideau Creek Segment 2

The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (45.5%, 60.2%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Roubideau Creek Segment 2.

Deep Creek

The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

In particular, the critical rarity of greenback cutthroat trout warrants the highest level of protective management, especially management and cooperative measures to ensure reliable and seasonally natural stream flows.

52

BLM_0149611

The relatively low percentage of federal land ownership along the stream and in the stream corridor (22.7%, 15.8%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Deep Creek, *so long as* those other methods continue to successfully protect the trout and its habitat.

<u>West Fork Terror Creek</u>
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (39.2%, 47.5%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for West Fork Terror Creek, *so long as* those other methods continue to successfully protect the trout and its habitat.

<u>Beaver Creek</u>
Traversing a narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad, otherwise private-land, geography. The creek is also an important contributing tributary to the San Miguel River.

Federal land ownership of nearly 100% will simplify effective implementation of protective management.

**We recommend that the full length of Beaver Creek be found suitable with modifications recommended by the SWRAC.**

<u>Dry Creek</u>
This stream traverses a uniquely un-roaded landscape, providing important wildlife support and general ecological vibrancy. It is also a seasonally large streamflow contributor to the San Miguel River.

The very distinctive scenery and geology of the area—formed in large part by the creek itself—warrant strong protective management for the stream and corridor.

Nearly 100% federal ownership of land along the stream corridor, and extensive federal land beyond the corridor, simplify effective implementation of protective management.

We concur with the SWRAC recommendation that the Dry Creek segment may be sufficiently protected by ACEC designation and no-surface-occupancy stipulations, so long as those alternative measures continue to protect the stream's free-flowing condition and identified ORVs.

<u>Naturita Creek</u>
This rare habitat for exemplary populations of endangered native fish and/or fish species of concern warrants the strongest possible protection, for both streamflows, related corridor vegetation, and water quality.

While the low percentage of federal ownership along the corridor might preclude a finding of suitability or wild & scenic designation, other immediate, effective, and enduring administrative protections—

53

BLM_0149612

including cooperative measures with landowners and with other government agencies—should be included in the resource management plan and its implementation.

Saltado Creek
Traversing a relatively narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad otherwise private-land geography. The creek is also an important and reliable streamflow-contributing tributary to the San Miguel River.

The healthy and remarkably undisturbed nature of this segments riparian vegetation and soils, worthy of strong protection itself, helps ensure clean streamflow in the San Miguel River.

100% federal land ownership along the lower four miles of the segment simplifies effective implementation of protective management.

**We recommend that the full length—certainly the federally owned portion—of Saltado Creek segment be found suitable with modifications recommended by the SWRAC.**

San Miguel River Segment 1
This large, regionally iconic river is inherently significant, and it provides important streamflow contribution to the Dolores River, itself severely diminished above its confluence with the San Miguel. This flow contribution is particularly important for the surviving population of endangered native fish, and/or fish species of concern, inhabiting the portion of the Dolores River just below that confluence. With flows from the upper reaches of the Dolores still highly variable and generally low, the San Miguel flow contribution is critical and must be protected.

This segment includes unparalleled scenery and attendant natural and cultural features.

The patchwork of federal-private land ownership along the segment may complicate protective management, but the segment's features warrant the extra effort that might be necessary to secure a finding of suitability and to implement cooperative measures to protect those features.

**We recommend that all of San Miguel River Segment 1 be found suitable.**

San Miguel River Segment 2
This relatively short segment of the San Miguel River contains unusually undisturbed stream and corridor features, warranting the strongest possible protection. The corridor includes stunning geological and landform scenery, much of it formed by the river itself, along with a uniquely undisturbed and vibrant riparian ecosystem.

Federal land ownership along the segment is 100%, simplifying effective implementation of protective management.

**We recommend that San Miguel River Segment 2 be found suitable with modifications recommended by the SWRAC.**

54

BLM_0149613

San Miguel River Segment 3
This segments uniquely wild condition affords recreational experiences important to local economy and to local sense of place. The segment also provides critical habitat for endangered native fish and/or fish species of concern, which must be protected in order to ensure continued local use of the river's flows.

While federal land ownership along the segment is only 72.5%, the bulk of private land is found at one location, facilitating the cooperative measures important for implementing protective measures essential for this segment.

**We recommend that San Miguel River Segment 3 be found suitable with modifications recommended by the SWRAC.**

San Miguel River Segment 5
In addition to ensuring strong and enduring protection for the public lands segments of the river traversing primarily federal public lands, the BLM should engage landowners and other land managers in Segment 5 to ensure cooperative measures to a) protect a continuous healthy stream corridor and b) to ensure natural-hydrograph flow contributions to the Dolores River. These and other measures should be undertaken to, among other things, enhance and preserve important habitat for imperiled native fish noted in the BLM's Final Eligibility Report.

**We recommend that San Miguel River Segment 5 be found suitable with modifications recommended by the SWRAC.**

San Miguel River, segment 6
This final segment to the San Miguel River's confluence with the Dolores River is of critical importance to a) preserve the beauty and natural dynamics of the confluence, to ensure a final, reliable, and healthy contribution to streamflows important for imperiled native fish uniquely flourishing in the segment and just downstream from the confluence, and c) to protect and enhance the healthy native riparian vegetation along the segment.

While less than 70% of the land along segment is federally owned, 100% of the final two miles above the confluence is federally owned, facilitating effective implementation of protective management.

**We recommend that San Miguel River segment 6—or at least the federal portion—be found suitable with modifications recommended the SWRAC.**

Tabeguache Creek Segment 1
This stream traverses a uniquely un-roaded, wild landscape on public lands, providing important wildlife support and general ecological vibrancy along the stream itself, and complementing congressionally designated national forest lands protected upstream.

Reliable protection is also needed for the segment's uniquely and flourishing riparian vegetation communities, and noted in the BLM's Final Eligibility Report.

Federal land ownership along the segment is 100%, simplifying effective implementation of protective management.

55

BLM_0149614

**We recommend that Tabeguache Creek Segment 1 be found suitable with modifications recommended by the SWRAC.**

Tabeguache Creek Segment 2

This segment contributes reliable and significant volume of streamflow to the San Miguel River, and the health of segment should be protected in order to maintain and enhance the quality of the contributed streamflows.

The segment's superior examples of unique stream-dependent riparian vegetation communities should themselves be preserved and enhanced.

Although less than 70% of the land along the segment is federally owned, 100% of the land immediately above the stream's confluence with the San Miguel River is federally owned. This facilitates effective implementation of protective management.

We reluctantly concur with the SWRAC recommendation that the free-flowing condition and outstandingly remarkable values of Tabeguache Creek Segment 2 be protected by means other than w&s suitability.

Lower Dolores River

Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is essential to, and appropriate for, that protection.

The esthetically and economically important recreation opportunities provided by the Lower Dolores River segment present sufficient justification for protecting the natural appearance and health of that segment. The existence of healthy populations of regionally imperiled native fish, as noted in the BLM's eligibility and suitability reports, make that protection even more important.

In conjunction with a finding of suitability, and protective management, for the San Miguel River segments upstream, corresponding protections for this segment complete an important recognition of the two rivers' importance, locally and nationally.

While just over 65% of the land along the segment is federally own, 100% of the upper portion of the segment is federally owned. This facilitates effective implementation of protective management for that federal portion; it also facilitates—and warrants—cooperative agreements and actions in the lower portions, lined primarily by private land, to help complete that protective management.

**We recommend that that full length of Lower Dolores River segment—or at least the upper federally owned portion—be found suitable with modifications recommended by the SWRAC.**

56

North Fork Mesa Creek

This segment warrants the strongest of protective measures for two basic reasons. First is the BLM-recognized presence of globally imperiled narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian woodlands along the segment. Second, and related, the segment contributes perennial, high quality streamflows to Mesa Creek, and thus to the severely depleted Dolores River itself.

A finding of suitability for this segment corresponds to the BLM's separate finding of eligibility for the upstream segment of the North Fork. In any case, the Uncompahgre and Grand Junction field offices should confer and protect effective coordinated protective management for both segments.

While just over 68% of the land along the segment is federally owned, 100% of the upper portion of the segment is federal. This facilitates effective implementation of protective management, and facilitates the implementation of cooperative agreements and actions for portions of the segment lined with private land.

We reluctantly concur with the SWRAC recommendation the free-flowing condition and outstandingly remarkable values of North Mesa Creek be protected by means other than w&s suitability.

Dolores River, segment 1

Identified as eligible in the San Juan Public Lands management plan, this segment complements and is essentially a component of Dolores River Segment 2. As such, its extensive and diverse outstandingly remarkable values and values-related flows, warrant the highest possible protection.

Suitability is consistent with the values and protective management for the adjacent Wilderness Study Area.

Such protections are described in our comments related to Dolores River Segment 2, and we advocated those protections for Dolores River segment 1 as well.

**We recommend that the full length of Dolores River segment 1 be found suitable with modifications recommended by the SWRAC.**

Dolores River Segment 2

Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is key to that protection.

With the longest and most diverse list of outstandingly remarkable values (seven) recognized in this segment, the segment is eminently qualified for the highest possible protective status and measures.

The healthy presence of regionally imperiled native fish in this segment and downstream, as recognized in the BLM's Final Eligibility Report, the importance of protecting the stream and supportive corridor in this segment is greatly magnified.

BLM_0149616

Only 47% of land along the segment is federally owned, but 100% of the corridor land in the upper half of the segment is federal. This facilitates the effective implementation of protective measures in that federal portion and facilitates cooperative agreements and measures for providing similar protections to the rest of the segment.

