Uncompahgre Draft RMP at 4-37. The unknown risks to local human health impacts of air pollutant emissions is unacceptable, and the BLM must include in the final plan adequate management of oil and gas leasing, including significant no leasing and no surface occupancy stipulations to safeguard the health of community members and residents who live within the Uncompahgre planning area.

ii.   Methane Capture in the North Fork Valley

The final RMP must take into account possible changes related to the Coal Leasing PEIS that the Department of the Interior is currently developing. The DOI will be mitigating the challenges our communities face in weathering the boom-bust cycles of mining which will require the highest degree of reclamation standards, full bonding (not self-bonding) for future reclamation activities, thorough analysis of all impacts to air, water and wildlife prior to issuing new leases, and assurance of a fair return from coal leasing.

One additional step that the BLM and DOI can take over the coming years is to incentivize and expedite the capture of coal mine methane, which the North Fork produces in excess. The OxBow mine coal methane recapture demonstration project is the ideal example.[61] It repurposes coal mine methane (CMM) gas, an unseen, toxic greenhouse gas, between 20-25 times more potent than carbon dioxide, into 3-megawatts of electricity for Aspen Ski Corporation. The project is at the now-closed OxBow Elk Creek mine in Somerset. It was collaboration between the Western Slope Conservation Center, a 501c3 non-profit organization headquartered in Paonia, Colorado, OxBow Delta Montrose Electric (DMEA), Holy Cross Electric, Aspen Ski Company, and mine that purchases the electricity, the BLM and others. It is expected to eliminate approximately 96,000 tons of $CO_2$ a year, with a projected life of at least 15 years.[62]

On June 18, 2016, the Federal Energy Regulatory Commission ruled in favor of DMEA, the local rural electric COOP. It struck down a "lost revenue recovery fee" imposed by Tri-State Generation & Transmission Association (Tri-State) reaffirming that DMEA couldn't be financially disadvantaged for following the law and purchasing local, renewable power.[63] This opens the door for DMEA to purchase locally recaptured CMM. This would meet member demands for clean energy, hedge against fossil-fuel price increases, promote economic development, and save money.

In many ways, the North Fork is a best-case scenario for coal mining communities. North Fork mines produce some of the cleanest burning coal in the country. Our communities have benefited from this wealth over many decades without sacrificing the other riches that our local land, water, and air provide. That, coupled with the methane recapture project and the methane off-gassing from our closed and operational mines, puts us in an excellent position for the federal government to leverage us as a methane recapture research and training site. It could create training and jobs for some displaced miners while diversifying our local economy and energy generation.

The North Fork also possesses a wealth of other renewable energy sources like micro-hydro, solar and biomass. Public lands that once extracted coal could become solar farms, as the infrastructure to transport this source of energy already exists at those sites. We would welcome an opportunity to pilot

---

[61] Aspen Times. "Coal Mine Is Key to Utility's 'Green' Goals." April 5, 2012. Retrieved June 25, 2016.

[62] Ray, Kecia. The Invisible Plume/ Why coal mine methane is worth looking at. Colorado Independent. May 2, 2016. Retrieved Jul 10, 2016.

[63] Federal Energy Regulatory Commission Summary, June 16, 2016 Meeting

BLM_0149643

some innovative ways to leverage those sources of energy for our homes, farms, businesses, government and community centers. This could similarly diversity our economy, create new jobs and realize the mass potential for renewable energies.

The final RMP must include adequate analysis of the air quality, climate change, and social costs of coal mine methane venting. These impacts are local, regional, and national. As our above comments attest, the North Fork Valley is primed to benefit massively from improved methane capture administrative policy.

The final RMP should also include stipulations that allow for coal mine methane drilling while excluding other forms of fluid mineral leasing and withdrawal associated with oil and gas development. However, coal *bed* methane leasing and extraction, which would occur above coal seams that have not yet been mined, should be subject to all the same standards and stipulations of other fluid mineral leasing and development.

### d.  Recreation

The final RMP must actively manage recreation on BLM lands within the North Fork and Lower Gunnison Watersheds through designation of recreation management areas (RMAs) and other recreation management stipulations.

We support following stipulations in the draft RMP which provide for improved recreation management and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mnt SRMA (with VRM Call II).

Other areas within the North Fork watershed also need recreation management designation to adequately manage the current and highly likely increased future recreation use on these lands within the lifetime of the RMP.  BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) and other recreation stipulations for places such as Elephant Hill, and Youngs Peak—all of which are seeing increasing, but unmanaged use. Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.

*Jumbo Mountain*

All 5,020 acres of the Jumbo Mountain unit deserves management as a Special Recreation Management Area (SRMA) in the final RMP. Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance. Documented activities include mountain biking, horseback riding, trail running, birding, hiking, hunting, and infrequent OHV use. Jumbo Mountain sits prominently within the valley, and the visual resources of the BLM parcels on Jumbo are significant to the quality of life in the entire valley. We also support all VRM stipulations and protective management prescriptions as well.

The final RMP should include the entire Jumbo Mountain unit as a SRMA, RMZ-1 and RMZ-2 as included in Alternative B. Uncompahgre Draft RMP at J-4. Members of the community attest to increasing use of

85

the Jumbo Mountain area, despite a lack of management and oversight. We believe the trend of use will continue to increase, and that the full area will be used heavily for recreation over the lifetime of the plan. RMZ-2, as defined in Alternative B, allows for trail connectivity with other current and future recreation areas. We also strongly support stipulations that would limit all oil and gas leasing and surface activities in this area, including those in the draft RMP (NSO-56, NSO-57), as these activities would not be compatible for the recreation experience, and would diminish the many other resources already identified in this area.

Support has been building for Jumbo Mountain to become an SRMA, with the Paonia Town Council, local trail advocacy and mountain bike clubs, and local businesses and chambers fully supporting the Jumbo Mountain SRMA as outlined in alternative B with all 5,020 acres included in the SRMA status. The full acreage deserves SRMA status since local trends of use indicate that recreation users will continue to expand into adjacent BLM lands due to the high quality of the recreational resources. Additionally, the full SRMA status will allow for the current Jumbo Mountain trail network to be connected to other existing and future recreational trails within the lifetime of this RMP.

ERMA status for Jumbo, as proposed for 5,020 acres in Alternative C, is inadequate to protect the visual resources of this unit, as well as mitigate future conflicts of multiple uses on this unit. Members of the public frequently take part in a number of different recreational activities, including hiking, biking, and running, almost exclusively non-motorized, on these acres, and these activities must be managed for the quality of the experience for all users.

The North Fork watershed currently suffers from a dearth of officially acknowledged and managed biking areas, despite numerous landscapes with superb terrain for mountain biking.[64] The trails on Jumbo have been built outside of established protocols and as such cannot be utilized for the gain of the community as trail systems like 18 Rd in Fruita.[65] We the trails and conditions on the Jumbo Mountain unit surpass those at 18 Rd, but without management and acknowledgment from the BLM with SRMA status, the full potential of the recreational resource on the Jumbo trails cannot be realized.

In addition to the economic and conflict mitigation gains that could come about from designating Jumbo Mountain as an SRMA, the acknowledgement of trails on Jumbo will allow trail building expertise, environmental considerations, signage, and enforcement to come together to produce a more sustainable trail network.

Lastly, the location of the Jumbo trails is quite unique in that the trails are located very close to the town of Paonia and thus the type of impacts on the land seen at locations like 18 Rd. can be shifted to the urbanized areas of Paonia, reducing the impact to natural landscapes.

---

[64] See https://www.mtbproject.com/
[65] http://www.gjsentinel.com/sports/articles/a-good-change

86



**Figure 1. Map of existing and proposed recreation routes on Jumbo Mountain.**
All routes shown in green and red are existing routes (except for the red route leading north from slantindicular). All segments in blue are proposed connector routes.

The draft RMP includes closure of the SRMA to competitive events (Appendix J-28, SRPs), which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA identified through the stakeholder/planning process. It is important to the economy of Paonia to be able to hold several non-motorized competitions on the Jumbo trails every year as these events can be major economic drivers for the community.

We also support the Ecological Emphasis Area designation for Jumbo Mountain/McDonald Creek, which we believe do not conflict with SRMA and successful recreation management of these areas. Please see our comments below on the proposed EEA.

*Elephant Hill*

We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Elephant Hill, located directly south of Jumbo Mountain. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer and winter recreational use is likely to significantly increase over the lifetime of this RMP. SRMA or ERMA designation would provide resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.

87



**Figure 2. Map of existing routes and proposed recreation routes on Elephant Hill.**
All solid green routes are proposed routes for recreation travel. Dotted green routes represent recreation winter routes located on preexisting roads.

*Youngs Peak*

We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Youngs Peak, located directly north of the town of Crawford. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer recreational use is likely to increase over the lifetime of this RMP. SRMA or ERMA designation would provide adequate resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.

88



**Figure 3. Map of existing routes and proposed recreation routes on Elephant Hill.**
All routes shown in red or green are proposed routes. Some primitive trails exist in the western area of Young's peak.

*North Delta SRMA*

We support the designation of the North Delta SRMA as well as the inclusion of mountain biking in the North Delta SRMA RMZ-1 and RMZ-2 for the development of non-motorized singletrack trails. Cyclists are not currently considered in the SRMA plan for North Delta.

*Hotchkiss High School Area*

We support ERMA designation for BLM lands in the immediate vicinity of Hotchkiss High School, which is a prime location for a trail network that would provide easy access to youth and families in the Hotchkiss area. There would be strong support for this recreation area due to an outdoor education coalition called the Nature Connection. The Nature Connection plans to give kids and families easy access to mountain bike equipment, for short-term use, to gain experience in a sport that promotes good health, and opportunities of adventure.  By developing a fun and exciting trail network on public lands in this area, residents of Delta County will have turnkey access to a healthy sport that allows them access to the natural environment, opportunities to improve outdoor knowledge and self-confidence, improve outdoor recreation skills, and gain more understanding of our community's dependence and impact on public lands.

89

### e.   Wildlife

#### i.   Jumbo Mountain/McDonald Creek Ecological Emphasis Area

We strongly support the designation of all 17,220 acres of all five zones of the Jumbo Mountain / McDonald Creek Ecological Emphasis Area included in Alternative B. Uncompahgre Draft RMP at Table 2-2, 103; Figure 2-2. As BLM outlines in the draft RMP, these areas are highly valuable for the habitat connectivity for a number of wildlife species within our region, particularly mule deer, elk, mountain lion, and black bear. *Id.* at D-2.

The draft RMP describes the ecological value of these areas as follows:

> Links North Fork Valley with the National Forest and West Elk Wilderness. Adjoins several conservation easements that link the southern three parcels. Important for landscape-scale linkage.

Uncompahgre Draft RMP at D-1. Based on the years of experience hunting, recreating, and living in close proximity to these lands, we can attest without any reservation that these lands provide exactly the quality of connectivity described. The wildlife value of these lands is difficult to overstate.

We also strongly support overlapping designations of both the Jumbo Mountain/McDonald Creek EEA, the Jumbo Mountain SRMA, and any additional overlapping ERMA or SRMA designations in the final plan (see above comments in support of additional recreation designations). We see no inherent conflict in these designations, which will not only protect the world-renowned mule deer herds and other wildlife, but also has the possibility of improving the recreation experience by limiting activities in late winter/early spring when recreation conditions, due to precipitation and soil moisture, are poor, and impacts to trails are greatest.

It should be clear from these comments and others that there exists a rare degree of cooperation and enthusiasm for increased management of the lands in the North Fork Valley, with many different users supportive of careful management of multiple resources that can be mutually managed on these lands. A unifying concern, however, is that oil and gas development of these lands will be prioritized over these many other resources upon which our communities depend for quality of life, economic gain, and recreation.

#### ii.   Imperiled species

Oil and gas exploration and development authorized through the Preferred Alternative in the draft RMP is likely to have negative impacts on several special status species. Federally listed threatened, endangered or candidate species that could occur or have potential habitat in the vicinity of lands open to leasing include Canada lynx, Gunnison Sage-grouse, greenback cutthroat trout and Colorado hookless cactus. Other special status species that could be impacted by the lease sale include white-tailed prairie dogs, clay-loving wild buckwheat, roundtail chub and Debeque milkvetch. BLM has not taken the requisite hard look at the impacts of unconventional oil and gas development on wildlife, including threatened and endangered species, and other sensitive species. BLM's existing analysis in the draft RMP does not fulfill the requirements of NEPA to assess the impacts of oil and gas leasing on these species. Nor do the CSU's as included in the Preferred Alternative adequately protect the following

BLM_0149649

species from adverse impacts from surface activities, and primarily those surface activities related to leasing of oil and gas.

*Canada Lynx*

The Canada lynx *(Lynx canadensis)* is a Federally Listed Threatened species and Colorado Parks and Wildlife (CPW) Endangered Species. The BLM has previously identified Lynx potential habitat, which also contains lynx winter habitat. Lynx Analysis Units (LAUs) have also been identified. In spite of the potential for negative impacts on lynx that could result from leasing within the planning area, BLM failed to prepare sufficient NEPA analysis of the impacts on lynx from leasing, failed to include No Surface Occupancy or No Leasing stipulations to protect lynx habitat.

During scoping for recent lease sales located within the North Fork Valley, comments were submitted by the U.S. Fish and Wildlife Service (FWS) expressing concern with the lease sale's potential impacts to lynx. The FWS determined that several lease parcels abutted primary and secondary suitable habitat for lynx. The Service stated that "[t]o date, *BLM has not updated their mapping or assessment of habitat suitability for Canada lynx. Therefore, these parcels, and others, should be evaluated for suitability for Canada lynx prior to leasing*." BLM has not undertaken the requisite evaluation of the lands included for leasing in the Preferred Alternative, and must provide No Surface Occupancy and No Leasing stipulations until it can determine that leasing and development will not jeopardize the species.

In 2000, when FWS concluded that listing the lynx as a threatened species under the ESA was warranted, it identified inadequate regulatory mechanisms in existing RMPs as a primary factor contributing to the lynx's decline. *Recognizing this, the UFO's draft Preferred Alternative of the RMP revision proposes new stipulations for Canada lynx habitat that are not included in the 1989 RMP*. Alternative B, however, provides the most protective stipulations, and should be included in the final RMP.

In this case, leasing without non-waivable NSO stipulations could result in jeopardy to lynx. Thus any future proposed leasing would require consultation with the FWS. Leasing any parcels in lynx habitat would violate the ESA, and these lands should be protected with No Surface Occupancy or No Leasing for the BLM to meet its obligations under the ESA.

*Gunnison Sage-grouse*

We support protective non-waivable NSO and No Leasing stipulations for all seasonal Gunnison sage-grouse habitat, as included in Alternative B.

Recent research indicates that all Gunnison Sage-grouse populations must be increased in size in order to avoid inbreeding depression and/or maintain adaptive potential and avoid increased extinction risk. It is now widely agreed that it will be necessary to maintain large expanses of suitable sagebrush habitat across the landscape to conserve populations. As such, BLM must consider what impacts leasing and development on suitable, former Gunnison Sage-grouse habitat would have on ongoing efforts to save this species from the brink of extinction. The Gunnison Sage-grouse Rangewide Conservation Plan states that "the issues of primary focus for [the Crawford] population are habitat enhancement and restoration, expansion of occupied habitat, and protection of habitat from permanent loss, especially in potential areas of expansion," and that "[e]xpansion of the area occupied by sage-grouse is necessary in this population in order to meet population goals."

91

All parcels with Historic or Potential Gunnison Sage-grouse habitat should be protected with non-waivable NSO or No Leasing stipulations in the final RMP.

*Colorado Hookless Cactus*

The draft RMP includes extensive description of documented existence of Colorado hookless cactus, a federally-listed threatened species, within the planning area, including in areas that would remain open to oil and gas leasing under the draft Preferred Alternative. The draft RMP also indicates that some individuals are being impacted by OHC use in the North Delta area (DEIS 3-115). For this reason, the BLM must include the Adobe Badlands LWC, Adobe Ecological Emphasis Area, and the Salt Desert Shrub Ecosystem ACEC in the final RMP.

*White-tailed Prairie Dog*

Active White-tailed Prairie Dog colonies occur within lands open to oil and gas leasing in the Preferred Alternative. The White-tailed Prairie Dog is a USFS Sensitive Species and Colorado BLM Sensitive Species. We support non-waivable stipulations, including NSO-41, that includes No Surface Occupancy and No Leasing within close proximity to active prairie dog colonies.

*Clay-loving Wild Buckwheat*

The draft RMP states that clay-loving wild buckwheat is found within the planning area, and we support the proposed action in Alternative B:

> Seven ACECs (92,900 acres) would be designated to protect special status and rare plants (Colorado hookless cactus, clay-loving wild buckwheat, Adobe Hills beardtongue, Colorado desert parsley, good-neighbor bladderpod, kachina daisy, Naturita milkvetch, Paradox Valley lupine, Paradox breadroot, and Grand Junction milkvetch), the most of any alternative. OHVs would be limited to designated trails on portions of the Kinikin Hills SRMA, where there are clay-loving wild buckwheat populations.

Uncompahgre Draft RMP at 2-394. Any lesser protection would be inadequate to protect clay-loving wild buckwheat and other special status species within the planning area.

*Debeque Milkvetch*

The UFO planning area contains populations of Debeque Milkvetch, a Colorado BLM Sensitive plant. In spite of this recognition, the draft RMP does not analyze or recommend any substantive protections for the species. BLM should survey the planning area for Debeque milkvetch to determine whether the species is present, with corresponding stipulations added for protections.

### iii.   Other wildlife considerations

Oil and gas exploration and development related to oil and gas leasing allowed in the Preferred Alternative is likely to have significant negative impacts on numerous areas of high wildlife conservation value, including elk winter range, mule deer winter range, and the Roeber and McCluskey State Wildlife Areas.

92

*Big Game Winter Range*

The final RMP must take into account significant new research demonstrating the effects of natural gas development on wildlife. See comments on Ecological Emphasis Areas. We commend the BLM for designating Ecological Emphasis Areas and encourage their inclusion in the final plan.

Critical big game winter range is dispersed across much of the land open to oil and gas leasing in the North Fork in the Preferred Alternative. The North Fork's deer and elk populations are vital for the local economy, and a key component of the landscape's ecosystem health.

We ask that the final RMP include additional analysis regarding the impacts on terrestrial wildlife habitat from oil and gas development specifically. Development across BLM lands in the North Fork particularly would result in additional roads, pipelines, habitat loss, fences and increased human disturbance on winter ranges used by thousands of elk and mule deer. BLM must determine how, when and to what degree elk and mule deer populations would be impacted. Reduction in effective winter range size caused by extensive oil and gas development in the North Fork cold increase deer density on remaining winter ranges, reducing forage quality, fawn survival and overwinter carrying capacity. Given the quality of big game habitat within the proposed lease parcels and the social and economic importance of hunting to the North Fork communities, it would be a travesty to rely on inadequate analysis.

*Roeber and McCluskey State Wildlife Area*

The leasing of lands adjacent to McCluskey and Roeber State Wildlife Areas is inappropriate. McCluskey SWA is popular for hunting deer, elk, dusky grouse and rabbit. Roeber SWA is a popular location for hunting deer, elk and rabbit, and for fishing in the cold water lake. State wildlife areas are paid for by revenue from sportsmen and under state law, Colorado Parks and Wildlife (CPW) is required to manage the areas for the benefit of wildlife. However, activities that conflict with the primary mission of providing wildlife recreation on State Wildlife Areas are discouraged. Oil and gas development adjacent to these protected areas could have negative impacts on the wildlife and recreational opportunities for which the lands have been set aside.

## X.    Oil and Gas Management

### a.    BLM should close additional lands to oil and gas leasing to conserve important resources and meet the agency's multiple use and sustained yield mandate.

The preferred alternative would make available 865,970 acres to oil and gas leasing, including lands with wilderness characteristics, areas of critical environmental concern, and important wildlife habitat. The acreage left open to leasing is 95% of the planning area, and is practically unchanged from the no action alternative. This is inappropriate management of resources BLM is charged with stewarding, does not balance conservation with development, and is unsupportable in an area with low potential for oil and gas development. BLM should close lands with conservation values to oil and gas leasing in the RMP.

BLM must consider the following when deciding which areas to allow fluid mineral leasing and development: 1) the BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development. 43 U.S.C. § 1712(c)(1); 2) BLM should significantly limit lands available for oil and gas leasing and development in order to support the effectiveness and long term

93

BLM_0149652

viability of conservation measures; and 3) the potential for development of oil and gas resources should inform oil and gas allocations in the land use plan.

1. The BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development.

FLPMA obligates BLM to abide by the principles of multiple use and sustained yield, especially during the land use planning process.  Specifically, multiple-use is defined as:

> ...the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

43 U.S.C. § 1702(c).  The definition of multiple use makes it clear that the BLM is obligated to manage the land for a number of resources other than oil and gas leasing, and states specifically that the BLM should manage some land for less than all of the resources and should not always be concerned with managing the land in order to receive the greatest economic return.  The definition of multiple-use makes it clear that simply because a particular resource exists does not mean that the BLM needs to be able to extract that resource for a profit.  It is well within the realm of BLM's multiple-use mandate to not have a significant portion of the planning area open to oil and gas leasing. In fact, the U.S. Court of Appeals for the 10th Circuit has reiterated in relation to this planning area: "[i]t is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses." *New Mexico v. Bureau of Land Management*, 563 F.3d 683, 710 (10th Cir. 2009).

IM 2010-117 plainly states that "under applicable laws and policies, there is no presumed preference for oil and gas development over other uses." It recognizes that oil and gas leasing is sometimes inconsistent with protecting other important resources and values. BLM must consider the range of resource values being managed on the public lands and close lands to oil and gas leasing where other resources are more important.

2. BLM should significantly limit lands available for oil and gas leasing and development in order to support the effectiveness and long term viability of conservation measures.

BLM has an opportunity in this RMP to make great strides in conservation and recreation management, as well as other multiple uses.  However, the long term viability of these strategies, programs and goals could be severely impacted by oil and gas development.  Oil and gas development is known to cause a variety of problems that are detrimental to natural resource conservation, and by leaving a large amount of the planning area open to leasing, BLM may undermine any conservation efforts or goals it identifies in the RMP.  Making areas available to oil and gas leasing also allows for speculative leasing, which can preclude conservation management of those areas. Even leases in areas with low potential for development or where leaseholders have no plans for development tie up the land for the duration of the lease due to the lease being a valid existing right. For example, BLM could not commit to

94

mitigation efforts in leased areas due to the possibility of the lease(s) eventually being developed. Therefore, BLM should limit lands available to leasing to ensure the viability and durability of conservation efforts.

Planning ahead to conserve other resources can avoid conflicts and damage.  The impacts from oil and gas development are now well known, and therefore, areas of high ecological or cultural resource density should simply not be available for leasing.  For example, Clait Braun, a leading researcher on sage grouse in the west, has stressed the impacts that oil and gas development can have on sage grouse populations:

> Road building, well pad construction, and noise disturbance associated with oil and gas development can fragment effective sage grouse habitat and compromise the quality of seasonal use areas. In addition, by creating more linear areas and smaller habitat patches, energy development can boost predation rates on sage grouse. So, for a variety of reasons, major oil and gas development reduces the area useable by sage grouse, which often leads to greater isolation of populations and a reduced ability to handle droughts, severe winters, or other natural disturbances.[66]

BLM simply cannot expect to have ecologically effective wildlife habitat and unlimited oil and gas development in the same area. Rather, the agency is then creating a situation where the goals, programs, and designations expected to protect valuable resources are only effective until such time that the right technology and/or price of oil and gas reaches a point that a previously non-economically extractable supply becomes economically extractable, or until a previously unknown supply not thought to exist is discovered, or prices encourage speculative leasing and drilling. History tells us that BLM must consider the impacts of oil and gas development across the planning area and close areas that have important wildlife, cultural, or wilderness values.

All lands managed for conservation values should be closed to oil and gas leasing, including all Areas of Critical Environmental Concern and lands with wilderness characteristics. This is consistent with multiple-use management and ensuring conservation management is appropriately carried out. For example, the White River National Forest in its recent oil and gas amendment acknowledged that in some places conservation values outweigh the benefits derived from fluid mineral development and closed areas of high development potential. The ROD states:

> There are a total of 198,513 acres of 'high oil and gas potential' on the White River National Forest... I chose to close through management direction approximately 61,000 acres of high potential lands on the Forest in order to maintain the natural character of the landscape and continue to protect the outstanding wildlife and recreation values of these lands.

WRNF ROD on Oil and Gas Leasing at 6.[67]

---

[66] This paragraph is adapted from detailed scoping comments on Upper Green sage grouse population trends and management issues prepared by Dr. Braun and submitted to the Pinedale BLM in October, 2002. Contact Linda Baker, Upper Green River Valley Coordinator (307-360-7198) to receive a copy of his 14 page comment letter.
[67] http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/61875_FS PLT3_2595815.pdf

95

BLM should close significant areas to oil and gas leasing, including areas managed for uses that are incompatible with oil and gas development, such as wilderness, wildlife and recreation, to appropriately steward the public lands resources and meet the agency's multiple use and sustained yield mandate.

   3.   The potential for development of oil and gas resources should inform oil and gas allocations in the land use plan.

In the preferred alternative, 865,970 of the 916,030 acres fluid federal mineral estate (95%) remains open to oil and gas leasing. Uncompahgre Draft RMP at 2-187—207. Of the 865,970 acres open to leasing, 433,230 acres are considered low potential for conventional oil and gas and 449,330 acres are considered no potential for coal bed methane. Out of the 433,230 total acres of low potential oil and gas BLM has kept 410,600 acres open (95%). Out of the 449,330 acres of no potential coal bed methane, BLM has kept 413,650 acres open (92%). Despite being classified as low or no potential and a severe lack of operator interest (only 5 leases have been issues in the field office since 2009[68]), BLM has chosen to keep a large amount of land open to leasing. This comes at the expense of protecting other resource values like wildlife, recreation and wilderness.

Clearly, BLM's analysis of development potential and reasonable foreseeable development in the planning area is not informing management alternatives in the Draft RMP. BLM should instead utilize this analysis to implement a management decision that reflects the likely development in the planning area during the life of the RMP. All areas identified as having "low" oil and gas potential should be removed from consideration for leasing. BLM can (and frequently does) amend land use plans to accommodate new interest in leasing and developing a resource when that interest transpires. Without such interest, it is irresponsible to allow for speculative leases to tie up public land that should instead be managed for multiple uses.

Making low development potential areas available for leasing compromises protections for wildlife, recreation and other resources while encouraging speculative leasing. An examination of current BLM policies and management practices shows that there is little effort to protect at least some public lands from oil and gas leasing.[69] Fundamental flaws in BLM's guidance have led to a current total of 32 million acres leased for oil and gas development, with less than 13 million under development.[70] And a Congressional Budget Office report recently found that, for parcels leased between 1996 and 2003 (all of which have reached the end of their 10-year exploration period), only about 10 percent of onshore leases issued competitively and three percent of those issued noncompetitively actually entered production.[71]

BLM's Handbook H-1624-1 guides the agency on planning for fluid mineral resources. Chapter III of Handbook H-1624-1 directs BLM to plan for oil and gas development on federal lands in light of where recoverable deposits of oil and gas are most likely to exist. The guidance requires that BLM use "development potential" to predict where future drilling activity will take place and where impacts from

---

[68] LR2000 Report

[69] See *No Exit* (http://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web_0.pdf) and accompanying technical report (https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%286.6.16%29.pdf).

[70] www.blm.gov/style/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTECTION_/energy/oil__gas_statistics/data_sets.Par.69959.File.dat/summary.pdf

[71] https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51421-oil_and_gas_options.pdf

BLM_0149655

oil and gas development will likely to be focused within a planning area. Using this information, the guidance directs BLM to assign lease stipulations and other management prescriptions to protect competing resources and mitigate unwanted impacts from drilling and development.

However, when applied in land use planning, this guidance often produces illogical allocation decisions and management prescriptions that result in significant resource conflicts. It tends to lead BLM to *open* low and no potential lands to leasing, and, in many instances, apply weaker protections and stipulations in these areas than high potential areas. Since low potential lands are open to leasing with weak stipulations, they are frequently targeted for speculative leasing. In turn, speculative leases in low potential areas often preclude management decisions that might benefit other public lands resources, such as wilderness-quality lands, wildlife and recreation.

The guidance prescribes a sequence of steps by which development potential is applied to make oil and gas lease stipulation planning and allocation decisions. Essentially, development potential is used to predict the location and intensity of oil and gas development assuming that existing management prescriptions will remain in place. Then, alternatives to existing management are formulated to mitigate impacts and resolve conflicts that would likely result from continuing with existing management.

Under Handbook H-1624-1, stipulations beyond existing management prescriptions or standard terms and conditions are to be applied where impacts from development require mitigation. That is, heightened protections are imposed in areas where more significant impacts are predicted. However, impacts are more likely to exist in areas with moderate to high development potential. The implied corollary is that strict constraints and strong protections are not necessary in low potential areas because standard or existing lease terms are likely to mitigate the impacts from oil and gas development to an acceptable level. Consequently, application of the sequence of steps prescribed by the guidance produces stricter lease stipulations in areas with high development potential than in areas with low development potential.

The following flowchart illustrates how application of the guidance can result in decisions to make low potential areas open to leasing with relatively weak lease stipulations, regardless of the presence of other resources that could be harmed should development happen:[72]

---

[72] See https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%286.6.16%29.pdf for detailed case studies.

97

BLM_0149656



The outcome of this approach to decision-making is that low development potential lands are frequently nominated and leased, presumably for speculative purposes, leading to public conflict and precluding protective management of other resources.

For example, in the Colorado River Valley Resource Management Plan, BLM decided not to manage lands for the protection of wilderness characteristics in the Grand Hogback lands with wilderness characteristics unit based on the presence of oil and gas leases, even though the leases had never experienced any development:

> The Grand Hogback citizens' wilderness proposal unit contains 11,360 acres of BLM lands. All of the proposed area meets the overall criteria for wilderness character...There are six active oil and gas leases within the unit, totaling approximately 2,240 acres. None of these leases shows any active drilling or has previously drilled wells. The ability to manage for wilderness characteristics in the unit would be difficult. If the current acres in the area continue to be leased and experience any development, protecting the unit's wilderness characteristics would be infeasible. . . .

Colorado River Valley PRMP (2015) at p. 3-135.

The Colorado River Valley RMP was finalized in July 2015, and already 5 of the 6 leases in the Grand Hogback lands with wilderness characteristics unit have expired. Yet, BLM has made a 20-year decision to not protect the wilderness qualities of this area. The Uncompahgre RMP can and should make better-reasoned decisions.

Similarly, last year, Wyoming BLM declined to manage the Rough Gulch area in the Cody Field Office for wilderness protection because "64% of the area [was] covered] by oil and gas leases," even though the leases had never been drilled. Rough Gulch borders a WSA—the McCullough Peaks WSA—and has "very low" potential for oil and gas development. Like most federal leases, especially those in areas with low development potential, the leases in Rough Gulch were never drilled, and they expired earlier this year. Yet, because the leases were in effect last year, when WY BLM made its land use planning decision for the area, BLM is not currently managing Rough Gulch for wilderness protection.

98

Prioritizing leasing outside of low potential areas also makes sense from an economic perspective. Leases in low potential areas generate minimal revenue but can carry significant costs. In terms of revenue, they are most likely to be sold at or near the minimum bid of $2/acre, and they are least likely to actually produce oil or gas and generate royalties.[73] *See* Bighorn Basin PRMP (2015) at p. 73 ("Leasing may be based on speculation, with leases within high risk prospects usually purchased for the lowest prices."); White River PRMP (1996) at p. A-7 ("At any given time, most of the acreage that is available for oil and gas leasing in the WRRA is under lease. . . . Most of the area is leased for speculative purposes and consequently only a small percentage of leases will ever be developed."). In terms of costs, leasing in low potential areas requires processing lease nominations, preparing environmental reviews, and resolving protests and resource use conflicts.

On the other hand, limiting leasing in low potential areas conflicts the least with industry objectives and can confer significant public benefits. Low potential lands are the "low-hanging fruit" by which the BLM can fulfill other objectives of its multiple-use mission, such as managing for fish, wildlife and recreation. Yet, as described above, speculative leases on low potential lands can prevent the BLM from otherwise managing lands for alternative purposes and fulfilling its multiple-use mandate. *See also* White River DRMPA (2012) at p. 4-377 (". . . authorized oil and gas uses would likely preclude other incompatible land use authorizations"). In addition, limiting exploration and development on low potential lands necessarily conflicts the least with industry objectives. As discussed in the Bighorn Basin PRMP (2015):

> [A]lternatives D and F place additional stipulations on oil and gas-related surface disturbances in the Absaroka Front, Fifteenmile, and Big Horn Front MLP analysis areas for the protection of big game, geologic features, and LRP soils. As a result, alternatives D and F could have additional adverse impacts on oil and gas development in these MLP analysis areas. . . . However, because of the generally low to very low potential for oil and gas development and redundancies with other restrictions on mineral leasing from the management of other program areas, management specific to the MLP is less likely to adversely affect oil and gas development in these areas.

Bighorn Basin PRMP at p. 4-87*; see also* White River DRMP (1994) at p. 4-21 ("Prohibiting development in Class I areas would not affect oil and gas production because oil and gas potential in these areas is low.").

The White River National Forest similarly utilized development potential to inform management alternatives and ultimately management decisions. There, the U.S. Forest Service in its Record of Decision on Oil and Gas Leasing used development potential to dictate what areas would remain open and what areas would be closed to oil and gas leasing. The ROD states:

> My decision includes closing through management direction, 1,281,726 acres of the Forest to oil and gas leasing for the life of this plan. It is very important to understand the context of this part

---

[73] Center for Western Priorities, "A Fair Share" ("Oil Companies Can Obtain an Acre of Public Land for Less than the Price of a Big Mac. The minimum bid required to obtain public lands at oil and gas auctions stands at $2.00 per acre, an amount that has not been increased in decades. In 2014, oil companies obtained nearly 100,000 acres in Western states for only $2.00 per acre. . . .Oil companies are sitting on nearly 22 million acres of American lands without producing oil and gas from them. It only costs $1.50 per year to keep public lands idle, which provides little incentive to generate oil and gas or avoid land speculation.").

99

of my decision. Approximately 1,067,000 of these acres are closed because there is little or no potential for oil and gas production due to the geology of the area. These lands have had no past drilling or natural gas production to speak of… The geology simply does not support natural gas formation.

WRNF ROD on Oil and Gas Leasing at 6.

There are also legal arguments for changing how BLM manages low potential lands for oil and gas development. As described in Instruction Memorandum 2010-117, the multiple-use mandate requires that "there [be] no presumed preference for oil and gas development over other uses." *See* p. 2; *see also New Mexico Ex. Rel. Richardson v. BLM*, 565 F.3d 683, 710 (10th Cir. 2009) ("It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses."). Yet, H-1624-1 provides that all lands, regardless of development potential, are presumptively open to oil and gas leasing under "least restrictive" stipulations. *See* H-1624-1 at p. III-11 ("The least restrictive stipulations that effectively accomplishes the resource objectives or uses for a given alternative should be used . . . the preferred alternative of the RMP/EIS should provide evidence that less restrictive measures were considered but found inadequate to provide effective protection for other land uses or resource values determined through the planning process to be deserving of protection."). Stricter stipulations and closures are only applied when necessary to mitigate conflicts and unwanted environmental impacts. *See, e.g.*, Kremmling PRMP (2014) at p. 2-1 ("It is the policy of the BLM that lands are generally available for oil and gas leasing where measures can be taken to mitigate conflicts and environmental consequences to an acceptable level. . . ."). Yet, as described above, leaving lands open to oil and gas leasing does not simply allow oil and gas resources to compete on a level playing field with other resources—it gives preference to oil and gas development over other uses.[74]

As demonstrated, BLM's typical application of the guidance leaves low and no potential lands open to leasing and assigns weak stipulations and protective measures in these areas. Several significant problems stemming from this practice are detailed in The Wilderness Society's 2016 report, *No Exit*:[75]

- It precludes lands from being managed for multiple values.
- It impedes meaningful conservation from taking place on sensitive lands.
- Other resources are endangered by oil and gas leases that do not include sufficient protections.
- It undermines the public's engagement in the land planning process.
- It causes poor fiscal stewardship of taxpayer-owned resources.
- It prevents us from effectively achieving our national climate targets.

Since low potential lands have favorable lease stipulations and can be acquired and held for minimal cost, low potential areas are often targeted for speculative leasing, though rarely drilled and developed. Although leases on low potential lands generate minimal revenue, BLM devotes significant administrative resources to managing nominations and protests and administering leases on low

---

[74] Oil and gas interests can obtain valid existing rights (i.e., leases) in interim periods between RMP revisions that can later preclude management decisions benefiting alternative resources and uses. There is no analogous mechanism for uses alternative to oil and gas to gain interim vested rights that will later preclude oil and gas development. In this sense, presumptively opening lands to oil and gas development gives preference to oil and gas development over other uses.

[75] See *No Exit* (http://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web_0.pdf) and accompanying technical report (https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%286.6.16%29.pdf).

BLM_0149659

potential lands. In addition, undeveloped leases on low potential lands impose less obvious opportunity costs in the form of precluding designations and management decisions that would otherwise benefit alternative resources. This, in turn, limits the ability of the BLM to fully comply with its multiple-use mandate. Eliminating the presumption that all lands, regardless of development potential, should be open to leasing would help ensure that other resources and uses of the public lands, such as wildlife and recreation, are on equal footing with oil and gas development. Doing so would also create opportunities to enhance the management of those other resources, particularly in areas with low or no development potential.

The TWS report *No Exit* (included as Attachment 4) argues that BLM should update agency guidance to reflect a smarter, more balanced approach to oil and gas management. However, BLM has the ability to apply a more balanced approach in current land use planning efforts in the absence of new guidance. A more thoughtful, realistic approach would be consistent with BLM's mandate to manage the public lands for multiple use and sustained yield. The agency's governing statute identifies a wide range of uses and values and provides for using lands "for some or all of these resources" and "with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." 43 U.S.C. § 1702(c). Other aspects of BLM's legal obligations also support limiting or eliminating leasing in low- and no-potential areas, including for purposes of protecting other important resources. For example, BLM is subject to numerous requirements to "minimize" the environmental and other impacts of oil and gas leasing and development.[76] By taking a proactive approach to managing oil and gas development as just one of the many uses of our public lands, BLM can also reduce unnecessary costs associated with speculative leasing and undeveloped lands, while making room for designating and managing lands for other uses, such as recreation, wilderness values, and fish and wildlife.

We are including with these comments a proposed approach to making oil and gas allocations consistent with development potential in the Uncompahgre RMP. (See Attachment 5.) Our recommended approach is unquestionably consistent with BLM's multiple use mandate and overarching guidance. Faithfully applying a current understanding of laws and policies would lead to closing more lands to oil and gas leasing, consistent with the agency's multiple use obligations. We therefore urge the Uncompahgre Field Office to apply these principles to the ongoing Uncompahgre RMP to achieve a more balanced land use plan that protects important resources and reduces the potential for public conflict over oil and gas leasing and development.

**Summary of Comments:** BLM should close all areas identified as having low or very low potential for oil and gas development to leasing to ensure speculative or unexpected leasing does not undermine conservation efforts. BLM should close significant areas to oil and gas leasing, including areas managed for uses that are incompatible with oil and gas development, such as wilderness, wildlife and recreation, to appropriately steward the public lands resources and meet the agency's multiple use and sustained yield mandate. BLM should utilize the proposal included as Attachment 5 to reevaluate oil and gas

---

[76] See 43 C.F.R. § 3101.1-2 (reasonable measures may be required to minimize adverse impacts on leases); 43 C.F.R. § 2920.7(b)(2) (land use authorizations shall minimize damage to specified environmental resources); BLM Standard Lease Form 3100-11 (lessees "must" conduct their operations so as to minimize adverse impacts); Onshore Order No. 1 §§ IV and III(F)(a)(3) (operators "must" minimize adverse impacts and BLM may require reasonable measures to minimize adverse impacts when APDs are approved); BLM Gold Book (several provisions referencing minimization including a provision to "minimizes undesirable impacts to the environment").

BLM_0149660

allocations in the Uncompahgre RMP.

### b.   Reasonable Foreseeable Development Scenario

An updated and accurate Reasonable Foreseeable Development Scenario (RFD) for oil and gas is critical to the RMP planning process. The RFD analysis plays an important role the development of an adequate range of alternatives and provides key assumptions used to assess the cumulative impacts and environmental consequences of each alternative on the affected environment. The draft RMP relies heavily on RFD data and ultimately factors into the selection of the preferred alternative and Approved RMP. Clearly, the RFD has severe implications for fluid mineral management decisions made on BLM lands. Due to the importance of this analysis we believe BLM should take the opportunity to update the UFO RFD itself to address the shortcomings detailed below.

The UFO RFD was completed in July 2012 and as a result relies on severely outdated information. Since 2012 we have seen the bottom fall out of both the domestic and international oil and gas markets. Henry Hub spot prices for natural gas have fallen from a high of $12 per million Btu in 2008 to $2 per million Btu today and crude futures on the West Texas Intermediate (WTI) are trading at $44 per barrel compared to $134 per barrel in 2008[77]. As a result, the planning area has seen a significant decline in exploration and production activities. According to data from the Colorado Oil and Gas Conservation Commission, in 2015 only 4 wells were started and 2 wells spudded between the five counties of Delta, Gunnison, Ouray and San Miguel[78]. Statewide, the number of drilling permits issued has decline 50% since 2010 and the number of active rigs has fallen from 73 in January 2012 to just 22 in January of 2015[79]. In fact, there are currently only 4 active rigs in the entire Piceance basin[80].

According to recent projections from the Energy Information Administration (EIA), the oil and gas markets will not be recovering to the near historic levels of production experienced from 2008 to 2014 any time soon. EIA predicts that domestic crude oil and condensate production will grow 0.9% by 2040 and natural gas consumption will grow by only 0.5%[81]. This corresponds with much slower growth in terms of price as well. Henry Hub spot prices are projected to average around $6/MMBtu in 2035 while WTI spot prices for crude and condensate are estimated to reach around $110 per barrel; significantly lower figures than those assumed by the 2012 RFD. And even those estimates are likely overly optimistic. The dramatically different and unforeseen change in market conditions necessitate a reevaluation of the RFD scenario and in particular the development potential estimates in the planning area.

The RFD made projections based on a number of assumptions that have proven to be wildly inaccurate. The RFD states that shale gas production would grow almost fourfold from 2009 to 2035 and that "Rising fuel prices [will] spur domestic energy production across all fuels."[82] It also relies on the EIA's 2012 Annual Energy Outlook (AEO) which projected natural gas prices to rise to $10.35/MMBtu and crude oil prices to move above $125 per barrel by 2035. Revised estimates from EIA show the 2012 projections to be overstated and recent inactivity in the Piceance basin clearly illustrates that shale gas

---

[77] http://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=rclc1&f=m
[78] http://cogcc.state.co.us/documents/library/Staff_Reports/2016/201608_StaffReport.pdf
[79] http://cogcc.state.co.us/documents/library/Staff_Reports/2016/201608_StaffReport.pdf
[80] http://www.naturalgasintel.com/topics/395
[81] http://www.eia.gov/forecasts/aeo/data/browser/#/?id=1-AEO2015
[82] 2012 UFO RFD, p. 57-58

BLM_0149661

production is not occurring to the extent predicted in 2012. Based on inaccurate assumptions and projections, BLM estimated that by 2035 the planning area could see as many as 1,271 wells drilled; 782 of those for the production of coalbed methane. The RFD analysis was then used to inform the development potential and environmental consequences for the area and eventually contributed to the development of the range of draft alternatives and selection of a preferred alternative[83].

The assumptions underlying the 2012 development potential projections and the RFD scenario have changed dramatically. BLM needs to reevaluate development potential and the RFD based on this new information. A new RFD and analysis of development potential will change the assumptions used in the development of the draft alternatives, in analyzing environmental consequences, in projecting the impact of oil and gas development in terms of jobs and revenues and ultimately the selection of the appropriate preferred alternative. We argue that new data would indicate the initial analysis grossly overestimated development potential and the associated positive impacts of fossil fuel development in the region. A new RFD would make the case for selecting a more balanced alternative that prioritizes protecting those resources and values that are most important to the local communities and broader public over fossil fuel extraction. We know the importance of wildlife, agriculture and wilderness as an economic driver in the region.[84] More realistic and conservative oil and gas development projections that would come from a reevaluation of the RFD in light of new data could drastically alter the decisions made in this RMP.

### c.   Inadequate range of alternatives

Under the preferred alternative, 865,970 of the 916,030 acres fluid federal mineral estate (95%) remains open to oil and gas leasing. Uncompahgre Draft RMP at 2-187—207. Of the 50,060 mineral acres that would be closed to leasing in Alternative D, nearly 90% (44,220 acres) are statutorily closed areas. In other words, BLM is using its discretionary authority provided in this RMP to close a mere 5,840 additional acres to oil and gas leasing over the no action alternative. Furthermore, the other two action alternatives only contemplate closing 219,580 acres and 306,670 acres. *Ibid*. This means that the full range of alternatives only contemplates closing 5%-33% of the planning area to oil and gas leasing. This does not represent a true range of alternatives.

As discussed above, BLM has a wide range of authority under FLPMA's multiple use mandate to specify that not all uses are appropriate in all places.  The many other natural resources present in the planning area (such as wilderness characteristics, scenic values, cultural resources, recreation, and fish and wildlife habitat) can and should be protected for public enjoyment.  By limiting the options for closing areas to oil and gas development, BLM is improperly constraining the range of management alternatives in contravention of NEPA.  Although many acres are open to oil and gas development subject to various lease stipulations, BLM often offers companies exceptions, modifications or waivers from the

---

[83] BLM notes in Chapter 4 that "It can be anticipated that assuming current rates of severance and royalty taxes, as presented in Chapter 3, increased production of oil and gas on BLM-administered lands would result in a comparable increase in contributions to local counties and communities."

[84] According to a PEW study, in 2014 there were 4.9 million visits to BLM lands in CO, $372 million in overall spending ($275 million on quiet recreation), $113 million generated in personal income specifically tied to quiet recreation on BLM lands and 3,412 jobs supported quiet recreation on BLM lands. See http://www.pewtrusts.org/en/research-and-analysis/analysis/2016/03/31/the-economic-value-of-quiet-recreation-on-blm-lands

103

BLM_0149662

application of "no surface occupancy" (NSO) stipulations.  Appendix B to the Draft RMP sets out a wide variety of "criteria" that could support a request for exceptions, modifications or waivers.

NEPA requires the BLM to consider and evaluate a reasonable range of alternatives for oil and gas development. The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. NEPA requires BLM to "rigorously explore and objectively evaluate" a range of alternatives to proposed federal actions. See 40 C.F.R. §§ 1502.14(a) and 1508.25(c); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72-73 (D.C. Cir. 2011) (requiring the BLM to consider a reasonable range of alternatives for oil and gas activity); IM 2010-117 (requiring consideration of "alternatives to the proposed action that may address unresolved resource conflicts."). "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action." *Northwest Envtl Defense Center v. Bonneville Power Admin.*, 117 F.3d 1520, 1538 (9th Cir. 1997). "[R]easonableness is judged with reference to an agency's objectives for a particular project." *New Mexico ex rel. Richardson*, 565 F.3d at 709.

Here, the BLM's objectives are set forth in the Draft RMP's "purpose and need" statement.  According to that statement, the RMP will "provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area."  Draft RMP at I-2.  The Draft RMP elaborates that "It also establishes the allowable uses, management actions, and special designations that will enable the BLM to achieve the desired outcomes." *Ibid.*  An alternative (or alternatives) that significantly restricts oil and gas leasing, including by prohibiting leasing in areas with low potential for development, clearly satisfies that "purpose and need" statement.

An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14), which extends to considering more environmentally protective alternatives and mitigation measures.  See, e.g., *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094,1122-1123 (9th Cir. 2002) (and cases cited therein).  For this RMP, the consideration of more environmentally protective alternatives, including alternatives to severely limit oil and gas leasing availability, is consistent with the requirement of FLPMA to "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved."  43 U.S.C. §1732(d)(2)(a).

In order to comply with NEPA, BLM must consider a broad spectrum of alternatives in regards to which lands will be available for oil and gas leasing.  A draft RMP which leaves all the lands within the planning area open to oil and gas leasing or only allows for very slight differences between the alternatives in this regard fails to meet the "reasonable range of alternatives" directive. BLM has an obligation to rigorously explore and evaluate a range of alternatives, including closing areas currently open to leasing in order to protect wildlife, wilderness and other important resource values, especially those areas with low potential for oil and gas development.

**Summary of Comments:**  BLM's obligation to manage these public lands for a variety of resources, of which oil and gas is only one, requires consideration of alternatives to close substantial areas to oil and gas leasing and a preferred alternative that better balances energy development with other multiple uses of the public lands.

104

### d.  Health Impact Assessment

As we stated in our scoping comments for the Uncompahgre RMP, BLM should conduct a Health Impact Assessment to adequately evaluate potential impacts of fossil fuel development on public health and adopt management decisions to minimize or eliminate those impacts. NEPA intends that human health be thoroughly considered in any Environmental Impact Statement. Congress stated that "...it is the continuing responsibility of the Federal Government to use all practicable means...to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may....assure for all Americans safe, healthful, productive and aesthetically and culturally pleasing surroundings.." and "...attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences..."[85] NEPA implementing regulations direct agencies to consider "the degree to which the proposed action affects public health or safety."[86] These regulations also state that Federal agencies shall to the fullest extent possible "Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment."[87]

Oil and gas development is acknowledged to have potentially severe impacts on human health, as noted below, and the Draft EIS should incorporate a formal methodology to evaluate all health issues and potential mitigations.  We therefore recommend that BLM incorporate a Health Impact Assessment (HIA), which is a systematic, comprehensive methodology for assessing human health impacts, as part of the EIS for the Uncompahgre RMP. A HIA looks at all the possible health effects from a decision, including contaminants and air pollutants but also water contamination, accidents and injuries, alcoholism and substance abuse, mental health impacts, and more. Not only is this approach used by U.S. and international health agencies, but it is used by the oil and gas industry itself in overseas operations.[88]

Two papers authored by environmental health experts at the University of Colorado's School of Public Health examined available information regarding the health effects of oil and gas drilling and production.  Among their findings is that: "Most of the hazardous chemicals associated with oil and gas production are well documented to produce adverse health effects in individuals." [89]  They also looked at information specific to Garfield County, Colorado, which can serve as a model to other western Colorado counties.[90] Some of their conclusions that are specifically relevant to the RMP revision include:

- Air and water quality studies conducted to date indicate that potential exposures to hazardous emissions exist.

---

[85] 42 USC § 4331
[86] 40 CFR 1508.27(b)2
[87] 40 CFR 1500.2(f)
[88] International Petroleum Industry Environmental Conservation Association and the International Association of Oil and Gas Producers, *A Guide to Health Impact Assessments in the Oil and Gas Industry*, (London; 2005): http://www.ipieca.org/activities/health/health_publications.php
[89] Witter, R. et al, " Potential Exposure-Related Human Health Effects of Oil and Gas Development: A Literature Review (2003-2008)," August 1, 2008, hea_08091702b.pdf.
[90] Witter, R. et al, "Potential Exposure-Related Human Health Effects of Oil and Gas Development: A White Paper," September 15, 2008, hea_08091702a.pdf.

105

BLM_0149664

- Many air toxics are essentially unmeasured in Garfield County and current plans for further air sampling may not be comprehensive enough to enable public health officials to determine the community health impact of oil and gas development.
- Preliminary testing results indicate that ozone levels in some places are exceeding National Ambient Air Quality Standards and may be hazardous to humans.
- There are no plans for comprehensive and systematic monitoring of surface and subsurface waters.
- Environmental monitoring must be relevant to the areas where oil and gas development activity is occurring and the results must be readily available to the public. Unbiased interpretation of the results must occur in a timely manner and be made available to the public.
- It is important not to ignore what is already known. There is an immediate need for specific information on exposures and the impact from oil and gas development on all aspects of human health.
- An adequate monitoring program should be developed through a rigorous scientific process that addresses all currently recognized data gaps and health risks. This process should be developed in a transparent and explicitly unbiased way.
- A Health Impact Assessment (HIA) is a practical tool to evaluate future impacts, alternatives and appropriate strategies to promote and protect human health.

**Summary of Comments:** BLM should incorporate a Health Impact Assessment (HIA) into the EIS accompanying the Uncompahgre RMP.

### e. Reclamation

BLM's current approach to well site reclamation is inadequate. We propose a change in the way reclamation is currently managed by moving away from relying on site-specific BMPs and COAs (which is accompanied by an increased level of inconsistency across the planning area) and instead implement a performance-based standards approach. Under such a system BLM would no longer dictate exactly how to proceed with reclamation. Instead, BLM would include reclamation goals in a reclamation plan or other planning document and allow companies to utilize their intellectual and financial resources to find the best way to achieve those goals. We recommend that BLM consider using this approach to well site reclamation in the Uncompahgre RMP.

BLM's approach to well pad reclamation for fluid mineral leases has remained unchanged since 2007 when BLM revised Onshore Oil and Gas Order No. 1 and the Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (Gold Book).

Onshore Oil and Gas Order No. 1 requires operators to submit a "Surface Use Plan of Operations" along with their Application for Permit to Drill (APD) package. The surface use plan must "include adequate measures for stabilization and reclamation of disturbed lands." The operator is required to elaborate on the methods that will be employed in the *Plan for Surface Reclamation*, a key element of the surface use plan[91]. The operator may elect to modify the reclamation plan at any time up to submission of the Notice of Intent to Abandon. Final abandonment however will not be approved until "the surface reclamation work required in the Surface Use Plan of Operations or Subsequent Report of Plug and Abandon has been completed to the satisfaction of the BLM or the FS and Surface Managing Agency..."[92]

---

[91] Onshore Oil and Gas Order No.1 (III.D.4)
[92] Onshore Oil and Gas Order No. 1 (XII.B)

BLM_0149665

In addition to the reclamation plan, BLM may include Conditions of Approval (COAs) and Best Management Practices (BMPs) as mitigation measures in the approved APD.[93] These BMPs and COAs are typically developed and identified in the field office's Resource Management Plan (RMP) and/or Master Leasing Plan (MLP). Commonly used reclamation standards and BMPs can also be found in the Gold Book.

Historically, each field office has used the requirements of Order No. 1 to create its own reclamation programs in an RMP. An RMP can address reclamation in a variety of ways. It can establish reclamation as a goal or objective, it can include specific management decisions where reclamation is necessary to achieve the larger objective, it can include reclamation stipulations, or it can recommend COAs and BMPs to be included with an operator's APD. In practice, it is rare that reclamation is included as a goal or objective. Occasionally a management decision may reference the need to conduct some form of reclamation or restoration in order to meet the goals and objectives of the plan. But, more often than not reclamation is handled through the incorporation of Conditions of Approval (COAs) or Best Management Practiced (BMPs) into APDs and Master Development Plans (MDPs).

The Draft RMP relies on this outdated approach to reclamation.  Under the "Management Common to all Alternatives" BLM states it will:

> Apply conditions of approval, best management practices (BMPs), standard operating procedures (shown in Appendix G), other site-specific mitigation, and/or off-site mitigation measures to all resource uses to promote rapid reclamation, maximize resource protection, and minimize soil erosion.

Uncompahgre Draft RMP at 2-23. In other words, reclamation will be dealt with on a case-by-case basis through the inclusion of COAs and BMPs at the APD stage. This concept of addressing reclamation is the same as it has always been as illustrated by the general statement included as an action common to all alternatives (including the no action alternative) under the fluid mineral stipulations in Chapter 2:

> Require operators to meet the current BLM Goldbook standards for soil and water protection and plans for surface reclamation, plus other BMPs (Appendix G), as applicable, for all permitted fluid minerals (i.e., oil and gas and geothermal) actions.

*Id.* at 2-207. The only other explicit reference reclamation in the context of fluid mineral development comes in the form of a very broad objective statement, "Lease federal fluid mineral and geothermal resources to facilitate economically and environmentally responsible exploration, development, and reclamation using the best available technology." *Id.* at 2-187. Otherwise, reclamation-centric stipulations tend to focus only on soil issues. The proposed alternative includes CSU-3/SSR-3, CSU-6/SSR-6 and NSO-6/SSR-8 state that an operator *may* be required to submit a reclamation plan if the proposed action will impact saline or selenium soils, biological soil crust or is located on a slope greater than 40%. *Id.* at 2-30, 2-32 and 2-34.

The current way in which reclamation is regulated has led to ongoing issues with unreclaimed, orphaned or abandoned sites as well as improperly reclaimed sites. This is not a new issue. According to a 2005 Government Accountability Office (GAO) study, seven of eight field offices reviewed had a backlog of

---

[93] Onshore Oil and Gas Order No. 1 (III.F.3)

BLM_0149666

reclamation inspections.[94] Additionally, the review revealed that 1,975 wells in the eight field offices had been abandoned over 4 years ago and did not have an approved Final Abandonment Notice.[95] While funding and personnel deficiencies certainly play a role in these issues, it can also be argued that an inefficient and burdensome reclamation program makes it harder for both operators to reclaim sites and for BLM officials to approve final reclamation. A new reclamation program can help to streamline the process for both operators and the agency.

All of these unreclaimed or improperly reclaimed sites can have devastating effects on wildlife, water quality, soil quality as well as local ecosystems and those services which they provide. The surface disturbance associated with energy development leads to increased habitat fragmentation that can disrupt migratory pathways, alter wildlife behavior and increase mortality, and allow for the proliferation of invasive species. Additionally, new research shows that the loss and degradation of ecosystems, through the direct removal of vegetation, associated with drilling for oil and gas has greatly reduced net primary productivity (NPP) across the United States.[96] It is crucial that well sites be properly reclaimed to protect wildlife, native ecosystems and preserve our ecosystem services.

There is no denying that unreclaimed sites have negative environmental impacts. However, it is also important to note the negative fiscal impact they have on the BLM. Reclamation can cost as much as $15,000 per acre and the cost to plug and reclaim a single way can easily exceed $100,000.[97] According to a 2011 GAO report, "The agency spent a total of about $3.8 million to reclaim 295 orphan wells in 10 states from fiscal years 1988 through 2009. BLM also estimated that there were an additional 144 orphan wells in seven states that needed to be reclaimed, with an estimated cost of approximately $1.7 million for 102 of these wells."[98] Establishing a program with input from the oil and gas industry could help to ensure that mutually agreed upon reclamation objectives are met, helping to eliminate the problem of unreclaimed orphaned and abandoned well sites.

In order to resolve these issues, some field offices have begun to move away from this approach and allocate more time and resources to develop reclamation plans. In particular, the White River Field Office created its own 40-page "Surface Reclamation Plan" as an Appendix to its recently finalized RMP amendment for oil and gas development. White River Approved RMPA (2015) at Appendix 3. This plan provides the minimum information and operation standards that the field office expects in reclamation plans, specific criteria the field office will implement which will determine if reclamation is successful, and it identifies a number of techniques and methodologies that can be incorporated into a site specific reclamation plans. The reclamation standards in the appendix apply to all surface disturbing activities in the field office. It is a unique standards-based approach that, with some improvement, could help inform the future of reclamation on BLM lands.

A similar approach has also been used by Colorado's Division of Minerals and Geology which established a performance based standards system for the state's coal mine reclamation program. Rule 4 of Colorado's "Regulations of the Colorado Mined Land Reclamation Board for Coal Mining" establishes performance standards for a variety of categories, including - and perhaps most relevant to this

---

[94] GAO-05-418
[95] GAO-05-418
[96] Ecosystem Services Lost to Oil and Gas in North America by Brady W. Allred, W. Kolby Smith, Dirac Twidwell, Julia H. Haggerty, Steven D. Running, David. Naugle, Samuel D. Fuhlendorf; Science, 24 APR 2015 : 401-402
[97] GAO-11-292
[98] GAO-11-292

BLM_0149667

conversation – revegetation. Under Rule 4.15.1 the state establishes a general requirement that, "Each person who conducts surface coal mining operations shall establish on all affected land a diverse, effective and permanent vegetation cover of the same seasonal variety native to the area of disturbed land, or species that support the approved postmining land use." Section 15.2 goes on to dictate more specific goals that all work toward "prompt establishment of vegetation cover and recovery of productivity levels compatible with the approved postmining land use," including achieving permanent vegetation cover as specified in 15.1 and erosion control. The rule also creates a system for monitoring and reporting.

We propose BLM establish a new performance standard based reclamation program for interim and final reclamation using some of the principles from Colorado's coal mine program and the White River Field Office RMPA. Several key elements would need to be developed in order to move forward with this including defining the reclamation standards, creating a reporting framework and establishing a monitoring and review system. While that level of detail may be beyond the scope of the RMP, BLM could lay the groundwork for the establishment of such a program at the implementation stage by including specific fluid mineral objectives that commit the agency to creating and implementing a comprehensive fluid mineral reclamation program for the planning area. Alternatively, BLM could develop a reclamation plan and include it as an appendix to the RMP similar to the approach taken by the WRFO.

### f.   Additional management actions that should be considered and implemented

#### i.   Phased leasing and development and surface disturbance caps

Phased leasing is the concept of limiting the number of parcels offered for sale in a given time period or otherwise leasing parcels in a strategic manner. BLM includes phased leasing as a "Resource Protection Measure" in its formal guidance on MLPs. Handbook H-1624-1, Section V.C.2. Phased development is used to manage the timing and location of oil and gas development in a given area. As stated by the BLM, phased development "refers to prescribing the sequence of drilling operations by geographic area to allow for the development of certain areas while restricting or temporarily restricting development of other areas. Subsequent development occurs as areas developed earlier are completed and reclaimed." Phased development can be applied in a variety of ways. It can be based on timing - developing one area, then completing reclamation before moving to another area. It can be based on location - delaying development in wildlife corridors.  Phased development can also be used to limit the amount of surface disturbance on a lease at any given time (applying surface disturbance caps – as a percent of a lease or unit or using an acreage figure) and requiring successful restoration before permitting additional disturbance. This concept allows development to proceed in a controlled manner and gives BLM the flexibility and time necessary to address any problems that may arise and develop a solution before the same issue arises somewhere else.

Phased leasing and development have been used effectively in a number of land-use planning decisions. We have seen phased leasing successfully incorporated into both the Dinosaur Trail MLP and Beaver Rim MLP. In Dinosaur Trail, BLM includes phased leasing as an approach to achieve the overall RMP objective:

> Within the Dinosaur Trail MLP, the BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by

BLM_0149668

managing leasing opportunities in a phased approach in order to take advantage of new information and the best available technology.

White River Field Office Approved RMPA at 1-4. Within the Dinosaur Trail MLP, BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by managing leasing opportunities in a phased approach in order to take advantage of new information and the best available technology. Under the phased approach, leasing will first proceed in that portion of the Dinosaur Trail planning area with the most accessible oil and gas resources and fewest potential resource conflicts, and later proceed to areas with lower development potential.

Phased development was also incorporated into the Beaver Rim MLP which utilizes a surface disturbance cap approach to phased development and provides that the BLM will:

> Allow no more than 5 percent surface disturbance in the township in which the parcel is located until interim reclamation goals are achieved. Require co-location of new disturbance if technically feasible. If new disturbances cannot be co-located, they must be at least 1.2 miles from existing disturbance.

Lander Record of Decision and Approved RMP, Record No. 2028.

In the Uncompahgre RMP, BLM could apply a similar phased approach as described in Dinosaur Trail, by first providing for leasing and development in that portion of the planning area where industry interest is most heavily focused, where development potential is medium to high, where infrastructure already exists, and where resource conflicts are minimal. Once high and medium potential lands have been fully leased and there is expressed interest from industry, the agency would then consider leasing parcels in low potential areas, pending additional planning. This framework is essential to ensuring the adequate protection of other resources in undesirable oil and gas areas. The Uncompahgre RMP could also incorporate phased development by establishing a surface disturbance cap as done was done in the Beaver Rim MLP to incentive successful final reclamation prior to approving new APDs.

ii.   Clustered leasing and development

Clustered development based upon best available technology can minimize surface area development and impacts as well as reduce noise and dust caused by traffic to and from drill sites. In the Uncompahgre Field Office, BLM should focus development in places where there are active wells or where there is existing infrastructure like piping and roads. This is a viable way of reducing habitat fragmentation and protecting sensitive species while allowing development activities to proceed responsibly.

We encourage BLM to create mechanisms and make land use allocations that results in clustered development for oil and gas. There are at least 17 wells in the planning area, but the RFD estimates that during the planning cycle of 2010 through 2030, as many as 1,271 wells could be drilled in the planning area with 418 under BLM management. Uncompahgre Draft RMP at 3-120. While this number is speculative and contingent upon stipulations and authorizations made in the RMP, it points to future

110

opportunities to concentrate development in a way that limits the extent of lateral development and the overall impact of oil and gas activities.

      iii.     Master Development Plans

A critical drawback to the BLM's reliance upon stipulations and COAs on an individual lease and permit basis is that is does not allow for comprehensive and holistic management or effective cumulative impact analysis. The best way to promote those positive management strategies is for BLM to require comprehensive development plans through Master Development Plans (MDPs). By requiring the submission of multi-well plans that include details on proposed locations, access points and ancillary facilities, the agency can gain a clearer picture of the scope and scale of not just the development, but the potential impacts to surrounding resources and values. Although MDPs have been used in this field office - most recently with Whitewater and Bull Mountain - BLM fails to identify MDPs as a tool for minimizing impacts associated with fluid mineral development in the Draft RMP. In fact, there is no reference to MDPs anywhere in the draft alternatives.

Other field offices have encouraged the use of MDPs by including specific stipulations in planning documents. This approach was adopted in the White River Field Office's Dinosaur Trail MLP, which directs that "Master Development Plans would be required for all oil and gas activities, including exploratory drilling, within the Dinosaur Trail MLP." White River Field Office Approved RMPA at 2-45. Notably, within the Dinosaur Trail MLP, "specific resource protection measures would be evaluated when an operator submits a Master Development Plan"; and those measures can include unitization, phased development, limitations on surface disturbance, multi-well pads, protections for scenic values and placing all linear disturbances (e.g., power lines, pipelines, roads) in common corridors and interim reclamation. *Id.* at 2-46. The Grand Junction Field Office utilizes this approach in the recently revised RMP as well. Fluid mineral Stipulation MIN-MA-05 states:

> In areas being actively developed, the operator will be encouraged to submit a Master Development Plan (formerly known as Geographic Area Proposal) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM). Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation. The extent of the analysis will be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.

GJFO Approved RMP at 181.

MDPs can also be a useful tool in managing oil and gas units. Requiring MDPs can help BLM manage how development occurs across a unit and protect important public lands resources while providing for development of the unit.

MDPs are an effective tool for minimizing impacts from oil and gas development and help incentivize smart and systematic development. They are an efficient way for BLM to manage oil and gas resources in the planning area. We encourage BLM to require MDPs for all fluid mineral development in the planning area.

111

BLM_0149670

iv.    New drilling techniques

Relatively recent drilling approaches such as stacked and biplanar horizontal drilling or a "wine rack" approach are reducing surface infrastructure and overall impacts, while making monitoring, inspection and enforcement more efficient for the agency. For instance, stacked horizontal or lateral drilling can allow numerous wells to be drilled from a pad that can access different depths and conditions; as discussed in a recent article on drilling in shale formations, "Pioneer can drill 30 to 40 wells from the same pad site to different depths before turning them horizontally through six different strata, each with its own characteristics."[99] This technique can limit surface disturbance and infrastructure, while also providing access to fluid mineral resources.

The Dinosaur Trail Master Leasing Plan, in the White River Field Office, includes taking advantage of the best available technology in its overall vision for the WRFO Oil and Gas Development Amendment:

> Within the Dinosaur Trail MLP, the BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by managing leasing opportunities in a phased approach in order to **take advantage of new information and the best available technology**.

White River Field Office Approved RMPA at 1-4. Recognizing that technology already exists and is rapidly evolving to minimize impacts and maximize efficiencies should be an integral component of oil and gas planning on public lands, and BLM should incorporate stipulations encouraging the use new technologies in the Uncompahgre RMP.

As noted above, BLM can incorporate requirements such as surface disturbance limitations and placing multiple wells on a pad in COAs and/or MDPs. In addition to including a stipulation incentivizing the use of new technologies, BLM should also require advanced drilling techniques as COAs within the planning area at the APD level to minimize impacts and increase efficiencies as part of fulfilling the overall goals of the RMP.

v.    Suspensions

Pursuant to 43 CFR 3103.4-4 and 43 CFR 3165.1, operators are allowed to apply for and BLM may approve a request for suspension of an existing lease. A suspension effectively puts a lease on hold, stopping the clock and ensuring the lease will not expire. While in suspension, operators are exempt from making rental payments on that lease and have no obligation to diligently develop those resources that would otherwise be subject to royalty payments. Nationally, 10% (3.25 million acres) of currently leased federal minerals are held in suspension, often without appropriate justification. This deprives American taxpayers of the royalty and rental payment revenues they are owed while allowing industry to pad their books for investors. A study conducted by The Wilderness Society found that approximately $82 million have been lost on rental payments not made due to suspensions.[100] Additionally, suspensions tie up land and keep BLM from protecting other resource values like wildlife, wilderness and recreation.

---

[99] Online at http://www.bizjournals.com/dallas/blog/2013/05/pioneer-using-stacked-laterals-in.html
[100] Online at: https://wilderness.org/sites/default/files/TWS%20Hoarders%20Report-web.pdf

112

BLM_0149671

Compounding this problem is inadequate monitoring and review of suspended leases by the agency. Often, suspension orders expire or the stated justification for the suspension is resolved, but the suspension is not lifted by the BLM. This results in leases remaining in suspension well beyond the timeframe specified in the order and in some instances allows suspensions to remain even when a suspension is no longer permissible under the agency's own rules and regulations.

The revision to the Uncompahgre RMP provides BLM with an opportunity to address this issue across the entire planning area to ensure suspensions are issued and rescinded appropriately. We encourage BLM to pursue the following actions:

- **Include a management action that commits the agency to a review of all suspensions within the planning area**. The BLM should lift suspensions on all leases where there are no valid reasons to continue suspension and cancel all those that have expired. The BLM should take immediate action to address problematic lease suspensions by cleaning up records, lifting unnecessary and expired suspensions and issuing expiration notices on leases that should have expired by the terms of applicable suspension agreements.

- **The BLM should increase transparency and opportunities for public involvement in lease suspensions and monitoring**. The BLM should post documentation of lease suspension requests and decisions, including on its NEPA log, but also in a dashboard available via state office websites. Information on suspended leases, including status and reason for suspension, should be made public to provide for public oversight and accountability on the length of suspensions in annual oil and gas program reports. A summary of lease suspensions should be included in the BLM's annual reporting of oil and gas statistics, as well.

- The field office **should develop and issue guidance for considering suspension requests that includes clear criteria for when the authorized official does and does not have discretion to grant a suspension request and provides the authorized official with parameters on issuing suspensions**. This guidance should also clarify when the agency should exercise its discretion to approve or deny a suspension request and establish a monitoring and tracking system for suspensions.

## XI.    Uranium

The Draft RMP presents an unrealistic expectation of the viability of future uranium mining based on an unsupported assertion that "because past mining operations did not completely remove all potential uranium and vanadium resources in the area, the potential for new economically profitable mines in the region remains strong." Uncompahgre Draft RMP at 3-128.

Unfortunately, the draft RMP is based on an outdated 2011 Mineral Potential Report ("MPR") that only identified the potential occurrence of uranium and vanadium deposits, and speculated on future mining viability based on an artificially inflated 2011 spot price.  If accepted mining economic analysis were applied to the plan-level NEPA analysis, which includes social and environmental costs, it is likely that the MPR would confirm that there is very low potential for viable claims on BLM-managed uranium deposits in the plan area.  The uranium mines are of such low viability, that a properly conducted socio-economic analysis would likely support an area-wide uranium withdrawal to protect other resource values <u>and</u> improve the regional economy.

113

BLM_0149672

The MPR is silent as to the effect of the high production costs on the economic and commercial viability of these deposits. It is well established that the validity of a federal mining claim on BLM lands is dependent on a consideration of all costs. "Claim validity is determined by the ability of the claimant to show that a profit can be made after accounting for the costs of compliance with all applicable laws . . ." *Great Basin Mine Watch*, 146 IBLA 248, 256 (1999) (emphasis added). In addition to production costs, environmental compliance costs must also be factored in the claimant's economic analysis in order to prove the existence of a valuable mineral deposit. Since a profitable mining operation must be proven for any mining claim to be considered valuable, determining the costs of environmental compliance is a necessary precursor towards validating a discovery. *Great Basin Mine Watch*, 146 IBLA 248, 256 (1999); *U.S. v. Pittsburgh Pacific Company*, 30 IBLA 388,405 (1977), *citing U.S. v. Kosanke Sands*, 12 IBLA 282, 298-99 (1973). As the Board in *Pittsburgh Pacific* recognized, environmental cost factors may be significant enough to "stand in the way of a profitable mining operation" and therefore, must be factored in by the BLM. *Id.* at 393.

The draft RMP's use of the term "mineral resources" is misleading, and ignores the financial viability parameters that must be addressed in "mining claim validity exams." If this analysis is carried out at the RMP level, which NEPA reasonably requires, it is foreseeable that there would be no valid mineral claims due to the prohibitively high cost to conventionally mine and mill yellowcake from the ores located in the sandstone deposits. Uncompahgre Draft RMP at 2-413. Historically, uranium mines have not made enough money to carry out necessary reclamation and decontamination of the mine sites. The draft RMP conclusion that price exceeds cost of production is supported by the mere recognition that "over 400 documented abandoned uranium mines in the planning area." *Id.* at 3-175. Focus should be placed on the undisclosed number of inactive federally owned mines in the planning area. Ideally, the federal taxpayers should not pay for the clean-up costs at claims that the claimants have failed to reclaim, due in part to deficiencies in the 1872 Mining Law and the 43 C.F.R.§ 3809 regulations. However, at many of the inactive federal mines, the operators are long gone and the responsibility falls on the federal government to carry out clean up.

The MPR analysis is based on an unrealistic "price of uranium (U3O8) at $72 per pound and the price of ferro-vanadium at $31 per kilogram as of February 14, 2011." The $72 level is simply not supportable. This price may be indicative of the hedge fund bubble of 2007 that drove the price into the $140 range, but bears no relation to current market conditions or production costs. The $72 spot price ignores the post-Fukishima realities as they apply to nuclear energy and the ongoing disposal of Department of Energy uranium stockpiles.

The plan-level NEPA analysis must be based on a current analysis that recognizes $20.00 per pound price reported by TradeTech as of Oct. 21, 2016. The $20 per pound spot price is more reflective of the supply/demand and production costs for this global commodity. Because in situ leach uranium mining and mining richer deposits involves dramatically lower production costs, it is likely that the Uravan Mineral Belt deposits will never be economically viable.

The Mineral Potential Report provides an unsupportable account of the history of uranium mining that is brought into the draft RMP. Uncompahgre Draft RMP at 4-477, MPR at 30. The uranium deposits in the Uravan Mineral Belt have never supported a viable uranium industry. Reported opinions from the lawsuits brought against the federal government provide details of federal buying programs and price supports in the 1950s that created a non-market boom. *Cotter Corp. v. Seaborg*, 370 F.2d 686, 690 (10th Cir. 1966)(describing Atomic Energy Commission buying program). Due to new discoveries, such as the "uranium-bearing ore deposits on the Spokane Reservation, located near Ford, Washington," the Atomic

BLM_0149673

Energy Commission curtailed its price support programs. *Gay v. United States*, 174 Ct. Cl. 420, 460, 356 F.2d 516, 525 (1966). Early controversies over mining included "court orders that [Bureau of Land Management] must be given the opportunity to expeditiously review Cotter's reclamation plan." *Utah v. Andrus*, 486 F. Supp. 995, 1009 (D. Utah 1979). The Uravan Mineral Belt crashed shortly after federal price support program ended in 1958, with area uranium mills staying open and only sporadically operating under various agreements with the United States Atomic Energy Commission." *Duman v. Commissioner*, 1967 Tax Ct. Memo LEXI S 99, at *4 (U.S. T.C. Aug. 3, 1967). The history of the industry between 1958 and 1970 is thus misstated.

After 1958, the largely bankrupt uranium industry did not, and was not required to reclaim or clean up the impacts of mines and mills. The federal government spent an undisclosed billions of tax dollars under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. and the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA), to remedy the damage caused by a patchwork of ineffective state regulatory programs. *Dep't of Health v. Mill*, 887 P.2d 993, 1004 (Colo. 1994) *citing* 42 U.S.C. § 7901.3. The MPR also misstates the status of the Uravan Mill. MPR at 31. Uravan has still not achieved full clean-up and closure, and remains subject to Colorado-issued UMTRCA license and EPA CERCLA actions. *W. Colo. Cong. v. Umetco Minerals Corp.*, 919 P.2d 887, 890 (Colo. App. 1996). The passage of modern pollution and mining laws intended to ensure the pollution prevention and clean-up costs fall on the mining company, not the federal fisc are not addressed in the draft RMP and MPR. Preliminary comparisons suggest that billions of dollars spent on disposal and maintenance of uranium mill tailings has eclipsed the income generated from the mining and milling activity in the Uravan Mineral Belt.

The MPR is based on outdated information. The Cotter mill in Cañon City has been demolished, and Denison Mines has abandoned its United States holdings. The status of the mills in the region is also outdated. The Piñon Ridge Mill license has been twice rejected by the Colorado Courts and is now being held in abeyance during remand. The future tailings disposal capacity of the White Mesa Mill is highly questionable, and it is not clear whether the mill will accept any new sources of mined uranium ore. Rather, a new business model is emerging at White Mesa that focuses exclusively on charging disposal fees and processing "alternate feed materials" from commercial, industrial, and military clean-ups.[101] In short, the existing infrastructure to support Uravan Mineral Belt uranium mining has either been demolished, is nearing the end of its serviceable life, or has been shelved.

BLM's analysis must include data on the full economic and financial cost of producing uranium into yellowcake, rather than reliance on anecdotal "communication with industry experts and government officials." MPR at 40. Reliance on a 2004 report to suggest that $15 prices over the next 20 years would support a uranium industry is not supportable. MPR at 42 citing (Spanski et al 2004). To the contrary, industry reports establish costs of at least $80/lb to mine and mill uranium into yellowcake. "The simple fact is that the World is currently oversupplied with uranium. Utilities appear to be well-covered for now."[102]

The DOE-leased mines in the plan area remain subject to a permanent injunction that invalidated the underlying NEPA analysis relied upon in the MPR. MPR at 42. *Colorado Environmental Coalition v. Office of Legacy Management,* 819 F. Supp. 2d 1193, 1217 (D. Colo. 2001) *amended by* 2012 U.S. Dist. LEXIS

---

[101] *See*:  http://www.energyfuels.com/news-pr/energy-fuels-secures-new-processing-contract/ (last visited 10/31/2016).

[102] http://www.energyfuels.com/news-pr/energy-fuels-issues-letter-shareholders. (last visited 10/31/2016).

115

BLM_0149674

24126, 2012 WL 628547 (D. Colo. Feb. 27, 2012). DOE has not properly asked the District Court to lift the permanent injunction. The 2014 Final Environmental Impact Statement contains many of the same deficiencies identified by the 2011 District Court opinion, especially the failure of the programmatic NEPA analysis to address site-specific impacts to inform the cumulative impacts analysis.  Reliance on the DOE approach and analysis has infused BLM's DEIS analysis with the same legal deficiencies.

The prospects of mines reopening are also based on unreasonable and inapplicable assumptions about price. MPR at 45.  In reality, these mines are opened sporadically due to Colorado mining laws applicable to five year "temporary cessation" periods.  There is a financial incentive to avoid reclamation and clean-up by keeping these mines in an "active" status under Colorado mining law.  The assumed relationship between price and activity in the MPR is disproven by a mining industry that has not re-opened any mine since 2009, even though the price has remained above the assumed $15 threshold.  At no place in the analysis does BLM reveal the production costs that are publicly reported by Energy Fuels and other publicly traded companies.   This data is available, but was not included in the MPR analysis.  The draft RMP does contain a correct conclusion that high energy costs and high transportation costs have resulted in mine and mill closures. Uncompahgre Draft RMP at 4-10.

The socioeconomic analysis ignores the data generated during the Colorado licensing of the Piñon Ridge mill.  Of key importance is the report generated by Dr. Tom Powers. (See Attachment 5.)  In short, uranium mining is simply not economically viable, and the RMP and DEIS repeat demonstrably false myths that perpetuate "false hopes" of a uranium revival and create a negative economic impact on viable sources of economic development.[103]

The draft RMP assumes an active uranium mining and milling economy, yet there are zero active mines and mills in the plan area.  The draft RMP asserts "[a]ctivities associated with underground coal mining and surface uranium and vanadium mining are also predicted to be major contributors to particulate matter emissions, albeit at levels consistent with current conditions." Uncompahgre Draft RMP at 4-20. No data is provided to support the conclusion that major contributions from an active uranium mining industry would remain consistent with the emissions from the currently inactive industry.  The lack of analysis must be addressed because emissions from current and potential uranium production is expected to have serious impacts on "Class I airsheds and sensitive Class II areas." *Id.* at 4-25. The draft RMP confirms the importance of mine validity exams on the RMP and site-specific scale: "The magnitude and rate of increased mining operations over the life of the RMP is dependent on economics and the demand for the materials as well as the construction of product transportation facilities and mineral processing facilities." *Id.* at 4-29.

Informed planning decisions cannot be made without informing the public and the decisionmakers that uranium mining has never been economically viable in the Uravan Mineral Belt without direct (ore buying) or indirect (reclamation and clean-up) subsidies.  If equipped with this information, planning can couple mineral withdrawal with terms that protect the BLM and federal taxpayers from the predictable impacts left behind a half-century of uranium mine speculation that has left BLM with more than 4000 federal mines that lack easily identifiable operators to pay for reclamation costs.  At this stage, most operators are insolvent and short of a region-wide Superfund designation, BLM will be stuck with these stranded land management costs.

---

[103] http://www.durangoherald.com/article/20140507/OPINION01/140509617/ (last visited 10/31/2016)

BLM_0149675

The draft RMP lacks information to support reasoned decisions involving "[c]hanges in restrictions that can be placed on mineral claiming, leasing, or development activities." Uncompahgre Draft RMP at 4-254. None of the alternatives consider the past costs, current impacts, and future costs of deferred reclamation.  Taken together, the historical and current lack of viability supports analysis, and selection, of an alternative withdrawing all uranium from mineral entry. *Id.* at 4-290.

Plan conformance allows specific mining-related proposals to be conditioned or restricted based on the specifics in the land use plan.  BLM should revise the draft RMP to consider alternatives that ensure that all mining-related proposals are conducted only in a manner to protect public health, water quality, and wildlife.  This includes such concepts as restricting the placement of wastes or ores in riparian areas, requiring radiometric surveys as part of baseline and reclamation plan analyses, and seasonal closures for wildlife as appropriate.  Such provisions are well within BLM's authority. BLM regulations state that: "All future resource management authorizations and actions . . . shall conform to the approved plan." 43 C.F.R. § 1610.5-3(a).  Further, "Conformity or conformance means that a resource management action shall be specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan or amendment." 43 C.F.R. § 1601.0-5(b).  The draft RMP does not conform with the actual conditions on the ground.

FLPMA governs the management of, and planning for, all BLM administered federal lands. FLPMA provides that:

> The Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands. Land use plans shall be developed for the public lands regardless of whether such lands previously have been classified, withdrawn, set aside, or otherwise designated for one or more uses.

43 U.S.C. § 1712(a).  The planning process "may be implemented by including in land-use plans restrictions aimed at Mining Law activities in particular planning areas or in parts of them. . . . FLPMA gives the Department of the Interior authority to restrict Mining Law activities through the process of land-use planning." John D. Leshy, The Mining Law, A Study In Perpetual Motion (1987); *see also* Michael Graf, *Application of Takings Law to the Regulation of Unpatented Mining Claims*, 24 ECOLOGY LAW QUARTERLY 57, at 84-87 (1997).

Similar to the BLM's land use planning authority, the authority of the U.S. Forest Service to condition mining activities through land use plans is well-established.  The Ninth Circuit has held that, "[p]ursuant to the NFMA, the Forest Service must demonstrate that a site-specific project would be consistent with the land resource management plan of the entire forest." *Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372, 1377 (9th Cir. 1998) (citing 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(c)). *See also Friends of the Southeast's Future v. Morrison*, 153 F.3d 1059 (9th Cir. 1998).  "The Forest Service must comply with the requirements of their Forest Plans, and failure to comply violates NFMA." *Siskiyou Regional Educ. Project v. Rose*, 87 F. Supp. 2d 1074 (D. Or. 1999) (court rejected Forest Service approval of mining without compliance with Forest Plan). *See also Friends*, 153 F.3d at 1070-71.

117

BLM_0149676

XII.   **Coal**

a.   **The Draft RMP Fails to Consider a Reasonable Range of Alternatives**

Under FLPMA, BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for coal development. 43 U.S.C. § 1712(c)(1). As such, in the NEPA analysis for the Uncompahgre RMP, BLM must consider a reasonable range of alternatives regarding areas open to coal leasing. The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14). This evaluation extends to considering more environmentally protective alternatives. See, e.g., *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1122-1123 (9th Cir. 2002) (and cases cited therein).

The consideration of more environmentally protective alternatives in the BLM's analysis is consistent with FLPMA's requirement to "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved." 43 U.S.C. §1732(d)(2)(a). FLPMA does not mandate that every use be accommodated on every piece of land; instead, it demands a delicate balancing. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage." *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)). As held by the Tenth Circuit, "[i]f all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined." *Rocky Mtn. Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 738 n. 4 (10th Cir.1982) (quoting *Utah v. Andrus*, 486 F.Supp. 995, 1003 (D.Utah 1979)); *see also* 43 U.S.C. § 1701(a)(8) (stating, as a goal of FLPMA, the necessity to "preserve and protect certain public lands in their natural condition"); *Pub. Lands Council,* 167 F.3d at 1299 (citing § 1701(a)(8)).

As further provided by the Tenth Circuit:

> *It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses* . . . . BLM's obligation to manage for multiple use does not mean that development *must* be allowed on [a particular piece of public land]. Development is a *possible* use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

*New Mexico ex rel. Richardson*, 565 F.3d 683, at 710 (10th Cir. 2009) (emphasis added). BLM manages federal coal leasing under the Mineral Leasing Act (MLA) of 1920, as amended by the 1976 Federal Coal Leasing Amendments Act. 30 U.S.C. § 181, et seq. The statute directs the agency to authorize leasing of coal on federal lands, in its "discretion," only as the agency "finds appropriate and in the public interest." 30 U.S.C. § 201. Furthermore, BLM must be guided by its statutory mandate to administer federal coal leasing in a manner that protects the Nation's "environmental, air and

118

atmospheric, [and] water resource[s]," takes into "account the long-term needs of future generations," and considers "the use of some land for less than all of the resources" to accomplish these objectives. 43 U.S.C. § 1701(a)(8), § 1701(c). Put differently, the driving force behind agency-authorized coal development must be the long-term and broad public interest, not the often short-term and narrow interest of coal companies. Thus, the RMP is obligated to consider the enduring legacy of coal development, which is to be balanced against other critical multiple-use resource values.

An examination of the RMP finds no evidence that BLM considered alternatives that balance uses and impacts within areas known to have coal resources. Rather, the agency across all alternatives not only prioritizes coal leasing and development over other, equally valid resource considerations, but posits no alternatives that consider, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal. BLM cannot ignore its obligation to evaluate these competing uses, and must give due weight to FLPMA's mandate to preserve and protect public lands in their natural condition. *See* 43 U.S.C. § 1701(a)(8).

The objective reasonableness of alternatives can be judged by how they relate to the RMP's purpose and need statement. As stated in the Draft RMP:

> The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses . . . BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy.

Uncompahgre Draft RMP at I-2.This purpose does not accept coal development as a foregone conclusion. The BLM has a responsibility in this planning process to match its expansive land and resource management to current conditions and evolving demands, not business-as-usual expectations from the coal industry.

As further explained in BLM's NEPA Handbook:

> The purpose and need statement dictates the range of alternatives, because action alternatives are not "reasonable" if they do not respond to the purpose and need for the action. The broader the purpose and need statement, the broader the range of alternatives that must be analyzed. The purpose and need statement will provide a framework for issue identification and will form the basis for the eventual rationale for selection of an alternative. Generally, the action alternatives will respond to the problem or opportunity described in the purpose and need statement, providing a basis for eventual selection of an alternative in a decision.

BLM NEPA Handbook at 6.2.1. To adequately address current resource conditions, changes in circumstances, and new or revised national-level policy, the UFO RMP must provide more than a one-sided range of alternatives.

By the measures identified above, BLM's range of alternatives fails to satisfy its procedural obligations under NEPA, its statutory obligation under FLPMA and MLA, and the purpose and need of the RMP. All of the alternatives in the Draft RMP propose to leave available vast amounts of land for coal leasing and development, with little difference in direct, indirect or cumulative impacts. While the alternatives may

119

reflect subtle differences in acreage open for coal leasing, there is virtually no difference in the foreseeable range of coal leasing and development, or in greenhouse gas (GHG) rates across alternatives.

## Summary of Alternatives (Coal)

| Resource | Alt. A | Alt. B | Alt. B.1 | Alt. C | Alt. D |
|---|---|---|---|---|---|
| Maximum Annual Indirect GHG from Coal (MMTCO$_2$e)[104] | 27.1 | 27.1 | 27.1 | 27.1 | 27.1 |
| Coal Acceptable to Leasing (Acres)[105] | 144,790 | 320,440 | 320,440 | 405,230 | 371,400 |
| Coal Unsuitable or Closed to Leasing (Acres)[106] | 1,070 (0.7%) | 101,060 (24.0%) | 101,060 (24.0%) | 16,270 (3.9%) | 50,100 (11.9%) |

The unreasonableness of the BLM's alternatives analysis with respect to coal leasing is remarkable. For example, the Draft RMP considers four alternatives with varying levels of lands "acceptable" for coal leasing. But the alternatives leave open to leasing between 76% and 99.3% of all lands with coal development potential. *See also id.* at 4-274 ("Within the coal potential area, [Alternative B] would be the most restrictive, with 24 percent of the coal potential area unavailable for leasing"). The draft RMP indicates that coal leasing restrictions in the most active coal field – the Somerset – vary between 0% and 12% of the lands in that field that "would be unacceptable for further consideration of leasing and development," meaning that every alternative left *at least* 88% of the most active coal field open for development. *Id.* at 4-289 – 4-290. In other words, across the planning area the BLM would sanction mining on more than three out of every four acres where mining is technologically practicable, prioritizing one use over the myriad other uses and values within the landscape.

Yet even under this lopsided "range" of alternatives, the likely amount of coal produced and burned across all of them is *identical*. Under each alternative, the Draft RMP predicts the same amount of GHG emissions from coal combustion – 27.1 million tons. This entails that none of the alternatives would limit coal production or GHG-related impacts in any way. The BLM specifically assumes that for every alternative, "[t]he output from the two active mines on BLM-administered land within this coal field is estimated to *remain the same as current production*, between 9 and 11 million tons of coal each year for the next 20 years." Uncompahgre Draft RMP at 4-454 (emphasis added).

The similarity in available acreage and the identical emissions resulting from coal development conflicts with NEPA's requirement that an *actual range* of alternatives is considered, such that will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished by only one alternative . . . ." *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999), citing *Simmons v. United States Corps of Engineers*, 120 F.3d 664, 669 (7th Cir. 1997). A fair reading of the Draft RMP strongly suggests that the objective of the BLM is to maximize coal leasing and development in a manner unencumbered by other resource considerations, making its

---

[104] Uncompahgre Draft RMP at 4-41 – 4-42 (maximum figures for indirect GHG emissions from coal production); *id.* at 2-409; 4-297 ("coal production is expected to remain the same across all alternatives").
[105] *Id.* at 2-9 – 2-10, Table 2-1.
[106] *Id.*

BLM_0149679

analysis only a "foreordained formality" in violation of NEPA. *City of New York v. Department of Transp.*, 715 F.2d 732, 743 (2nd Cir. 1983). See also, *Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002).

The "range" of alternatives regarding coal production is unreasonably narrow across the various coal fields in the planning area. For example, the vast majority of the Tongue Mesa coal field is left open under each action alternative (92% or more), despite the fact that the RMP predicts no coal will be produced there because the area's geology makes it "economically unviable to mine in the next 20 years." Uncompahgre Draft RMP at 4-289 – 4-290, 4-454. Similarly, while most of the Grand Mesa coal field is open to coal leasing under all three action alternatives, coal there is also unlikely to be mined in the next two decades. *Id.* at 4-289 – 4-290, 4-454 – 4-455. It appears then that the BLM is unwilling to even consider any reasonable limitations on coal mining, no matter how economically unviable development may be. At the very least the BLM should have considered an alternative that eliminates coal mining in the Tongue Mesa and Grand Mesa coal fields, fields that realistically cannot be mined.

For perspective, compare the RMP's coal scenario to its treatment of renewable energy. For wind and solar development, the draft RMP considers alternatives that would open the planning area to a relatively small acreage (5%), about a third of the acreage, a little over half the acreage, and most of the acreage (83%). Uncompahgre Draft RMP at Table 2-3, 2-379. That table shows that the following acres (% of total acres) would be open to solar and wind under the alternatives: Alt. A: 561,200 acres (83%); Alt. B: 34,040 acres (5%); Alt. C: 369,970 acres (55%); Alt. D: acres (34%). Thus the *greatest* percentage of land open to wind and solar under any of the alternatives (83%) is still *smaller* than the *least* percentage of land open to coal mining under any alternative (88% of coal-bearing lands).

**Summary of Comments:** BLM must evaluate a robust range of alternatives for coal management in the Uncompahgre RMP. This includes considering alternatives that balance uses and impacts within areas known to have coal resources rather than prioritizing coal leasing and development over other multiple uses across all alternatives. BLM should develop a truer range of alternatives that considers, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal.

### b.   The Draft RMP Relies on Stale Data

NEPA mandates that EISs contain "high quality" information and "[a]ccurate scientific analysis" sufficient to "help public officials make decisions that are based on understanding environmental consequences." 40 C.F.R. § 1500.1(b), (c). Agencies must affirmatively collect new scientific and technical information to support their hard look at impacts where "available information" is stale. See *Northern Plains Resource Council v. Surface Transportation Bd.* 668 F.3d 1067, 1085---87 (9th Cir. 2011). To satisfy the "hard look" requirement of NEPA, the BLM must supplement its existing analyses when new circumstances "raise significant new information relevant to environmental concerns . . . ." *Portland Audubon Soc'y v. Babbitt*, 998 F.2d 705, 708 (9th Cir. 2000). An "agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a hard look at the environmental effects of [its] planned actions." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000). Federal courts have long held that agency reliance on data that is stale or inaccurate invalidates environmental review. *See, e.g.*, *Northern Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085-86 (9th Cir. 2011) (ten-year old survey data for wildlife "too stale" thus reliance on it in EIS was arbitrary and capricious); *Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005) (six year-old survey data for cutthroat trout was "too outdated to carry the weight assigned to it" and reliance on that data violated NEPA); *Seattle Audubon Soc. v. Espy*, 998 F.2d 699, 704-05 (9th Cir. 1993) (reliance on

121

"stale scientific evidence" regarding owl population data without adequate discussion of scientific uncertainty violated NEPA).

Yet in several important respects that relate to climate and socioeconomic impacts, the Draft RMP uses outdated evidence, despite having access to readily available information. Relying on antiquated data runs counter to basic NEPA requirements, and precludes the public from understanding the impacts of the alternatives and reasonable ways to avoid those effects.

i. Stale Climate Change Data

The Draft RMP almost wholly relies on climate change data from 2010 or earlier, ignoring new science emphasizing the growing impacts from climate change, as well as new economic conditions reflective of the increasingly problematic connection between coal and climate change. For example, the Draft RMP's description of climate change in Chapter Three relies on three studies: an EPA study published in 2007 and two state studies published in 2008. Uncompahgre Draft RMP at 3-14 – 3-16. The RMP's description of projected climate change in Colorado relies on a single study from 2008. *Id.* at 3-26 – 3-27; 3-57. To affirm that impacts from climate change are already occurring, the BLM relies on a 2009 report. *Id.* at 3-93. The information in Chapter Four is little better. It describes potential GHG emissions based on EPA reports from 2010 – 2012, and dismisses the relative level of direct GHG emissions from activities in the planning area based on a discredited EPA letter from 2008. *Id.* at 4-38 – 4-40. In its discussion of the cumulative impacts of climate change in the project area, the BLM relies on studies published between 1996 and 2010. *Id.* at 4-125.

The Draft RMP's brief look at methane emissions exemplifies its reliance on outdated science, and how that misplaced reliance can falsely minimize impacts analysis. The Draft RMP uses a scientifically stale warming potential of 21 for methane on the basis, presumably, of the Intergovernmental Panel on Climate Change's (IPCC's) 1996 Second Assessment Report (AR2).[107] Even though EPA has since taken action to update methane's warming potential based on the Fourth Assessment Report (AR4),[108] wherein methane's 100-year warming potential is measured at 25, the Draft RMP adopts EPA's obsolete warming potential of 21. Uncompahgre Draft RMP at 4-38. Moreover, the IPCC has issued a new report, the 2013 Fifth Assessment Report (AR5), which supersedes its previous reports. The IPCC AR5 explains that methane, over a 100-year time frame and accounting for climate-carbon feedbacks, is *36 times as potent as carbon dioxide, not 21 or 25.*[109]

The data utilized and conclusions drawn in the Draft RMP are stale to the point that they do little to aid the public's understanding of the relationship between coal mining and the affected landscape, climate or socioeconomics. In 2011, the U.S. Court of Appeals for the Ninth Circuit in *Northern Plains Resource Council v. Tongue River Railroad* addressed the duty of federal agencies to gather "baseline data" during

---

[107] Intergovernmental Panel on Climate Change, *Second Assessment Report* (1996). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016).

[108] Intergovernmental Panel on Climate Change, *Fourth Assessment Report* (2007). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016).

[109] IPCC, *Climate Change 2013: The Physical Science Basis, Working Group I Contribution to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change*, at Ch. 8, p. 714, Table 8.7 (2013). Available at www.climatechange2013.org/ (last viewed October 20, 2016).

BLM_0149681

the NEPA process. *Northern Plains Resource Council v. Tongue River Railroad*, 668 F.3d 1067, 1083-85 (9th Cir. 2011). The court found that "[r]eliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious." *Id.* at 1086. Like the agency in *Northern Plains*, the BLM here cannot to rely on old and generalized data in considering the impacts from coal leasing and development. There is abundant data that has been generated over the last four years concerning most facets of the climate change issue, yet no new information since 2012 is included or cited in the Draft RMP. Any subsequently prepared NEPA document must include and refer to this data.

    ii.   Stale Coal Production and Employment Data

To understand the nature of GHG emission impacts on the environment, the BLM must first quantify the *amount* of emissions that result from the various alternatives. But to quantify the GHG pollutants attributable to the UFO RMP management scheme, the BLM must first accurately project the volume of coal that the RMP would make available that otherwise would remain in the ground. Unfortunately, the production forecasts and scenarios in the BLM's analysis are stale and not indicative of current or anticipated future output.

Since 2010 (the date of much of the Draft RMP's coal production data – see below), much has changed in national and international coal markets in general, and to mines in the North Fork Valley in particular. Some of the most significant developments include:
- the closure of the Elk Creek mine in 2013, its demolition in 2016, and the layoff of virtually all of its employees;[110]
- the idling of the Bowie No. 2 mine in February 2016, and the layoff of most of its employees;[111]
- layoffs and production declines at the West Elk mine in 2016 from "continuing challenges" in domestic and international coal markets;[112] and
- the announcement that the Nucla coal mine, and the power station it serves, will close in 2022.[113]

These market conditions are unlikely to improve, due to low natural gas prices, the increasingly competitive pricing of wind and solar energy, and international commitments to address climate change. In fact, a coal company executive recently predicted that mines in Colorado and Utah would be shipping zero coal west for export by 2030 due to deteriorating overseas markets and because West Coast states are moving swiftly toward a renewable energy future.[114] As a result of these changes,

[110] D. Webb, Oxbow shifts to permanent shutdown of Elk Creek Mine, Grand Junction Sentinel (April 30, 3016). Available at http://www.gjsentinel.com/news/articles/oxbow-shifts-to-permanent-shutdown-of-elk-creek-mi (last viewed October 20, 2016).
[111] D. Webb, Bowie idles Paonia mine, Grand Junction Sentinel (Feb. 26, 2016). Available at http://www.gjsentinel.com/breaking/articles/bowie-idles-paonia-mine (last viewed October 20, 2016).
[112] D. Webb, West Elk Mine undergoes layoffs, Grand Junction Sentinel (June 2, 2016). Available at http://www.gjsentinel.com/breaking/articles/ west-elk-mine-undergoes-layoffs (last viewed October 20, 2016).
[113] G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 20, 2016).
[114] C. Coates, Murray Energy CEO sees end of westbound Uinta coal by 2030, SNL (June 10, 2016). Available at https://www.snl.com/InteractiveX/articleabstract.aspx?id=36796676&KPLT=8 (last viewed June 28, 2016).

BLM_0149682

employment and production in the Somerset coal field has fallen dramatically since 2010, as the table below indicates:

**Coal Production and Employment, Somerset Coal Field and Colorado, 2010 and 2016^**

| | Coal production, Somerset coal field mines (million tons) | Coal production, Colorado (million tons) | % of total Colorado coal production from Somerset coal mines | Coal employment, Somerset coal field* | Coal employment, Colorado | % of total Colorado coal employment from Somerset coal mines |
|---|---|---|---|---|---|---|
| 2010 | 9.96 | 25.21 | 39.5% | 923 | 2,041 | 45.2% |
| 2016 (through July) | 1.48 | 6.64 | | 228 | 1,123 | 20.3% |
| 2016 (annualized) | 2.55 | 11.38 | 22.4% | 228 | | |

^ All coal production and employment figures derived from Colorado Division of Reclamation, Mining and Safety website (http://mining.state.co.us/Reports/Reports/Pages/Coal.aspx).
* Employment figures are calculated from the last reported date of the period: Dec. 2010 for 2010, and July 2016 for this year.

The Draft RMP's data, much of it dating back to 2010 or older, is especially stale in light of dwindling coal production and employment in the Somerset Coal Field. As a result, the RMP's assumptions and conclusions are misplaced. For example, much of its coal conclusions derive from a BLM document entitled "Coal Resource and Development Potential," dated April 2010. *See, e.g.*, Uncompahgre Draft RMP at 4-13. Similarly, the BLM relies on the July 2010 "Socioeconomic Baseline Assessment Report," which, for coal resources, again relies on outdated coal data from 2009 and before that paints an exceedingly optimistic picture of the importance and value of coal to the local economy in the future. *Id.* at 3-178.

Over six years of data are available for the agency to consider, data which reveals upheaval in the national coal industry and for coal field mines in the UFO planning area in particular. Any subsequently prepared NEPA document must include up-to-date data concerning coal markets, coal production and coal employment.

The following data and conclusions are stale given the changes in the local coal industry:
- The Draft RMP uses production averages from June 2014 and June 2015, though an additional 13 months of data exist demonstrating a steep drop in production since last year. *Id.* at 3-126.
- The Draft RMP assumes a coal production rate of "9 to 11 million tons per year," which is well above the permitted level of the West Elk mine, the only remaining operating mine in the area. *Id.* at 4-255; *See also id.* at 4-289 – 4-290.
- The Draft RMP states that projections from the "Energy Information Administration indicate that demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal," citing 2010 data. *Id.* at 3-126 – 3-127. Production of coal from Colorado mines fell 41% in the first half of 2016 compared to the

BLM_0149683

same period in 2015.[115]  The state's Division of Reclamation Mining and Safety reported that Colorado mines produced 5.73 million tons of coal in the first six months of 2016, compared to 9.80 million tons in the first half of 2015.[116] Colorado's drop is consistent with, but larger than, the national trend. The EIA estimates that 2016 total U.S. coal production through July 23 was down 26% compared to the same period in 2015.[117]

- The Draft RMP cites EIA data indicating coal production contributes nearly $400 million annually based on the local production of over 12 million tons of coal from the region. *Id.* at 3-193 – 3-194. *See also* BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-18 (containing same assumptions and conclusions). In 2016, the Somerset field provides less than a quarter of Colorado's coal, and production has fallen by three-quarters.

- The Draft RMP bases its socioeconomic analysis on assumptions about the level of coal production that appear to be far higher than current levels: "Approximately 13.8 million tons of coal would be mined in the planning area in Delta, Gunnison, and Montrose Counties in 2012, with approximately 13.1 million tons of that being federal coal (see Table 4-89 [2012 Coal Extraction Levels]). Coal contributions to employment and income from these uses would annually provide approximately 2,018 jobs and over $175 million in labor income, with these figures increasing to 50,350 jobs and over $3.5 billion in labor income over the expected 20 year lifespan of the RMP." *Id.* at 4-468. Similarly optimistic assumptions are contained in the BLM's 2010 Socioeconomic Baseline report. *See* BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-6; 2-17. These critical economic assumptions are outdated and inaccurate; the annual rate for coal production in 2016 is well under three million tons, and employment has dropped by roughly 75% since 2012. Nearly 1,000 miners worked three active coal mines in the Somerset field in 2012;[118] today that number is less than 250.

- The Draft RMP describes the Bowie #2 mine as "actively producing," and suggests that the Elk Creek mine may someday resume production. Uncompahgre Draft RMP at 3-125. *See also id.* at 4-11 – 4-12; *id.* at 4-258 – 4-259. But Bowie #2 is idle, and Elk Creek is permanently closed.

- The Draft RMP also appears to assume that the New Horizon mine will continue to produce coal at its current rate indefinitely, although its operator agreed to close it in 2022.[119] *Id.* at 4-289 – 4-290.

- The Draft RMP makes assumptions about coal mining rates to address potential impacts to natural resources. For example, it predicts an increase in impacts to some natural resources because coal mining, among other activities, is "becoming more active once again and energy and mineral resources are expected to increase over time, likely resulting in increasing demand for extraction." *Id.* at 3-41. While some mineral extraction may be increasing, coal is falling compared to historic levels.

---

[115] D. Worthington, Colorado coal production down 42 percent for first six months of 2016, injuries up 20 percent, Denver Post (August 3, 2016). Available at http://www.denverpost.com/2016/08/03/colorado-coal-production-2016-down-42-percent/ (last viewed October 26, 2016).

[116] *Id.*

[117] *Id.*

[118] See DRMS coal production and employment data for 2012, available at http://mining.state.co.us/SiteCollectionDocuments/2012RevisedDetail2013.pdf (last viewed October 20, 2016).

[119] G. Harmon, *Power station slated to close; coal mine will shut down in 2022*, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 26, 2016).

BLM_0149684

- To address air quality impacts, the Draft RMP assumes that "Coal mine production remains unchanged from base year rates with any drop off in existing mine production replaced by production from future mine development in the area." *Id.* at 4-28. In the base year of 2011, Colorado produced 27 million tons of coal, more than twice as much as it is likely to produce this year, and Somerset coal field mines produced 11 million tons, about four times their likely output this year. Thus, the Draft RMP's assumption that coal production rates are "unchanged" from 2011 are false. *See id.* at 4-20.

The fact that the BLM relies on stale data is significant because it distorts the agency's analysis of both climate impacts and economic values. Assuming an inflated value for coal production and employment in the future misrepresents the economic health and long-term viability of this industry. Similarly, relying on stale climate data diminishes our understanding of the relationship between UFO-sanctioned coal management and climate change. Given deteriorating market conditions and the urgent need to transition away from coal combustion, it is imperative that the BLM provide accurate information.

**Summary of Comments:** BLM must utilize current, high quality information to analyze coal management alternatives in the Uncompahgre RMP, including updated climate and production and employment data. Relying on antiquated data runs counter to basic NEPA requirements, and precludes the public from understanding the impacts of the alternatives and reasonable ways to avoid those effects.

### XIII.   Climate Change

#### a.   BLM's Obligation and Authority to Analyze Climate Change in RMPs

BLM has a legal duty to address the impacts of climate change both from land management actions and to the resource area in the Uncompahgre RMP. The Uncompahgre Field Office will undoubtedly experience real effects of climate change during the 20 year period that the RMP is in effect and beyond. Many management decisions in the RMP may contribute to and exacerbate the impacts of human-induced global climate change, and BLM stewards many resources that must be managed so as to maximize their ability to adapt and endure in the face of climate change.

We appreciate that BLM acknowledges the need to manage for climate change impacts, analyzes some of those impacts from BLM actions and from other actions affecting the Uncompahgre Field Office, quantifies greenhouse emissions from alternatives under consideration in the RMP and proposes a goal and objective specifically related to climate change in the draft RMP. *See, e.g.,* Uncompahgre Draft RMP at 2-24; 3-14—16; 4-37—43; Appendix Q. These are all important initial steps in bringing climate change analysis and management into resource management planning. However, at this time, BLM has access to significant amounts of data and useful tools to assist with climate change analysis, relevant policy and guidance for completing robust climate analysis in environmental reviews, and an obligation to make management decisions that more comprehensively address climate change impacts and adaptation. The Uncompahgre RMP is wholly inadequate in addressing this important issue at this critical time.

1.   BLM must take a hard look at climate change impacts from management decisions in the environmental impact statement for the resource management plan.

Impacts to the ecosystem from climate change include shrinking water resources; extreme flooding events; invasion of more combustible non-native plant species; soil erosion; loss of wildlife habitat; and larger, hotter wildfires. Many of these impacts have been catalogued in recent studies by federal

126

agencies showing the impacts of climate change specifically in the United States such as the National Climate Assessment.[120]

An important source of information for impacts from climate change is BLM's Rapid Ecoregional Assessment (REA) for the Colorado Plateau.[121] BLM should be using the results of the REA to inform the RMP/EIS and to address management issues at the landscape-scale, such as climate change. The Draft RMP states that, "Data in the Colorado Plateau Rapid Ecological Assessment [sic] will be considered as appropriate." Uncompahgre Draft RMP at 1-12. However, BLM appears to rely very little on data available from the REA, as there is hardly any reference to the REA other than that vague commitment, and the RMP fails to consider management alternatives that reflect data derived from the REA. The REA should be a central tool relied upon in resource management planning to plan for climate change adaptation:

> REAs are timely in supporting planning, management, and mitigation strategies for impacts anticipated from rapidly-developing issues related to traditional and renewable energy development, the spread of invasive species, changing fire regimes, and climate change. REAs provide a foundation for an adaptive management approach that will allow implementation strategies to be adjusted for new information and changing conditions. REAs represent a baseline condition from which to evaluate the results of adaptive management and to characterize potential trends in resource condition both in the near-term (2025)—as a consequence of development activities—and in the long-term (2060) as a result of climate change. The final chapter of this REA report (Chapter 6) provides examples showing how the data and results may be arranged and manipulated using mapped and tabular results, for all land ownerships and BLM-lands only, for areas of intact habitats, resource value hotspots, and opportunities for connectivity with existing designated lands.

Colorado Plateau REA Final Report II-3-c at viii.

Unfortunately, with all of this data available, BLM fails to address climate change in a meaningful way, instead intimating that the agency is incapable of managing public lands and resources to reduce impacts to climate change or adapt to climate change impacts. For example, under the stated goal to: "Manage native vegetation and wildlife species, soil and water resources, and wildlife habitats to maintain productivity, viability, and natural processes in response to stresses induced by climate change," BLM includes the vague management action to "Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values." Uncompahgre Draft RMP at 2-24. The only other actions under the climate change goal are to seed local native species to improve survival of plan populations and to minimize soil and vegetation disturbance in ecological emphasis areas. Id at 2-25.

This does not meet the obligation of the agency to assess impacts from climate change and contributions to climate change from agency actions. On August 2, 2016, the Council on Environmental Quality (CEQ) released its long-awaited final guidance on considering greenhouse gas (GHG) emissions and the effects of climate change in NEPA reviews. The overarching goal of the guidance is to provide greater clarity and more consistency in how federal agencies address climate change in their NEPA

---

[120] Available at http://nca2014.globalchange.gov/
[121] Information on the REA is available at:
http://www.blm.gov/wo/st/en/prog/more/Landscape_Approach/reas/coloplateau.html.

BLM_0149686

reviews and to facilitate compliance with existing NEPA requirements. The guidance recognizes that "[c]limate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview." CEQ Guidance at 2. It recognizes that identifying and analyzing the interactions between our changing climate and the environmental impacts from a proposed action can have a number of benefits, including identifying opportunities to reduce and mitigate GHG emissions, to improve environmental outcomes, and to help safeguard communities, infrastructure, and resources against the effects of climate change.

The guidance counsels agencies to use the information developed during the NEPA review to consider alternatives that are more resilient to the effects of a changing climate. CEQ Guidance at 5. BLM must not only analyze greenhouse gas emissions from proposed actions, but use that information to make better decisions for public lands resources and, equally importantly, assess likely impacts to our public lands from climate changes already underway in order to respond and adapt. Notably, the guidance contains special considerations for biogenic sources of greenhouse gas emissions from land management actions, such as prescribed burning. CEQ Guidance at 18. While the final CEQ guidance was recently released, a second draft of this guidance has been out since 2014. Therefore, the Uncompahgre RMP is not exempt from considering and using this guidance in analyzing climate change, and BLM should have incorporated principles from the CEQ guidance into the draft RMP.

Additionally, BLM has other requirements to analyze climate change in NEPA analyses that are not met in the draft RMP. NEPA regulations and U.S. courts direct that BLM must fully analyze the cumulative and incremental impacts of the proposed decisions in the RMP. *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d 1172, 1217 (9th Cir. 2008). In *CBD v. NHTSA*, the NHTSA failed to provide analysis for the impact of greenhouse gas emissions on climate change and was rebuked by the U.S. Court of Appeals for the Ninth Circuit, which observed that "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." 538 F.3d at 1217. For example, off-road vehicle designations, oil and gas management stipulations, and renewable energy development may significantly increase or reduce greenhouse gas emissions contributing to climate change and must be analyzed under NEPA.

Further, NEPA regulations require that NEPA documents address not only the direct effects of federal proposals, but also "reasonably foreseeable" indirect effects.  These are defined as:

> Indirect effects, which are caused by the action and are later in time or farther removed in distance, *but are still reasonably foreseeable.* Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b) (emphasis added).

BLM is required to take a hard look at direct, indirect, and cumulative impacts to and from climate change in the planning area in the RMP. BLM baseline data on climate change must be sufficient to permit analysis of impacts under NEPA. Importantly, 40 C.F.R. § 1502.15 requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." Establishment of baseline conditions is a requirement of NEPA.  In *Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA."  The court further held that

128

"[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

There is a growing body of scientific information already available on climate change baseline conditions, much of it generated by or available through federal agencies. Where there is scientific uncertainty, NEPA imposes three mandatory obligations on BLM: (1) a duty to disclose the scientific uncertainty; (2) a duty to complete independent research and gather information if no adequate information exists unless the costs are exorbitant or the means of obtaining the information are not known; and (3) a duty to evaluate the potential, reasonably foreseeable impacts in the absence of relevant information, using a four-step process. Unless the costs are exorbitant or the means of obtaining the information are not known, the agency must gather the information in studies or research. 40 C.F.R. § 1502.22.  Courts have upheld these requirements, stating that the detailed environmental analysis must "utiliz[e] public comment and the best available scientific information." *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1171-72 (10th Cir. 1999) (citing *Robertson v. Methow Valley Citizens' Council*, 490 U.S. at 350); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1521-22 (10th Cir. 1992).

As the Supreme Court has explained, while "policymaking in a complex society must account for uncertainty," it is not "sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 52* (1983).  Instead, in this context, as in all other aspects of agency decision-making, "[w]hen the facts are uncertain," an agency decision-maker must, in making a decision, "identify the considerations he found persuasive." *Small Refiner Lead Phase-Down Task Force v. EPA,* 705 F.2d 506, 520 (D.C. Cir. 1983), quoting Ind. *Union Dept., AFL-CIO v. Hodgson*, 499 F.2d 467, 476 (D.C. Cir. 1974).

BLM's duty to evaluating reasonably foreseeable significant adverse impacts includes "impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22(b). Such impacts are especially significant in the face of climate change.

Finally, BLM Instruction Memorandum 2013-094 regards management during drought. This IM requires BLM to modify uses and management to lessen impacts from drought including activities such as grazing, recreation, lands actions and minerals activities. IM 2013-094 also states that BLM should consider the information in BLM's Rapid Ecoregional Assessments in assessing drought and mitigation measures and states a preference for RMPs and other plans to proactively address potential drought and its effects.

2.   BLM must craft long-term management prescriptions without permanent impairment and unnecessary or undue degradation to the resources in the face of climate change.

FLPMA gives BLM the authority to manage and plan for emerging issues and changing conditions that global climate change will affect in the planning area.  FLPMA mandates that when BLM revises land use plans, it must "use and observe the principles of multiple use and sustained yield set forth in this and other applicable law" 43 U.S.C. § 1712(c).

> The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future

BLM_0149688

needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions. . . a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources. . . and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.  43 U.S.C. § 1702(c) (emphasis added).

Additional pertinent requirements of FLPMA that specifically apply to land use planning include using "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences; consider[ing] relative scarcity of the values involved; and weigh[ing] long-term benefits to the public against short-term benefits. *Id.*  FLPMA also provides that BLM must "take any action necessary to prevent unnecessary or undue degradation to managed resources." 43 U.S.C. § 1732(b). Collectively, the provisions of FLPMA highlighted above necessitate on-the-ground implementation of climate change policies.

In addition to the agency's duty under NEPA to take a hard look at the impacts of climate change to and from decisions in the resource management plan, BLM must also include a range of alternatives that includes a strategy for mitigating these impacts. CEQ regulations instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact, specifically stating that "[f]ederal agencies shall to the fullest extent possible: . . . Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e) (emphasis added); *see also*, 40 C.F.R. §§ 1502.14, 1502.16.

The impacts of climate change should be a major factor in every alternative that is created since it is an undeniable reality that will drive all land use planning decisions. As provided in the Oregon/Washington BLM State Office guidance document IM OR-2010-012, "[r]esource management plans and other broad programmatic analyses are actions that would typically have a long enough duration that climate change could potentially alter the choice among alternatives."

Further, general statements that BLM will conduct monitoring are also not an appropriate form of mitigation.  Simply monitoring for expected damage does not actually reduce or alleviate any impacts. Instead, a vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem. A detailed monitoring approach is also required under the BLM's planning regulations:

> The proposed plan shall establish intervals and standards, as appropriate, for monitoring and evaluation of the plan. Such intervals and standards shall be based on the sensitivity of the resource to the decisions involved and shall provide for evaluation to determine whether mitigation measures are satisfactory, whether there has been significant change in the related plans of other Federal agencies, State or local governments, or Indian tribes, or whether there is new data of significance to the plan. The Field Manager shall be responsible for monitoring and evaluating the plan in accordance with the established intervals and standards and at other times as appropriate to determine whether there is sufficient cause to warrant amendment or revision of the plan. 43 C.F.R. § 1610.4-9 (emphasis added).

130

Such vigilant monitoring is absolutely necessary in order to create an effective adaptive management framework in the face of climate change.

3.   BLM must estimate the potential increase in vulnerability to climate change impacts.

As discussed above, the agency must evaluate the direct, indirect and cumulative impacts of climate change emissions from the project. The agency must also take a hard look at the impacts of climate change and the potential increase in vulnerability to the project area from climate change. As stated in the CEQ Guidance:

> The analysis of climate change impacts should focus on those aspects of the human environment that are impacted by both the proposed action and climate change. Climate change can make a resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change. This increase in vulnerability can exacerbate the effects of the proposed action . . . Such considerations are squarely within the scope of NEPA and can inform decisions on whether to proceed with, and how to design, the proposed action to eliminate or mitigate impacts exacerbated by climate change. They can also inform possible adaptation measures to address the impacts of climate change, ultimately enabling the selection of smarter, more resilient actions.

CEQ Guidance at 21-22. In order to fulfill its responsibilities under NEPA, the BLM must fully evaluate the potential increased vulnerabilities to the landscape and communities caused by climate change and the impacts of this project to potentially exacerbate those vulnerabilities. This will provide the agency, the project proponent and the public with more information on possible mitigation measures that could be implemented as well as measures to boost the resiliency of the landscape.

4.   BLM must evaluate climate emissions in the context of U.S. climate commitments and seek to meet those national goals.

The climate change impacts observed from GHG emissions are already evident and will worsen unless emissions of GHGs are greatly reduced. The wide range of impacts from climate change, including melting glaciers and earlier snow melts in our mountains that disrupt water supplies in the west, thawing permafrost, forest fires, widespread drought, rising sea levels, and the spread of invasive species, have been rigorously and scientifically documented by the Intergovernmental Panel on Climate Change (IPCC), as well as American researchers and agencies. These have led to substantial commitments made by this Administration to reduce our national contribution to climate change. As part of these commitments, federal agencies must begin to not just measure, but to act on the basis of potential GHG emissions.

Our public lands and minerals are held in trust for the public. We must ensure this trust is not broken when authorizing actions on our public lands that contribute to climate emissions. In particular, fossil fuel production on federal public lands and mineral estates is extensive and the production of GHGs resulting from the exploration, extraction, transportation and combustion of these fuels is significant. The federal fossil fuels program must provide assurance the public trust will not be violated by carefully considering climate change issues and taking steps to avoid, minimize and offset impacts through

131

compensatory mitigation. In 2012, as much as 21 percent of the Nation's GHG emissions originated from coal, oil and natural gas extracted from the public lands.[122]

**Leading science has firmly established the need for developing thresholds of acceptable fossil energy extraction for the planet based on expected GHG emissions.** The scientific understanding that the global increase in temperature due to greenhouse gas emissions must be capped at or below 2-degree Celsius to avoid unmanageable climate change consequences is well-established. The 2-degree Celsius threshold was first enshrined in the 2009 Copenhagen Accord[123] and reaffirmed in the 2015 Paris Agreement as the limit for "acceptable" warming.[124] During that time, the international scientific community's understanding of the interaction between fossil fuel development and temperature thresholds has greatly increased, and today it is widely agreed that development of additional reserves should be considered in the context of warming goals—giving rise to the idea of a carbon budget for the planet. In fact, this notion has been assessed and supported by the IPCC in all assessment reports going back to 1990 and has yielded a methodology routinely employed and updated annually by the Global Carbon Project.[125]

The IPCC's analytic method was further advanced in January 2015 in a journal paper that evaluated known fossil fuel reserves to determine, based on current emissions factors and global warming potential, how much should be left in-place to maximize the planet's chances of remaining below 2 degrees Celsius.[126] Importantly, it quantifies the regional distribution of known fossil-fuel reserves and

---

[122] Claire Moser, Joshua Mantell, Nidhi Thakar, Chase Huntley and Matt Lee-Ashley. *Cutting Greenhouse Gas from Fossil-Fuel Extraction on Federal Lands and Waters*. March 19, 2015. Policy brief and underlying analysis is available at http://wilderness.org/blog/blind-spot-plan-reduce-emissions-slowing-progress-fight-against-climate-change (accessed July 28, 2016).

[123] Copenhagen Accord ¶ 1, *agreed* Dec. 18, 2009, FCCC/CP/2009/11/Add.1, *available at* http://unfccc.int/resource/docs/2009/cop15/eng/11a01.pdf ("recognizing the scientific view that the increase in global temperature should be below 2 degrees Celsius" relative to pre-industrial temperatures to "stabilize greenhouse gas concentration in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system"); *id.* at ¶ 2 (agreeing that "deep cuts in global emissions are required according to science" to meet this goal).

[124] The United States and other signatory nations committed to reducing greenhouse gas emissions "well below 2 °C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5 °C above pre-industrial levels." Paris Agreement art. 2, ¶ 1(a), *adopted* Dec. 12, 2015, FCCC/CP/2015/L.9, *available at* http://unfccc.int/resource/docs/2015/cop21/eng/l09r01.pdf. The authority cited in the letter is being provided via regualtions.gov and it should be included in the administrative record for this decision.

[125] The IPCC has produced and reviewed a carbon budget for the planet in all assessment reports (Ciais et al., 2013; Denman et al., 2007; Prentice et al., 2001; Schimel et al., 1995; Watson et al., 1990), as well as by others (e.g. Ballantyne et al., 2012). These assessments included carbon budget estimates for the decades of the 1980s, 1990s (Denman et al., 2007) and, most recently, the period 2002–2011 (Ciais et al., 2013). The IPCC methodology has been adapted and used by the Global Carbon Project (GCP, www.globalcarbonproject.org), which has coordinated a cooperative community effort for the annual publication of global carbon budgets up to the year 2005 (Raupach et al., 2007), 2006 (Canadell et al., 2007), 2007 (published online; GCP, 2007), 2008 (Le Quéré et al., 2009), 2009 (Friedlingstein et al., 2010), 2010 (Peters et al., 2012b), 2012 (Le Quéré et al., 2013; Peters et al., 2013), 2013 (Le Quéré et al., 2014), and most recently 2014 (Friedlingstein et al., 2014; Le Quéré et al., 2015). Each of these papers updated previous estimates with the latest available information for the entire time series. From 2008, these publications projected fossil fuel emissions for one additional year using the projected world gross domestic product (GDP) and estimated trends in the carbon intensity of the global economy (Rogelj, 2016).

[126] McGlade, Christophe and Paul Ekins, *The Geographical Distribution of Fossil Fuels Unused When Limiting Global Warming to 2 °C*, 517 Nature (187) (2015).

132

resources and, through modeling a range of scenarios based on least-cost climate policies, identifies geographically-specific resources that should not be burned between 2010 and 2050 to ensure the world stays within a 2-degree Celsius limit in the most cost-efficient manner.[127] Importantly, this study demonstrates that there are geographically-specific analyses available that support comparative judgments about the appropriateness of tapping into different resources and plays.

**The United States has set national commitments to reduce GHG emissions.** The United States has submitted its target to cut net GHG emissions to the United Nations Framework Convention on Climate Change. This Intended Nationally Determined Contribution (INDC), as provided for in the Paris Agreement, is a formal statement of the U.S. target to reduce emissions by 26 to 28 percent below 2005 levels by 2025. In addition, to achieve a no more than 2 degrees Celsius temperature increase, heat trapping gasses in the atmosphere must be kept at or below 450 parts per million CO2-eq., which means that industrialized nations like the U.S. will have to reduce their emissions an average of 70 to 80 percent below 2000 levels by 2050.

In addition, on June 29, 2016 the leaders of Canada, Mexico, and the United States committed to the North American Climate, Clean Energy, and Environment Partnership. Under this agreement, the countries will pursue an historic goal for North America to strive to achieve 50 percent clean power generation by 2025. "Canada, the U.S., and Mexico will work together to implement the historic Paris Agreement, supporting our goal to limit temperature rise this century to well below 2 degrees C, and pursuing efforts to limit the temperature increase to 1.5 degrees C."[128]

These commitments are consistent with and required by The President's Climate Action Plan (June 2013) which calls for many steps to combat climate change such as reductions in CO2 emissions from power plants, increased use of renewable energy, improved automobile efficiency standards, and reducing methane emissions, among many other things.[129] But to achieve the goals of the Climate Action Plan, which include "steady, responsible action to cut carbon pollution, [so] we can protect our children's health and begin to slow the effects of climate change so that we leave behind a cleaner, more stable environment," it will also be necessary to address issues related to fossil fuel extraction from our public lands, such as establishing a carbon management system.

The RMP must analyze climate emissions and alternatives for managing climate change in the context of these national commitments and targets, both in terms of fossil fuel management and other activities authorized under the RMP that would contribute to GHG emissions.

5.  <u>Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.</u>

BLM has significant obligations and authority related to mitigation for all unavoidable impacts. Secretarial Order 3330 requires the development of a landscape-scale mitigation policy for the Department of the Interior. Section 4(c) of Secretarial Order 3330 directs the Task Force to: "[I]dentify

---

[127] *See id.* at 187-90.
[128] See https://www.whitehouse.gov/the-press-office/2016/06/29/leaders-statement-north-american-climate-clean-energy-and-environment (presenting Leaders' Statement on a North American Climate, Clean Energy, and Environment Partnership).
[129] *See also* Climate Action Plan Strategy to Reduce Methane Emissions (March 2014) (presenting the President's methane reduction strategy).

BLM_0149692

any new policies or practices, revisions to existing policies or practices, or regulatory or other changes that could be implemented to incorporate landscape-scale planning into mitigation-related decisions…"

In a report to the Secretary of the Interior, the Energy and Climate Change Task Force laid out a landscape approach to mitigation.[130] This approach contained the following steps:

1. Identifying key landscape attributes, and the conditions, trends and baselines that characterize these attributes;

2. Developing landscape-scale goals and strategies;

3. Developing efficient and effective compensatory mitigation programs for impacts that cannot be avoided or minimized; and

4. Monitoring and evaluating progress and making adjustments, as necessary, to ensure that mitigation is effective despite changing conditions.

BLM is also considering new tools and approaches the agency could use to increase the effectiveness of mitigation on public lands, including layering protective management and designations and exploring creative ways existing authorities could be used for conservation benefits. Effective new mitigation tools and approaches should be integrated into planning as well.

Mitigating climate-related impacts includes avoiding and minimizing generation of GHG emissions through management prescriptions and preventing harm to carbon sinks. The CEQ guidance on considering climate change in NEPA analyses provides that agencies should analyze reasonable alternatives that would mitigate both direct and indirect GHG emissions impacts and the cumulative effects of climate change (e.g., enhanced energy efficiency, carbon sequestration, lower GHG-emitting technology). CEQ Guidance at 19. BLM must address the quality of mitigation measures as well as ensure they are additional, verifiable, durable, enforceable, and will be implemented.

It is important to underscore that, as a land manager, the federal government is facing huge and rapidly escalating costs to address the impacts caused by fossil-fuel driven climate change. Forest fires, widespread drought, unusual flooding, rising sea levels, spread of invasive species and spread of disease already result in significant costs to the federal government, and each new oil production project the BLM authorizes increases these problems and the associated costs. Research from the University of Vermont's Gund Institute for Ecological Economics and The Wilderness Society suggests that total costs in degraded ecosystem services could exceed $14.5 billion annually under a 2-degree Celsius warming scenario.[131] These costs are ultimately borne by all American taxpayers, and BLM has a responsibility to minimize and recoup these costs when it makes decisions authorizing activities that cause these impacts and associated costs.

---

[130] Clement, J.P. et al. 2014. A strategy for improving the mitigation policies and practices of the Department of the Interior. A report to the Secretary of the Interior from the Energy and Climate Change Task Force, Washington, D.C., 25 p.

[131] See Esposito, Valerie; Phillips, Spencer; Boumans, Roelof; Moulaert, Azur; Boggs, Jennifer. 2011. "Climate change and ecosystem services: The contribution of and impacts on federal public lands in the United States." In: Watson, Alan; Murrieta-Saldivar, Joaquin; McBride, Brooke, comps. *Science and stewardship to protect and sustain wilderness values: Ninth World Wilderness Congress symposium*; November 6-13, 2009; Merida, Yucatan, Mexico. Proceedings RMRS-P-64. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. 155-164. Available at http://www.fs.fed.us/rm/pubs/rmrs_p064.pdf? (accessed July 23, 2016).

134

BLM_0149693

**Summary of Comments:**  The Uncompahgre RMP provides BLM with an excellent opportunity to analyze the impacts from climate change to the planning area over the next two decades, including increases in vulnerability, as well as the contribution to climate change from management decisions made in the plan. This analysis should lead to the development of thoughtful management prescriptions and alternatives in the land use plan that will address how BLM will mitigate these causes and adapt its management over the coming years to prevent permanent impairment and unnecessary or undue degradation to the resources in the face of climate change. BLM must analyze climate emissions in the context of national climate commitments detailed above. Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

### b.  Recommended Approach to Managing Climate Change in RMPs

Under the pressures of global change, it must be acknowledged that many objects of conservation are at risk wherever they are found, and the traditional natural resource management paradigm of modifying ecosystems to increase yield must change to a new paradigm of managing wildland ecosystems to minimize loss – specifically loss of the ecosystem composition, structure, and function that yields the benefits we seek from wildlands. Natural resource management must change from a paradigm of maximum sustained yield to a paradigm of risk management.

Although there is no widely-accepted method of assessing and managing risk, we recommend breaking risk down into its component parts—vulnerability, exposure, and uncertainty—as a useful way to think about risk to biodiversity and productive potential. In the TWS report, "Recommended Risk Assessment and Management Approach for Addressing Climate Change in BLM Land Use Planning" (included as Attachment 6), we recommend an approach for assessing risk in the planning area as well as an approach for management of that risk for BLM to comply with its legal obligations under NEPA and FLPMA as set out above.

**Summary of Comments:** BLM should utilize the attached management framework to address and manage climate change in the RMP.

### c.  Adapting to Climate Change

In addition to the analyzing the impacts of climate change, The Department of Interior Manual for climate change adaptation (523 DM 1) requires BLM to plan for uncertainty and risk in the face of climate change. Among other things, this policy guidance requires BLM to:
- use the best available science of climate change risks, impacts and vulnerabilities,
- use the network of Landscape Conservation Cooperatives, Climate Science Centers and other partnerships to understand and respond to climate change,
- use well-defined and established approaches for managing through uncertainty including vulnerability assessments, scenario planning and other risk management approaches,
- promote landscape-scale, ecosystem-based management approaches to enhance the resilience and sustainability of linked human and natural systems,
- Manage linked human and natural systems that help mitigate climate change impacts, such as:
  - protect diversity of habitat, communities and species,
  - protect and restore core, unfragmented habitat areas and key habitat linkages,
  - maintain key ecosystem services,
  - monitor, prevent and slow the spread of invasive species,

135

    o    focus development activities in ecologically disturbed areas and avoid ecologically sensitive landscapes, culturally sensitive areas, and crucial wildlife corridors.

The biggest question that land managers face today is how we respond to uncertainty in the face of global climate change. It is especially challenging for planners to make predictions about future ecosystem dynamics 10, 20 or 50 years down the line. Adaptation to changing conditions is and will be essential. However, general statements that BLM will plan to "be adaptive" is not planning—it is a strategy that is reactive only. A true plan for climate adaptation will require applying knowledge and foresight gained from a "learn as you go" approach.

We recommend using an experimental, adaptive design known as the "portfolio approach" of management strategies (Belote et al.)[132] in the RMP. As stated by Belote et al., "[u]ncertainty about how ecosystems and species will respond to co-occurring, interactive, and synergistic impacts of the Anthropocene precludes our ability to know which strategy will best sustain wildland values in to the future." Thus, Belote et al. concludes that land managers should use an experimental zoning approach for managing certain lands that include the following zones as management strategies:

- **Restoration Zones:** areas that are devoted to forestalling change through the process of ecological restoration;
- **Innovation Zones:** areas that are devoted to innovative management that anticipates climate change and guides ecological change to prepare for it; and
- **Observation Zones:** areas that are left to change on their own time to serve as scientific "controls" and to hedge against the unintended consequences of active management elsewhere.

These strategies should be used in conjunction with each other in order to spread the risk among the different strategies and to allow for diverse outcomes to inform rapid learning about management strategies in the future. This is the kind of deliberate yet dynamic planning process that BLM should be fostering in RMPs.

The BLM is especially equipped to apply this type of portfolio approach due to its wide variety of designations and management regimes. The purpose of **restoration zones** is to sustain existing or historical ecosystems. This type of strategy lends itself to designations such as national conservation areas, ACECs and other lands that are set aside for conservation of natural and cultural resources, but that may also be appropriate for restoration in certain areas.

Due to the acknowledgement that returning to historical range of variability is an increasingly challenging concept in the study of climate change, **innovation zones** are also necessary. This is where the forecasting of climate change may drive greater intervention to experiment with things like anticipatorily boosting resiliency or facilitating transition to an altered future state where shifts seem inevitable. This strategy would be more appropriate for BLM-managed lands that have already sustained substantial change or where future impacts of climate change may severely disrupt the production of ecosystem goods and services. Conservation designations or allocations would typically not fall within this management strategy.

---

[132] These concepts are set out in Belote, et al. "Wilderness and Conservation Strategy in the Anthropocene." The Pinchot Letter (Spring 2014).

136

The third strategy of establishing **observation zones** is necessary to allow for ecosystems to generally change without specific intervention, as a scientific control. This management strategy would be most appropriate for Wilderness, WSAs, and lands managed for wilderness characteristics, but would also be the default strategy for lands that could not be managed for treatment under the restoration and innovation zones due to budget and operational constraints or in lands between such designations where connectivity is desirable to facilitate movement in response to climate change.

**Summary of Comments:** BLM should implement a portfolio approach to land use planning that allows for diverse strategies and adaptive, dynamic planning as a climate change adaptation strategy. This involves establishing restoration, innovation and observation zones in order to "learn while doing."

### XIV.   Mitigation

A robust policy framework exists to guide mitigation considerations in land use planning. In addition to mitigation requirements under FLPMA and NEPA, numerous other policies and guidance documents direct the BLM to require mitigation and specify how mitigation must be employed. These include the Presidential Memorandum: Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment (2015); Secretarial Order 3330, Improving Mitigation Policies and Practices of the Department of the Interior (2013);[133] the follow-up report entitled *A Strategy for Improving the Mitigation Policies and Practices of The Department of the Interior* (2014);[134] the Department of the Interior's Landscape-Scape Mitigation Manual (2015);[135] and BLM's Draft Regional Mitigation Manual (2013).[136]

Secretarial Order 3330 called for a departmental mitigation strategy with five central components: (1) the use of a landscape-scale approach to identify and facilitate investment in key conservation priorities in a region; (2) early integration of mitigation considerations in project planning and design; (3) ensuring the durability of mitigation measures over time; (4) ensuring transparency and consistency in mitigation decisions; and (5) a focus on mitigation efforts that improve the resilience of our Nation's resources in the face of climate change.

In response to S.O. 3330, the Energy and Climate Change Task Force issued a report that outlined a strategy for improving departmental mitigation policies and practices ("Task Force Report," April 2014[137]). The Task Force Report emphasizes the importance of landscape-scale mitigation planning to enable the Interior Department to appropriately manage and conserve our public lands resources and meet its statutory obligations:

> Consideration of the landscape-scale context provides the opportunity to see project development in the context of the larger landscape it will occupy and associated resource values it will affect; enhances the ability to evaluate cumulative effects of multiple projects; expands the capacity to avoid, minimize, and offset project impacts; and allows managers to make

---

[133] https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Secretarial-Order-Mitigation.pdf
[134] https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Mitigation-Report-to-the-Secretary_FINAL_04_08_14.pdf
[135] https://www.doi.gov/sites/doi.gov/files/uploads/TRS and Chapter FINAL.pdf
[136] http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/im_attachments/2013.Par.57631.File.dat/IM2013-142_att1.pdf
[137] Available at http://www.doi.gov/news/loader.cfm?csModule=security/getfile&pageid=526203.

137

BLM_0149696

avoidance and compensatory mitigation site selection decisions that optimize for multiple resource values. Task Force Report at 9.

It identifies several principles to guide landscape-scale mitigation, including utilizing the full mitigation hierarchy, advance mitigation planning, ensuring durability and promoting transparency and collaboration, which are reiterated in BLM's draft mitigation manual.

Of particular relevance to resource management planning, BLM is currently implementing draft MS-1794[138], which the agency is instructed to utilize as interim policy while the guidance is finalized. Instruction Memorandum No. 2013-142.[139] Draft MS-1794 provides for BLM to use the land use planning process to identify potential mitigation sites and measures. Draft MS-1794 at 1.6(C). This would be appropriate for the Uncompahgre RMP to balance reasonably foreseeable development and the various resource values present throughout the planning area. Mitigation is most effective when planned at a regional scale so that development avoids impacting critical conservation resources and compensatory mitigation investments are directed to areas and activities that will best fully address unavoidable development impacts. In outlining a landscape-scale mitigation strategy for the Uncompahgre Field Office, BLM should apply the mitigation hierarchy of avoidance, minimization, and offsets.

BLM is directed to incorporate four elements into mitigation planning at the land use planning stage per the Task Force Report and Draft MS-1794:

a. Describe regional baseline conditions against which unavoidable impacts are assessed;
b. Establish and prioritize regional mitigation objectives for the planning area;
c. Identify appropriate land-use allocations or areas for landscape-level conservation and management actions to achieve regional mitigation objectives (e.g., Areas of Critical Environmental Concern (ACEC) or sage-grouse priority habitat); and
d. Develop long-term monitoring and adaptive management requirements to evaluate and maximize the effectiveness of mitigation projects and measures.

*Ibid.* Importantly, regional mitigation measures must have additionality – that is, the offsetting conservation measures would not have occurred otherwise. Task Force Report at 6. BLM should not simply cast land use allocations currently under consideration in the Draft RMP as contributing to the achievement of regional mitigation objectives. Rather, BLM must identify foreseeable unavoidable impacts, account for impacts to resource values throughout the relevant range of the resource that is being impacted, and identify conservation designations and other land use allocations that are appropriate to those impacts.

Conservation designations and other land use allocations that are intended as regional mitigation measures must have strong protective management prescriptions to ensure effective and durable conservation, restoration, and management and adequate funding for and commitment to enforcement. In directing BLM to ensure long-term durability of compensatory mitigation, the

---

[138] Available at
http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/im_attachments/2013.Par.57631.File.dat/IM2013-142_att1.pdf.
[139] Available at
http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-142.html.

BLM_0149697

mitigation guidance notes that "the land use plan may be the most effective tool for protecting important regional mitigation sites on BLM-managed lands from future impacts in order to ensure the durability of mitigation projects." Draft MS-1794 at 1.6(D)(12). To achieve long-term durability, BLM must commit to and implement management actions, such as restoration projects and enforcement, within mitigation-based conservation designations that are appropriate to specific unavoidable impacts and that provide beneficial effects that are additional to conservation that would have otherwise occurred.

**Summary of Comments:** BLM should include the four elements of landscape-scale mitigation planning outlined in Draft MS-1794 in the Uncompahgre RMP. By establishing regional mitigation objectives for the planning area, BLM can identify durable, additional land use allocations that appropriately mitigate likely impacts from development authorized under the RMP.

We reiterate that we appreciate the effort BLM has put into the Uncompahgre RMP to this point and look forward to continuing working with the agency on finalizing the RMP and other management and planning efforts in the Uncompahgre Field Office.

Sincerely,

Juli Slivka, Planning Specialist
**The Wilderness Society**
1660 Wynkoop St. Ste. 850
Denver, CO 80202
(303) 650-1179
jslivka@tws.org

Steve Allerton, President
**Western Colorado Congress**
134 N 6th St
Grand Junction, CO 81501
(970) 256-7650

Karen Tuddenham, Executive Director
**Sheep Mountain Alliance**
220 W. Colorado Ave
PO Box 189
Telluride, CO 81435
(970) 728-3729
lexi@sheepmountainalliance.org

Jimbo Buickerood, Lands and Forest Protection Program Manager
**San Juan Citizens Alliance**
1309 East Third Avenue #5
PO Box 2461
Durango, CO 81302
(970) 259-3583
jimbo@sanjuancitizens.org

139

BLM_0149698

Matt Rice, Director, Colorado River Basin Program
**American Rivers**
1536 Wynkoop Street, Office 321
Denver, CO 80202
(303) 454-3395
mrice@americanrivers.org

Amber Clark, Program Coordinator
**Dolores River Boating Advocates**
PO Box 1173
Dolores, CO 81323
(970) 799-8704
amber@doloresriverboating.org

Steve Smith
Glenwood Springs
ssmith@rof.net
(970) 618-8264

Luke Schafer, West Slope Advocacy Director
**Conservation Colorado**
529 Yampa Ave
Craig, CO 81625
(970) 824-5241
luke@conservationco.org

Shelley Silbert, Executive Director
**Great Old Broads for Wilderness**
Box 2924
Durango, CO 81302
(970) 385-9577
shelley@greatoldbroads.org

Robyn Cascade, Northern San Juan Chapter Leader
**Great Old Broads for Wilderness**
Ridgway, CO
northernsanjuanbroadband@gmail.com

Sherry Schenk, Grand Junction Area Broadband Co-leader
**Great Old Broads for Wilderness**
Grand Junction, CO
sherryleeschenk@gmail.com

Alan Apt, Wilderness Chair
**Sierra Club**
Rocky Mountain Chapter
P.O. Box 620
Nederland, CO 80466

140

Megan Mueller, Senior Conservation Biologist
**Rocky Mountain Wild**
1536 Wynkoop Street, Suite 900
Denver, Colorado 80202
(303) 704-9760
megan@rockymountainwild.org

Christine Canaly, Director
**San Luis Valley Ecosystem Council**
P.O. Box 223
Alamosa, CO 81101
(719) 589-1518
slvwater@fairpoint.net

Peter Hart, Staff Attorney/Conservation Analyst
**Wilderness Workshop**
PO Box 1442
Carbondale, CO 81623
(970) 963-3977
peter@wildernessworkshop.org

141

**List of Attachments**
1. Rio Puerco Draft RMP, Section 2.2.8 (Management of Lands with Wilderness Characteristics)
2. White River Proposed RMPA, Table 2-22 (Management of Lands with Wilderness Characteristics)
3. Grand Junction Approved RMP, Appendix L (Special Recreation Permit Program Overview)
4. The Wilderness Society. *No Exit: Fixing the BLM's Indiscriminate Energy Leasing.* 2016.
5. Recommended Approach for Using Oil and Gas Development Potential to Inform Land Use Planning Decisions: A Proposal to the Uncompahgre Field Office
6. A Socioeconomic Analysis of the Impact of the Proposed Piñon Ridge Uranium Project on Western Mesa, Montrose, and San Miguel Counties, Colorado. Power Consulting, 2010.
7. The Wilderness Society. "Recommended Risk Assessment and Management Approach for Addressing Climate Change in BLM Land Use Planning."

**Literature cited in these comments and bibliography of literature BLM should consult in this planning process**

Albano, C. M. 2015. Identification of geophysically diverse locations that may facilitate species' persistence and adaptation to climate change in the southwestern United States. Landscape Ecology 30:1023–1037.

Anderson, M. G., M. Clark, and A. O. Sheldon. 2014. Estimating climate resilience for conservation across geophysical settings. Conservation Biology 28:959–970.

Aplet, G. H. 1999. On the Nature of Wildness: Exploring What Wilderness Really Protects. Denver Law Review 76:347–367.

Aplet, G., J. Thomson, and M. Wilbert. 2000. Indicators of wildness: Using attributes of the land to assess the context of wilderness. Pages 89–98 *in* S. F. McCool, D. N. Cole, W. T. Borrie, and J. O'Laughlin, editors.Proceedings: Wilderness science in a time of change.

Attanasi, E.D. 1998. Economics and the 1995 National Assessment of United States Oil and Gas Resources. US Geological Survey Circular 1145.

Aycrigg, J. L., J. Tricker, R. T. Belote, M. S. Dietz, L. Duarte, and G. H. Aplet. 2015. The Next 50 Years : Opportunities for Diversifying the Ecological Representation of the National Wilderness Preservation System within the Contiguous United States. Journal of Forestry 114:1–9.

Belote, R. T., M. S. Dietz, B. H. McRae, D. M. Theobald, M. L. McClure, G. H. Irwin, P. S. McKinley, J. A. Gage, and G. H. Aplet. 2016. Identifying Corridors among Large Protected Areas in the United States. PLoS ONE 11:e0154223.

Belote, Travis et al. *Wilderness and Conservation Strategy in the Anthropocene*. The Pinchot Letter (Spring 2014).

Confluence Consulting, Inc. 2005. Annotated bibliography of the potential impacts of gas and oil exploration and development on coldwater fisheries. Report prepared for Trout Unlimited. Confluence Consulting, Inc. Bozeman, MT. 30 p.

142

Corn, M.L., B.A. Gelb and P. Baldwin. 2001. The Arctic National Wildlife Refuge: The Next Chapter. Congressional Research Service. Updated August 1, 2001.

Dickson, B. G., L. J. Zachmann, and C. M. Albano. 2014. Systematic identification of potential conservation priority areas on roadless Bureau of Land Management lands in the western United States. Biological Conservation 178:117–127.

Dietz, M. S., R. T. Belote, G. H. Aplet, and J. L. Aycrigg. 2015. The world's largest wilderness protection network after 50 years: An assessment of ecological system representation in the U.S. National Wilderness Preservation System. Biological Conservation 184:431–438.

Dobrowski, S. Z. 2011. A climatic basis for microrefugia: the influence of terrain on climate. Global Change Biology 17:1022–1035.

Dobrowski, S. Z., J. Abatzoglou, A. K. Swanson, J. a Greenberg, A. R. Mynsberge, Z. a Holden, and M. K. Schwartz. 2013. The climate velocity of the contiguous United States during the 20th century. Global change biology 19:241–51.

Foley, J. a, R. Defries, G. P. Asner, C. Barford, G. Bonan, S. R. Carpenter, F. S. Chapin, M. T. Coe, G. C. Daily, H. K. Gibbs, J. H. Helkowski, T. Holloway, E. a Howard, C. J. Kucharik, C. Monfreda, J. a Patz, I. C. Prentice, N. Ramankutty, and P. K. Snyder. 2005. Global consequences of land use. Science (New York, N.Y.) 309:570–4.

*Forman, R.T.T., et al. 2003. Road ecology: science and solutions. Island Press: Washington, D.C.*

Fortmann, L.P. et al. 1989. Community stability: The foresters' fig leaf. In D.C. Le Master and J.H. Beuter (Eds.) Community stability in forest-based economies. Timber Press.

Freeman, L. R.; March, F.; Spensley, J.W. 1994. NEPA Compliance Manual, 2nd Edition. Government Institutes, Inc., Rockville, MD.

Freudenburg, W.R. 1992. Addictive economies: extractive industries and vulnerable localities in a changing world economy. Rural Sociology. Vol. 57:305-332.

Freudenburg, W.R. and R. Gramling. 1994. Natural resources and rural poverty: A closer look. Society and Natural Resources. Vol. 7.

Gauthier-Warinner, R.J. 2000. Oil and gas development. In: Drinking water from forests and grasslands: A synthesis of the scientific literature. Dissmeyer, G. E. ed. Gen. Tech. Rep.  SRS-39. Asheville, NC: U.S. Department of Agriculture, Forest Service, Southern Research Staiton. 246 p.

*Gill, Thomas E. 1996.* Eolian sediments generated by anthropogenic disturbance of playas: human impacts on the geomorphic system and geomorphic impacts on the human system. Geomorphology 17: 207–228.

Goldsmith, O.S. 1992. Economic instability in petroleum-based economies. Presented at OPEC/Alaska Conference on Energy Issues in the 1990's. Anchorage AK, July 23-24, 1992.

143

BLM_0149702

Guilliford, A. 1989. Boomtown Blues: Colorado Oil Shale 1885-1985. Niwot, CO: University Press of Colorado.

Harrison, R.T., R.N. Clark and G.H. Stankey.  1980.  Predicting impact of noise on recreationists.  USDA Forest Service, Equipment Technology & Development Center, San Dimas, CA.

Havlick, D.G.  2002.  No Place Distant: Roads and Motorized Recreation on America's Public Lands. Island Press, Washington, D.C.

Haynes, R. W.; Horne, A.L. 1997. Economic Assessment of the Basin. In T.M. Quigley and S.J. Arbelbide (eds.), An assessment of ecosystem components in the Interior Columbia Basin and portions of the Klamath and Great Basins: Volume IV. 1715-1870. USDA Forest Service, PNW-GTR-405, Pacific Northwest Research Station, Portland, OR.

Heller, N. E., and E. S. Zavaleta. 2009. Biodiversity management in the face of climate change: A review of 22 years of recommendations. Biological Conservation 142:14–32.

Hoekstra, T.W., Alward, G.S., Dyer, A.A., Hof, J.G., Jones, D.B., Joyce, L.A., Kent, B.M., Lee, R., Sheffield, R.C., Williams, R. 1990. Analytical tools and information. Critique of Land Management Planning, Volume 4. USDA Forest Service, FS-455. 47 pp.

Hoffman, S.A. and Fortmann, L. 1996. Poverty in forested counties: an analysis based on aid to families with dependent children. In *Sierra Nevada Ecosystem Project: Final report to Congress,* vol. II, *Assessments and scientific basis for management options.* Davis: University of California, Centers for Water and Wildland Resources, 1996.

Humphrey, C.R. et al. 1993. Theories in the study of natural resource-dependent communities and persistent poverty in the United States. In Persistent poverty in rural America., ed. Rural Sociological Society Task Force on Persistent Rural Poverty. Boulder, CO: Westview Press.

Jenkins, C. N., K. S. Van Houtan, S. L. Pimm, and J. O. Sexton. 2015. US protected lands mismatch biodiversity priorities. Proceedings of the National Academy of Sciences of the United States of America 112:5081–5086.

Johnson, J. and R. Rasker. 1993. The role of amenities in business attraction and retention. Montana Policy Review, Vol. 3, No. 2.

Johnson, J.; Rasker, R. 1995. The role of economic and quality of life variables in rural business location. Journal of Rural Studies, 11(4), 405-416.

Keppel, G., K. P. Van Niel, G. W. Wardell-Johnson, C. J. Yates, M. Byrne, L. Mucina, A. G. T. Schut, S. D. Hopper, and S. E. Franklin. 2012. Refugia: identifying and understanding safe havens for biodiversity under climate change. Global Ecology and Biogeography 21:393–404.

Knight, R. L. and K. J. Gutzwiller, editors. 1995. Wildlife and recreationists: coexistence through management and research. Island Press, Washington, D.C.

144

Krikelas, A.C. 1991. Industry structure and regional growth: A vector autoregression forecasting model of the Wisconsin regional economy. Ph.D. Dissertation. University of Wisconsin-Madison.

Krikelas, A.C. 1992. Why regions grow: A review of research on the economic base model. Economic Review. Vol. 77(4).

LaTourrette, T., Bernstein, M., Holtberg, P., Pernin, C., Vollaard, B., Hanson, M., Anderson, K., Knopman, D. 2002. Assessing Gas and Oil Resources in the Intermountain West: Review of Methods and Framework for a New Approach. RAND Science and Technology, Santa Monica, CA. 94 pp.

Limerick, Patricia Nelson; Travis, William; Scoggin, Tamar. 2002. Boom and bust in the American West. Workshop Report. Center of the American West, University of Colorado, Boulder, CO.

Loarie, S. R., P. B. Duffy, H. Hamilton, G. P. Asner, C. B. Field, and D. D. Ackerly. 2009. The velocity of climate change. Nature 462:1052–5.

Loomis, J. 1992. Importance of joint benefits of wilderness in calculating wilderness recreation benefits. In: C. Payne; and others (Eds.) The economic value of wilderness. USDA Forest Service, GTR SE-78, Southeastern Forest Experiment Station, Asheville, NC.

Loomis, J. 1993. Integrated public lands management. Columbia University Press, New York.

Loomis, J. 2000. Economic values of wilderness recreation and passive use: what we think we know at the turn of the 21st century. In: Cole, David N.; McCool, Stephen F. 2000. Proceedings: Wilderness Science in a Time of Change. Proc. RMRS-P-000. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Loomis, J., and R. Walsh. Future economic values of wilderness. In *The Economic Value of Wilderness*, ed. C. Payne et al. Southeastern Forest Experiment Station. GTR SE-78.

Lorah, P. 2001. Population growth, economic security and cultural change in wilderness counties. In: Cole, David N.; McCool, Stephen F. 2000. Proceedings: Wilderness Science in a Time of Change. Proc. RMRS-P-000. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Mace, Britton L. et al., *Aesthetic, Affective, and Cognitive Effects of Noise on Natural Landscape Assessment*, Society & Natural Resources, 12: 225-242, 1999.

Margules, C. R., and R. L. Pressey. 2000. Systematic conservation planning. Nature 405:243–253. Noss, R. F. 1983. A Regional Landscape Approach to Maintain Diversity. BioScience 33:700–706.

Morton, P. 1997. Sustaining recreation resources on the Southern Appalachian National Forests. Journal of Park and Recreation Administration. Vol. (15):4, pp61-78.

Morton, P. 1999. The economic benefits of wilderness: theory and practice. University of Denver Law Review. Volume 76, No. 2 pp. 465-518.

145

BLM_0149704

Morton, P. 2000a. Wildland economics: theory and practice. In: Cole, David N.; McCool, Stephen F. 2000. Proceedings: Wilderness Science in a Time of Change. Proc. RMRS-P-000. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. http://www.wilderness.org/Library/Documents/upload/Wildland-Economics-Theory-Practice-Morton.pdf

Morton, P. 2000b. Wilderness, the silent engine of the west's economy. The Wilderness Society: Washington, DC.

Morton, P., C. Weller, and J. Thomson, 2002. *Energy and western wildlands: A GIS analysis of economically recoverable oil and gas*. The Wilderness Society, Denver, CO and Seattle, WA http://www.wilderness.org/Library/Documents/Energy_WesternWildlands.cfm

Morton, P., Weller, C., Thomson, J., Haefele, M., Culver, N. 2004. Drilling in the Rockies: How much and at what cost? http://www.wilderness.org/Library/Documents/upload/Drilling-in-the-Rocky-Mountains-How-Much-and-at-What-Cost.pdf

Nakata, J. K., H. G. Wilshire, and G. C. Barnes. 1976. Origin of Mojave Desert dust plume photographed from space. Geology 4: 644- 648.

Neff JC, Ballantyne AP, Farmer GL, *et al*. 2008. Increasing eolian dust deposition in the western United States linked to human activity. *Nat Geosci* doi:10.1038/ngeo133.

Nie, Martin A. & Schultz, Courtney A. *Decision-Making Triggers in Adaptive Management*, at 26. Conservation Bio. 1137 (April 2012).

Notaro, M., A. Mauss, and J. Williams. 2012. Projected vegetation changes for the American Southwest: combined dynamic modeling and bioclimatic-envelope approach. Ecological Applications 22:1365–1388.

Opdam, P., and D. Wascher. 2004. Climate change meets habitat fragmentation: linking landscape and biogeographical scale levels in research and conservation. Biological Conservation 117:285–297.

Ordonez, A., S. Martinuzzi, V. C. Radeloff, and J. W. Williams. 2014. Combined speeds of climate and land-use change of the conterminous US until 2050. Nature Climate Change 4:811–816.

Ouren, D.S., C. Haas, C.P. Melcher, S.C. Stewart, P.D. Ponds, N.R. Sexton, L. Burris, T. Fancher and Z.H. Bowen.  2007.  Environmental effects of off-highway vehicles on Bureau of Land Management lands: a literature synthesis, annotated bibliographies, extensive bibliographies, and internet resources.  U.S. Geological Survey, Open-File Report 2007-1353, Reston, VA.

Painter, Thomas H., et al. Impact of Disturbed Desert Soils on Duration of Mountain Snow Cover, Geophysical Research Letters, Vol. 24, L12502 (June 23, 2007).

Painter, Thomas H. Presentation, Colorado River District Water Seminar, September 18, 2009, Grand Junction, Colorado.

Parmesan, C. 2006. Ecological and Evolutionary Responses to Recent Climate Change. Annual Review of Ecology Evolution and Systematics 37:-.

BLM_0149705

Parmesan, C., and G. Yohe. 2003. A globally coherent fingerprint of climate change impacts across natural systems. Nature 421:37–42.

Pearson, R. G. 2006. Climate change and the migration capacity of species. Trends in ecology & evolution 21:111–3.

Pearson, R. G., and T. P. Dawson. 2003. Predicting the impacts of climate change on the distribution of species: are bioclimate envelope models useful? Global Ecology and Biogeography 12:361–371.

Pederson Planning Consultants, 2001. Appendix D in the Wyoming Energy Commission, Preliminary Progress Report to the Wyoming Legislature, Joint Minerals, Business and Economic Development Committee, December 14, 2001. Draft Report commission by the Wyoming Energy Commission. 34 pages.

Peterson, G. L.; Sorg, C. F. 1987. Toward the measurement of total economic value. USDA Forest Service. GTR RM-148. Rocky Mountain Forest and Range Experiment Station, Fort Collins, CO.

Pickett, S., and M. Cadenasso. 1995. Landscape ecology: spatial heterogeneity in ecological systems. Science-AAAS-Weekly Paper Edition 269:331–334.

Power, T. 1995. Economic well being and environmental protection in the Pacific Northwest: a consensus report by Pacific Northwest economists. Missoula, MT: University of Montana.

Power, T. M. 1996. Lost landscapes and failed economies. Island Press, Covelo, CA.

Randall, A.; Stoll, J. 1983. Existence value in a total valuation framework. In: (R, Rowe and L, Chestnut (eds.), Managing Air Quality and Scenic resources at the National Parks and Wilderness areas. Boulder, CO: Westview Press.

Rasker, R. 1994. A new look at old vistas: the economic role of environmental quality in western public lands. University of Colorado Law Review. Volume 52, Issue 2 pp369-399.

Rasker, R., Alexander, B., van den Noort, J., Carter, R. 2004. Public Lands Conservation and Economic Well-Being. The Sonoran Institute, Tucson, AZ.

Richardson, H.W. 1985. Input-Output and Economic Base Multipliers: Looking backward and forward. Journal of Regional Science Vol. 25(4).

Rohlf, D.J. 2004. Science, Law, and Policy in Managing Natural Resources: Toward a Sound Mix Rather than a Sound Bite. Pages 127-142 *in* K. Arabas and J. Bowersox, editors. *Forest futures: science, politics, and policy for the next century*. Rowman and Littlefield, Lanham, Maryland, USA.

Rudnick, D. A., S. J. Ryan, P. Beier, S. A. Cushman, F. Dieffenbach, C. W. Epps, L. R. Gerber, J. Hartter, J. S. Jenness, J. Kintsch, A. M. Merenlender, R. M. Perkl, D. V. Preziosi, and S. C. Trombulak. 2012. The Role of Landscape Connectivity in Planning and Implementing Conservation and Restoration Priorities. Page Issues in Ecology.

BLM_0149706

Rudzitis, G.; Johansen, H. E. 1989. Amenities, Migration, and Nonmetropolitan Regional Development. Report to Nat. Science Foundation, Dept. of Geography, Univ. of Idaho.

Rudzitis, G.; Johansen, H. E. 1991. How important is wilderness? Results from a United States survey. Environmental Management, Vol. (15):2, pp 227-233.

Seager, R., M. Ting, I. Held, Y. Kushnir, J. Lu, G. Vecchi, H. Huang, N. Harnik, A. Leetma, N. Lau, C. Li, J. Velez, and N. Naik. 2007. Model projections of an imminent transition to a more arid climate in southwestern North America. Science (New York, N.Y.) 316:1181–1184.

Shanley, K.W.; Robinson, J.; Cluff, R.M. 2004. Tight-gas myths, realities have strong implications for resource estimation, policymaking, operating strategies. Oil and Gas Journal, August 2, 2004

Simberloff, D. 1998. Flagships, umbrellas, and keystones: Is single-species management passe in the landscape era? Biological Conservation 83:247–257.

Smith, Edward J. 1986. Boom and bust in energy extraction. Agriculture and Rural Economics Division, Economic Research Service, U.S. Department of Agriculture, Washington, DC. Staff Report No. AGES860423.

Stevens, J.B. 1978. The Oregon wood products labor force; job rationing and worker adaptions in a declining industry. Special Report 529, Ag. Exp. Station, Oregon St. Univ., Corvallis OR.

Theobald, D. M. 2010. Estimating natural landscape changes from 1992 to 2030 in the conterminous US. Landscape Ecology 25:999–1011.

Theobald, D. M., K. R. Crooks, and J. B. Norman. 2011. Assessing effects of land use on landscape connectivity: Loss and fragmentation of western U.S. forests. Ecological Applications 21:2445–2458.

Theobald, D. M., S. E. Reed, K. Fields, and M. Soulé. 2012. Connecting natural landscapes using a landscape permeability model to prioritize conservation activities in the United States. Conservation Letters 5:123–133.

Theobald, D. M. 2013. A general model to quantify ecological integrity for landscape assessments and US application. Landscape Ecology 28:1859–1874.

Tiebout, C.M. 1956. Exports and regional economic growth. Journal of Political Economy 64:160-64.

US Congress, Office of Technology Assessment. 1992. Forest Service planning: Accommodating uses, producing outputs, and sustaining ecosystems, OTA-F-505. Washington, DC.

Westec Services. 1979. Fugitive dust impacts during off-road vehicle (ORV) events in the California desert. Westec Services Inc: Tustin, California.

Western Organization of Resource Councils. 1999. Coal-bed methane development: boon or bane for rural residents? Billings, MT.

BLM_0149707

Western Organization of Resource Councils. 2005. Law and order in the oil and gas fields: a review of inspection and enforcement programs for five western states. WORC: Billings MT. 37 p.

Whitelaw, E.; Niemi, E. G.. 1989. Migration, economic growth, and the quality of life, In: Proceedings of the twenty-third annual Pacific Northwest regional economic conference, pp 36-38.

Whitelaw, E., et al. 2003. A letter from economists to President Bush and the governors of eleven western states regarding the economic importance of the west's natural environment. (100 total authors) http://www.econw.com/pdf/120303letter.pdf.

Williams, B. K., R. C. Szaro, and C. D. Shapiro. 2009. Adaptive Management: The U.S. Department of the Interior Technical Guide. Adaptive Management Working Group, U.S. Department of the Interior, Washington, DC.

Williams, P.B. 1998. Considering the role of science within the policy and planning process for the Grand Staircase-Escalante National Monument.  In: Learning from the Land: Grand Staircase-Escalante National Monument Science Symposium proceedings. Hill, L.M. and Koselak, J.J. (eds.) 455-465. U.S. Dept. of Interior, Bureau of Land Management, Grand Staircase-Escalante National Monument, BLM/UT/GI-98/006+1220.

BLM_0149708



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Proposed RMP comments
1 message

**mark waltermire** <thistlewhistlefarm@gmail.com>                                    Tue, Nov 1, 2016 at 2:03 PM
To: uformp@blm.gov

To Whom It May Concern:

I am writing to comment on the BLM's UFO proposed RMP and to state my support for alternative B1, the North Fork Alternative.

My family and I run Thistle Whistle Farm near Hotchkiss, a small organic farm marketing mainly vegetables to locals, surrounding mountain communities, and to the front-range. Our farm activities include a wide range of educational programs for locals and to groups and individuals from around the state and beyond. Our success as a small farm comes from our reputation for high-quality, chemical-free produce, grown in a relatively pristine environment with clean air, water and soil. Our success as a farm-education destination comes from this same reputation.

The North Fork Alternative, alternative B1 in your proposed RMP, incorporates the best mix of land-use values that will protect our livelihood here. Any threat, and for marketing purposes even a perceived threat, will hamper our ability to operate our farm, attract visitors and educational programs, and to effectively market our produce.

I urge the BLM to adopt alternative B1 in its RMP, the alternative that will best guide the BLM's decisions for the lands surrounding the North Fork Valley.

Sincerely,

Mark Waltermire
Thistle Whistle Farm
10872 3500 Rd.
Hotchkiss, CO 81419
970-623-5015

BLM_0149709



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comments on the Draft Resource Management Plan and Environmental Impact Statement

1 message

**Ralph D'Alessandro** <rdinca@yahoo.com>                                              Tue, Nov 1, 2016 at 3:51 PM
Reply-To: Ralph D'Alessandro <rdinca@yahoo.com>
To: "uformp@blm.gov" <uformp@blm.gov>

Attached please find the above-identifed submission.

Ralph D'Alessandro
36291 Sunshine Mesa Road
Hotchkiss, CO 8419

 **RMP DEIS Comment Ltr.docx**
34K

BLM_0149710

36291 Sunshine Mesa Road
Hotchkiss, CO 81419
November 1, 2016

Bureau of Land Management
Colorado State Office
Montrose District Office
Uncompahgre Field Office
2815 Youngfield St.
Lakewood, CO 80215

Submitted electronically to uformp@blm.gov

Cc:
Ruth Welch, Colorado State Director, Bureau of Land Management, rwelch@blm.gov
Joe Meyer, District Manager, Southwest District of Colorado, BLM, jmeyer@blm.gov
Teresa Pfifer, Field Manager, Uncompahgre Field Office, BLM, tpfifer@blm.gov

RE: Draft Uncompahgre Field Office Resource Management Plan Public Comments

Dear Ruth Welch, Joe Meyer, and Teresa Pfifer:

Please accept these comments on the draft Uncompahgre Field Office Resource Management Plan. I appreciate the substantial effort and amount of time that must go into creating a new Resource Management Plan for the Uncompahgre Field Office and submit the following comments to address areas that I feel need to be addressed either more fully or initially.

I do not feel any of the alternatives adequately address all of the issues, especially not Alternative A, the no action alternative. Nor does Alternative D, the preferred alternative, adequately protect the resources and economy of the Uncompahgre Field Office (UFO) area. The inclusion of Alternative B1 in the options signifies its validity as a conservation based plan and suggest, with the below comments, that it be incorporated into Alternative D. Alternative C also largely emphasizes mineral extraction without the needed protections for water sources and consideration of the impact of such extraction on the local economies that would be affected. Selected comments relating to issues important to agriculture touched on in Alternative C are identified individually and presented for incorporation also into Alternative D.

References hereafter to specific line items will be by Volume II, line #, Action sub-line # and Alternative, for example **Page 2-16, line 19 B** to direct to Table 2-2, Climate line 16, Action sub-line 19 in Alternative B.

Specifically, there is inadequate protection in Alternative D for the springs that provide domestic water companies their water to serve their customers, especially in areas where oil and gas exploration and extraction would be permitted on lands lying above such source springs to protect those down slope springs whose water flow could be affected by drilling and hydraulic fracturing, potentially altering the water flow path to such springs. Those immediately overlying areas should be designated as No Leasing (addressed in **Page 2-28, line 55 in B1**). Additionally, passage through such overlying areas to areas where leasing is permitted should be via Controlled Surface Access.

Land with deer and elk winter concentration areas, such as the areas above and on Sunshine Mesa in Hotchkiss, should be protected from oil and gas exploration and extraction to inflict minimal disruption on the wildlife (addressed in **Page 2-111, line 114 B1**). Additionally the parturition protective provisions

BLM_0149711

in **Page 2-111, line 114 B** should be incorporated into Alternative D.   This is especially important in those prime hunting areas, such as exist in Delta County, where substantial revenue is derived from wildlife hunting.

Similarly, wildlife migration routes should not be disturbed by oil and gas exploration and leasing, such as that which exists across the BLM lands across Sunshine Mesa and across Highway 133 in Hotchkiss where a herd of 250 elk, sometimes split into two groups, has been a regular resident of this area for the past 11 years during which I have lived in the area and personally observed them, regardless of whether the Colorado Department of Wildlife recognizes this area as such. Hence, I think a no leasing designation is appropriate in such specific areas, imposing a more restrictive provision than the stipulation provided in **Page 2-111, line 114 B1**. If this restriction is not applied, then at a minimum the aforementioned stipulation should be incorporated into Alternative D.

Selenium control is an area that appears to save received too little consideration in areas where there are steep slopes of 30% or greater. The Selenium Task Force and those individuals and organizations working on the Selenium Management Plan in the UFO area have worked hard to reduce the addition of selenium into the rivers and tributaries that feed the Colorado River. In accordance with the existing agreement with the BLM and other federal agencies (ex. BOR), I believe Controlled Surface Use is appropriate for areas adjacent high selenium soils and No Surface Occupancy is appropriate for areas with steep slopes in selenium soils addressed as a stipulation in **Page 2-28, line 40 B1** and should be incorporated into Alternative D. I also advocate the incorporation into Alternative D the provisions in **Page 2-28, line 34 B1** to address the selenium soil issue comprehensively.

I advocate the incorporation of the actions and allowable uses of Alternative B1 into Alternative D, and where in conflict, replace those of Alternative D at the following locations in Table 2-2 according to the method noted above:

> **Page 2-28** (Soils and Water Uses), **lines 34 B1, 35 B1, 40 B1, 44 B1, 45 B1, 47 B1, 50 B1, 55 B1 56 B1**
>
> **Page 2-73** (Vegetation, Riparian), **line 81 B1**
>
> **Page 2-111** (Terrestrial Wildlife), **lines 114 B1 and 115B1**
>
> **Page 2-145** (Special Status Fish and Aquatic Life) **lines 148 B1 and 149 B1**
>
> **Page 2- 161** (Special Status Terrestrial Wildlife – Gunnison Sage Grouse) **line 166 B1,** plus include language that allows for range improvements, which could be excluded if the language of Alternative C reference permanent structures were to be adopted
>
> **Page 2-248** (Visual Resources) **lines 253 B1 and 257 B1**
>
> **Page 2-319** (Coal) **line 319 B1**
>
> **Page 2-330** (Fluid Minerals) **lines 333 B1 – 338 B1** plus incorporate the restriction of Alternative B relative to a NSO stipulation for saline/selenium soils and slopes of 30 percent or greater from Alternative B in **line 336**
>
> **Page 2-524** (Areas of Critical Environmental Concern) **line 532 B1**

The analysis of climate change impacts caused by the different alternatives does not appear to be included in the draft. Specifically there does not appear to be any analysis of the $CO_2$, methane and ozone effects from oil and gas leasing. An area such as the North Fork Valley bounded by the West Elk Mountains on the east and the Grand Mesa on the west already has high ozone concentration. The topography of the alley will trap and hold gaseous emissions so the analysis of at least the above identified gases should be made to better understand the impact on air quality. This has recently been identified as an air quality issue especially with respect to ozone for oil and gas exploration and extraction on BLM lands in Utah near the Colorado border (see Grand Junction Daily Sentinel Monday, October 3, 2016).

BLM_0149712

I request that my specific comments be considered and that this submission preserve my rights to participate in further review of the eventual final UFO Resource Management Plan.

Respectfully submitted.

Ralph D`Alessandro

11/2/2016                                 DEPARTMENT OF THE INTERIOR Mail - rmp comment



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

# rmp comment
1 message

---

**Bill Day** <billday@paonia.com>                                    Tue, Nov 1, 2016 at 4:08 PM
To: uformp@blm.gov

   Attached are my comments on the RMP.  Thanks,

   Bill Day

---

 **BDay uformp comments nov2016.docx**
16K

---

BLM_0149714

Nov 1, 2016

RE: UFO RMP comments

Thanks for your work on the UFO draft RMP. I have been involved in the RMP process for several years as a member of the RMP subRAC and a member of several local organizations. I have lived in Ouray and Delta Counties since 1985, and am familiar with most of the area.

While most of alt B looks really good, it is disappointing that many of the best parts of alt B are not in the preferred alt D. For the final RMP to be a successful forward looking plan, I believe the following items must be addressed:

- All of the EEAs (line 103) from alt B need to be in the final RMP.  They need to maintain their size and management from B, also. These areas can preserve much of the remaining connectivity for wildlife, even with changes in climate. These areas should have NSO and NGD stips.  Motorized recreation should be planned to avoid the EEAs, which the draft RMP mentions regarding placement of SRMAs over EEAs at p 4-135.
- Most of the ACECs from alt B and should be in the final preferred alt. It is disappointing to see the acres of ACECs cut from 216k down to 51k in alt D. I realize some of these may still receive lesser protection as EEAs or various SRMA zones, but this leaves too many important areas with little protection. La Sal and Tabeguache deserve strict protections under some designation. Adobe needs some level of protection over its entire area.
- I can't see why the UFO would not to manage all of the remaining LWCs to protect their wilderness character. If there is a reason to downgrade any areas, they should at least be managed as ACECs or similar management with another name.
- The total acres of NGD, NSO and No Lease are fine in alt B-and especially good in B1- and surprisingly low in alt D. These don't even look like compromises, but allow very large parts of the UFO to be degraded. The draft RMP admits that local economies benefit more from protected land and recreation than from industrial uses.

I could have gone into more line by line details, but just want to emphasize-as the UFO obviously understands- that the connectivity and core areas of natural habitat are critically important for wildlife and for many human uses. Planning for these areas over large scales and long time periods is one thing that will make a real difference over the life of the plan.

Sincerely,

Bill Day

Hotchkiss, CO

billday@paonia.com



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Alternative B1
1 message

---

**twandcj@aol.com** <twandcj@aol.com>                    Tue, Nov 1, 2016 at 3:27 PM
To: uformp@blm.gov

Please consider supporting alternative B1 in your plan for leasing drilling rights.
We live on Pitkin Mesa overlooking one of the most beautiful and productive valleys in Colorado.  We enjoy some of the best domestic water that comes from springs off of the Grand Mesa.
We would hate for this valley and its way of life to be spoiled by gas or oil drilling.
Our riches come from the beauty and quiet serenity of an unspoiled surroundings.  Not from the money that can be made from the retrieving of fossil fuels.
Please consider ALTERNATIVE B1 in your planning.
Thank you.
Claudia Henshall
15360 Amsbury Road
Paonia Colorado 81428

---

BLM_0149716

11/2/2016                                      DEPARTMENT OF THE INTERIOR Mail - comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## comments
1 message

**Pete Kolbenschlag** <pete@mountainweststrategies.com>          Tue, Nov 1, 2016 at 4:31 PM
To: uformp@blm.gov
Cc: info@theconservationcenter.org

Please accept the attached comments on the UFO RMP revision.

Pete Kolbenschlag
970-527-7469

📄 **ufocomments.kolbenschlag.pdf**
177K

BLM_0149717

Pete Kolbenschlag
229 HWY 133
Paonia, CO 81428

Teresa Pfifer, Acting Field Office Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401

### Re: Draft Environmental Impact Statement—UFO RMP revision

Dear Ms. Pfifer and RMP Revision Team:

Please accept and fully consider these comments on the draft Environmental Impact Statement (EIS), and as appropriate for inclusion into the Bureau of Land Management (BLM)'s final revised Resource Management Plan (RMP) for agency lands and minerals in the Uncompahgre Field Office (UFO).

Thank you for this opportunity and for including the North Fork Alternative Plan as Alternative B1 in the analysis. I was a primary author of the original document submitted to the BLM that was the basis for that alternative. These comments are submitted on my own behalf, as that author, as an environmental professional, as a long time public lands advocate, and as a 16-year resident of the North Fork Valley.

My domestic water comes via the Pitkin Mesa Pipeline Company. My irrigation water comes from Farmers' Ditch. Both these water sources could be impacted by agency decisions and by activity on BLM lands and/or minerals. Living along Colorado State Highway 133, breathing the air, and appreciating the beauty of my surroundings, I also am adversely affected by oil and gas traffic and the overall industrialization it brings to the valley, indirectly and in a cumulative manner. I feel a strong ethical commitment to protecting the quality of the local environment, including maintaining its healthy wildlife populations. I regularly recreate and otherwise enjoy, find solitude on and solace in, the BLM lands in and around the North Fork, and across the UFO.

### I.    B1: BLM Should Adopt the North Fork Alternative Plan ... Or It Must Go Back to the Drawing Board

Only DEIS Alternative B1 comes close to providing the proper management

Regarding oil and gas leasing and development in the North Fork area (and other than a plan that closes the area to oil and gas leasing altogether, which is not included for analysis in the DEIS), I support Alternative B1; and then the general provisions of Alternative B (or as otherwise indicated throughout these comments).[1]

Alternative B1 is derived from a detailed document developed over an 18-month period by stakeholders, organizations and individuals from the North Fork Valley, and supported by local governments.[2] The community-based proposal was submitted to the Uncompahgre Field Office of BLM in December 2013.[3]

---

[1] These comments will argue that BLM should have included a fuller range of alternatives in its analysis, that would better present lawful options to the decisionmaker and which would result in significant differences in type, level and scope of impacts that are likely not properly captured in the current DEIS. However, a final plan that adopts Alternative B1 and a strengthened Alternative B otherwise in the resource area is the best approach of those considered in the DEIS.

[2] *The North Fork Alternative Plan: A Proposal to the BLM for Managing Oil and Gas Development in the North Fork Valley, Citizens for a Healthy Community, Western Slope Conservation Center, et. al.* December 2013.

[3] "North Fork Submits Community-based Management Plan to the BLM," News release, December 4, 2013. Online at www.citizensforahealthycommunity.org/wp-content/uploads/2013/12/North-Fork-Community-submit-Alternative-Plan.pdf

---

2                                                                                                          Pete Kolbenschlag

The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area (DEIS I 2-7).

Considering Alternative B1, and given the unique quality of the resources at stake from the agency's land use decisions; comparing the management outlined for oil and gas leasing and development under the alternatives, only B1 provides the level of protection warranted.[4]

Finally, it must be noted that the agency-identified Preferred Alternative (Alternative D) is especially unacceptable for the North Fork Valley; and that other deficiencies in the draft RMP/EIS could leave the agency especially vulnerable to challenge, especially under a management regime like that proposed for Alternative D.

### A.   B1: Community Proposal for Oil and Gas Leasing and Development in the North Fork Valley

Alternative B1 reinforces broader community-wide efforts to establish a more resilient, place-based economy in Delta County. A local government commissioned 2015 Better City report for Delta County reinforces what the stakeholders who crafted the NFAP have long maintained: Economic resiliency and growth in the North Fork Valley depends more on safeguarding the area's natural resources than exploiting them.

> Delta County is home to a number of unique resources, attributes, organizations, and conditions that help differentiate it from other communities. The County is home to natural attractions including two rivers, the Grand Mesa National Forest, and two National Conservation Areas. The County enjoys a more temperate climate than the majority of the state, has a large amount of farmland, and has access to water resources and clean air.  ... Although its coal deposits remain a vital asset for the community, they are not a source of future growth.[5]

B1 sets out to protect features that make the North Fork Valley both beloved and unique. B1 would place 75% of the North Fork area into a No Leasing category, impose strict nonwaivable, nonmodifiable No Surface Occupancy stipulations on an additional 20% of the area, and manage the remaining 5% of the BLM lands/minerals under Controlled Surface Use stipulations.[6]

The community-submitted NFAP considered oil and gas leasing and development for BLM lands and BLM-administered minerals under private/nonfederal lands ("split estate") and it imposed protective measures for six key resources, plus management designations for recreation areas and visual resource protection.[7] For these comments, those can be simplified as those that contribute to the North Fork's character of place, water supply, wildlife habitat, and recreational opportunities. B1 includes the strongest protections for the valley's scenic features and its visual and rural character. B1 provides the strongest protection for the North Fork's water supplies. B1 provides the strongest protections for fish and wildlife habitat, including threatened, endangered, and sensitive species. B1 best ensures the valley's recreational assets will not be diminished by ill-conceived oil and gas development.

---

[4] See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22.

[5] Economic Development Strategic Plan Executive Summary Delta County, CO prepared by Better City, 2015. Available online at www.deltacountyed.org/resources/Documents/EDA%20Study%20Summary%202016.pdf

[6] DEIS at Volume II 4-276

[7] "Executive Summary," North Fork Alternative Plan. Citizens for a Healthy Community, et al. December 2013.

---

BLM_0149718

3                                                                 Pete Kolbenschlag

*1.  Character of place.*

The North Fork Valley is a unique landscape and its scenic features, rural communities, and bucolic charm are critical components of the area's economy. The character of place includes its sense of health and well-being, clean living, fresh water, healthy land. Public health considerations, the known impacts to air quality, water quality, and other health factors that oil and gas development can contribute to are not to be understated.[8]

Character of place relies on healthy communities and vibrant economies, and the rural, farm-based settlement of the valley. I urge the agency to adopt—at a minimum—the following stipulations for oil and gas in the North Fork to protect current and emerging economic activity, and to provide setbacks from communities and community facilities: NL-13 Coal leases;[9] NSO-68 Community facilities; and NSO-3 Agricultural operations. Given the high importance of protecting the area's visual features and sensitive landscapes I support the VRM classifications in Alternative B1, and the following stipulations: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors; NSO-7 Major river corridors; NSO-5 High geologic hazards; CSU-47 Vistas; CSU-7 Moderate geologic hazards.[10]

*2.  Water supply.*

Protection of the valley's water supply relies on preventing pollution, protecting source water areas, protecting water bodies and riparian areas, and protecting water systems. The combination of individual wells, private and public water companies, with source water areas ringing the valley—safeguarding domestic water supplies are a top concern. Colorado agriculture depends on irrigation. Organic agriculture, specialty crops and high quality hay all depend on abundant water, free from contamination. Irrigation in the valley relies on an interconnected series or canal, ditches and wall water impoundments. Surface contamination and spills, which occur regularly in oil and gas fields, could spread rapidly though the irrigation systems that water the valley.[11]

Drilling is known to contaminate water supplies, both above and below ground, and to harm water bodies, rivers and source areas.[12] That is a risk too great for many operators in the valley, home to Colorado's highest concentration of organic farms, an agritourism haven, and major headwaters to the Colorado River system.

To protect water supplies I urge the BLM to adopt the following stipulations into the final revised RMP. Where other alternatives provide better protection than B1, and where those stipulations overlap, I recommend that the more protective stipulations apply. I support—at a minimum—the following stipulations for oil and gas leasing and development in the valley: NL-1 Selenium soils; NL-3 Major river corridors; NL-4 Water bodies; NL-6 Public water supplies (*Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NSO-15 Domestic wells and water systems; NSO-55 Bureau of Reclamation dams & facilities (*Alts. B, C, D); NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-2 Selenium soils; NSO-7 Major river corridors.

[8] Intermountain Oil and Gas BMP Project: Public Health. Online at www.oilandgasbmps.org/resources/public_health.php  See the Grand Junction Daily Sentinel, "Ursa holds off on plan to drill close to school," October 6, 2016.

[9] Re: Agency comment at DEIS Volume II 4-276: We think that the NL-Coal lease areas can be made available for Coal Mine Methane capture by classifying them as 'Leasable' and stipulating that is only in conjunction with an approved coal mine methane capture/utilization facility. This would also have a climate benefit.

[10] NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B1 cannot be waived, modified or excepted.

[11] "Oil and gas companies in Colorado reported 615 spills in 2015," Denver Post March 17, 2016. Online at www.denverpost.com/2016/03/17/oil-and-gas-companies-in-colorado-reported-615-spills-in-2015/

[12] "Stanford scientist weighs the risk of groundwater contamination from oil and gas wells," Stanford News: February 8, 2016. Article online at http://news.stanford.edu/2016/02/18/aaas-jackson-water-021816/

4                                                                 Pete Kolbenschlag

*3.  Wildlife habitat and migration routes.*

The North Fork Valley is a wildlife haven. The BLM lands in and around the valley provide for an abundance and diversity of wildlife, from moose, bear and lynx in the upper reaches, to Gunnison sage grouse, Yellow-bill Cuckoo, fox and coyote in the bottomlands—which are critical winter range for herds of elk and deer. Waterbodies and riparian areas provide important habitat and travel routes for a variety of species. Upland migration routes and connectivity are critical elements to maintaining healthy populations, from endangered and sensitive species to big game. Specific habitat areas—nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the strongest protections.

Wildlife have been utilizing the valley for millennia. Colorado Parks and Wildlife, in previous comments on the cancelled 2011-12 lease sale, emphasized the importance of protecting the critical winter habitat that covers the valley, and of protecting migration routes that connect this winter range with uplands and calving areas.

In cases where species or habitat management plans, other considerations, or other alternatives in the draft RMP/EIS propose stronger protections for resources than in Alternative B1, I prefer the stronger stipulation, as noted in the following, which I urge the BLM to adopt into its final revised RMP: NL-4 Waterbodies; NL-3 Major river corridors; NL- NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.

*4.  Recreational opportunities and access.*

The North Fork is a public lands paradise, nestled among national forest, park and conservation lands managed by the Forest Service, National Park Service, BLM and the State of Colorado.[13] Hunting is a mainstay that brings large revenue for western Colorado coffers. The economic contributions made by maintaining healthy and abundant fish and wildlife populations are substantial. Hunting and fishing are multimillion dollar industries in the region, estimated at over $80 million annually (in 2007) for the two counties.[14] The CPW comments emphasized the economic importance of protecting this habitat for the hunting opportunities provided.[15]

Public lands recreation is a multi-billion-dollar industry on Colorado's public lands, and forms the basis for tourism based economies, and is a draw for new residents, new business, and new economic opportunity.[16] Recreational opportunities surround the North Fork's homes, farms and communities – from those provided by the public lands directly, to the indirect benefit the scenic nature of the area provides for tourists and visitors. The rivers, nearby trailheads, unique public lands features, mountain biking and hiking opportunities, together with the scenic landscape wound together with farm roads, wineries, and rolling hayfields.

The following stipulations provide protection for recreational areas and amenities, and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mnt SRMA (with VRM Call II).

[13] DeltaCountyColorado.com – Public Lands: Diverse Destinations at www.deltacountycolorado.com/public_lands/

[14] Ibid.

[15] Colorado Park and Wildlife comments on March 2012 oil and gas lease sale, February 3 2012.

[16] Ray Rasker, Patricia H. Gude, and Mark Delorey, "The Effect of Protected Federal Lands on Economic Prosperity in the Non-metropolitan West," Headwaters Economics, 2013. Online at http://headwaterseconomics.org/wphw/wp-content/uploads/ProtectedPublicLands_Manuscript_2012.pdf

BLM_0149719

**B. Alternative B1 Includes Reasonable but Strong Management for the North Fork**

Even in comparison to Alternative B, which is the most conservation-oriented full alternative in the DEIS, when considering the North Fork none of the alternatives come close to the protection offered in B1.

*1. B1 Best Meets Agency Obligations & Public Need*

B1 best protects North Fork resources and is within the scope of agency authority. The DEIS notes that:

> Implementing actions from any of the RMP alternatives would be in compliance with all valid existing rights, federal regulations, BLM policies, and other requirements.  (DEIS II 4-2)

Alternative B1 would be highly protective of the North Fork Valley but leave most of the UFO administered lands and minerals, and Colorado BLM lands and federal minerals, open to oil and gas leasing. B1 barely impacts the federal mineral estate, and fulfills the purposes of all public lands and resource laws.

The Federal Lands Policy and Management Act (FLPMA), often described as BLM's "Organic Act," establishes public lands policy that, among other things, sets it as law that:

> (7) ...management be on the basis of multiple use and sustained yield unless otherwise specified by law; (8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use; and that
> (12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber...

Under the Mineral Leasing Act the BLM is given the authority to decide which of its lands are available for oil and gas leasing, as well as which lands to lease in any quarterly oil and gas lease sale. [17] While the BLM is obligated to manage the public resources it administers according to the Multiple Use/Sustained Yield Act, B1 not only meets the requirements of that law, but is actually the best DEIS alternative for doing so:

> The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

[17] 10th U.S. Circuit Court of Appeals, WESTERN ENERGY ALLIANCE v. KEN SALAZAR, No. 11-8071 March 12, 2013. Online at www.eenews.net/assets/2013/03/13/document_ew_01.pdf

In the case of Alternative B1 the management stipulations proposed do best meet the "present and future need" of the American people; best make judicious use of the lands for a variety of purposes both within the North Fork area and across the resource area; best balances use, not allowing all uses on all lands in a manner that accounts for the needs of future generations, for recreation, watershed, wildlife and fish, natural scenic, scientific and historical values, range, timber, and minerals; and that best avoids impairment of the public land resources in consideration of their relative value, according to the analysis provide by the DEIS itself.

Alternative B1 is the only DEIS alternative that would impose an acceptable level of protection. Only Alternative B1 closes to leasing areas with the most severe selenium loading problems, area within a half mile of rivers and riparian corridors, water bodies and waterways, areas around communities and community facilities, and for protection of the valley's exceptional scenic qualities. Only B1 includes stipulations that are not waivable or modifiable, for features and resources such as agricultural operations, moderate and high geologic hazards, critical wildlife habitat, unstable geology, irrigation facilities, and recreational lands.

Alternative B1 provides the best protections for the resources that the agency is obligated to protect including their "scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." And it provides the strongest management for those resources and features that most members of the public favor protecting.

Climate change is another matter but one that he BLM is fully obligated to address. Recent guidance from the White House Council on Environmental Quality (CEQ) makes it clear that climate change is a "fundamental environmental issue, and its effects fall squarely within NEPA's purview." [18]

This analysis, of course, is not supposed to be an agency afterthought but an importance part of the comparative analysis that allows the decision maker and the public the opportunity to compare management choices and outcomes. The guidance sets out how agencies and departments should use NEPA to fully account for, compare management outcomes that pertain to, and manage for climate change. The CEQ guidance notes:

> Analyzing a proposed action's GHG emissions and the effects of climate change relevant to a proposed action—particularly how climate change may change an action's environmental effects—can provide useful information to decision makers and the public.

Alternative B1 is not only the least harmful to our climate of any of the action alternatives (Alts. B,C,D), it is the only action alternative projected to contribute less to greenhouse gas emissions than Alternative A (No Action/Continuation of Current Management) according to the DEIS. [19] B1 also has the added benefit of doing most to ensure natural system resiliency to the effects of climate change (DEIS II 4-114 and 4-151).

The CEQ guidance, of course, only states the obvious. That the best available science shows climate change is real, that it has significant impacts to people, public lands and resources, and that use of fossil fuels—including coal, natural gas and oil development and consumption—is the leading contributor to the pollution driving this planetary crisis. This all means that the agency is required to have considered this sort of data and analysis prior to and regardless of the CEQ guidance (or its issuance date).

[18] Council on Environmental Quality: MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES - *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews*, August 1, 2016.
[19] Table 4-10, DEIS II 4-39

Although the overall analysis (and range of alternatives) is limited in the DEIS, and quite likely deficient, only B1 makes progress—small though it is—toward management that slows our climate impacts rather than accelerates them. And simply put oil and gas leasing in the North Fork is simply not needed.

*2. B1 Would Not Significantly Impact Energy Development in United Sates or Western Colorado*

The North Fork sits at the southern edge of the gas-rich Piceance Basin, recently subject to an updated USGS estimate for the shale resource that sits beneath the sandstone formations previously targeted.[20] There are hundreds of thousands of public lands already leased in the Piceance Basin.[21] Hundreds of thousands of additional acres are owned outright or otherwise under control of the oil and gas industry, including major companies like ExxonMobil.[22] These lands in the Piceance Basin provide an inventory that offers decades of suitable sites for drilling.[23] The relative size of the resource in the portion of the North Fork that overlaps the Piceance Basin is miniscule in comparison. Moreover, there is a natural gas glut, and the resource's abundance is certainly projected far beyond the life of this resource management plan.[24]

Alternative B1 would have no impact on currently leased federal minerals, and a negligible impact on minerals overall. B1 would likely not affect energy production in the region. B1 would "best meet the present and future needs of the American people," as well as the most responsible choice of those presented in the DEIS.

Given that impact from B1 on oil and gas resources is insignificant while the public benefit of not developing these lands is significant; and that impacts from oil and gas development are reduced across the board under B1 while the overabundance of gas remains unchanged; then closing most, or even all, of the North Fork to oil and gas leasing is more than just a reasonable course of action. On the other hand, leasing in the North Fork is not in the public interest. While drilling in the North Fork would not significantly alter the amount of gas available in the region over the life of the plan, it would bring unwanted impacts to the valley and threaten real harm.

**C.  Only B1 Provides Adequate Management for the North Fork**

Alternative B1 has the support of many residents, area businesses, organizations and associations, local governments, water companies, irrigators, farmers, ranchers and others. That is because the resources that the public, myriad stakeholders, local governments, and resource professionals have all urged be protected are in fact best protected by B1.

The superior management that B1 provides includes better protections for special status species, delicate soils, sensitive landscapes, recreation, visual resources, habitat, water resources, new economic activity, agriculture, communities, public health, river systems, and other features of the valley. B1 provides the level of protection that best meets the needs of the public and best protects the public's resources.

---

[20] "40 Times More Natural Gas Underground in Colorado's Piceance Basin, USGS Report Finds," Colorado Public Radio, June 29, 2016. Online at www.cpr.org/news/story/40-times-more-natural-gas-underground-colorados-piceance-basin-usgs-report-finds

[21] "Oil & Gas Development Proposed RMPA/FinalEIS," White River Field Office-Powerpoint for RAC, June 4 2015. Online at www.blm.gov/style/medialib/blm/co/resources/resource_advisory/northwest_rac/minutes.Par.30953.File.dat/WRFO%20Presentation%20to%20RAC_6.4.15a.pdf

[22] "Piceance," ExxonMobil at http://corporate.exxonmobil.com/en/energy/natural-gas/operations/piceance

[23] "E&P startup agrees to buy WPX's Piceance unit for $910 million," Oil and Gas Journal, 2/15/16. Online at http://www.ogj.com/articles/print/volume-114/issue-2b/general-interest/e-p-startup-agrees-to-buy-wpx-s-piceance-unit-for-910-million.html

[24] "Shale gas production drives world natural gas production growth," U.S. Energy Information Administration August 2016. Online at www.eia.gov/todayinenergy/detail.php?id=27512

---

**II.     B1 Comes Closest to Protecting What Matters in the North Fork, Other Alternatives Fail**

<u>B1 best protects the North Fork even when contrasted with the conservation-oriented Alternative B</u>

B1 provides management to safeguard the valley's character, water, wildlife, and recreation. Adoption of B1 will not significantly affect the number of oil and gas jobs available regionally, the numbers of rigs operating, or the amount of energy being produced but it does offer the best protections for the critical resources of the valley.

**A.  Character of place: visual resources, healthy communities, farms, landscapes, river corridors**

The scenic qualities of the valley are a driving force for business, for increasing property values, a force behind the burgeoning creative economy, a central ingredient to the marketing of bed and breakfasts, wineries, retreat centers, guest ranches and numerous other ventures. Other community issues include loss of dark sky, increased traffic, noxious odors, property values, and harm to reputation. Public health impacts are another top concern.

In considering North Fork visual resource management (VRM) classifications specifically, under Alternative B1 over 82,218 acres are classified as either the VRM I or II, the most protective. Under Alternative B only 15,824 acres in the North Fork fall into VRM I or II.[25] And B1 not only protects more acres than alternative B, but it also applies stronger stipulations to do so.[26] B1 includes NSO setbacks from community facilities, including schools, recreation facilities, and parks (NSO-68).[27] B1 reduces these threats from poor air quality.[28]

The BLM analysis anticipates "increased benefit to non-extractive uses in [the North Fork]" under Alternative B1 (DEIS II 4-473). This is, of course, exactly what economic experts recommend for the North Fork, including the Better City report.[29] That report also goes on to highlight the area's agricultural industry and heritage as a strong sector upon which to build for a more diverse economy.[30] Impacts from oil and gas development on agriculture and ranching operations would lessen under B1.[31] Importantly B1 is also the most protective of the valley's water supply including irrigation facilities.

**B.  Water supply: river system, waterbodies, private wells, water systems, public water source areas, irrigation facilities**

B1 is also more protective generally of water supply resources, as noted at DEIS II 4.90. And Alternative B1 is the most protective of the river corridors.[32] The river systems, riparian corridors, and other water resources are important not only to the character of place and the water supply, but also for all life in the valley. The rivers in the area provide broad benefit, including to the valley's character, water supply, wildlife habitat, and recreational opportunities.

---

[25] Acreages developed from analysis of GIS data downloaded from BLM.

[26] DEIS II 4-208

[27] If stipulation NSO-67 (Alt. B) for "high occupancy buildings," provides protections beyond B1; then we recommend it be carried forward as well.

[28] DEIS II 4-21

[29] "New Study Repeats Changing of Delta County Economic Basics," Merchant Herald, 11/12/15. Article online at www.merchantherald.com/new-study-repeats-changing-of-delta-county-economic-basics-new-study-repeats-changing-of-delta-county-economic-basics/

[30] "Better City presents economic development visions for Delta, Gunnison Counties," Region 10 Website, article at www.region10.net/better-city-presents-economic-development-visions-for-delta-gunnison-counties/

[31] DEIS II at 4-69

[32] DEIS II 4-117

BLM_0149721

### C.  Wildlife habitat and migration: wildlife and species habitat, floodplains riparian areas

Protecting the abundant wildlife populations is a top priority and main component of the North Fork Alternative Plan. Overall fish and wildlife protections in B1 are the strongest proposed (DEIS II 4-154,) including for the native Colorado River cutthroat trout (DEIS II 4-155). B1 best protects riparian corridors, which are critical components in the habitat systems in the valley (DEIS II 4-116). And the stronger management in B1 include more protection for the valley's special status species (DEIS II 4-155).

### D.  Recreation areas and access: river access, hunting opportunities, visual resource protection, Jumbo Mountain SRMA

Alternative B1 best preserves the valleys river corridors and riparian areas, which is important to protecting the valley, its water supply, and its wildlife, and for the recreational opportunities provided. Alternative B1 provides the strongest protections overall for recreational access, resources, and opportunities in the North Fork, and for the features in the valley that help drive tourism.

The Jumbo Mountain area is important to the Town of Paonia and to many who recreate and live in the valley. Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo Mountain as a SRMA, with B1 acreage and stipulations. Under B1 all 5,020 acres of the Jumbo SRMA would have NSO stipulations, rather than only a slice as under Alternative B (DEIS II 4-306).

These stronger protections for public land resources like Jumbo Mountain benefit recreation directly, and recreation benefits from the stronger protections in B1 indirectly in many cases, for example through strong fish and habitat protections under B1 that enhance hunting and fishing opportunities and preserve river access.

### III.      Range of alternatives lacking, analysis too narrow

Lack of robust range of alternatives limits analysis and management choices

Regarding oil and gas development, as well as in other matters, the analysis offered is limited by the somewhat narrow range of alternatives in the draft EIS. A range of alternatives should represent the full suite of choices available to the decision-maker. This allows the decision-maker to consider all her options to best protect the resource while meeting other agency priorities.

Take the climate change impact analysis in the DEIS, for example, to highlight the limited range of alternatives considered. While B1 provides some contrast, due to its restrictions on oil and gas leasing, the alternatives otherwise present very little range in outcomes for the decision-maker or public to consider when it comes to this "fundamental" environmental issue. The August 2016 CEQ Climate guidance stresses the importance of a range of analysis in the alternatives considered, and notes:

> NEPA calls upon agencies to use the NEPA process to "identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." The requirement to consider alternatives ensures that agencies account for approaches with no, or less, adverse environmental effects for a particular resource.[33]

[33] CEQ: *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews*, August 1, 2016.

And that:

> Consideration of alternatives also provides each agency decision maker the information needed to examine other possible approaches to a particular proposed action ... that could alter the environmental impact or the balance of factors considered in making the decision. Agency decisions are aided when there are reasonable alternatives that allow for comparing GHG emissions and carbon sequestration potential, trade-offs with other environmental values...

### A.  Agency Should Consider a B1-like Alternative Across the UFO Resource Area

If the purpose of NEPA's alternative requirements, "the heart" of the analysis, is to allow for full consideration of the array of management outcomes possible under competing lawful possibilities, then the DEIS appears to fall short. For instance, BLM could have included a "B1-like" alternative that covered the entire UFO resource area, which—even if for oil and gas development only—would have likely led to significant differences in outcomes.

Clearly Alternative B1 is reasonable and clearly it results in meaningful differences in outcomes to resources and the human and natural environment. Alternative B1 is superior in protecting the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values resources of the North Fork. In considering cumulative impacts, including to things like climate, air quality, wildlife and special status species, and indirect and direct impacts including to public health, visual resources, water supplies, and recreational opportunities a B1-like alternative across the UFO lands would make a real difference.

### B.  Missing No Leasing Alternative

A No Leasing alternative would better allow the decision maker—looking out over two decades or more—to consider a fuller range of potential management outcomes, and it would account for the public sentiment to "keep it in the ground." The climate crisis is leading a growing number of people, organizations, and even nations to demand decisive action. And there is a growing movement, as well as local support, to stop leasing federal lands altogether.[34] Furthermore this view, although perhaps seen as 'fringe" is not extreme.

The earth's atmosphere just passed the 400-ppm level of atmospheric carbon, a "symbolic threshold" that demonstrates the seriousness of the climate crisis. The *New York Times* reported:

> Because rising amounts of carbon dioxide, a heat-trapping gas, in the atmosphere have been linked to climate change, scientists suggest that rising above 400 parts per million line makes it even harder to prevent global temperatures from rising beyond the goal of two degrees Celsius agreed to in Paris. It has been millions of years since atmospheric levels of $CO_2$ have risen so high.[35]

The carbon budget is real thing, and many scientists think we are at the edge of having expended it already.[36] A No Leasing alternative would certainly allow for a stark analysis of climate impacts, it seems, in a region with both coal and fluid mineral resources. No Leasing across the resource area, of course, would make for many different management outcomes—not only for climate. Wildlife would also benefit. Air quality would be less impacted. Recreational opportunities would improve.

[34] "Groups to Obama: Keep It in the Ground, Cancel Colorado Oil and Gas Sale," Great Old Broads for Wilderness website, at www.greatoldbroads.org/groups-to-obama-keep-it-in-the-ground-cancel-colorado-oil-and-gas-sale/
[35] *New York Times*: "A Milestone for Carbon Dioxide in the Atmosphere," 10/3/16
[36] Phys.org: "Climate 'carbon budget' soon maxed out: study," 2/23/16 http://phys.org/news/2016-02-climate-carbon-maxed.html

And while a more limited, "No Leasing in the North Fork" alternative is certainly within the range of reasonableness that could have been considered in the DEIS as an alternative as well, the difference in available acres of leasable public lands between Alternative B1 and "No Leasing in the North Fork" is mostly insignificant, only an additional 34,790 acres. Meaning BLM could select that as its final plan as well.

## C.  Other Deficiencies

In addition to the somewhat narrow range of alternatives that frames the agency's analysis, some of that analysis is itself lacking—or missing altogether. Before committing resources to oil and gas leasing, which the RMP approves land eligible for, it seems incumbent to know what resources are being committed. This is a primary purpose of a programmatic NEPA document such as a RMP, along with cumulative and connected impacts analysis. The DEIS analysis falls short in several places regarding oil and gas, including hydrological resources, public health, and impacts from fracking including frackwater injection wells.

Regarding hydrology in a residential area with many private water wells, public and private water systems, springs, irrigation facilities, source areas and other water supply infrastructure; unless the agency adopts an alternative that closes all or most of the area to oil and gas development it seems reckless to lease lands with nothing more than a CSU stipulation as management under all the other (non B1) action alternatives would do in many places. Similarly, the DEIS—except to a lesser degree under B1—would allow for potentially harmful activities in areas proximate to schools and homes despite the clear public health risk.
Impacts from hydraulic fracturing remain in dispute. There remains a significant amount of controversy around this activity. Concerns include harm to water quality, both above and below ground; and impacts to water quantity, in a dry region made even more susceptible to drought in a changing climate. Unconventional oil and gas development more generally requires intense industrial activity, and leads to degraded air quality, increased methane pollution, and potential for all sorts of hazardous mishaps.

Fracking and unconventional, shale development requires massive quantities of water and produces mass quantities more that must be disposed of in wells, evaporation ponds, or otherwise. Wastewater injection wells are widely believed to be a source of induced (human-caused) seismic events, also called "frackquakes." The upper North Fork, near where several of these waste wells are already located, is known for its unstable geology. The DEIS should better detail and explain how much water will be needed and where it will be sourced, how much water will be produced and where it will be disposed of, and the risk of and plans to mitigate them induced seismic events from oil and gas operations.

## IV.  Natural Lands and Rivers

## A.  Wilderness Quality and Natural Lands

I support the BLM designating "ecological emphasis areas" to preserve habitat connectivity and wildlife corridors. I appreciate the inclusion of LWWC consideration for the Potter and Monitor Creek areas adjacent to the Camelback Wilderness Study Area, the final plan should protect all lands with wilderness characteristics. The BLM should not neglect places like Adobe Badlands, a personal favorite of mine. Adobe Badlands protects as a natural area a landscape that is under-represented in the region, where much of the Mancos shale lands have already been badly degraded or altered.

## B.  Wild and Scenic Rivers

I appreciate the opportunity to comment on Wild and Scenic River protections, and recommend that the BLM reach a finding of suitability, and implement corresponding strong protective management measures for: Monitor Creek; Potter Creek; Roubideau Creek Segment 1; Beaver Creek; Saltado Creek; San Miguel River Segment 1; San Miguel River Segment 2; San Miguel River Segment 3; San Miguel River Segment 5; San Miguel River Segment 6; Tabeguache Creek Segment 1; Lower Dolores River; Dolores River Segment 1; Dolores River Segment 2; La Sal Creek Segment 2; La Sal Creek Segment 3; and, Roc Creek.

## V.  Summary & Conclusion

## A.  BLM Should Select B1 for the North Fork Valley

The North Fork Alternative Plan fits a clear and pressing public need by proposing a set of strong oil and gas management stipulations and protective designations to safeguard the area's character of place, water supply, wildlife habitat and recreational opportunities. B1, which is the DEIS version of the North Fork Alternative Plan provides the best management options of oil and gas leasing and development presented in the DEIS. Alternative B1 presents reasonable but strong management to protect the North Fork's most important resources and uses, and only B1 provides the level of management that is warranted to protect these resources. B1 is a reasonable and prudent approach to managing the resources in the North Fork Valley which the agency should select as part of its final Resource Management Plan.

## B.  BLM Must Adopt Resource Management Plan That is At Least as Protective as B1

Overall the draft EIS and RMP provides a management framework that could protect and enhance natural resources as directed by FLPMA through conservation management of valuable public lands. However, BLM's approach to oil and gas management and addressing climate change is inconsistent with relevant law and policy. BLM must substantially adapt the Uncompahgre RMP to evaluate reasonable alternatives for energy development, as it shows it can do in the B1 alternative.

While a challenge to the final RMP decision is likely, given the many interests and perspectives involved among organizations, industry and stakeholders the protections provided by Alternative B1 would help ensure that the resources in the North Fork are secure. BLM should move to adopt and implement as much of the North Fork Alternative Plan as it can, even if it is compelled to amend, supplement, or otherwise update its NEPA analysis.

The DEIS ultimately fails to consider or implement reasonable management alternatives for oil and gas across the planning area. And it fails to meaningfully analyze and respond to climate change. B1 comes closest to balancing oil and gas with other uses, and is the only action alternative that slows the race toward climate calamity, but only for the North Fork. These flaws should be remedied before BLM finalizes the RMP.

Thank you for the opportunity to provide these comments. Please keep me updated as to developments in this planning process and on other agency actions.

Sincerely,

Pete Kolbenschlag

11/2/2016                                     DEPARTMENT OF THE INTERIOR Mail - Comment on RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Comment on RMP
1 message

---

**jason love** <jasonlove7@msn.com>                                    Tue, Nov 1, 2016 at 3:48 PM
Reply-To: jason love <jasonlove7@msn.com>
To: "uformp@blm.gov" <uformp@blm.gov>

Hello, I have been a resident of Delta County for around 10 years and involved in mountain biking for the last 5.
I am currently President of the Delta Area Mountain Bikers, a chapter of COPMOBA.
Since getting into mountain bikes I have had the opertunity to ride a wide variety of trails in Colorado as well as other states and have also been involved in the building and maintenance of many trails I'm Deltas neighboring county's.
Two things I have seen very clearly. 1.A large number of people spending there time and money in areas with well developed trail systems like 18rd in Fruita and the Lunch Loops in Grand Junction to name just a  couple.
2. A glaring lack of non motorized trail development in Delta County.

I support alternative B and B.1 of the RMP proposal and would especially like to see the Jumbo Mountain area designated as SRMA as well as several well designed none motorized trails from the top of the Grand Mesa down into the city of Delta.
I am in favor of quiet use trails (non motorized) as well as lifting any ban on competitive events as I believe this could be a significant financial boon for Delta County in the future.
To close I believe that outdoor recreation and the development of sustainable trail systems and supporting infrastructure is the road map to the health and economic recovery of  Delta County.
Thank you for your consideration.
Jason Love.
--
Sent from myMail for Android

---

BLM_0149724



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comments on Resource Management Plan Revision for UFO planning area
1 message

**Marissa Mommaerts <mmommaerts@gmail.com>**                    Tue, Nov 1, 2016 at 2:20 PM
To: uformp@blm.gov

To: Uncompahgre Field Office, Bureau of Land Management

Re: Resource Management Plan Revision

Uncompahgre Field Office

2465 South Townsend Avenue

Montrose, CO 814201

To Whom It May Concern,

As a soon-to-be parent and a young person inheriting a planet in distress, I am very concerning about maintaining a livable environment for future generations. **Your role in providing strong protections for the North Fork Valley's air, water, lands, and the local economy which depends on these irreplaceable natural resources is absolutely critical to the health and well-being of our families and communities.**

With this in mind, the BLM's "Preferred Alternative" – Alternative D—is unacceptable. It fails to provide the necessary protections for our communities, rivers, air, water, wildlife, and landscapes.

As citizens, we are entrusting the BLM to put management in place for the North Fork Valley and other public lands managed by the Uncompahgre Field Office that emphasizes conservation and provides maximum protection for public resources.

The BLM is responsible for protecting public lands for the highest common good, and safeguarding resources and ensuring proper management is particularly critical in regards to oil and gas development to protect the area's clean air and water, pristine landscapes, abundant local agriculture, recreation, and wildlife habitat.

Rather than promoting extractive development and short-term gain, we need to be redesigning our economy to be regenerative and beneficial in the long term. Unconventional (shale) oil extraction has a low energy return on energy invested, and studies show most fracking wells decline rapidly and are not a wise long-term investment (see Post Carbon Institute's report "Drilling Deeper: A Reality Check on U.S. Government Forecasts for a Lasting Tight Oil& Shale Gas Boom.")

At the same time, organic farming and eco-tourism have the potential to create widespread economic benefit for our communities, if our natural resources are managed responsibly. These industries will actually build ecological and economic resilience in our region, rather than making our communities more vulnerable. And in an era of increasing economic and ecological instability, building community resilience is absolutely vital.

BLM_0149725

Given these realities, the "North Fork Alternative" (Alternative B1) is the most protective alternative presented in the draft RMP that, along with the other components of Alternative B, would provide the best management of the resource area of any of the options being considered in the current draft.

Personally, *I strongly support a "no-leasing" option.* But if the BLM chooses to move forward with any option presented in the draft, I strongly urge you to adopt Alternative B1 for the North Fork Valley and Alternative B for the rest of the UFO planning area.

Thank you for considering my concerns – the concerns shared by so many citizens in our region—as you make this important decision.

Sincerely,

Marissa Mommaerts, MIPA

38620 Pitkin Rd, Paonia CO 81428

BLM_0149726



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## UFO DRMP
1 message

---

**robgret tds.net** <robgret@tds.net>                    Tue, Nov 1, 2016 at 5:32 PM
To: uformp@blm.gov
Cc: jmeyer@blm.gov, rwelch@blm.gov, director@blm.gov


Bureau of Land Management,  Uncompahgre Field Office

2465 South Townsend

Montrose, CO 81401


Dear Acting UFO Field Manager, Joseph Meyer, Neil Kornze, and Ruth Welch,


Thank you for the opportunity to comment on the Uncompahgre Field Office's Draft Resource Management Plan. Having already provided input to the comments you received from Black Canyon Audubon Society, Western Colorado Congress, and Western Slope Conservation Center, I will not reiterate the many points contained therein but I am writing additional comments here of a more personal nature.


I have lived in the North Fork Valley between Paonia and Hotchkiss for 44 years.  I own and operate a small organic farm, part of which abuts BLM land, as well as a construction company specializing in building custom homes. I have added well over ten million dollars worth of construction to the Delta County property tax base.  Most of my construction clients are retirees who have moved here specifically for the ecosystem amenities available on our nearby public lands including the clean air and water and low volume of traffic.  An increase in oil and gas development will adversely affect my construction business, the craftsmen and tradesmen I employ, and the quality of life of my clients. It will also adversely affect my farming operation because my irrigation water originates on the GMUG National Forest and is stored and delivered to me through BLM lands that are proposed in the Draft RMP to be open to fluid mineral leasing. Similarly, my domestic water originates on BLM land.  I am extremely concerned that the Preferred Alternative of the DRMP does not go far enough in protecting the water rights enumerated above nor the values that enticed my construction clients to move to this valley.


I am opposed to oil and gas leasing on public lands in and near the North Fork Valley.  After reading the DRMP, I do not believe the BLM is capable of protecting the many non-extractable resources that are critical to the economy and lifestyle of our communities if virtually all of the BLM land is made available for oil and gas leasing.  It is why I participated with hundreds of others in producing the North Fork Alternative, which you have analyzed as Alternative B1. I find Alternative D to be unacceptable for the many reasons contained in the above-mentioned comments, but particularly for the potential negative impacts to wildlife and to the hunting, fishing, and wildlife viewing that comprise a significant component of the economy of western Colorado and Delta County in particular.


The following is from a study I conducted in 2002 and updated in 2012 on the potential impacts from oil and gas development to the wildlife-based economy of Delta County.

Wildlife and related resources are a major contributor to the economy of Delta County, both in direct and indirect expenditures as well as the  unquantifiable "quality of life" and aesthetic values.  The largest wildlife-related economic contributions are from hunting and fishing, which would be negatively impacted

BLM_0149727

by natural gas drilling and development.  The Colorado Division of Wildlife's latest report "The Economic Impacts of Hunting, Fishing, and Wildlife Watching in Colorado" (BBC Research & Consulting, 2008) determined that direct expenditures in Delta County from fishing, deer and elk and small game hunting in **2008** (based on data collected from 2006 to 2008) was $16,300,000.  When the secondary economic impacts and CDOW direct expenditures are added, the total impact was  $27,840,000.  The state-wide Total Impact amounts to $1,843,300,000. These figures do not include the economic benefits of wildlife watching which totals $1,218,200,000 state-wide. While county-by-county amounts were not available in the report for wildlife watching, if we use the same ratio of Delta County/State of Colorado hunting and fishing applied to wildlife watching we get a figure of $18,394,800 of total economic impact for Delta County.  In other words, according to this report the wildlife resources of Delta County are responsible for over 46 million dollars of economic activity in Delta County ANNUALLY.


The negative effects on deer and elk from roads have been well-documented over the past four decades.  For mule deer "Roads generally   decrease the value of habitat for distances up to 1/2 mile from the road.  If roads are to be left open in an area, the combined length of roads should be less than 1 mile per square mile of habitat."  (Managing  Forested Lands For Wildlife, Colorado Division of Wildlife and USDA Forest Service, 1984).  Elk are sensitive to human activity and "should be afforded maximum protection from disturbance... It is important that elk be relatively free from human disturbances. This is particularly true during parturition, young-rearing, and in winter."  (Ibid.)  More recently, studies of deer populations around Pinedale Wyoming show a 45% decline in mule deer populations over the past 3 years thanks to intensive gas drilling and development.


Parachute  Creek  Mule  Deer  Monitoring  Report -1982-2000, by Bio-Resources, Inc.  is a major long-term study of deer populations near Parachute, Colorado commissioned by then energy giant UNOCAL Corporation.  It concludes that


Natural gas drilling operations in the lower valley add another adverse impact that should require mitigation of negative influence on the health of the deer herd.  At present, the mule deer herd should be managed with *several years of deferred hunting, and sheep and cattle grazing should be managed to avoid the steep-slope xeric shrub habitat*.  Natural gas development operations need to initiate a concerted mitigation program with realistic, measurable, result-oriented habitat and herd management.  ...land management in Parachute Creek needs to assist the recovery by decreasing human land use impacts. *Human presence should be controlled while deer occupy winter range*. (emphasis added)


In other words, not only the hunting economy would likely be damaged, but the livestock industry as well. In fact, restoration of deer herd health and numbers from the effects of gas well activity will require the radical   measure of controlling mere human presence.


The study found that deer populations declined "most drastically" in areas of gas well drilling:


Since 1993 mule deer habitat has been reduced by the development of additional gas well installations, well access roads, and the constant traffic associated with ongoing well service personnel.  Ongoing natural gas operations should mandate a well-planned and executed mitigation

BLM_0149728

plan with UNOCAL that will measurably demonstrate re-vegetation and mule deer habitat restoration success.

Gas well drilling and pipe line construction each require road construction and high levels of truck traffic and heavy machinery operations that will disturb deer and elk.  Such disturbance during calving and fawning would likely result in increased calf and fawn mortality.   Disruption to migration patterns is another likely detriment.  Chronic Wasting Disease may be exacerbated by the increased stress to herds from prolonged disturbance.  Some wells would likely be drilled in deer and elk security areas which are a requirement for healthy populations.

The third major component of Delta County's wildlife-related economy is fishing.  The potential damage to our fisheries resource would be mainly from contamination of streams by toxic hydro-fracturing compounds, produced  water, fuel spills, sediment loading from soil erosion associated with well pad construction and pipe line installation, etc. [ In 2015 the oil and gas industry reported 615 spills, or nearly 2 per day. The number of unreported spills is unknown.]

In  summary, the wildlife  resources of Delta County contribute significantly to the  economic health of the county and should be protected.  Hundreds of gas wells with their attendant thousands of miles of roads and pipelines, high-decibel  compressors,  vastly  increased truck  traffic, unavoidable soil erosion, and use of toxic chemicals will result in increased stress to the wildlife resources and  could significantly impact the economic benefits derived from those resources.

It is interesting that Colorado Parks and Wildlife is currently considering destroying hundreds of mountain lions and black bears because of declining mule deer populations.  Yet they have little evidence to suggest that predation is responsible for the decline.  However, most wildlife biologists would agree with the above-cited Parachute Creek report that mule deer populations are, at the least, being stressed by anthropogenically-induced disturbance to and loss of their habitat.

It is imperative that the BLM take a hard look at the negative results of wide-scale oil and gas development on the sensitive biosphere and the nature-dependent economies of the communities within the UFO area.

Sincerely,

Robin Nicholoff

36295 Sunshine Mesa Road

Hotchkiss, CO 81419

cc:

Senator Michael Bennet

BLM_0149729

11/2/2016                                    DEPARTMENT OF THE INTERIOR Mail - UFO DRMP

Neil Kornze

Director, BLM

Email:director@blm.gov


Ruth Welch

State Director, Colorado BLM


Joseph Meyer

BLM Colorado, Southwest Director

Email:jmeyer@blm.gov

---

**2 attachments**

 **UFO DRMP Comments11:1:16.docx**
199K

 **UFO DRMP Comments11:1:16.docx**
199K

BLM_0149730

11/2/2016                    DEPARTMENT OF THE INTERIOR Mail - Citizen Comments - 2016 Draft Uncompahgre Field Office RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Citizen Comments - 2016 Draft Uncompahgre Field Office RMP
1 message

**Karen Ortiz** <techiebetty@gmail.com>                              Tue, Nov 1, 2016 at 11:50 PM
To: uformp@blm.gov

To Whom This May Concern:

Attached you will find my comments regarding the draft Draft Uncompahgre RMP. I thank you in advance for your consideration and for making them part of the public record.

Sincerely,

Karen Ortiz
970-596-9977 (c)
970-872-4120 (h)

📄 **2016_UFO_RMP_Draft_Comments_Ortiz.pdf**
68K

BLM_0149731

Karen M. Ortiz
12152 – 3550 Road
Hotchkiss, CO  81419
November 1, 2016

Joe Meir, District Manager, Southwest District of Colorado
Teresa Pfifer, Field Manager, Uncompahgre Field Office
Bureau of Land Management
Montrose District Office
Uncompahgre Field Office
2815 Youngfield St.
Lakewood, CO 80215

Submitted electronically to uformp@blm.gov

RE: 2016 Draft Uncompahgre Field Office Resource Management Plan

Dear Joe Meir and Teresa Pfifer:

Please accept the following comments regarding the draft Uncompahgre Field Office Resource Management
Plan.

I lived in Paonia and on Barrow and Redlands mesas in the North Fork Valley from 1982-1999. I enjoyed running
rivers, skiing, hiking, mountain biking and camping in the BLM lands, primarily in the North Fork Valley. During that
time I was an educator in the Delta and Montrose school districts. As a fourth/fifth grade teacher I promoted the
enjoyment of local lands and wildlife resources. I worked with BLM staff at 4th grade water festivals and used
*Project Wet*, *Project Wild* as well as other age-appropriate curricula in my classroom.

In 2012 I returned to Delta County, making my present home on a tiny mesa north-east of Hotchkiss. Now semi-
retired, I enjoy hiking, skiing, mountain biking and river running on our local public lands and have developed an
interest in birding. I just purchased a lot and plan to build a home in the Vista Creek subdivision, adjacent to
Jumbo Mountain.

The breadth and detail provided in the draft RMP are commendable. I'd like to thank the BLM's leadership for
postponing the release of the draft until the communities and stakeholders in the North Fork Valley (of the
Gunnison River) completed their recommendation for oil and gas leasing in the area, otherwise known as the
North Fork Alternative Plan (NFAP), into the draft RMP/EIS as Alternative B.1:

> Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork
> and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in portions of Delta
> and Gunnison Counties. Alternative B.1 is a resource-based set of recommendations provided by a
> community group. [DEIS Executive Summary 2-7]

**I will focus my comments to support inclusion of the North Fork Alternative Plan - Alternative B.1 into the
final RMP and some specific recommendations from other alternatives where appropriate.** Alternative B.1,
a grassroots effort, offers the strongest protection to the North Fork Valley of any alternative in the draft RMP/
EIS[1]. It would safeguard the unique communities and surrounding wild lands in the valley from unacceptable
impacts from oil and gas leasing and corresponding development activities, restricting, not eliminating, future
surface and underground exploration and development.

Alternative B.1 best preserves the valley's river corridors and scenic visual character of the valley, its surrounding
mesas and BLM-administered lands that can be accessed by the West Elk Loop Scenic Byway. As such growing
tourism in the valley is safeguarded as B.1 specifically protects scenic vistas and travel corridors (DEIS II 4-208). I

---

[1] See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22.

favor of the **Visual Resource Management classifications in Alternative B.1, and the protection of landscape and visual characteristics through the following stipulations**: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors; NSO-7 Major river corridors; CSU-47 Vistas.[2]

Alternative B.1 not only benefits the tourist economies of the North Fork Valley, it protects the natural resources of the valley and surrounding areas, its abundance and diversity of wildlife, waterbodies and riparian areas, and migration routes and habitat areas. Nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the stronger protections than provided by the B.1. **In regards to the valley's natural resources I support specific recommendations in both Alternative B.1 and No Leasing stipulation from Alternative B as follows:** NL-4 Waterbodies; NL-3 Major river corridors; NL-NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.

Furthermore, **I would like to see Jumbo Mountain designated a Special Recreation Management Area (SRMA)** as a strategy to develop and protect the special recreational opportunities in that locale for residents and visitors alike. I plan to build a home in the Creek Vista subdivision adjacent to Jumbo Mountain. My friends and I have personally enjoyed mountain bike riding and hiking since the mid-1980s. Alternative B.1 offers protective management to safeguard the natural features adjacent to my future home and the outstanding recreational opportunities at the mountain. The Jumbo Mountain area is also important to the Town of Paonia. Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo Mountain as a SRMA, with Alternative B.1 acreage and stipulations. Under B.1 the entire Jumbo SRMA would have NSO stipulations, rather than only a slice as under Alternative B (DEIS II 4-306). Should Jumbo Mountain be designated a SRMA in the final plan, I am confident the aforementioned groups supporting the classification would work with the BLM to develop and implement the specifics of a plan and rally around maintaining the area.

I thank you in advance for considering my preference for Alternative B.1 to the Preferred Alternative as you finalize the Uncompahgre RMP. I welcome your questions and feedback.

Respectfully,

Karen M. Ortiz

---

[2] NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B.1 cannot be waived, modified or excepted.

BLM_0149733

11/2/2016                     DEPARTMENT OF THE INTERIOR Mail - Uncompahgre Field Office draft Resource Management Plan



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Uncompahgre Field Office draft Resource Management Plan
1 message

**Krista Beyer** <krbeyer721@gmail.com>                          Tue, Nov 1, 2016 at 11:04 PM
To: uformp@blm.gov

Hello,

The attached letter is a public comment on the Uncompahgre Field
Office Draft Resource Management Plan. I am a resident of Durango, a
recreational boater, a river hydrologist, and river advocate. I hope
you take the time to read the comments.

Thanks for your time and commitment to the waters of the Colorado River Basin.
Sincerely,

Krista Beyer

📄 **BLMUncompahgre_comments.pdf**
112K

BLM_0149734

BLM Uncompahgre Field Office
2465 S. Townsend Ave,
Montrose, CO 81401                                            November 1, 2016

To whom it may concern,

I'm writing as a river advocate in both recreation as well as the environment. I have been fortunate enough to have seen both the Dolores as well as the San Miguel Rivers and believe both meet the suitability requirements for Wild and Scenic designations. Both rivers are situated in incredible scenic as well as historical locations important to the past, present, and future culture of the Four Corners area. Both rivers contain a rich history of Native American presence as well as explorers, pioneer settlers, miners, homesteaders, and/or outlaws. This history along with the priceless value of water in the Colorado River Basin, wilderness in the west, and new found recreational boating and angling value make these river segments ideal for a Wild and Scenic suitability designation that should be maintained as a part of the Resource Management Plan.

I do understand the necessity of water for industry as well as recreation and general natural vitality. From this mindset I support the Colorado Water Conservation Board's request to manage flows through the Colorado State Instream Flow Program (ISF). However, I recognize the difficulty attempting to please too many and reach a compromise that pleases none. It is my hope that the ISF will actively manage flows in a way that will allow for sufficient flows to protect ecology of the rivers along with whitewater and angling recreation. If the ISF's protections fall short, I expect the BLM and the Secretary of the Interior pursue alternative flow protections.

I wish to end this letter with a personal experience rafting the Dolores River. This June I had the chance to experience firsthand what is lost when a river is entirely harnessed and purposed for human's alone. The much anticipated dam release this June offered boaters to see the isolated 30,000 acre wilderness study area in the best possible way; via raft. It is one thing to sit on the shore and watch the current bubble and boil by, and an entirely different thing to allow it to take you in its arms. To offer yourself up to the capricious nature of its twist and turns and become a part off the river instead of a sideline observer. The Dolores was an incredible experience. Its beauty is unmeasurable and it is a shame its canyons haven't seen recreational or ecologically healthy flows in five years.

It is my hope that through better water management practices, no canyon will be starved of flows to the extent the Dolores has experienced. I strongly believe that Industry, Recreation, and Ecology can live and thrive together. If we don't try we are bound to lose something extraordinary.

Thanks for your time and dedication to the rivers of the Colorado River Basin.
Sincerely,

Krista Beyer
Hydrologist, River Advocate, Recreational Boater
krbeyer721@gmail.com



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Colorado Department of Natural Resources Comments on UFO DRMP/EIS
1 message

---

**Laughlin - DNR, Amy** <amy.laughlin@state.co.us>                    Tue, Nov 1, 2016 at 3:01 PM
To: uformp@blm.gov

Dear Ms. Pfifer:

The Colorado Department of Natural Resources submits the attached comments on the Uncompahgre Field Office Draft Resource Management Plan/ Draft Environmental Impact Statement including letters from two of our divisions: Colorado Parks and Wildlife and the Colorado Water Conservation Board.

Thank you for the opportunity to submit these comments, and we look forward to working with you and your staff as this planning process moves forward.

--
Amy Laughlin
Policy Advisor
Executive Directors Office



For CPW comment letter, see
UFORMP_000492

P 303.866.3311 x 8671  |  F 303.866.2115  |  C 720.662.4778
1313 Sherman Street, Room 718, Denver, CO 80203
amy.laughlin@state.co.us   |   www.colorado.gov/DNR

---

📄 **DNR Comments_UFO DRMP EIS_Final.pdf**
1272K

BLM_0149736



**COLORADO**

**Department of Natural Resources**

Executive Director's Office
1313 Sherman Street, Room 718
Denver, CO 80203

November 1, 2016

Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Uncompahgre Field Office Draft Resource Management Plan/ Environmental Impact Statement

Dear Ms. Pfifer:

The Colorado Department of Natural Resources submits the following comments on the Uncompahgre Field Office (UFO) Draft Resource Management Plan / Environmental Impact Statement prepared by two of our divisions: Colorado Parks and Wildlife (CPW) and the Colorado Water Conservation Board (CWCB).

CPW recommends additional detail be included in the preferred alternative in the final RMP/EIS to incorporate the desired conditions, suggested standards, and best management practices related to the management, preservation, and conservation of fish and wildlife species and habitat, while also remaining consistent with species management plans, agreements, listing decisions, and BLM policies. CPW also offers specific comments related to aquatic species, bighorn sheep, land health standards, and stipulations for fluid mineral leasing and other surface disturbing activity.

Further, the draft RMP/EIS lacks the appropriate analysis and protections related to the Gunnison Sage Grouse (GuSG) given its current listing status as a threatened species under the Endangered Species Act. (Indeed, Chapter 3 and Appendix O both state incorrectly that the Gunnison sage-grouse is merely a candidate species, with a proposal to list it as endangered. That changed two years ago when the U.S. Fish & Wildlife Service issued a rule listing the species as threatened.) Although the language in Section 2.2.4 of the Draft RMP acknowledges the concurrent planning process under way for a Gunnison sage-grouse ranngewide RMP amendment intended to provide specific management guidance to conserve Gunnison sage-grouse and their habitat (GuSG RMP), we are concerned that Section 2.2.4 contains no commitment either to amend the final UFO RMP with the provisions of the final GuSG RMP (should the UFO RMP be finalized before the GuSG RMP) or to incorporate the provisions of the final GuSG RMP into the UFO RMP (should the GuSG RMP be finalized first). BLM must provide stronger assurances that the UFO RMP will provide adequate protection for this federally listed species.

CWCB offers specific comments related to the preferred alternative (Alternative D) and the findings of the Draft Wild and Scenic River Suitability Report. CWCB's comments reflect a dual purpose of addressing Colorado's water-related needs, while also continuing to afford the appropriate environmental protections for stream segments with outstanding remarkable values (ORVs). I would encourage the BLM to work with the CWCB to consider the possibility of utilizing its Instream Flow Program as an alternative method of flow protection for flow-related ORVs.



BLM_0149737

Finally, CPW has devoted significant staff resources to reviewing and attempting to improve the Draft RMP throughout the multi-year planning process, yet the BLM at times seemed disinclined to utilize CPW's special expertise in wildlife management and in the status and needs of wildlife in the planning area. Accordingly, the Draft RMP contains factual inaccuracies, methodological errors, conflicts with other planning documents, and critical omissions. As described in CPW's comment letter, we see a need for significant revisions to address these deficiencies before issuance of a Final RMP/EIS. CPW staff continue to be available to assist in these efforts, and we remain hopeful that future cooperative processes result in more productive outcomes.

Thank you for the opportunity to submit these comments. DNR looks forward to finding solutions to these matters and to continue working with the UFO as this important planning process moves forward.

Sincerely,

Robert Randall
Executive Director



**COLORADO**
Colorado Water
Conservation Board
Department of Natural Resources

John Hickenlooper, Governor

Robert Randall, DNR Executive Director

James Eklund, CWCB Director

October 7, 2016

Barbara Sharrow
Acting Southwest District Manager
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

### Subject: Uncompahgre Field Office (UFO) Draft Resource Management Plan (RMP) / Environment Impact Statement (EIS)

Dear Ms. Sharrow:

The Colorado Water Conservation Board (CWCB) appreciates the opportunity to comment on the Bureau of Land Management (BLM)'s preferred alternative (Alternative D) that recommends three segments in the Lower Gunnison Basin, eight segments in the San Miguel Basin and five segments in the Dolores River Basin as suitable for inclusion in the National Wild and Scenic Rivers System (NWSRS), as presented in the Uncompahgre Field Office (UFO) Draft Resource Management Plan (RMP)/Environment Impact Statement (EIS).

The CWCB recognizes the strength of a Wild and Scenic suitability determination as a land management tool and a means to protect outstandingly remarkable values (ORVs). The CWCB also acknowledges that a suitability determination can hold implications for water rights and water development within the State of Colorado. The recommendations in this letter are intended to address the CWCB's water-related concerns while recognizing the BLM's desire to use suitability as a land management tool to protect environmental values. As emphasized in Colorado's Water Plan, our state is striving to meet water supply demands of our growing population while fostering a strong and resilient natural environment.

#### Stakeholder Process Background

Utilizing the CWCB's Wild and Scenic Alternatives fund, the Gunnison Basin Wild & Scenic Stakeholder Group met in Delta, Colorado roughly ten times between October 2010 and February 2011. The process resulted in a consensus recommendation that many of the segments in the Gunnison Basin should be considered "not suitable." However, the group did not reach consensus on the suitability of the three tributary segments that the BLM has proposed as suitable.

For the San Miguel and Dolores Rivers, the Southwest Resource Advisory Council (SW RAC) subgroup conducted ten public meetings between November 2010 and January 2011. Through this stakeholder process, the SW RAC considered private land, the potential for mining, and

Interstate Compact Compliance • Watershed Protection • Flood Planning & Mitigation • Stream & Lake Protection
Water Project Loans & Grants • Water Modeling • Conservation & Drought Planning • Water Supply Planning



UFO Draft RMP/EIS
October 7, 2016
Page 2

existing and proposed projects, and recommended that some reaches not be found suitable. The SW RAC held public hearings and voted unanimously to recommend that eight segments in the San Miguel Basin and five segments in the Dolores Basin be found suitable. The BLM incorporated these recommendations into its preferred Alternative D.

### Update of Information

The CWCB recognizes that much of the work for the suitability analysis was completed many years ago. Accordingly, the BLM is aware of the need to update the suitability analyses to incorporate new information. The CWCB recommends that the BLM consider the following new information that has come out to update the BLM's original suitability analysis:

- Colorado's Water Plan (CWP)
- Southwest (SW) Basin Roundtable's Basin Implementation Plan (BIP), including an updated Identified Projects and Processes (IPP) list
- Dolores Water Conservancy District (DWCD) 2014 Water Management and Conservation Plan
- Stipulation Between the CWCB Staff and the DWCD, in the Matter of the CWCB Staff's Recommendation for an Instream Flow Appropriation on the Dolores River, dated August 31, 2015 (Dolores ISF Stipulation)
- Letter from Ruth Welch, BLM Acting State Director, to Mike King, Executive Director, Colorado Department of Natural Resources, January 6, 2015 (Tres Rios RMP Letter)
- San Miguel River Flow Survey being prepared by American Whitewater, anticipated in 2017
- DWCD Drought Contingency Plan, anticipated April 2017
- Colorado Decision Support System (CDSS)
- Statewide Water Supply Initiative (SWSI) 2010 (Appendix P - Summary of Draft Wild and Scenic River Suitability Report contains several references to SWSI 2004)

The CWCB requests specific updates to Appendix P as set forth below:

1. On page P-37 in the first paragraph of the "Water Rights and Uses" section, please revise the last sentence to read as follows: "The CWCB took final action on the appropriation at a hearing on September 13, 2011, and the Division 4 Water Court decreed this instream flow water right on May 20, 2013." This comment also applies to the last sentence of the second paragraph of the "Water Rights and Uses" section on page P-41.
2. For the Lower Dolores River segment, in the first paragraph on page P-47, please delete the second sentence ("There is no instream flow water right protection on the segment.") and replace it with: "In January 2015, the CWCB declared its intent to appropriate an instream flow water right on the Dolores River from its confluence with the San Miguel River to the confluence with West Creek for the following flow rates: 900 cfs (4/15-6/14), 400 cfs (6/15-7/15), 200 cfs (7/16-8/14), 100 cfs (8/15-3/15), and 200 cfs (3/16-4/14). The CWCB took final action on the appropriation at a hearing in September 2015, and filed an application for this instream flow water right on December 30, 2015 that is pending in the Division 4 Water Court."

UFO Draft RMP/EIS
October 7, 2016
Page 3

## Permitting Concerns

Sections 7(a) and (b) of 36 CFR 297 indicate that any water projects with a federal nexus that exist in, above or below a designated Wild and Scenic reach could be prohibited or restricted through the consultation process if they would "invade the area or unreasonably diminish the ORV." If a stream segment were designated as Wild and Scenic, this provision would apply to all existing, new or enlarged structures (regardless of water right status) that have a federal nexus, such as being located on federal land, using federal funds or requiring a Section 404 permit from the Corps of Engineers.

While the current process is only a step towards a Wild and Scenic designation, this same provision would apply to structures on BLM lands at the suitability stage. Upon a finding of suitability, the BLM would be required to manage suitable segments as if they were designated when reviewing proposed actions on BLM land.

Colorado's Water Plan contemplates the construction and/or enlargement of reservoirs to meet future water demands. The SW Basin Roundtable's BIP indicates that the region's municipal and industrial demand is expected to be met by "investigating means of providing additional water, firming of existing supplies, and enlargement of distribution systems," with many of the necessary water rights already decreed. Furthermore, the BIP identifies permitting as one of the primary constraints in developing these future projects.

Montrose County holds conditional water rights within the San Miguel Basin pursuant to decrees entered in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169. The development of reservoir sites associated with these rights represents a reasonably foreseeable action within the RMP planning area. This action should be included in Draft RMP Section 4.2.2 "Past, Present and Reasonably Foreseeable Future Actions" as well as any other sections that are applicable to this action.

The CWCB has partnered with Montrose County to assist in the required geotechnical and feasibility analyses necessary for development of the conditional water rights. These analyses are otherwise known as the Montrose County Firming Project. Given the substantial work and investment that has already gone into this project, the CWCB wishes to assure that the proposed RMP does not adversely impact the future potential of the conditional water rights held by Montrose County. In furtherance of this goal, the CWCB requests that the following language be included in the RMP.

> Development of Montrose County's existing conditional water rights within the San Miguel Basin shall be subject to review to the extent required by law. Nothing in this RMP, including an administrative determination of WSR suitability, shall be construed as a prohibition on the rights of Montrose County with regard to development of the existing water rights decreed in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169, or a limitation that would result in Montrose County being unable to meet its water supply needs with the Montrose County Firming Project.

The CWCB understands that the BLM may also use the suitability findings as a basis for the agency's comments on projects that have a federal nexus. Additional planned projects that may fall into this category include the following (this list is not exhaustive):

- Upper Plateau Storage Reservoir
- Gurley Reservoir
- Straw Dam
- Lone Cone Reservoir

UFO Draft RMP/EIS
October 7, 2016
Page 4

- Projects identified in the 2014 DWCD Water Management Plan
- Other projects listed as IPPs

It is unclear at this time whether the BLM or other federal agencies would consider the implementation of these projects as unreasonably diminishing the flow-related ORVs in the proposed downstream segments. For projects with downstream suitable segments, a federal agency's determination that diminishment of an ORV would occur may lead to permitting delays and reduced yield from these future projects. Additionally, the CWCB is concerned that required mitigation could reduce the project yields such that the region may not be able to meet its future demands. The CWCB proposes that the BLM, the CWCB, the DWCD (where applicable) and any interested project sponsors work together to address these concerns while considering mitigation measures needed to protect the ORVs. We recommend that these meetings occur prior to issuance of the proposed final RMP/EIS.

## Federal Reserved Water Rights

Historically, the CWCB has taken the position that federal reserved water rights are not the best method for protecting flow-related ORVs in river corridors. Rather, the CWCB's Instream Flow (ISF) Program may provide adequate protection of flow-related values in the subject stream segments. The CWCB notes that in recent decisions, the BLM has taken into account its long-standing working relationship with the CWCB and use of the state's ISF Program. However, the CWCB and the BLM have not yet had an opportunity to develop a joint approach for addressing float boating recreational ORVs until now. For San Miguel Segments 1, 2 and 3, Lower Dolores, and Dolores Segments 1a and 2, the CWCB requests that the BLM consider any recreational float boating protections that may be gained by coordinating with local governmental entities to obtain a recreational in-channel diversion water right (RICD) rather than obtaining a federal reserved water right. The CWCB acknowledges that whitewater structures would be required to obtain a RICD right; however, the SW Basin Roundtable's BIP indicates that local water users are considering a RICD as an IPP for the San Miguel River.

The CWCB requests that the BLM analyze and address the projected flow needs for recreational ORVs and compare those to the average amount of water available on the subject stream segments to identify the likelihood of a conflict between meeting recreational and water development needs. The CWCB also requests that the BLM analyze and consider the totality of existing senior water rights that may already pull water through these reaches to support the recreational ORVs. For example, the BLM should consider the flows that will be pulled downstream by the pending ISF appropriation on the Dolores River when evaluating impacts of upstream projects during the permitting process. The CWCB requests that the BLM present the results of these analyses to the CWCB, the DWCD (where applicable), interested project sponsors, and other stakeholders at the meetings requested above.

## Dolores River Segment Comments

### Clarification of Proposed Suitability Findings on Dolores Project Operations

In the analysis of the proposed suitability determinations on the Dolores River, the BLM has noted several times that flow through the Dolores River sections is greatly diminished by the operation of the McPhee Dam upstream. The issue of the relationship between Wild and Scenic Rivers Act suitability determinations and the operation of the Dolores Project was raised in the recent Tres Rios Resource Management Plan process and was addressed by the BLM in the Tres Rios RMP Letter and in the section of the Tres Rios Resource Management Plan addressing Government to Government

BLM_0149742

consultation—Ute Mountain Ute. The CWCB invites the BLM to work with the CWCB to develop language for the UFO RMP and EIS that provides similar clarity on the relationship of the UFO Wild and Scenic Rivers Act suitability determinations and the operation of the Dolores Project. Such language could include incorporating the January 6, 2015 letter from the BLM State Director to the Executive Director of the Colorado Department of Natural Resources by reference, citing the Government-to-Government consultation provisions in the Tres Rios RMP, and some version of the following language to be included as findings for the Dolores River segments:

> The Wild and Scenic Rivers Act suitability determinations found in Sections [denote section of the UFO RMP] will not affect the delivery of water allocations in the Dolores Project. Rather, the suitability determinations are intended to guide BLM land use decisions that could affect the streams that are determined to be suitable. When the BLM determines that a river is suitable under the Wild and Scenic Rivers Act, the authority to protect ORVs is limited to existing BLM authorities under the Federal Land Policy and Management Act. A suitability determination by BLM does not obligate other agencies, such as Reclamation, to utilize their authorities to protect the ORVs identified by the BLM. Congress has not granted any authority to BLM that would allow the BLM to dictate how a Reclamation project is operated, nor could a BLM administrative decision supersede congressionally enacted legislative direction for the Dolores Project. Accordingly, the Dolores River suitability determinations and the BLM identification of flow-based ORVs on the Dolores River below the Dolores Project will not affect the delivery of water allocations or water rights decrees for the Dolores Project.

## Upper Dolores River Segment 1a and La Sal Creek Segment Comments

Three of the four segments considered for suitability (Dolores River, Segment 1a and La Sal Creek, Segments 2 & 3) in the Upper Dolores River are in the area currently being considered for a National Conservation Area (NCA). The CWCB anticipates that, if an NCA is established on these segments, Congress will determine that none of these segments are suitable.

## Upper Dolores River Segment 2 Comments

For the Dolores River Segment 2, the CWCB is concerned that there could be conflict between the proposed suitability determination and water rights associated with the operation of the Dolores Project. In addition to the CWCB's suggestions regarding "Clarification of Proposed Suitability Findings on Dolores Project Operations," the CWCB proposes that the BLM work with the CWCB, water users, and other collaborative stakeholders on the Dolores River to protect flow-based ORVs on this reach with the existing ISF water right and available water supply from McPhee Reservoir, in conformance with Dolores Project contracts and Reclamation laws applicable to the Dolores Project. The CWCB requests that the BLM include the following language in the final RMP:

> If alternative forms of flow protection are provided to support flow-related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

BLM_0149743

UFO Draft RMP/EIS
October 7, 2016
Page 6

## Lower Dolores River Segment Comments

The CWCB stipulated with the DWCD in 2015 in the ISF appropriation proceeding on the Lower Dolores River segment. Among other things, this stipulation states that "it is the Board's intent that this ISF water right is adequate to meet all requirements as a streamflow guideline in federal administrative or regulatory permitting contexts." We encourage the BLM to consider the spirit of this stipulation when considering flow-related concerns associated with suitability of this reach and to consider the CWCB's suggestions regarding a "Clarification of Proposed Suitability Findings on Dolores Project Operations." The stipulation also provides a number of provisions intended to make sure that the pending ISF water right does not reach up the Dolores River, into McPhee Reservoir and above McPhee, to protect State appropriated water rights above the confluence of the San Miguel and the Dolores Rivers. The CWCB requests that the intent outlined in the stipulations for protection of upstream water rights be acknowledged by the BLM in the final RMP.

Further, the BLM, in its Grand Junction Field Office (GJFO) Proposed RMP and Final EIS, found a segment of the Dolores River suitable. We recommend that a similar finding be included in any Lower Dolores River Segment's RMP's suitability finding as indicated below:

> If the Colorado water court system decrees an ISF water right for the lower Dolores River in the locations, flow rates, and timing appropriated by the CWCB at its March 2014 Board meeting, and if the instream flow right is vigorously enforced by the CWCB, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

## Gunnison River Segment Comments

We request and invite the BLM to work with the CWCB in seeking new or increased ISF water rights to address the flow-related ORVs for the proposed Gunnison River Segments with some version of the following language included as findings:

> If the BLM is able to obtain an alternative form of flow protection to support flow-related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

## San Miguel Segment Comments

Recognizing that the SW RAC's public process resulted in recommending that eight segments in the San Miguel Basin be found suitable, the CWCB will not recommend against the results of that process provided that the CWCB's permitting, water right and classification concerns are addressed. The CWCB requests and invites the BLM to work with its staff in seeking new or increased ISF water rights to address the flow-related ORVs for the proposed San Miguel River Segments, with the following language to be included as findings for these segments:

> If the BLM is able to obtain an alternative form of flow protection to support flow-related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

UFO Draft RMP/EIS
October 7, 2016
Page 7

The CWCB would like to thank you for considering our comments.  We look forward to working with you to ensure a successful outcome for the citizens of Colorado and the ORVs that you have identified for protection. Please contact Suzanne Sellers or Linda Bassi of my staff if you have any questions.

Best regards,

James Eklund, Director
Colorado Water Conservation Board


cc:     CWCB Members
        Dana Wilson, Acting Field Manager

Attachments

BLM_0149745



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Comments on the Uncompahgre Field Office Draft RMP and EIS
1 message

**Laura King** <king@westernlaw.org>                                     Tue, Nov 1, 2016 at 12:31 PM
Reply-To: king@westernlaw.org
To: uformp@blm.gov

Dear Uncompahgre RMP Project Manager,


On behalf of the Western Environmental Law Center, Citizens for a Healthy Community, Center for Biological Diversity, Earthjustice, Sierra Club, WildEarth Guardians, and Wilderness Workshop, I submit the attached comments regarding the Uncompahgre Field Office Draft Resource Management Plan and Environmental Impact Statement. A copy of these comments, along with referenced exhibits on multiple discs, will also be arriving by certified mail.


Thank you for your consideration of our comments. Please do not hesitate to contact us with any questions.


Best,

Laura


Laura King

Staff Attorney

Western Environmental Law Center

103 Reeder's Alley

Helena, MT 59601

(406) 204-4852 (tel.)

king@westernlaw.org

www.westernlaw.org


 **Uncompahgre RMP Comments - 2016-11-1.pdf**
1734K

BLM_0149746



| | | |
|---|---|---|
| **Northwest** | **Rocky Mountains** | **Southwest** |
| 1216 Lincoln Street | 103 Reeder's Alley | 208 Paseo del Pueblo Sur #602 |
| Eugene, Oregon 97401 | Helena, Montana 59601 | Taos, New Mexico 87571 |
| (541) 485-2471 | (406) 443-3501 | (575) 751-0351 |

**Defending the West**   www.westernlaw.org

# Western Environmental Law Center

November 1, 2016

*Sent via e-mail (comments only) and Certified Mail, Return Receipt Requested (comments and exhibits)*

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401
Email: uformp@blm.gov

**Re:   Comments on the Uncompahgre Field Office's Draft Resource Management Plan and Environmental Impact Statement**

Dear Uncompahgre RMP Project Manager:

The Western Environmental Law Center, along with Citizens for a Healthy Community, Center for Biological Diversity, Earthjustice, Sierra Club, WildEarth Guardians, and Wilderness Workshop (together "Conservation Groups"), submit the following comments regarding the Bureau of Land Management ("BLM") Uncompahgre Field Office ("UFO") Draft Resource Management Plan ("Draft RMP") and Environmental Impact Statement ("EIS"). The Uncompahgre RMP planning area includes 3,097,460 acres of federal, private, state, and city land in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties in southwestern Colorado. The Uncompahgre RMP planning area covers about 675,800 acres of BLM-administered public lands—including portions of the Dominguez Canyon Wilderness Area and four river systems (the Gunnison, San Miguel, Dolores, and Uncompahgre)—and 971,220 acres of federal subsurface mineral estate.

Conservation Groups have participated in the planning process for the UFO RMP—specifically by submitting two supplemental information letters with the BLM, on October 23, 2012 and February 3, 2014, both of which are incorporated herein by this reference—and have interests that are adversely affected by planning decisions made in the EIS. *See* 43 C.F.R. § 1610.5-2. Conservation Group, Citizens for a Healthy Community ("CHC"), also participated in the collaborative effort developing the North Fork Alternative Plan ("NFAP"), which was submitted to BLM on December 2, 2013 and included as BLM Alternative B.1. Moreover, Conservation Groups contracted with air resources expert, Megan Williams, who submitted comments on the Bull Mountain Master Development Plan on April 14, 2015 [hereinafter

BLM_0149747

Williams Comments], which are directly relevant to the UFO RMP planning process and are incorporated herein by this reference and attached as Exhibit 313.

This letter focuses on the BLM's failure to adequately analyze and disclose the direct, indirect, and cumulative impacts of fossil fuel leasing and development authorized and made available by BLM in the Uncompahgre Draft Resource Management Plan and Environmental Impact Statement, and correspondingly, the impact that such development will have on air, water, human health, and climate change. Finalizing the Uncompahgre RMP, as proposed, would cement BLM's place as dramatically out of step with the realities facing modern public lands management, including current science and national policy on climate change.

On behalf of members and supporters that live, work, and recreate in Colorado, the Conservation Groups call on the BLM to reconsider the wisdom of the fossil fuel leasing and development considered by the Uncompahgre RMP/EIS. Specifically, Conservation Groups request that:

- BLM must consider and analyze a "no-leasing" alternative that would bar new fossil fuel leases in the Uncompahgre planning area.
- BLM must take steps to reduce methane emissions from both oil and gas operations and coal mining, including (1) by undertaking a true hard-look analysis of methane waste and global warming potential; (2) by adopting enforceable mitigation requirements to minimize methane emissions and waste; and (3) by considering alternatives that require coal mines in the Uncompahgre planning area to capture or flare methane emissions.
- BLM must address new scientific and economic information, including regarding (1) the impacts of climate change on the Uncompahgre planning area; (2) the social burden, or cost, of carbon and methane waste that would be authorized by the RMP; and (3) fossil fuel production and employment.
- BLM must take a hard look at impacts to air, water, and human health, which must include a detailed Health Impact Assessment.

The **Western Environmental Law Center** ("WELC") uses the power of the law to defend and protect the American West's treasured landscapes, iconic wildlife and rural communities. WELC combines legal skills with sound conservation biology and environmental science to address major environmental issues in the West in the most strategic and effective manner. WELC works at the national, regional, state, and local levels; and in all three branches of government. WELC integrates national policies and regional perspective with the local knowledge of our 100+ partner groups to implement smart and appropriate place-based actions.

**Citizens for a Healthy Community** ("CHC") is a grass-roots organization with more than 450 members formed in 2010 for the purpose of protecting communities (people and their environment) within the air-, water- and food-sheds of Delta County, Colorado from the impacts of oil and gas development. CHC's members and supporters include organic farmers, ranchers, vineyard and winery owners, sportsmen, realtors, and other concerned citizens impacted by oil and gas development. CHC members have been actively involved in commenting on BLM's oil and gas activities.

BLM_0149748

The **Center for Biological Diversity** is a non-profit environmental organization with over 48,500 members, many of whom live and recreate in western Colorado. The Center uses science, policy and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats in Colorado. The lands that will be affected by the proposed resource management plan include habitat for listed, rare, and imperiled species that the Center has worked to protect including rare, endangered and threatened species like the Gunnison Sage-Grouse and the Gunnison and Uncompahgre River's fish species such as the Colorado Pikeminnow and Razorback Sucker. The Center's board, staff, and members use the public lands in Colorado, including the lands and waters that would be affected by expanded fossil fuel development authorized by this resource management plan, for quiet recreation (including hiking and camping), scientific research, aesthetic pursuits, and spiritual renewal.

The **Sierra Club** is America's largest and most influential grassroots environmental organization, with more than 2.4 million members and supporters nationwide. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

**WildEarth Guardians** ("Guardians") is dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians is a west-wide environmental advocacy organization with thousands of members in Colorado and surrounding states. Guardians members live in and regularly use and enjoy lands in the Uncompahgre Field Office.

**Wilderness Workshop** ("WW") is a 501(c)(3) dedicated to preservation and conservation of the wilderness and natural resources of the White River National Forest and adjacent public lands, including the Uncomphgre Field Office (UFO). WW engages in research, education, legal advocacy and grassroots organizing to protect the ecological integrity of local landscapes and public lands. WW focuses on the monitoring and conservation of air and water quality, wildlife species and habitat, natural communities and lands of wilderness quality. WW is the oldest environmental nonprofit in the Roaring Fork Valley, dating back to 1967 with a membership base of more than 800 people. Many of our members live, work, recreate and otherwise use and enjoy lands managed by the UFO. All members have a great interest in the protection and enhancement of natural values in the planning area. WW has monitored proposals, developments, and management actions in the UFO for years.

BLM_0149749

# TABLE OF CONTENTS

I.   BLM Must Consider Existing, New, and Revised National Policy on Climate Change Into RMP Decisionmaking. ....................................................................................... 1

   A.   BLM Failed to Consider National Policy on Climate Change in Agency Decisionmaking. ............................................................................................. 4

   B.   BLM Failed to Consider Recent Climate Science and Carbon Budgeting. .................... 5

II.  BLM Fails to Consider All Reasonable Alternatives. .......................................... 15

   A.   BLM Has a Legal Obligation to Consider All Reasonable Alternatives. ...................... 15

   B.   BLM Fails to Consider a Range of Reasonable Alternatives. ....................................... 18

   C.   BLM Must Consider the No Fossil Fuel Leasing Alternative in Response to Threats Posed by Climate Change. ............................................................................................ 22

      1.   BLM Has Legal Authority to Not Issue New Oil and Gas or Coal Leases on Public Lands in the Uncompahgre Area. ........................................................................ 22

      2.   No-Leasing or Limited Leasing Alternatives Meet the RMP's Purpose and Need.... 24

      3.   The Draft EIS's Justifications for Rejecting No-Leasing Alternatives Are Arbitrary and Capricious. ................................................................................................... 25

      4.   BLM Cannot Forego Analysis of a "No-Leasing" Alternative for Coal by Instead Relying on the Programmatic EIS. ....................................................................... 27

   D.   BLM Must Analyze Alternatives That Require Coal Mines in the Uncompahgre Planning Area to Mitigate Climate Impacts by Capturing or Flaring Methane Emissions. ................................................................................................................... 28

      1.   BLM Has the Legal Authority to Require Mines That Operate on Public Lands to Capture or Flare Methane. ................................................................................... 28

      2.   It Is Critically Important To Reduce Methane Emissions In Order To Limit Climate Damages................................................................................................................ 30

      3.   Existing Technologies Could Significantly Reduce Methane Emissions From Coal Mines in the Uncompahgre Planning Area. .......................................................... 31

   E.   BLM Must Explicitly Consider a Renewable Energy Alternative or Include Renewable Energy as a Priority Element in Each Alternative. ....................................................... 35

III. The UFO Failed to Take a Hard Look at Climate Change Impacts...................................... 39

   A.   The Draft EIS Fails To Address Whether the Alternatives Considered Are Consistent with National Climate Goals......................................................................................... 48

   B.   The Draft EIS Relies on Outdated Data Concerning Climate Change. ......................... 50

   C.   The Draft EIS Fails to Address New Information Concerning the Impacts of Climate Change in the Uncompahgre Area. ................................................................................ 51

   D.   The Draft EIS Relies on Outdated Coal Production and Employment Data. ................. 58

   E.   BLM Must Quantify the Severity of Harm from Greenhouse Gas Emissions............... 62

BLM_0149750

| | 1. | Social Cost of Carbon Protocol ................................................................ 62 |
| | 2. | Social Cost of Methane Protocol ............................................................. 68 |
| F. | | Methane Emissions and Waste.................................................................... 69 |
| | 1. | Mineral Leasing Act's Duty to Prevent Waste............................................ 71 |
| | 2. | President Obama's Climate Action Plan and Secretarial Order 3289. ....... 73 |
| | 3. | BLM Must Strengthen Its Approach to Methane Mitigation. .................... 75 |
| | 4. | The Capture of Methane Is Critical Due to Its Global Warming Potential. .............. 83 |
| G. | | Managing for Community and Ecosystem Resiliency.................................... 89 |
| H. | | BLM Must Ensure That Any Subsequently-Prepared NEPA Document Addresses Mitigation for Climate Impacts Consistent with All Relevant Laws and Policies, Including Current Mitigation Guidance......................................................... 92 |
| | 1. | Consistent with the Mitigation Hierarchy, BLM Must Avoid, Minimize and Offset Impacts from Fossil Fuels Made Available by the Uncompahgre RMP, Including Climate Change-Related Impacts. ............................................... 94 |
| | 2. | BLM Should Adopt a Mitigation Strategy as Part of the Uncompahgre Field Office RMP to Address Unavoidable Climate Change Impacts............................ 96 |
| IV. | | The UFO Failed to Take a Hard Look at the Direct, Indirect and Cumulative Impacts of Fossil Fuel Development on Resource Values in the Planning Area.................................. 97 |
| A. | | The UFO Failed to Take a Hard Look at Certain Impacts to Air Quality..................... 99 |
| | 1. | Comprehensive Air Resource Protection Protocol.................................... 99 |
| | 2. | Air Resource Mitigation Measures......................................................... 101 |
| | 3. | Ozone Impacts .................................................................................... 102 |
| | 4. | Hazardous Air Pollutant Impacts........................................................... 105 |
| | 5. | Visibility and Ecosystem Impacts .......................................................... 105 |
| | 6. | Air Quality Impacts on Human Health.................................................... 106 |
| B. | | The UFO Has Failed to Take a "Hard Look" at Resource Impacts from Hydraulic Fracturing............................................................................................. 109 |
| | 1. | Impacts from Hydraulic Fracturing are Well Documented. ..................... 110 |
| | 2. | The UFO failed to sufficiently consider issues of water supply related to fracking. 116 |
| | 3. | The UFO failed to sufficiently consider impacts to surface water related to fracking. 117 |
| | 4. | The UFO failed to sufficiently consider impacts to groundwater related to fracking. 119 |
| | 5. | The UFO failed to sufficiently consider issues of wastewater disposal.................. 122 |
| | 6. | Hydraulic Fracturing Disclosure Rules are Insufficient. .......................... 122 |
| | 7. | The Reasonable Foreseeable Development Scenario Failed to Sufficiently Consider Increased Oil and Gas Development Due to Fracking............................... 123 |

8.    Induced Seismicity from Hydraulic Fracturing Remain Unaddressed. ..................... 125

9.    The RMP/EIS and RFD Failed to Consider Impacts Regarding Subsequent Fracturing Treatments, or Re-Fracking Operations. .................................................................... 128

10.    The UFO Failed to Consider Use of Best Management Practices. ........................... 129

C.    The Uncompahgre RMP DEIS Inadequately Analyzes Impacts from Colorado River Withdrawals for Fracking and Other Unconventional Drilling Methods on Endangered Fish Populations and Water Supply, in Violation of NEPA and Section 7 of the ESA. ......................................................................................................................................... 145

1.    Horizontal Wells Will Require Greater Water Depletions Than Previously Anticipated. ............................................................................................................. 147

2.    Climate Change Is Reducing Stream Flows in the Upper Colorado River Basin. .... 150

3.    Persistent Drought Conditions and Increasing Water Demand Have Reduced Water Supply. ................................................................................................................... 156

4.    Mercury and Selenium Are Adversely Impacting the Endangered Fish. ................. 157

5.    Population Numbers of the Endangered Fish Are Declining. .................................. 162

6.    The Recovery Program Is Failing to Meet Recommended Flows. ........................... 164

D.    The UFO Failed to Sufficiently Consider Traffic Impacts That Will Result from Increased Oil and Gas Development. ....................................................................... 165

E.    The UFO Failed to Consider the Impacts of Unregulated Pipelines. .......................... 167

F.    The BLM Failed to Take a Hard Look at Impacts to Human Health. ......................... 170

1.    The UFO Must Conduct a Health Impact Assessment. .......................................... 175

2.    Health data ............................................................................................................ 177

3.    Cumulative impacts on human health .................................................................... 179

4.    Ozone .................................................................................................................... 180

5.    Naturally Occurring Radioactive Materials ........................................................... 181

VI.    The BLM Is Required to Suspend All Oil and Gas Development in the Uncompahgre Area for as Long as the Uncompahgre RMP Revision Remains Uncompleted. ........................ 181

VII.    FLPMA: Unnecessary and Undue Degradation ................................................................ 186

VIII.    Conclusion .......................................................................................................................... 187

I.    **BLM Must Consider Existing, New, and Revised National Policy on Climate Change Into RMP Decisionmaking.**

The National Environmental Policy Act ("NEPA") is our "basic national charter for the protection of the environment," achieving its purpose through "action forcing procedures. . . requir[ing] that agencies take a *hard look* at environmental consequences." 40 C.F.R. § 1500.1; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted) (emphasis added). This includes the consideration of best available information and data, as well as disclosure of any inconsistencies with federal policies and plans.

In 2014, President Obama described climate change as an "urgent and growing threat . . . that will define the contours of this century more dramatically than any other."[1] In that same year, the U.S. pledged to reduce its greenhouse gas ("GHG") emissions 26-28 percent below 2005 levels by 2020.[2] Since then, the President has also announced a new goal to cut methane emissions from the oil and gas sector by 40-45 percent below 2012 levels by 2025,[3] and set standards to reduce carbon dioxide emissions from the electricity sector by 32 percent from 2005 levels by 2030.[4] In 2015, President Obama recognized, "ultimately, if we're going to prevent large parts of this Earth from becoming not only inhospitable but uninhabitable in our lifetimes, we're going to have to keep some fossil fuels in the ground rather than burn them and release more dangerous pollution into the sky."[5] In his final State of the Union address, President Obama again noted the federal government's commitment to fighting climate change, vowing "to accelerate the transition away from old, dirtier energy sources," and making a powerful promise "to change the way we manage our oil and coal resources so that they better reflect the costs they impose on taxpayers and our planet."[6] These statements culminated in December, 2015 when the President joined with 194 other nations in recognizing "that climate change represents an urgent and potentially irreversible threat to human societies and the planet" and setting the goal of "holding the increase in the global average temperature to well below 2°C

---

[1] The White House, Remarks by the President at U.N. Climate Change Summit (Sept. 23, 2014), available at: https://www.whitehouse.gov/the-press-office/2014/09/23/remarks-president-un-climate-change-summit.
[2] U.S.-China Joint Announcement on Climate Change (Nov. 11, 2014), available at: https://www.whitehouse.gov/the-press-office/2014/11/11/us-china-joint-announcement-climate-change (attached as Exhibit 46).
[3] The White House, Climate Action Plan: Strategy to Reduce Methane Emissions (March 2014), available at: https://www.whitehouse.gov/blog/2014/03/28/strategy-cut-methane-emissions (attached as Exhibit 1).
[4] Environmental Protection Agency, Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 80 Fed. Reg. 64662 (Oct. 23, 2015).
[5] The White House, Statement by the President on the Keystone XL Pipeline (Nov. 6, 2015), available at: https://www.whitehouse.gov/the-press-office/2015/11/06/statement-president-keystone-xl-pipeline.
[6] President Barack Obama, State of the Union (Jan. 12, 2016), available at: https://www.whitehouse.gov/sotu.

BLM_0149753

above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5°C."[7] The President ratified the Paris Agreement, along with China, on September 3, 2016.[8] The President has also recognized that "the Paris Agreement alone will not solve the climate crisis. Even if we meet every target embodied in the agreement, we'll only get to part of where we need to go."[9]

Although national policy and statements addressing climate change have accelerated in recent years—as they should given the narrowing window of time to take meaningful action—the federal government's recognition of climate change is not new. The Secretary of the United States Department of the Interior stated, in Secretarial Order 3226, *Evaluating Climate Change Impacts in Management Planning* (January 19, 2001), that "[t]here is a consensus in the international community that global climate change is occurring and that it should be addressed in governmental decision making." Order 3226 established the responsibility of agencies to "consider and analyze potential climate change impacts when undertaking long-range planning exercises, when setting priorities for scientific research and investigations, when developing multi-year management plans, and/or when making major decisions regarding potential utilization of resources under the Department's purview."

In a 2007 report entitled *Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources,* the GAO concluded that the Department of the Interior had not provided specific guidance to implement Secretarial Order 3226, that officials were not even aware of Secretarial Order 3226, and that Secretarial Order 3226 had effectively been ignored. This report led to Secretarial Order 3289, *Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources* (September 14, 2009), which reinstated the provisions of Order 3226, and recognized that "the realities of climate change require us to change how we manage land, water, fish and wildlife, and cultural heritage and tribal lands and resources we oversee," and acknowledged that the Department of the Interior is "responsible for helping protect the nation from the impacts of climate change." A month later, in Executive Order No. 13514, *Federal Leadership in Environmental, Energy, and Economic Performance* (Oct. 5, 2009), President Obama called on all federal agencies to "measure, report, and reduce their greenhouse gas emissions from direct and indirect activities." 74 Fed. Reg. 52,117 (Oct. 8, 2009). This directive was followed by Executive Order No. 13693, *Planning for Federal Sustainability in the Next Decade* (March 25, 2015), which reaffirmed the federal government's commitment to reducing GHG emissions. 80 Fed. Reg. 15,871 (March 25, 2015).

---

[7] United Nations Framework Convention on Climate Change, Conference of the Parties (Nov 30-Dec. 11, 2015), Adoption of the Paris Agreement, Art. 2, U.N. Doc. FCCC/CP/2015/L.9 (Dec. 12, 2015), available at: http://unfccc.int/resource/docs/2015/cop21/eng/l09.pdf ("Paris Agreement") (attached as Exhibit 2).

[8] The White House, President Obama: The United States Formally Enters the Paris Agreement (Sept. 3, 2016), available at: https://www.whitehouse.gov/blog/2016/09/03/president-obama-united-states-formally-enters-paris-agreement.

[9] The White House, Office of the Press Secretary, Remarks by the President on the Paris Agreement (Oct. 5, 2016), attached as Exhibit 3, and available at https://www.whitehouse.gov/the-press-office/2016/10/05/remarks-president-paris-agreement (last viewed Oct. 26, 2016).

BLM_0149754

In 2009, the Environmental Protection Agency ("EPA") issued a finding that the changes in our climate caused by elevated concentrations of greenhouse gases in the atmosphere are reasonably anticipated to endanger the public health and welfare of current and future generations. 74 Fed. Reg. 66496 (Dec. 15, 2009). In 2015, EPA acknowledged more recent scientific assessments that "highlight the urgency of addressing the rising concentrations of $CO_2$ in the atmosphere." 80 Fed. Reg. 64661 (Oct. 23, 2015).

Earlier this year, the White House Council on Environmental Quality ("CEQ")—the federal agency tasked with managing the federal government's implementation of NEPA— recognized the unique nature of climate change and the challenges it imposed on NEPA compliance. On August 1, 2016, CEQ released *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews* (hereafter, "Final Climate Guidance") (attached as Exhibit 4). The Final Guidance applies to all proposed federal agency actions, "including land and resource management actions." *Id.* at 9. Notably, while CEQ's final guidance post-dates the UFO's release of the draft EIS, (draft guidance was published December 18, 2014), it is intended to "facilitate compliance with existing NEPA requirements." *Id.* at 1. In other words, the Final Guidance is meant to underscore BLM's existing legal obligations to disclose and consider the foreseeable effects that, for example, coal, oil and gas leasing and development has on climate change. BLM still has ample time to incorporate this Guidance into the Final RMP and EIS. In its Final Guidance, the CEQ recognized that:

> Climate change results from the incremental addition of GHG emissions from millions of individual sources, which collectively have a large impact on a global scale. CEQ recognizes that the totality of climate change impacts is not attributable to any single action, but are exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government. Therefore, a statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA. Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact.

*Id.* at 10-11. CEQ's Final Guidance also explains the application of NEPA principles and practices to the analysis of GHG emissions and climate change, including: (1) that agencies quantify a proposed action's projected direct and indirect GHG emissions, taking into account available data and GHG quantification tools; (2) that agencies use projected GHG emissions as a proxy for assessing potential climate change effects when preparing a NEPA analysis; (3) where GHG emission tools, methodologies, or data inputs are not reasonably available, that agencies include a qualitative analysis in the NEPA document and explain the basis for determining that

BLM_0149755

quantification is not reasonably available; (4) that agencies analyze foreseeable direct, indirect, and cumulative GHG emissions and climate effects; (5) that agencies consider reasonable alternatives and the short- and long-term effect and benefits in the alternatives and mitigation analysis; (6) that agencies consider alternatives that would make the actions and affected communities more resilient to the effects of a changing climate; and (7) that agencies assess the broad-scale effects of GHG emissions and climate change, either to inform programmatic decisions, or at both the programmatic and project-level. *See id.* at 4-6.

> A.    **BLM Failed to Consider National Policy on Climate Change in Agency Decisionmaking.**

NEPA requires BLM to consider national policy in its decisionmaking process—a fact expressly recognized by the agency's purpose and need, DEIS 1-2—yet the DEIS fails to do so with regard to climate change, as detailed above. Remarkably, in a statement detached from the reality of climate change, the science used to understand it, and national policy meant to address it, the UFO's draft EIS claims:

> It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP. It is important to note that projected changes are likely to occur over several decades to a century. Many of the projected changes associated with climate change may not be measurably discernible within the reasonably foreseeable future. Existing climate prediction models are global or continental in scale; therefore, they are not appropriate to estimate potential impacts of climate change on the planning area. The current state of the science involves calculating potential quantities of greenhouse gases that may be added to the atmosphere from a particular activity. However, tools to analyze or predict how global or regional climate systems may be affected by a particular activity or activities within the planning area are not currently available. Assessing the impacts of greenhouse gas emissions on global climate change requires modeling on a global scale which is beyond the scope of this analysis. Potential impacts on climate change are influenced by greenhouse gas emission sources from around the globe and it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area.

Draft EIS at 4-40. The UFO then concluded: "The projected UFO planning area emissions are a fraction of the EPA's modeled sources and are shorter in duration, and therefore it is reasonable to conclude that these activities would have no measurable impact on climate, although the emissions would add incrementally to the global GHG loading burden." *Id.*

The UFO's position is reflective of a fundamental disconnect with regard to how our public lands are managed for energy production and national policies to limit GHG emissions. The agency not only fails to take informed action to address climate change, as required by Order 3226 and Order 3289, but signals a deep misunderstanding of basic climate science as well as the "tools and methodologies for quantifying GHG emissions and comparing GHG quantities

BLM_0149756

across alternative scenarios." *See* Final Guidance at 11.[10] As stated in Order 3289, BLM must "appl[y] scientific tools to increase understanding of climate change and to coordinate an effective response to its impacts," and "management decisions made in response to climate change impacts must be informed by [this] science." Through statements meant to avoid any actual analysis, BLM fails to take a hard look at the climate impacts of fossil fuel leasing and development on public lands in the planning area, as required by NEPA and underscored by the CEQ, as detailed below. Perhaps more importantly, the UFO failed to consider any alternatives that would meaningfully address greenhouse gas emissions and climate change impacts in the planning area—including a no-leasing alternative—and that are reflective of current science and national policy.

### B.      BLM Failed to Consider Recent Climate Science and Carbon Budgeting.

The UFO's draft EIS frames climate change impacts in precisely the manner warned against by the CEQ,[11] stating that "impacts on climate change are influenced by greenhouse gas emission sources from around the globe and it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area," concluding that "[a]ssessing the impacts of greenhouse gas emissions … is beyond the scope of this analysis." Draft EIS at 4-40. Despite the agency's refusal to provide climate analysis, the UFO does recognize that, "[w]ith respect to global GHG emissions, the following predictions were identified by the EPA for the Mountain West and Great Plains region"—notably contradicting an earlier statement that "[i]t may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP." Draft EIS at 4-40. These predictions include, for example: warmer temperatures with less snowfall; earlier snowmelt impacting ranchers, farmers, recreationalists, and others; more frequent and more severe droughts; impacts to crop and livestock production; forest impacts and increased susceptibility to fire; and that ecosystems will be stressed, impacting wildlife. Draft EIS at 4-40 to 41.

Since the dawn of the industrial revolution a century ago, the average global temperature has risen some 1.6 degrees Fahrenheit. Most climatologists agree that, while the warming to date is already causing environmental problems, another 0.4 degree Fahrenheit rise in temperature, representing a global average atmospheric concentration of carbon dioxide ("$CO_2$") of 450 parts per million ("ppm"), could set in motion unprecedented changes in global climate and a significant increase in the severity of natural disasters—and could represent the point of no return.[12] In August 2016, the atmospheric concentration of $CO_2$ was approximately 402.25 ppm,

---

[10] *See also*, Final Climate Guidance at 12 n. 28 (linking to quantification tools that "are widely available, and are already in broad use in the Federal and private sectors").

[11] *See* Final Climate Guidance at 11 ("comparisons [to global or regional emissions] are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations").

[12] *See* David Johnston, *Have We Passed the Point of No Return on Climate Change?*, Scientific American (April 2015), available at: http://www.scientificamerican.com/article/have-we-passed-the-point-of-no-return-on-climate-change/.

up from 398.93 ppm the same month a year earlier.[13]

Climate change has been intensively studied and acknowledged at the global, national, and regional scales. Climate change is being fueled by the human-caused release of greenhouse gas emissions, in particular carbon dioxide and methane. The Intergovernmental Panel on Climate Change ("IPCC") is a Nobel Prize-winning scientific body within the United Nations that reviews and assesses the most recent scientific, technical, and socio-economic information relevant to our understanding of climate change. In its most recent report to policymakers in 2014, the IPCC provided a summary of our understanding of human-caused climate change. Among other things, the IPCC summarized:[14]

- Human influence on the climate system is clear, and recent anthropogenic emissions of greenhouse gases are the highest in history. Recent climate changes have had widespread impacts on human and natural systems.

- Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, and sea level has risen.

- Anthropogenic greenhouse gas emissions have increased since the pre-industrial era, driven largely by economic and population growth, and are now higher than ever. This has led to atmospheric concentrations of carbon dioxide, methane, and nitrous oxide that are unprecedented in at least the last 800,000 years. Their effects, together with those of other anthropogenic drivers, have been detected throughout the climate system and are extremely likely to have been the dominant cause of the observed warming since the mid-20[th] century.

- In recent decades, changes in climate have caused impacts on natural and human systems on all continents and across the oceans. Impacts are due to observed climate change, irrespective of its cause, indicating the sensitivity of natural and human systems to changing climate.

- Continued emission of greenhouse gases will cause further warming and long-lasting changes in all components of the climate system, increasing the likelihood of severe, pervasive, and irreversible impacts for people and ecosystems. Limiting climate change would require substantial and sustained reductions in greenhouse gas emissions which, together with adaptation, can limit climate change risks.

---

[13] NOAA, Earth System Research Laboratory, *Trends in Atmospheric Carbon Dioxide*, available at: http://www.esrl.noaa.gov/gmd/ccgg/trends/.
[14] IPCC AR5, *Summary for Policymakers* (March 2014) available at: http://www.ipcc.ch/pdf/assessment-report/ar5/syr/AR5_SYR_FINAL_SPM.pdf (attached as Exhibit 5).

BLM_0149758

- Surface temperature is projected to rise over the 21st century under all assessed emission scenarios. It is very likely that heat waves will occur more often and last longer, and that extreme precipitation events will become more intense and frequent in many regions. The ocean will continue to warm and acidify, and global mean sea level to rise.

Carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride are recognized as the key greenhouse gases contributing to climate change. In 2009, the EPA found that these "six greenhouse gases taken in combination endanger both the public health and the public welfare of current and future generations."[15] The D.C. Circuit has upheld this decision as supported by the vast body of scientific evidence on the subject. *See Coal. for Responsible Regulation, Inc. v. EPA.*, 684 F.3d 102, 120-22 (D.C. Cir. 2012).

According to the National Oceanic and Atmospheric Administration ("NOAA"), "[t]he combined average temperature over global land and ocean surfaces for August 2016 was the highest for August in the 137-year period of record, marking the 16th consecutive month of record warmth for the globe."[16] The global climate crisis is happening and it may well be accelerating quickly.



**The graphs show globally averaged historic and monthly mean carbon dioxide.**

The IPCC in 2013 affirmed: "Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, sea level has risen, and the concentrations of greenhouse gases have increased" causing "widespread impacts on human and natural systems."[17] This is consistent with the findings of the United States' 2014

---

[15] Environmental Protection Agency, *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act* 74 Fed. Reg. 66,496 (Dec. 15, 2009).
[16] NOAA, Global Analysis – August 2016, available at: https://www.ncdc.noaa.gov/sotc/global/201608.
[17] IPCC AR5 Synthesis Report at 2 (attached as Exhibit 5).

BLM_0149759

Third National Climate Assessment, stating: "That the planet has warmed is 'unequivocal,' and is corroborated through multiple lines of evidence, as is the conclusion that the causes are very likely human in origin."[18] With particular regard to the Southwest Region—which includes Colorado, New Mexico, Utah, Arizona, Nevada, and California—the National Climate Assessment included in the following overview:[19]

- Snowpack and streamflow amounts are projected to decline in parts of the Southwest, decreasing surface water supply reliability for cities, agriculture, and ecosystems.

- The Southwest produces more than half of the nation's high-value specialty crops, which are irrigation-dependent and particularly vulnerable to extremes of moisture, cold, and heat. Reduced yields from increasing temperatures and increasing competition for scarce water supplies will displace jobs in some rural communities.

- Increased warming, drought, and insect outbreaks, all caused by or linked to climate change, have increased wildfires and impacts to people and ecosystems in the Southwest. Fire models project more wildfire and increased risks to communities across extensive areas.

- Flooding and erosion in coastal areas are already occurring even at existing sea levels and damaging some California coastal areas during storms and extreme high tides. Sea level rise is projected to increase as Earth continues to warm, resulting in major damage as wind-driven waves ride upon higher seas and reach farther inland.

- Projected regional temperature increases, combined with the way cities amplify heat, will pose increased threats and costs to public health in southwestern cities, which are home to more than 90% of the region's population. Disruptions to urban electricity and water supplies will exacerbate these health problems.

Immediate and substantial greenhouse gas reductions are required to avoid catastrophic impacts to people and communities. "Following the warmest year on record in 2014 according to most estimates, 2015 reached record warmth yet again, surpassing the previous record by more than 0.1°C."[20]

---

[18] Jerry M. Melillo, *et al.*, Climate Change Impacts in the United States: The Third National Climate Assessment (2014) at 61, available at: http://nca2014.globalchange.gov (attached as Exhibit 6).

[19] *See id.* at 463-86.

[20] American Meteorological Society, *State of the Climate in 2015*, Vol.97, No.8 (Aug. 2016), at S7 (attached as Exhibit 7).

BLM_0149760



**VERY FEW COOL SPOTS IN 2015**



**NEW HOTTEST YEAR ON RECORD**

NOAA Climate.gov, adapted from State of the Climate 2015

As noted above, the Paris Agreement commits all signatories—including the United States—to a target holding long-term global average temperature "to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels."[21] As articulated by a team of international climate scientists, including Dr. James Hansen, in a 2013 report: "The widely accepted target of limiting human-made global warming to 2 degrees Celsius (3.6 degrees Fahrenheit) above preindustrial level is too high and would subject young people, future generations and nature to irreparable harm…. Observational data reveal that some climate extremes are already increasing in response to warming of several tenths of a degree in recent decades; these extremes would likely be much enhanced with

---

[21] Paris Agreement at Art. 2 (attached as Exhibit 2).

BLM_0149761

warming of 2°C or more."[22] "Runaway climate change—in which feedback loops drive ever-worsening climate change, regardless of human activities—are now seen as a risk even at 2°C of warming."[23] Indeed, the impacts of 2°C temperature rise have been "revised upwards, sufficiently so that 2°C now more appropriately represents the threshold between 'dangerous' and 'extremely dangerous' climate change."[24]

Although the Paris Agreement has underscored that immediate action is needed to avoid 'extremely dangerous' warming, meeting the voluntary commitments adopted in Paris alone will be insufficient to meet goal of limiting temperature change to between 1.5°C and 2.0°C above pre-industrial levels. As noted by a 2015 UNEP technical report:

> The emissions gap between what the full implementation of the unconditional [intended nationally determined contributions (INDCs)] contribute and the least-cost emission level for a pathway to stay below 2°C, is estimated to be 14 GtCO$_2$e (range: 12-17) in 2030 and 7 GtCO$_2$e (range: 5-10) in 2025. When conditional INDCs are included as fully implemented, the emissions gap in 2030 is estimated to be 12 GtCO2e (range: 10-15) and 5 GtCO$_2$e (range: 4-8) in 2025.[25]

In other words, far greater emissions reductions are necessary to stay below and 2.0°C, let alone aspire to 1.5°C of warming. If no further progress were made beyond the Paris Agreement, expected warming by 2100 would be 3.5°C.[26] In the alternative, if no action is taken and the status quo is maintained—a position reflected in BLM's draft EIS—estimated warming by 2100 is upwards of 4.5°C.[27]

---

[22] James Hansen, *et al.*, *Assessing "Dangerous Climate Change": Required Reduction of Carbon Emissions to Protect Young People, Future Generations and Nature*, 8 PLoS ONE 8 e81648 (2013) (attached as Exhibit 8).

[23] Greg Muttitt, *et al.*, *The Sky's Limit: Why the Paris Climate Goals Require a Managed Decline of Fossil Fuel Production*, Oil Change International (Sept. 2016) at 6 (attached as Exhibit 9); *see also* David Spratt, *Climate Reality Check: After Paris, Counting the Cost* (March 2016) at 8 (attached as Exhibit 10) ("there is an unacceptable risk that before 2°C of warming, significant "long-term" feedbacks will be triggered, in which warming produces conditions that generate more warming, so that carbon sinks such as the oceans and forests become less efficient in storing carbon, and polar warming triggers the release of significant permafrost and clathrate carbon stores. Such an outcome could render ineffective human efforts to control the level of future warming to manageable proportions.").

[24] Kevin Anderson and Alice Bows, *Beyond 'Dangerous' Climate Change: Emission Scenarios for a New World*, Phil. Trans. R. Soc. (2011) (attached as Exhibit 11).

[25] United Nations Environment Programme (UNEP), *The Emissions Gap Report 2015: A UNEP Synthesis Report* (Nov. 2015) at xviii (attached as Exhibit 12).

[26] Spratt, *Climate Reality Check* at 2 (attached as Exhibit 10).

[27] *See* Climate Interactive, Climate Scorecard, available at: https://www.climateinteractive.org/programs/scoreboard/; *see also*, Andrew P. Schurer, *et al.*, *Separating Forced from Chaotic Climate Variability over the Past Millennium*, Journal of Climate, Vol. 26 (March 2013) (attached as Exhibit 13).

BLM_0149762

With specific regard to United States commitments under the Paris Agreement, the U.S. INDC set specific greenhouse gas emissions reduction target for 2025 of a 26% to 28% reduction below the 2005 emission levels, producing a range in 2005 net GHG emissions from 6,323 to 7,403 MTCO$_2$e.[28] The difference between this target and the estimated 2025 emissions without INDC policies results in an 'emissions gap' ranging from 896 to 2,121 MTCO$_2$e.[29]

Both the IPCC and National Climate Assessment recognize the dominant role of fossil fuels in driving climate change:

> While scientists continue to refine projections of the future, observations unequivocally show that climate is changing and that the warming of the past 50 years is primarily due to human-induced emissions of heat-trapping gases. These emissions come mainly from burning coal, oil, and gas, with additional contributions from forest clearing and some agricultural practices.[30]
>
> ***
>
> CO$_2$ emissions from fossil fuel combustion and industrial processes contributed about 78% to the total GHG emission increase between 1970 and 2010, with a contribution of similar percentage over the 2000–2010 period (*high confidence*).[31]

As summarized in a recent report:

> The Paris Agreement aims to help the world avoid the worst effects of climate change and respond to its already substantial impacts. The basic climate science involved is simple: cumulative carbon dioxide (CO$_2$) emissions over time are the key determinant of how much global warming occurs. This gives us a finite *carbon budget* of how much may be emitted in total without surpassing dangerous temperature limits.[32]

According to the IPCC, as of 2011, the remaining carbon budget of cumulative CO$_2$ emissions from all anthropogenic sources must remain below 1,000 GtCO$_2$ to provide a 66% probability of limiting warming to 2°C above pre-industrial levels.[33] For years 2012-2014,

---

[28] Jeffery Greenblatt & Max Wei, *Assessment of the climate commitments and additional mitigation policies of the Unites States*, Nature Climate Change (Sept. 2016), available at: http://www.nature.com/nclimate/journal/vaop/ncurrent/full/nclimate3125.html (attached as Exhibit 14).

[29] *Id.* at 2; *see also* UNEP, Emissions Gap Report (attached as Exhibit 12).

[30] Third National Climate Assessment at 2 (attached as Exhibit 6).

[31] IPCC AR5 Synthesis Report at 46 (attached as Exhibit 5).

[32] *The Sky's Limit* at 6 (attached as Exhibit 9).

[33] IPCC AR5 Synthesis Report at 63-64 & Table 2.2 (attached as Exhibit 5). For an 80% probability of staying below 2°C, the budget from 2000 is 890 GtCO$_2$, with less than 430 GtCO$_2$ remaining. Malte Meinshausen *et al., Greenhouse-gas emission targets for limiting global warming to 2°C*, Nature (2009) at 1159 (attached as Exhibit 15).

BLM_0149763

approximately 107 GtCO$_2$ was emitted, averaging approximately 36 GtCO$_2$ per year, which left us at the start of 2016 with a carbon budget of only 850 GtCO$_2$.[34] These emissions were the highest in human history and 60% higher than in 1990 (the Kyoto Protocol reference year). Of course, the Paris Agreement aim of limiting global warming to 1.5°C requires adherence to a more stringent carbon budget of only 400 GtCO$_2$ from 2011 onward, of which about 250 GtCO$_2$ remained at the start of 2016.[35] "With global annual emissions amounting to 36 GtCO$_2$ in 2015, scientists predict that at current rates global emissions will exceed the carbon budgets necessary to stay under the 1.5°C target by 2021 and the 2°C target by 2036.[36]

The potential carbon emissions from *existing* fossil fuel reserves—the known belowground stock of extractable fossil fuels—considerably exceed both 2°C and 1.5°C of warming. "Estimated total fossil carbon reserves exceed this remaining [carbon budget] by a factor of 4 to 7."[37] "For the 2°C or 1.5°C limits, respectively 68% or 85% of reserves must remain in the ground."[38] The reserves in currently operating oil and gas field alone, even with no coal, would take the world beyond 1.5°C.[39]

In order for the world to stay within a carbon budget consistent with Paris Agreement goals—"holding the increase in the global average temperature to well below 2°C above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5°C"[40]—significant fossil fuel resources must remain in the ground. More specifically, to meet the target of 2°C, globally "a third of oil reserves, half of gas reserves and over 80 percent of current coal reserves should remain unused from 2010-2050."[41] Studies estimate that global coal, oil and gas resources considered currently economically recoverable contain potential greenhouse gas

---

[34] *See* Annual Global Carbon Emissions, available at: https://www.co2.earth/global-co2-emissions; *see also* C. Le Quéré, *et al.*, *Global Carbon Budget 2015*, Earth Syst. Sci. Data (Dec. 2015) (attached as Exhibit 16).

[35] Dustin Mulvaney, *et al.*, *Over-Leased: How Production Horizons of Already Leased Federal Fossil Fuels Outlast Global Carbon Budgets,* EcoShift Consulting (July 2016) (attached as Exhibit 17) at 2 (citing Joeri Rogelj, *et al.*, *Difference between carbon budget estimates unraveled*, Nature Climate Change (2016) (attached as Exhibit 18).

[36] Mulvaney at 2 (citing Oak Ridge National Laboratories, Carbon Dioxide Information Analysis Center (2015), available at: http://cdiac.ornl.gov/GCP/).

[37] IPCC AR5 Synthesis Report at 63 (attached as Exhibit 5).

[38] The Sky's Limit at 6 (attached as Exhibit 9); *see also* Kevin Anderson and Alice Bows, *Reframing the climate change challenge in light of post-2000 emission trends*, Phil. Trans. R. Soc. (2008) (attached as Exhibit 19) ("to provide a 93% mid-value probability of not exceeding 2°C, the concentration (of atmospheric greenhouse gases) would need to be stabilized at or below 350 parts per million carbon dioxide equivalent (ppm CO$_2$e)" compared to the current level of ~485 ppm CO$_2$e.).

[39] The Sky's Limit at 5, 17 (attached as Exhibit 9).

[40] Paris Agreement at Art. 2 (attached as Exhibit 2).

[41] Christophe McGlade & Paul Ekins, *The geographical distribution of fossil fuels unused when limiting global warming to 2°C*, Nature (Jan 2015) (attached as Exhibit 20).

CONSERVATION GROUPS' COMMENTS
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

12

emissions of 4,196 GtCO$_2$,[42] with other estimates as high as 7,120 GtCO$_2$.[43]

Critically, the United States carbon quota—equivalent to 11% of the global carbon budget needed for a 50% chance of limiting warming to 2°C—allocates approximately 158 GtCO$_2$ to the United States as of 2011.[44] By way of comparison, federal and non-federal fossil fuel emissions together would produce between 697 and 1,070 GtCO$_2$.[45] Regarding just federal fossil fuel resources, the United States contains enough recoverable coal, oil and gas that, if extracted and burned, would result in as much as 492 GtCO$_2$, far surpassing the entire global carbon budget for a 1.5°C target and nearly eclipsing the 2°C target—to say nothing of the United States 'share' of global emissions.[46] Unleased federal fossil fuels comprise 91% of these potential emissions, with already leased federal fossil fuels accounting for as much as 43 GtCO$_2$.[47]

In 2012, "the GHG emissions resulting from the extraction of fossil fuels from federal lands by private leaseholders totaled approximately 1,344 MMTCO$_2$e."[48] Between 2003 and 2014, approximately 25% of all United States and 3-4% of global fossil fuel greenhouse gas emissions are attributable to federal minerals leased and developed by the Department of the Interior.[49] Continued leasing and development of federal fossil fuel resources commits the world to 'extremely dangerous' warming well beyond the 2°C threshold. As one study put it, "the disparity between what resources and reserves exist and what can be emitted while avoiding a temperature rise greater than the agreed 2°C limit is therefore stark."[50] In short, *any* new leasing of federal fossil fuel resources is inconsistent with a carbon budget that would seek to avoid catastrophic climate change.

The production horizons for already leased federal fossil fuel resources underscore how unwarranted any additional leasing is, and in turn the reasonableness of the UFO's consideration of a no-leasing alternative. Comparing these production horizons to dates at which carbon budgets would be exceeded if current emission levels continue:

---

[42] Michael Raupach, *et al., Sharing a quota on cumulative carbon emissions*, Nature Climate Change (Sept. 2014) (attached as Exhibit 21).

[43] IPCC AR5, Mitigation of Climate Change, Contribution of Working Group III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (2014) at Table 7.2 (attached as Exhibit 22).

[44] Raupach at 875 (attached as Exhibit 21).

[45] Dustin Mulvaney, *et al., The Potential Greenhouse Gas Emissions from U.S. Federal Fossil Fuels*, EcoShift Consulting (Aug. 2015) at 16 (attached as Exhibit 23).

[46] *Id.*

[47] *Id.*

[48] Stratus Consulting, *Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters: An Update* (Dec. 2014) at 9 (attached as Exhibit 24).

[49] *See* Energy Information Administration, *Sales of Fossil Fuels Produced from Federal and Indian Lands, FY 2003 through FY 2014* (July 2015) (attached as Exhibit 25); *see also* Stratus Consulting (attached as Exhibit 24).

[50] McGlade at 188 (attached as Exhibit 20).

BLM_0149765

- Federal crude oil already leased will continue producing for 34 years beyond the 1.5°C threshold and 19 years beyond the 2°C threshold;
- Federal natural gas already leased will continue producing 23 years beyond the 1.5°C threshold and 8 years beyond the 2°C threshold;
- Federal coal already leased will continue producing 20 years beyond the 1.5°C threshold and 5 years beyond the 2°C threshold.[51]

Opportunities to reduce GHG emissions through the cessation of new leasing and non-renewal of non-producing leases further underscores how unwarranted continued leasing is, and in turn how reasonable the UFO's consideration of a no-leasing alternative is.

If new leasing and renewal of existing non-producing leases continues, by 2040 it will contribute about two-thirds of expected federal fossil fuel production (forecast based on EIA and other sources).[52] On the other hand, if new leasing ceases and existing non-producing leases are not renewed, 40% of forecast coal production could be avoided in 2025 and 74% of coal production could be avoided in 2040. As for oil and gas, 12% of oil production could be avoided in 2025 and 65% could be avoided by 2040 while 6% of natural gas production could be avoided in 2025 and 59% could be avoided by 2040.[53]

This avoided production would significantly reduce future U.S. emissions. Cessation of new and renewed leases for federal fossil fuel extraction could reduce $CO_2$ emissions by about 100 Mt per year by 2030. Annual emission reductions could become greater than that over time as production declines on existing leases and maintaining or increasing production becomes dependent on yet-to-be issued leases.[54]

A comparison with other measures shows that "no leasing" could be a very significant part of U.S. efforts to address climate change. The 100 Mt $CO_2$ emissions savings that could result from no leasing in 2030 compares favorably with EPA standards for light- and medium-vehicles that are expected to yield 200 Mt in CO2 savings in 2030, and with standards for heavy-duty vehicles that are expected to yield 70 Mt in CO2 savings in the same year. The 100 Mt $CO_2$ emissions reduction from leasing restrictions would be greater than either the emission reductions that the EPA expects to achieve through its existing regulation of oil and gas industry emissions or reductions the BLM expects to achieve from its proposed methane waste standards on oil and gas operations on federal land. Clearly, cessation of new and renewed leases could make an important contribution to U.S. climate change mitigation efforts.[55]

Also, importantly, avoided production through no new leasing and non-renewal of existing non-producing leases could help avoid further carbon lock-in in terms of investment in

---

[51] Mulvaney (2016) at 5 (attached as Exhibit 17).
[52] Peter Erickson and Michael Lazarus, *How Would Phasing Out U.S. Federal Leases for Fossil Fuel Extraction Affect CO2 Emissions and 2°C Goals?,* Stockholm Environmental Institute (2016) at 12 (attached as Exhibit 323).
[53] Erickson and Lazarus at 16.
[54] *Id.* at 26.
[55] *Id.* at 27.

BLM_0149766

both fossil fuel-producing and fossil fuel-using infrastructure.[56]

Simply put, the timeframe to avoid catastrophic climate change is short, and the management of our federal minerals is dangerously out of step with this reality. As noted above, the UFO failed to consider *any* alternative that would meaningfully reduce the projected 3.11 MMTCO$_2$e of annual emissions from the planning area. Draft EIS at 4-39.

## II.     BLM Fails to Consider All Reasonable Alternatives.

### A.     *BLM Has a Legal Obligation to Consider All Reasonable Alternatives.*

The centerpiece of environmental regulation in the United States, the National Environmental Policy Act ("NEPA") requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives. *See* 42 U.S.C. § 4331(b) (congressional declaration of national environmental policy); *U.S. Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 756–57 (2004). BLM must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action in comparative form, so as to provide a "clear basis for choice among the options" open to the agency. 40 C.F.R. § 1502.14. At a minimum, the agency must identify and analyze its preferred alternative, as well as a null or "no action" alternative that would occur if the agency elected to maintain the current state of affairs unchanged. *Id.* In addition, the agency should address all other reasonable alternatives to the proposed action. *See Colorado Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1245 (D. Colo. 2012).

Through the RMP planning process, the UFO is required to "estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail. The estimation of effects shall be guided by the planning criteria and procedures implementing [NEPA]." 43 C.F.R. § 1610.4-6. Essential to any NEPA process is a robust analysis of alternatives to the proposed action. Consideration of reasonable alternatives is necessary to ensure that the agency has before it and takes into account all possible approaches to, and potential environmental impacts of, a particular project. NEPA's alternatives requirement, therefore, ensures that the "most intelligent, optimally beneficial decision will ultimately be made." *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971).

"[T]he heart" of an environmental analysis under NEPA is the analysis of alternatives to the proposed project, and agencies must evaluate all reasonable alternatives to a proposed action." *Colorado Environmental Coalition*, 185 F.3d at 1174 (quoting 40 C.F.R. § 1502.14). An agency must gather "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Greater Yellowstone*, 359 F.3d at 1277 (citing *Colorado Environmental Coalition*, 185 F.3d at 1174); *see also Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1528 (10th Cir. 1992). Thus, agencies must "ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." *Izaak Walton*

---

[56] *Id.* at 30.

BLM_0149767

*League of America v. Marsh*, 655 F.2d 346, 371 (D.C. Cir. 1981) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976)).

When determining whether an EIS analyzed sufficient alternatives to allow BLM to take a hard look at the available options, courts apply the "rule of reason." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 709 (10th Cir. 2009) (citing *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004)). The reasonableness of the alternatives considered is measured against two guideposts. First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. *Westlands*, 376 F.3d at 866. Second, reasonableness is judged with reference to an agency's objectives for a particular project.[57] *See Dombeck*, 185 F.3d at 1174–75; *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 668–69 (7th Cir. 1997); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992).

On the first point, FLPMA is BLM's organic act and delegates authority to the agency to create and amend land use plans. FLPMA's congressional declaration states:

> It is the policy of the United States that … the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will <u>preserve and protect certain public lands in their natural condition</u>; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use;

43 U.S.C. § 1701(a)(8) (emphasis added). Indeed, BLM is duty bound to develop and revise land use plans according to this congressional mandate, so as to "observe the principles of multiple use." 43 U.S.C. § 1712(c)(1). "Multiple use" means "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." 43 U.S.C. § 1702(c).

The RMP revision process, undertaken pursuant to FLPMA, requires BLM to engage in the type of foundational land use planning that is intended to give context to the agency's multiple use mandate. Accordingly, FLPMA provides specific criteria for land use plan revisions, requiring consideration of things such as: observation of the principles of multiple use and sustained yield; integrated consideration of physical, biological, economic, and other sciences; reliance on public lands resources and other values; consideration of present and future uses of the public lands; consideration of the relative scarcity of resource values; and weighing the long-term benefits to the public against the short-term benefits. *See* 43 U.S.C. § 1712(c)(1)-(9). Consideration of these criteria must drive the RMP revision.

---

[57] While an agency may restrict its analysis to alternatives that suit the "basic policy objectives" of a planning action, *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996), it may do so only as long as "the statements of purpose and need drafted to guide the environmental review process ... are not unreasonably narrow," *Dombeck*, 185 F.3d at 1175.

BLM_0149768

Critically, FLPMA does not mandate that every use be accommodated on every piece of land; rather, delicate balancing is required. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage." *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)). As held by the Tenth Circuit, "[i]f all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined." *Rocky Mtn. Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 738 n. 4 (10th Cir.1982) (quoting *Utah v. Andrus*, 486 F.Supp. 995, 1003 (D.Utah 1979)); *see also* 43 U.S.C. § 1701(a)(8) (stating, as a goal of FLPMA, the necessity to "preserve and protect certain public lands in their natural condition"); *Pub. Lands Council*, 167 F.3d at 1299 (citing § 1701(a)(8)). As further provided by the Tenth Circuit:

> It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses... BLM's obligation to manage for multiple use does not mean that development *must* be allowed on [a particular piece of public lands]. Development is a *possible* use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

*New Mexico ex rel. Richardson*, 565 F.3d at 710. Accordingly, the RMP revision must consider, on equal footing, the value of permanent protection and preservation of public lands in the planning area, along with industry pressure to lease and develop public lands for fossil fuel resources. It is incumbent on the UFO to re-evaluate these competing resources and give suitable weight to FLPMA's mandate to preserve and protect public lands in their natural condition. *See* 43 U.S.C. § 1701(a)(8). This is, after all, the agency's statutory mandate. *See New Mexico ex rel. Richardson*, 565 F.3d at 709.

The second factor in considering the reasonableness of alternatives is judged by the RMP's purpose and need. As stated by BLM:

> The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses... BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy.

BLM_0149769

Draft EIS at 1-2. This purpose does not take fossil fuel leasing and development in the planning area as a foregone conclusion. Rather, the central purpose is to "provide broad-scale direction" in light of "current resource conditions, changes in circumstances… and new or revised national-level policy." *See New Mexico ex rel. Richardson,* 565 F.3d at 710-11.

### B.   BLM Fails to Consider a Range of Reasonable Alternatives.

By these measures, BLM's range of alternatives fails to satisfy its statutory obligation under FLPMA, as well as the purpose and need of the RMP. All of the draft EIS alternatives propose to leave available extensive lands for fossil fuel leasing and development. *See* Summary of Alternatives, below. Critically, although acreage may reflect subtle differences between alternatives, there is virtually no change in the foreseeable range of coal, oil and gas leasing and development, or in greenhouse gas emission rates across alternatives. In fact, each alternative shows an *increase* in direct greenhouse gas emissions over base year emissions of between 10 and 12 percent, ranging from 3.08 to 3.13 MMTCO$_2$e annually. In other words, any difference in BLM's range of alternatives is mere window-dressing for an RMP aimed at leaving all foreseeable fossil fuel resources fully available to exploitation. In effect, the agency's alternatives analysis becomes little more than an exercise of form over substance.

### Summary of Alternatives

| Resource | Alt. A | Alt. B | Alt. B.1 | Alt. C | Alt. D* |
|---|---|---|---|---|---|
| Estimated Annual Direct GHG Emissions (MMTCO$_2$e)[58] | 3.08 | 3.09 | 3.06 | 3.13 | 3.11 |
| Direct Annual CO$_2$ Emissions (Tons per year) (Base 81,978)[59] | 256,212 | 258,174 | 247,280 | 283,901 | 273,027 |
| Direct Annual CH$_4$ Emissions (Tons per year) (Base 128,840)[60] | 134,569 (20 yr. GWP = 11.7 MMTCO$_2$e) | 134,475 (20 yr. GWP = 11.7 MMTCO$_2$e) | 133,955 (20 yr. GWP =11.7 MMTCO$_2$e) | 135,609 (20 yr. GWP = 11.8 MMTCO$_2$e) | 135,082 (20 yr. GWP = 11.8 MMTCO$_2$e) |
| Total Annual GHG Emissions Increase (Base year 2.79)[61] | 10% | 10% | 10% | 12% | 11% |
| Maximum Annual Indirect GHG | 27.1 | 27.1 | 27.1 | 27.1 | 27.1 |

---

[58] Uncompahgre RMP Draft EIS at 4-38, Table 4-9
[59] *Id.*
[60] *Id.*
[61] *See Id.*

BLM_0149770

| from Coal (MMTCO$_2$e)[62] | | | | | |
|---|---|---|---|---|---|
| Oil & Gas Open to Leasing (Acres)[63] | 871,810 | 729,330 | 635,190 | 871,810 | 865,970 |
| Oil & Gas Closed to Leasing (Acres)[64] | 44,220 (4.8%) | 186,700 (20.4%) | 280,840 (30.7%) | 44,220 (4.8%) | 50,060 (5.5%) |
| Coal Acceptable to Leasing (Acres)[65] | 144,790 | 320,440 | 320,440 | 405,230 | 371,400 |
| Coal Unsuitable or Closed to Leasing (Acres)[66] | 1,070 (0.7%) | 101,060 (24.0%) | 101,060 (24.0%) | 16,270 (3.9%) | 50,100 (11.9%) |

(*)Agency Preferred Alternative

For example, with respect to coal mining, the draft EIS considers four alternatives with varying levels of lands open ("acceptable") to coal leasing. But the range is skewed toward leaving the vast majority of coal-bearing lands open for leasing. As the table above demonstrates, the alternatives leave open to leasing between 76% and 99.3% of all lands with coal resources.[67]

Yet even under this lopsided "range" of alternatives, the likely amount of coal produced and burned is identical. Under each alternative, the Draft EIS predicts the same amount of greenhouse gas emissions from coal combustion—27.1 million tons—indicating that none of the alternatives will limit coal production in the planning area in any way. The draft EIS specifically assumes that for each alternative, "[t]he output from the two active mines on BLM-administered land within this coal field is estimated to *remain the same as current production*, between 9 and 11 million tons of coal each year for the next 20 years."[68]

Further, the draft EIS indicates that nearly all of the coal production in the resource area will come from a 40,000 acre area that is almost entirely open to leasing under each alternative:

---

[62] *Id.* at 4-41 – 4-42 (maximum figures for indirect GHG emissions from coal production); *id.* at 2-409; 4-297 ("coal production is expected to remain the same across all alternatives").
[63] *Id.* at 4-262, Table 4-31; *but see id.* at 2-10 (displaying different figures for acreage closed to leasing).
[64] *Id.*
[65] *Id.* at 2-9 – 2-10, Table 2-1.
[66] *Id.*
[67] *See also id.* at 4-274 ("Within the coal potential area, [Alternative B] would be the most restrictive, with 24 percent of the coal potential area unavailable for leasing"). The draft EIS indicates that coal leasing restrictions in the most active coal field – the Somerset – vary between 0% and 12% of the lands in that field that "would be unacceptable for further consideration of leasing and development," meaning that every alternative leaves *at least* 88% of the most active coal field open for development. *Id.* at 4-289 – 4-290.
[68] *Id.* at 4-454 (emphasis added).

BLM_0149771

the Somerset coal field.[69] The only way to produce a range of alternative coal outcomes would be to analyze alternatives that placed significant portions of the Somerset area off-limits to coal mining—which BLM failed to do, in violation of NEPA. Conservation Groups therefore request that BLM evaluate at least one alternative that will result in at least a 50% reduction in coal production in the resource area over the 20-year life of the plan, and another that will eliminate new leasing. *See infra* at II.C.

The "range" of alternatives regarding coal production is not reasonably broad based on its treatment of other coal producing regions within the Uncompahgre field office area. For example, the vast majority of the Tongue Mesa coal field is left open under each action alternative (92% or more), despite the fact that the draft EIS predicts zero coal will be produced there because the area's geology makes it "economically unviable to mine in the next 20 years."[70] Similarly, while most of the Grand Mesa coal-field is open to coal leasing under all three action alternatives, coal there is also unlikely to be mined in the next two decades.[71] This begs the question: if no coal will be mined in the Tongue Mesa and Grand Mesa coal fields, why did BLM fail to consider an alternative that eliminates coal mining there?

In addition, the draft EIS's consideration of a skewed range alternatives for coal stands in marked contrast to its treatment of renewable energy. The draft EIS considers alternatives that would open to such development a relatively small acreage (5%), about a third of the acreage, a little over half the acreage, and most the acreage (83%) to wind and solar development.[72] The *greatest* percentage of land open to wind and solar under any alternatives (83%) is still smaller than the *least* percentage of land open to coal mining in the most active coal field under any alternative (88% of coal-bearing lands), underscoring the lack of range of alternatives concerning coal.

BLM's alternatives fail to account for current resource conditions, changes in circumstances, and new or revised national-level policy, in particular with regard to climate change. Beyond the agency's failure to take a meaningful hard look at resource impacts from global warming, as detailed below, BLM failed in its basic obligation to consider all reasonable alternatives, including alternatives that would significantly reduce planning area greenhouse gas emissions, and in particular an alternative that considers not leasing public lands for fossil fuel development. 40 C.F.R. § 1502.14.

The UFO draft RMP and EIS dismisses a number of no-leasing alternatives, citing BLM's mandate under the Mineral Leasing Act of 1920 ("MLA") to use the least restrictive

---

[69] *Id.* at 4-454 – 4-455.

[70] *Id.* at 4-289 – 4-290 (percentage of Tongue Mesa coal field acceptable for coal leasing); *id.* at 4-454 (economically unviable).

[71] *Id.* at 4-289 – 4-290 (90% or more of Grand Mesa coal field open to mining under all action alternatives); *id.* at 4-454 – 4-455 (due to the Grand Mesa coal field's "low coal quality and transportation constraints," no coal mining is forecast in the area for the next 20 years).

[72] *See* Table 2-3, *id.* at 2-379. That table shows that the following acres (% of total acres) would be open to solar and wind under the alternatives: Alt. A: 561,200 acres (83%); Alt. B: 34,040 acres (5%); Alt. C: 369,970 acres (55%); Alt. D: acres (34%).

BLM_0149772

management constraints to reach principle use and resource development goals. Draft EIS at 2-15. Courts have interpreted BLM's authority under the MLA as discretionary and not as an absolute mandate to lease. In fact, the Ninth Circuit held that the MLA "allows the Secretary to lease such lands, but does not require him to do so.... [T]he Secretary has discretion to refuse to issue any lease at all on a given tract . . . we affirm the district court's holding that the agencies failed to give the no action alternative meaningful consideration and thereby violated NEPA." *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1229-30 (9th Cir. 1988) (internal citations omitted). BLM's rejection of no-leasing alternatives in this RMP is unsubstantiated and relies on a very narrow and outdated interpretation of BLM's leasing and planning authority, particularly in an EIS development context. Based upon a similar set of facts and administrative record, the district court in *Wilderness Soc., Ctr. For Native Ecosystems v. Wisely* found:

> [T]he BLM's rejection of the 'no surface occupancy' alternative violated NEPA in both a technical and substantive sense. The Court finds that final September 2005 EA does not adequately explain why the 'no surface occupancy' alternative was dropped. 40 C.F.R. § 1502.14(a) requires that the EA 'briefly discuss the reasons' why an alternative was eliminated. Moreover, even if the BLM had fully articulated the reasons for excluding the 'no surface occupancy' alternative, the Court would nevertheless find that, on the present record, the decision to eliminate that alternative was arbitrary and capricious.

524 F. Supp. 2d 1285, 1311–12 (D. Colo. 2007). As is the case here, BLM has provided no basis in law or fact to dismiss outright the no-leasing alternatives outlined in the draft UFO EIS. And because BLM is conducting an EIS review for this RMP, the requirement for analyzing or dismissing no action or no-leasing alternatives is heightened. *See W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1274-75 (10th Cir. 2013) ("Regulations require both documents to incorporate a range of reasonable alternatives, but the depth of discussion and analysis required is different depending on whether the document is an EIS or an EA. For example, section 40 C.F.R. §1502.14 provides that an EIS should '[r]igorously explore . . . all reasonable alternatives,' and '[d]evote substantial treatment to each alternative' with 'detail.' *Id.* at (a)-(b).")

Thus, not only is BLM's consideration of a no-leasing alternative reasonable in light of new information, science, and national policy related to climate change, and therefore must be included in the UFO's RMP, but this information underscores the unreasonableness of the UFO's action alternatives. This is particularly true of the agency's preferred Alternative D, which leaves 371,400 acres open to coal leasing, 865,970 acres open to oil and gas leasing (draft EIS at 2-10), projects 1,271 wells will be drilled in the planning area over the planning period (draft EIS at 4-457), and commits the planning area to 3.11 MMTCO$_2$e emissions, every year, for the foreseeable future (draft EIS at 4-39). This type of status quo approach to federal lands management is unhinged from current reality and the demands of the time.

BLM_0149773

C.    *BLM Must Consider the No Fossil Fuel Leasing Alternative in Response to Threats Posed by Climate Change.*

Climate change has fundamentally altered the paradigm of public lands management—a reality reflected in new national policy as well as international commitments—but ignored by the Uncompahgre draft EIS. The business-as-usual approach reflected by BLM fails to meet the needs of present and future generations—the agency's core mandate in managing public lands and minerals. 43 C.F.R. § 1702(c). Both science and common sense dictate that perpetuating a management approach which has substantially contributed to climate change is no longer sufficient. The agency must consider alternatives that are responsive to this reality, including not leasing fossil fuel minerals.

Every ton of carbon dioxide added to the atmosphere worsens climate change. So any additional oil and gas or coal production permitted on BLM land managed by the Uncompahgre field office and the combustion of those fossil fuels will worsen climate change. Due to the urgent need to protect mankind and federal public lands from the potentially devastating impacts of catastrophic global warming, BLM must consider and analyze an alternative that reduces or eliminates the number of new fossil fuel leases in the Uncompahgre area.

As noted above, an alternative is "reasonable" if it falls within the agency's statutory mandate, and meets at least a part of the agency's purpose and need. *See supra* at II.A. No-leasing and limited leasing alternatives meet both tests.

1.    **BLM Has Legal Authority to Not Issue New Oil and Gas or Coal Leases on Public Lands in the Uncompahgre Area.**

The BLM has explicit legal authority under FLPMA, the MLA and NEPA to adopt a no-leasing alternative as necessary to respond to the threats posed by climate change. BLM has broad discretion in determining when, how, and if fossil fuel resources are made available for leasing.

With regard to oil and gas, the MLA states: "All lands subject to disposition under this Act which are known or believed to contain oil or gas deposits *may* be leased by the Secretary." 30 US.C. § 226(a) (emphasis added); *see also Udall v. Tallman*, 30 U.S. 1, 4 (1965) (MLA "left the Secretary discretion to refuse to issue any lease at all on a given tract"); *Burglin v. Morton*, 527 F.2d 486, 488 (9th Cir. 1975) ("The permissive word 'may' in Section 226(a) allows the Secretary to lease such lands, but does not require him to do so."); *Pease v. Udall*, 332 F.2d 62, 63 (9th Cir. 1964) ("[T]he Mineral Leasing Act has consistently been construed as leaving to the Secretary, within his discretion, a determination as to what lands are to be leased thereunder.").

Although the MLA states that, for oil and gas, "[l]ease sales shall be held for each State where eligible lands are available at least quarterly and more frequently *if* the Secretary of the Interior determines such sales are necessary," quarterly leasing is *not required* if no lands are "eligible" and "available" due to factors including withdrawal from the operation of the MLA under FLPMA, allocation decisions under an applicable land management plan, need for additional environmental review, or exercise of Secretarial discretion. 30 U.S.C. § 226(b)(1)(A);

BLM_0149774

*see also* 43 C.F.R. § 3120.1-1; U.S. Bureau of Land Management, Oil and Gas Leasing Reform, Instruction Memorandum No. 2010-117 ("Eligible lands include those identified in 43 C.F.R. § 3120.1-1 as being available for leasing (BLM Manual 3120, Competitive Leases). They are considered available for leasing when all statutory requirements have been met, including compliance with the NEPA, appropriate reviews have been conducted, and *lands have been allocated for leasing in the RMP* (BLM Handbook H-3101-1, Issuance of Leases).") (emphasis added). Thus, a decision to allocate an area as ineligible for leasing through the planning process is contemplated by BLM's regulations, contradicting any perceived requirement that BLM must lease the area.

The Federal Onshore Oil and Gas Leasing Reform Act ("FOOGLRA")—while not altering the fundamental leasing structure of the MLA—imposed a competitive bidding requirement on all offered leases. 30 U.S.C. §§ 188, 195, 226. Critically, FOOGLRA did not repeal or alter Secretarial discretion of *whether* to offer any particular lands for lease. *See Western Energy Alliance v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013) ("Before the MLA was amended by the [FOOGLRA]…it was well established that the Secretary had extremely broad discretion and was not obligated to issue any lease on public lands…. The MLA, as amended by the Reform Act of 1987, continues to vest the Secretary with considerable discretion to determine which lands are 'to be leased' under § 226(b)(1)(A)."). As held by the Court of Appeals in *Bob Marshall Alliance v. Hodel*:

> the Mineral Leasing Act gives the Interior Secretary discretion to determine which lands are to be leased under the statute. 30 U.S.C. §226(a) (1982); *see Mountain States,* 499 F.Supp. at 391-92. We have held that the Mineral Leasing Act "allows the Secretary to lease such lands, but does not require him to do so.... [T]he Secretary has discretion to refuse to issue any lease at all on a given tract." *Burglin v. Morton*, 527 F.2d 486, 488 (9th Cir. 1975) (citing *Udall v. Tallman*, 380 U.S. 1, 4 (1965), *cert denied*, 425 U.S. 973 (1976)).

852 F.2d 1223, 1230 (9th Cir. 1988).

For coal, the Federal Coal Leasing Amendments Act ("FLCAA") provides that the Interior Secretary "is authorized" to identify tracts for leasing and thereafter "shall, in his discretion … from time to time, offer such lands for leasing …." 30 U.S.C. § 201. *See also WildEarth Guardians v. Salazar*, 859 F. Supp. 2d 83, 87 (D.D.C. 2012) ("Under the [FLCAA], the Secretary is *permitted* to lease public lands for coal mining operations after conducting a competitive bidding process" (emphasis added)). This discretion has been consistently upheld by the courts. *See, e.g., Krueger v. Morton*, 539 F.2d 235, 238-40 (D.C. Cir. 1976); *NRDC v. Hughes*, 437 F.Supp. 981, 983-85 (D.D.C. 1977). Further, the Secretary has discretion to reject lease applications on the grounds that "leasing of the lands covered by the application, for environmental or other sufficient reasons, would be contrary to the public interest." 43 C.F.R. § 3425.1-8(a)(3).

The Secretary of the Interior also has authority under FLPMA to "withdraw" an area of federal land from oil, gas or coal leasing to "maintain . . . public values" or for a "particular public purpose." FLPMA defines a withdrawal as:

BLM_0149775

> withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program . . .

43 U.S.C. § 1702(j). FLPMA further provides that Congress declares that it is the policy of the United States that "the public lands [shall] be managed in a manner that will protect the quality of … air and atmospheric … values." 43 U.S.C. § 1701(a)(8).

Under FLPMA's "multiple use and sustained yield" management directive, *id.* § 1701(a)(7), the federal government must manage public lands and resources in a manner that "takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land[,]" *id.* § 1702(3). Further, "[i]n managing the public lands the Secretary shall … take any action necessary to prevent unnecessary or undue degradation of the lands." *Id.* § 1732(b).

Under these authorities, BLM is required not only to evaluate the impacts of federal coal leasing to public lands, water, and wildlife resources, but to avoid harm to those resources whenever possible.

Accordingly, the MLA and FLPMA provide BLM the legal authority to either decide not to lease particular lands, or to withdraw large tracts from leasing.[73]

### 2.    No-Leasing or Limited Leasing Alternatives Meet the RMP's Purpose and Need.

Alternatives that prohibit or strictly limit new fossil fuel leasing meet the proposed action's purpose and need. BLM defines the RMP's purpose and need as follows:

---

[73] Even if BLM concludes that the agency lacks authority to bar new oil, gas, and coal leasing throughout the planning area, it should still consider such an alternative because it is otherwise reasonable. Federal courts hold that agencies have the duty to consider reasonable alternatives that are outside the jurisdiction of the agency or that require a change of law to implement. *See* 40 C.F.R. § 1502.14(c) (an EIS "shall" "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency"); Council on Environmental Quality, Executive Office of the President, Publication of Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations, 46 Fed. Reg. 18,026–01 at 18,027 (1981) ("An alternative that is outside the legal jurisdiction of the lead agency must still be analyzed in the EIS if it is reasonable. A potential conflict with local or federal law does not necessarily render an alternative unreasonable"); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (setting aside EIS for failure to address alternative requiring Congressional action).

BLM_0149776

> The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses. It also establishes the allowable uses, management actions, and special designations that will enable the BLM to achieve the desired outcomes.
>
> Management direction presented in the Uncompahgre RMP adheres to statutory requirements and is in accordance with principles of multiple use and sustained yield, as mandated by the provisions of the FLPMA, which establishes public land policy and sets forth the requirement for the BLM to develop, maintain, and when appropriate, revise or amend land use plans for the management of public lands. The RMP guides the Uncompahgre Field Office in the implementation of subsequent management actions within the planning area.

Draft EIS at 1-2. Barring new leases to achieve national, regional and local greenhouse gas reduction goals would constitute "broad-scale direction" for the planning area. A desired outcome for a reasonable alternative could be reducing the planning area's contribution to climate pollution. It would establish that certain uses—oil, gas, and coal production—would be allowable only on current leases, and it would enable BLM to achieve a desired outcome of reducing the chance of catastrophic climate change and increasing the chance for the U.S. to reach its greenhouse gas reduction goals set by the Paris Agreement. As discussed above, such management direction would adhere to the law and BLM's multiple use mandate.

As such, a no or limited fossil fuel leasing alternative would meet the purpose and need for the RMP.

### 3. The Draft EIS's Justifications for Rejecting No-Leasing Alternatives Are Arbitrary and Capricious.

The draft EIS explicitly rejects providing full consideration to alternatives that would "Prohibit Fluid Mineral Leasing throughout Decision Area" and "Prohibit Coal Leasing throughout Decision Area,"[74] but the three grounds on which it does so lack legal or factual basis.

First, in rejecting both alternatives, the draft EIS asserts that all fully-analyzed alternatives propose closing *some* areas to fossil fuel leasing, and that "[r]esource values that can only be protected by prohibiting all fluid mineral leasing throughout the decision area have not been identified."[75] This is both irrelevant and untrue. It is irrelevant because BLM need not identify some other resource value that "can only be protected" by barring fossil fuel leasing. It need only determine that leasing may not be in the public interest. It is untrue because virtually every resource value in the decision area—water, recreation, human health, wildlife, the

---

[74] Draft EIS at 2-16.
[75] *Id.*

BLM_0149777

economy, air quality, etc.—are threatened by climate change, as the draft EIS itself recognizes, and as a wealth of scientific literature demonstrates.[76] In an order issued more than seven years ago, the Secretary of Interior warned that "dramatic effects of climate change … are already occurring," and that "[t]he realities of climate change require us to change how we manage the land, water, fish and wildlife, and cultural heritage … we oversee."[77] The draft RMP itself includes as one of its objectives: "Reduce impacts from climate change on soil and water resources, native vegetation and wildlife species and communities, and wildlife habitats," recognizing that climate change threatens all of those resources.[78]

Second, the draft EIS claims neither alternative would meet the purpose and need for the RMP because part of the RMP's purpose is to adopt "management direction in accordance with principles of multiple use and sustained yield."[79] As discussed above, the principle of multiple use explicitly anticipates that some use would be prohibited on public lands. Further, the keystone of multiple use is to "take[] into account the long-term needs of future generations for renewable and nonrenewable resources." 43 U.S.C. § 1702(3). There is no greater or more urgent threat to public land resources in the long-term than climate change. Taking action on climate change by limiting one use—fossil fuel extraction—to benefit all the others is the very essence of the kind of trade-off anticipated by the multiple use mandate.

Further, the Tenth Circuit Court of Appeals has explicitly rejected the argument that FLPMA's multiple use mandate requires that public lands be made available for fossil fuel extraction.

> BLM's obligation to manage for multiple use does not mean that development *must* be allowed on [a particular piece of public lands]. Development is a *possible* use, which BLM must weigh against other possible uses – including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

*New Mexico ex rel. Richardson*, 565 F.3d at 710 (emphasis in original).

Third, BLM alleges that for coal as well as oil and gas, the authority for leasing derives from the MLA, and that that law "directs field offices to apply the least restrictive management constraints necessary to achieve resource goals and objectives for principal uses of public

---

[76] *See, e.g.,* Draft EIS at 3-16 (listing impacts of climate change in the Rocky Mountain West to snowpack, drought, wildfire, insect epidemics, human health, river flows, agriculture, groundwater, vegetation and wildlife, and forests).
[77] Secretarial Order 3289, *Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources* (September 14, 2009) (attached as Exhibit 26).
[78] Draft EIS at 2-24.
[79] *Id.* at 2-16.

BLM_0149778

lands."[80] We have scoured the MLA and found no such provision. If BLM believes that such a provision exists, we request that it provide a citation for the public to review as soon as possible.

BLM may have been alluding to a provision of the Energy Policy Act of 2005 (Section 363) that bears resemblance to the draft EIS's language, but that provision is inapplicable for numerous reasons. The Energy Policy Act provision directs the Secretaries of Agriculture and Interior to "enter into a memorandum of understanding [MOU] regarding oil and gas leasing" on BLM and Forest Service lands, and states that the MOU "shall include provisions that … ensure that lease stipulations are … only as restrictive as necessary to protect the resource for which the stipulations are applied."[81] This provision, on its face, is inapplicable to coal leasing. Further, it relates to "lease stipulations," which assumes, first, that the land has been open to leasing under the applicable land management plan. And the MOU itself appears to be aimed at ensuring consistency of stipulations where leased lands cross BLM and Forest Service boundaries. Thus even if the draft EIS meant to invoke this provision, it is not a basis for failing to provide full consideration to the no-leasing alternative(s) in a resource management plan revision.

In sum, none of the justifications BLM provides for rejecting consideration of the no-leasing alternative is supported by fact or law. BLM therefore must consider in detail alternatives that bar new leasing in the Uncompahgre area.

> ### 4.    BLM Cannot Forego Analysis of a "No-Leasing" Alternative for Coal by Instead Relying on the Programmatic EIS.

BLM's press release announcing the draft EIS's availability raises the specter that the agency will argue that the draft EIS need not discuss reducing the level of coal production or coal leasing because the proposed programmatic EIS on the federal coal program will address those issues. Any implication that the Uncompahgre RMP cannot consider or adopt an alternative that limits coal leasing is incorrect.

The press release first disclaims that the RMP will impact coal production, stating that "the plans do not authorize any specific leases or mining operations; any new coal leases would require environmental reviews specific to the particular lease application."[82] While it is true that coal leasing will require additional environmental review beyond that for the RMP, the RMP makes the initial, and arguably most significant, decision about coal leasing: whether the public lands are open to coal leasing and production at all. If the RMP closes the planning area to coal leasing, there will be no need for further environmental review.

---

[80] *Id.*

[81] 42 U.S.C. § 15922(b)(3)(C).

[82] BLM, BLM Releases Draft Management Plan for Land and Mineral Estate Managed by Uncompahgre Field Office in Southwest Colorado (May 27, 2016) at 2, available at: http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_2.Par.5016.File.dat/BLM%20Uncompahgre%20RMP%20press%20release%205-27-16.pdf (attached as Exhibit 27).

BLM_0149779

The release also states that "[s]everal other processes, as well as compliance with Secretarial Order 3338, which orders a comprehensive review of the federal coal program, would be necessary before any additional coal leasing could occur."[83] But Secretarial Order 3338 orders a discretionary PEIS; the Secretary of Interior (who is likely to be replaced in the next few months) could revoke the order, and/or end the porous coal leasing "pause," or BLM could never complete the PEIS. The fact that BLM *may*, someday, complete a federal coal program PEIS does not eliminate BLM's duty under law to fully analyze a range of reasonable alternative concerning coal leasing and coal production in the Uncompahgre RMP EIS. While the PEIS could result in BLM amending numerous RMPs to address changes to coal leasing, whether or how that would occur is unknown. The Uncompahgre Field Office cannot dodge its responsibility to address coal production and coal leasing in the hopes that the PEIS may do the job later.

### D.    BLM Must Analyze Alternatives That Require Coal Mines in the Uncompahgre Planning Area to Mitigate Climate Impacts by Capturing or Flaring Methane Emissions.

BLM must consider and analyze alternatives that require all coal mines operating in the Uncompahgre planning area to mitigate climate impacts by using capturing or flaring the mine's methane emissions. Several technologies to capture or flare methane are in use now, both flaring and capture have been studied or used at coal mines in the planning area, BLM has already confirmed that it has the authority to require methane capture and flaring at underground mines on public lands, and doing so here would generate significant savings on the greenhouse gas emissions that will result from BLM's plan over the next two decades.

The draft EIS for the Uncompahgre RMP, however, does not address potential climate mitigation measures and does not consider an alternative requiring methane capture, methane flaring, or any other approach to mitigate the climate impact of methane emissions from coal mines in the planning area. This is a significant oversight for an area containing some of the most methane-heavy mines in the country. BLM estimates that under each of the alternatives it considers, coal mines in the planning area will emit more than 3 million tons of $CO_2e$ every year in direct emissions from operation of the mines, and BLM confirms that the vast majority of these emissions are "primarily from fugitive methane emissions." DEIS at 4-39; *see* DEIS Tables 4-9 and 4-10 at 4-38, 4-39.

### 1.    BLM Has the Legal Authority to Require Mines That Operate on Public Lands to Capture or Flare Methane.

NEPA requires agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives" and to "[d]evote substantial treatment to each alternative considered." 40 C.F.R. § 1502.14(a)-(b). These alternatives must "include reasonable alternatives not within the jurisdiction of the lead agency." *Id.* at 1502.14(c). NEPA also requires agencies to identify measures to mitigate the adverse environmental impacts of their actions. 40 C.F.R.

---

[83] *Id.*

BLM_0149780

§§ 1502.14(f), 1502.16(h); *Robertson*, 490 U.S. at 351-52; *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1522 (10th Cir. 1992).

CEQ has stated: "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperation agencies."[84] Further, an agency's analysis of mitigation measures "must be 'reasonably complete' in order to 'properly evaluate the severity of the adverse effects' of a proposed project prior to making a final decision." *Colo. Env't'l Coalition v. Dombeck*, 185 F.3d 1162, 1173 (10th Cir. 1999) (quoting *Robertson*, 490 U.S. at 352). Mitigation measures "must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *City of Carmel-by-the-Sea, v. United States Dept. of Transp.*, 123 F.3d 1142, 1154 (9th Cir. 1997) (quoting *Robertson*, 490 U.S. at 353).

Moreover, both the CEQ's 2014 Draft and 2016 Final NEPA climate guidance instructs agencies to "consider the potential for mitigation measures to reduce or mitigate GHG emissions and climate change effects when those measures are reasonable and consistent with achieving the purpose and need for the proposed action."[85] The guidance specifies that mitigation measures could include, among other things, "capturing or beneficially using GHG emissions such as methane."[86]

Finally, although neither mitigation measures nor alternatives must be within an agency's jurisdiction in order to be incorporated in the agency's NEPA review (40 C.F.R. §1502.14(c)), here it is worth noting that BLM has explicitly stated that it has authority to require coal mines operating on public lands to capture methane in order to mitigate climate impacts.

In 2014, BLM issued an advance notice for proposed rulemaking ("ANPR") requesting "comments and suggestions that might assist the agency in the establishment of a program to capture, use, or destroy waste mine methane that is released into the mine environment and the atmosphere as a direct consequence of underground mining operations on Federal leases for coal and other minerals." 79 Fed. Reg. 23,923 (Apr. 29, 2014). The waste mine methane ANPR noted that the agency had the authority to require methane capture in coal leases:

> Based on the readjustment authority [30 U.S.C. § 207], the BLM may readjust lease terms to both authorize <u>and require lessees to capture otherwise vented [waste mine methane] to use or sell</u>. The BLM also has authority under the same section of the MLA to include such terms and conditions in new coal leases.

79 Fed. Reg. at 23,924; *see also, id.* at 23,923 (citing 30 U.S.C. § 189, which states: the Secretary "is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of" the MLA governing coal leasing; and 30 U.S.C. § 207, which states: coal leases "shall include such other terms and

---

[84] Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,031 (March 23, 1981).
[85] Final Climate Guidance at 19 (attached as Exhibit 4).
[86] *Id.*

BLM_0149781

conditions as the Secretary shall determine.").  BLM also notes in the ANPR that Obama Administration climate policies support the control or elimination of methane pollution from coal mines:

> [R]educing [waste mine methane] venting would reduce emissions of a potent greenhouse gas, consistent with the President's Climate Action Plan— Strategy to Reduce Methane Emissions (March 2014) and Secretarial Order 3289, Amendment No. 1 ("Addressing the Impacts of Climate Change on America's Water, Land, and other Natural and Cultural Resources," dated February 22, 2010).

79 Fed. Reg. at 23,924.

### 2.  It Is Critically Important To Reduce Methane Emissions In Order To Limit Climate Damages.

There is increasing scientific evidence that for humanity to have a chance to keep climate change within tolerable levels (well below 2 °C above preindustrial times), governments around the world must act quickly to reduce methane emissions in particular.[87] Part of that consensus is that methane pollution is more damaging than previously thought. The Fifth Assessment Report of the IPCC in 2013 concluded that methane is a much more potent driver of climate change than scientists understood it to be just a few years ago—with a global warming potential as much as 36 times greater than carbon dioxide over a 100-year time frame, and 87 times greater than $CO_2$ over a 20-year time frame, as detailed below.

In 2013, climate scientists working with the IPCC concluded that approximately one-third of the anthropogenic climate change we are experiencing today is attributable to methane and other short-lived climate pollutants, and about thirty percent of the warming we will experience over the next two decades as a result of that year's greenhouse gas emissions will come from methane.[88] Climate scientists now recognize that avoiding catastrophic climate change will require both a long-term strategy to reduce carbon dioxide emissions and near-term action to mitigate methane and similar "accelerants" of climate change. As a 2013 article in the journal *Science* stated: "The only way to permanently slow warming is through lowering

---

[87] Bill McKibben, *Global Warming's Terrifying New Chemistry*, The Nation (Mar. 23, 2016), available at: http://www.thenation.com/article/global-warming-terrifying-new-chemistry/ (attached as Exhibit 28).

[88] Thomas Stocker *et al.*, Climate Change 2013: The Physical Science Basis, Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (2013), available at: http://www.climatechange2013.org/images/report/WG1AR5_ALL_FINAL.pdf (attached as Exhibit 113).

BLM_0149782

emissions of $CO_2$. The only way to minimize the peak warming this century is to reduce emissions of $CO_2$ and [short-lived climate pollutants]," including methane.[89]

Because of methane's outsize role in near-term climate-forcing, the Obama Administration, and BLM in particular, have specifically targeted methane pollution. In 2013, the White House published a climate strategy that concluded: "Curbing emissions of methane is critical to our overall effort to address global climate change."[90] In 2014, the Obama Administration updated its policies, publishing a strategy to reduce methane pollution that specifically identified the need for voluntary and regulatory actions to limit methane emissions from coal mines.[91]

The need to address methane's damaging climate impacts spurred both BLM and EPA to limit fugitive methane emissions from oil and gas operations in recent years.[92] Both agencies concluded that reducing methane pollution would have significant social benefits, based in large part on the significant social cost of continuing to permit unnecessary methane releases.[93] Earlier this year, the U.S. and Canada also signed a climate agreement which calls for significant methane reductions from the oil and gas sectors.[94]

> ### 3.   Existing Technologies Could Significantly Reduce Methane Emissions From Coal Mines in the Uncompahgre Planning Area.

Coal mine methane generally is removed from underground mines in one of two ways, and in both instances coal companies can either capture the methane and put it to beneficial use

---

[89]   J.K. Shoemaker *et al.,* What Role for Short-Lived Climate Pollutants in Mitigation Policy? 342 Science 1323-24 (2013), available at: http://www-ramanathan.ucsd.edu/files/pr200.pdf (attached as Exhibit 29).

[90]   Executive Office of the President, The President's Climate Action Plan (June 2013) available at: https://www.whitehouse.gov/sites/default/files/image/president27sclimateactionplan.pdf (attached as Exhibit 30).

[91]   The White House, Climate Action Plan: Strategy to Reduce Methane Emissions (attached as Exhibit 1).

[92]   EPA, Proposed Rule, Oil and Natural Gas Sector, 80 Fed. Reg. 56,593, 56,598 (Sep. 18, 2015), available at: https://www.gpo.gov/fdsys/pkg/FR-2015-09-18/pdf/2015-21023.pdf; BLM, Proposed Rule, Waste Prevention, Production Subject to Royalties, and Resource Conservation, 81 Fed. Reg. 6616, 6617 (Feb. 8, 2016), available at: https://www.gpo.gov/fdsys/pkg/FR-2016-02-08/pdf/2016-01865.pdf.

[93]   EPA, Proposed Rule, Oil and Natural Gas Sector, 80 Fed. Reg. at 56,657; BLM, Proposed Rule, Waste Prevention, 81 Fed Reg. at 6670-71; BLM, Regulatory Impact Analysis for Revisions to Onshore Oil and Gas Leasing (Jan. 14, 2016) at 32, 130-49, available at: http://www.blm.gov/style/medialib/blm/wo/Communications_Directorate/public_affairs/news_release_attachments.Par.11216.File.dat/VF%20Regulatory%20Impact%20Analysis.pdf.

[94]   The White House, U.S.-Canada Joint Statement on Climate, Energy, and Arctic Leadership (Mar. 10, 2016), available at: https://www.whitehouse.gov/the-press-office/2016/03/10/us-canada-joint-statement-climate-energy-and-arctic-leadership (attached as Exhibit 31).

BLM_0149783

generating power or flare it in ways that lowers its climate impact. [95] First, methane can be removed by moving vast quantities of air, including dilute quantities of methane, through a mine's ventilation system. This is termed "ventilation air methane" (often called "VAM"). Second, methane drainage wells drilled into the coal seam from above can be used to capture, flare, or (more commonly) vent methane directly into the atmosphere. A number of underground coal mines operating on federal lands use both methods to remove methane. This includes the West Elk Mine, which has thus far resisted all voluntary incentives to either capture or flare its methane emissions and instead currently emits all of its methane directly into the atmosphere.

Studies show that flaring results in an 87% reduction in greenhouse gas emissions compared with venting methane directly into the atmosphere. [96] As a State of Colorado 2016 report found:

> From a climate change standpoint, emitting carbon dioxide is much less harmful on the environment than a mine's direct emission of methane into the atmosphere. Accordingly, flaring methane, which converts the residual gas emission to carbon dioxide, has nearly the same environmental impacts as using methane to generate electricity or heat. [97]

Further, the report documents recent changes in state and federal regulation of power that has improved the financing environment for coal mine methane mitigation and power projects. The report notes that a 2015 FERC ruling may make it easier for coal mines, including West Elk, to sell power produced from coal mine methane to utilities:

> FERC's decision could enable [coal mine methane] project developers to overcome industry barriers by securing reasonable power supply contracts with utilities in Tri-State's service area in western Colorado, where most of the "high value" [coal mine methane] emission targets are located. [98]

Even before these recent changes, methane capture and flaring had been used by mines throughout the country, and either could be or already have been used by mines within the planning area. The Colorado report concludes that there is a potential to generate 17.4 megawatts of electricity from ventilation air methane at West Elk, and concludes that it is technically

---

[95]   In comments on BLM's ANPR for the coal mine methane rulemaking, Sierra Club, Center for Biological Diversity, WildEarth Guardians, Earthjustice and others provided detailed recommendations listing feasible and immediately available mine methane mitigation measures. *See* Comments by Sierra Club, et al., 1004-AE23, Waste Mine Methane Capture, Use, Sale, or Destruction, Advance Notice of Proposed Rulemaking (June 30, 2014) (attached as Exhibit 32).
[96]   Daniel J. Brunner & Karl Schultz, *Effective Gob Well Flaring* 724 (1999) (attached as Exhibit 33).
[97]   State of Colorado, Coal Mine Methane in Colorado, Market Research Report at 14 (Mar. 2016), available at: https://www.colorado.gov/pacific/sites/default/files/atoms/files/Coal%20Mine%20Methane%20Report%202016%20FINAL%203_2016.pdf (attached as Exhibit 34).
[98]   *Id.* at 13-14.

BLM_0149784

feasible to produce 20% of that amount or 3.49 megawatts of power.[99] Additional climate savings could be secured by putting to use the massive quantities of methane vented from West Elk every day. In 2010 the mine vented nearly 3.5 million cubic feet of methane into the atmosphere a day; in 2013, that number was about 2 million cubic feet per day.[100]

Likewise, flaring is a viable alternative, both nationally and in the planning area. EPA reported in 2014 that it had identified "40 projects where flaring has been practiced, either in conjunction with energy recovery technologies or as a stand-alone mitigation technology," and that flaring projects had the advantage of being far less costly than coal mine methane energy generation projects.[101]

At the Elk Creek Mine, located just a few hundred yards west of the West Elk Mine—Oxbow Mining has developed a system for capturing and utilizing coal mine methane to generate electricity.[102] Oxbow's methane capture facilities include a flare that has been safely operated for years.[103] The Colorado Division of Mining, Reclamation and Safety ("DRMS") approved this project, including the flare, in March 2012.[104] The State of Colorado reports that the Elk Creek Mine has been safely and economically flaring coal mine methane at Elk Creek for over three years as part of a system that generates electricity and revenue:

In 2012, Vessels Coal Gas, Inc. (Vessels) officially began generating GHG emission reductions from the project under the Climate Action Reserve. Vessels had The Elk Creek Coal Mine Methane Destruction and Utilization Project verified, registering the first offset credits via the Climate Action Reserve in September of 2014 (CAR, 2015).[105]

The Elk Creek mine project demonstrates that flaring of coal mine methane in the North Fork Valley, as well as the use of such methane to generate electricity, is safe, technical feasible and economically viable.

As with the Elk Creek example, methane capture and flaring mitigation measures could similarly be implemented in ways that are economic at the West Elk Mine. In the 2011 case study attached to this comment letter, Ph.D. economist Dr. Tom Power demonstrates the

---

[99] *Id.* at Appendix D, page 38.
[100] *Id.* at 31.
[101] EPA, CMM Flaring: Technology and Case Studies (Sep. 2014) (attached as Exhibit 35).
[102] *See* letter of J. Kiger, Oxbow, to B. Bowles, Colo. Div. of Mining, Reclamation & Safety, at 1 (Oct. 14, 2011) (attached as Exhibit 36) (stating that "North Fork Energy LLC has determined the economic viability of constructing and operating a facility to utilize mine methane from Oxbow's underground mine methane collection system" and seeking agency approval for the same).
[103] *Id.* at un-paginated attachment to letter.
[104] *See* letter of J. Kiger, Oxbow to F. Kirby, Office of Surface Mining, (Mar. 15, 2012) (attached as Exhibit 37).
[105] State of Colorado, Coal Mine Methane in Colorado at 18 (attached as Exhibit 34).

BLM_0149785

economic feasibility of methane capture and flaring projects at the West Elk mine in
Colorado.[106]

In 2009 BLM directed Mountain Coal Company, which owned and operated the West
Elk Mine near Somerset, Colorado, to analyze the economic feasibility of capturing and using
coal mine methane released into the atmosphere at West Elk. Mountain Coal Company, through
a series of consultants, carried out a study but concluded that there were no available
technologies that could capture methane in a way that was economically feasible.

Dr. Power's report provides a critical review of the Mountain Coal Company's economic
analysis of the coal mine methane releases from the West Elk drainage wells. He concludes that
there were in fact at least three economically viable means of capturing methane, two of which
had been considered and rejected by Mountain Coal Company. These methane mitigation
strategies include flaring, electricity generation, and conversion of methane into liquid natural
gas. Notably, these alternatives became economically feasible when the economic value of
reducing emissions of methane was incorporated into the analysis. The company's conclusion
that there was no economically feasible solution to the methane waste problem was tied in part to
its flawed assumption that there was no economic value associated with the reduction of methane
emissions.

Moreover, rather than treating any pollution control technology as part of the cost of
doing business, Mountain Coal Company asserted the need to make greater than a 10% return on
investment in that technology in order to be considered economically feasible. While Dr.
Power's analysis shows how the company could nonetheless meet that criterion, that should not
be the standard for BLM's determination to consider an alternative that would require methane
capture or flaring as requisite for obtaining authorization to lease federal coal within the
Uncompahgre planning area.

Finally, Dr. Power's case study refutes seven critical and erroneous assumptions that
Mountain Coal Company made to support its rejection of economic feasibility, including the
volume of methane available for use, the cost of operating methane collection systems, the cost
of electricity generation (applicable where a mine uses recovered methane to generate
electricity), the length of time methane recovery equipment can be used, and treating pollution
control costs as a corporate commercial investment, among others.

Given the new science documenting the urgency of reducing methane emissions to
combat climate change and the failure of voluntary incentive programs to encourage methane
mitigation, here BLM must consider an alternative that requires companies to utilize
technologies that capture and/or flare coal mine methane pollution as a condition for
authorization to mine federally-owned coal in the Uncompahgre planning area.

---

[106]   Thomas Power, An Economic Analysis of the Capture and Use of Coal Mine Methane at the
West Elk Mine, Somerset, Colorado (Dec. 2011) (attached as Exhibit 38).

BLM_0149786

### E.    BLM Must Explicitly Consider a Renewable Energy Alternative or Include Renewable Energy as a Priority Element in Each Alternative.

None of the alternatives considered look specifically at renewable energy. However, a transition to clean energy is critical to achieving the national climate goals discussed in Section I of these comments.

Several statements of national policy in regulations and executive orders create an obligation for BLM to look more closely at renewable energy as a resource in the Uncompahgre Field Office planning area. As of 2010, these include:

- The Energy Policy Act of 2005 (Title II, Sec. 211), which requires the DOI to approve at least 10,000 megawatts of non-hydropower renewable energy on public lands by 2015. The President has requested that BLM produce an additional 10,000 megawatts beyond that mandated in the Energy Policy Act of 2005.

- Secretarial Order 3285, which requires the DOI to identify and prioritize specific locations best suited for large-scale renewable energy production.

- Instruction Memorandum 2007-097, Solar Energy Development Policy (BLM 2007), establishes policy for the processing of right-of-way (ROW) applications for solar energy development projects on BLM-administered lands and evaluating the feasibility of installing solar energy systems on BLM administrative facilities and projects.

- Instruction Memorandum 2006-216, Wind Energy Development Policy (BLM 2006), provides guidance on implementing the Record of Decision for the Programmatic Environmental Impact Statement (EIS) on Wind Energy Development (BLM 2005) and processing ROW applications for wind energy projects on BLM-administered lands. Instruction Memorandum 2009-043, Wind Energy Development Policy (BLM 2009b), provides updated guidance on processing ROW applications for wind energy projects on BLM-administered lands.

- Instruction Memorandum 2004-227, Biomass Utilization Strategy (BLM 2004), updated in July 2005, provides sets of goals to help focus and increase utilization of biomass from BLM lands. In June 2005, the final rule in the *Federal Register* revised the authority of 48 Code of Federal Regulations (CFR) Part 1452 by adding 1452.237-71, which is a new contract clause for removal and utilization of woody biomass generated as a result of land management service contracts whenever ecologically and lawfully appropriate. The BLM issued Instruction Memorandum 2009-120 in May 2009, which updated the contract clause for utilization for woody biomass.

The BLM recognizes that "potential solar, biomass, wind, and geothermal resources occur in various locations and forms within the planning area." DEIS 3-151. While "there are no permit applications or current leases for concentrated solar, wind generation, biomass, or geothermal energy production within the planning area," by omission this indicates that there are

BLM_0149787

existing leases and/or permits for solar photovoltaics, but the BLM has not identified their numbers or locations. DEIS 3-151.

The BLM identified photovoltaic solar resource potential as very good on all 675,700 acres of BLM-administered lands within the planning area. DEIS 3-151. For concentrating solar resource potential, 557,000 acres of BLM-administered lands within the planning area have good potential, while the remaining 118,400 acres have moderate potential. The identified high-potential areas for both concentrating solar power and photovoltaic solar resources are predominantly found in the western and central regions of the planning area. DEIS 3-151.

The BLM conducted a study of renewable energy potential for the planning area in 2010.[107] The Reasonable Foreseeable Development Scenario for solar development states that:

> The likelihood of future solar project development in the Uncompahgre RMP planning area can be estimated by considering the quality of solar resources, the acreage of lands with slope less than five percent (which is required for Central Generation Technology), existing solar projects in the area, the number of pending ROW applications within the UFO, the quality of solar resources in the UFO compared with other areas in the region, and expressions of interest by solar companies.[108]

However, the BLM failed to develop information about these factors to conduct a detailed analysis to determine the likelihood of future solar development. Nevertheless, BLM found that:

> Despite the lack of existing projects, ROW applications, low-slope lands, and interest by the solar industry at the time of this writing, changes in national policy, economic factors (such as incentives, regulation of carbon emissions), and technology could reasonably result in one commercial-scale solar project on lands within the Uncompahgre RMP planning area within the next 15 to 20 years. Additionally, as technology changes, there may be a shift toward smaller commercial or community scale solar facilities, potentially resulting in several such smaller projects by year 2030.[109]

The Renewable Energy Potential Report provides a map of solar energy potential in the planning area.[110]

The BLM found that wind energy resource potential is generally marginal to poor within the planning area. However, there are several areas that have significant wind energy potential. These include 40 acres with an outstanding wind resource (class 6), 50 acres with an excellent

---

[107] Uncompahgre Field Office, "Renewable Energy Potential Report," Resource Management Plan Revision and Environmental Impact Statement, May 2010, available at: http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf (attached as Exhibit 39).
[108] *Id.* at 3-5
[109] *Id.* at 3-11
[110] *Id.* at 3-9 (Fig. 3-1).

wind resource (class 5), and 60 acres with a good resource (class 4). The identified high-potential areas are located on the eastern side of the planning area." DEIS 3-151.

The Reasonable Foreseeable Development Scenario prepared for wind energy found that:

Due to the limited size of plots of BLM-administered land with good-quality wind resources, the lack of wind projects in the UFO or western Colorado, the lack of pending ROW applications in the UFO, and the fact that much better wind resources occur in other parts of the state, it is not expected that many, if any, commercial-scale wind energy projects would be developed within the planning area by year 2025. If such development were to occur, it is expected it would be along Cimarron Ridge in the area described above.[111]

The Renewable Energy Potential Report provides a map of wind energy potential in the planning area.[112]

Biomass energy potential was not addressed by BLM in the DEIS, yet the BLM dismissed the potential for this resource, asserting that "it is unlikely that developers would propose the construction of any biomass facilities on BLM-administered lands due to the lack of infrastructure present on BLM-administered lands that would be needed to support such facilities." DEIS 4-337. However, the Reasonable Foreseeable Development Scenario for biomass in the Renewable Energy Potential Report found that even if a biomass facility were to be sited outside of BLM-administered lands, there is potential for biomass feedstock to be sourced from the planning area. It states that:

Biomass energy production typically involves the collection of materials from BLM lands as the byproduct of other actions. In this case, a reasonable foreseeable development scenario is not applicable. However, because of some past interest in exploring the feasibility of harvesting local forests and woodlands solely for biomass, setting aside an area for biomass harvest (feedstock) could be considered as an alternative in the RMP.[113]

It further states that:

Given the flexibility in siting a power plant and the likelihood that a developer would prefer private lands over public lands, it is not expected that any biomass energy facilities would be developed in the planning area by year 2025. Biomass materials are likely to be produced from lands within the planning area during certain BLM activities such as stewardship and fire management actions.[114]

---

[111] *Id.* at 4-9
[112] *Id.* at 4-7 (Fig. 4-1).
[113] *Id.* at 5-4
[114] *Id.* at 5-7

BLM_0149789

The Renewable Energy Potential Report provides a map of biomass potential in the planning area.[115]

Contradicting the lack of in-depth analysis of renewable energy potential, the BLM assumes that "the demand for renewable energy ROWs would increase over the life of this RMP." DEIS 4-336. The basis for this assumption and the magnitude of this increase go unexplained. Yet, ultimately, BLM dismisses the potential for renewable energy development in the planning area, stating that: "Although state of Colorado policies and financial incentives are classified as favorable for renewable energy development, the UFO does not rank nationally among the top 25 BLM field offices with potential." DEIS 3-151. The DEIS further states that "the demand for renewable energy-related ROWs should increase nationally, although within the planning area, the potential for wind, solar, and biomass energy is considered to be low relative to other field offices in BLM." DEIS 3-152. This dismissive approach ignores the high potential found for solar photovoltaic resources, and future economic conditions and energy demand in the planning area. The planning area's national rank is immaterial to BLM's requirement to adequately analyze the potential for renewable energy.

A Comparative Summary of Alternatives is presented in Table 2-1. DEIS 2-8. It shows that many resource uses were considered, including coal and fluid minerals, but, other than addressing ROWs and utility corridors generally, the table plainly illustrates how the Alternatives considered fail to incorporate renewable energy as a resource. The DEIS fails to even list renewable energy development as an Alternatives Considered but Eliminated from Detailed Analysis. DEIS 2-15. On the other hand, the DEIS provides an extensive look at coal, DEIS 4-11, and fluid minerals leasing, DEIS 4-12. The Uncompahgre Field Office also conducted an extensive Reasonable Foreseeable Development Scenario report for oil and gas development in 2012.[116]

Importantly, the BLM also fails to consider the impacts of coal and oil and gas development on renewable energy resources and the potential incompatibility of these resource uses. The DEIS identifies the impacts of protections for ecological, scenic and recreational resources on wind and solar development, including exclusion and avoidance areas. DEIS 2-376. But the DEIS does not examine in depth the impact of oil and gas development on high renewable energy potential areas, simply stating generally that:

> *Implementing management for the following resources would have negligible or no impact on renewable energy and are therefore not discussed in detail:* air quality, climate, soils and water, vegetation, fish and wildlife, special status species, wild horses, wildland fire ecology and management, cultural resources, paleontological resources, lands with wilderness characteristics, forestry and woodland products, livestock grazing,

---

[115] *Id.* at 5-5 (Fig. 5-1).
[116] Uncompahgre Field Office, Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado, 2012, available at http://www.blm.gov/style/medialib/blm/co/information/nepa/uncompahgre_field/13-22_bull_mountain.Par.0265.File.dat/UncompahgreRFD_Feb_2012.pdf (attached as Exhibit 40) ("UFO RFD").

BLM_0149790

*energy and minerals*, comprehensive trails and travel management, lands and realty, renewable energy, ACECs, wild and scenic rivers, national trails and byways, watchable wildlife viewing sites, Native American tribal uses, and public health and safety.

DEIS 4-338 (emphasis added).

Nevertheless, the BLM recognizes that renewable energy facilities are usually sited based on resource potential and proximity to transmission lines or end uses. Oil and gas development that will impinge on these areas would create conflicts with renewable energy development that must be addressed. The discussion of cumulative impacts does identify the impacts of oil and gas on renewable energy development as follows, but no further analysis is conducted:

> Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect renewable energy are energy and minerals development.

DEIS 4-341.

Given the urgent need to transition away from fossil fuels and toward renewable energy to meet our nation's commitment to address climate change, it is incumbent upon the BLM to ensure that renewable energy development, especially photovoltaic solar development, is not precluded in the planning area by new oil and gas development. Further, the BLM is required to include a renewable energy alternative or include renewable energy as a priority element in each alternative to ensure that a thorough analysis of this important public lands resource is conducted.

### III. The UFO Failed to Take a Hard Look at Climate Change Impacts.

If we are to stem the impacts of climate change and manage for sustainable ecosystems, not only must the BLM take a hard look at greenhouse gas ("GHG") emitted by fossil fuel leasing and development in the planning area, but the agency's decision must be reflective of the challenges we face.

The EPA has determined that human emissions of greenhouse gases are causing global warming that is harmful to human health and welfare. *See* 74 Fed. Reg. 66,496 (Dec. 15, 2009), *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act.* The D.C. Circuit has upheld this decision as supported by the vast body of scientific evidence on the subject. *See Coal. for Responsible Regulation, Inc. v. E.P.A.*, 684 F.3d 102, 120-22 (D.C. Cir. 2012). Indeed, EPA could not have found otherwise, as virtually every climatologist in the world accepts the legitimacy of global warming and the fact that human activity has resulted in atmospheric warming and planetary climate change.[117] The world's

---

[117] *See, e.g.,* INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, *The Science of Climate Change* (1995) (attached as Exhibit 47); U.S. Climate Change Science Program, *Abrupt Climate Change* (Dec. 2008) (attached as Exhibit 48); James Hansen, et. al., *Global Surface Temperature Change*, REVIEWS OF GEOPHYSICS, 48, RG4004 (June 2010) (attached as Exhibit 49); *see also,*

BLM_0149791

leading minds and most respected institutions—guided by increasingly clear science and statistical evidence—agree that dramatic action is necessary to avoid planetary disaster.[118] Greenhouse gas concentrations have been steadily increasing over the past century,[119] and our insatiable consumption of fossil fuels is pushing the world to a tipping point where, once reached, catastrophic change will be unavoidable.[120] In fact, the impacts from climate change are already being experienced, with drought and extreme weather events becoming increasingly common.[121]

---

Richard A. Muller, *Conversion of a Climate Change Skeptic*, NEW YORK TIMES, July 28, 2012 (attached as Exhibit 50) (citing Richard A. Muller, et. al., *A New Estimate of the Average Earth Surface Temperature, Spanning 1753 to 2011,* (attached as Exhibit 51); Richard A. Muller, et. al., *Decadal Variations in the Global Atmospheric Land Temperatures* (attached as Exhibit 52)).

[118] *See, e.g.,* Rob Atkinson, et. al., *Climate Pragmatism: Innovation, Resilience, and No Regrets* (July 2011) (attached as Exhibit 53); Veerabhadran Ramanathan, et. al., *The Copenhagen Accord for Limiting Global Warming: Criteria, Constraints, and Available Avenues* (Feb. 2010) (attached as Exhibit 54); UNITED NATIONS, INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, *Climate Change 2007: Synthesis Report* (2007) (attached as Exhibit 55); A.P. Sokolov, et. al., *Probablistic Forecast for Twenty-First-Century Climate Based on Uncertainties in Emissions (without Policy) and Climate Parameters,* MASSACHUSETTS INSTITUTE OF TECHNOLOGY (MIT) (Oct. 2009) (attached as Exhibit 56); UNITED NATIONS, FRAMEWORK CONVENTION ON CLIMATE CHANGE, *Report of the Conference of the Parties* (Dec. 2011) (attached as Exhibit 57); Bill McKibben, *Global Warming's Terrifying New Math,* ROLLING STONE, July 19, 2012 (attached as Exhibit 58); Elizabeth Muller, *250 Years of Global Warming,* BERKLEY EARTH, July 29, 2012 (attached as Exhibit 59); Marika M. Holland, et. al., *Future abrupt reductions in summer Arctic sea ice,* Geophysical Research Letters, Vol. 33, L23503 (2006) (attached as Exhibit 60).

[119] *See* Randy Strait, et. al., *Final Colorado Greenhouse Gas Inventory and Reference Case Projections: 1990-2020,* CENTER FOR CLIMATE STRATEGIES (Oct. 2007) (attached as Exhibit 61); Robin Segall et. al., *Upstream Oil and Gas Emissions Measurement Project,* U.S. ENVIRONMENTAL PROTECTION AGENCY (attached as Exhibit 62); Lee Gribovicz, *Analysis of States' and EPA Oil & Gas Air Emissions Control Requirements for Selected Basins in the Western United States,* WESTERN REGIONAL AIR PARTNERSHIP (Nov. 2011) (attached as Exhibit 63).

[120] *See, e.g.,* James Hansen, *Tipping Point: Perspective of a Climatologist,* STATE OF THE WILD 2008-2009 (attached as Exhibit 64); GLOBAL CARBON PROJECT, *A framework for Internationally Co-ordinated Research on the Global Carbon Cycle,* ESSP Report No. 1 (attached as Exhibit 65); INTERNATIONAL ENERGY AGENCY, *CO₂ Emissions from Fuel Combustion,* Highlights 2011 (attached as Exhibit 66); GLOBAL CARBON PROJECT, *10 Years of Advancing Knowledge on the Global Carbon Cycle and its Management* (attached as Exhibit 67); Meinshausen, et. al. (attached as Exhibit 15).

[121] *See, e.g.,* UNITED NATIONS, INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, *Managing the Risks of Extreme Events and Disasters to Advance Climate Change Adaptation* (2011) (attached as Exhibit 68); Aiguo Dai, *Increasing drought under global warming in observations and models,* NATURE: CLIMATE CHANGE (Aug. 2012) (attached as Exhibit 69); Stephen Saunders, et. al., *Hotter and Drier: The West's Changed Climate* (March 2008) (attached as Exhibit 70).

BLM_0149792

Renowned NASA climatologist Dr. James Hansen provides the analogy of loaded dice – suggesting that there still exists some variability, but that climate change is making these extreme events ever more common.[122] In turn, climatic change and GHG emissions are having dramatic impacts on plant and animal species and habitat, threatening both human and species resiliency and the ability to adapt to these changes.[123] According to experts at the Government Accountability Office ("GAO"), federal land and water resources are vulnerable to a wide range of effects from climate change, some of which are already occurring. These effects include, among others, "(1) physical effects, such as droughts, floods, glacial melting, and sea level rise; (2) biological effects, such as increases in insect and disease infestations, shifts in species distribution, and changes in the timing of natural events; and (3) economic and social effects, such as adverse impacts on tourism, infrastructure, fishing, and other resource uses."[124]

The UFO RMP/EIS acknowledges that "mounting evidence suggests" that numerous climate change impacts are already occurring in the Mountain West and Great Plains region, including warming temperatures, less snowfall, earlier snowmelt, more drought, greater wildfire risk, and the expansion of grasslands and rangelands into previously forested areas. DEIS at 4-41. The UFO RMP/EIS further acknowledges that these climate change impacts will cause ecosystem and wildlife damage and stress in numerous ways. For example, "[I]f global climate change results in a warmer and drier climate, increased particulate matter impacts could occur due to increased windblown dust from drier and less stable soils." *Id.* "[E]xtinction of endemic threatened or endangered plants may be accelerated." *Id.* And: "The population of some animal species may be reduced." *Id.* The UFO concludes: "Increased fire activity and intensity would increase greenhouse gas emissions, providing for a negative feedback loop. *In fact, most of the predicted changes on a global scale have some level of a predicted negative feedback loop, making the problem particularly vexing.*" *Id.* (emphasis added).

However, despite these acknowledgments, the UFO fails to adequately address climate change in its Plan or EIS, as NEPA requires, through robust consideration of reasonable

---

[122] *See,* James Hansen, et. al., *Climate Variability and Climate Change: The New Climate Dice* (Nov. 2011) (attached as Exhibit 71); James Hansen, et. al., *Perception of Climate Change* (March 2012) (attached as Exhibit 72); James Hansen, et. al., *Increasing Climate Extremes and the New Climate Dice* (Aug. 2012) (attached as Exhibit 73).

[123] *See* Fitzgerald Booker, et. al., *The Ozone Component of Climate Change: Potential Effects on Agriculture and Horticultural Plant Yield, Product Quality and Interactions with Invasive Species,* J. INTEGR. PLANT BIOL. 51(4), 337-351 (2009) (attached as Exhibit 74); Peter Reich, *Quantifying plant response to ozone: a unifying theory,* TREE PHYSIOLOGY 3, 63-91 (1987) (attached as Exhibit 75).

[124] GAO Report, *Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources* (2007) (attached as Exhibit 76); *see also* Committee on Environment and Natural Resources, National Science and Technology Council, *Scientific Assessment of the Effects of Global Climate Change on the United States* (2008) (attached as Exhibit 77); Melanie Lenart, et. al. *Global Warming in the Southwest: Projections, Observations, and Impacts* (2007) (attached as Exhibit 78) (describing impacts from temperature rise, drought, floods and impacts to water supply on the southwest).

BLM_0149793