Scanned
0013972

**Please consider this a public comment on**
**BLM's Uncompahgre Field Office Draft Resource Management Plan.**

Reference page number or section in RMP (optional): _____

Title of comment (area or trail name): _Caddel Peak addition_

Name: _Jud Stephenson_

Address: _P.O. Box 272 – Ridgway, Co 81452_

Email (optional): _____ Phone (optional): _____

Consider answering one or more of these questions:

(1) **Describe the area and your historical use/activities there** (Time of year and hiking, camping, photography, etc):
(2) **What do you like about this area/trail?** (Close to home, wildlife, historic sites, scenic views, etc. include experiential data and resource knowledge when possible):
(3) **With what aspects of BLM's findings do you agree and/or disagree and why?** (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):
(4) **Additional Comments** (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

① - Hiking - Photographing

② This area is near enough to my home that I can enjoy the solitude & quiet recreation year around - Wildlife can be seen frequently.

③ - This area need the highest level of Protection possible. The areas up to & possibly including mesa tops should be included in the protected areas. - This should be considered for habitat connectivity.

Scanned
00 14014

**Please consider this a public comment on**
**BLM's Uncompahgre Field Office Draft Resource Management Plan.**

Reference page number or section in RMP (optional): _____

Title of comment (area or trail name): Camel Back addition area

Name: Terry Randall

Address: 60951 Kansas Rd. Montrose, Co.

Email (optional): tlr1536@gmail.com    Phone (optional): _____

Consider answering one or more of these questions:

(1) **Describe the area and your historical use/activities there** (Time of year and hiking, camping, photography, etc):
(2) **What do you like about this area/trail?** (Close to home, wildlife, historic sites, scenic views, etc. include experiential data and resource knowledge when possible):
(3) **With what aspects of BLM's findings do you agree and/or disagree and why?** (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):
(4) **Additional Comments** (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

I have hiked and ridden horseback several times into the Robideau - Potter Creek area, including the tops of Winter and Monitor mesas. In the spring there are wildflowers I don't get to see in the mountain areas. In the fall this area is close enough to home to see fall colors when I don't have to drive far.

I would like to see this area designated as LWC for the creek beds but also the Mesas as ACEC to protect & buffer the creek areas. This buffer would prevent civilization from destroying the wilderness experience & driving off wildlife. At least part of the Monitor Mesa should be preserved to provide a wildlife corridor without inroads of vegetation control & fencing by grazing cows & sheep owners.

Scanned
00 14 178

**Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.**

Reference page number or section in RMP (optional): _____

Title of comment (area or trail name): _CAMEL BACK ADDITION_

Name: _ROBERT L. OLIVIER_

Address: _PoBox 306, OURAY, CO 81427_

Email (optional): _____  Phone (optional): _____

Consider answering one or more of these questions:

(1) **Describe the area and your historical use/activities there** (Time of year and hiking, camping, photography, etc):

(2) **What do you like about this area/trail?** (Close to home, wildlife, historic sites, scenic views, etc. include experiential data and resource knowledge when possible):

(3) **With what aspects of BLM's findings do you agree and/or disagree and why?** (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):

(4) **Additional Comments** (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

HIKED TO THE TOP OF THE END OF MONITOR MESA ON 5/10/14. CHOSE THIS AREA BECAUSE OF: (1) SOLITUDE: VERY WILD, NO HUMAN ACTIVITY IN VIEW. (2) APPRECIATION OF NATURAL VEGETATION + WILDLIFE. (3) WANTED TO OBSERVE AN AREA OF HISTORICAL INTEREST.

I FEEL THAT THE WILD NATURE OF THIS AREA SHOULD BE MAINTAINED AND INCREASED. IN PARTICULAR THE WIND CANYON BOTTOM AND RIPARIAN ZONE NEEDS TO BE PROTECTED BY EXTENDING THE PROTECTION TO INCLUDE THE CANYON WALLS. IF POSSIBLE, THE PROTECTION SHOULD BE EXTENDED TO INCLUDE PARTS OF THE TOP OF THE MESA.

Scanned
0014274

**Please consider this a public comment on**
**BLM's Uncompahgre Field Office Draft Resource Management Plan.**

Reference page number or section in RMP (optional): _____

Title of comment (area or trail name): Camel back Addition

Name: JANE HAEFNER

Address: 13335 CR1  Ridgway CO 81432

Email (optional): _____  Phone (optional): _____

Consider answering one or more of these questions:

(1) **Describe the area and your historical use/activities there** (Time of year and hiking, camping, photography, etc):
(2) **What do you like about this area/trail?** (Close to home, wildlife, historic sites, scenic views, etc. include experiential data and resource knowledge when possible):
(3) **With what aspects of BLM's findings do you agree and/or disagree and why?** (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):
(4) **Additional Comments** (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

On this 10 May 2014 hike I WCC in the Camel back Addition area, my personal interest is purely visual. We are surrounded by such unique landscape that can only & truly be appreciated by foot. I realize land may be used for multi purpose reasons, but the Camelback WSA addition is a prime primative area from the creeks up to the mesa rims. Wildlife, plants, birds, solitude & lack of civilization is an experience that should remain available to all.

We would like to see this area managed for its wilderness characteristics & support & lue & ACE designation.

Scanned
00143 7B

**Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.**

Reference page number or section in RMP (optional): _____

Title of comment (area or trail name): CAMEL BACK ADDITION

Name: JAN VAN WEST

Address: 453 CTY RD. #5 / RIDGWAY, CO.

Email (optional): _____ Phone (optional): _____

Consider answering one or more of these questions:

(1) **Describe the area and your historical use/activities there** (Time of year and hiking, camping, photography, etc):
(2) **What do you like about this area/trail?** (Close to home, wildlife, historic sites, scenic views, etc. include experiential data and resource knowledge when possible):
(3) **With what aspects of BLM's findings do you agree and/or disagree and why?** (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):
(4) **Additional Comments** (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

Winter, Spring, & Fall hiking is incredible in this area. The Roubideau, Monitor, = Potter ACEC is necessary to protect this area by expanding the Canyon's rims and up onto Monitor Mesa. The plant community is incredible — all kinds of relationships between the plant are in place from the Cottonwood communities up into the Pinon / Juniper & the Mesa Tops as well. Riparian too! Great opportunities here for solitude — for habitat to be protected! I had such a beautiful time in this exquisite (and rare) area. Please keep it as it is by implementing the ACEC for this area!

Scanned
00 14476

**Please consider this a public comment on**
**BLM's Uncompahgre Field Office Draft Resource Management Plan.**

Reference page number or section in RMP (optional): _____

Title of comment (area or trail name): Camel Back adition

Name: BILL EMBROCK

Address: 11092  3300  Rd.

Email (optional): KBTEMBROCK@tds.net  Phone (optional): 970 - 872 - 3987

Consider answering one or more of these questions:

(1) **Describe the area and your historical use/activities there** (Time of year and hiking, camping, photography, etc):
(2) **What do you like about this area/trail?** (Close to home, wildlife, historic sites, scenic views, etc. include experiential data and resource knowledge when possible):
(3) **With what aspects of BLM's findings do you agree and/or disagree and why?** (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):
(4) **Additional Comments** (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

all of Camelback, Potter + Moniter
I visit and hike in year around

Scenery, Wildlife, Vegatation, solitude rudeness
are all important

all of the river bottom, Canyons
and Mesa tops must be included
and saved

No place in Colo has this unique
value, please protect it.

Bill Embrock

Scanned
0014596

**Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.**

Reference page number or section in RMP (optional): _____

Title of comment (area or trail name): _Camelback WSA addition_

Name: _Jim Schwarz_

Address: _23 Columbia Way    Montrose, Co 81401_

Email (optional): _jschw@mind spring.com_    Phone (optional): _928 853 3641_

Consider answering one or more of these questions:

(1) **Describe the area and your historical use/activities there** (Time of year and hiking, camping, photography, etc):

(2) **What do you like about this area/trail?** (Close to home, wildlife, historic sites, scenic views, etc. include experiential data and resource knowledge when possible):

(3) **With what aspects of BLM's findings do you agree and/or disagree and why?** (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):

(4) **Additional Comments** (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

After hiking in Potter & Monitor canyons for the
first time — what an incredible place. I can see
the addition of it as lands with Wilderness characteristics
as something worthy. It felt primitive & remote yet
accessible from nearby towns. The riparian areas
provide important habitat plus adding this will provide
connectivity to the existing Camelback WSA. Some
proposals for further protection could further
ensure this great place stays special. It also
looks like a solution can be achieved that allows
ranching to continue on the mesas — something I also
value.
I look forward to frequent future visits

Scanned
00146??

Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.

Reference page number or section in RMP (optional): _____

Title of comment (area or trail name): Camel back WSA Addition

Name: Andrew Goldman

Address: 58657 Meadow Lane, Montrose, Co 81403

Email (optional): Fishman2@ montrose. net     Phone (optional): 970 275 9818

Consider answering one or more of these questions:

(1) **Describe the area and your historical use/activities there** (Time of year and hiking, camping, photography, etc):
(2) **What do you like about this area/trail?** (Close to home, wildlife, historic sites, scenic views, etc. include experiential data and resource knowledge when possible):
(3) **With what aspects of BLM's findings do you agree and/or disagree and why?** (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):
(4) **Additional Comments** (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

1) Have visited the confidence of Potter and Monitor Canyons in the spring of
2014. Hiking in the area approximately 4 miles in. It is easily accessible to
the trailhead via 4 WD. It is a beautiful unspoiled canyon/mesa system
with incredible rock formations and canyon vistas from the mesa top. When
hiking with our party we saw no other individuals so the opportunity of
for solitude is likely there. The area shows little the evidence of human
disturbance except for the impact of cattle grazing. (Trail erosion, fencing)
There was no sound of airplanes or off road vehicles. Lots of
wild flowers were in bloom at the time of our visit. Hiking to the top of
monitor mesa provided opportunity for a more primitive trail, bushwhacking
experience. It is one of the nicest riparian woodland areas I have
hiked in this part of Colorado, and it is accessable enough that an older
person like myself can experience its remoteness with minimum difficulty.
I would like to see the WSA managed as a LWC or at least
an ACEC from the tops of the Monitor and Potter Canyon walls
including the top of Monitor Mesa as this represents an larger
and natural contiguous land boundary and is contiguous with Camelback WSA
The areas connectivity to both the Roubideau WSA and the
Camel Back WSA makes it ripe for related and varied exploration
on foot or horseback. Its suitability as a bird sanctuary was evident

To whom it may concern,

I have to ask why?
Why jeopardize our sustainable life here: organic food, renewable energy, creative coalition.

We are making life work in the face of global warming.

Our precious water supply can't support support water guzzling fracking let alone contamination.

Fracking is the past. It's a dinosaur. BLM be visionary. Keep it simple: NO oil/gas leasing.

Sincerely TINA HALL

970-778-9324
1494 3350 RD
CRAWFORD CO

8/4/15

The North Fork Valley being an incredible place, needs to be protected from just on industry that can be so damaging. Jumbo mnt. is used by so many towns people, plus drawing people that come here specificly to bike and hike. This is such an important resource to our valley. Our land value and investment we have made with our own sweat equity. We feel with gas fracking, will devalue our property value. We have farmed 22 acres for 15 yrs. We need our clean water, clean air, we are the biggest organic producers in the state. The Minnesota creek coridor is an important water shed that should be off limits to any gas developement. The town of Pania's water source above town should be taken off any developement. As property owners at the bottom of Jumbo Mnt, we are very concerned. Thank you for Reading our concerns we would recommend the B1 Alternative.

NOV 0 1 2016

Ray Taylor
41993 Minnesota Creek Rd
Paonia Co. 81428

To Whom It May Concern:

My name is Sandy York and I currently own a home and am a resident of Paonia, CO. Please "incorporate by reference" my previous letter for details on how this sale effects me and the parcel that effect my household water supply and my irrigation shares/rites.   But this isn't just about me. It is about us. WE THE PEOPLE of the North Fork Valley, WE THE PEOPLE of Delta County, WE THE PEOPLE of the western slope, WE THE PEOPLE of Colorado, and WE THE PEOPLE of the United States of America. Please let me give you at least 3out of 6 facts as to why I think gas-drilling never need to be near residents.   Ones that your EA did not take into account.
FACTS:

1.    There are know and studied environmental concerns with hydraulic fracturing ( Department of Energy report of 2011 indicated a substantial risks for environment and serious health consequences for those who live close to drilling operations.)–one incident which is confirmed as related to natural gas drilling is in Pavillion Wyoming.
MY CONCERN: Of the 9000 miles of streams in Colorado only 168 miles are GOLD MEDAL WATERS and we live on the North Fork of the Gunnison River, the headwaters for a GOLD MEDAL WATERWAY. Do we really want to risk one incident into those waterways? Perhaps an Environmental Impact statement taking these Gold Medal waterways into account is needed especially in regard to horizontal fracking which your EA did not take into account.

2.   Emissions associated with natural gas development and production, is from combustion, NOX(example: diesel trucks running continuously for 36 hours during the fracking process) Another group of emissions that are routinely vented in to atmosphere that linked with natural gas itselfare volatile organic compounds-BTEX/ (VOCs), neurotoxins. The VOC's are especially impactful on health. Health effects of exposure to these chemicals include neurological problems, birth defects, premature births, and cancer. MY CONCERNS for this are professional. Never in my 40 years as a Speech and Language therapist have I had the number of neurological issue with children on my caseload. I currently have 10 non-verbal neurological impaired children in 3 pre-schools in Delta CO. Schools, in the city of Delta and that is just my caseload. Currently as part of the childfind team- we take referrals from doctors, parents, teachers, and NICU referrals from St. Mary's hospital in Grand Junction.  This  year is it highest number I have ever had and the year is not over. This includes the increased number of NICU infants from St. Mary's Hospital in Grand Junction.  I use to tell people that were pregnant to stop drinking their tap water and now maybe I should tell them to stop breathing the air.  I believe we are already in "HARM'S WAY" in regard to this, from drilling already on the western slope.

3.   An Analysis of potential adverse impacts to air quality was taken at Walker Field in Grand Junction , which is some 60 miles away and at a substantially lower elevation in a desert valley floor. Which does not fully consider the

daily diurnal winds that occur in the south facing slopes of the Grand Mesa. When coupled with inversions that are common in this North Fork area, the impact can be significant and should be and have not been analyzed, especially in regard to the negative impacts to agriculture located in the North Fork Valley. This green lovely valley provides 68% of the apples grown in Colorado. This needs to be studied prior to the sale-now-not later. The Preamble to the constitution states that WE THE PEOPLE established the Constitution for many reasons, one of them being to promote the general welfare, and I do not believe that drilling natural gas around residents, schools. waterways, watersheds, nursing homes, ets. promotes our general welfare, nor does it insure domestic tranquility.- and that is why I support the NO ACTION/NO LEASING/NORTH FORK ALTERNATIVE. Please reference my previous letter in regard to the other 3 facts and "incorporate by reference". I know that leasing does not impact the environment-but what that individual/company does with that lease could and would if natural gas drilling occurs in this pristine valley. The BLM cannot put off analyzing the impacts of oil an gas development to a future date, all impacts must be analyzed before the selling of these leases. PLEASE 63% of the North Fork Valley wrote you not to lease to natural gas drilling individuals and/or companies. LISTEN TO US AND DO NOT PUT US IN HARM'S WAY. And if you do,( and I believe that oil and natural gas drilling does, for I am a former resident and land owner in Parachute, Colorado and I have seen, smelled, heard, the up close and personal horrors that occurred there on my 40 acreas backed to BLM land), then you will hear from me again and again and again. I believe it goes against my constitution rights and I will stand up for what I believe in time and time again.

Sincerely,

Sandy York
208 Minnesota Ave.
Paonia, Co. 81428
970-901-2944
sandykyork@gmail.com

BLM Uncompahgre Field Office
ATTN: Comments on RMP
Montrose CO 81401

Dear Bureau of Land Management,

Please accept my comments on the new RMP. I am a resident of Paonia Colorado
and this is not the first letter I have written in regard to the risk to watersheds,
humans, and animals of Natural gas fracking. In my first letter I gave you current
research facts, in my second letter I appealed to you from my heart. I am 65 years
old and have worked since I was 14 years of age. I have raised 4 sons, gotten
numerous degrees and seen pristine beautiful lovely vista and a former landowner
from Parachute Colorado. I have been up close to the horrors of natural gas drilling
and fracking. The noise and vibration of the fracking, which literally made my dog,
cower in the corner. The smell of chemicals-the bright glaring lights coming
through my bedroom window, the greasy film on my plants and cars, let alone my
hair when I was outside upwind from the rig that lay near my property. The caution
signs that state that Hydrogen Sulfide is probably present. I left—took a loss on my
home and started over. Now after about 15 years I have finally recovered and will
retire in about 4 years in a house paid for- in what I thought would be free from
these horrors. And here they come again. Please stop this madness. Your reports
do not consider many factors one being the fact that this is now an agriculture
organic farm area and no longer a coal town, plus the outfitters for elk in this area
exceed 54 million per year, and if fracking begins, the elk will leave. I have enclosed
a recent article from Mother Earth News. It tells you of recent research done by
Dominic C. DiGiulio and Robert B. Jackson who published their research about
fracking flaws in the journals of "Environmental Science and Technology". Their
published findings show that not only did fracking operations pose an above and
belowground risk to drinking water, they strongly affected both. Just one more
thing--- would you lease these parcels if your property was near it--- if the answer to
that is no—then do not lease these parcels that are near me or anyone—and if the
answer is yes—then come buy my place for what I owe and I will move away. What
you do to the earth-you do to yourself. Please don't add any more wells to this area-
PLEASE STOP!!!! Let me retire without these horrors outside my windows. I
request the BLM place a moratorium on all oil and gas development in the North
Fork area and if a no leasing option is not a possibility in this area then please
consider the North Fork Alternative.

Sincerely,
Sandy York MS/CCC/SLP
208 Minnesota Ave.
Paonia, CO. 81428
970-901=2944

BLM_0150073

BLM_0150074

# Stanford News (http://news.stanford.edu/)

MARCH 29, 2016

# Stanford researchers show fracking's impact to drinking water sources

*A case study of a small Wyoming town reveals that practices common in the fracking industry may have widespread impacts on drinking water resources.*

BY ROB JORDAN

Only one industry is allowed to inject toxic chemicals into underground sources of drinking water – hydraulic fracturing, or "fracking." Concerns about this practice have riled the U.S. political landscape and communities around the country, perhaps nowhere more so than in Pavillion, Wyoming, population 231.



U.S. Environmental Protection Agency staff members sample a monitoring well for contaminants from hydraulic fracturing. A Stanford study in Pavillion, Wyoming, finds that practices common in the fracking industry have affected the community's drinking water. *(Image credit: Dominic DiGiulio)*

A new study by Stanford scientists published in *Environmental Science & Technology (http://pubs.acs.org/journal/esthag)* finds for the first time that fracking operations near Pavillion have had clear impact to underground sources of drinking water. The research paints a picture of unsafe practices including the dumping of drilling and production fluids containing diesel fuel, high chemical concentrations in unlined pits and a lack of adequate cement barriers to protect groundwater.

The well field has gone through several corporate hands since the 1960s, but various fracking operators have used acid and hydraulic fracturing treatments at the same depths as water wells in the area.

"This is a wake-up call," said lead author Dominic DiGiulio, a visiting scholar at Stanford School of Earth, Energy & Environmental Sciences. "It's perfectly legal to inject stimulation fluids into underground drinking water resources. This may be causing widespread impacts on drinking water resources."

"Decades of activities at Pavillion put people at risk. These are not best practices for most drillers," said co-author Rob Jackson (http://earth.stanford.edu/rob-jackson), the Michelle and Kevin Douglas Provostial Professor at the School of Earth, Energy & Environmental Sciences (http://earth.stanford.edu/).

As part of the so-called frackwater they inject into the ground, drilling companies use proprietary blends that can include potentially dangerous chemicals such as benzene and xylene. When the wastewater comes back up after use, it often includes those and a range of potentially dangerous natural chemicals.



over

BLM_0150075

"There are no rules that would stop a company from doing this anywhere else," said Jackson, who is also a senior fellow at the Stanford Woods Institute for the Environment (http://woods.stanford.edu) and at the Precourt Institute for Energy (http://energy.stanford.edu/).

The study, based on publically available records and documents obtained through the Freedom of Information Act, is part of Jackson's ongoing research on shallow fracking and its impact on groundwater. He and his colleagues have done various studies across the United States and in the Pavillion Field, an area of Wyoming's Wind River Basin pocked by more than 180 oil and gas wells, some of them plugged and abandoned.

Back in 2008, the residents of Pavillion complained of a foul taste and odor in their drinking water and questioned whether it was related to physical ailments. In 2011, the U.S. Environmental Protection Agency issued a preliminary report putting the tiny town at the center of a growing fracking debate.

The EPA report, which linked shallow fracking to toxic compounds in aquifers, was met with heavy criticism from the drilling industry as well as state oil and gas regulators. Three years later, having never finalized its findings, EPA turned its investigation over to Wyoming. The state released a series of reports without firm conclusions, and, as of last month, has said it has no firm plans to take further action. In the meantime, the federal Agency for Toxic Substances and Disease Registry has advised area residents to avoid bathing, cooking or drinking with water from their taps.

The new Stanford study goes a step beyond the 2011 EPA report to document not only the occurrence of fracking chemicals in underground sources of drinking water but also their impact on that water that is making it unsafe for use.

The ripple effect goes well beyond Pavillion.

"Geologic and groundwater conditions at Pavillion are not unique in the Rocky Mountain region," said DiGiulio. "This suggests there may be widespread impact to underground sources of drinking water as a result of unconventional oil and gas extraction."

To avoid what happened in Pavillion, Jackson and DiGiulio suggest further investigation and regulations to limit shallow fracking and require deeper protective casings. Wyoming does not require the cementing of surface casings, and only two U.S. states, Colorado and Texas, have special requirements for shallow hydraulic fracturing. Safeguards mean little, however, if they are not enforced – something the EPA has done a mixed job with, according to Jackson.

"The EPA has consistently walked away from investigations where people and the environment appear to have been harmed" by fracking's impact on groundwater, Jackson said.

## Media Contacts

Dominic DiGiulio, Stanford School of Earth, Energy & Environmental Sciences: (580) 279-9283, ddigiuli@stanford.edu
Rob Jackson, School of Earth, Energy & Environmental Sciences: (650) 497-5841, rob.jackson@stanford.edu
Rob Jordan, Stanford Woods Institute for the Environment: (650) 721-1881, rjordan@stanford.edu

BLM_0150076

8/24/2016                               Stanford researchers show fracking's impact to drinking water sources



 (mailto:?

subject=An%20interesting%20article%20from%20Stanford%20News&body=I%20want%20to%20share%20this%

BLM_0150077

BLM_0150078

8/24/2016    The Depths of Hydraulic Fracturing and Accompanying Water Use Across the United States - Environmental Science & Technology (ACS Publications)



EARLY REGISTRATION NOW OPEN!     REGISTER

Log In    Register    Cart

ACS    ACS Publications    C&EN    CAS

ACS Journals    ACS ChemWorx    eBooks    ACS Style Guide    C&EN Archives

Search    Citation    Subject    Advanced Search

Enter search text / DOI    Anywhere    Search
○ Environ. Sci. Technol.   ○ All Publications/Website

**Environmental Science & Technology**

Environ. Sci. Technol.    Environ. Sci. Technol. Lett.

Browse the Journal    Articles ASAP    Current Issue    Multimedia    Submission & Review    Open Access    About the Journal

## Policy Analysis

Previous Article    Next Article    Table of Contents

# The Depths of Hydraulic Fracturing and Accompanying Water Use Across the United States

Robert B. Jackson[†‡§], Ella R. Lowry[†], Amy Pickle[‖], Mary Kang[†], Dominic DiGiulio[†], and Kaiguang Zhao[⊥]
[†]School of Earth, Energy, and Environmental Sciences, [‡]Woods Institute for the Environment, and [§]Precourt Institute for Energy, Stanford University, Stanford, California 94305, United States
[‖] Nicholas Institute for Environmental Policy Solutions, Duke University, Durham, North Carolina 27708, United States
[⊥] School of Environment and Natural Resources, OARDC, The Ohio State University, Wooster, Ohio 44691, United States

Environ. Sci. Technol., 2015, 49 (15), pp 8969–8976
DOI: 10.1021/acs.est.5b01228
Publication Date (Web): July 21, 2015
Copyright © 2015 American Chemical Society
*Phone: 1-650-497-5841; fax: 1-650-498-5099; e-mail: rob.jackson@stanford.edu.

### Article Options

ACS ActiveView PDF
Hi-Res Print, Annotate, Reference QuickView

PDF (2984 KB)

PDF w/ Links (390 KB)

Full Text HTML

**Abstract**
Supporting Info
Figures
References
Citing Articles

Add to ACS ChemWorx

Add to Favorites
Download Citation
Email a Colleague
Order Reprints
Rights & Permissions
Citation Alerts

### Metrics

Received 10 March 2015
Date accepted 7 July 2015
Published online 21 July 2015
Published in print 4 August 2015

SciFinder®    Sign in

Retrieve Detailed Record of this Article
Retrieve Substances Indexed for this Article
Retrieve All References Cited for this Article
Retrieve All References Citing this Article

Explore by:
○ Author of this Article
○ Any Author
○ Research Topic

## Abstract



Reports highlight the safety of hydraulic fracturing for drinking water if it occurs "many hundreds of meters to kilometers underground". To our knowledge, however, no comprehensive analysis of hydraulic fracturing depths and water use exists. Based on fracturing depths and water use for ~44 000 wells reported between 2010 and 2013, the average fracturing depth across the United States was 8300 ft (~2500 m). Many wells (6900; 16%) were fractured less than a mile from the surface, and 2600 wells (6%) were fractured above 3000 ft (900 m), particularly in Texas (850 wells), California (720), Arkansas (310), and Wyoming (300). Average water use per well nationally was 2 400 000 gallons (9 200 000 L), led by Arkansas (5 200 000 gallons), Louisiana (5 100 000 gallons), West Virginia (5 000 000 gallons), and Pennsylvania (4 500 000 gallons). Two thousand wells (~5%) were fractured shallower than one mile and 350 wells (~1%) shallower than 3000 ft were hydraulically fractured with >1 million gallons of water, particularly in Arkansas, New Mexico, Texas, Pennsylvania, and California. Because hydraulic fractures can propagate 2000 ft upward, shallow wells may warrant special safeguards, including a mandatory registry of locations, full chemical disclosure, and, where horizontal drilling is used, predrilling water testing to a radius 1000 ft beyond the greatest lateral extent.

BLM_0150079

Case No. 1:20-cv-02484-MSK    Document 72-10    filed 04/29/21    USDC Colorado    pg 20 of 181

8/24/2016    The Depths of Hydraulic Fracturing and Accompanying Water Use Across the United States - Environmental Science & Technology (ACS Publications)

View: ACS ActiveView PDF | PDF | PDF w/ Links | Full Text HTML

| Citing Articles | Related Content |

Citation data is made available by participants in CrossRef's Cited-by Linking service. For a more comprehensive list of citations to this article, users are encouraged to perform a search in SciFinder.



**Impact to Underground Sources of Drinking Water and Domestic Wells from Production Well Stimulation and Completion Practices in the Pavillion, Wyoming, Field**
Dominic C. DiGiulio and Robert B. Jackson
*Environmental Science & Technology* **2016** *50* (8), 4524-4536
Abstract | Full Text HTML | PDF | PDF w/ Links



**Water Use and Management in the Bakken Shale Oil Play in North Dakota**
R. M. Horner, C. B. Harto, R. B. Jackson, E. R. Lowry, A. R. Brandt, T. W. Yeskoo, D. J. Murphy, and C. E. Clark
*Environmental Science & Technology* **2016** *50* (6), 3275-3282
Abstract | Full Text HTML | PDF | PDF w/ Links

## c&en

Jackson, Robert B. ⌄    Search

**Graduate students at private schools may unionize**
Chemistry teaching and research assistants among those looking to negotiate terms of employment

**ChemChina's Syngenta acquisition clears hurdle**
Green light from U.S. security committee comes amid more industry restructuring

**ACS Meeting News: Super cool catalysts oxidize carbon monoxide**

**ACS Meeting News: Radiochemical synthesis of fluorinated pyridine offers new view of the brain**

**ACS Meeting News: Aromas could help us eat healthy**

C&EN Online    Current Issue    News RSS Feed

**More From Archives**

1155 Sixteenth Street N.W.
Washington, DC 20036

京ICP备13047075

Copyright © 2016
American Chemical Society

**Products**
Journals A-Z
eBooks
C&EN
C&EN Archives
ACS Legacy Archives
ACS Mobile
Video

**User Resources**
About Us
ACS Members
Librarians
Authors & Reviewers
Website Demos
Privacy Policy
Mobile Site

**Support**
Get Help
For Advertisers
Institutional Sales

**Live Chat**

Partners



BLM_0150080

8/24/2016                                                                                                                 Print Article

# MOTHER EARTH NEWS

# New Study on Fracking and Water Contamination

*According to yet another study, the hydraulic fracturing (fracking) process used to extract natural gas can cause drinking water contamination.*

*August/September 2016*

http://www.motherearthnews.com/renewable-energy/energy-policy/does-hydraulic-fracturing-contaminate-drinking-water-zm0z16aszkin.aspx

*By Shelley Stonebrook*



Fracking drills go much deeper than our freshwater aquifers, and unfortunately water contamination near fracking sites does occur.

*Photo by Aunt Spray/Fotolia*

For years, researchers, environmentalists, and community members living near horizontal hydraulic fracturing ("fracking") sites have argued that this questionable method of extracting natural gas contaminates drinking water. In 2011, the U.S. Environmental Protection Agency (EPA) published a controversial draft report regarding an investigation of groundwater pollution related to fracking operations near Pavillion, Wyoming. After examining above- and belowground instances of contamination, the report found that fracking processes can contaminate drinking water. However, EPA scientists were unable to show a widespread, systemic pattern of risk, and the investigation was prematurely withdrawn.

Eventually, one of the EPA scientists leading the original investigation, Dominic C. DiGiulio, left the agency for a job at Stanford University. This year, he and Robert B. Jackson published findings from the Pavillion study in *Environmental Science & Technology*. Their published findings show that not only did fracking operations pose an above- and belowground risk to drinking water, they strongly affected both. Most significantly, the report showed that natural gas companies in Pavillion have failed to maintain aboveground, unlined pits known as "legacy wells," resulting in local well contamination. Further, the report shows that current fracking in the region can impact and has affected underground sources of drinking water.

The natural gas industry has refuted that fracking could affect the water supply, but this research provides

BLM_0150081

evidence to the contrary. Wenonah Hauter, executive director of the environmental nonprofit Food & Water Watch, says, "Had the EPA finalized its own study with similar findings on Pavillion years ago, we might have already turned the corner toward a clean energy future."

BLM_0150082

0175 8P

Dear Dana Wilson,

The North Fork Valley is an environmental gem and the organic farming epicenter of Colorado. OIt The NFV has the potential, if it continues on its trajectory to lead Colorado and our country in sustainability and health. As a property owner in Paonia I am personally at great health risk if Oil & gas development ensues in the North Fork. Not only are their tremendous healthy risks associated with Oil & gas but economic dangers as well. Property values will drop and our community's economy will be DESTROYED. Our economy's biggest asset is our environment- especially clean air & water. At the top of this list is organic agriculture, food + wine production in which we lead the State. This gives birth to Agri- tourism. Also other recreation opportunity abound, hiking, fishing, hunting. All this will end our community will get SICK and the blood will be on your hands. Being situated at the top of Colorado River watershed the impact of oil & gas drilling will stretch across the west. I implore you to promote + implore a NO LEASE alternative for the NFV and let our community + economy flourish. At the very least alternative B1 must be adopted.

Sincerely,

JAKE SAKSON
Paonia, CO 81428

BLM_0150083

BLM_015008⁴

PO Box 242
Paonia, CO 81428

GRAND JUNCTION CO 815

31 OCT 2016 PM 1 L



UFO RMP
Uncompahgre Field Office
2465 S. Townsend Ave
Montrose, CO 81401

RECEIVED
NOV 01 2016
UNCOMPAHGRE FIELD OFFICE

81401$5436

BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Thank you for the opportunity to comment on the Uncompahgre Field Office's draft Resource Management Plan (draft RMP). As presented, I believe that none of the alternatives offer the level of protection these lands warrant, or that the local citizens and communities in your planning area have specifically asked for and favored, and which federal law requires.

I am writing to ask the BLM to **include all proposed actions in the North Fork Alternative, B1, in the final RMP.** The North Fork Alternative boundaries include the communities of Hotchkiss, Paonia and Crawford and include areas that supply municipal water, irrigation, and domestic water companies, impact the scenic features of the Valley, and are high quality wildlife lands.

I am writing to ask the BLM to ensure the strongest level of long-term protection for resources of particular concern included in Alternative B1, such as water supplies and riparian areas; scenic qualities of the valley; undeveloped wildlife lands including winter range and migration corridors.

**While I strongly support the No Fracking Alternative, I am writing to ask the BLM to include, at the minimum, all conservation protections in Alternative B in the final RMP.** (These include, but are not limited to, those listed above.)

Also, I believe the final Resource Management Plan should include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans; include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.

I moved to the area 13 year ago and have seen many changes – many small to medium organic farms have started up or flourished, CSA (Community Supported Agriculture) programs and orchards have multiplied, the region has been discovered as a prime grape growing area by viticulturalists and wineries are now abundant. I hear this Valley called the Napa Valley of Colorado. High-end tourism has been and is continuing to grow, in addition to the already established influx of hunters, cyclists, fisherman, hikers, backpackers, concert goers, and sight-seers that appreciate the Valley's beautiful views, recreational access to public lands, and the many other amazing offerings this Valley has to offer. Many families are drawn to raise their children here by the friendly local people, the safe atmosphere, the clean air and the good locally grown organic food. I chose the area because of the organic farming and the amazing recreational wilderness access. I appreciate the natural beauty, clean air, clean water, quiet nights, quality of life, and abundant wildlife. That lifestyle is in jeopardy with the BLM's preferred alternative RMP. I would be directly and negatively impacted by oil and gas development by increased heavy truck traffic, the possible impacts on my drinking water and irrigation water, the air quality, and the wildlife impacts that development of the area would have. As a small business owner I have already been affected as some of my colleagues and students have already moved away from the NFV in search of places were their water supply and air quality are not being continually threatened by proposed oil and gas leases in their backyard. My livelihood would also be ever more negatively impacted by more oil and gas development in the area because we rely in part on tourism dollars to support our family. The fact that my family's irrigation water comes from Fire Mountain Canal and Farmer's Ditch, whose headwaters are deep in a

1

section of BLM that would be developed under your preferred alternative, is very concerning as we are raising a two year old and our organic garden produce is a big source of his healthy diet. Industrial activities are inappropriate for water drainages. I value the preservation of all public lands and the uses they provide to my neighbors and wildlife.

- The current Resource Management Plan currently in effect was approved at least 26 years ago and did not account for the many changes that have occurred since that time.

- The socioeconomic benefits being derived from the agricultural operations that now exist in the North Fork Valley have changed in importance and character and unfortunately have not been accounted for in the current draft RMP either.

- The draft RMP only contains a brief acknowledgement of the existence of the unique agriculture that occurs in the North Fork Valle and has not adequately or appropriately described what makes the North Fork Valley of such unique agricultural, artistic and entrepreneurial importance to all of Colorado and surrounding states nor given it the protections it deserves regarding water quality, air quality, and general standard of living.

- This omission of fully describing this valley does not constitute meeting the requirement of "succinctly describing the environment of the area(s) to be affected by the alternatives under consideration" as required by **40 CFR 1502.15**.

**This valley is recognized for its unique agriculture (it contains the highest concentration of organic farms, orchards and vineyards in Colorado), local business, art, agribusiness, agritourism, and recreation industries and deserves protection from any threat of environmental degradation that would harm these endeavors.**

**Evidence for the uniqueness of this valley:**

a) It has been described as "**An American Provence**" in the book by the same name written by University of Colorado professor, Thomas Huber. He compares the North Fork Valley with its vineyards to the famous wine growing region of southern France. http://www.merchantherald.com/geographer-says-the-north-fork-is-an-american-provence/ This valley was also featured in the book **At Mesa's Edge: Cooking and Ranching in Colorado's North Fork Valley** https://www.amazon.com/At-Mesas-Edge-Ranching-Colorados/dp/0618221263

b) This valley was designated by the state of Colorado as **a Colorado Certified Creative District** in 2013. Information on the significance of this designation can be viewed at http://www.coloradocreativeindustries.org/showcase/colorado-creative-districts

c) Delta County was recently **awarded three Blueprint 2.0 Initiatives by the Colorado Office of Economic Development and International Trade**. The Initiatives include Strengthening Local Business Brand, Adaptive Reuse Workshop and Tourism Promotion. http://choosecolorado.com/lt-gov-donna-lynne-announces-colorado-blueprint-2-0-initiative-recipients/

d) The North Fork Valley has also been **designated as an American Viticulture Area** by the U.S. government. This designation was officially adopted in 2001 and codified at 27 CFR https://www.gpo.gov/fdsys/pkg/CFR-2016-title27-vol1/pdf/CFR-2016-title27-vol1-sec9-172.pdf An American Viticulture Area is a delineated grape-growing region having distinguishing features as established in Federal regulation and a name and delineated boundary. This is only one of two such designated areas in Colorado

BLM_0150086

e) The North Fork Valley has been featured in a number of articles by the New York Times including coverage of previous attempts to pursue drilling http://www.nytimes.com/2013/02/03/us/colorado-communities-take-on-fight-against-energy-land-leases.html?_r=0  and many other articles like this one: http://www.nytimes.com/2014/06/19/garden/he-found-his-corner-of-the-sky.html.

The potential environmental consequences presented in this draft RMP do not in any way address the depth and breadth of potential effects to the valley from fluid mineral exploration and production. This is in direct conflict with BLM regulation **40 CFR 1610.4-6**: Estimation of effects of alternatives, which requires that the Field Manager "will estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail." Without acknowledging and describing the North Fork Valley in detail, this requirement cannot and has not been achieved.

The inadequacy of the draft RMP is further exemplified by the following:

1)    **Chapter 1, Section 1.4 and Table 1.3:**  This section and table fail to appropriately and adequately acknowledge and discuss the North Fork Alternative Plan (NFAP) presented to the BLM during scoping by citizens and governmental entities in the North Fork Valley. The section summarizing the scoping comments received does not include this important scoping submittal and has consequently resulted in the lack of any meaningful reference to this agriculturally important area throughout the remainder of the draft RMP. This violates the Council on Environmental Quality (CEQ) regulation at **40 CFR 1501.7(a)(2)** which requires the lead agency to determine the significant issues to be analyzed in depth in an Environmental Impact Statement.

This absence of acknowledgment of the North Fork Valley's unique qualities is also in direct conflict with Section 1500.1(b) of the CEQ regulations which states that "NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."

2)    **Chapter 1, Table 1-2, Step 7:** By not appropriately including the North Fork Valley and the potential negative environmental effects to it by the various proposed alternatives as a "planning issue," this draft RMP does not adequately meet the requirement that the preferred alternative be the "alternative that best resolves planning issues."

3)    **Chapter 2, Section 2.2.3:** The lack of adequate discussion and acknowledgement of the North Fork Valley in Chapter 1 (as discussed above) has created a situation where the significance of each alternative to potentially impact the human and natural environment within the BLM planning area is missing from the fundamental underpinnings of the analysis. This absence of appropriate consideration is evident throughout the remainder of the document and in taking this approach, this document does not meet the level of analysis required by **CEQ regulations (40 CFR 1502.1; 1502.2; 1508.8; 1508.14 and 1508.27(a), (b)(3), (b)(4) and (b)(6))** or the **National Environmental Policy Act, Section 101(b)**.

4)    **Chapter 2, Table 2-1 and Appendix D, Ecologic Emphasis Areas:**  The North Fork Valley should have been included in this portion of the analysis. Although it does not fit the BLM's routine (boilerplate) areas of analysis - *unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors* – does not make this ecologically unique area any less worthy of consideration. In fact, minimizing impacts to this culturally and agriculturally significant geographic area should be the core value addressed throughout the draft RMP and presented under each of the Alternatives in Tables 2-1 through 2-6.

5)    **Chapter 3, Section 3.1.3 Geology and Soils:** The following statement is included in this section; "There are no farmlands of national or statewide importance **on BLM-administered lands within the planning area** (emphasis added). However, according to a report by the Soil Conservation Service, "irrigated and prime irrigated lands of statewide importance, most of which are situated at low elevations on valley floors, occur in

3

the Uncompahgre, North Fork, Surface Creek, and Smith Fork drainage basins" (Soil Conservation Service 1980).

Analysis of potential impacts to irrigated and prime irrigated lands existing within the Uncompahgre planning area (North Fork Valley) resulting from federal actions taking place on BLM-administered lands must be analyzed and disclosed in Chapter 4 and they are not.  Chapter 4 is completely silent on the impacts to irrigated and prime irrigated lands occurring within the valley floors in the planning area which violates 40 CFR 1508.14.

**6)     Chapter 3, Section 3.1.5, Vegetation & Chapter 4, Section 4.3.4 Vegetation:** Section 3.1.5 fails to acknowledge or discuss any of the agricultural crops existing in the North Fork Valley, including the large amount of organic agriculture and vineyards, which is part of the Uncompahgre Field Office planning area. Omission of these existing and important resources in Chapter 3 has resulted in the complete omission of possible effects to these resources in Chapter 4, Environmental Consequences. This violates **CEQ regulations at 40 CFR 1502.15**; Affected Environment and **40 CFR 1508.8**; Effects.

**7)     Chapter 4, Section 4.1.1 Analytical Assumption, fifth bullet:** This bullet asserts that "Direct and indirect impacts of implementing the RMP primarily occur on the decision area lands:" This is a seriously flawed assumption because many of the direct and indirect impacts of implementing the RMP on lands underlain by federal fluid mineral estate have the potential to seriously impact the people (and their livelihoods) living in the North Fork Valley including myself and my family.

"Planning area" is defined as the Uncompahgre Field Office boundary, including all lands, **regardless of land ownership** (emphasis added), except the Gunnison Gorge NCA Planning Area and the Dominguez-Escalante NCA" and is depicted on Figure 1-1 provided in the draft RMP. Whereas "decision area lands" are limited to public lands and federal mineral estate managed by the USDOI, Bureau of Land Management. The federal mineral estate managed by the BLM is depicted on Figure 1-2, also provided in the draft RMP.

The North Fork Valley's organic and traditional farming, fruit growing and viticulture areas occur less than one mile, in many places, from the BLM decision area boundary (but within the Uncompahgre planning area). This proximity is especially true for the thousands of acres of land surrounding Paonia, Hotchkiss and Crawford that would be made available for fluid minerals leasing according to the BLM's preferred alternative. Obviously, these agricultural lands are at risk of being either directly or indirectly impacted by gas activity occurring on the adjacent or contiguous decision area land.

**8)     Chapter 4, Section 4.3.2 Soils and Geology:** Because Chapter 3, Section 3.1.3 dismisses the need for identifying and describing irrigated and prime irrigated lands occurring within the planning area, this Section is completely silent on the environmental consequences of federal actions on these agriculturally significant lands. This is a serious omission which only further reinforces the fact that the BLM did not take the environment actually in existence in the planning area into consideration which violates **40 CFR 1502.15 of the CEQ** regulations.

**9)     Chapter 4, Section 4.3.3 Water Resources:** The following statement is made on page 4-84, "*The organic farming industry relies on clean water for agricultural production. Contamination of irrigation waters could affect the ability of local organic farms to maintain their designations.*" This is the only mention of organic farming in the entire draft RMP. Such a serious threat to the North Fork Valley cannot be allowed to ever occur. And the only way to prevent it is to close the entire area within the NFAP area to any new oil and gas leasing or at the very least, adopt Alternative B1. Oil and gas drilling is incompatible with the existing land uses currently occurring in this valley.

BLM_0150088

The oil and gas industry in Colorado has reported at least 5,188 spills from statewide operations over the last ten years to the Colorado Oil and Gas Conservation Commission. It is not a matter of if a spill will happen, but when a spill associated with drilling activity occurring up valley and upstream from the North Fork Valley will create long-term devastating effects on the soils, surface water and groundwater supporting this agricultural area.

**Appendix D** speaks directly to habitat fragmentation and the importance of the connectivity between the West Elk Wilderness and The Grand Mesa. ANY development, including recreation, will further degrade and fragment the quality of the habit in the RMP area that the BLM is charged to protect. Not that we shouldn't do any development, but that it must be extremely careful and perhaps limited to quiet use.

**In Conclusion:**

The draft RMP states that "When there are conflicts among resource uses or when a land use activity could result in unacceptable or irreversible impact on the environment, the BLM may restrict or prohibit some land uses in specific areas."

Based on the comments presented above, there is definitely a conflict between the extraction of the gas resource and the prevailing land use in the North Fork Valley. Additionally, the land use activity of producing natural gas would result in unacceptable and irreversible impacts on the environment in the North Fork Valley. Therefore, the leasing of any federal fluid minerals within the borders of the NFAP should be prohibited and this prohibition on further leasing incorporated into the alternative chosen for the revised leasing RMP or at the very least, those in Alternative B1. This is the only way to preserve and protect the integrity of this unique and renowned part of Colorado and its habitat.

Gas exploration and development is not compatible with the economic culture of this valley and in fact, its very presence would threaten its highly regarded reputation as an organic agricultural area as well as a great vacation destination. At the bare minimum, I urge you to please include all proposed actions in the North Fork Alternative, B1, in the final RMP. Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities.

Again, I strongly oppose any hydraulic fracturing or new oil and gas well development in or around the North Fork Valley of the Gunnison River. This stance and view point seems consistent with most of the Valley residents as this plan will not bring many (if any) locals new job opportunities and we are all hoping to protect this special place for generations to come. There have been multiple scientific studies (one recently from Yale) showing the potential dangerous side effects and diseases (like cancer) linked to the by-products used in oil and gas extraction on the local population, fauna, wildlife and environment.

I thank you personally for your consideration on this topic, and I thank you for the well-being of future generations as well.

David Alderdice
35003 Hanson Mesa Road
Hotchkiss, CO 81419
970-872-4238
gaicahimsa@yahoo.com

5

NOV 0 1 2016

# Draft Resource Management Plan and EIS-Uncompahgre Field Office

## Comments

Comments included in this summary are from Calvin Inda, Juan Inda, Ross Allen and Ernie Etchart, all grazing permittees within the Uncompahgre Field Office (UFO).

1. The Draft Resource Management Plan (DRMP) does not go into any evaluation of goals and objectives of the existing RMP. Without evaluating what was accomplished and not accomplished in the existing document it makes it very difficult to know if there needs to be any changes in the new RMP and to what extent alternatives B through D are even valid. One example would be in the Range Monitoring program that was proposed in the existing RMP vs. what is proposed in the DRMP. A cursory review of the monitoring files in the UFC indicates that monitoring data, including Land Health Assessment, trend and utilization studies, have not been collected with any consistency or reliability since the current RMP was approved.

2. The DRMP proposes significant changes to the Grazing program and does not appear to be in the congressionally mandated Multiple Use fashion as required through their own directives. Examples would be in the ACEC program, Recreation program and the Wildlife program (Big Horn Sheep/Domestic Sheep).

3. In Appendix E of the DRMP the UFO has outlined proposed changes from alternative A through D. In reviewing recent decisions by the UFO many of the changes that have already been made in permittees allotments have not been carried forward into the DRMP. This is just one example of the inaccuracies of the DRMP.

4. There are no details in the DRMP or explanations as to why changes are being made in grazing permits and changes that are currently being made in term grazing permits are not included in the DRMP. One example is the 35% maximum utilization on winter sheep allotments when there is absolutely no data or research available to substantiate this severe limitation.

5. BLM has consistently reduced grazing permits since the implementation of the existing RMP and continues to do so in the DRMP. Monitoring data collected and to be collected for grazing permits has not and will not be completed as outlined in either document. Decisions are based on "professional judgement" and ocular observations and not on scientific data. BLM has proven it cannot keep up with the required monitoring data that they are supposed to be gathering to make informed scientific decisions let alone what is being proposed in the DRMP.

6. We support and agree with comments made by the Colorado Wool Growers Association in reference to Appendix K Bighorn/Domestic Sheep Risk of Association Modeling. Please see attached comments by the Colorado Wool Growers Association.

7. We support Alternative A as outlined in the DRMP with limited changes that could be worked out with us.

8. The lack of communication, coordination, and consultation has been severely lacking in the development of the DRMP. In our opinion UFO needs to go back to the drawing board to ensure all Multiple Use goals and objectives are considered for all activities, not just special interest activities. In addition all changes/decisions need to be based on sound and proven scientific studies, not cherry picked studies or parts of studies that this DRMP uses.

Thank you for your consideration. Sincerely, Calvin Inda, Juan Inda, Ross Allen and Ernie Etchart.



## Colorado Wool Growers Association

*PO Box 292 ° Delta, CO  81416-0292      (970) 874-1433 ° (970) 874-4170 fax*
*cwgawool@aol.com  °  coloradosheep.org*

Project Manager, Uncompahgre RMP                                October 28, 2016
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO  81401
uformp@blm.gov

### RE:  Draft Resource Management Plan and EIS – Uncompahgre Field Office

The Colorado Wool Growers Association represents BLM and USFS permittees throughout the state, and appreciates the opportunity to provide input for the draft RMP.

The CWGA supports Alternative C with some changes referenced below; and also supports the comments submitted by the Delta County Board of County Commissioners which are incorporated in this document by reference.

The CWGA opposes any reduction or elimination of aums based on the proximity of bighorn sheep to domestic sheep grazing areas, and encourages the BLM and permittees to work together to minimize the risk of potential contact between domestic and bighorn sheep.  In 2014, Colorado Parks & Wildlife (CPW), the Colorado Wool Growers Association (CWGA), the Colorado Department of Agriculture (CDA), and the BLM and USFS renewed the *Memorandum of Understanding for Management of Domestic Sheep and Bighorn Sheep*, but we don't see the *MOU* referenced in the RMP.

### Comments – Appendix K Bighorn/Domestic Sheep Risk of Association Modeling

**Exaggerated Risk of Contact**
We are very concerned about the reliance upon and incorporation of the USFS flawed Payette modeling as a baseline to manage BLM domestic sheep allotments with the Uncompahgre RMP.

Both the Payette modeling and the Snow Mesa EA (K15) failed to follow scientific standards for risk assessment (see attached *Comments on Snow Mesa Allotment Analysis: Assessment of Risk of Physical Contact between Rocky Mountain Bighorn Sheep and Domestic Sheep in the Snow Mesa Sheep Allotment Grazing Landscape – M. Thurmond DVM, PhD – September 7 2015)*.

The RMP is fundamentally flawed by using the Probability of Interaction (PoI) Model in its risk assessment.  This ill-conceived notion lies at the root of the inaccuracies produced by the Risk of Contact ("RoC") Model utilized by the BLM.  Even more inaccurately, contact is almost

1 | Page

universally equated with guaranteed disease transmission. While the RMP concedes a lack of confirming research, it selectively cites certain literature to bolster its argument to reduce domestic sheep grazing. Consequently, the RMP is crafted with an unfounded and faulty assumption—that contact between bighorn sheep and domestic sheep automatically results in disease transmission and die-offs.

The deliberate bias and inaccuracies built into the RoC is staggering. "The RoC model estimates the probability that foraging bighorn sheep will reach a domestic sheep allotment. However, within an allotment it is not possible to determine where and when domestic sheep would consistently occur or for how long. Use of some areas with an allotment may present less chance of contact with bighorn sheep than others, while some areas may have higher probability of contact. Consequently, because of this uncertainty, the RoC model predicts potential interspecies contact by using the assumption that contact with an allotment results in interspecies contact (K-9)." This assumption is so far removed from the reality of what actually takes place when grazing, that it would be laughable; if not for the fact that the BLM and USFS are using the results from this flawed process to reduce or eliminate domestic sheep grazing. Further compounding the issue, the BLM cites the unsubstantiated USFS claims in the Snow Mesa EA (K-15), stating that "a disease occurring in a bighorn herd every 25 years or less would result in a high risk to bighorn long term viability and low probability of population persistence." However, both BLM and USFS documents fail to mention that in reality, there has not been any bighorn die-offs or confirmed disease transmission in the Snow Mesa area caused by domestic sheep, despite the fact that domestic and bighorn sheep have both been in the same area for a number of years.

The PoI model notes that in order for the model to be useful, the number of variables needs to be kept small to retain enough predictive power to be useful (K3). Death in bighorns as a result of pneumonia-causing bacteria is a multi-factorial issue including internal and external stressors such as lack of genetic diversity (inbreeding), nutritional deficits, parasite loads, weather conditions, overall health of the bighorn population, etc. So, combining the PoI model and the Risk of Contact (RoC) model is of no value, as both models fail to include parameters that would shift the risk assessment results away from the "high risk" category, and instead gives a predetermined and exaggerated risk of contact rating.

The potential for contact is not only quite low but it is also further minimized by best management practices already used by permittees. These measures accomplish the need to balance multiple-use demands with the management practices to support viable populations of bighorn sheep and a healthy domestic sheep industry.

Currently used management practices include constant herder supervision, compliance monitoring, adhering to on/off dates for grazing allotments, removal of sheep after the grazing season, removal of stray domestic sheep, hazing of bighorn sheep nearing domestic sheep flocks, reporting known contact, and cleaning up salting areas upon departure. These guidelines already accomplish temporal and spatial separation.

Furthermore, the herding instinct of range sheep, guiding them to stay in a manageable bunch and not scatter, complements the above-listed practices. Domestic sheep that wander from the main band are much more likely to be killed by a predator than to encounter a bighorn sheep. The bands of ewes have at least one herder with them or within close proximity to them throughout the day, and the sheep are bedded near camp at night to reduce the risk of predator

BLM_0150092

attacks. Herders have been instructed to chase away any bighorn sheep, if they were to see any. Livestock protection dogs also guard the sheep. The livestock protection dogs keep intruders out of the sheep. An intruder is typically a coyote, bear, or lion, but can also be anything the guardian dog does not recognize such as a bighorn sheep. The livestock protection dogs position themselves between the intruder and the domestic sheep to prevent contact. To this end, the BLM has no reason, need, authority nor expertise to dictate the number of livestock dogs recommended by the RMP.

These rigorous practices already present a strong line of defense in preventing contact with bighorn sheep. However, one of the most disturbing aspects of the RMP is that it abandons land and forage management in favor of single species management by prioritizing bighorn sheep populations (despite lack of scientific evidence) over agriculture.

In April 2014, the CWGA, Colorado Parks & Wildlife, Colorado Department of Agriculture, and the BLM and USFS renewed the aforementioned existing *MOU*. The purpose of the *MOU* is to provide general guidance for cooperation in reducing contact between domestic and bighorn sheep in order to minimize potential interspecies disease transmission and to ensure healthy bighorn sheep populations while sustaining an economically viable domestic sheep industry in Colorado. The RMP contravenes the cooperative intent of the *MOU*, and ignores research data from the USDA Agricultural Research Service ("ARS").

### Flawed Information Regarding the Potential for Disease Transmission

The RMP clearly demonstrates a bias against domestic sheep, with leading statements such as, *"Transmission of M. haemolytica from domestic sheep to bighorn sheep was irrefutable, as demonstrated by Lawrence et al (2010)... (K1)"* In particular, the Lawrence et al. 2010 study cited in the RMP was not conducted under conditions relevant to reality as it was a pen study which forced the animals to have fence line contact and ultimately to commingle. Additionally, the results of the Lawrence study are misinterpreted and deliberately misused. The Lawrence study simply showed that the domestic sheep and bighorns exchanged respiratory bacteria (just the same as humans would that were standing very close to each other). It did not prove that the bacteria exchanged from the domestic sheep to the bighorn sheep is what killed the bighorns. It is also important to point out that in order to cause the fluorescent tagged bacteria to show up on the slides, researchers had to use antibiotics to kill the other bacteria present in order to be able to photograph the fluorescent tagged bacteria. Researchers also had to use a greater magnification in the photos in order to make the fluorescent tagged bacteria more noticeable vs. the other bacteria present. This not-so-subtle manipulation during the research phase, created yet another "study" with a predetermined outcome biased against domestic sheep. To understand the results and implications of the study, we request that the BLM contact Don Knowles, DVM with the USDA Agricultural Research Service (USDA – WSU – Pullman, WA) since he was one of the researchers involved in this project, and is not interested in perpetuating inaccurate information.

Thus far, all of the experiments related to disease transmission have been conducted under laboratory conditions--in pens with controlled conditions and using animals that have been acclimated to those conditions. Such studies are very different from what might actually happen as far as disease transmission on the open range, where herd management practices are designed to avoid domestic-bighorn contact. Available research cited in the RMP focuses on the potential for contact, without looking at a broad scope of what else is going on with the bighorn populations. None of the studies cited in the RMP have proven that bighorn sheep and domestic

BLM_0150093

sheep currently have high risk of contact on the range, or that contact almost inevitably results in disease.

The RMP further states that "no one form of evidence can conclusively demonstrate that bighorn sheep in the wild coming into contact with domestic sheep frequently leads to die-offs; however, taken together, the experiments and observations from the laboratory and the field do indicate that wild bighorn sheep coming into contact with domestic sheep does pose a risk of disease transmission and die-offs in free-ranging bighorn populations." This illogical premise betrays a continued lack of credibility, accountability, and a desire to misrepresent the available facts. As stated herein, the experiments and lab observations are *not* representative of the actual conditions on the range. They are forced simulations that require nose-to-nose contact in order to ensure transmission of pneumonia-causing bacteria. Furthermore, there is a scarcity of irrefutable data available from the field; hence, the BLM's reliance on outdated records that have little if any bearing on current conditions. Determining a course of action based on these faulty sources of information would be both illogical and contrary to the Agency's statutory mandates.

The degree of risk of potential disease transmission from domestic sheep to bighorns in open range conditions is unknown and it is not clearly understood even in experimental confinement settings. Forced enclosure experiments ("pen studies") are not indicative of, and do not provide a direct correlation to, what happens in open range situations. Therefore, we strenuously object to the BLM continued efforts to use bighorn sheep as a means to eliminate domestic sheep grazing on our western rangelands.

### Risk of Contact (RoC) Process Crippled by Lack of Data
The BLM is following suit with the U.S. Forest Service by using its flawed modeling process and inaccurate research references. A lack of objective scientific accuracy cripples support for the revocation or reduction of the grazing allotments. The mathematical modeling studies utilized by the U.S. Department of Agriculture Forest Service's Bighorn Sheep Working Group to determine potential contact are fundamentally flawed. By starting with set mathematical formulas using specific mathematical parameters, a conclusion to a possible scenario is generated based on inaccurate input. The obvious problem with this method is in how and what parameters are chosen. Input of inaccurate data will result in the output of inaccurate answers. This modeling method allows the operator to tailor the data in order to fit a preordained conclusion. This same modeling method has been shown to be erroneous in comparisons of simulations to real outcomes. Such issues cause the proposal to fail the standards of quality, integrity, and utility of the Data Quality Act ("DQA") and the best available science standards of the Environmental Species Act ("ESA"). They also run afoul of Presidential orders on scientific integrity and transparency.

The basic flaws of the RoC modeling process are clearly explicated in the RMP itself when it states that "much of the needed data was not available for individual Colorado bighorn populations. The BLM made the following assumptions….." Key input factors such as bighorn range and suitable habitat are assumed, while failing to incorporate management practices that discourage or eliminate contact. Not only does the method not qualify as the best available science, but the BLM intends to implement draconian, unfair policies due to these imbalanced and inaccurate predictions. At best, the results are guesswork alone and, by any standard of common sense, should therefore not become the basis of agency policy. The entire PoI / RoC modeling is based on estimates, speculations, assumptions, and pre-determined parameters to arrive at a predetermined outcome of "high risk." There are simply too many facets to this multi-

BLM_0150094

factorial issue, too many assumptions, and too much of selectively omitted input information to make this modeling accurate or useful.

In summary, as the BLM approaches the ongoing concern of contact between bighorn sheep and domestic sheep, the agency's apprehension regarding potential contact relies on a litany of biased and discouragingly well-established fallacies. Chief among these false premises is a lack of empirical science regarding the potential contact risk of bighorn sheep and domestic sheep. Not only is scientific information regarding rates of contact and potential disease transmission scarce, but the modeling process has too many assumptions to be useful. Furthermore, let's not lose sight of the fact, that the percentage of potential habitat overlap is very small. Consequently, the possibility of contact is minimal, as is the potential for the transmission of any pneumonia-causing bacteria that may or may not negatively impact bighorns. Allowing unscientific studies and flawed modeling to become the bedrock of the anti-grazing movement betrays the bias so deeply ingrained in both the BLM and USFS.

## Livestock Grazing and Forage Management

The CWGA has numerous concerns with the RMP. The RMP proposes sweeping changes that do not equally balance grazing, and other multi-use activities with environmental concerns. Additionally, the RMP introduces many subjective concepts (Special Recreation Management Area Targeted Benefits – "restored mind from unwanted stress; improved mental well-being", etc) that clearly favor recreation, and open up the BLM to numerous lawsuits, as it creates very subjective special-use categories for land that is Congressionally mandated as multi-use. The continual splintering and development of additional special designation categories simply creates more regulatory and administrative overburden; and further restricts the BLM's ability to do crucial on-the-ground activities, such as accurate, and up-to-date range monitoring. Multiple-use activities such as livestock grazing and mineral extraction are economic drivers for local communities and should not be restricted due to environmental extremism and recreation. The RMP wants to further restrict livestock grazing yet fails to provide clear evidence as to why that's necessary; instead, it relies upon numerous, artificially constructed "what-if" scenarios. Despite the voluminous size of this document, it fails to demonstrate the need to reduce aums, or the impacts to the permit renewal process when the RMP is finalized.

BLM's single-minded approach of always reducing aums, often times ignores actual forage conditions and utilization, by failing to increase aums when range conditions warrant increased utilization. The BLM increasingly relies upon inaccurate computer modeling (bighorn sheep), and artificially created matrixes (bighorns and forage manage) to create a pre-determined outcome of reducing/eliminating livestock grazing. We find it egregious for a land management agency to spend more time on administration, modeling, and matrixes, than it does meeting monitoring requirements in the field, where the real data exists. For a number of years, the BLM has been severely deficient in fulfilling its role to accurately and fairly monitor range conditions.

Determinations regarding forage utilization need to be done in conjunction with the permittee, and monitoring sites need to be indicative of the overall allotment. Additionally, inadequately trained staff (seasonal and/or inexperienced) often times make causal observations that are incorrect, but end up in EAs, EISs, and RMPs. The RMP lacks specificity at a number of levels.

BLM_0150095

and indicates that meeting numerous dubious parameters will be addressed during the permit renewal process, without disclosing the effects on the permittee during the permit renewal process.

Placing restrictions on sheep grazing favors recreation, single-species management (bighorn sheep), and environmental extremism over multiple-use and adaptive range management; and it will only serve to advance a radical agenda to permanently end livestock grazing on our western rangelands. Instead of unilaterally adopting strict policies without permittee input, we urge the BLM to support adaptive management by working actively with the permittees. We strongly urge the BLM to comply with its mandate to manage for multiple-use.

In closing, we would like to reiterate the negative impact that regulatory overburden is having on our members. It's egregious that the government keeps expanding at the administrative level, and every document that comes out is larger than the last. It's incredibly difficult for individuals or small organizations to be able to effectively evaluate and comment on these documents due to the sheer size, sometimes in excess of a thousand pages, not including the dozens of reference documents that should be closely scrutinized for their accuracy. It is imperative that the federal government start streamlining its management processes, in order to effectively focus on on-the-ground management of our public lands.

Respectfully,

*Angelo Theos*

Attachment: *Comments on Snow Mesa Allotment Analysis: Assessment of Risk of Physical Contact between Rocky Mountain Bighorn Sheep and Domestic Sheep in the Snow Mesa Sheep Allotment Grazing Landscape (M. Thurmond DVM, Phd – September 7, 2015)*

BLM_0150096

Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.

Reference page number or section in RMP:  4.3.12 Lands with Wilderness Characteristics

Title of comment (area or trail name): Various

Name: Neal Platzer     Address: 2849 Lost Creek Rd N, Montrose, CO 81401-7617

Email: nsplatzer@gmail.com          Phone: 970-901-2854

1. **The land covered in the Uncompahgre RMP Planning Area is very special land for a variety of recreational and grazing uses. This area plus the nearby US Forest service areas have had a wonderful restorative effect on my health since moving here over nine years ago. My health was so bad when I moved here that the only attribute I could grasp was the beauty and solitude when driving back roads. This was still very therapeutic. My health has since improved, largely due to the air quality, water quality and general climate, to the point that I can now also enjoy this area through hiking, mountain biking and snowshoeing.  I think maintaining these attributes as we encounter the pressure of more people seeking recreation here is imperative.**

2. **All of our local public lands in the Western Slope of Colorado, including that in this Draft Resource Management Plan are becoming more popular for recreation, including Jeeping, OHVs, Dirt Biking, Mountain Biking, horseback riding and hiking.  Given this growing use, I feel that setting aside all of the areas identified as Lands with Wilderness Characteristics as called out in Alternate B would bring a better balance to the use of this area as all uses and needs for this area grows.**

3. **As I mentioned in a previous comment specifically related to O&G leasing/development in this region, I believe that this should be limited to private land until a more specific need for access to public land can be shown by the O&G industry.  There should be additional protection for Lands with Wilderness Characteristics so that there is no leasing of these lands and that additional restrictions be placed on the nearness to these LwWC so that emissions from any likely neighboring leasing will not impact the pristine nature and air quality of the LwWC areas.**

4. **In the planning and management of Lands with Wilderness Characteristics, I would like to see in areas where there is access to these lands through trail heads, trail extensions, that more secure protection from abuse of non-motorized / non-mechanized trails be incorporated into these this development. Although I am sure it is a very small percentage of the recreation industry responsible for this violation and damage, I do see it regularly when out hiking and biking. The standard "no motorized vehicles" sign is usually just a target for some mean-spirited motorized traveler.**

Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP Or email: uformp@blm.gov

Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.

5. **As this plan receives final revisions and moves to be implemented, I look forward to offering any more thoughts, comments, etc. I also offer time and help if needed for any way I can be of service to adequately protect and manage these precious lands.**

Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP Or email: uformp@blm.gov

Scanned
0012607

**Please consider this a public comment on**
**BLM's Uncompahgre Field Office Draft Resource Management Plan.**

Reference page number or section in RMP (optional): _____

Title of comment (area or trail name): _____ Potter/Monitor Ck area _____

Name: ____ Sandy Miller _____

Address: ___ 324 Shadow Lake Ct   GJT   CO   81507 ___

Email (optional): _____ Phone (optional): _____

Consider answering one or more of these questions:

(1) **Describe the area and your historical use/activities there** (Time of year and hiking, camping, photography, etc):
(2) **What do you like about this area/trail?** (Close to home, wildlife, historic sites, scenic views, etc. include experiential data and resource knowledge when possible):
(3) **With what aspects of BLM's findings do you agree and/or disagree and why?** (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):
(4) **Additional Comments** (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

Even a hot July hike was a great day for my first venture into the Monitor/Potter Creek area. I was struck by two key elements right away = very close to town but so very wild and a place of solitude. It is very important to maintain the areas such as this. It was exciting to observe the geological aspects readily apparent. And to actually see evidence of dinosaur track formation, a rare finding. The fauna is also of note, ponderosa at a low elevation; small leaf cottonwood in abundance, at this elevation, almost no tamarisk or Russian olive (invasive species) is important to add to the naturalness of the area. I found this to be such a beautiful, natural wild place that needs to be designated and maintained as a wilderness area. It expands a current WSA (Camelback), allowing for better management. I value wild areas and applaud the BLM proposition - a hike in such solitude will draw me back.

**Please turn in comments to the BLM by September 1st, 2016**

**Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP**

**Or email:** uformp@blm.gov

to BLM

I don't want my family to be poisoned by oil + gas development + fracking which pollute the air and water. So please make a no-leasing rule for the land under consideration.

RMP comments

Bureau of Land Management

BLM 0150102

L. Vonus
15521 BlackBridge Rd.
Paonia, CO 81428

RMP Comments

Bureau of Land Management

2465 South Townsend Avenue

Montrose, CO 81401

Greetings,

We came to the North Fork Valley almost 21 years ago from Oakland, California - at which time we brought ourselves and our business to this beautiful, pristine valley. Since then the spector of large-scale industrial gas drilling has come to be a sad reality.

I think that oil and gas development as well as fracking on public lands should not be permitted as it would risk the public's health and have the potential to contaminate the water, pollute the air. and poison our foodsheds.

A no-leasing alternative is the only reasonable conclusion to a rigouous analysis of the risks posed by oil and gas operations, including fracking technologies and large scale industrialization.

Please place a moratorium on oil and gas leasing and impose a ban on these activities until rural gas gathering pipelines are regulated by the Pipeline Hazardous Materials and Safety Administration.

I have MS and it would be a sad day to leave the place we have called home for 21 years, due to the greed and short-sightedness of oil and gas companies.

Very Sincerely,

Celeste Hill

PO Box 1209

Paonia CO 81428

1

BLM_0150103

RMP Comments

Bureau of Land Management

2465 South Townsend Avenue

Montrose, CO 81401

To whom it may concern,

We came to the North Fork Valley almost 21 years ago from Oakland, California - at which time we brought ourselves and our business to this beautiful, pristine valley. Since then the spector of large-scale industrial gas drilling has come to be a sad reality.

I think that oil and gas development and fracking on public lands should not be permitted as it would risk the public's health and have the potential to contaminate the water, pollute the air. and poison our foodsheds.

A no-leasing alternative is the only reasonable conclusion to a rigouous ~~conclusion to a rigorous~~ analysis of the risks posed by oil and gas operations, including fracking technologies and large scale industrialization.

Please place a moratorium on oil and gas leasing and impose a ban on these activities until rural gas gathering pipelines are regulated by the Pipeline Hazardous Materials and Safety Administration.

We ask you to honor our request and will thank you for keeping the place that we searched 7 years to find in the condition in which we discovered it.

Sincerely,

David Sheppard

PO Box 1209

Paonia CO 81428

1

BLM_0150104

Bureau of Land Management
Uncompahgre Field Office
Department of the Interior
c/o Barbara Sharrow
2465 South Townsend Avenue
Montrose, CO 81401

Dear Ms.Sharrow,

The intent of this letter is to affirm our support of the North Fork Alternative Plan and its inputs to the revision of the Uncompahgre Field Office Resource Management Plan.

The West Elks American Viticultural Area (AVA) is one of approximately 200 AVA's designated by the United States Department of the Treasury, Alcohol and Tobacco Tax and Trade Bureau (TTB). It is one of only two such areas within Colorado and, as such, recognizes a geographic area possessing a unique combination of climate, geology, soils, physical features, and elevation. The TTB, by its recognition of the AVA, acknowledges that these distinguishing features impart unique, identifiable characteristics to the wine produced from grapes grown in this region. The North Fork Alternative Plan recognizes these characteristics and provides specific protections for them.

The wineries in the North Fork depend upon the public lands surrounding us to provide clean, reliable drinking and processing water and to provide clean, reliable irrigation water. As an agritourism industry, we depend upon our unspoiled vistas, our unpolluted air, our bucolic atmosphere, our dark night skies, and our quiet background to attract customers to our tasting rooms. The North Fork Alternative Plan acknowledges this dependency and calls for specific protections for these features.

The North Fork Alternative Plan is the culmination of a year-long effort by a diverse group of citizens concerned with the pace of, and process behind, oil and gas exploration and development on public lands surrounding our valley. The members of the West Elks Winery Association endorse this grass roots effort and ask the BLM to incorporate the suggestions contained therein into the revised Resource Management Plan.

Respectfully,

The Wineries of the West Elks American Viticultural Area

BLM_0150106

Rob Kimball
5680' Vineyards

Yvon Gross and Joanna Reckert
Leroux Creek Vineyards

Eames and Pam Peterson
Alfred Eames Cellars

Scott and Lisa Fairbank
Liliputian Winery

Ty and Helen Gillespie
Azura Cellars

Wink Davis and Max Eisle
Mesa Winds Winery

Lee and Kathy Bradley
Black Bridge Winery

Steve Rhodes
S. Rhodes Vineyard

Jeff and Tracey Schwartz
Delicious Orchards

Brent and Karen Helleckson
Stone Cottage Cellars

Larry and Nina Parker
Fire Mountain Vineyard

John and Joan Mathewson
Terror Creek Winery

Cc:   Lori Armstrong, BLM District Manager
      Helen Hankins, BLM Colorado State Director
      Neil Kornze, BLM Principal Deputy Director
      U.S. Senator Mark Udall
      U.S. Senator Michael Bennet
      U.S. Representative Scott Tipton
      Colorado State Senator Gail Schwartz
      Colorado State Representative Millie Hamner
      Mike King, Director, Colorado Department of Natural Resources
      Paonia Town Council
      Hotchkiss Town Council
      Crawford Town Council
      Delta County Board of County Commissioners
      Gunnison County Board of County Commissioners

BLM_0150107

To Senator Scott Tipton,

I am a homeowner in the North Fork Valley and I am seriously concerned about the looming threat that Hydraulic Fracturing poses to the North Fork Valley.

The threats include loss of value of my primary life investment, my home. Pollution to the air, water and soil in my home land that impact health of the ecosystem including residents.  Hydraulic fracturing is a threat to our local economy. We will not build a stable local economy by exploiting the environment.

Oil and Gas drilling negatively impact ranching, farming, wine production, tourism, recreation, hunting and real estate.  These things are essential to the economy and lifestyle in the North Fork Valley.

The benefits of hydraulic fracturing are limited to an elite few and do not trickle down to local communities. The responsibility of dealing with cleaning up after the industrial mess of hydraulic fracturing is left to local citizens and local environmental agencies.

For these reasons I strongly urge you as a leader in Colorado to join with the progressive counties, states and countries that ban Hydraulic Fracturing for the protection and well being of the natural resources, wildlife and human life.

At minimum I urge you to support North Fork Alternative B1.

Joan Green
JOAN GREEN
995 GLEN OAK LN
GLENWOOD SPG, CO 81601

Dana Wilson
UFO Manager
2465 S. Townsend Ave
Montrose, CO 81401

Dear Dana Wilson,

I am a resident of the North Fork Valley and I oppose the use of public lands for private gain and hydraulic fracturing.

I utilize public lands for hiking, camping, water sports, mountain biking and recreating. The preservation of our public lands is beneficial for the lifestyle here in the North Fork Valley, the wildlife, and the well being of our citizens.

The threat that the Gas and Oil industry poses to the environment, economy and community do not balance the benefit that hydraulic fracking brings to a chosen few, who for the most part live outside of the North Fork valley.

As stewards of our public lands and natural resources, I encourage you to stop the practice of hydraulic fracturing on public lands.

I encourage you to adopt the North Fork alternative B1 and to exceed those standards.

Sincerely,

John Rogan

NAME: 3131 Maroon Creek Rd    ADDRESS: Cabin 38
Aspen C.O.  81611

Cc: S. Jewell, N. Kornze, R. Welch, M. Roeber, B. Hovde, M. Bennet

Dear Joe Meyer,

I oppose all options included in the Draft RMP. The damage caused by hydraulic fracturing and how it spreads its toxins through the air, soil and water to impact every living being must be considered by all of us. I have so many concerns. Where do I begin! The more I learn-- I find too many gaps in the Draft RMP which opens the valley and all of us to many hazards.

The BLM did not take a hard look at direct, indirect, and cumulative impacts as required by NEPA, including:

- BLM failed to meaningfully analyze greenhouse gas emissions and the impacts of climate change, including the severity of these impacts and social cost of carbon;
- BLM failed to consider impacts on human health and should have performed a comprehensive health impact assessment ("HIA");
- BLM failed to consider various drilling technologies, including horizontal drilling and multi-stage fracking in its analysis;
- BLM failed to consult with the Pipeline Hazardous Materials and Safety Administration and failed to consider the potential impacts that an exemption from safety rules would have on human health, the environment, and wildlife.
- BLM did not properly analyze methane and other air pollutants, or consider mitigation measures to reduce these impacts

The economy, the health of the residents and visitors and the future of this valley require all to step back and reconsider any steps forward with the Draft RMP. I see too many problems and not enough safe, considered analyses or well thought out plans to protect the valley for future generations.

Therefore, I demand that the BLM issue a moratorium on all oil and gas leasing and hydraulic fracturing.

With regards,

P.O. Box 5268
Snewmass Vlg co
81615

Buck Jones
Taz Stetson LLC

Cc: M. Bennet, J. Hickenlooper, S. Jewell, N. Kornze, R. Welch

Ruth Welch,

I am a Colorado citizen for healthy soil, water, air and people.

I oppose hydraulic fracturing in the North Fork Valley.

Please ban oil and gas in the North Fork Valley.

Please use open space for the good of the environment and it's residents.

At a bare minimum, please adhere to the North Fork Alternative B1 guidelines and explore reasonable alternatives for a renewable future.

Sincerely,

Name:

Mary H. Rogers

Address:

236 1/2 Little Park Rd

Grand Jct. Co 81507

Cc: B. Sharrow, D. Wilson, G. Jones, M. Roeber, B. Hovde, M. Bennet

To the BLM,

I am a Colorado resident who enjoys visiting the North Fork Valley for Mountain Biking and water recreation.

I enjoy the serenity and peace of the public lands in the North Fork valley and the Paonia Reservoir.

I am concerned about the threat posed to public lands and public health by the gas and oil industry.

I urge you to ban the practice of hydraulic fracturing in the North Fork Valley.

At minimum, adopt the North Fork Alternative B1.

Thank you for protecting the environment and public health.

Sincerely,

Address: 659 Lincoln Ave
Cfebardale, CO 81623

Cc: S. Jewell, N. Kornze, R. Welch, B. Sharrow, D. Wilson, M. Roeber, M. Bennet

RMP COMMENT

Dana Wilson and Barb Sharrow,

I am in support of the North Fork Alternative Plan (B1). I surely am not completely satisfied with the NFAP, but it appears to be the best option. I believe this is the most responsible option because it takes into consideration the value of Delta County's water shed and natural water systems. I am very fond of hunting in the North Fork region. If any of the other RMP plans are used, I don't believe I will be coming to hunt in the North Fork area any more. I like to insure that my family is eating game that is living in the most pristine environments. It is common knowledge that hydraulic fracturing can contaminate the air, land and water. A clear indication of this can be seen because France, Bulgaria, Germany and Scotland and states, such as New York and Vermont completely banned hydraulic fracturing in order to protect their citizens' health and their environment and economic futures. I hope you fully consider the impact on your citizens as well as your outdoor recreation/tourism.

I'm also opposed to the final environmental impact statement for SG Interests I Ltd.'s Master Development Plan Proposal and BLMS's preferred alternative to develop up to 146 natural gas wells, four water disposal wells, and associated access roads and pipelines for the same reasons mentioned above.

Lastly, I don't believe the BLM has explored all alternative option, as I did not see a no leasing option in the RMP plans. One concern I have is for the birds that will drink from the open waste water pools at the sites, as there are many undisclosed chemicals in the hydraulic fracturing fluids. We don't if them drinking this water will give them a disease or outright kill them. I know it's the BLM's duty to help protect sensitive species, which in this region we have the Bald eagle, Golden Eagle, among many other birds on your sensitive species list.

Please consider how the future generations will look back on these big decisions you are making. I believe deciding a no leasing alternative will leave you on the right side of history.

Sincerely,

*Amabilla Hemsell*

340 Canty Rd. 24
Ridgway, CO
81432

225 North 5th Street, Suite 702
Grand Junction, CO 81501


Scott Tipton,


I am opposed to Western Colorado Lease Exchange and Conservation Act of 2016 because it is irresponsible to locate oil and gas operations in a food shed, it is irresponsible to lease federal land for oil and gas development without federal, state, and local environmental review, it is irresponsible to impose oil and gas development on impacted communities without appropriate compensation for health, economic, and environmental impact, and it is irresponsible to not consider the food and environmental security in the national security equation. I am a resident of the North Fork Valley and I ask that you chose the North Fork Alternative, B1, and all other reasonable conservation protections in Alternative B.

Avoidance, or not allowing harmful activity like Hydraulic Fracturing in sensitive places, such as the eco-system of the North Fork Valley, is the first step of proper mitigation, and one that the BLM must consider and should adopt in appropriate places. Places such as watersheds, view-sheds, and critical wildlife lands, all of which are found in the North Fork Valley, should be safeguarded by closing this area to oil and gas leasing or imposing strict No Surface Occupancy requirements. After all, the job of the BLM is to protect our watersheds and visual landscape. The BLM proposes to lease practically EVERY ACRE of the North Fork to oil and gas. This is unacceptable. Chose the North Fork Alternative, B1, and all other reasonable conservation protections in Alternative B.


Thank you,

Jennifer Johnson
552 Jacobs place
Carbondale, CO 81623


Cc: Jared Polis, Millie Hamner, Kerry Donovan

Dana Wilson,

I am a Colorado citizen for healthy soil, water, air and people.

I oppose hydraulic fracturing in the North Fork Valley.

Please consider that option that fracking is something that could seriously hurt Colorado. Right now the majority of our land is pristine, open, and healthy. That is how people envision Colorado. Imagine someone wanting to move here and coming to visit only to find unsightly hydraulic fracturing machines spread about. Imagine taking a hike in the mountains and then running across one of these eyesores. Worse yet, what if you already lived here and they put one near your home and one of the mystery chemicals in the fluid seeped into the ground water and affected the drinking water.

There are so many scary and real possibilities, you must consider joining New York, Vermont, and Maryland in banning fracking or instating a moratorium until more research has been conducted.

At a bare minimum, please adhere to the North Fork Alternative B1 guidelines and explore reasonable alternatives for a renewable future.

Sincerely,

Sharon Sullivan

Name: Sharon Sullivan     Address: 949 Santa Clara
Grand Junction
CO 81503

Cc: B. Sharrow, D. Wilson, G. Jones, M. Roeber, B. Hovde, M. Bennet

TO THE BLM:

I am concerned that the BLM didn't consider the damage of fracking or do a human health impact study on fracking operations before drafting the RMP. A recent study released by John Hopkins indicates that an increase of health problems in areas near hydraulic fracturing is directly related:

"New research suggests that Pennsylvania residents with the highest exposure to active natural gas wells operated by the hydraulic fracturing ('fracking') industry are nearly twice as likely to suffer from a combination of migraine headaches, chronic nasal and sinus symptoms and severe fatigue.

Researchers from the Johns Hopkins Bloomberg School of Public Health, reporting online Aug. 25 in the journal *Environmental Health Perspectives*, say their findings add to a growing body of evidence linking the fracking industry to health problems.

'These three health conditions can have debilitating impacts on people's lives,' says first author Aaron W. Tustin, MD, MPH, a resident physician in the Department of Environmental Health Sciences at the Bloomberg School. 'In addition, they cost the health care system a lot of money. Our data suggest these symptoms are associated with proximity to the fracking industry.' "

Why is the BLM not acknowledging the people whose health has been damaged or those who have died near fracking operations? The only way to prevent destroying the human health of 10,000 plus people is to close off 100% of the North Fork Valley to oil and gas leasing and issue a moratorium.

Regards,

Hugh Curry 2401 Clear Fork Rd, Crawford, CO 970 778 7078

http://www.jhsph.edu/news/news-releases/2016/study-unconventional-natural-gas-wells-associated-with-migraine-fatigue-chronic-nasal-and-sinus-symptoms.html

Cc: N. Kornze, S. Jewell, R. Welch, M. Bennet, Delta County Commissioners, J. Hickenlooper

Dana Wilson
UFO Manager
2465 S. Townsend Ave
Montrose, CO 81401


Dear Dana Wilson,


I utilize public lands for hiking, camping, water sports, mountain biking and recreating. The preservation of our public lands is beneficial for the lifestyle here in the North Fork Valley, the wildlife, and the well being of our citizens.

The threat that the Gas and Oil industry poses to the environment, economy and community do not balance the benefit that hydraulic fracking brings to a chosen few, who for the most part live outside of the North Fork valley.

As stewards of our public lands and natural resources, I encourage you to stop the practice of hydraulic fracturing on public lands.

I encourage you to adopt the North Fork alternative B1 and to exceed those standards.


Sincerely,


NAME: Justyna Lukasczyk

ADDRESS: 2600 S. Oakhurst
Glenwood Springs
CO 81601


Cc: S. Jewell, N. Kornze, R. Welch, M. Roeber, B. Hovde, M. Bennet

BLM_0150117

Dana Wilson:

I ask that you chose the North Fork Alternative B1, and all other reasonable conservation protections in Alternative B. More ideally, however, would be if BLM would explore the idea of having zero hydraulic fracturing. There are many reasons why, but it is fearsome that there are so many undisclosed chemicals in the hydraulic fracturing fluids. We have no idea what will happen if these chemicals got into our ground water or how they will affect the wildlife. These are questions that need to be answered.

I live in this Valley and care deeply about our environment. I chose to live here because of the dense and lively eco-system in the area. To me, it seems as though we are effectively killing our eco-system and putting an end to sustainability in Western Colorado.

The BLM should ensure the strongest level of protection for our resources. I hope that you reconsider doing any hydraulic fracturing until more research has been conducted and we know what actually could be the long-term affects.


Thank you,

*Amy R Deere*
*602 W. 12th St.*
*QWS, CO 81601*


Cc: S. Jewell, R. Welch, B. Sharrow, B. Hovde, M. Bennet, S. Tipton, J. Polis

October 12, 2016

Barb Sharrow
District Manager
Bureau of Land Management
2465 South Townsend Ave
Montrose, CO 81401

I am writing to express my strong opposition to increased oil and gas leasing in the North Fork Valley, and therefore my strong opposition to the BLM's "Preferred Alternative" for the Resource Management Plan of the Uncompahgre Field Office region as it relates to oil and gas development in this area.

On a local level oil and gas development will negatively impact both the local communities, which rely heavily upon clean air and water for the sustainability of the many organic farms and recreational activities, and the wild communities, which rely upon unfragmented healthy ecosystems for their wellbeing.

I can not understand why the BLM is supporting the acceleration of fossil fuel extraction from undeveloped land while, at the same time, governmentally funded climate scientist are in consensus that in order mitigate climate change we, as a country, need to be leaving much of the fossil fuels in the ground.

An appropriate compromise, if it is even fathomable to compromise the health of the environment, is the adoption of Alternative B as listed in the BLM's RMP.

Thank you for considering my opinion as you move forward with this extremely important decision concerning the future of the North Fork Valley and beyond.

Sincerely,

Tim Shortell
PO Box 1174
Paonia, CO 81428

Attn: Dana Wilson

RE: Draft Resource Management Plan

I am a resident of the Roaring Fork Valley. I enjoy many of the natural resources provided by the North Fork Valley. I am opposed to fracking and have great concerns around the industry and its harmful effects on the environment and community.

- Fracking harms the environment. The clean water in the North Fork Valley benefits many in the Roaring Fork who enjoy fresh organic produce form the North Fork.
- Fracking is a threat to the local economy. Local business that rely on tourism and visitors from out of town will be harmed by the pollution and traffic that fracking brings.
- Human health and wellness is not supported by fracking industries.
- The benefits of fracking do not stay in local communities, however, the responsibilities of clean up and reclamation do.

I support the ban of fracking in the North Fork Valley's public lands and throughout Colorado.
I support renewable energy and clean energy, which is abundant and cost effective.
I stand with the North Fork Valley uniting the North Fork and The Roaring Fork Valleys for a healthy and sustainable future for Colorado.

I propose no land swaps, and no hydraulic fracturing!

Let Colorado stand strong with other forward thinking communities, states and countries that have banned hydraulic fracturing all together.

Sincerely,

*[signature]*
po box 5287
eagle co 81631

Name:

Street Address:
City, State, Zip:

Cc: S. Jewell, N. Kornze, R. Welch, M. Roeber, B. Hovde, M. Bennet, J. Polis

BLM_0150120

Shari Dangremond
P.O. Box 1266
Paonia, CO 81428

Dana Wilson, Uncompaghre Field Office Manager
Re: Resource Management Plan Revision
2465 South Townsend Ave
Montrose, CO 81410

Dear Ms. Wilson:

I hope you will consider the North Fork Alternative plan, listed in the RMP, alternative B and B1.

The negative impacts of possible gas development on the newly developing industries in the area, including wineries, organic agriculture, agri-tourism, and increased tourism, would be very bad for our economy! Even the perception that the Valley irrigation was contaminated due to the BLM allowing leasing could be devastating, and affect property values.

Also, I feel that we, as a society, must move away from rampant energy consumption as a way of life. I am willing, and do, make an effort to minimize my personal energy consumption, and find that, far from being a deprivation, my life is better for it. I seldom drive, don't have a computer or T.V. I don't miss it — I like reading or walking in whatever nature is available.

So I hope you will consider my opinion in your plans for the North Fork. Sincerely,
Shari Dangremond

343

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Thank you for the opportunity to comment on the draft Uncompahgre Field Office resource management plan (RMP). It is essential that the BLM consider ways to protect natural resources like wildlife, domestic and irrigation water, wild and scenic rivers, air quality, and recreation. The Preferred Alternative (D) in the draft plan would open 90 percent of the Uncompahgre area to oil and gas leasing, thus endangering wildlife, recreation, wilderness-quality lands, and cultural sites. It would risk the air and water quality, along with the scenic viewsheds, which our local communities and economies depend upon. It would also put our public lands and adjoining communities at risk for negative impacts from development activities including large-scale oil and gas drilling and lease speculation. The BLM should adopt a final plan that makes important wildlife habitat, recreation areas, and sensitive air, water, and viewsheds off-limits to energy development. The only acceptable alternative addressed in the draft RMP that would protect North Fork Valley (NFV) residents, would be the North Fork Alternative (B1) in the draft RMP, and it is essential to the NFV that all the components of Alternative B1 be addressed and included in the final RMP.

The final RMP decision impacts me in many ways, which are described below. I am a resident of Hotchkiss, Colorado, in the NFW, and have owned and lived on Sunshine Mesa, adjacent to BLM lands, for 20 years. This is beautiful sloping, southeast facing farmland, extremely suitable for farming, with great potential for viticulture in this important wine producing region. I believe that the following potential impacts and factors must be more thoroughly scrutinized before making any decision for the preferred alternative in the final RMP:

- Water impacts:
  - Domestic water

    My domestic water comes through a small water company, Sunshine Mesa Domestic, which is sourced through springs on BLM land in the target area of the draft RMP. This is just one of many small water companies that could be adversely affected by BLM's final RMP. Most of the domestic water sources in the NFV are surface springs and streams that are either on or near BLM lands affected by this plan. The final plan must protect the health of the watershed for the greatest number of users. Our communities are heavily invested in developing both domestic and agricultural water systems for their homes, farms and ranches. The final plan must exclude all oil and gas activities within a half-mile of all surface and ground domestic water sources, including municipal water supplies that risk being impacted by surface spills and well failure.

  - Irrigation water

    Surface water irrigation is supplied to me and thousands of others by the Fire Mountain canal, a vital water source from the Paonia Reservoir, in an area that would be left open to oil and gas development in the draft RMP Preferred Alternative. The final plan must protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, or canals. This is a minimum distance required to safeguard direct and rapid impacts from surface spills and other contamination from oil and gas activity.

  - Streams and surface water quality

    The final plan must protect streams and surface water quality, protecting ecological resources, aquatic habitat, recreational attractions, water storage, and flood control by closing areas within a half mile of lakes, ponds, wetlands, and reservoirs to oil and gas activities including leasing. The final plan should also recognize that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters are priority habitats with adequate protections from all surface activities.

  - Federally listed and threatened aquatic species

    The final plan must designate known habitats of rare and threatened fish species as Right of Way exclusion areas and prohibiting oil and gas surface activities. The same holds true for riparian zones and wetlands. Roads, pipelines, powerlines, and well pads will negatively impact water quality and reduce available habitat for local fish species.

- Air impacts

  The final plan must protect the health of the airshed. The NFW is affected by daily up and down-valley winds and any oil and gas activities occurring in higher elevations could have direct impact on air quality at lower elevations, including from dust, methane, VOCs, ozone, and other particulates and gases hazardous to public health. The BLM does not have the adequate information to assess airshed impacts of oil and gas activities.

- Economic impacts:
  - Recreation

    River and trail recreation are a growing economic opportunity in the NFV, with these industries bringing millions of dollars to communities in Colorado. The North Fork Alternative provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area. These protections should be included in the final plan.

  - Agritourism

    The final plan must protect the idyllic character and scenic beauty of the NFV, which is home to the West Elk Wine region and has been called Colorado's Farm-to-Table Capital. That character would be jeopardized by oil and gas activity. Alternative B1 requires development setbacks from agricultural lands, prevents damage to visual qualities, and best preserves the current rural character of the valley.

- Scenic viewshed impacts

  The NFV sits at the very heart of the West Elk Loop Scenic Byway, world renowned for its scenery and rural character. Oil and gas development could jeopardize the scenic qualities of the area. The final plan should include Alternative B1, which provides the adequate protections for the valley's scenic features.

- Real estate impacts

  Real estate sales in the NFV continue to be driven by those seeking a rural, non-industrial, and agricultural lifestyle. The final plan must protect the investments locals have made in the value of their home and land, and should not allow for speculative oil and gas leasing which discourages homebuyers from purchasing in our communities, producing real and direct negative economic impacts on our communities.

- Public health and safety impacts:
  - Pipeline safety and integrity

    Pipeline safety and integrity management was not mentioned in the draft RMP. The integrity of the pipeline can be compromised not only from faulty construction, but from flooding, mudslides, earthquakes, and geologic instability. Not only can leaks and spills occur along the pipeline, which contaminate soil and water, but ruptures and explosions occur from faulty construction or a compromised pipeline.

    Rural gas gathering pipelines must be regulated to prevent leaks, spills and explosions and give the public confidence that a web of gas gathering pipelines on BLM leases will not endanger campsites, risk forest fires, damage the environment, risk human and animal life, and other economic and environmental risks not considered by the BLM.

  - Traffic

    The final plan must adequately mitigate the traffic impacts of oil and gas activity within the North Fork of the Gunnison Watershed. Local residents rely on a handful of narrow state highways for daily transportation and emergency access. Oil and gas activities would significantly increase the number and frequency of oversized trucks and machinery transported on our highways, increasing the risk of accident and emergency vehicle blockage while negatively impacting the experience of everything on and near the roadways.

  - Seismic activity

    New data indicates deep injection wells and other oil and gas activities increases seismic activities. The final plan must assess and mitigate potential impacts of human-caused earthquakes, particularly in the North Fork region which is prone to unstable soils and landslides.

- Recreation impacts:
  - Trails

    The BLM lands on and surrounding Jumbo Mountain are a well-used and well-loved recreation asset for North Fork residents. The final plan should include the entire Jumbo Mountain unit as a special recreation management area to protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism, and the businesses that rely on those tourists. The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat.

  - Hunting and fishing

    Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The final plan should include ecological emphasis areas for all critical winter habitats within the North Fork Valley. The final plan should also include the protections of B1 which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.

  - Future recreation development

    Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land- and water-based recreation. The final plan should include special recreation management areas and extensive recreation management areas for all lands identified as high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte, and Roubideaux Canyon.

- Wildlife impacts:

  My property is directly on a winter migration route of 300-400 elk from the river valley to the BLM land above me. Oil and gas drilling would directly affect this winter range. The final plan should protect all lands with wilderness characteristics, including the Adobe Badlands and Stevens Gulch. The badlands is full of fascinating canyons, mesas and arroyos, and provides important connectivity between the Dominguez-Escalante National Conservation Area and pristine roadless lands in the Grand Mesa National Forest. Stevens Gulch is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest.

In conclusion, I believe that the BLM should listen to the local residents in Crawford, Hotchkiss, and Paonia and include all provisions of the North Fork Alternative, B1, for the area in and around the NFV. This locally-driven proposal is the right way to protect the entire Gunnison Watershed, supporting farmers, protecting public health, sustaining ecological well-being, and building a sustainable rural economy on Colorado's Western Slope. The BLM owes it to all citizens that this area be protected as much as possible in perpetuity.

Sincerely,

Mark Walsh
P O Box 719
Hotchkiss, CO 81419

Scan#2
0013174

**Please consider this a public comment on**
**BLM's Uncompahgre Field Office Draft Resource Management Plan.**

Reference page number or section in RMP (optional): _____

Title of comment (area or trail name): Roubideau - Potter Creek trails

Name: Susan Sky Baldwin

Address: 4261 Cedarow Rd, Olathe, Co 81425

Email (optional): susanskybaldwin @ _____ Phone (optional): _____

Consider answering one or more of these questions:

(1) **Describe the area and your historical use/activities there** (Time of year and hiking, camping, photography, etc):
(2) **What do you like about this area/trail?** (Close to home, wildlife, historic sites, scenic views, etc. include experiential data and resource knowledge when possible):
(3) **With what aspects of BLM's findings do you agree and/or disagree and why?** (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):
(4) **Additional Comments** (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

1) In late spring (after water levels subside) and in late fall, I enjoy riding my horse either alone or with friends. We all agree it is a spectacular area that is only a few mile west of where we live outside Olathe, so we can go here without having to drive very far. Sometimes the access road is very bad - large pot holes.

2) We usually don't see others once we leave the parking area, so it provide an experience of solitude along with the beauty. We also like trying to find old remnants of history of the area like old cabins, root cellars or corrals and pondering what life must have been for these early pioneers.
We enjoy trying to find or site Bighorn Sheep. I have noticed just very small groups however.
We also enjoy the special beauty of having bushes and trees along the creeks which brings its own plant and bird diversity.

3) BLM is going to have to control the area at the end of the road as more people use this area so it doesn't

*ACEC in the RMP.*

*asa*

50 | 26

# DEAR BLM,

Hey guys there is clear evidence from many scientific sources that fracking impacts human life. Fracking harms our habits. Children and pregnant women are the most adversely affected. The North Fork is a secure location for families to thrive, and these big industry propositions will ~~really~~ ~~create~~ create noticeably less effective conditions for the well-being of our youth.

I support No-Leasing of any BLM Lands. Managing, in my opinion, mutually excludes the right to sell or lease lands for private interests. Why? Because this land has been ~~was~~ here longer than all of us, and we need to respect how it ~~was~~ labors to sustain us. When we disrespect these lands it parallels a disregard and disrespect for our children and their posterity. How do we explain there is no clean drinking water or wildlife? If we damage this now, when ~~will~~ will we have ~~first~~ ~~this~~ the chance to try again?

Thank you for your considerations.

661 88P.

Gina Jones,

I am a Colorado resident who is opposed to the Final Environmental Impact Statement (FEIS) for SG Interests I, Ltd's Master Development Plan (MDP) proposal, and BLM's preferred alternative to develop up to 146 natural gas wells, four water disposal wells, and associated access roads and pipelines. This plan is irresponsible and potentially hazardous to clean air, fresh water, and food sheds. As an organic farmer, this plan upsets me, and leaves me in fear of going out of business. Who really wants to eat food from an organic farm whose irrigation water comes so close from a natural gas well or water disposal well? Please consider that.

Development in the North fork would contaminate soils, water, and air. This valley has a long agricultural history and with the closure of the coal industry, the valley is just now experiencing the opportunity to re-invent itself. Hydraulic Fracturing, just like coal before it, will soon enough prove itself unsustainable, pushing the valley further into poverty. Rather, we should focus on cleaning up our environment and creating revenue from our excellent agro-tourism industry.

Leasing BLM land for SG interests is unethical and unfair to the people of the North Fork, Colorado, and the country as a whole. It is entirely irresponsible to permanently remove water from the hydraulic system. We don't know what the undisclosed chemicals used in hydraulic fracturing are. These chemicals could destroy BLM land. Our unique biodiversity may never recover. No leasing MUST be explored as an option. What will this do to our watersheds?

I urge you, before leasing our beautiful land to be pumped and destroyed in the conquest of quick revenue, please consider all that would be destroyed by doing so. Let this Valley flourish, not just for a few years, but also for generations. Let us have our own sustainable economy. I am opposed to any oil and gas leasing in the North Fork Valley.

Sincerely,

Prima Merry
110 Clark Avenue
Paonia, CO 81428

665 88P

BLM staff

I moved to the North Fork Valley because it not only beautiful but it is a place where can be active all year round by taking advantage of cross-country skiing in the winter on Kebler Pass, Stevens Gulch & Grand Mesa. I bowhunt for elk up Steven's Gulch Rd near Hubbard Park, I hike near Hubbard Park and have seen numerous herds of elk on Terror Crk Trail (Bison Pk Tr). Increased traffic, noise and surface disturbance will drive elk away.

I also moved here to enjoy organic gardening and to be able to buy from organic farmers. Our irrigation + drinking water is primarily surface water (reservoirs, open irrigation ditches and creeks) which makes irrigation ditches and creeks) which makes all water vulnerable to the frequent spills of oil/gas development. My irrigation water comes from Minnesota Res. & Beaver Res. plus Lucas Crk. My drinking water comes from springs on Mt Lamborn.

I lived in Denver for 18 years and many times discovered my "allergy symptoms" were due to polluted air. I haven't had those "cold symptoms", e.g. sore throat, stuffy nose since I moved to the North Fork Valley. The drainage winds emanating from potential and already leased areas endanger the good air quality.

Risks have been identified but not impacts to human health. There is a wealth of emerging research on negative health impacts, includ-

The RMP uses not carrying the action plan implemented should the risks to air, water, wildlife and human health occur.

Sincerely
Marilyn
PO Box 1534
Paonia CO 81428



*This is a replica of one of the cards made by Rwandan women who participate in the Women for Women International program.*

*Produced from banana leaves, each card is created by hand and sold to help Rwandan women earn an income and care for their families.*



WOMEN for WOMEN
INTERNATIONAL

WFW 12 P97A

BLM_0150128

BLM 0150129

Dear BLM

. I AM 12 years old and i like my
Health I Have eregation and my
10 Ducks swimin it if oil goes
in it the Ducks Might die or get sick
and we eat their eggs!

. our Erigation leads to our
garden and i Love vegtables
and I Don't want to Eat Food
with Fuel on it!

. I like to Rikle I've made it
to the top of Mount Lamborn!
I Don't want to not hike!
I Don't ever Play video games

. I go to the river park at leaf those
oNese a week I love the river
Don't Let it Have oil in it those
the Fishes Home How would you
like it if someone Dumped
oil in your Home and on your
Family! THINK about that.

Thank you!

673

BLM UFD Draft RMP/DEIS 674888.
Public Comment

I am opposed to BLM's alternatives and the preferred Alt D plan. These are big picture comments related to national strategy and fiscal policy.

1. The US currently faces a natural gas surplus that is driving oil & gas E&P companies to seek export markets / build LNG export terminals, in order to increase demand and increase the price of natural gas. US strategy/national security policy should seek to preserve/conserve national resources for future use, while also promoting national competitiveness from low NG prices. Producing more NG at this point is completely counter productive to these strategic goals.

2. US government policy that encourages oil & gas production, especially on publicly owned lands, completely contradicts the actions required to combat further global warming and future climate change. Production of more oil and NG (1) serves to reduce the price of these fossil-fuels, encouraging more use, and (2) reduces incentives and affordability of clean energy sources by comparison. If we are serious about slowing down global warming, we must keep the CARBON in the GROUND, not burn it into our atmosphere.

OVER →

BLM_0150130

3. BLM's duty to the public includes getting the best financial return on publicly owned land as possible. With oil ≈ $50/barrel and NG ≈ $3, BLM is giving away valuable resources on the cheap. At some point in the future (even 100 years – if you believe the USA will still be around then), prices of oil and NG will almost certainly increase. The Earth only has so much oil and NG, despite the fact that the dreaded "peak oil" date may be extended a bit beyond estimates of 10 years ago. Besides preserving the natural beauty and environment of UFD publicly-owned lands, now is not the time to divest of natural resources, when prices are so low.

Brian Wy

Brian Wegner

Paonia, CO 81428

1-Nov-2016 04:07 From Joe Bullock. Phone #9999999999 ed 04/29/21 faxzero.com pg 72 of p.1

Case No. 1:20-cv-02484-MSK Document 72-10 filed 04/29/21 USDC Colorado pg 72 of 181

## Recipient Information

To: joe
Company: joes magic foods
Fax #: 19702405367



## Sender Information

From: Joe Bullock
Email address: bullockphoto@yahoo.com (from 67.176.170.246)
Phone #: 9999999999
Sent on: Monday, October 31 2016 at 4:00 PM EDT

Teresa, I understand you are in need of leasing our BLM lands for land usage and
revenu but please look at their track record as there are other options. (Recreation,
Hunting, Farming, Hemp etc...) Communities are being torn apart as in Battlement
mesa. Farm lands are being contaminated from accidents and natural desasters as in
the Boulder flood. Most importantly our food is in jepordy: In the proposed region is
Colorado's largest concentration of organic farms and orchards. If nearly 900,000 acres go
to the oil and gas industry are food supply is in imminent danger to their **under-regulated
industry***. In Colorado alone the track record is alarming; some are considering it a natural
holocaust of daily accidental spills and larger disasters have occurred. Weather changes of
mountain floods, landslides as well as **other natural disasters are imminent over time***.
These critical farmlands would be irreparably harmed. The food safety of all farms located
within an industrial oil and gas zone would be forever questioned.
Thank You for making a choice for the health of our nation and not the wealth of a few.
Joe Bullock
Cholaca Inc.
Joes Magic Foods
HempCures.Org
444 Stahl Rd.
Paonia, CO 81428
(970) 871-9240
Joesmagicfoods@gmai.com

This fax was sent using the FaxZero.com free fax service. FaxZero.com has a zero tolerance policy for abuse and junk faxes. If this fax is
spam or abusive, please e-mail support@faxzero.com or send a fax to 855-330-1238, or phone 707-400-6360. Specify fax #17986715. We will
add your fax number to the block list.

BLM_0150132

1-Nov-2016 04:00  From Joe Bullock. Phone #5555555555  faxzero.com

Case No. 1:20-cv-02484-MSK   Document 72-10   filed 04/29/21   USDC Colorado   pg 73 of 181

p.2



## Fracking Madness!! February 5, 2016|By Alicia Silverstone

- Tweet this article
- Share on Facebook
- Share on Google+
- Pin on Pinterest

Fracking (also called hydraulic fracturing) is an extreme and unsafe method of extracting fossil fuels from the ground that harms our drinking water, food, health, environment, and climate and has been even linked to earthquakes. Not to mention, it keeps us from shifting away from fossil fuels and into renewable energy! Fracking is carried out by drilling deep into the ground and injecting millions of gallons of toxic fluid – a mix of water, sand, and harsh chemicals – at a high enough pressure to fracture the rock and release oil or gas. Doesn't that sound nuts?? The scariest part is that fracking is exempt from major environmental laws such as the Safe Drinking Water Act!

BLM_0150133

I recently went to an event focused on this issue that was hosted by Mark Ruffalo. Man is he great! I love him as an actor and a person. He is a genuine, intelligent, and heartfelt man who cares so passionately about change. It was so great to talk to a like-minded activist about all things eco! Mark has been a key face behind the fracking movement since the beginning, so a huge thank you to him for all of his involvement in this, truly! Anyways, one of the most shocking parts of the evening was realizing this toxic process is impacting even organically grown fruits, nuts, and vegetables!!

*WaterDefense.org*



*The Nation*

You might be wondering how this yucky wastewater can even be re-used on plants...? This is because of a recycling program implemented to help deal with water shortages. It seems like a cool idea on the surface, but since this process requires heavy chemical use, it's no good! Take Chevron, they recycle 21 million gallons of their wastewater each day and sell it to farmers who use it on about 45,000 acres of crops, which equals about 10% of Kern County's farmland. Crazy right? It's almost hard to grasp what this means in plain terms... And in addition to recycling water, chemicals can migrate along fissures through abandoned wells, leaky well casings, or spill from holding ponds or pipelines. If your like me, your probably thinking there's no way a farm can be certified organic if the water it's using is filled with chemicals. Unfortunately, these standards strictly ban petroleum-derived fertilizers commonly used in convention agriculture, but the same rules do not prohibit farmers from irrigating their crops with petroleum-laced wastewater gained from oil and gas wells. Insane and scary right?? For this reason it's extremely important to know where your food is coming from, in comparison to where fracking wells can be found. You can find a map here of where drilling sites are located.

On top of this, the impacts fracking has on human health are frightening. Theo Colborn, an environmental health analyst, identified 632 chemicals used in natural-gas production. More than 75 percent of them could affect sensory organs and the respiratory and gastrointestinal systems; 40 to 50 percent have the potential impacts on the kidneys and on the nervous, immune and cardiovascular systems; 37 percent act on the hormone system; and 35 percent are linked with cancer or mutations... If you haven't seen the documentary Gasland, it gives an upclose look at how fracking is effecting individuals health all over the country. I encourage you to watch it and share it with your family and friends!

BLM_0150134

Case No. 1:20-cv-02484-MSK   Document 72-10   filed 04/29/21   USDC Colorado   pg 75 of 181

Join me in taking a stand. There is SO much to be done! Banning fracking is what needs to happen, and we're getting there! Fracking was banned in the state of New York, so I'm optimistic. Let's stop the contamination of irrigation, ban fracking on public lands, and stop this madness that's making many very sick.

*Take Action:*

Email, Tweet, sign this petition, and/or send a message on Facebook, and call Governor Jerry Brown's office at (916) 445-2841 and tell him he needs to stop relying on destructive fossil fuel extraction processes and start transitioning to renewable energy immediately! We simply can't say California is 'green' while we frack!!

*Ban Fracking on Public Lands*

Sign this petition for members of Congress, call your Congress person, and share news and action on social media!

**What's going on in your community in regards to fracking? Have you organized to achieve a ban? How can we alert each other of what farms are using this recycled wastewater??**

Photo Credit: Treehugger

BLM_0150135

6666 88P

from ~ anonymouseXIIV

Dearest representAtive of my human family & land, I humbly but assertively insist on a no leasing alternative for our BLM land in and surrounding the north fork Valley. I understand that allowing our BLM land to be subject to the will of Oil Companies is Beneficial to many of your ~~~~~ pockets from a short term point of view. please allow yourself to look at the perspective I am about to present in this short writing, **BEFORE** you decide this is a worthy compromise or harmless to you and your Earth. Imagine you stand (or sit) in the middle of a lush field. Hundreds of thousands of blades of grass tremble sensually as the winds Wild uneven caressing breeze blows on your side. Beez float as freely and gracefully ~~~ from flower to tree to have as water can stream line through crevice and cave and rock. Rocks made of compressed sand and chunks of lava rock are strewn all about amidst a plethora of other Beautiful minerals and stones and the mystical sight that awaits your eyes ~~~~~ upon looking up is made of fruit orchards, ancient juniper forests and crystal Clean rivers All woven intricately into a diverse healthy ecosystem. The north fork Valley produces a range percentage of colorados food crop. Ask yourself, with the recent Surge in renewable energy resources like the Tesla turbine & solar panels is this perspective worth ~~~~~~ Murdering brutally for the sake of oil?

BLM_0150136



please Read ME AND HeART with an @Pen Mind

BLM_0150137

CW scanned 8/8/16

Scanned 00 81 22

Received 8/4/16

Dear Gina Jones,

As a resident of the Western Slope, I appreciate the quality of life we have here and the opportunity to enjoy the wilderness for all types of recreation. In addition I value the food that is produced in this part of Colorado and want to see the air, water and soil protected for all who live or visit these many amazing valleys. As stewards of the land, we all have a responsibility to preserve what we can by thoroughly researching and considering the implications of any changes which might cause harm or hurt our economy.

Therefore, I cannot support any increase in natural gas wells in the sensitive watershed of the upper North Fork Area totaling an estimated 30,000 acres without any environmental oversight, public input, and is subject to a dubious valuation process. This is irresponsible due to undisclosed chemicals which are in the fracking fluid. Therefore, a no leasing option should be considered because we don't know the ramifications of those chemicals put into our ground water or potentially spilled or consumed by animals.

It is imperative that the BLM should offer a no lease option which permits no increase in hydraulic fracturing. If that is not a possibility, then the only option I would reluctantly accept is Alternative Plan B1.

Yours Sincerely,

Cc: Barb Sharrow, Dana Wilson, Ruth Welch, Gov. John Hickenlooper, Sen. Michael Bennet, Sen. Kerry Donovan

BLM_0150138

BLM,

As the comment period for deciding the fate of the North Fork Valley comes to a close, in regards to hydraulic fracturing, I am writing to say thank you in advance for making the right decision. Thank you for listening to the residents of this valley and putting their interests in front of the interests of oil and gas executives. Thank you for understanding the importance of protecting this beautiful valley and the people, plants, and animals that call it home. Thank you for looking at the big picture and realizing the impact that fracking would have on not only this valley and the people who live downstream, but also the entire planet, as fracking releases methane and will contribute to global climate change. Thank you for doing your job and researching in depth the impact that hydraulic fracturing would have on the future generation. I know that this decision must not have been an easy one, as the pressures that you face to produce revenue must be strong, so thank you for making the right choice. Thank you for putting the interests of the people and the planet above the interest of making more $ — that is a revolutionary act!

Thank You!

Sara L. Peterson



GARTNER
© All Rights Reserved

THANK YOU

BLM_0150140

Timothy Ratman
GRAND JUNCTION CO 815
38620 Pitkin Road
Paonia CO 18142 2016 PM  1 T

forever usa
pets

Bureau of Land Management
2465 S. Townsend Ave
Montrose, CO  81401



Northwest
1216 Lincoln Street
Eugene, Oregon 97401
(541) 485-2471

Rocky Mountains
103 Reeder's Alley
Helena, Montana 59601
(406) 443-3501

Southwest
208 Paseo del Pueblo Sur #602
Taos, New Mexico 87571
(575) 751-0351

**Defending the West**   www.westernlaw.org

# Western Environmental Law Center

November 1, 2016

*Sent via e-mail (comments only) and Certified Mail, Return Receipt Requested (comments and exhibits)*

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401
Email: uformp@blm.gov

**Re:   Comments on the Uncompahgre Field Office's Draft Resource Management Plan and Environmental Impact Statement**

Dear Uncompahgre RMP Project Manager:

The Western Environmental Law Center, along with Citizens for a Healthy Community, Center for Biological Diversity, Earthjustice, Sierra Club, WildEarth Guardians, and Wilderness Workshop (together "Conservation Groups"), submit the following comments regarding the Bureau of Land Management ("BLM") Uncompahgre Field Office ("UFO") Draft Resource Management Plan ("Draft RMP") and Environmental Impact Statement ("EIS"). The Uncompahgre RMP planning area includes 3,097,460 acres of federal, private, state, and city land in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties in southwestern Colorado. The Uncompahgre RMP planning area covers about 675,800 acres of BLM-administered public lands—including portions of the Dominguez Canyon Wilderness Area and four river systems (the Gunnison, San Miguel, Dolores, and Uncompahgre)—and 971,220 acres of federal subsurface mineral estate.

Conservation Groups have participated in the planning process for the UFO RMP—specifically by submitting two supplemental information letters with the BLM, on October 23, 2012 and February 3, 2014, both of which are incorporated herein by this reference—and have interests that are adversely affected by planning decisions made in the EIS. *See* 43 C.F.R. § 1610.5-2. Conservation Group, Citizens for a Healthy Community ("CHC"), also participated in the collaborative effort developing the North Fork Alternative Plan ("NFAP"), which was submitted to BLM on December 2, 2013 and included as BLM Alternative B.1. Moreover, Conservation Groups contracted with air resources expert, Megan Williams, who submitted comments on the Bull Mountain Master Development Plan on April 14, 2015 [hereinafter

CONSERVATION GROUPS' COMMENTS
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

i

Williams Comments], which are directly relevant to the UFO RMP planning process and are incorporated herein by this reference and attached as Exhibit 313.

This letter focuses on the BLM's failure to adequately analyze and disclose the direct, indirect, and cumulative impacts of fossil fuel leasing and development authorized and made available by BLM in the Uncompahgre Draft Resource Management Plan and Environmental Impact Statement, and correspondingly, the impact that such development will have on air, water, human health, and climate change. Finalizing the Uncompahgre RMP, as proposed, would cement BLM's place as dramatically out of step with the realities facing modern public lands management, including current science and national policy on climate change.

On behalf of members and supporters that live, work, and recreate in Colorado, the Conservation Groups call on the BLM to reconsider the wisdom of the fossil fuel leasing and development considered by the Uncompahgre RMP/EIS. Specifically, Conservation Groups request that:

- BLM must consider and analyze a "no-leasing" alternative that would bar new fossil fuel leases in the Uncompahgre planning area.
- BLM must take steps to reduce methane emissions from both oil and gas operations and coal mining, including (1) by undertaking a true hard-look analysis of methane waste and global warming potential; (2) by adopting enforceable mitigation requirements to minimize methane emissions and waste; and (3) by considering alternatives that require coal mines in the Uncompahgre planning area to capture or flare methane emissions.
- BLM must address new scientific and economic information, including regarding (1) the impacts of climate change on the Uncompahgre planning area; (2) the social burden, or cost, of carbon and methane waste that would be authorized by the RMP; and (3) fossil fuel production and employment.
- BLM must take a hard look at impacts to air, water, and human health, which must include a detailed Health Impact Assessment.

The **Western Environmental Law Center** ("WELC") uses the power of the law to defend and protect the American West's treasured landscapes, iconic wildlife and rural communities. WELC combines legal skills with sound conservation biology and environmental science to address major environmental issues in the West in the most strategic and effective manner. WELC works at the national, regional, state, and local levels; and in all three branches of government. WELC integrates national policies and regional perspective with the local knowledge of our 100+ partner groups to implement smart and appropriate place-based actions.

**Citizens for a Healthy Community** ("CHC") is a grass-roots organization with more than 450 members formed in 2010 for the purpose of protecting communities (people and their environment) within the air-, water- and food-sheds of Delta County, Colorado from the impacts of oil and gas development. CHC's members and supporters include organic farmers, ranchers, vineyard and winery owners, sportsmen, realtors, and other concerned citizens impacted by oil and gas development. CHC members have been actively involved in commenting on BLM's oil and gas activities.

BLM_0150143

The **Center for Biological Diversity** is a non-profit environmental organization with over 48,500 members, many of whom live and recreate in western Colorado. The Center uses science, policy and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats in Colorado. The lands that will be affected by the proposed resource management plan include habitat for listed, rare, and imperiled species that the Center has worked to protect including rare, endangered and threatened species like the Gunnison Sage-Grouse and the Gunnison and Uncompahgre River's fish species such as the Colorado Pikeminnow and Razorback Sucker. The Center's board, staff, and members use the public lands in Colorado, including the lands and waters that would be affected by expanded fossil fuel development authorized by this resource management plan, for quiet recreation (including hiking and camping), scientific research, aesthetic pursuits, and spiritual renewal.

The **Sierra Club** is America's largest and most influential grassroots environmental organization, with more than 2.4 million members and supporters nationwide. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

**WildEarth Guardians** ("Guardians") is dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians is a west-wide environmental advocacy organization with thousands of members in Colorado and surrounding states. Guardians members live in and regularly use and enjoy lands in the Uncompahgre Field Office.

**Wilderness Workshop** ("WW") is a 501(c)(3) dedicated to preservation and conservation of the wilderness and natural resources of the White River National Forest and adjacent public lands, including the Uncomphgre Field Office (UFO). WW engages in research, education, legal advocacy and grassroots organizing to protect the ecological integrity of local landscapes and public lands. WW focuses on the monitoring and conservation of air and water quality, wildlife species and habitat, natural communities and lands of wilderness quality. WW is the oldest environmental nonprofit in the Roaring Fork Valley, dating back to 1967 with a membership base of more than 800 people. Many of our members live, work, recreate and otherwise use and enjoy lands managed by the UFO. All members have a great interest in the protection and enhancement of natural values in the planning area. WW has monitored proposals, developments, and management actions in the UFO for years.

BLM_0150144

# TABLE OF CONTENTS

I.   BLM Must Consider Existing, New, and Revised National Policy on Climate Change Into RMP Decisionmaking. .................................................................................................. 1

   A.   BLM Failed to Consider National Policy on Climate Change in Agency Decisionmaking. .................................................................................................. 4

   B.   BLM Failed to Consider Recent Climate Science and Carbon Budgeting. .................. 5

II.  BLM Fails to Consider All Reasonable Alternatives. ........................................................ 15

   A.   BLM Has a Legal Obligation to Consider All Reasonable Alternatives. ...................... 15

   B.   BLM Fails to Consider a Range of Reasonable Alternatives. ......................................... 18

   C.   BLM Must Consider the No Fossil Fuel Leasing Alternative in Response to Threats Posed by Climate Change. ................................................................................. 22

      1.   BLM Has Legal Authority to Not Issue New Oil and Gas or Coal Leases on Public Lands in the Uncompahgre Area. ........................................................ 22

      2.   No-Leasing or Limited Leasing Alternatives Meet the RMP's Purpose and Need.... 24

      3.   The Draft EIS's Justifications for Rejecting No-Leasing Alternatives Are Arbitrary and Capricious. ................................................................................. 25

      4.   BLM Cannot Forego Analysis of a "No-Leasing" Alternative for Coal by Instead Relying on the Programmatic EIS. ....................................................... 27

   D.   BLM Must Analyze Alternatives That Require Coal Mines in the Uncompahgre Planning Area to Mitigate Climate Impacts by Capturing or Flaring Methane Emissions. ................................................................................................. 28

      1.   BLM Has the Legal Authority to Require Mines That Operate on Public Lands to Capture or Flare Methane. ......................................................... 28

      2.   It Is Critically Important To Reduce Methane Emissions In Order To Limit Climate Damages. ........................................................................................ 30

      3.   Existing Technologies Could Significantly Reduce Methane Emissions From Coal Mines in the Uncompahgre Planning Area. ................................................ 31

   E.   BLM Must Explicitly Consider a Renewable Energy Alternative or Include Renewable Energy as a Priority Element in Each Alternative. ....................................... 35

III. The UFO Failed to Take a Hard Look at Climate Change Impacts. ..................................... 39

   A.   The Draft EIS Fails To Address Whether the Alternatives Considered Are Consistent with National Climate Goals. .......................................................................... 48

   B.   The Draft EIS Relies on Outdated Data Concerning Climate Change. .......................... 50

   C.   The Draft EIS Fails to Address New Information Concerning the Impacts of Climate Change in the Uncompahgre Area. ............................................................. 51

   D.   The Draft EIS Relies on Outdated Coal Production and Employment Data. ................. 58

   E.   BLM Must Quantify the Severity of Harm from Greenhouse Gas Emissions. .............. 62

BLM_0150145

1. Social Cost of Carbon Protocol ........................................................................... 62

2. Social Cost of Methane Protocol ........................................................................ 68

F. Methane Emissions and Waste ............................................................................... 69

1. Mineral Leasing Act's Duty to Prevent Waste. .................................................. 71

2. President Obama's Climate Action Plan and Secretarial Order 3289. .......... 73

3. BLM Must Strengthen Its Approach to Methane Mitigation. ....................... 75

4. The Capture of Methane Is Critical Due to Its Global Warming Potential. ............. 83

G. Managing for Community and Ecosystem Resiliency. ....................................... 89

H. BLM Must Ensure That Any Subsequently-Prepared NEPA Document Addresses Mitigation for Climate Impacts Consistent with All Relevant Laws and Policies, Including Current Mitigation Guidance. ........................................................................ 92

1. Consistent with the Mitigation Hierarchy, BLM Must Avoid, Minimize and Offset Impacts from Fossil Fuels Made Available by the Uncompahgre RMP, Including Climate Change-Related Impacts. ................................................................. 94

2. BLM Should Adopt a Mitigation Strategy as Part of the Uncompahgre Field Office RMP to Address Unavoidable Climate Change Impacts. ........................................... 96

IV. The UFO Failed to Take a Hard Look at the Direct, Indirect and Cumulative Impacts of Fossil Fuel Development on Resource Values in the Planning Area. ..................................... 97

A. The UFO Failed to Take a Hard Look at Certain Impacts to Air Quality. ............... 99

1. Comprehensive Air Resource Protection Protocol ........................................... 99

2. Air Resource Mitigation Measures .................................................................... 101

3. Ozone Impacts ..................................................................................................... 102

4. Hazardous Air Pollutant Impacts ..................................................................... 105

5. Visibility and Ecosystem Impacts ..................................................................... 105

6. Air Quality Impacts on Human Health ............................................................. 106

B. The UFO Has Failed to Take a "Hard Look" at Resource Impacts from Hydraulic Fracturing. ................................................................................................................. 109

1. Impacts from Hydraulic Fracturing are Well Documented. .......................... 110

2. The UFO failed to sufficiently consider issues of water supply related to fracking. 116

3. The UFO failed to sufficiently consider impacts to surface water related to fracking. 117

4. The UFO failed to sufficiently consider impacts to groundwater related to fracking. 119

5. The UFO failed to sufficiently consider issues of wastewater disposal. .................. 122

6. Hydraulic Fracturing Disclosure Rules are Insufficient. ........................................... 122

7. The Reasonable Foreseeable Development Scenario Failed to Sufficiently Consider Increased Oil and Gas Development Due to Fracking. ............................................. 123

BLM_0150146

8.  Induced Seismicity from Hydraulic Fracturing Remain Unaddressed..................... 125

9.  The RMP/EIS and RFD Failed to Consider Impacts Regarding Subsequent Fracturing Treatments, or Re-Fracking Operations.................................................................. 128

10. The UFO Failed to Consider Use of Best Management Practices. ........................... 129

C.  The Uncompahgre RMP DEIS Inadequately Analyzes Impacts from Colorado River Withdrawals for Fracking and Other Unconventional Drilling Methods on Endangered Fish Populations and Water Supply, in Violation of NEPA and Section 7 of the ESA. .................................................................................................................................. 145

1.  Horizontal Wells Will Require Greater Water Depletions Than Previously Anticipated.................................................................................................................. 147

2.  Climate Change Is Reducing Stream Flows in the Upper Colorado River Basin. ... 150

3.  Persistent Drought Conditions and Increasing Water Demand Have Reduced Water Supply. ...................................................................................................................... 156

4.  Mercury and Selenium Are Adversely Impacting the Endangered Fish................. 157

5.  Population Numbers of the Endangered Fish Are Declining. ................................... 162

6.  The Recovery Program Is Failing to Meet Recommended Flows............................ 164

D.  The UFO Failed to Sufficiently Consider Traffic Impacts That Will Result from Increased Oil and Gas Development....................................................................... 165

E.  The UFO Failed to Consider the Impacts of Unregulated Pipelines........................... 167

F.  The BLM Failed to Take a Hard Look at Impacts to Human Health........................... 170

1.  The UFO Must Conduct a Health Impact Assessment............................................. 175

2.  Health data ............................................................................................................... 177

3.  Cumulative impacts on human health ...................................................................... 179

4.  Ozone........................................................................................................................ 180

5.  Naturally Occurring Radioactive Materials.............................................................. 181

VI. The BLM Is Required to Suspend All Oil and Gas Development in the Uncompahgre Area for as Long as the Uncompahgre RMP Revision Remains Uncompleted........................ 181

VII. FLPMA: Unnecessary and Undue Degradation ................................................................ 186

VIII. Conclusion ....................................................................................................................... 187

BLM_0150147

I.    **BLM Must Consider Existing, New, and Revised National Policy on Climate Change Into RMP Decisionmaking.**

The National Environmental Policy Act ("NEPA") is our "basic national charter for the protection of the environment," achieving its purpose through "action forcing procedures. . . requir[ing] that agencies take a *hard look* at environmental consequences." 40 C.F.R. § 1500.1; *Robertson v. Methow Valley Citizens' Council*, 490 U.S. 332, 350 (1989) (citations omitted) (emphasis added). This includes the consideration of best available information and data, as well as disclosure of any inconsistencies with federal policies and plans.

In 2014, President Obama described climate change as an "urgent and growing threat . . . that will define the contours of this century more dramatically than any other."[1] In that same year, the U.S. pledged to reduce its greenhouse gas ("GHG") emissions 26-28 percent below 2005 levels by 2020.[2] Since then, the President has also announced a new goal to cut methane emissions from the oil and gas sector by 40-45 percent below 2012 levels by 2025,[3] and set standards to reduce carbon dioxide emissions from the electricity sector by 32 percent from 2005 levels by 2030.[4] In 2015, President Obama recognized, "ultimately, if we're going to prevent large parts of this Earth from becoming not only inhospitable but uninhabitable in our lifetimes, we're going to have to keep some fossil fuels in the ground rather than burn them and release more dangerous pollution into the sky."[5] In his final State of the Union address, President Obama again noted the federal government's commitment to fighting climate change, vowing "to accelerate the transition away from old, dirtier energy sources," and making a powerful promise "to change the way we manage our oil and coal resources so that they better reflect the costs they impose on taxpayers and our planet."[6] These statements culminated in December, 2015 when the President joined with 194 other nations in recognizing "that climate change represents an urgent and potentially irreversible threat to human societies and the planet" and setting the goal of "holding the increase in the global average temperature to well below 2°C

---

[1] The White House, Remarks by the President at U.N. Climate Change Summit (Sept. 23, 2014), available at: https://www.whitehouse.gov/the-press-office/2014/09/23/remarks-president-un-climate-change-summit.

[2] U.S.-China Joint Announcement on Climate Change (Nov. 11, 2014), available at: https://www.whitehouse.gov/the-press-office/2014/11/11/us-china-joint-announcement-climate-change (attached as Exhibit 46).

[3] The White House, Climate Action Plan: Strategy to Reduce Methane Emissions (March 2014), available at: https://www.whitehouse.gov/blog/2014/03/28/strategy-cut-methane-emissions (attached as Exhibit 1).

[4] Environmental Protection Agency, Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 80 Fed. Reg. 64662 (Oct. 23, 2015).

[5] The White House, Statement by the President on the Keystone XL Pipeline (Nov. 6, 2015), available at: https://www.whitehouse.gov/the-press-office/2015/11/06/statement-president-keystone-xl-pipeline.

[6] President Barack Obama, State of the Union (Jan. 12, 2016), available at: https://www.whitehouse.gov/sotu.

CONSERVATION GROUPS' COMMENTS                                                                          1
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

BLM_0150148

above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5°C."[7] The
President ratified the Paris Agreement, along with China, on September 3, 2016.[8] The President
has also recognized that "the Paris Agreement alone will not solve the climate crisis. Even if we
meet every target embodied in the agreement, we'll only get to part of where we need to go."[9]

Although national policy and statements addressing climate change have accelerated in
recent years—as they should given the narrowing window of time to take meaningful action—
the federal government's recognition of climate change is not new. The Secretary of the United
States Department of the Interior stated, in Secretarial Order 3226, *Evaluating Climate Change
Impacts in Management Planning* (January 19, 2001), that "[t]here is a consensus in the
international community that global climate change is occurring and that it should be addressed
in governmental decision making." Order 3226 established the responsibility of agencies to
"consider and analyze potential climate change impacts when undertaking long-range planning
exercises, when setting priorities for scientific research and investigations, when developing
multi-year management plans, and/or when making major decisions regarding potential
utilization of resources under the Department's purview."

In a 2007 report entitled *Climate Change: Agencies Should Develop Guidance for
Addressing the Effects on Federal Land and Water Resources,* the GAO concluded that the
Department of the Interior had not provided specific guidance to implement Secretarial Order
3226, that officials were not even aware of Secretarial Order 3226, and that Secretarial Order
3226 had effectively been ignored. This report led to Secretarial Order 3289, *Addressing the
Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural
Resources* (September 14, 2009), which reinstated the provisions of Order 3226, and recognized
that "the realities of climate change require us to change how we manage land, water, fish and
wildlife, and cultural heritage and tribal lands and resources we oversee," and acknowledged that
the Department of the Interior is "responsible for helping protect the nation from the impacts of
climate change." A month later, in Executive Order No. 13514, *Federal Leadership in
Environmental, Energy, and Economic Performance* (Oct. 5, 2009), President Obama called on
all federal agencies to "measure, report, and reduce their greenhouse gas emissions from direct
and indirect activities." 74 Fed. Reg. 52,117 (Oct. 8, 2009). This directive was followed by
Executive Order No. 13693, *Planning for Federal Sustainability in the Next Decade* (March 25,
2015), which reaffirmed the federal government's commitment to reducing GHG emissions. 80
Fed. Reg. 15,871 (March 25, 2015).

---

[7] United Nations Framework Convention on Climate Change, Conference of the Parties (Nov 30-
Dec. 11, 2015), Adoption of the Paris Agreement, Art. 2, U.N. Doc. FCCC/CP/2015/L.9 (Dec.
12, 2015), available at: http://unfccc.int/resource/docs/2015/cop21/eng/l09.pdf ("Paris
Agreement") (attached as Exhibit 2).
[8] The White House, President Obama: The United States Formally Enters the Paris Agreement
(Sept. 3, 2016), available at: https://www.whitehouse.gov/blog/2016/09/03/president-obama-
united-states-formally-enters-paris-agreement.
[9] The White House, Office of the Press Secretary, Remarks by the President on the Paris
Agreement (Oct. 5, 2016), attached as Exhibit 3, and available at
https://www.whitehouse.gov/the-press-office/2016/10/05/remarks-president-paris-agreement
(last viewed Oct. 26, 2016).

BLM_0150149

In 2009, the Environmental Protection Agency ("EPA") issued a finding that the changes in our climate caused by elevated concentrations of greenhouse gases in the atmosphere are reasonably anticipated to endanger the public health and welfare of current and future generations. 74 Fed. Reg. 66496 (Dec. 15, 2009). In 2015, EPA acknowledged more recent scientific assessments that "highlight the urgency of addressing the rising concentrations of $CO_2$ in the atmosphere." 80 Fed. Reg. 64661 (Oct. 23, 2015).

Earlier this year, the White House Council on Environmental Quality ("CEQ")—the federal agency tasked with managing the federal government's implementation of NEPA— recognized the unique nature of climate change and the challenges it imposed on NEPA compliance. On August 1, 2016, CEQ released *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews* (hereafter, "Final Climate Guidance") (attached as Exhibit 4). The Final Guidance applies to all proposed federal agency actions, "including land and resource management actions." *Id.* at 9. Notably, while CEQ's final guidance post-dates the UFO's release of the draft EIS, (draft guidance was published December 18, 2014), it is intended to "facilitate compliance with existing NEPA requirements." *Id.* at 1. In other words, the Final Guidance is meant to underscore BLM's existing legal obligations to disclose and consider the foreseeable effects that, for example, coal, oil and gas leasing and development has on climate change. BLM still has ample time to incorporate this Guidance into the Final RMP and EIS. In its Final Guidance, the CEQ recognized that:

> Climate change results from the incremental addition of GHG emissions from millions of individual sources, which collectively have a large impact on a global scale. CEQ recognizes that the totality of climate change impacts is not attributable to any single action, but are exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government. Therefore, a statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA. Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact.

*Id.* at 10-11. CEQ's Final Guidance also explains the application of NEPA principles and practices to the analysis of GHG emissions and climate change, including: (1) that agencies quantify a proposed action's projected direct and indirect GHG emissions, taking into account available data and GHG quantification tools; (2) that agencies use projected GHG emissions as a proxy for assessing potential climate change effects when preparing a NEPA analysis; (3) where GHG emission tools, methodologies, or data inputs are not reasonably available, that agencies include a qualitative analysis in the NEPA document and explain the basis for determining that

CONSERVATION GROUPS' COMMENTS                                                                                    3
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

BLM_0150150

quantification is not reasonably available; (4) that agencies analyze foreseeable direct, indirect, and cumulative GHG emissions and climate effects; (5) that agencies consider reasonable alternatives and the short- and long-term effect and benefits in the alternatives and mitigation analysis; (6) that agencies consider alternatives that would make the actions and affected communities more resilient to the effects of a changing climate; and (7) that agencies assess the broad-scale effects of GHG emissions and climate change, either to inform programmatic decisions, or at both the programmatic and project-level. *See id.* at 4-6.

### A. *BLM Failed to Consider National Policy on Climate Change in Agency Decisionmaking.*

NEPA requires BLM to consider national policy in its decisionmaking process—a fact expressly recognized by the agency's purpose and need, DEIS 1-2—yet the DEIS fails to do so with regard to climate change, as detailed above. Remarkably, in a statement detached from the reality of climate change, the science used to understand it, and national policy meant to address it, the UFO's draft EIS claims:

> It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP. It is important to note that projected changes are likely to occur over several decades to a century. Many of the projected changes associated with climate change may not be measurably discernible within the reasonably foreseeable future. Existing climate prediction models are global or continental in scale; therefore, they are not appropriate to estimate potential impacts of climate change on the planning area. The current state of the science involves calculating potential quantities of greenhouse gases that may be added to the atmosphere from a particular activity. However, tools to analyze or predict how global or regional climate systems may be affected by a particular activity or activities within the planning area are not currently available. Assessing the impacts of greenhouse gas emissions on global climate change requires modeling on a global scale which is beyond the scope of this analysis. Potential impacts on climate change are influenced by greenhouse gas emission sources from around the globe and it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area.

Draft EIS at 4-40. The UFO then concluded: "The projected UFO planning area emissions are a fraction of the EPA's modeled sources and are shorter in duration, and therefore it is reasonable to conclude that these activities would have no measurable impact on climate, although the emissions would add incrementally to the global GHG loading burden." *Id.*

The UFO's position is reflective of a fundamental disconnect with regard to how our public lands are managed for energy production and national policies to limit GHG emissions. The agency not only fails to take informed action to address climate change, as required by Order 3226 and Order 3289, but signals a deep misunderstanding of basic climate science as well as the "tools and methodologies for quantifying GHG emissions and comparing GHG quantities

BLM_0150151

across alternative scenarios." *See* Final Guidance at 11.[10] As stated in Order 3289, BLM must "appl[y] scientific tools to increase understanding of climate change and to coordinate an effective response to its impacts," and "management decisions made in response to climate change impacts must be informed by [this] science." Through statements meant to avoid any actual analysis, BLM fails to take a hard look at the climate impacts of fossil fuel leasing and development on public lands in the planning area, as required by NEPA and underscored by the CEQ, as detailed below. Perhaps more importantly, the UFO failed to consider any alternatives that would meaningfully address greenhouse gas emissions and climate change impacts in the planning area—including a no-leasing alternative—and that are reflective of current science and national policy.

### B.    *BLM Failed to Consider Recent Climate Science and Carbon Budgeting.*

The UFO's draft EIS frames climate change impacts in precisely the manner warned against by the CEQ,[11] stating that "impacts on climate change are influenced by greenhouse gas emission sources from around the globe and it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area," concluding that "[a]ssessing the impacts of greenhouse gas emissions … is beyond the scope of this analysis." Draft EIS at 4-40. Despite the agency's refusal to provide climate analysis, the UFO does recognize that, "[w]ith respect to global GHG emissions, the following predictions were identified by the EPA for the Mountain West and Great Plains region"—notably contradicting an earlier statement that "[i]t may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP." Draft EIS at 4-40. These predictions include, for example: warmer temperatures with less snowfall; earlier snowmelt impacting ranchers, farmers, recreationalists, and others; more frequent and more severe droughts; impacts to crop and livestock production; forest impacts and increased susceptibility to fire; and that ecosystems will be stressed, impacting wildlife. Draft EIS at 4-40 to 41.

Since the dawn of the industrial revolution a century ago, the average global temperature has risen some 1.6 degrees Fahrenheit. Most climatologists agree that, while the warming to date is already causing environmental problems, another 0.4 degree Fahrenheit rise in temperature, representing a global average atmospheric concentration of carbon dioxide ("$CO_2$") of 450 parts per million ("ppm"), could set in motion unprecedented changes in global climate and a significant increase in the severity of natural disasters—and could represent the point of no return.[12] In August 2016, the atmospheric concentration of $CO_2$ was approximately 402.25 ppm,

---

[10] *See also*, Final Climate Guidance at 12 n. 28 (linking to quantification tools that "are widely available, and are already in broad use in the Federal and private sectors").

[11] *See* Final Climate Guidance at 11 ("comparisons [to global or regional emissions] are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations").

[12] *See* David Johnston, *Have We Passed the Point of No Return on Climate Change?*, Scientific American (April 2015), available at: http://www.scientificamerican.com/article/have-we-passed-the-point-of-no-return-on-climate-change/.

BLM_0150152

up from 398.93 ppm the same month a year earlier.[13]

Climate change has been intensively studied and acknowledged at the global, national, and regional scales. Climate change is being fueled by the human-caused release of greenhouse gas emissions, in particular carbon dioxide and methane. The Intergovernmental Panel on Climate Change ("IPCC") is a Nobel Prize-winning scientific body within the United Nations that reviews and assesses the most recent scientific, technical, and socio-economic information relevant to our understanding of climate change. In its most recent report to policymakers in 2014, the IPCC provided a summary of our understanding of human-caused climate change. Among other things, the IPCC summarized:[14]

- Human influence on the climate system is clear, and recent anthropogenic emissions of greenhouse gases are the highest in history. Recent climate changes have had widespread impacts on human and natural systems.

- Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, and sea level has risen.

- Anthropogenic greenhouse gas emissions have increased since the pre-industrial era, driven largely by economic and population growth, and are now higher than ever. This has led to atmospheric concentrations of carbon dioxide, methane, and nitrous oxide that are unprecedented in at least the last 800,000 years. Their effects, together with those of other anthropogenic drivers, have been detected throughout the climate system and are extremely likely to have been the dominant cause of the observed warming since the mid-20th century.

- In recent decades, changes in climate have caused impacts on natural and human systems on all continents and across the oceans. Impacts are due to observed climate change, irrespective of its cause, indicating the sensitivity of natural and human systems to changing climate.

- Continued emission of greenhouse gases will cause further warming and long-lasting changes in all components of the climate system, increasing the likelihood of severe, pervasive, and irreversible impacts for people and ecosystems. Limiting climate change would require substantial and sustained reductions in greenhouse gas emissions which, together with adaptation, can limit climate change risks.

---

[13] NOAA, Earth System Research Laboratory, *Trends in Atmospheric Carbon Dioxide*, available at: http://www.esrl.noaa.gov/gmd/ccgg/trends/.
[14] IPCC AR5, *Summary for Policymakers* (March 2014) available at: http://www.ipcc.ch/pdf/assessment-report/ar5/syr/AR5_SYR_FINAL_SPM.pdf (attached as Exhibit 5).

CONSERVATION GROUPS' COMMENTS                                                                                      6
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

- Surface temperature is projected to rise over the 21st century under all assessed emission scenarios. It is very likely that heat waves will occur more often and last longer, and that extreme precipitation events will become more intense and frequent in many regions. The ocean will continue to warm and acidify, and global mean sea level to rise.

Carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride are recognized as the key greenhouse gases contributing to climate change. In 2009, the EPA found that these "six greenhouse gases taken in combination endanger both the public health and the public welfare of current and future generations."[15] The D.C. Circuit has upheld this decision as supported by the vast body of scientific evidence on the subject. *See Coal. for Responsible Regulation, Inc. v. EPA.*, 684 F.3d 102, 120-22 (D.C. Cir. 2012).

According to the National Oceanic and Atmospheric Administration ("NOAA"), "[t]he combined average temperature over global land and ocean surfaces for August 2016 was the highest for August in the 137-year period of record, marking the 16th consecutive month of record warmth for the globe."[16] The global climate crisis is happening and it may well be accelerating quickly.



The graphs show globally averaged historic and monthly mean carbon dioxide.

The IPCC in 2013 affirmed: "Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, sea level has risen, and the concentrations of greenhouse gases have increased" causing "widespread impacts on human and natural systems."[17] This is consistent with the findings of the United States' 2014

---

[15] Environmental Protection Agency, *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act* 74 Fed. Reg. 66,496 (Dec. 15, 2009).

[16] NOAA, Global Analysis – August 2016, available at: https://www.ncdc.noaa.gov/sotc/global/201608.

[17] IPCC AR5 Synthesis Report at 2 (attached as Exhibit 5).

BLM_0150154

Third National Climate Assessment, stating: "That the planet has warmed is 'unequivocal,' and is corroborated through multiple lines of evidence, as is the conclusion that the causes are very likely human in origin."[18] With particular regard to the Southwest Region—which includes Colorado, New Mexico, Utah, Arizona, Nevada, and California—the National Climate Assessment included in the following overview:[19]

- Snowpack and streamflow amounts are projected to decline in parts of the Southwest, decreasing surface water supply reliability for cities, agriculture, and ecosystems.

- The Southwest produces more than half of the nation's high-value specialty crops, which are irrigation-dependent and particularly vulnerable to extremes of moisture, cold, and heat. Reduced yields from increasing temperatures and increasing competition for scarce water supplies will displace jobs in some rural communities.

- Increased warming, drought, and insect outbreaks, all caused by or linked to climate change, have increased wildfires and impacts to people and ecosystems in the Southwest. Fire models project more wildfire and increased risks to communities across extensive areas.

- Flooding and erosion in coastal areas are already occurring even at existing sea levels and damaging some California coastal areas during storms and extreme high tides. Sea level rise is projected to increase as Earth continues to warm, resulting in major damage as wind-driven waves ride upon higher seas and reach farther inland.

- Projected regional temperature increases, combined with the way cities amplify heat, will pose increased threats and costs to public health in southwestern cities, which are home to more than 90% of the region's population. Disruptions to urban electricity and water supplies will exacerbate these health problems.

Immediate and substantial greenhouse gas reductions are required to avoid catastrophic impacts to people and communities. "Following the warmest year on record in 2014 according to most estimates, 2015 reached record warmth yet again, surpassing the previous record by more than 0.1°C."[20]

---

[18] Jerry M. Melillo, *et al.*, Climate Change Impacts in the United States: The Third National Climate Assessment (2014) at 61, available at: http://nca2014.globalchange.gov (attached as Exhibit 6).
[19] *See id.* at 463-86.
[20] American Meteorological Society, *State of the Climate in 2015*, Vol.97, No.8 (Aug. 2016), at S7 (attached as Exhibit 7).

BLM_0150155

VERY FEW COOL SPOTS IN 2015



Difference from 1981–2010 average (°F)

NEW HOTTEST YEAR ON RECORD



As noted above, the Paris Agreement commits all signatories—including the United States—to a target holding long-term global average temperature "to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels."[21] As articulated by a team of international climate scientists, including Dr. James Hansen, in a 2013 report: "The widely accepted target of limiting human-made global warming to 2 degrees Celsius (3.6 degrees Fahrenheit) above preindustrial level is too high and would subject young people, future generations and nature to irreparable harm…. Observational data reveal that some climate extremes are already increasing in response to warming of several tenths of a degree in recent decades; these extremes would likely be much enhanced with

---

[21] Paris Agreement at Art. 2 (attached as Exhibit 2).

warming of 2°C or more."[22] "Runaway climate change—in which feedback loops drive ever-worsening climate change, regardless of human activities—are now seen as a risk even at 2°C of warming."[23] Indeed, the impacts of 2°C temperature rise have been "revised upwards, sufficiently so that 2°C now more appropriately represents the threshold between 'dangerous' and 'extremely dangerous' climate change."[24]

Although the Paris Agreement has underscored that immediate action is needed to avoid 'extremely dangerous' warming, meeting the voluntary commitments adopted in Paris alone will be insufficient to meet goal of limiting temperature change to between 1.5°C and 2.0°C above pre-industrial levels. As noted by a 2015 UNEP technical report:

> The emissions gap between what the full implementation of the unconditional [intended nationally determined contributions (INDCs)] contribute and the least-cost emission level for a pathway to stay below 2°C, is estimated to be 14 GtCO$_2$e (range: 12-17) in 2030 and 7 GtCO$_2$e (range: 5-10) in 2025. When conditional INDCs are included as fully implemented, the emissions gap in 2030 is estimated to be 12 GtCO2c (range: 10-15) and 5 GtCO$_2$e (range: 4-8) in 2025.[25]

In other words, far greater emissions reductions are necessary to stay below and 2.0°C, let alone aspire to 1.5°C of warming. If no further progress were made beyond the Paris Agreement, expected warming by 2100 would be 3.5°C.[26] In the alternative, if no action is taken and the status quo is maintained—a position reflected in BLM's draft EIS—estimated warming by 2100 is upwards of 4.5°C.[27]

---

[22] James Hansen, *et al.*, *Assessing "Dangerous Climate Change": Required Reduction of Carbon Emissions to Protect Young People, Future Generations and Nature,* 8 PLoS ONE 8 e81648 (2013) (attached as Exhibit 8).

[23] Greg Muttitt, *et al.*, *The Sky's Limit: Why the Paris Climate Goals Require a Managed Decline of Fossil Fuel Production,* Oil Change International (Sept. 2016) at 6 (attached as Exhibit 9); *see also* David Spratt, *Climate Reality Check: After Paris, Counting the Cost* (March 2016) at 8 (attached as Exhibit 10) ("there is an unacceptable risk that before 2°C of warming, significant "long-term" feedbacks will be triggered, in which warming produces conditions that generate more warming, so that carbon sinks such as the oceans and forests become less efficient in storing carbon, and polar warming triggers the release of significant permafrost and clathrate carbon stores. Such an outcome could render ineffective human efforts to control the level of future warming to manageable proportions.").

[24] Kevin Anderson and Alice Bows, *Beyond 'Dangerous' Climate Change: Emission Scenarios for a New World,* Phil. Trans. R. Soc. (2011) (attached as Exhibit 11).

[25] United Nations Environment Programme (UNEP), *The Emissions Gap Report 2015: A UNEP Synthesis Report* (Nov. 2015) at xviii (attached as Exhibit 12).

[26] Spratt, *Climate Reality Check* at 2 (attached as Exhibit 10).

[27] *See* Climate Interactive, Climate Scorecard, available at: https://www.climateinteractive.org/programs/scoreboard/; *see also,* Andrew P. Schurer, *et al.*, *Separating Forced from Chaotic Climate Variability over the Past Millennium,* Journal of Climate, Vol. 26 (March 2013) (attached as Exhibit 13).

CONSERVATION GROUPS' COMMENTS                                                                10
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

With specific regard to United States commitments under the Paris Agreement, the U.S. INDC set specific greenhouse gas emissions reduction target for 2025 of a 26% to 28% reduction below the 2005 emission levels, producing a range in 2005 net GHG emissions from 6,323 to 7,403 $MTCO_2e$.[28] The difference between this target and the estimated 2025 emissions without INDC policies results in an 'emissions gap' ranging from 896 to 2,121 $MTCO_2e$.[29]

Both the IPCC and National Climate Assessment recognize the dominant role of fossil fuels in driving climate change:

> While scientists continue to refine projections of the future, observations unequivocally show that climate is changing and that the warming of the past 50 years is primarily due to human-induced emissions of heat-trapping gases. These emissions come mainly from burning coal, oil, and gas, with additional contributions from forest clearing and some agricultural practices.[30]

> \*\*\*

> $CO_2$ emissions from fossil fuel combustion and industrial processes contributed about 78% to the total GHG emission increase between 1970 and 2010, with a contribution of similar percentage over the 2000–2010 period (*high confidence*).[31]

As summarized in a recent report:

> The Paris Agreement aims to help the world avoid the worst effects of climate change and respond to its already substantial impacts. The basic climate science involved is simple: cumulative carbon dioxide ($CO_2$) emissions over time are the key determinant of how much global warming occurs. This gives us a finite *carbon budget* of how much may be emitted in total without surpassing dangerous temperature limits.[32]

According to the IPCC, as of 2011, the remaining carbon budget of cumulative $CO_2$ emissions from all anthropogenic sources must remain below 1,000 $GtCO_2$ to provide a 66% probability of limiting warming to 2°C above pre-industrial levels.[33] For years 2012-2014,

---

[28] Jeffery Greenblatt & Max Wei, *Assessment of the climate commitments and additional mitigation policies of the Unites States*, Nature Climate Change (Sept. 2016), available at: http://www.nature.com/nclimate/journal/vaop/ncurrent/full/nclimate3125.html (attached as Exhibit 14).

[29] *Id.* at 2; *see also* UNEP, Emissions Gap Report (attached as Exhibit 12).

[30] Third National Climate Assessment at 2 (attached as Exhibit 6).

[31] IPCC AR5 Synthesis Report at 46 (attached as Exhibit 5).

[32] *The Sky's Limit* at 6 (attached as Exhibit 9).

[33] IPCC AR5 Synthesis Report at 63-64 & Table 2.2 (attached as Exhibit 5). For an 80% probability of staying below 2°C, the budget from 2000 is 890 $GtCO_2$, with less than 430 $GtCO_2$ remaining. Malte Meinshausen *et al., Greenhouse-gas emission targets for limiting global warming to 2°C*, Nature (2009) at 1159 (attached as Exhibit 15).

BLM_0150158

approximately 107 $GtCO_2$ was emitted, averaging approximately 36 $GtCO_2$ per year, which left us at the start of 2016 with a carbon budget of only 850 $GtCO_2$.[34] These emissions were the highest in human history and 60% higher than in 1990 (the Kyoto Protocol reference year). Of course, the Paris Agreement aim of limiting global warming to 1.5°C requires adherence to a more stringent carbon budget of only 400 $GtCO_2$ from 2011 onward, of which about 250 $GtCO_2$ remained at the start of 2016.[35] "With global annual emissions amounting to 36 $GtCO_2$ in 2015, scientists predict that at current rates global emissions will exceed the carbon budgets necessary to stay under the 1.5°C target by 2021 and the 2°C target by 2036.[36]

The potential carbon emissions from *existing* fossil fuel reserves—the known belowground stock of extractable fossil fuels—considerably exceed both 2°C and 1.5°C of warming. "Estimated total fossil carbon reserves exceed this remaining [carbon budget] by a factor of 4 to 7."[37] "For the 2°C or 1.5°C limits, respectively 68% or 85% of reserves must remain in the ground."[38] The reserves in currently operating oil and gas field alone, even with no coal, would take the world beyond 1.5°C.[39]

In order for the world to stay within a carbon budget consistent with Paris Agreement goals—"holding the increase in the global average temperature to well below 2°C above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5°C"[40]—significant fossil fuel resources must remain in the ground. More specifically, to meet the target of 2°C, globally "a third of oil reserves, half of gas reserves and over 80 percent of current coal reserves should remain unused from 2010-2050."[41] Studies estimate that global coal, oil and gas resources considered currently economically recoverable contain potential greenhouse gas

---

[34] *See* Annual Global Carbon Emissions, available at: https://www.co2.earth/global-co2-emissions; *see also* C. Le Quéré, *et al., Global Carbon Budget 2015*, Earth Syst. Sci. Data (Dec. 2015) (attached as Exhibit 16).

[35] Dustin Mulvaney, *et al., Over-Leased: How Production Horizons of Already Leased Federal Fossil Fuels Outlast Global Carbon Budgets,* EcoShift Consulting (July 2016) (attached as Exhibit 17) at 2 (citing Joeri Rogelj, *et al., Difference between carbon budget estimates unraveled*, Nature Climate Change (2016) (attached as Exhibit 18).

[36] Mulvaney at 2 (citing Oak Ridge National Laboratories, Carbon Dioxide Information Analysis Center (2015), available at: http://cdiac.ornl.gov/GCP/).

[37] IPCC AR5 Synthesis Report at 63 (attached as Exhibit 5).

[38] The Sky's Limit at 6 (attached as Exhibit 9); *see also* Kevin Anderson and Alice Bows, *Reframing the climate change challenge in light of post-2000 emission trends*, Phil. Trans. R. Soc. (2008) (attached as Exhibit 19) ("to provide a 93% mid-value probability of not exceeding 2°C, the concentration (of atmospheric greenhouse gases) would need to be stabilized at or below 350 parts per million carbon dioxide equivalent (ppm $CO_2$e)" compared to the current level of ~485 ppm $CO_2$e.).

[39] The Sky's Limit at 5, 17 (attached as Exhibit 9).

[40] Paris Agreement at Art. 2 (attached as Exhibit 2).

[41] Christophe McGlade & Paul Ekins, *The geographical distribution of fossil fuels unused when limiting global warming to 2°C*, Nature (Jan 2015) (attached as Exhibit 20).

BLM_0150159

emissions of 4,196 GtCO$_2$,[42] with other estimates as high as 7,120 GtCO$_2$.[43]

Critically, the United States carbon quota—equivalent to 11% of the global carbon budget needed for a 50% chance of limiting warming to 2°C—allocates approximately 158 GtCO$_2$ to the United States as of 2011.[44] By way of comparison, federal and non-federal fossil fuel emissions together would produce between 697 and 1,070 GtCO$_2$.[45] Regarding just federal fossil fuel resources, the United States contains enough recoverable coal, oil and gas that, if extracted and burned, would result in as much as 492 GtCO$_2$, far surpassing the entire global carbon budget for a 1.5°C target and nearly eclipsing the 2°C target—to say nothing of the United States 'share' of global emissions.[46] Unleased federal fossil fuels comprise 91% of these potential emissions, with already leased federal fossil fuels accounting for as much as 43 GtCO$_2$.[47]

In 2012, "the GHG emissions resulting from the extraction of fossil fuels from federal lands by private leaseholders totaled approximately 1,344 MMTCO$_2$e."[48] Between 2003 and 2014, approximately 25% of all United States and 3-4% of global fossil fuel greenhouse gas emissions are attributable to federal minerals leased and developed by the Department of the Interior.[49] Continued leasing and development of federal fossil fuel resources commits the world to 'extremely dangerous' warming well beyond the 2°C threshold. As one study put it, "the disparity between what resources and reserves exist and what can be emitted while avoiding a temperature rise greater than the agreed 2°C limit is therefore stark."[50] In short, *any* new leasing of federal fossil fuel resources is inconsistent with a carbon budget that would seek to avoid catastrophic climate change.

The production horizons for already leased federal fossil fuel resources underscore how unwarranted any additional leasing is, and in turn the reasonableness of the UFO's consideration of a no-leasing alternative. Comparing these production horizons to dates at which carbon budgets would be exceeded if current emission levels continue:

---

[42] Michael Raupach, *et al., Sharing a quota on cumulative carbon emissions*, Nature Climate Change (Sept. 2014) (attached as Exhibit 21).

[43] IPCC AR5, Mitigation of Climate Change, Contribution of Working Group III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (2014) at Table 7.2 (attached as Exhibit 22).

[44] Raupach at 875 (attached as Exhibit 21).

[45] Dustin Mulvaney, *et al., The Potential Greenhouse Gas Emissions from U.S. Federal Fossil Fuels*, EcoShift Consulting (Aug. 2015) at 16 (attached as Exhibit 23).

[46] *Id.*

[47] *Id.*

[48] Stratus Consulting, *Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters: An Update* (Dec. 2014) at 9 (attached as Exhibit 24).

[49] *See* Energy Information Administration, *Sales of Fossil Fuels Produced from Federal and Indian Lands, FY 2003 through FY 2014* (July 2015) (attached as Exhibit 25); *see also* Stratus Consulting (attached as Exhibit 24).

[50] McGlade at 188 (attached as Exhibit 20).

BLM_0150160

- Federal crude oil already leased will continue producing for 34 years beyond the 1.5°C threshold and 19 years beyond the 2°C threshold;
- Federal natural gas already leased will continue producing 23 years beyond the 1.5°C threshold and 8 years beyond the 2°C threshold;
- Federal coal already leased will continue producing 20 years beyond the 1.5°C threshold and 5 years beyond the 2°C threshold.[51]

Opportunities to reduce GHG emissions through the cessation of new leasing and non-renewal of non-producing leases further underscores how unwarranted continued leasing is, and in turn how reasonable the UFO's consideration of a no-leasing alternative is.

If new leasing and renewal of existing non-producing leases continues, by 2040 it will contribute about two-thirds of expected federal fossil fuel production (forecast based on EIA and other sources).[52] On the other hand, if new leasing ceases and existing non-producing leases are not renewed, 40% of forecast coal production could be avoided in 2025 and 74% of coal production could be avoided in 2040. As for oil and gas, 12% of oil production could be avoided in 2025 and 65% could be avoided by 2040 while 6% of natural gas production could be avoided in 2025 and 59% could be avoided by 2040.[53]

This avoided production would significantly reduce future U.S. emissions. Cessation of new and renewed leases for federal fossil fuel extraction could reduce $CO_2$ emissions by about 100 Mt per year by 2030. Annual emission reductions could become greater than that over time as production declines on existing leases and maintaining or increasing production becomes dependent on yet-to-be issued leases.[54]

A comparison with other measures shows that "no leasing" could be a very significant part of U.S. efforts to address climate change. The 100 Mt $CO_2$ emissions savings that could result from no leasing in 2030 compares favorably with EPA standards for light- and medium-vehicles that are expected to yield 200 Mt in CO2 savings in 2030, and with standards for heavy-duty vehicles that are expected to yield 70 Mt in CO2 savings in the same year. The 100 Mt $CO_2$ emissions reduction from leasing restrictions would be greater than either the emission reductions that the EPA expects to achieve through its existing regulation of oil and gas industry emissions or reductions the BLM expects to achieve from its proposed methane waste standards on oil and gas operations on federal land. Clearly, cessation of new and renewed leases could make an important contribution to U.S. climate change mitigation efforts.[55]

Also, importantly, avoided production through no new leasing and non-renewal of existing non-producing leases could help avoid further carbon lock-in in terms of investment in

---

[51] Mulvaney (2016) at 5 (attached as Exhibit 17).

[52] Peter Erickson and Michael Lazarus, *How Would Phasing Out U.S. Federal Leases for Fossil Fuel Extraction Affect CO2 Emissions and 2°C Goals?*, Stockholm Environmental Institute (2016) at 12 (attached as Exhibit 323).

[53] Erickson and Lazarus at 16.

[54] *Id.* at 26.

[55] *Id.* at 27.

both fossil fuel-producing and fossil fuel-using infrastructure.[56]

Simply put, the timeframe to avoid catastrophic climate change is short, and the management of our federal minerals is dangerously out of step with this reality. As noted above, the UFO failed to consider *any* alternative that would meaningfully reduce the projected 3.11 $MMTCO_2e$ of annual emissions from the planning area. Draft EIS at 4-39.

## II.   BLM Fails to Consider All Reasonable Alternatives.

### A.   *BLM Has a Legal Obligation to Consider All Reasonable Alternatives.*

The centerpiece of environmental regulation in the United States, the National Environmental Policy Act ("NEPA") requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives. *See* 42 U.S.C. § 4331(b) (congressional declaration of national environmental policy); *U.S. Dep't of Transp. v. Public Citizen,* 541 U.S. 752, 756–57 (2004). BLM must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action in comparative form, so as to provide a "clear basis for choice among the options" open to the agency. 40 C.F.R. § 1502.14. At a minimum, the agency must identify and analyze its preferred alternative, as well as a null or "no action" alternative that would occur if the agency elected to maintain the current state of affairs unchanged. *Id.* In addition, the agency should address all other reasonable alternatives to the proposed action. *See Colorado Envtl. Coal. v. Salazar,* 875 F. Supp. 2d 1233, 1245 (D. Colo. 2012).

Through the RMP planning process, the UFO is required to "estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail. The estimation of effects shall be guided by the planning criteria and procedures implementing [NEPA]." 43 C.F.R. § 1610.4-6. Essential to any NEPA process is a robust analysis of alternatives to the proposed action. Consideration of reasonable alternatives is necessary to ensure that the agency has before it and takes into account all possible approaches to, and potential environmental impacts of, a particular project. NEPA's alternatives requirement, therefore, ensures that the "most intelligent, optimally beneficial decision will ultimately be made." *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n,* 449 F.2d 1109, 1114 (D.C. Cir. 1971).

"[T]he heart" of an environmental analysis under NEPA is the analysis of alternatives to the proposed project, and agencies must evaluate all reasonable alternatives to a proposed action." *Colorado Environmental Coalition,* 185 F.3d at 1174 (quoting 40 C.F.R. § 1502.14). An agency must gather "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Greater Yellowstone,* 359 F.3d at 1277 (citing *Colorado Environmental Coalition,* 185 F.3d at 1174); *see also Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1528 (10th Cir. 1992). Thus, agencies must "ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." *Izaak Walton*

---

[56] *Id.* at 30.

BLM_0150162

*League of America v. Marsh,* 655 F.2d 346, 371 (D.C. Cir. 1981) (citing *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21 (1976)).

When determining whether an EIS analyzed sufficient alternatives to allow BLM to take a hard look at the available options, courts apply the "rule of reason." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.,* 565 F.3d 683, 709 (10th Cir. 2009) (citing *Westlands Water Dist. v. U.S. Dep't of the Interior,* 376 F.3d 853, 868 (9th Cir. 2004)). The reasonableness of the alternatives considered is measured against two guideposts. First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. *Westlands,* 376 F.3d at 866. Second, reasonableness is judged with reference to an agency's objectives for a particular project.[57] *See Dombeck,* 185 F.3d at 1174–75; *Simmons v. U.S. Army Corps of Eng'rs,* 120 F.3d 664, 668–69 (7th Cir. 1997); *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1520 (9th Cir. 1992).

On the first point, FLPMA is BLM's organic act and delegates authority to the agency to create and amend land use plans. FLPMA's congressional declaration states:

> It is the policy of the United States that ... the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will <u>preserve and protect certain public lands in their natural condition</u>; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use;

43 U.S.C. § 1701(a)(8) (emphasis added). Indeed, BLM is duty bound to develop and revise land use plans according to this congressional mandate, so as to "observe the principles of multiple use." 43 U.S.C. § 1712(c)(1). "Multiple use" means "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." 43 U.S.C. § 1702(c).

The RMP revision process, undertaken pursuant to FLPMA, requires BLM to engage in the type of foundational land use planning that is intended to give context to the agency's multiple use mandate. Accordingly, FLPMA provides specific criteria for land use plan revisions, requiring consideration of things such as: observation of the principles of multiple use and sustained yield; integrated consideration of physical, biological, economic, and other sciences; reliance on public lands resources and other values; consideration of present and future uses of the public lands; consideration of the relative scarcity of resource values; and weighing the long-term benefits to the public against the short-term benefits. *See* 43 U.S.C. § 1712(c)(1)-(9). Consideration of these criteria must drive the RMP revision.

---

[57] While an agency may restrict its analysis to alternatives that suit the "basic policy objectives" of a planning action, *Seattle Audubon Soc'y v. Moseley,* 80 F.3d 1401, 1404 (9th Cir. 1996), it may do so only as long as "the statements of purpose and need drafted to guide the environmental review process ... are not unreasonably narrow," *Dombeck,* 185 F.3d at 1175.

BLM_0150163

Critically, FLPMA does not mandate that every use be accommodated on every piece of land; rather, delicate balancing is required. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage." *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)). As held by the Tenth Circuit, "[i]f all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined." *Rocky Mtn. Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 738 n. 4 (10th Cir.1982) (quoting *Utah v. Andrus,* 486 F.Supp. 995, 1003 (D.Utah 1979)); *see also* 43 U.S.C. § 1701(a)(8) (stating, as a goal of FLPMA, the necessity to "preserve and protect certain public lands in their natural condition"); *Pub. Lands Council,* 167 F.3d at 1299 (citing § 1701(a)(8)). As further provided by the Tenth Circuit:

> It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses… BLM's obligation to manage for multiple use does not mean that development *must* be allowed on [a particular piece of public lands]. Development is a *possible* use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

*New Mexico ex rel. Richardson,* 565 F.3d at 710. Accordingly, the RMP revision must consider, on equal footing, the value of permanent protection and preservation of public lands in the planning area, along with industry pressure to lease and develop public lands for fossil fuel resources. It is incumbent on the UFO to re-evaluate these competing resources and give suitable weight to FLPMA's mandate to preserve and protect public lands in their natural condition. *See* 43 U.S.C. § 1701(a)(8). This is, after all, the agency's statutory mandate. *See New Mexico ex rel. Richardson,* 565 F.3d at 709.

The second factor in considering the reasonableness of alternatives is judged by the RMP's purpose and need. As stated by BLM:

> The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses… BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy.

BLM_0150164

Draft EIS at 1-2. This purpose does not take fossil fuel leasing and development in the planning area as a foregone conclusion. Rather, the central purpose is to "provide broad-scale direction" in light of "current resource conditions, changes in circumstances… and new or revised national-level policy." *See New Mexico ex rel. Richardson*, 565 F.3d at 710-11.

### B.   BLM Fails to Consider a Range of Reasonable Alternatives.

By these measures, BLM's range of alternatives fails to satisfy its statutory obligation under FLPMA, as well as the purpose and need of the RMP. All of the draft EIS alternatives propose to leave available extensive lands for fossil fuel leasing and development. *See* Summary of Alternatives, below. Critically, although acreage may reflect subtle differences between alternatives, there is virtually no change in the foreseeable range of coal, oil and gas leasing and development, or in greenhouse gas emission rates across alternatives. In fact, each alternative shows an *increase* in direct greenhouse gas emissions over base year emissions of between 10 and 12 percent, ranging from 3.08 to 3.13 MMTCO$_2$e annually. In other words, any difference in BLM's range of alternatives is mere window-dressing for an RMP aimed at leaving all foreseeable fossil fuel resources fully available to exploitation. In effect, the agency's alternatives analysis becomes little more than an exercise of form over substance.

### Summary of Alternatives

| Resource | Alt. A | Alt. B | Alt. B.1 | Alt. C | Alt. D* |
|---|---|---|---|---|---|
| Estimated Annual Direct GHG Emissions (MMTCO$_2$e)[58] | 3.08 | 3.09 | 3.06 | 3.13 | 3.11 |
| Direct Annual CO$_2$ Emissions (Tons per year) (Base 81,978)[59] | 256,212 | 258,174 | 247,280 | 283,901 | 273,027 |
| Direct Annual CH$_4$ Emissions (Tons per year) (Base 128,840)[60] | 134,569 (20 yr. GWP = 11.7 MMTCO$_2$e) | 134,475 (20 yr. GWP = 11.7 MMTCO$_2$e) | 133,955 (20 yr. GWP =11.7 MMTCO$_2$e) | 135,609 (20 yr. GWP = 11.8 MMTCO$_2$e) | 135,082 (20 yr. GWP = 11.8 MMTCO$_2$e) |
| Total Annual GHG Emissions Increase (Base year 2.79)[61] | 10% | 10% | 10% | 12% | 11% |
| Maximum Annual Indirect GHG | 27.1 | 27.1 | 27.1 | 27.1 | 27.1 |

---

[58] Uncompahgre RMP Draft EIS at 4-38, Table 4-9
[59] *Id.*
[60] *Id.*
[61] *See Id.*

BLM_0150165

| from Coal (MMTCO$_2$e)[62] | | | | | |
|---|---|---|---|---|---|
| Oil & Gas Open to Leasing (Acres)[63] | 871,810 | 729,330 | 635,190 | 871,810 | 865,970 |
| Oil & Gas Closed to Leasing (Acres)[64] | 44,220 (4.8%) | 186,700 (20.4%) | 280,840 (30.7%) | 44,220 (4.8%) | 50,060 (5.5%) |
| Coal Acceptable to Leasing (Acres)[65] | 144,790 | 320,440 | 320,440 | 405,230 | 371,400 |
| Coal Unsuitable or Closed to Leasing (Acres)[66] | 1,070 (0.7%) | 101,060 (24.0%) | 101,060 (24.0%) | 16,270 (3.9%) | 50,100 (11.9%) |

(*)Agency Preferred Alternative

For example, with respect to coal mining, the draft EIS considers four alternatives with varying levels of lands open ("acceptable") to coal leasing. But the range is skewed toward leaving the vast majority of coal-bearing lands open for leasing. As the table above demonstrates, the alternatives leave open to leasing between 76% and 99.3% of all lands with coal resources.[67]

Yet even under this lopsided "range" of alternatives, the likely amount of coal produced and burned is identical. Under each alternative, the Draft EIS predicts the same amount of greenhouse gas emissions from coal combustion—27.1 million tons—indicating that none of the alternatives will limit coal production in the planning area in any way. The Draft EIS specifically assumes that for each alternative, "[t]he output from the two active mines on BLM-administered land within this coal field is estimated to *remain the same as current production*, between 9 and 11 million tons of coal each year for the next 20 years."[68]

Further, the draft EIS indicates that nearly all of the coal production in the resource area will come from a 40,000 acre area that is almost entirely open to leasing under each alternative:

---

[62] *Id.* at 4-41 – 4-42 (maximum figures for indirect GHG emissions from coal production); *id.* at 2-409; 4-297 ("coal production is expected to remain the same across all alternatives").

[63] *Id.* at 4-262, Table 4-31; *but see id.* at 2-10 (displaying different figures for acreage closed to leasing).

[64] *Id.*

[65] *Id.* at 2-9 – 2-10, Table 2-1.

[66] *Id.*

[67] *See also id.* at 4-274 ("Within the coal potential area, [Alternative B] would be the most restrictive, with 24 percent of the coal potential area unavailable for leasing"). The draft EIS indicates that coal leasing restrictions in the most active coal field – the Somerset – vary between 0% and 12% of the lands in that field that "would be unacceptable for further consideration of leasing and development," meaning that every alternative leaves *at least* 88% of the most active coal field open for development. *Id.* at 4-289 – 4-290.

[68] *Id.* at 4-454 (emphasis added).

CONSERVATION GROUPS' COMMENTS                                                    19
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

the Somerset coal field.[69] The only way to produce a range of alternative coal outcomes would be to analyze alternatives that placed significant portions of the Somerset area off-limits to coal mining—which BLM failed to do, in violation of NEPA. Conservation Groups therefore request that BLM evaluate at least one alternative that will result in at least a 50% reduction in coal production in the resource area over the 20-year life of the plan, and another that will eliminate new leasing. *See infra* at II.C.

The "range" of alternatives regarding coal production is not reasonably broad based on its treatment of other coal producing regions within the Uncompahgre field office area. For example, the vast majority of the Tongue Mesa coal field is left open under each action alternative (92% or more), despite the fact that the draft EIS predicts zero coal will be produced there because the area's geology makes it "economically unviable to mine in the next 20 years."[70] Similarly, while most of the Grand Mesa coal-field is open to coal leasing under all three action alternatives, coal there is also unlikely to be mined in the next two decades.[71] This begs the question: if no coal will be mined in the Tongue Mesa and Grand Mesa coal fields, why did BLM fail to consider an alternative that eliminates coal mining there?

In addition, the draft EIS's consideration of a skewed range alternatives for coal stands in marked contrast to its treatment of renewable energy. The draft EIS considers alternatives that would open to such development a relatively small acreage (5%), about a third of the acreage, a little over half the acreage, and most the acreage (83%) to wind and solar development.[72] The *greatest* percentage of land open to wind and solar under any alternatives (83%) is still smaller than the *least* percentage of land open to coal mining in the most active coal field under any alternative (88% of coal-bearing lands), underscoring the lack of range of alternatives concerning coal.

BLM's alternatives fail to account for current resource conditions, changes in circumstances, and new or revised national-level policy, in particular with regard to climate change. Beyond the agency's failure to take a meaningful hard look at resource impacts from global warming, as detailed below, BLM failed in its basic obligation to consider all reasonable alternatives, including alternatives that would significantly reduce planning area greenhouse gas emissions, and in particular an alternative that considers not leasing public lands for fossil fuel development. 40 C.F.R. § 1502.14.

The UFO draft RMP and EIS dismisses a number of no-leasing alternatives, citing BLM's mandate under the Mineral Leasing Act of 1920 ("MLA") to use the least restrictive

---

[69] *Id.* at 4-454 – 4-455.

[70] *Id.* at 4-289 – 4-290 (percentage of Tongue Mesa coal field acceptable for coal leasing); *id.* at 4-454 (economically unviable).

[71] *Id.* at 4-289 – 4-290 (90% or more of Grand Mesa coal field open to mining under all action alternatives); *id.* at 4-454 – 4-455 (due to the Grand Mesa coal field's "low coal quality and transportation constraints," no coal mining is forecast in the area for the next 20 years).

[72] *See* Table 2-3, id. at 2-379.  That table shows that the following acres (% of total acres) would be open to solar and wind under the alternatives:  Alt. A: 561,200 acres (83%); Alt. B: 34,040 acres (5%); Alt. C: 369,970 acres (55%); Alt. D: acres (34%).

BLM_0150167

management constraints to reach principle use and resource development goals. Draft EIS at 2-15. Courts have interpreted BLM's authority under the MLA as discretionary and not as an absolute mandate to lease. In fact, the Ninth Circuit held that the MLA "allows the Secretary to lease such lands, but does not require him to do so.... [T]he Secretary has discretion to refuse to issue any lease at all on a given tract . . . we affirm the district court's holding that the agencies failed to give the no action alternative meaningful consideration and thereby violated NEPA." *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1229-30 (9th Cir. 1988) (internal citations omitted). BLM's rejection of no-leasing alternatives in this RMP is unsubstantiated and relies on a very narrow and outdated interpretation of BLM's leasing and planning authority, particularly in an EIS development context. Based upon a similar set of facts and administrative record, the district court in *Wilderness Soc., Ctr. For Native Ecosystems v. Wisely* found:

> [T]he BLM's rejection of the 'no surface occupancy' alternative violated NEPA in both a technical and substantive sense. The Court finds that final September 2005 EA does not adequately explain why the 'no surface occupancy' alternative was dropped. 40 C.F.R. § 1502.14(a) requires that the EA 'briefly discuss the reasons' why an alternative was eliminated. Moreover, even if the BLM had fully articulated the reasons for excluding the 'no surface occupancy' alternative, the Court would nevertheless find that, on the present record, the decision to eliminate that alternative was arbitrary and capricious.

524 F. Supp. 2d 1285, 1311–12 (D. Colo. 2007). As is the case here, BLM has provided no basis in law or fact to dismiss outright the no-leasing alternatives outlined in the draft UFO EIS. And because BLM is conducting an EIS review for this RMP, the requirement for analyzing or dismissing no action or no-leasing alternatives is heightened. *See W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1274-75 (10th Cir. 2013) ("Regulations require both documents to incorporate a range of reasonable alternatives, but the depth of discussion and analysis required is different depending on whether the document is an EIS or an EA. For example, section 40 C.F.R. §1502.14 provides that an EIS should '[r]igorously explore . . . all reasonable alternatives,' and '[d]evote substantial treatment to each alternative' with 'detail.' *Id.* at (a)-(b).")

Thus, not only is BLM's consideration of a no-leasing alternative reasonable in light of new information, science, and national policy related to climate change, and therefore must be included in the UFO's RMP, but this information underscores the unreasonableness of the UFO's action alternatives. This is particularly true of the agency's preferred Alternative D, which leaves 371,400 acres open to coal leasing, 865,970 acres open to oil and gas leasing (draft EIS at 2-10), projects 1,271 wells will be drilled in the planning area over the planning period (draft EIS at 4-457), and commits the planning area to 3.11 MMTCO$_2$e emissions, every year, for the foreseeable future (draft EIS at 4-39). This type of status quo approach to federal lands management is unhinged from current reality and the demands of the time.

BLM_0150168

### C.    BLM Must Consider the No Fossil Fuel Leasing Alternative in Response to Threats Posed by Climate Change.

Climate change has fundamentally altered the paradigm of public lands management—a reality reflected in new national policy as well as international commitments—but ignored by the Uncompahgre draft EIS. The business-as-usual approach reflected by BLM fails to meet the needs of present and future generations—the agency's core mandate in managing public lands and minerals. 43 C.F.R. § 1702(c). Both science and common sense dictate that perpetuating a management approach which has substantially contributed to climate change is no longer sufficient. The agency must consider alternatives that are responsive to this reality, including not leasing fossil fuel minerals.

Every ton of carbon dioxide added to the atmosphere worsens climate change. So any additional oil and gas or coal production permitted on BLM land managed by the Uncompahgre field office and the combustion of those fossil fuels will worsen climate change. Due to the urgent need to protect mankind and federal public lands from the potentially devastating impacts of catastrophic global warming, BLM must consider and analyze an alternative that reduces or eliminates the number of new fossil fuel leases in the Uncompahgre area.

As noted above, an alternative is "reasonable" if it falls within the agency's statutory mandate, and meets at least a part of the agency's purpose and need. *See supra* at II.A. No-leasing and limited leasing alternatives meet both tests.

### 1.    BLM Has Legal Authority to Not Issue New Oil and Gas or Coal Leases on Public Lands in the Uncompahgre Area.

The BLM has explicit legal authority under FLPMA, the MLA and NEPA to adopt a no-leasing alternative as necessary to respond to the threats posed by climate change. BLM has broad discretion in determining when, how, and if fossil fuel resources are made available for leasing.

With regard to oil and gas, the MLA states: "All lands subject to disposition under this Act which are known or believed to contain oil or gas deposits *may* be leased by the Secretary." 30 US.C. § 226(a) (emphasis added); *see also Udall v. Tallman,* 30 U.S. 1, 4 (1965) (MLA "left the Secretary discretion to refuse to issue any lease at all on a given tract"); *Burglin v. Morton,* 527 F.2d 486, 488 (9th Cir. 1975) ("The permissive word 'may' in Section 226(a) allows the Secretary to lease such lands, but does not require him to do so."); *Pease v. Udall,* 332 F.2d 62, 63 (9th Cir. 1964) ("[T]he Mineral Leasing Act has consistently been construed as leaving to the Secretary, within his discretion, a determination as to what lands are to be leased thereunder.").

Although the MLA states that, for oil and gas, "[l]ease sales shall be held for each State where eligible lands are available at least quarterly and more frequently *if* the Secretary of the Interior determines such sales are necessary," quarterly leasing is *not required* if no lands are "eligible" and "available" due to factors including withdrawal from the operation of the MLA under FLPMA, allocation decisions under an applicable land management plan, need for additional environmental review, or exercise of Secretarial discretion. 30 U.S.C. § 226(b)(1)(A);

BLM_0150169

*see also* 43 C.F.R. § 3120.1-1; U.S. Bureau of Land Management, Oil and Gas Leasing Reform, Instruction Memorandum No. 2010-117 ("Eligible lands include those identified in 43 C.F.R. § 3120.1-1 as being available for leasing (BLM Manual 3120, Competitive Leases). They are considered available for leasing when all statutory requirements have been met, including compliance with the NEPA, appropriate reviews have been conducted, and *lands have been allocated for leasing in the RMP* (BLM Handbook H-3101-1, Issuance of Leases).") (emphasis added). Thus, a decision to allocate an area as ineligible for leasing through the planning process is contemplated by BLM's regulations, contradicting any perceived requirement that BLM must lease the area.

The Federal Onshore Oil and Gas Leasing Reform Act ("FOOGLRA")—while not altering the fundamental leasing structure of the MLA—imposed a competitive bidding requirement on all offered leases. 30 U.S.C. §§ 188, 195, 226. Critically, FOOGLRA did not repeal or alter Secretarial discretion of *whether* to offer any particular lands for lease. *See Western Energy Alliance v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013) ("Before the MLA was amended by the [FOOGLRA]...it was well established that the Secretary had extremely broad discretion and was not obligated to issue any lease on public lands…. The MLA, as amended by the Reform Act of 1987, continues to vest the Secretary with considerable discretion to determine which lands are 'to be leased' under § 226(b)(1)(A)."). As held by the Court of Appeals in *Bob Marshall Alliance v. Hodel*:

> the Mineral Leasing Act gives the Interior Secretary discretion to determine which lands are to be leased under the statute. 30 U.S.C. §226(a) (1982); *see Mountain States*, 499 F.Supp. at 391-92. We have held that the Mineral Leasing Act "allows the Secretary to lease such lands, but does not require him to do so…. [T]he Secretary has discretion to refuse to issue any lease at all on a given tract." *Burglin v. Morton*, 527 F.2d 486, 488 (9th Cir. 1975) (citing *Udall v. Tallman*, 380 U.S. 1, 4 (1965), *cert denied*, 425 U.S. 973 (1976)).

852 F.2d 1223, 1230 (9th Cir. 1988).

For coal, the Federal Coal Leasing Amendments Act ("FLCAA") provides that the Interior Secretary "is authorized" to identify tracts for leasing and thereafter "shall, in his discretion … from time to time, offer such lands for leasing …." 30 U.S.C. § 201. *See also WildEarth Guardians v. Salazar*, 859 F. Supp. 2d 83, 87 (D.D.C. 2012) ("Under the [FLCAA], the Secretary is *permitted* to lease public lands for coal mining operations after conducting a competitive bidding process" (emphasis added)). This discretion has been consistently upheld by the courts. *See, e.g., Krueger v. Morton*, 539 F.2d 235, 238-40 (D.C. Cir. 1976); *NRDC v. Hughes*, 437 F.Supp. 981, 983-85 (D.D.C. 1977). Further, the Secretary has discretion to reject lease applications on the grounds that "leasing of the lands covered by the application, for environmental or other sufficient reasons, would be contrary to the public interest." 43 C.F.R. § 3425.1-8(a)(3).

The Secretary of the Interior also has authority under FLPMA to "withdraw" an area of federal land from oil, gas or coal leasing to "maintain . . . public values" or for a "particular public purpose." FLPMA defines a withdrawal as:

> withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program . . .

43 U.S.C. § 1702(j). FLPMA further provides that Congress declares that it is the policy of the United States that "the public lands [shall] be managed in a manner that will protect the quality of … air and atmospheric … values." 43 U.S.C. § 1701(a)(8).

Under FLPMA's "multiple use and sustained yield" management directive, *id.* § 1701(a)(7), the federal government must manage public lands and resources in a manner that "takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land[,]" *id.* § 1702(3). Further, "[i]n managing the public lands the Secretary shall … take any action necessary to prevent unnecessary or undue degradation of the lands." *Id.* § 1732(b).

Under these authorities, BLM is required not only to evaluate the impacts of federal coal leasing to public lands, water, and wildlife resources, but to avoid harm to those resources whenever possible.

Accordingly, the MLA and FLPMA provide BLM the legal authority to either decide not to lease particular lands, or to withdraw large tracts from leasing.[73]

### 2.   No-Leasing or Limited Leasing Alternatives Meet the RMP's Purpose and Need.

Alternatives that prohibit or strictly limit new fossil fuel leasing meet the proposed action's purpose and need. BLM defines the RMP's purpose and need as follows:

---

[73] Even if BLM concludes that the agency lacks authority to bar new oil, gas, and coal leasing throughout the planning area, it should still consider such an alternative because it is otherwise reasonable. Federal courts hold that agencies have the duty to consider reasonable alternatives that are outside the jurisdiction of the agency or that require a change of law to implement. *See* 40 C.F.R. § 1502.14(c) (an EIS "shall" "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency"); Council on Environmental Quality, Executive Office of the President, Publication of Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations, 46 Fed. Reg. 18,026–01 at 18,027 (1981) ("An alternative that is outside the legal jurisdiction of the lead agency must still be analyzed in the EIS if it is reasonable. A potential conflict with local or federal law does not necessarily render an alternative unreasonable"); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (setting aside EIS for failure to address alternative requiring Congressional action).

BLM_0150171

The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses. It also establishes the allowable uses, management actions, and special designations that will enable the BLM to achieve the desired outcomes.

Management direction presented in the Uncompahgre RMP adheres to statutory requirements and is in accordance with principles of multiple use and sustained yield, as mandated by the provisions of the FLPMA, which establishes public land policy and sets forth the requirement for the BLM to develop, maintain, and when appropriate, revise or amend land use plans for the management of public lands. The RMP guides the Uncompahgre Field Office in the implementation of subsequent management actions within the planning area.

Draft EIS at 1-2. Barring new leases to achieve national, regional and local greenhouse gas reduction goals would constitute "broad-scale direction" for the planning area. A desired outcome for a reasonable alternative could be reducing the planning area's contribution to climate pollution. It would establish that certain uses—oil, gas, and coal production—would be allowable only on current leases, and it would enable BLM to achieve a desired outcome of reducing the chance of catastrophic climate change and increasing the chance for the U.S. to reach its greenhouse gas reduction goals set by the Paris Agreement. As discussed above, such management direction would adhere to the law and BLM's multiple use mandate.

As such, a no or limited fossil fuel leasing alternative would meet the purpose and need for the RMP.

### 3.    The Draft EIS's Justifications for Rejecting No-Leasing Alternatives Are Arbitrary and Capricious.

The draft EIS explicitly rejects providing full consideration to alternatives that would "Prohibit Fluid Mineral Leasing throughout Decision Area" and "Prohibit Coal Leasing throughout Decision Area,"[74] but the three grounds on which it does so lack legal or factual basis.

First, in rejecting both alternatives, the draft EIS asserts that all fully-analyzed alternatives propose closing *some* areas to fossil fuel leasing, and that "[r]esource values that can only be protected by prohibiting all fluid mineral leasing throughout the decision area have not been identified."[75] This is both irrelevant and untrue. It is irrelevant because BLM need not identify some other resource value that "can only be protected" by barring fossil fuel leasing. It need only determine that leasing may not be in the public interest. It is untrue because virtually every resource value in the decision area—water, recreation, human health, wildlife, the

---

[74] Draft EIS at 2-16.

[75] *Id.*

BLM_0150172

economy, air quality, etc.—are threatened by climate change, as the draft EIS itself recognizes, and as a wealth of scientific literature demonstrates.[76] In an order issued more than seven years ago, the Secretary of Interior warned that "dramatic effects of climate change … are already occurring," and that "[t]he realities of climate change require us to change how we manage the land, water, fish and wildlife, and cultural heritage … we oversee."[77] The draft RMP itself includes as one of its objectives: "Reduce impacts from climate change on soil and water resources, native vegetation and wildlife species and communities, and wildlife habitats," recognizing that climate change threatens all of those resources.[78]

Second, the draft EIS claims neither alternative would meet the purpose and need for the RMP because part of the RMP's purpose is to adopt "management direction in accordance with principles of multiple use and sustained yield."[79] As discussed above, the principle of multiple use explicitly anticipates that some use would be prohibited on public lands. Further, the keystone of multiple use is to "take[] into account the long-term needs of future generations for renewable and nonrenewable resources." 43 U.S.C. § 1702(3). There is no greater or more urgent threat to public land resources in the long-term than climate change. Taking action on climate change by limiting one use—fossil fuel extraction—to benefit all the others is the very essence of the kind of trade-off anticipated by the multiple use mandate.

Further, the Tenth Circuit Court of Appeals has explicitly rejected the argument that FLPMA's multiple use mandate requires that public lands be made available for fossil fuel extraction.

> BLM's obligation to manage for multiple use does not mean that development *must* be allowed on [a particular piece of public lands]. Development is a *possible* use, which BLM must weigh against other possible uses – including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

*New Mexico ex rel. Richardson*, 565 F.3d at 710 (emphasis in original).

Third, BLM alleges that for coal as well as oil and gas, the authority for leasing derives from the MLA, and that that law "directs field offices to apply the least restrictive management constraints necessary to achieve resource goals and objectives for principal uses of public

---

[76] *See, e.g.,* Draft EIS at 3-16 (listing impacts of climate change in the Rocky Mountain West to snowpack, drought, wildfire, insect epidemics, human health, river flows, agriculture, groundwater, vegetation and wildlife, and forests).

[77] Secretarial Order 3289, *Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources* (September 14, 2009) (attached as Exhibit 26).

[78] Draft EIS at 2-24.

[79] *Id.* at 2-16.

26

BLM_0150173

lands."[80] We have scoured the MLA and found no such provision. If BLM believes that such a provision exists, we request that it provide a citation for the public to review as soon as possible.

BLM may have been alluding to a provision of the Energy Policy Act of 2005 (Section 363) that bears resemblance to the draft EIS's language, but that provision is inapplicable for numerous reasons. The Energy Policy Act provision directs the Secretaries of Agriculture and Interior to "enter into a memorandum of understanding [MOU] regarding oil and gas leasing" on BLM and Forest Service lands, and states that the MOU "shall include provisions that ... ensure that lease stipulations are ...only as restrictive as necessary to protect the resource for which the stipulations are applied."[81] This provision, on its face, is inapplicable to coal leasing. Further, it relates to "lease stipulations," which assumes, first, that the land has been open to leasing under the applicable land management plan. And the MOU itself appears to be aimed at ensuring consistency of stipulations where leased lands cross BLM and Forest Service boundaries. Thus even if the draft EIS meant to invoke this provision, it is not a basis for failing to provide full consideration to the no-leasing alternative(s) in a resource management plan revision.

In sum, none of the justifications BLM provides for rejecting consideration of the no-leasing alternative is supported by fact or law. BLM therefore must consider in detail alternatives that bar new leasing in the Uncompahgre area.

### 4. BLM Cannot Forego Analysis of a "No-Leasing" Alternative for Coal by Instead Relying on the Programmatic EIS.

BLM's press release announcing the draft EIS's availability raises the specter that the agency will argue that the draft EIS need not discuss reducing the level of coal production or coal leasing because the proposed programmatic EIS on the federal coal program will address those issues. Any implication that the Uncompahgre RMP cannot consider or adopt an alternative that limits coal leasing is incorrect.

The press release first disclaims that the RMP will impact coal production, stating that "the plans do not authorize any specific leases or mining operations; any new coal leases would require environmental reviews specific to the particular lease application."[82] While it is true that coal leasing will require additional environmental review beyond that for the RMP, the RMP makes the initial, and arguably most significant, decision about coal leasing: whether the public lands are open to coal leasing and production at all. If the RMP closes the planning area to coal leasing, there will be no need for further environmental review.

---

[80] *Id.*

[81] 42 U.S.C. § 15922(b)(3)(C).

[82] BLM, BLM Releases Draft Management Plan for Land and Mineral Estate Managed by Uncompahgre Field Office in Southwest Colorado (May 27, 2016) at 2, available at: http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs _2.Par.5016.File.dat/BLM%20Uncompahgre%20RMP%20press%20release%205-27-16.pdf (attached as Exhibit 27).

BLM_0150174

The release also states that "[s]everal other processes, as well as compliance with Secretarial Order 3338, which orders a comprehensive review of the federal coal program, would be necessary before any additional coal leasing could occur."[83] But Secretarial Order 3338 orders a discretionary PEIS; the Secretary of Interior (who is likely to be replaced in the next few months) could revoke the order, and/or end the porous coal leasing "pause," or BLM could never complete the PEIS. The fact that BLM *may*, someday, complete a federal coal program PEIS does not eliminate BLM's duty under law to fully analyze a range of reasonable alternative concerning coal leasing and coal production in the Uncompahgre RMP EIS. While the PEIS could result in BLM amending numerous RMPs to address changes to coal leasing, whether or how that would occur is unknown. The Uncompahgre Field Office cannot dodge its responsibility to address coal production and coal leasing in the hopes that the PEIS may do the job later.

### D. *BLM Must Analyze Alternatives That Require Coal Mines in the Uncompahgre Planning Area to Mitigate Climate Impacts by Capturing or Flaring Methane Emissions.*

BLM must consider and analyze alternatives that require all coal mines operating in the Uncompahgre planning area to mitigate climate impacts by using capturing or flaring the mine's methane emissions. Several technologies to capture or flare methane are in use now, both flaring and capture have been studied or used at coal mines in the planning area, BLM has already confirmed that it has the authority to require methane capture and flaring at underground mines on public lands, and doing so here would generate significant savings on the greenhouse gas emissions that will result from BLM's plan over the next two decades.

The draft EIS for the Uncompahgre RMP, however, does not address potential climate mitigation measures and does not consider an alternative requiring methane capture, methane flaring, or any other approach to mitigate the climate impact of methane emissions from coal mines in the planning area. This is a significant oversight for an area containing some of the most methane-heavy mines in the country. BLM estimates that under each of the alternatives it considers, coal mines in the planning area will emit more than 3 million tons of $CO_2$e every year in direct emissions from operation of the mines, and BLM confirms that the vast majority of these emissions are "primarily from fugitive methane emissions." DEIS at 4-39; *see* DEIS Tables 4-9 and 4-10 at 4-38, 4-39.

### 1. BLM Has the Legal Authority to Require Mines That Operate on Public Lands to Capture or Flare Methane.

NEPA requires agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives" and to "[d]evote substantial treatment to each alternative considered." 40 C.F.R. § 1502.14(a)-(b). These alternatives must "include reasonable alternatives not within the jurisdiction of the lead agency." *Id.* at 1502.14(c). NEPA also requires agencies to identify measures to mitigate the adverse environmental impacts of their actions. 40 C.F.R.

---

[83] *Id.*

BLM_0150175

§§ 1502.14(f), 1502.16(h); *Robertson*, 490 U.S. at 351-52; *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1522 (10th Cir. 1992).

CEQ has stated: "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperation agencies."[84] Further, an agency's analysis of mitigation measures "must be 'reasonably complete' in order to 'properly evaluate the severity of the adverse effects' of a proposed project prior to making a final decision." *Colo. Envt'l Coalition v. Dombeck*, 185 F.3d 1162, 1173 (10th Cir. 1999) (quoting *Robertson*, 490 U.S. at 352). Mitigation measures "must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *City of Carmel-by-the-Sea, v. United States Dept. of Transp.*, 123 F.3d 1142, 1154 (9th Cir. 1997) (quoting *Robertson*, 490 U.S. at 353).

Moreover, both the CEQ's 2014 Draft and 2016 Final NEPA climate guidance instructs agencies to "consider the potential for mitigation measures to reduce or mitigate GHG emissions and climate change effects when those measures are reasonable and consistent with achieving the purpose and need for the proposed action."[85] The guidance specifies that mitigation measures could include, among other things, "capturing or beneficially using GHG emissions such as methane."[86]

Finally, although neither mitigation measures nor alternatives must be within an agency's jurisdiction in order to be incorporated in the agency's NEPA review (40 C.F.R. §1502.14(c)), here it is worth noting that BLM has explicitly stated that it has authority to require coal mines operating on public lands to capture methane in order to mitigate climate impacts.

In 2014, BLM issued an advance notice for proposed rulemaking ("ANPR") requesting "comments and suggestions that might assist the agency in the establishment of a program to capture, use, or destroy waste mine methane that is released into the mine environment and the atmosphere as a direct consequence of underground mining operations on Federal leases for coal and other minerals." 79 Fed. Reg. 23,923 (Apr. 29, 2014). The waste mine methane ANPR noted that the agency had the authority to require methane capture in coal leases:

> Based on the readjustment authority [30 U.S.C. § 207], the BLM may readjust lease terms to both authorize and require lessees to capture otherwise vented [waste mine methane] to use or sell. The BLM also has authority under the same section of the MLA to include such terms and conditions in new coal leases.

79 Fed. Reg. at 23,924; *see also, id.* at 23,923 (citing 30 U.S.C. § 189, which states: the Secretary "is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of' the MLA governing coal leasing; and 30 U.S.C. § 207, which states: coal leases "shall include such other terms and

---

[84] Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,031 (March 23, 1981).

[85] Final Climate Guidance at 19 (attached as Exhibit 4).

[86] *Id.*

BLM_0150176

conditions as the Secretary shall determine."). BLM also notes in the ANPR that Obama Administration climate policies support the control or elimination of methane pollution from coal mines:

> [R]educing [waste mine methane] venting would reduce emissions of a potent greenhouse gas, consistent with the President's Climate Action Plan— Strategy to Reduce Methane Emissions (March 2014) and Secretarial Order 3289, Amendment No. 1 ("Addressing the Impacts of Climate Change on America's Water, Land, and other Natural and Cultural Resources," dated February 22, 2010).

79 Fed. Reg. at 23,924.

## 2.    It Is Critically Important To Reduce Methane Emissions In Order To Limit Climate Damages.

There is increasing scientific evidence that for humanity to have a chance to keep climate change within tolerable levels (well below 2 °C above preindustrial times), governments around the world must act quickly to reduce methane emissions in particular.[87] Part of that consensus is that methane pollution is more damaging than previously thought. The Fifth Assessment Report of the IPCC in 2013 concluded that methane is a much more potent driver of climate change than scientists understood it to be just a few years ago—with a global warming potential as much as 36 times greater than carbon dioxide over a 100-year time frame, and 87 times greater than $CO_2$ over a 20-year time frame, as detailed below.

In 2013, climate scientists working with the IPCC concluded that approximately one-third of the anthropogenic climate change we are experiencing today is attributable to methane and other short-lived climate pollutants, and about thirty percent of the warming we will experience over the next two decades as a result of that year's greenhouse gas emissions will come from methane.[88] Climate scientists now recognize that avoiding catastrophic climate change will require both a long-term strategy to reduce carbon dioxide emissions and near-term action to mitigate methane and similar "accelerants" of climate change. As a 2013 article in the journal *Science* stated: "The only way to permanently slow warming is through lowering

---

[87] Bill McKibben, *Global Warming's Terrifying New Chemistry*, The Nation (Mar. 23, 2016), available at: http://www.thenation.com/article/global-warming-terrifying-new-chemistry/ (attached as Exhibit 28).

[88] Thomas Stocker *et al.,* Climate Change 2013: The Physical Science Basis, Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (2013), available at:
http://www.climatechange2013.org/images/report/WG1AR5_ALL_FINAL.pdf (attached as Exhibit 113).

emissions of $CO_2$. The only way to minimize the peak warming this century is to reduce emissions of $CO_2$ and [short-lived climate pollutants]," including methane.[89]

Because of methane's outsize role in near-term climate-forcing, the Obama Administration, and BLM in particular, have specifically targeted methane pollution. In 2013, the White House published a climate strategy that concluded: "Curbing emissions of methane is critical to our overall effort to address global climate change."[90] In 2014, the Obama Administration updated its policies, publishing a strategy to reduce methane pollution that specifically identified the need for voluntary and regulatory actions to limit methane emissions from coal mines.[91]

The need to address methane's damaging climate impacts spurred both BLM and EPA to limit fugitive methane emissions from oil and gas operations in recent years.[92] Both agencies concluded that reducing methane pollution would have significant social benefits, based in large part on the significant social cost of continuing to permit unnecessary methane releases.[93] Earlier this year, the U.S. and Canada also signed a climate agreement which calls for significant methane reductions from the oil and gas sectors.[94]

### 3. Existing Technologies Could Significantly Reduce Methane Emissions From Coal Mines in the Uncompahgre Planning Area.

Coal mine methane generally is removed from underground mines in one of two ways, and in both instances coal companies can either capture the methane and put it to beneficial use

---

[89] J.K. Shoemaker *et al., What Role for Short-Lived Climate Pollutants in Mitigation Policy?* 342 Science 1323-24 (2013), available at: http://www-ramanathan.ucsd.edu/files/pr200.pdf (attached as Exhibit 29).

[90] Executive Office of the President, The President's Climate Action Plan (June 2013) available at: https://www.whitehouse.gov/sites/default/files/image/president27sclimateactionplan.pdf (attached as Exhibit 30).

[91] The White House, Climate Action Plan: Strategy to Reduce Methane Emissions (attached as Exhibit 1).

[92] EPA, Proposed Rule, Oil and Natural Gas Sector, 80 Fed. Reg. 56,593, 56,598 (Sep. 18, 2015), available at: https://www.gpo.gov/fdsys/pkg/FR-2015-09-18/pdf/2015-21023.pdf; BLM, Proposed Rule, Waste Prevention, Production Subject to Royalties, and Resource Conservation, 81 Fed. Reg. 6616, 6617 (Feb. 8, 2016), available at: https://www.gpo.gov/fdsys/pkg/FR-2016-02-08/pdf/2016-01865.pdf.

[93] EPA, Proposed Rule, Oil and Natural Gas Sector, 80 Fed. Reg. at 56,657; BLM, Proposed Rule, Waste Prevention, 81 Fed Reg. at 6670-71; BLM, Regulatory Impact Analysis for Revisions to Onshore Oil and Gas Leasing (Jan. 14, 2016) at 32, 130-49, available at: http://www.blm.gov/style/medialib/blm/wo/Communications_Directorate/public_affairs/news_release_attachments.Par.11216.File.dat/VF%20Regulatory%20Impact%20Analysis.pdf.

[94] The White House, U.S.-Canada Joint Statement on Climate, Energy, and Arctic Leadership (Mar. 10, 2016), available at: https://www.whitehouse.gov/the-press-office/2016/03/10/us-canada-joint-statement-climate-energy-and-arctic-leadership (attached as Exhibit 31).

BLM_0150178

generating power or flare it in ways that lowers its climate impact.[95] First, methane can be removed by moving vast quantities of air, including dilute quantities of methane, through a mine's ventilation system. This is termed "ventilation air methane" (often called "VAM"). Second, methane drainage wells drilled into the coal seam from above can be used to capture, flare, or (more commonly) vent methane directly into the atmosphere. A number of underground coal mines operating on federal lands use both methods to remove methane. This includes the West Elk Mine, which has thus far resisted all voluntary incentives to either capture or flare its methane emissions and instead currently emits all of its methane directly into the atmosphere.

Studies show that flaring results in an 87% reduction in greenhouse gas emissions compared with venting methane directly into the atmosphere.[96] As a State of Colorado 2016 report found:

> From a climate change standpoint, emitting carbon dioxide is much less harmful on the environment than a mine's direct emission of methane into the atmosphere. Accordingly, flaring methane, which converts the residual gas emission to carbon dioxide, has nearly the same environmental impacts as using methane to generate electricity or heat.[97]

Further, the report documents recent changes in state and federal regulation of power that has improved the financing environment for coal mine methane mitigation and power projects. The report notes that a 2015 FERC ruling may make it easier for coal mines, including West Elk, to sell power produced from coal mine methane to utilities:

> FERC's decision could enable [coal mine methane] project developers to overcome industry barriers by securing reasonable power supply contracts with utilities in Tri-State's service area in western Colorado, where most of the "high value" [coal mine methane] emission targets are located.[98]

Even before these recent changes, methane capture and flaring had been used by mines throughout the country, and either could be or already have been used by mines within the planning area. The Colorado report concludes that there is a potential to generate 17.4 megawatts of electricity from ventilation air methane at West Elk, and concludes that it is technically

---

[95] In comments on BLM's ANPR for the coal mine methane rulemaking, Sierra Club, Center for Biological Diversity, WildEarth Guardians, Earthjustice and others provided detailed recommendations listing feasible and immediately available mine methane mitigation measures. *See* Comments by Sierra Club, et al., 1004-AE23, Waste Mine Methane Capture, Use, Sale, or Destruction, Advance Notice of Proposed Rulemaking (June 30, 2014) (attached as Exhibit 32).
[96] Daniel J. Brunner & Karl Schultz, *Effective Gob Well Flaring* 724 (1999) (attached as Exhibit 33).
[97] State of Colorado, Coal Mine Methane in Colorado, Market Research Report at 14 (Mar. 2016), available at: https://www.colorado.gov/pacific/sites/default/files/atoms/files/Coal%20Mine%20Methane%20Report%202016%20FINAL%203_2016.pdf (attached as Exhibit 34).
[98] *Id.* at 13-14.

CONSERVATION GROUPS' COMMENTS                                                                         32
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

BLM_0150179

feasible to produce 20% of that amount or 3.49 megawatts of power.[99] Additional climate savings could be secured by putting to use the massive quantities of methane vented from West Elk every day. In 2010 the mine vented nearly 3.5 million cubic feet of methane into the atmosphere a day; in 2013, that number was about 2 million cubic feet per day.[100]

Likewise, flaring is a viable alternative, both nationally and in the planning area. EPA reported in 2014 that it had identified "40 projects where flaring has been practiced, either in conjunction with energy recovery technologies or as a stand-alone mitigation technology," and that flaring projects had the advantage of being far less costly than coal mine methane energy generation projects.[101]

At the Elk Creek Mine, located just a few hundred yards west of the West Elk Mine— Oxbow Mining has developed a system for capturing and utilizing coal mine methane to generate electricity.[102] Oxbow's methane capture facilities include a flare that has been safely operated for years.[103] The Colorado Division of Mining, Reclamation and Safety ("DRMS") approved this project, including the flare, in March 2012.[104] The State of Colorado reports that the Elk Creek Mine has been safely and economically flaring coal mine methane at Elk Creek for over three years as part of a system that generates electricity and revenue:

In 2012, Vessels Coal Gas, Inc. (Vessels) officially began generating GHG emission reductions from the project under the Climate Action Reserve. Vessels had The Elk Creek Coal Mine Methane Destruction and Utilization Project verified, registering the first offset credits via the Climate Action Reserve in September of 2014 (CAR, 2015).[105]

The Elk Creek mine project demonstrates that flaring of coal mine methane in the North Fork Valley, as well as the use of such methane to generate electricity, is safe, technical feasible and economically viable.

As with the Elk Creek example, methane capture and flaring mitigation measures could similarly be implemented in ways that are economic at the West Elk Mine. In the 2011 case study attached to this comment letter, Ph.D. economist Dr. Tom Power demonstrates the

---

[99] *Id.* at Appendix D, page 38.

[100] *Id.* at 31.

[101] EPA, CMM Flaring: Technology and Case Studies (Sep. 2014) (attached as Exhibit 35).

[102] *See* letter of J. Kiger, Oxbow, to B. Bowles, Colo. Div. of Mining, Reclamation & Safety, at 1 (Oct. 14, 2011) (attached as Exhibit 36) (stating that "North Fork Energy LLC has determined the economic viability of constructing and operating a facility to utilize mine methane from Oxbow's underground mine methane collection system" and seeking agency approval for the same).

[103] *Id.* at un-paginated attachment to letter.

[104] *See* letter of J. Kiger, Oxbow to F. Kirby, Office of Surface Mining, (Mar. 15, 2012) (attached as Exhibit 37).

[105] State of Colorado, Coal Mine Methane in Colorado at 18 (attached as Exhibit 34).

BLM_0150180

economic feasibility of methane capture and flaring projects at the West Elk mine in Colorado.[106]

In 2009 BLM directed Mountain Coal Company, which owned and operated the West Elk Mine near Somerset, Colorado, to analyze the economic feasibility of capturing and using coal mine methane released into the atmosphere at West Elk. Mountain Coal Company, through a series of consultants, carried out a study but concluded that there were no available technologies that could capture methane in a way that was economically feasible.

Dr. Power's report provides a critical review of the Mountain Coal Company's economic analysis of the coal mine methane releases from the West Elk drainage wells. He concludes that there were in fact at least three economically viable means of capturing methane, two of which had been considered and rejected by Mountain Coal Company. These methane mitigation strategies include flaring, electricity generation, and conversion of methane into liquid natural gas. Notably, these alternatives became economically feasible when the economic value of reducing emissions of methane was incorporated into the analysis. The company's conclusion that there was no economically feasible solution to the methane waste problem was tied in part to its flawed assumption that there was no economic value associated with the reduction of methane emissions.

Moreover, rather than treating any pollution control technology as part of the cost of doing business, Mountain Coal Company asserted the need to make greater than a 10% return on investment in that technology in order to be considered economically feasible. While Dr. Power's analysis shows how the company could nonetheless meet that criterion, that should not be the standard for BLM's determination to consider an alternative that would require methane capture or flaring as requisite for obtaining authorization to lease federal coal within the Uncompahgre planning area.

Finally, Dr. Power's case study refutes seven critical and erroneous assumptions that Mountain Coal Company made to support its rejection of economic feasibility, including the volume of methane available for use, the cost of operating methane collection systems, the cost of electricity generation (applicable where a mine uses recovered methane to generate electricity), the length of time methane recovery equipment can be used, and treating pollution control costs as a corporate commercial investment, among others.

Given the new science documenting the urgency of reducing methane emissions to combat climate change and the failure of voluntary incentive programs to encourage methane mitigation, here BLM must consider an alternative that requires companies to utilize technologies that capture and/or flare coal mine methane pollution as a condition for authorization to mine federally-owned coal in the Uncompahgre planning area.

---

[106] Thomas Power, An Economic Analysis of the Capture and Use of Coal Mine Methane at the West Elk Mine, Somerset, Colorado (Dec. 2011) (attached as Exhibit 38).

**E.     BLM Must Explicitly Consider a Renewable Energy Alternative or Include Renewable Energy as a Priority Element in Each Alternative.**

None of the alternatives considered look specifically at renewable energy. However, a transition to clean energy is critical to achieving the national climate goals discussed in Section I of these comments.

Several statements of national policy in regulations and executive orders create an obligation for BLM to look more closely at renewable energy as a resource in the Uncompahgre Field Office planning area. As of 2010, these include:

- The Energy Policy Act of 2005 (Title II, Sec. 211), which requires the DOI to approve at least 10,000 megawatts of non-hydropower renewable energy on public lands by 2015. The President has requested that BLM produce an additional 10,000 megawatts beyond that mandated in the Energy Policy Act of 2005.

- Secretarial Order 3285, which requires the DOI to identify and prioritize specific locations best suited for large-scale renewable energy production.

- Instruction Memorandum 2007-097, Solar Energy Development Policy (BLM 2007), establishes policy for the processing of right-of-way (ROW) applications for solar energy development projects on BLM-administered lands and evaluating the feasibility of installing solar energy systems on BLM administrative facilities and projects.

- Instruction Memorandum 2006-216, Wind Energy Development Policy (BLM 2006), provides guidance on implementing the Record of Decision for the Programmatic Environmental Impact Statement (EIS) on Wind Energy Development (BLM 2005) and processing ROW applications for wind energy projects on BLM-administered lands. Instruction Memorandum 2009-043, Wind Energy Development Policy (BLM 2009b), provides updated guidance on processing ROW applications for wind energy projects on BLM-administered lands.

- Instruction Memorandum 2004-227, Biomass Utilization Strategy (BLM 2004), updated in July 2005, provides sets of goals to help focus and increase utilization of biomass from BLM lands. In June 2005, the final rule in the *Federal Register* revised the authority of 48 Code of Federal Regulations (CFR) Part 1452 by adding 1452.237-71, which is a new contract clause for removal and utilization of woody biomass generated as a result of land management service contracts whenever ecologically and lawfully appropriate. The BLM issued Instruction Memorandum 2009-120 in May 2009, which updated the contract clause for utilization for woody biomass.

The BLM recognizes that "potential solar, biomass, wind, and geothermal resources occur in various locations and forms within the planning area." DEIS 3-151. While "there are no permit applications or current leases for concentrated solar, wind generation, biomass, or geothermal energy production within the planning area," by omission this indicates that there are

BLM_0150182

existing leases and/or permits for solar photovoltaics, but the BLM has not identified their numbers or locations. DEIS 3-151.

The BLM identified photovoltaic solar resource potential as very good on all 675,700 acres of BLM-administered lands within the planning area. DEIS 3-151. For concentrating solar resource potential, 557,000 acres of BLM-administered lands within the planning area have good potential, while the remaining 118,400 acres have moderate potential. The identified high-potential areas for both concentrating solar power and photovoltaic solar resources are predominantly found in the western and central regions of the planning area. DEIS 3-151.

The BLM conducted a study of renewable energy potential for the planning area in 2010.[107] The Reasonable Foreseeable Development Scenario for solar development states that:

> The likelihood of future solar project development in the Uncompahgre RMP planning area can be estimated by considering the quality of solar resources, the acreage of lands with slope less than five percent (which is required for Central Generation Technology), existing solar projects in the area, the number of pending ROW applications within the UFO, the quality of solar resources in the UFO compared with other areas in the region, and expressions of interest by solar companies.[108]

However, the BLM failed to develop information about these factors to conduct a detailed analysis to determine the likelihood of future solar development. Nevertheless, BLM found that:

> Despite the lack of existing projects, ROW applications, low-slope lands, and interest by the solar industry at the time of this writing, changes in national policy, economic factors (such as incentives, regulation of carbon emissions), and technology could reasonably result in one commercial-scale solar project on lands within the Uncompahgre RMP planning area within the next 15 to 20 years. Additionally, as technology changes, there may be a shift toward smaller commercial or community scale solar facilities, potentially resulting in several such smaller projects by year 2030.[109]

The Renewable Energy Potential Report provides a map of solar energy potential in the planning area.[110]

The BLM found that wind energy resource potential is generally marginal to poor within the planning area. However, there are several areas that have significant wind energy potential. These include 40 acres with an outstanding wind resource (class 6), 50 acres with an excellent

---

[107] Uncompahgre Field Office, "Renewable Energy Potential Report," Resource Management Plan Revision and Environmental Impact Statement, May 2010, available at: http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs _1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf (attached as Exhibit 39).
[108] *Id.* at 3-5
[109] *Id.* at 3-11
[110] *Id.* at 3-9 (Fig. 3-1).

BLM_0150183

wind resource (class 5), and 60 acres with a good resource (class 4). The identified high-potential areas are located on the eastern side of the planning area." DEIS 3-151.

The Reasonable Foreseeable Development Scenario prepared for wind energy found that:

Due to the limited size of plots of BLM-administered land with good-quality wind resources, the lack of wind projects in the UFO or western Colorado, the lack of pending ROW applications in the UFO, and the fact that much better wind resources occur in other parts of the state, it is not expected that many, if any, commercial-scale wind energy projects would be developed within the planning area by year 2025. If such development were to occur, it is expected it would be along Cimarron Ridge in the area described above.[111]

The Renewable Energy Potential Report provides a map of wind energy potential in the planning area.[112]

Biomass energy potential was not addressed by BLM in the DEIS, yet the BLM dismissed the potential for this resource, asserting that "it is unlikely that developers would propose the construction of any biomass facilities on BLM-administered lands due to the lack of infrastructure present on BLM-administered lands that would be needed to support such facilities." DEIS 4-337. However, the Reasonable Foreseeable Development Scenario for biomass in the Renewable Energy Potential Report found that even if a biomass facility were to be sited outside of BLM-administered lands, there is potential for biomass feedstock to be sourced from the planning area. It states that:

Biomass energy production typically involves the collection of materials from BLM lands as the byproduct of other actions. In this case, a reasonable foreseeable development scenario is not applicable. However, because of some past interest in exploring the feasibility of harvesting local forests and woodlands solely for biomass, setting aside an area for biomass harvest (feedstock) could be considered as an alternative in the RMP.[113]

It further states that:

Given the flexibility in siting a power plant and the likelihood that a developer would prefer private lands over public lands, it is not expected that any biomass energy facilities would be developed in the planning area by year 2025. Biomass materials are likely to be produced from lands within the planning area during certain BLM activities such as stewardship and fire management actions.[114]

---

[111] *Id.* at 4-9
[112] *Id.* at 4-7 (Fig. 4-1).
[113] *Id.* at 5-4
[114] *Id.* at 5-7

BLM_0150184

The Renewable Energy Potential Report provides a map of biomass potential in the planning area.[115]

Contradicting the lack of in-depth analysis of renewable energy potential, the BLM assumes that "the demand for renewable energy ROWs would increase over the life of this RMP." DEIS 4-336. The basis for this assumption and the magnitude of this increase go unexplained. Yet, ultimately, BLM dismisses the potential for renewable energy development in the planning area, stating that: "Although state of Colorado policies and financial incentives are classified as favorable for renewable energy development, the UFO does not rank nationally among the top 25 BLM field offices with potential." DEIS 3-151. The DEIS further states that "the demand for renewable energy-related ROWs should increase nationally, although within the planning area, the potential for wind, solar, and biomass energy is considered to be low relative to other field offices in BLM." DEIS 3-152. This dismissive approach ignores the high potential found for solar photovoltaic resources, and future economic conditions and energy demand in the planning area. The planning area's national rank is immaterial to BLM's requirement to adequately analyze the potential for renewable energy.

A Comparative Summary of Alternatives is presented in Table 2-1. DEIS 2-8. It shows that many resource uses were considered, including coal and fluid minerals, but, other than addressing ROWs and utility corridors generally, the table plainly illustrates how the Alternatives considered fail to incorporate renewable energy as a resource. The DEIS fails to even list renewable energy development as an Alternatives Considered but Eliminated from Detailed Analysis. DEIS 2-15. On the other hand, the DEIS provides an extensive look at coal, DEIS 4-11, and fluid minerals leasing, DEIS 4-12. The Uncompahgre Field Office also conducted an extensive Reasonable Foreseeable Development Scenario report for oil and gas development in 2012.[116]

Importantly, the BLM also fails to consider the impacts of coal and oil and gas development on renewable energy resources and the potential incompatibility of these resource uses. The DEIS identifies the impacts of protections for ecological, scenic and recreational resources on wind and solar development, including exclusion and avoidance areas. DEIS 2-376. But the DEIS does not examine in depth the impact of oil and gas development on high renewable energy potential areas, simply stating generally that:

> *Implementing management for the following resources would have negligible or no impact on renewable energy and are therefore not discussed in detail*: air quality, climate, soils and water, vegetation, fish and wildlife, special status species, wild horses, wildland fire ecology and management, cultural resources, paleontological resources, lands with wilderness characteristics, forestry and woodland products, livestock grazing,

---

[115] *Id.* at 5-5 (Fig. 5-1).

[116] Uncompahgre Field Office, Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado, 2012, available at http://www.blm.gov/style/medialib/blm/co/information/nepa/uncompahgre_field/13-22_bull_mountain.Par.0265.File.dat/UncompahgreRFD_Feb_2012.pdf (attached as Exhibit 40) ("UFO RFD").

BLM_0150185

*energy and minerals*, comprehensive trails and travel management, lands and realty, renewable energy, ACECs, wild and scenic rivers, national trails and byways, watchable wildlife viewing sites, Native American tribal uses, and public health and safety.

DEIS 4-338 (emphasis added).

Nevertheless, the BLM recognizes that renewable energy facilities are usually sited based on resource potential and proximity to transmission lines or end uses. Oil and gas development that will impinge on these areas would create conflicts with renewable energy development that must be addressed. The discussion of cumulative impacts does identify the impacts of oil and gas on renewable energy development as follows, but no further analysis is conducted:

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect renewable energy are energy and minerals development.

DEIS 4-341.

Given the urgent need to transition away from fossil fuels and toward renewable energy to meet our nation's commitment to address climate change, it is incumbent upon the BLM to ensure that renewable energy development, especially photovoltaic solar development, is not precluded in the planning area by new oil and gas development. Further, the BLM is required to include a renewable energy alternative or include renewable energy as a priority element in each alternative to ensure that a thorough analysis of this important public lands resource is conducted.

## III.    The UFO Failed to Take a Hard Look at Climate Change Impacts.

If we are to stem the impacts of climate change and manage for sustainable ecosystems, not only must the BLM take a hard look at greenhouse gas ("GHG") emitted by fossil fuel leasing and development in the planning area, but the agency's decision must be reflective of the challenges we face.

The EPA has determined that human emissions of greenhouse gases are causing global warming that is harmful to human health and welfare. *See* 74 Fed. Reg. 66,496 (Dec. 15, 2009), *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act.* The D.C. Circuit has upheld this decision as supported by the vast body of scientific evidence on the subject. *See Coal. for Responsible Regulation, Inc. v. E.P.A.*, 684 F.3d 102, 120-22 (D.C. Cir. 2012). Indeed, EPA could not have found otherwise, as virtually every climatologist in the world accepts the legitimacy of global warming and the fact that human activity has resulted in atmospheric warming and planetary climate change.[117] The world's

---

[117] *See, e.g.,* INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, *The Science of Climate Change* (1995) (attached as Exhibit 47); U.S. Climate Change Science Program, *Abrupt Climate Change* (Dec. 2008) (attached as Exhibit 48); James Hansen, et. al., *Global Surface Temperature Change*, REVIEWS OF GEOPHYSICS, 48, RG4004 (June 2010) (attached as Exhibit 49); *see also,*

BLM_0150186

leading minds and most respected institutions—guided by increasingly clear science and statistical evidence—agree that dramatic action is necessary to avoid planetary disaster.[118] Greenhouse gas concentrations have been steadily increasing over the past century,[119] and our insatiable consumption of fossil fuels is pushing the world to a tipping point where, once reached, catastrophic change will be unavoidable.[120] In fact, the impacts from climate change are already being experienced, with drought and extreme weather events becoming increasingly common.[121]

---

Richard A. Muller, *Conversion of a Climate Change Skeptic*, NEW YORK TIMES, July 28, 2012 (attached as Exhibit 50) (citing Richard A. Muller, et. al., *A New Estimate of the Average Earth Surface Temperature, Spanning 1753 to 2011,* (attached as Exhibit 51); Richard A. Muller, et. al., *Decadal Variations in the Global Atmospheric Land Temperatures* (attached as Exhibit 52)).
[118] *See, e.g.,* Rob Atkinson, et. al., *Climate Pragmatism: Innovation, Resilience, and No Regrets* (July 2011) (attached as Exhibit 53); Veerabhadran Ramanathan, et. al., *The Copenhagen Accord for Limiting Global Warming: Criteria, Constraints, and Available Avenues* (Feb. 2010) (attached as Exhibit 54); UNITED NATIONS, INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, *Climate Change 2007: Synthesis Report* (2007) (attached as Exhibit 55); A.P. Sokolov, et. al., *Probablistic Forecast for Twenty-First-Century Climate Based on Uncertainties in Emissions (without Policy) and Climate Parameters,* MASSACHUSETTS INSTITUTE OF TECHNOLOGY (MIT) (Oct. 2009) (attached as Exhibit 56); UNITED NATIONS, FRAMEWORK CONVENTION ON CLIMATE CHANGE, *Report of the Conference of the Parties* (Dec. 2011) (attached as Exhibit 57); Bill McKibben, *Global Warming's Terrifying New Math,* ROLLING STONE, July 19, 2012 (attached as Exhibit 58); Elizabeth Muller, *250 Years of Global Warming,* BERKLEY EARTH, July 29, 2012 (attached as Exhibit 59); Marika M. Holland, et. al., *Future abrupt reductions in summer Arctic sea ice,* Geophysical Research Letters, Vol. 33, L23503 (2006) (attached as Exhibit 60).
[119] *See* Randy Strait, et. al., *Final Colorado Greenhouse Gas Inventory and Reference Case Projections: 1990-2020,* CENTER FOR CLIMATE STRATEGIES (Oct. 2007) (attached as Exhibit 61); Robin Segall et. al., *Upstream Oil and Gas Emissions Measurement Project,* U.S. ENVIRONMENTAL PROTECTION AGENCY (attached as Exhibit 62); Lee Gribovicz, *Analysis of States' and EPA Oil & Gas Air Emissions Control Requirements for Selected Basins in the Western United States,* WESTERN REGIONAL AIR PARTNERSHIP (Nov. 2011) (attached as Exhibit 63).
[120] *See, e.g.,* James Hansen, *Tipping Point: Perspective of a Climatologist,* STATE OF THE WILD 2008-2009 (attached as Exhibit 64); GLOBAL CARBON PROJECT, *A framework for Internationally Co-ordinated Research on the Global Carbon Cycle,* ESSP Report No. 1 (attached as Exhibit 65); INTERNATIONAL ENERGY AGENCY, *$CO_2$ Emissions from Fuel Combustion,* Highlights 2011 (attached as Exhibit 66); GLOBAL CARBON PROJECT, *10 Years of Advancing Knowledge on the Global Carbon Cycle and its Management* (attached as Exhibit 67); Meinshausen, et. al. (attached as Exhibit 15).
[121] *See, e.g.,* UNITED NATIONS, INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, *Managing the Risks of Extreme Events and Disasters to Advance Climate Change Adaptation* (2011) (attached as Exhibit 68); Aiguo Dai, *Increasing drought under global warming in observations and models,* NATURE: CLIMATE CHANGE (Aug. 2012) (attached as Exhibit 69); Stephen Saunders, et. al., *Hotter and Drier: The West's Changed Climate* (March 2008) (attached as Exhibit 70).

BLM_0150187

Renowned NASA climatologist Dr. James Hansen provides the analogy of loaded dice –
suggesting that there still exists some variability, but that climate change is making these
extreme events ever more common.[122] In turn, climatic change and GHG emissions are having
dramatic impacts on plant and animal species and habitat, threatening both human and species
resiliency and the ability to adapt to these changes.[123] According to experts at the Government
Accountability Office ("GAO"), federal land and water resources are vulnerable to a wide range
of effects from climate change, some of which are already occurring. These effects include,
among others, "(1) physical effects, such as droughts, floods, glacial melting, and sea level rise;
(2) biological effects, such as increases in insect and disease infestations, shifts in species
distribution, and changes in the timing of natural events; and (3) economic and social effects,
such as adverse impacts on tourism, infrastructure, fishing, and other resource uses."[124]

The UFO RMP/EIS acknowledges that "mounting evidence suggests" that numerous
climate change impacts are already occurring in the Mountain West and Great Plains region,
including warming temperatures, less snowfall, earlier snowmelt, more drought, greater wildfire
risk, and the expansion of grasslands and rangelands into previously forested areas. DEIS at 4-
41. The UFO RMP/EIS further acknowledges that these climate change impacts will cause
ecosystem and wildlife damage and stress in numerous ways. For example, "[I]f global climate
change results in a warmer and drier climate, increased particulate matter impacts could occur
due to increased windblown dust from drier and less stable soils." *Id.* "[E]xtinction of endemic
threatened or endangered plants may be accelerated." *Id.* And: "The population of some animal
species may be reduced." *Id.* The UFO concludes: "Increased fire activity and intensity would
increase greenhouse gas emissions, providing for a negative feedback loop. *In fact, most of the
predicted changes on a global scale have some level of a predicted negative feedback loop,
making the problem particularly vexing." Id.* (emphasis added).

However, despite these acknowledgments, the UFO fails to adequately address climate
change in its Plan or EIS, as NEPA requires, through robust consideration of reasonable

---

[122] *See,* James Hansen, et. al., *Climate Variability and Climate Change: The New Climate Dice*
(Nov. 2011) (attached as Exhibit 71); James Hansen, et. al., *Perception of Climate Change*
(March 2012) (attached as Exhibit 72); James Hansen, et. al., *Increasing Climate Extremes and
the New Climate Dice* (Aug. 2012) (attached as Exhibit 73).

[123] *See* Fitzgerald Booker, et. al., *The Ozone Component of Climate Change: Potential Effects on
Agriculture and Horticultural Plant Yield, Product Quality and Interactions with Invasive
Species,* J. INTEGR. PLANT BIOL. 51(4), 337-351 (2009) (attached as Exhibit 74); Peter Reich,
*Quantifying plant response to ozone: a unifying theory,* TREE PHYSIOLOGY 3, 63-91 (1987)
(attached as Exhibit 75).

[124] GAO Report, *Climate Change: Agencies Should Develop Guidance for Addressing the Effects
on Federal Land and Water Resources* (2007) (attached as Exhibit 76); *see also* Committee on
Environment and Natural Resources, National Science and Technology Council, *Scientific
Assessment of the Effects of Global Climate Change on the United States* (2008) (attached as
Exhibit 77); Melanie Lenart, et. al. *Global Warming in the Southwest: Projections, Observations,
and Impacts* (2007) (attached as Exhibit 78) (describing impacts from temperature rise, drought,
floods and impacts to water supply on the southwest).

BLM_0150188

alternatives, mitigation measures and standards in the plan. The UFO could take action to reduce GHG impacts from the UFO planning below the level of significance, *e.g.* by further limiting development and/or requiring further emission controls. Instead, the UFO provides a long list of excuses in the RMP/EIS as to why action is either not possible or not meaningful, such as:

- Several activities contribute to climate change beyond fossil fuel development, including fires, combustion engines, changes to the natural carbon cycle, and changes to radiative forces and reflectivity (albedo). DEIS at 4-39.
- Projected changes are likely to occur over several decades to a century and may not be "measurably discernable within the reasonably foreseeable future." *Id.* at 4-40.
- Assessing the impacts of greenhouse gas emissions on global climate change requires modeling on a global scale which is beyond the scope of the EIS/RMP analysis. *Id.*
- It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP. *Id.*
- It is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area. *Id.*

This type of dismissive approach fails to satisfy the guidance outlined in Department of Interior Secretarial Order 3226, discussed below, or the requirements of NEPA. "Reasonable forecasting and speculation is ... implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labelling any and all discussion of future environmental effects as 'crystal ball inquiry.'" *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1246 n.9 (9th Cir. 1984 (quoting *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm.*, 481 F.2d 1079, 1092 (D.C. Cir. 1973)).

The GHG emissions from BLM actions in the planning area are significant. The UFO estimates annual direct emissions from BLM actions under the Uncompahgre RMP of 3,110,000 metric tons $CO_2e$, and maximum indirect (combustion) emissions from BLM actions under the Uncompahgre RMP of 27,366,562 tons $CO_2$. *See* DEIS at 4-39 (Table 4-10); DEIS at 4-42 (Table 4-11). Such emissions would make a significant contribution to total emissions from federal lands, and contribute significantly to total U.S. emissions.[125]

The UFO should be commended for attempting to quantify indirect emissions, as well as for including methane emissions from drilling and completion in its quantification of direct emissions. However, the BLM continues to take a dismissive approach to climate change impacts. In an effort to shrug off the significance of the GHG impacts of the BLM's actions under the UFO RMP, the BLM compares the emissions from the RMP to statewide greenhouse emissions, to the carbon dioxide emissions from a power plant in Montrose County, and to total U.S. 2008 greenhouse gas emissions. DEIS at 4-39. Such comparisons are unhelpful and misleading. First, in making these comparisons, the BLM omits the substantial *indirect*

---

[125] The Wilderness Society, *Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters*, February 2012, available at: http://wilderness.org/sites/default/files/FINAL%20STRATUS%20REPORT.pdf (attached as Exhibit 24).

BLM_0150189

emissions elsewhere identified by the agency. Moreover, as explained by the CEQ, these comparisons do not reveal anything beyond "the nature of the climate change challenge itself"; i.e., the fact that many individual sources together make a big impact on the climate:

> Climate change results from the incremental addition of GHG emissions from millions of individual sources, which collectively have a large impact on a global scale. CEQ recognizes that the totality of climate change impacts is not attributable to any single action, but are exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government. Therefore, a statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA. Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact. When considering GHG emissions and their significance, agencies should use appropriate tools and methodologies for quantifying GHG emissions and comparing GHG quantities across alternative scenarios. Agencies should not limit themselves to calculating a proposed action's emissions as a percentage of sector, nationwide, or global emissions in deciding whether or to what extent to consider climate change impacts under NEPA.[126]

Meaningful consideration of GHGs is clearly within the scope of required NEPA review. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008). As the Ninth Circuit has held, in the context of fuel economy standard rules:

> The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct. Any given rule setting a CAFE standard might have an "individually minor" effect on the environment, but these rules are "collectively significant actions taking place over a period of time" *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008)(quoting 40 C.F.R. § 1508.7).

The courts have ruled that federal agencies should consider indirect GHG emissions resulting from agency policy, regulatory, planning and leasing decisions. For example, agencies cannot ignore the indirect air quality and climate change impact of decisions that would open up access to coal reserves. *See Mid States Coal. For Progress v. Surface Transp. Bd.*, 345 F.3d 520, 532, 550 (8th Cir. 2003); *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F.Supp. 3d 1174, 1197-98 (D.Colo. 2014).

---

[126] Final Climate Guidance at 9 (attached as Exhibit 4).

BLM_0150190

The CEQ Final Climate Guidance is dispositive on the issue of federal agency review of greenhouse gas emissions as foreseeable direct and indirect effects of the proposed action. 81 Fed. Reg. 51,866 (Aug. 5, 2016). The CEQ guidance provides clear direction for BLM to conduct a lifecycle greenhouse gas analysis because the modeling and tools to conduct this type of analysis are readily available to the agency:

> If the direct and indirect GHG emissions can be quantified based on available information, including reasonable projections and assumptions, agencies should consider and disclose the reasonably foreseeable direct and indirect emissions when analyzing the direct and indirect effects of the proposed action. Agencies should disclose the information and any assumptions used in the analysis and explain any uncertainties. To compare a project's estimated direct and indirect emissions with GHG emissions from the no-action alternative, agencies should draw on existing, timely, objective, and authoritative analyses, such as those by the Energy Information Administration, the Federal Energy Management Program, or Office of Fossil Energy of the Department of Energy. In the absence of such analyses, agencies should use other available information.

81 Fed. Reg. 51,866 at 16 (Aug. 5, 2016)(citations omitted).

CEQ's guidance even provides an example of where a lifecycle analysis is appropriate in a leasing context:

> The indirect effects of such an action that are reasonably foreseeable at the time would vary with the circumstances of the proposed action. For actions such as a Federal lease sale of coal for energy production, the impacts associated with the end-use of the fossil fuel being extracted would be the reasonably foreseeable combustion of that coal.[127]

The volume of potential coal, oil and gas from the new parcels available for lease in the UFO draft RMP and EIS is knowable, and the lifecycle GHG emissions impact from these new lease parcels is also quantifiable. Indeed, BLM attempts to quantify direct and indirect GHG emissions on pages 4-38 and 4-42 of the UFO RMP DEIS. However, the analysis falls short of an accurate depiction of actual climate change emissions impact for this planning area, in particular, for potential oil and gas leasing. We easily generated an accurate, site-specific impact analysis for each alternative by utilizing BLM's own Energy Policy and Conservation Act phase III Oil and Gas Inventory Model geodatabase and the Uncompahgre draft RMP DEIS alternative GIS shapefiles to establish future extractible oil and gas volume from the planning area.[128] Then,

---

[127] *Id.* at 16, n. 42 (attached as Exhibit 4).

[128] Center for Biological Diversity, Maps and volume estimates of future extractible oil and gas volume in the Uncompahgre planning area based on GIS mapping of U.S. Bureau of Land Management's EPCA Phase III Inventory GIS Data, published May 2008, *found at* http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/EPCA_III/EPCA_III_geodata.html; U.S. Bureau of Land Management, Uncompahgre Field Office draft Resource Management Plan and Environmental Impact Statement GIS mapping shapefiles, published June 3, 2016 *found at* http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html; Emails and Dropbox files from

CONSERVATION GROUPS' COMMENTS                                                                    44
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

we generated potential lifecycle greenhouse gas emissions for resultant oil and gas volumes using a peer-reviewed carbon calculator and lifecycle greenhouse gas emissions model developed by EcoShift consulting.[129] This model is not novel in its development or methodology. Numerous greenhouse gas calculation tools exist to develop lifecycle analyses, particularly for fossil fuel extraction, operations, transport and end-user emissions.[130]

For purposes of this comment letter, we have provided a complete and accurate GHG lifecycle emissions analysis for the potential volume of new leasable parcels of oil and gas for each alternative in the UFO draft RMP:[131]

| Alternative | Oil or Gas (volume units) | Volume | Tons of CO2e |
|---|---|---|---|
| A | Oil (MMbbl) | 17.479285 | 6,123,094.60 |
| A | Gas (Bcf) | 118.734952 | 8,866,471.01 |
| | | | **14,989,565.61** |
| B | Oil (MMbbl) | 14.11527 | 4,944,646.73 |
| B | Gas (Bcf) | 99.371955 | 7,404,024.85 |
| | | | **12,348,671.58** |
| B1 | Oil (MMbbl) | 13.704939 | 4,801,019.02 |
| B1 | Gas (Bcf) | 75.311941 | 5,611,358.53 |
| | | | **10,412,377.55** |
| C | Oil (MMbbl) | 17.477671 | 6,122,744.29 |
| C | Gas (Bcf) | 118.728611 | 8,846,279.30 |
| | | | **14,969,023.59** |
| D | Oil (MMbbl) | 17.469117 | 6,119,591.48 |
| D | Gas (Bcf) | 117.273097 | 8,737,795.42 |
| | | | **14,857,386.90** |

David Sinton, Geographic Information Systems Specialist, BLM Uncompahgre Field Office, re: Uncompahgre draft RMP and EIS shapefiles supplemental data (October 7, 2016 2:14 PM MT). *Methodology used*: Intersect the leasable oil and gas areas for each alternative provided in the Dropbox files and on the planning website for the Uncompahgre field office's draft RMP and EIS with the model layer from BLM's Oil and Gas Inventory Model Geodatabase. Then calculate new acreage for each polygon and multiply the "Total Oil Density" and "Total Gas Density" layers by this acreage to create volume data. The resultant maps are attached as Exhibits 79-83.

[129] *See* Mulvaney (attached as Exhibit 23).

[130] *See* Council on Environmental Quality, Revised draft guidance for greenhouse gas emissions and climate change impacts (2014), https://ceq.doe.gov/current_developments/GHG-accounting-tools.html.

[131] *See supra* note 128, Center for Biological Diversity, Maps and volume estimates.

BLM_0150192

Exhibits 79, 80, 81, 82, and 83 provide a visual representation of the potential leasable areas in each alternative for oil and gas that were used to quantify the above emissions totals.[132] For coal, the only volume information provided in the draft RMP is in the supporting document entitled the *Uncompahgre Field Office's Colorado Resource Management Plan Revision and Environmental Impact Statement Coal Resource and Development Potential Report.* BLM estimates that coal development in the Uncompahgre planning area would occur in an area encompassing about 45,280 acres and containing an estimated 829 million tons of recoverable coal reserves.[133] 829 million tons of recoverable coal reserves translates into 2.21 GtCO2e, using the same Ecoshift lifecycle emissions calculation tool referenced above. A visual representation of the potential coal leasing acreage for each alternative is provided in exhibits 84, 85, 86, and 87.[134] It is starkly evident that if BLM were to actually undertake an accurate assessment of potential lifecycle greenhouse gas emissions from each alternative, like we have demonstrated here, the significance of the greenhouse gas emissions impact from future fossil fuel development proposed in the UFO RMP would be undeniable.

Other federal agencies have begun to employ upstream, downstream and lifecycle greenhouse gas emissions analyses for NEPA review of energy-related projects.[135] For example,

---

[132] *See supra* note 128, Center for Biological Diversity Maps and volume estimates.

[133] U.S. Bureau of Land Management, Uncompahgre Resource Management Plan Revision and Environmental Impact Statement Final Coal Resource and Development Potential Report at 67 (April 2010) *available at*
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.93060.File.dat/UFO-FinalCoalRpt_04-15-10_508.pdf (attached as Exhibit 88).

[134] Center for Biological Diversity, Maps and volume estimates of future extractible coal mining acreage in the Uncompahgre planning area based on U.S. Bureau of Land Management, Uncompahgre Field Office draft Resource Management Plan and Environmental Impact Statement GIS mapping shapefiles, published June 3, 2016 *found at*
http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html. *See also id.* at 67.

[135] U.S. Bureau of Land Management, Final Supplemental Environmental Impact Statement for the Leasing and Underground Mining of the Greens Hollow Federal Coal Lease Tract, UTU-84102, 287 (Feb 2015) (attached as Exhibit 89) (BLM expressly acknowledged that "the burning of the coal is an indirect impact that is a reasonable progression of the mining activity" and quantified emissions from combustion without any disclaimer about other sources of coal. *Id* at 286. In that same EIS, BLM also acknowledged that truck traffic to haul coal would be extended as a result of the proposed lease approval, and this would generate additional emissions); *see also* U.S. Forest Service, Record of Decision and Final Environmental Impact Statement, Oil and Gas Leasing Analysis, Fishlake National Forest, 169 (Aug 2013) (attached as Exhibit 90) (Table 3.12-7: shows GHG emissions from transportation, offsite refining and end use; and total direct and indirect emissions); *see also id.* at Appendix E/SIR-2 (more detailed calculations of direct and indirect emissions); U.S. Army Corps of Engineers, Final Environmental Impact Statement: Alaska Stand Alone Gas Pipeline, Volume 2 Sec. 5.20-70–71 (Oct. 2012) (attached as Exhibit 91) (The Corps, in a 2012 EIS for an intrastate natural gas pipeline in Alaska, estimated downstream emissions from combustion of the natural gas that would be transported, and also discussed the potential for natural gas to displace other, dirtier fuel sources such as coal and oil.); U.S. Department of State, Final Supplemental Environmental Impact Statement for the Keystone

BLM_0150193

the Department of Energy has historically utilized these types of lifecycle emissions analyses in NEPA review of oil and gas infrastructure projects.[136] Courts have upheld the viability and usefulness of lifecycle analyses, and adoption of this trend is clearly reflected in the CEQ Guidance on Climate Change. 81 Fed. Reg. 51, 866 at 11 (Aug. 5, 2016) ("This guidance recommends that agencies quantify a proposed agency action's projected direct and indirect GHG emissions. Agencies should be guided by the principle that the extent of the analysis should be commensurate with the quantity of projected GHG emissions and take into account available data and GHG quantification tools that are suitable for and commensurate with the proposed agency action").[137]

---

XL Project, § 4.14.3, Appendix U (Jan. 2014) (attached as Exhibit 92) (The Department of State, as lead agency on the Keystone XL Pipeline Review conducted a relatively comprehensive life-cycle greenhouse gas analysis for the proposed pipeline, alternatives, and baseline scenarios that could occur if the pipeline was not constructed.); U.S. Environmental Protection Agency Region X, Letter from Dennis McLerran, Regional Administrator, to Randel Perry, U.S. Army Corps of Engineers Seattle District, re Gateway Pacific Projects (Jan 22, 2013) *available* at: http://www.eisgatewaypacificwa.gov/sites/default/files/content/files/EPA_Reg10_McLerran.pdf #overlay-context=resources/project-library (attached as Exhibit 93) (EPA submitted comments on the scope of impacts that should be evaluated in the coal terminal EIS that the Corps is preparing, in which it urged the Corps to conduct a lifecycle emissions analysis of GHG emissions from the coal that would be transported via the terminal.)

[136] U.S. Department of Energy National Renewable Energy Laboratory, Life Cycle Greenhouse Gas Emissions from Electricity Generation Fact Sheet, Pub No. NREL/FS-6A20-57817 (2013) *available at* http://www.nrel.gov/docs/fy13osti/57187.pdf (attached as Exhibit 95); U.S. Department of Energy National Energy Technology Laboratory Role of Alternative Energy Sources: Natural Gas Technology Assessment, Pub No. DOE/NETL- 2012/1539 (NETL, 2012) *available at* https://www.netl.doe.gov/File%20Library/Research/Energy%20Analysis/Life%20Cycle%20Ana lysis/LCA-2012-1539.pdf (attached as Exhibit 96); U.S. Department of Energy National Energy Technology Laboratory, Life Cycle Greenhouse Gas Inventory of Natural Gas Extraction, Delivery and Electricity Production, Pub No. DOE/NETL/1522 (NETL, 2011) *available at* http://www.fossil.energy.gov/programs/gasregulation/authorizations/2013_applications/sierra_cl ub_13-69_venture/exhibits_44_45.pdf (attached as Exhibit 97); U.S. Department of Energy National Energy Technology Laboratory, Life Cycle Analysis: Natural Gas Combined Cycle (NGCC) Power Plant, Pub No DOE/NETL-403-110509 (Sep 10, 2012) (NETL, 2010) *available at* https://www.netl.doe.gov/energy-analyses/temp/FY13_LifeCycleAnalysisNaturalGasCombinedCycle(NGCC)PowerPlantFinal_06 0113.pdf (attached as Exhibit 98).

[137] *High Country Conservation Advocates v. United States Forest Serv.*, 52 F. Supp. 3d 1174 (D. Colo. 2014) (Court held that the agencies' failure to quantify the effect of greenhouse gas (GHG) emissions from the mining lease modifications was arbitrary in violation of NEPA because the social cost of carbon protocol tool existed for such analysis under 40 C.F.R. § 1502.23 but the agencies did not provide reasons in the final EIS for not using the tool; and that the agencies' decision to forgo calculating the foreseeable GHG emissions was arbitrary in light of their ability to perform such calculations and their decision to include a detailed economic analysis of the benefits.); *see also Dine Citizens Against Ruining Our Env't v. United States Office of Surface*

BLM_0150194

The extreme urgency of the climate crisis requires BLM to pursue all means available to limit the climate change effects of its actions, beginning with a robust and accurate quantitative analysis of potential greenhouse gas emissions from fossil fuel development proposed in the planning area. Any emissions source, no matter how small, is potentially significant, such that BLM should fully explore mitigation and avoidance options for all sources.

BLM is, at the end of the day, responsible for the management of nearly 700 million acres of federal onshore subsurface minerals.[138] How the BLM chooses to manage this resource has significant climate implications. Indeed, "the ultimate downstream GHG emissions from fossil fuel extraction from federal lands and waters by private leaseholders could have accounted for approximately 23% of total U.S. GHG emissions and 27% of all energy-related GHG emissions."[139] This suggests that "ultimate GHG emissions from fossil fuels extracted from federal lands and waters by private leaseholders in 2010 could be more than 20-times larger than the estimate reported in the CEQ inventory, [which estimates total federal emissions from agencies' operations to be 66.4 million metric tons]. Overall, ultimate downstream GHG emissions resulting from fossil fuel extraction from federal lands and waters by private leaseholders in 2010 are estimated to total 1,551 [million metric tons of $CO_2$ equivalent ("MMTCO$_2$e")]."[140]

To suggest that the agency does not, here, have to meaningfully analyze and mitigate GHG pollution from activity authorized by the RMP and EIS, is to suggest that the collective 700 million acres of subsurface mineral estate is not relevant to protecting against climate change. This sort of flawed, reductive thinking is problematic, and contradicted by the agency's very management framework that provides a place-based lens to account for specific pollution sources to ensure that the broader public interest is protected. Therefore, even though climate change emissions from the Alternatives may look minor when viewed in isolation, when considered cumulatively with all of the other GHG emissions from BLM-managed land, they become significant and cannot be ignored.

### A.    The Draft EIS Fails To Address Whether the Alternatives Considered Are Consistent with National Climate Goals.

NEPA regulations require agencies to account for conflicts with existing laws and requirements imposed for the protection of the environment when engaging in environmental

---

*Mining Reclamation & Enf't*, 82 F. Supp. 3d 1201, 1213-1218 (D. Colo. 2015) (Court held that the agency failed to adequately consider the reasonably foreseeable combustion-related downstream effects of the proposed action. Also held that that combustion emissions associated with a mine that fed a single power plant were reasonably foreseeable because the agency knew where the coal would be consumed).

[138] *See* DOI-BLM, *Mineral and Surface Acreage Managed By BLM,* available at: http://www.blm.gov/wo/st/en/info/About_BLM/subsurface.html.

[139] Stratus Consulting, prepared for: THE WILDERNESS SOCIETY, *Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters* (Feb. 1, 2012) (attached as Exhibit 24).

[140] *Id.*

BLM_0150195

analysis.[141] In addition, Executive Order 12,866 also requires that "[e]ach agency shall avoid regulations that are inconsistent [or] incompatible" with the regulations of any other agency.[142]

Any subsequently prepared NEPA document must disclose whether each of the proposed plan alternatives would interfere with efforts to meet federal and international greenhouse gas emission reduction targets.[143] As explained by the CEQ in its Final Climate Guidance, federal agencies evaluating the climate impacts of their decisions should "discuss relevant approved federal, regional, state, tribal, or local plans, policies, or laws for GHG emission reductions or climate adaptation to make clear whether a proposed project's GHG emissions are consistent with such plans or laws."[144]

Here, the BLM must address whether the proposed alternative plans, and the additional coal, oil and gas combustion they facilitate, are in line with the goals of President Obama's Clean Power Plan. The Clean Power Plan calls for reducing power sector greenhouse gas emissions to 30 percent below 2005 levels by 2030.[145] EPA's Regulatory Impact Analysis for the proposed Clean Power Plan estimates that the plan will reduce coal-fired electricity generation by 16 to 22 percent in 2020 and by 25 to 27 percent in 2030.[146]

Additionally, in November 2014 the President announced a joint U.S.-China agreement aimed at reducing climate pollution that calls for even more aggressively cutting net greenhouse gas emissions to 26-28 percent below 2005 levels by 2025.[147] Further, the BLM must address whether the plan alternatives accord with the Paris Agreement, which represents an international agreement to limit global temperatures to 1.5-2°C below pre-industrial levels.

As part of its analysis, BLM should disclose to the public the clearly competing interests at stake: one the one hand, meeting these national and international climate emission reduction targets set by EPA, the President, or agreed upon by 195 nations; and on the other, the fact that the plan alternatives will likely benefit only one or two coal companies and a handful of oil and gas operators.

---

[141] *See* 40 C.F.R. § 1506.2(d) (EISs must discuss inconsistencies with state law); 40 C.F.R. § 1508.27(b)(10) (when examining whether actions are "significant" within the meaning of NEPA, agencies must consider whether the action "threatens a violation of Federal, State, or local law or *requirements imposed for the protection of the environment*.").

[142] Executive Order 12,866 (Sep. 30, 1993), Sec. 1(b)(10).

[143] *See* 40 C.F.R. § 1506.2(d); 40 C.F.R. § 1508.27(b)(10).

[144] Final Climate Guidance at 28 (attached as Exhibit 4).

[145] EPA, Fact Sheet, Clean Power Plan (2014) (attached as Exhibit 44).

[146] EPA, Regulatory Impact Analysis for the Proposed Carbon Pollution, Guidelines for Existing Power Plants and Emission Standards for Modified and Reconstructed Power Plants, 3-26 to 3-29 (June 2014), available at: http://www2.epa.gov/sites/production/files/2014-06/documents/20140602ria-clean-power-plan.pdf (attached as Exhibit 45).

[147] White House Fact Sheet, U.S.-China Joint Announcement on Climate Change and Clean Energy Cooperation (November 11, 2014), available at: https://www.whitehouse.gov/the-press-office/2014/11/11/us-china-joint-announcement-climate-change (attached as Exhibit 46).

BLM_0150196

The draft EIS does not appear to acknowledge the existence of the Clean Power Plan or the Paris Agreement—hardly surprising given that the climate analysis appears to have been completed in 2010. The Draft EIS therefore fails to acknowledge any conflict between the alternative plans and the CPP or the nation's commitments under the Paris accord. However, it is clear that each alternative, which projects up to 27 million tons of $CO_2$ emissions from coal mined in the plan area for the foreseeable future, totaling up to half a billion tons over 20 years, may conflict with the CPP, which intends to limit pollution from power plants that is predicted and cut coal combustion in the U.S. by nearly a quarter by 2030. The potential conflict with the Paris Agreement, which pledges the U.S. to reduce GHG emissions by 26-28% from 2005 levels by 2025, on a path to reduce those emissions by 80% by 2050, is also readily apparent. BLM's failure to acknowledge this conflict is arbitrary and capricious, in violation of NEPA and Executive Order 12,866.

### B.    The Draft EIS Relies on Outdated Data Concerning Climate Change.

NEPA mandates that EISs contain "high quality" information and "[a]ccurate scientific analysis" sufficient to "help public officials make decisions that are based on understanding environmental consequences." 40 C.F.R. § 1500.1(b), (c). Moreover, agencies have a duty to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." 40 C.F.R. § 1502.24. NEPA therefore prohibits BLM from relying on outdated data.

Federal courts have long held that agency reliance on data that is stale or inaccurate invalidates environmental review. *See, e.g.*, *Northern Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085-86 (9th Cir. 2011) (ten-year old survey data for wildlife "too stale" thus reliance on it in EIS was arbitrary and capricious); *Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005) (six year-old survey data for cutthroat trout was "too outdated to carry the weight assigned to it" and reliance on that data violated NEPA); *Seattle Audubon Soc. v. Espy*, 998 F.2d 699, 704-05 (9th Cir. 1993) (reliance on "stale scientific evidence" regarding owl population data without adequate discussion of scientific uncertainty violated NEPA).

Yet, in several important respects that relate to climate and socioeconomic impacts, the draft EIS uses stale, outdated evidence. BLM must rely on the latest information on climate change, coal mining, and economics in any subsequently prepared NEPA document.

The understanding of, and scientific literature concerning, the climate crisis, and the steps necessary to prevent catastrophic warming, have evolved dramatically since 2010. Since then, the IPCC has revised its assessment of climate change, the Paris Agreement has been signed, the Clean Power Plan adopted (and temporarily stayed by the Supreme Court), and numerous studies have demonstrated that significant additional measures will be required to achieve the United States' goals of reducing greenhouse gases from 2005 levels by 26-28% by 2025 and set the United States on the pathway to achieve reductions of 80 percent or more by 2050.[148]

---

[148] White House, Fact Sheet: U.S. Reports its 2025 Emissions Target to the UNFCCC (Mar. 21, 2015) (attached as Exhibit 99), available at: https://www.whitehouse.gov/the-press-

BLM_0150197

The draft EIS appears to rely largely on data concerning climate change from 2010 or earlier, ignoring the wealth of new policies meant to guide BLM, and new studies and data emphasizing the worsening nature of the climate threat. Such ignorance is impermissible.

For example, the description of climate change in draft EIS Chapter Three relies on three studies: an EPA study published in 2007, and two state studies published in 2008. Draft EIS at 3-14 – 3-16. The EIS's description of projected climate change in Colorado relies on a single study from 2008. *Id.* at 3-26 – 3-27, 3-57. To affirm that impacts from climate change are already occurring, the EIS relies on a 2009 report. *Id.* at 3-93.

The information in Chapter Four of the EIS is also outdated. It describes potential greenhouse gas emissions based on EPA reports from 2010 – 2012, and dismisses the relative level of direct GHG emissions from activities in the planning area based on a discredited EPA letter from 2008—drafted during waning days of the climate-denying Bush administration. *Id.* at 4-38 – 4-40. To discuss the cumulative impacts of climate change in the project area, BLM relies on studies published between 1996 and 2010. *Id.* at 4-125.

As detailed above, there is abundant new data concerning the nature of climate change, the contribution of anthropogenic sources to that change, the impacts of that change, and the need for urgent action to address the climate crisis.[149] No new information since 2012 is included in or cited by the draft EIS. Any subsequently prepared NEPA document must include and refer to this data.

### C.   The Draft EIS Fails to Address New Information Concerning the Impacts of Climate Change in the Uncompahgre Area.

The draft EIS omits significant new information concerning climate impacts to the North Fork Valley. In February, the GMUG National Forest published its Final EIS and proposed decision for the Spruce Beetle Epidemic and Aspen Decline Management Response ("SBEADR") project on the GMUG National Forest, including lands directly adjacent to, and in most cases upstream of, BLM lands in the Uncompahgre field office. The Forest Service developed SBEADMR to respond to "the ongoing spruce beetle epidemic and sudden aspen decline that is occurring across a broad landscape" of the forest.[150] To address the epidemics, the GMUG National Forest proposes to log aspen and spruce-fire stands in certain parts of the forest "to reduce hazards to the public and infrastructure, salvage dead and dying timber, [and]

---

office/2015/03/31/fact-sheet-us-reports-its-2025-emissions-target-unfccc (last viewed Oct. 27, 2016).

[149] *See supra* at Section I.

[150] U.S. Forest Service, Final Environmental Impact Statement, Spruce Beetle Epidemic and Aspen Decline Management Response (Feb. 2016) at iii (hereafter "SBEADMR Final EIS"), available at:
http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/96623_FSPLT3_2720775.pdf (excerpts attached as Exhibit 100).

reestablish forest cover and increase resiliency in green stands."[151] The Forest Service admits that climate change is a key factor in both the ongoing spruce beetle epidemic and sudden aspen decline, and predicts significant changes to forest structure over the next 44-84 years.

The Final EIS states that "documented climate trends" are "creating conditions conducive to beetle outbreaks" impacting spruce-fir forests.[152] Relying on earlier studies, the Final EIS concludes that the western U.S. will suffer a catastrophic loss of spruce-fir habitat in the next 45-85 years due to climate change:

> Results [of climate studies] projected a 47% drop in suitable spruce habitat in the decade around 2060, and a 72% loss of spruce habitat by 2090. Only 23% of habitat was expected to persist in place through 2100.[153]

The SBEADMR Final EIS looks specifically at the likely impacts of climate change on spruce-fir forests within the GMUG National Forest as a result of climate change, and concludes they will be similarly dramatic:

> The Rehfeldt (2015) model (Figure 3) projects little remaining habitat for spruce on the Uncompahgre Plateau, and substantial loss in the West Elk Mountains, east of Grand Mesa, and south of the Black Canyon/Blue Mesa Reservoir. Much of the Grand Mesa and low elevations elsewhere are in the threatened zone…. About 22% of the current spruce distribution is classified as lost and 58% is classified as threatened, meaning that *it is conceivable that 80% of current spruce distribution may not continue into the next century*.[154]

In addition to the impacts on spruce-fir forests, the Forest Service recognizes that climate change is a key factor causing sudden aspen decline (SAD).

> Due to expected increases in dry weather [attributable to climate change], especially drought, more cases of SAD are expected. Suitability for aspen in the Southern Rockies is expected to deteriorate rapidly through the rest of the century. Rehfeldt's (2015) bioclimatic model (Figure 4) and studies on climatic change point to a complete loss of aspen in some lower-elevation sites and on south slopes ….[155]

As with spruce forests, the Final EIS concludes that climate change will eliminate vast swathes of aspen forest across the GMUG National Forest.

---

[151] *Id.*

[152] *Id.* at 7 ("several documented climate trends across the western United States [are] creating conditions conducive to beetle outbreaks" including "[m]ore precipitation in the form of rain, and less in the form of snow;" "[e]arlier peaks in streamflow; and "[e]arlier spring onset." "These climate patterns, together with disturbance such as windthrow and vast areas of susceptible forest, are supporting huge [beetle] outbreaks across the landscape.").

[153] *Id.* at 9.

[154] *Id.* at 10 (emphasis added).

[155] *Id.* at 16.

BLM_0150199

> Results of the bioclimatic model show that 52% of the current aspen distribution
> on the GMUG is in the lost category and 42% is in the threatened category,
> meaning it is conceivable that *94% of current aspen distribution may not continue
> into the next century* (Figure 5).... Little suitable habitat is expected to remain on
> the Uncompahgre Plateau, the southern and eastern fringes of the Grand Mesa,
> and the western West Elks. The remainder is largely threatened, as persistent
> habitat is mostly limited to the southeastern portion of the GMUG.[156]

Maps in the Final EIS display the likely near-elimination of spruce and aspen on the
Uncompahgre Plateau and in the North Fork Valley in the next 44 years.[157]

The loss of wildlife, water, and recreation that these adjacent and nearby forests protect
on National Forest lands will have cross-boundary and downstream impacts on BLM lands in the
Uncompahgre field office. Aspen and spruce on BLM lands in the area will also likely be
similarly impacted.[158] Forest loss will have economic and fiscal impacts on local communities
and the state. Yet the Uncompahgre draft EIS mentions aspen and spruce decline only in passing,
without addressing the cascading impacts to natural resources in the Uncompahgre field office
(other than lamenting the potential impacts to the logging industry).[159] Further, the draft EIS fails
to use the same models and information that the Forest Service relied on earlier this year to
attempt to understand the potential impacts of the climate crisis on forests and other ecosystems
on BLM land in the same area. BLM must address these deficiencies in any subsequently
prepared NEPA document.

The RMP and EIS also fails to address adequately the fact that wildfire in the western
U.S., including within the Uncompahgre Field Office, is becoming more frequent and damaging
larger landscapes. For example, the New York Times published a story on its front page on
April 13 reporting that fire season in the United States and elsewhere is starting earlier and
lasting longer; that fires are burning with more intensity; and that firefighting is eating up an
ever-increasing amount of the Forest Service's budget.[160]

The article cites numerous experts, including Forest Service researchers, who all agree
that the fire season in the U.S., from Arizona to Alaska, is getting longer.

And one of the key drivers in the lengthening fire season is climate change. As the Times
puts it: "A leading culprit is climate change. Drier winters mean less moisture on the land, and

---

[156] *Id.* at 17 (emphasis added).

[157] *Id.* at 10, 17 (maps).

[158] *See* Uncompahgre Draft EIS at 3-111; 3-20; 3-90 (describing forest type in BLM fire
management units).

[159] *Id.* at 4-232 (acknowledging that aspen decline and spruce beetle epidemics may impact the
timber industry); *id.* at 4-480 (same).

[160] M. Richtel and F. Santos, The New York Times, "Wildfires, Once Confined to a Season,
Burn Earlier and Longer" (Apr. 13, 2016) (attached as Exhibit 191).

BLM_0150200

warmer springs are pulling the moisture into the air more quickly, turning shrub, brush and grass into kindling."[161]

The story quotes Secretary of Agriculture Tom Vilsack: "We take our job to protect the public seriously, and recently, the job has become increasingly difficult *due to the effects of climate change*, chronic droughts and a constrained budget environment in Washington."[162] Secretary Vilsack also noted that seven firefighters died and 4,500 homes burned in wildfires in 2015.[163] The article states that the Forest Service spent more than half of its entire budget on firefighting last year, "at the expense of programs aimed at minimizing the risk of fires in the wild, such as planned burns of overgrown patches."[164]

More recently, a study published in the Proceedings of the National Academy of Sciences concludes that human-caused climate change nearly doubled the area impacted by forest fire in the West over the last thirty years. The study found that human-caused warming in the period 2000 to 2015:

> contributed to 75% more forested area experiencing high … fire-season fuel aridity and an average of nine additional days per year of high fire potential.… We estimate that human-caused climate change contributed to an additional 4.2 million ha [10.4 million acres] of forest fire area during 1984–2015, nearly doubling the forest fire area expected in its absence.… [A]nthropogenic climate change has emerged as a driver of increased forest fire activity and should continue to do so .…[165]

For comparison to the estimate that climate change contributed to over ten million acres of forest fire area since 1984, we note that the total acreage of national forest land in Colorado is about 13 million acres. The study concludes that climate-caused wildfire will worsen in the future, and will tax the Forest Service's budgets even further:

> The growing ACC [anthropogenic climate change] influence on fuel aridity is projected to increasingly promote wildfire potential across western US forests in the coming decades and pose threats to ecosystems, the carbon budget, human health, and fire suppression budgets that will collectively encourage the development of fire-resilient landscapes. Although fuel limitations are likely to eventually arise due to increased fire activity, this process has not yet substantially disrupted the relationship between western US forest fire area and aridity. We expect anthropogenic climate change and associated increases in fuel

---

[161] *Id.* at PDF page 1.

[162] *Id.* at PDF page 2 (emphasis added).

[163] *Id.*

[164] *Id.* at PDF page 3.

[165] J. Abatzoglou & A. Williams, Impact of anthropogenic climate change on wildfire across western US forests, Proceeding of the National Academy of Sciences (Oct. 2016) at 1 (attached as Exhibit 192).

CONSERVATION GROUPS' COMMENTS                                                           54
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

BLM_0150201

aridity to impose an increasingly dominant and detectable effect on western US
forest fire area in the coming decades while fuels remain abundant....[166]

A recent study published in the Proceedings of the National Academy of Sciences
(PNAS) bolsters this finding, concluding that human-caused climate change nearly doubled the
area impacted by forest fire in the West over the last thirty years. The study found that human-
caused warming in the period 2000 to 2015:

> contributed to 75% more forested area experiencing high ... fire-season fuel
> aridity and an average of nine additional days per year of high fire potential....
> We estimate that human-caused climate change contributed to an additional 4.2
> million ha [10.4 million acres] of forest fire area during 1984–2015, nearly
> doubling the forest fire area expected in its absence.... [A]nthropogenic climate
> change has emerged as a driver of increased forest fire activity and should
> continue to do so ....[167]

For comparison to the estimate that climate change contributed to over ten million acres
of forest fire since 1984, we note that the total acreage of national forest land in Colorado is
about 8.4 million acres. The PNAS study concludes that climate-caused wildfire will worsen in
the future, and will tax federal fire budgets even further:

> The growing ACC [anthropogenic climate change] influence on fuel aridity is
> projected to increasingly promote wildfire potential across western US forests in
> the coming decades and pose threats to ecosystems, the carbon budget, human
> health, and fire suppression budgets that will collectively encourage the
> development of fire-resilient landscapes. Although fuel limitations are likely to
> eventually arise due to increased fire activity, this process has not yet
> substantially disrupted the relationship between western US forest fire area and
> aridity. We expect anthropogenic climate change and associated increases in fuel
> aridity to impose an increasingly dominant and detectable effect on western US
> forest fire area in the coming decades while fuels remain abundant....[168]

In sum, climate change will continue to alter ecosystems and consume agency funding in
the area of the Uncompahgre Field Office. To take the required hard look at the proposed RMP
and alternatives, BLM must consider both the fact that: (1) fires are likely to become more
frequent and burn more terrain in the UFO area; and (2) BLM's actions in managing the UFO
that contribute to fire-worsening climate change will burn through the agency's budget.

The EIS must also disclose, and the RMP should address the fact that a new study
predicts that climate change is likely to worsen drought across the Uncompahgre Field Office. A
peer-reviewed article in *Science Advances* published in October estimates that the chance of a
"megadrought" – a period of "aridity as severe as the worst multiyear droughts of the 20th
century [that] persist[s] for decades" – in the American Southwest before the end of the century

---

[166] *Id.* at 4 (citations omitted).

[167] *Id.* at 1.

[168] *Id.* at 4 (citations omitted).

BLM_0150202

is between 70% and 99%, in large part due to human-caused climate change.[169] The study projects that:

> business-as-usual emissions of greenhouse gases will drive regional warming and drying, regardless of large precipitation uncertainties. We find that regional temperature increases alone push megadrought risk above 70, 90, or 99% by the end of the century, even if precipitation increases moderately, does not change, or decreases, respectively. Although each possibility is supported by some climate model simulations, the latter [99% risk] is the most common outcome [of the models used]. An aggressive reduction in global greenhouse gas emissions cuts megadrought risks nearly in half.[170]

Local effects of climate change are already being felt by farmers, including lower-than-typical snow pack, warmer and earlier spring thaws, earlier bud break, warmer summertime highs, and warmer falls.[171] Agriculture in the North Fork Valley relies exclusively on the timely availability of clean irrigation water, which depends on a healthy, vegetated watershed.[172] Multiple years of drought combined with increasing temperatures have stressed the North Fork watershed in multiple ways.[173] Sudden Aspen Decline, a drought- and temperature-induced dieback of aspen groves, has caused a decline in the shadowing protecting the snowpack in mid- to late spring.[174] The resultant early runoff occurs at a time when farms are not able to use the runoff water to irrigate.[175] The reservoirs fill as they should but are tapped earlier because the runoff water is no longer available when crops are ready to use it.[176] Various beetle infestations threaten to decimate the conifer cover of higher elevations in the watershed, again contributing to snowpack degradation and early runoff.[177] The level of fossil fuel development contemplated by the RMP/EIS alternatives would further exacerbate the degradation of the watershed by road construction, well pad development, pipeline construction, and dust.[178]

Orchard growers are at the greatest risk from climate change due to warmer winters and late frosts.[179] Fruit trees require chill hours, which are hours between the temperatures of 32-45 degrees Fahrenheit.[180] Winter hours above 60 degrees are

---

[169] T. Ault *et al.*, Relative impacts of mitigation, temperature, and precipitation on 21st-century megadrought risk in the American Southwest, Science Advances (Oct. 5, 2016) at 1 (attached as Exhibit 193).

[170] *Id.*

[171] Interview with Brent Helleckson, Owner of Helleckson Vineyards and Stone Cottage Cellars.

[172] *Id.*

[173] *Id.*

[174] *Id.*

[175] *Id.*

[176] *Id.*

[177] *Id.*

[178] *Id.*

[179] *Id.*

[180] *Id.*

BLM_0150203

subtracted from the totals.[181] A deciduous plant goes dormant in the cold winter to
protect itself from the cold.[182] The plant needs to stay dormant while the weather is
freezing and then know how soon after it gets above freezing it can safely start
growing.[183] It must do it late enough so it doesn't get frozen back by a late frost but early
enough so it can get a full season of growth and fruiting in before it must go dormant for
the next year.[184] The plant has a process, refined over millennia of evolution, that tells it
when to start growing in the spring, and that process accounts for the amount of above-
freezing temperature (the number of chilling hours) it needs.[185] If winters are too warm,
the tree development will be damaged.[186] If frost comes late and when the trees are in
bloom, an entire year's harvest can be lost.[187] Late frosts decimated crop production for
many orchardists two years in a row in the North Fork Valley, in 2014 and 2015.[188]

Hunters and anglers are also experiencing the effects of climate change. The first
and second week of September used to consistently be the time of year to hunt for elk.[189]
Since the early 2000s, the temperatures during that period in September have been too
high for elk to remain at an elevation of approximately 9000 feet.[190] Elk now migrate
higher, to 12,500- 13,000 feet, seeking cooler temperatures.[191] Spring runoff is occurring
earlier and finishing earlier, which makes it difficult to fish during peak runoff.[192] It is
also causing concern over spawning, because as the water flow diminishes at the end of
runoff, the flow is often not high enough to enable fish eggs to hatch, according to local
wildlife professionals.[193]

All of the alternatives considered in the draft EIS would increase emissions over a
baseline year and would continue "business-as-usual" indirect climate emissions from coal
produced in the Somerset coal field and burned. The draft EIS must disclose the potential for a
megadrought, and disclose that BLM's alternatives will only increase the chances of such an
event. Further, BLM must consider planning standards and goals that address the potential for a
megadrought and measures that can be taken to reduce the impacts of such a drought on fish,
wildlife, ecosystems, soils, etc. *See also* Section IV.C.2., discussing the impact of climate change
on stream flows in the Upper Colorado River Basin.

---

[181] *Id.*
[182] *Id.*
[183] *Id.*
[184] *Id.*
[185] *Id.*
[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] Interview with Mike Drake, sportsman and bow hunter.
[190] *Id.*
[191] *Id.*
[192] *Id.*
[193] *Id.*

CONSERVATION GROUPS' COMMENTS
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

BLM_0150204

**D.     The Draft EIS Relies on Outdated Coal Production and Employment Data.**

Since 2010, much has changed in national and international coal markets in general, and to mines in the North Fork Valley in particular. Some of the most significant local developments include:

- the closure of the Elk Creek mine in 2013, its demolition in 2016, and the layoff of virtually all of its employees;[194]
- the idling of the Bowie No. 2 mine in February 2016, and the layoff of most of its employees;[195]
- layoffs and production declines at the West Elk mine in 2016;[196] and
- the announcement that the Nucla coal mine, and the power station it serves, will close in 2022.[197]

As a result of these changes, and changes in the coal market more broadly, employment and production in the Somerset coal field has fallen dramatically since 2010:

**Coal Production and Employment, Somerset Coal Field and Colorado, 2010 and 2016^**

|  | Coal production, Somerset coal field mines (million tons) | Coal production, Colorado (million tons) | % of total Colorado coal production from Somerset coal mines | Coal employment, Somerset coal field* | Coal employment, Colorado | % of total Colorado coal employment from Somerset coal mines |
|---|---|---|---|---|---|---|
| 2010 | 9.96 | 25.21 | 39.5% | 923 | 2,041 | 45.2% |
| 2016 (through Sept.) | 2.49 | 8.78 |  | 196 | 1,228 | 16.0% |
| 2016 (annualized) | 3.32 | 11.71 | 28.2% | 196 |  |  |

^ All coal production and employment figures derived from Colorado Division of Reclamation, Mining and Safety website (http://mining.state.co.us/Reports/Reports/Pages/Coal.aspx).

* Employment figures are calculated from the last reported date of the period: Dec. 2010 for 2010, and September 2016 for this year.

---

[194] D. Webb, Oxbow shifts to permanent shutdown of Elk Creek Mine, Grand Junction Sentinel (April 30, 3016), available at: http://www.gjsentinel.com/news/articles/oxbow-shifts-to-permanent-shutdown-of-elk-creek-mi (attached as Exhibit 101).

[195] D. Webb, Bowie idles Paonia mine, Grand Junction Sentinel (Feb. 26, 2016), available at: http://www.gjsentinel.com/breaking/articles/bowie-idles-paonia-mine (attached as Exhibit 102).

[196] D. Webb, West Elk Mine undergoes layoffs, Grand Junction Sentinel (June 2, 2016), available at: http://www.gjsentinel.com/breaking/articles/ west-elk-mine-undergoes-layoffs (attached as Exhibit 103).

[197] G. Harmon, Power station slated to close; coal mine shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016), available at: http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (attached as Exhibit 104).

CONSERVATION GROUPS' COMMENTS                                                      58
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

BLM_0150205

Coal production and employment in the Somerset coal field have dropped by nearly three-quarters since 2010, with the only operating Somerset field mine likely to produce less than four million tons this year. The Somerset field's relative share of the state's coal production has fallen by a third, and its share of employment has dropped by nearly two-thirds. These changes are likely the result of the reduction in coal exports, competition between thermal coal and natural gas, solar, and wind in the utility sector, and regulations limiting haze pollution from coal combustion in national parks and limiting poisonous mercury pollution from power plants. The potential for regulations further internalizing the climate costs of coal (such as the Clean Power Plan) and the increasingly competitive price of cleaner wind and solar make it unlikely that coal markets will mount a long-term recovery.

Falling coal production and employment in the Somerset coal fields demonstrates that draft EIS's data—most of it from 2010 or before—is stale, and that its assumptions and conclusions are misplaced. For example, much of the draft EIS's coal data derive from a BLM document entitled "Coal Resource and Development Potential," dated April 2010. *See, e.g.*, Draft EIS at 4-13 (citing the report to reach conclusions about predicted coal production). That document in turn bases its production estimates in part on 2010 projections from the Energy Information Administration (EIA) which then predicted, among other things, that demand for coal from the Rocky Mountain Region would increase and that "coal will remain the dominant energy source for electricity generation."[198] That prediction has already proven wrong, as natural gas is likely to overtake coal as the dominant source this year.[199] EIA's 2016 report now projects continued coal plant retirements with or without implementation of the Clean Power Plan, and about a 35% decline in coal consumption by 2040 if the CPP is implemented.[200] The sharpest declines in coal production under the CPP, will occur in the Western coal region, and EIA estimates coal production in the West will fall even without the CPP.[201] While EIA's Annual Energy Outlook may not be the most reliable predictor of coal production—after all, U.S. coal production this year is already down 20% from 2015 levels—BLM cannot rely on a document that has been revised each year since 2010 and that in 2016 reaches significantly different conclusions than the 2010 report.

Similarly, the draft EIS relies on BLM's July 2010 "Socioeconomic Baseline Assessment Report," which, for coal resources, again relies on outdated information (coal data from 2009 and before) that paints an overly rosy picture of the predicted importance and value of coal to the local economy. *See* Draft EIS at 3-178. Nearly every data point and prediction in this report as it relates to coal production and employment is obsolete given the additional six-plus years of data

---

[198] BLM, Coal Resource and Development Potential Report (April 2010) at 65 (attached as Exhibit 88).
[199] Energy Information Administration, Natural gas expected to surpass coal in mix of fuel used in U.S. power generation in 2016 (Mar. 16, 2016), and available at: http://www.eia.gov/todayinenergy/detail.php?id=25392# (attached as Exhibit 105).
[200] Energy Information Administration, Annual Energy Outlook 2016 with projections to 2040 (2016) at MT-17 – MT-18; MT-22, available at: http://www.eia.gov/forecasts/aeo/pdf/0383(2016).pdf.
[201] *Id.* at MT-31.

available to the agency in a time of turmoil for the coal industry in general and for North Fork mines in particular. Any subsequently-prepared NEPA document must include up-to-date data concerning coal markets, and coal production and coal employment in the area.

The following data and conclusions in the draft EIS are stale given the changes in the local coal industry:

- The draft EIS uses production averages from June 2014 and June 2015, Draft EIS at 3-126, although an additional 13 months of data exist demonstrating a steep drop in production since last year (due to Bowie #2's idling and West Elk's production drop). The draft also assumes a coal production rate of "9 to 11 million tons per year," *id.* at 4-255, which is well above the permitted level, let alone the current production rate, of the West Elk mine, the only remaining operating mine in the area. *See also id.* at 4-289 – 4-290 ("Over the last six years, total yearly production for these underground coal mines has been between 8 and 11 million tons, and is expected to remain about the same").

- The draft EIS states that projections from the "Energy Information Administration indicate that demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal," citing 2010 data. *Id.* at 3-126 – 3-127. The draft also cites EIA data indicating coal production economic contributes nearly $400 million annually based on the local production of over 12 million tons of coal from the region. *Id.* at 3-193 – 3-194. *See also* BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-18 (containing same assumptions and conclusions). In 2016, the Somerset field provides less than a third of Colorado's coal, and production has fallen by two-thirds. Coal's "economic contribution" as well as taxes and royalties have thus likely dramatically fallen as well.

- The draft EIS alleges that "Locally, coal mining is also an important industry." Draft EIS at 3-180. *See also id.* at 3-172 ("Coal mining represents a key component of the economy in this unit"); BLM, Socioeconomic Baseline Assessment Report (July 2010) at 6-1 (stating that "[c]oal mining represents a key component of the economy" of the North Fork Valley."). Given the precipitous drop in coal employment in the last several years, BLM must reevaluate the truth of these statements.

- The draft EIS bases its socioeconomic analysis on assumptions about the level of coal production that appear to be far higher than current levels.

  "Approximately 13.8 million tons of coal would be mined in the planning area in Delta, Gunnison, and Montrose Counties in 2012, with approximately 13.1 million tons of that being federal coal (see Table 4-89 [2012 Coal Extraction Levels]). Coal contributions to employment and income from these uses would annually provide approximately 2,018 jobs and over $175 million in labor income, with these figures increasing to 50,350 jobs and over $3.5 billion in labor income over the expected 20 year lifespan of the RMP."

BLM_0150207

Draft EIS at 4-468. Similarly optimistic assumptions are contained in the BLM's 2010 Socioeconomic Baseline report. *See* BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-6; 2-17. These critical economic assumptions are outdated and inaccurate because it is extremely unlikely that mines in the region will produce 13.2 million tons of coal ever again. The annualized rate for coal production in 2016 based on data through September is under four million tons, and employment has dropped by roughly 80% since 2012. Nearly 1,000 miners worked three active coal mines in the Somerset field in 2012;[202] today that number is less than 200. The draft EIS's conclusions concerning jobs and labor income over the life of the RMP are thus inaccurate, and likely to mislead the public, agency decision-makers, and local governments.

- The draft EIS describes the Bowie #2 mine as "actively producing" although the mine is now idle, and further suggests that the Elk Creek mine may someday resume production. Draft EIS at 3-125. *See also id.* at 4-11 to 4-12 (making similar statements); *id.* at 4-258 to 4-259 (same). But Bowie #2 is idle, and Elk Creek is permanently closed.

- The draft EIS also appears to assume that the New Horizon mine will continue to produce coal at its current rate indefinitely, *id.* at 4-289 – 4-290, although its operator agreed to close it in 2022, six years or fewer into the plan's life.

- The draft EIS makes assumptions about coal mining rates to address potential impacts to natural resources. For example, the draft EIS predicts an upswing in impacts to some resources because coal mining, among other activities is "becoming more active once again and energy and mineral resources are expected to increase over time, likely resulting in increasing demand for extraction." *Id.* at 3-41. While some mineral extraction may be increasing, coal is falling compared to historic levels. Similarly, to address air quality impacts, the draft EIS assumes that "Coal mine production remains unchanged from base year rates with any drop off in existing mine production replaced by production from future mine development in the area." *Id.* at 4-28. In the base year of 2011 (*see id.* at 4-20), Colorado produced 27 million tons of coal, more than twice as much as it is likely to produce this year, and Somerset coal field mines produced 11 million tons, about three times their likely output this year. The draft EIS's assumption that coal production rates are "unchanged" from 2011 is false.

The fact that the draft EIS relies on stale data is not a mere flyspeck. It is significant because it skews BLM's analyses of economic values and climate pollution, among many others. Assuming an inflated value for coal production and employment gives a false impression of the relative importance and staying power of this industry as it enters a decline from which there is no foreseeable recovery, given not only competition from cheaper energy sources but the need for the nation – and the world – to end coal combustion if we are to avoid the worst impacts of

---

[202] See DRMS coal production and employment data for 2012, available at: http://mining.state.co.us/SiteCollectionDocuments/2012RevisedDetail2013.pdf.

BLM_0150208

climate change and comply with international and national climate commitments. It also prevents
BLM from considering how to prepare for and transition from fossil fuel production in the
region.

### E.    BLM Must Quantify the Severity of Harm from Greenhouse Gas Emissions

#### 1.    Social Cost of Carbon Protocol

Research conducted by the National Research Council has confirmed that the negative
impacts of energy generation from fossil fuels are not represented in the market price for such
generation.[203] In other words, failing to internalize the externalities of energy generation from
fossil fuels—such as the impacts to climate change and human health—has resulted in a
market failure that requires government intervention. Executive Order 12866 directs federal
agencies to assess and quantify such costs and benefits of regulatory action, including the effects
on factors such as the economy, environment, and public health and safety, among others. *See*
Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993).[204] The Ninth Circuit has ruled
that agencies must include the climate benefits of a significant regulatory action in federal cost-
benefit analyses to comply with EO 12866.

> [T]he fact that climate change is largely a global phenomenon that includes
> actions that are outside of [the agency's] control ... does not release the agency
> from the duty of assessing the effects of its actions on global warming within
> the context of other actions that also affect global warming.

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th
Cir. 2008) (quotations and citations omitted); *see also Border Power Plant Working Grp. v.
U.S. Dep't of Energy*, 260 F. Supp. 2d 997, 1028-29 (S.D. Cal. 2003) (finding agency failure
to disclose project's indirect carbon dioxide emissions violates NEPA).

In response, an Interagency Working Group ("IWG") was formed to develop a
consistent and defensible estimate of the social cost of carbon—allowing agencies to
"incorporate the social benefits of reducing carbon dioxide ($CO_2$) emissions into cost-benefit
analyses of regulatory actions that impact cumulative global emissions."[205] In other words, SCC

---

[203] *See, e.g.,* National Research Council, *Hidden Costs of Energy: Unpriced Consequences of
Energy Production and Use* (2010) (attached as Exhibit 106); Nicholas Muller, et. al.,
*Environmental Accounting for Pollution in the United States Economy*, AMERICAN ECONOMIC
REVIEW (Aug. 2011) (attached as Exhibit 107); *see also* Generation Investment Management,
*Sustainable Capitalism,* (Jan. 2012) (attached as Exhibit 108) (advocating a paradigm shift to "a
framework that seeks to maximize long-term economic value creation by reforming markets to
address real needs while considering *all* costs and stakeholders.").

[204] *See also* Executive Order 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011) (reaffirming the
framework of EO 12866 and directing federal agencies to conduct regulatory actions based on
the best available science).

[205] *See* Interagency Working Group on the Social Cost of Carbon, United States Government,
*Technical Support Document: Technical Update on the Social Cost of Carbon for Regulatory
Impact Analysis – Under Executive Order 12866* (May 2013) at 2 (hereinafter 2013 TSD)
(attached as Exhibit 109).

BLM_0150209

is a measure of the benefit of reducing greenhouse gas emissions now and thereby avoiding costs in the future.[206] The charts below depict, (A) dramatically increasing damages from global warming over time, as well as (B) the social cost of these carbon emissions based on 2013 TDS values.[207]



**CARBON'S COSTLY LEGACY**

Economic models of climate change project that resulting damage worldwide (A) will increase with future emissions and may cost several per cent of global gross domestic product (GDP) with the warming expected by 2100. Uncertainties in future socio-economics, emission rates and climate impacts result in a range of estimates of the social cost of carbon, which is also affected by the choice of 'discount rate' used to convert future harms into today's money (B).

Leading economic models all point in the same direction: that climate change causes substantial economic harm, justifying immediate action to reduce emissions.[208] The interagency process to develop SCC estimates—originally described in the 2010 interagency technical support document ("TSD"), and updated in 2013 and 2015—developed four values based on the average SCC from three integrated assessment models (DICE, PAGE, and FUND), at discount rates of 2.5, 3, and 5 percent,[209] as well as a fourth value, which represents the 95th percentile

---

[206] *See* Ruth Greenspan and Dianne Callan, *More than Meets the Eye: The Social Cost of Carbon in U.S Climate Policy, in Plain English,* WORLD RESOURCES INSTITUTE (July 2011) (attached as Exhibit 110).

[207] *See* Richard Revesz, *et al., Global warming: Improve economic models of climate change,* NATURE 508, 173-175 (April 10, 2014) (attached as Exhibit 111).

[208] *See id.* at 174.

[209] The choice of which discount rate to apply—translating future costs into current dollars—is critical in calculating the social cost of carbon. The higher the discount rate, the less significant future costs become, which shifts a greater burden to future generations based on the notion that the world will be better able to make climate investments in the future. The underlying assumption of applying a higher discount rate is that the economy is continually growing. The IWG's "central value" of three percent is consistent with this school of thought—that successive generations will be increasingly wealthy and more able to carry the financial burden of climate impacts. "The difficultly with this argument is that, as climate change science becomes increasingly concerning, it becomes a weaker bet that future generations will be better off. If they are not, lower or negative discount rates are justified." WRI Report, at 9 (attached as Exhibit 110). "Three percent values an environmental cost or benefit occurring 25 years in the future at about half as much as the same benefit today." *Id.*

BLM_0150210

SCC estimate across all three models at a 3 percent discount rate, and demonstrates the cost of
worst-case impacts.[210] These models are intended to quantify damages, including health impacts,
economic dislocation, agricultural changes, and other effects that climate change can impose on
humanity. While these values are inherently speculative, a recent GAO report has confirmed the
soundness of the methodology in which the IWG's SCC estimates were developed, therefore
further underscoring the importance of integrating SCC analysis into the agency's
decisionmaking process.[211] In fact, certain types of damages remain either unaccounted for or
poorly quantified in IWG's estimates, suggesting that the SCC values are conservative and
should be viewed as a lower bound.[212]

The updated interagency SCC estimates for 2020 are $12, $42, $62 and $123 per ton of
$CO_2$ (in 2007$).[213] The IWG does not instruct federal agencies which discount rate to use,
suggesting that the 3 percent discount rate ($42 per ton of $CO_2$) as the "central value," but
further emphasizing "the importance and value of including all four SCC values[;]" i.e., that
the agency should use the range of values in developing NEPA alternatives.[214]

In 2014, the district court for the District of Colorado faulted the Forest Service for
failing to calculate the social cost of carbon, refusing to accept the agency's explanation that
such a calculation was not feasible. *High Country Conservation Advocates v. U.S. Forest
Service*, 52 F.Supp.3d 1174 (D.Colo. 2014) (a decision the agency decided not to appeal, thus
implicitly recognizing the importance of incorporating a social cost of carbon analysis into
NEPA decisionmaking). Notably, the *High Country Conservation Advocates* decision applies
to the same geographic area (the North Fork Valley), and to the same coal field (the Somerset),
that is at issue here. In his decision, Judge Jackson identified the IWG's SCC protocol as a tool
to "quantify a project's contribution to costs associated with global climate change." *Id.* at
1190.[215] To fulfill this mandate, they agency must disclose the "ecological[,] ... economic,

---

[210] *See* 2013 TSD at 2 (attached as Exhibit 109).

[211] GAO-14-663, *Social Cost of Carbon* (July 24, 2014).

[212] *See* Peter Howard, et al., *Omitted Damages: What's Missing From the Social Cost of Carbon*,
ENVIRONMENTAL DEFENSE FUND, INSTITUTE FOR POLICY INTEGRITY, NATURAL RESOURCES
DEFENSE COUNCIL (March 13, 2014) (attached as Exhibit 112) (providing, for example, that
damages such as "increases in forced migration, social and political conflict, and violence;
weather variability and extreme weather events; and declining growth rates" are either missing or
poorly quantified in SCC models).

[213] *See* 2013 TSD (July 2015 Revision) at 3 (attached as Exhibit 109) (including a table of
revised SCC estimates from 2010-2050). To put these figures in perspective, in 2009 the British
government used a range of $41-$124 per ton of $CO_2$, with a central value of $85 (during the
same period, the 2010 TSD used a central value of $21). WRI Report at 4 (attached as Exhibit
110). The UK analysis used very different assumptions on damages, including a much lower
discount rate of 1.4%. The central value supports regulation four times stringent as the U.S.
central value. *Id.*

[214] *See* 2013 TSD at 12 (attached as Exhibit 109).

[215] *See also id.* at 18 (noting the EPA recommendation to "explore other means to characterize
the impact of GHG emissions, including an estimate of the 'social cost of carbon' associated
with potential increases in GHG emissions.") (citing Sarah E. Light, *NEPA's Footprint:
Information Disclosure as a Quasi-Carbon Tax on Agencies*, 87 Tul. L. Rev. 511, 546 (Feb.
2013)).

BLM_0150211

[and] social" impacts of the proposed action. 40 C.F.R. § 1508.8(b). Simple calculations applying the SCC to GHG emissions from this project offer a straightforward comparative basis for analyzing impacts, and identifying very significant costs.[216]

Notably, according to the IPCC, the 20-year GWP for methane—which is not only the planning lifespan of the RMP, but the relevant timeframe for consideration if we are to stem the worst of climate change—is 87.[217] Here, BLM's reliance on the outdated 1996 100-year horizon of 21 significantly underestimates the magnitude of emissions. DEIS 4-38. Accordingly, if the updated GWP of 87 for methane is applied to 135,082 tons of methane emissions per year under BLM's Preferred Alternative D, direct emissions from the activities increase dramatically from 2,836,722 MTCO$^2$e to 11,752,134 MTCO$^2$e. When added to emissions of carbon dioxide and nitrous oxide, *true* direct planning area **emissions increase to 12.03 MMTCO$_2$e** (up from 3.11 MMTCO$_2$e), or a **social cost of carbon of \$505,186,962** when applying a median value of \$42.

Critically, however, these costs only relate to *direct* planning area emissions. BLM also includes, in table 4-11, annual indirect emissions from BLM actions resulting from the combustion of coal, oil and gas, which together total 27,366,562 MMTCO$_2$e each year. When combined with direct emissions, this totals **39,394,823 MMTCO$_2$e** of annual BLM related emissions, or a **social cost of \$1,654,582,566 per year from BLM** related actions.

Instead of considering these costs, the agency remarkably concludes that "it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area" and later that "[t]he projected UFO planning area emissions are a fraction of the EPA's modeled source and are shorter in duration, and therefore it is reasonable to conclude that these activities would have no measurable impact on the climate." DEIS at 4-40.

As noted by Judge Jackson, the SCC protocol provides a tool to quantify the costs of these emissions. *See High Country Conservation Advocates,* 52 F.Supp.3d at 1190. By failing to consider the costs of GHG emissions from the Proposed Action, the agency's analysis effectively assumes a price of carbon that is \$0. *See id.* at 21 (holding that although there is a "wide range of estimates about the social cost of GHG emissions[,] neither the BLM's economist nor anyone else in the record appears to suggest the cost is as low as \$0 per unit. Yet by deciding not to quantify the costs as all, the agencies effectively zeroed out the cost in its quantitative analysis."). The agency's failure to consider the SCC is arbitrary and capricious, and ignores the explicit directive of EO 12866.

Further, BLM's failure to undertake a social cost of carbon analysis here is also arbitrary

---

[216] It is important to note that, although the 2010 IWG SCC protocol did not address methane impacts, the 2013 IWG Technical Update explicitly addresses methane impacts. Thus, it is appropriate to calculate a SCC outcome that takes into account the full CO$_2$e emissions associated with the proposed leasing.

[217] *See* INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, *Working Group I Contribution to the IPCC Fifth Assessment Report Climate Change 2013: The Physical Science Basis,* at 8-58 (Table 8.7) (Sept. 2013) (attached as Exhibit 113).

CONSERVATION GROUPS' COMMENTS                                                                                65
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

BLM_0150212

because the Forest Service in November 2015 undertook an initial social cost of carbon analysis for coal to be made available by the Colorado Roadless Rule coal mine exception. That analysis – in which BLM is a cooperating agency – involves coal from the *very same coal field* (the Somerset) and some of the *very same mines* (including the West Elk mine) that are at issue in the Uncompahgre Field Office RMP.[218] While the Colorado Roadless Rule's social cost of carbon analysis has many flaws,[219] it is evidence that this metric can be, and is being, used by BLM and other agencies to address the climate impacts of some of the same coal from the same mines at issue in the Uncompahgre draft RMP.

An agency must "consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 107 (1983) (quotations and citation omitted). This includes the disclosure of direct, indirect, and cumulative impacts of its actions, including climate change impacts and emissions. 40 C.F.R. § 1508.25(c). The need to evaluate such impacts is bolstered by the fact that "[t]he harms associated with climate change are serious and well recognized," and environmental changes caused by climate change "have already inflicted significant harms" to many resources around the globe. *Massachusetts v. EPA*, 549 U.S. 497, 521 (2007); *see also id.* at 525 (recognizing "the enormity of the potential consequences associated with manmade climate change."). Among other things, the agency's analysis must disclose "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity[,]" including the "energy requirements and conservation potential of various alternatives and mitigation measures." 42 U.S.C. § 4332(c); 40 C.F.R. § 1502.16(c). As explained by CEQ, this requires agencies to "analyze total energy costs, including possible hidden or indirect costs, and total energy benefits of proposed actions." 43 Fed. Red. 55,978, 55,984 (Nov. 29, 2978); *see also* Executive Order 13514, 74 Fed. Reg. 52,117 (Oct. 5, 2009) (requiring government agencies to disclose emissions information annually from direct and indirect activities). Failing to perform such analysis undermines the agency's decisionmaking process and the assumptions made.

Moreover, BLM measures the planning area's GHG emissions against a baseline of national and/or global GHG emissions—thereby marginalizing the Proposed Actions contribution to our climate crisis while concluding the agency is powerless to avoid or mitigate such impacts. CEQ warns against such a comparison, providing:

> Government action occurs incrementally, program-by-program and step-by-step, and climate impacts are not attributable to any single action, but are exacerbated by a series of smaller decisions, including decisions made by the government. Therefore, the statement that emissions from a government action or approval represent only a small fraction of global emissions is more a statement about the

---

[218] Forest Service, Rulemaking for Colorado Roadless Areas, Supplemental Draft Environmental Impact Statement (Nov. 2015) at 98-101, available at http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd485194.pdf (last viewed Nov. 1, 2016).
[219] *See, e.g.*, letter of Environmental Defense Fund *et al.* to Forest Service *et al.* (Jan. 15, 2016) (attached as Exhibit 234); T.M. Power *et al.*, Comments on the Rulemaking for the Colorado Roadless Areas Supplemental Draft Environmental Impact Statement (Jan. 14, 2016) (attached as Exhibit 235).

CONSERVATION GROUPS' COMMENTS                                                                66
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

nature of the climate change challenge, and is not an appropriate basis for deciding whether to consider climate impacts under NEPA. Moreover, these comparisons are not an appropriate method for characterizing the potential impacts associated with ta proposed action and its alternatives and mitigation.

CEQ Guidance at 9. CEQ also provides that "[i]t is essential ... that Federal agencies not rely on boilerplate text to avoid meaningful analysis, including consideration of alternatives or mitigation." *Id.* at 5-6 (citing 40 C.F.R. §§ 1500.2, 1502.2). Indeed, the EPA has also cautioned "against comparing GHG emissions associated with a single project to global GHG emission levels" because it erroneously leads to a conclusion that "on a global scale, emissions are not likely to change" as a result of the project.[220] Applying the SCC, as provided above, takes these abstract emissions and places them in concrete, economic terms. It also allows the agency to easily perform the cost-benefit analysis envisioned by EO 12866, as well as BLM's own policy. Specifically, Instruction Memorandum No. 2013-131 (Sept. 18, 2013) is reflective of the BLM's attempt to internalize the costs of such emissions:

> All BLM managers and staff are directed to utilize estimates of nonmarket environmental values in NEPA analysis supporting planning and other decision-making where relevant and feasible, in accordance with the attached guidance. At least a qualitative description of the most relevant nonmarket values should be included for the affected environment and the impacts of alternatives in NEPA analyses....

> Nonmarket environmental values reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions and therefore lack prices. Examples include the perceived benefits from hiking in a wilderness or fishing for subsistence rather than commercial purposes. The economic methods described in this guidance provide monetary estimates of nonmarket values. Several non-economic, primarily qualitative methods can also be used to characterize the values attributed to places, landscapes, and other environmental features. Guidance on qualitative methods for assessing environmental values, including ethnography, interviews, and surveys, is in preparation.

> Ideally, economic analysis for resource management should consider all relevant values, not merely those that are easy to quantify. Utilizing nonmarket values provides a more complete picture of the consequences of a proposed activity than market data alone would allow. The BLM's Land Use Planning Handbook, Appendix D encourages inclusion of information on nonmarket values, but does not provide detail.

The agency simply cannot continue to ignore its obligation to consider the costs of GHG emissions in its decisionmaking, as it has done here.

---

[220] *See* Light, 87 Tul. L. Rev. 511, 546.

BLM_0150214

Nor can the agency tout the benefits of coal, oil and gas development without similarly disclosing the costs. *See* 40 C.F.R. § 1502.23. For example, BLM identifies "tax impact from coal extraction in the planning area" as a benefit, with revenues "associated with the sales and income earned from extraction and transportation of coal." DEIS at 4-465. Although not quantified in the same way, BLM also assumes that "increased production of oil and gas on BLM-administered lands would result in a comparable increase in contributions to local counties and communities." *Id.* Accordingly, BLM relies on figures in Table 4-90 (Baseline Regional Economic Impacts for Coal), to suggest a substantial net economic benefit, including $556 million in annual output and $175 million in labor income. DEIS at 4-469. Setting aside that this economic data is based on wildly optimistic assumptions on future coal production and employment for 2,518 people—with a current reality of coal mines being shut down and present employment of around 250 people—this type of misleading and one-sided analysis is expressly forbidden under NEPA. *See Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446-47 (4th Cir. 1996) ("it is essential that the EIS not be based on misleading economic assumptions); *Sierra Club v. Sigler*, 695 F.2d 957, 979 (5th Cir. 1983) (agency choosing to "trumpet" an action's benefits has a duty to disclose its costs). Moreover, even assuming BLM's optimistic economic benefits, it still pales when compared to the social costs of planning area greenhouse gas emissions, totaling $1,654,582,566 per year.

## 2.    Social Cost of Methane Protocol

In August 2016, the Interagency Working Group ("IWG") provided an update to the social cost of carbon technical support document,[221] and, for the first time, adopted a similar methodology for evaluating the climate impact of each additional ton of methane and nitrogen oxide emissions.[222] Given its recent endorsement by the IWG, BLM should use the social cost of methane to quantify the expected climate damage caused by the extraction and combustion of coal, oil, and natural gas extracted under BLM's draft plan for the Uncompahgre planning area. Similar to the social cost of carbon, the social cost of methane provides a standard methodology that allows state and federal agencies to quantify the social benefits of reducing methane emissions through actions that have comparatively small impacts on cumulative global emission levels. The social cost of methane is intended to "offer a method for improving the analyses of

---

[221] Interagency Working Group, Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 (August 2016), available at https://www.whitehouse.gov/sites/default/files/omb/inforeg/scc_tsd_final_clean_8_26_16.pdf (last visited November 1, 2016) (attached as Exhibit 324). The August 2016 update added some clarifying information around uncertainties in the modeling that supports the social cost of carbon, but did not adjust the damages values (the costs) published in the 2015 update.

[222] Interagency Working Group, Addendum to Technical Support Document on Social Cost of Carbon for Regulatory Impact Analysis under Executive Order 12866: Application of the Methodology to Estimate the Social Cost of Methane and the Social Cost of Nitrous Oxide (August 2016), available at https://www.whitehouse.gov/sites/default/files/omb/inforeg/august_2016_sc_ch4_sc_n2o_addendum_final_8_26_16.pdf (last visited October 30, 2016) (attached as Exhibit 325.

BLM_0150215

regulatory actions that are projected to influence [methane or nitrogen oxide] emissions in a manner consistent with how [carbon dioxide] emission changes are valued."[223] Like the social cost of carbon, the social cost of methane is presented as a range of figures across four discount rates; it is based on results from three integrated assessment models; displayed in dollars per metric ton of emissions; and increases over time because emissions become more damaging as their atmospheric concentrations increase.[224] Like the social cost of carbon, the social cost of methane has been subject to peer review and will be updated by the IWG to ensure it reflects the best available scientific information.[225] The IWG estimates that each additional ton of methane emitted in 2020 will cause between $540 and $3,200 dollars (measured in $2007).[226]

BLM should use the best tools available to it in order to fully analyze and disclose the climate impacts of its proposal. Given that both the social cost of carbon and social cost of methane have been adopted by the IWG, which includes a dozen federal offices and agencies including the Department of Interior, BLM should use these tools to evaluate the climate impacts of its draft plan for the Uncompahgre planning area, which, as noted, anticipates generating more than half a billion tons of CO2-e over the next two decades.

### F.   *Methane Emissions and Waste*

Methane emission rates can differ quite dramatically from one oil and gas field to the next, and, depending on the type of mitigation and emission controls employed, natural gas production emissions have been found to average 5.4%—ranging anywhere from 1% to 12% of production.[227] A series of peer-reviewed studies have shown leakage rates for individual sources in the natural gas supply chain and in Western basins to be much higher than that estimated by EPA.[228]

---

[223] *Id*. at 3.

[224] *Id*. at 7.

[225] *Id*. at 3.

[226226] *Id*. at 7.  For comparison purposes, the current social cost of carbon values for CO2 emissions in 2020 range from $120 to $123 per ton.

[227] A.R. Brandt et al., *Methane Leaks from North American Natural Gas Systems*, 343 Science 733 (finding average methane emissions from natural gas production of 5.4%) (attached as Exhibit 114)

[228] *See, e.g.,* David T. Allen et. al., *Measurements of Methane Emissions at Natural Gas Production Sites in the United States,* Proceedings of the National Academy of Sciences, August. 19, 2013 (finding emissions as low as 1.5% of production at select sites) (attached as Exhibit 115); Austin L. Mitchell et al., *Measurements of Methane Emissions from Natural Gas Gathering Facilities and Processing Plants: Measurement Results*, 49 Environ. Sci. Technol. 3219 (2015) (finding leakage rates from gas gathering and processing infrastructure eight times greater than EPA estimates) (attached as Exhibit 116); David T. Allen et al., *Methane Emissions from Process Equipment at Natural Gas Production Sites in the United States: Pneumatic Controllers*, 49 Environ. Sci. Technol. 633, 636, 638 (2014) (finding leakage rates from pneumatic controllers three times greater than EPA estimates) (attached as Exhibit 117); David R. Lyon, et al., *Aerial Surveys of Elevated Hydrocarbon Emissions from Oil and Gas Production Sites*, 50 Environ. Sci. Technol. 4877 (2016) (finding high leak rates from storage tanks)

BLM_0150216

Assuming a lower-bound leak rate of 1%—which is approximately one-third lower than the EPA estimate of methane emissions in the Inventory of U.S. GHG Emissions and Sinks: 1990-2011[229]—methane emissions from gas production by the proposed action could represent a meaningful contribution of emissions over the life of the developed field.[230] Assuming an upper-bound leak rate of 12%—the high end of the rate found in a 2012 study using air sampling over the neighboring Uinta Basin[231]—methane emissions from gas could be truly significant indeed. Although there is substantial variability between the 1% and 12% emission leak rates—and, even without specific data from the proposed action, we can assume leakage somewhere between these two extremes—even at the low end emissions would not be trivial.

The BLM discloses estimated annual methane emissions from the proposed action to be 135,083 metric tons. *See* DEIS (Table 4-9). However, BLM does not disclose what leak rate this calculation represents. Furthermore, the BLM underestimates the climate impact of these emissions. Specifically, BLM uses a global warming potential (GWP) of 21 over a 100-year time horizon (meaning that methane is assumed to be 21 times as potent as $CO_2$ over a 100-year time horizon). DEIS at 4-38. This assumption is derived from a 1996 report from the Intergovernmental Panel on Climate Change ("IPCC"). However, the 100-year GWP for methane was updated by the IPCC in a 2013 Report to reflect that methane is 36 times as potent as $CO_2$. Additionally, the IPCC's new research has calculated that methane is 84 times as potent as $CO_2$ over a 20-year time horizon.[232] Furthermore, recent peer-reviewed science demonstrates

---

(attached as Exhibit 118); Anna Karion et. al., *Methane Emissions Estimate from Airborn Measurements Over a Western United States Gas Field*, 40 Geophysical Research Letters 4393 (2013) (finding emissions of 6 to 12 percent, on average, in the Uintah Basin) (attached as Exhibit 119); Gabrielle Pétron et al., *A New Look at Methane and Nonmethane Hydrocarbon Emissions from Oil and Natural Gas Operations in the Colorado Denver-Julesburg Basin*, 119 Journal of Geophysical Research: Atmospheres 6836 (2014) (finding leak rates averaging 4% in the Denver-Julesburg Basin) (attached as Exhibit 120); *see also* Joe Romm, *Study of Best Fracked Wells Finds Low Methane Emissions But Skips Super-Emitters*, ThinkProgress (September 19, 2013), https://thinkprogress.org/study-of-best-fracked-wells-finds-low-methane-emissions-but-skips-super-emitters-1d20bb873fc8#.hb1wfflq6; U.S. Gov't Accountability Office, GAO-11-34, Opportunities Exist to Capture Vented and Flared Natural Gas, Which Would Increase Royalty Payments and Reduce Greenhouse Gases 25 (October 2010) (using a conversion factor of .4045 $MMTCO_2e$/Bcf for vented gas) (attached as Exhibit 121).

[229] *See* U.S. Environmental Protection Agency, *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011* (April 2013) (attached as Exhibit 122).

[230] *See* U.S. Environmental Protection Agency, *Greenhouse Gas Equivalencies Calculator*, available at: http://www.epa.gov/cleanenergy/energy-resources/calculator.html.

[231] *See* Brian Maffly, *Uinta Basin gas leakage far worse than most believe*, THE SALT LAKE TRIBUNE (Aug 05, 2013), available at: http://www.sltrib.com/sltrib/news/56692751-78/basin-carbon-emissions-gas.html.csp ("Between 6 percent and 12 percent of the Uinta Basin's natural gas production could be escaping into the atmosphere.").

[232] G. Myhre et al., Anthropogenic and Natural Radiative Forcing, in INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, *Working Group I Contribution to the IPCC Fifth Assessment*

BLM_0150217

that gas-aerosol interactions amplify methane's impact such that methane is actually 105 times as potent as $CO_2$ over a twenty-year time period. These values should be used—or at the very least acknowledged—in the DEIS, but are instead ignored.

Even setting aside the issue of climate change, every ton of methane emitted to the atmosphere from oil and gas development is a ton of natural gas *lost*. Every ton of methane lost to the atmosphere is therefore a ton of natural gas that cannot be used by consumers. Methane lost from federal leases may also not yield royalties otherwise shared between federal, state, and local governments. This lost gas reflects serious inefficiencies in how BLM oil and gas leases are developed. Energy lost from oil and gas production—whether avoidable or unavoidable—reduces the ability of a lease to supply energy, increasing the pressure to drill other lands to supply energy to satisfy demand. 40 C.F.R. §§ 1502.16(e)-(f). In so doing, inefficiencies create indirect and cumulative environmental impacts by increasing the pressure to satisfy demand with new drilling. 40 C.F.R. §§ 1508.7, 1508.8(b).

## 1. Mineral Leasing Act's Duty to Prevent Waste.

Conservation Groups, and in particular the Western Environmental Law Center, have been urging field offices throughout the West to adopt common sense and economical measures to address the issue of fugitive methane waste. Though not fully realized here, the UFO has expansive authority—and, indeed, the responsibility and opportunity—to prevent the waste of oil and gas resources, in particular methane, which is the primary constituent of natural gas. The Mineral Leasing Act of 1920 ("MLA") provides that "[a]ll leases of lands containing oil or gas ... shall be subject to the condition that the lessee will, in conducting his explorations and mining operations, use all reasonable precautions to prevent waste of oil or gas developed in the land...." 30 U.S.C. § 225; *see also* 30 U.S.C. § 187 ("Each lease shall contain...a provision...for the prevention of undue waste...." As the MLA's legislative history teaches, "conservation through control was the dominant theme of the debates." *Boesche v. Udall*, 373 U.S. 472, 481 (1963) (citing H.R.Rep. No. 398, 66th Cong., 1st Sess. 12-13; H.R.Rep. No. 1138, 65th Cong., 3d Sess. 19 ("The legislation provided for herein...will [help] prevent waste and other lax methods....")).

BLM's implementing regulations, reflecting these provisions, currently provide that "[t]he objective" of its MLA regulations "is to promote the orderly and efficient exploration, development and production of oil and gas." 43 C.F.R. § 3160.0-4. In part, "orderly and efficient" operations are ensured through unitization or communitization agreements. 43 C.F.R. §§ 3161.2, 3162.2-4(b) (BLM authority to require lessees unitization or communitization agreements); 43 C.F.R. Subpart 3180 (general rules pertaining to drilling unit agreements). Such agreements, because they may limit BLM authority in subsequent stages, must encompass methane mitigation if they are to serve as tools for preventing waste. *See William P. Maycock et al.*, 177 IBLA 1, 20-21 (Dec. Int. 2008) ("BLM is not required to analyze an alternative that is [n]ot feasible because it is inconsistent with the basic presumption of the Unit Agreement and BLM cannot legally compel the operator to adopt that alternative under the terms of the Unit Agreement").

*Report Climate Change 2013: The Physical Science Basis*, Table 8.7 at 714 (attached as Exhibit 113).

BLM_0150218

Critically, § 3160 specifically requires BLM officials to ensure "that all [oil and gas] operations be conducted in a manner which protects other natural resources and the environmental quality, protects life and property and results in the <u>maximum ultimate recovery of oil and gas with minimum waste and with minimum adverse effect on the ultimate recovery of other mineral resources</u>." 43 C.F.R. § 3161.2 (emphasis added). The lease owner and or operator is, similarly, charged with "conducting all operations in a manner which ensures the proper handling, measurement, disposition, and site security of leasehold production; which protects other natural resources and environmental quality; which protects life and property; and <u>which results in maximum ultimate economic recovery of oil and gas with minimum waste and with minimum adverse effect on ultimate recovery of other mineral resources</u>." 43 C.F.R. § 3162.1(a) (emph. added). Waste is defined as "(1) A reduction in the quantity or quality of oil and gas ultimately producible from a reservoir under prudent and proper operations; or (2) avoidable surface loss of oil or gas." 43 C.F.R. § 3160.0-5. Avoidable losses of oil or gas are currently defined as including venting or flaring without authorization, operator negligence, failure of the operator to take "all reasonable measures to prevent and/or control the loss," and an operator's failure to comply with lease terms and regulations, order, notices, and the like. *Id.*

In many respects, we think that BLM's current rules can be tightened. Regardless, it is clear that BLM's expansive authority, responsibility, and opportunity to prevent waste must permeate the UFO's full planning and decision-making processes for oil and gas. This ensures that the UFO take advantage of not only proven, often economical technologies and practices to prevent methane waste, but, further, the agency's tools to ensure the orderly and efficient exploration, development, and production of oil and gas through controls placed on the very scale, pace, and nature of development. Moreover, it is clear that BLM's authority, responsibility, and opportunity extends to both existing and future oil and gas development. BLM, ultimately, manages the federal, publicly owned, onshore oil and gas resource in trust for the American people.

On November 19, 2013, a coalition of over 90 environmental, health, and sporting organizations submitted an open letter to Secretary Jewell of the U.S. Department of Interior and Administrator McCarthy of the U.S. Environmental Protection Agency calling for action to substantially reduce emissions of methane from the oil and gas industry on public and private lands, as well as from offshore oil operations. The coalition called on Secretary Jewell to reduce methane emissions from oil and gas operations on public lands by updating decades-old BLM rules on waste of mineral resources. Further, we asked Administrator McCarthy to directly regulate methane emissions from the oil and gas industry using existing Clean Air Act authority and to develop nationwide curbs on GHG emissions.

Notably, BLM is currently undertaking federal rulemaking pertaining to Onshore Oil and Gas Order No. 9, Waste Prevention and Use of Produced Oil and Gas for Beneficial Purposes. *See* 43 C.F.R. § 3164.1 (authorizing the Director to issue Onshore Oil and Gas Orders to implement or supplement regulations). On February 8, 2016, the BLM released a proposed rule. The agency provided:

BLM_0150219

This proposed regulation aims to reduce the waste of natural gas from mineral leases administered by the BLM. This gas is lost during oil and gas production activities through flaring or venting of the gas, and equipment leaks. While oil and gas production technology has advanced dramatically in recent years, the BLM's requirements to minimize waste of gas have not been updated in over 30 years. The Mineral Leasing Act of 1920 (MLA) requires the BLM to ensure that lessees "use all reasonable precautions to prevent waste of oil or gas developed in the land . . . . " 30 U.S.C. 225. The BLM believes there are economical, cost-effective, and reasonable measures that operators should take to minimize waste, which will enhance our nation's natural gas supplies, boost royalty receipts for American taxpayers, tribes, and States, and reduce environmental damage from venting and flaring.

Waste Prevention, Production Subject to Royalties, and Resource Conservation: Proposed Rule, 81 Fed. Reg. 6616, 6616 (February 8, 2016). The BLM must consider federal rulemaking on Order No. 9, and the implications that this rule would have on action in its planning level decision-making, such as the establishment of mandatory requirements to prevent methane venting, flaring, and leaks.

The Western Environmental Law Center and our partners also recently submitted comments on this proposed rule. These comments are incorporated herein, attached hereto as Exhibit 123, and must also be considered by the UFO when undertaking the Uncompahgre RMP/EIS planning process. *See* 40 C.F.R. § 1502.9(c)(1)(ii).

### 2.   President Obama's Climate Action Plan and Secretarial Order 3289.

President Obama's Climate Action Plan explains that "[c]urbing emissions of methane is critical to our overall effort to address global climate change." *See* Climate Action Plan at 10. More recently, in March 2014, the White House issued a "Strategy for Reducing Methane Emissions," which includes a directive to the Interior Department to reduce methane emissions:

**Minimizing Venting and Flaring on Public Lands:**
DOI's Office of Inspector General and the U.S. Government Accountability Office have both criticized BLM's outdated requirements governing venting and flaring for wasting Federal gas resources and associated royalties to the American taxpayer. To reduce the loss of natural gas through the venting or flaring of methane produced from Federal and Indian oil and gas leases, the BLM will develop a draft rule, known informally as Onshore Order 9, and anticipates releasing this proposed rule later this year. To aid in the development of the rule, DOI has begun outreach to tribes, industry and other stakeholders.[233]

The President's call-for-action on methane is directly related to BLM's authorities and responsibilities, beyond the MLA, to reduce methane emissions.

---

[233] White House, *Strategy for Reducing Methane Emissions,* (March 2014), available at: http://www.whitehouse.gov/sites/default/files/strategy_to_reduce_methane_emissions_2014-03-28_final.pdf (attached as Exhibit 1).

BLM_0150220

The starting point of this authority is the Federal Land Policy and Management Act of 1976 ("FLPMA"). Pursuant to FLPMA, the BLM must manage the public lands:

> In a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition, that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8) (emphasis added). The BLM, as a multiple use agency, must also manage the public lands and the oil and natural gas resource to "best meet the present and future needs of the American people" and to ensure that management "takes into account the long-term needs of future generations for…non-renewable resources, including….minerals." 43 C.F.R. § 1702(c). Put differently, the driving force behind agency-authorized oil and gas development is the long-term, and broad, public interest – not the often short-term, and narrow, interest of oil and gas companies. The BLM's duty to prevent waste must account for this driving force.

Here, the UFO is required to ensure that these objectives and duties are adhered to through the completion of the RMP, which must, *inter alia*, "use and observe the principles of multiple use and sustained yield" and "weigh long-term benefits to the public against short-term benefits." *See* 43 U.S.C. § 1712(c)(1), (7). Thus, the UFO has a substantive duty to consider the enduring legacy of oil and gas development in land management decision-making, which is to be balanced against other critical multiple use resource values.

Additionally, the BLM, as an agency within the U.S. Department of Interior, is subject to Secretarial Order 3289 (Dept. Int. Sept. 14, 2009). As noted above, Secretarial Order 3289, in section 3(a), provides that BLM "must consider and analyze climate change impacts when undertaking long-range planning exercises, setting priorities for scientific research and investigations, developing multi-year management plans, and making major decisions regarding potential use of resources under the Department's purview." Section 3(a) of Secretarial Order 3289 also reinstated Secretarial Order 3226 (January 19, 2001). Secretarial Order 3226 commits the Department of the Interior to address climate change through its planning and decision-making processes. As the Order explains: "climate change is impacting natural resources that the Department of the Interior (Department) has the responsibility to manage and protect." Sec. Or. 3226, § 1. The Order, therefore, "ensures that climate change impacts are taken into account in connection with Department planning and decision making." *Id.* The Order obligates BLM to "consider and analyze potential climate change impacts" in four situations: (1) "when undertaking long-range planning exercises"; (2) "when setting priorities for scientific research and investigations"; (3) "when developing multi-year management plans, and/or" (4) "when making major decisions regarding the potential utilization of resources under the Department's purview." *Id.* § 3. The Order specifically provides that "Departmental activities covered by this Order" include "management plans and activities developed for public lands" and "planning and management activities associated with oil, gas and mineral development on public lands." *Id.*

BLM_0150221

(emphasis added). BLM's oil and gas decisions, including UFO's RMP/EIS, are thus contemplated by and subject to section 3 of the Order.

These authorities and responsibilities can be properly exercised through effective use of NEPA. To comply with NEPA, the BLM must take a hard look at direct, indirect, and cumulative impacts, as discussed above. 40 §§ C.F.R. 1502.16(a), (b); 1508.25(c). In evaluating impacts, the UFO must discuss "[e]nergy requirements and conservation potential of various alternatives and mitigation measures," "[n]atural or depletable resource requirements and conservation potential of various alternatives and mitigation measures," and "[m]eans to mitigate adverse environmental impacts (if not fully covered under 1502.14(f))." 40 C.F.R. §§ 1502.16(e), (f), (h).

We emphasize, here, the "heart" of the NEPA process: BLM's duty to consider "alternatives to the proposed action" and to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(E); 40 C.F.R. § 1502.14(a). Alternatives, discussed above, are critical because, "[c]learly, it is pointless to 'consider' environmental costs without also seriously considering action to avoid them." *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Commn.*, 449 F.2d 1109, 1128 (D.C. Cir. 1971). Operating in concert with NEPA's mandate to address environmental impacts, BLM's fidelity to alternatives analysis helps "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decision maker and the public." 40 C.F.R. § 1502.14. An agency must, accordingly, "[r]igorously explore and objectively evaluate all reasonable alternatives" and specifically "[i]nclude the alternative of no action." 40 C.F.R. §§ 1502.14(a), (d). Even where impacts are "insignificant," BLM must still consider alternatives. *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988) (agency's duty to consider alternatives "is both independent of, and broader than," its duty to complete an environmental analysis); *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004) (duty to consider alternatives "is 'operative even if the agency finds no significant environmental impact'").

### 3.    BLM Must Strengthen Its Approach to Methane Mitigation.

If the BLM does not adopt a no-leasing alternative, it must strengthen its approach to methane mitigation. While the draft RMP/EIS recognizes methane as a source of GHG emissions from the proposed action and acknowledges the significant impact of methane on climate, the BLM fails to provide a detailed analysis of measures that could be employed to mitigate these emissions. The CEQ has identified "lower GHG-emitting technology" and "capturing or beneficially using GHG emissions such as methane" as two broad categories of mitigation measures that "should" be considered in NEPA reviews. CEQ Final Climate Guidance at 19. At the RMP stage, it is appropriate and advisable for the agency to identify required methane mitigation measures that must be included either (1) as stipulations in future lease sales, or (2) as conditions of approval ("COAs") for all future APD or MLP approvals or other authorizations for implementation when activities are conducted or equipment is installed. Colorado's Comprehensive Air Resource Protection Protocol ("CARPP"), provided in Appendix H to the RMP/EIS, is a tool that can provide an important state-of-the-art resource to guide the agency's

analysis of GHG mitigation measures applicable to the Uncompahgre RMP. In particular, Table V-I identifies Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development, which displays some emission reduction measures, their potential environmental benefits and liabilities, and feasibility. These methane measures are applicable to all new oil and gas development and are not dependent on conditions in leasing areas or site-specific conditions for individual APDs or MDPs, so they may and should be identified and required at the RMP stage.

The RMP/EIS, at 4-28, identifies several mitigation measures that are "assumed" to apply to all alternatives and that would address methane emissions and waste:

While the levels of oil and gas development differ by alternative, emissions controls were assumed to be the same for all alternatives, as follows:

- Drill rig and completion engines that meet or exceed Tier II engine emission standards as defined in 40 CFR Part 89

- Fugitive dust control from pad, road, and pipeline construction using frequent watering and speed control with an assumed control efficiency of 50 percent

- Control of waste gas from well stimulation and completion assuming 90 percent capture of all vented emissions, then 50 percent sent to flare and 50 percent sent to "green completion"

- 100 percent of drilling/completion fluids are delivered and disposed of by truck

- 88 percent well pad tank emissions are captured and flared at conventional gas wells; no well pad tank control is assumed for coalbed natural gas wells

- 100 percent disposal of produced water and condensate is by truck

Measures identified in the CARPP (Appendix H) target sources of methane emissions that contribute significant amounts of waste from natural gas production, processing and transmission, and include pneumatic devices, compressors, liquids unloading, pipeline maintenance and repair, and equipment leaks. Measures to control emissions and waste from these sources include:

- Reducing the pace of development or phasing development to ensure that methane can be used in the field or that gathering, boosting and processing infrastructure is in place to get gas produced to a sales line;

- Requiring natural gas-fired drill rig engines;

BLM_0150223

- Requiring centralized or consolidated gas processing facilities.

- Replacement of wet seals with dry seals in centrifugal compressors;

- Monitoring and replacement of rod packing systems in reciprocating compressors;

- Installation of well deliquification systems such as plunger lifts;

- Use of closed loop process for "blow-down" emissions;

- Replacement of hi-bleed with low- or no-bleed and other low-emission equipment for pneumatic devices;

Mandatory leak detection and repair programs.

There must be much tighter commitments for these "assumed" measures, and these measures must be revised to include the following amendments and additions:

- Use of reduced-emission completion practices including "routing all saleable quality gas to a flow line (rather than permitting some emissions to be vented or flared)

- Reduction in the pace or phasing of development to provide the time required to bring capture and sales line infrastructure into alignment with production.

- Curtailment of production when sufficient capture and sales line infrastructure is not available.

- Electric compression

- Use of dry seals on centrifugal compressors

- Periodic replacement of rod packing systems on reciprocal compressors

- Capture and sale of gas emitted from drilling, completions, production testing, pipeline maintenance, liquids unloading, and oil wells (associated gas)

- Replacement of existing high- or intermittent-bleed pneumatic controllers with low- or no-bleed controllers, and installation of low- or no-bleed controllers in new construction

- Installation of emissions controls on all storage tanks

- Equipment replacement  of TEG dehydrators with dessicant dehydrators

BLM_0150224

- Quarterly inspection of leaks with optical gas imaging and immediate repair

In BLM's proposed methane waste rule, there are many sources of methane emissions from oil and gas development that are identified and a few significant sources that are not included. The proposed rule also includes widely recognized methane emissions mitigation measures and best management practices ("BMPs"). The sources of methane emissions which will be present within the area of development, and the mitigation measures available, must be considered by BLM in its analysis of the proposed action.

Important sources of methane emissions include:

- Well drilling
- Well completion
- Production testing
- Pneumatic controllers
- Pneumatic pumps
- Separators and dehydrators
- Compressors
- Pipelines
- Storage tanks
- Liquids unloading
- Leaks
- Associated gas from oil wells

A key area of concern to Conservation Groups is the effectiveness of the mitigation measures adopted to ensure that methane is captured and able to make it to market for sale and not be vented or flared. Such considerations must be included in the agency's NEPA analysis. This includes, *inter alia*, how the agency will assess whether the gathering and processing investments proposed are adequate. That is, the agency is obligated to identify and describe how the infrastructure investments identified in the EIS (i.e., gathering pipelines, compressor stations and processing facilities) will be located and adequately sized to accommodate estimated levels of production of natural gas for the duration of the proposed project.

Notably, at least one BLM Field Office has already taken pioneering steps to address methane emissions and waste through mandatory mitigation measures at the RMP stage. Specifically, in a joint Land and Resource Management Plan ("LRMP"), BLM: 1610 (CO-933), adopted by BLM Colorado's Tres Rios Field Office ("TRFO") and the San Juan National Forest ("SJNF"), the agencies broke new and essential ground in both acknowledging that significant GHG pollution would result from oil and gas development on TRFO lands, and then establishing *required* methane mitigation standards at the planning stage that will bind future leases and permits to drill to comply with these measures. Given that the TRFO is directly adjacent to the UFO, including shared geologic formations and mineral resources, it is arbitrary and capricious for BLM here to ignore or not adopt mitigation measures consistent with those included by the TRFO. At the very least, BLM has an obligation to explain why such measures are not applied in the Uncompahgre planning area, which it has failed to do. As provided in the Final EIS for the TRFO LRMP:

BLM_0150225

> NEPA analysis is typically conducted for oil and gas leasing and when permits are issued. **This FEIS is the first NEPA analysis where lands that could be made available for lease are identified <u>and stipulated</u>.** In a subsequent analysis stage, when there is a site-specific proposal for development, additional air quality impact analysis would occur. This typically occurs when an application for a permit to drill is submitted. Based on the analysis results, additional mitigation or other equally effective options could be considered to reduce air pollution.

Final EIS at 372 (emphasis added). The TRFO set a new standard by recognizing that the climate change impacts from oil and gas industry activities are cumulative and that methane losses from business-as-usual industry practices at the field office level contribute significantly to climate change and must be mitigated. In the Final EIS, the TRFO also recognized that methane emissions represent waste of a key natural resource that belongs to all U.S. citizens, and the failure to control such waste robs the U.S. and state treasuries of royalty revenues. Accordingly, the TRFO adopted six important methane mitigation measures, which include:

- Centralized Liquid Gathering Systems and Liquid Transport Pipelines

- Reduced Emission Completions/Recompletions (green completions)

- Replacement of High-bleed Pneumatics with Low-Bleed/No-Bleed or Air-Driven Pneumatic Devices on all Existing Wells

- Installation of Low Bleed/No Bleed Pneumatic Devices on all New Wells

- Dehydrator Emissions Controls; and

- Electric Compression

*Id.* at 376.

As the BLM proceeds in the Uncompahgre planning process, it is essential to consider the pioneering action taken by the TRFO. *See* 40 C.F.R. § 1502.9(c)(1)(ii). The BLM's dismissive approach to climate change reflected in the Uncompahgre draft RMP/EIS, and its failure to adequately address methane emissions, is plainly incompatible with the climate impacts of oil and gas development. It is incumbent upon the UFO to confront the issues of climate change and methane emissions head-on, which must be accomplished through field office level planning and decisionmaking that is reflective of the challenges we face.

Beyond these methane mitigation measures, additional, widely recognized emissions reduction technologies, best management practices ("BMPs"), and planning tools for mitigating methane emissions and waste are available to the UFO that must be given a hard look in its

BLM_0150226

analysis of the proposed action. Wide ranges of technologies and BMPs have been identified in numerous sources, including the BLM itself.[234]

We believe that these additional measures must receive a hard look, and be adopted in the UFO RMP/EIS because: (1) they can reduce methane emissions to help protect the climate; (2) can minimize methane waste; (3) can have paybacks for industry from the sale of captured methane, even at today's low gas prices; and (4) because failure to adopt them as mandatory methane emissions and waste mitigation measures in the RMP/EIS may well jeopardize the ability of the UFO to require them in critical later stages of development, such as lease sales and APDs after lease rights are conveyed.

Conservation Groups also believe that the UFO should require gas capture planning by lessees and planning and timely development of gas gathering, boosting and processing infrastructure to ensure that GHG emissions are reduced, that revenues from gas sales are maximized for royalty payments for the federal and state governments, and that waste of this important resource is minimized.

Moreover, the EPA, in a recently released white paper,[235] also identifies additional field use measures that reduce flaring and waste:

- Compression of natural gas for transport;

- Methane re-injection;

- Electric power generation for on-site use or connection to the grid.

Critically, another approach—outlined below and promoted by industry—has been advanced to successfully reduce methane venting, flaring, and waste, and the UFO should require production and midstream companies to conduct front-end planning employing these techniques and provide the results of the plans to the UFO. In January 2014, the 500-member North Dakota Petroleum Council (www.ndoil.org) recommended that the state oil and gas regulator ("NDIC") require the following:

---

[234] *See* BLM, Best Management Practices for Fluid Minerals, available at: http://www.blm.gov/pgdata/etc/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE _PROTECTION_/bmps.Par.60203.File.dat/WO1_Air%20Resource_BMP_Slideshow%2005-09-2011.pdf (attached as Exhibit 124); BLM, Montana/Dakotas, *2010 Oil and Gas Leasing EAs,* available at: http://www.blm.gov/mt/st/en/prog/energy/oil_and_gas/leasing/leasingEAs.html; CARPP at Appendix L; EPA, Natural Gas STAR Program, available at: http://www.epa.gov/gasstar/; and Susan Harvey, et al., *Leaking Profits: The U.S. Oil and Gas Industry Can Reduce Pollution, Conserve Resources, and Make Money by Preventing Methane Waste* (attached as Exhibit 125).

[235] EPA, Office of Air Quality Planning and Standards, *Oil and Natural Gas Sector Hydraulically Fractured Oil Well Completions and Associated Gas during Ongoing Production* (April 2014), available at: https://www.epa.gov/controlling-air-pollution-oil-and-natural-gas-industry (attached as Exhibit 126).

CONSERVATION GROUPS' COMMENTS                                                          80
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

BLM_0150227

- Gas Capture Plan[s] (GCP):
    - o Forces gas capture planning prior to drilling
    - o GCP may include at the discretion of NDIC:
        - Location map gathering system connection, processing plant(s) identified
        - Flowback strategy (rate, duration, plan for multi-well start up)
        - Current system capacity and utilization
        - Time period for connection
    - o At the discretion of NDIC, penalty for failure to comply
        - Failure to submit GCP
            - New wells -- suspension or denial of permit
            - Existing wells – curtail production where no detriment to well or reservoir
        - Failure to comply with GCP
            - Curtail production
            - Not meeting flowback strategy
            - Mitigating circumstances may allow extension (i.e., economic evaluation, operator's overall capture rate, ROW, safety, weather, work crews, etc.)

- Midstream Planning and Tracking
    - o Midstream companies meet with NDIC on a regular basis (i.e., annual, bi-annual) to status operations and updates
    - o Suggested reporting to include:
        - Percent gas captured by gathering system
        - Gathering forecast by gathering system
        - Status plant processing capacity and gathering capacity with future obligations and capture targets
        - Utilization and downtime/interruptions of service
        - Field compression downtime / Plant downtime/maintenance

Based on these alternatives, Conservation Groups believe that capturing methane emissions is just the first of the UFO's duties in regards to GHG emissions and waste. The UFO must also ensure that methane will be used beneficially in the field or enter a sales gas line and make it to market, as opposed to simply being vented or flared and wasted. As an alternative to venting, flaring, and waste, UFO must take a hard look at these planning tools, which are alternatives available to ensure either field use of the resource or that gathering, boosting and processing infrastructure is in place prior to development activities. Further, we believe that public disclosure of the results of such planning should be required.

Finally, Conservation Groups also take issue with the notion that "adaptive management" is a viable approach to addressing methane emissions and waste. According to the draft RMP/EIS, at 4-20:

BLM_0150228

Total estimated emissions as well as predicted increases in emissions were analyzed to develop air resource management goals, objectives, and actions that would be effective in minimizing future impacts on air quality. The resulting adaptive management strategy is described in detail in Appendix H (Colorado BLM Comprehensive Air Resource Protection Protocol).

The RMP/EIS explains the relationship of monitoring and evaluation to adaptive management:

**Adaptive management**. A type of natural resource management in which decisions are made as part of an ongoing science-based process. Adaptive management involves testing, monitoring, and evaluating applied strategies, and incorporating new knowledge into management approaches that are based on scientific findings and the needs of society. Results are used to modify management policy, strategies, and practices.

The UFO seems to ignore the fact that methane emissions and waste are not monitored in the same manner and to the same degree as criteria and hazardous air pollutants. According to the EPA, reporting is only required of:

… sources that in general emit 25,000 metric tons or more of carbon dioxide equivalent per year in the United States. Smaller sources … are not included in the Greenhouse Gas Reporting Program.[236]

EPA has identified many small sources that are encompassed by the RMP/EIS but that would not exceed the reporting threshold and would, in the absence of additional monitoring and reporting requirements established in the RMP/EIS, go unmeasured. These include: venting from workovers, pneumatic devices, liquids unloading, and small compressors, and equipment leaks throughout natural gas systems.[237]

Therefore, by its own admission, UFO's reliance on adaptive management to address methane emissions and waste are "not possible" because the agency has failed to require monitoring of smaller—but cumulatively significant—sources of such waste in the oil and gas production process. The UFO must do more than cite the CARPP as a tool for future adaptive management. Rather, the agency must adopt the methane mitigation technologies, BMPs and planning tools identified above to address all future development authorized under the RMP/EIS, and to apply these tools, practices, and technologies not just to development on new leases but as RMP authorized stipulations on *all* new oil and gas development in the planning area.

---

[236] EPA, *Fact Sheet: Greenhouse Gas Reporting Program Implementation,* available at: https://www.epa.gov/sites/production/files/2014-09/documents/ghgrp-overview-factsheet.pdf (attached as Exhibit 127).
[237] EPA, *Petroleum and Natural Gas Systems* (Feb. 2013), available at: http://www.epa.gov/ghgreporting/documents/pdf/infosheets/OnshorePetroleumNaturalGasSyste ms.pdf (attached as Exhibit 128).

BLM_0150229

4.     **The Capture of Methane Is Critical Due to Its Global Warming Potential.**

As discussed in Section II.D.2., above, in the context of coal mine methane, it is critically important to reduce methane waste from fossil fuel production in order to limit climate damages. Ensuring compliance with the agency's methane waste obligations through proper analysis and documentation in the NEPA process is important: technologies and practices change, and the UFO's duty to prevent degradation and waste cannot be excused just because the agency apparently lags behind the technological curve. The GAO's 2010 report noted that BLM's existing waste prevention guidance—Notice to Lessees and Operators ("NTL") 4a—was developed in 1980, well before many methane reduction technologies and practices were developed and understood. GAO also found that NTL 4a does not "enumerate the sources that should be reported or specify how they should be estimated."[238] Problematically, GAO noted "that [BLM] thought the industry would use venting and flaring technologies if they made economic sense," a perspective which assumes – wrongly – that markets work perfectly in the absence of necessary regulatory signals and is belied by the lack of information about the magnitude of methane waste and the documented, if still poorly understood, barriers to the deployment of GHG reduction technologies and practices. *Id.* at 20-33. Compounding the problem, GAO also "found a lack of consistency across BLM field offices regarding their understanding of which intermittent volumes of lost gas should be reported to [the Oil and Gas Operations Report]." *Id.* at 11. BLM, to its credit, conceded: "existing guidance was outdated given current technologies and said that they were planning to update it by the second quarter of 2012." *Id.* at 27.

Indeed, a Report released by NRDC identified that "[c]apturing currently wasted methane for sale could reduce pollution, enhance air quality, improve human health, conserve energy resources, and bring in more than \$2 billion of additional revenue each year."[239] Moreover, the Report further identified ten technically proven, commercially available, and profitable methane emission control technologies that together can capture more than 80 percent of the methane currently going to waste. *Id.* Such technologies must also be considered in BLM's alternatives analysis.

Preventing GHG pollution and waste is particularly important in the natural gas context, where there is an absence of meaningful lifecycle analysis of the GHG pollution emitted by the production, processing, transmission, distribution, and combustion of natural gas. Although natural gas is often touted as a 'cleaner' alternative to dirty coal, recent evidence indicates that this may not, in fact be the case – and, at the least, indicates that we must first take immediate, common sense action to reduce GHG pollution from natural gas before it can be safely relied on as an effective tool to transition to a clean energy economy (a noted priority of this

---

[238] *See* GAO-11-34 (2010) at 11, 27 (attached as Exhibit 121).

[239] Susan Harvey, et al., *Leaking Profits: The U.S. Oil and Gas Industry Can Reduce Pollution, Conserve Resources, and Make Money by Preventing Methane Waste* (March 2012) (attached as Exhibit 125).

BLM_0150230

Administration).[240] A recent report by Climate Central addresses the leak rates estimated by various sources and the impacts of this new information on assertions that natural gas is a cleaner fuel than coal, ultimately concluding that given the losses from oil and gas sources it would be decades before switching electricity generation from coal to natural gas could bring about significant reductions in emissions.[241] While the UFO has identified the issue of fugitive emissions and waste, Conservation Groups urge the agency to strengthen this path through additional hard look analysis and enforceable mitigation requirements.

Oil and natural gas systems are the biggest contributor to methane emissions in the United States, accounting for over one quarter of all methane emissions.[242] Moreover, methane emissions in the planning area are further compounded by massive contributions from area coal mines—in particular the West Elk Mine—as well as significant oil and gas production and emissions in the Piceance Basin and Uintah Basin, both of which impact planning area air quality. In light of serious controversy and uncertainties regarding GHG pollution from oil and gas development, as noted above, the agency's quantitative assessment should account for methane's long-term (100-year) global warming impact and, also, methane's short-term (20-year) warming impact using the latest peer-reviewed science to ensure that potentially significant impacts are not underestimated or ignored. *See* 40 C.F.R. § 1508.27(a) (requiring consideration of "[b]oth short- and long-term effects").

Again, the UFO assumes that methane is 21 times as potent as carbon dioxide ("$CO_2$") over a 100-year time horizon,[243] a global warming potential ("GWP") based on the Intergovernmental Panel on Climate Change ("IPCC") Second Assessment Report from 1996.[244] However, the IPCC recently updated their 100-year GWP for methane, substantially increasing the heat-trapping effect to 36.[245] A Supplementary Information Report ("SIR"), prepared for BLM's oil and gas leasing program in Montana and the Dakotas, further explains that GWP "provides a method to quantify the cumulative effect of multiple GHGs released into

---

[240] Robert W. Howarth, *Assessment of the Greenhouse Gas Footprint of Natural Gas from Shale Formations Obtained by High-Volume, Slick-Water Hydraulic Fracturing* (Rev'd. Jan. 26, 2011) (attached as Exhibit 129). *See also* Robert W. Howarth et al., *Venting and Leaking of Methane from Shale Gas Development: Response to Cathles et al.* (2012) (attached as Exhibit 130); Eric D. Larson, PhD, Climate Central, *Natural Gas and Climate Change* (May 2013) (attached as Exhibit 131).

[241] *See* Larson (attached as Exhibit 131).

[242] *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011* (attached as Exhibit 122).

[243] *See* 78 Fed.Reg. 19802, April 2, 2013 (EPA proposal to increase methane's GWP to 25 times $CO_2$).

[244] INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, *Second Assessment Report* (1996) (attached as Exhibit 132); *see also* U.S. Environmental Protection Agency, *Methane*, available at: http://www.epa.gov/outreach/scientific.html.

[245] *See* INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, *Working Group I Contribution to the IPCC Fifth Assessment Report Climate Change 2013: The Physical Science Basis,* at 8-58 (Table 8.7) (Sept. 2013) (attached as Exhibit 113).

BLM_0150231

the atmosphere by calculating carbon dioxide equivalent ($CO_2e$) for the GHGs." SIR at 1-2.[246] However, substantial questions arise when you calibrate methane's GWP over the 20-year planning and environmental review horizon used in the SIR and, typically, by BLM, including the UFO. *See* SIR at 4-1 thru 4-45 (discussing BLM-derived reasonably foreseeable development potential in each planning area). Over this 20-year time period, the IPCC's new research has calculated that methane's GWP is 87[247] – yet another substantial increase from its earlier estimate of 72, which was still over three times as potent as otherwise assumed by the SIR.[248]

However, recent peer-reviewed science demonstrates that gas-aerosol interactions amplify methane's impact such that methane is actually 105 times as potent over a twenty-year time period.[249] This information suggests that the near-term impacts of methane emissions have been significantly underestimated. *See* 40 C.F.R. § 1508.27(a) (requiring consideration of short and long term effects). Further, by extension, BLM has also significantly underestimated the near-term benefits of keeping methane emissions out of the atmosphere. 40 C.F.R. §§ 1502.16(e), (f); *id.* at 1508.27. These estimates are important given the noted importance of near term action to ameliorate climate change – near term action that scientists say should focus, *inter alia*, on preventing the emission of short-lived but potent GHGs like methane while, at the same time, stemming the ongoing increase in the concentration of carbon dioxide.[250] These uncertainties – which, here, the agency does not address – necessitate analysis in the RMP and EIS. 40 C.F.R. §§ 1508.27(a), (b)(4)-(5).

Additional, serious, yet unaddressed uncertainties pertain to the magnitude of methane pollution from oil and gas emissions sources. The U.S. GHG Inventory takes a top down approach to estimating emissions from the oil and gas industry, using national activity data and equipment counts from a host of sources and applying emissions factors of varying vintages, primarily those from a 1996 study by EPA and the Gas Research Institute using 1992 data.[251] As provided in the EPA Inventory of Emissions and Sinks: 1990-2011, "[f]urther research is needed

---

[246] BLM, *Climate Change, Supplementary Information Report, Montana, North Dakota and South Dakota* (2010) available at: www.blm.gov/mt/st/en/prog/energy/oil_and_gas/leasing/leasingEAs.html (attached as Exhibit 133).

[247] *See* IPCC *Physical Science Report* (attached as Exhibit 113).

[248] *See* INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Fourth Assessment Report, Working Group 1, Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change, Ch. 2, p. 212, Table 2.14, available at: www.ipcc.ch/publications_and_data/ar4/wg1/en/ch2s2-10-2.html (attached as Exhibit 134).

[249] Drew Shindell et al., *Improved Attribution of Climate Forcing to Emissions*, SCIENCE 2009 326 (5953), p. 716, available at: www.sciencemag.org/cgi/content/abstract/326/5953/716 (attached as Exhibit 135).

[250] *See, e.g., Limiting Global Warming: Variety of Efforts Needed Ranging from 'Herculean' to the Readily Actionable, Scientists Say*, SCIENCE DAILY (May 4, 2010), available at: http://www.sciencedaily.com/releases/2010/05/100503161328.htm; *see also*, Ramanathan, et. al., (attached above as Exhibit 54).

[251] *See* U.S. EPA, *Methane Emissions from the Natural Gas Industry* (1996) (attached as Exhibit 136).

BLM_0150232

in some cases to improve the accuracy of emission factors used to calculate emissions from a variety of sources;" specifically citing the lack of accuracy in emission factors applied to methane sources.[252] A lack of data reliability has resulted in notable variation in methane emissions reporting from year to year. For example, in a Technical Support Document ("TSD") prepared for EPA's mandatory GHG reporting rule for the oil and gas sector for 2012, EPA determined that several emissions sources were projected to be "significantly underestimated."[253] EPA thus provided revised emissions factors for four of the most significant underestimated sources that ranged from ten times higher (for well venting from liquids unloading) to as many as 3,500 and 8,800 times higher (for gas well venting from completions and well workovers of unconventional wells).[254] When EPA accounted for just these four revisions, it more than doubled the estimated GHG emissions from oil and gas production, from 90.2 million metric tons of $CO_2$ equivalent ("MMTCO2e") to 198.0 MMTCO2e.[255] However, these emission estimates are based on an outdated GWP of 21. Using the IPCCs new 100-year GWP for methane of 36, that is 320.5 MMTCO2e, and, considering a 20-year GWP of 87, that is 792.0 MMTCO2e – or, respectively, the equivalent emissions from 90.7 or 224 coal fired power plants that is wasted annually. These upward revisions were based primarily on EPA's choice of data set, here, having replaced Energy Information Administration ("EIA") data with emissions data from an EPA and Gas Research Institute ("GRI") study. In the current year, EPA relied on yet another set of data; this time from an oil and gas industry survey of well data conducted by the American Petroleum Institute ("API") and the American Natural Gas Alliance ("ANGA").[256] The API/ANGA survey was conducted in response to EPA's upward adjustments in the previous GHG inventory, noting that "[i]ndustry was alarmed by the upward adjustment," and focused specifically on emissions from liquids unloading and unconventional gas well completions and workovers.[257] Overall, the survey found that revising emissions from these two sources alone would reduce EPA oil and gas methane emissions estimates, which resulted in reported oil and gas production emissions at 100 MMTCO2e pursuant to the EPA's GHG Reporting Program.[258]

To provide a specific example of these differing data sets, EPA previously used an emissions factor of three thousand standard cubic feet ("Mcf") of gas emitted to the atmosphere per well completion in calculating its GHG inventory. EPA determined that this figure was

---

[252] *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011*, at 1-19 (attached above as Exhibit 122).

[253] U.S. Environmental Protection Agency, *Greenhouse Gas Emissions Reporting From The Petroleum And Natural Gas Industry Background Technical Support Document*, at 8, available at: http://www.epa.gov/climatechange/emissions/subpart/w.html (attached as Exhibit 137).

[254] *Id.* at 9, Table 1; *see also Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011* (attached above as Exhibit 122).

[255] *See* EPA, *GHG Emissions Reporting* at 10, Table 2 (attached above as Exhibit 137).

[256] *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011*, at 3-63 (attached above as Exhibit 122).

[257] API/ANGA, *Characterizing Pivotal Sources of Methane Emissions from Natural Gas Production: Summary and Analysis of API and ANGA Survey Responses*, Sept. 2012, at 1 (attached as Exhibit 138).

[258] *See* EPA, Petroleum and Natural Gas Systems: 2011 Data Summary (for 2013 GHG Reporting), at 3 (attached as Exhibit 139).

BLM_0150233

significantly underestimated and that a far more accurate emissions factor was 9,175 Mcf per well.[259] The API/ANGA study suggested that this emission factor is 9,000 Mcf.[260] However, these emissions factors are simply broad, generalized estimates for well emissions across the nation, and can vary significantly from one geologic formation to the next. For example, emissions reported in the Piceance Basin – particularly relevant, here – are as high as 22,000 Mcf of gas per well.[261]

The methane loss rate associated with EPA inventory figures is around 1%. However, other recent peer-review studies of methane emissions based on aircraft sampling, some of which are already identified herein, have reported substantially higher methane loss rates associated with oil and natural gas activity. Analyses conducted by the National Oceanic and Atmospheric Administration and University of Colorado found methane losses from oil and gas development in Colorado's Denver-Julesberg Basin from 2.3-7.7%. *See* Petron et al. (attached as Exhibit 120). A study of Utah's Uintah Basin found methane loss rates from 6-12%. *See* Karion *et. al.*, (attached as Exhibit 119). A study analyzing air samples collected from tall towers and research aircraft found that methane emissions may be fifty-percent higher than EPA estimates.[262] And another recent study, published in March 2014, also based on aircraft sampling, found methane emissions at natural gas drilling sites in Pennsylvania from 100 to 1000 times greater than EPA estimates.[263]

Despite this variability in methane pollution data, what remains clear is that inefficiencies and leakage in oil and gas production results in a huge amount of avoidable waste and emissions, and, conversely, a great opportunity for the UFO to reduce GHG emissions on our public lands. Many of these uncertainties and underestimates, as EPA has explained, are a result of the fact that emissions factors were "developed prior to the boom in unconventional well drilling (1992) and in the absence of any field data and does not capture the diversity of well completion and workover operations or the variance in emissions that can be expected from different hydrocarbon reservoirs in the country." *Mandatory GHG Reporting Rule*, 75 Fed. Reg. 18608, 18621 (April 12, 2010). These underestimates are also caused by the dispersed nature of oil and gas equipment – rather than a single, discrete source, such as a coal-fired power plant, oil and gas production consists of large numbers of wells, tanks, compressor stations, pipelines, and other equipment that, individually, may appear insignificant but, cumulatively, may very well be quite significant. While dispersed, oil and gas development is nonetheless a massive, landscape-scale industrial operation – one that just happens to not have a single roof. BLM, as the agency charged with oversight of onshore oil and gas development, therefore has an opportunity to

---

[259] *See* EPA, *GHG Emissions Reporting* at Appendix B at 84-87 (attached above as Exhibit 137).
[260] *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011*, at 3-69 (attached above as Exhibit 122).
[261] *See, e.g.*, EPA, Natural Gas STAR Program, *Recommended Technologies and Practices for Wells*, available at: www.epa.gov/gasstar/tools/recommended.html; *see also* EPA, Natural Gas STAR Program, *Reduced Emissions Completions*, Oct. 26, 2005, at 14 (attached as Exhibit 140).
[262] Scott M. Miller, *et al., Anthropogenic emissions of methane in the United States* (2013) (attached as Exhibit 141).
[263] Dana Caulton, *et al., Toward a better understanding and quantification of methane emissions from shale gas development* (2014) (attached as Exhibit 142).

BLM_0150234

improve our knowledge base regarding GHG emissions from oil and gas production, providing some measure of clarity to this important issue by taking the requisite "hard look" NEPA analysis as part of its land use decision-making for the Uncompahgre RMP and EIS.[264]

Convincing evidence also exists to support the consideration of alternatives that would attach meaningful stipulations to areas open to oil and gas leasing, above and beyond the steps taken by the agency, here. As a prime contributor to short-term climate change over the next few decades, methane is a prime target for near-term GHG reductions. In fact, there are many proven technologies and practices already available to reduce significantly the methane emissions from oil and gas operations, further detailed below. These technologies also offer opportunities for significant cost-savings from recovered methane gas. Moreover, new research indicates that tropospheric ozone and black carbon ("BC") contribute to both degraded air quality and global warming, and that emission control measures can reduce these pollutants using current technology and experience.[265] Employment of these strategies will annually avoid a substantial number of premature deaths from outdoor air pollution, as well as increase annual crop yields by millions of metric tons due to ozone reductions. Indeed, reducing methane emissions is important not only to better protect the climate, but also to prevent waste of the oil and gas resource itself and the potential loss of economic value, including royalties. BLM should evaluate these technologies, analyzing the benefits of technological implementation versus current agency requirements.

These benefits – as well as the proven, cost-effective technologies and practices that achieve these benefits – are documented by EPA's "Natural Gas STAR" program, which encourages oil and natural gas companies to cut methane waste to reduce climate pollution and recover value and consolidates the lessons learned from industry for the benefit of other companies and entities with oil and gas responsibilities such as BLM.[266] EPA has identified well over 100 proven technologies and practices to reduce methane waste from wells, tanks, pipelines, valves, pneumatics, and other equipment and thereby make operations more efficient.[267] Though underutilized, EPA's Natural Gas STAR program suggests the opportunity to dramatically reduce GHG pollution from oil and gas development, *if* its identified technologies and practices were implemented at the proper scale and supported by EPA's sister agencies, such as BLM. For calendar year 2010, EPA estimated that this program avoided 38.1 million tons $CO_2$ equivalent, and added revenue of nearly $376 million in natural gas sales (at $4.00/Mcf) – revenue which translates into additional royalties to federal and state governments for the American public.[268]

---

[264] In this context, the 2010 SIR, while providing a basic literature review of GHG emissions sources, is merely a starting point for BLM's responsibility to take a hard look at GHG emissions in the context of foreseeable drilling operations in the geologic formations proposed for leasing.
[265] Drew Shindell, et al., *Simultaneously Mitigating Near-Term Climate Change and Improving Human Health and Food Security*, SCIENCE 2012 335, at 183 (attached as Exhibit 143).
[266] *See generally,* EPA, Natural Gas STAR Program, available at: www.epa.gov/gasstar/.
[267] *See* EPA, Natural Gas STAR Program, *Recommended Technologies and Practices*, available at: www.epa.gov/gasstar/tools/recommended.html.
[268] *See* EPA, Natural Gas STAR Program, *Accomplishments*, available at: www.epa.gov/gasstar/accomplishments/index.html#three (attached as Exhibit 144). BLM should also take a look at EPA's more detailed program accomplishments to provide a measure of what

BLM_0150235

Although the UFO has taken steps in requiring some mitigation measures, additional emission reduction strategies, as detailed herein, can both strengthen the UFO's existing requirements, as well as satisfy the requirements of SO 3226, FLPMA, and the MLA.

### G.    *Managing for Community and Ecosystem Resiliency.*

Re·sil·ience is "an ability to recover from or adjust easily to misfortune or change." MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2008). In the context of climate change and the many resultant impacts, such as the alteration to the biosphere and impairments to human health, the resiliency of our landscapes and a community's ability to respond and adapt to these changes takes on a new magnitude of importance.

According to experts at the Government Accountability Office ("GAO"), federal land and water resources are vulnerable to a wide range of effects from climate change, some of which are already occurring. These effects include, among others, "(1) physical effects, such as droughts, floods, glacial melting, and sea level rise; (2) biological effects, such as increases in insect and disease infestations, shifts in species distribution, and changes in the timing of natural events; and (3) economic and social effects, such as adverse impacts on tourism, infrastructure, fishing, and other resource uses."[269] These growing impacts and the necessity to employ climate mitigation measures to ensure landscape and human resiliency and their ability to adapt and respond to climate change impacts must be considered.

Beyond mitigating climate change by reducing contributions of GHG pollution to the atmosphere, the BLM can also help promote ecological resiliency and adaptability by reducing external anthropogenic environmental stresses (like coal, oil and gas development) as a way of best positioning public lands, and the communities that rely on those public lands, to withstand what is acknowledged ongoing and intensifying climate change degradation. It is crucial for the BLM to close the gap in their decisionmaking regarding the cumulative contribution of coal, oil and gas development made available in the planning area, particularly given the conflict between such authorization and the agency's responsibility to manage for healthy,

---

BLM could itself accomplish, and to understand the nature of the problem and opportunities. Also of interest, for calendar year 2008, EPA estimated that its program avoided 46.3 million tons of $CO_2$ equivalent, equal to the annual GHG emissions from approximately 6 million homes per year, and added revenue of nearly $802 million in natural gas sales. To speculate, the calendar year 2009 declines are likely associated with ongoing economic and financial stagnation and the low price of natural gas that has slowed natural gas drilling and production.

[269] GAO Report, *Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources* (2007) (attached as Exhibit 76); *see also* Committee on Environment and Natural Resources, National Science and Technology Council, *Scientific Assessment of the Effects of Global Climate Change on the United States* (2008) (attached as Exhibit 77); Melanie Lenart, et. al. *Global Warming in the Southwest: Projections, Observations, and Impacts* (2007) (attached as Exhibit 78) (describing impacts from temperature rise, drought, floods and impacts to water supply on the southwest).

BLM_0150236

resilient ecosystems. Although the BLM has recognized the threat of climate change, the agency's decisionmaking is not reflective of this harm and the agency fails to take the many necessary and meaningful steps to ameliorate the impacts to communities, landscapes, and species.

Moreover, CEQ Guidance requires that agencies address the impacts of climate change on the environmental consequences of a proposed action. As the CEQ Guidance recognizes, "[c]limate change can make a resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change." Final Climate Guidance at 21. These effects are already occurring and are expected to increase, resulting in shrinking water resources, extreme flooding events, invasion of more combustible non-native plant species, soil erosion, loss of wildlife habitat, and larger, hotter wildfires. These impacts have been catalogued in recent scientific studies by federal agencies, including the National Climate Assessment,[270] and highlighted by President Obama. *See* Exec. Order No. 13,653, § 1. As the CEQ Guidance recognizes, "GHGs already in the atmosphere will continue altering the climate system into the future, even with current or future emissions control efforts." Final Climate Guidance at 20. In other words, climate change impacts are and will continue to be part of the new normal, and "managing th[o]se risks requires deliberate preparation, close cooperation, and coordinated planning ... to improve climate preparedness and resilience; help safeguard our economy, infrastructure, environment, and natural resources; and provide for the continuity of ... agency operations, services, and programs." Exec. Order No. 13,653, § 1.

NEPA analyses must account for this reality. While the CEQ Guidance suggests that existing and reasonably foreseeable climate change impacts be considered as part of an agency's hard look at impacts, the guidance must also account for the fact that climate change effects are and will continue to be a key component of the environmental baseline. Agencies are required under NEPA to "describe the environment of the areas to be affected or created by the alternatives under consideration." 40 C.F.R. § 1502.15. The affected environment discussion sets the "baseline" for the impacts analysis and comparison of alternatives. As the Ninth Circuit has recognized, "without establishing...baseline conditions...there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." *Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988) (explaining further that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process").

Excluding climate change effects from the environmental baseline ignores the reality that the impacts of proposed actions must be evaluated based on the already deteriorating, climate-impacted state of the resources, ecosystems, human communities, and structures that will be affected. Accordingly, BLM must clarify that existing and reasonably foreseeable climate change impacts as part of the affected environment in the planning area, which then must be assessed as part of the agency's hard look at impacts, and integrated into *each* of the alternatives, including the no action alternative. Put differently, simply acknowledging climate impacts as part of the

---

[270] Available at http://nca2014.globalchange.gov/ (attached as Exhibit 6).

BLM_0150237

affected environment is insufficient. BLM must incorporate that information into their hard look at impacts (e.g., the cumulative impact of climate change, the proposed action, and other past, present, and reasonably foreseeable impacts), in particular to help inform the design and consideration of alternatives and mitigation measures.

Critically, the final plan should emphasize that agencies may not shirk their responsibility to assess climate change merely because of uncertainties. "Reasonable forecasting and speculation is…implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labelling any and all discussion of future environmental effects as 'crystal ball inquiry.'" *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1246 n.9 (9th Cir. 1984 (quoting *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm.*, 481 F.2d 1079, 1092 (D.C. Cir. 1973)). NEPA's hard look merely requires "a reasonably thorough discussion of the significant aspects of the probable environmental consequences" to "foster both informed decision-making and informed public participation." *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1194 (9th Cir. 2008) (quotations and citations omitted). As here, BLM has refused to address the implications of their actions in the context of climate change on the basis of uncertainties, such as the lack of fine-scale modeling, which has led BLM to take short-sighted, arbitrary, and capricious action that does not, in fact, account for climate change.

In this context, and to accurately account for and integrate climate change impacts into the affected environment, hard look, alternatives, and mitigation analysis, BLM should evaluate the relevant resources, ecosystems, or communities for key vulnerabilities as part of the baseline assessment. The vulnerability of ecosystems and communities, as well as the species and physical elements they comprise, depends on their inherent qualities and their ability to change or adapt to address new climatic conditions. For example, the vulnerability of certain species can be affected by the tolerance of individual organisms to the direct effects of climate change, the ability of populations to adapt to those conditions through the expression of genetic variability, and the ability to adjust behaviorally to changes in the ecosystem, such as prey shifts. A vulnerability assessment would examine the species and physical elements of existing ecosystems and determine which elements are sensitive, which are resilient, which have the ability to adapt, and what the likely consequences would be of anticipated changes in climate. Human infrastructure—bridges, roads, buildings, etc.—should be assessed similarly.

Because ecosystems (including the human communities that rest within such ecosystems) are so complex, it is impossible to evaluate the vulnerabilities of every population, species, community, or other element of the system in question. Instead, risk assessment must focus on particular, high-priority elements or "key vulnerabilities." In its 5th Assessment Report, the IPCC suggested the following criteria for identifying key vulnerabilities:

- Exposure of society, community or social-ecological system to climate stressors.

- Importance of vulnerable system(s).

- Limited ability of society, community, or social-ecological systems to cope with and build adaptive capacities or limit the adverse consequences of climate related hazard.

BLM_0150238

- Persistence of vulnerable conditions and degree of irreversibility of consequences.

- Presence of conditions that make societies highly susceptible to cumulative stressors in complex and multiple-interacting systems.

In other words, key vulnerabilities are likely to occur where the effects of climate change are large and intense, imminent, long lasting, highly probable, irreversible, and likely to limit the distribution of highly valued systems or system elements. BLM should clarify that understanding and assessing these vulnerabilities, based on existing information and tools,[271] is a key component of the affected environment, hard look at impacts, and the design and consideration of alternatives and mitigation measures.

### H.    BLM Must Ensure That Any Subsequently-Prepared NEPA Document Addresses Mitigation for Climate Impacts Consistent with All Relevant Laws and Policies, Including Current Mitigation Guidance.

NEPA's statutory language implicitly charges agencies with mitigating the adverse environmental impacts of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351-52 (1989); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1522 (10th Cir. 1992). Mitigation measures are required by NEPA's implementing regulations. 40 C.F.R. §§ 1502.14(f), 1502.16(h).

The CEQ has stated: "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperation agencies ...." Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18031 (March 23, 1981). According to the CEQ, "[a]ny such measures that are adopted must be explained and committed in the ROD." Forty Questions, 46 Fed. Reg. at 18036.

The Tenth Circuit has held that an agency's analysis of mitigation measures "must be 'reasonably complete' in order to 'properly evaluate the severity of the adverse effects' of a proposed project prior to making a final decision." *Colo. Envt'l Coalition v. Dombeck*, 185 F.3d 1162, 1173 (10th Cir. 1999) (quoting Robertson, 490 U.S. at 352). Mitigation "must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1154 (9th Cir. 1997) (quoting *Robertson*, 490 U.S. at 353).

"[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." *Robertson*, 490 U.S. at 353. A "perfunctory description," of mitigation, without "supporting analytical data" analyzing their efficacy, is inadequate to satisfy NEPA's requirements that an agency take a "hard look" at possible mitigating measures. *Neighbors of*

---

[271] Where there is scientific uncertainty, agencies must satisfy the requirements of 40 C.F.R. § 1502.22.

BLM_0150239

*Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998). An agency's "broad generalizations and vague references to mitigation measures ... do not constitute the detail as to mitigation measures that would be undertaken, and their effectiveness, that the Forest Service is required to provide." *Id.* at 1380-81. *See also Northwest Indian Cemetery Protective Association v. Peterson*, 795 F.2d 688, 697 (9th Cir. 1986), rev'd on other grounds, 485 U.S. 439 (1988) ("A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA."); *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1151 (9th Cir. 1988) ("Without analytical data to support the proposed mitigation measures, we are not persuaded that they amount to anything more than a 'mere listing' of good management practices."). Moreover, in its final decision documents, an agency must "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. § 1505.2(c).

CEQ also recognizes that the consideration of mitigation measures and reasonable alternatives is closely related. For example, CEQ's guidance on mitigation and monitoring states that "agencies may commit to mitigation measures considered as alternatives in an EA or EIS so as to achieve an environmentally preferable outcome." Council on Environmental Quality, Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact (Jan. 14, 2011) at 1 (hereafter "CEQ Mitigation Guidance"); *see also id.* at 6-7 ("When a Federal agency identifies a mitigation alternative in an EA or an EIS, it may commit to implement that mitigation to achieve an environmentally-preferable outcome.").

Guidance from CEQ specifically directs agencies to consider where appropriate a variety of mitigation measures for actions that will cause climate pollution, including measures that will capture or use methane emissions:

> As Federal agencies evaluate potential mitigation of GHG emissions and the interaction of a proposed action with climate change, the agencies should also carefully evaluate the quality of that mitigation to ensure it is additional, verifiable, durable, enforceable, and will be implemented. Agencies should consider the potential for mitigation measures to reduce or mitigate GHG emissions and climate change effects when those measures are reasonable and consistent with achieving the purpose and need for the proposed action. Such mitigation measures could include enhanced energy efficiency, lower GHG-emitting technology, carbon capture, carbon sequestration (e.g., forest, agricultural soils, and coastal habitat restoration), sustainable land management practices, and capturing or beneficially using GHG emissions such as methane.[272]

---

[272] Final Climate Guidance at 19 (attached as Exhibit 4) (citation omitted).

BLM_0150240

     **1.**     **Consistent with the Mitigation Hierarchy, BLM Must Avoid, Minimize and Offset Impacts from Fossil Fuels Made Available by the Uncompahgre RMP, Including Climate Change-Related Impacts.**

BLM has significant obligations and authority related to mitigation for all unavoidable impacts. Secretarial Order 3330 requires the development of a landscape-scale mitigation policy for the Department of the Interior, which is appropriately done at the field office plan level. Section 4(c) of Secretarial Order 3330 directs the Department of the Interior's Energy and Climate Change Task Force to:

> [I]dentify any new policies or practices, revisions to existing policies or practices, or regulatory or other changes that could be implemented to incorporate landscape-scale planning into mitigation-related decisions… The Task Force will also determine what steps can and should be taken to ensure that mitigation opportunities are identified as early in the permitting process as possible, such as at the scoping or pre-application stage, to maximize predictability and transparency in the review and permitting process.

In a report to the Secretary of the Interior, the Energy and Climate Change Task Force laid out a landscape approach to mitigation.[273] This approach contained the following steps:

> 1. Identifying key landscape attributes, and the conditions, trends and baselines that characterize these attributes;
>
> 2. Developing landscape-scale goals and strategies;
>
> 3. Developing efficient and effective compensatory mitigation programs for impacts that cannot be avoided or minimized; and
>
> 4. Monitoring and evaluating progress and making adjustments, as necessary, to ensure that mitigation is effective despite changing conditions.

BLM's current guidance (IM No. 2013-142 and Draft Manual Section 1794) states that as part of approving specific land uses, mitigation implementation may be "within (onsite) or outside of the area of impact." The manual emphasizes that onsite mitigation is always the first choice, including a "mitigation priority order," then discusses options to provide offsite mitigation by replacing or providing similar or substitute resources or values through "restoration, enhancement, creation, or preservation."

BLM's policy emphasizes that it is designed to "shift the BLM's mitigation focus from a permit-by-permit perspective to a proactive regional-scale mitigation planning perspective" and

---

[273] Clement, J.P. *et al.*, A strategy for improving the mitigation policies and practices of the Department of the Interior. A report to the Secretary of the Interior from the Energy and Climate Change Task Force (April 2014), available at: https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Mitigation-Report-to-the-Secretary_FINAL_04_08_14.pdf (attached as Exhibit 145).

BLM_0150241