to cut across jurisdictions and land ownership to "attain the highest mitigation benefit, regardless of land ownership."[274] These key tools from the agency's guidance should also be emphasized as important aspects of incorporating mitigation into land use planning.

BLM is also considering new tools and approaches the agency could use to increase the effectiveness of mitigation on public lands, including layering protective management and designations and exploring creative ways existing authorities could be used for conservation benefits. Effective new mitigation tools and approaches should be integrated into planning as well.

Mitigating climate-related impacts includes avoiding and minimizing generation of GHG emissions through management prescriptions and preventing harm to carbon sinks. The CEQ guidance on considering climate change in NEPA analyses provides that agencies should analyze reasonable alternatives that would mitigate both direct and indirect GHG emissions impacts and the cumulative effects of climate change (e.g., enhanced energy efficiency, carbon sequestration, lower GHG-emitting technology).[275] BLM must address the quality of mitigation measures as well as ensure they are additional, verifiable, durable, enforceable, and will be implemented.

In addition to the legal and policy directions which require mitigation for climate impacts from the Uncompahgre RMP and provide the agency with ample discretion to require mitigation, it is important to underscore that, as a land manager, the federal government in general and BLM in particular are facing huge and rapidly escalating costs to address the impacts caused by fossil-fuel driven climate change. Forest fires, widespread drought, unusual flooding, rising sea levels, spread of invasive species and spread of disease already result in significant costs to the federal government, and each new fossil fuel production project that BLM authorizes through the Uncompahgre plan will worsen these problems and increase the associated costs. Research from the University of Vermont's Gund Institute for Ecological Economics and The Wilderness Society suggests that total costs in degraded ecosystem services on federal public lands could exceed $14.5 billion annually under a 2-degree Celsius warming scenario.[276] These costs are ultimately borne by all American taxpayers, and BLM has a responsibility to recoup these costs when it makes decisions authorizing activities that cause these impacts and associated costs.

The Uncompahgre draft RMP alternatives presently contain no mitigation measures aimed at reducing GHG emissions attributable to the plan. The RMP's failure to contain any GHG mitigation measures (despite the demonstrated harm that continued emissions will have to

---

[274] BLM, *Draft – Regional Mitigation*, Manual Section 1794 at 1-3 (attached as Exhibit 146).

[275] Final Climate Guidance at 13, 16 (attached as Exhibit 4).

[276] *See* Esposito, Valerie; Phillips, Spencer; Boumans, Roelof; Moulaert, Azur; Boggs, Jennifer. 2011. "Climate change and ecosystem services: The contribution of and impacts on federal public lands in the United States." In: Watson, Alan; Murrieta-Saldivar, Joaquin; McBride, Brooke, comps. *Science and stewardship to protect and sustain wilderness values: Ninth World Wilderness Congress symposium*; November 6-13, 2009; Merida, Yucatan, Mexico. Proceedings RMRS-P-64. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. 155-164, available at: http://www.fs.fed.us/rm/pubs/rmrs_p064.pdf (last viewed Oct. 27, 2016) (attached as Exhibit 147).

the Uncompahgre area, BLM lands generally, and across the globe), or to even consider any such mitigation measures violates NEPA.

> **2.     BLM Should Adopt a Mitigation Strategy as Part of the Uncompahgre Field Office RMP to Address Unavoidable Climate Change Impacts.**

To comply with NEPA's mandates, and BLM policy, concerning mitigation, BLM should require compensatory mitigation to offset the unavoidable direct and indirect climate change impacts of the Uncompahgre RMP. Such mitigation would contain several key features:

> - *BLM should quantify and offset emissions through specific compensatory mitigation actions*

Quantifying climate change impacts is becoming increasingly more practical, and the science connecting impacts to temperature changes increasingly more precise. Compensatory mitigation actions can be directed at enhancing the adaptive capacity of human and natural communities in the affected landscape to improve their health and resilience in the face of expected change. Offsetting actions should include investments in land protection to ensure that the UFO's ecological systems have the space and conditions to adapt.

Significant opportunity exists to offset GHG emissions. EPA has repeatedly urged land management agencies to assess carbon offsets in Environmental Assessments and EISs as a way to reduce the climate change impacts of agency actions. For example, EPA specifically recommended that the Forest Service's Lease Modifications EIS for the West Elk Mine (on which the Uncompahgre Field Office was a cooperating agency) "acknowledge that revenues for carbon credits are available via several existing markets."[277] Similarly, EPA has recommended that a Forest Service NEPA analysis of a forest health project "discuss reasonable alternatives and/or potential means to mitigate *or offset* the GHG emissions from the action."[278] Numerous state agencies already use offsets to control GHG emissions.[279] Offsets can include participation in third-party offset markets or renewable energy credits.

In any subsequently prepared NEPA document, the BLM should consider mitigation measures that offset the direct and indirect carbon emissions attributable to the draft plan alternatives – 27 million tons. Specifically, BLM should consider requiring that purchasers of

---

[277] EPA July 2012 Comment Letter at 5 (attached as Exhibit 148) (identifying four U.S. carbon exchanges creating a market for carbon credits).

[278] Letter of L. Svoboda, EPA, to T. Malecek, USFS, at 8 (Oct. 27, 2010) (attached as Exhibit 149).

[279] *See, e.g.*, Settlement Agreement, ConocoPhillips and California (Sept. 10, 2007) (California agency requiring offsets as a condition of approving a project) (attached as Exhibit 150); Minn. Stat. § 216H.03 subd. 4(b) (Minnesota law requiring offsets for certain new coal-fired power plants); Me. Rev. Stat. Ann. tit. 38, § 580-B(4)(c) (Maine law establishing greenhouse gas initiative that includes the use of carbon offsets).

BLM_0150243

fossil fuel leases be required to purchase offsets from reputable carbon markets that offset the direct and indirect greenhouse gas emissions from the mining and combustion of fossil fuels from their leases.

> • *BLM should address the full scope of lifecycle emissions through avoidance, minimization, and compensatory mitigation for fossil fuel production, transport and combustion.*

The premise of compensatory mitigation is to address unavoidable harm. In the case of fossil fuel production, the harm from GHG emissions is primarily attributable to end-use combustion. Nevertheless, BLM should at least address the direct emissions that could be avoided or minimized by, for example, requiring the capture or combustion of methane from coal mines, adopting enforceable mitigation requirements to minimize methane emissions and waste from oil and gas production, etc.

> • *BLM should specify whether compensatory mitigation should be paid on an annual basis or paid up front.*

Fees collected for compensatory mitigation are often paid in a lump sum at the beginning of a project's operational life. In the case of climate impacts, however, it may make more sense to consider an annual payment on the basis of production, or an annualized payment schedule based on expected production with corrections on a semi-annual basis. By spreading payments over the life of the project (and tying them to when the impacts actually occur), the system should be both fairer to producers and more true to the spirit of mitigation.

> • *BLM must ensure that compensatory mitigation actions are additional and durable, and last for the duration of impacts.*

This is an established principle for the Department's approach to mitigation, but it is particularly important with regard to climate impacts. For example, the Australian Government's Climate Change Authority found that, "Assessing additionality is a key feature of all baseline and credit schemes. An additionality test assesses whether a project or activity creates 'additional' emissions reduction that would not have occurred in the absence of the incentive. The baseline for the project assesses how much emissions have been reduced. Additionality is important to ensure that a baseline and credit scheme does not pay for emissions reductions that would have occurred anyway."[280]

## IV.   The UFO Failed to Take a Hard Look at the Direct, Indirect and Cumulative Impacts of Fossil Fuel Development on Resource Values in the Planning Area.

The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and its implementing regulations, promulgated by the Council on Environmental Quality ("CEQ"), 40

---

[280] *See* Australian Government Climate Change Authority, *Additionality*,
http://www.climatechangeauthority.gov.au/reviews/carbon-farming-initiative-study/additionality.

BLM_0150244

C.F.R. §§ 1500.1 *et seq.*, is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1. Recognizing that "each person should enjoy a healthful environment," NEPA ensures that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences," among other policies. 43 U.S.C. § 4331(b).

NEPA regulations explain, in 40 C.F.R. §1500.1(c), that:

> Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.

Thus, while "NEPA itself does not mandate particular results, but simply prescribes the necessary process," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989), agency adherence to NEPA's action-forcing statutory and regulatory mandates helps federal agencies ensure that they are adhering to NEPA's noble purpose and policies. *See* 42 U.S.C. §§ 4321, 4331.

NEPA imposes "action forcing procedures … requir[ing] that agencies take a *hard look* at environmental consequences." *Methow Valley*, 490 U.S. at 350 (citations omitted) (emphasis added). These "environmental consequences" may be direct, indirect, or cumulative. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8. A cumulative impact – particularly important here – is defined as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

Federal agencies determine whether direct, indirect, or cumulative impacts are significant by accounting for both the "context" and "intensity" of those impacts. 40 C.F.R. § 1508.27. Context "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality" and "varies with the setting of the proposed action." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of the impact" and is evaluated according to several additional elements, including, for example: unique characteristics of the geographic area such as ecologically critical areas; the degree to which the effects are likely to be highly controversial; the degree to which the possible effects are highly uncertain or involve unique or unknown risks; and whether the action has cumulatively significant impacts. *Id.* §§ 1508.27(b).

BLM_0150245

Furthermore, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, directs that "the public lands be managed in a manner that will protect the quality of [critical resource] values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8). This substantive mandate requires that the agency not elevate the development of oil and gas resources above other critical resource values in the planning area, as the UFO has done, here. To the contrary, FLPMA requires that where oil and gas development would threaten the quality of critical resources, that conservation of these resources should be the preeminent goal.

## A.    *The UFO Failed to Take a Hard Look at Certain Impacts to Air Quality.*

### 1.    Comprehensive Air Resource Protection Protocol

In general, the Comprehensive Air Resource Protection Protocol ("CARPP") proposed for the RMP/EIS is a reactive management tool, as opposed to a proactive one. There is very little required action in the CARPP unless or until an exceedance of a National Ambient Air Quality Standard ("NAAQS") is recorded, making it ineffective as a tool to ensure air quality protection. And even when an air quality exceedance of the NAAQS is recorded, the BLM has established many opportunities for non-action. The discretionary nature of the CARPP is very concerning, especially if it is relied upon in the draft RMP/EIS as a primary means for protecting air resources and used by BLM to justify not proposing additional management actions to address significant impacts shown in the impact analysis. BLM must establish a comprehensive set of mitigation measures for the RMP/EIS that ensures no significant air quality impacts from the proposed development would occur based on the best currently-available analysis tools, and should then use the CARPP as a means to improve upon and update those measures, as needed, based on periodic and specific monitoring and modeling commitments that the agency agrees to implement.

Evaluation of the overarching purpose, scope and responsibilities under the CARPP (Section I) requires analysis of how the CARPP relates to the RMP/EIS and the BLM's authority under NEPA, which the UFO failed to provide. Of concern is the fact that the CARPP can be modified "without maintaining or amending any specific Field Office RMP". CARPP Section I.A. Any modifications to the CARPP should include adequate public participation opportunities. Important public notification and participation provisions of the CARPP include: (1) the commitment to make the Colorado Air Resources Management Modeling Study (CARMMS) results and analysis available to the public (Section III.C.3); and (2) the commitment to complete an annual summary report that is made available to public (Section V). The periodic review of the reasonably foreseeable development projections to be conducted every three to five years must also be made available to the public (Section IV.E).

It is important to ensure that monitoring data collected as part of the CARPP is also made available to the public. Under the Monitoring Data Transparency provision of the CARPP, BLM states that, "the BLM will ensure that ambient air monitoring data collected as a COA for any BLM authorized activity will be made publicly available within the body or our annual report required under Section V of this protocol". CARPP Section III.A.4. BLM must work with the

BLM_0150246

State of Colorado and EPA to establish a more comprehensive monitoring network in the planning area and it is vitally important that the data collected from monitoring efforts throughout the planning area are quality assured and made publicly available through the State and/or EPA websites.

The CARPP states that BLM will participate in a cooperative effort to establish a comprehensive monitoring network in the planning area and share collected data with other agencies and the public, "as appropriate" and "contingent upon available funding" (Section III.A.1). This is an important provision of the CARPP and BLM should work with the State and EPA to expand monitoring in the area. Establishment of a more comprehensive monitoring network will help serve as a backstop to track and ensure air quality protection throughout the planning area and to help identify areas of concern with regard to air impacts. But the adaptive management process must require frequent and specific actions are taken in order to *prevent* significant impacts throughout the planning area – as opposed to taking corrective action after a significant impact is identified, as the current management plan proposes.

For the BLM's Greater Natural Buttes adaptive management plan, the National Park Service advocated for the establishment of specific monitored ozone "trigger points" set at levels *below* the NAAQS and tied to immediate implementation of enhanced mitigation measures, including phased development.[281] Similarly, for the Gasco adaptive management plan, EPA provided the following input to BLM to ensure the adaptive management strategy would help prevent significant adverse impacts to air quality:

> First, the draft EIS does not make clear what would constitute a "significant increase" in the emissions inventory, triggering the need for a new modeling analysis. Second, the strategy should include monitoring that conforms to 40 CFR Parts 50 and 58, with an emphasis on obtaining measurements that contribute to the formation of secondarily formed pollutants such as $PM_{2.5}$ and ozone. The EIS should identify how monitoring results may trigger a need for additional modeling. Finally, the adaptive management strategy should address how BLM and Gasco will address the proposed lowering of the ozone standard.[282]

BLM must establish specific triggers, as outlined by NPS and EPA. Without these specific triggers for further specific action, the CARPP cannot function as an adaptive tool to ensure mitigation measures are appropriate to prevent significant impacts to air quality.

Section III of the CARPP is titled "Actions to Analyze & Protect Air Quality" yet it is almost entirely made up of discretionary and non-specific actions; *e.g.*, BLM *may* require pre-construction monitoring, *may* require life-of-project monitoring, *may* require project-specific modeling, *may* participate in future regional modeling studies, *may* require mitigation measures and best management practices, etc. BLM must establish a specific meaning for what is meant by "a substantial increase in emissions" in Section III.C.1, and must establish specific, numeric

---

[281] *See* BLM Greater Natural Buttes FEIS at P-68.

[282] Letter from EPA to BLM, Re: Comments on the Gasco Uinta Basin Natural Gas Development Project Draft EIS CEQ # 20100386 (January 7, 2011) [hereinafter "EPA 2011 Letter"] (attached as Exhibit 194).

criteria for the permitting factors in Section III.D., including, for example: what specific magnitude, duration, proximity, conditions, intensity and issues would trigger what specific, corresponding levels of analysis, monitoring, and reporting. More generally, BLM must establish more definitive requirements for monitoring, modeling, permitting and mitigations in Section III of the CARPP. As written, this section of the CARPP only offers analysis and protection of air resources through discretionary means and therefore cannot be relied on to ensure adequate air resource protection. The CARMMS predictions for all alternatives forecast a two- or three-fold increase in criteria pollutants. There is little chance that these significant increases won't cause or contribute to exceedances of the NAAQS. BLM must address this and plan restrictions in this RMP to avoid these almost certain violations.

Section IV of the CARPP includes the adaptive management processes but fails to include enforceable measures that will ensure protection of air resources. Even the enforcement and contingency planning for responding to exceedances of the NAAQS are discretionary and provide no assurances for action. As with Section III, the adaptive management process must incorporate specific, numeric thresholds that trigger further specific actions. Noted below are examples of the nonspecific, noncommittal language included in the CARPP:

> If during the course of our annual analysis it is determined that the model has not demonstrated a reasonable correlation of predicted impacts (for modeled emissions inventory levels) compared against the actual emissions recorded for a planning area, the BLM will investigate the potential sources of the discrepancy to determine a potential cause, such as meteorological factors (ex: winter time ozone, which cannot be modeled at this time), or fee mineral development (i.e. non-BLM authorized actions). If a probable cause for the discrepancy cannot be established, then the BLM will initiate interagency coordination with our regulatory partners to determine if a new modeling analysis is potentially warranted.

CARPP Section IV.C.

BLM should clearly define what it would consider to be "a reasonable correlation" and must specify what would trigger the need for a new modeling analysis. In the provision for evaluating projected future development BLM says it will, "use the projected development/emissions data to determine whether the modeling analysis remains appropriate as a reference for any subsequent project analyses." CARPP Section IV.E. Again, BLM must establish a threshold that defines what specific measure of difference in the inventory data would trigger a subsequent analysis. Without these specific thresholds that trigger further action, the CARPP cannot function as an adaptive tool to ensure mitigation measures are appropriate to prevent significant impacts to air quality.

### 2.    Air Resource Mitigation Measures

In addition to the CARPP, BLM should commit to implementation of specific and enforceable management actions that ensure no significant impacts to air quality and air quality related values—as determined by air quality modeling—in the RMP/EIS. The CARPP should only be used as a tool to improve upon and adapt these management actions as more and

BLM_0150248

improved data become available. Specifically, BLM must consider Best Management Practices (BMPs) to ensure that human health and the environment are protected from oil and gas drilling over the life of the new RMP—as detailed below in Section IV.B.10.

### 3. Ozone Impacts

Background concentrations of ozone in the Uncompahgre RMP planning area are already at or exceed the National Ambient Air Quality Standards ("NAAQS"), leaving virtually no room for growth in emissions as contemplated by the Uncompahgre RMP. The DEIS discloses: "The 2008 Base Case indicates that there are areas within the Uncompahgre planning area that are above the 70 parts per billion NAAQS, with the maximum ozone concentrations in the range of 73-76 parts per billion estimated in southeast Mesa County, central Montrose County, northeast Delta County and along the Delta and Gunnison County border." DEIS at 4-50; *see also* DEIS at 4-49.[283] Moreover, the DEIS does not include wintertime ozone monitoring information within the Uncompahgre RMP planning area. Spikes in ozone levels have been documented to occur in oil and gas producing basins in the Western United States during cold, snowy periods when wintertime "inversions" concentrate air pollutants from oil and gas activities.[284] Indeed, it is well known that the communities of Somerset, Paonia, Hotchkiss and Crawford (the North Fork Valley) experience inversions during the winter months, similar to the winter inversions experienced in the Upper Green River basin of Wyoming, which has been declared to be in nonattainment for ozone because of oil and gas development in the basin. Thus, the ozone data included in the DEIS likely underestimates wintertime levels. Adding hundreds of additional oil and wells to the area, as the Uncompahgre RMP DEIS contemplates, will add hundreds of tons of additional ozone precursors to the region, threatening considerable exceedances of the ozone NAAQS—especially in wintertime in the region's valleys. *See id.*

BLM may not avoid including winter ozone modeling, even if information about winter ozone levels is incomplete. According to NEPA regulation, if an estimation of reasonably foreseeable significant adverse impacts cannot be obtained because, among other things, the means to obtain it are "not known," BLM has an obligation to include an evaluation "based upon theoretical approaches or research methods generally accepted in the scientific community," provided that "the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22. These methods of dealing with incomplete information are required under NEPA and must be thoroughly exercised before drawing the conclusion that a wintertime ozone analysis cannot be included in the RMP/EIS. *See id.*

BLM has, in fact, modeled winter ozone concentrations for other recent NEPA actions. Even though BLM did not perform a winter ozone modeling analysis of the proposed development, modeling results for wintertime ozone concentrations were included as part of the base case modeling performance evaluation for the Continental Divide-Creston (CD-C) DEIS in

---

[283] *See also* American Lung Association, *Report Card: Colorado*, http://www.lung.org/our-initiatives/healthy-air/sota/city-rankings/states/colorado/.

[284] Peter M. Edwards et al., *High Winter Ozone Pollution from Carbonyl Photolysis in an Oil and Gas Basin*, 514 Nature 351 (October 16, 2014).

BLM_0150249

Wyoming.[285] The DEIS included model performance evaluations for the 2005 and 2006 base case scenarios based on CD-C project modeling and on previously-conducted modeling for the Hiawatha Regional Energy Development Project EIS (Hiawatha). The results of the base case modeling evaluations suggest it is not unreasonable or inappropriate to include wintertime modeling results in BLM's analysis. Specifically, model results are presented in the CD-C DEIS and compared with year-round monitoring data at several sites.[286] In general, the modeling results appear to underestimate winter ozone concentrations, but not in all cases.[287] Generally, the results of the CD-C DEIS performance evaluation indicate that there is a tendency towards underestimation, especially at observed maximum concentrations in winter. Even so, if modeled wintertime ozone concentrations are shown to be a problem and the performance evaluation for the modeling indicates that modeled results likely underestimate impacts in winter then, at a minimum, the BLM would have an obligation under NEPA to reduce emissions from the proposed development in order to ensure there will be no significant impacts to wintertime ozone levels based on the modeling, as evaluated (with an underestimation bias). BLM should have considered a similar approach for the RMP/EIS, but failed to do so. As shown by the high wintertime ozone levels nearby in Rangely, in the Uinta Basin in Utah, as well as in Wyoming's Sublette County, wintertime ozone near concentrated oil and gas development has simply become far too big of an issue, of tremendous public interest and concern, to be ignored in this long-term planning action. BLM should use the CARPP process to improve upon the analysis and monitoring methods used to evaluate impacts in the area but should not delay any further in completing a winter ozone analysis for the UFO planning area using the best available methods.

Ozone has long been recognized to cause adverse health effects. Exposure to ozone can cause or exacerbate respiratory health problems—including shortness of breath, asthma, chest pain and coughing—can decrease lung function, and can even lead to long-term lung damage. *See also* EPA's National Ambient Air Quality Standards for Particulates and Ozone, 62 FR 38,856 (July 18, 1997). Short term exposure to ozone causes multiple negative respiratory effects, from inflammation of airways to more serious respiratory effects that can lead to use of medication, absences from school and work, hospital admissions, emergency room visits, and chronic obstructive pulmonary disease ("COPD"). According to a recent report by the National Research Council ("NRC"), short-term exposure to current levels of ozone in many areas is likely to contribute to premature deaths.[288] As described in more detail below, even ozone concentrations as low as 60 ppb can be harmful to human health. Long-term exposure to elevated levels of ozone results in numerous negative harmful effects, such as permanent lung damage and abnormal lung development in children. Long-term exposure may also increase risk of death from respiratory problems. Short- and long-term exposure to elevated levels of ozone can also harm people's hearts and cardiovascular systems. *See* 79 Fed. Reg. 75234-311.

---

[285] *See* BLM Continental Divide-Creston (CD-C) AQTSD Appendix A.

[286] BLM CD-C AQTSD Appendix A at 68.

[287] *See, e.g.,* BLM CD-C AQTSD Appendix A at 68 (Close to the project area, the performance of the CD-C and Hiawatha modeling appears to be reasonably good "with the exception of a few days, the two base case simulations reproduce the observed ozone at [the OCI monitor] reasonably well.").

[288] National Research Council, *Link Between Ozone Air Pollution and Premature Death Confirmed,* (April 2008), available at:
http://www8.nationalacademies.org/onpinews/newsitem.aspx?RecordID=12198.

BLM_0150250

On October 26, 2015, EPA published a final rule to revise the NAAQS for ozone to 70 parts per billion (ppb) from the current 75 ppb. National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65292 (Oct. 26, 2015). This decision was driven by significant recent scientific evidence that the standard of 75 ppb was not adequately protecting public health. *Id.* at 136. In fact, recent studies have documented decreased lung functioning and airway inflammation in young, healthy adults at ozone concentrations as low as 60 ppb. *Id.* at 146.

Additionally, climate change is likely to worsen ozone pollution, offsetting the improvements in air quality and public health that would be expected from reductions in emissions of ozone precursors. As described by the EPA in its recent ozone rulemaking:

> In addition to being affected by changing emissions, future $O_3$ concentrations may also be affected by climate change. Modeling studies in the EPA's Interim Assessment (U.S. EPA, 2009a) that are cited in support of the 2009 Endangerment Finding under CAA section 202(a) (74 FR 66496, Dec. 15, 2009) as well as a recent assessment of potential climate change impacts (Fann et al., 2015) project that climate change may lead to future increases in summer $O_3$ concentrations across the contiguous U.S. While the projected impact is not uniform, climate change has the potential to increase average summertime $O_3$ concentrations by as much as 1-5 ppb by 2030, if greenhouse gas emissions are not mitigated. Increases in temperature are expected to be the principal factor in driving any $O_3$ increases, although increases in stagnation frequency may also contribute (Jacob and Winner, 2009). If unchecked, climate change has the potential to offset some of the improvements in $O_3$ air quality, and therefore some of the improvements in public health, that are expected from reductions in emissions of $O_3$ precursors.

80 Fed. Reg. 65292, 65300 (October 26, 2015). For example, climate change impacts include an increase in the area burned by wildfires, which, in turn are sources of $O_3$ precursors. *Id.* at 65371. While the DEIS acknowledges that climate change can increase the occurrence and severity of wildfires on BLM-administered land, DEIS at 4-18, the DEIS explicitly declines to address this impact of climate change on ozone pollution, DEIS at 4-24.

Venting from methane drainage wells from coal mines in the North Fork Valley may release significant amounts of volatile organic compounds (VOCs). As described in comments on a recent proposal to expand the West Elk mine, VOC emissions at Arch's West Elk mine are in violation of Colorado air quality regulations, according to data obtained by state regulators.[289] BLM must disclose these VOC emissions, address them in any air quality analysis, and acknowledge that any planning decision that permits these mines to continue mining will result in violations of the Clean Air Act due to the mines' continue refusal to obtain required permits.

---

[289] Letter of E. Zukoski, Earthjustice to S. Armentrout, Supervisor, GMUG National Forest (Apr. 12, 2016) at 63-68 (exhibit omitted) (attached as Exhibit 239).

BLM_0150251

### 4. Hazardous Air Pollutant Impacts

The UFO should look at additional hazardous air pollutant impacts from the proposed development, including the impacts from 1,3-butadiene and secondary formaldehyde that will result from the proposed development. The BLM has completed a more comprehensive analysis of HAPs in other recent NEPA actions which resulted in significant impacts from HAPs. Specifically, the Gasco EIS in Utah evaluated short-term and long-term impacts from numerous HAPs, including methanol, chlorinated solvents and acrolein.[290] The Gasco EIS analysis found elevated cancer risks for acetaldehyde, 1,3-butadiene, and ethylene dibromide, none of which are included in the RMP/EIS for the UFO.[291] DEIS, Appendix Q at Q-4 (identifying the HAP emissions that were estimated in the UFO RMP/EIS). The Gasco EIS also reported acrolein emissions that exceeded the acute Reference Exposure Level (REL) and the Reference Concentration for Chronic Inhalation (RfC).[292] Acrolein is also not included in the RMP/EIS assessment. BLM must include a more comprehensive analysis of HAP impacts and, in addition to the HAPs identified above, the BLM should also assess any HAP impacts associated with volatile emissions from hydraulic fracturing fluids. It is important to continue to improve upon the HAP analyses conducted under NEPA in order to ensure there are no significant health impacts from near-field exposure to HAPs from the proposed development in the planning area. *See* 40 C.F.R. §1508.27(b)(2).

### 5. Visibility and Ecosystem Impacts

Much of air pollution from oil and gas development and operations also degrades visibility. Section 169A of the Clean Air Act ("CAA"), 42, U.S.C. § 7401 *et seq.* (1970) sets forth a national goal for visibility, which is the "prevention of any future, and the remedying of any existing, impairment of visibility in Class I areas which impairment results from manmade air pollution." Congress adopted the visibility provisions in the CAA to protect visibility in "areas of great scenic importance." H.R. Rep. No. 294, 95th Cong. 1st Sess. at 205 (1977). In promulgating its Regional Haze Regulations, 64 Fed. Reg. 35,714 (July 1, 1999), the U.S. Environmental Protection Agency ("EPA") provided:

> Regional haze is visibility impairment that is produced by a multitude of sources and activities which emit fine particles and their precursors and which are located across a broad geographic area. Twenty years ago, when initially adopting the visibility protection provisions of the CAA, Congress specifically recognized that the "visibility problem is caused primarily by emission into the atmosphere of SO2, oxides of nitrogen, and particulate matter, especially fine particulate matter, from inadequate[ly] controlled sources." H.R. Rep. No. 95-294 at 204 (1977). The fine particulate matter (PM) (e.g., sulfates, nitrates, organic carbon, elemental carbon, and soil dust) that impairs visibility by scattering and absorbing light can cause serious health effects and mortality in humans, and contribute to environmental effects such as acid deposition and eutrophication.

---

[290] *See* BLM Gasco Energy Project FEIS, Table 4-12, Table 4-19 and Appendix H. April 2010.
[291] BLM Gasco FEIS Table 4-19.
[292] BLM Gasco FEIS Appendix H, at H-45.

BLM_0150252

The visibility protection program under sections 169A, 169B, and 110(a)(2)(J) of the CAA is designed to protect Class I areas from impairment due to man-made air pollution. The current regulatory program addresses visibility impairment in these areas that is "reasonably attributable" to a specific source or small group of sources, such as, here, air pollution resulting from oil and gas development and operations authorized by the RMP. *See* 64 Fed. Reg. 35,714.

Moreover, EPA finds the visibility protection provisions of the CAA to be quite broad. Although EPA is addressing visibility protection in phases, the national visibility goal in section 169A calls for addressing visibility impairment generally, including regional haze. *See e.g., State of Maine v. Thomas*, 874 F.2d 883, 885 (1st Cir. 1989) ("EPA's mandate to control the vexing problem of regional haze emanates directly from the CAA, which 'declares as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in Class I areas which impairment results from manmade air pollution.'") (citation omitted).

Here, there are at least 10 Class I areas in or near the planning area that may be impacted by the proposed development, including: the Black Canyon of the Gunnison National Park (inside the planning area); Arches National Park; Canyonlands National Park; Flat Tops Wilderness Area; Eagles Nest Wilderness; Maroon Bells – Snowmass Wilderness Area; West Elk Wilderness; Raggeds Wilderness; La Garita Wilderness; Weminuche Wilderness; and Mesa Verde National Park. *See* DEIS at 4-25.

The UFO provides visibility modeling based on the "projected federal and nonfederal oil and gas emissions throughout the 2.5 mile (4-kilometer) CARMMS domain plus mining on federal lands in Colorado," but provides no information about the contribution of the specific development contemplated by the UFO RMP/EIS. Yet the BLM acknowledges: "For all of the alternatives, the magnitude of emissions from oil and gas and coal and uranium mining development has the potential to impact air quality and air quality-related values (i.e., visibility and atmospheric deposition) within these areas." DEIS at 4-25. The nature and extent of these impacts must be considered and specifically analyzed in the UFO RMP/EIS.

## 6.     Air Quality Impacts on Human Health

Entirely absent from the agency's discussion of air quality impacts is the relationship to human health. Although adherence to air quality mitigation and NAAQS standards will have a positive relationship to human health, poor baseline air quality conditions due to direct, indirect and cumulative impacts in the planning area warrants an independent hard look analysis at human health; and, moreover, such analysis is required by NEPA and CEQ implementing regulations. As the Endocrine Disruption Exchange has noted:

> In addition to the land and water contamination issues, at each stage of production and delivery tons of toxic volatile compounds (VOCs), including BETX, other hydrocarbons, and fugitive natural gas (methane), can escape and mix with nitrogen oxides (NOx) from the exhaust of diesel-driven, mobile and stationary equipment, to produce ground-level ozone. One highly reactive molecule of ground level ozone can burn the deep aveolar tissue in the lungs, causing it to age

BLM_0150253

prematurely. Chronic exposure can lead to asthma and chronic obstructive
pulmonary diseases (COPD), and is particularly damaging to children, active
young adults who spend time outdoors, and the aged. Ozone combined with
particular matter less than 2.5 micrometers produces smog (haze) that has been
demonstrated to be harmful to humans as measured by emergency room
admissions during periods of elevation. Gas field produced ozone has created a
previously unrecognized air pollution problem in rural areas, similar to that found
in large urban areas, and can spread up to 200 miles beyond the immediate region
where gas is being produced. Ozone not only causes irreversible damage to the
lungs, it is similarly damaging to conifers, aspen, forage, alfalfa, and other crops
commonly grown in the West. Adding to this air pollution is the dust created by
fleets of diesel trucks working around the clock hauling the constantly
accumulating condensate and produced water to large waste facilities evaporation
pits on unpaved roads. Trucks are also used to haul the millions of gallons of
water from the source to the well pad.[293]

As discussed, development under the UFO RMP/EIS will increase ozone. The BLM
acknowledges: "The magnitude of estimated emissions from BLM-authorized oil and gas
activities at the level of development predicted over the life of the RMP in Alternatives A, B,
B.1, C, and D have the potential to contribute to increased ambient concentrations of ozone in,
adjacent to, and outside and downwind of the planning area." DEIS at 4-20. Research indicates a
strong correlation between oil and gas development and increased ozone concentrations –
particularly in the summer when warm, stagnant conditions yield an increase in $O_3$ from oil and
gas emissions.[294] Particularly in areas of significant existing oil and gas development – such as
heavily developed portions of the Piceance Basin, but also the San Juan Basin, which was the
subject of this research – summertime "peak incremental $O_3$ concentration of 10 ppb" have been
simulated. *Id.* at 1118. This study indicates a "clear potential for oil and gas development to
negatively affect regional $O_3$ concentrations in the western United States, including several
treasured national parks and wilderness areas in the Four Corners region. "It is likely that
accelerated energy development in this part of the country will worsen the existing problem."[295]
Additionally, and as mentioned above, oil and gas production in the mountain west has recently
been linked to winter ozone levels that greatly exceed the National Ambient Air Quality
Standards ("NAAQS").[296]

---

[293] Theo Colburn et al., *Natural Gas Operations from a Public Health Perspective*, available at:
http://endocrinedisruption.org/assets/media/documents/GasManuscriptPreprintforweb12-5-
11.pdf (attached as Exhibit 151).
[294] Marco A Rodriguez, et al., *Regional Impacts of Oil and Gas Development on Ozone
Formation in the Western United States*, JOURNAL OF AIR & WASTE MANAGEMENT ASSOCIATION
(Sept. 2009) (attached as Exhibit 152).
[295] *See* Rodriguez at 1118.
[296] *See* Gail Tonnesen and Richard Payton, EPA Region 8. *Winter Ozone Formation: Results
from the Wyoming Upper Green River Basin Studies and Plans for the 2012, Uintah Basin Study*
(seminar abstract) (Jan. 2012), available at:
http://www.esrl.noaa.gov/csd/seminars/2012/TonnesenPayton.html (citing, *inter alia*, Schnell, et.
al., *Rapid photochemical production ozone at high concentrations in a rural site during winter*, 2

BLM_0150254

Increases in ground-level ozone not only impact regional haze and visibility, but can also result in dramatic impacts to human health. According to the EPA:

> Breathing ground-level ozone can result in a number of health effects that are observed in broad segments of the population. Some of these effects include:
>
> - Induction of respiratory symptoms
> - Decrements in lung function
> - Inflammation of airways
>
> Respiratory symptoms can include:
>
> - Coughing
> - Throat irritation
> - Pain, burning, or discomfort in the chest when taking a deep breath
> - Chest tightness, wheezing, or shortness of breath
>
> In addition to these effects, evidence from observational studies strongly indicates that higher daily ozone concentrations are associated with increased asthma attacks, increased hospital admissions, increased daily mortality, and other markers of morbidity. The consistency and coherence of the evidence for effects upon asthmatics suggests that ozone can make asthma symptoms worse and can increase sensitivity to asthma triggers.[297]

Ozone is just one air-related byproduct of oil and gas development that may pose serious impacts to human health. Recent studies in Garfield County confirm that air toxics are generated during every stage of oil and gas development and can have potentially significant health impacts even at concentrations below regulatory thresholds.[298] Another recent study undertaken in rural Colorado locations found that women who lived close to gas wells were more likely to have children born with a variety of defects, from oral clefts to heart issues.[299] And, yet another recent study found that people who lived less than half a mile from a gas well had a higher risk of health issues. The research found a small increase in cancer risk and alleged that exposure to benzene was a major contributor to the risk.[300]

---

Nature Geosci. 120-122 (2009) (attached as Exhibit 153); *see also* Detlev Helmig *et al.*, *Highly Elevated Atmospheric Levels of Volatile Organic Compounds in the Uintah Basin, Utah,* ENVIRONMENTAL SCIENCE & TECHNOLOGY (March 13, 2014) (attached as Exhibit 154).
[297] EPA, *Health Effects of Ozone in the General Population,* available at: http://www.epa.gov/apti/ozonehealth/population.html (attached as Exhibit 155).
[298] Theo Colborn et al., *An exploratory study of air quality near natural gas operations,* HUM. ECOL. RISK ASSESS (Nov. 9, 2012) (attached as Exhibit 156).
[299] Lisa M. McKenzie et al., *Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado,* ENVIRONMENTAL HEALTH PERSPECTIVES (April 2014) (attached as Exhibit 157).
[300] McKenzie *et al.*

BLM_0150255

Oil and gas development is one of the largest sources of VOCs, ozone, and sulfur dioxide emissions in the United States. Nevertheless, the agency's preferred Alternative D leaves available approximately 865,970 surface acres within the planning area for oil and gas leasing and development, accounting for the development of approximately 330 federal wells. DEIS at 2-10, 4-36. The relationship between air quality and human health must be analyzed in the RMP/EIS. The failure of the UFO to do so, here, represents a fundamental shortcoming of the agency's analysis, and must be corrected. "The agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs., 463 U.S. at 43 (1983).*

## B.  The UFO Has Failed to Take a "Hard Look" at Resource Impacts from Hydraulic Fracturing.

Although advances in oil and gas extraction techniques – namely hydraulic fracturing, or "fracking" – have undoubtedly resulted in a growth of domestic production, the wisdom of these advances with regard to other resource values and human health is still very much in question.[301] As described in detail below, there is a wealth of information and reports stressing the dangers of fracking that must be considered in the agency's subject NEPA analysis. Of course, given the national attention and debate that fracking is generating, significant sources of new information and research are being consistently published warning against the dangers and impacts that fracking can produce, which must also be considered by the agency.

For example, as discussed in more detail below, hydraulic fracturing was identified as one of several causes of methane contamination of drinking water and a subsequent explosion at a home in Bainbridge Township, Ohio. Spills of hydraulic fracturing fluid into the Acorn Fork Creek in Kentucky resulted in a fish kill that affected the threatened Blackside Dace among other species. Also, one study modeled that chemically concentrated fracking fluids can migrate into groundwater aquifers within a matter of years – calling into question industry claims that rock layers separating aquifers are impervious to these pollutants.[302] Claims that there has never been a documented case of groundwater contamination from fracking was challenged by EPA's research in Pavillion, Wyoming. Indeed, a second round of testing in the Pavillion area was recently performed by the U.S. Geological Survey, which supported EPA's preliminary findings that hydraulic fracturing resulted in groundwater contamination.[303] Even in draft form, the Pavillion Report and its troubling findings as well as incidents described above and other evidence of fracking related contamination from around the country underscore the need for

---

[301] *See, e.g.,* A.R. Ingraffea, et. al., *Natural Gas, Hydraulic Fracking and a Bridge to Where?* (April 2011) (attached as Exhibit 158).

[302] *See,* Abrahm Lustgarten, *New Study Predicts Frack Fluids can Migrate to Aquifers Within Years,* PROPUBLICA, May 1, 2012, available at: https://www.propublica.org/article/new-study-predicts-frack-fluids-can-migrate-to-aquifers-within-years (attached as Exhibit 159); Josh Fox, *The Sky is Pink: Annotated Documents* (attached as Exhibit 160).

[303] Peter Wright, et. al., U.S. Geological Survey, *Groundwater-Quality and Quality-Control Data for Two Monitoring Wells near Pavillion, Wyoming,* April and May 2012 (attached as Exhibit 161).

BLM_0150256

thorough analysis to be performed by the UFO, which the agency failed to provide in the RMP and EIS.

The dangers and impacts of fracking can be found at every stage of the oil and gas production process. For example, fracking's waste stream can result in dramatic impacts – requiring onsite waste injection, trucking used frack fluids ("flowback") offsite, and in some cases even the direct release of fracking waste into watercourses – the impacts of which can be compounded by ineffective or nonexistent regulation.[304] As detailed herein, natural gas production itself can be inefficient and wasteful – with practices such as the venting of methane, [305] and the use of vast quantities of water in the fracking process.[306] In addition to being wasteful, these practices can also be quite harmful to human health and the environment.

### 1. Impacts from Hydraulic Fracturing Are Well Documented.

The potential impacts that may result from hydraulic fracturing are myriad and significant; and include, among others, impacts to water quality and supply, impacts to habitat and wildlife, impacts to human health, as well as impacts on greenhouse gas emissions and air quality.[307] Although industry often asserts that hydraulic fracturing is safe and doesn't result in contamination or harm to people and the environment, the New York Times recently uncovered a 1987 U.S. Environmental Protection Agency ("EPA") report to Congress which found, among other things, that fracking can cause groundwater contamination, and cites as an example a case where hydraulic fracturing fluids contaminated a water well in West Virginia.[308] The EPA

---

[304] *See* Abrahm Lustgarten, *The Trillion Gallon Loophole: Lax Rules for Drillers that Inject Pollutants Into the Earth,* PROPUBLICA, Sept. 20, 2012, available at:
https://www.propublica.org/article/trillion-gallon-loophole-lax-rules-for-drillers-that-inject-pollutants/single#republish (attached as Exhibit 162); Earthworks, *Breaking All the Rules: The Crisis in Oil & Gas Regulatory Enforcement,* September 2012 (attached as Exhibit 163).

[305] Energy Policy Research Foundation, *Lighting up the Prairie: Economic Considerations in Natural Gas Flaring,* Sept. 5, 2012 (attached as Exhibit 164); *see also,* James Hansen, et. al., *Greenhouse gas growth rates,* PNAS, vol. 101, no. 46, 16109-16114, Sept. 29, 2004 (attached as Exhibit 165) (curtailing methane waste is seen as a "vital contribution toward averting dangerous anthropogenic interference with global climate.").

[306] *See* GAO, *Energy-Water Nexus: Coordinated Federal Approach Needed to Better Manage Energy and Water Tradeoffs* (Sept. 2012) (attached as Exhibit 166); Nicholas Kusnetz, *The Bakken oil play spurs booming business – in water,* High Country News, Sept. 5, 2012, available at: http://www.hcn.org/issues/44.13/the-bakken-oil-play-spurs-a-booming-business-in-water/print_view (attached as Exhibit 167).

[307] *See, e.g.,* National Wildlife Federation, *No More Drilling in the Dark: Exposing the Hazards of Natural Gas Production and Protecting America's Drinking Water and Wildlife Habitats* (2011), available at: http://www.nwf.org/News-and-Magazines/Media-Center/Reports/Archive/2011/No-More-Drilling-in-the-Dark.aspx (attached as Exhibit167); *see also* United States Forest Service, Chloride Concentration Gradients in Tank-Stored Hydraulic Fracturing Fluids Following Flowback (Nov. 2010), available at: http://nrs.fs.fed.us/pubs/38533/ (last visited Oct. 27, 2016) (attached as Exhibit 168).

[308] *See* U.S. Environmental Protection Agency, Report to Congress, *Management of Wastes from*

BLM_0150257

report was further summarized and reviewed in an Environmental Working Group report,[309] and demonstrates the long-known dangers of employing this technology to extract mineral resources.

A Congressional Report issued in April 2011 reveals that energy companies have injected more than 30 million gallons of diesel fuel or diesel mixed with other fluids into the ground nationwide in the process of fracking to extract natural gas between 2005 and 2009.[310] In Colorado, 1.3 million gallons of fluids containing diesel fuel were used in fracking wells.[311] The EPA has stated that "the use of diesel fuel in fracturing fluids poses the greatest threat" to underground sources of drinking water.[312] According to Congresswoman Diana DeGette of Colorado, fracking with diesel fuel was done without permits in apparent violation of the Safe Drinking Water Act.[313]

Despite the energy industry's explanation that a thick layer of bedrock safely separates the gas-containing rock layer being fractured from ground-water used for drinking and surface water sources, evidence is emerging which warns that contaminants from gas wells are making their way into groundwater. Evidence suggesting contaminants from drilling and fracking operations have contaminated drinking water includes:

- In March 2004, gas was discovered bubbling up in West Divide Creek. The Colorado Oil and Gas Conservation Commission ("COGCC") took samples of the water and

---

the Exploration, Development, and Production of Crude Oil, Natural Gas, and Geothermal Energy (Dec. 1987), at Ch. IV, Damages Caused by Oil and Gas Operations (attached as Exhibit 169); see also Drilling Down, Documents: A Case of Fracking Related Contamination, THE NEW YORK TIMES ONLINE, available at: http://www.nytimes.com/interactive/us/drilling-down-documents-7.html?_r=1& (last visited Oct. 27, 2016).

[309] See Environmental Working Group, Cracks in the Façade: 25 Years ago, EPA Linked "Fracking" to Contamination (Aug. 2011) (attached as Exhibit 170).

[310] U.S. CONGRESS, HOUSE OF REPRESENTATIVES, COMMITTEE ON ENERGY AND COMMERCE, Chemicals Used in Hydraulic Fracturing (April 2011), at 10 (attached as Exhibit 171); see also Memorandum from Chairman Henry A. Waxman and Subcommittee Chairman Edward J. Markey, to Committee on Energy and Commerce, Examining the Potential Impact of Hydraulic Fracturing (Feb. 18, 2010) (attached as Exhibit 172).

[311] Karen Frantz, States probe use of diesel fuel, DURANGO HERALD, February 5, 2011, available at: http://www.durangoherald.com/article/20110206/NEWS01/702069922/-1/s.

[312] David O. Williams, U.S. House probe alleges Halliburton, others illegally used diesel in gas fracking, COLORADO INDEPENDENT, February 1, 2011, available at: http://coloradoindependent.com/73593/u-s-house-probe-alleges-halliburton-others-illegally-used-diesel-in-gas-fracking.

[313] Letter from U.S. CONGRESS, HOUSE OF REPRESENTATIVES, COMMITTEE ON ENERGY AND COMMERCE, Representatives Henry A. Waxman, Edward J. Markey, & Diana DeGette, to Lisa Jackson, Administrator, U.S. ENVIRONMENTAL PROTECTION AGENCY (Jan. 31, 2011), available at: http://degette.house.gov/media-center/press-releases/energy-commerce-committee-fracking-investigation-reveals-millions-of (attached as Exhibit 173); see also Environment News Service, Toxic Diesel Fuel Used Without Permits in Fracking Operations, February 4, 2011, available at: http://www.ens-newswire.com/ens/feb2011/2011-02-04-092.html.

BLM_0150258

discovered they contained benzene, which was traceable to a seep caused by EnCana while drilling for natural gas. EnCana was subsequently fined $371,000 as a result of contaminating West Divide Creek.[314]

- The COGCC investigated complaints from Weld County, Colorado that domestic water wells were allegedly contaminated from oil and gas development. The COGCC concluded after investigation that the Ellsworth's water well contained a mixture of biogenic and thermogenic methane that was in part attributable to oil and gas development. Ms. Ellsworth and the operator reached a settlement in that case.[315]

- In Pavillion, Wyoming, EPA found 11 of 39 water samples collected from domestic wells were contaminated with chemicals linked to local natural gas fracking operations. The EPA found arsenic, methane gas, diesel-fuel-like compounds and metals including copper and vanadium. Of particular concern were compounds called adamantanes – a natural hydrocarbon found in natural gas – and a little-known chemical called 2-butoxyethanol phosphate, or 2-BEp. 2-BEp is closely related to 2-BE, a substance known to be used in fracking fluids.[316]

- The Pennsylvania Department of Environmental Protection drafted a report that documented cases in two dozen communities where new or operating oil or gas wells led to methane migrating into drinking water wells and streams, as well as more than three dozen more cases where methane contamination of drinking water sources was linked to abandoned wells.[317]

- A house in Bainbridge, Ohio exploded on November 15, 2007. The investigators determined that the well had been improperly constructed, that hydraulic fractures grew out of zone, and pressure was not safely managed after fracturing, allowing gas to migrate into the shallow drinking water aquifer and subsequently into domestic water wells, culminating in the explosion.[318] The faulty cement casing of the well

---

[314] Colo. Oil & Gas Conservation Comm'n, *In the Matter of Alleged Violations of the Rules and Regulations of the Colorado Oil and Gas Conservation Commission by Encana Oil & Gas (USA) Inc., Garfield County Colorado*, Cause No. 1V, Order No. 1V-276 (August 16, 2004), available at: https://cogcc.state.co.us/orders/orders/1v/276.html (attached as Exhibit 196).

[315] Letter from David Neslin, Director, Colorado Oil and Gas Conservation Commission, to Mr. and Mrs. Ellsworth (August 7, 2009) (attached as Exhibit 175).

[316] *See* EPA Draft Report, *Investigation of Ground Water Contamination Near, Pavillion, Wyoming* (Dec. 2011) (attached as Exhibit 87).

[317] Pennsylvania Department of Environmental Protection, Bureau of Oil and Gas Management, *Stray Natural Gas Migration Associated with Oil and Gas Wells*, Draft Report (October 28, 2009), available at:
http://www.dep.state.pa.us/dep/subject/advcoun/oil_gas/2009/Stray%20Gas%20Migration%20C ases.pdf (attached as Exhibit 177).

[318] *See, e.g.* Ohio Department of Natural Resources, Division of Mineral Resources Management, *Report on the Investigation of the Natural Gas Invasion of Aquifers in Bainbridge Township of Geauga County, Ohio* (September 1, 2008) (attached as Exhibit 178); Bair, E. S.,

BLM_0150259

developed a crack allowing methane to seep underground and fill a residential basement.

- On January 1, 2009, a water well at a home in Dimock, Township, Susquehanna County, PA, exploded. The Pennsylvania Department of Environmental Protection ("PA DEP") documented elevated levels of methane in numerous drinking water wells near Cabot natural gas wells and concluded that the elevated methane in drinking water was a result of Cabot's failure to properly case and cement several of its gas wells, which allowed methane to migrate from the wells into drinking water.[319]

Other known and suspected adverse effects of drilling and fracking operations include:

- Garfield County, Colorado, Commissioners recently expressed their health and safety concerns regarding natural gas drilling and fracking by stating in a legal filing that, "No agency…can guarantee Garfield County residents that exposures to oil and gas emissions will not produce illness or latent effects, including death." They cited the cases of three people – Chris Mobaldi, Verna Wilson, and Jose Lara – who died after suffering from drilling-related illnesses in Garfield County.[320]

- In April 2008, a nurse at a hospital in Durango, Colorado, became critically ill and almost died of organ failure as a result of second-hand chemical exposure acquired while treating a drill rig worker who had fracking fluid on his clothes.[321]

- In Texas, which now has approximately 93,000 natural-gas wells, up from around 58,000 a dozen years ago, a hospital system in the six counties with some of the heaviest drilling reported in 2010 a 25 percent asthma rate for young children, more than three times the state rate of about 7 percent.[322]

---

Freeman, D. C., & Senko, J. M. (2010, June). *Expert Panel Technical Report, Subsurface Gas Invasion Bainbridge Township, Geauga County, Ohio*, available at: https://oilandgas.ohiodnr.gov/portals/oilgas/pdf/bainbridge/DMRM%20%20Title%20Page,%20 Preface,%20Acknowledgements.pdf (attached as Exhibit 179).

[319] Pennsylvania Department of Environmental Protection. (2009, November 4). Consent Order and Agreement between Cabot Oil and Gas Corporation and the Pennsylvania Department of Environmental Protection, available at: http://files.dep.state.pa.us/oilgas/OilGasLandingPageFiles/FinalCO&A121510.pdf (attached as Exhibit 180) (hereinafter "Cabot Consent Order").

[320] David O. Williams, *GarCo officials blast state gas drilling rules in case requesting more well density*, THE COLORADO INDEPENDENT, January 19, 2011, available at: http://coloradoindependent.com/72246/garco-officials-blast-state-gas-drilling-rules-in-case-requesting-more-well-density.

[321] Eric Frankowski, *Gas industry secrets and a nurse's story*, HIGH COUNTRY NEWS, July 28, 2008, available at: http://www.hcn.org/wotr/gas-industry-secrets-and-a-nurses-story.

[322] Ian Urbina, *Regulations Lax as Gas Well's Tainted Waters Hits Rivers*, THE NEW YORK TIMES, February 26, 2011, available at: http://www.nytimes.com/2011/02/27/us/27gas.html?pagewanted=all.

BLM_0150260

Abrahm Lustgarten, an investigative reporter with ProPublica, who has won the George Polk Award for Environmental Reporting for his work on the dangers of natural gas drilling, writes:

> Dennis Coleman, a leading international geologist and expert on tracking underground migration, says more data must be collected before anyone can say for sure that drilling contaminants have made their way to water or that fracturing is to blame. But Coleman also says there's no reason to think it can't happen. Coleman's Illinois-based company, Isotech Laboratories, has both the government and the oil and gas industry as clients. He says he has seen methane gas seep underground for more than seven miles from its source. If the methane can seep, the theory goes, so can the fluids.[323]

Important evidence of groundwater contamination from hydraulic fracturing is found in an EPA draft report investigating ground water contamination near Pavillion, Wyoming ("Pavillion Report").[324] Among its findings, the Pavillion Report provides:

> Elevated levels of dissolved methane in domestic wells generally increase in those wells in proximity to gas production wells. Pavillion Report, at xiii.

> Detection of high concentrations of benzene, xylenes, gasoline range organics, diesel range organics, and total purgeable hydrocarbons in ground water samples from shallow monitoring wells near pits indicates that pits are a source of shallow ground water contamination in the area of investigation. Pits were used for disposal of drilling cuttings, flowback, and produced water. There are at least 33 pits in the area of investigation. When considered separately, pits represent potential source terms for localized ground water plumes of unknown extent. When considered as whole they represent potential broader contamination of shallow ground water. *Id.* at 33 (emphasis added).

> The explanation best fitting the data for the deep monitoring wells is that constituents associated with hydraulic fracturing have been released into the Wind River drinking water aquifer at depths above the current production zone. *Id.* (emphasis added).

> Although some natural migration of gas would be expected above a gas field such as Pavillion, data suggest that enhanced migration of gas has occurred to ground water at depths used for domestic water supply and to domestic wells. *Id.* at 37 (emphasis added).

---

[323] Abrahm Lustgarten, *Hydrofracked? One Man's Mystery Leads to a Backlash Against Natural Gas Drilling*, PROPUBLICA, February 25, 2011, available at:
http://www.propublica.org/article/hydrofracked-one-mans-mystery-leads-to-a-backlash-against-natural-gas-drill/single.

[324] EPA Draft Report, Pavillion (attached above as Exhibit 176).

BLM_0150261

A lines of reasoning approach utilized at this site best supports an explanation that inorganic and organic constituents associated with hydraulic fracturing have contaminated ground water at and below the depth used for domestic water supply…. A lines of evidence approach also indicates that gas production activities have likely enhanced gas migration at and below depths used for domestic water supply and to domestic wells in the area of investigation. *Id.* at 39 (emphasis added).

Although the Pavillion Report was never finalized, EPA shared preliminary data with, and obtained feedback from, Wyoming state officials, EnCana, Tribes, and Pavillion residents, prior to release. Even in draft form, the Pavillion Report and its troubling findings – as well as other evidence of fracking related contamination from around the country – satisfies the low threshold for consideration of the impacts described therein in the NEPA analysis for the UFO RMP.[325]

Historically, BLM has been dismissive of possible impacts to water quality from hydraulic fracturing. However, given the weight of both new and old evidence documenting the risk of water contamination from gas drilling across the country and within the planning area, BLM's approach is becoming increasingly untenable. Indeed, even an industry report prepared for Gunnison Energy Corporation – a major oil and gas developer with leases just south of the UFO – has acknowledged the potential for significant impacts to water resources from fracking.[326] The simple fact of the matter is that natural gas development has the potential for poisoning our water with toxic, hazardous, and carcinogenic chemicals as well as naturally occurring radioactive radium, and BLM has failed to provide a thorough hard look analysis of these potentially significant impacts in its analysis for UFO RMP.

Recent reporting from New Mexico has acknowledged a proliferation of "frack hits," or "downhole communication," where new horizontal drilling for oil is communicating with both historic and active vertical wells.[327] This is a significant development that could result in well blowouts, contamination of resources, and issues over who is responsible for liabilities and costs of such impacts.

---

[325] For the results of a recent investigation of the potential contamination in Pavillion, *see* Dominic DiGiulio and Robert B. Jackson, *Impact to Underground Sources of Drinking Water and Domestic Wells from Production Well Stimulation and Completion Practices in the Pavillion, Wyoming, Field*, Environmental Science and Technology (March 29, 2016), available at: http://pubs.acs.org/doi/pdf/10.1021/acs.est.5b04970.

[326] *See* Gunnison Energy Corporation, *Analysis of Potential Impacts of Four Exploratory Natural Gas Wells to Water Resources of the South Flank of the Grand Mesa, Delta County, Colorado* (March 2003) at 42, 56 (attached as Exhibit 181).

[327] *See, e.g.,* Gayathri Vaidyanathan, *In N.M., a sea of 'frack hits' may be tilting production*, E&E News, (March 18, 2014) (attached as Exhibit 182); Tina Jensen, *Fracking fluid blows out nearby well*, KQRE (October 19, 2013), available at: https://www.earthworksaction.org/media/detail/fracking_fluid_blows_out_nearby_well#.WBJuhMnN6T9 (attached as Exhibit 183).

BLM_0150262

Without implementation of a precautionary approach to these risks, BLM will continue to place the health of our community and our environment at risk.

### 2. The UFO failed to sufficiently consider issues of water supply related to fracking.

In addition to impacts on water quality, mineral development processes, and particularly fracking, may result in significant impacts on water quantity. To frack a single well one time requires 2-8 million gallons of water.[328] Annually, the EPA estimates that 70-140 billion gallons of water are used to frack wells in the United States – enough to supply drinking water to 40-80 cities of 50,000.[329] This massive use of water is of particular concern in states in the interior west, like Colorado, were water supplies are scarce and already stretched.[330] Indeed, as the Department of Energy has recognized, "[a]vailable surface water supplies have not increased in 20 years, and groundwater tables and supplies are dropping at an alarming rate."[331] Because of the chemicals that are added to fracking water, the water may not be reused.[332] Removing water for fracking can stress existing water supplies by lowering water tables and dewatering aquifers, decreasing stream flows, and reducing water in surface reservoirs.[333] This can result in changes to water quality, can alter the hydrology of water systems, and can increase concentrations of pollutants in the water.

There is also potential for the reductions in water quantity to impact aquatic and riverine species and habitat by affecting water flows and natural river processes: this, in turn, could lead to fish declines, changes to riparian plant communities, and alterations to sediment.[334] Further, water resources in Colorado are in many locations stressed or over-allocated, and oil and gas development has already lead to unpermitted and illegal water withdrawals.[335]

Here, in its NEPA analysis BLM must closely assess the direct, indirect, and cumulative impacts of lease development on water supplies. 40 C.F.R. §§ 1508.7, 1508.8. This analysis must consider the potential sources of water in the UFO that would be used for oil and gas

---

[328] J. David Hughes, *Will Natural Gas Fuel America in the 21st Century?*, May 2011, at 23 (attached as Exhibit 184).

[329] *See* U.S. Envtl. Protection Agency, *Draft Plan to Study the Potential Impacts of Hydraulic Fracturing on Drinking Water Resources* (Feb. 2011) at 20 (attached as Exhibit 185).

[330] *See* Western Organization of Resource Councils, *Gone for Good: Fracking and Water Loss in the West* (2013) at 7-8 (attached as Exhibit 186) (noting water scarcity in west and significant water demands of fracking).

[331] U.S. Dep't of Energy, *Energy Demands on Water Resources: Report to Congress on the Interdependency of Energy and Water,* Dec. 2012, at 12 (attached as Exhibit 187).

[332] *See* EPA Draft Plan to Study the Impacts of Hydraulic Fracturing on Drinking Water at 20 (attached as Exhibit 185).

[333] *Id.*

[334] Nat'l Parks Conservation Ass'n, *National Parks and Hydraulic Fracturing: Balancing Energy Needs, Nature, and America's National Heritage* (2013) at 23 (attached as Exhibit 188).

[335] *See* WORC, Gone for Good at 21 (attached as Exhibit 186).

BLM_0150263

development, and the impacts of these water withdrawals on water availability for drinking,
agriculture, and wildlife. The analysis must further address the impacts to water quantity at
different annual, seasonal, monthly, and daily time scales because the impacts of such water
withdrawals could be more acute during times, months, and seasons of scarcity. For example,
increased withdrawal and irretrievable contamination of waters will be particularly harmful
during times – like the present – when much of the state is experiencing drought conditions.[336]
Based on the estimated 1,271 wells to be drilled over the life of the RMP, this will result in *2.5-
10.1 billion* gallons of water that will be removed from the hydrologic system. Nowhere does
BLM disclose or analyze the impact of this withdrawal on the planning area or resource values.

### 3. The UFO failed to sufficiently consider impacts to surface water related to fracking.

The BLM briefly considers the potential for hydraulic fracturing fluid spills, recognizing
that "[h]ydraulic fracturing could disturb surface water and groundwater hydrology and impact
water quality." EIS at 4-130. Although Appendix G does contain some best management
practices directed at reducing the potential for contaminating water resources with hydraulic
fracturing spills, EIS at G-9 to G-10, the UFO has failed to address several fundamental
questions that are central to fulfilling the agency's hard look mandate. It is undisputed that
millions of gallons of water are needed to frack a single well. This raises several issues which the
UFO has failed to fully address in the RMP/EIS. *See State of New Mexico v. BLM*, 656 F.3d 963,
714-15 (10th Cir. 2009) (providing that the EIS failed to take hard look at water quality impacts
from proposed oil and gas lease sale where wells would generated significant amounts of waste
water). For example:

- What source waters will be used for well development, and what are the direct,
  indirect, and cumulative impacts of extracting high volumes of these waters from
  surface or groundwater sources in this area?

- How would the produced water be disposed of? If produced water is returned to the
  surface as toxic waste for evaporation, where will such wastewater ponds be located?
  And, if produced water is re-injected in wastewater wells, where will such wells be
  located?

- What kind of treatment, if any, will be required of the producer for treating fracking
  wastewater?

- What is the potential footprint and location of the necessary treatment facilities, and
  what is the direct, indirect, and cumulative impact of such facilities?

- What mitigation measures and best management practices will BLM require, or at
  least recommend, to ensure that wastewater does not contaminate surface or
  groundwater resources, or impact threatened and endangered populations and
  designated critical habitat in the planning area?

---

[336] *See id.* at 8.

Conservation Groups' Comments                                                              117
Uncompahgre Field Office RMP and DEIS

The EIS does not adequately address or analyze the risks of water quality contamination from surface storage of fracking fluid and other oil and gas wastes, including produced and flowback water from wells. Surface pits, in particular, are a major source of water pollution. For instance, New Mexico data, as summarized by the Oil and Gas Accountability Project, shows 743 instances of groundwater contamination, almost all of it occurring over the last three decades. Over half of these incidents, totaling 398 instances of contamination, are linked to faulty pits.[337]

The bulk of pit contamination is associated with seeps into shallow groundwater – of the sort that can readily flow into drinking water wells, as the New Mexico data demonstrates – or as spills and runoff. Similar incidents are occurring across the country.[338] For example, in Pennsylvania, state authorities were forced to quarantine cattle after a pit leaked into their field, leaking into a smelly pool that killed the grass.[339] In Colorado, leaky pits with torn liners spilled more than 6,000 barrels of waste.[340] And in Ohio, compromised pit liners and pit wall failures have sent pollution spilling out into the environment.[341]

Likewise, the BLM does not quantify, nor fully address, the risk of potentially catastrophic spills and blowouts at well sites. This is a serious error because such major spills are not uncommon in natural gas drilling. For instance, a major well blowout in Pennsylvania recently sent thousands of gallons of contaminated fluid coursing into a stream feeding the Susquehanna River.[342] In February of 2013, a major spill occurred in Windsor, Colorado where at least 84,000 gallons of water contaminated with oil and chemicals used in hydraulic fracturing spilled from a broken wellhead and into a field.[343] The BLM has failed to demonstrate that such incidents could not occur on the leases that will be approved under this RMP. In 2015, there were 615 spills related to oil and gas activities in Colorado, with 90 spills resulting in water contamination. 268 spills occurred fewer than 50 feet from groundwater.[344]

---

[337] Earthworks, Oil and Gas Accountability Project, *Closed-Loop Drilling Systems: A Cost-Effective Alternative to Pits*, at 5 (attached as Exhibit 195).

[338] *See, e.g.*, Natural Resources Defense Council, *Petition for Rulemaking to Regulate Oil and Gas Waste* (Sept. 8, 2010) (collecting these incidents) [hereinafter "NRDC Petition"] (attached as Exhibit 189).

[339] Nicolas Kusnetz, *A Fracking First in Pennsylvania: Cattle Quarantine*, PRO PUBLICA (July 2, 2010), available at: http://www.propublica.org/article/a-fracking-first-in-pennsylvania-cattle-quarantine (attached as Exhibit 190).

[340] *See* Colorado Oil and Gas Conservation Commission, Inspection/Incident Inquiry, Spill Reports Doc. Nos. 1630424, 1630436, 1630427, 1630428, 1630429, 1630430.

[341] *See* NRDC Petition at 20 (attached as Exhibit 189).

[342] Associated Press, *Crews Stop Flow of Drilling Fluid from PA Well* (Apr. 22, 2011) (attached as Exhibit 198).

[343] Bruce Finely, *Water fouled with fracking chemicals spews near Windsor*, THE DENVER POST (Feb. 14, 2013), available at: http://www.denverpost.com/ci_22586154/water-fouled-fracking-chemicals-spews-near-windsor#ixzz2zpeQUnhK (attached as Exhibit 199).

[344] Center for Western Priorities, Colorado Toxic Release Tracker 2015 Summary, available at: http://westernpriorities.org/colorado-toxic-release-tracker/

BLM_0150265

Other data confirms the risk to surface waters from fracking and fracking-related activities:

> Gas well development of any type creates surface disturbances as a result of land clearing, infrastructure development, and release of contaminants produced from deep groundwater (e.g., brines). However, the use of hydraulic fracturing poses additional environmental threats due to water withdrawals and contamination from fracking fluid chemicals. . . .

> Elevated sediment runoff into streams, reductions in stream flow, contamination of streams from accidental spills, and inadequate treatment practices for recovered wastewaters are realistic threats.[345]

### 4.     The UFO failed to sufficiently consider impacts to groundwater related to fracking.

Oil and gas development authorized by the UFO's RMP/EIS will result in a significant potential to contaminate groundwater resources in the planning area. Such contamination may result during the following processes: (1) the state of chemical mixing due to spills, leaks, and transportation accidents; (2) during the fracking process due to well malfunctions, migration of fracking fluids or fluids from the fractured formation to aquifers, and mobilization of subsurface materials to aquifers; (3) during flowback due to releases, leakage of on-site storage, and spills from pits (caused by improper construction, maintenance, or closure); and (4) during wastewater disposal due to discharges of wastewater into groundwater, incomplete treatment, and transportation accidents.[346]  Fracking chemicals and wastewater may also contaminate groundwater supplies as a result of illegal dumping.[347] As further discussed below, not all chemical used in fracking have been fully disclosed, but many of those that have been disclosed or discovered are toxic, hazardous, or harmful to human health or welfare. Despite a general lack of adequate oversight of fracking operations, various instances of water pollution from fracking operations have been documented.[348]

BLM acknowledges that "[u]se, storage, and transportation of fluids, such as produced water, hydraulic fracturing fluids, and condensate, have the possibility of spills that could

---

[345] *See, e.g.*, Sally Entrekin, *et al.*, *Rapid expansion of natural gas development poses a threat to surface waters*, FRONTIERS IN ECOLOGY, vol. 9, issue 9 (October 2011) at 504, 510 (attached as Exhibit 200).

[346] *See* U.S. Environmental Protection Agency, *Draft Plan to Study the Potential Impacts of Hydraulic Fracturing on Drinking Water Resources* (Feb. 2011) (attached as Exhibit 185).

[347] Nicholas Kusnetz, *North Dakota's Oil Boom Brings Damage Along with Prosperity*, PROPUBLICA, July 7, 2012, available at: http://www.propublica.org/article/the-other-fracking-north-dakotas-oil-boom-brings-damage-along-with-prosperi#.

[348] *See, e.g., id.* (reporting on lack of oversight); Western Organization of Resource Councils, *Gone for Good: Fracking and Water Loss in the West* (2013) at 17-18, 31 (attached as Exhibit 186) (noting lack of state oversight).

BLM_0150266

migrate to surface or groundwater, causing human health impacts," and that "[i]f a groundwater source is contaminated, there are few cost-effective ways to reclaim that water; thus, the long-term impacts of groundwater contamination are considerable." DEIS 4-83. However, BLM says that "no scientific consensus has been reached" regarding the potential for hydraulic fracturing to contaminate shallow groundwater and notes that "[r]igorous well casing protocols can reduce the risk of such contamination." DEIS at 4-83 to -84. As identified above, there are many documented instances where groundwater contamination has, in fact, resulted from the fracking of oil and gas wells. The UFO's brief and dismissive response and analysis of the potential for contamination of groundwater as a result of fracking fails to satisfy the agency's obligation under NEPA to take a hard look at these impacts.

There is evidence that groundwater contamination from oil and gas operations may be significant, and underreported. For example, based on the Denver Post account of the Windsor, Colorado spill, mentioned above, the company responsible for that spill, PDC, reported *two other* spills near Greeley within weeks of the Windsor incident. Both spills contaminated groundwater, according to a state database of spills. A January 22, 2013 spill by PDC released 2,880 gallons of oil and covered 3,900 square feet, leaving groundwater contaminated with benzene at a concentration 128 times higher than the state limit along with toluene and xylene chemicals. About 17 percent of 2,078 oil and gas spills that companies reported in Colorado since January 2008 have contaminated groundwater. Fracking wastewater is one of the most common substances spilled.[349]

BLM's conclusion that the evidence of potential impacts to groundwater from fracking is inconclusive is challenged by existing models. For example, *see* T. Myers, *Potential Contaminant Pathways from Hydraulically Fractured Shale to Aquifers*, GROUND WATER (April 17, 2012) (attached as Exhibit 301):

> Fracking can release fluids and contaminants from the shale either by changing the shale and overburden hydrogeology or simply by the injected fluid forcing other fluids out of the shale. The complexities of contaminant transport from hydraulically fractured shale to near-surface aquifers render estimates uncertain, but a range of interpretative simulations suggest that transport times could be decreased from geologic time scales to as few as tens of years. Preferential flow through natural fractures fracking-induced fractures could further decrease the travel times to as little as just a few years. *Id.* at 9.

*And see*, N.R. Warner, *Geochemical evidence for possible natural migration of Marcellus Formation brine to shallow aquifers in Pennsylvania*, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES, vol. 109, iss. 30. (July 9, 2012) (attached as Exhibit 302):

> This study shows that some areas of elevated salinity with type D composition in NE PA were present prior to shale-gas development and most likely are unrelated to the most recent shale gas drilling; however, the coincidence of elevated salinity in shallow groundwater with a geochemical signature similar to produced water from the Marcellus Formation suggests that these areas could be at greater risk of

---

[349] *See* Finely (attached above as Exhibit 199).

BLM_0150267

contamination from shale gas development because of a preexisting network of cross- formational pathways that has enhanced hydraulic connectivity to deeper geological formations. *Id.* at 5.

BLM also overlooks the linkage between hydraulic fracturing and water wells. The BLM must recognize these and analyze this risk and impacts. In addition to the studies cited in the health section of this protest, *see e.g.,* S.G. Osborn, *et al.*, *Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing*, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES, vol. 108, iss. 20. (May 17, 2011) (attached as Exhibit 303):

> Methane concentrations were detected generally in 51 of 60 drinking-water wells (85%) across the region, regardless of gas industry operations, but concentrations were substantially higher closer to natural-gas wells. Methane concentrations were 17-times higher on average in shallow wells from active drilling and extraction areas than in wells from non-active areas. *Id.* at 8173.

> Although dissolved methane in drinking water is not currently classified as a health hazard for ingestion, it is an asphyxiant in enclosed spaces and an explosion and fire hazard. *Id.* at 8173.

> More research is also needed on the mechanism of methane contamination, the potential health consequences of methane, and establishment of baseline methane data in other locations. *Id.* at 8176.

In addition, *see also*, U.S. EPA, Draft Report, *Investigation of ground water contamination near Pavillion, Wyoming* (December 2011) (attached as Exhibit 176):

> The presence of synthetic compounds such as glycol ethers, along with enrichments in K, Cl, pH, and the assortment of other organic components is explained as the result of direct mixing of hydraulic fracturing fluids with ground water in the Pavillion gas field. *Id.* at 27.

And, *see also*, U.S. EPA, Report to Congress, *Management of wastes from the exploration, development, and production of crude oil, natural gas and geothermal energy*. Vol. 1. (December 1987) (attached as Exhibit 169):

> During the fracturing process, fractures can be produced, allowing migration of native brine, fracturing fluid, and hydrocarbons from the oil or gas well to a nearby water well. When this happens, the water well can be permanently damaged and new well must be drilled or an alternative source of drinking water found. *Id.* at IV-22.

> In 1982, Kaiser Gas Co. drilled a gas well on the property of Mr. James Parsons. The well was fractured using a typical fracturing fluid or gel. The residual fracturing fluid migrated into Mr. Parson's water well (which was drilled to a depth of 416 feet), according to an analysis by the West Virginia Environmental Health Services Lab of well water samples taken from the property. Dark and

BLM_0150268

light gelatinous material (fracturing fluid) was found, along with white fibers.
(The gas well is located less than 1,000 feet from the water well.) The chief of the
laboratory advised that the water well was contaminated and unfit for domestic
use, and that an alternative source of domestic water had to be found. *Id.* at IV-22.

### 5.   The UFO failed to sufficiently consider issues of wastewater disposal.

BLM should consider the possibility of using recycled water and decreasing the use of
evaporation ponds, as well as address concerns about the safety of injection wells. The UFO has
an obligation to take a hard look at wastewater disposal and provide a comparative analysis of
the different alternatives for disposal. It is not appropriate to assume that treatment can and will
be adequate to take care of the problem. For example, *see* Brian D. Lutz, *et al.*, *Generation,
Transport, and Disposal of Wastewater Associated with Marcellus Shale Gas Development*,
WATER RESOURCES RESEARCH (February 8, 2013) (attached as Exhibit 304).

> Contrary to current perceptions, Marcellus wells produce significantly less
> wastewater per unit gas recovered (approximately 35%) compared to conventional
> natural gas wells. Further, well operators classified only 32.3% of wastewater
> from Marcellus wells as flowback from hydraulic fracturing; most wastewater was
> classified as brine, generated over multiple years. *Despite producing less
> wastewater per unit of gas, developing the Marcellus shale has increased the total
> wastewater generated in the region by approximately 570% since 2004,
> overwhelming current wastewater disposal infrastructure capacity.*

*Id.* at 1 (emphasis added).

### 6.   Hydraulic Fracturing Disclosure Rules are Insufficient.

One basic purpose of NEPA is to assure that the public and policy makers are aware in
advance of the potential environmental consequences of proposed actions. 40 C.F.R. § 1500.1(a).
Furthermore, the presence of uncertain or unknown risks may compel an agency to prepare a
more thorough EIS, in lieu of an EA. 40 C.F.R. § 1508.27(b)(5). Currently, there are significant
uncertainties about the different chemicals that are being used in hydraulic fracking, though, as
mentioned above, it is clear that toxic, hazardous, and carcinogenic chemicals are used
throughout the fracking process. Current disclosure of fracking chemicals, via FracFocus, is
insufficient to adequately protect the public from potentially toxic, hazardous, and/or
carcinogenic chemicals.[350] In its NEPA analysis for the UFO RMP, the agency provides a Best
Management Practice that addresses chemicals used in the fracturing process:

> Chemicals used in the fracturing process should be biodegradable, non-toxic, neutral pH,
> residual free, non-corrosive, non-polluting and non-hazardous in the forms and
> concentrations being used. The operator should review the material safety data sheets to

---

[350] Kate Konschnik *et al.*, *Legal Fractures in Chemical Disclosure Laws: Why the Voluntary
Chemical Disclosure Registry FracFocus Fails as a Regulatory Compliance Tool*, HARVARD
LAW SCHOOL, ENVTL. LAW PROGRAM, Apr. 2013 (attached as Exhibit 201).

BLM_0150269

assure the chemicals are not known carcinogens in the methods or concentrations being
used.

DEIS at G-10.

While the BLM should be applauded for making strides to prevent the contamination of
water resources with this BMP, the BMP fails to address the fact that not all substances that will
be used in the fracturing process are made public. Moreover, regardless of the "concentrations
being used," BLM should categorize all substances as hazardous, toxic, carcinogenic, or benign.

### 7. The Reasonable Foreseeable Development Scenario Failed to Sufficiently Consider Increased Oil and Gas Development Due to Fracking.

There are significant flaws with the UFO's Reasonable Foreseeable Development
Scenario for Oil and Gas ("RFD") which undermine validity of the agency's analysis of resource
impacts, and here, impacts due to fracking. The RMP/EIS fails to consider the full potential of
recent hydraulic fracturing techniques and vastly underestimates the extent of oil and gas
development and its impacts on the environment. For example, BLM estimates that—as
projected by the RFD—1,271 wells would be developed under the RMP on all federal minerals
and private minerals within the planning area. DEIS at 4-3. However, this estimate does not
allow for the likely scenario that advances in hydraulic fracturing technology will increase the
number of drilled wells.

The RFD is outdated and underestimates the number of potential wells. Since the RFD is
four years old, and based on older data, it fails to consider the full extent of current and future
development. The RMP/EIS fails to take into account the most recent trends in well
development, which are the most crucial in predicting the extent of development and its likely
impacts. All evidence points to increased drilling in relation to historic trends. Many reports have
highlighted the recent nationwide growth in hydraulic fracturing and natural gas development, as
identified below.

For example, one report notes that "[a]s a result of hydraulic fracturing and advances in
horizontal drilling technology, natural gas production in 2010 reached the highest level in
decades," and that "[h]ydraulic fracturing, used in combination with horizontal drilling, has
allowed industry to access natural gas reserves previously considered uneconomical, particularly
in shale formations."[351] Another points out that "[s]ince 1998 unconventional natural gas
production [hydraulic fracturing] has increased nearly 65%."[352] The U.S. Department of
Energy's Energy Information Administration also forecasts a massive surge in oil and gas

---

[351] U.S. CONGRESS, HOUSE OF REPRESENTATIVES, *Chemicals Used in Hydraulic Fracturing*
(April 2011) at 1, 2 (attached above as Exhibit 171).
[352] ALL Consulting, *Hydraulic Fracturing Considerations for Natural Gas Wells of the
Marcellus Shale* (Sept. 2008) at 1, available at:
http://www.dec.ny.gov/docs/materials_minerals_pdf/GWPCMarcellus.pdf (attached as Exhibit
202).

BLM_0150270

development, in particular shale gas and shale oil from formations like the Monterey Shale.[353]
As the EIA explains in a review of shale gas resources dated July 8, 2011, "[t]he use of
horizontal drilling in conjunction with hydraulic fracturing has greatly expanded the ability of
producers to profitably recover natural gas and oil from low-permeability geologic plays—
particularly, shale plays."[354] As the EIA further explains, "only in the past 5 years has shale gas
been recognized as a 'game changer' for the U.S. natural gas market." This surge in well
development illustrates the impropriety of relying on old data. When new technology enables
industry to tap resources it was unable to access a few years ago, it makes historic baselines
meaningless under the current landscape.

Of particular note is the agency's failure to provide any information or analysis of
substance on the critical issue of hydraulic fracturing. For the most part, the RFD mentions
fracking as a technology that is currently used in some areas and may allow for future
development of additional plays. For example, the agency provides:

> Only one horizontal well has been drilled to date in the Study Area. New types of
> horizontal fracturing technology will likely be used to stimulate these types of
> wells in the future. Development could be similar to that used to stimulate the
> Bakken Formation Middle Member in North Dakota. For horizontal boreholes,
> multi-stage fracture stimulations could be used. RFD at 35.

> The combination of horizontal drilling and hydraulic fracturing technologies has
> made it possible to produce shale gas and tight gas economically. Much of the
> Study Area oil and gas supply growth is expected to come from production from
> existing known reservoirs, with most new reservoir discoveries potentially
> coming from exploration for nonconventional plays in the continuous assessment
> units (including shale gas and coalbed natural gas) identified by the U.S.
> Geological Survey in Appendix 1. RFD at 58.

While these statements acknowledge that increased production may "potentially" come
from exploration due to fracking and additional horizontal fracturing technology "will likely" be
used in the future, there is no quantification of the increase in the number of wells, acres
impacted, or required infrastructure. Further, there is no discussion of the increased adverse
impacts to human health or the environment. Thus, these statements, which implicitly recognize
that the RFD may not account for the full extent of production, provide little in terms of analysis
of fracking impacts. Such a void of analysis and consideration of a widely employed technology
that not only has the potential, but, in all likelihood, will drastically alter the foreseeable
development within the planning area, fails to satisfy the UFO's obligations under NEPA.
Notably, BLM also fails to consider analysis from a recent USGS report concerning the
development of Mancos Shale in the Piceance Basin—which may significantly affect
development projections in the Uncompahgre planning area—wherein USGS concluded: "Using

---

[353] U.S. Energy Information Administration, *Review of Emerging Resources: U.S. Shale Gas and
Shale Oil Plays* (July 2011) at 4, available at:
http://www.eia.gov/analysis/studies/usshalegas/pdf/usshaleplays.pdf (attached as Exhibit 203).
[354] *Id.*

BLM_0150271

a geology-based assessment methodology, the U.S. Geological Survey assessed technically recoverable mean resources of 74 million barrels of shale oil, 66.3 trillion cubic feet of gas, and 45 million barrels of natural gas liquids in the Mancos Shale of the Piceance Basin in Colorado and Utah."[355]

In sum, while fracking has been around for decades, the magnitude of the modern technique is new. Modern fracking calls for much more water and chemicals than older wells, and enables the drilling of far more wells in new areas than in the past. Conservation Groups request that the BLM update the RFD to account for this reality.

### 8. Induced Seismicity from Hydraulic Fracturing Remain Unaddressed.

The UFO must take a hard look at the issues of subsidence and the possibility of seismic activity that could result from expanded oil and gas development, wastewater disposal, and coal mining. The Draft RMP/EIS does not consider these issues at all.

Scientists have understood for decades that oil and gas production activities, including underground injection of fluids and the production of oil and gas, can cause earthquakes. Indeed, the USGS freely admits, "earthquakes induced by human activity have been documented."[356] The National Academy of Sciences recently published a comprehensive report on the relationship between energy production and induced seismicity.[357] Researchers at the USGS found that the rate of earthquakes greater than magnitude 3.0 in the central and eastern United States has increased significantly in the past decade, from an average of 21/year from 1967 through 2000 to more than 300 in the years 2010 through 2012, with 188 occurring in 2011 alone. The researchers hypothesize that this increase in activity could be related to oil and gas production activities, including underground injection of wastewater.[358]

Recently, "[a] northeast Ohio well used to dispose of wastewater from oil and gas drilling almost certainly caused a series of 11 minor quakes in the Youngstown area since last spring, a

---

[355] USGS, Assessment of Continuous (Unconventional) Oil and Gas Resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah (2016) ("USGS 2016"), available at http://pubs.usgs.gov/fs/2016/3030/fs20163030.pdf (attached as Exhibit 197).

[356] *See* USGS, Earthquakes Hazards Program, FAQs, available at: http://earthquake.usgs.gov/learn/faq/?categoryID=1&faqID=1; *see also* Craig Nicholson and Robert Wesson, *Earthquake Hazard Associated with Deep Well Injection – A report to the U.S. Environmental Protection Agency*, U.S. Geological Survey Bulletin 1951 (1990), at 74 (attached as Exhibit 204) (also citing other well-documented examples of seismic activity induced by fluid injection, including: Denver, Colorado; Rangely, Colorado; southern Nebraska; western Alberta and southwestern Ontario, Canada; western New York; New Mexico; and Matsushiro, Japan).
[357] Clarke, D., Detournay, E., Diederich, J., Dillon, D., Green, S., Habiger, R., ... & Smith, J. (2012). *Induced seismicity potential in energy technologies*. National Academies Press.
[358] William L.Ellsworth, *Injection-induced earthquakes*, SCIENCE (2013), available at: http://www.sciencemag.org/content/341/6142/1225942.

BLM_0150272

seismologist investigating the quakes said."[359] After the latest and largest quake Saturday, December 31, 2011, which registered at 4.0 magnitude, "state officials announced their beliefs that injecting wastewater near a fault line had created enough pressure to cause seismic activity. They said four inactive wells within a five-mile radius of the Youngstown well would remain closed."[360] As Andy Ware, deputy director of the Ohio Department of Natural Resources, which regulates gas drilling and disposal wells, stated, "the state asked on Friday that injection at the well be halted after analysis of the 10th earthquake, a 2.7-magnitude temblor on Dec. 24, showed that it occurred less than 2,000 feet below the well."[361] In addition, a recent Ohio study identified seismic activity caused by fracking, not just the re-injection of wastewater.[362]

The events in Youngstown unfortunately don't seem to be isolated. "A string of mostly small tremors in Arkansas, Oklahoma, Texas, British Columbia and other shale-gas-producing areas suggest that [fracking] may lead, directly or indirectly, to a dangerous earthquake."[363] The commonality of circumstances suggests that a strong correspondence between seismic activity and development techniques used by the oil and gas industry does indeed exist. For example, development of the Fayetteville Shale in Arkansas and corresponding development of deep waste injection wells is associated with a massive increase in earthquake activity in that region, including swarms of micro-earthquakes and significant quakes with magnitudes 3.9 and 4.7.[364] "The number and strength of earthquakes in central Arkansas have noticeably dropped since the shutdown of two injection wells in the area."[365] Scott Ausbrooks, the Geohazards Supervisor for the Arkansas Geological Survey, provided, "[w]e have definitely noticed a reduction in the number of earthquakes, especially the larger ones. It's definitely worth noting."[366]

Moreover, the Oklahoma Geological Survey ("OGS") released a report that links a series of earthquakes in Oklahoma, in January 2011, to a fracking operation underway there. The

---

[359] Thomas J. Sheeran, *Ohio Earthquakes Caused by Drilling Wastewater Well, Experts Say*, HUFFINGTON POST, January 2, 2012, available at:
http://www.huffingtonpost.com/2012/01/02/ohio-earthquakes-caused-by-wastewater-well-drilling_n_1180094.html.

[360] *Id.*

[361] Henry Fountain, *Disposal Halted at Well After New Quake in Ohio*, THE NEW YORK TIMES, Jan. 1, 2012, available at: http://www.nytimes.com/2012/01/02/science/earth/youngstown-injection-well-stays-shut-after-earthquake.html?scp=3&sq=fracking%20earthquake&st=cse.

[362] Julie Carr Smyth, *Ohio Geologists Link Small Quakes to Fracking,* ASSOCIATED PRESS (April 11, 2014), available at: http://bigstory.ap.org/article/ohio-regulators-link-seismic-activity-fracking.

[363] *Id.*

[364] *See, e.g.*, Courtney Spradlin, *Earthquakes Increase Friday*, The Log Cabin Democrat (Apr. 8, 2011); Sarah Eddington, *Shutdown of Wells Extended in Arkansas Quake Study*, Bloomberg BusinessWeek (Apr. 20, 2011); Sarah Eddington, *3.9 Magnitude Quake Hits North-Central Arkansas* (Apr. 8, 2011).

[365] Sarah Eddington, *Ark. Quakes Decline Since Injection Well Closures*, HUFFINGTON POST, March 14, 2011, available at: http://www.huffingtonpost.com/huff-wires/20110314/us-arkansas-earthquakes/.

[366] *Id.*

BLM_0150273

USGS determined after analyzing earthquake data that "the character of seismic recordings indicate that they are both shallow and unique."[367] The report continues, providing: "Our analysis showed that shortly after hydraulic fracturing began small earthquakes started occurring, and more than 50 were identified, of which 43 were large enough to be located. Most of these earthquakes occurred within a 24-hour period after hydraulic fracturing operations had ceased."[368]

In August 2011, an earthquake measuring 5.3-magnitude near Trinidad, Colorado, was the largest in more than 40 years.[369] However, seismic activity near Trinidad is not new. Indeed, a September 2001 swarm of earthquakes near Trinidad prompted a U.S. Geological Survey investigation. The USGS report provided, "In recent years, a large volume of excess water that is produced in conjunction with coal-bed methane gas production has been returned to the subsurface in fluid disposal wells in the area of the earthquake swarm;" and later continues, "Because of the proximity of these disposal wells to the earthquakes, local residents and officials are concerned that the fluid disposal might have triggered the earthquakes."[370] The USGS investigation concluded: "the characteristics of the seismicity and the fluid disposal process do not constitute strong evidence that the seismicity is induced by the fluid disposal, though they do not rule out this possibility."[371]

More recently, in September 2016, Oklahoma officials ordered oil and gas operators to shut down wastewater disposal wells following a 5.6 magnitude earthquake, which tied a record as the strongest in state history.[372]

In the North Fork Valley, earthquakes caused by coal mining are not uncommon.[373] Meanwhile, researchers from the University of Colorado and the U.S. Geological Survey have recognized the risk for earthquakes caused by wastewater injection in Colorado.[374]

---

[367] Austin Holland, Oklahoma Geological Survey, Examination of Possibly Induced Seismicity from Hydraulic Fracturing in Eola Field, Garvin County, Oklahoma (Aug. 2011), at 1 (attached as Exhibit 205).

[368] *Id.*

[369] Jordan Steffen, *5.3 quake in Trinidad, Colo., area unnerves regions residents*, DENVER POST, August 24, 2011, available at: http://www.denverpost.com/news/ci_18744329.

[370] Mark E. Mermonte, et al., USGS, *Investigation of an Earthquake Swarm Near Trinidad, Colorado, August – October 2001* (2002), available at: http://pubs.usgs.gov/of/2002/ofr-02-0073/ofr-02-0073.html (attached as Exhibit 206).

[371] *Id.*

[372] Niraj Chokshi and Henry Fountain, *Oklahoma Orders Shutdown of Wells After Record-Tying Earthquake*, The New York Times (September 3, 2016), available at:
http://www.nytimes.com/2016/09/04/us/earthquake-ties-record-for-strongest-in-oklahoma-history.html.

[373] *Quake Near Paonia Believed To Be Caused by Coal*, The Denver Post (January 4, 2013), available at: http://www.denverpost.com/2013/01/04/quake-near-paonia-believed-to-be-caused-by-coal/.

BLM_0150274

The threat of seismic activity induced from oil and gas development practices as well as coal mining must be analyzed by the UFO. As noted above, Ohio officials placed a five-mile buffer around waste injection wells. Given the recognized correlation between oil and gas development practices and the inducement of earthquakes, taking such a precautionary approach, here, through required stipulations that would attach to all future oil and gas development in the planning area is prudent and would help stem potential future impacts. At the very least, however, BLM must take a hard look at possible seismicity impacts from the proposed action, which the RMP/EIS has failed to do at all.

### 9.     The RMP/EIS and RFD Failed to Consider Impacts Regarding Subsequent Fracturing Treatments, or Re-Fracking Operations.

Wells are first fracked after they are initially drilled. Subsequently, re-fracking or re-stimulation operations are often conducted during the life of the well. Most or all of the impacts to air, water, habitat, wildlife, vegetation, and other resources are expected to be similar for re-fracking as for the original fracturing jobs. In some cases, there is little additional surface disturbance associated with re-fracking, but in other cases, additional stimulation activities increase the overall footprint of the development, undo the assumptions regarding temporary and long-term reclamation success, and further contribute to such issues as invasive weeds. The UFO's RMP/EIS and RFD focus on initial drilling operations and routine maintenance, while these documents remain silent on the frequency and impacts – direct, indirect, and cumulative – related to re-fracking operations.

The RFD estimates the life of new conventional and coalbed natural gas wells will be at least 20 years. If additional stimulation or re-fracturing takes place every five years on average, then at least 4 such operations could be expected for each well. *See* RFD at 75. Additionally, the water demand and overall impacts of both initial and re-fracking operations could be several orders of magnitude greater for deep wells with horizontal reaches exceeding 5,000 feet, which can be fractured at intervals of 300 feet.

The re-fracking impacts analysis appears to be absent from the EIS and must be conducted for all wells in the field office: private and public, existing and future, existing target formations, and potential new plays. Absent such analysis, BLM has failed to take a hard look at the direct, indirect or cumulative impacts of ongoing and reasonably foreseeable oil and gas development in the UFO.

Water requirements for re-fracking can be expected to be similar to those for the original fracking job, unless cleanout operations require additional water. If re-fracturing includes operations to clean out the wellbore prior to treatment, BLM needs to disclose the volumes of

---

[374] Dennis Webb, *GarCo OKs Injection Well; Court Challenge Is Possible*, The Daily Sentinel (June 23, 2015), available at: http://www.gjsentinel.com/news/articles/garco-oks-injection-well-court-challenge-is-possib.

BLM_0150275

water and other impacts or resource uses associated with such operations.[375] Emissions might be greater or less. Disturbance to wildlife can be highly significant, and re-stimulation activities should be treated like drilling for purposes of seasonal closures and other habitat protections in the RMP. If reclamation projections currently assume that pads will be reclaimed up to the direct footprint of the well, they must be re-calculated to take into account the potential for future operations utilizing a footprint closer to the original drilling pad area if needed for the truck traffic and other activities associated with re-stimulation. Current disturbance estimates and projections are found in the RFD at 75.

BLM sundry notices should allow the agency to track and regulate surface disturbances associated with re-fracking. To the extent sundry notices have not covered these activities, BLM must consider and impose new requirements to allow it to regulate and assess the impacts of these operations. Although COGCC may not have required permits or compiled records for re-fracking jobs or re-stimulation operations when the RFD was prepared, COGCC commenced tracking such information on April 1 2012, the effective date of COGCC Rule 205A, regarding chemical disclosure for hydraulic fracturing treatments. If BLM currently lacks its own records, it can secure such information from COGCC to be incorporated into its analysis of oil and gas impacts. To the extent the UFO currently lacks a comprehensive database of re-fracking operations, it needs to rectify this omission in the new RMP.

Revised analysis must take a hard look at these issues, including whether the potential cumulative impacts associated with all projected oil and gas development could result in unnecessary and undue degradation under FLMPA.

### 10.     The UFO Failed to Consider Use of Best Management Practices.

Oil and gas development can result in serious impacts to the environment and human health. The technology used in oil and gas production has evolved rapidly but, unfortunately, regulation has not kept pace. The BLM's and Colorado's current regulations are insufficient to protect public health and the environment. The use of Best Management Practices ("BMPs") can greatly reduce the risks presented by oil and gas development by incorporating processes and technologies that are readily available.

Application of proposed site-specific requirements is not outside the scope of the RMP planning process. For example, in the proposed Land and Resource Management Plan and Final Environmental Impact Statement ("LRMP/FEIS") for BLM public lands in the San Juan Public Lands Planning Area/Tres Rios Field Office ("TRFO"), BLM required the use of BMPs through stipulations, standards, and guidance. Furthermore, it is not necessary for many BMPs to be site-specific; rather they can be applied broadly to all oil and gas operations in the UFO area. For example, near public water supply intakes, the TRFO-LRMP requires the use of pitless drilling systems, tanks to store stimulation and flowback fluids, and non-toxic hydraulic fracturing fluids only, among other requirements.

---

[375] BLM Wyoming State Office, *Hydraulic Fracturing White Paper* (July 2013), available at: http://www.blm.gov/pgdata/etc/medialib/blm/wy/information/NEPA/og/2014/02feb.Par.49324.F ile.dat/v1AppE.pdf (attached as Exhibit 207).

BLM_0150276

Appendix G contains many important provisions to reduce the risks to the environment and human health from oil and gas operations and the UFO RMP can and should require the use of these BMPs through stipulations, standards, and guidance. However, additional protections are needed, including but not limited to: improved site characterization to look for pathways by which contaminants may reach groundwater; stronger well design and construction standards; stimulation operation monitoring and reporting requirements; and improved waste water handling planning and practices.

NEPA was enacted to promote efforts that will prevent or eliminate damage to the human environment. BMPs help "mitigate" environmental impacts. "Mitigation" is defined in CEQ regulations as measures to help, avoid, reduce or compensate for environmental impacts. 40 CFR 1508.20. BLM's failure to analyze the potential benefits of requiring these BMPs in alternatives does not satisfy NEPA's hard look mandate and frustrates the purpose of preparing an EIS (40 CFR 1502.1 states that the purpose of preparing an EIS is to "…provide full and fair discussion of significant environmental impacts and [ ] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."). By failing to implement these BMPs in the RMP, BLM has failed to take adequate measures to minimize and mitigate the adverse impacts that will result from the RMP. The following BMPs should be required for all oil and gas operations in the UFO area.

### a. Site Characterization and Corrective Action

Detailed site characterization and planning and baseline testing prior to any oil and gas development are crucial. Site characterization and planning must take into account cumulative impacts over the life of a project or field.

#### i. Geologic Suitability

Operators of wells that will be hydraulically fractured must demonstrate to the satisfaction of the regulator that the wells will be sited in a location that is geologically suitable. In order to allow the regulator to determine suitability, the owner or operator must provide:

1. A detailed analysis of regional and local geologic stratigraphy and structure including, at a minimum, lithology, geologic facies, faults, fractures, stress regimes, seismicity, and rock mechanical properties;
2. A detailed analysis of regional and local hydrology including, at a minimum, hydrologic flow and transport data and modeling and aquifer hydrodynamics; properties of the producing and confining zone(s); groundwater levels for relevant formations; discharge points, including springs, seeps, streams, and wetlands; recharge rates and primary zones, and; water balance for the area including estimates of recharge, discharge, and pumping;
3. A detailed analysis of the cumulative impacts of hydraulic fracturing on the geology of producing and confining zone(s) over the life of the project. This must include, but is not limited to, analyses of changes to conductivity, porosity, as well as permeability, geochemistry, rock mechanical properties, hydrologic flow, and fracture mechanics; and

BLM_0150277

4. A determination that the geology of the area can be described confidently and that the fate and transport of injected fluids and displaced formation fluids can be accurately predicted through the use of models.

Wells that will be hydraulically fractured must be sited such that a suitable confining zone is present. The operator must demonstrate to the satisfaction of the regulator that the confining zone:

1. Is of sufficient areal extent to prevent the movement of fluids to USDWs, based on the projected lateral extent of hydraulically induced fractures, injected hydraulic fracturing fluids, and displaced formation fluids over the life of the project;
2. Is sufficiently impermeable to prevent the vertical migration of injected hydraulic fracturing fluids or displaced formation fluids over the life of the project;
3. Is free of transmissive faults or fractures that could allow the movement of injected hydraulic fracturing fluids or displaced formation fluids to USDWs;
4. Contains at least one formation of sufficient thickness and with lithologic and stress characteristics capable of preventing or arresting vertical propagation of fractures; and
5. The regulator may require operators of wells that will be hydraulically fractured to identify and characterize additional zones that will impede or contain vertical fluid movement.

### ii. Area of Review

Operators must delineate an "area of review," which is the region around a well or group of wells that will be hydraulically fractured where USDWs may be endangered. It should be delineated based on 3D geologic and reservoir modeling that accounts for the physical and chemical extent of hydraulically induced fractures, injected hydraulic fracturing fluids and proppant, and displaced formation fluids and must be based on the life of the project. The physical extent would be defined by the modeled length and height of the fractures, horizontal and vertical penetration of hydraulic fracturing fluids and proppant, and horizontal and vertical extent of the displaced formation fluids. The chemical extent would be defined by that volume of rock in which chemical reactions between the formation, hydrocarbons, formation fluids, or injected fluids may occur, and should take into account potential migration of fluids over time. The model must take into account all relevant geologic and engineering information including but not limited to:

1. Rock mechanical properties, geochemistry of the producing and confining zone, and anticipated hydraulic fracturing pressures, rates, and volumes;
2. Geologic and engineering heterogeneities;
3. Potential for migration of injected and formation fluids through faults, fractures, and manmade penetrations; and
4. Cumulative impacts over the life of the project.

As actual data and measurements become available, the model must be updated and history matched. Operators must develop, submit, and implement a plan to delineate the area of

BLM_0150278

review. The plan should include the time frame under which the delineation will be reevaluated, including those operational or monitoring conditions that would trigger such a reevaluation. Within the area of review, operators must identify all wells that penetrate the producing and confining zones and provide:

1. A list of all such wells, including but not limited to wells permitted but not yet drilled, drilling, awaiting completion, active, inactive, shut-in, temporarily abandoned, plugged, and orphaned;
2. A description of each well's type, construction, date drilled, location, depth, record of plugging and/or completion, and any additional information the Division may require;
3. An assessment of the integrity of each well identified;
4. A plan for performing corrective action if any of the wells identified are improperly plugged, completed, or abandoned;
5. An assessment to determine the risk that the stimulation treatment will communicate with each well identified;
6. For each well identified as at-risk for communication, a plan for well control, including but not limited to:

   a. A method to monitor for communication;
   b. A determination of the maximum pressure which the at-risk well can withstand;
   c. Actions to maintain well control;
   d. If the at-risk well is not owned or operated by the owner/operator of the well to be stimulated, a plan for coordinating with the offset well operator to prevent loss of well control;

7. The location, orientation, and properties of known or suspected faults, fractures, and joint sets;
8. An evaluation of whether such features may act as migration pathways for injected fluids or displaced formation fluids to reach protected water or the surface;
9. An assessment to determine the risk that the stimulation treatment will communicate with such features; and
10. If such features may act as migration pathways and are at-risk for communication, the stimulation design must be revised to ensure that the treatment will not communicate with such features or the well must be re-sited.

This information should be provided with the stimulation permit application. Communication between offset wells during stimulation is a serious problem, risking blowouts in adjacent wells and/or aquifer contamination during well stimulation. A New Mexico oil well recently experienced a blowout, resulting in a spill of more than 8,400 gallons of fracturing fluid, oil, and water. The blowout occurred when a nearby well was being hydraulically fractured and the fracturing fluids intersected this offset well.[376] The incident led the New Mexico Oil Conservation Division to request information about other instances of communication between

---

[376] Tina Jensen, *Fracking fluid blows out nearby well; Cleanup costs, competing technologies at issue*, KASA.COM. (Oct. 18 2013).

wells during drilling, completion, stimulation or production operations.[377] Incidents of communication between wells during stimulation have been documented in British Columbia[378], Pennsylvania,[379] Texas, and other states across the country.[380]

The Alberta Energy Regulator ("AER"), the oil and gas regulator in Alberta, Canada, recognized that communication between wells during fracturing is a serious risk to well integrity and groundwater after a number of spills and blowouts resulted from communication between wells during fracturing. As a result, AER created requirements to address the risk of communication and reduce the likelihood of occurrence.[381] Similarly, Enform, a Canadian oil and gas industry safety association, published recommended practices to manage the risk of communication.[382] We recommend that the BLM review these rules and incorporate similar requirements.

### iii. Baseline Water Testing

Operators must submit to the regulator a statistically significant sample, as determined by the regulator, of existing and/or new geochemical analyses of each of the following, within the area of review:

1. Any and all sources of water that serve as underground sources of drinking water ("USDWs") in order to characterize baseline water quality. This data must be made publically available through an online, geographically-based reporting system. The sampling methodology must be based on local and regional hydrologic characteristics such as rates of precipitation and recharge and seasonal fluctuations. At a minimum, characterization must include:

    a. Standard water quality and geochemistry;[383]

---

[377] State of New Mexico, Energy, Minerals and Natural Resources Department, *Aztec District III-Request for information*, n.p. (Oct. 22, 2013).

[378] "BC Oil and Gas Commission, *Safety Advisory 2010-03, May 20, 2010: Communication During Fracture Stimulation*, n.p. (May 20 2010).

[379] *See, e.g.* Scott Detrow, *Perilous Pathways: How Drilling Near An Abandoned Well Produced a Methane Geyser,* State Impact Pennsylvania, NPR (October 9, 2012); Pennsylvania Department of Environmental Protection, Bureau of Oil and Gas Management, *Draft Report - Stray Natural Gas Migration Associated with Oil and Gas Wells* (October 28, 2009).

[380] Gayathri Vaidyanathan, *When 2 wells meet, spills can often follow*, ENERGYWIRE (Aug. 5, 2013).

[381] Alberta Energy Board, *Directive 083: Hydraulic Fracturing – Subsurface Integrity* (May 2013) at 15, available at: http://www.aer.ca/documents/directives/Directive083.pdf (attached as Exhibit 208).

[382] Enform Canada, *Interim IRP 24: Fracture Stimulation: Interwellbore Communication; An Industry Recommended Practice For The Canadian Oil And Gas Industry*, Interim Volume 24, 1st Edition (Mar. 27, 2013).

[383] Including: Turbidity, Specific Conductance, Total Solids, Total Dissolved Solids, pH, Dissolved Oxygen, Redox State, Alkalinity, Calcium, Magnesium, Sodium, Potassium, Sulfate,

    b. Stable isotopes;

    c. Dissolved gases;

    d. Hydrocarbon concentration and composition. If hydrocarbons are present in sufficient quantities for analysis, isotopic composition must be determined;

    e. Chemical compounds or constituents thereof, or reaction products that may be introduced by the drilling or hydraulic fracturing process. The use of appropriate marker chemicals is permissible provided that the operator can show scientific justification for the choice of marker(s);

Operators should also consider testing for environmental tracers to determine groundwater age;

2. Any hydrocarbons that may be encountered both vertically and really throughout the area of review;

3. The producing zone(s) and confining zone(s) and any other intervening zones as determined by the regulator. At a minimum, characterization must include:

    a. Mineralogy;

    b. Petrology; and

    c. Major and trace element bulk geochemistry.

The site characterization and planning data listed above does not have to be submitted with each individual well application as long as such data is kept on file with the appropriate regulator and the well for which a permit is being sought falls within the designated area of review.

### iv. Water Use and Disposal Planning

Operators must submit to the regulator a plan for cumulative water use over the life of the project. The plan should take into account other activities that will draw water from the same sources, such as agricultural or industrial activities; designated best use; seasonal and longer timescale variations in water availability; and historical drought information. Elements of the plan must include but are not limited to:

1. The anticipated source, timing, and volume of withdrawals and intended use;

2. Anticipated transport distances and methods (e.g. pipeline, truck) and methods to minimize related impacts including, but not limited to: land disturbance, traffic, vehicle accidents, and air pollution;

3. Anticipated on-site storage methods;

---

Chloride, Fluoride, Bromide, Silica, Nitrite, Nitrate + Nitrite, Ammonia, Phosphorous, Total Organic Carbon, Aluminum, Antimony, Arsenic, Barium, Beryllium, Boron, Bromide, Cadmium, Chromium, Cobalt, Copper, Cyanide, Iron, Lead, Manganese, Mercury, Molybdenum, Nickel, Selenium, Silver, Strontium, Thallium, Thorium, Uranium, Vanadium, Zinc, Cryptosporidium, Giardia, Plate Count, Legionella, Total Coliforms, and Organic Chemicals including Volatile Organic Compounds (VOCs).

BLM_0150281

4. A description of methods the operator will use to maximize the use of non-potable water sources including reuse and recycling of wastewater;
5. An evaluation of potential adverse impacts to aquatic species and habitat, wetlands, and aquifers, including the potential for the introduction of invasive species, and methods to minimize those impacts; and
6. Anticipated chemical additives and chemical composition of produced water, with particular attention to those chemicals that would hinder the reuse or recycling of wastewater or pose a challenge to wastewater treatment

Operators must submit to the regulator a proposed plan for handling wastewater, such as flowback and produced fluids. Elements of the plan must include, but are not limited to:

1. Anticipated cumulative volumes of wastewater over the life of the project, reported in three categories: reuse, recycle, and disposal;
2. Anticipated on-site temporary storage methods;
3. Anticipated transport distances and methods (e.g. pipeline, truck) and methods to minimize related impacts including, but not limited to: land disturbance, traffic, vehicle accidents, and air pollution; and
4. An assessment of currently available and anticipated disposal methods, *e.g.* disposal wells, wastewater treatment facilities, etc. This assessment must enumerate the disposal options available and evaluate the ability of those options to handle projected wastewater volumes. In the case of wastewater treatment facilities, the assessment must also evaluate the ability of those facilities to successfully treat the wastewater such that it would not pose a threat to water supplies into which it is discharged.

### v. Well Design and Construction

Proper well construction is crucial to ensuring protection of USDWs. The first step to ensuring good well construction is ensuring proper well drilling techniques are used. This includes appropriate drilling fluid selection, to ensure that the wellbore will be properly conditioned and to minimize borehole breakouts and rugosity that may complicate casing and cementing operations. Geologic, engineering, and drilling data can provide indications of potential complications to achieving good well construction, such as highly porous or fractured intervals, lost circulation events, abnormally pressured zones, or drilling "kicks" or "shows." These must be accounted for in designing and implementing the casing and cementing program. Reviewing data from offset wellbores can be helpful in anticipating and mitigating potential drilling and construction problems. Additionally, proper wellbore cleaning and conditioning techniques must be used to remove drilling mud and ensure good cement placement. Hydraulic fracturing requires fluid to be injected into the well at high pressure and, therefore, wells must be appropriately designed and constructed to withstand this pressure. The casing and cementing program must:

- Properly control formation pressures and fluids;
- Prevent the direct or indirect release of fluids from any stratum to the surface;
- Prevent communication between separate hydrocarbon-bearing strata;
- Protect freshwater aquifers/useable water from contamination;

BLM_0150282

- Support unconsolidated sediments;
- Protect and/or isolate lost circulation zones, abnormally pressured zones, and any prospectively valuable mineral deposits.

Casing must be designed to withstand the anticipated stresses imposed by tensile, compressive, and buckling loads; burst and collapse pressures; thermal effects; corrosion; erosion; and hydraulic fracturing pressure. The casing design must include safety measures that ensure well control during drilling and completion and safe operations during the life of the well. The components of a well that ensure the protection and isolation of USDWs are steel casing and cement. Multiple strings of casing are used in the construction of oil and gas wells, including: conductor casing, surface casing, production casing, and potentially intermediate casing. For all casing strings, the design and construction should be based on Good Engineering Practices ("GEP"), Best Available Technology ("BAT"), and local and regional engineering and geologic data. All well construction materials must be compatible with fluids with which they may come into contact and be resistant to corrosion, erosion, swelling, or degradation that may result from such contact.

## 1.    Conductor Casing

Depending on local conditions, conductor casing can either be driven into the ground, or a hole drilled and the casing lowered into the hole. In the case where a hole is excavated, the space between the casing and the wellbore – the annulus – should be cemented to surface. A cement pad should also be constructed around the conductor casing to prevent the downward migration of fluids and contaminants.

## 2.    Surface Casing

Surface casing setting depth must be based on relevant engineering and geologic factors, but be shallower than any hydrocarbon-bearing zones, and at least 100 feet but not more than 200 feet below the deepest protected water. If shallow hydrocarbon-bearing zones are encountered when drilling the surface casing portion of the hole, operators must notify regulators and take appropriate steps to ensure protection of protected water.

Surface casing must be fully cemented to surface by the pump and plug method. If cement returns are not observed at the surface, remedial cementing must be performed to cement the casing from the top of cement to the ground surface.

## 3.    Intermediate Casing

Depending on local geologic and engineering factors, one or more strings of intermediate casing may be required. This will depend on factors including, but not limited to: the depth of the well, the presence of hydrocarbon-or fluid-bearing formations, abnormally pressured zones, lost circulation zones, or other drilling hazards. Casing setting depth must be based on local engineering and geologic factors and be set at least 100 feet below the deepest protected water, anomalous pressure zones, lost circulation zones, and other drilling hazards. Intermediate casing

BLM_0150283

must be set to protect groundwater if surface casing was set above the base of protected water, and/or if additional protected water was found below the surface casing shoe.

When intermediate casing is installed to protect groundwater, the operator shall set a full string of new intermediate casing to a minimum depth of at least 100 feet below the base of the deepest strata containing protected water and cement to the surface. The location and depths of any hydrocarbon strata or protected water strata that is open to the wellbore above the casing shoe must be confirmed by coring, electric logs, or testing, and shall be reported as part of the completion report.

When intermediate casing is set for a reason other than to protect strata that contain protected water, it must be fully cemented to surface unless doing so would result in lost circulation. Where this is not possible or practical, the cement must extend from the casing shoe to 600 feet above the top of the shallowest zone to be isolated (*e.g.* productive zone, abnormally pressured zone, etc). Where the distance between the casing shoe and shallowest zone to be isolated makes this technically infeasible, multi-stage cementing must be used to isolate any hydrocarbon or fluid-bearing formations or abnormally pressured zones and prevent the movement of fluids. An excess of 25% cement should be mixed unless a caliper log is run to more accurately determine necessary cement volume.

## 4.     Production Casing

If both surface casing and intermediate casing are used as water protection casing, or if intermediate casing is not used, a full string of production casing is required. A production liner may be hung from the base of the intermediate casing and used as production casing as long as the surface casing is used as the water protecting casing, and intermediate casing is set for a reason other than isolation of protected water. When the production string does not extend to the surface, at least 200 feet of overlap between the production string and next larger casing string should be required. This overlap should be cemented and tested by a fluid-entry test at a pressure that is at least 500 psi higher than the maximum anticipated pressure to be encountered by the wellbore during completion and production operations to determine whether there is a competent seal between the two casing strings.

When intermediate casing is not used, production casing must be fully cemented to surface unless doing so would result in lost circulation. If not cemented to the surface, production casing shall be cemented with sufficient cement to fill the annular space from the casing shoe to at least 600 feet above fluid-bearing formations, lost circulation zones, oil and gas zones, anomalous pressure intervals, or other drilling hazards. Where the distance between the casing shoe and shallowest zone to be isolated makes this technically infeasible, multi-stage cementing must be used to isolate any hydrocarbon or fluid-bearing formations or abnormally pressured zones and prevent the movement of fluids. Sufficient cement shall also be used to fill the annular space to at least 100 feet above the base of the freshwater zone, either by lifting cement around the casing shoe or cementing through perforations or a cementing device placed at or below the base of the freshwater zone.

BLM_0150284

### 5.    General

For surface, intermediate, and production casing, at a minimum, centralizers are required at the top, shoe, above and below a stage collar or diverting tool (if used), and through all protected water zones. In non-deviated holes, a centralizer shall be placed every fourth joint from the cement shoe to the ground surface or to within one joint of casing from the bottom of the cellar, or casing shall be centralized by implementing an alternative centralization plan approved by the BLM. In deviated holes, the BLM may require the operator to provide additional centralization. All centralizers must meet API Spec 10D (Recommended Practice for Casing Centralizers – for bow string centralizers), or API Spec 10 TR4 (rigid and solid centralizers) and 10D-2 (Petroleum and Natural Gas Industries, Equipment for Well Cementing, Part 2, Centralizer Placement and Stop Collar Testing).

All cemented casing strings must have a uniformly concentric cement sheath of at least 1" (*i.e.* minimum difference of 2" between wellbore diameter and casing outside diameter). An excess of 25% cement should be mixed unless a caliper log is run to more accurately determine necessary cement volume.

For any section of the well drilled through fresh water-bearing formations, drilling fluids must be limited to air, fresh water, or fresh water based mud, and exclude the use of synthetic or oil-based mud or other chemicals.

In areas where the depth to the lowest protected water is not known, operators must estimate this depth and provide the estimate with the application for a permit to drill. This depth should then be verified by running petrophysical logs, such as resistivity logs, after drilling to the estimated depth. If the depth to the deepest protected water is deeper than estimated, an additional string of casing is required. Surface casing must be of sufficient diameter to allow the use of one or more strings of intermediate casing. All instances of protected water not anticipated on the permit application must be reported, including the formation depth and thickness and water flow rate, if known or estimated.

All cement must have a have a 72-hour compressive strength of at least 1200 psi and free water separation of no more than two milliliters per 250 milliliters of cement, tested in accordance with the current API RP 10B. Cement must conform to API Specification 10A and gas-blocking additives must be used. Cement mix water chemistry must be proper for the cement slurry designs. At a minimum, the water chemistry of the mix water must be tested for pH prior to use, and the cement must be mixed to manufacturer's recommendations. An operator's representative must be on site verifying that the cement mixing, testing, and quality control procedures used for the entire duration of the cement mixing and placement are consistent with the approved engineered design and meet the cement manufacturer recommendations, API standards, and the requirements of this section.

Compressive strength tests of cement mixtures without published performance data must be performed in accordance with the current API RP 10B and the results of these tests must be provided to the regulator prior to the cementing operation. The test temperature must be within 10 degrees Fahrenheit of the formation equilibrium temperature at the top of cement. A better

BLM_0150285

quality of cement may be required where local conditions make it necessary to prevent pollution or provide safer operating conditions.

Prior to cementing, the hole must be prepared to ensure an adequate cement bond by circulating at least two hole volumes of drilling fluid and ensuring that the well is static and all gas flows are killed. Top and bottom wiper plugs and spacer fluids must be used to separate drilling fluid from cement and prevent cement contamination. Casing must be rotated and reciprocated during cementing when possible and when doing so would not present a safety risk. Cement should be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus. During placement of the cement, operator shall monitor pump rates to verify they are within design parameters to ensure proper displacement efficiency. Throughout the cementing process operator shall monitor cement mixing in accordance with cement design and cement densities during the mixing and pumping.

All surface, intermediate, and production casing strings must stand under pressure until a compressive strength of 500 psi is reached before drilling out, initiating testing, or disturbing the cement in any way. In no case should the wait-on-cement ("WOC") time be less than 8-hours. All surface, intermediate, and production casing strings must be pressure tested. Drilling may not be resumed until a satisfactory pressure test is obtained. Casing must be pressure tested to a minimum of 0.5 psi/foot of casing string length or 1500 psi, whichever is greater, but not to exceed 80% of the minimum internal yield. If the pressure declines more than 10% in a 30-minute test or if there are other indications of a leak, corrective action must be taken.

A formation integrity test ("FIT") must be performed immediately after drilling out of all surface and intermediate casing. The test should demonstrate that the casing shoe will maintain integrity at the anticipated pressure to which it will be subjected while drilling the next section of the well, no flow path exists to formations above the casing shoe, and that the casing shoe is competent to handle an influx of formation fluid or gas without breaking down. If any FIT fails, the operator must contact the BLM and remedial action must be taken to ensure that no migrations pathways exist. The casing and cementing plan may need to be revised to include additional casing strings in order to properly manage pressure.

Cement integrity and location must be verified using cement evaluation tools that can detect channeling in 360 degrees. If fluid returns, lift pressure, displacement and/or other operations indicate inadequate cement coverage, the operator must: (i) run a radial cement evaluation tool, a temperature survey, or other test approved by the Division to identify the top of cement; (ii) submit a plan for remedial cementing to the Division for approval; and (iii) implement such plan by performing additional cementing operations to remedy such inadequate coverage prior to continuing drilling operations. Cement evaluation logging must be performed on all strings of cemented casing that isolate protected water, potential flow zones, or through which stimulation will be performed.

When well construction is completed, the operator should certify, in writing, that the casing and cementing requirements were met for each casing string.

BLM_0150286

### vi.     Well Logs

After drilling the well but prior to casing and cementing operations, operators must obtain well logs to aid in the geologic, hydrologic, and engineer characterization of the subsurface. Open hole logs, *i.e.* logs run prior to installing casing and cement, should at a minimum include:

#### Gamma Ray Logs:

Gamma ray logs detect naturally occurring radiation. These logs are commonly used to determine generic lithology and to correlate subsurface formations. Shale formations have higher proportions of naturally radioactive isotopes than sandstone and carbonate formations. Thus, these formations can be distinguished in the subsurface using gamma ray logs.

#### Density/Porosity Logs:

Two types of density logs are commonly used: bulk density logs, which are in turn used to calculate density porosity, and neutron porosity logs. While not a direct measure of porosity, these logs can be used to calculate porosity when the formation lithology is known. These logs can be used to determine whether the pore space in the rock is filled with gas or with water.

#### Resistivity Logs:

These logs are used to measure the electric resistivity, or conversely conductivity, of the formation. Hydrocarbon and fresh water-bearing formations are resistive, *i.e.* they cannot carry an electric current. Brine-bearing formations have a low resistivity, *i.e.* they can carry an electric current. Resistivity logs can therefore be used to help distinguish brine-bearing from hydrocarbon-bearing formations. In combination with Darcy's Law, resistivity logs can be used to calculate water saturation.

#### Caliper Logs:

Caliper logs are used to determine the diameter and shape of the wellbore. These are crucial in determining the volume of cement that must be used to ensure proper cement placement.

These four logs, run in combination, make up one of the most commonly used logging suites. Additional logs may be desirable to further characterize the formation, including but not limited to Photoelectric Effect, Sonic, Temperature, Spontaneous Potential, Formation Micro-Imaging ("FMI"), Borehole Seismic, and Nuclear Magnetic Resonance ("NMR"). The use of these and other logs should be tailored to site-specific needs.

### vii.     Core and Fluid Sampling

Operators of wells that will be hydraulically fractured should also obtain whole or sidewall cores of the producing and confining zone(s) and formation fluid samples from the producing zone(s). At a minimum, routine core analysis should be performed on core samples

BLM_0150287

representative of the range of lithology and facies present in the producing and confining zone(s). Special Core Analysis ("SCAL") should also be considered, particularly for samples of the confining zone, where detailed knowledge of rock mechanical properties is necessary to determine whether the confining zone can prevent or arrest the propagation of fractures. Operators should also record the fluid temperature, pH, conductivity, reservoir pressure and static fluid level of the producing and confining zone(s). Operators should prepare and submit a detailed report on the physical and chemical characteristics of the producing and confining zone(s) and formation fluids that integrates data obtained from well logs, cores, and fluid samples. This must include the fracture pressure of both the producing and confining zone(s). This data does not need to be gathered for every well but operators should obtain a statistically significant number of samples.

### viii.   Mechanical Integrity

Operators must maintain mechanical integrity of wells at all times. Mechanical integrity should be periodically tested by means of a pressure test with liquid or gas, a tracer survey such as oxygen activation logging or radioactive tracers, a temperature or noise log, and a casing inspection log. The frequency of such testing should be based on-site, with operation specific requirements and be delineated in a testing and monitoring plan prepared, submitted, and implemented by the operator.

Mechanical integrity and annular pressure should be monitored over the life of the well. Instances of sustained casing pressure can indicate potential mechanical integrity issues. The annulus between the production casing and tubing (if used) should be continually monitored. Continuous monitoring allows problems to be identified quickly so repairs may be made in a timely manner, reducing the risk that a wellbore problem will result in contamination of USDWs.

### ix.   Operations and Monitoring

Each hydraulic fracturing treatment must be modeled using a 3D geologic and reservoir model, as described in the Area of Review requirements, prior to operation to ensure that the treatment will not endanger USDWs. Prior to performing a hydraulic fracturing treatment, operators should perform a pressure fall-off or pump test, injectivity tests, and/or a mini-frac. Data obtained from such tests can be used to refine the hydraulic fracture model, design, and implementation.

Prior to well stimulation, all casing and tubing to be used by the operator to perform the stimulation treatment must be pressure tested. For cemented completions, the test pressure must be at least 500 psi greater than the anticipated maximum surface pressure to be experienced during the stimulation operation or the life of the completion operation. For non-cemented completions, the test pressure must be a minimum of: (i) 70% of the lowest activating pressure for pressure actuated sleeve completions; or (ii) 70% of formation integrity for open-hole completions, as determined by a formation integrity test. A failed test is one in which the pressure declines more than 10% in a 30-minute test or if there are other indications of a leak.

In the event of a failed test, the operator must:

BLM_0150288

1. Orally notify the authorized officer as soon as practicable but no later than 24 hours following the failed test, and;
2. Perform remedial work to restore mechanical integrity.

Stimulation operations may not begin until a successful mechanical integrity test is performed and the results are submitted to the regulator. If mechanical integrity cannot be restored, the well must be plugged and abandoned.

During the well stimulation operation, the operator must continuously monitor and record the pressures in each well annuli, surface injection pressure, slurry rate, proppant concentration, fluid rate, and the identities, rates, and concentrations of all additives (including proppant).

If during any stimulation operation the annulus pressure:

1. increases by more than 500 pounds per square inch as compared to the pressure immediately preceding the stimulation; or
2. exceeds 80% of the API rated minimum internal yield on any casing string in communication with the stimulation treatment.

The operation must immediately cease, and the operator must take immediate corrective action and orally notify the authorized officer immediately following the incident. Within one week after the stimulation operations are completed, the operator must submit a report containing all details pertaining to the incident, including corrective actions taken.

If at any point during the hydraulic fracturing operation the monitored parameters indicate a loss of mechanical integrity or if injection pressure exceeds the fracture pressure of the confining zone(s), the operation must immediately cease. If either occurs, the operator must notify the regulator within 24 hours and must take all necessary steps to determine the presence or absence of a leak or migration pathways to USDWs. Prior to any further operations, mechanical integrity must be restored and demonstrated to the satisfaction of the regulator and the operator must demonstrate that the ability of the confining zone(s) to prevent the movement of fluids to USDWs has not been compromised. If a loss of mechanical integrity is discovered or if the integrity of the confining zone has been compromised, operators must take all necessary steps to evaluate whether injected fluids or formation fluids may have contaminated or have the potential to contaminate any unauthorized zones. If such an assessment indicates that fluids may have been released into a USDW or any unauthorized zone, operators must notify the regulator within 24 hours, take all necessary steps to characterize the nature and extent of the release, and comply with and implement a remediation plan approved by the regulator. If such contamination occurs in a USDW that serves as a water supply, a notification must be placed in a newspaper available to the potentially affected population and on a publically accessible website and all known users of the water supply must be individually notified immediately by mail and by phone.

The use of diesel fuel and related products, BTEX compounds, and 2-BE in well stimulation fluids should be prohibited.

BLM_0150289

Techniques to measure actual fracture growth should be used, including downhole tiltmeters and microseismic monitoring. These techniques can provide both real-time data and, after data processing and interpretation, can be used in post-fracture analysis to inform fracture models and refine hydraulic fracture design. Tiltmeters measure small changes in inclination and provide a measure of rock deformation. Microseismic monitoring uses highly sensitive seismic receivers to measure the very low energy seismic activity generated by hydraulic fracturing.

Hydraulic fracturing fluid and proppant can sometimes be preferentially taken up by certain intervals or perforations. Tracer surveys and temperature logs can be used to help determine which intervals were treated. Tracers can be either chemical or radioactive and are injected during the hydraulic fracturing operation. After hydraulic fracturing is completed, tools are inserted into the well that can detect the tracer(s). Temperature logs record the differences in temperature between zones that received fracturing fluid, which is injected at ambient surface air temperature, and in-situ formation temperatures, which can be in the hundreds of degrees Fahrenheit.

Operators should develop, submit, and implement a long-term groundwater quality monitoring program. Dedicated water quality monitoring wells should be used to help detect the presence of contaminants prior to their reaching domestic water wells. Placement of such wells should be based on detailed hydrologic flow models and the distribution and number of hydrocarbon wells. Baseline monitoring should begin at least a full year prior to any activity, with monthly or quarterly sampling to characterize seasonal variations in water chemistry. Monitoring should continue a minimum of 5 years prior to plugging and abandonment.

### x.    *Reporting*

At a minimum, operators must report:

- All instances of hydraulic fracturing injection pressure exceeding operating parameters as specified in the permit;
- All instances of an indication of loss of mechanical integrity;
- Any failure to maintain mechanical integrity;
- The results of:
  - Continuous monitoring during hydraulic fracturing operations;
  - Techniques used to measure actual fracture growth; and
  - Any mechanical integrity tests;
- The detection of the presence of contaminants pursuant to the groundwater quality monitoring program;
- Indications that injected fluids or displaced formation fluids may pose a danger to USDWs;
- All spills and leaks; and
- Any non-compliance with a permit condition.

BLM_0150290

The following must be made publically available on a well-by-well basis through an online, geographically based reporting system, a minimum of 30 days prior to a hydraulic fracturing operation:

1. Baseline water quality analyses for all USDWs within the area of review;
2. Proposed source, volume, geochemistry, and timing of withdrawal of all base fluids; and
3. Proposed chemical additives (including proppant coating), reported by their type, chemical compound or constituents, and Chemical Abstracts Service ("CAS") number, and the proposed concentration or rate and volume percentage of all additives.

The following must be made publically available on a well-by-well basis through an online, geographically based reporting system, a maximum of 30 days subsequent to a hydraulic fracturing operation:

1. Actual source, volume, geochemistry and timing of withdrawal of all base fluids;
2. Actual chemical additives used, reported by their type, chemical compound or constituents, CAS number, and the actual concentration or rate and volume percentage of all additives; and
3. Geochemical analysis of flowback and produced water, with samples taken at appropriate intervals to determine changes in chemical composition with time and sampled until such time as chemical composition stabilizes.

### xi.   *Emergency and Remedial Response*

Operators must develop, submit, and implement an emergency response and remedial action plan. The plan must describe the actions the operator will take in response to any emergency that may endanger human life or the environment – including USDWs – such as blowouts, fires, explosions, or leaks and spills of toxic or hazardous chemicals. The plan must include an evaluation of the ability of local resources to respond to such emergencies and, if found insufficient, how emergency response personnel and equipment will be supplemented. Operators should detail what steps they will take to respond to cases of suspected or known water contamination, including notification of users of the water source. The plan must describe what actions will be taken to replace the water supplies of affected individuals in the case of the contamination of a USDW.

### xii.   *Plugging and Abandonment*

Prior to plugging and abandoning a well, operators should determine bottom hole pressure and perform a mechanical integrity test to verify that no remedial action is required. Operators should develop and implement a well plugging plan. The plugging plan should be submitted with the permit application and should include the methods that will be used to: determine bottom hole pressure and mechanical integrity; the number and type of plugs that will be used; plug setting depths; the type, grade, and quantity of plugging material that will be used; the method for setting the plugs; and, a complete wellbore diagram showing all casing setting depths and the location of cement and any perforations.

BLM_0150291

Plugging procedures must ensure that hydrocarbons and fluids will not migrate between zones, into USDWs, or to the surface. A cement plug should be placed at the surface casing shoe and extend at least 100 feet above and below the shoe. All hydrocarbon-bearing zones should be permanently sealed with a plug that extends at least 100 feet above and below the top and base of all hydrocarbon-bearing zones. Plugging of a well must include effective segregation of uncased and cased portions of the wellbore to prevent vertical movement of fluid within the wellbore. A continuous cement plug must be placed from at least 100 feet below to 100 feet above the casing shoe. In the case of an open hole completion, any hydrocarbon or fluid-bearing zones shall be isolated by cement plugs set at the top and bottom of such formations, and that extend at least 100 feet above the top and 100 feet below the bottom of the formation.

At least 60-days prior to plugging, operators must submit a notice of intent to plug and abandon. If any changes have been made to the previously approved plugging plan the operator must also submit a revised plugging plan. No later than 60-days after a plugging operation has been completed, operators must submit a plugging report, certified by the operator and person who performed the plugging operation.

After plugging and abandonment, operators must continue to conduct monitoring and provide financial assurance for an adequate time period, as determined by the regulator, that takes into account site-specific characteristics including but not limited to:

- The results of hydrologic and reservoir modeling that assess the potential for movement of contaminants into USDWs over long time scales; and
- Models and data that assess the potential degradation of well components (*e.g.* casing, cement) over time and implications for mechanical integrity and risks to USDWs.

    **C.**    **The Uncompahgre RMP DEIS Inadequately Analyzes Impacts from Colorado River Withdrawals for Fracking and Other Unconventional Drilling Methods on Endangered Fish Populations and Water Supply, in Violation of NEPA and Section 7 of the ESA.**

Cumulative impacts are those impacts on the environment resulting from "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions." 40 C.F.R. § 1508.7. By all accounts, the impacts stemming from future oil and gas leasing and development in the Uncompahgre planning area discussed at length in these comments are cumulative with the impacts from development of neighboring planning areas. *Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir. 1985) (reasoning that effects of proposed road and of timber sales that road was designed to facilitate were cumulative actions for which comprehensive analysis was required). Indeed, under NEPA, BLM has an obligation to consider the effects of neighboring lease sales and oil and gas development projects as cumulative impacts of any future development stemming from new leasing in the Uncompahgre planning area. 40 C.F.R. §§ 1508.7, 1508.8.

A foreseeable cumulative impact from oil and gas development occurring adjacent to and in the Uncompahgre planning area are Colorado River water withdrawals necessary for fracking

BLM_0150292

and horizontal drilling techniques. Indeed, millions of gallons of water are withdrawn from the Colorado River for oil and gas extraction, potentially impacting endangered fish in the Gunnison River and Uncompahgre Rivers and communities that rely on this water downstream in the North Fork Valley and elsewhere. BLM must analyze the effects of the massive water demand resulting from relatively new horizontal drilling techniques in the Upper Colorado River Basin (the "Upper Basin") which would impact watersheds in the Uncompahgre planning area, including (1) the significant cumulative impacts on local water supplies and the Colorado River endangered fish under NEPA and (2) the cumulative impacts of water depletion effects on the Colorado River endangered fish under Section 7 of the Endangered Species Act. The loss of adequate flows in the endangered fishes' habitat within the Upper Colorado River Basin is so serious that the Service has determined that any depletion of Upper Basin stream flows adversely affects and jeopardizes the endangered fish.[384] The UFO draft RMP and EIS identifies critical habitat of at least two endangered fish populations within the planning area, namely the Colorado Pikeminnow and the Razorback Sucker in the Gunnison and Uncompahgre Rivers. UFO RMP DEIS at 3-75. Therefore, any depletion is subject to Section 7 consultation and review under NEPA.

While the Uncompahgre Field Office has not published a Biological Assessment (BA) as a part of the DEIS process yet, any potential reliance in the UFO BA on the 2008 Programmatic Biological Opinion for Water Depletions Associated with Bureau of Land Management's Fluid Mineral Program within the Upper Colorado River Basin in Colorado (the "Fluid Mineral PBO" or "PBO") (attached as Exhibit 311), is improper. The PBO does not take into account the enormous water depletion effects of horizontal drilling. The PBO is also unreliable in numerous other respects due to significant new information revealing that the Fluid Mineral Program may have effects on the endangered fish in a manner or to an extent not previously considered. This includes new information about (a) the potential for increased Mancos shale play development within the Piceance Basin, much of which would require horizontal drilling and therefore increased water depletions; (b) climate change effects on Upper Colorado River Basin stream flows (which is not even acknowledged in the PBO or the UFO DEIS); (c) long-term drought and increased water demand which has drastically reduced water supplies; (d) mercury and selenium pollution effects on the endangered fish; (e) declining humpback chub and Colorado

---

[384] U.S. Bureau of Land Management, White River FEIS at 3-71 (2015) ("The FWS has determined that any federally authorized depletion from the Upper Colorado River Basin has an adverse effect on listed Colorado River fishes.") (Chapter 3 attached as Exhibit 310); Biological Opinion for BLM Resource Management Plan (RMP), Price Field Office (PFO), 138 (Oct. 27, 2008), available at:
http://www.blm.gov/style/medialib/blm/ut/price_fo/Planning/rod_approved_rmp.Par.2742.File.d at/Price%20Biological%20Opinion.pdf (attached as Exhibit 209) ("The USFWS determined that any depletion will jeopardize their continued existence and will likely contribute to the destruction or adverse modification of their critical habitat") (citing USDI, Fish and Wildlife Service, Region 6 Memorandum, dated July 8, 1997); Biological Opinion for BLM Resource Management Plan (RMP), Vernal Field Office (VFO), 113 (Oct. 23, 2008), available at: http://www.blm.gov/style/medialib/blm/ut/vernal_fo/planning/rod_approved_rmp.Par.4719.File. dat/VernalBiologicalOpinion.pdf (attached as Exhibit 210) (same).

BLM_0150293

pikeminnow populations and failure to meet these populations' recovery targets; (f) the Recovery Program's failure to meet recommended stream flows necessary for recovery of the endangered fish and (g) the failure of BLM to adequately monitor and track actual water use and depletions in the Upper Colorado River Basin, which could result in higher water use and greater depletions in the UFO planning area than anticipated in the PBO.

### 1. Horizontal Wells Will Require Greater Water Depletions Than Previously Anticipated.

While the 2008 PBO is designed to address any depletions resulting from oil and gas development within the Uncompahgre Field Office and other western Colorado field offices, BLM can no longer rely on that consultation for its Section 7 compliance. The PBO did not consider the likely increase in horizontal drilling and other unconventional drilling practices that deplete enormous amounts of water to develop the Mancos/Mowry and Niobrara shale plays (collectively "Mancos shale play"). Nor did it consider the use of these water-intensive practices throughout the rest of the programmatic action area, including the Grand Junction, Little Snake, Tres Rios, White River, Gunnison and Colorado River Valley Field Offices.[385]

For example, in the White River planning area, the PBO projects that new vertical wells would consume 2.62 acre-feet per well, while in the Grand Junction planning area, vertical wells were estimated to require 0.77 acre-feet of water per well. But BLM water depletion logs indicate that between FY2011 and FY2015, the average depletion for horizontal wells in BLM's western Colorado field offices was 26.45 acre-feet of water per well in the field offices covered by the PBO.[386] Indeed, in FY2015 horizontal drilling in the Grand Junction Field Office resulted in a violation of the PBO's Incidental Take Statement (ITS) water depletion limit in the Colorado River sub-basin—under the ITS, water depletions are a surrogate for take. In FY2015, an operator drilled eight horizontal wells in the Grand Junction Field Office, which consumed a total of 620.87 acre-feet of water.[387] The total amount of water depleted in the Colorado River sub-basin by all horizontal and vertical wells was 691.09 acre-feet of water, which exceeds the 379 acre-feet annual projection for this sub-basin by 1.8 times.[388]

The drastic increase in the use of this water-intensive drilling technique was not considered in the PBO, nor in BLM's consultations over the recent White River, Kremmling, Little Snake, and Grand Junction RMP amendments or revisions, which only relied on the PBO regarding the RMPs' water depletion effects. These increased water depletion impacts throughout the Upper Basin could alter the Service's analysis of the cumulative effects on the

---

[385] BLM Instruction Memorandum CO-2011-022 (April 11, 2011) (attached as Exhibit 211) ("All of the estimates in the PBO were based on using conventional vertical drilling technology.").

[386] *See* Water Depletion Logs (Exhibits 212-218), which are completed, pursuant to requirements within the PBO, on an annual basis by the BLM to estimate water depletion resulting from fluid minerals development on BLM lands in western Colorado.

[387] *Id.*

[388] *Id.*

BLM_0150294

endangered fish, as all BLM-authorized fluid mineral development activity within the Basin is part of a single programmatic action that impacts the endangered fish.

Moreover, recently, on June 8, 2016, the U.S. Geological Survey published a report reassessing the total technically recoverable reserves in the Mancos shale play in the Piceance Basin, including the Niobrara strata of the play.[389] According to the report, the Mancos shale play's total technically recoverable natural gas reserves are over 40 times greater than the USGS's 2003 estimate and is the second-largest in the U.S., behind the Marcellus shale.[390] Specifically, 66.3 trillion cubic feet of natural gas, 74 million barrels of oil and 45 million barrels of natural gas liquids are potentially recoverable.[391] While tight gas in the younger, shallower Mancos shale intervals is produced primarily from vertical and directional wells in which the reservoirs have been hydraulically fractured, the tight gas and continuous oil and gas in the older and deeper intervals of the Mancos shale are produced mostly from horizontal wells that have been hydraulically fractured.[392] These reserves underlie large areas of the Grand Junction, White River, Colorado River Valley, Uncompahgre, and Gunnison Field Offices, all of which fall under the PBO.[393]

Increasing interest in the Piceance Basin's Mancos shale play should therefore be expected in the Uncompahgre field office and these other field offices, given its enormous production potential. Indeed, since the 2003 USGS assessment, more than 2,000 wells have already been drilled and completed in one or more intervals of the study area.[394] A review of BLM oil and gas projects in western Colorado indicates that operators are planning a number of projects involving horizontal drilling, which would most likely target the Mancos shale.[395]

Accordingly, Mancos shale drilling projects could increase within the Upper Basin, including the UFO, but the PBO does not take into account this expansion in new development potential. Because the RMPs for the Uncompahgre Field Office and other Piceance Basin field offices overlapping the Mancos shale play do not limit total new wells that may be drilled, and actually, the UFO draft RMP anticipates greater oil and gas leasing within the planning area, the greater amount and availability of technically recoverable oil and gas reserves could result in the development of many more new wells in the Upper Basin than assumed in the RMPs and the PBO. For example, the RFDs for the Colorado River Valley and White River RMPs did not take into account Mancos shale drilling (other than exploratory wells) and thus such drilling is not

[389] Assessment of Continuous (Unconventional) Oil and Gas Resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah (2016) ("USGS 2016"), available at http://pubs.usgs.gov/fs/2016/3030/fs20163030.pdf (attached as Exhibit 197).

[390] *See id.*

[391] *Id.*

[392] *Id.*

[393] Exhibit 219 (map showing overlap of Mancos shale with field office boundaries).

[394] *Id.*

[395] *See* Center for Biological Diversity, Spreadsheet of Horizontal Well Projects in Colorado (attached as Exhibit 220) (listing horizontal well projects listed in BLM's NEPA register and projected water use).

BLM_0150295

considered in the PBO.[396] Further, a substantial portion of new wells would be horizontal wells, as the lower strata of the Mancos formation would likely be accessed via horizontal drilling, but again, the PBO does not take into account the extraordinarily higher water use for horizontal wells. Water depletions in the Gunnison river sub-basin and throughout the entire Upper Colorado River Basin could therefore exceed projected water use estimates in the PBO.

Additionally, the UFO RMP DEIS must analyze cumulative impacts from oil and gas projects moving forward in the Uncompahgre planning area, namely the Bull Mountain Unit Master Development Plan. The Bull Mountain plan's Final Environmental Impact Statement (FEIS) anticipates the development of 146 new gas wells, half of which are assumed shale wells including horizontal drilling in the northwest portion of Gunnison County, within the UFO.[397] The preferred alternative's water use in the Bull Mountain FEIS would exceed levels contemplated in the PBO. The FEIS estimates that construction, drilling, dust abatement, and completion of the 146 gas wells for the preferred alternative would require 2,480.2 acre-feet of water, of which 744.1 acre-feet would be fresh water.[398] Per well fresh water use, then, would amount to just over five acre-feet, nearly five times greater than the PBO's projections for vertical well depletions in the Gunnison River sub-basin.[399] The anticipated life of the project is six years, with an average of 27 wells drilled per year.[400] Total fresh water depletions divided by the six year duration of the project amounts to 124 acre feet of fresh water depleted annually. As noted above, the PBO estimated total *annual* water depletions from the Gunnison sub-basin at 16 acre-feet—given the preferred alternative's proximity to tributaries of the Gunnison River, water would likely be taken from the Gunnison River sub-basin, although the Bull Mountain FEIS fails to clearly state the project's water source.[401] The preferred alternative, then, would likely lead to annual water depletions from the Gunnison River sub-basin of over seven times greater than projected in the PBO. Even if water were drawn from the Colorado River sub-basin, the 124 acre-feet required annually by the preferred alternative alone would amount to nearly one third of

---

[396] *See* White River RMP FEIS at K-358 ("Development of the Mancos and Niobrara outside the Rangely Field in Rio Blanco County in the WRFO are not [] currently well defined and are exploratory in nature. This development is in the initial stages of the exploration phase to determine of the maturity of the reservoir and the potential viability of the Niobrara within the WRFO."); *see also* Colorado River Valley RMP FEIS at 4-576 (attached as Exhibit 221) ("To date, use of horizontal drilling in relation to the deep marine shales [i.e., Niobrara, Mancos, and Eagle Basin formations] has been limited and is considered experimental. As a result, the development intensity, timing, and location of development of the deep marine shales was considered too speculative for quantitative impact analysis in connection with this planning process.").

[397] Bull Mountain Unit Master Development Plan Final Environmental Impact Statement (FEIS) (January, 2015), DOI -BLM-CO-S050-201 3-0022-EIS, at ES-1, available at http://www.blm.gov/style/medialib/blm/co/information/nepa/uncompahgre_field/13-22_bull_mountain.Par.23863.File.dat/Bull_Mtn_DEIS_Jan2015_508_reduced.pdf (attached as Exhibit 222).

[398] Bull Mountain FEIS, at ES-8 Table ES-1, ES-10-11.

[399] *Id.*

[400] *Compare id.* at ES-7 with Exhibits 212-218 (water depletion logs).

[401] FEIS at 3-31, Figure 3-4.

BLM_0150296

all allowable annual depletions for the Colorado River sub-basin under the 2008 PBO. The
Uncompahgre DEIS does not contemplate or analyze water depletions from the Bull Mountain
project, nor does it address projected future water depletions, in clear violation of NEPA's
cumulative impacts analysis requirements. Additionally, to the extent that approval of the
Uncompahgre draft RMP would rely on the PBO, such reliance is arbitrary and cannot constitute
BLM's section 7 compliance. BLM must either reinitiate consultation on the PBO or initiate
section 7 consultation for the UFO draft RMP DEIS.

## 2. Climate Change Is Reducing Stream Flows in the Upper Colorado River Basin.

The Uncompahgre RMP DEIS and the PBO entirely fails to acknowledge climate change
effects on Upper Colorado River Basin stream flows, and related effects on the endangered
fish.[402] Anthropogenic climate change is profoundly impacting the Colorado River in ways that
are altering temperature, streamflow, and the hydrologic cycle. As detailed below, changes
observed to date include rising temperatures, earlier snowmelt and streamflow, decreasing
snowpack, and declining runoff and streamflow. Modeling studies project that these changes will
only worsen, including continued declines in streamflow and intensification of drought. Climate
change is likely to have significant effects on the endangered fish species in the Colorado River
basin and the Colorado River ecosystem.

### Rising temperatures

The Colorado River basin has warmed significantly during the past century, with average
increases in surface temperature of 1.6°F (0.9°C) over the Southwest during 1901-2010
(Hoerling et al. 2013).[403] The greatest warming has occurred in spring and summer, and in
daytime high temperatures and nighttime low temperatures (Bonfils et al. 2008, Hoerling et al.
2013). Surface temperatures in the Southwest are projected to increase steeply in this century by
an average of 4.5 to 7.9° F depending on the emissions scenario, with an average of 2.5 to 3°F of
warming projected for 2021-2050 alone (Cayan et al. 2013). In the Colorado River basin,
temperatures have increased roughly by 2° F, and "additional decades of warming are 'locked in'
regardless of any behavioral changes that may or may not be implemented by the world's
governments"—roughly an additional 5° F of warming can be expected in the basin by 2050
(CRRG 2016). As explained below, warming temperatures are having significant effects on

---

[402] In contrast, the Biological Assessment for the Bull Mountain MDP acknowledges that climate
change "could impact listed fish species and their habitats by reducing suitable habitat, changing
distributions, and altering food webs and water quality, including temperatures. Additional
effects of climate change may include severity and frequency of droughts, floods, and wildfires,
as well as changes in the timing of snowmelt and peak flows (Isaak et al. 2012; Haak et al. 2010;
Rieman and Isaak 2010; Wenger et al. 2011), all of which may impact listed fish species in the
analysis area." BLM, Biological Assessment, Uncompahgre Field Office, Bull Mountain Unit
Master Development Plan and EIS, 4-9 (2015) (attached as Exhibit 223).

[403] Some of the references in this section are provided as short cites in parentheses. Full citations
for these parenthetical references are included in a bibliography at the end of the section.

BLM_0150297

streamflow, drought severity, and the hydrologic cycle in the Southwest (Barnett al. 2008,
Woodhouse et al. 2016).

*Earlier snowmelt and streamflow*

In much of the Colorado River basin, snowmelt, snowmelt runoff, and streamflow timing
have trended earlier since the mid-1950s, in parallel with warming temperatures (Hamlet et al.
2005, Stewart et al. 2005, Barnett et al. 2008, Hoerling et al. 2013, Garfin et al. 2014). The
Colorado River basin's spring pulse from 1978-2004 shifted to two weeks earlier compared to
flows before 1978 (Ray et al. 2008). Although there are both natural and human influences on
these hydrologic trends, studies indicate that anthropogenic greenhouse gases began to impact
snow-fed streamflow timing during 1950-1999 (Barnett et al. 2008, Hidalgo et al. 2009, Hoerling
et al. 2013). Modeling studies have projected that snowmelt, spring runoff, and streamflow
timing will continue to shift earlier across much of the Southwest (Stewart et al. 2004, Rauscher
et al. 2008, Dettinger et al. 2015).

*Decreasing snowpack*

The Colorado River receives most of its water from winter snowpack from the Rocky
Mountains, where 15% of the total basin areas generates 85% of the river flow (Dettinger et al.
2015). Across much of the Colorado River basin, the spring snowpack is decreasing and more
winter precipitation is falling as rain instead of snow (Hamlet et al. 2005, Pierce et al. 2008, Das
et al. 2009). Approximately half of the observed decline in snowpack in the western United
States during 1950-1999 has been attributed to the effects of anthropogenic greenhouse gases,
ozone and aerosols (Pierce et al. 2008). Modeling studies project a continued reduction of
Southwest mountain snowpack during February through May during this century, largely due to
the effects of rising temperatures (Cayan et al. 2013, Dettinger et al. 2015).

*Declining Runoff and Streamflow*

Annual runoff in the Colorado River basin appears to be declining (USBR 2011), with
significant consequences for reduced streamflow. During 2001–2010, warm temperatures and
dry conditions reduced average naturalized flows in the Colorado River (measured at Lees Ferry)
to the second-lowest-flow decade since 1901, to12.6 million acre-feet per year compared to the
1901–2000 average of 15.0 million acre-feet per year (Hoerling et al. 2013).

Modeling studies project that runoff and streamflow will continue to decrease
substantially in the Colorado River basin during this century (Ray et al. 2008, Das et al. 2011,
USBR 2011, Cayan et al. 2013, Georgakakos et al. 2014, Dettinger et al. 2015). Barnett and
Pierce (2009) concluded that anthropogenic climate change is likely to reduce runoff in the
Colorado River basin by 10-30% by 2050. Projected reductions in runoff range from 6-7%
(Christensen and Lettenmaier 2007) to 45% (Hoerling and Eischeid 2007) depending on the
models and methods used in each study (see Barnett and Pierce 2009 at Table 2). In the short
term, Hoerling and Eischeid (2007) predict streamflow to decrease by 25% during 2006-2030,
and by 45% during 2035-2060.

BLM_0150298

Importantly, numerous studies show that warming temperatures alone will cause runoff and streamflow declines in the Colorado River basin. For example, in a recent review, Vano et al. (2014) estimated that future streamflow in the Colorado River basin will be reduced by 5% to 35% due to rising temperature alone. When precipitation change is considered, a 5% decrease in precipitation would further reduce streamflow by 10% to 15% (Vano et al. 2014).

Moreover, warming temperatures will play an increasingly important role in causing runoff to decline in the Colorado River basin, and must be factored into streamflow forecasts (Woodhouse et al. 2016). An empirical study of the influence of precipitation, temperature, and soil moisture on upper Colorado River basin streamflow over the past century found that warmer temperatures have already resulted in flows less than expected based on precipitation levels (Woodhouse et al. 2016). Consistent with past research, the study found that cool season precipitation explains most of the variability in annual streamflow. However, temperature was highly influential in determining streamflow under certain conditions. The study concluded that "[s]ince 1988, a marked increase in the frequency of warm years with lower flows than expected, given precipitation, suggests continued warming temperatures will be an increasingly important influence in reducing future UCRB water supplies." The researchers warned that "streamflow forecasts run the risk of overprediction if warming spring and early summer temperatures are not adequately considered."

According to the study's press release it is the "first to examine the instrumental historical record to see if a temperature effect [on stream flows] could be detected."[404] The study's lead author highlighted its significance: "If we have a warmer spring, we can anticipate that the flows will be less relative to the amount of snowpack[.]….What we're seeing is not just the future – it's actually now. That's not something I say lightly."[405]

*Increasing Drought Severity*

Historically, droughts in the Colorado River basin were primarily driven by precipitation deficits. However, studies indicate that rising temperatures have begun to play a more important role in driving droughts (Hoerling et al. 2013, Vano et al. 2014). Importantly, rising temperature superimposed on natural drought variability is expected to exacerbate the impacts of droughts (Seager et al. 2012, Cook et al. 2015). Modeling studies project that droughts in Southwest will intensify due to longer periods of dry weather and more extreme heat, leading to higher evapotranspiration and moisture loss (Seager et al. 2007, Cayan et al. 2010, Trenberth et al. 2013). In the Colorado River basin, future droughts are projected to be substantially hotter, and drought is projected to become more frequent, intense, and longer lasting than in the historical record (Garfin et al. 2014). Moreover, under a business-as-usual GHG emissions scenario, the risk of mega-drought in the southwest would increase to 70-99% by the end of the century (Ault 2016). This substantial risk of mega-drought would exist regardless of how or whether precipitation changes.

---

[404] American Geophysical Union, Colorado River Flows Reduced by Warmer Spring Temperatures (March 9, 2016), available at http://news.agu.org/press-release/colorado-river-flows-reduced-by-warmer-spring-temperatures/ (attached as Exhibit 236).
[405] *Id.*

BLM_0150299

*Reduced reservoir levels and unsustainable demand for water*

Of the more than 90 reservoirs on the river and its tributaries, the two largest are Lake Mead and Lake Powell which together can store up to 85% of the total flow for the basin combined (Christensen et al. 2004). Reservoirs in the Colorado River basin are highly vulnerable to climate change, particularly because the amount of storage in reservoirs is sensitive to runoff changes (Barnett and Pierce 2008). Even small decreases in runoff have caused average reservoir levels to markedly decrease (Christensen et al. 2004). Christensen et al. (2004) predicted that climate change impacts on the hydrology of the Colorado River system would result in water demand (deliveries and evaporation) exceeding reservoir inflows (which would also be decreased), resulting in a degraded system. Likewise, Barnett and Pierce (2008) projected that a 10% reduction in runoff would result in requested water deliveries surpassing sustainable deliveries by 2040, while a 20% reduction in runoff would cause unsustainable water demands by 2025. A greater demand than supply makes the system more prone to long-term sustained droughts, as reservoirs will not have sufficient time to be naturally replenished and more water will be extracted from a dwindling supply than is sustainable (Christensen and Lettenmaier 2007). Reservoirs would spend additional time in a depleted state, weakening the system's buffering ability in years where there is low precipitation (Barnett and Pierce 2009).

A recent Bureau of Reclamation report looks at how climate change will affect water supplies in the West and finds that warming weather will increase the likelihood of shortages, particularly for farmers.[406] In addition to runoff changes, increased temperatures are expected to increase the demand for irrigation water and for Reclamation's hydroelectricity, as well as for water dedicated to maintaining habitat for fish and other river species.[407] Collectively, the impacts of climate change to water resources give rise to difficult questions about how best to operate Reclamation facilities to address growing demands for water and hydropower now and how to upgrade and maintain infrastructure to optimize operations in the future.[408]

*** 

In addition to reducing the overall amount of water in the Upper Colorado River Basin, these climate change effects would worsen effects from toxic spills by increasing the concentration of pollutants and toxic contaminants. Climate change is also likely to further exacerbate mercury and selenium effects on the endangered fish. Mercury deposited into soil from coal burning, or selenium naturally found in Mancos rock outcrops or soil, will increasingly

---

[406] U.S. Department of the Interior Bureau of Reclamation. Secure Water Act Section 9503(c) – Reclamation Climate Change and Water, at 10-13, March 2016 (Chapter 10 attached as Exhibit 237)

[407] Kahn, Debra, Climate change bodes ill for Western supplies, E&E Reporter: The Politics and Business of Climate Change (March 2016) (attached as Exhibit 312).

[408] U.S. Department of the Interior Bureau of Reclamation. Secure Water Act Section 9503(c) – Reclamation Climate Change and Water at 1-10 (Chapter 1 attached as Exhibit 238).

BLM_0150300

run off into streams with increased heavy rainfall events.[409] More frequent and severe wildfire events will result in increased charring of soil, releasing mercury and selenium that can wash off into streams.[410] Warmer water conditions will hasten the conversion of mercury into toxic methylmercury,[411] and reduced flows will increase mercury and selenium concentrations.

Ample evidence, including empirical research, demonstrates that climate change is already reducing stream flows in the Colorado River Basin and that flows will continue to dwindle as Colorado Basin temperatures rise. Accordingly, BLM must either reinitiate consultation on the PBO or initiate section 7 consultation for the UFO draft RMP DEIS.

## References

Ault, Toby R. et al., Relative Impacts of mitigation, temperature, and precipitation on 21st-century megadrought risk in the American Southwest, Science Advances. 2016;2: e1600873 (attached as Exhibit 193).

Barnett, T. P., et al. 2008. Human-induced changes in the hydrology of the western United States. Science 319: 1080–1083 (attached as Exhibit 329).

Barnett, T.P. and D.W. Pierce. 2008. When will Lake Mead go dry? Water Resources Research 44: W03201 (attached as Exhibit 330).

Barnett, T.P. and D.W. Pierce. 2009. Sustainable water deliveries from the Colorado River in a changing climate. PNAS 106: 7334-7338 (attached as Exhibit 331).

Bonfils, C., et al. 2008. Detection and attribution of temperature changes in the mountainous western United States. Journal of Climate 21: 6404–6424 (attached as Exhibit 332).

Cayan, D.R., T. Das, D.W. Pierce, T.P. Barnett, M. Tyree, and A. Gershunov. 2010. Future dryness in the southwest US and the hydrology of the early 21st century drought. PNAS 107: 21227-21276 (attached as Exhibit 333).

Cayan, D. et al. 2013. Future climate: projected average. Pages 101–125 in G. Garfin, A. Jardine, R. Merideth, M. Black, and S. LeRoy, editors. Assessment of climate change in the southwest United States: a report prepared for the National Climate Assessment. A report by the Southwest Climate Alliance. Island Press, Washington, D.C., USA.

Christensen, N.S., Wood, A.W., Voisin, N., Lettenmaier, D.P., and R.N. Palmer. 2004. The effects of climate change on the hydrology and water resources of the Colorado River basin. Climatic change 62: 337-363 (attached as Exhibit 335).

Christensen, N.S. and D.P. Lettenmaier. 2007. A multimodel ensemble approach to assessment of climate change impacts on the hydrology and water resources of the Colorado River basin. Hydrology and Earth System Sciences 11: 417-1434 (attached as Exhibit 336).

Colorado River Research Group, Climate Change and the Colorado River: What We Already Know (Oct. 2016), available at http://www.coloradoriverresearchgroup.org/uploads/4/2/3/6/42362959/crrg_climate_change.pdf (attached as Exhibit 337).

---

[409] National Wildlife Federation, Swimming Upstream: Freshwater Fish in a Warming World, 19 (2013), available at http://www.nwf.org/~/media/PDFs/Global-Warming/Reports/NWF-Swimming%20Upstream-082813-B.ashx (attached as Exhibit 240).

[410] *Id.*

[411] *Id.*

BLM_0150301

Cook, B.I., T.R. Ault, and J.E. Smerdon. 2015. Unprecedented 21st century drought risk in the American Southwest and Central Plains. Sci. Adv. 1: e1400082–e1400082 (attached as Exhibit 338).

Das, T., H. G. Hidalgo, M. D. Dettinger, D. Cayan, D. W. Pierce, C. Bonfils, T. P. Barnett, G. Bala, and A. Mirin. 2009. Structure and detectability of trends in hydrological measures over the western United States. Journal of Climate 10: 871-892 (attached as Exhibit 339).

Das, T., Pierce, D.W., Cayan, D.R., Vano, J.A., and D.P. Lettenmaier. 2011. The importance of warm season warming to western US streamflow changes. Geophysical Research Letters 38(23) (attached as Exhibit 340).

Dettinger, M., B. Udall, and A. Georgakakos. 2015. Western water and climate change. Ecological Applications 25: 2069-2093 (attached as Exhibit 341).

Garfin, G., G. Franco, H. Blanco, A. Comrie, P. Gonzalez, T. Piechota, R. Smyth, and R. Waskom, 2014: Ch. 20: Southwest. Climate Change Impacts in the United States: The Third National Climate Assessment, J. M. Melillo, Terese (T.C.) Richmond, and G. W. Yohe, Eds., U.S. Global Change Research Program, 462-486 (attached as Exhibit 342).

Georgakakos, A., P. Fleming, M. Dettinger, C. Peters-Lidard, T.C. Richmond, K. Reckhow, K. White, and D. Yates. 2014. Water resources. Pages 69–112 in J. M. Melillo, T. C. Richmond, and G. W. Yohe, editors. Climate change impacts in the United States: the third National Climate Assessment. U.S. Global Change Research Program, Washington, D.C., USA (attached as Exhibit 343).

Hamlet, A., P.W. Mote, M.P. Clark, and D.P. Lettenmaier. 2005. Effects of temperature and precipitation variability on snowpack trends in the western United States. Journal of Climate 18: 4545-4561 (attached as Exhibit 344).

Harding, B. L., Wood, A. W. and J.R. Prairie. 2012. The implications of climate change scenario selection for future streamflow projection in the Upper Colorado River basin. Hydrology and Earth System Sciences 16: 3989-4007 (attached as Exhibit 345).

Hidalgo, H. G., T. Das, M. D. Dettinger, D. Cayan, D.W. Pierce, T. P. Barnett, G. Bala, A. Mirin, A.W. Wood, C. Bonfils, B.D. Santer, and T. Nozawa. 2009 Detection and attribution of streamflow timing changes to climate change in the western United States. Journal of Climate 22: 3838-3855 (attached as Exhibit 346).

Hoerling, M. and J. Eischeid. 2007. Past peak water in the Southwest. Southwest Hydrology 35: 18–19 (attached as Exhibit 347).

Hoerling, M. P., M. Dettinger, K. Wolter, J. Lukas, J. Eischeid, R. Nemani, B. Liebmann, and K. E. Kunkel. 2013. Evolving weather and climate conditions of the Southwest United States. Pages 74–100 in G. Garfin, A. Jardine, M. Black, R. Merideth, J. Overpeck, and A. Ray, editors. Assessment of climate change in the Southwest United States: a report prepared for the National Climate Assessment. Island Press, Washington, D.C., USA (attached as Exhibit 348).

Pierce, D. W., T. P. Barnett, H. G. Hidalgo, T. Das, C. Bonfils, B. D. Santer, G. Bala, M. D. Dettinger, D. Cayan, A. Mirin, A. W. Wood, and T. Nozawa. 2008. Attribution of declining western U.S. snowpack to human effects. Journal of Climate 21: 6425-6444 (attached as Exhibit 349).

Rauscher, S. A., J. S. Pal, N. S. Diffenbaugh, and M. M. Benedetti. 2008. Future changes in snowmelt-driven runoff timing over the western US. Geophysical Research Letters 35: L16703, doi:10.1029/2008GL034424 (attached as Exhibit 350).

BLM_0150302

Ray, A.J., Barsugli, J.J., Averyt, K.B., Wolter, K., Hoerling, M., Doesken, N. Udall, B. and R.S.
Webb. 2008. Climate change in Colorado: a synthesis to support water resources
management and adaptation. Report for the Colorado Water Conservation Board.
University of Colorado, Boulder (attached as Exhibit 351).

Seager, R., M. Ting, I. Held, Y. Kushnir, J. Lu, G. Vecchi, H. Huang, N. Harnik, A. Leetmaa, N.
Lau, C. LI, J. Velez, and N. Naik. 2007. Model projections of an imminent transition to a
more arid climate in southwestern North America. Science 316: 1181-1184 (attached as
Exhibit 352).

Seager, R., M. Tang, C. Li, N. Naik, J. Nakamura, and H. Lui. 2012. Projections of declining
surface-water availability for the southwestern United States. Nature Climate Change
doi:10.1038/NCLIMATE1787 (attached as Exhibit 353).

Stewart, I. T., D. R. Cayan, and M. D. Dettinger. 2004. Changes in snowmelt runoff timing in
western North America under a 'Business as Usual' climate change scenario. Climatic
Change 62: 217-232 (attached as Exhibit 354).

Trenberth, K.E., A. Dai, G. van der Schrier, P.D. Jones, J. Barichivich, K.R. Briffa, and J.
Sheffield. 2013. Global warming and changes in drought. Nature Climate Change 4: 17-
22 (attached as Exhibit 355).

US Bureau of Reclamation and Colorado River Basin Water Supply and Demand Study Team.
2011. Colorado River basin Water Supply and Demand Study: Technical Report B –
Water Supply Assessment. Interim Report No. 1 (attached as Exhibit 356).

U.S. Fish and wildlife Service. 2008. Programmatic Biological Opinion for Water Depletions
Associated with Bureau of Land Management's Fluid Mineral Program within the Upper
Colorado River basin in Colorado. USDC Colorado (attached as Exhibit 311).

Vano, J. A., Udall, B., Cayan, D. R., Overpeck, J. T., Brekke, L. D., Das, T., Hartmann, H. C.,
Hidalgo, H. G., Hoerling, M., McCabe, G. J., Morino, K., Webb, R. S., Werner, K. &
Lettenmaier, D. P. 2014. Understanding uncertainties in future Colorado River
streamflow. Bulletin of the American Meteorological Society 95: 59-78 (attached as
Exhibit 357).

Woodhouse, C. A., G. T. Pederson, K. Morino, S. A. McAfee, and G. J. McCabe. 2016.
Increasing influence of air temperature on upper Colorado River streamflow. Geophys.
Res. Lett. 43, doi:10.1002/2015GL067613 (attached as Exhibit 358).

### 3.    Persistent Drought Conditions and Increasing Water Demand Have Reduced
Water Supply.

Compounding this threat to the endangered fish are persistent drought conditions that
have diminished natural flows in the Colorado River Basin and reduced water storage that is
needed to supplement Upper Basin flows. The period from 2000 to 2015 was the lowest 16-year
period for natural flow in the last century, and one of the lowest 16-year periods for natural flow
in the past 1,200 years, according to paleorecords.[412] As a result, water storage in the Colorado

---

[412] Bureau of Reclamation, Managing Water in the West: SECURE Water Act Section 9503(c)
Report to Congress, Chapter 3, Colorado River Basin at 3-64 (2016) (Chapter 3 attached as
Exhibit 241).

BLM_0150303

River system reservoirs have declined "from nearly full to about half of capacity," and led to local shortages in the Upper Colorado's sub-basins.[413]

Further, population growth will increase water demand for agriculture and municipal uses, making it increasingly difficult to ensure sufficient water availability for the endangered fish, which rely on the release of stored water, especially in dry years.[414] An ever widening gap between water supply and water demand is weakening the Colorado River water supply system's reliability and ability to buffer the system in dry years.[415] According to the U.S. Geological Survey, "increased water demand and declining water availability make the restoration of endangered fish habitat extremely challenging."[416] This growing gap between supply and demand in the Upper Colorado River Basin must be taken into account in a reinitiated consultation.

### 4.    Mercury and Selenium Are Adversely Impacting the Endangered Fish.

New scientific information regarding (a) mercury and selenium effects on fish reproduction and population viability, (b) mercury and selenium concentrations in Upper Colorado and White River fish, (c) the potential role of oil and gas development in mercury contamination levels in the White River, (d) the potential for development of the Mancos shale play to increase selenium pollution, and (e) the relationship between climate change and mercury and selenium toxicity constitutes new information revealing that the Fluid Mineral Program may have effects on the endangered fish to an extent that was not considered in the PBO, and requires reinitiation of consultation over the Fluid Mineral Program.[417]

*Mercury contamination is harming Colorado pikeminnow populations*

The Uncompahgre DEIS and Fluid Mineral PBO's discussion of the environmental baseline for, and threats to, the Colorado pikeminnow and razorback sucker contains no discussion whatsoever of environmental and tissue mercury contamination or the resulting toxicity and reproductive impairment to the endangered fish. Significant new research since the Uncompahgre DEIS and the 2008 PBO has demonstrated that elevated levels of mercury in Colorado pikeminnow muscle tissue, including within the Upper Colorado River Basin, are at concentrations likely to cause reproductive and behavioral impairment to the fish.[418]

---

[413] *Id.*

[414] *See id.* at 3-7, 3-8.

[415] *Id.* at 3-10, 3-12.

[416] USGS, Effects of Climate Change and Land Use on Water Resources in the Upper Colorado River Basin, 5 (2010), available at https://pubs.usgs.gov/fs/2010/3123/pdf/FS10-3123.pdf (attached as Exhibit 242).

[417] 50 C.F.R. § 402.16(b).

[418] USFWS, Upper Colorado River Endangered Fish Recovery Program, Colorado pikeminnow (*Ptychocheilus lucius*), 5-Year Review: Summary and Evaluation 21 (2011) ("[T]he recovery goal revision needs to consider the impacts of mercury. . . the majority (64 %) of Colorado pikeminnow may be experiencing some reproductive impairment through mercury exposure.")

BLM_0150304

Mercury is a potent neurotoxin shown to cause numerous reproductive and endocrine impairments in fish in laboratory experiments, including effects on production of sex hormones, gonadal development, egg production, spawning behavior, and spawning success.[419] Concentrations of mercury in Colorado pikeminnow in the Upper Basin are documented to be well in excess of the thresholds for reproductive impairment and population-level impacts.[420] 2008-2009 muscle tissue averages were 0.60 mg/Kg Hg for Colorado pikeminnow in the Upper Colorado basin and 0.95 mg/Kg Hg for Colorado pikeminnow in the White River – well above the 0.2 mg/kg threshold of concern.[421]

Mercury deposition and accumulation in critical habitat is attributable to a number of local and global factors, including air emissions from coal-fired power plants both in the immediate region and around the world.[422] In addition, because of discrepancies in mercury concentrations between pikeminnow in the Yampa and White Rivers, research suggests that "[i]t is possible that there is some localized sources of mercury contamination into the White River drainage connected with oil and gas exploration and development."[423]

Once mercury is deposited on land or water, it is converted into a biologically available form, methylmercury (MeHg) by bacteria. Methylmercury "bioaccumulates in food chains, and particularly in aquatic food chains, meaning that organisms exposed to MeHg in their food can build up concentrations that are many times higher than ambient concentrations in the environment."[424] Once it accumulates, mercury is a potent neurotoxin, affecting fish in many ways, including brain lesions, reduced gonadal secretions, reproductive timing failures, reduced ability to feed, suppressed reproductive hormones, reduced egg production, reduced reproductive success, and transfer of mercury into developing eggs.[425] Although the precise effects vary with

---

(attached as Exhibit 309) ("Colorado Pikeminnow 5-year Review"); USFWS, Biological Opinion for the Four Corners Power Plant and Navajo Mine Energy Project at 76 & Table 3 (April 8, 2015) ("Four Corners Biological Opinion") (attached as Exhibit 243).

[419] USFWS, Draft 2014-2015 Assessment of Sufficient Progress Under the Upper Colorado River Endangered Fish Recovery Program in the Upper Colorado River Basin, and of Implementation of Action Items in the December 20, 1999, 15-Mile Reach Programmatic Biological Opinion and December 4, 2009, Gunnison River Basin Programmatic Biological Opinion, 10 (Oct. 7, 2015) ("Sufficient Progress Assessment") (attached as Exhibit 244).

[420] *See* Barb Osmundson and Joel Lusk, Field assessment of mercury exposure to Colorado pikeminnow within designated critical habitat (May 5, 2011) ("Osmundson & Lusk 2011") (attached as Exhibit 245).

[421] *See* Four Corners Biological Opinion at 76 & Table 3 (attached as Exhibit 243); *see generally* Beckvar, N., T.M. Dillon, and L.B. Reads, Approaches for linking whole-body fish tissue residues of mercury or DDT to biological effects threshold, Environmental Toxicology and Chemistry 24:2094-2105 (2005) (attached as Exhibit 246).

[422] *See* Four Corners Biological Opinion at 73-74 (attached as Exhibit 243); Osmundson & Lusk 2011 at 9-10 (attached as Exhibit 245).

[423] *Id*. at 29.

[424] Four Corners Biological Opinion at 73 (attached as Exhibit 243).

[425] *See* Lusk, Joel D., USFWS, Mercury (Hg) and Selenium (Se) in Colorado Pikeminnow and in Razorback Sucker from the San Juan River, 17 (2010), available at

CONSERVATION GROUPS' COMMENTS
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

158

relative concentrations, mercury and selenium may have synergistic toxic effects at certain ratios.[426]

The Service has acknowledged that its recovery planning for the Colorado pikeminnow needs updating to reflect this new information regarding mercury:

> In addition, the recovery goal revision needs to consider the impacts of mercury. Beckvar et al. (2005) associated studies involving survival, growth, reproduction, and behavior and recommended that 0.2 mg/kg in whole fish be viewed as protective, while adverse biological effects are more likely at higher concentrations. Based on this threshold, the majority (64 %) of Colorado pikeminnow may be experiencing some reproductive impairment through mercury exposure. Management strategies for controlling anthropogenic mercury emissions are necessary as atmospheric pollution can indirectly affect this endangered species, its critical habitat, and its recovery by ambient air exposure, deposition into aquatic habitat and bioaccumulation in diet and in fish tissues.[427]

Moreover, the Service's 2015 Sufficient Progress Assessment for the Recovery Program acknowledges that population viability studies show that mercury- and selenium-related reproductive impairment is likely to influence population levels in the San Juan Basin,[428] but no comparable analysis has yet been done for the higher levels of contamination present in Upper Colorado River Basin fish.

The significant difference in mercury concentrations in fish found in the neighboring Yampa and White Rivers also offers significant new information potentially relevant to the effect of BLM-authorized oil and gas development. Osmundson and Lusk found very high (average 0.95 mg/Kg WW) mercury concentrations in Colorado pikeminnow and in the White River, and lower (0.49 mg/Kg) concentrations in the neighboring Yampa.[429] Based on this discrepancy, they noted:

> The Yampa and White rivers are relatively close geographically in northwestern Colorado. Because of this proximity, it is interesting that the Yampa River had the lowest mercury concentrations in Colorado pikeminnow while the White River had the highest mercury concentrations. If most of the mercury was from aerial wet and dry deposition, the two drainages should be similar. This difference may indicate a localized source/s of mercury contamination into the White River drainage. There are currently >2,600 gas and oil wells in Rio Blanco county. It is

---

https://www.fws.gov/southwest/sjrip/pdf/DOC_Evaluation_Hg_Se_SJR_pikeminnow%20or_raz orback_SJRIP_BC_2010.pdf. (attached as Exhibit 247)

[426] Four Corners Biological Opinion at 103 (attached as Exhibit 243).

[427] Colorado Pikeminnow 5-year Review at 21 (attached as Exhibit 309); *see also* Significant Progress Assessment at 10-11 (attached as Exhibit 244).

[428] Sufficient Progress Assessment at 10-11 (attached as Exhibit 244).

[429] Osmundson & Lusk 2011 at 21 & Table 2 (attached as Exhibit 245).

BLM_0150306

possible that there is some localized sources of mercury contamination into the White River drainage connected with oil and gas exploration and development.[430]

Although site-specific information for the Upper Basin planning areas appears scarce, there is scientific as well as circumstantial evidence that oil and gas operations can contribute to mercury contamination.[431] The Fluid Mineral PBO does not consider the effect of oil and gas development within the White River watershed on the threat to Colorado pikeminnow and razorback sucker from mercury toxicity.

Nor does the PBO give any consideration to the multiple ways in which climate change will exacerbate mercury and selenium contamination and toxicity. Climate change can foreseeably be predicted to increase heavy rainfall events and ensuing runoff, increase pollutant concentrations due to reduced flows during low-flow periods, and contribute to increased methylmercury conversion due to higher temperatures.

*Selenium pollution is harming the endangered fish*

The Uncompahgre DEIS acknowledges, without detail or quantitative analysis, that "selenium is a particularly important issue in the Gunnison River Basin, as elevated levels are the suspected cause of reproductive failure of select species of warm water fishes in the Lower Gunnison River. The most widespread impairment to area water quality is excessive selenium. Elevated levels of selenium have been shown to cause reproductive failure and deformities in fish and aquatic birds and are suspected to be the cause of reproductive failures in select species in the Lower Gunnison River." UFO RMP DEIS at 3-31. While the UFO RMP does reference its participation in the Gunnison River Basin Selenium Management Program (SMP) as part of a 2009 programmatic Biological Opinion for selenium in the Gunnison River, the UFO RMP does not address how they are monitoring or minimizing selenium loadings from non-agricultural nonpoint sources in this RMP, especially for potential fossil fuel development. In fact, in the 2011 "Program Formulation Document" for the SMP, as well as its latest (2014) Annual Progress Report, it stated that BLM will "address selenium in new [Uncompahgre] Resource Management Plan."[432] There is no substantive review of the SMP or requirements within the

---

[430] *Id.* at 29 (citations omitted).

[431] *See* U.S. EPA, National Risk Management Research Laboratory, Mercury in Petroleum and Natural Gas: Estimation of Emissions from Production, Processing, and Combustion, EPA/600/SR-01/066 (Oct. 2001) (attached as Exhibit 248); Visvanathan, C., Treatment and Disposal of Mercury Contaminated Waste from Oil and Gas Exploration Facilities, available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.549.9515&rep=rep1&type=pdf (attached as Exhibit 249).

[432] U.S. Bureau of Reclamation, Selenium Management Program: Program Formulation Document Gunnison River Basin, Colorado, Prepared by Selenium Management Program Workgroup at 69 (December 2011), available at http://www.usbr.gov/uc/wcao/progact/smp/docs/Final-SMP-ProgForm.pdf (attached as Exhibit 250); U.S. Bureau of Reclamation, Selenium Management Program Annual Report at 23 (2014) available at http://www.usbr.gov/uc/wcao/progact/smp/docs/SMP-2014AnnualRep.pdf (attached as Exhibit 251).

BLM_0150307

SMP referenced anywhere in the draft UFO RMP DEIS. The effects of selenium on endangered
fish species in the UFO are extensively documented in the below comments.

Selenium harms the endangered fish and other aquatic species through bioaccumulation
in the food chain. Concentrations of 3µg/g in the food chain have been found to cause gill and
organ damage in certain fish and may lead to death.[433] These bioaccumulative effects resulting in
direct toxicity to juvenile and adults are known as "Type 1" effects. Moreover, selenium
bioaccumulation can result in maternal transfer of selenium to fish egg yolks and lead to
developmental abnormalities, known as "Type 2 effects."[434] Waterborne concentrations of
selenium in the 1-5 µg/L range can bioaccumulate and lead to Type 1 and/or Type 2 effects.[435]

Recent studies reveal significant exposures of the endangered fish to selenium. In one
study analyzing selenium concentrations of 26 fish specimens collected from designated critical
habitat in the Gunnison River, one Colorado pikeminnow specimen exhibited concentrations in
muscle plugs that exceeded the 8 micrograms per gram dry weight toxicity guideline for
selenium in fish muscle tissue.[436] Several species, including the razorback sucker and Colorado
pikeminnow, exhibited selenium exposures in excess of the critical concentration at which Type
1 health effects begin to occur.[437]

In the Lower Gunnison River Basin, 2014 data indicated a range of dissolved selenium
(chronic values) from 0.97 µg/L to 16.7 µg/L along the Uncompahgre River. Out of 18 sites in
the lower Gunnison that were considered, the Colorado water-quality standard for chronic
dissolved selenium of 4.6 µg/L was exceeded at two sites.[438] In regards to acute values, the
range measured was from 1.1 µg/L for a portion of the Uncompahgre River to 125 µg/L along a
portion of Loutzenhizer Arroyo, with 125 µg/L being well in excess of any criteria for
instantaneous selenium measurements.[439] In another 2015 study, mean concentrations of
selenium in various fish species in the lower Colorado River Basin exceeded the risk for
maternal transfer to eggs, while selenium concentrations in various species of macroinvertebrate

---

[433] Lemly, A.D., Appalachian Center for the Economy & the Environment and Sierra Club,
Aquatic hazard of selenium pollution from mountaintop removal coal mining, 3 (2009) ("Lemly
2009") (attached as Exhibit 252).

[434] Lemly 2009 at 3 (attached as Exhibit 252); Hamilton, S.J., Review of residue-based selenium
toxicity thresholds for freshwater fish, Ecotox. Environ. Saf. 56: 201-210 (2003) (attached as
Exhibit 253).

[435] *See id.*

[436] May, Thomas W. and Michael J. Walther, USGS, Determination of selenium in fish from
designated critical habitat in the Gunnison River, Colorado, March through October, 2012,
Open-File Report 2013-1104, 2 (2013) (attached as Exhibit 254).

[437] *Id.*

[438] Henneberg, M.F., 2014 annual summary of the lower Gunnison River Basin Selenium
Management Program water-quality monitoring, Colorado: U.S. Geological Survey Open-File
Report 2016–1129, 25 p. (2016), http://dx.doi.org/10.3133/ofr20161129 (attached as Exhibit
255).

[439] *Id.*

BLM_0150308

prey exceeded the risk value for larval fishes.[440] Average selenium concentrations in the studied fish species were found to be 2- to 4-fold higher than the risk threshold for piscivorous (fish-eating) wildlife, with samples exceeding this threshold in 81-100% of cases depending on the species. The risk value for larval fishes, who either absorb selenium via maternal transfer to eggs or through invertebrate diet, was exceeded in 56-100% of cases depending on the adult species (with risk posed to larvae due to maternal transfer), and 86-100% of cases among invertebrates (with risk posed to larval fishes through diet). Thus, the transfer of selenium toxicity from invertebrates to fish to piscivores is readily observable.[441]

Natural erosion and runoff, as well as selenium leaching into irrigation runoff, are the primary sources of this toxic pollutant. The weathering of Cretaceous marine shales can produce high selenium soils, which are present in many areas of the western U.S.[442] Most notable of these Cretaceous shales is the Mancos Shale, which is found in Colorado, Utah, Wyoming, New Mexico, and Arizona. Irrigation of selenium-rich soils for crop production in arid and semi-arid regions can mobilize selenium and move it off-site in surface water runoff or via leaching into groundwater. Groundwater in contact with the Mancos Shale is known to have high levels of selenium due to leaching, and irrigation activities on Mancos Shale have led to selenium loading of nearby rivers and streams such as those in the Colorado River Basin.[443] As discussed previously, increased exploitation of the Mancos shale play could also put surface waters and endangered fish at risk. Selenium-laced produced water from oil and gas operations may find a pathway to surface waters via hydraulically induced fractures in Mancos shale rock, or via surface spills.

### 5.  Population Numbers of the Endangered Fish Are Declining.

Colorado pikeminnow populations are in decline throughout the Green River and Colorado River Basin, indicating that the Recovery Plan for the endangered fish has not been effective and that the impacts of water depletions could be more severe than previously anticipated.

According to Fish and Wildlife Service, the latest 2014 Colorado River sub-basin population number of 501 is "cause for great concern," and catch of sub-adults and adults in 2013 and 2014 "were near lowest observed in the history of the project."[444] 2015 catch numbers are within the same range, which suggests that the population estimate for 2015 will be similar to

---

[440] Walters, David M., et al. Mercury and selenium accumulation in the Colorado River food web, Grand Canyon, USA. Environmental Toxicology and Chemistry, 34(10):2385-2394, 2390 (2015) (attached as Exhibit 256).

[441] Id.

[442] Lemly, A.D., Guidelines for evaluating selenium data from aquatic monitoring and assessment studies. Environ. Monitor. Assess. 28(1):83-100 (1993) (attached as Exhibit 257).

[443] Environmental Sciences Laboratory, Natural Contamination from the Mancos Shale, U.S. Department of Energy, Doc. No. S07480 (2011) (attached as Exhibit 258).

[444] Sufficient Progress Assessment at 23, 36 (attached as Exhibit 244).

BLM_0150309

the 2014 estimate.[445] Preliminary data show that the Green River sub-population is "in decline throughout the entire Green River Subbasin" and has fallen under 2,000, below the minimum viable population of 2,600 adults.[446] The Yampa River portion of the sub-basin population also "remains low and may be in further decline."[447] Recent studies show that Colorado pikeminnow declines in the Yampa River are linked to "persistent high densities of nonnative predators (e.g., smallmouth bass and northern pike)," and that northern pike are outnumbering Colorado pikeminnow by three to one.[448]

Humpback chub numbers are also low. Fish and Wildlife Service is "concerned that wild populations of humpback chub in Black Rocks and Westwater Canyon of the Colorado River (near the Colorado-Utah state line) have not recovered from declines detected in the late 1990's. The reason for those population declines is uncertain."[449] After this steep reduction, the Black Rocks/Westwater population continued to decline.[450] In 2008, the population "dropped below the population size downlist criterion (MVP = 2,100 adults) for the first time."[451] In 2011 and 2012, the core population estimates were 1,846 and 1,718, respectively.[452]

The Desolation/Gray Canyons population in the Green River has also not met the population-size downlist criterion, and was observed to be "trending downward" based on 2006-2007 population estimates.[453] This trend has been attributed to "increased nonnative fish abundance and habitat changes associated with dry weather and low river flows."[454] The 2014 estimate is 1,863 adults, substantially below the 2,100-adults recovery criterion.[455]

These declining population numbers are new baseline conditions, such that the endangered fish could be more vulnerable to water depletion and other oil and gas development effects than previously assumed. These downward trends also strongly suggest that the Endangered Fish Recovery Program is not achieving recovery targets nor adequately offsetting water depletion effects as intended.

---

[445] *See* USFWS, Monitoring the Colorado Pikeminnow Population in the Mainstem Colorado River via Periodic Population Estimates, 3 (Nov. 2015), available at http://www.coloradoriverrecovery.org/documents-publications/work-plan-documents/arpts/2015/rsch/127.pdf (attached as Exhibit 259) (showing similar capture rates of pikeminnow in 2014 and 2015).
[446] Sufficient Progress Assessment at 7 (attached as Exhibit 244).
[447] *Id.*
[448] *Id.* at 8.
[449] *Id.* at 36.
[450] *Id.* at 13.
[451] *Id.*
[452] *Id.* at 13-14.
[453] *Id.* at 12.
[454] *Id.* at 23.
[455] *Id.* at 12.

BLM_0150310

6. **The Recovery Program Is Failing to Meet Recommended Flows.**

A consistent pattern of failing to meet recommended flows in the Colorado River's 15-Mile Reach requires BLM and the Service to reinitiate consultation over the Fluid Mineral Program.

The Recovery Program establishes minimum recommended flows within various segments of the Upper Colorado River Basin that should be maintained to ensure recovery of the endangered fish.[456] The PBO's effects analysis assumes that, at the very least, the minimum recommended flow of 810 cubic feet per second (cfs) for dry years will be maintained within the 15-Mile Reach of the Colorado River within Colorado's Grand Valley in the Grand Junction Field Office.[457] The 15-Mile Reach extends from the confluence of the Gunnison River in Grand Junction to Palisade, Colorado, fifteen miles upstream.[458] According to the Service, when flows drop below 810 cfs, "habitat becomes compromised to the point that adult pikeminnow likely vacate the 15-Mile Reach to points downstream where flows increase either due to tributary input from the Gunnison River or irrigation return flow."[459] The 15-Mile Reach is one of the most important habitats to the Colorado pikeminnow and razorback sucker,[460] providing important spawning grounds for both species and year-round habitat for the Colorado pikeminnow.[461]

In its discussion of the environmental baseline, the Fluid Mineral PBO notes various recommended flows for the Colorado River sub-basins, including minimum flows for wet years, wet-average years, dry-average years, and dry years.[462] The PBO notes that in some recent years, recommended flows have not been met in the 15-Mile Reach.[463] However, the PBO's effects

---

[456] *See id.* at 41; USFWS, Final Programmatic Biological Opinion for Bureau of Reclamation's Operations and Depletions, Other Depletions, and Funding and Implementation of Recovery Program Actions in the Upper Colorado River above the Confluence with the Gunnison River, 54 (Dec. 1999) ("Colorado River PBO"), available at http://www.coloradoriverrecovery.org/documents-publications/section-7-consultation/15mile/FinalPBO.pdf (attached as Exhibit 260).

[457] PBO at 42, 48.

[458] PBO at 4.

[459] *See* Sufficient Progress Assessment at 34-35 (attached as Exhibit 244); Osmundson, Douglas B. & Patrick Nelson, USFWS, Relationships Between Flow and Rare Fish Habitat in the '15 Mile Reach' of the Upper Colorado River Final Report, 6 (1995), available at http://www.coloradoriverrecovery.org/documents-publications/technical-reports/isf/OsmundsonNelson1995.pdf (attached as Exhibit 261) ("Osmundson 1995").

[460] PBO at 36, 42; Colorado River PBO at 25, 32, 45 (attached as Exhibit 260); Osmundson 1995 at 6.

[461] PBO at 36; Colorado River PBO at 31-32.

[462] PBO at 41-44.

[463] *See id.* at 42-44 (e.g., "Since the publication of the spring flow recommendations in 1991, peak 1-day average flows through the 15-mile reach have been below 12,900 cfs approximately one-third of the years through 2006 and these targets have not been met."); *id.* at 42 ("Mean

BLM_0150311

analysis assumes that the lowest recommended flow for dry years (810 cfs) will be maintained;
this minimum flow is the baseline by which the PBO determined the Fluid Mineral Program's
depletion effects on the Colorado pikeminnow.[464]

The Endangered Fish Recovery Program's latest Sufficient Progress Assessment
indicates that recommended flows for dry years in the 15-Mile Reach of the Colorado River were
not met in 2012 and 2013.[465] Flows also fell short of recommended levels in 2015, despite it
being a dry-average precipitation year. In April, May, August and October 2015, the 15-Mile
Reach missed the recommended minimum average flows for those months for dry-average
precipitation years.[466] This average year shortfall (following a "wet-average" year) strongly
suggests that minimum recommended flows for later dry years will almost certainly not be met
when water will be scarcer, and as declining stream flows overall due to climate change weaken
the Recovery Program's ability to supplement natural flows in dry years.[467] Indeed, in the period
since the PBO was adopted, between 2009 and 2015, the Recovery Program has failed to meet
mean monthly recommended flows in the 15-Mile Reach in over half of all months.[468] This new
information strongly suggests that critical habitat within the 15-Mile Reach is likely to be
unsuitable for the Colorado pikeminnow and razorback sucker in dry years, and that flow
depletions from oil and gas development will only exacerbate these unsuitable conditions and
reduce these species' chances of recovery.

The Recovery Program's continuing pattern of failing to meet recommended flows is new
information revealing that the Fluid Mineral Program may have effects on the endangered fish to
an extent that was not considered in the PBO or in the Uncompahgre RMP DEIS, and requires
reinitiation of consultation over the Fluid Mineral Program or more specifically to the
Uncompahgre RMP DEIS.

### D. The UFO Failed to Sufficiently Consider Traffic Impacts That Will Result from Increased Oil and Gas Development.

The UFO's NEPA analyses must include analysis of impacts from increases in vehicle
traffic that development authorized under the RMP/EIS would induce. For example, cases have
required NEPA analyses of proposed casino projects to include impacts of increases in vehicle

---

monthly flows have…dropped below 810 cfs [the minimum flow for drought years] for at least
one of the summer-time months during 7 of the last 17 years (1991-2007).").
[464] *Id.* at 48.
[465] *See* Sufficient Progress Assessment at 34 (attached as Exhibit 244) (noting average monthly
flows significantly below 810 cfs in 15-mile reach in 2012 and 2013); *id.* at 31 (recognizing need
to reduce the amount of time flows drop below 810 cfs in the 15-Mile Reach).
[466] *Compare* Colorado River PBO at 40-41 (recommended mean monthly stream flows for 15-
Mile Reach) *with* Exhibit 262 & Email from Tom Chart, FWS, Director, Upper Colorado River
Endangered Fish Recovery Program to Wendy Park (July 15, 2016) (attached as Exhibit 263)
(chart indicating dry, average, and wet precipitation years).
[467] *See* n. 415 above & accompanying text (noting ability to buffer Colorado River system will
become more difficult as streamflows decrease).
[468] *See* Exhibit 264 (spreadsheet showing 15-Mile Reach flows and months with shortfall).

BLM_0150312

traffic the projects would induce. *See Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29 (D.C. Cir. 2008); *Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 863 (D.C. Cir. 2006).

As noted above, fracking requires huge amounts of water, and consequently a great number of tanker truck trips to transport this water and chemicals to the site and to transport waste from the site. *See* EIS at 4-28 (noting that all alternatives assume that 100 percent of drilling/completion fluids are delivered and disposed of by truck, and 100 percent of produced water and condensate is disposed of by truck). Given that fracking can require thousands of round trips by heavy trucks when developing each well – the impacts of which are compounded exponentially for development of an entire oil and gas field – it is clear that this heavy industrial transport activity will result in dramatic impacts. However, the RMP/EIS underestimates truck traffic and provides an understated and cursory analysis of its impacts, which fails to satisfy the agency's NEPA obligations.

Specifically, the RMP/EIS fails to undertake a substantive analysis of the impacts from oil and gas related traffic. The RMP/EIS acknowledges that oil and gas development will result in increased traffic, *see e.g.,* EIS at 3-206, 4-478. However, the RMP/EIS makes no effort to take a meaningful look at the effects from this significant rise in traffic, merely mentioning generalized impacts from delays, dust, road degradation, and increased vehicle safety concerns as potential negative impacts to the area. *Id.* This type of cursory analysis fails to satisfy the UFO's hard look obligations.

Absent from the RMP/EIS, for example, is any attempt by the agency to estimate increased maintenance demands, consider safety costs for increased roadway use, increased traffic accidents and associated medical impacts and burdens on local hospitals, burdens on first responders and the criminal justice system, or to even project where or how many miles of access roads will be constructed. Moreover, while the RMP/EIS calculates projected emissions caused by oil and gas related traffic, *see* Emission Inventory Technical Support Document Appendix A at A-5, the RMP/EIS underestimates the number of truck trips needed per well associated with the more water-intensive techniques necessary for hydraulic fracturing.

A recent and comprehensive 2013 study by Boulder County, Colorado of the impacts of fracking-related truck traffic (hereafter "Boulder Study"), concluded that the hydraulic fracturing process for a single well would require an average of 1,400 one-way truck trips just to haul water to and from the site. *See* Boulder Study at 8. Using national data, the study also finds that taking into account the full development process (construction, drilling, and completion), the average fracked well requires 2,206 one-way truck trips. *Id.* at 10. This figure does not include production phase trips, which could add an additional 730 truck trips per year depending on various factors including the success of the well and whether it is re-fracked. *Id.*

The Boulder Study serves as an example of what BLM should analyze in its EIS. The Study uses this trip generation data to analyze the impacts of oil and gas development on the county's roadway system and, ultimately, to quantify these impacts in terms of maintenance and safety costs. *Id.* at 4. To establish a baseline, the Study inventoried current roadways including surface conditions, traffic volumes, and shoulder widths. In addition to the number of truck trips,

BLM_0150313

the Study also examined the vehicle classification, load, origin, and destination of the trips. Finally, road deterioration and safety costs are calculated under three development scenarios, resulting in an average cost of $36,800 per well over 16 years. *Id.* at 55. The Boulder Study is just one example of the type of quantitative analysis of oil and gas related traffic that can be completed with currently available information.

### E.     *The UFO Failed to Consider the Impacts of Unregulated Pipelines.*

Furthermore, the BLM did not consult agencies with pipeline safety jurisdiction and did not consider the environmental, public safety, and human health impacts associated with a web of unregulated gas gathering pipelines. EIS 5-5. Rural gas gathering pipelines are exempt from federal pipeline safety regulations and therefore state regulation. 49 CFR § 192. Unregulated gas gathering pipelines are at higher risk of failure than regulated pipelines. *See* PHMSA Notice of Proposed Rulemaking on Gas Transmission and Gathering Lines 68 Fed. Reg. 20728 (April 8, 2016) (amending 49 CFR Parts 191 and 192).

BLM failed to consider the following in its risk analysis:

1.  The lack of risk management regulations to ensure public safety when it comes to rural gas gathering pipelines.
    a.  Under current federal and state regulations, the BLM and oil and gas operators have no way of assuring the public that rural gas gathering pipelines will be properly constructed to prevent risks of failure. Regulatory agencies do not have specific knowledge of the construction of rural gas gathering pipelines because they are largely non-jurisdictional to federal and state oversight.[469]
    b.  Under current federal and state regulations, oil and gas operators do not have an obligation to disclose incremental failures that may occur or may have occurred on unregulated gas gathering pipelines. All oil and gas operators are only required to report gas leaks that necessitate evacuation of people or closure of a public road, or result in a defined incident.[470]
    c.  Non jurisdictional pipeline operators are not required to take all practicable measures to protect pipelines from "washouts, floods, unstable soil, landslides, or other hazards that may cause the pipeline to move or to sustain abnormal loads."[471] While Colorado pipeline safety regulators expect "that an operator be able to demonstrate through appropriate documentation that it has addressed its obligations under §192.317... which would include addressing all potential geologic hazards," this is not guaranteed. BLM has not demonstrated that it has taken geologic hazards into consideration from a pipeline safety perspective.
    d.  The Pipeline Hazardous Materials and Safety Administration (PHMSA) has exclusive jurisdiction over pipeline safety. Interstate pipelines are delegated to the states via an interagency agreement with PHMSA called a "certification

---

[469] *See* Letter from Joe Molloy, Section Chief, COPUC Pipeline Safety Program, to Natasha Leger (October 17, 2016) (attached as Exhibit 305) ("Molloy Letter").
[470] *Id.*
[471] *See id*; 49 CFR 192.317.

BLM_0150314

agreement."[472]  While BLM consulted the Colorado Oil and Gas Conservation
Commission (COGCC) on this draft RMP, COGCC does not have jurisdiction
over gas gathering pipelines.

e. In the current regulatory environment, state and federal pipeline safety inspectors
do not specifically keep records on jurisdictional pipeline operator's contractors.
Instead, it is expected that the operators themselves have records regarding work
performed on the pipeline by contractors so that they have an adequate ability to
trace and remedy any issues associated with the contractor's work. Therefore
neither BLM, COGCC, nor the state and federal pipeline safety inspectors have
visibility into the qualification of contractors or whether the actual work
performed was adequate.[473] In addition, existing federal pipeline safety rules do
not address or require accurate mapping of gas gathering pipelines. "Due to the
sheer mileage of active pipeline in the United States, regulatory agencies rarely
keep detailed operator maps."[474]

2. The risks to public safety from unregulated rural gas gathering pipelines.

a. The BLM did not consider the cumulative impact and environmental risk of a
projected 1,271 miles of unregulated gas gathering pipelines based on their
estimated 1271 wells for the planning area.[475] This estimate of gas gathering
pipeline mileage assumes 1 mile of gathering pipeline per well, a conservative
estimate compared to 1.65 miles of gathering pipeline in the Marcellus Shale
region.[476] In addition, because the BLM's oil and gas assumptions are based on
conventional, not unconventional oil and gas development through hydraulic
fracturing and multiwell drilling technologies, these estimates may be
significantly underestimated.[477]

b. BLM did not consider the impact of extreme weather causing flooding, mudslides
and geological instability, which can compromise the integrity of pipelines and
result in leaks and potential explosions. The nation's pipeline system faces a
greater risk from failure due to extreme weather events such as hurricanes, floods,
mudslides, tornadoes, and earthquakes.

i. A 2011 crude oil spill into the Yellowstone River near Laurel, MT, was
caused by channel migration and river bottom scour, leaving a large span
of pipeline exposed to prolonged current forces and debris washing

---

[472] *A Regulatory Review of Liquid and Natural Gas Pipelines in Colorado* at 4 (December 2014)
(attached as Exhibit 306).

[473] Molloy Letter at 6.

[474] Molloy Letter at 7.

[475] RMP/EIS 4-2; *Reasonable Forseeable Development Scenario for Oil and Gas for the
Uncompahgre Field Office, Colorado, Final Report* at 61 (February 16, 2012) ("UFO RFD")
(attached as Exhibit 40).

[476] Nels Johnson, Tamara Gagnolet, Rachel Ralls, and Jessica Stevens, *Natural Gas
Pipelines:Excerpt from Report 2 of the Pennsylvania Energy Impacts Assessment* at 3 (December
16, 2011) (attached as Exhibit 307).

[477] RMP/EIS 4-2; UFO RFD at 61 (attached as Exhibit 40).

BLM_0150315

downstream in the river. Those external forces damaged the exposed pipeline.

ii.  In October 1994, flooding along the San Jacinto River led to the failure of eight hazardous liquid pipelines and also undermined a number of other pipelines. The escaping products were ignited, leading to smoke inhalation and burn injuries of 547 people.

iii.  From 2003 to 2013, there were 85 reportable incidents in which storms or other severe natural force conditions damaged pipelines and resulted in their failure. Operators reported total damages of over $104M from these incidents.

iv.  PHMSA has issued several Advisory Bulletins to operators warning about extreme weather events and the consequences of flooding events, including river scour and river channel migration.[478]

c.  BLM did not consider the pipeline safety impacts on hikers, campers, hunters, and anglers utilizing the public lands for recreation purposes. On August 19, 2000, a 30-inch-diameter gas transmission pipeline ruptured adjacent to the Pecos River near Carlsbad, NM. The released gas ignited and burned for 55 minutes. Twelve persons who were camping under a concrete-decked steel bridge that supported the pipeline across the river were killed, and their vehicles were destroyed. Two nearby steel suspension bridges for gas pipelines crossing the river were damaged extensively.[479]

d.  BLM did not consider forest fire risks from pipeline explosions.  On December 11, 2012, a 20-inch-diameter gas transmission line ruptured in a sparsely populated area about 106 feet west of Interstate 77 (I-77) in Sissonville, West Virginia. An area of fire damage about 820 feet wide extended nearly 1,100 feet along the pipeline right-of-way. Three houses were destroyed by the fire, and several other houses were damaged. Reported losses, repairs, and upgrades from this incident totaled over $8.5 million, and major transportation delays occurred. I-77 was closed in both directions because of the fire and resulting damage to the road surface. The northbound lanes were closed for about 14 hours, and the southbound lanes were closed for about 19 hours while the road was resurfaced, causing delays to both travelers and commercial shipping.[480]

e.  BLM did not consider lack of pipeline safety inspections. The National Association of Pipeline Safety Representatives, an association representing state pipeline safety officials, produced a compendium of state pipeline regulations showing that most states with delegated authority from PHMSA to conduct intrastate inspections do not have expanded regulations that cover increased

---

[478] *See* Notice of Proposed Rulemaking on Gas Transmission and Gathering Lines, 68 Fed. Reg. 20728 (April 8, 2016) (amending 49 CFR Parts 191 and 192).
[479] *Id.* at 20730.
[480] *Id.* at 20728.

BLM_0150316

oversight of gathering companies building gathering pipelines in rural areas are generally not subject to inspection and do not have to report the location and characteristics of much of the gathering pipelines being installed.[481]

   f.   BLM did not consider the risks associated with undisclosed incremental pipeline failures on wildlife, ground water and surface water contamination, grazing cattle, human health, and uptake of oil and gas chemicals by crops.

In this regard the BLM again has not taken a "hard look" at the subject, and given the lack of regulatory oversight in this area it is incumbent upon BLM to explain how it would ensure animal, human, and environmental safety from unregulated pipelines. 40 C.F.R. § 1502.22.

In addition, the RMP/EIS is unclear on whether or what pipelines will be required, whether they would be limited in what they transport, how many barrels per day they would transport, and how much truck traffic this would displace (if any, since the pipelines ultimately are transferring product to trucks). There are no specific estimates of how many pipelines will be constructed, how many miles of pipe will be laid, what their diameter would be, how many water-bodies they would cross, or where they will be located. In this regard the BLM again has not taken a "hard look" at the subject, and if this information is not available it is incumbent upon BLM to explain what would be required to obtain it and why it cannot collect the information. 40 C.F.R. § 1502.22.

Reducing truck traffic through the installation of pipelines introduces different impacts to the environment, but the RMP/EIS provides no treatment of these impacts. Further, while the RMP/EIS acknowledges the potential for contamination of soils, surface water, and groundwater as a result of spills, *see, e.g.,* DEIS at 4-83, there is no discussion of possible spill volumes or consideration of various spill scenarios.

### F.   *The BLM Failed to Take a Hard Look at Impacts to Human Health.*

As introduced above, emissions from oil and gas development are not limited only to the combustion stage but, rather, occur throughout the chain of production. These emissions not only impact the critical resource values of the UFO – as detailed throughout these Comments – but also can result in serious harm to human health. BLM must fully consider the potential human health impacts that may be caused by oil and gas operations approved under the UFO RMP, as required by NEPA.[482] Congress stated that "…it is the continuing responsibility of the Federal Government to use all practicable means…to attain the widest range of beneficial uses of the environment **without degradation, risk to health or safety**, or other undesirable and unintended consequences…" 42 U.S.C. § 4331 (emphasis added). NEPA implementing regulations direct agencies to consider "the degree to which the proposed action affects public health or safety." 40

---

[481] *See* GAO Report, *Oil and Gas Transportation: Department of Transportation Is Taking Actions To Address Rail Safety, But Additional Actions Are Needed To Improve Pipeline Safety* (August 2014) at 27 (attached as Exhibit 308).

[482] *See* North Fork Resident Declarations (attached as Exhibit 300); Photos (attached as Exhibits 314-322).

BLM_0150317

C.F.R. § 1508.27(b). These regulations also state: "Federal agencies shall to the fullest extent possible…. Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." 40 C.F.R. § 1500.2(f). The UFO has failed to sufficiently address and analyze these impacts to human health in the RMP/EIS.

The implementation of methane waste mitigation technologies, as discussed above, can not only help spur economic benefit, but can also allay some of the harmful health effects of oil and gas development by reducing emissions of NOX, VOCs and other criteria pollutants. Aside from the direct health impacts of these emissions,[483] they can also result in significant increases in ground-level ozone (i.e., ozone precursors), and, consequently, can have a dramatic impact on human health.[484] For example, ozone has been shown to decrease lung function – particularly in adolescents and young adults – as well as increase the risk of death from respiratory causes.[485]

According to the EPA, the oil and gas industry is "the largest industrial source of emissions of volatile organic compounds (VOCs), a group of chemicals that contribute to the formation of ground-level ozone (smog)."[486] Moreover, "[e]xposure to ozone is linked to a wide range of health effects, including aggravated asthma, increased emergency room visits and hospital admissions, and premature death."[487] The oil and natural gas industry is also "a significant source of emission of methane," as well as an emitter of "air toxics such as benzene, ethylbenzene, and n-hexane," which are "pollutants known, or suspected of causing cancer and

---

[483] *See, e.g.,* Colorado Department of Public Health and Environment, *2010 Air Quality Data Report* (2010) (attached as Exhibit 265).

[484] *See, e.g.,* GAO Report, *Oil and Gas: Information on Shale Resources, Development, and Environmental and Public Health Risks* (Sept. 2012) (attached as Exhibit 266); GAO Report, *Unconventional Oil and Gas Development: Key Environmental and Public Health Requirements* (Sept. 2012) (attached as Exhibit 267); Earthworks, *Natural Gas Flowback: How the Texas Natural Gas Boom Affects Health and Safety* (April 2012) (attached as Exhibit 268); Green River Alliance, *Healthy Air Questionnaire Final Report: Clean Air and Healthy Communities* (2011) (attached as Exhibit 269); Lisa McKenzie, Ph.D., et. al., *Human health and risk assessment of air emissions from development of unconventional natural gas resources* (Feb. 2012) (attached as Exhibit 270); Lisa McKenzie, Ph.D., Testimony on: *Federal Regulation: Economic, job, and energy security implications of federal hydraulic fracturing regulation,* May 2, 2012 (attached as Exhibit 271); Earthworks, *Gas Patch Roulette: How Shale Gas Development Risks Public Health in Pennsylvania,* October 2012 (attached as Exhibit 272).

[485] *See* Ira B. Tager, et. al., *Chronic Exposure to Ambient Ozone and Lung Function in Young Adults,* EPIDEMIOLOGY, Vol. 16, No. 6 (Nov. 2005) (attached as Exhibit 273); Michael Jerrett, Ph.D., et. al., *Long-Term Ozone Exposure and Mortality,* THE NEW ENGLAND JOURNAL OF MEDICINE, 360: 1085-95 (2009) (attached as Exhibit 274).

[486] EPA, *Oil and Natural Gas Pollution Standards: Basic Information, Emissions from the Oil & Natural Gas Industry* (2011), available at: http://www.epa.gov/airquality/oilandgas/basic.html; *see also* Cally Carswell, *Cracking the ozone code – Utah's gas fields,* HIGH COUNTRY NEWS, Sept. 4, 2012 (attached as Exhibit 275).

[487] *See id.,* EPA, *Pollution Standards.*

BLM_0150318

other serious health effects."[488] The EPA reports that the oil and gas industry:

> emits 2.2 million tons of VOCs, 130,000 tons of air toxics, and 16 million tons of greenhouse gases (methane) each year (40% of all methane emission in the U.S.). The industry is one of the largest sources of VOCs and sulfur dioxide emissions in the United States.[489]

The rapid development of high volume/horizontal drilling in conjunction with hydraulic fracturing has driven expansion of new sources resulting in increased emissions – a change that requires consideration in the UFO's RMP analysis.

Many of the impacts to human health have already been documented in communities subject to industrial scale oil and gas development. Of particular note, attached information from North Fork Valley residents describes health impacts and concerns about oil and gas development in their region.[490]

Additionally, in other nearby communities such as Garfield County, Colorado, residents have experienced health effects they believe to be caused from oil and gas development. "Community concerns range from mild complaints such as dizziness, nausea, respiratory problems, and eye and skin irritation to more severe concerns including cancer."[491] Additionally, the community has "environmental concerns related to noise, odors, dust, and 'toxic' chemicals in water and air."[492] After a thorough review of ambient air data across Garfield County, ATSDR determined that, "considering both theoretical cancer risks as well as non-cancer health effects and the uncertainties associated with the available data, it is concluded that the exposures to air pollution in Garfield County pose an indeterminate public health hazard for current exposures."[493] ATSDR further provided that "estimated theoretical cancer risks and non-cancer hazards for benzene [in the community], which is within the oil and gas development area, appear significantly higher than those in typical urban and rural area, causing some potential concern," and later concluded that "[t]hese elevated levels are an indicator of the increased potential for health effects related to benzene exposure … in the oil and gas development area.[494]

---

[488] *Id.*

[489] Letter from American Lung Association, American Public Health Association, American Thoracic Society, Asthma and Allergy Foundation of America, and Trust for America's Health to Lisa Jackson, Administrator, U.S. Environmental Protection Agency (Nov. 30, 2011), at 4 (attached as Exhibit 276).

[490] *See* North Fork Resident Declarations (attached as Exhibit 300).

[491] U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR"), *Health Consultation: Garfield County, Public Health Implications of Ambient Air Exposures to Volatile Organic Compounds as Measured in Rural, Urban, and Oil & Gas Development Areas* (2008), at 1 (attached as Exhibit 277).

[492] *Id.*

[493] *Id.*

[494] *Id.*

BLM_0150319

Unfortunately, impacts to human health are not limited only to natural shale gas emissions, but can result from exposure to chemicals necessary for gas extraction – namely, the hundreds of chemicals used in hydraulic fracturing.[495] Indeed, "[b]etween 2005 and 2009, the 14 oil and gas service companies [analyzed by Congress] used more than 2,500 hydraulic fracturing products containing 750 chemicals and other components. Overall, these companies used 780 million gallons of hydraulic fracturing products – not including water added at the well site – between 2005 and 2009."[496] Chemical components include BTEX compounds – benzene, toluene, xylene, and ethylbenzene – which are hazardous air pollutants and known human carcinogens. The UFO has failed to sufficiently consider the human health impacts associated with these extractive practices in the RMP and DEIS.

Leading doctors and scientists studying these issues recognize the unknown risks inherent to fracking. "We don't know the chemicals that are involved, really; we sort of generally know," Vikas Kapil, chief medical officer at National Center for Environmental Health, part of the U.S. Centers for Disease Control and Prevention, said at a conference on hydraulic fracturing.[497] "We don't have a great handle on the toxicology of fracking chemicals."[498]

The Endocrine Disruption Exchange ("TEDX") has, however, documented nearly 1,000 products and chemicals that energy companies use in drilling, fracturing ("frac'ing," "fracking," or "stimulation"), recovery and delivery of natural gas. Many of these products contain chemicals that are harmful to human health. On its website, TEDX says this:

> To facilitate the release of natural gas after drilling, approximately a million or more gallons of fluids, loaded with toxic chemicals, are injected underground under high pressure. This process, called fracturing (frac'ing or stimulation), uses diesel-powered heavy equipment that runs continuously during the operation. One well can be frac'ed 10 or more times and there can be up to 28 wells on one well pad. An estimated 30% to 70% of the frac'ing fluid will resurface, bringing back with it toxic substances that are

---

[495] *See* Theo Colborn, et. al., *Comments to the Bureau of Land Management, Uncompahgre Field Office*, THE ENDOCRINE DISRUPTION EXCHANGE, April 20, 2012 (attached as Exhibit 278); Theo Colborn, et. al., *Natural Gas Operations from a Public Health Perspective*, HUMAN AND ECOLOGICAL RISK ASSESSMENT, 17: 1039-1056 (2011) (attached as Exhibit 279).

[496] U.S. CONGRESS, HOUSE OF REPRESENTATIVES (attached above as Exhibit 171).

[497] Alex Wayne, *Fracking Moratorium Urged by U.S. Doctors Until Health Studies Conducted*, BLOOMBERG NEWS, January 9, 2012, available at: http://www.bloomberg.com/news/2012-01-09/fracking-moratorium-urged-by-u-s-doctors-until-health-studies-conducted.html; *see also* American Nurses Association 2012 House of Delegates, *Resolution: Nurses' Role in Recognizing, Educating and Advocating for Healthy Energy Choices*, available at: http://www.nursingworld.org/MainMenuCategories/WorkplaceSafety/Healthy-Work-Environment/Environmental-Health/nurses-role-in-recognizing-educating-advocating-healthy-energy-choices.pdf (attached as Exhibit 328).

[498] *Id.*

BLM_0150320

naturally present in underground oil and gas deposits, as well as the chemicals used in the frac'ing fluid. Under some circumstances, nothing is recovered.[499]

According to TEDX:

In the 980 products identified…[for use during natural gas operations], there were a total of 649 chemicals. Specific chemical names and CAS numbers could not be determined for 286 (44%) of the chemicals, therefore, the health effects summary is based on the remaining 362 chemicals with CAS numbers…Over 78% of the chemicals are associated with skin, eye or sensory organ effects, respiratory effects, and gastrointestinal or liver effects. The brain and nervous system can be harmed by 55% of the chemicals. These four health effect categories…are likely to appear immediately or soon after exposure. They include symptoms such as burning eyes, rashes, coughs, sore throats, asthma-like effects, nausea, vomiting, headaches, dizziness, tremors, and convulsions. Other effects, including cancer, organ damage, and harm to the endocrine system, may not appear for months or years later. Between 22% and 47% of the chemicals were associated with these possibly longer-term health effects. Forty-eight percent of the chemicals have health effects in the category labeled 'Other.' The 'Other' category includes such effects as changes in weight, or effects on teeth or bones, for example, *but the most often cited effect in this category is the ability of the chemical to cause death.*[500] (emphasis added)

Christopher Portier, director of the CDC's National Center for Environmental Health and Agency for Toxic Substances and Disease Registry further provided that "additional studies should examine whether wastewater from wells can harm people or the animals and vegetables they eat."[501] "We do not have enough information to say with certainty whether shale gas drilling poses a threat to public health."[502]

Indeed, a new study demonstrates that animals, especially livestock, are sensitive to the contaminants released into the environment by drilling and by its cumulative impacts.[503] Because animals often are exposed continually to air, soil, and groundwater and have more frequent reproductive cycles, animals can be used to monitor potential impacts to human health – they are natural shale gas drilling's "canary in the coalmine." The study evaluated all available fracking-related reports on sick or dying animals. Although secrecy surrounds the fracking

---

[499] *See* TEDX webpage describing "Chemicals in Natural Gas Operations," available at: http://endocrinedisruption.org/chemicals-in-natural-gas-operations/introduction.

[500] TEDX, *Chemicals In Natural Gas Operations*.

[501] Alex Wayne and Katarzyna Klimasinska, *Health Effects of Fracking for Natural Gas Need Study, Says CDC Scientist*, BLOOMBERG NEWS, January 4, 2012, available at: http://www.bloomberg.com/news/2012-01-04/health-effects-of-fracking-for-natural-gas-need-study-says-cdc-scientist.html.

[502] *Id.*

[503] Michelle Bamberger and Robert E. Oswald, *Impacts of Gas Drilling on Human and Animal Health*, NEW SOLUTIONS, VOL. 22(1) 51-77 (2012) (attached as Exhibit 280).

BLM_0150321

industry, "a few 'natural experiments' have provided powerful evidence that fracking can harm animals."[504]  For example:

> Two cases involving beef cattle farms inadvertently provided control and experimental groups.  In one case, a creek into which wastewater was allegedly dumped was the source of water for 60 head, with the remaining 36 head in the herd kept in other pastures without access to the creek. Of the 60 head that were exposed to the creek water, 21 died and 16 failed to produce calves the following spring. Of the 36 that were not exposed, no health problems were observed, and only one cow failed to breed. At another farm, 140 head were exposed when the liner of a wastewater impoundment was allegedly slit, as reported by the farmer, and the fluid drained into the pasture and the pond used as a source of water for the cows. Of those 140 head exposed to the wastewater, approximately 70 died and there was a high incidence of stillborn and stunted calves. The remainder of the herd (60 head) was held in another pasture and did not have access to the wastewater; they showed no health or growth problems. These cases approach the design of a controlled experiment, and strongly implicate wastewater exposure in the death, failure to breed, and reduced growth rate of cattle.[505]

The health problems and uncertainties that proliferate in communities where oil and gas development takes place warrants the further collection of data and research, as contemplated under NEPA, before such development can be made possible through the authorization of development through the UFO RMP. NEPA requires a hard look at these impacts.

### 1.    The UFO Must Conduct a Health Impact Assessment.

BLM did not conduct a health impact assessment, or equivalent analysis, and, as a result, the agency's RMP/EIS does not satisfy NEPA and its implementing regulations.

NEPA requires that the BLM employ at least the same level of effort to analyze human health impacts as it does to promote industry's interest in development when preparing the RFD and associated analyses regarding projected drilling levels.

A health impact assessment ("HIA") or equivalent analysis would fulfill the regulations governing NEPA, to examine human health impacts "to the fullest extent possible." A HIA would be forward-looking and attempt to identify all of the potential direct, indirect, and cumulative links between a proposed activity and the health and well-being of affected communities, and to develop mitigation measures to minimize harms and maximize benefits. The RMP does not does not include this type of analysis of human health impacts.

---

[504] See Peter Montague, *Why Fracking and Other Disasters Are So Hard to Stop*, HUFFINGTON POST, Jan. 20, 2012, available at: http://www.huffingtonpost.com/peter-montague/why-fracking-and-other-di_b_1218889.html (last visited Oct. 29, 2016).
[505] See Bamberger at 60 (attached above as Exhibit 280).

BLM_0150322

The U.S. EPA has posted on its website an excellent document on the utility of an HIA as part of the NEPA analysis of federal agencies where public health impacts are at issue.[506] HIA "provides a systematic process and methodology to anticipate and proactively address the potential health consequences of a program or policy in order to maximize the potential benefits and minimize adverse outcomes."[507] Steps in the HIA process include:

1. Screening: Determines whether an HIA is necessary, and whether it is likely to be useful.
2. Scoping:  Establish the population to which the HIA applies, the scope of health problems to be analyzed, the HIA team, methods to be used in the assessment, and data sources.
3. Assessment: describe the baseline health status and determinants of health in the population and assess likely impacts through a literature review and qualitative or quantitative analysis.
4. Decision and recommendations to minimize adverse impacts and maximize benefits.
5. Monitoring and reassessment plan: select a set of outcomes likely to be sensitive/accurate indicators of the changes predicted, such as health outcomes and develop a plan to monitor and then reassess if needed.

The BLM did not conduct these steps, and did not analyze the impacts to the population within the planning area, considering how many people might be exposed to health impacts, analyze where development would take place relative to water sources or residences, or assess the likely impacts to the actual population in the area, including particularly vulnerable populations. It also omitted significant potential impacts. For example, the agency did not include any potential impacts from vehicle accidents or other safety issues, or the illness caused by the stress and mental anguish associated with living near intensive oil and gas development.

According to the U.S. Centers for Disease Control, "HIA can be used to evaluate objectively the potential health effects of a project or policy before it is built or implemented. It can provide recommendations to increase positive health outcomes and minimize adverse health outcomes. A major benefit of the HIA process is that it brings public health issues to the attention of persons who make decisions about areas that fall outside of traditional public health arenas, such as transportation or land use."[508]

BLM's section examining health effects, EIS at 4-444 to -451, is cursory, states the obvious, provides only comparative assessments between alternatives, and does not quantify harms. For example, the brief discussion of Alternative D (the agency preferred alternative)

---

[506] *See* EPA, Human Impact Partners, *Frequently Asked Questions About Integrating Health Impact Assessment into Environmental Impact Statement,* available at: http://www.epa.gov/region9/nepa/PortsHIA/pdfs/FAQIntegratingHIA-EIA.pdf (attached as Exhibit 281).

[507] *See* Aaron Wernham, *Inupiat Health and Proposed Alaskan Oil Development: Results of the First Integrated Health Impact Assessment/Environmental Impact Statement for Proposed Oil Development on Alaska's North Slope,* ECOHEALTH, 2007 (attached as Exhibit 282).

[508] Centers for Disease Control, *Health Impact Assessment,* available at: http://www.cdc.gov/healthyplaces/hia.htm (attached as Exhibit 283).

BLM_0150323

states, regarding air quality, that impacts will be the same as under Alternative C, but at a slightly reduced level. EIS at 4-450. In turn, Alternative C merely provides that "[t]his alternative would have the greatest potential to contribute to volatile organic compounds and local increases in hazardous air pollutants and associated risks to human health." *Id.* at 4-449. Regarding air quality, BLM's only other generic observation, unconnected to any analysis of the specific alternatives at issue, is that "[m]anagement actions that maintain or move towards compliance with standards by limiting emissions from BLM managed or permitted activities would improve public health while those that allow for increased emissions and result in non-compliance with standards could impact public health." EIS at 4-445.

Further, no impacts to water resources from fracking are identified by BLM in its examination of health effects, which is unacceptable. Any later, site-specific analysis and application of mitigation measures is no substitute for analysis of impacts and development of alternatives and mitigation measures at the RMP/EIS level. Waiting for the approval of site-specific projects forecloses not only analysis of the true impacts of the agency action that is actually being proposed, but in so doing, forecloses the ability of BLM, other agencies, and the public to identify at an early stage the significant environmental issues that are deserving of study in this EIS. This RMP is a major point in the leasing decision-making process, requiring analysis of all of the impacts at this stage.

## 2.  Health data

In Colorado, symptoms reported in the state's inspection/incident database by residents living within a half mile of well development included headaches, nausea, upper respiratory irritation, and nosebleeds.[509] In Pennsylvania, the following symptoms were reported by over half the people living near gas development who responded to a health survey. They included fatigue (62%), nasal irritation (61%), throat irritation (60%), sinus problems (58%), burning eyes (53%), shortness of breath (52%), joint pain (52%), feeling weak and tired (52%), severe headaches (51%), and sleep disturbance (51%). The survey was completed by 108 individuals (in 55 households) in 14 counties across Pennsylvania.[510]

These and additional recent studies that were not considered by BLM include:

1. Lisa M. McKenzie et al., *Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado,* Environmental Health Perspectives (April 2014) (attached above as Exhibit 157).

---

[509] Roxana Z. Witter, *et al., The Use of Health Impact Assessment for a Community Undergoing Natural Gas Development,* FRAMING HEALTH MATTERS (2013) (attached as Exhibit 284).

[510] Nadia Steinzor, *et al., Investigating links between shale gas development and health impacts through a community survey project in Pennsylvania,* NEW SOLUTIONS, vol. 23 iss. 1. (2013) (attached as Exhibit 285).

BLM_0150324

2. Jessica Gilman, *et al., Source signature of volatile organic compounds (VOCs) from oil and natural gas operations in northeastern Colorado*, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2013) (attached as Exhibit 286).

3. John L. Adgate, *et al., Potential Public Health Hazards, Exposures and Health Effects from Unconventional Natural Gas Development*, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2014) (attached as Exhibit 295).

4. Seth Shonkoff, *et al., Environmental Public Health Dimensions of Shale and Tight Gas Development*, ENVIRONMENTAL HEALTH PERSPECTIVES (2014) (attached as Exhibit 287).

5. Christopher W. Moore, *et al., Air Impacts of Increased Natural Gas Acquisition, Processing, and Use: A Critical Review*, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2014) (attached as Exhibit 288).

6. Avner Vengosh, *et al., The effects of shale gas exploration and hydraulic fracturing on the quality of water resources in the United States*, PROCEDIA EARTH AND PLANETARY SCIENCE (2014) (attached as Exhibit 289).

7. Christopher D. Kassotis, *et al., Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region*, Endocrinolgy (2014) (attached as Exhibit 176). (attached above as Exhibit 176).

8. Brian E. Fontenot, *et al., An Evaluation of Water Quality in Private Drinking Water Wells Near Natural Gas Extraction Sites in the Barnett Shale Formation*, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2013) (attached as Exhibit 290).

9. Sherilyn A. Gross, *et al., Analysis of BTEX Groundwater Concentrations from Surface Spills Associated with Hydraulic Fracturing Operations*, JOURNAL OF THE AIR & WASTE MANAGEMENT ASSOCIATION (2013) (attached as Exhibit 291).

10. K.D. Retzer, *et al., Motor vehicle fatalities among oil and gas extraction workers*, ACCIDENT ANALYSIS & PREVENTION (2013) (attached as Exhibit 292).

11. Eric J. Esswein, *et al, Occupational exposures to respirable crystalline silica during hydraulic fracturing*, JOURNAL OF OCCUPATIONAL AND ENVIRONMENTAL HYGIENE (2013) (attached as Exhibit 293).

12. R.Z. Witter, *et al., Occupational exposures in the oil and gas extraction industry: state of the science and research recommendations*, AMERICAN JOURNAL OF INDUSTRIAL MEDICINE (2014) (attached as Exhibit 294).

13. Physicians for Social Responsibility, *Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Oil and Gas Extraction)*, Third Edition (October 14, 2015), available at: http://www.psr.org/assets/pdfs/fracking-compendium.pdf (attached as Exhibit 326).

14. Gayathri Vaidyanathan, *Fracking Can Contaminate Drinking Water*, Climate Wire (April 4, 2016), available at: https://www.scientificamerican.com/article/fracking-can-contaminate-drinking-water/ (last visited November 1, 2016).

15. A. Austin, et al., *Associations Between Unconventional Natural Gas Development and Nasal and Sinus, Migraine Headache, and Fatigue Symptoms in Pennsylvania*, Environmental Health Perspectives (July 31, 2016), available at: http://ehp.niehs.nih.gov/wp-content/uploads/advpub/2016/8/EHP281.acco.pdf (attached as Exhibit 327).

EPA is also currently investigating the potential impacts of hydraulic fracturing on drinking water resources due to concerns about its potential environmental and human health impacts. Until such research is completed, there is insufficient information to fully understand the potential impacts on human health, an uncertainty that the BLM failed to take into consideration. The EPA is still in the process of completing this study. Nevertheless, the BLM ignored the uncertainty of the impacts of hydraulic fracturing on drinking water. BLM must consider these studies in any subsequently prepared NEPA document to ensure that it took the required hard look at health impacts.

### 3.    Cumulative impacts on human health

BLM must fully consider cumulative health impacts of different alternatives. Because the BLM will be leasing minerals located directly beneath and adjacent to private property, and because thousands of people live in close proximity to the industrial activity that will be permitted by the agency, BLM has the responsibility to consider potential impacts on human health from all development, and look at them cumulatively. For example, an individual exposed to both air and water pollution will have different health impacts than an individual exposed only to air pollution.

The assessment of cumulative impacts in NEPA documents is required by Council on Environmental Quality (CEQ) regulations. *See* 40 C.F.R. §1508.25 (Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act). Oil and gas development involves multiple sources of pollutants and disturbance caused by connected actions, including the operations of wellpads, trucks, wells, compressors, pipelines, tanks, pits, separators, dehydrators, rigs and more. Oil and gas development also includes hundreds of potential pollutants, both man-made and naturally occurring. When considered together, pollutants emitted with common timing and/or common geography may create additional health impacts that should be assessed. Also, oil and gas development may create health impacts from air pollution, water contamination, soil contamination, or a combination of all three. Due to the multiple variables and factors involved in oil and gas development, it is essential that the BLM ensure a health impact assessment that fully considers all cumulative impacts to comply with federal regulations and to appropriately assess health impacts and inform the public.

If the full cumulative health impacts are not considered by BLM at this stage it is unlikely that BLM would consider them adequately in connection with individual lease sales, or in

CONSERVATION GROUPS' COMMENTS                                                                        179
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

project-level and site-specific EAs. This type of shell game, whereby the agency avoids an analysis of the cumulative impacts of the entire project (in this case, 15,000 plus wells) is in contravention of NEPA. *See e.g. Blue Mountains Biodiversity Project v. U.S. Forest Service*, 161 F.3d 1208, 1215 (9th Cir. 2008).

### 4.    Ozone

As discussed in Section IV.A.3., above, background concentrations of ozone in the Uncompahgre RMP planning area are already at or exceed the National Ambient Air Quality Standards ("NAAQS"), leaving virtually no room for growth in emissions as contemplated by the Uncompahgre RMP. Several studies that measured and/or modeled natural gas related air emissions in various states have identified significant increases in ground level ozone as a result of natural gas development.[511] Ozone was once a summertime urban phenomenon but is now being seen increasingly in western rural areas during the winter due to the natural gas boom, so much so that some relatively small cities are no longer in compliance with the federal regulations that set allowable ozone levels.[512]

Ozone can cause difficulty breathing, coughing and sore throat. It can also inflame and damage the airways. It aggravates lung diseases like asthma, emphysema, and chronic bronchitis. It can make the lungs more susceptible to infection and it can continue to damage the lungs even when the symptoms have disappeared.[513]

Children are particularly vulnerable because their lungs are still developing until about age 18. As their lungs grow in the presence of ozone, their alveoli production is reduced, and they can end up with smaller, more brittle lungs. Women exposed during pregnancy deliver preterm, low birth weight babies with a high probability of developing asthma. In a letter to former EPA Administrator Lisa Jackson, a group of five national medical and public health groups wrote that the most vulnerable individuals, including children, teens, senior citizens, people who exercise or work outdoors, and people with chronic lung diseases like asthma, COPD, and emphysema, are most in danger of being sickened by ozone and that children who grow up in areas of high ozone pollution may never develop their full lung capacity as adults, which can put them at greater risk of lung disease throughout their lives.[514]

---

[511] *See, e.g.,* Seth Lyman and Howard Shorthill, *Final Report: 2012 Uintah Basin Winter Ozone & Air Quality Study*, UTAH STATE UNIVERSITY, February 1, 2013.

[512] Gabrielle Pétron, *et al.*, *Estimation of emissions from oil and natural gas operations in northeastern Colorado*, Power Point available at:

http://www.epa.gov/ttnchie1/conference/ei20/session6/gpetron_pres.pdf (attached as Exhibit 296).

[513] *See* EPA, *Ozone – Good Up High Bad Nearby*, available at:

http://www.epa.gov/oar/oaqps/gooduphigh/bad.html#7.

[514] *See* American Lung Association (attached above as Exhibit 276).

BLM_0150327

5.       **Naturally Occurring Radioactive Materials**

Processes used to produce oil and gas often generate radioactive waste containing concentrations of naturally occurring radioactive materials (NORM). Radioactive wastes from oil and gas production can be found in produced water, flowback water from hydraulic fracturing, drilling waste including cuttings and mud, and/or sludge. This material can concentrate in pipes, storage tanks and facilities, and on other extraction equipment, and may be left on site or be emitted into the environment. Some of these materials can penetrate the skin and raise the risk of cancer. The RMP includes no discussion on potential health impacts associated with NORM that may be released into the environment due to oil and gas extraction activities.

## VI.    The BLM Is Required to Suspend All Oil and Gas Development in the Uncompahgre Area for as Long as the Uncompahgre RMP Revision Remains Uncompleted.

The Uncompahgre RMP revision will replace the existing 1985 San Juan/San Miguel Resource Management Plan and the 1989 Uncompahgre Basin Resource Management Plan. These 1985 and 1989 RMPs are completely out-of-date and can no longer serve their intended land use planning function with regard to oil and gas development in the UFO. Due to the insufficiency of BLM's existing management framework, all oil and gas leasing and development decisions, at all stages of BLM's administrative processes, should be suspended until the Uncompahgre RMP revision is complete and these deficiencies can be addressed. An oil and gas moratorium is not only a logical approach to BLM's minerals management responsibilities; it is also required under NEPA and its implementing regulations.

NEPA requires that, until an agency issues a Record of Decision for a pending NEPA document, "no action concerning the proposal shall be taken which would: (1) have an adverse environmental impact; or (2) limit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a)(1), (2). NEPA prohibits agencies from making an "irreversible and irretrievable commitment of resources." 40 C.F.R. §§ 1502.2(f); *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1986); *see also Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1056-57 (9th Cir. 1994), *cert. denied*, 115 S. Ct. 1793 (1995) (interpreting identical language in ESA). "The purpose of an EIS is to apprise decisionmakers of the disruptive environmental effects that may flow from their decisions at a time when they 'retain[] a maximum range of options.'" *Conner*, 848 F.2d at 1446. Taking actions in the interim which could limit those options undermines the purpose and effectiveness of the NEPA process. As provided by CEQ regulations:

> While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:
>
> (1) Is justified independently of the program;

BLM_0150328

> (2) Is itself accompanied by an adequate environmental impact statement; and
>
> (3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

40 C.F.R. §§ 1506.1(c)(1)-(3).

Proceeding with oil and gas leasing and development—including, for example, the activities contemplated in the Bull Mountain Master Development Plan and the Dual Operator Proposal: Development of 25 Federal Natural Gas Wells and Associated Infrastructure on 5 Multi-Well Pads—is impermissible due to the inherent prejudice that any such action would create on the pending revision of the Uncompahgre RMP and EIS. As identified in CHC's earlier comments submitted to BLM UFO, the 1985 and 1989 RMPs and associated documents did not anticipate the pace or scale of oil and gas leasing and development that is now proposed, and therefore, did not analyze the impacts from development which are now facing the communities of the North Fork Valley and beyond. Those documents contain little analysis of oil and gas development generally, much less any analysis of the impacts associated with modern extraction techniques, such as hydraulic fracturing, or the specific areas where current oil and gas development is focused. *See, e.g.,* 1989 RMP at 28, 31. Moreover, and as unambiguously provided in the 1987 Technical Report, any analysis contained therein was inherently limited in its temporal scope – providing that its evaluation of projected development was limited to "the next ten to fifteen years." 1987 Technical Report, at 10-11. Indeed, it has now been over 25 years since the report's release, well beyond the period where its findings are of any utility. Without the foundational land use planning guidance that is only available through a current and up-to-date RMP, it would be impossible for BLM UFO to make the type of fully informed decision that NEPA requires prior to completion of the Uncompahgre RMP revision.

Accordingly, it would serve both the public and industry alike if BLM UFO were to acknowledge that the existing RMP cannot be used to guide oil and gas leasing and development decision-making – and announce a moratorium on all oil and gas activity pending the completion of the Uncompahgre RMP revision.

## VI.    The Uncompahgre DEIS Fails to Take a Hard Look at Reasonably Foreseeable Effects on the Threatened Gunnison Sage-Grouse.

Contrary to the DEIS's characterization of the Gunnison sage-grouse as a candidate species, DEIS  at 3-76, the Gunnison sage-grouse was listed as a threatened species under the Endangered Species Act in November 2014. *See* U.S. Fish and Wildlife Service, Threatened Status for Gunnison Sage-Grouse, Final Rule, 79 Fed. Reg. 69,192 (Nov. 20, 2014). Approximately 88 to 93 percent of the species's historical range has been lost since Euro-American settlement, and "[t]his contraction in the birds' range indicates the vulnerability of all the populations to extirpation." Gunnison Sage-Grouse Listing Rule, 79 Fed. Reg. at 69,228. The listing rule found that "the persistence of Gunnison sage-grouse is dependent on large and contiguous sagebrush habitats, that human development and disturbance contribute to the decline of this needed habitat, and that such impacts negatively affect the survival and persistence of

BLM_0150329

Gunnison sage-grouse." *Id.* Numerous activities on BLM land and minerals contribute to loss of these sage-grouse habitats, including road-building, power lines, livestock grazing practices, invasive plants, fire, and leasable minerals (i.e. oil and gas development). Oil and gas development has numerous adverse effects on Gunnison sage-grouse habitat, behavior, and population not acknowledged in the DEIS:

> Energy development impacts sagegrouse and sagebrush habitats through direct habitat loss from well pad construction, seismic surveys, roads, powerlines and pipeline corridors, and indirectly from noise, gaseous emissions, changes in water availability and quality, and human presence. The interaction and intensity of effects could cumulatively or individually lead to habitat degradation and fragmentation (Suter 1978, pp. 6–13; Aldridge 1998, p. 12; Braun 1998, pp. 144–148; Aldridge and Brigham 2003, p. 31; Knick *et al.* 2003, pp. 612, 619; Lyon and Anderson 2003, pp. 489–490; Connelly *et al.* 2004, pp. 7–40 to 7–41; Holloran 2005, pp. 56–57; Holloran *et al.* 2007, pp. 18–19; Aldridge and Boyce 2007, pp. 521–522; Walker *et al.* 2007a, pp. 2652–2653; Zou*et al.* 2006, pp. 1039–1040; Doherty *et al.* 2008, p. 193; Leu and Hanser 2011, pp. 270–271). Increased human presence resulting from oil and gas development can also impact sagegrouse either through avoidance of suitable habitat or disruption of breeding activities (Braun *et al.* 2002, pp. 4–5; Aldridge and Brigham 2003, pp. 30–31; Aldridge and Boyce 2007, p. 518; Doherty *et al.* 2008, p. 194). The development of oil and gas resources requires surveys for economically recoverable reserves, construction of well pads and access roads, subsequent drilling and extraction, and transport of oil and gas, typically through pipelines. Ancillary facilities can include compressor stations, pumping stations, electrical generators and powerlines (Connelly *et al.* 2004, p. 7–39; BLM 2007, p. 2–110). Surveys for recoverable resources occur primarily through loud seismic exploration activities. These surveys can result in the crushing of vegetation. Well pads vary in size from 0.10 ha (0.25 ac) for coal-bed natural gas wells in areas of level topography to greater than 7 ha (17.3 ac) for deep gas wells and multi-well pads (Connelly *et al.* 2004, p. 7–39; BLM 2007, p. 2–123). Pads for compressor stations require 5–7 ha (12.4–17.3 ac) (Connelly *et al.* 2004, p. 7–39). Individually, impacts from well pads, infrastructure, and ancillary features may be small; however, the cumulative impact of such development can be significant.
>
> The amount of direct habitat loss within an area of oil and gas development is ultimately determined by well densities and the associated loss from ancillary facilities. Roads associated with oil and gas development were suggested as the primary impact to greater sage-grouse due to their persistence and continued use even after drilling and production ceased (Lyon and Anderson 2003, p. 489). Declines in male greater sage-grouse lek attendance were reported within 3 km (1.9 mi) of a well or haul road with a traffic volume exceeding one vehicle per day (Holloran 2005, p. 40). Because of reasons discussed previously, the effects of oil and gas development to Gunnison sage-grouse are expected to be similar to those observed in greater sage-grouse. Sage-grouse also may be at increased risk

BLM_0150330

for collision with vehicles simply due to the increased traffic associated with oil
and gas activities (Aldridge 1998, p. 14; BLM 2003, p. 4–222).

Habitat fragmentation resulting from oil and gas development infrastructure,
including access roads, may have greater effects on sage-grouse than habitat loss
associated with drill sites. Energy development and associated infrastructure
works cumulatively with other human activity or development to decrease
available habitat and increase fragmentation. Greater sage-grouse leks had the
lowest probability of persisting (40–50 percent) in a landscape with less than 30
percent sagebrush within 6.4 km (4 mi) of the lek. These probabilities were even
less in landscapes where energy development also was a factor.[515]

The Fish and Wildlife Service found, in considering the adequacy or inadequacy of
existing regulatory mechanisms to safeguard Gunnison sage-grouse, that existing BLM RMPs,
including the current Uncompahgre RMP, are inadequate as regulatory mechanisms. Existing
"RMPs provide only partial protection for Gunnison sage-grouse in terms of land use allocation
decisions specific to the species and its habitat and, therefore, are considered inadequate to
protect the species." In particular, with regard to fluid mineral development, "Given the already
small and fragmented nature of the populations where future oil and gas leases are likely to
occur, additional development within occupied habitat would negatively impact those
populations by contributing to further habitat decline."[516]

In part in response to this finding of inadequate regulatory mechanisms for BLM lands
and minerals, the Colorado and Utah BLM have undertaken a range-wide RMP Amendment
process for Gunnison Sage-Grouse habitat, encompassing the UFO, with a draft RMP
Amendment and EIS released in August 2016. This amendment process overlaps the UFO RMP
Revision: "If the GUSG RMP Amendment is issued prior to the revised Uncompahgre RMP,
then it would amend the existing Uncompahgre Basin RMP (as well as the San Juan/San Miguel
RMP) for lands in the Uncompahgre RMP planning area. Analysis from the GUSG EIS would be
incorporated by reference into the Uncompahgre Proposed RMP/Final EIS, and decisions made
in the GUSG Approved RMP Amendment/ROD would be carried forward to the Uncompahgre
Approved RMP/Record of Decision. However, if the revised Uncompahgre RMP is issued first,
then the GUSG RMP Amendment could require amendment of the Uncompahgre RMP."[517] Yet
the UFO DEIS fails to acknowledge or take into account substantial scientific information
available in both the Listing Rule and the Gunnison Sage-Grouse Rangewide DEIS.

Contrary to the DEIS's assertion, the UFO supports four, not three, of the remaining
populations of Gunnison sage-grouse: "the Uncompahgre FO operates . . . provides habitat for
four GUSG populations: the Cerro Summit-Cimarron-Sims Mesa Population (with the Sims
Mesa sub-population entirely within the Uncompahgre FO), the Crawford Population, the

---

[515] Gunnison Sage-Grouse Final Listing Rule, 79 Fed. Reg. at 69,255-256 (attached as Exhibit
297).

[516] Gunnison Sage-Grouse Listing Rule at 69,284.

[517] BLM, Gunnison Sage-Grouse Rangewide Draft Resource Management Plan Amendment
Draft Environmental Impact Statement 1-14 (attached as Exhibit 298)

BLM_0150331

Gunnison Basin Population, and the Piñon Mesa Population."[518] The Crawford population in particular has been classified by the BLM has having "medium potential" for oil and gas development.[519] Although it currently has only a single federal well, additional oil and gas development within the Crawford Population could adversely affect its persistence and chance of recovery.

In addition, an even more recent scientific study confirms the established finding that sage-grouse lek attendance is negatively related to oil and gas density, regardless of sagebrush cover and participation.[520] Green et al. examined greater sage-grouse lek attendance ,oil and gas well, and habitat and precipitation data from Wyoming over the period 1984 to 2008, and, consistent with numerous prior studies, that lek attendance declines are closely associated with the density of oil and gas development:

> Oil and gas development correlates well with sage-grouse population declines from 1984 to 2008 in Wyoming, which is supported by other findings (Doherty et al. 2010b, Harju et al. 2010, Hess and Beck 2012, Taylor et al. 2013, Gregory and Beck 2014). As with other studies, we also found support for 4-year lag effects of oil and gas development on lek attendance (Walker et al. 2007, Doherty et al. 010a, Harju et al. 2010, Gregory and Beck 2014). This result suggests that development likely affects recruitment into the breeding population rather than avoidance of wells by adult males or adult survival. Adult sage-grouse are highly philopatric to lek sites (Dalke et al. 1963, Wallestad and Schladweiler 1974, Emmons and Braun 1984, Dunn and Braun 1985, Connelly et al. 2011a), and males typically recruit to the breeding population in 2–3 years. We would expect a delayed response in lek attendance if development affects recruitment, either by reducing fecundity or avoidance of disturbance by nesting females, as adult males die and are not replaced by young males.

On average, lek attendance was stable when no oil and gas development was present within 6,400m (Fig. 4). However, attendance declined as development increased. [521] Importantly, Green et al. confirmed that declines in sage-grouse populations may continue even within Wyoming's "core areas," where density of wells is limited to one pad per square mile. Yet the UFO DEIS fails to consider any alternative that either prohibits fluid mineral leasing or regulates the density of allowable oil and gas facilities. Althoug the DEIS does consider minimal buffers and seasonal operation restrictions around leks, the DEIS acknowledges that its preferred alternative would "fall short of accepted minimum protection standards to maintain sage-grouse viability:

---

[518] Gunnison Sage-Grouse Rangewide RMP DEIS at 1-13.

[519] Gunnison Sage-Grouse Listing Rule, 79 Fed. Reg. at 69,255.

[520] Green, Adam et al., Investigating Impacts of Oil and Gas Development on Greater Sage-Grouse, Journal of Wildlife Management (2016), DOI: 10.1002/jwmg.21179 (attached as Exhibit 299).

[521] Green et al. at 9.

BLM_0150332

For Gunnison sage-grouse, stipulations would provide some level of protection from surface occupancy and site disturbance in all seasonal habitats. Breeding habitat would be protected with similar stipulations as Alternative C (NSO-20/SSR-32), and would similarly fall short of accepted minimum protection standards to maintain sage-grouse viability (Knick and Connelly 2011). However, disturbance/disruption would be prohibited during the breeding season within four miles of active leks (CSU-28/SSR-34).[522]

Even with only one operating oil and gas well, the UFO's Crawford Population has been in dramatic decline from 2000 through 2012, and had to be supplemented with birds from the Gunnison Basin in 2011 through 2013.[523] BLM manages approximately 63% of the remaining occupied habitat for this population, as well as 13% of occupied habitat. Despite the precarious status of the Crawford Population in particular, the UFO DEIS fails either to take a hard look at the extensive science showing relationship between oil and gas density and sage-grouse population decline, or to consider any alternative that would either limit density of development or exclude oil and gas entirely from Gunnison sage-grouse occupied and/or suitable habitat. Given that 63% of the Crawford Population's remaining habitat is on BLM land with "moderate" oil and gas decisions, BLM consideration of a no-leasing alternative for the area has the potential to eliminate a significant threat to the extirpation of one of the few remaining populations of Gunnison sage-grouse.

## VII.   FLPMA: Unnecessary and Undue Degradation

Pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, "[i]n managing the public lands," the agency "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). Written in the disjunctive, BLM must prevent degradation that is "unnecessary" and degradation that is "undue." *Mineral Policy Ctr. v. Norton*, 292 F.Supp.2d 30, 41-43 (D. D.C. 2003). This protective mandate applies to BLM planning and management decisions, and should be considered in light of its overarching mandate that the agency employ "principles of multiple use and sustained yield." 43 U.S.C. § 1732(a); *see also, Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1136 (10th Cir. 2006) (finding that BLM's authority to prevent degradation is not limited to the RMP planning process). While these obligations are distinct, they are interrelated and highly correlated. The Bureau must balance multiple uses in its management of public lands, including "recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values." 43 U.S.C. § 1702(c). It must also plan for sustained yield – "control [of] depleting uses over time, so as to ensure a high level of valuable uses in the future." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004).

"Application of this standard is necessarily context-specific; the words 'unnecessary' and 'undue' are modifiers requiring nouns to give them meaning, and by the plain terms of the statute, that noun in each case must be whatever actions are causing 'degradation.' " *Theodore*

---

[522] DEIS at 3-77.

[523] *See* Gunnison Sage-Grouse Rangewide RMP DEIS at 3-14.

BLM_0150333

*Roosevelt Conservation Partnership v. Salazar,* 661 F.3d 66, 76 (D.C. Cir. 2011) (citing *Utah v. Andrus,* 486 F.Supp. 995, 1005 n. 13 (D. Utah 1979) (defining "unnecessary" in the mining context as "that which is not necessary for mining" – or, in this context, "for oil and gas development" – and "undue" as "that which is excessive, improper, immoderate or unwarranted.")); *see also Colorado Env't Coalition,* 165 IBLA 221, 229 (2005) (concluding that in the oil and gas context, a finding of "unnecessary or undue degradation" requires a showing "that a lessee's operations are or were conducted in a manner that does not comply with applicable law or regulations, prudent management and practice, or reasonably available technology, such that the lessee could not undertake the action pursuant to a valid existing right.").

Here, that action is the development authorized by the UFO. The inquiry, then, is whether the UFO has taken sufficient measures to prevent degradation unnecessary to, or undue in proportion to, the development the RMP and EIS permits. *See Theodore Roosevelt Conservation Partnership,* 661 F.3d at 76. For example, methane waste and pollution may cause "undue" degradation, even if the activity causing the degradation is "necessary." Where methane waste and pollution is avoidable, even if in the process of avoiding such emissions lessees or operators incur reasonable economic costs that are consistent with conferred lease rights, it is "unnecessary" degradation. 43 U.S.C. § 1732(b).

Therefore, drilling activities may only go forward as long as unnecessary and undue environmental degradation does not occur. This is a *substantive* requirement, and one that the UFO must define and apply in the context of oil and gas development authorized in the planning area. In other words, the UFO must define and apply the substantive unnecessary and undue degradation ("UUD") requirements in the context of the specific resource values at stake.

In fact, the UFO has expressly recognized this mandate in the context of Wilderness Study Areas. *See* DEIS at 3-158 and 4-397. However, the obligation to implement a management regime that sufficiently protects the air, water, lands, and health goes beyond Wilderness Study Areas to encompass the entire planning area. Of critical importance in regard to oil and gas development is the agency's failure to require mitigation measures and best management practices on all future development within the planning area.

These UUD requirements are distinct from requirements under NEPA. "A finding that there will not be significant impact [under NEPA] does not mean either that the project has been reviewed for unnecessary and undue degradation or that unnecessary or undue degradation will not occur." *Ctr. for Biological Diversity,* 623 F.3d at 645 (quoting *Kendall's Concerned Area Residents,* 129 I.B.L.A. 130, 140 (1994)). In the instant case, the UFO's failure to specifically account for UUD in the RMP and EIS – which is distinct from its compliance under NEPA – is also actionable on procedural grounds and must occur before the proposed RMP is approved.

## VIII.   Conclusion

The Conservation Groups appreciate your consideration of the information and concerns addressed herein, as well as the information included in the attached exhibits. This information is critical and must be reflected in the agency's Final Environmental Impact Statement.

BLM_0150334

For the reasons described above, we urge BLM to prepare a supplemental EIS that: (1) fully considers a range of alternatives, including a "no-leasing" alternative; (2) fully considers the problem of methane waste, and takes steps to control methane waste; (3) fully considers current scientific and economic information, especially regarding climate change; and (4) strengthens its "hard look" at impacts to air, water, and human health, including by conducting a Health Impact Assessment.

Should you have any questions, please do not hesitate to contact us.

Sincerely,

Kyle Tisdel, Attorney, Climate & Energy Program Director
Laura King, Staff Attorney
WESTERN ENVIRONMENTAL LAW CENTER
208 Paseo del Pueblo Sur, Unit 602
Taos, New Mexico 87571
575.751.0351
tisdel@westernlaw.org
king@westernlaw.org

*Attorneys for Conservation Groups*

Edward B. Zukoski, Staff Attorney
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
303.996.9622

*Attorney for Sierra Club*

Nathan Matthews
Nathaniel Shoaff
Staff Attorneys
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
2100 Webster Street, Suite 1300
Oakland, CA 94612
415.977.5695

Diana Dascalu-Joffe, Senior Attorney
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop Street, Suite 421
Denver, CO 80202
720.925.2521
ddascalujoffe@biologicaldiversity.org

BLM_0150335

Jeremy Nichols
Climate and Energy Program Director
WILDEARTH GUARDIANS
2590 Walnut St.
Denver, CO 80205
303.437.7663
jnichols@wildearthguardians.org

Natasha Léger
Interim Executive Director
CITIZENS FOR A HEALTHY COMMUNITY
303.667.1544
natasha@citizensforahealthycommunity.org

Peter Hart
Staff Attorney/Conservation Analyst
WILDERNESS WORKSHOP
PO Box 1442
Carbondale, CO 81623
970.963.3977 (office)
303.475.4915 (cell)

BLM_0150336

BLM_0150337

# Decadal Variations in the Global Atmospheric Land Temperatures

Richard A. Muller[1,2,3], Judith Curry[4], Donald Groom[2], Robert Jacobsen[1,2], Saul Perlmutter[1,2], Robert Rohde[3], Arthur Rosenfeld[1,2], Charlotte Wickham[5], Jonathan Wurtele[1,2]

[1] Dept. of Physics, University of California, Berkeley CA 94720; [2]Lawrence Berkeley National Laboratory, Berkeley CA 94720; [3]Novim Group, Berkeley Earth Surface Temperature Project, 211 Rametto Road, Santa Barbara CA 92104 ; [4]Georgia Institute of Technology, Atlanta GA 30332; [5]University of California, Berkeley, now at Dept. of Statistics, Oregon State University.  Correspondence for all authors should be sent to The Berkeley Earth Surface Temperature Project, 2831 Garber St., Berkeley CA 94705.

BLM_0150338

2

# Abstract

Interannual to decadal variations in Earth global temperature estimates have often been identified with El Nino Southern Oscillation (ENSO) events. However, we show that variability on timescales of 2-15 years in mean annual global land surface temperature anomalies, Tavg are more closely correlated with variability in sea surface temperatures in the North Atlantic. In particular, the cross-correlation of annually-averaged values of Tavg with annual values of the AMO, the Atlantic Mutidecadal Oscillation index, is much stronger than the cross-correlation of Tavg with ENSO. The pattern of fluctuations in Tavg from 1950 to 2010 reflects true climate variability, and is not an artifact of station sampling. A world map of temperature correlations shows that the association with AMO is broadly distributed and unidirectional. The effect of El Nino on temperature is locally stronger, but can be of either sign, leading to less impact on the global average. We identify one strong narrow spectral peak in the AMO at period $9.1 \pm 0.4$ years and p-value 1.7% (CL 98.3%). Variations in the flow of the Atlantic Meridional Overturning Circulation may be responsible for some of the 2-15 year variability observed in global land temperatures.

# 1. Introduction

The average earth land surface temperature, Tavg, is a key indicator of climate change. Detailed analyses of Tavg have been reported by three major teams: the National Oceanographic and Atmospheric Administration (NOAA; see Menne et al. [2005]), the NASA Goddard Institute for Space Science (GISS; see Hansen et al. [2010]), and a collaboration of the Hadley Centre of the UK Meteorological Office with the Climate Research Unit of East Anglia  (HadCRU; see Jones et al. [2003], Brohan et al. [2005]). Results from their analysis are shown in Figure 1.  The time period in the plot begins at 1950 since a large number of new stations were introduced at that time. The uncertainties prior to 1950 are substantially larger.  Note that in this paper we focus of the land-only temperature average – not including oceans – so that the time series will not directly include the ocean data that we will use for our correlation analysis.

Also shown in Figure 1 is a new estimate of the Earth atmospheric land surface temperature that we created from data independent of that used by the other three groups.  We obtained this estimate by choosing 2000 sites randomly from a list of approximately 30,964 temperature recording stations world-wide that had not been used by NOAA, GISS, or HadCRU.  Each temperature record was adjusted by an additive parameter, one per record, to bring it into a best least-squares fit with the other records; details of this procedure are described by Rohde et al. [2011]. The statistical techniques used (Kriging) are designed to compensate for sampling biases in station coverage.   This permits a random selection of stations to be made without giving excessive weight to heavily sampled regions, such as North America and Europe.  No adjustments or corrections were made for systematic effects such as urban heat island warming or change of instrumentation.  Despite these limitations,

BLM_0150339

3

the virtue of this estimate is that it is derived independently from previously used data. Because of this, the qualitative agreement with the prior estimates confirms that the fluctuations are true indicators of climate and not artifacts of data selection and processing. The four curves show a broad trend of "global warming" with some unevenness; the lack of warming from 1950 to 1975 has been attributed to a combination of natural and anthropogenic factors, especially the cooling effect of increased aerosol pollution [Jones et al., 2003].



Figure 1. Global land temperature estimates Tavg, smoothed by a 12-month moving average. The temperature anomaly is the difference between the estimated temperature and the mean in the period 1950-1980 for each temperature series. Note the similarity of many of the short-term fluctuations with periods 2-15 years. The Berkeley Earth data were randomly chosen from 30,964 sites that were not used by the other groups.

## 2. Decadal (2 – 15 yr) Variations

Much attention has been given to the small Tavg maxima of 1998 and 2005. The maximum in 1998 occurred during a very strong El Nino, and is plausibly associated with that oceanic event [Trenberth, 2002]. In this study we examined the annually-averaged global land temperature time series to study their possible correlation not only with the El Nino Southern Oscillation index (ENSO; see NOAA [2005]) but with the Atlantic Multidecadal Oscillation (AMO; see Schlesinger et al. [1994] and Enfield et al. [2001]), the Pacific Decadal Oscillation (PDO, see Zhang et al. [1997] ), the North Atlantic Oscillation (NAO, see Zhang et al. [1997], Hurrell et al. [1995]), and the Arctic Oscillation (AO, see Thompson et al. [1998]). Three of these indices: ENSO, AMO, PDO, are derived from sea surface temperature records, in the equatorial Pacific, the North Atlantic, and the North Pacific respectively. Two of these, the NAO and the AO, are derived from surface pressure differences at locations in the northern Atlantic and

BLM_0150340

4

Arctic. We find that the strongest cross-correlation of the decadal fluctuations in land surface temperature is not with ENSO but with the AMO. The AMO index is plotted in Figure 2.



Figure 2. The AMO index. The pattern is dominated by the 65-70 year multidecadal oscillation that gave the index its name. In this paper, we are more interested in the short-term 2-15 year variations that are evident in the 12-month smoothed curve.

Our analysis used the monthly land-surface average temperature records made available by the four groups previously referenced: NOAA, NASA GISS, HadCRU, and ours, the Berkeley Earth Surface Temperature group. The land temperature data were smoothed with a 12-month running average (boxcar smoothing); this removes high frequency (e.g. monthly) changes. The data prior to 1950 were noisier than the subsequent data, primarily because the number of stations was smaller, and for that reason we restricted the period for our analysis to 1950-2010.

To emphasize the decadal-scale variations, the long-term changes in the temperature records and oceanic indices were "pre-whitened." This is a process to remove a large signal that is not being studied in order to reduce bias in the remainder. To do this, we fit each record (yearly data sets) separately to 5th order polynomials using a linear least-squares regression; we subtracted the respective fits, and normalized the results to unit mean-square deviation. This procedure effectively removes slow changes such as global warming and the ~70 year cycle of the AMO, and gives each record zero mean. The 12-month smoothing removes high frequency (e.g. monthly) changes. All of the remaining analysis in this paper is based on the pre-whitened temperature records and oceanic indices.

The four temperature estimates after this conditioning are shown in Figure 3A. In 3B and 3C, these four temperature estimates were averaged and compared, in turn, to the

BLM_0150341

conditioned AMO and ENSO. In 3C we directly compare the AMO and ENSO decadal variations.



Figure 3. Decadal fluctuations in surface land temperature estimates and in oceanic indices. The long-term variability was suppressed by removing the least-squares fit 5th order polynomial from each curve. (A) shows the 12-month smoothed land surface temperature estimates from the four groups. The decadal variations are very similar to each other. The Berkeley Earth data were derived from 2000 sites chosen randomly from a set of 30964 that did not include any of the sites from the other groups. (B) shows the AMO index compared to Tavg, the average of the four land estimates. (C) shows the ENSO index compared to the average of the four land estimates. (D) shows the AMO and ENSO directly. Note that the AMO agreement in (b) is qualitatively stronger than the ENSO agreement in (c).

## 3. Difference and Correlation Analysis

Visual inspection of Figure 3 suggests that the AMO fluctuations match the temperature variations better than does the ENSO index almost everywhere; perhaps the only prominent exception being 1968 – 1973. This impression is verified by calculating the RMS (root-mean-squared) differences of pairs of plots. The results are shown in Table 1. Note that the RMS of the difference between ENSO and Tavg is over 50% larger than the RMS of the difference between AMO and Tavg. The RMS of the difference between AMO and ENSO is 67% larger than that of AMO and Tavg. The "random" signal, put to show the RMS expected when there is no correlation, was

BLM_0150342

created by breaking the ENSO signal into 10 parts and randomly scrambling them; the RMS of the difference between it and the AMO agrees with the theoretical expectation of $\sqrt{2}$.

| records | RMS |
|---|---|
| (4 estimates) – Tavg | 0.26 C |
| AMO – Tavg | 0.75 C |
| ENSO – Tavg | 1.14 C |
| AMO – ENSO | 1.25 C |
| AMO - random | 1.41 C |

Table 1.  Root-mean-squared difference of the data shown in Figure 3. The first row shows the RMS deviation of the 4 temperature estimates from Tavg, the average of the four.  The other entries show the RMS deviation of the signal differences.  The "random" signal was generated by breaking ENSO into 10 parts and randomly scrambling them in time.

To quantify further the relationship between Tavg and AMO and ENSO, we performed a correlation analysis.  Correlation C(A ,B) is a measure of the linear time invariant dependence between two time series {A(t)} and {B(t)}.  Here, A and B represent either pre-whitened temperature signals or oceanic indices, normalized to zero mean and unit standard deviation.  If we include the possibility of a time delay or lag L between the two signals, then we can define the cross-correlation C as

$$(A, B; L) = \frac{1}{N(L)} \sum A(t)B(t + L)$$

where A and B have zero mean and unit standard deviation and N(L) is the number of terms in the sum.  With this definition, the correlation of a function can vary between –1 and +1. At zero lag, the autocorrelation = 1.  The value of the correlation at zero lag is commonly called Pearson's Correlation Coefficient, often designated by r.

The correlation estimates between major temperature records and oceanic indices are shown in Figure 4.  In these plots, a peak at 0 lag indicates a direct linear correlation between the data sets.  A peak offset from zero also indicates correlation but with one lagging the other by the offset.

BLM_0150343



Figure 4. Decadal correlations of the Berkeley Earth land temperature estimates Tavg with the (a) AMO index, (b) ENSO index, (c) PDO index, and (d) NAO index. The strongest correlation observed, 0.65 ± 0.04, is with the AMO.

The strongest correlation is observed between the estimates of the average land temperature Tavg and AMO, the Atlantic Multidecadal oscillation, with a correlation coefficient r = 0.65 ± 0.04. (In this paper, ± refers to 1 standard error, frequently called by physicists "one standard deviation".) This is the highest peak in any of the cross-correlation plots we calculated, and it occurs at zero lag. The correlation coefficient for the temperature data with ENSO is substantially less, with r = 0.49 ± 0.04. The error uncertainties were estimated from the variance of the four correlations. There is no statistically significant correlation seen in panels (c) and (d).

For reference, the maximum correlation between AMO and ENSO in these data is 0.50 ± 0.04; with AMO lagging ENSO by 0.70 ± 0.25 years. This is a somewhat larger lag than previously reported in a more detailed analysis of ENSO by Trenberth et al. [2002].

To estimate the statistical significance of the AMO r-factor, we did a permutation test based on a Monte-Carlo simulation. The AMO pre-whitened record contains 16 points at which the index rises through zero; we chopped the record at these points, creating 17 AMO segments. The order of these segments was then permuted randomly and reassembled, creating a simulated AMO. Because of the manner of cutting, the

BLM_0150344

8

scrambled AMO has many of the same statistical properties as the original AMO; it has the identical amplitude distribution as well as the same number and shapes of peaks and valleys; indeed, it looks to the eye very much like the original AMO. We generated 1,000,000 of these simulated AMOs, and calculated the correlation coefficient r for each of these with the Tavg of the Berkeley Earth surface land temperature record. In those 1,000,000 simulated AMO trials, the highest value of r obtained was 0.49, substantially less than the value of 0.65 ± 0.04 obtained with the real AMO, giving a p-factor less than 10-6. Of course, it is not too surprising that land temperature estimates are correlated with sea temperature indices; the key observation is that for interannual to decadal variations, it is the AMO that has the strongest correlation, not ENSO or one of the other indices.

Figure 5(A) shows the conditioned AMO and PDO indices as a function of time. It can be seen on this plot that PDO generally leads AMO. The correlation is shown in Figure 5(B). Although the correlation peaks near zero lag, the bulk of the central correlation peak is at a lag of about 2 years. The periodicity of the correlation plot is an indication of a periodicity in both AMO and PDO that we will discuss next.



Figure 5. (a) shows the pre-whitened AMO and PDO indices plotted together vs time. It can be seen that PDO leads AMO by about 2.5 years. (b) shows the correlation of AMO and PDO vs lag. The periodicity of the correlation (4.5 cycles in 40 years of lag) is a result of the apparent presence of a 9-year cycle in both.

It is not possible from the correlations to ascribe causality with any certainty. For example, Zhang and Delworth [2007] suggested that the observed AMO leads the inverted PDO index by about 12 years, and discussed the possible mechanism for the Atlantic-Pacific linkage. On our plot Figure 5(b) this corresponds to the large downward variation at Lag of negative 12 years. Such ambiguities could be addressed by mapping the correlation over the world as a function of time.

## 4. Correlation Map

In Figure 6 we show a map of the decadal correlations of both AMO and ENSO with the NOAA global temperature anomaly map; this map includes oceans as well as land.

BLM_0150345

9

The association with AMO is broadly distributed and unidirectional.  The effect of El Nino on temperature is locally stronger, but can be of either sign, leading to less impact on the global average.  The strong correlation of AMO with the Atlantic is, of course, a result of the fact that the AMO is derived from Atlantic temperatures; similarly for the strong correlation between ENSO and the equatorial Pacific.  ENSO also shows a strong correlation with the Indian ocean.  On the land, the AMO affects Africa, southern Asia, and Canada; ENSO correlates most strongly to the continents in the Southern hemisphere.  Note its weak correlation to the Atlantic.



Figure 6. Correlation maps of the filtered AMO and ENSO time series with similarly filtered temperature time series taken from the Earth's surface temperature map constructed by the NOAA group.  Colors show the degree of correlation at each location.  AMO is observed to have positive or neutral correlation almost everywhere, while ENSO shows both strong positive and negative correlations.

Remarkably, neither AMO nor ENSO shows a strong correlation with the temperature in the United States, although ENSO reaches strongly up the west coast of the US.  The variations in the Caribbean, related to the hurricane intensity hitting the southern coast of the US, is more strongly affected by AMO than by ENSO.  The correlation patterns help to explain the larger association observed between AMO and Tavg than between ENSO and Tavg.  ENSO is locally a more intense effect, but it is also a more complex one giving rise to both correlated and anti-correlated behavior.  By contrast, the AMO map shows positive (or neutral) correlation nearly everywhere.  Given this, it is not surprising that the simpler AMO association corresponds to a clearer imprint on the large scale average, Tavg.

## 5. Spectral Analysis

In Figure 7 we show the spectral power for the AMO and PDO pre-whitened indices. This spectral power estimate is a periodogram, calculated using a Fourier transform with no taper, padded with zeros to yield intermediate frequencies; the spectral method is described in Muller and MacDonald [2002].



Figure 7. Spectral power in the (a) Atlantic Multidecadal Oscillation and in (b) the Pacific Decadal Oscillation. The low frequency oscillations (< 0.06/yr) have been suppressed by the subtraction of a best-fit 5th order polynomial from each time series prior to calculation of the spectrum; similarly, a 12-month running average eliminated high frequency (e.g. monthly) fluctuations. A strong peak is observed in the AMO at 0.110 ± 0.005 cycles/year, corresponding to a period of 9.1 ± 0.4 years, at the 98.3% confidence level. The maximum peak in the PDO occurs at a similar frequency, 0.111 ± 0.006, although with a confidence level of 94%.

In the AMO spectrum, a strong peak appears at frequency 0.11 ± 0.005 /yr, period 9.1 ± 0.4 years. We place no error bars on this plot because the expected distribution for a power spectrum is exponential, not gaussian. Instead, we estimate the statistical significance of this peak using the Monte Carlo approach described earlier. 10,000 time-scrambled AMO data were used as estimates of random background. In these runs, we obtained a peak (at any frequency) of spectral power level of 18 or greater a total of 170 times. Based on this, we conclude that probability that the observed peak in the unscrambled data could be due to chance is 170/10,000, i.e. the p-value is 1.7%. For the frequency uncertainty, a cycle of fixed frequency 0.1 cycle/yr and power amplitude 18 (same as the observed peak) was injected into a set of 10,000 scrambled AMO sets, and the observed root-mean-square of the frequency distribution was taken to be the frequency uncertainty.

Although the 9.1 year peak in the AMO has high statistical significance, it contains only 30% of the spectral power; for this reason its presence is not evident to the eye in Figures 3 or 4.

The highest peak in the PDO spectrum, Figure 7 (b) has period 9.0 ± 0.5 years with amplitude 14.4 and p-value 6%. None of the other peaks in Figure 6 are statistically significant. We also looked at the spectra of ENSO, NAO, and Tavg; we did not find any statistically significant narrow spectral signals, although there is of course broad power in the decadal bands.

BLM_0150347

## 6. Summary and Discussion

The similarity between the decadal fluctuations in land surface temperature records that use different sources indicates that the fluctuations are physical and not the effect of statistical fluctuations. The 2-15 year variations in AMO, based on sea surface temperature records, strongly correlates with the land record Tavg. Although short-term excursions, such as the temperature maximum in 1998 was widely associated with a strong El Nino event, the AMO is more closely associated with variability in the globally-average land surface temperature than is ENSO.

For a discussion of the variability of the AMO, see Frankcombe et al. [2009], who identified important variability in two time scales: 20-30 years, and 50-70 years. In this and much of other analyses prior to ours, the key focus was on longer time scales and so the data were smoothed with a decade-long running average; such a procedure suppresses the interannual to decadal scale variations (2 to 15 year) that are the subject of the present paper.

In the interannual to decadal region we studied, there is only one statistically-significant spectral peak, with the period of $9.1 \pm 0.4$ years, strong in the AMO, weaker in the PDO. It is not present at a statistically significant level in the land Tavg or in ENSO or in other ocean indices that we examined. Spectral analysis of global temperatures by others had previously yielded claims of many frequencies, most of which we conclude are not statistically significant when we analyze them using our Monte Carlo background estimation. For example, Scafetta [2010], reported a forest of 11 spectral peaks based on a multitaper analysis; to each of these peaks he calculated 99% confidence intervals. He reported 7 peaks with periods in the range from 5.99 years to 14.8 years. One of these is at our period of 9.1 years; he suggests that this year cycle could be induced by lunar tidal variations. However, we find that when we use our Monte Carlo methods to estimate background, none of his claimed peaks are statistically significant except for the 9.1 year peak; we do not find them in the AMO, PDO, or ENSO.

Correlation does not imply causation. The association between Atlantic sea surface temperature fluctuations and land temperature may simply indicate that both sets of temperatures are responding to the same source of natural variability. However, it is also interesting to consider whether oceanic changes in the AMO may be driving short-term fluctuations in land surface temperature. Such fluctuations might originate as instabilities in the AMO region itself, or they might occur as a non-linear response to changes elsewhere (such as within the ENSO region).

If the fluctuations originate locally, then they might be associated with natural variations in the meridional overturning circulation (MOC) or from salinity anomaly events (Dickson et al., 1988; Belkin,2004). They could be related to a larger instability in the flow of the thermohaline circulation (the oceanic conveyor belt). Computer simulations of the thermohaline circulation by Jungclaus et al. [2010] "show pronounced multidecadal fluctuations of the Atlantic overturning circulation and the associated meridional heat transport. The period of the oscillations is about 70–80 yr. The low-frequency variability of the meridional overturning circulation (MOC)

BLM_0150348

contributes substantially to sea surface temperature and sea ice fluctuations in the North Atlantic."

A theory for decadal oscillations in the North Pacific was devised by Munnich [1998]. It involves an interaction between wind and the thermohaline circulation. Such models predict broad spectrum of frequencies, and could drive the structure we see in Figure 3(A), but we would not expect such a driving force to result in the narrow 9.1 yr peak. For more on exited internal modes, see Frankcombe et al. [2010] and Sévellec et al. [2009, 2010] and the references therein.

Given that the 2-15 year variations in world temperature are so closely linked to the AMO raises (or re-raises) an important ancillary issue: to what extent does the 65-70 year cycle in AMO contribute to the global average temperature change? (Enfield, 2006; Zhang et al., 2007; Kerr, 1984.)  Since 1975, the AMO has shown a gradual but steady rise from -0.35 C to +0.2 C (see Figure 2), a change of 0.55 C.  During this same time, the land-average temperature has increased about 0.8 C.  Such changes may be independent responses to a common forcing (e.g. greenhouse gases); however, it is also possible that some of the land warming is a direct response to changes in the AMO region.  If the long-term AMO changes have been driven by greenhouse gases then the AMO region may serve as a positive feedback that amplifies the effect of greenhouse gas forcing over land.  On the other hand, some of the long-term change in the AMO could be driven by natural variability, e.g. fluctuations in thermohaline flow.  In that case the human component of global warming may be somewhat overestimated.

 In conclusion, our analysis suggests that strong interannual and decadal variations observed in the average land surface temperature records represent a true climate phenomenon, not only during the years when fluctuations on the timescale of 2-15 years had been previously identified with El Nino events. The variations are strongly correlated with the similar decadal fluctuations observed in the Atlantic Multidecadal Oscillation index, and less so with the El Nino Southern Oscillation index.  This correlation could indicate that the AMO plays an important intermediary role in the influence of the Pacific ENSO on world climate; alternatively, it might indicate that variability in the thermohaline flow plays a bigger role than had previously been recognized.  The models could be tested by studying the temperature correlations in the ocean as a function of location and time.  A 9.1 ± 0.4 year cycle is observed in the pre-whitened AMO, but it contributes only 30% to the variance.  A similar cycle at 9.0 ± 0.5 years is seen in the PDO.

## 7. Acknowledgments

This work was done as part of the Berkeley Earth project, organized under the auspices of the Novim Group (www.Novim.org).  We thank many organizations for their support, including the Lee and Juliet Folger Fund, the Lawrence Berkeley National Laboratory, the William K. Bowes Jr. Foundation, the Fund for Innovative Climate and Energy Research (created by Bill Gates), the Ann and Gordon Getty

13

Foundation, the Charles G. Koch Charitable Foundation, and three private individuals (M.D., N.G. and M.D.). More information on the Berkeley Earth project can be found at www.BerkeleyEarth.org.

## 8. References

[1] Belkin, I.M. (2004), Propagation of the "Great Salinity Anomaly" of the 1990s around the northern North Atlantic. Geophys. Res. Lett., 31, L08306.

[2] Brohan, P., J. J. Kennedy, I. Harris, S. F. B. Tett & P. D. Jones (2005), Uncertainty estimates in regional and global observed temperature changes: a new dataset from 1850, J. Geophys. Res. 111, D12106, soi:10.1029/2005JD006548. Temperature data are available at:
http://hadobs.metoffice.com/hadcrut3/diagnostics/comparison.html

[3] Dickson, R. R., Meincke, J., Malmber, S. A. & Lee, A. J. (1988), The "great salinity anomaly" in the northern North Atlantic 1968–1982. Prog. Oceanogr. 20, 103–151. Enfield, D.B., A.M. Mestas-Nunez, and P.J. Trimble (2001), The Atlantic Multidecadal Oscillation and its relationship to rainfall and river flows in the continental U.S., Geophys. Res. Lett., 28: 2077-2080.

[4] Frankcombe, L. M., A. von der Heydt and H. A. Dijkstra (2010) North Atlantic Multidecadal Climate Variability: An investigation of dominant time scales and processes, J. Climate, 23, 3626–3638, available at
www.phys.uu.nl/~heydt/Publications/Frankcombe-etal-2010.pdf

[5] Hansen, J., R. Ruedy, Mki. Sato, and K. Lo (2010), Global surface temperature change. Rev. Geophys., 48, RG4004, doi:10.1029/2010RG000345. Updated Land Temperature data available at: data.giss.nasa.gov/gistemp/graphs/

[6] Hurrell, J.W., (1995) Decadal trends in the North Atlantic Oscillation and relationships to regional temperature and precipitation. Science 269, 676-679.

[7] Jones, P.D., Jónsson, T. and Wheeler, D. (1997), Extension to the North Atlantic Oscillation using early instrumental pressure observations from Gibraltar and South-West Iceland. Int. J. Climatol. 17, 1433-1450. The NAO index data are available from NCAR at www.cgd.ucar.edu/cas/catalog/climind/

[8] Jones, P. D., and A. Moberg (2003), Hemispheric and Large- Scale Surface Air Temperature Variations: An Extensive Revision and an Update to 2001, J. Clim., 16, 206–23;

[9] Jungclaus, J. H., H. Haak, M. Latif, U. Mikolajewicz (2005), Arctic–North Atlantic Interactions and Multidecadal Variability of the Meridional Overturning Circulation, J. Clim., pp. 4013-4030.

BLM_0150350

14

[10] Kerr, R. A., A North Atlantic Climate Pacemaker for the Centuries (2000), Science 16 Vol. 288 no. 5473 pp. 1984-1985.  DOI: 10.1126/science.288.5473.1984
Meehl, Gerald A., W.M. Washington, C. M. Ammann, J. M. Arblaster, T. M. L. Wigley, C. Tebaldi (2004). "Combinations of Natural and Anthropogenic Forcings in Twentieth-Century Climate". J. Clim. 17: 3721–7. DOI:10.1175/1520-0442(2004)017%3C3721:CONAAF%3E2.0.CO;2. ISSN 1520-0442.

[11] Menne, M.J., and C. N. Williams (2005), Detection of undocumented change points using multiple test statistics and reference series, J. Clim., 18, 4271-4286.  The NOAA average land temperature estimate can be downloaded at
ftp.ncdc.noaa.gov/pub/data/anomalies/monthly.land.90S.90N.df_1901-2000mean.dat

[12] Muller, R. A. and G. MacDonald, (2002), Ice Ages and Astronomical Causes: data, spectral analysis, and models. 337 p.  ISBN 978-3540437796.  Springer/Praxis Publishing.

[13] Munnich, M. Latif, S. Venzke, E. Maier-Reimer (1998),  Decadal Oscillations in a Simple Coupled Model, J. Clim. vol 11, 3309-3319.

[14] NOAA (2011).  We used the Nino 3.4 data available from the Earth System Research Laboratory, Physical Sciences Division, at:
www.esrl.noaa.gov/psd/data/correlation/nina34.data
and from the NOAA Climate Prediction Center at:
www.cpc.ncep.noaa.gov/data/indices/wksst.for

[15] Rohde, R., D. Brillinger, J. Curry, D. Groom, R. Jacobsen, R.A. Muller, S. Perlmutter, A. Rosenfeld, C. Wickham, J. Wurtele (2011), Berkeley Earth Temperature Averaging Process, submitted to Econometrics.

[16] Scafetta, N. (2010), Empirical evidence for a celestial origin of the climate oscillations and its implications. Journal of Atmospheric and Solar-Terrestrial Physics, doi:10.1016/j.jastp.2010.04.015
Schlesinger, M. E., and Ramankutty, N. (1994), An Oscillation in the global climate system of period 65-70 years, Nature 367, 723 - 726); doi:10.1038/367723a0

[17] Sévellec, F. and A. V. Fedorov (2010), Excitation of SST anomalies in the eastern equatorial Pacific by oceanic optimal perturbations, accepted in J. Mar. Res.

[18] Sévellec, F., T. Huck, M. Ben Jelloul and J. Vialard (2009), Non-normal multidecadal response of the thermohaline circulation induced by optimal surface salinity perturbations, J. Phys. Oceanogr., 39, 852-872.

[19] Thompson, D. W. J., and J. M. Wallace (1998), The Arctic Oscillation signature in the wintertime geopotential height and temperature fields. Geophys. Res. Lett., 25, No. 9, 1297-130.

BLM_0150351

15

[20] Trenberth, K.E., J. M. Caron, D. P. Stepaniak, and S. Worley (2002), Evolution of El Niño–Southern Oscillation and global atmospheric surface temperatures   J.Geophys.Res., 107, D8, doi:10.1029/2000JD000298, 2002

[21] Trenberth & Shea (2006), Geophysical Research Letters 33, L12704, doi:10.1029/2006GL026894.  Updated index available from NOAA at: www.esrl.noaa.gov/psd/data/correlation/amon.us.long.data and www.cdc.noaa.gov/Timeseries/AMO/

[22] Zhang, R., and T. L. Delworth (2007), Impact of the Atlantic Multidecadal Oscillation on North Pacific climate variability. Geophysical Research Letters, 34, L23708, doi:10.1029/2007GL031601.

[23] Zhang, R., T. L. Delworth, and I. Held (2007), Can the Atlantic Ocean drive the observed multidecadal variability in Northern Hemisphere mean temperature? Geophysical Research Letters, 34, L02709, doi:10.1029/2006GL028683

BLM_0150352

Climate Change 2007:
Synthesis Report

# Synthesis Report

**An Assessment of the Intergovernmental Panel on Climate Change**

*This underlying report, adopted section by section at IPCC Plenary XXVII (Valencia, Spain, 12-17 November 2007), represents the formally agreed statement of the IPCC concerning key findings and uncertainties contained in the Working Group contributions to the Fourth Assessment Report.*

Based on a draft prepared by:

*Core Writing Team*

Lenny Bernstein, Peter Bosch, Osvaldo Canziani, Zhenlin Chen, Renate Christ, Ogunlade Davidson, William Hare, Saleemul Huq, David Karoly, Vladimir Kattsov, Zbigniew Kundzewicz, Jian Liu, Ulrike Lohmann, Martin Manning, Taroh Matsuno, Bettina Menne, Bert Metz, Monirul Mirza, Neville Nicholls, Leonard Nurse, Rajendra Pachauri, Jean Palutikof, Martin Parry, Dahe Qin, Nijavalli Ravindranath, Andy Reisinger, Jiawen Ren, Keywan Riahi, Cynthia Rosenzweig, Matilde Rusticucci, Stephen Schneider, Youba Sokona, Susan Solomon, Peter Stott, Ronald Stouffer, Taishi Sugiyama, Rob Swart, Dennis Tirpak, Coleen Vogel, Gary Yohe

*Extended Writing Team*

Terry Barker

*Review Editors*

Abdelkader Allali, Roxana Bojariu, Sandra Diaz, Ismail Elgizouli, Dave Griggs, David Hawkins, Olav Hohmeyer, Bubu Pateh Jallow, Lučka Kajfež-Bogataj, Neil Leary, Hoesung Lee, David Wratt

BLM_0150353

BLM_0150354

# Introduction

BLM_0150355

## Introduction

This Synthesis Report is based on the assessment carried out by the three Working Groups (WGs) of the Intergovernmental Panel on Climate Change (IPCC). It provides an integrated view of climate change as the final part of the IPCC's Fourth Assessment Report (AR4).

Topic 1 summarises observed changes in climate and their effects on natural and human systems, regardless of their causes, while Topic 2 assesses the causes of the observed changes. Topic 3 presents projections of future climate change and related impacts under different scenarios.

Topic 4 discusses adaptation and mitigation options over the next few decades and their interactions with sustainable develop-

ment. Topic 5 assesses the relationship between adaptation and mitigation on a more conceptual basis and takes a longer-term perspective. Topic 6 summarises the major robust findings and remaining key uncertainties in this assessment.

A schematic framework representing anthropogenic drivers, impacts of and responses to climate change, and their linkages, is shown in Figure I.1. At the time of the Third Assessment Report (TAR) in 2001, information was mainly available to describe the linkages clockwise, i.e. to derive climatic changes and impacts from socio-economic information and emissions. With increased understanding of these linkages, it is now possible to assess the linkages also counterclockwise, i.e. to evaluate possible development pathways and global emissions constraints that would reduce the risk of future impacts that society may wish to avoid.

**Schematic framework of anthropogenic climate change drivers, impacts and responses**



**Figure I.1.** *Schematic framework representing anthropogenic drivers, impacts of and responses to climate change, and their linkages.*

BLM_0150356

## Treatment of uncertainty

The IPCC uncertainty guidance note[1] defines a framework for the treatment of uncertainties across all WGs and in this Synthesis Report. This framework is broad because the WGs assess material from different disciplines and cover a diversity of approaches to the treatment of uncertainty drawn from the literature. The nature of data, indicators and analyses used in the natural sciences is generally different from that used in assessing technology development or the social sciences. WG I focuses on the former, WG III on the latter, and WG II covers aspects of both.

Three different approaches are used to describe uncertainties each with a distinct form of language. Choices among and within these three approaches depend on both the nature of the information available and the authors' expert judgment of the correctness and completeness of current scientific understanding.

Where uncertainty is assessed qualitatively, it is characterised by providing a relative sense of the amount and quality of evidence (that is, information from theory, observations or models indicating whether a belief or proposition is true or valid) and the degree of agreement (that is, the level of concurrence in the literature on a particular finding). This approach is used by WG III through a series of self-explanatory terms such as: *high agreement, much evidence; high agreement, medium evidence; medium agreement, medium evidence; etc.*

Where uncertainty is assessed more quantitatively using expert judgement of the correctness of underlying data, models or analyses, then the following scale of confidence levels is used to express the assessed chance of a finding being correct: *very high confidence* at least 9 out of 10; *high confidence* about 8 out of 10; *medium confidence* about 5 out of 10; *low confidence* about 2 out of 10; and *very low confidence* less than 1 out of 10.

Where uncertainty in specific outcomes is assessed using expert judgment and statistical analysis of a body of evidence (e.g. observations or model results), then the following likelihood ranges are used to express the assessed probability of occurrence: *virtually certain* >99%; *extremely likely* >95%; *very likely* >90%; *likely* >66%; *more likely than not* > 50%; *about as likely as not* 33% to 66%; *unlikely* <33%; *very unlikely* <10%; *extremely unlikely* <5%; *exceptionally unlikely* <1%.

WG II has used a combination of confidence and likelihood assessments and WG I has predominantly used likelihood assessments.

This Synthesis Report follows the uncertainty assessment of the underlying WGs. Where synthesised findings are based on information from more than one WG, the description of uncertainty used is consistent with that for the components drawn from the respective WG reports.

Unless otherwise stated, numerical ranges given in square brackets in this report indicate 90% uncertainty intervals (i.e. there is an estimated 5% likelihood that the value could be above the range given in square brackets and 5% likelihood that the value could be below that range). Uncertainty intervals are not necessarily symmetric around the best estimate.

---

[1] See http://www.ipcc.ch/meetings/ar4-workshops-express-meetings/uncertainty-guidance-note.pdf

BLM_0150357

BLM_0150358

# 1

# Observed changes in climate and their effects

BLM_0150359

## 1.1 Observations of climate change

Since the TAR, progress in understanding how climate is changing in space and time has been gained through improvements and extensions of numerous datasets and data analyses, broader geographical coverage, better understanding of uncertainties and a wider variety of measurements. *{WGI SPM}*

> **Definitions of climate change**
>
> Climate change in IPCC usage refers to a change in the state of the climate that can be identified (e.g. using statistical tests) by changes in the mean and/or the variability of its properties, and that persists for an extended period, typically decades or longer. It refers to any change in climate over time, whether due to natural variability or as a result of human activity. This usage differs from that in the United Nations Framework Convention on Climate Change (UNFCCC), where climate change refers to a change of climate that is attributed directly or indirectly to human activity that alters the composition of the global atmosphere and that is in addition to natural climate variability observed over comparable time periods.

**Warming of the climate system is unequivocal, as is now evident from observations of increases in global average air and ocean temperatures, widespread melting of snow and ice and rising global average sea level (Figure 1.1).** *{WGI 3.2, 4.8, 5.2, 5.5, SPM}*

Eleven of the last twelve years (1995-2006) rank among the twelve warmest years in the instrumental record of global surface temperature (since 1850). The 100-year linear trend (1906-2005) of 0.74 [0.56 to 0.92]°C is larger than the corresponding trend of 0.6 [0.4 to 0.8]°C (1901-2000) given in the TAR (Figure 1.1). The linear warming trend over the 50 years from 1956 to 2005 (0.13 [0.10 to 0.16]°C per decade) is nearly twice that for the 100 years from 1906 to 2005. *{WGI 3.2, SPM}*

The temperature increase is widespread over the globe and is greater at higher northern latitudes (Figure 1.2). Average Arctic temperatures have increased at almost twice the global average rate in the past 100 years. Land regions have warmed faster than the oceans (Figures 1.2 and 2.5). Observations since 1961 show that the average temperature of the global ocean has increased to depths of at least 3000m and that the ocean has been taking up over 80% of the heat being added to the climate system. New analyses of balloon-borne and satellite measurements of lower- and mid-tropospheric temperature show warming rates similar to those observed in surface temperature. *{WGI 3.2, 3.4, 5.2, SPM}*

Increases in sea level are consistent with warming (Figure 1.1). Global average sea level rose at an average rate of 1.8 [1.3 to 2.3]mm per year over 1961 to 2003 and at an average rate of about 3.1 [2.4 to 3.8]mm per year from 1993 to 2003. Whether this faster rate for 1993 to 2003 reflects decadal variation or an increase in the longer-term trend is unclear. Since 1993 thermal expansion of the oceans has contributed about 57% of the sum of the estimated individual contributions to the sea level rise, with decreases in glaciers and ice caps contributing about 28% and losses from the polar ice sheets contributing the remainder. From 1993 to 2003 the sum of these climate contributions is consistent within uncertainties with the total sea level rise that is directly observed. *{WGI 4.6, 4.8, 5.5, SPM, Table SPM.1}*

Observed decreases in snow and ice extent are also consistent with warming (Figure 1.1). Satellite data since 1978 show that annual average Arctic sea ice extent has shrunk by 2.7 [2.1 to 3.3]% per decade, with larger decreases in summer of 7.4 [5.0 to 9.8]% per decade. Mountain glaciers and snow cover on average have declined in both hemispheres. The maximum areal extent of seasonally frozen ground has decreased by about 7% in the Northern Hemisphere since 1900, with decreases in spring of up to 15%. Temperatures at the top of the permafrost layer have generally increased since the 1980s in the Arctic by up to 3°C. *{WGI 3.2, 4.5, 4.6, 4.7, 4.8, 5.5, SPM}*

At continental, regional and ocean basin scales, numerous long-term changes in other aspects of climate have also been observed. Trends from 1900 to 2005 have been observed in precipitation amount in many large regions. Over this period, precipitation increased significantly in eastern parts of North and South America, northern Europe and northern and central Asia whereas precipitation declined in the Sahel, the Mediterranean, southern Africa and parts of southern Asia. Globally, the area affected by drought has *likely*[2] increased since the 1970s. *{WGI 3.3, 3.9, SPM}*

Some extreme weather events have changed in frequency and/or intensity over the last 50 years:

- It is *very likely* that cold days, cold nights and frosts have become less frequent over most land areas, while hot days and hot nights have become more frequent. *{WGI 3.8, SPM}*
- It is *likely* that heat waves have become more frequent over most land areas. *{WGI 3.8, SPM}*
- It is *likely* that the frequency of heavy precipitation events (or proportion of total rainfall from heavy falls) has increased over most areas. *{WGI 3.8, 3.9, SPM}*
- It is *likely* that the incidence of extreme high sea level[3] has increased at a broad range of sites worldwide since 1975. *{WGI 5.5, SPM}*

There is observational evidence of an increase in intense tropical cyclone activity in the North Atlantic since about 1970, and suggestions of increased intense tropical cyclone activity in some other regions where concerns over data quality are greater. Multi-decadal variability and the quality of the tropical cyclone records prior to routine satellite observations in about 1970 complicate the detection of long-term trends in tropical cyclone activity. *{WGI 3.8, SPM}*

Average Northern Hemisphere temperatures during the second half of the 20th century were *very likely* higher than during any other 50-year period in the last 500 years and *likely* the highest in at least the past 1300 years. *{WGI 6.6, SPM}*

---

[2] Likelihood and confidence statements in italics represent calibrated expressions of uncertainty and confidence. See Box 'Treatment of uncertainty' in the Introduction for an explanation of these terms.

[3] Excluding tsunamis, which are not due to climate change. Extreme high sea level depends on average sea level and on regional weather systems. It is defined here as the highest 1% of hourly values of observed sea level at a station for a given reference period.

BLM_0150360

**Changes in temperature, sea level and Northern Hemisphere snow cover**



*Figure 1.1. Observed changes in (a) global average surface temperature; (b) global average sea level from tide gauge (blue) and satellite (red) data; and (c) Northern Hemisphere snow cover for March-April. All differences are relative to corresponding averages for the period 1961-1990. Smoothed curves represent decadal averaged values while circles show yearly values. The shaded areas are the uncertainty intervals estimated from a comprehensive analysis of known uncertainties (a and b) and from the time series (c). {WGI FAQ 3.1 Figure 1, Figure 4.2, Figure 5.13, Figure SPM.3}*

## 1.2 Observed effects of climate changes

The statements presented here are based largely on data sets that cover the period since 1970. The number of studies of observed trends in the physical and biological environment and their relationship to regional climate changes has increased greatly since the TAR. The quality of the data sets has also improved. There is a notable lack of geographic balance in data and literature on observed changes, with marked scarcity in developing countries. {WGII SPM}

These studies have allowed a broader and more confident assessment of the relationship between observed warming and impacts than was made in the TAR. That assessment concluded that "there is *high confidence*[2] that recent regional changes in temperature have had discernible impacts on physical and biological systems". {WGII SPM}

**Observational evidence from all continents and most oceans shows that many natural systems are being affected by regional climate changes, particularly temperature increases.** {WGII SPM}

There is *high confidence* that natural systems related to snow, ice and frozen ground (including permafrost) are affected. Examples are:

- enlargement and increased numbers of glacial lakes {WGII 1.3, SPM}
- increasing ground instability in permafrost regions and rock avalanches in mountain regions {WGII 1.3, SPM}
- changes in some Arctic and Antarctic ecosystems, including those in sea-ice biomes, and predators at high levels of the food web. {WGII 1.3, 4.4, 15.4, SPM}

Based on growing evidence, there is *high confidence* that the following effects on hydrological systems are occurring: increased runoff and earlier spring peak discharge in many glacier- and snow-fed rivers, and warming of lakes and rivers in many regions, with effects on thermal structure and water quality. {WGII 1.3, 15.2, SPM}

BLM_0150361

### Changes in physical and biological systems and surface temperature 1970-2004



**Figure 1.2.** *Locations of significant changes in data series of physical systems (snow, ice and frozen ground; hydrology; and coastal processes) and biological systems (terrestrial, marine, and freshwater biological systems), are shown together with surface air temperature changes over the period 1970-2004. A subset of about 29,000 data series was selected from about 80,000 data series from 577 studies. These met the following criteria: (1) ending in 1990 or later; (2) spanning a period of at least 20 years; and (3) showing a significant change in either direction, as assessed in individual studies. These data series are from about 75 studies (of which about 70 are new since the TAR) and contain about 29,000 data series, of which about 28,000 are from European studies. White areas do not contain sufficient observational climate data to estimate a temperature trend. The 2 x 2 boxes show the total number of data series with significant changes (top row) and the percentage of those consistent with warming (bottom row) for (i) continental regions: North America (NAM), Latin America (LA), Europe (EUR), Africa (AFR), Asia (AS), Australia and New Zealand (ANZ), and Polar Regions (PR) and (ii) global-scale: Terrestrial (TER), Marine and Freshwater (MFW), and Global (GLO). The numbers of studies from the seven regional boxes (NAM, ..., PR) do not add up to the global (GLO) totals because numbers from regions except Polar do not include the numbers related to Marine and Freshwater (MFW) systems. Locations of large-area marine changes are not shown on the map. {WGII Figure SPM.1, Figure 1.8, Figure 1.9; WGI Figure 3.9b}*

BLM_0150362

There is *very high confidence*, based on more evidence from a wider range of species, that recent warming is strongly affecting terrestrial biological systems, including such changes as earlier timing of spring events, such as leaf-unfolding, bird migration and egg-laying; and poleward and upward shifts in ranges in plant and animal species. Based on satellite observations since the early 1980s, there is *high confidence* that there has been a trend in many regions towards earlier 'greening' of vegetation in the spring linked to longer thermal growing seasons due to recent warming. *{WGII 1.3, 8.2, 14.2, SPM}*

There is *high confidence*, based on substantial new evidence, that observed changes in marine and freshwater biological systems are associated with rising water temperatures, as well as related changes in ice cover, salinity, oxygen levels and circulation. These include: shifts in ranges and changes in algal, plankton and fish abundance in high-latitude oceans; increases in algal and zooplankton abundance in high-latitude and high-altitude lakes; and range changes and earlier fish migrations in rivers. While there is increasing evidence of climate change impacts on coral reefs, separating the impacts of climate-related stresses from other stresses (e.g. overfishing and pollution) is difficult. *{WGII 1.3, SPM}*

**Other effects of regional climate changes on natural and human environments are emerging, although many are difficult to discern due to adaptation and non-climatic drivers.** *{WGII SPM}*

Effects of temperature increases have been documented with *medium confidence* in the following managed and human systems:

- agricultural and forestry management at Northern Hemisphere higher latitudes, such as earlier spring planting of crops, and alterations in disturbances of forests due to fires and pests *{WGII 1.3, SPM}*
- some aspects of human health, such as excess heat-related mortality in Europe, changes in infectious disease vectors in parts of Europe, and earlier onset of and increases in seasonal production of allergenic pollen in Northern Hemisphere high and mid-latitudes *{WGII 1.3, 8.2, 8.ES, SPM}*
- some human activities in the Arctic (e.g. hunting and shorter travel seasons over snow and ice) and in lower-elevation alpine areas (such as limitations in mountain sports). *{WGII 1.3, SPM}*

Sea level rise and human development are together contributing to losses of coastal wetlands and mangroves and increasing damage from coastal flooding in many areas. However, based on the published literature, the impacts have not yet become established trends. *{WGII 1.3, 1.ES, SPM}*

## 1.3  Consistency of changes in physical and biological systems with warming

Changes in the ocean and on land, including observed decreases in snow cover and Northern Hemisphere sea ice extent, thinner sea ice, shorter freezing seasons of lake and river ice, glacier melt, decreases in permafrost extent, increases in soil temperatures and borehole temperature profiles, and sea level rise, provide additional evidence that the world is warming. *{WGI 3.9}*

Of the more than 29,000 observational data series, from 75 studies, that show significant change in many physical and biological systems, more than 89% are consistent with the direction of change expected as a response to warming (Figure 1.2). *{WGII 1.4, SPM}*

## 1.4  Some aspects of climate have not been observed to change

Some aspects of climate appear not to have changed and, for some, data inadequacies mean that it cannot be determined if they have changed. Antarctic sea ice extent shows inter-annual variability and localised changes but no statistically significant average multi-decadal trend, consistent with the lack of rise in near-surface atmospheric temperatures averaged across the continent. There is insufficient evidence to determine whether trends exist in some other variables, for example the meridional overturning circulation (MOC) of the global ocean or small-scale phenomena such as tornadoes, hail, lightning and dust storms. There is no clear trend in the annual numbers of tropical cyclones. *{WGI 3.2, 3.8, 4.4, 5.3, SPM}*

BLM_0150363

BLM_0150364

# 2

# Causes of change

BLM_0150365

# Causes of change

This Topic considers both natural and anthropogenic drivers of climate change, including the chain from greenhouse gas (GHG) emissions to atmospheric concentrations to radiative forcing[4] to climate responses and effects.

## 2.1 Emissions of long-lived GHGs

The radiative forcing of the climate system is dominated by the long-lived GHGs, and this section considers those whose emissions are covered by the UNFCCC.

**Global GHG emissions due to human activities have grown since pre-industrial times, with an increase of 70% between 1970 and 2004 (Figure 2.1).[5]** *{WGIII 1.3, SPM}*

Carbon dioxide ($CO_2$) is the most important anthropogenic GHG. Its annual emissions have grown between 1970 and 2004 by about 80%, from 21 to 38 gigatonnes (Gt), and represented 77% of total anthropogenic GHG emissions in 2004 (Figure 2.1). The rate of growth of $CO_2$-eq emissions was much higher during the recent 10-year period of 1995-2004 (0.92 GtCO$_2$-eq per year) than during the previous period of 1970-1994 (0.43 GtCO$_2$-eq per year). *{WGIII 1.3, TS.1, SPM}*

### Carbon dioxide-equivalent ($CO_2$-eq) emissions and concentrations

GHGs differ in their warming influence (radiative forcing) on the global climate system due to their different radiative properties and lifetimes in the atmosphere. These warming influences may be expressed through a common metric based on the radiative forcing of $CO_2$.

- **$CO_2$-equivalent emission** is the amount of $CO_2$ emission that would cause the same time-integrated radiative forcing, over a given time horizon, as an emitted amount of a long-lived GHG or a mixture of GHGs. The equivalent $CO_2$ emission is obtained by multiplying the emission of a GHG by its Global Warming Potential (GWP) for the given time horizon.[6] For a mix of GHGs it is obtained by summing the equivalent $CO_2$ emissions of each gas. Equivalent $CO_2$ emission is a standard and useful metric for comparing emissions of different GHGs but does not imply the same climate change responses (see WGI 2.10).

- **$CO_2$-equivalent concentration** is the concentration of $CO_2$ that would cause the same amount of radiative forcing as a given mixture of $CO_2$ and other forcing components.[7]

The largest growth in GHG emissions between 1970 and 2004 has come from energy supply, transport and industry, while residential and commercial buildings, forestry (including deforestation) and agriculture sectors have been growing at a lower rate. The

## Global anthropogenic GHG emissions



**Figure 2.1.** *(a) Global annual emissions of anthropogenic GHGs from 1970 to 2004.[5] (b) Share of different anthropogenic GHGs in total emissions in 2004 in terms of $CO_2$-eq. (c) Share of different sectors in total anthropogenic GHG emissions in 2004 in terms of $CO_2$-eq. (Forestry includes deforestation.) {WGIII Figures TS.1a, TS.1b, TS.2b}*

---

[4] *Radiative forcing* is a measure of the influence a factor has in altering the balance of incoming and outgoing energy in the Earth-atmosphere system and is an index of the importance of the factor as a potential climate change mechanism. In this report radiative forcing values are for changes relative to pre-industrial conditions defined at 1750 and are expressed in watts per square metre (W/m²).

[5] Includes only carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs) and sulphurhexafluoride ($SF_6$), whose emissions are covered by the UNFCCC. These GHGs are weighted by their 100-year Global Warming Potentials (GWPs), using values consistent with reporting under the UNFCCC.

[6] This report uses 100-year GWPs and numerical values consistent with reporting under the UNFCCC.

[7] Such values may consider only GHGs, or a combination of GHGs and aerosols.

BLM_0150366

sectoral sources of GHGs in 2004 are considered in Figure 2.1c. {WGIII 1.3, SPM}

The effect on global emissions of the decrease in global energy intensity (-33%) during 1970 to 2004 has been smaller than the combined effect of global income growth (77%) and global population growth (69%); both drivers of increasing energy-related $CO_2$ emissions. The long-term trend of declining $CO_2$ emissions per unit of energy supplied reversed after 2000. {WGIII 1.3, Figure SPM.2, SPM}

Differences in per capita income, per capita emissions and energy intensity among countries remain significant. In 2004, UNFCCC Annex I countries held a 20% share in world population, produced 57% of the world's Gross Domestic Product based on Purchasing Power Parity ($GDP_{PPP}$) and accounted for 46% of global GHG emissions (Figure 2.2). {WGIII 1.3, SPM}

## 2.2 Drivers of climate change

Changes in the atmospheric concentrations of GHGs and aerosols, land cover and solar radiation alter the energy balance of the climate system and are drivers of climate change. They affect the absorption, scattering and emission of radiation within the atmosphere and at the Earth's surface. The resulting positive or negative changes in energy balance due to these factors are expressed as radiative forcing[4], which is used to compare warming or cooling influences on global climate. {WGI TS.2}

Human activities result in emissions of four long-lived GHGs: $CO_2$, methane ($CH_4$), nitrous oxide ($N_2O$) and halocarbons (a group of gases containing fluorine, chlorine or bromine). Atmospheric concentrations of GHGs increase when emissions are larger than removal processes.

**Global atmospheric concentrations of $CO_2$, $CH_4$ and $N_2O$ have increased markedly as a result of human activities since 1750 and now far exceed pre-industrial values determined from ice cores spanning many thousands of years**

**(Figure 2.3). The atmospheric concentrations of $CO_2$ and $CH_4$ in 2005 exceed by far the natural range over the last 650,000 years. Global increases in $CO_2$ concentrations are due primarily to fossil fuel use, with land-use change providing another significant but smaller contribution. It is *very likely* that the observed increase in $CH_4$ concentration is predominantly due to agriculture and fossil fuel use. The increase in $N_2O$ concentration is primarily due to agriculture.** {WGI 2.3, 7.3, SPM}

The global atmospheric concentration of $CO_2$ increased from a pre-industrial value of about 280ppm to 379ppm in 2005. The annual $CO_2$ concentration growth rate was larger during the last 10 years (1995-2005 average: 1.9ppm per year) than it has been since the beginning of continuous direct atmospheric measurements (1960-2005 average: 1.4ppm per year), although there is year-to-year variability in growth rates. {WGI 2.3, 7.3, SPM; WGIII 1.3}

The global atmospheric concentration of $CH_4$ has increased from a pre-industrial value of about 715ppb to 1732ppb in the early 1990s, and was 1774ppb in 2005. Growth rates have declined since the early 1990s, consistent with total emissions (sum of anthropogenic and natural sources) being nearly constant during this period. {WGI 2.3, 7.4, SPM}

The global atmospheric $N_2O$ concentration increased from a pre-industrial value of about 270ppb to 319ppb in 2005. {WGI 2.3, 7.4, SPM}

Many halocarbons (including hydrofluorocarbons) have increased from a near-zero pre-industrial background concentration, primarily due to human activities. {WGI 2.3, SPM; SROC SPM}

**There is *very high confidence* that the global average net effect of human activities since 1750 has been one of warming, with a radiative forcing of +1.6 [+0.6 to +2.4] W/m$^2$ (Figure 2.4).** {WGI 2.3, 6.5, 2.9, SPM}

The combined radiative forcing due to increases in $CO_2$, $CH_4$ and $N_2O$ is +2.3 [+2.1 to +2.5] W/m$^2$, and its rate of increase during



**Figure 2.2.** (a) Distribution of regional per capita GHG emissions according to the population of different country groupings in 2004 (see appendix for definitions of country groupings). (b) Distribution of regional GHG emissions per US$ of $GDP_{PPP}$ over the GDP of different country groupings in 2004. The percentages in the bars in both panels indicate a region's share in global GHG emissions. {WGIII Figures SPM.3a, SPM.3b}

37

BLM_0150367

### Changes in GHGs from ice core and modern data



the industrial era is *very likely* to have been unprecedented in more than 10,000 years (Figures 2.3 and 2.4). The $CO_2$ radiative forcing increased by 20% from 1995 to 2005, the largest change for any decade in at least the last 200 years. *{WGI 2.3, 6.4, SPM}*

Anthropogenic contributions to aerosols (primarily sulphate, organic carbon, black carbon, nitrate and dust) together produce a cooling effect, with a total direct radiative forcing of -0.5 [-0.9 to -0.1] W/m² and an indirect cloud albedo forcing of -0.7 [-1.8 to -0.3] W/m². Aerosols also influence precipitation. *{WGI 2.4, 2.9, 7.5, SPM}*

In comparison, changes in solar irradiance since 1750 are estimated to have caused a small radiative forcing of +0.12 [+0.06 to +0.30] W/m², which is less than half the estimate given in the TAR. *{WGI 2.7, SPM}*

## 2.3 Climate sensitivity and feedbacks

The equilibrium climate sensitivity is a measure of the climate system response to sustained radiative forcing. It is defined as the equilibrium global average surface warming following a doubling of $CO_2$ concentration. Progress since the TAR enables an assessment that climate sensitivity is *likely* to be in the range of 2 to 4.5°C with a best estimate of about 3°C, and is *very unlikely* to be less than 1.5°C. Values substantially higher than 4.5°C cannot be excluded, but agreement of models with observations is not as good as for those values. *{WGI 8.6, 9.6, Box 10.2, SPM}*

Feedbacks can amplify or dampen the response to a given forcing. Direct emission of water vapour (a greenhouse gas) by human activities makes a negligible contribution to radiative forcing. However, as global average temperature increases, tropospheric water vapour concentrations increase and this represents a key positive feedback but not a forcing of climate change. Water vapour changes represent the largest feedback affecting equilibrium climate sensitivity and are now better understood than in the TAR. Cloud feedbacks remain the largest source of uncertainty. Spatial patterns of climate response are largely controlled by climate processes and feedbacks. For example, sea-ice albedo feedbacks tend to enhance the high latitude response. *{WGI 2.8, 8.6, 9.2, TS.2.1.3, TS.2.5, SPM}*

Warming reduces terrestrial and ocean uptake of atmospheric $CO_2$, increasing the fraction of anthropogenic emissions remaining in the atmosphere. This positive carbon cycle feedback leads to larger atmospheric $CO_2$ increases and greater climate change for a given emissions scenario, but the strength of this feedback effect varies markedly among models. *{WGI 7.3, TS.5.4, SPM; WGII 4.4}*

## 2.4 Attribution of climate change

Attribution evaluates whether observed changes are quantitatively consistent with the expected response to external forcings (e.g. changes in solar irradiance or anthropogenic GHGs) and inconsistent with alternative physically plausible explanations. *{WGI TS.4, SPM}*

*Figure 2.3. Atmospheric concentrations of $CO_2$, $CH_4$ and $N_2O$ over the last 10,000 years (large panels) and since 1750 (inset panels). Measurements are shown from ice cores (symbols with different colours for different studies) and atmospheric samples (red lines). The corresponding radiative forcings relative to 1750 are shown on the right hand axes of the large panels. {WGI Figure SPM.1}*

BLM_0150368

**Radiative forcing components**



**Figure 2.4.** *Global average radiative forcing (RF) in 2005 (best estimates and 5 to 95% uncertainty ranges) with respect to 1750 for $CO_2$, $CH_4$, $N_2O$ and other important agents and mechanisms, together with the typical geographical extent (spatial scale) of the forcing and the assessed level of scientific understanding (LOSU). Aerosols from explosive volcanic eruptions contribute an additional episodic cooling term for a few years following an eruption. The range for linear contrails does not include other possible effects of aviation on cloudiness. {WGI Figure SPM.2}*

Most of the observed increase in global average temperatures since the mid-20th century is *very likely* due to the observed increase in anthropogenic GHG concentrations.[8] This is an advance since the TAR's conclusion that "most of the observed warming over the last 50 years is *likely* to have been due to the increase in GHG concentrations" (Figure 2.5). *{WGI 9.4, SPM}*

The observed widespread warming of the atmosphere and ocean, together with ice mass loss, support the conclusion that it is *extremely unlikely* that global climate change of the past 50 years can be explained without external forcing and *very likely* that it is not due to known natural causes alone. During this period, the sum of solar and volcanic forcings would *likely* have produced cooling, not warming. Warming of the climate system has been detected in changes in surface and atmospheric temperatures and in temperatures of the upper several hundred metres of the ocean. The observed pattern of tropospheric warming and stratospheric cooling

is *very likely* due to the combined influences of GHG increases and stratospheric ozone depletion. It is *likely* that increases in GHG concentrations alone would have caused more warming than observed because volcanic and anthropogenic aerosols have offset some warming that would otherwise have taken place. *{WGI 2.9, 3.2, 3.4, 4.8, 5.2, 7.5, 9.4, 9.5, 9.7, TS.4.1, SPM}*

It is *likely* that there has been significant anthropogenic warming over the past 50 years averaged over each continent (except Antarctica) (Figure 2.5). *{WGI 3.2, 9.4, SPM}*

The observed patterns of warming, including greater warming over land than over the ocean, and their changes over time, are simulated only by models that include anthropogenic forcing. No coupled global climate model that has used natural forcing only has reproduced the continental mean warming trends in individual continents (except Antarctica) over the second half of the 20th century. *{WGI 3.2, 9.4, TS.4.2, SPM}*

---

[8] Consideration of remaining uncertainty is based on current methodologies.

BLM_0150369



**Figure 2.5.** *Comparison of observed continental- and global-scale changes in surface temperature with results simulated by climate models using either natural or both natural and anthropogenic forcings. Decadal averages of observations are shown for the period 1906-2005 (black line) plotted against the centre of the decade and relative to the corresponding average for the 1901-1950. Lines are dashed where spatial coverage is less than 50%. Blue shaded bands show the 5 to 95% range for 19 simulations from five climate models using only the natural forcings due to solar activity and volcanoes. Red shaded bands show the 5 to 95% range for 58 simulations from 14 climate models using both natural and anthropogenic forcings. {WGI Figure SPM.4}*

Difficulties remain in simulating and attributing observed temperature changes at smaller scales. On these scales, natural climate variability is relatively larger, making it harder to distinguish changes expected due to external forcings. Uncertainties in local forcings, such as those due to aerosols and land-use change, and feedbacks also make it difficult to estimate the contribution of GHG increases to observed small-scale temperature changes. *{WGI 8.3, 9.4, SPM}*

**Advances since the TAR show that discernible human influences extend beyond average temperature to other aspects of climate, including temperature extremes and wind patterns.** *{WGI 9.4, 9.5, SPM}*

Temperatures of the most extreme hot nights, cold nights and cold days are *likely* to have increased due to anthropogenic forcing. It is *more likely than not* that anthropogenic forcing has increased the risk of heat waves. Anthropogenic forcing is *likely* to have contributed to changes in wind patterns, affecting extra-tropical storm tracks and temperature patterns in both hemispheres. However, the observed changes in the Northern Hemisphere circulation are larger than simulated by models in response to 20th century forcing change. *{WGI 3.5, 3.6, 9.4, 9.5, 10.3, SPM}*

It is *very likely* that the response to anthropogenic forcing contributed to sea level rise during the latter half of the 20th century. There is some evidence of the impact of human climatic influence

BLM_0150370

on the hydrological cycle, including the observed large-scale patterns of changes in land precipitation over the 20th century. It is *more likely than not* that human influence has contributed to a global trend towards increases in area affected by drought since the 1970s and the frequency of heavy precipitation events. *{WGI 3.3, 5.5, 9.5, TS.4.1, TS.4.3}*

**Anthropogenic warming over the last three decades has *likely* had a discernible influence at the global scale on observed changes in many physical and biological systems.** *{WGII 1.4}*

A synthesis of studies strongly demonstrates that the spatial agreement between regions of significant warming across the globe and the locations of significant observed changes in many natural systems consistent with warming is *very unlikely* to be due solely to natural variability of temperatures or natural variability of the systems. Several modelling studies have linked some specific responses in physical and biological systems to anthropogenic warming, but only a few such studies have been performed. Taken together with evidence of significant anthropogenic warming over the past 50 years averaged over each continent (except Antarctica), it is *likely* that anthropogenic warming over the last three decades has had a discernible influence on many natural systems. *{WGI 3.2, 9.4, SPM; WGII 1.4, SPM}*

Limitations and gaps currently prevent more complete attribution of the causes of observed natural system responses to anthropogenic warming. The available analyses are limited in the number of systems, length of records and locations considered. Natural temperature variability is larger at the regional than the global scale, thus affecting identification of changes to external forcing. At the regional scale, other non-climate factors (such as land-use change, pollution and invasive species) are influential. *{WGII 1.2, 1.3, 1.4, SPM}*

BLM_0150371

BLM_0150372

# 3

# Climate change and its impacts in the near and long term under different scenarios

BLM_0150373

## 3.1   Emissions scenarios

There is *high agreement* and *much evidence[9]* that with cur-
rent climate change mitigation policies and related sustain-
able development practices, global GHG emissions will con-
tinue to grow over the next few decades. Baseline emis-
sions scenarios published since the IPCC Special Report
on Emissions Scenarios (SRES, 2000) are comparable in
range to those presented in SRES (see Box on SRES sce-
narios and Figure 3.1).[10] *{WGIII 1.3, 3.2, SPM}*

The SRES scenarios project an increase of baseline global GHG
emissions by a range of 9.7 to 36.7 GtCO$_2$-eq (25 to 90%) between
2000 and 2030. In these scenarios, fossil fuels are projected to
maintain their dominant position in the global energy mix to 2030
and beyond. Hence CO$_2$ emissions from energy use between 2000
and 2030 are projected to grow 40 to 110% over that period. *{WGIII
1.3, SPM}*

Studies published since SRES (i.e. post-SRES scenarios) have
used lower values for some drivers for emissions, notably popula-
tion projections. However, for those studies incorporating these new
population projections, changes in other drivers, such as economic
growth, result in little change in overall emission levels. Economic
growth projections for Africa, Latin America and the Middle East
to 2030 in post-SRES baseline scenarios are lower than in SRES,
but this has only minor effects on global economic growth and over-
all emissions. *{WGIII 3.2, TS.3, SPM}*

Aerosols have a net cooling effect and the representation of
aerosol and aerosol precursor emissions, including sulphur diox-
ide, black carbon and organic carbon, has improved in the post-
SRES scenarios. Generally, these emissions are projected to be lower
than reported in SRES. *{WGIII 3.2, TS.3, SPM}*

Available studies indicate that the choice of exchange rate for
Gross Domestic Product (GDP) (Market Exchange Rate, MER or

**Scenarios for GHG emissions from 2000 to 2100 in the
absence of additional climate policies**



**Figure 3.1.** *Global GHG emissions (in GtCO$_2$-eq per year) in the absence of
additional climate policies: six illustrative SRES marker scenarios (coloured
lines) and 80th percentile range of recent scenarios published since SRES
(post-SRES) (gray shaded area). Dashed lines show the full range of post-
SRES scenarios. The emissions include CO$_2$, CH$_4$, N$_2$O and F-gases. {WGIII
1.3, 3.2, Figure SPM.4}*

Purchasing Power Parity, PPP) does not appreciably affect the pro-
jected emissions, when used consistently.[11] The differences, if any,
are small compared to the uncertainties caused by assumptions on
other parameters in the scenarios, e.g. technological change. *{WGIII
3.2, TS.3, SPM}*

<div style="border:1px solid #ccc; background:#fdfce0; padding:8px;">

**SRES scenarios**

SRES refers to the scenarios described in the IPCC Special Report on Emissions Scenarios (SRES, 2000). The SRES scenarios are
grouped into four scenario families (A1, A2, B1 and B2) that explore alternative development pathways, covering a wide range of
demographic, economic and technological driving forces and resulting GHG emissions. The SRES scenarios do not include additional
climate policies above current ones. The emissions projections are widely used in the assessments of future climate change, and their
underlying assumptions with respect to socio-economic, demographic and technological change serve as inputs to many recent climate
change vulnerability and impact assessments. *{WGI 10.1; WGII 2.4; WGIII TS.1, SPM}*

The A1 storyline assumes a world of very rapid economic growth, a global population that peaks in mid-century and rapid introduc-
tion of new and more efficient technologies. A1 is divided into three groups that describe alternative directions of technological change:
fossil intensive (A1FI), non-fossil energy resources (A1T) and a balance across all sources (A1B). B1 describes a convergent world,
with the same global population as A1, but with more rapid changes in economic structures toward a service and information economy.
B2 describes a world with intermediate population and economic growth, emphasising local solutions to economic, social, and environ-
mental sustainability. A2 describes a very heterogeneous world with high population growth, slow economic development and slow
technological change. No likelihood has been attached to any of the SRES scenarios. *{WGIII TS.1, SPM}*

</div>

---

[9] Agreement/evidence statements in italics represent calibrated expressions of uncertainty and confidence. See Box 'Treatment of uncertainty' in the Intro-
duction for an explanation of these terms.

[10] Baseline scenarios do not include additional climate policies above current ones; more recent studies differ with respect to UNFCCC and Kyoto Protocol
inclusion. Emission pathways of mitigation scenarios are discussed in Topic 5.

[11] Since the TAR, there has been a debate on the use of different exchange rates in emissions scenarios. Two metrics are used to compare GDP between
countries. Use of MER is preferable for analyses involving internationally traded products. Use of PPP is preferable for analyses involving comparisons of
income between countries at very different stages of development. Most of the monetary units in this report are expressed in MER. This reflects the large
majority of emissions mitigation literature that is calibrated in MER. When monetary units are expressed in PPP, this is denoted by GDP$_{PPP}$. {WGIII SPM}

BLM_0150374

## 3.2   Projections of future changes in climate

**For the next two decades a warming of about 0.2°C per decade is projected for a range of SRES emissions scenarios. Even if the concentrations of all GHGs and aerosols had been kept constant at year 2000 levels, a further warming of about 0.1°C per decade would be expected. Afterwards, temperature projections increasingly depend on specific emissions scenarios (Figure 3.2). {WGI 10.3, 10.7; WGIII 3.2}**

Since the IPCC's first report in 1990, assessed projections have suggested global averaged temperature increases between about 0.15 and 0.3°C per decade from 1990 to 2005. This can now be compared with observed values of about 0.2°C per decade, strengthening confidence in near-term projections. *{WGI 1.2, 3.2}*

### 3.2.1   21st century global changes

**Continued GHG emissions at or above current rates would cause further warming and induce many changes in the global climate system during the 21st century that would *very likely* be larger than those observed during the 20th century. {WGI 10.3}**

Advances in climate change modelling now enable best estimates and *likely* assessed uncertainty ranges to be given for projected warming for different emissions scenarios. Table 3.1 shows best estimates and *likely* ranges for global average surface air warming for the six SRES marker emissions scenarios (including climate-carbon cycle feedbacks). *{WGI 10.5}*

Although these projections are broadly consistent with the span quoted in the TAR (1.4 to 5.8°C), they are not directly comparable. Assessed upper ranges for temperature projections are larger than in the TAR mainly because the broader range of models now available suggests stronger climate-carbon cycle feedbacks. For the A2 scenario, for example, the climate-carbon cycle feedback increases the corresponding global average warming at 2100 by more than 1°C. Carbon feedbacks are discussed in Topic 2.3. *{WGI 7.3, 10.5, SPM}*

Because understanding of some important effects driving sea level rise is too limited, this report does not assess the likelihood, nor provide a best estimate or an upper bound for sea level rise. Model-based projections of global average sea level rise at the end of the 21st century (2090-2099) are shown in Table 3.1. For each scenario, the mid-point of the range in Table 3.1 is within 10% of the TAR model average for 2090-2099. The ranges are narrower than in the TAR mainly because of improved information about some uncertainties in the projected contributions.[12] The sea level projections do not include uncertainties in climate-carbon cycle feedbacks nor do they include the full effects of changes in ice sheet flow, because a basis in published literature is lacking. Therefore the upper values of the ranges given are not to be considered upper bounds for sea level rise. The projections include a contribution due to increased ice flow from Greenland and Antarctica at the rates observed for 1993-2003, but these flow rates could increase or decrease in the future. If this contribution were to grow linearly with global average temperature change, the upper ranges of sea level rise for SRES scenarios shown in Table 3.1 would increase by 0.1 to 0.2m.[13] *{WGI 10.6, SPM}*

**Table 3.1.**  *Projected global average surface warming and sea level rise at the end of the 21st century. {WGI 10.5, 10.6, Table 10.7, Table SPM.3}*

| Case | Temperature change (°C at 2090-2099 relative to 1980-1999) [a, d] | | Sea level rise (m at 2090-2099 relative to 1980-1999) |
| --- | --- | --- | --- |
| | Best estimate | *Likely* range | Model-based range excluding future rapid dynamical changes in ice flow |
| Constant year 2000 concentrations[b] | 0.6 | 0.3 − 0.9 | Not available |
| B1 scenario | 1.8 | 1.1 − 2.9 | 0.18 − 0.38 |
| A1T scenario | 2.4 | 1.4 − 3.8 | 0.20 − 0.45 |
| B2 scenario | 2.4 | 1.4 − 3.8 | 0.20 − 0.43 |
| A1B scenario | 2.8 | 1.7 − 4.4 | 0.21 − 0.48 |
| A2 scenario | 3.4 | 2.0 − 5.4 | 0.23 − 0.51 |
| A1FI scenario | 4.0 | 2.4 − 6.4 | 0.26 − 0.59 |

Notes:
a)  These estimates are assessed from a hierarchy of models that encompass a simple climate model, several Earth Models of intermediate Complexity, and a large number of Atmosphere-Ocean General Circulation Models (AOGCMs) as well as observational constraints.
b)  Year 2000 constant composition is derived from AOGCMs only.
c)  All scenarios above are six SRES marker scenarios. Approximate $CO_2$-eq concentrations corresponding to the computed radiative forcing due to anthropogenic GHGs and aerosols in 2100 (see p. 823 of the WGI TAR) for the SRES B1, AIT, B2, A1B, A2 and A1FI illustrative marker scenarios are about 600, 700, 800, 850, 1250 and 1550ppm, respectively.
d)  Temperature changes are expressed as the difference from the period 1980-1999. To express the change relative to the period 1850-1899 add 0.5°C.

---

[12] TAR projections were made for 2100, whereas the projections for this report are for 2090-2099. The TAR would have had similar ranges to those in Table 3.1 if it had treated uncertainties in the same way.

[13] For discussion of the longer term see Sections 3.2.3 and 5.2.

BLM_0150375

### 3.2.2  21st century regional changes

**There is now higher confidence than in the TAR in projected patterns of warming and other regional-scale features, including changes in wind patterns, precipitation and some aspects of extremes and sea ice. {WGI 8.2, 8.3, 8.4, 8.5, 9.4, 9.5, 10.3, 11.1}**

Projected warming in the 21st century shows scenario-independent geographical patterns similar to those observed over the past several decades. Warming is expected to be greatest over land and at most high northern latitudes, and least over the Southern Ocean (near Antarctica) and northern North Atlantic, continuing recent observed trends (Figure 3.2 right panels). {WGI 10.3, SPM}

Snow cover area is projected to contract. Widespread increases in thaw depth are projected over most permafrost regions. Sea ice is projected to shrink in both the Arctic and Antarctic under all SRES scenarios. In some projections, Arctic late-summer sea ice disappears almost entirely by the latter part of the 21st century. {WGI 10.3, 10.6, SPM; WGII 15.3.4}

It is *very likely* that hot extremes, heat waves and heavy precipitation events will become more frequent. {SYR Table 3.2; WGI 10.3, SPM}

Based on a range of models, it is *likely* that future tropical cyclones (typhoons and hurricanes) will become more intense, with larger peak wind speeds and more heavy precipitation associated with ongoing increases of tropical sea-surface temperatures. There is less confidence in projections of a global decrease in numbers of tropical cyclones. The apparent increase in the proportion of very intense storms since 1970 in some regions is much larger than simulated by current models for that period. {WGI 3.8, 9.5, 10.3, SPM}

Extra-tropical storm tracks are projected to move poleward, with consequent changes in wind, precipitation and temperature patterns, continuing the broad pattern of observed trends over the last half-century. {WGI 3.6, 10.3, SPM}

Since the TAR there is an improving understanding of projected patterns of precipitation. Increases in the amount of precipitation are *very likely* in high-latitudes, while decreases are *likely* in most subtropical land regions (by as much as about 20% in the A1B scenario in 2100, Figure 3.3), continuing observed patterns in recent trends. {WGI 3.3, 8.3, 9.5, 10.3, 11.2-11.9, SPM}

### 3.2.3  Changes beyond the 21st century

**Anthropogenic warming and sea level rise would continue for centuries due to the time scales associated with climate processes and feedbacks, even if GHG concentrations were to be stabilised. {WGI 10.4, 10.5, 10.7, SPM}**

If radiative forcing were to be stabilised, keeping all the radiative forcing agents constant at B1 or A1B levels in 2100, model experiments show that a further increase in global average temperature of about 0.5°C would still be expected by 2200. In addition, thermal expansion alone would lead to 0.3 to 0.8m of sea level rise by 2300 (relative to 1980-1999). Thermal expansion would continue for many centuries, due to the time required to transport heat into the deep ocean. {WGI 10.7, SPM}

**Atmosphere-Ocean General Circulation Model projections of surface warming**





*Figure 3.2. Left panel: Solid lines are multi-model global averages of surface warming (relative to 1980-1999) for the SRES scenarios A2, A1B and B1, shown as continuations of the 20th century simulations. The orange line is for the experiment where concentrations were held constant at year 2000 values. The bars in the middle of the figure indicate the best estimate (solid line within each bar) and the likely range assessed for the six SRES marker scenarios at 2090-2099 relative to 1980-1999. The assessment of the best estimate and likely ranges in the bars includes the Atmosphere-Ocean General Circulation Models (AOGCMs) in the left part of the figure, as well as results from a hierarchy of independent models and observational constraints. Right panels: Projected surface temperature changes for the early and late 21st century relative to the period 1980-1999. The panels show the multi-AOGCM average projections for the A2 (top), A1B (middle) and B1 (bottom) SRES scenarios averaged over decades 2020-2029 (left) and 2090-2099 (right). {WGI 10.4, 10.8, Figures 10.28, 10.29, SPM}*

BLM_0150376

**Multi-model projected patterns of precipitation changes**



*Figure 3.3. Relative changes in precipitation (in percent) for the period 2090-2099, relative to 1980-1999. Values are multi-model averages based on the SRES A1B scenario for December to February (left) and June to August (right). White areas are where less than 66% of the models agree in the sign of the change and stippled areas are where more than 90% of the models agree in the sign of the change. {WGI Figure 10.9, SPM}*

Contraction of the Greenland ice sheet is projected to continue to contribute to sea level rise after 2100. Current models suggest ice mass losses increase with temperature more rapidly than gains due to increased precipitation and that the surface mass balance becomes negative (net ice loss) at a global average warming (relative to pre-industrial values) in excess of 1.9 to 4.6°C. If such a negative surface mass balance were sustained for millennia, that would lead to virtually complete elimination of the Greenland ice sheet and a resulting contribution to sea level rise of about 7m. The corresponding future temperatures in Greenland (1.9 to 4.6°C global) are comparable to those inferred for the last interglacial period 125,000 years ago, when palaeoclimatic information suggests reductions of polar land ice extent and 4 to 6m of sea level rise. *{WGI 6.4, 10.7, SPM}*

Dynamical processes related to ice flow – which are not included in current models but suggested by recent observations –

could increase the vulnerability of the ice sheets to warming, increasing future sea level rise. Understanding of these processes is limited and there is no consensus on their magnitude. *{WGI 4.6, 10.7, SPM}*

Current global model studies project that the Antarctic ice sheet will remain too cold for widespread surface melting and gain mass due to increased snowfall. However, net loss of ice mass could occur if dynamical ice discharge dominates the ice sheet mass balance. *{WGI 10.7, SPM}*

Both past and future anthropogenic $CO_2$ emissions will continue to contribute to warming and sea level rise for more than a millennium, due to the time scales required for the removal of this gas from the atmosphere. *{WGI 7.3, 10.3, Figure 7.12, Figure 10.35, SPM}*

Estimated long-term (multi-century) warming corresponding to the six AR4 WG III stabilisation categories is shown in Figure 3.4.

**Estimated multi-century warming relative to 1980-1999 for AR4 stabilisation categories**



*Figure 3.4. Estimated long-term (multi-century) warming corresponding to the six AR4 WG III stabilisation categories (Table 5.1). The temperature scale has been shifted by -0.5°C compared to Table 5.1 to account approximately for the warming between pre-industrial and 1980-1999. For most stabilisation levels global average temperature is approaching the equilibrium level over a few centuries. For GHG emissions scenarios that lead to stabilisation at levels comparable to SRES B1 and A1B by 2100 (600 and 850 ppm $CO_2$-eq; category IV and V), assessed models project that about 65 to 70% of the estimated global equilibrium temperature increase, assuming a climate sensitivity of 3°C, would be realised at the time of stabilisation. For the much lower stabilisation scenarios (category I and II, Figure 5.1), the equilibrium temperature may be reached earlier. {WGI 10.7.2}*

47

BLM_0150377

## 3.3  Impacts of future climate changes

**More specific information is now available across a wide range of systems and sectors concerning the nature of future impacts, including some fields not covered in previous assessments.** *{WGII TS.4, SPM}*

The following is a selection of key findings[14] regarding the impacts of climate change on systems, sectors and regions, as well as some findings on vulnerability[15], for the range of climate changes projected over the 21st century. Unless otherwise stated, the confidence level in the projections is *high*. Global average temperature increases are given relative to 1980-1999. Additional information on impacts can be found in the WG II report. *{WGII SPM}*

### 3.3.1  Impacts on systems and sectors

**Ecosystems**

- The resilience of many ecosystems is *likely* to be exceeded this century by an unprecedented combination of climate change, associated disturbances (e.g. flooding, drought, wildfire, insects, ocean acidification) and other global change drivers (e.g. land-use change, pollution, fragmentation of natural systems, over-exploitation of resources). *{WGII 4.1-4.6, SPM}*
- Over the course of this century, net carbon uptake by terrestrial ecosystems is *likely* to peak before mid-century and then weaken or even reverse[16], thus amplifying climate change. *{WGII 4.ES, Figure 4.2, SPM}*
- Approximately 20 to 30% of plant and animal species assessed so far are *likely* to be at increased risk of extinction if increases in global average temperature exceed 1.5 to 2.5°C (*medium confidence*). *{WGII 4.ES, Figure 4.2, SPM}*
- For increases in global average temperature exceeding 1.5 to 2.5°C and in concomitant atmospheric $CO_2$ concentrations, there are projected to be major changes in ecosystem structure and function, species' ecological interactions and shifts in species' geographical ranges, with predominantly negative consequences for biodiversity and ecosystem goods and services, e.g. water and food supply. *{WGII 4.4, Box TS.6, SPM}*

**Food**

- Crop productivity is projected to increase slightly at mid- to high latitudes for local mean temperature increase of up to 1 to 3°C depending on the crop, and then decrease beyond that in some regions (*medium confidence*). *{WGII 5.4, SPM}*
- At lower latitudes, especially in seasonally dry and tropical regions, crop productivity is projected to decrease for even small local temperature increases (1 to 2°C), which would increase the risk of hunger (*medium confidence*). *{WGII 5.4, SPM}*
- Globally, the potential for food production is projected to increase with increases in local average temperature over a range of 1 to 3°C, but above this it is projected to decrease (*medium confidence*). *{WGII 5.4, 5.5, SPM}*

**Coasts**

- Coasts are projected to be exposed to increasing risks, including coastal erosion, due to climate change and sea level rise. The effect will be exacerbated by increasing human-induced pressures on coastal areas (*very high confidence*). *{WGII 6.3, 6.4, SPM}*
- By the 2080s, many millions more people than today are projected to experience floods every year due to sea level rise. The numbers affected will be largest in the densely populated and low-lying megadeltas of Asia and Africa while small islands are especially vulnerable (*very high confidence*). *{WGII 6.4, 6.5, Table 6.11, SPM}*

**Industry, settlements and society**

- The most vulnerable industries, settlements and societies are generally those in coastal and river flood plains, those whose economies are closely linked with climate-sensitive resources and those in areas prone to extreme weather events, especially where rapid urbanisation is occurring. *{WGII 7.1, 7.3, 7.4, 7.5, SPM}*
- Poor communities can be especially vulnerable, in particular those concentrated in high-risk areas. *{WGII 7.2, 7.4, 5.4, SPM}*

**Health**

- The health status of millions of people is projected to be affected through, for example, increases in malnutrition; increased deaths, diseases and injury due to extreme weather events; increased burden of diarrhoeal diseases; increased frequency of cardio-respiratory diseases due to higher concentrations of ground-level ozone in urban areas related to climate change; and the altered spatial distribution of some infectious diseases. *{WGI 7.4, Box 7.4; WGII 8.ES, 8.2, 8.4, SPM}*
- Climate change is projected to bring some benefits in temperate areas, such as fewer deaths from cold exposure, and some mixed effects such as changes in range and transmission potential of malaria in Africa. Overall it is expected that benefits will be outweighed by the negative health effects of rising temperatures, especially in developing countries. *{WGII 8.4, 8.7, 8ES, SPM}*
- Critically important will be factors that directly shape the health of populations such as education, health care, public health initiatives, and infrastructure and economic development. *{WGII 8.3, SPM}*

**Water**

- Water impacts are key for all sectors and regions. These are discussed below in the Box 'Climate change and water'.

---

[14] Criteria of choice: magnitude and timing of impact, confidence in the assessment, representative coverage of the system, sector and region.

[15] Vulnerability to climate change is the degree to which systems are susceptible to, and unable to cope with, adverse impacts.

[16] Assuming continued GHG emissions at or above current rates and other global changes including land-use changes.

BLM_0150378

## Climate change and water

Climate change is expected to exacerbate current stresses on water resources from population growth and economic and land-use change, including urbanisation. On a regional scale, mountain snow pack, glaciers and small ice caps play a crucial role in freshwater availability. Widespread mass losses from glaciers and reductions in snow cover over recent decades are projected to accelerate throughout the 21st century, reducing water availability, hydropower potential, and changing seasonality of flows in regions supplied by meltwater from major mountain ranges (e.g. Hindu-Kush, Himalaya, Andes), where more than one-sixth of the world population currently lives. {WGI 4.1, 4.5; WGII 3.3, 3.4, 3.5}

Changes in precipitation (Figure 3.3) and temperature (Figure 3.2) lead to changes in runoff (Figure 3.5) and water availability. Runoff is projected with *high confidence* to increase by 10 to 40% by mid-century at higher latitudes and in some wet tropical areas, including populous areas in East and South-East Asia, and decrease by 10 to 30% over some dry regions at mid-latitudes and dry tropics, due to decreases in rainfall and higher rates of evapotranspiration. There is also *high confidence* that many semi-arid areas (e.g. the Mediterranean Basin, western United States, southern Africa and north-eastern Brazil) will suffer a decrease in water resources due to climate change. Drought-affected areas are projected to increase in extent, with the potential for adverse impacts on multiple sectors, e.g. agriculture, water supply, energy production and health. Regionally, large increases in irrigation water demand as a result of climate changes are projected. {WGI 10.3, 11.2-11.9; WGII 3.4, 3.5, Figure 3.5, TS.4.1, Box TS.5, SPM}

The negative impacts of climate change on freshwater systems outweigh its benefits (*high confidence*). Areas in which runoff is projected to decline face a reduction in the value of the services provided by water resources (*very high confidence*). The beneficial impacts of increased annual runoff in some areas are *likely* to be tempered by negative effects of increased precipitation variability and seasonal runoff shifts on water supply, water quality and flood risk. {WGII 3.4, 3.5, TS.4.1}

Available research suggests a significant future increase in heavy rainfall events in many regions, including some in which the mean rainfall is projected to decrease. The resulting increased flood risk poses challenges to society, physical infrastructure and water quality. It is *likely* that up to 20% of the world population will live in areas where river flood potential could increase by the 2080s. Increases in the frequency and severity of floods and droughts are projected to adversely affect sustainable development. Increased temperatures will further affect the physical, chemical and biological properties of freshwater lakes and rivers, with predominantly adverse impacts on many individual freshwater species, community composition and water quality. In coastal areas, sea level rise will exacerbate water resource constraints due to increased salinisation of groundwater supplies. {WGI 11.2-11.9; WGII 3.2, 3.3, 3.4, 4.4}

**Projections and model consistency of relative changes in runoff by the end of the 21st century**



**Figure 3.5.** *Large-scale relative changes in annual runoff (water availability, in percent) for the period 2090-2099, relative to 1980-1999. Values represent the median of 12 climate models using the SRES A1B scenario. White areas are where less than 66% of the 12 models agree on the sign of change and hatched areas are where more than 90% of models agree on the sign of change. The quality of the simulation of the observed large-scale 20th century runoff is used as a basis for selecting the 12 models from the multi-model ensemble. The global map of annual runoff illustrates a large scale and is not intended to refer to smaller temporal and spatial scales. In areas where rainfall and runoff is very low (e.g. desert areas), small changes in runoff can lead to large percentage changes. In some regions, the sign of projected changes in runoff differs from recently observed trends. In some areas with projected increases in runoff, different seasonal effects are expected, such as increased wet season runoff and decreased dry season runoff. Studies using results from few climate models can be considerably different from the results presented here. {WGII Figure 3.4, adjusted to match the assumptions of Figure SYR 3.3; WGII 3.3.1, 3.4.1, 3.5.1}*

BLM_0150379

**Studies since the TAR have enabled more systematic understanding of the timing and magnitude of impacts related to differing amounts and rates of climate change.** *{WGII SPM}*

Examples of this new information for systems and sectors are presented in Figure 3.6. The upper panel shows impacts increasing with increasing temperature change. Their estimated magnitude and timing is also affected by development pathways (lower panel). *{WGII SPM}*

Depending on circumstances, some of the impacts shown in Figure 3.6 could be associated with 'key vulnerabilities', based on a number of criteria in the literature (magnitude, timing, persistence/reversibility, the potential for adaptation, distributional aspects, likelihood and 'importance' of the impacts) (see Topic 5.2). *{WGII SPM}*

### 3.3.2  Impacts on regions[17]

**Africa**

- By 2020, between 75 and 250 million of people are projected to be exposed to increased water stress due to climate change. *{WGII 9.4, SPM}*
- By 2020, in some countries, yields from rain-fed agriculture could be reduced by up to 50%. Agricultural production, including access to food, in many African countries is projected to be severely compromised. This would further adversely affect food security and exacerbate malnutrition. *{WGII 9.4, SPM}*
- Towards the end of the 21st century, projected sea level rise will affect low-lying coastal areas with large populations. The cost of adaptation could amount to at least 5 to 10% of GDP. *{WGII 9.4, SPM}*
- By 2080, an increase of 5 to 8% of arid and semi-arid land in Africa is projected under a range of climate scenarios (*high confidence*). *{WGII Box TS.6, 9.4.4}*

**Asia**

- By the 2050s, freshwater availability in Central, South, East and South-East Asia, particularly in large river basins, is projected to decrease. *{WGII 10.4, SPM}*
- Coastal areas, especially heavily populated megadelta regions in South, East and South-East Asia, will be at greatest risk due to increased flooding from the sea and, in some megadeltas, flooding from the rivers. *{WGII 10.4, SPM}*
- Climate change is projected to compound the pressures on natural resources and the environment associated with rapid urbanisation, industrialisation and economic development. *{WGII 10.4, SPM}*
- Endemic morbidity and mortality due to diarrhoeal disease primarily associated with floods and droughts are expected to rise in East, South and South-East Asia due to projected changes in the hydrological cycle. *{WGII 10.4, SPM}*

**Australia and New Zealand**

- By 2020, significant loss of biodiversity is projected to occur in some ecologically rich sites, including the Great Barrier Reef and Queensland Wet Tropics. *{WGII 11.4, SPM}*
- By 2030, water security problems are projected to intensify in southern and eastern Australia and, in New Zealand, in Northland and some eastern regions. *{WGII 11.4, SPM}*
- By 2030, production from agriculture and forestry is projected to decline over much of southern and eastern Australia, and over parts of eastern New Zealand, due to increased drought and fire. However, in New Zealand, initial benefits are projected in some other regions. *{WGII 11.4, SPM}*
- By 2050, ongoing coastal development and population growth in some areas of Australia and New Zealand are projected to exacerbate risks from sea level rise and increases in the severity and frequency of storms and coastal flooding. *{WGII 11.4, SPM}*

**Europe**

- Climate change is expected to magnify regional differences in Europe's natural resources and assets. Negative impacts will include increased risk of inland flash floods and more frequent coastal flooding and increased erosion (due to storminess and sea level rise). *{WGII 12.4, SPM}*
- Mountainous areas will face glacier retreat, reduced snow cover and winter tourism, and extensive species losses (in some areas up to 60% under high emissions scenarios by 2080). *{WGII 12.4, SPM}*
- In southern Europe, climate change is projected to worsen conditions (high temperatures and drought) in a region already vulnerable to climate variability, and to reduce water availability, hydropower potential, summer tourism and, in general, crop productivity. *{WGII 12.4, SPM}*
- Climate change is also projected to increase the health risks due to heat waves and the frequency of wildfires. *{WGII 12.4, SPM}*

**Latin America**

- By mid-century, increases in temperature and associated decreases in soil water are projected to lead to gradual replacement of tropical forest by savanna in eastern Amazonia. Semi-arid vegetation will tend to be replaced by arid-land vegetation. *{WGII 13.4, SPM}*
- There is a risk of significant biodiversity loss through species extinction in many areas of tropical Latin America. *{WGII 13.4, SPM}*
- Productivity of some important crops is projected to decrease and livestock productivity to decline, with adverse consequences for food security. In temperate zones, soybean yields are projected to increase. Overall, the number of people at risk of hunger is projected to increase (*medium confidence*). *{WGII 13.4, Box TS.6}*
- Changes in precipitation patterns and the disappearance of glaciers are projected to significantly affect water availability for human consumption, agriculture and energy generation. *{WGII 13.4, SPM}*

---

[17] Unless stated explicitly, all entries are from WG II SPM text, and are either *very high confidence* or *high confidence* statements, reflecting different sectors (agriculture, ecosystems, water, coasts, health, industry and settlements). The WG II SPM refers to the source of the statements, timelines and temperatures. The magnitude and timing of impacts that will ultimately be realised will vary with the amount and rate of climate change, emissions scenarios, development pathways and adaptation.

BLM_0150380

### Examples of impacts associated with global average temperature change
### (Impacts will vary by extent of adaptation, rate of temperature change and socio-economic pathway)



† Significant is defined here as more than 40%.    ‡ Based on average rate of sea level rise of 4.2mm/year from 2000 to 2080.

### Warming by 2090-2099 relative to 1980-1999 for non-mitigation scenarios



**Figure 3.6.** Examples of impacts associated with global average temperature change. **Upper panel:** Illustrative examples of global impacts projected for climate changes (and sea level and atmospheric $CO_2$ where relevant) associated with different amounts of increase in global average surface temperature in the 21st century. The black lines link impacts; broken-line arrows indicate impacts continuing with increasing temperature. Entries are placed so that the left-hand side of text indicates the approximate level of warming that is associated with the onset of a given impact. Quantitative entries for water scarcity and flooding represent the additional impacts of climate change relative to the conditions projected across the range of SRES scenarios A1FI, A2, B1 and B2. Adaptation to climate change is not included in these estimations. Confidence levels for all statements are high. The upper right panel gives the WG II references for the statements made in the upper left panel.* **Lower panel:** Dots and bars indicate the best estimate and likely ranges of warming assessed for the six SRES marker scenarios for 2090-2099 relative to 1980-1999. {WGI Figure SPM.5, 10.7; WGII Figure SPM.2; WGIII Table TS.2, Table 3.10}

*Where ES = Executive Summary, T = Table, B = Box and F = Figure. Thus B4.5 indicates Box 4.5 in Chapter 4 and 3.5.1 indicates Section 3.5.1 in Chapter 3.

BLM_0150381

**North America**

- Warming in western mountains is projected to cause decreased snowpack, more winter flooding and reduced summer flows, exacerbating competition for over-allocated water resources. *{WGII 14.4, SPM}*
- In the early decades of the century, moderate climate change is projected to increase aggregate yields of rain-fed agriculture by 5 to 20%, but with important variability among regions. Major challenges are projected for crops that are near the warm end of their suitable range or which depend on highly utilised water resources. *{WGII 14.4, SPM}*
- Cities that currently experience heat waves are expected to be further challenged by an increased number, intensity and duration of heat waves during the course of the century, with potential for adverse health impacts. *{WGII 14.4, SPM}*
- Coastal communities and habitats are increasingly stressed by climate change impacts interacting with development and pollution. *{WGII 14.4, SPM}*

**Polar Regions**

- The main projected biophysical effects are reductions in thickness and extent of glaciers, ice sheets and sea ice, and changes in natural ecosystems with detrimental effects on many organisms including migratory birds, mammals and higher predators. *{WGII 15.4, SPM}*
- For human communities in the Arctic, impacts, particularly those resulting from changing snow and ice conditions, are projected to be mixed. *{WGII 15.4, SPM}*
- Detrimental impacts would include those on infrastructure and traditional indigenous ways of life. *{WGII 15.4, SPM}*
- In both polar regions, specific ecosystems and habitats are projected to be vulnerable, as climatic barriers to species invasions are lowered. *{WGII 15.4, SPM}*

**Small Islands**

- Sea level rise is expected to exacerbate inundation, storm surge, erosion and other coastal hazards, thus threatening vital infrastructure, settlements and facilities that support the livelihood of island communities. *{WGII 16.4, SPM}*
- Deterioration in coastal conditions, for example through erosion of beaches and coral bleaching, is expected to affect local resources. *{WGII 16.4, SPM}*
- By mid-century, climate change is expected to reduce water resources in many small islands, e.g. in the Caribbean and Pacific, to the point where they become insufficient to meet demand during low-rainfall periods. *{WGII 16.4, SPM}*
- With higher temperatures, increased invasion by non-native species is expected to occur, particularly on mid- and high-latitude islands. *{WGII 16.4, SPM}*

### 3.3.3    Especially affected systems, sectors and regions

**Some systems, sectors and regions are *likely* to be especially affected by climate change.[18] *{WGII TS.4.5}***

Systems and sectors: *{WGII TS.4.5}*
- particular ecosystems:
  - terrestrial: tundra, boreal forest and mountain regions because of sensitivity to warming; mediterranean-type ecosystems because of reduction in rainfall; and tropical rainforests where precipitation declines
  - coastal: mangroves and salt marshes, due to multiple stresses
  - marine: coral reefs due to multiple stresses; the sea-ice biome because of sensitivity to warming
- water resources in some dry regions at mid-latitudes[19] and in the dry tropics, due to changes in rainfall and evapotranspiration, and in areas dependent on snow and ice melt
- agriculture in low latitudes, due to reduced water availability
- low-lying coastal systems, due to threat of sea level rise and increased risk from extreme weather events
- human health in populations with low adaptive capacity.

Regions: *{WGII TS.4.5}*
- the Arctic, because of the impacts of high rates of projected warming on natural systems and human communities
- Africa, because of low adaptive capacity and projected climate change impacts
- small islands, where there is high exposure of population and infrastructure to projected climate change impacts
- Asian and African megadeltas, due to large populations and high exposure to sea level rise, storm surges and river flooding.

Within other areas, even those with high incomes, some people (such as the poor, young children and the elderly) can be particularly at risk, and also some areas and some activities. *{WGII 7.1, 7.2, 7.4, 8.2, 8.4, TS.4.5}*

### 3.3.4    Ocean acidification

The uptake of anthropogenic carbon since 1750 has led to the ocean becoming more acidic with an average decrease in pH of 0.1 units. Increasing atmospheric $CO_2$ concentrations lead to further acidification. Projections based on SRES scenarios give a reduction in average global surface ocean pH of between 0.14 and 0.35 units over the 21st century. While the effects of observed ocean acidification on the marine biosphere are as yet undocumented, the progressive acidification of oceans is expected to have negative impacts on marine shell-forming organisms (e.g. corals) and their dependent species. *{WGI SPM; WGII SPM}*

### 3.3.5    Extreme events

**Altered frequencies and intensities of extreme weather, together with sea level rise, are expected to have mostly adverse effects on natural and human systems (Table 3.2). *{WGII SPM}***

Examples for selected extremes and sectors are shown in Table 3.2.

---

[18] Identified on the basis of expert judgement of the assessed literature and considering the magnitude, timing and projected rate of climate change, sensitivity and adaptive capacity.

[19] Including arid and semi-arid regions.

BLM_0150382

**Table 3.2.** *Examples of possible impacts of climate change due to changes in extreme weather and climate events, based on projections to the mid- to late 21st century. These do not take into account any changes or developments in adaptive capacity. The likelihood estimates in column two relate to the phenomena listed in column one. {WGII Table SPM.1}*

| Phenomenon[a] and direction of trend | Likelihood of future trends based on projections for 21st century using SRES scenarios | Examples of major projected impacts by sector | | | |
|---|---|---|---|---|---|
| | | Agriculture, forestry and ecosystems {WGII 4.4, 5.4} | Water resources {WGII 3.4} | Human health {WGII 8.2, 8.4} | Industry, settlement and society {WGII 7.4} |
| Over most land areas, warmer and fewer cold days and nights, warmer and more frequent hot days and nights | *Virtually certain[b]* | Increased yields in colder environments; decreased yields in warmer environments; increased insect outbreaks | Effects on water resources relying on snowmelt; effects on some water supplies | Reduced human mortality from decreased cold exposure | Reduced energy demand for heating; increased demand for cooling; declining air quality in cities; reduced disruption to transport due to snow, ice; effects on winter tourism |
| Warm spells/heat waves. Frequency increases over most land areas | *Very likely* | Reduced yields in warmer regions due to heat stress; increased danger of wildfire | Increased water demand; water quality problems, e.g. algal blooms | Increased risk of heat-related mortality, especially for the elderly, chronically sick, very young and socially isolated | Reduction in quality of life for people in warm areas without appropriate housing; impacts on the elderly, very young and poor |
| Heavy precipitation events. Frequency increases over most areas | *Very likely* | Damage to crops; soil erosion, inability to cultivate land due to waterlogging of soils | Adverse effects on quality of surface and groundwater; contamination of water supply; water scarcity may be relieved | Increased risk of deaths, injuries and infectious, respiratory and skin diseases | Disruption of settlements, commerce, transport and societies due to flooding: pressures on urban and rural infrastructures; loss of property |
| Area affected by drought increases | *Likely* | Land degradation; lower yields/crop damage and failure; increased livestock deaths; increased risk of wildfire | More widespread water stress | Increased risk of food and water shortage; increased risk of malnutrition; increased risk of water- and food-borne diseases | Water shortage for settlements, industry and societies; reduced hydropower generation potentials; potential for population migration |
| Intense tropical cyclone activity increases | *Likely* | Damage to crops; windthrow (uprooting) of trees; damage to coral reefs | Power outages causing disruption of public water supply | Increased risk of deaths, injuries, water- and food-borne diseases; post-traumatic stress disorders | Disruption by flood and high winds; withdrawal of risk coverage in vulnerable areas by private insurers; potential for population migrations; loss of property |
| Increased incidence of extreme high sea level (excludes tsunamis)[c] | *Likely[d]* | Salinisation of irrigation water, estuaries and fresh-water systems | Decreased fresh-water availability due to saltwater intrusion | Increased risk of deaths and injuries by drowning in floods; migration-related health effects | Costs of coastal protection versus costs of land-use relocation; potential for movement of populations and infrastructure; also see tropical cyclones above |

Notes:
a) See WGI Table 3.7 for further details regarding definitions.
b) Warming of the most extreme days and nights each year.
c) Extreme high sea level depends on average sea level and on regional weather systems. it is defined as the highest 1% of hourly values of observed sea level at a station for a given reference period.
d) in all scenarios, the projected global average sea level at 2100 is higher than in the reference period. The effect of changes in regional weather systems on sea level extremes has not been assessed. {WGI 10.6}

## 3.4   Risk of abrupt or irreversible changes

**Anthropogenic warming could lead to some impacts that are abrupt or irreversible, depending upon the rate and magnitude of the climate change.** *{WGII 12.6, 19.3, 19.4, SPM}*

Abrupt climate change on decadal time scales is normally thought of as involving ocean circulation changes. In addition on

longer time scales, ice sheet and ecosystem changes may also play a role. If a large-scale abrupt climate change were to occur, its impact could be quite high (see Topic 5.2). *{WGI 8.7, 10.3, 10.7; WGII 4.4, 19.3}*

Partial loss of ice sheets on polar land and/or the thermal expansion of seawater over very long time scales could imply metres of sea level rise, major changes in coastlines and inundation of low-lying areas, with greatest effects in river deltas and low-lying

BLM_0150383

islands. Current models project that such changes would occur over very long time scales (millennial) if a global temperature increase of 1.9 to 4.6°C (relative to pre-industrial) were to be sustained. Rapid sea level rise on century time scales cannot be excluded. *{SYR 3.2.3: WGI 6.4, 10.7; WGII 19.3, SPM}*

Climate change is *likely* to lead to some irreversible impacts. There is *medium confidence* that approximately 20 to 30% of species assessed so far are *likely* to be at increased risk of extinction if increases in global average warming exceed 1.5 to 2.5°C (relative to 1980-1999). As global average temperature increase exceeds about 3.5°C, model projections suggest significant extinctions (40 to 70% of species assessed) around the globe. *{WGII 4.4, Figure SPM.2}*

Based on current model simulations, it is *very likely* that the meridional overturning circulation (MOC) of the Atlantic Ocean will slow down during the 21st century; nevertheless temperatures in the region are projected to increase. It is *very unlikely* that the MOC will undergo a large abrupt transition during the 21st century. Longer-term changes in the MOC cannot be assessed with confidence. *{WGI 10.3, 10.7; WGII Figure, Table TS.5, SPM.2}*

Impacts of large-scale and persistent changes in the MOC are *likely* to include changes in marine ecosystem productivity, fisheries, ocean $CO_2$ uptake, oceanic oxygen concentrations and terrestrial vegetation. Changes in terrestrial and ocean $CO_2$ uptake may feed back on the climate system. *{WGII 12.6, 19.3, Figure SPM.2}*

BLM_0150384

# 4

# Adaptation and mitigation options and responses, and the inter-relationship with sustainable development, at global and regional levels

BLM_0150385

## 4.1 Responding to climate change

Societies can respond to climate change by adapting to its impacts and by reducing GHG emissions (mitigation), thereby reducing the rate and magnitude of change. This Topic focuses on adaptation and mitigation options that can be implemented over the next two to three decades, and their inter-relationship with sustainable development. These responses are complementary. Topic 5 addresses their complementary roles on a more conceptual basis over a longer timeframe.

The capacity to adapt and mitigate is dependent on socio-economic and environmental circumstances and the availability of information and technology[20]. However, much less information is available about the costs and effectiveness of adaptation measures than about mitigation measures. *{WGII 17.1, 17.3; WGIII 1.2}*

## 4.2 Adaptation options

**Adaptation can reduce vulnerability, both in the short and the long term.** *{WGII 17.2, 18.1, 18.5, 20.3, 20.8}*

Vulnerability to climate change can be exacerbated by other stresses. These arise from, for example, current climate hazards, poverty, unequal access to resources, food insecurity, trends in economic globalisation, conflict and incidence of diseases such as HIV/AIDS. *{WGII 7.2, 7.4, 8.3, 17.3, 20.3, 20.4, 20.7, SPM}*

Societies across the world have a long record of adapting and reducing their vulnerability to the impacts of weather- and climate-related events such as floods, droughts and storms. Nevertheless, additional adaptation measures will be required at regional and local levels to reduce the adverse impacts of projected climate change and variability, regardless of the scale of mitigation undertaken over the next two to three decades. However, adaptation alone is not expected to cope with all the projected effects of climate change, especially not over the long term as most impacts increase in magnitude. *{WGII 17.2, SPM; WGIII 1.2}*

A wide array of adaptation options is available, but more extensive adaptation than is currently occurring is required to reduce vulnerability to climate change. There are barriers, limits and costs, which are not fully understood. Some planned adaptation is already occurring on a limited basis. Table 4.1 provides examples of planned adaptation options by sector. Many adaptation actions have multiple drivers, such as economic development and poverty alleviation, and are embedded within broader development, sectoral, regional and local planning initiatives such as water resources planning, coastal defence and disaster risk reduction strategies. Examples of this approach are the Bangladesh National Water Management Plan and the coastal defence plans of The Netherlands and Norway, which incorporate specific climate change scenarios. *{WGII 1.3, 5.5.2, 11.6, 17.2}*

Comprehensive estimates of the costs and benefits of adaptation at the global level are limited in number. However, the number of adaptation cost and benefit estimates at the regional and project levels for impacts on specific sectors, such as agriculture, energy demand for heating and cooling, water resources management and infrastructure, is growing. Based on these studies there is *high confidence* that there are viable adaptation options that can be implemented in some of these sectors at low cost and/or with high benefit-cost ratios. Empirical research also suggests that higher benefit-cost ratios can be achieved by implementing some adaptation measures at an early stage compared to retrofitting long-lived infrastructure at a later date. *{WGII 17.2}*

**Adaptive capacity is intimately connected to social and economic development, but it is not evenly distributed across and within societies.** *{WGII 7.1, 7.2, 7.4, 17.3}*

The capacity to adapt is dynamic and is influenced by a society's productive base, including natural and man-made capital assets, social networks and entitlements, human capital and institutions, governance, national income, health and technology. It is also affected by multiple climate and non-climate stresses, as well as development policy. *{WGII 17.3}*

Recent studies reaffirm the TAR finding that adaptation will be vital and beneficial. However, financial, technological, cognitive, behavioural, political, social, institutional and cultural constraints limit both the implementation and effectiveness of adaptation measures. Even societies with high adaptive capacity remain vulnerable to climate change, variability and extremes. For example, a heat wave in 2003 caused high levels of mortality in European cities (especially among the elderly), and Hurricane Katrina in 2005 caused large human and financial costs in the United States. *{WGII 7.4, 8.2, 17.4}*

---

[20] Technology is defined as the practical application of knowledge to achieve particular tasks that employs both technical artefacts (hardware, equipment) and (social) information ('software', know-how for production and use of artefacts).

BLM_0150386

**Table 4.1.** *Selected examples of planned adaptation by sector.*

| Sector | Adaptation option/strategy | Underlying policy framework | Key constraints and opportunities to implementation (Normal font = constraints; *italics = opportunities*) |
|---|---|---|---|
| **Water** {WGII 5.5, 16.4; Tables 3.5, 11.6,17.1} | Expanded rainwater harvesting; water storage and conservation techniques; water reuse; desalination; water-use and irrigation efficiency | National water policies and integrated water resources management; water-related hazards management | Financial, human resources and physical barriers; *integrated water resources management; synergies with other sectors* |
| **Agriculture** {WGII 10.5, 13.5; Table 10.8} | Adjustment of planting dates and crop variety; crop relocation; improved land management, e.g. erosion control and soil protection through tree planting | R&D policies; institutional reform; land tenure and land reform; training; capacity building; crop insurance; financial incentives, e.g. subsidies and tax credits | Technological and financial constraints; access to new varieties; markets; *longer growing season in higher latitudes; revenues from 'new' products* |
| **Infrastructure/ settlement (including coastal zones)** {WGII 3.6, 11.4; Tables 6.11, 17.1} | Relocation; seawalls and storm surge barriers; dune reinforcement; land acquisition and creation of marshlands/wetlands as buffer against sea level rise and flooding; protection of existing natural barriers | Standards and regulations that integrate climate change considerations into design; land-use policies; building codes; insurance | Financial and technological barriers; availability of relocation space; *integrated policies and management; synergies with sustainable development goals* |
| **Human health** {WGII 14.5, Table 10.8} | Heat-health action plans;  emergency medical services; improved climate-sensitive disease surveillance and control; safe water and improved sanitation | Public health policies that recognise climate risk; strengthen health services; regional and international cooperation | Limits to human tolerance (vulnerable groups); knowledge limitations; financial capacity; *upgraded health services; improved quality of life* |
| **Tourism** {WGII 12.5, 15.5, 17.5; Table 17.1} | Diversification of tourism attractions and revenues; shifting ski slopes to higher altitudes and glaciers; artificial snow-making | Integrated planning (e.g. carrying capacity; linkages with other sectors); financial incentives, e.g. subsidies and tax credits | Appeal/marketing of new attractions; financial and logistical challenges; potential adverse impact on other sectors (e.g. artificial snow-making may increase energy use); *revenues from 'new' attractions; involvement of wider group of stakeholders* |
| **Transport** {WGII 7.6, 17.2} | Realignment/relocation; design standards and planning for roads, rail and other infrastructure to cope with warming and drainage | Integrating climate change considerations into national transport policy; investment in R&D for special situations, e.g. permafrost areas | Financial and technological barriers; availability of less vulnerable routes; *improved technologies and integration with key sectors (e.g. energy)* |
| **Energy** {WGII 7.4, 16.2} | Strengthening of overhead transmission and distribution infrastructure; underground cabling for utilities; energy efficiency; use of renewable sources; reduced dependence on single sources of energy | National energy policies, regulations, and fiscal and financial incentives to encourage use of alternative sources; incorporating climate change in design standards | Access to viable alternatives; financial and technological barriers; acceptance of new technologies; *stimulation of new technologies; use of local resources* |

Note:
Other examples from many sectors would include early warning systems.

BLM_0150387

Case No. 1:20-cv-02484-MSK   Document 72-11   filed 04/29/21   USDC Colorado   pg 147 of 149

Topic 4          Adaptation and mitigation options and responses, and the inter-relationship with sustainable development, at global and regional levels

## 4.3 Mitigation options

Both bottom-up and top-down studies[21] indicate that there is *high agreement* and *much evidence* of substantial economic potential[21] for the mitigation of global GHG emissions over the coming decades that could offset the projected growth of global emissions or reduce emissions below current levels. *{WGIII 11.3, SPM}*

Figure 4.1 compares global economic mitigation potential in 2030 with the projected emissions increase from 2000 to 2030. Bottom-up studies suggest that mitigation opportunities with net negative costs[22] have the potential to reduce emissions by about 6 $GtCO_2$-eq/yr in 2030. Realising these requires dealing with implementation barriers. The economic mitigation potential, which is generally greater than the market mitigation potential, can only be achieved when adequate policies are in place and barriers are removed.[21] *{WGIII 11.3, SPM}*

Sectoral estimates of economic mitigation potential and marginal costs derived from bottom-up studies corrected for double counting of mitigation potential are shown in Figure 4.2. While top-down and bottom-up studies are in line at the global level, there are considerable differences at the sectoral level. *{WGIII 11.3, SPM}*

No single technology can provide all of the mitigation potential in any sector. Table 4.2 lists selected examples of key technologies, policies, constraints and opportunities by sector. *{WGIII SPM}*

Future energy infrastructure investment decisions, expected to total over US$20 trillion[23] between 2005 and 2030, will have long-term impacts on GHG emissions, because of the long lifetimes of energy plants and other infrastructure capital stock. The widespread diffusion of low-carbon technologies may take many decades, even if early investments in these technologies are made attractive. Initial estimates show that returning global energy-related $CO_2$ emissions to 2005 levels by 2030 would require a large shift in the pattern of investment, although the net additional investment required ranges from negligible to 5 to 10%. *{WGIII 4.1, 4.4, 11.6, SPM}*

### Comparison between global economic mitigation potential and projected emissions increase in 2030



**Figure 4.1.** *Global economic mitigation potential in 2030 estimated from bottom-up (Panel a) and top-down (Panel b) studies, compared with the projected emissions increases from SRES scenarios relative to year 2000 GHG emissions of 40.8 GtCO₂-eq (Panel c). Note: GHG emissions in 2000 are exclusive of emissions of decay of above-ground biomass that remains after logging and deforestation and from peat fires and drained peat soils, to ensure consistency with the SRES emissions results. {WGIII Figures SPM.4, SPM.5a, SPM.5b}*

[21] The concept of '**mitigation potential**' has been developed to assess the scale of GHG reductions that could be made, relative to emission baselines, for a given level of carbon price (expressed in cost per unit of carbon dioxide equivalent emissions avoided or reduced). Mitigation potential is further differentiated in terms of 'market mitigation potential' and 'economic mitigation potential'.

  **Market mitigation potential** is the mitigation potential based on private costs and private discount rates (reflecting the perspective of private consumers and companies ), which might be expected to occur under forecast market conditions, including policies and measures currently in place, noting that barriers limit actual uptake.

  **Economic mitigation potential** is the mitigation potential that takes into account social costs and benefits and social discount rates (reflecting the perspective of society; social discount rates are lower than those used by private investors ), assuming that market efficiency is improved by policies and measures and barriers are removed.

  Mitigation potential is estimated using different types of approaches. **Bottom-up studies** are based on assessment of mitigation options, emphasising specific technologies and regulations. They are typically sectoral studies taking the macro-economy as unchanged. **Top-down studies** assess the economy-wide potential of mitigation options. They use globally consistent frameworks and aggregated information about mitigation options and capture macro-economic and market feedbacks.

[22] Net negative costs (no regrets opportunities) are defined as those options whose benefits such as reduced energy costs and reduced emissions of local/regional pollutants equal or exceed their costs to society, excluding the benefits of avoided climate change.

[23] 20 trillion = 20,000 billion = $20 \times 10^{12}$

BLM_0150388

**Economic mitigation potentials by sector in 2030 estimated from bottom-up studies**



**Figure 4.2.** *Estimated economic mitigation potential by sector and region using technologies and practices expected to be available in 2030. The potentials do not include non-technical options such as lifestyle changes. {WGIII Figure SPM.6}*

*Notes:*

a) The ranges for global economic potentials as assessed in each sector are shown by vertical lines. The ranges are based on end-use allocations of emissions, meaning that emissions of electricity use are counted towards the end-use sectors and not to the energy supply sector.

b) The estimated mitigation potentials have been constrained by the availability of studies particularly at high carbon price levels.

c) Sectors used different baselines. For industry the SRES B2 baseline was taken, for energy supply and transport the World Energy Outlook (WEO) 2004 baseline was used; the building sector is based on a baseline in between SRES B2 and A1B; for waste, SRES A1B driving forces were used to construct a waste-specific baseline; agriculture and forestry used baselines that mostly used B2 driving forces.

d) Only global totals for transport are shown because international aviation is included.

e) Categories excluded are non-$CO_2$ emissions in buildings and transport, part of material efficiency options, heat production and cogeneration in energy supply, heavy duty vehicles, shipping and high-occupancy passenger transport, most high-cost options for buildings, wastewater treatment, emission reduction from coal mines and gas pipelines, and fluorinated gases from energy supply and transport. The underestimation of the total economic potential from these emissions is of the order of 10 to 15%.

While studies use different methodologies, there is *high agreement* and *much evidence* that in all analysed world regions near-term health co-benefits from reduced air pollution, as a result of actions to reduce GHG emissions, can be substantial and may offset a substantial fraction of mitigation costs. *{WGIII 11.8, SPM}*

Energy efficiency and utilisation of renewable energy offer synergies with sustainable development. In least developed countries, energy substitution can lower mortality and morbidity by reducing indoor air pollution, reduce the workload for women and children and decrease the unsustainable use of fuelwood and related deforestation. *{WGIII 11.8, 11.9, 12.4}*

**Literature since the TAR confirms with *high agreement* and *medium evidence* that there may be effects from Annex I countries' action on the global economy and global emissions, although the scale of carbon leakage remains uncertain. *{WGIII 11.7, SPM}***

Fossil fuel exporting nations (in both Annex I and non-Annex I countries) may expect, as indicated in the TAR, lower demand and prices and lower GDP growth due to mitigation policies. The extent of this spillover depends strongly on assumptions related to policy decisions and oil market conditions. *{WGIII 11.7, SPM}*

Critical uncertainties remain in the assessment of carbon leakage. Most equilibrium modelling supports the conclusion in the TAR of economy-wide leakage from Kyoto action in the order of 5 to 20%, which would be less if competitive low-emissions technologies were effectively diffused. *{WGIII 11.7, SPM}*

There is also *high agreement* and *medium evidence* that changes in lifestyle and behaviour patterns can contribute to climate change mitigation across all sectors. Management practices can also have a positive role. *{WGIII SPM}*

Examples that can have positive impacts on mitigation include changes in consumption patterns, education and training, changes in building occupant behaviour, transport demand management and management tools in industry. *{WGIII 4.1, 5.1, 6.7, 7.3, SPM}*

**Policies that provide a real or implicit price of carbon could create incentives for producers and consumers to significantly invest in low-GHG products, technologies and processes. *{WGIII SPM}***

An effective carbon-price signal could realise significant mitigation potential in all sectors. Modelling studies show that global carbon prices rising to US$20-80/$tCO_2$-eq by 2030 are consistent with stabilisation at around 550ppm $CO_2$-eq by 2100. For the same

BLM_0150389

*Table 4.2 Selected examples of key sectoral mitigation technologies, policies and measures, constraints and opportunities. {WGIII Tables SPM.3, SPM.7}*

| Sector | Key mitigation technologies and practices currently commercially available. *Key mitigation technologies and practices projected to be commercialised before 2030 shown in italics.* | Policies, measures and instruments shown to be environmentally effective | Key constraints or opportunities (Normal font = constraints: *italics = opportunities*) |
|---|---|---|---|
| **Energy Supply** {WGIII 4.3, 4.4} | Improved supply and distribution efficiency; fuel switching from coal to gas; nuclear power; renewable heat and power (hydropower, solar, wind, geothermal and bioenergy); combined heat and power; early applications of carbon dioxide capture and storage (CCS) (e.g. storage of removed $CO_2$ from natural gas); *CCS for gas, biomass and coal-fired electricity generating facilities; advanced nuclear power; advanced renewable energy, including tidal and wave energy, concentrating solar, and solar photovoltaics* | Reduction of fossil fuel subsidies; taxes or carbon charges on fossil fuels | Resistance by vested interests may make them difficult to implement |
| | | Feed-in tariffs for renewable energy technologies; renewable energy obligations; producer subsidies | *May be appropriate to create markets for low-emissions technologies* |
| **Transport** {WGIII 5.4} | More fuel-efficient vehicles; hybrid vehicles; cleaner diesel vehicles; biofuels; modal shifts from road transport to rail and public transport systems; non-motorised transport (cycling, walking); land-use and transport planning; *second generation biofuels; higher efficiency aircraft; advanced electric and hybrid vehicles with more powerful and reliable batteries* | Mandatory fuel economy; biofuel blending and $CO_2$ standards for road transport | Partial coverage of vehicle fleet may limit effectiveness |
| | | Taxes on vehicle purchase, registration, use and motor fuels; road and parking pricing | Effectiveness may drop with higher incomes |
| | | Influence mobility needs through land-use regulations and infrastructure planning; investment in attractive public transport facilities and non-motorised forms of transport | *Particularly appropriate for countries that are building up their transportation systems* |
| **Buildings** {WGIII 6.5} | Efficient lighting and daylighting; more efficient electrical appliances and heating and cooling devices; improved cook stoves, improved insulation; passive and active solar design for heating and cooling; alternative refrigeration fluids, recovery and recycling of fluorinated gases; *integrated design of commercial buildings including technologies, such as intelligent meters that provide feedback and control; solar photovoltaics integrated in buildings* | Appliance standards and labelling | Periodic revision of standards needed |
| | | Building codes and certification | *Attractive for new buildings.* Enforcement can be difficult |
| | | Demand-side management programmes | Need for regulations so that utilities may profit |
| | | Public sector leadership programmes, including procurement | *Government purchasing can expand demand for energy-efficient products* |
| | | Incentives for energy service companies (ESCOs) | *Success factor: Access to third party financing* |
| **Industry** {WGIII 7.5} | More efficient end-use electrical equipment; heat and power recovery; material recycling and substitution; control of non-$CO_2$ gas emissions; and a wide array of process-specific technologies; *advanced energy efficiency; CCS for cement, ammonia, and iron manufacture; inert electrodes for aluminium manufacture* | Provision of benchmark information; performance standards; subsidies; tax credits | *May be appropriate to stimulate technology uptake.* Stability of national policy important in view of international competitiveness |
| | | Tradable permits | Predictable allocation mechanisms and stable price signals important for investments |
| | | Voluntary agreements | Success factors include: clear targets, a baseline scenario, third-party involvement in design and review and formal provisions of monitoring, close cooperation between government and industry |
| **Agriculture** {WGIII 8.4} | Improved crop and grazing land management to increase soil carbon storage; restoration of cultivated peaty soils and degraded lands; improved rice cultivation techniques and livestock and manure management to reduce $CH_4$ emissions; improved nitrogen fertiliser application techniques to reduce $N_2O$ emissions; dedicated energy crops to replace fossil fuel use; improved energy efficiency; *improvements of crop yields* | Financial incentives and regulations for improved land management; maintaining soil carbon content; efficient use of fertilisers and irrigation | *May encourage synergy with sustainable development and with reducing vulnerability to climate change, thereby overcoming barriers to implementation* |
| **Forestry/forests** {WGIII 9.4} | Afforestation; reforestation; forest management; reduced deforestation; harvested wood product management; use of forestry products for bioenergy to replace fossil fuel use; *tree species improvement to increase biomass productivity and carbon sequestration; improved remote sensing technologies for analysis of vegetation/soil carbon sequestration potential and mapping land-use change* | Financial incentives (national and international) to increase forest area, to reduce deforestation and to maintain and manage forests; land-use regulation and enforcement | Constraints include lack of investment capital and land tenure issues. *Can help poverty alleviation.* |
| **Waste** {WGIII 10.4} | Landfill $CH_4$ recovery; waste incineration with energy recovery; composting of organic waste; controlled wastewater treatment; recycling and waste minimisation; *biocovers and biofilters to optimise $CH_4$ oxidation* | Financial incentives for improved waste and wastewater management | *May stimulate technology diffusion* |
| | | Renewable energy incentives or obligations | Local availability of low-cost fuel |
| | | Waste management regulations | Most effectively applied at national level with enforcement strategies |