Ditch, Cow Creek, and from various reservoirs and irrigation ditches enhances recharge to the Leroux Creek aquifer. Leroux Creek probably is a losing stream along the northeast-trending reach, where regional recharge is lost to the Mesaverde aquifer. The stream should not be losing flow to the bedrock along the north-south trending reach, where the Mancos Shale is present. Numerous phreatophytes along the entire length of this creek, as well as in Cow, Jay, and Roatcap creeks, result in large amounts of evapotranspiration. The dewatering of the Mesaverde unit by coal mining may alter the surface water and shallow groundwater flow of Leroux Creek (Figures 15, 16, and 17); however, the impacts would tend to be muted by the vast groundwater recharge network which is independent of the bedrock system.

Figure 17. Google Earth View of the Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems.

2.6.2 Regional Bedrock Subsystems

The regional hydrogeologic units in the Oak Mesa study area, discussed in Section 2.4, are the Tertiary and Cretaceous bedrock units (Figure 12 and Table 1b), including the following potentially water-bearing units: Tertiary Wasatch Fm (Tw); Cretaceous Mesaverde Formation (Kmv), including Ohio Creek, Barren, and Upper and Lower Coal Bearing members (Kmvc), and the Rollins Sandstone member (Kmvr); and the Mancos Shale unit (Km), that may act as a thick, poorly transmissive confining layer (Figures 12, 15, 18, and 19; Table 1b). The shallow Quaternary unconsolidated materials in this subsystem are ubiquitous, and are the overlying materials providing conditions that allow recharge to the regional bedrock system mostly in stream valley and mesa top areas (Figures 15 and 18).

SOUTH _ NORTH

I

O

o p. IA Ion Precip talon

Evapo-transpiration

Preaseation

Evape-

earisiarabon

A

A

CH • Hillside DePOSItS

C; Qgo - Older Mesa Top Gravels

Kmv - mesaverde Formalion

Kmvr - Rollins Member of Mesaverde F.

Km - Maeoos Shale

Groundwater Flow

A'

M Stalk Groundwater Level in Well

— • • — Top Coal-bearing Members lKinvci

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 25

Figure 18. Cross-sectional View of the Conceptual Site Model of the Regional Bedrock Subsystems

(A-A' in Figure 14).

The general aspects of shallow groundwater flow in the Quaternary unconsolidated materials have been discussed in Section 2.5. The unconsolidated units are variably to fully

saturated based on spatial location and seasonal precipitation events, and serve as the conduits for regional recharge along with losing streams, leaky ditches, and reservoir and ditch enhancement of surface water and groundwater systems. The lower reaches of Leroux, Cow, Jay, and Roatcap creeks are losing streams located along French drains, and are areas of regional recharge to the Wasatch and Mesaverde aquifers (Figures 15, 18, and 19).

The general aspects of the bedrock hydrogeology and hydrostructures are discussed in Section 2.5. The bedrock units are variably to fully saturated based on location and proximity to recharge area. The Mesaverde aquifer is partially saturated in the south and central areas of Oak Mesa, as evidenced by the water levels recorded in well logs (see Figure 15). The water table appears to be above the Upper and Lower Coal Bearing units, which suggests that dewatering will be necessary.

Groundwater flows vertically, then horizontally to the north along hydrostructures, where it becomes incorporated into the regional groundwater flow system. The groundwater flow direction in the regional bedrock systems is from south to north beneath Oak Mesa and Grand Mesa (Figures 18 and 19). This flow direction is away from the coal mining activities, drinking water supplies, and Delta County in general.

Legend

' 1...

1 Oak Mesa area

- Ditches and enhanced streams

- Rivers

Streams

La keS and reservoirs

Towne

- Highways

- Roads

- Oak Mesa hydro-structures

I= Older Mesa Top Gravels logo]

=I Wasatch Formation 17vi]

? Mesaverde Formation IKmvl

? Rollins Sandstone [Krmal

I_

I Mentos Shale [Km]

Dakola-Burro Canyon [Kdhl

Rpgb Recharge from precipitation through gravels to bedrock

Rrab - Recharge from leaky river through alluvium into bedrock

Rdgb - Recharge from leaky ditch through gravels info bedrock

- Direction of groundwater flow

0.5 1 2 Miles

litilitil

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 26

Figure 19. Plan View of the Conceptual Site Model of the Regional Bedrock.

2.7 Anthropogenic Influences

Human activity in the Oak Mesa study area has affected both the surface and subsurface parts of the hydrologic systems. Past land use and human activity was mostly associated with agricultural production and reservoir construction and operation, and has resulted in removal of native vegetation, introduction of irrigation and high-ET (evapotranspiration) crops, construction of (often leaking) irrigation ditches, and the drilling of primarily domestic wells (Figure 20). This activity has resulted in long-term increase of water levels in local, shallow aquifers of the Quaternary materials both on top of Oak Mesa, and in the high valleys of Roatcap, Jay, Cow, and Leroux creeks. Invariably, regional recharge into the Wasatch and Mesaverde aquifers has occurred, as well.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 27 Figure 20. Google Earth Image of Anthropogenic Influences: Irrigation Ditches and Reservoirs in the Oak Mesa Study Area.

2.7.1 Effects of Land Use Changes on Groundwater Systems

Traditionally, agricultural activities take place on the bottomlands and terraces of the valleys, while most grazing activities focus in a relative small area on the uplands. Agricultural production is supported by surface water irrigation, often delivered through an extensive conveyance system. The main irrigation method in use is flood irrigation, which tends to provide more water to the fields than can be consumed by vegetation. Excess water from irrigation results in infiltration to the water table and recharge of the groundwater system (i.e., irrigation return flow). At this time, the Oak Mesa is not experiencing a shift from agricultural to nonagricultural land use at the same rate as many other areas of the western United States.

The Oak Mesa study area consists primarily of mesa top, hillslope, bottomland and terraces, limiting the irrigated areas to the top and lower portions of the subsystems. Here, there are a number of mostly unlined irrigation ditches that are excavated primarily in unconsolidated Quaternary deposits (Figure 21). When carrying water, the ditches may leak, as evidenced by the phreatophytes often found alongside them. The ditch system in the study area contains two types of ditches: 1) primary ditches, which carry water during most of the growing season; and 2) secondary ditches, which carry water only during an actual irrigation cycle. The water leaking from the ditches may be used by vegetation and discharged as evapotranspiration, or may recharge the underlying groundwater system, forming a local groundwater mound or divide. As most of the groundwater systems in the study area are local in nature, ditch leakage may contribute significantly to the local water balance, increase the water table elevation, and alter groundwater flow patterns.

Legend

: : Oak Mesa area

— Ditches and enhanced streams

— Rivers tr

.

Streams and ditcheS

V.

Lakes and reservoirs

Towns

— Highways

Roads

' ..;

BLM_0156035

Imgated_Parcals 1993 ECDSS Div 5]
t
I Itgated_Parcals 2000 ECDSS Div 5]
4 •
•
• Irrigated_Parcels 2005 [CDSS DIN 5] 11°
•
•
'
• _
. -
"
•
....
•
1.
n
IL
Aff
r
.5
4,./..
r• ----
-• •
Iti :1,11rF•
..,
, • , q 11,U (4'1
r . 111
4
,
• q.' . 1.• _ _.....",1
1
..e"...., ,---._ . . . .
1 •
3 • I. . V.^... Ay. .
t t : 1 • 1VC•1.-41.
N
A
0 0.5 1 2
Miles
_...
r.,,.
-
• _ A .
t .
• - • .

BLM_0156036

_ „,..p.....4·,
or
"h. •
.7 ....i .
II Li 11111
Ir --&-

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 28

As discussed above, irrigation return flow and leaky irrigation ditches can be a significant recharge element in the local and regional groundwater balance. Taking irrigated fields out of production and re-allocating ditch-conveyed water reduces recharge of groundwater resulting in lowered water tables, reduced groundwater discharges to wetlands and streams, and decreased water supplies.

Figure 21. Anthropogenic Influences: Irrigated Areas and Irrigation Ditches in the Oak Mesa Study Area

(Source: Delta County GIS, 2010; CDWR GIS, 2011).

The water wells in the Oak Mesa study area are clustered mostly along Leroux, Cow, Jay, and Roatcap creeks and bottomland (Figure 22). Most of these wells serve domestic water supply needs, or the needs of municipalities located along the North Fork of the Gunnison River (Hotchkiss, for example), and the effect on the groundwater system is limited. However, if additional water is needed, or water is displaced by mining activities, for example, the compound effect on the groundwater system could be significant in the future, resulting in a possible lowering of the water table, changes in flow direction, decreasing discharge to streams or increasing stream loss to groundwater, draining of wetlands, or even depletion of local aquifers.

Legend

Oak Mesa area
— Ditches and enhanced streams
— Rivers
— Streams and ditches
._. Lakes and reservoirs
— HighwayS

Roads
0 Wells - decreed ICDWR database 2009]
• Wells - other [CDR database 2009]
G Selected wells From LISGS WRI85-4230]
• Selecled springs prom USGS WRI854.290]
TownS
%
• 110.
...• i •
s
s
•
s
0 s
•
A, •

BLM_0156037

.....
•
.
IIP
, ,
s
0 .
•
•
a
•
•
•
0
alb
N. 11.
.r+
, -..•
ii
.
l
..
•
IIIIːi'
.
.
;,
•
a
• ,*.
A
..;:•
... 104 - idl•-
.. *"..
I=
N
A ...3.
.1111
..
111
,'',
..43
.....
--
0 0.5 1 2 Miles
9

•• • N,
410 el
0 '
•t: —1
••
I I 1111111

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 29

Figure 22. Anthropogenic Influences: Wells in the Oak Mesa Study Area
(Source: CDWR GIS, 2011).

2.7.2 Potential Effects of Coal Mine Hydrology

The hydrology of a natural groundwater hydrologic system will be altered by the construction and operation of the proposed underground coal mining operation. During mine dewatering, the coal mine may behave like a very large well, drawing water towards it from locations further away. Depending on management strategies for produced water disposal, groundwater levels may increase at other locations. The groundwater levels in the bedrock systems will also be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geo-hydrological, and, potentially, legal consequences.

Assuming that the coal mining activities are underground, and assuming that dewatering is the major activity of the coal mining operations, both the shallow and bedrock aquifer subsystems will potentially be affected. The effects of water disposal after dewatering are not discussed in this report as the mine design plans and operations are not available at this time.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 30

These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.

The mesa top and upper hillslope parts of the Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystem are least likely to be affected by mining operations because they are located in the recharge area and have a shallow groundwater flow system above the bedrock dewatering zone (Figures 15, 16, 18, and 19). However, the amount of groundwater discharge from the bedrock to the shallow aquifers in the lower hillslope and valley bottom areas in the Leroux Creek drainage may be reduced by dewatering action (Figures 15, 16, 18, 19), which could affect the Hotchkiss water supply. In addition, significant amounts of alluvial water in both Jay and Roatcap creeks may be reduced due to mine dewatering (Figures 15, 16, 18, 19).

The regional groundwater subsystem will be affected by the mining operations as the edge will be effectively removed and the regional recharge area of the regional bedrock system will be dewatered (Figures 18 and 19). However, the effects of the reduced groundwater amounts in the regional system will most likely be insignificant relative to the flows supporting the Colorado River drainage in the areas north of Grand Mesa.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 31

3 GIS MAPS, LAYERS, DATABASES, AND DATA SOURCES

U3.1 GIS and GIS Maps

Geographical information system (GIS)-based maps provide a flexible and efficient way to analyze and display spatial information. The strength of a GIS system is that data from various sources can be collected in local or remotely accessed databases, which can be easily maintained and updated. GIS maps support optimal analysis, specifically in hydrogeologic

BLM_0156039

evaluations at different scales, geographic distribution densities, and different levels of accuracy and information value.

A GIS map consists of a series of layers, each containing a single or multiple topological features. These features can represent a variety of geographic items, such as rivers and lakes, roads, towns and cities, land use, land ownership, wells, etc. Selected features can be further described with associated attribute tables and linked to other types of information by their attribute tables or via their spatial location. At each step of a geographic analysis, individual features can be displayed, analyzed, and combined with other features via layers, and individual features interrogated with respect to their attributes. Switching scales, like enlarging (zooming in to) a particular detail or regionalizing (zooming out) to encompass a larger set of features can be accomplished at any time; the ability to selectively visualize (switch) layers, perform advanced searches, and use select and overlay capabilities, further enhances the utility of a GIS map.

The GIS maps resulting from this study allow for informed planning and management of groundwater resources in the Oak Mesa area. The database formats that have been used in this study include ESRI shape files, database tables, georeferenced images, and ESRI GRID files (for the digital elevation model [DEM], among others). The GIS map and database for the Oak Mesa study were prepared using

ArcViewPPTMPP

version 8.3 and Arc-DesktopPPTMPP

version 10.1 (ESRIPP®PP,

Redlands, California).

U3.2 Use of GIS in the Oak Mesa Study

In this study, GIS has been used in support of the HESA described in Chapter 2 and in the preparation of report figures. In addition, the GIS maps and databases will provide a base for further studies of the hydrology and hydrogeology of the Oak Mesa area, as well as other parts of Delta County. Two multi-layer GIS maps have been prepared for this study: 1) a map with hydrologic and hydrogeologic features of Delta County (Figure 23); and 2) a map with hydrologic and hydrogeologic features of the Oak Mesa area (Figure 24). The GIS maps consist of a number of layers representing various data types relevant to the assessment of the groundwater resources at user-specified locations. Below is a detailed description of the layers and the related data sources.

4d• CIC• =RCA — rmrianion gadab.

,.…

qt ="

'.=7...=: —.

A

••

—.—.

• t 2 .1.

J . 1

AA Orta..41.

R Z;.";-…………

. .e• -1' -' .(-- -;;;; p 4

--""---'-- -.....—....----

…_......_

...aa

.... -7 — . fP 0:111  " :l?  _..7" :4114  1 '46'  1 ,:l  it  MI9 it . tI :1  11 hgri#.  1465: ' It :

/- -VP 10 19 i 4- 4" ,n1 44 Irr

4141: ,)ift  All (

_Ifi• —/L•

. .

...ii •

, .

, „p

fit . 'lip

4

1

•

w4ire,.. , -., i

e .. •

1.

. 0114

,l

1

AG tt , ...v

,

fi'e' .1... / ,i''"-' .-4. f•'-i'A:e'•

%. ,..,•••

...• i

1 4 ...9,

'A,'A'

to-COOMZ IN t ' T.

• s:Virm•  1

...._ ,

El d

1.1•16.11,64  1.1.1:129•11.1   Irma .1•55 53111,..a

.

aoa

. nn

• X

D

aid

pc DM

O icarr RIN

n0. en.;

.1111

17.6

3 21

C... ,

8.4 eallK

id i.12?

BLM_0156041

0
0 • 1.[W0111
O ;IACS..11
0 wecnard olane3 Nam Fai p. pa-12A:
0 ...1.111.....d1...or.c R;1.5.11
• Pael.
I..... p.....nair.C5!
loss.. .31
!CDS., s .1
0 ? 1.4.1,...13911[055.1.111
r..1
2 • t...
Oa t0.0 0.01
? E00 ri.tora
Or , 14001
QT. • OU Ga. IPla 4011., ^Pr...7]
....1lin.i.ena.
ry.. C.a10.11.
h. • 1/.., ..1.1
1 lam.a.
1..14.d. Y.
ma •11.1
ilk._ a it.*
TR.
PC • Itak
Ilc.C....-fir' • x10.1
Li...
• cS: • • .7.1E- 7 'L. : 20: 2 .21. .1. 13
. ....
16 OP
a
Wu MI
a on eapire.•
a
Dr.
nd eet,e
a II..
a
PM
GS 1010 card, Wan Mai
a ard, km. IOC am
a ra
C....0.0 7•1Ij
a na...." ea.1.1M
? „•0400.01x 0.1,003.„i
1110 ILDsa(u-pi

BLM_0156042

,..-9......1 1,0010.4301
r:3
0 W. anna.t...K.1111.9.1
0 Cl. aan parimck ICOAR 21101
0 at-a.a.......,54,ani5 , 101
10 ? hen
10 103.1:51.00...d
Cr ? Wig NrO.P.P.
•
a Oa alla hOlema *la niellw)
as ?. 1.1.• 1011•••••• • M.S... en...
• .0.15.$14.t
- a
...P..
0 00 -
sow ? . CapIAMC 1.014.11.1113....!
Legend

L_2041/eas Yea
- aria .11(.31C..17,MML
- 1:11Ver.
— mee
WU. oad ,esvo.s.
— alaphways
- 20E0
- 110a lrydro-Imululee
1_1 Alum.
1 1 Tcuncr Wiley Grart!s
Ywnper Rrver Ter..
ran an0 LOA. Mew Gravels
IM2 ilipacie *Jowl Off..
2600 Meta 11, 6.04
WelalatM1 Femlawn
11.11 amp, Formation
Ram
6161.1 snne
Meal. earn Cerimon
Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 32
Figure 23. Delta County GIS Map Showing Streams, Ditches and Roads on Top of County-wide Geology.
(The left display area is the table of contents [TOC] showing all available layers;
the right side of the window is the map display area showing the activated layers.)
Figure 24. Oak Mesa GIS Map Showing Streams, Ditches and Roads on Top of Hydrogeologic Unconsolidated and Bedrock Units and Hydrogeologic Structures.
(The left display area is the TOC showing all available layers;
the right side of the window is the map display area showing the activated layers.)

BLM_0156043

12 ocsacsssi.g5As.suara. Ike ..1

_ank_ _ —

6 Me

G. red ..w rarrwr rm. war., ErFpr.... Cr.... War ...

...

c?. GI •:. ' E • ^ • ... "33. • g.m'a."... -:sc•cr7-, A ,,,,7:::: w• *.• ::.1.10:,c - T. Ide31•0:3B an A - m.

-

oaria

• 1

roarte•er....n • .. 0

0 1. 0 IC IC.. I.

re

-•• la L

- r.i [Irk ...11. 1rIner.Nprrprey

, pa rr μ cr .,.

I li3 Ow mom..oss., d...

.,..0 Eisk. rasa, ...a RC RIR

, ;3 Ararerg ......"..13,rer

.. a ...Cc...PM^

A g u...,*,............. to< Ain • t .

. m na.CM1•31IX 71.l

n 30 II.R.".....n. ec-- .1,..rr

30 ma ...down.,

49

.1-

".

1.

Li • lg.,

,•9 D. K,......•10C XR , I

.. .....

,.f• ...,.......k.m.....011

li.

I=1 =IA

.. 0 lq.1.-a . twee ma ic.. , aril

m:. ....••••

,...•......

di a ingate0yrodi a431[Irrh•51

r 0 frrrear,141,51.1

.5 0 kr.d.r..,1....1.Ear...1

r 1211...... am tr.. R asss mai

",4, •

. 1.47,- . .

. 0 1..1111MEMI

.% I

i tY .1•11[. wrs• •••I

sr.... L.....

g. 0 0••45.......,...........1.......

0 Caa dpke N•11.....

.

R

. 0 C.. IroalOr• .... • Marri......er Ira rr, CnIdi  I

Legend  Mil3

..

r"•

p.,..n.

...'"  L''''  r."..  '

En El ... hrirmori•  P....5.1.... ea L ..:; aok mesa aaso R..°Irs'€

CI CO law /sdssmli • Wags AA

r 0 04 rm,....ls - Ir.rIlwrCy.r, — Cr cl'er ar] mho me. 93,..

— 1: R

. . N ....

14 • eryr.

r0 ne• Car 1 ,1%. Gr.. 1.16.r. air1,1.11.410t10M1.1.911  -,

a rt......

kri.

Lar. -.r.• D LAIM•

' Ir Ber.L.

NO3 iIp..

=LP.. we, ...an _11011 ,

... 0,d,

.::.-.

,,,,,,

.k..

a car.

.;;•

w. a L...... trr•

— Frenrer,

Roads

WO° -

a Pm.

a....,. pr. r.,..

— Cr k Mesa hadre•masoures

E''''

NOE'r E:=3=

-• • •

k

.11  1111111  4114

•

A

. .._ '.,..*. Ili

E -MEIE'' 4,.... =- --- M:21

...

ar tiMaLlrH ' t-416.1. - - : .111 11 7, 1 *

MEIE" ...........

1 . .• .K. omen...el

i•Cti.ruNO,F.-....

Mgt :.• r d —..••as.,

1.15. LEMel.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 33
Enabling the Table of Contents (TOC; the left side of the display in Figures 23 and 24) in
ArcGIS provides information on the layers displayed in the Map Display area (the right side of
the display in Figures 23 and 24). The GIS layers of the Delta County and Oak Mesa maps
contain three types of geographic information: 1) general geographic information (county border,
roads, towns, DEM-elevations) used primarily for orientation purposes; 2) hydrologic
information (including precipitation, watersheds, streams, lakes/ponds, irrigation ditches, and
irrigated areas); and 3) hydrogeologic information (including hydrogeologic units, faults and
hydro-structures, springs and wells). Most layers have been georeferenced with respect to State
Plane, Colorado Central Zone, NAD83 (units of measure in feet), except for some public data
obtained from state and federal sources.

U3.3 GIS Map, Layers, and File Structure

Each line in the TOC is a GIS layer representing a set of features of the same type, such
as streams, parcels, wells, etc. By clicking on a check box in the TOC, elements of the activated
layer become visible in the map display area. A layer may consist of point values (e.g., wells),
line features (e.g., roads, streams, ditches), and area features (e.g., parcels, lakes, hydrogeologic
units). Right-clicking on a layer in the TOC and selecting the open attribute table option,
provides additional information on the layer, such as the names of particular features (Figure 25).
This additional information can be used to label the features in the map display area.

Figure 25. GIS Map Showing the Attribute Table for the Hydro(logic) Structures Layer in the
Oak Mesa

Area (right side of figure).

0

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 34
The order of the layers in the GIS maps may be changed, affecting which layer(s) are in
the foreground in the map and which layers are in the background. When enabled, a layer is
shown on top of the layer listed below it in the TOC. When this layer is opaque, the layer
beneath it is not visible. Some layers are (partially) transparent, others are opaque, dependent on
the type of information they display and the use in the assessment procedure. Layer
transparency/opaqueness can be changed by the user using the layer properties option under the
display tab. The order of the layers can be changed by the user by dragging a layer to the desired
location in the TOC.

The map is designed to show relevant labels (text) for most of the layers based on the
contents of one of the fields in the attribute table, such as stream name, well number, etc. When
zooming in on a particular area of the map, additional information of a selected layer can be
displayed by activating the Label feature. This can be done by right-clicking the layer and
selecting Label Feature. The label feature can be set by right-clicking the layer, selecting
Properties, clicking the Label tab, and selecting the appropriate field of the database table.
Database information regarding a particular feature on the map can also be obtained by using the
(Identify) option from the Tools toolbar, clicking on the feature of interest, and selecting the

BLM_0156046

appropriate layer in the popup Identify Results window.

U3.4 Data Sources

Delta County and Oak Mesa GIS maps retrieve various files included in six relative-path subdirectories: 1) CDOT; 2) CDSS; 3) Delta_County; 4) Integral; 5) NRCS; and 6) USGS_DEM. The directories reflect the various data sources used for the map. Selection of the relative-path option in the GIS program provides for straightforward portability between computers. Note that layers that refer to a state-wide data set (such as the NRCS precipitation file), or a multi-county data set (such as the CDSS irrigated areas files), have been clipped on the maps to show only the Delta County or Oak Mesa area coverage.

The CDOT (Colorado Department of Transportation) subdirectory contains the Colorado county boundaries (counties files). In this project this layer is primarily used for general orientation purposes. The CDOT GIS data can be downloaded from: http://apps.coloradodot.info/dataaccess/.

The CDSS subdirectory contains six sets of GIS files and databases downloaded from the Colorado Decision Support System (CDSS), which is managed by the Colorado Water Conservation Board and the Colorado Division of Water Resources (CDWR). These file sets are 1) irrigated areas in CDWR Division 4 on the Western Slope as of 1993 (Div_4_Irrigated_Lands_1993.mdb); 2) irrigated areas in CDWR Division 4 on the Western Slope as of 2000 (Div_4_Irrigated_Lands_2000.mdb); 3) irrigated areas in CDWR Division 4 on the Western Slope as of 2005 (Div_4_Irrigated_Lands_2005.mdb); 4) National Weather Service (NWS) precipitation stations in Colorado (co_precipstations files); 5) decreed wells included in the CDWR's Hydrobase (co_wells_decreed files); and 6) other wells included in the CDWR's Hydrobase (co_wells_other files). The well data reflect the Hydrobase status of July 2009. The irrigated areas data sets provide a single year snapshot of the irrigated lands and crop types of the western slope of Colorado. In the GIS maps, the 2000 data layer lies on top of the 1993 data layer, and the 2005 data layer lies on top of the 1993 and 2000 data layers, showing the irrigated acreage taken out between 1993 and 2005. The CDSS data can be downloaded from: http://water.state.co.us/DataMaps/Pages/default.aspx#onlinedata.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 35

The Delta_County subdirectory contains selected files received from the Delta County GIS department in June 2012. Coverages used in this project include county boundary, highways, roads, streams and ditches, lakes, irrigation ditches (and enhanced streams), and towns. The ditch data provided by the county does not distinguish between primary and secondary ditches. Additional field verification is needed to assess the hydrologic importance of individual ditches. One important ditch for the Oak Mesa study was not included in the county's ditch file: the connection between the Overland Ditch and West Reservoir on Oak Mesa. Our field observations indicated that this ditch can carry significant water and is used to supply West Reservoir from the Overland Ditch. It should be noted that the GIS-based aerial photography (Ortho files) provided by the county has been used, in conjunction with GIS-based topographic images obtained from the NRCS data portal and GoogleTM Earth imagery, to remotely assess topography, vegetation and hydrology.

The Integral subdirectory contains the databases produced for this project by Integral. It contains various (hydro-)geology files (OakMesa_Hydrogeol_xxx, OakMesa_hydrostructures, DeltaCounty_Geology, Springs) and files related to the location of the study area (OakMesa_DisplayArea, OakMesa_StudyArea). The main_streams_dc files were created to separately show the county's major rivers and are based on Delta County's stream layer. The

hydrogeology layers resulted from digitizing and evaluating the 1:48,000 scale geologic maps of the Cedaredge and Hotchkiss areas (Hail, 1972a, 1972b), and the 1:100,000 scale geologic map of the Paonia and Gunnison area (Ellis and Others, 1987), and combining and editing the GIS versions (Day and Others, 1999) of the Leadville, Montrose, Grand Junction and Moab

1PPoPP

x

2PPoPP

quadrangle geologic maps (scale 1:250,000) (Tweto and Others, 1976; Tweto and Others, 1978; Whitney, 1981; Williams, 1964). The Oak Mesa hydro-structures layer is primarily based on the 1:100,000 scale geologic map of the Paonia and Gunnison area (Ellis and Others, 1987).

Selected wells and springs used in a study of the groundwater resources of the North Fork Gunnison River basin have been digitized from a low-quality scanned image of an appendix of the report (Ackerman and Brooks, 1986). It should be noted that the location of these wells and springs are approximate and may be inaccurate. During a field reconnaissance in June 2012, a ditch connecting the Overland Ditch with West Reservoir was found to be of importance to the hydrology of Oak Mesa and has been digitized from topographic maps, the Delta County ortho files, and Google Earth views (newditch_OakMesa).

There are six GIS layers and databases for the hydogeologic units in the Oak Mesa area (i.e., "hydro units" for short) (Figures 11 and 12): 1) a layer showing the Quaternary unconsolidated deposits grouped by their hydrogeological characteristics (Oak Mesa Hydro Units - Unconsolidated Sediments; see Figure 24); and 2) five layers each showing the extent of an individual bedrock hydrogeologic unit (Oak Mesa Geology - Wasatch Formation, Oak Mesa Geology - Mesaverde Formation [incl. Ohio Creek member], Oak Mesa Geology - Rollins Sandstone, Oak Mesa Geology - Mancos Shale, Oak Mesa Geology - Dakota-Burro Canyon). When all five layers are activated, the GIS map shows top bedrock (see Figure 12).

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 36

The NRCS subdirectory contains state-wide averaged annual precipitation data for the period 1961–1990 obtained from the NRCS (precip_a_co files). These data have been developed from the NWS precipitation data using PRISM (Parameter elevation Regression on Independent Slopes Model), which utilizes a rule-based combination of point measurements and a DEM and includes consideration of topographic facets (Daly and Johnson, 1999). The NRCS subdirectory also includes files for the location and name of the 1:24,000 (7.5 minute) quadrangles in Delta County (quads24k_a_co029) and the 1:250.000 (2 degree) quadrangles (quads250k_a_co), and data for the watersheds in the county (wbdhu12_a_14020002 - 06). The NRCS data can be downloaded from:

TUhttp://datagateway.nrcs.usda.gov/GatewayHome.htmlUT.

The USGS_DEM subdirectory contains the raster-based DEM for Delta County. In the database, surface elevations are stored in meters; however, in the TOC of the GIS maps, the elevations are given in feet for display purposes. The USGS DEM was downloaded from the NRCS Data Gateway portal in May 2012 and is based on the USGS version published in April 2012.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 37

4 SUMMARY AND CONCLUSIONS

A HESA of the groundwater system of the Oak Mesa area in Delta County, Colorado, and the development of supporting GIS databases and maps of hydrogeologic and hydrologic characteristics, have been completed to provide support for planning, zoning, and other decision-

BLM_0156048

making

tasks of county staff, including those related to protection of groundwater resources for use as public or communal water supplies. This study consisted of the following tasks: 1) conduct a comprehensive HESA and formulate relevant conceptual hydrologic models to provide the physical framework for assessment of potential impacts of anthropogenic system modifications on groundwater resources and interrelated surface water resources; 2) develop a consistent and practical hydrogeologic nomenclature that can be expanded to county-wide use; 3) digitize existing geologic maps and convert them to hydrogeologic system layers and databases in the GIS, including layers showing hydrogeologic units and characteristic stacks of such units, and hydrostructures; and 4) adapt additional hydrological and other GIS maps and databases needed to evaluate the groundwater resources in the county; these databases will contain data from various public domain sources.

The HESA analysis showed that there are two significant groups of hydrogeologic units in the Oak Mesa study area:

1. Quaternary unconsolidated clastic materials, which are predominantly glacial-fluvial outwash plains and terrace gravels (older mesa top gravels and glacial drift), slope deposits, alluvial fans and bajadas and lower mesa gravels, younger valley gravels and river terraces, and alluvial valley bottom deposits; and

2. Tertiary and Cretaceous bedrock units, including the following potentially water-bearing units: Tertiary Wasatch Formation (Tw); Cretaceous Mesaverde Formation (Kmv), including Ohio Creek, Barren, and Upper and Lower Coal Bearing members (Kmvc), as well as the Rollins Sandstone member (Kmvr); and the Mancos Shale unit (Km), which may act as a thick, poorly transmissive confining layer.

The Quaternary unconsolidated clastic units (Qal, Qgy, Qat, Qs, Qgf, and Qgo), which are moderately to highly permeable, are recharged by infiltration from precipitation that is non-uniformly distributed due to the slope steepness, slope aspect, and to position in the landscape, and by the incidental leaky irrigation ditch and irrigation return flow. There may be lateral and vertical connection (upward or downward groundwater flow depending on position in the hydrologic system) between the unconsolidated materials and the Tertiary and Cretaceous sedimentary units in the underlying bedrock formations.

Three broad hydrostructures occur in the Oak Mesa area: 1) the northwest-trending Roatcap Creek fault zone and associated en-echelon faults to the east; 2) the northeast-trending Upper Leroux Creek fault zone and en-echelon lineaments such as the Dever Creek lineament; and 3) the north-south-trending Jay Creek lineament-fracture zone and associated en-echelon lineaments such as Lower Leroux Creek and faults such as the west Oak Mesa fault. These hydrostructures function as French drains and are responsible for various springs and groundwater discharge and recharge areas observed in Roatcap, Jay, and Leroux creeks. These hydrostructures move significant quantities of groundwater horizontally and vertically, interconnecting the shallow aquifers with deep bedrock aquifers.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 38 Based on the presence and orientation of various hydrogeologic and hydrostructural units, hydrography and topography, two CSMs in the Oak Mesa study area—Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems; and Regional Bedrock Subsystems—are discussed. Specifically, the Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems in the Oak Mesa area are dominated by the Quaternary unconsolidated materials, which receive

BLM_0156049

recharge by infiltration of precipitation (snow and rain in the highest elevations in the north part of Oak Mesa), leaky irrigation ditches (for example, the Overland Ditch), infiltration at reservoir sites (for example, West Reservoir on Oak Mesa), and losing streams, such as the central reaches of Leroux, Cow, Jay, and Roatcap creeks.

Groundwater flow on top of Oak Mesa then moves with topography into Dever Creek to the west, and Jay Creek to the east. In addition, groundwater that flows through the hillslope deposits in the northeast area eventually discharges into Roatcap Creek, which in turn flows through the hillslope deposits in the northwest area, eventually discharging into Cow Creek. In the valley of Jay Creek, the groundwater system flows parallel to the creek. Jay Creek becomes a losing stream about halfway down the mesa, and the stream and shallow groundwater system recharge the Cretaceous Mesaverde Bedrock system at about the Coal Bearing members unit. In the valley of Roatcap Creek, the groundwater system flows parallel to the creek. Roatcap Creek becomes a losing stream about halfway down the valley from the headwaters to the North Fork of the Gunnison River, and the stream and shallow groundwater system recharge the Cretaceous Mesaverde Bedrock system at about the Coal Bearing members units. The groundwater system flows in the valley of Leroux Creek parallel to the creek. Leroux Creek and the Leroux Creek aquifer receive large quantities of water from other bedrock and alluvial aquifers on Grand Mesa, and receive enhanced recharge from the Overland Ditch, Cow Creek, the hillslope materials, high precipitation amounts, and leakage and enhancement from various reservoirs and irrigation ditches. The lower reaches of Leroux, Cow, Jay, and Roatcap creeks are losing streams located along French drains, and are areas of recharge to the regional Wasatch and Mesaverde bedrock aquifers.

The Regional Bedrock Subsystems in the Oak Mesa study area include the following potentially water-bearing units: Tertiary Wasatch Fm (Tw); Cretaceous Mesaverde Formation (Kmv), including Ohio Creek, Barren, and Upper and Lower Coal Bearing members (Kmvc), as well as the Rollins Sandstone member (Kmvr); and the Mancos Shale unit (Km). The bedrock units are variably saturated based on location and proximity to recharge area. The Mesaverde aquifer is partially saturated in the south and central areas of Oak Mesa, as evidenced by the water levels recorded in well logs. The water table appears to be above the Upper and Lower Coal Bearing units, which suggests that dewatering will be necessary. Groundwater flows vertically, then horizontally to the north along hydrostructures that become part of the regional groundwater flow system. The groundwater flow direction in the regional bedrock systems is from south to north beneath Oak Mesa and Grand Mesa, and is away from the coal mining activities, drinking water supplies, and Delta County in general.

The main land use in the Oak Mesa area is agricultural, and includes irrigated land cultivation and cattle grazing. The Oak Mesa study area consists primarily of mesa top, hillslope, bottomland, and terraces, limiting the irrigated areas to the top and lower portions of the Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 39 subsystems where there are a number of unlined and leaky irrigation ditches that are excavated in mostly unconsolidated Quaternary deposits. The water leaking from the ditches and the return flow from irrigated lands may recharge the underlying groundwater system, forming a local groundwater mound or divide, and may contribute significantly to the local water balance, increase the water table elevation, and alter groundwater flow patterns.

The hydrology of a natural groundwater hydrologic system will be altered by the construction and operation of the proposed underground coal mining operation. During dewatering, the coal mine may act as a very large well, drawing water in towards it from

BLM_0156050

surrounding areas. Depending on management strategies for water disposal, water levels may increase in other locations. Groundwater levels in the bedrock systems will also be altered in the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system may have unintended ecological, geo-hydrological, and legal consequences.

The mesa top and upper hillslope parts of the Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystem are least likely to be affected by the mining operations, as they are located in the recharge area and shallow groundwater flow system above the bedrock dewatering zone. However, the amount of groundwater discharge from the bedrock to the shallow aquifers in the lower hillslope and valley bottom areas in the Leroux Creek drainage may be reduced by dewatering action, which could affect the Hotchkiss water supply. In addition, significant amounts of alluvial water in both Jay and Roatcap creeks may be reduced due to mine dewatering.

The GIS maps resulting from this study provide for use in planning and management of groundwater resources in the Oak Mesa area. The database formats that have been used in this study include ESRI shape files, database tables, georeferenced images, and ESRI GRID files (for the DEM, among others). The GIS map and database for the Oak Mesa study were prepared using

ArcViewPPTMPP

version 8.3 and Arc-DesktopPPTMPP

version 10.1 (ESRIPP®PP, Redlands, California).

Two multi-layer GIS maps have been prepared for this study: 1) a map with hydrologic and hydrogeologic features of Delta County; and 2) a map with hydrologic and hydrogeologic features of the Oak Mesa area. The GIS maps consist of a number of layers representing various data types relevant to the assessment of groundwater resources at user-specified locations. The GIS layers of the Delta County and Oak Mesa maps contain three types of geographic information: 1) general geographic .information (county border, roads, towns) used primarily for orientation purposes; 2) hydrologic information (including precipitation, watersheds, streams, lakes/ponds, irrigation ditches, and irrigated areas); and 3) hydrogeologic information (including hydrogeologic units, faults and hydrostructures, springs, and wells.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 40

5 REFERENCES

Ackerman, D.J., and T. Brooks. 1986. Reconnaissance of Ground-Water Resources in the North Fork Gunnison River Basin, Southwestern Colorado. U.S. Geological Survey. Water Resources Investigations 85-4230.

Brooks, T. 1983. Hydrology and subsidence potential of proposed coal-lease tracts in Delta County, Colorado. U.S. Geological Survey. Water Resources Investigations 83-4069.

Brooks, T., and D.J. Ackerman. 1985. Reconnaissance of Ground-Water Resources in the Lower Gunnison River Basin, Southwestern Colorado. U.S. Geological Survey. Water Resources Investigations 84-4185.

Cordilleran Compliance Services, Inc. 2002. Hydrogeology of the South Flank of the Grand Mesa in the Vicinity of Cedaredge and Paonia, Delta County, Colorado. Prepared for Gunnison Energy Corporation.

Daly, C., and G.L. Johnson. 1999. PRISM Spatial Climate Layers: An Overview of the USDA-NRCS Spatial Climate Mapping Project. PRISM Guide Book. PRISM Group, Oregon State University in cooperation with USDA-NRCS.

BLM_0156051

Davis, S.N., and R.J.M. DeWiest. 1966. Hydrogeology. John Wiley & Sons, New York.

Day, W.C., G.N. Green, D.H. Knepper, Jr., and R.C. Phillips. 1999. Mineral Resource Assessment Area, Southwestern Colorado and Digital Data for the Leadville, Montrose, Durango, and Colorado Parts of the Grand Junction, Moab, and Cortez 1o X 2o Geologic Maps'. U.S. Geological Survey. Open-File Report 99-427.

Ellis, M.S., D.L. Gaskill, and C.R. Dunrud. 1987. Geologic Map of the Paonia and Gunnison Area, Delta and Gunnison Counties, Colorado. U.S. Geological Survey. Coal Investigations Map C-109.

Freethey, G.W., and G.E. Cordy. 1991. Geohydrology of Mesozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin. U.S. Geological Survey. Professional Paper 1411-C.

Geldon, A.L. 2003. Hydrologic Properties and Ground-Water Flow Systems of the Paleozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin. U.S. Geological Survey. Professional Paper 1411-B.

Hail, W. J., Jr. 1972a. Reconnaissance Geologic Map of the Cedaredge Area, Delta County, Colorado. U.S. Geological Survey. IMAP 697.

Hail, W. J., Jr. 1972b. Reconnaissance Geologic Map of the Hotchkiss Area, Delta and Montrose Counties, Colorado. U.S. Geological Survey. IMAP 698.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 41

Kolm, K. E., P.K.M. van der Heijde, J.S. Downey, and E.D. Gutentag. 1996. Conceptualization and Characterization of Ground-Water Systems. In: Subsurface Fluid-Flow (Ground Water and Vadose Zone) Modeling, ASTM STP 1288, J. D. Ritchey and J. O. Rumbaugh, eds., American Society for Testing and Materials, West Conshohocken, PA.

Robson, S.G., and E.R. Banta. 1995. Groundwater Atlas of the United States: Colorado Plateau Aquifer. U.S. Geological Survey, HA 730-C.

Topper, R., K.L. Spray, W.H. Bellis, J.L. Hamilton, and P.E. Barkmann, 2003. Ground Water Atlas of Colorado. Colorado Geological Survey, Special Publication 53.

Tweto, O., R.H. Moench, and J.C. Reed. 1978. Geologic Map of the Leadville 1 Degree x 2 Degrees Quadrangle, Northwestern Colorado. U.S. Geological Survey. Miscellaneous Investigations Series Map I-999, scale 1:250000.

Tweto, O, T.A. Steven, W.J. Hail, and R.H. Moench. 1976. Preliminary Geologic Map of the Montrose 1 Degree x 2 Degrees Quadrangle, Northwestern Colorado. U.S. Geological Survey. Miscellaneous Field Studies Map MF-761, scale 1:250000.

Watts, K.R., 2008. Availability, Sustainability, and Suitability of Ground Water, Rogers Mesa, Delta County, Colorado—Types of Analyses and Data for Use in Subdivision Water-supply Reports. U.S. Geological Survey. Scientific Investigation Report 2008–5020.

Whitney, J.W. 1981. Surficial Geologic Map of the Grand Junction 1 Degree x 2 Degrees Quadrangle, Colorado and Utah. U.S. Geological Survey. Miscellaneous Investigations Series Map I-1289, scale 1:250000.

Williams, P.L. 1964. Geology, Structure, and Uranium Deposits of the Moab Quadrangle, Colorado and Utah. U.S. Geological Survey. Miscellaneous Geologic Investigations Map I-360, scale 1:250000.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 42

Appendix 1. Climate Data for the Oak Mesa Area, Delta County

(Source: Western Regional Climate Center, Desert Research Institute, Reno, Nevada)

Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec Annual

Average Max.
Temperature (F) 24.0 24.2 32.4 39.4 50.1 62.1 67.9 64.1 56.4 44.8 33.7 23.5 43.5
Average Min.
Temperature (F) -1.1 -0.5 6.5 14.9 25.3 34.3 40.4 38.6 30.7 22.2 11.0 1.4 18.6
Average (Mean)
Temperature (F) 11.4 11.8 19.1 27.2 37.8 48.2 54.2 51.3 43.6 33.5 22.4 12.5 31.1
Average Total
Precipitation (in.) 3.02 2.80 3.89 3.03 2.19 1.31 2.26 2.52 2.36 2.98 2.93 3.50 32.79
Average Total
Snow Fall (in.) 32.0 38.2 41.9 24.2 7.2 0.4 0.0 0.0 1.4 12.6 18.2 38.4 214.5
Average Snow
Depth (in.) 46 55 65 46 18 0 0 0 0 1 11 36 23
Table 1. Monthly Climate Summary for Bonham Reservoir, Colorado [station 050825] for period 7/1/1963 to 5/31/2012.
Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec Annual
Average Max.
Temperature (F) 38.8 44.2 52.2 62.2 72.0 82.1 87.9 85.5 77.9 66.0 50.7 40.2 63.3
Average Min.
Temperature (F) 14.5 19.8 26.0 33.2 40.9 48.7 55.3 53.3 45.6 35.5 24.8 16.7 34.5
Average (Mean)
Temperature (F) 26.6 32.0 39.1 47.7 56.4 65.4 71.6 69.4 61.8 50.8 37.7 28.4 48.9
Average Total
Precipitation (in.) 0.90 0.89 1.11 1.04 1.11 0.70 0.89 1.20 1.18 1.32 0.86 0.87 12.07
Average Total
Snow Fall (in.) 11.3 8.4 6.8 2.5 0.5 0.0 0.0 0.0 0.0 0.9 4.0 8.9 43.4
Average Snow
Depth (in.) 3 2 0 0 0 0 0 0 0 0 2 1
Table 2. Monthly Climate Summary for Cedaredge, Colorado [station 051440] for period 1/1/1898 to 5/31/1994.
Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec Annual
Average Max.
Temperature (F) 38.7 47.0 57.4 67.6 77.5 87.9 93.1 90.1 82.4 69.9 53.4 40.6 67.1
Average Min.
Temperature (F) 12.2 19.0 26.1 33.8 41.9 48.5 54.8 53.1 44.1 33.4 22.8 14.6 33.7
Average (Mean)
Temperature (F) 25.5 33.0 41.8 50.7 59.7 68.3 73.9 71.6 63.2 51.6 38.1 27.6 50.4
Average Total
Precipitation (in.) 0.48 0.43 0.56 0.61 0.75 0.48 0.72 1.12 0.94 0.93 0.53 0.44 8.01
Average Total
Snow Fall (in.) 4.6 2.7 2.0 0.5 0.0 0.0 0.0 0.0 0.0 0.0 0.2 1.5 3.7 15.2
Average Snow
Depth (in.) 1 0 0 0 0 0 0 0 0 0 0 0
Table 3. Monthly Climate Summary for Delta, Colorado [station 052192] for period 1/1/1893 to 12/31/1999.
Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec Annual
Bonham Reservoir

BLM_0156053

(32.79" annually) 3.41 3.7 4.74 3.57 2.75 1.40 2.29 2.48 2.29 3.15 3.94 4.01 37.75
Cedaredge (12.07"
annually) 1.10 0.93 1.25 1.08 1.18 0.64 0.88 1.14 1.27 1.55 1.30 1.08 13.39
Delta (8.01"
annually) 0.51 0.37 0.59 0.59 0.71 0.48 0.74 0.84 0.97 1.00 0.70 0.47 7.97
Table 4. Average Total Precipitation (in.) for period 1/1/1971 to 12/31/2000
•n
11/1/2016  DEPARTMENT OF THE INTERIOR Mail - Additional  attachments from Delta
County
https://mail. google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=15822050b3ebcbe1&siml=1582205…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Additional  attachments from Delta County
1 message
Robbie LeValley <rlevalley@deltacounty.com>  Tue, Nov 1, 2016 at 4:29 PM
To: "UFORMP@blm.gov"  <UFORMP@blm.gov>
Cc: Doug Atchley <datchley@deltacounty.com>,  Bruce Hovde <bhovde@deltacounty.com>,
Mark Roeber
<mroeber@deltacounty.com>,  Bruce Bertram <bertram@tds.net>


Robbie Baird LeValley
Delta County Administrator
970-874-2102

NOTICE: This email transmission from the County of Delta, and any documents, fi les, or
previous email messages a? ached to it,
are intended solely for the individual(s)  to whom it is addressed and may contain informa? on
that is confi den? al, legally
privileged, and/or exempt from disclosure under applicable law. If you are not the intended
recipient, you are hereby no? fi ed
that any unauthorized  review, forwarding, prin? ng, copying, distribu? on, or use of this
transmission  or the informa? on it
contains is strictly prohibited.  A misdirected transmi? al of this email does not cons? tute waiver
of any applicable privilege.  If you
received this transmission in error, please immediately  no? fy the sender and delete the original
transmission  and its
a? achments. Notwithstanding  the foregoing,  sender and receiver should be aware that all
incoming  and outgoing emails may be
subject to the Colorado Open Records Act, C.R.S. 24- 72- 100.1 et seq. Thank you.
Phase3-Surface_Creek_Valley_Study_Report_Opt_201502091519273677.pdf
16735K
GROUNDWATER SYSTEMS IN DELTA COUNTY, COLORADO:
SURFACE CREEK VALLEY AREA
GIS-Based Hydrological  and Environmental  Systems Analysis and
Formulation  of Conceptual Site Models

BLM_0156054

Authors:
Dr. Kenneth E. Kolm, Hydrologic Systems Analysis, LLC., Golden, Colorado
and
Paul K.M. van der Heijde, Heath Hydrology, Inc., Boulder, Colorado
Prepared For:
Delta County Board of County Commissioners, Colorado
October 2014
Front Page: Surface Creek Valley at Cedaredge (March 2014).
Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page i
Table of Contents

1. INTRODUCTION ................................................................................................ 1
2. DEVELOPMENT OF CONCEPTUAL MODELS OF THE SURFACE CREEK
VALLEY (SCV) STUDY AREA ...................................................................... 5
2.1 Climate ...................................................................................................... 5
2.2 Topography and Geomorphology ............................................................... 9
2.3 Surface Water Characteristics and Springs ............................................... 11
2.4 Hydrogeologic Framework ....................................................................... 15
2.4.1 Regional Hydrogeologic Units ............................................................. 16
2.4.2 Hydrogeologic Units of the SCV Area .................................................. 18
2.4.3 Hydrostructural Units of the SCV Area ................................................. 21
2.5 Groundwater Flow Systems....................................................................... 26
2.6 Groundwater System Conceptual Site Models by Subsystem ................... 28
2.6.1 Mesa Top and Hillslope Shallow Aquifer Subsystems ..................... 28
2.6.2 Valley Bottom Shallow Aquifer Subsystems ....................................... 34
2.6.3 Regional Bedrock Aquifer Subsystems ................................................. 41
2.7 Anthropogenic Influences ......................................................................... 42
2.7.1 Effects of Land Use Changes on Groundwater Systems ......................... 42
2.7.2 Potential Effects of Oil and Gas on Hydrology ...................................... 43
3. GIS MAPS, LAYERS, DATABASES, AND DATA SOURCES ...................... 46
3.1 GIS and GIS Maps .................................................................................... 46
3.2 Use of GIS in the SCV Area Study ........................................................... 46
3.3 GIS Map, Layers, and File Structure ........................................................ 48
3.4 Data Sources and Databases....................................................................... 49
4. SUMMARY AND CONCLUSIONS ............................................................... 52
5. REFERENCES .................................................................................................. 57
Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page ii
List of Tables

Table 1a Average Maximum, Minimum and Mean Monthly and Annual
Temperature, and Average Monthly and Annual Precipitation, Snow Fall
and Snow Depth for Cedaredge (051440) for period 1/1/1898 to 5/31/1994  7
Table 1b Average Maximum, Minimum and Mean Monthly and Annual
Temperature, and Average Monthly and Annual Precipitation, Snow Fall
and Snow Depth for Delta (052192) for period 1/1/1893 to 12/31/1999......  7
Table 2a Correlation of Geological and Hydrogeologic Units in the SCV Study Area:
Unconsolidated Sediments………………………………………….………… 24
Table 2b Correlation of Geological and Hydrogeologic Units in the SCV Study Area:

Bedrock Units ................................................................................ 25

List of Figures

Figure 1 Location of the Surface Creek Valley Study Area and the Major Regional Watersheds.................................................................................... 1

Figure 2 Surface Creek Valley Display Area, Showing the Water Planning Areas and the Study Area's Major Streams. ............................................................. 2

Figure 3 Surface Creek Valley Study and Display Areas in Relationship to the Areas Covered by the Previous Studies. Also Shown Is the Area Covered by the Integrated Hydrogeological Databases Generated in this and Previous Studies ...................................................................................... 3

Figure 4 Location of NWS/COOP Weather Stations in and near Delta County and the SCV Study Area. ...................................................................... 6

Figure 5a Average Monthly Precipitation, Snow Fall and Snow Depth for Cedaredge (051440) for period 1/1/1898 to 5/31/1994 ....................................... 8

Figure 5b Average Monthly Precipitation, Snow Fall and Snow for Delta (052192) for period 1/1/1893 to 12/31/1999 ........................................................ 8

Figure 6 Spatial Distribution of the Average Annual Precipitation in the SCV Area, Delta County, Colorado ............................................................... 9

Figure 7 Topography in the SCV Area........................................................ 10

Figure 8 Major Watersheds, Streams, Reservoirs and Ditches in the SCV Area ...... 12

Figure 9 Springs and Seeps in Relationship to Irrigated Areas and Hydrogeology in the SCV Area ............................................................................. 13

Figure 10 Generalized Map Showing Regional Geographic and Geological Features 17

Figure 11 Composite Large Scale Map of the Geology of Delta County ................. 18

Figure 12 Generalized Northeast-Southwest Geological Cross Section Representative for Delta County ............................................................................ 19

Figure 13 Map Showing the Shallow Unconsolidated Hydrogeologic Units in the SCV Area .......................................................................................... 20

Figure 14 Map Showing Top of Bedrock Hydrogeologic Units in SCV Area ............ 21

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page iii

Figure 15 Map Showing Major Hydrostructures (Faults and Fracture Zones) in the SCV Area .................................................................................... 22

Figure 16

Map Showing the Locations of the Cross-sections Representative for the Conceptual Site Models in the SCV Area on Top of the Hydrogeologic Units ......................................................................................... 29

Figure 17 Google Earth View of the Study Area Looking North ........................... 30

Figure 18a East-west Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope, and Valley Bottom Shallow Aquifer Subsystems in the SCV Study Area (Western section; A-A' in Figure 16) ........................ 30

Figure 18b East-west Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope, and Valley Bottom Shallow Aquifer Subsystems in the SCV Study Area (Eastern section; A"-A"' in Figure 16) ......................... 31

Figure 19 North-south Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope Subsystem in the Redlands Mesa area (B-B'' in Figure 16) ................................................................................ 31

Figure 20 Plan View of the Conceptual Site Model of the Mesa Top and Hillslope, and Valley Bottom Shallow Aquifer Subsystems with Discharge Zones and Groundwater Flow Direction ........................................................... 32

Figure 21a Google Earth View of the Mesa Top and Hillslope Subsystem at Redlands Mesa, Looking North. Note Groundwater Discharge in the Gullies at the Southern Slopes of Redlands Mesa and the Line of Seepage from a Ditch Halfway Down the Slopes (dark green areas) ...................................... 33

Figure 21b Google Earth View of the Mesa Top and Hillslope Subsystem at Redlands Mesa, Looking Northeast. Note Groundwater Discharge Areas in Discontinuous Hillslope Deposits on Northwestern Side of Redlands Mesa. In Some Areas Hillslope Deposits Connect Gravels on Top of Mesa with Currant Creek Alluvium ............................................................... 33

Figure 22 North-south Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope Subsystem in the Cedar Mesa Area (C-C' in Figure 16) ....................................................................................... 34

Figure 23a Google Earth View of the Mesa Top and Hillslope Subsystem at Cedar Mesa, Looking North. Note Groundwater Discharge at the Southeastern Slopes along Currant Creek and towards Harts Basin on the Southwestern Slopes (dark green areas) .......................................................... 35

Figure 23b Google Earth View of the Mesa Top and Hillslope Subsystem at Harts Basin, Looking Northeast. Note Groundwater Discharge from Harts Basin Is Towards Fruitgrowers Reservoir; Groundwater Discharge from Antelope Hill Is Primarily Through Springs and Seeps (dark green areas) ................ 35

Figure 24 North-south Cross-sectional View of the Conceptual Site Models of the Valley Bottom Shallow Aquifer Subsystem in the Surface Creek Valley (D-D' in Figure 16) ........................................................................ 36

Figure 25a Google Earth View of the Valley Bottom Subsystem in the Currant Creek Drainage, Looking Southwest ...................................................... 37

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page iv

Figure 25b Google Earth View of the Upper Section of the Valley Bottom Subsystem at Surface Creek, Looking Northeast. Note the Shale Outcroppings in the Lower Left and Right Indicative of Local Near-surface Bedrock .............. 38

Figure 25c Google Earth View of the Lower Part of the Valley Bottom Subsystems at Surface and Tongue Creeks and Tributaries, Looking North. Note Groundwater Discharge Zones at Southern Slopes of Surface Creek Valley System (dark green areas directly below terrace) and Effects of Leaking Ditch Along Bottom of Southern Slopes ......................................... 39

Figure 25d Google Earth View of the Upper Part of the Valley Bottom Subsystem at Tongue Creek and Tributaries, Looking North .................................. 40

Figure 25e Google Earth View of Detail of Central Part of the Valley Bottom Subsystem at Tongue Creek and Tributaries, Looking East. Note Seepage Faces and 'Wet' Landslide Deposits on Terrace Slopes ......................... 40

Figure 26 Plan View of the Conceptual Site Model of the Regional Bedrock Subsystems ................................................................................ 41

Figure 27 Anthropogenic Influences: Irrigated Areas and Irrigation Ditches in the SVC Area .................................................................................... 43

Figure 28 Anthropogenic Influences: Constructed Wells in the SCV Area ............. 44

Figure 29 Delta County GIS Map Showing SCV Study Area, Area Covered by Hydrogeological Databases, Streams, Ditches and Roads on Top of County-wide Geology ...................................................................... 47

Figure 30 SCV GIS Map Showing Streams, Ditches and Irrigated Areas on Top of Unconsolidated Hydrogeologic Units and Groundwater Discharge Areas ... 47

Figure 31 NFVSC GIS Map Showing Streams, Ditches and SCV Study Area on Top of Hydrogeologic Unconsolidated and Bedrock Units and Hydrogeologic Structures ................................................................... 48

Figure 32 GIS Map Showing the Attribute Table for the Hydrogeologic Structures (Hydrostructures) Layer in the SCV Area ...................................... 49

CM Surface Creek study area [2014]

I=Surface Creek clipping area

®Rogers Mesa

11=1Della County boundary

— Delta County highways

—Major Rivers

Delta County streams

Watershed [hydro! unit] Lower Gunnison R

= Watershed [hydrolunit] Upper Gunnison R. - ,

' :.

I"-

Sit

d

= Watershed [hydro! unit] Uncompahgre R.

Watershed [hydrolunit] North Fork Gunnison R.

al USES Lands

. . I

41

1 11111

'

--,--- 7

' ,0.

4 II

N

±

0 1 2 3 4 Miles

Illililil

111, 11n

L'IP 111° -

ID

I

2

/

BLM_0156058

.
,
//
-
,,,
/0. "
'i' z eiA%;
, ,- Psonia
Delta je,.,.6., z
.--.
= Hotchkiss
1 4;19./
,-=
.> . _ .
..../
4 .... li .
_,' _'
-,:.... ',
....,,
M
-
o
Craw,rd

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 1

# 1 INTRODUCTION

Under an agreement with Delta County, Colorado, Hydrologic Systems Analysis LLC (HSA) of Golden, Colorado, in conjunction with Heath Hydrology, Inc. (HHI) of Boulder, Colorado, was tasked to perform a study of the groundwater resources of the valley and surrounding area of Surface Creek in Delta County, Colorado between Leroux Creek to the East, Dirty George Creek to the West, US Forest Service lands to the North, and the Gunnison River to the South (Figure 1). The delineation of the study area is based on the nature and extent of the major hydrogeological systems present, the hydrology of the area, and water resources related land use considerations. The study area is located in the North Fork and Lower Gunnison watersheds and roughly covered by Delta County water planning areas 1b, 1c, 1f, 2b, 4d, 6 and a small part of sections 3c and 4b, located to the north of the Gunnison River between Delta and Hotchkiss (Figures 1 and 2). The study area is to the west and adjacent to the previously conducted Oak Mesa and North Fork Valley groundwater studies (Kolm and van der Heijde, 2012, 2013; Figure 3), but does not include Rogers Mesa as its groundwater system has already been studied by the US Geological Survey (Watts, 2008). It should be noted that for display purposes in this report a rectangular area is used, referred to as Clipping or Display Area, which include the entire Surface Creek Valley study area (Figures 1 and 3). However, all analyses regarding the groundwater systems in this report are focused on the irregular shaped Surface Creek Valley (SCV) Study Area.

Figure 1. Location of the Surface Creek Valley Study Area and the Major Regional Watersheds.
=Delta County Water Planning Areas
cza Surface Creek study area 12014]

BLM_0156059

11=ISurface Creek clipping area
— Highways
— Major streams
• Streams and ditches
0 05 1 15 2 MIles
I
Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 2
This study includes a Hydrologic and Environmental System Analysis (HESA) of the groundwater system in the study area and the development of GIS databases and maps of hydrogeologic and hydrologic characteristics of this groundwater system. The HESA is documented in this report, which also contains a description of the development and use of the GIS databases and maps. The report and GIS databases provide support for planning, zoning and other decision-making tasks of county staff, including those related to protection of groundwater resources for use as public or communal water supplies.
Figure 2. Surface Creek Valley Display Area, Showing the Water Planning Areas and the Study Area's
Major Streams.
The GIS maps have been created, in part, from previously published, or otherwise available public information, as well as the results of the HESA. Additional data layers and evaluation were needed to construct the GIS database – particularly with respect to the hydrogeologic layers. The HESA included a few scoping site visits to the study area; no additional fieldwork has been conducted. The maps (and underlying databases) have been produced using the ARCGIS/ARCMAP GIS software system.
The Surface Creek Valley groundwater study included the following tasks:
®Surface Creek study area [2014]
CISurface Creek clipping area
® North Fork Valley & Terraces study area [2013]
Ea Oak Mesa study area [2012]
Integrated hydrogeological database coverage
1=1Delta County boundary
— Delta County highways
— Major study area streams
Delta County streams
N
0 1 2 3 Miles
LLLLLLI
ORCHARD CITY
Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 3
1. Conduct a comprehensive HESA and formulate relevant conceptual hydrologic site models to provide the physical framework for the availability, sustainability and vulnerability assessments;
2. Refine and, if necessary, extend the hydrogeologic nomenclature developed in previous studies;
3. Digitize existing geologic maps – to the extent and detail necessary for the project – and converting them to hydrogeologic system layers in the GIS, including layers showing hydrogeologic units and characteristic stacks of such units, and

BLM_0156060

hydrostructures; and

4. Adapt additional hydrological and other GIS maps and databases needed to evaluate the groundwater resources in the county; these databases will contain data from various public domain sources.

Figure 3. Surface Creek Valley Study and Display Areas in Relationship to the Areas Covered by the

Previous Studies. Also Shown Is the Area Covered by the Integrated Hydrogeological Databases Generated in this and Previous Studies.

The hydrogeological databases for the SCV study area are a continuation and extension of the hydrogeological databases prepared during the earlier studies and include the results of the earlier studies. They provide coverages for the area shown in Figure 3 (see chapter 3 for details).

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 4

It should be noted that that these maps and databases will not obviate the need for additional hydrogeologic analysis on a site-specific/parcel-specific basis by developers and/or the County, or in any water right, geotechnical, or environmental study requiring due diligence. These maps and the associated groundwater evaluation procedure are intended to be used as indicators only, as part of a multi-step land use decision-making process, and to provide a starting point for further study of the County's groundwater resources.

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 5

## 2 DEVELOPMENT OF CONCEPTUAL SITE MODELS OF THE SURFACE CREEK VALLEY (SCV) STUDY AREA

HESA is an approach used to conceptualize and characterize relevant features of hydrologic and environmental systems, integrating relevant considerations of climate, topography, geomorphology, groundwater and surface water hydrology, geology, ecosystem structure and function, and the human activities associated with these systems into a holistic, three-dimensional dynamic conceptual site model (CSM). This watershed-based, hierarchical approach is described by Kolm and others (1996) and codified in ASTM D5979 Standard Guide for Conceptualization and Characterization of Ground Water Systems (ASTM 1996(2008)). The CSM of the SCV study area covers elements of climate, topography, soils and geomorphology, surface water characteristics, hydrogeologic framework, hydrology, and anthropogenic activity as related to the shallow groundwater systems in the study area.

Based on field surveys and a preliminary HESA, a number of hydrogeologic subsystems were identified within the SCV study area. Each of these subsystems has a unique hydrogeologic setting and groundwater flow system and is described in detail in forthcoming sections of the report. Furthermore, current anthropogenic modifications of the natural hydrologic features in these subsystems were identified, including groundwater recharge from large scale irrigation ditches and reservoirs, groundwater recharge from irrigated acreage subsurface return flow, and increased or decreased groundwater discharge from existing or newly created springs and seeps. A brief discussion of potential modification of natural flow patterns and impacts on water budgets from proposed oil and gas activities is included.

## 2.1 Climate

The climate in the study area has both local and regional components and includes effects of elevation and slope aspect (i.e., steepness and orientation with respect to the prevailing winds and sun exposure). The presence of Grand Mesa further influences the climate at the lower elevations by orographic precipitation effects, causing enhanced precipitation on the windward side and local and regional rain shadows on the leeward sides. From the relevant weather stations

of the National Weather Service (NWS) Cooperative Network (COOP) near the study area Cedaredge (COOP 051440), located near the town of Cedaredge, and Delta (COOP 052192), located in the town of Delta, have been selected as representative for the study area (Figure 4). Table 1 shows monthly and annual long-term averages for temperature, precipitation, snowfall and snow depth (WRCC, 2013); Figure 5 summarizes the average total monthly precipitation (i.e., rain and snowfall SWE - Snow Water Equivalent), snowfall (i.e., thickness of freshly fallen snow), and snow depth (i.e., snow pack) for the two stations. These two stations are located well to represent the climatic differences and, therefore, climatic and hydrologic gradation from the core of the five subsystems of the SCV study area to be discussed, and their down-gradient boundary regions.

The NWS data were used by the Natural Resources Conservation Service (NRCS) to prepare a map of spatially distributed precipitation corrected for elevation (see Figure 6). As these data sources show, there is a significant precipitation gradient in the area from about 30 Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 6 inches annually at the far northern boundary of the study area on the southern slopes of Grand Mesa to about 8 inches near the Gunnison River in the southwest corner of the study area.

Figure 4. Location of NWS/COOP Weather Stations in and near Delta County and the SCV Study Area.

Precipitation type (rainfall versus snowfall), amount, and temporal and spatial distribution are important for determining the amount of recharge that a groundwater system may receive, particularly as infiltration from precipitation to the shallow bedrock groundwater systems. Average annual precipitation determines the climate of the project area, and in the case of the Surface Creek Valley, the topographically higher terrains near Grand Mesa are humid-to-subhumid and cool and have excellent groundwater recharge potential, both from rainfall in the spring, summer, and autumn months, and from the melting of snowpack throughout the winter and early spring, especially where covered by gravels and slope deposits. By comparison, the lower parts of the hydrologic system, including the terraces and stream valleys between Cedaredge and the Gunnison River, are mostly semi-arid-to-arid and have a small natural recharge potential, mostly from rain and some snow throughout the winter and spring. The summer months are characterized by high evaporation rates and are too desiccated for significant Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 7 groundwater infiltration and recharge. Thus, most of the natural groundwater recharge in the near-surface aquifers occurs during a very short period of time in the winter and early spring (December to March). It should be noted that the entire study area has groundwater recharge potential, with even the driest areas probably receiving about 1- 2 inches of recharge annually. This is important when considering the ultimate groundwater system flow directions and areas of groundwater recharge.

Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec Annual
Average Max.
Temperature (F) 38.8 44.2 52.2 62.2 72.0 82.1 87.9 85.5 77.9 66.0 50.7 40.2 63.3
Average Min.
Temperature (F) 14.5 19.8 26.0 33.2 40.9 48.7 55.3 53.3 45.6 35.5 24.8 16.7 34.5
Average (Mean)
Temperature (F) 26.6 32.0 39.1 47.7 56.4 65.4 71.6 69.4 61.8 50.8 37.7 28.4 48.9
Average Total

Precipitation (in.) 0.90 0.89 1.11 1.04 1.11 0.70 0.89 1.20 1.18 1.32 0.86 0.87 12.07
Average Total
Snow Fall (in.) 11.3 8.4 6.8 2.5 0.5 0.0 0.0 0.0 0.0 0.9 4.0 8.9 43.4
Average Snow
Depth (in.) 3 2 0 0 0 0 0 0 0 0 2 1
Table 1a. Average Maximum, Minimum and Mean Monthly and Annual Temperature, and Average Monthly
and Annual Precipitation, Snow Fall and Snow Depth for Cedaredge (051440)
for period 1/1/1898 to 5/31/1994.
(Source: Western Regional Climate Center (WRCC), Desert Research Institute, Reno, Nevada).
Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec Annual
Average Max.
Temperature (F) 38.7 47.0 57.4 67.6 77.5 87.9 93.1 90.1 82.4 69.9 53.4 40.6 67.1
Average Min.
Temperature (F) 12.2 19.0 26.1 33.8 41.9 48.5 54.8 53.1 44.1 33.4 22.8 14.6 33.7
Average (Mean)
Temperature (F) 25.5 33.0 41.8 50.7 59.7 68.3 73.9 71.6 63.2 51.6 38.1 27.6 50.4
Average Total
Precipitation (in.) 0.48 0.43 0.56 0.61 0.75 0.48 0.72 1.12 0.94 0.93 0.53 0.44 8.01
Average Total
Snow Fall (in.) 4.6 2.7 2.0 0.5 0.0 0.0 0.0 0.0 0.0 0.0 0.2 1.5 3.7 15.2
Average Snow
Depth (in.) 1 0 0 0 0 0 0 0 0 0 0 0
Table 1b. Average Maximum, Minimum and Mean Monthly and Annual Temperature, and Average Monthly
and Annual Precipitation, Snow Fall and Snow Depth for Delta (052192)
for period 1/1/1893 to 12/31/1999.
(Source: Western Regional Climate Center (WRCC), Desert Research Institute, Reno, Nevada).
J11 flixi Ji JU1 ul ,
1 1 1,,,, J1 J1 J1- A 1
Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 8
Figure 5a. Average Monthly Precipitation, Snow Fall and Snow Depth for Cedaredge (051440)
for period 1/1/1898 to 5/31/1994.
(Source: Western Regional Climate Center, Desert Research Institute, Reno, Nevada).
Figure 5b. Average Monthly Precipitation, Snow Fall and Snow for Delta (052192)
for period 1/1/1893 to 12/31/1999.
(Source: Western Regional Climate Center, Desert Research Institute, Reno, Nevada).
0.00
2.00
4.00
6.00
8.00
10.00
12.00
Jan
Feb

BLM_0156063

Mar
Apr
May
Jun
Jul
Aug
Sep
Oct
Nov
Dec
Average Total Precipitation (in.)
Average Total Snow Fall (in.)
Average Snow Depth (in.)
0.00
2.00
4.00
6.00
8.00
10.00
12.00
Jan
Feb
Mar
Apr
May
Jun
Jul
Aug
Sep
Oct
Nov
Dec
Average Total Precipitation (in.)
Average Total Snow Fall (in.)
Average Snow Depth (in.)
Surface Creek Valley Study Area
Highways
Rivers
Streams
Lakes
Precipitation [in/yr]
7-10
11 -15
17 - 20
- 21 - 25
27 - 30

-31-35

- 37.40

? 41 - 45

- 47.50

- 51-55

ti

00.8 1.6 2.4 3.2 4 Miles

I i I I 11 11 1

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 9

Figure 6. Spatial Distribution of the Average Annual Precipitation in the SCV Area, Delta County, Colorado

(Source: Natural Resources Conservation Service 2011).

## 2.2 Topography and Geomorphology

The surface elevation in the SCV study area ranges from about 1,525 m (~5,000 ft) in the North Fork valley near Delta to about 2,750 m (~9,000 ft) on the terraces, fans, and bedrock above the town of Cedaredge (Figure 7). The topography of the study area has three distinct terrains: 1) steeply sloping to gently rolling, gullied bedrock uplands; 2) poorly to moderately dissected, connected and disconnected, continuous and discontinuous hillslope fans and mass wasting features, and alluvial terraces; and 3) continuous alluvial valley bottoms.

In the core of the SCV study area--including Redlands Mesa, Cedar Mesa/Fruitgrowers Reservoir/Harts Basin, Currant Creek Valley, Surface Creek Valley, and Tongue Creek Valley--the fans, mass wasting features, and alluvial terraces are separated topographically by fault- and fracture-controlled drainages derived from Grand Mesa. Each of these topographic regions functions as a separate hydrologic system and is not connected across the drainages to nearby systems. The effects of the stream and valley dissection on the groundwater systems will be discussed in the Groundwater System Conceptual Site Models sections.

Surface Creek Study Area

— Highways

— Streams

Lakes

Elevation in Feet [USGS 2011]

< 5,000

5,000 - 5,500

5,500 - 6,000

6,000 - 6,500

F-1 6,500 - 7,000

7,000 - 7,500

7,500 - 8,000

8,000 - 8,500

1= 8,600 - 9,000

1= 9,000 - 9,500

1= 9,500 - 10,000

11M 10,000 - 10,500

10,500 - 11,000

1.11 > 11,000

0 1 2 3 4 Miles

BLM_0156065

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 10

The deeper bedrock groundwater systems, if not topographically dissected by the surficial processes, will be continuous and regional in nature. Examples of these regional systems are observed in sedimentary bedrock underlying the northern part of the SCV-study area, and these deeper bedrock systems can be a source of regional groundwater. These systems are recharged by, or are discharging into, the shallow groundwater systems depending on the geomorphic geometry. Most of the alluvial terraces, fans, and river bottoms in the study area are isolated topographically, which results in discrete and localized groundwater systems and can result in discrete and localized springs.

The topographic gradients in the SCV area can be divided into two types: 1) steep gradient bedrock slopes (greater than 2% slope); and 2) low gradient (less than 2% slope) fan and terrace levels and alluvial valley bottoms. The topographic gradient is useful in estimating the surface of the water table and for estimating the amounts of infiltration versus overland flow and interflow.

Figure 7. Topography in the SCV Area.

(Sources: Natural Resources Conservation Service 2011; Delta County 2011).

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 11

2.3 Surface Water Characteristics and Springs

The SCV study area contains parts of four local watersheds draining to the Gunnison River: Leroux Creek, Currant Creek, Surface Creek, and the Tongue Creek system, including Dirty George Creek, Ward Creek, Kiser Creek and Youngs Creek (Figure 8). Streams can be gaining flow (from groundwater) or losing flow (to groundwater), dependent on local hydrology and time of year. For example, Surface Creek, Currant Creek, and the Tongue Creek main stem and tributaries may be gaining streams in their upper reaches where groundwater discharges from the Quaternary slope deposits (Qs). In the central reaches of these streams above the irrigated regions, surface water most likely enters (recharges) the Quaternary younger valley gravels (Qgy) and Quaternary alluvium (Qal) along the river and may recharge underlying bedrock, resulting in loosing stretches of these streams. The gaining and losing dynamics of these streams is seasonal, with bank full conditions occurring during the spring runoff, and during monsoon rains resulting in losing conditions, and low water conditions occurring during the rest of the year resulting in gaining conditions. In the middle and lower reaches of these streams near and below the irrigated regions of Cedaredge and in Orchard City and near the confluence with the Gunnison River, the streams would be primarily gaining as groundwater would be discharging from the Quaternary younger valley gravels (Qgy) and Quaternary alluvium (Qal) aquifers back into the stream. There would be a net steam flow loss due to well use and irrigation evapotranspiration, but a larger net stream gain from return irrigation groundwater flow.

The Gunnison River is generally a gaining river along the southern boundary of the SCV study area due to the added ground water and surface water from the Currant Creek, Surface Creek, and Tongue Creek hydrologic systems, and from the lower Surface Creek and Cedar Mesa/Fruitgrowers Reservoir/Harts Basin groundwater systems. Groundwater flow back to the Gunnison River is driven by groundwater recharge in nearby alluvium (Qal) and younger valley gravels (Qgy) from infiltration of precipitation, leaky irrigation ditches, and flood irrigation water, and loosing stretches of tributaries along the edges of the modern alluvial valley. The Gunnison River may be locally gaining or losing due to local irrigation dynamics, and seasonality of river stage (spring flooding and monsoon storm runoff verses autumn low stream

BLM_0156066

flow).

The larger mesas as well as the surface Creek valley contain local natural drainages, incising into the mesa and valley gravels mainly in southern and southwestern direction (Big Gulch, Cedar Gulch, Singley Gulch, Lawhead Gulch and Madison Gulch on Redland Mesa; Poison Gulch on Cedar Mesa; Happy Hollow Gulch in the Surface Creek Valley) (Figure 8). These local drainages provide discharge zones for the adjacent groundwater systems. Their natural eroding capacity may have been enhanced by increased runoff due to irrigation return flow.

The SCV area has Fruitgrowers Reservoir and some smaller reservoirs, as well as many ponds (primarily related to farmland modifications and sub-urban development requirements), and an extensive network of irrigation and water diversion ditches (Figure 8; see also Section 2.7). Fruitgrowers Reservoir is located between and fed by diversions from both Currant and Surface Creeks, and affects the surrounding groundwater system as a hydrologic system head

Surface Creek Study Area

Highways

- Ditches and Enhanced Streams

- Streams

1

Lakes and reservoirs

1 Lower Gunnison River Watershed

IMI Upper Gunnison River Watershed

North Fork Gunnison River Watershed

0 1

A

2 3 4 Miles

13 I I I i I

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 12

boundary (constant head in annual assessments, variable head with season in monthly assessments). Most of the smaller reservoirs and ponds, by comparison, are affiliated with local landowners, and affect only the local surrounding groundwater system. These ponds are filled with groundwater by direct discharge, or by wells or springs supplying local groundwater – most of which is sustained by irrigation, leaky ditches, or to a lesser extent, direct precipitation. These ponds leak into the local aquifer system depending upon location, and tend to concentrate nutrients.

Figure 8. Major Watersheds, Streams, Reservoirs and Ditches in the SCV Area.

(Sources: NRCS 2011; Delta County 2011).

The extensive network of ditches has been inventoried by Delta County (Figure 8; see Section 3 for details). Generally, some ditches flow more or less continuously, at least during part of the year, others are only used when fields are being irrigated. Some ditch alignments coincide with stream sections, resulting in so-called "enhanced streamflows" or "enhanced streams." Other ditch alignments contour throughout the landscape, and affect the various streams and mesas that are traversed. Most ditches are unlined, and leak water into the subsurface. More modern practices of piping have minimized this water loss. Wetlands and phreatophyte vegetation are indicators of groundwater discharge to the land surface. The irrigation ditches located on the fans and terraces and along stream valleys often have wetlands, = Surface Creek study area

- Streams
- Ditches and enhanced streams
Lakes and reservoirs
- Highways
Irrigated_Parcels [2005]
Unconsolidated Hydrogeological Units
Gal-Alluvium
Gd - Glacial Deposits
I l Qgy -Younger Valley Gravels
1 l Qat - Younger River Terraces
Qgf - Fans and Lower Mesa Gravels
Os - Hillside (Slope) Deposits
Ogo - Older Mesa Top Gravels
Bedrock
Appropriated Springs and Seeps
Appropriated Flow Rate
• < 0.01 cfs
• 0.01 - 0.04 cfs
• 0.05 - 0.1 cfs
• 0.11 - 1.0 cfs
• > 1.0 cfs
4`•
s"-?…-
0
'1 %.
\-'r--

.

,
MESA
\ 1
• g
/
HA
s
'
•--
f Fruitgrow
Reservoir
m
ei
'''
,. 1110 it
cz
s
e•
#e.

BLM_0156068

•
G ED
•
•
•
•
•
• •
•
›_
.....
r.
•
01/4
0
•
REDLAN.
..-
r
i
cr PI
N
A
0 1 2 3 4 Mlles
r Mr•ssi
ZidlOgur
il
more Li
le.
y,.'
t,...,0
ME-1,
,..e
I I i I 1 I 1 I i
A1MI1E111,....

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 13
phreatophytes and seeps, indicative of leaky, unlined ditch perimeters, which can be a source of significant groundwater recharge to a hydrogeologic unit that may naturally be dry in normal conditions, but may be an aquifer due to long time ditch leakance into the hydrologic system. Given this situation, there may be an effect of increased surface water flow in springs and drainages due to reservoir and ditch releases that ultimately can affect groundwater recharge to shallow and bedrock systems in various areas. These diversions and anthropogenic changes to the surface water system must be accounted for in the water balance calculations, including springs, for the overall hydrologic system of the SCV area.

Each hydrologic subsystem in the SCV area has ditches that primarily deliver water from the nearby parent stream to the irrigated lands located topographically down gradient from the

highpoint of the ditch entry into the subsystem. These ditches typically are responsible for two forms of groundwater recharge to the hydrologic subsystem: 1) If unlined, as linear groundwater recharge sources underneath and beside the ditch in areas indicated by the light blue lines showing ditch location (Figure 8); and 2) Where water is dispersed onto the crop field area, as areal groundwater recharge sources due to irrigation return flow in areas indicated by the green irrigated fields (Figure 9).

Figure 9. Springs and Seeps in Relationship to Irrigated Areas and Hydrogeology in the SCV Area.

(Sources: CDSS 2014, NRCS 2011).

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 14

There are three major ditch groups affiliated with the Redlands Mesa area: 1) The Highline Ditch on the east side; 2) the ditches affiliated with Cedar Gulch in the center of the mesa, including the Overland Canal, and 3) the Stull Ditch group on the west side (Figure 8). These ditches, which originate primarily from Leroux Creek, traverse the lower mesa fan gravels (Qgf) and would significantly affect springs located along the southern and western borders of the lower mesa fan gravels (Qgf) and slope deposits (Qs) (Figure 9).

There are three major ditches affiliated with the Currant Creek area: 1) Durkee Ditch on the east side of Currant Creek; 2) the West Fork of Currant Creek ditch group, which connects ditches fed from Surface Creek with those originating in Currant Creek; and 3) Transfer Ditch. The first two ditches traverse the alluvial sediments (Qal) of upper Currant Creek, and would significantly affect the springs located along the southwestern area of the alluvial fan (Qal) (Figure 9). Transfer Ditch transports water from Currant Creek to Fruitgrowers Reservoir.

There are 2 major ditches affiliated with the Cedar Mesa area: 1) (Cedar) Mesa Ditch; and 2) Lone Pine Ditch (Figure 8). These ditches, which originate primarily from Surface Creek, traverse the axis of the lower mesa fan gravels (Qgf) and would significantly affect the streams and Fruitgrowers Reservoir located in the southern and southwestern area of the subsystem (Figure 9).

There are various ditches affiliated with the Surface Creek area, including: 1) Child Ditch, Gipe Ditch, and Omega Ditch between Tongue Creek and Surface Creek, originating from Surface Creek and the Tongue Creek system; and 2) West/East Fogg Ditch and West/East Butte Ditch located east of Surface Creek in the Orchard City area and originating from Surface Creek. These ditches traverse the axis of the younger valley gravels (Qgy) subparallel to Surface Creek, and would significantly affect the surface water flow of Surface Creek from the irrigated lands above the town of Cedaredge for the entire length of the stream below Orchard City (Figure 9).

Finally, there are ditches affiliated with the Tongue Creek system, which originate from the various tributaries of Tongue Creek, traverse the younger valley gravels (Qgy) and alluvium (Qal), and would significantly affect the springs and surface water flow in to the central Tongue Creek system west of Cedaredge (Figures 8 and 9).

As is indicated by wetlands, phreatophytes, and springs/seeps, these unlined ditches leak water into the groundwater systems of the upland lower mesa fan gravels and alluvial fans (Qgf) and slope deposits (Qs), younger valley gravels (Qgy) and some alluvial tributaries (Qal) that are crossed by the ditches, which serve as aquifers used for irrigation and drinking water for landowners located topographically downgradient from the ditch (see sections 2.5 and 2.6). Springs and seeps indicate places where water flows naturally from a rock or the soil onto the land surface or into a body of surface water. They represent the contact between (saturated)

BLM_0156070

groundwater and the land surface at that location. Springs usually emerge from a single point and result in a visible and measurable flow of water, or contribute measurably to the flow of a stream or the volume of a reservoir or pond. Seeps tend to be smaller than springs, with a more distributed character, and often no visible runoff, especially in the (semi) arid West where, in Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 15 many cases, the water emerging in seeps is lost to evapotranspiration. Springs may be an expression of discharge of shallow groundwater from an unconfined aquifer, or of discharge from deeper aquifers at the contact between (more) permeable and (near) impermeable formations at or near the land surface, in fracture zones, or through karst conduits.

The SCV study area contains a number of springs and seeps as identified in the Water Rights data base of the State of Colorado [CDWR 2014]. Plotting the location of springs and seeps is very helpful in analyzing the characteristics of localized groundwater systems, and in determining where regional groundwater systems may interact with shallow groundwater systems and streams (Figure 9). Of particular interest is the relationship found between (leaking) irrigation ditches and irrigated areas and spring discharges from shallow groundwater in the SCV area. A detailed discussion of springs and seeps in the SCV area and their relationship with the local groundwater systems is presented in section 2.5.

2.4 Hydrogeologic Framework

Bedrock and unconsolidated materials have traditionally been classified as either aquifers or aquitards based upon being able to provide sufficient water for irrigation and industrial and municipal consumption, In this context, an aquifer is a permeable body of rock that is saturated with water and is capable of yielding economically significant quantities of water to wells (human and agricultural use) and springs (human and ecological use). A low-permeability formation overlying an aquifer is often called an aquitard or confining unit. As the terms "aquifer" and "aquitard" are rather ambiguous (e.g., what are economically significant quantities? or how confining is a low-permeability unit with respect to the transport of contaminants?), the use of these terms is replaced by that of the term hydrostratigraphic unit or hydrogeologic unit, in combination with terms qualifying the permeability and/or saturation of the unit (e.g., saturated, high-permeable hydrogeologic unit). A hydrogeologic unit is a geologic formation, part of a formation, or a group of formations with similar hydrologic characteristics (e.g., similar permeability characteristics and storage capacity). It should be noted that hydrogeologic units may not equate to geological units such as formations, formation members, and formation groups due to the frequently encountered variability of the flow characteristics of such geologic units. The term aquifer in this report is used to indicate a significant source of water supply from hydrogeologic units, and may include the qualifier potential (i.e., potential aquifer) when parameter uncertainty exists, especially with respect to average saturated thickness and water table fluctuations.

From a groundwater flow and water supply perspective, the most important property of rocks is the incorporated pore space and related permeability. The pore space, which defines the amount of water storage within a hydrogeologic unit, may be contemporaneous with the rock formation (primary or matrix porosity), or due to secondary geological processes, such as fracturing, faulting, chemical solution, and weathering (secondary porosity, fracture/karst porosity). The degree of connectivity and the size of the pore openings define the permeability of the rock, that is, the ease with which fluid can move through the rock. As with porosity, permeability may be primarily matrix based (matrix permeability), fracture and/or karst based

BLM_0156071

(fracture/karst permeability),  or may be a combination  of both (Davis and DeWiest, 1966).
Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 16
Unconsolidated  sediments  and clastic materials,  as found in the Surface Creek Valley
study area, and observed draping  down the south and southwest sides of Grand Mesa, are
geologically  very young and consist primarily  of silts, sands, and gravels. They are generally
very porous and permeable, but can be quite variable  in their thickness,  continuity,  and hydraulic
properties. For example, field observations revealed that the thickness  of the unconsolidated
sediments  in the SCV study area ranges from less than 1 ft to greater than 100 ft. Estimates of
hydraulic conductivity  (K) range from 0.1 to 500 ft per day (Watts, 2008). These hydrogeologic
units most likely  contain  the greatest amount of groundwater.
Consolidated  sedimentary rock and extrusive volcanic rock, by comparison, are often
quite porous, but variable  in permeability.  Most fine-grained detrital rocks like shale, claystone,
and siltstone  may have relatively  high matrix  porosities, but very low permeabilities  (Davis and
DeWiest, 1966). These fine-grained bedrock hydrogeologic  units are the dominant  confining
layers of sedimentary groundwater systems, with small hydraulic  conductivity  values typically
less than 0.01 ft per day. Coarser-grained sedimentary rock, such as sandstone, and volcanic
basalt, can pair relatively  high matrix  porosity  with significant  permeability,  and may contain
significant  amounts of groundwater.
The hydraulic  properties of sedimentary and extrusive igneous rock may be largely
enhanced when fractures and faults are present (Davis and DeWiest, 1966). As a case in point,
most of the sandstones and crystalline  extrusive volcanic  rocks in and near the SCV study area
have enhanced permeability  due to fracture and fault density and connectivity.  Significant
secondary porosity and permeability  are developed through faulting,  fracturing, and weathering
of the sedimentary and extrusive igneous rock, especially  in association with active faults,
fracture zones, and near-surface stress-release.

2.4.1 Regional Hydrogeologic  Units

From a regional  perspective, the county-wide  geology  is part of the southern  edge of the
Piceance Basin (Figure 10), the northern edge of the Black Canyon of the Gunnison  uplift,  and
the western edge of the Uncompaghre uplift.  As a result, the sedimentary bedrock stratum
ranges from younger rock to the north and east, to older rock in the south and west, and the
stratum shows a regional  dipping  trend to the north and east (see Figures 11 and 12). The
youngest bedrock units in the county are the Tertiary intrusive  (quartz monzonite)  and extrusive
(basalt) units of the West Elk Mountains and Grand Mesa volcanic field. These units form
mountains  and high plateaus in the northern and eastern part of the county. It is in these
sedimentary and volcanic  units that regional  groundwater flow systems are known to occur
(Freethey and Cordy, 1991; Geldon, 2003).

CI 5 10 15 20
M iles
Paonia
0 Hotchkiss
Gunnison
((\
%CI:"
'01
4;)
0,0!

Avon

Vail

()Gypsum

o

°Glenwood Springs

. 116

Carbondale

0 Collapse

Orchard

City

0

Delta

Oak

Mesa

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 17

Figure 10. Generalized Map Showing Regional Geographic and Geological Features
(After Topper and others, 2003; Tweto and others, 1978).

Given the regional geology of the SCV area, the hydrogeologic framework present in the Currant Creek, Surface Creek and Tongue Creek watersheds is complex similar to the Oak Mesa region studied previously (Kolm and van der Heijde, 2012). Upon reviewing various groundwater reports (Ackerman and Brooks, 1986; Brooks, 1983; Brooks and Ackerman, 1985; and Cordilleran Compliance Services, Inc., 2002, among others) and (hydro-)geologic maps (Ellis and others, 1987; Hail, 1972a, 1972b; Noe and Zawaski, 2013; Tweto and others, 1976, 1978; Williams, 1976), the SCV study area hydrological systems consist of multiple distinct hydrogeologic and hydrostructural units, including unconsolidated units consisting of various Quaternary-aged, highly permeable deposits, multiple water-bearing and confining bedrock units, and highly transmissive fault and fracture zones. The major hydrogeologic unconsolidated and bedrock units are presented in Figures 13 and 14 and described in Tables 2a and 2b; the major hydrostructural units are presented in Figure 15.

Geological Units

Oa -Nluvium Streams and ditches

? - Besak [Lave floes] Surface Creek Study Area

rid • Glacial Drib [Till] Roars

Cie- Bohan Deposits

I. Lakes and reservoirs

Os -Young Gravela [Tumas, lees, minimal] deposits] - Highway,

Oso - Old Gravels [On ridge and muse tops]

niCita - Landslide Deposits [Callao um, talus]

? ffla - Basalt [lava dowel

lbl - Basalt Dikes and Plugs [Intrusions]

? Tg- Green River Formation

Tgp- Green River Formation • Parachute Greek Member

Tmi -Mid Intrusions [Stceks, dikes, sills, 1r...faiths]

r.

Idl

1 To • Uinta Formation

BLM_0156073

Inv - Wasatch Formation
Two - Wasatch and Ohio Creek Formations
? Kdb - Dakota Sandstone and Ram Canyon Formation
Pre - Manors Shale
Kmv - Mess Verde Group or Formation
Jinti - Morrison Formation • Brushy Been Member
Ala -Mormon Formation - Salt Wash Sandstone Member
Jmwe • Morrison and Wainakah Formations and Entrada Sandstone
Jan Summerville Formation and Entrada Sandstona
TFtc - Chinle Formation
TRsii - Angate Sandstone
? pC -Precambrian Crystalline Rod
A
0 2 4 6 8 10 Miles
1 1 1 1 1 1 1 1 1 1 1
Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 18
Figure 11. Composite Large Scale Map of the Geology of Delta County
(Based on Tweto and others, 1976; Tweto and others, 1978; Whitney, 1981; Williams, 1976).

2.4.2 Hydrogeologic Units of the SCV Area

There are two significant groups of hydrogeologic units in the SCV study area: 1) Quaternary unconsolidated clastic materials (Figure 13; Table 2a), which are predominantly glacial-fluvial outwash plains and terrace gravels (older mesa top gravels and glacial drift), hillside (slope) deposits, alluvial fans and bajadas (coalescing fans) and lower mesa gravels, younger valley gravels and river terraces, and alluvial valley bottom deposits; overlying 2) Tertiary and Cretaceous bedrock units (Figure 14; Table 2b), including the following potentially water-bearing units: Tertiary Wasatch Formation including the Ohio Creek Formation (Two); Cretaceous Mesaverde Formation (Kmv), including the Barren, and Upper and Lower Coal Bearing members (Kmv), as well as the Rollins Sandstone member (Kmvr); and the Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb). The Mesaverde hydrogeologic units have porosity values ranging from $0.7 - 12\%$, a matrix transmissivity of less than 50 ft2 /day and a fracture transmissivity of up to 100 times matrix transmissivity (Robson and Banta, 1995).

SW
FEET
Lu
12000
cc
< Lu
1:1-
0
0
10000
8000
6000
4000
2000
Big Dominque Creek Fault

NE
FEET
— 12000
GRAND MESA
10000
— 8000
6000
— 4000
2000
0 2.5 5 MILES
Indian Creek
S
Big Dominque Creek
Tb - Basalt [Lava flows] Km - Mancos Shale
11-1 Tu - Uinta Formation - Dakota Sandstone and Burro Canyon Formation
Tg - Green River Formation Jme- Morrison Formation and Entrada Sandstone
l Two - Wasatch /Ohio Creek Formation TRwc - Wingate Sandstone and Chinle Formation
Kmv - Mesa Verde Group or Formation 1=1 pC - Precambrium Crystalline Rock
Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 19
Figure 12. Generalized Northeast-Southwest Geological Cross Section Representative for Delta County.
(Modified from Brooks and Ackerman, 1985).

The Upper and Lower Coal Bed members of the Mesaverde Formation have good transmissivities ranging from 1.5 – 16.7 ft2 /day (Brooks, 1983).The Dakota/Burro Canyon hydrogeologic units have porosity values ranging from 0.7 – 12% and transmissivities in the range 10-100ft2 /day (Robson and Banta, 1995). By comparison, the Mancos Shale unit (Km) may act as a thick, poorly transmissive confining layer (Robson and Banta, 1995).

From a water supply perspective, the unconsolidated clastic sediments, specifically when composed of larger size particles (>2.5 mm or 0.1 in) and observed to have sufficient saturated thickness and horizontal continuity, may provide a significant and accessible water supply. The water supply function of bedrock units is largely dependent on rock type, large-scale structure and degree of fracturing, layer geometry and orientation, and the spatially variable hydrologic inputs and outputs, and may vary significantly dependent on location. The focus of this project was on both the shallow groundwater flow systems in the Quaternary unconsolidated clastic materials, which is a source of drinking and irrigation water for several municipalities and households, and the Cretaceous Mancos Shale bedrock confining unit that may protect the integrity and water quality of the shallow drinking water systems, particularly from nearby energy development activities. In addition, the Tertiary Wasatch Formation., the Cretaceous Mesa Verde Group, and the Cretaceous Dakota-Burro Canyon hydrogeologic units are considered as a source for water supply.

- Streams
= Surface Creek study area
- Ditches and enhanced streams
AI
4
Lakes and reservoirs

BLM_0156075

- Highways
Delta County - Elevation (100ft interval)
Unconsolidated Hydrogeological Units
Qa1 -Alluvium
CM - Glacial Deposits
Ow - Younger Valley Gravels
Qat - Younger River Terraces
All Qgf - Fans and Lower Mesa Gravels
1111 Qs - Hillside (Slope) Deposits
( Exposed (weathered) bedrock
Ogo - Older Mesa Top Gravels
...
S,
ck
,
4;6
.
0
ii --
.4
k:/ -4, / ,. .;(; 1410W
r 'A
I r.
". el? i
•
ed
of..
.0
, . 9
.1
111. 1
H
/)
eservoir
..
,r :.
..
., '
il
i1
.110
S
SIN
i*
9
1'66'

BLM_0156076

.._
CEDAR
1.
g.,
c..?
1
.*-
e
MESA
REDLA
111 CIO'
1---
N
A
0 1 2 3 4 Miles
I 1 I 1 I I 1 I
, /V0 4 I
or
e -
- •eidtij  4 .10 i
illyA  if.
4.
,1 , Of Delta --AP Gu 'River
-1
4,
cva9
ROGERS
MESA
,,··
·,

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 20
Figure 13. Map Showing the Shallow Unconsolidated Hydrogeologic Units in the SCV Area.
The Quaternary unconsolidated clastic units (Qal, Qgy, Qat, Qs, Qd, Qgf, and Qgo in
Table 2a and Figure 13) are locally heterogeneous, with predominantly a mix of coarser and finer
materials in the older alluvial deposits, and finer materials in the younger deposits. These
deposits, which are moderately to highly permeable, are recharged by infiltration from
precipitation that is non-uniformly distributed due to the slope steepness, slope aspect, and to
position in the landscape, and by the incidental leaky irrigation ditch and irrigation return flow.
The unconsolidated units are variably to fully saturated based on spatial location and seasonal
precipitation events. There may be lateral and vertical groundwater flow connection between the
unconsolidated materials and the Tertiary and Cretaceous sedimentary units in the underlying
bedrock formations.
Of special hydrological interest is the possible occurrence of a weathered zone on the
surface of the Mancos Shale (Km). This occurs near the topographic surface of exposed or
shallow Mancos Shale bedrock Km(w) on the top of and along the hills surrounding Redlands
Mesa, Cedar Mesa, Harts Basin, Surface Creek, or the Tongue Creek (and tributaries) areas.

BLM_0156077

This weathered surface is due to natural rebound of the land surface combined with the physical and chemical weathering processes. As a result, this weathered zone may transmit water of variable water quality along the topographic gradient of occurrence, and as a result, Qgf and Qgy
=I Surface Creek study area
— Streams
— Ditches and enhanced streams
Lakes sod reservoirs
— Highways
Bedrock Hydrogeological Units
Tmi - Tertiary Intrusions
Two - Wasatch [incl. Ohio Creek Formation]
Kmv - Mesaverde Formation [incl. Rollins Sandstone]
Km - Mancos Shale
Kdb - Dakota-Burro Canyon Formation
Jmwe - Morrison & Wanakah Formations,
• Entrada Sandstone
a -,'---' .
OPIP. 1111/1
1
44111 4,10 1r
.'gk 'Illik .
.7
•
*
4.011414
/
)
.
01. "0 0
1
,.
4
/I
i --, _./
N
;
I"
.
7
,
.52
.,
/
./
'
,

BLM_0156078

,
- Fruitgroweit
:: er
j'. ,..
/
Orc hard City'
R servoir O
Codaredge
,
j
CE• ME
'4°
H
l*
1
r
40,
c
f
PI
t,
REMAND
i
a l
A
2 3 4 Miles
'IMF
1 1 I 1 I J 1 i I
Of Delta....,./ 4a —' "Mr
_Risk
' 11
-411.-
7. ....... \404A1
am.
RI=

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 21
deposits can be connected to the Hillslope deposits (Qs) as one system. Indeed, the weathered
Mancos Shale will tend to fail in slump failures and mudflows to become the Hillslope (Qs)
aquifer. This will become apparent in the discussions of the Redlands Mesa and Cedar Mesa
(Qgf-Km(w)-Qs) hydrologic connectivity, and the Tongue Creek Subsystem (Qgy-Km(w)-Qs-
Qal) hydrologic connectivity.

Figure 14. Map Showing Top of Bedrock Hydrogeologic Units in SCV Area.

2.4.3 Hydrostructural Units of the SCV Area

Hydrostructures, which are defined by faults and fracture zones, control the location of
most of the main drainages and exist subregionally and regionally (Figure 15). These fault and
fracture zones have influenced the location of the main surface water drainages in the SCV study

area by providing zones of weakness whereby the streams have downcut through the unconsolidated deposits into the underlying Mancos Shale bedrock. As a result, the SCV study area is dissected into five distinct and unconnected hydrologic systems: Redlands Mesa; Currant Creek; Cedar Mesa (including Harts Basin); Surface Creek Valley, and the Tongue Creek drainage system with associated tributaries.

, ..... ,
. ..... .i Surface Creek study area
-Streams
Ditches and enhanced streams
Lakes and reservoirs
- Highways
Della County - Elevation (100ft interval)
Unconsolidated Hydrogeological Units
Qal - Alluvium
Qd - Glacial Deposits
Qgy - Younger Valley
Qat - Younger River Terraces
agt - Fans and Lower Mesa Gravels
A Qs - Hillside (Slope) Deposits
• Qgo - Older Mesa Top
- -structures
I .... . .....
.. "*
. .
/
..
e
.
.
. ,.
.. ' .
0
. -.0—
-...
or
....
.
....
. .
"
.
,
e I
_
_
,

, .

—

-;••,,

.
.'
.'

—
.
0

... l'. -

41442  1

t. Faul

' "

t

-

f

,.…

1

. ,

1

..
..

- ..hr • • o • •

reek Fau lt

---- -...... .. 1:

•

., • ' .

\

lWl

at

aa

l l i

fII

II

P%redg e Fa

:

•

Ilik

.. .

…0

t

P

P*

--.."1111

kb

ok 4...

S

2

\
'O
r
.
,.….,..
4s.. ..
i
1 - 4.4.
..
;
. ' - -
Z I MIOr i
:110.. .. . . ....
..,, . . .
e
N i r:.
po
%
N._ t)! "e s
.
-"••….. . , .
\
i.•\\
' 204.
4.
1/
. .
4.
0
1
' •
k
/
NS
.
"
.
'
NFSCV hydro
N
A
, 1 2 3 4 Miles
L k 1111111
Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 22
Figure 15. Map Showing Major Hydrostructures (Faults and Fracture Zones) in the SCV Area.
The faults and fracture zones may influence the hydrogeology and hydrologic systems of

BLM_0156082

Currant Creek, Surface creek, and the Tongue Creek main stem and tributaries and the main Gunnison River as hydrostructures (Figure 15). These hydrostructures underlie these drainages in the bedrock systems (Mancos Shale primarily) and are most likely associated with preferential groundwater flow along fault and fracture zones that are observed or hypothesized to transmit groundwater either vertically or laterally along the fault or fracture planes or zones. These structures may serve as distinct hydrogeologic units, may enhance the permeability of sections of bedrock hydrogeologic units, may connect multiple hydrogeologic units together, or may restrict the thickness and flow of overlying unconsolidated deposits resulting in springs and groundwater discharge areas. These hydrostructures, if "open", may also result in connectivity between deeper groundwater systems and the streams, which may be a concern if oil and gas activity is progressing at depth (fracking, horizontal drilling).

Each fault and fracture zone should be evaluated for the following characteristics: 1) fault and fracture plane geometry, including the vertical or horizontal nature of the fault/fracture plane and the relations of rock types and geometry on both sides of the structure; and 2) the transmissive nature of the fault/fracture plane or fault/fracture zone, including the nature of fault gouge, if any (clay, gravel) and tectonic setting of fault/fracture plane or zone (extension or Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 23 compression). The fault/fracture plane geometry is important to evaluate if groundwater can move horizontally across the zone from one transmissive unit to another, or whether the groundwater is forced to move vertically upward to the surface, in many cases, or downward into a different hydrogeologic unit, or laterally parallel to the fault and fracture zone like a geotechnical French drain. The tectonic setting helps determine whether the fault/fracture plane is "open"—able to easily move water (extension), or "closed"—not able to easily move water (compression).

Three broad hydrostructure sets occur in the SCV area: 1) the northeast-trending faults and fractures that parallel the Currant and Surface Creek fault zones and associated en-echelon faults and fracture zones to the east (for example, Upper Leroux Creek fault zone and the North Fork Valley lineament); 2) the north-south-trending Tongue Creek fracture zone and Cottonwood Creek and Ward Creek faults, which parallel the Lower Leroux Creek fault zone; and 3) the east-west trending Gunnison River lineament (Figure 15).

The northeast-trending faults and fractures are relatively young, as the geomorphic systems of Currant Creek and Surface Creek are responding with considerable downcutting, allowing for partial to full penetration of the unconsolidated hydrogeologic unit aquifers. It is hypothesized that the northeast fracture zones are "open" and function like French drains. Groundwater moves laterally down valley and vertically downward along the northeast-trending fault and fracture zone planes, and may move vertically up along the fault and fractures plane near the lower reaches of the various drainages (this would be evidenced by gaining reaches in streams or increased groundwater head with depth in local wells).

The north-south-trending Tongue Creek fracture zone and associated en-echelon fault and fracture zones, are also hypothesized to be "open" and function like French drains. Groundwater moves laterally down valley and vertically downward along the north-south-trending fault and fracture zone planes, and may move vertically up along the fault and fractures plane near the lower reaches of the various drainages (this would be evidenced by gaining reaches in streams or increased groundwater head with depth in local wells).

In the east-west trending Gunnison River lineament/fracture zone, groundwater in alluvium and the underlying bedrock systems moves horizontally along the fault plane from east

BLM_0156083

to west, and vertically upward from bedrock systems into unconsolidated materials in the lower reaches below Orchard City, where it discharges into the lower Gunnison River. Therefore, the effects of anthropogenic activities, such as irrigation or oil and gas activity, may propagate to the land surface along the Gunnison River (Figure 15).

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 24

Geological Unit Geological Subunit Hydrogeological
Unit
Hydro-geological
Unit
Symbol
Composition Hydrogeological Characteristics Permeability/Storativity Depth to Water
(small/ moderate/
large/ highly
fluctuating)
Extent
(local/
sub-regional/
regional)
Recharge Type
(natural/
anthropogenic)
Alluvium (Qa); alluvium and
eolian deposits (Qae)
Alluvium Qal Poorly sorted riverine gravel, sand
and silt deposited mainly in stream
channels and floodplains in major
stream valley bottoms; moderately
to well bedded deposits
Generally good local phreatic aquifer with
matrix based permeability; limited variations
in groundwater levels; often sustained by local
and sub-regional discharge to adjacent stream
or recharge directly from stream. Seasonal
and storm variations of water table with
stream variations
high matrix-permeability; high
storativity
small local natural and
anthropogenic
Younger gravel (Qg, Qgy) Younger valley
gravels
Qgy Poorly sorted sands and gravels;
pebbles and cobbles in sand to silt
matrix
Potentially good, spatially continuous phreatic

aquifer with high matrix based permeability;
may be supported by underlying bedrock.
high matrix-permeability; high
storativity
highly fluctuating local natural and
anthropogenic
Glacial drift, till, moraine (Qd,
Qm, Qpt)
Quaternary glacial
deposits
Qd Heterogeneous, poorly sorted
deposits of boulders, gravel, sand, silt
and clay
Potentially good local phreatic aquifer with
variable matrix based permeability and high
water table gradients.
high matrix-permeability; high
storativity
highly fluctuating local natural and
anthropogenic
Landslide deposits, colluvium,
mudflow deposits, talus (Ql,
Qcl, Qs, Qls, Qta);
unconsolidated deposits
derived from the Wasatch
Formation and Basalt cap on
Grand Mesa (Quw)
Hillside (slope)
deposits
Qs Loose gravels and rock debris with
mixed matrix composition (sand-clay)
on valley sides, valley floors and
hillslopes; deposited by gravitational
processes
Potentially good, highly localized phreatic
aquifer with high matrix based permeability
and high water table gradients.
high matrix-permeability; high
storativity
highly fluctuating local natural and
anthropogenic
Old/older gravels (Qgo, Qgd) Older mesa top
gravels
Qgo Poorly sorted sands and gravels;
pebbles and cobbles in sand to silt
matrix

Potentially good, spatially continuous phreatic
aquifer with high matrix based permeability;
may be prone to significant (seasonal) water
table fluctuations; tends to recharge bedrock
systems
high matrix-permeability; high
storativity
moderate local natural and
anthropogenic
Middle gravel (Qgm) and fans
(Qf)
Fans and lower mesa
gravels
Qgf Poorly sorted sands and gravels;
pebbles and cobbles in sand to silt
matrix
Having high matrix based permeability,
presence of groundwater depends on location
in topography and on landuse. In the NFVT
area this unit only contains significant
groundwater where leaking ditches are
present; in the SCV area and on Rogers Mesa
it is a major groundwater unit due to irrigation
return flow..
high matrix-permeability; high
storativity
highly fluctuating local natural and
anthropogenic
High level alluvium (Qat);
younger terraces (Qad);
alluvial gravels (Qga)
Younger river
terraces
Qat Poorly sorted sands and gravels;
pebbles and cobbles in sand to silt
matrix; forms terraces above current
North Fork level
Potentially good, spatially continuous phreatic
aquifer with high matrix based permeability.
high matrix-permeability; high
storativity
highly fluctuating local natural and
anthropogenic
Table 2a. Correlation of Geological and Hydrogeologic Units in the SCV Study Area:
Unconsolidated Sediments.
North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page

BLM_0156086

25

| Geological Unit | Geological Subunit | Hydrogeo-logical Unit | Hydro-Unit Symbol | Composition | Hydrogeological Characteristics | Permeability/Storativity (small/ moderate/ large/ highly fluctuating) | Depth to Water | Extent (local/ sub-regional/ regional) | Recharge Type (natural/ anthropogenic) |
|---|---|---|---|---|---|---|---|---|---|
| Tertiary Intrusive Rocks | Tertiary Intrusive Rocks | | Tmi | Granodiorite and quartz monzonite; may occur as dikes and sills | Fractured crystalline system with very low matrix permeability; not a (sub-)regionale aquifer; may produce locally water in fracture zones and support adjacent unconsolidated aquifers. These characteristics may extend into adjacent rocks,methamorphosed during the Tertiary intrusion. | mostly low permeability, localized zones with moderate fracture permeability; low storativity | | large | local natural |
| Wasatch Formation (Tw) - including Ohio Creek Member | Wasatch Formation | | Two | Channel sandstones and overbank siltstones and shales; conglomerate; carbonaceous shales and lignite near base | Overbank sandstones form a good aquifer system with moderate to good matrix and fracture based permeability; may be a locally good water producer; | | | | |

BLM_0156087

siltstones and shales are confining layers; outcrops
are recharge areas for a regional flow.
layers with very low
permeability and layers with
moderate matrix and fracture
permeability; low to moderate
storativity
large regional natural
Barren Member
Upper Coal-bearing Layer
Lower Coal-bearing Layer
Rollins Sandstone Member
Undivided
Upper and Lower Sandstone
Members of Mancos Shale
(Kms, Kmsl)
Fort Hays Limestone Member
of Mancos Shale (Kmf)
Lower Mancos Shale, including
Frontier Sandstone and
Mowry Shale members (Kml)
Dakota Sandstone
and Burro Canyon
Formation (Kdb)
Dakota Sandstone
and Burro Canyon
Formation
Kdb Well indurated, medium to coarse
grained quartzose sandstones in well-cemented
thick beds and
conglomerate with occasional
siltstones and carbonaceous shale
Good regional bedrock aquifer system; sandstones
have both moderate matrix and fracture based
permeability; sub-regionally aquifer with recharge in
outcrop areas.
moderate matrix and fracture
permeability; moderate
storativity
large regional natural
Morrison
Formation (Jm,
Jmb, Jms);
Morrison,
Wanakah and
Entrada

BLM_0156088

Formations
undivided (Jmwe)
Morrison and
Entrada
Formations
Jmwe Morrison Form. (Jm): Siltstones and
claystones throughout with
sandstones becoming more common
in lower sections, and limestone near
base; Entrada Form. (Je): fine-grained,
well-sorted sandstones; Je is
overlain by Jm
Entrada is a very good, regionally sustainable aquifer
with moderate to good matrix and fracture based
permeability. Morrison shales are confining layers
while the lower Morrison sandstones and limestone
may serve as local to sub-regional aquifers.
layers with very low
permeability and layers with
moderate matrix and fracture
permeability; low to moderate
storativity
large regional natural
Mancos Shale
(Km)
Mancos Shale
(undivided)
Km
Undivided Mesa Verde Group Kmv
(undivided)
natural
Mesa Verde
Group (Kmv)
Silty to sandy shale with bentonites
with minor limestone- and sandstone
beds; when undivided, lower section
includes Ft Hays limestone
very low permeability rock
with some moderately
permeable beds; low
storativity
Mostly aquitard with very low permeability serving highly fluctuating
as a confining layer for underlying or embedded
aquifers; however, locally moderate aquifer
conditions when highly fractured or in areas with
sand lenses and sandy beds.

BLM_0156089

n.a.

Interbedded sandstones and
siltstones, shales and carbonaceous
shales and coals.

Good regional bedrock aquifer system; sandstones
and coals have both moderate matrix and fracture
based permeability; may locally be a good water
producer; shales are confining layers; outcrops are
recharge areas for regional flow.

layers with very low
permeability and layers with
moderate matrix and fracture
permeability; low to moderate
storativity

large regional natural

Table 2b. Correlation of Geological and Hydrogeologic Units in the SCV Study Area: Bedrock Units.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 26

2.5 Groundwater Flow Systems

Groundwater flow is the movement of water from the earth's surface into the subsurface (groundwater infiltration and recharge), through the subsurface materials (groundwater flow and storage), and from the subsurface back to the Earth's surface (groundwater discharge), expressed in terms of flow directions, patterns and velocities. The driving force for groundwater flow is a difference in (piezometric) "head" or groundwater levels, as expressed, for example, by the slope of the water table. The general CSM of the groundwater flow system consists of 1) water inputs (recharge); 2) storage in and movement through subsurface hydrogeologic units (groundwater flow); and 3) outputs (discharge). Natural recharge is based on climate and soils resulting in infiltration of precipitation and snowmelt. Groundwater interaction with streams, vegetation (evapotranspiration), and human activity (irrigation, urbanization, wells and individual sewage disposal systems, reservoirs and ponds, oil and gas activity, mining, dewatering) will affect groundwater movement to varying degrees. The CSM also incorporates topography (steepness, slope aspect, degree of landscape dissection), geomorphology, and soil and rock properties. Because of the time-space variance of these inputs and outputs, a groundwater system often shows significant variations in water levels, water storage, flow velocities, and flow patterns. Some of the variations are seasonal; others may be related to multi-year periods of above-average
or below-average precipitation. This results in variations in the availability of water from these hydrogeologic units.

Based on the HESA approach (Kolm and others, 1996), and previously collected
supporting data, the subregional and local scale (typically less than 100 square miles) shallow groundwater flow systems are delineated. The broad hydrologic system inputs include infiltration of precipitation as rain and snowmelt, areas of losing streams and rivers (upper Currant Creek, upper Surface Creek, upper Tongue Creek, sections of the Gunnison River below Hotchkiss) in some locations, infiltration and runoff from water bodies (cattle and house ponds, Fruitgrowers Reservoir), upland irrigation areas (leaking ditches, irrigation return flow), and inter-aquifer transfer of groundwater between unconsolidated materials and bedrock systems.

BLM_0156090

Mesa Top and Hillslope subsystems consist of the hydrologic processes of surface runoff (overland flow) and rapid near-surface runoff (interflow or shallow through-flow); saturated groundwater flow in parts of the bedrock units, landslides, terraces, and valley bottoms; and discharge to springs and seeps, graining streams, by plants as evapotranspiration, and by pumping wells. In general, shallow groundwater flow in these systems is towards the valley bottoms, perpendicular to the major streams. Where permeable bedrock units intersect mesa tops, hillslopes, and valley bottoms, recharge by groundwater moving from unconsolidated hydrogeologic units into the bedrock hyhdrogeologic units may force the groundwater into a more regional pattern determined by geological structure, independent from local topography and hydrography, as is observed in the northern part of the study area near the higher slopes of Grand Mesa. The SCV groundwater systems are a complex mix of predominantly the shallow aquifer systems underlain by a more confining hydrogeologic unit: the Cretaceous Mancos shale. Locally and subregionally, various hydrostructures may influence interconnectivities of the shallow units with deeper bedrock systems.

The Mesa Top (Redlands Mesa; Cedar Mesa/Harts Basin) subsystems, located in close proximity to the Valley Bottom subsystems, have a unique, sometimes complex groundwater story, often resulting from human interference. Under natural conditions, these subsystems have hydrologic system inputs and outputs, similar to Hillslope subsystems. However, natural and North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 27 anthropogenic influences have frequently attached these subsystems hydrologically to adjacent Valley Bottom subsystems.

The Valley Bottom subsystems, where stream-aquifer-wetland interactions occur, are areas of both groundwater recharge and discharge, and groundwater flow can have a rather diffuse character and often flows towards or aligns more or less with the streams and rivers. These subsystems depend primarily on interactions with their main streams such as Currant Creek, Surface Creek, and Tongue Creek (with tributaries), and the Gunnison River; and the management of subregional ditches and subsurface return flow from irrigation lands and corresponding spring storage.

The wetlands associated with the local hydrogeologic subsystems in the Gunnison River, and in Currant, Surface, and Tongue Creeks are a mix of slope-type and riverine-type classifications given the groundwater support of various ditches and irrigation schemes, unconsolidated hydrogeologic unit groundwater systems, and hydrostructures.

As springs are discharge points of groundwater flow systems, their presence in the SCV study area provide clues about these groundwater flow systems, including the role of the hydrogeological units, and the effects of natural and anthropogenic recharge on flow and water quality. To identify the location and discharge rates of springs and seeps in the SCV area the State water rights database was searched in May 2014 (CDWR 2014).

There are two general categories of springs, based on spring location with respect to hydrogeologic location, that are identified on topographic maps and in the State water rights records for Delta County (Figure 9): 1) Unconsolidated Unit/Cretaceous Mancos Shale interface springs; and 2) Unconsolidated Unit or non-interface springs controlled by topography and geomorphology. The interface springs are located at the Qa/Km interfaces along drainages or at the Qgf/Qs/Km interfaces along the edges of mesas where the fans and lower mesa gravels (Qgf) and mass wasting slope materials (Qs), which are the potential unconsolidated aquifers, abut against the Cretaceous Mancos Shale (Km), which is a confining unit, forcing groundwater to the surface. The non-interface springs are located in the modern alluvium (Qal) and younger valley

gravels (Qgy).

Springs can also be categorized with respect to recharge dynamics: 1) Springs recharged primarily by natural precipitation and infiltration; 2) Springs recharged primarily by leaky irrigation ditches, with secondary recharge by return flow from irrigation and infiltration of natural precipitation; and 3) Springs recharged primarily by return flow from irrigation, and secondary recharge by precipitation and/or leaky irrigation ditches. Springs recharged primarily by natural precipitation and infiltration are observed in Qs in the uppermost (northern) regions of the SCV study area (for example in the Ward Creek and Currant Creek area). Springs recharged primarily from leaky irrigation ditches, with secondary recharge by return flow from irrigation and infiltration of natural precipitation are observed in the upper parts of the Cedar Mesa and Redlands Mesa, where the irrigation ditches initially connect with the Qgf units and the effects of irrigation return flow are not present. The springs recharged primarily from return flow from irrigation, and secondary recharge by precipitation and/or leaky irrigation ditches, are observed in the lower discharge areas in the Qgf units on Cedar and Redlands Mesas, the Qs deposits associated with the Cedar and Redlands Mesas, and the Qgy springs in the Surface Creek Valley near Cedaredge.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 28

Finally, springs can also be categorized with respect to age based on information from the State water rights data base for springs/seeps and ditches (CDWR 2014): 1) Pre-irrigation springs

that most likely were the result of infiltration of natural precipitation; and 2) Post-irrigation springs that most likely were the result of either irrigation return flow to the groundwater or infiltration of water due to leaky irrigation ditches. This latter category of springs and nearby wells is most vulnerable to changes in water use and water rights decisions. Most of the springs in the SCV area and affiliated water rights will be associated with the effects of the various leaky irrigation ditches and the return flow of irrigated water.

2.6 Groundwater System Conceptual Site Models by Subsystem

Based on the presence and orientation of various hydrogeologic and hydrostructural units, hydrography and topography, three CSMs will be discussed in the SCV study area:

1. Mesa Top and Hillslope Shallow Aquifer Subsystems, which include the Redlands Mesa and Cedar Mesa\Harts Basin Subsystems;

2. Valley Bottom Shallow Aquifer Subsystems, which include the Currant Creek, Surface Creek, and Tongue Creek Subsystems; and

3. Regional Bedrock Aquifer Subsystems.

In addition, a brief discussion of the interface of the Valley Bottom Shallow Aquifer Subsystems with the Gunnison River Subsystem will be presented.

The conceptual models are discussed in forthcoming sections and illustrated by cross-sectional and plan view figures, and by Google Earth screen shots. The locations of representative cross-sections

are shown in Figure 16. A landscape view of the area is shown in Figure 17. Note that Redlands Mesa, Cedar Mesa, and Antelope Hill are topographic islands.

2.6.1 Mesa Top and Hillslope Shallow Aquifer Subsystems

As stated in Section 2.4.2, there are two significant hydrogeologic groups in the Mesa Top and Hillslope Shallow Aquifer Subsystems, which include the Redlands Mesa Subsystem, and the Cedar Mesa\Harts Basin Subsystem:

1. Quaternary unconsolidated clastic units (Qs and Qgf in Table 2a and Figure 13),

which are predominantly hillside (slope) deposits and lower mesa gravels and fans; and

2. Cretaceous bedrock unit of the Mancos Shale (Km) (Table 2b and Figure 14).

The shallow Quaternary unconsolidated materials in these two subsystems are ubiquitous, and include glacial-alluvial, mass wasting, and paleo-alluvial (terrace) deposits (Figure 13 and Table 2a). These highly-permeable deposits are locally heterogeneous, with a mix of coarser and finer materials in all of the deposits. These deposits are underlain by a paleotopographic surface carved out by paleofluvial systems that eventually deposited the Quaternary unconsolidated materials that are the aquifers being evaluated.

The general aspects of groundwater flow in the Quaternary unconsolidated materials have been discussed in Section 2.5. Specifically, the shallow groundwater on Redlands Mesa is dominated by the Quaternary unconsolidated materials (Qgf and Qs), which receive natural recharge by infiltration of precipitation (snow and rain; Rp), and major recharge from leaky

- Streams

: : Sufface Creek study area

V

4. ........ ..................

- Ditches and enhanced streams

Lakes and reservoirs

- Highways

Delta County - Elevation (100ft interval)

Unconsolidated Hydrogeologioal Units

Qal -Alluvium

Qd - Glacial Deposits

', ',.

11

14

-

I

106°

..

5,)

...

Qgy - Younger Valley Gravels

Qat - Younger River Terraces

Qgf - Fans and Lower Mesa Gravels

Qs - Hillside (Slope) Deposits

Qgo - Older Mesa Top Gravels

Exposed (weathered) bedrock

r

,,,4/

7

; r

AA.

:7

.

BLM_0156093

, ,
)'
fr ,;:r

,,,
I
A'
..,
11,
c
:
, ..
Surface Creek Valley Cross-sections
41 1
.
4 ,
illigi
Te
rAf,
AN i
molt-
.,j
.2 ,
,
/, , ,v, DLA (
IF A A r ro• . . , :
,,,
.
Pitg, e
orr 4 4
N
0 1 2 3 4 Miles
11111 I 1 I
•
0
7i ,I.,*
10
or
4,10
11-.41111 111 (River
f 4
R
r
=s
,i-
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 29
irrigation ditches originating from Leroux Creek (Rd) and reservoirs locally, and return flow

BLM_0156094

from area irrigation locally(Ri) (Figures 18, 19, and 20). The unlined ditches are "line" sources of groundwater recharge (Rd) leading to and at the top of the irrigated field areas; the return flow from irrigation is considered an "area" source of groundwater recharge (Ri). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands) (Figures 18, 19, and 20).

Figure 16. Map Showing the Locations of the Cross-sections Representative for the Conceptual Site Models in the SCV Area on Top of the Hydrogeologic Units.

Groundwater flow on top of the gravel-capped Redlands Mesa then moves with topography or subsurface paleo-topography to discharge into springs at the gravel/Mancos Shale interface along the incised drainages that bound the mesas (Dsp), discharge directly out the front of the mesa as seeps or springs (Dsp) at the gravel/Mancos Shale interface, or discharge into the hillslope slope and mudslide deposits (Qs) causing further mass wasting activity (Figures 18, 19, 20, and 26). Given the "new" water that has recharged the aquifer, springs may have been developed after the initiation of irrigation on the mesa and claimed as being "new" springs. There is also groundwater discharge from the gravels locally by groundwater wells (Dw) and by phreatophytes (Dp). The shallow groundwater subsystems in this Mesa Top and Hillslope area have little connection to the local bedrock or the regional groundwater systems, or to nearby alluvial systems, such as Leroux or Currant Creeks. Google Earth can be used to visualize these relationships (for example, Figures 21a and b).

WEST
Bluenose Mesa
EAST
Surface Creek Valley
I
1
Qgy - Younger Valley Gravels
Qa - Local Alluvium
ws
f
Discharge to phreatophytes (Evapotranspiration) (Dr)
Recharge from precipitation (Rp)
Discharge from gravels to Springs (Dsp)
Recharge from ditches to gravels (Rd)
Domestic well (Discharge from gravels; ;)
Recharge of gravels from irrigation return flow (Ri)
Fracture Zone
Dirty Georg Cree e k
Surface
4— ElevatIon
6350
ft
? Qs - Slope 8 Mudslide Deposits
? Km - Mancos Shale
Groundwater flow
0

BLM_0156095

Groundwater flow perpendicular to
plane of cross section (Rd)
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 30
Figure 17. Google Earth View of the Study Area Looking North.
Figure 18a. East-west Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope, and
Valley Bottom Shallow Aquifer Subsystems in the SCV Study Area
(Western section; A-A' in Figure 16).
WEST EAST
Qgy - Younger Valley Gravels
Qgf - Fans and Lower Mesa Gravels
IM Qs - Slope & Mudslide Deposits
Km - Mancos Shale
Fracture Zone
0
Groundwater flow perpendicular to
plane of cross section (R0)
Qa - Local Alluvium  Discharge to phreatophytes (Evapotranspiration) (Dp)
Recharge from precipitation (Rp)
Discharge from gravels to Springs (Dsp)
Recharge from ditches to gravels (Rd)
Domestic well (Discharge from gravels; Dw)
Recharge of gravels from irrigation return flow (R1)
Groundwater flow
Cedar Mesa
Redlands Mesa
•
* )
surface
t
6.5 ft
I 1-
A' A"
Surface
Elevation
5870 fl
4111b NORTHEAST
Preupdatwn
SOUTHWEST
Redlands
Mesa
Leroux Cre ek
Surface
Elevation
720011
Surface

BLM_0156096

Elevation
70001
Shamrock Mesa
Surface
elevation
61008
Surface
Elevation
55001
B B'
Qgf - Fans and Lower Mesa Gravels
=I Qs - Hillside (Slope) deposits
Km - Mancos Shale
.6— Groundwater flow
4, Recharge of gravels from irrigation
return flow (RI)
Recharge from precipitation (Rp)
Discharge to phreatophyles (Evapotranspiration) (Dr)
Domestic well (Discharge from gravels; Dw)
Discharge from gravels to springs (Dsp)
Recharge from (Leaking) ditches or
water bodies to gravels (Rd)
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 31
Figure 18b. East-west Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope,
and Valley Bottom Shallow Aquifer Subsystems in the SCV Study Area
(Eastern section; A"-A'" in Figure 16).
Figure 19. North-south Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope
Subsystem in the Redlands Mesa area (B-B'' in Figure 16).
• SCV study area
- M2101 streams
- Other streams and ditches
Lakes and reservoirs
- Highways
Surface elevation (100ft interval)
Springs and seeps - Appropriated Flow Rate [2013]
• <0.01 cfs
• 0.01 - 0.04 cfs
• 0.05 - 0.1 cfs
• 0.11 - 1.0 cfs
• > 1.0 cfs
Groundwater discharge zones
Irrigated Parcels [2005]
Direction of groundwater flow
Unconsolidated Hydrogeological Units

BLM_0156097

Gal - Alluvium
Od - Glacial Deposits
Ogy -Younger Valley Gravels
Qat - Younger River Terraces
Ogf - Fans and Lower Mesa Gravels
Os - Hillside (Slope) Deposits
Qgo - Older Mesa Top Gravels
A
0 1 2 3 4 Miles
I III Ili
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 32
Figure 20. Plan View of the Conceptual Site Model of the Mesa Top and Hillslope, and Valley Bottom
Shallow Aquifer Subsystems with Discharge Zones and Groundwater Flow Direction.

A similar hydrologic system exists on Cedar Mesa, a subsystem that extends from Cedar Mesa through Harts Basin to Surface Creek (Figures 18, 20, and 22). The Cedar Mesa\Harts Basin Subsystem is dominated by the Quaternary unconsolidated materials (Qgf), which receive natural recharge by infiltration of precipitation (snow and rain; Rp), and major recharge from leaky irrigation ditches originating from upper and middle Surface Creek (Rd) and reservoirs locally, and return flow from flood irrigation locally(Ri) (Figures 18, 20, and 22). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands). (Figures 18, 20, and 22).

Groundwater flow on top of the gravel-capped Cedar Mesa aquifer (Qgf) then moves with topography or subsurface paleo-topography to discharge into springs at the gravel/Mancos Shale interface along the incised drainages that bound the mesas (Dsp), discharge directly out the front of the mesa as seeps or springs (Dsp) at the gravel/Mancos Shale interface, discharge into partially incised drainages as gaining streams (Dgs), discharge as surface springs due to underlying topography (Dss), or discharge into the hillside slope and mudslide deposits (Qs) causing further mass wasting activity (Figures 18, 20, 22 and 26). Given the "new" water that has recharged the aquifer from irrigation related sources, springs may have been developed and claimed as being "new" springs. There is also groundwater discharge from the gravels locally by North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 33 groundwater wells (Dw) and by phreatophytes (Dp). The shallow groundwater subsystems in this Mesa Top and Hillslope area have little connection to the local bedrock or the regional groundwater systems, or to nearby alluvial systems, such as Surface or Currant Creeks. Google Earth can be used to visualize these relationships (for example, Figure 23).

Figure 21a. Google Earth View of the Mesa Top and Hillslope Subsystem at Redlands Mesa, Looking North.
Note Groundwater Discharge in the Gullies at the Southern Slopes of Redlands Mesa and the Line of Seepage
from a Ditch Halfway Down the Slopes (dark green areas).
Figure 21b. Google Earth View of the Mesa Top and Hillslope Subsystem at Redlands Mesa, Looking
Northeast. Note Groundwater Discharge Areas in Discontinuous Hillslope Deposits on Northwestern Side of

Redlands Mesa. In Some Areas Hillslope Deposits Connect Gravels on Top of Mesa with
Currant Creek
Alluvium.
Surface
Elevation
7t005
;
Harts Basin
5
• A •
Fut Growers Reservoir
a
St
Surface
Elevation
sonar
1 mile
C
No Flow Unit
C'
SOUTHWEST NORTHEAST
ecl V a precipitation
Cedar Mesa
Qgf - Fans and Lower Mesa Gravels
Qs - Hillside (slope) deposits
Qa -Alluvial stream and mudslide deposits
Km - Mancos Shale
Groundwater flow
Recharge of gravels from irrigation
return flow (IR)
;' Recharge from precipitation (Rp)
Discharge to phreatophytes (Evapotranspiration) (Dp)
ir Domestic well (Discharge from gravels; Dw)
Discharge from gravels to springs (13,p)
•
Recharge from (Leaking) ditches or
water bodies to alluvium and gravels (Rd)
• Evaporation from open water
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 34
Groundwater discharge from the Cedar Mesa subsystem enters the surface water system
in ditches and gaining streams, and contributes to the surface water flow into the north side of
Fruitgrowers Reservoir (Figures 20 and 22).
Figure 22. North-south Cross-sectional View of the Conceptual Site Models of the Mesa Top and
Hillslope
Subsystem in the Cedar Mesa Area (C-C' in Figure 16).
2.6.2 Valley Bottom Shallow Aquifer Subsystems

As stated in Section 2.4.2, there are three significant hydrogeologic groups in the Valley Bottom Shallow Aquifer Subsystems, which include the Currant Creek Subsystem, the Surface Creek Subsystem, and the Tongue Creek (and affiliated tributaries) Subsystem:

1. Quaternary unconsolidated clastic materials (Qal and Qgy) in Table 2a and Figure 13), which are predominantly alluvial valley bottom and terrace deposits;

2. Bedrock units, including the Tertiary Wasatch Formation (including the Ohio Creek Member; Two in Table 2b and Figure 14); Cretaceous Mesa Verde Group (Kmv in Table 2b and Figure 14); Cretaceous Mancos Shale bedrock unit (Km in Table 2b and Figure 14); and Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb in Table 2b and Figure 14); and

3. Northeast-trending and north-south trending fault/fracture zone/lineament hydrostructures (Figure 15).

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 35

Figure 23a. Google Earth View of the Mesa Top and Hillslope Subsystem at Cedar Mesa, Looking North.

Note Groundwater Discharge at the Southeastern Slopes along Currant Creek and towards Harts Basin on

the Southwestern Slopes (dark green areas).

Figure 23b. Google Earth View of the Mesa Top and Hillslope Subsystem at Harts Basin, Looking Northeast.

Note Groundwater Discharge from Harts Basin Is Towards Fruitgrowers Reservoir; Groundwater Discharge

from Antelope Hill Is Primarily Through Springs and Seeps (dark green areas).

The shallow Quaternary unconsolidated materials in these subsystems are ubiquitous, and include modern alluvium (Qal) and younger valley gravels (Qgy) (Figure 13 and Table 2a). These highly-permeable deposits are locally heterogeneous, with a mix of coarser and finer materials in the alluvial deposits (usually coarser sediments on the bottom grading to finer sediments on top). These are underlain by a paleo-topographic surface carved out by

SOUTHWEST

Precipitation

NORTHEAST

Precipitation

I

O

iir

Discharge to phreatophytes (Evapotranspiration) (Do)

Domestic well (Discharge from gravels; Dw)

Discharge from gravels to stream (Ds; gaining stream)

Recharge from stream to gravels (R5; losing stream)

Flow from gravels to bedrock (Fgb)

Recharge of gravels from irrigation return flow (RI)

Recharge from adjacent uplands to gravels (Ro)

Discharge from gravels to springs (Dsp)

Orchard City

Cedaredge

Ogy/Qa - Younger Valley Gravels and

BLM_0156100

Local Alluvium
Two - Wasatch F.
Kmv - Mesa Verde F.
Km - Mancos Shale
Surface Creek
Groundwater flow
Recharge from precipitation (Rp)
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 36
paleo-fluvial systems that eventually deposited the Quaternary unconsolidated materials that are
the aquifers being evaluated.

The general aspects of groundwater flow in the Quaternary unconsolidated materials have
been discussed in Section 2.5. Specifically, the shallow groundwater in the Currant Creek
subsystem is dominated by the Quaternary alluvium (Qal), which receives natural recharge by
infiltration of precipitation (snow and rain; Rp) and losing streams (Rs); input from hillside
(slope) deposits derived from the glacial gravels (Rsd); and additional recharge from leaky
irrigation ditches originating from both Leroux Creek and Currant Creek (Rd); and return flow
from irrigation locally (Ri) (Figures 18b and 24). Water leaking from the unlined ditches and
irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the
discharge zones (streams, springs and seeps, and wetlands) (Figures 18b and 24).

Figure 24. North-south Cross-sectional View of the Conceptual Site Models of the Valley
Bottom Shallow
Aquifer Subsystem in the Surface Creek Valley (D-D' in Figure 16).

Groundwater flow in the Currant Creek alluvium moves in the same direction as the
stream with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface
topography, saturated thickness of the alluvium, or the seasonal variations caused by snowpack
runoff or storm events. Springs are observed at the Qal/Mancos Shale (Km) interface along the
stream bed (Figures 18b and 20). There is also groundwater discharge from the alluvium locally
by groundwater wells (Dw) and by phreatophytes (Dp). The shallow groundwater in the Currant
Creek subsystem would normally have little connection to the local bedrock or the regional
groundwater systems, given the Mancos Shale bedrock. However, underlying the Currant Creek
alluvium is the Lower Currant Creek Lineament – Fracture Zone, the Cedar Gulch lineament, the
Upper Currant Creek Lineament, and the Cactus Park Fault Zone (Figure 15). These areas of
hydrostructures are hypothesized to be open conduits, where the faulted and fractured bedrock
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 37
may combine with the alluvium (Qal) to form a French Drain effect resulting in increased
groundwater flow and storage, and connectivity to deeper hydrologic systems (Figure 18b). This
could result in decreased water quality either naturally (Mancos Shale water has higher TDS,
metals) or due to human activities, such as fracking or waste disposal activities. A Google Earth
view of the Valley Bottom subsystem in the Currant Creek drainage is shown in Figure 25a.

Figure 25a. Google Earth View of the Valley Bottom Subsystem in the Currant Creek Drainage,
Looking
Southwest.

A second valley bottom hydrologic system exists along Surface Creek, a subsystem that
extends from the top of Grand Mesa and west of Cedar Mesa through the towns of Cedaredge
and Orchard City ending at the Gunnison River (Figures 20 and 24). The Surface Creek
subsystem is dominated by the Quaternary unconsolidated younger gravels (Qgy), which receive

natural recharge by infiltration of precipitation (snow and rain; Rp) system-wide, by input from adjacent uplands to gravels (Ru) and by hillside (slope) deposits derived from the glacial gravels (Rsd) in the upper reaches of the subsystem, and major recharge from leaky irrigation ditches originating from upper and middle Surface Creek and upper Ward Creek (Rd); and return flow from irrigation throughout the middle and lower part of the subsystem (Ri) (Figures 20 and 24). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands) (Figures 20 and 24).

Groundwater flow in the Surface Creek younger valley gravels (Qgy) moves in the same direction as Surface Creek with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface topography, saturated thickness of the alluvium, or the seasonal variations caused by snowpack runoff or storm events (Figure 20 and 24). Generally, the upper part of Surface Creek is gaining when flowing through the hillside (slope) gravels (Qs) as these gravels are discharging groundwater into the stream (Ds). However, at depth, the Surface Creek hillside (slope) gravels and younger valley gravels (Qgy) are recharging the Wasatch (Two) and Mesa Verde (Kmv) bedrock aquifers (Rgb) (Figures 20 and 24).

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 38

As Surface Creek crosses into the younger valley gravels (Qgy) underlain by the Mancos Shale (Km), the surface flow decreases as groundwater recharge occurs to the gravels (Rs). This function is reversed above Cedaredge and Surface Creek becomes a gaining stream due to an increase in groundwater discharge derived from leaky irrigation ditches and return flow from irrigation. Springs are observed near Cedaredge due to the thinning of the Qgy at the Qgy/Mancos Shale (Km) interface beneath the stream bed (Figure 20 and 24). There is also groundwater discharge from the gravels locally by groundwater wells (Dw) and by phreatophytes (Dp).

The shallow groundwater in the Surface Creek subsystem would normally have little connection to the local bedrock or the regional groundwater systems in the central and southern part of the subsystem, given the Mancos Shale bedrock. However, underlying the Surface Creek gravels is the Surface Creek Lineament – Fracture Zone (Figure 15). This hydrostructure is hypothesized to be an open conduit, where the faulted and fractured bedrock may combine with the younger valley gravels (Qgy) to form a French Drain affect resulting in increased groundwater flow and storage, and connectivity to deeper hydrologic systems. This could result in decreased water quality either naturally (Mancos Shale water has higher TDS, metals) or due to human activities, such as fracking or waste disposal activities.

A Google Earth view of the Valley Bottom subsystem in the Surface Creek drainage is shown in Figure 25b (upper part of valley) and Figure 25c (lower part of valley).

Figure 25b. Google Earth View of the Upper Section of the Valley Bottom Subsystem at Surface Creek,
Looking Northeast. Note the Shale Outcroppings in the Lower Left and Right Indicative of Local Near-surface
Bedrock.

The Tongue Creek Subsystem (and tributaries including Oak Creek, Dirty George Creek, Ward Creek, and Cottonwood Creek, is a third Valley Bottom subsystem (Figures 20 and 25). The shallow groundwater in the Tongue Creek Subsystem is dominated by the Quaternary alluvium (Qal), which receives natural recharge by infiltration of precipitation (snow and rain; Rp) and losing streams (Rs); input from hillside (slope) deposits derived from the glacial gravels

BLM_0156102

(Rsd) in the upper reaches of the tributaries and from younger valley gravels (Qgy) on the North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 39 drainage divides in the middle and lower reaches of the drainage; and additional recharge from return flow from irrigation along most of the alluvial sections of the stream (Ri) (Figures 20 and 24). The return flow from irrigation (Ri) discharges locally to nearby streams (Figure 20).

Figure 25c. Google Earth View of the Lower Part of the Valley Bottom Subsystems at Surface and Tongue

Creeks and Tributaries, Looking North. Note Groundwater Discharge Zones at Southern Slopes of Surface

Creek Valley System (dark green areas directly below terrace) and Effects of Leaking Ditch Along Bottom of

Southern Slopes.

Groundwater flow in the Tongue Creek alluvium moves in the same direction as the stream with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface topography, saturated thickness of the alluvium, proximity to irrigation areas, or the seasonal variations caused by snowpack runoff or storm events. Springs are observed along several reaches of the stream bed due to the thinning of the Qal at the Qal/Mancos Shale (Km) interface beneath the stream bed, or where mass wasting deposits (landslides) connect the gravels of the drainage divide (Qgy) with the Tongue Creek alluvium (Qal) (Figure 20). There is also groundwater discharge from the gravels locally by groundwater wells (Dw) and by phreatophytes (Dp).

The shallow groundwater in the middle and lower Tongue Creek subsystem would normally have little connection to the local bedrock or the regional groundwater systems, given the Mancos Shale bedrock. However, underlying the Tongue Creek alluvium is the Lower Tongue Creek Lineament – Fracture Zone, the Upper Dirty George Creek Lineament-Fracture Zone, the Oak Creek Lineament – Fracture Zone, the Ward Creek Lineament-Fault Zone, and the Cottonwood Creek Fault Zone (Figure 15). These areas of hydrostructures are hypothesized to be open conduits, where the faulted and fractured bedrock may combine with the alluvium (Qal) to form a French Drain affect resulting in increased groundwater flow and storage, and connectivity to deeper hydrologic systems. This could result in decreased water quality either naturally (Mancos Shale water has higher TDS, metals) or due to human activities, such as fracking or waste disposal activities.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 40

A Google Earth view of the Valley Bottom subsystem in the Tongue Creek drainage is shown in Figure 25c (lower part) and Figure 25d (upper part). Figure 25e shows a detail of the western slope of the Surface Creek Valley terrace and Tongue Creek near the confluence with Surface Creek,

Figure 25d. Google Earth View of the Upper Part of the Valley Bottom Subsystem at Tongue Creek and

Tributaries, Looking North.

Figure 25e. Google Earth View of Detail of Central Part of the Valley Bottom Subsystem at Tongue Creek

and Tributaries, Looking East. Note Seepage Faces and 'Wet' Landslide Deposits on Terrace Slopes.

Surface Creek study area

— Streams

— Ditches and enhanced streams
INF Lakes and reservoirs
- Highways
Kit Towns
Bedrock Hydrogeological  Units
Two -Wasatch [incl. Ohio Creek Formation]
Kmv - Meseverde Formation  [incl. Rollins
Sandstone]
I I Km - Mancos Shale
Kdb - Dakota-Burro Canyon Formation
Jmwe - Morrison & Wanakah Formations,
Entrada Sandstone
41......
Area with recharge of bedrock from soil surface
ii t0.14 and quaternary gravels
'11' Direction of groundwater flow in bedrock
N
S\•,:,
A-
N N',,,
\
Ne
'
'\,\
NY N\14 *
41
,
,,.
T
. 4,
'.
%•'
:
Orchard
.\
i V4,
•
'''
'
•
• c,
*
'.I',
City
,
,Nk.z, .•

BLM_0156104

•itly,
S k\
44. . t-1 :4 NS"
4', 4 ' k.CA \
"N—,.. \ -
.
N
\
\ 4
,c4 .1.—.4,
'4
4,..,...., ..
,
.. .,,: ..":4
10.
,
1:,1
,
''14-
416 '
Nr
,,,*
i:A
0
CE,AR
V
re
AO •
_,., /
Frulfpro
,Reservoir
Z5'
t.i 4
e
Pe
,
Ito
.
•
t`
MESA
7.,
.....
.
Xi
VA

BLM_0156105

.;
it
1.
I
\
\
.
\
1.11'
44
.*
.
W I ' '
.;.
ti .
··",
-..'
ii
"S4
.
lb
4.4 ...S.
.
.
REDLA B
p
\
.kk
\\
N'IN,
0
'k
I
\
* ii\
S',..
AP
N
0 1 2 3 kMiles
1 , 1 , 1 J I I I
i
fi
.
..
,···
4
,

BLM_0156106

:er
Of Delta
.,,..
ilt -11111.11
l,
'6.
0 / re; .
—MO — - \" /71.111  1rl il
ar .
fr
r' cit""1".. --.."..-- \---
OGERS
MESA

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 41

2.6.3 Regional Bedrock Aquifer Subsystems

The regional hydrogeologic units in the SCV study area, discussed in Section 2.4, are the Tertiary and Cretaceous bedrock units (Figure 15 and Table 2b), including the following potentially water-bearing units: Tertiary Wasatch Formation including the Ohio Creek Formation (Two); Cretaceous Mesaverde Formation (Kmv), including the Barren, and Upper and Lower Coal Bearing members (Kmv), as well as the Rollins Sandstone member (Kmvr); and the Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb). The general aspects of the bedrock hydrogeology and hydrostructures are discussed in Section 2.5. The bedrock units are variably to fully saturated based on location and proximity to recharge area. Groundwater recharge by infiltration of precipitation (snow and rain) and by losing streams, for example Currant Creek and Surface Creek, occurs through the Hillside (slope) deposits (Qs) and younger valley gravels (Qgy) in the outcrop area (Rgb; Figures 20 and 24), and groundwater flows laterally to the north along the dip of the bedrock, where it becomes incorporated into the regional groundwater flow system. The groundwater flow direction in the regional bedrock systems is from south to north beneath the SCV Study Area and Grand Mesa (Figures 24 and 26). This flow direction is away from human activities and Delta County in general.

Figure 26. Plan View of the Conceptual Site Model of the Regional Bedrock Subsystems.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 42

2.7 Anthropogenic Influences

Human activity in the SCV study area has affected both the surface and subsurface parts of the hydrologic systems. Past land use and human activity was mostly associated with agricultural production and reservoir construction and operation, and has resulted in removal of native vegetation, introduction of irrigation and high-ET (evapotranspiration) crops, construction of (often leaking) irrigation ditches, and the drilling of primarily domestic wells. This activity has resulted in long-term increase of water levels in local, shallow aquifers of the Quaternary materials (Qgf and Qs) both on top of the Mesa Top and Hillslope subsystems, such as the Redlands Mesa and Cedar Mesa Subsystems, and in the alluvium (Qal) and younger valley gravels (Qgy) of Currant Creek, Surface Creek, and the Tongue Creek (with tributaries) Subsystems.

2.7.1 Effects of Land Use Changes on Groundwater Systems

Traditionally, agricultural activities take place on the bottomlands and terraces of the

valleys, while most grazing activities focus in a relative small area on the uplands. Agricultural production is supported by surface water irrigation, often delivered through an extensive conveyance system. The main irrigation method in use is flood irrigation, which tends to provide more water to the fields than can be consumed by vegetation. Excess water from irrigation results in infiltration to the water table and recharge of the groundwater system (i.e., irrigation return flow). At this time, this part of Delta County is experiencing a shift from agricultural to nonagricultural land use, particularly around the towns of Cedaredge and Orchard City and in the Surface Creek Valley. This may lead to decreasing return flow from irrigation and subsequent reduced groundwater recharge, and to changes in groundwater quality due to fertilization practices or urban activities.

The SCV study area consists primarily of mesa top, hillslope, bottomland and terraces, limiting the irrigated areas to the top and lower portions of the subsystems (Figures 27). Here, there are a number of mostly unlined irrigation ditches that are excavated primarily in unconsolidated Quaternary deposits (Figures 8, 13, and 27). When carrying water, the ditches may leak, as evidenced by the phreatophytes often found alongside. The ditch system in the study area contains two types of ditches: 1) primary ditches, which carry water during most of the growing season; and 2) secondary ditches, which carry water only during an actual irrigation cycle. The water leaking from the ditches may be used by vegetation and discharged as evapotranspiration, or may recharge the underlying groundwater system, forming a local groundwater mound or divide. As most of the groundwater systems in the study area are local in nature, ditch leakage may contribute significantly to the local water balance, increase the water table elevation, and influence groundwater flow patterns.

As discussed previously, irrigation return flow and leaky irrigation ditches can be a significant recharge element in the local and regional groundwater balance. Taking irrigated fields out of production and re-allocating ditch-conveyed water reduces recharge of groundwater resulting in lowered water tables, reduced groundwater discharges to wetlands and streams, and decreased water supplies. Note that the change in irrigation acreage between 1993 and 2005 has been minimal (Figure 27).

i Surface Creek study area

..(7( -

_.....

i

,

.... '

'

7. F.

. .... ... .., ......

Ditches and enhanced streams

l

C5

..,,,..... —

— Streams

,.

' : ' 7' c` -- - "' "J -

•

•

BLM_0156108

.... •-'41 -- -7.--4 • _.,,,,i --

1 to

L--- /,'

Lakes and reservoirs

Highways

Delta County - Elevation (100ft interval)

'i- - \

i PI • ,

dl

= Irrigated Parcels 2005 • ,

c,0

0

1 Irrigated_Parcels 2000

"i• ..• 00 i- */ o, ,k

•.....,,.

--•

Irrigated_Parcels 1993

1.- r

1• i

5

{Ni b

lir CE.,,,1KIES ,

IA

,

•,' ,.,  .

I/

_

,.. , /. ,

.;••••-• or

.,,,¯

, A', •

.

, r

/I

Aze ., .• — P.-

i , "",A "-!..ii!

' v

ii

i

.

,,,¯ ¯..

._ , '.07 , ,,.., 4

m..)

'

, eivzi

,.

----- ,-,---1---s--

N

A

01 2 3 4 Miles

Ar-

a

.

*

—

' :

45

.

li!

4

41,.: '.-.•11 " '.'

A ' 7111111111r ' On River

FO

.

---,---

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 43

Figure 27. Anthropogenic Influences: Irrigated Areas and Irrigation Ditches in the SCV Area (Source: Delta County GIS, 2010; CDWR GIS, 2011).

Water wells are found throughout the SCV study area, primarily in the unconsolidated Quaternary deposits at the mesa tops and valley bottoms (Figure 28). Most of these wells serve domestic water supply needs, or the needs of municipalities located along Surface Creek (for example Cedaredge), and the effect on the groundwater system locally may be significant. However, if additional water is needed by urban or agricultural development, or water is displaced by oil and gas activities, for example, the compound effect on the groundwater system could be more significant in the future, resulting in a possible lowering of the water table, changes in flow direction, decreasing discharge to streams or increasing stream loss to groundwater, draining of wetlands, or even depletion of local aquifers.

2.7.2 Potential Effects of Oil and Gas on Hydrology

The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and Surface Creek study area

, ··

• 4

Streams

Ditches and enhanced streams

1' e 1

•

BLM_0156110

• '•
4
• .....
1
Lakes and reservoirs • . .
- Highways
1
•
Delta County - Elevation (100ft interval)
• Well Permits - Well Constructed
Unconsolidated Hydrogeological Units
_____
pal - Alluvium
1.1 Qd - Glacial Deposits
Qgy - Younger Valley Gravels
Qat - Younger River Terraces
Qgf - Fans and Lower Mesa Gravels
-1- Qs - Hillside (Slope) Deposits
-1. Q90 - Older Mesa Top Gravels
Exposed (weathered) bedrock
9.
%
.
14
•
•
k
.11
111 4
.../',A -
' ,4
1 irar/Ifi e
t ." I.4".
,4 4r,
"MOrT -
,
roV
FA N
e.
-1
( OA
e ,f 1;"
C
....- ..,.... v
,,or ...r
Sk

BLM_0156111

.
e.
. $
i • 0'
....
.•
..
'111.
•
Ir 40
•
—
.
Jr/
HA
eseivoir
t
e
•
•
•
1
ft t .
• •
•
•
0
fr
CEO
.i. •
•
•
•
.
ft •
...
C.•
• .
6 -
e
,
.
• •
MESA' •
. 8 • •
. •

BLM_0156112

.
• t •• .
71.
•• .
•
•
• • • •
• e. • •
.
..REDLAN S ESA. • .
• •
• •
• ..
1.
• ... .
. t. • •
.
• •
.re
N
A
0 1 2 3 4 Miles
1 1 1 1 I 1 1 1 I
....
d
1,1. Of trelea
MESA
v
.
oi
l,1 :01
.
4
-0,6•ERsq
oi. ,,,,. I l' ...110.
.
• II
,4,04 ;,•,-. ..._.,,,,,
f kon.
• 4 411
ta, .
-
41111111 s' Gu .41r. River
• ip
•
itio.,,,,

BLM_0156113

r •

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 44
discharges. Changes to the natural groundwater system will likely have ecological, geo-hydrological,
and, potentially, legal consequences. The effects of water disposal after fracking
and oil and gas well development are not discussed in this report as relevant information on the
planned oil and gas development and operations is not available at this time. These management
strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in
more detail. Currently, there are no oil/gas lease parcels present in the SCV area.
Figure 28. Anthropogenic Influences: Constructed Wells in the SCV Study Area
(Source: CDWR GIS, 2014).
The Redlands Mesa and Cedar Mesa Subsystems are least likely to be affected by oil and
gas operations because they are located in the recharge area and have a shallow groundwater flow
system above the affected bedrock zones and have relatively few hydrostructures that could
promote connectivity (Figures 13, 15, 18, and 20). However, the potential for groundwater
discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems,
including Currant Creek, Surface Creek, and Tongue Creek, due to hydrostructures, may be
affected by fracking or other oil and gas drilling activities (Figures 13, 15, 18, 20 and 24), which
could affect the water supply and water quality. In addition, significant amounts of shallow
aquifer water quality may be affected by the surface water runoff and groundwater recharge
affected by drill site activities and water disposal.
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 45
The regional groundwater subsystem may be affected by the oil and gas operations, but
these systems are not currently being explored for water supplies. However, the
interconnectivity between these deeper systems and the shallow unconsolidated systems is
hypothesized, but currently undetermined (Figures 14, 15, and 26).
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 46
3 GIS MAPS, LAYERS, DATABASES, AND DATA SOURCES
3.1 GIS and GIS Maps
Geographical information system (GIS)-based maps provide a flexible and efficient way
to analyze and display spatial information. The strength of a GIS system is that data from
various sources can be collected in local or remotely accessed databases, which can be easily
maintained and updated. GIS maps support optimal analysis, specifically in hydrogeologic
evaluations at different scales, geographic distribution densities, and different levels of accuracy
and information value.
A GIS map consists of a series of layers, each containing a single or multiple topological
features. These features can represent a variety of geographic items, such as rivers and lakes,
roads, towns and cities, land use, land ownership, wells, etc. Selected features can be further
described with associated attribute tables and linked to other types of information by their
attribute tables or via their spatial location. At each step of a geographic analysis, individual
features can be displayed, analyzed, and combined with other features via layers, and individual
features interrogated with respect to their attributes. Switching scales, like enlarging (zooming
in to) a particular detail or regionalizing (zooming out) to encompass a larger set of features can
be accomplished at any time; the ability to selectively visualize (switch) layers, perform
advanced searches, and use select and overlay capabilities, further enhances the utility of a GIS
map.

BLM_0156114

The GIS maps resulting from this study allow for informed planning and management of groundwater resources in the SCV area. The database formats that have been used in this study include ESRI shape files, database tables, georeferenced images, Microsoft Excel files, and ESRI GRID files (for the digital elevation model [DEM], among others). The GIS map and database for the SCV study were prepared using ArcViewTM version 8.3 and evaluated using Arc-DesktopTM version 10.2 (ESRI® , Redlands, California).

3.2 Use of GIS in the SCV Area Study

In this study, GIS has been used in support of the HESA described in Chapter 2 and in the preparation of report figures. In addition, the GIS maps and databases will provide a base for further studies of the hydrology and hydrogeology of SCV area, as well as other parts of Delta County. Three multi-layer GIS maps have been prepared for this study: 1) a map with hydrologic and hydrogeologic features of Delta County (Figure 29); 2) a map with hydrologic and hydrogeologic features of the SCV area (Figure 30); and 3) a map with hydrologic and hyrdogeologic features of the combined SCV (Surface Creek Valley), NFVT (North Fork Valley and Terraces, Kolm and van der Heijde 2013), and the Oak Mesa (Kolm and van der Heijde 2012) study areas referred to as the NFVSC area (Figure 31). The GIS maps consist of a number of layers representing various data types relevant to the assessment of the groundwater resources at user-specified locations. Below is a detailed description of the layers and the related data sources.

1158911961  eaA
OC_GM.NTCY_PepartROLIF:00 (es
Ed. Mtn Aerekmar, Insert Sale... Geepraca,ng
16 a .1 • 1.110..I.
1,61.1.1Co.term
E M SLY sludy IH1.2:11.11
E p•mayal,nmah  1,160* arc.
- .iorstrearn
0 Nall, [Feek 1,,,.. nee INI-0.111]
Surleee Cite. tinpley area 1.11-110,...
a Della County river,111129161
Er q Delte Caw., streams end ditrImilDC  20121
p a DeleCounty dik..10C20 ,12.1
69 Deis Count,. lok-510,
O
E
q Oa. County rowan [D.0121
Lt Dela County towns ILIC 20121
0 Solace ale...en (NM interval) illSGS00•1]
Frecip.eldon Stenons ILDS5
0 Precipitation INIICS2014
• P... • We. Cendr.r.
L. 0 Well...1M. • Pemmtkaued ,CMPR.20.41
E 8 loge.. parcels "DM [COO D..5101.1
? Ye gated Parcels MID [CD.. 201.31
0 tenglerep Parcel:]U* ECOSS On 120331
171 A...p.n.. Swings can Seeps KOWA 20111

Sp, snel.*s - APPrePern.o., ele

• 0.01....4

• 04S - OAchc

* 011

• .1. els

• 1.1..5C hydro.n.rcems INSA/FIHIN-141

lc a KV GreunMer discharge 3ones1.....111[201.1.]

E a /4.1C hydro,nrts 211.1.11.1m1.1.2.1.nor,

UntonsolidaLetl Hydrogeologio.1LIn.

? Qd • Gle•Liel Deposits

QD

VOIR, MI, ...lc

pQn- Dwane...A..4mm.

CI [NJ - MS and Loner Mesa Gravels

- HAnde pep, Oepeeies

i 191 Older Me. Top Dray.

®D 1,11,5C - Tertiary...mem

E e,

• NI./51 brim-units IHSA.611201.11 • .1•-eyorde Fon...on lied Rollins 5-and1one1

D 1.F15C Mentek Able

• W.., hyde-uries rHS1.11-11-. XL] -1.1-e. 013.3 Fonnations, Entrada San .tene

0 11.10.neci Nod...unit] 10......rinnon A.

rnsen

INKS 1-011)

? Watershed Illyelrol.un0 ilppeuGunnison R MKS mEll

M D 601433034[0ydrel.un1]1e.13h Felk Gunnison 9. [uacs zol]1

E p Watershed IhydroLunk, ...compel...It 0000111

R I0141, 4

.

,

Le

Kt5.1

? 5,Fteee feet. t/L.fy am. 11-1,1-1.2131..

I. .O AM. Fe& Alley Study Area (.15,1-11-.20111

E 171 On Mara Study Area N.V.( rntagra-1.21

I. la Nor. Fo.Surlace Creek Hydrogeologia1 111.9-111X116)

,1m Della Courtly ...Rd, [MEI,

E In Rene c..ror Skom and 0.k/Ks 111[4.21

. m

Dena Courrty rakm.•211121

p a Delta fem., [b[2014

- Highways

I. 0 Delta County Ram, pcmazi

? Dab County IOC 20111

0 PI-cc...on Ramos 101m Deb County

0 Imptetl Parcels 19.3 ,C135.5 Di. SI

BLM_0156116

q kr,. Parcels 2.30 [c.5.5 QNsl
• ..quad Parcel, lops ,COSS Dn M
0 Wells - Decreed IcOM drabase20131
0 Wells - 20131
E m Dehe County 1:2501 Geology Rased on 1116,rnaps 1961.1976.1,76. 19B 11
•
CI Pa - Nlemum
Taal
Gleeiel DM. 1ll
0 - Eel,a.1.1,81M
g - younq Gra.eis lTanace, fen, ounpmn &pan,
? 4, LH .N•els ddge end en ma taps!
47101s - Landslide OM. talusl
1Th - Hasa, Vowel
• rg • ..em S. er Forma-uen
Mrm. - w - opoyhlmrwna[Srocudad, lo"olOal
.Tu. Uinta Ferm14ien
? - Fe.-ner,e•
CITwo • Nresdcn end Ohio Formniong
• Nelb - Dakota Sandstone and Burro Canyon Formation
171 - Shale
Ame-Mat.vemeGroup Fomulion
P.11-np • Morns.. Fmnstre. s.n WasM1Sand-rto•ne Member
CIImode - Mormon and wana4aINFerrnanona and Emreda Sandstone
1111FRe - chink Formation
• 1A.-armpit Sandstone
Frecembrium Crystalline puck
[E....Lund] Iowa Gunman, INK520:111
133 q WI... 0 1...InAwn.1.1.0. P.A....in.. INKS MI
Inm I :,,
Q ec_cmsstko ics erml -
File E. Ven Bookmarks Insert Selection Geoproces, Customize Windom- Help
ur6cla - miNsm 4 ,1,re. —
g
122MIS=1073Z11:TE001=101
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 47
Figure 29. Delta County GIS Map Showing SCV Study Area, Area Covered by Hydrogeological Databases,
Streams, Ditches and Roads on Top of County-wide Geology.
(The left display area is the table of contents [TOC] showing all available layers;
the right side of the window is the map display area showing the activated layers.)
Figure 30. SCV GIS Map Showing Streams, Ditches and Irrigated Areas on Top of Unconsolidated
Hydrogeologic Units and Groundwater Discharge Areas.
(The left display area is the TOC showing all available layers;
the right side of the window is the map display area showing the activated layers.)

0 L. ' 7 ,air
oOt_G4gLESLY_I,....m..01.1_iigh  (GE arem,
E. leer VBookmar Insert Selection Geomacesing Custom. Winekess Help
L9 0 qt
ks
cla u
TelrleOrContenta
L
15le,11.f 8,5wrleee Creek hydro deulnest eme 1v1.2014]
E 5-Cle study um gilt1,01  , 11
C:7
B 0 Otte Calmly town; DC .21
Pro.ris
F. p Penny dmen,,n SLY study area 111 -IIMAI
, 0 Delta County nverFIDC H1II20111
E 0 Deno A-n-wnsvmd OFI[en10,201-21
0 Deltram,..Inchn,IDC 200
— Nena end e-d-lemed ormms
H.
De. 'County...Ls 110,201,
0 Delta Com, highways IX All]
E Delta Cu,' Fuas15 RIC111121
Lt q Solace ele,ation IMOft interval, IUS0 0.11
E q PrecyrtMon ,NRCS 20.!
F. 0 Well Peon.- Well construe. [C.F.I.)
, Well Penn. Pew. issued ILEMMMIC
, [legated Rreels.S[C0S1,5201.3.1
? Imgeletl Parcels ]0001CD55.1..5.2.01.3.1
Isngaled Parcels Igg3
E 0 ,rmrop, 41.2p.mgw end kem10,W120141
SPnegffl end mei. APP,Mted F.. Re. 1-.131
• OM • U04 cl;
• OM - erg
• 0.11-10 cis
• aSdcls
0 AlFVSC hydro-M.1er. [H.,IF12.5111
& q NrSC, Grown.wer glisc,erge zones 11[5.4.11130.1
WI 0 NFU.
rHS.1-1H20, . u.memohd•ed Sarney,
illn,owle,d41...-rygdwqrokwrgr,
• AJImourri
? Gla-111.51,w.
CI Pp, Younger valley Gmeel,
Q. -1mger River Terrace
• . Fens msILVIRF Mere Greeels
? - [Slope, !Dep.,.

BLM_0156118

E a NrYSC hydro. umti IF15.1-11-11X111 • intieryIntwoom

MT. • Te11,.111.18.15

E 0 urvsc 1..41-1R 2014j - M.A.& We Cm* Fam-mbon

CITen. Wasatch [incl. oho creeleForrnanio.

eel

0 Nil. hyrimunks [1.6.6.h.10 MA] - Polneyerie Ferman l•el RIAM2Sanchtewei

P.m • IvImaversle Farm-lien On& Rollins Seam.

1, NFVEC hvelre-uriti [FISIVHH.1.1] - Mantes Shale

IN Km- /..enwes.ele

? KtIlk - Ilakma-E,m Canyon Forma,.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 48

Figure 31. NFVSC GIS Map Showing Streams, Ditches and SCV Study Area on Top of Hydrogeologic

Unconsolidated and Bedrock Units and Hydrogeologic Structures.

Enabling the Table of Contents (TOC; the left side of the display in Figures 29, 30 and 31) in ArcGIS provides information on the layers displayed in the Map Display area (the right side of the display in Figures 29, 30 and 31). The GIS layers of the three GIS maps contain three types of geographic information: 1) general geographic information (county border, roads, towns, DEM-elevations) used primarily for orientation purposes; 2) hydrologic information (including precipitation, watersheds, streams, lakes/ponds, irrigation ditches, and irrigated areas); and 3) hydrogeologic information (including hydrogeologic units, faults and hydro-structures, springs and wells). Most layers have been georeferenced with respect to State Plane, Colorado Central Zone, NAD83 (units of measure in feet), except for some public data obtained from state and federal sources.

3.3 GIS Map, Layers, and File Structure

Each line in the TOC is a GIS layer representing a set of features of the same type, such as streams, parcels, wells, etc. By clicking on a check box in the TOC, elements of the activated layer become visible in the map display area. A layer may consist of point values (e.g., wells), line features (e.g., roads, streams, ditches), and area features (e.g., parcels, lakes, hydrogeologic units). Right-clicking on a layer in the TOC and selecting the open attribute table option, provides additional information on the layer, such as the names of particular features (Figure 32). This additional information can be used to label the features in the map display area.

The order of the layers in the GIS maps may be changed, affecting which layer(s) are in the foreground in the map and which layers are in the background. When enabled, a layer is shown on top of the layer listed below it in the TOC. When this layer is opaque, the layer beneath it is not visible. Some layers are (partially) transparent, others are opaque, dependent on the type of information they display and the use in the assessment procedure. Layer

DI I

7 Pp e AL Oa

Ea c F le

9 Po n - 9 Fre n

Po^ ne N C la, re m

Poone Emu. tow iremre

!time Caaverme Ppm

22 PoiiPPe CoMP ,•••• rapt

SD Feeilne CanePwa.C..areelirre

BLM_0156119

PA. le,r•Irk FlIclufe Yaw
C3 P.m., Kor Preen. Znao
1,04. owsr
d0 PoHrna Low'r.ivOesfe•fadirrectrel.elv
ranaDan•
17 nob... indele rip. Pen MM...
Pe ine R. canyon [rem rnehre zone
pe R r.
D rohlEe Ski-1011w recture ZOne
PolyIne 511•114 Fon FFeclue zone
3." intone 'Spruce F NIA
1.. 5,,ao• Crevic P 'adv. 2oP,
04 Poo. Toni. Creo rm.re Zorn-
Pe.e MOewwDedere Zone
wryer,
!Pel, ova. rem
e .1.14 Ilorthro.Freclure
• Per, wate
14•1.0 zme
i3 wNMe 1wM rervronror
7 Paine Wow Oat Mae,.
+wnscrewrnaaeeDKR
• 1 Pi
a. Meuto1925tlectedi
WYK shucturn11-15M-1.202.1]
Ot_GM.S_SLVfiry,...01.11ig12 (GE 1.1.1.8p
Fibe E. View Bookmarks Insert Selection Geoprocairpo Custom. Window, Help
L9 01 0, it " 4.41.7,r;NEI
Conient
" I
L
Surface Creek Wpm. ,Delta Gray,
170 SC'd PP,,Ply Pm.
Ottece,. Suplaee C reek Valley eniss-seeiens [1-11,213111
Onrrny ArtarrIp Ihrtuciyarsa 1..,111141
- Mijor
p. 0 North P orldSurlace Creek Iwolinpletaloem twee 11- 1.201.1
t q Surlice Ore. climiay arta 11.021 ,11
E Dent.PP,PoPPP,PID, d112.1..1.41
- ipepp
0 Delta County stream and ri.nnt...1
pu Dele [pm, dimPe IOC MEP]
— end enhented Mums
,-®Delta County laknIDC 20111
P Lae. rescreen
Chi q Deli Courty highways!. 201.21

Fr, 0 lPePP,PPP,,y
E Dap CoLmytownp
Topmps
q Surlece,evenon Ddwt interv.1,111500f
q Pre d.ation anions ICD552P091
, q PmeioPmen1P1P.CSIMM
0 Well Penner VIA conmcied NMI/R.111
IP 0 1.'411 hands Den.
[cow..]
E 0 Oarqe,51.51COSSM S10131
0 Ipnopied Pareelt 1913 [03441.529131
0. td SMPPOP ...1.1031APIP 21,14,
0 =El
N1.50iGropuldwiter dischame aonm1145.4411-620,11
E NNSC hydronnetp [115"11.2011]-  Unconsolidated Sethrnen,
11,0.1104p.  i-Pailingeological Up.
®Qa-Glorro, Nyowti
p-pipy- Younger Pallay Gra'Pelp
p cpm Fans a. Low!. mei. Graved,
1(w - pope, Cepesris
Frye • Older Mem ,Grip.
NHL, -Bedrock
0 P.ISC hydro-Imes [1-6,1-11-11  MIA- Wasatch PE IAA Creek Rermetinn
NLYSC Isydre-unrts [FISPOIPI-11201.11 Plancos Shale
0 rErv. hydro-La., [115.1.1.1.1] - DelaruElturnEf anyen Fermat.
NNSC hydroqinitp  IFISIVIIIPP 20111 • Ploprigon 3i rowneliwnp.P.Mmde Sandstone
0 Waleislped (PydreLuntri lex. Gunman, 0. MKS
.ienhetlIHydreLdrklUppuGgr.me..1,-INKS1 -0111
Mk? 0 • lAkbj .7
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 49
transparency/opaqueness can be changed by the user using the layer properties option under the
display tab. The order of the layers can be changed by the user by dragging a layer to the desired
location in the TOC.
Figure 32. GIS Map Showing the Attribute Table for the Hydrogeologic Structures
(Hydrostructures) Layer
in the SCV Area (right side of figure).
The map is designed to show relevant labels (text) for most of the layers based on the
contents of one of the fields in the attribute table, such as stream name, well number, etc. When
zooming in on a particular area of the map, additional information of a selected layer can be
displayed by activating the Label feature. This can be done by right-clicking the layer and
selecting Label Feature. The label feature can be set by right-clicking the layer, selecting
Properties, clicking the Label tab, and selecting the appropriate field of the database table.
Database information regarding a particular feature on the map can also be obtained by using the
(Identify) option from the Tools toolbar, clicking on the feature of interest, and selecting the
appropriate layer in the popup Identify Results window.
3.4 Data Sources and Databases

Delta County and study area GIS maps retrieve various files included in five relative-path subdirectories: 1) CDWR_CDSS; 2) Delta_County;  3) HHI; 4) NRCS; and 5) USGS_DEM. The directories reflect the various data sources used for the three GIS maps introduced in the previous section. Selection of the relative-path option in the GIS program provides for straightforward portability between computers. Note that layers that refer to a state-wide data set (such as the NRCS precipitation file), or a multi-county data set (such as the CDSS irrigated areas files), have been clipped on the maps to show only the Delta County, NFVSC, or SCV area coverage.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 50
The CDWR_CDSS subdirectory contains seven sets of GIS files and databases downloaded from Colorado Division of Water resources (CDWR) water rights and well permits databases and from the Colorado Decision Support System (CDSS), which is managed by the Colorado Water Conservation Board and the Colorado Division of Water Resources (CDWR). These file sets are 1) irrigated areas in CDWR Division 4 on the Western Slope as of 1993 (Irrigated_Parcels_1993 files); 2) irrigated areas in CDWR Division 4 on the Western Slope as of 2000 (Irrigated_Parcels_2000 files); 3) irrigated areas in CDWR Division 4 on the Western Slope as of 2005 (Irrigated_Parcels_2005 files); 4) permitted wells that have been completed (WellPermits_WellConstructed files); 5)permitted wells that have not yet been drilled (WellPermits_PermitIssued files); 6) appropriated springs and seeps (NorthForkSurfaceCr_Springs files); and 7) precipitation stations in Colorado (co_precipstations files). The well, spring and irrigation data have been downloaded in 2013 and 2014. The irrigated areas data sets provide a single year snapshot of the irrigated lands and crop types of the western slope of Colorado. In the GIS maps, the 2000 data layer lies on top of the 1993 data layer, and the 2005 data layer lies on top of the 1993 and 2000 data layers, showing the irrigated acreage taken out between 1993 and 2000 and between 2000 and 2005. The CDSS files can be downloaded from: http://water.state.co.us/DataMaps/Pages/default.aspx#onlinedata.The well records can be accessed at: http://www.dwr.state.co.us/wellpermitsearch/, and the springs and seeps records at: http://cdss.state.co.us/onlineTools/Pages/WaterRights.aspx. More details about the springs and seeps layer can be found in Appendix 1 of Kolm and Van der Heijde (2013).

The Delta_County subdirectory contains selected files received from the Delta County GIS department in 2012. Coverages used in this project include county boundary, highways, roads, streams and ditches, lakes, irrigation ditches (and enhanced streams), water planning areas, and towns. The ditch data provided by the county does not distinguish between primary and secondary ditches. Additional field verification is needed to assess the hydrologic importance of individual ditches. It should be noted that the GIS-based aerial photography provided by the county has been used, in conjunction with GIS-based topographic images obtained from the NRCS data portal and GoogleTM Earth imagery, to remotely assess topography,
vegetation and hydrology in preparation of this report.

The HHI subdirectory contains the databases produced for this project by Heath Hydrology, Inc. It contains various hydrogeology files, including: NorthFork_SurfaceCreek_Hydrogeol_xxx, NorthFork_SurfaceCreek_Hydrostructures, and DeltaCounty_Geology;  and files related to the location of current and previous study areas: SurfaceCreek_StudyArea, NorthForkValley_ StudyArea, OakMesa_StudyArea,and NorthFork_SurfaceCreek_DisplayArea). The SCV_SelectedStreams files were created to separately show the more important streams in the SCV study area and are based on Delta

BLM_0156122

County's stream layer. The hydrogeology layers resulted from digitizing and evaluating the 1:24.000 scale geological map of the Orchard City quad (Noe and Zawaski 2013), 1:48,000 scale geologic maps of the Cedaredge and Hotchkiss areas (Hail, 1972a, 1972b), and the 1:100,000 scale geologic map of the Paonia and Gunnison area (Ellis and Others, 1987), and combining and editing the GIS versions (Day and Others, 1999) of the Leadville, Montrose, Grand Junction and Moab 1o x 2o quadrangle geologic maps (scale 1:250,000) (Tweto and Others, 1976; Tweto and Others, 1978; Whitney, 1981; Williams, 1964). The NFVSC hydro-structures

layer is in part based on the 1:100,000 scale geologic map of the Paonia and Gunnison area (Ellis and Others, 1987), and enhanced through analysis of geomorphic features, including lineaments, by the project team.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 51

There are seven GIS layers and databases for the hydogeologic units in the SCV (and NFVSC) area (i.e., "hydro units" for short) (Figures 13, 14, 30 and 31): 1) a layer showing the Quaternary unconsolidated deposits grouped by their hydrogeological characteristics (NFVSC hydro-units [HSA/HHI 2014] - Unconsolidated Sediments); and 2) six layers each showing the extent of an individual bedrock hydrogeologic unit (NFVSC hydro-units [HSA/HHI 2014] – Tertiary Intrusions, NFVSC hydro-units [HSA/HHI 2014] - Wasatch and Ohio Creek Formation, NFVSC hydro-units [HSA/HHI 2014] - Mesaverde Formation [incl. Rollins Sandstone], NFVSC hydro-units [HSA/HHI 2014] - Mancos Shale, NFVSC hydro-units [HSA/HHI 2014] - Dakota-Burro Canyon, and NFVSC hydro-units [HSA/HHI 2014] – Morrison & Wanakah Formations, Entrada Sandstone). When all six bedrock layers are activated, the GIS map shows top bedrock (see Figure 14).

The NRCS subdirectory contains state-wide averaged annual precipitation data for the period 1961–1990 obtained from the NRCS (precip_a_co files). These data have been developed from the NWS precipitation data using PRISM (Parameter elevation Regression on Independent Slopes Model), which utilizes a rule-based combination of point measurements and a DEM and includes consideration of topographic facets (Daly and Johnson, 1999). The NRCS subdirectory also includes files for the watersheds in the county (wbdhu12_a_14020002 - 06). The NRCS data can be downloaded from: http://datagateway.nrcs.usda.gov/GatewayHome.html.

The USGS_DEM subdirectory contains the raster-based DEM and the 100ft elevation contours for Delta County. In the database, surface elevations are stored in meters; however, in the TOC of the GIS maps, the elevations are given in feet for display purposes. The USGS DEM was downloaded from the NRCS Data Gateway portal in May 2012 and is based on the USGS version published in April 2012.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 52

4 SUMMARY AND CONCLUSIONS

A Hydrologic and Environmental Systems Analysis (HESA) of the groundwater system of the Surface Creek Valley area (SCV) in Delta County, Colorado, and the development of supporting GIS databases and maps of hydrogeologic and hydrologic characteristics, have been completed to provide support for planning, zoning, and other decision-making tasks of county staff, including those related to protection of groundwater resources for use as public or communal water supplies. This study consisted of the following tasks: 1) conduct a comprehensive HESA and formulate relevant conceptual hydrologic models to provide the physical framework for assessment of potential impacts of anthropogenic system modifications on groundwater resources and interrelated surface water resources; 2) develop a consistent and

practical hydrogeologic nomenclature that can be expanded to county-wide use; 3) digitize existing geologic maps and convert them to hydrogeologic system layers and databases in the GIS, including layers showing hydrogeologic units and characteristic stacks of such units, and hydrostructures; and 4) adapt additional hydrological and other GIS maps and databases needed to evaluate the groundwater resources in the county; these databases will contain data from various public domain sources.

The HESA analysis showed that there are two significant groups of hydrogeologic units in the SCV study area: 1) Quaternary unconsolidated clastic materials, which are predominantly glacial-fluvial outwash plains and terrace gravels (older mesa top gravels and glacial drift), hillside (slope) deposits, alluvial fans and bajadas (coalescing fans) and lower mesa gravels, younger valley gravels and river terraces, and alluvial valley bottom deposits; overlying 2) Tertiary and Cretaceous bedrock, including the following potentially water-bearing units: Tertiary Wasatch Formation including the Ohio Creek Formation (Two); Cretaceous Mesaverde Formation (Kmv), including the Barren, and Upper and Lower Coal Bearing members (Kmv), as well as the Rollins Sandstone member (Kmvr); and the Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb). The Mancos Shale unit (Km) may act as a thick, poorly transmissive confining layer.

The Quaternary unconsolidated clastic units (Qal, Qgy, Qat, Qs, Qd, Qgf, and Qgo) are locally heterogeneous, with predominantly a mix of coarser and finer materials in the older alluvial deposits, and finer materials in the younger deposits. These deposits, which are moderately to highly permeable, are recharged by infiltration from precipitation that is non-uniformly distributed due to the slope steepness, slope aspect, and to position in the landscape, and by the incidental leaky irrigation ditch and irrigation return flow. The unconsolidated units are variably to fully saturated based on spatial location and seasonal precipitation events. There may be lateral and vertical groundwater flow connection between the unconsolidated materials and the Tertiary and Cretaceous sedimentary units in the underlying bedrock formations.

Three broad hydrostructure sets occur in the SCV area: 1) the northeast-trending faults and fractures that parallel the Currant and Surface Creek fault zones and associated en-echelon faults and fracture zones to the east (for example, Upper Leroux Creek fault zone and the North Fork Valley lineament); 2) the north-south-trending Tongue Creek lineament and fault zone, which parallels the Lower Leroux Creek fault zone; and 3) the east-west trending Gunnison River lineament.

The northeast-trending and north-south trending faults and fracture zones are relatively young, as the geomorphic systems of Currant Creek and Surface Creek are responding with North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 53 considerable downcutting, allowing for partial to full penetration of the unconsolidated hydrogeologic unit aquifers. It is hypothesized that these faults/fracture zones/lineaments are "open" and function like French drains. Groundwater moves laterally down valley and vertically downward along the northeast-trending fault and fracture zone planes, and may move vertically up along the fault and fractures plane near the lower reaches of the various drainages.

Based on the presence and orientation of various hydrogeologic and hydrostructural units, hydrography and topography, three CSMs observed in the SCV study area: 1) Mesa Top and Hillslope Shallow Aquifer Subsystems; 2) Valley Bottom Shallow Aquifer Subsystems; and 3) Regional Bedrock Aquifer Subsystems are discussed. The Mesa Top and Hillslope Subsystems, including the Redlands Mesa Subsystem and the Cedar Mesa\Fruitgrowers Reservoir Subsystem,

and Valley Bottom Shallow Aquifer Subsystems, including the Currant Creek, Surface Creek, and Tongue Creek (with associated tributaries) subsystems, in the SCV area are dominated by the Quaternary unconsolidated materials. Specifically, the shallow groundwater on Redlands Mesa and Cedar Mesa is dominated by the Quaternary unconsolidated materials (Qgf and Qs), which receive natural recharge by infiltration of precipitation (snow and rain; Rp), and major recharge from leaky irrigation ditches (Rd) and reservoirs locally, and return flow from flood irrigation locally (Ri). The unlined ditches are "line" groundwater recharge sources (Rd) at the top of the irrigated field areas, and water leaks from the ditches into all of the connected gravels underneath and downgradient. The return flow from flood irrigation are "area" groundwater recharge sources (Ri) located downgradient and along the nearby irrigation ditches.

Groundwater flow on top of the gravel-capped Redlands Mesa and Cedar Mesa then moves with topography or subsurface paleo-topography to discharge into springs at the gravel/Mancos Shale interface along the incised drainages that bound the mesas (Dsp), discharge directly out the front of the mesa as seeps or springs (Dsp) at the gravel/Mancos Shale interface, or discharge into the hillslope slope and mudslide deposits (Qs) causing further mass wasting activity. Given the "new" water that has recharged the aquifer, springs may have been developed and claimed as being "new" springs. There is also groundwater discharge from the gravels locally by groundwater wells (Dw) and by phreatophytes (Dp). The shallow groundwater subsystems in this Mesa Top and Hillslope area have little connection to the local bedrock or the regional groundwater systems, or to nearby alluvial systems, such as Leroux Creek, Currant Creek, or Surface Creek.

The shallow groundwater flow in the Current Creek, Surface Creek, and Tongue Creek Valley Bottom subsystems is dominated by the Quaternary unconsolidated materials, and include modern alluvium (Qal) and younger valley gravels (Qgy). Specifically, the shallow groundwater in the Currant Creek and Tongue Creek subsystems is dominated by the Quaternary alluvium (Qal), which receives natural recharge by infiltration of precipitation (snow and rain; Rp) and losing streams (Rs); input from hillside (slope) deposits derived from the glacial gravels (Rsd); and additional recharge from leaky irrigation ditches (Rd); and return flow from irrigation locally (Ri). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands.

Groundwater flow in the Currant Creek and Tongue Creek alluvium moves in the same direction as the streams with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface topography, saturated thickness of the alluvium, or the seasonal variations caused by snowpack runoff or storm events. Springs are observed at the Qal/Mancos Shale (Km) interface along the stream bed or due to the thinning of the Qal/Mancos Shale (Km) interface beneath the stream bed, or where mass wasting deposits (landslides) connect the gravels of the drainage divide (Qgy) with local alluvium (Qal). There is also groundwater discharge from the alluvium locally by groundwater wells (Dw) and by phreatophytes (Dp). The shallow groundwater in the Currant Creek and middle and lower Tongue Creek subsystems would normally have little connection to the local bedrock or the regional groundwater systems, given the Mancos Shale bedrock. However, underlying the Currant Creek and Tongue Creek alluvium is the Lower Currant Creek Lineament – Fracture Zone, the Cedar Gulch lineament, the Upper Currant Creek Lineament, the Cactus Park Fault Zone Lower Tongue Creek Lineament – Fracture Zone, the Upper Dirty George Creek Lineament-Fracture Zone, the Oak Creek

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 54

Lineament – Fracture Zone, the Ward Creek Lineament-Fault Zone, and the Cottonwood Creek Fault Zone. These areas of hydrostructures are hypothesized to be open conduits, where the faulted and fractured bedrock may combine with the alluvium (Qal) to form a French Drain affect resulting in increased groundwater flow and storage, and connectivity to deeper hydrologic. This could result in decreased water quality either naturally (Mancos Shale water has higher TDS, metals) or due to human activities, such as fracking or waste disposal activities. By comparison, the Surface Creek Valley Bottom subsystem extends from the top of Grand Mesa and west of Cedar Mesa through the towns of Cedaredge and Orchard City ending at the Gunnison River. The Surface Creek subsystem is dominated by the Quaternary unconsolidated younger gravels (Qgy), which receive natural recharge by infiltration of precipitation (snow and rain; Rp) system-wide, by input from adjacent uplands to gravels (Ru) and by hillside (slope) deposits derived from the glacial gravels (Rsd) in the upper reaches of the subsystem, and major recharge from leaky irrigation ditches originating from upper and middle Surface Creek and upper Ward Creek (Rd); and return flow from irrigation throughout the middle and lower part of the subsystem (Ri). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands).

Groundwater flow in the Surface Creek younger valley gravels (Qgy) moves in the same direction as Surface Creek with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface topography, saturated thickness of the alluvium, or the seasonal variations caused by snowpack runoff or storm events. Generally, the upper part of Surface Creek is gaining when flowing through the hillside (slope) gravels (Qs) as these gravels are discharging groundwater into the stream (Ds). However, at depth, the Surface Creek hillside (slope) gravels and younger valley gravels (Qgy) are recharging the Wasatch (Two) and Mesa Verde (Kmv) bedrock aquifers (Rgb).

As Surface Creek crosses into the younger valley gravels (Qgy) underlain by the Mancos Shale (Km), the surface flow decreases as groundwater recharge occurs to the gravels (Rs). This function is reversed above Cedaredge and Surface Creek becomes a gaining stream due to an increase in groundwater discharge derived from leaky irrigation ditches and return flow from irrigation. Springs are observed near Cedaredge due to the thinning of the Qgy at the Qgy/Mancos Shale (Km) interface beneath the stream bed . There is also groundwater discharge from the gravels locally by groundwater wells (Dw) and by phreatophytes (Dp).

The shallow groundwater in the Surface Creek subsystem would normally have little connection to the local bedrock or the regional groundwater systems in the central and southern part of the subsystem, given the Mancos Shale bedrock. However, underlying the Surface Creek North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 55 gravels is the Surface Creek Lineament – Fracture Zone. This hydrostructure is hypothesized to be an open conduit, where the faulted and fractured bedrock may combine with the younger valley gravels (Qgy) to form a French Drain affect resulting in increased groundwater flow and storage, and connectivity to deeper hydrologic systems. This could result in decreased water quality either naturally (Mancos Shale water has higher TDS, metals) or due to human activities, such as fracking or waste disposal activities.

The regional hydrogeologic units in the SCV study area, discussed in Section 2.4, are the Tertiary and Cretaceous bedrock units, including the following potentially water-bearing units: Tertiary Wasatch Formation including the Ohio Creek Formation (Two); Cretaceous Mesaverde Formation (Kmv), including the Barren, and Upper and Lower Coal Bearing members (Kmv), as

well as the Rollins Sandstone member (Kmvr); and the Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb). The general aspects of the bedrock hydrogeology and hydrostructures are discussed in Section 2.5. The bedrock units are variably to fully saturated based on location and proximity to recharge area. Groundwater recharge by infiltration of precipitation (snow and rain) and by losing streams, for example Currant Creek and Surface Creek, occurs through the Hillside (slope) deposits (Qs) and younger valley gravels (Qgy) in the outcrop area (Rgb), and groundwater flows laterally to the north along the dip of the bedrock, where it becomes incorporated into the regional groundwater flow system. The groundwater flow direction in the regional bedrock systems is from south to north beneath the SCV Study Area and Grand Mesa. This flow direction is away from human activities and Delta County in general.

Human activity in the SCV study area has affected both the surface and subsurface parts of the hydrologic systems. Past land use and human activity was mostly associated with agricultural production and reservoir construction and operation, and has resulted in removal of native vegetation, introduction of irrigation and high-ET (evapotranspiration) crops, construction of (often leaking) irrigation ditches, and the drilling of primarily domestic wells. This activity has resulted in long-term increase of water levels in local, shallow aquifers of the Quaternary materials (Qgf and Qs) both on top of the Mesa Top and Hillslope subsystems, such as the Redlands Mesa and Cedar Mesa Subsystems, and in the alluvium (Qal) and younger valley gravels (Qgy) of Currant Creek, Surface Creek, and the Tongue Creek (with tributaries) Subsystems. At this time, this part of Delta County is not experiencing a shift from agricultural to nonagricultural land use at the same rate as many other areas of the western United States. The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.

The Redlands Mesa and Cedar Mesa Subsystems are least likely to be affected by oil and gas operations because they are located in the recharge area and have a shallow groundwater flow system above the affected bedrock zones and have relatively few hydrostructures that could promote connectivity. However, the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems, including Currant Creek, North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 56 Surface Creek, and Tongue Creek, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities, which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal.

The GIS maps resulting from this study provide for use in planning and management of groundwater resources in the SCV area. The database formats that have been used in this study include ESRI shape files, database tables, georeferenced images, and ESRI GRID files (for the DEM, among others). The GIS map and database for the NFVT study were prepared using ArcViewTM version 8.3 and evaluated using Arc-DesktopTM version 10.2 (ESRI® , Redlands, California).

BLM_0156127

Three multi-layer GIS maps have been prepared for this study: 1) a map with hydrologic and hydrogeologic features of Delta County; 2) a map with hydrologic and hydrogeologic features of the SCV area; and 3) a map with hydrologic and hyrdogeologic features of the combined SCV (Surface Creek Valley), NFVT (North Fork Valley and Terraces), and the Oak Mesa study areas referred to as the NFVSC area. The GIS maps consist of a number of layers representing various data types relevant to the assessment of groundwater resources at user-specified

locations. The GIS layers of the Delta County, SCV and NFVSC maps contain three types of geographic information: 1) general geographic information (county border, roads, towns, imagery) used primarily for orientation purposes; 2) hydrologic information (including precipitation, watersheds, streams, lakes/ponds, irrigation ditches, and irrigated areas); and 3) hydrogeologic information (including hydrogeologic units, faults and hydrostructures, recharge and discharge areas, springs/seeps, and wells. The hydrogeological databases prepared for the SCV area include all data collected and prepared for the previous studies (Oak Mesa and North Fork Valley and Terraces).

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 57

## 5 REFERENCES

Ackerman, D.J., and T. Brooks. 1986. Reconnaissance of Ground-Water Resources in the North Fork Gunnison River Basin, Southwestern Colorado. U.S. Geological Survey. Water Resources Investigations 85-4230.

ASTM Standard D5979, 1996 (2008), Standard Guide for Conceptualization and Characterization of Groundwater Systems. ASTM International, West Conshohocken, PA, DOI: 10.1520/D5979-96R08.

Brooks, T. 1983. Hydrology and subsidence potential of proposed coal-lease tracts in Delta County, Colorado. U.S. Geological Survey. Water Resources Investigations 83-4069.

Brooks, T., and D.J. Ackerman. 1985. Reconnaissance of Ground-Water Resources in the Lower Gunnison River Basin, Southwestern Colorado. U.S. Geological Survey. Water Resources Investigations 84-4185

CDWR 2014. State Water Rights Database. CDSS Water Rights Data Selector, Division of Water Resources - State of Colorado. [cdss.state.co.us/onlineTools/Pages/WaterRights.aspx].

Cordilleran Compliance Services, Inc. 2002. Hydrogeology of the South Flank of the Grand Mesa in the Vicinity of Cedaredge and Paonia, Delta County, Colorado. Prepared for Gunnison Energy Corporation.

Daly, C., and G.L. Johnson. 1999. PRISM Spatial Climate Layers: An Overview of the USDA-NRCS Spatial Climate Mapping Project. PRISM Guide Book. PRISM Group, Oregon State University in cooperation with USDA-NRCS.

Davis, S.N., and R.J.M. DeWiest. 1966. Hydrogeology. John Wiley & Sons, New York.

Day, W.C., G.N. Green, D.H. Knepper, Jr., and R.C. Phillips. 1999. Mineral Resource Assessment Area, Southwestern Colorado and Digital Data for the Leadville, Montrose, Durango, and Colorado Parts of the Grand Junction, Moab, and Cortez 1o X 2o Geologic Maps'. U.S. Geological Survey. Open-File Report 99-427.

Ellis, M.S., D.L. Gaskill, and C.R. Dunrud. 1987. Geologic Map of the Paonia and Gunnison Area, Delta and Gunnison Counties, Colorado. U.S. Geological Survey. Coal Investigations Map C-109.

Freethey, G.W., and G.E. Cordy. 1991. Geohydrology of Mesozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan

Basin. U.S. Geological Survey. Professional Paper 1411-C.

Geldon, A.L. 2003. Hydrologic Properties and Ground-Water Flow Systems of the Paleozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin. U.S. Geological Survey. Professional Paper 1411-B.

Hail, W. J., Jr. 1972a. Reconnaissance Geologic Map of the Cedaredge Area, Delta County, Colorado. U.S. Geological Survey. IMAP 697.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 58

Hail, W. J., Jr. 1972b. Reconnaissance Geologic Map of the Hotchkiss Area, Delta and Montrose Counties, Colorado. U.S. Geological Survey. IMAP 698.

Kolm, K.E., and P.K.M. van der Heijde. 2012. Groundwater Systems of Delta County, Colorado: Oak Mesa Area -- GIS-Based Hydrological and Environmental Systems Analysis and Formulation of Conceptual Site Models (With Addendum). Report prepared for Delta County Board of County Commissioners, Integral Consulting, Louisville, Colorado.

Kolm, K.E., and P.K.M. van der Heijde. 2013. Groundwater Systems in Delta County, Colorado: North Fork Valley and Terraces Area. Report prepared for Delta County Board of County Commissioners; Hydrologic Systems Analysis, LLC, Golden, Colorado and Heath Hydrology, Inc., Boulder, Colorado.

Kolm, K.E., P K.M. van der Heijde, J.S. Downey, and E.D. Gutentag. 1996. Conceptualization and Characterization of Ground-Water Systems. In: Subsurface Fluid-Flow (Ground Water and Vadose Zone) Modeling, ASTM STP 1288, J. D. Ritchey and J. O. Rumbaugh, eds., American Society for Testing and Materials, West Conshohocken, PA.

Noe, D.C., and M.J. Zawaski. 2013. Orchard City Quadrangle Geologic Map, Delta County, Colorado. Colorado Geological Survey.

Robson, S.G., and E.R. Banta. 1995. Groundwater Atlas of the United States: Colorado Plateau Aquifer. U.S. Geological Survey, HA 730-C.

Topper, R., K.L. Spray, W.H. Bellis, J.L. Hamilton, and P.E. Barkmann, 2003. Ground Water Atlas of Colorado. Colorado Geological Survey, Special Publication 53.

Tweto, O., R.H. Moench, and J.C. Reed. 1978. Geologic Map of the Leadville 1 Degree x 2 Degrees Quadrangle, Northwestern Colorado. U.S. Geological Survey. Miscellaneous Investigations Series Map I-999, scale 1:250000.

Tweto, O, T.A. Steven, W.J. Hail, and R.H. Moench. 1976. Preliminary Geologic Map of the Montrose 1 Degree x 2 Degrees Quadrangle, Northwestern Colorado. U.S. Geological Survey. Miscellaneous Field Studies Map MF-761, scale 1:250000.

Watts, K.R., 2008. Availability, Sustainability, and Suitability of Ground Water, Rogers Mesa, Delta County, Colorado—Types of Analyses and Data for Use in Subdivision Water-supply Reports. U.S. Geological Survey. Scientific Investigation Report 2008–5020.

Whitney, J.W. 1981. Surficial Geologic Map of the Grand Junction 1 Degree x 2 Degrees Quadrangle, Colorado and Utah. U.S. Geological Survey. Miscellaneous Investigations Series Map I-1289, scale 1:250000.

Williams, P.L. 1976. Geology, Structure, and Uranium Deposits of the Moab Quadrangle, Colorado and Utah. U.S. Geological Survey. Miscellaneous Field Studies MF-360, scale 1:250000.

000421_FonkeD_20161101  Organization: Daniel Fonke
Received: 11/1/2016 12:00:00 AM
Commenter1: Daniel Fonke - ,

Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000421_FonkeD_20161101.htm (000421_FonkeD_20161101-386589.htm Size = 1 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Oh to be in PROVENCE...PAONIA...TELLURIDE...
1 message
D F <dfonke@outlook.com> Tue, Nov 1, 2016 at 5:30 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Please accept this image with text as a letter of comment for the
BLM's Uncompahgre Field Office's Draft Resources Management
Plan 30 year plan.
Please consider it with great care!
Thanks! - Daniel
WouldYouFrackProvence_SFW.jpg
467K


000422_FonkeD_20161101 Organization: Daniel Fonke
Received: 11/1/2016 12:00:00 AM
Commenter1: Daniel Fonke - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000422_FonkeD_20161101.htm (000422_FonkeD_20161101-386590.htm Size = 1 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Peaches & Corn...
1 message
D F <dfonke@outlook.com> Tue, Nov 1, 2016 at 10:05 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Please accept this image with text as a letter of
comment for the BLM's Uncompahgre Field
Office's Draft Resources Management Plan 30

year plan.

Please consider it with great care!
Thank you for protecting our lands & livelihoods!
- Daniel
WhoWillBuyOurTrustedBrands_SFW.jpg
571K


000423_BainsmithM_20161031  Organization:  Matthew Bainsmith
Received: 10/31/2016 12:00:00  AM
Commenter1: Matthew Bainsmith  -,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000423_BainsmithM_20161031.htm  (000423_BainsmithM_20161031-386591.htm  Size = 1 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Dolores Wild and Scenic Designation
1 message
Matthew Bainsmith <matthew.bainsmith@merit.com>  Mon, Oct 31, 2016 at 8:29 AM
To: "uformp@blm.gov"  <uformp@blm.gov>
To whom it may concern,

A perspective from a young engineer and teacher living in SLC.

On Memorial day of 2014, we hiked and paddled from Fisher Mesa to the Dewey Bridge via the
Dolores River and Water
Canyon. We believe that this stretch of remote river deserves protection like all of Utah's natural
places. We believe that
protection means sustainably managing recreation to protect the natural resource that is the
riparian and canyon
ecosystem.

Regards,
Matt and Dani


Matthew Bainsmith

Engineer II
P: +1 (801) 316-3844
matthew.bainsmith@merit.com

000424_DoolingP_20161030  Organization:  Peter Dooling
Received: 10/30/2016  12:00:00  AM
Commenter1: Peter Dooling  - Paonia, Colorado 81428  (United States)
Organization1:
Commenter Type: Individual
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison  10/30/2016  12:00:00  AM
Attachments: 000424_DoolingP_20161030.htm  (000424_DoolingP_20161030-388442.htm  Size
= 6 KB)
UFORMP_000424_DoolingP_20161030.pdf  (000424_DoolingP_20161030-388441.pdf  Size =
169 KB)
Submission  Text
Patrick Dooling  <patrick.r.dooling@gmail.com>  Sun, Oct 30, 2016 at 3:44 PM

Please find the attached document for comments in support of the B1 Alternative of the
BLMUFO RMP. These
comments regard oil and gas production,  specifically  concerns around the disposal of produced
water via injection  wells,  a process that has been linked  with increased frequency of earthquakes
in hydrocarbon  producing  states across the U.S. I hope you will  consider  my comments in
support of the B1 Alternative  before the final recommendations  are made in order to protect our
communities.
Regards,

Patrick R. Dooling
14138 Burgess Lane
Paonia, CO 81428
215-630-3779

Dear BLM-UFO Staff and RMP Comment  Team,

Thank you for allowing  me to comment on the Draft Resource Management Plan for the
Uncompahgre Field Office. I am glad the BLM is considering  the development  of natural
resources as well as its impacts on the environment,  watersheds, viewsheds, and human
populations.  There is undoubtedly  a worldwide need for oil, gas, and products derived from
petroleum.  However, as a geologist  who worked in the oil and gas industry  for over 3 years, I
have seen up-close the dangers of petroleum development.  From increased truck traffic and
accidents on rural roads to uncontrolled  releases of hydrocarbons  or produced water from
pipelines  and facilities,  there are many dangers that pose a real risk to the welfare of our

community. My main concerns in this letter revolve around the disposal of produced waters, saltwaters, and brines into underground storage reservoirs via injection wells. Injection of these fluids is linked with increased seismic activity that can pose serious issues for human populations. I support the B1 Alternative, the North Fork Alternative, which will provide the necessary precautions to protect our communities from the dangers of this induced seismicity.

Water used in the petroleum extraction process including during drilling and hydraulic fracturing, contain toxic chemicals, dissolved solids, and many other components that largely render it unusable without treatment. With the current collapse of the price of oil, it is far cheaper for companies to dispose of this produced water in buried geologic formations rather than have it recycled. While the benefits of recycling this water would be innumerable due to the dire state of water resources in the arid west, the project economics dictate these companies inject this water back underground, where it will never be used again. Water is a precious commodity in Colorado and disposing of this water will waste precious resources.

My main concern with injection wells revolves around the risk of induced earthquakes. Produced water is injected into underground reservoirs in a process termed Saltwater Disposal (SWD). The risk of induced seismicity (earthquakes) from these SWD injection wells has been known since the 1950s (Nicholson and Wesson, 1951). Recently, the shale revolution has led to unprecedented petroleum production across the United States. With the increase in horizontal wells being drilled and hydraulically fractured comes a proportional increase in SWD wells, and induced seismicity. Recent studies in Oklahoma have observed a five- to ten-fold increase in seismicity in areas with salt water injection (Walsh and Zoback, 2015). There is a clear correlation between seismicity and salt water injection. Additional studies find the rate of injection in a well is the most likely triggering factor in regions with seismic activity (Weingarten, M., S. Ge, et al. 2015). This is important because SWD companies will often inject at very high rates in order to dispose of product more quickly and increase revenue. Often drilling/ exploration/ production companies hire saltwater disposal companies to get rid of their unwanted produced water. These SWD companies lack the resources and will to do detailed scientific studies of the local risks of injection. For example, seismic reflection studies provide critical information on local faults that could be activated during injection of water. However, due to the cost and labor associated with seismic reflection, SWD companies generally do not acquire or use this data before operating, instead opting to inject "in the dark" without regard for local seismic risks. Earthquakes can cause serious infrastructure damage to buildings and roadways. Unlike places like California, infrastructure in Colorado is not built to withstand large earthquakes. Landslides triggered by earthquakes could have even worse effects on our already dangerous roadways. Recently a landslide closed CO-133 above Paonia Reservoir for ~1 week, crippling access to communities north of the North Fork Valley.

To stress how big of a problem SWD is, even the exploration/production petroleum company I worked for despised these SWD companies who were just looking to make a quick dollar in the industry. At the urging of company management, I actively worked to stop a SWD company from placing an injection well on our acreage. Now I am urging the BLM to take the same actions to protect our community.

<([#1 [21.1] No alternatives in the RMP provide enough specific regulations or stipulations

regarding SWD injection. A more detailed study on the risks associated with SWD must be considered before allowing any injection in the UFO. #1])> However, I support the B1 Alternative because it provides the most effective measures to avoid risks associated with induced seismicity from injection wells.

Sincerely,
Patrick R. Dooling
Geologist
patrick.r.dooling@gmail.com
215-630-3779

REFERENCES
C. Nicholson, R. L. Wesson, Earthquake hazard associated with deep well injection: A report to the U.S. Environmental Protection Agency. U.S. Geol. Surv. Bull. 1951

Walsh, F. R. and M. D. Zoback (2015). "Oklahoma's recent earthquakes and saltwater disposal." Science Advances 1(5).

Weingarten, M., S. Ge, et al. (2015). "High-rate injection is associated with the increase in U.S. mid-continent seismicity." Science 348(6241): 1336-1340.

000425_DoolingP_20161030 Organization: Patrick Dooling
Received: 11/30/2016 12:00:00 AM
Commenter1: Patrick Dooling - Paonia, Colorado 81401 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000425_DoolingP_20161030.htm (000425_DoolingP_20161030-386592.htm Size = 3 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
BLM-UFO RMP Comments in Support of Expanded SRMA of Jumbo Mountain
1 message
Patrick Dooling <patrick.r.dooling@gmail.com> Sun, Oct 30, 2016 at 3:47 PM
To: uformp@blm.gov

BLM-UFO RMP Comment Staff,
Please find the attached document in support of the expanded SRMA status of Jumbo Mountain as outlined in
Alternative B/B1. I hope you will consider my comments before making final recommendations in order to provide a

BLM_0156134

much needed asset to our community to increase tourism to the North Fork Valley.

Regards,
Patrick R. Dooling
Paonia, CO
215-630-3779

Dooling RMP Comments in support of Alt B Jumbo.pdf
67K
Patrick R. Dooling
14138 Burgess Lane
Paonia, CO 81428
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Thank you for allowing me to comment on the Draft Resource Management Plan for the Uncompahgre Field Office. <([#1 [27.1] I am glad the BLM is considering Special Recreation Management
Area status for Jumbo Mountain. I support the SRMA status as outlined in Alternative B, providing the most comprehensive protections for this gem of our community.
Unlike most people that are probably commenting in support of the expanded SRMA status as outlined in Alt B, I am not a mountain biker. However, I believe one key to advancing the economy of the North Fork Valley beyond the coal industry lies in tourism. It is no secret that the North Fork Valley is looking for an industry to provide income as the coal industry is collapsing. Adventure tourism can achieve this while protecting and enhancing our lands. Jumbo Mountain can provide a hotspot for mountain bikers across Colorado to enjoy world-class trails in an incredibly scenic location. An increase in tourism will support almost every local industry, including hospitality, restaurants, and retail, including places such as The Cirque Cyclery in Paonia. Expanded SRMA status for Jumbo Mountain will not only give local mountain bikers an opportunity to enjoy their land, but also bring bikers from around the country to enjoy the beauty of the North Fork Valley.
#1])>
Sincerely,
Patrick R. Dooling


000426_EiseleM_20161028  Organization: Max Eisele
Received: 10/28/2016 12:00:00 AM
Commenter1: Max Eisele - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique

Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Attachments: 000426_EiseleM_20161028.htm (000426_EiseleM_20161028-388455.htm Size = 4 KB)
UFORMP_000426_EiseleM_20161028.pdf (000426_EiseleM_20161028-388454.pdf Size = 166 KB)
Submission Text
Max Eisele <max@mesawindsfarm.com> Fri, Oct 28, 2016 at 4:00 PM

I wish to add my two cents as a long time resident of the North Fork community re: fracking in the North Fork Valley.

The following points very aptly list the reasons I am opposed to the BLM's Preferred Alternative:

NASA predicts Impacts to climate, increasingly long periods of drought for the West Our farm and winery is dependent on irrigation water, especially clean water as we are certified organic and our water is monitored federally by the NOP Our business is dependent upon visitors and tourists to the valley because of the unique beauty, wildlife for hunting, support for organic and local products, and lack of congestion Oil and gas wells do and will leak, pollute ground water, despoil the natural beauty and disrupt wildlife, and damage outdoor recreation opportunities which in turn harms our personal and community economic stability.

In addition, recently fracking operations have taken on more debt and expansion than can be maintained. The bubble is bursting. Fracking companies are leaving communities and taxpayers holding the bag for their mess while they dissolve in Court. This scenario alone should give great pause in assessing risk versus gain. Strapped fracking businesses will no doubt cut their costs by ignoring safety procedures and protections required by government entities, which the BLM cannot watchdog due to the bureau's own lack of resources.

I support the North Fork Alternative Plan (NFAP) as the only way to insure our community's well being in the coming years. It is clearly the only correct option and well supported by the majority of people who live in the North Fork.

Max Eisele
Mesa Winds Farm
PO Box 327
31262 L Rd
Hotchkiss, CO 81419

Max Eisele max@mesawindsfarm.com
719.227.1396
PO Box 327
Hotchkiss, CO 81419

BLM_0156136

October 29, 2016

I wish to add my two cents as a long time resident of the North Fork community re: fracking in the North Fork Valley.

The following points very aptly list the reasons I am opposed to the BLM's Preferred Alternative:

• NASA predicts Impacts to climate, increasingly long periods of drought for the West

• Our farm and winery is dependent on irrigation water, especially clean water as we are certified organic and our water is monitored federally by the NOP

• Our business is dependent upon visitors and tourists to the valley because of the unique beauty, wildlife for hunting, support for organic and local products, and lack of congestion

• Oil and gas wells do and will leak, pollute ground water, despoil the natural beauty and disrupt wildlife, and damage outdoor recreation opportunities which in turn harms our personal and community economic stability.

In addition, recently fracking operations have taken on more debt and expansion than can be maintained. The bubble is bursting. Fracking companies are leaving communities and taxpayers holding the bag for their mess while they dissolve in Court.

This scenario alone should give great pause in assessing risk versus gain. Strapped fracking businesses will no doubt cut their costs by ignoring safety procedures and protections required by government entities, which the BLM cannot watchdog due to the bureau's own lack of resources.

I support the North Fork Alternative Plan (NFAP) as the only way to insure our community's well being in the coming years. It is clearly the only correct option and well supported by the majority of people who live in the North Fork.

Max Eisele
Mesa Winds Farm
PO Box 327
31262 L Rd
Hotchkiss, CO 81419

Links:
A 'megadrought' will grip U.S. in the coming decades, NASA researchers say https://www.washingtonpost.com/national/health-science/todays-drought-in-the-west-is-nothingcompared-to-what-may-be-coming/2015/02/12/0041646a-b2d9-11e4-854ba38d13486ba1_story.html

Oil and Gas Exploration Bankruptcies Could Sextuple This Year http://fortune.com/2016/03/25/

fracking-bankruptcies/

000427_WalshOeinckP_20161031  Organization:  Patricia  WalshOenick
Received:  10/31/2016  12:00:00  AM
Commenter1:  Patricia  WalshOenick - Paonia,  Colorado  81428  (United States)
Organization1:
Commenter Type:  Individual
Classification:  Substantive
Submission  Category:  Unique
Submitted  As:  E-Mail
Form Letter Category:  Unique
Form Letter Master:
Current Task:  Done Assigned/Due:  zghali
Attachments:  000427_WalshOeinckP_20161031.htm  (000427_WalshOeinckP_20161031-
386593.htm  Size = 9 KB)
Submission  Text
UFO_RMP,  BLM_CO <blm_co_ufo_rmp@blm.gov>

Draft RMP for Uncompahgre Field Office
1 message
pwoeinck@paonia.com  <pwoeinck@paonia.com>  Mon, Oct 31, 2016 at 7:30 AM
To: uformp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org

Dear BLM-UFO Staff and RMP Comment Team,
My husband and I have lived at 41918 O Rd. in Paonia for 23 years. We are both 62 years old
now and approaching  retirement.  A tremendous  amount of hard work and dedication  went into
building  this home, through  raising children,  forgoing  vacations and other luxuries,  working all
day and coming  home to work on the house,  managing  through joblessness  and periods  of low
income, but now we have the home we love. We plan on living  at this place as far into our
retirement  as our health  will  allow.  We chose this area because of the beauty, rural atmosphere
and ability  to live an active and healthy lifestyle.  Utilizing  water from Barry Pipeline, which is
deeded to our property,  we grow most of our organic vegetables and some of our organic fruit.
What we don't grow ourselves, we buy from neighbors  who also grow organically.  I walk my
dog every single  day up O Rd. or Minnesota Creek Rd. or Dry Gulch Rd. We just finished
cutting  gambel oak for firewood  from up Stevens Gulch which  we have done every year for 8
years. That is my favorite place, it is so beautiful  and quiet I'd like my ashes scattered up there.
My husband enjoys fishing  at Crawford Reservoir. But our most loved activity  is to sit in the
summer on our porch overlooking  Jumbo Mountain.  We just love to be outdoors here.

Thank you for taking my comments on the Draft Resource Management Plan that will  determine,
for the remainder of my husband's and my life, the use of the public  lands that surround us.
At the public  open house I attended at Hotchkiss High School I learned that the preferred
alternative D will  essentially  destroy all it is that we love about our home. Oil and gas
exploration  and development  in such a special area will  be handing  over to one destructive
industry  all the resources that are currently  shared by many sustainable livelihoods.  It was a step

in the right direction to include alternative B and especially B1 but given more recently acquired information about the toxic impacts of fracking on air, water, health, and local economies, a no-lease option is completely reasonable and should have been included and ultimately adopted. The BLM needs to further analyze the following:

1. <([#4 [11.3] Climate change needs to be considered in light of the Paris Climate Agreement. #4])>
2. <([#3 [18.3] New studies have shown a distinct link between adverse health outcomes and proximity to gas wells. #3])>
3. <([#5 [10.3] Atmospheric inversion incidents, especially in winter, aggravate the health risk of increased air pollution. #5])>
4. <([#6 [37.3] The risk of contamination of municipal and irrigation water sources through casing failure, pipeline breaks and truck spills can cause permanent damage. Also permanent will be the water loss from the hydrologic cycle in an area where water is already scarce. #6])> 5.<([#7 [30.3] The negative impact to the existing economy which depends on scenic beauty, clean water and air and low traffic ingress and egress. The branding of the North Fork cannot survive even the perception of the loss of any of the above qualities. #7])> 6. <([#8 [21.1] The leasing of parcels which are unlikely to be productive should not even be considered. #8])> 7. <([#1 [30.3] The impact of industrial traffic on fragile rural roads will be devastating, not just the damage to the structure of the roads themselves but the impact on the mobility of residents and visitors. My husband works in the Roaring Fork Valley and relies on Hwy.133. A recent rock slide added over one hour to his commute and it could have been much worse if the slide occurred in a different location. The danger of very many large trucks to the safety of commuters needs to be studied. There is also the diminished quality of life in the Town of Paonia and outskirts caused by the constant parade of heavy, loud trucks spewing carbon monoxide, running over pets and making leisurely strolls with the family a thing of the past. My frequent walks up Minnesota Creek Road with my dog will become unpleasant and too dangerous.The bucolic nature of the community which drives the economy in so many ways will be destroyed. #1])>
8. <([#2 [18.3] The possibility of mudslides and earthquakes due to fracking-related activities in delicate geological areas should be considered. #2])> 9. <([#9 [30.3] The fragmentation of wildlife habitat impacts not only the wildlife but the hunting industry. Hunting is a way of life here. #9])> While my husband hasn't hunted in a while because of injuries, most of our friends do. At the elementary school at which I work, it is common for children to take off from school to hunt with their families. Out of town hunters support local businesses. How will drilling rigs and trucks affect the viability of continuing this tradition?
10. <([#10 [30.3] Even if highway views can be preserved through site regulations, the existence of well sites back country would diminish the pleasure of hikers and hunters and they will stay away and take their money elsewhere. #10])>
11. <([#11 [30.3] Despite coal mine closures and the loss of jobs for hundreds of local families, real estate values are currently strong. That will end with even the suggestion that gas wells could become part of the landscape #11])> . If, in the future, health issuesforce my husband and myself to find assisted living housing and we have to sell our home, we are relying on a strong market to finance the move.

12<([#12 [30.3] . The few and temporary jobs involved in oil and gas development will surplant many existing long term jobs in agriculture, arts and culture, and tourism. #12])>

13. <([#13 [30.3] In the decades since we moved here, we have watched the North Fork Valley become a mecca for artists of many different disciplines. Many festivals and music events have cropped up, luring out-of-towners who spend money at local businesses. Without the threat of extractive industries and the destruction they bring, the self- determined trajectory of this state -designated Creative District is to expand on this cultural richness. #13])>

Further, we very strongly support having the entire Jumbo Mountain area designated a Special Recreation Management Area. This is literally our back yard. I will be out walking up Dry Gulch, into Hidden Valley, up Lone Cabin Road a bit and over to Minnesota Creek Road this morning as soon as I finish working on this letter. When I am out on Jumbo, I meet many other hikers and mountain bikers enjoying the trails. My son is planning to bring a group of his mountain biking friends from Glenwood Springs to Paonia very soon to ride Jumbo. Just last week, a friend from Delta stopped by after a strenuous Mount Jumbo ride. It is a destination attraction, bringing much needed revenue into the area. Hiking and biking on BLM lands is what we do here. It is intrinsic to our daily lives.

Finally, the BLM is certainly charged with balancing many uses on public lands and energy extraction is an very important aspect that has to be accommodated until renewables replace fossil fuels, but not all uses are appropriate on all lands.

The North Fork Valley is well known as a source of food. With the highest concentration of organic farms outside of California and one of only a few designated American Viticultural Areas, it is vital to maintain the ability of local farmers and ranchers to feed people without fear of contamination of water and air quality. In order to encourage investment in agricultural pursuits, it has to be very definite that there will be protections of the resources that are needed to be successful. We will eventually be able to heat our homes and propel our cars with new, cleaners sources of energy but we will always need food and the North Fork Valley stands ready to provide a wide assortment of high quality and nutritious nourishment for many people. Please consider your role in helping our area continue this incredibly important work by adopting a no-lease alternative in the new RMP. Thank you.

Patricia Walsh-Oeinck
41918 O Rd.
Paonia, CO 81428


000428_PrestonM_20161028  Organization: Dolores Water Conservancy District, Michael Preston
Received: 10/28/2016 12:00:00 AM
Commenter1: Michael Preston - Cortez, Colorado 81321
Organization1:Dolores Water Conservancy District
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:

BLM_0156140

Current Task: Review Assigned/Due: ewozniak
Attachments: 000428_PrestonM_20161028.htm (000428_PrestonM_20161028-387721.htm Size = 15 KB)
xUFORMP_000428_PrestonM_20161028_DWCD.pdf (000428_PrestonM_20161028-387720.pdf Size = 16262 KB)
Submission Text
DWCD Comment Letter and attachments on the UFO Draft RMP
1 message
Michael Preston <mpreston@frontier.net> Fri, Oct 28, 2016 at 3:35 PM
To: uformp@blm.gov
Cc: James.Eklund@state.co.us
To Whom It May Concern,
Attached is the comment letter dated October 28, 2015 from the Dolores Water Conservancy District concerning the Uncompahgre BLM Field Office Draft RMP and EIS. The attachments to this email are very closely related to the Draft comment and should be considered very carefully in conjunction with the comment letter. Other attachments to the letter will be sent in two supplemental emails: Supplement #1 is the Southwest Basin Implementation Plan and "IPP" (Identified Projects and Processes) list; and Supplement 2: DWCD 2014 Water Management Plan.

_____
Michael Preston, General Manager
Dolores Water Conservancy District
Chair, Southwest Basin Roundtable
60 South Cactus, Cortez, CO 81321
(970) 5657562
4 attachments
DWCD Comment UFO Draft RMP, EIS 102816.
pdf
2613K
20111221 MOU BLMCWCB.
pdf
2196K
DoloresCWCBStipulation.pdf
133K
Welch Letter to Mike King 1615.
pdf
375K
October 28, 2016
Barbara Sharrow
Acting Southwest District Manager
Bureau of Land Management, Uncompahgre Field Office
2465 Townsend Avenue
Montrose, Colorado 81401
Re: Dolores Water Conservancy District Comments on Uncompahgre Field Office Draft Resource Management Plan and Environmental Impact Statement
Dear Ms. Sharrow:

BLM_0156141

The Dolores Water Conservancy District (DWCD) submits these comments to you regarding the Bureau of Land Management (BLM)'s preferred alternative
recommending five segments of the Dolores River as Suitable for inclusion in the National Wild and Scenic Rivers System. The alternative, Alternative D, is presented in the Uncompahgre Field Office (UFO) Draft Resource Management Plan/ Environmental Impact Statement.

This comment letter from DWCD is submitted in support of the comment letter submitted by the Colorado Department of Natural Resources (DNR) and the Colorado Water Conservation Board (CWCB) on the Uncompahgre Field Office Draft RMP and EIS (CWCB/DNR Comment Letter).

McPhee Reservoir is a Federal Project
The DWCD operates McPhee Reservoir, the facilities of which are owned by the United States Bureau of Reclamation, located on the Dolores River upstream of the five Dolores River segments proposed for Wild and Scenic Suitability determination. The DWCD began operation of the 381 ,160 acre-foot (229, 182 AF active) McPhee Reservoir in 1987. Since 1987, irrigation water has been delivered to Full Service Dolores Project Irrigators, the Montezuma Valley Irrigation Company and the Ute Mountain Ute Tribal Farm and Community of Towaoc. Domestic water has also been provided to the City of Cortez, the Town of Dove Creek and the Montezuma Water Company. These federally-sanctioned Dolores Project operations are buttressed by Colorado water rights held by the DWCD.
<([#1 39.2] The CWCB/DNR Comment Letter points out that the BLM has noted several times that flow through the proposed Dolores River sections is greatly diminished by the operation of the Dolores Project upstream. The DWCD strongly disagrees with this position of the BLM. The DWCD maintains that before McPhee Reservoir, the Dolores River was a heavy spring run-off river which usually ran dry by the end of the summer. McPhee Reservoir has allowed for flows in the Dolores River to be more constant later in the year than in previous history. #1])>
The relationship between Wild and Scenic Rivers Act (WSRA) suitability determinations and the operation of the Dolores Project was raised in the recent Tres Rios Resource Management Plan process and was addressed by the BLM in the January 6, 2015 letter from the BLM State Director to the Executive Director of the Colorado Department of Natural Resources and in the section of the Tres Rios Resource Management Plan addressing Government to Government consultation. The DWCD joins the CWCB in its request for similar clarity between the relationship of the UFO WSRA suitability determinations and the operation of the Dolores Project. <([#2 39.1] The UFO RMP must state that any Dolores River suitability determinations and the BLM identification of flow-based ORVs on the Dolores River below the Dolores Project shall not affect the delivery of water allocations or water rights decrees for the Dolores Project.
Use of State Programs to ensure ISF and ORV protections

A Memorandum of Understanding has been entered into among the BLM, the State of Colorado and the CWCB which is relevant to river segments on BLM lands which may be considered as Suitable under the WSRA. The MOU, which was last renewed in December of 2011 and is due for extension in 2016, sets forth a framework for interaction between the BLM and the CWCB relevant to joint Federal-State-Local efforts to protect the Dolores River segments.

The DWCD joins the CWCB in recommending that the BLM should work through the CWCB's

Instream Flow (ISF) Program to provide protections adequate for
flow-related values in the subject Dolores River segments. The DWCD notes that the BLM
regularly initiates the CWCB process for ISF water rights to be held by the CWCB for many
streams through lands managed by the BLM. Currently, the CWCB holds ISF water rights on
145 miles of the 200-mile Dolores River and has a pending case in State water court for an ISF
water right for an additional 35 miles of the lower Dolores River below the confluence with the
San Miguel River. Therefore, more than 90 percent of the Dolores River is currently protected
for fish and instream habitat by the Colorado ISF program. In addition, the Dolores River also
currently has 118.9 miles of river designated as Suitable under the WSRA.

In regard to the most recent 35-mile segment of the lower Dolores River, the CWCB and the
DWCD entered into a Stipulation regarding the application pending in Water Court. The
Stipulation is referenced in the CWCB/DNR Comment Letter and quotes a section that states, "it
is the Board's intent that this ISF water right is adequate to meet all requirements as a streamflow
guideline in federal administrative or regulatory permitting contexts." The DWCD submits that
the pending ISF water right is adequate to meet all requirements as a streamflow guideline for
the UFO RMP and suitability guidelines for
the ORVs on the Dolores River. The CWCB also points out that the Stipulation provides a
number of provisions intended to ensure the pending ISF water right does not reach up the
Dolores River, into McPhee Reservoir and above McPhee, to protect State appropriated water
rights above the confluence of the San Miguel and the Dolores Rivers. The DWCD joins the
CWCB in requesting that the intent outlined in the Stipulations for protection of upstream water
rights be acknowledged by the BLM in the body of the final RMP.
#2])>
Collaborative Community Efforts to Protect ORVs
Many community efforts have been in place and continue to be in place to address the
environmental concerns on the Dolores River, including Suitability
concerns and related ORVs. While seeking to ensure that operations of the Dolores Project will
not be impacted, the DWCD has participated in many
collaborative efforts including the Dolores River Dialogue; the Lower Dolores River Plan
Working Group; the "A Way Forward" Study: "Status and Trends of
the Flannelmouth Sucker, Bluehead Sucker, and Roundtail Chub in the Dolores River Colorado
and Opportunities for Improvement" by Kevin Bestgen, William
Miller and Phaedra Budy (July 2011 ); "Lower Dolores River Implementation, Monitoring and
Evaluation Plan for Native Fish" (June 2014 ); Dolores River
Native Fish Monitoring and Recommendation Team; and the Lower Dolores River Working
Group - Legislative Subcommittee.

Monitoring of native fish populations on the Dolores River from McPhee Dam to Bedrock
framed within the "A Way Forward" Study and the Range-Wide
Conservation Agreement ("Three Species Agreement") is being conducted by Colorado Parks
and Wildlife and reviewed by the Dolores River Monitoring and
Recommendation Team. This monitoring has indicated that Roundtail Chub populations prefer
pool habitats and are stable above the San Miguel confluence.
By contrast the blu.ehead sucker and flannel mouth sucker monitor poorly within this reach
because they require higher flows which are only available below the San Miguel River

BLM_0156143

confluence.

<([#3 [16.1] DWCD requests that the UFO RMP commits to a holistic approach to monitoring populations of each of the three native fish species listed as ORVs which
includes the entire Dolores River from McPhee Dam to the Confluence of the Colorado River. This commitment should include all three Colorado BLM Field
Offices along the Dolores River that now fall within the Southwest District Office of BLM, in cooperation with Colorado Parks and Wildlife native fish monitoring efforts and local collaboratives such as the Dolores River Native Fish Monitoring and Recommendation Team.

A focus of this coordination should involve the identification of areas along the Dolores River in which each of the three species is currently viable. The intent of this coordination is to identify the habitats within which each species is viable and build on these strongholds, so if any of these three species is ever listed under the Endangered Species Act, there will be a solid set of relationships and strategies that involve BLM, CPW, CWCB, Water Management Entities, Conservation Advocates and local governments with the best possible capability to care for these native fish species within available hydrologic and habitat conditions. #3])> <([#4 [39.1] Most recently the DWCD has worked with citizens of various community interests including four counties, two water boards, TNC, Wilderness Society and San Juan Citizens Alliance to develop a legislative proposal for a congressionally approved National Conservation Area (NCA) to address the various water supply and ecological interests on the Dolores River from McPhee Dam to Bedrock.

Three of the four segments considered for suitability (Dolores River, Segment 1 a and La Sal Creek, Segments 2 & 3) in the Upper Dolores River are in the area currently being considered for the NCA. The DWCD again joins the CWCB in anticipating that, if an NCA is established on these segments, Congress will release these and other segments within the NCA from designation as Suitable and from potential legislative designation under the Wild and Scenic Rivers Act.
#4])>
Specific Language requests for the UFO RMP
<([#5 [3] The DWCD joins the CWCB and DNR to request certain specific language be included in the body of the final RMP regarding the Dolores River segments. These include:

1. The Wild and Scenic Rivers Act suitability determinations found in Appendix P of the UFO RMP will not affect the delivery of water allocations in the Dolores Project. Rather, the suitability determinations are intended to guide BLM land use decisions that could affect the streams that are determined to be suitable. When the BLM determines that a river is suitable under the Wild and Scenic Rivers Act, the authority to protect ORVs is limited to existing BLM authorities under the Federal Land Policy and Management Act. A suitability determination by BLM does not obligate other agencies, such as Reclamation, to utilize their authorities to protect the ORVs identified by the BLM. Congress has not granted any authority to BLM that would allow the BLM to dictate how a Reclamation project is operated, nor could a BLM administrative decision supersede congressionally enacted legislative direction for the Dolores Project. Accordingly, the Dolores River suitability determinations and the BLM identification of flow-based ORVs on the Dolores River below the

BLM_0156144

Dolores Project will not affect the delivery of water allocations or water rights decrees for the Dolores Project.

2. If the Colorado water court system decrees an ISF water right for the lower Dolores River in the locations, flow rates, and timing appropriated by
the CWCB at its March 2014 Board meeting, and if the instream flow right is vigorously enforced by the CWCB, the BLM will determine it unnecessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

3. If alternative forms of flow protection are provided to support flow-related ORVs, the BLM will determine it unnecessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system . #5])>

Supporting Documents
Attached to this letter are documents the DWCD submits are important for this review and should be incorporated into the public record on this matter. These documents include:
• Memorandum of Understanding between DNR, the CWCB, and BLM, dated December 21, 2011
• Stipulation Between the CWCB Staff and the DWCD, ln the Matter of the CWCB Staff's Recommendation for an lnstream Flow Appropriation on the Dolores River, dated August 31, 2015 (Dolores ISF Stipulation)
• Letter from Ruth Welch, BLM Acting State Director, to Mike King, Executive Director, Colorado Department of Natural Resources, January
6, 2015 {Tres Rios RMP Letter)
• Southwest (SW) Basin Roundtable's Basin Implementation Plan (BIP), including an updated Identified Projects and Processes (IPP) list
• Dolores Water Conservancy District (DWCD) 2014 Water Management and Conservation Plan
• DWCD Drought Contingency Plan, anticipated April 2017

The DWCD recognizes the importance of ensuring that the Dolores River is protected for both the ecological values and the operations of the Dolores
Project. The DWCD believes that the active community collaborative efforts are making great strides in establishing these protections, including but not limited to the NCA, and will continue to work with the BLM and other federal agencies to ensure establishment and enforcement of these protections. The DWCD will remain active in the process of developing the final RMP and hopes its suggested language will be incorporated into the final RMP.
Thank you for considering these ideas and please contact me with any questions you may have.
Sincerely,
D:2 Preston, General Manager
Dolores Water Conservancy District
Cc. James Eklund, Director, Colorado Water Conservation Board

000429_ElaS_20161101 Organization: Ela Family Farms, Steve Ela
Received: 11/1/2016 12:00:00 AM
Commenter1: Steve Ela - Hotchkiss, Colorado 81419

BLM_0156145

Organization1:Ela Family Farms
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000429_ElaS_20161101.htm (000429_ElaS_20161101-387505.htm Size = 4 KB)
Submission Text
Date:11/01/2016
Commenter:Steve Ela
Organization:Ela Family Farms
Email:steve@elafamilyfarms.com
Address:30753 L Rd, Hotchkiss, CO 81419
Phone:970-872-3488
Comment:
To whom it may concern:
I would like to express my support for including the North Fork Alternative plan in the Uncompahgre Resource Management Plan.
As a fourth-generation Colorado fruit grower and a certified organic grower for twenty years, I feel it is imperative to protect the water and air resources of the North Fork Valley. The North Fork Alternative Plan does not preclude oil or gas development in the area, but it does focus on protecting the parts of our area that our critical to maintaining the agricultural integrity of the North Fork.
<([#2 [37.3] We are located on Rogers Mesa, an alluvial fan of Leroux Creek. The United States Geological Survey of the groundwater resources of Rogers Mesa noted that most of the groundwater that is currently being accessed for domestic and irrigation purposes comes from the infiltration of surface water into the aquifer. Any degradation or pollution of the water flowing down Leroux Creek would find its way into our agricultural ditch systems and ultimately into the aquifer through this direct link of surface water recharging our aquifer. The same would be true for any contamination finding its way into the Fire Mountain Ditch system which also flows across Rogers Mesa. #2])>
<([#1 [30] Additionally, our organic certification is dependent on demonstrating that no contamination on non-allowable substances occurs. We have to test the water we use for contaminants and if they were to appear, we would potentially lose our certification and one of our main marketing attributes. Since we annually generate over a million dollars of revenue from our marketing, this would have a dramatic impact on our income and livelihood.
In addition to water, our orchards depend on the clean air of the valley. While the main wind direction during the day is from the southwest, at night we experience a wind shift and the main flow is from the north east as the downslope winds kick in. This means that there is the potential for any air contaminants from anywhere to the east or west of us to be distributed over our area. Again, our organic certification depends on documenting no outside contaminants and we are obligated to maintain buffer strips around our orchards to prevent contamination. However, any air contaminant would be very difficult to mitigate and could again jeopardize our certification. #1])>

BLM_0156146

The North Fork Alternative plan helps to protect the critical water and air supplies around the North Fork Valley, thus helping to protect the resources that we all depend on for our livelihood. I support the more detailed comments that have been submitted by the Western Slope Conservation Center, the Valley Organic Growers Association and Citizens for a Healthy Community. I urge you to include the North Fork Alternative plan in the final Resource Management Plan.

Sincerely,
Steve Ela
Steve Ela
Ela Family Farms
30753 L Rd
Hotchkiss, CO 81419
970 872 3488
www.elafamilyfarms.com
steve@elafamilyfarms.com
www.facebook.com/elafamilyfarms


000430_ElliotA_20161027 Organization: Allison Elliott
Received: 10/27/2016 12:00:00 AM
Commenter1: Allison Elliott - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000430_ElliotA_20161027.htm (000430_ElliotA_20161027-387508.htm Size = 6 KB)
Submission Text
Date:10/27/2016
Commenter:Allison Elliot
Organization:
Email:brilliot@gmail.com
Address:PO Box 747, Paonia, CO 81428
Phone:
Comment:
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and RMP Comment Team,
Thank you for the opportunity to comment on the draft Uncompahgre plan. I am glad the BLM is making an effort to protect our important natural resources for our future generations.

BLM_0156147

At one time Americans thought of this continent as vast and nearly limitless. We are now coming up against those limits. We are slowly coming to understand that those once wide-open spaces are getting carved up and smaller while the demands upon them are growing. We now have to make choices to balance the competing interests and how to best manage the resources of our public lands in this changing world.

In the last many years we have seen the Bureau of Land Management (BLM) recognize and respond to this new reality. There are many new designations to preserve land for its inherent value as wildlife habitat, recreation and scenic areas, in addition to the more traditional uses of extractive industries and grazing. For this I applaud the BLM.

The North Fork Alternative plan, know as B1 in the Draft BLM Uncompahgre Resource Management Plan (RMP), is a further indication that the BLM is changing with the times. Sub-alternative B1 was written by a community whose economy is deeply entwined with the public lands that surround them. It represents the best efforts from all segments of the community trying to balance their own lively hoods with that of others. The group which included the Delta County Commissioners, came up with a plan that both supports the new emerging economy that is based on recreation and ago-tourism of organic farms, which depends on a pristine environment, while not cutting off the possibility of gas development as a potential part of our traditional extractive industries. For these reasons I strongly urge the BLM to incorporate the B1 alternative into the final plan.

I believe that the small surface area open to gas development in alternative B1 is appropriate when considering the overall impact that that particular activity inflicts or could potentially inflict upon all other resources that the BLM manages. With the advent of directional drilling a significant amount of gas can still be recovered while minimizing the need to road construction and all other activities that would damage habitat and recreation.

I have done my best to educate myself on the matter of the RMP. I believe the North Fork Alternative, does the best job of protecting our water resources as well as wildlife. Appendix D of the draft discusses the importance of Ecological Emphasis Areas (EEAs). I support the BLM designating "ecological emphasis areas" to preserve habitat connectivity and wildlife corridors. <([#1 [20.1] The final plan must protect all lands with wilderness characteristics, including the Terror Creek, one of the EEAs. I believe that both Roatcap and Hubbard Creeks should be included in the listed EEAs. The upper reaches of these areas have a large, mature aspen stand, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest and The West Elk Wilderness. #1])> Hunting in this area is an important part of both our culture and our economy.

<([#2 [14.1.1] I have read that the National Wildlife Federation, a hunting and conservation group, sights habitat loss and fragmentation as a primary cause of the decline of Colorado deer. And that state biologists have determined that oil and gas drilling in deer habitat is hurting the ability of deer to recover. The final plan must include EEAs all critical winter habitats within the North Fork Valley. #2])> The protections provided for in B1, which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies are the very least we can do for the wildlife which are an intrinsic part of both our natural and cultural heritages.

Alternative D, the "preferred plan" would open more than 90 percent of the Uncompahgre area to oil and gas leasing, endangering quality habitat, wildlife, recreation and cultural sites. Much of the area doesn't even have oil and gas reserves that are feasible for development, meaning the BLM is putting our public lands at risk for speculative leasing. Fortunately, the BLM has made

the North Fork Alternative available as a choice of alternatives that could be included. The North Fork Alternative is the only alternative that balances the development of our natural resources without threatening our way of life. I support the inclusion of Alternative B1, which balances all the resources managed by the BLM.

The North Fork Alternative Plan represents a historic effort by a community to balance all of the resources that the BLM is charged with protecting and managing. This locally driven proposal is the best way to protect the Gunnison Watershed—supporting hunters, farmers and building a sustainable rural economy on Colorado's Western Slope.

Sincerely,

Allison Elliot


000431_EllisonP_20161031  Organization: Pamela Ellison
Received: 10/31/2016 12:00:00 AM
Commenter1: Pamela Ellison - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Attachments: 000431_EllisonP_20161031.htm (000431_EllisonP_20161031-388458.htm Size = 4 KB)
UFORMP_000431_EllisonP_20161031.pdf (000431_EllisonP_20161031-388469.pdf Size = 209 KB)
Submission Text
Pam Ellison <paoniapam@gmail.com> Mon, Oct 31, 2016 at 1:50 PM

Pamela Ellison
13006 Crawford Rd
Paonia, CO 81428
970-527-7994

28 October 2016

Field Office

Dear Ms Sharrow,

I am writing to express my opposition to oil and gas leasing on public lands in the North Fork Valley. My opposition is based on the potential that drilling and the associated infrastructure development has to damage the clean air and abundant clean fresh water that we rely on. Our fragile environment here in the arid Western
Slope of Colorado is dependent on the water we derive from winter snowpack. A recent report prepared for the Delta County Board of County Commissioners,

http://www.heathhydrology.com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf
drew the following conclusions:

<([#1 [21.1] "The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.

The potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek drainages, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities, which, in turn, could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal."

I'm curious if the BLM took this information into account when determining which areas are suitable for drilling, and treated all the stakeholders with equal weight.
#1])>
The fragile yet growing economy that is now flourishing is providing many jobs. The broadband internet project that has been undertaken by our local electricity provider, DMEA, will further enable certain telecommuters and industries to locate in the area.

It is the nature of commodity markets to experience wide swings in the supply/demand chain, which inevitably lead to the boom and bust cycle seen so recently in the oil and gas markets. When the bust comes, it will leave the damage to the environment behind forever.

Please reconsider adopting the draft plan (or: Alternative D, the "preferred plan"); it would open 90 percent of the Uncompahgre area to oil and gas leasing, endangering wilderness-quality lands, wildlife, recreation and cultural sites. The BLM needs to adopt a final plan that makes wilderness-quality lands, important wildlife habitat and recreation areas off-limits to energy development. The potential for damage to the environment, wildlife and human health is just too great!

Instead, please support the inclusion of Alternative B1 which balances all the resources managed by the BLM.

Thank you for your attention to this matter.
Pamela Ellison

000432_EspinosaG_20161029  Organization:  Gerald Espinosa
Received: 10/29/2016 12:00:00  AM
Commenter1: Gerald Espinosa - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000432_EspinosaG_20161029.htm  (000432_EspinosaG_20161029-388403.htm
Size = 6 KB)
Submission  Text
11/1/2016  DEPARTMENT OF THE INTERIOR Mail UFO
RMP Response
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO RMP Response
1 message
Gerald Espinosa <gm.espinosa@yahoo.com>  Sat, Oct 29, 2016 at 10:46 PM
ReplyTo:
Gerald Espinosa <gm.espinosa@yahoo.com>
To: "uformp@blm.gov"  <uformp@blm.gov>
Please see my attached response to the proposed UFO RMP changes and my preference for the
NFV B1
Alternative.
Thank you,
Gerald
Dear BLMUFO
RMP Response_Gerald.docx
153K


Dear BLM and fellow Western Slope Lovers,
I am a resident of the North Fork Valley, writing in response to the RMP before the
BLM UFO office. I am one of the people who will have to live with your final decision
who, along with the next generation of residents and our present children who
explore and are schooled here, could see upwards of 95% of our public lands be
developed for the benefit of the oil and gas industry. I urge you to consider a no
lease option though I am willing to settle on safeguards present in the B1
alternative. In the spirit of your multiple purpose mandate, please consider my
below comments about the other natural resources and immeasurable externalities
of the place I call home.
I call it home because it is the first place in 10 years of moving for school and work
where I have desired to settle and build. The NFV to me is a place of friendships, a
new career, mental and physical healing, and potential homeownership. Since

moving to the North Fork Valley two years ago, something remarkable has happened to me. I know and believe for the first time in my life that there is an alternative way to living and moving through this world.

I want to share with you my experiences as an impacted citizen who does not wish to see this sacred place turned into a wasteland. Oil and gas development is a threat to the vital watersheds in our valley and downriver neighbors. These waters sustain the highest concentration of organic farms in the state, which provide food that have not only healed me, but also feed many more outside our region. Only behind family, an honest wage and community, we cherish clean mountain water and the soil it percolates into.

As our own valley transitions from coal, in the midst of rebuilding our local economy and reclaiming our land, I firmly reject the notion that a far more invasive energy industry like fracking is compatible with the future of this valley. To suggest so neglects the contribution our surrounding lands have given us, beyond just fossil fuels.

<([#1 [30.2] The greater Delta County recognizes the need to diversify from boom and bust extraction industry, dating back to their 1996 Master Plan, where today's initiatives to promote recreation and value-added agriculture were first articulated as a community. Jumbo Mountain is a premiere mountain biking spot, where locals are willing to share their track (try finding that elsewhere in Colorado). Before the trains were laid for coal, our fruit was carried to acclaim at the 1893 Chicago World Fair. Today's Mountain Harvest Fest and Cherry Days are a gathering in celebration of our bumper-crops but more so our community.

Today the Delta County Commissioners and economic development agencies like REGION 10 and DCED are working on a broad range of regional initiatives from commercial kitchens, co-branding of tourism, riverfront development and urban revitalization as strategies of economic and community resilience. DMEA, the largest equity-holder in the two counties, is advancing high-speed fiber and local energy as a means of economic injection to our community. These share broad communal support, unlike fracking and the selloff of our shared public lands. #1])> A short drive out of town yields views of the Ragged Mountains, the West Elks, San Juans or the Grand Mesa depending where you are facing, and the rift of Escalante-Dominquez and Black Canyons on the land. Pullouts in our public lands offer a hike after work with my rescued dog, launch pads for hunter camps, snowmobiles readied for an excursion. Last weeks backpacking trip, the last before the snow settles, was interjected by mountain lion calls. I saw a mountain goat family last summer, on a ridge in the Gunnison National Forest. I picked up a fishing pole for the first time this summer, the first time since my childhood after having learned from my father. Excursions into our lands sustain us just as much as the water it sheds down to our orchards below sustain the produce.

I do not need to be a biologist, public lands defender, environmentalist, or air quality specialist to understand the magnitude of what can be lost should we permit the privatization of mineral resources and the further socialization of costs, measurable or immeasurable, should this vision of our public lands go forward.

The BLM directive is multi-purpose management. I urge you to remember this in your decision and hope you affirm that no single industry (particularly a foreign one

at that) can trample the voices of impacted citizens. They certainly will not overpower our (local) voices. I stand for the B-1 alternative, but strongly prefer a no lease option of our public lands.
Sincerely,
Gerald Espinosa
Paonia Fall 2016


000433_FielderA_20161029  Organization: Adrian Fielder
Received: 10/29/2016  12:00:00 AM
Commenter1: Adrian Fielder - Carbondale, Colorado 81401
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000433_FielderA_20161029.htm  (000433_FielderA_20161029-387509.htm  Size = 13 KB)
Submission Text
Date:10/29/2016
Commenter:Adrian Fielder
Organization:
Email:adrissafall@gmail.com
Address:Carbondale, CO 81623
Phone:
Comment:
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Thank you for taking the time to consider my comments on the Uncompahgre Field Office draft Resource Management Plan (RMP). <([#1 [5.3] As presented, none of the alternatives offer the level of protection these lands warrant, that communities and the public in your planning area have specifically asked for and favored, and which federal law requires. #1])>
<([#2 [18.3] [3] A large portion of my family's diet consists of food grown in the North Fork Valley, and so our health would be directly and negatively impacted by the mining activity that would be allowed in Alternative D of the RMP. There is no denying that food security depends on clean air and water, and that unconventional fossil fuel extraction threatens air and water quality in many lasting ways. Unconventional reserves have only recently been made

BLM_0156153

commercially viable and accessible through horizontal drilling and hydraulic fracturing, and yet a rich and voluminous body of peer-reviewed scholarly research already provides us with ample evidence of the dangers posed by the same types of development that Alternative D would allow.[1] Alternative D is therefore an assault on the basic human rights of my family and my community to drink water, breathe air and grow food that is uncontaminated by industrial pollution associated with fossil fuel extraction.

[1] As a start, please refer to the New York State Department of Health's study "A Public Health Review of High Volume Hydraulic Fracturing for Shale Gas Development" (Dec 2014) and "The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction)," 3rd edition (Oct 2015), by Concerned Health Professionals of New York and the Physicians for Social Responsibility. #2])>

<([#3 Furthermore, the mining activities allowed by this RMP draft pose a grave threat to the sustainable economic development of our region. Indeed, the sectors upon which our communities depend most – tourism, agriculture, real estate, hunting and fishing and other types of wilderness recreation – would all be adversely affected by fossil fuel extraction.[2]

[2] For starters, see: "Drilling vs. the American Dream: Fracking impacts on property rights and home values," Resource Media, March 14, 2014, http://www.resource- -media.org/drilling- -vs- -the- - american- -dream- -fracking- impacts- -on- -property- -rights- -and- -home- -values/#.V354cs7I89Y; "The fracking/real estate conundrum," Boulder Weekly, December 12, 2013 http://www.boulderweekly.com/the- -frackingreal- -estate- -conundrum/; "The economic dark side of the West's oil and gas boom," The Washington Post (Dec 12, 2013) https://www.washingtonpost.com/news/wonk/wp/2013/12/12/the- -dark- -side- -of- -the- - wests- -oil- -and- -gas- -boom/; "Quantifying the Effects of Underground Natural Gas Storage on Nearby Residents," by Michaela Jellicoe and Michael S. Delgado, Department of Agricultural Economics, Purdue University, September 29, 2014 http://web.ics.purdue.edu/~delgado2/JD%202014.pdf;
"Local fiscal effects of oil and gas development in eight states," Daniel Raimi and Richard G. Newell, Duke University Energy Initiative, May 2016 https://energy.duke.edu/sites/default/files/attachments/2a.%20Local%20fiscal%20effects% 20of% 20oil%20and%20gas%20development%20in%20eight%20states%20FINAL.pdf #3])>
My own business – and therefore my family's security – depends on the continuing vitality of these same
sectors, and the majority of citizens living in this region are similarly beholden. <([#4 [30] Worst of all, the operators who wish to conduct mining activity on these lands are not required by your RMP to prove the safety of their proposed activity, as would be the case if this agency were applying the Precautionary Principle to its decisions. In the absence of proof that industrial activity on these public lands would cause no harm to the communities living here, it is not acceptable, or
even permissible, for your agency to allow forms of development that could undermine the economic vitality of our region, as fossil fuel extraction would most likely do. #4])>

Finally, as stewards of public assets that have a real, measurable effect when mined, processed and released into the atmosphere, you have a moral and legal obligation to protect the human

population – in this region and elsewhere – from the effects of anthropogenic climate change. Governments and agencies are already being held accountable for making climate-wise decisions in accordance with the Public Trust Doctrine, and the number of environmental justice court cases will continue to increase exponentially in the years to come. <([#5 [11.1] In light of the well-established scientific principles of climate science, and in recognition of our country's commitment to the Paris Climate Agreement, the carbon contained in these public assets must be left in the ground in order to maintain their highest possible worth and to preserve the habitability of Earth for human civilization. Far from opening new areas to exploration and exploitation, you should be forbidding access to the remaining carbon reserves in the ground. Secure the legacy our grandchildren will expect of us by protecting those carbon reserves on BLM lands.

#5])> The following points illustrate areas in which the draft RMP is lacking adequate information:
-<([#6 [5.3] There is no alternative being considered that would prohibit the leasing of these lands for mining operations, and as such, it fails to evaluate the full range of reasonable management plans. #6])>
-<([#7 [11.3] There is no Social Cost of Carbon (SCC) analysis of any of the alternatives, despite the fact that respected scientists within your agency have attempted to conduct such analysis and have advocated for the inclusion of such analysis in the RMPs and EISs conducted by your agency. #7])>

-<([#8 [5.3] There is no consideration of how this RMP complies with the Public Trust Doctrine and thus how it measures up to the moral and legal obligations of the federal government to the citizens of the United States. #8])>

-There is no consideration of the Precautionary Principle in making agency decisions.

To compensate for these failures, the final Resource Management Plan should:
-<([#9 [5.3] Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.
-Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.
-Comply with the legal obligations of the Public Trust Doctrine. #9])>

-<([#10 [11.3] Include an in-depth analysis of the Social Cost of Carbon associated with fossil fuel extraction in these locations, so that the operators wishing to develop these lands are liable for the true costs of their activities. Without such analysis, the costs of the health and environmental impacts of those operators' activities will be paid for primarily by people and communities who are not in favor of oil and gas development on these lands, including current residents of the region, future generations, the plant and animal communities that depend on clean air and water,
and people around the world affected by anthropogenic climate change. #10])>

-<([#11 [5.3] Require the application of the Precautionary Principle in making agency decisions, and hence the establishment of incontrovertible proof of the safety of any proposed activity on

these lands before the approval of such activity.
#11])>

Thank you for your service and for your openness to this input.


Sincerely,
Adrian Fielder


000434_HiattC_20161028  Organization: Carol Hiatt
Received: 10/28/2016  12:00:00  AM
Commenter1: Carol Hiatt - Hastings Mesa, Colorado
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 00434_HiattC_20161028.htm  (000434_HiattC_20161028-387510.htm  Size = 2 KB)
Submission  Text
Subject: BLM public  comment
I am voicing  my hope that the new Resource Management  Plan currently being drafted will place high priority  on preservation, responsible  stewardship of land management, and recreation use. In additional  it would be in the best interest of public  health and protecting natural resources to be more restrictive in regard to oil and gas leasing.
Much has changed in our region since the last Resource Management  Plan in 1985, and hopefully  civil  servants like  Shannon Borders will  try strike a balance between varying interests. Please take into account all the changes that have taken place with these lands in the last 30 years; but more importantly,  consider what will  best serve the next 30 years of land management.
Let's not look back and realize we failed to factor in climate change, the
wildlife  needs, and habitat protection.  These are all important  issues to be considered in a responsible  Resource Management  Plan.
This is our chance to pass on a legacy to the
future that shows we were making  responsible  stewardship the highest  priority.
Most respectfully,
Carol Hiatt
Sent from my iPhone
Carol Hiatt
Hastings Mesa CO

000435_GallegosT_20161031  Organization: Tim Gallegos
Received: 10/31/2016 12:00:00 AM
Commenter1: Tim Gallegos - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000435_GallegosT_20161031.htm  (000435_GallegosT_20161031-387511.htm
Size = 7 KB)
Submission Text
Date:10/31/2016
Commenter:Tim Gallegos
Organization:
Email:tglaw@wic.net
Address:
Phone:
Comment:
Please accept the following as my personal comments regarding the draft resource management
plan for the BLM public lands managed by the Uncompahgre Field Office.
As background, I am a lifelong resident of Delta County (except for several years away at school
and working in other locations.) I am now semi-retired, and enjoying our public Forest Service
and BLM lands, primarily for recreational purposes. I am a parent, and a grandparent, with
many family members living in the area, but many more living outside the area. I am a member
of the Delta County Tourism Cabinet, and I am very concerned with the economic viability of
our county towns and businesses. I am also the chairman of the Area Agency on Aging Regional
Advisory Council for Region 10, and am very interested in promoting activities and recreational
opportunities that are of benefit to senior citizens and disabled persons. I am also active in Delta
Area Mountain Bikers (DAMB) and COPMOBA, both of which promote and advocate for
mountain bike trails.
I would like to see BLM manage our public resources and these public lands to meet the human
needs of all of our world residents as necessary, while at the same time, preserving the lands in
such a manner to allow us and future generations to enjoy the unique features that these lands
can provide. I would like to see these lands preserved, as much as possible, for scenic and
environmental value, and to allow, protect and enhance our access to these areas by mechanized
means, as well as other quiet means, such as hiking and equestrian use.
<([#1 [27.1] As an outdoor recreationalist, I am primarily concerned with preserving and
enhancing specific
areas within the Uncompahgre Field Office district within Delta County, for present use, and for
use in the future, by outdoor lover types, including myself, my family, and my friends. I would
like specific areas to be set aside for recreational non-motorized trails. #1])> It is also my
perspective that future recreational trail development will help stimulate and enhance the local
economy, by providing areas that are attractive to the general public, and hence encourage

BLM_0156157

recreational tourism. There are many well-known studies that establish that recreational tourism is of great economic value, and our county – especially now with the demise of the coal mining industry – is in dire need of economic stimulus.

Normally, I and others I know like to have access to areas that are peaceful and quiet, and allow us to enjoy the benefits of the great outdoors without interruptions by motorized travelers or by visual, environmental, or auditory intrusions. Generally, our activities are social in nature, and the use of these trails provide the basis for interaction with our friends and family. In addition, these trails also provide the basis for activities that can be enjoyed in solitude, and allow thought and reflection. Also, we seek out these areas for physical activity and exercise, and we like areas that allow for varying degrees of physically demanding activity, from mild to extreme.

For these reason, I would like to advocate for trails throughout our county, within the UFO area, that are specifically designated for non-motorized trail development, and are free from adverse intrusions such as motorized trails and road, and extraction activities.

In my opinion, alternative B and alternative B.1 provide the best management strategies for the preservation of lands for the uses identified above, and will also help to provide support for local economies based on recreational activities.

<([#2 [27.1] I would specifically support the designation of Jumbo Mountain as an SRMA and as part of economic development and tourism concerns, would ask that any prohibition on competitive events be removed from consideration, as it is important, for economic development concepts, that competitive events be allowed. #2])>

<([#3 [27.1] In addition to the trails on Jumbo, I would ask that other areas in the UFO be considered for the
designation and development of non-motorized single track trails, trailheads, and trailhead facilities, such as parking areas, restrooms, signage for tourism, and possibly picnic and camping area development.

I would ask that areas in North Delta, particularly around the Adobe Badlands Wilderness Study Area, and over to the present Devil's Thumb Golf Course, owned by the City of Delta, be considered and studied, for an epic trail to be developed from the existing Drop Off Trail on Forest Service lands on the Grand Mesa, through BLM land, possibly across Delta County land, and down to the City of Delta. This could be a great economic boost for the city.

Specifically, in the North Fork, areas on Young's Peak north of Crawford, Elephant Hill/Lone Cabin south of Jumbo Mountain, should be considered for non-motorized trail development, and possible recreational designation. #3])>

All of the areas mentioned in these paragraphs contain areas that are uniquely appropriate for trail system development, and lend themselves to the goal of providing a basis for economic development.

Thank you for the opportunity to comment on the RMP.

Sincerely,

000436_GatesJ_20161031  Organization: Jonathan Gates
Received: 10/31/2016 12:00:00 AM
Commenter1: Jonathan Gates - Hotchkiss, Colorado 81419
Organization1:
Commenter Type: Individual

Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000436_GatesJ_20161031.htm (000436_GatesJ_20161031-387512.htm Size = 3 KB)
Submission Text
Date:10/31/2016
Commenter:Jonathan Gates
Organization:
Email:b32gates@yahoo.com
Address:PO Box 2062, Hotchkiss, CO 81419
Phone:
Comment:
To whom it may concern:
I have lived in Hotchkiss the last 8 years and I have been a resident of the Western Slope since 1988. I am deeply disappointed in the BLM's Preferred Alternative for the Draft Resource Management Plan. It will industrialize the local public lands with oil and gas development and fracking activity that will negatively impact an area that is more suited to agriculture and tourism.
Oil and gas development and fracking should not be permitted on our public lands when the risks and side effects to public health have the ability to contaminate our area farms with poison. Oil and gas development will also pollute our air causing respiratory illnesses and it will more than likely contaminate the water resources we rely upon for our physical and economic well being with toxic industrial chemicals.
The no leasing alternative is the only conclusion to be made after analyzing the risks and potential impacts posed by oil and gas operations which include fracking technologies and large-scale industrialization. These activities are not appropriate for the entire area that comprises the North Fork of the Gunnison.
<([#1 [41.1] I request that the BLM impose a moratorium on oil and gas leasing until rural gas gathering pipelines are regulated by the Pipeline Hazardous Materials and Safety. Administration. #1])>
Finally, while I do realize that we use oil and gas as a society, not everywhere is an appropriate place to develop oil and gas resources. Especially when oil and gas development will negatively impact and potentially destroy the tourism and agricultural economies that presently exist in the North Fork of the Gunnison river basin.
Please adopt the No Leasing Alternative.
Thank you for you consideration.
Jonathan Gates
P.O. Box 2062
Hotchkiss, CO 81419


000437_GentryC_20161028 Organization: Chris Gentry
Received: 10/28/2016 12:00:00 AM

Commenter1: Chris Gentry - Crawford, Colorado 81415
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000437_GentryC_20161028.htm  (000437_GentryC_20161028-387513.htm  Size = 5 KB)
Submission Text
Date:10/28/2016
Commenter:Chris Gentry
Organization:
Email:river57@tds.net
Address:PO Box 312, Crawford, CO 81415
Phone:
Comment:
October 23, 2016
BLM, Uncompahgre Field Office
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and RMP Comment Team,
Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft Resource Management Plan.
My name is Chris Gentry and I live in Crawford, Colorado and am expressing my opposition to proposals in your draft plan for the leasing of public lands for gas and oil exploration and development here in the North Fork Valley.
I am a Colorado native and have extensive outdoor experience throughout the state and believe the
North Fork Valley is an area that should unquestionably be removed from the gas and oil equation
because of its unique resources and their dependence on clean water and air.<([#1 [30] This valley possesses unquantifiable value in fruit and vegetable production and boasts more organic farms per square mile than any other location in Colorado. We are becoming a national model for biodynamic farming, permaculture practices and self-sustenance. Organic farms, vineyards, wineries, and a host of other local businesses make this valley truly special. This goes without mentioning the multitude of outdoor recreation opportunities also available here that would be adversely affected by gas/oil/coal development. #1])> I certainly understand the continuing need for some oil and gas production as many of us are still dependent on it until we make the transition to alternative sources, which is imperative. The biggest issue though, is what areas are acceptable for extraction and what areas are just too fragile and pose too much risk to the natural environment and populated areas.
<([#2 [30] [41.2] Regarding the agricultural base and related businesses in the North Fork Valley, there is no way they can operate in tandem with gas and oil development when their

lifeblood is this watershed which will be at risk if these lands are opened to leasing. Multi-stage fracking and horizontal drilling have definite risks and it seems these were not considered within this new RMP. #2])> Our water and natural environment are our lifeblood, let's not take any chances when we don't absolutely have to.

Lastly, I would like to mention that I have a B.S. degree in Commercial Recreation and Tourism from the University of Colorado and fully understand the economics of outdoor recreation. Before moving to Crawford, I spent ten years in Lake City, CO and was involved in marketing Lake City, and in particular, its outdoor recreation opportunities and how they affect local economy.<([#3 [30] I cannot understate how vital, undisturbed natural resources are to local economies and the tax revenues generated through outdoor recreation and tourism. As Colorado continues to attract new residents, people are looking more and more to the western slope for both residence and recreation. Implementing oil, gas and coal development in the North Fork Valley would absolutely stifle the progress and vitality that many have worked so hard to achieve. #3])> With all my heart, I urge you to consider the qualities that make this valley special and the implications of your proposals.

Sincerely,
Chris Gentry


000438_GoldmanA_20161031 Organization: Andrew Goldman
Received: 10/31/2016 12:00:00 AM
Commenter1: Andrew Goldman - Montrose, Colorado 81403
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000438_GoldmanA_20161031.htm (000438_GoldmanA_20161031-387514.htm
Size = 5 KB)
Submission Text
Date:10/31/2016
Commenter:Andy Goldman
Organization:
Email:fishman2@montrose.net
Address:58657 Meadow Lane, Montrose, Colorado 81403
Phone:970-275-9815
Comment:
<([#1 [20.1] I am writing to support the BLM's inclusion of the Roc Creek LWC in the agency's preferred Alternative D of the draft RMP. It has opportunities for primitive and unconfined recreation, is natural in appearance and offers the perception of solitude due to its remoteness in the West End of Montrose County. Its location adjacent to Roc Creek Roadless Area as well as Sewemup Mesa further adds to the suitability for a LWC management prescription. #1])>

<([#2 [20.1] I would also strongly urge the BLM to restore the Tabaguache and Shavano Creek LWCs as proposed in Alt. B to the final RMP. As required for inclusion as an LWC both areas are large enough (11,060 and 6060 acres respectively). Tabaguache Creek, with the exception of some human activity at its edges, and two areas of the unit excluded for livestock purposes, retains its natural appearance and lack of influence by human activity, There is also the opportunities for solitude and primitive unconfined recreation since the area is accessible only by non motorized means.

A similar argument can be made for Shavano Creek with regard to primitive and unconfined recreation, naturalness, and opportunities for solitude since there is limited road access to the area. It also possesses supplemental values including important wildlife habitat connectivity between the Tabaguache WSA, forest lands on the Uncompahgre Plateau and adjacent lower elevation lands.
#2])>
<([#3 [40.1] With regard to the proposed Camel Back WSA adjacent LWC, I urge the BLM to restore the 1750 acres
removed from the top of Monitor Mesa. The small portion of the mesa top that has constructed and
maintained routes can be cherry stemmed out of the LWC. Having hiked in the area, it retains its "natural" feeling having recovered from past vegetative treatments and represents an ecologically important addition to the proposed LWC between the canyon rims below. The eliminated acreage possesses the required opportunity for primitive and unconfined recreation, the feeling of solitude and retains its natural appearance to both myself as well as the "casual observer".
#3])>
<([#4 [9.1] Finally, a general comment about ACECs in the proposed Alt. D. I urge the BLM to restore the 7 eliminated ACECS with their enhance protection status to the agency's preferred alternative. Allowing a mere 25% of the eligible acreage to be managed as ACECs represents a mere 5000 out 675,000 acres of public lands subject to additionally equivalent landscape protection over already existing same or more restrictive management practices. The limited number and reduced acreage in the preferred alternative is inadequate to support a connected landscape and maintain its ecological integrity. I contend that this decision would be contrary to the BLM's mandate to maintain a balanced multi use approach to public lands management, specifically preserving lands with the high degrees cultural, ecological and/or environmental significance that the eliminated ACECs possess.

#4])> Thank you for your efforts in protecting our public lands for future generations.

Andrew Goldman
58657 Meadow Lane
Montrose, Colorado 81403


000439_GravesB_20161101  Organization: Ben Graves
Received: 11/1/2016 12:00:00 AM
Commenter1: Ben Graves - Paonia, Colorado 81428 (United States)
Organization1:

BLM_0156162

Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000439_GravesB_20161101.htm (000439_GravesB_20161101-388481.htm Size = 8 KB)
UFORMP_000439_GravesB_20161101.pdf (000439_GravesB_20161101-388482.pdf Size = 279 KB)
Submission Text
Ben Graves <benjgraves@gmail.com> Tue, Nov 1, 2016 at 6:58 PM

Ben Graves
1004 3rd St
Paonia, CO 81428
/\
Ben Graves

To Whom It May Concern,

Thank you for the allowing the public to comment on the resource management plan. I moved to Delta County in 2012 to teach high school in Paonia. I now am a science teacher at Delta High School. I have been an avid mountain biker, hiker, backcountry skier and wilderness user of the BLM areas in Delta County including the Jumbo Mountain, Adobe Badlands, lower Roubideau Canyon, Lone Cabin and Steven's Gulch areas for the last 5 years. I strongly support Alternatives B and B1 in the RMP because they best preserve the quality of life that will help Delta County recover from the declines in the coal industry.

My wife's and my primary motivation for living in Delta County are the landscape, the tight-knit communities and access to high-quality recreation experiences. We now own two homes and have structured our lives around staying in Delta County (despite some of the lowest teacher salaries in the state) because of the quality of life we
enjoy in the North Fork. As hundreds of coal miners were laid-off, many in Delta County and the school district feared huge losses of students and families. However, enrollment in 2016 is up in the North Fork and real estate is booming. I think a major piece of this growth, despite declines in the traditional energy industry is due to families, like my own, who value the quality of life and access to recreation in the North Fork. The BLM needs to ensure that the RMP prioritizes recreational access and preserving the air, water and wildlife habitat so that the North Fork can redefine itself as a recreation destination.

The Preferred Alternative in the draft plan would keep 90 percent of the UFO area open to oil and gas leasing, endangering wildlife, recreation, wilderness-quality lands, and cultural sites. It would also put at-risk the air and water quality, along with compromising the scenic viewsheds, on which our local communities and economies

depend. Because of the low potential for economically practicable oil and gas development in much of the Jumbo Mountain and North Fork area, the trade-off with respect to less oil and gas revenue and royalties is minimal. I recognize there is ongoing oil and gas development in the area, and more development, when located in areas where
it is the higher/best use, is appropriate and part of a diversified economy. Yet with high enough oil and gas prices, the Preferred Alternative would put some specific public lands at odds with higher-valued amenities directly adjacent to North Fork communities: recreation, scenery, water and wildlife. The BLM must adopt a final plan that makes such important wildlife habitat, recreation areas, and sensitive air, water, and viewsheds off-limits to energy development.

I especially support Alternative B and the protections for Jumbo Mountain as a SRMA because I see first-hand the growth in the trail system over the last 5 years and the increased use of the trails and want to make sure the resource is managed responsibly for recreation. I am an avid trail user and I mountain bike or trail run almost every day. I live about 3 blocks from Jumbo trails and a major reason for my family moving to Paonia was this trail access. The ability for children, the elderly and tourists to have access to a scenic wildlife-viewing and high quality singletrack recreation experience from downtown Paonia is a unique feature of our community and is a draw for people around the state. The Mancos shale geology, steep, rugged trails and fragile desert vegetation are not compatible with heavily motorized, industrial oil and gas development or off-trail use. Some existing user-created trails are not sustainable. SRMA status for the Jumbo Mountain area and the 4000 acreas east of Jumbo Mountain would enable the BLM to improve the current management of this fragile landscape and help put Paonia on the map as an outdoor recreation destination. In Alternative B, the added room for growth of the existing trail system into the areas east of Jumbo Mountain towards the Sunset Roadless Area and the National Forest, would be a way for the Paonia community to continue to attract mountain bike and singletrack recreation users from around the state. Motorized use in the close to town trails is just not compatible with the high amount of non-motorized use. <([#1 [27.1] In order to prevent use-conflict, the BLM should expand the SRMA as proposed in Alternative B and encourage motorized use and expand hunting access in the areas east of Jumbo Mountain. #1])> I support Alternative B over the Preferred Alternative because the Jumbo area needs room to grow so we can balance recreation conflicts and expand the availability of high-quality recreation experiences for locals and tourists that are easily accessible from town.

The only provision in Alternative B that I disagree with is that I would like to see provisions for the local community to host small competitive events. From the mid-2000s until 2014, local groups hosted charity runs on the Jumbo Trails for Cherry Days and Harvest Festival. These events drew competitors from around the Western Slope to Paonia. In 2013 Paonia High School hosted a regional cross-country meet on the Jumbo trails. Our local businesses would benefit greatly from community groups hosting nonmotorized, small-scale events like trail runs and mountain bike competitions. This would further allow our community to redefine itself as a recreation destination. River and trail recreation are a growing economic opportunity in the North Fork, with these industries bringing millions of dollars to communities in Colorado. The North Fork Alternative B1 provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area. These protections must be included in the final plan. Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present,

including land- and water-based recreation. The final plan should include Special Recreation Management Areas identified in Alternative B. Recreation activities in these areas include mountain biking, horseback riding, motor biking, OHV use, trail running, snowmobile use, hunting, fishing, cross-country skiing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, Lone Cabin, the North Fork of the Gunnison River corridor in the Paonia area and the Smith Fork river corridor, McDonald Creek, Elephant Hill, Adobe Butte, and Roubideau

Canyon in the rest of Delta County.

With the decline in the coal industry, the North Fork Valley needs to redefine and continue to diversify the economy. As a classroom teacher, I see firsthand what the loss of jobs and steady incomes does to the fabric of a community. I believe the BLM should do everything in its power to help the North Fork maintain the potential for a diversified economy through embracing public lands access, wildlife protection, scenic viewsheds and recreation with a balanced approach toward oil and gas development. Such a balanced approach recognizes that some locations are not appropriate for such development, when the development would compromise higher-valued amenities. Alternative B1 would ensure that industrial development does not dominate the agricultural and recreational lands that are helping the North Fork redefine itself post-coal mines.

In conclusion, the BLM should listen to the local residents in Crawford, Hotchkiss, and Paonia and adopt the North Fork Alternative, B1, for the area in and around the North Fork Valley and Alternative B for the whole UFO. This locally-driven proposal is a balanced way to manage the entire Gunnison Watershed, and will contribute to re-building a sustainable rural economy on Colorado's Western Slope.

Sincerely,
Ben Graves
1004 3rd St
Paonia, CO 81428


000440_ReedM_20161101_HCCA  Organization: High Country Conservation Advocates, Matt Reed
Received: 11/1/2016 12:00:00 AM
Commenter1: Matt Reed - Crested Butte, Colorado 81224 (United States)
Organization1:High Country Conservation Advocates
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000440_ReedM_20161101_HCCA.htm (000440_ReedM_20161101_HCCA-387960.htm Size = 71 KB)
UFORMP_000440_ReedM_20161101_HCCA.pdf (000440_ReedM_20161101_HCCA-

387959.pdf Size = 761 KB)
Submission  Text
Date:11/01/2016

Commenter:Matt  Reed

Organization:HCCA

Email:matt@hccacb.org

Address:PO Box 1066,  Crested Butte, CO 81224

Phone:303-505-9917

Comment:
Please find attached comments from HCCA, resubmitted  with my contact information  on the
comment. Apologies  for the inconvenience.  Thank you.

Matt Reed
Public Lands Director
High Country  Conservation  Advocates
PO Box 1066
Crested Butte, CO 81224
(303) 505-9917

Dear Bureau of Land Management,

Please accept and fully  consider the following  comments from High Country Conservation
Advocates (HCCA) regarding the Uncompahgre Field  Office (UFO) Draft Resource
Management  Plan (RMP). HCCA
was founded in 1977 to keep Mount Emmons,  located above the Town of Crested Butte,
molybdenum
mine-free.  HCCA's work now addresses other issues that affect Gunnison  County's clean air,
clean water, public lands and healthy wildlife.  HCCA has over 800 members who enjoy the rural
and wild character of Gunnison  County and Western Slope public lands.

While the UFO RMP encompasses a wide geographic area and many resource issues, our focus
in these
comments is the issue of coal leasing, development,  and related impacts. Leasing and
development of coal resources sanctioned under all alternatives in the Draft RMP would lead to
significant,  unacceptable and irreversible environmental  impacts across a wide landscape.
Unfortunately,  the Draft RMP not only maintains the untenable status quo for coal mining, but it
significantly  expands the amount of coal available for leasing and development,  while also
failing to adequately consider environmental  impacts. By sanctioning greater exploration, leasing
and mining,  the Draft RMP undercuts our national commitments  to address and rectify the worst
impacts of climate change at a time when limiting  fossil fuel extraction is obligatory.

BLM_0156166

Regarding oil and gas development, BLM can and should close the North Fork area to oil and gas leasing in the proposed RMP. This can be accomplished without requiring supplemental National Environmental Policy Act (NEPA) under the Council on Environmental Quality (CEQ) regulations, as the additional acreage would represent just 3.8% of the planning area and is therefore not "substantial." If it does not close the North Fork area to leasing, HCCA supports the incorporation into the final RMP of Alternative B1 (North Fork Alternative) as the only management alternative evaluated in the draft RMP that could provide the protection warranted for the North Fork area. Alternative B1 provides the best management options for oil and gas leasing and development presented in the Draft RMP, and it should be adopted by BLM into the final RMP. The North Fork Alternative Plan fits a clear and pressing public need by proposing a set of strong oil and gas management stipulations and protective designations to safeguard the area's character of place, water supply, wildlife habitat and recreational opportunities.

The Draft RMP Fails to Consider a Reasonable Range of Alternatives

NEPA Requirements

<([#1 [5.3] BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for coal development.1

[1 43 U.S.C. § 1712(c)(1).]

As such, in its NEPA analysis the agency must consider a reasonable range of alternatives regarding areas open to coal leasing. #1])> The range of alternatives is "the heart of the environmental impact statement."2 An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action.3 This evaluation extends to considering more environmentally protective alternatives.4

FLPMA and MLA Obligations

The consideration of more environmentally protective alternatives in BLM's analysis is consistent with the requirement of the Federal Lands Policy and Management Act (FLPMA) to "minimize adverse
impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved."5 FLPMA does not mandate that every use be accommodated on every piece of land; instead, it demands a delicate balancing.6 "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage."7 As held by the Tenth Circuit, "[i]f all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined."8 As further provided by the Tenth Circuit:

It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses . . . . BLM's obligation to manage for multiple use does not mean that

development must be allowed on [a particular piece of public land]. Development is a possible use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.9

[2 40 C.F.R. § 1502.14.]

[3 City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14).]

[4 See, e.g., Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1122-1123 (9th Cir. 2002) (and cases cited therein).]

[5 43 U.S.C. §1732(d)(2)(a).]

[6 See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 58 (2004).]

[7 Public Lands Council v. Babbitt, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)).]

[8 Rocky Mtn. Oil & Gas Ass'n v. Watt, 696 F.2d 734, 738 n. 4 (10th Cir.1982) (quoting Utah v. Andrus, 486 F.Supp. 995, 1003 (D.Utah 1979)); see also 43 U.S.C. § 1701(a)(8) (stating, as a goal of FLPMA, the necessity to "preserve and protect certain public lands in their natural condition"); Pub. Lands Council, 167 F.3d at 1299 (citing § 1701(a)(8)).]

[9 New Mexico ex rel. Richardson, 565 F.3d 683, at 710 (10th Cir. 2009) (emphasis added).]

BLM manages federal coal leasing under the Mineral Leasing Act (MLA) of 1920, as amended by the
1976 Federal Coal Leasing Amendments Act.10 The statute directs the agency to authorize leasing of coal on federal lands, in its "discretion," only as the agency "finds appropriate and in the public interest."11 Furthermore, BLM must be guided by its statutory mandate to administer federal coal leasing in a manner that protects the Nation's "environmental, air and atmospheric, [and] water resource[s]," 12 takes into "account the long-term needs of future generations," and considers "the use of some land for less than all of the resources" to accomplish these objectives.13 Put differently, the driving force behind agency-authorized coal development must be the long-term and broad public interest, not the often short-term and narrow interest of coal companies. Thus, the RMP is obligated to consider the enduring legacy of coal development, which is to be balanced against other critical multiple-use resource values.

An examination of the RMP finds no evidence that the BLM considered alternatives that balance uses and impacts within areas known to have coal resources. Rather, the agency across all alternatives not only prioritizes coal leasing and development over other, equally valid resource

considerations, but posits no alternatives that consider, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal. The BLM cannot ignore its obligation to evaluate these competing uses, and must give due weight to FLPMA's mandate to preserve and protect public lands in their natural condition. 14

Purpose and Need

The objective reasonableness of alternatives can be judged by how they relate to the RMP's purpose and need statement. As stated by BLM:

The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses . . . BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy. 15

This purpose does not accept coal development as a foregone conclusion. The BLM has a responsibility in this planning process to match its expansive land and resource management to current conditions and evolving demands, not business-as-usual expectations from the coal industry.

As further explained in BLM's NEPA Handbook:

[10 30 U.S.C. § 181, et seq.]

[11 30 U.S.C. § 201.]

[12 43 U.S.C. § 1701(a)(8).]

[13 Id. § 1702(c).]

[14 See 43 U.S.C. § 1701(a)(8).]

[15 Bureau of Land Management Uncompahgre Field Office, Draft Resource Management Plan and Environmental Impact Statement (May 2016), at I-2 (hereinafter Draft RMP).]

The purpose and need statement dictates the range of alternatives, because action alternatives are not "reasonable" if they do not respond to the purpose and need for the action. The broader the purpose and need statement, the broader the range of alternatives that must be analyzed. The purpose and need statement will provide a framework for issue identification and will form the basis for the eventual rationale for selection of an alternative. Generally, the action alternatives will respond to the problem or opportunity described in the purpose and need statement, providing a basis for eventual selection of an alternative in a decision. 16

BLM_0156169

To adequately address current resource conditions, changes in circumstances, and new or revised national-level policy, the UFO RMP must provide more than a one-sided range of alternatives.

Inadequate Range of Alternatives

<([#2 [5.3] By the measures identified above, BLM's range of alternatives fails to satisfy its procedural obligations under NEPA, its statutory obligation under FLPMA and MLA, and the purpose and need of the RMP. All of the alternatives in the Draft RMP propose to leave available vast amounts of land for coal leasing and development, with little difference in direct, indirect or cumulative impacts. While the alternatives may reflect subtle differences in acreage open for coal leasing, there is virtually no difference in the foreseeable range of coal leasing and development, or in greenhouse gas (GHG) rates across alternatives.
#2])>
[ Table in PDF Summary of Alternatives (Coal)]

[16 BLM NEPA Handbook at 6.2.1.]

[17 Draft RMP at 4-41 – 4-42 (maximum figures for indirect GHG emissions from coal production); id. at 2-409; 4-297 ("coal production is expected to remain the same across all alternatives").]

[18 Id. at 2-9 – 2-10, Table 2-1.]

[19 Id.]

The unreasonableness of the BLM's alternatives analysis with respect to coal leasing is remarkable. For example, the draft RMP considers four alternatives with varying levels of lands "acceptable" for coal leasing. But the alternatives leave open to leasing between 76% and 99.3% of all lands with coal development potential.20 In other words, across the planning area BLM would sanction mining on more than three out of every four acres where mining is technologically practicable, prioritizing one use over the myriad other uses and values within the landscape.

Yet even under this lopsided "range" of alternatives, the likely amount of coal produced and burned across all of them is identical. Under each alternative, the Draft RMP predicts the same amount of GHG emissions from coal combustion – 27.1 million tons. This entails that none of the alternatives would limit coal production or GHG-related impacts in any way. The BLM specifically assumes that for every alternative, "[t]he output from the two active mines on BLM-administered land within this coal field is estimated to remain the same as current production, between 9 and 11 million tons of coal each year for the next 20 years."21

The similarity in available acreage and the identical emissions resulting from coal development conflicts with NEPA's requirement that an actual range of alternatives is considered, such that will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished by only one alternative . . . ."22 A fair reading of the Draft RMP strongly suggests that the objective of the BLM is to maximize coal leasing and

BLM_0156170

development in a manner unencumbered by other resource considerations, making its analysis only a "foreordained formality" in violation of NEPA.23

The "range" of alternatives regarding coal production is unreasonably narrow across the various coal fields in the planning area. For example, the vast majority of the Tongue Mesa coal field is left open under each action alternative (92% or more), despite the fact that the RMP predicts no coal will be produced there because the area's geology makes it "economically unviable to mine in the next 20 years."24 Similarly, while most of the Grand Mesa coal field is open to coal leasing under all three action alternatives, coal there is also unlikely to be mined in the next two decades.25 It appears then that the BLM is unwilling to even consider any reasonable limitations on coal mining, no matter how economically unviable development may be. At the very least the BLM should have considered an alternative that eliminates coal mining in the Tongue Mesa and Grand Mesa coal fields, fields that realistically cannot be mined.

[20 See also id. at 4-274 ("Within the coal potential area, [Alternative B] would be the most restrictive, with 24 percent of the coal potential area unavailable for leasing"). The draft RMP indicates that coal leasing restrictions in the most active coal field – the Somerset – vary between 0% and 12% of the lands in that field that "would be unacceptable for further consideration of leasing and development," meaning that every alternative left at least 88% of the most active coal field open for development. Id. at 4-289 – 4-290.]

[21 Id. at 4-454 (emphasis added).]

[22 Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999), citing Simmons v. United States Corps of Engineers, 120 F.3d 664, 669 (7th Cir. 1997).]

[23 City of New York v. Department of Transp., 715 F.2d 732, 743 (2nd Cir. 1983). See also, Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002).]

[24 Draft RMP at 4-289 – 4-290 (percentage of Tongue Mesa coal field acceptable for coal leasing); id. at 4-454 (economically unviable).]

[25 Id. at 4-289 – 4-290 (90% or more of Grand Mesa coal field open to mining under all action alternatives); id. at 4-454 – 4-455 (due to the Grand Mesa coal field's "low coal quality and transportation constraints," no coal mining is forecast in the area for the next 20 years).]

The Draft RMP indicates that almost all of the coal production in the resource area will come from the Somerset Coal Field. This 40,000 acre area is almost entirely open to leasing under every alternative.26 The most restrictive alternative closes only 12% of the Somerset field to leasing, while the Preferred Alternative leaves 98% open to leasing. But again, GHG emissions would remain the same, rendering the slight acreage difference irrelevant in terms of climate impacts. The only way to address a reasonable range of coal scenarios and outcomes would be to analyze alternatives that place significant portions of the Somerset coal field off-limits to coal mining, which the BLM has chosen not to do.

BLM_0156171

For perspective, compare the RMP's coal scenario to its treatment of renewable energy. For wind and solar development, the draft RMP considers alternatives that would open the planning area to a relatively small acreage (5%), about a third of the acreage, a little over half the acreage, and most of the acreage (83%).27 Thus the greatest percentage of land open to wind and solar under any of the alternatives (83%) is still smaller than the least percentage of land open to coal mining under any alternative (88% of coal-bearing lands).

BLM must consider the following when deciding which areas to allow for coal leasing and development: 1) the BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for coal development;28 2) BLM must consider a reasonable range of alternatives in regards to areas open to coal leasing;29 and 3) any decision which leaves the vast majority of the field office open to coal development will preclude the effectiveness or long-term viability of conservation measures. The Draft RMP largely ignores these considerations, and in doing so violates its legal obligations under NEPA and FLPMA.

The BLM Must Consider a No Leasing Alternative and Should Adopt it as the Preferred Alternative

To comply with NEPA's requirements for a reasonable range of alternatives, the BLM should consider a "no leasing" alternative for coal resources in the planning area. Such an alternative is a necessary counterbalance to the current alternatives that skew heavily in favor of coal leasing. A no leasing alternative is critical because, "[c]learly, it is pointless to 'consider' environmental costs without also seriously considering action to avoid them."30 Because all of the alternatives posited in the Draft RMP would lead to identical GHG emissions (27.1 million tons) and open nearly identical acreage to leasing, a no leasing alternative is necessary to take a "hard look" at environmental impacts and how to avoid them. The BLM's consideration of a no leasing alternative is also reasonable in light of information, science, and national policy related to climate change, discussed in detail below.

[26 Id. at 4-454 – 4-455.]

[27 See Table 2-3, id. at 2-379. That table shows that the following acres (% of total acres) would be open to solar and wind under the alternatives: Alt. A: 561,200 acres (83%); Alt. B: 34,040 acres (5%); Alt. C: 369,970 acres (55%); Alt. D: acres (34%).]

[28 43 U.S.C. § 1712(c)(1).]

[29 40 C.F.R. § 1502.14]

[30 Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Commn., 449 F.2d 1109, 1128 (D.C. Cir. 1971).]

In its skeletal analysis of indirect GHG emissions from BLM actions in the planning area, the agency notes that "[a]ll of the alternatives outlined above provide for continued coal, oil, and gas exploration and development within the UFO. As such, the BLM understands that the majority, if not all, of any developed resources will eventually be consumed to produce energy."31 This

assumption of unrestricted fossil fuel consumption is reflective of a fundamental disconnect between how our public lands are managed for energy production and national policies and expectations to limit GHG emissions. Importantly, the Draft RMP fails to consider any alternatives that would meaningfully address GHG emissions and climate change impacts in the planning area and that are reflective of current science and national policy. To address these impacts, a no leasing alternative must be analyzed.

In order for the BLM to comply with FLPMA and NEPA the agency should, at a minimum, consider and
"rigorously explore" the possibility and design alternatives which do not leave a significant portion of the planning area open to coal leasing.32 We recommend, at a minimum, that the areas identified as having "low" coal potential be removed from consideration for leasing. As it stands, the BLM has identified 180,000 acres "where the coal resource is present, contribute to the coal development potential area, but they are not further discussed in this analysis because they have low coal potential and no interest from industry."33 If that is the case, why does the agency leave at least 130,000 acres of those lands available for leasing under every alternative? If there is low potential and no interest in this coal, BLM should make that coal unavailable in the RMP.

It is evident that there are lands in the Planning Area where other resource values besides coal should prevail. FLPMA affords BLM great authority to appropriately balance these competing interests, which expressly includes the responsibility to "preserve and protect certain public lands in their natural condition."34 Moreover, FLPMA further delegates BLM authority to permanently withdraw lands from consideration.35 This ability authorizes the Secretary to "make, modify, extend, or revoke withdrawals."36 The BLM has the legal authority and obligation to consider and adopt a no leasing alternative, and we request that it do so in the planning process. Not only is BLM's consideration of a no leasing alternative reasonable in light of new information, science, and national policy related to climate change, and therefore must be included in the UFO's RMP, but this information underscores the unreasonableness of the UFO's action alternatives.

The BLM Fails to Take a Hard Look at Climate Change

To address the impacts of climate change and manage for vibrant ecosystems, healthy wildlife and
sustainable recreation, not only must environmental analysis take a hard look at GHG emissions from coal development, but the agency's decision must reflect the challenges faced by residents and visitors of the UFO planning area and surrounding landscapes. A fair reading of the Draft RMP reveals that it places undue emphasis on coal mining while deflecting the climate-related challenges that are already occurring and will worsen in the future. In 2005, Colorado's greenhouse emissions were 35 percent higher than they were in 1990. They are projected to grow 81 percent above the 1990 levels by 2020.37 Current and proposed coal leasing and development on lands managed by the UFO directly contribute to Colorado's GHG emissions and directly impact public lands, resources and communities. Approximately 21% of America's GHG emissions in 2012 originated from coal, oil and gas extracted from public lands. The federal coal program accounts for the bulk of those emissions – over 57% of emissions from federal fossil

fuel production, or 12% of total U.S. GHG emissions.38

[31 Draft RMP at 4-41.]

[32 See 43 U.S.C. § 1712(c)(1) and 40 C.F.R. §§ 1502.14(a) and 1508.25(c).]

[33 Draft RMP at 4-264.]

[34 43 U.S.C. § 1701(a)(8).]

[35 See 43 U.S.C. § 1714.]

[36 Id.]

As noted above, NEPA imposes "action forcing procedures . . . requir[ing] that agencies take a hard look at environmental consequences."39 These "environmental consequences" may be direct, indirect, or cumulative.40 Even if science cannot isolate every single contribution to overall emissions, this does not obviate BLM's responsibility to consider coal development in the action area. In other words, the UFO cannot ignore the larger relationship that its coal mining management decisions have to the broader climate crisis. The RMP's analysis must include the full scope of GHG emissions from its coal management scenarios.41 If we are to realistically avoid climate disaster, the BLM's decision making must acknowledge this reality and plan accordingly. An examination of the Draft RMP reveals that this has not happened.

The Draft RMP acknowledges that "mounting evidence suggests" that numerous climate change impacts
are already occurring in the Mountain West and Great Plains region, including warming temperatures, less snowfall, earlier snowmelt, more drought, greater wildfire risk, and the expansion of grasslands and rangelands into previously forested areas.42 The Draft RMP further acknowledges that these climate change impacts will cause ecosystem and wildlife damage and stress in numerous ways. For example, "[I]f global climate change results in a warmer and drier climate, increased particulate matter impacts could occur due to increased windblown dust from drier and less stable soils;"43 "extinction of endemic threatened or endangered plants may be accelerated;"44 and "the population of some animal species may be reduced."45

[37 U.S. Dept. of Agriculture, Spruce Beetle Epidemic and Aspen Decline Management Response Final Environmental Impact Statement (February 2016), at 228.]

[38 See Dustin Mulvaney et al., Center for Biological Diversity and Friends of the Earth, The Potential Greenhouse Gas Emissions of U.S. Federal Fossil Fuels (Aug. 2015).]

[39 Methow Valley, 490 U.S. 332, 350 (1989) (citations omitted).]

[40 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.]

[41 See Neighbors of Cuddy Mountain v. U.S. Forest Service, 137 F.3d 1372, 1379 (9th Cir.

BLM_0156174

1998) ("To 'consider' cumulative effects, some quantified or detailed information is required. Without such information, neither the courts nor the public, in reviewing the [agency's] decisions, can be assured that the [agency] provided the hard look that it is required to provide.").]

[42 Draft RMP at 4-41.]

[43 Id.]

[44 Id.]

[45 Id.]

The Draft RMP acknowledges that "[c]oal mining activities would be the largest contributor to greenhouse gas emissions for all alternatives."46 Yet in spite of these concerns, the UFO completely avoids taking meaningful action to address the specific cause of climate change that it confronts in planning process, namely the mining and burning of coal. The BLM could reduce GHG impacts by limiting development, declining to lease coal resources, or by requiring significant emission controls. Instead, the UFO abdicates its responsibility by providing an extensive list of excuses as to why action is not possible, including:

-Several activities contribute to climate change beyond fossil fuel development, including fires, combustion engines, changes to the natural carbon cycle, and changes to radiative forces and reflectivity.47

-Projected changes are likely to occur over several decades to a century and may not be "measurably discernable within the reasonably foreseeable future."48

-Assessing the impacts of GHG emissions on global climate change requires modeling on a global
scale which is beyond the scope of this analysis.49

-It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP.50

-It is not possible to distinguish the impacts on global climate change from GHG emissions originating from the planning area.51

These excuses do not comport with the agency's responsibilities under law and policy.

The BLM Must Consider Existing, New and Revised National Policy on Climate Change

On June 20, President Obama spoke at Yosemite National Park, declaring that climate change is "the biggest challenge we're going to face in protecting this place and places like it."52 He could just have easily been discussing public lands in western Colorado. President Obama condemned those who pay "lip service" to protecting America's natural areas while making climate change

worse.53 Unfortunately, it appears that the UFO has not taken this to heart. On the one hand, the Draft RMP acknowledges the impacts of climate change on the planning area's iconic landscapes, but on the other hand its alternatives allow and promote coal development across the same affected landscape, with little or no constraint.

[46 Id. at 4-39.]

[47 Id.]

[48 Id. at 4-40.]

[49 Id.]

[50 Id.]

[51 Id.]

[52 The White House, Remarks by the President at Sentinel Bridge, Yosemite National Park, Office of the Press Secretary (June 20, 2016), available at https://www.whitehouse.gov/the-press-office/2016/06/20/remarkspresident-sentinel-bridge (last viewed October 20, 2016).]

[53 Id.]

In 2014, President Obama described climate change as an "urgent and growing threat . . . that will define the contours of this century more dramatically than any other."54 In that same year, the U.S. pledged to reduce its GHG emissions 26-28 percent below 2005 levels by 2020.55 In his final State of the Union address, President Obama again noted the federal government's commitment to fighting climate change, vowing "to accelerate the transition away from old, dirtier energy sources," and making a powerful promise "to change the way we manage our oil and coal resources so that they better reflect the costs they impose on taxpayers and our planet."56 These statements culminated in December, 2015 where the President joined with 194 other nations in recognizing "that climate change represents an urgent and potentially irreversible threat to human societies and the planet" and setting the goal of "holding the increase in the global average temperature to well below 2°C above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5°C."57 The President ratified the Paris Agreement, along with China, on September 3, 2016.58 Unfortunately, the Alternatives identified in the Draft RMP undermine this commitment by increasing and extending GHG emissions from coal and by suppressing generation of renewables.

The Secretary of the United States Department of the Interior stated, in Secretarial Order 3226, Evaluating Climate Change Impacts in Management Planning (January 19, 2001), that "[t]here is a
consensus in the international community that global climate change is occurring and that it should be addressed in governmental decision making." Secretarial Order 3226 commits the Department of the Interior to address climate change through its planning and decision making processes, having established the responsibility of agencies to "consider and analyze potential

climate change impacts when undertaking long-range planning exercises, when setting priorities for scientific research and investigations, when developing multi-year management plans, and/or when making major decisions regarding potential utilization of resources under the Department's purview."59 The Order specifically provides that "Departmental activities covered by this Order" include "management plans and activities developed for public lands" and "planning and management activities associated with oil, gas and mineral development on public lands."60 Development of the UFO RMP as it pertains to coal and coal related climate effects are thus contemplated by and subject to the Order.

54 The White House, Remarks by the President at U.N. Climate Change Summit (Sept. 23, 2014), available at: https://www.whitehouse.gov/the-press-office/2014/09/23/remarks-president-un-climate-change-summit (last viewed October 20, 2016).

55 U.S.-China Joint Announcement on Climate Change (Nov. 11, 2014), available at: https://www.whitehouse.gov/the-press-office/2014/11/11/us-china-joint-announcement-climate-change (last viewed October 20, 2016).

56 President Barack Obama, State of the Union (Jan. 12, 2016), available at: https://www.whitehouse.gov/sotu (last viewed October 20, 2016).

57 United Nations Framework Convention on Climate Change, Conference of the Parties (Nov 30-Dec. 11, 2015), Adoption of the Paris Agreement, Art. 2, U.N. Doc. FCCC/CP/2015/L.9 (Dec. 12, 2015), available at: http://unfccc.int/resource/docs/2015/cop21/eng/l09.pdf ("Paris Agreement") (last viewed October 20, 2016).

58 The White House, President Obama: The United States Formally Enters the Paris Agreement (Sept. 3, 2016), available at: https://www.whitehouse.gov/blog/2016/09/03/president-obama-united-states-formally-enters-parisagreement (last viewed October 20, 2016).

59 Id. (emphasis added).

The BLM is also subject to Secretarial Order 3289, Addressing the Impacts of Climate Change on
America's Water, Land, and Other Natural and Cultural Resources (September 14, 2009). That Order
reinstated the provisions of Order 3226, and recognized that "the realities of climate change require us to change how we manage land, water, fish and wildlife, and cultural heritage and tribal lands and resources we oversee," and acknowledged that the Department of the Interior is "responsible for helping protect the nation from the impacts of climate change."

In Executive Order No. 13514, Federal Leadership in Environmental, Energy, and Economic Performance (Oct. 5, 2009), President Obama called on all federal agencies to "measure, report, and reduce their greenhouse gas emissions from direct and indirect activities."61 This directive was followed by Executive Order No. 13693, Planning for Federal Sustainability in the Next Decade (March 25, 2015), which reaffirmed the federal government's commitment to reducing GHG emissions.62

BLM_0156177

On August 1, 2016, the White House Council on Environmental Quality issued Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews.63 The Final Guidance applies to all proposed federal agency actions, "including land and resource management actions."64 Notably, while CEQ's final guidance post-dates the UFO's release of the Draft RMP, (draft guidance was published December 18, 2014), it is intended to "facilitate compliance with existing NEPA requirements."65 In other words, the Final Guidance is meant to emphasize BLM's existing legal obligations to disclose and consider the foreseeable effects that, for example, Federal coal leasing and development have on climate change. "Consistent with NEPA, Federal agencies should consider the extent to which a proposed action and its reasonable alternatives would contribute to climate change through GHG emissions, and take into account the ways in which a changing climate may impact the proposed action and any alternative actions, change the action's environmental effects over the lifetime of those effects, and alter the overall environmental implications of such actions."66 The responsibilities identified above can be properly implemented through effective use of NEPA. To comply with NEPA, the BLM must take a hard look at direct, indirect, and cumulative impacts.67 In evaluating impacts, the agency must discuss "[e]nergy requirements and conservation potential of various alternatives and mitigation measures," "[n]atural or depletable resource requirements and conservation potential of various alternatives and mitigation measures," and "[m]eans to mitigate adverse environmental impacts . . . ."68 This was not done in the Draft RMP. In a statement detached from the reality of climate change, the science used to understand it, and national policy meant to address it, the Draft RMP asserts:

[60 Id.]

[61 74 Fed. Reg. 52,117 (Oct. 8, 2009) (emphasis added).]

[62 80 Fed. Reg. 15,871 (March 25, 2015).]

[63 See Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews (Aug. 1, 2016) (hereafter "CEQ Final Guidance").]

[64 Id. at 9.]

[65 Id. at 1.]

[66 Id. at 9.]

[67 40 §§ C.F.R. 1502.16(a), (b); 1508.25(c).]

It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP. It is important to note that projected changes are likely to occur over several decades to a century. Many of the projected changes associated with climate change may not be measurably discernible within the reasonably foreseeable future. Existing climate

BLM_0156178

prediction models are global or continental in scale; therefore, they are not appropriate to estimate potential impacts of climate change on the planning area. The current state of the science involves calculating potential quantities of greenhouse gases that may be added to the atmosphere from a particular activity. However, tools to analyze or predict how global or regional climate systems may be affected by a particular activity or activities within the planning area are not currently available. Assessing the impacts of greenhouse gas emissions on global climate change requires modeling on a global scale which is beyond the scope of this analysis. Potential impacts on climate change are influenced by greenhouse gas emission sources from around the globe and it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area.69

The BLM then concluded: "The projected UFO planning area emissions are a fraction of the EPA's
modeled sources and are shorter in duration, and therefore it is reasonable to conclude that these activities would have no measurable impact on climate, although the emissions would add incrementally to the global GHG loading burden."70

This total disregard for any meaningful analysis in the Draft RMP equates to the BLM failing to take informed action to address climate change, as required by Order 3226 and Order 3289. Furthermore, it signals a deep misunderstanding of the "tools and methodologies for quantifying GHG emissions and comparing GHG quantities across alternative scenarios."71 As stated in Order 3289, BLM must "appl[y] scientific tools to increase understanding of climate change and to coordinate an effective response to its impacts," and "management decisions made in response to climate change impacts must be informed by [this] science." Through statements meant to avoid any actual analysis, BLM fails to take a hard look at the climate impacts of coal leasing and development on public lands in the planning area, as required by NEPA and emphasized by CEQ.

[68 40 C.F.R. §§ 1502.16(e), (f), (h).]

[69 Draft RMP at 4-40.]

[70 Id.]

[71 See CEQ Final Guidance at 11.]

As a starting point, the direct, indirect and cumulative impacts from burning the 829 million tons of recoverable coal in the Somerset Coal Field are undeniable.72 Compare this with the comparatively small 172 million tons of coal that could be accessed and burned under the auspices of the North Fork Coal Area Exemption to the Colorado Roadless Rule.73 The total gross accumulated GHG emissions from mining and burning that coal "could range from approximately 449 to 486 million metric tons CO2eq, depending up the production scenario,"74 with about 10% −15% of that coming from methane emissions during coal mine production.75 Assuming average levels of coal production, mining and burning the coal in the North Fork coal mining area would likely result in an additional 28.1 million tons of CO2eq into the atmosphere every year for 17 years. That is the equivalent of more than one-fifth of all

BLM_0156179

human-caused climate pollution in the State of Colorado annually,76 or three times the volume of annual carbon emissions from Colorado's single largest climate pollution source, the Craig Station coalfired power plant.77

The GHG emissions from BLM actions in the planning area are significant. The UFO estimates annual
direct emissions from BLM actions under the Uncompahgre RMP of 3,110,000 metric tons CO2e, and
maximum indirect emissions from BLM actions of 27,366,562 tons CO2.78 Such emissions would make a
significant contribution to total emissions from federal lands, and contribute significantly to total U.S.
emissions.79

The Draft RMP's off-hand dismissal of climate change impacts and mitigation measures fails to satisfy the guidance outlined in Department of Interior policy, CEQ guidance, or the requirements of NEPA. "Reasonable forecasting and speculation is . . . implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labelling any and all discussion of future environmental effects as 'crystal ball inquiry.'"80 In an effort to discount the significance of the GHG impacts of the BLM's actions under the UFO RMP, the BLM compares the emissions from the RMP to statewide greenhouse emissions, to the carbon dioxide emissions from a power plant in Montrose County, and to total U.S. 2008 greenhouse gas emissions. Such comparisons are unhelpful and misleading. As explained by the Council of Environmental Quality, these comparisons do not reveal anything beyond the nature of the climate change challenge itself:

[72 Bureau of Land Management Uncompahgre Field Office, Coal Resource and Development Potential Report (April 2010), at 63.]

[73 See U.S. Dept. of Agriculture, Rulemaking for Colorado Roadless Areas, Supplemental Draft Environmental Impact Statement (November 2015).]

[74 Id. at 39.]

[75 Id. at 37, Table 3-3.]

[76 Id. at 48.]

[77 See EPA, Facility Level Information on Greenhouse gasses Tool for Craig Station. Available at
http://ghgdata.epa.gov/ghgp/main.do (last viewed Dec. 14, 2015).]

[78 See Draft RMP at 4-39 (Table 4-10); DEIS at 4-42 (Table 4-11).]

[79 The Wilderness Society, Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters, February 2012, available at:

BLM_0156180

http://wilderness.org/sites/default/files/FINAL%20STRATUS%20REPORT.pdf.]

[80 Save Our Ecosystems v. Clark, 747 F.2d 1240, 1246 n.9 (9th Cir. 1984 (quoting Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm., 481 F.2d 1079, 1092 (D.C. Cir. 1973)).]

<([#3 [11.3] [A] statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA. Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact. When considering GHG emissions and their significance, agencies should use appropriate tools and methodologies for quantifying GHG emissions and comparing GHG quantities across alternative scenarios. Agencies should not limit themselves to calculating a proposed action's emissions as a percentage of sector, nationwide, or global emissions in deciding whether or to what extent to consider climate change impacts under NEPA.81 #3])>

As CEQ's Climate Change Guidance explains, although "[c]limate change is a particularly complex
challenge given its global nature and inherent interrelationships among its sources, causation, mechanisms of action, and impacts," it is a "fundamental environmental issue, and the relation of Federal actions to it falls squarely within NEPA's purview."82 This is consistent with CEQ's Cumulative Impacts Guidance, which calls on agencies to consider impacts on the "global atmosphere."83

To suggest that the agency does not have to account for GHG pollution from coal development authorized by the RMP would be to suggest that coal development is not relevant to climate change. This flawed, reductive thinking is problematic, and is contradicted by the BLM's own management framework that requires an accounting of specific pollution sources to ensure that the broader public interest is protected. CEQ recognizes that many agency NEPA analyses to date have concluded that GHG emissions from an individual agency action will have small, if any, potential climate change effects.84 But government action occurs incrementally, and climate impacts are exacerbated by numerous smaller decisions. Therefore, the statement that emissions from coal leasing in the UFO planning area represent only a small fraction of global emissions is more a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether to consider climate impacts under NEPA. Moreover, these comparisons are not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations.85

In short, every Alternative in the Draft RMP is designed to result in long-term coal mining. But while the BLM sustains and champions significant coal mining under the Alternatives, it fails to disclose the impacts of that increased mining in terms of climate change pollution. The reality of climate change is that it is caused by numerous, specific sources of GHG pollution. Therefore, for BLM to disavow itself of responsibility for these specific emissions, as it does in the Draft

RMP, is to condemn us to the consequences of unabated GHG emissions.

[81 CEQ Final Guidance, at 9.]

[82 Id. at 2 (emphasis added).]

[83 Council on Environmental Quality, Guidance on Cumulative Impacts (1997), at 16.]

[84 CEQ Guidance at 9.]

[85 Id.]

The BLM Relies on Stale Data

NEPA mandates that EISs contain "high quality" information and "[a]ccurate scientific analysis" sufficient to "help public officials make decisions that are based on understanding environmental consequences."86 Agencies must affirmatively collect new scientific and technical information to support their hard look at impacts where "available information" is stale.87 To satisfy the "hard look" requirement of NEPA, the BLM must supplement its existing analyses when new circumstances "raise significant new information relevant to environmental concerns . . . ."88 An "agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a hard look at the environmental effects of [its] planned actions."89 Federal courts have long held that agency reliance on data that is stale or inaccurate invalidates environmental review.90 Yet in several important respects that relate to climate and socioeconomic impacts, the Draft RMP uses outdated evidence, despite having access to readily available information. Relying on antiquated data runs counter to basic NEPA requirements, and precludes the public from understanding the impacts of the alternatives and reasonable ways to avoid those effects.

[86 40 C.F.R. § 1500.1(b), (c).]

[87 See Northern Plains Resource Council v. Surface Transportation Bd. 668 F.3d 1067, 1085--87 (9th Cir. 2011).]

[88 Portland Audubon Soc'y v. Babbitt, 998 F.2d 705, 708 (9th Cir. 2000).]

[89 Friends of the Clearwater v. Dombeck, 222 F.3d 552, 557 (9th Cir. 2000).]

[90 See, e.g., Northern Plains Resource Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1085-86 (9th Cir. 2011) (ten-year old survey data for wildlife "too stale" thus reliance on it in EIS was arbitrary and capricious); Lands Council v. Powell, 395 F.3d 1019, 1031 (9th Cir. 2005) (six year-old survey data for cutthroat trout was "too outdated to carry the weight assigned to it" and reliance on that data violated NEPA); Seattle Audubon Soc. v. Espy, 998 F.2d 699, 704-05 (9th Cir. 1993) (reliance on "stale scientific evidence" regarding owl population data without adequate discussion of scientific uncertainty violated NEPA).]

BLM_0156182

Stale Climate Change Data

<([#4 [11.2] The Draft RMP almost wholly relies on climate change data from 2010 or earlier, ignoring new science emphasizing the growing impacts from climate change, as well as new economic conditions reflective of the increasingly problematic connection between coal and climate change. For example, the Draft RMP's description of climate change in Chapter Three relies on three studies: an EPA study published in 2007 and two state studies published in 2008.91 The RMP's description of projected climate change in Colorado relies on a single study from 2008.92 To affirm that impacts from climate change are already occurring, the BLM relies on a 2009 report.93 The information in Chapter Four is little better. It describes potential GHG emissions based on EPA reports from 2010 – 2012, and dismisses the relative level of direct GHG emissions from activities in the planning area based on a discredited EPA letter from 2008.94 In its discussion of the cumulative impacts of climate change in the project area, the BLM relies on studies published between 1996 and 2010.95

[91 Draft RMP at 3-14 – 3-16.]

[92 Id. at 3-26 – 3-27; 3-57.]

[93 Id. at 3-93.]

[94 Id. at 4-38 – 4-40.]

[95 Id. at 4-125.]
#4])>
The Draft RMP's brief look at methane emissions exemplifies its reliance on outdated science, and how that misplaced reliance can falsely minimize impacts analysis. The Draft RMP uses a scientifically stale warming potential of 21 for methane on the basis, presumably, of the Intergovernmental Panel on Climate Change's (IPCC's) 1996 Second Assessment Report (AR2).96 Even though EPA has since taken action to update methane's warming potential based on the Fourth Assessment Report (AR4),97 wherein methane's 100-year warming potential is measured at 25, the Draft RMP adopts EPA's obsolete warming potential of 21.98 Moreover, the IPCC has issued a new report, the 2013 Fifth Assessment Report (AR5), which supersedes its previous reports. The IPCC AR5 explains that methane, over a 100-year time frame and accounting for climate-carbon feedbacks, is 36 times as potent as carbon dioxide, not 21 or 25.99

The data utilized and conclusions drawn in the Draft RMP are stale to the point that they do little to aid the public's understanding of the relationship between coal mining and the affected landscape, climate or socioeconomics. In 2011, the U.S. Court of Appeals for the Ninth Circuit in Northern Plains Resource Council v. Tongue River Railroad addressed the duty of federal agencies to gather "baseline data" during the NEPA process.100 The court found that "[r]eliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious."101 Like the agency in Northern Plains, the BLM here cannot rely on old and generalized data in considering the impacts from coal leasing and development. There is abundant data that has been generated over the last four years concerning most facets of the climate change issue, yet no new

information since 2012 is included or cited in the Draft RMP. Any subsequently prepared NEPA document must include and refer to this data.

Stale Coal Production and Employment Data

To understand the nature of GHG emission impacts on the environment, the BLM must first quantify the amount of emissions that result from the various alternatives. But to quantify the GHG pollutants attributable to the UFO RMP management scheme, the BLM must first accurately project the volume of coal that the RMP would make available that otherwise would remain in the ground. Unfortunately, the production forecasts and scenarios in the BLM's analysis are stale and not indicative of current or anticipated future output.

[96 Intergovernmental Panel on Climate Change, Second Assessment Report (1996). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016).]

[97 Intergovernmental Panel on Climate Change, Fourth Assessment Report (2007). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016).]

[98 Draft RMP at 4-38.]

[99 IPCC, Climate Change 2013: The Physical Science Basis, Working Group I Contribution to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change, at Ch. 8, p. 714, Table 8.7 (2013). Available at www.climatechange2013.org/ (last viewed October 20, 2016).]

[100 Northern Plains Resource Council v. Tongue River Railroad, 668 F.3d 1067, 1083-85 (9th Cir. 2011).]

[101 Id. at 1086.]

<([#5 [22.2] Since 2010 (the date of much of the Draft RMP's coal production data – see below), much has changed in national and international coal markets in general, and to mines in the North Fork Valley in particular. Some of the most significant developments include:

-the closure of the Elk Creek mine in 2013, its demolition in 2016, and the layoff of virtually all of its employees;102

-the idling of the Bowie No. 2 mine in February 2016, and the layoff of most of its employees;103

-layoffs and production declines at the West Elk mine in 2016 from "continuing challenges" in domestic and international coal markets;104 and

-the announcement that the Nucla coal mine, and the power station it serves, will close in

2022.105
#5])>

These market conditions are unlikely to improve, due to low natural gas prices, the increasingly competitive pricing of wind and solar energy, and international commitments to address climate change. In fact, a coal company executive recently predicted that mines in Colorado and Utah would be shipping zero coal west for export by 2030 due to deteriorating overseas markets and because West Coast states are moving swiftly toward a renewable energy future. 106 As a result of these changes, employment and production in the Somerset coal field has fallen dramatically since 2010, as the table below indicates:

[102 D. Webb, Oxbow shifts to permanent shutdown of Elk Creek Mine, Grand Junction Sentinel (April 30, 3016). Available at http://www.gjsentinel.com/news/articles/oxbow-shifts-to-permanent-shutdown-of-elk-creek-mi (last viewed October 20, 2016).]

[103 D. Webb, Bowie idles Paonia mine, Grand Junction Sentinel (Feb. 26, 2016). Available at http://www.gjsentinel.com/breaking/articles/bowie-idles-paonia-mine (last viewed October 20, 2016).]

[104 D. Webb, West Elk Mine undergoes layoffs, Grand Junction Sentinel (June 2, 2016). Available at http://www.gjsentinel.com/breaking/articles/ west-elk-mine-undergoes-layoffs (last viewed October 20, 2016).]

[105 G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 20, 2016).]

[106 C. Coates, Murray Energy CEO sees end of westbound Uinta coal by 2030, SNL (June 10, 2016). Available at https://www.snl.com/InteractiveX/articleabstract.aspx?id=36796676&KPLT=8 (last viewed June 28, 2016).]

[Table in PDF Coal Production and Employment, Somerset Coal Field and Colorado, 2010 and 2016^]

^ All coal production and employment figures derived from Colorado Division of Reclamation, Mining and Safety website (http://mining.state.co.us/Reports/Reports/Pages/Coal.aspx).

* Employment figures are calculated from the last reported date of the period: Dec. 2010 for 2010, and July 2016 for this year.

The Draft RMP's data, much of it dating back to 2010 or older, is especially stale in light of dwindling coal production and employment in the Somerset Coal Field. As a result, the RMP's assumptions and conclusions are misplaced. For example, much of its coal conclusions derive from a BLM document entitled "Coal Resource and Development Potential," dated April 2010.107 Similarly, the BLM relies on the July 2010 "Socioeconomic Baseline Assessment

Report," which, for coal resources, again relies on outdated coal data from 2009 and before that paints an exceedingly optimistic picture of the importance and value of coal to the local economy in the future.108

Over six years of data are available for the agency to consider, data which reveals upheaval in the national coal industry and for coal field mines in the UFO planning area in particular. Any subsequently prepared NEPA document must include up-to-date data concerning coal markets, coal production and coal employment.

The following data and conclusions are stale given the changes in the local coal industry:

-The Draft RMP uses production averages from June 2014 and June 2015,109 though an additional
13 months of data exist demonstrating a steep drop in production since last year.

[107 See, e.g., Draft RMP at 4-13 (citing the report to reach conclusions about predicted coal production).]

[108 Id. at 3-178.]

[109 Id. at 3-126,]

-The Draft RMP assumes a coal production rate of "9 to 11 million tons per year,"110 which is well above the permitted level of the West Elk mine, the only remaining operating mine in the area.111

<([#6 [31.1] -The Draft RMP states that projections from the "Energy Information Administration indicate that
demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal," citing 2010 data.112 Production of coal from Colorado mines fell 41% in the first half of 2016 compared to the same period in 2015.113 The state's Division of Reclamation Mining and Safety reported that Colorado mines produced 5.73 million tons of coal in the first six months of 2016, compared to 9.80 million tons in the first half of 2015.114 Colorado's drop is consistent with, but larger than, the national trend. The EIA estimates that 2016 total U.S. coal production through July 23 was down 26% compared to the same period in 2015.115

-The Draft RMP cites EIA data indicating coal production contributes nearly $400 million annually
based on the local production of over 12 million tons of coal from the region.116 In 2016, the Somerset field provides less than a quarter of Colorado's coal, and production has fallen by three-quarters.

-The Draft RMP bases its socioeconomic analysis on assumptions about the level of coal production that appear to be far higher than current levels: "Approximately 13.8 million tons of coal would be mined in the planning area in Delta, Gunnison, and Montrose Counties in 2012,

with approximately 13.1 million tons of that being federal coal (see Table 4-89 [2012 Coal Extraction Levels]). Coal contributions to employment and income from these uses would annually provide approximately 2,018 jobs and over $175 million in labor income, with these figures increasing to 50,350 jobs and over $3.5 billion in labor income over the expected 20 year lifespan of the RMP."117 Similarly optimistic assumptions are contained in the BLM's 2010 Socioeconomic Baseline report.118 These critical economic assumptions are outdated and inaccurate; the annual rate for coal production in 2016 is well under three million tons, and employment has dropped by roughly 75% since 2012. Nearly 1,000 miners worked three active coal mines in the Somerset field in 2012;119 today that number is less than 250.

[110 Id. at 4-255.]

[111 See also id. at 4-289 – 4-290 ("Over the last six years, total yearly production for these underground coal mines has been between 8 and 11 million tons, and is expected to remain about the same).]

[112 Id. at 3-126 – 3-127]

[113 D. Worthington, Colorado coal production down 42 percent for first six months of 2016, injuries up 20 percent, Denver Post (August 3, 2016). Available at http://www.denverpost.com/2016/08/03/colorado-coal-production2016-down-42-percent/ (last viewed October 26, 2016).]

[114 Id.]

[115 Id.]

[116 Id. at 3-193 – 3-194. See also BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-18 (containing same assumptions and conclusions).]

[117 Id. at 4-468.]

[118 See BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-6; 2-17.]

[119 See DRMS coal production and employment data for 2012, available at http://mining.state.co.us/SiteCollectionDocuments/2012RevisedDetail2013.pdf (last viewed October 20, 2016).]

-The Draft RMP describes the Bowie #2 mine as "actively producing," and suggests that the Elk Creek mine may someday resume production.120 But Bowie #2 is idle, and Elk Creek is permanently closed.

-The Draft RMP also appears to assume that the New Horizon mine will continue to produce coal
at its current rate indefinitely,121 although its operator agreed to close it in 2022.122

-The Draft RMP makes assumptions about coal mining rates to address potential impacts to natural resources. For example, it predicts an increase in impacts to some natural resources because coal mining, among other activities, is "becoming more active once again and energy and mineral resources are expected to increase over time, likely resulting in increasing demand for extraction."123 While some mineral extraction may be increasing, coal is falling compared to historic levels.

-To address air quality impacts, the Draft RMP assumes that "Coal mine production remains unchanged from base year rates with any drop off in existing mine production replaced by production from future mine development in the area."124 In the base year of 2011,125 Colorado
produced 27 million tons of coal, more than twice as much as it is likely to produce this year, and Somerset coal field mines produced 11 million tons, about four times their likely output this year. Thus, the Draft RMP's assumption that coal production rates are "unchanged" from 2011 are false.
#6])>
The fact that the BLM relies on stale data is significant because it distorts the agency's analysis of both climate impacts and economic values. Assuming an inflated value for coal production and employment in the future misrepresents the economic health and long-term viability of this industry. Similarly, relying on stale climate data diminishes our understanding of the relationship between UFO-sanctioned coal management and climate change. Given deteriorating market conditions and the urgent need to transition away from coal combustion, it is imperative that the BLM provide accurate information.

BLM Fails to Consider the Social Cost of Carbon

Research conducted by the National Research Council has confirmed the fact that the negative impacts of energy generation from fossil fuels are not represented in the market price for such generation.126 In other words, failing to internalize the externalities of energy generation from fossil fuels—such as the impacts to climate change and human health—has resulted in a market failure that requires government intervention. Executive Order 12866 directs federal agencies to assess and quantify such costs and benefits of regulatory action, including the effects on factors such as the economy, environment, and public health and safety, among others.127 The Ninth Circuit has ruled that agencies must include the climate benefits of a significant regulatory action in federal cost-benefit analyses to comply with EO 12866.

[120 Draft RMP at 3-125. See also id. at 4-11 – 4-12 (making similar statements); id. at 4-258 – 4-259 (same).]

[121 Id. at 4-289 – 4-290,]

[122 Id. at 4-289 – 4-290G. See Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at
http://www.gjsentinel.com/news/articles/2-power-stations-slated-toclose-coal-mine-will-sh (last

viewed October 26, 2016).]

[123 Id. at 3-41.]

[124 Id. at 4-28.]

[125 See id. at 4-20),]

[126 See, e.g., National Research Council, Hidden Costs of Energy: Unpriced Consequences of Energy Production and Use (2010); Nicholas Muller, et. al., Environmental Accounting for Pollution in the United States Economy, AMERICAN ECONOMIC REVIEW (Aug. 2011); see also, Generation Investment Management, Sustainable Capitalism, (Jan. 2012) (advocating a paradigm shift to "a framework that seeks to maximize long-term economic value creation by reforming markets to address real needs while considering all costs and stakeholders.").]

[T]he fact that climate change is largely a global phenomenon that includes actions that are outside of [the agency's] control … does not release the agency from the duty of assessing the effects of its actions on global warming within the context of other actions that also affect global warming.128

In response, an Interagency Working Group ("IWG") was formed to develop a consistent and defensible estimate of the social cost of carbon (SCC)—allowing agencies to "incorporate the social benefits of reducing carbon dioxide (CO2) emissions into cost-benefit analyses of regulatory actions that impact cumulative global emissions."129 In other words, SCC is a measure of the benefit of reducing greenhouse gas emissions now and thereby avoiding costs in the future.130

The agency's obligation to analyze the costs associated with GHG emissions through NEPA was directly affirmed by the court in High Country Conservation Advocates v. U.S. Forest Service, 52 F.Supp.3d 1174 (D.Colo. 2014) (a decision the agency decided not to appeal, thus implicitly recognizing the importance of incorporating a social cost of carbon analysis into NEPA decision making). In his decision, Judge Jackson identified the IWG's SCC protocol as a tool to "quantify a project's contribution to costs associated with global climate change."131 To fulfill this mandate, they agency must disclose the "ecological[,] … economic, [and] social" impacts of the proposed action.132 Simple calculations applying the SCC to GHG emissions from this project offer a straightforward comparative basis for analyzing impacts, and identifying very significant costs.133

[127 See Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993).See also Executive Order 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011) (reaffirming the framework of EO 12866 and directing federal agencies to conduct regulatory actions based on the best available science).]

[128 Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1217 (9th Cir. 2008) (quotations and citations omitted); see also Border Power Plant Working Grp. v. U.S. Dep't of Energy, 260 F. Supp. 2d 997, 1028-29 (S.D. Cal. 2003) (finding agency failure to

BLM_0156189

disclose project's indirect carbon dioxide emissions violates NEPA).]

[129 See Interagency Working Group on the Social Cost of Carbon, United States Government, Technical Support Document: Technical Update on the Social Cost of Carbon for Regulatory Impact Analysis – Under Executive Order 12866 (May 2013) at 2 (hereinafter 2013 TSD).]

[130 See Ruth Greenspan and Dianne Callan, More than Meets the Eye: The Social Cost of Carbon in U.S Climate Policy, in Plain English, WORLD RESOURCES INSTITUTE (July 2011).]

[131 the b. at 1190. See also id. at 18 (noting the EPA recommendation to "explore other means to characterize the impact of GHG emissions, including an estimate of the 'social cost of carbon' associated with potential increases in GHG emissions.") (citing Sarah E. Light, NEPA's Footprint: Information Disclosure as a Quasi-Carbon Tax on Agencies, 87 Tul. L. Rev. 511, 546 (Feb. 2013)).]

As noted by Judge Jackson, the SCC protocol provides a tool to quantify the costs of these emissions.134 By failing to consider the costs of GHG emissions from the Proposed Action, the agency's analysis effectively assumes a price of carbon that is $0.135 The agency's failure to consider the SCC is arbitrary and capricious, and ignores the explicit directive of EO 12866.

Conclusion

Any subsequent "hard look" at impacts from coal leasing and development should include a range of
alternatives with varying degrees of environmental protections. These alternatives should be consistent with comments provided herein, and include a "no lease" alternative that would leave coal in the ground. HCCA requests that the agency specifically consider an alternative that would withdraw the planning area's coal from operation of the public lands laws, including the Mineral Leasing Act, and that would remove these resources from their availability for lease or other extractive activity.136

Thank you for your consideration of these comments.

Sincerely,

Matt Reed
Public Lands Director
High Country Conservation Advocates
PO Box 1066
Crested Butte, CO 81224
(303) 505-9917
matt@hccacb.org

[132 40 C.F.R. § 1508.8(b).]

[133 It is important to note that, although the 2010 IWG SCC protocol did not address methane impacts, the 2013 IWG Technical Update explicitly addresses methane impacts. Thus, it is appropriate to calculate a SCC outcome that takes into account the full CO2e emissions associated with the proposed leasing.]

[134 See High Country Conservation Advocates, 52 F.Supp.3d at 1190.]

[135 See id. at 21 (holding that although there is a "wide range of estimates about the social cost of GHG emissions[,] neither the BLM's economist nor anyone else in the record appears to suggest the cost is as low as $0 per unit. Yet by deciding not to quantify the costs as all, the agencies effectively zeroed out the cost in its quantitative analysis.").]

[136 See 43 U.S.C. §§ 1712, 1714.]

000441_HellecksonB_20161101  Organization: Terror Ditch and Reservoir Company , Brent Helleckson
Received: 11/1/2016 12:00:00 AM
Commenter1: Brent Helleckson - ,
Organization1:Terror Ditch and Reservoir Company
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000441_HellecksonB_20161101.htm (000441_HellecksonB_20161101-387524.htm Size = 17 KB)
Submission Text
Date:11/01/2016
Commenter:Brent Helleckson
Organization:
Email:brent@stonecottagecellars.com
Address:
Phone:
Comment:
Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision Team
Thank you for the opportunity to comment on the Draft Resource Management Plan (DRMP). Terror Ditch and Reservoir Company (TDRC) remains opposed to oil and gas development in the watershed of Terror Creek, a tributary to the North Fork of the Gunnison.
<([#1 [18.1] The BLM preferred alternative, alternative D, opens nearly all of the North Fork watershed to oil and gas exploration and development (DRMP at 2-409). While the underlying assumption is a well count of 1,271 throughout the UFO region by the year 2030 (DRMP at 3-14), statements by the energy companies currently operating in the North Fork, on lands

already leased by the BLM, exceed that number by a factor of 2 to 3. This is in advance of the recent USGS study identifying the Mancos Shale as a likely significant gas resource. Therefore, offering nearly all of the North Fork watershed as available for oil and gas leasing virtually guarantees the industrialization of that watershed, including the Terror Creek watershed. While the specifics of each well will be unique, the commonly accepted impacts include multiple millions of gallons of water per well, multiple thousands of truck trips per well, multiple millions of gallons of produced waste per well and multiple miles of roadway per well pad. No reasonable person could claim that the current rural/arboreal landscape would suffer "no significant impact" from such a change of use. The DRMP admits as much at page 3-176. #1])> The farms that are stockholders in TDRC depend upon the reliable availability of clean irrigation water, stock water and domestic water. Industrial development of the scale proposed by the DRMP and the preferred alternative poses significant, unmitigated risks to each.

<([#2 [18.3] The Denver Post reports that over the last 3 years, the oil and gas industry has reported nearly 2 spills per day or nearly 700 per year, all of which had the potential to contaminate surface water and 15% of which did contaminate ground water. As the State relies on self-reporting by
industry, this number must be assumed to be a lower bound. At the scale of development proposed by the DRMP preferred alternative, the North Fork watershed should expect similar spill activity. Multiple thousands of truck trips per well, many of which carry hazardous or noxious chemicals, will likely add to this number. This is yet another example of a risk/cost that is tacitly expected to be borne by the residents down gradient of the oil and gas extraction activity in support of the profitability of the industry and the revenue streams of various governmental agencies. #2])> <([#3 [18.5] [5.3] The absence of viable mitigation measures, the absence of mechanisms to compensate affected entities and penalize responsible parties argues for the realization that the proposed development in the preferred alternative is incompatible with existing uses and with the BLM mandate to manage for multiple use and sustained yield. Further it argues for a "no leasing in the North Fork watershed" option. #3])>

<([#4 [37.3] Contamination of ground water by oil and gas development, hydraulic fracturing, and associated activity is well documented and of great concern. Although there is little or no data specific to Colorado or specific to the Terror Creek drainage, Ingraffea et. al., prominent researchers
on the effects of oil and gas development, estimate the failure rate of gas well bores to be between 7% and 60%, depending upon the age of the well. Further they describe, "Fluid migration from faulty wells is a well-known chronic problem with an expected rate of occurrence." Should
such scientific evidence be supported under North Fork conditions, the extremely conservative estimate in the DRMP of 1,271 wells provides that something like 90 wells would begin leaking shortly after completion and nearly 800 wells might be expected to leak over multiple decades. These wells would leak not only methane but also the 40% to 75% of the fracking fluid volume used to produce the methane. For reasons described earlier, the number of wells in the North Fork is expected to be much higher than that assumed in the DRMP, thereby increasing the expected number of failed wells by a similar factor. #4])>

<([#5 [18.3] [41.2] The topology of the watershed introduces another risk not addressed either in

the scientific literature or in the DRMP. In order for the efficient exploitation of the natural gas resource to occur, wells must be drilled on a grid pattern within the bearing strata such that the horizontal portions of one well cluster meet or nearly meet the horizontal portions of an adjacent cluster. The fracturing operation would be expected to open pathways such that trapped gas might find its way to one or the other well bore and migrate to the collection system. This communication between horizontal well bores provides a pathway for water accumulating in a failed well bore of higher elevation to establish hydrostatic pressure in an adjacent well bore. Should that well bore fail and should it exit the surface at a lower elevation than the first, the result may well be a man-made toxic spring spewing fracking fluid, methane, and other chemicals and radioactive material dissolved in the gas-bearing strata. #5])> The resulting effect is reminiscent of the "Gold King" fiasco in Durango Colorado or the on-going struggle in the watershed above Crested Butte to contain and treat mine outflow from the Keystone Mine. The latter requires a million dollar per year treatment plant to be operated indefinitely.

<([#6 [37.1] The sum total of groundwater protection measures defined in the DRMP preferred alternative seems to be found on page 2-47 with an exhortation for companies to extend casings through the aquifer and use freshwater mud for drilling. This is wholly inadequate for the risks involved. Again the residents of the North Fork and the shareholders of TDRC are being tacitly forced to bear the cost of well-bore failures. The absence of any analysis of well bore failures and their effects, any proposed long term mitigation, or any method to assign responsibility, and funding, for the long-term monitoring and remediation of well bores argues that the proposed development embodied in the DRMP preferred alternative is incompatible with existing enterprise in the Valley and incompatible with the BLM mandate for multiple use and sustained yield. #6])> It also argues for a "no leasing in the North Fork watershed" alternative.

<([#7 [18.3] [41.2] Wastewater generated during hydraulic fracturing operations is commonly disposed of in injection wells. Several such wells are already proposed for the North Fork watershed. The link between wastewater disposal wells and earthquake exacerbation is now well established in Oklahoma and in Ohio. Further, experiments with similar disposal techniques on the Rocky Mountain Arsenal outside of Denver in the 1960's and 70's produced similar results, i.e. an activation of faults beneath Denver and the Front range. The geology of the North Fork is replete with fault zones, fractures, etc. Highway 133 has experienced multiple, extended closures due to rockslides in the past several years. Indeed, the DRMP identifies 683 movement features (e.g. rockslides, debris flows, debris slides, etc.) between Paonia and McClure Pass (DRMP at 3-178). The increased ismic activity resulting from oil and gas operations can be expected to increase the disturbance of these movement features. TDRC expends significant money each year to clear our conveyance system of rockfall and slides. We also monitor a slide above our reservoir yearly to assure that no motion is occurring. The dam retaining our reservoir water has recently been reclassified to reflect the increased risk of damage to new downstream development, should a dam failure occur. Increased seismicity presents an immediate increase in risk and likely increase in direct cost to TDRC for insurance, monitoring and compliance. Further, increased seismic activity must almost certainly be correlated to increased well bore failure, exacerbating the issues outlined in the previous section.

The geologic character of the North Fork watershed make it uniquely susceptible to induced seismicity #7])> and again argues for a "no leasing in the North Fork watershed" alternative. As mentioned previously, at the shareholders of TDRC rely exclusively on the timely availability of clean irrigation water. That can only be accomplished via a healthy, vegetated watershed.

BLM_0156193

Multiple years of drought combined with increasing temperatures have stressed the Terror Creek watershed in multiple ways. Sudden Aspen Decline, a drought and temperature -induced dieback of aspen groves, has caused a decline in the shadowing protecting the snowpack in mid to late spring. The resultant early runoff occurs at a time when farms are not able to use the runoff water to irrigate, The reservoirs fill as they should but are tapped earlier because the runoff water is no longer available when crops are ready to use it. Various beetle infestations threaten to decimate the conifer cover of higher elevations in the watershed, again contributing to snowpack degradation and early runoff. The level of development inherent in the DRMP preferred alternative further exacerbates the

degradation of the watershed by road construction, well pad development, pipeline construction and dust. <([#8 [5.9] In addition to directly contradicting the DRMP goal of minimizing habitat fragmentation, the DRMP preferred alternative passes the cost of energy extraction on to the shareholders of TDRC in the form of decreased irrigation water supply. There is no mitigation for the construction of the infrastructure necessary to support the development scenario likely to occur as a result of the DRMP preferred alternative. #8])> This again argues for the adoption of a "no leasing in the North Fork watershed" alternative.

<([#9 [11.3] The DRMP explicitly acknowledges the fact of climate change (DRMP at 3-15). The effects of climate change will likely increase the amount of land in the North Fork that fails to fully meet the land health standard from the current approx. 50% to something significantly more than 50% (DRMP at 3-18). The effects of climate change are already being felt at the individual farm as lower than typical snow pack, warmer and earlier spring thaws, earlier bud break, warmer summertime highs, warmer falls, etc. As mandated by the Council on Environmental Quality, the BLM must begin to assess the contribution of its actions to climate change and, by extension, to avoid them where possible. #9])> When finding oneself in a hole and wishing to get out, the first step is to stop digging. When tasked with combating climate change the first step is to reduce the production of greenhouse gasses and the first places that should be removed from production are those with the highest risk of damage to non oil and gas resources and enterprises. The Terror Creek watershed is certainly one of those places and should be protected with a no leasing alternative.

The development inherent in the DRMP preferred alternative is incompatible with the existing mandate of the BLM and incompatible with the existing uses of the lands under your management. In stark contrast to the stated mission of the BLM, the preferred alternative will degrade the health, diversity and productivity of public lands and will curtail the use and enjoyment of present and future generations. It will result in neither multiple use nor sustained yield. It will force the costs of energy extraction onto the residents of the North Fork and the shareholders of Terror Ditch and Reservoir Company in multiple ways, supporting the profitability of the oil and gas industry and the tax, royalty and severance income of multiple governmental agencies at the expense of those of us who live here.

We Strongly urge the BLM to adopt a no fluid mineral leasing policy for the North Fork of the Gunnison as a whole and for the Terror Creek watershed in particular.

Board of Directors
Terror Ditch and Reservoir Company
Brent Helleckson, Secretary


000442_HickamC_20161028 Organization: Carol Hickam
Received: 10/28/2016 12:00:00 AM

Commenter1: Carol Hickam - Hotchkiss, Colorado 81419
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000442_HickamC_20161028.htm (000442_HickamC_20161028-387525.htm Size = 5 KB)
Submission Text
Date:10/25/2016
Commenter:Carol Hickam
Organization:
Email:woodyhickam@gmail.com
Address:802 Short Rd. PO Box 503, Hotchkiss, CO 81419
Phone:
Comment:
To Whom It May Concern:
I agree with all the statements made by the public comment document created by the Citizens for a Healthy Community. I believe I signed such a letter this summer. I wanted to highlight some of my personal concerns.

My son, Jon, and daughter-in-law, Shannon, moved to the Hotchkiss area 11 years ago following the birth of their first child. They believed it was their duty to provide the best lifestyle possible for their child and now 2 children. To them, this means good organic, local food to nourish their bodies, clean air, freedom to explore the land and lots of family time. They own property, 60 acres, that is adjacent to the BLM. They are both very active in the community where Shannon teaches and Jon works for local non-profits. I followed them to this valley once I retired from Denver Public Schools. The lifestyle here feeds my soul; but it is being threatened in a way that sickens and scares me. Every reason we had for moving here is being challenged.

I have a dear friend who grew up in New Raymer, CO. and lives in that area. What fracking has done to the prairie is heartbreaking, i.e. traffic, pollution of all kinds, some wells running dry, ruination of the landscape, etc. But, I did not hear very much protest to fracking from that area. They did not have the diversified, sustainable alternatives that have been developed here. This makes the North Fork Valley a very different situation.

<([#1 [41.1] [18.3] I do not believe the BLM has done its due diligence in performing the required in depth risk analysis. If they have, I have not seen it. If for no other reason, pipelines should not be put in rural areas where they are unregulated. Pipeline safety was not considered. They break despite best efforts at building adequate ones. In addition, recent studies have shown radioactive waste water which only fuels climate change. #1])>

<([#2 [30] We are not just an isolated group of people. Tourists are flocking here to escape into the pristine valley where we live. Restaurants and farmer's markets in the front range relying on local, organic foods get much of it from our farmers and ranchers. Our economy does not need fracking to survive. In fact, our local economies are in jeopardy if we have fracking. As the coal

BLM_0156195

mines have shut down, there have been dire predictions for the schools, etc. The Delta County Schools student count is only down by 80. We are absorbing the loss of the coal industry due to our economy which is enhanced by non-industrialized public lands. Yes, we should do everything possible to support coal miners who have lost jobs along with helping them stay in this community if they choose. But, fracking jobs are not long term employment opportunities. It is the devastation of land and natural resources for short term employment and gain. #2])>

I would rather not rely on foreign oil: but there is plenty of oil in the east to provide for us where there is also more water needed for fracking operations. I really, really do not ever want to depend on foreign countries for our food because we don't have enough water or our water is contaminated. And, I don't want our local food ruined by fracking operations.

There is nothing about Alternative D that is acceptable. I only want a No Leasing alternative. I am not even convinced that Alternative B1 does enough to protect public lands; but it is the best of the proposed alternatives. I think if the BLM started from the beginning with the required risk analysis, there would be a No Leasing stance.

Thank you for reading this and considering other options. I am asking for a drastic change in your recommendations for my children and grandchildren more than myself!

Very sincerely,
Carol Hickam


000443_InouyeK_20161031  Organization: Kevin Inouye
Received: 10/31/2016 12:00:00 AM
Commenter1: Kevin Inouye - Laramie, Wyoming 82072
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000443_InouyeK_20161031.htm (000443_InouyeK_20161031-387528.htm Size = 4 KB)
Submission Text
Date:10/31/2016
Commenter:Kevin Inouye
Organization:
Email:k.inouye@gmail.com
Address:2532 Plains St, Laramie, WY 82072
Phone:
Comment:
I am providing this comment letter on the Uncompahgre Field Office Draft Resource Management Plan. I will document in this letter why I believe strongly that you should adopt a no-leasing option in a revised RMP.

I grew up spending much of my time in CO, and still have family in the North Fork Valley, and am concerned about the potential for negative effects on their health, quality of life, and the value of property they own if there is significant development of oil and gas resources in the

planning area We are concerned about the impacts that development of gas production facilities on BLM property in the study area would have, and as a state employee in Wyoming, I can personally attend to the dangers of catering to or relying on fossil fuels as an economic driver; we're now solidly in the bust part of our boom and bust cycle, and I don't expect the boom days to ever return to the degree many here have become accustomed to.

The oil and gas industries can have a significant negative effect on property values of nearby properties because of the negative effects they can have on noise, air pollution, light pollution, and water pollution. We are concerned that if BLM property is developed for oil or gas extraction in the study area that we will no longer find the quiet, clean air, and solitude that attracted my family to that area, that there would be potential health impacts from air pollution, and that the stream on our property and Fire Mountain Canal water they rely on for irrigation could be contaminated. These impacts would reduce the value of their property as well (which I stand to inherit part of).

I know my father and others have already cited extensive evidence about the health and environmental concerns associated with fracking and fossil fuel production, and I ask you to please heed their warning. <([#1 [5.3] We in Wyoming gave up far too much to attack the temporary jobs and income that coal and natural gas (and uranium and gas previously) offered, and now we're suffering from a broken state economy, cleanup costs the businesses can't cover (in part because we let them waive their deposits), and the environmental and economic fallout of having let ourselves essentially be used then thrown away by these corporate interests as the markets shift. The consequences will far outlast the benefits for you too, I fear.

I request that you adopt a no-leasing alternative as the logical conclusion for management in the study area. The economics of fossil fuel extraction are changing rapidly; witness the decline of coal mining in the North Fork Valley in the past few years, and the rapid increase in renewable energy development. #1])> For example, last year I installed enough solar panels that I am now a net producer of electricity. Social attitudes toward fossil fuels are also changing rapidly, as the feasibility of replacing fossil fuels with renewable resources is demonstrated. At least five countries around the world have already or will soon be independent of fossil fuels for most or all energy demands (http://theantimedia.org/5-countries-that-prove-the-world-doesnt-need-fossilfuels/). The USA is on track to follow their lead and we should not develop fossil fuel resources that will put areas like the North Fork Valley at risk.

Sincerely,
Kevin Inouye
2532 Plains St
Laramie, WY 82072


000444_JackinoR_20161029 Organization: Uncompahgre Valley Trail Riders, Rich Jackino
Received: 10/29/2016 12:00:00 AM
Commenter1: Rich Jackino - ,
Organization1:Uncompahgre Valley Trail Riders
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:

Current Task: Review Assigned/Due: ewozniak
Attachments: 000444_JackinoR_20161029.htm (000444_JackinoR_20161029-387531.htm  Size = 14 KB)
Submission  Text
Date:10/29/2016
Commenter:Rich  Jackino
Organization:Uncompahgre  Valley Trail Riders
Email:richjakino@hotmail.com
Address:
Phone:970-209-8900
Comment:
Dear Sirs,

The Uncompahgre Valley Trail Riders is pleased to offer the attached documents as comments to the RMP process. The attachments to this email include a cover letter and three pages of comments. If you have any difficulty opening the documents please call or email me right away. And, if you want or need clarification on the comments made we are available locally at most times to meet with you to discuss. We do look forward to working with you for many years in the future.

Rich Jackino, President
Uncompahgre Valley Trail Riders
(970)209-8900
Dear Sirs,
Our organization would like to make some comments pertaining to the Draft RMP. These comments are included in the pages that follow this letter. But first, permit us to introduce our organization to you.
Formed some 18 years ago we are a Montrose based ATV and snowmobile club. We have 123 families currently in our membership. We place great importance on the availability of trails for recreational use on public land in the Montrose and Delta areas. For this we are thankful and appreciative. We also value a positive working relationship with USFS and BLM personnel and want to work hard to continue this relationship. We recognize the importance of making our contribution in this two way affair.
For example, our club has an arrangement with the USFS to provide maintenance on 85 miles of ATV trails in the area. In addition, our club, using club owned grooming equipment, maintains 95 miles of snow trails on the Uncompaghre Plateau and Cimarron areas. And, we are currently offering our club's services to the UFO for trail maintenance responsibilities.
Our club has assumed an attitude of inclusiveness in working with other land users. We appreciate others rights to use the land and support them. For example, we do not schedule club rides during hunting seasons. And we are supporting a local bicycle group in their efforts to expand single track opportunities.
In a larger sense, we are interested in working with Montrose County, and the City of Montrose in developing efforts which result in economic opportunities for the area. We recognize the importance of outdoor recreation as one of the key drivers of local quality of life for residents and visitors alike.
Respectfully submitted,

Rich Jakino, President

STATEMENT OF UVTR VALUES and OBJECTIVES

The UVTR club values well established trails (routes) which access pretty country, with viewpoints, which are well marked and maintained. We do not value nor want helter skelter "go anywhere" use of the land by ATV's. If the end product of this RMP results in some 30 to 40 well defined trails, each several miles in length, in the UFO, we would consider this process a huge success. Times have changed. High quality trail experiences now define the ATV/UTV users of today, rather than the "rip em up" "go anywhere" days of the past. Both local people and visitors alike will access BLM land by transporting their machines to trailheads on trailers. The ATV/UTV riders will then appreciate unique trail experiences, interesting destinations and "loop" routing. These riders truly want a quality nature oriented experience. Trees, rocks, canyons, overlooks, streams, an occasional pond will provide the juice that keep these riders happy. They can get this experience on carefully crafted trails.

These to be established designated trails can become "signature" level experiences for the user and destinations worthy of the time and effort to use then. They can be a foundation for local economic advantage, providing for a quality outdoor experience for locals and visitors alike. A good example is the 2009 Dry Creek Travel Plan which provides a reasonable approach to motorized use even after closing over 300 miles of legacy trails. Some work still needs to be done to fully mature the current approved trails in this area but the plan is going in the right direction by the implementation of designated trails as a planning and management approach.

TRAVEL MANAGEMENT

OPEN AREAS

<([#1 [32.1]

An exception to the designated trails approach are the "open" areas in Peach Valley and north of Delta which are viewed as small discreet special use areas for a small segment of the motorized crowd. Those should remain in their current condition as there are few of them available anywhere in Colorado. The users of these areas have special needs which should not/cannot be met in any other areas managed by BLM. In fact, we recommend that BLM designate one additional open area in the West End of Montrose County comprised of a few thousand acres. Doing so would accommodate these special need users in that part of the county. Hopefully by providing these approved open areas motorized users needs will be met in these confined areas and they will refrain from violating other BLM lands. It would be much more effective to manage all lands if BLM permitted these users to use specified areas, otherwise they will infringe on lands where they are not welcome by BLM. In summary, we support Alternative A in ITEM 476 with one exception and that is the creation of one additional open area in the West End.

#1])> TRAILHEADS:

<([#2 [32.1]

The user of designated trails will travel to the trailhead in a vehicle with a trailer hauling their machine. Therefore a parking area is required for loading and unloading, and parking during the day while the user is out on the trail. An area large enough for twenty vehicles with trailers will accommodate most trail users. These trailheads will be served by county roads and therefore it will be important for the BLM to work with the county to establish trailhead locations. Where none exist today the trailhead will need to be created with land clearing, gravel surface, signage, etc. As a part of this Draft RMP we respectfully submit that trailhead locations be anticipated when determining management plans. No management plan should be enacted which would

prevent the establishment of these trailheads in the future. With these thoughts in mind we support ITEM 485 as written.
#2])> DRAFT RMP ITEMS:
<([#3 [32.1]
While the current RMP does not specify individual ATV/UTV trails, it is important that selection of alternatives throughout the RMP today does not close the door to the establishment of trails in the future. Therefore, we recommend that Alternative A (ITEM 475) be selected at this time. This NO ACTION Alternative will then permit the BLM much latitude when it embarks on a UFO-wide travel management plan in the future. Please remember that the overall objective from our viewpoint is the creation of 30 to 40 designated trails, looped, several miles long each throughout the whole UFO.
#3])> Travel Management items:
<([#4 [3]
ITEM 475: See above paragraph recommending NO ACTION with exception for OPEN areas noted above.
ITEM 476: See above paragraph on OPEN areas
ITEM 477: We support Alternative D but this could wait until overall travel management plan is executed.
ITEM 478: We support Alternative A as we recommend the status quo until a new plan is executed.
ITEM 479: We support Alternative A as we recommend the status quo be maintained until a new plan is executed.
ITEM 480: We support Alternative A as we recommend no action until the new plan is executed.
ITEM 481: The weight limit of 1200 pounds does not reflect the reality of present day ATV/UTV
equipment. Why have a weight limit at all? If BLM requires a weight limit, then make it 2400 pounds which reflects new equipment on the market when fully loaded with accessories.
ITEM 482: This item, if implemented, has no standards of measurement. It will be too subjective to administer and therefore we recommend abandonment of this item.
ITEM 484: We heartily support the implementation of this item and will be glad to commit our resources to work with BLM to assist in the development of this item.
ITEM 485: See above paragraph
ITEM 486: Wait until a travel plan is developed so take no action now.
ITEM 487: Wait until a travel plan is developed so take no action now.
ITEM 488: Wait until a travel plan is developed so take no action now.
ITEM 489: We support this item as integration with local partners and jurisdictions is necessary to ensure a comprehensive western slope vision for outdoor recreation. See Western Governors Outdoor Vision Report. #4])>


ACEC's PROLIFERATION
<([#5 [9.1] There is concern regarding the expansion within the Draft RMP of areas proposed as ACEC's. Our
concern is based on the proposal to limit or close acreage to motorized travel when an area is designated as ACEC. In Alternative D there are 21,560 acres of NEW ACEC's recommended. The total
acreage becomes 51,320 acres within Alternative D, a 42 % increase. In our estimate, some

BLM_0156200

ACEC areas merit closure to ATV/UTV use. Others can accommodate the designated trails approach. Again, our club's objective is to establish a few, high quality, designated trails for ATV/UTV use.

Throughout the eight ACEC's noted in ITEM 526 Alternative D, which we support, we would ask BLM,

through the future travel plan development, to create some number of designated trails. An exception is in ITEM 541, Alternative D, that closure to motorized should be changed to limited to designated trails within these 9780 acres.

We also request that in the remaining 34,560 ACEC acres which are recommended for designated trails, in Alternative D, that a number of high quality looped trails be created. This can be a part of the travel management process in the future but nothing should be decided at this point in time that would restrict this trail development from happening.

#5])> RECREATION AND VISITOR SERVICES

Table 2-6 ITEM 52: Our group favors Alternative C as we support the continued development on public lands surrounding the Montrose/Delta areas for ATV/UTV use. Again, our vision is the implementation of designated trails on BLM lands where appropriate.

WILDERNESS STUDY AREAS

<([#6 [40.1] Over thirty years ago these areas were designated, restrictions were put in place and they have

languished in a "hold" state for all this time. FEW STUDIES have been performed even though that was the stated intent. These areas do NOT include any special wilderness characteristics, with maybe a couple of exceptions. Few, if any, inventories have been completed documenting special characteristics. These 36,160 acres have been locked up while we all wait for congressional action to return these areas to BLM management. We request that one of these areas (Camel Back – 10,680 acres) be immediately managed with the creation of a few designated ATV trails. This area is located in close proximity to the population centers of Delta and Montrose and will serve the recreational needs of these communities. The designated trails approach does not create harm to other fauna and flora attributes of these areas if any exist.

#6])> Thank you for your consideration of these comments.

Uncompahgre Valley Trail Riders


000445_JanusJ_20161031  Organization: John Janus
Received: 10/31/2016  12:00:00  AM
Commenter1: John Janus - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000445_JanusJ_20161031.htm  (000445_JanusJ_20161031-387534.htm  Size = 2 KB)
Submission Text
Date:10/31/2016

BLM_0156201

Commenter:John Janus
Organization:
Email:Telluriderealty@gmail.com
Address:
Phone:
Comment:
Regarding the management plan, please consider the sustainability of our land and economy. It is very short sighted to consider allowing any further gas and oil development in the region. <([#1 [30] Yes it has a positive effect on our local economy in the short run though will leave our economy and land in ruins in a decade or so. Is this the kind of economy and environment you want to leave to your children and grandchildren. Yes it is easy to brush it off as everything will be fine and the gas and oil companies will make it all right. Historically this is not true. And the damage will be done forever. Significantly harming our sustainable and strong agricultural heritage. Real estate values will go down, and our tourist numbers will decrease. #1])> Look around we live in one of the best places on earth how on earth could you throw it all away for a few short term dollars from the gas and oil industry. This model no longer works. 30 years ago things were different we are now heading into new perdine and I sincerely ask you to consider thinking outside of the corporate rhetoric and begin thinking in terms of preserving our public lands for
the people not the gas and oil corporations.
Thank you for your honest consideration.
John Janus


000446_KlingspornK_20161101  Organization: Katie Klingsporn
Received: 11/1/2016 12:00:00 AM
Commenter1: Katie Klingsporn  -,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000446_KlingspornK_20161101.htm  (000446_KlingspornK_20161101-387635.htm  Size = 14 KB)
Submission  Text
Date:11/01/2016
Commenter:Katie Klingsporn
Organization:
Email:katie.klingsporn@gmail.com
Address:
Phone:
Comment:
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-Uncompahgre Field Office Staff and RMP Comment Team,

Thank you for this opportunity to comment on the Draft Resource Management Plan (RMP) for the Uncompahgre Field Office of the BLM. I am a resident of Norwood but have lived in the Telluride area for a decade.

The lands managed by the BLM within the Uncompahgre Field Office include many places that I personally care about, and regularly visit. They are critical for the health and happiness of me and of my community—they are where we recreate, where we relax, and where we find opportunities for exercise, joy, solitude and solace. Our public lands both shape and represent our identity as a community. In large part, they are why many of us have chosen to live here. <([#1 30.3] At the same time, with nearly 500,00 visitors per year coming to these public lands, they are a critical resource that drive the dominant economy of our region, tourism. My quality of life and my identity, but also my livelihood depends on maintaining the beauty, integrity, and diversity of these unique landscapes. Despite a long history of extractive use, Telluride has been able to successfully transition to a tourism-driven economy based on sustainable use of these lands that surround us. The income our visitors have brought in has even enabled us to start cleaning up the legacy of scarred land and toxic drainage that mining left behind. We do not want to move backward in time.

While grazing, oil and gas leasing, and other forms of resource development are also significant and historic uses on lands in the UFO, I ask you to consider as well the much more significant revenue generated in tourism every year in Telluride.

Conversely, protection of terrestrial and riparian habitats through means such as the Ecological Emphasis Areas, Special Recreation Management Areas, Areas of Critical Environmental Concern, Lands with Wilderness Characteristics identified in Alternative B will serve to strengthen our economy, improve our resilience, and provide our visitors and residents with high-quality outdoor experiences. #1])>

<([#3 20.1] However, out of the 42,150 acres found in the Conservation Alternative to have wilderness characteristics, only 18,320 are included in the BLM Preferred Alternative. Areas like Shavano Creek, Atkinson Breaks, and the Dolores Canyon WSA-adjacent area should all be included with the other LWCs in Alternative D, as they each possess qualities of solitude, outstanding views, or other attributes that would not be sufficiently protected by lower levels of protection. Lands that are managed for their wilderness characteristics have a host of other benefits, including air, water, and soil protection, wildlife habitat, and reduction in sound and light pollution.

#3])> <([#4 9.1] Similarly, only 51,320 acres of the 215,840 acres of recommended ACECs in Alternative B were recommended in the Preferred Alternative. Significant omissions include the East and West Paradox ACECs, as well as the Coyote Wash ACEC, the La Sal Creek ACEC, and the Tabeguache Pueblo and Tabeguache Cave ACECs. Both East and West Paradox ACECs, (as well as the Paradox Rock Art ACEC, which is included) have irreplaceable cultural resources that could easily be degraded through mineral development or improper management. Specifically, these ACECs have "rare northern extent Anasazi rock art" and signs of occupation that show a relationship between the Fremont and Anasazi cultures. They are significant at local, regional and national levels, holding importance for Native American people and our larger national story and identity #4])> .

<([#5 27.1] I commend the BLM for creating Special Recreation Management Areas as an important tool for protecting the many places throughout this field office where recreation abounds. Unfortunately, the Paradox Extensive Recreation Management Area included in Alternative D does not contain sufficient protections for the conservation and recreational values

contained in this section of land. Only the Paradox Special Recreation Management Area outlined in Alternative B (for the purposes of rock climbing, hiking, biking, and camping) would provide for some of the protections (such as withdrawal from or limitation to oil and gas, coal, and mineral leasing of all types) that this area is worthy of. This is an area that receives consistent use by recreationalists. Many young people have learned to climb on the short pitches and excellent rock of what is locally known as "Atomic Energy Crag." In addition, an SRMA in this area would help protect the outstanding scenic and historical values of the confluence of the Dolores and the San Miguel, the "Hanging Flume," relics of uranium mining, and fantastic views of the San Juans and La Sals.

In general, the mere 3% of lands in Alternative D that are currently to be managed as "quiet use" should be expanded—the majority of recreation in this area is non-motorized, and an expansion of these areas through careful travel management planning would help to protect recreational and habitat values, and reduce user conflict. #5])>

<([#6 [39.1] I support the Wild and Scenic suitability findings of the Draft RMP, and ask the BLM to protect the 104.6 miles of these sections as wild and free-flowing rivers. The SW Resource Advisory Council, which helped to come up with these suitable reaches on the San Miguel and the Dolores Rivers, facilitated an extremely inclusive, collaborative process, that brought together user groups from across the board. Wild and Scenic suitability is an important tool for protecting our water resources for drinking water, ecological function, and many other uses. As a headwater community, these values are no less important for us; we recognize that every deficiency in downstream water quality and quantity also affects us. #6])> Therefore, I additionally support all of the Ecological Emphasis Areas, Special Recreation Management Areas, and ACECs proposed along the San Miguel River and Dolores River Corridors in Alternative B. Layered protection of the rivers and their terrestrial surroundings is critical in an era of increasingly scarce water resources.

Under current management plans, approximately 95% of BLM-managed mineral estate in the UFO is available for oil and gas leasing. This is deeply concerning given the fact that much of this land lacks significant and commercially viable fluid mineral resources. At the same time, management for leasing impairs the other important values that these lands possess, such as wildlife habitat, recreation opportunities, and conservation. Oil and gas leasing maps need to be redrawn to reflect current values and climate change science, not speculative possibilities for future development or historical mineral interests.

Recreation is a far more sustainable driver of local economies than the boom and bust cycles of resource extraction. Current uranium prices do not support the sort of mineral leasing proposed in Alternative D, nor will they ever, if a thorough accounting is made for the remediation costs that are so often eliminated from economic valuations. The last thing we need is to further compromise our air and water with yet more sources of contamination, compounding the health burden already placed on our people and ecosystems by the thousands of abandoned mining claims that continue to leak toxic runoff into our rivers and streams. Instead, the BLM should be supporting sustainable, diversified local economies.

The West End of San Miguel County is struggling socioeconomically, but resource extraction cannot provide a long-term solution to the problems that these communities face. <([#7 [22.1] [5.3]

The fact that the BLM Alternative D continues to outline extensive areas for potential coal leasing highlights the fact that much of the information it is working off is out of date. Current climate change directives, enacted at the federal level, require that public agencies such as the

BLM account for climate change mitigation and adaptation in their planning, policy, and operations.

Unfortunately, this Draft RMP does not incorporate current science or policy in any of its alternatives. Even Alternative B would open up 494,580 acres to fluid mineral leasing. Alternative D would leave 627,290 acres, or 95% of the mineral estate open to fluid mineral leasing, an insignificant reduction from the current plan, which leaves 631,580 open. #7])>

Finally, our health as a community is tied into the resilience of our region as a whole. For this reason, I support the North Fork Alternative (B.1). This is a community-generated plan that received broad support from a diversity of interests, from farmers and ranchers to conservationists. The North Fork Alternative is an excellent example of the way in which federal land agencies can empower local communities to take an active role in determining the future of their local environment. <([#8 [18.3] Furthermore, much of the fresh, organic food that is served in Telluride's top-notch restaurants come from the verdant fields and orchards of the North Fork Valley. An increase in oil and gas leasing in this area—particularly in fracking—would have direct impacts on the safety and reputation of our food sources. #8])>

Our community depends on thoughtful management and strong public lands protections for into the future. I thank you for considering my comment on the Draft Resource Management Plan of the Uncompahgre Field Office of the BLM.

Sincerely,
Katie Klingsporn


000447_LeValleyM_20161101  Organization: LeValley Ranch, Robbie LeValley
Received: 11/1/2016 12:00:00 AM
Commenter1: Robbie LeValley - Hotchkiss, Colorado 81419
Organization1:LeValley Ranch
Commenter Type: Private Industry
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000447_LeValleyM_20161101.htm (000447_LeValleyM_20161101-387716.htm
Size = 18 KB)
Submission Text
Date:11/01/2016
Commenter:Robbie LeValley
Organization:LeValley Ranch
Email:tlazytbamone@gmail.com
Address:PO Box 835, Hotchkiss, CO 81419
Phone:
Comment:
Project Manager,
LeValley Ranch and Mark, Robbie and Hank LeValley supports Alternative C for the

Uncompahgre Field Office Resource Management Plan and submit the following comments. Alternative C also provides a greater separation between broad requirements and site specific issues that should only be addressed during the review of proposed site specific activities. Alternative C, therefore, allows for greater flexibility for the public and the BLM to address and regulate those sight specific requirements through various then current permitting processes. <([#1 [3]

The few portions of Alternative C that _____ believes should be changed or removed noted below and identified by the page and corresponding line number in Table 2.2 (Description of Alternatives) in Chapter 2 of the proposed RMP.

Table 2.2 Description of Alternatives

Land Health

o Page 2-25, Line 24, Given the lower precipitation rate over the entire UFO resource area, it is more realistic to manage for upward trend for land health

o Page 2-27, Line 26, add recreation to actions that can cause land health problems

Vegetation

o Page 2-53, Line 71, add livestock grazing where the language describes uplands to support big game species habitat and fuels reduction given the threats listed for Gunnison Sage grouse

o Page 2-62, Line 89, add threatened and endangered species for weed control treatments

Special Status Terrestrial Wild Life

o Designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive. Habitats at site specific locations would be addressed during the application for a specific activity.

o Page 2-95, Line 152, designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive.

o Page 2-102-105, Line 161-167, Gunnison Sage Grouse, see comment regarding Gunnison Sage Grouse plan amendment.

Recreation and Visitor Services

o Page 2-243, Line 395, the mental benefits section does not belong in a RMP. This language opens the BLM up to additional litigation and undoes process. Who determines what creates the well-being and happiness of an individual. #1])>

Ecological Emphasis Areas

o <([#2 [14.1.1] The UFO RMP calls out 12 areas as Ecological Emphasis Areas for the basis of unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors. In researching FLMPA and other BLM legal documents, Delta County can find no legal basis for

Ecological Emphasis Areas (EEAs). Additionally, the RMP specifically calls out the multiple use mandate of the BLM as causing habitat fragmentation. Multiple use and sustained yield are the reason BLM lands were set aside and continue to be managed for today. This is especially troubling when cross referencing the livestock grazing language in an EEA. EEAs appear to be a way to designate defacto Wilderness Study Areas without going through the extensive studies and public process. This designation is not backed up by any legal designation nor is the prioritization given an EEA needed with the tremendous number of planning tools at the BLM's disposal. This is deficiency in this plan and should be removed. Protecting wildlife and plant habitat is already occurring within the planning tools and designations that BLM has. #2])>

Livestock Grazing

<([#3 [3]
o Page 2-165 Line 298, reactivate Winter-Monitor allotment
o Page 2-166 Line 299, Trailing overnight in sensitive areas. This needs to be clarified to not unduly penalize moving through an area.
o Page2-163, Line 294, add counties to the statement regarding supporting local agricultural communities
o Page 2-164, Line 295, maintain the ability to increase AUMs
o Page 2-165, Line 297, before acreage is removed for AUM on ACEC, write language in to change management of livestock use. Increase the flexibility of management.
o Page 2-166, Line 299, define that trailing livestock is not the same as gathering and moving livestock from pasture to pasture.
o Page 2-168, Line 302, add counties to the fourth bullet for consultation
o Page 2-169, Line 303, add Colorado Resource Monitoring Imitative to the list of plans to base decisions on. In addition, include the MOU with CCA, CWGA, BLM, USFS, and Department of Ag.
o Page 2-167, Line 300, no mention of using livestock as tool for vegetation treatments. Targeted grazing is an economical, viable tool and has been extensively researched to benefit sage grouse and big game habitat. In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other shrubs.
o Page 2-167, Line 301, Alternative B is very subjective and open to individual interpretation. Closure of permits is sufficiently covered in other sections of the RMP.
o Page 2-170, Line 304, add forage quantity to Alternative D. Increases to forage can also come from improved management in Alternative C
o Page 2-172, Line 306, Major ecological damage does not equate to maintaining range improvements
o Page 2-172, Line 307, alternative C is more feasible and allows for the sustainability of multi-generational use of working landscapes.

#3])> o <([#4 [23.2] Grazing is but one of many factors influencing grass height with others including precipitation, soils and temperature. Grass and forb vegetation expressed as herbaceous cover and height in sagebrush ecosystems is subject to wide annual variation that is related to precipitation. Grass height also depends on shrub density and morphology of the shrub community. Grass and forb height and diversity do matter, as documented by numerous studies, but to say that grass height alone can predict whether or not a nest will be successful is not consistent with recent science. Enforcing an annual stubble height requirement is at best, suspect. #4])>

o <([#5 [23.1] The BLM Instruction Memorandum and Handbook provides clear direction that before any adjustment is made, rangeland monitoring and vegetation trend must show a downward trend and that livestock grazing is the causal factor. Plant composition at any one point in time varies because plant communities are constantly changing in composition and production owing to changes in environmental influences and site potential (Rangeland Health: New Methods to Classify, Inventory and Monitor Rangelands 1994). An ecological site is recognized and described on the basis of the characteristics that differentiate it from other sites in its ability to produce and support a characteristic plant community. This variation on the landscape makes managing for a single

standard not reflective of the ability of the various sites to produce the desired vegetation and does not account for the full breadth of environmental influences that determine vegetation composition and structure. #5])>

o <([#6 [14.1] Page 2-175, Line 316, given that the Desert bighorn sheep were introduced into the UFO, utilize current rotations and life cycle of the domestic sheep and wild sheep to reduce the potential for interaction. The 9-mile buffer reduces the available forage and managed grazing that the majority of the sheep grazing adheres to. Delta Board of County Commissioners (BoCC) represents 17,000 head of sheep in our county and we see similar pressures to reduce sheep grazing in numerous BLM
and USFS planning documents. The UFO RMP is covered by the MOU between the Colorado Department of Agriculture, Colorado Parks and Wildlife, Colorado Wool growers and BLM. The MOU covered what
would be done in the case of contact and how to minimize risk. These guidelines already accomplish the temporal and spatial separation which the RMP claims will effectively redress disease transmission. The mentioned practices provide for the separation needed and are closer to what is actually seen on the landscape. The experiments mentioned in the UFO RMP have been conducted under laboratory conditions and in small pens and again do not reflect the largeness of the landscape. The Delta BoCC urges BLM to discontinue using the presence of bighorn sheep as a means to reduce or eliminate domestic sheep grazing in the Uncompahgre Resource Area. #6])>

o <([#7 [23.1] Delta County opposes any reduction or elimination of AUMs based on the proximity of bighorn sheet to domestic sheep grazing areas, and encourages the BLM and permittees to work together to minimize the risk of potential contact between domestic and bighorn sheep. In 2014, Colorado Parks and Wildlife, the Colorado Wool Growers Association, the Colorado Department of Agriculture and the BLM and USFS renewed the Memorandum of Understanding for Management of Domestic Sheep and
Bighorn Sheep. This MOU is not mentioned or referenced in the RMP. Additionally, the RMP does not mention the USDA Agriculture Research Service specific to the potential disease transmission and impacts from contact on large landscapes. The RMP should contain the full body of research and not selected citations. The degree of risk of potential disease transmission from domestic sheep to bighorns in open range conditions is unknown and it is not clearly understood even in experimental confinement settings.

o This document details the management of potential interaction and should be included in the RMP. Currently used management practices that were agreed upon by all parties include constant herder supervision, compliance monitoring, turning out bred females, adhering to on/off dates for grazing allotments, removal of sheep after the grazing season, removal of stray domestic sheep, hazing of bighorn sheep nearing domestic sheep flocks and reporting known contact, and cleaning up salting areas upon departure. These guidelines already accomplish temporal and spatial separation. #7])>
Table 2.3 Renewable Energy exclusion and Avoidance Areas
Solar, Wind and Hydropower

<([#8 [28.1] o Page2-377, Line 640, Given the hundreds of species that are listed in the mega settlement with Wild Earth Guardians and Center for Biological Diversity and the ever increasing potential for hundreds of more species, this section is tying the hands of the BLM for decades to even mitigate
habitat for renewable energy. Technology is ever changing and there is significant need to retain flexibility of where the renewable energy infrastructure can be located. #8])>
Table 2.6 Summary of Environmental Consequences
Summary of Environmental Consequences
<([#9 [3]
o Page 389, line 9, Alternative B is written to equate all use to vegetation diversity. These landscapes are disturbance driven and need periodic use to maintain diversity in the age classes of primarily shrubs. This particular section makes broad generalizations.
o Page2-391 Line 391, the statement that SRMAs could concentrate weed populations is a stretch. Weeds are not discriminatory of which method of dispersal they take advantage of.
o Page 2-407, Line 39. Alternative D, improving range improvements is allowed if it is compatible with other resources uses, however this is not defined and subject to interpretation and potential abuse.
o Chapter 4 Page 4-131, the benefits of livestock grazing should also be included in this section. The one paragraph on this page only presents one side of the equation.
o Chapter 4 Page 4-235, no such management term as low duration grazing system. Duration is generally described as short or long. If big game herbivory is found to be the causal effect of a downward trend, livestock should not be the mitigation tool for this particular impact.
o Acreage closed to grazing for VRM I and II are not clearly defined and subject to misinterpretation.
#9])> <([#10 [8] All management decisions related to Gunnison Sage Grouse habitat should be amended to defer to the BLM's Gunnison Sage-Grouse Rangewide Resource Management Plan Amendment and Environmental Impact Statement, which is currently in draft form. #10])>
Sincerely,
LeValley Ranch
Mark, Robbie, Hank LeValley


000448_LishC_20161101 Organization: Christopher Lish
Received: 11/1/2016 12:00:00 AM
Commenter1: Christopher Lish - San Rafael, California
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000448_LishC_20161101.htm (000448_LishC_20161101-387717.htm Size = 9 KB)
Submission Text
Date:11/01/2016

Commenter:Chris Lish
Organization:
Email:lishchris@yahoo.com
Address:San Rafael, CA
Phone:
Comment:
Dear Uncompahgre field manager Barbara Sharrow and BLM Director Neil Kornze,

I am writing today concerning the Bureau of Land Management's recently released Draft
Resource Management Plan (RMP) and Environmental Impact Statement (EIS) for the
Uncompahgre Field
Office, which includes Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties in
southwestern Colorado. I feel that the draft RMP should be strengthened to better safeguard
lands
with wilderness character as well as critical habitat for wildlife. I am also deeply concerned that
the draft RMP fails to seriously address climate change, the most significant threat to Colorado's
public lands and to the planet.

"Our duty to the whole, including to the unborn generations, bids us to restrain an unprincipled
present-day minority from wasting the heritage of these unborn generations. The movement for
the conservation of wildlife and the larger movement for the conservation of all our natural
resources are essentially democratic in spirit, purpose and method."
-- Theodore Roosevelt

The Uncompahgre Field Office (UFO) manages 675,000 acres of public lands. Within this area,
the Bureau of Land Management (BLM) has identified 24,910 acres of lands with wilderness
character—roadless lands that would qualify for designation under the Wilderness Act.
Additionally, the BLM has identified more than 242,500 acres of potential Ecological Emphasis
Areas—places that contain vulnerable networks of interconnected habitat and migration
corridors
—throughout the Uncompahgre Field Office. While the identification of these lands is a great
first step, many of them are not recommended for protection in the draft RMP. The BLM needs
to
safeguard the entirety of these vulnerable wild lands in the proposed RMP.

"It is horrifying that we have to fight our own government to save the environment."
-- Ansel Adams

<([#2 [11.1] Every alternative the BLM is considering would allow coal mining to continue at
current levels for the next 10 to 20 years, a decision that your own EIS admits could result in
more than half a billion tons of climate pollution. In fact, every single alternative the EIS
analyzes would increase climate pollution over baseline levels, and none would result in any
reduction of coal production. Every alternative would allow more leasing, more fracking, and
more drilling for oil and gas.
#2])>
"Our government is like a rich and foolish spendthrift who has inherited a magnificent estate in

perfect order, and then has left his fields and meadows, forests and parks to be sold and plundered and wasted."
-- John Muir

I am opposed to oil and gas leasing on public lands, particularly in the North Fork Valley, which is one of the most beautiful and fertile places in the world. The North Fork Valley is located in Delta County and includes the towns of Paonia, Crawford, and Hotchkiss and is surrounded by public lands. This area is positioned to be as iconic as Napa Valley in Northern California and Provence in the south of France.

"As we peer into society's future, we—you and I, and our government—must avoid the impulse to live only for today, plundering for our own ease and convenience the precious resources of tomorrow. We cannot mortgage the material assets of our grandchildren without risking the loss also of their political and spiritual heritage. We want democracy to survive for all generations to come, not to become the insolvent phantom of tomorrow."
-- Dwight D. Eisenhower

<([#4 [5.3] I urge the BLM to reconsider opening 95% of lands to oil and gas leasing without adequate analysis of the risks large-scale and gas development poses to human and animal health, the environment, and the economy of this unique corner of Colorado, and adopt a no-leasing alternative. The draft RMP is a roadmap to industrializing the UFO region, and in particular, contaminating the air, water, soil, and agricultural lands of the very special North Fork Valley. #4])>

"It is our task in our time and in our generation, to hand down undiminished to those who come after us, as was handed down to us by those who went before, the natural wealth and beauty which is ours."
-- John F. Kennedy

<([#1 [41.1] It is unacceptable and unconscionable to not only risk destroying this vital ecosystem, but to sanction additional greenhouse gas emissions, which increase disastrous climate change impacts. The only way to prevent irreparable harm to this special area is to close off all BLM lands and minerals in the area to oil and gas leasing. At a minimum it BLM must impose a moratorium on oil and gas leasing and development until rural gas gathering pipelines are subject to federal pipeline safety regulations. As long as operators are not subject to the Pipeline Hazardous Materials and Safety Administration regulations on rural gas gathering pipelines, they are allowed to use public lands to put the public and the environment at even higher risk of leaks, spills, and explosions. This is unacceptable. #1])>

"Then I say the Earth belongs to each generation during its course, fully and in its own right, no generation can contract debts greater than may be paid during the course of its own existence."
-- Thomas Jefferson

Federal public lands must be part of the climate solution, not continue to make the problem worse.

BLM_0156211

I therefore urge the BLM to:
-Adopt goals for the planning area that include significantly reducing the climate pollution from BLM-approved actions on these lands
-Seriously consider alternatives that prohibit new leases for climate-polluting fossil fuels, including coal, oil and natural gas
-Honestly disclose the direct and indirect climate emissions of fossil fuel leasing, including the costs of climate pollution (the "social cost of carbon")
-Take a hard look at how to work with communities in the area to transition from fossil fuels to cleaner economies
"Every man who appreciates the majesty and beauty of the wilderness and of wild life, should strike hands with the farsighted men who wish to preserve our material resources, in the effort to keep our forests and our game beasts, game-birds, and game-fish—indeed, all the living creatures of prairie and woodland and seashore—from wanton destruction. Above all, we should realize that the effort toward this end is essentially a democratic movement."
-- Theodore Roosevelt

I urge you to maximize conservation for lands with wilderness character as well as Ecological Emphasis Areas in the Uncompahgre Field Office's proposed RMP in order to safeguard western Colorado's wild places for our future generations.

"A thing is right when it tends to preserve the integrity, stability, and beauty of the biotic community. It is wrong when it tends otherwise."
-- Aldo Leopold

Thank you for your consideration of my comments. Please do NOT add my name to your mailing
list. I will learn about future developments on this issue from other sources.

Sincerely,
Christopher Lish
San Rafael, CA


000449_AllowayC_20161031 Organization: Coleen Alloway
Received: 10/31/2016 12:00:00 AM
Commenter1: Coleen Alloway - Cedaredge, Colorado
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000449_AllowayC_20161031.htm (000449_AllowayC_20161031-387718.htm
Size = 1 KB)
Submission Text

Date:10/31/2016

Commenter:Coleen  Alloway

Organization:

Email:9702751953@vzwpix.com

Address:Cedaredge, CO

Phone:

Comment:
My husband & I are new to Mountain biking (& this cell phone stuff!) but we wanted to give
your our input regarding trails for biking.  People need these places just like for hikers & skiers,
to reconnect with the outdoors & let off steam from life's stresses. It seems that there are a very
passionate & dedicated group of Mountain bikers who also love to give back, as in making trails
& maintaining  them too! We're in the use-it-or-lose-it  phase of our lives and Mountain biking  is
something  even us older folks can do! Thanks for letting me spout off. Thanks for the trails &
open spaces we already have!

Coleen & Mark Alloway,  Cedaredge, CO


000450_BagleyJ_20161024  Organization:  Jay Bagley
Received:  10/24/2016  12:00:00  AM
Commenter1: Jay Bagley - Paonia, Colorado  81428
Organization1:
Commenter  Type: Individual
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due:  ewozniak
Attachments: 000450_BagleyJ_20161024.htm  (000450_BagleyJ_20161024-387719.htm  Size =
4 KB)
Submission  Text
Date:10/24/2016
Commenter:Jay  Bagley
Organization:
Email:jaycbagley@gmail.com
Address:310  Oak Avenue, Paonia, CO 81428
Phone:
Comment:
Hello BLM Field  Office in Montrose,
I have attached a Word document  with my comments provided  to you on the Draft RPM. Thank

you very much for this opportunity to provide you with my comments on this issue. If you have any questions on my comments you can reach me via return email at:
jaycbagley@gmail.com
Thank you again.
Jay Bagley
Dear BLM-UFO Staff and RMP Comment Team,
Thank you very much for the opportunity to provide you with my comments on the Resource Management Plan for the Uncompahgre Field Office. I am a Paonia resident, having moved here about
six years ago. I am "semi" retired and moved here for the outdoor opportunities such as hiking, camping, fishing, and photography. (for a hobby) While I have so much more to explore, I have had the
opportunity to see quite a bit of our surrounding area here in the North Fork Valley of the Gunnison and thoroughly love it. Many of the environmental benefits of living here did not exist in my previous California home so I am very happy and excited to live here. I enjoy good food, clean air, clean water, wonderful hiking areas, excellent fishing, and the wildlife that exists in this Western Colorado area.
After reading and trying to understand the Draft RMP as much as possible, I would like you to incorporate Alternative B1 into the final RMP. As a person who consumes products made from oil I
understand our need to drill for these resources until we can replace energy generation with alternative means to meet our consumption. That is why I believe the alternative B1 will allow the required oil and gas activity to take place in areas where those resources exist while simultaneously helping to maintain the wildlife and to keep the air and water clean in this area.
<([#1 [20.1] I would also like to see the final plan protect all lands with wilderness characteristics, including the Terror Creek, one of the Ecological emphasis areas. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest. While I am personally not a hunter, hunting in this area is an important part of both our culture and our economy.
#1])> A<([#2 [27.1] s someone who visits the Jumbo Mountain area near Paonia about five days per week, I would also like to see all of this area designated as an SRMA. There are so many more recreational opportunities that can be experienced in this area with valuable BLM planning here. #2])>
Thank you very much for considering my brief comments on this very complicated issue. While I do not believe I have the complete understating of everything presented in the draft RMP, I know that Alternative B1 describes to me a fair and equitable basis for extracting needed resources from the land while simultaneously protecting the wildlife, air, water, and valuable food production coming from the North Fork Valley of the Gunnison. I urge you to include Alternative B1 in the final RMP.
Sincerely Yours,
Jay C. Bagley
Paonia, CO

BLM_0156214

000451_BishopB_20161031_HasAttach Organization: Sarah Bishop
Received: 10/31/2016 12:00:00 AM
Commenter1: Sarah Bishop - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000451_BishopB_20161031_HasAttach.htm
(000451_BishopB_20161031_HasAttach-387736.htm Size = 14 KB)
UFORMP_000451_BishopB_20161031_HasAttach.pdf
(000451_BishopB_20161031_HasAttach-387739.pdf Size = 149 KB)
UFORMP_000451_BishopB_20161031_Attachment.pdf
(000451_BishopB_20161031_HasAttach-387740.pdf Size = 196 KB)
Submission Text
Date:10/31/2016

Commenter:Sarah Bishop

Organization:

Email:sgbishop@tds.net

Address:PO Box 130, Paonia, CO 81428

Phone:970-527-6675

Comment:
Attention Draft RMP review committee:

Attached are comments on the BLM/UFO Draft RMP, with an attached signature page, and excerpts from a letter we wrote in 2011 describing the potential impacts on our land from proposed oil and gas lease sales. Please consider these three documents as our joint response to the RMP.

Thank you.

Bill and Sarah Bishop
POB 130
Paonia, CO 81428
970-527-6675

Thank you for the opportunity to offer comments on the BLM/UFO 2016 Draft RMP. Our major

areas of concern are as follows: 1) <([#5 [5.4] We believe the information the RMP is based on is so out of date as to be in violation of NEPA requirements #5])> . 2) <([#6 [30.2] The characterization of Paonia and surrounding lands as being dependent on resource extraction is totally inaccurate #6])> . 3) <([#7 [5.3] The BLM preferred Alternative D is described as a compromise between resource use/extraction and resource conservation. It leans heavily toward resource use/extraction. #7])> 4) <([#8 [41.2] [11.3] Two current and significant concerns are not addressed in the RMP - Hydraulic Fracturing and Climate Change. #8])> 5) <([#9 [5.3] Alternative D pays little to no attention to the impact of BLM management decisions on private lands in the North Fork Valley. We find Alternative D an inadequate approach to the management of BLM resources in the North Fork Valley #9])> .

Therefore, we support the extensively researched, and much more current North Fork Citizens Alternative, B 1.

## 1) NEPA REQUIREMENTS

<([#1 [5.4] To put it succinctly, NEPA requires decisions on the use of public lands to be based on the most current, available scientific data and information. As best we can determine, BLM ceased collecting information for this RMP in 2010. While there are a few references from later dates, e.g., the closure of the Elk Creek Mine in 2013, they are indeed, few. BLM had an enormous amount of data and information available to it, at least for the North Fork Valley, in the North Fork Citizens Alternative, which it seems not to have taken into account. The entire process of drafting this RMP has taken eight years so far. It is unconscionable to think that nothing of significance has changed in the RMP planning area during that period of time. There have been huge upheavals in the energy industry and in the understanding of its impact on human health and the environment. These changes and others cannot be ignored. To rely on Adaptive Management and Regional Mitigation Strategies as described in 2.3.1 to make RMP implementation adjustments is way beyond BLM's authority in light of such major changes in public information and public policy. (See also comments in the fourth section below.) The RMP may indeed be fatally flawed. #1])>

## 2) CHARACTERIZATION OF PAONIA

<([#2 [30.2] The RMP divides the UFO into socioeconomic units. It places Paonia, Bowie and Somerset in Unit 1, which it characterizes as dependent on resource extraction (3 - 182 and 4 - 472). If one is to place Paonia anywhere, it fits in socioeconomic Unit 2:"Issues in this unit relate to growing the economy in concert with the natural landscape. Utilization of public land and enhancing environmental values, while preserving open space, are also important. The key issue is finding the balance that allows residents to retain a lifestyle that meets their needs and provides recreational opportunities for visitors to the area." That describes our mindset perfectly. Agriculture, retirees and self-proprietors also make a significant contribution to the local economy. The North Fork Valley is the Farm to Table capital of Colorado. #2])>

<([#10 [30.2] The RMP is laughably out of date in regards to coal mining in the North Fork. Not one, but two coal mines are shut down, and the third employs little more than 200 people and produced only 5.1 million tons of coal in 2015. Coal mining in this country is waning as other

sources of energy become more attractive both economically and environmentally. Clean though the North Fork Valley coal may be, its future as an energy source is dim. The only other mineral extraction of any note are the gas wells in the Bull Mountain Unit, northeast of Paonia Reservoir in Gunnison County. This is a long way from Paonia and has modest, if any impact on the community and its surrounds, except for the negative aspects noted in the last section of this comment letter.
#10])>

<([#11 [30.2] Paonia's recent past, current and future economic engine is not resource extraction dependent. Residents of the town and surrounding area are building a robust and multifaceted economy that is based on both conventional and organic agriculture; art, music, and an abundance of other creative endeavors; agricultural and recreational tourism; entrepreneurs; retirees; and others. Paonia is part of the North Fork Valley Creative District. Paonia's Mountain Harvest Festival just won the 2016 Governor's Award for the best small town festival. Life style may be a cliché to some, but it is a, if not the, feature that attracts new residents and causes those living here to celebrate every day the choice to live here.
#11])>

3) BLM PREFERRED RMP ALTERNATIVE D

<([#3 [21.1] [5.3] BLM states in ES.6.5: "Alternative D is the agency-preferred alternative, which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, . . ." If balance implies compromise, this is surely a noble goal. However, Alternative D falls way short of both balance and compromise. Table 4-31 shows the Quantitative Impacts on Fluid Mineral Resources for the five RMP Alternatives under consideration. The first entry shows acres of land proposed for closure to fluid mineral leasing among the Alternatives. Alt. B, the "resource protection" alternative shows 186,700 acres closed; Alt. C, the "resource extraction" alternative shows 44,200 acres closed; Alt. D shows 50,060 acres closed. How is this balanced? It is certainly not a compromise! The entry that shows acres of land open to fluid mineral leasing subject to standard terms and conditions is hugely out of balance. The entries that show acres of land under NSO and CSU stipulations show a better balance between resource use and protection. However, Alternative D leans heavily on stipulations that do little to change the character of the use of the land in the RMP planning area. Indeed, "Alternative D would have the second highest [of the Alternatives] estimated emissions levels, with impacts above Alternative A [the current RMP]." (4 - 450) Under Alt. D mineral extraction would be permitted along with all the negative impacts the involved industry would bring to the area. (See comments in the fifth section below.) Stipulations simply do not change the overall impact of oil and gas leasing, at least not in the North Fork Valley.
#3])>

The starting point here is perception. <([#12 [30.3] The valley has a reputation of being a place just short of Shangri-la. Whether it is deserved or not, whether it is hyperbole or not, is not the issue. It is what people who live here, visit here, have heard about here, think and believe. That reputation is gold. It provides a huge base to our economy. While it is strong, it is also fragile. Any change in the use of land that impacts the valley either enhances or detracts from that reputation. Alternative D would fatally damage that reputation. BLM's defense of Alt. D in 4 - 477 may be appropriate for lands outside of the North Fork Valley, but stating that "continued

development of energy and mineral resources would allow for economic contributions from resource extraction, while preserving values that impact quality of life nonmarket values . . ." is patently false.
#12])>

## 4) HYDRAULIC FRACTURING AND CLIMATE CHANGE

<([#4 [41.2] [21.2] It strains credulity that there is no mention of hydraulic fracturing (fracking) in this RMP. If there is one issue of greatest concern to the residents of the North Fork Valley, it is the fracking of gas wells and all the attendant public health and environmental impacts and risks. BLM simply cannot ignore the "gorilla in the room". BLM cannot hide behind its policy of adaptive management and regional mitigation strategies as described in 2.3.1. Its claim that "the RMP revision is based on current scientific knowledge and best available data" is specious. If it can cite coal production figures for the Somerset area mines from 2013 and 2014, it must do better than rely on information available only as late as 2007 or 2008 concerning industry practices in oil and gas extraction. Considering the massive potential impact on the North Fork Valley of oil and gas leasing, this is a huge and unacceptable lack of effort to deal with an issue of such overwhelming concern. BLM simply must take into account the new technologies that the oil and gas industry are employing and their associated risks. #4])>

<([#13 [11.3] While there is some discussion of climate change, there is no analysis of the RMP's proposed land use on it. BLM claims management of climate would have no impact on energy and minerals (4-260). The RMP should discuss just the opposite concern, that of the impact of oil and gas extraction on the climate. The world's understanding of climate change, its causes and impacts, has changed dramatically since 2007. The U.S. just signed the Paris Agreement on Climate Change, which will have a dramatic effect on public policy especially concerning emissions of greenhouse gases. BLM states that Alt. D would have the second highest emissions level of all the proposed alternatives. While the draft RMP cannot be expected to reflect the instructions of the Paris Agreement, BLM must now take them into account as it adjusts its preferred alternative. We believe the changes dictated by new public policy regarding climate change to be so great as to require a second round of public comment on a revised RMP before the final version is published. #13])>

## 5) RMP IMPACT ON PRIVATE LANDS

<([#14 [30.3] BLM must take ownership of the impacts of the management of its lands on the private properties and residents of the RMP planning area. BLM claims of lack of control over public perception and concerns, transportation, and other matters regarding mineral extraction are disingenuous. While it may lack control, BLM must recognize these concerns and include discussion in the RMP of how the allowed use of its lands will impact others. BLM recognizes the value of agriculture, open lands and view scape in the North Fork Valley (4-459, 460). The RMP also states that public health and safety is a priority (4-444). BLM has utterly failed to advance this priority by not acknowledging the potential impact on roads and other infrastructure of oil and gas extraction in the North Fork Valley.

The roads in the valley are not built to handle the heavy truck traffic required by oil and gas well drilling and will need constant and costly repair. If all the proposed areas in the RMP are open

for drilling, the low key ambiance of a small town - Paonia - will be destroyed by the large trucks traveling through the middle of downtown. Public safety will be severely impacted everywhere throughout the North Fork Valley by the presence of so many large vehicles.
#14])>

<([#15 [21.1] BLM recognizes that the economic contributions of natural gas development represent a small

fraction of jobs and income (4-462). Why would a public land agency even consider the North Fork Valley a suitable place for drilling with all its potential negative impacts for such an insignificant positive result? A responsible public land agency would not do so. In 2011 BLM proposed an oil and gas lease sale of some 30,000 acres in the North Fork Valley. After receiving approximately 3000 negative comments, BLM revised its proposal to include a bit more than 20,000 acres. It appears that all 30,000 acres are now back under consideration for leasing. In our lengthy comment letter (excerpts of which are attached and are included here as part of this response to the draft RMP) we noted all the reasons why leasing was inappropriate for parcels 6195 and 6191 [T14S/R92W sections 3 and 4; T13S/R92W section 33 and 34], which surround our property. BLM removed them from further consideration. Nothing has changed on those lands, so why are they back under consideration for leasing, stipulations not withstanding?
#15])> Under no circumstances would we allow access across our property to drillers on BLM lands to the west of our property.

In summary, we find the RMP seriously flawed for all the reasons stated above. Frankly, it is an unworthy effort of a public land management agency to put forth such a document for public consideration. BLM's preferred Alternative D is an inadequate approach to the management of BLM resources in the North Fork Valley. If BLM insists on moving forward with this RMP, the only alternative we could possibly support is the extensively researched, and much more current North Fork Citizens Alternative, B 1.

Sincerely yours,

[signed page appears as ATTACHMENT A]

Sarah G. Bishop
William P. Bishop
ATTACHMENT A - Signature page
ATTACHMENT B - Excerpts from comment letter to BLM, Dec. 30, 2011
Copies with Attachment sent to:
Sally Jewell, Secretary of the Interior
Neil Kornze, Director of the Bureau of Land Management
Ruth Welch, Colorado State Director of the Bureau of Land Management
Teresa Pfifer, Acting Field Manager, Uncompahgre Field Office
Town of Paonia
Delta County Commissioners
State Senator Kerry Donovan
State Representative Millie Hamner
U.S. Senator Michael Bennet
U.S. Senator Cory Gardener

Representative Scott Tipton

000452_BrandtL_20161101  Organization: Laurie Brandt
Received: 11/1/2016 12:00:00 AM
Commenter1: Laurie Brandt - Montrose, Colorado 81403 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000452_BrandtL_20161101.htm (000452_BrandtL_20161101-387745.htm Size = 4 KB)
UFORMP_000452_BrandtL_20161101.pdf (000452_BrandtL_20161101-387744.pdf Size = 120 KB)
Submission Text
Date:11/01/2016

Commenter:Laurie Brandt

Organization:

Email:lbrandt@dowl.com

Address:1681 6429 Circle, Montrose, CO 81403

Phone:970-596-4801

Comment:
Dear UFO RMP staff,

Thank you for the opportunity to comment on the draft RMP for the UFO.

This was a massive undertaking and I appreciate the effort the BLM has put forth to protect the resources of our local public lands. There are a wide variety of users and demands on the resources that you are tasked to protect and you have a mandate to balance the needs of those users. With that in mind, I would like to comment that <([#1 [27.1] I feel that none of the alternatives offered adequately provide for the needs of non--motorized, quiet users, especially mountain bikers. In other words, none of the alternatives offer a balance between motorized and non--motorized use. I would like to see the BLM come up with an alternative that includes a focus on setting aside more non--motorized areas, especially areas where bicycles are welcome and encouraged.

Hikers and horseback riders can use wilderness areas and "Areas with Wilderness

Characteristics," but mountain bikers are pushed into motorized areas. Except for a few SRMA's that focus on mountain biking such as the RAT trails, Buzzard Gulch and Jumbo Mountain, there are relatively few miles where we can ride in peace and quiet when compared with the many hundreds of miles of motorized trails in our region. The immense popularity of the RAT and Buzzard Gulch trails speak to the demand for trails designed for mountain biking. These areas are becoming destination trails for locals and visitors and this helps drive our economy and promotes a healthy lifestyle. If you look at the BLM model in the Grand Junction and Fruita areas, they have successfully designated separate areas for motorized and non--motorized use. They have achieved more of a balance of these two user groups and it has made for world--class recreation for both groups. #1])>

<([#2 27.1] We need to have multiple non--motorized areas in all portions of the region that are easily accessible to Montrose, Olathe, Delta, Paonia, Norwood and other towns within the UFO's region. We as mountain bikers like the proposed Kinikin Hills area and expanding Buzzard Gulch/Spring Creek, but there can be more areas in Dry Creek, for example, that can be designated as non--motorized or mountain biking areas.
#2])>
As mountain bikers, we like the quiet and peaceful nature of non--motorized trails. We see wildlife and their tracks and we smell the plants around us. It is disruptive and startling to have motorcycles or ATV's come upon us and their exhaust smells bad and lingers in the air. We are out on our bicycles because we love the fresh air and exercise we are getting. We also love the skills and challenges that single-track trails provide. We don't prefer dirt roads or two--track; single-track trails are what we seek and love to ride. Motorized trails are also often too steep, rutted, and unsustainable, which can be difficult or impossible to ride on a bicycle. We are looking for a different experience and we are more compatible with hikers and other non--motorized users because of our slower speed, quietness, and desire to be self propelled.

<([#3 27.1] To create more of a balance of motorized and non--motorized use, I request that you come up with an alternative that provides for more quiet user areas, some of which are designated for mountain biking. With your areas with wilderness characteristics, where bikes presumably wouldn't be allowed, this will ensure that there are more opportunities for mountain biking in the UFO planning area. We have world- class terrain on vast areas of BLM land managed by the UFO, so let's have a more equal designation for low impact, environmentally -friendly activities like mountain biking.
#3])>
Thank you,

Laurie Brandt
1681 6429 Circle
Montrose, CO 81403
970-596-4801
lbrandt@dowl.com

Laurie J. Brandt, CPG

BLM_0156221

Certified Professional Geologist

000452_MayJ_20160912  Organization: Garry Baker
Received: 10/28/2016 12:00:00 AM
Commenter1: Garry Baker - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Done Assigned/Due: dprobison  12/8/2016 12:00:00 AM
Attachments: 000452_MayJ_20160912.htm  (000452_MayJ_20160912-387757.htm  Size = 2 KB)
Submission Text
Date:10/28/2016

Commenter: Garry Baker

Organization:

Email:guardshack@gmail.com

Address:

Phone:

Comment:
I would like to submit the following comments regarding the draft Uncompahgre Resource Management Plan:

1. <([#4 [27.1] Appendix J, p. J-33: Kinikin Hills SRMA:

I fully support the Alternative B to designate this area as a SRMA, for non-motorized singletrack stacked loop systems. Please also include the option to construct a BLM trailhead accessed off of Uncompahgre Rd. #4])>

<([#5 [27.1] 2. Appendix J, p. J-85, Spring Creek SRMA, RMZ 2:

I support Alternative B, which would allow non-motorized trails. Competitive events should also be allowed, although this was not included in the alternatives. #5])>

3. <([#3 [27.1] In general the RMP reserves over 90% of the land area to motorized travel. More land should be reserved for nonmotorized quiet users (mountain bikes, hiking, etc.) #3])>

4. <([#2 [20.1] The proposed Dry Creek Lands with Wilderness Characteristics includes existing, signed, BLM- sanctioned trails (Coyote Cutoff, Coyote Ridge, Fenceline). The boundary of lands with Wilderness Characteristics should exclude these trails. In particular, Fenceline Trail is a spectacular trail that explores Dry Creek Canyon. Fenceline should be designated non-motorized open to bicycles in the RMP, with the option to reroute portions of the trail to make it ridable on a mountain bike. It could be an epic trail.

#2])> 5. <([#1 [3] The word "mechanized" refers to motorized uses only. "Mechanized" should not be used to refer to bicycles. #1])>

Thanks for the opportunity to comment.

Garry Baker


000453_CarpenterN_20161031_partial DUP of 000412 Organization: Nicole Carpenter
Received: 10/31/2016 12:00:00 AM
Commenter1: Nicole Carpenter - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Attachments: 000453_CarpenterN_20161031_partial DUP of 000412.htm
(000453_CarpenterN_20161031_partial DUP of 000412-388483.htm Size = 21 KB)
UFORMP_000453_CarpenterN_20161031_partial DUP of 000412.pdf
(000453_CarpenterN_20161031_partial DUP of 000412-388484.pdf Size = 434 KB)
Submission Text
Nicole Carpenter <nicolecarpenter86@gmail.com> Mon, Oct 31, 2016 at 12:37 PM


Attached you will find my comment letter in response to the UFO BLM's release of the draft RMP. Thank you for your consideration on this matter.
Nicole Carpenter
(631) 3871206
40881 Hwy 133
Paonia, Co 81428
(631)387-1206


Dear BLM-UFO Staff and RMP Comment Team,

Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft Resource Management Plan. As presented, the preferred alternative (D) does not offer the level of protection these lands warrant, that communities and the public in your planning area have

specifically asked for, and which federal law requires you to consider.

The preferred alternative in the draft RMP is remarkably similar to the "development" alternative, in terms of fluid mineral leasing. If the preferred alternative were to become the final RMP, and fluid mineral development were to meet or exceed the expectations published in the Reasonably Foreseeable Development Scenario, it would completely change life as we know it in the North Fork Valley (NFV).

The NFV is, as you ought to be well aware, the greatest concentration of organic farms in Colorado, with vast agricultural, scenic, recreational and natural resources. The Economic Development Analysis performed by Better Cities and funded by Delta County and DCED recommends an economy based in agriculture, value-added food exports, tourism, arts, and hospitality. These industries are incompatible with heavy fluid mineral extraction. To sacrifice all those values and potential, and to instead industrialize the valley would be reckless and irresponsible.

I am an organic farmer and my partner is an artist. I work as an EMT in the valley and I have a background in biology and chemistry. We will be opening a healing retreat/bed and breakfast on our farm outside Paonia in late Spring 2017. We rely on the good water and air quality in the NFV for our livelihood and health. We count on the tourism that the natural beauty and the community draws to the area to sell our products. We take advantage of the stellar reputation that the North Fork Valley has for quality produce, the NFV brand, if you will, when we send our products to markets and restaurants. Fluid mineral extraction has the potential to destroy all that, and for what? The RMP states that drilling provides less than .01% of jobs and is not a significant contributor to the economy in the planning area and that, even if development meets the projections in the Reasonably Foreseeable Development Scenario, it still won't benefit the local economy. So, answer me, why would you risk what we're working so hard to create: a healthy, beautiful, abundant retreat with fresh air, clean water, and friendly folks where people can come to retire, de-stress, hunt, fish, relax, heal, recreate, eat high-quality food, listen to rockin' music, and enjoy an ever-rarer piece of paradise?

Over 11% of organic farms across the US now share a watershed with active drilling, and that number is expected to rise to up to 31%, as projected by FracFocus. According to the COGCC, Over 700 spills were reported at oil and gas operations in Colorado in 2014. The spills released more than a million gallons of oil and other chemicals. 11% of them contaminated water sources. There is rapidly mounting scientific evidence that produced water can contain toxic chemicals including natural mineral salts, chemical additives, dissolved hydrocarbons, toxic metal ions, and radioactive materials. These chemicals cause cancer, they alter endocrine function, they affect human and animal reproductive systems, and they affect cognitive development in children. These facts are becoming well-known. If a spill were to occur upstream of the NFV that contaminated the irrigation water that feeds our farms, ranches, orchards, and vineyards, not only would it be unethical to sell our products, but the market would reject them. 4% of the UFO planning area is employed in the agricultural sector but in the NFV it's closer to 15%. It's bad enough that natural gas is putting our coal miners out of work. We don't need the oil and gas industry displacing our local hunting, fishing, recreation, agricultural and tourism economies, as well. Natural gas production does not provide enough stable, full-time employment to sustain the valley's economy. What it will achieve is to threaten the economic diversity we are striving to

create in order to provide the stable, prosperous economy we desire. The BLM is aware of this, yet they chose to ignore this fact when they created their preferred alternative.

The following points illustrate areas in which the draft RMP is lacking adequate information:

<([#1 [37.4] - The draft RMP does not consider the cumulative effect that the level of fluid mineral extraction (drilling) outlined in the Reasonably Forseeable Development Scenario will have on existing domestic and commercial water supplies, including springs, wells or surface water. The BLM has the means to estimate this figure and yet it does not.

- The draft RMP makes no mention of wastewater disposal for fluid mineral development. Drilling uses a lot of water in the process of extracting natural gas. What is acceptable in terms of wastewater disposal on our public lands? The only time wastewater is mentioned is in the ACEC's portion of the Environmental Impacts section: "Energy and minerals development could impact ACEC values by …. contaminating surface water from wastewater spills and runoff containing drilling fluids." (4-346) These same negative impacts would occur anywhere fluid mineral development is allowed to take place, why is it not mentioned anywhere else?

- The BLM admittedly does not have mapping of the planning area's groundwater hydrology, which makes it difficult for future project EIS's to predict the impact of fluid mineral development on private and commercial water sources.
#1])>
- In the draft RMP, the NFAP is tacked onto the 'conservation' Alternative B, as a sub-alternative B1. All parts of the planning area not covered in the NFAP are overlaid with alternative B. This makes it appear that the NFAP and alternative B1 are much more restrictive than the public intended, since the public only proposed to protect the North Fork Valley. By tacking the NFAP onto alternative B, it appears that the public proposed to remove 95% of the entire planning area from being available for leasing, which is not an accurate representation. If overlaying the NFAP onto another alternative is their way of analyzing the plan, they should overlay the NFAP over each alternative, so it's effect on each proposed plan can be accurately evaluated. Otherwise, it appears that the BLM tacked the NFAP onto the conservation alternative as a matter of protocol, without giving it serious consideration.

<([#2 [18.3] - The draft RMP does not adequately address human health impacts. The only mention of potential health impacts in relation to fluid minerals is that "energy and mineral development...includes inherent risks for workers and the public related to safety during construction and operation, as well as the potential introduction of hazardous materials that could impact human health should exposure occur. Introduction of hazardous materials could indirectly affect health due local air, soil, or water contamination" and "Contaminated surface waters pose health risks to recreational users who may come into contact with those waters. Development activities in the vicinity of drinking water aquifers (groundwater) pose a risk of contaminating those aquifers and causing health impacts on groundwater consumers." (Page 4-445) The document makes no mention of the effects that water contaminated with mineral salts, chemical additives, dissolved hydrocarbons, toxic metal ions, and radioactive materials will have on human health, agriculture, livestock, or the economy. The document does not address mitigation or protocols to manage incidents of air/water/soil contamination, nor does it mention

any existing legislation that would regulate such potential risks. #2])>

- The draft RMP repeatedly describes how fluid mineral development would negatively impact, to some unknown degree, other resources such as wildlife habitat and migration corridors, grazing land, soil productivity, vegetative diversity, special status fish and aquatic wildlife, air quality, and visual resources, as well as non-market values including ecosystem services, natural amenities, scenic beauty, human health, quality of life, and sense of place.

- The draft RMP estimates that ecosystem services in the planning area could provide up to $1,492 million in value. (4-461)

- The draft RMP states that natural amenities like proximity to wilderness areas, national parks and other special protection areas tend to have a positive impact on tourism, property values, population growth due to positive net migration, higher incomes, and employment growth.

- The draft RMP states that approving an alternative that emphasizes "resource development over conservation likely would result in more impacts on nonmarket values and how planning area individuals perceive their own quality of life." (4-460)

- The draft RMP repeatedly states that, at the projected rate of fluid mineral development outlined in the Reasonably Forseeable Development Scenario, oil and gas development would not have a significant impact on regional employment or the economy. It makes some mention of severance taxes but does not give estimates of what the income amount could be. It states that current employment in the planning area by oil and gas is less than .01%, and is not expected to increase to greater than 1%. "Across all alternatives, for natural gas development, the economic contributions to the planning area represent a small fraction of jobs and income." (Page 4-462)

- "Agriculture represents 3.6% of jobs in the planning area...The North Fork Valley represents a region where traditional agricultural uses have maintained importance due to the presence of organic and conventional small-scale farms, orchards, and wineries. Delta County is home to the highest concentration of organic farms of any Colorado county." (4-459)

- Given the previous five points, why does the UFO's draft RMP prefer an alternative that will produce a net negative impact on the planning area's economy, natural resources, and quality of life?

- The draft RMP did not address possible environmental disasters caused by or affecting fluid mineral development. It is possible that wastewater injection wells can cause seismic activity. There is no mention of this in the RMP. It is also possible that naturally occurring mudslides and avalanches could affect the safety and integrity of extraction infrastructure. There was a close call on May 25, 2014, when a mudslide came within feet of burying a drilling pad near Colbran, Co. and killed three people. The West Elk Mountains are geologically unstable and these issues need to be mentioned in the RMP to provide a basis for future EIS's to address these risks.

- The draft RMP does not adequately address the possibility of explosions, or lightning strikes, and the risk that these events can pose to nearby residences, structures, property and other natural

resources when natural gas and other flammable/explosive materials are involved. The planning area is often subject to drought conditions, in which fires can quickly get out of control. The RMP states that "mineral resource development....would introduce additional ignition sources into the planning area, which...could increase the potential for high-intensity wildland fires." (4-482) That is the extent of the content of this issue, briefly mentioned in the "Unavoidable Adverse Impacts" section. We can avoid this "adverse impact" by designating places where wildfires are a risk as unsuitable for fluid mineral extraction.

- The draft RMP does not address how fluid mineral development would strain local emergency services such as volunteer fire, ems and rescue groups. In the fall of 2015, there was a report of flames in the forest alongside Hwy 133. Paonia Volunteer Fire Dept was dispatched to the scene, over an hour's drive from their station. It turned out that one of the wells was flaring gasses and hadn't notified the local authorities as they were required, by law. This had the effect of wasting volunteers' time and could have been detrimental if there had been a real emergency during the time the fire department's limited resources were tied up investigating this false alarm. If there were a true emergency in this remote location, where is the nearest HAZMAT team that is qualified to deal with oil and gas spills? What is the response time? The specifics should be determined in project EIS's but the issue needs to be mentioned in the RMP that guides future EIS's.

- In 2012, North Fork Valley residents submitted over 3000 comments to the BLM in protest of a 30,000 acre lease sale. We were successful in fighting back that sale, and the latter 20,000 acres lease sale, in part because the BLM had relied on a 30-year old RMP, which did not consider how the valley had changed over the last 30 years, nor the impacts of hydraulic fracturing and multi-stage drilling technologies, which are relatively new technologies. The BLM's draft RMP still does not consider how the changes in technology will impact the land, human health, wildlife habitat-- including hunting and fishing populations, the environment, and the local economy. Relative to oil and gas, Alternative D, BLM's preferred alternative, is only a .1% improvement over the existing 30-year RMP.

<([#3 [11.3] - The draft RMP does not mention climate change and the extent that fluid mineral development would contribute to atmospheric $CO_2$. This is now required under NEPA. The final RMP needs to include this analysis.
#3])>
- The draft RMP does not consider proximity to designated wilderness areas such as the West Elk Wilderness and Raggeds Wilderness, which are protected with Class 1 Airshed classifications. What would be the air quality impacts caused by adjacent development. There is currently a proposed well pad within 1 mile of the Wilderness Area border.

Specifically, the draft Resource Management Plan needs to:

- Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.

- Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.

BLM_0156227

- Address the issues of human health, water quality, air quality, emergency response, environmental disasters, climate change and the effect on existing surface and ground water sources in relation to fluid mineral extraction.

And the final RMP should:

- Include NL protections for land with highly erodible selenium soils, land within .5 miles of any water body, including streams and rivers, and land within .25 miles of any public or private water supplies.

- Preserve the valuable visual assets and scenic character of the NFV by protecting the visual landscape and prominent landmarks with NL and VRM Class I and II designations

- Include NSO protections for land with high geologic hazard risk, land designated as big game range, land in the Jumbo Mountain area, and within 100-year floodplains

- Include NSO protections for lands with selenium soils, agricultural land, water conveyances such as irrigation canals and springs, trout streams, scenic corridors and community facilities including schools and parks.

Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to fulfill it's duty to consider the full range of reasonable management possibilities. I was shocked to read that the preferred alternative in the draft RMP was so skewed toward the development side of the range of possible management scenarios. Not only did the BLM neglect to even consider a no-leasing option, but they tacked the NFAP onto the 'conservation alternative' and then proceeded to create a preferred alternative that included almost no elements from the conservation alternative nor the NFAP. That is hardly the balanced approach to resource management that the RMP process is intended to produce. It makes me wonder, too, what kind of influences caused the BLM to support such heavy fluid mineral development in spite of all the reasons included in the RMP, cited above, that would suggest that such development would have a net negative impact on the planning area's residents, other natural resources, economy, and non-market values. I would like to see a conservation plan implemented, and the points I noted above addressed.

Thank you for taking the time to consider my comments. I hope you are able to create a final RMP that succeeds in it's mission to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

Sincerely,

Nicole Carpenter <nicolecarpenter86@gmail.com> Mon, Oct 31, 2016 at 12:04 PM

I hereby add the following information to my comments pertaining to the draft RMP that I submitted last week. Please consider the following information in your process. In June, 2016 at

BLM_0156228

the RMP info meeting at the Hotchkiss High School, I asked Jedd B Sondergard, the UFO hydrologist, if the BLM had maps and information determining the hydrology of the area they were proposing to open to oil and gas leasing because the information was omitted from the draft RMP. His response was a firm no, that BLM did not have that information. Well, here it is, and by law you must include it in your analysis.

I was made aware today of the report that was submitted to the Delta County Board of County Commissioners three
years ago on the groundwater systems of the North Fork Valley and Terraces area (http://www.heathhydrology.
com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf). Some conclusions from it that should be cause for alarm by anyone who uses drinking or irrigation water in the Valley are:

<([#4 [37.3] "The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geohydrological, and, potentially, legal consequences. The effects of water disposal after fracking and oil and gas well development are not discussed in this report as relevant information on the planned oil and gas development and operations is not available at this time. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.
....the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom
subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek
drainages, due to hydro-structures, may be affected by fracking or other oil and gas drilling activities (Figures 19, 20, 22, 23 and 29), which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal (Figures 19, 20, 22, 23 and 29)." #4])>

I am a resident of the North Fork Valley who is dependent on the clean water we now have access to for domestic water use, the wellbeing of my livestock, and for irrigation. Given this hydrological situation, I don't see how those water sources can be guaranteed to remain safe if drilling for oil and gas takes place on a large scale in this area. Polluted groundwater and springs are not an acceptable "unavoidable adverse impact" of fluid mineral extraction. These issues must be addressed in your draft RMP so they can be reasonably assessed in future EA's and EIS's. Thank you for your time and consideration.

Sincerely,
Nicole Carpenter

NFV resident, farmer and EMT
(631) 3871206

000454_OchsD_20161101_CBMBA  Organization:  Crested Butte Mountain  Bike Association,
David Ochs
Received: 11/1/2016 12:00:00 AM
Commenter1: David Ochs - ,
Organization1:Crested Butte Mountain Bike Association
Commenter Type: Organization (nonprofit/citizens  group)
Classification: Substantive
Submission  Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000454_OchsD_20161101_CBMBA.htm (000454_OchsD_20161101_CBMBA-
387746.htm Size = 2 KB)
UFORMP_000454_OchsD_20161101_CBMBA.pdf  (000454_OchsD_20161101_CBMBA-
387747.pdf Size = 305 KB)
Submission  Text
Date:11/01/2016

Commenter:David Ochs

Organization:Crested Butte Mountain Bike Association

Email:dave@cbmba.org

Address:

Phone:970-349-7324

Comment:
<([#2 [27.1] [30.3] The Crested Butte Mountain Bike Association (CBMBA) supports the
creation of an SRMA on Jumbo Mountain east of Paonia as outlined in Alternative B (lines 377-
428) of Resource Management Plan 1610(COSO50). The North Fork area has no established
mountain biking network and the creation of an SRMA on Jumbo Mountain will provide this
area with a recreation amenity that will serve the local and surrounding communities with an
economic driver and healthy lifestyle opportunities. #2])>

The North Fork area has suffered economically from reductions in mining activities.
Communities and areas surrounding the North Fork area are providing healthy and positive
lifestyle choices with a tourist and recreation based economy, to great success. Jumbo Mountain
is an existing and responsible means for providing this amenity for the Paonia area specifically.

A recreation based economy provides jobs and growth opportunities, and supports initiatives

BLM_0156230

from Governor Hickenlooper's office to "connect" more Colorado communities via trails and recreation.

<([#1 [27.1] CBMBA would ultimately like to see a backcountry connection with Paonia and the North Fork Valley, and feels the connection between Gunnison, Paonia, and Crested Butte would be a destination amenity for the future. Jumbo Mountain would be a large piece of that puzzle, and provides a responsible and sustainable network of trails and connectivity. #1])>

Thank you for your consideration.

David Ochs
Executive Director
Crested Butte Mountain Bike Association
Since 1983
dave@cbmba.org


000455_ClearyM_20161101_4CRanch,LLC  Organization: Michael P. Cleary
Received: 11/1/2016 12:00:00 AM
Commenter1: Michael P. Cleary - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000455_ClearyM_20161101_4CRanch,LLC.htm
(000455_ClearyM_20161101_4CRanch,LLC-387749.htm  Size = 7 KB)
UFORMP_000455_ClearyM_20161101_4CRanch,LLC.pdf
(000455_ClearyM_20161101_4CRanch,LLC-387748.pdf  Size = 279 KB)
Submission Text
Date:11/01/2016

Commenter: Michael P. Cleary

Organization:

Email:mikecleary@orbisengr.com

Address:4500 3675 Road, Crawford, CO 81415

Phone:720-883-2774

Comment:
RE: Resource Management Plan Comments

BLM_0156231

Project Manager:

I, Mike Cleary, owner of the 4C Ranch in Crawford appreciate the opportunity to submit comments on the Uncompahgre Field Office's (UFO) Draft Resource Management Plan (RMP) Revision and Environmental Impact Statement. My ranch runs 400 head of cattle and grazing is of utmost importance to me. I continue to support full multiple use opportunities balanced against the positive and negative impacts and the protection of private property rights within the UFO area. Therefore, I support Alternative C with some changes and additions outlined in the following text. I believe Alternative C preserves a greater amount of multiple use and protection of private party rights within the plan. Alternative C also provides a greater separation between broad requirements and site specific issues that should only be addressed during the review of proposed site specific activities. Alternative C, therefore, allows for greater flexibility for the public and the BLM to address and regulate those sight specific requirements through various then current permitting processes.

The few portions of Alternative C that the I believe should be changed or removed noted below and identified by the page and corresponding line number in Table 2.2 (Description of Alternatives) in Chapter 2 of the proposed RMP.

Special Status Terrestrial Wild Life

o Page 2-95, Line 152, designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become unnecessarily extensive and restrictive.

<([#1 [15.2] o Page 2-102-105, Line 161-167, Gunnison Sage Grouse. Need to write language that allows for range improvements. When Alternative C says no permanent structures, that includes range improvements. #1])>

Land Health

<([#2 [3] o Page 2-25, Line 24, Given the lower precipitation rate over the entire UFO resource area, it is more realistic to manage for upward trend for land health

o Page 2-27, Line 26, add recreation to actions that can cause land health problems

o Page 2-164, Line 295, maintain the ability to increase AUMs

o Page 2-165, Line 297, before acreage is removed for AUM on ACEC, write language in to change management of livestock use. Increase the flexibility of management.

o Page 2-166, Line 299, define that trailing livestock is not the same as gathering and moving livestock from pasture to pasture.

o Page 2-169, Line 303, add Colorado Resource Monitoring Initiative to the list of plans to base decisions on. In addition, include the MOU with CCA, CWGA, BLM, Department of Ag.

BLM_0156232

o Page 2-167, Line 300, no mention of using livestock as tool for vegetation treatments. Targeted grazing is an economical, viable tool and has been extensively researched to benefit sage grouse and big game habitat. In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other shrubs.

o Page 2-167, Line 301, No permits or allotments should be closed

o Page 2-172, Line 306, Major ecological damage does not equate to maintaining range improvements

o Page 2-172, Line 307, alternative c is more feasible and allows for the sustainability of multi-generational use of working landscapes

o Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of Delta County. This is a more accurate way to reflect livestock grazing in the RMP.

o IMPLAN calculates economic impact based on forage used in the UFO; however additional analysis needs to include the value of the livestock for the entire year. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus Delta County. If livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers.
#2])>
Water / ROW issues:

The issue of perpetual easements for irrigation ditches that traverse BLM holdings is not addressed in the RMP. The government is promoting and financing piping of irrigation ditches and that brings up 2 issues:

<([#3 [37.5] o Irrigation ditches have a perpetual ROW. Currently the BLM will not allow a ditch company to straighten a piped ditch outside of its existing perpetual right without losing that right and trading it for a 30 year term ROW. The BLM needs to be more flexible here as that would save the government money, clean up erosion issues in existing ditches and reduce pipeline operating costs.

o 5% of construction cost is allocated to mitigate the environmental impact of drying up ditches. It would be wise for the BLM to adopt a policy that focuses the location of the mitigation near the proposed piping project, and that the a priority of the allocated funds be directed to providing access to water for wildlife in arid areas.
#3])>
Another water issue that should be addressed is under no circumstance should the Federal government be allowed to appropriate water that impact the beneficial use of by the people of Colorado.

BLM_0156233

Oil and Gas issues:

The board should not support any language that infringes on privately owned surface property that is situated above a federally owned mineral estate.

The BLM is disingenuous when it promotes drilling on private agricultural land to provide access to federal minerals. Instead, the BLM should develop a "corridor rule" that allows for easier access to federal land that border prime farmland, provided that the adjacent land owner supports mineral activity in BLM land that is adjacent to his or her land.

The BLM should take a more active interest in the dewatering of coal seam wells for natural gas exploitation on the federal estate. They should ensure that studies (during the dewatering process) are undertaken to verify that ground and surface water is not expropriated by fresh water coal seam dewatering operations.

Apply the following requirements (as taken verbatim from Alternative D) to oil and gas well bores that are within 305 meters (1,000 feet) of a domestic water well, beginning at the ground surface and extending through the freshwater aquifer:

• Extend surface casing through the freshwater aquifer.

• Require freshwater mud for drilling the surface casing.

Visual Resource Management (VRM):

The Board recommends all applications of VRM that apply to privately held land are removed from the document. This has the potential of usurping private land owner rights.

Yours truly,
Mike Cleary, Manager
4C Ranch
Cell: 720-883-2774


000456_ColeK_20161031  Organization: Board of County Commissioners for Mesa County, Kristen Cole
Received: 10/31/2016 12:00:00 AM
Commenter1: Kristen Cole - Grand Junction, Colorado 81502 (United States)
Organization1:Board of County Commissioners for Mesa County
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000456_ColeK_20161031.htm (000456_ColeK_20161031-387751.htm Size = 8

KB)
UFORMP_000456_ColeK_20161031_MesaCounty.pdf (000456_ColeK_20161031-387750.pdf
Size = 225 KB)
Submission Text
Date:10/31/2016

Commenter: Kristen Cole

Organization: Board of County Commissioners for Mesa County

Email:kristen.cole@mesacounty.us

Address:544 Rood Avenue, Grand Junction, CO 81502

Phone:970-244-1757

Comment:
Good Afternoon All,
Please see the attached letter, approved at public hearing this morning (October 31, 2016) and
signed by the Mesa County Board of Commissioners. The letter and a video copy of the hearing
is available on the Mesa County website.

Thank you,

Kristen Cole
Mesa County Administration

Dear Project Manager:

The Board of County Commissioners for Mesa County, Colorado ("BoCC") is submitting this
letter to the Bureau of Land Management (BLM) to provide comments on the Uncompahgre
Field Office (UFO) Draft Resource Management Plan revision and associated Draft
Environmental Impact Statement (collectively, the "DRMP/EIS").

The DRMP/EIS describes and analyzes four alternatives and one partial alternative for managing
over 675,800 acres of BLM-administered lands and 971,220 acres of federal mineral estate in
Western Colorado. Mesa County is the economic regional center for Western Colorado and
Eastern Utah. Multiple uses of BLM lands and resources administered by the UFO and
surrounding field offices, directly and indirectly impact Mesa County's economy. The BoCC's
goal is to help the BLM ensure the public lands in Mesa County and the region in general are
managed in the most appropriate and beneficial manner.

Mesa County staff has thoroghly reviewed the DRMP/EIS, and for the most part the BoCC
supports Alternative C (resource use emphasis), which is not the "Preferred Alternative".
Alternative C preserves a greater amount of multiple use and the protection of private property
rights. Alternative C also provides a greater separation between broad requirements and site-

specific issues that should only be addressed during the review of proposed site-specific activities. Alternative C, therefore, allows for greater flexibility for the public and the BLM to address and regulate those site-specific requirements through various current permitting processes.

The BoCC fully supports and concurs with those written comments provided by Delta and Montrose counties on the DRMP. We have summarized specific topic areas of greatest importance to the BoCC, as follows:

Lands with Wilderness Characteristics (LWC) and Wilderness Study Areas (WSA)

<([#1 20.1] We do not support the de facto creation of additional wilderness areas by managing any areas outside of WSAs to protect wilderness characteristics. We assert such management is outside of BLM jurisdiction and legislatively prohibited by Congress. Also, to manage LWC for solitude given the increase in recreation and directive to allow for increased use, is not feasible. #1])>
Oil and Gas (Fluid Minerals)

Preserving the ability for the oil and gas industry to operate, extract and explore is of great importance to the region due to positive economic impacts. In general we do not support closing areas to leasing. <([#2 5.3] The amount of acreage where no surface occupancy (NSO) stipulations would be applied to future leased lands in the DRMP needs to be reduced significantly to meet FLPMA guidelines where the least restrictive measures available should be applied to protect other resources such as special status species, WSAs, ACECs, sensitive soils, riparian areas and recreation sites before applying NSO stipulaitons as a last resort. #2])> <([#3 21.1] The DRMP proposes a 162,670 acre increase in lands "Open to leasing subject to NSO-BLM surface/federal minerals". If the intent of the DRMP is to continue to allow for productive leases on these acres as shown in Figure 2-23, it would be more practical to apply Controlled Surface Use (CSU) restrictions.
#3])>
<([#4 21.1] Although directional/horizontal drilling capabilities have improved in recent years, total elimination of surface occupancy on leased ground would render much of the subject acreage inaccessible to drilling. We believe CSU restrictions are a fair compromise and would provide the necessary resource protection while also maintaining the potential for future resource development. #4])>

<([#5 21.1] Although areas with existing leases would not be subject to the stipulations in the DRMP, we are not supportive of applying new conditions of approval (COA) based on the new DRMP. The unpredictability of changing and unknown COAs will deter the industry from developing the resources to their fullest extent while using best management practices and result in a reduction of economic activity locally and regionally. #5])>

Wild and Scenic Rivers (WSR)

<([#6 39.1] We strongly support utilizing available and recommended management tools to protect the free-flowing nature and Outstanding Recreational Values for the stretches of

waterways identified as eligible for designation. We do not support any recommendation of these waterways as suitable for wild or scenic designation. #6])>

As a general comment with regard to WSR designations, <([#7 [39.1] we find it to be a dramatic overreach of authority for BLM to use an administrative determination (WSR suitability) as the basis for imposing NSOs and similar land use restrictions on adjoining land. We respectfully ask that BLM reconsider imposing such restrictions adjoining suitable WSR segments until such time as Congress has formally determined the proposed WSR determinations. As written, this management action substitutes as administrative determination of "suitability" in lieu of Congressional action as intended by the WSR Act.
#7])>
Socio-Economics

<([#8 [30.3] Accurate portrayal and analysis of the social and economic impacts of multiple use of BLM lands is lacking in the DRMP. It appears that parts of the DRMP rely on old, outdated, or non-applicable and inconsistent socio-economic data and analyses, resulting in underestimated impacts of multiple uses of the BLM to the local and regional economy.
#8])>
Grazing Allotments

Agriculture is a very important component of our region's economy, culture, and lifestyle. The use of BLM lands is key to the local ranching industry.<([#10 [23.1] The status of all allotments needs to be determined on a case-by-case basis in concert with the permittees at the implementation stage of planning #10])> . <([#9 [30.3] Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of the region. IMPLAN calculates economic impact based on forage used in the UFO; however, additional analysis needs to include the value of the livestock for the entire year. This is a more accurate way to reflect livestock grazing in the RMP. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus the region. If livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers #9])> .

Comprehensive Travel and Transportation Management

<([#11 [6.2] The BLM should work closely with the various user groups and counties when designating uses for specific trails and areas. Multiple use of roads and other routes in the UFO are important economic drivers for the entire region. Within the UFO planning area, there are existing county roads upon which counties have clear jurisdiction and maintenance responsibilities. Whether BLM has recognized these roads through an RS 2477 process is irrelevant to the county's jurisdiction. We suggest that in preparation and mapping for travel management activities, BLM consult with the affected counties to prepare an accurate inventory of roads that are known county jurisdiction.

#11])> Gunnison Sage Grouse

BLM_0156237

<([#12 [8] All management decisions related to Gunnison Sage Grouse habitat should be amended to defer to the BLM's Gunnison Sage-Grouse Rangewide Resource Management Plan Amendment and Environmental Impact Statement, which is also currently in "draft" form with public comment due in January, 2017. #12])>

Thank you for your attention and consideration of our comments.

Sincerely,

Rose Pugliese, Chair
Board of County Commissioners

John Justman
Commissioner

Scott Mcinnis
Commissioner


000457_BlandC_20161031  Organization:  Carter Bland
Received: 10/31/2016  12:00:00  AM
Commenter1: Carter Bland - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type:
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mmccarter
Attachments: 000457_BlandC_20161031.htm (000457_BlandC_20161031-387752.htm  Size = 5 KB)
Submission  Text
Date:10/31/2016
Commenter:Carter Bland
Organization:
Email:carterbland@gmail.com
Address:15362  Fire Mountain  Road, Paonia CO 81428
Phone:
Comment:
Please consider these comments on the Uncompahgre Field  Office Draft Resource Management Plan.
1. BLM's preferred alternative D poses unacceptable risks to the North Fork Valley's water quality, air quality, agricultural economy, and recreational resources.
2. Only North Fork alternative B.1 clearly identifies lands that should be designated no-lease, no surface occupancy-- a critical provision that must be included in any final RMP.
3. BLM specifically excluded from its analysis a no-leasing alternative for the North Fork

Valley. Considering the unique but fragile agricultural and recreational resources of the region, this is an unreasonable exclusion.

<([#1 [21.2] 4. BLM does not consider hydraulic fracturing and multi-stage drilling technologies, and therefore it's development and impact projections are probably inaccurate. The number of wells, laterals, and supporting infrastructure is likely to be much higher than reflected in the draft RMP. #1])>

The draft RMP lacks adequate data and analysis in the following areas:

<([#2 [18.3]

1. Risks to air quality from volotile organic compounds, silicates, and other airborne contaminants;

2. Risks to potable drinking water supplies for the towns of Somerset, Paonia, Hotchkiss, Crawford, and Delta as well as for those individuals and families served by private water companies such as: Bone Mesa Water Company, Stucker Mesa Water Company, and Pitkin Mesa Pipeline Company;

3. Risks to irrigation and crops from water contamination and from damage to irrigation canal access and bridges; #2])>

<([#3 [14.1.3]

4. Risks to wildlife from habitat fragmentation, interference with mitigation, and damage to grazing and wintering grounds;

5. Risks of damage to valuable recreational, hunting, and fishing resources; #3])>

6.<([#4 [30.3] Risks of significant reductions to residential, farm, and ranchland property values #4])> .

In conclusion, before creating a final Resource Management Plan, BLM should:

<([#5 [5.3] -Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.

-Include sub-alternatives for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative. #5])> -<([#6 [37.4] Include a more extensive analysis of regional hydrology and specifically that of the North Fork Valley to fully assess risks to drinking water, agriculture, wildlife, and recreation.

#6])> Lacking these elements, BLM's draft RMP fails to consider the full range of reasonable management possibilities.

We are retired residents of Paonia who will be directly affected by any degradation of the environment and quality of life that results from BLM's decisions.

Respectfully,

Carter and Robin Bland


000458_YaleL_20161028  Organization: Laura Yale
Received: 10/28/2016  12:00:00  AM
Commenter1: Laura Yale - Crested Butte, Colorado (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique

BLM_0156239

Form Letter Master:
Current Task: Review Assigned/Due: dprobison  12/8/2016  12:00:00  AM
Attachments: 000458_YaleL_20161028.htm  (000458_YaleL_20161028-387756.htm  Size = 2 KB)
UFORMP_000458_YaleL_20161028.pdf  (000458_YaleL_20161028-387755.pdf  Size = 109 KB)
Submission  Text
Date:10/28/2016

Commenter:  Laura Yale

Organization:

Email:yale.laura@gmail.com

Address:135  Wildbird  Lane, Crested Butte, CO

Phone:970-456-2373

Comment:
To Whom it may Concern,

The North Fork Valley is home to valuable lands, waters and businesses for all Coloradans. These
businesses, like organic farming, ranching and outfitting, all rely on healthy land and clean water. It is also important to protect much of these values for wildlife  habitat, as our state is growing and the wildlife  we share our land with are receiving more pressure by the day. I believe that the RMP should include the following  rules:

-The BLM must analyze and adopt a "no leasing" alternative for coal. Such an alternative is a necessary counterbalance to the current alternatives that skew heavily in favor of coal leasing, and is the only effective way to realistically  minimize  climate impacts.

-The Final RMP must include up--to--date data concerning coal markets, coal production  and coal
employment  in the area. The Draft RMP's data, much of it dating  back to 2010 or older, is stale in light of shrinking  coal production  and employment.

-I support the "North Fork Alternative,"  which provides for no oil and gas leasing across 75% of the North Fork Valley.

Thank you for your consideration.  I hope you all have the vision and forethought to do what is best for the long  term and health of our land and our communities.

Sincerely,

BLM_0156240

Laura Yale
Gunnison Country Resident
135 Wildbird Lane
Crested Butte Colorado
970-456-2373


000459_HardyR_20161027 Organization: Robert Hardy
Received: 10/27/2016 12:00:00 AM
Commenter1: Robert Hardy - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000459_HardyR_20161027.htm  (000459_HardyR_20161027-387497.htm  Size = 9 KB)
Submission Text
Date:10/27/2016

Commenter:Robert Hardy

Organization:

Email:rahwine@yahoo.com

Address:PO Box 420, 13966 2900 Rd., Hotchkiss, CO 81419

Phone:

Comment:
Dear BLM-UFO Staff and RMP Comment Team,

My name is Robert Hardy. My physical address is: 13966 2900 Rd, Hotchkiss, CO 81419. My mailing address is: PO Box 420, Hotchkiss, CO 81419. My email address is: rahwine@yahoo.com My wife and I are home owners and purchased our home on Redlands Mesa 10 years ago. We moved back to Colorado from San Francisco. We choose to move to the North Fork due to its amazing beauty, the high concentration of small, family-owned organic farms, and because the area reminded me of the Colorado of my childhood. My early years were spent in Winter Park, as my father was the US Forest Service ranger there. Anyone growing up in rural Colorado in the 50's knows how special the fishing, camping, hunting and skiing were. While attending college in Colorado Springs, I worked seasonally for the BLM on survey crews across the West. Because of this experience, I know the North Fork is unique.

BLM_0156241

I am retired from my career in wine sales in Northern California. We keep our property in agriculture and grow some of our own food and purchase much of the rest from local farmers and
ranchers such as Thistle Whistle Farm and Princess Beef. Both our domestic (Upper Surface Creek Domestic Water Users Association) and irrigation (Overland) water comes from reservoirs that could be significantly impacted by natural gas leasing and development.

I consider the prospect of an industrialized North Fork for natural gas development to be the greatest threat to our health and happiness. Everyone who lives here is invested and dependent on the North Fork's clean water and air. Our farming and ranching friends' livelihoods would be in jeopardy if widespread leasing and development took place. And an industrialized North Fork would no longer be the special place that has drawn us and others to it.

Many think that after the coal mine closures that the North Fork would be desperate for the jobs that natural gas development would bring. But we don't want development that will fundamentally
change our community and rob the very people that have invested in our valley. As improbable as
it seems, the North Fork is in the middle of a boom with young couples, families and retirees moving to the area starting businesses, buying farms or bringing their work with them. A young electrician who worked on a project for us recently, told us his business has never been better. Growing up in a coal mining family, he was sorry to see the mines close, but saw his future tied to the influx of newcomers to the valley.

Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft Resource Management Plan. As presented, none of the alternatives offer the level of protection these lands warrant, that communities and the public in your planning area have specifically asked for and favored, and which federal law requires.

I am opposed to oil and gas leasing on public lands in the North Fork Valley, which is one of the most beautiful and fertile places in the world. I am opposed to leasing because it has the potential to lead to loss of the clean air and abundant clean fresh water that have made this area Colorado's largest concentration of organic farms, and to cause significant harm to human health and a local economy based on recreation, hunting, tourism, and agriculture. I oppose the BLM's Preferred Alternative, as it relates to oil and gas development, in the Draft Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado. I am opposed to leasing for oil and gas development in this area for the following reasons and request that BLM address each one of the following:

Poor and inadequate analysis.

• <([#1 [30.3] BLM did not consider the uniqueness of the North Fork Valley. The Gold Medal fishing, prized big-game hunting, and award-winning fruits, vegetables, and wines can all be harmed by air
pollution or surface or ground water contamination that are inevitably associated with oil and gas

BLM_0156242

extraction.

• The North Fork valley has the highest concentration of organic farms in Colorado. Neither Chapter 2 (Affected Environment) nor Chapter 4 (Environmental Consequences) acknowledge the existence of this rare, unique and unrivaled agricultural area containing numerous vineyards, orchards and vegetable growing operations. Analyzing the effects of drilling and all the associated risks to this agricultural area must be addressed in detail. #1])>

• <([#2 [5.3] BLM did not consider a reasonable no-leasing alternative for the North Fork Valley. #2])>
• <([#3 [21.2] BLM relies on a 2012 Foreseeable Development Scenario report, which is based on an
analysis of conventional oil and gas development from 2004. #3])>

•<([#4 [5.6] BLM did not analyze the impacts of hydraulic fracturing and multi-drilling technologies.
#4])>
•<([#5 [41.1] BLM did not analyze the cumulative impacts of unregulated gas gathering pipelines.
#5])>
• <([#6 [18.3] BLM did not consider the impact of extreme weather causing flooding, mudslides and
geological instability, which can compromise the integrity of pipelines and result in leaks and potential explosions. #6])>

• <([#7 [37.3] BLM did not analyze the impact of permanently removing water from the hydrologic cycle.
#7])>
• <([#8 [37.3] [31.1] BLM did not analyze injection wells and the potential for earthquakes and contamination of aquifers.
#8])>
•<([#9 [18.3] BLM did not conduct a human health impact assessment.
#9])>
• <([#10 [10.3] BLM did not consider that, by their own modeling, ozone levels already exceed the EPA
threshold of 70ppb in certain areas.
#10])>
• <([#11 [37.1] BLM did not consider community source water protection plans.
#11])>
• <([#12 [30.3] The BLM did not adequately consider the impact of industrial oil and gas operations, air
pollution and water contamination on the health of wildlife animals, nor the impact on the hunting and fishing economy. Oil and gas development in the NFV will fragment the wildlife habitat and negatively impact the big game population. It will also result in increased sedimentation impacting the fish population.

BLM_0156243

• BLM did not consider the impacts on hunting due to changes in wildlife migration and reproduction habits.

• BLM did not consider the decreased recreational value of BLM lands from industrial oil and gas activities. #12])>

In addition,

• It is an inappropriate use of public lands. It would open almost every acre of public lands in the region to leasing (865,970 acres or 94.5% of total oil, gas, and mineral acreage), and specifically in sensitive air, water and foodsheds. The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.

• The potential for human, animal and environmental damage is too high.

• Development would contaminate soils, water, and air, and impair human health, including increases in respiratory, endocrine, immune, and cardiovascular disease.

• Development of the leases would destroy local investments and resources required in transitioning the economy to one based on agro-tourism, recreation, renewable energy, agriculture, and organic/clean food.

Climate change impact.

• Development would contribute to increased greenhouse gas emissions and climate change impacts on community resources, including agriculture and wildlife.

A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil and gas operations including fracking technologies and large-scale industrialization. <([#13 [5.3] Because BLM did not consider new information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed. A no-leasing alternative is the only reasonable
alternative to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. #13])> BLM must keep the federal oil and gas minerals in the UFO
planning area in the ground and adopt a noleasing alternative. I request that BLM adopt a noleasing alternative.

Sincerely,
Robert Hardy

000460_BakerG_20161028 Organization: Garry Baker
Received: 10/28/2016 12:00:00 AM

BLM_0156244

Commenter1: Garry Baker - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000460_BakerG_20161028.htm  (000460_BakerG_20161028-387498.htm  Size = 2 KB)
Submission Text
Date:10/28/2016

Commenter:Garry Baker

Organization:

Email:guardshack@gmail.com

Address:

Phone:

Comment:
I would like to submit the following comments regarding the draft Uncompahgre Resource Management Plan:

1. <([#2 [27.1] [3] Appendix J, p. J-33: Kinikin Hills SRMA:

I fully support the Alternative B to designate this area as a SRMA, for non-motorized singletrack stacked loop systems. Please also include the option to construct a BLM trailhead accessed off of Uncompahgre Rd.
#2])>
2. <([#1 [3] [27.1] Appendix J, p. J-85, Spring Creek SRMA, RMZ 2:

I support Alternative B, which would allow non-motorized trails. Competitive events should also be allowed, although this was not included in the alternatives. #1])>

3. <([#3 [3] [27.1] In general the RMP reserves over 90% of the land area to motorized travel. More land should be reserved for nonmotorized quiet users (mountain bikes, hiking, etc.)
#3])>
4. <([#4 [20.1] [3] The proposed Dry Creek Lands with Wilderness Characteristics includes existing, signed, BLM-sanctioned trails (Coyote Cutoff, Coyote Ridge, Fenceline). The boundary of lands with Wilderness Characteristics should exclude these trails. In particular, Fenceline Trail is a spectacular trail that explores Dry Creek Canyon. Fenceline should be designated

non-motorized open to bicycles in the RMP, with the option to reroute portions of the trail to make it ridable on a mountain bike. It could be an epic trail.
#4])>
5. <([#5 [3] The word "mechanized" refers to motorized uses only. "Mechanized" should not be used to refer to bicycles.
#5])>
Thanks for the opportunity to comment.

Garry Baker


000461_multiplenames_20160912_MontroseCtyBOCC Organization: Montrose County Commissioners, Ron Henderson
Received: 9/12/2016 12:00:00 AM
Commenter1: Ron Henderson - Montrose, Colorado 81401 (United States)
Organization1:Montrose County Commissioners
Commenter2: David White - Montrose, Colorado 81401 (United States)
Organization2:Montrose County Commissioners
Commenter3: Gary Ellis - Montrose, Colorado 81401 (United States)
Organization3:Montrose County Commissioners
Commenter Type: Local Government
Classification:
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000461_multiplenames_20160912_MontroseCtyBOCC.htm
(000461_multiplenames_20160912_MontroseCtyBOCC-381914.htm  Size = 6 KB)
Submission Text
Montrose County, Colorado
Board of County Commissioners
161 South Townsend Avenue
Montrose, CO 81401
Phone 970.249.7755
Fax 970.249.7761


August 11, 2010

Ms. Barb Sharrow
BLM Uncompahgre Field Office
2505 South Townsend Avenue
Montrose CO 81401

Dear Ms. Sharrow:

The Department of Interior, through Federal Bureau of Land Management ("BLM"), has

determined that certain portions of the San Miguel and Dolores Rivers, and their tributaries located in Montrose County Colorado, are eligible for designation as wild and scenic rivers under the Federal Wild and Scenic Rivers Act, 16 USC 1271-1287 as amended (the "Act"). The eligibility was made following a study carried out this year by the BLM Uncompahgre Field Office of whether or not the rivers qualified as eligible for designation. The final study report was published in June of this year.

The process is now in the "suitability" phase, with public comment due to the Bureau of Land Management Uncompahgre Field Office on August 16, 2010. Under the Act, rivers can be designated as wild, scenic or recreational if the waterways are determined to have scenic, recreational, fish and wildlife, geologic, historic or cultural values, among others. The proposed designation for these rivers and their tributaries is mostly for recreational purposes. A map is included showing the portions of the rivers and their tributaries determined to be eligible for designation.

<([#1 [39.1] On behalf of the citizens of Montrose County, the Board of County Commissioners for Montrose County stand in opposition to the Department of Interior Bureau of Land Management ("BLM") inclusion for designation of portions of the San Miguel and Dolores Rivers, and some of their tributaries located in Montrose County under the Federal Wild and Scenic Rivers Act, 16 USC 1271-1287 as amended (the "Act"). On August 11, 2010, the County, acting through its Commissioners adopted Resolution #45-2010 opposing these designations. A copy of the Resolution is included.

These waterways flow through private land holdings, as well as those of the BLM, and land in the unincorporated areas of Montrose County. Many of the private land owners have owned and protected their land for many years. The waterways, and adjacent land, are already being used for recreational purposes where appropriate. The adjacent land that is a part of the BLM holdings, as well and the County land, is also being used for recreational purposes, where and when appropriate. As is obvious, there is no need to designate them for recreational purposes, since they are being used as such. #1])>

The citizens of Montrose County, in collaboration with their County government, are in the best position to protect the future of the County and determine its course and direction. They have a vested interest in protecting these waterways for both current and future generations to use.

The need to consider responsible energy and mineral development is of prime importance to the nation. We simply must look to every resource available and keep all potential avenues open for that development to prevent being totally dependent on foreign energy sources from unstable governments that do not have our nation's best interest in view. Areas of land close to these eligible waterways contain the potential to contribute greatly to future energy and mineral development for the country. To close the door to that potential by designating the selected portions of these rivers and their tributaries under the Act is not in the best interest of country as a whole.

<([#2 [39.1] In addition to those already mentioned, there are multiple other reasons for not placing these waterways [San Miguel and Dolores Rivers] under the Act. These rivers and their

BLM_0156247

tributaries are in the FEMA flood plain. To designate them under the Act would be to compromise needed health, safety and welfare protections for control of water flow to prevent flooding. It would also compromise the ability to control wildfires in the area and to properly route county traffic flow. The designation could also have a negative economic impact on the County. It stands to limit private landowners from utilizing their land to their determination of highest and best potential. In this time of economic hardship for many, to compromise the economic health of Montrose County by imposing limitations on the agricultural community, as well as land use ability, would create additional economic burdens.

These rivers and their tributaries have adequate protection under the current system of state and federal laws, including BLM regulations, as well as Montrose County land use regulations. To add another layer of government regulation and barriers would create a very fragmented system of regulations. #2])>

For these reasons, as well as others, we, the Montrose County Board of County Commissioners, on behalf of the people of Montrose County Colorado oppose the designation of portions of the San Miguel and Dolores Rivers and their tributaries located in Montrose County as Wild and Scenic Rivers under the Wild and Scenic Rivers Act. We respectfully request that you deny this designation.

Sincerely,
Ron Henderson, Chairman
David White, Vice Chairman
Gary Ellis, Commissioner

Enclosures
[Enclosure 1: Resolution #45-2010, August 11, 2010]
[Enclosure 2: Individual WSR Segment Comments]


000462_SanMiguelCoBoardofCommissioners Organization: San Miguel Counties Board of Commissioners
Received: 2/17/2017 10:03:22 AM
Commenter1: - Telluride, Colorado 81435
Organization1:San Miguel Counties Board of Commissioners
Commenter Type: Local Government
Classification:
Submission Category:
Submitted As:
Form Letter Category:
Form Letter Master:
Current Task: To be parsed Assigned/Due: mmccarter
Attachments: 000462.htm (000462_SanMiguelCoBoardofCommissioners-400042.htm Size = 22 KB)
Submission Text
10/30/2016 DEPARTMENT OF THE INTERIOR Mail Fwd:

W&SR Questions UFO

Plan (3 attachments)

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=1571f6af6e95eea3&siml=1…   1/2

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

Fwd: W&SR Questions UFO

Plan (3 attachments)

1 message

Jones, Gina <gmjones@blm.gov>  Mon, Sep 12, 2016 at 11:20 AM

To: BLM_CO UFO_RMP <blm_co_ufo_rmp@blm.gov>

Forwarded

message From:

Sharrow, Barbara <bsharrow@blm.gov>

Date: Mon, Sep 12, 2016 at 11:15 AM

Subject: Fwd: W&SR Questions UFO

Plan (3 attachments)

To: Roy Smith <r20smith@blm.gov>, Dana Wilson <dmwilson@blm.gov>, Angie Adams <angie.adams@empsi.com>,

"John (Bruce) Krickbaum" <bkrickba@blm.gov>, "Sherman (Edd) Franz" <Edd_Franz@blm.gov>, Jedd Sondergard <jsondergard@blm.gov>, Gina Jones <gmjones@blm.gov>

The following letters have come from Montrose and San Miguel Counties. They came during cooperating agency review

of draft. We may get more from them by Nov 1.

Barb

Forwarded

message From:

Magee, Deborah (Maggie) <dmagee@blm.gov>

Date: Fri, Sep 9, 2016 at 2:54 PM

Subject: Re: W&SR Questions UFO

Plan (3 attachments)

To: "Sharrow, Barbara" <bsharrow@blm.gov>

WSR suitability comments from Montrose and San Miguel county BOCCs are attached.

D. Maggie Magee

970.240.5323 office

970.208.4328 mobile

dmagee@blm.gov

Planning & Environmental Coordinator

BLM Colorado Southwest District

On Fri, Sep 9, 2016 at 1:30 PM, Sharrow, Barbara <bsharrow@blm.gov> wrote:

Angie,

Do you know if Montrose County or San Miguel County commented on UFO RMP W&SR suitability anytime in process

to date?

Barb

Forwarded

message From:
Smith, Roy <r20smith@blm.gov>
Date: Fri, Sep 9, 2016 at 1:05 PM
Subject: W&SR Questions UFO
Plan
To: Barbara Sharrow <bsharrow@blm.gov>, Dana Wilson <dmwilson@blm.gov>, "Sherman (Edd) Franz"
<efranz@blm.gov>
10/30/2016 DEPARTMENT OF THE INTERIOR Mail Fwd:
W&SR Questions UFO
Plan (3 attachments)
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1571f6af6e95eea3&siml=1… 2/2
Have our cooperating agencies, especially Montrose County and San Miguel County, made any comments to BLM
concerning our suitability determinations? If Montrose County didn't suggest any changes to our draft determinations,
that would be very good to know for the upcoming CWCB meeting.
Roy
E. Smith
Water Rights, Instream Flows, Wild and Scenic Rivers
Bureau of Land Management
2850 Youngfield St.
Lakewood, CO 80215
phone: 3032393940
email:
r20smith@blm.gov
Gina
Jones
BLM Southwest
District NEPA Coordinator
2465 S. Townsend Ave.
Montrose, CO 81401
Office: 9702405381
Cell: 9705899852
gmjones@blm.gov
3 attachments
WSR Suitability 10081600 Montrose Cty BOCC White.pdf
3512K
WSR Suitability 10081601 Montrose Cty BOCC.pdf
6867K
WSR Suitability 11011901 San Miguel Cty BOCC.pdf
9248K
SAN MIGUEL COUNTY
BOARD OF COMMISSIONERS
ELAINE FISCHER

January 19,2011
Barbara Sharrow, Manager
Bureau of Land Management
Uncompahgre Field Office
Attention: RMP Revision
2465 South Townsend Avenue
Montrose, CO 81401
Email: UFORMP@BLM.GOV
ART GOODTIMES JOAN MAY
Re: Wild and Scenic River Eligibility Report and Suitability Determinations
Dear Ms. Sharrow:

San Miguel County would like to thank BLM and the Sub-Rac members for informational pres~ntations by BLM and DOW staff in our local communities. The opportunity to ask questions and hear local input was very helpful in evaluating the stream segments in the study area found eligible for Wild and Scenic River (WSR) designation as to their suitability for such a designation.

The local economies in San Miguel County are inextricably dependent on the attraction of our natural assets to provide for their long term sustainability. As a region, we have determined that while traditional industries contribute to our economy and the character of our county, our economic future will continue to be dependent on tourism as a primary engine. A recent socioeconomic analysis (attached for your reference) developed to analyze the potential impact of a new uranium mill noted the economies of Western Montrose and San Miguel County exhibited ongoing economic vitality despite the stagnation or decline in the traditional economic bases. The dynamic, non-traditional parts of these counties new economic bases included:

• The growth of income not associated with the current labor force activities including retirement and investment income.
• The retention and attraction of retirees and their "footloose" income
• The immigration of new residents and businesses
• The growth of a visitor economy including tourists, recreationists, and second home owners. .

The study indicated that many of these new sources of economic vitality are associated the attractiveness of this region as a place to live, work, do business and raise a family as well as a place to visit or live part time. The report noted that "this underlines the reality of ongoing economic development supported by amenities or quality-of-life characteristics. It also underlines the economic threat associated with any economic activities that degrade those amenities or quality of life."

P.O. BOX 1170 • Telluride, Colorado 81435 • (970) 728-3844 • FAX (970) 728-3718
www.sanmiguelcounty.org

The waterways analyzed in the WSR eligibility report represent an important component of these natural amenities. This is supported by the data contained in the report "Commercial River Use in the State of Colorado 1988-2009" which showed the number of boater days on the San Miguel growing from 50 in 1988 to 5,969 in 2008. There are certain to be corresponding increases in the number of fishermen using the river. A September 26, 2006 study prepared for the DOW "The Economic Impacts of Hunting, Fishing, and Wildlife Watching in Colorado" estimated the economic contribution of

fishing in San Miguel County in 2007 to be $8,440,000. This same study found the total impact of Wildlife Watching to be $1,218,200,000 statewide in Colorado. The waterways and their associated riparian areas analyzed in this study, represent some of the richest and most important areas in the region.

The 2005 Report Card, The Ecological Health of the San Miguel River Watershed, gave the San Miguel watershed an Overall Watershed Health GP A of "C". This report, in its discussion of "N atural Processes" in the San Miguel watershed reports "flooding and a hydro graph altered by 354 recorded reservoirs retaining 64,110 acre feet, and 1,401 diversions totaling 3,631 cfs"

This highlights the need for proactive protection of the Outstandingly Remarkable Values (ORVs) found by the interdisciplinary (ID) team in the most unique and exceptional segments of the region's waterways. These areas are natural assets that will-yield economic and ecological returns indefinitely. San Miguel County believes these stream segments warrant the management that best provides for the conservation of these values. We further believe that with regard to sensitive warm water fish species there should be preemptive measures taken to avoid listings under the Endangered Species Act and the potential for a federally mandated water management plan being imposed on some waterways. We are primarily concerned with the segments in the San Miguel and Dolores Hydrologic Units as we believe these contribute significantly to our local economies.

The San Miguel County Board of Commissioners therefore makes the following comments and recommendations and requests the Sub-Rac and BLM make the following findings on specific stream segments:

Beaver Creek

We believe this segment should be found suitable for Wild and Scenic (W &S) . deSIgnatIon WIth a classIficatIOn of"Scenic. Also this segment's management is largely controled by BLM as the river segment is 99.5% federal with little private lands included in the half mile corridor. We believe this determination best serves the public interest.

Dry Creek

The BOCC believes this river segment should have a finding of "suitable" with a classIfication of Wild. Wee agree with the ID team that this is a visually exceptional area offering a uniqae opportunity to observe geologic processes in a localized area. Its primItIve naure and intriguing geologic features represent ORVs warranting protection. In addition, this segment's management is largely under the control of the BLM, as the river segment is 99.3% public and the lands in the half mile corridor are 97.1 % public. We believe this designation best serves the public interest.

Naturita Creek

The San Miguel County BOCC believes this river segment should be found "suitable" for W&S designation with a classification of "Scenic". This segment contains public lands of outstanding primitive character in San Miguel County frequented by county residents and visitors. It is adjacent to National Forest lands proposed for special protections based on their wilderness character. We would like to see similar protective management on this river segment, particularly for the portion in San Miguel County. We believe the primitive nature of the public lands and the ORV as a tributary used as a spawning area for tfiree BLM and Colorado sensItIve SpeCIeS and its value in the upper reaches of the

segment as a wild trout fishery warrant this designation. We believe this finding would best serve the public interest.

Saltado Creek

The BOCC believes this river segment should be fouml'suitable" for W &S designation with a classification of "Wild". We agree that asuperior (A-ranked) riparian forest with occurrences considered globally vulnerable is deserving of this designation. We concur with the ID team that this is an ORV warranting protection. This river segment and corridor is over three quarters federally owned putting most of the lands under management by the BLM. Other private landowners are also in support of such designation. This corridor is essentially free of development and is extremely primitive. We believe this designation best serves the public interest.

San Miguel River, Segment 1

The BOCC believes this river segment should be found to be'suitable" for W &S designation with a classification of "recreational," We concur with the ID team that this segment contains ORVs that include scenic, recreational, wildlife, historic, vegetation, and paleontology. This segment has the greatest contribution to our local economies due to its wide range of ORV s and proximity to population centers. This segment also has special significance because of its location on a scenic byway and outstanding accessibility and exposure to the driving tourist. It has the most outstanding opportunities for fishing, kayaking, rafting, and wildlife watching.

This segment affords the driving public with a unique opportunity to enjoy one of the most spectacular trips through a remarkable river canyon that can be found anywhere, exposing outstanding geology. In addition, it has great cultural and historical significance. The section of this segment below Leopard Creek, inspite of its proximity to a highway, is very natural in appearance due to its largely Federal and Nature Conservancy ownership. This affords BLM a high degree of management control. This is in evidence with the tasteful and appropriately scaled recreational facilities BLM has developed.

This segment contributes millions of dollars to our local economies and defines the experience of traveling through San Miguel County. The BOCC believes these ORVs warrant protection and it is in the best interest of the public that this river segment receives this designation.

San Miguel River, Segment 2

The BOCC believes this segment should be found to lie-"suitable" for W &S designation with a classification of "Wild" . We concur with the ID 'team tJJjlt-t~is segment contains scenic, recreational, wildlife, and vegetation ORVs.

The ID team assigned the segment a Scenic Classification of "A." We agree with this assessment. This is the most natural and undeveloped segment of the San Miguel River exhibiting an outstanding variety of superior ranked plant communities, some of which are globally vulnerable. It has the most outstanding old growth Ponderosa/Spruce forests and riparian areas found on the San Miguel. As one of the finest examples of Southwest Canyon Riparian Habitat, recognized as the richest terrestrial bird habitat in North America, the area it is host to over three hundred bird species. It is an outstanding natural asset for wildlife watchers.

It also contributes greatly to our local economy as a favorite opportunity for boating and fishing. The outstanding character of this segment is documented in the comment by the

DOW Fisheries Biologist "this segment does nearly reach Gold Medal fishing; the best fishing in the San Miguel. The angler attitudes about their experience are extremely positive, regardless of sometimes low catch rates. This is a rare phenomenon as most fishing experiences are measured as positive based on successful catch rates." This speaks volumes about the other ORVs that can be experienced in this segment. With 100% of the river and 98.3% of the corridor in federal control the BLM has an outstanding opportunity for management of this segment to protect these ORVs.
This area is essentially primitive and is perhaps the most outstanding segment of the San Miguel. We believe it represents an irreplaceable natural asset which can continue to support our local economies indefinitely. We believe this segment's ORVs warrant special protection and are deserving of this designation. We believe this designation best serves the interest public.

San Miguel River, Segment 3
The BOCC believes this segment should be f0urid "suitable" ~or W &S designation with a classification of "scenic." Although this segment is substantially impacted by diversions for the CCC Ditch, we believe it has the ORVs of recreation, fish, wildlife and vegetation noted by the ID team. This segment contributes substantially to our local economy by being a favorite of kay akers due to the opportunities "The Ledges" area offers for "play waves." In addition, it has outstanding Southwest Canyon Riparian Habitat with more than 300 bird species observed. The relatively easy primitive road affords excellent opportunities for the driving and less active user to have access to outstanding wildlife watching opportunities.
In addition, this segment harbors exemplary population of three BLM and Colorado native fish species. We believe it is in the public interest that these fish and their habitat, as well as the other ORVs, be protected by the recommended designation.

San Miguel River, Segments 5 and 6
The San Miguel County BOCC believes these river segments should be fourr~~'siii;bi~~ for W &S designation with a designation of Recreational. We concur with the 'fll1QLl!g~oJ.; the ID team that these segments have recreational, fish, historic and vegetation related ORVs. The Unaweep-Tabeguache Scenic Byway, which parallels the river through both of these segments extends into San Miguel County and connects to the San Juan Skyway. This route is very popular for the driving tourist and contributes to our local economies. It provides outstanding opportunities for photography and viewing of historic remnants. The Hanging Flume has been added to the National Register of Historic Places and is a remarkable historic feature. The Nature Conservancy Tabeguache Preserve is also within this reach, representing a significant portion of the private land that will be managed for conservation values. This Byway is promoted nationally and internationally and we believe it plays an important role in bringing driving tourists and travelers into our county . We believe it would be beneficial to have a continuity of management throughout this corridor.
Additionally, this area contains an intact native warm water fishery containing exemplary populations of BLM and Colorado sensitive species. These segments also supports populations of New Mexico Privet riparian shrublands and other vegetative associations considered globally imperiled. We believe these ORVs warrant protection and it is in the public interest that they receive the designation suggested in the Eligibility Report.

Tabeguache Creek Segments 1 and 2

BLM_0156254

The BOCC concurs. with. the I? team ~h~t ~~ese stream segments contai~_~~~v~ge~f ?_n and cultural values Identified In the EllgIbIlIty Report and should be fouJl~_"s~!table" ToI'\ W &S designations with the classification of "Wild" in the upper segment and "Recreational" in the lower segment. We believe the superior (A-ranked) occurrences of woodland shrubs and presence of globally vulnerable plants warrant protection. The lower reach has outstanding cultural values that should also be protected. The upper reach is exceptionally wild; the stream is 100% federally owned and the corridor is 99.4% publicly owned. This affords the BLM an outstanding opportunity to manage the land ina fashion that preserves the identified ORVs. The lower section contains more private land and we therefore believe the "Recreational" classification is appropriate. However we believe these segments should receive the suggested designation to protect the outstanding vegetation and cultural values as well as the wild character of the canyon.

Lower Dolores

The BOCC believes this segment should be found "suitable" for W &S designation with a classification as "Scenic." This segment is paralled by a continuation of the Unaweep-Tabeguache

Scenic Byway. We believe this Byway is an outstanding regional economic asset that brings driving travelers and boaters into San Miguel County. We concur with the ID team that this segment has outstanding scenic, recreational and geologic value. The Scenic Byway is promoted nationally and internationally and consistently receives high acclaim from those traveling it for the first time. With the tourist destination being developed at Gateway, we anticipate there will be many return travelers to this region based on their initial experiences.

In addition, we again stress the need to protect the "exemplary populations" of three sensitive warm water native fish species. Colorado has committed to actively participate in this effort. This segment has additional importance as historic habitat for a federally endangered species, the Colorado pikeminnow.

We believe it is in the public interest that this segment's ORVs be protected and that it receive the designation suggested in the Eligibility Report.

La Sal Creek, Segments 2 and 3

The San Miguel County BOCC believes stream segments 2 and 3 should be found "Suitable" for W &S designation with the classifications of "Scenic" for segment 2 and "Wild" for segment 3. We agree with the ID team that these segments both have ORVs for fish and vegetation containing an intact warm water native fish species as well as globally imperiled riparian woodlands.

These segments are almost entirely public land affording BLM with an excellent opportunity to manage for maintenance of these ORVS. This area is often frequented because of its outstanding scenic values by San Miguel County residents accessing by the county road or from the Dolores River. This is an exceptionally primitive canyon offering excellent opportunities for hiking, photography and wildlife watching. We believe these stream segments represent a significant economic natural asset to the region and the ORV s identified warrant protection.

The San Miguel County BOCC wishes to thank the BLM staff for all their efforts in assessing regional waterways and identifying and highlighting the outstandingly remarkable natural values we have the privilege of being able experience and enjoy in this ·region. We appreciate your outreach and consideration of our recommendations.

BLM_0156255

We also wish to thank the Sub-Rac for their efforts in hosting local meetings. As a local government we look forward to working with BLM to preserve the natural capital our quality of life and economy depend on.

Sincerely,

SAN MIGUEL COUNTY, COLORADO

BOARD OF COUNTY COMMISSIONERS

Joan May, Chair

With a finding of Suitability, a stream segment and the corresponding corridor will be managed to protect the ORV's but little additional funding would be needed. Upon designation a stream corridor would require some additional funding for signage, public education, ranger patrolling, and maintenance, the amount of which would vary depending on the expected increase in visitor use, and the size, location and other attributes of the stream segment.

000463_LamarP_20161101   Organization:   Paul Lamar

Received: 12/7/2016 1:13:48 PM

Commenter1: Paul Lamar - Paonia, Colorado

Organization1:

Commenter Type: Individual

Classification: Nonsubstantive

Submission Category: Unique

Submitted As: E-Mail

Form Letter Category: Unique

Form Letter Master:

Current Task: Review Assigned/Due: zghali

Attachments: 000463_LamarP_20161101.htm (000463_LamarP_20161101-387499.htm Size = 1 KB)

Submission Text

Date:11/01/2016

Commenter:Paul Larmer

Organization:

Email:paul@hcn.org

Address:Paonia, CO

Phone:

Comment:

See attached letter and photos. Thanks.

For people who care about the West.

Dear BLM:

I am writing to urge you to maintain all lands with wilderness qualities in their within the RMP, and expand the Adobe Badlands WSA to the west, as outlined in the citizen's alternative. I hike these lands often, and they provide an incredible, quite experience just minutes away from Delta. This weekend, however, I saw three motorcyclists carving new tracks through the WSA. See the attached photo. They were having fun, but there are plenty of badlands to the east for them to enjoy without disrupting the rare beauty, ecology, and quite of the Adobe Badlands.

Obviously, protecting these lands in name is not enough. There needs to be better signage that clearly restricts motorized access to these lands, and a more consistent presence of BLM staff.

Thank you for your consideration,

Paul Larmer
Paonia, Colorado

000464_MalleckC_20161101  Organization: Cynthia Malleck
Received: 12/7/2016 1:19:49 PM
Commenter1: Cynthia Malleck - Grand Junction, Colorado 81501 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000464_MalleckC_20161101.htm (000464_MalleckC_20161101-387501.htm Size = 2 KB)
Submission Text
Date:11/01/2016

Commenter:Cynthia Malleck

Organization:

Email:cynthiamalleck@gmail.com

Address:1410 White Ave, Grand Junction, CO 81501

Phone:

Comment:
Hello,

Thank you for extending the period to comment as the past few months have been busy, and though my comments are short, I appreciate your consideration.

BLM_0156257

As a resident of the western slope for eight years which included working in Olathe and living in Montrose last year, I am in strong support of Option B.1 on the planning report.

As a native of Colorado, I have seen my access to clean air and clean water depleted over a lifetime. I have also witnessed first hand the loss of habitat and habitat fragmentation for wildlife. Eight years ago I moved to the western slope from the Front Range, away from where I was born, raised and where I obtained two college degrees. I moved to the western slope to have access to cleaner air, and also cleaner water, better access public lands and hunting as well as high quality local produce and orchards.

Our public land resources are most important for providing clean air and clean water and land for wildlife and hunting. Secondarily they are best used for sustainable tourism. Option B.1 best supports these most important uses of our public lands. The other options are a detriment to our clean air, our clean water, wildlife uses etc. and a detriment to our quality of life on the western slope. Any other option in the plan does not protect these most valuable resources.

Thank you for your additional efforts to involve the local communities on this extremely important issue for our most valuable resources, our clean air, our clean water and the subsequent medical health benefits of protecting these resources on our communities!

Sincerely,

Cynthia Malleck
Field Biologist and Physical Therapist Assistant

1410 White Ave
Grand Junction, CO 81501
cynthiamalleck@gmail.com


000465_McGarryJ_20161101_HasAttach Organization: Jane McGarry
Received: 11/1/2016 12:00:00 AM
Commenter1: Jane McGarry - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Flags:
Attachments: 000465_McGarryJ_20161101_HasAttach.htm
(000465_McGarryJ_20161101_HasAttach-388485.htm Size = 13 KB)
UFORMP_000465_McGarryJ_20161101_HasAttach.pdf
(000465_McGarryJ_20161101_HasAttach-388486.pdf Size = 131 KB)

BLM_0156258

Submission Text
Jane McGarry <westelk@tds.net> Tue, Nov 1, 2016 at 12:09 PM

Dear Public Servants at the BLM,

Thank you for the opportunity to comment on the Bureau of Land Management – Uncompahgre
Field Office (BLM-UFO) Resource Management Plan (RMP).

Thank you for BLM's hard work on the RMP? it is a big improvement over RMP documents in
the past.
We feel that only Alternatives B and B1 adequately address planning for long-term and UFO-
wide wildlife habitat and for non-consumptive and less intrusive recreation, like hiking, biking,
camping, and fishing. The other alternatives do not adequately address the lack of habitat
connectivity and scarcity of undeveloped core areas of habitat in the region.

We think the BLM-UFO RMP document contains sufficient reasons to incorporate all of the
EEAs and LWCs and nearly all of the ACECs from Alternative B into the final preferred
alternative. This is the most important part of the plan for long-term preservation of the
remaining wildlife core areas and connectivity of the UFO. We also support Alternative B1
regarding oil and gas development, and Alternative B regarding NGD stipulations.
Specifically, these points are all made again in Table 2-6, Summary Comparison of
Environmental Comparisons, especially on Lines 6 and 9 (No ground disturbance), Line 15 (Fish
and Wildlife / EEAs), Line 18 (Special Status Species), Line 34 (LWCs), Line 43 (Fluid
minerals), Line 65 (ACECs), and Line 87 (socioeconomics).

Finally, we encourage the BLM to take examine No Exit: Fixing the BLM's Indiscriminate
Energy Leasing, published by The Wilderness Society (
https://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web.pdf   ).

This draft RMP proposes to lease nearly 95% of the acreage within the UFO analysis area. Since
the U.S. is now producing much more oil and gas domestically than it is using, while damaging
more habitat and nonmineral resources than at any time in our country's history, it makes no
sense for the BLM to continue wide-scale and wholesale leasing.

The oil and gas glut is projected to continue for the near future, while the extinction of flora and
fauna species is likely to accelerate. Is the BLM abandoning its multipleuse mandate in favor of
leasing to multinational corporations for speculative purposes? This overemphasis on leasing is
contrary to the spirit and letter of the recent Paris Agreement on Climate Change. How can the
U.S. assure the rest of the world that we will reduce greenhouse gases as soon as possible while
simultaneously encouraging domestic fossil fuel extraction via the BLM's leasing program? The
BLM should analyze its energy leasing program and site-specific projects as they relate to the
Paris Agreement and the quantities of greenhouse gases either both generated or prevented from
entering the atmosphere.

Following are our comments on specific lines of the alternatives and their impacts:

-Table 21, page 2-11, Restrictions for Ground Disturbing Activities, No Ground Disturbance. Alternative B is excellent. This is very important. The other alternatives do not include enough NGD.

-Lines (L) 17-19 (from Table 2.2). BLM discusses this on page 4-151, and we concur. "These protections would provide the most intact natural landscapes, the greatest amount of corridor conservation for species movements, and the greatest resiliency against climate change or other longterm changes that might require species or communities to move over time." The actions here are the same, but they all require preserving connectivity, which requires incorporating all of the Ecological Emphasis Areas (EEAs) from Alternative B into the preferred alternative.

-L 44. No lease setbacks. The larger setback from Alternative B1 is better.

-L 45 to 50, and 55. No Surface Occupancy stipulations as described for Alternatives C and D do not allow for as much protection of this critically important resource as the No Lease stipulation. Under Alternatives C and D, horizontal drilling could occur subsurface under a flood plain, irrigation canal, reservoir, or water course,
introducing the possibility of major water pollution and degradation. The rationale for larger setbacks and/or No Lease stipulations can be found by examining how far toxic chemical plumes have traveled at various locations Lease stipulations can be found by examining how far toxic chemical plumes have traveled at various locations around the state, such as at the leaking underground storage tanks and chemical use facilities at Commerce City and Denver. For example, the underground volatile organic compound (VOC) plume and Superfund cleanup at Chemical Sales Co. covered 5 square miles.

-L 50. Municipal water setbacks. The larger buffer in Alternative B is better.

-L 69. Exemplary, ancient, rare, and relict vegetation. Only Alternative B has NGD and NSO stipulations, which
should be in the final preferred alternative.

-L 71. Nongame wildlife. Alternative B is good. We disagree with Alternative D's plan to manage all land mainly for resource production and big game, except for special designations and a few others. All of the proposed EEAs and Areas of Critical Environmental Concern (ACECs) from Alternative B should be included in Alternative D.

-L 103-105. Ecological Emphasis Areas (EEAs). Only Alternative B is sufficient, as is made clear from evidence on page 4-129 and 130, and Volume 3 Appendix D introduction. All of the EEAs in their full size and management
from Alternative B should be incorporated into the final preferred alternative. Reasons include the need for more elevations for wildlife to use in adapting to climate change? the historic loss of most migration routes, which should be considered under cumulative impacts of past management? and the importance of big game to local economies.

-The Naturita, Dry Creek, Tabeguache, and Adobe EEAs should be carried forward to the preferred alternative in their full Alternative B sizes. Adobe, as it is in Alternative D, is

BLM_0156260

insufficient because much of the whitetailed prairie dog habitat is omitted (burrowing owls here).

-L. 127. Migratory birds. Alternatives B and D are good. Lines 126 and 128 mention species lists but do not
describe possible actions. Habitat should be protected year round, even when the birds are not nesting.

-L 133. Special Status and Sensitive Species (SSS). Some combination of Alternatives B and D would be better. Alternative D doesn't include enough habitat protections. Apparently no Pinyon-Juniper species are included in Alternative D.

-L. 177. NGD in prairie dog towns. Alternative B is better because of the slightly earlier closure, but NGD should apply all year, because of the two prairie dog species and other SSS that rely on them.

-L 178. No shooting in prairie dog towns. Hunting could be allowed, but not target shooting. How can one state that BLM is trying to preserve the Special Status Species otherwise.

-L251. Visual Resources. Alternatives B and B1 are much better for wildlife and recreation. As stated in Volume 2, page 4-132, Visual Resource Management (VRM) Classes I and II are important.

-L 265. Lands with Wilderness Characteristics (LWCs). LWCs are indeed the core areas regarding wildlife, as stated on page 4-154. All of the few remaining eligible areas should be managed to protect their wilderness characteristics (i.e., manage all 42,150 acres of LWCs under Alternative B).

-L 332-336. No Leasing (NL) and No Surface Occupancy (NSO). We generally agree with Alternative B1
regarding Line 333, No Leasing and Line 336 No Surface Occupancy stipulations. NSO is especially needed for Exemplary vegetation, all EEAs, the larger four-mile buffer around Gunnison sagegrouse leks, VRM Class 1, and for the areas described in Alternative B1's list, including setbacks from water, agricultural areas, and big game migration corridors. The 1,000ft. setbacks of Alternative D are inadequate, given the daily multiple leaks at oil
and gas operations in Colorado. See the above discussion of leaks and VOC plumes. The Draft RMP offers no legitimate rationale for the levels of leasing in Alternative D. L 380. Special Recreation Management Areas (SRMAs). We favor SRMAs in general and support BLM's effort to manage these areas through zones. We worry about the possibility of stimulating too much human activity in some of the most important wildlife habitat, which is discussed well on page 4135.

Recreation, especially motorized recreation, has to be planned carefully in or near the EEAs and other important wildlife areas. Most of these areas, such as Jumbo Mountain (in its Alternative B full size), are probably fine. It is difficult for the public to assess how the areas overlap with which uses and zones in the different alternatives. BLM must plan this very carefully, regardless of what general comments say. Dry Creek, Spring Canyon, and Ridgway/Kinikin Hills might be

especially important ones to look at closely.

-L 478 and 480. Travel closures. Alternative B is better because it has more ACECs and EEAs and includes elk calving areas.

-L 524to 528. Areas of Critical Environmental Concern (ACEC). We support Alternative B. Proposed areas that don't qualify have already been eliminated. La Sal, Salt Desert, and Tabeguache should be included in the final preferred alternative. Others, including the Gunnison Sagegrouse ACECs, should get at least EEA or similar status.

-L 586. Wild and Scenic Rivers. It is hard to see why any of the segments that are really suitable would not be included. Alternative B makes more sense.

-Page 3-66. Habitat fragmentation is understated. Typically, species (such as Sage grouse) that can afford disturbance the least are discounted because they have already declined. Changes resulting in habitat fragmentation usually only benefit the few species (ravens, red fox) that are increasing, causing further damage to struggling species.

-Page 3-80. Prairie dogs. BLM accurately says threats include plague, habitat loss and rec shooting. BLM has most of the responsibility for the survival of these two declining species and for the other species that depend on them.

-P 3-82. Burrowing owls. Burrowing owls have been yearly for the last several years in the part of the Salt Desert ACEC that is not proposed as an EEA in Alternative D, according to reports on West Slope Birding Network (WSBN) on the internet.

Volume 2, pages 126-135. This section (4.3.5 Environmental Consequences, Fish and Wildlife) is very good, and explains in detail why only Alternative B satisfies the Multiple Use components of wildlife and non-motorized recreation, especially regarding LWCs, EEs and ACECs. All of the travel management and energy citations on pages 129 and 130 should be considered in every part of the RMP.

-Page 4-8. Cumulative impacts. Migrating elk is a good example of a resource that has been affected by past
and current actions. This is exactly the case (along with mule deer) throughout the UFO and is why we believe all of the proposed EEAs from Alternative B should be in the eventual preferred alternative.

-Page 4-142. Special Status Species. The bullets on NGD and especially on roads are good. Road density and distance of roads from Special Status Species is as important as anything in this plan. This is why we need more EEAs, LWCs, and ACECs in Alternative D.

-Page 4-153. This summarizes what we think is the most important part of the RMP, and why we want to see all of these potentially protected areas put into the final preferred alternative. BLM discusses the much lessened impacts to Special Status Species under alt B, due largely to the larger area of EEAs and ACECs.

-Pages 4-460 and 461. Special designations, including wilderness, increase nonmarket values, property values,
and local economic activity. Actions that emphasize resource development have greater impacts on nonmarket
values and quality of life. This applies especially to oil and gas development.

-Page 4-484. NEPA requirement for short term use versus long term productivity. Alternative B provides the greatest longterm productivity. This should be a big part of planning, and it makes it hard to justify considering the more resource producing intensive alternatives.

-Volume 3, Table B-6, No Ground Disturbance stipulations for surface disturbing activities. Alternative B is
excellent. Alternative D does not have enough regarding soil, wildlife, visual resources, cultural, hydrology, public water, SRMAs, or ACECs. The LWC stipulations in Alternative D should be extended to all or most of the above.

Thank you for considering our comments. We look forward to the final Resource Management Plan.

Jane McGarry and Chuck Behrensmeyer
Paonia, Colorado


000466_McGavinR_20161031 Organization: Rick McGavin
Received: 10/31/2016 12:00:00 AM
Commenter1: Rick McGavin - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000466_McGavinR_20161031.htm (000466_McGavinR_20161031-387502.htm
Size = 8 KB)
Submission Text
Date:10/31/2016

Commenter:Rick McGavin

Organization:

Email:mcgavinrick@yahoo.com

Address:PO Box 1805, Paonia, CO 81428

Phone:

Comment:
We would like to thank the BLM for the ongoing efforts of the Uncompahgre Field Office in developing a reasonable Resource Management Plan that safeguards all resources in the North Fork Valley. Specifically, we appreciate the inclusion of the North Fork Alternative, or B1, as part of the draft RMP. This locally driven proposal ensures protection of the entire Gunnison Watershed, supports farmers, protects public health, sustains ecological well-being and allows for continued building of a sustainable rural economy. We request that the BLM adopt the North Fork Alternative in the final RMP.

We think that at a minimum the issues that need to be addressed and considered are:

a) analysis of the impacts of hydraulic fracturing and multi-drilling technologies.
b) the cumulative impacts of unregulated gas gathering pipelines.
c) the impact of extreme weather causing flooding, mudslides and geological instability, which can compromise the integrity of pipelines and result in leaks and potential explosions.
d) the impact of permanently removing water from the hydrologic cycle.
e) injection wells and the potential for earthquakes and contamination of aquifers.
f) the impacts on human health
g) that ozone levels already exceed the EPA threshold of 70ppb in certain areas.
h) community source water protection plans.
i) impacts on hunting due to changes in wildlife migration and reproduction habits.
j) impacts on currently used recreation areas

Our valley is growing and people are moving here for a clean and healthy lifestyle. Our valley is moving away from singular dependence on mining, oil and gas development to an economy focused on organic food, outdoor recreation and the opportunity to raise young families in a healthy environment.

We own four business in this valley; a retail liquor store, a jewelry store, a karate dojo and we own rentals. Most of our karate students are either involved in the organic food business or moved here to provide their young growing families with a clean, healthy life style. This would be negatively affected by large scale oil and gas development. Our retail wine business and jewelry business is also supported by persons who again moved here for the North Fork lifestyle.

The BLM must adopt a management plan that protects these resources which make Paonia and the North Fork Valley such a special place. Inappropriate development over the next twenty years has great potential to cause air and water pollution, which would significantly degrade Paonia residents' quality of life.

The BLM should consider the uniqueness of the North Fork Valley in adopting the final RMP. We have Gold Medal fishing, prized big game hunting, and award-winning fruits, vegetables, and wines which can all be harmed by air pollution or surface or ground water contamination that are inevitably associated with oil and gas extraction.

Clean water is one of the greatest assets to the North Fork Valley, and as we move into the 21st century it will become increasingly important. The North Fork Alternative stipulates that a buffer area of a half of a mile from all source water supplies oil and gas surface activities be maintained. We strongly support this part of the Alternative plan.

In addition to drinking water, irrigation water is a major concern in and around the town of Paonia. Irrigation waters are used not only for animals but the farms and orchards that are highly regarded throughout the state for providing high quality products. Many of these farms and orchards are certified organic and any contamination would jeopardize this certification.

In the last few years we have seen a major growth in hops, cider and organic food production in this valley. It's very exciting. These products are sold to many places around the nation, making the valley's future America's future. Unforeseen contamination in this valley could significantly impact the land and subsequently the agricultural industry that is vital to the economic stability of this area. Mineral leasing and severance tax funds will not compensate for the loss of agricultural endeavors and its attributed labor force.

<([#1 [14.1.1] Any proposed areas open for leasing in the final RMP that are on or near critical wildlife habitat, such as the Roeber State Wildlife Area, which is designated as a critical habitat area by the Division of Wildlife, should be protected from any potential negative impacts from oil and gas development. This particular area is a calving area for elk and is closed in the winter; any human disturbance could affect the wildlife calving or migration.

The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat. #1])>

Furthermore, areas which are in close proximity to town limits and are used for recreation must be protected from potential damage due to oil and gas development. In addition to the concerns about the impacts on local recreation areas, any development in these potential parcels would severely impact our already degrading roads. Heavy truck traffic is cause for concern at the municipal level. Not only would the increase in traffic cause real damage to the surfaces of our roads, there would be an increase in exhaust fumes and dust which would settle into the valley and deteriorate air quality. The North Fork Alternative, B1, considers all of these protections and ensures that these valuable assets remain intact.

<([#2 [27.1] We strongly encourage the BLM to designate Elephant Hill and Jumbo Mountain as a Special Recreation Management Area (SRMA) and manage it as such. This designation would allow an area that is already being predominantly used for recreation, such as hiking, biking, hunting, equestrian and ATV use to be managed and maintained for the quality of these uses. We use the area for daily recreation and exercise, one of the great things about being residents of this valley. Management of this area should benefit from BLM resources that will ensure that the trails remain safe and that residents and visitors will enjoy a high-quality experience. #2])>

On a personal note, we have a vested interest in the hunting and recreational activities that take place in proximity to these wildlife areas as these types of activities create an economic interest

for us.

The RMP as written is an inappropriate use of public lands. It would open almost every acre of public lands in the region to leasing (865,970 acres or 94.5% of total oil, gas, and mineral acreage), and specifically in sensitive air, water and food sheds. The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.

The potential for human, animal and environmental damage is too high.

We ask that the BLM adopt the North Fork Alternative to the RMP instead of the Preferred Alternative.

Thank you for your consideration in this matter,

Rick and Jennifer McGavin
North Fork Karate, Tridea, West Wine and Spirits, McG 3 LLC
PO Box 1805
Paonia CO 81428


000467_McGuireO_20161031_HasAttach Organization: Eugenie McGuire
Received: 10/31/2016 12:00:00 AM
Commenter1: Eugenie McGuire - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Flags:
Attachments: 000467_McGuireO_20161031_HasAttach.htm
(000467_McGuireO_20161031_HasAttach-388489.htm Size = 15 KB)
UFORMP_000467_McGuireO_20161031_HasAttach.pdf
(000467_McGuireO_20161031_HasAttach-388494.pdf Size = 360 KB)
Submission Text
Oogie McGuire <oogiem@desertweyr.com> Mon, Oct 31, 2016 at 1:12 PM

Eugenie (Oogie) McGuire
Desert Weyr, LLC Hi
Performance Black Welsh Mountain Sheep www.DesertWeyr.com
LambTracker Open Source Flock Management Software www.LambTracker.com
16870 Garvin Mesa Rd
Paonia, CO 81428
28 October 2016

BLM_0156266

Dear BLM-UFO Staff and RMP Comment Team,

Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft Resource
Management Plan. As presented, none of the alternatives offer the level of protection these lands warrant,
that communities and the public in your planning area have specifically asked for and favored, and which
federal law requires.

Desert Weyr, LLC is a small farm located in Paonia Colorado. We own the second largest flock of Black
Welsh Mountain Sheep in North America and are a cooperating researcher with the US Department of
Agriculture, National Animal Germplasm Program conducting basic research into sheep reproduction.
The RMP does not provide a full look into all the issues related to extensive oil and gas development in the
area.

We have a number of specific concerns.

The first issue is that the North Fork Alternative should be included as an option in every proposed version.
The North Fork Alternative, B1 was hammered out by the communities after a long and arduous process. It
provides the minimum level of protection we need for our critical farming lands in the North Fork valley
and must be included in every proposed alternative. Only with it included can we make a fair comparison
of all the various alternatives.

The RMP does not include a no leasing option. That option would provide the highest protection for our
irreplaceable views, clean air and water and new economy and must be included for the BLM to comply
with it's hard look requirements at alternatives. No leasing is a reasonable alternative given the geologic,
environmental and economic problems with any oil and gas development.

Within the preferred alternative D the BLM is proposing to open to oil and gas drilling over 90% of the
public lands. However in the Reasonable Foreseeable Development Final Report the BLM failed to take
into account the changes in hydraulic fracturing and multi-drilling technology. The report is

BLM_0156267

based on
analysis done in 2004, over 12 years ago. The technology has changed so dramatically and there are so
many more reports of earthquakes and other harms that the BLM must look more closely as the current
state of the science regarding potential harms. As shown in Oklahoma there can be no mitigation from the
geologic risks and that alone is a reason to prefer a no leasing alternative.

Another issue is that all the rural gas gathering pipelines are not required to have any inspection and they
are at risk of leaks and ruptures that could destroy critical wildlife habitat as well as contaminate the air and
water that is the lifeblood of our agriculture economy. The developments will crisscross critical wildlife
habitat, irrigation systems and geologically active slide and steep slope areas. None of these issues were
properly addressed in the RMP. Even with Colorado's strict guidelines on reporting surface spills and
contamination the network of irrigation systems means that any spill could destroy a ditch company and
send polluted water down onto organic and conventional croplands long before anyone has a chance to
turn off the headgates or perform required clean-up operations. In our case our Terror Ditch Company
water system consists of many miles of ditches and gathering areas in steep terrain that would be severely
compromised by even the simplest of surface spills.

We have significant concerns about potential contamination of our water resources.

Even if drilling and fracking can be performed without any risk of contamination the potential for surface
contamination and spills from even the best managed drilling will cause irreparable harm to the waters of
the valley. Within the last 3 years Garvin Mesa has experienced 3 separate "50 Year" storms that sent water
down stream overflowing all the ditches and culverts. This water spread out over the Garvin Mesa irrigated
lands. These events would have completely overwhelmed any settling ponds and sent the pollution from
those ponds directly into our fields. Once contaminated the effect is permanent. There can be no mitigation from the effects of the air and water pollution from these events. The only reasonable course is to
totally prevent any drilling at all anywhere within the North Fork valley.

BLM_0156268

As documented as far back as 1992 surface contamination of drinking water can cause death in livestock.

The article "Toxicosis in Sheep Following Ingestion of Natural Gas Condensate" R. Adler, H. J. Boermans,

J. E. Moulton and D. A. Moore published in Veterinary Pathology 1992 29: 11 DOI: 10.1177/030098589202900102 describes the loss of 30 ewes who had a single day exposure to contaminates from gas drilling. These sheep died even though they had access to fresh drinking water.

Many of the areas proposed for development in the preferred alternative are adjacent to Garvin Mesa or are

within the watershed for the Terror Ditch and Reservoir Company irrigation system. Desert Weyr, LLC

depends on this water to provide irrigation water for the pastures and orchard and to provide drinking

water for our livestock. The risk of a catastrophic contamination of our ditch system puts our rare breed

sheep at risk. There is no compensation or mitigation that can cover the loss of the critical genetic diversity

that our flock represents.

The RMP also fails to protect the water supplies of the local towns and small water companies. We have significant concerns about the removal of water from our local environment. Contaminated

drilling fluids are proposed to be pumped back into the ground and all drilling removes some water from

the hydrological cycle. There was no discussion of the potential impacts to irrigation and weather system by

the removal of that water and the destruction of clean water. Even closed loop systems use good water. In

our desert environment with drought a constant threat it is irresponsible for he BLM to ignore the impacts

of water removal on the local environment.

We have major concerns about air pollution.

The RMP does not take into account the increased haze and dust from the miles of surface roads that

would be required to develop in the area. With the Black Canyon nearby as well as other Wilderness areas

any loss of visibility and clear air impacts the recreational and view shed areas.

Cornell University published their findings from a study of the impacts of gas drilling on food animals.

"Impacts of gas drilling on human and animal health." Bamberger M, Oswald RE Department of Molecular Medicine, Cornell University, Ithaca, NY 14853, USA. Because animals often are exposed

continually to air, soil, and groundwater and have more frequent reproductive cycles, animals can be used
as sentinels to monitor impacts to human health. The findings illustrate which aspects of the drilling
process may lead to health problems. Complete evidence regarding health impacts of gas drilling cannot be
obtained due to incomplete testing and disclosure of chemicals, and nondisclosure agreements. Without
disclosure of everything used in the drilling process it is impossible to effectively test the environment for
contaminants.

Yet another scientific paper, "An Exploratory Study of Air Quality near Natural Gas Operations" by Theo
Colborn, Kim Schultz, Lucille Herrick, and Carol Kwiatkowski has been peer reviewed and accepted for
publication by Human and Ecological Risk Assessment. This research looked at the air pollution from even
a totally closed loop drilling and fracking procedure. Closed loop is being touted by the industry as a way
to eliminate the risks from air pollution but this research indicates that it is ineffective at reducing
exposures to the endocrine disrupting chemicals that affect reproduction.

Our flock is over 10% of the entire North American population of Black Welsh Mountain sheep but is
responsible for over 30% of the breeding population. The loss of any animals from this flock in the event of
a single exposure to toxic chemicals from gas drilling would represent a significant threat to the continued
genetic diversity of the entire North American population.

The National Oceanic and Atmospheric Administration has been conducting studies in oil and gas fields
across the nation. They are finding huge increases in ozone near oil and gas wells.

http://www.esrl.noaa.gov/news/2009/winter_ozone.html A recent study of the Denver-Julesburg Basin in
northeastern Colorado by the National Oceanic and Atmospheric Administration found elevated levels of
methane coming from well sites. NOAA scientists say initial results from another study show high
concentrations of butane, ethane and propane in Erie, east of Boulder, where hundreds of natural-gas wells
are operating. These airborne contaminants would cause permanent harm to the reproductive capacity of

BLM_0156270

our sheep flock. These risk have not be discussed in the RMP. There is no way to mitigate the problems
posed by this activity.

We are in year twelve of a major research project in cooperation with the USDA. Our research focuses on
reproduction in sheep. The known problems from air and water pollution and their effect on the
reproductive systems of our sheep would render them useless for the research if there is any drilling activity
within the valley. At Desert Weyr, LLC we have had a weather station in operation for over 15 years. Our
data show a constant wind flow that moves up and down the valley. Any contaminants anywhere in the
valley will find their way to our farm and impact our sheep flock.

Within the RMP the BLM did not even consider that their own models show that ozone levels have
exceeded EPA guidelines. Thus any increase due to development is foolhardy.

As part of the Garvin Mesa Wine Loop we give farm tours all summer in cooperation with local wineries.
This food and drink based tourism is a major portion of our business. The visual impacts from the drilling
rigs, lights, dust and increased traffic would make our area undesirable for these tourists. Our customers
come to the valley to enjoy the scenery, clean air and ready access to local public lands for hunting, fishing,
mountain biking, hiking to name a few uses. These uses are incompatible with oil and gas development.
The BLM also ignored the impact that additional oil and gas development would have on our ability to
counteract climate change. The BLM should only propose alternative that fully comply with federal rules
regarding reducing carbon emissions. We need to move beyond fossil fuels and cannot support this type of
development in our critical food shed. It is inconceivable that the BLM did not provide a no leasing option
to provide the highest protection for our irreplaceable views, clean air and water and new economy.
We have concerns about the visual and scenic values.

While within the RMP many areas were considered important scenic vistas there was insufficient analysis of
how the scenic views from private lands on the mesas in the North Fork valley affect the economics of the
wineries, agri-tourism and recreational users who are becoming the primary economic drivers in

the valley.

The increase in broadband internet capability in Paonia has fostered a number of new businesses moving in.

These businesses are comprised of people who can live anywhere in the world they choose to as long as

there is internet. They have come to the North Fork for our good food, clean air, and water and recreational

opportunities. The RMP did not take into account the impact that development of oil and gas would have

on the perception os the people who are coming in to replace the lost coal mining jobs.

Desert Weyr, LLC also provides meat to local restaurants and consumers through our on-farm retail store.

Our customers depend on additive free meat from our pasture finished flock. Any perceived contamination

will negatively impact our business.

According to the BLM: "It is the mission of the Bureau of Land Management (BLM), an agency of the

Department of the Interior, to manage BLM-administered lands and resources in a manner that best serves

the needs of the American people. Management is based upon the principles of multiple use and sustained

yield, taking into account the long-term needs of future generations for renewable and nonrenewable

resources."

The proposed alternative violates the mission statement of the BLM because it does not administer the

lands to serve the needs of the American people and it does not take into account the long term needs of

future generations. By definition all oil and gas development cannot be sustained. Once the resource is

removed from the ground it is gone. The surface impacts from such development will adversely impact the

other uses of the land. This violates the BLM mandate for sustained yield.

Specifically the preferred alternative D ignores a number of recent scientific studies and does not take into

account the rapidly changing economics of our valley. Nowhere in the RMP is there any discussion of the

number of organic farms and the risks that any development pose to this growing source of local income.

The North Fork is home to Colorado's largest concentration of organic farms and any perceived or real

contamination of those farms through even the best managed oil and gas extraction will devastate

an
economy already hit hard by the loss of coal mining jobs.

Our farm depends on tourism to sell our products. Visitors have already expressed dismay that there might
be any oil and gas drilling. We have been unable to sell our breeding rams to people who are concerned
about the existing gas development up the Muddy and the risks of reproductive harm due to the VOCs that
drift in the winds that bathe our mesa daily. To expand this to include oil and gas development as far as the
eye can see will effectively destroy our entire business.


000468_MillerL_20161031 Organization: Linda Miller
Received: 10/31/2016 12:00:00 AM
Commenter1: Linda Miller - Telluride, Colorado 81435 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000468_MillerL_20161031.htm (000468_MillerL_20161031-387503.htm Size = 1 KB)
Submission Text
Date:10/31/2016

Commenter:Linda Miller

Organization:

Email:bosque2@earthlink.net

Address:Telluride, CO 81435

Phone:

Comment:
Dear Decision Makers:

The task before you is daunting: a vision of management for the next 20+ years.

BLM staff has the scientific expertise necessary to protect the resource, however, the balancing
act to prioritize values expressed by the public is an impossible task. I would suggest that the

BLM_0156273

guiding factors should be: climate change and the population explosion affecting Colorado.

Too many people and a scarcity of water, The BLM cannot provide multiple uses, it is time to put protection of the resource first.

Good luck,
Linda J. Miller
Telluride, Colorado
81435


000469_MilvenanE_20161025  Organization: Eileen Milvenan
Received: 10/25/2016 12:00:00 AM
Commenter1: Eileen Milvenan - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000469_MilvenanE_20161025.htm  (000469_MilvenanE_20161025-387504.htm
Size = 14 KB)
Submission Text
Date:10/25/2016

Commenter:Eileen Milvenan

Organization:

Email:emilvenan1@gmail.com

Address:14099 Thompson Road, Paonia, CO 81428

Phone:

Comment:
Dear Teresa Pfifer,

Please fully consider the issues raised in my comments on the Uncompahgre Field Office draft Resource Management Plan. The BLM did not conduct a human health impact assessment in its Draft Resource Management Plan, and there has been inadequate risk analysis to date. It is my professional opinion that the health risks to newborns and pregnant mothers, and to children and adults are significant enough to warrant much more analysis. A moratorium pending further study is the only responsible way to protect the current and future generations in the North Fork Valley.

BLM_0156274

I am a Neonatologist (Pediatrician with subspecialty care of hospitalized critically ill newborns with birth defects, prematurity, and low birth weight) of 33 years experience, and I am also a North Fork Valley resident.

In 2011 my husband and I purchased 12 acres of land in Paonia, Colorado on which to build a farm and spend our retirement. While my husband will most certainly submit a comment about the ways this plan and its alternatives will personally affect us, the Paonia community, and the beautiful land in the valley, I wanted to focus on some of the troubling information I've uncovered while researching hydraulic fracturing and what we currently know about the health impacts of living in an area where these activities are present.

Allow me to preface my concerns with an analogous illustration of the need for proper risk analysis and impact assessment. Generations of physicians and health care providers have collected evidence to guide programs of therapy in order to optimize short- and longterm outcomes for patients. Through careful analysis over time, treatments that may initially appear beneficial or without significant other complications can be found to have risks of unexpected poor outcomes. As a result, a problematic treatment may be adjusted or even abandoned, but ongoing evaluation of associated risks and benefits is critical to the process. Many treatment studies have been terminated due to evidence that the risk of adverse complications was too great to warrant continuation of the therapy. In the history of neonatology, there is a well-remembered chapter about blindness in premature infants in the 1940s-50s. In the US and other affluent countries, oxygen was piped into incubators because it was improving survival outcomes. However, the long-term effect of this therapy was blindness in a great number of infants (Stevie Wonder is know to be one of those infants). At the time, there was no suspicion that oxygen could be the cause of the blindness, and research efforts took years to discover this fact through precise ongoing monitoring and risk assessment. It is a lesson to those in my field about the critical need for thorough analysis.

<([#1 [41.1] There is growing concern about the potential health problems in children and adults living

near gas drilling, and efforts to quantify these risks are underway. This type of research requires funding and time. Ongoing research results continue to be released, and must be evaluated before expanding the practice of hydraulic fracturing throughout the country. It is particularly important to bring attention to recent findings because the Bureau of Land Management stopped the clock on accepting new information four years ago, and as such, it did not take these findings into account when formulating the Draft Resource Management Plan for the North Fork Valley. The BLM did not conduct a human health impact assessment in its plan. There should be provisions for ongoing risk analysis, and regulations in place for rural gas gathering pipelines under the Pipeline Hazardous Materials and Safety Administration. #1])>

From my more than thirty years of professional experience, I know that any increase in prematurity and birth defects leads to more inpatient hospital days and risk of childhood chronic illnesses, which then leads to significant financial and social problems for the families and communities. The United States overall has shown an increase in preterm births by 20 percent from 1990 to 2006, and ongoing analysis of causes continues. Caring for acute and

chronically ill children has both short- and long-term affects. Besides the specific suffering and quality of life problems for the affected child, the financial and emotional stress on the family is well-documented. Families of children with chronic health problems are known to have higher divorce rates. There are associated community increases in healthcare costs and loss of worker income and productivity. Beyond the potential effect on a developing fetus exposed to gas drilling, there is also uncertainty about the negative impact on developing children. Our community cannot afford uncertainty regarding the health impact that proximity to gas drilling will have on our children.

<([#2 [2] [18.3] Please see below scientific data from studies published in 2015 and 2016 regarding the significant impact on birth defects, birth weight, and infant mortality, collated by Citizens for
a Healthy Community. These studies were cited in The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction), Third Edition, October 14, 2015, by Concerned Health Professionals of New York and the Physicians for Social Responsibility.

• In rural Colorado a study of almost 25,000 births from 1996-2009, congenital heart defects and neural tube defects (defects of the brain, spine, or spinal cord) were associated with the density and proximity of natural gas wells within a 10-mile radius of mothers' residences. There are several chemicals emitted by natural gas development known to increase the risk of birth defects. PSC-C p.76 https://www.ncbi.nlm.nih.gov/p mc/articles/PMC3984231/

• A University of Pittsburgh study of three heavily-drilled Pennsylvania counties found that the more exposure a pregnant woman had to gas wells, the higher her risk for a smallerthan-normal baby. Mothers living nearest to a high density of wells were 34% more likely to have babies small for their gestational age. Low birth weight is a leading cause of infant mortality. PSR-C p72,73

• Health professionals in Vernal, UT reported a 6-fold increase in infant death rates over a three-year period. The air quality which was formerly pristine in Uintah County, UT received an "F" rating for ozone in the American Lung Association's 2013 State of the Air Report. The Uintah Basin has 11,200 oil and gas wells. PSR-C p76. Pregnant women who breathe more air pollution have much higher rates of virtually every adverse pregnancy outcome that exists.

• Preliminary data from researchers at Princeton University, Columbia, and MIT used Pennsylvania birth records from 2004-2011 to assess the health of infants born within a 2.5 kilometer radius of natural-gas fracking sites. They found that proximity to fracking increased the likelihood of low birth weight by more than half, from about 5.6% to more than 9%. The chances of a low APGAR score (a summary measure of the health of newborns at birth) roughly doubled, to more than 5%. PSR-C p.77

• Other preliminary studies from Colorado and Pennsylvania comparing infant birth weights and premature births with proximity to wells had similar findings as above. PSRC

p77; 72-73

We must analyze thoroughly the evidence of the impact of gas drilling on developing children, including incidence of asthma and respiratory problems. The California Council on Science and Technology studied the impacts of exposure to fracking-related air pollution and asserted "officials should fully understand the toxicity and environmental profiles of all chemicals before allowing them to be used in California's oil operations." PSR-C p.72 #2])>

<([#3 [2] I cannot empasize this one enough. Jerome Paulson, MD; Medical Director for National & Global Affairs; Director of the Mid-Atlantic Center for Children's Health & The Environment; Child Health Advocacy Institute, Children's National Health System and Professor of Pediatrics and of Environmental & Occupational Health George Washington University states in a public letter to the Secretary of Pennsylvania Department of Environmental Protection on June 30, 2014:

• "In protecting children from environmental health hazards, it is essential to recognize that for many reasons children may be more exposed to environmental health hazards than adults in the same location. Moreover, children may have different outcomes than adults similarly exposed. For example, children breathe more air and drink more water per unit of body weight than adults do, Therefore, if the air or water are contaminated, the children will receive a higher dose than the adults. Children also live longer than adults. While that may seem self-evident, it is important in the environmental context because many outcomes of environmental exposures occur years after the exposure. If the delay between exposure and outcome is, for example, 40 years or more, as it may well be in terms of some of the chronic lung diseases of adulthood, if a 60 year old adult is exposed, s/he may not live long enough to develop the adverse outcome. A child,
however, will, in all likelihood, live long enough to experience that adverse outcome."

• "As a physician with significant expertise in environmental health, I want to point out that there is no information in the medical or public health literature to indicate that [Unconventional Gas Exploitation] can be implemented with a minimum of risk to human health." http://citizenshale.org/2014/07/physician-warns-pa-dep-to-protect-children-andpregnant-moms/#_edn1 #3])>

<([#4 [2] Please also note the following additional sources that I found useful and informative. I have
pulled and emphasized particularly relevant information below the links, but the overarching takeaway is that there are indications of increased health risks surrounding hydraulic fracturing and more research is needed in order to determine how to proceed safely:

From a December 2014 government (NIH) informational article summarizing hydraulic fracturing and what it means for communities:
https://www.niehs.nih.gov/health/materials/hydraulic_fracturing_and_health_508.pdf

• The National Institute of Environmental Health Sciences (NIEHS) is a branch of the

National Institutes of Health. This agency is involved in funding for research to investigate potential health impacts related to hydraulic fracturing. Some reseearch activities include the following:

· Examining patterns of pregnancy and asthma near the Marcellus Shale (Geisinger Clinic, Danville, PA – led by Brian Schwartz)
· Investigation of pregnancy risks near the Barnett Shale hydraulic fracturing sites (UTHSC – Houston, led by Kristina Whitworth)
· Assessing markers of stress inflammation, cardiovascular health and quality of life (U of C, Denver – John Adgate.) p.2

From an April 2014 reference article associating increase in birth defects and maternal proximity to gas drilling: http://ehp.niehs.nih.gov/1306722/

• This study suggests a positive association between greater density and proximity of natural gas wells within a 10-mile radius of maternal residence and greater prevalence of CHDs [congenital heart defects] and possibly NTDs [Neural Tube Defects], but not oral clefts, preterm birth, or reduced fetal growth. Further studies incorporating information on specific activities and production levels near homes over the course of pregnancy would improve exposure assessments and provide more refined effect estimates. Recent data indicate that exposure to NGD [development and production of natural gas] activities is increasingly common... Taken together, our results and current trends in NGD underscore the importance of conducting more comprehensive and rigorous
research on the potential health effects of NGD.

From a June 2013 article describing a Health Impact Assessment process in Battlement Mesa/Parachute, Colorado: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3698738/

• To fully understand the health impacts associated with natural gas development, extensive research in environmental emissions, community impacts, and health outcomes should be conducted. Regulators, legislators, and planners, however, must make real-time decisions and are often unable to wait for science to catch up. In the absence of good data on the effects of natural gas development on their citizenry, concerned community governments have been invoking temporary moratoriums that may impede even potentially safe natural gas development. In such circumstances, when definitive scientific data are incomplete, HIA methods can provide guidance to community
leaders for the inclusion of health in the decision-making process.

Here is an August 2014 list indicating instances of national groups in government, academia and industry calling for more research on health effects of hydraulic fracturing:
http://mdehn.org/wp-content/uploads/2014/12/calls_for_moreresearch.pdf
#4])>
There are many locations in the United States with hydraulic fracturing in place and ongoing research on health effects on both those living in close proximity to these wells and on the workers. While these investigations continue collecting and analyzing data, the best practice would be to avoid mineral rights leasing on public lands in the North Fork Valley until there is

BLM_0156278

more definitive information about the effects of hydraulic fracturing on the health of the people living here.

Sincerely,

Eileen Milvenan, M.D.

000470_PennettaR_20161026 Organization: Robert Pennetta
Received: 10/26/2016 12:00:00 AM
Commenter1: Robert Pennetta - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000470_PennettaR_20161026.htm (000470_PennettaR_20161026-387506.htm
Size = 4 KB)
Submission Text
Date:10/26/2016

Commenter:Robert Pennetta

Organization:

Email:bobpennetta@gmail.com

Address:

Phone:

Comment:
<([#1 [2] Fracking Linked to Cancer-Causing Chemicals, Yale Study Finds

EcoWatch

EnergyOct. 26, 2016 08:05AM EST

Fracking Linked to Cancer-Causing Chemicals, Yale Study Finds

Yet another study has determined that hydraulic fracturing, or fracking, might be a major public health threat. In one of the most exhaustive reviews to date, researchers from the Yale School of Public Health have confirmed that many of the chemicals involved and released by the controversial drilling process can be linked to cancer.

BLM_0156279

Yale researchers have unpacked "the most expansive review of carcinogenicity of hydraulic fracturing-related chemicals in the published literature."Pixabay

"Previous studies have examined the carcinogenicity of more selective lists of chemicals," lead author Nicole Deziel, Ph.D., assistant professor explained to the school. "To our knowledge, our analysis represents the most expansive review of carcinogenicity of hydraulic fracturing-related chemicals in the published literature."

For the study, published in Science of the Total Environment, the researchers assessed the carcinogenicity of 1,177 water pollutants and 143 air pollutants released by the fracking process and from fracking wastewater. They found that 55 unique chemicals could be classified as known, probable or possible human carcinogens. They also specifically identified 20 compounds that had evidence of leukemia/lymphoma risk.

One of the scarier parts from this study is that the researchers could not completely unpack the health hazards of fracking's entire chemical cocktail. More than 80 percent of the chemicals lacked sufficient data on cancer-causing potential, "highlighting an important knowledge gap," the school noted.

The unconventional drilling rush in the U.S. has expanded to as many as 30 states, spelling major consequences to the air we breathe and the water we drink. The Wall Street Journal reported in 2013 that more than 15 million Americans lived within a mile of a well.

The biggest concern is for people and especially children with fracking operations right in their backyards. In fact, Environment America found that more than 650,000 kindergarten through 12th grade children in nine states attend school within one mile of a fracked oil or gas well.

"Because children are a particularly vulnerable population, research efforts should first be directed toward investigating whether exposure to hydraulic fracturing is associated with an increased risk," Deziel said.

Per the study, "Childhood leukemia in particular is a public health concern related to [unconventional oil and gas] development, and it may be an early indicator of exposure to environmental carcinogens due to the relatively short disease latency and vulnerability of the exposed population."

According to the school, the researchers are now taking air and water samples in a community living near a fracking operation. They are testing for the presence of known and suspected carcinogens and will determine whether these people have been exposed to these compounds, and if so, at what concentrations.

Lorraine is a reporter for EcoWatch. She tweets @lorrainelchow
#1])>

BLM_0156280

000471_NoeD_20161101  Organization: David Noe
Received: 11/1/2016 12:00:00 AM
Commenter1: David Noe - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000471_NoeD_20161101.htm (000471_NoeD_20161101-387507.htm  Size = 36 KB)
Submission Text
Date:11/01/2016

Commenter:David Noe

Organization:

Email:dcnoe@hotmail.com

Address:PO Box 191, Paonia CO 81428

Phone:

Comment:
I am a resident of Paonia, in west-central Colorado's North Fork Valley, and am active in the community there as a volunteer, musician, and, as a recently retired geologist who has conducted research in the region, a source of geologic knowledge. These comments incorporate my unique perspective of knowing the landscape and its resources intimately.

Thank you for your interest in contributing to the economic vitality and the ecological integrity of this fantastic area! With BLM's assistance, I look forward to living a productive life in the valley, and to having a diverse and robust economy that utilizes but also preserves our natural scenery, vegetation and wildlife habitat, sustainable organic agriculture, and clean air and water.

David C. Noe
Paonia, Colorado

Dear BLM-UFO Staff and RMP Comment Team,

Thank you for the opportunity to comment on this document. I am a resident of Paonia since 2015. Before that, from 2006 to 2014, I conducted geologic field studies and made geologic maps for the State of Colorado in the Montrose, Delta, Orchard City, and North Fork areas. In work and now in retirement, I have spent extensive time driving and hiking on BLM lands and

adjacent USFS and private lands in these areas. I have provided geologic maps and expertise to BLM-UFO staff and worked with them from time to time on volunteer projects and geology-related issues. At present I am a board member with the Western Slope Conservation Center in Paonia, where I contribute my expertise on local public-land initiatives and provide public education and outreach.

For this letter, I am providing my own comments as a private citizen. Where applicable, I shall use my knowledge of the region's geology to frame support for various RMP land-use alternatives as proposed by BLM-UFO. I hope that this approach will be valuable and substantive, and that it will be a different approach than is used by other comment writers.

Finally, thank you for your work that went into formulating these alternatives. And, in particular, thank you for considering the community-developed North Fork Alternative for oil & gas leasing, exploration, and development (Alternative B.1) and including it as one of the official alternatives.

Fluid Mineral Leasing (Oil & Gas)

I am in full support of Alternative B.1 ("The North Fork Alternative") as BLM's management plan for oil & gas development in the North Fork area, and Alternative B for the remainder of the BLM planning area. The "North Fork Alternative" (NFA) was conceived by a broad group of stakeholders in the North Fork Gunnison River area, and it considers the protection of air, water, and existing and future uses of private and public land in this region. Although I did not live in the area at the time of its formulation, my coincident geologic mapping in the area was used as part of the background data for the NFA. As a State employee at the time, I could not directly take part in or provide language to the NFA.

Now that I am retired and speaking for myself, I can provide more-specific bases for the geological reasoning behind the NFA's significant reduction in leasable BLM parcels. In short, and beyond the obvious protections of water and agricultural resources in the North Fork area, the NFA reflects that the target production zones for oil & gas drilling in the Piceance Basin do not exist in the North Fork Region:

-<([#1 [2] The Niobrara Formation is the focus of the current oil & gas boom in Colorado. It has prolific
production in the Denver Basin. Niobrara-equivalent strata within the Mancos Shale is productive in northwestern Colorado and in the Piceance Basin. Oil & gas production from this formation is achieved using horizontal drilling and hydro-fracturing of the rock; before this modern methodology was adopted, this formation was long considered to be non-productive. #1])>
-<([#2 [2] In the North Fork area, I mapped the surface outcrops of the Mancos Shale, including twelve different sub-formations (called members). This is the first time that the Mancos Shale has been mapped in such detail. The Niobrara-equivalent strata include the Fort Hays and Smoky Hill Members. References for the geologic-map publications produced by myself and my colleagues are listed at the end of this letter. #2])>

BLM_0156282

-<([#3 [21.1] My mapping in the North Delta, Orchard City, Lazear, Hotchkiss, Paonia, and Crawford quadrangles shows that Niobrara-equivalent strata and older strata in the Mancos Shale are found in extensive outcrops to the north and south of the Gunnison and North Fork Gunnison Rivers in the Delta to Hotchkiss areas, and along Cottonwood Creek, the Smith Fork River, and other tributary drainages in the Crawford area. In these areas, the Niobrara target zone either exists at the ground surface or has been eroded away. In short, the target zone no longer exists and no oil & gas production is possible. These areas would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense.
#3])>

-<([#4 [21.1] To the north of the Niobrara outcrops, there is a topographic escarpment that forms the southern edge of the traditional Piceance Basin. It becomes several thousand feet higher than the adjacent North Fork Gunnison River valley. The Niobrara-equivalent strata are covered progressively, as one goes northward, by overlying formations, including younger members of the Mancos Shale, the Mesaverde Formation, and the Wasatch and Green River Formations. As a consequence of higher-elevation topography and bedrock that dips (tilts) and deepens into the basin northward, a significant amount of overburden strata become present atop the Niobrara zone. For safe oil & gas drilling using horizontal drilling and hydro-fracturing, there needs to be enough overburden to separate the deep "frac'ing" or production zone from overlying, nearsurface aquifers. (I do not know how much overburden is "safe." However, oil & gas promotional literature appears to state that the production depth needs to be 5,000-7,000 feet below the ground surface. I assume that this requisite amount of overburden exists in the central Piceance Basin in order to make for a viable Niobrara play there.) From these relationships, it can be easily inferred that, at the southern edge of the Piceance Basin, there will be a broad area to the north of the Niobrara where there is insufficient overburden to safely and practically develop and produce from the subsurface Niobrara zone. The northern edge of this area (i.e., the boundary between "non-sufficient" and "sufficient" overburden is not known, and is probably highly dependent upon the surface topography, which can vary markedly in the presence of deep tributary canyons. In the most general terms, these areas of insufficient overburden would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense.
#4])>

<([#5 [37.2] -My mapping, and previous geological studies by the USGS in the area show that ground-water from certain formations migrates from deeper in the Piceance Basin to outcrops along the Gunnison and North Fork Gunnison Rivers, forming naturally occurring mineral springs. Many of these springs form along Dakota Sandstone outcrops. However, in the LeRoux Creek valley, I have found and mapped mineral springs that align with the outcrops of limestone-bearing members of the Mancos Shale, including the Juana Lopez and the Fort Hays and Smoky Hill Members. This out-of-basin migration and surface discharge of Niobrara-equivalent formation waters onto the landscape is a potential red flag for oil & gas development, in that it would be potentially risky to perform hydro-fracturing and pump millions of gallons of toxic "frac'ing" fluids into a formational zone that conveys water to and is in contact with surface aquifers and surface streams. The risk, and the velocity at which the ground-water moves through these zones is unknown and unstudied. It should be mentioned ground-water flow and temperature modeling studies done by Lazear (2006; 2009) found that infiltrating surface waters on the southern flanks of Grand Mesa most likely flow downward into the underlying formations before coming to the surface as formation-water seeps and springs. He postulated that vertical fractures with depths of up to 1 km (3,280 feet) influence the apparently deep flow paths of the

ground-water. With regard to oil & gas production and potential contamination of aquifers, the problem is that, because of the geometry of the sedimentary rocks, both formation and downward circulating meteoric ground-waters flow along certain bedrock layers toward the outcrops at the southern edge of the basin, bringing those waters into contact with shallow aquifers and with surface waters. As a result, there is an area of unknown width that extends northward from the springs into the Piceance Basin where "frac'ing" fluids should not be mixed with migrating formation waters on account of transport (of unknown duration) and potential contamination of the surface and near-surface water aquifers and streams. And also very generally, this area (roughly coincident with insufficient overburden area) would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense. #5])>

-<([#6 [21.1] The NFA removes parcels that are coincident or proximal to a number of drinking water springs, both along the North Fork Gunnison River valley between Hotchkiss and Paonia, and on the western flanks of Mt. Lamborn and Landsend Peak. This is an appropriate and necessary protection. It should be noted, however, that some of the allowed leases in the upper Roatcap Creek drainage basin are upstream and up (ground-water) gradient from four drinking water springs. I would urge you to withdraw those parcels as part of your final RMP. #6])>
-<([#7 [21.1] In the northern Piceance Basin, and in northwestern Colorado and the Denver Basin as well, the productive zones in the Niobrara consist of closely stacked layers of limestone, ranging up to 20-40 feet thick and sandwiched between expanses of claystone. The limestone layers are an ideal medium for horizontal drilling, as they are brittle yet soft, and they can yield much oil & gas. The bounding claystones cannot be drilled or developed so efficiently and are not regarded as production targets. My mapping has found that limestones along the Delta-to-Paonia outcrop corridor are present as widely separated, individual beds that are each a foot thick or less. Most of the Niobrara-equivalent outcrops are comprised of claystone. Interpolating, this means that there is a major facies change somewhere in the subsurface Piceance Basin, between the limestone-rich New Castle outcrops and productive oil & gas fields in the north and the limestone-poor outcrops along the southern margin of the Basin. Thin, individual limestone beds cannot be drilled horizontally, and they cannot possibly yield oil & gas in commercially viable quantities. I have taken groups of oil & gas geologists to Niobrara-equivalent outcrops near Delta and Paonia, and they cannot believe they are seeing the same formation that they are drilling to the north! But the difference is real. There is some yet-unknown place beneath the Piceance Basin where the reservoir rock undergoes a facies change and the limestone all but disappears to the south. While it is not up to BLM to delineate that boundary, it is clear that the Mancos strata in the southern part of the Basin do not contain enough limestone to constitute a viable reservoir rock. (As a point of reference, Gunnison Energy's recent Oak Mesa exploratory well was drilled into this limestone-poor Niobrara zone. It was a very costly dry hole.) In a general way, these Limestone-poor areas along the Piceance Basin escarpment areas would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense. #7])>
-<([#8 [37.3] Much of the terrain in the RMP planning area is underlain by Mancos Shale. The Mancos is a prolific contributor to salt and salinity levels in the lower Gunnison River drainage basin. From my work with the interagency Salinity Task Force in recent years, I am aware of efforts that have been done to understand how human actions can increase salt and selenium concentrations in streams, and also of the mitigative activities that have been funded for purposes

of lowering salt and selenium levels. Oil & gas drilling and associated activities, such as road and drilling pad building, emplacement of drainage pits, and erosion of the emplaced infrastructure, would undoubtedly increase the transport of salt and selenium into the local streams. I am concerned that, with the exception of Alternative B.1 in the North Fork (and Alternative B elsewhere), none of the other alternatives offers a means of keeping salt and selenium concentrations at manageable levels.
#8])>

-<([#9 [21.1] Horizontal drilling and hydro-fracturing cannot be done in hard, brittle, silica-rich formations, including the Dakota Sandstone, Morrison Formation, and Entrada Sandstone that underlie the Mancos Shale. All of these formations were drilled and tested during the early to mid 20th century, using conventional vertical drilling, throughout the BLM-UFO planning area. With the exception of a minor oil-production well near Crawford, these wildcat wells were all dry holes. Unlike horizontal drilling, which can exploit target formations in a variety of structural configurations, vertical drilling requires that there must be some type of structural closure or facies change to trap oil & gas in order for production to occur. The previous drilling has already tested those traps, mostly without success. From this, I conclude that a deeper, sub-Mancos oil & gas resource does not exist in the North Fork and nearby areas. #9])>

-<([#10 [21.1] [3] Please note that the Cozzette and Cameo Sandstone Members of the Mesaverde Group, which are listed as potential conventional drilling targets in the RMP document (page 3-120), do not exist in the North Fork area. My mapping shows that these zones pinch out to the west, near North Delta/Cedaredge. This lack of conventional targets in the North Fork area further justifies the limiting of leases in the North Fork area, as provided in Alternative B.1.
#10])>

<([#11 [21.1] In the paragraphs above, I have outlined many reasons why the Niobrara-equivalent strata of the Mancos Shale constitute a very poor to non-existent oil & gas play, based on geologic mapping and the distribution and character of the formation. I believe that there is a mistaken assumption – that all potentially leasable parcels on BLM lands are also potentially productive. If all of the parcels were potentially equally productive, then removing parcels from leasing would constitute a serious loss of oil & gas production and income. However, this assumption is most definitively untrue, for the reasons noted in the previous paragraphs. Removing a large number of low-quality or outwardly unproductive parcels will not have a large effect on the oil & gas production potential of BLM lands.

"The North Fork Alternative" plan (Alternative B.1) removes most of these parcels from leasing, and rightfully so. All of the other alternatives introduce leasing into these areas of very poor production potential, and are therefore inappropriate, impractical, and economically unsound. Lease restrictions would be of little use if the resource is not there! The remaining parcels that are leasable under Alternative B.1, particularly in the Oak Mesa area, probably have low economic potential. After the failure of the Oak Mesa well, I would be surprised if those parcels are actually drilled in the future. #11])>

For BLM-UFO lands that are not covered under the NFA (including the Cedaredge area and south of
Delta), I would imagine that many of these same basic geologic limitations would be in play.

This would mean that viable target production zones do not exist in those areas, as well. Unlike the North Fork, however, this has not been studied for these other areas. I strongly suggest that Alternative B is the most appropriate alternative for these other areas. Alternatives A, C, and D are entirely inappropriate, not only because they afford inadequate protections to land and water resources, but also because maximizing leasable parcels will not result in huge gains in oil & gas production in this region.

My other concerns for oil & gas development in the North Fork area include the following:

-<([#12 [18.3] Induced earthquakes seismic activity. In my work at the state geological survey of Colorado, we were well aware of the effect of deep, waste-fluid disposal injection wells in causing seismic instability and earthquakes. Colorado contains some famous and well-documented examples (including the Rocky Mountain Arsenal near Denver, the Rangely oil field, the Raton Basin coal gas play near Trinidad, and the U.S. Bureau of Reclamation's brine injection well near Bedrock. In addition to general concerns to the public, induced-earthquake hazards are a potential threat to coal mine operations and the Paonia Reservoir dam. Many of the hillsides in the North Fork area are comprised of metastable to active landslides and sandstone cliffs that regularly produce rockfalls. These hazards are recognized by the Colorado Geological Survey, which names the North Fork Gunnison River corridor and the 2nd -highest landslide hazard area in Colorado (Rogers, 2003). The additional occurrence of induced earthquakes in this area could potentially increase the frequency and magnitude of damaging landslides and rockfalls.
#12])>
-Water and air quality. Any plan involving oil & gas needs to contain provisions for protecting the water and air quality in the North Fork area. The valley contains an extensive infrastructure of domestic and private drinking water supply systems (many of which are sourced from groundwater springs) and irrigation systems (canals and ditches that support organic agriculture). Clean water is essential for these systems and their uses, and must be protected from potential spills. Riparian health must be protected, as well. The North Fork area is influenced by daily up- and down-valley breezes. Higher-elevation oil & gas operations could contribute to potential degradation of down-valley air quality by increasing the concentrations of dust, methane, VOCs, ozone, and other particulates and gases hazardous to public health.

-<([#14 [37.3] Water supply. The North Fork Gunnison River is already mostly allocated to supporting organic agriculture. The river has a short annual period of snowmelt runoff. During the summer months, when water is shunted into numerous irrigation canals, the stream flows at a trickle. It would appear that the additional water needed to support extensive oil & gas drilling and disposal operations is not available from the North Fork drainage basin. #14])>

-<([#15 [30.3] Economic impacts. Oil & gas development would have an adverse effect on recreation, agritourism,
scenic viewsheds, and real estate in the North Fork area. This part of Colorado is gaining renown for it idyllic character, organic farming, recreation lifestyles, and for its clean air and water. Compared to long-cycle employment opportunities that exist here from coal mining, boom-and-bust oilfield economics offer little in the way of long-term economic solutions. #15])> Given these varied and serious concerns, the only alternative in BLM's RMP that provides adequate

protections for the North Fork area is Alternative B.1.

Coal Mineral Leasing

Coal mining has been a livelihood of the North Fork populace for over a hundred years. Unlike the oil & gas industry, which relies on a largely imported work force and works in short boom-and-bust cycles, the coal mines have provided longer-term, high-paying employment. Mine workers and their families make up an important part of our communities. The coal mines themselves have been good neighbors to the North Fork community, providing severance taxes, sponsorships, and participating in conservation and stream-health monitoring initiatives (including a pilot methane capture initiative). The Western Slope Conservation Center (WSCC) has historically been supportive of coal mining in the North Fork area so long as the ecological function of the North Fork Gunnison River is maintained. The high quality of North Fork coal is a source of pride in the community. However, a series of recent events have occurred that have significantly slowed coal production and shuttered two of the three remaining mining operations.

In assessing BLM's RMP alternatives for coal leasing, I find that I am most supportive of Alternative B. This alternative has the smallest amount of leasable acreage; however, I agree that the excluded areas are those such as Areas of Critical Ecological Concern, which warrant protections and would therefore be incompatible for coal leasing. Ultimately, I believe that market forces and governmental actions will influence the amount of actual leasing that will take place in the UFO-managed area over the next 20 years. The focus would still be in the North Fork area, because of its higher quality of coal versus the other coal fields in the UFO-managed area. All new mining initiatives should be assessed in terms of environmental impacts and contribution to climate change. I would encourage BLM to continue to pursue partnership opportunities for methane venting as an alternative power source.

I favor the stipulations listed in the North Fork Alternative (Alternative B.1) that call for no oil & gas leasing within 0.25 miles of various types of coal leases, with the exception of methane-capture wells. This only makes sense to me, as coal mining and oil & gas exploration are non-compatible land uses and should not have overlapping footprints. Maximum economic coal recovery should be managed.

Recreation Management Areas

<([#16 [27.1] North Delta. I am quite familiar with the lands contained within the North Delta off-road area, as a consequence of my geologic mapping fieldwork studies. I support designating it a Special Recreation Management Area (SRMA) (Alternative B), rather than an Extensive Recreation Management Area (ERMA) (Alternative D). The call for a more comprehensive management plan is warranted, in my mind, because of the geologic character of the Mancos Shale. This is one of the few areas of the Adobes where ice-age streams did not flow; it is a bypass area. As a result, there are few gravel-capped mesas. Instead, there is an abundance of shale peaks, cuestas, and rounded summits, forming an extensive badlands terrain that is quite susceptible to erosion. This high erodibility of the landscape is a cause for a more comprehensive scrutiny and long-term management of off-road land uses here #16])> .

<([#17 [27.1] Jumbo Mountain. Again, I am quite familiar with this area because of my geologic mapping fieldwork studies, and also because I mountain bike and hike in the area. The BLM is aware of the numerous, "citizen-built" trails that have been constructed in this area. At present, this trail systems represents a minor draw for out-of-town tourists, and a source of revenue for businesses in the town of Paonia. I applaud the BLM for recognizing this, and for proposing two variants of Special Recreation Management Area (SRMA) status that would bring the trail system under federal management. The preferred alternative (Alternative D) is limited to the present extent of trails, on the western flank of Jumbo Mountain. A potential problem here is that motorized travel is not represented. The SRMA under this scenario is OK for biking and hiking, by motorized vehicle use would be incompatible. I prefer Alternative B, which features a much-expanded SRMA that encompasses most of Jumbo Mountain. This larger area holds promise for future, managed recreational uses, including a possible minor expansion of the mountain bike trail system, plus the possibility of locating motorized off-road vehicle and dirt-bike trails around the bulk of Jumbo Mountain, in its central and eastern parts. I feel that this is an opportunity to account for numerous recreation uses for Jumbo Mountain, while giving incompatible or conflicting uses their own territories. With the opportunity for increased future recreational uses comes an opportunity for the town of Paonia to capitalize and prosper from those uses. This is the time to seize that opportunity and manage it properly. Thank you for proposing these areas! #17])>

<([#18 [27.1] Kinikin Hills. Similar to the Adobe Badlands and McDonald Creek, this is an area of Mancos Shale and gravel-capped hills near Montrose. I am quite familiar with this area as a result of my geologic mapping. Among other things, it contains some notable geologic features, including (a) upland gravel deposits of a prehistoric river system (termed "the Bostwick River") that existed prior to the development of the modern Uncompahgre River valley, and (b) a deposit of the Lava Creek B tephra, an ashfall deposit that came from an enormous volcanic eruption in Wyoming's Yellowstone region, about 640,000 years ago (see Noe and others, 2007 for discussions). I support Alternative B for this area, which calls for a Special Recreation Management Area (SRMA) and non-motorized day use. I feel that this is an appropriate plan for managing the full range of Adobes-type terrains here. #18])>

Lands With Wilderness Characteristics and Areas of Critical Ecological Concern

<([#19 [9.1] Adobe Badlands. This area is just to the north of the town of Delta. The agency-preferred Area of Critical Ecological Concern (ACEC) (listed as the agency-preferred Alternative D in the RMP) is a rather small area of very pristine Adobes badland landscape that contains various ice-aged, mesa-top gravels and shale peaks to the west of Petrie Mesa. Although lacking certain wilderness characteristics, in my geologic-mapping ramblings I have found it to contain stunning scenery; the sense of solitude there is almost unbelievable!

I much prefer Alternative B, with its provisions for a much larger ACEC that includes the root area near Petrie Mesa but extends far to the north, south, and west, as far as the U.S. Highway 50 corridor. Though broken by some large "island" parcels of private land, this large ACEC contains a rather complete complex of Adobes landscape types. In addition to many more gravel mesas and shale peaks, it also contains extensive mud-fan complexes (which are not present in the smaller, Alternative D area). The result is that the expanded ACEC would contain a greater

biodiversity and greater protection for the specialized types of plants that occupy all of the Adobes ecological niches. In particular, the mud-fan complexes house a large population of prairie dogs, which in turn are an important food source for many species of raptors. The mud-fans and shale slopes in this area are often encrusted with biotic soil crusts that favor the clayey soils. (And, interestingly, include the Delta Range Munitions Response Site for unexploded ordnance!) The northward extensions extend into the mid-slope area of Grand Mesa, and into pinon-juniper forests and shrublands. I urge you to adopt the alternative (Alternative B) that allows for the opportunity to manage an entire interconnected ecosystem, and not just parts of it. #19])>

<([#20 [20.1] Alternative B also contains the provision of designating an area of Lands With Wilderness Characteristics (LWC) ("Adobe Badlands Adjacent") along the middle slopes at the southern tip of Grand Mesa. This is to the north of the proposed ACEC, and it borders USFS lands that are on the higher slopes of the mesa. I have been near this area a few times while doing my geologic mapping. But mainly, I found it to be largely inaccessible due to lack of roads, as well as landslide terrain that supports heavy pinon-juniper forest and shrubland growth. In other words, it contains many things that are earmarks of wilderness characteristics! I would imagine that this type of terrain is under-represented in the LWC realm, and so I would encourage you to adopt this area as a LWC. #20])>

<([#21 [27.1] McDonald Creek. I know this little-visited area well as a result of my geologic mapping. It contains some varied, upland and Adobes-type terrains. The bedrock is Mancos Shale and many of the mesas are gravel capped. This area is somewhat similar to the Adobe Badlands/Devils Thumb area near North Delta and the Kinikin Hills area near Montrose. I could not find in the RMP document a specific listing of potential use alternatives or designations for this area, except for being named as an Ecological Emphasis Area, grouped along with Jumbo Mountain (RMP Appendix A, Figure 2-2). It possibly contains the Lone Cabin, Elephant Hill, and Youngs Peak ('C' Hill) areas, as well. Because of the geologic and ecological similarities of this area with the Adobes Hills and Kinikin Hills, I would support a use alternative (such as an Extensive Recreation Management Area, or ERMA designation) for McDonald Creek and the other nearby areas that is in line with the Alternative B designation for that area. #21])>

<([#22 [2] Needle Rock. I support the maximum level of protection for this unique landform. Please note, for future interpretational materials and signage for this area: In our geologic mapping of the Crawford quadrangle (Noe and Klink, 2015), my colleague and I have devised a new and different interpretation for this intriguing geologic feature! Rather than being an eroded volcanic neck, we re-interpret it to be the crown dike at the top of a buried igneous laccolith of unknown size. We need to test this amongst other geologists by writing and publishing a peer-reviewed paper. If the idea seems to have merit, I would be happy to work with BLM-UFO staff in the future to create new interpretive materials. #22])>

As a general statement, I believe that the time is now to enact the highest levels of protection for all of the unique landform areas within the UFO-managed area (e.g., SRMA'S instead of ERMA's, ACEC's instead of nothing at all). It will be difficult to upgrade the protection status in the future, particularly working within a 20-year time frame. I thank you for including these designations and opportunities within your RMP alternatives.

Other RMP Resource Management Plan Categories

I am pleased to see that many of the agency preferred actions (Alternative D) are the same or close to the actions listed in the "conservation" actions (Alternative B) for RMP items such as Climate Change, Land Health, Soils and Water Resources, Vegetation, Weeds, Wildlife, Special Status Species, Wildland Fire and Ecology Management, Cultural Resources, Paleontological Resources, Visual Resources, Forestry and Woodland Products, and Livestock Grazing. For all of these items, I hope that you will adopt Alternative B over Alternative D in all cases where the two alternative differ, as this will best protect the integrity and function of the lands from erosion and other degradations. In all cases, I believe that Alternatives A or C are not warranted at all, as they do not provide for adequate resource protections.

In the North Fork area, the "North Fork Alternative" (Alternative B.1) contains specific and strong stipulations that were designed to protect the integrity of that watershed and its vegetation and wildlife. As I've already discussed, this alternative makes the most sense for the North Fork area for geologic reasons. The proposed stipulations not only make good sense for limiting potentially negative effects of oil & gas drilling, but they additionally provide other beneficial protections for those lands. Wherever possible, I urge that you adopt the stipulations detailed in Alternative B.1.

In Conclusion

Again, I thank you for considering my comments. I have attempted to approach these issues from a
geology perspective, based on my expertise and knowledge of the northern part of the BLM-UFO
district, and in particular, the North Fork Gunnison River valley. I am also a resident of this area. You have no doubt received many letters extolling the sustainable rural economy of the North Fork, and the need for protecting those resources and life activities. Clean air and fresh water, viewsheds, and the support of organic farming and high-quality coal production are important to me, as well. I hope that you will consider adopting Alternative B.1 into your management plan wherever possible.

Sincerely,

David C. Noe
Geologist, retired
P.O. Box 191
Paonia, CO 81428

References

Lazear, G.D., 2006, Evidence for deep groundwater flow and convective heat transport in mountainous terrain, Delta County, Colorado, USA: Hydrogeology Journal, v. 14, p. 1582-1598.

BLM_0156290

Lazear, G.D., 2009, Fractures, convection and underpressure – hydrogeology on the southern margin of the Piceance basin, west-central Colorado, USA: Hydrogeology Journal, v. 17, p. 641-664.

Noe, D.C., 2015, Geologic map of the Paonia quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 15-08, 50 p., scale 1:24,000.

Noe, D.C., and Klink, A.T., 2015, Geologic map of the Crawford quadrangle, Delta and Montrose Counties, Colorado: Colorado Geological Survey Open-File Report 15-06, scale 1:24,000.

Noe, D.C., Logan, Z.D., McCall, K.J., and Warden, G.W., 2015, Geologic map of the Lazear quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 15-08, 11 p., scale 1:24,000.

Noe, D.C., Morgan, M.L., Hanson, P.R., and Keller, S.M., 2007, Geologic map of the Montrose East quadrangle, Montrose County, Colorado: Colorado Geological Survey Open-File Report 07-02, 92 p., scale 1:24,000.

Noe, D.C., and Rodgers, E.L., 2014, Geologic map of the Hotchkiss quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 14-15, 41 p., scale 1:24,000.

Noe, D.C., White, J.L., and Nelson, M., 2015, Geologic map of the North Delta quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 15-09, 9 p., scale 1:24,000.

Noe, D.C., and Zawaski, M.J., 2013, Geologic map of the Orchard City quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 13-05, 40 p., scale 1:24,000.

Rogers, W.P., 2003, Critical landslides in Colorado – a year 2002 review and priority list: Colorado Geological Survey Open-File Report 03-16, 55 p., 1 map plate, scale 1:500,000.

CC.'s Submitted Electronically

Teresa Pfifer, Field Manager, BLM Uncompahgre Field Office; tphifer@blm.gov
Ruth Welch, BLM State Director for Colorado; rwelch@blm.gov
Neil Kornze, BLM Director; director@blm.gov
Sally Jewell, Secretary, U.S. Department of the Interior; via web site
Doug Atchley, Delta County Commissioner; datchley@deltacounty.com
Bruce Hovde, Delta County Commissioner; bhovde@deltacounty.com
Mark Roeber, Delta County Commissioner; mroeber@deltacounty.com
Kerry Donovan, State Senator; kerry.donovan.sd5@gmail.com
Millie Hamner, State Representative; millie.hamner.house@state.co.us
Michael Bennet, U.S. Senator; via web site
Cory Gardner, U.S. Senator; via web site
Scott Tipton, U.S. Representative; via web site
John Hickenlooper, Colorado Governor; via web site

BLM_0156291

Alex Johnson, Director, Western Slope Conservation Center;
director@theconservationcenter.org

000472_JensenJ_20161101_NPS Organization: National Park Service, Jill Jensen
Received: 11/1/2016 12:00:00 AM
Commenter1: Jill Jensen - Salt Lake City, Utah 84111 (United States)
Organization1:National Park Service
Commenter Type: Federal Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000472_JensenJ_20161101_NPS.htm (000472_JensenJ_20161101_NPS-
387515.htm Size = 6 KB)
Submission Text
Date:11/01/2016

Commenter:Jill Jensen

Organization:USDOI National Park Service

Email:jill_jensen@nps.gov; imrextrev@nps.gov

Address:324 South State Street, Suite 200, Salt Lake City, Utah 84111

Phone:801-741-1012 ext 115

Comment:
Dear Sir/Madam,

Please use the link(s) below to download National Park Service comments on the Uncompahgre
Field Office Draft Resource Management Plan.

If you have questions, please contact David Hurd at imrextrev@nps.gov.

NPS comments on the Uncompahgre Field Office Draft RMP.docx:
https://irma.nps.gov/ERTS/Download/382f62785471753475444b564b4364654538704b4141636
752546c4d666e6e4d352b46576d3357434b6d4a516e76577974585a6c675763365349694950773
1346e38434d484f6379354c7a305533592f4733664b4e492b344c5a694f6c4e7734

Memorandum

To: Gina Jones, Tres Rios Field Office, Bureau of Land Management

From: Jill Jensen, Archaeologist

Subject: NPS comments on the Uncompahgre Field Office Draft Resource Management Plan, Delta, Gunnison, Mesa, Montrose, Ouray and San Miguel Counties, Colorado.

Thank you for the opportunity to review the draft Resource Management Plan (RMP) for the Uncompahgre Field Office. As noted in the draft RMP, the Old Spanish National Historic Trail is located within the planning area for the Uncompahgre Field Office of the BLM. As the federal co-administrators of this National Historic Trail (alongside the Bureau of Land Management), we appreciate the thoughtful consideration your office has invested in the incorporation of the Old Spanish National Historic Trail in your long range planning efforts. We offer the following comments and corrections for the draft RMP, please don't hesitate to contact us if you would like to discuss any of these comments.

General Comment #1: <([#1 [3] [5] We would like to see a section clearly describing how the requirements of BLM Manual 6280 were (or will be) met in the land use planning process. #1])>

General Comment #2: <([#2 [25] We would prefer to see a more flexible, viewshed based avoidance area approach for National Historic Trails. #2])>

<([#3 [25.1] [3] Table 2-2, Line 595: Please explain why all National Historic Trails except the Old Spanish National Historic Trail will be managed as VRM Class II. This appears to be an arbitrary decision with a bias against preserving existing viewshed along the Old Spanish National Historic Trail. #3])>

<([#4 [25.1] Table 2-5, Line 596-598: In our opinion Alternative D is not a balance between Alternatives B and C. We would propose that viewshed-based avoidance areas would present a more balanced alternative. #4])>

<([#5 [3] Table 2-3: Please provide a definition of what is mean by "avoid" versus "exclude". How will avoidance be achieved? #5])>

<([#6 [25.2] Chapter 3, page 3-168: The Comprehensive Management Plan referred to in this section (and elsewhere) is now a Comprehensive Administrative Strategy (CAS). Unfortunately, the CAS will not provide the type of management guidance you seem to be referring to here. While it does identify high potential sites and segments, as well as provide some very general high-level administrative goals, it does not identify the National Trail Right-of-Way nor does it provide management suggestions. #6])>

<([#7 [5.2] [25.2] Chapter 3, page 170: The local office needs to work with the federal trail administrators (in the case of the Old Spanish Trail, this would be National Park Service and the Utah State office of the BLM) as first point of contact, in addition to including the Old Spanish Trail Association as a consulting party. #7])>

<([#8 [3] [25.3] Chapter 4, page 4-420 (consultation): This section seems to imply that the field office will only consult with the SHPO for undertakings on the National Historic Trails. With

respect to the Old Spanish National Historic Trail, the National Park Service, the Old Spanish Trail Association and any other interested party are also consulting parties under section 106 of the National Historic Preservation Act. Unless other arrangements are made (e.g. Programmatic Agreement, Memorandum of Understanding, etc.) the federal trail administrators are to be consulted for all actions on the National Historic Trails, as all such actions are subject to compliance with the National Trails System Act. #8])>

<([#9 [25.1] [3] Chapter 4, page 4-420 (assumptions): We couldn't agree more heartily with the following statement made in this section: "Recognizing that national trails often comprise numerous routes rather than a single trace, all protective zones begin at the outer edges of trails rather than at a centerline, which is difficult to define." However, all of the protective measures for the Old Spanish National Historic Trail outlined in this draft RMP are based on a somewhat arbitrary centerline. BLM Manual 6280 directs the development of a National Historic Trail Management Corridor in the land use planning process, it does not appear that these directions have been carried out with respect to the Old Spanish National Historic Trail. #9])>

<([#10 [25.1] [3] Chapter 4, page 4-422: As discussed in previous comments, the Comprehensive Administrative Strategy (CAS) will not provide the type of guidance you are referring to here. We suggest that you cite BLM Manual 6280 instead of the CAS. #10])>

Please don't hesitate to contact me should you need clarification or additional information. I can be reached via phone (801-741-1012 ext 115), email (jill_jensen@nps.gov) or the address listed above for future notices regarding this project.

Sincerely,

Jill Jensen
Archaeologist

Cc:
Rob Sweeten, Co-administrator Old Spanish National Historic Trail
Bureau of Land Management
Utah State Office
440 West 200 South, Suite 500
Salt Lake City, UT 84101-1345


000473_PadgettL_20161101_OurayCtyBOCC Organization: Ouray County Board of Commissioners, Lynn Padgett
Received: 11/1/2016 12:00:00 AM
Commenter1: Lynn Padgett - ,
Organization1:Ouray County Board of Commissioners
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique

Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000473_PadgettL_20161101_OurayCtyBOCC.htm
(000473_PadgettL_20161101_OurayCtyBOCC-381915.htm Size = 22 KB)
Submission Text
November 1, 2016
Joseph Meyer, Southwest District Manager
Dana Wilson, Acting Uncompahgre Field Office Manager
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Via Email: uformp@blm.gov

Dear Joe and Dana,
Ouray County is pleased to be able to provide comments on the Uncompahgre Field Office of the
Bureau of Land Management (UFO BLM) Draft UFO Resource Management Plan (RMP) /
Environmental Impact Statement (EIS) [hereafter, "DRMP/EIS"].
In 2015, Ouray County Board of County Commissioners approved Resolution 2015-014 "Stating
the value of public lands to Ouray County's economy, recreation, heritage and quality of life, and
supporting continued federal ownership of federal public lands."
Ouray County's Master Plan1, Land Use Code (2) and zoning (3), orient higher density
development and commercial activity towards our municipalities in exchange for preserving our
rural working landscapes, scenic vistas, open space, wildlife habitat, and outdoor recreation
opportunities towards the unincorporated portions of the county and our public lands. [1http://co-
ouraycounty.civicplus.com/DocumentCenter/View/144][2http://ouraycountyco.gov/DocumentCe
nter/Index/41]
[3http://ouraycountyco.gov/DocumentCenter/View/145]
We have sections of our land use code addressing visual impact mitigation of development to
protect our economically important scenic vistas, wildfire mitigation, protecting wildlife
corridors and sensitive landscapes, avoiding geohazards and floodplains, and protecting dark
skies. Our countywide economic goals include working toward abundant, affordable and
redundant broadband, and enhancing outdoor
recreation opportunities in all seasons. (4,5)
4http://www.ouraycountyco.gov/ArchiveCenter/ViewFile/Item/96
5http://www.ouraycountycolorado.org/bottomup/Ouray_County_Resolution_2011_022.pdf

We offer the following comments on the DRMP/EIS:

1. Land Disposals
The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "consider disposal of
lands that would consolidate public ownership for greater management efficiency while serving
the public interest, including communities and their expanding needs." (6)
[6Page 2-
319;http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_
vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf]

The lands identified for disposal were identified on Appendix A, Figure 2-59 to 2-62 (7) and legal descriptions were provided in Appendix N. (8)

BLM has a number of "in-holdings" within Ouray County that may be subject to disposal by BLM.

[7http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_ap pendix.Par.78374.File.d at/App%20A%20Combined.pdf]

[8http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_ap pendix0.Par.77552.File.dat/N_Disposal_UFO-DRMP-2016_508.pdf]

<([#1 [19.1] Ouray County would like to have notice of any proposed disposal so that the County may engage in discussions regarding any proposed transfer of lands and potential new uses. Ouray County desires that the BLM not dispose of any public lands that would increase the amount of private land intersected by public rights-of-way, including county roads and trails. Please see Ouray County Resolution 2014-014 (9) and the map that comprises Exhibit A (10) for an inventory of designated public rights-of-way. There may be others, including some new trails within the system known as the "RAT" trails in the Ridgway area that are not yet on Exhibit A. 9http://ouraycountyco.gov/ArchiveCenter/ViewFile/Item/229 10http://ouraycountyco.gov/documentcenter/view/2476 #1])>

<([#10 [19.1] In general, Ouray County does not want land disposals to create parcels that are non-conforming to our county land use code and minimum parcel sizes within our zones. A GIS shapefile of land disposal parcels was obtained from UFO staff on October 31, 2016. We could not match up the legal descriptions of the parcels as described in Appendix N with the parcel legal descriptions in the GIS shapefile. A parcel of approximately 22 acres, that our GIS shows is in T45N R8W Section 9 and lies on the west side of the Uncompahgre River and contains a portion of the Uncompahgre Riverway trail is not recommended for disposal under Alternatives A, C and D, but is recommended for disposal under alternative B. Ouray County does not support disposal of this parcel, as it is imperative for trail linkage and recreation that it remain accessible to the public. The public uses this parcel as a popular picnicking area, bird watching area, and for quiet reflection by the river. It has facilities that are used for needed breaks along the approximately 4-mile trailway. #10])> <([#11 [19.1] There are two parcels east of US 550 within T44N R8W Section 13 that are adjacent to U.S. Forest Service lands, in the general vicinity of Lake Lenore. These parcels are recommended for deferral under Alternative C but not the agency preferred alternative D. Because they are proximal to other public lands and are mapped as having a public trail intersecting them. Ouray County does not support disposal of these parcels. #11])> <([#12 [19.1] There are two parcels west of US 550 that are recommended for disposal under several alternatives but not Alternative D, south of Portland. The northern of these two is also within T44N R8W Section 13 and contains the Uncompahgre River corridor and riparian habitat. It should not be disposed of. The southern parcel is within T44N R9W Section 14 and contains portions of a public trail. It also should not be disposed of. #12])> <([#13 [19.1] A parcel consisting of approximately 129 acres within T44N R8W Section 11, lies on the slopes of Miller Mesa. It appears that it contains a public trail and contains Elk Ridge Trail Road, used as access for private lands. It is recommended for disposal under Alternative D. Prior to disposal the county should be consulted so that a full investigation can be conducted to learn if there will be any loss of historic access to other properties or public rights

BLM_0156296

of way. If disposed of, the BLM should ensure that it is transferred so that no ROWs are altered or lost. A portion of County Road 17 intersects the southwest corner of this parcel. This parcel also contains the drainage that feeds into Black Lake. It is the desire of Ouray County that any diseased forests be treated prior to any land disposal, and we are aware of significant forest health issues on this parcel.
#13])> <([#14 [19.1] There are two parcels within Cow Creek Valley area on the east side of U.S. 550 not recommended for disposal in Alternative D due to saline soil conditions. The three isolated approximately 35-40 acre parcels on Log Hill Mesa recommended for disposal seems to make sense for disposal so long as there is access for a new private owner. County Road 1 splits one of the parcels, and Ouray County would desire that any lands disposed of be done in a way that does not create parcels that do not conform to our underlying zoning. This should be able to be accomplished with this parcel. #14])>

2. Areas of Critical Environmental Concern (ACEC)s
There are no existing ACECs in Ouray County. Alternative B contemplates creating the Cerro Summit- Sims Mesa Gunnison Sage-grouse ACEC in northern Ouray County, where there is BLM land proximal to occupied habitat. On November 12, 2014, the U.S. Fish and Wildlife Service (USFWS) announced that it determined that the Gunnison Sage-grouse, a ground-dwelling bird found only in southwestern Colorado and southeastern Utah, required the protection of the Endangered Species Act (ESA) as a threatened species. The USFWS originally proposed to list the species as 'endangered' under the ESA in January 2013, but efforts by the two states, tribes, local communities, private landowners and other stakeholders to conserve the species and its habitat were found to have helped reduce the threats to the bird sufficiently to give it the more flexibly protected status of 'threatened.' ( 11)
[11https://www.fws.gov/mountainprairie/pressrel/2014/11122014_ServiceProtectsGunnisonSage GrouseAsThreatenedUnderESA.php]

The supporting EIS for the Threatened Status designation of the Gunnison Sage-grouse12 and for the Designation of Critical Habitat for the Gunnison Sage-grouse13 is dated November 9, 2014.
[12https://www.fws.gov/mountain-
prairie/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf]
[13https://www.fws.gov/mountain-
prairie/species/birds/gunnisonsagegrouse/GuSGCriticalHabitat_11202014.pdf]
These designations prompted a process for the BLM to prepare a draft Gunnison Rangewide Plan Amendment that would potentially result in multiple resource plan amendments (GuSG DRMPa) and a companion draft environmental impact statement (GuSG DEIS) which more closely analyzes planning issues, including energy and minerals actions, in order "to analyze the addition of GuSG conservation measures to several existing RMPs", including the BLM UFO DRMP/EIS. The deadline for comments on the GuSG DRMPa is after the deadline to comment on this UFO DRMP/EIS. The GuSG DRMPa documents were released as drafts in August 2016. In the GuSG DRMPa, the BLM states, "The BLM manages approximately 40 percent of GUSG habitat across twelve counties in southwestern Colorado and southeastern Utah…The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision." (14)
[14Page I; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-

0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf]

The Purpose section of the GuSG DRMPa states, "This RMP amendment provides a framework for conserving and assisting with the recovery of the GuSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird." The Need section of this document states, "The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs 'shall be revised as necessary based on …, new data, new or revised policy…(43 CFR 1610.5-6).'" 15 [15Page iii; https:/eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf]

<([#2 [8] Due to the UFO DRMP/EIS alternative formulation and scoping work occurring mostly between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS. The UFO Gunnison Sage-grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.
Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM DRMPa ROD so that the BLM DRMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices. All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease is allowed a 20-year period with out-of-date stipulations and practices. While the GuSG DRMPa goes much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and habitat enhancement and connectivity measures, it still needs additional work and we plan on providing comments for the GuSG DRMPa separately. #2])>

3. <([#3 [27.1] Special Recreation Management Areas (SRMAs).
Ouray County appreciates the collaborative work the UFO staff did with the Ridgway Area Trails (RAT) group (now a chapter of Colorado Plateau Mountain Bike Trail Association, COPMOBA) to allow for a multi-use single-track trail system to be accomplished on BLM lands just north of Ridgway. This new trail system has been successful economically, in that as soon as the first 3 miles of trails were open, Ridgway had a new bike shop and two new jobs. During the season the trails are open, it is typical to see vehicles with plates from multiple states and from all over Colorado. Local families with children are also enjoying the highly scenic trail system. These trails also leverage other trails along the Uncompahgre Riverway and Ridgway State Park. We support RAT and COPMOBA in their comments and requests to enhance our trail systems. The Ridgway Trails and Spring Creek SRMAs will be welcome in Ouray County.
Ouray County fully supports the Zone 1 Objective of the Ridgway Trails SRMA, which states "Through the life of the plan, manage Zone 1 for visitors of all abilities to engage in day use nonmotorized and educational activities, including disabled accessible trails…" and supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in day use, stacked loop, nonmotorized, trail activities, including challenging, natural surfaced, disabled accessible trails…"16 We are curious if "single-track" should have been included in the objective for Zone 2?
[16Pages 2-258 to 2-262;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_

1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf]  #3])>

<([#15 [27.1] Ouray County fully supports the Zone 1 Objective of the Spring Creek SRMA, which states "…manage Zone 1 for visitors to engage in day use, nonmotorized, single-track, stacked loop, trail activities…"; supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in canyon viewing
through single-track trail activities..."; and supports the Zone 3 Objective, "…manage Zone 3 for visitors to engage in camping and scenic viewing through motorized and nonmotorized trail activities…"17
[17Pages 2-281 to 2-287;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2 _UFODRMP 2016_508.pdf]
Only Zones 2 and 3 occur within Ouray County, but the three zones are complimentary of each other. Ouray County agrees with the stipulations for both SRMAs and all Zones, presented in Appendix J. 18
[18http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.40130.File.dat/J_Rec_UFO-DRMP-2016_508.pdf]
#15])>
4. <([#4 [27.1] Enhanced Ecological Areas (EEAs).
The County applauds the BLM for the recent cooperative efforts in enlarging the trail opportunities on BLM lands within Ouray County. It appears that BLM has identified additional potential trails systems which could be developed within Ouray County, including opportunities to increase travel and recreation
on McKenzie Butte. The County supports these efforts to increase recreation, including hunting, hiking, horseback riding, trail biking, and OHV uses. #4])>
<([#16 [14.1.1] In this spirit, we notice that McKenzie Butte and Pinon Ridge on Log Hill Mesa are recommended to be included in a Ridgway EEA. Ouray County appreciates that the UFO is trying to incorporate connectivity of core habitat for multiple species into the management plan. However, we are concerned about the stipulations recommended that include ROW avoidance in Alternative D.
Appendix D describes the proposed Ridgway EEA as:
"BlM land on Log hill Mesa and arounf Billy Creek State wildfe Area. Contributes to linkage between Cimarron Ridge and Uncompahgre Plateau, in cirtical big game wintering area. Divided into four zones"
#16])> <([#17 [27.1] We encourage the UFO to work with Ouray County trails groups and stakeholders to ensure that there can be a companion trail system, similar to the quality and benefits of the RAT trail system north of Ridgway, that can be located on the McKenzie Butte parcel. It will be important to refine any stipulations for this Core Zone 1, to ensure that this possibility can be realized in the next few years. The parcel outlined in bright blue below, is where McKenzie Butte and Pinon Ridge are located: [see pdf for parcel map]. Figure 5.a. Showing parcels of the proposed Ridgway EEA. Ouray County does not desire the designation of the western parcel (Core Zone 1) to be included in this EEA, if this would interfere and prohibit the ability to develop enhanced single-track trail systems for pedestrians, horses, and mountain biking. #17])> Log Hill Mesa is home to approximately ? of Ouray Country residents and this area.
<([#18 [30.2] The ridge and butte are also topographically advantageous to expanding cell phone

service and wireless broadband on the mesa. Currently, outside of the southern portion of Log Hill Mesa, where infrastructure on Tower Road is able to serve residents and where limited DSL exists, much of the mesa area suffers from little landline, spotty cell phone, and no broadband service. It appears the EEA stipulations being contemplated for Alternative D, and certainly for Alternative B, for Core Zone 1 could prohibit a ROW for communications and/or broadband infrastructure. Cell phones and satellite dishes are neither affordable, nor reliable replacements for broadband. Ouray County continues to be a place that attracts entrepreneurs, telecommuters, and "creatives". It will be essential to have a topographically suitable location to provide essential communications and broadband services with a minimum of towers or infrastructure. Power and fiber are generally needed to be able to be extended to sites for infrastructure. #18])>

5.<([#5 [5.2] [14.1.2] Wildlife and Watchable Wildlife Viewing Areas
Ouray County encourages the BLM to work with Colorado Parks and Wildlife (CPW) to ensure that the species-specific buffers, timing limitations, best management practices and other wildlife data relating to alternatives and stipulations is incorporated into the final RMP/Record of Decision. At the October 15, 2016 cooperators' meeting with the BLM in Montrose, CPW staff indicated that information they had provided was not yet incorporated. Ouray County also supports CPW's desire to protect big game winter range and other important habitats by limiting well pad densities to no more than 1 per 160 acres, and requiring Master Leasing Plans and implementing compensatory mitigation requirements. #5])>
<([#6 [36.1] [19.1] Ouray County would support the creation of watchable wildlife viewing sites within BLM lands as discussed in Chapter 3 (page 3-170) near Billy Creek State Wildlife Area and the Uncompahgre Riverway. Winter bald eagle viewing is very popular along the Uncompahgre Riverway by locals and visitors. Increasing educational opportunities adds value to our public lands and promotes conservation and consideration of human impacts on wildlife. Ouray County prefers Alternative B stipulations for fluid minerals over the agency preferred Alternative D.
Ouray County has had several landowners place conservation easements on their property, thousands of acres in aggregate, to benefit big game habitat, riparian habitat, Gunnison Sage-grouse habitat, and scenic open space. We request that the BLM obtain from the county and other sources GIS files showing the locations of these conservation easements, and that an NSO stipulation be placed on all private conserved lands with split estate.
#6])>
6. <([#7 [31.1] Slopes
Ouray County is concerned about the Alternative D stipulations that change 30% slopes to 40% slopes for the threshold of applying a stipulation. We have highly saline and easily erodible soils and loose rocks. We desire that the BLM leave stipulations that are related to slopes at the percentages they are in Alternative A and B. #7])>

7. <([#8 [11.1] Visual Resources and Dark Skies.
Ouray County appreciates the language in the RMP providing protections to dark skies and limiting lights. Please add language that says that lights left on at night should be directed downward, which is good for wildlife and for preserving our dark skies. Dark skies are good for our economy, star gazing, astronomy, and protect our rural character.
#8])>
8. <([#9 [17.1] [3] Top of the Pines.

Ouray County has specific comments or requested revisions as follows:

The current RMP contains an action item to transfer timber rights on the property conveyed to Ouray County known as the Top of the Pines property (approximately 168 acres that was formerly a Girl Scout camp, conveyed to the County in 2000). The Draft RMP/EIS is unclear as to the intent of BLM with regard to the reserved timber resource. Table 2-2 at page 2-156 seems to indicate that the preferred alternative is the same as the current RMP. If that is an accurate interpretation of Table 2-2, page 2-156, then the County supports the preferred alternative. To the extent that Table 2-2 simply reflect that 168 acres have been deeded to the County, but BLM retains the timber resource, the County requests that BLM clarify Table 2-2, page 2-156, to reflect that BLM will proceed to deed to the County the currently-reserved retained interest in the timber resource at the Top of the Pines property. The County believes that conveyance of the timber will eliminate unnecessary potential disagreements between BLM and the County over fire mitigation work and other non-commercial uses and stewardship of the timber and the property that has already been conveyed to the County. Given that the BLM has eliminated timber from its commercial resource inventory, conveyance of the reserved interest to the County would seem to have negligible impact to the BLM.

#9])>

If there are any questions or clarifications regarding Ouray COunty's comments, please do not hesitate to contact us.

Respectfully Submitted,
Lynn M. Padgett
Chair, Ouray County Borad of Commissioners


000474_SgammaK_20161031_WEA  Organization: Western Energy Alliance, Kathleen Sgamma
Received: 10/31/2016 12:00:00 AM
Commenter1: Kathleen Sgamma - ,
Organization1:Western Energy Alliance
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000474_SgammaK_20161031_WEA.htm (000474_SgammaK_20161031_WEA-387516.htm Size = 9 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comments on the Draft Uncompahgre RMP/EIS
1 message
Tripp Parks <tparks@westernenergyalliance.org> Mon, Oct 31, 2016 at 1:47 PM
To: "uformp@blm.gov" <uformp@blm.gov>

Good afternoon,
Attached please find comments from Western Energy Alliance on the Draft RMP/EIS for the

Uncompahgre Field Office.
Please do not hesitate to contact me with any questions.
Thank you,
Tripp Parks
Policy Analyst
Western Energy Alliance
Main: 3036230987
Direct: 3035011061
tparks@westernenergyalliance.org

Western Energy Alliance Comments on the Uncompahgre RMP 10.31.16.pdf
213K
October 31, 2016
Submitted via e-mail to uformp@blm.gov
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan/Environmental Impact Statement for the
Colorado Bureau of Land Management Uncompahgre Field Office

Dear Sir/Madam:
Western Energy Alliance opposes Alternative D, the preferred alternative, in the draft
Resource Management Plan (RMP) for the Bureau of Land Management's (BLM)
Uncompahgre Field Office (UFO). Under the preferred alternative, BLM would close or
severely restrict leasing of oil and natural gas on significant acreage in the planning area,
preventing access to valuable resources that the plan itself identifies as "important."
Western Energy Alliance represents over 300 companies engaged in all aspects of
environmentally responsible exploration and production of oil and natural gas in Colorado
and across the West. Alliance members are independents, the majority of which are small
businesses with an average of fifteen employees.
Oil and Natural Gas Leasing
Oil and natural gas deposits in the UFO planning area are a valuable resource for our
nation's future, as the draft RMP's section on Fluid Minerals – Oil and Gas highlights:
"Carbonaceous shale is expected to become an important future source
of natural gas in the United States… [w]hen and if the Mancos, Gothic,
or Hovenweep shale gas plays are characterized for the planning area
and technology and well completion methods are optimized, these
shale gas resources could become an important energy source." 1
[Footnote1 Uncompahgre Field Office Draft Resource Management Plan and Environmental
Impact Statement at 3-121.]
The importance of access to shale gas resources in the planning area is further heightened
by a recent U.S. Geological Service (USGS) survey which found that the Mancos Shale holds
an estimated 66 trillion cubic feet of undiscovered, technically recoverable shale gas, some
of which lies in the UFO.2 The Mancos Shale is the second largest continuous shale gas

assessment in the nation, according to USGS, and is ripe for future development absent federal restrictions that limit access.

Under the preferred alternative, though, BLM would foreclose access to large amounts of natural gas in the UFO. Specifically, it would prohibit leasing on 5,840 acres and add stipulations such as No Surface Occupancy (NSO) on an additional 431,840 acres. Despite the extended reach of horizontal drilling, an NSO restriction is likely to place substantial acreage off limits to drilling due to an inability to access the leased parcels. Significant acreage will remain well beyond the lateral reach of horizontal wells. Closing access to this acreage will limit future development of a large, important resource, and BLM should reconsider this approach.

Western Energy Alliance supports Alternative C, which adopts a more reasonable approach to leasing. While it would remove 333,950 acres from the "leasing subject to standard terms and conditions" category, the vast majority of these acres would be subject to Controlled Surface Use (CSU) and Timing Limitation (TL) stipulations, rather than NSO restrictions. CSU and TL stipulations provide adequate environmental protections while still allowing for environmentally responsible development of oil and natural gas resources.

2 Assessment of Continuous (Unconventional) Oil and Gas Resources in the Late Cretaceous Mancos

Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah, 2016: U.S. Geological

Survey Fact Sheet 2016-3030, Hawkins, S.J., Charpentier, R.R., Schenk, C.J., Leathers-Miller, H.M.,

Klett, T.R., Brownfield, M.E., Finn, T.M., Gaswirth, S.B., Marra, K.R., Le, P.A., Mercier, T.J., Pitman,

J.K., and Tennyson, M.E., May 2016, p. 4.


<([#1 [19.1] Private Property Rights and Negotiated Surface Use Agreements

Placing stipulations on private lands above federally-owned minerals is an infringement of private property rights and conflicts with existing BLM policy. Restrictions in the plan should only apply to federal lands.

BLM's 2007 "Split Estate Rights, Responsibilities, and Opportunities" brochure states that BLM's policy is to "offer[] the surface owner the same level of resource protection provided on federally owned surface." It does not say that BLM will mandate the surface use terms for private surface estate. The 2007 brochure states that the operator must consult in good faith with the surface owner and that the surface owner "will have [his or her] views on protection standards and construction and operation issues carefully considered by the BLM as the BLM determines appropriate mitigation measures." How is BLM supposed to "carefully consider" the surface owner's views when BLM has bound itself to apply all RMP management direction to split estate land regardless of the surface owner's views?


Under the procedure contemplated in Onshore Order Number 1, an operator must engage in good-faith negotiations with the private surface owner to reach an agreement for the protection of surface resources and reclamation of the disturbed areas. BLM should

respect this process. The RMP should expressly state that surface use issues on private surface will be resolved primarily between the surface owner and the operator and that BLM will not apply management direction that conflicts with the agreement reached between the surface owner and operator. #1])>

<([#2 [6] [20.1] Lands with Wilderness Characteristics
The preferred alternative would designate more than 18,320 acres as new Lands with Wilderness Characteristics (LWCs) areas. Designation of these areas would result in burdensome restrictions on development of substantial portions of the Planning Area, including NSO, CSU, and TL stipulations.
Under Section 102 of FLPMA, Congress directed BLM to manage lands on a multiple-use basis to "…best meet the present and future needs of the American people" in a "combination of balanced and diverse resource uses," including minerals development. Importantly, in Section 103(c) of FLPMA, Congress listed resources that BLM should take into account in allocating management, and "wilderness characteristics" is not included as such a resource. On the other hand, mineral development is a "principal or major use" of public lands under FLPMA. Congress further emphasized the importance of minerals development by, as noted above, declaring that public lands be managed "in a manner which recognizes the Nation's need for domestic sources of minerals." 43 U.S.C. § 1701(a)(12).
In addition, designation of LWCs conflicts with a Congressional prohibition. Congress has explicitly denied funding for the implementation of Secretarial Order 3310 concerning the designation of "Wild Lands." LWCs are "wild lands" in all but name. It is therefore a violation of law to designate LWCs through the RMP process. BLM designation of LWCs violates FLMPA's multiple-use directive, and as such we oppose their inclusion in the preferred alternative. Alternative C, which does not manage for lands with wilderness characteristics, takes the proper approach. #2])>
We urge BLM to adopt Alternative C in the final RMP, with the modification specified above. Thank you for the opportunity to comment, and please do not hesitate to contact me with any questions.

Sincerely,
Kathleen M. Sgamma
Vice President of Government & Public Affairs


000475_PierceC_20161030 Organization: Carol Pierce
Received: 10/30/2016 12:00:00 AM
Commenter1: Carol Pierce - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali

BLM_0156304

Attachments: 000475_PierceC_20161030.htm (000475_PierceC_20161030-387517.htm Size = 12 KB)
Submission Text
Date:10/30/2016

Commenter:Carol Pierce

Organization:

Email:carolcolo@yahoo.com

Address:42326 Hwy 133, Paonia, CO 81428

Phone:

Comment:
Bureau of Land Management Uncompahgre Field Office,

Thank you for allowing the extension period for this most important decision to be extended. I hope you will take into account my positions regarding the BLMs decision when making your final
decisions regarding the UFO RMP 2016. Carol Pierce Paonia, CO

I am writing to comment on the UFO Resource Management Plan (RMP) during this comment period. I would like to start by quoting The BLM mission statement. "It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations." For years now it has been my belief that the technology being used to extract natural gas by hydraulic fracturing (fracking) is far and away the worst man made threat to our environment being implemented in our time. I often refer to it as having science fiction qualities! I say it is my belief but my beliefs are based on extensive and ongoing research I have learned regarding negative impacts to people and the environment. There are too many variables that can and do go wrong while using many carcinogenic chemicals in the process, too many toxins being blasted into underground rock fissures and then pumped back into injection wells for storage (causing earthquakes), too many spills from gas pipe lines (contaminating whole rivers), transporting said chemicals, well casing failures, and too many carcinogenic volatile organic compounds (VOC's) spewing into the atmosphere. I've been exposed to the contaminated air coming from and around condenser tanks, and from flaring fields. In both cases I wasn't able to breathe one breath without covering my nose and mouth. Add to all this the impacts on the flora and fauna which has already been compromised due to so much human activity and it's a recipe for extensive issues for them too. The research keeps growing regarding impacts to human health including respiratory related problems, endocrine disruption, and immune related and cardiovascular disease. The negative effects are vast and I find it incredulous and unacceptable for 94.5 percent of 856,970 acres of the regions land being designated as acceptable for oil and gas in your preferred RMP proposal. It is my understanding the RMP is supposed to be the guideline, after hopefully much intense research, of what the cumulative impacts would be on the land in the entire area. It is intended to

be the master plan for all activities during the next quarter century or so, and it is to be in keeping with NEPA (National Environment Policy Act) of 1969. <([#2 [41.2] The preamble to NEPA reads:

"To declare national policy which will encourage productive and enjoyable harmony between man
and his environment; to promote efforts which will prevent or eliminate damage to the environment
and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

The plan's allocation of so much land for possible gas production is so off target from NEPA or the BLM's mission statements. I find myself in ABSOLUTE DISBELIEF you took a good hard look and
came up with the plan you "preferred." For you to propose that 94.5 % of the land mass as suitable for gas development. I am sorry to sound disrespectful but this is how I see it. Please decrease the amount of land you propose to be open to fracking. #2])> The technology needs to be improved upon. There are not enough people in the field to provide oversight for the gas development already in place. Often spills and leaks are stumbled upon by individuals at a period which is way too late for the mitigation to be effective enough.
<([#1 [20.1]
Regarding Lands with Wilderness Characteristics (LWC) in the plan; I see you believe that seven areas totaling 42,000 acres deserve to be managed in a way to protect their wilderness characteristics in Alternative plan B. BUT you only propose to manage three of the seven totaling
only 18,000 acres under the preferred alternative plan. It makes no sense to qualify them as deserving and then disregard that discovery in your preferred proposal. Please qualify the full 7 areas. #1])> I am an avid hiker and have visited many of these areas in my 31 years living in this area.

<([#3 [9.1] Regarding Areas of Critical Environmental Concern (ACEC). Fifteen areas fit your criteria to be
considered ACEC's. As seen in appendices O and A this was established after a very in depth evaluation to qualify as such. Of these fifteen identified areas the BLM is proposing only eight as ACEC. The following seem especially deserving of protection at this level: La Sal Creek, Salt Desert Shrub, and Tabeguache Pueblo and Tabeguache Caves. Please protect most if not all of the fifteen areas in your final plan!
#3])>
<([#4 [14.1.1] Regarding Ecological Emphasis Areas (EEA) are shown in Appendix A and D. The BLM showed
ample indicators discussing the importance of a number of areas in Appendix D qualifying for this
status. I feel the importance of protection for these areas is critically important due to studies indicating they are some of the only remaining areas providing higher to lower elevation movement of wildlife. There is much literature available showing the effects of oil and gas

drilling damaging the elk and deer herds. Many of these areas are identified in Alternative B but not in Alternative D. Please include all the EEA's shown in Alternative B as a preferred alternative. Please put No Surface Occupancy (NSO) regulations on each as well. Please include burrowing owls, kit fox, and prairie dogs habitat along Hwy. 50 in the Adobe EEA.
#4])>

Regarding Special Recreation Management Areas (SRMA). Appendices A and J. Among the things
that keep this area vibrant are the recreational opportunities. We may not have a downhill ski mountain area in our backyard, but the fact that we have other types of lands that people are drawn to is vital to our economy. It is very important to maintain their beauty and peacefulness that make them so attractive, as well as the many hunting and fishing opportunities here. Please consider non motorization rules for the Jumbo area and others. My son and family in Montrose do a lot of motorized dirt biking. I have become familiar with the extensive amount of country that fits that recreational activity throughout this area. I myself love hiking, biking, both kinds of skiing, birding, camping, and spend as much of my free time that I can in the mountains and back country. I am a Colorado native. While raising our kids we didn't have a lot of money, but we had the public lands to explore. What a fantastic way to grow kids! Please protect all SRMA's as much as possible!!

I want to say thank you for including the North Fork Alternative Plan (NFAP) B1 as one of the proposed alternatives. Regarding the areas around the North Fork Valley I speak in favor of this proposal. In some cases Plan B offers more protection and I would like that to be what is deferred to in those instances. When I was in my early 20's living in Routt County, CO, for a number of years, groups of us would come to Paonia for fresh fruit to put up for the winter and eat fresh. In 1985 I moved here with my husband and kids for that reason and the beautiful surroundings and recreational opportunities. I've read articles recently that state with the latitude people have now to live where they want, due to technology etc., the places they choose are ones with quality public lands surrounding them, This factor is keeping populations up in many rural areas and the economies thriving.<([#5 [41.2] I would like to list other negative impacts hydraulic fracturing extractions brings to communities and areas that the BLM did not give adequate analysis or consideration to:

*heavy truck traffic damage, dust pollutants along with the VOC's

*more crime in areas with man camps etc.,

*property value declines, an exodus of those that see fracking as a great negative rather than positive

* water contamination in an area with the most organic grower concentration in the state

* ozone levels in certain parts of the area are already reading 70ppb (levels exceeding EPA's threshold of acceptability

*fragmentation of wildlife habitat and impact on big game populations

BLM_0156307

* increased sedimentation in the fishing streams (some of which are gold medal fishing waters)

* negative impacts on these recreational aspects

* impacts on agri-tourism in the region; BLM did not analyze the impacts of unregulated gas gathering pipelines impact of weather related incidents compromising the integrity of those pipelines

*BLM did not analyze the impact of water removal from the water sources

* the potential for earthquakes where injections wells are placed and the effects on contamination of aquifers regarding those sites

*source water protection plans were not considered
#5])>
<([#6 [30.3] In your preferred proposal choice; Chapters 2 (Affected Environment), and 4 (Environmental
Consequences) did not even acknowledge the scope of the rarity and uniqueness of the North Fork
area. The area is unrivaled in this state for organically raised vegetables, fruit, hay, livestock, and vineyards. The BLM needs to fully analyze the effects of water contamination and air pollution, which are inevitable, for the entire area.

The effect of impacts on the present local resources and economical endeavors will be thwarted and the investments would be shifted from what is presently in place regarding agro-tourism, recreation, renewable energy, agriculture and organically grown foods. It is likely we'd never regain that foothold again. #6])> Also, this development will contribute to greenhouse gases and be a continued detriment to all that is impacted by that.

I have lived on several acres a few miles outside of Paonia, along the North Fork of the Gunnison
River for 31 years. I have grown organically raised fruit, vegetables and hay throughout that period. It was very important to me to raise my kids in such a way year round by putting food up each year to a large degree. I have a domestic well for my home usage. My well's source is the river and I worry for its health. It has always tested to be potable and without bacteria. I live on Hwy. 133 and I have no doubt the traffic increases would negatively affect me significantly. Along with the increased noise component there is a curve that we in the neighborhood call "dead man's curve" due to the many accidents, just 100' or so from my entrance/exit onto the highway. This whole stretch of highway does not even have a shoulder whatsoever. I ask you to help us who live in this area by making it off limits to drilling indefinitely as proposed in alternative plan B1 as well as the more protective pieces of plan B to be included.

Please protect the unique, characteristics, resources and attributes in this area that have made it economically sustainable and a wonderful place to live and raise children for more than a century.

BLM_0156308

Sincerely,
Carol Pierce
42326 Hwy. 133
Paonia, CO 81428


000476_RobertsonL_20161101  Organization:  Leigh Robertson
Received: 11/1/2016  12:00:00 AM
Commenter1: Leigh Robertson - Ridgway, Colorado 81432 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mmccarter
Attachments: 000476_RobertsonL_20161101.htm  (000476_RobertsonL_20161101-387518.htm
Size = 6 KB)
Submission  Text
Date:11/01/2016

Commenter:Leigh  Robertson

Organization:

Email:leighrobertson3@gmail.com

Address:596  Sabeta Drive, Unit D, Ridgway, CO 81432

Phone:970-316-1650

Comment:
Thanks for considering  the attached comments!

Kind regards,

Leigh Robertson

Dear Gina,
Thanks for considering  the following  comments on the Uncompahgre Field  Office Draft
Resource Management Plan. If possible, I'd prefer that my name and contact information  are not
made public.

These are my personal comments, but as some background, I've been the coordinator  for the San
Miguel  Basin Gunnison  Sage-grouse Working  Group for the past10 years. I have a B.S. degree
in Natural Resources and have been working  in the field  for 25 years.

BLM_0156309

<([#1 [3] [15.2] Since the Gunnison Sage-grouse has been listed as a threatened species since this plan was started, I feel it's imperative that the RMP uses the recommendations in Alternative B in order to protect this rare bird and its habitat. Actually, in some cases I believe the science warrants even stricter protections, as I'll reference below.

If the BLM goes generally chooses the recommendations in Alternative D, I request that the following specific changes be made:

Change to recommendations in those in Alternative B (or larger buffers) at least on the following pages:

2-102,

2-377: Within GUSG designated critical habitat: exclude wind, solar and hydropower.

2-103, 2-195 ideally change the buffer to 6.2 miles, or 4 miles at a minimum.

References to support larger buffers:

Per BLM Instruction Memorandum No. 2014-100 Disturbance will be focused outside of a 4-mile buffer around leks.

A multiscale assessment of factors associated with lek abandonment between 1965 and 2007 found that the level of the human footprint within 5 km (3.1 mi) of the lek was negatively associated with lek persistence (Knick and Hanser, 2011).

Coates and others (2013) suggested that an 8 km (5 mi) protection area centered on an active lek location should encompass the seasonal movements and habitat use of 90-95% of sage-grosue associated with the lek.

The Colorado Plan [Colorado Greater Sage-grouse Steering Committee, 2008] recommended a 6.4 km
[4 mi] circular buffer.

Holloran and Anderson (2005) reported 64% of monitored nests fell within 5 km (3.1 mi) of a lek, and response to industrial development (decreased nesting rates and success rates) was observable to distances between 5 and 10 km (3.1 – 6.2 mi) from a lek.

Gregory and Beck (2014) suggested significant immediate effects on lek attendance with one well pad within 2 km (1.2 mi) of a lek and time-lagged effects due to industrial development within 10 km (6.2 mi) of a lek. Direct impacts of energy development on sage-grouse habitats and populations, such as loss of sagebrush canopy or nest failure, have been estimated to occur within a 1.2-ha (3-acre) area of leks (radius: 62 m [68 yards]); indirect influences, such as habitat degradation or utilization displacement, have been estimated to extend out to 19 km (11.8 mi) from leks (Naugle and others, 2011).

BLM_0156310

Regional analyses of well-density and distance effects (Johnson and others, 2011) suggested negative trends in populations (lek counts) when distance was less than 4 km (2.5 mi) to the nearest producing well; whereas density effects were evident rangewide based on decreasing population trends when greater than eight active wells occurred within 5 km (3.1 mi) of leks, or when more than 200 active wells occurred within 18 km (11 mi) of leks.

p. 2-104: Would line 165, Alternative B prohibit brush-beating of a lek? If so, the wording should be changed to allow it.

p. 2-105 line 167 and 2-314 line 494 Need greater than a 0.6 mile radius around a lek for ROW exclusion, based on the following from:

Manier, D.J., Bowen, Z.H., Brooks, M.L., Casazza, M.L., Coates, P.S., Deibert, P.A., Hanser, S.E., and Johnson, D.H., 2014, Conservation buffer distance estimates for Greater Sage-Grouse—A review: U.S. Geological Survey Open-File Report 2014–1239, 14 p., http://dx.doi.org/10.3133/ofr20141239.

Recent research has added important information to previous speculations and estimations, specifying concentrated foraging behaviors by common ravens (a common predator of sage-grouse nests) at 2.2 km (1.4 mi) from electrical transmission towers with the observed foraging area extending out to 11 km (6.8 mi; Coates, and others, 2014a). According to estimates, the greatest potential impact on sage-grouse nests occurs within 570 m (0.35 mi) of structures (Howe and others, 2014). Negative trends in lek counts were associated with increasing number of communication towers within 18 km of leks range wide (Johnson and others 2011). Johnson and others (2011) also documented negative trends in lek counts for Great Plains populations within 20 km (12.4 mi) of a power transmission line or when the linear density of powerlines within 5 km (3.1 mi) of leks was greater than 10 km (6.2 mi)—notably, affected areas may be greater in these habitats (compared to other intermountain communities) because visibility is often greater in gentle terrain.

All: lek area avoidance should start March 15, not April 1, or customize it to the appropriate date for the
subpopulation, e.g., page 2-350.

2-349 Alternative B: Follow recommendations in San Miguel Basin Gunnison Sage-grouse Conservation
Plan…ADD: with adjustments as needed to incorporate the latest science and/or findings from monitoring after management activities.

Pages 3-76, 3-77: changed GUSG to Threatened.
#1])>
Thank you!

Sincerely,

BLM_0156311

Leigh Robertson
596 Sabeta Drive, Unit D
Ridgway, CO 81432
970-316-1650

000477_MayJ_20161101_SanMiguelCty_HasAttach Organization: San Miguel County Board of
Commissioners, Joan May
Received: 11/1/2016 12:00:00 AM
Commenter1: Joan May - Telluride, Colorado 81435 (United States)
Organization1:San Miguel County Board of Commissioners
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mtrieger 12/8/2016 12:00:00 AM
Attachments: 000477_MayJ_20161101_SanMiguelCty_HasAttach.htm
(000477_MayJ_20161101_SanMiguelCty_HasAttach-387742.htm Size = 75 KB)
xUFORMP_000477_MayJ_20161101_SanMiguelCty_HasAttach.pdf
(000477_MayJ_20161101_SanMiguelCty_HasAttach-387741.pdf Size = 6539 KB)
Submission Text
Date:11/01/2016

Commenter: Joan May

Organization: San Miguel County Board of Commissioners

Email:lynnp@sanmiguelcountyco.gov

Address: PO Box 1170 Telluride, CO 81435

Phone:970-369-5441

Comment:
Greetings,

The San Miguel County Board of County Commissioners is pleased to provide our comments on
the UFO Draft Resource Management Plan/EIS.

San Miguel County • PO Box 1170 Telluride CO 81435
Lynn Padgett • 970-369-5441 • lynnp@sanmiguelcountyco.gov

SAN MIGUEL COUNTY
BOARD OF COMMISSIONERS
ART GOODTIMES AMY LEVEK JOAN MAY

October 31, 2016

Joseph Meyer, Southwest District Manager
Dana Wilson, Acting Uncompahgre Field Office Manager
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Via Email: uformp@blm.gov

Dear Joe and Dana,

San Miguel County (SMC) is pleased to be offered the opportunity to comment on the
Uncompahgre Field Office of the Bureau of Land Management (UFO BLM) Draft UFO
Resource Management Plan (RMP) / Environmental Impact Statement (EIS) [hereafter,
"DRMP/EIS"]

In 2015, the San Miguel County Board of County Commissioners approved Resolution 2015-
009[1] (Attachment A), stating that public land under the management of the U.S. Forest Service
and BLM constitute more than 60% of the land within San Miguel County and included the
following statements:

[1 http://www.sanmiguelcountyco.gov/301/Document-Viewer]

-federal public lands are essential to the quality of life in San Miguel County, providing public
recreational opportunities for wildlife watching, hiking, hunting, fishing, backpacking, horseback
riding, skiing, bicycling, sightseeing, and numerous other outdoor recreational activities;

-federal public lands provide essential habitat for wildlife;

-wildlife and scenic landscapes on the public lands attract outdoor recreation and tourism that are
the dominant drivers of San Miguel County's economy;

-San Miguel County business owners attract employees in large part because of the iconic
landscape and recreational opportunities on federal public lands;

-San Miguel County's agriculture industry includes numerous ranchers and sheepherders who
are
dependent on grazing on federal public land;

-San Miguel County residents are actively collaborating among diverse interests and with public
land managers to improve public land management and public access.

We have attempted to recommend actions that San Miguel County would like to have

incorporated into the Final RMP and Record of Decision (ROD) and recommend improvements for what we consider shortcomings in portions of the plan and. We are not asking for just a single alternative to be implemented. We have identified places where we do not agree with the agency preferred Alternative D, and might agree in whole or in part with another Alternative, such as Alternative B. However, we have tried to approach each item that we perceive to be within or directly affecting San Miguel County in such a way as to offer desired actions and stipulations, which may be a customized mix or hybrid of different alternatives. We have attempted to offer our desires so that they can be practically accomplished when implementation of the Final RMP begins. We believe incorporating our recommendations will strengthen the document so that it provides clearer guidance and expectations in resource management programs, practices, and protections for the present and for the future.

Our comments are also offered in the spirit of the DRMP/EIS statement, "The BLM's planning regulations require that RMPs be consistent with officially approved or adopted resource-related plans …so long as they are also consistent with the purposes, policies, and programs of federal laws and regulations applicable to BLM-administered lands." 2

[2http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vo l_1.Par.7326.File.dat/1_UFO-DRMP2016_508.pdf]

We also offer our comments in the spirit that the BLM attempted to "explore opportunities to enhance management of resources and resources uses; resolve conflicts among resources and resource uses; meet the purpose and need for the RMP; and are feasible to accomplish."

While San Miguel County philosophically is more supportive of the intent of Alternative B over Alternatives C and D, there are times where our comments realize that a balanced multiple use and human activities and structures are necessary for economic development and recreation, where they can avoid or mitigate impacts to other activities or wildlife needs.

2.3.3 Alternative B (From Page 2-7 of the DRMP/EIS)
2.3.6 Alternative D: Agency Preferred (From Page 2-8 of the DRMP/EIS)


With the intent that our comments are practical, we are not commenting on Alternative B-1 or designations that are not within or do not have direct impacts on San Miguel County.

We have prepared our comments mostly by special designation or resource use categories, and our comments are generally specific to areas, resources, resource uses, and potential designations within San Miguel County. In some cases where the RMP decision may affect San Miguel County, we have also commented. We have attempted to provide clear comments and recommendations, but in reviewing a plan, supporting materials, and spatial data, we realize our comments may not be as clear as we intended. Please encourage the UFO staff to contact our staff lead, at 970-369-5441 or lynnp@sanmiguelcountyco.gov if there are any questions or clarifications needed.

1. LANDS WITH WILDERNESS CHARACTERISTICS/WILDERNESS STUDY AREAS

BLM_0156314

(WSAs)

Summary: There are no Lands with Wilderness Characteristics or WSAs mapped within San Miguel
County. San Miguel County appreciates that these lands were inventoried by the BLM and supports
comments being submitted by Conservation Colorado and Western Colorado Congress on this subject.

2. WILD AND SCENIC RIVER (WSR) SUITABILITY.

Summary:

-San Miguel County fully supports the designations of the identified river segments with in the San Miguel Basin as suitable.

-San Miguel County fully supports the designation as "suitable" of the segments proposed in DRMP/EIS Alternative D, with some differences in the Alternative D stipulations.

-See Rational/Discussion for specific comments on segment management stipulations.

Rationale/Discussion:

Determination of Suitability

By making a determination of "suitable" for inclusion in the National Wild and Scenic Rivers System for the segments contained in Alternative D of the DRMP/EIS, the UFO BLM is honoring the countless hours of work from local stakeholders, citizens, sub-RAC (Resource Advisory Council), RAC members, and state and federal agency specialists, along with all of the public input gathered in-person and via multiple written comment periods.

The number of segments recommended as "suitable" is a very small subset of the number of segments
analyzed and their designation as suitable was found to be the best locally acceptable method to maintaining important native fish or other critical wildlife habitat, recreation and scenic values. Private property rights and water rights were carefully considered during the suitability process led by the stakeholder group and had been appropriately respected in Alternative D of the draft RMP/EIS. 3, 4

[3 Pages 3-164-167;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.96289.File.dat/3_UFO-DRMP2016_508.pdf]

[4 http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.2133.File.dat/P_WSRSuit_UFO-DRMP-2016_508.pdf]

BLM_0156315

<([#1 [39.1] San Miguel County urges the UFO BLM to support these determinations of suitability within the Dolores and San Miguel Basin and to work with the Colorado Water Conservation Board (CWCB) to obtain flow protections using state processes to support the flow-related Outstandingly Remarkable Values (ORVs) where they do not already exist within these segments. #1])>

In June 2010, the UFO BLM published their findings of eligibility for 174 river segments studied and evaluated in advance of the Uncompahgre Resource Management Plan (RMP). The analysis area included a portion of the Dominguez-Escalante National Conservation Area (NCA). An additional segment of the Dolores River, identified in the San Juan Public Lands Draft Land Management Plan, was evaluated by the UFO BLM because the northernmost 11.8-mile downstream portion of this segment is within the UFO planning area.

The BLM found after completion of field assessments and data analysis that informed their eligibility determination process, that 34 segments out of the 174 segments scoped were determined to be both free-flowing and to possess one or more outstandingly remarkable values (ORVs) that are necessary for Wild and Scenic River eligibility. During the eligibility process, reviews of free-flowing character and determinations of ORVs were made by Colorado Parks and Wildlife (formerly Colorado Division of Wildlife; CPW), U.S. Fish and Wildlife Service (USFWS), and Colorado Natural Heritage Program (CNHP). The Draft Eligibility Report had a typical public comment period with comments received by the BLM from diverse interests.

<([#2 [39.2] In addition, fish values were assessed by Colorado Parks and Wildlife (CPW) on the San Miguel and
Dolores Rivers. A presentation by Dan Kowalski, Aquatic Biologist, CPW, stated that San Miguel River Segments 1 and 2 are very important and highly used fisheries with important recreational fishing values. San Miguel River Segment 2 was identified as exceeding the Gold Medal Biomass standard in some years. Native fish species identified on the San Miguel River are Colorado Pikeminnow (Federally Endangered/State Threatened); Bluehead Sucker (State Threatened); Flannelmouth Sucker (State Threatened); Roundtail chub (State Species of Special Concern; BLM Sensitive Species); Colorado River Cutthroat Trout (State Species of Special Concern); Speckled Dace and Mottled Sculpin.5

[5http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/wsr_docs.Par .32765.File.dat/San%20Miguel%20Dolores%20Fish%20DOW%20Presentation%20Dan%20Ko walski.pdf] #2])>

In February 2013, the UFO BLM published their final Wild and Scenic River Suitability Report, which further analyzed the suitability of 28 river segments, including the 11.88-mile segment of the Dolores River.6 (Six river segments, found eligible, were separately analyzed for suitability within the DominguezEscalante NCA RMP.)

[6http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_do cs_1.Par.70506.File.dat/WSR%20Suitability%20Report_Final_04272012.pdf]

During the robust suitability process, the BLM weighed protective measures for eligible river

segments and the corresponding corridor in relation to current and potential identified uses. Possible environmental and economic consequences of, management issues resulting from, and reasonable alternatives to WSR designation were considered. Preliminary segment boundaries and classifications were reevaluated in response to public input. Geographic information systems data was recalculated, at times resulting in modified segment lengths and land ownership measures. Public participation and comments resulted in refinement of which segments were considered suitable for 10 stakeholder group meetings within the Dolores/San Miguel Basin. (Separate stakeholder processes were initiated for segments in the Gunnison River Basin and those in the Dolores and San Miguel river basins.) Stakeholder groups held public meetings during late 2010 and early 2011. The Dolores/San Miguel Basin subgroup considered BLM analysis and public input and developed recommendations for each of the Dolores-San Miguel segments. A second public comment period was held to receive even more input prior to suitability recommendations from the stakeholder group. Hundreds of public comments were considered during the formal suitability public comment period.

San Miguel County fully believes that the stakeholder group, co-chaired by John Reams, a construction and mining contractor and rancher based in Norwood and Naturita, and Peter Mueller, a project director for the Nature Conservancy, based in Telluride, represented diverse backgrounds and interests and solicited diverse input from the public that was deeply considered in the final results of the process.

Stakeholder meetings were held in Norwood, Naturita, and Telluride, whose residents are known to have very different political views on energy, minerals, recreation, agriculture, and forestry.7 The Dolores/San Miguel Basin subgroup examined 21 different stream segments and public input received was incorporated into their findings.8 The stakeholder group found 7 segments to be Suitable with modifications, 6 segments to be Suitable, and 8 to be Not Suitable.9 Their recommendations were then considered by the BLM Southwest Resource Advisory Council (SW RAC) which voted unanimously to recommend that 8 segments in the San Miguel Basin and 5 segments in the Dolores Basin be found suitable. The BLM incorporated these recommendations into its preferred Alternative D of the UFO draft RMP/EIS.

[7http://www.telluridenews.com/news/article_d60c6f40-91d2-542e-8dad-e06bb13d4e85.html]

[8http://matchbin-assets.s3.amazonaws.com/public/sites/165/assets/64CW_The_Watch___March_17__2011.pdf]

[9http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/wsr_docs.Par.31074.File.dat/2011-0225%20WSR%20Dolores%20San%20Miguel%20Segment%20Analysis%20RAC%20Recommendation.pdf]

San Miguel County is supportive of NCA legislation on the Dolores River Segments 1 and 2 and the La Sal Creek Segments 2 and 3, which overlap with the Tres Rios and Uncompahgre BLM offices. If the NCA is successful, we believe that a Suitability determination would no longer be relevant. However, until an NCA is agreed upon, Suitability is a powerful tool to bring stakeholders and governments to the table to agree on NCA terms. Currently, there is no

guarantee that an NCA will happen in the near future or that there will be agreement as to how the NCA will protect flows in place of current Suitability. <([#3 [39.1] Therefore, until such time as an NCA may be established that protects both flow-related and non-flow dependent ORVs, San Miguel County urges the CWCB to support the Alternative D suitability recommendations for the Dolores River. If an NCA is established that accomplishes full protection of ORVs, we would then support the determination for these 4 segments to be changed to not suitable. #3])>

San Miguel County understands that when the CWCB voted to appropriate an Instream Flow right (ISF) on the Dolores River from the San Miguel to Gateway (Lower Dolores Segment), the BLM offered in an unprecedented agreement, not to seek a federal water right on this river segment to protect the ORV flows. This was a very important consideration by the CWCB in voting to appropriate the ISF. We support the CWCB in asking for this language to be carried through on the other Dolores River sections.

While the ISF is important to protect the Lower Dolores segment (25), the ISF alone would not protect the wide array of ORVs, including: recreational and the extraordinary rafting, kayaking and canoeing opportunities; peregrine falcon habitat, including for breeding and nesting; and geologic and scenic, including the historic hanging flume. The BLM's Report admits that due to the limited unappropriated water, it is unlikely that the high flows needed to sustain recreational activities could be secured. The Suitability determination on the Lower Dolores sections would complement the State's ISF by adding land management protection for this incredibly scenic and remote stretch of river with its historical, cultural and wildlife attributes.

San Miguel County also understands that The Lower Dolores from McPhee Dam to Bedrock already
operates with a Suitability designation that was in place when the dam was built. The BLM has made it clear that it can't take away the senior water rights of the Dolores Project or require new reservoir releases through Suitability; rather it must work within the Colorado water rights system. The current Suitability determination on the Dolores has not appeared to affect Drought Contingency Planning or any coordinated management efforts.

A. San Miguel River Segment 1 – ORVs are Scenic, Recreational, Wildlife, Historic, Vegetation, and Paleontology. Over 19 miles of this segment lies within the existing San Miguel ACEC, and it appears nearly the whole segment lies within the proposed San Miguel Expansion ACEC (GIS files). 10

[10http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp/ufo_draft_rmp_shape.html]

The San Miguel River corridor is extremely important for the local economy. Preserving scenic views while allowing for high-quality boating, fishing, and retaining the existing travel management plan uses/limitations is extremely important to San Miguel County.

<([#4 [39.1] Due to the scenic and recreational ORVs, the fact that this segment is within the designated San
Juan Skyway Scenic Byway and the Unaweep-Tabeguache Scenic and Historic Byway, it is very important to retain no less than a V-2 category for visual resource management. This is

BLM_0156318

consistent with the San Juan Scenic Byway Management Plan11 , the Unaweep-Tabeguache Scenic and Historic Byway Corridor Management Plan12 , and the San Miguel County Comprehensive Development Plan13 . While the DRMP/EIS states "The BLM would not permit any actions that would adversely affect the free-flowing condition, ORVs, and adequate water quality to support those ORVs or tentative classification of any of the segments, or would result in the reduction of water quality to the extent that it would no longer support the ORVs…"14 , the stipulations provided in Alternative D do not provide the safeguards needed to make this a true statement. If this is indeed a fact, then stronger stipulations are needed to replace those in Alternative D and/or in addition to the Alternative D stipulations. Also, reaches within this segment contain four globally vulnerable (G3) riparian communities.

[11https://www.codot.gov/travel/scenic-byways/southwest/san-juanskyway/SanJuanSkywayCorridorManagmentPlan.pdf/at_download/file]

[12https://www.codot.gov/travel/scenic-byways/southwest/unaweep-tabeguache/unaweep-tageguache-byway-corridor-managementplan-sep-2013]

[13http://www.sanmiguelcountyco.gov/DocumentCenter/Home/View/222]

[14Page 4-409;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_2.Par.12939.File.dat/4_UFO-DRMP2016_508.pdf]  #4])>

B. Saltado Creek – This segment is proposed for a WSR designation of Wild in Alternative D. The
stated ORV for this segment is Vegetation, described as an "A-ranked" superior occurrence of globally vulnerable (G3) narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest, which is a primary reason the existing San Miguel ACEC was created.15

[15Page 64;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.16348.File.dat/Final%20WSR%20Eligibility%20Report%20Final%20Web%20071210.pdf]

C. Beaver Creek --This segment is proposed for a WSR designation of Recreational in Alternative D. The stated ORV for this segment is Vegetation, described as an "A-ranked" superior occurrence of globally vulnerable (G3) narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest, which is a primary reason the existing San Miguel ACEC was created.16 The designation of Recreational received strong support from a primary private landowner and San Miguel County, and was chosen to provide "reasonable certainty that future water development projects would receive
consideration and could move forward with minimal difficulty." 17

[16Page 64;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.16348.File.dat/Final%20WSR%20Eligibility%20Report%20Final%20Web%20071210.pdf]

BLM_0156319

[17Page 37;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs
_1.Par.70506.File.dat/WSR%20Suitability%20Report_Final_04272012.pdf]

3. SAN MIGUEL RIVER/SALTADO CREEK/BEAVER CREEK AREA COMMENTS:
<([#5 [3] [39.1] First, the San Miguel River corridor along with tributaries Saltado and Beaver
Creeks was analyzed by San Miguel County staff holistically. These areas have several existing
and proposed designations within either Alternative A, Alternative B, and/or Alternative D.
However, we found that the stipulations provided in the UFO BLM DRMP/EIS GIS files did not
match the language within the RMP, and added quite literally, layers of complexity to understand
which stipulation (generally the most protective or stringent) would apply to which portion of
land within this area.

To aid in this analysis, San Miguel County staff prepared a comparison table (Attachment B) that
showed the stated stipulations for each designation category, for the San Miguel River mainstem
and surrounding canyon/Area of Critical Environmental Concern (ACEC) lands; the Saltado
Creek drainage and surrounding canyon/ACEC lands; and the Beaver Creek drainage and
surrounding canyon/ACEC lands.

As one example of the inconsistencies of stipulations in this area, a single place within the San
Miguel River proposed Wild and Scenic River (WSR) Segment 1, near the confluence with
Specie Creek -- was within:

-the Alternative D WSR segment proposed as Suitable, Recreation;

-the Alternative D San Miguel River Special Recreation Management Area (SRMA);

-the Alternative A and D existing San Miguel River Area of Critical Environmental Concern
(ACEC)
designated in 1993 to protect the high-quality riparian vegetation resources, habitat for many
bird species, and the scenic value of the corridor, within or proximal to a State designated Scenic
Byway; (According to the BLM's ACEC Final Report of 2013, the riparian vegetation
community exists "mainly due to the undammed San Miguel River and its intact hydrology." The
report when on to state, "Such communities are becoming increasingly rare in Colorado." 18 The
report also states that the Visual Resource Index (VRI) should be V-2 for the existing San
Miguel River ACEC.)

[18Page 41;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs
_1.Par.52182.File.dat/ACEC%20Report%20Final%2001152013.pdf]

-the Alternative D San Miguel Ecological Emphasis Area;

-the Alternative D fluid minerals stipulation: No Surface Occupancy (NSO)

-the Alternative B San Miguel River Expansion ACEC which would expand the ACEC to protect

BLM_0156320

additional lands having high-quality riparian vegetation resources, bird habitats, and scenic values, within or proximal to State designated Scenic Byways; (The BLM's ACEC Final Report states that the VRI should be V-2 for the San Miguel River Expansion ACEC.)

-the Alternative B fluid minerals stipulation: No Lease (NL);

-the Alternative A lands shown as not having Coal potential.

What we found in our comparison table was that the preferred Alternative D, for the above designations and shapefiles, would classify this with a hodge-podge of V-2 within the WSR polygon, but V-3 within the ACEC and SRMA. This makes no sense because these lands are proximal/in/adjacent to two state-designated scenic byways. The Enhanced Ecological Area and WSR would have a Controlled Surface Occupancy (CSO) stipulation, while the overlapping ACEC, SMRA, and fluid minerals layers would have No Surface Occupancy (NSO) for Alternative D. The SMRA, ACEC Expansion, and fluid minerals Alternative B stipulation would be NL.

Rather than have so many overlapping layers with varying and conflicting stipulations overlying each other on the ground, a situation that will certainly be more prone to human error in interpretation and implementation, San Miguel County desires that the lands within the San Miguel Expansion ACEC and/or San Miguel SMRA Alternative B boundaries be given protections that will be simplified, allow for appropriate recreation, allow for adequate protection for the ACEC and WSR values, provide co-protection for wildlife, and adequately protect the visual resources. #5])>

The final decision should:

A. Include a determination of "suitable" for inclusion in the National Wild and Scenic Rivers System for San Miguel River Segment 1, Beaver Creek and Saltado Creek.

B. Expand the San Miguel River ACEC to include all of the lands within the existing San Miguel River ACEC and the proposed San Miguel River Expansion ACEC in Alternative B.

C. <([#6 [27.1] Continue the existing San Miguel River SRMA which is included in the agency preferred Alternative D. There are an additional 76 acres that would be included in the SRMA just southwest of the confluence of Willow Creek and the San Miguel River. San Miguel County does not want this SRMA changed to become the San Miguel River Corridor Extensive Recreation Management Area (ERMA) that is proposed in Alternative C. The VRM classification should be changed from VRM-III to VRM-II to be consistent with the ACEC and the two state-designated scenic byways. The incredible scenic qualities of this area are very important economically to the region and should be maintained and managed at VRM-II. The SRMA should be expanded to match the San Miguel River Expansion ACEC boundary, such as in Big Bear Creek area.

According to the BLM, any area not identified as an SRMA is automatically managed as an ERMA. On the BLM UFO Recreation Management Area web page, the BLM states: "Within

ERMAs, recreation is unstructured and does not require intensive management or significant investment in trails or facilities. This type of custodial or "dispersed" recreation management provides minimal visitor services and few developed recreational facilities."19 Because there is a large identified local, regional, national and international market demand for structured recreation, the San Miguel River SRMA is the best management fit. Within the San Miguel River SRMA, there are developed recreation sites, including campgrounds, staging areas, visitor information, and limited facilities.

[19 http://www.blm.gov/co/st/en/fo/ufo/recreation.print.html] #6])>

D. <([#7 [27.1] [14.1.1] With appropriate stipulations for the above, the complex mosaic of Enhanced Ecological Areas
as proposed in the San Miguel River Expansion ACEC/SRMA areas should not be needed as wildlife will be getting protection benefits from the management decisions and implementation of the WSRs, SMRA, and expanded ACEC. The stipulations contained in the Enhanced Ecological Area shapefile for Alternatives B and D are much weaker than those for the other intersecting designations of ACEC, SRMA, and WSR (see Attachment A). 20

[20
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.P ar.60521.File.dat/ecological_emphasis_areas.zip]

The BLM's stated reason for contemplating an EEA in the San Miguel River is provided in its description in the DRMP/EIS Appendix D21 :

[21 Page D4;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_app endix.Par.39615.File.dat/D_EEAs_UFO-DRMP-2016_508.pdf]

San Miguel County desires that within the San Miguel River existing/expansion ACEC - San Miguel River SRMA - San Miguel Segment 1/Beaver Creek/Saltaldo Creek WSRs that the final RMP/ROD does not designate the additional San Miguel Enhanced Ecological Areas. With the stipulations recommended below, these areas will be well served. All of the stipulations recommended for Alternative D for creating the San Miguel EEA are included or exceeded in our list of stipulations below. #7])>

The BLM defines Ecological Emphasis Areas (EEAs) as areas that are "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," with the objective of having a designated EEA being "manage to preserve the continuity of habitats, vegetation communities, and native wildlife within, while following vegetation mosaic objectives" 22

[22Page 2-68;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_ 1.Par.31726.File.dat/2_UFO-DRMP2016_508.pdf]

BLM_0156322

E. <([#8 [27.1] [39.1] [3] San Miguel County believes that the San Miguel River, including the Saltado and Beaver Creek
areas, can be served by a single set of stipulations that meet the needs and criteria of all of the overlapping designations recommended by the BLM and/or requested by San Miguel County (San
Miguel ACEC Expansion, San Miguel River SRMA, and all 3 WSR segments). The stipulations for
these lands collectively should include:

-"7" = Limit camping to 7 days, 6 nights maximum within a 30-day period for dispersed camping.

o SMC Note: Do not change the current maximum length of stays at the improved BLM campgrounds: Fall Creek (7 days), Caddis Flats (14 days), or Lower Beaver (7 days).

-"AVOID" = ROW Avoidance.

o SMC Note: San Miguel County would support an EXCL = ROW Exclusion for some areas where no ROWs currently exist, however, it is the county's desire to have the ability to scope a bike path or trail from Telluride to Placerville somewhere off of State Highway 135 and near the San Miguel River and/or additional broadband infrastructure on existing ROWs or short segments of new ROW, if there are not significant negative impacts to ACECs, WSR, or recreation.

-"CAMPFIRE" = No Campfires for dispersed camping.

o SMC Note: San Miguel County is ok with campfires in existing campgrounds -- Fall Creek, Caddis Flats and Lower Beaver if already allowed.

-"COAL" = Closed to coal mineral leasing.
o SMC Note: BLM data that there is little to no actual coal potential and allowing for coal mineral disposal would negatively impact ORVs with little actual mineral resource benefit. This entire area is given a classification of no coal potential in Alternative A.

-"CWOD" = Closed to commercial wood cutting.

-"DES" = Limited to designated routes / Limited to existing routes.

-"DR_Timing" = Designated routes - Timing Limitations, Limited to designated routes all other times (for wildlife).

-*"HYDROE" = Exclusion area for hydropower.
o SMC Note: This is consistent with the importance of this segment for fishing and recreational boating.

-"LOCATE" = Petition Secretary of Interior to withdrawal for locatable minerals.

BLM_0156323

-"NL" = No lease.

o SMC Note: There are low oil and gas potential in the eastern portion of the expanded San Miguel River ACEC. According to Colorado Oil & Gas Commission (COGCC), Well Data downloaded in September 2016, only one well has been drilled within 2 miles of the proposed WSR suitable segments. This well was a wildcat well near Placerville, drilled in 1960 and was "DA: dry and abandoned."

o SMC Note: SMC finds that the negative impacts to the San Miguel River, Beaver Creek, and Saltado Creek corridors, scenic byways, traffic, recreation, visual resources, and wildlife in an area without any oil/gas infrastructure, identified oil/gas fields, and history of interest or past production far outweighs any possible benefits from resource exploration or extraction within this area. According to the Fluid Minerals Alt D code in the Fluid Minerals Alt D shapefile23 , the entire San Miguel River Segment 1, Beaver Creek, and Saltado Creek WSRs, and the existing and expanded San Miguel ACEC and San Miguel SRMA is coded as NSO for the preferred alternative. However, this stipulation seems to missing from the WSR Alt D shapefile attribute table24 . Alternative B gives all these areas the stipulation of "NL" which is preferred by San Miguel County as it conserves valuable staff time and resources from even going through the federal lease process.

[23http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_1.Par.20291.File.dat/fluid_minerals_alt_d.zip]

[24http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.28698.File.dat/WSR_ALT_D_FINAL.zip]

-"RANGE" = Closed to livestock grazing.

o SMC Note: essentially already recommended in Alternatives B and D. This is a high conflict area with many uses constrained in a narrow canyon. Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer. Grasses and forbs should not be grazed as they provide protection. Wildlife needs this food source.

-"RECMINE" = No recreational mining.

o SMC Note: SMC has found recreational mining is disruptive to other quiet uses, wildlife, and has caused conflicts with public access, boating, fishing, hiking, photography and other quiet use activities within the San Miguel River corridor. Non-motorized recreational mining does not have the same level of impact and disruption to the aquatic and riparian ecosystems as motorized recreational mining. San Miguel County believes that to protect the WSR, ACEC, SRMA, and highly scenic and important riparian and aquatic ecosystems, there at should be no motorized recreational mining on the San Miguel River Segment 1, and the Beaver and Saltado Creek segments found suitable for WSR designation.

-"SALABLE" = Closed to salable mineral disposal.

o SMC Note: Gravel and dimension stone mining is not consistent with the ORVs and ACEC riparian values.

BLM_0156324

-"SEED" = Area closed to seed collection.

-"SHEEP" = Grazing of sheep and goats not permitted
o SMC Note: essentially already recommended in Alternatives B and D. SMC Note: This is a high conflict area with many uses constrained in a narrow canyon. Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer. Grasses and forbs should not be grazed as they provide protection. Wildlife needs this food source.

-*"SOLARE" = Exclusion area for solar.
o SMC Note: Commercial solar concentrators or PV panels are not compatible with the WSR/SRMA/ACEC/scenic and wildlife values here. The San Miguel River corridor is determined to have "Very Good" Solar PV potential by the UFO BLM Renewable Energy Potential Report (2010), which doesn't take into account distance from substations. PV arrays for off-site uses need to be proximal to substations. 25

[25http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf]

-"SOLID"= Closed to non-energy solid mineral leasing.
o SMC Note: Ground disturbing activities, such as surface mining, are not consistent with the ORVs, wildlife and ACEC values, nor the important scenic qualities.

-"SSR" = Site-Specific Relocation.

-"TAR"=Prohibit target shooting.
o SMC Note: Target shooting in the narrow rock-walled canyons results in amplified noise and disturbances to the wildlife, birds and pristine experiences of these areas.

-"V-2"=VRM II
o SMC Note: WSR and San Miguel River Existing/Expansion ACEC should have a VRM II, as the DRMP/EIS states "Managing the segments according to VRM Class 1 or II objectives would provide direct protection to segments with a scenic ORV by requiring that the alterations to the landscape be done so as not to dominate the viewshed. If alterations cannot be mitigated to reach the VRM class objective, they would not be permitted...In turn, this would provide indirect protection to segments with a cultural or historical ORV." 26 As noted elsewhere, the BLM 2013 ACEC Final Report states that the San Miguel existing and expansion ACECs should have VRM II.

[26Page 4-412; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_2.Par.12939.File.dat/4_UFO-DRMP2016_508.pdf]

o SMC Note: Beaver Creek was not provided any VRM stipulation in the WSR Alt D shapefile. WSR should have a VRM II.

BLM_0156325

-*"WINDE"=Exclusion area for the wind.
o SMC Note: The San Miguel River corridor is determined to have "Poor" wind potential by the UFO BLM Renewable Energy Potential Report (2010). 27

[27http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf]

-"WOOD"=Closed to wood cutting.

*All above stipulations apply where there is BLM surface estate, however, HYDROE, SOLARE, AND WINDE are not included as stipulations on the non-BLM surface estate (private, U.S. Forest Service lands).

We obtained definitions of these codes from BLM GIS metadata made available for each BLM UFO DRMP/EIS shapefile, such as the WSR Alt D shapefile metadata.28

[28http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.87378.File.dat/WSR_ALT_D_FINAL.html]  #8])>

3. Special Recreation Management Areas (SRMAs) & Extensive Recreation Management Areas (ERMAs)
Summary: There are two SRMAs discussed in the DRMP/EIS within San Miguel County: San Miguel River
(which includes the San Miguel River Segment 1, Saltado Creek and Beaver Creek segments determined to be suitable for Wild & Scenic River designation in Alternative D; and Burn Canyon. We commented above that we desire to continue the designation of the San Miguel River SRMA. The San Miguel River SRMA already exists but the preferred Alternative D would add approximately 76 acres to this SRMA, just southwest of the confluence of Willow Creek and San Miguel River.

Specific to the Burn Canyon SRMA, we note that it is within the proposed Naturita Canyon EEA. The Burn Canyon SRMA is recommended in Alternative B, but not in the agency preferred alternative, Alternative D. Under Alternative B, if designated, the Burn Canyon SRMA would have the following management stipulations:

SRMA Scenario (Alternative B)

Figure 3.1 -- showing the Burn Canyon SRMA Alternative B scenario.

It would have travel restricted to mostly designated routes, portions (purple) would be closed to mechanized (bikes) and motorized vehicles, and would not allow competitive events. It would be closed to coal and solid mineral leasing, the BLM would petition for withdrawal of locatable minerals, and there would be no surface occupancy for oil and gas. It would have VRM II.

Targeted activities would be hiking and horseback riding and enjoyment of nature in the canyons. On the mesa tops and slopes, activities would also include mountain biking.

BLM_0156326

Under the agency preferred ERMA in Alternative D, the ERMA would have VRM III and controlled surface use for oil/gas development only. The SRMA and ERMA have the same boundary. However, under the ERMA scenario, the lands would be managed to allow ATVs and motorcycles, mountain biking, and hiking in both the canyons and the mesa top/slopes, while retaining a natural appearing landscape and providing necessary recreation facilities such as trails/trailheads/staging areas/signage to facilitate recreational activities. 29

[29Pages J-5-7; J-91;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_app
endix0.Par.40130.File.dat/J_Rec_UFODRMP-2016_508.pdf]

ERMA Scenario (Alternative D)

Figure 3.2 -- showing the Burn Canyon SRMA Alternative D scenario.

<([#9 [27.1] San Miguel County desires that the Burn Canyon SMRA as mapped and stipulated in Alternative B be
approved and incorporated into the final RMP. We believe that the SRMA will complement the proposed Naturita Canyon EEA as mapped and recommended in Alternative B, along with the fluid minerals stipulations from Alternative B in this area. #9])>

4. Enhanced Ecological Areas (EEAs)

A. San Miguel EEA.

The BLM UFO DRMP/EIS contemplates two EEAs within San Miguel County: San Miguel EEA and Naturita
Canyon EEA. 30 The San Miguel River Expanded ACEC preferred by San Miguel County, the existing San Miguel SRMA and the Alternative D recommended WSR segments for San Miguel River Segment 1,

[30Pages D-3 & D-4;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_app
endix.Par.39615.File.dat/D_EEAs_UFODRMP-2016_508.pdf]

Beaver Creek and Saltado Creek. <([#12 [14.1.1] San Miguel County recommended a standardized set of stipulations
(pages 7-9 of this document) that would meet the needs of all of these San Miguel County desired
designations, and also meet and exceed the stipulations that had been proposed by the BLM for the San Miguel EEA. #12])>

B. Naturita Canyon EEA.

The BLM describes the reasons for considering Naturita Canyon EEA on Page D-4 of Appendix

D of the DRMP/EIS as:

<([#11 [14.1.2] Geographically, there are several parcels mapped as comprising the Naturita Canyon EEA for Alternative B. The purple and red polygons (see figures below) make up the Naturita Canyon EEA. It would provide linkages between adjacent State land (blue) and National Forest land (green). The hatching shows occupied critical Gunnison Sage-grouse habitat as designated by U.S. Fish and Wildlife Service (USFWS). The DRMP/EIS does not list Gunnison Sage-grouse (GuSG) as a species that the EEA would be managed to benefit. #11])>

Figure 4b.1 -- Showing the Naturita Canyon EEA Alternative B.

In Alternative D, the agency preferred alternative, only the two red parcels of the Naturita Canyon EEA would actually be designated as an EEA:

Figure 4b.2 is showing Naturita Canyon EEA Alternative D and Colorado Oil and Gas Commission (COGCC) wells.

Above, the BLM surface that would not be part of the Naturita Canyon EEA is shown in yellow. We also show oil and gas wells, with green wells being producing oil or gas wells, and red wells being mostly wildcat wells that are non-producing. An EEA consisting of just the red polygons, especially with simply controlled surface use (CSU) and ROW avoidance (AVOID), instead of no surface occupancy (NSO), designated routes- timing limitations (DR_TIMING), seems this would result in two small token EEA parcels without meaningful habitat protection or connectivity, beyond what is already anticipated by the fluid minerals management in Alternative D. Most of these two polygons are already anticipated to be NSO. However, the remainder of the area that is analyzed for Naturita Canyon EEA is CSU under alternative D.

Alternative D, agency preferred, for Naturita Canyon EEA and fluid minerals stipulations:

Figure 4b.3 -- showing the Naturita Canyon EEA Alternative D with fluid minerals Alternative D

Alternative B, San Miguel County preferred, for Naturita Canyon EEA and fluid minerals stipulations:

Figure 4b.4 showing Naturita Canyon Alternative B and fluid minerals Alternative B.

<([#10 [14.1.1] San Miguel County believes that since the wildlife values warranted studying the Naturita Canyon area for an EEA, that Alternative B for the EEA boundary and EEA stipulations, as well as Alternative B fluid minerals stipulations, should be applied by the final decision in this area. We could not locate a discussion in the DRMP/EIS explaining the BLM rationale for how choosing Alternative D over Alternative B with respect to this EEA and the fluid minerals stipulations that overlap, would achieve the stated objectives of preserving the continuity of habitats, vegetation communities, and native wildlife. 31

[31Pages 2-68 & 2-69;

http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_
1.Par.31726.File.dat/2_UFO-DRMP2016_508.pdf]  #10])>

San Miguel County recommends that the full Naturita Canyon EEA be designated, as mapped in
Alternative B, along with Alternative B fluid minerals stipulations. This will be complimented
by also designating the Burn Canyon SRMA as mapped in Alternative B.

5. Areas of Critical Environmental Concern (ACECs)

The UFO DRMP/EIS contemplates three ACECs within San Miguel County:

A. San Miguel River ACEC and San Miguel River Expansion ACEC.

These ACECs have been discussed in detail in this document above, and San Miguel County
strongly
supports Alternative B, which would designate the additional lands within the San Miguel River
Expansion ACEC. According to the BLM's Final ACEC report (2013), all of the relevance and
importance criteria were met, just as with the existing San Miguel River ACEC. 32 San Miguel
County also strongly supports a cohesive management of the overlapping ACEC lands, SRMA
lands, and WSR segments within San Miguel River Segment 1, Beaver Creek and Saltado Creek
through one set of stipulations, with a VRM II stipulation. The agency preferred VRM III
stipulation does not adequately protect the exceptional scenic qualities of this area, nor the
regional economy, nor the viewshed of the two state-designated Scenic Byways. Please see this
document, Section 3, pages 5-9 above for specific requests for changes and implementation that
San Miguel County desires in the final decision.

[32Pages 41-47;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs
_1.Par.52182.File.dat/ACEC%20Report%20Final%2001152013.pdf]

B. San Miguel Gunnison Sage-grouse ACEC.

This ACEC is comprised of 470 acres in multiple parcels occurring on scattered critical
Gunnison Sagegrouse habitat that whose surface estate is managed by the BLM. San Miguel
County was originally one of the proponents of this ACEC. When the BLM's Final ACEC report
was published in 2013, this was prior to the federal decision to list the Gunnison Sage-grouse as
Threatened and designate critical habitat in 2014.

On November 12, 2014, the U.S. Fish and Wildlife Service (USFWS) announced that it
determined that the Gunnison Sage-grouse, a ground-dwelling bird found only in southwestern
Colorado and southeastern Utah, required the protection of the Endangered Species Act (ESA) as
a threatened species. The USFWS originally proposed to list the species as 'endangered' under
the ESA in January 2013, but efforts by the two states, tribes, local communities, private
landowners and other stakeholders to conserve the species and its habitat were found to have
helped reduce the threats to the bird sufficiently to give it the more flexibly protected status of
'threatened.' 33

BLM_0156329

[33
https://www.fws.gov/mountainprairie/pressrel/2014/11122014_ServiceProtectsGunnisonSageGrouseA
sThreatenedUnderESA.php]

The supporting EIS for the Threatened Status designation of the Gunnison Sage-grouse34 and for the Designation of Critical Habitat for the Gunnison Sage-grouse35 is dated November 9, 2014.

[34
https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf]

[35
https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GuSGCriticalHabitat_11202014.pdf]

<([#13 [8] The Gunnison Sage-grouse ACEC as proposed in this UFO DRMP/EIS does not contemplate the status of
the species or critical habitat as listed in the federal register in 2014, does not contemplate surface disturbance and other disturbances on critical habitat that may be non-BLM surface estate but is BLM-managed federal mineral estate, and does not contemplate guidelines within numerous plans and the latest best management practices for stipulations and buffers from leks.

The UFO DRMP/EIS does not take into consideration that Occupied GuSG Habitat includes specific
properties (and split estate) that the USFWS excluded from the critical habitat designation. The political removal of surface lands coinciding within these specific private properties under conservation easements from listed critical habitat is appropriate, but the removal of subsurface public lands from Occupied Habitat is not appropriate because it excludes the subsurface mineral estate from the management actions contained in the UFO DRMP/EIS.

A. In summary, San Miguel County does not support the Gunnison Sage-grouse ACEC as proposed in
Alternative B of this UFO DRMP/EIS. The proposed alternatives with regards to Gunnison Sage-grouse and this ACEC are neither adequate, accurate, nor informed by the most recent federal actions and data available. The UFO DRMP/FEIS also predates the new alternative B analysis within the GuSG DRMPa/DEIS which analyzes an ACEC for all GUSG Occupied and Unoccupied Habitat. #13])> Please see Section 6, Gunnison Sage-grouse.

6. Gunnison Sage-grouse.

These designations prompted a process for the BLM to prepare a draft Gunnison Rangewide Plan Amendment that would potentially result in multiple resource plan amendments (GuSG DRMPa) and a

companion draft environmental impact statement (GuSG DEIS) which more closely analyzes planning
issues, including energy and minerals actions, in order "to analyze the addition of GuSG conservation measures to several existing RMPs", including the BLM UFO DRMP/EIS. The deadline for comments on the GuSG DRMPa is after the deadline to comment on this UFO DRMP/EIS. The GuSG DRMPa documents were released as drafts in August 2016.

In the GuSG DRMPa, the BLM states, "The BLM manages approximately 40 percent of GUSG habitat
across twelve counties in southwestern Colorado and southeastern Utah…The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision." 36

[36 Page I; https:/eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf]

<([#14 [8] We realize that since much of the UFO DRMP/EIS work occurred between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS. The San Miguel Gunnison Sage Grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.

Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM RMPa ROD so that the BLM RMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices. #14])> <([#15 [8] All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease is allowed a 20-year period with out-of-date stipulations and practices. #15])> While the GuSG DRMPa goes much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and habitat enhancement and connectivity measures, it still needs additional work, which San Miguel County will comment on separately under that comment process. The GuSG DRMPa does contemplate that removal of subsurface public lands from Occupied Habitat management actions is inappropriate, which is differently than how these lands are treated in the UFO DRMP/EIS.

It would be remiss to issue leases under any circumstances within the UFO until there is a final decision on the Gunnison Sage-grouse amendments.

The Purpose section of the GuSG DRMPa states, "This RMP amendment provides a framework for
conserving and assisting with the recovery of the GuSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird." The Need section of this document states, "The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs 'shall be revised as necessary based on …, new data, new or revised policy…(43 CFR 1610.5-6).'" 37

[37 Page iii; https:/eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-

0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf]

<([#16 [8] [15.2] San Miguel County believes that the listing of the GuSG and designation of critical habitat is a new circumstance that requires modification of the UFO DRMP/EIS, but to be consistent where the San Miguel Basin population has key areas such as Miramonte Reservoir area that are split among the UFO and Tres Rios Field Office (TRFO) there needs to be a consistent set of management guidelines and stipulations across the entire San Miguel Basin population. There may be different lek buffers and needs between the different subpopulations, such as the Gunnison Basin and the San Miguel Basin populations. Seasonal habitat has not been delineated within the San Miguel Basin population the way it has in the Gunnison population. The fact that the BLM is conducting the GuSG DRMPa/DEIS process and recommending a preferred alternative that would amend the TRFO RMP seems to point to that need. San Miguel County also does not agree that the range of alternatives analyzed in the 2013 TRFO RMP/FEIS nor this UFO DRMP/EIS is appropriate with respect to the needs of GuSG. #16])>

<([#17 [15.2] The range of alternatives considered in the GuSG DRMP/DEIS includes having the stipulation of No
Surface Occupancy being applied to all BLM lands within 4-miles of a lek. These documents analyze all BLM lands within occupied, unoccupied or a 4-mile buffer of a lek as the decision area. Yet, the 2005 Gunnison Sage-grouse Rangewide Conservation Plan38 and the presence of occupied critical habitat more than 4 miles from leks within the San Miguel Basin show that GuSG is found occupying habitat and using seasonal habitat 6 or more miles away from leks. 39 For example, the occupied habitat within the Dry Creek Basin area, San Miguel Basin GuSG population, shown on Map 1 that is beyond the 4-mile lek buffer, is between 6- and 6.25-miles from leks. The BLM should allow for additional review of appropriate protections for Gunnison Sage-Grouse habitat from oil and gas development within at least a 6-mile buffer, preferably a 6.2-mile buffer of leks within the San Miguel Basin.

[38 http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx]

[39 Page J-5;
http://cpw.state.co.us/Documents/WildlifeSpecies/SpeciesOfConcern/GunnisonSageGrouse/Con sPlan/AppendixJSGHabitatUse03.pdf] #17])>

Section 7. Lands Identified For Disposal.

The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "consider disposal of lands that would consolidate public ownership for greater management efficiency while serving the public interest, including communities and their expanding needs." 40

[40 Page 2-319;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_ 1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf]

The lands identified for disposal were identified on Appendix A, Figure 2-6041 and legal descriptions were provided in Appendix N. 42 It appears that only the lands recommended for

disposal under the agency preferred alternative D are shown in Figure 2-60.

[41
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_app
endix.Par.78374.File.dat/App%20A%20Combined.pdf]

[42
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_app
endix0.Par.77552.File.dat/N_Disposal_UFO-DRMP-2016_508.pdf]

<([#18 [19.2] We recommend that it would be very helpful for the reviewing public and agencies
if the UFO made more readily available the Land Tenure/Land Disposal GIS files on the UFO
RMP GIS web page, and also if the name of the county were provided in Appendix N. We were
able to obtain from UFO GIS staff the land tenure shapefile via email. While actual reasons for
recommending individual parcels for disposal or nondisposal in the four alternatives were not
located in the DRMP/EIS, there were some cryptic rationales present within the land tenure
shapefile attribute table for a few but not all parcels. #18])>

<([#19 [19.1] San Miguel County does not desire any parcels to be disposed of that would
interfere with existing public roads or trails, existing private driveways or access roads, irrigation
ditches or other easements. Any parcels disposed of should conform with the criteria and
standards set forth in the San Miguel County Comprehensive Plan. Parcels that contain critical
habitat for sensitive or listed species or that provide connectivity between other public lands
should not be disposed of. If the BLM doesn't want to manage such parcels, then the adjacent
federal or state agency should be given an opportunity for management or ownership. #19])>

The metadata from the land tenure shapefile for the 10 parcels analyzed by the DRMP/EIS for
disposal within San Miguel County is below:

Table 7.1 -- the land tenure GIS shapefile attribute table for parcels within San Miguel County.

a. Fall Creek Area Parcels.

We attempted to map the legal descriptions of the parcels (SMC Parcel Reference #s 1 & 2 in the
table above) within San Miguel County and found that these two of the parcels (in T42N R11W
Section 2) were just east of Little Cone, adjacent to Fall Creek Road, County Road 57 P (see
pink outlines below). It appears these two parcels were currently listed for disposal by the
existing RMP (Alternative A), and are not recommended for disposal in Alternatives B or D.
They are located within the Fall Creek riparian corridor. San Miguel County agrees with the
Alternative D (no disposal) for these parcels.

Figure 7a. Fall Creek area parcels in T42N R11W Section 2, not recommended by SMC or
agency preferred Alternative D for disposal.

b. Beaver Creek and Saltado Creek Area Parcels.

BLM_0156333

We could not quite get the legal descriptions rectified for the parcels in Saltado Creek between Appendix N and the GIS land tenure file provided. However, the parcel within the Saltado Creek area intersects the Saltado Creek WSR segment, the existing ACEC and the SRMA. It also is adjacent to critical occupied Gunnison Sage-grouse habitat. It is within 1 to 2 miles of 3 active leks. It should not be disposed of.

The Beaver Creek parcel in T43N R12W Sections 9 & 10 is within the Beaver Creek WSR segment, existing ACEC and SRMA. It also is adjacent to critical occupied Gunnison Sage-grouse habitat. It is within 0.3 to 0.75 mile of 3 active leks. It should not be disposed of.

Both of these areas appear also to be within the San Miguel River Expansion ACEC (which San Miguel County recommends be designated. The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "retain lands in public ownership when it will serve the public interest, protect valuable resources, or achieve management goals." 43 Alternative B and Alternative D state that the UFO action will be to retain lands that are within ACECs or SRMAs. 44 Lands immediately adjacent to critical Gunnison Sage-grouse habitat should not be disposed of. The 2005 Gunnison Sage-grouse Rangewide Conservation Plan45 and the presence of occupied critical habitat more than 6 to 6.25 miles from leks within the San Miguel Basin subpopulation show that GuSG is found occupying habitat and using seasonal habitat 6 or more miles away from leks. 46

[43 Page 2-321;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf]

[44 Page 2-322;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf]

[45 http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx]

[46 Page J-5;
http://cpw.state.co.us/Documents/WildlifeSpecies/SpeciesOfConcern/GunnisonSageGrouse/ConsPlan/AppendixJSGHabitatUse03.pdf]

Figure 7b. Showing the Beaver Creek (left) and Saltado Creek (right) area disposal parcels in T43N R12W Sections 9 & 10; not recommended by SMC or agency preferred Alternative D for disposal. If sold for private development, there would be impacts to the scenic and primitive qualities of these areas, as well as the important riparian ecosystem and wildlife. Alternatives B and D do not recommend these parcels for disposal. San Miguel County believes it is best for the public and for the protection of valuable river corridors, ORVs, and Gunnison Sage-grouse if these parcels are not disposed of.

c. Lone Cone & Gurley Reservoir Area Parcels.

<([#21 [19.2] The BLM land tenure shapefile identified 3 parcels in the Lone Cone/Gurley

Reservoir area that are recommended for disposal under the agency preferred Alternative D (according to the shapefile attribute table). They are shown with the bright blue highlight around the pink parcel boundaries in Figure 7c below:

Figure 7c. Lone Cone Reservoir and Gurley Reservoir Area Parcels identified in GIS metadata within the provided land tenure GIS shapefile as being recommended for disposal in the agency preferred Alternative D.

Appendix N only recommends two parcels for disposal in the agency preferred Alternative D. So we are concerned that there is an error in mapping the southernmost parcel on Figure 7c. It appears to be within T43N R13W S12. However, this does not match a legal description in Appendix N. Appendix N, and the land tenure shapefile should be rectified before the final RMP and ROD. #21])> The southernmost parcel is entirely surrounded by Gunnison Sage-grouse occupied habitat and is also mapped on top of (or under?) the Lone Cone Reservoir. This parcel is within 0.5 miles of an active lek and 0.7 miles of a second inactive lek. San Miguel County does not support disposal of this parcel.

The parcel directly west of Gurley Reservoir (just south of Red Cone Rd.) is the parcel with the legal description of T44N R13W Section 35. The parcel directly north of Gurley Reservoir in the northern portion of Figure 7c is the parcel with the legal description of T44N R13W Section 35.

The northernmost parcel in Section 24 is 1.5 miles north of occupied Gunnison Sage-grouse habitat but is also surrounded by private land. It is 3.5 miles from the nearest active lek and 2 miles from the nearest inactive lek. If a parcel were to be disposed of, this would probably be the only parcel that makes sense. There are some undesignated BLM routes mapped on the fringes of this parcel.

The parcel in Section 35 is within 0.5 miles of an active lek and is adjacent to occupied Gunnison Sage-grouse critical occupied habitat. There is an undesignated BLM route mapped on this parcel. San Miguel County does not recommend disposal of this parcel.

d. Hastings Mesa Area Parcel

<([#22 [19.1] One additional isolated BLM parcel was analyzed for disposal is located on Hastings Mesa near Alder Creek in T44N R10W Section 29 adjacent to the Alder Creek Ranches subdivision. This parcel is entirely surrounded by private land. It was recommended for disposal in Alternatives A-C. However, no reason is given why it is not included for disposal in the agency preferred Alternative D. It is close to the Alder Creek riparian area. We would like an opportunity to review this parcel further with the UFO to examine it with respect to our Comprehensive plan, public rights of way, easements and other items, and to understand the UFO rationale for not including it for disposal in Alternative D. San Miguel County desires that if the BLM disposes of parcels it ensures there are either public ROW or private easements already in place prior to disposal, to ensure ingress/egress for future owners. #22])>

Figure 7c. Hastings Mesa/Alder Creek Area Parcel within T44N R10W Section 29. This parcel is not recommended for disposal in the agency preferred Alternative D.

e. Big Bear Creek Area Parcels

These parcels are within T42N R10W Section 4. Under the agency preferred alternative they are not
recommended for disposal. San Miguel County agrees that they should not be disposed of by the
BLM. They are within the Big Bear Creek riparian corridor, and the San Miguel River
Expansion ACEC desired to be designated by San Miguel County. The San Miguel SRMA
boundary should be expanded to match the San Miguel River Expansion ACEC boundary in this
area.

Figure 7e. Showing the Big Bear Creek Area parcels. If sold for private development, there
would be impacts to the scenic and primitive qualities of these areas, as well as the important
riparian ecosystem and wildlife. Alternatives B and D do not recommend these parcels for
disposal. San Miguel County believes it is best for the public and for the protection of valuable
river corridors and riparian habitat if these parcels are not disposed of. The San Miguel River
Expansion ACEC should be designated, and it would include these parcels. The San Miguel
River SRMA boundary should be expanded to include all of these parcels and the expansion
ACEC.

Section 8. Wildlife management.

<([#23 [14.1.5] San Miguel County urges the BLM to further consult and consider the Colorado
Parks and Wildlife (CPW), formerly Colorado Department of Wildlife (CDOW), detailed list of
Best Management Practices (BMPs) for oil and gas development titled "Actions to Minimize
Adverse Impacts to Wildlife Resources." With species-specific BMPs, including
recommendations on protective buffers, timing information, and recommendations on surface
density caps, referenced in their letter to BLM State Director Helen Hankins dated December 13,
2010. #23])>

<([#24 [5.2] We appreciate the statement in the DRMP/EIS on Page I-11 of Volume 1[47] that
says "The BLM will consult with Colorado Parks and Wildlife (CPW). The RMP will recognize
the State's responsibility and authority to manage wildlife." At the UFO RMP co-operator
meeting in Montrose on October 15, 2016, we heard CPW staff say that their information was
not incorporated into at least one alternative and that the RMP has not included BMPs, timing
limitations or stipulations offered by CPW.

[47 Page I-11;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_
1.Par.7326.File.dat/1_UFO-DRMP-2016_508.pdf] #24])>

San Miguel County supports CPW's desire that at least a "No Surface Occupancy" (NSO)
stipulation be applied to all Federal minerals within the boundaries of State Wildlife Areas
(SWAs) and State Park boundaries to balance mineral extraction with the protection of surface
resources.

San Miguel County has assisted in the protection of thousands of acres of private lands with important wildlife habitat values, including GuSG critical habitat, during the last few decades by participating in the acquisition of conservation easements intended to preserve and protect GuSG habitat. San Miguel County has contributed between roughly $1.4 and $1.6 million during this period for habitat conservation and improvements through the County's Land Heritage Program, co-funding of the GuSG working group, and other actions to benefit GuSG.

<([#25 [8] U.S. Fish and Wildlife Service did not include in its final listed critical habitat private lands that were under conservation easement. However, the BLM states in the GuSG DRMPa on Page ii, in the introductory discussion of occupied habitat for Gunnison Sage-grouse48 that "Occupied Habitat includes specific properties coinciding with BLM-administered federal minerals that the [US] FWS excluded from critical habitat designation. While the removal of surface lands with these properties from critical habitat is appropriate, the removal of subsurface public lands from Occupied Habitat is not." In other words, the BLM in its GuSG DRMPa understands that subsurface mineral estate actions should not be precluded from management actions. San Miguel County requests that the UFO RMP obtain from San Miguel County our GIS shapefile and database of private land conservation easements, and where split estate managed by the BLM exists, that the BLM implement NSO and other stipulations consistent with the primary conservation easement values on these properties.

[48 Page ii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf] #25])>

<([#26 [15.6] San Miguel County supports CPW in their statement in the 2010 letter, "As the surface density of
development increases beyond one well pad per section, literature sources strongly suggest that avoidance and minimization measures alone are no longer sufficient to address adverse impacts to some species, and compensatory mitigation is necessary to offset the permanent loss of wildlife resources." We support the concept that the UFO (and Tres Rios) RMP incorporate ways to obtain compensatory mitigation when surface density exceeds one well pad per section (within habitats identified by CPW). #26])>

<([#27 [14.1.1] San Miguel County requests that the UFO examine carefully CPW recommended species-specific
stipulations and ensured that the stipulations in the final UFO RMP/ROD meet or exceed the recommended species-specific stipulations. #27])> <([#28 [14.1.1] We also request that standards and guidelines be developed for oil and gas activities in Gunnison Sage-grouse habitat, mule deer winter range, raptor nesting areas, bighorn sheep lambing areas, lynx denning and winter foraging habitat to address impacts from oil and gas operations to the maximum extent possible. Such standards and guidelines within these habitats should require that operators use the best technically and economically available development technology to meet the intent of guidelines while acting on a right to develop a lease. #28])>

<([#29 [14.1.1] San Miguel County requests that the UFO RMP also consider adding winter range to ungulate protection strategies, which we understand has implications across all management activities. CPW has strongly recommended the use of deer and elk winter range as

defined in CPW species mapping when applying protection strategies for deer and elk in RMP documents in Colorado49 . CPW states, "Winter concentration areas and critical winter range are more narrowly defined subsets within the broader winter range category that fail to capture the totality of important wintering areas for ungulates. 'Winter Range' is defined as that part of the overall range where 90% of individuals reside during five winters out of ten. During an 'average' winter, animals residing in 'winter range' are no less sensitive to disturbance than those on severe winter range or winter concentration areas."

[49 Such as in the CPW San Juan Plan Revision comment letter dated April 11, 2008 titled "San Juan Public Lands Center, Draft Land Management Plan and Draft Environmental Impact Statement, 72 Fed. Reg. 71148 (December 14, 2007)" and addressed to the San Juan Plan Revision, P.O. Box 162909 Sacramento, CA 95816-2909.]

San Miguel County requests revisions to the DRMP/EIS and stipulations to acknowledge the increasing body of evidence that Timing Limitation Stipulations on oil and gas development activities are not adequate to protect winter habitats and migratory corridors for big game, and that additional limitations on the density of surface facilities may be necessary to maintain big game populations in developing areas. 50,51,52,53,54

[50 http://fwpiis.mt.gov/content/getItem.aspx?id=35572]

[51 http://www.wyofile.com/wp-content/uploads/2011/04/Deer.2010annualreport_muledeer.pdf]

[52 http://onlinelibrary.wiley.com/doi/10.2193/2008-478/abstract]

[53 http://www.blm.gov/style/medialib/blm/wy/information/NEPA/pfodocs/anticline/revdrcomments/ eg.Par.10425.File.dat/02Bio-attach1.pdf]

[54 https://www.fws.gov/southwest/ES/Documents/Oil-Gas-Fragmentation-Wilbert%20et%20al%202008.pdf] #29])>

<([#30 [4] San Miguel County further requests that a Master Leasing Plan be prepared and implemented as required by BLM IM No. 2010-117. #30])>

Section 9. Watchable Wildlife Viewing Areas.

Incorporating a watchable wildlife viewing area under the federal Watchable Wildlife Program to foster education and appreciation of wildlife in their habitats would be a positive addition within the UFO. When there are enhanced opportunities for public and educational institutions like local and regional schools to view, enjoy, and learn about wildlife, then there are tangible positive benefits for the local and regional economies and for appreciation of the national treasure that our public lands are. When people know about the needs and impacts of human activities on species, then they are more likely to support resource conservation and the hard choices of altering human activities that lead to climate change.

<([#31 [36.1] The San Miguel River is identified as being a very rich terrestrial bird habitat within North America by the BLM, the Audubon Society, and others. 55 San Miguel County supports the concept of studying the San Miguel River ACEC and San Miguel River Expansion ACEC for creating one or more watchable wildlife viewing areas. We believe this will actually help with future mitigation of threats such as invasive plants, non-native species, feral cats, and other disturbances. The scenic qualities of this area also further enhance the potential high-quality viewing experience.

[55 Page 3-171; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.96289.File.dat/3_UFO-DRMP-2016_508.pdf] #31])>

We appreciate your consideration of these comments for the Uncompahgre Field Office Draft Resource Management Plan/Environmental Impact Statement. As we have offered specific requests, we hope the final RMP and ROD will not simply take the recommendations of a single alternative but will create a final hybrid decision that will incorporate our specific requests.

Respectfully,

SAN MIGUEL COUNTY
BOARD OF COUNTY COMMISSIONERS

Joan May, Chair
_____

Attachment A: Resolution 2015-009
Attachment B: Comparison Tables

[Has attachments]

000478_ShannonL_20161031 Organization: Laurie Shannon
Received: 10/31/2016 12:00:00 AM
Commenter1: Laurie Shannon - Ridgeway , Colorado 87432 (United States)
Organization1:
Commenter2: Tom Powers - , Colorado (United States)
Organization2:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mtrieger 12/8/2016 12:00:00 AM
Attachments: 000478_ShannonL_20161031.htm (000478_ShannonL_20161031-387738.htm
Size = 5 KB)

xUFORMP_000478_ShannonL_20161031.pdf (000478_ShannonL_20161031-387737.pdf Size = 1714 KB)
Submission Text
Tom and Laurie Powers/Shannon <2ruggers@gmail.com> Mon, Oct 31, 2016 at 1:07 PM
To: Uformp@blm.gov

Hi, attached are my comments on the RMP. Thanks for the opportunity to comment. Laurie
Laurie Shannon
Tom Powers

UFORMP_comments_lshannon.pdf
1589K

October 31, 2016
Laurie Shannon
1189 Canyon Drive
Ridgway, CO 87432

Dear Planning team;

Thank you for the opportunity to submit comments on the draft Resource Management Plan (RMP). lt's obvious you all put a lot of work into this effort, and I commend your efforts.

Having recently moved to the Ridgway area, I have come to really appreciate the BLM lands within the Uncompahgre Field Office planning area. Having spent time in all the designated wilderness areas in Colorado, over the past few years I have been branching out to see the Wilderness Study Areas as well. I have found that many of these areas are little gems that offer a great opportunity to experience everything that is embodied in wilderness characteristics. <([#1 [20.1] I would urge you to include more of the lands that have wilderness characteristics that are identified alternative B into alternative D. #1])> <([#2 [9.1] I would also encourage you to include more Areas of Critical Environmental Concern (ACEC) into the final preferred alternative. #2])>
<([#3 [20.1] Under alternative B, you found about 41,780 acres that have wilderness characteristics, so it is splitting hairs to only carry forward about 18,320 acres into alternative D. With a huge planning area of nearly 700,000 acres, when you divide up the 41,780 acres into all the different geographic areas you identified, it's pretty small stuff, so why not go ahead and protect most if not all the lands that contain wilderness characteristics in the preferred alternative? #3])> I didn't go through all of your tables to sort out every nit-noid of data that would be affected if you did protect these lands. The overall amount of land that would still be available for oil and gas leasing or other economic uses would not change to any great degree. It wouldn't affect existing motorized uses very much either. Since it's been nearly 30 years since you last rewrote the RMP, it is silly not to go ahead and protect the areas you've identified to have sensitive resources or contain other wilderness characteristics. No doubt it will be a long time before you do another rewrite of the plan.

BLM_0156340

Over the past few weeks, I've had the opportunity to check out the lands with wilderness characteristics in both the Tabeguache area and the Potter and Monitor Creeks. I found that as soon as I stepped off the road in these two areas, l was immediately enveloped in solitude and expansive viewsheds. I'm glad I made the effort to see these areas. They are worthy of protection.

I would like to also encourage you to carry more of the ACECs into the preferred alternative (D) as well. I had a chance to see some of the Rock Art in Paradox Valley. I was very impressed with the amount and quality of these cultural resources. At least by identifying these areas as needing protection, it is a starting point for the future. Even though I understand how limited your resources are in protecting these areas, I think using citizen monitoring or other outreach could be a good way to engage the local communities about the importance of these areas. <([#4 [9.1] I also think the mesa between Monitor and Potter Creeks should be included as an ACEC in alternative D, as it is a key linkage between the two areas. #4])> I went up to the area the day before hunting season started. The main road was full of trucks and campers with their ATVs and grills headed up the road. It almost had the feel of the l-70 corridor on a Friday afternoon. As soon as I stepped off the road, everything was quiet and I didn't see a soul. Except for a few hunters and other users who are looking for this type of experience, I don't see that most people are going to make the effort to travel these areas by foot. There is certainly not a lack of motorized trails up on the Uncompahgre Plateau or elsewhere within your planning area. I would also encourage you to include more protection for the areas around the Adobe Badlands. It shouldn't just be a big sacrifice area.

Sincerely,
Laurie Shannon


000479_MatthewsN_20161101_SierraClub_HasAttach Organization: Sierra Club Environmental Law Program, Nathan Matthews
Received: 12/8/2016 1:43:05 PM
Commenter1: Nathan Matthews - Oakland, California 94612 (United States)
Organization1:Sierra Club Environmental Law Program
Commenter2: Nathaniel Shoaff - Oakland, California 94612 (United States)
Organization2:Sierra Club Environmental Law Program
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mtrieger 12/8/2016 12:00:00 AM
Attachments: 000479_MatthewsN_20161101_SierraClub_HasAttach.htm
(000479_MatthewsN_20161101_SierraClub_HasAttach-387754.htm Size = 67 KB)
xUFORMP_000479_MatthewsN_20161101_SierraClub_HasAttach.pdf
(000479_MatthewsN_20161101_SierraClub_HasAttach-387753.pdf Size = 406 KB)
Submission Text
Date:11/01/2016

Commenter:Nathan  Matthews

Organization:Sierra  Club

Email:nathan.matthews@sierraclub.org

Address:2101  Webster Street, Suite  1300, Oakland,  CA 94612

Phone:415-977-5695

Comment:
Please accept these comments from Sierra Club on the draft RMP/EIS. These comments are in
addition  to the comments  submitted  by the Western Environmental  Law Center et al., to which
Sierra Club is also a signatory.

Please confirm  receipt of these comments, and let me know  if you have any difficulty  with the
attachemnt.

Thanks,

Nathan Matthews
--
Nathan Matthews
Staff Attorney
Sierra Club Environmental  Law Program
2101  Webster Street, Suite  1300
Oakland, CA 94612
(415) 977-5695
Nathan.Matthews@sierraclub.org

Dear Uncompahgre  RMP Project Manager:

The Sierra Club's Rocky Mountain  Chapter and Our Wild  America and Beyond Coal Campaigns
submit  the following  submit  the following  comments regarding the Bureau of Land Management
("BLM") Uncompahgre  Field  Office ("UFO") Draft Resource Management Plan ("Draft RMP")
and Environmental  Impact Statement ("EIS"). These comments  are in addition  to the comments
submitted  by the Western Environmental  Law Center et al., to which Sierra Club is also a
signatory.

We agree that revision  to the Uncompahgre  RMP is long  overdue, as the existing  plan does not
reflect present circumstances and national  climate policies. DEIS 1-2. As has been made
abundantly  clear by President Obama, addressing climate change is one of our most important
and urgent national  priorities.  In recent years, the United States has become an international
leader in the fight against climate change and the Obama Administration  has taken important  and
ambitious  steps to start to address the problem  and our contribution  to it. Unfortunately,  the Draft

BLM_0156342

Plan for the Uncompahgre, if finalized as proposed, would be a step backward on critically important climate issues.

Under BLM's Draft Plan, the public lands at issue here would be used to generate more than 11 million tons of coal, 7,500 barrels of oil, and more than 3,746,000 thousand cubic feet of natural gas every year for the next two decades. DEIS p. 4-42, Table 4-11. All told, BLM's plan would result in the massive methane and carbon dioxide emissions – more than half a billion tons of $CO_2e$ over twenty years -- at precisely the same time that our President and the world's leading climate scientists are saying it is more important than ever to sharply reduce our greenhouse gas emissions.

It is clear that emissions from the use and development of coal, oil, and natural gas resources are the primary driver of climate change. BLM has the opportunity to lead the Administration's efforts to address the climate problem by setting management priorities for these public lands that help us achieve our national climate objectives rather than perpetuate status quo management that we can no longer afford. As President Obama stated in his final State of the Union: "Now we've got to accelerate the transition away from old, dirtier energy sources. Rather than subsidize the past, we should invest in the future . . . ."1 On behalf of our millions of members and supporters, Sierra Club and its Rocky Mountain Chapter, Beyond Coal and Our Wild America Campaigns urge BLM to consider -- and ultimately adopt -- an alternative that prevents new leasing of coal, oil, and natural gas in the Uncompahgre planning area. Any other approach would harm the climate, contribute to myriad environmental and public health effects of climate disruption, and hinder our ability to meet our national climate objectives and international greenhouse gas reduction targets.

[1 President Obama, State of the Union (Jan. 13, 2016), available at https://www.whitehouse.gov/thepress-office/2016/01/12/remarks-president-barack-obama-%E2%80%93-prepared-delivery-state-unionaddress.]

Sierra Club is America's largest and most influential grassroots environmental organization, with more than 2.4 million members and supporters nationwide. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

The Sierra Club and its Rocky Mountain Chapter, which includes more than 17,000 members that live in Colorado, have spent many years working to protect communities and public lands in Colorado from the harmful effects of coal, oil, and natural gas development. The Rocky Mountain Chapter has helped communities across the Front Range and elsewhere advocate for a local voice in the development of fossil fuels, and in particular fracking, near their homes and schools, supported drilling moratoria in Ft. Collins, Longmont, Broomfield, Boulder County, and elsewhere, and worked collaboratively with the U.S. Forest Service to help protect the pristine Thompson Divide in the White River National Forest. The Sierra Club and its Rocky Mountain Chapter spent years with allies fighting to protect the Roan Plateau from oil and gas development and have been a key part of the coalition working to protect the Sunset Roadless Area and nearby

BLM_0156343

wilderness-capable public lands from the harmful effects of coal mining and exploration.

I. Contents

I. The RMP Must Include Goals and Objectives for Limiting Contributions to
Climate Change ...................................................................................................... 4
II. BLM Must Fully Consider Additional Alternatives, Including "No Fossil Fuel
Leasing" Alternatives ............................................................................................. 6
A. BLM Must Consider, and Should Adopt, an Alternative That Prohibits
All Future Fossil Fuel Leasing ............................................................................. 6
B. BLM Must Consider Other Alternatives that Limit Additional
Fossil Fuel Development ....................................................................................... 9
C. BLM Must Consider Alternatives That Mandate Additional Mitigation
Measures.............................................................................................................. 10
1. Coal Mine Methane Capture or Flaring ........................................................ 10
2. Planning to Reduce Oil and Gas Methane Emissions ................................... 13
III. BLM Failed to Take a Hard Look at Numerous Impacts ............................... 14
A. The Draft RMP/EIS Fails to Consider the Full Range of Reasonably Foreseeable
Oil and Gas Development .................................................................................... 14
B. The Draft RMP/EIS Fails to Take a Hard Look at Climate Impacts .................. 15
1. BLM Understates Greenhouse Gas Emissions .............................................. 15
2. BLM Must Take A Hard Look at Indirect Effects on U.S. Energy Markets 18
3. BLM Must Address the Severity and Significance of Greenhouse Gas
Emissions ............................................................................................................ 21
C. The Draft RMP/EIS Fails to Take a Hard Look at Impacts to Surface and
Groundwater ....................................................................................................... 24
IV. Conclusion ...................................................................................................... 26

II. The RMP Must Include Goals and Objectives for Limiting Contributions to
Climate Change

According to the President, "no challenge poses a greater threat to our children, our planet, and future generations than climate change."2 Climate change poses two challenges for federal agencies: first, an agency must prepare for climate change's effects on the agency's mission and actions, and second, agencies must also limit their actions' contribution to climate change.3

[2
https://www.whitehouse.gov/sites/whitehouse.gov/files/achievements/atf_climate_booklet.pdf]

[3 Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews at 2 (August 1, 2016),
https://www.whitehouse.gov/sites/whitehouse.gov/files/documents/nepa_final_ghg_guidance.pdf
]

Here, the goals and objectives proposed for the RMP only do the former. BLM proposes to adopt the goal of ensuring resilience in the face of climate change. DEIS at 2-24. But BLM must also

adopt the goal of preventing, rather than merely withstanding, climate change's harms, as the agency has recently done for RMPs covering adjacent areas. BLM's recently adopted RMP for the adjacent Tres Rios field office provides an appropriate example, where BLM included the following goal: "Administrative and permitted activities emit the lowest practicable greenhouse gas emissions and have the smallest ecological footprint possible to promote sustainable natural resource management."4 Objectives adopted for individual alternatives to effectuate this goal should specify specific emission limits and budgets.

[4 Record of Decision for the Approved Resource Management Plan for Public Lands Administered by the Tres Rios Field Office, Dolores, Colorado at II-63, (Feb. 27, 2015), http://www.blm.gov/style/medialib/blm/co/field_offices/san_juan_public_lands/land_use_planni ng /approved_lrmp.Par.81229.File.dat/TRFO%20ROD%20and%20ARMP%20508%20Compliant.p df]

<([#1 [6] Prevention, rather than merely adaptation to, climate change is required by the Federal Land Management Policy Act ("FLPMA") and federal policy. FLPMA requires that "[i]n managing the public lands the Secretary [of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b) (emphasis added). The recent Presidential Memorandum, Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment, affirms that "It shall be the policy of the Department[] of … the Interior, … to avoid and then minimize harmful effects to land, water, wildlife, and other ecological resources (natural resources) caused by land- or water-disturbing activities."5 BLM's recently-proposed "Planning 2.0" rule recognizes that this policy should apply to land use planning, adopting "avoiding impacts" as the first and most important step in the "mitigation hierarchy," 81 Fed. Reg. at 9686, id. at 9725 (proposed 40 C.F.R. § 1601.0-5). President Obama has specifically instructed BLM, in its management of fossil fuel extraction on federal lands, to reduce the greenhouse gas emissions that contribute to climate change.6

[5 https://www.whitehouse.gov/the-press-office/2015/11/03/mitigating-impacts-natural- resourcesdevelopment-and-encouraging-related (emphasis added).]

[6 See, e.g., White House, Fact Sheet: Administration Takes Steps Forward on Climate Action Plan by Announcing Actions to Cut Methane Emissions (Jan. 14, 2015) https://www.whitehouse.gov/the-pressoffice/2015/01/14/fact-sheet-administration-takes-steps- forward-climate-action-plan-anno-1.]

These policies and concerns must be integrated into land use planning; they cannot be postponed to the lease or later stage. Climate change presents the quintessential situation in which BLM must "weigh long-term benefits to the public against short-term benefits," 43 U.S.C. § 1712(c)(7), and BLM's development and adoption of land use plans must consider the available scientific evidence, id. § 1712(c)(2), including the evidence regarding climate change, the impact of fossil fuel extraction and use in general, and the effects of federal fossil fuel leasing in particular.7 The proposed RMP's failure to adopt goals and objectives regarding limiting greenhouse gas emissions from activities in the decision area was arbitrary and capricious. BLM

BLM_0156345

adopted precisely such goals in the recent amendment to plan for the adjacent Tres Rios field office, and BLM has not provided -- and cannot provide – a rational basis for failing to do so here.

[7 See, e.g., Peter Erickson and Michael Lazarus, How Would Phasing Out U.S. Federal Leases for Fossil Fuel Extraction Affect CO2 Emissions and 2°C Goals? 1, 31-32, Stockholm Environment Institute Working Paper 2016-02 (May 2016), available at https://www.seiinternational.org/mediamanager/documents/Publications/Climate/SEI-WP-2016-US-fossilfuel-leasesclimate.pdf.] #1])>

III. BLM Must Fully Consider Additional Alternatives, Including "No Fossil Fuel Leasing" Alternatives

<([#2 [2] NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E), (2)(C). The analysis of alternatives "is characterized as 'the heart' of the environmental impact statement." Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999) (quoting 40 C.F.R. § 1502.14). In the EIS, the agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" in response to a "specif[ied] ... purpose and need." 40 C.F.R. §§ 1502.13, 1502.14(a) (emphasis added); see also New Mexico ex rel. Richardson, 565 F.3d at 703 (stating that "an EIS must 'rigorously explore and objectively evaluate' all reasonable alternatives to a proposed action, in order to compare the environmental impacts of all available courses of action," (quoting 40 C.F.R. § 1502.14)). #2])>

A. BLM Must Consider, and Should Adopt, an Alternative That Prohibits All Future Fossil Fuel Leasing

As the President has recognized, "ultimately, if we're going to prevent large parts of this Earth from becoming not only inhospitable but uninhabitable in our lifetimes, we're going to have to keep some fossil fuels in the ground rather than burn them and release more dangerous pollution into the sky." 8 BLM is uniquely situated among federal agencies in its ability to keep fossil fuels in the ground.

[8 President Barack Obama, Statement by the President on the Keystone XL Pipeline (Nov. 6, 2015), https://www.whitehouse.gov/the-press-office/2015/11/06/statement-president-keystone-xl-pipeline]

<([#3 [5.3] The draft RMP/EIS's elimination of alternatives that would prohibit future coal, oil, and gas leasing without detailed analysis, DEIS 2-15, was improper. BLM believed that these alternatives were: prohibited by the Federal Land Management Policy Act and Mineral Leasing Act, inconsistent with the goals adopted by the RMP, and not necessary to protect resource values. DEIS 2-16. Each argument is mistaken. #3])>

<([#4 [6] FLPMA's incorporation of "the principles of multiple use and sustained yield", 43

U.S.C. 1712(c)(1), does not preclude BLM from closing the Uncompahgre decision area, or any other land management unit, to further fossil fuel leasing. The Tenth Circuit has squarely rejected the argument that FLPMA's multiple use provisions permit BLM to exclude no lease alternatives from review in the RMP context:

BLM's obligation to manage for multiple use does not mean that development must be allowed on [a particular piece of public lands]. Development is a possible use, which BLM must weigh against other possible uses – including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 710 (10th Cir. 2009).

The keystone of multiple use is to "take[] into account the long-term needs of future generations for renewable and nonrenewable resources;" closing the planning area to future fossil fuel leasing is essential to, rather than inconsistent with, that purpose. 43 U.S.C. § 1702(3). In addition, substantial portions of the planning area will be open to fossil fuel development even if BLM closes the area to further leasing. Twenty-five percent of the fluid mineral estate is already leased. DEIS 4-12. Insofar as FLPMA requires some accommodation of fossil fuel extraction on federal lands, that accommodation has already been provided, as the Uncompahgre and other planning areas have been open to such extraction throughout their history, substantial portions are already leased, and development of those leases will likely continue even if areas are entirely closed to further leasing. FLPMA's principle of "multiple use" must be understood in light of the FLPMA obligation to prevent "unnecessary or undue degradation," 43 U.S.C. § 1732(b). Because BLM has not shown any need for additional fossil fuel leasing and development, and degradation caused by such development would be unnecessary and undue.
#4])>
<([#5 [7] [21.1] Nor does the Mineral Leasing Act preclude no-lease alternatives.9 Contrary to the draft RMP/EIS's assertion, nothing in the MLA "directs field offices to apply the least restrictive management constraints necessary to achieve resource goals and objectives for principal uses of public lands" in any way that would preclude adopting an RMP that prohibits further leasing. DEIS at 2-16. Courts have consistently held that section 226 of the MLA provides BLM with the discretion to decline to issue leases. See, e.g., Udall v. Tallman, 30 U.S. 1, 4 (1965), Bob Marshall All. v. Hodel, 852 F.2d 1223, 1229-30 (9th Cir. 1988). See also Ash Creek Min. Co. v. Lujan, 969 F.2d 868, (10th Cir. 1992) (affirming that federal courts lack authority to order federal lands to be leased and "the decision to offer the lands in question for competitive leasing would be in the sole discretion of the Secretary. MLA § 2(a), [30] U.S.C. § 201"). The language quoted above from the Draft Plan does not appear in the MLA or the implementing regulations. BLM's Land Use Planning Handbook states that "When applying leasing restrictions, the least restrictive constraint to meet the resource protection objective should be used."10 Even on its own terms, however, this non-binding policy statement does not apply to the threshold question of whether BLM can adopt a goal of reducing contribution to climate change, or objectives of eliminating greenhouse gas emissions. BLM can and should adopt such a goal, and leasing restrictions are the only means of achieving it guaranteed to be

effective.

[9 Although not relied upon by BLM, we also note that neither the Federal Coal Leasing Act Amendments nor the Federal Onshore Oil and Gas Leasing Reform Act limit BLM's authority to close some or all areas to further coal, oil, or gas leasing in the RMP process. See WildEarth Guardians v. Salazar, 859 F. Supp. 2d 83, 87 (D.D.C. 2012) , 43 C.F.R. § 3425.1-8(a)(3), Western Energy Alliance v. Salazar, 709 F.3d 1040, 1044 (10th Cir. 2013).]

[10 BLM, Land Use Planning Handbook, H-1601-1 (March 11, 2005), (emphasis added) http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_ha n
dbook.Par.38665.File.dat/h1601-1.pdf.] #5])>

<([#6 [5.3] Further fossil fuel leasing categorically fails to meet even the goals and objectives proposed by the draft RMP/EIS, which would only permit coal, oil, and gas development that is "environmentally sound" or "environmentally responsible." DEIS 2-178, 2-187. As BLM has recognized, fossil fuel development is the major source of air pollution within the planning area, and the level of pollution correlates with the amount of such development. DEIS 2-385. Additional leasing and development will have significant direct and indirect effects, especially with regard to greenhouse gas emissions. Prohibiting that leasing is the only way to fully prevent the harm done by these emissions: although the draft RMP includes some technological measures to limit greenhouse gas emissions, and we have proposed others, these measures cannot reduce downstream indirect emissions, and only partially reduce direct emissions. Therefore, the only way achieve the necessary reduction in greenhouse gas emissions, and to avoid additional harm to all "resource values" impacted by climate change, is to prohibit further expansion of fossil fuel extraction by closing the decision area to further leasing.11

[11 See Land Use Planning Handbook at 24 (areas should be closed when "appropriate protection can be ensured only by closing the lands to leasing.").] #6])>

<([#7 [5.3] Finally, prohibiting further fossil fuel leasing does not conflict with the proposed RMP/EIS's other goals. BLM proposes the goal of "provid[ing] opportunities to develop fluid minerals consistent with other resource goals and uses to support local and national energy needs," DEIS 2-187, but nothing in the draft RMP/EIS evaluates those energy needs, much less shows that satisfying those needs requires development of additional fossil fuels beyond areas already leased. #7])>

B. BLM Must Consider Other Alternatives that Limit Additional Fossil Fuel Development

<([#8 [5.3] BLM must "'[r]igorously explore and objectively evaluate all reasonable alternatives.'" New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 708 (10th Cir. 2009) (quoting 40 C.F.R. § 1502.14(a)). Here, by BLM's own admission, the alternatives selected for detailed analysis each present only a "a slightly different mix of resources and resource uses." DEIS 2-6 (emphasis added). BLM did not evaluate any alternative that BLM expected to result in decreases in future coal production: BLM anticipates the exact same level of coal production and associated air emissions across all alternatives. See, e.g., DEIS

BLM_0156348

at 4-27 to 4-36, 4-42. For oil and gas, BLM expects the alternatives to lead to only slight changes in production: between 16 and 19 conventional, and between 23 and 31 coalbed methane, new oil and gas wells per year.12

[12 See Emissions Inventory Technical Support Document at A-1 and B-1.]

These slight differences fail to span the "full spectrum" of available alternatives.13 For example, CEQ had explained that when considering " a proposal to designate wilderness areas within a National Forest …. [a]n appropriate series of alternatives might include dedicating 0, 10, 30, 50, 70, 90, or 100 percent of the Forest to wilderness."14

[13 CEQ, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," Question 1, http://energy.gov/sites/prod/files/G-CEQ-40Questions.pdf.]

[14 Id.]

Here, alternatives that would have reduced future fossil fuel development below these levels were reasonable. BLM must consider alternatives that lead to reduced coal development, and more significant reductions in oil and gas activity, whether by closing areas to further fossil fuel leasing or by some other method. These alternatives should span a range of possible development intensities. For example, BLM could develop an alternative that reduces greenhouse gas emissions, relative to a no action/business as usual baseline, by the amounts specified in U.S. emission reduction targets.15 Another benchmark would be an alternative that restricted oil and gas development to levels sufficient to avoid contributing to ozone levels that violate the recently-adopted national ambient air quality standard. DEIS 4-49 to 4-50. All told, alternatives could impose substantial restrictions on future fossil fuel leasing and development while still falling far short of "implement[ing] exclusive" or "maximum" environmental protection. DEIS 2-15.

[15 We reiterate that meeting these nationwide targets will require federal agencies to do more than a prorate share, such that BLM should instead adopt a no fossil fuel leasing alternatives.] #8])>

C. BLM Must Consider Alternatives That Mandate Additional Mitigation Measures

1. Coal Mine Methane Capture or Flaring

<([#9 [5.3] BLM must consider and analyze alternative that requires all coal mines operating in the Uncompahgre planning area to mitigate climate impacts by capturing or flaring the mine's methane emissions. Technologies to capture or flare methane are readily available, both flaring and capture have been studied or used at coal mines in the planning area, and BLM has already confirmed that it has the authority to require methane capture and flaring at underground mines on public lands. Moreover, doing so here would generate significant savings on the greenhouse gas emissions that will result from BLM's plan over the next two decades. #9])>

<([#10 [11.5] As noted, NEPA requires agencies to "[r]igorously explore and objectively

evaluate all reasonable alternatives" and to "[d]evote substantial treatment to each alternative considered." 40 C.F.R. § 1502.14(a)-(b). These alternatives must "include reasonable alternatives not within the jurisdiction of the lead agency." Id. at 1502.14(c). NEPA also requires agencies to identify measures to mitigate the adverse environmental impacts of their actions. 40 C.F.R. §§ 1502.14(f), 1502.16(h). According to CEQ's recent NEPA Climate Guidance, when analyzing the climate impacts under NEPA, "an agency should compare the anticipated levels of GHG emissions from each alternative – including the no-action alternative – and mitigation actions to provide information to the public and enable the decision maker to make an informed choice." 16 Both the CEQ's 2014 Draft and 2016 Final NEPA climate guidance instruct agencies to "consider the potential for mitigation measures to reduce or mitigate GHG emissions and climate change effects when those measures are reasonable and consistent with achieving the purpose and need for the proposed action." 17 The guidance specifies that mitigation measures could include, among other things, "capturing or beneficially using GHG emissions such as methane." 18

[16 CEQ Guidance at 11.]

[17 Id. at 19.]

[18 Id.]

BLM's draft plan, however, does not address potential climate mitigation measures and does not consider an alternative requiring methane capture, methane flaring, or any other way to mitigate the climate impact of methane emissions from coal mines in the planning area. This is a significant oversight for an area containing some of the most methane-heavy mines in the country. BLM estimates that under each of the alternatives considered, coal mines in the planning area will emit more than 3 million tons of $CO_2$-e every year in direct emissions from operation of the mines, "primarily from fugitive methane emissions." DEIS at 4-39; see DEIS Tables 4-9 and 4-10, pp. 4-38, 4-39.

Although neither mitigation measures nor alternatives must be within an agency's jurisdiction in order to be incorporated in the agency's NEPA review, (40 C.F.R. 1502.14(c)), BLM has explicitly stated that it has authority to require coal mines operating on public lands to capture methane in order to mitigate climate impacts. In 2014, as part of BLM's "advanced notice of proposed rulemaking" on coal mine methane capture, BLM spelled out this authority in clear terms both as to new and existing mines:

Based on the readjustment authority [30 U.S.C. § 207], the BLM may readjust lease terms to both authorize and require lessees to capture otherwise vented [waste mine methane] to use or sell. The BLM also has authority under the same section of the MLA to include such terms and conditions in new coal leases. 19

[19 79 Fed. Reg. 23,923 (Apr. 29, 2014) (emphasis added).] #10])>

Coal mine methane generally is removed from underground mines one of two ways, and in both instances coal companies can either capture the methane and put it to beneficial use generating

power or flare it in ways that lowers its climate impact. First, methane can be removed by moving vast quantities of air, including dilute quantities of methane, through a mine's ventilation system. This is termed "ventilation air methane" (often called "VAM"). Second, methane drainage wells drilled into the coal seam from above can be used to capture, flare, or (more commonly) vent methane directly into the atmosphere. Captured methane can then be used to generate electricity either at the site or sold into the marketplace. A number of underground coal mines operating on federal lands use both methods to remove methane – including the West Elk Mine, which has thus far resisted all voluntary incentives to either capture or flare its methane emissions and instead currently emits all of its methane directly into the atmosphere.

<([#11 [22.1] A recent report published by the state of Colorado confirms that both methane capture and flaring are feasible within the Uncompahgre planning area.20 As explained in that 2016 report, the Oxbow mine has been flaring methane since 2012, and the West Elk mine has the potential to generate more than 17 megawatts of electricity from the mine's ventilation air methane system.21 Moreover, EPA reported in 2014 that it had identified "40 projects where flaring has been practiced, either in conjunction with energy recovery technologies or as a stand-alone mitigation technology."22

[20 State of Colorado, Coal Mine Methane in Colorado, Market Research Report at 14 (Mar. 2016),
available at
https://www.colorado.gov/pacific/sites/default/files/atoms/files/Coal%20Mine%20Methane%20Rep
ort%202016%20FINAL%203_2016.pdf (last viewed Oct. 21, 2016).]

[21 Id. at 18, 38.]

[22 EPA, Coal Mine Methane Flaring: Technology and Case Studies (Sep. 2014).]

BLM's failure to consider an alternative requiring methane flaring or capture as a condition of mining coal on public lands in the planning area violates NEPA and must be corrected by the agency. #11])>

2. Planning to Reduce Oil and Gas Methane Emissions

<([#12 [10.1] BLM also should have considered an alternative that would have imposed planning measures to reduce the air pollution emitted from oil and gas production by, for example:

1. Controlling the timing, pace, and location of development to maximize economies of scale in oil and gas fields;

2. Aligning oil and gas production with construction of gas capture infrastructure on the lease, unit, or communitization area so that oil production does not outpace gas capture; and
3. Synchronizing upstream production operations with midstream gas pipeline and processing capacity to ensure that gas is transported to market for sale and use by consumers.

BLM_0156351

We previously recommended these measures in comments regarding BLM's anticipated methane venting and flaring rule.23 BLM responded by explaining that it was "considering the integrated approach suggested by the commenters" and that BLM recognized that "[p]art of the solution to flaring, … is to align the timing of well development with that of capture and processing infrastructure development, and to create incentives for operators to capture rather than flare." 81 Fed. Reg. 6616, 6662 (Feb. 8, 2016). However, neither the proposed methane rule nor the proposed RMP adopt
measures to achieve this effect. Thus, at this stage, it is entirely unclear precisely how in fact BLM "is considering the integrated approach" we have recommended.

[23 See Comments submitted to the U.S. Bureau of Land Management by Western Environmental
Law Center et al. on April 22, 2016, pp. 30-41
(https://www.regulations.gov/#!documentDetail;D=BLM2016-
0001-9084).] #12])>

IV. BLM Failed to Take a Hard Look at Numerous Impacts

A. The Draft RMP/EIS Fails to Consider the Full Range of Reasonably Foreseeable Oil and Gas Development

<([#13 [21.2] The draft RMP/EIS fails to consider the full scope of reasonably foreseeable future oil and gas development, and associated environmental impacts, by failing to adequately address likely growth in Mancos Shale oil and gas development. The draft relies on outdated estimates of the amount of gas available, and fails to account for the possibility of future boom in development of this gas. By underestimating reasonably foreseeable future oil and gas development, BLM impermissibly understated the likely greenhouse gas and other air emissions from those activities.

The Reasonably Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office (Feb. 16, 2012) ("RFD") acknowledges that "[s]hale gas production could become important in the part of the Piceance Basin that lays in the northeast part of the Study Area ... if Mancos Shale exploration occurring there is determined to be economically successful." RFD at 57. However, the RFD and draft RMP/EIS do not appear to have included such development in their predictions of future activity. Id.; DEIS at 3-120 to 3-121.

Although shale gas production in the decision area has not reached levels seen in some other regions, future growth beyond that predicted in the RFD is reasonably foreseeable. As BLM recently recognized in the foreseeable development scenario for the Farmington, New Mexico office, unfavorable economics may delay "significant activity … for the Mancos gas play" for several years, but "once the economics become favorable, the activity is anticipated to rapidly increase."24 Here, however, the forecasts of foreseeable future development do not appear to have accounted for such an increase. More broadly, the draft RMP/EIS and RFD do not appear to have followed BLM's instruction, in BLM's Fluid Mineral Leasing Handbook, to "Always assume at least one boom and bust cycle over the life of the plan."25

BLM_0156352

[24 BLM, RFD for Farmington, NM, Executive Summary (Oct. 2014),
http://www.blm.gov/style/medialib/blm/nm/field_offices/farmington/farmington_planning/ffo_pl
a
nning_docs/rmpa_mancos.Par.52727.File.dat/SJB%20Mancos%20RFD%20final%20report-
10.27.pdf]

[25 Fluid Mineral Leasing Handbook at III-8,
http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_han
n
dbook.Par.44374.File.dat/H_1624_1.pdf]  #13])>

<([#14 [21.2] While an increase in Mancos Shale production could be foreseen even on the basis
of material cited in the RFD, the RFD and draft RMP/EIS also fail to account for recent
information demonstrating that far higher levels of development are possible. The RFD relies on
a 2003 assessment of the amount of gas available in the broader Uinta-Piceance Basin. RFD at
82 (citing U.S. Geological Survey Uinta-Piceance Assessment Team, 2002[26]). The USGS has
recently explained that its prior assessments sorely understated technically recoverable oil and
gas volumes. As USGS explained, "The previous USGS assessment of the Mancos Shale in the
Piceance Basin ... estimated 1.6 trillion cubic feet of shale natural gas."27 USGS now believes
that this understates recoverable gas by a factor of 40, and that "The Mancos Shale in the
Piceance Basin of Colorado contains an estimated mean of 66 trillion cubic feet of shale natural
gas, 74 million barrels of shale oil and 45 million barrels of natural gas liquids."28 These revised
USGS estimates must be incorporated into the NEPA and planning process.29

[26 https://pubs.usgs.gov/dds/dds-069/dds-069-b/]

[27 https://www.usgs.gov/news/usgs-estimates-66-trillion-cubic-feet-natural-gas-colorado-s-
mancosshale-formation]

[28 Id.]

[29 Fluid Mineral Leasing Handbook at III-4.] #14])>

## B. The Draft RMP/EIS Fails to Take A Hard Look at Climate Impacts

## 1. BLM Understates Greenhouse Gas Emissions

The draft RMP/EIS understates impacts on climate by both understating the impact of each ton
of greenhouse gas emitted and by understating the likely total of emissions.

First, <([#15 [11.2] the draft RMP/EIS errs by using long-outdated estimates of the "global
warming potential," or "GWP," of greenhouse gases other than carbon dioxide. GWP expresses
warming caused by a greenhouse gas relative to the warming caused by an equivalent mass of
carbon dioxide. GWP allows emissions of non-CO2 pollutants to be expressed in terms of CO2-
equivalent. The draft RMP/EIS uses estimates provided by the Intergovernmental Panel on
Climate Change more than twenty years ago. DEIS 4-38. These estimates have twice been

BLM_0156353

superseded by updated IPCC reports, most recently, in September 2013, when the IPCC released its Fifth Assessment Report.30 For example, this report estimates, on the basis of more recent and thorough science, that methane from fossil sources has 36 times the global warming potential of carbon dioxide over a 100 year time frame and at least 87 times the global warming potential of carbon dioxide over a 20-year time frame.31 Both the EPA and the Department of Energy have recognized that the newer estimates represent the best available science regarding the impact of non-CO2 GHGs. Specifically, although EPA uses the older IPCC values in compiling EPA's GHG Inventory, EPA has explained that EPA believes more recent estimates to be more accurate and better reflect scientific consensus; EPA uses the old values for the narrow purpose of compiling the inventory because the convention establishing the inventory has specified old values and has not been updated.32 The Department of Energy has similarly recognized that the Fifth Assessment Report values using climate feedbacks (e.g., 36 and 87 for methane) reflect the current scientific consensus.33

[30 IPCC, Climate Change 2013: The Physical Science Basis: Chapter 8, page 714, Table 8.7.]

[31 Id.]

[32 https://www3.epa.gov/climatechange/ghgemissions/gwps.html]

[33 Department of Energy, Opinion and Order 3357-C, DOE/FE Dkt. 11-161-LNG, at 30 (Dec. 4, 2015) ("We agree with Sierra Club that using 20- and 100-year methane GWPs of 87 and 36 is most appropriate for use today and that climate carbon feedbacks should be captured in the GWP values for methane."), available at www.fossil.energy.gov/programs/gasregulation/authorizations/2011_applications/ord3357c.pdf.] #15])>

Second, <([#16 [11.2] the draft RMP/EIS understates the volume of greenhouse gases likely to be emitted by oil and gas development. BLM estimates emissions using a "bottom up" methodology that principally functions by multiplying "emission factor" estimates of emissions from individual activities, such as venting associated with completion of a single well, by "activity factors," estimates of those events' frequency. See Garvin Heath, et al., National Renewable Energy Laboratory, Estimating U.S. Methane Emissions from the Natural Gas Supply Chain at iv (August 2015) (describing these terms and methodology)34, Air Emission Inventory Technical Support Document at 10-37 (explaining analysis conducted here).

[34 http://www.nrel.gov/docs/fy16osti/62820.pdf; but see https://www.epa.gov/sites/production/files/2016-08/documents/revision_under_consideration_for_ghgi_ng_and_petro_uncertainty_4_2016.pdf at 2 ("For natural gas systems, calculations are commonly more complex than simply multiplying an emission factor by an activity factor.").]

Here, the draft RMP/EIS relies on long-outdated inputs in applying this method of assessment. Many of the emission factor estimates used in the Air Emission Inventory TSD are taken from a 1995 EPA document. However, as EPA has recognized, those estimates were developed "when

BLM_0156354

the industry practices were much different from now. In some cases, the emissions factors were developed using limited sample data and knowledge about the industry's operations (e.g., wells, compressors)."35 More recent and accurate is available, and should have been used here. There have been numerous published, peer-reviewed studies providing more recent measurements of emissions, which BLM should have used.36 For example, EPA, in preparing its most recent nationwide inventory of greenhouse gas emissions, "used multiple recently published studies as well as [greenhouse gas reporting program] Subpart W data to revise the [1990s era] emission factors and activity data for majority of the natural gas systems emission sources and many petroleum systems production segment emission sources."37 Reflecting this improved data, EPA's estimate of methane emissions from the oil and gas sector rose by 34%, relative to the prior estimate.38

[35 EPA, Greenhouse Gas Emissions Reporting from the Petroleum and Natural Gas Industry: Background Technical Support Document at 47 (Apr. 12, 2010), available at https://www.epa.gov/sites/production/files/2015-05/documents/subpart-w_tsd.pdf.]

[36 See, e.g., See Allen, et al., Measurements of methane emissions at natural gas production sites in the United States, Proceedings of the National Academy of Sciences 110:44 (Oct. 29, 2013) at 17,768-17,773, available at http://www.pnas.org/content/110/44/17768.full.pdf+html (supplemental appendices and tables available at http://www.pnas.org/content/suppl/2013/09/11/1304880110.DCSupplemental/sapp.pdf); Prasino Group, Final Report For Determining Bleed Rates for Pneumatic Devices in British Columbia (Dec. 18, 2013), at 15, available at http://scek.ca/sites/default/files/ei-2014-01-finalreport20140131.pdf.]

[37 EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks: Revisions under Consideration for
Natural Gas and Petroleum Systems Uncertainty Estimates at 7, (April 2016), https://www.epa.gov/sites/production/files/2016-08/documents/revision_under_consideration_for_ghgi_ng_and_petro_uncertainty_4_2016.pdf]

[38 See, e.g., Envt'l Def. Fund, New EPA Stats Confirm: Oil & Gas Methane Emissions Far Exceed Prior Estimates (Apr. 15, 2016), https://www.edf.org/media/new-epa-stats-confirm-oilgas-methaneemissions-far-exceed-prior-estimates; Gina McCarthy, Remarks on Climate Action at CERA in Houston, Texas (Feb. 24, 2016), available at https://yosemite.epa.gov/opa/admpress.nsf/8d49f7ad4bbcf4ef852573590040b7f6/5c432a7068e191e985257f630054fea8!OpenDocument (acknowledging that "methane emissions from existing sources in the oil and gas sector are substantially higher than we previously understood").] #16])>

<([#17 [11.3] Even EPA's revised inventory likely likely underestimates the total amount of methane that is emitted by the oil and gas sector, because "bottom-up" analyses, such as the one BLM used here and EPA's inventory, consistently produce estimates far lower than those indicated by "top-down" studies that measure atmospheric concentrations of methane in areas with heavy oil and gas development, and estimate the oil and gas sector's contribution to those levels using isotopic analysis. One top-down analysis of emissions of Colorado's Denver-

BLM_0156355

Julesberg Basin estimates an emission rate of 2.6% to 5.6%.39 Another study of Utah's Uinta Basin indicated an emission rate of 6% to 12%.40 Peer-reviewed studies that have compared bottom-up and top-down studies have recognized that top-down studies consistently produce higher estimates, and indicate likely underestimates in bottom-up studies.41

[39 Gabrielle Pétron et al., A New Look at Methane & Non-Methane Hydrocarbon Emissions from Oil and Natural Gas Operations in the Colorado Denver-Julesburg Basin, 119 J. Geophysical Research 6836, 6850 (2014), available at http://onlinelibrary.wiley.com/doi/10.1002/2013JD021272/epdf.]

[40 Anna Karion et al., Methane Emissions Estimate from Airborne Measurements Over a Western United States Natural Gas Field, 40, Geophysical Research Letters 4393, 4393 (2013), available at http://onlinelibrary.wiley.com/doi/10.1002/grl.50811/full.]

[41 A.R. Brandt et al., Methane Leaks from North American Natural Gas Systems, 343 Science 733 (2014), available at http://www.novim.org/images/pdf/ScienceMethane.02.14.14.pdf (comaring top-down and bottom-up estimates); see also Clean Air Task Force, NRDC, and Sierra Club, Waste Not: Common Sense Ways to Reduce Methane Pollution from the Oil and Natural Gas Industry at 9-11 (Jan. 2015), http://catf.us/resources/publications/files/WasteNot.pdf]

Here, BLM must recalculate its emission estimates using more recent data, and BLM must address whether the resulting estimates are consistent with the emissions estimates provided by these top-down studies. Because the draft RMP/EIS and air emission inventory TSD do not identify methane emissions from gas production specifically, Sierra Club, decision makers, and the public cannot readily provide this comparison. #17])>

2. BLM Must Take A Hard Look at Indirect Effects on U.S. Energy Markets

Federal agencies have long understood that decisions they make regarding management of public lands and waters impact not only the resources within those areas, but can also affect broader energy markets. <([#18 [11.3] By expanding or contracting the supply of coal, oil, and natural gas, BLM's decisions here will alter not only how much of the planning area's resources are used, but also the prices at which they are available in the market. Those price shifts will most certainly be significant enough to alter demand for both fossil fuels and renewable resources such as wind and solar, and those changes in the market could lead to stark differences in greenhouse gas emissions that must be quantified here. Admittedly, if each of the alternatives BLM evaluates are identical in the amount of fossil fuels produced -- as is the currently the case for coal and nearly so for oil and gas -- then the market impacts of those alternatives will be identical. However, this analysis would be particularly useful comparing BLM's action alternatives with a "no leasing" conservation alternative that limits supply of coal, oil, and natural gas. BLM's failure to even acknowledge this issue flies in the face of decades of Department of Interior precedent, ignores relevant modeling already conducted on the market and climate impacts of expanding coal production in the Uncompahgre planning area, and fails to use readily available tools that would allow BLM to analyze and disclose the climate impacts

of its proposal. #18])>

<([#19 [28.3] As the Secretary of Interior has recognized, opening up more federal lands for fossil fuel production could not only affect the amount of coal produced, but also the amount of wind and solar generation in our energy grid. That is why, in ordering a comprehensive study of the climate impacts of the federal coal program, the Secretary directed the Department of Interior to evaluate "how the administration, availability, and pricing of Federal coal affect regional and national economies (including job impacts), and energy markets in general, including the pricing and viability of other coal resources... and other energy sources."42 The Secretary further directed the Department to study, "[t]he impact of possible program alternatives on the projected fuel mix and cost of electricity in the United States."43

[42 Secretarial Order 3338 at 8 (Jan. 15, 2016) available at
http://www.blm.gov/style/medialib/blm/wo/Communications_Directorate/public_affairs/news_rele
ase_attachments.Par.4909.File.dat/FINAL%20SO%203338%20Coal.pdf (last visited July 1, 2016).]

[43 Id.]

BLM makes no attempt to analyze market changes and instead ignores the issue altogether. Nor can BLM simply punt on market effects until it finishes that programmatic review. Simply because BLM might complete a discretionary review, untethered from any particular proposal, at some point in the future does not mean that BLM can dodge meaningful consideration of its proposals here. The Draft Plan prepared by BLM, if not vastly improved, would constitute an unlawful dodge – preventing both the public and decision makers from fully understanding the environmental impacts of the choice BLM is making. #19])>

<([#20 [21.3] BLM's failure to study the market effects of its plan is particularly egregious because BLM was a cooperating agency on the U.S. Forest Service's preparation of a supplemental Draft EIS that looked at the market effects of a proposal to open up additional lands for coal production in much of the Uncompahgre planning area. The U.S. Forest Service's 2015 analysis, though flawed in significant respects, nonetheless used a robust energy-economy model to predict impacts to wind and solar generation from a proposal that would open up approximately 170 million tons of coal on otherwise protected lands in Colorado. After using ICF's Integrated Planning Model to study the market and climate impacts of its proposal, the Forest Service concluded:

Changes in gross production and consumption of coal from the North Fork Coal Mining Area are expected to have an effect on production and consumption of other fuel sources, including alternative supplies of coal, natural gas, and other energy supplies such as renewables.44

[44 U.S. Forest Service, Rulemaking for Colorado Roadless Areas Supplemental Draft Environmental
Impact Statement, p. 80 (November 2015), available at
http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd485194.pdf (last visited Nov. 1,

2016).]

The Forest Service explained that opening up 170 million tons of coal for mining would cause "the mixture of fuels [to] shift[], including increases in production and consumption of underground coal, and decreases in production and consumption of substitute fuel sources such as surface coal, natural gas, and renewable energy," with the result being a net 131 million ton increase in greenhouse gas emissions.45 As a cooperating agency to that analysis, BLM cannot now pretend that it does not exist. If the BLM no longer stands by that analysis, it should say so. If it somehow does not think the analysis is relevant to BLM's decision here, it should say so. But ignoring recent analysis looking at the same resources studied here, prepared with input from the same agency, is arbitrary and capricious.

[45 Id. at 81.]

In addition to the recent Forest Service analysis, ICF International's Integrated Planning Model has been used to evaluate these types of market responses to numerous state and federal proposals in recent years. A recent, but by no means exhaustive list, of examples include the following projects and analyses: EPA, Clean Power Plan; State Department, Keystone XL Pipeline; Surface Transportation Board, Tongue River Railroad; and Washington Department of Ecology, Millennium Bulk Export Terminal. There are additional energy market models that could further inform BLM's evaluation here, particularly with regard to oil and gas. We point to the recent use of the Integrated Planning Model not to suggest BLM must use this particular model in revamping its analysis, but rather to note that this analysis can and has been done across a wide range of agencies studying the market and climate impacts of a variety of fossil fuel extraction and infrastructure proposals. BLM's refusal to study the market impacts of its decision here is thus not only out of touch with how energy markets work, it is out of step with the way in which other federal agencies review the market and climate impacts of their decisions under NEPA. #20])>

<([#21 [5.6] Understanding the market and climate impacts of a decision to allow extensive development of coal, oil, and natural gas resources is essential to making an informed decision -- particularly when weighed against an alternative that would prohibit new fossil fuel leasing in the area, as Sierra Club and others have advocated. BLM violated NEPA by failing to either use available tools to provide that essential information or explain why it could not do so. Under NEPA regulations, agencies "shall" explain in an EIS (1) why essential information is incomplete or unavailable; (2) its relevance to reasonably foreseeable impacts; (3) a summary of existing science on the topic; and (4) the agency's evaluation based on any generally accepted theoretical approaches. 40 C.F.R. § 1502.22(b). BLM's failure to conduct this analysis violates NEPA and must be corrected before BLM finalizes the Uncompahgre RMP revision. #21])>

3. BLM Must Address the Severity and Significance of Greenhouse Gas Emissions

<([#22 [11.3] In addition to correcting BLM's flawed assessment of the amount and potency of greenhouse gas emissions, BLM must provide discussion and context for assessing the severity or significance of those emissions. One way to do so is by using the social cost of carbon dioxide and other greenhouse gases, as discussed in the separate comments submitted by Western

BLM_0156358

Environmental Law Center et al., p. 62-68. Another tool BLM must use is to address the impact of BLM's management plan for the Uncompahgre planning area -- which anticipates adding more than half a billion tons of CO2-e to the atmosphere over the next twenty years -- on the numerous federal policies and international agreements that call for steep reductions in U.S. greenhouse gas emissions by 2025 and 2030. #22])>

<([#23 [11.3] In order to take the hard look NEPA requires, BLM must provide the public and decision-makers with an up to date review of the Obama Administration's climate objectives and international climate agreements and assess whether its Draft Plan is consistent with those goals and commitments.

NEPA regulations direct federal agencies, "to discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned)," 40 C.F.R. § 1506.2(d), and require agencies to address "possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned." 40 C.F.R. § 1502.16(c). CEQ's NEPA Climate Guidance interprets these regulations to encompass the requirement to address "approved federal, regional, state, tribal, or local plans, policies, or laws for GHG emission reductions or climate adaptation to make clear whether a proposed project's GHG emissions are consistent with such plans or laws."46

[46 CEQ NEPA Climate Guidance at 28-29.]

BLM has made no attempt to comply with this mandate. #23])> The U.S. has set ambitious greenhouse gas emission reduction targets and established itself as an international leader on protecting the climate. For example, in December 2015 the international climate summit in Paris produced an historic agreement establishing the ambitious goal of limiting warming to 1.5 degrees Celsius above pre-industrial times, a target that will require ambitious emission reductions beyond those currently identified.47

[47 White House, U.S. Leadership and the Historic Paris Agreement to Combat Climate Change (Dec. 12, 2015), https://www.whitehouse.gov/the-press-office/2015/12/12/us-leadership-and-historic-parisagreement-combat-climate-change (last visited Oct. 30, 2016).]

Domestically, President Obama's Clean Power Plan, currently stayed pending litigation, calls for reducing power sector emissions to 30 percent below 2005 levels by 2030.48 In November 2014, the President announced a joint U.S.-China agreement aimed at reducing climate pollution that called for even more aggressively cutting net greenhouse gas emissions to 26-28 percent below 2005 levels by 2025. Id.

[48 White House Fact Sheet, U.S.-China Joint Announcement on Climate Change and Clean Energy Cooperation (November 11, 2014), available at http://www.whitehouse.gov/the-pressoffice/2014/11/11/fact-sheet-us-china-joint-announcement-climate-change-and-clean-energy-c (last visited Oct. 30, 2016).]

BLM_0156359

Although much of the climate information in BLM's Draft Plan is from 2010 or earlier, recent climate science demonstrates that increasing greenhouse gas emissions from coal, oil, and natural gas extraction and combustion would undermine our national climate objectives and conflict with the international commitments our country made as part of the historic United Nations Framework Convention on Climate Change conference in Paris in December 2015.

In September 2016, both the White House Council of Economic Advisors and the peer-reviewed journal Nature published reports concluding that existing domestic climate policies are very likely insufficient to meet our commitments made as part of the December 2015 Paris Agreement.49
Even the White House's own analysis shows that existing policies -- including the currently stayed Clean Power Plan -- might allow us to meet our Paris commitments, but only if we make the most optimistic assumptions possible for each of several uncertainties in our assessment of likely emissions and their
impact.

[49 Jeffrey B. Greenblatt and Max Wei, Assessment of the climate commitments and additional mitigation policies of the United States, Nature Climate Change (Sept. 26, 2016); White House Council of Economic Advisors, The Economic Record of the Obama Administration: Addressing Climate Change (Sept. 2016), available at
https://www.whitehouse.gov/sites/default/files/page/files/20160921_record_climate_energy_cea.pdf
(last viewed Sept. 30, 2016).]

Finally, Oil Change International's recent "The Sky's Limit" report identifies the global carbon budget needed to reach the Paris and Clean Power Plan emission reduction goals and concludes that "[t]he oil, gas, and coal in already-producing fields and mines are more than we can afford to burn while keeping likely warming below 2°C;" and that "[t]he oil and gas alone [in already producing fields] are more than we can afford for a medium chance of keeping to 1.5°C."50 The report further concludes that "at current rates of emissions, the carbon budget for a likely chance of limiting warming to 2°C will be fully exhausted by 2037, and by 2025 for a medium chance at 1.5°C."51 This dramatic finding underscores the urgent need to take immediate and drastic steps to reduce greenhouse gas emissions. Merely ten more years of status quo emissions would entirely exhaust the total amount of carbon dioxide we can emit – forever – and still have even a "medium chance (50%)" of limiting global temperatures to the
internationally-agreed upon 1.5°C increase above pre-industrial times.52

[50 Oil Change International, The Sky's Limit: Why The Paris Climate Goals Require A Managed Decline Of Fossil Fuel Production, ES-6 (Sep. 2016), and available at
http://priceofoil.org/content/uploads/2016/09/OCI_the_skys_limit_2016_FINAL_2.pdf.]

[51 Id. at 12.]

[52 Id. at 13.]

<([#24 [11.3] Decisions that purport to merely extend the status quo for greenhouse gas

emissions would in reality drive us dangerously close to expensive and destructive global temperature increases. BLM must acknowledge this reality in order to give the public and decision-makers the appropriate context in which to view the competing alternatives here. As proposed, BLM's Draft plan predicts that the coal, oil, and natural gas generated in the Uncompahgre planning area over the twenty years would release more than half a billion tons of CO2-e into our atmosphere. BLM's plan is thus in direct conflict with our international climate commitments and domestic greenhouse gas reduction targets, but BLM fails to reconcile or even acknowledge this conflict.

More fossil fuel leasing, or even a continuation of the status quo, is totally out of step both with our Administration's priorities and the latest science on the urgent need to reduce greenhouse gas emissions. At a minimum, NEPA requires BLM to address these inconsistencies and explain the extent of the conflict so that both the public and decision-makers have an accurate understanding of the climate impacts of BLM's proposal. #24])>

C. The Draft RMP/EIS Fails to Take a Hard Look at Impacts to Surface and Groundwater

<([#25 [37.3] BLM has recognized, as it must, that fluid mineral leasing, exploration, and development impact water resources. "Use, storage, and transportation of fluids, such as produced water, hydraulic fracturing fluids, and condensate, have the possibility of spills that could migrate to surface or groundwater, causing human health impacts." DEIS 4-83. Waters can also be affected by activities other than fluid spills, such as sedimentation or mobilization of underground contaminants. "Hydraulic fracturing," in particular, "could disturb surface water and groundwater hydrology and impact water quality." DEIS 4-130.

However, BLM failed to take a hard look at these impacts. #25])> While we summarize many areas where additional analysis is required in the companion comment submitted with Western Environmental Law Center et al., we highlight several of these impacts here.

For one, <([#26 [37.3] BLM cannot provide a "hard look" at the impacts of spills without discussing the contaminants that might be present in spilled fluid. BLM recognizes that fracturing fluid contains numerous "chemical additives," and that hydraulic fracturing presents a risk of spill of these chemicals, or of fracturing fluid or wastewater that contains them. DEIS 4-83; see also id. at 4-61, 4-80,[53] 4-445. But BLM provides no discussion of what these additives might be, the amounts used, or the consequences of a spill of any particular additive, chemical, or other hazardous material.

[53 The DEIS identifies "spills of hazardous materials in water bodies" as an "indicator" of impacts on water resources. DEIS at 4-80 (emphasis added). BLM must recognize that spills are likely to impact water resources even when the spill is not directly into a water body; for example, material spilled on soil can be mobilized by rain and then reach surface or groundwater.] #26])>

<([#27 [41.2] We agree that, insofar as hydraulic fracturing occurs at all, the chemicals used should be "biodegradable, non-toxic neutral pH, residual free, non-corrosive, non-polluting and non-hazardous in the forms and concentrations being used," and we support BLM's

BLM_0156361

identification of this as a "best management practice." DEIS at G-10. BLM must do more, however, and prohibit use of chemicals that fail to meet these criteria. The draft RMP/EIS does not clearly state that adherence to identified best management practices is mandatory. Even if BLM requires that additives meet this standard, a "hard look" requires BLM to identify chemicals that are likely to be used, and to assess the impacts of a spill of those particular chemicals. #27])>

In addition to discussing the particular chemicals that will foreseeably be used and potentially spilled, <([#28 [37.3] BLM must take a hard look at the broader efficacy of the BLM's Onshore Orders, the Colorado Oil and Gas Conservation Commission's requirements for well completions, and the "stipulations and site-specific condition of approvals for drilling, completions, and fluids management" that BLM asserts will protect water resources. DEIS at 4-83. As explained by BLM's Handbook on Planning for Fluid Mineral Resources, it is not enough for BLM to identify mitigation measures: BLM must take a hard look at "The residual impacts that would remain following the application of the mitigation measures ... i.e., effectiveness of mitigation measures in ameliorating potential impacts."54 See New York v. Nuclear Regulatory Comm'n, 681 F.3d 471, 481 (D.C. Cir. 2012) ("merely pointing to [a] compliance program is in no way sufficient to support a scientific finding" of no "significant environment[al] impact."). BLM has not provided such an analysis. For example, although BLM argues that effects would be minimized by adherence to BLM's onshore orders, DEIS 4-83, in formulating Onshore Order #8, "Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands," BLM's NEPA analysis was "not intended to analyze the effects that may result from actual hydraulic fracturing activities," and instead only considered the incremental effects of the "procedures" the rule would require "prior to, during, and subsequent to hydraulically fracturing an oil and gas well," such as performing a cement evaluation log.55

[54 Planning for Fluid Mineral Resources at III-8.]

[55 BLM, Environmental Assessment: Proposed Hydraulic Fracturing Rule, at 4, https://www.regulations.gov/contentStreamer?documentId=BLM-2013-0002-0003.] #28])>

In short, although BLM has recognized that fluid mineral development in general, and hydraulic fracturing of shale and other tight formations in particular, poses a risk of spills or other releases of hazardous chemicals into the environment, BLM has not provided an assessment of the likelihood of such a release or the consequences thereof. This falls far short of the hard look NEPA requires.

V. Conclusion

We appreciate your consideration of these comments, and BLM's willingness to facilitate public participation by extending the public comment period. For the reasons described above, however, we believe the draft RMP/EIS to be seriously flawed in its treatment of fossil fuel production. BLM should consider and adopt an alternative that prohibits further fossil fuel leasing, and additional analysis is needed to provide a hard look at the impacts of fossil fuel development.

Sincerely,

Nathan Matthews
Staff Attorney
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
415.977.5695
nathan.matthews@sierraclub.org

Nathaniel Shoaff
Staff Attorney
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
415.977.5610
nathaniel.shoaff@sierraclub.org

000480_SmithR_20161028  Organization:  Robin  Smith
Received: 10/28/2016  12:00:00  AM
Commenter1:  Robin  Smith - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mtrieger 12/9/2016  12:00:00  AM
Attachments: 000480_SmithR_20161028.htm  (000480_SmithR_20161028-387966.htm  Size =
13 KB)
xUFORMP_000480_SmithR_20161028.pdf  (000480_SmithR_20161028-387965.pdf  Size = 607
KB)
Submission  Text
Date:10/28/2016

Commenter: Robin  Smith

Organization:

Email:larzymranch@skybeam.com

Address:40849  M Road, Paonia Colorado 81428

Phone:

Comment:
Please accept my comments (attached) on the UFO draft RMP.

Robin Smith

Dear UFO BLM,

I am writing to urge you to select Alternative B as the agency's preferred alternative, with the stipulation that it be revised to incorporate language prohibiting fossil fuel leasing on 95% of the lands within the decision area throughout the life of the Resource Management Plan.

Outlined below are my comments on the Draft RMP.

FAILURE TO CONSIDER ALL REASONABLE ALTERNATIVES

<([#1 [5.3] BLM has failed to consider all reasonable alternatives in the Draft RMP. Paragraph (a) of §1502.14 of the Council on Environmental Quality regulations direct federal agencies undergoing the NEPA process to:

Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated. (Emphasis added.)

Section 2.4.1 of the Draft RMP provides the following additional information on how BLM formulates its alternatives:

…the purpose of this RMP is to ensure that public lands are managed in accordance with the intent of Congress, as stated in the FLPMA, under the principles of multiple use and sustained yield. Alternatives that promote exclusive use or maximum development, production, or protection of one resource at the expense of other resources or resource uses were eliminated from further consideration. (Emphasis added.)

Consistent with these guidelines, Section 2.4.3 of the draft RMP dismisses a no oil and gas leasing alternative by stating:

An alternative that prohibits fluid mineral leasing throughout the decision area would not meet the purpose of and need for the RMP.

Further, Section 2.4.4 states:

An alternative that prohibits coal leasing throughout the decision area would not meet the purpose of and need for the RMP.

However, an analysis of Alternative D, the Agency's Preferred Alternative, reveals BLM is proposing to make approximately 870,000 acres, or 95%, of the 916,000 acres in the planning area available for oil and gas leasing. Apparently, BLM considers making 95% of the acreage

BLM_0156364

available for oil and gas leasing a reasonable alternative and not an exclusive use or maximum development alternative.

To remain consistent with BLM's proposed Preferred Alternative, I propose inserting language in Alternative B, the Conservation Alternative, prohibiting fossil fuel (coal, oil and gas) leasing on 95% of the lands within the planning area throughout the life of the RMP. #1])>

<([#2 [21.1] When deciding where to locate the 5% of lands, or approximately 46,000 acres, that will be open to fossil fuel leasing in Alternative B, BLM must take into account where there is opposition to oil and gas development and where there is support. Due to the overwhelming opposition to leasing anywhere near the North Fork Valley, this area should be included in the 870,000 acres that will remain closed to leasing. Similarly, the 46,000 acres available for fossil fuel leasing should be located in those communities within the UFO that support oil and gas development. #2])>

FAILURE TO CONSIDER IMPACTS OF CLIMATE CHANGE

Scientists say that 2016 is turning out to be the warmest year on record, breaking the second warmest year that occurred in 2015. As a result of warmer temperatures, severe climate events are becoming more commonplace. For example, southern Louisiana recently received 30 inches of rain in three days! Let's put that in perspective—since we don't receive much rain within the UFO, let's translate this into snow. Thirty inches of rain is equivalent to approximately 300 inches (25 feet) of snow. In three days! This extreme weather would result in the loss of many lives.

According to a recent article in CommonDreams.org, three of the world's biggest insurance companies are warning that climate change amounts to the "mother of all risks" and are demanding the industrialized countries of the world stop bankrolling the fossil fuels industry. This article states:

Multi-national insurance giants Aviva, Aegon, and Amlin, which together manage $1.2 trillion in assets, released a statement in August of this year calling on the leaders of the world's biggest economies to commit to ending coal, oil, and gas subsidies within four years.

"Climate change in particular represents the mother of all risks—to business and to society as a whole. And that risk is magnified by the way in which fossil fuel subsidies distort the energy market," said Aviva CEO Mark Wilson.

One of the subsidies our local oil and gas companies receive is the leasing of publicly-owned lands for a pittance—often for as little as $2 per acre. Meanwhile, the "real costs" associated with damage to the environment and human health are foisted on others and are not paid by polluters.

Indeed, insurance companies are increasingly shouldering many of the costs associated with a warming planet, whether it be from extreme weather damage or reimbursing farmers for lost crops.

BLM_0156365

In the first half of 2016 alone, natural catastrophes worldwide have caused $70 billion in losses, of which $27 billion was insured, according to an assessment by insurance and reinsurance company Munich RE—with events of particular note being climate-related "storms in the U.S. and Europe, massive forest fires in Canada, and the complete absence of typhoons in the northwestern Pacific."

And housing data firm Zillow recently published an analysis which found that as many as 1.9 million homes across the country could be underwater by 2100 if the seas rise as much as climate scientists predict, amounting to property losses in the hundreds of billions of dollars.

"These subsidies fuel dangerous climate change," said Whitley. "If we are to have any chance of meeting the 2°C target set at the Paris climate summit then governments need to start a program of rapid decarbonization. The finance sector recognizes the importance of moving away from fossil fuels, governments need to realize they may be the only ones left not moving." (Emphasis added.)

It is absolutely unconscionable for BLM to propose fossil fuel leasing on approximately 870,000 of available acreage in the Preferred Alternative. BLM must instead adopt Alternative B with the inclusion of a provision prohibiting fossil fuel leasing on 95% of the acreage in the planning area because the climate crisis we are currently facing demands action. Approximately 73% of fossil fuel extraction in the U.S. takes place on private lands while the remaining 27% occurs on publicly-owned land. Preventing fossil fuel extraction on private lands is difficult, if not impossible, for citizens and government agencies to stop. Therefore, to protect our families and all life forms on Earth from this impending crisis, it is imperative that we keep those fossil fuels we have direct control over—the federal mineral estate—in the ground.

FAILURE TO CONSIDER DIRECT AND INDIRECT IMPACTS TO NON-DECISION AREA LANDS

The fifth bullet point found in Section 4.1.1 of the Draft RMP states that "Direct and indirect impacts of implementing the RMP primarily occur on the decision area lands."

Nothing could be further from the truth. BLM's decisions are about to destroy many people's lives—including that of my family.

When it came time to retire, my wife and I choose to move from Ohio to a 45-acre property three miles south of Paonia. We put much of our savings into building our dream home where we intended to live the remainder of our days. Now, thanks to BLM, our future is at risk.

The Agency's Preferred Alternative makes available for a leasing a parcel of land that is directly adjacent to our property at 40849 M Road, Paonia. Consequently, we have the potential of having oil and gas drilling occurring right next door to our property. We also have water well and a pond that is located 488 yards from the parcel BLM is proposing to make available for oil and gas leasing. If my well and pond become contaminated with chemicals from the oil and gas industry, will BLM provide my family with drinking water in perpetuity? We grow much of our

BLM_0156366

own food on our property—herbs and vegetables in the garden, as well as apples, peaches, plums, pears, nectarines, cherries, grapes, blackberries, and raspberries in our orchard. Will BLM provide us with food when we can no longer grow our own organic produce due to contaminated irrigation water?

<([#3 [5.6] It is a bold-faced lie for BLM to state that oil and gas development occurring on the federal mineral estate property adjacent to ours will not have any direct or indirect impacts on our non-decision lands—our private property. The negative impacts of oil and gas drilling next to our property will result in us being forced to:

• Breathe contaminated air;

• Risk drinking contaminated water;

• Risk irrigating our organically cultivated garden and orchard with contaminated water;

• Listen to constant fracking noise;

• Feel the ground vibrate from fracking;

• Endure endless truck traffic breaking the peace and tranquility of our rural property;

• Lose our dark skies due to light pollution;

• Have our beautiful mountain views obscured by oil and gas wells; and

• No longer see dozens of migrating deer, elk, and other wildlife on our property.

Because we do not want to live next to an oil and gas patch, the direct and indirect negative impact of oil and gas drilling next to our property will result in us having to sell our property and move out of the area. That assumes, of course, that we will be able to find someone to buy our property—after-all, who would buy his dream home next to an oil and gas well? Additionally, our reduced property values will cause financial hardship on our family. #3])> And, by the way, will BLM pay our moving costs? Or will this be another indirect financial impact that we must bear because of BLM's poor decision making?

Lastly, if BLM is so sure there will not be any direct or indirect impacts to our property, then they should be willing to pay us the difference between an appraisal of our property value done before leasing and another one done while fracking is taking place on the adjacent property.

IGNORING PUBLIC INPUT

The Draft RMP continues BLMS past history of ignoring public comments from residents of the North Fork community.

<([#4 [2] It is absolutely mind boggling that BLM continues to ignore the requests of thousands

of people in the North Fork Valley and around the country to stop oil and gas development in our area. Over the past six years our community has spent considerable time, money, and effort developing the North Fork Alternative. And how does BLM respond to our considerable effort to provide public input? Not one iota of the North Fork Community Alternative was incorporated into the Preferred Alternative! #4])> Talk about a slap in the face!

Perhaps the UFO of the BLM needs a refresher course in high school civics. BLM needs to go back to school to learn that Republican President Abraham Lincoln, in dedicating a Civil War military cemetery at Gettysburg, said: "that we here highly resolve that these dead shall not have died in vain—that this nation, under God, shall have a new birth of freedom—and that government of the people, by the people, for the people, shall not perish from the earth."

With the recent release of the UFO Draft RMP calling for 95% of our publicly-owned lands to be made available for oil and gas leasing, it appears BLM misunderstood President Lincoln to say that our government of the fossil fuel corporations, by the fossil fuel corporations, and for the fossil fuel corporations shall not perish from the earth.

Somewhere along the way, BLM has lost its way and forgotten they are responsible to the people of this country. It is time for BLM to regain the trust of the public by listening to our voices and developing an RMP that responds to our concerns.

CONCLUSION

BLM's Draft RMP fails to consider: all reasonable alternatives; impacts resulting from climate change; and direct and indirect impacts to non-decision area lands (private property). Additionally, the Draft continues BLM's saga of ignoring public input from residents of the North Fork community.

The Draft RMP provides BLM an opportunity to correct these deficiencies by selecting Alternative B as the Preferred Alternative with the inclusion of language that incorporates a prohibition on fossil fuel leasing on 95% of the lands within the decision area throughout the life of the Resource Management Plan.

Sincerely,

Robin Smith
40849 M Road
Paonia Colorado 81428


000481_SweitzerK_20161031 Organization: Kim Sweitzer
Received: 10/31/2016 12:00:00 AM
Commenter1: Kim Sweitzer - Gunnison, Colorado 81230 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique

Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000481_SweitzerK_20161031.htm (000481_SweitzerK_20161031-387967.htm
Size = 1 KB)
xUFORMP_000481_SweitzerK_20161031.pdf (000481_SweitzerK_20161031-387968.pdf Size
= 131 KB)
Submission Text
Date:10/31/2016

Commenter:Kim Sweitzer

Organization:

Email:klsweitzer@earthlink.net

Address:566 Tomichi Trail, Gunnison, CO 81230

Phone:

Comment:
Dear BLM Regional Management -

I support the "North Fork Alternative," which provides for no oil and gas leasing across 75% of
the North Fork Valley.

I am opposed to expanding coal and natural gas expansion in Gunnison county. As proposed, the
RMP would facilitate the expansion of coal mining and natural gas development across rural
landscape, impacting wildlife, watersheds, air quality and sustainable recreation. These public
land should not be impacted in this way. Additionally, the affected parts of Gunnison County are
directly upstream from the orchards, vineyards and small farms surrounding Paonia, Hotchkiss
and the North Fork Valley. These agricultural areas should not become vulnerable to the debris
of coal and natural gas exploration.

thank you for your consideration,

Kim and Dick Sweitzer
566 Tomichi Trail
Gunnison, CO 81230

000482_MeyersK_20161101_Tri-State_HasAttach Organization: Tri-State Generation and
Transmission Association, Diana Leiker
Received: 11/1/2016 12:00:00 AM
Commenter1: Diana Leiker - Westminster, Colorado 80234 (United States)
Organization1:Tri-State Generation and Transmission Association

BLM_0156369

Commenter2: Karl Myers - Denver, Colorado 80233 (United States)
Organization2:Tri-State Generation and Transmission Association
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Flags:
Attachments: 000482_MeyersK_20161101_Tri-State_HasAttach.htm
(000482_MeyersK_20161101_Tri-State_HasAttach-387758.htm Size = 19 KB)
UFORMP_000482_MyersK_20161101_Tri-State_HasAttach.pdf
(000482_MeyersK_20161101_Tri-State_HasAttach-387759.pdf Size = 208 KB)
Submission Text
Date:11/01/2016

Commenter: Karl Myers; Diana Leiker

Organization: Tri-State Generation and Transmission Association

Email:dleiker@tristategt.org

Address:PO Box 33695 Denver, CO 80233; 1100 W. 116th Avenue, Westminster, CO 80234

Phone:303-452-6111; 303-254-3565

Comment:
Good afternoon,

Please find attached Tri-State's comments on the Uncompahgre Draft RMP. Please feel free to contact with us any additional information needs or comments on our letter.

We appreciate the opportunity to be involved in this planning effort. Have a good afternoon.

Diana

Diana Leiker
Senior Transmission Siting and Environmental Planner
Tri-State Generation and Transmission Association, Inc
1100 W. 116th Avenue
Westminster, CO 80234
Office: 303-254-3565
Cell: 303-241-5653

Dear Project Manager,

Tri-State Generation and Transmission Association, Inc. (Tri-State) is a wholesale electric power producer/supplier that serves 43 rural electric cooperatives and public power districts in Colorado, Nebraska, New Mexico and Wyoming. Tri-State's member distribution systems serve nearly 578,000 metered customers (translating to a population of more than 1.4 million people). Tri-State's 250,000-square-mile member service territory includes all or parts of 56 of Colorado's 64 counties, all or parts of 27 counties throughout New Mexico, all or parts of 20 counties in western Nebraska and all or parts of 14 counties in central and northern Wyoming. Tri-State's transmission system includes approximately 5,600 miles of high-voltage transmission line and 135 substations and switching stations.

Tri-State welcomes the opportunity to provide comments to the Bureau of Land Management (BLM) regarding the proposed revisions to the Uncompahgre Field Office (UFO), Resource Management Plan (RMP) and Draft Environmental Impact Statement (DEIS). Tri-State is committed to siting, routing, designing, constructing, and maintaining generation, transmission, and telecommunication facilities in a manner that will result in minimal disturbance to the natural and human environment.

Tri-State's overall siting and maintenance operations for the electric transmission system are aligned to comply with the BLM regulations and principles of multiple use contained in the Federal Land Policy and Management Act of 1976 (FLPMA) to: (1) conserve BLM managed land values and characteristics; (2) protect human health and safety; (3) supply continuous, affordable reliable electricity; (4) preserve wildlife habitats where necessary; (5) maintain existing facilities and access to those facilities; and (6) construct new facilities and access with a regard to BLM requirements and resource protection.

Tri-State has one substation (Starr Nelson), six telecommunication facilities, and approximately 132 miles of transmission line that occurs within the UFO Planning Area as detailed below and depicted in the attached figure.

Transmission Lines that Occur Within the UFO Planning Boundary
- Nucla-Cahone transmission line (currently 115-kV): 3.6 miles
- Montrose-Nucla (currently 115-kV): 14.7 miles
- Cow Creek-Dallas Creek 115kV: .9 miles
- Cow Creek-South Canal 115-kV: 7.1 miles
- Doughspoon-Gunnison Valley 115kV: 1.5 miles
- Doughspoon-Starr Nelson 115kV: 7.4 miles
- East Montrose-Peach Valley 115kV: 4.7 miles
- Garnet Mesa-Hotchkiss 115kV: 6.2 miles
- Garnet Mesa Tap-Peach Valley 115kV: 6.2 miles
- Grand Junction-Montrose 115kV: 25.3 miles
- Grand Junction-Montrose 345kV: 33.2 miles
- Hesperus-Montrose 345Kv: 6.5 miles
- Hesperus to Montrose 115kV:
- Hotchkiss-North Fork 115kV: 4.1 miles
- Juanita-North Fork 115kV: 2 miles

- Nucla-Norwood 115kV: 3.6 miles
- Norwood-Wilson Mesa 115kV: 1.1

Telecommunication Facilities that Occur Within the UFO Planning Boundary
- Sheebs Knob
- Tv Hil
- Storm King
- Dallas Creek
- South Canal
- Starr Nelson

Tri-State respectfully submits the following comments on the proposed revisions to the UFO Draft Resource Management Plan and Draft Environmental Impact Statement (DEIS) as they pertain to the construction and maintenance generation facilities and electric transmission lines and substations within the RMP planning area.

Areas of Critical Environmental Concern (ACEC):

Tri-State has multiple facilities under each alternative that occur within proposed ACECs. Tri-State has concerns that these designations have incorporated portions of existing rights-of-ways (ROWS) and associated access roads which could affect line maintenance activities including access road authorization, use, new development, and improvement. Tri-State is currently working with the BLM on re-authorization of existing roads for the Grand Junction-Montrose 115-kV transmission line. Access is critical to Tri-State providing safe and reliable power to our member cooperatives.

For Alternatives B and D use of existing and designated routes in the most of the proposed ACECs that affect Tri-State facilities are permitted. However, there may be occasions where a new overland route or short spur route is needed in the future to replace existing transmission line structures or repair damaged wires.

<([#1 [9.1] It is not clear if major maintenance activities, rebuilds, upgrades (which may require a ROW
expansion) or major structure replacement/line re-conductoring would be permitted in a designated ACEC, even if the line is an existing authorized use. The ACEC designation under all proposed alternatives should either 1.) Allow for use of existing access and allow for development of new access when necessary for existing infrastructure within ACEC boundaries and allow for upgrade and replacement within authorized and expanded ROWs or 2.) Tri-State would request that the BLM exclude all existing utility ROWs and associated access roads from incorporation into the ACEC. #1])> The BLM has been provided GIS shapefiles for access and transmission line locations within the UFO during project development and as part of reauthorization of older lines and construction of new transmission lines. Tri-State requests that this data is utilized in the future to assist with management decisions as they pertain to authorized uses. If there are data sets the BLM may be missing, we would be happy to provide under the terms of our data sharing agreement (2015).

A detailed list of our facilities within proposed ACECs as proposed in Alternatives A and B are included below:

-The proposed Salt Desert Shrub Ecosystem ACEC proposed under Alternative B would incorporate portions of the Grand Junction-Montrose 345-kV and 115kV lines, the Star Nelson-Doughspoon 115kV line, the Star Nelson Substation, and associated access roads. A portion of the area also occurs in a designated energy corridor which may conflict with resource management objectives. Exclusion of the corridor from the ACEC designation would still allow for protection and management of the federally listed Colorado hookless cactus. Exclusion of the transmission ROWs in this area would still require Tri-State's compliance and due diligence under Section 7 of the Endangered Species Act to avoid, minimize, and mitigate impacts to federally listed plant species.

-The Lower Uncompahgre Plateau Cultural ACEC proposed under Alternative B would incorporate portions of the Grand Junction-Montrose 115kV and 345kV transmission lines and associated access roads.

-The San Miguel River Expansion proposed under Alternative B would incorporate portions of the Norwood-Wilson Mesa 115-kV line in two locations.

-The San Miguel River ACEC proposed under Alternatives A, C, and D would also incorporate the same Norwood-Wilson Mesa 115kV transmission lines.

-The Fairview South (CNHP) Expansion proposed under Alternative B would incorporate portions of the South Canal-Cow Creek transmission line.

Right-of-Way Avoidance and Exclusion Areas

In Tri-State's original scoping letter regarding the RMP amendment, we had requested that Tri-State's facilities be incorporated onto the Utility Planning figures along with other existing facilities owned/operated by Western Area Power Association, Kinder Morgan TransColorado Pipeline. <([#2 [4] The Draft RMP and DEIS does not appear to specifically acknowledge Tri-State
facilities in the planning area, nor was Tri-State contacted as requested to specifically discuss ROW avoidance and exclusion area designations. As a major stakeholder in the RMP revisions, we feel that Tri-State's electrical facilities should be considered for planning purposes when discussing ROW avoidance and exclusion designations. #2])> This focus of the RMP would have
directly benefitted from utilities involvement throughout the development process.

Similar to our concerns regarding the incorporation of existing transmission facilities into ACECs, there are also proposed ROW avoidance and exclusion areas that currently have existing electrical infrastructure present. Tri-State's facilities that occur in proposed ROW exclusion/avoidance areas include the following:

Alternative A: (Exclusion Areas):

Norwood-Wilson Mesa 115-kV
Starr Nelson-Doughspoon

Alternative B: (Avoidance and Exclusion):
Norwood-Wilson Mesa 115kV
Nucla-Norwood 115kV
Montrose-Nucla-Cahone 115-k (proposed for 230kV upgrade)
Hotchkiss-North Fork 115kV
Juanita-North Fork 115kV
Starr-Nelson Doughspoon 115kV
Grand Junction-Montrose 115 and 345 kV

Alternative C: (Avoidance and Exclusion):
Grand Junction-Montrose 115 and 345kV
Starr Nelson-Doughspoon 115kV
Starr Nelson Substation
Hotchkiss-North Fork 115kV
Montrose-Nucla-Cahone existing 115-kV
South Canal-Cow Creek 115kV
Norwood-Wilson Mesa

Alternative D (Avoidance):
Grand Junction-Montrose 115 and 345kV
Starr Nelson-Doughspoon 115kV
Starr Nelson Substation
Hotchkiss-North Fork 115kV
South Canal-Cow Creek 115kV
Montrose-Nucla-Cahone existing 115-kV
Juanita-North Fork 115kV
Nucla-Norwood 115kV
Norwood-Wilson Mesa115kV

<([#3 [19.1] Tri-State formally requests that these existing ROWs and substation are excluded from the ROW
exclusion categories for all Draft RMP and DEIS alternatives to permit lawful and authorized maintenance and operation activities including access roads use and improvement to continue. #3])> Tri-State has no foreseeable plans to construct new power lines in the UFO planning area, but in
general, prefer to utilize existing utility corridors for upgrades or new alignments whenever feasible to reduce impacts to land use and the natural and human environment. The BLM should consider encouraging the use of existing corridors whenever feasible for future development. Designating existing corridors and ROW exclusion areas in areas with existing electrical infrastructure may result in greater impacts to the environment from future development.

Surface Disturbing Activities

Tri-State also has facilities located within areas proposed for reducing surface disturbing activities. The following Tri-State facilities are incorporated into areas proposed for eliminating or reducing surface disturbing activities in the UFO planning area (by alternative):

Alternative A: Starr Nelson-Doughspoon 115kV


Alternative B: Montrose-Nucla-Cahone 115kV
Norwood-Wilson Mesa 115kV
Hotchkiss-North Fork 115kV
North Fork-Juanita 115kV
South Canal-Cow Creek 115kV
Starr Nelson-Doughspoon 115kV
Starr Nelson Substation
Grand Junction-Montrose 115kV and 345kv

Alternative C: Montrose-Nucla-Cahone 115kV
Norwood-Wilson Mesa 115kV
South Canal-Cow Creek 115kV
Starr Nelson-Doughspoon 115kV
Starr Nelson Substation
Hotchkiss-North Fork 115kV
North Fork-Juanita 115kV
Grand Junction-Montrose 115kV and 345kv

Alternative D: Montrose-Nucla-Cahone 115kV
Norwood-Wilson Mesa 115kV
Hotchkiss-North Fork 115kV
North Fork-Juanita 115kV
South Canal-Cow Creek 115kV
Starr Nelson-Doughspoon 115kV
Starr Nelson Substation
Grand Junction-Montrose 115kV and 345kv


The discussion of this surface disturbance category primarily focused on fluid mineral leasing. Appendix B, however, addresses non-fluid mineral leasing activities, which would presumably include transmission ROWs. <([#4 [4] [19.1] Tri-State would again request the Final RMP acknowledges these
existing facilities and the right to continue to maintain, access, and improve authorized infrastructure.
#4])>
Travel Management Plan
Tri-State is required to access and maintain electrical infrastructure in compliance with federal standards and requirements. Tri-State has existing permitted facilities within the BLM UFO planning area that were constructed and permitted prior to travel management planning objectives. In the case of Grand Junction-Montrose 115-kV transmission line, access has been

BLM_0156375

used since the line was constructed in the early 1960s, but that access was never formally incorporated into the right-of-way grant, which necessitates a request to the BLM to provide for access to this and other older facilities. Tri-State is currently working with the UFO to formally authorize access to this facility.

For many years, Tri-State has effectively worked with BLM to identify and designate access (or administrative) roads for our existing and new transmission infrastructure. The GIS data for these transmission lines and associated access roads have been provided to the BLM through a data sharing agreement.

It is critical that Tri-State is able to maintain access rights to our transmission, telecom, and substation facilities within the Planning Area. Motorized cross-country travel should be allowed in areas designated as open, limited to existing roads and trails, limited to designated roads and trails and closed to motorized use, for maintenance of existing and planned transmission lines and associated facilities. The BLM should leave areas open for OHV use where an existing use or ROW grant is issued or for those areas designated as critical to the health and safety of the public. Access should be allowed in coordination with the BLM for new facilities and ROWs within the planning area that will minimize disturbance to the greatest extent feasible. We believe that formally designating access routes for transmission operation and maintenance will concentrate and reduce environmental impacts to any given area over time.

This process of permit renewal has been effective and efficient; however, it would be helpful to all in the industry if BLM, in this case, could identify the issue and provide for continued access to transmission facilities for maintenance and emergency services in any final promulgated rule.

Surface Disturbance for Non-Fluid Mineral Activities

Tri-State believes in the implementation of seasonal restrictions to reduce impacts to soils, vegetation, and wildlife. It is imperative; however, that with the implementation of these surface disturbing restrictions that it is still feasible for permittees to construct and maintain their authorized facilities in an efficient and cost effective manner. Complying with overlapping and in some cases yearlong seasonal restrictions for long linear projects can make maintenance and construction of permitted facilities challenging if not impossible. Tri-State appreciates that Table B-4 of Appendix B incorporates exceptions, modifications, and waivers to permit construction/maintenance activities based on current conditions. It is unclear, however, what this process would require. <([#5 [3] Tri-State would request that the Final RMP clarifies what is required of a permittee if a modification is required.
#5])>
The Final RMP should be consistent with our existing ROW Grants which allow year-round access of our facilities in emergency situations that pose a threat to electric reliability, health, and safety.

Visual Resource Management

Existing transmission lines and associated facilities are located within the boundaries of the planning area. We urge the BLM to continue to allow valid existing rights and uses such as

existing and planned utilities to be considered with appropriate and reasonable mitigation measures.

Renewable Energy Development

Tri-State is supportive of alternatives that improve renewable energy development opportunities. It is crucial to these developments that the interconnection of these facilities (transmission lines) is also incorporated into this planning process and that the final Right-of-Way Exclusion boundaries consider interconnection of renewable resources.

Target Shooting/Vandalism Concerns

Vandalism (shooting) of Tri-State's infrastructure on the UFO district is a past and ongoing health and safety concern. Significant damage has been done to our lines on the district and more frequent and substantial repairs have been required. Our maintenance staff is regularly repairing shot conductor wire, static wire, and insulators. Many of our lines also carry critical communications in the form of an optical ground wire (OPGW). These wires in many cases are carrying internet and 911 services. Damage to electrical infrastructure is serious threat from an electrical reliability perspective but also from a public health and safety perspective. <([#6 [18.5] [27.1] Tri-State is formally requesting that the BLM incorporate a no shooting policy around electric infrastructure similar to what has been implemented for trails and roads into the Final RMP and EIS. We would also request that all existing distribution and transmission ROWs are formally designated as no target shooting areas under Alternatives A through D. #6])>
Thank you for your consideration of our comments. We appreciate ongoing project coordination with the BLM UFO staff and we look forward to continuing to work with the BLM through the RMP planning revision. Please don't hesitate to contact us for further information or data needs.

Sincerely,

Karl Myers
Manager, Transmission Siting, Permitting and Environmental

Attachment: Figure: Tri-State Facilities in BLM UFO Planning Area
CC: Teresa Pfifer-BLM Acting Field Manager

000483_HanksG_20161101 Organization: Trout Unlimited, Garrett Hanks
Received: 11/1/2016 12:00:00 AM
Commenter1: Garrett Hanks - Durango, Colorado 81301 (United States)
Organization1:Trout Unlimited
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique

Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000483_HanksG_20161101.htm  (000483_HanksG_20161101-381182.htm  Size = 43 KB)
Submission Text
Garrett Hanks <ghanks@tu.org> Save Submission

To Whom it May Concern,

Please find the attached comments from Trout Unlimited to the Uncompahgre Field Office Draft Resource Management Plan. We appreciate the opportunity to be involved in this public process, and look forward to the Final Resource Management Plan.

Sincerely,
Garrett Hanks
Southwest Colorado Field Coordinator
ghanks@tu.org
970.590.9367
Trout Unlimited
1309 E 3rd Ave, Suite 109
Durango, CO 81301
http://www.tu.org

TU Comments Uncompahgre RMP.pdf
343K

Sent via email to: uformp@blm.gov

November 1, 2016

RMP Project Manager
BLM, Uncompahgre Field Office
2465 S. Townsend Ave., Montrose, CO 81401

RE: Comments on Uncompahgre Field Office Draft Resource Management Plan

Dear RMP Project Manager,

Please accept the following comments from Trout Unlimited (TU) on the Uncompahgre Field Office (UFO) Draft Resource Management Plan (DRMP) document. We appreciate the BLM's invitation to participate in the planning process and for working with TU and other stakeholders in the management of our public resources.

Trout Unlimited is the nation's oldest and largest coldwater conservation non-profit organization with more than 150,000 members nationwide dedicated to conserving, protecting and restoring

North America's trout and salmon fisheries and their watersheds. Since 1959, TU staff and volunteers have worked toward the protection of sensitive ecological systems necessary to support robust native and wild trout populations in their respective ranges. We recognize the high value of public lands and the role public lands play in providing habitat to coldwater fisheries, drinking water, and wildlife habitat. Trout Unlimited believes that the actions taken on public lands are ultimately reflected in the quality of fish and wildlife habitat and their populations.

In Colorado, TU plays a critical role in watershed conservation, restoration, and rehabilitation on public lands. Twenty-four chapters and 10,000 members statewide actively participate in projects with the federal land managers, local communities, and private landowners in order to maintain healthy watersheds that are so vital to the social and economic community in this area.

The DRMP footprint is host to headwater habitat for truly unique and native fish – the Colorado River cutthroat trout (CRCT) and Greenback cutthroat trout (GBCT). Because these fish are only found in specific and limited places, protection of their watersheds and habitats are especially important. Colorado River cutthroat trout have adapted to this region for eons; they are a part of our culture and angling heritage. Trout Unlimited has worked on CRCT and GBCT issues consistently over many years, and we are excited to take advantage of this opportunity in the planning process to ensure even better protections for these fish.

As sportsmen and women we have considerable stake in the management direction, strategy, and priorities of the BLM planning process. These are the lands on which we fish and hunt, and we feel privileged to participate in the public process that guides the management of those resources. Members of TU believe in multiple uses of public lands but have greatest interest in their coldwater fisheries, big game habitat, pristine watersheds, and backcountry areas.

General Comments to Uncompahgre Field Office Draft Resource Management Plan

<([#1 [16.2] Cutthroat Trout

Colorado River cutthroat trout (CRCT) historically occupied numerous tributary systems of the Upper Colorado and Green River systems. Today the CRCT is found in only 16% of historically occupied subwatersheds, even less in the Gunnison Basin. Habitat alterations and non-native trout have pushed remaining populations into isolated tributaries where the habitat quality continues to remain high and risk from non-native introductions is reduced. Many of these small populations, however, do not meet minimum habitat and abundance requirements for long-term persistence[1].
[Footnote 1] Williams, J.E., A.L. Haak, N.G.Gillespie, and W.T.Colyer. 2007b. The Conservation Success Index: synthesizing and communicating salmonid condition and management needs. Fisheries 32:477-492

As identified on page 1-12, it was indicated by BLM that "Additional planning criteria received in public scoping comments included incorporation of the Conservation Agreement or Strategy for Colorado River Cutthroat Trout." Neither of these documents were referenced in the DRMP or used to evaluate potential threats or opportunities within the DRMP footprints for

conservation of native cutthroat trout. Furthermore the 1998 Greenback Recovery plan that is cited is dated, and even without a new recovery plan in place, Trout Unlimited would like to see more and updated references guiding the current and future managements on the Uncompahgre Field Office.

The failure to obtain and incorporate identified sources of information specific to native trout is a concern, and potentially a cause for further revision to the RMP. The Cutthroat trout Species and Conservation Assessment for the Grand Mesa, Uncompahgre, and Gunnison National Forests[2] clearly identifies populations of conservation status for both CRCT and GBCT, as well as threats, habitat types, and management suggestions.
[Footnote 2] Dare, M., M. Carrillo, and C. Speas. 2011. Cutthroat trout (Oncorhynchus clarkii) Species and Conservation Assessment for the Grand Mesa, Uncompahgre, and Gunnison National Forests. Grand Mesa, Uncompahgre, and Gunnison National Forests, Delta, Colorado.

As this study shows CRCT are not only isolated to high elevations, as is claimed on page 3-78 of the DRMP. Presented in Trout Unlimited's original comments for the scoping of this DRMP was a map and information regarding suitable waters for CRCT reintroduction. CRCT area BLM identified Sensitive Species, there should be more consideration put on these resources during the planning process.

Trout Unlimited does support the directives of some alternatives to prioritize native trout fisheries by removing barriers and competitive non-native species. These are all tactics towards a successful future for our native fish, but more needs to be done on this front to ensure the longterm viability of the cutthroat legacy. #1])>

Coldwater Fisheries

Even though Trout Unlimited puts a large emphasis on native trout, non-native recreation focused fisheries are also important to our organization and membership. Within the DRMP footprint reside some of the most storied and healthy fisheries in the state of Colorado. Rivers like the Gunnison, the North Fork of the Gunnison, the Little Cimarron, the San Miguel, and the Dolores, amongst many others are not native trout fisheries but still deserve acknowledgement and protections. As is detailed below, this is one reason to reconsider some of the riparian language in the DRMP to better protect these coldwater resources.

<([#2 [30] The fisheries of the DRMP footprint play a huge part in the local economy. Indeed they are managed as a resource by the state wildlife agency, and revered for their recreational and business opportunities by locals and tourists. The socioeconomic impacts of these waters are elaborated on later in this document, but as of a 2013 report, an economic output from fishing alone in the South West region of Colorado, totaled $110 million[3]. The monies raised through state fishing license sales and the nationwide, Dingell- Johnson excise tax, earmarked for the conservation of these resources should be added to the total value of habitat based economy. Angler dollars are being spent on BLM land and will continue to be into the future so long as these fisheries remain healthy and productive.
[Footnote 3] "The Economic Contributions of Outdoor Recreation: A regional and county-level analysis." Southwick Associates study conducted for Colorado Parks and Wildlife,

http://c.ymcdn.com/sites/www.cpra-
web.org/resource/resmgr/imported/Colorado%20SCORP%20Econ%20Report%2011-27-13.pdf
#2])>
<([#3 [27.3] Although some language pertaining to fish and wildlife in general was found within
the DRMP, there was no reference to the overall fisheries aspect on the DRMP footprint. Like
hunting, recreational fishing requires a different type of relationship with the wildlife we pursue
as sportsmen and women. Overall, year round, health of the total population is important, not just
singular instances or point impacts. With recreational travel management, recreational shooting,
and wildlife viewing areas requiring complete analyses and sections within the DRMP, we ask
for similar level of consideration for the traditional sporting recreation of hunting and fishing.
Our chosen form of recreation may not come with some of the larger impacts of others, but it is
certainly affected by management decisions within the DRMP and, not free from serious
cumulative implications. #3])>

<([#4 [37.4] Watershed approach to management

Trout Unlimited's mission, more than anything, revolves around watershed health. We believe
that impacts, negative or beneficial, are cumulative and compounding moving down a watershed.
Rather than using site specific impacts, often times a bigger picture is a better perspective. Water
quality, temperature, sediment, grazing, and water resources, all are addressed in the DRMP in
terms of site specific impacts, but not addressed cumulatively. A better scale of analysis would
be more appropriate in many cases when examining environmental consequences specifically.

Water resources, for example, throughout the DRMP footprint are heavily taxed by existing
water uses resulting in water shortages, water quality impacts, and conflict amongst water users
locally and in the greater Colorado River Basin. By looking at both scales now, the DRMP
would be strengthened well into the plan's lifespan.

An example of more watershed based management can be found by looking to the Beaverhead-
Deerlodge National Forest implementation of a protection approach where they applied NSO
stipulations to entire drainages for the protection of cutthroat trout in key watersheds
(Beaverhead- Deerlodge Final Forest's Management Plan, 2009). Outside of designated key
watersheds, there is a drainage-wide controlled surface use (CSU) that requires no net increase in
sediment loading. These kind of federal land use plans represent proactive efforts addressing oil
and gas drilling on public lands where there is potential to degrade or permanently impact
important riparian and trout habitat.
#4])>
<([#5 [2] Alternatives

TU does not support any one alternative, rather pieces from each. In general, Trout Unlimited
supports strict protections for waterways and riparian health. Over the course of the DRMP's
lifespan, we can reasonably expect variable and changing conditions in overall watershed health.
Throughout the DEIS is language to address some of the collective impacts from various
different development scenarios, but also from larger possible impacts from climate change and
natural variability. Because of the sensitive nature of our high desert waterways and our pristine
headwaters, TU hopes that more protections, rather than less, can sustain these priceless and

BLM_0156381

irreplaceable habitats.
#5])>
Environmental Consequences

4.3 Resources

<([#6 [3] [11.3] [14.1.3] 4.3.1 Air Quality and Climate

The DRMP fails to adequately address the impacts of climate change on fish and wildlife habitat. Impacts of climate change are particularly threatening in the western U.S. where warmer water, changes in the timing of spring snowmelt, and increased droughts, floods, and wildfires are attributed to changes in ecological processes brought on by a warmer planet. The health of the landscape has a direct influence on the ability of natural systems to rebound after a catastrophic event and adapt to a changing climate.

Coldwater species such as trout are, by definition, especially vulnerable to climate change because of their dependence on clean, cold water. Cutthroat trout are exceptionally vulnerable. Existing stressors from reduced populations, loss of life history forms, degraded and fragmented habitat and non-native species have already pushed many native trout populations to the edge of extinction. The added effects of climate change may take these populations over the edge.

The first and most important component of TU's conservation strategies is to protect remaining critical habitat areas. Protecting the strongholds is more cost-effective and has a higher likelihood of success

than trying to restore an area that has already been substantially degraded. These fish cannot afford any further reduction in available habitat across their range. They have already been extirpated or severely reduced from the lower elevation edges of their historic range so it is critical that the remaining headwater strongholds remain intact.

Removal of vegetation, road construction, and other surface disturbing activities all pose a risk for increased sedimentation and degradation of native trout habitat in the project area. Since the UFO contains locations holding GBCT and CRCT, TU contends the DRMP must develop a more comprehensive analysis of the impacts climate change will potentially have on native trout and other native fish species in the UFO DRMP footprint. Such discussion and analysis should include:
* Analyze the latest innovative technologies that will contribute to minimizing impacts to trout streams that are important spawning and rearing areas.
* Evaluate the potential for removal or elimination of any stream barriers within the UFO boundaries that may impact instream flows.
* Develop a science-based protection plan of streamside habitats that may be impacted by oil and gas development in the UFO.
* Identify the most important reaches of these streams which contain pure conservation populations of cutthroat and develop protection measures.
* Provide an annual monitoring program that establishes goals and objectives for improving stream habitat and minimizes contamination from drilling and production.

* Implement conservation strategies for water management required for all operators that helps minimize water decreases during low water periods.
#6])>
<([#7 [14.1.3] 4.3.2 Soils and Geology

Trout Unlimited originally requested that underlying soils be identified across the UFO DRMP footprint, specifically in CRCT watersheds. Native fish are especially susceptible to the ill-effects of sedimentation to their habitat. Though we recognize the included mapping efforts with soil classifications, nowhere was referenced the local soils and potential consequences to CRCT or any other coldwater fisheries. The DRMP failed to provide a review of the numerous impacts to critical and sensitive fish and wildlife habitat from act of massive soil movement and changes from oil and gas development and we request that such information be provided in the Final RMP.

The DRMP fails to adequately analyze the impacts of soil sedimentation and revegetation as it impacts fish and wildlife habitat. Exploration and extraction of oil and gas resources does create alterations to the subsurface and surface environment. Analysis of the gravel and soil regime and its behavior during spring thaw events, flooding events, impacts to wetlands, and streams was inadequate in the DEIS. TU feels that the DRMP presents inadequate discussion of the long term and short term impacts from exploration and drilling activities that can be damaging to the soils and geology and the aquatic ecology of the surrounding areas. #7])>

<([#8 [3] [37.3] 4.3.3 Water Resources

Water resources, water quantity specifically, are of concern in the part of the state underlying the UFO. In this region water resources are already taxed, and where those implications are felt locally every day, increased water development would add additional stresses to an over appropriated system.. Increased water demand would advance conflicts between users, interest groups, and fish and wildlife habitat. Currently, existing instream flow rights, which only protect minimum flow necessary to maintain native environment, go unmet on normal years on many streams in the UFO. These rights are typically not monitored in real time and are junior to existing senior irrigation rights some of which place calls on upstream junior users thereby curtailing existing users. Increased water use in this area will increase structural deficits on the Colorado mainstem further jeopardizing existing water users.

A good example of water resource issues that should be considered is the North Fork of the Gunnison watershed. In this area water users often are curtailed to provide water to downstream seniors, tributaries are disconnected from the mainstem, CWCB instream flow rights go unmet, and trout habitat and populations have been diminished as a result of diversions for irrigation and other users. Trout Unlimited is concerned that further water development would stress water resources and currently healthy portions of the basin and drive continued conflict amongst users.

Currently, groups like Trout Unlimited are working to promote mutually beneficial water partnerships just to keep enough water in its natural banks to support fish. Unlike other water uses, there can be no break in supply for trout and other aquatic wildlife. We would like to work with BLM on this issue so that any impacts to water resources are not a battle but instead a

partnership with positive outcomes for all.

Water resources to Trout Unlimited have similar meaning as outlined in section 4.3.3 of the DRMP. Page 4-80 states the impacts on water resources as:
"Every management action that directly or indirectly has the potential to alter aquifer properties and water quality and quantity and the natural hydrograph can have accompanying temporary or permanent impacts on water resources. The discussion of impacts on water resources includes the effects of surface- and subsurface-disturbing actions on water quality, water quantity, and cumulative watershed health."

And implications to water resources as:
* Alteration of the physical characteristics of streams, springs/seeps/fens, wetlands, riparian areas, and groundwater aquifers that affect the properly functioning condition and sustainability of these resources
* Ability to maintain sustainable yield of groundwater resources
* Number of state and federal water quality standard exceedances for surface and groundwater
* Changes in water quality that affect the survival rate of downstream aquatic or riparian species
* Number of spills of hazardous materials in water bodies
* Acre-feet of water depleted

Trout Unlimited certainly agrees with all of these impacts. Yet, the remainder of section 4.3.3 does not explicitly quantify the potential impacts to any of these bullet points in terms of water quantity. Furthermore, the BLM focuses on different alternative's mitigations rather than direct impacts of development. What is lacking are the numbers on streamflows, groundwater use, and strain on water rights for agriculture and municipalities, all caused from potential energy development scenarios. Without this imperative information and analysis, we are hard pressed to support any alternative as believers in responsible energy development on our public lands. Also missing from the evaluation is cumulative impacts to overall watershed health. In fact, the DRMP does not provide information pertinent to expected withdrawals.

Trout Unlimited urges the UFO to seriously consider reevaluating the environmental consequences to water resources before the Final RMP is complete. A revision of this section would be necessary to compile the information necessary to make a responsible decision on any proposed alternative.
#8])>
<([#9 [16.3] [16.1] [15.4] 4.3.5 Fish and Wildlife

The DRMP identifies CRCT as species of specific concern, and GBCT as federally threatened and though not expressly listed, identifies populations of these fish in waterways of the UFO. Given the level of oil and gas development along with other factors affecting water quality and quantity, TU remains particularly concerned with the management of these streams and the overall watershed condition. Most of these populations are isolated from one another and without implementing stringent protection measures; a single damaging event could exterminate any one of these populations. TU believes that these high value water bodies deserve full protective measures from oil and gas development, should be identified and mapped, and be assigned strict stipulations that include strong buffers (as defined below), NGD language, and ongoing defined

water quality monitoring.

The BLM is within its regulatory and management jurisdiction to prioritize the protection of all of these streams. Such measures will ensure the retention and proliferation of these populations in both the short- and long-term including restoration efforts that expand the ranges in and around these streams.

We strongly disagree that buffer recommendations of less than 500 feet would protect all fish-bearing streams. Riparian and stream setbacks, or buffers, must be expanded to provide better protection from accidents and spills. Current stipulation proposals are inadequate and insufficient to protect the fisheries and riparian components should a spill occur. Strong buffers provide significant protections. We support the quarter-mile buffer required on major rivers; however, many sensitive populations of native trout (CRCT and GBCT) exist outside of those major rivers and are located in more isolated first order streams. Any other buffer size, such as proposed 325 foot, from a multi-well pad oil and gas rig will offer little protection. Instead, we recommend one-quarter mile buffer for all perennial waters, similar to that which the Little Snake River Field Office has implemented (October 2011). For sensitive fish species, such as CRCT, we recommend minimum one-half mile buffer.

It is TU's assertion, supported by science (see discussion on buffers below) that the larger a buffer area, the better protection measures are allowed. Oil and gas activities involve extreme disturbances to surface and subsurface lands. We are advocating for stronger buffer stipulation requirements in the DRMP, reasoning that it is easier to modify larger buffer protections to lesser buffer protections through negotiated conditional use approvals and agreements, science-backed exemptions, and increased monitoring.

Potential impacts to surface and groundwater sources include increased sedimentation, turbidity of surface water, erosion, wetland loss, effects on water quality from contamination with drilling fluids, petroleum, hydraulic fracturing chemicals, other industrial chemicals used during drilling practices, and the disruption of historic and normal flow patterns of surface water due to the increased number of roads, well pads, permanent surface facilities, and traffic. The DRMP fails to adequately address these significant impacts.
#9])>
<([#10 [37.1] Intermittent Stream Buffers

We applaud the BLM for implementing a buffer on intermittent and ephemeral streams across alternatives. However, the protection of intermittent and ephemeral streams merits further consideration in the DRMP. In most mountain regions during runoff or sudden event storms, ephemeral drainages can become perennial mountain streams in a matter of hours and can run for a period of weeks or often months (Elmore, 2008). Trout may enter these drainages and may be spawning or have spawned and are at an early life stage. A thorough inventory of the streams and drainages in the planning area would potentially reveal those areas containing new flow systems or potential flow systems and would be subject to stronger buffering protections. Again, as we have mentioned above, by implementing a planning wide buffer requirement at the RMP level (such as that recently completed in the Little Snake FO RMP; October 2011), it will be easier to mitigate specific project cases to a more reasonable buffer based on case by case project

applications and review. #10])>

<([#11 [37.1] Riparian Buffers

Because of the chances for accidents and contamination through surface runoff from well pads, TU strongly advocates for the implementation of stronger, more effective buffers along perennial streams. Riparian setbacks, or buffers, are valuable in a variety of ways. From headwaters to downstream municipal communities, protection of our nation's water systems remains a top priority. Protecting water systems provide a healthy benefit for more than just fish; terrestrial wildlife including big game, large and small mammals, birds, insects, amphibians and reptiles all benefit by having clean water. Additionally, livestock and agricultural operations benefit from managed riparian areas. Scientific literature for management states that a stream buffer, a riparian setback, or forested buffer should be viewed as not only a parcel-specific best management practice, such as a stormwater management pond or a bioretention structure, but also as a watershed-scale management system[5].
[Footnote 5] Chagrin River Watershed Partners, Inc. 2006. "Riparian Setbacks: Technical Information for Decision Makers.

TU's concerns center on the harms done to riparian and stream areas when an oil or gas pad is situated too close to a water body. Surface runoff from rain and/snow events provides both benefits and damage. On well pads where industrial contaminants including oil, diesel, chemicals and an assorted variety of other equipment lubricants, transporting of these harmful materials becomes a problem when a pad is situation too close to water. Surface runoff is a conduit for sediment and particulate pollutants, particularly in areas that have little vegetative material (or buffers) or on steep slopes with erodible soils.

We now understand the greater role of water quality on the physical association between streams and their riparian corridor. Moreover, small first order streams that generate more of the runoff in watersheds and are home to Colorado's cutthroat trout species appear to play a significant role in intercepting runoff that reaches the downstream system. These small streams provide important water quality filtration services that extend far downstream and enhance water quality throughout the watershed. When these systems become contaminated with pollutants, large acreage distribution of these pollutants becomes a significant impact, affecting more than just the localized surface area, it affects the entire watershed[6].
[Footnote 6] Burkhart, M.R., D.E. James, and M.D. Tomer. 2004. "Hydrologic and terrain variables to aid strategic location of riparian buffers" Journal of Soil and Water Conservation. 59(5): p.216-223

By implementing half-mile buffers on sensitive fish bearing streams and one-quarter mile buffer on all perennial waters provides an effective barrier to intercept any potential spill or subsurface contamination event, and potentially minimizing costly remediation efforts.

Precedent Setting for Increased Buffers

The BLM and the Forest Service are tending to increase buffer setbacks, as recently witnessed in multiple examples:

BLM_0156386

* Establishment of a half-mile stream buffer for occupied and potential cutthroat trout habitat (Montana's Butte BLM RMP, 2009);
* Establishment of up to one-quarter mile stream buffer for all perennial streams (Colorado's Little Snake BLM RMP, 2011); and
* Implementation of one-quarter mile buffer for all native Yellowstone cutthroat trout habitat (Wyoming's Lander BLM Final RMP, ROD soon to be released, 2014).
* Implementation of a 500-foot stream buffer for native trout habitat (Utah's Dixie National Forest LUP, 2011).

TU suggests that the Final RMP implement a one-half mile NSO buffer stipulation as a progressive management strategy in providing the needed attention to cutthroat trout management in the UFO resource planning area. Implementing stronger setbacks assists in meeting the conservation objectives of the CRCT Conservation Agreement, of which the BLM is a signature to. These suggested and agency supported buffer stipulation recommendations will help in the co-existence of native trout protection and restoration, and oil and gas development, potentially lessening the impacts to quality fish habitat. #11])>

<([#12 [14.1.1] Timing Limitations

TU is concerned about the use of Timing Limitations (TL) in lieu of NSO in areas of big game winter range and strongly support NSO applications both during oil and gas exploration and development, and operations and maintenance. Timing limitations are temporary and do not account for loss of habitat once an area can be accessed and disturbed after the timing limitations expire. Current science supports the recommendation of NSO stipulations in critical winter range. Critical winter ranges contain the important cover, forage, and security that assure the survival of mule deer and elk herds, even in the worst of winters. Any direct habitat loss to these important lands compromises the ability of populations to survive when snowpack is at a maximum and temperatures are coldest. TU felt the DRMP failed to discuss the possibility of NSO in critical winter big game habitat under any alternative.
#12])>
4.4 Resource Uses

4.4.4 Recreation and Visitor Services

<([#13 [30.3] Total economic output from hunting, fishing, and wildlife watching accounts for $405 million annually and provides approximately 6,600 jobs in the South West region (inclusive of Delta, Gunnison, Mesa, Montrose, Ouray and San Miguel counties) of the state according to a 2013 Southwick and Associates report for Colorado Parks and Wildlife. Not only are sportsmen and women dependent on quality habitat and healthy wildlife, they are actively contributing to the conservation of these places and species. Traditional sporting values were not discussed in the consequences section of the DRMP. Trout Unlimited has highlighted many possible impacts to habitat, wildlife, and access throughout our comments, and ask the BLM to evaluate the costs and benefits in future management decisions made under the Final RMP to hunting, fishing, and wildlife watching. #13])>

4.4.5 Comprehensive Travel and Transportation Management

Below are suggestions for consideration in formulating the Final RMP from the Proposed Alternatives. Trout Unlimited supports many different uses of our public lands, and responsible OHV use is one of them. Striking a balance between these uses and others, while weighing impacts from each is an important part of this RMP process.

<([#14 [32.1] Minimum road system: In order to protect fish and wildlife resources, allow for management, provide quality motorized access and develop a financially maintainable system of roads, the plan set forth should be the minimum road system capable of fulfilling these goals. Furthermore, TU strongly supports the decommissioning of unused, unnecessary and illegal routes. Numerous studies show the benefits, both fiscally and ecologically, of road and route decommissioning and the consequent positive effects on the general quality of public lands.

Road density: To preserve the backcountry experience, we believe that the route density outside of Wilderness and areas without roads should be less than 1 mile per square mile. One mile of road for every square mile of area is still a high road density and this should be the bare minimum for all districts – outside of designated motorized recreation areas – in order to protect road and traffic sensitive animals such as elk, mule deer, bighorn sheep, and cutthroat trout.

Water resources: In accordance with riparian area BMPs, we recommend that new motorized routes be located a minimum of 500 feet from all streams, springs, wetlands, lakes, and rivers. Routes that cannot be relocated in order to protect streams and riparian areas should be closed or have appropriate sediment reduction materials installed.

Protection of wild and native fish: Coldwater fish and native CRCT in particular are sensitive to runoff and streambed degradation that can occur when motorized use is inadequately managed or poorly planned. Route management planning is inherently good for fish as it tends to eliminate redundant routes and limit motorized use in riparian areas and areas of sensitive soils. CRCT are designated as a species of special concern in Colorado and we fully expect BLM will protect the watersheds containing CRCT by limiting route density, eliminating routes in riparian corridors and carefully considering how motorized travel will impact sediment loads in these valuable watersheds. Sportsmen also place a high value on wild, non-native trout that exist in other watersheds inside the planning area and we are confident that the BLM will seek reasonable protections for the watersheds while still providing sportsmen access.
#14])>
Special Designations

4.5.3 Wild and Scenic Rivers

TU supports BLM managing all eligible and suitable Wild and Scenic waterways to retain their Outstanding Values, and in general supports the recommended suitability designations as proposed in the DRMP, with some exceptions.

<([#15 [39.2] West Fork Terror Creek

Preventing the listing of suitability in this RMP is the lack of information on Greenback

Cutthroat trout. Instead of dropping the suitability of the segment, Trout Unlimited would prefer a directive to gather more information and retain management as if found suitable until presence of GBCT is researched.
#15])>
<([#16 [39.1] Deep Creek

The suitability study for Deep Creek (segment 12) recommends that BLM manage to prevent any more degradation to flows, but says reason for recommendation of non-suitable is because of lack of instream flow in the future. If BLM is committed to managing for a beneficial outcome in regards to flow, what justification is left for not suggesting suitability? Trout Unlimited would like to add to the conversation that in Deep Creek are Greenback lineage native trout with less than 1% non-native genes. This classification of a conservation population is the cornerstone of recovery for a successful recovery of the entire species. This information was not mentioned or considered in the suitability study, and should be re-evaluated as an Outstanding Remarkable Value. The classification of a conservation population would give incentive to pursue some of the identified possibilities to secure necessary water sources in order to meet suitability standards on Deep Creek.
#16])>
Appendices

<([#17 [23.1] Appendix C. BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado

Trout Unlimited has been partners to federal agencies and grazing permittees on past projects in many places. Partnerships like these can lead to mutually beneficial relationships that are good for the land, the recreational users of the land, water users, the grazing operations, and the overseeing agency. Through these types of partnerships appropriate monitoring can done and standards upheld or exceeded. We would like to see the prioritization of partnerships and mutually beneficial projects added to the grazing management section of the Final RMP. #17])>

<([#18 [14.1.1] Appendix D. Ecological Emphasis Areas

The concept of Ecological Emphasis Areas is intriguing to Trout Unlimited since it is focused on landscape level connectivity and watershed health, two of TU's guiding principles in public lands management. We would like to suggest to BLM to include more than vegetation and terrestrial language in making these designations. Connectivity and landscape level analysis for coldwater fisheries is also important. Two examples of where this has played out on federal lands is the Beaverhead-Deerlodge National Forest mentioned previously and Flathead National Forest's creation of a Watershed Conservation Network for Native Fish[7]. Similar analysis and management directions could be applied in the case of an Ecological Emphasis Area on the UFO, and should be considered for the Final RMP and future planning.
[Footnote 7] http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd502201.pdf
#18])>
<([#19 [37.3] Appendix I. Drought Management

Drought is not only a term reserved to the natural input of a water balance, it needs to be

evaluated by water uses too. By defining drought conditions using only the Palmer index, it does not take into consideration human use or influence. If these considerations were factored, including traditional, municipal, and proposed development use, an extreme classification as baseline would be likely. As such, according to Appendix I, prohibition of surface disturbing activities, closure of open OHV areas, and additional BMP's for erosion control would be implemented. In this light, rather than being retroactive, Trout Unlimited is asking the UFO to use thoughtful planning when it comes to development scenarios and water resources. TU would like to point out that the strategy of monitoring existing CWCB instream flow rights would prove inadequate to protect valuable fisheries. Few of the instream flow rights have adequate measurement and monitoring that can provide real time information about flows and administrative processes would likely not completed in time to prevent tributaries from running dry or below the established minimum flow necessary to protect the riparian resources. #19])>

Specific Stipulations

<([#20 [37.1] [3] p. 2 -36/37 – Stipulations for Hydrologic setbacks on major rivers

Trout Unlimited supports NL-2/NGD-3: Hydrology River across all major rivers in the DRMP footprint. The Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores Rivers make up the bulk of recreational trout fishing in the DRMP. These places are all amazing fisheries in their own right, some holding or qualifying for Gold Medal designation. As discussed elsewhere in this document, with new technology available to make NDG possible in these corridors, and the potential negative impacts to financially and ecologically rich these resources, TU hopes to see more NL-2/NGD-3 adopted in the Final RMP. #20])>

<([#21 [37.1] [3] p. 2 – 38/39 - ROW exclusions (Alt B) in riparian 0.25 mi for riparian, 325 ft for perennial

Road and sediment impacts to fish and fisheries can be as deadly as any other form of water quality degradation. This does not only apply to small waterways, and the 0.25 mile ROW on major rivers should be upheld in the Agency Preferred Alternative and Final RMP. Although TU applauds BLM for consideration of perennial streams and the Preferred Alternative's 325 foot ROW avoidance buffer, TU urges BLM to consider potential cumulative impacts to overall watershed health and increase protections on perennial streams with a wider buffer or ROW exclusion on these systems.
#21])>
<([#22 [14.1.1] p. 2- 67/68Wildlife Native and Sports Fish

Trout Unlimited encourages using TL-3 rather than TL-5 in the Final RMP based on disturbance of Brown Trout spawning dates. These fish, though non-native, are not typically not stocked fish, making them valuable wild fisheries. Their spawning cycles in the fall are arguably extremely valuable from an economic and ecologic standpoint. During this critical time of year, projects should at minimum need additional review and approval.
#22])>
<([#23 [16.1] Cutthroat Trout Specific Stipulations

Trout Unlimited strongly supports Stipulation NSO-25: Occupied Native Cutthroat Trout Habitat, to prohibit surface occupancy within 0.50-mile of stream segments occupied by native cutthroat trout. We also feel that Stipulation NSO-26/ SSR-25 of the Preferred Alternative is absolutely unacceptable. As discussed frequently in this document, cutthroat trout are a highly sensitive species, and already face numerous threats on the DRMP footprint. Allowing such development so close to our native coldwater trout strongholds seems not only irresponsible, but outright hostile. Furthermore, conservation populations deserve NL/NGD stipulations rather than CSU/SSR language. These places might be the last remaining stock of these fish left in their name stake state. Failure to adequately address this issue in planning likely cause for future failures on the ground.
#23])>
<([#24 [37.1] Stipulation CSU-16 Hydrology Features:

Protections of perennial streams is more important than the DRMP has made it out to be. Trout Unlimited feels the cumulative downstream, watershed wide, effects are worthy of analysis and evaluated for best possibilities of mitigating any potentially negative impacts. Also problematic is the BLM definition of perennial streams, which can vary from year to year based on hydrology and water balance. As such, Trout Unlimited asks for minimum of 500 feet CSU on wetlands, springs and seeps, and perennial streams in the Final DRMP. #24])>

<([#25 [14.1.2] Stipulation TL-6 Wildlife Big Game Winter Habitat:

Trout Unlimited would like to support Timing Limitations as detailed in Stipulation TL-6 with one exception. TU feels that excluding CPW data is unreasonable and irresponsible. As the managing agency of the wildlife itself, a partnership and collaboration between agencies would be greatly preferred to complete exclusion. BLM's reasoning that the area is too large and therefore "compromises a considerable proportion of the resource area" is not a valid reason to not implement protections. If the science indicates winter range, and that impacts to big game in winter range is significant (see previous comments) then BLM cannot ignore this issue. A better refined dataset of winter range may be beneficial, but that should be spelled out in the stipulation language rather than ignored. Otherwise, TU supports Timing Limitations for all big game species, not just elk and deer. #25])>

Conclusion

Trout Unlimited acknowledges the intent of the Uncompahgre Field Office's Resource Management Plan for managing resources with the dual mandate of multiple use and sustained yield. As users of public lands and as a conservation stewardship organization, we hope that these comments have assisted in forming a plan that is implementable and true to its intent of multiple use. Our concerns of watershed health, and riparian ecosystem integrity are core to the mission of Trout Unlimited, and are hopeful to see how those values additionally considered in the next planning stage. Mostly, we hope to continue to be partners to the BLM through the remaining planning process and through the implementation of the Final Resource Management Plan.

Sincerely,

Garrett Hanks
Trout Unlimited
SW Colorado Field Coordinator
1309 E 3rd Ave, Suite 107
Durango, CO 81401
ghanks@tu.org

David Nickum
Colorado Trout Unlimited
Executive Director
1536 Wynkoop Street, Suite. 320
Denver, CO 80302
dnickum@tu.org

000484_GoldsteinE_20161030_HasAttach  Organization: Elena Goldstein
Received: 10/30/2016 12:00:00 AM
Commenter1: Elena Goldstein - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Flags:
Attachments: 000484_GoldsteinE_20161030_HasAttach.htm
(000484_GoldsteinE_20161030_HasAttach-387760.htm  Size = 13 KB)
UFORMP_000484_GoldsteinE_20161030_HasAttach.pdf
(000484_GoldsteinE_20161030_HasAttach-387761.pdf  Size = 271 KB)
Submission Text
Date:10/30/2016

Commenter: Elena Goldstein

Organization:

Email:ellie@paonia.com

Address:38324 Saddle Mountain Lane, Crawford CO 81415

Phone:

Comment:
Dear Reader,

BLM_0156392

My name is Elena Goldstein.  I reside at 38324 Saddle Mountain Lane in Crawford, CO and have owned a small ranch outside of Crawford for the past 25 years. I am a retired educator, organic gardener, hiker, and community volunteer.

I am writing to request that you consider placing a moratorium on any intentions to sell leases for fracking until the questions which follow can be answered beyond a shadow of a doubt.  Without that guarantee I am opposed to anything but a no leasing alternative in the UFO RMP draft. The reasons that the BLM should not accept any of the proposed alternatives regarding leasing land for fracking are almost too numerous to address.

1. Will there be enough water to irrigate the farms in the North Fork Valley, provide adequate drinking water for the populous and allow for our rivers and lakes to maintain adequate levels to support the creatures that live in them …. and the fishers who enjoy them?

There is reason to be seriously concerned about the availability of adequate water needed to frack as the entire south-west of the US faces the threat of "megadroughts".

An article recently published in Science Advances states:

... a megadrought would impose "unprecedented stress on the limited water resources" of the parched US south-west, researchers found, bringing conditions similar to the 1930s dustbowl to California, Nevada, New Mexico, Colorado and Utah – but over a lengthier period. Using a combination of temperature and precipitation models, the study predicts a 70% chance of a megadrought by the end of the century, should rainfall levels remain the same, with a 90% chance of an elongated drought should rainfall decrease, as most climate models forecast.

"We can't rule out there could be a 99.9% chance of a megadrought, which makes it virtually certain," said Toby Ault, a scientist at Cornell University and lead author of the study. "Imagine if the current drought in California lasted for another 30 years.

2. Has the BLM looked at new scientific studies related to health and exposure to fracking that have been done in the last four years?

Since the North Fork Alternative Plan was presented to the BLM there has been significant research on the adverse affects of oil and gas extraction. The chemicals released by fracking, blowback and production have been documented to have health consequences on humans, plant life and wildlife. There is a significant association with birth defects and miscarriage.

McKenzie, L. M., et al. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environmental Perspectives 122:412-417.

Bamberger, M., Oswald, R. (2012).Impacts of Gas Drilling on Animal and Human Health. New Solutions: A Journal of Environmental and Occupational Health, 22(1): 51-77.

The researchers conducted interviews with animal owners in six states–Colorado, Louisiana, New York, Ohio, Pennsylvania, and Texas–affected by gas drilling. They also interviewed the

owners' veterinarians, and examined the results of water, soil, and air testing as well as the results of laboratory tests on affected animals and their owners. The study highlights the possible links between gas drilling and negative health effects, along with the difficulties associated with conducting careful studies of such a link.

Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2012.Natural Gas Operations from a Public Health Perspective,Human and Ecological Risk Assessment: an International Journal 17(5):1039-1056.

The authors examined the chemicals known to be used in natural gas fracking procedures. Researchers were able to compile a list of 632 chemicals, though this list is incomplete due to trade secret exemptions given to the energy companies by Congressional allies. Many of the chemicals are toxic and represent the 'bad boys' of health concerns–causing everything from skin and eye irritation to cancer and mutations. They also highlight the "side effect" of air pollution and the resulting irreversible damage to lung tissue, along with damage to vegetation in the surrounding area.

<([#1 [18.2] McKenzie L, Witter RZ, Newman LS, Adgate JL, 2012, Human Health Risk Assessment of Air Emissions from Development of Unconventional Natural Gas Resources, Science of the Total Environment,424:79-87.

Researchers from the Colorado School of Public Health used EPA guidance to estimate chronic and subchronic non-cancer hazard indices and cancer risks from exposure to hydrocarbons for two
populations: (1) residents living > ½ mile from wells and (2) residents living = ½ mile from wells. Risks were higher for those living less than a 1/2 mile from wells than those living further from drilling sites.
#1])>
Stephen G. Osborn, Avner Vengosh, Nathaniel R. Warner, and Robert B. Jackson Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing PNAS 2011 108: 8172-8176.

Scientists found methane contamination of drinking water associated with shale-gas extraction. Average and maximum methane concentrations in drinking- water wells increased with proximity to the nearest gas well. Researchers also found a potential explosion hazard with the related concentrations of methane.

<([#2 [18.2] Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology
DOI: http://dx.doi.org/10.1210/en.2013-1697

This study found that a selected subset of chemicals used in natural gas drilling operations and also surface and ground water samples collected in a drilling- dense region of Garfield County, Colorado, can exhibit estrogen and androgen receptor activities. Water samples were collected, solid-phase extracted, and measured for estrogen and androgen receptor activities using reporter

BLM_0156394

gene assays in human cell lines. Of the 39 unique water samples, 89%, 41%, 12%, and 46% exhibited estrogenic, antiestrogenic, androgenic, and antiandrogenic activities, respectively. Testing of a subset of natural gas drilling chemicals revealed novel antiestrogenic, novel antiandrogenic, and limited estrogenic activities. The Colorado River, the drainage basin for this region, exhibited moderate levels of estrogenic, antiestrogenic, and antiandrogenic activities, suggesting that higher localized activity at sites with known natural gas–related spills surrounding the river might be contributing to the multiple receptor activities observed in this water source. The majority of water samples collected from sites in a drilling-dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than reference sites with limited nearby drilling operations. Our data suggest that natural gas drilling operations may result in elevated endocrine-disrupting chemical activity in surface and ground water.

Vidic, R. D., et al. 2013. Impact of shale gas development on regional water quality. Science 340 (6134): DOI: 10.1126/science.1235009

Horizontal drilling and hydraulic fracturing make the extraction of tightly bound natural gas from shale formations economically feasible. These technologies are not free from environmental risks, however, especially those related to regional water quality, such as gas migration, contaminant transport through induced and natural fractures, wastewater discharge, and accidental spills. The focus of this Review is on the current understanding of these environmental issues.

Jackson RB, B Rainey Pearson, SG Osborn, NR Warner, A Vengosh. 2011. Research and policy recommendations for hydraulic fracturing and shale-gas extraction. Center on Global Change, Duke University, Durham, NC.

The potential for contamination from wastewaters associated with hydraulic fracturing depends on many factors, including the toxicity of the fracturing fluid and the produced waters, how close the gas well and fractured zone are to shallow ground water, and the transport and disposal of wastewaters. Despite precautions by industry, contamination may sometimes occur through corroded well casings, spilled fracturing fluid at a drilling site, leaked wastewater, or, more controversially, the direct movement of methane or water upwards from deep underground. #2])>
During the first month of drilling and production alone, a single well can produce a million or more gallons of waste water that can contain pollutants in concentrations far exceeding those considered safe for drinking water and for release into the environment. These pollutants sometimes include formaldehyde, boric acid, methanol, hydrochloric acid, and isopropanol, which can damage the brain, eyes, skin, and nervous system on direct contact. Another potential type of contamination comes from naturally occurring salts, metals, and radioactive chemicals found deep underground. After hydraulic fracturing, fracking fluids and deep waters flow through the well to the surface along with the shale gas.

These studies raise serious concerns about the impacts natural gas wells have on human health and the environment. These impacts would have serious consequences for the economy of the North Fork valley which depends on clean air and water for agriculture, recreation, and domestic consumption.

BLM_0156395

These impacts and consequences need to be addressed, as the only way to guarantee that there will be no such environmental and health consequences is a no -fracking option.

3. Can fracking have impacts on drinking water?

In 2008 residents of Pavillion, Wyoming experienced highly disagreeable odors and tastes of their drinking water. When the EPA was finally involved in researching whether there was a connection to nearby fracking operations, the issue, basically was suspiciously buried. A new study out of Stanford University provides more clarity on this issue. The researchers' conclusion, which was published in Environmenta? Science and Techno?ogy, was that fracking operations near Pavillion have had a clear influence on the quality of groundwater.

Using data from two EPA-monitored wells as well as state reviews of natural gas wells, drinking water wells, and drilling pits, the study found that chemicals associated with fracking had migrated from underground storage wells and unlined storage pits into aquifers that supply Pavillion residents with their drinking water, though the study did not go so far as to find fracking-associated chemicals in Pavillion's drinking water itself. This result is consistent with the EPA's 2011 draft report, which found high levels of fracking chemicals and cancer- causing toxins in monitoring wells.

A revelation such as this should alert the BLM to the machinations that can prevail at the cost to human health and economic security.

It is no wonder that the state of New York leads the nation in banning fracking after having made a serious study of the health impacts of this process.

4. Does the U.S. government indicate any concern over the need to monitor the effects of fracking?

On November 3, 2015, President Obama released a memorandum regarding impacts on the natural environment by "land or water disturbing activities: Agencies shall each adopt a clear and consistent approach for avoidance and minimization of, and compensatory mitigation for, the impacts of their activities a to avoid and then minimize harmful effects to land, water, wildlife, and other ecological resources (natural resources) caused by landor
water-disturbing activities, and to ensure that any remaining harmful effects are effectively addressed, consistent with existing mission and legal authorities. Agencies shall each adopt a clear and consistent approach for avoidance and minind the projects they approve. That approach should also recognize that existing legal authorities contain additional protections for some resources that are of such irreplaceable character that minimization and compensation measures, while potentially practicable, may not be adequate or appropriate, and therefore agencies should design policies to promote avoidance of impacts to these resources.

I beg you to take a precautionary approach to deciding on anything as potentially dangerous to the environment and health as fracking the earth for oil and gas. Delay until all the evidence is in. Wait until measures have been put in place to ensure the safety of this process. Wait to see if the

renewable energy industry has grown enough to supply the U.S. with an adequate source of clean fuel. Wait and see if you are convinced that fracking can be done without releasing carbon and methane into our already overheating planet.

Thank you for your consideration.

Elena Goldstein
38324 Saddle Mountain Lane
Crawford, CO 81415


000485_GermanK_20161030  Organization: Katherine German
Received: 10/30/2016  12:00:00 AM
Commenter1: Katherine German - Bellevue, Washington 98006 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000485_GermanK_20161030.htm (000485_GermanK_20161030-387763.htm Size = 1 KB)
UFORMP_000485_GermanK_20161030.pdf (000485_GermanK_20161030-387762.pdf Size = 84 KB)
Submission Text
Date:10/30/2016

Commenter: Katherine German

Organization:

Email:action@wildearthguardians.org

Address:3879 139th Ave SE, Bellevue, WA 98006

Phone:

Comment:
Dear Uncompahgre Field Office,

Please don't allow new leasing of coal, oil and gas in the Uncompahgre Field Office. This country needs to be more concerned about the climate, clean air and water instead of pandering to the companies that stand to make a mint from our public lands.

The communities in the area will suffer along with the land and all the wildlife that live there.

Please protect our public lands - once they are polluted and ravaged, they will never be the same and their health will be permanently compromised.

Thank you.

Sincerely,
Katherine German
3879 139th Ave SE
Bellevue, WA 98006
nicknkat2@msn.com

000486_ClaytonJ_20161101 Organization: U.S. Fish and Wildlife Service, J Creed Clayton
Received: 11/1/2016 12:00:00 AM
Commenter1: J Creed Clayton - Grand Junction, Colorado 81501 (United States)
Organization1:U.S. Fish and Wildlife Service
Commenter Type: Federal Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000486_ClaytonJ_20161101.htm (000486_ClaytonJ_20161101-381183.htm Size = 9 KB)
Submission Text
Creed Clayton <creed_clayton@fws.gov>
Thank you for the opportunity to comment on your Resource Management Plan revision. Our comments are attached. Please let us know if you have any questions.

Note: Just before sending this we noticed that the Gunnison Gorge NCA boundary (and thus the RMP revision area) appears to have expanded sometime in the recent past. Our comments were crafted based on the old NCA boundary.

Thanks, Creed.
J. Creed Clayton, PhD
Fish and Wildlife Biologist
U.S. Fish and Wildlife Service
445 W Gunnison Ave, Suite 240
Grand Junction, CO 81501
970-628-7187
creed_clayton@fws.gov

20161101 BLM_UFO_FWS 2016 Draft RMP revision comments.docx
35K

U.S. Fish and Wildlife Service, Western Colorado Field Office Comments on the BLM-

Uncompahgre Field Office Resource Management Plan Revision

November 1, 2016

General Comments

Our comments are focused on Alternative B, which typically provides the most protection for threatened and endangered species and on Alternative D, the Agency Preferred Alternative.

We provide some comments below relating to conservation of the Gunnison sage-grouse (GUSG). However, we realize that the GUSG RMP amendment is underway as a separate effort. We are a cooperating agency for the GUSG RMP amendment and we will provide the bulk of our comments on GUSG conservation through this other effort at a later date.

<([#1 [15.2] [3] In this proposed RMP revision, particularly in Alternative D, descriptors such as 'may be' or 'might be' are often used for management actions that could be taken to protect listed species such as GUSG or listed plant species. Instead, we recommend using terms such as 'will be' or 'shall be' taken. This more definitively addresses the requirements of section 7(a) as they pertain to Federal action agencies under the Endangered Species Act. #1])>

Specific comments [NOTE: COMMENTS PRESENTED IN TABLE IN PDF]

<([#2 [34.1] [3] Page: 2-50
Line: 64
Comment: Alternative B: Does this include all areas that have degraded vegetation, including all of the areas mentioned in alternative D? What criteria will be used to determine if restoration in an area will have a high probability of success? How long will the test plots be monitored for success? Why is offsite mitigation added in alternative D and not alternative B? #2])>

<([#3 [3] Page: 2-89
Line: 142
Comment: Alternative D: When will the buffer be used? When will operations be required to move? Given that this CSU states that operations may be relocated, it is difficult to know if they will be relocated. It would be helpful if some criteria were provided or some indication was given as to when relocation would or would not be required. #3])>
<([#4 [15.2] Page: 2-89
Line: 143
Comment: Alternative D: We believe that an NSO (as in alternative B) would be more appropriate for areas where threatened and endangered plants are found than a CSU. The plan states that an inventory of habitat may be required before drilling. How will we know when inventory of habitat be required? What criteria will be used to determine when an inventory of habitat is required?
Also, is there an ACEC proposed for any Colorado hookless cactus populations to protect core areas? We recommend protection, such as an ACEC designation, for one or more large, dense, healthy hookless cactus populations to aid in the recovery of the species. #4])>

BLM_0156399

<([#15 [15.2] Page: 2-103
Line: 63
Comment: Surface use closure dates should be from March 1- July 15 (also change in Appendix A and B). These are our current guidelines to include the entire breeding season, including lekking, nesting and early brood-rearing (comparable to greater sage-grouse). Please change these dates elsewhere in the RMP when referencing GUSG reproductive/breeding season closures. It is also unclear why Alternative B applies to "Gunnison Sage-Grouse Breeding (Non-lek) Habitat" whereas Alternative D applies to "Gunnison Sage-Grouse Breeding (Lek and Non-lek) Habitat." Why would Alternative B not include lek habitat? We recommend that both lek and non-lek habitat be included in Stipulation 17 (Alternative B).
#15])>
<([#5 [15.2] Page: 2-104
Line: 66
Comment: Alternative B.1 describes restrictions that only apply within mapped GUSG nesting and early brood rearing habitat. This alternative should also describe the indirect effects of any activity occurring outside of mapped habitat that would impact GUSG (such as noise, tall structures, etc.) and what restrictions would be included to address these indirect effects. Indirect effects from activities occurring outside of mapped habitat should be included elsewhere in this RMP when describing activities within buffer distances or CH boundaries. #5])>

<([#6 [23.1] Page: 2-170
Line: 304
Comment: There is no mention of vegetation criteria for wildlife, including listed species such as GUSG, in any of these alternatives. For example, the GUSG Rangewide Conservation Plan's Structural Habitat Guidelines are not referenced. We recommend including this criterion in the development of these grazing systems.
#6])>
<([#7 [21.1] [3] [15.2] Page: 2-187 to 2-191
Line: 333-334
Comment: Alternative B specifies no leasing of Federal minerals within 0.6 mile of GUSG leks. We recommend a 1-mile no-leasing zone, as in the BLM Northwest Colorado plan to protect greater sage-grouse. #7])>

<([#8 [3] [15.2] Page: 2-195
Line: 336
Comment: Alternative B: Where leasing is allowed, we recommend an NSO throughout all GUSG CH and within 4 miles of a lek.
Alternative D: A 0.6 mile buffer only offers protection for lekking and mating. A 4.0 mile buffer will include most nesting and brood-rearing protection. An NSO throughout all occupied habitat would protect all nesting and broodrearing habitat from direct impacts. See our related comment on NSO-32 below.
#8])>
<([#9 [3] [8] Page: 2-201
Line: 337
Comment: Alternative B does not have specific protective CSU stipulations for GUSG or its CH.

Furthermore, this action does not describe how CSUs can avoid or minimize effects to GUSG. A GUSG CSU needs to be included in the stipulations.

In addition, oil and gas activities outside but adjacent to CH could still have indirect effects on GUSG inside CH (e.g., noise and tall structures which avian predators can use to nest or perch, allowing for an increase their hunting effectiveness within CH). Those effects should be considered and could be addressed via a CSU surrounding and between GUSG CH units. #9])>


<([#10 [3] Page: 2-205
Line: 338
Comment: The timelines in Table B-4 should be updated for breeding season, from March 1-July 15
#10])>
<([#11 [32.1] [3] Page: 2-304
Line: 480
Comment: Alternative B: GUSG closure to vehicles in San Miguel/CSCSM population areas should be from March 1- July 15.

No alternatives appear to specify a closure period for GUSG in the Crawford population—this should be added. The lekking and nesting periods should be protected. The closure should also be timed to address and minimize the effects of high-intensity elk use on vegetation in the Crawford CH unit.

Alternative D: no specific reference to GUSG closure needs. We recommend specifying GUSG closures for this alternative as was done in Alternative B.
#11])>
<([#12 [15.2] Page: 2-313
Line: 494
Comment: Alternative D: only specifies avoidance for occupied habitat, leks, and 0.6 mile buffer. If GUSG CH is not designated as an exclusion area (as in Alternative B line 493), we recommend ROW avoidance for all CH and within 4 miles of a lek to include the majority of GUSG nesting and brood-rearing habitat and to address indirect effects. If avoidance is selected, adaptive management that would address downward trends is recommended.
#12])>
<([#16 [9.1] Page: 2-329
Line: 531
Comment: Alternative B: The Service supports the CNHP expansion to Fairview South, in particular the areas that are occupied by clay-loving wild buckwheat. Also, we support this area being closed to sheep and cattle grazing.
#16])>
<([#19 [9.1] Page: 2-348
Line: 554
Comment: The Service supports the proposal of the Salt Desert Shrub Ecosystem ACEC/Research Natural Area and the inclusion of the Adobe Badlands into this ACEC, in particular the areas that are occupied by Colorado hookless cactus.
#19])>
<([#18 [3] [9.5] Page: B-27
Line: NSO-32/NGD-13
Comment: We recommend NSO/NGD protection throughout all GUSG CH, including

unoccupied CH.
For an exception, modification, or waiver, we recommend only allowing this if the action would not impair the function or utility of the site for current or subsequent GUSG use in any season (e.g., reproductive display, nesting, brood rearing, wintering, etc.) and would not adversely affect GUSG. #18])>

<([#14 [3] [15.2] Page: B-87
Line: TL-14
Comment: We recommend extending the Timing Limitation (TL) through August 31 to protect nesting cuckoos that have not yet finished nesting and might still have un-fledged young. We also recommend extending the TL buffer out to 800 m instead of 100 m (at least for major activities such as drilling, use of explosives, pile-driving, etc.). And we recommend that the TL not be restricted to riparian areas—noise and human disturbance outside of and adjacent to riparian habitats could indirectly disturb nesting cuckoos nearby. Exceptions could be appropriate within this area for minor disturbances meeting specified criteria. #14])>

000487_WeltK_20161101_MCC  Organization: Mountain Coal Company, LLC, Kathy Welt
Received: 11/1/2016 12:00:00 AM
Commenter1: Kathy Welt - Somerset, Colorado 81434 (United States)
Organization1:Mountain Coal Company, LLC
Commenter Type: Private Industry
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000487_WeltK_20161101_MCC.htm (000487_WeltK_20161101_MCC-387765.htm Size = 5 KB)
UFORMP_000487_WeltK_20161101_MCC.pdf (000487_WeltK_20161101_MCC-387764.pdf Size = 190 KB)
Submission Text
Date:11/01/2016

Commenter: Kathy Welt

Organization:

Email:kwelt@archcoal.com

Address:5174 Highway 133, Somerset, CO 81434

Phone:970-929-2238

Comment:

Please see the attached comments on the Draft RMP EIS.

Kathy Welt,
Environmental Engineer III
Mountain Coal Company, LLC
West Elk Mine
5174 Highway 133
Somerset, CO 81434
Phone (970) 929-2238
Cell (970) 433-1022
Fax (970) 929-5050

Project Manager; Uncompahgre Field Office,

Mountain Coal Company, LLC (MCC) and Ark Land Company (ALC) submit the following brief comments, in reference to the Uncompahgre Draft Resource Management Plan (RMP) revision, as provided in the Uncompahgre Field Office Draft RMP/Environmental Impact Statement (EIS). MCC and ALC appreciate that the BLM recognizes that public input is critical to refining the RMP. <([#7 [5.1] We remain concerned, however, that this public process will be politicized by publishing the number of comments submitted "for" and/or "against" one or more alternatives analyzed, as in a vote. NEPA was never intended to be a "vote" and as such we ask that the number of comments received not be published and instead focus on each individual substantive comment. #7])>

MCC and ALC understand the importance of balancing multiple resource uses on federal lands, and our 30+ year history of mining along with grazing, recreation, water rights and other uses exemplifies how to successfully accomplish this mission. We have strived for and accomplished environmental compliance excellence and effective stewardship of the land. <([#1 [5.3] Although we believe that sustainability ecological resources must be addressed, we do not believe that the intent of the Multiple Use Sustained Yield Act can be fulfilled if ecological resources are given priority as presented in Alternative B. Similarly, to exclude/prohibit uses, such as potential future oil and gas development as presented in Alternative B1 of the RMP EIS, seems to conflict with the BLM's mission of Maximum Economic Recovery of mineral resources. Mineral resource extraction, whether coal, oil and gas, or other resources, has improved dramatically over the past several decades and will continue to improve while protecting and even enhancing the environment.
#1])>
To preclude any of these resources in this 20-year Plan does not recognize or allow for improvements or advancements in technology to overcome/mitigate potential issues or concerns. Site specific applications would seem to be the best process for restricting or eliminating the development of any resource. This is recognized in the BLM's May 27th press release that states, "<([#2 [5.3] Additionally, the plans do not authorize any specific leases or mining operations; any new coal leases would require environmental reviews specific to the particular lease application. The purpose of the RMP is to provide balanced management of all of the resources in the area including wildlife habitat, ranching, recreation, conservation and mineral development." The RMP should be broad enough to allow for these site-specific applications,

not eliminate/restrict them at the Planning stage. #2])>

Other items to consider:

1.) <([#4 [22.1] Reference L-2: 4) "Consult with the surface owner regarding private surface land overlying federal coal." - Landowner considerations for coal operations are already addressed by SMCRA, and requiring consultation seems excessive.
#4])>
2.) <([#3 [22.2] Reference L-2: "Somerset Coal Field contains three active mines on federal leases."

This needs to be updated as one mine has been permanently sealed and is in final reclamation, and another mine is in cessation of operations #3])> .

3.) <([#5 [3] Reference L-10: Criterion 17 - Municipal Watersheds and Criterion 18 – Natural Resource Waters

This criterion is a concern could be mis-interpreted, resulting in the unintentional restrictions/exclusions over broad areas (i.e. "municipal watersheds is likely to increase over time".) Again, many years of successful, environmentally-compliant coal operations have been conducted within municipal watersheds and it is not a viable reason to exclude these reserves at the Plan stage. #5])>

4.) <([#6 [22.2] Pages 3-125 & 126: The coal operations data and trends need to be updated to reflect more current information and potential in the coming decades. Mines and reserves in the Somerset and Nucla/Naturita area have or are planned to experience significant changes.
#6])>
Sincerely,

Kathleen G. Welt,
Environmental Engineer III
cc: Weston Norris – MCC
Casey Smith -ALC


000488_WolcottB_20161031_HasAttach Organization: Ben Wolcott
Received: 10/31/2016 12:00:00 AM
Commenter1: Ben Wolcott - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000488_WolcottB_20161031_HasAttach.htm

(000488_WolcottB_20161031_HasAttach-387767.htm  Size = 3 KB)
UFORMP_000488_WolcottB_20161031_HasAttach.pdf
(000488_WolcottB_20161031_HasAttach-387766.pdf  Size = 90 KB)
Submission  Text
Date:10/31/2016

Commenter:  Ben Wolcott

Organization:

Email:bwolcott1983@gmail.com

Address:

Phone:

Comment:
My Name is Ben D. Lindsey--Wolcott  I was born in Paonia Colorado on August 1st 1983. I have
lived in the North Fork Valley for my entire life. After carefull study of the Issue of fracking in
our local area and the RMP Plan that you the BLM are proposing,  I MUST COME OUT AND
SAY I DO NOT SUPPORT IT! The reasons are simple  The BLM has not to my satisfaction
shown how they will implement  fracking in a safe or sustainable way. Until you release an EIS
that actually addresses the issues of water contamination  and water loss for local communities
then I and many others in my community  will remain OPPOSED to your plan.  You Over at the
BLM need to read the report the DELTA COUNTY COMMISSIONERS RELEASED and take
it seriously  and do a lot more research before you  come back with another plan that is skewed to
make profit  for the industry  who wants to do this while  not looking  at what the local community
is saying. Here is a quote from that release.

"The hydrology  of a natural groundwater hydrologic  system may be altered by the construction
and operation of proposed oil and gas wells. During drilling  and fracking,  the oil and gas
operations  may behave like a connection mechanism between the deep and shallow aquifers,
mixing  water of various chemistries  from various bedrock and shallow aquifers. Depending on
management strategies for produced water disposal and use, groundwater levels in the shallow
unconsolidated  systems may be altered with respect to the amount, velocity,  storage, and
direction of the local groundwater system and related regional  groundwater levels and
discharges. Changes to the natural groundwater system will likely  have ecological,
geohydrological,  and, potentially,  legal consequences. The effects of water disposal  after
fracking and oil and gas well development  are not discussed in this report as relevant information
on the planned oil and gas development  and operations  is not available  at this time. These
management strategies and their effects on the shallow and bedrock aquifer subsystems should
be evaluated in more detail.

....the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the
Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell,
McDonald,  and Cottonwood  Creek drainages, due to hydrostructures,  may be affected by

BLM_0156405

fracking or other oil and gas drilling activities (Figures 19, 20, 22, 23 and 29), which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal (Figures 19, 20, 22, 23 and 29)."

Again My Name is Ben D. Lindsey-Wolcott and I am OPPOSED to this BLM RMP plan as it will put our entire community and way of life at risk, this Valley is Based on Organic agriculture and we will not just allow you to destroy our valley's water.


000489_JohnsonA_20161101  Organization: Western Slope Conservation Center, Alex Johnson
Received: 11/1/2016 12:00:00 AM
Commenter1: Alex Johnson - ,
Organization1:Western Slope Conservation Center
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mmccarter
Attachments: 000489_JohnsonA_20161101.htm (000489_JohnsonA_20161101-387982.htm
Size = 371 KB)
Submission Text
November 1, 2016


Bureau of Land Management
Colorado State Office
2815 Youngfield St.
Lakewood, CO 80215

Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401

Submitted electronically to uformp@blm.gov via Google Drive. These comments are also available via
http://westernslopeconservation.org/wp-content/uploads/2016/11/WSCCDraftRMPComments-Final.pdf.

Cc:
Ruth Welch, Colorado State Director, Bureau of Land Management, rwelch@blm.gov
Joe Meyer, District Manager, Southwest District of Colorado, BLM, jmeyer@blm.gov
Teresa Pfifer, Field Manager, Uncompahgre Field Office, BLM, tpfifer@blm.gov
Neil Kornze, Director, BLM, director@blm.gov
Secretary Sally Jewell, Department of Interior

RE: Draft Uncompahgre Field Office Resource Management Plan Public Comments

Dear Ms. Pfifer, Mr. Meyer, and Ms. Welch:

Please accept these comments on the draft Uncompahgre Field Office Resource Management Plan on behalf of the staff, board, and members of the Western Slope Conservation Center (WSCC). The WSCC is a grassroots non-profit with 450 members who live in the North Fork Valley and Western Slope of Colorado. The WSCC has a 40-year legacy of conservation environmental resources in the North Fork Valley, and we are dedicated to the mission of building an active and aware community to protect and enhance the lands, air, water and wildlife of the Lower Gunnison Watershed.

The WSCC understands the magnitude of the challenge that the BLM faces in producing a new Resource Management Plan (RMP) for the Uncompahgre planning area, and we appreciate the significant amount of time and energy that has gone into the current draft plan. The WSCC also recognizes the significance of this RMP in determining the future of the BLM lands that surround our homes, farms, businesses, and recreational areas for the next 20-30 years. Consequently, we have engaged our members in a thorough analysis of the draft plan and ask that the BLM incorporate the following additional information and comments into the final plan.

The WSCC has determined that the Preferred Alternative will not provide adequate management protections for the water, air, viewshed, wildlife, recreational opportunities, foodshed, or economies of the North Fork Valley and Western Slope. We would like to thank the BLM for including the North Fork Alternative within the draft plan as Alternative B1, which provides a minimum degree of protection for these resources identified by our community members. For all other management actions not associated with oil and gas leasing in the North Fork planning area, Alternative B provides a minimum degree of protection for the resources identified above.

Our following comments are organized into three main sections: I) Detailed information and support for Alternative B1, the only alternative in the plan that adequately protects the communities in the North Fork Valley from unreasonable impacts from oil and gas leasing and corresponding development activities? II) Specific concerns regarding water resources in the planning area, especially as related to actions included in the Preferred Alternative? and III) Additional specific concerns and support for management prescriptions in the draft RMP.

Sincerely, Alex
Alex Johnson
Executive Director
Western Slope Conservation Center
director@theconservationcenter.org
Office: 970-527-5307
Cell: 970-778-8181
www.theconservationcenter.org
Follow us on Facebook
Follow us on Twitter

BLM_0156407

WSCCDraftRMPComments-Final.pdf

November 1, 2016

Bureau of Land Management
Colorado State Office
2815 Youngfield St.
Lakewood, CO 80215

Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401

Submitted electronically to uformp@blm.gov

Cc:
Ruth Welch, Colorado State Director, Bureau of Land Management, rwelch@blm.gov
Joe Meyer, District Manager, Southwest District of Colorado, BLM, jmeyer@blm.gov
Teresa Pfifer, Field Manager, Uncompahgre Field Office, BLM, tpfifer@blm.gov
Neil Kornze, Director, BLM, director@blm.gov
Secretary Sally Jewell, Department of Interior

RE: Draft Uncompahgre Field Office Resource Management Plan Public Comments

Dear Ms. Pfifer, Mr. Meyer, and Ms. Welch:

Please accept these comments on the draft Uncompahgre Field Office Resource Management
Plan on behalf of the staff, board, and members of the Western Slope Conservation Center
(WSCC). The WSCC is a grassroots non-profit with 450 members who live in the North Fork
Valley and Western Slope of Colorado. The WSCC has a 40-year legacy of conservation
environmental resources in the North Fork Valley, and we are dedicated to the mission of
building an active and aware community to protect and enhance the lands, air, water and wildlife
of the Lower Gunnison Watershed.

The WSCC understands the magnitude of the challenge that the BLM faces in producing a new
Resource Management Plan (RMP) for the Uncompahgre planning area, and we appreciate the
significant amount of time and energy that has gone into the current draft plan. The WSCC also
recognizes the significance of this RMP in determining the future of the BLM lands that
surround our homes, farms, businesses, and recreational areas for the next 20-30 years.
Consequently, we have engaged our members in a thorough analysis of the draft plan and ask
that the BLM incorporate the following additional information and comments into the final plan.

The WSCC has determined that the Preferred Alternative will not provide adequate management
protections for the water, air, viewshed, wildlife, recreational opportunities, foodshed, or
economies of the North Fork Valley and Western Slope. We would like to thank the BLM for

including the North Fork Alternative within the draft plan as Alternative B1, which provides a minimum degree of protection for these resources identified by our community members. For all other management actions not associated with oil and gas leasing in the North Fork planning area, Alternative B provides a minimum degree of protection for the resources identified above.

Our following comments are organized into three main sections: I) Detailed information and support for Alternative B1, the only alternative in the plan that adequately protects the communities in the North Fork Valley from unreasonable impacts from oil and gas leasing and corresponding development activities; II) Specific concerns regarding water resources in the planning area, especially as related to actions included in the Preferred Alternative; and III) Additional specific concerns and support for management prescriptions in the draft RMP.

Sincerely,
Alex Johnson
Executive Director
Western Slope Conservation Center
director@theconservationcenter.org
970-527-5307x201

Comment Contents [SEE PDF FOR FULL TABLE OF CONTENTS. SEE PDF FOR FIGURES AND APPENDICES]

I) The North Fork Alternative (B1) and Oil and Gas Leasing in the North Fork Valley

Regarding oil and gas leasing and development, we support the incorporation into the final RMP of Alternative B1 (North Fork Alternative) as the only proposed management prescriptions and designations that provide the protection warranted for the North Fork area; with all additional general provisions beyond oil and gas leasing of Alternative B, or as otherwise indicated throughout these comments.

Alternative B1 is derived from a detailed document submitted by stakeholders, organizations and individuals from the North Fork Valley to the Uncompahgre Field Office of BLM in December 2013. The North Fork Alternative Plan: A Proposal to the BLM for Managing Oil and Gas Development in the North Fork Valley was developed over an 18-month period by a group of stakeholders and supported by local governments. It seeks to manage oil and gas leasing and development on the North Fork Valley's public lands and minerals in balance with the unique and highly cherished resources that those lands contain, surround and impact directly, indirectly, and cumulatively.[1]
[Footnote 1] "North Fork Submits Community-based Management Plan to the BLM," News release, December 4, 2013. Online at www.citizensforahealthycommunity.org/wp-content/uploads/2013/12/North-Fork-Community-submit-Alternative-Plan.pdf

The North Fork Alternative Plan (NFAP) is included in the draft RMP/EIS as Alternative B1: Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in portions of Delta and Gunnison Counties. Alternative B.1 is a resource-based set of

recommendations provided by a community group. [DEIS at 2-7]

Alternative B1 reinforces broader community-wide efforts to establish a more resilient, place-based economy in Delta County. In 2015 Better City was retained through a federal grant to help strategize ways to strengthen the local economy. That report reinforces what the stakeholders who crafted the NFAP have long maintained. Economic resiliency and growth in the North Fork Valley depends on safeguarding the area's natural resources not exploiting them.

Delta County is home to a number of unique resources, attributes, organizations, and conditions that help differentiate it from other communities. The County is home to natural attractions including two rivers, the Grand Mesa National Forest, and two National Conservation Areas. The County enjoys a more temperate climate than the majority of the state, has a large amount of farmland, and has access to water resources and clean air. ... Although its coal deposits remain a vital asset for the community, they are not a source of future growth. [2]

[Footnote 2] Economic Development Strategic Plan Executive Summary Delta County, CO prepared by Better City, 2015. Available online at www.deltacountyed.org/resources/Documents/EDA%20Study%20Summary%202016.pdf

The NFAP, incorporated as Alternative B1, set out to protect six key sets of resources that are dependent on, tied to, and impacted by activity on the area's BLM-administered lands. These include: the existing economy, towns and community areas, water source areas and delivery systems, river corridors and riparian areas, important wildlife habitat and migration routes, and sensitive landscapes and soils. In addition, the NFAP sought protective management to safeguard outstanding recreational opportunities at Jumbo Mountain and the overall highly scenic visual character of the valley and its surrounding mesas.

These characteristics of the valley, its high quality scenery features, good water and abundant wildlife, and outstanding recreational opportunities are the backbone of the area's growing, emerging, and future economy.

Our comments are overall supportive of Alternative B1 in the draft RMP/EIS, however they recommend some changes and additions, as well as raise some concerns and weaknesses in the draft RMP/EIS and the analysis. Our comments regarding Alternative B1 will first consider four major areas of emphasis that should guide management objectives and that must be part of any acceptable resource plan.

It is our belief that the agency-identified Preferred Alternative (Alternative D) is especially unacceptable for the North Fork Valley regarding oil and gas leasing; and that other deficiencies in the draft RMP/EIS could leave the overall decision open to challenge, especially under a management regime like that proposed under Alternative D. Thus we urge that the agency not only adopt the provisions in Alternative B1 for the North Fork, but begin to apply this level of protection to additional public lands under its purview. We will outline specific deficiencies identified in Alternative D in section III and the conclusion of these comments.

A. Purpose and Need: North Fork Alternative Plan

The North Fork Alternative Plan (NFAP) was crafted by North Fork Valley stakeholders,

organizations and individuals that wanted to ensure any potential future oil and gas leasing and development would not jeopardize the many important values, resources and features of the area's public lands—which in many cases form the basis of the local economy, convey and/or are source areas for water supplies, represent critical wildlife lands, and provide outstanding recreational opportunities for residents and visitors alike.

The NFAP identified critical resources and shared values, and researched appropriate leasing and oil and stipulations, best management practices, and public land designations. It was derived as a resource-based approach to oil and gas leasing and development to achieve the necessary level of management to protect cherished features, public land resources, wildlife and economic well-being of the valley.

Development of the NFAP started with a careful review of the thousands of comments submitted to the BLM in response to the withdrawn lease sales (Dec. 2011, Nov. 2012), and through conversations with valley residents and stakeholders. The NFAP was incorporated into the draft RMP/EIS as Alternative B1, as noted in the DEIS Executive Summary:
The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area. [DEIS, ES-8]

Since the NFAP in its entirety has been submitted and accepted by the BLM UFO, and has formed the basis of the draft RMP/EIS sub-alternative B1, these comments incorporate that submitted information herein by reference, and refer—unless otherwise noted—to the agency's presentation of the information in the draft RMP/EIS.

In both cases—as a stakeholder proposal and as the sub-alternative B1 in the draft RMP/EIS — NFAP/B1 sets out to protect the important character, resources, and features that make the North Fork Valley both beloved and unique. For the purpose of these comments, those can be described as 1) Character of place, 2) Water supply, 3) Wildlife habitat and migration routes, 4) Recreational opportunities and access.

1. Character of place.

The North Fork Valley is a nationally unique landscape: geographically, geologically, ecologically, economically, and socially. As the Better City report notes, the area is 44th in the United States as a hub of organic agriculture, is one of only two federally recognized wine regions in the state, and is Colorado's only multi-jurisdictional and rural Creative District. The Valley is known for its dark skies, rural charm, bucolic beauty, and stunning views. Thomas Huber, a Colorado geographer and author describes the area in An American Provence, a book linking the North Fork with France's Coulon River valley, according to a January 2012 article in the Grand Junction Daily Sentinel:
The landscapes of the two valleys have one critical thing in common, the reason they are near-clones of each other in the broader dimension: they are both human-scale places," he writes.
"The towns and villages are all easily walkable, the fields are small and individually tended, the

trails are suitable for walking and biking, the food comes from local farmers as much as possible, and the wine is a personal statement from the vintner, not a corporate artifact.

This economy-of-place, coupled with more standard regional tourist attractions—popular mule deer and elk hunting seasons, U-pick orchards, whitewater rafting, mountain biking, horse packing, and backpacking—is a driving force in the North Fork, a trend noted in a 2007 Colorado State University study and report.[3]

Colorado's abundant wildlife, vineyards and vast agricultural landscapes help draw thousands of visitors to the state and are ripe in potential to anchor emerging agritourism markets, according to a recent Colorado State University study.

[Footnote 3] CSU: "Colorado's Agritourism Market Climbing, Says New CSU Report," August 14, 2007.

The North Fork's scenic features, rural communities, and bucolic charm are critical components of the area's existing and emerging economy that must be safeguarded under any management regime. Furthermore, the character of place includes its sense of health and well-being, clean living, fresh water, healthy land. The North Fork strives to be a place that welcomes families at all stages and ages.

Public health considerations, the known impacts to air quality, water quality, and other health factors that oil and gas development can contribute to are not to be understated. [4] Both in terms of real and meaningful threat, and also in terms of intense public concern that the agency is obligated to consider in weighing the significance of its actions and the effectiveness of its management.

[Footnote 4] Intermountain Oil and Gas BMP Project: Public Health. Online at www.oilandgasbmps.org/resources/public_health.php. See the Grand Junction Daily Sentinel, "Ursa holds off on plan to drill close to school," October 6, 2016.

2. Water supply.

Colorado agriculture depends on irrigation, along with area residents. The North Fork is well-situated even as climate change threatens increased scarcity, being primarily gravity fed and located just below the source areas on the Grand Mesa and West Elk Mountains.

The water quality of the North Fork remains good, and industrial pollutants remain low. The primary water quality issues for irrigators are related to salinity and selenium loads, which increase as the river and ditches flow down valley, and is exacerbated by development on the highly erodible Mancos soils that comprise much of the region. Irrigation in the valley relies on an interconnected series of canals, ditches and water impoundments. Surface contamination and spills, which occur regularly in Colorado oil and gas fields, could spread rapidly through the irrigation systems that water the valley, and in turn provide fresh food locally, regionally, and nationally.[5] With such a short pathway from water source to table, oil and gas contaminants from a surface spill in the North Fork Valley could enter the irrigation water supply, irrigate plants that are then harvested, and be served to customers locally at one of our farm- to-table restaurants before the oil and gas company is even mandated to report the spill.

[Footnote 5] "Oil and gas companies in Colorado reported 615 spills in 2015," Denver Post

March 17, 2016.  Online at www.denverpost.com/2016/03/17/oil-and-gas-companies-in-colorado-reported-615-spills-in-2015/

In addition,  impacts in source areas carry real risk of groundwater harm.  Recharge areas for aquifers are both broad and shallow,  as noted in a comment from one local domestic water company.

These springs are primarily  fed by subsurface collection  of precipitation  percolating  through talus and glacial  deposits into a larger sub-surface groundwater storage in the till  deposits.  These springs are dependent entirely upon precipitation  and surface runoff for their supply and recharge of the underground  well system (Wright Engineering  Study of 1977, extracting data from U.S. Geological  Survey's Professional Paper No. 617 entitled "Quaternary Geology  of the Grand and Battlement  Mesas Area, Colorado")  and do so from an area of greater than 1 sq. mi.[6]

[Footnote 6] Pitkin  Mesa Pipeline  Company  draft RMP/EIS comments.

Finally,  the North Fork and Smith  Fork Rivers sit in the Gunnison  Basin, a major headwater for the Colorado  River System. The Gunnison  Basin is identified  as a "water bank" to ensure adequate flows remain in the Colorado  River to meet Colorado  River Compact requirements.  Adequate flows in the Gunnison  are also needed to maintain  water quality  considerations  due to selenium  and salinity  loads, and to avoid irrigators  being forced to cut back on water use under the Endangered Species Act.[7] Any water quality  impacts that occur within  the North Fork and Smith Fork Rivers could  produce  corresponding  impacts  to the full  downstream Colorado  River System.

[Footnote 7] "Program Overview," Gunnison  Basin Selenium  Task Force. Online at www.usbr.gov/uc/wcao/progact/smp/overview.html

3. Wildlife  habitat and migration  routes.

Situated  between the West Elk Mountains  and Wilderness  Area, Grand and Black Mesas, and encompassing  two significant  river riparian areas, the North Fork (and contiguous  Smith Fork) Valley is a wildlife  haven. The West Elk Mountains  and the flanks  that lie on BLM lands are known as concertation  areas for black bears, especially  in the crucial  late summer and early fall period when this species is preparing for winter hibernation.[8]  BLM lands in the area are critical winter range for both deer and elk. Public lands in and surrounding  the North Fork are home to threatened, endangered and sensitive species including  the Gunnison  Sage Grouse, and important hunting  and migration  routes for others including  the Canada lynx.  Yellow-billed  cuckoos nest in the riparian  vegetation  along the North Fork River and tributaries.  Raptors frequent the area, including  wintering  bald eagles and peregrine falcons.

[Footnote 8] 8 Oil and Gas Leasing and Development  Final  EIS, Grand Mesa Uncompahgre Gunnison  National  Forest 1993.

Streams and rivers that begin on the Grand Mesa and West Elks contain  important  trout fisheries, and the Gunnison  River just below the confluence with the North Fork is a Colorado Gold Medal trout stream. The Gunnison  River is also home to three species of endangered fish that are known to be impacted by activity  on the selenium  rich soils of the valley.[9]

[Footnote 9] "Aspinall  Unit Operations Biological  Assessment," US Bureau of Reclamation https://www.usbr.gov/uc/envdocs/ba/AspinallUnitOps/ch4.pdf

BLM_0156413

Wildlife have been utilizing the valley for millennia, and the ethical importance of protecting wildlife habitat, managed jointly with the state as a "public trust," is paramount.[10] Colorado Parks and Wildlife, in previous comments on the recently deferred lease sales in the North Fork Valley, emphasized the importance not only of protecting the critical winter habitat that covers nearly all of the valley, but of the important migration routes that connect the winter range with uplands and calving areas.
[Footnote 10] DEIS at Volume II 4-127.

4. Recreational opportunities and access.

The North Fork is a public lands paradise, nestled among national forest, park, and conservation lands managed by the Forest Service, National Park Service, BLM, and the State of Colorado.[11] Hunting is a mainstay that brings large revenue for western Colorado coffers. The economic contributions made by maintaining healthy and abundant fish and wildlife populations are substantial. The CPW comments emphasized the economic importance of protecting this habitat for the hunting opportunities provided.
...benefits from hunting and fishing recreational activities are a sustainable annual source of economic benefit for Delta and Gunnison counties only if wildlife populations, and particularly big game populations, are maintained and quality hunting opportunities continue to exist.[12]
[Footnote 11] DeltaCountyColorado.com – Public Lands: Diverse Destinations at www.deltacountycolorado.com/public_lands/
[Footnote 12] Colorado Park and Wildlife comments on March 2012 oil and gas lease sale, February 3 2012.

Hunting and fishing are multimillion dollar industries in the region, estimated at over $80 million annually (in 2007) for the two counties.[13] River sports, hiking, camping, mountain biking, climbing and trail running are other highly popular public lands pursuits in which the North Fork excels.
[Footnote 13] Ibid.

And then there are the "windshield tourists" and those that bask in the beauty of the surrounding landscape while enjoying a visit requiring less physical exertion. The communities and farms of the valley are stitched together by the world-famous West Elk Loop Scenic Byway. Area features that must be protected to safeguard recreation and tourism opportunities include the overall rural and scenic character of the place—which draws in an ever-increasing number of tourists and residents, benefits the wineries and farm stands, fuels the creative muses of the area's growing number of artists, performers and authors.

<([#1 [27.1] Finally, the final RMP must start to actively manage recreation on BLM lands, through designation of recreation management areas. Jumbo Mountain is the obvious example that deserves designation as a Special Recreation Management Area (SRMA). Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance. Jumbo Mountain sits prominently within the valley, and the visual resources of the BLM parcels on Jumbo are significant to the quality of life in the entire valley.

BLM_0156414

Jumbo Mountain is not the only area on North Fork BLM lands likely to need special attention to better direct recreation activity, especially during the life of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use.

Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.

Public lands recreation is a multi-billion-dollar industry on Colorado's public lands, and forms not only the basis for tourism based economies across the state, but also as a draw for new residents, new business, and new economic opportunity.[14]
[Footnote 14] Ray Rasker, Patricia H. Gude, and Mark Delorey, "The Effect of Protected Federal Lands on Economic Prosperity in the Non- metropolitan West," Headwaters Economics, 2013. Online at http://headwaterseconomics.org/wphw/wp-content/uploads/ProtectedPublicLands_Manuscript_2012.pdf #1])>
B. Sub-alternative B1: North Fork Alternative

1. Alternative B1 is the best alternative proposed in the RMP, which the BLM should adopt for the North Fork Valley

We support the protections outlined in Alternative B1 as those that provide the strongest protection (of any alternative in the draft RMP/EIS) for the important features of the North Fork Valley that are interwoven with management on the adjacent and proximate public lands.[15] Only B1 provides the level and type of protections that the resources and public land values of the North Fork warrant.
The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area (DEIS I 2-7).
[Footnote 15] See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22.

B1 would place 75% of the North Fork area into a No Leasing category, impose strict nonwaivable, nonmodifiable No Surface Occupancy stipulations on an additional 20% of the area, and manage the remaining 5% of the BLM lands/minerals under Controlled Surface Use stipulations.
In the North Fork area, 104,750 acres (75 percent of the North Fork area) would be unavailable for leasing, compared to 10,610 acres in Alternative B, and 27,280 acres (20 percent of the North Fork area) would have an NSO stipulation... (DEIS II 4-276).

The NFAP considers oil and gas leasing and development for BLM lands and BLM-administered minerals under private/nonfederal lands ("split estate"); and it imposes protective measures for six key resources, plus management designations for recreation areas and visual resource protection.[16]

[Footnote 16] "Executive Summary," North Fork Alternative Plan. Citizens for a Healthy Community, et al. December 2013.

For features vital to the area's character of place, B1 includes the strongest protections. This includes leasing and development setbacks for certain visual and scenic resources, leasing and development setbacks from towns and community facilities, and leasing and development setbacks and other protection for sensitive soils and delicate landscapes. B1 provides the strongest protection for the North Fork's water supply, with setbacks from water source areas and systems, irrigation facilities, and waterbodies; and prohibitions on leasing on the areas with highest potential for selenium loading. These measures will help to ensure that the area's nationally significant water supplies are protected.

B1 prohibits development within critical fish and wildlife habitat, and includes leasing and development setbacks from rivers—all measures that serve to provide strong protections to the important fish and wildlife species of the valley, including threatened, endangered, and sensitive species.

B1 would designate 5,020 acres at Jumbo Mountain area as a Special Recreation Management Area (SRMA), and provides the strongest level of protection for the highly scenic features of the valley, including a Visual Resource Management (VRM) II classification ensuring the scenic and rugged features of Jumbo Mountain are not degraded. B1 includes leasing and development setbacks from rivers and riparian areas. These protective measures, together with protection for wildlife habitat, ensure that the valley's recreational assets will not be diminished by ill-conceived oil and gas development.

2. Alternative B1 includes reasonable but strong stipulations to protect resources in the North Fork.

Given the unique quality of the resources at stake, directly, indirectly and cumulatively from the agency's land use decisions, and the management outlined for oil and gas leasing and development under all four alternatives and sub-alternative B1, only B1 provides the level of protection warranted.

Only Alternative B1 closes to all oil and gas leasing the areas with the most severe selenium loading problems, area within a half mile of rivers and riparian corridors, water bodies and waterways, areas around communities and community facilities, and for protection of the valley's exceptional scenic qualities. And only Alternative B1 includes protective surface development prohibitions that are not waivable or modifiable, for features and resources such as agricultural operations, moderate and high geologic hazards, critical wildlife habitat, unstable geology, irrigation facilities, and recreational lands.

[B1] would be the most restrictive to oil and gas exploration and development activities because a larger percentage of the planning area would be unavailable for leasing, and areas open to

leasing would have major restrictions. ...[Under] Alternative B.1, approximately 280,840 acres would be unavailable for oil and gas leasing, exploration, development, or production, 6 times the acreage under Alternative A. In the North Fork area, 104,750 acres would be closed to leasing, 94,140 acres more than in Alternative B. Approximately 635,190 acres would be open to leasing, 27 percent less than under Alternative A. (DEIS II 4-276)

Even in comparison to Alternative B, which is the most conservation-oriented full alternative in the draft RMP/EIS, none come close to the protection offered in B1. Alternative B1 provides a baseline of management to safeguard the valley's character of place, water supply, wildlife habitat, and recreation.

a. Character of place.

The overall character of place in the North Fork Valley, its high quality scenic features, its rural charm, its backdrop of undeveloped public lands, mesas melting into mountains, is of utmost importance to the area residents, businesses, and economic future. Character of place relies on healthy communities and vibrant economies, and the rural, farm-based settlement of the valley. We support the B1 stipulations NL-13 Coal leases; [17] NSO-68 Community facilities; and NSO-3 Agricultural operations. These provide reasonable and prudent leasing and development restrictions and stipulations to protect current and emerging economic activity, and to provide setbacks from communities and community facilities.
[Footnote 17] Re: Agency comment at DEIS Volume II 4-276: We think that the NL-Coal lease areas can be made available for Coal Mine Methane capture by classifying them as 'Leasable' and stipulating that is only in conjunction with an approved coal mine methane capture/utilization facility. This would also have a climate benefit.

<([#2 [35.1] The quality 'character of place,' is difficult to under-emphasize as a critical component to what is special about, and must be preserved of, the North Fork Valley. Specifically, given the high importance of protecting the area's visual features and sensitive landscapes we support the VRM classifications in Alternative B1, and the protection of landscape and visual characteristics through the following stipulations: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors; NSO-7 Major river corridors; NSO-5 High geologic hazards; CSU-47 Vistas; CSU-7 Moderate geologic hazards.[18]
[Footnote 18] NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B1 cannot be waived, modified or excepted.
#2])>
<([#3 [37.1] b. Water supply.

Protection of the valley's water supply relies on preventing pollution, protecting source water areas, protecting water bodies and riparian areas, and protecting water systems and conveyances. For agricultural operators, water quantity and quality are both of utmost importance. Organic agriculture, specialty crops and high quality hay all depend on abundant water, free from contamination.

BLM_0156417

The combination of individual wells, several private and public water companies, and with source water areas ringing the valley—safeguarding water quality is a top concern. Drilling is known to contaminate water supplies, both above and below ground, and to harm water bodies, rivers and source areas.[19] That is a risk too great for many operators in the valley, home to Colorado's highest concentration of organic farms, an agritourism haven, and major headwaters to the Colorado River system.

[Footnote 19] "Stanford scientist weighs the risk of groundwater contamination from oil and gas wells," Stanford News: February 8, 2016. Article online at http://news.stanford.edu/2016/02/18/aaas-jackson-water-021816/

We support the following stipulations to protect water supply. In cases where other alternatives in the draft RMP/EIS provide more protection than B1 for water supply resources, and where those stipulations overlap with B1, we recommend that the more protective stipulations apply. Here we recommend both the NL-6 stipulation (from Alternative B) and NL-7 stipulation (B1) be included in the final RMP. To adequately protect the water supply, we favor—at a minimum—the following stipulations for oil and gas leasing and development in the valley: NL-1 Selenium soils; NL-3 Major river corridors; NL-4 Water bodies; NL-6 Public water supplies (*Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NSO-15 Domestic wells and water systems; NSO-55 Bureau of Reclamation dams & facilities (*Alts. B, C, D); NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-2 Selenium soils; NSO-7 Major river corridors.
#3])>
<([#4 [14.1.1] [15.2] c. Wildlife habitat and migration routes.

The BLM lands in and around the valley provide for an abundance and diversity of wildlife, from moose, bear and lynx in the upper reaches, to Gunnison sage grouse, Yellow-bill Cuckoo, fox and coyote in the bottomlands—which are critical winter range for herds of elk and deer. Waterbodies and riparian areas provide important habitat and travel routes for a variety of species. Upland migration routes and connectivity are critical elements to maintaining healthy populations, from endangered and sensitive species to big game. Specific habitat areas—nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the strongest protections.

In cases where species or habitat management plans, other considerations, or other alternatives in the draft RMP/EIS propose stronger protections for resources than in Alternative B1, we prefer the stronger stipulation; for instance, with Gunnison sage grouse habitat: we recommend that the No Leasing stipulation from Alternative B also be carried forward and applied where applicable. We support the following stipulations as providing a minimum level of protection for wildlife habitat: NL-4 Waterbodies; NL-3 Major river corridors; NL-NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.
#4])>
<([#5 [27.1] d. Recreational access and opportunities

Recreational opportunities surround the North Fork's homes, farms and communities – from those provided by the public lands directly, to the indirect benefit the scenic nature of the area provides for tourists and visitors. The rivers, nearby trailheads, unique public lands features, mountain biking and hiking opportunities, together with the scenic landscape wound together with farm roads, wineries, and rolling hayfields. The following stipulations provide protection for recreational areas and amenities, and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mountain SRMA (with VRM Call II). At Jumbo Mountain, Alternative B1 closes the SRMA to competitive events, which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA through the stakeholder/planning process. See below (WSCC RMP Comments III.E) for additional comments on recreation management not specific to the North Fork Alternative.

#5])>

3. Only B1 provides management that North Fork's unique character, culture, and resources requires

In considering important features of the North Fork, only B1 provides the level of management needed.

a. Alternative B1 protects what matters, even where Alternative B mostly fails

B1 best protects the North Fork even when contrasted with the conservation-oriented Alternative B.

i. Character of place: visual resources, healthy communities, farms, landscapes, river corridors

The scenic qualities of the valley are a driving force for business, for increasing property values, a force behind the burgeoning creative economy, a central ingredient to the marketing of bed and breakfasts, wineries, retreat centers, guest ranches and numerous other ventures. Visual scarring raises a point in general, that much of the opposition to oil and gas development is a response to industrial impacts that are incompatible with this growing economy. Alternative B1 goes furthest to address this general concern, closing most BLM lands in the North Fork to oil and gas leasing altogether.[20]

[Footnote 20] DEIS II 4-91

And in considering North Fork visual resource management (VRM) classifications specifically, under Alternative B1 over 82,218 acres are classified as either the VRM I or II, the most protective. Under Alternative B only 15,824 acres in the North Fork fall into VRM I or II.[21] And B1 not only protects more acres than alternative B, but it also applies stronger stipulations to do so.

Depending on the location, VRM Class II under Alternative B.1 would be closed to leasing, have an NSO stipulation, or have a CSU stipulation, compared to Alternative B where VRM Class II would have a CSU stipulation. (DEIS II 4-208)

[Footnote 21] Acreages developed from analysis of GIS data downloaded from BLM.

BLM_0156419

Other community issues include loss of dark sky, increased traffic, noxious odors, declining property values, and harm to reputation. Public health impacts are also a top concern. Community and residential setbacks attempt to lessen these threats. B1 includes NSO setbacks from community facilities, including schools, recreation facilities, and parks (NSO-68).[22] B1 reduces these threats, from poor air quality.

Alternative B.I emission estimates result in the lowest total air pollutant emissions in future planning years and decreases in emissions of some pollutants over the base year. ...Alternative B.1 would likely result in the least adverse impacts on air quality. (DEIS II 4-21)

[Footnote 22] If stipulation NSO-67 (Alt. B) for "high occupancy buildings," provides protections beyond B1; then we recommend it be carried forward as well.

The BLM analysis anticipates "increased benefit to non-extractive uses in [the North Fork]" under Alternative B1 (DEIS II 4-473). This is, of course, exactly what economic experts recommend for the North Fork, including the Better City report.[23]

Efforts to identify opportunities in other industries that provide a diverse employment base could help mitigate the boom bust cycle associated with extractive industries.

[Footnote 23] "New Study Repeats Changing of Delta County Economic Basics," Merchant Herald, 11/12/15. Article online at www.merchantherald.com/new-study-repeats-changing-of-delta-county-economic-basics-new-study-repeats-changing-of-delta- county-economic-basics/

The Better City report goes on to highlight the area's agricultural industry and heritage as a strong sector upon which to build for a more diverse economy.[24]

Based on its rich agriculture base, Delta County is well positioned to leverage the existing boom in organic food markets.

[Footnote 24] "Better City presents economic development visions for Delta, Gunnison Counties," Region 10 Website, article at www.region10.net/better-city-presents-economic-development-visions-for-delta-gunnison-counties/

Impacts from oil and gas development on agriculture and ranching operations would less under B1 which includes specific protections and a 0.25-mile No Surface Occupancy setback from "prime and unique farmlands, livestock operations, organic farm, conventional farm, ranch, orchard, and the West Elks American Viticultural area, thereby protecting these" (DEIS II at 4-69). Importantly B1 is also the most protective of the valley's water supply including irrigation facilities.

ii. Water supply: river system, waterbodies, private wells, water systems, public water source areas, irrigation facilities

The rivers in the area provide broad benefit, including to the valley's character, water supply, wildlife habitat, and recreational opportunities. Alternative B1 is the most protective of the river corridors.

In addition to these Alternative B restrictions, Alternative B.1 would also apply NL areas within 0.5-mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, lakes, ponds, naturally occurring wetlands and impounding reservoirs, streams, watercourses, and waterways; and would apply NSO within 0.5 to 1.0 mile of the North Fork of the Gunnison and

Smith Fork of the Gunnison Rivers, and within the 100-year floodplain of any stream or river system. These NL areas (96,910 acres) and NSO restrictions (9,680 acres) would further protect riparian and wetland vegetation in the North Fork area. (DEIS II 4-117)

B1 is also more protective generally of other water supply resources, as noted at DEIS II 4.90: Unlike Alternative B, Alternative B.1 also includes an NSO stipulation within 1,320 feet of any dam, ditch, irrigation intake, canal, or other water conveyance. ...Alternative B.1 offers the most protection of private water supplies and would only apply to the North Fork area.

While B1 is overall more protective of water resources: from river systems, water bodies and irrigation facilities to water wells and systems; in two cases regarding public water supplies, the stipulations in Alternative B area stronger.[25] We have recommended (in WSCC Comments Table 1 and the discussion above) that the stronger (Alternative B) stipulation be included in the final RMP regarding public water supplies.

[Footnote 25] DEIS II 4-90: Under Alternative B.1, a buffer of 1,320 feet from public water supplies would be closed to oil and gas leasing and geophysical exploration, half the distance as under Alternative B. As such, Alternative B provides greater protection than Alternative B.1 for public water supplies from a classified surface water-supply stream segment. Beyond 1,320 feet and up to 2,640 feet, such water supplies would be subject to NSO stipulations. This would offer more protection than Alternative A but less than Alternative B.

The river systems, riparian corridors, and other water resources are important not only to the character of place and the water supply, but also for all life in the valley. River systems are a critical component of the West's habitat. In the winter deer and elk concentrate in the river bottom, and the riparian corridors provide year-round habitat for birds, reptiles and mammals, and migration routes for larger species.

Table 1: Recommended oil and gas stipulations (*Several stipulations are recommended from other alternatives in the draft RMP/EIS, as noted.)

Character of Place
Alt. B1+ Stipulations*: Visual resources, local economies, farms & communities, sensitive landscapes, river corridors
No Leasing: NL-11 Prominent landmarks; NL-13 Coal leases; NL-3 Major river corridors.
No Surface Occupancy: NSO-52 Travel & Scenic Corridors; NSO-5 High geologic hazards; NSO-67* High occupancy buildings (Alts. B, D); NSO-68 Community facilities; NSO-3 Agricultural operations; NSO-7 Major river corridors.
Controlled Surface Use: CSU-7 Moderate geologic hazards; CSU-47 Vistas.

Water supply
Alt. B1+ Stipulations*: Waterbodies, private wells, water systems, public water source areas, irrigation facilities, river system
No Leasing: NL-1 Selenium soils; NL-4 Water bodies; NL-6* Public water supplies (Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NL-5 Water ways; NL-3 Major river corridors.
No Surface Occupancy: NSO-2 Selenium soils; NSO-15 Domestic wells and water systems;

NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-55* BuRec dams & facilities (Alts. B,C,D).
Controlled Surface Use: [blank]

Wildlife habitat and migration
Alt. B1+ Stipulations*: Wildlife and species habitat, floodplains, riparian areas
No Leasing: NL-4 Water bodies; NL-5 Water ways; NL-10* Gunnison sage grouse (Alt. B).
No Surface Occupancy: NSO-35 Raptor sites; NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-30* Yellow billed cuckoo (Alt. B); NSO-39* Mexican spotted owl (Alt. B); NSO-21 Deer & elk habitat; NSO-17* Rare plant communities (Alt. B); NSO-20* Ecological Emphasis Area (Alt. B); NSO-8 Floodplains.
Controlled Surface Use: [blank]

Recreational areas and access
Alt. B1+ Stipulations*: Jumbo Mountain SRMA, river access, hunting opportunities, visual resource protection
No Leasing: NL-11 Prominent landmarks; NL-14* Parks (Alt. B); NL-3 Major river corridors.
No Surface Occupancy: NSO-57 Recreation-Jumbo Mountain SRMA (VRM II); NSO-52 Travel & Scenic Corridors; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-7 Major river corridors.
Controlled Surface Use: CSU-47 Vistas.

Table 1 provides a summary of recommended oil and gas stipulations for the North Fork area. Most are those proposed are from Alternative B1, although some other stipulations from among the other alternatives are also recommended, as noted in the table above and in the narrative.

iii. Wildlife habitat and migration: wildlife and species habitat, floodplains riparian areas

Protecting the abundant wildlife populations is a top priority and main component of the North Fork Alternative Plan.

B1 would be the most protective of wildlife habitat in the North Fork.[26] The DEIS notes: Under Alternative B.1, an NSO would be applicable within 0.25mile of any active or historic bald eagle or golden eagle nest site, and within 0.50-mile of any active or historic peregrine falcon nest site. This would further protect these species within the North Fork area. Alternative B.1 also includes an NSO on mule deer and elk crucial winter range, including severe winter range and winter concentration areas, and in elk reproduction areas, as well as in big game migration corridors, which would further protect big game within the North Fork area. (DEIS II 4-136)
[Footnote 26] DEIS Volume II 4-134

B1 best protects riparian corridors, which are critical components in the habitat systems in the valley.
These actions would reduce the potential for impacts on vegetation in the North Fork area more than Alternative B. (DEIS II 4-116)

BLM_0156422

The stronger management in B1 include more protection for the valley's special status species. These actions would reduce the potential for impacts on special status species in the North Fork area more than Alternative B. (DEIS II 4-155)

Overall protections in B1 are the strongest proposed, and this includes for fish as well as wildlife habitat.
Alternative B.1 provides more enhanced protection of aquatic and riparian species and their habitats than Alternative B. (DEIS II 4-154)

B1 provides the strongest level of protections proposed for the native Colorado River cutthroat trout.
In addition, Alternative B.1 would apply NSO within 0.50-mile of stream segments that have existing and potential habitat for native cutthroat trout, further protecting this species in the North Fork area. (DEIS II 4-155)

And it is not only the direct management prescriptions that benefit wildlife. A number of the prescriptions in Alternative B1 overlap to provide the strongest proposed levels of habitat protection.
[VRM] Classes I and II, which preserve or retain the existing character of the landscape, would restrict surface-disturbing activities, reduce direct impacts on fish and wildlife, and retain habitats. (DEIS II 4-131)

In a few cases, Alternative B identifies stipulations for species that are not included in B1. In these cases, we recommend those stipulations be included in the final RMP (as indicated above and in Table 1). However, in addition to best protecting important features to the humans that occupy the North Fork—in nearly every case B1 provides the best protections for furred, finned and feathered residents as well.

iv. Recreation areas and access: river access, hunting opportunities, visual resource protection, Jumbo Mountain SRMA

Alternative B1 best preserves the valleys river corridors and riparian areas, which is important to protecting the valley, its water supply, and its wildlife, and for the recreational opportunities provided. Alternative B1 provides the strongest protections overall for recreational access, resources, and opportunities in the North Fork, and for the features in the valley that help drive tourism.

Oil and gas development poses a direct threat to the scenic features of the valley, as the DEIS notes:
Development could also add to the changes in the scenic values and other non-market commodities. (DEIS II 4-479)

Thus the stronger visual resource protections under B1 is a plus for tourism and recreation in the valley.
[Fewer] acres available to fluid minerals leasing would result in fewer areas impacted from construction and operation. Applying NSO stipulations on 325,940 acres of BLM-administered

BLM_0156423

lands would preserve the natural character of the landscape and would maintain existing recreation opportunities. (DEIS II 4-301)

The DEIS notes that recreation and tourism related activity is likely to increase across the resource area.
Recreation is expected to increase as the Colorado population and the desire to live near or recreate on BLM-administered lands increase. This follows the trend of recent years seen across the state. (DEIS II 4-479)

The Jumbo Mountain area is important to the Town of Paonia and to many who recreate and live in the valley. Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo Mountain as a SRMA, with B1 acreage and stipulations. Under B1 the entire Jumbo SRMA would have NSO stipulations, rather than only a slice as under Alternative B (DEIS II 4-306).

Given the likelihood that use at Jumbo will increase, and that the Town of Paonia and other local stakeholders are likely to incorporate the area into marketing and planning, keeping incompatible activity out of this close-in and primarily non-motorized recreational area only makes sense. However, and although the draft RMP/EIS notes that public use is likely to increase, under all alternatives except B1 the agency leaves most of the area open to oil and gas leasing and development.

Tourism is booming in the North Fork, and the current (Summer 2016) season is reportedly the busiest ever according to numerous area merchants. This trend is consistent with reports from across the state. B1 specifically protects scenic vistas and travel corridors (DEIS II 4-208). Other potential growth areas include recreation and information industries. Identifying avenues to support the development of these industries could provide additional diversification to the local economy.

These stronger protections benefit recreation directly, and also indirectly in many cases, for example through strong fish and habitat protections under B1 that enhance hunting and fishing opportunities.

In addition to stipulations included in B1 to protect recreational lands, access, and opportunities, we also recommend the NL-14 from Alternative B be carried forward to the final RMP, to protect public lands administered by the National Park Service. Regarding competitive events in the Jumbo Mountain SRMA, we propose the decision to allow some of these events be deferred until the SRMA planning process. And although not part of the North Fork Alternative Plan, and not identified in earlier scoping, new information that BLM should consider includes potential future Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use. The decision record should note this eventuality.

II) Specific concerns for water resources in the planning area, particularly as related to the Preferred Alternative

For the last 40 years, the Western Slope Conservation Center has advocated for our public lands as well as stewarded our water resources within the North Fork Valley and Lower Gunnison watershed. Consequently, we would be remiss not to include a detailed description of our water resource concerns beyond the geographic scope of the North Fork Alternative, B1, as well as our water resource concerns unrelated to oil and gas within the greater Lower Gunnison watershed.

We have focused these comments primarily on the failures of the draft RMP and Preferred Alternative, Alternative D, to adequately protect surface and groundwater quality, stream and water body health, and threatened and endangered aquatic and riparian species from surface activities including oil and gas development, road building, and naturally occurring salinity and selenium within the watershed.

<([#6 [37.3] The draft RMP (DEIS 4.3.3) provides only a general outline for impacts to water resources within the planning area. There is no discussion of impacts or mitigations to water resources due to specific management actions in particular locations. The final RMP must include a detailed discussion and analysis of water resource impacts with a much higher degree of specificity to location, scale, and scope of impacts.
#6])>
<([#7 [37.2] The final RMP must also include all best available data regarding impacts of oil and gas development on water quality as well as water resources within the planning area, which includes a number of studies and reports references in these comments as well as other concerned parties. Part of this data includes a newly released Western Slope Conservation Center report on the Water Quality of the North Fork Watershed based on water quality monitoring conducted monthly between April 2001 and April 2014. (WSCC Comments, Appendix II) All of the following comments should be read in reference to this newly released report.
#7])>
A. Fluid Minerals

It is clear that the final RMP's treatment of fluid mineral leasing and development will determine the water quality and watershed health of the Lower Gunnison watershed for decades to come.

<([#8 [37.1] 1. Surface Occupancy, No Surface Occupancy, and No Leasing stipulations

Surface occupancy can produce highly consequential impacts to water resources, particularly with regards to the application, handling, and transport of liquids and chemicals associated with oil and gas activities. Surface occupancy can result in the following:

* Increased risk for surface and groundwater contamination as "current scientific consensus is that accidents and malfunctions, such as well blowouts, leaking casings, and spills of drilling fluids or wastewater, are more likely to contaminate surface and groundwater supplies than the process of high-volume hydraulic fracturing itself"[27]
* The development and maintenance of new roads and/or increased traffic on existing roads, and the corresponding negative impacts to surface and groundwater contamination.
* Increased air and water pollution due to "(1) direct and fugitive emissions of methane and non-methane hydrocarbons from the well and associated infrastructure (e.g., production tanks, valves, pipelines, and collection and processing facilities); (2) diesel engines that power equipment,

BLM_0156425

trucks, and generators; (3) drilling muds, fracturing fluids, and flowback water; and (4) deliberate venting and flaring of gas and related petroleum products"[28]
* Negative impacts on federally protected fish habitats and the native cutthroat trout and other species of concern.
[Footnote 27] Adgate, John L., Bernard D. Goldstein, and Lisa M. Mckenzie. "Potential Public Health Hazards, Exposures and Health Effects from Unconventional Natural Gas Development." Environmental Science & Technology Environ. Sci. Technol. 48.15 (2014): 8307-320. Web. 19 Oct. 2016.
[Footnote 28] (8310 Adgate et al)

The Preferred Alternative does not include adequate limitations to surface occupancy through the No Surface Occupancy and No Leasing management prescriptions. NSO and No Leasing buffer zones for domestic and irrigation water sources, stream bodies, and other sensitive ecological and agricultural resources as identified in Alternative B and B1 are supported by all referenced documentation in the NFAP as previously submitted to the BLM, as well as in these comments. These prescriptions are absolutely necessary to provide a minimum degree of protection for the water resources within the North Fork and Lower Gunnison watersheds, and similar buffers and protections should be extended to the full planning area.
#8])>
<([#9 [37.1] 2. Controlled Surface Use Stipulations in Preferred Alternative not adequate for protection of water resources in the North Fork Valley

It is clear that the Preferred Alternative attempts to address many of the impacts of oil and gas leasing and development on water resources in the planning area through the use of non-binding, waivable controlled surface use (CSU) stipulations. Nearly across the board, these CSUs do not provide adequate protections for water resources compared to the management prescriptions in Alternatives B1 and B. (See Table 2 in Appendix)

There is a 73%-96% difference in No Leasing prescription acreage between Alternatives B and D, with Alternative D drastically limiting the use of No Leasing, and therefore minimizing protections for water resources. Alternative D does not include B1 protections within .50 mile of Paonia, Hotchkiss, and Crawford. Alternative D also fails to include 76%-86% of acreage closure/withdrawal from locatable mineral entry as compared to Alternatives B (DEIA VI, Table 2-2: action 333,334,336, 348,352)(DEIS Vol II 4-92,4-99, 4-98)
#9])>
<([#10 [37.5] 3. Best Management Practices for Fluid Mineral Management

The Best Management Practices outlined in the draft RMP are inadequate for providing minimum degrees of protection for water resources within the planning area.
#10])>
<([#11 [21.5] [31.1] a. Final plan should exclude oil and gas activities on slopes steeper than 30%

Best Management Practices as outlined in the agency preferred alternative do not sufficiently protect slopes steeper than 30%, listing them as avoidance areas rather than exclusion areas (table 2-2, actions 39 and 40). Furthermore, a stipulation is made in Alternative D for slopes

between 30-39% to allow occupancy and use along with special designs, construction, and implementation measures (including the possibility of an operator submitted engineering report) to maintain soil stability. Based on decades of local knowledge, along with a long record of local surface instability within the region, we recommend that the agency adopts surface use stipulations included in alternatives B and B1 for slopes over 30% rather than the stipulations outlined in action 40, alternative D. Unstable geology in the North Fork of the Gunnison watershed lead to broad destabilization resulting in high sediment loads within waterways as well as landslides.[29]

[Footnote 29] Regmi, N.R., Giardino, J.R. & Vitek, J.D. Landslides (2014) 11: 589. doi:10.1007/s10346-013-0412-6

#11])>

<([#12 [21.5] b. Abandoned and non-viable wells

The BLM's Preferred Alternative does not address best management practices or standard operating procedures for the processes involved with plugging and abandoning wells that are no longer viable. The final RMP must include mitigation and protection from impacts to water resources from abandoned, plugged, and non-viable wells.

#12])>

<([#13 [37.2] 4. Not enough data exists to make decisions about processing produced water.

Throughout the BLM's draft RMP, actions in the Preferred Alternative lack informed data to make informed decisions. This is particularly evident with regard to the best management plans (and lack thereof) for produced water associated with hydraulic fracturing for oil and gas development. The relationship between the injection of produced water and its impacts to the environment is still too new and too dynamic for the best available science to make prudent decisions that will protect our natural resources for future generations. From the initial diversion from the natural water system to disposal and processing post processing, produced water has the potential to negatively impact natural resources such as surface and groundwater, riparian and stream health, and geologic functions. For example, some have alleged that the storage of produced water in Oklahoma has caused an increase in the quantity and intensity of earthquakes in the area.[30] However, in the past year, the number of earthquakes has decreased since their peak.[31] Because of the consumptive nature of this water use and the potentially toxic chemicals and components that are present in produced water, this is highly concerning for what it indicates about possible impacts to the North Fork Valley of future oil and gas drilling. The potential impacts that produced water could incur on the environment and communities are too great, and too little data exists to make scientifically sound decisions that allow for safe development of oil and gas while protecting the communities that will be impacted by the BLM's final RMP.

[Footnote 30] Ellsworth, W. L. "Injection-Induced Earthquakes." Science 341.6142 (2013): 1225942. Web. 19 Oct. 2016.

[Footnote 31] Regan, Michael D. "Why Is Oklahoma Seeing Fewer Earthquakes? Scientists Point to New Oil & Gas Rules." PBS. PBS, 28 Aug. 2016. Web. 19 Oct. 2016.

#13])>

<([#14 [37.5] [37.3] 5. The RMP does not address concerns to groundwater health, potential seismic activity, and surface water impacts associated with produced water

Not only does too little data exist to make informed decisions, but no action in the RMP addresses the potential environmental impacts of any part of the process that involves produced water. It is highly concerning that the preferred alternative opens 865,970 acres to oil and gas development but does not address the impacts and corresponding best management practices associated with management of produced water.

The local impacts of withdrawing significant quantities of water for hydraulic fracturing on stream and riparian health, local industry other than oil and gas development, and community health have also not been addressed by the draft RMP. A conservative estimate of water needed for hydraulic fracturing is 500,000 gallons per well.[32] While this totals into a relatively small percentage compared to total water use compared to agricultural and municipal water use statewide and nationally, the amount of water required locally can be comparatively significant within the immediate water system's supply and use. This dynamic can have serious repercussions on local river health, especially when the North Fork of the Gunnison River already experience flows of under 20 cubic feet per second (cfs) during summer months. For example, in the Marcellus Shale of Pennsylvania, the early shale gas boom led to water withdrawal problems that had to be rectified by the state due to withdrawing too much water.[33]
[Footnote 32] Jackson, Robert B., Avner Vengosh, J. William Carey, Richard J. Davies, Thomas H. Darrah, Francis O'sullivan, and Gabrielle Pétron. "The Environmental Costs and Benefits of Fracking." Annual Review of Environment and Resources Annu. Rev. Environ. Resour. 39.1 (2014): 327-62. Web. 19 Oct. 2016.
[Footnote 33] (Jackson et al 335).

The final RMP must include adequate best management practices to mitigate impacts of storing, transporting, or disposing produced water.

On-site storage of produced water (and flowback water) typically occurs in surface pits or sealed tanks prior to reuse and/or disposal.[34] While current evidence "suggests that wastewater is more effectively treated onsite because effluents discharged to publicly owned treatment plants may not be able to be sufficiently treated by such treatment plants for this waste stream," the proposed RMP lacks any actions to address protocol for this potentially toxic fluid.[35]
[Footnote 34] (8313, Adgate et al).
[Footnote 35] (8313, Adgate et al).

Should 100 percent of the produced water and condensate from oil and gas development be transported by truck, the transport will exhibit significant risks to the environmental and population. On-site release incidents from leaks, faulty equipment, and inadvertent human error can have significant and permanent impacts.

The transport of produced water and condensates will also produce negative impacts such as: increased local traffic along small, rural highways; increased emissions from heavy truck travel (thus contributing to greenhouse gases that exacerbate climate change); poor air quality due to increased particulate in the air due to dirt-road travel; and the negative impacts to the North Fork Valley and Western Slope way of life.

These persistent impacts would have little consequence compared to the high-impact potential of

an accident of a vehicle that is transporting produced water and condensate. Any release that might occur along local highways and roads would contaminate local rivers and streams, negatively impacting water quality in a water system that is part of the Colorado River's headwaters. Additionally, we are concerned that the transport of produced water from the Uncompahgre region to be injected at another site would induce undue negative impacts on other communities and environments.

Should less than 100 percent of the produced water and condensate from oil and gas development not be transported by truck, the remaining produced water and condensate would likely be injected into earth or recycled.

The final RMP must address best management practices for these activities, and include management actions that mitigate possible impacts on other resources as detailed in these comments. #14])>

B. Concerns regarding impacts to Soils and Water Resources

The Preferred Alternative in the draft RMP does not provide adequate safeguards for sensitive soil and water resources within the planning area.

<([#15 [37.3] 1. Water Quality Impacts to Domestic and Agricultural Water Use

Residents within the North Fork Valley and Uncompahgre planning area are fully dependent on the quality of their domestic and agricultural water supply for their health, happiness, and livelihoods. The Preferred Alternative in the draft RMP does not provide adequate protections for these essential water resources.

a. RMP does not adequately describe protections for groundwater

Domestic groundwater sources vary greatly throughout the planning area. The protections outlined in the agency's preferred alternative are not sufficient for protecting groundwater aquifers. Objective 54 in Table 2-2, states "Protect groundwater resources and recharge areas to maintain functioning condition of all parameters within the hydrologic cycle, including groundwater quantity and quality." However, the agency's actions do not meet this proposed objective.

Action 55 allows an unlimited surface occupancy distance (no prohibition or setbacks) and only vaguely describes the required mechanisms for sealing the interface of casing and substrate. The interconnected nature of groundwater aquifers (some of them quite shallow), and the potential loss of drilling fluid into aquifers during exploration poses too high a risk for permanent contamination. It is recommended that the BLM adopt the protections outlined in Alternative B and B1 to meet the objective outlined in line 54.

Fluid mineral exploration and development often produces significant amounts of saltwater/ produced water containing oil, sand, polymers, chemicals, and dissolved solids. As this water is no longer usable, it is recycled or disposed of in underground reservoirs, which produces

significant surface disturbance in addition to the surface disturbance of the oil and gas producing wells. If these disposal wells are permitted by the BLM, they should be subject to at least the same surface restrictions as oil/gas wells. The draft RMP does not address regulatory specifics associated with fluid mineral exploration and development.
#15])>
<([#16 [37.5] b. Water Rights

While the BLM supports existing water rights through quantitative protections, it does not protect the quality of the water associated with those rights. Current uses of the water rights depend on a historical standard of water quality.

The WSCC supports Objective 51 and the agency preferred alternatives 52 and 53 to provide sufficient water quantity on BLM lands for multiple use management and functioning, healthy riparian and aquatic ecosystems. Healthy instream flows are vital for fisheries, wetlands, and riparian areas. Action 52 will help keep those ecosystems that depend on instream flows viable and healthy. Additionally, maintaining historical water quality standards is critical for human and economic health.

The Preferred Alternative, however, would allow oil and gas development (fluid mineral exploration and development, non-fluid mineral exploration and development, construction and maintenance of roads, and other surface disturbing activities including recreation) which would negatively impact the quality of the water within the watershed, through the inadvertent release of potentially and proven toxic chemicals, increased particulate matter in air and watersheds due to increased surface activity, etc. Historical water use, primarily associated with farming, depends on the continuation of the high standards of water quality that have persisted in the area for generations.

The final RMP must include specific stipulations, actions, and best management practices for maintaining the historical water quality standards and mitigating potential negative impacts to water quality. This should include publicly available monitoring for conductivity, total and dissolved metals including selenium, nutrients, and field parameters to evaluate conditions. The final RMP must also include enforceable action plans should water quality conditions exceed state and national water quality standards or shift substantially from historical records. The Western Slope Conservation Center has gathered water quality on the North Fork of the Gunnison River for 15 years and has used this data to establish a water quality baseline (WSCC, See Appendix). Management thresholds should be based on the site specific water quality classifications determined by the state of Colorado.[36]
[Footnote 36]
https://www.colorado.gov/pacific/sites/default/files/42_2014%2807%29withmaps.pdf
#16])>
<([#17 [37.1] c. Final plan must include adequate buffers for domestic and irrigation water sources

The North Fork Valley and Colorado's Western Slope have been defined for over one hundred years by their idyllic, agricultural landscapes. In a water scarce landscape, the hard work of farming families over the course of generations to channel and beneficially use the water that is

BLM_0156430

available is nothing less than extraordinary. Some of the ditches that provide these farms were built by hand with mule teams. Now, those ditches provide water for people who are keeping the agricultural tradition of the region alive. The agricultural products and value-added goods are sold nationally, statewide, and locally. Neighboring resort communities like Aspen, Telluride, and Crested Butte particularly benefit from the North Fork Valley's agricultural production because they attract tourists who are interested in human powered lifestyles like hiking and skiing that heavily emphasize the consumption of local foods. Locally, it is universally known that Paonia peaches are the best in the country.

The value of agriculture is "often understated because some of its most valuable attributes are intrinsic and qualitative. It is valuable because it is an iconic part of the culture and heritage, its expansive landscape provides value to residents and visitors, it has a strong and complementary relationship to visitor enjoyment, return flows from irrigation sustain late season stream flows for fisheries and recreation and replenish underground aquifers needed for some rural residential real estate."[37]

[Footnote 37] Coley/Forrest, Inc. "Water and Its Relationship to the Economies of Headwater Counties." Http://nwccog.org/wp- content/uploads/2015/03/QQStudy_Report_Jan-2012.pdf. The Northwest Colorado Council of Governments Foundation, Inc, Dec. 2011. Web. 19 Oct. 2016. 10.

The final plan must include adequate buffers for irrigation and domestic water sources in order to protect the livelihoods, foodshed, and residents of the North Fork Valley. Fruit, hay, corn, vegetables, and more depend on clean water that is free of highly toxic chemicals, components, and condensates. In the North Fork Valley, many people raise their crops organically, but even if someone uses agricultural aids to maximize their production, those crops will still be negatively impacted by poor water quality. While the North Fork's quintessential way of life is shaped by fields and orchards, many local residents also nurture gardens that help feed their families throughout the year. Those gardens depend on clean domestic and municipal water, as do the people who tend them.

The preferred Alternative does not give this legacy of agriculture the protections that the farmers deserve. The BLM's preferred alternative in Table 2-2, does not stipulate surface occupancy protections with regards to agricultural water conveyance systems. Ditches that were dug by hand and fields and orchards that have been tended by generations will not be protected from the potential inadvertent accidents and releases associated with surface occupancy.

In addition to failing to protect local farms, the BLM's proposed RMP does not provide adequate protection for domestic water supplies and does not fulfill the BLM's objective to "manage lands within municipal watersheds and public water supply areas to provide clean drinking water to local communities."

Some of the proposed actions include the following:

* Applying inadequate restrictions and closures on lands to activities such as fluid mineral leasing and geophysical exploration, mineral materials disposal, etc. (Action 50).
* Manage land within 1,000 feet of a surface water supply-stream as a right of way avoidance

area.
* Allow well bores to be drilled within 1,000 feet of a domestic water well (Action 55).
* Allow fluid mineral drilling leasing and geophysical exploration on 36,810 acres more than Alternative B by only prohibiting leasing and exploration on land that is within 1,000 feet of public water supply water (Action 334).
* Allowing surface occupancy on 214,790 acres more than Alternative B by stipulating only minimal protections for rivers and streams (Action 336)
* Allowing controlled surface occupancy on 333,330 acres by stipulating only minimal protections for rivers and streams (Action 337)

None of these actions give public water supplies the protection they deserve because of the highly consequential impacts of development. Currently, no comprehensive, population-based study of the public health effects of unconventional natural gas operations exists.[38] As such, the proposed alternative's actions that impact public water supplies and subsequently public health are a highly inappropriate and arbitrary attempt at minimizing the impacts from surface occupancy, leasing, and exploration associated with oil and gas development in addition to other minerals.
[Footnote 38] (Adgate et al).

Furthermore, the protection amount of 1,000 feet is applied widely throughout the draft RMP, under the agency preferred alternative D, as a buffer to streams, wetlands, domestic water sources (including wells and springs), as well as irrigation ditches and other water conveyance systems. Clarification supported by the best available science is needed to clarify the otherwise arbitrary distances proposed in the preferred Alternative. In its absence, it is recommended that the BLM adopt the protections described in alternative B and B.1 for buffer zones as they are more specific to the needs of each particular use.

For all actions that address public water supply, it is recommended that the BLM adopt Alternatives B and B1 in order to meet the RMP's objectives related to water supply.
#17])>
<([#18 [37.2] 2. Salinity and selenium

The watersheds within the UFO have been the subject of much attention because of the high levels of salinity and selenium that have negative downstream impacts when they are released into rivers and streams. Indeed, "[t]he Lower Gunnison Basin represents the largest contribution of salinity to the Colorado River system, with a total annual loading of 1,440,000 tons."[39] "The Mancos Shale is a major source of dissolved solids and selenium in the study area. The Mancos Shale is the lateral equivalent to the Niobrara Shale, Cody Shale, and Pierre Shale in Colorado, Montana, Nebraska, South Dakota, and Wyoming (Tweto, 1979; Green, 1992; Wright and Butler, 1993)".[40]
[Footnote 39] URS, and US Department of the Interior / Bureau of Reclamation. Final Findings and Strategies: Comprehensive Planning Studies for Salinity Control Measures in the Upper Colorado River Basin. Rep. N.p.: n.p., 2013. Print.
[Footnote 40] Thomas, Judith C., Jennifer L. Moore, Keelin R. Schaffrath, Jean A. Dupree, Cory A. Williams, and Kenneth J. Leib. "Characterization and Data-Gap Analysis of Surface-Water Quality in the Piceance Study Area, Western Colorado, 1959–2009." Scientific Investigations

Report 2013–5015 (2013): Iii-300. Web. 19 Oct. 2016, 4.

Salinity control efforts in the Gunnison River Basin dates back to the 1970s with the creation of the Colorado River Basin Salinity Control Forum. "The Bureau of Reclamation (2011a) estimated that 47 percent of the salinity load in the entire Colorado River Basin is derived from natural sources, including geological formations, saline springs, and surface runoff; 37 percent results from irrigation; and the remaining 16 percent results from reservoir-storage effects and municipal and industrial activities".[41] In response, the "Natural Resources Conservation Service and US Bureau of Reclamation have been replacing irrigation ditches with buried pipe to conserve water and reduce salinity and selenium within the Colorado River system" (RMP Volume II, 4-17). The effect of these efforts has resulted in the reduction of "227,100 tons per year by both on-farm and off- farm measures through combined efforts from Reclamation, USDA/NRCS, and the BLM."[42]

[Footnote 41] Thomas, Judith C., Jennifer L. Moore, Keelin R. Schaffrath, Jean A. Dupree, Cory A. Williams, and Kenneth J. Leib. "Characterization and Data-Gap Analysis of Surface-Water Quality in the Piceance Study Area, Western Colorado, 1959–2009." Scientific Investigations Report 2013–5015 (2013): Iii-300. Web. 19 Oct. 2016. 12.

[Footnote 42] (URS, 1-5).

The Western Slope Conservation Center is concerned that the agency preferred alternative in the proposed RMP will exacerbate the concentrations of salinity and selenium in the Lower Gunnison River and Colorado River Basins through run-off and erosion due to the deterioration of aging, existing agricultural infrastructure and surface disturbing activities (such as fluid mineral exploration and development, off- trail recreation, and road and infrastructure construction and maintenance) coupled with wind and water erosion, the effects of drought, and the unpredictability and extreme weather events and trends associated with global climate change. Additionally, as stated in the proposed RMP (Volume I, 3-32): "Management actions in the planning area that could result in accelerated selenium yields from deep water percolation include ROWs involving open water sources (such as irrigation ditches and canals), and land sales or exchanges that involve lands dominated by Mancos Shale."

Already, millions of dollars have been invested in the watershed to minimize salinity and selenium leaching. The Western Slope Conservation Center is concerned that the preferred alternative will negate that investment of time and money and will increase salinity and selenium loading in the Lower Gunnison River. This will result in a failure to protect domestic and agricultural water within the UFO and downstream in the Colorado River Basin. It is recommended that the BLM adopt Alternative B in order to meet Objective 30 in Table 2-2 to "manage the activities to minimize the yield of sediment, salt, and selenium contributions from BLM administered lands to water resources."

As referenced in Vol. II, page 4-84, motorized travel has detrimental effects on erosion, soil health, water quality, and watershed health. It is suggested that to minimize the detrimental effects of motorized travel on saline/selenium soils and to minimize saline/ selenium loading in this watershed and the greater Colorado River watershed, that soils with high concentrations for saline/selenium be managed as ROW exclusion areas. Table 2-2, Action 33 outlines management of saline/selenium soils with relation to ROW travel. It is recommended that the BLM adopt the

BLM_0156433

actions outlined in alternative B rather than the preferred alternative D which is "no action".

Table 2-2, Action 31: The agency preferred alternative D supports activities to minimize the yield of sediment, salt, and selenium contributions from BLM administered lands to water resources as outlined in Objective 30.
#18])>
3. Stream and water body health

Streams, wetlands, and riparian corridors are of critical importance to watershed health. While riparian areas only account for one percent of land cover, they "are among the most productive and valuable natural resources," and in western desert areas, "riparian areas are the major providers of habitat for endangered and threatened species."[43] These sensitive areas are critical for the services they provide. These services include, but are not limited to: helping control nonpoint source pollution; supplying food, cover, and water a large diversity of animals including threatened and endangered species; providing migration routes and stopping points during migration; streambank stabilization and floodwater mitigation.[44]
[Footnote 43] "Natural Resources Conservation Service." Riparian Areas Environmental Uniqueness, Functions, and Values. NRCS, 1996. Web. 19 Oct. 2016.
[Footnote 44] (NRCS).

a. RMP does not adequately protect sensitive areas

Proposed management actions in the preferred alternative of the draft RMP fail to protect sensitive areas such as streams, wetlands, and riparian corridors, and as such, the proposed actions fail to protect the species, livelihoods, and economies dependent on the health of that habitat. What follows includes a list of concerns and recommendations related to particular actions of the preferred alternative. Unless otherwise stated, the Western Slope Conservation Center recommends the adoption of alternatives B and B1 as a minimum compromise to protect and preserve these sensitive and valuable areas and the species that are dependent on them.
<([#19 37.1] * Table 2-2, Action 44 fails to protect the Gunnison, North Fork Gunnison, Smith Fork, San Miguel, Uncompahgre, and Dolores Rivers from oil and gas leasing, geophysical exploration, surface occupancy, and its subsequent impacts. These rivers provide invaluable economic, environmental, and public health resources, and the proposed action has the potential to negatively impact all of these resources indefinitely. Only Alternatives B and B.1 adequately provide protections for these riverine resources while still allowing for surface occupancy, exploration, and development in more appropriate areas.
#19])> <([#20 34.1] [3] * Table 2-2, Actions 63 & 64 outline methods and actions for maximizing native vegetation throughout BLM lands. The maximization of native vegetation is essential for the health of riparian areas, wetlands, and other sensitive habitats. The BLM has taken great effort to promote the success of native vegetation in this section. The agency preferred alternative D is a reasonable option, but when allowing for the use of non-native revegetation, the agency should add the words "as a last and final option" or "when all other native re-vegetation options have been exhausted."
#20])> * <([#21 34.1] [3] Table 2-2, Action 75 fails to protect valuable riparian and wetland areas by managing a 325-foot buffer zone as a right of way avoidance area. Avoidance areas do not guarantee that these valuable habitat resources will receive the levels of protection that they

deserve.
* Table 2-2, Action 76 does not provide an adequate buffer to protect the valuable riparian habitat within the UFO. It is recommended that the BLM modify their preferred Alternative D to include a 500-foot buffer (rather than the 100ft buffer currently drafted), in addition to requiring stipulations for commercial special recreation permits.
* Table 2-2, Action 79 does not ensure that wetlands and riparian areas impacted by historic land use and flow regime modification will be enhanced and restored. It is suggested that the words "Pursue opportunities to" are removed from Alternative D to ensure that wetlands and riparian areas impacted by historic land use and flow regime modification are enhanced and restored. #21])>
*<([#22 [37.1] [3] Table 2-2, Action 81 fails to protect the ecological values, water quality, aquatic value, recreational attractions, water storage, and flood control services provided by lakes, ponds, naturally occurring wetlands and impounding reservoirs from the impacts of surface occupancy and use. The proposed action of the preferred alternative does not give ample protections to these water bodies, subsequently endangering the viability of the species, farms and irrigated acreage, public health, and environmental health dependent on them. Only alternatives B and B.1 offer a minimum level of protection for these invaluable resources. #22])> * <([#23 [34.1] Table 2-2, Action 88 fails to manage lands under Integrated Weed Management strategies to support BLM Colorado Public Land Health Standards. Invasive species negatively impact riparian and wetland health. Suppressing and eradicating noxious and invasive species is essential for the health of these habitats.
#23])> * <([#24 [15.2] [14.1.1] Table 2-2, Actions 99, 139, and 147 endanger the health of fisheries by failing to protect aquatic habitat to the most prudent extent necessary to ensure a viable and healthy fish habitat into the future. The pursuit of "opportunities to enhance, protect, or restore native aquatic species habitats" (Action 99) does not guarantee that such goals will be met. Additionally, the preferred alternative fails to recognize priority habitats for special status fish and aquatic wildlife which include perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters. These failures have the potential to place undue stress on these species and threaten the community health of these organisms (Action 133). Threatened and endangered species are particularly under threat because the habitat they occupy will be managed under the proposed preferred alternative as right of way avoidance, rather than exclusion areas (Action 139). Finally, the proposed alternative fails to provide adequate protection for the Native Cutthroat Trout (Action 147). This federally listed fish species requires the maintenance of its habitat integrity and the promotion of their recovery, and the buffer zones and other restrictions threaten that integrity and recovery.
#24])>
<([#25 [37.5] b. RMP does not put in place adequate monitoring metrics including macro-invertebrates

The preferred alternative proposes actions that have the potential to negatively impact stream health and water quality. However, the RMP does not put into place adequate monitoring metrics for parameters for evaluating stream health and water quality, nor does it establish best management practices for entities that might engage in resource development on the landscapes addressed by the RMP. This is unacceptable because it fails to provide metrics to evaluate the impacts of activity on the landscape. In order to understand the impacts of activity, it is recommended that a baseline for parameters including but not limited to conductivity, dissolved

metals, and macroinvertebrates be established where surface activity occurs and monitoring continues during and after such activity.
#25])>
<([#26 [37.1] c. Stream health standards in RMP do not equate to healthy ecosystems, but instead are inadequate minimum-level protections

Stream health is a vital component for functioning land and water-based ecosystems. Should the quality of rivers, streams, and their riparian and wetland areas falter, the entire system and the economies dependent on it will falter as well. Because the health of streams and sensitive areas such as riparian and wetland areas play an important role in not just a functioning ecosystem but also a functioning economy, it is critical to afford them maximum protections. However, the stream health standards in the RMP outline measures that do not meet even minimum needs for protection.

The preferred alternative, as stated in Table 2-2, Action 43, will promote the delisting of state impaired water bodies for 303[d]-listed water bodies only, and that it will "develop a water and aquatic monitoring plan, if necessary, to determine areas where adaptive management is needed." Alternative B will promote the delisting of state impaired 303[d]-listed and Monitoring and Evaluation list water bodies. It is recommended that the final RMP include water bodies which are on the Monitoring and Evaluation List in order to address issues on less impaired streams before they become more impaired and more expensive to improve. The final RMP must also define what requirements necessitate adaptive management plans and the process required to develop a water and aquatic monitoring plan. The final RMP should include all other available water quality data and reports for the planning area, including the Western Slope Conservation Center's newly released "VOLUNTEER WATER QUALITY MONITORING NETWORK, April 2001 – April 2014 Data Report." (WSCC Comments, Appendix II)

Though the draft RMP makes an effort at protecting sensitive areas (DEIS Table 2-2, Actions 23-24), there are many objectives and actions that need to be modified to better reach the goals outlined for land health (Table 2-2, Goal 22). The preferred alternative, Objective 24 partitions some of BLM lands (those specially designated as sensitive areas) to be managed and protected to "fully meet Colorado Public Land Health Standards", but leaves the remaining lands to be managed "with problems" as long as they are trending in the general direction of meeting Colorado Public Land Health Standards. We ask that the BLM manage all lands to fully meet Colorado Public Land Health Standards, thereby closing loopholes that could allow ambiguous protections for sensitive areas left undesignated.
#26])>
<([#27 [37.1] d. RMP standards and Best Management Practices do not adequately protect water bodies

The WSCC is extremely concerned that the standards and Best Management Practices outlined in the RMP are inadequate to meet the goals and objectives listed for Water Resources (Table 2-2, Action 29). Table 2-2, Action 32 describes methods to protect water bodies in areas with high levels of salt and selenium. While Alternatives B and B1 mandate inventory assessments for activities completed within these hazardous areas (and also outlines specific geographic hazards), the agency preferred alternative leaves site assessments/evaluation as an option to be completed

BLM_0156436

or ignored “when feasible.” The preferred alternative here falls far short of outlining the protections necessary to meet aforementioned goals.

In regard to riparian areas, the preferred alternative states: “Manage naturally occurring riparian and wetland areas to maintain or improve hydrologic and riparian vegetation conditions and to improve or exceed proper functioning conditions” (Table 2-2, Objective 74). However, the supporting agency preferred actions fail to adequately meet that objective. It is our concern that by managing buffer zones as “avoidance areas” rather than “exclusion areas” (Action 75) these sensitive areas are open to all manner of disturbance which would result in irreversible ecological damage.

The WSCC is also concerned that the preferred alternative actions outlined to meet Objective 74 are too ambiguous in their management of sensitive areas such as water bodies. For example, Action 79, alternative B mandates that the agency “create, enhance, and restore wetland and riparian areas impacted by historic land use and flow regime modification” however, the agency preferred alternative dictates the action to only “pursue” such measures and in effect gives this action very little in the way of requirements to complete restoration measures. It is of great concern to the WSCC that these types of vague measures as outlined in the agency’s preferred alternative will result in vague management and therefore negatively impact sensitive ecological areas.

The WSCC also recommends that the BLM adopt the measures described in alternatives B and B1 for allowable use and surface occupancy (Table 2-2, Action 81). While the preferred alternative describes stipulations that would allow for various types of use and occupancy (including oil and gas leasing), the stipulations described are inadequate for the protection of these water bodies. For example, the preferred alternative prohibits use and occupancy within 325’-500’ of the water bodies listed and briefly describes how to determine the mapped extent of such water bodies according to observed vegetation. However, such boundaries such as riparian and wetland margins can be difficult to determine and are not necessarily dictated by the vegetation observed in the field. Hydrologic conditions must be taken into account as well as the connectivity of source water for such impounded ponds, perennial, intermittent /ephemeral streams, wetland, fens, springs, seeps, and riparian areas. At times, the source water for such sensitive ecological areas is not easily observable and can originate from a myriad of locations, many of them much further than the 500’ buffer. We highly recommend that the BLM adopt the measures described in Alternatives B and B1 for allowable use and surface occupancy when it comes to these important water bodies.
#27])>
<([#28 [37.2] e. BLM has not completed research or accrued necessary information to make an informed or accurate management plan for water bodies

The Western Slope Conservation Center is disappointed with the extent to which the draft RMP addresses the cumulative impacts of the preferred alternative’s proposed actions to water resources. As it stands, the actions included in the preferred alternative are deficient in addressing water resource concerns. The lack of baseline monitoring and evaluation current conditions will make it impossible to understand and address changes in water quality and stream health which in turn will impact public health and the economy.

While Alternative B and B1 do provide more support for water resources, they too fail to address the impacts of the potential consumptive water use of fluid minerals development on watershed, stream, riparian, and wetland health.

The final RMP must include additional baseline data (see Appendix II) and a more thorough analysis of cumulative impacts to water bodies, including from all consumptive water uses. #28])>

<([#29 [37.3] f. Ecological Impacts from motorized use

The WSCC is concerned about the impacts from motorized use particularly near sensitive areas such as intermittent streams, wetlands, fens, seeps, springs, water bodies, and other ACEC's.

The draft RMP describes (in acres) the amount of area impacted by motorized use according to each alternative (Volume II, Tables 4-21, 4-22, 4-23). In all tables, the agency preferred alternative D opens more land to motorized use than any of the other alternatives, barring Alternative C. Table 4-22 shows the amount of lands closed to motorized use for slopes greater than 30%. The preferred alternative closes only 40 acres of this highly erodible topography (compared with the alternative B, 2,440acres). Alternative C, in this case, opens all lands over 30% slope for motorized use. The agency's preferred alternative D and alternative C are unacceptable options for sensitive areas and will lead to harmful ecological impacts for streams and waterbodies throughout the UFO. #29])>
<([#30 [37.1] [3] 4. Drought Management

Under severe drought conditions (D2), Appendix I (DEIS) of the draft RMP states that drought letters would be sent to grazing permittees and other land users. Please provide information in Appendix I on what these letters would say, and what follow up in management would occur with these letters, including actions by the land users, if required.

Similarly, Appendix I (DEIS) states that under severe drought conditions (D2), the BLM will "prepare local seasonal precipitation graphs." Please explain how "local" are these graphs, how many of these are prepared within the planning area, how the data are collected that are used in these graphs, and what is done with the graphs after they are prepared.

Also, Appendix I (DEIS) states that under extreme drought conditions (D3), OHV Open Areas and designated routes would be temporarily closed. Please explain what conditions would allow these areas to be re-opened, and what a reasonable timeline for that reopening would look like. #30])>
<([#31 [37.1] C. Right Of Way (ROW) Concerns - The draft RMP does not adequately protect surface water quality from development impacts including increased sedimentation, pollutants, etc.

The WSCC is concerned that the preferred alternative does not protect surface water quality from surface activities as determined by Right of Way. ROW buffers outlined under the agency's

preferred alternative D fall far short of the protections needed to meet goals and objectives for surface water quality throughout the draft RMP. The WSCC recommends that the BLM adopt the guidelines expressed in alternative B and B1 for ROW buffers. The following actions are examples of inadequate protections as outlined in the agency preferred alternative D and recommendations for modification.

* (Table 2-2, Action 45) Alternative B designates a ROW avoidance area within 0.25 miles along major river corridors. However, the agency preferred alternative D is "no action". Though ROW exclusion of major river corridors is infeasible, it is recommended that the BLM adopt ROW avoidance areas outlined in Alternative B to meet the agency objectives.

* (Table 2-2, Action 46) The agency preferred alternative would manage a 325-foot buffer along perennial streams as ROW avoidance areas as the preferred alternative. Alternative B would manage a 325-foot buffer along perennial streams as ROW exclusion areas. The WSCC is concerned that perennial streams will be impacted by the construction and use of roads, pipelines, etc. While these areas would be operated with stipulation, by managing the areas as avoidance areas some perennial streams would ultimately be adversely impacted by the construction and development of roads, pipelines, and utility lines, etc. It is recommended that these impacts be avoided by managing the area according to Alternative B as an exclusion area. (Vol. I, Table 2-2: Action 45, 46, 49, 493, 494); (Vol. II: 4-90, 4-93, 4-97, 4-99, 4-100)

* (Table 2-2, Action 75-84) The ROW protections in the agency's preferred alternative D for Riparian and Wetland areas as described in Table 2-2, are not adequate to meet the corresponding Objective 74. For example: In addition to the action proposed in alternative D, there needs to be a ROW "exclusion" in the naturally occurring riparian and wetland areas, seeps, and springs instead of an ROW "avoidance" buffer.

* (Table 2-2, Action 49) Alternative D manages lands within 1,000 feet of a surface water supply- stream segment as ROW avoidance areas. Alternative B manages lands within 2,640 (.5 mile) of a supply stream segment as ROW exclusion areas. As listed above in section II.3, until clarification supported by the best available science is given for the otherwise arbitrary buffer distance of "1,000ft," the WSCC recommends that the BLM adopt the ROW buffers outlined in alternatives B and B.1 as they are specific to the needs of each particular use

* (Table 2-2, Action 26) The overall goal for land health as stated in Table 2-2 is to "Manage soils, riparian- wetland areas, native plant and animal communities, special status species, and water quality to meet land standards". However, the corresponding actions do not support the objectives outlined to meet that goal. For example: It is stated in Action 26 "Limit, modify, or manage the cause..." It is suggested that the BLM should add "Close" to these management actions in Alternative D in order to fully meet the goal for land health as described in Table 2-2. #31])>

<([#32 [15.2] [14.1.1] D. Special Status Species, Wildlife & Vegetation (Aquatic and Riparian)

The draft RMP does not adequately protect fish from adverse surface activity. The WSCC is concerned the BLM has not taken sufficient measures within the draft RMP to protect and support and growth of fisheries within the UFO. Inadequate buffers zones described in the agency's preferred alternative D for ROW, surface use, and travel management are pervasive throughout the draft RMP. It is imperative that the BLM protect special status fish and aquatic wildlife by recognizing that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters as priority habitats (Action 133, Alt. B).

Furthermore, it is vitally important that the BLM protect federally listed fish species, maintain the integrity of habitat for federally listed species, and promote their recovery by prohibiting surface occupancy and restricting all ground disturbances within one mile of federally listed fish occupied habitat as described in Action 147, Alt. B; Appendix B, B-24.

The WSCC has found that throughout the draft RMP there are multiple areas where the agency preferred alternative leaves far too much uncertainty in its prescribed actions. For example, in Table 2-2, action 99, the preferred alternative dictates that the action "pursue opportunities to enhance, protect or restore native aquatic species habitat". The word "Pursue" allows for incompletion of the presented objective of the action. However, Alternative B dictates precise actions to enhance protect and restore native aquatic species habitat' The WSCC recommends the BLM adopt actions described in alternative B to protect habitat for fisheries and aquatic animals by enhancing, protecting, and restoring at least 5 miles of aquatic habitat by doing things like modifying or removing fish migration barriers and improving stream vegetation and structure to benefit non-game native species (Action 99, Alt. B) and thereby achieve the intended objective.
#32])>
E. Best Management Practices and Standard Operating Procedures not adequate for protecting Water Resources

In the draft RMP's discussion of Best Management Practices and Standard Operating Procedures, it does not provide adequate information regarding these practices and procedures in order to assess mitigation of impacts to water resources within the planning area.

<([#33 [37.3] 1. Road construction and management

Please address the management of the construction of permanent and semi-permanent roads as related to Forestry and Woodland Products. It is noted that in Table 2-2, Action 270, that there doesn't seem to be any action under Forestry and Woodland Products that addresses the construction of permanent or semi- permanent roads, and the corresponding impacts to surface water and stream bodies. (DEIS 2.4.91 and 2.4.97)
#33])>
<([#34 [32.1] Also, the draft RMP does not sufficiently explain how the BLM will prevent "using roads during wet periods if use will damage the road drainage features?" (DEIS G-10). WSCC members have observed that historically the BLM continually fails to close roads during wet periods, and BLM roads are substantially damaged by heavy rutting caused by use during said wet periods.
#34])>
<([#35 [3] 2. Water – Oil and Gas

In Appendix G, the WSCC suggests that the word "should" be replaced by "is required to" or "will" to make it clear that the BMPs and SOPs listed in this section are required by BLM rather than suggested (DEIS G-10).
#35])>
<([#36 [34.5] 3. Vegetation – Riparian

Please describe the methods to be used by BLM or land users to minimize livestock grazing and trailing impacts in riparian areas (DEIS G-13).
#36])>
<([#37 [3] 4. Forestry – Best Management Practices

It is suggested that the bullet that states "perform construction, installation, and removal work during low- water flow if circumstances allow" be changed to state that all instream and near-stream work be performed during low water flows. (DEIS G-28)
#37])>
<([#38 [3] 5. Reducing Fluid Mineral Development Footprint

It is stated that drilling will be done with closed loop systems as much as possible within municipal watersheds, and that the operator will develop and implement a Watershed Protection Plan in municipal watersheds. Within the UFO area, there are numerous private water companies whose watersheds also need protection to ensure that their drinking water supplies are not impaired and human health is not adversely affected. It is suggested that the bullets on page G-34 that refer to municipal watersheds be changed to say "in watersheds used to supply water to public or private domestic water systems…" (DEIS G-34)
#38])>
III) Additional specific concerns regarding the Preferred Alternative and support for protective management prescriptions in the draft Resource Management Plan

In addition to the concerns and recommendations already outlined in these comments regarding the North Fork Alternative, B1, and water resources in the planning area, the WSCC would like to address concerns related to other resources not otherwise mentioned, and provide support for corresponding prescription recommendations.

<([#39 [30.3] A. Socio-economics

We have clearly state in Part I of these comments why the North Fork Alternative, B1, is the only alternative in the draft RMP that would adequately protect against the negative socio-economic impacts of oil and gas activities within the North Fork planning area.

This support notwithstanding, we strongly urge the BLM to include in the final RMP more robust analysis on socio-economic impacts from oil and gas development within the full Uncompahgre planning area. The U.S. Bureau of Land Management should ensure that management of public lands do not harm, but rather enhance, the economic opportunities that exist within the Uncompahgre planning area by working to maintain the area's current character, visual and scenic resources, clean air and water, non- industrialized public lands and recreational trails and access.
#39])>
<([#40 [30.2] 1. Economic sectors to be included in full socio-economic analysis.

The final RMP should provide protections that enhance the following inputs into the economies of the Uncompahgre planning area:

BLM_0156441

Trails-based and River Recreation

Colorado is emerging as a leader in the recreation economy, and both nonmotorized (i.e. hiking, trail running, mountain biking, etc.) and motorized (snowmobiling, OHV, etc.) trail-based recreation on Colorado's public lands contribute millions of dollars into local economies. River recreation is a growing opportunity in the North Fork, one being increasingly prioritized by area communities and stakeholders. The North Fork Alternative provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area.[45]
[Footnote 45] "Colorado emerging as a national leader in developing a recreational-based economy," Denver Post June 5, 2016 "The Economic Value of Quiet Recreation on BLM Lands: Colorado," Pew Charitable Trust fact sheet,
www.pewtrusts.org/~/media/assets/2016/03/wli_co_quietrec_final.pdf?la=en.

Hunting and Angling

Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The North Fork Alternative would prohibit any surface occupancy in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.[46]
[Footnote 46] "Big game hunting pours massive money into state, regional economy," Glenwood Springs Post Independent, October 25, 2015 www.postindependent.com/news/local/big-game-hunting-pours-massive-money-into-state-regional-economy/. "Colorado Parks & Wildlife 2016 Fact Sheet," at http://cpw.state.co.us/Documents/About/Reports/StatewideFactSheet.pdf

North Fork Valley Festivals and Events

Festivals and events, including agritourism-related activities like the West Elk Wine Trail, farm-to-field dining, car, bike and motorcycle rallies, races, and groups rides, community festivals (like Cherry Days, the Harvest Festival, Pioneer Days, Sheep Camp Stock Dog Trials in Hotchkiss) rely in part on the characteristics provided by the small town atmosphere and undeveloped public lands in and around our valley. The North Fork Alternative prohibits leasing and development on the edges of towns and away from farms and residences, schools, parks, and community facilities.[47]
[Footnote 47] "Annual Festivals & Events," North Fork Visitors Guide, at www.northforkvisitorguide.com/annual-festivals--events.html. Behind the Vines: Stone Cottage Cellars, 5280 Magazine, June 30 2016 at www.5280.com/digital/2016/06/behind-vines-stone-cottage-cellars

Windshield Tourism

The North Fork Valley sits at the very heart of the West Elk Loop Scenic Byway, world renowned for its scenery and rural character, called "the closest you can come to a wilderness experience in a passenger car." Oil and gas development could jeopardize the scenic qualities of the area. The North Fork Alternative includes the strongest protections for the Valley's scenic

BLM_0156442

features.[48]
[Footnote 48] "Scenic Byways of Colorado: West Elk Scenic and Historic Byway,"
GrandCircle.org at http://www.grandcircle.org/scenic- byways/scenic-byways-of-colorado/324-
west-elk-scenic-and-historic-byway

Agritourism

Agritourism relies on a character inherent in the place, the North Fork Valley in this case, which
is home to the West Elk Wine region and has been called America's Provenance, Colorado's
Farm-to-Table Capital, and other laudatory titles. That character would be jeopardized by
industrialization that accompanies oil and gas development. Alternative B1 requires development
setbacks from agricultural lands, prevents damage to visual qualities, and best preserves the
current rural character of the valley.[49]
[Footnote 49] "Agritourism in the North Fork Valley Is Blooming," Slow Food Western Slope,
July 18 2014 at http://slowfoodwesternslope.org/agritourism-in-the-north-fork-valley-is-
blooming/. "Agritourism," Delta County Tourism Cabinet, at
http://www.deltacountycolorado.com/about/agritourism.aspx

Farming, Ranching and Food-based Enterprise

Agriculture remains the dominant force in the valley, known for its concentration of organic and
sustainable farms, orchards, and ranches. The brand that food-based enterprise already in the
North Fork Valley relies on is its reputation for high quality, organic or natural products. This
North Fork brand has been acknowledged widely throughout the state and region, including in a
recent federally funded economic study for Delta County completed by Better Cities. [50]
Impacts to agriculture from the management of nearby and adjacent public lands, which include
water conveyances for, lie upslope, and otherwise directly impact farms and private lands from
oil and gas development poses a legitimate concern and potential, if uncertain, threat.
[Footnote 50] "Shale Development and Agriculture, Agricultural and Applied Economics
Association," 2014 at http://www.choicesmagazine.org/choices-magazine/theme-articles/is-the-
natural-gas-revolution-all-its-fracked-up-to-be-for- local-economies/shale-development-and-
agriculture. "Economic opportunities lie in ag, tourism and manufacturing," Delta County
Independent, August 25, 2015.

Creative Industries

The North Fork Valley is an emerging hotspot for the creative industries—from musicians and
poets, founders, sculptures and glassblowers, to authors, playwrights, photographers and
painters—and is Colorado's only rural state-designated Creative District. The agricultural roots
and bucolic character of the valley are primary components of what makes the North Fork a
uniquely inspirational base for a growing creative community.[51]
[Footnote 51] "Supporting the Creative Industries of Colorado's North Fork Valley," North Fork
Valley Creative Coalition at http://northforkcreative.org/

Footloose Economy

BLM_0156443

Economic activity that follows quality-of-life cannot not be understated in quantifying value of nearby public lands. This is especially true for the North Fork, due to the outstanding opportunities to access top quality public lands and the spectacular backdrop these lands provide our community, paired with the other initiatives happening in the valley. This includes current efforts to bring a food enterprise hub, new educational facilities, and gigabyte speed broadband. Combined these efforts at economic development can continue to attract consultants, start-up entrepreneurs, educators and students, creative industries such as photography, art, design, and music, tele-commuters, and many other of the self-employed—all drawn to the area's high quality of life, rural and healthy environment, and adjacent non-industrialized public lands. The North Fork Alternative goes furthest in protecting and maintaining these features.[52]
[Footnote 52] "Understanding the Recreation Economy on Nearby Public Lands," Headwaters Economic white paper, November 2014 at http://headwaterseconomics.org/public-lands/insights-understanding-the-recreation-economy/. "Colorado: Assessing the Economic Value of Public Lands," OurPubliclnds.org at www.ourpubliclands.org/public-lands-report-co. "Western Public Lands," Wilburforce Foundation, September 2014 at www.wilburforce.org/files/western-lands-messaging- report/at_download/file

Real Estate

Real estate sales in the North Fork Valley continue to be driven be those seeking a rural, non-industrial, and agricultural lifestyle. "The argument repeated many times was that gas development on public lands this close to organic farms and wineries who are marketing the healthy setting and perceived purity of their production as well as the product itself, is incompatible and would result in the federal government willfully vandalizing a local economy. A group of area realtors filed a joint protest that echoed this thought." [53]
[Footnote 53] "BLM Deadline Passes – The Valley Waits to See Results of Protests," Merchant Herald, December 2012 at www.merchantherald.com/blm-deadline-passes-the-valley-waits-to-see-results-of-protests/

2. The RMP does not adequately take into account economic trends such as the decline of local coal production

The BLM has not completed the necessary research needed to develop an accurate economic impact study. It is recommended the BLM reconsider their assumption for mineral development with regards to coal extraction. Specifically, in the Somerset coal field in order to take into account market forces that have caused coal mines to close. This will change the results of the economic impact study in regards to anticipated economies and population growth in the next 20 years. (Vol II, paragraph 2, 4-458, Paragraph 2, 4-457)
#40])>
<([#41 [10.4] B. Air Quality

1. Cumulative Air Quality Impacts

Impacts to air quality begin when the first exploratory well is drilled—according to some recent studies, including research by Paonia-based The Endocrine Disruptor Exchange, according to an article in the Glenwood Springs Post-Independent ("Study calls for scrutiny of air emissions at

gas well sites" November 20, 2012).

These effects continue and build cumulatively in regards to other oil and gas activity in the region. Communities in the West that are near BLM lands subject to oil and gas development are seeing significant problems with winter smog, believed to be—in large part—caused by federal leasing of these lands for oil and gas. But the draft RMP does incorporate adequate data collected from relevant state and federal agencies, including the Colorado Oil and Gas Conservation Commission (COGCC) before determining final management actions.

The lack of cumulative air analysis was at the heart of a recent decision by the BLM-Uncompahgre Office to complete an EIS for the Bull Mountain Master Development Plan,[54] located within the upper North Fork Watershed. The air quality analysis in the Bull Mountain MDP FEIS has not yet been incorporated into the draft RMP's discussion of environmental consequences of the alternatives nor the cumulative impacts of regional oil and gas activity on air quality.
[Footnote 54] BLM Bull Mountain MDP FEIS 2016. 4.2.1
http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html

BLM has lost in court on several notable occasions of late on very similar issues: its failure to consider the impacts on air quality of leasing lands for oil and gas development given the other activity it is permitting in the region. Notably, a federal judge sent the Roan Plateau RMP amendment back to the BLM due to these concerns (and due to the failure of the agency to adequately consider an alternative management plan put forward by local stakeholders).

The clean and usually clear air of the North Fork Valley is a high quality community and shared resource. The BLM in Colorado has already been brought to task on its failure to properly consider the cumulative impacts of its own actions on the region's air quality, particularly in regards to oil and gas leasing. This has happened elsewhere as well, like at Otero Mesa in New Mexico. The final RMP revision that properly considers this activity in relation to the area's air quality.

The draft RMP states explicitly that oil and gas development are a major contributor to total pollutant emissions:
Emissions from oil and gas (fluid minerals) development are a major contributor to total estimated emissions under all alternatives. For the Uncompahgre planning area, this category includes conventional oil and gas and coalbed natural gas development. Activities quantified in this category include well drilling and completion, road and well pad construction, flaring and venting, compressor operations, dehydrator and separator operations, tank venting and load out, wellhead fugitives, pneumatic device operations, and vehicle traffic. The quantities of emissions estimated from these activities are based on reasonably foreseeable estimates of development rates, well counts, production rates, and existing technologies. (DEIS 4-25)

It also states that Alternative B1 would produce the lowest level of emissions, followed by Alternative B. The draft RMP simultaneously states plainly that emissions from all four alternatives included in the draft RMP could produce a number of negative impacts to local air quality and corresponding public health:

BLM_0156445

estimated emissions from oil and gas development would increase for all pollutants over the base year due to increased development. The emissions of carbon monoxide, nitrogen oxide, sulfur dioxide, volatile organic compounds, and particulate matter could impact air quality and air quality-related values. Nitrogen oxide and volatile organic compound emissions could contribute to regional ozone formation. The CARMMS analysis presented below estimates these emissions sources' impacts on air quality (including potential ozone formation) and air quality-related values (visibility and atmospheric deposition) in planning Year 10.

Hazardous air pollutants emissions could increase the risk of localized human health impacts. (DEIS 4-37)

The unknown risks to local human health impacts of air pollutant emissions is unacceptable, and the BLM must include in the final plan adequate management of oil and gas leasing, including significant no leasing and no surface occupancy stipulations to safeguard the health of community members and residents who live within the Uncompahgre planning area. #41])>

<([#42 [22.5] [11.5] 2. Methane Capture in the North Fork Valley

The Western Slope Conservation Center believes the final RMP must take into account possible changes related to the Coal Leasing PEIS that the Department of the Interior is currently undertaking. The DOI will be mitigating the challenges our communities face in weathering the boom-bust cycles of mining which will require the highest degree of reclamation standards, full bonding (not self-bonding) for future reclamation activities, thorough analysis of all impacts to air, water and wildlife prior to issuing new leases, and assurance of a fair return from coal leasing.

One additional step that the BLM and DOI can take over the coming years is to incentivize and expedite the capture of coal mine methane, which the North Fork produces in excess. The OxBow mine coal methane recapture demonstration project is the ideal example.[55] It repurposes coal mine methane (CMM) gas, an unseen, toxic greenhouse gas, between 20-25 times more potent than carbon dioxide, into 3- megawatts of electricity for Aspen Ski Corporation. The project is at the now-closed OxBow Elk Creek mine in Somerset. It was collaboration between the Western Slope Conservation Center, a 501c3 non- profit organization headquartered in Paonia, Colorado, OxBow Delta Montrose Electric (DMEA), Holy Cross Electric, Aspen Ski Company, and mine that purchases the electricity, the BLM and others. It is expected to eliminate approximately 96,000 tons of $CO_2$ a year, with a projected life of at least 15 years.[56]

[Footnote 55] Aspen Times. "Coal Mine Is Key to Utility's 'Green' Goals." April 5, 2012. Retrieved June 25, 2016.

[Footnote 56] Ray, Kecia. The Invisible Plume/ Why coal mine methane is worth looking at. Colorado Independent. May 2, 2016. Retrieved Jul 10, 2016.

On June 18, 2016, the Federal Energy Regulatory Commission ruled in favor of DMEA, the local rural electric COOP. It struck down a "lost revenue recovery fee" imposed by Tri-State Generation & Transmission Association (Tri-State) reaffirming that DMEA couldn't be financially disadvantaged for following the law and purchasing local, renewable power.[57] This opens the door for DMEA to purchase locally recaptured CMM. This would meet member

demands for clean energy, hedge against fossil-fuel price increases, promote economic development, and save money.
[Footnote 57] Federal Energy Regulatory Commission Summary, June 16, 2016 Meeting

In many ways, the North Fork is a best-case scenario for coal mining communities. North Fork mines produce some of the cleanest burning coal in the country. Our communities have benefited from this wealth over many decades without sacrificing the other riches that our local land, water, and air provide. That, coupled with the methane recapture project and the methane off-gassing from our closed and operational mines, puts us in an excellent position for the federal government to leverage us as a methane recapture research and training site. It could create training and jobs for some displaced miners while diversifying our local economy and energy generation.

The North Fork also possesses a wealth of other renewable energy sources like micro-hydro, solar and biomass. Public lands that once extracted coal could become solar farms, as the infrastructure to transport this source of energy already exists at those sites. We would welcome an opportunity to pilot some innovative ways to leverage those sources of energy for our homes, farms, businesses, government and community centers. This could similarly diversity our economy, create new jobs and realize the mass potential for renewable energies.

The final RMP must include adequate analysis of the air quality, climate change, and social costs of coal mine methane venting. These impacts are local, regional, and national. As our above comments attest, the North Fork Valley is primed to benefit massively from improved methane capture administrative policy.

The final RMP should also include stipulations that allow for coal mine methane drilling while excluding other forms of fluid mineral leasing and withdrawal associated with oil and gas development. However, the Western Slope Conservation Center believes coal bed methane leasing and extraction, which would occur above coal seams that have not yet been mined, should be subject to all the same standards and stipulations of other fluid mineral leasing and development.
#42])>
<([#43 [5.6] [16.3] [15.4] C. Wildlife

1. Imperiled Species

Oil and gas exploration and development authorized through the Preferred Alternative in the draft RMP is likely to have negative impacts on several special status species. Federally listed threatened, endangered or candidate species that could occur or have potential habitat in the vicinity of lands open to leasing include Canada lynx, Gunnison Sage-grouse, greenback cutthroat trout and Colorado hookless cactus. Other special status species that could be impacted by the lease sale include white-tailed prairie dogs, clay-loving wild buckwheat, roundtail chub and Debeque milkvetch. BLM has not taken the requisite hard look at the impacts of unconventional oil and gas development on wildlife, including threatened and endangered species, and other sensitive species. BLM's existing analysis in the draft RMP does not fulfill the requirements of NEPA to assess the impacts of oil and gas leasing on these species. Nor do the

BLM_0156447

CSU's as included in the Preferred Alternative adequately protect the following species from adverse impacts from surface activities, and primarily those surface activities related to leasing of oil and gas.
#43])>
<([#44 [15.4] 1. Canada Lynx

The Canada lynx (Lynx canadensis) is a Federally Listed Threatened species and Colorado Parks and Wildlife (CPW) Endangered Species. The BLM has previously identified Lynx potential habitat, which also contains lynx winter habitat. Lynx Analysis Units (LAUs) have also been identified. In spite of the potential for negative impacts on lynx that could result from leasing within the planning area, BLM failed to prepare sufficient NEPA analysis of the impacts on lynx from leasing, failed to include No Surface Occupancy or No Leasing stipulations to protect lynx habitat.

During scoping for recent lease sales located within the North Fork Valley, comments were submitted by the U.S. Fish and Wildlife Service (FWS) expressing concern with the lease sale's potential impacts to lynx. The FWS determined that several lease parcels abutted primary and secondary suitable habitat for lynx. The Service stated that "[t]o date, BLM has not updated their mapping or assessment of habitat suitability for Canada lynx. Therefore, these parcels, and others, should be evaluated for suitability for Canada lynx prior to leasing." BLM has not undertaken the requisite evaluation of the lands included for leasing in the Preferred Alternative, and must provide No Surface Occupancy and No Leasing stipulations until it can determine that leasing and development will not jeopardize the species.

In 2000, when FWS concluded that listing the lynx as a threatened species under the ESA was warranted, it identified inadequate regulatory mechanisms in existing RMPs as a primary factor contributing to the lynx's decline. Recognizing this, the UFO's draft Preferred Alternative of the RMP revision proposes new stipulations for Canada lynx habitat that are not included in the 1989 RMP. Alternative B, however, provides the most protective stipulations, and should be included in the final RMP.

In this case, leasing without non-waivable NSO stipulations could result in jeopardy to lynx. Thus any future proposed leasing would require consultation with the FWS. Leasing any parcels in lynx habitat would violate the ESA, and these lands should be protected with No Surface Occupancy or No Leasing for the BLM to meet its obligations under the ESA.
#44])>
<([#45 [15.2] 2. Gunnison Sage-grouse

We support protective non-waivable NSO and No Leasing stipulations for all seasonal Gunnison sage-grouse habitat, as included in Alternative B.

Recent research indicates that all Gunnison Sage-grouse populations must be increased in size in order to avoid inbreeding depression and/or maintain adaptive potential and avoid increased extinction risk. It is now widely agreed that it will be necessary to maintain large expanses of suitable sagebrush habitat across the landscape to conserve populations. As such, BLM must consider what impacts leasing and development on suitable, former Gunnison Sage-grouse

habitat would have on ongoing efforts to save this species from the brink of extinction. The Gunnison Sage-grouse Rangewide Conservation Plan states that "the issues of primary focus for [the Crawford] population are habitat enhancement and restoration, expansion of occupied habitat, and protection of habitat from permanent loss, especially in potential areas of expansion," and that "expansion of the area occupied by sage-grouse is necessary in this population in order to meet population goals."

All parcels with Historic or Potential Gunnison Sage-grouse habitat should be protected with non- waivable NSO or No Leasing stipulations in the final RMP.
#45])>
<([#46 [15.2] 4. Colorado Hookless Cactus

The draft RMP includes extensive description of documented existence of Colorado hookless cactus, a federally-listed threatened species, within the planning area, including in areas that would remain open to oil and gas leasing under the draft Preferred Alternative. The draft RMP also indicates that some individuals are being impacted by OHC use in the North Delta area (DEIS 3-115). For this reason, the BLM must include the Adobe Badlands LWC, Adobe Ecological Emphasis Area, and the Salt Desert Shrub Ecosystem ACEC in the final RMP.
#46])>
<([#47 [16.1] 5. White-tailed Prairie Dog

Active White-tailed Prairie Dog colonies occur within lands open to oil and gas leasing in the Preferred Alternative. The White-tailed Prairie Dog is a USFS Sensitive Species and Colorado BLM Sensitive Species. We support non-waivable stipulations, including NSO-41, that includes No Surface Occupancy and No Leasing within close proximity to active prairie dog colonies.
#47])>
<([#48 [15.2] 6. Clay-loving Wild Buckwheat

The draft RMP states that clay-loving wild buckwheat is found within the planning area, and we support the proposed Action 20. in Alternative B:
Seven ACECs (92,900 acres) would be designated to protect special status and rare plants (Colorado hookless cactus, clay-loving wild buckwheat, Adobe Hills beardtongue, Colorado desert parsley, good-neighbor bladderpod, kachina daisy, Naturita milkvetch, Paradox Valley lupine, Paradox breadroot, and Grand Junction milkvetch), the most of any alternative. OHVs would be limited to designated trails on portions of the Kinikin Hills SRMA, where there are clay-loving wild buckwheat populations.

Any lesser protection would be inadequate to protect clay-loving wild buckwheat and other special status species within the planning area.
#48])>
<([#49 [16.1] 8. Debeque Milkvetch

The UFO planning area contains populations of Debeque Milkvetch, a Colorado BLM Sensitive plant. In spite of this recognition, the draft RMP does not analyze or recommend any substantive protections for the species. BLM should survey the planning area for Debeque milkvetch to determine whether the species is present, with corresponding stipulations added for protections.

#49])>
<([#50 [14.1.3] B. Areas of High Conservation Value

Oil and gas exploration and development related to oil and gas leasing allowed in the Preferred Alternative is likely to have significant negative impacts on numerous areas of high conservation value, including elk winter range, mule deer winter range, and the Roeber and McCluskey State Wildlife Areas.

1. Big Game Winter Range

The final RMP must take into account significant new research demonstrating the effects of natural gas development on wildlife. See comments on Ecological Emphasis Areas. We commend the BLM for designating Ecological Emphasis Areas and encourage their inclusion in the final plan.

Critical big game winter range is dispersed across much of the land open to oil and gas leasing in the North Fork in the Preferred Alternative. The North Fork's deer and elk populations are vital for the local economy, and a key component of the landscape's ecosystem health.

We ask that the final RMP include additional analysis regarding the impacts on terrestrial wildlife habitat from oil and gas development specifically. Development across BLM lands in the North Fork particularly would result in additional roads, pipelines, habitat loss, fences and increased human disturbance on winter ranges used by thousands of elk and mule deer. BLM must determine how, when and to what degree elk and mule deer populations would be impacted. Reduction in effective winter range size caused by extensive oil and gas development in the North Fork cold increase deer density on remaining winter ranges, reducing forage quality, fawn survival and overwinter carrying capacity. Given the quality of big game habitat within the proposed lease parcels and the social and economic importance of hunting to the North Fork communities, it would be a travesty to rely on inadequate analysis.
#50])>
<([#51 [27.3] [21.1] 3. Roeber and McCluskey State Wildlife Area

The leasing of lands adjacent to McCluskey and Roeber State Wildlife Areas is inappropriate. McCluskey SWA is popular for hunting deer, elk, dusky grouse and rabbit. Roeber SWA is a popular location for hunting deer, elk and rabbit, and for fishing in the cold water lake. State wildlife areas are paid for by revenue from sportsmen and under state law, Colorado Parks and Wildlife (CPW) is required to manage the areas for the benefit of wildlife. However, activities that conflict with the primary mission of providing wildlife recreation on State Wildlife Areas are discouraged. Oil and gas development adjacent to these protected areas could have negative impacts on the wildlife and recreational opportunities for which the lands have been set aside.
#51])>
<([#52 [6.1] [20.1] D. Lands with Wilderness Characteristics

We appreciate that BLM has inventoried lands with wilderness characteristics in the planning area and that the Draft RMP considers multiple alternatives to protectively manage those lands. Specifically, we are particularly concerned with the Adobe Badlands WSA Adjacent and Camel

Backs WSA Adjacent units, both of which have been partially included within Alternative B to be Lands Managed to Protect Wilderness Characteristics (LWCs). We strongly support all acres of these units to be included as LWCs within the final plan.

We recognize that the Uncompahgre Field Office has been a leader in Colorado in regards to complying with the updated inventory requirements, as the field office publicly posted inventory information in a timely fashion when the new policy was released and refined that information in 2015 to better align with BLM Manual 6310. We value the UFO's commitment to addressing this resource through the RMP revision. However, BLM should make some adjustments in the draft RMP to better comply with agency policy, and the agency's obligations under FLPMA and NEPA, to achieve a more balanced land use plan that embodies multiple use and sustained yield.

FLPMA requires BLM to inventory and consider lands with wilderness characteristics during the land use planning process. 43 U.S.C. § 1711(a); see also Ore. Natural Desert Ass'n v. BLM, 625 F.3d 1092, 1122 (9th Cir. 2008) (holding that "wilderness characteristics are among the values the FLPMA specifically assigns to the BLM to manage in land use plans).[58] IM 2011-154 and Manuals 6310 and 6320 contain mandatory guidance on implementing that requirement. The IM directs BLM to "conduct and maintain inventories regarding the presence or absence of wilderness characteristics, and to consider identified lands with wilderness characteristics in land use plans and when analyzing projects under [NEPA]." This includes the "necessary forms for each area" including photo logs, route analysis forms and inventory area evaluations (Manual 6310, Appendices A-D). Manual 6310 reiterates that, "[r]egardless of past inventory, the BLM must maintain and update as necessary, its inventory of wilderness resources on public lands." Manual 6320 requires BLM to consider lands with wilderness characteristics in land use planning, both in evaluating the impacts of management alternatives on lands with wilderness characteristics and in evaluating alternatives that would protect those values. Wilderness inventories are to be done on a continuing basis and relevant citizen-submitted data is to be evaluated. BLM Manual 6310 at .04(C)(1).

[Footnote 58] In an April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and the State of Utah, the BLM abdicated its authority to designate any additional WSAs, and we maintain that this agreement is invalid and will ultimately be overturned. In addition, the Utah Settlement is based on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with BLM Manual 6330. This administration has the authority to create new WSAs under § 202 and BLM should be considering this within its range of reasonable alternatives that are deserving of consideration in this NEPA process. #52])>

1. Inventory

There are a few specific instances in which BLM's LWC inventory is inconsistent with current agency policy. Below are comments addressing where and how BLM's inventory fails to follow the guidance for conducting lands with wilderness characteristics inventories detailed in BLM Manual 6310.

<([#53 [20.2] Adobe Badlands WSA Adjacent

BLM's inventory for the Adobe Badlands LWC unit is 6,200 acres, while partner assessments, submitted in their comments on this draft RMP show the unit to be about 8,200 acres. The major difference is in the far southwest portion of the unit, where BLM drew boundary lines to cut out two portions of the unit (downslope towards the power lines) based on the argument those areas do not have either outstanding opportunities for solitude or primitive recreation. However, these areas are contiguous with the Adobe Badlands WSA, and therefore inherit the outstanding opportunities already identified in the WSA. BLM Manual 6310 provides that if a polygon of land is contiguous with lands currently managed to protect their wilderness character (e.g. WSA) and that contiguous land meets the naturalness criterion, then that naturally appearing contiguous land meets the criteria for LWC because it inherits the outstanding opportunities already identified in the adjacent WSA. BLM Manual 6310 is clear that not every acre needs to have outstanding opportunities, including when the area is contiguous with a WSA: "The area does not have to possess outstanding opportunities for both elements, nor does it need to have outstanding opportunities on every acre, even when an area is contiguous to lands with identified wilderness characteristics." BLM Manual 6310 at .06(C)(2)(c). BLM finds in its inventory report for the Adobe Badlands LWC unit that the eliminated areas are both contiguous with the WSA and natural; therefore, they should qualify as LWC. Furthermore, BLM should not cut out areas that don't have outstanding opportunities; cut outs should be for impacts related to naturalness only according to BLM Manual 6310.
#53])>

<([#54 [20.2] Camel Back WSA Adjacent

BLM's Camel Back LWC unit only includes lands from the canyon rims down, eliminating obviously qualifying lands on the mesa tops, which may total 1,000-2,000 additional acres. BLM's report for this unit states that BLM removed 1,750 acres on Monitor Mesa for further consideration as lands with wilderness characteristics because of "substantial evidence of human modification" on "most" of Monitor Mesa, including "constructed and maintained routes that run the length of the mesa top" and mechanical vegetative treatments…that are obvious to the casual observer.

However, while two constructed and maintained routes do traverse the length of the mesa top, these routes are easily cherry-stemmed from the larger unit; stating that these routes contribute to "substantial evidence of human modification" across "most of Monitor Mesa" is entirely misleading. These two routes only make up a small portion of the mesa top, and because of significant vegetative screening along there length, they have little impact on the naturalness of the area as a whole.

Further, BLM's claims that "most of" Monitor Mesa "shows substantial evidence of human modification" and that old vegetative treatment areas are "obvious to a casual observer" is factually incorrect. Such statements are an indication that BLM inventoried this area using aerial imagery, rather than on-the- ground investigation.
#54])>

Summary of Comments: BLM should refine the LWC inventory to address the inconsistencies

with BLM Manual 6310 identified above, and should include LWC management status for all acreage of Adobe Badlands WSA Adjacent and Camel Back WSA Adjacent units

<([#55 [5.6] 2. Environmental Consequences Analysis

Manual 6320 provides that BLM must "consider the benefits that may accrue to other resource values and uses as a result of protecting wilderness characteristics." BLM Manual 6320.06(A)(1)(b). Those benefits should be analyzed in the RMP, particularly in the environmental effects analysis. They include the following:

(a) Scenic values – FLPMA specifically identifies "scenic values" as a resource of BLM lands for purposes of inventory and management (43 U.S.C. § 1711(a)), and the unspoiled landscapes of lands with wilderness characteristics generally provide spectacular viewing experiences. The scenic values of these lands will be severely compromised if destructive activities or other visual impairments are permitted.

(b) Recreation – FLPMA also identifies "outdoor recreation" as a valuable resource to be inventoried and managed by BLM. 43 U.S.C. § 1711(a). Lands with wilderness characteristics provide opportunities for primitive recreation, such as hiking, camping, hunting and wildlife viewing. Most, if not all, primitive recreation experiences will be foreclosed or severely impacted if the naturalness and quiet of these lands are not preserved.

(c) Wildlife habitat, connectivity and riparian areas – FLPMA acknowledges the value of wildlife habitat found in public lands and recognizes habitat as an important use. 43 U.S.C. § 1702(c). Due to their unspoiled state, lands with wilderness characteristics provide valuable habitat for wildlife, thereby supporting additional resources and uses of the public lands. As part of their habitat, many species are also dependent on riparian and other wetland habitats, especially during either seasonal migrations or seasons and years when surrounding habitats are dry and unproductive. Wilderness-quality lands support biodiversity, watershed protection and overall healthy ecosystems. In addition, they provide connectivity that facilitates wildlife migration, seasonal movements and dispersal of young. The low route density, absence of development activities and corresponding absence of motorized vehicles, which are integral to wilderness character, also ensure the clean air, clean water and lack of disturbance necessary for productive wildlife habitat, large scale connectivity and riparian areas (which support both wildlife habitat and human uses of water).

(d) Cultural resources – FLPMA also recognizes the importance of "historical values" as part of the resources of the public lands to be protected. 43 U.S.C. § 1702(c). The lack of intensive human access and activity on lands with wilderness characteristics helps to protect these resources. Managing lands to protect wilderness qualities will also help protect cultural and archaeological sites.

(e) Quality of life – The wildlands located within the planning area help to define the character of this area and are an important component of the quality of life for local residents and future generations, providing wilderness values in proximity to the population centers spread across the planning area. Their protection enables the customs and culture of this community to continue.

BLM_0156453

(f) Balanced use – The vast majority of BLM lands are open to motorized use and development. FLPMA recognizes that "multiple use" of the public lands requires "a combination of balanced and diverse resource uses" that includes recreation, watershed, wildlife, fish, and natural scenic and historical values. 43 U.S.C. § 1702(c). FLPMA also requires BLM to prepare land use plans that may limit certain uses in some areas. 43 U.S.C. § 1712. Many other multiple uses of public lands are compatible with protection of wilderness characteristics – in fact, many are enhanced if not dependent on protection of wilderness qualities (such as primitive recreation and wildlife habitat). Protection of wilderness characteristics will benefit many of the other multiple uses and values of BLM lands such as air and water quality, night skies, soundscapes, and viewsheds, while other more exclusionary uses (such as off-road vehicle use and timber harvesting) will still have adequate opportunities on other BLM lands.

(g) Economic benefits – The recreation opportunities provided by wilderness quality lands also yield direct economic benefits to local communities. According to the U.S. Fish & Wildlife Service, in 2011 state residents and non-residents spent $3 billion on wildlife recreation in Colorado.[59] In addition, local communities that protect wildlands reap measurable benefits in terms of employment and personal income. Sonoran Institute 2004. Other "non-market" economic values arise from the ability of wildlands to contribute to recreation and recreation-related jobs, scientific research, scenic viewsheds, biodiversity conservation, and watershed protection. Morton 1999; Loomis 2000. All of these economic benefits are dependent upon adequate protection of the wilderness characteristics of the lands.

[Footnote 59] USFWS 2011, National Survey of Hunting, Fishing and Wildlife-associated Recreation, available at http://www.census.gov/prod/2013pubs/fhw11-co.pdf

We appreciate that the Draft RMP acknowledges in many instances that protecting lands with wilderness characteristics will also protect other resources such as soil, water, vegetation, fish and wildlife, and wild and scenic river ORVs. See, e.g., Uncompahgre Draft RMP at 4-68, 4-91, 4-115, 4-151, 4-414. However, those analyses do not appear to inform the decisions made in the Draft RMP, particularly the preferred alternative, because BLM would only manage 18,320 acres of lands with wilderness characteristics in the preferred alternative – less than 3% of the public land in the planning area. This preferred plan does not reflect BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics.

Additionally, the Draft RMP does not adequately analyze or acknowledge the economic benefits of protecting lands with wilderness characteristics. We appreciate that BLM discusses nonmarket values, including the fact that setting land aside for protection can maintain and enhance nonmarket values associated with natural amenities. Uncompahgre Draft RMP at 4-460. However, the Draft RMP fails to meaningfully analyze nonmarket values, stating: "Nonmarket values are difficult to quantify, and insufficient data exists in order to assess the impacts of management actions." Ibid. The brief and qualitative treatment of nonmarket values in the Draft RMP is not adequate to inform management decisions in the RMP, and does not conform to agency guidance. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics.

BLM has current guidance on estimating nonmarket environmental values and analyzing those

values in land use planning.[60] IM 2013-131 directs BLM to "utilize estimates of nonmarket environmental values in NEPA analysis supporting planning and other decision-making." Nonmarket values are described as values that "reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions and therefore lack prices," such as "the perceived benefit of hiking in wilderness."

[Footnote 60] IM 2013-131, available at: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-131Ch1.print.html.

BLM's guidance directs the agency to analyze nonmarket values for each alternative and adopt management decisions that are informed by that analysis:

In framing information for management decisions, focus on the difference in changes to nonmarket values between action alternatives. Such information can highlight tradeoffs. For example, an alternative designating an additional thirty miles of trails for off-highway vehicles may increase the visitor days of use – therefore the total nonmarket benefits – from motorized recreation, but may decrease the benefits of subsistence hunting and watershed protection in this area. The difference between the changes to nonmarket values between this alternative and an alternative that, for example, only designates an additional ten miles of trails, can inform the choice among action alternatives. IM 2013-131, Attachment 1-5.

The guidance also directs that quantitative analysis of nonmarket values is strongly encouraged when "the alternatives to be considered present a strong contrast between extractive and non-extractive uses of land and resources. For example, an RMP may include alternative resource allocations that vary between managing land primarily for oil and gas development or managing it for habitat conservation and recreation." IM 2013-131, Attachment 1-7. Because the Uncompahgre RMP is evaluating a range of alternatives that has a development-focused alternative at one end of the spectrum and a conservation- focused alternative at the other, this criterion applies to the RMP and BLM should conduct quantitative analysis of nonmarket values.

Summary of Comments: BLM should adopt a final plan that actually reflects BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics. BLM should analyze the economic benefits of protecting lands with wilderness characteristics for each alternative and utilize that analysis to inform the management decisions ultimately adopted in the RMP. #55])>

<([#56 [6.1] [20.2] 3. Management

i. An accurate and comprehensive inventory of lands with wilderness characteristics is necessary to inform management alternatives, impact analysis and decision-making.

Evaluating management alternatives for lands with wilderness characteristics requires an accurate inventory to serve as baseline information. FLPMA requires BLM to inventory the resources of the public lands in order to development management plans. 43 U.S.C. § 1711(a). The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., requires agencies to

"describe the environment of the areas to be affected or created by the alternatives under consideration." See 40 C.F.R. § 1502.15. Establishment of baseline conditions is a requirement of NEPA. In Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

The U.S. Court of Appeals for the Ninth Circuit has held: "wilderness characteristics are among the 'resource and other values' of the public lands to be inventoried under § 1711. BLM's land use plans, which provide for the management of these resources and values, are to 'rely, to the extent it is available, on the inventory of the public lands, their resources, and other values.' 43 U.S.C. § 1712(c)(4)." Ore. Natural Desert Ass'n v. Bureau of Land Management, 531 F.3d at 1119. Therefore, BLM is required to consider "whether, and to what extent, wilderness values are now present in the planning area outside of existing WSAs and, if so, how the Plan should treat land with such values." Id. at 1143.

Conducting an accurate and comprehensive inventory as directed by Manual 6310 is BLM's current policy for establishing the baseline conditions required by NEPA. While we appreciate that the Uncompahgre Field Office has completed lands with wilderness characteristics inventory under BLM Manual 6310, BLM must correct the remaining inconsistencies with the Manual in order to have an inventory that is sufficient to inform land use planning.

Summary of Comments: In order to establish a true set of baseline conditions as required under NEPA, BLM must refine its lands with wilderness characteristics to fully comply with BLM Manual 6310 in order to adequately evaluate management alternatives and environmental consequences in the Uncompahgre RMP.
#56])>
<([#57 [20.1] [6] ii. BLM should manage additional lands to protect their wilderness characteristics in the final RMP in order to meet its statutory and regulatory obligations.

Although the BLM identified 42,150 acres of lands with wilderness characteristics, the preferred alternative would only manage 18,320 acres to protect those values. This is less than half of the inventoried wilderness resource and less than 3% of the public land in the planning area. This approach does not evidence a meaningful consideration of the value of this important resource in the planning area or balanced land management.

FLPMA directs BLM to inventory for the many values of the public lands and consider ways to protect them in the RMP (i.e., not all uses are appropriate in all places). 43 U.S.C. §§ 1711, 1712. FLPMA further requires that: "In managing the public lands the [Secretary of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. §1732(b) (emphasis added). BLM's duty to prevent unnecessary or undue degradation under FLPMA is mandatory, and BLM must, at a minimum, demonstrate compliance with this standard. See, Sierra Club v. Hodel, 848 F.2d 1068, 1075 (10th Cir. 1988). As the court found in Mineral Policy Center v. Norton, "in enacting FLPMA,

Congress's intent was clear: Interior is to prevent, not only unnecessary degradation, but also degradation that, while necessary to mining, is undue or excessive." 292 F.Supp.2d 30 (D.D.C. 2003) (emphasis added). Further: "FLPMA, by its plain terms, vests the Secretary of the Interior with the authority—and indeed the obligation—to disapprove of an otherwise permissible mining operation because the operation though necessary for mining, would unduly harm or degrade the public land." Id. at 20.

Protecting all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office is arguably appropriate to prevent unnecessary and/or undue degradation to wilderness resources on the public lands. BLM has not shown that such a decision is infeasible. Accordingly, BLM is under a statutory obligation to demonstrate compliance with FLPMA's requirement to not cause undue or unnecessary degradation to important resources. See e.g., Kendall's Concerned Area Residents, 129 IBLA 130, 138 (1994). In fact, declining to manage the reasonable amount of land BLM has found to possess wilderness characteristics could be a choice not to avoid unnecessary or undue degradation. BLM should discuss a variety of options to protect this important resource, including through explicitly managing to protect wilderness characteristics.
#57])>
<([#58 [20.1] BLM also is not in compliance with its regulations regarding off-road vehicles in the management alternatives under consideration in the Draft RMP. While Alternative B would close lands managed to protect wilderness characteristics to off-road vehicle use, the preferred alternative would limit motorized travel to designated routes. Uncompahgre Draft RMP at 2-149. In allowing ORV use to be designated as limited in lands with wilderness characteristics, the Draft RMP is in direct violation of Executive Orders and agency regulations implementing these Orders. Executive Orders (EO No. 11644 (1972)) as amended by Executive Order No. 11989 (1977)) and the BLM's regulations (43 C.F.R. § 8342.1) require BLM to ensure that areas and trails for off-road vehicle use are located:
* to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability; to minimize harassment of wildlife or significant disruption of wildlife habitats, and especially for protection of endangered or threatened species and their habitats;
* to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands; and
* outside officially designated wilderness areas or primitive areas and in natural areas only if the agency determines that off-road vehicle use will not adversely affect their natural, aesthetic, scenic, or other values for which such areas are established.

These Executive Orders put the burden of proof on the BLM to make sure that sensitive and protected conservation lands are not harmed by ORV use. Given the small amount of public land managed to protect wilderness characteristics, and the high likelihood of off-road vehicle use causing conflict with quiet recreation experiences and other public lands resources that benefit from protected lands with wilderness characteristics, these areas should be closed to ORV use.
#58])>
<([#59 [20.1] Furthermore, BLM should maximize protection of wilderness characteristics through layering management, as contemplated in several areas in the Draft RMP. Layering management that protects a variety of resources is an important tool that BLM consistently uses.

Protection of wilderness characteristics can be effective as a standalone management approach but is also effective along with designation of ACECs and other conservation-oriented designations, as well as portions of special and extensive recreation management areas.

In the RMP for the Monticello Field Office, BLM responded to resistance to layering designations in the following appropriate way:

"Layering" is planning. Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands. Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives. Under the multiple use concept, BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands. The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering". BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area. Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land use plan, and litigation. Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner. All uses and values cannot be provided for on every acre. That is why land use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan. Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.

Monticello Proposed RMP, Response to Comments, at 7-48. This rationale is equally applicable to the many opportunities to layer management of LWC with management of other values and uses in this plan.

Summary of Comments: BLM should better balance the multiple uses of public lands and prevent unnecessary or undue degradation by managing significantly more lands for protection of wilderness characteristics, including closing those areas to motorized use and layering them with other special management areas.
#59])>
<([#60 [20.1] iii. Management prescriptions must be robust to adequately protect wilderness resources identified for protection in the RMP and BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics.

BLM must adopt meaningful protections for wilderness resources as part of its multiple use mission. Manual 6320 directs that "an alternative that protects lands with wilderness characteristics must contain management actions to achieve protection." Manual 6320 at .06(A)(2)(d). The manual provides examples of land use plan decisions that could protect wilderness characteristics, including: recommend withdrawal from mineral entry; close to leasing or NSO with no exceptions, waivers or modifications; right-of-way exclusion; close to construction of new roads; close or limit motorized and/or mechanized use; designate as VRM I or II; among others. We appreciate that the Uncompahgre Draft RMP evaluates management

decisions for lands with wilderness characteristics consistent with BLM Manual 6320.

BLM also has wide discretion regarding how it manages lands with wilderness characteristics outside of lands prioritized for protection of wilderness characteristics over other multiple uses. While certain lands with wilderness characteristics units undoubtedly deserve the highest levels of protection to ensure that their outstanding wilderness, wildlife, cultural, scenic, and/or recreation values are protected, other lands with wilderness characteristics units may overlap with different types of multiple uses that suggest BLM should consider a wider range of uses for those lands. In this case the Draft RMP simply selects all identified lands with wilderness characteristics and gives them identical management prescriptions (Alternative B), or selects a sub-set of those units for protection and gives that smaller set an identical set of management prescriptions (Alternative D).

Analyzing alternatives that would "avoid or minimize" adverse environmental effects is a requirement of NEPA, and current guidance outlined in Manual 6320 states that land use planning efforts should consider several outcomes for lands with wilderness characteristics. BLM should not simply analyze alternatives that would protect or leave unprotected lands with wilderness characteristics, but can also consider additional management options for these lands, where other multiple uses are emphasized "while applying management restrictions (conditions of use, mitigation measures) to reduce impacts to wilderness characteristics." Manual 6320 at .06(A). In fact, even for areas where BLM specifically decides to not protection wilderness characteristics, BLM is still required to "consider measures to minimize impacts on those characteristics." Manual 6320 at .06(A)(2)(d).

The only goal for lands with wilderness characteristics in the Draft RMP is to: "Manage lands with wilderness characteristics that are identified for protection to maintain those characteristics." Uncompahgre Draft RMP at 2-148. Where lands with wilderness characteristics are not explicitly managed for protection in the draft alternatives, no description of management goals or objectives is provided that describes how impacts to any of the other identified lands with wilderness characteristics areas might be minimized "to reduce impacts to wilderness characteristics" as outlined in Manual 6320. For example, the Rio Puerco (NM) Draft RMP developed three approaches for managing lands with wilderness characteristics: Protect Wilderness Characteristics, Minimize Impacts to Wilderness Characteristics, and Not Managed to Protect Wilderness Characteristics (Rio Puerco Draft RMP, p. 2-38—40; excerpt included as Attachment 1). All three categories, including lands not managed to protect wilderness characteristics, have management prescriptions in place to minimize impacts to wilderness characteristics.

For the Uncompahgre RMP, we recommend BLM manage lands with wilderness characteristics in two categories: high quality LWC meriting the strongest levels of protection; and additional LWC managed to protect wilderness characteristics while providing for other multiple uses. Because all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office comprise just 6% of the public land in the planning area, it is perfectly reasonable to manage all LWC to protect wilderness resources in some form. Both categories should include management direction to consider impacts to wilderness characteristics in implementation-level decisions and avoid, minimize or mitigate those impacts to the extent possible.

For example, the Rio Puerco (NM) Draft RMP developed three approaches for managing lands with wilderness characteristics: Protect Wilderness Characteristics, Minimize Impacts to Wilderness Characteristics, and Not Managed to Protect Wilderness Characteristics. Rio Puerco Draft RMP, p. 2-38—40; excerpt included as Attachment A.1. All three categories, including lands not managed to protect wilderness characteristics, have management prescriptions in place to minimize impacts to wilderness characteristics. Similarly, the White River (CO) Proposed RMPA grouped inventoried LWC into 3 management tiers ranging from most restrictive management to least. Even the least restrictive tier allows for applying management decisions to avoid and minimize impacts to wilderness characteristics. White River Proposed RMPA at Table 2-22; excerpt included as Attachment A.2.
#60])>
<([#61 [20.1] 4. High quality LWC meriting the strongest levels of protection

Management prescriptions for Camel Back WSA-adjacent should include:
* VRM I
* Closed to oil and gas leasing
* Closed to renewable energy development
* Closed to new rights-of-way (ROW exclusion)
* Closed to motorized and mechanized use
* Construction of new permanent and temporary roads is prohibited
* Close to mineral material disposal and non-energy solid leasable mineral exploration and development
* Recommend withdrawal from locatable mineral entry
* Closed to commercial timber harvest
* Vegetation treatments must utilize the minimum tool necessary
* Seek opportunities to acquire and incorporate non-federal inholdings
* Retain lands in federal ownership
* Close area to military training activities, including landings associated with High Altitude Mountain Environment Training.

This area is proposed for management to protect its wilderness characteristics in the Draft RMP preferred alternative.
#61])>
<([#62 [20.1] (1) Additional LWC managed to protect wilderness characteristics while providing for other multiple uses

Management prescriptions for Adobe Badlands WSA Adjacent should include:
* VRM II
* NSO stipulation for fluid minerals without exception, modification, or waiver.[61]
* Closed to renewable energy development
* Closed to new rights-of-way (ROW exclusion) outside of designated utility corridors
* Motorized and mechanized use limited to designated routes
* Construction of new permanent and temporary roads is prohibited
* Close to mineral material disposal and non-energy solid leasable mineral exploration and development

* Recommend withdrawal from locatable mineral entry
* Closed to commercial timber harvest
* Vegetation treatments must not have long-term impacts on wilderness characteristics
* Seek opportunities to acquire and incorporate non-federal inholdings
* Retain lands in federal ownership
[Footnote 61] By way of example, the White River RMPA would apply an NSO stipulation without exception, modification or waiver for Tier 1 LWC in the proposed plan. White River Proposed RMPA at A-42.

This area is evaluated for management to protect its wilderness characteristics in Alternative B of the Draft RMP preferred alternative. Our rationale for managing it in a second category of LWC management in the proposed plan is as follows:
#62])>
<([#63 [20.1] Adobes LWC

The Adobe Badlands WSA-adjacent unit contains oil and gas leases that are part of the Whitewater Unit. However, the Master Development Plan for the Whitewater Unit that is currently under evaluation only proposes development in the northern portion of the unit and explicitly states that "development in the southern portion of the Whitewater Unit is not reasonably foreseeable." (Fram Whitewater Unit MDP EA at 1.1). Therefore, BLM should not preclude protection of highly valuable wilderness characteristics of the Adobe Badlands WSA-adjacent unit based on the existing Whitewater Unit leases.

The Adobe Badlands WSA adjacent unit also provides a critical resource as a place for quiet and unconfined recreation close to the city of Delta. Although close to a population center, once one hikes into the unit away from the boundary roads and past the WSA, the area clearly still has wilderness characteristics in terms of solitude, naturalness and unconfined recreation.

Solitude: After hosting multiple hikes into the area over a three-year period, we only once saw other people in the area and they were on the boundaries of the WSA, not in the LWC unit boundaries. The further in you hike; the eroded hills and gullies of the Mancos shale hide the signs of human proximity and can give a person the feeling of hiking in a desert far from other people. Once you are in the higher topography with pinon and juniper, the vegetative screening provides additional privacy. This area provides the public a rare opportunity to find solitude without having to travel far distances from home.

Unconfined recreation: The unit also allows people a large area to explore through primitive and unconfined recreation. Again, if one stays close to the boundary roads, the character of the area is very different from when you hike further in. Apart from the boundary roads, there are not recreational developments or established/maintained trails. One can find opportunities for both easy and challenging hiking. People are able to explore freely through the gullies and climb the mesas of their own accord.

Naturalness: Again, on the boundaries of the greater Adobes area and in proximity to the private inholdings, there are obvious signs of human disturbance and encroachment of motorized recreation. However, the further one explores the area and heads north, the more natural it

BLM_0156461

becomes as you travel towards the Grand Mesa FS boundary. The proposed LWC boundaries encompass the core of this natural area.

In summary, the BLM should manage this area to protect and maintain these rare characteristics in a place where they provide valued opportunities for people to find solitude and naturalness literally in their backyard. The need for added protection is only heightened because of its proximity to a population center, not lessened, and we encourage the BLM to protect this unit to the highest degree possible through a LWC designation in the final RMP. The surrounding adobe areas that do not meet LWC qualifications should then be protected as ACECS and EEA, as described later.
#63])>
Summary of Comments: BLM must adopt robust management prescriptions for lands managed to protect wilderness characteristics to ensure wilderness resources are adequately protected. BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics to allow for management of other multiple uses in conjunction with maintaining wilderness characteristics.

<([#64 [27.1] E. Recreation

1. Specific RMA Recommendations for the North Fork and Lower Gunnison Watersheds

The final RMP must actively manage recreation on BLM lands within the North Fork and Lower Gunnison Watersheds through designation of recreation management areas (RMAs) and other recreation management stipulations.

We support following stipulations in the draft RMP which provide for improved recreation management and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mountain SRMA (with VRM Call II).

Other areas within the North Fork watershed also need recreation management designation to adequately manage the current and highly likely increased future recreation use on these lands within the lifetime of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) and other recreation stipulations for places such as Elephant Hill, and Youngs Peak—all of which are seeing increasing, but unmanaged use.

Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.
#64])>
<([#65 [27.1] a. Jumbo Mountain

All 5,020 acres of the Jumbo Mountain unit deserves management as a Special Recreation Management Area (SRMA) in the final RMP. Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural

appearance. Documented activities include mountain biking, horseback riding, trail running, birding, hiking, hunting, and infrequent OHV use. Jumbo Mountain sits prominently within the valley, and the visual resources of the BLM parcels on Jumbo are significant to the quality of life in the entire valley. We also support all VRM stipulations and protective management prescriptions as well.

The final RMP should include the entire Jumbo Mountain unit as a SRMA, RMZ-1 and RMZ-2 as included in Alt B (DEIS J-4). Our members attest to increasing use of the Jumbo Mountain area, despite a lack of management and oversight. We believe the trend of use will continue to increase, and that the full area will be used heavily for recreation over the lifetime of the plan. RMZ-2, as defined in Alt B, allows for trail connectivity with other current and future recreation areas. We also strongly support stipulations that would limit all oil and gas leasing and surface activities in this area, including those in the draft plan (DEIS NSO-56, NSO-57), as these activities would not be compatible for the recreation experience, and would diminish the many other resources already identified in this area.

Support has been building for Jumbo Mountain to become an SRMA, with the Paonia Town Council, local trail advocacy and mountain bike clubs, and local businesses and chambers fully supporting the Jumbo Mountain SRMA as outlined in alternative B with all 5,020 acres included in the SRMA status. The full acreage deserves SRMA status since local trends of use indicate that recreation users will continue to expand into adjacent BLM lands due to the high quality of the recreational resources. Additionally, the full SRMA status will allow for the current Jumbo Mountain trail network to be connected to other existing and future recreational trails within the lifetime of this RMP.

ERMA status for Jumbo, as proposed for 5,020 acres in Alternative C, is inadequate to protect the visual resources of this unit, as well as mitigate future conflicts of multiple uses on this unit. Members of the public frequently take part in a number of different recreational activities, including hiking, biking, and running, almost exclusively non-motorized, on these acres, and these activities must be managed for the quality of the experience for all users.

The North Fork watershed currently suffers from a dearth of officially acknowledged and managed biking areas, despite numerous landscapes with superb terrain for mountain biking.[62] The trails on Jumbo have been built outside of established protocols and as such cannot be utilized for the gain of the community as trail systems like 18 Rd in Fruita.[63] The trails and conditions on the Jumbo Mountain unit surpass those at 18 Rd, but without management and acknowledgment from the BLM with SRMA status, the full potential of the recreational resource on the Jumbo trails cannot be realized.
[Footnote 62] See https://www.Mountainbproject.com/
[Footnote 63] http://www.gjsentinel.com/sports/articles/a-good-change

In addition to the economic and conflict mitigation gains that could come about from designating Jumbo Mountain as an SRMA, the acknowledgement of trails on Jumbo will allow trail building expertise, environmental considerations, signage, and enforcement to come together to produce a more sustainable trail network.

BLM_0156463

Lastly the location of the Jumbo trails is quite unique in that the trails are located very close to the town of Paonia and thus the type of impacts on the land seen at locations like 18 Rd. can be shifted to the urbanized areas of Paonia, reducing the impact to natural landscapes.

Please see the Figure 2a for mapped current and proposed trails within the Jumbo Mountain area.

[SEE PDF FOR Figure 2a. Map of existing and proposed recreation routes on Jumbo Mountain. All routes shown in green and red are existing routes (except for the red route leading north from slantindicular). All segments in blue are proposed connector routes.]

The draft RMP includes closure of the SRMA to competitive events (DEIS Appendix J-28, SRPs), which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA identified through the stakeholder/planning process. It is important to the economy of Paonia to be able to hold several non-motorized competitions on the Jumbo trails every year as these events can be major economic drivers for the community.

We also support the Ecological Emphasis Area designation for Jumbo Mountain/McDonald Creek, which we believe do not conflict with SRMA and successful recreation management of these areas. Please see our comments below (WSCC RMP Comments Part III.G).
#65])>
<([#66 [27.1] b. Elephant Hill

We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Elephant Hill, located directly south of Jumbo Mountain. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer and winter recreational use is likely to significantly increase over the lifetime of this RMP. SRMA or ERMA designation would provide resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.

Please see Figure 2b for mapped current and proposed trails on Elephant Hill.

[SEE PDF FOR Figure 2b. Map of existing routes and proposed recreation routes on Elephant Hill. All solid green routes are proposed routes for recreation travel. Dotted green routes represent recreation winter routes located on preexisting roads.]
#66])>
<([#67 [27.1] c. Youngs Peak

We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Youngs Peak, located directly north of the town of Crawford. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer recreational use is likely to increase over the lifetime of this RMP. SRMA or ERMA designation would provide adequate resources and management for these lands to maintain and

develop access, trails, and management plans that mitigate conflict between multiple users.

Please see Figure 2c for mapped current and proposed trails on Youngs Peak.
[SEE PDF FOR Figure 2c. Map of existing routes and proposed recreation routes on Youngs Peak. All routes shown in red or green are proposed routes. Some primitive trails exist in the western area of Young's peak.]
#67])>
<([#68 [27.1] d. North Delta SRMA - WSCC supports the designation of the North Delta SRMA as well as the inclusion of mountain biking in the North Delta SRMA RMZ-1 and RMZ-2 for the development of non- motorized singletrack trails. Cyclists are not currently considered in the SRMA plan for North Delta.
#68])>
<([#69 [27.1] e. Hotchkiss High School Area – WSCC supports ERMA designation for BLM lands in the immediate vicinity of Hotchkiss High School, which is a prime location for a trail network that would provide easy access to youth and families in the Hotchkiss area. There would be strong support for this recreation area due to an outdoor education coalition called the Nature Connection. The Nature Connection plans to give kids and families easy access to mountain bike equipment, for short-term use, to gain experience in a sport that promotes good health, and opportunities of adventure. By developing a fun and exciting trail network on public lands in this area, residents of Delta County will have turnkey access to a healthy sport that allows them access to the natural environment, opportunities to improve outdoor knowledge and self-confidence, improve outdoor recreation skills, and gain more understanding of our community's dependence and impact on public lands.
#69])>
<([#70 [27.1] f. Roubideau SRMA

We support designation, as proposed in Alternative B and the Preferred Alternative, of all 25,350 acres of Roubideau as a SRMA. This designation, however, should not supersede protections for wildlife management. We:
* Support motorized being limited to RMZ 4 and to designated trails within that Zone.
Understand desire to leave routes in RMZ 3 open for hunting purposes however recommend that it include seasonal closures for off-season use.
* Support RMZ 1 and RMZ2 being closed to motorized and mechanized uses to prioritize hiking, back pacing and horseback riding in LWC areas.
* Support Alt B closing RMZ 1 to all fluid and recommending locatable mineral withdraw- as it is within the WSA. No leasing should be applied to RMZ 2 and 3 as we as it overlaps with the LWC proposal and we recommend that all "Tier 1" LWC units should be closed to leasing.

Similarly, the area is also identified as and ACEC and EEA. In order to manage for these areas to protect the identified vulnerable resources (riparian forest and montane ecosystems with identified BLM and CNHP sensitive species), should carry Alt B management prescription of NO LEASING for all parts of the SRMA that overlap with the Roubideau ACEC as identified in Alternative B1.

Similar logic applies to the over lapping EEA designation for the Roubideau area. As mentioned in our broader comments, EEAs should require stronger management requirements for leasing.

The BLM identifies sensitive species such as the Grand Junction milkvetch, desert bighorn sheep and northern leopard frog in the area and should manage the area to protect these natural values that make it a unique and special place for people to visit and have a pleasant recreation experience.

In summary, the Roubideau area has many high valued resources that qualify it for LWC, ACEC, EEA and SRMA management. In order to fully protect all the canyons, mesa tops and connecting areas- and manage for future recreational use- a layered management decision utilizing all of these designations is warranted.

As the Roubideau area is identified as a high value are for habitat, wilderness and recreation values, we recommend that it be closed to oil and gas leasing in accordance to our larger comments on oil and gas leasing throughout the field office. The area is clearly valued for other resources other than oil and gas development and should be managed to highlight and protect these values over oil and gas minerals that have low development potential in this area. #70])>
<([#71 [27.2] 2. Planning for Recreation and Visitor Services

In the Draft RMP, we note that there is an apparent lack of background data conducted or provided by BLM to inform the recreation analysis and alternatives development. As indicated in BLM Manual 8320, planning, management and monitoring of recreation and visitor services is an iterative process. Monitoring methods such as social surveys and visitation rates are essential for assessing the effectiveness of recreation planning and implementation actions. Under all planning phases of the RMP, BLM should collect data that is sufficient to address the nature and complexity of existing and potential issues. BLM Manual 8320 at .06(B)(1)(b).

In general, we support the extensive and special Recreation Management Areas that are evaluated in the range of alternatives targeting primitive and non-motorized recreation opportunities. We recommend the Uncompahgre Field Office build on these opportunities for quiet recreation such as hiking, wildlife viewing, back country hunting and horseback riding in the final RMP, which are popular activities for public lands visitors in the planning area. The draft RMP states that the primary recreation activities in the planning area are hunting, fishing, whitewater rafting, OHV use, canoeing, kayaking, camping, hiking, backpacking, mountain biking, horseback riding, rock climbing, photography, and scenery and wildlife viewing. Uncompahgre Draft RMP at 3-130. However, the draft RMP fails to provide sound data on the relative prevalence of these uses, stating: "Most public land use and activity participation estimates depend on a mix of computerized trail counter data, field observations, and professional judgment of the recreation staff and hence are not scientifically based." Id. at 3-132. This is not sufficient to analyze recreation trends and make long range management decisions that reflect accurate data.

Public lands surveys in nearby areas have found that non-motorized recreation activities are dominant among public lands visitors. For example, a 2006-2007 visitor field survey and focus group study of BLM lands coordinated by the Colorado River Valley Field Office and Arizona State University found that hiking is the most popular activity, at 33%, followed by mountain biking, at 26%. Colorado River Valley Draft RMP at 3-151. The Moab Field Office completed a

National Visitor Use Monitoring Program (NVUM)[64] as a pilot project for visitor use monitoring on BLM lands, which showed that motorized use is a small portion of recreation activity on public lands in the Moab Field Office. The NVUM states: "In terms of total participation, the top five recreation activities of the visits to the Moab Field Office were viewing natural features, hiking/walking/trail running, relaxing (hanging out, escaping heat and noise), viewing wildlife and driving for pleasure (Table 16)."
[Footnote 64]
http://www.blm.gov/wo/st/en/prog/Recreation/national_recreation/visitor_use_surveys.html

We would expect similar results in the Uncompahgre Field Office, which would support the designation of expansive Recreation Management Areas for quiet recreation as contemplated in the range of alternatives. Guidance issued in 2010 indicates that Recreation Management Area designations should reflect recreation demand and issues (IM 2011-004). BLM must include recreation data and foreseeable impacts in the baseline assessment in order to provide reasonable explanation and analysis of SRMA and ERMA designations in the range of alternatives. Moreover, environmental consequences described in Chapter 4 should more closely align to the expected increases in recreation demand (particularly of OHV use) described in Chapter 3, and account for the differences in recreation management area designations put forth in the range of alternatives.

Summary of Comments: In creating management objectives and allowable uses for recreation management areas, BLM should utilize and include monitoring data and trends by user type in the RMP. Recreation Management Area designations should reflect recreation demand. We also point out that managing lands for wilderness characteristics is another way for BLM to provide opportunities for quiet recreation in natural and scenic areas within the Uncompahgre Field Office. We therefore recommend the RMP protect expansive areas as lands with wilderness characteristics to provide desirable recreation experiences for hikers, back country hunters, and other non-motorized public land users.
#71])>
<([#72 [27.1] 3. Designating Recreation Management Areas for Non-Motorized Recreation

In 2010, BLM issued new guidance (IM 2011-004) for recreation and visitor services planning in the land use planning process. This guidance was incorporated into BLM Manual 8320 in 2011 as well as BLM's updated recreation planning handbook (H-8320-1) in 2014. The guidance changes recreation management to a three-category system wherein lands in the planning area can be designated as special recreation management areas (SRMAs), managed as extensive recreation management areas (ERMAs), or classified as public lands not designated as recreation management areas.

Management focus for SRMAs is to "protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics," whereas ERMAs are managed to "support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA." In SRMAs, recreation is to be the dominant use, and in ERMAs management is "commensurate with the management of other resources and resource uses." Whereas SRMAs are intended for more intensive management, ERMAs may be appropriate to designate for quiet-use, backcountry experiences and layer with other special designations that

are compatible with quiet recreation, such as ACECs and lands with wilderness characteristics. Both SRMAs and ERMAs provide mechanisms for the BLM to actively manage different types of recreation to the benefit of users while protecting the other resources of the public lands.

We support efforts made by the BLM to include management for quiet-use and non-motorized recreation in many Recreation Management Areas (RMAs) evaluated in the Draft RMP. Developing and differentiating recreation areas for various user groups are important to protect multiple recreation resources and avoid conflict, consistent with the agency's regulations. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." 43 C.F.R. § 8342.1.

BLM's ORV regulations also provide for protection of other values that are critical parts of not only a healthy ecosystem on BLM lands, but also of enjoying quiet recreation activities, such as hunting, photography and bird-watching, requiring that management minimize "damage to soil, watershed, vegetation, air, or other resources of the public lands" and "harassment of wildlife or disruption of habitat; and to prevent impairment of wilderness suitability or adverse effects on natural areas." Ibid.

The Draft RMP considers a comprehensive approach to managing recreation through a framework of SRMA and ERMA designations in each alternative. We support BLM's approach, which offers alternatives for multiple RMA designations and associated management prescriptions for important recreation areas. Uncompahgre RMP at Appendix J. This is consistent with agency policy and offers the public an opportunity to consider alternative management regimes for recreation areas, opportunities and experiences they are interested in accessing during the life of the RMP.

While we support the RMA framework provided in the draft RMP, we have gotten feedback from our members and the public that the mosaic of potential RMAs is highly complex, especially in the context of other designations and allocations under consideration in the RMP, and is therefore difficult for the public to understand. We do not believe BLM needs to simplify its approach, but instead encourage the agency to conduct additional public education and outreach on this important and complex issue. For example, BLM could conduct public workshops in the near future where the public can review spatial data for RMA and other designations/allocations and ask questions of resource specialists. BLM could accept additional public input on RMAs specifically through these workshops. This would not needlessly or extensively delay the RMP, but could greatly assist BLM in developing a proposed RMP with the best information submitted by the public on recreation resources, ultimately leading to a better RMP that serves the public and local communities and is implemented successfully.

Summary of Comments: BLM should move forward with designating Recreation Management Areas for quiet, non-motorized recreation, which is an appropriate way to implement the minimization criteria and provide opportunities for multiple recreation uses. BLM should

consider public workshops to further educate the public on recreation management alternatives and collect better information and comments from the public on recreation management. #72])>

<([#73 [27.1] 4. Special Recreation Permits

The BLM authorizes special recreation permits (SRPs) for specified recreation uses. Accordingly, the Draft RMP offers guidance and limitations for the issuance of SRPs. See, e.g., Uncompahgre Draft RMP at 2-220—221; G-30. We are concerned, however, with the general lack of specificity provided by the Draft RMP on guiding the authorization of special recreation permits.

The BLM Handbook on Recreation Permit Administration states that field offices can and should develop guidelines for issuing SRPs, including thresholds for when permits are required for organized groups and events for specific types of recreation activities, land areas, or resource settings. BLM Handbook 2930-1 at 13. Analysis of the impacts of permits on a cumulative basis is best accomplished in the RMP. The Uncompahgre RMP should include a clear decision making framework for reviewing SRP applications. The Price (Utah) and Grand Junction (Colorado) RMPs offer exemplary guidance for this process. The standards set out in these RMPs are very specific so that BLM can easily determine whether and where to issue an SRP, and can better estimate cumulative impacts from such permits.

Summary of Comments: In the Uncompahgre RMP, BLM should provide specific criteria for evaluating special recreation permits to guide agency staff on processing applications. #73])>

<([#74 [27.1] 5. Game Retrieval

We support the prohibition on cross-country motorized/mechanized travel for big game retrieval (with very narrowly limited exceptions). Uncompahgre Draft RMP at 2-307. This management action is necessary to prevent unnecessary resource damage as well as to address safety and private property concerns. A key component of the RMP and future travel planning is to create a travel network that protects resources and is enforceable. This restriction should be carried forth in the final RMP.

Summary of Comments: BLM should prohibit cross-country motorized/mechanized travel for game retrieval as proposed in the draft RMP preferred alternative. #74])>
<([#75 [41.3] 6. Natural Soundscapes

Natural soundscapes are a public lands resource that deserves careful consideration when planning for recreation. Like viewsheds and air quality, sound is one of the resources on the public lands that is affected by agency-authorized uses and can impact other resources as well, such as recreation and wildlife. BLM has a statutory obligation to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition." 43 U.S.C. § 1701(8). To fulfill this mandate, it is important for BLM to consider natural soundscapes in order to give meaningful

BLM_0156469

effect to this provision, especially on those lands which are to be managed in their "natural condition," including Wilderness Study Areas and lands with wilderness characteristics.

For recreation in particular, BLM's obligation to preserve natural soundscapes is further described in Executive Order 11644 (1972), as amended by Exec. Order 11989 (1977), which directs the BLM to locate areas and trails so as to: "Minimize conflicts between off-road vehicle use and other existing or proposed recreation uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors."

We recommend the agencies incorporate soundscapes in the designation and management of backcountry recreation areas, as preserving the natural soundscape is an essential component of protecting and enhancing the backcountry experience.

BLM should furthermore utilize acoustic modeling to analyze and preserve natural soundscapes, especially in special management areas managed for quiet use recreation. The Wilderness Society has developed a GIS-based model based on The System for the Prediction of Acoustic Detectability (SPreAD; Harrison et al. 1980), which is a tool that was developed nearly 30 years ago by FS and EPA to predict the acoustic impacts of recreational activity in wildland settings. SPreAD was originally developed as a system of worksheets and tables, where the user could enter information about the sound source and environment and manually calculate noise propagation from a single point source to a single point receiver. We have adapted the SPreAD model to ArcGIS, automating the hand calculation method to predict the propagation of noise for all directions throughout the area of interest.

SPreAD-GIS can be used to 1) determine the areas within a planning unit where the natural soundscape is predominant and protect that setting through recreation planning; and 2) model sound propagation from uses such as motorized vehicles in a proposed quiet-use recreation area to determine what planning decisions, such as route closures, could restore and enhance the natural soundscape. In this way, the agencies could ensure that travel and recreation planning decisions provide opportunities for experiencing naturalness and solitude. There are other models and methodologies available, but we highlight SPreAD- GIS because it is available by request from TWS.[65]
[Footnote 65] The tool is free, but installation of SPreAD-GIS requires an ArcInfo-level licensed copy of ArcGIS 9.3 or higher with the Spatial Analyst extension.

One possible method for BLM to manage sound resources on the federal lands would be to model the approach BLM uses to manage visual resources, with a classification gradient ranging from most protective of natural soundscapes to allowing significant impacts to the soundscape.[66] This would provide for areas where maintaining the natural soundscape is prioritized to benefit recreation, wildlife, wilderness and other natural values on the public lands. It would also assist the agency with managing activities that impact sound resources by clearly defining where and how those impacts may occur. The classification system should primarily be based on desired and achieved experiences of public lands visitors.
[Footnote 66] See information on BLM's Visual Resource Management system at http://www.blm.gov/wo/st/en/prog/Recreation/recreation_national/RMS/2.html.

BLM_0156470

The following classes provide an example of possible BLM guidance for inventorying and managing sound resources in landscape-level planning:

* Class I Objective: The objective of this class is to preserve the natural soundscape. This class would be appropriate for lands managed to preserve wilderness characteristics, promote primitive recreation experiences, and protect wildlife habitat and ecological systems. The level of change to the characteristic soundscape should be very low and must not attract attention.
* Class II Objective: The objective of this class is to retain the natural soundscape such that noticeable impacts are infrequent and isolated instances. The level of change to the natural soundscape should be low. Management activities may be heard on occasion, such as a passing motorized vehicle, but should not detract from the experience of the natural landscape.
* Class III Objective: The objective of this class is to partially retain the natural soundscape where practicable. Management activities may attract attention but should not dominate the auditory experience of the casual observer. This class would be appropriate for front country recreation areas or other areas where natural soundscapes are not critical to the experience being sought out by visitors.
* Class IV Objective: The objective of this class is to provide for management activities which require significant impacts to the natural soundscape, including highly impactful events or impacts sustained over the long term. These management activities may dominate the sound of the landscape and may be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating basic elements.

These potential management objectives for sound resource classes are similar to the BLM Manual for Visual Resource Classes (BLM Manual 8400). Likewise, planning areas could be delineated into sound quality rating units for management purposes. Considerations on rating sound resources, such as landform, vegetation, and scarcity, are among the factors that could logically be incorporated into baseline data and management objectives for auditory resources. Acoustic modeling would be an important component of assessing sound quality rating units.

By going beyond a simple dichotomy of quiet-zones and zones with noise, BLM can position itself in a way that adequately addresses the adverse effects of noise on public land resources, resource-uses, and existing land designations. Soundscape classes give land managers both the authority and the flexibility to make management decisions that enhance landscape-level planning. Recognizing that lands have different soundscapes, and visitor expectations and experiences vary within a planning area, soundscape classes provide a way to determine appropriate levels of management.

Summary of Comments: BLM should acknowledge the sound resource on the public lands and address the soundscape as a separate resource which must be analyzed; complete sound modeling to the extent practicable to assess noise impacts of management alternatives on recreation and wildlife; adopt management decisions based on sound modeling data or other information generated from soundscape analysis that minimize or mitigate noise impacts on recreation and wildlife; and identify areas of the public lands where protection of the natural soundscape is prioritized. #75])>

<([#76 [32.1] F. Travel Management

1. Area allocations for off-road vehicles

i. Providing and protecting quiet recreation opportunities

The Draft RMP defers comprehensive travel planning, but evaluates a range of alternatives for vehicle use designations (open, limited, closed). BLM's preferred alternative would only close 58,560 acres to motorized use, representing less than 9% of the planning area. Uncompahgre Draft RMP at 2-301. This includes statutorily closed areas (such as Wilderness Study Areas), meaning BLM is hardly exercising any discretion to close areas to motorized use so they may be allocated for other multiple uses such as quiet recreation, wildlife habitat or cultural resource protection. Even Alternative B would only close 17% of the planning area to motorized vehicle use. Ibid. This does not represent balanced management, and is inconsistent with current BLM travel planning guidance. It is also inconsistent with the agency's obligations to comply with the minimization criteria, as detailed below.

Travel and transportation considerations play an important role in the experience of the recreation user and the management provided by BLM. The area designations that the RMP will put in place will be key determinants of recreation setting characteristics as well as fundamental tools for providing specific recreation experiences.

As such, BLM should implement OHV area designations that protect recreation opportunities for quiet and non-motorized recreation users throughout the planning area. The public land in the UFO has ample opportunity for recreation activities such as hiking, camping, and mountain biking. In this regard, the agency's 2011 Travel and Transportation Management (TTM) Manual generally recognizes that:
The recreation program has a specific need to recognize and manage motorized recreational use of off-highway vehicles (OHVs) and non-motorized travel, such as foot, equestrian, and non-motorized mechanical travel. The planning process should consider and address the full range of various modes of travel on public lands, not only motorized access needs.

BLM Manual 1626 at .06(A)(1) (emphasis added).

BLM must adequately address the needs of non-motorized and quiet users in addition to motorized use. Ensuring opportunities for a full range of non-motorized travel is crucial for creating a comprehensive transportation and travel plan. In places managed primarily for non-motorized recreation, travel allocations and designations should reflect this desired recreation character setting. This should include restrictions and closures in areas that provide opportunities for non-motorized recreation such as lands with wilderness characteristics, areas of critical environmental concern, and other special designations.

ii. Applying the minimization criteria to area allocations

In response to the growing use of off-road vehicles (ORVs) and corresponding environmental damage, Presidents Nixon and Carter issued Executive Orders 11644 and 11989 in 1972 and

1977, respectively, requiring federal land management agencies to plan for ORV use based on protecting resources and other recreational uses.[67] When designating areas or trails available for ORV use, agencies must locate them to:

* minimize damage to soil, watershed, vegetation, or other resources of the public lands; (2) minimize harassment of wildlife or significant disruption of wildlife habitats; and
* minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands.[68]

[Footnote 67] Exec. Order No. 11644, 37 Fed. Reg. 2877 (Feb. 9, 1972); Exec. Order No. 11989, 42 Fed. Reg. 26,959 (May 24, 1977).

[Footnote 68] Exec. Order No. 11644, § 3(a).

BLM codified these "minimization criteria" in its OHV regulations at 43 C.F.R. § 8342.1, which provide:

The authorized officer shall designate all public lands as either open, limited, or closed to off-road vehicles. All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands; and in accordance with the following criteria:

(a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

(b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.

(c) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

(d) Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

Despite its long-standing legal obligation, BLM has struggled to properly apply and implement the minimization criteria in its travel management decisions. Federal courts have repeatedly sent BLM, Forest Service, and National Park Service travel management plans back to the agencies for failure to satisfy their obligation to minimize resource damage and conflicts between recreational uses.[69] Collectively, these cases confirm the agencies' substantive obligation to meaningfully apply and implement – not just identify or consider – the minimization criteria when designating each area or trail, and show in the administrative record how they did so.[70] As a recent circuit court of appeals decision confirmed, agencies must "document how [they] applied [relevant] data on an area-by-area [or route-by-route] basis with the objective of minimizing impacts."[71] BLM's Travel and Transportation Manual confirms that BLM must pay particular attention to thoroughly documenting its application of the minimization criteria in making both OHV area designations (Manual 1626.06(A)) and route designations (Manual 1626.06(B)).

[Footnote 69] See WildEarth Guardians v. U.S. Forest Service, 790 F.3d 920, 929-32 (9th Cir. 2015) (Forest Service failed to "apply the minimization criteria to each area it designated for

BLM_0156473

snowmobile use" and to provide the "granular analysis [necessary] to fulfill the objectives of Executive Order 11644"); Friends of the Clearwater v. U.S. Forest Service, No. 3:13-CV-00515-EJL, 2015 U.S. Dist. LEXIS 30671, at *37-52 (D. Idaho Mar. 11, 2015) (Forest Service's conclusory statements failed to show how it selected motorized routes with the objective of minimizing their impacts); SUWA v. Burke (SUWA), 981 F. Supp. 2d 1099, 1104-06 (D. Utah 2013) (BLM acknowledgment of minimization criteria insufficient where record showed no analysis of specific impacts of designated OHV routes); The Wilderness Society v. U.S. Forest Service, No. CV08-363-E-EJL, 2013 U.S. Dist. LEXIS 153036, at *22-32 (D. Idaho Oct. 22, 2013) (remanding travel plan where Forest Service relied on unsupported conclusion that route closures and elimination of cross-country travel minimized impacts); Defenders of Wildlife v. Salazar, 877 F. Supp. 2d 1271, 1304 (M.D. Fla. 2012) (record failed to demonstrate how Park Service decision to reopen trails was made with the objective of minimizing impacts); Central Sierra Environmental Resource Center v. U.S. Forest Service, 916 F. Supp. 2d 1078, 1094-98 (E.D. Cal. 2012) (Forest Service failed to show that it actually aimed to minimize environmental damage when designating motorized routes); Idaho Conservation League v. Guzman, 766 F. Supp. 2d 1056, 1071-74 (D. Idaho 2011) (record did not reflect whether or how the Forest Service applied the minimization criteria); Center for Biological Diversity v. BLM, 746 F. Supp. 2d 1055, 1071-81 (N.D. Cal. 2009) (record provided no indication that BLM considered or applied minimization criteria).

[Footnote 70] See, e.g., CBD v. BLM, 746 F. Supp. 2d at 1080-81 ("the BLM is required to place routes specifically to minimize" impacts); Idaho Conservation League, 766 F. Supp. 2d at 1072-73 (consideration of the minimization criteria insufficient where agency failed to demonstrate that the criteria "were then implemented into the decision process").

[Footnote 71] WildEarth Guardians, 790 F.3d at 931.

As Executive Order 11644, 43 C.F.R. § 8342.1, and Manual 1626 make clear, the substantive duty to minimize impacts applies equally to OHV area allocations made in resource management plans. With RMP area allocations setting the framework for where route designations will occur and providing the best opportunity to analyze OHV impacts across the broader landscape, it is critical that the Uncompahgre RMP apply and implement the minimization criteria when making area designations. To satisfy its substantive duty to minimize impacts, BLM must apply a transparent and common-sense methodology for meaningful application of the minimization criteria to each area being considered for designation. That methodology must include several key elements:

First, proper application of the minimization criteria is not solely an office exercise. As the courts have repeatedly made clear, use of cryptic spreadsheets or matrices that favor OHV use and do not facilitate implementation of the substantive duty to minimize impacts is inadequate.[72] Rather, BLM must get out on the ground, gather site- and resource-specific information, ground-truth desk-top analyses, and then utilize that data to actually apply the criteria to minimize resource damage and use conflicts associated with each designated area and route. This necessarily will require the agency to incorporate monitoring data and other information identifying resource or recreational use conflicts compiled by the agency or submitted by the public.[73] That information must be applied in what courts have described as a "granular analysis [necessary] to fulfill the objectives of Executive Order 11644."[74]

[Footnote 72] See, e.g., Idaho Conservation League, 766 F. Supp. 2d at 1071-74 (agency may not

BLM_0156474

rely on "Route Designation Matrices" that fail to show if or how the agency selected routes with the objective of minimizing their impacts); SUWA, 981 F. Supp. 2d at 1105 ("cryptic spreadsheet for each route segment provides inadequate information . . . for someone other than the BLM to know why or how the routes were chosen").

[Footnote 73] See 43 C.F.R. § 8342.2(a) (public participation required in travel management decision-making); Idaho Conservation League, 766 F. Supp. 2d at 1074-77 (invalidating travel management plan that failed to utilize monitoring and other site-specific data submitted by the public showing resource damage).

[Footnote 74] WildEarth Guardians, 790 F.3d at 931.

Second, application of the minimization criteria should be informed by the best available scientific information and associated strategies and methodologies for minimizing impacts to particular resources.[75] In 2012, the Journal of Conservation Planning published a literature review and best management practices (BMPs) for ORVs on national forest lands.[76] The BMPs provide guidelines, based on peer-reviewed science, for ORV designation decisions, implementation actions, and monitoring activities that are intended to minimize impacts to soils, water quality, vegetation, and wildlife, and conflicts with other recreational uses. Although they were formulated for national forest lands, most of the BMPs are applicable to OHV designation decisions on BLM lands as well. Travel management planning processes should reference and incorporate these BMPs.[77]

[Footnote 75] See Friends of the Clearwater, 2015 U.S. Dist. LEXIS 30671, at *24-30, 40-52 (invalidating route designations that failed to consider best available science on impacts of motorized routes on elk habitat effectiveness or to select routes with the objective of minimizing impacts to that habitat and other forest resources).

[Footnote 76] T. Adam Switalski and Allison Jones, Off-road vehicle best management practices for forestlands: A review of scientific literature and guidance for managers, 8 Journal of Conservation Planning 12-24 (2012), available at http://www.journalconsplanning.org/2012/JCP_v8_2_Switalski.pdf and attached. Development of a BLM-specific literature review and set of BMPs is in progress.

[Footnote 77] The Bitterroot National Forest recently referenced and applied BMPs from Switalski and Jones in its Decision Notice/Finding of No Significant Impact for a project involving the designation of ORV trails. See Bitterroot National Forest, Darby Lumber Lands Phase I – Decision Notice and Finding of No Significant Impact, pp. 13-14, available at http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/ne pa/80742_FSPLT3_2541294.pd f.

Third, proper application of the minimization criteria must address both site-specific and larger-scale impacts.[78] For example, agencies must assess and minimize landscape-scale impacts such as habitat fragmentation, cumulative noise and air and water quality impacts, and degradation of wilderness characteristics and associated opportunities for primitive forms of recreation. The agency also must assess and minimize site-specific impacts to soils, vegetation, water, and other public lands resources, sensitive wildlife habitat, and important areas for non-motorized recreation.

[Footnote 78] See, e.g., Idaho Conservation League, 766 F. Supp. 2d at 1066-68, 1074-77 (invaliding travel plan that failed to consider aggregate impacts of short motorized routes on wilderness values or site-specific erosion and other impacts of particular routes).

BLM_0156475

Fourth, application of the minimization criteria must take into account available resources for monitoring and enforcement of the designated system.[79] BLM is obligated under Executive Orders 11644 and 11989 and its travel management regulations to monitor the effects of OHV use on designated areas and routes and make adjustments to the designated system as necessary.[80] To ease enforcement obligations and ensure user compliance in the first place, OHV area designations and identification of Travel Management Areas should establish clear boundaries and simple, consistent restrictions designed to minimize resource damage and user conflicts.

[Footnote 79] See Sierra Club v. U.S. Forest Serv., 857 F. Supp. 2d 1167, 1176-78 (D. Utah 2012) (NEPA requires agency to take a hard look at the impacts of illegal motorized use on forest resources and the likelihood of illegal use continuing under each alternative).

[Footnote 80] Exec. Order No. 11644, § 8(a); 43 C.F.R. § 8342.3.

Finally, attempts to mitigate impacts associated with an existing OHV system are insufficient to fully satisfy the duty to minimize impacts, as specified in the executive orders. The language of the executive orders makes this clear: "[a]reas and trails shall be located to minimize" impacts and conflicts.[81] 43 C.F.R. § 8342.1 mirrors that language. Thus, application of the minimization criteria should be approached in two steps: first, the agency locates areas and routes to minimize impacts, and second, the agency establishes site-specific management actions to further reduce impacts. The best available science confirms this tiered approach.[82] As described above, this approach is consistent with DOI's Landscape Mitigation Policy that prioritizes project design and siting to avoid adverse impacts in the first instance, followed by other minimization and mitigation measures.

[Footnote 81] Exec. Order 11644, § 3(a); see also Center for Biological Diversity, 746 F. Supp. 2d at 1080-81 ("'Minimize' as used in the regulation . . . refers to the effects of route designations, i.e. the BLM is required to place routes specifically to minimize 'damage' to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts' of uses." (footnote and citations omitted)).

[Footnote 82] See Switalski and Jones, 2012 (cataloguing best management practices for: (1) siting/locating routes to minimize impacts; (2) implementation, including maintenance, restoration, adaptive management, and other mitigation measures; and (3) monitoring).

iii. ORV "open" areas

We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP. Uncompahgre Draft RMP at 2-301. Nationally, BLM has for many years been moving away from allowing cross-country motorized use on a large scale or designating large ORV play areas. This type of motorized use is difficult for BLM field offices to properly manage; it damages natural, cultural and other resources; and it leads to conflict with other users of the public lands. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into

BLM_0156476

account noise and other factors." 43 C.F.R. § 8342.1.

Summary of Comments: BLM should close more of the planning area to motorized use to protect natural resources and quiet recreation opportunities and create more balanced management among the multiple uses and recreation visitors in the Uncompahgre Field Office. BLM must apply the executive order minimization criteria to demonstrate how each OHV area has been located to minimize resource damage and conflicts with other recreational uses. This will require a granular analysis of the impacts of OHV use in each area that addresses both site-specific and landscape-scale impacts, incorporates the best available scientific information and best management practices for minimizing impacts to particular resources, utilizes site- and resource-specific data, and accounts for available monitoring and enforcement resources. We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP.
#76])>
<([#77 [32.1] 2. Comprehensive Travel and Transportation Management Planning

The Uncompahgre RMP defers comprehensive travel and transportation planning, as provided for in BLM's regulations. While the Draft RMP includes several important components such as a prioritization scheme for future travel planning and criteria to guide route designations, the Draft RMP is not fully compliant with BLM's policy for deferred travel planning. BLM policy provides for deferred travel planning and interim designation of "Limited to Existing Routes" as long as a preliminary network is identified and a process established to select a final travel management network. Specifically, BLM Manual 1626 provides a list of requirements for deferring travel planning:
If the transportation network is to be deferred in the RMP, then the RMP documents the decision-making process used to develop the initial network, provides the basis for future implementation level decisions, and helps set guidelines for making transportation network adjustments throughout the life of the plan. The following tasks should be completed in the RMP for each planning area or TMA:
a. Produce a map of the known network of transportation linear features, including modes of travel;
b. Define the long term management goals for the transportation system;
c. Define interim management objectives for areas or sub-areas where route designations were not completed concurrent with the RMP. Clearly state the process of moving from an interim designation of "limited to existing roads, primitive roads, and trails" to a designation of "limited to designated roads primitive roads and trails" upon completion of TMP.
d. Identify any incomplete travel and transportation tasks:
i. Outline additional data needs and a strategy to collect needed information;
ii. Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints;
iii. Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process; and
iv. Identify any easements and rights-of-way (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.

BLM_0156477

BLM Manual 1626 at .06(B)(2). Those components underlined above are absent from the Uncompahgre Draft RMP. Manual 1626 also provides that "If the decision on delineating travel and transportation networks is deferred in the land use plan to the implementation phase, the work should be completed within five (5) years of the signing of the Record of Decision (ROD) for the RMP." Id. at .06(B)(3).

The Draft RMP does not include a map of the known network of transportation linear features, and in fact indicates that BLM has not completed an inventory of the existing routes that motorized travel will be limited to. Uncompahgre Draft RMP at M-2. BLM is required to complete this inventory during the land use planning process and utilize that inventory to inform travel planning decisions, even if those decisions are being deferred from the RMP. BLM cannot limit travel to existing routes unless those routes are known and mapped. The draft RMP also does not detail long-term management goals for the transportation system or interim management objectives other than some interim management guidance for areas limited to existing routes. Id. at 2-306—308. These elements must be fleshed out in the Proposed RMP to comply with agency policy.

We support BLM's commitment to identifying travel management areas, setting a prioritization scheme for completing comprehensive route designation, and completing route designations within 5 years of signing the ROD. The draft RMP identifies the following management action across the range of alternatives:
Establish Travel Management Areas and, within five years of the Approved RMP/Record of Decision, initiate comprehensive travel management plans within each the following Travel Management Areas and in the following order unless a change is deemed necessary by the BLM Authorized Officer (Figure 2-81, Appendix A):
1. North Fork (71,020 acres)
2. South Montrose (66,180 acres)
3. North Delta (61,270 acres)
4. San Miguel (74,960 acres)
5. West End (289,960 acres)
Uncompahgre Draft RMP at 2-308. Furthermore, those areas may be too large for efficient and effective route designation processes, especially the West End. The draft RMP appropriately indicates that, "At the time of comprehensive travel management planning, the Travel Management Area may be broken down into subareas to address different resource management objectives." Id. at 2-309. We encourage BLM to retain this language in the RMP and follow through with creating smaller areas for travel management planning at the route designation stage.

We also greatly support BLM's commitment that "Route density for designated public routes will be used as an analysis tool" in future travel management planning. Id. at M-9. However, BLM does not set route density targets in the RMP, but seems to defer identifying those targets to comprehensive travel planning. BLM should not defer using route density as a tool but should instead utilize that important tool in the Uncompahgre RMP. Setting route density targets is an appropriate way for BLM to address habitat fragmentation in travel planning in the absence of route-by-route designations. For example, BLM must consider alternatives to minimize and mitigate impacts to habitat fragmentation in the RMP, such as closing areas to motorized use,

setting route density limits, and designating wildlife corridors, conservation rights-of-way or other mitigating land use allocations. Thus, BLM should set route density limits in the RMP to guide future route designations that minimize impacts to wildlife.

Route density targets must be based on the best available science, and must meet scientifically-based thresholds or be combined with mitigating actions. BLM should complete density analysis of existing transportation network features, buffer analysis to examine the effect zone of the transportation network and core area analysis to identify habitat that remains unaffected by the transportation network. BLM should use wildlife literature to interpret fragmentation metrics developed through spatial analyses and adopt management decisions that minimize and mitigate habitat fragmentation.

Summary of Comments: The Uncompahgre RMP must comply with BLM's guidance for deferred travel planning. This includes mapping the existing route network, setting long-term goals for the transportation network and identifying interim travel management objectives. BLM should carry forward other elements of the preliminary travel plan, including the prioritization of travel management areas, route designation criteria and commitment to utilizing route density as a travel planning tool. #77])>

<([#78 [32.1] 3. Non-motorized trail networks

BLM is not planning to make route designations through this planning process. In order to set management direction for future travel planning efforts, the RMP should specify the criteria that BLM will use to designate a non-motorized trail network. While BLM is designating routes for motorized use, pursuant to the minimization criteria and agency guidance, BLM can and should also designate non- motorized trail systems.

In implementing its 2006 Roads and Trails Terminology Report, BLM emphasized the importance of taking a "holistic" approach to the management of roads and trails (see, Instruction Memorandum 2006-173), which includes non-motorized trails. Likewise, IM 2008-014 states that the travel planning process "requires recognition and designation of non-motorized trails or routes." In this planning process, BLM should not simply addresses motorized use in individual travel management areas, but should set a broad vision for protecting and enhancing the experiences of non-motorized users.

FLPMA requires BLM to develop land use plans that "consider the relative scarcity of values involved and the availably of alternative means and sites for realization of those values." 43 U.S.C. § 1712(C)(6). Access to a "quiet use" recreation experience on our public lands through non-motorized trails is a growing need as opportunities for this use is shrinking with an increasing motorized population. As motorized recreation continues to grow in the region, BLM must be more proactive and deliberate in designing travel networks that preserve quiet recreation opportunities.

The RMP should specifically address and identify how BLM will meet the needs of quiet recreation users and provide non-motorized trail opportunities as part of its transportation system. The guidelines for deferring route designations set forth in BLM Manual 1626 should be

fully incorporated by defining the goals for the use, location, and development/decommissioning; specifically, for a long-term, non- motorized trail system. BLM H- 8342 at 18.

In order to set management direction for future travel planning efforts, BLM should specify the process that will be used to designate a non-motorized trail network. As discussed previously in these comments, BLM's travel and transportation planning manual specifies the types of travel planning decisions that should be included in a travel planning process when route designations are being deferred. The RMP should ensure these decisions are applied specifically to non-motorized travel management, including:
* Define the long term management goals for the transportation system;
* Define interim management objectives for areas or sub-areas where route designations are not being completed
* Identify any incomplete travel and transportation tasks:
o Outline additional data needs and a strategy to collect needed information;
o Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints;
o Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process
BLM Manual 1626 at .06(B)(2). As part of developing a preliminary travel plan for the non-motorized route network, BLM should identify management goals and objectives for travel management areas where primitive recreation experiences will be emphasized and develop criteria for future non-motorized trail designation.

One of these criteria should be identifying and implementing opportunities to convert existing routes to non-motorized trails, which is less impactful than creating new trails and requires fewer resources. The initial route inventories BLM has released show that there is an abundance of existing routes in the field office and therefore plentiful opportunities to designate existing routes for non-motorized use. To minimize the impact from a non-motorized trail network, BLM should prioritize existing linear features that are in low-conflict and low-impacts places on the landscape. In any travel designation, BLM should minimize impacts to sensitive resources such take the necessary steps to avoid impacts wildlife habitat and other sensitive resources.

BLM should evaluate and include additional criteria for new trails in the RMP. One example of considering non-motorized trail networks comes from the Beaver Dam Wash NCA Draft RMP. This Draft RMP sets out criteria for designing a non-motorized trail system as follows:
a) Addresses the needs of equestrians, hikers, climbers, and mountain bikers;
b) Protects diverse NCA resource values from direct or indirect recreation impacts by promoting compliance with regulatory requirements and visitor use restrictions;
c) Results in sustainable systems;
d) Provides high quality experiences;
e) Serves the abilities of non-motorized recreational users;
f) Offers opportunities for looping, varying distances, linking between geographic areas and trailheads, and connecting to heritage and other educational resources.
g) Minimizes user conflicts by separating user groups whenever feasible;

h) Limits the desire to venture off-trail.
Beaver Dam Wash NCA Draft RMP at 150. BLM should set similar criteria in the Uncompahgre RMP.

As BLM considers any motorized use allocations and/or motorized trail designations, it should consider how those decisions might foreclose or limit an opportunity to designate the same or a nearby trail as non- motorized. Motorized trails can have far reaching impacts throughout the region. Designating an area as open to motorized use may preclude BLM's ability to effectively manage an adjacent or nearby area for quiet recreation. As such, BLM should give strong consideration to potential user-conflict generated from travel designations, in accordance with the minimization criteria. BLM should provide sufficiently large non-motorized areas to provide quality primitive recreation experiences and minimize disturbance to quiet-use activities from other forms of travel and recreation.

Summary of Comments: BLM should make allocations and designations in the RMP that provide for non-motorized recreation, and limit impacts from motorized use on quiet users. For areas that are intended to provide a semi-primitive or primitive recreation experience, the RMP should provide direction for completion of non-motorized trail systems in compliance with agency policy for completing a preliminary travel plan. BLM should prioritize lands with wilderness characteristics for non-motorized travel networks and should protect the primitive recreation resources and values found in lands with wilderness characteristics.
#78])>
<([#79 [32.1] 4. Temporary Closures

BLM has authority to institute temporary route closures to protect public lands and resources. 43 C.F.R. § 8364.1. BLM must immediately close any areas where the agency finds that OHVs are or will cause considerable adverse effects upon natural or natural resources. 43 C.F.R. § 8341.2. BLM has policy guidance (Instruction Memorandum 2013-035) that describes how RMPs and TMPs should address temporary closures including defining thresholds for when OHV-related closures will take place. The IM states that all RMPs and TMPs shall include the following statement in accordance with 43 C.F.R. § 8341.2 with regard to OHV use:
Where off-road vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, the affected areas shall be immediately closed to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.
IM 2013-035, Attachment 1. The IM goes on to state that the RMP and TMP should also describe the resources, uses, situations, and locations likely to be adversely affected by OHV use. Moreover, the IM provides that if BLM analyzes potential for temporary closures properly, then there will be no further need for additional NEPA analysis and the temporary closure can be issued with a DNA.

Summary of Comments: The above guidance from IM 2013-035 on incorporating analysis of potential for temporary closures should be included in the RMP. BLM should issue temporary closures for any area where ORVs are currently harming or may harm natural or cultural resources in the interim.

BLM_0156481

#79])>

<([#80 [32.1] 5. Revised Statute 2477

The Draft RMP appropriately asserts that BLM does not address the validity of R.S. 2477 assertions through the planning process:

Although the courts may recognize adjudicated Revised Statute 2477 rights-of-way as valid existing rights, current BLM policy does not allow BLM to consider adjudicated Revised Statute 2477 claims as valid existing rights. The current moratorium precluding the BLM from processing Revised Statute 2477 claims is still in effect, making Revised Statute 2477 assertions a legal issue beyond the scope of this planning effort.

Uncompahgre Draft RMP at ES-6, I-13; see also 2-309. We support this approach, and note it is the correct approach under relevant law and policy. BLM must ensure it does not make inappropriate decisions based on R.S. 2477 claims, and must communicate clearly to cooperating agencies and the public that BLM is prohibited from considering such claims in this planning process.

Summary of Comments: BLM should uphold its assertion that R.S. 2477 claims are not addressed in the agency's planning process. #80])>

G. Ecological Emphasis Areas and Areas of Critical Environmental Concern

We support that BLM is considering innovative planning approaches for managing natural resources at a landscape scale and implementing a comprehensive conservation framework in the Uncompahgre RMP. The networks of Ecological Emphasis Areas (EEAs) and Areas of Critical Environmental Concern (ACECs) evaluated in the range of alternatives create integrated conservation designations that, in context with other specially designated areas and allocations evaluated in the RMP, aspire to protect and enhance the ecological integrity of the Uncompahgre Field Office.

We also see this approach as consistent with BLM's Planning 2.0 initiative. The landscape-level approach committed to through the agency's Planning 2.0 initiative will guide agency planning for the foreseeable future. While the Uncompahgre RMP is not currently being developed under Planning 2.0, consistency with the new agency direction will lead to more forward-thinking plan that aligns better with BLM's new planning rule and principles. Planning 2.0 presents an important opportunity for BLM to develop a landscape level strategy for conservation on our public lands. BLM's approach to EEAs and ACECs in the Uncompahgre Draft RMP fits well within BLM's movement towards a landscape approach to managing public lands articulated in Planning 2.0.

Developing integrated networks of land use allocations to manage ecosystems at a landscape scale is critical to addressing climate change and the future of land management, and modern science emphasizes the importance of this approach as well as provides useful data for successful implementation. The rate of land use change across the conterminous United States has been, and is projected to continue increasing into the future. These changes are resulting in habitat fragmentation, loss of biodiversity, and are negatively impacting sensitive habitats and important

BLM_0156482

ecological processes. The effects of anthropogenic changes upon landscapes are no longer explicitly localized, rather the scale, speed of change, and subsequent impacts are having increasingly pronounced consequences at regional and global scales. Significant shifts in climate and climate change velocity are changing public lands, and the effects have been reliably modeled and observed across the United States. Specifically, in the Southwest region, broad scientific consensus supports an imminent shift in climate towards increasing seasonal temperatures and a significant reduction of annual precipitation, resulting in an increasingly arid climate with prolonged periods of drought.

These changes in climate and land use patterns are projected to continue causing an increase in habitat fragmentation and shifts in the distribution of plants, animals, and ecological processes across local, regional, and global scales. At the global scale, species migration and shifts in habitat range that match climate change projections have been empirically observed. At a regional level, biodiversity in the Southwest, including Colorado, are modeled to undergo significant shifts in plant distributions. It is expected that grass communities will expand and dominate in lower elevations, as the distribution of forested communities will migrate to higher elevations and potentially occupy smaller, favorable areas of refugia.

In order for species to survive, the persistence of suitable climates is necessary, but in some cases may be insufficient. Species must also have the capacity to migrate and disperse at a velocity that keeps pace with suitable climates as they shift across the landscape. The ability of ecosystems to adapt and persist in a changing climate will be dependent on the ability of species and ecological processes to migrate over and operate at broad scales. The rate at which species must adapt and migrate to keep pace with human- and climate-driven landscape change may vary widely and be difficult to predict, but migration capacity and ability will be necessary for survival.

For species and ecological processes to migrate and persist over different temporal and geographical scales, it is crucial that they have access to landscape areas capable of supporting high levels of biotic and abiotic diversity. This diversity is known as landscape heterogeneity, and includes areas with a diversity of terrestrial, riparian, and aquatic ecosystems, and the associated plants and animals they support. Landscape heterogeneity also includes a diverse range of geophysical characteristics including; topographic complexity, large elevation ranges, soil type and structure, soil chemistry, soil moisture availability, and underlying geological features. Together, all of these characteristics comprise landscape heterogeneity and are crucial for maintaining the long-term persistence of habitat, biodiversity, and ecological processes at the landscape scale, especially under changing climate and land use conditions. Landscape heterogeneity provides increased opportunities for biodiversity to occupy small habitat areas that serve as a refuge in a changing climate. Habitat 'refugia' created by a diverse and heterogeneous landscape are important land characteristics that allow species to migrate to, persist in, and expand from during times of a rapidly changing climate.

In an effort to increase the capacity of plants, animals, and important ecological processes to migrate, adapt, and persist across the West, a systematic and increased network of conserved and protected areas needs to be implemented by conservation and land management planners. An increasingly large and diversified network of conserved areas in the West will help ensure the protection of important geophysical, biological, and ecological heterogeneity and allow for

BLM_0156483

conservation management of large landscape level processes containing many important ecological processes.

A networked, connected, and dynamic regional system of protected areas will provide the greatest conservation benefit as single species conservation programs may become too costly, administratively complicated, and ultimately unsuccessful in the face of unpredictable, site-specific landscape and climate driven change. The regional approach to land conservation management, drawing from biogeography and landscape ecology, have great implications for understanding the importance of incorporating different ecological scales (single species vs. multiple ecosystems) at which biodiversity conservation will be most successful.

<([#81 [9.1] The BLM also can utilize EEAs and ACECs to more effectively manage ecologically valuable resources, particularly in the face of shifting climates. Many significantly large, road-less areas managed by BLM have been identified as having very high conservation value, yet much of this land is currently not allocated or managed with any type of conservation protection or special management prescriptions. Dickson et al. 2014. By utilizing a landscape level strategy for conservation planning, BLM can fulfill its responsibility and exercise its capacity to expertly manage our valuable public landscapes. #81])>

<([#82 [14.1.1] 1. Ecological Emphasis Areas

The UFO Draft RMP proposes a new designation across the range of alternatives, called Ecological Emphasis Areas. BLM defines EEAs as "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," and they are identified with the intention of contributing to connectivity across the larger landscape. Uncompahgre Draft RMP at D-1. This innovative approach would complement ACECs, as well as other land use allocations and conservation designations considered and applied across the landscape. The stated objective of designating EEAs is to "manage to preserve the continuity of habitats, vegetation communities, and native wildlife within." Id. at 2-68. The draft RMP includes a range of alternatives for management actions to achieve that objective. This is an important and admirable management objective as the BLM is looking for new ways to manage public lands at a landscape scale in a way that facilitates climate change resilience and adaptation.

While we fully support BLM considering and designating EEAs to achieve these important management goals and objectives, we encourage the agency to utilize modern research to improve the designation and management of these areas. The scientific literature referenced in the RMP appendix addressing EEAs is decades old. The only somewhat recent research is from 2001.[83] BLM should utilize more modern science to evaluate and designate EEAs that achieve the stated goals and objectives of the EEAs and habitat management in the RMP generally. For example, The Wilderness Society has conducted recent research that would be valuable in identifying potential EEAs in the Uncompahgre Field Office, detailed below.
[Footnote 83] Noss, R. 2001. Beyond Kyoto: Forest Management in a time of rapid climate change. Conservation Biology. Vol. 15, Issue 3, pg. 578-590.)

Mapping Wildland Values to Support Conservation Strategies Across the US

BLM_0156484

Overview: For over 100 years, conservation efforts have led to the establishment of hundreds of protected areas covering millions of hectares in the United States. These conservation reserves form the foundation of strategies to protect biological diversity and ecological processes upon which species and people depend. However, there is growing recognition that these existing conservation reserves may be insufficient in sustaining biodiversity as climate change and land use continues to impact natural ecosystems. Recent calls have been made to "complete the system" of protected areas by establishing an ecologically-connected network that is more inclusive of ecosystems and species currently under- represented in protected areas. Here, we conduct a national assessment of priorities for expanding conservation reserves that protect the most ecologically intact lands, establishes a national connected network, and better represents ecosystem and hotspots of range-limited species.

Ecological integrity and "wildness": The relative wildness of land is based on its ecological condition and the degree of human control over ecological processes. Places that are ecologically intact and are maintained in a natural condition with minimal influence by human impacts or management are wilder than those with degraded ecological conditions and a high degree of human influence. The Wilderness Society works to protect the last remaining wild places (Figure 3a, upper left). For our national assessment, we used a high resolution dataset on the degree of human modification and ecological integrity to serve as a surrogate for wildness. Maps of wildness are highly correlated with Theobald's map of ecological integrity, but is higher resolution and more updated than the wildness index.

Connectivity: The importance of creating a connected network of protected areas has emerged as one of the most important conservation strategies in the face of a changing climate. Our connectivity model identifies the wildest and most natural corridors linking large protected core areas across the lower 48 states. Maintaining the wildest and least human modified corridors between protected areas may give the most numbers of species the best opportunities to move and disperse as the climate change and development continues to fragment other areas (Figure 3b, upper right). We are working to bring this science to bear on additional conservation protections on federal lands so that these wild corridors are maintained or improved.

Ecosystem representation: Effectively conserving all of nature's biological diversity requires that protected areas be representative of all habitat types. Unfortunately, our protected areas systems currently do not include full representation of all habitats, but we are working to identify those places across the country that – if protected – would diversify the protected areas system making it more representative of our entire natural heritage. Lands in red and yellow represent ecological systems (i.e., different habitats) that are not well-protected in wilderness, national parks, or other protected areas (Figure 3c, lower left). As we prioritize the conservation lands of the future, adding diversity to our existing wilderness and parks will ensure that all of nature's diversity is protected.

Hotspots of endemic biodiversity: There are some places where many rare species co-occur. These lands are said to be rich in endemic biodiversity. Alarmingly, many of these places are home to species that occur nowhere else on earth and are currently unprotected in conservation lands. The index developed by Clinton Jenkins and colleagues and appearing in the Proceedings

BLM_0156485

of the National Academy of Science in 2015 maps these unprotected hotspots as conservation priorities. We are including these data into our wildland conservation priority index to ensure that we work on protecting those rare and precious places that are globally significant homes to many rare species (Figure 3d, lower right).

Wildland conservation priorities: We combined the mapped data described above (ecological integrity, connectivity, representation, and hotspots of endemic biodiversity) into one index by simply adding up the mapped layers (Figure 4). This new index allows us to identify wildland conservation priorities based on the land's relative wildness, its importance for creating a connected network of protected areas, its value in adding to the representation of habitats, and whether it has been identified as a hotspot of endemic species diversity. Ultimately, this approach will foster a national protected system of wildlands that is more prepared to handle the projected consequences of climate change.

Applying this data to the Uncompahgre Field Office, we can review how the EEAs evaluated in the draft RMP align with criteria used to map conservation priorities and overall wildland conservation values. As seen on the maps in Figure 5 (WSCC Comment Appendix I), additional or alternative areas should be considered for EEA designation to ultimately achieve a network of conservation areas that maximize their potential to contribute to connectivity across the larger landscape.

Additionally, this research could also help BLM prioritize management prescriptions for EEAs. In the draft RMP, BLM considers essentially one set of management prescriptions for all EEAs in each alternative. Given the large amount of acreage under consideration, the more reasonable approach may be to tailor management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs. This is how BLM develops management prescriptions for ACECs, and this approach could give the agency flexibility to designate large amounts of EEAs while giving each area the level of protective management that is required.

Summary of Comments: BLM should move forward with designating Ecological Emphasis Areas in the Uncompahgre RMP to create a network of interconnected habitat areas that contributes to the ecological integrity of the broader landscape. We encourage the agency to utilize modern research to improve the designation and management of these areas, such as the wildland values mapping information provided above. BLM should consider tailoring management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs.
#82])>
<([#83 [14.1.1] [27.1] 2. Comments on Specific Ecological Emphasis Areas

a. Jumbo Mountain/McDonald Creek

We strongly support the designation of all 17,220 acres of all five zones of the Jumbo Mountain / McDonald Creek Ecological Emphasis Area included in Alternative B (DEIS Table 2-2, 103; DEIS Figure 2-2, Appendix A) As the BLM outlines in the draft RMP (DEIS Appendix D-2), these areas are highly valuable for the habitat connectivity for a number of wildlife species

within our region, particularly mule deer, elk, mountain lion, and black bear.

The draft RMP describes the ecological value of these areas as follows:
Links North Fork Valley with the National Forest and West Elk Wilderness. Adjoins several conservation easements that link the southern three parcels. Important for landscape-scale linkage. (DEIS Table D-1)

Based on the years of experience hunting, recreating, and living in close proximity to these lands, we can attest without any reservation that these lands provide exactly the quality of connectivity described. The wildlife value of these lands is difficult to overstate.

We would also like to express our strong support for overlapping designations of both the Jumbo Mountain / McDonald Creek EEA, the Jumbo Mountain SRMA, and any additional overlapping ERMA or SRMA designations in the final plan (see WSCC and DAMB/COPMOBA Comments in support of additional recreation designations). We see no inherent conflict in these designations, which will not only protect the world-renowned mule deer herds and other wildlife, but also has the possibility of improving the recreation experience by limiting activities in late winter/early spring when recreation conditions, due to precipitation and soil moisture, are poor, and impacts to trails are greatest.

It should be clear from these comments and others (DAMB/COPMOBA), that there exists a rare degree of cooperation and enthusiasm for increased management of the lands in the North Fork Valley, with many different users supportive of careful management of multiple resources that can be mutually managed on these lands. A unifying concern, however, is that oil and gas development of these lands will be prioritized over these many other resources upon which our communities depend for quality of life, economic gain, and recreation.
#83])>
<([#84 [14.1.1] b. Adobe Ecological Emphasis Area

The BLM is also proposing to manage part of the greater Adobes area under an Ecological Emphasis Area designation, which as described above, we support. However, the specific proposal for the Adobe area changes drastically from Alterative B to Alternative D as it is basically gutted through the center, leaving only portions of the area designated on the northwest and far eastern boundaries.

This would leave the center of the Adobes/Desert Salt Brush Ecosystem ACEC area completely without any special designation status to protect the many unique values and resources that have been highlighted through the LWC, ACEC and EEA analysis. For the BLM to truly protect this area from further degradation and maintain the landscape scale habitat management it aspires to, the full acreage of the Adobes EEA must be restored in the Final RMP.

Taken altogether, the LWC, ACEC and EEA designations will create a holistic management proposal that will protect a large area of unique a vulnerable desert shrub lands and habitat that connect to Forest Service lands on the Grand Mesa.
#84])>
c. Monitor/Potter/Roubideau

We support BLM including the Roubideau EEA as identified in both Alterative B and Alternative D in the Final RMP as it maintains its full acreage in both.

<([#85 [9.1] [6] 3. Areas of Critical Environmental Concern

Under FLPMA, BLM is obligated to develop and revise land use plans to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values…[and] where appropriate, will preserve and protect certain public lands in their natural condition…" 43 U.S.C. §1701(a)(8). FLPMA obligates BLM to "give priority to the designation and protection of areas of critical environmental concern [ACECs]." 43 U.S.C. § 1712(c)(3). ACECs are areas "where special management is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes." 43 U.S.C. § 1702(a).

BLM's ACEC Manual (1613) provides additional detail on the criteria to be considered in ACEC designation, as discussed in the applicable regulations, as well. See, BLM Manual 1613 at .1 (Characteristics of ACECs); 43 C.F.R. § 8200. An area must possess relevance (such that it has significant value(s) in historic, cultural or scenic values, fish & wildlife resources, other natural systems/processes, or natural hazards) and importance (such that it has special significance and distinctiveness by being more than locally significant or especially rare, fragile or vulnerable). In addition, the area must require special management attention to protect the relevant and important values.

For potential ACECs, management prescriptions are to be "fully developed" in the RMP. BLM Manual 1613 at .22 (Develop Management Prescriptions for Potential ACECs). These management prescriptions include general policies and mitigation measures that "protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources…" BLM Manual 1613 at .02.

We support that BLM is considering a robust range of ACECs for designation in the Uncompahgre RMP. The fact that the proposed Planning 2.0 rule emphasizes ACECs, as well as the fact that BLM is currently updating its ACEC Manual, speaks to both the importance of incorporating ACEC designation into the agency's landscape-level strategy for land use planning and the unique position that ACECs will have in the next chapter of BLM land use planning. Therefore, the limited number and acreage of ACECs that would be designated in the preferred alternative is inadequate to support a connected landscape and maintain its ecological integrity. At the same time, we note that many of the ACECs under consideration in the draft RMP overlap with potential EEAs, particularly in Alternative B. Uncompahgre Draft RMP at Figures 2-2 and 2-64. We encourage BLM to ultimately designate a network of ACECs and EEAs that is consistent with FLPMA and agency policy, and also maximizes the ability of these designations to create a connected network of protected areas across the Uncompahgre Field Office.

Summary of Comments: In compliance with FLPMA and BLM's obligation to designate ACECs

where lands exhibit relevant and important qualifying criteria, we recommend that BLM adopt a comprehensive ACEC framework that designates adequate new ACECs, applies robust management prescriptions to protect relevant and important criteria, and creates an integrated network with EEAs and other conservation allocations and designations in the planning area. #85])>

4. Comments on Specific Areas of Critical Environmental Concern


a. Needle Rock

We support managed of Needle Rock as an Area of Critical Environmental Concern.

<([#86 [9.1] b. Roubideau – Potter – Monitor

In BLMs ACEC analysis, the Roubideau-Potter and Monitor mesa and canyon complex is recognized as an ACEC of 20,502 acres in size with valuable resources of riparian vegetation. The area is recognized by the CNHP for its high biodiversity rating, giving it statewide and global significance.

The area also has cultural and historical sites that are vulnerable to change and warrant protection as an ACEC. If the BLM is planning to manage this area as an SRMA expecting more visitation in the future (as explained in the rational for moving it towards "front country management") these historic resources need to be managed so increased recreational use does not damage them.

The Roubideau ACEC is present in Alternative D and named "Roubideau Corridors," but is drastically reduced in size to 8,720 and only includes the canyons, not the mesa tops. This proposal would leave the mesa tops without either LWC or ACEC protection, only selectively managing to protect the riparian vegetation in the canyons and not the montane forest also identified in the area.

After leading many on the ground hikes in both the canyons and the mesa tops, it is clear the area should be treated as a holistic unit and not separated into canyons and mesas. The experience of being in this area in not complete without being able to enjoy a hike through the canyons and then climb up to the mesa tops to get a full view of the surrounding area. If BLM is not going to manage the mesa tops as part of the LWC unit, an ACEC designation should include to mesa tops to ensure the holistic management of the area to protect it and maintain the quality of the experience.

We recommend that the BLM include the full Roubideau ACEC as identified in Alternative B in the Final RMP. #86])>

<([#87 [9.1] d. Adobe Badlands and Salt Desert Shrub Ecosystem ACECs

i. The greater Adobe badlands in north Delta are a fascinating and vulnerable environment. It is a system based on fragile shales and soil crusts that in turn support rare high desert plant and

animal species. The Colorado Natural Heritage Program considered salt desert shrub lands in the area to be globally vulnerable and locally imperiled. These fragile desert systems need a high level of preservation to retain an intact ecosystem as they have a high difficulty in recovery from disturbance.

ii. The greater adobes area has two different proposed ACECs that overlap. One is the existing Adobe Badland ACEC which basically overlaps the WSA. The other is the Salt Desert Shrub Ecosystem ACEC which is much larger in size and would go further in protecting these fragile systems. We encourage the BLM to carry the Salt Desert Shrub Ecosystem ACEC into the final RMP with the full acreage as identified in Alternative. This management decision would lessen the impacts to Special Status Species and protect a system that is already facing encroachment and fragmentation.

iii. The proposed ACEC meets BLM's ACEC criteria and should be designated as such:
a. The area has significant wildlife values: populations of white tallied prairie dogs, kit fox, burrowing owl, ferruginous hawk and pronghorn antelope. All together it has been ranked as an area of "very high biodiversity significance" by the Colorado Natural Heritage Program.
b. Natural processes or systems: significant populations of hookless cactus, adobe penstemon, and clay-loving buckwheat, all endangered or threatened endemic sensitive plants
c. More than local qualities: In addition to providing an important natural area for local residents to enjoy, the area is listed in the state and regional hiking guide books because of its scenic formations. If one looks on line, there is evidence of evidence of visitors from as far away a Europe who post photos and GPS coordinates of their trips into this area.
d. Vulnerable qualities: the area is clearly vulnerable to high levels of erosion and without special management. Issues such as illegal off road recreation, dumping and other damaging uses are difficult for systems such as these to recover from. Saline soils are vulnerable to adverse change. Without added management protection, the area could be damaged for decades to come. #87])>

H. Wild & Scenic

1. Legal and procedural requirements

We appreciate the BLM's conscientious and professional compliance with requirements regarding wild & scenic analyses and decisions within the RMP process, including section 5(d)(a) of the Wild and Scenic Rivers Act and by the BLM Manual at 8351 and 6400. Beyond mere compliance, we also thank the BLM for its thoroughness in reviewing potential rivers at each stage of its W&S analysis—including initial inventory of rivers, eligibility report, and suitability report—and for its extra efforts in community outreach and in field assessment of potential rivers.

We believe that the W&S suitability findings included in the BLM's Wild and Scenic River Suitability Report, February 2013 (included as Appendix P to the draft RMP), provides a fair and sound analysis and set of recommendations. We believe that the suitability findings should be fully implemented in the final RMP, as represented in the preferred alternative of the Draft RMP.

BLM_0156490

2. Critique of working groups

One component in the W&S suitability analysis was a series of public-engagement meetings and negotiations, structured separately for the Gunnison River basin and the San Miguel-Dolores River basin.

The citizens' working group focused on eligible segments within the Gunnison River basin was loosely organized and marginally facilitated, open to a frequently changing array of interested individuals, without consistent representation, and with changing protocols for discussion and decision-making.

As a result, no consensus was reached on recommendations to the BLM. Two reports were submitted from that process: One report recommended no stream segments be found suitable; the other recommended three segments be found suitable (Monitor Creek, Potter Creek, Roubideau Creek segment 1). Both reports are included on the BLM's website for the RMP, and we appreciate that fact that both were considered by the BLM in crafting its draft RMP.

For the San Miguel and upper Dolores river basin, the BLM's Southwest Resource Advisory Council (RAC) appointed a diverse citizens committee to review candidate rivers.

The sub-RAC, as it was known, was thoughtfully and fairly structured, was professionally facilitated and recorded, hosted nine public-comment meetings, and included a deliberately selected membership intended to represent a comprehensive spectrum of community and resource interests.

That group studied each eligible river in detail and recommended thirteen stream segments be found suitable, those recommendations later affirmed by the full RAC and forwarded to the BLM. In many instances, river segments were adjusted in length—most typically to remove private land from suitability implications—and some were adjusted in classification to better fit local water use and other resource needs.

3. Watershed approach to rivers management and protection

The BLM's suitability findings in the San Miguel-Dolores River basin are correspondingly well founded in careful analysis, in strong public engagement and support, and in a constructive spirit of compromise and mutual accommodation among protection, commodity, and community interests.

Moreover, the suitability findings for the San Miguel River, for portions of the Dolores River, and for key tributaries to both are consistent with suitability determinations in adjacent federal land management units. Specifically, W&S suitability findings recently established or affirmed in the watershed by the San Juan National Forest, the BLM Tres Rios Field Office, and the BLM Grand Junction Field Office will now be complemented by similar findings of suitability—and corresponding protective management—in the Uncompahgre Field Office.

That consistency is further enhanced by the BLM's recent realignment of management districts,

now including in the entire Dolores River watershed in one coordinating district.

The call for a comprehensive and coordinated watershed approach to rivers management and protection was a frequent and consistent refrain during the working group processes. The management decisions noted above, the BLM organization restructuring, and now strong and well-founded suitability decisions in the Uncompahgre Field Office provide affirmative response to those requests.

4. Opportunities for federal-state cooperation

The BLM's administrative management and protection for potential Wild & Scenic Rivers, through eligibility or suitability, affords an important opportunity to comprehensively address river values. A combination of federal land management prescriptions under the RMP and streamflow protections using the State of Colorado's Stream and Lake Protection Program will ensure the continued health and natural vibrancy of the full spectrum of river flow and river corridor features.

Correspondingly, we appreciate the position recently taken by the Colorado Water Conservation Board (CWCB) (which manages the state stream protection program), acknowledging the potential value of W&S suitability findings in both watersheds and requesting several specific accommodations from the BLM.

Specifically, we encourage the BLM to a) incorporate into its final RMP preparation information and documents prepared under the state's Basin Roundtable process, b) acknowledge existing state instream flow water rights affecting W&S suitable stream segments and encourage cooperation on the selective expansion of those rights and establishment of new rights to complement the suitability status, c) affirmation of stipulation between the CWCB and the Dolores Water Conservation District in the matter of CWCB staff recommendation for instream flow appropriation on the Dolores River, d) incorporate updates regarding CWCB instream flow water rights, both established and pending, e) include clarification regarding effects that W&S suitability may or may not have on potential development conditional water-storage rights held by Montrose County, and f) provide clarifications regarding the effects that W&S suitability may or may not have on continued operation of McPhee Reservoir and the Dolores Project.

While we understand that the pending RMP is probably not the correct context in which to address potential federal legislation, we encourage the BLM to otherwise acknowledge and affirm the its openness to streamflow protection for potential W&S rivers by means other than pursuit of federal reserved water rights.

At the same time, we recommend that the BLM should not adjust its RMP suitability findings for stream segments being discussed for possible federal legislation (upper Dolores River, La Sal Creek e.g.), leaving final or adjusted determinations to Congress or to future BLM administrative processes. It is important that legislative deliberations benefit from the BLM's professional and objective assessment of particular stream values and of their potential for inclusion in the Wild and Scenic Rivers System or other protective designation.

5. Comments on specific stream segments

We strongly endorse all the W&S suitability findings included in the BLM's Wild and Scenic Suitability Report, highlighted in Appendix P to the draft RMP, and we urge BLM to include those findings in the final RMP, along with protective management prescriptions appropriate to suitability status and classification.

Further, we urge BLM to fully and reliably implement, in the RMP, other protection measures for rivers and river corridors determined to be W&S eligible but found not suitable. In many instances, a combination of recommendations from the citizen working groups and acknowledgements in the draft RMP have asserted that suitability was not necessary for certain stream segments specifically because other measures are in place to protect the free-flowing condition and the outstandingly remarkable values that warranted the original eligibility determination. It is important that the BLM ensure the continued protection of values identified under eligibility.

Related, the BLM, through the RMP and otherwise, should continue to monitor the presence and effectiveness of those alternative protection measures. If those measures fail or are discontinued for any stream segments that had been found eligible, BLM should promptly reconsider, through an RMP amendment, eligibility and suitability for those segments.

a. Gunnison River Segment 2

As documented the BLM's W&S eligibility report, this regionally significant river warrants strong and enduring protection as an important recreational opportunity, as the hydrologic heart of unique adjacent public lands, and as essential habitat for at least two endangered species of native fish, along with three other species of ancient native fish that are imperiled primarily because of loss of habitat or changes in river flows.

Other federal programs—primarily the Endangered Species Act—and evolving federal management efforts—including re-operation the Aspinall Unit dams upstream—contribute, or will contribute, to the reliability of those critical-habitat flows.

It therefore is not necessary to apply a finding of wild & scenic suitability to this portion of the Gunnison River, so long as those other federal measures are implemented and properly maintained. If those measures are either removed or fail to protect the native fish and their habitat, the BLM should reconsider a finding of suitability in future planning processes.

b. Monitor Creek
This stream is an important feature flowing through the heart of federal lands with wilderness character and wilderness characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

BLM's classification of this stream segment as wild affirms those wilderness characteristics and

values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values identified by the BLM (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Monitor Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and Outstandingly Remarkable Value (ORV)) identified by the BLM for nearby Roubideau Creek (desert bighorn sheep). The features, condition, and importance of this wildlife habitat along Monitor Creek are of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Monitor Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), the version found along Monitor Creek is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude- preserving recreation opportunities noted here for Monitor Creek are also present in Roubideau Creek, which is included, stream and corridor, in the Roubideau (Camel Back) Wilderness Study Area, thus necessarily defined by those same backcountry recreation opportunities.

Meanwhile, a finding of wild & scenic suitability for Monitor Creek—a finding most directly applicable to the lands in the stream corridor—will provide reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest).

Federal ownership of 100% of this stream segment, and of 96.2% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 104.9 acres of private land within the stream corridor are actually separate from the stream, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Monitor Creek segment be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should be expanded to include recreational opportunities and wildlife habitat.

c. Potter Creek

This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for

BLM_0156494

protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values originally identified in the BLM's eligibility report (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Potter Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and ORV) identified by the BLM for adjacent Roubideau Creek (desert bighorn sheep). The features, condition, and importance of that wildlife habitat along Potter Creek is of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Potter Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), it is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Potter Creek are also present in Roubideau Creek. Roubideau Creek and its corridor are included in the Roubideau (Camel Back) Wilderness Study Area, which is necessarily defined by those same backcountry recreation opportunities.

Meanwhile, the BLM's decision to remove the one outstandingly remarkable value originally identified in the agency's eligibility report is in error. The BLM's rather arbitrary distinction between a classification as critically imperiled globally (G1) and vulnerable throughout its range (G2) is not well founded.

A plant community that is currently vulnerable throughout its range warrants the highest possible level of protection in each of its occurrences, lest damage from human activity, climate change, or other harmful factors translate vulnerable to imperiled. The best way to avoid plant community failures in the future is an active protection in the present. A finding of suitability, and accompanying protective management, is an appropriate and timely tool for this plant community.

A finding of wild & scenic suitability for Potter Creek—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest).

Federal ownership of 100% of this stream segment, and of 98.5% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 44.3 acres of private land are located at the far lower end of the stream segment, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Potter Creek be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should continue to include the highlighted vegetation communities, and they should be expanded to include recreational opportunities and wildlife habitat.

d. Roubideau Creek Segment 1

This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, both within the long-standing Roubideau (Camel Back) Wilderness Study Area and in the larger citizens' wilderness proposal of the same name. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

A finding of wild & scenic suitability for Roubideau Creek Segment 1—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring protection for the continued health of the ORVs identified in the BLM's eligibility report, including: rare plant communities (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest); wildlife (northern leopard frog, desert bighorn sheep); cultural; and recreational (primitive and non-mechanical exploration and exercise).

Federal ownership of 93% of this stream segment, and of 94.8% of the land in the stream corridor simplifies the effective implementation of protective management.

We recommend that the full length of the Roubideau Creek Segment 1 be found suitable, applicable at least to the federal lands in the corridor.

e. Roubideau Creek Segment 2

The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

BLM_0156496

The relatively low percentage of federal land ownership along the stream and in the stream corridor (45.5%, 60.2%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Roubideau Creek Segment 2.

<([#88 [40.1] I. Wilderness Study Areas

We support that the Uncompahgre Draft RMP identifies management actions for Wilderness Study Areas in the event they are released from wilderness consideration by Congress.

The Camel Back WSA would receive minimal protections for its natural resource values under the preferred alternative in the Draft RMP if it were to be released from WSA status. The only overlapping designations in the preferred alternative are the Roubideau Corridors ACEC and Roubideau SRMA. Uncompahgre Draft RMP at Maps 2-66 and 2-47. The Roubideau Corridors ACEC is small relative to the Camel Back WSA, and the Roubideau SRMA as considered in Alternative D would not provide adequate protection to the important public lands resources in the Camel Back WSA. Therefore, the final RMP should adopt the Roubideau SRMA as contemplated in Alternative B; designate the Roubideau-Potter- Monitor ACEC as contemplated in Alternative B; or identify specific management actions to protect the natural resources of the Camel Back WSA in the event of Congressional release similarly to how the draft RMP would manage the Sewemup Mesa WSA in the event of Congressional release.
#88])>
<([#89 [35.1] J. Night Sky Resources

We support that the Uncompahgre Draft RMP addresses protection of dark night skies across the range of alternatives. In the alternatives table for visual resources, one of the identified objectives is to: "Maintain dark night sky conditions in areas that are generally unaffected by man-made light sources." Uncompahgre Draft RMP at 2-147. The draft RMP goes on to detail actions for achieving this objective, including prohibiting permanent outdoor artificial lighting in VRM I and II areas, requiring that permanent and temporary artificial outdoor lighting be shielded and downward-facing, and requiring that permanent artificial outdoor lighting be turned off when it is not needed. Id at 2-147—148. These are appropriate actions to ensure that night sky resources, which are important visual resources of our public lands, are protected from light pollution.

BLM has been given an explicit mandate to manage the lands under its jurisdiction for their scenic and atmospheric values, which includes night skies. See, FLPMA, 43 U.S.C. § 1701(a)(8) (stating that "…the public lands be managed in a manner that will protect the quality of the…scenic…[and] air and atmospheric…values…"); National Environmental Policy Act, 43 U.S.C. § 4331(b)(2) (requiring measures to be taken to "…assure for all Americans…esthetically pleasing surroundings…"); National Historic Preservation Act, 36 C.F.R. § 800.1(a) (requiring federal agencies to consider measures to avoid impacts on historic properties, including their "settings"). A dark night sky is undoubtedly a scenic and atmospheric value within that term's meaning as defined in FLPMA.

Since 1984, BLM has interpreted its mandate as a "stewardship responsibility" to "protect visual values on public lands" by managing all BLM-administered lands "in a manner which will

protect the quality of scenic (visual) values." Visual Resource Management Handbook, H-8400-1 at .02, .06(A). Night sky management is an inherent component of this responsibility. VRM is not restricted to land-based resources. To this end, BLM should develop minimum management prescriptions to be included in its resource management plan that give due consideration to the value of a dark night sky, consistent with BLM's multiple use mandate, as defined at 43 U.S.C. § 1702(c).

In addition to carrying forward the management actions contemplated in the Draft RMP, BLM should adopt minimal additional management actions to even better steward this important visual resource. The Arizona Strip District incorporated the following prescriptions in the RMPs for the District in 2008, which would be appropriate for the Uncompahgre Field Office:
* Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review. These measures may include directing all light downward, using shielded lights, using only the minimum illumination necessary, using lamp types such as sodium lamps (less prone to atmospheric scattering), using circuit timers, and using motion sensors.
* Any facilities authorized will use the best technology available to minimize light emissions. Arizona Strip RMP at 65; Grand Canyon-Parashant National Monument RMP at 67; Vermilion Cliffs National Monument RMP at 47-48.

Furthermore, the Uncompahgre RMP should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that BLM can accurately and appropriately apply the dark night sky management actions in RMP implementation.

Summary of Comments: BLM should adopt management actions contemplated in Alternative B of the Uncompahgre Draft RMP, which extends the prohibition on permanent artificial outdoor lighting to VRM II areas in addition to VRM I areas. BLM should also adopt the following management actions to further protect dark night sky resources:
* Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review.
* Any facilities authorized will use the best technology available to minimize light emissions.

Additionally, BLM should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that these management actions can be applied in implementation.
#89])>
K. Climate Change

<([#90 [11.3] 1. BLM's Obligation and Authority to Analyze Climate Change in RMPs

BLM has a legal duty to address the impacts of climate change both from land management actions and to the resource area in the Uncompahgre RMP. The Uncompahgre Field Office will undoubtedly experience real effects of climate change during the 20-year period that the RMP is in effect and beyond. Many management decisions in the RMP may contribute to and exacerbate the impacts of human-induced global climate change, and BLM stewards many resources that

BLM_0156498

must be managed so as to maximize their ability to adapt and endure in the face of climate change.

We appreciate that BLM acknowledges the need to manage for climate change impacts, analyzes some of those impacts from BLM actions and from other actions affecting the Uncompahgre Field Office, quantifies greenhouse emissions from alternatives under consideration in the RMP and proposes a goal and objective specifically related to climate change in the draft RMP. See, e.g., Uncompahgre Draft RMP at 2-24; 3-14—16; 4-37—43; Appendix Q. These are all important initial steps in bringing climate change analysis and management into resource management planning. However, at this time, BLM has access to significant amounts of data and useful tools to assist with climate change analysis, relevant policy and guidance for completing robust climate analysis in environmental reviews, and an obligation to make management decisions that more comprehensively address climate change impacts and adaptation. The Uncompahgre RMP is wholly inadequate in addressing this important issue at this critical time. #90])>

<([#91 [11.3] a. BLM must take a hard look at climate change impacts from management decisions in the environmental impact statement for the resource management plan.

Impacts to the ecosystem from climate change include shrinking water resources; extreme flooding events; invasion of more combustible non-native plant species; soil erosion; loss of wildlife habitat; and larger, hotter wildfires. Many of these impacts have been catalogued in recent studies by federal agencies showing the impacts of climate change specifically in the United States such as the National Climate Assessment.[84]
[Footnote 84] Available at http://nca2014.globalchange.gov/

An important source of information for impacts from climate change is BLM's Rapid Ecoregional Assessment (REA) for the Colorado Plateau.[85] BLM should be using the results of the REA to inform the RMP/EIS and to address management issues at the landscape-scale, such as climate change. The Draft RMP states that, "Data in the Colorado Plateau Rapid Ecological Assessment [sic] will be considered as appropriate." Uncompahgre Draft RMP at 1-12. However, BLM appears to rely very little on data available from the REA, as there is hardly any reference to the REA other than that vague commitment, and the RMP fails to consider management alternatives that reflect data derived from the REA. The REA should be a central tool relied upon in resource management planning to plan for climate change adaptation: REAs are timely in supporting planning, management, and mitigation strategies for impacts anticipated from rapidly-developing issues related to traditional and renewable energy development, the spread of invasive species, changing fire regimes, and climate change. REAs provide a foundation for an adaptive management approach that will allow implementation strategies to be adjusted for new information and changing conditions. REAs represent a baseline condition from which to evaluate the results of adaptive management and to characterize potential trends in resource condition both in the near-term (2025)—as a consequence of development activities—and in the long-term (2060) as a result of climate change. The final chapter of this REA report (Chapter 6) provides examples showing how the data and results may be arranged and manipulated using mapped and tabular results, for all land ownerships and BLM-lands only, for areas of intact habitats, resource value hotspots, and opportunities for

connectivity with existing designated lands.
Colorado Plateau REA Final Report II-3-c at viii.
[Footnote 85] Information on the REA is available at:
http://www.blm.gov/wo/st/en/prog/more/Landscape_Approach/reas/coloplateau.html.

Unfortunately, with all of this data available, BLM fails to address climate change in a meaningful way, instead intimating that the agency is incapable of managing public lands and resources to reduce impacts to climate change or adapt to climate change impacts. For example, under the stated goal to: "Manage native vegetation and wildlife species, soil and water resources, and wildlife habitats to maintain productivity, viability, and natural processes in response to stresses induced by climate change," BLM includes the vague management action to "Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values." Uncompahgre Draft RMP at 2-24. The only other actions under the climate change goal are to seed local native species to improve survival of plan populations and to minimize soil and vegetation disturbance in ecological emphasis areas. Id at 2-25.

This does not meet the obligation of the agency to assess impacts from climate change and contributions to climate change from agency actions. On August 2, 2016, the Council on Environmental Quality (CEQ) released its long-awaited final guidance on considering greenhouse gas (GHG) emissions and the effects of climate change in NEPA reviews. The overarching goal of the guidance is to provide greater clarity and more consistency in how federal agencies address climate change in their NEPA reviews and to facilitate compliance with existing NEPA requirements. The guidance recognizes that "[c]limate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview." CEQ Guidance at 2. It recognizes that identifying and analyzing the interactions between our changing climate and the environmental impacts from a proposed action can have a number of benefits, including identifying opportunities to reduce and mitigate GHG emissions, to improve environmental outcomes, and to help safeguard communities, infrastructure, and resources against the effects of climate change.

The guidance counsels agencies to use the information developed during the NEPA review to consider alternatives that are more resilient to the effects of a changing climate. CEQ Guidance at 5. BLM must not only analyze greenhouse gas emissions from proposed actions, but use that information to make better decisions for public lands resources and, equally importantly, assess likely impacts to our public lands from climate changes already underway in order to respond and adapt. Notably, the guidance contains special considerations for biogenic sources of greenhouse gas emissions from land management actions, such as prescribed burning. CEQ Guidance at 18. While the final CEQ guidance was recently released, a second draft of this guidance has been out since 2014. Therefore, the Uncompahgre RMP is not exempt from considering and using this guidance in analyzing climate change, and BLM should have incorporated principles from the CEQ guidance into the draft RMP. #91])>

<([#92 [11.4] Additionally, BLM has other requirements to analyze climate change in NEPA analyses that are not met in the draft RMP. NEPA regulations and U.S. courts direct that BLM must fully analyze the cumulative and incremental impacts of the proposed decisions in the

RMP.[86] In CBD v. NHTSA, the NHTSA failed to provide analysis for the impact of greenhouse gas emissions on climate change and was rebuked by the U.S. Court of Appeals for the Ninth Circuit, which observed that "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." 538 F.3d at 1217. For example, off-road vehicle designations, oil and gas management stipulations, and renewable energy development may significantly increase or reduce greenhouse gas emissions contributing to climate change and must be analyzed under NEPA.
[Footnote 86] Center for Biological Diversity v. National Highway Traffic Safety Administration, 538 F.3d 1172, 1217 (9th Cir. 2008).

Further, NEPA regulations require that NEPA documents address not only the direct effects of federal proposals, but also "reasonably foreseeable" indirect effects. These are defined as: Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b) (emphasis added).

BLM is required to take a hard look at direct, indirect, and cumulative impacts to and from climate change in the planning area in the RMP. BLM baseline data on climate change must be sufficient to permit analysis of impacts under NEPA. Importantly, 40 C.F.R. § 1502.15 requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." Establishment of baseline conditions is a requirement of NEPA. In Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

There is a growing body of scientific information already available on climate change baseline conditions, much of it generated by or available through federal agencies. Where there is scientific uncertainty, NEPA imposes three mandatory obligations on BLM: (1) a duty to disclose the scientific uncertainty; (2) a duty to complete independent research and gather information if no adequate information exists unless the costs are exorbitant or the means of obtaining the information are not known; and (3) a duty to evaluate the potential, reasonably foreseeable impacts in the absence of relevant information, using a four-step process. Unless the costs are exorbitant or the means of obtaining the information are not known, the agency must gather the information in studies or research. 40 C.F.R. § 1502.22. Courts have upheld these requirements, stating that the detailed environmental analysis must "utiliz[e] public comment and the best available scientific information."[87]
[Footnote 87] Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1171-72 (10th Cir. 1999) (citing Robertson v. Methow Valley Citizens' Council, 490 U.S. at 350); Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1521-22 (10th Cir. 1992).

As the Supreme Court has explained, while "policymaking in a complex society must account for

uncertainty," it is not "sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions."[88] Instead, in this context, as in all other aspects of agency decision-making, "[w]hen the facts are uncertain," an agency decision-maker must, in making a decision, "identify the considerations he found persuasive."[89]

[Footnote 88] Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 52 (1983).

[Footnote 89] Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 520 (D.C. Cir. 1983), quoting Ind. Union Dept., AFL-CIO v. Hodgson, 499 F.2d 467, 476 (D.C. Cir. 1974).

BLM's duty to evaluating reasonably foreseeable significant adverse impacts includes "impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22(b). Such impacts are especially significant in the face of climate change. #92])>

<([#93 [37.5] Finally, BLM Instruction Memorandum 2013-094 regards management during drought. This IM requires BLM to modify uses and management to lessen impacts from drought including activities such as grazing, recreation, lands actions and minerals activities. IM 2013-094 also states that BLM should consider the information in BLM's Rapid Ecoregional Assessments in assessing drought and mitigation measures and states a preference for RMPs and other plans to proactively address potential drought and its effects. #93])>

<([#94 [11.1] [6] b. BLM must craft long-term management prescriptions without permanent impairment and unnecessary or undue degradation to the resources in the face of climate change.

FLPMA gives BLM the authority to manage and plan for emerging issues and changing conditions that global climate change will affect in the planning area. FLPMA mandates that when BLM revises land use plans, it must "use and observe the principles of multiple use and sustained yield set forth in this and other applicable law" 43 U.S.C. § 1712(c).

The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions. . . a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources. . . and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output. 43 U.S.C. § 1702(c) (emphasis added).

Additional pertinent requirements of FLPMA that specifically apply to land use planning include using "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences; consider[ing] relative scarcity of the values involved; and weigh[ing] long- term benefits to the public against short-term benefits. Id. FLPMA also provides that BLM must "take any action necessary to prevent unnecessary or undue degradation

to managed resources." 43 U.S.C. § 1732(b). Collectively, the provisions of FLPMA highlighted above necessitate on-the-ground implementation of climate change policies.

In addition to the agency's duty under NEPA to take a hard look at the impacts of climate change to and from decisions in the resource management plan, BLM must also include a range of alternatives that includes a strategy for mitigating these impacts. CEQ regulations instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact, specifically stating that "[f]ederal agencies shall to the fullest extent possible: . . . Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e) (emphasis added); see also, 40 C.F.R. §§ 1502.14, 1502.16.

The impacts of climate change should be a major factor in every alternative that is created since it is an undeniable reality that will drive all land use planning decisions. As provided in the Oregon/Washington BLM State Office guidance document IM OR-2010-012, "[r]esource management plans and other broad programmatic analyses are actions that would typically have a long enough duration that climate change could potentially alter the choice among alternatives." #94])>

<([#95 [11.5] Further, general statements that BLM will conduct monitoring are also not an appropriate form of mitigation. Simply monitoring for expected damage does not actually reduce or alleviate any impacts. Instead, a vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem. A detailed monitoring approach is also required under the BLM's planning regulations:
The proposed plan shall establish intervals and standards, as appropriate, for monitoring and evaluation of the plan. Such intervals and standards shall be based on the sensitivity of the resource to the decisions involved and shall provide for evaluation to determine whether mitigation measures are satisfactory, whether there has been significant change in the related plans of other Federal agencies, State or local governments, or Indian tribes, or whether there is new data of significance to the plan. The Field Manager shall be responsible for monitoring and evaluating the plan in accordance with the established intervals and standards and at other times as appropriate to determine whether there is sufficient cause to warrant amendment or revision of the plan. 43 C.F.R. § 1610.4-9 (emphasis added).

Such vigilant monitoring is absolutely necessary in order to create an effective adaptive management framework in the face of climate change. #95])>

<([#96 [11.3] c. BLM must estimate the potential increase in vulnerability to climate change impacts.

As discussed above, the agency must evaluate the direct, indirect and cumulative impacts of climate change emissions from the project. The agency must also take a hard look at the impacts of climate change and the potential increase in vulnerability to the project area from climate change. As stated in the CEQ Guidance:
The analysis of climate change impacts should focus on those aspects of the human environment that are impacted by both the proposed action and climate change. Climate change can make a

resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change. This increase in vulnerability can exacerbate the effects of the proposed action . . . Such considerations are squarely within the scope of NEPA and can inform decisions on whether to proceed with, and how to design, the proposed action to eliminate or mitigate impacts exacerbated by climate change. They can also inform possible adaptation measures to address the impacts of climate change, ultimately enabling the selection of smarter, more resilient actions.

CEQ Guidance at 21-22. In order to fulfill its responsibilities under NEPA, the BLM must fully evaluate the potential increased vulnerabilities to the landscape and communities caused by climate change and the impacts of this project to potentially exacerbate those vulnerabilities. This will provide the agency, the project proponent and the public with more information on possible mitigation measures that could be implemented as well as measures to boost the resiliency of the landscape. #96])>

<([#97 [11.1] d. BLM must evaluate climate emissions in the context of U.S. climate commitments and seek to meet those national goals.

The climate change impacts observed from GHG emissions are already evident and will worsen unless emissions of GHGs are greatly reduced. The wide range of impacts from climate change, including melting glaciers and earlier snow melts in our mountains that disrupt water supplies in the west, thawing permafrost, forest fires, widespread drought, rising sea levels, and the spread of invasive species, have been rigorously and scientifically documented by the Intergovernmental Panel on Climate Change (IPCC), as well as American researchers and agencies. These have led to substantial commitments made by this Administration to reduce our national contribution to climate change. As part of these commitments, federal agencies must begin to not just measure, but to act on the basis of potential GHG emissions.

Our public lands and minerals are held in trust for the public. We must ensure this trust is not broken when authorizing actions on our public lands that contribute to climate emissions. In particular, fossil fuel production on federal public lands and mineral estates is extensive and the production of GHGs resulting from the exploration, extraction, transportation and combustion of these fuels is significant. The federal fossil fuels program must provide assurance the public trust will not be violated by carefully considering climate change issues and taking steps to avoid, minimize and offset impacts through compensatory mitigation. In 2012, as much as 21 percent of the Nation's GHG emissions originated from coal, oil and natural gas extracted from the public lands.[90]
[Footnote 90] Claire Moser, Joshua Mantell, Nidhi Thakar, Chase Huntley and Matt Lee-Ashley. Cutting Greenhouse Gas from Fossil-Fuel Extraction on Federal Lands and Waters. March 19, 2015. Policy brief and underlying analysis is available at http://wilderness.org/blog/blind-spot-plan-reduce-emissions-slowing-progress-fight-against-climate-change (accessed July 28, 2016).

Leading science has firmly established the need for developing thresholds of acceptable fossil energy extraction for the planet based on expected GHG emissions. The scientific understanding that the global increase in temperature due to greenhouse gas emissions must be capped at or below 2-degree Celsius to avoid unmanageable climate change consequences is well-established.

The 2-degree Celsius threshold was first enshrined in the 2009 Copenhagen Accord[91] and reaffirmed in the 2015 Paris Agreement as the limit for "acceptable" warming.[92] During that time, the international scientific community's understanding of the interaction between fossil fuel development and temperature thresholds has greatly increased, and today it is widely agreed that development of additional reserves should be considered in the context of warming goals—giving rise to the idea of a carbon budget for the planet. In fact, this notion has been assessed and supported by the IPCC in all assessment reports going back to 1990 and has yielded a methodology routinely employed and updated annually by the Global Carbon Project.[93]

[Footnote 91] Copenhagen Accord ¶ 1, agreed Dec. 18, 2009, FCCC/CP/2009/11/Add.1, available at http://unfccc.int/resource/docs/2009/cop15/eng/11a01.pdf ("recognizing the scientific view that the increase in global temperature should be below 2 degrees Celsius" relative to pre-industrial temperatures to "stabilize greenhouse gas concentration in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system"); id. at ¶ 2(agreeing that "deep cuts in global emissions are required according to science" to meet this goal).

[Footnote 92] The United States and other signatory nations committed to reducing greenhouse gas emissions "well below 2 °C above pre- industrial levels and to pursue efforts to limit the temperature increase to 1.5 °C above pre-industrial levels." Paris Agreement art.2, ¶ 1(a), adopted Dec. 12, 2015, FCCC/CP/2015/L.9, available at http://unfccc.int/resource/docs/2015/cop21/eng/l09r01.pdf. The authority cited in the letter is being provided via regualtions.gov and it should be included in the administrative record for this decision.

[Footnote 93] The IPCC has produced and reviewed a carbon budget for the planet in all assessment reports (Ciais et al., 2013; Denman et al., 2007; Prentice et al., 2001; Schimel et al., 1995; Watson et al., 1990), as well as by others (e.g. Ballantyne et al., 2012). These assessments included carbon budget estimates for the decades of the 1980s, 1990s (Denman et al., 2007) and, most recently, the period 2002–2011 (Ciais et al., 2013). The IPCC methodology has been adapted and used by the Global Carbon Project (GCP, www.globalcarbonproject.org), which has coordinated a cooperative community effort for the annual publication of global carbon budgets up to the year 2005 (Raupach et al., 2007), 2006 (Canadell et al., 2007), 2007 (published online; GCP, 2007), 2008 (Le Quéré et al., 2009), 2009 (Friedlingstein et al., 2010), 2010 (Peters et al., 2012b), 2012 (Le Quéré et al., 2013; Peters et al., 2013), 2013 (Le Quéré et al., 2014), and most recently 2014 (Friedlingstein et al., 2014; Le Quéré et al., 2015). Each of these papers updated previous estimates with the latest available information for the entire time series. From 2008, these publications projected fossil fuel emissions for one additional year using the projected world gross domestic product (GDP) and estimated trends in the carbon intensity of the global economy (Rogelj, 2016).

The IPCC's analytic method was further advanced in January 2015 in a journal paper that evaluated known fossil fuel reserves to determine, based on current emissions factors and global warming potential, how much should be left in-place to maximize the planet's chances of remaining below 2 degrees Celsius.[94] Importantly, it quantifies the regional distribution of known fossil-fuel reserves and resources and, through modeling a range of scenarios based on least-cost climate policies, identifies geographically- specific resources that should not be burned between 2010 and 2050 to ensure the world stays within a 2- degree Celsius limit in the most cost-efficient manner.[95] Importantly, this study demonstrates that there are geographically-

specific analyses available that support comparative judgments about the appropriateness of tapping into different resources and plays.

[Footnote 94] McGlade, Christophe and Paul Ekins, The Geographical Distribution of Fossil Fuels Unused When Limiting Global Warming to 2 °C, 517 Nature (187) (2015).

[Footnote 95] See id. at 187-90.

The United States has set national commitments to reduce GHG emissions. The United States has submitted its target to cut net GHG emissions to the United Nations Framework Convention on Climate Change. This Intended Nationally Determined Contribution (INDC), as provided for in the Paris Agreement, is a formal statement of the U.S. target to reduce emissions by 26 to 28 percent below 2005 levels by 2025. In addition, to achieve a no more than 2 degrees Celsius temperature increase, heat trapping gasses in the atmosphere must be kept at or below 450 parts per million $CO_2$-eq., which means that industrialized nations like the U.S. will have to reduce their emissions an average of 70 to 80 percent below 2000 levels by 2050.

In addition, on June 29, 2016 the leaders of Canada, Mexico, and the United States committed to the North American Climate, Clean Energy, and Environment Partnership. Under this agreement, the countries will pursue an historic goal for North America to strive to achieve 50 percent clean power generation by 2025. "Canada, the U.S., and Mexico will work together to implement the historic Paris Agreement, supporting our goal to limit temperature rise this century to well below 2 degrees C, and pursuing efforts to limit the temperature increase to 1.5 degrees C."[96]

[Footnote 96] See https://www.whitehouse.gov/the-press-office/2016/06/29/leaders-statement-north-american-climate-clean-energy-and- environment (presenting Leaders' Statement on a North American Climate, Clean Energy, and Environment Partnership).

These commitments are consistent with and required by The President's Climate Action Plan (June 2013) which calls for many steps to combat climate change such as reductions in $CO_2$ emissions from power plants, increased use of renewable energy, improved automobile efficiency standards, and reducing methane emissions, among many other things.[97] But to achieve the goals of the Climate Action Plan, which include "steady, responsible action to cut carbon pollution, [so] we can protect our children's health and begin to slow the effects of climate change so that we leave behind a cleaner, more stable environment," it will also be necessary to address issues related to fossil fuel extraction from our public lands, such as establishing a carbon management system.

[Footnote 97] See also Climate Action Plan Strategy to Reduce Methane Emissions (March 2014) (presenting the President's methane reduction strategy).

The RMP must analyze climate emissions and alternatives for managing climate change in the context of these national commitments and targets, both in terms of fossil fuel management and other activities authorized under the RMP that would contribute to GHG emissions. #97])>

<([#98 [11.5] e. Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

BLM has significant obligations and authority related to mitigation for all unavoidable impacts. Secretarial Order 3330 requires the development of a landscape-scale mitigation policy for the

Department of the Interior. Section 4(c) of Secretarial Order 3330 directs the Task Force to: "[I]dentify any new policies or practices, revisions to existing policies or practices, or regulatory or other changes that could be implemented to incorporate landscape-scale planning into mitigation-related decisions…"

In a report to the Secretary of the Interior, the Energy and Climate Change Task Force laid out a landscape approach to mitigation.[98]  This approach contained the following steps:
1. Identifying key landscape attributes, and the conditions, trends and baselines that characterize these attributes;
2. Developing landscape-scale goals and strategies;
3. Developing efficient and effective compensatory mitigation programs for impacts that cannot be avoided or minimized; and
4. Monitoring and evaluating progress and making adjustments, as necessary, to ensure that mitigation is effective despite changing conditions.
[Footnote 98] Clement, J.P. et al. 2014. A strategy for improving the mitigation policies and practices of the Department of the Interior. A report to the Secretary of the Interior from the Energy and Climate Change Task Force, Washington, D.C., 25 p.

BLM is also considering new tools and approaches the agency could use to increase the effectiveness of mitigation on public lands, including layering protective management and designations and exploring creative ways existing authorities could be used for conservation benefits. Effective new mitigation tools and approaches should be integrated into planning as well.

Mitigating climate-related impacts includes avoiding and minimizing generation of GHG emissions through management prescriptions and preventing harm to carbon sinks. The CEQ guidance on considering climate change in NEPA analyses provides that agencies should analyze reasonable alternatives that would mitigate both direct and indirect GHG emissions impacts and the cumulative effects of climate change (e.g., enhanced energy efficiency, carbon sequestration, lower GHG-emitting technology). CEQ Guidance at 19. BLM must address the quality of mitigation measures as well as ensure they are additional, verifiable, durable, enforceable, and will be implemented.

It is important to underscore that, as a land manager, the federal government is facing huge and rapidly escalating costs to address the impacts caused by fossil-fuel driven climate change. Forest fires, widespread drought, unusual flooding, rising sea levels, spread of invasive species and spread of disease already result in significant costs to the federal government, and each new oil production project the BLM authorizes increases these problems and the associated costs. Research from the University of Vermont's Gund Institute for Ecological Economics and The Wilderness Society suggests that total costs in degraded ecosystem services could exceed $14.5 billion annually under a 2-degree Celsius warming scenario.[99] These costs are ultimately borne by all American taxpayers, and BLM has a responsibility to minimize and recoup these costs when it makes decisions authorizing activities that cause these impacts and associated costs.
[Footnote 99] See Esposito, Valerie; Phillips, Spencer; Boumans, Roelof; Moulaert, Azur; Boggs, Jennifer. 2011. "Climate change and ecosystem services: The contribution of and impacts on federal public lands in the United States." In: Watson, Alan; Murrieta- Saldivar, Joaquin;

McBride, Brooke, comps. Science and stewardship to protect and sustain wilderness values: Ninth World Wilderness Congress symposium; November 6-13, 2009; Merida, Yucatan, Mexico. Proceedings RMRS-P-64. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. 155-164. Available at http://www.fs.fed.us/rm/pubs/rmrs_p064.pdf? (accessed July 23, 2016). #98])>

Summary of Comments: The Uncompahgre RMP provides BLM with an excellent opportunity to analyze the impacts from climate change to the planning area over the next two decades, including increases in vulnerability, as well as the contribution to climate change from management decisions made in the plan. This analysis should lead to the development of thoughtful management prescriptions and alternatives in the land use plan that will address how BLM will mitigate these causes and adapt its management over the coming years to prevent permanent impairment and unnecessary or undue degradation to the resources in the face of climate change. BLM must analyze climate emissions in the context of national climate commitments detailed above. Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

2. Recommended Approach to Managing Climate Change in RMPs

Under the pressures of global change, it must be acknowledged that many objects of conservation are at risk wherever they are found, and the traditional natural resource management paradigm of modifying ecosystems to increase yield must change to a new paradigm of managing wildland ecosystems to minimize loss – specifically loss of the ecosystem composition, structure, and function that yields the benefits we seek from wildlands. Natural resource management must change from a paradigm of maximum sustained yield to a paradigm of risk management.

Although there is no widely-accepted method of assessing and managing risk, we recommend breaking risk down into its component parts—vulnerability, exposure, and uncertainty—as a useful way to think about risk to biodiversity and productive potential. In the TWS report, "Recommended Risk Assessment and Management Approach for Addressing Climate Change in BLM Land Use Planning," we recommend an approach for assessing risk in the planning area as well as an approach for management of that risk for BLM to comply with its legal obligations under NEPA and FLPMA as set out above.

<([#100 [11.1] 3. Adapting to Climate Change

In addition to the analyzing the impacts of climate change, The Department of Interior Manual for climate change adaptation (523 DM 1) requires BLM to plan for uncertainty and risk in the face of climate change. Among other things, this policy guidance requires BLM to:
* use the best available science of climate change risks, impacts and vulnerabilities,
* use the network of Landscape Conservation Cooperatives, Climate Science Centers and other partnerships to understand and respond to climate change,
* use well-defined and established approaches for managing through uncertainty including vulnerability assessments, scenario planning and other risk management approaches,
* promote landscape-scale, ecosystem-based management approaches to enhance the resilience

and sustainability of linked human and natural systems,
* Manage linked human and natural systems that help mitigate climate change impacts, such as:
o protect diversity of habitat, communities and species,
o protect and restore core, unfragmented habitat areas and key habitat linkages,
o maintain key ecosystem services,
o monitor, prevent and slow the spread of invasive species,
o focus development activities in ecologically disturbed areas and avoid ecologically sensitive landscapes, culturally sensitive areas, and crucial wildlife corridors.

The biggest question that land managers face today is how we respond to uncertainty in the face of global climate change. It is especially challenging for planners to make predictions about future ecosystem dynamics 10, 20 or 50 years down the line. Adaptation to changing conditions is and will be essential. However, general statements that BLM will plan to "be adaptive" is not planning—it is a strategy that is reactive only. A true plan for climate adaptation will require applying knowledge and foresight gained from a "learn as you go" approach.

We recommend using an experimental, adaptive design known as the "portfolio approach" of management strategies (Belote et al.)[100] in the RMP. As stated by Belote et al., "[u]ncertainty about how ecosystems and species will respond to co-occurring, interactive, and synergistic impacts of the Anthropocene precludes our ability to know which strategy will best sustain wildland values in to the future." Thus, Belote et al. concludes that land managers should use an experimental zoning approach for managing certain lands that include the following zones as management strategies:
* Restoration Zones: areas that are devoted to forestalling change through the process of ecological restoration;
* Innovation Zones: areas that are devoted to innovative management that anticipates climate change and guides ecological change to prepare for it; and
* Observation Zones: areas that are left to change on their own time to serve as scientific "controls" and to hedge against the unintended consequences of active management elsewhere.
[Footnote 100] These concepts are set out in Belote, et al. "Wilderness and Conservation Strategy in the Anthropocene." The Pinchot Letter (Spring 2014).

These strategies should be used in conjunction with each other in order to spread the risk among the different strategies and to allow for diverse outcomes to inform rapid learning about management strategies in the future. This is the kind of deliberate yet dynamic planning process that BLM should be fostering in RMPs.

The BLM is especially equipped to apply this type of portfolio approach due to its wide variety of designations and management regimes. The purpose of restoration zones is to sustain existing or historical ecosystems. This type of strategy lends itself to designations such as national conservation areas, ACECs and other lands that are set aside for conservation of natural and cultural resources, but that may also be appropriate for restoration in certain areas.

Due to the acknowledgement that returning to historical range of variability is an increasingly challenging concept in the study of climate change, innovation zones are also necessary. This is where the forecasting of climate change may drive greater intervention to experiment with things

like anticipatorily boosting resiliency or facilitating transition to an altered future state where shifts seem inevitable. This strategy would be more appropriate for BLM-managed lands that have already sustained substantial change or where future impacts of climate change may severely disrupt the production of ecosystem goods and services. Conservation designations or allocations would typically not fall within this management strategy.

The third strategy of establishing observation zones is necessary to allow for ecosystems to generally change without specific intervention, as a scientific control. This management strategy would be most appropriate for Wilderness, WSAs, and lands managed for wilderness characteristics, but would also be the default strategy for lands that could not be managed for treatment under the restoration and innovation zones due to budget and operational constraints or in lands between such designations where connectivity is desirable to facilitate movement in response to climate change.

Summary of Comments: BLM should implement a portfolio approach to land use planning that allows for diverse strategies and adaptive, dynamic planning as a climate change adaptation strategy. This involves establishing restoration, innovation and observation zones in order to "learn while doing." #100])>

<([#101 [5.9] L. Mitigation

A robust policy framework exists to guide mitigation considerations in land use planning. In addition to mitigation requirements under FLPMA and NEPA, numerous other policies and guidance documents direct the BLM to require mitigation and specify how mitigation must be employed. These include the Presidential Memorandum: Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment (2015); Secretarial Order 3330, Improving Mitigation Policies and Practices
of the Department of the Interior (2013);[101] the follow-up report entitled A Strategy for Improving the Mitigation Policies and Practices of The Department of the Interior (2014);[102] the Department of the Interior's Landscape-Scape Mitigation Manual (2015);[103] and BLM's Draft Regional Mitigation Manual (2013).[104]
[Footnote 101] https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Secretarial-Order-Mitigation.pdf
[Footnote 102] https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Mitigation-Report-to-the-Secretary_FINAL_04_08_14.pdf
[Footnote 103] https://www.doi.gov/sites/doi.gov/files/uploads/TRS and Chapter FINAL.pdf
[Footnote 104]
http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/im_atta chments/2013.Par.57631.File. dat/IM2013-142_att1.pdf

Secretarial Order 3330 called for a departmental mitigation strategy with five central components: (1) the use of a landscape-scale approach to identify and facilitate investment in key conservation priorities in a region; (2) early integration of mitigation considerations in project planning and design; (3) ensuring the durability of mitigation measures over time; (4) ensuring transparency and consistency in mitigation decisions; and (5) a focus on mitigation efforts that improve the resilience of our Nation's resources in the face of climate change.

In response to S.O. 3330, the Energy and Climate Change Task Force issued a report that outlined a strategy for improving departmental mitigation policies and practices ("Task Force Report," April 2014[105]). The Task Force Report emphasizes the importance of landscape-scale mitigation planning to enable the Interior Department to appropriately manage and conserve our public lands resources and meet its statutory obligations:

Consideration of the landscape-scale context provides the opportunity to see project development in the context of the larger landscape it will occupy and associated resource values it will affect; enhances the ability to evaluate cumulative effects of multiple projects; expands the capacity to avoid, minimize, and offset project impacts; and allows managers to make avoidance and compensatory mitigation site selection decisions that optimize for multiple resource values. Task Force Report at 9.

[Footnote 105] Available at http://www.doi.gov/news/loader.cfm?csModule=security/getfile&pageid=526203.

It identifies several principles to guide landscape-scale mitigation, including utilizing the full mitigation hierarchy, advance mitigation planning, ensuring durability and promoting transparency and collaboration, which are reiterated in BLM's draft mitigation manual.

Of particular relevance to resource management planning, BLM is currently implementing draft MS-1794[106], which the agency is instructed to utilize as interim policy while the guidance is finalized. Instruction Memorandum No. 2013-142.[107] Draft MS-1794 provides for BLM to use the land use planning process to identify potential mitigation sites and measures. Draft MS-1794 at 1.6(C). This would be appropriate for the Uncompahgre RMP to balance reasonably foreseeable development and the various resource values present throughout the planning area. Mitigation is most effective when planned at a regional scale so that development avoids impacting critical conservation resources and compensatory mitigation investments are directed to areas and activities that will best fully address unavoidable development impacts. In outlining a landscape-scale mitigation strategy for the Uncompahgre Field Office, BLM should apply the mitigation hierarchy of avoidance, minimization, and offsets.

[Footnote 106] Available at http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/i m_attachments/2013.Par.57631.F ile.dat/IM2013-142_att1.pdf.

[Footnote 107] Available at http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instru ction/2013/IM_2013-142.html.

BLM is directed to incorporate four elements into mitigation planning at the land use planning stage per the Task Force Report and Draft MS-1794:

a. Describe regional baseline conditions against which unavoidable impacts are assessed;
b. Establish and prioritize regional mitigation objectives for the planning area;
c. Identify appropriate land-use allocations or areas for landscape-level conservation and management actions to achieve regional mitigation objectives (e.g., Areas of Critical Environmental Concern (ACEC) or sage-grouse priority habitat); and
d. Develop long-term monitoring and adaptive management requirements to evaluate and maximize the effectiveness of mitigation projects and measures.

Ibid. Importantly, regional mitigation measures must have additionality – that is, the offsetting conservation measures would not have occurred otherwise. Task Force Report at 6. BLM should not simply cast land use allocations currently under consideration in the Draft RMP as contributing to the achievement of regional mitigation objectives. Rather, BLM must identify foreseeable unavoidable impacts, account for impacts to resource values throughout the relevant range of the resource that is being impacted, and identify conservation designations and other land use allocations that are appropriate to those impacts.

Conservation designations and other land use allocations that are intended as regional mitigation measures must have strong protective management prescriptions to ensure effective and durable conservation, restoration, and management and adequate funding for and commitment to enforcement. In directing BLM to ensure long-term durability of compensatory mitigation, the mitigation guidance notes that "the land use plan may be the most effective tool for protecting important regional mitigation sites on BLM-managed lands from future impacts in order to ensure the durability of mitigation projects." Draft MS-1794 at 1.6(D)(12). To achieve long-term durability, BLM must commit to and implement management actions, such as restoration projects and enforcement, within mitigation-based conservation designations that are appropriate to specific unavoidable impacts and that provide beneficial effects that are additional to conservation that would have otherwise occurred.

Summary of Comments: BLM should include the four elements of landscape-scale mitigation planning outlined in Draft MS-1794 in the Uncompahgre RMP. By establishing regional mitigation objectives for the planning area, BLM can identify durable, additional land use allocations that appropriately mitigate likely impacts from development authorized under the RMP. #101])>

IV) Conclusion. The Preferred Alternative does not provide a necessary level of management for the North Fork Valley

Only Alternative B1 provides the scope and level of protection that is required for the North Fork's cherished and concentrated set of important and sensitive resources. This is not only the case due the better classification of resources and more protective management prescriptions in general, but also due to the nature of the stipulations themselves. Only under Alternative B1 are the protective stipulations not open to exceptions, waivers and modifications (DEIS III Appendix B-2).

And this high level of protection in Alternative B1 has the added advantage of safeguarding other resources, and of mitigating other harmful impacts beyond those directly covered by the stipulations. Under Alternative B1, for instance, 96 % of the highest potential areas for paleontological resources are protected with either No Leasing or No Surface Occupancy stipulations.[108]
[Footnote 108] DEIS II 4-193

Climate change is another matter—the elephant in the room, really, when it comes to questions of fossil fuel development, long term land use planning, and the resiliency many key features we cherish in the valley. Alternative B1 is the only action alternative in the draft RMP/EIS projected

to contribute less to greenhouse gas emissions (and climate change) than Alternative A: No Action/Continuation of Current Management (Table 4-10, DEIS II 4-39). And B1 also has the added benefit of doing most to ensure natural system resiliency to the effects of climate change (DEIS II 4-114 and 4-151).

A. Only B1 meets the needs of the North Fork Valley

As detailed above, what is clear is that Alternative B1 provides the level of protection that best meets the needs of the public and best protects the public's resources, as the only alternative that adequately protects the resources and public land values of the North Fork Valley. As such Alternative B1 has the support of many local residents, area businesses, Delta and Gunnison County organizations and associations, local governments, water companies, irrigators, farmers, ranchers and others.

That is because, as the DEIS shows, the resources that the public, myriad stakeholders, local governments, and resource professionals have all urged be protected are in fact best protected by Alternative B1. The superior level of management that Alternative B1 provides includes better protections for special status species, delicate soils, sensitive landscapes, recreation, visual resources, plant, fish and wildlife habitat, water resources, new economic activity, agriculture, communities, public health, river systems, and other cherished features of the valley. None of the other alternatives presented in the draft RMP/EIS offer the level protection afforded by B1, and all others fail to provide adequate management for the valley's resources, public uses, and cherished features.

B. Alternative D is unacceptable

As shown above, only Alternative B1 provides the level of protection that the North Fork's resources warrant, even as compared to Alternative B—the next most protective alternative in the draft RMP/EIS.

Outside the North Fork, and on matters that B1 is silent on within the North Fork, we support much of the management proposed in Alternative B, as indicated elsewhere in these comments. But the contrast it provides in the North Fork compared to B1 is striking.

Moreover, the agency's identified Preferred Alternative (D) proposes a management regime for the valley that is simply unacceptable. Not only would it leave the majority of public lands open to oil and gas leasing, many with only a CSU stipulation, but its impacts would be higher across the full range of resources in the valley, including those identified by the public as most important to the community.

Problems with Alternative D are discussed elsewhere in these comments. Regarding mitigating impacts from oil and gas development, the superiority of B1 is clear as detailed above. However, some particular examples of how badly Alternative D misses the mark in protecting the North Fork are the following.

Consider Visual Resource Management, in which B1 alone has the strongest nonwaivable

BLM_0156513

stipulations to protect visual resources, and the largest areas designated for their important and high quality scenic features (VRM Classifications I & II). In Alternative D, the agency Preferred Alternative, only 17,170 acres are classified in these most protective categories. In B1 it is 82,218 acres.[109]

[Footnote 109] Acreages developed from analysis of GIS data downloaded from BLM.

Regarding Ecological Emphasis Areas, the DEIS notes "Protections are reduced under Alt. D" (DEIS II 4-160). On wildlife impacts: "These measures ... do not provide as much protection as Alternative B" (DEIS II 4-163). The Preferred Alternative "results in the second-highest estimated emission levels" (DEIS II 4-21), including the second highest level of greenhouse gas emissions (DEIS II Table 4-10).

The Preferred Alternative relegates over six times as much public lands to the lowest visual resource management classification. Alternative D closes less than 25% of what Alternative B does to oil and gas leasing in the resource area, and only a miniscule fraction of what B1 closes in the North Fork.

The Preferred Alternative includes far fewer protections for the valley's water supply, allowing drilling and fracking on lands adjacent to private water wells, where B1 prohibits leasing altogether and Alternative B requires No Surface Occupancy. Stipulations to protect special status species are far weaker under Alternative D than Alternative B.

On highly seleniferous soils Alternative B1 follows the recommendations of the Gunnison Basin Selenium Task Force, and applies No Leasing stipulations. Alternative D applies only the much weaker Controlled Surface Use (CSU) restriction. Unlike Alternative B and B1, the Preferred Alternative would allow oil and gas development on steep slopes of up to 40 percent. (DEIS I 2-30, Table 2-2).

At Jumbo Mountain the Preferred Alternative protects one-fifth the acreage of what Alts B and B1 do, with NSO stipulations applying to just over 1,000 acres (DEIS I Table ES-3). Across the entire range of resource identified through scoping, comment on previous agency activity, and this comment period Alternative D, the Agency Preferred, fails to provide the management required.

<([#102 [5.3] C. Range of alternatives might be lacking, analysis too narrow

Regarding oil and gas development, as well as in other matters, the analysis offered is limited by the somewhat narrow range of alternatives in the draft EIS. There is certainly a growing national movement, as well as strong local support, to stop leasing federal lands for oil and gas altogether.[110] A No Leasing alternative, an alternative that closes all of the North Fork, or a North Fork-like (B1) alternative across the resource area, would each alter the scope of analysis and possible decisions that could be made.

[Footnote 110] "Groups to Obama: Keep It in the Ground, Cancel Colorado Oil and Gas Sale," Great Old Broads for Wilderness website, at www.greatoldbroads.org/groups-to-obama-keep-it-in-the-ground-cancel-colorado-oil-and-gas-sale/

A range of alternatives should represent the full suite of management choices available to the decision- maker. This allows the decision-maker to consider all her options to best protect the resource while meeting other agency obligations and priorities.

When there are conflicts among resource uses or when a land use activity could result in unacceptable or irreversible impacts on the environment, the BLM may restrict or prohibit some land uses in specific areas. When there are conflicts among resource uses or when a land use activity could result in unacceptable or irreversible impacts on the environment, the BLM may restrict or prohibit some land uses in specific areas. (DEIS II 4-2)

Regardless, the level of protection provided by B1 reduces impacts from subsequent management decisions and reduces the likelihood for an irretrievable commitment of resources (via more NSO and NL stipulations). Thus of the alternative presented, adopting Alternative B1 is the most prudent action.
#102])>
D. Alternative B1 is prudent and reasonable, best fulfilling agency obligations and future resource needs

B1 best protects North Fork resources. B1 is within the scope of agency authority. The DEIS notes that:

Implementing actions from any of the RMP alternatives would be in compliance with all valid existing rights, federal regulations, BLM policies, and other requirements. (DEIS II 4-2)

Alternative B1 would be highly protective of the North Fork Valley but leave the majority of resource area and Colorado BLM lands and federal minerals, open to oil and gas leasing. B1 barely impacts the federal mineral estate, and fulfills the purposes of all public lands and resource laws.

<([#103 [21.1] 1. B1 is highly protective of North Fork yet represents only a small impact to oil and gas resource

Alternative B1 would have no impact on currently leased federal minerals, and a negligible impact on federal minerals overall. B1 would likely not affect energy production or jobs in the region. To anticipate the miniscule impact B1 might have, consider the overall oil and gas jobs anticipated across the resource area under Alternative D, which would allow a higher level of development in the North Fork.

It is likely, however, that less than one percent of employment and labor income would continue to be supported by oil and gas extraction under Alternative D. (DEIS II 4-476)

Leasing in the North Fork is simply not needed. For one there is a natural gas glut, and the resource's abundance is certainly projected far beyond the life of this resource management plan.[111]
[Footnote 111] 111 "Shale gas production drives world natural gas production growth," U.S. Energy Information Administration August 2016. Online at www.eia.gov/todayinenergy/detail.php?id=27512

B1 is clearly the responsible choice: Given that the impact on developable resources is

insignificant while the public benefit is significant, that the impacts to resources across the board from oil and gas development are reduced under B1 while the overabundance of natural gas, likely to last for another decade or longer by most accounts, remains unchanged; then closing most, or even all, of the North Fork to oil and gas leasing seems to be more than just a reasonable course of action.

The North Fork sits at the southern edge of the gas-rich Piceance Basin, recently subject to an updated USGS estimate for the shale resource that sits beneath the sandstone formations previously targeted.[112]
The new estimate could mean the Piceance Basin has the second-largest natural gas reserves in the country, after the Marcellus Shale formation in Pennsylvania and neighboring states...
[Footnote 112] "40 Times More Natural Gas Underground in Colorado's Piceance Basin, USGS Report Finds," Colorado Public Radio, June 29, 2016. Online at www.cpr.org/news/story/40-times-more-natural-gas-underground-colorados-piceance-basin-usgs-report-finds

Leasing in the North Fork is not in the public interest, which benefits more from managing to protect the valley's unique resources and communities. There are hundreds of thousands of public lands already leased in the Piceance Basin.[113] Hundreds of thousands of additional acres are owned outright or otherwise under control of the oil and gas industry, including major companies like ExxonMobil.[114]
Rio Blanco County, home of ExxonMobil's Piceance project, covers an area larger than 3,000 square miles and contains enough clean-burning, domestic natural gas to benefit millions of people. With interest in approximately 300,000 acres in the Piceance Basin, ExxonMobil's leases hold a potential recoverable resource of more than 45 trillion cubic feet of gas over the life of the project. That's enough natural gas to power 50 million homes for almost a decade. While this expansive gas resource will take years to produce, ExxonMobil is committed to increasing natural gas production more efficiently and with less environmental impact.
[Footnote 113] "Oil & Gas Development Proposed RMPA/Final EIS," White River Field Office-Powerpoint for RAC, June 4 2015. Online at
www.blm.gov/style/medialib/blm/co/resources/resource_advisory/northwest_rac/minutes.Par.30
953.File.dat/WRFO%20Presentation%20to%20RAC_6.4.15a.pdf
[Footnote 114] "Piceance," ExxonMobil website at
http://corporate.exxonmobil.com/en/energy/natural-gas/operations/piceance

These lands in the Piceance Basin provide decades of suitable sites for drilling.[115]
The acquired assets consist of a 200,000-net-acre position in the Piceance basin of Colorado with recent net production of 500 MMcfd of natural gas equivalent. Terra estimates that the assets contain 2 tcf of proved developed producing reserves and an extensive inventory of low-risk drilling locations. The assets also include deep rights across 150,000 net acres prospective for the emerging horizontal Mancos-Niobrara play.
[Footnote 115] "E&P startup agrees to buy WPX's Piceance unit for $910 million," Oil and Gas Journal, 2/15/16. Online at http://www.ogj.com/articles/print/volume-114/issue-2b/general-interest/e-p-startup-agrees-to-buy-wpx-s-piceance-unit-for-910-million.html

Drilling in the North Fork would not materially alter the amount of gas available for development over the life of the Resource Management Plan. Adoption of the North Fork

BLM_0156516

Alternative will not affect the number of jobs available in the oil and gas industry regionally, the numbers of rigs operating, or the amount of energy being produced. Rather given the abundance of resource available for exploitation, the large number of existing leases and owned minerals, and willing lessees, owners and operators—it is the market and industry's willingness alone that will determine how may rigs employ how many people.
#103])>

2. B1 meets public needs, provides strong protections, and fulfills public lands and resource laws

The Federal Lands Policy and Management Act establishes public lands policy that, among other things, sets it as law that:
(7) ...management be on the basis of multiple use and sustained yield unless otherwise specified by law;
(8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use; and that
(12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber...

Alternative B1 clearly meet the requirements of the Multiple Use/Sustained Yield Act, which directs much of BLM's resource management, as per the agency's land use planning regulations: The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

In the case of Alternative B1 the management proposed do best meet the "present and future need" of the American people; makes judicious use of the lands for a variety of purposes both within the North Fork area and across the resource area; balances use, not allowing all uses on all lands in a manner that accounts for the needs of future generations, for recreation, watershed, wildlife and fish, natural scenic, scientific and historical values, range, timber, and minerals; and that seeks to avoid impairment of the public land resources in consideration of their relative value.

Alternative B1 clearly is superior in protecting the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values

BLM_0156517

resources of the North Fork. Finally, Alternative B1 balances the need to protect resources with ensuring that public lands provide a balance of minerals, fiber, and food: B1 is consistent with the Mineral Leasing Act (MLA), which clearly gives the agency authority to close 75% of the North Fork area, or of the entire resource area for that matter, to oil and gas leasing and development.[116]

[Footnote 116] 10th U.S. Circuit Court of Appeals, WESTERN ENERGY ALLIANCE v. KEN SALAZAR, No. 11-8071 March 12, 2013. Online at www.eenews.net/assets/2013/03/13/document_ew_01.pdf

E. BLM should select Alternative B1 for the North Fork Valley

Based on the large quantity of information provided by the WSCC, community residents, and other individuals and organizations, it is clear that the North Fork Alternative, B1, is the only reasonable alternative for the BLM to include in the final RMP that would mitigate impacts from oil and gas leasing and corresponding oil and gas development.

1. The North Fork Alternative fits a clear and pressing public need.

Alternative B1 proposes a set of strong oil and gas management stipulations and protective designations to safeguard the area's character of place, water supply, wildlife habitat and recreational opportunities.

Alternative B1, which is the DEIS' version of the North Fork Alternative Plan provides the best management options of oil and gas leasing and development presented in the draft RMP/EIS, and it should be adopted by the BLM into the final RMP.

Alternative B1 presents reasonable but strong management to protect the North Fork's most important resources and uses, and only B1 provides the level of management that is warranted to protect these resources.

Alternative B1 is a reasonable and prudent approach to managing the resources in the North Fork Valley which the agency should select as part of its final Resource Management Plan.

2. Alternative B1 is the best management decision in the face of uncertainty regarding the adoption and implementation of the final RMP.

While a challenge to the final RMP decision is likely, given the many interests and perspectives involved among organizations, industry and stakeholders the protections provided by Alternative B1 would help ensure that the resources there are secure. BLM should move to adopt and implement as much of the North Fork Alternative Plan as it can, even if it is compelled to amend, supplement, or otherwise update its NEPA analysis.

[SEE PDF FOR APPENDIX I and APPENDIX II.]
APPENDIX I:
* Table 1: Recommended oil and gas stipulations
* Figure 1. Table from Public Health Risks of Oil and Natural Gas

BLM_0156518

* Figure 2. Maps of Jumbo Mountain, Elephant Hill, and Youngs Peak.
* Figure 3. Multiple criteria used to map wildland conservation priorities and values including wildness, connectivity, representation, and endemic species diversity. These criteria were combined to produce map in Figure 4.
* Figure 4. Composite wildland values map based on criteria in Figure 3. The composite value was produced by setting each criterion to the same scale and summing.
* Figure 5. Wildland conservation values and potential Ecological Emphasis Areas in the Uncompahgre Field Office.
APPENDIX II. North Fork Water Quality Report]


000490_ZarleyM_20161101  Organization: Monica Zarley
Received: 11/1/2016 12:00:00 AM
Commenter1: Monica Zarley - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000490_ZarleyM_20161101.htm (000490_ZarleyM_20161101-387769.htm Size = 1 KB)
UFORMP_000490_ZarleyM_20161101.pdf (000490_ZarleyM_20161101-387768.pdf Size = 84 KB)
Submission Text
Date:11/01/2016

Commenter: Monica Zarley

Organization:

Email:monicazarley@gmail.com

Address:222 Box Elder, Paonia CO 81428

Phone:

Comment:
I have lived in the North Fork valley for 19 years. I am a teacher in Delta County School District. I love this valley and I feel very strongly that we should not allow oil and gas development or fracking here! The financial gain for a few is not worth the risk. Our economy based on farming, hunting, and ranching will be compromised! The beauty that brought us here must be preserved for this generation and future generations.

Thank you,

Monica Zarley 222 Box Elder, Paonia CO 81428.

000491_ClementE_20161031 Organization: Eddie Clement
Received: 10/31/2016 12:00:00 AM
Commenter1: Eddie Clement - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000491_ClementE_20161031.htm (000491_ClementE_20161031-387771.htm
Size = 1 KB)
UFORMP_000491_ClementE_20161031.pdf (000491_ClementE_20161031-387770.pdf Size =
270 KB)
Submission Text
Date:10/31/2016

Commenter:Eddie Clement

Organization:

Email:stirrupbarranch@skybeam.com

Address:80050 B 80 Road, Crawford, CO 81415

Phone:

Comment:
I , Eddie Clement thank you for the opportunity to submit comments on the Uncompahgre field
office's draft management plan revision and environmental impact statement. I support full
multiple use of the land equally. I would like to see alternative C implemented , because it seems
to support multiple use of land and private rights the best.

Thank you for your time, Eddie Clement

000492_RandallR_20161101 Organization: Colorado Department of Natural Resources, Amy
Laughlin
Received: 11/1/2016 12:00:00 AM
Commenter1: Amy Laughlin - Denver, Colorado 80203 (United States)
Organization1:Colorado Department of Natural Resources
Commenter2: Robert Randall - , Colorado (United States)
Organization2:Colorado Parks and Wildlife

BLM_0156520

Commenter3: Renzo DelPiccolo - , Colorado (United States)
Organization3:Colorado Parks and Wildlife
Commenter Type: State Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000492_RandallR_20161101.htm (000492_RandallR_20161101-381184.htm Size = 39 KB)
Submission Text
Laughlin, Amy <amy.laughlin@state.co.us>
Dear Ms. Pfifer:
The Colorado Department of Natural Resources submits the attached comments on the Uncompahgre Field Office Draft Resource Management Plan/ Draft Environmental Impact Statement including letters from two of our divisions: Colorado Parks and Wildlife and the Colorado Water Conservation Board.
Thank you for the opportunity to submit these comments, and we look forward to working with you and your staff as this planning process moves forward.
Amy Laughlin
Policy Advisor
Executive Directors Office
P 303.866.3311 x 8671
F 303.866.2115
C 720.662.4778
1313 Sherman Street, Room 718
Denver, CO 80203
amy.laughlin@state.co.us
www.colorado.gov/DNR

DNR Comments_UFO DRMP EIS_Final.pdf
1272K

November 1, 1016

Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Uncompahgre Field Office Draft Resource Management Plan/ Environmental Impact Statement

Dear Ms. Pfifer:

The Colorado Department of Natural Resources submits the following comments on the Uncompahgre Field Office (UFO) Draft Resource Management Plan/Environmental Impact Statement prepared by two of our divisions: Colorado Parks and Wildlife (CPW) and the Colorado Water Conservation Board (CWCB).

<([#19 [14.1.1] CPW recommends additional detail be included in the preferred alternative in the final RMP/EIS to incorporate the desired conditions, suggested standards, and best management practices related to the management, preservation, and conservation of fish and wildlife species and habitat, while also remaining consistent with species management plans, agreements, listing decisions, and BLM policies. CPW also offers specific comments related to aquatic species, bighorn sheep, land health standards, and stipulations for fluid mineral leasing and other surface disturbing activity.
#19])>
<([#1 [15.2] Further, the draft RMP/EIS lacks the appropriate analysis and protections related to the Gunnison Sage Grouse (GuSG) given its current listing status as a threatened species under the Endangered Species Act. (Indeed, Chapter 3 and Appendix 0 both state incorrectly that the Gunnison sage-grouse is merely a candidate species, with a proposal to list it as endangered. That changed two years ago when the U.S. Fish & Wildlife Service issued a rule listing the species as threatened.) Although the language in Section 2.2.4 of the Draft RMP acknowledges the concurrent planning process under way for a Gunnison sage-grouse rangewide RMP amendment intended to provide specific management guidance to conserve Gunnison sage-grouse and their habitat (GuSG RMP), we are concerned that Section 2.1.4 contains no commitment either to amend the final UFO RMP with the provisions of the final GuSG RMP (should the UFO RMP be finalized before the GuSG RMP) or to incorporate the provisions of the final GuSG RMP into the UFO RMP (should the GuSG RMP be finalized first). BLM must provide stronger assurances that the UFO RMP will provide adequate protection for this federally listed species #1])> .

CWCB offers specific comments related to the preferred alternative (Alternative D) and the findings of the Draft Wild and Scenic River Suitability Report. CWCB's comments reflect a dual purpose of addressing Colorado's water-related needs, while also continuing to afford the appropriate environmental protections for stream segments with outstanding remarkable values (ORVs). <([#2 [5.2] I would encourage the BLM to work with the CWCB to consider the possibility of utilizing its Instream Flow Program as an alternative method of flow protection for flow-related ORVs.

Finally, CPW has devoted significant staff resources to reviewing and attempting to improve the Draft RMP throughout the multi-year planning process, yet the BLM at times seemed disinclined to utilize CPW's special expertise in wildlife management and in the status and needs of wildlife in the planning area. Accordingly, the Draft RMP contains factual inaccuracies, methodological errors, conflicts with other planning documents, and critical omissions. As described in CPW's comment letter, we see a need for significant revisions to address these deficiencies before issuance of a Final RMP/EIS. CPW staff continue to be available to assist in these efforts, and we remain hopeful that future cooperative processes result in more productive outcomes. #2])>

Thank you for the opportunity to submit these comments. DNR looks forward to finding solutions to these matters and to continue working with the UFO as this important planning process moves forward.

Robert Randall
Executive Director

November 1, 2016
Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

RE: UNCOMPAHGRE FIELD OFFICE DRAFT RESOURCE MANAGEMENT PLAN AND ENVIRONMENTAL IMPACT STATEMENT-MAY 2016

Dear Ms. Pfifer:

Colorado Parks and Wildlife (CPW) reviewed the Bureau of Land Management's (BLM) Draft Resource Management Plan (RMP) and Environmental Impact Statement (EIS) for the Uncompahgre Field Office (UFO). CPW became a Cooperating Agency in 2010 and last submitted cooperating agency comments to the BLM on the administrative final version of this document in June of 2012. In summary, CPW has concerns about the lack of integration of several species management plans and agreements,[1] absence of desired condition and standards for big game ungulates, raptors and fishes, the use of Ecological Emphasis Areas to achieve ecosystem functionality (without regulatory protections), the inclusion of a risk of contact model for bighorn sheep that is built on several incorrect assumptions, and an inadequate analysis of Gunnison sage grouse, given its current listing status and BLM policies. Our detailed comments are included below.

[footnote 1] Gunnison Sage-grouse Range-wide Conservation Plan (2005), Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015).

<([#3 [5.2] CPW enters into cooperating agency relationships on large scale NEPA documents when the requesting federal agency has a sincere desire for CPW's expertise, a willingness to collaborate on the impact analysis, and common goals to implement strategies that avoid,

minimize, and mitigate impacts to wildlife resources. CPW asked to be included during the earliest planning/conceptualization/alternatives development stages, and volunteered to provide staff to assist with writing and reviewing sections of the RMP where particular expertise in wildlife, wildlife habitat, and wildlife management is needed or in areas where other resources may have impacts on wildlife. CPW participated in all official cooperating agency meetings, provided substantive written and verbal comments, and met with UFO field staff outside of formal cooperating agency meetings on numerous occasions between 2010-2012 in an attempt to discuss and resolve outstanding issues in the development of the RMP.

Based on the cooperating agency process and RMP document review, CPW's input was largely confined to reviewing and commenting on draft text rather than being utilized as an agency with 'special expertise' (40 CFR 1508.26). The BLM did not respond to our cooperating agency comments (see administrative record Cooperating Agency Meeting #10 Minutes). We were not provided a final administrative copy of the RMP to review prior to the document being finalized and sent to the Colorado State Office or the Washington Office. Nor, were we provided an opportunity to review the Draft RMP prior to it being distributed to the public after nearly 4 years since our last review.

The Cooperating Agency meeting notes in the administrative record detail some of the concerns that we raised, and were recorded as 'Action Items' for the BLM and their contractor to address within the RMP. These action items are not reflected in the Draft RMP. Outlined below is a reiteration of many of the comments previously submitted via direct written, verbal or email communication that were left unaddressed in this Draft RMP. In addition, in many instances on the ground conditions within the planning area and BLM policies have changed. The Draft RMP does not adequately reflect those changed conditions or the latest BLM guidance, policy or law. #3])>

Wildlife

<([#4 [5.3] [14.1.1] The goals and objectives for resource condition, the proposed actions and management practices fail to describe the desired conditions of wildlife populations and wildlife habitat across the planning area per 43 CFR 1601.0-5(n). There are few metrics with which to evaluate the range of alternatives, the affected environment, and environmental consequences of the RMP resource allocation.

The wildlife section does not identify specific opportunities that the BLM will pursue for individual species conservation and management, and does not clearly identify how wildlife issues will be managed in association with competing resource values. CPW recommends including clear descriptions of the desired resource condition, goals, and objectives within the planning area so that the EIS can substantively and reliably evaluate BLMs proposed land use allocations with respect to wildlife. Those descriptions would also allow for comparison of each alternative with the desired outcomes stated in applicable State and Federal wildlife conservation and management plans, ensuring their compatibility and consistency, as required by FLPMA. The RMP should incorporate the objectives and commitments contained in the following plans and agreements: Gunnison Sage-grouse Range-wide Conservation Plan (2005), The Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth

sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015). Currently, the RMP does not incorporate these plans or contain clear rationale describing why the desired conditions, goals and objectives in these plans are not addressed. #4])>

<([#5 [14.1.1] Previous administrative RMP drafts contained "priority species and habitat types" and had specific desired conditions, goals, objectives, and actions to promote, enhance, and conserve wildlife and wildlife habitat within the UFO boundary. During the cooperating agency process UFO staff explained that there are no unique habitats or key species within the planning boundaries except for Federally designated critical habitat under the ESA. As a result, opportunities for species conservation were purposely removed from the Draft RMP. Regardless of key habitats or priority species designations, the RMP should contain descriptions and criteria for the management, preservation, and conservation of fish and wildlife species and habitat within the planning area. #5])>

<([#6 [14.1.1] Below is a list of suggested Desired Conditions and suggested Standards to include in the Final Draft RMP, many of which are incorporated into the BLM Tres Rios RMP (2015). CPW recommends incorporating these into the UFO RMP to provide consistency between the Field Offices and to reflect the commitments and strategies associated with the aforementioned plans.

Desired Conditions

* Big game severe winter range, winter concentration areas, production areas and desert bighorn sheep summer ranges are capable of supporting populations that meet State of Colorado population objectives. These areas provide sustainable forage and habitat in areas with acceptable levels of human disturbance which do not reduce habitat effectiveness.
* Invasive exotic wildlife species and diseases do not become established within the planning area. Existing invasive exotic wildlife species and diseases do not spread.
* Habitat components (e.g., snags and downed logs) are maintained. Unique habitat types (e.g., springs, seeps, willow carrs, caves, and cliffs) support associated flora and fauna (with abundance and distribution commensurate with the capability of the land).
* Large predator species contribute to ecological diversity and ecosystem functioning.
* Projects and activities occurring on BLM lands near state and federal highways are designed to provide for long term connectivity and integrity of habitats to facilitate effective wildlife movement.
* Effective raptor nesting habitat occurs throughout the planning area with abundance and distribution commensurate with the capability of the land to sustain populations.
* Ecosystems and habitat conditions for terrestrial wildlife species sensitive to human disturbance are maintained.
* Vegetation openings created through management actions preserve the natural patchiness

inherent in Southern Rocky Mountain ecosystems.
* Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats.
* Populations are conserved by maintaining or improving habitat availability and quality through the incorporation of conservation strategies and species' habitat needs during project development and implementation.
* Riparian and aquatic habitat, including springs and fens, support well distributed populations of invertebrate and vertebrate riparian and aquatic dependent wildlife.
* Disturbances from management activities occur at levels that support critical life functions and sustain key habitat characteristics for wildlife species.
* Areas identified as critical habitat or proposed critical habitat for special status wildlife species have the characteristics to support sustainable populations, promoting recovery of the species.
* Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species.
* Special status species are able to disperse within the planning area and into adjacent lands. This will allow for the interchange between populations and the maintenance of genetic diversity.
* Wildlife are able to disperse freely across the planning area allowing for the interchange between populations and the maintenance of genetic diversity.
#6])>
<([#7 [14.1.1] Standards [to include in FEIS]


* Raptors: Raptor nesting disturbance buffers and timing limitations adhere to CPW's Raptor Buffer Recommendations (CDOW 2008)
* Ungulates: Projects or activities in big game critical winter range, winter concentration areas, severe winter range, production areas, and important migration corridors are designed and conducted in a manner that preserves and does not reduce habitat effectiveness within those mapped areas.
* Ungulates: In order to provide for healthy ungulate populations capable of meeting state population objectives, anthropomorphic activity and improvements across the planning area are designed to maintain and continue to provide effective habitat components that support critical life functions. This includes components of size and quality on the landscape providing connectivity to seasonal habitats (wildlife travel corridors), production areas, critical winter range, severe winter range, and winter concentration areas, along with other habitat components necessary to support herd viability.
* Road and Trail Density for Ungulate Production Areas, Winter Concentration Areas, Severe Winter Range, and Critical Winter Range on BLM Lands: The intent is to ensure no net loss of existing habitat effectiveness within the areas listed below. In order to maintain wildlife habitat effectiveness of BLM lands, road and trail densities should be addressed when analyzing and approving management actions that affect routes. Where management actions would result in road and trail densities exceeding 1 mile/square mile on UFO lands actions should be designed to maintain habitat effectiveness on UFO lands throughout each mapped wildlife habitat listed below.
* Habitat effectiveness is considered maintained when road and trail densities within the CPW mapped big game production areas (calving or lambing areas), elk and deer severe winter range, elk and deer winter concentration areas, mule deer critical winter range. pronghorn summer concentration areas, and bighorn sheep summer concentration areas on UFO lands are less than

or equal to 1 mile/square mile. If route densities exceed 1 mile/square mile within the CPW mapped areas listed below on UFO lands, densities should not be increased without compensatory mitigation designed to maintain habitat effectiveness.
#7])>
Aquatic Species

<([#8 [15.3] [8] Section 3.1.7 does not include a adequate discussion of the distribution, status, or baseline habitat conditions of the endangered fish species that are in the Gunnison River and its tributaries including the Colorado pikeminnow, razorback sucker and bonytail chub, the three species (roundtail chub, bluehead sucker and flannelmouth sucker) and the Colorado River cutthroat trout. Likewise, the wildlife section of the draft RMP does not identify actions to sustain in-stream conditions, attempt to address other resource management issues that contribute to aquatic habitat degradation (e.g. sedimentation from stream bank destabilization resulting in degraded habitat and the loss of spawning habitat), or identify a desired future conditions for the aquatic environment.
#8])>
<([#9 [14.1.1] Below we have outlined several additional desired conditions, many of which are incorporated into the BLM Tres Rios RMP (2015) for the benefit of aquatic species. CPW recommends incorporating these into the UFO RMP as they are consistent with the commitments and strategies associated with the aforementioned plans.

* Streams, lakes, riparian vegetation, and adjacent uplands provide habitats adequate to maintain healthy aquatic ecosystems capable of supporting a variety of native and desired non-native aquatic communities.
* The quantity and quality of aquatic habitats are maintained or enhanced to provide for the long-term sustainability of biological diversity and population viability of all native and/or desired non-native vertebrate species.
* Channel characteristics, water quality, flow regimens, and physical habitat features are diverse and appropriately reflect the climate, geology, and natural biota of the area.
* An adequate range of stream flow provides for the long-term maintenance of physical habitat features. Channel features, including bank stability, width-to-depth ratio, pool/riffle ratio, pool depth, slope, sinuosity, cover, and substrate composition, are commensurate with those expected to occur under natural ranges of stream flow.
* Water flow conditions in streams, lakes, springs, seeps, wetlands, fens, and aquifers support functioning habitats for a variety of aquatic and semi-aquatic species and communities.
* Macroinvertebrate diversity and abundance reflect high water quality.
* Populations of aquatic species are adequately mobile, genetically diverse, and functionally diverse throughout the planning area.
* Aquatic systems are connected in a manner that avoids fragmentation of aquatic habitats and isolation of aquatic species.
* Connectivity between water bodies provides for all life history functions of aquatic species except where barriers are beneficial and necessary to achieve conservation goals for certain aquatic species.
* Non-native fish removal is a supported and encouraged management strategy in areas where CPW identifies restoration efforts for native aquatic species conservation and recovery.
#9])>

Ecological Emphasis Areas

<([#10 [14.1.1] BLM staff selected Ecological Emphasis Areas (EEA) using very narrow criteria to provide connectivity between large blocks of relatively un-fragmented habitats. The purpose of the EEA designation was to dominantly manage for ecological processes and functionality. We were initially encouraged by BLM's efforts to identify and designate areas where core wildlife and native plant habitat were provided extra protection in the RMP. CPW provided recommendations on criteria to identify important core wildlife habitat and management strategies for their protection. In particular we suggested defining some EEA's using limiting habitat factors for ungulates, given that priority species designations and key habitats were removed from the administrative draft RMP. #10])>

<([#20 [14.1.1] The RMP includes one CPW suggested EEA, Simms Mesa (designated for Gunnison Sage Grouse). CPW has identified several areas that we recommend be designated as Ecological Emphasis Areas (Figure 1). These areas incorporate some of the highest densities of wintering big game within the UFO boundary, and were selected by CPW staff based on mapped winter concentration areas, CPW classification flight data, and VHF and GPS collar data. These polygons represent the best available data in their development. Some of the EEAs overlap with portions of the CPW identified big game polygons, however it is unclear what data sources were used to develop the proposed EEAs and thus the overlap appears to be largely coincidental.

[Figure 1 CPW recommended big game winter range emphasis areas and BLM proposed ecological emphasis areas]

CPW is concerned that the draft RMP will not achieve the purpose for which the Ecological Emphasis Areas were selected. RMP land use authorizations are not restrictive enough and allow competing uses that may preclude or significantly impact the functionality of these areas for wildlife. For instance, without density restrictions in mineral leasing and development, wintering wildlife may be displaced or avoid the Ecological Emphasis Area. It is not clear in the draft RMP how these competing uses such as grazing, travel management, mineral leasing and development, ROW authorizations, recreation, lands and realty will be managed to support the values that are contained within each unique Ecological Emphasis Area.

Many EEAs (or significant portions of them) have also been identified as Special Recreation Management Areas (SRMAs). Of the twelve identified EEAs in the Draft RMP, nine are also designated as an SRMA. We agree that similar allocation restrictions may benefit both recreationalist and wildlife within the same geographic area, yet they are also potentially in conflict. The draft RMP does not indicate how these types of potential conflicts will be managed. #20])>

<([#11 [5.2] [14.1.1] Despite the lack of detail in how the resources with the Ecological Emphasis Areas will be managed, we have been generally supportive of the concept through the development of the RMP during the Cooperating Agency process since 2010. However, during a recently convened Cooperating Agency Meeting (10-14-2016) we learned that the BLM does not consider EEAs as an area designation, but rather as a "resource designation". This is a contradictory statement to the development of these areas and is not reflected in the language

BLM_0156528

within the RMP. The lack of communication continues to create disconnects regarding the intent of the Cooperating Agency relationship in the development of the UFO RMP. #11])>

Big Horn Sheep

<([#12 [14.1.1] The BLM Washington Office recently issued policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016) and the Colorado BLM State Office recently designated Rocky Mountain bighorn sheep as a BLM Sensitive Species [2]. The recent policy and status designation are not reflected in the Draft RMP. In addition, the Draft RMP lacks desired conditions to promote the conservation of special status species, and thus is in conflict with BLM Handbook H-6840, Special Status Species Management.

[Footnote 2] BLM Information Bulletin No. CO-2015-034 #12])>

<([#21 [14.1.2] The Draft RMP/EIS details the methodology and results of both the "Probability of Interaction" (a.k.a the local model) and the "Risk of Contact" (a.k.a. the national model) for domestic sheep and bighorn sheep. The local model was developed by the Uncompahgre Field Office and the national model was developed by the BLM and U.S. Forest Service.

In our cooperating agency role throughout the completion of the UFO RMP/EIS, we reiterated that the local model relies on numerous incorrect assumptions, is not based on the best available science, and has not undergone peer review. CPW recommends that BLM use its national Risk of Contact model for the analysis in the UFO RMP/EIS and work with stakeholders to develop meaningful management prescriptions. An abbreviated summary of our concerns with the local model is detailed below.

* The local model assumes that CPW's mapped bighorn sheep range is equivalent to "suitable habitat." CPW's mapped bighorn sheep range is "occupied habitat." There is a considerable difference between suitable and occupied habitat particularly when attempting to model interaction.
* The local model assumes high, moderate or "some" risk categories based on the percentage of overlap between domestic and bighorn sheep. The existing biological and behavioral bighorn sheep data indicates that the distance between wild and domestic sheep increases the risk of contact. When there is no distance between sheep, i.e., direct overlap there is high risk of contact.
* The local model assumes that temporal separation may affect risk. CPW assumes year round occupancy in some areas mapped as bighorn sheep habitat.
* The local model assumes that bighorn sheep are not attracted to domestic sheep outside of the breeding season. Sheep are gregarious and CPW has documented domestic and bighorn sheep at the same location within hours of each other outside of the breeding season. Desert bighorn sheep have been documented to breed year round.
* The local model assumes that slopes greater than or equal to 60% lower the probability of contact. Slope, as used in this assessment, is not a barrier to interaction and meets the definition of suitable bighorn habitat.
* The local model assumes flat terrain as a 100% barrier to wild sheep. CPW GPS collar data illustrates that flat terrain is not a barrier to wild sheep, especially rams.
#21])>

BLM_0156529

<([#22 [14.1.1] The RMP allows the conversion of "Some" and "Moderate" probability allotments from cattle to sheep. We are concerned that conversion of cattle allotments to sheep allotments in areas identified as Some Probability could have the unintended consequence of moving domestic sheep into closer proximity or directly onto existing occupied bighorn sheep habitat. The EIS does not disclose this potential conflict and demonstrates a major shortcoming with the RMP's reliance on the PoI model results. We recommend the BLM clarify in the RMP that conversion of allotments will not result in any degradation or increased risk of disease transmission to BLM sensitive species.
#22])>

<([#13 [14.1.1] The UFO RMP/EIS incorporates some but not all of the 2012 WAFWA Best Management Practices (BMPs) in its allotment management prescriptions described in Figure K-3 Management of Risk. CPW agrees with the BLM that incorporating BMPs should reduce risk of contact and that they are necessary and reasonable steps that land managers and operators can implement in instances where existing conditions have resulted in domestic sheep and wild sheep being in relatively close proximity. The effectiveness of the many of the BMPs at preventing contact remains untested and uncertain. BMPs in recent domestic-wild sheep contact events were unsuccessful in preventing contact.

The capacity of BMPs to prevent contact in these instances, and the heavy reliance on BMPs within the EIS to manage contact does not 'construe a high degree of confidence that there is low or no risk of contact[3]' with wild sheep as a result of the management actions outlined in the RMP. We recommend that the BLM remove this model from the UFO RMP and to exclude it from future planning efforts to inform or manage for effective separation between domestic and bighorn sheep in Colorado until it has been peer reviewed. We recommend that the BLM's National Risk of Contact model be used in its place.

[Footnote 3] BLM WO policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016)
#13])>

<([#24 [14.1.1] In addition, to the 2012 WAFWA BMPs, CPW recommends the following BMPs be included in the RMP where there is overlap and/or a risk of contact:

* Prohibit supplemental feeding of domestic sheep on allotments. If the range condition cannot support the energy demands of domestic sheep, allotment management should be adjusted accordingly. Supplemental feeding may attract bighorn sheep into close proximity with domestics.
* Require reporting of any bighorn sheep sighting within 2 miles proximity of domestic sheep within 24 hours to the BLM and CPW.
* Require removal plan for live or dead domestic sheep left on allotment following sweeping. Clarify removal responsibilities, courses of action, and timelines if permittee is not available.
* In existing allotments with overlap or where the RoC is High Probability- maintain domestic sheep band of no greater than 2000 head, based on manageability by herder only if grazing period will be shorter than running a smaller band.
* Annual operating plans should include adaptive changes to allotment management that address issues identified the previous year.
* Require trucking of sheep to allotments where trailing routes are within existing overlap or the

RoC modeled risk categories of High or Moderate.
* Modify allotment boundaries or pasture boundaries to eliminate grazing in direct overlap with occupied habitat.
* Require count-on and count-off reports for all domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
* Require report within 24 hours of known missing sheep and notify CPW and BLM in domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
* Require entire domestic sheep band in treed habitat to be within .5 mile of each other to minimize opportunity for domestic sheep to be spread out and lose track of smaller groups.
* Develop plan to allow for authorized removal of bighorn sheep that interact with domestic sheep by herder or permittee following defined criteria, immediate follow up with CPW and BLM personal following action, and incident evaluation to determine legitimacy of kill. #24])>

<([#23 [14.1.3] In the Final RMP, Chapter 4 should include a discussion of the effects of potential disease transmission and potential impacts on bighorn sheep within the planning area. #23])>

<([#14 [15.2] Gunnison Sage Grouse

The Gunnison Sage-grouse (GuSG) was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on November 20, 2014 (79 Fed. Reg. 69192).[4] The RMP fails to include the necessary land protection, resource allocation, and stipulations to protect and enhance GuSG within the UFO. The BLM has initiated a planning effort to amend all of the RMPs throughout the GuSG range to address the federally threatened status of the species and outline management actions that will conserve and assist in the recovery of GuSG (GuSG Rangewide RMP Amendments). The Draft UFO RMP does not contain consistent habitat definitions with BLM's administrative Draft GuSG Rangewide RMP Amendments and does not contain consistent proposed management actions to conserve and recover GuSG. Instead, the UFO RMP agency preferred alternative relies on the use of an EEA in GuSG with few land use restrictions associated with that designation (see EEA discussion above). The use of EEAs for GuSG as the sole land designation and source of management emphasis for GuSG in the preferred alternative is not consistent with the approach in BLM's administrative Draft GuSG Rangewide RMP Amendments, and is inadequate for GuSG conservation and recovery efforts. We recommend that the BLM commit to providing a consistent management approach in the UFO RMP and the GuSG Rangewide Plan Amendments, either by amending the final UFO RMP with the provisions of the final GuSG Rangewide Plan or by incorporating the final GuSG Rangewide Plan into the final UFO RMP as discussed in Section 2.2.4. We recommend that the EEAs for GuSG in the UFO RMP be incorporated as ACECs in the preferred alternative. ACECs are supported by established BLM policy and law. #14])>

<([#25 [15.3] [3] [Footnote 4] Table 3-23 should be updated to include GuSG, and the information included for the GuSG on page 3-73 should be corrected by removing the statement, "The species is proposed for listing under the ESA," and replacing with the current listing status. Additionally, the western yellow-billed cuckoo was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on October 03, 2014, effective November 03, 2014 (79

Fed. Reg. 59992). This species should also be included in Table 3-23. #25])>

Land Health Standards

<([#15 [23.1] The draft RMP does not have any discussion on how Land Health Standards (LHS) will be achieved through grazing implementation. The Draft EIS indicates that out of the 181 grazing allotments, 30 of those allotments are "not meeting" or "meeting with problems" the LHS with grazing identified as the cause. The RMP should indicate that the best available science will be used to design grazing systems that allow the LHS to be achieved and describe the monitoring frequency that is necessary to substantiate the grazing forage allocations. #15])>

Stipulations for Fluid Mineral Leasing and other Surface Disturbing Activity

<([#16 [14.1.1] CPW appreciates BLM including a "No Surface Occupancy" stipulation for fluid mineral leasing within State Parks and State Wildlife Areas in the Draft RMP (Appendix B, Table B-2, p. B-38). This stipulation will help avoid conflicts between mineral development and existing and planned recreational activities on State Parks and State Wildlife Areas while continuing to allow mineral resources to be developed.

In many instances, stipulations intended to address impacts to wildlife vary across alternatives in ways that render the stipulations ineffective for reducing impacts. For example, the shortening of a seasonal timing limitation on development may no longer provide any intended benefit to wildlife if it does not correspond with the life history requirements of the species for the sensitive biological season it was intended to address. CPW recommends varying wildlife-related stipulations across alternatives by geographic application of the stipulation, not by changing the substance of biologically-based stipulations in ways that may render their intended benefit to wildlife meaningless. CPW is not aware of this approach being used as a planning tool by any other BLM Resource Area in Colorado.

In some cases, the stipulations identified for the preferred alternative are not consistent with lease stipulations recommended to BLM by CPW. On December 13, 2010, CPW provided BLM's State Office recommendations for fluid mineral lease stipulations relevant to Resource Management Plan (RMP) revisions and quarterly lease sales in Colorado (statewide stipulation letter). CPW has provided this document to UFO staff and EMPSI in 2011. CPW's statewide stipulation recommendations reflect our understanding of the best available science regarding protective lease stipulations necessary to maintain existing wildlife populations. Moreover, many of these stipulations can also be applied to minimize impacts from other land use authorizations (travel management, coal, uranium, recreation, etc).

CPW has provided extensive background information to UFO regarding the need to implement these stipulations to minimize the impacts to wildlife resources from specific developments (please refer to 3 February 2012 CPW August 2012 Lease Sale Comments and CPW 24 April2012 Bull Mountain Master Development Plan Preliminary Environmental Assessment (DOI-BLM-CO-S050-2009-0005). CPW recommends that Appendix B be modified where necessary to include these statewide stipulation recommendations for the preferred alternative. If the BLM elects to not incorporate our recommendations in the preferred alternative, we

recommend the analysis provide data, with clear rationale supporting that decision and alternative recommendations to avoid, minimize, and mitigate impacts. #16])>

<([#17 [8] Finally, the stipulations and restrictions on surface disturbance in the RMP intended to protect GuSG are inconsistent with the stipulations and restrictions described in BLM's recently released Draft GuSG Rangewide RMP Amendments. These documents need to be consistent. Please update the RMP as needed to reference and incorporate the stipulations and surface use constraints contained in BLM's Draft GuSG Rangewide RMP Amendments. #17])>

Conclusion

<([#18 [5.2] The BLM did not use CPW as a cooperating agency resource with special expertise in wildlife management to help guide development of the RMP. The RMP is lacking resource allocation direction for wildlife and contains resource management decisions that conflict with and/or fail to incorporate other BLM and CPW planning documents. We see a need for significant revisions before publishing the Final RMP/EIS and CPW staff are available to assist in these efforts. We are hopeful that future cooperating agency processes result in shared efforts with meaningful outcomes. #18])>

Sincerely
Renzo DelPiccolo, Area Wildlife Manager – Montrose
xc: Broscheid, Dorsey, A. McLaughlin, Magee, Wenwn, Wait, Alves, Holst, SWRO File, Area 18 File, DNR File

000494_GannettA_20161031  Organization: Alison Gannett
Received: 10/31/2016 12:00:00 AM
Commenter1: Alison Gannett - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000494_GannettA_20161031.htm (000494_GannettA_20161031-387774.htm Size = 3 KB)
UFORMP_000494_GannettA_20161031.pdf (000494_GannettA_20161031-387773.pdf Size = 135 KB)
Submission Text
Date:10/31/2016

Commenter: Alison Gannett

BLM_0156533

Organization:

Email:alisongannett@mac.com

Address:42485 Highway 133, Paonia, CO 81428

Phone:

Comment:
To the BLM - Regarding the RMP:

The Interior Department in January 2016 announced a three- year moratorium on federal coal leasing in Wyoming and elsewhere to analyze whether the government is getting a fair return on those leases and the environmental effects of burning that coal to produce electricity.

There is a current lawsuit in motion for the federal oil and gas leasing program, regarding the fact that the US has failed to consider the same factors regarding fluid mineral extraction.

The current lawsuit is regarding the fact that the federal government needs to consider greenhouse emissions and the potential contribution to climate change before allowing oil and gas development on public land.

Almost 10 percent of U.S. greenhouse gas emissions trace back to publicly owned oil and gas reserves, an amount more than the total greenhouse emissions of Central America, according to new information released in the lawsuit.

The lawsuit accuses the government of opening up public land in the three states to drilling without properly analyzing the "direct, indirect and cumulative" impacts to emissions/climate change.

This lawsuit illustrates the fact that the BLM can in no way have properly analyzed the effects of fluid mineral extraction on climate change. Recent studies from the NOAA, Cornell (Howarth, et al), have shown that the cumulative impact of natural gas on greenhouse gas emissions is actually HIGHER than coal. This is due to the fact that older studies have failed to take into account the escape of greenhouse gasses during exploratory drilling, actual drilling, the actual moments of fracking injections, pipeline leaks, condensate tank leakage, compressor station leakage, spills, transportation of actual gasses and also other materials (sand, compressors, generators, etc).

The cumulative effects of natural gas must be properly analyzed with the most current emission studies before moving forward with RMP. The current RMP is already outdated, as it states that greenhouse gases have been analyzed and are not a problem. If this is the case, why is the Department of the Interior being sued currently as the January 2016 lawsuit is presenting?

A no leasing moratorium should be considered until the facts are gathered.

BLM_0156534

If you insist on moving forward without proper studies, then the BLM should expect a similar lawsuit in the near future.

If you insist on moving forward, please consider the North Fork Alternative B1, as this would lessen the impact on climate change, and also protect our food, water and clean air. We can always build solar panels, but we cannot create a cooler planet, nor can we create clean water, air and soil out of the thin air. We have no "alternative" planet to move to, should the US government fail to take action on climate change with the most current science.

Alison Gannett
Holy Terror Farm
42485 Highway 133
Paonia, CO 81428

000495_GulickJ_20161031 Organization: Jacqueline Gulick
Received: 10/31/2016 12:00:00 AM
Commenter1: Jacqueline Gulick - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000495_GulickJ_20161031.htm (000495_GulickJ_20161031-387776.htm Size = 1 KB)
UFORMP_000495_GulickJ_20161031.pdf (000495_GulickJ_20161031-387775.pdf Size = 85 KB)
Submission Text
Date:10/31/2016

Commenter: Jacqueline Gulick

Organization:

Email:sgulick1@yahoo.com

Address:449 Vista Drive, Paonia

Phone:

Comment:

BLM, Uncompahgre Field Office, Montrose

By way of a comment on the RMP this is just to say I don't want there ever to be any oil and gas drilling in the North Fork Valley where I live. For the North Fork Valley I support Alternative B1, also called the North Fork Alternative, which was thoughtfully written by a group of local citizens in the best interests of our region. Of the RMP choices you give to us, that is the best one. I support the long-winded comments about it sent to you by my husband, Steve Gulick.

Jacqueline Gulick
449 Vista Drive, Paonia
October 31, 2016

000496_WiltanenW_20161031  Organization: Wayne Wiltanen
Received: 10/31/2016 12:00:00 AM
Commenter1: Wayne Wiltanen - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000496_WiltanenW_20161031.htm (000496_WiltanenW_20161031-387778.htm
Size = 4 KB)
UFORMP_000496_WiitanenW_20161031.pdf (000496_WiltanenW_20161031-387777.pdf Size
= 160 KB)
Submission Text
Date:10/31/2016

Commenter: Wayne Wiltanen

Organization:

Email:wiltanen@paonia.com

Address:40575 O Rd, Paonia, CO 81428

Phone:970-527-4051

Comment:
I am a small farm owner in the North Fork area of Delta County, Colorado. I have several objections to the inadequate planning of the draft RMP with respect to certain areas of concern.

1. <([#1 [30.3] The effect of leasing on local infrastructure. Local roads are not engineered to

BLM_0156536

accommodate the kind of heavy traffic that leasing will cause. Medical and emergency services in the area are hardly sufficient to service the local populace much less the increase resulting from the sale of leases. Law enforcement will be challenged as will public safety generally by the influx of gas/oil field crews. There is considerable concern over increased drug infiltration into the area and the safety of our children generally. The tiny increase in local business is far offset by the societal costs of oil/gas development in the North Fork. #1])>

2. <([#2 [37.3] Water. For farmers, ranchers, orchardists and viticulturists clean water is the life-blood of their work. Contamination of surface water by oil/gas operations compromises the value of their products. Of equal concern is the contamination of domestic water supplies, which in the North Fork rely heavily on sub-surface sources (e.g. springs and wells). The social and economic effects of bad domestic water should be obvious. An additional factor not generally addressed is that the Bureau of Reclamation has recently invested millions in projects to put irrigation canal systems into a pipes. This is part of a project to reduce downstream pollution, primarily by selenium. I cannot imagine that the Bureau of Reclamation would be pleased if their investment is compromised because in place of selenium pollution, surface water pollution is being passed downstream. A simple solution is to not lease in a surface water catchment area that has an existing water collection system for irrigation water. Similarly for domestic drinking water catchment areas. The BLM is not required by law to lease land, it is permitted to do so and may so decide to withhold lease blocks at its discretion. #2])>

<([#3 [30.3] 3. Property values. Farmers, ranchers, orchardists and viticulturists have made a major investment in the property that is relevant to their businesses. In my own case what I can leave to my posterity is the value of the farm, not a stock portfolio. Local realtors report that when the BLM was planning initial leasing in the North Fork, about 4 years ago, that existing contracts to buy property in the North Fork were dropped like hot potatoes. There is no reason to assume that similar effects on property values would not result from oil/gas leasing. Which in turn means that the value of my investment in my farm would be decreased (and if recognized by the county assessor, property taxes would drop -- not something any county wants to hear). #3])>

4. <([#4 [30.3] Short term versus sustainable long term economics. Farms, ranches, orchards and vineyards in the North Fork are long established sustainable enterprises that provide food, not just locally but state-wide and some even nationally, and have done so for decades (a few for over a century). Leasing that has the potential to destroy this long-term sustainable productive activity for short term returns that in no way benefit the North Fork or Delta County is unconscionable. Not only are the ranches, farms, orchards and vineyards productive but they also support agrotourism, which would be sharply curtailed with the industrialization of Delta County. The economics of long-term sustainable enterprises versus short term gains for corporations must be considered seriously. #4])>

Wayne Wiitanen, PhD
Small Potatoes Farm & Bakery
40575 O Rd
Paonia Co 81428
(970) 527-4051

000497_MarstonE_20161101  Organization:  Ed Marston
Received: 11/1/2016 12:00:00 AM
Commenter1: Ed Marston - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000497_MarstonE_20161101.htm  (000497_MarstonE_20161101-387780.htm  Size
= 9 KB)
UFORMP_000497_MarstonE_20161101.pdf  (000497_MarstonE_20161101-387779.pdf  Size =
450 KB)
Submission Text
Date:11/01/2016

Commenter: Ed Marston

Organization:

Email:edhmarston@paonia.com

Address:PO Box 279, Paonia, CO 81428

Phone:970-527-3166

Comment:
Other respondents will have adequately responded to the deficiencies in the Bureau of
Land Management's Resource Management Plan and the threat that the preferred alternative
poses to the emerging economy of eastern Delta County, aka the North Fork Valley.

I write as the owner and manager of 17,000 square feet of offices, shops, a restaurant
and bar. In past years, I remodeled another almost 5,000 square feet of commercial space on
Paonia's Grand Avenue. So I write as someone whose living and whose estate is in mortal
danger from the preferred alternative D. I write as someone whose enjoyment of life in the
North Fork Valley will be ruined by Alternative D.

I have lived in Paonia for 41 years. My spouse and I founded and ran the weekly newspaper
North Fork Times from 1975 to 1980. It is now part of the Delta County Independent. We moved
the regional environmental newspaper High Country News to Paonia in 1983 and ran it for 19
years. I was a director of Delta Montrose Electric Association, serving for six elected terms/18
years, between 1983 and 2013. At present, I serve as Board President of Solar Energy

BLM_0156538

International, which trains people to install and design solar panels and small hydroelectric operations. It has an 8-acre campus west of Paonia and over 40,000 alumni around the world. I have written or edited several books about the interior West.

To summarize my remarks, if the BLM with its preferred alternative D had deliberately set out to destroy an economy and a way of life, it could not have done better. The fact that the destruction of our livings and lives is an accidental by-product of the working of the BLM Montrose office makes it all the worse.

How did this preferred alternative come about? How did our fellow citizens who work for the federal government create a document that will destroy or cause to be still born our growing economy? Why is our government doing this to us?

There is no reason rooted in public policy or in the Constitutional mandate to "form a more perfect union." The BLM's Organic Act, aka FLPMA, has at its heart Multiple Use, defined in the Act as "management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people."

We know that the roading and drilling of public land eliminates all other uses. There is no "combination" when 95 percent of the land is leased. There is only roading and drilling and fracking. There is only the destruction of country roads by massive trucks. Once the land is roaded and drilled and fracked it is no longer available for hunting or hiking or bird watching or other forms of recreation. Gradually, grazing becomes more and more problematic as the land is industrialized and as trucks race through the forest. Wildlife is squeezed. Putting 95 percent of the land up for leasing turns it into a single use.

This is a clear violation of the multiple use mandate. It is also a violation of the main purpose of FLPMA: to keep the land in public hands. FLPMA ended the privatization of the land via homesteading. And yet the roading, drilling and fracking that will be done under Alt D essentially privatizes what was meant by the Congress to be forever public. This preferred alternative betrays the agency's organic act. It betrays its core principles.

Perhaps worse than this betrayal is the fact that there is no need at this time for the resource in question. Natural gas is a drug on the market, with the current price roughly $2 per thousand cubic feet under the price needed with present technology to bring it to market profitably.

Beyond dollars, we know that natural gas is not the so-called bridge fuel that the Sierra Club, President Obama and the gas industry promoted it as. We now know that because of inevitable pipeline and storage leakages, and the fact that in its first few years in the atmosphere $CH_4$ is 90 times more potent a greenhouse gas than $CO_2$, that coal should be our bridge fuel.

My scientific authority for this can be found in Bill McKibben's article in The Nation: https://www.thenation.com/article/global-warming-terrifying-new-chemistry/

BLM_0156539

The damage to the atmosphere will be intensified in part because rural gathering pipelines are unregulated. This area is the worst possible place to drill and lay pipelines. Given the marginal nature of the economics of developing gas in this region, we can be sure that the developers will have to cut every corner to save money. The unregulated pipelines will inevitably leak.

So why are the employees of the federal government issuing a document in which the preferred alternative will damage those of us who live in the North Fork Valley, damage the climate and damage the nation, and violate the agency's founding document?

From the outside, it appears that the BLM staff are trudging along a well-worn path of agency obedience to the fossil fuel industry. This nation's prosperity was based on fossil fuel development. There was good reason for the federal agencies to favor them, to subsidize them, to do everything possible to strengthen fossil fuels.

That day is now past. We now know that fossil fuels are a threat to the nation. And in this particular case, natural gas development is a threat to a fertile and beautiful valley. Unlike many rural areas, the North Fork Valley is thriving. Its only threat is the federal government's apparent intention to lease a huge expanse of land within the valley itself and north of it.

It has never been more important that our federal agencies make decisions based on current information and current conditions. It has never been more important than now our federal agencies behave with integrity.

The consequences of not behaving with integrity and bravery are in today's headlines. Because the BLM/Department of Interior dodged its responsibilities in Nevada and let the Bundys steal federal grass and trespass for decades we ended up with the Malheur takeover – you can never appease bullies - and now their inexplicable vindication by a federal jury. That decision can only mean more lawlessness on the federal estate. The failure of the BLM/DOI to do the right thing in Nevada initially – to take the easy path – has led to a threat to our land and to our federal land managers.

What does that have to do with this preferred alternative? Am I holding the Montrose office of the BLM responsible for the Bundy thefts and rampages? Not exactly. But the Bundys' prominence is due in part to the fact that the BLM, on its own hook or because of orders from higher up, failed to do its job with regard to the Bundy family's grazing privileges. The failure to enforce its regulations has discredited the agency and endangered its employees.

The people who work for the BLM Montrose office have also failed to do their job in writing this RMP and in the choice of the preferred alternative. Alternative D could only be chosen by deliberately looking away from the agency's fundamental mandates: To keep the federal estate in public hands and in multiple use. Leasing 95 percent of the land privatizes it in all but title because all other uses become impossible. The Montrose staff in charge of our federal estate are on the brink of putting this land off limits to almost all of us and to all but one use.

BLM_0156540

My conclusion is that the Uncompahgre Field Office should withdraw its preferred alternative D and study and substitute a no leasing or a very light leasing alternative. The only honorable path is for the UFO to go back to the drawing board. The only path that can preserve public ownership and multiple use is to re-examine the foundations of the process that led to this preferred alternative. It may also be the only path to preserve the Bureau of Land Management itself. As we saw with the Bundy situation, bad decisions made out of political convenience will inevitably damage and perhaps even destroy the agency itself.

Sincerely,

Ed Marston
POB 279
Paonia, Colorado 81428
970.527.3166
edhmarston@paonia.com

000498_AntonelliD_20161101   Organization: Daniel Antonelli
Received: 11/1/2016 12:00:00 AM
Commenter1: Daniel Antonelli - Grand Junction, Colorado 81507 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000498_AntonelliD_20161101.htm (000498_AntonelliD_20161101-387962.htm Size = 5 KB)
UFORMP_000498_AntonelliD_20161101.pdf (000498_AntonelliD_20161101-387961.pdf Size = 267 KB)
Submission Text
Date:11/01/2016

Commenter:Daniel Antonelli

Organization:

Email:dansandi@acsol.net

Address:2295 N. Arriba Circle, Grand Junction, CO 81507

Phone:970-270-8575

BLM_0156541

Comment:

I would like to comment on the management of BLM lands located in the West End of San Miguel county. I have family in the area and have been working, exploring and recreating in that area for nearly 35 years.

I have been riding mountain bikes in the back country since 1988. I believe mountain bike use has very low impacts on the environment, wildlife and BLM resources. It is highly beneficial to the physical and mental health of a community. The positive economic impacts of popular trails could be extremely beneficial to struggling communities such as Nucla and Naturita. As an active member of COPMOBA for 15 years I can assure you that we have been and will continue to be trail stewards in that area.

<([#1 [32.1] Singletrack trail is what most mountain bike users seek out and have the best experience riding. There are some trails in this area that qualify for some of the best experiences I have had. I would highly recommend that the single track trails in this area be inventoried and protected. I would be willing to work with your office in identifying areas and trails that would be of benefit to all concerned.

There are several that come to mind and are listed below:

1) Single track trail leading down the Atkinson Creek drainage from the Paradox trail intersection downstream to an intersection with a 4x4 road near Hog Point. A good return route uses a trail on the east ridge above the same Atkinson Creek drainage.

2) The Beehive Canyon trail from the water tank near Biscuit rock to the intersection with a 4x4 road on Carpenter Flats is a very cool ride. There are several mine buildings along the way to explore.

3) And a big favorite, Y11 trail leaving from the lower portion of the Uravan site leading down the south side of the San Miguel River and then still high on the cliff following the Dolores River upstream to a fork. One fork leads down to the river road and the other is a trail leading higher up and to the south east to connect with 4x4 roads in the Saucer Basin. A return on theses roads then a short switchback trail returns to the start of the Y11 trail.

4) A trail on the west side of the Dolores River starting just downstream from the bridge at Biscuit rock and then eventually climbing up on top of the mesa at the northernmost point of Carpenter Flats to an intersection with a 4x4 drive road is a challenge but rewarding adventure.

5) Another favorite is an old road almost single track trail starting above and east of the Tabaguache Creek and San Miguel River confluence. It travels upstream on the north side of the San Miguel River for 6-8 miles and the forks. One fork leads up Coal Creek with and exit up Box Canyon. The other fork in the trail crosses Coal Creek and stays next to the San Miguel River and heads upstream to a shallow ford and one can access Highway 141 or other trails for a return trip. This trail is always good as an out and back also.

6) A trail leading up the South Fork of Mesa Creek and connecting with trails on Forest Service lands

7) Farther west and up onto Carpenter Ridge there are two different trails that are located on a bench just below the rim that overlook the Paradox valley in spectacular fashion. One takes off of 6 Road coming out of Paradox Valley and heads to the southeast. The other is a few miles west and is near the Forest Boundary. The views off of the bench these trails are on is also spectacular.

8) There a several trails starting on south side of Highway 141 near the the San Miguel River and Coal Creek confluence. These trails make very interesting loops up to the rim of Sawtooth Ridge and back. There is some mining history, slick rock formations, small canyons and interesting vegetation in this area.

9) One of the trails on Sawtooth Ridge follows the very edge of the rim for several miles making for spectacular views of the Paradox Valley and the La Sal mountains.

10) There are several other old or abandoned 4x4 roads that make for wonderful experiences on a bike in the Atkinson Breaks and Martin Mesa Areas. Many of these trails have a bunch of mining ruins, great views and challenging terrain. I can elaborate on these if you would like.

There are several trails in the Burro Creek area that are near or in the area proposed as Lands with Wilderness Characteristics. I would like to protect the area but recommend another form of protection that does not exclude mountain bike access. I would be willing to look at adjusting the boundary of the LWC with BLM personnel if that is the only option.

I would like to see these trails be accessible to mountain bike users for years to come. I would be willing to help GPS the routes or meet with BLM personnel to perform tasks to make this happen #1])> .

Thanks for accepting my comments,

Daniel Antonelli
2295 N. Arriba Circle Grand Junction, CO 81507
970-270-8575
dansandi@acsol.net

000499_BacigalupiL_20161101  Organization:  Linda Bacigalupi
Received:  11/1/2016 12:00:00 AM
Commenter1: Linda Bacigalupi - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification:  Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique

Form Letter Master:
Current Task: Done Assigned/Due: dprobison  12/9/2016 12:00:00 AM
Attachments: 000499_BacigalupiL_20161101.htm  (000499_BacigalupiL_20161101-387964.htm
Size = 7 KB)
UFORMP_000499_BacigalupiL20161101.pdf  (000499_BacigalupiL_20161101-387963.pdf
Size = 146 KB)
Submission Text
Date:11/01/2016

Commenter: Linda Bacigalupi

Organization:

Email:lmb@tds.net

Address:36291 Sunshine Mesa Road, Hotchkiss, CO 81419

Phone:970-270-9932

Comment:
RE: Comments on the Draft Resource Management Plan and Environmental Impact Statement
for the Uncompahgre Field Office, Colorado

Thank you to all who participated in assembling the vast amount of data and analysis for this
large and very important part of Western Colorado. Altho I consider this region important to the
country, the state and to my own personal experience of Western Colorado, I am limiting my
comments to those which pertain or emanate from my home location in the North Fork Valley
where I have lived since 1973.

DELINEATION OF ALTERNATIVES

In reading the brief synopses of the alternatives, it became clear that the drafting authorities
consider Alternative B to be what one might call a "conservation" alternative. The draft
describes this alternative to emphasize: "... improving, rehabilitating, and restoring resources and
sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species,
while allowing appropriate development scenarios for allowable uses.... Goals and objectives
focus on environmental and social outcomes achieved by sustaining relatively unmodified
physical landscapes and natural and cultural resource values for current and future
generations..... Appropriate and allowable uses and restrictions would be contingent on
minimizing impacts on natural and cultural resources.

In contrast, the PREFERRED Alternative D emphasizes balancing resources and resource use
among competing human interest, land uses, and the conservation of natural and cultural
resources values, while sustaining and enhancing ecological integrity across the landscape,
including plant, wildlife and fish habitat. This alternative incorporates a balanced level of
protection, restoration, enhancement and use of resources....

BLM_0156544

The point I want to make is that I believe Alternative B-1, "the North Fork Alternative", in the form of its "ACTIONS" and "ALLOWABLE USES", are more appropriately integrated into the PREFERRED ALTERNATIVE than into ALTERNATIVE B. The extensive public involvement effort and the resulting detailed recommended actions and allowable uses embody the incorporation of local knowledge and fine-tuning that results in "balancing resources and resource use among competing human interest, land uses, and the conservation of natural and cultural resources values" which is the objective stated above for the PREFERRED ALTERNATIVE.

No doubt your office has received a high volume of comments recommending no oil and gas leasing at all for the North Fork Valley. Stipulations in support of that objective would be appropriately housed within Alternative B. I strongly submit that the stipulations itemized below which represent the lengthy research and discussion at the local level within Delta County and the North Fork Valley are more appropriately housed within the PREFERRED ALTERNATIVE: D as representing not the most stringent "conservation alternative" but rather a "balanced" alternative.

<([#3 [5.3] [3] ACTIONS AND ALLOWABLE USES of the NORTH FORK ALTERNATIVE which should be included in the PREFERRED ALTERNATIVE D

All references and numbers below pertain to TABLE 2.2: Descriptions of Alternatives A, B/B-1, C and D:

Line 28: Soils and Water Uses
North Fork items on Lines 34,35,40,44,47,50,55,56
Line 73: Vegetation. Riparian
North Fork items on Line 81
Line 111: Terrestrial Wildlife
North Fork items on Line 114
Line 145: Special Status Fish and Aquatic Life
North Fork items on Lines 148, 149
Line 161: Special Status Terrestrial Wildlife - Gunnison Sage-Grouse
North Fork items on Line 166
Line 168: Raptors
North Fork items on Line 171
Line 248: Visual Resources
North Fork items on Lines 253,257
Line 319: Coal
North Fork items on Line 327
Line 330: Fluid Minerals
North Fork items on Lines 333 through 338
Line 524: Areas of Critical Environmental Concern
North Fork items on Line 532
#3])>
In addition, I think there are at least two impact areas that have not been adequately covered by

the current analysis.

<([#2 [11.3] On Line 17 of Table 2.2 (Description of Alternatives), the RMP states a goal of managing resources "in response to stresses induced by climate change". I do not find an analysis of climate change IMPACTS CAUSED BY VARIOUS ALTERNATIVES. Specifically, I do not find that the net energy and net $CO_2$ effects of a massive oil and gas leasing in this area of Western Colorado have been adequately analyzed.(nor have they been adequately analyzed nationally). However, as responsible land managers, I believe we have control in our local area to consider this important impact before leasing is permitted. I am cognizant that stipulations can to a certain extent limit environmental impacts of energy development, but also that the act of leasing conveys a property right...and rightly so since companies invest a good deal of resources in just the initial act of acquiring these leases. I think it is incumbent upon the BLM, for both public and private interests, to have adequately considered ALL IMPACTS of development, and the societal costs thereof, before putting forward a mineral leasing green light in their RMP. #2])>

<([#1 [13.3] On Line 191-206 Wildland Fire Ecology and Management, it was interesting to see the detailed commitment the BLM has/will have for managing the fuels on public land to minimize wildfire issues. I am particularly sensitive to this issue because my property was affected by the 1994 Wake Fire of 3,500+ acres. That was a lightening- caused fire; and I applaud the BLM and other local agencies for their public education and incentive programs to protect private property since that fire. However, I do not find an analysis of the potential fire-creating impacts of various activities on the public lands, specifically the concentrated oil and gas development of BLM and other private surface lands in fire-prone PinonJuniper and Sagebrush habitats. I believe these risks and their accompanying costs should be considered in your analysis
#1])>
Linda Bacigalupi
36291 Sunshine Mesa Road
Hotchkiss, CO 81419
970-270-9932
lmb@tds.net

000500_BilchakR_20161031 Organization: Rosemary Bilchak
Received: 10/31/2016 2:00:00 PM
Commenter1: Rosemary Bilchak - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM

Attachments: xUFORMP_000500_BilchakR_20161031.pdf (000500_BilchakR_20161031-387969.pdf Size = 416 KB)
Submission Text
Date:10/31/2016

Commenter: Rosemary Bilchak

Organization:

Email:rosemary@paonia.com

Address:410 Duke Hill Rd., Hotchkiss, CO 81419

Phone:

Comment:
Dear Sir/Madame:

We are writing to express our concern at the RMP alternatives presented by this office. None of these provide the protection required by your mandate to support diverse use of public lands. In fact, with the "preferred alternative" selected by this office, you may as well strike "public" from that sentence and replace it with "industry", since the plan opens essentially all of the lands to industry for development.

There are really only two options that should even be considered: The North Fork Alternative Plan, and; a no lease alternative. Only these plans would protect the human interests that are served by public lands. It is apparent that the BLM did not fully consider the impact of oil and gas drilling on those constituents; the living, breathing constituents. The preferred alternative is so lopsided in favor of a non-living industry, it is as if the BLM has forgotten to even consider the impacts on real people.

We speak from first-hand knowledge, having lived in Silt, Colorado where we experienced Divide
Creek burning, the death of a neighbor in a traffic accident where the gas worker was doing 70 in a 20 mph blind zone on the wrong side of the road, and the gagging of multiple neighbors after settlements with the gas companies for contaminated wells, dead animals, and occurrences of rare
illnesses. Some of these settlements entailed the purchase of the affected property and the removal of the residents, sometimes from lands that had been in their families for generations. Everywhere that drilling occurs, incidences have accompanied that industrial activity including the contamination of air and water from leaking casings and pipelines, from flaring activities and explosions, and from diesel engines and compressor stations. The operational requirements of drilling necessarily lead to excessive traffic with its concomitant increase in pollution, wear on the roads, and accidents. The industry also creates excessive noise, including the body-throbbing C-Scale noise.

For these reasons, drilling is incompatible with organic growing. The North Fork Valley has the largest number of organic farms in the state of Colorado. Where does this alternative protect our livelihoods? The answer is, it doesn't.

<([#1 [30.3] Another significant economic driver for this valley is the hiking, fishing, hunting and other
recreational uses that will be threatened by drilling. The multi-faceted requirements of these activities such as clean air, clean water, sustainable food supplies, and undisturbed migration corridors and birthing locations for wildlife have been blatantly ignored.
The draft RMP fails to fulfill its duty to protect the lands under consideration and fails to address the concerns of the affected communities.
#1])>
Sincerely,

Rosemary Bilchak & Gordon MacAlpine




000500_BilchakR_20161031_Poss_Dup Organization: Rosemary Bilchak
Received: 10/31/2016 12:00:00 AM
Commenter1: Rosemary Bilchak - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000500_BilchakR_20161031_Poss_Dup.htm
(000500_BilchakR_20161031_Poss_Dup-387978.htm  Size = 3 KB)
Submission Text
Date:10/31/2016

Commenter:Rosemary Bilchak

Organization:

Email:rosemary@paonia.com

Address:410 Duke Hill Rd., Hotchkiss, CO 81419

Phone:

Comment:
Dear Sir/Madame:

We are writing to express our concern at the RMP alternatives presented by this office. None of these provide the protection required by your mandate to support diverse use of public lands. In fact, with the "preferred alternative" selected by this office, you may as well strike "public" from that sentence and replace it with "industry", since the plan opens essentially all of the lands to industry for development.

There are really only two options that should even be considered: The North Fork Alternative Plan, and; a no lease alternative. Only these plans would protect the human interests that are served by public lands. It is apparent that the BLM did not fully consider the impact of oil and gas drilling on those constituents; the living, breathing constituents. The preferred alternative is so lopsided in favor of a non-living industry, it is as if the BLM has forgotten to even consider the impacts on real people.

We speak from first-hand knowledge, having lived in Silt, Colorado where we experienced Divide
Creek burning, the death of a neighbor in a traffic accident where the gas worker was doing 70 in a 20 mph blind zone on the wrong side of the road, and the gagging of multiple neighbors after settlements with the gas companies for contaminated wells, dead animals, and occurrences of rare
illnesses. Some of these settlements entailed the purchase of the affected property and the removal of the residents, sometimes from lands that had been in their families for generations. Everywhere that drilling occurs, incidences have accompanied that industrial activity including the contamination of air and water from leaking casings and pipelines, from flaring activities and explosions, and from diesel engines and compressor stations. The operational requirements of drilling necessarily lead to excessive traffic with its concomitant increase in pollution, wear on the roads, and accidents. The industry also creates excessive noise, including the body-throbbing C-Scale noise.

For these reasons, drilling is incompatible with organic growing. The North Fork Valley has the largest number of organic farms in the state of Colorado. Where does this alternative protect our livelihoods? The answer is, it doesn't.

<([#1 [30.3] Another significant economic driver for this valley is the hiking, fishing, hunting and other
recreational uses that will be threatened by drilling. The multi-faceted requirements of these activities such as clean air, clean water, sustainable food supplies, and undisturbed migration corridors and birthing locations for wildlife have been blatantly ignored.

The draft RMP fails to fulfill its duty to protect the lands under consideration and fails to address the concerns of the affected communities. #1])>

Sincerely,

Rosemary Bilchak & Gordon MacAlpine

BLM_0156549

000501_Bockus_20161101_NPS Organization: National Park Service, Danguole Bockus
Received: 11/1/2016 12:00:00 AM
Commenter1: Danguole Bockus - ,
Organization1:National Park Service
Commenter Type: Federal Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000501_Bockus_20161101_NPS.htm (000501_Bockus_20161101_NPS-
381185.htm Size = 8 KB)
Submission Text
Bockus, Danguole <danguole_bockus@nps.gov>

Hello,
Attached are comments from 2 NPS staff. Please feel free to contact either of us if more
information is needed.
Thank you
Danguole B. Bockus
Ecologist
Black Canyon of the Gunnison NP/Curecanti NRA
970-249-1914 x432
"Most of the shadows of this life are caused by our standing in our own sunshine." Ralph Waldo
Emerson

Uncompahgre Draft Resource Management Plan - NPS staff comments.docx
21K

Uncompahgre Draft Resource Management Plan (RMP) – NPS Comments 8/22/2016

REVIEWER: ZAENGER
<([#1 [4] PAGE/PARAGRAPH: 1-10
COMMENT: Issue 3 in Planning Issue Statements: how does interpretation fit in with human
activities, specifically, recreation. Or should it? It remains unmentioned in the table. #1])>

REVIEWER: ZAENGER
<([#2 [4] PAGE/PARAGRAPH: 1-10
COMMENT: Issue 5 in Planning Issue Statements: How does interpretation fit with the
management and protection of cultural, historic and paleontological resources? Careful attention
to all resources needs to be given before interpretation is developed. Not all resources need on
site interpretation, including easy-to-access resources. This is unmentioned here.
#2])>

REVIEWER: ZAENGER
<([#3 [27.1] PAGE/PARAGRAPH: Table 2 Alternatives, 2-259, 2-263, 2-271, 2-281
COMMENT: Although the analysis shows some recreation areas would be developed, and some would not, it's important to note that not every location needs recreational facilities developed. Sustainability in relationship to cost, upkeep, and the staff to manage far-flung recreational facilities should be recognized. Too often, facilities are put in place, often through partner or community financing, but no plan exists to maintain them after they are vandalized, wear out or just fall apart. And sometimes there isn't necessarily a need. A few locations show 2 or more trails are built in the very close proximity which have greater impacts on the landscape than necessary #3])> .

REVIEWER: ZAENGER
<([#4 [27.1] PAGE/PARAGRAPH: 3-202/203
COMMENT: 3.5.2 – Interpretation and Environmental Education. We strongly suggest that the RMP calls for a separately developed strategy for interpretation which would help guide the development of interpretive services. Current use of partners to disseminate travel information & brochures is sound and reduces impact on the land. Yet, not every place or location needs to be interpreted, and many partners see "Interpretation" only as tourism development. It might be helpful to realize how the interpretive function can address management "issues in a way that relates those issues to the visitors' experiences" as already mentioned in the plan. A range of interpretation could be considered which would provide services at important or unique locations, but others would be open for self-discovery by those who arrive at those resources, and should be addressed in such a strategy.
The idea of working through various digital media, where available and appropriate is also sound. This helps to reduce on-site impacts, and may target specific messages and stories relevant to particular resources. #4])>

REVIEWER: ZAENGER
<([#5 [3] [27.2] PAGE/PARAGRAPH: 3-203
COMMENT: Trends section. The western Colorado landscape is littered with "interpretation," usually wayside panels, created decades ago, which are now terribly outdated. The information contained on them is sometimes incorrect, and the materials, often fiberglass embedded, are so weather-worn they are difficult to read and present an embarrassing condition. The plan seems to foreshadow many places to be "interpreted," but doesn't suggest how the places will be monitored to determine if the interpretation has encouraged visitor impacts to the point that the resources are damaged or destroyed. It also suggests that many partners will likely provide the financial resources to install them (often through grant money, for which there are seldom replacement dollars), without a plan to update or replace dilapidated or vandalized materials. As mentioned above, a separate strategy to identify the most worthwhile places, which can also be protected, would be a worthy consideration. Sometimes government offices embrace opportunities because "interpretation" buys agency good will. While this is a valid goal, it often creates unsustainable conditions and unintended resource impacts which become impossible to reverse. Coupled with all of the trails and recreational facilities identified in this plan, it's possible that BLM could become overextended. Good advance planning helps to interface with communities and partners so understanding can be realized with them, while also providing for sustainable conditions and good resource stewardship.

BLM_0156551

#5])>
REVIEWER: ZAENGER
<([#6 [9.1] PAGE/PARAGRAPH: 3-154
COMMENT: The Needle Rock ACEC is a perfect example of the kind of resource which might benefit from interpretive planning mentioned above. A greater analysis of existing services may lead to a determination to increase the level of services, leave the existing conditions as is, or lower the level. Opening a great conversation on a desired condition, though would help clarify the level of priority the place should have in overall UFO management and then steer BLM to sustainable services which also protect the site.
Similar, a strategy to evaluate existing interpretive signage and services might be helpful. Planning to identify all of the sites on Scenic Byway sections within the UFO, the San Miguel river corridor, and other locations should be considered before moving forward. In some cases coordination with other field offices might be appropriate. As mentioned above, this would be instrumental in preventing BLM from becoming over-extended in its ability to manage resources. #6])>

<([#7 [27.1] REVIEWER: ZAENGER
PAGE/PARAGRAPH: 4-292
COMMENT: The bullet statement, "Development of improved facilities especially recreation trails, would result in increased use," suggests that sustainability of facilities should be considered when in facility development is contemplated. #7])>

REVIEWER: Bockus
<([#8 [23.2] PAGE/PARAGRAPH: Vol III, Appendix E Grazing Allotments
COMMENT: There are grazing allotments listed in this table that include NPS and/or private lands that are not accounted for under "other acres". These allotments are: Dead Horse Common, Spring Gulch and Rawhide-Coffeepot. NPS would like re- initiate the update of the 1993 Grazing MOU between our agencies to increase the level of communication and coordination of grazing management activities in these and other allotments that include NPS lands. #8])>

REVIEWER: Bockus
<([#9 [20.1] [40.1] PAGE/PARAGRAPH: Vol III, Appendix F Wilderness Characteristics Inventory
COMMENT: The 2008 publication of "Keeping It Wild: An Interagency Strategy for Monitoring Wilderness Character Across the National Wilderness Preservation System" (Landres and others 2008) provided the first nationally consistent interagency strategy to assess whether wilderness character is being preserved. This strategy was recently updated by the 2015 publication of "Keeping It Wild 2: An Updated Strategy to Monitor Trends in Wilderness Character Across the National Wilderness Preservation System". Will the BLM UFO be adopting this interagency strategy to monitor for wilderness character in WSAs, proposed or designated wilderness that have wilderness characteristics? The adoption of this monitoring strategy may assist with future wilderness planning and management. #9])>

REVIEWER: Bockus
<([#10 [20.1] PAGE/PARAGRAPH: Table 2-1, 2-9
COMMENT: The Preferred Alternative D should include all areas with wilderness

characteristics to be protected and managed as such. If not protected, the wilderness character of these lands could become degraded and eventually lost. 42,150 acres is a very small percentage of the total land area covered in this plan, so why not protect these areas? #10])>

000502_SchroederA_20161101_BOR  Organization:  Bureau of Reclamation,  Alan Schroeder
Received: 11/1/2016  12:00:00  AM
Commenter1: Alan Schroeder - Grand Junction, Colorado 81501 (United States)
Organization1:Bureau  of Reclamation
Commenter Type: Federal Government
Classification: Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000502_SchroederA_20161101.htm  (000502_SchroederA_20161101_BOR-381186.htm  Size = 24 KB)
Submission  Text
Schroeder, Alan <aschroeder@usbr.gov>

Thank you for the opportunity  to review and comment on the Draft Uncompahgre Field  Office Resource Management  Plan and Environmental  Impact Statement (DRMP/EIS). The attachment is the BOR, Western Colorado  Area Office's comments and recommendations  regarding the DRMP/EIS.

If you have any questions  regarding these comments/recommendations,  please contact me. Thank you.

Alan Schroeder
Natural Resource Specialist
Bureau of Reclamation
Western Colorado  Area Office
445 W Gunnison  Ave., Suite 221
Grand Junction,  CO 81501
Phone: 970-248-0692
Fax: 970-248-0601

UFO Draft RMP revu cmt wcao 110116.docx
40K

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation,  Western Colorado  Area Office
11/01/16

General

BLM_0156553

1. <([#1 [3] [19.2] BOR has approximately 16,270 acres of acquired or withdrawn lands associated with constructed and active projects (i.e., 5A lands), plus another undetermined acres of land associated with non-authorized or non-constructed projects (i.e., 5B lands). These lands and land interests generally are not identified separately in Tables and Figures. Rather, they are included under other federal, private, state, or BLM lands. It is often unclear which BOR lands, if any, are included within a given land category. BOR lands (both acquired/withdrawn) associated with constructed and active projects (i.e., 5A BOR lands), include the following: Aspinall Unit, CRSP-7200 A; Bostwick Park- 236 A; Dallas Creek- 3448 A; Fruitgrowers- 575 A; Paonia- 1943 A; Paradox Valley Unit, CRBSCP- 458 A; SF- 741 A; Uncompahgre- 1671 (withdrawn only; acquired- not calculated). BOR lands (withdrawn) associated with non-constructed projects (i.e., 5B BOR lands), include the following: Whitewater Unit, CRSP (aka Dominguez Project) and Fruitland Mesa; GIS acreage determinations are needed for the portions of these 2 withdrawals within the planning area. #1])>

2. <([#2 [19.2] BOR facilities (canals, laterals, etc.) on public domain are valid existing rights, whether or not there is a formal BLM authorization identified. They were generally authorized by Reclamation or other applicable law, but may not have been formally reserved by Reclamation previously. BOR will work with BLM to formalize necessary rights-of-way for undocumented BOR facilities on public domain lands. #2])>

3. <([#3 [19.2] All of BOR's current withdrawn lands are reserved for reclamation purposes (i.e., project/irrigation works) and are closed to location under the mining laws, but not to leasing under the mineral leasing acts.
#3])>

4. <([#4 [19.2] The Curecanti National Recreation Area (CNRA) is a special management area. BOR withdrew or acquired most of the lands currently within CNRA for reclamation purposes. The Aspinall Unit, CRSP, is the constructed Reclamation project associated with the CNRA lands. BOR and NPS jointly manage the CNRA under their respective and applicable laws, policies, regulations, and management agreements. #4])>

5. <([#20 [2] BLM is a cooperating agency on the Paradox Valley Unit EIS which is being conducted to evaluate alternatives to the existing injection well for salinity control in the Paradox Valley. As alternatives are further developed, there may be a need [for BOR/Reclamation] to acquire easements, rights-of-ways, or request withdrawal of land BLM in order to implement a selected alternative. Reclamation will continue to coordinate [with] and seek BLM's input and expertise as a cooperating agency regarding alternatives and potential effects to lands managed by BLM.
#20])>

6. <([#5 [3] [19.2] There appear to be inaccuracies or discrepancies in BOR withdrawn acreages throughout the document. BOR and BLM should confirm these acreages and BLM should revise the RMP/EIS accordingly. #5])>

7. <([#6 [19.2] [3] BOR is attempting to get its withdrawals revoked on certain lands within the UFO planning area. This effort includes the entire Whitewater Unit, CRSP (aka Dominguez Project) and Fruitland Mesa Project, and an isolated 40-acre parcel associated with the Dallas

Creek Project. The withdrawals associated with the Whitewater Unit and the Fruitland Mesa Project are included within the 28,060 acres which BLM repeatedly identifies as continuing the withdrawal from location under the mining laws. We would appreciate BLM's full cooperation and assistance in expediting BOR's recommended revocations of its withdrawals. Any subsequent BLM decision to withdraw those lands from location under the mining laws should be based on its needs; BOR no longer needs to retain these withdrawal to protect its interests. The document should be revised throughout, as necessary, to show this difference. #6])>

8. <([#7 [2] Various aspects of BOR's lands, projects and related resources are generally managed under contract or agreement by other entities, although BOR generally retains an oversight role in the overall management. These managing entities may include private organizations, State or local agencies, or other federal agencies. #7])>

9. <([#8 [3] Do not use the terms "BOR project land" or "BOR non-project land." All BOR acquired or withdrawn lands are associated with at least a contemplated Reclamation project. However, not all contemplated projects were authorized for construction, or constructed, even if authorized. We recommend the following wording be used to identify the two classes of BOR lands: "5A BOR lands" for lands associated with a BOR project authorized for construction or constructed (I.e. BOR administered lands) and "5B BOR lands" for lands associated with a BOR project not authorized for constructed or not constructed (I.e. BLM administered lands). The recommended wording is based on Section 5 of the 1983 BOR/BLM IA. #8])>

10. <([#9 [19.2] BLM decisions which create general surface use restrictions (e.g., no ground disturbance, row exclusion/avoidance, site-specific relocation etc.) on BLM lands adjacent to or in close proximity to BOR facilities may limit BOR's options to expand project facilities outside of current footprints if necessary. This is of particular concern for BOR's efforts to reduce salt loading in the Colorado River basin (e.g., CRBSCP and associated salinity reduction programs such as lining/piping of irrigation ditches/canals and the Paradox brine disposal (injection, evaporation). The following table lists the constructed and active BOR projects, or portions thereof, within the UFO planning area and lists the general surface use restrictions of concern by project.

TABLE: BOR Constructed Projects/Facilities within the UFO Planning Area

Project: Aspinall Unit (portion only)
Location: Along Gunnison River between the Black Canyon of the Gunnison NP and Gunnison, CO.
Managers:
* Project O&M-BOR
* Recreation (CNRA; Sec. 8, CRSPA)- NPS
* Land Use (CNRA)- Joint BOR and NPS
* Recreation and Land Use (Non- CNRA)- BOR
Major Facilities:
* Crystal Dam and Reservoir
* Crystal Dam Access Road
BLM Decision Areas of Concern:

* Sims-Cerro Gunnison Sage-Grouse ACEC
* ROW avoidance and exclusion areas
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- Old Spanish Trail, West Elk Loop Scenic Byway

Project: Bostwick Park
Location: From Silver Jack Reservoir between the Cimarron River and Cimarron Ridge, over Cerro Summit to Bostwick Park, east of Montrose, CO
Managers:
* Project O&M-Bostwick Park WCD
* Recreation (Silver Jack Reservoir)- USFS
* Land Use (Silver Jack Reservoir)- joint, BOR, USFS, BPWCD
Major Facilities:
* Silver Jack Dam and Reservoir
* Cimarron Canal System (BPWCD)
BLM Decision Areas of Concern:
* Sims-Cerro Gunnison Sage Grouse ACEC
* ROW avoidance and exclusion areas
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- Old Spanish Trail

Project: Dallas Creek
Location: Along Uncompahgre River between Ridgway, CO and Colona, CO
Managers:
* Project O&M Tri-County Water Conservancy District (TCWCD)
* Recreation (Ridgway Reservoir)- CP&W
* Land Use- Joint, BOR, TCWCD, CP&W
Major Facilities:
* Ridgway Dam and Reservoir
BLM Decision Areas of Concern:
* SRMAs/ERMAs: Ridgway Trails
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* Ecological Emphasis Area- Ridgway
* Surface Disturbing Activity Restrictions- NGD and SSR

Project: Fruitgrowers Project
Location: Along Alfalfa Run between Eckert, CO, and Corey, CO and Austin, CO
Managers:
* Project O&M-Orchard City Irrigation District
* Recreation- BOR
* Land Use- Joint, BOR, OCID
Major Facilities:
* Fruitgrowers Dam and Reservoir
* Diversion dam and feeder canal
BLM Decision Areas of Concern:

* ROW avoidance and exclusion areas
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* Surface Disturbing Activity Restrictions- NGD and SSR

Project: Paradox Valley Unit, CRBSCP
Location: Along Dolores River in Paradox Valley near Bedrock, CO
Managers:
* Project O&M- BOR
* Land Use- BOR
Major Facilities:
* Brine Collection wells and pumping station
* Brine injection well
BLM Decision Areas of Concern:
* ROW avoidance and exclusion areas
* ACECs: La Sal Creek, West Paradox, East Paradox, Coyote Wash, Dolores Slick Rock Canyon, and Biological Soil Crust.
* Dolores River Canyon WSA
* Wilderness Characteristics Protection: Dolores River Canyon WSA adjacent
* Travel Management: use of existing or designated trails or roads that adjoin or provide access to BOR lands or facilities
* Wild/Scenic Rivers- Dolores River Seg. 1a, Dolores River Seg. 1B, Dolores River Seg. 2, La Sal Creek Seg. 1, La Sal Creek Seg 2, La Sal Creek Seg. 3, Ice Creek Seg. 2, Lion Creek, Seg. 2, and Spring Creek
* SRMAs/ERMAs: Dolores River Canyon, Paradox Valley
* Ecological Emphasis Area- La Sal
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- Paradox Trail

Project: Paonia Project
Location: Along Muddy Creek and the north side of the North Fork of the Gunnison River from Paonia Reservoir to Hotchkiss, CO
Managers:
* Project O&M- North Fork Water Conservancy District and Fire Mountain Reservoir & Canal Co.
* Recreation (Paonia Reservoir)- CP&W
* Land Use (Paonia Reservoir)- joint, BOR, NFWCD, FMCR&CC, CP&W
* Land Use (FMC)- joint, BOR, NFWCD, FMCR&CC
Major Facilities:
* Paonia Dam and Reservoir
* Fire Mountain Canal
BLM Decision Areas of Concern:
* ROW avoidance and exclusion areas
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* W/SRs: Deep Creek?
* Coal Leasing; Adjacent to and underlying Paonia Reservoir
* Oil/Gas Leasing; Adjacent to and underlying Paonia Reservoir?

* Ecological Emphasis Area- Terror Creek
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- West Elk Loop Scenic Byway

Project: Smith Fork Project
Location: Area surrounding Crawford, CO
Managers:
* Project O&M- Crawford Water Conservancy District
* Recreation (Crawford Reservoir)- CP&W
* Land Use (Crawford Reservoir)- joint, BOR, CWCD, CP&W
Major Facilities:
* Crawford Dam and Reservoir
* Aspen Canal
BLM Decision Areas of Concern:
ROW avoidance and exclusion areas
Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
ACECs: Needle Rock
WSAs: Needle Rock
Surface Disturbing Activity Restrictions- NGD and SSR
National Trails and Scenic Byways- West Elk Loop Scenic Byway

Project: Uncompahgre Project (portion only)
Location: From the East Portal Area on the Gunnison River along the Gunnison Tunnel
alignment and within the Uncompahgre Valley from about Colona to Delta
Managers:
* Project O&M- Uncompahgre Valley Water Users Association
* Recreation (East Portal area)- NPS
* Recreation (elsewhere)- joint, BOR, UVWUA
* Land Use (East Portal area - joint, BOR, UVWUA, NPS
* Land Use (elsewhere)- joint, BOR, UVWUA
Major Facilities:
* Gunnison Diversion Dam and Tunnel
* South Canal system
* Loutzenhiser Canal system
* Selig Canal system
* Delta/Montrose Canal system
* West Canal system
* Others?
BLM Decision Areas of Concern:
* ROW avoidance and exclusion areas
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* ACECs: Sims-Cerro Gunnison Sage Grouse, Lower Uncompahgre Plateau, Fairview
South/Expansions
* W/SRs: Robideau Creek Seg. 2
* SRMAs/ ERMAs: Kinikin Hills, Spring Creek, Dry Creek
* Ecological Emphasis Areas- Sims Mesa, Ridgway, Spring Canyon, Dry Creek, Monitor-

Potter-Robideau
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- Old Spanish Trail
#9])>
Chapter 1- Introduction

<([#10 [3] [5.4] Pg 1-4, Paragraph 4
Comment: This paragraph is inaccurate and should be revised.
Recommendation:  Reword the paragraph along the following lines: "The federal mineral estate underlying that portion of the Curecanti National Recreation Area (CNRA) within the planning area is not part of the RMP decision area. BOR withdrew or acquired the land underlying the CNRA for reclamation purposes. BOR and NPA jointly manage the CNRA pursuant to applicable laws, regulations, and agreements. BOR's land is closed to location under the mining laws and BOR determines whether leasing under the mineral leasing laws is appropriate on lands under its administrative jurisdiction. NPS regulations in 36 CFR Chapter 1, Parts 1-7 include prohibitions on location under the mining laws and leasing under the mineral leasing laws."
Rationale: This paragraph appears to be describing the status of the federal mineral estate under the CNRA and BLM's role in managing same. Within the planning area, these lands are under BOR's and NPS's administrative jurisdiction as defined in an MOA. They were withdrawn or acquired by BOR for reclamation purposes and there is a constructed project. NPS is responsible for carrying out Section 8 of the Colorado River Storage Project Act (CRSPA) on these lands (i.e. management for recreation/wildlife purposes). BOR's withdrawal is a withdrawal from public entry, including under the mining laws. Leasing or sale of federal minerals on those CNRA lands within the RMP planning area is a joint discretionary decision of BOR and NPS based on applicable laws, regulations, and agreements. Further, CNRA is a National Park system unit and NPS regulations in 36 CFR Chapter 1 include prohibitions on location under the mining laws and leasing under the mineral leasing laws on its units. #10])>

Chapter 2- Alternatives

<([#11 [5.4] Pg 2-2, Paragraph 4
Comment: This paragraph is oversimplified and somewhat inaccurate.
Recommendation: The paragraph should be revised along the same line as Paragraph 5 (DOE management). The following wording is suggested: "BOR currently manages ten constructed and active projects on approximately 11,674 acres of withdrawn and acquired lands within the planning area. BOR has agreements or contracts with entities for management of its projects and/or the associated resources and recreation, but retains an oversight and/or cooperative role in said management. The 1983 interagency agreement between BOR and BLM outlines the roles and responsibilities of these agencies on BOR lands within the planning area. On BOR acquired and withdrawn lands on which there are authorized for construction or constructed Reclamation projects (5A lands), BOR has full management jurisdiction. On BOR acquired and withdrawn lands not within National Forest boundaries or under another agency administration and on which there are no authorized for construction or constructed projects (5B lands), BLM has full administrative responsibility, subject to protection of BOR's interests. On BOR lands, BLM has the general responsibility for management of mineral and geothermal leasing, but BOR determines whether or not leasing is permissible and, if so, under what terms and conditions. On

BLM_0156559

5A lands, BLM will not issue permits, leases or licenses without BOR's consent and concurrence on all conditions and stipulations. On 5B lands, BOR's recommendations are advisory only insofar as Reclamation planned or current project uses are not adversely affected. (BLM and BOR 1983)

Rationale: The above wording is more reflective of the overall intent and wording in the 1983 IA.

#11])>

<([#12 [21.2] [3] Pg 2-11 (Table 2-1)- BLM Surface/Federal Minerals [superscript] 6.

Comment: It is unclear which BOR withdrawn lands, if any, are included in this category; we presume it is only BOR's 5B withdrawn lands. The [superscript] 6 table note on page 2-15 should be revised to be more specific as to the BOR withdrawn lands included in this category.

Recommendation: Replace the current [superscript] 6 table note wording on page 2-15 with, "Includes BOR withdrawn lands for the Whitewater Unit, CRSP and the Fruitland Mesa Project."

Rationale: BOR has no withdrawn "non-project" lands. We presume only the 5B lands for which BLM has full administrative responsibility pursuant to the 1983 BOR/BLM Interagency Agreement are included in these acreages. Those lands include those portions of the Whitewater Unit, CRSP (aka, Dominguez Project) and Fruitland Mesa Project withdrawals within the planning area. #12])>


<([#13 [24.1] [3] Pg 2-11, Table 2-1, Private, State, or BOR Project Lands Surface/Federal Minerals: Withdrawn from locatable mineral entry

Comment: The table shows no BOR acreage withdrawn from locatable minerals. There should be approximately 11,764 acres [to be verified] of BOR withdrawn lands in this category within the planning area.

Recommendation: The table should be revised to show the acreages of BOR 5A withdrawn lands within the planning area; they are withdrawn from locatable mineral entry. Acreages for this category should include the following constructed and active projects or portions thereof within the planning area: Paonia Project; Dallas Creek Project; Bostwick Park Project; Aspinall (formerly Curecanti) Unit, CRSP; Fruitgrowers Dam Project; Smith Fork Project; and Uncompahgre Project. Actual acres within the planning area should be determined through GIS applications, if necessary.

Rationale: The table does not show any acreages for BOR project lands withdrawn from locatable mineral entry. We presume this category consists of BOR 5A withdrawn lands pursuant to the '83 IA. All current BOR withdrawn lands are withdrawn from locatable mineral entry. #13])>

<([#14 [24.1] [3] Pg 2-208: Table 2-2, Line 347 - maintain following areas as WD from locatable minerals: BOR 9,010 acres.

Comment: How was this acreage derived? BOR records indicate about 11,764 acres of BOR 5A withdrawn lands within the UFO planning area, plus another undetermined acreage of 5B lands. A 2,754 acre difference in 5A lands is substantial.

Recommendation: Verify the acreage, and revise as necessary.

Rationale: This document is going to be cited by various entities throughout its life; it needs to be accurate. #14])>

<([#15 [24.1] [3] Figs 2-32, 2-33, 2-34, 2-35 (Alts A, B, C, D, respectively), - Lands withdrawn

and to be Recommended for withdrawal from Locatable Mineral Entry; and Fig 2-82 Land Withdrawals and Powersite Classifications
Comment: These figures do not show all current BOR withdrawals within the planning area. They are missing portions of the withdrawals for the Uncompahgre and Bostwick Park (USFS lands) Projects and Whitewater and Aspinall Units, CRSP; and all of the withdrawals for the Dallas Creek, Smith Fork, Paonia, and Fruitgrowers Projects.
Recommendation: Revise these figures to show all current BOR withdrawn lands (approximately 14,000 acres).
Rationale: All of the lands currently under BOR withdrawals are withdrawn from locatable mineral entry.
#15])>
Chapter 4- Environmental Consequences

<([#16 [5.7] Pg 4-16; Table 4-1: Paradox Valley Unit desalination plant
Comment: The first sentence is inaccurate; the plant is not seven miles south of Bedrock, CO. The injection well and appurtenant facilities are about 1.3 miles south of Bedrock and the brine collection well field and pump plant are about 2.1 miles east-northeast of Bedrock.
Recommendation: Revise the first sentence as appropriate.
Rationale: Provide accurate information. #16])>

<([#17 [3] Pg 4-265; Table 4-33:
Comment: This table is confusing and is inaccurate. All current BOR withdrawals are withdrawn from locatable mineral entry, but are not shown as such. Current BOR withdrawals fall under either the "BLM surface/federal minerals" or the "Private, state, or Bureau of Reclamation project lands surface/federal minerals" headings.
Recommendation: Revise the table so that it is more easily understood and is more accurate.
Rationale: All current BOR withdrawals (approximately 13,000 acres) are withdrawn from locatable mineral entry.
#17])>
<([#18 [19.3] [3] Pg 4-330; Bullet 2:
Comment: This bullet implies a level of withdrawal that may not exist under current withdrawals.
Recommendation: Revise this bullet along the following lines: "The BLM would continue to manage all previously withdrawn BLM-administered lands in accordance with the applicable withdrawal order(s) and its associated legislation. That may include withdrawal from entry, appropriation, or disposal under the public land laws; location, entry, and patent under the mining laws; or operation of the mineral leasing, mineral materials, and geothermal leasing laws." Also, some of the terms used, should be defined in the glossary (See comments under "Glossary").
Rationale: There is no universal withdrawal wording for current withdrawals, as implied by this bullet; a withdrawal does not necessarily withdraw lands from all of the actions described in this bullet. Each withdrawal order is specifically worded based on legislation or intent. For example, a BOR withdrawal of land under the first form of withdrawal pursuant to Sec. 3 of the Reclamation Act of 1902, withdraws land from public entry and reserves it for Reclamation irrigation works contemplated under the provisions of that act. Based on subsequent rulings as noted in the USDI book, Federal Reclamation and Related Laws Annotated, Reclamation's first

form withdrawal apparently withdrew lands from entry under the various disposal or appropriation acts, such as the mining laws and homestead acts, but not from the mineral or other leasing acts.
#18])>
Glossary

<([#19 [3] Comment/Recommendation: Add the following terms with their appropriate definition, especially as they apply to the various land and mining laws, to the Glossary:
* appropriation (under the mining and public land laws)
* disposal (under the public land laws)
* entry (under the mining and public land laws)
* location (under the mining laws and/or public land laws)
* public land laws
Rationale: These terms have specific meanings regarding land and mineral management which many people may not know or understand. Also, some of these terms (such as appropriation, entry, location, and disposal) may have general definitions that apply regardless of the various land and mining laws which may allow the action.
#19])>


000503_Campbell_20161029 Organization: Randy Campbell
Received: 10/29/2016 12:00:00 AM
Commenter1: Randy Campbell - Paonia, Colorado 81428 (United States)
Organization1:
Commenter2: Sharon Campbell - Paonia, Colorado 81428 (United States)
Organization2:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter D
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000503_Campbell_20161029.htm (000503_Campbell_20161029-387971.htm Size = 5 KB)
xUFORMP_000503_Campbell_20161029.pdf (000503_Campbell_20161029-387970.pdf Size = 208 KB)
Submission Text
Date:10/29/2016

Commenter:Randy Campbell, Sharon Campbell

Organization:

Email:randyc@paonia.com

Address:PO Box 457, Paonia, CO 81428

Phone:970-527-3633

Comment:
We are responding to the call for public comments regarding the updated Resource Management Plan.

We are limiting our comments to the question of policies regarding potential oil and gas leasing in the North Fork Valley. We are aware that the RMP addresses a number of other land use issues, but time constraints have prevented us from analyzing the RMP in its entirety.

We favor the North Fork Alternative plan in this regard.

During the breathing space afforded by the time you have been working on the updated RMP, our economy has continued to develop in the direction of small scale organic forms, wineries, farm-to-table, agri-and-arts tourism. This is not a pipe dream, as an analysis prepared by Better Cities recommended exactly this kind of economic development in the wake of the loss of roughly two thirds of our coal mining jobs. This development and the "lifestyle economy" which is attracting many retirees to the area, are critical to our economic survival. The specter of drilling in the valley floor is anathema to this direction. We have seen in other areas that gas activity provides little in the way of long-term employment opportunity and provides much in the way of threats to the very quality of life that is sustaining us with a longer-term outlook.

Just don't. Don't do that to us. We're working hard to recover from the blow of the mining cutbacks. Many of us, us two included, are actively involved in volunteer organizations striving to strengthen and improve our communities and make the North Fork Valley a long-term, sustainable and enjoyable place to live. Please don't undermine that.

The following paragraphs are excerpted from our 2012 letter in response to the gas leasing proposal. These concerns are the same now as then, to wit:

WATER: Our drinking water is hauled from the Town of Paonia. Thus our concern there would be with extraction activities across the valley near the Paonia domestic water source on the side of Mt. Lamborn.

We use irrigation water from the Terror Ditch for our landscaping and gardening. We have received a copy of a letter submitted to the BLM by the Terror Ditch Board of Directors detailing the threats to our irrigation supply, and we will not enumerate them here; we only stress that contamination or interruption of the Terror Ditch would be disastrous for us and our neighbors who rely on this resource for their agricultural livelihoods.

RECREATION and OTHER USES: The adjacent BLM lands are used by us and other local residents as informal hiking access and for hunting. These activities would be negatively impacted by drilling activity. We might emphasize that hunting is a significant contributor to the local economy, bringing in not only locals, but hunters from around the country. Anything that discourages hunting will hurt the local economy. Some of these lands are leased by local

BLM_0156563

ranchers for grazing. The real and potential pollution from drilling would negatively impact that use which is very important in our area.

WILDLIFE: Considerable numbers of deer, elk and wild turkeys travel through our property and adjacent BLM lands, including the area of lease parcel 6207. We occasionally see bear, mountain lions, bobcats and coyotes. A nearby gulch is a significant migration alley for seasonal movement of elk between high country to the north and the valley bottom to the south. We fear this habitat and these movements would be severely disrupted by extraction work.

PROXIMITY TO RESIDENCE: How close to our house might drilling take place? Theoretically within 100 yards – the boundary of parcel 6207 is about 50 yards upslope from our residence. Sites within ¼ mile seem feasible. If drilling were to take place anywhere near that close, the effects on us would likely include (but not necessarily be limited to): - Pollution by dust, machine exhaust, fracking chemicals, etc., with attendant health effects. Sharon is already known to have some chemical sensitivity, so we have a very real concern that nearby drilling would make her ill.

- Loss of sleep due to lights and noise.
- Impairment of travel (see more below).
- General reduction in quality of life.
- Loss of property value.

ROAD and TRAFFIC: Farmers Mine Rd. is a narrow, steep gravel road, hardly two lanes wide in many places. Transport of large equipment and supply trucks would seriously impair residents' ability to use the road safely and conveniently. Large trucks and equipment moving slowly have the potential to impede emergency vehicles.

We sincerely hope that this input is useful, and that by taking it into account, impacts on the lives, health and economy of the North Fork residents will be minimized.

Regards,

Randy and Sharon Campbell


000503_Campbell_20161029_PossDup Organization: Randy Campbell
Received: 10/29/2016 12:00:00 AM
Commenter1: Randy Campbell - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000503_Campbell_20161029_PossDup.htm

(000503_Campbell_20161029_PossDup-387981.htm   Size = 5 KB)
Submission  Text
Date:10/29/2016

Commenter:Randy  Campbell, Sharon Campbell

Organization:

Email:randyc@paonia.com

Address:PO Box 457, Paonia, CO 81428

Phone:970-527-3633

Comment:
We are responding to the call for public comments regarding the updated Resource Management
Plan.

We are limiting  our comments to the question of policies  regarding potential oil and gas leasing
in the North Fork Valley.  We are aware that the RMP addresses a number of other land use
issues, but time constraints have prevented us from analyzing  the RMP in its entirety.

We favor the North Fork Alternative plan in this regard.

During the breathing space afforded by the time you have been working on the updated RMP,
our economy has continued to develop in the direction of small scale organic forms, wineries,
farm-to-table, agri-and-arts tourism. This is not a pipe dream, as an analysis prepared by Better
Cities recommended exactly this kind of economic development in the wake of the loss of
roughly two thirds of our coal mining jobs. This development and the "lifestyle economy" which
is attracting many retirees to the area, are critical to our economic survival. The specter of
drilling  in the valley floor is anathema to this direction. We have seen in other areas that gas
activity provides little in the way of long-term employment opportunity and provides much in the
way of threats to the very quality of life that is sustaining us with a longer-term outlook.

Just don't. Don't do that to us. We're working hard to recover from the blow of the mining
cutbacks. Many of us, us two included, are actively involved in volunteer organizations striving
to strengthen and improve our communities and make the North Fork Valley a long-term,
sustainable and enjoyable place to live. Please don't undermine that.

The following  paragraphs are excerpted from our 2012 letter in response to the gas leasing
proposal. These concerns are the same now as then, to wit:

WATER: Our drinking water is hauled from the Town of Paonia. Thus our concern there would
be with extraction activities across the valley near the Paonia domestic water source on the side
of Mt. Lamborn.

We use irrigation water from the Terror Ditch for our landscaping and gardening. We have received a copy of a letter submitted to the BLM by the Terror Ditch Board of Directors detailing the threats to our irrigation supply, and we will not enumerate them here; we only stress that contamination or interruption of the Terror Ditch would be disastrous for us and our neighbors who rely on this resource for their agricultural livelihoods.

RECREATION and OTHER USES: The adjacent BLM lands are used by us and other local residents as informal hiking access and for hunting. These activities would be negatively impacted by drilling activity. We might emphasize that hunting is a significant contributor to the local economy, bringing in not only locals, but hunters from around the country. Anything that discourages hunting will hurt the local economy. Some of these lands are leased by local ranchers for grazing. The real and potential pollution from drilling would negatively impact that use which is very important in our area.

WILDLIFE: Considerable numbers of deer, elk and wild turkeys travel through our property and adjacent BLM lands, including the area of lease parcel 6207. We occasionally see bear, mountain lions, bobcats and coyotes. A nearby gulch is a significant migration alley for seasonal movement of elk between high country to the north and the valley bottom to the south. We fear this habitat and these movements would be severely disrupted by extraction work.

PROXIMITY TO RESIDENCE: How close to our house might drilling take place? Theoretically within 100 yards – the boundary of parcel 6207 is about 50 yards upslope from our residence. Sites within ¼ mile seem feasible. If drilling were to take place anywhere near that close, the effects on us would likely include (but not necessarily be limited to): - Pollution by dust, machine exhaust, fracking chemicals, etc., with attendant health effects. Sharon is already known to have some chemical sensitivity, so we have a very real concern that nearby drilling would make her ill.

- Loss of sleep due to lights and noise.
- Impairment of travel (see more below).
- General reduction in quality of life.
- Loss of property value.

ROAD and TRAFFIC: Farmers Mine Rd. is a narrow, steep gravel road, hardly two lanes wide in many places. Transport of large equipment and supply trucks would seriously impair residents' ability to use the road safely and conveniently. Large trucks and equipment moving slowly have the potential to impede emergency vehicles.

We sincerely hope that this input is useful, and that by taking it into account, impacts on the lives, health and economy of the North Fork residents will be minimized.

Regards,

Randy and Sharon Campbell

BLM_0156566

000504_BrownD_20161101_CDA Organization: Colorado Department of Agriculture, Les Owner
Received: 11/1/2016 12:00:00 AM
Commenter1: Les Owner - Broomfield, Colorado 80021
Organization1:Colorado Department of Agriculture
Commenter Type: State Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000504_BrownD_20161101_CDA.htm (000504_BrownD_20161101_CDA-381187.htm Size = 8 KB)
Submission Text
Attached are CDA's comments regarding the Uncompahgre Draft RMP and EIS. Please contact me with any questions or concerns.

Sincerely,
Les Owen
Conservation Services Division Director
P 303.869.9032
305 Interlocken Parkway, Broomfield, CO 80021
les.owen@state.co.us
www.colorado.gov/ag

20161101_BLM_Uncompahgre RMP.pdf
2303K

November 1, 2016
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, Colorado 81401

Dir Sir or Madam:

The Colorado Department of Agriculture (CDA) submits the following comments regarding the Bureau of Land Management (BLM) Uncompahgre Field Office Draft Resources Management Plan (RMP) and Environmental Impact Statement (EIS).

CDA's mission is to strengthen and advance Colorado agriculture; promote a safe, high quality and sustainable food supply; and protect consumers, the environment, and natural resources. It is with this mission in mind that we focus or comments on effects this RMP may have on the range livestock industry and natural resources associated with the 675,800 acres of BLM administered

BLM_0156567

federal lands and 971,220 acres of federal subsurface mineral estate in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties in southwestern Colorado. CDA supports sustainably managed livestock grazing as a congressionally mandated use of federal lands that is vital to the ranching industry and beneficial to wildlife and associated natural resources.

<([#1 [23.1] The range of alternatives provided in the RMP for levels of livestock grazing is inconsistent with guidance provided in the Forty Most Asked Questions Concerning the Council on Environmental Quality's National Environmental Policy Act Regulations [1] (CEQ40). CEQ40 states in 1b that, "…a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS." Alternatives in the RMP allow only for livestock grazing to decrease from current levels; none of the alternatives provide for an increase in domestic livestock grazing.
[footnote 1] https://ceq.doe.gov/nepa/regs/40/40p3.htm
#1])>
<([#2 [23.1] The Federal Land Policy and Management Act of 1976 [2] (FLPMA) defines domestic livestock grazing as one of the principal or major uses of federal land. A reasonable range of alternatives that covers the full spectrum should include management options that allow for an increase in domestic livestock grazing provided that land health requirements are met as described in the BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (Standards and Guidelines).
[footnote 2] 43 USC §1701 et seq. #2])>

<([#3 [23.1] The preferred alternative objective for livestock grazing, Table 2-2 Line 295, provides the needed management direction to ensure that watershed, wildlife, and other resource needs are met. Adherence to the Standards and Guidelines ensures that livestock grazing would not be the causal factor in compromising other resources. Proposed restrictions or changes to livestock grazing management beyond those described in the Standards and Guidelines should be removed from the RMP. Decisions to reduce or increase livestock grazing use on federal lands should be baed on data from site-specific, scientifically defensible resource monitoring techniques.
#3])>
<([#4 [34.3] The analysis of livestock grazing impacts fails to consider relevant science regarding the positive impacts that properly managed livestock grazing has on vegetative communities. Research has shown that in arid and semiarid areas, grazing at use levels below 40 percent can have positive impacts to forage plants compared to exclusion of grazing.[3] Additionally, the analysis understates the importance of water systems developed on federal land as part of a livestock grazing operation to wildlife habitat.
[footnote 3] Holechek, J .L., T.T. Baker, J. C. Boren, and D. Galt. 2006. Grazing Impacts on Rangeland Vegetation: What We Have Learned. Rangelands 28:7- 13. #4])>

<([#5 [23.3] The preferred alternative states that restrictions on domestic sheep allotments due to bighorn sheep would be based on the probability of interaction assessment. The Probability of Interaction and Risk of Contact models used for the assessment are based on limited data, numerous uncertainties, and unjustified assumptions. Further, the assessment does not take into account the significant role that domestic sheep management plays in reducing the risk of interaction between domestic and bighorn sheep. Implementation of restrictions based on the

flawed assessment methodology would likely result in domestic sheep operations going out of business with little benefit for bighorn sheep. #5])>

<([#6 [30.2] The EIS estimates the value of BLM forage to livestock producers to be the difference between private land grazing fees and the BLM grazing fee. This represents a major flaw in the analysis. Extensive cost of grazing studies have shown that ranchers, on average, spend as much per unit of forage on public lands (current fees plus additional costs of use) as is paid for private land grazing leases.[4] The estimated value of BLM forage provided in the EIS actually represents additional costs of use incurred by permitted ranching operations compared to grazing on private land.
[footnote 4] Whittlesey, N. K., R. G. Huffaker, and W. R. Butcher. 1993. Grazing Policy on public lands. Choices 3rd Quarter: 15-19

An animal unit month (AUM) of forage is the quantified amount of forage necessary to maintain an animal unit (I cow or 5 sheep) for one month. The value of this forage to a livestock producer is the gross revenue from livestock production made possible by having access to the forage. Revenue from livestock production is the same regardless of land ownership.

Colorado State University produces Colorado Livestock Enterprise Budgets [5] that provide an estimate of total gross revenues from production for rangeland sheep and cattle operations. The 2014-2015 rangeland sheep estimate of the gross revenue from production per ewe is $204.54. This can be converted to an annual gross revenue from production per AUM of forage by multiplying $204. 54 by 5 ewes/animal unit and dividing by 12 months resulting in an annual gross revenue from production per sheep AUM of $84.39. The 201 4-2015 cow-calf estimate of the gross revenue from production per cow is $1,256.80. This can be converted to an annual gross revenue from production per AUM of forage by dividing by 12 months resulting in an annual gross revenue from production per cattle AUM of $104.73. AUM values provide a metric to compare alternatives and can be used to analyze the magnitude of impacts that changes to authorized livestock use under each alternative would have on individual allotments and communities within the planning area. For example, the preferred alternative would reduce maximum permitted cattle AUMs by 1,940. This reduction represents an estimated decrease of $202,176.40 per year in gross revenue from cattle production.
[footnote 5] Available at: http://www.coopext.colostate.edu/ABM/livestock.shtml #6])>

In summary, the importance of consistent access to forage on federal lands cannot be overstated for the ranching industry in Colorado. Many ranchers have invested significant resources into range improvements on federal lands that benefit both wildlife and livestock. These operations rely on consistent access to forage on federal lands in order to maintain economic viability. Properly managed livestock grazing is a valuable resource management tool that can improve wildlife habitat, biodiversity, and overall ecological conditions while providing cultural and economic benefits to communities.

Thank you for the opportunity to comment on this RMP and EIS analysis. Please keep us informed about this and other management decisions within the Uncompahgre Field Office. Contact Mr. Les Owen at 303-869-9032 or les.owen@state.co. us for questions about these comments.

BLM_0156569

Sincerely,
Dan Brown
Commissioner

000505_DayD_20161102  Organization:  Durfee Day
Received: 11/2/2016 12:00:00 AM
Commenter1: Durfee Day - Telluride, Colorado 81435 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000505_DayD_20161102.htm (000505_DayD_20161102-387973.htm  Size = 1 KB)
xUFORMP_000505_DayD_20161102.pdf (000505_DayD_20161102-387972.pdf  Size = 86 KB)
Submission Text
Date:11/02/2016

Commenter:Durfee Day

Organization:

Email:durfeeday@aol.com

Address:PO Box 1365, 152 w. San Juan Ave, Telluride, CO 81435

Phone:970-361-5331

Comment:
Today, I see, is the last day of comment on the plan, and I'm hoping that you'll accept this email statement within your review period.

I have 250 ac of hay and wildlife habitat at the foot of Saddle Mt., Crawford, CO and am engaged with the North Fork Organic Producers in efforts to preserve our industry and the brand it represents in the valley. I support preserving within this broad and complex study area its water quality, the diversity of species not yet well understood, and a cultural history that can inform our own.

And, I support the recreational and tourist industry that depends on such stewardship and management. Since 1973, I've been an advocate for the Dolores River and the rich plateau and canyon experience it provides.

BLM_0156570

Please reject any suggestion of turning over our public lands to state control and oil industry shills who endanger these values.

Thank you.

I am:
Durfee Day
Pob 1365
152 w. san juan ave
Telluride, CO 81435

970-361-5331


000506_FonkeD_20161102_HasAttach Organization: Daniel Fonke
Received: 11/2/2016 12:00:00 AM
Commenter1: Daniel Fonke - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000506_FonkeD_20161102_HasAttach.htm
(000506_FonkeD_20161102_HasAttach-387975.htm  Size = 1 KB)
xUFORMP_000506_FonkeD_20161102_HasAttach.pdf
(000506_FonkeD_20161102_HasAttach-387974.pdf  Size = 689 KB)
Submission Text
1 message
D F <dfonke@outlook.com>  Wed, Nov 2, 2016 at 12:34 AM
To: "uformp@blm.gov"  <uformp@blm.gov>
Please accept this image with text as a letter of comment for the BLM's Uncompahgre Field Office's
Draft Resources Management Plan 30 year plan.
Please consider it with great care!
Thank you for protecting our lands & livelihoods!  Daniel
WaterContaminatedIsThereRecovery_
SFW.jpg
525K

Businesses can recover from a listeria problem in a season and with good PR.
Businesses, towns, people, cows, grapes, elk, beer, corn, farms and ranches, and our neighbors downstream can't recover from contaminated water...in a season or with good PR. Economy,

BLM_0156571

health, environment, and generations suffer when accidents or everyday opperations pollute.

000507_DimickR_20161101  Organization: Rick Dimick
Received: 11/1/2016 12:00:00 AM
Commenter1: Rick Dimick - Bedrock, Colorado 81411 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000507_DimickR_20161101.htm (000507_DimickR_20161101-387977.htm Size
= 3 KB)
xUFORMP_000507_DimickR_20161101.pdf (000507_DimickR_20161101-387976.pdf Size =
296 KB)
Submission Text
Date:11/01/2016

Commenter:Rick Dimick

Organization:

Email:jethurston@gmail.com

Address:PO Box 31, Bedrock, CO 81411

Phone:970-859-7392

Comment:
I would like to comment on the UFO Draft Resource Management Plan and support the
Conservation Alternative. I have lived in Paradox Valley since 2004 and moved here to enjoy the
remoteness. I regularly use BLM lands for recreation, personal enjoyment, to appreciate quiet
uses, dark skies at night, and quiet days. I regularly kayak on the San Miguel and Dolores Rivers.
I also use public lands to hunt, fish, hike, watch wildlife, collect firewood and visit cultural and
archeological sites.

I am a carpenter and find it difficult to make a living here and I can see that a certain amount of
development is necessary for the economic health of the area. But I don't see that the oil and gas
area has really helped this area economically and I can see a small but steady growth in the quiet
and recreational uses of the area. In lieu of the gas and oil industry, I believe that encouraging
quiet recreational use of the area could be economically beneficial. Moab, as an example, has
created a huge industry and is quite successful in their biking and hiking uses of public lands and
we should encourage that here as well.

BLM_0156572

One of the real pleasures of this area is that the kayaking is close by and the Dolores River is one of the finest floats of all. One of the major disappointments is that the Dolores River is being managed without consideration for the recreational development of the area. When there are releases from the dam, BLM needs to communicate the times in order to reduce crowding and make it more pleasant for all. I'm for Wild & Scenic designations if it will help protect the rivers and improve communications. Wild & Scenic should also help protect soils from washing into the river, and that can effect the kayaking.

Economic development of BLM land should be in balance so that we are not so dependent on mining, oil and gas, and other earth-destroying activities. Organic farming and activities in Paradox Valley are just beginning to get started and with a little bit of encouragement could help economically. I think it's important to have areas designated to protect organic farms from pollution caused by mining and oil and gas. These industries can also have a big influence on the dark skies that this part of the country provides. It is so spectacular that even the local school has built an astronomical observing platform so students can be educated.

Living where I do with great views allows me to see amazing wildlife activities. I especially enjoy seeing peregrine falcons, prairie falcons, golden eagles and migratory travelers that come through. I also get to see bugling elk, big bucks, coyotes and weasels, all of which contribute to the peaceful pleasures of the Paradox Valley. Anything the BLM can do to protect the habitat for the big and little wildlife is appreciated.

Please also don't sell any BLM lands or turn them over to the states.

Please select Alternative B and Alternative B-1 for the Roaring Fork Valley for the new BLM Resource Management Plan.

Sincerely,
Rick Dimick
P.O. Box 31
Bedrock, CO 81411


000508_DrakeM_20161101  Organization: Michael Drake
Received: 11/1/2016  12:00:00 AM
Commenter1: Michael Drake - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000508_DrakeM_20161101.htm (000508_DrakeM_20161101-387980.htm Size = 15 KB)
xUFORMP_000508_DrakeM_20161101.pdf (000508_DrakeM_20161101-387979.pdf Size =

703 KB)
Submission Text
Date:10/31/2016

Commenter:Michael Drake

Organization:

Email:mldht1@live.com

Address:Paonia, CO 81428

Phone:970-527-4535

Comment:
Dear BLM Uncompahgre Field Office (UFO) Staff and RMP Comment Team,

<([#6 [5.3] The UFO draft Resource Management Plan (RMP) does not contain an alternative
that offers the level of protection these lands warrant. The current draft RMP appears to have
ignored:
-What the communities and the public in your planning area have specifically
suggested/requested
-The economic development plans that Gunnison and Delta Counties are implementing
-What federal law requires.
#6])>
Declaration of Impacts – The "preferred" Alternative D, as well as the rest of the Alternatives,
would have a significant impact on my family's life in the North Fork Valley (NFV). The
following details the impacts on my life if any of the current RMP alternatives are adopted.

In 1977 I started my almost annual trip from Ohio to Colorado to hunt. In 2000, my job moved
me from Dayton, Ohio to Ogden, Utah, which greatly reduced my trip to hunt in Colorado. In
2001, my wife and I started evaluating where in the West we were going to live when we retired.
We investigated and visited multiple places in Idaho, Wyoming, Montana, and Colorado. We
decided that Colorado was the best place for us to live. We looked across the state from Canon
City to Craig. In late 2002, we found Paonia, in the NFV.

It was 2004 before we found and closed on our home in the NFV. We became permanent
residents in February 2008. We live on a 7-acre mini-farm where we have an organic home
garden. We have been improving much of our property to allow organic grazing for sheep and
goats, and expect to start the grazing operation in 2017.

We choose the NFV because of the following:

-The abundant organic animal, vegetable, and fruit farms

-The organic wineries

-The traditional farms and ranches

-The year-round outdoor activities such as hiking, biking, fishing, hunting, camping and cross-country skiing

-The clean air and water

-The small town and rural environment

-The brilliant night sky

Both the indigenous Ute Indians and the US immigrant population that settled this area after the Utes were forced out, were in the NFV because of the valley's abundant clean water, fertile soil, and climate. At the 1893 World Fair in Chicago, all six NFV fruits entered in that Fair won the Gold Medal for their category. The NFV continues to be known for the fruits, vegetables and livestock grown here.

My wife and I started hiking, camping, and fishing in the NFV in 2003. In 2006 we started archery hunting in the NFV. I have killed two elk and two deer here, and my wife has killed two deer.

My direct impacts from the development of oil and gas in the North Fork Valley occur in each of the three major parts of my life – farm operations, home life, and outdoor activities.

Farm Operations – My farm, like most farms in the valley, exists because of the irrigation water rights that I own. Clean irrigation water is the key to successful farming in the NFV.

Two separate irrigation water facts combine to prove that O&G development in the NFV will have a devastating impact on my farm and farming in general within the NFV. The first fact is that all irrigation water in the NFV will be impacted directly by any surface water contamination. The second fact is that reports from all O&G development sites document a variety of regular spills that result in surface water contamination. In 2014 there were over 700 spills reported in Colorado. The only mitigation plan for a contaminated open dirt ditch irrigation system is the remediation of the contaminated ditch dirt and all the contaminated farms served by that ditch, including the on-farm irrigation systems such as sprinkler systems. I should note that my particular irrigation company used sections of naturally occurring creeks, in conjunction with both dirt ditches and piped ditches, to deliver irrigation water to the farms served.

Air pollution from O&G development will provide a significant risk to both organic and traditional farming operations in the NFV, including my farm.

Home Life – We use irrigation water for our home organic garden. Therefore, all the comments above about irrigation water contamination from O&G applies to our organic garden. When a spill contaminates our irrigation water, our garden system of 10 raised beds will require complete replacement of the contaminated soil.

BLM_0156575

Our home drinking water comes from springs in the mountains close to Paonia. O&G spills will directly impact our drinking water source. The entire water system from the source, raw water storage, purification system, treated water storage, and water delivery will require decontamination. Not only will there be a large loss of water from the contamination event, but there also will be a large amount of water lost through the decontamination process. Water wasted in Colorado should be a crime because of the limited amount of water available and the predicted large water shortage by 2050.

Most of the drinking water in the NFV will be directly impacted by O&G spills that contaminate surface water. The town of Somerset and the three coal mines in the area get their drinking water directly from the North Fork of the Gunnison River, with the mines also getting their industrial water for mining operations directly from the North Fork River. All creeks in the NFV Mountains flow into this river. Again, the cost of remediation of the town and coal mine water systems would be large.

Life Activities – This first paragraph details a very personal impact of O&G air pollution.

As the Executive Director of Painted Sky Resource Conservation and Development, I had the opportunity to observe a demonstration of a new technology for handling O&G produced water. The demonstration was being conducted at a Vernal Utah outdoors O&G evaporation pond facility. My wife and a co-worker accompanied me on the trip to see the demonstration. The tech demo was on the far side of the facility. Within a couple of minutes of us driving through this large multi-pond facility, my wife started feeling lightheaded and sick to her stomach. The people running the demonstration told her to stay inside the office trailer, which had an air conditioners in a couple of the windows and all the rest of the windows were closed. They told us that other folks have had the same reaction. My co-worker and I had no problem. Our demonstration and tour lasted
about 30 minutes. About an hour after leaving the facility, my wife's symptoms remained and we stopped in Rangely, Colorado to get something to settle her stomach. The rapid onset of my wife's symptoms demonstrated my wife's susceptibility to O&G air pollution. BLM's responsibility is to protect those with the highest levels of sensitivities. Obviously, we cannot go hiking, biking, fishing, hunting, camping or cross-country skiing in an area where there is O&G development.

Hunting and fishing will be directly impacted by O&G development. The impact will require us stop hunting 45 minutes from the house and revert to driving 3 to 7 hours to get to a place with no O&G development to hunt. Needless to say, this defeats one of the main reasons we moved to the NFV. The impacts on hunting and fishing involve surface water contamination, air pollution, habitat fragmentation. Additional impacts are the industrial light and noise, traffic and human activities that O&G development brings to the area. Combined, the impacts cause the game to avoid these areas and disrupt migration patterns. We saw directly the habitat fragmentation impact from the results of logging in the area that reduced the elk population. The elk simply left the area because of the changes in the required elk habitat and to avoid the human traffic and activities. As the area recovers from the logging, the elk are slowing coming back.

BLM_0156576

Our hiking, biking, camping and cross-country skiing activities (including wildlife viewing during all these activities) will all be impacted by the industrialization from O&G development in the NFV. The prime drivers of the impacts will be the surface water contamination and the air pollution, industrial noise, traffic and human activities that O&G development brings. The impacts defined above also cause the wildlife to avoid these areas, disrupt migration patterns and greatly reducing the area's wildlife viewing opportunities.

There are multiply problems that come with surface water contamination. One of the major concerns would be that safe drinking water would not be available. All current water filters that most hunters, anglers, hikers, bikers, campers, and skiers do not provide protection from O&G pollution.

Major Flaws in the RMP – the BLM Mission statement from the draft RPM states, "It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations."

1. My declaration of impact makes it clear that the current RMP does not meet the mission statement of the BLM.

2. The RMP is the management plan for the next 20 to 30 years. The plan presents a process in Table ES-2 for the resource categories and planning issues statement for these resource categories. The plan includes a process to analyze and evaluate projected impacts. These processes are detailed throughout Volume 1 and 2 of the RMP.

<([#7 [5.6] Although this detailed process covers many of the requirements for a management plan, it is missing the key management element required for successful implementation of any management plan. That key element is a Risk Management Plan.

A risk is defined as "an uncertain event or condition that, if it occurs, has a positive or negative effect on a project's objectives." Risk is inherent with any project, and project managers should assess risks continually and develop plans to address them. The risk management plan contains an analysis of likely risks with both high and low impact, as well as mitigation strategies to help the project avoid being derailed should common problems arise. Risk management plans should be periodically reviewed by the project team to avoid having the analysis become stale and not reflective of actual potential project risks.

A Risk Management Plan is a document prepared by a project manager to foresee/define risks, to estimate both the probability of the occurrence and the details of the impact for the risks defined (the risk assessment matrix), rank the identified risks by the level of impact, to create mitigation plans to reduce the probability of occurrence of the risks, and to create recovery plans for the most critical impact risks. #7])>

With the current state of risk management technology and the utilization of the risk management technology by many different organizations within the US government, the lack of a detailed Risk Management Plan makes the BLM look like an archaic organization and potentially criminally liable for the occurrence of the BLM identified risks in the RMP.

3. <([#2 [21.1] There is no doubt that if the UFO had completed a Risk Management Plan that there
would be multiple areas within the UFO region what would have been identified as appropriate for a "No Lease for O&G" option. Considering the O&G risk impacts and the current worldwide surplus with O&G, it is obvious that delaying O&G development for the next 20 years is reasonable. There is little doubt that the extraction technologies will greatly improve in the next 20 years and the risks associated with the O&G development will drop. #2])>

4. <([#3 [37.3] The RMP does not consider the O&G water use impact on the Colorado Water Conservation Board's (CWCB) studies indicating that the Colorado will have a water deficit as early as 2030. The O&G development uses about 0.5% of the total water usage in Colorado in a year. That means that every decade the total amount of water available in Colorado drops by 5% because the water used by O&G development is removed from the earth's water cycle. The earth isn't generating any new water, just reusing what has been here for millennials. CWCB's website is http://cwcb.state.co.us/watermanagement/ Pages/WaterManagementHome.aspx #3])>

5. <([#4 [5.4] The majority of your reference materials were not generated within the last five years.
This situation is totally unacceptable because of the rapid advancements in technology and studies in the O&G area. I am confident that multiple organizations are providing you with recommendations on how to update your reference material, which would greatly affect some of the conclusions in the RMP and any Risk Management Plan. #4])>

6. <([#8 [30.3] Delta County and the Delta County Economics Development organization received a grant from the federal government to complete a study aimed at defining the best ways to develop a resilient and sustainable economy in Delta County. The Better City Company located in Utah developed that plan. The bottom line from that plan was to expanded the agricultural increase "value-added" agriculture businesses, increase Agri-tourism, and increase recreational and arts tourism. If you refer to the above "Farm Operations" and "Home Life" sections, you can rabidly see how O&G development poses a great risk to the plan that Delta County has started to implement. #8])>

<([#9 [5.6] The final Resource Management Plan must:
- Include a complete Risk Management Plan,
#9])>
<([#11 [5.3] [The Final Resource Management Plan must:]
- Include a no-leasing alternative to adequately evaluate the full range of reasonable management plans. There is little doubt that multiple areas with the UFO, like the NFV and all of Delta County, need the no-leasing alternative to be incorporated in the final "Preferred Alternative" #11])>

<([#12 [37.3] [The Final Resource Management Plan must:]
- Include the detailed evaluation of the reduction in Colorado water supply in future years based on the fact that the water used in O&G development is removed from the earth's water cycle. #12])>

BLM_0156578

<([#10 [30.3] [The Final Resource Management Plan must:]
-Include the detailed evaluation of the impacts of O&G on the economic development effort underway in Delta and Gunnison counties. #10])>

Without detailed consideration of the bullet list above and considering how the no-leasing option would be integrated into the preferred alternative, the draft RMP fails to fulfill it's duty to consider the full range of reasonable management possibilities.

Sincerely,

Michael Drake

000509_WolcottE_20161102  Organization: Eli Wolcott
Received: 11/2/2016 12:00:00 AM
Commenter1: Eli Wolcott - Paonia, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: xUFORMP_000509_WolcottE_20161102.pdf (000509_WolcottE_20161102-387993.pdf Size = 240 KB)
Submission Text
Eli <eli@dreamthefuture.org>  Wed, Nov 2, 2016 at 12:17 AM To: uformp@blm.gov

Dear sirs, a minor but important typographical correction to my comment letter: When the letter stated in the 2nd to last paragraph:

"Short of a no lease alternative, the BLM should use alternative B1, and also apply the mitigations, buffers and protections of B1 to the entire B1 region"

It was meant to state:

"Short of a no lease alternative, the BLM should use alternative B1, and also apply the mitigations, buffers and protections of B1 to the entire RMP region"

Thank you for your help in this matter. A corrected version of the letter is also attached.
Eli Wolcott BLM RMP Letter 11_1_2016 - typo corrected.pdf
148K

UFO RMP
2465 South Townsend Ave.
Montrose, CO 81401

(via emmail to: uformp@blm.gov)

Re: UFO draft RMP

Nov 1st, 2016
Paonia CO 81428

I am a second generation, long time resident of Delta County and live outside of Paonia on ranch properties, one of my own and my family's ranch, some of which is protected by conservation easements for wildlife and related values, and located adjacent to BLM lands. I also own other properties in the region. I have a degree in environmental science and a background in ranching, construction, producing large tourism events in the local region, GIS mapping including coordinating several extensive GIS and field inventories of the region, and baseline water testing in the area.

I myself as well as and large numbers of my friends and neighbors use BLM lands regularly for hiking, biking and a range of other recreation. Firewood used to heat my home comes from BLM land. My domestic water comes from springs located on BLM land, and travels miles in a delicate and very old pipeline over BLM lands which would be easily damaged and costly to replace. My irrigation water comes from ditches and canals that travel across BLM land including Overland Ditch, as well as streams that come across BLM land such as Roatcap Creek. Irrigation water is a significant part of my and my family's livelihood, and the value of the properties that we own. This is also true for my friends, neighbors, and people throughout the region. My family hunts on BLM lands. Property that I and my family own are adjacent to BLM lands and in other cases near to BLM lands, and in all cases have viewsheds which represent a large portion of the value and quality of life associated with the property - viewsheds that include large amounts of BLM lands. The final plan in the RMP must protect these uses and values - which are almost entirely incompatible with gas development.

STEEP SLOPES, LANDSLIDES

The family ranch that I grew up on is adjacent to BLM lands on the north side of the North Fork Valley. I obviously know these areas (as well as much of the region) intimately. These BLM lands have steep slopes which are unstable and have already had landslides. Some of the slopes have already also been destabilized by wildfires and all of these burned areas should be removed from surface occupancy entirely to avoid landslides. The Wake Fire area is adjacent to and uphill of my family's ranch and directly above our domestic water springs and would be hugely impacted by a landslide on BLM lands in that area. In addition, oil and gas activity would also severely increase the risk of further similar catastrophic fires, and the highly fire-susceptible pinyon juniper biome (where many these past fires have taken place in their entirely should not be allowed any oil and gas surface occupancy in the final decision. This same biome has been the target of extensive and expensive programs by the BLM to reduce fire risk, represent extensive domestic/wildland fire risk areas and together are not compatible with the increased risk of fire. Seismic activity from gas development activities has been documented and would further endanger unstable and steep slopes such as these and many others. The Roberts Stucker Ditch which supplies irrigation water to my ranch and my family's ranch is located on very steep slopes

BLM_0156580

- both on BLM lands and adjacent to BLM lands. Seismic activity, landslides and destabilized soils due to wildfire would all greatly endanger the ditch and our ability to get irrigation water which is critical to our livelihoods. It could also endanger homes and lives downstream if the ditch were to fail and flood below. These hazards also apply to irrigation ditches throughout the RMP region, some of which would directly threaten other property we own as well as public safety and the homes and livelihoods of our neighbors and communities. Seismic activity originating on BLM lands of course pays no heed to administrative boundaries and would likely affect nearby lands, ditches, homes, etc throughout the region. <([#1 [31.1] The preferred alternative does not entirely remove those steep slopes from oil and gas development, surface occupancy or oil and gas development. Alternative B1 does. It is critical that the BLM go much further in removing the steep slopes on the north side of the North Fork Valley and throughout the RMP region from surface occupancy and gas development, as well as protecting ditches, homes and other resources from seismic activity throughout the RMP region. #1])>

DOMESTIC WATER SOURCES

<([#2 [37.2] These BLM lands are also only in some cases several hundred feet upstream from domestic and other water sources which have not been identified on your maps. This is the case with our ranch on Stucker Mesa, which includes springs on our ranch which are only hundreds of feet downstream of normally dry draws - springs which are used for domestic, stock, irrigation, grape/wine production, wildlife and other uses. In the case of landslide, erosion from road building, contaminating spills from vehicles/hauled fluids/oil and gas activities (which are documented to happen all too often and cannot be mitigated) these springs would be contaminated or silted in or both, destroying the source of water for many households. These types of springs as well as shallow water wells also exist on property to the west and east of our ranch up and down the valley. These springs must be protected, and should have been fully inventoried by the BLM (DNR and other state water agency maps and data showing points of diversion for water sources, wetlands, ditches and canals, streams, rivers, irrigated fields and wells should be included in RMP along with large buffers which not only take into account lateral distance BUT ALSO elevation, drainages including dry drainages and watershed models which demonstrate where spills, landslides and sedimentation would travel to, both in general and in relation to the water features listed above) and no surface occupancy should be allowed for gas development in watersheds upstream of water sources until new practices, financial bonding or new technology can guarantee no spills, erosion or other adverse effects on water sources. #2])> Without these protections and analyses, many of which are included in alternative B1 (but not all, and B1 only addresses some of these issues in the North Fork Valley, while these same analyses and protections should apply to the entire RMP area - all of which affects residents of the North Fork and all of which includes water sources, wildlife, etc. that demand the same level of protection as the NFV) the "multiple use" is replaced with gas development precluding many other uses and endangering water sources, wildlife, livelihoods and property values throughout the region for the elevation of ONE use.

In essence, with oil and gas development in the RMP region, there is no "multiple use." There is ONE use and detrimental impacts that cannot be mitigated to all other uses and resources. FLPMA specifically requires the agency to manage for the multiple use and sustained yield of public land resources for both present and future generations ? oil and gas development are NOT

compatible with sustainable yield and in this region will have detrimental impacts to public land resources for present and future generations.

<([#3 [18.3] Radioactive materials and disposal have been problematic in the gas development in the Dakotas and elsewhere, and this needs to fully studied and addressed in the final decision. #3])>

CONSERVATION EASEMENTS

Our state legislature, the federal government, and populace recognizes the value of conservation easements and has invested immensely in them both publicly and privately . These easements would in many cases be severely reduced in their value by gas development. <([#4 The final plan must recognize the value and investment - public and private - into conservation easements and ensure that no gas development or other uses will negatively impact conservation easement lands - through contamination, sedimentation, reduction or fragmentation of wildlife habitat, landslides, viewshed impacts, air quality, water quality, noise, etc etc. Many of these conservation easements were supported as mitigation for the impacts of other development activity in the area - oil and gas development adjacent or nearby to these lands would undo much of that intent. #4])>

TOURISM

Many of the large tourism events that I have produced draw thousands of people to the area and are often hosted by or benefit charitable non-profit organizations.  These are recreational and educational events supported by but not directly related to agri-tourism.  Chambers of commerce and other groups have stated that these events are large economic drivers for the area and have at times represented record sales and revenues for local businesses. These events are often on private property adjacent to BLM lands or within close proximity to BLM lands - much of the region is in close proximity to BLM lands and impacted by what happens there . These events would not be possible under the preferred alternative.

My family also hosts hunters and guides on our properties, which would not be possible with oil and gas development on adjacent lands or throughout the region. The visual impacts alone from oil and gas development in the region's viewshed would deter tourists from attending these and many other events, and would severely impact many other businesses in the area. Further, tourists will not drive through large gas developments to a small isolated island with reduced gas development as proposed in alternative B1. A no lease alternative is the only thing that would really mitigate against The negative impacts of fracking. To a lesser degree the analysis and protections described in alternative B1 applied throughout the region would serve to protect the tourism in the area, both the large events that I produce and the many other tourism opportunities.

ECONOMIC IMPACTS, QUANTIFYING EXTERNALIZED COSTS

The impacts of large truck traffic, flaring, air quality, and the inevitable traffic accidents and spills that cannot be mitigated away would further destroy tourism, businesses and the local

economy. I live on a narrow, steep, winding gravel county road, like many of the roads in the county we use every day. Heavy truck traffic from oil and gas development would be a huge safety risk to these roads and my family and me.

Studies have shown that any local economic gain from gas development is both short lived and jobs are largely given to workers from outside the region, while the burden on local road maintenance (and driving safety) and public services is huge. <([#5 [30.3] [30.5] These specific impacts including short term economic gain in exchange for sacrificing or detrimental impact to most of the long term sustainable economic drivers in the region and impacts on public roads and services need to be addressed in detail and the final plan must fully protect the area from these impacts. The economically externalized costs of oil and gas development must be fully studied, monetarily quantified and mitigated - impacts to property values, water values, tourism, hunting/fishing, photography, agriculture, renewable resources on BLM lands (firewood, wildcrafting, etc), costs to public roads and services, social impacts including crime and drug use amongst oil and gas workers, traffic and traffic accidents, loss and contamination of water, sedimentation, game damage, viewshed damage, night pollution, other impacts outlined in this letter and others. Only a no lease alternative would fully mitigate these impacts, and to a lesser degree B1 analysis and protections applied throughout the region. #5])>

I do business with folks who run bed and breakfasts, organic orchards, farms, many types of ranches, wineries, guide services and hunting, run construction businesses, are realtors and real estate investors, horse facilities, restaurants, farm supply businesses, and many others, all of whom would be negatively impacted by oil and gas development as proposed in the preferred alternative. These same impacts, risks, perceived impacts and possible future impacts to viewshed, water sources/ditches/wells/wetlands/streams/rivers/etc, traffic safety, landslides, air quality, habitat fragmentation and road building, noise, dust, reduced recreational opportunities, spills, light pollution, and many other documented impacts outlined in this letter and elsewhere would have detrimental impacts to me, my family, my neighbors and local businesses throughout the region with whom I do business. These impacts are not able to be mitigated except through a no lease alternative or to a lesser degree by extending analysis and protections outlined in B1 to the entire RMP region.

VIEWSHED ANALYSIS

<([#6 [35.3] The preferred alternative does not adequately address viewshed impacts. #6])>
BLM lands are visible extensively throughout the region, from my home, the areas in which I recreate, through which tourists that I host travel, from special recreation areas like Jumbo Mountain and many many others and oil and gas development as outlined in the preferred alternative would severely impact the viewshed and a host of economic and quality of life factors as described throughout this letter for me and my neighbors and communities. A no lease alternative, no surface occupancy alternative throughout the region or to a lesser degree applying analysis and protections of B1 throughout the region would be required to mitigate these impacts - and in this region with its incredible viewshed, tourism and other sustainable economic and recreational opportunities, especially over time far outweighs the value of any oil and gas resources. <([#7 [30.3] A full economic analysis of the value of these viewsheds and the cost of their destruction over time should be conducted. #7])>

PERCIEVED IMPACTS, PERCIEVED RISK, FUTURE PLANNING

Further, it is very important to note that these tourism events and tourism and land values for the entire region are affected not only by the direct impacts of oil and gas development, but also by the perceived impacts and any risks or perceived contamination or even perceived future impacts or possible contamination. I have neighbors who have delayed purchasing property or building a house because of the perceived possible impacts of oil and gas development. I have delayed home purchase for the same reasons. This has had a measurable and very real impact on real estate values. Just the potential for a fracking related spill or future viewshed and traffic impacts or other related impacts will have a large impact on the tourism, commercial (largely organic) food production, hunting, fishing, guiding, real estate and economy of the NFV and the greater region. These impacts would affect me and my family personally and directly. Real estate that I and my family own would be severely impacted in value by oil and gas development or the perceived possibility and risks of oil and gas development as outlined in the preferred alternative. The large monetary value of irrigation water and domestic water shares that I and my family own would be severely impacted and possibly unsellable by oil and gas development or the perceived possibility and risks of oil and gas development as outlined in the preferred alternative. This is true for properties that my family owns in the North Fork Valley and Cedaredge area. Speculative oil and gas development should not be elevated and allowed to proceed at the expense of property and water values in the region. A no lease alternative is needed in order to fully mitigate these impacts and ensure there is neither risk nor perceived present or future risk of the detrimental impacts from oil and gas development, while applying the analysis and protections of alternative B1 to the entire RMP area would partially mitigate these impacts. The preferred alternative would be disastrous in unmitigated impacts in these regards.

NIGHT TIME LIGHT POLLUTION

<([#8 [11.1] The final plan must study and protect the region from nighttime light pollution, especially in the case of oil and gas development. #8])> Use of light towers, HID lighting, flaring and all other light sources should be restricted and fully mitigated or prohibited in the NFV and throughout the region to protect land values, recreational opportunities, wildlife habitat and tourism. Truck traffic at night should be prohibited for both light and safety concerns by the final plan. Or surface occupancy should be precluded throughout the RMP area until these impacts are fully addressed.

FIRE RISK

The final plan should address fire risk. My family ranch is located adjacent to BLM lands that burned in the Wake fire, which originated on BLM lands and burned a portion of our ranch and neighboring houses. These same BLM lands have burned subsequently due to lightning strikes. This directly impacted us with extreme sedimentation of springs, ponds and ditches, washouts of public roads, invasive weeds, viewshed impacts, reduction in land value, and more. Fire represents a significant risk to lands, wildlife, tourism, property and water sources, human life and fighting fires represents a significant financial burden on public services and risk to human life. Oil and gas development, with surface occupancy, increases fire risk through new roads,

BLM_0156584

truck traffic, flaring, water from streams and other sources used in hydrofracking, drivers and workers who smoke cigarettes, surface disturbance, etc. We had a local lose his property and almost his life from a cigarette discarded out the window on the highway recently. There have also been several recent reports in the news of natural gas pipelines exploding, resulting in fires and loss of life. One accident of this sort is one too many in our communities and is an unacceptable risk. <([#9 [13.1] This increased risk of wildfire must be addressed and fully mitigated in the final plan through largely limiting surface occupancy as described in alternative B1 in the NFV and further throughout the RMP region, requiring road closures/locked gates on any new roads related to oil and gas development, banning smoking and the use of open flame by oil and gas development and support service employees, and other effective methods. Or surface occupancy should be precluded from all areas until these potential impacts are fully addressed. #9])>

## NOXIOUS WEEDS AND INVASIVE SPECIES

Surface occupancy and road building from oil and gas development will cause the introduction and spread of noxious weeds and invasive species. We experience this on our family ranch with invasive weeds spreading onto the ranch from BLM lands after wildfires. This also affects cattle ranchers that lease part of our ranch and adjacent BLM lands. <([#10 [34.5] The final plan needs to address this by largely limiting surface occupancy as described in alternative B1 in the NFV and further throughout the RMP region, requiring road closures/locked gates on any new roads related to oil and gas development, and requiring trucks to be washed, mechanical non-chemical requirements for weed removal or other effective measures to prevent to spread of noxious weeds and invasive species. #10])>

## AIR QUALITY

Like many others, my family and I also breath air on and adjacent to BLM lands, and <([#11 [10.5] mitigation of air quality from oil and gas development has not been addressed under the preferred alternative and cannot be fully mitigated except under a no lease alternative. #11])> Air quality would be impacted by oil and gas development throughout the RMP region, and additional protections beyond alternative B1 are needed to protect air quality. In the winter the North Fork Valley experiences inversions which cause the air and pollutants to be trapped down in the bottom of the valley, where the towns and many people, are located. <([#12 [10.3] The BLM needs to consider the expected increase in respiratory illness that would result from fracking pollutants and truck traffic. What can be done to mitigate that? #12])>

## HABITAT FRAGMENTATION AND CORRIDORS

The preferred alternative is wholly inadequate in mitigating habitat fragmentation. I have in the past conducted in depth analyses of habitat fragmentation and corridors for deer, elk and other species in the region with the support and involvement of several institutions of higher education. <([#13 [14.1.3] Impacts of road densities and proximity on habitat fragmentation and corridors is well documented in the scientific literature. This type of analysis is not represented at all in the preferred alternative which does very little to address or mitigate habitat fragmentation. BLM lands are very important in the region in this regard, and a full analysis and robust

mitigation should be applied. #13])> <([#14 [14.1.3] Historical changes over time of habitat fragmentation should also be analyzed, along with cumulative fragmentation and corridors impacts in conjunction with oil and gas and other development on Forest Service, private and other lands. #14])> BLM has permitted the continued fragmentation of habitat over time, endangering the resource. This trend should be fully analyzed, addressed and reversed, not dangerously exacerbated as proposed under the preferred alternative. The evidence from my past in depth analyses of habitat fragmentation and corridors in the region would strongly suggest that no surface occupancy throughout the region, a no lease alternative or to a lesser degree B1, would be required to mitigate critical habitat fragmentation and corridors. This is important to me personally because my family derives income related to hunting and tourism in the region, and is impacted by game damage and would be impacted more by further fragmented habitat, and our property values, tourism income and hunting opportunities are all dependent on healthy unfragmented habitat and corridors. This also applies to our neighbors and people with whom we do business - the local and regional economy as a whole.

CUMULATIVE IMPACTS

<([#15 [5.7] The final decision needs to address the cumulative impacts of oil and gas development on BLM, Forest Service, private and other lands, not only the BLM lands in isolation. #15])> These cumulative impacts will be felt by myself, my family, neighbors and communities I am part of throughout the RMP region. These cumulative impacts should be studies and mitigated for all of the concerns I have outlined in this letter and concerns that other individuals and groups in the community have raised.

CLIMATE CHANGE

Climate change is an important issue that affects us now and into the future as well as future generations - including my kids and grandchildren to come. <([#16 [11.3] The final decision needs to fully study and address the impacts on climate change posed by oil and gas development in the RMP, individually and cumulatively. #16])>

GRAZING AND LIVESTOCK

My family leases cattle grazing on some of our property, both for income and more importantly in our case for fire mitigation. Cheat grass eaten down by cattle over a 2-4 wk period in the spring is no longer a large fire risk, and the cattle are removed before damaging native grasses, bushes and trees. This approach has been hugely successful for us. At some times the cattle owners also lease adjacent BLM lands for grazing in a similar fashion, further reducing fire danger to our property. Apart from my family ranch I also own a ranch that I lease to a neighbor to graze cattle on. However, the area has become known for its organic farms, orchards and grass fed beef. This industry would be severely impacted by oil and gas development, and we would likely be unable to lease our property or encourage grazing leases on adjacent BLM lands to mitigate fire risk if gas development takes place in the area. Consumers of beef want clean, grass fed beef, not beef raised amongst fracking sites, gas wells and settling ponds.

The same can be said for the many livestock apart from cattle that we raise ourselves on our

ranch. We will be impacted economically with difficulty selling meat or produce from our ranch or private hunts on our ranch if the region is developed for gas - which would be better if protected under B1, but would still carry a stigma from the large area of gas development that would surround the NFV under B1. This represents a large economic impact on one of the primary sources of income for my family.

STREAMS AND TRIBUTARIES

The preferred alternative does not protect streams, tributaries and rivers in the region from spills, sedimentation and other impacts from oil and gas development. <([#17 [39.2] This includes waterways on BLM lands and downstream. Many of these waterways have been inventoried for their unique and important characteristics, and yet these inventories have not been included in the analysis and should be. #17])> These waterways represent to me and my family drinking water, irrigation, property value, recreation, fire mitigation, fishing, tourism income both direct and indirect, part of health, game habitat, quality of life and more. This might be most relevant to me in drainages adjacent to our property or drinking water sources like Roatcap creek, Long Draw, Surface Creek, Love Gulch and others like Jay creek, Hubbard, Terror, Minnesota, Lone Cabin area, but also applies to waterways and rivers throughout the region such as those in the Black Mesa and Cathedral Peak areas, Uncompaghre Plateau, Gunnison Gorge and many many others that are on BLM land or downstream of BLM lands that would be irreparably harmed by the the inevitable spills and impacts In addition, perceived risks and perceived impacts of oil and gas development and would directly impact me, my family our neighbors, those we do business with and the communities in which we live.

RECREATION

I am sure that many have written in regards to protecting trails and recreation in the Jumbo mountain area. My family and I use the trails and that area and the plan should protect this area, the adjacent areas (the area is not protected if gas wells are placed immediately adjacent to it as shown in the preferred alternative), the viewshed from the jumbo area looking out, and the watershed upstream. Again, tourism to use the Jumbo area would also be hugely impacted if immediately adjacent areas were developed for oil and gas, areas within the viewshed from Jumbo were developed for oil and gas, or under Alternative B1 the NFV was an isolated area surrounded by heavy oil and gas development. The final decision must address these impacts and protect the recreational resources. FURTHER, there are many, many other recreational areas and trails that are critical to protect in the NFV and across the entirety of the RMP region that I have hiked, hunted, fished, biked, rock climbed, photographed, visited and enjoyed recreationally for over 30 years and that my family has visited and recreated on now for generations. In the NFV alone these important areas would include trails that I and my family and friends use regularly in the areas of Lamborn, Land's End, Crawford, Lone Cabin, Minnesota Creek, Hubbard drainage, Bear Creek, the Muddys, Anthracite drainage, Stevens Gulch, Oak Mesa, Leroux Creek, Gunnison Gorge, many areas on and adjacent to the Uncompahgre Plateau, Smith Fork, Cathedral Peak, Saddle Mountain, south of Hotchkiss, all along the south side of the Grand Mesa, and many, many others far too numerous to list. In fact ALMOST ALL BLM LANDS IN THE RMP REGION CONTAIN IMPORTANT TRAILS AND CRITICAL RECREATIONAL RESOURCES THAT MY FAMILY, FRIENDS, COMMUNITY AND I USE AND DEPEND

BLM_0156587

ON FOR TOURISM AND MUST BE PROTECTED FROM OIL AND GAS DEVELOPMENT. <([#18 [27.1] The BLM would need to present a strong documented case to support leaving any areas out of a special recreation area or extending the protections of a special recreation area from oil and gas development #18])> - nearly all BLM areas in the region have robust and important recreational resources that would be irreparably harmed by oil and gas development. This kind of documentation and justification of course does not exist and would be impossible in the face of the facts. These land and treasured recreational opportunities are a long term sustainable source of tourism and income supporting the entire region, including my family for generations now. This should not be sacrificed for any speculative, short term gain from oil and gas development which in the long term, and perhaps even the short term (which should both be analysed) would fall far short of the sustainable economic engine represented by recreation and tourism. Of course loss of recreational resources would also affect property values, water values, and a long list of business directly or indirectly benefitting from recreation and tourism. A no lease alternative, or to a lesser degree the protections laid out in alternative B1, applied to the entirety of the RMP region are needed to protect these trails, recreational opportunities and tourism throughout the region.

SUBSTANTIVE COMMENTS

Sub·stan·tive, adjective
?s?bst?n(t)iv,s?b?stan(t)iv/
1. having a firm basis in reality and therefore important, meaningful, or considerable.
2. having a separate and independent existence.

I would like to remind the BLM that this is an energy and time intensive process not only for BLM staff but also for the public - real people like me in our communities who are not being paid a salary to work on the critical issues and impacts that the RMP raises in our lives. It is very difficult to find time to read and understand the many hundreds of pages of entire draft RMP (and hard copies were not readily available), analyze it, bring to bear a background and expertise in the myriad of topics, understand the implications of it as a whole, research and contrast the impacts, shortcomings and impacts where similar activities and planning have taken place elsewhere and find time to draft a comprehensive substantive comment letter. Anyone who makes a reasonable attempt at this should be applauded. Comment should be encouraged, not discouraged, and public input should be included whenever possible, not sidelined or discouraged.

<([#19 [5.9] Unfortunately, public comment is further hampered by incomplete information, as the draft falls woefully short on analysis and recommendations for mitigation of oil and gas development impacts. This should have been addressed with a no lease alternative, alternative B1 analysis and protections considered for the entire RMP area, and a myriad of other analyses and study presented in this letter and others. #19])> <([#20 [5.1] Hard copies of the draft should have been made readily available directly to any individuals requesting them. #20])>
I attended public meetings with BLM staff at the local presentations, and was given the distinct and direct impression by BLM staff that the term "non-substantive" was to be used by the BLM as an ill-defined excuse to dismiss large numbers of comments and concerns from the public,

BLM_0156588

even if said concerns were in fact substantive. BLM staff was not able to define the term substantive in general or in this specific context even when pressed directly and repeatedly, but stated the refrain over and over that only substantive comments would be considered. I was told outright by BLM staff that duplicated language in comment letters would generally be discarded and ignored, and that letters from members of the same group or organization would largely be discarded and ignored. I was also told by BLM employees that the number of people raising a concern would not matter - one person with comments in favor of gas development (perhaps an employee of the gas industry) or the preferred alternative would be treated with the same weight as hundreds of comment letters with substantive comments supporting B1 or raising valid concerns about gas development and its impacts - and that if the hundreds of letters had semi-duplicate wording or were from members of the same organization they would be disregarded entirely. This is not in the spirit nor perhaps the letter of law of the public comment process. <([#21 [5] Please understand that all substantive comments and concerns need to be fully addressed even if they are duplicated in concept or word amongst many separate people. The fact that many people have the same concerns does not obviate the duty of the BLM to address those concerns. Actually, the fact that hundreds of people have the same concerns should make it even more imperative for the BLM to fully address them - and hopefully encourage the BLM to reflect on why the draft RMP failed address many of these obvious concerns and impacts often previously clearly raised in writing and at public meetings in any of the proposed alternatives. #21])>

Further, the public meetings appeared to be designed to discourage public input and information sharing - there was no shared forum for making comments or asking questions, no microphone, very fragmented small tables and most of the presentations and staff I interacted with had limited or no knowledge of the official topic at any given table. Even the one person we found that had expertise in the specific topic was unable to explain why or how decisions were made for the various alternatives regarding that tables topic and generally considered the entire planning process to be so large and cumbersome as to be generally beyond interpretation or explanation to the public. <([#22 [5.1] We were unable to speak with or ask questions at the oil and gas related table because there were not enough staff present to speak with all of the people concerned with the oil and gas topic, and though we patiently waited long for our turn for an a BLM staff member to be free, just before our turn came the staff at the oil and gas table packed up early before the designated time and exited refusing to speak with us. We asked the BLM host at the front door about this and they informed us there were no further public meetings scheduled in our local area and that "it had already been a long night" even though the official meeting closing time had not yet passed. #22])> I do not believe these obvious efforts to dismiss and silence the public and deny access to information and public comment is in compliance with the public input requirements of the NEPA process or in the spirit of the BLMs mandates.

NO LEASE ALTERNATIVE

<([#23 [5.3] Decisions to lease or not to lease legally available lands must be made in accordance with planning regulations and appropriate NEPA analysis. The BLM should have included a no lease alternative, and must immediately rectify this oversight by reissuing the draft with a no lease alternative for public comment. #23])> Further, a no lease alternative should be the preferred alternative, as supported by analysis and science. Analysis clearly demonstrates that

BLM_0156589

special lease stipulations cannot satisfactorily mitigate potential impacts to other resource values, as further analysis as outlined in this letter and elsewhere and under a no lease alternative will support. Scientific evidence clearly demonstrates (as would analysis under a no lease alternative) that oil and gas leasing and subsequent development would be unacceptably detrimental to other resources, which far outweigh the social and economic value of the oil/gas resource when given due consideration. With the extensive leasing that has already taken place on BLM lands, the entire RMP region qualifies as one of the rare instances that analysis shows un-mitigatable impacts to other resources clearly and rationally require severely restricting access to oil and gas resources.

EXTEND B1 ANALYSIS, MITIGATION AND PROTECTIONS TO ENTIRE RMP REGION

Short of a no lease alternative, the BLM should use alternative B1, and also apply the mitigations, buffers and protections of B1 to the entire RMP region. Myself and most residents of the NFV visit, recreate, drive through, can see from our homes viewsheds, and depend on tourism and businesses throughout the entire region. I own property inside and outside the NFV that are near or adjacent to BLM lands in the RMP area, source domestic, stock and irrigation water from on or through BLM lands, and are impacted by BLM lands in all of the ways listed throughout this letter - and have for my entire life, as have my parents and as will my children and future generations if properly protected. I also hike, bike, fish, hunt, camp, visit, rock climb, swim, boat, source firewood from, eat beef raised on, teach student classes on, host tourism events - all on and adjacent to BLM lands throughout the region, not only in the North Fork Valley. All of these activities and the health, quality of life and livelihoods of myself, my family and large numbers of residents in the entire RMP area require a no lease alternative or short of that, the full analysis and protections under alternative B1 be extended to the entire area under consideration for leasing in the RMP.

Please understand that I appreciate all of the effort that you have made to study and protect the resources on and adjacent to BLM lands that myself, my family, my livelihood and communities and future generations depend on. And we are now truly depending on you to do the right thing and fully protect the resources and communities throughout the RMP region from the detrimental impacts of speculative oil and gas development, as is your mandate, patriotic duty and moral obligation.

Sincerely,
Eli Wolcott
Paonia, CO
[please feel free to contact me with any questions via email]


000510_EllingerS_20161031 Organization: Susan Ellinger
Received: 10/31/2016 12:00:00 AM
Commenter1: Susan Ellinger - Paonia , Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique

Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000510_EllingerS_20161031.htm (000510_EllingerS_20161031-388007.htm Size = 1 KB)
xUFORMP_000510_EllingerS_20161031.pdf (000510_EllingerS_20161031-388006.pdf Size = 85 KB)
Submission Text
Date:10/31/2016

Commenter: Susan Ellinger

Organization:

Email:susanellinger@gmail.com

Address:12999 Minerich Road, Paonia, CO 81428

Phone:

Comment:
I support the North Fork Alternative B1 RMP because it represents the best way to protect our local organic farms, drinking water, pristine recreational areas and tourist base economy that continues to grow in the region.

I am Susan Ellinger, a professional classical musician that has made my home in the North Fork Valley for the past six years. I produce a local concert series at the Blue Sage Center for the Arts in downtown Paonia, teach private music lessons, and consider this area my base to return to after traveling for work.

Thank you for your consideration.

Sincerely,
Susan Ellinger
12999 Minerich Road
Paonia, CO 81428


000511_FitzhughR_20161101_COPMOBA-RAT Organization: Colorado Plateau Mountain Bike Trail Association, Rodney Fitzhugh
Received: 11/1/2016 12:00:00 AM
Commenter1: Rodney Fitzhugh - Ridgeway, Colorado 81432 (United States)
Organization1:Colorado Plateau Mountain Bike Trail Association
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique

Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000511_FitzhughR_20161101_COPMOBA-RAT.htm
(000511_FitzhughR_20161101_COPMOBA-RAT-388008.htm  Size = 7 KB)
xUFORMP_000511_FitzhughR_20161101_COPMOBA-RAT.pdf
(000511_FitzhughR_20161101_COPMOBA-RAT-388009.pdf  Size = 500 KB)
Submission Text
Date:11/01/2016

Commenter:Rodney Fitzhugh

Organization:

Email:fitzearl1953@gmail.com

Address:525 Chipeta Drive, Ridgway, CO 81432

Phone:970-209-1007

Comment:
Dear Joe and Dana,

On behalf of the Ridgway Area Trails Chapter (RAT) of Colorado Plateau Mountain Bike Trail
Association, Inc. (COPMOBA) I submit these comments on the Uncompahgre Field Office of
the Bureau of Land Management (UFO) Draft UFO Resource Management Plan/Environmental
Impact Statement (DRMP).

By way of background, RAT and COPMOBA have worked cooperatively with the UFO for
many years to create and maintain non-motorized, single track trail recreational opportunities on
BLM lands. RAT is extremely proud of the working relationship built with the UFO over the
past several years, especially concerning recent trail development northeast of Ridgway. That
development has already produced large social, recreational and economic dividends for the
local community. In the past 2 years bicycle tourism has begun to impact many local businesses,
bringing an influx of user traffic during the summer and fall. RAT and the entire Ouray/Ridgway
community would benefit immensely from addition of more non-motorized, single track
recreation opportunities to Ouray County. RAT has identified the McKenzie Butte area between
Highway 550 and County Road 1, north of Ridgway Reservoir, as an ideal area for trail
development. It is within easy vehicle access of both Ridgway and Colona. With BLM land
touching highway 550 just south of Colona, and the proximity to County Road 1, trail users
could potentially access the area via bicycle from Colona and Log Hill Village. All these
considerations influence the following comments.

1. Land Disposals.

The DRMP states that in Alternatives B-D, identifies a number of in-holdings for possible disposal. RAT has long range plans to develop additional non-motorized recreational opportunities, including trails, on public lands that are adjacent to lands currently owned by BLM. <([#1 [19.1] RAT prefers that BLM not dispose of any public lands that either (a) would increase the amount of private land intersected by public rights-of-way, especially trails, or (b) are located adjacent to USFS or other public lands which may be suitable for further development of recreation opportunities. #1])>

2. Special Recreation Management Areas (SRMAs).

As noted above, the new trail system currently under development north of Ridgway has provided a major, positive economic impact on the community. Ridgway now has a new bike shop employing at least two Ridgway residents. The trails have brought new people to town and helped current residents develop new social networks and a strong sense of pride in the community, and local businesses have noticed a definite increase in traffic during the summer and fall when the trails are open.

<([#3 [27.1] RAT essentially endorses the Ridgway SRMA objectives stated in Alternatives B and D of the DRMP. Rat generally agrees with the stipulations for both zones of the Ridgway SRMA, as described in Appendix J. RAT also generally supports DRMP comments submitted by the Montrose, Delta and West End Chapters of COPMOBA concerning various other RMP's designated in the DRMP. We believe careful and consistent management of the Burn Canyon, Dry Creek, Kinikin Hills, Jumbo Mountain and Ridgway RMP's will have a synergistic effect to enhance social, recreational and economic benefits in the adjacent communities #3])> .

3. Enhanced Ecological Areas (EEAs).

RAT values immensely the recent cooperation of BLM in expanding the trail opportunities on BLM lands within Ouray County. As noted above, RAT has identified additional potential trails systems which could be developed within Ouray County, particularly opportunities to increase non-motorized recreation on McKenzie Butte. RAT has already had discussions with CPW concerning the potential for trail development in that area, and strategies for minimizing impact on wildlife habitat, particularly that of big game. RAT has also worked with private contractors to create a conceptual trail system for consideration by CPW. We have tried to get up front with CPW on this plan, because we realize the importance of the area for wildlife management.

With this in mind, we notice that McKenzie Butte and Pinon Ridge on Log Hill Mesa are recommended to be included in a Ridgway EEA. <([#4 [14.1.1] While we certainly appreciate that the UFO's efforts to preserve connectivity of core habitat for big game and other wildlife, we are concerned about the stipulations recommended that include ROW avoidance in Alternative D. The parcel of most concern to RAT is depicted in Figure 2-4 of the DRMP (the westernmost parcel labeled "Ridgway"). RAT would support the designation of the western parcel (Core Zone 1) to be included in this EEA, only if only if its inclusion would not have a substantial negative impact on the development of enhanced single-track trail systems in the area. We note the proximity of this area to Log Hill Mesa, where about a third of all Ouray County citizens reside #4])> .

BLM_0156593

In reviewing the summary of concept and purpose for EEA's (at appendix D, page D-2), we note the purpose seems to be the preservation of migration corridors between critical areas of wildlife habitat, and we are encouraged by the following comment: "Resource management planning offers the opportunity to emphasize certain uses over others in different parts of the landscape. If important core areas and corridors are designated during planning, then conflicting uses could be emphasized and located in other areas, core or modified to minimize impacts within core and corridor habitat." We consider that language in light of the Appendix D description of the proposed Ridgway EEA:

[Table 1 in PDF]

This suggests that the area is especially valued as a game wintering area. <([#2 [14.1.1] We believe that to the extent trail development may be considered in conflict with management of this proposed EEA [Ridgeway], that conflict can be minimized by well defined, publicized and enforced winter closures, and by development of a suitable travel management plan to elimate some of the multitude of motorized trails currently located in the area, and prevent their further proliferation. #2])>

Thanks for considering this comment.

RAT/COPMOBA
By: Rodney E. Fitzhugh
fitzearl1953@gmail.com
525 Chipeta Drive
Ridgway, CO 81432
(970)209-1007.


000512_FurimskyB_20161031 Organization: Ben Furimsky
Received: 10/31/2016 12:00:00 AM
Commenter1: Ben Furimsky - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000512_FurimskyB_20161031.htm (000512_FurimskyB_20161031-387984.htm
Size = 2 KB)
UFORMP_000512_FurimskyB_20161031.pdf (000512_FurimskyB_20161031-387983.pdf Size
= 87 KB)
Submission Text
Date:10/31/2016

BLM_0156594

Commenter: Ben Furimsky

Organization:

Email:ben@flyfishingshow.com

Address:

Phone:

Comment:
To whom it may concern,

I would like you to consider limiting fossil fuel leasing and development in the Draft Resource
Management Plan for the North Fork Valley and beyond. The BLM must analyze and adopt a
"no leasing" alternative for coal. Such an alternative is a necessary counterbalance to the current
alternatives that skew heavily in favor of coal leasing, and is the only effective way to
realistically minimize climate impacts. Colorado has many options for newer and greener power
options.

<([#1 [22.2] [30.2] The Final RMP must include up-to-date data concerning coal markets, coal
production and coal employment in the area. The Draft RMP's data, much of it dating back to
2010 or older, is stale in light of shrinking coal production and employment.
#1])>
As someone that grew up in a coal mining area, I support the "North Fork Alternative," which
provides for no oil and gas leasing across 75% of the North Fork Valley. I've seen the results are
limited to the local communities and leave long lasting damages.

As a fly fishing guide, and now a promoter of the fly fishing industry, my livelihood depends on
protecting the natural resources. I have many clients that depend on healthy watersheds and
mining is not the solution.

Thank you,

Ben Furimsky
President || CEO
Fly Fishing Show
www.flyfishingshow.com
ben@flyfishingshow.com


000513_GarciaJ_20161101  Organization: Jeremiah Paul Garcia
Received: 12/9/2016 3:35:40 PM
Commenter1: Jeremiah Paul Garcia - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive

Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000513_GarciaJ_20161101.htm (000513_GarciaJ_20161101-387985.htm Size = 2 KB)
UFORMP_000513_GarciaJ_20161101.pdf (000513_GarciaJ_20161101-387986.pdf Size = 105 KB)
Submission Text
Date:11/01/2016

Commenter: Jeremiah Paul Garcia

Organization:

Email:jeremiahpaulg@gmail.com

Address:38620 Pitkin Road, Paonia, CO 81428

Phone:

Comment:
To whom is responsible for determining the fate of young families, like my own, in the North Fork Valley:

Fall of 2016 is unusually hot, with lower than expected rainfall. This is the trend we are expecting to see if we do nothing. We will continue to see worse heatwaves and prolonged drought if we continue to develop oil and gas infrastructure. But if we decide to be responsible stewards of this beautiful land, then we can begin to mitigate and alleviate these dire trends. The way we achieve this is by growing food, medicine, fiber, and even fuel in a regenerative manner that will increase carbon in the soil. Not only will agrarian economic development help us in addressing the changing climate, it will create opportunities for young families to become first-time homeowners as well as build resilience into our food system and ecosystems.

With this in mind, I strongly urge you to adopt a no-leasing alternative in the North Fork Valley, instead supporting the thriving, resilient organic agriculture and eco-tourism industries that have taken root in our communities and pose an excellent economic alternative to oil and gas development.

Sincerely,

Jeremiah P Garcia
38620 Pitkin Rd
Paonia, CO 81428

000514_GrotherC_20161029_Backcountry Hunters and Anglers Organization: Backcountry
Hunters and Anglers, Craig Gother
Received: 10/29/2016 12:00:00 AM
Commenter1: Craig Gother - Norwood, Colorado 81423 (United States)
Organization1:Backcountry Hunters and Anglers
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000514_GrotherC_20161029_BackCountry Hunters and Anglers.htm
(000514_GrotherC_20161029_Backcountry Hunters and Anglers-381188.htm  Size = 40 KB)
Submission Text
Craig Grother
craiggrother@yahoo.com

Attached is my response to the opportunity to comment on the Draft RMP/EIS for the
Uncompahgre Field Office of the Bureau of Land Management. I am submitting these comments
on behalf of the Colorado Chapter of Backcountry Hunters and Anglers. I represent Backcountry
Hunters and Anglers as the Habitat Watchman for the Uncompahgre and the Regional Director
for the Central Western Slope of Colorado.

I would appreciate acknowledgement of receipt of these comments from the project manager
and/or acting field office manager.

Craig Grother
PO Box 156
Norwood, CO. 81423
craiggrother@yahoo.com

RMP Comments.doc
504K

Colorado Backcountry Hunters & Anglers
"The sportsmen's voice for our wild public lands, waters and wildlife"
www.backcountryhunters.org

October 29, 2016
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401

BLM_0156597

Comments on the Draft RMP/EIS for the Uncompahgre Field Office

Submitted by:
Craig Grother
P.O. Box 156
Norwood, CO. 81423
(970) 327-4850

Representing: Backcountry Hunters and Anglers

Thank you for the opportunity to comment on the Draft Resource Management Plan and Environmental Impact Statement (Draft RMP/EIS) for the Uncompahgre Field Office (UFO). I am a resident of Norwood Colorado and have lived and worked in the area since 1989. I have worked as a wildlife biologist for the US Forest Service for 33 years on various Ranger Districts in Idaho, Nevada, and Colorado. For the last 20 years of my career I was the wildlife biologist for the Norwood and Ouray Ranger Districts of the GMUG National Forest. During that time I was able to work with various staff members of the UFO on cooperative wildlife habitat improvement projects through programs and initiatives such as the Habitat Partnership Program and the Uncompahgre Plateau Project.

I am submitting my comments on behalf of the Colorado Chapter of the Backcountry Hunters and Anglers. I represent our State Chapter as the Habitat Watchman for the Uncompahgre and as the Regional Director for the Central Western Slope. Backcountry Hunters and Anglers is a grass roots organization of sportsmen and women who strongly believe in the principals of the North American Wildlife Conservation Model and the value of our public lands for fish and wildlife habitat and the traditional fishing and hunting opportunities that are available to all sportsmen. As a group of sportsmen, we are highly dependent upon our public lands to support the fish and wildlife species we all enjoy. We believe in the conservation and management of fish and wildlife habitats on our public lands, and in providing undisturbed backcountry areas for fish and wildlife and the opportunity for traditional methods of hunting and fishing that challenge us physically and mentally and emphasize the principals of fair chase.

Our membership can also be characterized as families who enjoy undistructed backcountry for reasons other than hunting and fishing. We cherish the opportunity to venture into areas free of the noise and activity of OHV's and bicycles to enjoy the peace and solitude of the outdoors with our friends and family on river trips, day hikes, backpacking trips, and horse pack trips. We also strongly feel that these opportunities should not only be available to us now but to our future generations as well.

Although I have reviewed much of the Draft EIS and Supporting Documents for this RMP, my comments are focused on those Appendices which are of primary concern to Backcountry Hunters and Anglers. I would appreciate any opportunity to discuss these comments with you and BLM staff working on this revision.

<([#1 [14.1.3] Appendix G – Best Management Practices and Standard Operating Procedures

There have been several wildlife habitat improvement projects implemented on the UFO to enhance winter range for big game. Several of those projects were developed and implemented in cooperation with the US Forest Service and Colorado Parks and Wildlife. The primary objective of these projects was to enhance existing winter range conditions and encourage elk and mule deer to utilize traditional winter ranges on public lands by improving winter forage and browse condition and production. These projects in combination with wildfire rehab efforts were largely successful in meeting these objectives.

During that time the Uncompahgre National Forest also developed and implemented a forest-wide travel management plan which includes specific direction and actions to further encourage big game use of these winter ranges through an active program of reducing open road and trail densities through route decommissioning and seasonally closing big game winter range areas to all forms of motorized and mechanized travel from December 1 through April 15. In combination, these efforts have had a significant effect on seasonal use patterns and distribution of big game.

While the BLM did implement the vegetation projects, there has not been an equal effort to reclaim or manage the existing roads, trails, or fire lines within these areas, or to control use by the public. This was largely due to the lack of direction in the current RMP, or a comprehensive travel management plan for the UFO. The effectiveness of the vegetation treatments for big game on BLM lands has been reduced by this lack of travel management. Over the years of implementing these projects and suppressing and rehabbing wildfires, there has been a steady progression and increase in open road and OHV trail densities which are having a significant impact upon big game habitat effectiveness.

The UFO has made the decision to approach travel management on a watershed or implementation-level scale. There is a lot of merit to this approach, but there needs to be stronger direction and guidance in the RMP to prevent cumulative effects to wildlife habitat and our remaining unroaded landscapes. As one recent example, a travel management plan was developed for the Burn Canyon area south of Norwood. The final decision intends to provide a mix of recreation opportunities for hiking/horseback, bicycle, and OHV recreation. The Burn Canyon area is located within one of the most heavily used big game winter ranges of the San Miguel watershed. The decision includes seasonal use restrictions on the BLM roads and trails to mitigate impacts to wintering big game. Unfortunately, use within the project areas has not gone according to plan. Bicycles continue to use the horse & foot use only trails in McKee Draw. Access to BLM lands is provided by a system of county roads which the BLM has no jurisdiction over. People are using any and all of the trails whenever they physically can, regardless of their seasonal restriction or use designation. The area attracts more use now that trail systems have been formally developed, and the impacts to big game have increased as a result of the project. #1])>

The following comments are specific to some of the resources area BMP's and SOP's included in Appendix G that I believe are necessary to provide direction in the RMP.

<([#2 [34.5] Vegetation – General and Upland

Retain the following direction to meet landscape objectives and enhance success of treatments:

* Limit authorized use levels and activities where needed to allow vegetation to recover from fire, drought, disease and insect outbreaks
* Incorporate strategies in grazing plans which manage fuel build up to enhance natural fire use.
* Defer vegetation disturbing activities during severe or extreme drought to allow for vegetation recovery.
* On a landscape scale, maintain a diversity of age classes. Any 100 square mile patch of pinyon-juniper should encompass the full range of seral stages. Preferentially achieve diversity by actions in younger age classes rather than reductions of older stands.
* To benefit species sensitive to habitat fragmentation, maintain unroaded stands or patches no less than 1.2 square miles in size.
* Maintain connectivity between stands of pinyon-juniper, sagebrush, and ponderosa pine by preserving corridors of similar vegetation.
* Reclaim unused or undesired roadbeds in pinyon-juniper woodland, salt desert shrub, and ponderosa pine.
* Place high requirements for justifying creation or retention of roads (or other linear features that fragment the habitat) in sagebrush. Reclaim unused or undesired roadbeds in sagebrush land cover types.
#2])>
<([#3 [23.1] Wildlife – Terrestrial

Retain the following direction to improve habitat effectiveness:

* In all habitat improvements and manipulations, and maintenance of those areas, including projects designed to improve livestock grazing, reduce fuel loading, or otherwise, consider the habitat requirements of native wildlife communities, game and non-game alike, and acknowledge the ecological tradeoffs.
* During severe or extreme drought years, to the extent possible, assure that some pastures retain the maximum herb cover (even standing dead material) possible for ground-nesting birds.

Modify or add the following direction to improve habitat effectiveness:

* "Where winter range areas are not protected by lease stipulations, operations such as construction, drilling, completion, work-overs and other intensive activities will be avoided from January 1 to March 1 to minimize impacts to wintering big game." Modify this direction to include seasonal closures on public recreation use to avoid impacts to wintering big game, and change the dates to December 1 through March 1. These dates encompass the winter season for big game animals, and would be more consistent with seasonal closures on adjacent National Forest lands.
* Manage big game winter ranges to provide habitat conditions and seclusion that will encourage use of public lands by elk and mule deer. #3])>

<([#4 [23.1] Livestock Grazing

Retain the following direction to meet landscape objectives and enhance success of treatments:

* Grazing will be deferred on new vegetation treatments and rehabilitated burned areas to the extent necessary to comply with BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997).
* Seasonal utilization levels on palatable forage species should not exceed 50 percent unless required to meet specific range management objectives as identified in an allotment management plan or other activity plan.
* During any time of the year, livestock use shall not exceed an average of 30 percent on native woody vegetation in riparian areas unless required to meet specific range or riparian management objectives as identified in an allotment management plan or other activity plan.
* Develop rotational grazing strategies, incorporating rest, deferment, and/or other grazing methods to improve rangeland health. All developed strategies that are not during dormant periods should ensure livestock grazing does not occur in the same location during the same time period in any two consecutive years.
#4])>
<([#5 [32.5] Comprehensive Trails and Travel Management

Appendix G currently lacks any direction specific to wildlife. The following direction should be added to improve habitat effectiveness:

* Recreational trail systems will not be developed in areas identified as big game winter concentration areas, severe winter range, or critical winter range.
* All proposals for the establishment, modification, and funding of recreational trails will be reviewed by local District Wildlife Managers and Biologists with Colorado Parks and Wildlife prior to BLM proceeding with implementation.
* Where effective, the use of seasonal route and/or area restrictions will be in effect from December 1 through March 1 regardless of current weather and snow conditions.
* The analysis of OHV and bicycle trail system proposals will include identification of open road and trail densities and the potential impacts of the alternatives on habitat effectiveness.
* The implementation of travel management plans will include corresponding measures and funding to decommission roads and user-developed routes concurrently with trail development.
#5])>
<([#6 [20.1] Appendix F - Lands with wilderness characteristics

The Draft RMP/EIS identifies a total of eight areas that meet the qualifications for lands with wilderness characteristics. Lands that qualify for this designation are of primary interest to Backcountry Hunters and Anglers. They can provide essential habitat and security for wildlife and fish as well as high quality backcountry hunting and fishing opportunities. In reviewing the analysis and management alternatives for these areas in the Draft RMP/EIS, it is apparent that the BLM recognizes that several of these areas have been severely impacted by roads and trails used for past mining and energy development, utilities, livestock grazing, and OHV use. We are adamant that the remaining areas that retain their wilderness character be protected from further energy and recreation development and emphasized for the improvement of land health objectives and habitat for terrestrial wildlife.

The Camel Back WSA Adjacent area includes a total of 8,700 acres of BLM lands that include

Monitor and Potter Canyons as well as most of the Monitor Mesa area in between. According to the BLM's analysis, at least 6,950 acres still retain their wilderness character. In combination with the Camel Back WSA and adjacent National Forest lands, this area represents some of the best remaining roadless and backcountry habitat on this portion of the Uncompahgre Plateau. It provides high quality habitat for a population of desert bighorn sheep as well as winter range for elk and mule deer. Management of the Camel Back area should emphasize the retention and enhancement of its roadless character and wildlife habitat. The RMP should acknowledge the resource values of this landscape for wildlife and its primitive backcountry character, and develop a management prescription that is specific to these values. As a minimum, the RMP should specify that there will not be any motorized or mechanized trail development within this area. It should also specify that vegetation treatments will be utilized and livestock grazing will be managed to maintain or improve land health objectives while providing residual forage for big game. The RMP should also specify that domestic sheep grazing will only be authorized and managed to achieve no contact between domestic sheep and desert bighorn to prevent disease transmission.

The Lower Tabeguache/Campbell Creek area includes 11,060 acres of BLM lands that include Long Mesa, Burro Creek Mesa, Wild Cow Mesa, and Spring Creek Mesa. This area represents another large block of unroaded backcountry habitat that has escaped the development associated with past uranium mining on this portion of the Uncompahgre Plateau. This portion of the Uncompahgre Plateau also contains high quality big game winter range and important security from the disturbance of roads and OHV trails. In order to retain and improve habitat for elk and mule deer, and encourage them to remain on public lands during the winter months, the RMP should include specific direction for this area that will prohibit any development of motorized and mechanized trails. Some attempts by the BLM and Forest Service have been made to allow OHV and bicycle trail development within big game winter range while mitigating impacts to wildlife through the use of seasonal closures. Unfortunately this has not prevented use of these trail systems by the public. If the conditions on the ground are favorable, people use the roads and trails regardless of the seasonal closure. The agencies do not have the law enforcement presence capable of ensuring compliance. It is far better to not create a trail system in these areas in the first place.

Shavano Creek includes 6,090 acres of BLM lands in the upper Campbell Creek and West Campbell Creek adjacent to the north side of the Tabeguache SMA. In combination with the adjacent National Forest lands, this area provides a significant roadless area on this portion of the Uncompahgre Plateau. The Upper Campbell Creek drainage of the BLM would increase the size of this area if it were not for a county road (U472) going to a stock pond development, presumably for maintenance of this pond. Other user-developed OHV trails have been created off county road 226 in to Shavano Creek. Much of this area burned in the Campbell Creek wildfire of 2004 which significantly enhanced habitat conditions on big game winter range, creating a large winter concentration area. The RMP should acknowledge the resource values of this area for wildlife and its primitive backcountry character, and develop a management prescription that is specific to these values. As a minimum, the RMP should specify that there will not be any motorized or mechanized trail development within this area, and implement an aggressive decommissioning program to eliminate the user-developed OHV trails. It should also specify that vegetation treatments will be utilized and livestock grazing will be managed to

maintain or improve land health objectives while providing residual forage for big game. Implementing these management standards would encourage elk and mule deer to remain on preferred habitats on public lands and reduce game damage occurring to adjacent private lands in and around Nucla.

Norwood Canyon contains 5,600 acres of BLM lands along the San Miguel River between Norwood Bridge and Pinyon Bridge. This part of the San Miguel River canyon provides river rafting, kayaking, and fishing opportunities that are not adjacent to the noise and activities of highway 145 or 141. River recreation and fishing activities are far less than the section above Norwood Bridge so the area provides opportunities for more solitude and quiet use. There are currently at least two ways to legally hike into the Norwood Canyon to gain fishing access. Both access routes are not official "government" trails which further limits activity in this area and provides a high quality backcountry fishing experience. This situation needs to be maintained by the BLM and the RMP should specify that there will not be any trail development or OHV/bicycle use into or within the Norwood Canyon. Access on the BLM would continue to be provided by boat and/or hiking the old road on the north side of the river which goes around the Cascabel Ranch private land.
#6])>
<([#7 [32.3] Appendix J – Recreation Management Areas

Appendix J provides a series of tables that outlines goals and objectives for various Recreation Management Areas on BLM lands under various alternatives. Some of the RMA's include the entire range of alternatives in the Draft EIS, while others do not. Presumably the areas that do not include a range of alternatives already have a recently approved travel management plan in place (such as Burn Canyon, Ridgway, Dry Creek).

One of the primary concerns we have with increased trail development for OHV's and bicycles on BLM lands is where this development is occurring, and the level to which it is being developed. Most big game winter range occurs in the lower elevation valleys and foothills, and extends upward in elevation on the drier south and west facing slopes. Much of the habitat for big game and other species that occurs in the valleys is now developed for our towns and housing in the rural areas surrounding these towns, or for agricultural production. As a result, extensive areas of winter habitat have been lost to this development and its associated roads, traffic, and other human activities. This has generally displaced big game to higher elevation winter ranges on the foothills and mesas of the adjacent public lands. With our increase in human population there is also a tremendous increase in recreation on the adjacent public lands and pressure on the BLM to build and/or authorize more and more OHV and bicycle trails to accommodate this use. Once a few trails are established, other user-developed trails appear and additional proposals from user-groups come to the BLM for even more trails that reach farther and farther into areas that have provided big game winter range. The result has been a dramatic increase in the displacement of wildlife off their limited winter range areas and a subsequent decline in the health and productivity of our big game herds.

This RMP provides an opportunity for the BLM to define which areas are critical for wildlife and should not be developed for recreational use, and which areas can be developed for recreation while still protecting other resource values. We strongly feel that the BLM should provide this

direction in the RMP instead of continuing to react to proposals from user-groups that are only focused on their own goals and activities.

In general, we support the efforts to manage use of the most popular destinations by providing good maps, access to the trailheads, and education for the users of those areas. However, we are very concerned that there are no Management Actions or Allowable Use Decisions for fish or wildlife in any proposed RMA's, and request that the BLM include this direction in the Final RMP. The following are some specific comments on a few of the proposed RMA's.

Burn Canyon SRMA. A travel management plan was recently developed for this SRMA and projects are currently being implemented within the planning area. As previously stated, the Burn Canyon area is located within one of the most heavily used big game winter ranges of the San Miguel watershed. The decision includes seasonal use restrictions on the BLM roads and trails to mitigate impacts to wintering big game. Unfortunately, use within the project areas has not gone according to plan. Bicycles continue to use the horse & foot use only trails in McKee Draw. Access to BLM lands is provided by a system of county roads which the BLM has no jurisdiction over. People are using any and all of the trails whenever they physically can, regardless of their seasonal restriction or use designation. The area attracts more use now that trail systems have been formally developed, and the impacts to big game have increased as a result of the project.

The BLM promised in its decision to monitor use of the area and apply adaptive management to further actions. The main lessons that should be learned from here is that 1) seasonal restrictions to protect big game winter range are ineffective when the BLM has no jurisdiction over primary access roads managed by the county, 2) overall use of the area increases substantially after becoming a designated RMA, 3) people do not comply with allowable trail use designations, 4) the UFO does not have the resources to monitor and enforce compliance with established regulations for recreational use.

Dolores River Canyon SRMA. We agree entirely with the management goals and objectives for this SRMA. We are also aware of several user-developed OHV trails in the area that access the south rim of the Dolores River canyon, as well as go all the way into the bottom of the Dolores River canyon from Sylvia's Pocket. Appendix J should also include direction to obliterate these trails to restore the primitive nature of this Canyon.

Dry Creek SRMA. Management emphasis within this area is primarily for a variety of motorized and mechanized recreation, both trail based and off-trail rock crawling. The matrix in Appendix J does not have any mitigation measures for wildlife. There are substantial areas of big game winter range within this SRMA and there is currently a proposal to construct another 50 miles of mountain bike trails. As stated above, we are concerned with the continued loss of big game winter range to recreation development and the additional trail development proposed in this area would result in an extreme density of trails and associated disturbance. The BLM needs to develop and include a standard for open route density to alleviate these impacts. Similar to Burn Canyon, we believe that the presence of county roads and the ineffectiveness of a seasonal closure (if there is one) would not adequately minimize harassment of wildlife or significant disruption of wildlife habitat.

Paradox Valley SRMA. Zone 3 of this SRMA includes a substantial amount of area that should be included in the Zone 4 management strategy. Any plans to provide OHV and bicycle trail riding in this area should be limited to existing roads that are managed by the county or that are roads that remain from previous mining activity that are somewhat used and maintained, and would create a logical and safe trail system. Much of the area near the rim of the Paradox Valley and Dolores River canyon is very primitive in nature, and should be left available for dispersed hiking, hunting, and exploring. Appendix J only includes one alternative, and the BLM should at least consider and analyze an alternative that retains and enhances the primitive nature of this area for wildlife habitat and undeveloped, dispersed uses.

San Miguel River SRMA. The San Miguel River is the most significant fishery in the west end of the UFO and provides other river based recreation opportunities such as rafting and kayaking. The UFO has done an excellent job in providing river access and overnight camping facilities on this portion of the San Miguel. The San Miguel River above the Cascabel Ranch is also adjacent to public highways and county roads which provide unlimited public access to the river for fishing. We are opposed to any trail development into the Norwood Canyon below the Cascabel Ranch. This area is already accessible on foot, and provides an excellent opportunity for more solitude and quiet use. We also oppose any plans to develop trails into the Beaver Creek and Saltado Creek Canyons, which is compatible with the recreation strategy for zone 2. These two major tributary canyons also provide excellent opportunities for solitude and backcountry hunting or fishing experiences adjacent to the main river corridor.
#7])>
<([#8 [14.1.5] [23.1] [14.1.1] Appendix K – Bighorn/Domestic Sheep Risk of Association Modeling

Rocky Mountain and desert bighorn sheep represent one of the premier backcountry hunts available in Colorado, and are of very high interest to us in the BHA. We are extremely concerned about the health and productivity of our limited bighorn sheep herds. There is an abundance of research and anecdotal evidence to undeniably support the devastating effects of disease transmission between wild and domestic sheep. To prevent this disaster from occurring, the only certain method to avoid disease transmission is to prevent contact between wild and domestic sheep.

We appreciate the efforts the BLM and CPW has taken to utilize both the PoI and RoC Risk Assessment Models to evaluate and compare the results for potential risk of contact between wild and domestic sheep within the UFO. Although we are skeptical of the assumptions utilized in the local PoI model, we do feel that it adds some perspective to the planning-level analysis when compared to the results of the national RoC model. When the results of both models are examined, it is very apparent that there are allotments where domestic sheep grazing is authorized directly within and adjacent to existing populations of bighorn sheep, and the BLM needs to take action to eliminate this threat to bighorn sheep. Based upon the current science and professional experience and judgement of range and wildlife managers, we believe the only effective way to achieve this is to prevent physical contact between wild and domestic sheep. Domestic sheep herd management practices and mitigation measures included in Appendix K have been short term and marginally effective at preventing contact.

The RMP should use the results of the analysis presented in Appendix K to determine the suitability of existing grazing allotments for domestic sheep grazing. The risk of contact should preclude other suitability criteria such as historic/current use, terrain, forage type, etc. We believe this is a planning-level decision that is appropriate and missing from the current Draft RMP/EIS. In addition to a suitability determination, there should be specific direction to remove domestic sheep from allotments that have potential for contact, and that there will be no conversion of class of livestock from cattle to sheep where there is any potential for contact with bighorn.

Implementation of the decisions within the final RMP would occur through subsequent updates and revisions of allotment management plans. Those updates and revisions should occur in a timely (5 years) fashion and be based upon the suitability determinations in the RMP with input from the CPW and the public. This could be achieved through the development of an implementation plan for allotment management plans and permit actions. #8])>

<([#9 [14.1.3] Appendix M – Travel Management

The RMP will determine planning level decisions for the UFO, such as which areas are open, closed, or limited to OHV and bicycle use, and which types of uses will be emphasized within those broad allocations (Recreation Management Areas – Appendix J). We believe the BLM should strive to provide a balance in those allocations, and to recognize the values we place on providing large blocks of undisturbed habitat for fish and wildlife and the opportunity for traditional methods of hunting and fishing in the backcountry. That balance would include a priority for the retention and enhancement of lands with wilderness characteristics and/or lands with low densities of open routes, lands that currently provide seasonally important big game habitat and migration corridors, and lands adjacent to communities surrounding the UFO that will provide opportunities for quiet use and solitude.

Appendix M includes a description of the process and criteria that will be considered by the BLM when evaluating routes within area-specific travel management plans during implementation of the RMP. Within Appendix M we would like to see the BLM include additional management goals and objectives for big game habitat capability and effectiveness. We strongly fell there is a need for additional consideration and recognition of the impacts of motorized and mechanized recreation use upon big game distribution, productivity, vulnerability, and population structure, as well as hunter success in relation to open road/trail density on the landscape. There is a large and growing body of research available that needs to be recognized and implemented by the BLM. We have posted several of the most relevant research studies on our website at backcountryhunters.org:

Literature Reviews of OHV Impacts on Hunting, Fishing and Habitat:

1. ATV Impacts on the Landscape and Wildlife [] (2011). A white paper by BHA which provides a synthesis of OHV-related articles in three sections focused on the effects of ATV use on: 1) soils, water quality and vegetation 2) wildlife (primarily elk) 3) the habitat and environment that wildlife depend upon.

https://d3n8a8pro7vhmx.cloudfront.net/backcountryhunters/pages/2374/attachments/original/145 5919275/ORV_WHITE_PAPER.pdf?1455919275

2. Off Road Vehicle Impacts on Hunting and Fishing. An excellent illustrated literature review by the Isaac Walton League highlighting the impacts that off road vehicle use has on our sporting heritage. http://www.recpro.org/assets/Library/Trails/collision_course_ohv_report_2007.pdf

3. Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands (2007). A synthesis of literature compiled by the Department of Interior. https://pubs.usgs.gov/of/2007/1353/report.pdf

4. The Effects of Off-Road Vehicles on Ecosystems. A research review by Texas Parks and Wildlife. https://tpwd.texas.gov/publications/pwdpubs/media/pwd_rp_t3200_1081.pdf

5. Effects of Roads on Elk: Implication for Management in Forested Ecosystems (2005). Research which builds on a large body of research demonstrating the impacts of roads on elk behavior and habitat. http://www.emwh.org/pdf/elk/Effects%20of%20Roads%20on%20Elk%20Implications%20for% 20Management%20in%20Forested%20Ecosystems%202005.pdf

6. Behavioral Responses of North American Elk to Recreational Activity (2008). A study which found that "activities of elk can be substantially affected by off-road recreation. Mitigating these effects may be appropriate where elk are a management priority. Balancing management of species like elk with off-road recreation will become increasingly important as off-road recreational uses continue to increase on public lands in North America." http://www.bioone.org/doi/abs/10.2193/2008-102

7. Reproductive Success of Elk Following Disturbance Following Disturbance by Humans During Calving Season (2011). A study which shows that cow/calf ratios decease when disturbance increases and therefore "maintaining disturbance-free areas for elk during parturitional periods" is necessary. https://www.jstor.org/stable/3803250?seq=1#page_scan_tab_contents

There are additional Goals and Objectives and the associated Actions that relate to open road/trail densities, the impacts of bicycle trails and use, and the conservation of our existing backcountry areas that I request the BLM to include in Appendix M to guide implementation of travel management on the UFO. These additional Goals, Objectives, and Actions will also enable the BLM to fully comply with 43CFR 8342.1 b) Areas and trails will be located to minimize harassment of wildlife or significant disruption of wildlife habitat, and c) Areas and trails will be located to minimize conflicts between OHV's and other uses.

Goal/Objective – Locate and manage OHV and mechanized routes and trails to minimize harassment of wildlife or significant disruption of wildlife habitat.

Action #1 – Limit and reduce motorized and mechanized routes and trails in areas managed for mixed uses. Implement road and trail density standards within these areas that are favorable to

BLM_0156607

big game habitat requirements as defined in current scientific research.

Action #2 – Motorized and mechanized routes and trails will avoid lands managed for wilderness characteristics, critical wildlife areas, and wildlife emphasis areas.

Action #3 – No motorized off-route down game retrieval will be allowed anywhere within the UFO.

Action #4 – Seasonal closures to protect big game winter range will include snowmobiles.

Action #5 – Routes designated for administrative use within all mixed use areas, lands managed for wilderness characteristics, critical wildlife areas, and wildlife emphasis areas will be closed to public OHV and bicycle use yearlong.
#9])>
<([#10 [9.1] Appendix O - Areas of Critical Environmental Concern

The Draft RMP/EIS includes analysis of several potential ACEC's that demonstrate the exceptional biological and environmental resource values of several areas within the UFO (Appendix O). We at Backcountry Hunters and Anglers support the designation of ACEC's for the Roubideau-Potter-Monitor, San Miguel River Expansion, and Dolores River-Slickrock Canyon areas of the UFO. The Draft RMP/EIS does not appear to contain integrated resource management direction under any alternative that would fully protect these resource values. Designation of these ACEC's does not preclude livestock grazing, mining, energy development, utility corridors, or recreation emphasis designations such as SMRA or ERMA. The designation of these ACEC's should provide further emphasis in the RMP to manage these areas for their unique character and biological resources and substantially reduce and limit impacts to these values from recreation, livestock grazing, and energy development.

The Roubideau-Potter-Monitor and Dolores-Slickrock Canyon ACEC's provide crucial habitat for existing populations of desert bighorn sheep. It is essential that the RMP include clear direction for both wildlife and livestock grazing resources to emphasize the perpetuation of healthy populations of desert bighorn sheep within these ACEC's and any other occupied habitat areas within the UFO through active vegetation management and the elimination of any potential contact between wild and domestic sheep. The BLM must utilize the most current science-based information and nationally accepted analysis methods to determine potential contact between wild and domestic sheep on these landscapes, and implement permit actions to resolve the issues associated with disease transmission to these populations. The RMP should include specific direction to subsequently develop an implementation plan to resolve the conflicts identified in the EIS through permit actions and/or updated allotment management plans within a five year time period.

Both of these ACEC's also provide critical big game winter range and security areas for elk and mule deer. The RMP should include clear direction for wildlife, vegetation, and livestock grazing resources to manage vegetation to provide habitat conditions favorable to big game, and to manage livestock grazing use in these areas to provide abundant residual forage for wildlife. The management prescriptions for recreation included in Appendix J do not adequately address

mitigation of the potential impacts of current and future OHV and bicycle use or development within big game winter ranges. As I stated previously, attempts have been made to allow by the BLM and Forest Service to allow OHV and bicycle trail development within big game winter range while mitigating impacts to wildlife through the use of seasonal closures. Unfortunately this has not prevented use of these trail systems by the public and the impacts from these activities continue to degrade habitat quality and displace big game from preferred wintering areas. If the conditions on the ground are favorable, people use the roads and trails regardless of a seasonal closure. The agencies do not have the law enforcement presence capable of ensuring compliance. It is far better to not create a trail system in these areas in the first place. Recreation strategies within Appendix J also need to include no motorized or mechanized use in these important wildlife areas. If there are user-developed routes already in place within these areas, the RMP should also include direction to actively decommission those routes to prevent continued disturbance to wildlife and restore habitat effectiveness.

We also support designation of the San Miguel River ACEC. It would expand the current ACEC to a total of 35,480 acres, and include the entire river corridor as well as the major tributaries. The San Miguel River is the most significant fishery in the west end of the UFO and provides other river based recreation opportunities such as rafting and kayaking. The UFO has done an excellent job in providing river access and overnight camping facilities on this portion of the San Miguel. The San Miguel River above the Cascabel Ranch is also adjacent to public highways and county roads which provide unlimited public access to the river for fishing. As previously stated, we are opposed to any trail development into the Norwood Canyon below the Cascabel Ranch. This area is already accessible on foot, and provides an excellent opportunity for more solitude and quiet use. We also oppose any plans to develop trails into the Beaver Creek and Saltado Creek Canyons. These two major tributary canyons also provide excellent opportunities for solitude and backcountry hunting or fishing experiences adjacent to the main river corridor. #10])>

000515_RobinsonB_20161101_GunnisonEnergy Organization: Gunnison Energy, Brad Robinson
Received: 11/1/2016 12:00:00 AM
Commenter1: Brad Robinson - Denver, Colorado 80202 (United States)
Organization1:Gunnison Energy
Commenter Type: Private Industry
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000515_RobinsonB_20161101.htm
(000515_RobinsonB_20161101_GunnisonEnergy-381189.htm Size = 3 KB)
Submission Text
Brad Robinson <Brad.Robinson@oxbow.com> Tue, Nov 1, 2016 at 3:39 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Please see the attached comments to the Uncompahgre Field Office Draft Resource

Management Plan.
Thank you.
Gunnison Energy LLC Comments to Resource Management Plan 103116.pdf
1140K

GUNNISON ENERGY LLC
AN OXBOW COMPANY
Delivered via Overnight Currier and E-Mail
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan
Dear Project Manager:
October 31, 2016

Gunnison Energy LLC ("Gunnison") is an independent, privately owned natural gas exploration and production company doing business primarily in Gunnison, Delta and Mesa Counties of Colorado. Gunnison has been actively engaged in natural gas exploration and production in the area for almost fifteen years and is one of the largest oil and gas operators in the area. Gunnison hereby submits its comments to the Uncompahgre Field Office Draft Resource Management Plan and related environmental impact statement (the "Draft RMP").
Gunnison has reviewed the comments to the Draft RMP submitted by Mesa County, Montrose County and the Western Energy Alliance. Gunnison endorses the comments made by these entities and for the sake of brevity will not relist those comments.
<([#1 [21.1] Gunnison asks that the Preferred Alternative be rejected . Specifically, this alternative lacks flexibility and attempts to make vast areas closed to all minerals extraction and oil and gas development. The over use of no surface occupancy and other onerous stipulations is a not so vailed attempt to merely ban all future oil and gas activity in the area.
The area in question has been the site of oil and gas development for more than fifty years. During this time, there has never been a significant adverse event or impact to the area. The current oil and gas operators in the area have demonstrated a responsible approach to development. This responsible development can continue in harmony with land other uses. #1])>
Thank you and I urge the BLM to reconsider its proposed action.

Yours very truly,
M. Brad Robinson
President
Gunnison Energy LLC
1801 Broadway, Suite 1200 ·Denver, CO 80202 ·Main: (303) 296-4222 ·Fax: (303) 296-4555
BLM Uncompahgre Field Office
October 31, 2016

CC: Senator Cory Gardner
Senator Michael Bennet
Congressman Scott Tipton

BLM_0156610

Delta County Board of County Commissioners
Gunnison County Board of County Commissioners
Mesa County Board of County Commissioners
1801 Broadway,

000516_HukekH_20161101  Organization: Heidi Hudek
Received: 11/1/2016 12:00:00 AM
Commenter1: Heidi Hudek - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000516_HukekH_20161101.htm (000516_HukekH_20161101-387988.htm  Size =
7 KB)
UFORMP_000516_HudekH_20161101.pdf (000516_HukekH_20161101-387987.pdf  Size =
174 KB)
Submission Text
Date:11/01/2016

Commenter: Heidi Hudek

Organization:

Email:vistaverve@gmail.com

Address:

Phone:

Comment:
I am a resident of Paonia, Colorado. I choose to live here because it is a healthy environment to
raise my son; quite, entertaining, and beautiful, with a plethora of fresh food, clean air, and
outdoor recreation.

I am deeply concerned about the BLM proposal to lease much of our North Fork Valley BLM
lands to Oil and Gas development. This development would threaten our clean drinking and
irrigation water, and our recreational activities. I am a single mother with three jobs, and I
choose this so I may live in this beautiful, healthy place. I am taking a lot of time (not easy to
allocate) to research and write to you because the health of our valley and my son is of vital
importance to me. I am writing today in favor of a No Lease Alternative to the BLM Resource
Management Plan for the North Fork Valley. A No Lease Alternative is the responsible and most
appropriate option for the culture and health of our valley.

BLM_0156611

There are many studies and incidents that prove that the industry causes health threats. The New York State Department of Health released "A Public Health Review of High Volume Hydraulic Fracturing for Shale and Gas Development" in December 2014. It found that residents living near "fracking" activities had the following health problems: skin rash, nausea or vomiting, abdominal pain, breathing difficulty, cough, nosebleed, anxiety, stress, headache, and eye and throat irritation. The study led to recommending that "fracking" be banned in New York State. Concerned Health Professionals of New York and Physicians for Social Responsibility cited a number of studies in "The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction)." One was a study in rural Colorado stating that there are several chemicals emitted by natural gas development known to increase risk of birth defects, and finding congenital heart defects and neural tube defects in births mothers living within a 10 mile radius of natural gas wells. (pg 76) Health Professionals in Vernal, UT reported a 6-fold increase in infant death rates in a three year period, and the air quality in Uintah County, UT - which was formerly pristine - received an "F" rating by the American Lung Association's 2-13 State of the Air Report.

<([#1 [37.2] The current clean water we have is necessary for the organic foods I choose to buy locally. While developing a Resource Management Plan, the BLM is required to honor Source Water Protection Plans, as were developed by the Towns of Paonia, Crawford, and Hotchkiss. These Protection Plans were not taken in consideration by the BLM for its Preferred Alternative. Please consider these plans. #1])>

<([#2 [37.3] Please also consider the permanent removal of water required to support the drilling process. Our hydrologic cycle and the water needs down the flow would be greatly damaged if the amount of water needed for the potential development of the Preferred Alternative were taken from our environment - an environment which is more often troubled by drought. #2])>

<([#3 [37.2] Drinking and irrigation water sources have been contaminated by naturally occurring gasses and radioactive materials released by geologic disturbance, processing chemicals, leaks, spills, and airborne contaminants. According to the Center for Western Priorities, 2015 Colorado Oil and Gas Toxic Release Tracker, there were 615 spills in Colorado in 2015! Colorado does not have regulations in place to manage radioactive waste from oil and gas operations, and these operations are exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our water resources. Please take the time to analyze the risks of exposure to these chemicals and radioactive waste. #3])>

<([#4 [41.1] Please also consider pipeline safety. Rural gas gathering lines are exempt from Federal pipeline safety regulations. Extreme weather causing flash floods, mudslides and geologic instability can cause damage to pipelines that has yet to be considered in our safety. From 2003 to 2013 there were 85 incidences in which storms or other natural conditions damaged pipelines resulting in failure. In 1994 flooding in the San Jacinto River led to the failure of eight hazardous liquid pipelines. The escaping liquid ignited, lead to injuries of 547 people #4])> .

These are just some of many examples as to the importance of considering the safety of residents

and our water. Please take these studies, lack of regulation, and our health into consideration.

Our health also relies on the outdoor recreation we enjoy. My 10 year old son and I have explored and learned about different environments including bugs in the North Fork of the Gunnison River, plants on the 'dobies southwest of Bone Mesa, geology on Lone Cabin Road, and many more. The learning opportunities in these many environments has been enlightening and fun.

The North Fork community has put great effort and our souls into developing a trail system for hiking, trail running, and mountain biking on Jumbo Mountain. While I enjoy the hiking, he is learning to mountain bike - a good choice to occupy his time, giving him freedom and responsibility. <([#5 27.1] Please designate BLM lands on and surrounding Jumbo Mountain as a Special Recreation Management Area, and include Elephant Hill, Lone Cabin Rd, McDonald Creek, and C hill #5])> - where my son's school takes regular hikes, learning about plants, animals, and geology.

I implore you, as a mother concerned with my child's health and our vital recreational activities, to consider all I have taken time to write about today. A No Leasing Alternative is the most responsible way to protect the North Fork Valley. However, the next best compromise is the North Fork Alternative (B1) because it requires that areas chosen for development be set back from agricultural lands, and best preserves the rural culture of the area. It also does the best to protect rivers and watersheds, trail areas, Jumbo Mountain area, and the outskirts of the West Elk Wilderness. If we must have a compromise, please include all proposed actions in the North Fork Alternative, B1, in the final RMP.

I am interested in your response and being informed of ways I may help the UFO in their conclusions and maintenance of our public lands. Please send a reply and keep me informed of available opportunities.

Thank you for your time and consideration.

Heidi Hudek


000517_JonesD_20161029  Organization:  David Jones
Received: 10/29/2016  12:00:00  AM
Commenter1: David Jones - Ridgway, Colorado 81432 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison  10/29/2016  12:00:00  AM
Attachments: 000517_JonesD_20161029.htm  (000517_JonesD_20161029-387989.htm  Size = 4 KB)

UFORMP_000517_ JonesD_20161029.pdf (000517_JonesD_20161029-387990.pdf Size = 291 KB)
Submission Text
Date:10/29/2016

Commenter:David Jones

Organization:

Email:drdjjc@gmail.com

Address:700 Sabeta Drive, Ridgway, CO 81432

Phone:

Comment:
I am writing concerning BLM's recently released Draft Resource Management Plan and Environmental
Impact Statement for the Uncompahgre Field Office, which includes Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties in southwestern Colorado.

This letter details why I am totally opposed to oil and gas leasing on public lands in the North Fork Valley. The North Fork Valley, famed for its orchards and vineyards, is home to the largest concentration of organic farms in Colorado. It is home to thriving communities, a Creative Cultural District, and the surrounding areas provide great fishing, hunting, and other outdoor recreation. The heart and soul of these growing communities is based on their clean water, clean air, and beautiful natural setting.

My wife and I travel to the North Fork Valley often to pick apples and peaches and to visit the towns and vineyards. We are canoeing tomorrow on the beautiful Gunnison River with six friends. The only way to prevent irreparable harm to this special area is to close off BLM lands and minerals in the area to oil and gas leasing. (At a minimum the BLM should impose a moratorium on oil and gas leasing and development until rural gas gathering pipelines are subject to federal pipeline safety regulations. As long as operators are not subject to the Pipeline Hazardous Materials and Safety Administration regulations on rural gas gathering pipelines, they are allowed to use public lands to put the public and the environment at even higher risk of leaks, spills, and explosions. This is unacceptable.)

The U.S. has committed to a clean energy future, and most Colorado citizens fully support that change. Colorado is a tremendous site for generating clean energy, and the North Fork Valley has long been at the forefront of that effort. Paonia-based Solar Energy International (SEI), now in its third decade, provides industry-leading technical training and expertise in renewable energy. Graduates of that program move into renewable energy jobs locally, nationally, and internationally.

While fossil fuels are currently critical to our economy, the U.S. already has a tremendous

number of oil and gas extraction sites. Today, our economy is shifting toward non-carbon based fuels. The three largest coal companies in the U.S., two located in CO, filed for bankruptcy last year. In 2015 the U.S. had the smallest number of active oil rigs since 1940. Ninety U.S. oil and gas companies went bankrupt last year, sometimes leaving abandoned wells with inadequate clean-up funds. At this time, there is twice as much global investment in clean energy as in fossil fuels, and the North Fork stands ready to re-train those who have lost those carbon-based fuel jobs. While there may be future oil and gas boom/bust cycles, clean energy will continue to grow and dominate. We do not need new oil and gas drilling surrounding a community whose businesses, educational institutions and ecotourism focus on its pristine environment, from its award winning organic orchards and vineyards to an internationally recognized institution that provides critical alternative energy training.

The mission of the BLM is to sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations. I urge the BLM to reconsider opening 95% of lands to oil and gas leasing without adequate analysis of the risks large-scale oil and gas development poses to human and animal health, the environment, and the economy of this unique corner of Colorado. Please adopt a no-leasing alternative.

Thank you,
David L. Jones, COL USA RET
700 Sabeta Drive
Ridgway, CO 81432


000518_LaBountyS_20161101  Organization: Shawn LaBounty
Received: 11/1/2016 12:00:00 AM
Commenter1: Shawn LaBounty - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000518_LaBountyS_20161101.htm (000518_LaBountyS_20161101-387992.htm Size = 5 KB)
UFORMP_000518_LaBountyS_20161101.pdf (000518_LaBountyS_20161101-387991.pdf Size = 289 KB)
Submission Text
Date:11/01/2016

Commenter: Shawn La Bounty

Organization:

Email:shawnlab@tds.net

Address:

Phone:

Comment:
To All It Concerns,

I don't envy these monumental tasks before the BLM in regards to these leases here in the North Fork and around our region. I know that this issue has some bipartisan support at the federal and state levels. But I implore you to think hard about these leases. I hope and pray that you will think about the present and future of the community impacted, and the motivations that drive both sides of this issue. Drilling in the North Fork Valley makes very little since, and these parcels are dangerous parcels to extract more resources from. The stigma associated with this drilling is severe for the vast majority of people, and the impact will be devastating and long lasting. Geologically, politically, and realistically it makes since to choose not to pursue further drilling in the North Fork Valley.

I have lived on the North Fork of the Gunnison River East of Paonia since 1994, and in Paonia my entire life with the exception of college. My property has a series of springs which come from higher ground on a BLM Parcel. These springs feed a series of active Beaver Ponds creating one of the largest wetlands and active floodplains on the North fork of the Gunnison River. These wetlands under your care were cited by Rob Molicek of the NRCS in his 1997-2000 study as "the most pristine section of wetlands with the best example of native species on the entire North Fork of the Gunnison and Lower Gunnison River". Our spring is known as the Toltec Spring. This spring has purposes domestic agriculture as well as for the use of wildlife.

I hold a degree in Geology, and know the Geology of this valley well. I have spent vast amounts of time hiking this land, and know these sections as well as anyone. I know the parcels being considered for drilling are composed of unstable geology. Many of the parcels contain massive escarpments which make up the steep valley walls, and are in view of everything around. These escarpments are pitted with current and historical mine shafts that go to great depths and have highly fractured the bedrock all the way to the surface. The past and current mining and natural geology make these escarpments prone to subsidence and massive landslides. The long term danger is that the proposed well casings will fracture due to landslide pressures and the highly fractured bedrock will make groundwater pollutants had to track and allow them to reenter the watershed through the course of time. A simple quick glance of the landscape will prove that our landscape is shaped by recent, historic and prehistoric landslides. I am afraid many are blind to the geological and practical dangers due to current political and fiscal pressures.
The biggest problem with drilling and fracking is the horrible stigma that "fracked" communities are subjected to. We are currently and historically an agriculture/ recreation based economy that relies on our wildland reputation for our livelihoods. The stigma brought on by this gas extraction puts a stain on our community that would infect us from now on: The type of people we hoping will join our community will make the decision not to move here, and the people that are here already will decide to move. Fracking brings on a series of negative events that spells

BLM_0156616

devastation to our way of life; if that is fair to the reality of fracking of not. It is public opinion that has the weight when it comes to the lifestyle people choose, and people are not going to choose a place that has fracking stigma over them. You must realize that there are reasons why communities with grace and beauty always fight against this marring of the land by fracking. It is so unfair that such short term profits of such a very few current people can outweigh the infinitely long multitudes of generations of lives of everyone else.

I beg you to follow the thought process of your predecessors who, originally, preserved public land for future benefits. I hope and pray that you can remember who and what you work for, and don't lose site on the long term vision of what public land means. These recourses are not currently being considered for extraction because of necessity of a country short on energy, or because of an emergency in our world: some noble and worthy reason to sacrifice. BUT NO! These resources are being considered to satisfy the hunger of insatiable greed of a few, and only for a few modest years. We are talking about the marring and scarring of our land and our hearts and our minds of a whole region for virtually nothing, and for no good reason. Please, don't give away this land, and water for short term monetary and political reasons. Take the high road and make the wise choice. Take this land off the chopping block!

Best Regards
Shawn LaBounty


000519_LegerN_20161102  Organization:  Natasha Leger
Received: 11/2/2016 12:00:00 AM
Commenter1: Natasha Leger - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000519_LegerN_20161102.htm  (000519_LegerN_20161102-387995.htm  Size = 3 KB)
UFORMP_000519_LegerN_20161102.pdf (000519_LegerN_20161102-387994.pdf  Size = 131 KB)
Submission Text
Date:11/02/2016

Commenter: Natasha Leger

Organization:

Email:natasha@bluepearlcommunity.com

Address:

Phone:

Comment:
Dear Ms. Pfifer,

I have reviewed the draft Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office (RMP/EIS) from an oil and gas development perspective. The conclusion to open 95% of BLM lands and minerals to oil and gas leasing, without creating irreparable harm to the North Fork Valley in terms of human health, environmental, and economic impact is not supported by BLM's current analysis. Many of the deficiencies in this draft RMP are addressed by the Western Environmental Law Center's Comments on the Uncompahgre Field Office's Draft Resource Management Plan and Environmental Impact Statement, dated November 1, 2016, which I hereby incorporate by reference.

<([#1 [5.6] I want to bring to your attention the omission of risk management, and BLM's human capital challenges and lack of resources from BLM's risk analysis in the draft RMP. The BLM remains on the GAO's list of high- risk programs as of its February 2015 High Risk Series Update.

The BLM's ability to manage the Federal Government's oil and gas resources and ensure environmental and public safety is considered at high risk because the BLM does not offer a competitive salary to recruit or retain experienced staff, BLM experiences high turnover rates in key oil and gas inspection and engineering positions, and some field offices have only a few employees in any given position, which results in a and a single separation having significant impact on operations. "According to Interior officials, these challenges made it more difficult to carry out oversight activities, including conducting production facility inspections, in some field offices. As a result, Interior faces challenges meeting its oil and gas oversight responsibilities, potentially placing both the environment and royalties at risk." GAO, High Risk Series Update, February 2015. I understand that the FY2017 budget proposes a 35% salary increase to address the human capital program. However, how does that impact the UFO? In addition, it was just brought to my attention that the BLM has lost thirty percent of its staff in Colorado in the last year. Please explain how BLM plans to meet its oversight, monitoring, and inspection obligations to ensure public safety and prevent irreparable harm under resource constraints. #1])>

When resources are limited or lacking, organizations generally reduce their scope to effectively manage their resources. In this case, BLM, according to the GAO report is sufficiently over burdened by its lack of resources and at risk of meeting its current oil and gas resource management obligations. Adopting a no oil and gas leasing alternative would be an effective risk management strategy for the UFO on multiple levels.

Sincerely,

Natasha Léger

000520_LindseyL_20161031  Organization: Linda Lindsey
Received: 10/31/2016 12:00:00 AM
Commenter1: Linda Lindsey - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 000520_LindseyL_20161031.htm (000520_LindseyL_20161031-388500.htm Size
= 36 KB)
UFORMP_000520_LindseyL_20161031.pdf (000520_LindseyL_20161031-388501.pdf Size =
648 KB)
Submission Text
Linda Lindsey <linda@paonia.com> Mon, Oct 31, 2016 at 7:23 PM
38274 Stucker Mesa Rd.
Hotchkiss CO 81419
October 24, 2016

Dear Sirs:

My husband I live on a 220 acre ranch located on Stucker Mesa between Paonia and Hotchkiss.
We
have spent over 40 years trying to find the best way to make a living on a ranch in the most
sustainable
fashion and we concluded that raising exotic animals is the key. We have raised Colorado
colored
sheep, angora goats, horses, emus, ostriches, and finally settled on elk and alpacas. We currently
have
about 35 elk and 22 alpacas. We are also building cabins to rent to tourists, so that they can enjoy
the
incredible views and interesting exotic animals on the ranch. Our way of life is now threatened
by the
BLM proposal to lease land in the North Fork for fracking.

Our ranch actually borders on BLM tracts, where we and our visitors enjoy hiking and
picnicking. We
also sometimes get licenses and hunt on the BLM lands and we offer tresspass rights to people
who
also have licenses to hunt on the adjacent BLM tracts. In fact, I can hear the sound of hunters'
shots
ringing out from our West 40 as I sit at the computer right now. Therefore I wish to comment on

the
draft Uncompaghre Field Office Resource Management Plan.

We do not feel it is legally or morally defensible for the BLM to endanger small businesses like our
ranch in order to facilitate oil and gas development for the benefit of big corporations. The water and
air pollution that accompany fracking, as well as the destruction of the view shed, would be extremely
detrimental to our ranch as well as to all the organic and other farms in the North Fork Valley and to
our budding tourism industry, hunting and fishing and other forms of recreational business. Even the
announcement of the proposal to lease for hydrulic fracturing (fracking) has reduced real estate prices
around here, and does not bode well for our intended agritourism business.

I appreciate the fact that in the Resource Management Plan the BLM is to some degree trying to
mitigate harm to our natural resources such as domestic water, irrigation water, rivers, air quality,
wildlife and viewsheds. The designation of Ecological Emphasis Areas and Special Recreation
Management Areas is important in this regard. However, the "Preferred Alternative" (D) chosen by the
BLM in the Draft plan would open 90% of the Uncompaghre area to oil and gas leasing! This is not
protection. The BLM is clearly ignoring its legal mandate in NEPA to "prevent undue degradation of the
lands" in proposing this alternative. It would appear that in the RMP the BLM started out with the
understanding that Alternative D was a given and then worked backwards to justify this selection.
Actually, avoidance, i.e., simply dis?allowing harmful activity in sensitive localities, is the ?irst step in
true mitigation of harm. The term "undue" means "exceeding what is appropriate or normal",
"excessive," "unwarranted." I would argue that it is excessive and unwarranted to permit oil and gas
development in places where it could cause devastation to the local environment and economy. There
is no national emergency that requires development of oil and gas reserves; to the contrary, it is in the
national interest to leave reserves in the ground for future generations.

The Ecological Emphasis Areas and Special Recreation Management areas would not be extensive
enough to really do much good and should include areas that are important to the local citizens, such

BLM_0156620

as Jumbo Mountain. The ?inal plan should include emphasis areas for all critical winter wildlife
habitats in the North Fork Valley among the Ecological Emphasis Areas.

Adopting the BLM's current preferred alternative (D) would endanger the quality of our air and water,
as well as the scenic view sheds, on which our local economy and tourism depend, as well as
threatening wildlife and livestock downstream of any water source. The BLM needs to adopt a ?inal
plan that puts energy development off limits in all areas in which a spill of any size could damage
domestic water, irrigation water, water sources for wildlife or recreational waters.

DOMESTIC WATER

Does the BLM have the right to endanger the domestic water supplies for all the people and livestock
on Stucker Mesa and the North Fork? We think not.

Since the 1800's settlers of our valley have been developing our water resources, digging reservoirs,
building irrigation ditches, laying pipelines for domestic water. Our own domestic water is provided by
the Stucker Mesa Domestic Water Company. The company owns 5 miles of pipeline, of which
approximately 4 miles runs through land controlled by the BLM. Fracking on or near this 4 miles on
BLM land would bring great risk of pollution and disruption to everyone on our system.

One of the springs that are the souce of the company's domestic water is actually on BLM land The
company has recently spent a lot of money installing a reliable treatment plant, and this is our only
possible source of domestic water. Most of the domestic water sources in the North Fork, including
ours, are surface springs and streams. Therefore the chosen plan must, at a minimum, exclude all oil
and gas activities within ½ mile of all domestic water sources (including municipal water supplies)
that are located either on or near BLM lands affected by this plan, as provided for in Alternative B1.

There have been many instances of pollution of wells and other domestic water sources by oil and gas
operations, and the BLM has a legal duty to protect us from such disasters.

IRRIGATION WATER

BLM_0156621

We live in an arid region, which receives an average of only 15 inches of rainfall a year. Irrigation water
is essential to agriculture here. This is not the Front Range, where dry land farming is possible. Our
water has to be collected in the high country and transported across the BLM lands. The irrigation
water for our ranch comes out of the Overland Reservoir, through the Overland Ditch down Roatcap
Creek to the Roberts?Stucker ditch. Five miles of this delivery system is on BLM controlled land.
Naturally we are very concerned for the safety of our irrigation system. The BLM's current preferred
alternative does not do enough to protect it.

This is a mountainous region, the Western Slope of the Rocky Mountains. It is not ?lat and geologically
stable like other areas of Colorado. It is not boring; rather it is very attractive to the human eye. It has
beautiful vistas and valleys are full of trees and orchards. It is not a desolate landscape as in Gar?ield or
Weld county; on the contrary, it is starting to draw tourists and recreationists from all over the country
as it becomes discovered. Much of the attractiveness of the area is due to the availability of irrigation
water, which allows trees and vegetation to grow.

The Overland Ditch is built on the side of the Grand Mesa, and is already subject to washouts that cost
the shareholders are great deal of money to repair. The Roberts?Stucker irrigation pipeline also goes
through some rather unstable geology which could be subject to earthquakes caused by fracking, as
has occurred in Oklahoma, Kansas and the Front Range of Colorado. In fact the dam on the Overland
Ditch reservoir as well as the canal could be threatened by seismic activity caused by fracking. Even
exploratory drilling could bring about landslides that could cause failure of the ditch and pollution of
our irrigation water. It appears to me that BLM has failed to take current research results concerning
the hazards of fracking into consideration in choosing Alternative D as its preference. This should be
considered a violation of NEPA.

There are many other ditch companies with reservoirs and ditches or canals in the area that would

also be endangered by hydraulic fracturing (fracking). The largest of these is probably the Fire Mountain Canal, which also runs through the valley and across the bottom of Stucker Mesa where we
live. The BLM analysis has not considered these possibilities. If you were to consider the cost of such
damage the risk of fracking would outweigh any bene?its provided to the BLM by leasing. In fact, the
BLM analysis does not really take seriously the dangers of oil and gas development to our water. The
current preferred alternative is woefully inadequate and needs to be replaced by the North Fork
Alternative, which would protect irrigation water. The chosen plan must, at a minimum, exclude all oil
and gas activities within ½ mile of all irrigation water sources, canals or ditches, pipelines or storage
facilities, that are located either on or near BLM lands affected by this plan, as provided for in Alternative B1.

AIR QUALITY

The BLM has not obtained enough information to assess the impacts of oil and gas activities on our air
quality and prevent pollution. Yes, the Norh Fork Valley does have a coal mine (two others have closed). But these are underground mines outside of the town of Paonia, that cause very little air pollution. They do not have trucks driving around and through the town, raising dust and putting out
emissions, as would occur with fracking. In the winter the valley experiences inversions that hold pollutants down in the lower areas, thereby affecting the people who are breathing the air, as well as
livestock and wildlife. The North Fork is not an industrial area. It is not already a "sacrifice area". It is a
relatively pristine and special place whose citizens have already worked out agreements with coal
companies to prevent pollution of our air and water. It does not deserve to be subjected to an onslaught of oil and gas leasing. Protection for air quality as well as water quality must be included in
the final plan.

WILDLIFE, RECREATION AND TOURISM

In addition, there need to be real protections for water, wildlife and recreational areas, the basis for the
hunting and tourism economy, in any plan adopted by the BLM. This means protecting streams and
surface water quality, river, ponds, reservoirs, by closing to development areas within half a mile of any
lake, pond, spring, well, wetland, or reservoir. Perennial water sources, riparian areas,

BLM_0156623

intermittent
streams and ponds and seasonal waters are priority habitats that require protection from all surface
and underground activities.

The North Fork alternative (B1) provides protection from oil and gas development for streams and
river corridors, trail heads, the ?lanks of the West Elk Mountains and the Jumbo Mountain area (which
should be designated as a Special Recreation Management Area) all of which are important to recreation and tourism in the Valley.

There is a budding agritourism industry in the North Fork, involving vineyards, exotic animals and
organic orchards and vegetable farms, with their associated restaurants. Oil and gas development must not be allowed to jeopardize agriculture and agritourism. We take the BLM leasing proposal as a
direct attack on our way of life and our personal ?inancial well ?being.

Fracking on the BLM land adjacent to our ranch could destroy the viewshed, scare away wildlife and
contaminate water sources, thereby destroying our hunting and agritourism business. That is why we
favor Alternative Bl, which requires development setbacks from agricultural lands and protects the
scenic qualities and view sheds in the area. The ?inal plan should include the protections for the scenic
features of the valley as provided in Alternative B1.

Another area of concern in this regard is the BLM land up Stevens Gulch, which has one of the largest
mature aspen stands in the world. This area is quite close to our ranch and we are proud of the fact
that is provides prime habitat for cervids, and provides transit routes for wildlife between the valley
and the roadless areas in the Grand Mesa National Forest. This area is important to hunters and hikers,
and edible mushroom collectors. Members of our family, as well a many tourists, often hike around
Stevens Gulch and drive there to see the beautiful aspen colors in the fall. The BLM's ?inal plan should
protect all lands with wilderness characteristics, as in Alternative B1.

Finally, any plan adopted should prohibit oil and gas surface activities in known habitats of rare and
threatened ?ish species, as well as riparian zones and wetlands through the use of right of way

exclusion areas. It should be obvious that roads, pipelines, power lines and well pads would negatively impact anything living there, including ?ish, reptiles and amphibians, mammals and birds.

The RMP fails to take into consideration the latest research ino the dangers of hydraulic fracturing, as required by NEPA. It does not fully evaluate the economic and environmental impacts that oil and gas development would have. It fails to consider and analyze a "no leasing" alternative.

In closing again let me state that the current preferred alternative (D) in the plan does not provide adequate protection for the environment, human beings or wildlife in or near the BLM lands under consideration. Recent veri?ied scienti?ic research has linked fracking to severe fatigue, migraine headaches, low birth weights in babies, cancer, asthma, and other health issues in humans. These issues have not been studied in wildlife, but Colorado CPW biologists have agreed that oil and gas development is a major contributor to the rapid decline of the deer population in the state.

Of the alternatives included in the RMP, the North Fork Alternative, B1, the developed by the citizens who live here, should be preferred. However, I believe that the BLM should include a no?leasing alternative, as it is required by NEPA to "take any action necessary to prevent undue degradation of the lands."

I would like to invite BLM personnel to come and visit our ranch and our domestic and irrigation water systems so that you will be better able to understand the threats that the proposed leasing poses to our way of life.

Sincerely yours,

Linda Lindsey
P. S. I just came upon an article in the Denver Post dated October 23, 2016 entitled "State May Kill Bears, Lions." It reveals that state biologists agree that oil and gas development is a major cause of deer habitat destruction but propose to remedy the drastic decline in the state deer population by carrying out hunts for bear and mountain lions! This is true even though the Colorado Department of Parks and Wildlife does not know how to accurately measure lion and bear populations, and therefore cannot determine the possible harm to the predator populations.

According to the article, the CPW does not have proof that predators are are contributing to the decline of the deer population. It says, however, "The National Wildlife Federation, a hunting

BLM_0156625

and
conservation group, emphasizes habitat loss and fragmentation as the primary cause of the decline of
Colorado deer. And state biologists have determined that oil and gas drilling in deer habitat is hurting
the ability of deer to recover."

The article reports that the CPW has not taken a position on BLM plans to allow 15,000 new wells on
prime deer habitat in northwestern Colorado.

"However CPW did assert in a Sept 7 letter to the BLM from northwestern Colorado regional manager
Ron Velarde, that winter range is essential for deer. Velarde recommdended restricted oil and gas
activity between Dec. l and April l5. "

Note: The CPW should know what every hunter around here knows: that deer and elk generally do not
calve until after April 15 in Western Colorado! So this date must have been picked for the bene?it of
the oil and gas industry, not the deer. It is becoming clear that the oil and gas industry has great
in?luence over state agencies as well as the BLM.

It is the duty of the BLM to safeguard wildlife as well as humans from the detrimental effects of oil and
gas development if they are to lease land for fracking. Appendix D of the RMP includes discussion of
the problems that habitat destruction and fragmentation are causing to deer and other wildlife. Yet the
BLM continues to recommend oil and gas development on 90% of the lands under consideration,
which would guarantee increased habitat destruction and fragmentation and prevent travel between
wilderness areas. How is this possible?

The BLM is supposed to adhere to the principle of "multiple use," not the princple of "oil and gas above
all else."

38274 Stucker Mesa Rd.
Hotchkiss CO 81419
October 24, 2016

000521_LoweJ_20161101  Organization:  Jere Lowe
Received: 11/1/2016 12:00:00 AM
Commenter1: Jere Lowe - Paonia, Colorado 81428 (United States)
Organization1:

BLM_0156626

Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000521_LoweJ_20161101.htm (000521_LoweJ_20161101-388505.htm Size = 4 KB)
UFORMP_000521_LoweJ_20161101.pdf (000521_LoweJ_20161101-388506.pdf Size = 219 KB)
Submission Text
Jere Lowe <jere.lowe@paonia.com> Tue, Nov 1, 2016 at 3:17 PM

Thank you for the opportunity to comment on the draft Uncompahgre plan.

The outcome is important to me because it will affect my home, farm, commercial business and community for years to come.

At this writing, It so happens that I am currently running for Delta County Commissioner of District 3. That said, I think it safe to say that the North Fork Valley is extremely important to me, my family and my constituents. That Is why I am taking a strict no oil and gas extraction position. I sincerely believe that some places like the North Fork Valley should simply be left wild no matter the amount of carbon energy that may be in the ground. I lived right next to it in Erie, Colorado and I can firmly attest that we do not want that around here. One of the main reasons we moved here was to get away from that mess. Our home was well within 2000 ft. of an existing gas well. I personally experienced nausea and migraine headaches as well as vertigo in my 8 years living next to this well. Upon moving to the North Fork Valley ten years ago my symptoms literally disappeared. I will take our well managed coal mines over fracking and continuous extraction any day. Instead I am asking that the BLM designate their areas in the North Fork Valley to be changed over to either an SRMA (Special Recreation Management Area), or an ACEC (Area of Critical Environmental Concern), or an EEA (Ecological Emphasis Area). At a minimum, simply sustainable energy leases on the affected BLM land only!

I am quite confident that the United States, Colorado, and even Delta County will still survive hundreds of more years, even if we choose to leave that oil and gas in the ground. I am also quite confident that should that industry come to the North Fork Valley it will hurt our property values and could potentially ruin all of our health and livelihoods. That is why I propose that should you decide against a no extraction policy for Colorado's North Fork Valley that you at least apply the following conditions in the RMP. Given our extremely crucial, sensitive and volatile ecosystem, these conditions are necessary to the long term health and well being of our local ecosystem, watersheds, economy and our community. Full and complete compliance at all times with the Clean Water Act for every wellhead / drilling site. Full and complete compliance at all times with the Clean Air Act for every wellhead / drilling site. A $500MM security bond per wellhead / drilling site for all immediate and ongoing issues that may arise up to and including complete shut down and clean up / restoration. A one time $250K roads and associated infrastructure

BLM_0156627

improvement fee per well head for the life of the well. A one time community impact fee of $250K fee per well head for the life of the well. A one time Sustainable Energy Research and Development fee of $250K per well head for the life of the well. A one time Science and Engineering grant fee of $100k per well head for the life of the well. A biannual water resources improvement fee of $150K per well head for the life of the well.
If the vested interests think this is excessive then they are not part of the community they wish to extract from and should be denied any potential extraction rights and leases.

We are the head waters of some of the nations freshest, cleanest waters. Climate Change has certainly reared it's head here in the west however. And our water resources are sparse. Even the slightest little spill or accident could have a devastatingly destructive impact on our community and watershed. We are one of the wildest places left in the lower 48. Seeing that they cannot submit letters to the BLM, I believe I speak for the Mountains and the Rivers and the Trout and the Deer and the Elk and the Bears and the Trees and the Flora when I say No Thank You! Please do not jeopardize that for the short term gains of the private for profit oil and gas extraction industry. Whilst
the People are far too poorly compensated for our resources. The strongest level of protection should be afforded to the North Fork Valley.

Thank You,
Jere Lowe


000522_McClellanR_20161102_Rocky Mountain Recreation Initiative Organization: Rocky Mountain Recreation Initiative, Rosalind McClelland
Received: 11/2/2016 12:00:00 AM
Commenter1: Rosalind McClelland - Nederland, Colorado 80466
Organization1:Rocky Mountain Recreation Initiative
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative.htm (000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-381190.htm Size = 21 KB)
Submission Text
Rosalind B McClellan mcclelr@colorado.edu

easier to read.

UFO Draft RMP RMRI comments.docx
151K

Rocky Mountain Recreation Initiative

1567 Twin Sisters Rd.
Nederland, CO 80466

To Field Manager Barb Sharrow
and the UFO RMP Planning Team
BLM Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, Colorado 81401

November 1, 2016

Comments on Draft UFO RMP

Dear Barb and RMP Planning Team,

RMRI promotes ecological trail planning for BLM and Forest Service travel plans across the state. As you may know, RMRI submitted extensive comments during the RMP draft scoping period, participated in a meeting of conservation leaders with Barb and other UGO staff, and organized a workshop in Montrose in 2012 to facilitate info sharing between local conservation biologists such as Peggy Lyons, Bill Day, Craig Grother and Megan Mueller, of Rocky Mountain Wild. The topics covered in the workshop were wildlife connectivity, sensitive areas most threatened by recreation and mineral development, and priority conservation areas for sage grouse and other endangered and sensitive species.

Out of this conversation were developed RMP scoping recommendations you received from the different conservation groups on topics such as critical locations for ACECs, wildlife emphasis areas, wildlife linkage priorities and priority protection areas for rare and vulnerable plant and animal species in the field office.

I have first hand knowledge and a strong interest in the future of the Tabequache Special Management additions, less trailed areas in Paradox Valley, the Potter and Camel Back complex, Adobe Badlands, Simms Mesa, Dry Creek and other high profile protection priorities in the field office.

The focus of RMRI's scoping comments was on the Tabequache addition, protecting remaining large, 5000 acre +, less roaded areas in the Paradox Valley such as Saw Tooth Mesa, Burn Canyon (from mountain bike encroachment and mineral development. RMRI has also engaged closely in the Dry Creek and Burn Canyon TMPs and otherwise tracked OHV and mountain bike proliferation in the field office for twenty years.

RMRI is thus a long time stakeholder in the 2016 released Draft UFO RMP from the perspective of maintaining wildlife viability and habitat effectiveness in the face of rapid spread of landscape fragmentation by OHV and mountain bike trails. RMRI's comments below focus on the protections provided in the draft RMP for specific areas based on engagement, knowledge, and involvement in UFO field office travel planning over two decades.

BLM_0156629

AREA-SPECIFIC RECOMMENDATIONS

<([#1 [9.1] [20.1] [14.1.1] Lower Tabeguache

As per my scoping letter, and based on my knowledge of this unique, lower elevation extension of the Tabeguache Special Management Area, I recommend combining all three protective designations in the RMP to do justice to this outstanding backcountry primitive area. This means including the entire LWC, the EEA to preserve wildlife values, and including the full cultural ACEC boundaries---all wrapped into one large protected area----20,000 + acres in all including the ACEC.

While the overall area has some low use roads and ranching activity, these uses do not disturb wildlife in the way recreational trails do. Tabeguache is one of the last areas in the Paradox Valley with high quality, undisturbed habitat that has not been heavily impacted by motorized and mechanized trails or uranium roads; it needs to be kept that way to insure continued health and viability of resident big game herds.

However, as with Potter-Monitor and other large UFO primitive areas addressed below, protective designations for Tabeguache will be ineffective without greatly strengthened management prescriptions for each category, LWC, ACEC and EEA. The management prescriptions should include NSO and prohibit motorized and mechanized trails. Without these protections, these lands could be taken over by the same homogeneous gridwork of trails and uranium roads that dominates the surrounding the Paradox Valley.
#1])>
<([#2 [20.1] Shavano Creek

Same story for the Shavano Creek/Campbell Creek area: The area provides a concentration of high quality forage for big game and outstanding roadless and primitive values. It provides an extension of the Tabaquache primitive area to the south and similarly needs a full range of protections, including LWC designation for the full 6,090 acres of LWC qualifying lands . User created motorized trails in the area need prompt and effective closures to stop further incursions, and a management prescription banning future motorized and mechanized trails. #2])>

<([#3 [9.1] [27.1] Paradox Valley

Again, as per my scoping letter, I recommend a primitive nonmechanized, non motorized type of management for this area so as to retain its uncrowded sense of space, solitude and vast vistas. This would mean a SRMA zoned for the most primitive recreation settings, combined with the full suite of proposed ACECs in Alternative B that would be managed for no human disturbance, to complement the primitive settings prescribed in the SRMA portions of the area.

The following 6 Paradox Valley ACECs contain unmatched and irreplaceable cultural, archeological, geological and biological values: West Paradox ACEC, Paradox Rock Art, East Paradox, La Sal Creek, Dolores Slick Rock Canyon and Coyote Wash---also the Biological Soil Crust ACEC. These ACECs should all be carried into the preferred alternative in the final RMP, with strong restrictions on human encroachment and disturbance, since the BLM does not have

BLM_0156630

the resources to handle intensive management of future crowds of visitors.

I also recommend minimizing trail build-up in the following relatively unroaded areas:

* Sawtooth Ridge (has 5000 acres of unroaded land)
* Nyswonger Mesa
* Saucer Basin

Also the following areas have some uranium roads, but have only recently seen motorized trail encroachment and could still be protected as less crowded, more remote, nonmechanized lands:

* Roc Creek
* Hamilton Creek
* Hamilton Mesa,
* Callan Draw,
* McKee Draw,
* Bramiers Draw,
* Wickson Draw,
* Mailbox Draw

As with Tabeguache and other primitive areas in the field office, protective designations for Paradox Valley will be ineffective without greatly strengthened management prescriptions for each category: LWC, ACEC and EEA. The management prescriptions should include NSO stipulations and prohibit motorized and mechanized trails, to assure these lands will not be taken over by the gridwork of trails, that now dominates the rest of the Paradox Valley. #3])>
<([#4 [27.1] [14.1.1] Dry Creek

RMRI commented on the Dry Creek TMP back in 2008, which was commendable for its numerous route closures that reduced the route fragmentation characterizing the area at that time.

Pressures for habitat fragmentation by trails continue in Dry Creek due to new mountain bike proposals, etc. Nonetheless, the Dry Creek LWC should be managed for its existing and potential wilderness characteristics and should remain free of mechanized trails in order to maintain its less crowded, more primitive, more wilderness-like character.

Once trails are built it's difficult for the BLM to limit use levels; by definition motorized and especially mt bike trails, become high-traffic thoroughfares leading to continued off-trail use and other problems.

Dry Creek should also have the additional protection of the overlapping EEA as defined in Alt B. A SRMA designation might be desirable if the area has O & G potential. Otherwise an ERMA would be preferable as attracting less use and impacts. Even a full SRMA might remain manageable if it were limited to the nonmechanized, primitive backcountry setting found in the BLM's Recreation Settings Matrix. #4])>

<([#13 [14.1.3] In Dry Creek, the final RMP needs to recognize that not all trails are created equal, but rather factor in the mileage-requirements of long distance trail uses such motorized and mechanized, along with the additional habitat fragmentation these additional miles create. The RMP needs to analyze projected fragmentation by trails in this and other high use areas, to assess the carrying capacity of the land and to establish an upper limit on the amount of trail fragmentation that will still maintain habitat connectivity and BLM Land Use Health Standards into the future.
#13])>
<([#5 [27.1] [14.1.3] Burn Canyon

Burn Canyon is an example of an overlap between a high trail use area, and a critical winter concentration big game area ---an overlap of a type that occurs in at least seven other places in the field office. The kind of high quality habitat found in Burn Canyon is increasingly rare on this largely desert mesa landscape, and disturbance by trails is raising stress levels in herds due to human interaction and avoidance, with potential to cause displacement of animals to less productive habitat. This in turn creates the likelihood over time of diminished reproductive success and ultimately declines in herd health and populations.

The Burn Canyon SRMA designation is a mixed blessing. There is first the manageability problem of locating a high-use SRMA adjacent to incompatible protective designations such as EEAs, ACECs or LWCs. Also RMRI has concerns about downshifting the Recreation Zones in the Burn Canyon SRMA into the less primitive backcountry and middle country settings, as an endless downward slide.

NOTE: Statewide, it is to be noted that even though Colorado citizens prioritize wildlife slightly higher than trails in recent CPW policy docs, they are not informed of the connections between the two, nor are the properly apprised of how trails could be designed and located to mitigate these impacts.
#5])>
<([#6 [9.1] [20.1] Potter-Monitor-Roubideaux

As with Tabeguache above, this is a large, primitive extension of the Camel Back WSA, forming a continuous ecosystem spanning higher elevation ponderosa/fir down to lower elevation red rock canyons-----a stunning and dramatic landscape worthy of the full battery of protections. Equally important the area provides habitat security to big game including vulnerable the Desert Big Horn sheep species.

Recommendations - For Roubideau-Potter Creek, please combine the full array of protections, the almost 7000 acres of LWC-quality lands, the larger Alt B ACEC boundaries, and the full extent of EEA protection.

As with Tabeguache and other primitive areas in the field office, Potter-Roubideau designations will be ineffective without greatly strengthened management prescriptions for each category: LWC, ACEC and EEA. The management prescriptions should include NSO stipulations and prohibit motorized and mechanized trails, to assure these lands will not be taken over by a gridwork of trails.

BLM_0156632

I would question locating a SRMA in a more remote and primitive area like Potter Monitor (unless SRMA status is the only way to prevent mineral leasing) as it is next to impossible to maintain uncrowded, primitive backcountry settings once an area has been designated for a recreation emphasis. #6])>

MORE GENERAL EEA, LWC AND ACEC COMMENTS

NOTE: All citations below are taken from the summary in Table 2-1, or from the line items in Table 2-2, p 2-24, Vol I.

<([#7 [14.1.1] Ecological Emphasis Areas

Overall RMP Recommendation - Include all 242,500 acres of ecological emphasis areas and restore them to their full acreage in the final RMP.

EEAs are an excellent addition to the tool kit of existing protections provided by LWCs and ACECs. The EEA designation captures the landscape dimension not well protected by LWCs and ACECs and that conservationist comments have been pointing to for a number of years.

The EEA category fills in the gaps by identifying "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," with EEAs being "managed to protect the large landscape over the long term." This is an exciting acknowledgement of landscape connectivity and how it relates to trail connectivity which has previously been the sole focus. We are grateful to the UFO Field Manager and staff for their foresight in including this critical but missing piece of holistic landscape protection. #7])>

RMRI is also pleased to see that a full 242,580 of the 700,000 + acres in the field office have been identified as EEAs for a total of 13 EEAs---

However, this commendable new designation will be only minimally effective unless the following changes are made:

A.<([#14 [14.1.1] The full 242,580 acres of EEAs need to be carried into the final decision, in recognition of the fact that all lands in the field office play some role in landscape functioning, and even 200,000 + acres identified---much less the meager 177,700 acres recommended in Alt D-----fall short of the mark.
#14])>
B. <([#15 [14.1.1] Second, EEA management prescriptions must be greatly strengthened to assure meaningful protection of the identified areas-----at the very least NSO restrictions and motorized/mechanized recreation closures. (for NSO rationale, see RMP EIS pages 4-129 and 130 for discussion of O&G impacts on deer and elk)
#15])>
C. <([#16 [14.1.1] Third, EEA management needs to proceed cautiously on mountain bike use considering it has become the new "unmanaged use" of the day, having overtaken OHV use in its ability to spread human disturbance rapidly across landscapes. Because mountain bike use is

BLM_0156633

still largely unregulated and unmanaged, any mechanized trail designations occurring in EEAs should ideally be put on hold until such time as the BLM is able to institute trail planning guidelines that accomplish the following:
a) protect unfragmented habitat,
b) halt user-created trail proliferation, and
c) bring about a culture of compliance in the mountain bike community----at least on a par with the compliance that has been achieved by the OHV community #16])> .

<([#8 [11.1] [14.1.1] Importance of EEAs to big game and nongame species

From a wildlife perspective, there are a number of reasons why all 12 EEAs---as well as all ACECs and LWCs in Alternative B---need to be carried forward together into the final preferred alternative. Also why Alt B EEAs need to be retained in their full boundaries, not have reduced boundaries as in Alt D – see [*] below.

[*]NOTE Naturita Canyon, Dry Creek, Tabeguache and Adobe EEAs should keep their original acreage from alt B. The Adobe EEA, which the EIS notes has white-tailed prairie dogs, burrowing owls and possibly kit foxes, has regrettably had the majority of the prairie dog habitat in Alt D.

Reason 1 - Inadequate protections
Lines 64 and 71. Only EEA's and special designations get consideration for restoration (line 64) and non game wildlife is secondary to resource production in all of the other areas (line 71) Similarly with Lines 103-105.

Reason 2 - Climate change - Landscape connectivity –
All the designations combined are necessary to give wildlife the range of elevation and corridors they need to be able to move in reaction to changes in climate and vegetation. The Vol 3, appendix D intro to EEAs commendably acknowledges some of this.

Climate advantages of EEAs - Line 17-19. EEAs in this way mitigate climate change for wildlife, allowing wildlife habitat to shift uphill, as well as provide connectivity, see p 4-132.

Reason 3 – Seasonal migrations
EEAs will facilitate seasonal migrations of deer and elk, as well; see discussion of EEAs in vol 2, pages 128, 134 and 135. Wildlife movement facilitated by EEAs will also help remedy the disruption of critical migration corridors in the past.
#8])>
<([#9 [27.1] Special Recreation Management Areas SRMAs

It is difficult to manage levels of trail use on SRMA trails once designated. The draft RMP should acknowledge that while SRMA status in some cases may protect from the bigger threat of mineral leasing, in fact SRMAs tend to attract volumes of use that themselves become problematic.

Burn Canyon: Enforcement, mountain bikes and wildlife impacts

As one example, Burn Canyon shows how SRMAs can impact wildlife by attracting higher levels of unmanageable trail use. Bicyclists are violating seasonal bike closures in McKee Draw and throughout Burn Canyon, bringing in new use and disturbance to previously less disturbed wildlife areas.

This kind of conflict between critical habitat and high human use areas should have been avoided in Burn Canyon by proactively channeling trail use elsewhere. Avoiding such conflicts should be a strong priority in the RMP and future management. #9])>

<([#17 [32.5] However challenging, incentives for compliance with seasonal closures should be instituted in Burn Canyon, to maintain habitat security as intended.

Such incentives for effective trail closures need to be featured in the final RMP as well. This letter strongly recommends Adaptive Management, whereby trails are closed until the ingredients for compliance, enforcement, signs, using cooperation, etc. are in place.

This kind of resolve in instituting Adaptive Management needs to permeate all the recreation sections in the RMP, with creative incentives such as trail closures used, so the onus and expense of compliance is shifted to the trail user community. This could avoid the serious wildlife impacts from noncompliance we are seeing in Burn Canyon.

NOTE: Human society has the ingenuity the adapt to wildlife. Wildlife does not have a similar ability to adapt to humans.
#17])>
<([#10 [20.1] Lands with Wilderness Characteristics (LWCs)

While I understand that the wilderness characteristics of some UFO LWCs have degraded over time, it is unjustified to drop over half--- 24,000 acres---of the original 42,150 acres of identified LWCs, as does Alternative D.

Instead, I recommend that all seven of the Alt B LWCs be carried into the final decision, (Line 265, Alt B) including the Adobe Badlands unit, the Lower Tabeguache unit and the Shavano Creek unit, all of which can be managed easily for their outstanding opportunities for solitude, primitive recreation opportunities and naturalness.

These areas would benefit as well by being considered core areas for wildlife (4-154). #10])>

<([#11 [9.1] ACECS

It is disappointing to see that BLM has identified 15 ACECs totaling 215,840 acres but has included only eight of these areas preferred alt D, while reducing the acreage to only a small fraction of the total, 51,320 acres. Each ACEC in the RMP has been carefully documented as to its qualifications, by Rocky Mountain Wild as well as by the BLM, and has been found to have outstanding historic, cultural, and scenic values or fish, wildlife and other natural systems.

The reasons for dropping so much acreage are insufficient. We strongly recommend Alt B with that all identified ACECs being included in RMP and being restored to their originally identified acreage.
#11])>
<([#12 [32.1] TRAVEL MANAGEMENT AND WILDLIFE

For maximum protection for wildlife, we recommend the proposed route closures in Alt B, including Alt B seasonal closures, See Lines 478 and 480, travel closures. pages 4-128 and 4-132. through 4-130, also citations pp. 4-129.
#12])>
OIL AND GAS

It is unfortunate the draft RMP would leave 95% of the planning area open to oil and gas leasing, even in areas where there is low potential for development. Instead I recommend the BLM close areas with low development potential to protect other more important resources these areas contain.

As an example, I recommend that the final RMP include all proposed actions in the North Fork Alternative, B1. This is a thoughtful and home-grown proposal developed by local residents of the North Fork Valley to ensure the protection of the resources that make the North Fork such a unique and special place to live.

Alternative B1 ensures the strongest level of long-term protection for resources of particular concern, such as water supplies and riparian areas; scenic qualities of the valley and our 'million dollar' view sheds; undeveloped wildlife lands including winter range and migration corridors. The conservation protections in Alternative B1 should be included in the final plan.

Conclusion

In concluding I want thank you all for your good work on this important RMP and for the opportunity to comment.

Sincerely,
Roz McClellan, Director
Rocky Mountain Recreation Initiative

000523_MeltonA_20161101 Organization: Allison Melton
Received: 11/1/2016 12:00:00 AM
Commenter1: Allison Melton - Crested Butte, Colorado 81224 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:

Current Task: Done Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000523_MeltonA_20161101.htm (000523_MeltonA_20161101-387997.htm Size = 3 KB)
UFORMP_000523_MeltonA_20161101.pdf (000523_MeltonA_20161101-387996.pdf Size = 459 KB)
Submission Text
Date:11/01/2016

Commenter: Alli Melton

Organization:

Email:alli.melton@gmail.com

Address: PO Box 3024, Crested Butte, CO 81224

Phone:

Comment:
This comment focuses on two aspects of the BLM UFO's Draft RMP: coal and oil and gas.

Coal

<([#1 [22.1] It is necessary that BLM analyze and adopt a "no leasing" alternative for coal. Such an alternative is a required to counterbalance the current alternatives that skew heavily in favor of coal leasing. A "no leasing" alternative for coal is also the only effective way to realistically minimize climate impacts. It is irresponsible for the BLM to ignore the real and lasting impacts of its preferred alternative, especially when the neighboring and overlapping sister agency's (GMUG's) recent analysis in a forest-wide project (Spruce Beetle Aspen Decline Management Response DEIS) demonstrates that these public lands and surrounding lands are going to have substantial negative impacts as the result of climate change #1])> . For too long BLM has ignored the climate change ramifications of coal leasing and mining. Now is the time for BLM to use the revision process to inform management for years to come in a manner that will work towards climate stability and security for our local communities and public lands. At a minimum, the Final RMP must include up-to-date data concerning coal markets, coal production and coal employment in the area. Much of the Draft RMP's data dates back to 2010 or older. As such, it is stale in light of shrinking coal production and employment.

Oil and Gas

I support the "North Fork Alternative," which provides for no oil and gas leasing across 75% of the North Fork Valley. The North Fork Valley is where much of the food I buy comes from, and this is true for many that live in my community just on the other side of Kebler Pass. It is also an area that I routinely recreate in because of its towering and intact aspen galleries that blanket rolling hillsides and the robust oak scrub landscape. As the organic and general breadbasket of the state, it is thoughtless for BLM to allow the North Fork to be overrun with incompatible oil

BLM_0156637

and gas industrialization that would threaten the strong and sustainable economic drivers of this area of the state. Tourism in the North Fork and where I live (Upper Gunnison Valley), rely heavily on ecotourism; tourism that is driven by the pristine public lands, scenic and intact vistas, healthy and vibrant farms, as well as remote and pleasant scenic country drives. Pock-marked landscapes, spiderwebs of roads, increased industrial traffic (semis, etc.), and the deleterious air quality impacts that result from Volatile Organic Compounds, methane, and more, jeopardizes our way of life and the very core of our communities' economic drivers.

Please ensure the adopted RMP will protect our public lands and communities for years to come by
protecting them from coal and oil and gas leasing.

Sincerely,

/s Allison N. Melton
Allison N. Melton
PO Box 3024
Crested Butte, CO 81224


000524_MilfordL_20161101  Organization: Laurie Milford
Received: 11/1/2016 12:00:00 AM
Commenter1: Laurie Milford  - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 000524_MilfordL_20161101.htm (000524_MilfordL_20161101-388507.htm Size = 6 KB)
UFORMP_000524_MilfordL_20161101.pdf (000524_MilfordL_20161101-388509.pdf Size = 444 KB)
Submission Text
Laurie Milford <lkmilford@gmail.com> Tue, Nov 1, 2016 at 12:17 PM
418 Delta Ave.
Paonia, CO 81428

Dear BLM-UFO Staff and RMP Comment Team,

I am a resident of Paonia and live near BLM lands. I have lived in the North Fork Valley for two months. Prior to that, I lived and worked in Laramie, Casper, and Lander, Wyoming for nearly twenty years. During that time, I came to know many landscapes and communities that have been drilled intensely for oil and gas, including the Pinedale, Worland, Casper, and Rawlins Field Offices. In these places, oil and gas drilling severely degraded air quality, polluted sources

of household water and water used for livestock, harmed mule deer, sage-grouse, and other wildlife, and left the landscape pocked with drilling rigs and, later, wells. By the mid-2000s, within a decade of the beginning of the Town of Pinedale was an "ozone nonattainment zone." The Wind River Range was dimmed by haze, and the lights of drilling rigs lit up a sky that was dark for eons before. Now the North Fork Valley of

Colorado is home to my husband, young son, and me. We moved here because the landscape is still beautiful, and the water and air are still clean. I'm writing to ask that you consider carefully the opportunity of the Uncompahgre Resource

Management Plan to protect these resources.

My family and I care deeply about BLM lands around Paonia, including Jumbo Rocks and the foothills of the West Elks. We trail-run and walk, and our son is learning to ride his pedal bike on some of these beautiful trails. In fact, walking on public lands is one of our favorite activities—one of the top reasons we live in the West and why

we have chosen to bring our community service and tax dollars to Delta County. But it isn't just one or a few specific points on a map that need to be protected. Our clean air and water must be safeguarded as well. When we moved to Paonia from Portland, OR, in August, our son had an elevated level of lead in his blood—perhaps

from the high levels of lead found recently in the air and soil in Portland, where we lived until this summer. We chose the Western Slope in part because the air here is still clean, and we believed our son would have the chance to grow up breathing cleaner air and drinking clean water. The water at our house comes from the Paonia

municipal water supply. If nearby BLM lands are drilled according to the draft, preferred alternative, North Fork Valley water would risk contamination, and air could see significant degradation.

One of the great joys of Paonia—and one of the main amenities attracting people to visit or make their homes here—is fresh, organic produce. The final management plan must protect the health of the watershed for the sake of people and of agriculture. For that reason, I ask that you exclude all oil and gas activities within a half-mile of all surface and ground domestic water sources, including municipal waters supplies. Most of the domestic water sources in the North Fork Valley are surface springs and streams that are either on or near BLM lands affected by this plan. Please also protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, and canals. This is a minimum distance required to safeguard direct and rapid contamination from spills and other oil and gas activity.

The final plan must also protect streams and surface water quality, protecting ecological resources, aquatic habitat, recreational attractions, water storage, and flood control by closing areas within a half mile of lakes, ponds, wetlands, and reservoirs to oil and gas activities including leasing. The final plan should also recognize that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters are priority habitats with adequate protections from all surface activities.

Thank you for the opportunity to comment on the draft Uncompahgre Field Office resource management plan. I am glad the BLM is considering ways to protect important natural resources

like wildlife habitat, domestic and irrigation water, wild and scenic rivers, air quality, and recreation. In particular, I support the designation
of ecological emphasis areas and special recreation management areas. These will preserve habitat connectivity, wildlife corridors, undeveloped open space, and recreation opportunities within our region.

Sincerely,
Laurie Milford


000525_RutledgeT_20161101_MountainTripInternational Organization: Mountain Trip, Todd Rutledge
Received: 11/1/2016 12:00:00 AM
Commenter1: Todd Rutledge - Telluride, Colorado 81435 (United States)
Organization1:Mountain Trip
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000525_RutledgeT_20161101.htm
(000525_RutledgeT_20161101_MountainTripInternational-381191.htm Size = 6 KB)
Submission Text
Comments on Draft Resource Management Plan
1 message
Mountain Trip <info@mountaintrip.com> Tue, Nov 1, 2016 at 9:23 AM
To: uformp@blm.gov
Dear Partners at the BLM,
We would like to respectfully submit the attached letter of comment on the Uncompahgre Draft Resource Management
Plan. Please find a letter of comment attached.
Respectfully,
Todd Rutledge
Guide/Director
Mountain Trip
PO Box 3325
Telluride, CO 81435
T. +19703691153
(GMT 6)
F. +13034960998
info@mountaintrip.com
www.mountaintrip.com
Find us on Facebook!

Mountain Trip International, LLC

BLM_0156640

PO Box 3325,
Telluride,
CO
81435
October 28, 2016
Project Manager, Uncompahgre RMP
Bureau of Land Management,
Uncompahgre Field Office
2465 S.Townsend Ave.
Montrose, CO
81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM---UFO Staff and RMP Comment Team,
Thank you for this opportunity to comment on the Draft Resource Management Plan (RMP) for the Uncompahgre Field Office of the BLM. Mountain Trip International (dba Mountain Trip) has been leading outdoor enthusiasts into wild spaces in southwest Colorado for the past 12 years. Our company has grown from a small, regional guide service to a world---renown industry leader, operating on all seven continents and serving a global clientele. In the past two years, our local operations, operating under a BLM permit issued by the Uncompahgre Field Office and under USFS permits issued by the Norwood District, have increased over 500%.

Our greatest resources are the wild and scenic spaces for which our area is world famous. We help people from around the world explore and enjoy our local public lands. We are concerned how the often short---term benefits from rampant energy development harm the environment around such projects, yet often have negative long---term impacts on tourism, recreation and community health. While there are many economic drivers to host energy development, many are short---sighted and don't take into consideration the public's enjoyment of these public lands, which can be forever altered.

<([#2 [39.1] We ask the BLM to fully protect all river and stream segments identified in the BLM Uncompahgre Wild & Scenic eligibility report as being suitable for Wild and Scenic designation. These river and stream segments have been recognized for their free---flowing condition and for their outstanding and remarkable values, including providing critical habitat for fish and excellent places to fly fish, raft and recreate. Having boated and explored many stretches threatened by potential development, we plead you to embrace the necessity of keeping such wild places in their natural condition. We therefore urge you to strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "Preferred Alternative," and urge you to retain all those stretches in the final RMP. Please include the 154 miles of streams and rivers found suitable in Alternative B to be included in your final plan. #2])>
<([#4 [20.1] Also, please support the Lands with Wilderness Characteristics (LWCs), and Areas of Critical Environmental Concern (ACECs) identified in Alternative B, ensuring that this land does not default to mineral leasing. The landscape itself is a natural resource, and one of the highlights for our guests is to capture wild spaces that are free from the blight of mineral development and its associated infrastructure. The areas of concern also contain numerous archaeological sites and unique plant species #4])> . <([#3 [21.1] We ask that you include no

surface occupancy on any of the EEAs identified in Alternative B in order to protect wildlife habitat and migration corridors. In the "Preferred Alternative," Alternative D --- over 90% of land would be open for oil and gas leasing. This is the default, yet many of these lands have low potential for oil and gas, or possess other outstanding values and should be protected for recreation, wildlife, or other conservation values. We ask that the BLM set reasonable limits to mineral extraction on our public land. #3])>

Our understanding of climate change has come a long way in the last two decades, and we need to take proactive steps to address these impacts by reducing fossil fuel extraction and leasing. A segment of our business is dependent on the snowpack in the San Juan Mountains, which has seen negative changes in recent years from climate change as well as from dust layers likely generated by increased mineral development on the Utah side of the border. The majority of the land at stake in our interest area is along the San Miguel River downstream from the Telluride valley and west of Naturita to the Paradox Valley.

The BLM's Preferred Alternative would allow these areas to be leased to oil and gas companies, and compromise air and water quality and recreation. Energy development would also have a direct negative effect on local tourism. The economic future of our region will depend upon the health and quality of our land and environment, and the diverse opportunities and economies this offers.

<([#1 [30.3] The BLM's final plan should limit available oil and gas leasing lands west of Naturita, on public lands in the Paradox Valley, and anywhere else that energy development encroaches on recreational areas.
Please take into full consideration the negative impact that energy development would have to local tourism and the human---powered activities that many of us enjoy in those areas.
#1])> As the stewards of the 675,800 acres of public lands at stake, the BLM needs to protect these lands for the future, not sell them off for immediate, short---term gain.
We appreciate the opportunity to comment on the Draft Resource Management Plan.
Sincerely,


000526_NavyS_20161101  Organization: Sue Navy
Received: 11/1/2016 12:00:00 AM
Commenter1: Sue Navy -,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000526_NavyS_20161101.htm (000526_NavyS_20161101-387999.htm Size = 3 KB)
UFORMP_000526_NavyS_20161101.pdf (000526_NavyS_20161101-387998.pdf Size = 203 KB)

Submission Text
Date:11/01/2016

Commenter: Sue Navy

Organization:

Email:suenavy@gmail.com

Address:

Phone:

Comment:
Dear BLM representative,

I am writing to address the Draft UFO RMP, which I find disappointing and lacking in several areas. Knowing that it was written by informed people makes it harder to understand the emphasis on continued coal and gas production.

Since the final plan will stand for possibly decades, it is completely counterproductive to rely on methods of the past that are soon to be relegated to history books. As we go further into the 21st century, fossil fuels are, of necessity, going to be further discounted, and therefore should not be encouraged by this plan.

Greenhouse gas emissions need to be curtailed, in conjunction with the proliferation of clean energy sources, which are now overtaking fossil fuels as suppliers of energy globally:

"According to the International Energy Agency (IEA), total clean power capacity increased by 153 gigawatts, overtaking coal for the first time…The agency also raised its five-year forecast for renewable energy by 13 percent and now expects renewables to be 42 percent of global energy capacity by 2021."
[http://www.ecowatch.com/renewable-energy-overtakes-coal-electricity2062921638.html].

"Renewable energy has surpassed coal as the largest source of global electricity generation and it is expected to grow at a faster pace than originally thought, industry experts have found."
[http://www.investopedia.com/news/renewable-energy-overtakescoal-fslr-nee/].

The North Fork Valley depends on organic farming, wineries and ranches, all of which depend on clean water. As the North Fork progresses into the future, it no longer can afford to rely on the outmoded and unhealthy industries that coal and gas represent.

With the health of the environment and citizens of the North Fork at stake, along with those of us who live and recreate downwind of coal and gas emissions (i.e. Gunnison County), it is

imperative that you choose the North Fork Alternative. This alternative would limit fossil fuel extraction throughout the North Fork, and is thus the most valid approach to reducing these causative sources of climate change.

It is absolutely time to change our ways if we want to sustain ourselves, our economies, our environment into the future. Continuing on an antiquated and destructive path would only heighten the uncertainty of human and natural life on our planet.

Thank you for acting responsibly.

Sincerely,
Sue Navy

000527_NieceJ_20161101  Organization:  Jake Niece
Received: 11/1/2016  12:00:00  AM
Commenter1: Jake Niece - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000527_NieceJ_20161101.htm (000527_NieceJ_20161101-388001.htm Size = 3 KB)
UFORMP_000527_NieceJ_20161101_HasAttach.pdf (000527_NieceJ_20161101-388000.pdf Size = 801 KB)
Submission Text
Fwd: Public Comment Include
The Paradox Special Recreation Management Area in the RMP
1 message
Pfifer, Teresa <tpfifer@blm.gov> Tue, Nov 1, 2016 at 9:15 AM
To: BLM_CO UFO_RMP <uformp@blm.gov>
Forwarded
message From:
Jake Niece <jacobniece@gmail.com>
Date: Tue, Nov 1, 2016 at 9:03 AM
Subject: Public Comment Include
The Paradox Special Recreation Management Area in the RMP
To: tpfifer@blm.gov

One last public comment to you. I've lived in Colorado my whole life, and I value our wide open spaces. I recreate in both motorized and nonmotorized ways, including hunting. I have also been a wildland firefighter in southwest Colorado for the last six years, and have spent a lot of time working in the oil patches southeast of Durango. Seeing the extent of oil and gas development

BLM_0156644

there has been very disheartening, and I wish for protection of as much public land against it as possible.

The damage wreaked in the oil patches goes beyond the checkerboard of noisy wells, pads, and maze of roads. I've personally been sickened by hydrogen sulfide gas expelled from these wells, and I've happened across a lot of dead wildlife on the ground that I surmise was killed by it. In 2008 several firefighters were evacuated from the area and hospitalized because of hydrogen sulfide exposure (see the Maverick Fire Hydrogen Sulfide Gas Exposure Incident). I realize H2S gas may not necessarily be present in the The Paradox Special Recreation Management Area, but this is one of the unintended consequences brought on by mineral extraction
.

Here are more unintended consequences. The water at my house in the area of Arboles, CO was undrinkable because of fracking contamination, and the oil roads are used as trash dumps, meth lab locations, and poaching hotspots. We also now know that fracking can cause earthquakes, and poison the groundwater. The jobs provided by mineral extraction are boom and bust style that mostly bring drillers and pipeliners from out of the region, and do little to provide longterm stability.

I fear the day when every square foot of land that isn't a designated wilderness or national park is either dotted by a gas well every quarter mile, or covered by tailings piles. Do you want to see what this looks like? Attached is an image from google earth of the Southern Ute Indian Reservation where oil and gas development is unrestricted. You can see it yourself if you fly out of the Durango airport. This is what our future looks like if we don't protect SOME space from mineral extraction. There is so much area already available to mining, why don't we leave some unruined pieces for our kids? Please include the Paradox Special Recreation Management Area in the final RMP.
Jake Niece
720 352 2250
www.jakeniece.com

[see map in attachment]


000528_NorrisG_20161101  Organization: Greg Norris
Received: 11/1/2016 12:00:00 AM
Commenter1: Greg Norris - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 000528_NorrisG_20161101.htm (000528_NorrisG_20161101-388511.htm Size = 3 KB)
UFORMP_000528_NorrisG_20161101.pdf (000528_NorrisG_20161101-388512.pdf Size = 91

KB)
Submission  Text
Greg Norris <gsnorris@gmail.com>  Tue, Nov 1, 2016 at 2:22 PM

I am a resident of Paonia, CO and I support Alternative B and B1 for the future plan. Thank you for including  plan B1 in the draft RMP process.

There are multiple  reasons for my concern regarding the draft Resource Management Plan:

The area under consideration  is one of the most beautiful and environmentally  rich areas for humans,  wildlife,  fish,
ranching,  farming and recreation. Careful consideration  must be given to future use. We purchased a home in paradise, that is Paonia, which we use for our work and our retirement. We chose to live in this location for its beauty, climate, clean air and water, abundance of farms, ranches, orchards, wineries and the diversity  of people who live and work here.

We, along with many other residents, have many fruit trees that rely on uncontaminated  water from the mountains
streams and rivers. Drilling  and hydraulic  fracturing and resultant harm to the water table will have a negative impact on all of this. There will also be increased air pollution  and negative impacts on the abundant and diverse local wildlife.  The reasons for my statements are as follows:

16 million  gallons of water per well will be used. That is water taken out of the water needed for all the above. This
amounts to 70140 billion  gallons  nationwide.

Fracking affects groundwater and surface water resources.

1 million  gallons  of fracking "water" contains 4500 gallons  of chemicals.

Flow back can contaminate  streams and shallow  aquifers.

Potential leakage of wells.

A good example of unintended  consequences is the Animas River disaster. The EPA reports the over 1000 chemicals are used in fracking. 659 organic compounds are used. In addition,  fracking companies hide which chemicals they use by "confidential  product exclusion".  The US has > 112,000  wells. Do we really need more?
Fracking has proven to increase earthquakes. Many "culprit"  old wells didn't  have deep enough casings on them.
If the workers at the fracking sites don't  live in the area in which they are drilling,  I'm worried that they won't  care enough about the quality  of their work.

With reference to section 2.3 and 2.3.4 on page 27 of the DRMP, alternatives B and B1, pleae protect the areas where we fish north of Hotchkiss and hike in the North Fork Valley, close to our area of residence. We routinely  hike Jumbo Mountain and support Jumbo Mountain for the

BLM_0156646

designation of Special Recreation Management Area.
Again, the North Fork Valley is an agricultural and ranching community that has organic farms, wineries and ranchlands.

Drilling and horizontal hydraulic fracturing have negative impacts to the water, air and land in this area.
This area does not have the infrastructure to support the increases in industrialization that are part of drilling and
hydraulic fracturing. Our community is developing agriculture, recreation and tourism as the economic base at this
time. The ability to sustain and protect the views, watersheds and wildlife areas is important to the future of this area.

I respectfully request that you find Plan B and B1 as the RMP that will be the plan for the future for the Uncompahgre Field Office area.

Yours truly,
Gregory Norris, M.D.


000529_PaulsonD_20161101  Organization: Deborah Paulson
Received: 11/1/2016 12:00:00 AM
Commenter1: Deborah Paulson - Durango, Colorado 81301 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000529_PaulsonD_20161101.htm (000529_PaulsonD_20161101-388003.htm Size = 4 KB)
UFORMP_000529_PaulsonD_20161101.pdf (000529_PaulsonD_20161101-388002.pdf Size = 134 KB)
Submission Text
Date:11/01/2016

Commenter: Deborah Paulson

Organization:

Email:deborah.paulson@gmail.com

Address:7852 CR 203, Durango, CO 81301

Phone:

Comment:
Thank you for the opportunity to comment on the draft Uncompahgre Field Office RMP. I strongly support the citizens' Alternative B1 and Alternative B. The "balanced" approach you recommend in Alternative D will result in losses of quality of life in the North Fork Valley, loss of wilderness and ecological values in areas that deserve greater protections, and threats to endangered species.

<([#1 [15.2] It is especially important that species on the edge, like the Gunnison Sage--grouse, be given the strongest protections possible. As someone who has worked with the San Miguel Basin GSG Working Group, I have watched the transformation of Dry Creek Basin with the development of the oil and gas over the last decade. The road traffic and noise have increased dramatically, almost certainly with negative impacts for the grouse. The plan to withdraw leases in GSG habitat as they expire is helpful, but not sufficient. Restrictions on surface activities should err on the side of protection, using the maximum buffer distances from the literature to protect nesting, resting and winter habitat, as well as leks. According to the USGS Open-File Report 2014-1239, the maximum effect of most types of disturbance on grouse behavior and survival is about 5 miles. Buffers should be at least that much, as we are not currently succeeding in stopping the decline of this species. The ACECs for Gunnison Sage-grouse should be implemented. #1])>

The North Fork Valley is a beautiful and productive rural landscape. To open this area to oil and gas leasing makes no sense at all. The area will begin losing economic value as this peaceful agricultural landscape is industrialized with drilling, even without the spills and pollution of water this is likely. As a person who has visited the North Fork Valley many times as a tourist, buying fruit, visiting the towns and recreating on the BLM and FS lands nearby, I can assure you that O& G development in the valley would ruin that area's attraction; I would likely not go there anymore on my vacation time. Even more important, the people of the valley do not want the level of leasing you propose. I support them in favoring Alternative B1.

You have identified far more areas of critical environmental concern than you plan to protect in the RMP. Why would you not give the full protection to any area of critical concern that meets your criteria? In general, the Uncompahgre Plateau and surrounding area is probably more special than we have realized. All of the areas that you have identified as potential ACECs deserve strong protection in the face of the recreational and other pressures you document.

I value wilderness highly. I seek quiet recreation in landscapes with wilderness qualities. These areas are incredibly important to me personally. This includes those lower elevation areas, like the Adobe Badlands that are most threatened by motorized use. When I last visited the Adobe Badlands WSA, it was clear that it was being violated. It deserves wilderness designation and enforcement. So much of the badlands have already been made accessible to motorized recreation, you should protect the areas that still have wilderness qualities. I have also spent time in the lower Tabeguache Creek and Shavano Creek areas, hiking, birdwatching and botanizing with my husband. These, too, are areas that deserve recognition and protection of their wilderness values.

Deborah Paulson
7852 CR 203
Durango, CO 81301

000530_PlattA_20161101_EPA Organization: Environmental Protection Agency, Amelia A. Platt
Received: 11/1/2016 12:00:00 AM
Commenter1: Amelia A. Platt - Denver, Colorado 80202 (United States)
Organization1:Environmental Protection Agency
Commenter Type: Federal Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/12/2016 12:00:00 AM
Attachments: 000530_PlattA_20161101_EPA.htm (000530_PlattA_20161101_EPA-388004.htm
Size = 46 KB)
UFORMP_000530_PlattA_20161101_EPA.pdf (000530_PlattA_20161101_EPA-388005.pdf
Size = 1701 KB)
Submission Text
Hello: Please find attached EPA's comments on the subject document. A hard copy of the letter
was placed in today's mail. If further explanation of our comments is desired, please don't
hesitate to contact me.

Thanks,
Amy
Amelia A. Platt, Environmental Scientist
EPA Region 8 NEPA Program (8EPR-N)
1595 Wynkoop Street
Denver, CO 80202
303-312-6449?
Platt.Amy@epa.gov
http://www.epa.gov/compliance/nepa/

EPA 11-1-16 Comments UFO RMP DEIS.pdf


UNITED STATES ENVIRONMENTAL PROTECTION AGENCY REGION 8
1595 Wynkoop Street
Denver, CO 80202-1129
Phone 800-227-8917
www.epa.gov/region08

Ref: 8EPR-N
Dana Wilson, Acting Field Manager

BLM_0156649

Uncompahgre Field Office
Bureau of Land Management
Attn: Gina Jones, NEPA Coordinator
2465 S. Townsend Avenue
Montrose, Colorado 81401

RE: Uncompahgre Field Office Draft RMP/EIS, CEQ #20160118

Dear Ms. Wilson:

The U.S. Environmental Protection Agency Region 8 has reviewed the May 2016 Draft
Resource Management Plan (RMP) and Environmental Impact Statement (EIS) prepared by the
Bureau of Land Management for the Uncompahgre Field Office (UFO). The Draft EIS is
intended to analyze impacts associated with the BLM's long-range decisions concerning the use
and management of resources in the UFO RMP planning area. Our comments are provided for
your consideration pursuant to our responsibilities and authority under Section 102(2)(C) of the
National Environmental Policy Act (NEPA) and Section 309 of the Clean Air Act (CAA).

Background

The UFO planning area consists of approximately 3.1 million acres in southwestern Colorado
and includes BLM, U.S. Forest Service (USFS), National Park Service, Bureau of Reclamation,
state and private lands in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties. Of
this large planning area, about 675,800 surface acres and 971,000 mineral acres are administered
by the BLM. If approved, the new RMP will replace applicable portions of the BLM's San
Juan/San Miguel Planning Area RMP (1985) and the entire Uncompahgre Basin RMP (1989a).

Alternatives identified in the Draft RMP/EIS include: Alternative A (No Action), Alternative B
(emphasis on improving and restoring resources), Alternative B.1 (resource-based partial
alternative developed from recommendations provided by a community group and specific to oil
and gas leasing/development in the North Fork and Smith Fork drainages of the Gunnison River-
referred to as the "North Fork Area"), Alternative C (emphasis on maximizing resource uses),
and Alternative D- the BLM's Preferred Alternative (emphasis on balancing resource
conservation and resource use among competing interests).

The EPA's Comments and Recommendations

<([#1 [5.4] Based on the EPA's review of the Draft RMP/EIS, .an overarching observation is that
much of the existing conditions information is dated. For example, some of the discussion under
the Affected Environment sections for air, water, and energy resources rely on data that are 5-9
years old. An accurate representation of existing conditions is prerequisite to the ability to assess
future impacts. We recommend updating the existing conditions information, including the maps,
for the Final RMP/EIS and providing an explanation for any older data that the BLM considers
representative of current conditions.
#1])>
It appears that many aspects of the draft analysis are responsive to the EPA's recommendations

provided in our April 5, 2010 scoping letter. Given potential energy development over the Draft RMP's 15-20 year planning horizon and the high value air and water resources of the area, the EPA is interested in the BLM's approach to ensuring protection of these valuable resources. The EPA's remaining recommendations are intended to further inform the decision to be made and the public's understanding of potential impacts to public health and the environment.

The EPA's specific comments and recommendations pertain to the following issues: (1) air resources and climate change; (2) solid leasable minerals- coal; (3) groundwater resources; (4) surface water resources; (5) public drinking water supply sources; (6) water management and water resource monitoring; and (7) wetlands, riparian areas and floodplains. These issues serve as the basis for the EPA's EC-2 rating discussed at the conclusion of this letter.

1. Air Resources and Climate Change

Air Quality Analyses and Disclosure of Potential Impacts

The Draft RMP/EIS relies on the Colorado Air Resources Management Modeling Study (CARMMS) for far-field and regional air quality impacts, and focuses exclusively on the CARMMS high scenario for the UFO planning area. Although a primary purpose of NEPA is to enable the decision-maker and the public to understand the potential impacts of the alternatives analyzed, the air quality impacts (both detriments and benefits) of each of the alternatives are not identified in the Draft RMP/EIS. Further, it is unclear whether the CARMMS scenarios are representative of the level(s) of development being analyzed for this action because the CARMMS scenarios do not directly align with each project alternative, and the Draft RMP/EIS does not explain how the model scenarios are associated with the alternatives for the UFO planning area. As a result, the decision-maker and the public may not be sufficiently informed regarding air quality impacts associated with the alternatives' varying levels of development over the full planning horizon.

<([#2 [10.3] We recommend that the analysis be amended to include results from the low and medium CARMMS scenarios, and to the extent possible, the analysis explain how those impacts could be interpreted with regard to each of the Draft· RMP/EIS alternatives. We recommend that comparisons of impacts be made between the alternatives and not between base-year and future-year model results alone.

We also recommend considering whether the selected future year of 2021 is still representative or needs to be updated given that it is only 5 years from the date of this Draft EIS. For NEPA purposes, we recommend that the analysis of the cumulative impacts be based on the maximum emission year during the RMP planning horizon of about 15-20 years. The appendices to the June 2011 MOU for Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions through NEPA (AQ MOU) include an example that could be adapted for use with a reusable modeling framework such as CARMMS. This example emphasizes the importance of designing future year projections "to examine the potential for maximum growth in the planning area." At a minimum, we recommend that the Final RMP/EIS update current conditions with the most recently available information for the planning area counties, and then update the analysis to highlight any significant differences in air quality impacts between the alternatives. #2])>

Greenhouse Gas (GHG) Emissions and Climate Change

While the Draft RMP/EIS includes the direct and indirect emissions associated with the proposed activities and alternatives within the planning area, further clarification around the coal production assumptions is needed to ensure the estimates are reasonable. For example, given the projected continued decline in demand for coal, the BLM's assumption in the Draft EIS that coal mine production will remain unchanged from the base year (2008) and any existing mine production will be replaced by production from future mine development in the area may greatly overestimate associated GHG emissions. In addition, further clarification is needed on the source of information for the BLM's estimate of the current maximum expected production rate of approximately 11 million metric tons per year, versus the current permitted rates used for the direct emissions analysis. <([#3 [11.2] Given this RMP covers the same North Fork Area recently analyzed under the USPS's Colorado Roadless Rule EIS, [1] we recommend the BLM consider this analysis and incorporate relevant information regarding a range of potential future coal production scenarios and their associated direct and indirect GHG emissions into the Final RMP/EIS.

[footnote 1] Colorado Roadless Rule Website:
http://www.fs.usda.gov/wps/portal/fsinternet/!ut/p/c4/04SB8K8xLLM9MSSzPy8xBz9CPOos3g
DfxMDT8MwRydLA1ci72BTFzMTAwiQL8h2VAQAJp-
nEg!!/?ss=119930&navtype=BROWSEBYSUBJECT&cid=null&navid=111OOOOOOOOOOO
O&pnavid=null&position=BROWSEBYSUBJECT&ttype=roadmain&pname=Roadless-%2520
Colorado%2520Roadless%2520Rule #3])>

As mentioned earlier, the Draft RMP/EIS relies on the CARMMS for calculating indirect emissions, and focuses exclusively on the CARMMS high scenario for the UFO planning area. Therefore, we recommend that the Final RMP/EIS utilize the low and medium CARMMS scenarios to provide a reasonable range of indirect GHG emissions and explain to the decision-maker and the public how those impacts could be interpreted with regard to each of the Draft RMP/EIS alternatives.

In the Draft RMP/EIS, the BLM compares the proposal's estimated GHG emissions to U.S. and Colorado Statewide GHG emission levels. Such comparisons are "not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact."[2] <([#4 [11.3] EPA recommends that BLM follow the approach outlined by the CEQ's GHG Guidance regarding the analysis of GHG emissions and climate change.

[footnote 2] CEQ Guidance, p.11.

The Draft RMP/EIS incorrectly states that "the tools to analyze or predict how global or regional climate systems may be affected by a particular activity or activities within the planning area are not currently available." In addition, BLM inappropriately references conclusions from a 2008

modeled source to determine that activities under the UFO planning area would have no measurable impact on the climate. We recommend removing these statements and instead refer to CEQ's GHG Guidance for how to analyze climate change impacts. #4])>

2. Solid Leasable Minerals - Coal

Acres Proposed as Acceptable for Coal Leasing

The Draft RMP alternatives appear to substantially increase the amount of acres available for coal leasing (e.g., the 145,270. acres currently acceptable would be increased to 374,450 acres under the Preferred Alternative D) without explaining the change in management emphasis. Such an increase in available acreage would have inherent resource impacts at the development stage, including potential air and water resources impacts associated with developing or expanding a mine in areas with limited previous commercial coal mining. <([#6 22.1] Perhaps most importantly, the Draft RMP/EIS does not identify which coal fields have high levels of methane that would be vented prior to and during mining. #6])>

Coal demand is currently at low levels, and a number of energy market analysts predict a continuing decline in demand. In September 2016, Tri-State Generation and Transmission Association announced that its Nucla Station will be retired by the end of 2022. Coal for this power plant is supplied by the one operating coal mine in the Nucla-Naturita coal field. <([#7 [22.3] Accordingly, we recommend that the Final RMP/EIS assess whether coal demand in the Nucla-Naturita coal field will be short term and whether the amount of coal needed through 2022 may already be covered by existing leases. #7])>

<([#8 [22.1] Further, the coal technical report [3] prepared for the Draft RMP/EIS identified areas with potential for coal development during the plan life. The conclusions of the report include no expectation of commercial mining for the Tongue Mesa or Grand Mesa coalfields over the next 20 years (p. 59). In addition, the Draft RMP/EIS alternatives propose a new area for coal leasing in the Dakota Formation west of Montrose even though, according to the report, this area appears to have poor prospects for commercial mining.

[footnote 3] Coal Resource and Development Potential Report, Uncompahgre Field Office, Colorado, April 2010

With the above issues in mind, we recommend that the Draft RMP/EIS alternatives be revised regarding acreage proposed for coal leasing in order to reflect the predicted potential for development and anticipated market conditions for the planning horizon of the RMP (i.e., 15-20 years). To reflect changes in coal demand, specifically, we recommend that the Preferred Alternative be revised as follows: reduce the acreage available for leasing in the Nucla-Naturita field to the amount of coal needed to continue operating the power plant until 2022; delete available leasing for the Tongue Mesa and Grand Mesa coal fields due to the lack of commercial scale mining anticipated over the planning horizon of this analysis; and delete the proposed acreage acceptable for coal leasing in the area of the Dakota Formation west of Montrose due to poor prospects for commercial mining over the next 15-20 years. These changes to the Preferred Alternative would help to limit the potential for air and water resources impacts resulting from

BLM_0156653

project-level development. #8])> Should coal market conditions dramatically change, the decision to open any of these areas to coal leasing should be more fully analyzed with a site-specific environmental analysis, including whether these coal fields contain high methane coals and if there could be additional impacts related to accessing, mining and shipping coal from these fields.

If the BLM does not agree with the above recommendation to revise the Preferred Alternative's acreage proposed as acceptable for coal leasing, then it will be important to provide a more detailed rationale for proposing such a large increase over the existing acreage- particularly given the Draft RMP/EIS's prediction of lack of commercial mining interest in certain areas over the planning horizon.

Methane Mitigation Measures

As described in the Draft RMP/EIS and supporting documents, coal leasing and development activities are likely to continue around the existing operations at the Somerset coal field. This coal field is well known for being a gassy formation with substantial GHG emissions of methane. This ongoing issue has been analyzed in a number of the BLM's leasing decision environmental assessments and the USFS's EISs and EAs for exploration activities, vent holes and roads located on USFS land. The majority of methane from these coal mines is vented directly into the atmosphere. <([#9 [22.5] [22.1] We recommend that new leases in this area include stipulations that require the successful lessee to either use or combust a substantial portion of the methane vented from these mines. Given the magnitude of GHG emissions from these uncontrolled vents, if it is not economical to install methane mitigation measures then we recommend not issuing the leases until economic conditions improve sufficiently to make methane reduction feasible. #9])>
3. Groundwater Resources

Groundwater Characterization

<([#10 [37.2] It is important to characterize both the existing and potential groundwater and drinking water resources in the planning area. We recommend that the Final EIS identify and describe the quality of all groundwater sources that meet both the BLM definition of usable water under Onshore Order No.2, and those considered underground sources of drinking water (USDW) under the Safe Drinking Water Act (SDWA). Useable waters are "those waters containing up to 10,000 ppm of total dissolved solids" which must be reported, protected and/or isolated under BLM Onshore Order No.2; these aquifers are also considered Underground Sources of Drinking Water (USDW) if their total dissolved solids (TDS) concentrations are< 10,000 mg/L. As such, these USDWs are subject to protection under the SDWA unless an aquifer exemption has been granted.

One option to address this recommendation is to provide a set of stratigraphic column diagrams representative of the planning area that includes those formations containing mineral resources and all aquifers and water-bearing intervals. We recommend including additional information regarding water quality (TDS) and whether or not the groundwater may be considered useable or USDW. It would also be informative to describe what (if any) current use exists for those water

bearing zones.

We note that Figure 3-8, displaying the major geologic structures, is helpful. We recommend that the Final RMP/EIS map include all known geologic structures (i.e., faults and fractures) to further inform well placement at the project level and to avoid structures that are more likely to act as conduits for deeper fluid flow into shallower aquifers. Please also include the outline of the Piceance Basin Province, not just the structural boundary. #10])>

We would welcome the opportunity to discuss these recommendations further with you and/or the BLM Colorado State Office Hydrogeologist, if desired.

Mitigation for Impacts from Resource Extraction

Potential impacts to groundwater quality and quantity from resource extraction, such as mining and oil and gas production, are of concern in the planning area, including those associated with the following: leaks and spills; production and disposal of produced water or processing waters; use of pits, underground injection control (UIC) wells, infiltration basins and evaporation ponds; production wellbore integrity; closure requirements; pipeline use; and impacts associated with restimulation and abandonment of existing wells. The BLM's Preferred Alternative D includes leasing stipulations that will address some of these groundwater concerns. For example, No Leasing (NL) and Controlled Surface Use (CSU) stipulations are identified to protect groundwater wells and springs used in Public Water Supply systems. In addition, Alternative D includes a No Surface Occupancy (NSO) leasing stipulation that requires a 500 foot buffer from occupied dwellings- which by default would protect the associated domestic water wells in those areas. We support these measures.

<([#11 [37.5] In addition, the EPA recommends that the Final RMP/EIS include the following:

* A mitigation plan for remediating future unanticipated impacts to drinking water wells, such as requiring the operator to remedy those impacts through treatment, replacement or other appropriate means.

* A general production wellbore diagram and discussion to demonstrate how near-surface and deeper useable waters will be isolated and protected from fluid migration that may occur during oil and gas development activities. At a minimum, current Colorado Oil and Gas Conservation Commission (COGCC) protections for groundwater resources should be implemented. Specifically, we recommend that a discussion of the requirements of COGCC Rule 317, most recently updated on March 16, 2016, be included in the Final RMP/EIS. These requirements apply wherever "freshwater" groundwater sources exist (as described by COGCC Rule 317). In addition, we suggest requiring disclosure of all chemicals introduced to the wellbore (including maintenance chemicals) used at well pads to inform response decisions in the event of a spill or other impact.

* Abandonment procedures for sealing wells no longer in use in order to reduce the potential for inactive wells to serve as the conduits for fluid movement between production zone(s) and aquifer(s). This is particularly important where existing wells do not have surface casing set into

the base of USDWs and lack sufficient production casing cement.

Lastly, please update the reference to the EPA's hydraulic fracturing study (p. 4-83). While the original draft concluded that no "widespread" contamination related to oil and gas exploration was evident, there are scientific studies of groundwater impacts directly related to oil and gas operations in the Piceance Basin, Colorado, and elsewhere. We can provide a list of references if so desired. Please discuss these impacts in the Piceance Basin and what well construction practices will be required to prevent similar groundwater contamination within the planning area. #11])>

4. Surface Water Resources

Surface Water Characterization

<([#12 [37.2] Draft RMP/EIS Figure 3-10, Hydrologic Units, does not provide the level of detail necessary to understand the existing water resources of the planning area. The EPA recommends the Final RMP/EIS include maps with the following information:

* Water bodies in the planning area, including perennial, intermittent and ephemeral water bodies;

* Using the most recent EPA-approved CWA Section 303(d) list (which is 2016), water body segments classified by the CDPHE as water quality impaired or threatened under the Clean Water Act (CWA) Section 303(d); water bodies considered not impaired by CDPHE, and water bodies that have not yet been assessed by the CDPHE for impairment status. We also recommend that a table be provided to identify the designated uses of water bodies and the specific pollutants of concern, where applicable.

In addition, Tables 3-9 through 3-11 present data from the 2007-2008 timeframe, including some sampling data from 1998-2007. To ensure an adequate representation of existing conditions, we recommend that this information be updated for the Final EIS with the most recent available data. We recommend comparing existing conditions to existing water quality standards or other reference conditions and presenting associated water quality status and trends. #12])>

Surface Water Impacts

The Draft RMP/EIS presents information on impaired waterbodies based on the Colorado 2008 CWA Section 303(d) list. <([#13 [37.3] We recommend that the Final RMP/EIS address potential impacts to impaired water bodies within and/or downstream of the planning area based on the most recent EPA-approved CWA Section 303(d) list (which is 2016). The BLM should coordinate with CDPHE if there are identified potential impacts to impaired water bodies (in order to avoid causing or contributing to the exceedance of water quality standards). Where a Total Maximum Daily Load (TMDL) exists for impaired waters in the area of potential impacts, we recommend that pollutant loads from activities on BLM lands comply with the TMDL allocations for point and nonpoint sources. Where new loads or changes in the relationships between point and nonpoint source loads are created, we recommend that the BLM work with CDPHE to revise TMDL documents and develop new allocation scenarios that ensure attainment

of water quality standards. Where TMDL analyses for impaired water bodies within, or downstream of, the planning area still need to be developed, we recommend that proposed activities in the drainages of CWA impaired or threatened water bodies be either carefully limited to prevent any worsening of the impairment or avoided where such impacts cannot be prevented. #13])>

Erosion and Sediment Load Analysis

As noted in the Draft RMP/EIS, the Mancos Shale Formation, which overlays much of the planning area, often contains high levels of selenium and soluble salts that can degrade water quality in receiving streams and may represent a significant source of pollutants when mobilized by natural and human- caused soil disturbances. Both salinity and selenium yields can be accelerated by the same processes that increase sediment. Depending on a host of variables including soil characteristics, industrial operations and topography, associated runoff could introduce selenium, selenium and salts, as well as heavy metals, radium isotopes, biological pathogens, nutrients and other pollutants into surface waters.

We note that fragile soils such as those with elevated levels of salinity or selenium and/or those prone to erosion have been identified in the planning area. Because sediment loading is already a concern, and future activities (including livestock grazing, oil and gas development, and mining) that may be authorized under this RMP would result in new surface disturbance that may enable erosion, it is important the Final RMP/EIS include information about this issue. <([#14 [37.3] To fully disclose and, if necessary, mitigate the potential impacts of soil disturbance, we recommend that the Final RMP/EIS include an estimate of erosion rates and resulting impacts to water quality for each alternative. For example, the Wyoming BLM's Bighorn Basin Draft RMP/EIS estimated erosion rates based on projected amount of surface disturbance, types of surface disturbance and general characteristics of the basin (erodible soils, slopes, etc.). Erosion rates were calculated using the Water Erosion Prediction Project model (WEPP), a web-based interface developed by the U.S. Department of Agriculture, Agricultural Research Service, which can be accessed at http://www.ars.usda.gov/Research/_docs.htm?docid=18084&pf=l. We recommend that the BLM consider using this model or another appropriate model that would be applicable to this planning area.
#14])>
Surface Water Mitigation

We support the Best Management Practices (BMPs) and Standard Operating Procedures (SOPs) identified in the Draft RMP/EIS Appendix G. In particular, BMPs and SOPs applicable to livestock grazing, roads, oil and gas development, stream crossings, forestry, and travel management should reduce impacts to soils, wetlands/riparian areas and water resources from ELM-authorized activities in the planning area. We recommend augmenting these measures with the EPA's recommendations, described below.

Fluid Minerals Leasing and Other Surface-Disturbing Activities

Contaminants from surface events such as spills, pit and pipeline leaks, and nonpoint source runoff from surface disturbance have the potential to enter and impact surface water resources if

these events occur in close proximity to water bodies. If surface activities are set back from the immediate vicinity of surface water, wetlands, and designated source water protection zones, this provides an opportunity for accidental releases to be detected and remediated before impacts reach water resources. If accidental releases are not detected, the setback provides a safety factor and some possibility of natural attenuation occurring. Setbacks also help prevent nonpoint source pollutants such as sediments from impacting surface waters.

The Draft RMP/EIS contemplates a large increase in acreage subject to restrictions applicable to fluid minerals leasing and other surface-disturbing activities as compared to the existing RMPs. The Preferred Alternative D includes NL, NSO, CSU, and Timing Limitation (TL) fluid mineral leasing stipulations and No Ground Disturbance (NGD) and Site-Specific Relocation (SSR) restrictions for other surface-disturbing activities. These measures will be applied at the project level to protect water resources, including public water supplies; major rivers; perennial, intermittent, and ephemeral streams; and riparian areas, fens, springs and wetlands. Taken together, these leasing stipulations and surface-disturbing restrictions represent a significant improvement over the existing requirements, and we encourage you to continue this positive trend in protecting the UFO's valuable water resources.

<([#15 [37.1] Some of the BLM's proposed lease stipulations are not completely consistent with the EPA's general recommendations. For example, we generally recommend a minimum 100 foot NSO setback buffer from slopes greater than 30%; a minimum 500 foot NSO setback for flowing waters (rivers and streams) or 100-year floodplain, whichever is greater; a minimum 500 foot NSO setback for lakes, ponds and reservoirs, wetland and riparian areas and springs; and a minimum 750 foot NSO setback for 303(d) impaired waters. With this in mind, we recommend that the BLM's Preferred Alternative incorporate either these EPA recommendations or the stipulations described for Alternatives B/B.1 (which the Draft RMP/EIS describes as being more protective of water resources). In addition, we recommend clarifying Appendix B stipulation CSU-12 regarding protection of hydrology features under Alternative D. The stipulation description notes that CSU restrictions would apply from 325-500 feet of perennial streams, but it does not provide the related distances from intermittent and ephemeral streams; riparian areas, fens, wetlands; and water impoundments.
#15])>
Locatable Minerals - Uranium

<([#16 [24.5] The Draft RMP/EIS notes that there is a high occurrence potential for uranium in the planning area and predicts an increase in uranium extraction and processing over the planning horizon. It is unclear from the Draft RMP/EIS discussion (p. 4-287) which BMPs will be required for uranium exploration and reclamation. We recommend using existing roads to the fullest extent possible and following strict standards for any necessary road construction, stockpiling of topsoil, and sediment basins, similar to those identified in Appendix G., BMPs and SOPs, under the categories of Water, Riparian, Forestry, and Fluid Minerals practices and procedures for protection of water resources. We also recommend including a discussion of requirements for the adequate bonding of exploration activities to restore the mining site and repair any road damage that may occur from high runoff events. In addition, we recommend including a discussion and/or map to specify the areas more likely to experience heavy exploration in the future or to be the sites of new mines (we note that Figure 3-22 identifies

current active exploration sites). We encourage higher reclamation and bonding standards for exploration and mining in areas that have not been previously mined. Conversely, if the exploration and mining will be in an area with previous mining and incomplete reclamation, we recommend encouraging the proponent to improve reclamation for historic mining activities as part of the permitting process.
#16])>

Livestock Grazing

We support the development of design criteria to be utilized and refined during site specific analyses, including adaptive management/mitigation and monitoring measures to reduce the potential for impacts to aquatic resources. <([#17 [23.5] We recommend that the Final RMP/EIS include an expanded list of BMPs with consideration of the following:

* Management to limit deposition of animal waste in and adjacent to waterbodies, including protecting or repairing any existing exclusions, providing upland water developments, and development of new range improvements to discourage congregation near waterbodies.

* Enhanced monitoring of resource conditions adjacent to high value water resources.

* Monitoring to assess effectiveness of range improvements in protecting aquatic resources.
#17])>

<([#18 [23.5] We recommend that the Final RMP/EIS clarify whether adaptive management techniques would be applied under all alternatives since it currently appears to be discussed only under Alternative B. If adaptive management is included, we recommend that the Final RMP/EIS also identify the features of an effective adaptive management plan that would be utilized at the project level, including the following:

* Achievable and measurable objectives to provide accountability and guide future decisions;

* Specific decision thresholds with identified indicators for each impacted resource;

* Targets that specify a desired future condition;

* Commitment to implement a monitoring plan with protocols to assess whether thresholds are being met;

* Commitment to use monitoring results to modify management strategies as necessary; and

* Designated timeframes for completion of necessary management modifications.
#18])>

5. Public Drinking Water Supply Sources

The Preferred Alternative D includes fluid minerals leasing stipulations, including NL and CSU, to protect Public Water Supply systems. We support these measures as a strong step forward in protecting these valuable resources.

BLM_0156659

<([#19 [37.5] [37.1] Note that for groundwater and groundwater under the direct influence of surface water (GWUDI) public drinking water supply sources, we generally recommend a minimum one-half mile (2,640 feet) NSO or CSU concentric buffer. This recommendation is based on the professional judgment of the CDPHE Source Water Protection Program (SWPP). For additional information, please contact the CDPHE SWPP Coordinator, John Duggan, at 303-692-3534.

To further strengthen the BLM's efforts to protect public drinking water supply sources, we recommend that the Final RMP/EIS Preferred Alternative's Public Water Supply leasing stipulations incorporate either the above EPA recommendation for protection of groundwater and GWUDI public drinking water supply sources or the related stipulations described for Alternatives B/B.1 and noted by the BLM as being more protective of water resources. #19])>

6. Water Management and Water Resource Monitoring

Water Management

Water demand associated with mining or the drilling and completion of new wells in the planning area is an important consideration that will benefit from analysis and disclosure in the Final EIS. Although the oil and gas reasonably foreseeable development scenario for the planning area is relatively low over the RMP planning horizon, depletion of surface water in the planning area watersheds may affect major rivers and produced water from oil and gas development may affect groundwater. <([#20 [37.3] We recommend that the Final RMP/EIS include a general discussion of the following:

* A range of water demand per well developed in the planning area (based on predicted well depths, formation characteristics, and well designs, as well as hydraulic fracturing operations, if used);

* Possible sources of water needed for oil and gas development; and

* Potential impacts of the water withdrawals (e.g., drawdown of aquifer water levels, reductions in stream flow, impacts on aquatic life, wetlands, and other aquatic resources).

In addition, the EPA recommends the Final RMP/EIS include a general discussion of how flow back and produced water will be managed including:

* Estimated volume of produced water per well;

* Options and potential locations for managing the produced water (i.e., .UIC wells, evaporation ponds, and surface discharges);

* Possible target injection formations, formation characteristics and depth of any UIC wells; and

* Potential impacts of produced water management.

The EPA also recommends the BLM encourage operators to consider recycling produced water for use in well drilling and stimulation, thereby decreasing the need for water withdrawals and for produced water management/disposal facilities and minimizing the associated impacts. #20])>

Water Resource Monitoring

We fully support the intent of the Draft RMP/EIS Alternatives Band D to require more water resource monitoring than the No Action Alternative in an effort to inform protection of water resources, including detection of any impacts before they become widespread. We were unable to locate a monitoring plan in the available documents and recommend that one be provided in the Final RMP/EIS. We have identified some specific recommendations below for your consideration.

Fluid Minerals Leasing and Other Surface-Disturbing Activities

<([#21 [37.2] [37.5] The EPA recommends that the Final RMP/EIS address how water quality monitoring in the planning area will occur at the project level prior to, during, and after anticipated development to detect impacts to both surface water and groundwater resources, including private well monitoring. The EPA notes that for groundwater, operators will at a minimum need to conform to the COGCC requirements for pre-development and post-development groundwater monitoring described in Rule 609. As Colorado has no present requirements for surface water pre- and post-development monitoring, the EPA recommends the Final RMP/EIS describe how project-level monitoring will occur to identify any impacts to surface water resources resulting from oil & gas exploration and production. A recent example of a surface and groundwater quality monitoring plan is the "Water Quality Monitoring Plan" developed by the BLM for the Monument Butte Oil and Gas Development Project Final EIS.[4]

[footnote 4] Under "Documents" please see Final EIS, Appendix H: http://go.usa.gov/xgjTJ #21])>

Livestock Grazing

<([#22 [37.5] We recommend that Section 4.4.2, Livestock Grazing, include a discussion of how monitoring requirements will be applied at the project level to ensure that the BLM Colorado Public Land Health Standards are met. An explanation regarding how the Annual Operating Instructions will ensure compliance with project level monitoring requirements for parameters such as water quality would be helpful. To evaluate and adjust grazing management strategies, we recommend a monitoring section that describes how monitoring will be implemented on an allotment level and watershed or sub-watershed level to determine rangeland conditions including water quality status and trends. A wide array of monitoring options exist, and we are available to discuss the options if desired. #22])>

7. Wetlands, Riparian Areas, and Floodplains

Existing Conditions

<([#23 [37.2] We recommend that the Final RMP/EIS present inventories and maps of existing

wetlands and waters of the U.S. within the planning area, including waters that are regulated under Section 404 of the CWA and wetlands and waters that are protected under Executive Order 11990 - Protection of Wetlands (May 24, 1977). Providing information on existing acreage and functional health of these areas will be a valuable addition to the Final RMP/EIS in order to understand baseline conditions.
#23])>
Avoidance and Mitigation

It appears that activities approved under the Draft RMP could create adverse impacts to waters of the U.S., including wetlands, due to redundant road crossings, impacts form oil and gas pads (minimum of 1 acre) and grazing impacts from concentrated watering activity. Since ELM-authorized activities in the planning area, including grazing, oil and gas development and mining activities, have the potential to cause changes in hydrology due to surface disturbance, compaction and increased run-off, these changes in hydrology may result in stream structure failure and additional sediment loading of wetlands and riparian areas.

<([#24 [37.1] With this in mind, we recommend that the Final RMPI EIS describe how the BLM intends "to minimize the destruction, loss or degradation of wetlands, and to preserve and enhance the natural and beneficial values of wetlands" as described in EO 11990, including how wetlands will be identified and avoided, and how unavoidable impacts would be mitigated. Methods to protect wetlands, riparian areas and floodplains, include the following:

* Application of minimum setback requirements through leasing stipulations such as NSO for wetlands and riparian areas. The EPA recommends NSO within the footprint of wetland and riparian areas, as well as a 500 foot NSO setback from wetland and riparian areas (described in the Surface Water Mitigation section of Comment #4 above);

* Leasing stipulations to protect floodplains, such as NSO within the 100-year floodplain (described in the Surface Water Mitigation section of Comment #4 above); and

* Delineation and marking of perennial seeps, springs and wetlands on maps and on the ground prior to project level development to ensure identification of these resources to facilitate their protection.
#24])>
As noted above under Comment #4, the Preferred Alternative D's proposed increase in planning area acreage subject to restrictions applicable to fluid minerals leasing and other surface-disturbing activities at the project level to protect water resources, including riparian areas, fens, springs and wetlands, represent a significant improvement over the existing requirements. Again, we recommend clarifying Appendix B, stipulation CSU-12 regarding protection of hydrology features under Alternative D to provide the related setback distances from intermittent and ephemeral streams; riparian areas, fens, wetlands; and water impoundments. In addition, we recommend further strengthening these proposed protections by including either (1) the EPA's recommendations identified above or (2) the stipulations described for Alternatives B/B.1 (which the Draft RMP/EIS describes as being more protective of water and riparian/wetland resources).

<([#25 [34.1] [37.1] We also recommend that the Preferred Alternative include special

protections from livestock grazing, such as buffer zones for high quality riparian and wetland resources including springs and fens. In addition, we note that 11 grazing allotments were identified as "having problems meeting," or "not meeting," the BLM Colorado Public Land Health Standard 2 (riparian/water quality standard). We support including the full acreage of these affected 11 allotments in the "Improve" management category under the Preferred Alternative D.
#25])>

Lastly, we support the Preferred Alternative D proposal for several Areas of Critical Environmental Concern (ACEC) that will protect riparian/wetland resources and aquatic species values. We recommend that the BLM consider broadening these protections by including the additional or expanded ACECs related to riparian/wetland values identified under Alternative B (i.e., Dolores Slickrock Canyon, Roubideau-Potter-Monitor, and San Miguel River Expansion).

Other Issues

Mancos Shale Development Potential

<([#26 [21.2] We suggest that the Final RMP/EIS include a discussion regarding how or if the updated development potential of the Mancos Shale in the Piceance Basin, as recently determined by the U.S. Geological Survey, affects reasonably foreseeable development for the planning area. Based on this discussion, it may be necessary to update related sections of the Environmental Consequences chapter. (See Assessment of continuous (unconventional) oil and gas resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah, 2016: https://pubs.er.usgs.gov/publication/fs20163030.) #26])>

Threatened and Endangered Species

The Draft RMP/EIS identifies numerous Endangered Species Act-listed species known to exist or potentially exist in the UFO RMP planning area. We recognize that the BLM will discuss its determinations and findings regarding these species with the U.S. Fish and Wildlife Service (USFWS). <([#27 [15.1] Documentation of the USFWS's consultation and recommendations for mitigation and monitoring will be a valuable addition to the Final RMP/EIS.

In addition, given that water consumption and produced water disposal considerations identified in our Comment #6 above could impact four Colorado River endangered fish species, we recommend the Final RMP/EIS describe how the BLM will ensure that future projects will comply with the recovery goals of the Upper Colorado River Endangered Fish Recovery Program.
#27])>

The EPA's Rating

<([#28 [5] Based on our review, the EPA is rating Alternative D, the Preferred Alternative, as "Environmental Concerns- Insufficient Information" (EC-2). The "EC" rating means that the EPA's review has identified potential impacts that should be avoided in order to fully protect the environment, including potential impacts to air quality and water quality. The "2" rating means that the Draft EIS does not contain sufficient information for the EPA to fully assess

BLM_0156663

environmental impacts. #28])> A description of EPA's rating system can be found at: http://www2.epa.gov/nepa/environmental-impact-statement- rating-system-criteria.

Although we rated Alternative D as the BLM's Preferred Alternative, we recommend that the BLM's decision incorporate either the EPA's additional recommendations for water resource protections (described above) or the water resource protection measures identified under Alternatives B/B.1 since, as noted numerous times in the Draft RMP/EIS, these alternatives provide greater protection of water and wetland/riparian resources in the planning area. Relevant measures that were not part of the Preferred Alternative include additional restrictions applicable to fluid minerals leasing and other surface-disturbing activities (e.g., NL, NSO, CSU, TL, NGD, and SSR) to protect water and wetland/riparian resources and the additional or expanded ACECs related to riparian resource values.

We appreciate the opportunity to comment on this document and hope our suggestions for improving it will assist you with preparation of the Final RMP/EIS. We would be happy to discuss these comments and our recommendations. If you have any questions, please feel free to contact me at 303-312-6704 or Amy Platt, of my staff, at 303-312-6449 or by email at platt.amy@epa.gov.

Sincerely,
Philip S. Strobel
Director, NEPA Compliance and Review Program
Office of Ecosystems Protection and Remediation


000531_RazianoR_20161028 Organization: Renata Raziano
Received: 10/28/2016 12:00:00 AM
Commenter1: Renata Raziano - Montrose, Colorado 81403 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/12/2016 12:00:00 AM
Attachments: 000531_RazianoR_20161028.htm (000531_RazianoR_20161028-388367.htm Size = 2 KB)
UFORMP_000531_RazianoR_20161028.pdf (000531_RazianoR_20161028-388366.pdf Size = 275 KB)
Submission Text
Date:10/28/2016

Commenter: Renata Raziano

BLM_0156664

Organization:

Email:renata.raziano@gmail.com

Address:62062 Highway 90, Montrose, CO 81403

Phone:

Comment:
Dear BLM-UFO Staff and RMP Comment Team,

My family and I enjoy mountain biking, hiking and trail running. We live on the Uncompahgre Plateau and use the trails at Buzzard Gulch on a weekly basis. While we enjoy this trail system, the mileage at Buzzard Gulch is limited, and we often travel to other towns in the Western Slope to bike and hike. I feel the BLM needs to designate more nonmotorized SRMAs in Montrose so there are more opportunities for quiet recreation. Montrose has hundreds of miles of motorized trails, but Buzzard Gulch stands as the only nonmotorized trail system and has less than 10 miles of trail.

<([#1 27.1] I support the designation of nonmotorized SRMAs in Dry Creek and Spring Creek, but also would like to see the Kinikin Hills ERMA be designated an SRMA. This area is easily accessed from town and has terrain that is very promising for mountain biking. #1])>

<([#2 20.1] In addition, I am concerned that the Lands with Wilderness Characteristics designation in Dry Creek includes the Coyote Ridge and Coyote Cutoff trails. These trails are two of the most suitable trails for mountain biking in that Dry Creek area and should not be closed to mechanized use. #2])>

Beyond the enjoyment my family and I would derive from these trails, quality nonmotorized singletrack will bring visitors to Montrose and provide an economic benefit to businesses in town. Gas stations, restaurants, hotels and other stores all benefit when visitors come to recreate on the trails. Several other towns on the Western Slope, such as Fruita, Grand Junction and Cortez, have proven that quality nonmotorized trails provide a very tangible economic benefit, and Montrose is currently missing out on this opportunity.

Thanks you again for accepting my comments for the RMP process.

Sincerely,

Renata Raziano

000532_PritchardM_20161101_RFMBA Organization: Roaring Fork Mountain Bike Association, Mike Pritchard
Received: 11/1/2016 12:00:00 AM
Commenter1: Mike Pritchard - ,
Organization1:Roaring Fork Mountain Bike Association

Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000532_PritchardM_20161101_RFMBA.htm
(000532_PritchardM_20161101_RFMBA-381192.htm Size = 4 KB)
Submission Text
Mike Pritchard <mike.pritchard@imba.com> Tue, Nov 1, 2016 at 12:18 AM
To: uformp@blm.gov
Please see attached pdf for comments on the Bureau of Land Management, Uncompahgre Field
Office's
Resource Management Plan.
Sincerely,
Mike Pritchard
RFMBA, Executive Director / IMBA, Associate Region Director
(970) 9483486
. www.rfmba.org
(303) 5459011.
www.imba.com

October 31, 2016
Attention: Bureau of Land Management, Uncompahgre Field Office
Send Via Email: uformp@blm.gov

Please accept the following comments, provided by the Roaring Fork Mountain Bike
Association, a Chapter of the International Mountain Bicycling Association, regarding the draft
Resource Management Plan for the BLM public lands managed by the Uncompahgre Field
Office.
RFMBA recommends selection of Alternative B (and where it applies, Alt. B1) to provide the
best management strategies for the preservation of public lands while providing support for local
economies based on recreational activities and development. <([#4 [27.1] The Roaring Fork
Valley, managed by the BLM's Colorado River
Valley Field Office, benefits from two Special Recreation Management Areas (SRMA's) as well
as additional Extensive Recreation Management Areas (ERMA's). These designations allow for
BLM land managers and community partners to agree on the areas where specific investment in
developing high quality recreation amenities, especially non-motorized trail systems, will serve
the greatest needs of local populations. RFMBA wholeheartedly recommends that SRMA's and
ERMA's be designated within UFO's final RMP.
While our board members, and members at large, are focused on maintaining and evolving the
trail systems within the Roaring Fork Valley, many of us often travel to neighboring regions to
explore public lands and high quality trail systems. We stay in local hotels and B&B's with our
families, and search out new restaurants while enjoying time away from work. The economic
benefit story of high quality trails is one that has been grasped by communities throughout

BLM_0156666

Colorado, and we hope that towns like Delta and Paonia will benefit similarly based upon decisions that will be made within this RMP. #4])>

<([#3 [27.1] In consultation with our mountain bike and trail advocacy contacts at the Delta Area Mountain Bikers, we support the creation of an SRMA for the Jumbo Mountain area (as outlined in Alt. B1). Maximizing the size of this SRMA will ensure a diversity of recreation uses will be possible throughout the life of this Resource Management Plan. #3])>

<([#2 [27.1] In addition, we recommend designation of SRMA's and/or ERMA's for:
-North Delta (to connect the Grand Mesa to Delta City limits with mechanized routes).
-Hotchkiss High School Area (transformative educational pursuits on public lands).
-The Youngs Peak area near Crawford (community benefits: health, wellness, destination tourism).
-Elephant Hill / Lone Cabin (remote non-motorized backcountry experiences near Paonia).
-Paonia State Park & Reservoir (increased public access and amenity to existing state assets).
-Powell Mesa / Oak Mesa near Hotchkiss (community benefits: health, wellness, destination tourism).
-McDonald Mesa (remote non-motorized backcountry experiences near Crawford).
-Stevens Gulch (reclamation of mining impacted lands for recreation near Paonia). #2])>

Given the BLM's National Recreation Strategy of Connecting with Communities, implementing multiple SRMA's and ERMA's throughout the Uncompahgre Field Office will help to streamline the process of creating strong partnerships with the constituent communities in this region.

Please don't hesitate to contact me at (970) 948-3486 or mike.pritchard@imba.com. Thank you for your consideration of our recommendations.

Sincerely,
Mike Pritchard
RFMBA, Executive Director
IMBA CO/WY Associate Region Director


000533_RiddellJ_20161101 Organization: Jim Riddell
Received: 11/1/2016 12:00:00 AM
Commenter1: Jim Riddell - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Attachments: 000533_RiddellJ_20161101.htm (000533_RiddellJ_20161101-388470.htm Size = 15 KB)
UFORMP_000533_RiddellJ_20161101.pdf (000533_RiddellJ_20161101-388472.pdf Size = 674 KB)
Submission Text
Date:11/01/2016

Commenter: Jim Riddell

Organization:

Email:jriddell@frontier.net

Address:

Phone:

Comment:
Personal Information: I moved to Montrose Colorado in January 1999. For about the last three years, I have been sharing my time between Grand Junction and Montrose, and still own a home on Uncompahgre Road south of Montrose. My primary uses of public lands are quiet uses, such as hiking, mountain biking, skiing, backpacking, photography, wildlife watching, nature study, and stress relief.

I am a member of the Uncompahgre Valley Association and the Public Lands Committee of the Western Colorado Congress. I have helped promote wilderness protections for public lands in Western Colorado through those organizations as well as others, such as the Colorado Environmental Coalition (now merged into Conservation Colorado), the Colorado Mountain Club, the Wilderness Society, the Sierra Club, the Colorado Wilderness Network, and others. As such, I support the comments submitted jointly by those conservation groups.

I wish to add a few personal comments of my own about the UFO's current draft RMP and its impact on the resources of the UFO and its implications for me.

LANDS WITH WILDERNESS CHARACTERISTICS

To me, these are the most important lands managed by the UFO, as well as the most highly at risk. The assessments I have seen indicate that only about 6% of the land area covered by the RMP are inventoried as Lands with Wilderness Characteristics (LWCs). To me, this shows how thoroughly overrun and overused our local public lands already are. A guiding principle in Resource Management must be that the rarest resources deserve the most protection.

Sadly, the Preferred Alternative only recommends less than half of those lands for LWC designation. From half, will we take away another half, then another half, until there isn't enough left to be worth protecting? I urge the BLM to include far more of the inventoried LWCs in the final plan.

These lands are valuable not just because they are rare. They provide a human experience that is desperately important in our society: the opportunity to see how the world works when it is not all managed and damaged by humans, the opportunity to get away from the pressures of modern life and experience a slower, quieter, in some ways simpler, but also mode of living, within a dynamic, creative system far larger than ourselves. Not to mention, it's beautiful!

Natural places like LWCs also serve its previous inhabitants: the plants, animals, rocks, water systems. Those systems depend on far larger interconnected areas that go way beyond the boundaries of the tiny parcels we contemplate in our small plans like RMPs. Roads and drilling rigs and OHVs may come and go, but the natural systems are impacted far beyond our momentary impulses. As John Muir observed over a century ago, it only takes moments to destroy something that took millennia to grow or build.

I also encourage the BLM to consider that not all lands with naturalness, opportunities for solitude and unconfined recreation need to be ultimately destined to become permanent Wilderness Areas for them to deserve to have their wilderness characteristics protected as they currently exist.

It is also worth noting that motorized uses have far more impact per person than nonmotorized. Sound carries for miles in the dry desert, they create more erosion, have more visually disturbing impact, require more parking. Therefore, in terms of maximizing the recreational opportunities, the more land that is set aside for quiet uses, the more recreational opportunities overall. Taking a few percent of the land out of motorized use only decreases the motorized opportunity a tiny fraction. Taking away quiet use lands takes away a large fraction of those opportunities, for those of us (and there are many) who truly value most our recreation when it is out of sight and sound of "civilization."

Specifically, the LWCs in the Preferred Alternative are both too small, and too few.

Roubideau, Potter and Monitor Canyons and surrounding mesas:

This canyon system is both unique and spectacular. It has BY FAR the most remote feeling of any place I have explored in Western Colorado. But the experience of naturalness, unconfined recreation, and solitude is dependent on minimizing encroachment from surrounding areas. I have spent many days over the last 15 years in these canyons and absolutely adore them for their wild, primitive, pristine qualities. I have noted with delight that these lands have actually increased in their wildness over the years I have been traveling in them. There is less illegal motorized use, less vandalism, especially of signage, less impact from livestock due to improved rangeland management, the areas on the mesa tops that had vegetative treatments like herbicides, chaining and roller chopping have continued to regenerate. And a massive flood in Potter and Monitor about 10 years ago cut a far deeper stream channel and left debris scattered in a 100 foot swath up to 15 feet deep in some places. Nature is trying to reassert herself.

And Monitor Canyon, which currently has the least protection, also currently is the wildest. Access is challenging. There is no followable trail along the canyon floor, and the brush is thick and progress on foot is slow as I found a few weeks ago when I was there. This gives the opportunity for a type of "unconfined recreation" that is especially rare and valuable. The recreation of Discovery! Going where others haven't, or at least where signs that they have are nearly non-existent. Finding my own way. Knowing that bighorns or mountain lions or deer, elk, and smaller critters are more likely to be close by than people. Where else in the UFO can one get that, and still be so near to frequently traveled roads?

I urge the BLM to give full LWC, ACEC, EEA and Wild & Scenic designation to the entire region around Roubideau, Potter and Monitor Canyons. From the riparian habitat along the streams, one can easily look right up to the canyon rim roughly 1,000 feet above. Why should that area have more than a single management designation? If I can see any activity from the rim to the creek, so can the wildlife. And the hydrology suggests any human activity anywhere within the canyon will affect the stream at the bottom. The canyons are a whole. They should be treated as such.

I urge the BLM to create adequate buffers around the canyons. While the land surfaces on the mesa tops are not pristine to the trained eye, they still have a quality of wildness worth preserving. Plus, any motorized activity which might get right to the rim would certainly break the magic spell and destroy the soundscape within the wildest parts. I urge the BLM to keep motorized uses near the canyon rims to a minimum (no large groups or competitive events), and keep them more than 100 feet away from the rim wherever possible. This will benefit not only the quiet users and wildlife, but will enhance the experience for motorized users on the rim as well. It feels very different to stand at the edge of a vast chasm in silence, hearing only the wind, rather than sitting in or on a vehicle with the motor still running. Motorized users who park and walk a few feet to the rim may discover a far more satisfying experience. If they choose not to turn off and get away from their vehicles, then it wouldn't have mattered so much where they were, and they can have their experiences elsewhere where it won't destroy this unique wild place.

In addition, there are cultural resources, such as rock shelters, petroglyphs, historic rock carving, sheep-herder stone huts, Ute wickiups, etc. both along the canyon floor and on the top of Monitor Mesa. These irreplaceable resources will be far likelier to be preserved, the less vehicular travel is near them. I urge the BLM to close Monitor Mesa to any motorized travel.

These lands have no known mineral reserves, and the likelihood of finding something precious enough to make it worth developing is very low, while the likelihood of losing wild places is very high. I further urge the BLM to remove these lands from any mineral development, or new Rights of Way.

I understand from conversations with hunters that some prize Monitor Mesa I urge the BLM that if Monitor Mesa is left open to motorized use, that such use be seasonal only, for the hunting season, and that camping be limited to designated sites only, to minimize the loss of naturalness, and potential harm to archeological sites even on the mesa top.

Dry Creek:

This is another unexpected gem. The lands upstream (south) of where the Tabeguache Trail crosses Dry Creek is not as isolated or wild feeling as Roubideau/Potter/Monitor, but they are far wilder than anything else in the neighborhood (except R/P/M). I urge the BLM to designate the inventoried LWCs as LWC in the Final RMP.

One of the few signs of modern human activity is a single-track trail that cuts through the area.

My explorations recently suggested that there has been very little motorized use in recent years. Any motorized use, especially increased motorized use, would severely diminish the quality of solitude and naturalness of this area. There are other areas nearby that have recently been developed with new trails for mountain bikes, and many for singletrack, ATV, and 4WD in the area, which I am content with. They can stay in their areas. They don't need to destroy the few remaining wild places. I urge the BLM to close the LWC-inventoried portions of Dry Creek valley to motorized and mechanized uses.

West-End LWCs: Tabeguache Creek, Shavano Creek, Roc Creek, Dolores Canyon Addition

I am not as familiar with the wild lands in the western portions of the UFO, but soon I would like to explore them. If they are still there to explore. There are clearly segments there which have been inventoried to have wilderness qualities. I have heard no compelling arguments to allow them to be used for other purposes, and there certainly are reasons to protect those wilderness characteristics.

The population is growing in Western Colorado, and public land use per person is also growing rapidly. These areas are still wild because they have been farther away from population centers than most people have been willing to travel, and they have had little or no publicity. Let's keep it that way. They also are important as wildlife corridors, and connecting with higher-altitude ecosystems, including some areas that already have extensive Congressionally-approved protections within the National Forest. I urge the BLM to set aside all lands that have been inventoried to have wilderness qualities. It only takes a short time to reopen for other purposes a wild area that has been set aside. Oh sure, maybe a few years of hearings and EIRs and procedures. But it takes centuries for lands that have been used for other purposes to become truly wild and pristine again.

NON-MOTORIZED MECHANIZED USES (BICYCLES)

While I am arguing for more places with no motorized or mechanized uses at all, I must also speak up for mountain biking. I have had it pointed out from mountain bikers that they are often forgotten in planning processes. While I know that Travel Management in the UFO is largely being handled separately from the RMP process, I feel it is worth including a few thoughts here.

In my experience, bikes and horses don't mix well. Bikes move too quickly and too quietly and can easily spook horses, and horses cannot quickly get off a trail to allow mountain bikes to pass, so nobody's happy. Hikers and horseback riders seem to co-exist much more easily, and while I find that trails are often much looser, deeper and rougher when used heavily by horses, I don't begrudge them that experience. Otherwise, as long as they follow proper grazing, tethering and weed-free feed rules, they don't interfere with my enjoyment of wild places.

But all too often in planning processes, routes are open to a progression of priorities, from 4WD to ATV to Single-track motorized to hikers and horses. Bikes are left out, and do not get to have quiet recreation experiences but get lumped in with motorcycles. There deserve to be two parallel designations in the priority chain: 1) Hikers and horses, such as Wilderness or LWCs,. and 2) Hikers and non-motorized mechanized (bicycles). Occasionally there ought to be hiking

only with no horses or bicycles, but I have found that to be rarely needed.

TARGET SHOOTING

I see no reason why target shooting needs to be allowed in most areas of the UFO, with the possible exception of during hunting season. I find it frightening to hear gunshots out of season. I worry about the reliability and responsibility of gun users. I urge the BLM to limit target shooting to designated areas and times throughout the UFO.

THE NORTH FORK:

The district known as the North Fork of the Gunnison really deserves a special look. It, too is unique, not necessarily for its wild experiences, so much as for an isolated valley with a unique culture. It's idyllic. It's pastoral. It represents almost a throw-back to an earlier era.

Qualities that make it unique: Organic farming. Diverse, small, family operated farms both organic and conventional. Natural landscapes all around. A clear, clean river. Access to mountains, including one of the best fall color roads in the country.

These qualities would all be severely compromised by oil and gas development. The mineral development potential is not superior to that found elsewhere, or it would have already been developed. The pastoral character and culture is superior. It should be preserved, and that preservation can be aided by BLM management.

The only argument I can imagine for allowing it to be drilled/extracted is to hold it open "in case we need it later." We already know we will need clean water, clean air, wildlife and natural undisturbed places NOW and IN THE FUTURE.

I urge the BLM to close the North Fork Valley to Oil and Gas development. At the very least adopt Alternative B/B1 to protect the communities, culture and character of the North Fork Valley.

000534_HenningB_20161028_RockyMtnElkFdn Organization: Rocky Mountain Elk Foundation, Blake Henning
Received: 10/28/2016 12:00:00 AM
Commenter1: Blake Henning - ,
Organization1:Rocky Mountain Elk Foundation
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000534_HenningB_20161028_RockyMtnElkFdn.htm
(000534_HenningB_20161028_RockyMtnElkFdn-381193.htm Size = 7 KB)

Submission  Text
Toni O'Hara <tohara@rmef.org>

Dear BLM Uncompahgre Field Office,
Attached please find the Rocky Mountain Elk Foundation's (RMEF) comments on the
Uncompahgre Draft Resource Management Plan and Environmental Impact Statement. RMEF
appreciates the opportunity  to comment.
Sincerely,
Toni O'Hara
Lands & Conservation  Office Administrator
Rocky Mountain  Elk Foundation
406-523-0264  phone
406-523-4550  fax
tohara@rmef.org
www.rmef.org

RMEF Comments_Uncompahgre  RMP_10-28-2016.pdf
480K

October 28, 2016

Project Manager, Uncompahgre  RMP
Bureau of Land Management
Uncompahgre  Field Office
2465 South  Townsend  Ave.
Montrose, CO 81401
Email:  uformp@blm.gov

Re: Uncompahgre  Draft Resource Management Plan and Environmental  Impact Statement

The Rocky Mountain  Elk Foundation  (RMEF) appreciates the opportunity  to comment on the
Uncompahgre  Draft Resource Management Plan and Environmental  Impact Statement. The
RMEF has gone on record in favor of more active management on our public  lands.  We believe
that early successional  stages of habitat are largely  under-represented  across the west and we
favor plans  that address that shortfall.

<([#3 [2] The RMEF supports  Alternative  D, which emphasizes balancing resources and
resource use among  competing  human interests, land uses, and the conservation  of natural and
cultural  resource values, while  sustaining  and enhancing  ecological  integrity  across the
landscape, including  plant, wildlife,  and fish habitat. Table 3-16 of your analysis  indicates some
of the major vegetation issues in the decision  area: 1) Not enough  cool season perennial  grass; 2)
Exotic plants in community;  3) Not enough perennial  forbs; 4) Low plant diversity  in
community;  5) Shrubs in low vigor; 6) Not enough  warm season perennial  grass; 7) Browse
shrubs heavily  hedged; 8} Noxious weeds within  or nearby community;  and 9} Plant spacing too
great. The land health assessments determined that, in general, early seral (or grass- and forb-
dominated)  vegetation  is most lacking,  with the majority  of the landscape units needing  more of

this stage. Early mid-seral stage (shrub- and grass-dominated) vegetation is also lacking in the majority of units. While late-stage vegetation (mature tree or shrub) is too abundant in just over half of the units, it is lacking in other units. We agree with that assessment, and are pleased that the plan calls for remedying that situation.
#3])>

<([#1 [40.1] The only part of Alternative D that we do not support is the recommendation for Wilderness designation of 13, 350 acres of the Dolores River Canyon and 1,800 acres of the Sewemup Mesa. We are pleased that the Camel Back (10,400 acres), Adobe Badlands (10,430 acres), and Needle Rock (80 acres) Wilderness Study Areas were not recommended for Wilderness designation by Congress. With the identified shortage of early succession habitat within the planning area, active management is needed on a large scale and classification as Wilderness would prohibit active management for wildlife habitat. In the Colorado Plateau ecoregion's mid-elevation forest type the analysis points out that only 5% is in grass-forb type, while more than 71% is in Pinyon-Juniper type. While in the Southern Rockies ecoregion there is nothing identified in the grass-forb type, we suspect that it may be contained in the mountain shrub type.
#1])>

<([#2 [2] We do not promote management for grasses, forbs, and browse in early seral condition for the benefit of only elk or big game, but for a wide variety of wildlife that is dependent on "early seraI" for all or part of their habitat needs during their life cycle. It is estimated that more than 1/3 of all birds in North America are in population decline, and most have a close tie to early seral habitat. Recent elk nutrition research points out the importance of summer forage to ensure that a cow elk has sufficiently good body condition to become pregnant, provide for good calf development through the winter, and successfully nurse the calf in the spring. While wilderness and back country do provide hiding cover for elk and other wildlife, the closed canopy condition in many of these areas precludes early seraI conditions on the forest floor. Active management through prescribed burning, forest thinning (fuel treatments), timber harvest, noxious weed control, and natural unplanned ignitions can open the canopy and provide sunlight to the forest floor. This provides good biodiversity in the understory and benefits a wide variety of wildlife species. #2])>

Alternative D would provide substantial protection and enhancement of fish and wildlife populations and their habitats. It also would provide for significantly fewer impacts on fish and wildlife than would Alternative A (No action). Alternative D's overall objectives for fish and wildlife are similar to those of Alternative C: To restore, enhance, conserve, and promote aquatic and terrestrial species conservation and ecosystem integrity with the use of vegetation mosaic objectives. Alternative D's overall emphasis is on native species management, with objectives for ensuring habitat diversity, productivity, and viability, and on promoting ecosystem processes.

Compared with Alternative A, Alternatives B and D would reduce cumulative effects on fish and wildlife, due to fish and wildlife management emphasis based on current science and greater emphasis on landscape scale management of habitats and populations.

Compared with Alternative A, Alternative D's increased use of planned and unplanned fires to meet resource objectives would, in the long term, further decrease fire intensity and fuel loading. Mechanical treatments in all vegetation types, but especially in forest communities, could also

BLM_0156674

help reduce the potential for crown fires and make fires easier to manage and control.

Alternative D's vegetation management objectives focused on reducing fuel loads and flexibility in the use of planned and unplanned fires are likely to result in the lowest long-term fire suppression costs of any alternative.

Compared to Alternative A, Alternative D has more acres that could cause impacts on forestry due to timing limits. Under Alternative D there are 394,340 acres open to forest product harvest that overlap with timing limits, which is 22,100 more acres than under Alternative A.

RMEF supports Alternative D as the one that provides for the most active management while also providing wildlife habitat needs for elk and other wildlife. Thank you for the opportunity to comment.

Sincerely,
Blake L. Henning
Chief Conservation Officer

000535_RussellC_20161101 Organization: Chason Russell
Received: 11/1/2016 12:00:00 AM
Commenter1: Chason Russell - Woody Creek, Colorado 81656 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/12/2016 12:00:00 AM
Attachments: 000535_RussellC_20161101.htm (000535_RussellC_20161101-388369.htm Size = 2 KB)
UFORMP_000535_RussellC_20161101.pdf (000535_RussellC_20161101-388368.pdf Size = 86 KB)
Submission Text
Date:11/01/2016

Commenter: Chason Russell

Organization:

Email:chasonphoto@gmail.com

Address:144 Woody Creek Plaza, Woody Creek, CO 81656

Phone:

BLM_0156675

Comment:

Fall Greetings BLM,

I am writing in favor of the Wild and Scenic designation for the San Miguel and Dolores rivers. These rivers are the life blood of southwestern Colorado. Understanding there is a large demand from the agricultural industry to divert a vast majority of the water, a balance must be reached to insure a sustainable flow for fish and other wildlife.

Our greatest assets are free flowing rivers in this region. When sufficient flows allow, both the San Miguel and Dolores provide vast recreational opportunities, boosting economies in an otherwise quiet part of the sate. Unfortunately the lack of water released from the McPhee reservoir has all but decimated the wildlife habitat on the lower reaches of the Dolores river canyons. This is apparent to any river runner fortunate enough to float down either of the canyon sections below the dam when sufficient flows are returned to the river corridor.

The San Miguel has long since been a favorite location for moderate whitewater and pristine scenery and wildlife viewing. Because of the free flowing nature of the San Miguel, wildlife sightings and fishing opportunities are abundant. It is important this river corridor remains this way through the protection of a Wild and Scenic designation. Below the confluence of the two rivers the Dolores holds on to survival by thread of hope provided by whats left after diversions in the San Miguel River.

<([#1 [39.1] Please consider both the Dolores and San Miguel for Wild and Scenic designation #1])> . It is both important for the present and the future.

Thank you,

Chason Russell
144 Woody Creek Plaza
Woody Creek, CO
81656

000536_SchottJ_20161031 Organization: James Schott
Received: 10/31/2016 12:00:00 AM
Commenter1: James Schott - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 10/31/2016 12:00:00 AM
Attachments: 000536_SchottJ_20161031.htm (000536_SchottJ_20161031-388371.htm Size = 9 KB)
UFORMP_000536_SchottJ_20161031.pdf (000536_SchottJ_20161031-388370.pdf Size = 101

BLM_0156676

KB)
Submission  Text
Date:10/31/2016

Commenter:  James Schott

Organization:

Email:jamesschott@sopris.net

Address:42229  Lamborn Mesa Road, Paonia, CO 81428

Phone:

Comment:
Dear BLM-UFO Staff and RMP Comment Team

We are writing  to express our support for the North Fork Alternative Plan (NFAP) referred to in
the Resource Management Plan, (RMP) as Alt B1and our opposition  to the draft plan referred to
as Alternative D the "preferred plan"  which would open 90 % of the Uncompahgre area to oil
and gas leasing, endangering  wilderness  quality  land, wildlife,  recreation, cultural and
agricultural  resources. One need only visit  this area to know that putting these lands and
resources at risk with speculative oil and gas leasing is a needless risk. The economy, health, and
welfare of the
community  will  not be well served by misunderstanding  the priorities.  The NFAP B1 alternative
puts wild lands, wildlife  habitat, recreation areas and agricultural  resources off-limits  to oil and
gas speculation  and balances all resources managed by the Bureau of Land Management.

We live in the North Fork Valley on a small farm where we grow lavender, raise Highland cattle,
Dorper sheep, chickens for meat and eggs. These products  and the agro-tourism  associated with
them is the source of significant  income for us. We rely on the people  who come here for the
Festivals and summer activities to buy our products. We are also active hikers and campers. We
also fish in the streams and lakes of the area covered by the Resource Management Plan (RMP).
As semi-retired  persons we not only  rely upon the products we produce but we rely upon the
knowledge  that our investment in this property will  be secure into the future.

The North Fork Alternative Plan B1 (NFAP): The NFAP was submitted  to the BLM to ensure
that the agency considered its strongest levels of protections for the North Fork Valley's public
lands resources. The NFAP is a resource-based proposal that provides  strict protections  for the
North Fork Valley  and the watershed as a whole. The NFAP was the result of a collaborative
effort that included  the Western Slope Conservation Center, Valley Organic Growers
Association, the West Elk Winery Association,  and the Delta County Commissioners.  The plan
represents a minimum  level of management needed to ensure that the value  of the North Fork's
public  lands, its healthy lands and water, air quality,  scenic and recreational attributes are not
diminished.

BLM_0156677

<([#1 [21.1] The BLM has the authority to use a little used tool called "No Leasing". The BLM should use this tool to close 75% of the of the North Fork Area to oil and gas leasing for the life of the RMP. Based upon a complete and accurate assessment of the specific resource concerns of the area this designation is called for.
#1])>

<([#2 [21.1] 20% of the North Fork should be designated for "No Surface Occupancy"
#2])>

<([#3 [21.1] Less than 5% of the North Fork area would not be closed but be managed with stipulations to protect areas with moderate geologic hazard and vistas. #3])>

<([#4 [5.3] The RMP did not take the NFAP seriously and therefor did not compare it with all the alternative plans. It was treated as an add--on to alternative B only. A complete analysis of the NFAP is necessary. #4])>

<([#5 [37.3] [30.3] Agricultural concerns: Our farm is certified organic and biodynamic. Contamination of our water supply would not only be unhealthy to our products and animals it would ruin the economic value of our certifications. Our irrigation water comes from Turner Ditch with is fed from Minnesota Creek and Beaver Reservoir. This resource would be endangered by the known risks from the failure of pipelines, and the accidental release of pollutants into the streams, ditches, and watersheds from drilling operations. The RMP does not take into consideration these risks in its analysis. The RMP does not take into consideration the impact of flooding of oil and gas fields and pipelines which could cause contamination of irrigation water. There should be no oil or gas leasing near any of the major river and stream corridors of the North Fork of the Gunnison, the Gunnison and Smith Fork Rivers.
#5])>

<([#6 [37.3] Domestic water supply: The "preferred plan" removed only 1% of the total area proposed for leasing in the old RMP that was 30 years old. The current plan does not take into consideration the danger that the known risks from oil and gas operation produce in the form of contaminated streams, underground water sources including wells and springs. Our water originates from several springs on the lower slopes of Lamborn Mountain and Lands End. German Creek and Bell Creek are both put at risk. The RMP does nothing to protect those resources from known and proven risks from accidental spills and flooding. #6])>

<([#7 [10.3] Air quality: The plan does not take into consideration the cumulative impact of oil and gas exploration. There is proven release of methane gas from drilling and fracking operations and there are multiple proven cases of leaks from pipelines. In addition the massive increase in truck traffic will contribute to polluting the air we, as well as the plants and animals breath. Currently the BLM does not have adequate information to evaluate air quality impacts from the activities connected with oil and gas exploration and exploitation #7])> .

<([#8 [14.1.3] Wildlife: Oil and gas drilling and especially the fracturing process are loud, brightly lighted and operates 24 hours a day 7 days a week. The RMP does not take into consideration the negative impact these operations will have upon the wildlife. Pipelines cut through wild areas and interrupt the natural migration of elk and deer. Increased traffic and new roads cut into the wild, disrupt animal wellbeing and disrupt natural behaviors and could result in

BLM_0156678

diminished populations #8])> .

<([#9 [30.3] Economic impact: The RMP does not assess the economic impact of the industrialization of the valley that is currently famous for its wineries, organic agriculture, hunting and fishing, outdoor recreation, agri-tourism, scenic beauty and quality of life. There is a proven history in areas where oil and gas exploration take place that property values drop as much as 25%. In an area that is increasing attractive to retired persons the threat of oil and gas exploration has kept them away. Banks in areas with fracturing activity are reluctant to make mortgage loans on property. Even the threat of this kind of activity will have a negative impact upon the real estate business.

Damage done to the wildlife in the area will reduce the economic benefit the valley receives from hunting deer and elk. Outdoor recreation of all kinds from hiking, climbing to fishing would be impacted by the presence of oil and gas industrial installations.

The North Fork Valley is part of the West Elk Scenic By-Way. The RMP does not assess the impact of oil and gas exploration and activity on the rural character and the scenic beauty of the area that draws people from throughout the state and the country. #9])>

<([#10 [18.3] Human Health: The RMP does not assess the impact of oil and gas exploration and activity on human health. Every increasing numbers of studies are revealing the negative impact of fracturing on the air, water, visual and auditory environment which in turn has had health consequences for people and animals living in areas with these activities. The RMP must take these into consideration. #10])>

<([#11 [20.1] Terror Creek and Stevens Gulch area: The RMP must protect all lands with wilderness characteristics, including Terror Creek, one of the "Ecological emphasis areas". The area is home to the Purple Martin that are not found in other areas. It is also home to one of the largest mature aspen stands in the world, providing prime habitat for elk and deer and provides important connectivity between the valley bottom and the roadless lands on the Grand Mesa. Hunting in the area is an important part of our culture and our economy. #11])>

In conclusion: The BLM should listen to the local residents in Crawford, Hotchkiss, and Paonia who worked with local organizations and government to create the NFAP B1. This locally driven alternative is the best way to protect the whole Gunnison Watershed and support farmers, protect public health, sustain ecological well-being and build a sustainable rural economy on Colorado's Western Slope that does not depend upon "boom and bust" extractive industrial activity that will, in the end, leave us with a depressed economy and with a ruined environment.

James and Carol Schott
42229 Lamborn Mesa Road
Paonia, CO 81428

000537_SchultzK_20161101_TEDX Organization: The Endocrine Disruption Exchange, Kim Schultz
Received: 11/1/2016 12:00:00 AM

Commenter1: Kim Schultz - Paonia, Colorado 81428 (United States)
Organization1:The Endocrine Disruption Exchange
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000537_SchultzK_20161101_TEDX.htm (000537_SchultzK_20161101_TEDX-381194.htm Size = 23 KB)
Submission Text
Kim Schultz <kim@tedx.org>

To Whom It May Concern,
Please see the attached comments submitted by The Endocrine Disruption Exchange to the BLM regarding the Draft Resource Management Plan for the Uncompahgre Field Office.
Thanks,
Kim Schultz
Research Assistant
The Endocrine Disruption Exchange (TEDX)
PO Box 1407
Paonia, CO 81428
(970)527-4082
www.tedx.org

U.S. Department of the Interior
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Nov. 1, 2016

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Introduction

The Endocrine Disruption Exchange (TEDX) located in Paonia, Colorado, is a non-profit 501(c)3 organization dedicated to compiling and disseminating technical information on chemicals that affect health and the environment. Our clientele includes all levels of government, academicians, small to large non-profit organizations, and individuals involved in public health across the US and internationally. More information on the work of TEDX can be found at www.tedx.org.

<([#1 [2] [18.2] While we are pleased that the BLM is updating the outdated Resource

Management Plan (RMP), TEDX would like to see Alternative D, the BLM's Preferred Alternative, strengthened to better protect human and environmental health. Specifically, the BLM did not adequately take into account risks to human health from increased oil and natural gas development when drafting the Alternatives. For example, Alternative D has the second highest estimated total emissions level yet remains the Preferred Alternative. Coloradans already live with degraded air quality from oil and gas activity (Colborn et al 2014, McDuffie et al 2016). Nearly 16,000 people live within one-half mile of an oil or gas well drilled on public land in Colorado and new well development will further degrade our air quality, increasing the risk of health impacts in exposed populations (Oil and Gas Threat Map 2016). Further, under Alternative D total acreage available for leasing for fluid mineral development decreased by only 1% throughout the Planning Area.

[References:
Colborn T, Schultz K, Herrick L, Kwiatkowski C. 2014. An exploratory study of air quality near natural gas operations. Hum Ecol Risk Assess 20(1):86-105, doi:10.1080/10807039.2012.749447.

McDuffie EE, Edwards PM, Gilman JB, Lerner BM, Dubé WP, Trainer M, Wolfe DE, Angevine WM, deGouw J, Williams EJ, et al. 2016. Influence of oil and gas emissions on summertime ozone in the Colorado Northern Front Range. J Geophys Res Atmos 121, doi:10.1002/2016JD025265.]

Alternative B1, the North Fork Alternative Plan (NFAP), still allows fluid mineral leasing, but potential development estimates and associated emissions are much lower due to the increased buffer area between oil and gas development and population centers (4-32). The NFAP requires the strongest protections for air, groundwater, and surface water. While the BLM was required to consider the NFAP, none of the recommendations were included in Alternative D. #1])>

<([#2 [18.2] Public Health Risks from Oil and Natural Gas Development

Three hundred articles have been published in peer-reviewed journals since the NFAP was submitted in 2013. Articles documenting air and water pollution have expanded beyond chemical detections to include pollutant exposure pathways, and these articles indicate an increased potential public health risk from exposure to chemicals found near oil and gas development. Sensitive populations, including pregnant women, children, and the elderly residents, are more susceptible to adverse impacts from chemical exposure.

Six articles were published on endocrine disruption and unconventional oil and gas development (UOG). Three of these studies target prenatal exposure from populations impacted by UOG in Colorado and Pennsylvania. Associated developmental outcomes include congenital heart defects (McKenzie 2014), babies born with low birth weight and small for gestational age (Stacy et al 2015), and preterm birth (Casey et al 2015). Endocrine effects from environmentally relevant exposure levels to fracking fluids in laboratory mice include altered organ weights (testes, thymus, uterus, ovary), disrupted hormone activity, and potential impacts on fertility (Kassotis et al 2016a,b).

BLM_0156681

[References:

Casey JA, Savitz DA, Rasmussen SG, Ogburn EL, Pollak J, Mercer DG, Schwartz BS. 2015. Unconventional natural gas development and birth outcomes in Pennsylvania, USA. Epidemiology 27(2):163-172, doi: 10.1097/ede.0000000000000387.

Kassotis CD, Bromfield JJ, Klemp KC, Meng CX, Wolfe A, Zoeller RT, Balise VD, Isiguzo CJ, Tillitt DE, Nagel SC. 2016. Adverse reproductive and developmental health outcomes following prenatal exposure to a hydraulic fracturing chemical mixture in female C57Bl/6 Mice. Endocrinology 157(9):3469-3481, doi: 10.1210/en.2016-1242.

Kassotis CD, Klemp KC, Vu DC, Lin C-H, Meng C-X, Besch-Williford CL, Pinatti L, Zoeller RT, Drobnis EZ, Balise VD, et al. 2016b. Endocrine-disrupting activity of hydraulic fracturing chemicals and adverse health outcomes after prenatal exposure in male mice. Endocrinology 156(12):4458-4473, doi: 10.1210/en.2015-1375.

McKenzie LM, Guo R, Witter RZ, Savitz DA, Newman LS, Adgate JL. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environ Health Perspect: 122(4):412-417, doi: 10.1289/ehp.1306722.

Stacy SL, Brink LL, Larkin JC, Sadovsky Y, Goldstein BD, Pitt BR, Talbott EO. 2015. Perinatal outcomes and unconventional natural gas operations in southwest Pennsylvania. PLoS ONE 10(6):e0126425, doi: 10.1371/journal.pone.0126425.] #2])>

<([#3 [18.3] [18.2] UOG emissions can also impact the respiratory system. New research has found an association between proximity to UOG activity and an increase in asthma exacerbations (Rasmussen et al 2016). Inhalation of silica, a proppant used during fracking, and diesel exhaust from increased truck traffic and on-site equipment, can increase respiratory disease (McCawley 2015). Pride et al found that short-term exposure to rising ozone levels near UOG was associated with increased visits to a health clinic for respiratory effects in an impacted community in Wyoming (2015).

[References:

McCawley M. 2015. Air contaminants associated with potential respiratory effects from unconventional resource development activities. Semin Respir Crit Care Med 36(3):379-387, doi: 10.1055/s-0035-1549453.

Pride KR, Peel JL, Robinson BF, Busacker A, Grandpre J, Bisgard KM, Yip FY, Murphy TD. 2015. Association of short-term exposure to ground-level ozone and respiratory outpatient clinic visits in a rural location – Sublette County, Wyoming, 2008–2011. Environ Res 137:1-7, doi:10.1016/j.envres.2014.10.033.

Rasmussen SG, Ogburn EL, McCormack M, Casey JA, Bandeen-Roche K, Mercer DG, Schwartz BS. 2016. Association between unconventional natural gas development in the Marcellus Shale and asthma exacerbations. JAMA Intern Med 176(9):1334-1343, doi:10.1001/jamainternmed.2016.2436.]

BLM_0156682

Exposure to chemicals detected near UOG have led to other adverse health outcomes as well. A health symptom survey from a densely drilled area in Pennsylvania found that residents living within 1 km of a natural gas well more frequently reported respiratory as well as dermal symptoms compared to residents living 2 km or more from a well (Rabinowitz et al 2015). Another Pennsylvania study found a relationship between well density and hospitalization rates for cardiac, neurologic, and dermal effects among others (Jemielita et al 2015). Tustin et al found a relationship between residents living near UOG in Pennsylvania and nasal, sinus, migraine, and fatigue symptoms (2016). Like Colorado, Pennsylvania is heavily impacted by UOG. Due to concerns over health effects, the Pennsylvania Medical Association recently called for a moratorium on new drilling and hydraulic fracturing until the health risks are more thoroughly understood.

[References:
Jemielita T, Gerton GL, Neidell M, Chillrud S, Yan B, Stute M, Howarth M, Saberi P, Fausti N, Penning TM, et al. 2015. Unconventional gas and oil drilling is associated with increased hospital utilization rates. PloS One 10(7):e0131093, doi: 10.1371/journal.pone.0131093.

Rabinowitz PM, Slizovskiy IB, Lamers V, Trufan SJ, Holford TR, Dziura JD, Peduzzi PN, Kane MJ, Reif JS, Weiss TR, et al. 2015. Proximity to natural gas wells and reported health status: results of a household survey in Washington County, Pennsylvania. Environ Health Perspect 123(1):21-26, doi: 10.1289/ehp.1307732.

Tustin AW, Hirsch A, Rasmussen S, Casey J, Bandeen-Roche K, Schwartz B. 2016. Associations between unconventional natural gas development and nasal and sinus, migraine headache, and fatigue symptoms in Pennsylvania. Envion Health Perspect doi: 10.1289/EHP281.]
#3])>
<([#4 [18.3] Given that the BLM did not consider a No-Leasing Alternative and in light of the above research indicating significant adverse health impacts from UOG, the BLM should, at a minimum, adopt NFAP regarding fluid mineral leasing in the North Fork Valley, and the BLM should apply this conservation framework to cover leasing throughout the Planning Area. The BLM needs to consider the health risk to the populations living near leasable public lands.

BLM should be required to do the following:

* The BLM must begin with a realistic estimate of impact.
The BLM estimates 1,271 wells could be drilled in the Planning Area, 418 wells on land managed by the BLM, identifying impacts from only coalbed methane wells and conventional natural gas wells (3-121). Impacts from UOG including horizontal drilling and hydraulic fracturing were not analyzed.

* The BLM must take into account that UOG is more damaging to the health and the environment than conventional oil and gas extraction.
UOG wells are deeper and horizontal laterals can stretch up to a mile requiring larger amounts of toxic chemicals. Drilling muds containing weighting agents, emulsifiers, and lubricants are used

BLM_0156683

to help move the drill bit down the well bore and can contain toxic chemicals; naphthalene (endocrine, immune, and neurologic system toxicant, mutagen, carcinogen), and petroleum distillates (gastrointestinal, respiratory, and neurologic system toxicants) are some of the most common ingredients found in drilling products (Colborn et al 2011).

[References:

Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2011. Natural gas operations from a public health perspective. Hum Ecol Risk Assess 17(5):1039-1056, doi:10.1080/10807039.2011.605662.]
#4])>
<([#5 [10.3] Fracking requires millions of gallons of water to mix with thousands of pounds of chemicals per well, increasing the impact with additional truck trips to bring this water to the well site. Chemical products used for fracking include biocides, solvents, corrosion and scale inhibitors, friction reducers, and surfactants. Among the most common chemicals used during fracking are crystalline silica (respiratory toxicant, carcinogen), methanol (endocrine, cardiovascular, neurologic, and respiratory system toxicant), and 2- butoxyethanol (endocrine, immune, cardiovascular, neurologic, and respiratory system toxicant) (Colborn et al 2011). In addition, an estimated 30% to 70% of the fracking fluid will resurface as flowback, which, along with produced wastewater, will need to be trucked offsite for disposal. Recent studies by Colorado State University have found flowback to be the largest contributor to air pollution of any phase of well development (Colorado State University 2016a,b).

[References:
Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2011. Natural gas operations from a public health perspective. Hum Ecol Risk Assess 17(5):1039-1056, doi:10.1080/10807039.2011.605662.

Colorado State University. 2016a. Characterizing Emissions from Natural Gas Drilling and Well Completion Operations in Garfield County, CO. Available at http://www.garfield-county.com/air-quality/air-emissions-study.aspx.

Colorado State University. 2016b. North Front Range Oil and Gas Air Pollutant Emission and Dispersion Study. Available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0ahUKEwj7pb Hb5vjPAhUIx2MKHfLdDj0QFggcMAA&url=http%3A%2F%2Fsource.colostate.edu%2Fwp-content%2Fuploads%2F2016%2F09%2FCSU_NFR_Report_Final_20160908.pdf&usg=AFQjC NFImddRt3awfZVMah4QJVl4yJ3npQ&cad=rja.]
#5])>
* The BLM must assess impact from development of the Mancos Shale underlying the Upper North Fork Valley.
This formation was recently discovered to have the second largest reservoir of natural gas in the country, increasing interest in this area from the natural gas industry. Extraction from the Mancos Shale is obtainable only through UOG.

* <([#6 [10.3] The BLM must begin testing air quality immediately throughout the Planning

Area beginning with the EPA Criteria Pollutants list rather than estimating averages and relying on models.

Table 3-1 reports Average Annual Air Pollutant Emissions using data from 2008, when there was limited oil and gas development. Also, potential emissions from Criteria Pollutants were estimated for reasonably foreseeable activities until 2021, but the RMP may be in place as long as 30 years if following the current RMP timeframe. These emission levels significantly underestimate potential impacts to air quality. Due to varied characteristics such as elevation and topography, locations where the existing measurements are taken should be representative of the Planning Area. #6])>

* <([#7 [10.4] The BLM needs to address the cumulative air pollution contribution from multiple sources.

The BLM cannot assume that rural air is cleaner than towns and cities as it can already be impacted from industrial activities associated with natural resource extraction (3-4). In addition to oil and gas development, air pollution comes from coal mine methane vents, diesel exhaust, and mineral extraction among other sources. Increases of emissions from these sources are predicted to increase levels of particulate matter and encourage ozone formation in the Planning Area (4-21).
#7])>

* <([#8 [10.2] The BLM needs to establish background air quality in the 139,540 acres in the North Fork area open for leasing under Alternative D.

Multiple tests should be carried out in several locations throughout the proposed lease areas. These need to include analysis for volatile organic compounds (VOCs), nitrous oxides, polycyclic aromatic hydrocarbons, aldehydes, and sulfides.
#8])>

* <([#9 [10.3] The BLM needs to test for Hazardous Air Pollutants (HAPs).

Increased emissions of HAPs from oil and gas extraction are predicted for all Alternatives (4-21). HAPs are toxic compounds recognized as causing adverse impacts on health and the environment. Health effects associated with exposure to HAPs include endocrine effects such as increases in reproductive and developmental disorders, impacts on the cardiovascular and immune systems, and increased rates of cancer among many others.
#9])>

* <([#10 [10.3] [18.3] The BLM needs to test for secondary pollutant VOCs in areas near oil and gas development.

Multiple ozone precursors are released during well development and production, and Table 3-2 shows existing ozone concentrations are out of compliance under the National Ambient Air Quality Standards. The BLM acknowledges that ozone concentrations will increase under all Alternatives both near oil and gas activities and downwind of the Planning Area (4-20). Reliable data should be collected from the Planning Area rather than modeled using measurements taken outside of the Planning Area that is not impacted by UOG.

Ozone has historically been considered a summertime problem, but research from the last 10 years has shown that winter ozone levels near oil and gas production can exceed summer levels when snow cover and weather inversions are present. Even low levels of ozone can cause short term respiratory effects like coughing, wheezing, and shortness of breath. and exacerbates existing conditions such as asthma and emphysema. Children are particularly vulnerable because

BLM_0156685

their lungs are still developing until about age 18. Children get a higher "dose" of the ozone because they breathe in more air per pound of body weight and spend more time being active outdoors. Women exposed to ozone during pregnancy deliver low birth weight babies with compromised lung function (American Lung Association 2016).

[References:
American Lung Association. 2016. Ozone. Available at http://www.lung.org/our-initiatives/healthy-air/outdoor/air-pollution/ozone.html.]  #10])>

* The BLM must mandate the use of Best Management Practices in the final RMP. Community safety and environmental health needs to be a priority and strong guidelines must be adopted as standard operating procedure.

Conclusion

<([#11 [18.3] Alternative D should not be the Preferred Alternative regarding fluid mineral leasing. There is a large body of evidence that the BLM has not considered showing that reduced air quality near UOG can impact human and environmental health. The large leasable acreage available for fluid mineral extraction places potential development close to rural populations. The BLM needs to address the shortcomings of the available air quality data and risk to public health before allowing oil and gas development to proceed. At the very minimum, the BLM should incorporate the NFAP into the Preferred Alternative. Thank you for accepting these comments.
#11])>
Sincerely,
Carol Kwiatkowski
Executive Director

Kim Schultz
Research Assistant

cc:
Sally Jewel, Secretary Department of the Interior
Neil Kornze, Director Bureau of Land Management
Ruth Welch, State Director Bureau of Land Management
Joseph Meyer, Southwest District Manager Bureau of Land Management
Teresa Pfifer, Uncompahgre Field Office Manager Bureau of Land Management
Town of Hotchkiss
Town of Paonia
Doug Atchley, Delta County Commissioner
Bruce Hovde, Delta County Commissioner
Mark Roeber, Delta County Commissioner
Colorado State Senator Kerry Donovan
Colorado State Representative Millie Hamner
United States Senator Michael Bennet
United States Senator Cory Gardner

BLM_0156686

United States Representative Scott Tipton
Colorado Governor John Hickenlooper
Western Slope Conservation Center
Citizens for a Healthy Community

References

<([#12 [2] American Lung Association. 2016. Ozone. Available at http://www.lung.org/our-initiatives/healthy-air/outdoor/air-pollution/ozone.html.

Casey JA, Savitz DA, Rasmussen SG, Ogburn EL, Pollak J, Mercer DG, Schwartz BS. 2015. Unconventional natural gas development and birth outcomes in Pennsylvania, USA. Epidemiology 27(2):163-172, doi: 10.1097/ede.0000000000000387.

Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2011. Natural gas operations from a public health perspective. Hum Ecol Risk Assess 17(5):1039-1056, doi:10.1080/10807039.2011.605662.

Colborn T, Schultz K, Herrick L, Kwiatkowski C. 2014. An exploratory study of air quality near natural gas operations. Hum Ecol Risk Assess 20(1):86-105, doi:10.1080/10807039.2012.749447.

Colorado State University. 2016a. Characterizing Emissions from Natural Gas Drilling and Well Completion Operations in Garfield County, CO. Available at http://www.garfield-county.com/air-quality/air-emissions-study.aspx.

Colorado State University. 2016b. North Front Range Oil and Gas Air Pollutant Emission and Dispersion Study. Available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0ahUKEwj7pbHb5vjPAhUIx2MKHfLdDj0QFggcMAA&url=http%3A%2F%2Fsource.colostate.edu%2Fwp-content%2Fuploads%2F2016%2F09%2FCSU_NFR_Report_Final_20160908.pdf&usg=AFQjCNFImddRt3awfZVMah4QJVl4yJ3npQ&cad=rja.

Jemielita T, Gerton GL, Neidell M, Chillrud S, Yan B, Stute M, Howarth M, Saberi P, Fausti N, Penning TM, et al. 2015. Unconventional gas and oil drilling is associated with increased hospital utilization rates. PloS One 10(7):e0131093, doi: 10.1371/journal.pone.0131093.

Kassotis CD, Bromfield JJ, Klemp KC, Meng CX, Wolfe A, Zoeller RT, Balise VD, Isiguzo CJ, Tillitt DE, Nagel SC. 2016. Adverse reproductive and developmental health outcomes following prenatal exposure to a hydraulic fracturing chemical mixture in female C57Bl/6 Mice. Endocrinology 157(9):3469-3481, doi: 10.1210/en.2016-1242.

Kassotis CD, Klemp KC, Vu DC, Lin C-H, Meng C-X, Besch-Williford CL, Pinatti L, Zoeller RT, Drobnis EZ, Balise VD, et al. 2016b. Endocrine-disrupting activity of hydraulic fracturing chemicals and adverse health outcomes after prenatal exposure in male mice. Endocrinology 156(12):4458-4473, doi: 10.1210/en.2015-1375.

BLM_0156687

McCawley M. 2015. Air contaminants associated with potential respiratory effects from unconventional resource development activities. Semin Respir Crit Care Med 36(3):379-387, doi: 10.1055/s-0035-1549453.

McDuffie EE, Edwards PM, Gilman JB, Lerner BM, Dubé WP, Trainer M, Wolfe DE, Angevine WM, deGouw J, Williams EJ, et al. 2016. Influence of oil and gas emissions on summertime ozone in the Colorado Northern Front Range. J Geophys Res Atmos 121, doi:10.1002/2016JD025265.

McKenzie LM, Guo R, Witter RZ, Savitz DA, Newman LS, Adgate JL. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environ Health Perspect: 122(4):412-417, doi: 10.1289/ehp.1306722.

The Oil and Gas Threat Map. 2016. Available at http://oilandgasthreatmap.com/threat-map/colorado/#pl.

Pride KR, Peel JL, Robinson BF, Busacker A, Grandpre J, Bisgard KM, Yip FY, Murphy TD. 2015. Association of short-term exposure to ground-level ozone and respiratory outpatient clinic visits in a rural location – Sublette County, Wyoming, 2008–2011. Environ Res 137:1-7, doi:10.1016/j.envres.2014.10.033.

Rabinowitz PM, Slizovskiy IB, Lamers V, Trufan SJ, Holford TR, Dziura JD, Peduzzi PN, Kane MJ, Reif JS, Weiss TR, et al. 2015. Proximity to natural gas wells and reported health status: results of a household survey in Washington County, Pennsylvania. Environ Health Perspect 123(1):21-26, doi: 10.1289/ehp.1307732.

Rasmussen SG, Ogburn EL, McCormack M, Casey JA, Bandeen-Roche K, Mercer DG, Schwartz BS. 2016. Association between unconventional natural gas development in the Marcellus Shale and asthma exacerbations. JAMA Intern Med 176(9):1334-1343, doi:10.1001/jamainternmed.2016.2436.

Stacy SL, Brink LL, Larkin JC, Sadovsky Y, Goldstein BD, Pitt BR, Talbott EO. 2015. Perinatal outcomes and unconventional natural gas operations in southwest Pennsylvania. PLoS ONE 10(6):e0126425, doi: 10.1371/journal.pone.0126425.

Tustin AW, Hirsch A, Rasmussen S, Casey J, Bandeen-Roche K, Schwartz B. 2016. Associations between unconventional natural gas development and nasal and sinus, migraine headache, and fatigue symptoms in Pennsylvania. Envion Health Perspect doi: 10.1289/EHP281. #12])>

000538_ShishimS_20161101 Organization: Scott Shishim
Received: 11/1/2016 12:00:00 AM
Commenter1: Scott Shishim - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual

Classification: Nonsubstantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison  12/12/2016  12:00:00  AM
Attachments: 000538_ShishimS_20161101.htm  (000538_ShishimS_20161101-388373.htm  Size
= 6 KB)
UFORMP_000538_ShishimS_20161101.pdf  (000538_ShishimS_20161101-388372.pdf  Size =
125 KB)
Submission  Text
Date:11/01/2016

Commenter:  Scott Shishim

Organization:

Email:shishim79@gmail.com

Address:40487  O Rd., Paonia, CO 81428

Phone:970-759-9452

Comment:
Dear BLM,

Thank you for the opportunity  to comment on the Uncompahgre  Field Office's draft Resource
Management Plan.

I am commenting  as; a father, a teacher, a homeowner  and a business  owner.

I wish to see Jumbo Mountain  achieve Special Recreation  Management Area (SRMA) status. My
family  and I use these trails  multiple  times per week. It was one of the reasons were chose to
move to Paonia. I love the quiet solitude  you get, the views, the smells of the Juniper and the
scant amount of Pinon that remain, the wildlife  I see, the flowers in the spring and the chance to
get away and exercise either by trail running  or mountain biking.  Occasionally  I see eagles,
which is very exciting.  I love being able to look out from the trail below the Jumbo cliff and see
all the way out to the mesas West of Delta. The air quality  is great and I hope that it will remain
pristine  for generations to come. The view is void of serious development,  the air is clean, the
ground is clean and I see very little  trash. Jumbo is a place for people  to get back to nature and
recharge their batteries. They keep me sane and physically  fit. I consider these trails a treasure of
the Valley.  Please maintain  these experiences for generations to come.

This spring  was a special time on the Jumbo Trails because the cattle weren't grazing  there and
there were many flowers which my 5 year old daughter and her friend  were very interested in.
We took our flower book and did some plant identification.  There is more grass growing now

and no cow poop to step or ride through. If in the future this could be better managed for both the cattle and the people I would appreciate it. It would help the experience for all users, especially people from out of town. No one wants to hike or bike through a hoof hole filled trail system that's devoid of vegetation and has lots of poop on it. Please consider this an option if there is a future Travel Management Plan done on the Jumbo Trails.

As a business owner I am well aware of the benefits of having this unofficial trail network close to town. If it did not exist, I don't believe my business would either. 75% of my business comes from fixing mountain bikes that are primarily used in the Jumbo area or around town. I do work on road bikes as well, but they make up a fraction of my sales.

During this past summer, it was a daily occurrence that someone from out of town would come into the shop and ask how to get to the Jumbo trails. Both hikers and bikers. I would draw them a map and send them to the Pan American entrance. The trails are listed on Mountain Bike Project, an app for smartphones that locates trails. People are coming to Paonia to ride these trails, have lunch or dinner and look around town. Some people were staying the night at the Bross and riding the trails. I met a group in town from Denver to have a bachelor party and they stayed two nights and were mountain biking and road biking. I see first hand the economic benefits of having Jumbo trails and I believe that with SRMA status it would only increase the users on the trails, improve the trail system, benefit wildlife with possible seasonal closures and bring more money to Paonia and the North Fork Valley. I know the draw is small now, but I can only see it growing in popularity in the future.

According to americantrails.org over 50% of bicyclists earn over $100,000 a year and over 80% of bicyclists earn over $50,000 a year. This is a group of people that Delta County could benefit having visit and spend some money in the area. Keeping the Jumbo trails open and giving them SRMA status would only help the town of Paonia and surrounding communities.

Other places of interest to me and in need of development/management for trails are Elephant Hill, the BLM area north of the Hotchkiss Pool and High School, McDonald Mesa, Steven's Gulch, Powell Mesa/Oak Mesa, Paonia State Park/Paonia Reservoir and Young's Peak in Crawford. Young's Peak has some really interesting terrain on it and one of the most gorgeous 360 views from the top for a small mountain/hill.

Being the part time P.E. teacher at the Crawford school, Young's Peak and the southern side especially, is used frequently by our students. We play games, do orienteering, do outdoor education activities and hike through the pinon junipers regularly. At the end of each year we take 1st through 6th graders hiking to the top. The children love this activity and look forward to it. I also take the primary students (3-6 year olds) hiking through the lower trails.

As a hiker/biker, this place has potential for some great trails. There is one that follows the Western cliff for about a mile and it is technical, unique, has great views and is worth driving there for it. Young's Peak area would need some better access, but I could see Crawford only benefiting from trails in their backyard. There isn't much else for people to stop in Crawford for, but at least they could ride or hike some trails and go eat some food or stay the night.

Thank you for reading about my experiences and interests.

Scott Shishim
40487 O Rd.
Paonia, CO 81428
970-759-9452

Shish Kabikes LLC / Owner
Shishkabikes.com
shishkabikes@gmail.com
970-527-2221

NFM@C Physical Education Teacher
scott.shishim@deltaschools.com
970-921-4935


000540_SkokoM_20161102  Organization:  Michael Skoko
Received: 11/2/2016 12:00:00 AM
Commenter1: Michael Skoko - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/12/2016 12:00:00 AM
Flags:
Attachments: 000540_SkokoM_20161102.htm (000540_SkokoM_20161102-388375.htm Size = 2 KB)
UFORMP_000540_SkokoM_20161102_HasAttach.pdf (000540_SkokoM_20161102-388374.pdf Size = 351 KB)
Submission Text
Land Ownership Discrepancy
1 message
Michael Skoko <skoko306@gmail.com>
To: uformp@blm.gov

<([#1 [3] [19.2] Please see the image below regarding the land ownership discrepancy shown in your Draft RMP maps in the Kinikin Hills SRMA (RMZ 2) area. I have compared BLM Ownership Data (7/25/2016) with cross hatched areas are the area where there are problem. The labels below are showing the Name or the parcel owner along with the assessor s Account Number.
This may need to be updated before the Final UFO RMP goes out?

"Inholding" area in 48N, 8W, Sec. 32 is currently show as Private is indeed BLM (Acct Number

R0010083)
Piece of land that crosses 47N, 8W, Sec. 5 and 6 is currently shown as BLM is indeed private
(Acct Number R0023063)
Piece of land in 47N, 8W, Sec. 5 is currently shown as BLM is indeed private (Acct Number
R0023064)
[see pdf for map] #1])>

I'm not sure if this will change any of the acreages what have been calculated for this proposed
SRMA but thought I should mention this discrepancy.

I've also attached the screenshot.

000541_SponsellerN_20161031  Organization:  Nathan Sponseller
Received: 10/31/2016  12:00:00  AM
Commenter1: Nathan Sponseller - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison  12/12/2016  12:00:00  AM
Attachments: 000541_SponsellerN_20161031.htm  (000541_SponsellerN_20161031-388377.htm
Size = 5 KB)
UFORMP_000541_SponsellerN_20161031.pdf  (000541_SponsellerN_20161031-388376.pdf
Size = 156 KB)
Submission Text
Date:10/31/2016

Commenter: Nathan Sponseller

Organization:

Email:nathansponseller@gmail.com

Address: PO Box 151, Crawford, CO 81415

Phone:970-921-5683

Comment:
Dear Bureau of Land Management,

I am writing to urge the Bureau to adopt the North Fork Alternative B1 as the plan covering the
permitted uses of BLM land within the North Fork Valley of Delta County.

I have resided in the North Fork Valley for the past 21 years and have committed my life to bettering my community. I have expended much energy and almost half of my life working to assure that the North Fork Valley remains a place that supports the quality of life that I value, and remains a place that offers the economic opportunity myself and my family rely on. Following are some of the ways I have served my community:

-Employed by First State Bank of Colorado - 19 years
-Employed by Delta County Federal Credit Union- 2 years
-Founder and Co-owner of the North Fork Merchant Herald newspaper - 20 years
-Owner of The Stone House Inn, Crawford - 16 years
-Member of Board of Directors - Crawford Area Chamber of Commerce - 3 years
-Member of Board of Directors - Hotchkiss Community Chamber of Commerce - 21 years
-Trustee of the Town of Crawford - 4 years
-President of Hotchkiss Community Chamber of Commerce - 13 years
-Father of two

While my letter is not meant to reflect the official position of any of the entities listed above, I believe that my involvement in these has given me a broad and deep perspective on what would have a positive or negative impact on my community.

I have not been opposed to underground coal mining in this region, and such activity has had a measure of benefit to those of us who live here. I am saddened by the loss of jobs and families resulting from the collapse of the local coal mining industry. The end of local mining is something that many of us have seen coming for many years and have been working to mitigate. Many of us working for local economic betterment have been hitching our economic wagon to the promise of "creative agriculture" in the North Fork Valley, and the economic benefits that come from the production of our agricultural output, along with the economic boost that comes from the resulting tourism. In order for agricultural output and tourism to be a feasible component of our local economy, it is absolutely essential that the area's reputation as a clean and natural growing environment be kept in tact. I see no scenario where gas or oil extraction will not sully the Valley's reputation in this regard. Because of the very limited economic opportunities in this Valley, we cannot afford to risk either environmental contamination resulting from gas or oil extraction or the damage to the reputation that the Valley enjoys, as a wholesome area of food production.

I sincerely believe that fossil fuel extraction poses a real and legitimate threat to the watershed that makes agriculture possible in this Valley, and that no risks should be taken for the relatively short lived gain of gas and oil extraction.

The number of jobs available for local people will be nominal in comparison to the risk of undertaking this form of energy extraction.

On a personal level, I have a daughter with asthma and I will not be able to risk her respiratory health by remaining in a place where air quality is deteriorated. In addition, my lodging business relies almost entirely on tourism - tourism which would evaporate should the character of the North Fork Valley be changed through oil and gas extraction.

BLM_0156693

As the president of the Hotchkiss Community Chamber of Commerce, I sincerely believe that the further approval of gas and oil development in the North Fork Valley would be an unmitigated economic disaster to the population that resides here. It would almost certainly ruin my lodging business, and almost certainly negatively impact my employer as well.

Please support the North Fork Alternative B1 plan - it will mean the difference between a vibrant and growing community and the unraveling of what many of us have worked so hard to support. Thank you for considering my concerns.

Best Regards, Nathan Sponseller

Nathan R. Sponseller
Stone House Inn - Owner
PO Box 151
Crawford, CO 81415
970-921-5683 (home)
970-589-2903 (cell)


000542_SwackhamerP_20161101 Organization: Phyllis Swackhamer
Received: 11/1/2016 12:00:00 AM
Commenter1: Phyllis Swackhamer - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/12/2016 12:00:00 AM
Attachments: 000542_SwackhamerP_20161101.htm (000542_SwackhamerP_20161101-388380.htm Size = 12 KB)
UFORMP_000542_SwackhamerP_20161101.pdf (000542_SwackhamerP_20161101-388385.pdf Size = 296 KB)
Submission Text
Date:11/01/2016

Commenter: Phyllis Swackhamer

Organization:

Email:pslyons@tds.net

Address: Paonia, CO

BLM_0156694

Phone:

Comment:
I am a resident in the UFO area, specifically near the town of Paonia. I have lived here for 20 years and am currently retired here. My husband and I moved here because of the quality of life, including the Public Lands with wilderness areas close by. Wildlands located within this planning area are a primary definer of the culture of the community here. People live here because of the beauty and the access to recreation in the mountains and rivers. They also live here because of relatively clean air and water and the abundant produce that is grown here. These elements create a community culture that appeals to a diverse group of people.

Opening almost 95% of the area managed by the BLM to an industry that is a major cause of Climate Change absolutely does not make economic, environmental, ethical or moral sense given what we now know about Fossil Fuels. Therefore I believe that there are deficiencies in your dEIS/RMP that have to be addressed.

The areas I have investigated most are the impacts to Human and Animal Health from the Toxicity of various aspects of drilling and fracking including pollution of air, water, and land. Most of my comments are in these areas. I think this comment from Brian S. Schwartz, the lead researcher and a professor in the Department of Environmental Health Sciences at Johns Hopkins Bloomberg School of Public Health, who published a recent study on health in the journal Epidemology is a fitting summary of what has happened in this country: "The growth in the fracking industry has gotten way out ahead of our ability to assess what the environmental and, just as importantly, public health impacts are." Johns Hopkins has published three health studies within the last year.

As health and other science studies continue to come in regarding the harms of unconventional oil and gas extraction (fracking) and production, it is no wonder that citizens are becoming alarmed and see the need to take action. Over 80% of the peer reviewed science studies exposing the harms of fracking have only come out since 2013.

One Johns Hopkins study associated Unconventional Natural Gas Development (UNGD) with nasal and sinus, migraine headache, and fatigue symptoms. http://www.ehponline.org/EHP281. Another Hopkins study showed the connection between UNGD and the risk of Asthma Attacks. July 18 in JAMA Internal Medicine, In the third, an online study published in Epidemology, researchers found that expectant mothers living in the most active area of fracking, drilling and production activity were 40 percent more likely to give birth prematurely (before 37 weeks of gestation). Eleven percent of babies in this study were born pre-term. In addition, the women were 30 percent more likely to have a pregnancy labeled "highrisk," which can refer to factors such as high blood pressure or excessive weight gain (Low birth weight is a leading cause of infant mortality). This study was done in Pennsylvania, where the fracking industry now operates more than 8,000 active natural gas wells—up from 100 in 2006. Compare that to Colorado, which now has almost 55,000 active oil and gas wells.

A rural Colorado study of almost 25,000 births from 1996--2009 found congenital heart defects and neural tube defects (defects of the brain, spine or spinal cord) associated with the density and

BLM_0156695

proximity of natural gas wells within a 10--mile radius of mothers' residences. (McKenzie, L. M., et al. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environmental Perspectives 122:412-417.)

The Endocrine Disruption Exchange (TEDX) has published research and aggregated data identifying lowdose exposure to chemicals associated with oil and gas development and operations as Endocrine Disrupting Chemicals (EDC). These chemicals affect not only reproduction and fetal development, but are linked to respiratory health, metabolism issues, and malignancy.

<([#2 [18.2] Data from a recent study suggest that natural gas drilling operations may result in elevated endocrinedisrupting chemical activity in surface and ground water. The majority of water samples collected from sites in a drilling--dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than sites with limited nearby drilling operations. (Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology DOI: http://dx.doi.org/10.1210/en.2013-1697)
#2])>
<([#1 [18.2] The New York State Department of Health (NYSDOH) released A Public Health Review Of High Volume
Hydraulic Fracturing For Shale Gas Development in December 2014. This review found that residents living near fracking activities had the following health problems: skin rash, nausea or vomiting, abdominal pain, breathing difficulties, cough, nosebleed, anxiety, stress, headache, dizziness, and eye and throat irritation. This led to their recommendation that fracking should be banned in New York State. Following that review another publication, The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction), Third Edition, October 14, 2015, by Concerned Health Professionals of New York and the Physicians for Social Responsibility cites a number of studies. Please refer to the Compendium.
#1])>
This study just out from the Environment America Research & Policy Center exposes the proximity
of fracking near schools, hospitals, day care centers and nursing homes in 9 states: AR, CA, CO, NM, ND, OH, PA, TX and WV. Statistics from this report: More than 650,000 kindergarten through
12th grade children in 9 states attend school within one mile of a fracked well. Additionally 1,947 child care facilities, 1,376 schools, 236 nursing care providers and 103 hospitals are within a onemile radius of fracked wells in the nine states examined.
http://readersupportednews.org/newssection2/318-66/39676-650000-children-in-9-states-attend-school-within-1-mile-of-a-fracking-well

Although there aren't data yet for Delta County, neighboring counties' air quality has already been graded as F to C for high ozone days by the American Lung Association. A study of air quality in the Denver area found that about 18% of their ozone was produced by oil and gas wells. High levels or ozone are bad news for anyone with asthma or other respiratory conditions. There can also be consequences for your animals from exposure to chemicals released by gas

BLM_0156696

drilling (Bamberger, M., Oswald, R. (2012). Impacts of Gas Drilling on Animal and Human Health. New Solutions: A Journal of Environmental and Occupational Health, 22(1): 51-77.

Besides these chemicals and the pollution generated in the air and water, a Very Disturbing result of the industry is the "wastewater" produced in the drilling and fracking operations. I did not see the safety and handling of wastewater addressed in the draft RMP, This is an deficiency that has to be addressed for the future of all of us. Polluting our soils, water and air with radioactivity should relegate this technology to the Dark Ages!

Naturally Occurring Radioactive Material (NORM) is found many places on Earth, including deep
underground. Fracking (for both oil and gas) and the wastewater brought up in that process can concentrate that radioactive material. Here I will quote, "The rise of hydraulic fracturing over the past decade has created another boom: tons of radioactive materials experts call an "orphan" waste stream. No federal agency fully regulates oil and gas drilling byproducts—which include brine, sludge, rock and soiled equipment—leaving tracking and handling to states that may be reluctant to alienate energy interests." A study this spring from Duke University examined 3,900 wastewater spills over a 5 year period in North Dakota. Researchers found levels of radioactivity many times higher than allowed in streams, rivers, and soils. So down stream people are drinking and irrigating with "up-streams" radioactive wastes. Radioactive substances can last for millennia. Concentrations of salts and heavy metals are also in this wastewater. An 2013 study by Duke U. in PA. found that wastewater treated in a facility specifically for that purpose still discharged water with radioactive levels beyond acceptable levels.

These studies showing the magnitude of the risks to ground and surface waters from the increase of spills from waste water including toxic fracking chemicals have to be addressed. There does not seem to be any safe way to deal with this wastewater (except not to create it in the first place). Injection of wastewater not only produces earthquakes, but realistically who can know where these toxins will end up whether from the fracturing due to the Earthquake or the drilling and fracking process themselves.

I already submitted one comment regarding a hydrology study commissioned by our Delta Co. Commissioners in 2013, that concluded that ,"The hydrology of a natural groundwater hydrologic
system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between
the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. ..."

Storing wastewater in plastic lined ponds is also unacceptable because of spills, leaks, evaporation and no adequate way to reclaimate. Hauling these wastes is obviously dangerous--- and there is no safe way to dispose of them.

As this research grows, frankly it seems evident that our government including the BLM should be

banning any more leasing to the oil and gas industry. It is NOT the mission of the BLM to use our
Public Lands and Public Minerals to ruin the Health of the Public and the Environment that sustains us.

It is not as if we do not have options to this dirty extraction and burning of fossil fuels. Scientists have been working for years to determine a way forward to get our nation and our world off of fossil fuels. Please look up the work of Mark Z. Jacobson, Stanford University's director of Atmosphere and Energy Program. Their team has determined that without the use of any new technologies, we have the resources for each of the 50 states to generate 80--85% of America's power with wind, sun, and water by 2030 (14 years away). 100% could be generated by 2050. The team has also offered similar plans for over 139 nations. With this opportunity so close, why would we continue to pollute our land, air and water, compromising our health and the future of those who come after us?

While I am sure that many organizations and individuals have cited Climate Change science, I will merely conclude with the recognition that we cannot as a nation or as a planet continue to create more of the same mistakes that have put us on the edge of destruction for billions of people on this planet. Climate Change must be addressed and it must be addressed aggressively if we are to have a habitable planet on which to live.

Given the facts, the only reasonable conclusion is that fossil fuel leasing should cease and not be a part of plans to manage Public Lands as we go forward.

Thank you for this opportunity to comment.

Sincerely,

Phyllis Swackhamer
Paonia, Colorado


000543_TarbellM_20161101 Organization: Michael K. Tarbell
Received: 11/1/2016 12:00:00 AM
Commenter1: Michael K. Tarbell - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/12/2016 12:00:00 AM
Attachments: 000543_TarbellM_20161101.htm (000543_TarbellM_20161101-388387.htm Size = 3 KB)
UFORMP_000543_TarbellM_20161101.pdf (000543_TarbellM_20161101-388386.pdf Size = 90 KB)

Submission  Text
Date:11/01/2016
Commenter: Michael K. Tarbell
Organization:
Email:mkt-aux1@tds.net
Address:13495  Chickory  Rd., Hotchkiss  CO 81419
Phone:970-527-5565
Comment:
This is to express my objections  to the draft Resource Management Plan (RMP), as published  at
www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.  These objections  pertain specifically  to
the proposed  level(s) of availability  of public lands for the industrial  extraction of fossil fuels,
particularly  extraction of natural gas via hydraulic  fracturing techniques.
As I'm sure you're aware, there is ongoing,  urgent research underway worldwide  regarding the
effects of extraction and combustion  of fossil hydrocarbon  fuels. Your proposed levels of
availability  for fossil fuel extraction are completely  at odds with current scientific  research and
public  welfare in general, and your preferred Alternative  D is transparently  subsidizing  private
corporations  at the expense of taxpayers, not to mention  the entire ecosystem.
Aside from the ecological  implications,  even if natural gas were in short supply  domestically
(which it very clearly is not, and indeed is now being exported for profit in tremendous  volume),
it is completely  ludicrous  to open up public land in the immediate  vicinity  of homes, schools,
public  water systems, etc, to extractive  industry  when the resource itself  is abundant  across a
vastly larger encompassing  region (e.g., see Hawkins, S. J., et al, "Assessment of Continuous
(Unconventional)  Oil and Gas Resources in the Late Cretaceous Mancos Shale of the Piceance
Basin, Uinta- Piceance Province, Colorado and Utah, 2016", U.S. Geological  Survey Fact Sheet
2016-3030,  Jun 2016).
<([#1 [21.2] Moreover, your estimates for greenhouse gas emissions  (Tables 4-2, 4-9, etc)
associated with these extractive  activities  must be revised in light  of recent results indicating  that
rogue methane emissions  have been profoundly  underestimated  (e.g., Howard, T., "University  of
Texas Study Underestimates  National Methane Emissions  at Natural Gas Production  Sites due to
Instrument Sensor Failure", Energy Science & Engineering,  23 Jun 2015; Schwietzke, S.,
"Upward Revision  of Global Fossil Fuel Methane Emissions  Based on Isotope Database",
Nature, Vol 538, pp 88-91, 06 Oct 2016). #1])> I hope you will reconsider and revise your
Resource Management Plan so as to much more severely restrict extraction of fossil fuels from
public  lands.

Sincerely,
Michael K. Tarbell
13495 Chickory  Rd.
Hotchkiss  CO 81419
970-527-5565
mkt-aux1@tds.net

000544_ThompsonK_20161101  Organization:  Kathy Thompson
Received: 11/1/2016  12:00:00 AM
Commenter1: Kathy Thompson  - Paonia, Colorado 81428
Organization1:

BLM_0156699

Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000544_ThompsonK_20161101.htm (000544_ThompsonK_20161101-388378.htm Size = 15 KB)
Submission Text
Date:11/01/2016
Commenter:Kathy Thompson
Organization:
Email:kthompson2898@gmail.com
Address:40249 Swanson Road, PO Box 633, Paonia, CO 81428
Phone:303-919-2029
Comment:
Washington, D.C., and America itself, have been compared to "a shining city on a hill." First, John Winthrop, in 1630 aboard the flagship Arbella en route to America, said "We must always consider that we shall be as a city upon a hill-the eyes of all people are upon us." Two American Presidents, followed, John F. Kennedy in 1961, and Ronald Reagan in 1980, one democrat, one republican, who, respectively said, "Today the eyes of all people are truly upon us - and our governments, in every branch, at every level, must be as a city upon a hill - constructed and inhabited by men aware of their great trust and their great responsibilities," and "I believe that Americans in 1980 are as committed to that vision of a shining 'city on a hill' as they were 350 years ago."

As I put my thoughts on paper tonight regarding the serious matter before us - what is a compatible/working resolution to human beings, wildlife, and beautiful, natural land co-existing with the oil and gas industry in the North Fork Valley of the Gunnison - my question to you is are you committed to the vision of America, and our government, representing "a shining city on a hill," or a vast industrial waste land?

I acknowledge the responsibility that confronts you in executing the mission of the BLM. That mission is "to sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I also understand the challenges that you face in considering all sides of an issue when making decisions that affect the land and its people. You have my utmost respect as you deal with opposing forces. And I appreciate your research and hard work in developing the draft Resource Management Plan (RMP).

With that said, I am opposed to any oil and gas activity in or around the North Fork Valley (NFV) and favor a once and for all moratorium on such activity in the area, in other words "a no leasing alternative." If that is impossible to achieve, then my only support would be for the North Fork Alternative, Alternative B1, of the draft RMP.

My reasons for opposing any oil and gas activity in this region is supported by the following:
1. Extraction Activity and What it Entails is Incompatible with the Geology of the Region.

<([#1 [18.3] The draft RMP fails to adequately consider the fragile geology that surrounds the NFV. Highway 133, which runs from Carbondale to Hotchkiss over McClure Pass, is 2-lanes,

curvy, mountainous, with lots of rocky terrain that hugs the Highway. McClure Pass, near the Paonia Reservoir, is often closed these days, due to rock slides. It is highly likely that the rock slides are caused by the rumbling vibration of heavy trucks, speeding down the narrow mountain road. If the heavy truck traffic increases exponentially, which will happen as it has in all regions where extraction activity occurs, McClure Pass may become impassable to the private citizen due to increased slides which I believe, if studied, could be proven to be directly caused by increased traffic of large, heavy, fast moving trucks which are typically carrying several tons of water or gravel, making them even heavier. Neither the nature of the roads, nor the geology itself, can withstand the impacts of the truck nor of the extraction activity anywhere near the NFV.

Related to this is the danger in there being so many trucks on the steep, rocky, narrow roads. The oil and gas trucks that I have witnessed are driven aggressively, which puts other drivers and their vehicles (cars and motorcycles) at risk of needless injury and damage. I am aware of personal instances in which trucks have hit rocks that have shot into the tires of passing vehicles, ruining tires and front end suspensions. #1])>

Also, much of Highway 133 is designated as a "Scenic Byway." It is so designated because it winds through some of the prettiest countryside and mountains in Colorado. The NFV is unique in its beauty because the West Elk mountain range contrasts exquisitely against the bucolic countryside. Neither the terrain nor the natural beauty of the NFV are conducive to heavy truck traffic, extraction activities, or unsightly industrial materials.

<([#3 [18.3] [41.2] 2. Draft RMP Fails to Consider Recent Findings Associating Earthquakes with Fracking Activity. Recent studies have concluded that earthquake activity, especially in Oklahoma, is directly caused by [racking activity. Your failure to consider this recent information is irresponsible. Having lived in Washington, D.C., I recognize that the Federal government moves at snail 's pace sometimes. But, lives and livelihoods are at stake here. I applaud you for updating the obsolete RMP from 1989. The draft RMP, however, admits to not considering data from the last few years. The most recent data is some of the most important data to consider because it shows a direct correlation between fracking and injury to the land. You are not serving the people when you the oil and gas industry a blank check to frack when the recent studies are showing how dangerous it is. #3])>

3. Prohibition by Citizens to Enter Lands Occupied by Oil and Gas Activity. The mission of the BLM becomes meaningless if one industry, oil and gas, is pennitted to occupy public lands to the exclusion of other activities) such as recreating and hunting. Your mission says "multiple.use." Yet when oil and gas activity is present, all other persons and activities are prohibited from entering the property. It is against public policy to forbid the citizens from entering the public lands because of the oil and gas industry is hoarding the land for its own use and profits.

4. Additional Draft Resource Management Plan Omissions. <([#5 [30] The RMP does not adequately address the unique qualities of the NFV, most notably the bowl shape of the Valley and the post coa1 mining prolific organic farming and related businesses. #5])>
The effects of fracking on the Front Range of Colorado. for example. while far from positive, differ significantly from the probable negative effects to inhabitants of the NFV, if it is aJlowed to go forward. <([#6 [10.3] [14.1.3] The NFV is a Valley, and it is a small. It isn't a flat region

where toxic chemicals may only penetrate the surface. The NFV is a small funnel-like
environment in which toxicity, if present, will be concentrated in the lower regions of the Valley,
where we all live. Thus, because of the size and structure of our Valley, our water sheds and air
quality have a
significant chance of being negatively impacted by heavy concentrated amounts of toxicity that
would unequivocally impair the health of the citizens, causing respiratory and cancer re lated
problems, and cause the demise of our magnificent wildlife (birds, eagles, elk, deer, mountain
lions, bobcats) and their natural ecological habitats. #6])>


5. <([#7 [30.3] Draft RMP Fails to Consider the Negative Impacts to Burgeoning Economic
Activity in the NFV. The NFV has cohabited with neighboring coal mines for over 100 years.
The mines are closing, as you know. This has caused employment challenges for many whom
the mines employed. Some of those people are pursuing alternative livelihoods with alternative
energy industries, such as solar, wind, nuclear, geothermal, and others, or by joining other
longtime fanners and ranchers as well as newcomers to the "organic farming revolution."
Our most important resource is FOOD, not oil and gas; we can't live if we don't eat. If we don't
eat nutritional food, in a clean environment, our health suffers. Some of the best, and healthiest
food in America is grown right here in the NFV because of the high quality of our water, our
clean air, our unique climate, and the high standards of the farming practices employed by our
farmers and ranchers. The NVF in fact was named the Garden Spot of Colorado at the turn of the
20th century. It is incumbent upon us, you and me, the current stewards of the land, to make sure
this remains true.
In addition, the economy of the NFV is finally recovering from the slow-down in the coal
industry because we have used our ingenuity and creativity to revive, reinvent and reinvigorate
ourselves and our economy for the good of the Valley. We are engaged in all facets of healthy
food production and, given the opportunity. could feed a much broader segment of society if
even the mere threat of oil and gas, and especially fracking. completely disappeared from our
horizon. #7])>
6. Personal Impact and Declining Property Values. My husband and I moved to Paonia 4+ years
ago from Denver to savor the beauty and special sense of place and community that the NFV
offers. Many of our residents, including myself, have lived all over the country and, before
making the move, concluded that Paonia is the best town in the country to live. We therefore
invested our life savings to build new homes and start farms. It is our wish to preserve what
makes Paonia special - the quality of the irrigation and drinking water; the clear, clean air; the
pristine views of Mt. Lamborn, Lands End, Gunnison, and other mountain peaks; the numerous
hiking and biking trails; the unobstructed views of pastoral land, country roads, organic orchards
and vineyards (which include ours, which we started from scratch); and the incredible
community of diverse yet compatible folks. Such preservation will be impossible, and our
property values will suffer irreparable damage, if you submit to the will of the oil and gas
industry in or near this region.
The mission of the BLM is appealing and gives the public a false sense of security with words
like "to sustain the health, diversity, and productivity ... for the use and enjoyment of present and
future generations; and "the BLM will ensure that the nation's public lands are managed and
conserved for future generations ... to use and enjoy." We, the citizenry, feel that you are doing
everything but following your own mission. This unfortunately makes us lose faith in our

government, and in you.

If your final RMP cannot recommend a "no leasing aitemative/' please do the least harm to our pristine Valley by recommending the "NFV Alternative, B I Alternative." Please.

I humbly ask you to return to the drawing table, think long and hard about the consequences of your actions, and come out on the right side of history by retaining America's reputation of being a beacon to the world and a "shining city on a hill."

Thank you for the opportunity to respond to the draft Resource Management Plan.

Yours truly,

Kathy Thompson

303-919-2029


000545_SlivkaJ_20161101  Organization:  The Wilderness Society,  Juli Slivka
Received: 11/1/2016 12:00:00 AM
Commenter1: Juli Slivka - Denver, Colorado 80202 (United States)
Organization1:The Wilderness Society
Commenter2: Steve Allerton - Grand Junction, Colorado 81501 (United States)
Organization2:Western Colorado Congress
Commenter3: Karen Tuddenham - Telluride, Colorado 81435 (United States)
Organization3:Sheep Mountain Alliance
Commenter4: Jimbo Buickrood - Durango, Colorado 81302 (United States)
Organization4:San Juan Citizens Alliance
Commenter5: Matt Rice - Denver, Colorado 80202 (United States)
Organization5:American Rivers
Commenter6: Amber Clark - Dolores, Colorado 81323 (United States)
Organization6:Dolores River Boating Advocates
Commenter7: Steve Smith - , Colorado (United States)
Organization7:Glenwood Springs
Commenter8: Luke Schafer - Craig, Colorado 81625 (United States)
Organization8:Conservation Colorado
Commenter9: Shelley Silbert - Ridgway, Colorado (United States)
Organization9:Great Old Broads for Wilderness
Commenter10: Sherry Schenk - Grand Junction, Colorado (United States)
Organization10:Great Old Broads for Wilderness
Commenter11: - , Colorado (United States)
Organization11:
Commenter12: Alan Apt - Nederland, Colorado 80466 (United States)
Organization12:Sierra Club
Commenter13: Megan Mueller - Denver, Colorado 80202 (United States)
Organization13:Rocky Mountain Wild
Commenter14: Christine Canaly - Alamosa, Colorado 81101 (United States)
Organization14:San Luis Valley Ecosystem Council
Commenter15: Peter Hart - CO, Colorado 81623 (United States)
Organization15:Wilderness Workshop
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive

Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000545_SlivkaJ_20161101.htm (000545_SlivkaJ_20161101-385629.htm Size = 504 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov> Comments on the Uncompahgre Draft RMP 1 message Juli Slivka <jslivka@tws.org> Tue, Nov 1, 2016 at 3:05 PM
To: "uformp@blm.gov" <uformp@blm.gov> Cc: "tpfifer@blm.gov" <tpfifer@blm.gov>, "Jones, Gina" <gmjones@blm.gov>
Hi Teresa and Gina, Attached please find comments from The Wilderness Society and our partner organizations on the Uncompahgre Draft RMP. I am also mailing you a flash drive today with these comments and the attachments. Please let me know if you have any questions. Thanks very much, Juli Juli Slivka Planning Specialist The Wilderness Society BLM Action Center O: (303) 650-1179 C: (303) 241-9431 UFO DRMP - TWS et al comments - Nov 1 2016.pdf 2886K
November 1, 2016 Submitted via email (uformp@blm.gov) and US mail (with attachments) Teresa Pfifer, Acting Field Manager BLM Uncompahgre Field Office 2465 South Townsend Ave. Montrose, CO 81401
Re: Comments on the Uncompahgre Draft Resource Management Plan and Environmental Impact Statement Dear Ms. Pfifer, Thank you for considering these comments on the Uncompahgre Draft Resource Management Plan (RMP). We appreciate the opportunity to engage in management decisions for our public lands, and our organizations have longstanding interests and investments in the BLM-managed lands in Colorado and across the West. We are glad to see the BLM acknowledging the important fish and wildlife, wilderness, recreation and other values on these public lands that will be affected by management decisions encompassed in the Uncompahgre RMP and evaluating alternatives to protect and conserve those public lands resources.

We hope to see continued improvements in the RMP that commit the agency to meaningful conservation measures and provide a better balance with energy development and other resource uses.

We have proposed specific changes that will allow BLM to build upon the work included in the Draft RMP and provided reasoned analysis to support them in these comments.

Issue Addressed Page I. General Management Framework 2 II. Lands with Wilderness Characteristics 3 III. Recreation 18 IV. Travel Management 27 V. Ecological Emphasis Areas and Areas of Critical Environmental Concern 36 VI. Wild and Scenic Rivers 46 VII. Wilderness Study Areas 60 VIII. Night Sky Resources 61 IX. Management of the North Fork Area 62 X. Oil and Gas Management 93 XI. Uranium 113 XII. Coal 118 XIII. Climate Change 126 XIV. Mitigation 137 List of Attachments & Literature Cited 142

I. General Management Framework The Uncompahgre Resource Management Plan will provide management direction for 675,000 acres of public lands in western Colorado, including significant natural resources that must be balanced with other resource uses to fulfill BLM's multiple use and sustained yield mandate. The Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq., imposes a duty on BLM to identify, protect and monitor the many natural resources found on public lands governed by RMPs. FLPMA requires BLM to

inventory its lands and their resource and values, "including outdoor recreation and scenic values." 43 U.S.C. § 1711(a). FLPMA also obligates BLM to take this inventory into account when preparing land use plans, using and observing the principles of multiple use and sustained yield. 43 U.S.C. § 1712(c)(4); 43 U.S.C. § 1712(c)(1).

Through management plans, BLM can and should protect wildlife, scenic values, recreation opportunities and wilderness character present in the public lands through various management decisions, including by excluding or limiting certain uses of the public lands. See 43 U.S.C. § 1712(e). This is necessary and consistent with the definition of "multiple use," which identifies the importance of various aspects of wilderness characteristics (such as recreation, wildlife, natural scenic values) and requires BLM to consider the relative values of these resources but "not necessarily to the combination of uses that will give the greatest economic return." 43 U.S.C. § 1702(c).

Further, FLPMA requires that: "In managing the public lands the [Secretary of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation (UUD) of the lands." 43 U.S.C. §1732(b). BLM's duty to prevent unnecessary or undue degradation under FLPMA is mandatory, and BLM must, at a minimum, demonstrate compliance with the UUD standard.

See, Sierra Club v. Hodel, 848 F.2d 1068, 1075 (10th Cir. 1988) (the UUD standards provides the "law to apply" and "imposes a definite standard on the BLM").

The Uncompahgre Draft RMP recognizes in many instances the values and vulnerabilities of natural resources within the Uncompahgre Field Office. The range of alternatives includes management scenarios that would protect and enhance these resources and identifies critical opportunities for BLM to promote conservation and achieve balance among the multiple uses of our public lands. For example, we highlight BLM evaluating a new management tool – Ecological Emphasis Areas – to protect and enhance habitat connectivity across the broader landscape. Uncompahgre Draft RMP at 2-68.

Considering and eventually adopting a network of lands managed to protect and conserve natural resources on our public lands fits squarely within the agency's governing laws and policies, as well as forward-looking initiatives such as BLM's Planning 2.0 rule.

<([#1 [5.3] However, the Draft RMP ultimately fails to consider or implement reasonable management alternatives for oil and gas resources that would adequately protect local communities from oil and gas development or meaningfully analyze and respond to climate change. The prioritization of oil and gas development above all other multiple uses at the expense of healthy communities and climate solutions must be remedied before BLM finalizes the Uncompahgre RMP. Additionally, the Draft RMP misses other opportunities to appropriately balance multiple uses on Colorado's public lands and meet BLM's obligations under relevant laws and policies. Our comments demonstrate where and how BLM can create a lasting vision for conserving natural resources and balancing multiple uses through the RMP revision. #1])> <([#2 [11.1] Summary of Comments: The Uncompahgre Draft RMP has laid out a management framework that could protect and enhance natural resources as directed by FLPMA through conservation management of valuable public lands such as lands with wilderness characteristics, Ecological Emphasis Areas, ACECs and quiet recreation management areas. However, BLM's approach to oil and gas management and addressing climate change is inconsistent with relevant law and policy and reflects an antiquated bias that the agency is proactively seeking to overcome. BLM must substantially adapt the Uncompahgre RMP to evaluate reasonable alternatives for energy development and meaningfully address climate

change, including adaptation strategies and consistency with national climate goals. #2])>
II. Lands with Wilderness Characteristics FLPMA requires BLM to inventory and consider lands with wilderness characteristics during the land use planning process. 43 U.S.C. § 1711(a); see also Ore. Natural Desert Ass'n v. BLM, 625 F.3d 1092, 1122 (9th Cir. 2008) (holding that "wilderness characteristics are among the values the FLPMA specifically assigns to the BLM to manage in land use plans). [Footnote 1: In an April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and the State of Utah, the BLM abdicated its authority to designate any additional WSAs, and we maintain that this agreement is invalid and will ultimately be overturned. In addition, the Utah Settlement is based on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with BLM Manual 6330. This administration has the authority to create new WSAs under § 202 and BLM should be considering this within its range of reasonable alternatives that are deserving of consideration in this NEPA process.]

IM 2011-154 and Manuals 6310 and 6320 contain mandatory guidance on implementing that requirement. The IM directs BLM to "conduct and maintain inventories regarding the presence or absence of wilderness characteristics, and to consider identified lands with wilderness characteristics in land use plans and when analyzing projects under [NEPA]." This includes the "necessary forms for each area" including photo logs, route analysis forms and inventory area evaluations (Manual 6310, Appendices A-D). Manual 6310 reiterates that, "[r]egardless of past inventory, the BLM must maintain and update as necessary, its inventory of wilderness resources on public lands." Manual 6320 requires BLM to consider lands with wilderness characteristics in land use planning, both in evaluating the impacts of management alternatives on lands with wilderness characteristics and in evaluating alternatives that would protect those values. Wilderness inventories are to be done on a continuing basis and relevant citizen-submitted data is to be evaluated. BLM Manual 6310 at .04(C)(1).

<([#3 [20.1] We appreciate that BLM has inventoried lands with wilderness characteristics in the planning area and that the Draft RMP considers multiple alternatives to protectively manage those lands. We recognize that the Uncompahgre Field Office has been a leader in Colorado in regards to complying with the updated inventory requirements, as the field office publicly posted inventory information in a timely fashion when the new policy was released and refined that information in 2015 to better align with BLM Manual 6310. We value the UFO's commitment to addressing this resource through the RMP revision.

However, BLM should make some adjustments in the Proposed RMP to better comply with agency policy, and the agency's obligations under FLPMA and NEPA that policy is rooted in, and to achieve a more balanced land use plan that embodies multiple use and sustained yield. In an April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and the State of Utah, the BLM abdicated its authority to designate any additional WSAs, and we maintain that this agreement is invalid and will ultimately be overturned. In addition, the Utah Settlement is based on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with BLM Manual

6330. This administration has the authority to create new WSAs under § 202 and BLM should be considering this within its range of reasonable alternatives that are deserving of consideration in this NEPA process. #3])>

a. Inventory There are a few specific instances in which BLM's LWC inventory is inconsistent with current agency policy. Below are comments addressing where and how BLM's inventory fails to follow the guidance for conducting lands with wilderness characteristics inventories detailed in BLM Manual 6310.

<([#4 [40.1] Adobe Badlands WSA Adjacent BLM's inventory for the Adobe Badlands LWC unit is 6,200 acres, while our assessment shows the unit to be about 8,200 acres. The major difference is in the far southwest portion of the unit, where BLM drew boundary lines to cut out two portions of the unit (downslope towards the powerlines) based on the argument those areas do not have either outstanding opportunities for solitude or primitive recreation.

However, these areas are contiguous with the Adobe Badlands WSA, and therefore inherit the outstanding opportunities already identified in the WSA. BLM Manual 6310 provides that if a polygon of land is contiguous with lands currently managed to protect their wilderness character (e.g. WSA) and that contiguous land meets the naturalness criterion, then that naturally appearing contiguous land meets the criteria for LWC because it inherits the outstanding opportunities already identified in the adjacent WSA. BLM Manual 6310 is clear that not every acre needs to have outstanding opportunities, including when the area is contiguous with a WSA: "The area does not have to possess outstanding opportunities for both elements, nor does it need to have outstanding opportunities on every acre, even when an area is contiguous to lands with identified wilderness characteristics." BLM Manual 6310 at .06(C)(2)(c). BLM finds in its inventory report for the Adobe Badlands LWC unit that the eliminated areas are both contiguous with the WSA and natural; therefore they should qualify as LWC.

Furthermore, BLM should not cut out areas that don't have outstanding opportunities; cut outs should be for impacts related to naturalness only according to BLM Manual 6310. #4])>

<([#5 [40.1] Camel Back WSA Adjacent

BLM's Camel Back LWC unit only includes lands from the canyon rims down, eliminating obviously qualifying lands on the mesa tops, which may total 1,000-2,000 additional acres. BLM's report for this unit states that BLM removed 1,750 acres on Monitor Mesa for further consideration as lands with wilderness characteristics because of "substantial evidence of human modification" on "most" of Monitor Mesa, including "constructed and maintained routes that run the length of the mesa top" and mechanical vegetative treatments…that are obvious to the casual observer. (Emphasis added).

However, while two constructed and maintained routes do traverse the length of the mesa top, these routes are easily cherry-stemmed from the larger unit; stating that these routes contribute to "substantial evidence of human modification" across "most of Monitor Mesa" is entirely misleading.

These two routes only make up a small portion of the mesa top, and because of significant vegetative screening along there length, they have little impact on the naturalness of the area as a whole.

Image 4634 (above) shows the main route traversing Monitor Mesa from the southwest to the northeast. This route is clearly constructed and maintained. However, because this route is bordered on both sides by large vegetation including juniper trees exceeding 10 feet in height as well as dense stands of mature sagebrush, this route has little impact on the naturalness of the mesa top as a whole. Further, BLM's claims that "most of" Monitor Mesa "shows substantial

evidence of human modification" and that old vegetative treatment areas are "obvious to a casual observer" is factually incorrect. Such statements are an indication that BLM inventoried this area using aerial imagery, rather than on-the-ground investigation. A visit to the area clearly shows that the areas of former vegetative treatments are largely recovered, as seen in the following photos, all of which were taken amidst the vegetative treatment areas cited in BLM's report. These photos are representative of the entirety of Monitor Mesa as of May 2014:

The photo below looks generally west and southwest along BLM's proposed boundary for this unit. To the left of the photo is an area BLM found to be natural in appearance, to the right is an area removed from the unit because of "substantial evidence of human modification" that would be "obvious" to the average visitor:

BLM Manual 6310 is clear that "apparent naturalness refers to whether or not an area looks natural to the average visitor who is not familiar with the biological composition of natural ecosystems versus human-affected ecosystems". The above photos show, and any visit to the area would confirm, that Monitor Mesa "looks natural to the average visitor". BLM must revise its inventory of the Camel Back WSA Addition unit to incorporate the areas of removed because of former vegetative treatments, such as Upper Long Gulch, which BLM removed from the unit and which is shown below: #5])>

<([#6 [40.1] Dolores River Canyon WSA Adjacent
Similar to BLM's inventory of the Adobe Badlands LWC unit, the portions of the Dolores River LWC unit that are contiguous with the WSA should inherit the outstanding opportunities for solitude or primitive and unconfined recreation already found to exist in the Dolores River Canyon WSA. #6])>

<([#7 [20.1] Dry Creek Basin
Similar to the Camel Back LWC unit, BLM eliminated areas with past vegetation treatments that should actually qualify as LWC, as they now appear largely natural to the average visitor. BLM also eliminates small parcels within the larger unit for lack of outstanding opportunities, contrary to guidance which states: "The area does not have to possess outstanding opportunities…on every acre." BLM Manual 6310 at .06(C)(2)(c). BLM should not cut out areas that don't have outstanding opportunities; cuts outs should be for impacts related to naturalness only according to BLM Manual 6310. #7])>

<([#8 [20.1] Shavano Creek
Again, BLM inappropriately cuts out areas due to past vegetation treatments that do not appear unnatural to the average visitor.
#8])> <([#9 [20.1] Atkinson Breaks It appears BLM has not inventoried Atkinson Breaks area. BLM should inventory the area north of the Lower Tabeguache/Campbell Creek LWC unit, including the numerous canyons known as the Atkinson Breaks, as well as the steeper slopes abutting USFS lands of the Uncompahgre Plateau. In particular, the BLM lands below Campbell Point and around South Fork Mesa Creek and Blue Basin are likely to meet the criteria for lands with wilderness characteristics. #9])>

Summary of Comments: BLM should refine the LWC inventory to address the inconsistencies with BLM Manual 6310 identified above.

b. Environmental Consequences Analysis Manual 6320 provides that BLM must "consider the benefits that may accrue to other resource values and uses as a result of protecting wilderness characteristics." BLM Manual 6320.06(A)(1)(b). Those benefits should be analyzed in the RMP, particularly in the environmental effects analysis. They include the following:

(a) Scenic values – FLPMA specifically identifies "scenic values" as a resource of BLM lands

for purposes of inventory and management (43 U.S.C. § 1711(a)), and the unspoiled landscapes of lands with wilderness characteristics generally provide spectacular viewing experiences. The scenic values of these lands will be severely compromised if destructive activities or other visual impairments are permitted.

(b) Recreation – FLPMA also identifies "outdoor recreation" as a valuable resource to be inventoried and managed by BLM. 43 U.S.C. § 1711(a). Lands with wilderness characteristics provide opportunities for primitive recreation, such as hiking, camping, hunting and wildlife viewing. Most, if not all, primitive recreation experiences will be foreclosed or severely impacted if the naturalness and quiet of these lands are not preserved.

(c) Wildlife habitat, connectivity and riparian areas – FLPMA acknowledges the value of wildlife habitat found in public lands and recognizes habitat as an important use. 43 U.S.C. § 1702(c). Due to their unspoiled state, lands with wilderness characteristics provide valuable habitat for wildlife, thereby supporting additional resources and uses of the public lands. As part of their habitat, many species are also dependent on riparian and other wetland habitats, especially during either seasonal migrations or seasons and years when surrounding habitats are dry and unproductive. Wilderness-quality lands support biodiversity, watershed protection and overall healthy ecosystems. In addition they provide connectivity that facilitates wildlife migration, seasonal movements and dispersal of young. The low route density, absence of development activities and corresponding absence of motorized vehicles, which are integral to wilderness character, also ensure the clean air, clean water and lack of disturbance necessary for productive wildlife habitat, large scale connectivity and riparian areas (which support both wildlife habitat and human uses of water).

(d) Cultural resources – FLPMA also recognizes the importance of "historical values" as part of the resources of the public lands to be protected. 43 U.S.C. § 1702(c). The lack of intensive human access and activity on lands with wilderness characteristics helps to protect these resources. Managing lands to protect wilderness qualities will also help protect cultural and archaeological sites.

(e) Quality of life – The wildlands located within the planning area help to define the character of this area and are an important component of the quality of life for local residents and future generations, providing wilderness values in proximity to the population centers spread across the planning area.

Their protection enables the customs and culture of this community to continue.

(f) Balanced use – The vast majority of BLM lands are open to motorized use and development. FLPMA recognizes that "multiple use" of the public lands requires "a combination of balanced and diverse resource uses" that includes recreation, watershed, wildlife, fish, and natural scenic and historical values. 43 U.S.C. § 1702(c). FLPMA also requires BLM to prepare land use plans that may limit certain uses in some areas. 43 U.S.C. § 1712. Many other multiple uses of public lands are compatible with protection of wilderness characteristics – in fact, many are enhanced if not dependent on protection of wilderness qualities (such as primitive recreation and wildlife habitat). Protection of wilderness characteristics will benefit many of the other multiple uses and values of BLM lands such as air and water quality, night skies, soundscapes, and viewsheds, while other more exclusionary uses (such as off-road vehicle use and timber harvesting) will still have adequate opportunities on other BLM lands.

(g) Economic benefits – The recreation opportunities provided by wilderness quality lands also yield direct economic benefits to local communities. According to the U.S. Fish & Wildlife Service, in 2011 state residents and non-residents spent $3 billion on wildlife recreation in

BLM_0156709

Colorado. [Footnote 2: USFWS 2011, National Survey of Hunting, Fishing and Wildlife-associated Recreation, available at http://www.census.gov/prod/2013pubs/fhw11-co.pdf]
In addition, local communities that protect wildlands reap measurable benefits in terms of employment and personal income. Sonoran Institute 2004. Other "non-market" economic values arise from the ability of wildlands to contribute to recreation and recreation-related jobs, scientific research, scenic viewsheds, biodiversity conservation, and watershed protection. Morton 1999; Loomis 2000. All of these economic benefits are dependent upon adequate protection of the wilderness characteristics of the lands.

<([#10 [20.1] We appreciate that the Draft RMP acknowledges in many instances that protecting lands with wilderness characteristics will also protect other resources such as soil, water, vegetation, fish and wildlife, and wild and scenic river ORVs. See, e.g., Uncompahgre Draft RMP at 4-68, 4-91, 4-115, 4-151, 4-414. However, those analyses do not appear to inform the decisions made in the Draft RMP, particularly the preferred alternative, because BLM would only manage 18,320 acres of lands with wilderness characteristics in the preferred alternative – less than 3% of the public land in the planning area. This preferred plan does not reflect BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics. #10])>

<([#11 [30.3] Additionally, the Draft RMP does not adequately analyze or acknowledge the economic benefits of protecting lands with wilderness characteristics. We appreciate that BLM discusses nonmarket values, including the fact that setting land aside for protection can maintain and enhance nonmarket values associated with natural amenities. Uncompahgre Draft RMP at 4-460. However, the Draft RMP fails to meaningfully analyze nonmarket values, stating: "Nonmarket values are difficult to quantify, and insufficient data exists in order to assess the impacts of management actions." Ibid. The brief and qualitative treatment of nonmarket values in the Draft RMP is not adequate to inform management decisions in the RMP, and does not conform to agency guidance. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics.

BLM has current guidance on estimating nonmarket environmental values and analyzing those values in land use planning. [Footnote 3: IM 2013-131, available at: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-131__Ch1.print.html.] IM 2013-131 directs BLM to "utilize estimates of nonmarket environmental values in NEPA analysis supporting planning and other decision-making." Nonmarket values are described as values that "reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions and therefore lack prices," such as "the perceived benefit of hiking in wilderness."

USFWS 2011, National Survey of Hunting, Fishing and Wildlife-associated Recreation, available at http://www.census.gov/prod/2013pubs/fhw11-co.pdf  IM 2013-131, available at: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-131__Ch1.print.html.

BLM's guidance directs the agency to analyze nonmarket values for each alternative and adopt management decisions that are informed by that analysis:

In framing information for management decisions, focus on the difference in changes to nonmarket values between action alternatives. Such information can highlight tradeoffs. For example, an alternative designating an additional thirty miles of trails for off-highway vehicles may increase the visitor days of use – therefore the total nonmarket benefits – from motorized

recreation, but may decrease the benefits of subsistence hunting and watershed protection in this area.

The difference between the changes to nonmarket values between this alternative and an alternative that, for example, only designates an additional ten miles of trails, can inform the choice among action alternatives.

IM 2013-131, Attachment 1-5. The guidance also directs that quantitative analysis of nonmarket values is strongly encouraged when "the alternatives to be considered present a strong contrast between extractive and nonextractive uses of land and resources. For example, an RMP may include alternative resource allocations that vary between managing land primarily for oil and gas development or managing it for habitat conservation and recreation." IM 2013-131, Attachment 1-7. Because the Uncompahgre RMP is evaluating a range of alternatives that has a development-focused alternative at one end of the spectrum and a conservation-focused alternative at the other, this criterion applies to the RMP and BLM should conduct quantitative analysis of nonmarket values. #11])>

Summary of Comments: BLM should adopt a final plan that actually reflects BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics. BLM should analyze the economic benefits of protecting lands with wilderness characteristics for each alternative and utilize that analysis to inform the management decisions ultimately adopted in the RMP.

c. Management i. An accurate and comprehensive inventory of lands with wilderness characteristics is necessary to inform management alternatives, impact analysis and decision-making.

Evaluating management alternatives for lands with wilderness characteristics requires an accurate inventory to serve as baseline information. FLPMA requires BLM to inventory the resources of the public lands in order to development management plans. 43 U.S.C. § 1711(a). The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." See 40 C.F.R. § 1502.15.

Establishment of baseline conditions is a requirement of NEPA. In Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing ...baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

The U.S. Court of Appeals for the Ninth Circuit has held: "wilderness characteristics are among the 'resource and other values' of the public lands to be inventoried under § 1711. BLM's land use plans, which provide for the management of these resources and values, are to 'rely, to the extent it is available, on the inventory of the public lands, their resources, and other values.' 43 U.S.C. § 1712(c)(4)." Ore. Natural Desert Ass'n v. Bureau of Land Management, 531 F.3d at 1119. Therefore, BLM is required to consider "whether, and to what extent, wilderness values are now present in the planning area outside of existing WSAs and, if so, how the Plan should treat land with such values." Id. at 1143.

Conducting an accurate and comprehensive inventory as directed by Manual 6310 is BLM's current policy for establishing the baseline conditions required by NEPA. While we appreciate that the Uncompahgre Field Office has completed lands with wilderness characteristics inventory

under BLM Manual 6310, BLM must correct the remaining inconsistencies with the Manual in order to have an inventory that is sufficient to inform land use planning.

Summary of Comments: <([#12 [20.2] In order to establish a true set of baseline conditions as required under NEPA, BLM must refine its lands with wilderness characteristics to fully comply with BLM Manual 6310 in order to adequately evaluate management alternatives and environmental consequences in the Uncompahgre RMP. #12])>

ii. BLM should manage additional lands to protect their wilderness characteristics in the final RMP in order to meet its statutory and regulatory obligations.

<([#13 [20.1] Although the BLM identified 42,150 acres of lands with wilderness characteristics, the preferred alternative would only manage 18,320 acres to protect those values. This is less than half of the inventoried wilderness resource and less than 3% of the public land in the planning area. This approach does not evidence a meaningful consideration of the value of this important resource in the planning area or balanced land management. FLPMA directs BLM to inventory for the many values of the public lands and consider ways to protect them in the RMP (i.e., not all uses are appropriate in all places). 43 U.S.C. §§ 1711, 1712. Protecting all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office is appropriate to achieve BLM's multiple use and sustained yield mandate.

#13])> <([#14 [20.1] BLM also is not in compliance with its regulations regarding off-road vehicles in the management alternatives under consideration in the Draft RMP. While Alternative B would close lands managed to protect wilderness characteristics to off-road vehicle use, the preferred alternative would limit motorized travel to designated routes. Uncompahgre Draft RMP at 2-149. In allowing ORV use to be designated as limited in lands with wilderness characteristics, the Draft RMP is in direct violation of Executive Orders and agency regulations implementing these Orders. Executive Orders (EO No. 11644 (1972)) as amended by Executive Order No. 11989 (1977)) and the BLM's regulations (43 C.F.R. § 8342.1) require BLM to ensure that areas and trails for off-road vehicle use are located:

? to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability; to minimize harassment of wildlife or significant disruption of wildlife habitats, and especially for protection of endangered or threatened species and their habitats;

? to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands; and

? outside officially designated wilderness areas or primitive areas and in natural areas only if the agency determines that off-road vehicle use will not adversely affect their natural, aesthetic, scenic, or other values for which such areas are established.

These Executive Orders put the burden of proof on the BLM to make sure that sensitive and protected conservation lands are not harmed by ORV use. Given the small amount of public land managed to protect wilderness characteristics, and the high likelihood of off-road vehicle use causing conflict with quiet recreation experiences and other public lands resources that benefit from protected lands with wilderness characteristics, these areas should be closed to ORV use. #14])>

<([#15 [20.1] Furthermore, BLM should maximize protection of wilderness characteristics through layering management, as contemplated in several areas in the Draft RMP. Layering management that protects a variety of resources is an important tool that BLM consistently uses. Protection of wilderness characteristics can be effective as a standalone management approach but is also effective along with designation of ACECs and other conservation-oriented