**We recommend that the full length of Dolores River segment 2—or at least the federally owned upper portion—be found suitable with modifications recommended by the SWRAC.**

Ice Lake Creek Segment 2
This important tributary to La Sal Creek warrants strong protection for it free-flowing condition, water quality, and stream corridor values.

We concur with the SWRAC recommendation that, because of its short length and concerns about adjacent land and water uses, Ice Lake Creek should be protected by means other than w&s suitability.

La Sal Creek Segment 1
We concur with the SWRAC recommendation that, because of extensive private land ownership in the segment, the values of La Sal Creek Segment 1 should be protected by means other than w&s suitability.

La Sal Creek Segment 2
This stream traverses a distinctive canyon corridor, affording a stunning backdrop to outstanding recreation opportunities. The stream itself provides important streamflow source for the Dolores River, and it includes essential and healthy riparian environment in an otherwise arid area.

The presence of healthy populations of regionally imperiled native fish, and the presence of globally rare riparian ecosystem, provide complete justification for the strongest possible protective status and measures in this segment. In addition, the segment provides essential streamflows and healthy continuity for riparian habitats in the Dolores River Canyon Wilderness Study Area immediately downstream, and to the Dolores River itself.

Federal land ownership along the segment is 84.5%, facilitating effective implementation of protective management, particularly in the upper portion, which is 100% federal.

**We recommend that La Sal Creek segment 2 be found suitable with modifications recommended by the SWRAC.**

La Sal Creek, segment 3
If ever a stream segment were suitable under that definition of the *Wild and Scenic Rivers Act*, this is one. The segment lies wholly within the Dolores River Canyon Wilderness Study Area, supporting regionally rare riparian and scenic vibrancy. That habitat health is reflected in the presence of healthy populations of regionally imperiled native fish.

In addition, La Sal creek is among the more significant streamflow contributors to the severely depleted Dolores River.

Federal ownership of land along the segment is 100%, facilitating—and requiring—the strongest possible form of protective management.

58

BLM_0149617

**We recommend that the full length of La Sal Creek segment 3 be found suitable.**

Lion Creek
This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surround wilderness-quality lands and to the Dolores River.

While the length, location and federal ownership percentage of Lion Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed.

Spring Creek
This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surrounding wilderness-quality lands and to the Dolores River.

While the length, location and federal ownership percentage of Spring Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed.

*Additional river segments*

Roc Creek
Current w&s eligibility status for Roc Creek segments in the Manti-La Sal National Forest management plan warrant equal or stronger status and protection for segments in the UFO planning area, where Roc Creek traverses unique and sensitive areas with wilderness characteristics (both as identified by citizen inventory and by the BLM's own wilderness characteristics review) and other unique stream-related features.

The UFO's failure to find Roc Creek even eligible is doubly incongruous, both in light of those remarkable stream-related values and in light of the Manti-La Sal National Forest's determination that its portion of Roc Creek is eligible (with Wild classification and with Scenic and Geologic/Hydrologic Outstandingly Remarkable Values identified).

**This should be corrected with UFO affirmation of Roc Creek's eligibility, plus determination that it is suitable.**

<u>**Summary of Comments:**</u> We recommend that the BLM reach a finding of suitability, and implement corresponding strong protective management measures for:
- Monitor Creek
- Potter Creek
- Roubideau Creek Segment 1
- Beaver Creek
- Saltado Creek
- San Miguel River Segment 1
- San Miguel River Segment 2
- San Miguel River Segment 3
- San Miguel River Segment 5

59

- San Miguel River Segment 6
- Tabeguache Creek Segment 1
- Lower Dolores River
- Dolores River Segment 1
- Dolores River Segment 2
- La Sal Creek Segment 2
- La Sal Creek Segment 3
- Roc Creek

We recommend that the BLM implement the strongest possible protective management measures, other than a finding of wild & scenic suitability, for:
- Gunnison River Segment 2
- Roubideau Creek Segment 2
- Deep Creek
- West Fork Terror Creek
- Dry Creek
- Naturita Creek
- Tabeguache Creek Segment 2
- North Fork Mesa Creek
- Ice Lake Creek Segment 2
- La Sal Creek Segment 1
- Lion Creek Segment 2
- Spring Creek

### VII.    Wilderness Study Areas

We support that the Uncompahgre Draft RMP identifies management actions for Wilderness Study Areas in the event they are released from wilderness consideration by Congress. Uncompahgre Draft RMP at 2-357—358. Particularly, we support the robust management actions for Sewemup Mesa WSA in Alternatives B and D, and encourage BLM to carry those management actions through to the Proposed RMP. BLM should manage Sewemup Mesa as ROW exclusion rather than ROW avoidance, as contemplated in Alternative B. *Ibid.* Additionally, the commitment to managing the Adobe Badlands and Dolores River Canyon WSAs consistent with overlapping ACEC designations is appropriate to ensure the relevant and important values of these areas continue to be proactively managed in the event the WSAs are released from wilderness study by Congress.

The Camel Back WSA would receive minimal protections for its natural resource values under the preferred alternative in the Draft RMP if it were to be released from WSA status. The only overlapping designations in the preferred alternative are the Roubideau Corridors ACEC and Roubideau SRMA. Uncompahgre Draft RMP at Maps 2-66 and 2-47. The Roubideau Corridors ACEC is small relative to the Camel Back WSA, and the Roubideau SRMA as considered in Alternative D would not provide adequate protection to the important public lands resources in the Camel Back WSA. Therefore, the final RMP should adopt the Roubideau SRMA as contemplated in Alternative B; designate the Roubideau-Potter-Monitor ACEC as contemplated in Alternative B; or identify specific management actions to protect the natural resources of the Camel Back WSA in the event of Congressional release similarly to how the draft RMP would manage the Sewemup Mesa WSA in the event of Congressional release.

60

We also note that Special Recreation Management Areas overlapping with Wilderness Study Areas apply Visual Resource Management classes that are inconsistent with WSA policy, and how BLM states WSAs will be managed in the Draft RMP. BLM Manual 6330 states: "All WSAs should be managed according to VRM Class I management objectives until such time as Congress decides to designate the area as wilderness or release it for other uses." BLM Manual 6330 at 1.6(D)(9). Indeed, the Draft RMP states that all WSAs will be managed as VRM I across the range of alternatives. Uncompahgre Draft RMP at 2-355.

The Dolores River Canyon SRMA overlaps with the Dolores River Canyon WSA, but the SRMA would be assigned VRM II while the WSA is to be managed as VRM I. Uncompahgre Draft RMP at J-11, J-13. Similarly, the Roubideau SRMA overlaps with the Camel Back WSA. The Roubideau SRMA would be assigned VRM II while the WSA is to be managed as VRM I. *Id.* at J-63. BLM must clarify that where the SRMAs overlap with WSAs, those lands will be managed as VRM I consistent with BLM policy for WSA management and the direction for WSA management provided in the Draft RMP.

**Summary of Comments:** BLM should carry forward the management actions for Sewemup Mesa WSA from Alternative B. BLM should carry forward the commitment to manage released WSAs consistent with overlapping ACEC and SRMA designations, as stated in Alternatives B and D. Particularly for Camel Back WSA, if BLM does not designate the Roubideau-Potter-Monitor ACEC or Roubideau SRMA as outlined in Alternative B, BLM should identify specific management actions in the final RMP to protect the area similar to Sewemup Mesa. BLM must clarify that where the SRMAs overlap with WSAs, those lands will be managed as VRM I consistent with BLM policy for WSA management and the direction for WSA management provided in the Draft RMP.

### VIII.   Night Sky Resources

We support that the Uncompahgre Draft RMP addresses protection of dark night skies across the range of alternatives. In the alternatives table for visual resources, one of the identified objectives is to: "Maintain dark night sky conditions in areas that are generally unaffected by man-made light sources." Uncompahgre Draft RMP at 2-147. The draft RMP goes on to detail actions for achieving this objective, including prohibiting permanent outdoor artificial lighting in VRM I and II areas, requiring that permanent and temporary artificial outdoor lighting be shielded and downward-facing, and requiring that permanent artificial outdoor lighting be turned off when it is not needed. *Id* at 2-147—148. These are appropriate actions to ensure that night sky resources, which are important visual resources of our public lands, are protected from light pollution.

BLM has been given an explicit mandate to manage the lands under its jurisdiction for their scenic and atmospheric values, which includes night skies. *See*, FLPMA, 43 U.S.C. § 1701(a)(8) (stating that "...the public lands be managed in a manner that will protect the quality of the...scenic...[and] air and atmospheric...values..."); National Environmental Policy Act, 43 U.S.C. § 4331(b)(2) (requiring measures to be taken to "...assure for all Americans...esthetically pleasing surroundings..."); National Historic Preservation Act, 36 C.F.R. § 800.1(a) (requiring federal agencies to consider measures to avoid impacts on historic properties, including their "settings"). A dark night sky is undoubtedly a scenic and atmospheric value within that term's meaning as defined in FLPMA.

Since 1984, BLM has interpreted its mandate as a "stewardship responsibility" to "protect visual values on public lands" by managing all BLM-administered lands "in a manner which will protect the quality of scenic (visual) values." Visual Resource Management Handbook, H-8400-1 at .02, .06(A). Night sky

61

management is an inherent component of this responsibility.  VRM is not restricted to land-based resources.  To this end, BLM should develop  minimum management prescriptions to be included in its resource management plan that give due consideration to the value of a dark night sky, consistent with BLM's multiple use mandate, as defined at 43 U.S.C. § 1702(c).

In addition to carrying forward the management actions contemplated in the Draft RMP, BLM should adopt minimal additional management actions to even better steward this important visual resource. The Arizona Strip District incorporated the following prescriptions in the RMPs for the District in 2008, which would be appropriate for the Uncompahgre Field Office:

- Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review. These measures may include directing all light downward, using shielded lights, using only the minimum illumination necessary, using lamp types such as sodium lamps (less prone to atmospheric scattering), using circuit timers, and using motion sensors.
- Any facilities authorized will use the best technology available to minimize light emissions.

Arizona Strip RMP at 65; Grand Canyon-Parashant National Monument RMP at 67; Vermilion Cliffs National Monument RMP at 47-48.

Furthermore, the Uncompahgre RMP should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that BLM can accurately and appropriately apply the dark night sky management actions in RMP implementation.

**Summary of Comments:** BLM should adopt management actions contemplated in Alternative B of the Uncompahgre Draft RMP, which extends the prohibition on permanent artificial outdoor lighting to VRM II areas in addition to VRM I areas. BLM should also adopt the following management actions to further protect dark night sky resources:
- Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review.
- Any facilities authorized will use the best technology available to minimize light emissions.
Additionally, BLM should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that these management actions can be applied in implementation.

IX. **Management of the North Fork Area**

a. **Oil and Gas Management**

1. <u>BLM can and should close the North Fork area to oil and gas leasing in the final RMP.</u>

The existing range of alternatives in the Draft RMP adequately supports closing the North Fork area to oil and gas leasing in the final RMP. The planning area for the Uncompahgre RMP includes 917,030 acres of fluid minerals, of which the North Fork area is 139,540 acres. Alternative B1 would close 104,750 acres in the North Fork area (75% of the minerals in the North Fork area) to leasing. Uncompahgre Draft RMP at 2-189—191. Closing the full North Fork area to leasing would only close an additional 34,790 acres in a 917,030-acre decision area, which is 3.8% of the planning area. This change fits within the range of alternatives and would not require supplemental NEPA.

62

BLM can increase the areas closed to leasing in the Proposed RMP without requiring supplemental NEPA analysis if BLM determines that those changes are not "substantial." The CEQ regulations note, "Agencies shall prepare supplements... if: the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9. There is ample precedent for BLM making similar changes between draft and final EISs without determining supplemental NEPA is required.

As an example, we refer the agency to the changes made between the Draft and Proposed plans for the Little Snake Resource Management Plan in Colorado. In the Proposed RMP, BLM added a new surface disturbance limitation but concluded this was within the range of alternatives since "***The public had an opportunity to review and comment on such a management technique and its impacts***" based on the application of a different surface disturbance cap level to a different set of lands in the Draft RMP. *See* Draft Little Snake RMP at pp. 1-18 – 1-19.[26]

More recently, the Nevada and Northern California Greater Sage-Grouse Proposed LUPA/FEIS designated approximately 2.8 million acres of priority habitat as Sagebrush Focal Areas (SFA) to receive more protective management, even though this designation was not used in the Draft LUPA. BLM explained that, because the purpose of the planning effort was to protect habitat, the Draft EIS noted further refinements to habitat could be made, and elements of the management applied to SFAs appeared in other alternatives, "the management of these areas as SFAs and the impacts of the associated management decisions was addressed in the DEIS and is qualitatively within the spectrum of alternatives analyzed."  Nevada and Northern California Greater Sage-Grouse Proposed LUPA/FEIS at pp. 2-2 – 2-3.[27]

In another example, the Lower Sonoran Field Office found that adding lands managed for wilderness characteristics in the Proposed RMP that were not evaluated for such management in the Draft RMP did not require supplemental NEPA analysis through application of the CEQ regulation. The Lower Sonoran Field Office (LSFO) added 32,700 acres of lands to be managed for wilderness characteristics between draft and final RMP based on public comment and new policy.

In order to determine whether this new information was "significant," which would have required BLM to prepare a Supplemental EIS before incorporating this new information into the PRMP/FEIS, the LSFO reviewed the CEQ NEPA regulations and guidance and found that the new inventory data did not show that the actions in the PRMP/FEIS would affect the human environment to a substantial extent not already considered in the EIS. The difference in acreage proposed to manage to protect wilderness characteristics in the PRMP/FEIS Alternative E (Proposed RMP) are not appreciably different from those presented in the DRMP/DEIS's Alternative E (preferred alternative). The DRMP/DEIS's Alternative E would manage 166,300 acres, whereas the PRMP's Alternative E would manage 199,000 acres, a 32,700-acre increase. This increase represents an area of about 3.5 percent of the entire acreage in the Lower

---

[26] Available at
http://www.blm.gov/style/medialib/blm/co/field_offices/little_snake_field/rmp_revision/final_docs.Par.40673.File.dat/03_LS-FEIS_Vol-I_Chapter-1.pdf
[27] Available at: https://eplanning.blm.gov/epl-front-office/projects/lup/21152/58708/63771/7_Volume_1_Chapter_2_NVCA_GRSG.pdf

BLM_0149622

Sonoran and SDNM Decision Areas – almost exactly the same acreage and proportion of the planning area as the additional acreage at stake in the North Fork area.

Although the LWC unit locations vary slightly based on the final inventory findings, the Sonoran Desert environment and resource conditions are comparable, as are the environmental impacts. The impacts disclosed in the PRMP/FEIS are similar or identical to those described in Chapter 4, Environmental Consequences, of the DRMP/DEIS, such as those impacts related to travel management, minerals, lands and realty, wilderness characteristics, and recreation. In addition, the BLM found that the new information did not invalidate any conclusions in the DRMP/DEIS to a significant extent. Finally, the BLM found that the qualities presented in this new information are reflected in the goals, management actions, and mitigation measures in the DRMP/DEIS. The LSFO determined that the analysis in the DRMP/DEIS sufficiently disclosed impacts to management actions on the lands with wilderness characteristics.

Based on these findings, the LSFO concluded that the new information does not affect the environment to a significant extent not already considered and, therefore, BLM can include this new information in the PRMP/FEIS without issuing a Supplemental EIS. However, the new information did lead BLM to revise the PRMP/FEIS in those sections pertaining to lands with wilderness characteristics.

The Uncompahgre Field Office can similarly conclude that closing an additional 34,790 acres in a 917,030-acre decision area to oil and gas leasing would not be a significant change requiring supplemental NEPA. Based on the wide range of options for management for conservation and energy development considered in the Draft RMP, we believe the public has been provided with sufficient information on management techniques and impacts on other resources, such that the additional lands can and should be considered for closure to oil and gas leasing in the proposed RMP. Furthermore, Alternative B1 in the Draft RMP would apply No Surface Occupancy stipulations on 27,280 acres of the 34,790 left open to oil and gas leasing, meaning BLM has analyzed significant limitations on oil and gas development across 95% of the North Fork area. Uncompahgre Draft RMP at 2-198.

**Summary of Comments:** BLM can and should close the North Fork area to oil and gas leasing in the proposed RMP. This can be accomplished without requiring supplemental NEPA under the CEQ regulations, as the additional acreage would represent just 3.8% of the planning area and is therefore not "substantial." There is ample precedent for BLM making similar changes between draft and final EISs without supplemental NEPA.

2. <u>If BLM does not close the North Fork area to leasing, it must adopt Alternative B/B1 to protect the public lands resources and communities in the North Fork Valley.</u>

Regarding oil and gas leasing and development we support the incorporation into the final RMP of Alternative B1 (North Fork Alternative) as the only management alternative evaluated in the draft RMP that could provide the protection warranted for the North Fork area; and then the general provisions of Alternative B, or as otherwise indicated throughout these comments.

Alternative B1 is derived from a detailed document submitted by stakeholders, organizations and individuals from the North Fork Valley to the Uncompahgre Field Office of BLM in December 2013. *The North Fork Alternative Plan: A Proposal to the BLM for Managing Oil and Gas Development in the North Fork Valley* was developed over an 18-month period by a group of stakeholders and supported by local governments. It seeks to manage oil and gas leasing and development on the North Fork Valley's public

64

lands and minerals in balance with the unique and highly cherished resources that those lands contain, surround and impact directly, indirectly, and cumulatively.[28]

The North Fork Alternative Plan (NFAP) is included in the draft RMP/EIS as Alternative B1:

> Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in portions of Delta and Gunnison Counties. Alternative B.1 is a resource-based set of recommendations provided by a community group.

Uncompahgre Draft RMP at 2-7. Alternative B1 reinforces broader community-wide efforts to establish a more resilient, place-based economy in Delta County. In 2015 Better City was retained through a federal grant to help strategize ways to strengthen the local economy. That report reinforces what the stakeholders who crafted the NFAP have long maintained. Economic resiliency and growth in the North Fork Valley depends on safeguarding the area's natural resources not exploiting them.

> Delta County is home to a number of unique resources, attributes, organizations, and conditions that help differentiate it from other communities. The County is home to natural attractions including two rivers, the Grand Mesa National Forest, and two National Conservation Areas. The County enjoys a more temperate climate than the majority of the state, has a large amount of farmland, and has access to water resources and clean air.   ... Although its coal deposits remain a vital asset for the community, they are not a source of future growth. [29]

The NFAP sets out to protect six key sets of resources that are dependent on, tied to, and impacted by activity on the area's BLM-administered lands. These include: the existing economy, towns and community areas, water source areas and delivery systems, river corridors and riparian areas, important wildlife habitat and migration routes, and sensitive landscapes and soils. In addition, the NFAP seeks protective management to safeguard outstanding recreational opportunities at Jumbo Mountain and the overall highly scenic visual character of the valley and its surrounding mesas. These characteristics of the valley, its high quality scenery features, good water and abundant wildlife, and outstanding recreational opportunities are the backbone of the area's growing, emerging, and future economy.

These comments are overall supportive of Alternative B1 in the draft RMP, however they recommend some changes and additions, as well as raise some concerns and weaknesses in the draft RMP/EIS and the analysis. Comments will first consider four major areas of emphasis that should guide management objectives and that must be part of any acceptable resource plan.

We furthermore emphasize that the agency-identified Preferred Alternative (Alternative D) is especially unacceptable for the North Fork Valley. We also urge that the agency not only adopt the provisions to protect public lands resources and communities from oil and gas development included in Alternative B1 for the North Fork, but begin to apply this level of protection to additional public lands under its purview.

---

[28] "North Fork Submits Community-based Management Plan to the BLM," News release, December 4, 2013. Online at www.citizensforahealthycommunity.org/wp-content/uploads/2013/12/North-Fork-Community-submit-Alternative-Plan.pdf
[29] Economic Development Strategic Plan Executive Summary Delta County, CO prepared by Better City, 2015. Available online at www.deltacountyed.org/resources/Documents/EDA%20Study%20Summary%202016.pdf

BLM_0149624

A.  **Purpose and Need: North Fork Alternative Plan**

The North Fork Alternative Plan (NFAP) was crafted by North Fork Valley stakeholders, organizations and individuals that wanted to ensure any potential future oil and gas leasing and development would not jeopardize the many important values, resources and features of the area's public lands—which in many cases form the basis of the local economy, carry and are source areas for water supplies, represent critical wildlife lands, and provide outstanding recreational opportunities for residents and visitors alike.

The NFAP identifies critical resources and shared values, and researched appropriate leasing and oil and stipulations, best management practices, and public land designations. It was derived as a resource-based approach to oil and gas leasing and development to achieve the necessary level of management to protect cherished features, public land resources, wildlife and economic well-being of the valley.

Development of the NFAP started with a careful review of the thousands of comments submitted to the BLM in response to the withdrawn lease sales (Dec. 2011, Nov. 2012), and through conversations with valley residents and stakeholders. The NFAP was incorporated into the draft RMP/EIS as Alternative B.1, as noted in the DEIS Executive Summary:

> The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area.

Uncompahgre Draft RMP at ES-8. Since the NFAP in its entirety has been submitted and accepted by the BLM, and has formed the basis of the draft RMP/EIS sub-alternative B1, these comments incorporate that submitted information herein by reference, and direct discussion—unless otherwise noted—to the agency's presentation of the information in the draft RMP/EIS.

In both cases—as a stakeholder proposal and as the sub-alternative B1 in the draft RMP/EIS — NFAP/B1 sets out to protect the important character, resources, and features that make the North Fork Valley both beloved and unique. For the purpose of these comments, those can be described as 1) Character of place, 2) Water supply, 3) Wildlife habitat and migration routes, 4) Recreational opportunities and access.

1.  **Character of place.**

The North Fork Valley is a nationally unique landscape: geographically, geologically, ecologically, economically, and socially. As the Better City report notes, the area is 44th in the United States as a hub of organic agriculture, is one of only two federally recognized wine regions in the state, and is Colorado's only multi-jurisdictional and rural Creative District. The Valley is known for its dark skies, rural charm, bucolic beauty, and stunning views. Thomas Huber, a Colorado geographer and author describes the area in An American Provence, a book linking the North Fork with France's Coulon River valley, according to a January 2012 article in the Grand Junction Daily Sentinel:

> The landscapes of the two valleys have one critical thing in common, the reason they are near-clones of each other in the broader dimension: they are both human-scale places," he writes. "The towns and villages are all easily walkable, the fields are small and individually tended, the

66

trails are suitable for walking and biking, the food comes from local farmers as much as possible, and the wine is a personal statement from the vintner, not a corporate artifact.

This economy-of-place, coupled with the area's more standard tourist fare—hunting season—is a driving force in the North Fork, a trend noted in a 2007 Colorado State University study and report.[30]

Colorado's abundant wildlife, vineyards and vast agricultural landscapes help draw thousands of visitors to the state and are ripe in potential to anchor emerging agritourism markets, according to a recent Colorado State University study.

The North Fork's scenic features, rural communities, and bucolic charm are critical components of the area's existing and emerging economy that must be safeguarded under any management regime. Furthermore, the character of place includes its sense of health and well-being, clean living, fresh water, healthy land. The North Fork strives to be a place that welcomes families at all stages and ages.

Public health considerations, the known impacts to air quality, water quality, and other health factors that oil and gas development can contribute to are not to be understated.[31] Both in terms of real and meaningful threat, and also in terms of intense public concern that the agency is obligated to consider in weighing the significance of its actions and the effectiveness of its management.

## 2. Water supply.

Colorado agriculture depends on irrigation, along with area residents. The North Fork is well-situated even as climate change threatens increased scarcity, being primarily gravity fed and located just below the source areas on the Grand Mesa and West Elk Mountains.

The water quality of the North Fork remains good, and industrial pollutants remain low. The primary water quality issues for irrigators are related to salinity and selenium loads, which increase as the river and ditches flow down valley, and which are exacerbated by development on the highly erodible Mancos soils that comprise much of the region.

Irrigation in the valley relies on an interconnected series or canal, ditches and tail-water impoundments. Surface contamination and spills, which occur regularly in Colorado oil and gas fields, could spread rapidly though the irrigation systems that water the valley.[32]

In addition, impacts in source areas carry real risk of groundwater harm. Recharge areas for aquifers are both broad and shallow, as noted in a comment from one local domestic water company.

These springs are primarily fed by subsurface collection of precipitation percolating through talus deposits and glacial deposits into a larger sub-surface groundwater storage in the till deposits. These springs are dependent entirely upon precipitation and surface runoff for their supply and recharge of the underground well system (Wright Engineering Study of 1977, extracting data

---

[30] CSU: "Colorado's Agritourism Market Climbing, Says New CSU Report," August 14, 2007.
[31] Intermountain Oil and Gas BMP Project: Public Health. Online at www.oilandgasbmps.org/resources/public_health.php. See the Grand Junction Daily Sentinel, "Ursa holds off on plan to drill close to school," October 6, 2016.
[32] "Oil and gas companies in Colorado reported 615 spills in 2015," Denver Post March 17, 2016. Online at www.denverpost.com/2016/03/17/oil-and-gas-companies-in-colorado-reported-615-spills-in-2015/

BLM_0149626

from U.S. Geological Survey's Professional Paper No. 617 entitled "Quaternary Geology of the Grand and Battlement Mesas Area, Colorado") and do so from an area of greater than 1 sq. mi.[33]

Finally, the North Fork and Smith Fork rivers sit in the Gunnison Basin, a major headwaters area for the Colorado River System. The Gunnison Basin is identified as a "water bank" to ensure adequate flows remain in the Colorado River to meet Colorado River Compact requirements. Adequate flows in the Gunnison are also needed to maintain water quality considerations due to selenium and salinity loads, and to avoid irrigators being forced to cut back on water use under the Endangered Species Act.[34]

### 3.   Wildlife habitat and migration routes.

Situated between the West Elk Mountains (and Wilderness Area) Grand and Black Mesas, and encompassing two significant river riparian areas, the North Fork (and Smith Fork) Valley is a wildlife haven. The West Elk Mountains and the flanks that lie on BLM lands are known as concertation areas for black bears, especially in the crucial late summer and early fall period when this species is preparing for winter hibernation.[35] BLM lands in the area are critical winter range for both deer and elk. Public lands in and surrounding the North Fork are home to threatened, endangered and sensitive species including the Gunnison Sage Grouse, and important hunting and migration routes for others including the Canada lynx. Yellow-billed cuckoos nest in the riparian vegetation along the North Fork River and tributaries. Raptors frequent the area, including wintering bald eagles and nesting peregrine falcons.

Streams and rivers that head on the Grand Mesa and West Elks contain important trout fisheries, and the Gunnison River just below the confluence is a Colorado Gold Medal trout stream. The Gunnison River is also home to three species of endangered fish that are known to be impacted by activity on the selenium rich soils of the valley.

Wildlife have been utilizing the valley for millennia, and the ethical importance of protecting wildlife habitat, managed jointly with the state as a "public trust," is paramount.[36] Colorado Parks and Wildlife, in previous comments on the scuttled lease sale, emphasized the importance not only of protecting the critical winter habitat that covers nearly all of the valley, but of the important migration routes that connect the winter range with uplands and calving areas.

### 4.   Recreational opportunities and access.

The North Fork is a public lands paradise, nestled among national forest, park and conservation lands managed by the Forest Service, National Park Service, BLM and the State of Colorado.[37] Hunting is a mainstay that brings large revenue for western Colorado coffers. The economic contributions made by maintaining healthy and abundant fish and wildlife populations are substantial. The CPW comments emphasized the economic importance of protecting this habitat for the hunting opportunities provided.

---

[33] Pitkin Mesa Pipeline Company draft RMP/EIS comments.
[34] "Program Overview," Gunnison Basin Selenium Task Force. Online at www.usbr.gov/uc/wcao/progact/smp/overview.html
[35] Oil and Gas Leasing and Development Final EIS, Grand Mesa Uncompahgre Gunnison National Forest 1993.
[36] DEIS at Volume II 4-127.
[37] DeltaCountyColorado.com – Public Lands: Diverse Destinations at www.deltacountycolorado.com/public_lands/

68

BLM_0149627

...benefits from hunting and fishing recreational activities are a sustainable annual source of economic benefit for Delta and Gunnison counties only if wildlife populations, and particularly big game populations, are maintained and quality hunting opportunities continue to exist.[38]

Hunting and fishing are multimillion dollar industries in the region, estimated at over $80 million annually (in 2007) for the two counties.[39] River sports, hiking, camping, mountain biking, climbing and trail running are other highly popular public lands pursuits in which the North Fork excels.

And then there are the "windshield tourists" and those that bask in the beauty of the surrounding landscape while enjoying a more settled visit. The communities and farms of the valley are stitched together by the world-famous West Elk Loop Scenic Byway. Among area features that must be protected to safeguard recreation and tourism opportunities include the overall rural and scenic character of the place—which draws in an ever-increasing number of tourists and residents, benefits the wineries and farm stands, fuels the creative muses of the area's growing number of artists, performers and authors.

Finally, the revised RMP must start to actively manage recreation on BLM lands, through designation of recreation management areas. Jumbo Mountain is the obvious example that deserves designation as a Special Recreation Management Area (SRMA). Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance.

Jumbo Mountain is not the only area on North Fork BLM lands likely to need special attention to better direct recreation activity, especially during the life of the RMP.  BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use.

> Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.

Public lands recreation is a multi-billion-dollar industry on Colorado's public lands, and forms not only the basis for tourism based economies across the state, but also as a draw for new residents, new business, and new economic opportunity.[40]

## B.  Sub-alternative B1: North Fork Alternative

i.  Alternative B1 is the best approach evaluated in the draft RMP, which BLM should adopt for the North Fork.

We support the protections outlined in Alternative B1 as those that provide the strongest protection (of any alternative in the draft RMP/EIS) for the important features of the North Fork Valley that are

---

[38] Colorado Park and Wildlife comments on March 2012 oil and gas lease sale, February 3 2012.
[39] Ibid.
[40] Ray Rasker, Patricia H. Gude, and Mark Delorey, "The Effect of Protected Federal Lands on Economic Prosperity in the Non-metropolitan West," Headwaters Economics, 2013. Online at http://headwaterseconomics.org/wphw/wp-content/uploads/ProtectedPublicLands_Manuscript_2012.pdf

BLM_0149628

interwoven with management on the adjacent and proximate public lands.[41] Only B1 provides the level and type of protections that the resources and public land values of the North Fork warrant.

> The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area.

Uncompahgre Draft RMP at 2-7. B1 would place 75% of the North Fork area into a No Leasing category, impose strict nonwaivable, nonmodifiable No Surface Occupancy stipulations on an additional 20% of the area, and manage the remaining 5% of the BLM lands/minerals under Controlled Surface Use stipulations.

> In the North Fork area, 104,750 acres (75 percent of the North Fork area) would be unavailable for leasing, compared to 10,610 acres in Alternative B, and 27,280 acres (20 percent of the North Fork area) would have an NSO stipulation.

Uncompahgre Draft RMP at 4-276. The NFAP considers oil and gas leasing and development for BLM lands and BLM-administered minerals under private/nonfederal lands ("split estate"); and it imposes protective measures for six key resources, plus management designations for recreation areas and visual resource protection.[42]

For features vital to the area's character of place, B1 includes the strongest protections. This includes leasing and development setbacks for certain visual and scenic resources, leasing and development setbacks from towns and community facilities, and leasing and development setbacks and other protection for sensitive soils and delicate landscapes. B1 provides the strongest protection for the North Fork's water supply, with setbacks from water source areas and systems, irrigation facilities, and waterbodies; and prohibitions on leasing on the areas with highest potential for selenium loading. These measures will help to ensure that the area's nationally significant water supplies are protected.

B1 prohibits development within critical fish and wildlife habitat, and includes leasing and development setbacks from rivers—all measures that serve to provide strong protections to the important fish and wildlife species of the valley, including threatened, endangered, and sensitive species.

B1 would designate 5,020 acres at Jumbo Mountain area as a Special Recreation Management Area (SRMA), and provides the strongest level of protection for the highly scenic features of the valley, including a Visual Resource Management (VRM) II classification ensuring the scenic and rugged features of Jumbo Mountain are not degraded. B1 includes leasing and development setbacks from rivers and riparian areas. These protective measures, together with protection for wildlife habitat, help ensure that the valley's recreational assets will not be diminished by ill-conceived oil and gas development.

---

[41] See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22.
[42] "Executive Summary," North Fork Alternative Plan. Citizens for a Healthy Community, et al. December 2013.

70

BLM_0149629

ii.  Alternative B1 includes reasonable but strong stipulations to protect resources in the North Fork.

Given the unique quality of the resources at stake, directly, indirectly and cumulatively from the agency's land use decisions, and the management outlined for oil and gas leasing and development under all four alternatives and sub-alternative B1, only B1 provides the level of protection warranted.

Only Alternative B1 closes to all oil and gas leasing the areas with the most severe selenium loading problems, area within a half mile of rivers and riparian corridors, water bodies and waterways, areas around communities and community facilities, and for protection of the valley's exceptional scenic qualities. And only Alternative B1 includes protective surface development prohibitions that are not waivable or modifiable, for features and resources such as agricultural operations, moderate and high geologic hazards, critical wildlife habitat, unstable geology, irrigation facilities, and recreational lands.

> [B1] would be the most restrictive to oil and gas exploration and development activities because a larger percentage of the planning area would be unavailable for leasing, and areas open to leasing would have major restrictions. ...[Under] Alternative B.1, approximately 280,840 acres would be unavailable for oil and gas leasing, exploration, development, or production, 6 times the acreage under Alternative A. In the North Fork area, 104,750 acres would be closed to leasing, 94,140 acres more than in Alternative B. Approximately 635,190 acres would be open to leasing, 27 percent less than under Alternative A.

Uncompahgre Draft RMP at 4-276. Even in comparison to Alternative B, which is the most conservation-oriented full alternative in the draft RMP/EIS, none come close to the protection offered in B1. Alternative B1 provides a baseline of management to safeguard the valley's character of place, water supply, wildlife habitat, and recreation.

*Character of place*

The overall character of place in the North Fork Valley, its high quality scenic features, its rural charm, its backdrop of undeveloped public lands, mesas melting into mountains, is of utmost importance to the area residents, businesses, and economic future. Character of place relies on healthy communities and vibrant economies, and the rural, farm-based settlement of the valley. We support the B1 stipulations NL-13 Coal leases; [43] NSO-68 Community facilities; and NSO-3 Agricultural operations. These provide reasonable and prudent leasing and development restrictions and stipulations to protect current and emerging economic activity, and to provide setbacks from communities and community facilities.

The quality 'character of place,' is difficult to under-emphasize as a critical component to what is special about, and must be preserved of, the North Fork Valley. Specifically, given the high importance of protecting the area's visual features and sensitive landscapes we support the VRM classifications in Alternative B1, and the protection of landscape and visual characteristics through the following stipulations: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors;

---

[43] Re: Agency comment at DEIS Volume II 4-276: We think that the NL-Coal lease areas can be made available for Coal Mine Methane capture by classifying them as 'Leasable' and stipulating that is only in conjunction with an approved coal mine methane capture/utilization facility. This would also have a climate benefit.

71

NSO-7 Major river corridors; NSO-5 High geologic hazards; CSU-47 Vistas; CSU-7 Moderate geologic hazards.[44]

*Water supply*

Protection of the valley's water supply relies on preventing pollution, protecting source water areas, protecting water bodies and riparian areas, and protecting water systems and conveyances. For agricultural operators, water quantity and quality are both of utmost importance. Organic agriculture, specialty crops and high quality hay all depend on abundant water, free from contamination.

The combination of individual wells, several private and public water companies, and with source water areas ringing the valley—safeguarding water quality is a top concern. Oil and gas development is known to contaminate water supplies, both above and below ground, and to harm water bodies, rivers and source areas.[45] That is a risk too great for many operators in the valley, home to Colorado's highest concentration of organic farms, an agritourism haven, and major headwaters to the Colorado River system.

We support the following stipulations to protect water supply. In cases where other alternatives in the draft RMP/EIS provide more protection than B1 for water supply resources, and where those stipulations overlap with B1, we recommend that the more protective stipulations apply. Here we recommend both the NL-6 stipulation (from Alternative B) and NL-7 stipulation (B1) be included in the final RMP. To adequately protect the water supply, we favor—at a minimum—the following stipulations for oil and gas leasing and development in the valley: NL-1 Selenium soils; NL-3 Major river corridors; NL-4 Water bodies; NL-6 Public water supplies (*Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NSO-15 Domestic wells and water systems; NSO-55 Bureau of Reclamation dams & facilities (*Alts. B, C, D); NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-2 Selenium soils; NSO-7 Major river corridors.

*Wildlife habitat and migration routes*

The BLM lands in and around the valley provide for an abundance and diversity of wildlife, from moose, bear and lynx in the upper reaches, to Gunnison sage grouse, Yellow-bill Cuckoo, fox and coyote in the bottomlands—which are critical winter range for herds of elk and deer. Waterbodies and riparian areas provide important habitat and travel routes for a variety of species. Upland migration routes and connectivity are critical elements to maintaining healthy populations, from endangered and sensitive species to big game. Specific habitat areas—nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the strongest protections.

In cases where species or habitat management plans, other considerations, or other alternatives in the draft RMP/EIS propose stronger protections for resources than in Alternative B1, we prefer the stronger stipulation; for instance, with Gunnison sage grouse habitat: we recommend that the No Leasing stipulation from Alternative B also be carried forward and applied where applicable. We support the

---

[44] NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B1 cannot be waived, modified or excepted.

[45] "Stanford scientist weighs the risk of groundwater contamination from oil and gas wells," Stanford News: February 8, 2016. Article online at http://news.stanford.edu/2016/02/18/aaas-jackson-water-021816/

72

BLM_0149631

following stipulations as providing a minimum level of protection for wildlife habitat: NL-4 Waterbodies; NL-3 Major river corridors; NL- NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.

*Recreational access and opportunities*

Recreational opportunities surround the North Fork's homes, farms and communities – from those provided by the public lands directly, to the indirect benefit the scenic nature of the area provides for tourists and visitors. The rivers, nearby trailheads, unique public lands features, mountain biking and hiking opportunities, together with the scenic landscape wound together with farm roads, wineries, and rolling hayfields. The following stipulations provide protection for recreational areas and amenities, and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mnt SRMA (with VRM Call II). At Jumbo Mountain, Alternative B1 closes the SRMA to competitive events, which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA through the stakeholder/planning process.

**TABLE 1: Recommended oil and gas stipulations**
*Several stipulations are recommended from other alternatives in the draft RMP/EIS, as noted.

| Alt. B1+ Stipulations* | No Leasing | No Surface Occupancy | Controlled Surface Use |
|---|---|---|---|
| **Character of place** | | | |
| Visual resources, local economies, farms & communities, sensitive landscapes, river corridors | NL-11 Prominent landmarks; NL-13 Coal leases; NL-3 Major river corridors. | NSO-52 Travel & Scenic Corridors; NSO-5 High geologic hazards; NSO-67* High occupancy buildings (Alts. B, D); NSO-68 Community facilities; NSO-3 Agricultural operations; NSO-7 Major river corridors. | CSU-7 Moderate geologic hazards; CSU-47 Vistas. |
| **Water supply** | | | |
| Waterbodies, private wells, water systems, public water source areas, irrigation facilities, river system | NL-1 Selenium soils; NL-4 Water bodies; NL-6* Public water supplies (Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NL-5 Water ways; NL-3 Major river corridors. | NSO-2 Selenium soils; NSO-15 Domestic wells and water systems; NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-55* BuRec dams & facilities (Alts. B,C,D). | |

73

BLM_0149632

| Wildlife habitat and migration | | | |
|---|---|---|---|
| Wildlife and species habitat, floodplains, riparian areas | NL-4 Water bodies; NL-5 Water ways; NL-10* Gunnison sage grouse (Alt. B). | NSO-35 Raptor sites; NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-30* Yellow billed cuckoo (Alt. B); NSO-39* Mexican spotted owl (Alt. B); NSO-21 Deer & elk habitat; NSO-17* Rare plant communities (Alt. B); NSO-20* Ecological Emphasis Area (Alt. B); NSO-8 Floodplains. | |
| Recreational areas and access | | | |
| Jumbo Mountain SRMA, river access, hunting opportunities, visual resource protection | NL-11 Prominent landmarks; NL-14* Parks (Alt. B); NL-3 Major river corridors. | NSO-57 Recreation-Jumbo Mnt SRMA (VRM II); NSO-52 Travel & Scenic Corridors; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-7 Major river corridors. | CSU-47 Vistas. |

Table 1 provides a summary of recommended oil and gas stipulations for the North Fork area. Most are those proposed are from Alternative B1, although some other stipulations from among the other alternatives are also recommended, as noted in the table above and in the narrative.

iii.   Alternative B1 better protects the North Fork than the conservation-oriented Alternative B.

*Character of place: visual resources, healthy communities, farms, landscapes, river corridors*

The scenic qualities of the valley are a driving force for business, for increasing property values, a force behind the burgeoning creative economy, a central ingredient to the marketing of bed and breakfasts, wineries, retreat centers, guest ranches and numerous other ventures. Visual scarring raises a point in general, that much of the opposition to oil and gas development is a response to industrial impacts that are incompatible with this growing economy. Alternative B1 goes furthest to address this general concern, closing most BLM lands in the North Fork to oil and gas leasing altogether.[46]

And in considering North Fork visual resource management (VRM) classifications specifically, under Alternative B1 over 82,218 acres are classified as either the VRM I or II, the most protective. Under Alternative B only 15,824 acres in the North Fork fall into VRM I or II.[47] And B1 not only protects more acres than Alternative B, but it also applies stronger stipulations to do so.

---

[46] DEIS II 4-91
[47] Acreages developed from analysis of GIS data downloaded from BLM.

74

BLM_0149633

Depending on the location, VRM Class II under Alternative B.1 would be closed to leasing, have an NSO stipulation, or have a CSU stipulation, compared to Alternative B where VRM Class II would have a CSU stipulation.

Uncompahgre Draft RMP at 4-208. Other community issues include loss of dark sky, increased traffic, noxious odors, declining property values, and harm to reputation. Public health impacts are also a top concern. Community and residential setbacks attempt to lessen these threats. B1 includes NSO setbacks from community facilities, including schools, recreation facilities, and parks (NSO-68).[48] B1 reduces these threats, from poor air quality.

Alternative B.I emission estimates result in the lowest total air pollutant emissions in future planning years and decreases in emissions of some pollutants over the base year. ...Alternative B.1 would likely result in the least adverse impacts on air quality.

Uncompahgre Draft RMP at 4-21. The BLM analysis anticipates "increased benefit to non-extractive uses in [the North Fork]" under Alternative B1. Uncompahgre Draft RMP at 4-473. This is, of course, exactly what economic experts recommend for the North Fork, including the Better City report.[49]

Efforts to identify opportunities in other industries that provide a diverse employment base could help mitigate the boom bust cycle associated with extractive industries.

The Better City report goes on to highlight the area's agricultural industry and heritage as a strong sector upon which to build for a more diverse economy.[50]

Based on its rich agriculture base, Delta County is well positioned to leverage the existing boom in organic food markets.

Impacts from oil and gas development on agriculture and ranching operations would less under B1 which includes specific protections and a 0.25-mile No Surface Occupancy setback from "prime and unique farmlands, livestock operations, organic farm, conventional farm, ranch, orchard, and the West Elks American Viticultural area, thereby protecting these." Uncompahgre Draft RMP at 4-69. Importantly B1 is also the most protective of the valley's water supply including irrigation facilities.

*Water supply: river system, waterbodies, private wells, water systems, public water source areas, irrigation facilities*

The rivers in the area provide broad benefit, including to the valley's character, water supply, wildlife habitat, and recreational opportunities. Alternative B1 is the most protective of the river corridors.

In addition to these Alternative B restrictions, Alternative B.1 would also apply NL areas within 0.5-mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, lakes, ponds,

---

[48] If stipulation NSO-67 (Alt. B) for "high occupancy buildings," provides protections beyond B1; then we recommend it be carried forward as well.
[49] "New Study Repeats Changing of Delta County Economic Basics," Merchant Herald, 11/12/15. Article online at www.merchantherald.com/new-study-repeats-changing-of-delta-county-economic-basics-new-study-repeats-changing-of-delta-county-economic-basics/
[50] "Better City presents economic development visions for Delta, Gunnison Counties," Region 10 Website, article at www.region10.net/better-city-presents-economic-development-visions-for-delta-gunnison-counties/

BLM_0149634

naturally occurring wetlands and impounding reservoirs, streams, watercourses, and waterways; and would apply NSO within 0.5 to 1.0 mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, and within the 100-year floodplain of any stream or river system. These NL areas (96,910 acres) and NSO restrictions (9,680 acres) would further protect riparian and wetland vegetation in the North Fork area.

Uncompahgre Draft RMP at 4-117. B1 is also more protective generally of other water supply resources, as noted at DEIS II 4.90:

> Unlike Alternative B, Alternative B.1 also includes an NSO stipulation within 1,320 feet of any dam, ditch, irrigation intake, canal, or other water conveyance. ...Alternative B.1 offers the most protection of private water supplies and would only apply to the North Fork area.

While B1 is overall more protective of water resources: from river systems, water bodies and irrigation facilities to water wells and systems; in two cases regarding public water supplies, the stipulations in Alternative B area stronger.[51] We have recommended (in Table 1 and the discussion above) that the stronger (Alternative B) stipulation be included in the final RMP regarding public water supplies.

The river systems, riparian corridors, and other water resources are important not only to the character of place and the water supply, but also for all life in the valley. River systems are a critical component of the West's habitat. In the winter deer and elk concentrate in the river bottom, and the riparian corridors provide year-round habitat for birds, reptiles and mammals, and migration routes for larger species.

*Wildlife habitat and migration: wildlife and species habitat, floodplains riparian areas*

Protecting the abundant wildlife populations is a top priority and main component of the North Fork Alternative Plan.

B1 would be the most protective of wildlife habitat in the North Fork.[52] The DEIS notes:

> Under Alternative B.1, an NSO would be applicable within 0.25mile of any active or historic bald eagle or golden eagle nest site, and within 0.50-mile of any active or historic peregrine falcon nest site. This would further protect these species within the North Fork area. Alternative B.1 also includes an NSO on mule deer and elk crucial winter range, including severe winter range and winter concentration areas, and in elk reproduction areas, as well as in big game migration corridors, which would further protect big game within the North Fork area.

Uncompahgre Draft RMP at 4-136. Alternative B1 best protects riparian corridors, which are critical components in the habitat systems in the valley: "These actions would reduce the potential for impacts on vegetation in the North Fork area more than Alternative B." *Id* at 4-116. The stronger management in B1 include more protection for the valley's special status species: "These actions would reduce the potential for impacts on special status species in the North Fork area more than Alternative B." *Id* at 4-

---

[51] DEIS II 4-90: Under Alternative B.1, a buffer of 1,320 feet from public water supplies would be closed to oil and gas leasing and geophysical exploration, half the distance as under Alternative B. As such, Alternative B provides greater protection than Alternative B.1 for public water supplies from a classified surface water-supply stream segment. Beyond 1,320 feet and up to 2,640 feet, such water supplies would be subject to NSO stipulations. This would offer more protection than Alternative A but less than Alternative B.
[52] DEIS Volume II 4-134

BLM_0149635

155. Overall protections in B1 are the strongest proposed, and this includes for fish as well as wildlife habitat: "Alternative B.1 provides more enhanced protection of aquatic and riparian species and their habitats than Alternative B." *Id* at 4-154. Alternative B1 provides the strongest level of protections proposed for the native Colorado River cutthroat trout: "In addition, Alternative B.1 would apply NSO within 0.50-mile of stream segments that have existing and potential habitat for native cutthroat trout, further protecting this species in the North Fork area." *Id* at 4-155.

And it is not only the direct management prescriptions that benefit wildlife. A number of the prescriptions in Alternative B1 overlap to provide the strongest proposed levels of habitat protection: "[VRM] Classes I and II, which preserve or retain the existing character of the landscape, would restrict surface-disturbing activities, reduce direct impacts on fish and wildlife, and retain habitats." *Id* at 4-131.

In a few cases, Alternative B identifies stipulations for species that are not included in B1. In these cases, we recommend those stipulations be included in the final RMP (as indicated above and in Table 1). However, in addition to best protecting important features to the humans that occupy the North Fork— in nearly every case B1 provides the best protections for furred, finned and feathered residents as well.

*Recreation areas and access: river access, hunting opportunities, visual resource protection, Jumbo Mountain SRMA*

Alternative B1 best preserves the valleys river corridors and riparian areas, which is important to protecting the valley, its water supply, and its wildlife, and for the recreational opportunities provided. Alternative B1 provides the strongest protections overall for recreational access, resources, and opportunities in the North Fork, and for the features in the valley that help drive tourism.

Oil and gas development poses a direct threat to the scenic features of the valley, as the DEIS notes: "Development could also add to the changes in the scenic values and other non-market commodities." Uncompahgre Draft RMP at 4-479.

Thus the stronger visual resource protections under B1 is a plus for tourism and recreation in the valley.

> [Fewer] acres available to fluid minerals leasing would result in fewer areas impacted from construction and operation. Applying NSO stipulations on 325,940 acres of BLM-administered lands would preserve the natural character of the landscape and would maintain existing recreation opportunities.

Uncompahgre Draft RMP at 4-301. The DEIS notes that recreation and tourism related activity is likely to increase across the resource area: "Recreation is expected to increase as the Colorado population and the desire to live near or recreate on BLM-administered lands increase. This follows the trend of recent years seen across the state." *Id* at 4-479.

The Jumbo Mountain area is important to the Town of Paonia and to many who recreate and live in the valley. Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo Mountain as a SRMA, with B1 acreage and stipulations. Under B1 the entire Jumbo SRMA would have NSO stipulations, rather than only a slice as under Alternative B. Uncompahgre Draft RMP at 4-306.

77

BLM_0149636

Given the likelihood that use at Jumbo will increase, and that the Town of Paonia and other local stakeholders are likely to incorporate the area into marketing and planning, keeping incompatible activity out of this close-in and primarily nonmotorized recreational area only makes sense. However, and although the draft RMP/EIS notes that pubic use is likely to increase, under all alternatives except B1 the agency leaves most of the area open to oil and gas leasing and development.

Tourism is booming in the North Fork, and the current (Summer 2016) season is reportedly the busiest ever according to numerous area merchants. This trend is consistent with reports from across the state. B1 specifically protects scenic vistas and travel corridors.

> Other potential growth areas include recreation and information industries. Identifying avenues to support the development of these industries could provide additional diversification to the local economy.

Uncompahgre Draft RMP at 4-208. These stronger protections benefit recreation directly, and also indirectly in many cases, for example through strong fish and habitat protections under B1 that enhance hunting and fishing opportunities.

In addition to stipulations included in B1 to protect recreational lands, access, and opportunities, we also recommend the NL-14 from Alternative B be carried forward to the final RMP, to protect public lands administered by the National Park Service. Regarding competitive events in the Jumbo Mountain SRMA, we propose the decision to allow some of these events be deferred until the SRMA planning process. And although not part of the North Fork Alternative Plan, and not identified in earlier scoping, new information that BLM should consider includes potential future Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use. The decision record should note this eventuality.

## C.  BLM's Preferred Alternative

As detailed above, what is clear is that Alternative B1 provides the level of protection that best meets the needs of the public and best protects the public's resources, as the only alternative that adequately protects the resources and public land values of the North Fork Valley. As such Alternative B1 has the support of many local residents, area businesses, Delta and Gunnison County organizations and associations, local governments, water companies, irrigators, farmers, ranchers and others.

That is because, as the DEIS shows, the resources that the public, myriad stakeholders, local governments, and resource professionals have all urged be protected are in fact best protected by Alternative B1. The superior level of management that Alternative B1 provides includes better protections for special status species, delicate soils, sensitive landscapes, recreation, visual resources, plant, fish and wildlife habitat, water resources, new economic activity, agriculture, communities, public health, river systems, and other cherished features of the valley. None of the other alternatives presented in the draft RMP/EIS offer the level protection afforded by B1, and all others fail to provide adequate management for the valley's resources, public uses, and cherished features.

Moreover, the agency's identified Preferred Alternative (D) proposes a management regime for the valley that is simply unacceptable. Not only would it leave the majority of public lands open to oil and gas leasing, many with only a CSU stipulation, but its impacts would be higher across the full range of resources in the valley, including those identified by the public as most important to the community.

78

BLM_0149637

Problems with Alternative D are discussed elsewhere in these comments. Regarding mitigating impacts from oil and gas development, the superiority of B1 is clear as detailed above. However, some particular examples of how badly Alternative D misses the mark in protecting the North Fork are the following.

Consider Visual Resource Management, in which B1 alone has the strongest nonwaivable stipulations to protect visual resources, and the largest areas designated for their important and high quality scenic features (VRM Classifications I & II). In Alternative D, the agency Preferred Alternative, only 17,170 acres are classified in these most protective categories. In B1 it is 82,218 acres.[53]

Regarding Ecological Emphasis Areas, the DEIS notes "Protections are reduced under Alt. D." Uncompahgre Draft RMP at 4-160. On wildlife impacts: "These measures ... do not provide as much protection as Alternative B." *Id* at 4-163. And on air quality and climate pollution: the Preferred Alternative "results in the second-highest estimated emission levels", including the second highest level of greenhouse gas emissions. *Id* at 4-21, Table 4-10.

The Preferred Alternative relegates over six times as much public lands to the lowest visual resource management classification. Alternative D closes less than 25% of what Alternative B does to oil and gas leasing in the resource area, and only a miniscule fraction of what B1 closes in the North Fork.

The Preferred Alternative includes far fewer protections for the valley's water supply, allowing drilling and fracking on lands adjacent to private water wells, where B1 prohibits leasing altogether and Alternative B requires No Surface Occupancy. Stipulations to protect special status species are far weaker under Alternative D than Alternative B.

On highly seleniferous soils Alternative B1 follows the recommendations of the Gunnison Basin Selenium Task Force, and applies No Leasing stipulations. Alternative D applies only the much weaker Controlled Surface Use (CSU) restriction. Unlike Alternative B and B1, the Preferred Alternative would allow oil and gas development on steep slopes of up to 40 percent. Uncompahgre Draft RMP at 2-30.

At Jumbo Mountain the Preferred Alternative protects one-fifth the acreage of what Alts B and B1 do, with NSO stipulations applying to just over 1,000 acres (DEIS I Table ES-3). Across the entire range of resource identified through scoping, comment on previous agency activity, and this comment period Alternative D, the Agency Preferred, fails to provide the management required.

### D.   Alternative B1 would have minimal impacts on oil and gas resources

Alternative B1 would have no impact on currently leased federal minerals, and a negligible impact on federal minerals overall. B1 would likely not affect energy production or jobs in the region. To anticipate the miniscule impact B1 might have, consider the overall oil and gas jobs anticipated across the resource area under Alternative D, which would allow a higher level of development in the North Fork: "It is likely, however, that less than one percent of employment and labor income would continue to be supported by oil and gas extraction under Alternative D." Uncompahgre Draft RMP at 4-476.

---

[53] Acreages developed from analysis of GIS data downloaded from BLM.

79

BLM_0149638

Leasing in the North Fork is simply not needed. For one there is a natural gas glut, and the resource's abundance is certainly projected far beyond the life of this resource management plan.[54]

B1 is clearly the responsible choice: Given that the impact on developable resources is insignificant while the public benefit is significant, that the impacts to resources across the board from oil and gas development are reduced under B1 while the overabundance of natural gas, likely to last for another decade or longer by most accounts, remains unchanged; then closing most, or even all, of the North Fork to oil and gas leasing seems to be more than just a reasonable course of action.

The North Fork sits at the southern edge of the gas-rich Piceance Basin, recently subject to an updated USGS estimate for the shale resource that sits beneath the sandstone formations previously targeted:

> The new estimate could mean the Piceance Basin has the second-largest natural gas reserves in the country, after the Marcellus Shale formation in Pennsylvania and neighboring states... [55]

Leasing in the North Fork is not in the public interest, which benefits more from managing to protect the valley's unique resources and communities. There are hundreds of thousands of public lands already leased in the Piceance Basin.[56] Hundreds of thousands of additional acres are owned outright or otherwise under control of the oil and gas industry, including major companies like ExxonMobil:

> Rio Blanco County, home of ExxonMobil's Piceance project, covers an area larger than 3,000 square miles and contains enough clean-burning, domestic natural gas to benefit millions of people. With interest in approximately 300,000 acres in the Piceance Basin, ExxonMobil's leases hold a potential recoverable resource of more than 45 trillion cubic feet of gas over the life of the project. That's enough natural gas to power 50 million homes for almost a decade. While this expansive gas resource will take years to produce, ExxonMobil is committed to increasing natural gas production more efficiently and with less environmental impact. [57]

These lands in the Piceance Basin provide decades of suitable sites for drilling:

> The acquired assets consist of a 200,000-net-acre position in the Piceance basin of Colorado with recent net production of 500 MMcfd of natural gas equivalent. Terra estimates that the assets contain 2 tcf of proved developed producing reserves and an extensive inventory of low-risk drilling locations. The assets also include deep rights across 150,000 net acres prospective for the emerging horizontal Mancos-Niobrara play. [58]

Drilling in the North Fork would not materially alter the amount of gas available for development over the life of the Uncompahgre RMP. Adoption of the North Fork Alternative will not affect the number of jobs available in the oil and gas industry regionally, the numbers of rigs operating, or the amount of

---

[54] "Shale gas production drives world natural gas production growth," U.S. Energy Information Administration August 2016. Online at www.eia.gov/todayinenergy/detail.php?id=27512

[55] "40 Times More Natural Gas Underground in Colorado's Piceance Basin, USGS Report Finds," Colorado Public Radio, June 29, 2016. Online at www.cpr.org/news/story/40-times-more-natural-gas-underground-colorados-piceance-basin-usgs-report-finds

[56] "Oil & Gas Development Proposed RMPA/Final EIS," White River Field Office-Powerpoint for RAC, June 4 2015. Online at www.blm.gov/style/medialib/blm/co/resources/resource_advisory/northwest_rac/minutes.Par.30953.File.dat/WRFO%20Presentation%20to%20RAC_6.4.15a.pdf

[57] "Piceance," ExxonMobil website at http://corporate.exxonmobil.com/en/energy/natural-gas/operations/piceance

[58] "E&P startup agrees to buy WPX's Piceance unit for $910 million," Oil and Gas Journal, 2/15/16. Online at http://www.ogj.com/articles/print/volume-114/issue-2b/general-interest/e-p-startup-agrees-to-buy-wpx-s-piceance-unit-for-910-million.html

BLM_0149639

energy being produced. Rather given the abundance of resource available for exploitation, the large number of existing leases and owned minerals, and eager lessees, owners and operators—it is the market and industry's willingness alone that will determine how many rigs employ how many people.

### E.   Alternative B1 is consistent with relevant law and policy

FLPMA establishes public lands policy that, among other things, sets it as law that:

>  (7) ...management be on the basis of multiple use and sustained yield unless otherwise specified by law;
> (8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use; and that
> (12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber...

Alternative B1 clearly meet the requirements of FLPMA, which directs much of BLM's resource management, as per the agency's land use planning regulations:

> The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

In the case of Alternative B1 the management proposed do best meet the "present and future need" of the American people; makes judicious use of the lands for a variety of purposes both within the North Fork area and across the resource area; balances use, not allowing all uses on all lands in a manner that accounts for the needs of future generations, for recreation, watershed, wildlife and fish, natural scenic, scientific and historical values, range, timber, and minerals; and that seeks to avoid impairment of the public land resources in consideration of their relative value.

Alternative B1 clearly is superior in protecting the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values resources of the North Fork. Finally, Alternative B1 is consistent with the Mineral Leasing Act (MLA), which clearly gives the

81

agency authority to close 75% of the North Fork area, or of the entire resource area for that matter, to oil and gas leasing and development.[59]

**Summary of Comments:** Alternative B1, which is the DEIS' version of the North Fork Alternative Plan, provides the best management options of oil and gas leasing and development presented in the draft RMP/EIS, and it should be adopted by the BLM into the final RMP. The North Fork Alternative Plan fits a clear and pressing public need by proposing a set of strong oil and gas management stipulations and protective designations to safeguard the area's character of place, water supply, wildlife habitat and recreational opportunities. Alternative B1 presents reasonable but strong management to protect the North Fork's most important resources and uses, and only B1 provides the level of management that is warranted to protect these resources. B1 is a reasonable and prudent approach to managing the resources in the North Fork Valley which the agency should select as part of its final Resource Management Plan.

### b.  Water Resources

The Draft RMP, and particularly the agency's preferred alternative, fail to put necessary measures in place to protect the valuable water resources of the North Fork Valley and Lower Gunnison Watershed. As documented in the comments submitted by the West Slope Conservation Center, the Draft RMP and preferred alternative fail to adequately protect surface and groundwater quality, stream and water body health, and threatened and endangered aquatic and riparian species from surface activities including oil and gas development, road building, and naturally occurring salinity and selenium within the watershed. The final RMP must include a detailed discussion and analysis of water resource impacts with a much higher degree of specificity to location, scale, and scope of impacts. The final RMP must also adopt robust management decisions to protect this vital resource.

We herein reference and support West Slope Conservation Center's comments to BLM on the Uncompahgre Draft RMP regarding water resources.

### c.  Air Quality

#### i.   Cumulative Air Quality Impacts

Impacts to air quality begin when the first exploratory well is drilled—according to some recent studies, including research by Paonia-based The Endocrine Disruptor Exchange, according to an article in the *Glenwood Springs Post-Independent* ("Study calls for scrutiny of air emissions at gas well sites" November 20, 2012).

These effects continue and build cumulatively in regards to other oil and gas activity in the region. Communities in the West that are near BLM lands subject to oil and gas development are seeing significant problems with winter smog, believed to be—in large part—caused by federal leasing of these lands for oil and gas.  But the draft RMP does incorporate adequate data collected from relevant state and federal agencies, including the Colorado Oil and Gas Conservation Commission (COGCC) before determining final management actions.

---

[59] 10th U.S. Circuit Court of Appeals, WESTERN ENERGY ALLIANCE v. KEN SALAZAR, No. 11-8071 March 12, 2013. Online at www.eenews.net/assets/2013/03/13/document_ew_01.pdf

82

The lack of cumulative air analysis was at the heart of a recent decision by the BLM-Uncompahgre Office to complete an EIS for the Bull Mountain Master Development Plan,[60] located within the upper North Fork Watershed. The air quality analysis in the Bull Mountain MDP FEIS has not yet been incorporated into the draft RMP's discussion of environmental consequences of the alternatives nor the cumulative impacts of regional oil and gas activity on air quality.

BLM has lost in court on several notable occasions of late on very similar issues: its failure to consider the impacts on air quality of leasing lands for oil and gas development given the other activity it is permitting in the region. Notably, a federal judge sent the Roan Plateau RMP amendment back to the BLM due to these concerns (and due to the failure of the agency to adequately consider an alternative management plan put forward by local stakeholders).

The clean and usually clear air of the North Fork Valley is a high quality community and shared resource. The BLM in Colorado has already been brought to task on its failure to properly consider the cumulative impacts of its own actions on the region's air quality, particularly in regards to oil and gas leasing.  This has happened elsewhere as well, like at Otero Mesa in New Mexico.  The final RMP revision that properly considers this activity in relation to the area's air quality.

The draft RMP states explicitly that oil and gas development are a major contributor to total pollutant emissions:

> Emissions from oil and gas (fluid minerals) development are a major contributor to total estimated emissions under all alternatives. For the Uncompahgre planning area, this category includes conventional oil and gas and coalbed natural gas development. Activities quantified in this category include well drilling and completion, road and well pad construction, flaring and venting, compressor operations, dehydrator and separator operations, tank venting and load out, wellhead fugitives, pneumatic device operations, and vehicle traffic. The quantities of emissions estimated from these activities are based on reasonably foreseeable estimates of development rates, well counts, production rates, and existing technologies.

Uncompahgre Draft RMP at 4-25. It also states that Alternative B1 would produce the lowest level of emissions, followed by Alternative B. The draft RMP simultaneously states plainly that emissions from all four alternatives included in the draft RMP could produce a number of negative impacts to local air quality and corresponding public health:

> Estimated emissions from oil and gas development would increase for all pollutants over the base year due to increased development. The emissions of carbon monoxide, nitrogen oxide, sulfur dioxide, volatile organic compounds, and particulate matter could impact air quality and air quality-related values. Nitrogen oxide and volatile organic compound emissions could contribute to regional ozone formation. The CARMMS analysis presented below estimates these emissions sources' impacts on air quality (including potential ozone formation) and air quality-related values (visibility and atmospheric deposition) in planning Year 10.

> Hazardous air pollutants emissions could increase the risk of localized human health impacts.

---

[60] BLM Bull Mountain MDP FEIS 2016. 4.2.1
http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html

83

BLM_0149642